## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, <br><br>                 Plaintiff, <br><br>    v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*; DONALD J. WRIGHT, *in his official capacity as Acting Secretary of Health and Human Services*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, *in his official capacity as Secretary of the Treasury*; UNITED STATES DEPARTMENT OF THE TREASURY; RENE ALEXANDER ACOSTA, *in his official capacity as Secretary of Labor*; and UNITED STATES DEPARTMENT OF LABOR, <br><br>                 Defendants. | **CIVIL ACTION NO:** _____ <br><br> **COMPLAINT** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Commonwealth of Pennsylvania, by and through Attorney General Josh Shapiro, hereby files this Complaint against Defendants Donald J. Trump, in his official capacity as President of the United States; Donald J. Wright, in his official capacity as Acting Secretary of Health and Human Services; the United States Department of Health and Human Services; Steven T. Mnuchin, in his official capacity as Secretary of the Treasury; the United States Department of the Treasury; Rene Alexander Acosta, in his official capacity as Secretary of Labor; and the United States Department of Labor (collectively, the "Defendants") and, in support thereof, states the following:

## PRELIMINARY STATEMENT

1.      This lawsuit challenges the Defendants' illegal and unjustified attempt to deny millions of women in Pennsylvania and across this country access to necessary preventive health care through their employer-sponsored insurance plans. As set forth more fully below, Defendants' actions violate, among other provisions of law, the Administrative Procedure Act, the Affordable Care Act, the guarantee of equal protection enshrined in the Due Process Clause of the Fifth Amendment to the United States Constitution, Title VII of the Civil Rights Act, the Pregnancy Discrimination Act, and the Establishment Clause of the First Amendment. If Defendants are not blocked from implementing their unlawful rules, direct harm will result to the Commonwealth of Pennsylvania and the medical and economic health of its residents. Because these rules will cause irreparable harm and were issued in violation of law, the Commonwealth of Pennsylvania seeks declaratory and injunctive relief holding the new rules unlawful and preventing their further implementation.

## INTRODUCTION

2.      The Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 *et seq.* (2010) (the "Affordable Care Act" or "ACA"), together with its implementing regulations, requires employer-sponsored health plans to cover all FDA-approved methods of contraception without imposing cost-sharing requirements on the insured.

3.      Because of this requirement (the "Contraceptive Mandate") over 55 million women have access to birth control without paying out-of-pocket costs, including 2.5 million Pennsylvanians. *See* Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women: Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* 84 (2016) ("WPSI Report"). American women and their

families covered by private insurance have saved an estimated 70% on contraceptive costs as a result. WPSI Report at 84.

4.      Contraception is medicine, and its use has been shown to reduce the rates of unintended pregnancies and abortions. *See* Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 105 (2011) (the "Report"), attached hereto as Exhibit C.

5.      But Doctors prescribe contraception to their patients for any number of reasons, some not having to do with birth control at all. For example, doctors frequently prescribe contraception for treatment of various menstrual disorders, acne, abnormal growth of bodily hair, and pelvic pain. According to a 2011 report, more than 1.5 million women rely on oral "birth control" pills for medical reasons unrelated to preventing pregnancy, and 58% of *all* users of birth control pills – *more than half* – use them, at least in part, for purposes other than pregnancy prevention. *See* Guttmacher Institute, *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills* (2011), available at https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf.

6.      For these and other reasons, "access to contraception improves the social and economic status of women." Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012) (citations omitted).

7.      As a result of the Affordable Care Act, millions of American women enjoy a greater degree of control over their own medical health and have the ability to more fully participate in the workforce.

8. Defendants, however, threaten to deny many of these women the contraceptive health coverage on which they have come to rely by, in effect, making the Contraceptive Mandate optional.

9. They have issued regulations, targeted solely at women, that create broad exemptions from the ACA's Contraceptive Mandate, and they have done so in violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706 ("APA").

10. These regulations allow *individual employers* to decide whether women who are insured under their company's health insurance – specifically the company's female employees and the employees' female family members – may have access to contraception without out-of-pocket charges.

11. Defendants have issued two separate rules that dramatically expand the ability of employers to opt out of their obligation under the ACA to ensure that women covered by employer-sponsored health insurance plans have access to contraception without copays or deductibles. *See* "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" (filed Oct. 6, 2017) (the "Moral Exemption") and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" (filed Oct. 6, 2017) (the "Religious Exemption") (collectively, the "Exemption Rules"), which are attached hereto, respectively, as Exhibits A and B.

12. Because the Exemption Rules were styled as "Interim Final Rules" or "IFRs" under the APA, they went into effect *immediately*.

13. The Exemption Rules were issued in direct violation of the substantive and procedural requirements of the APA.

14.     Specifically, the Defendants failed to engage in notice-and-comment rulemaking, as required by the APA, and failed to offer an adequate justification for not doing so.

15.     In addition, the Exemption Rules themselves violate the requirements of the Affordable Care Act.

16.     They are also arbitrary and capricious, and their promulgation constitutes an abuse of discretion.

17.     Furthermore, the Exemption Rules apply only to one category of health services: *contraception*. And contraception is used only by women.

18.     By singling out women for such negative, differential treatment, the Defendants have violated the equal protection guarantee of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

19.     The Commonwealth will suffer direct, proprietary harm as a result of the Exemption Rules. Where employers refuse to allow their health insurance plans to cover access to contraception, the Commonwealth will be forced to bear additional health care costs, in part, due to an increase in unintended pregnancies. Unintended pregnancies already cost the Commonwealth over $248 million per year and will surely cost more if contraception access and use decline. *See* Guttmacher Institute, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy*-Related Care National and State Estimates for 2010 at 13 (Feb. 2015).

20.     In addition, the Commonwealth possesses strong interests in protecting the medical and economic health of its residents, minimizing unintended pregnancies and abortions, and ensuring that all of its residents – both men and women – are free and able to fully

participate in the workforce, maximize their social and economic status, and contribute to Pennsylvania's economy without facing discrimination on the basis of sex.

21.     These interested are enshrined in the Pennsylvania Constitution, which declares, "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." PA. CONST. art. I, § 28.

22.     Defendants' actions directly undermine these vital state interests.

23.     Because the Defendants have engaged in illegal conduct that will harm the Commonwealth and its citizens in these and other ways, this Court should hold that the Exemption Rules are unlawful and set them aside. The Commonwealth also seeks a preliminary injunction to maintain the status quo throughout all future proceedings in this matter.

## JURISDICTION AND VENUE

24.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706, and the United States Constitution. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

25.     In addition, this Court has the authority to issue the declaratory relief sought pursuant to 28 U.S.C. § 2201.

26.     Venue is proper in this Court because Plaintiff the Commonwealth of Pennsylvania resides in this district and because a substantial part of the events giving rise to this action occurred in this judicial district. *See* 28 U.S.C. §§ 1391(e)(1)(B) & (C).

## THE PARTIES

27.     Plaintiff, the Commonwealth of Pennsylvania, is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." PA. CONST. art. IV, § 4.1.

28.     In filing this action, the Attorney General seeks to protect the citizens and agencies of the Commonwealth from harm caused by Defendants' illegal conduct, prevent further harm, and seek redress for the injuries caused to the Commonwealth by Defendants' actions. Those injuries include harm to the Commonwealth's sovereign, quasi-sovereign, and proprietary interests.

29.     Defendant Donald J. Trump is the President of the United States of America and is sued in his official capacity. His principal address is 1600 Pennsylvania Avenue NW, Washington, D.C. 20201.

30.     Defendant Donald J. Wright is the Acting Secretary of the United States Department of Health and Human Services and is sued in his official capacity. His principal address is 200 Independence Avenue, SW, Washington, D.C. 20201

31.     Defendant the United States Department of Health and Humans Services is an executive agency of the United States of America. Its principal address is 200 Independence Avenue, SW, Washington, D.C. 20201

32.     Defendant Steven T. Mnuchin is the Secretary of the United States Department of the Treasury and is sued in his official capacity. His principal address is 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220.

33.     Defendant the United States Department of the Treasury is an executive agency of the United States of America. Its principal address is 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220.

34.     Defendant Rene Alexander Acosta is the Secretary of the United States Department of Labor and is sued in his official capacity. His principal address is 200 Constitution Avenue, NW, Washington DC 20210.

35.     Defendant the United States Department of Labor is an executive agency of the United States of America. Its principal address is 200 Constitution Avenue, NW, Washington DC 20210.

36.     Defendants the Department of Health and Humans Services, the Department of the Treasury, and the Department of Labor (collectively the "Departments") are each responsible for implementing various provisions of the ACA. The Departments jointly issued the Exemption Rules, which gave rise to this action.

37.     Defendants Wright, Mnuchin, and Acosta are each responsible for carrying out the duties of their respective agencies under the Constitution of the United States of America and relevant statutes, including the Affordable Care Act.

38.     Defendant Trump is responsible for faithfully enforcing the laws of the United States of America pursuant to and in accordance with the Constitution of the United States of America.

## BACKGROUND

### Congress Passes the Affordable Care Act and Women's Health Amendment

39.     Access to preventive health services, including contraception, is essential for women to exercise control over their own health care and fully participate as members of society.

40.     Access to contraception, in particular, allows women greater control over their reproductive health choices so they can better pursue educational, career, and personal goals.

41.     Indeed, the expansion of preventive health services for women was a specific goal of the health care reform efforts that led to the passage of the Affordable Care Act.

42.     Recognizing this need to expand women's access to preventive health services and reduce gender disparities in out-of-pocket costs, the U.S. Senate passed the "Women's

Health Amendment" during debate over the ACA. *See* S. Amdt. 2791, 111th Congress (2009-2010).

43.    This Amendment was included in the final version of the ACA, which was signed into law on March 23, 2010. *See* ACA § 1001; Public Health Service Act (as amended by the ACA) § 2713, 42 U.S.C. § 300gg–13(a)(4).

44.    During Senate debate on the Women's Health Amendment, lead sponsor Senator Barbara Mikulski set forth that Amendment's key feature: it "leaves the decision of which preventive services a patient will use between the doctor and the patient." 155 Cong. Rec. S11988 (Nov. 30, 2009) (statement of Sen. Barbara Mikulski). Senator Mikulski explained that this is essential because the "decision about what is medically appropriate and medically necessary is between a woman and her doctor." *Id.*

45.    Another sponsor of the Amendment, Senator Al Franken, stressed that insurance coverage for contraceptive care allows "women and families to make informed decisions about when and how they become parents." He described access to contraception as "a fundamental right of every adult American" that also "reduce[s] the number of unintended pregnancies." 155 Cong. Rec. S12052 (Dec. 1, 2009) (statement of Sen. Al Franken) ("It is also a top priority for me that health reform includes another crucial women's health service, which is access to affordable family planning services. These services enable women and families to make informed decisions about when and how they become parents. Access to contraception is fundamental, a fundamental right of every adult American, and when we fulfill this right, we are able to accomplish a goal we all share—all of us on both sides of the aisle to reduce the number of unintended pregnancies.").

46.     The Women's Health Amendment *mandated* that group health plans and health insurance issuers offering group or individual health insurance coverage cover preventive health services and screenings for women – and do so with no cost-sharing responsibilities. *See* 42 U.S.C.A. § 300gg-13(a)(3). Some employer-sponsored plans that were in existence prior to passage, were exempt from this requirement and most of the other requirements imposed by the ACA. *See* 29 C.F.R. § 2590.715-1251 (2010).

47.     The specific services insurers were required to cover without charge were to be determined by guidelines issued by the Health Resources and Services Administration (the "HRSA"), an agency of Defendant the United States Department of Health and Human Services ("HHS"). *Id.*

### The Institute of Medicine Report on Clinical Preventive Services for Women

48.     Following passage of the Affordable Care Act, the HRSA complied with its legal responsibility to determine coverage guidelines by commissioning the Institute of Medicine (the "Institute"), a widely respected organization of medical professionals, to issue recommendations identifying what specific preventive women's health services should be covered under the ACA's mandate.

49.     The Institute, in turn, convened a committee of sixteen members, including specialists in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines, to formulate specific recommendations. *See* Report.

50.     After conducting an extensive study, that committee issued a comprehensive report, which identified several evidence-based preventive health services, unique to women, that it recommended be included as part of the HRSA's comprehensive guidelines under the ACA. *See* Report.

51.    As set forth in their Report, the Institute found that contraceptives are a preventive service that should be covered under the ACA's mandate. *See* Report at 109-10. In making this finding, the Institute cited evidence that "contraception and contraceptive counseling" are "effective at reducing unintended pregnancies" and observed that "[n]umerous health professional associations recommend" that such family planning services be included as part of mandated preventive care for women. *See id.* at 109.

52.    Relying, in part, on recommendations from the American Academy of Pediatrics, the Society of Adolescent Medicine, the American Medical Association, the American Public Health Association, and the Association of Women's Health, Obstetric and Neonatal Nurses, the Institute recommended that all employer sponsored health plans cover the "the *full range* of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." Report at 109-10 (emphasis added).

53.    The Institute based its recommendation on several important factors, including the prevalence of unintended pregnancy in the United States. As stated in their Report, in 2001, an estimated "49 percent of all pregnancies in the United States were unintended—defined as unwanted or mistimed at the time of conception." Report at 102 (internal citations omitted).

54.    The Institute found that these unintended pregnancies disproportionately impact the most vulnerable: Although one in every 20 American women has an unintended pregnancy each year, unintended pregnancy is "more likely among women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority group." *Id.*

55.     And unintended pregnancies are more likely to result in abortions: "In 2001, 42

percent of [] unintended pregnancies [in the United States] ended in abortion." *Id.*

56.     Moreover, women carrying babies to term are less likely to follow best health

practices where those pregnancies are *unintended*. According to the Institute Committee on

Unintended Pregnancy, "women with unintended pregnancies are more likely than those with

intended pregnancies to receive later or no prenatal care, to smoke and consume alcohol during

pregnancy." Report at 103.

57.     Women facing unintended pregnancies are also more likely to be "depressed

during pregnancy, and to experience domestic violence during pregnancy."  *Id.*

58.     The Institute also found "significantly increased odds of preterm birth and low

birth weight among unintended pregnancies ending in live births compared with pregnancies that

were intended." *Id.*

59.     While all pregnancies carry inherent health risks, some women have serious

medical conditions for which pregnancy is strictly contraindicated. The Institute specifically

found that "women with serious medical conditions such as pulmonary hypertension (etiologies

can include idiopathic pulmonary arterial hypertension and others) and cyanotic heart disease,

and … Marfan Syndrome," are advised against becoming pregnant. Report at 103. For these

women, contraception can be necessary, lifesaving medical care.

60.     Use of contraceptives also promotes medically recommended "spacing" between

pregnancies. The Institute found that such pregnancy spacing is important because of the

"increased risk of adverse pregnancy outcomes for pregnancies that are too closely spaced

(within 18 months of a prior pregnancy)" and that "[s]hort interpregnancy intervals in particular

have been associated with low birth weight, prematurity, and small for gestational age births." Report at 103.

61.     The Institute also found that contraceptives are effective in preventing unintended pregnancies. As stated in the Report, "greater use of contraception within the population produces lower unintended pregnancy and abortion rates nationally." Report at 105.

62.     The Committee specifically highlighted a study showing that, as the rate of contraceptive use by unmarried women increased in the United States between 1982 and 2002, their rates of unintended pregnancy and abortion declined. *Id.*

63.     The Committee reported other studies that showed increased rates of contraceptive use by adolescents from the early 1990s to the early 2000s was associated with a "decline in teen pregnancies" and, conversely, that "periodic increases in the teen pregnancy rate are associated with lower rates of contraceptive use." Report at 105.

64.     The Institute also found that contraception, as a method of preventing unintended pregnancy, is highly cost-effective, citing, *inter alia*, savings in medical costs alone. It reported that "the direct medical cost of unintended pregnancy in the United States was estimated to be nearly $5 billion in 2002, with the cost savings due to contraceptive use estimated to be $19.3 billion." Report at 107.

65.     In addition to preventing unintended pregnancies, the Institute recognized that contraceptives have other significant health benefits unrelated to preventing unintended pregnancy. The Institute stated in its Report that these "non-contraceptive benefits of hormonal contraception include treatment of menstrual disorders, acne or hirsutism, and pelvic pain." Report at 104. Long-term use of oral contraceptives has also been shown to "reduce a woman's

risk of endometrial cancer, as well as protect against pelvic inflammatory disease and some benign breast diseases." *Id.*

66.     Indeed, a leading research and policy organization committed to advancing sexual and reproductive health and rights in the United States and globally, found in a 2011 report that more than 1.5 million women rely on oral contraceptive "birth control" pills for medical reasons *unrelated to preventing pregnancy* and that that 58% of *all* users of birth control pills – more than half – use them, at least in part, for purposes other than pregnancy prevention. *See* Guttmacher Report.

67.     As of 2008, there were still "approximately 36 million U.S. women of reproductive age (usually defined as ages 15 to 44 years)" who were "estimated to be in need of family planning services because they were sexually active, able to get pregnant, and not trying to get pregnant." Report at 103.

68.     Importantly, the Institute noted that *cost* is a meaningful barrier to contraceptive access, stating that "[d]espite increases in private health insurance coverage of contraception since the 1990s, many women do not have insurance coverage or are in health plans in which copayments for visits and for prescriptions have increased in recent years" and citing to a Kaiser Permanente study that found "when out-of-pocket costs for contraceptives were eliminated or reduced, women were more likely to rely on more effective long-acting contraceptive methods." Report at 109.

**The Health Resources and Services Administration
Adopts the IOM Report and Promulgates Guidelines**

69.     The HRSA agreed with and adopted the Institute's recommendation that contraceptive services be covered under the Women's Health Amendment to the Affordable Care Act.

14

70.     In August 2011, pursuant to its responsibility under the ACA, the HRSA promulgated the Women's Preventive Service Guidelines (the "Guidelines"). *See* HRSA, Women's Preventive Service Guidelines (2011), available at https://www.hrsa.gov/womens-guidelines/index.html#2.

71.     These Guidelines required that, as part of their group health plans, employers must cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," without any cost-sharing or payment by the insureds. *Id.*

72.     As recently as December 2016, HRSA updated the Guidelines, following yet another review of evidence-based facts, determining that full coverage for contraceptive care and services must continue to be required. *See* https://www.hrsa.gov/womens-guidelines-2016/index.html.

**The Departments Grant Limited Exemptions and Accommodations to Religious Objectors**

73.     The Affordable Care Act does not contain a "conscience clause" that would allow employers to opt out of providing those preventive services required by the statute.

74.     Nevertheless, in 2011, the Departments undertook regulatory action to accommodate religious objectors.

75.     The Departments issued regulations in 2011 that exempt "churches, their integrated auxiliaries, and conventions or associations of churches" from the ACA's requirement that employers cover contraceptive services, without cost-sharing requirements, under employee group health care plans – provided these conscientious objectors satisfied certain criteria (the "Original Religious Exemption"). *See* Group Health Plans and Health Insurance Issuers Relating

to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76

Fed. Reg. 46621 (Aug. 3, 2011).

76.     To qualify, the purpose of the organization had to be "[t]he inculcation of

religious values," the organization had to primarily employ and serve, "persons who share the

religious tenets of the organization," and the organization had to be a certified non-profit. 76 Fed.

Reg. 46621.

77.     Following the issuance of the HRSA guidelines, several Senators proposed

amending the Affordable Care Act to allow health plans to refuse to provide coverage for certain

services if doing so was "contrary to the religious beliefs or moral convictions of the sponsor,

issuer, or other entity offering the plan." S. Amdt. 1520, 112th Congress (2011-2012).

78.     The proposed amendment was necessary, as its signors specifically

acknowledged, because the ACA "does ***not*** allow purchasers, plan sponsors, and other

stakeholders with religious or moral objections to specific items or services to decline providing

or obtaining coverage of such items or services, or allow health care providers with such

objections to decline to provide them." *Id.* (emphasis added).

79.     That proposed amendment was rejected; it did not become law. 158 Cong. Rec.

S1172-S1172 (Mar. 1, 2012).

80.     The following year, the Departments issued regulations to accommodate

*additional* religious nonprofit organizations that had not been exempted from the ACA's

Contraceptive Mandate under the Departments' 2011 regulations but still wanted to avoid the

ACA's mandate of having to provide contraceptive services to their employees (the "Religious

Non-Profit Accommodation"). *See* 80 FR 41318-01.

81.     Under the Religious Non-Profit Accommodation, an objecting employer could notify its health insurance provider of religious objections and the insurer – not the objecting employer – would then have to provide the necessary and required contraceptive services directly to women covered under the employer's plan. *See* 80 FR 41318-01. In this way, women whose employers refused to pay for the legally mandated contraceptive coverage under the Religious Non-Profit Accommodation still had access to contraceptive care.

82.     This was different from those women who were insured under coverage from "churches, their integrated auxiliaries, and conventions or associations of churches" that were wholly exempt from the ACA's Contraceptive Mandate under the Original Religious Exemption.

83.     At that time, the Defendant Departments declined to create any broader exceptions to the Contraceptive Mandate. Instead, they struck a balance by adhering to the evidence-based approach to women's preventive health needs intended by Congress and allowing only the Original Religious Exemption and the Religious Non-Profit Accommodation, two reasonable exceptions under which religious organizations and nonprofit employers with religious objections, could opt out of the ACA's Contraceptive Mandate.

84.     Indeed, throughout this process, the government continued to focus on the evidence-based medical conclusion that guaranteeing women's access to contraceptives is an essential healthcare component to allowing women to participate as full members of society.

85.     For example, even while trying to accommodate the views of religious objectors, the Defendant Departments firmly articulated their evidence-based conclusion that barriers to contraceptive access "place[] women in the workforce at a disadvantage compared to their male co-workers" and observed that, "by reducing the number of unintended and potentially unhealthy pregnancies, [contraceptive coverage] furthers the goal of eliminating this disparity by allowing

women to achieve equal status as healthy and productive members of the job force." 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012) (footnote omitted).

## Litigation Challenging the ACA's Contraceptive Mandate

86.     Following enactment of the ACA and the relevant implementing regulations, several employers filed lawsuits to challenge the scope of the Contraceptive Mandate, the Original Religious Exemption and the Religious Non-Profit Accommodation.

87.     In *Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751 (2014), the Supreme Court concluded that applying the ACA's Contraceptive Mandate to closely held corporations that objected on the basis of sincerely held religious beliefs violated the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–1.

88.     That statute provides that the government may not "substantially burden a person's exercise of religion" unless it did so "in furtherance of a compelling governmental interest" and adopted "the least restrictive means of furthering that compelling governmental interest." *Id.*

89.     As a result of the ruling in *Hobby Lobby*, the Defendant Departments began allowing such employers to take advantage of the Religious Non-Profit Accommodation process previously available only to nonprofit employers.

90.     Two years later, in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), the Supreme Court considered several consolidated challenges to the accommodation process itself. Following oral argument, the Court sought clarification from the parties as to whether a modified accommodation process that did not require the employer to formally notify its insurance company of its objection – but would still ensure that the employer's employees received

contraceptive coverage – would accommodate both the government's interests and the objections of certain religious employers.

91.     After receiving clarification from the parties, the Supreme Court remanded to provide them with "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans 'receive full and equal health coverage, including contraceptive coverage.'" *Id.* at 1560 (citation omitted).

92.     On January 9, 2017, however, the Department of Labor announced that "no feasible approach has been identified … that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage." FAQs about Affordable Care Act Implementation Part 36 (Jan. 9, 2017).

## President Trump's Executive Order "Promoting Free Speech and Religious Liberty"

93.     On May 4, 2017, President Donald Trump issued an Executive Order entitled "Promoting Free Speech and Religious Liberty."  President Donald Trump, "Presidential Executive Order Promoting Free Speech and Religious Liberty," (May 4, 2017).

94.     Among other provisions, this Executive Order directed the Defendant Departments to "consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg-13(a)(4) of Title 42, United States Code."  *Id*. § 3.

95.     This Executive Order did not specifically mention the Contraceptive Mandate. Rather, the President directed the Defendant Departments to consider issuing amended

regulations to address conscience-based objections to services provided under the *Women's Health Amendment* to the Affordable Care Act **only**.

96.     The President did not, for example, direct the Departments to consider regulations addressing objections to any other preventive services.

97.     President Trump's Executive Order did not identify any deficiencies with the existing regulations that addressed conscience-based objections (the Original Religious Exemption and the Religious Non-Profit Accommodation) or provide any guidance whatsoever as to the amended regulations that the President had directed the Departments to consider issuing.

98.     The Executive Order stated only that any amended regulations issued must be "consistent with applicable law."  *Id.* § 6(b).

### The Departments Issue New Exemption Rules
### Without Engaging in Required Notice-and-Comment Rulemaking

99.     In May and June 2017, several news organizations obtained and published an otherwise unreleased draft regulation entitled "Coverage of Certain Preventive Services under the Affordable Care Act."  *See, e.g.*, Vox.com, "Leaked regulation: Trump plans to roll back Obamacare birth control mandate" (May 31, 2017), available at https://www.vox.com/policy-and-politics/2017/5/31/15716778/trump-birth-control-regulation.This draft regulation was dated May 23, 2017.

100.    Last Friday on October 6, 2017, the Defendant Departments simultaneously issued both the Religious Exemption Rule and the Moral Exemption Rule.

101.    These new Exemption Rules significantly expanded exemptions to the Contraceptive Mandate – they are the proverbial exceptions that swallowed the rule.

102.    Though more than four months had passed since the draft regulation had leaked, the Departments issued the Exemption Rules without any advance public notice and without inviting or providing opportunity for comment.

### *The Religious Exemption Rule*

103.    The Religious Exemption Rule significantly expands the scope of the existing Original Religious Exemption for certain religious employers.

104.    Specifically, it allows *all* employers – including large, publicly traded corporations – to opt out of providing no-cost contraceptive coverage to their employees on the basis of "sincerely held religious beliefs." Religious Exemption at 74.

105.    In the context of publicly traded corporations, the Religious Exemption Rule suggests that, if owners of a majority of a company's shares possess a religious objection to contraceptive coverage, the company can simply refuse to provide such coverage.

106.    The Religious Exemption Rule states that "in a country as large as America comprised of a supermajority of religious persons … the majority of shares (or voting shares) of some publicly traded companies might be controlled by a small group of religiously devout persons so as to set forth such a religious character."  Religious Exemption at 68-69.

107.    In other words, the rule is speculative, on its face, concerned with the possibility that a "religious publicly traded company *might* have objections to contraceptive coverage…" Religious Exemption at 69 (emphasis added).

108.    The Religious Exemption Rule is not based on any identifiable injury to any group of people.

### *The Moral Exemption Rule*

109.    The Moral Exemption Rule creates a brand new exemption allowing employers to refuse to provide their employees with contraceptive coverage solely "based on sincerely held moral convictions." IFR 2017-21852.

110.    This exemption applies to nonprofit entities *and* for-profit entities whose shares are not publicly traded. Unlike the Religious Exemption Rule, the Moral Exemption Rule does not allow publicly traded companies to opt out of the Mandate.

111.    Taken together, however, the Exemption Rules eliminate the accommodation process entirely because objecting entities "do not need to file notices or certifications of their exemption." *See* Moral Exemption 48-49; Religious Exemption 61.

112.    Employees of companies that object under either Exemption Rule will lose access to the contraceptive coverage required under the ACA's Contraceptive Mandate.

### <u>The Defendant Departments' Purported Justification for the New Exemption Rules</u>

113.    The Departments justify the Exemption Rules on the basis that *some **other** federal statutes* contain express provisions creating exemptions for individuals or organizations that object to certain conduct on religious or moral grounds. *See* Religious Exemption at 5 & n.1.

114.    But the Affordable Care Act is *not* one of them – the ACA contains no exemption whatsoever for individuals or organizations that object to provisions of the law based on religious or moral grounds.

115.    In fact, the Senate expressly rejected adding such an exemption to the ACA. *See supra* ¶¶ 74-76.

116.    Despite Congress's specific choice *not to include* such a provision in the ACA, the Defendant Departments claim that "Congress has *consistently* sought to protect religious

beliefs in the context of health care and human services, including health insurance, even as it has sought to promote access to health services." Religious Exemption at 5 (emphasis added).

117.    The Departments further suggest that the Religious Exemption was necessary to comply with the Religious Freedom Restoration Act, *id.* at 32 – but state that, "even if exemptions are not required" under that Act, they will "exercise their discretion to address the substantial burden identified in *Hobby Lobby* by expanding the exemptions from the [Contraceptive] Mandate instead of revising accommodations previously offered," *id.* at 53.

118.    The Defendant Departments did not rely on the Religious Freedom Restoration Act in issuing the Moral Exemption; instead they claimed that the ACA granted them broad discretion to create exemptions from the Contraceptive Mandate. *See* IFR 2017-21852 at 9 ("The Departments have consistently interpreted section 2713(a)(4)'s of the PHS Act grant of authority to include broad discretion to decide the extent to which HRSA will provide for and support the coverage of additional women's preventive care and screenings in the Guidelines. In turn, the Departments have interpreted that discretion to include the ability to exempt entities from coverage requirements announced in HRSA's Guidelines.").

119.    The Exemption Rules did *not* say, however, that HRSA had determined that contraception was no longer preventive medical care; nor did they assert any valid medical reasons for exempting certain employers from the mandate.

120.    Because both of the Exemption Rules were issued as Interim Final Rules (IFRs), they did not go through the ordinary notice-and-comment process—they became effective immediately.

121.    The Departments argued that it was necessary to take this extraordinary step of issuing the Exemption Rules as IFRs because several lawsuits challenging varying aspects of the

Contraceptive Mandate were ongoing and allowing the rules to go into effect immediately would "help settle or resolve cases, and … ensure, moving forward, that [the Departments'] regulations are consistent with any approach [they] have taken in resolving certain litigation matters." Religious Exemption at 81.

122.    Among the supposed burdens imposed by the ongoing litigation, the Departments identified the fact that "Courts of Appeals have been asking the parties in those cases to submit status reports every 30 through 90 days" and that "several courts have issued orders setting more pressing deadlines." Religious Exemption at 80.

123.    The Departments further asserted that they had been unable to comply with court orders directing them to set forth their position in specific lawsuits "because this interim final rule [the Religious Exemption] was not yet on public display." Religious Exemption at 81.

124.    The Departments do not explain why this litigation precluded them from following the notice-and-comment requirements of the APA, nor do they explain why their own inability to articulate their position in individual cases justifies imposing sweeping rules with immediate effect.

125.    The Exemption Rules undermine the balance struck under the prior regulatory scheme and run counter to the Affordable Care Act's mandate that evidence-based preventive services be provided.

126.    As a result of these abuses, which replace evidence-based science and medical reasoning with political calculation, millions of women will be penalized and denied needed contraceptive care against the advice of science, public health and medical professionals.

**Specific Harm to the Commonwealth of Pennsylvania Caused by the New Exemption Rules**

127.     The States are generally preempted from regulating self-insured plans. Such plans are, instead, governed by the Employee Retirement Income Security Act of 1974 ("ERISA") (Pub. L. 93–406, 88 Stat. 829, enacted September 2, 1974, codified in part at 29 U.S.C. ch. 18), a federal law that establishes minimum standards for pension plans in private industry and provides for extensive rules on the federal income tax effects of transactions associated with employee benefit plans.

128.     As of 2010, approximately 80% of "large employers" (with over 1000 employees), and 50% of "mid-sized employers" (with 200-1000 employees), offered self-insured plans. *See* Rand Corp., "Employer Self-Insurance Decisions," at 17-18 (Mar. 2011) (prepared for United States Department of Labor and HHS).

129.     As a result of the Defendants' new Exemption Rules, it is estimated that many employers will claim newly expanded exemptions and will bar their own employees from receiving medical coverage that is otherwise required under the Contraceptive Mandate.

130.     Upon information and belief, many of these newly-created Contraceptive Mandate-exempted employers are expected to be Pennsylvania companies.

131.     This will result in numerous insureds – and their female dependents – losing medical coverage for contraceptive care under the Affordable Care Act.

132.     Many of those losing this legally-mandated coverage will be Pennsylvania policy holders; all of the women affected will face an increased risk of medical harm or an increased economic burden if they choose to self-fund contraception

133.    This broad loss of formerly-mandated contraceptive care will result in significant, direct and proprietary harm to the Commonwealth, which will bear increased costs as a result of the Exemption Rules.

134.    Some women who lose their employer-sponsored health coverage for contraceptive care will seek coverage through Pennsylvania's subsidized family planning program, which provides preventive screenings and contraceptives for low-income women who are not eligible for Medicaid. This additional financial burden will be borne by the Commonwealth.

135.    Other women will forgo contraceptive health services altogether, because the loss of their employer-sponsored coverage will make their formerly-mandated care unaffordable or inaccessible. But this will not help Pennsylvania's coffers.

136.    Rather, as a result of the affected women no longer receiving coverage, Pennsylvania will see an increase in unintended pregnancies and other negative health outcomes which, in addition to other personal, social and societal burdens, will impose direct costs on the Commonwealth.

137.    Indeed, to date – before the Defendants issued their new Exemption Rules – the Contraceptive Mandate has resulted in extraordinary savings for women that are also enjoyed by the Commonwealth of Pennsylvania.

138.    A recent study conducted by the University of Pennsylvania found, for example, that the ACA's Contraceptive Mandate "is saving the average [contraceptive] pill user $255 per year" and "the average woman receiving an IUD is saving $248."*See* University of Pennsylvania School of Medicine, "Affordable Care Act results in dramatic drop in out-of-pocket prices for

prescription contraceptives," Press Release (July 7, 2015), https://www.eurekalert.org/
pub_releases/2015-07/uops-aca070615.php.

139.    Spread over an estimated 6.88 million privately insured oral contraceptive users in
the United States, the University of Pennsylvania study estimates that, as a result of the ACA's
Contraceptive Mandate, "consumer annual contribution to spending on the pill could be reduced
by almost $1.5 billion annually."  *Id*. It is believed that the Commonwealth has enjoyed
increased tax revenue as a result of its female citizens enjoying increased savings borne from the
contraceptive mandate.

140.    In addition to the direct, proprietary harm set forth above, the new Exemption
Rules impermissibly encroach on the Commonwealth's sovereign interest in protecting the
health, safety, and well-being of its residents, and in ensuring that they enjoy equal access to
federal programs. As such, in addition to proprietary standing, the Commonwealth has *parens
patriae* standing to vindicate these interests.

## CAUSES OF ACTION

## COUNT I

## Violation of Equal Protection of the Law

141.    The Commonwealth incorporates by reference the foregoing paragraphs of this
Complaint as if set forth at length.

142.    Under the Due Process Clause of the Fifth Amendment to the U.S. Constitution,
the federal government may not deny any person equal protection of the law. US CONST.
amend. V.

143.    Discrimination on the basis of sex violates this constitutional guarantee.

144.    The new Exemption Rules apply to one category of preventive medical care only – *contraception*.

145.    And contraception is used solely by women.

146.    Because the Exemption Rules allow employers to refuse previously-mandated preventive medical services for women only, they violate the Constitution's guarantee of equal protection under the law.

## COUNT II

## Violation of Title VII of the Civil Rights Act and the Pregnancy Discrimination Act

147.    The Commonwealth incorporates by reference the foregoing paragraphs of this Complaint as if set forth at length.

148.    The Exemption Rules violate Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, which prohibits discrimination based on sex. *See* 42 U.S.C. § 2000e et seq. (Title VII).

149.    The Pregnancy Discrimination Act prohibits discrimination "on the basis of pregnancy, childbirth, or related medical conditions." *See* 42 U.S.C.A. § 2000e. That protects employees from discrimination based on their need for contraception.

150.    Classifying employees on the basis of their childbearing capacity, regardless of whether they are, in fact, pregnant, is prohibited sex discrimination under Title VII.

151.    Male and female employees have different health care needs, and only women can get pregnant, bear children, or use contraception.

152.    The Exemption Rules violate Title VII because they discriminate against women on the basis of their capacity to get pregnant.

## COUNT III

### Violation of the Establishment Clause

153.    The Commonwealth incorporates by reference the foregoing paragraphs of this Complaint as if set forth at length.

154.    The IFRs violate the Establishment Clause of the First Amendment to the U.S. Constitution.

155.    The Departments have used their rulemaking authority for the primary purpose, and with the actual effect, of advancing and endorsing religious interests.

156.    The Departments have acted to promote employers' religious beliefs over the self-determination of women who do not share those beliefs, and over the ACA's mandate that preventive care be provided.

157.    Through the IFRs, the government has endorsed employers' religious beliefs, over science, to the detriment and discrimination of women. The expanded exemptions grant employers executive authority over whether employees receive contraceptive coverage, whether needed to prevent unintended pregnancy, and/or to treat a medical condition, with no accommodation process.

158.    The IFRs elevate employers' religious beliefs over the constitutional rights, and statutory guarantees, of women, in violation of the Establishment Clause to the United State Constitution.

## COUNT IV

### Failure to Engage in Notice and Comment Rulemaking

159.    The Commonwealth incorporates by reference the foregoing paragraphs of this Complaint as if set forth at length.

160.    Under the APA, a court shall "hold unlawful" and "set aside" any "agency action, findings, and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

161.    In issuing substantive rules, federal agencies are required to follow the notice and comment process set forth in the APA unless the agency "for good cause" finds that notice and public procedure are "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(3)(B) .Any such findings must be incorporated into the rules along with "a brief statement of reasons therefor." *Id.*

162.    Specifically, before issuing any rule, the agency must publish a "[g]eneral notice of proposed rule making" in the *Federal Register*. 5 U.S.C. § 553(b).

163.    That notice must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

164.    The agency must further provide "interested persons" an "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b)(c).

165.    Here, in issuing the Exemption Rules, the Defendant Departments failed to follow these basic legal requirements of the APA.

166.    Furthermore, the justifications offered by the Departments for their failure to engage in notice and comment rulemaking do not remotely satisfy the "good cause" standard required under section 553(b)(3)(B) of the APA; they are legally insufficient, contradictory, and inconsistent with the factual record.

167.    Because the Departments failed to follow the procedural requirements of the APA, both Rules should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(D).

## COUNT V

### Violation of the Substantive Requirements of the Administrative Procedure Act

168.    The Commonwealth incorporates by reference the foregoing paragraphs of this Complaint as if set forth at length.

169.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

170.    Both the Moral Exemption Rule and the Religious Exemption Rule are inconsistent with the Affordable Care Act's requirement that group health plans and insurers provide women with preventive care as provided for in guidelines issued by the HRSA, without any cost-sharing requirements.

171.    The Rules also violate the civil rights protections in the ACA prohibiting discrimination on the basis of sex and other protected categories in most health care programs and activities. These protections added to existing federal anti-discrimination provisions, including Title VII of the Civil Rights Act of 1964, which prohibits discrimination in the provision of employer sponsored health care plans. See 42 U.S.C.A. § 18116.

172.    They are also in derogation of the provisions of the ACA that prohibit the promulgation of any regulation that "[c]reates any unreasonable barrier to the ability of individuals to obtain appropriate medical care," "[i]mpedes timely access to health care services," or "[l]imits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 1811.

173.    In addition, neither Rule is required by the Religious Freedom Restoration Act or any other relevant statute.

174.    Indeed, when it passed the Affordable Care Act, Congress elected *not* to include a "conscientious objector" or other exemption for individuals or organizations who object to any portion of the ACA on religious or moral grounds.

175.    The Departments further abused their discretion and acted in a manner that was arbitrary and capricious in issuing the Rules.

176.    Both Rules should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, the Commonwealth of Pennsylvania requests that this Court enter judgment in its favor and grant the following relief:

a.   Declare the Moral Exemption Rule and the Religious Exemption Rule unlawful;

b.   Vacate the Moral Exemption Rule and the Religious Exemption Rule;

c.   Preliminarily and Permanently enjoin the application of the Moral Exemption Rule and the Religious Exemption Rule;

d.   Award Plaintiff reasonable costs, including attorneys' fees; and

e.   Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania


*/s Jonathan Scott Goldman*
JONATHAN SCOTT GOLDMAN
MICHAEL J. FISCHER
NICOLE J. BOLAND
PA Atty. Nos. 93909, 322311, and 314061
Office of Attorney General
Strawberry Square, 16th Floor
Harrisburg, PA 17120
(717) 787-3391
jgoldman@attorneygeneral.gov