**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**COMMONWEALTH OF
PENNSYLVANIA,**

**Plaintiff,**

**v.**

**DONALD J. TRUMP,** *et al.*,

**Defendants.**

**NO. 2:17-cv-04540-WB**

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

JONATHAN SCOTT GOLDMAN
Executive Deputy Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
NICOLE VAN ORDER
Senior Deputy Attorney General
NICOLE J. BOLAND
PATRICK GREENE
Deputy Attorneys General
Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(717) 787-3391
jgoldman@attorneygeneral.gov

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS...............................................................................................i

TABLE OF AUTHORITIES ......................................................................................iii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 4

    A.    The Institute of Medicine and Determines That Contraception Is Necessary Preventive Care for Women and Coverage Must Be Provided to Women Cost-Free.. 4

    B.    The HRSA Adopts the Institute's Recommendations and Requires Plans To Cover Contraceptive Care ..................................................................................................... 7

    C.    Religious Objectors Are Granted a Limited Exemption and Accommodation. ........... 8

    D.    Employers Challenge the Contraceptive Care Mandate............................................. 10

    E.    Defendant Donald Trump Issues an Executive Order "Promoting Free Speech and Religious Liberty." ................................................................................................... 11

    F.    The Defendant Departments Issue the New Rules Without Engaging in Required Notice-and-Comment Rulemaking ............................................................................ 11

        1.    *The Religious Exemption Rule.* ........................................................................ 12

        2.    *The Moral Exemption Rule.* ............................................................................ 13

    G.    The New Rules Cause Specific and Irreparable Harm to the Commonwealth of Pennsylvania and Its Citizens. ................................................................................. 13

        1.    *The Commonwealth Faces Additional Economic Harm Because Women Will Seek More Contraceptive Care Funded by the State.* ................................................ 14

        2.    *The Commonwealth Also Faces Additional Economic Harm Because It Will Share the Increased Economic Burden of Its Citizens Having Unintended Pregnancies and Negative Health Outcome.* ............................................................................ 15

        3.    *The Contraceptive Care Mandate Has Resulted in Significant Savings for Women* ........................................................................................................... 16

ARGUMENT .......................................................................................................... 17

    I.    The Commonwealth Will Prevail in this Litigation.................................................... 18

    A.    The Rules Violate the Administrative Procedure Act. .............................................. 18

        1.    *The Rules Are Procedurally Flawed* ................................................................ 18

        2.    *The Rules Are "Not in Accordance with Law," Arbitrary, Capricious, and an Abuse of Discretion.* ....................................................................................... 22

       *i.*   *The Rules Violate the Women's Health Amendment*.................................. 23

       *ii.*  *The Rules Cannot Be Justified Under the Religious Freedom Restoration Act.* ....................................................................................................... 24

       *iii. The Rules Are Arbitrary, Capricious, and an Abuse of Discretion.* ......... 27

  B.    The Rules Violate Title VII of the Civil Rights Act and the Pregnancy Discrimination Act. ................................................................................................................ 28

  C.    The Rules Violate the Equal Protection Guarantee of the Fifth Amendment. ........... 32

  D.    The Rules Violate the Establishment Clause. .............................................................. 34

II.     If Relief Is Not Granted, the Commonwealth Will Be irreparably Injured................... 37

  A.    Women Will Lose Contraceptive Care. ........................................................................ 39

  B.    The Commonwealth Will Suffer Direct, Irreparable Harm. ......................................... 43

  C.    The Commonwealth Will Be Harmed Because It Will Be Unable to Protect the Health, Safety, and Well-Being of Its Residents. ........................................................ 46

III.    The Public Interest Weighs Strongly in Favor of an Injunction. .................................. 47

CONCLUSION ................................................................................................................................. 49

## **TABLE OF AUTHORITIES**

### CASES

*Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001)..................................................... 32

*Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000) ..................................... 17

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 607 (1982) ............................... 46

*Am. Civil Liberties Union of Ohio Foundation, Inc. v. DeWeese*, 633 F.3d 424 (6th Cir. 2011). 36

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153 (D.C. Cir. 1981) ......................... 19

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994)......... 48

*Bolling v. Sharpe*, 347 U.S. 497 (1954)..................................................................... 32

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)............................................................ 45

*Brandt et al. v. Sebelius et al.*, No. 2:14-cv-00681 (W.D.P.A.) .................................... 41

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014)............................... passim

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)....................... 36

*Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10 (D.D.C. 2010) .................................... 19

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377 (3d Cir. 2013), rev'd and remanded sub nom. Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014)................................................................... 41

*Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997)........................ 48

*Cty. of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573 (1989)................................................................................................................. 34

*Cutter v. Wilkinson*, 544 U.S. 709 (2005)................................................................... 37

*Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266 (W.D. Wash. 2001) ............................ 30, 31

*Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985)................................................ 36

*Farrington v. Johnson*, 206 F. Supp. 3d 634 (D.D.C. 2016) ......................................... 32

*Feinerman v. Bernardi*, 558 F. Supp. 2d 36 (D.D.C. 2008) ......................................... 45

*Frisby v. U.S. Dep't of Hous. & Urban Dev.*, 755 F.2d 1052 (3d Cir. 1985).............................. 27

*General Electric Co. v. Gilbert*, 429 U.S. 125 (1976) ................................................. 29

*Geneva College et al. v. Sebelius et al.*, No. 2:12-cv-00207 (W.D.P.A.) ...................................... 41

*Geneva College v. Secretary United States Department of Health and Human Services*, 778 F.3d 422 (3d Cir. 2015), ........................................................................... 25

*In re Oxycontin Antitrust Litig.*, 821 F. Supp. 2d 591 (S.D.N.Y. 2011) ...................................... 46

*In re Union Pac. R.R. Employment Practices Litigation*, 479 F.3d 936 (8th Cir. 2007) ............. 30

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Exide Corp.*, 688 F. Supp. 174 (E.D. Pa.), *aff'd*, 857 F.2d 1464 (3d Cir. 1988) .................. 42, 43

*Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017) ...................................... 48

*Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466 (6th Cir. 2005), *cert. denied*, 546 U.S. 1015 (2005) ........................................................................... 30

*Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004) .................................... 48

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ............................................................ 35

*Maryland People's Counsel v. F.E.R.C.*, 760 F.2d 318 (D.C. Cir. 1985) .................................... 46

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ...................................................... 46, 47

*McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844 (2005) ............... 35, 36, 37

*Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983) ......................... 29

*Persico et al. v. Sebelius et al.*, No. 1:13-cv-00303 (W.D.P.A.) .................................... 41

*Pima Cty. Cmty. Coll. Dist. v. EEOC*, 1976 WL 548 (D. Ariz. 1976) ......................... 32

*Priests for Life v. U.S. Department of Health and Human Services*, 772 F.3d 229 (D.C. Cir. 2014) ........................................................................... 20

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) .................................... 16, 17

*Santa Fe Independent Sch. Dist. v. Doe*, 530 U.S. 290 (2000) ........................ 35, 37, 38

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017) ......................................... 32, 33

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *affirmed by an evenly divided Court*, 136 S. Ct. 2271 (2016) ........................................................................... 47

*Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811 (2014) ........................................................ 34

*U.A.W. v. Johnson Controls, Inc.*, 499 U.S. 187 (1991) ........................................................ 29, 30

*United States v. Reynolds*, 710 F.3d 498 (3d Cir. 2013) ........................................................ 21

*United States v. State of New York*, 708 F.2d 92 (2d Cir.1983) ........................................... 45

*United States v. Virginia*, 518 U.S. 515 (1996) ........................................................ 32

*Util. Solid Waste Activities Grp. v. E.P.A.*, 236 F.3d 749 (D.C. Cir. 2001) ................................. 19

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) ........................................................ 47

*Van Orden v. Perry*, 545 U.S. 677 (2005) ........................................................ 35, 36

*Wheaton Coll. v. Burwell*, 134 S. Ct. 2806 (2014) ........................................................ 20

*Zubik et al. v. Sebelius et al.*, No. 2:13-cv-01459 (W.D.P.A) ........................................... 41

*Zubik v. Burwell*, 136 S. Ct. 1557 (2016) ........................................................ 10, 20, 25, 41

**LAWS**

5 U.S.C.

§ 553 ........................................................................................................ 18, 19

§ 702 ........................................................................................................ 45

§ 706 ........................................................................................ 18, 22, 28, 32

29 U.S.C. § 1144 ........................................................................................ 47

42 U.S.C.

§ 18022 .................................................................................................... 32

§ 2000bb–1 .............................................................................................. 24

§ 300gg–13 .......................................................................................... 22, 31

§ 300gg–15 ............................................................................................... 44

§ 2000e ................................................................................................ 28, 29

§ 2000e–2 ................................................................................................ 28

Administrative Procedure Act, 5 USC § 551 *et seq.* (1946) ................................................. passim

Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* (1974) ........... 10, 19, 45, 47

Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 *et seq.* (2010)................... passim

Public Health Service Act, 42 U.S.C. § 300gg *et seq.* (1944) ................................................. 4, 22

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* (1993) .................. 10, 24, 25, 26

U.S. Const. amend. I ........................................................................................................... 34

U.S. Const. amend. V ........................................................................................................... 32

## LEGISLATIVE MATERIALS

155 Cong. Rec. S11979 (Nov. 30, 2009)...................................................................... 23

H. Rep. No. 95–948 (1978)...................................................................... 29, 30, 31

S. Amdt. 1520, 112th Congress (2011-2012) ...................................................... 24

S. Amdt. 2791, 111th Congress (2009-2010) ............................................................ 3

S. Rep. No. 79-752...................................................................................................... 19

## REGULATIONS

26 C.F.R. § 54.9815-2715................................................................................ 13, 46

29 C.F.R. § 2590.715-1251............................................................................... 4, 8

45 C.F.R. §§ 147.130-147.133.................................................................................... 1

Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39870 (2013)....................................................................................... 20

Coverage of Certain Preventive Services Under the Affordable Care Act, 79 Fed. Reg. 51092 (2014)....................................................................................... 20

Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41318 (2015)......................................................................................... 9

Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46621 (2011)......................................................................................... 8

Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (Oct. 6, 2017) ................................................... passim

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (Oct. 6, 2017) .......................................................... passim

## EXECUTIVE MATERIALS

Department of Labor, FAQs about Affordable Care Act Implementation Part 36 (Jan. 9, 2017) ....................................................................................................................... 11

Executive Order No. 13798, *Promoting Free Speech and Religious Liberty* (May 4, 2017)............................................................................... 11, 33, 34, 35

Health Resources & Services Administration, *Women's Preventive Service Guidelines* (2011)................................................................................................... 7, 8, 22

Health Resources & Services Administration, *Women's Preventive Service Guidelines* (2016)................................................................................................... 8, 22

## OTHER AUTHORITIES

Becker, Nora V. & Daniel Polsky, *Women Saw Large Decrease in out-of-Pocket Spending for Contraceptives after ACA Mandate Removed Cost Sharing*, Health Affairs, July 2015..................................................................................................................... 16

Couloumbis, Angela and Liz Navratil, *Pennsylvania Takes Credit Ratings Hit amid Budget Impasse*, Pittsburgh Post-Gazette, Sept. 20, 2017 ........................................... 45

Fosmoe, Margaret, *Notre Dame To End No-Cost Contraceptive Coverage for Employees*, South Bend Tribune, Oct. 31, 2017 ........................................................ 13, 46

Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* (2011) .. passim

Jones, Rachel K., *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills* (2011)..................................................................................................... 2

Rand Corporation, *Employer Self-Insurance Decisions* (2011) ................................... 47

Roper, Mark, *House Vote Closes Pennsylvania's Budget Gap*, Fox 43 News, Oct. 26, 2017 ..... 45

Sonfield, Adam, *The Case for Insurance Coverage of Contraceptive Services And Supplies Without Cost-Sharing*, *Guttmacher Policy Review*, Winter 2011...................................... 44

## PRELIMINARY STATEMENT

The Commonwealth of Pennsylvania respectfully asks this Court to enjoin the "Religious Exemption Rule" and the "Moral Exemption Rule," which the Defendants issued earlier this month in violation of the United States Constitution and other laws.[1] As set forth herein, the Commonwealth satisfies all criteria necessary for an immediate injunction: it is likely to win the underlying case, it faces irreparable harm in the absence of preliminary relief, and the public interest strongly favors an injunction to avoid imminent, direct and irreparable harm to the Commonwealth and its female citizens and their families. Accordingly, this Court should grant the Commonwealth's Motion and enjoin the Rules so they do not go into effect before a full trial on the merits.

In this case, the President of the United States and various secretaries and agencies of the federal government under his direction targeted a class of citizens that is protected under the Civil Rights Act, the Pregnancy Discrimination Act and the equal protection guarantee of the Fifth Amendment. They eliminated rights to which these citizens are entitled under the law. In so doing, the Defendants used the arm of the state to permit employers to impose their religious beliefs on their female employees and insureds, thereby violating the Establishment Clause of the First Amendment. And they did all of this in violation of the Administrative Procedure Act, the law that governs how such regulations must be issued.

---

[1] *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (filed Oct. 6, 2017) (attached hereto as Exhibit A) (the "Religious Exemption"); and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (filed Oct. 6, 2017) (the "Moral Exemption") (attached hereto as Exhibit B). These two rules, which are collectively referred to as the "Exemption Rules" or the "Rules," were subsequently published in the Federal Register on October 13, 2017. *See* 82 Fed. Reg. 47611, 47792 and 47838. The Rules are codified at 45 C.F.R. §§ 147.130-147.133.

Under the law, health care plans are required to cover contraceptive care, cost-free, for those they insure. Yet by Executive Order, the President specifically directed the other Defendants to pursue additional "conscience-based objections" to mandated coverage of these services under the Women's Health Amendment to the Affordable Care Act.

To be clear, a reasonable exemption and accommodation already allowed employers to opt out of providing this mandated contraceptive coverage on religious grounds. If an employer (other than churches and certain affiliated organizations) opted out of paying for contraceptive coverage, its insurer had to provide coverage directly to the employees to comply with the law. The new Rules that the Defendants issued in response to the President's Executive Order do away with this requirement and allow any employer to claim an absolute exemption from providing mandated contraceptive coverage. They are the "exceptions that swallow the rule."

Millions of women need and rely on contraception. It enables women to plan their families, participate fully in the workforce, and exercise greater control over their lives and health. For some women, pregnancy can be life-threatening. And contraception is not only birth control – it is frequently prescribed to treat menstrual disorders, acne, pelvic pain and other medical concerns. Long-term use of oral contraceptives reduces a woman's risk of endometrial cancer, and protects against pelvic inflammatory disease and some benign breast diseases. In fact, more than half of all women who use contraception use it to manage health issues unrelated to birth control.[2]

Despite this, under the new Rules, the Defendants allow employers to prevent women from receiving otherwise legally mandated coverage under their health care plans based on the

---

[2] *See* Jones, Rachel K., *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills* (Nov. 2011), available at https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf.

employers' own religious or moral beliefs. And under the Rules, a "moral belief" can be just about anything. As a result, virtually any private employer can opt out of providing basic medical care that is mandated under the law without any explanation or oversight by regulators charged with enforcing this mandate. If employers opt out under the Religious Exemption Rule, their insurers will no longer provide that coverage.

As a result, many women who are otherwise insured will no longer be covered for preventive contraceptive services – and the Commonwealth of Pennsylvania (and other States around the Country) will face irreparable harm. If the women who lose contraceptive coverage cannot get it elsewhere, they will have to pay up to $1200 per year in out-of-pocket costs to purchase contraception directly – assuming they can afford it.[3] The Commonwealth will face increased costs of providing contraceptive care services through already over-burdened state programs. And, where women do not seek or cannot get contraceptive care, these state programs will face additional costs in connection with the medical outcomes that result. Some women will face unintended pregnancies and potentially life-threatening medical consequences. The Commonwealth of Pennsylvania, its female citizens, and their families will face irreparable harm.

The Commonwealth's Motion should be granted and an injunction should issue.

## **BACKGROUND**

During debate over the Affordable Care Act, the U.S. Senate passed the "Women's Health Amendment" to expand women's access to preventive health services and reduce gender disparities in out-of-pocket costs. *See* S. Amdt. 2791, 111th Congress (2009-2010). It was included in the final

---

[3] *See* Center for American Progress, *The High Costs of Birth Control* (Feb. 15, 2010), *available at* https://www.americanprogress.org/issues/women/news/2012/02/15/11054/the-high-costs-of-birth-control/.

version of the law, which was signed by the President on March 23, 2010. *See* Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 *et seq.* (2010) (the "ACA" or "Affordable Care Act"); *see also* Public Health Service Act (as amended by the ACA) § 2713, 42 U.S.C. § 300gg–13(a)(4). The Women's Health Amendment mandated that group health plans and health insurance issuers offering group or individual health insurance coverage provide coverage for preventive health services and screenings for women – and that they do so with no cost-sharing responsibilities, or further cost to patients. *See* 42 U.S.C. § 300gg-13(a)(4).[4] Exactly which "preventive health services and screenings" were required to be included was to be determined by guidelines issued by the Health Resources and Services Administration (the "HRSA"), an agency of Defendant United States Department of Health and Human Services ("HHS"). *Id.* This was required under the law.

A.     **The Institute of Medicine Determines That Contraception Is Necessary Preventive Care for Women and Coverage Should Be Provided to Women Cost-Free.**

The HRSA commissioned the Institute of Medicine (the "Institute"), a widely respected organization of medical professionals, to issue recommendations identifying what specific preventive women's health services should be covered under the ACA's mandate. The Institute, in turn, convened a committee of sixteen members, including specialists in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines, to formulate specific recommendations (the "Committee"). After conducting an extensive study, the Institute, through the Committee, issued a comprehensive report that identified eight evidence-based preventive health services, which it recommended be included. *See* Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 105 (2011) (the "Report") (attached hereto as

---

[4] Like many other requirements of the ACA, the Women's Health Amendment did not apply to so-called "grandfathered plans" in which the participant was enrolled prior to passage of the ACA. *See* 29 C.F.R. § 2590.715-1251 (2010).

Exhibit C); *see also* Declaration of Carol S. Weisman, Ph.D. (the "Weisman Decl.") (attached hereto as Exhibit D). Consistent with the Women's Health Amendment to the ACA, these recommended preventive health services were unique to women. *See* Report, Exh. C at 105.

Among other things, the Institute found that contraceptive care should be covered under the ACA's mandate. *See* Report, Exh. C at 109-10. In making this finding, the Institute cited evidence that "contraception and contraceptive counseling" are "effective at reducing unintended pregnancies" and considered that "[n]umerous health professional associations," including the American Academy of Pediatrics, the Society of Adolescent Medicine, the American Medical Association, the American Public Health Association, and the Association of Women's Health, Obstetric and Neonatal Nurses, recommend that such family planning services be included as mandated preventive care for women. *See id.* at 109. Based on its analysis, the Institute recommended that health plans cover the "the *full range* of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." Report, Exh. C at 109-10 (emphasis added).

The Institute based its recommendation on several important factors, among them:

**1. Unintended Pregnancy Is Prevalent in the United States.** As stated in the Institute's Report, in 2001, an estimated "49 percent of all pregnancies in the United States were unintended – defined as unwanted or mistimed at the time of conception." Report, Exh. C at 102 (internal citations omitted). These unintended pregnancies disproportionately impact the most vulnerable, including the young and lower-income women. *Id.* And unintended pregnancies are more likely to result in abortions: "In 2001, 42 percent of [] unintended pregnancies [in the United States] ended in abortion." *Id.* Moreover, women carrying babies to term are less likely to

follow best health practices where those pregnancies are unintended, resulting in adverse pregnancy outcomes. *Id.*

2. ***For Some Women, Pregnancy is Especially Dangerous.*** Further, while all pregnancies carry inherent health risks, the Institute found that some women have serious medical conditions for which pregnancy is strictly contraindicated or ill-advised. It specifically found that "women with serious medical conditions such as pulmonary hypertension (etiologies can include idiopathic pulmonary arterial hypertension and others) and cyanotic heart disease, and … Marfan Syndrome," are advised against becoming pregnant. Report, Exh. C at 103. For these women, contraception is not a convenience; it is necessary, lifesaving medical care.

3. ***Pregnancies Should Be "Spaced" at Least 18 Months Apart.*** The Institute found that contraceptives promote medically recommended "spacing" between pregnancies. Such spacing is important because of the "increased risk of adverse pregnancy outcomes for pregnancies that are too closely spaced (within 18 months of a prior pregnancy)." Report, Exh. C at 103. This is true for all women.

4. ***Contraceptives Are Effective at Preventing Unintended Pregnancies.*** The Institute also found that contraceptives are, in fact, effective at preventing unintended pregnancies. Put simply, "greater use of contraception within the population produces lower unintended pregnancy and abortion rates nationally." Report, Exh. C at 105. The Report highlighted a study showing that, as the rate of contraceptive use by unmarried women increased in the United States between 1982 and 2002, their rates of unintended pregnancy and abortion declined. *Id.* Other studies show that increased rates of contraceptive use by adolescents were associated with a "decline in teen pregnancies" and, conversely, that "periodic increases in the teen pregnancy rate are associated with lower rates of contraceptive use." *Id.* at 105.

**5.  *Contraceptives Have Other Significant Health Benefits.*** In addition, the Institute recognized that contraceptives have other significant health benefits unrelated to preventing unintended pregnancy. The Report states that these "non-contraceptive benefits of hormonal contraception include treatment of menstrual disorders, acne or hirsutism, and pelvic pain." Report, Exh. C at 104. Long-term use of oral contraceptives has also been shown to "reduce a woman's risk of endometrial cancer, as well as protect against pelvic inflammatory disease and some benign breast diseases." *Id.*

**6.  *Cost Is A Meaningful Barrier to Contraceptive Access.*** Importantly, the Institute found that *cost* is a meaningful barrier to contraceptive access. It stated that "[d]espite increases in private health insurance coverage of contraception since the 1990s, many women do not have insurance coverage or are in health plans in which copayments for visits and for prescriptions have increased in recent years" and, citing to a Kaiser Permanente study, noted that reduced cost brings more effective contraceptive care: "when out-of-pocket costs for contraceptives were eliminated or reduced, women were more likely to rely on more effective long-acting contraceptive methods." Report, Exh. C at 109.[5]

**B.  The HRSA Adopts the Institute's Recommendations and Requires Plans to Cover Contraceptive Care without Additional Cost.**

On August 1, 2011, the HRSA promulgated the Women's Preventive Service Guidelines, which adopted the Institute's recommendation that contraceptive care services be covered under the Women's Health Amendment to the Affordable Care Act. *See* Health Resources & Services

---

[5] The fact that the Report is based upon sound scientific and empirical evidence is confirmed by experts in the field. *See e.g.,* Declaration of Cynthia H. H. Chuang, M.D., MSc (the "Chuang Decl.") (attached hereto as Exhibit E); Weisman Decl., Exh. D; and, Declaration of Samantha F. Butts, M.D., MSCE (the "Butts Decl.") (attached hereto as Exhibit F).

Administration, *Women's Preventive Service Guidelines* (2011), *available a*t https://www.hrsa.gov/womens-guidelines/index.html#2 (attached hereto as Exhibit G) (the "Guidelines").[6] The Guidelines required that plans must cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," without any cost-sharing or payment by the insureds. *Id.* (the "Contraceptive Care Mandate"). This requirement applied to all health insurance issuers offering individual or group insurance as well as all group health plans, with the exception of those plans that were "grandfathered" under the ACA. *See* 29 C.F.R. § 2590.715-1251 (2010). As a result, employers, colleges and universities, and other organizations that provide health plans were required to comply with the mandate.

### C.    Religious Objectors Are Granted a Limited Exemption and Accommodation.

The Affordable Care Act does not contain a "conscience clause" that would allow employers and other plan sponsors to opt out of providing the preventive contraceptive services required by the statute. Nevertheless, in 2011, the Administration undertook regulatory action to accommodate religious objectors. It issued regulations in August 2011 that exempt "churches, their integrated auxiliaries, and conventions or associations of churches" from the ACA's requirement that employers cover contraceptive services – provided these objectors satisfied certain specified criteria[7] (the "Original Religious Exemption"). *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable

---

[6] The Guidelines were updated in 2016, but continued to identify contraception as covered preventive care. *See* Health Resources & Services Administration, *Women's Preventive Service Guidelines*, *available a*t https://www.hrsa.gov/womens-guidelines-2016/index.html (2016) (attached hereto as Exhibit H) (the "2016 Guidelines").

[7] Specifically, the purpose of the organization had to be "[t]he inculcation of religious values," the organization had to primarily employ and serve "persons who share the religious tenets of the organization," and the organization had to be a nonprofit entity. 76 Fed. Reg. 46621.

Care Act, 76 Fed. Reg. 46621 (Aug. 3, 2011). When employers in this discrete group claim this exemption, their employees do not receive the otherwise mandated contraceptive coverage from any source. This Original Religious Exemption went into effect August 1, 2011, years before the new Rules were issued.

The next year, the Administration issued additional regulations to accommodate religious nonprofit organizations that were not already exempt under the Original Religious Exemption but objected to the ACA's Contraceptive Care Mandate. *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41318 (2015) (the "Religious Non-Profit Accommodation" or the "Accommodation"). Under the Accommodation, an objecting employer could notify its health insurance provider (in the case of fully insured plans) or third-party administrator (in the case of self-insured plans) of a religious objection. Then the insurer or administrator, rather than the objecting employer, would have to provide the legally required contraceptive services directly to women covered under the employer's plan. *Id*.[8] In this way, women still had access to legally mandated no-cost contraceptive care, but employers did not have

---

[8] Employer-sponsored health coverage is generally categorized as "self-insured" or "fully insured." Self-insured plans, which are typically offered by larger companies, are those in which the plan sponsor pays for enrollees' health benefits directly. A self-insured plan will typically contract with a third party to administer the plan, but the plan sponsor will bear the financial risks associated with the plan. A fully insured plan, by contrast, is one in which the plan sponsor contracts with an insurance company to provide benefits to plan participants. In the case of a fully insured plan, the insurance company bears the risks associated with the plan.

Both types of plans are subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), which regulates employee benefit plans. While ERISA preempts state laws that "relate to any employee benefits plan," it contains an exception for laws that regulate "insurance, banking, or securities." *Id.* § 1144(b)(2)(A). As a result, states may regulate the benefits offered under fully insured plans, which are provided by insurance companies. They may not, however, regulate the benefits offered by self-insured plans, which are provided by the plan sponsor itself. *See generally* Declaration of Seth Mendelsohn (the "Mendelsohn Decl.") (attached hereto as Exhibit I).

to pay for it. This Accommodation was different from the Original Religious Exemption, under which employees did not get insurance coverage for preventive contraceptive services at all.

### D.    Employers Challenge the Contraceptive Care Mandate.

Following enactment of the ACA and the relevant implementing regulations, several employers, including some in Pennsylvania, filed lawsuits to challenge the scope of the Contraceptive Care Mandate, the Original Religious Exemption and the Religious Non-Profit Accommodation. Two of these cases were argued before the Supreme Court:

In *Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751 (2014), the Supreme Court concluded that applying the ACA's Contraceptive Care Mandate to closely held corporations that objected on the basis of sincerely held religious beliefs violated the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–1 ("RFRA"). Under RFRA, the government may not "substantially burden a person's exercise of religion" unless it is acting "is in furtherance of a compelling governmental interest" and employing the "least restrictive means" to further that interest. 42 U.S.C. § 2000bb–1(a) & (b). Therefore, following *Hobby Lobby*, the Administration began allowing such employers to take advantage of the Religious Non-Profit Accommodation, which had previously been available to nonprofit employers only.

Two years later, in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), the Supreme Court considered several consolidated challenges to the Accommodation process itself. The plaintiffs in these cases were employers and other plan sponsors who were eligible for the Accommodation but alleged that the act of notifying their insurer so the insurer could pay for contraception directly substantially burdened their exercise of religion. Ultimately, the Supreme Court did not decide this issue but instead remanded the cases to provide the parties with "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans 'receive full and equal health coverage,

including contraceptive coverage.'" *Id.* at 1560 (citation omitted). On January 9, 2017, however, the Department of Labor announced that "no feasible approach has been identified … that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage." Department of Labor*, FAQs about Affordable Care Act Implementation Part 36* (Jan. 9, 2017), *available at* https://www.dol. gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

### E.   Defendant Donald Trump Issues an Executive Order "Promoting Free Speech and Religious Liberty."

On May 4, 2017, President Donald Trump issued an Executive Order entitled "Promoting Free Speech and Religious Liberty." *See* President Donald Trump, Executive Order No. 13798, "Promoting Free Speech and Religious Liberty," (May 4, 2017) (the "Executive Order"), 82 Fed. Reg. 21675 (attached hereto as Exhibit J). Among other things, this Executive Order directed the other Defendants to "consider issuing amended regulations" to address "conscience-based objections to the preventive-care mandate promulgated under section 300gg-13(a)(4) of Title 42, United States Code" – *the Women's Health Amendment*. *Id*. § 3. To be clear, the Executive Order did not address the Affordable Care Act as a whole. Rather, the President directed his co-Defendants to target amended regulations at services provided under the Women's Health Amendment only.

### F.   The Defendant Departments Issue the New Rules Without Engaging in Required Notice-and-Comment Rulemaking.

On October 6, 2017, the Departments simultaneously issued both the Religious Exemption Rule and the Moral Exemption Rule. The Departments issued the Rules without any advance public notice and without inviting or providing opportunity for comment. These new Rules significantly expanded exemptions to the Contraceptive Care Mandate – they are the proverbial exceptions that swallow the rule.

11

      1.    *The Religious Exemption Rule.*

The Religious Exemption Rule significantly expands the scope of the existing Original Religious Exemption Rule for certain religious employers. Specifically, it allows *all* employers and other plan sponsors – including large, publicly traded corporations – to opt out of providing no-cost contraceptive coverage to their employees on the basis of "sincerely held religious beliefs." Religious Exemption, Exh. A at 74. In fact, the Rule suggests that if owners of a majority of a company's shares oppose contraceptive coverage, the company can refuse to provide it. *Id.* at 68-69.

In addition, the Religious Exemption Rule renders the Accommodation process optional. *See id.* at 54. As a result, any employer, university, or other plan sponsor can simply stop providing contraceptive coverage; there is no longer any obligation that the sponsor inform its insurer so the insurer can provide the coverage itself. *See id.* at 58 ("[T]he Departments have determined that the expanded exemptions rather than accommodations are the appropriate response to the substantial burden that the Mandate has placed upon the religious exercise of many religious employers.").

Employers that stop providing contraceptive coverage under the Religious Exemption Rule have no obligation to explain their decision, and the Rules provide for no oversight to determine whether employers are abusing the Exemption. In fact, the Rules do not require plans to provide any notice of their decision beyond what is already required by ERISA and the ACA. Entities that stop providing contraceptive care "do not need to file notices or certifications of their exemption, and [the Exemption Rules] do not impose any new notice requirements on them." *Id.* at 62. Under existing notice requirements, a plan need only provide 30 days' notice of any reduction in benefits occurring at the beginning of a plan year, and only 60 days' notice of a reduction imposed during the plan year. *See id.* at 138 ("[T]he revocation will be effective on the first day of the first plan

year that begins on or after 30 days after the date of the revocation …. Alternatively, an eligible organization may give sixty-days' notice."); *see also* 26 C.F.R. § 54.9815–2715(a)(i)(C)(2) & (b).

### 2. *The Moral Exemption Rule.*

The Moral Exemption Rule creates a new exemption that allows employers to refuse to provide their employees with contraceptive coverage "based on sincerely held moral convictions." Moral Exemption, Exh. B at 8. This Rule applies to nonprofit entities *and* for-profit entities whose shares are not publicly traded, but unlike the Religious Exemption Rule, it does not allow publicly traded companies to opt out of the Mandate. As with the Religious Exemption Rule, there is no mandatory accommodation process, and no notice requirement beyond those in other provisions of law.

### G. The New Rules Cause Specific and Irreparable Harm to the Commonwealth of Pennsylvania and Its Citizens.

For every employer, college, or other health plan sponsor who claims either of these new, certification-free exemptions, women will lose contraceptive coverage otherwise required under the Contraceptive Care Mandate.[9] Not only will these women face imminent medical harm for lack of contraceptive care or financial harm if they are able to and choose to self-fund their contraceptive needs, but the loss of ACA-mandated contraceptive care will result in significant, direct and proprietary harm to the Commonwealth.

---

[9] Just last week, the University of Notre Dame informed faculty, staff, and students that it would no longer provide contraceptive coverage as a result of the Exemption Rules. *See* Fosmoe, Margaret, *Notre Dame to end no-cost contraceptive coverage for employees*, South Bend Tribune, Oct. 31, 2017, *available at* https://www.southbendtribune.com/news/politics/notre-dame-to-end-no-cost-contraceptive-coverage-foremployees/article_512017b8-f873-50b0-841a-5158296b36aa.html (attached hereto as Exhibit O). Not only will the many Pennsylvania residents that attend Notre Dame be directly affected, but Notre Dame's decision is likely a harbinger that many of Pennsylvania's religiously-affiliated colleges and universities will follow.

13

1.      *The Commonwealth Faces Additional Economic Harm Because Women Will Seek More Contraceptive Care Funded by the State.*

In Pennsylvania, the Commonwealth will bear increased costs because of the new Rules. Some women who lose employer-sponsored contraceptive coverage will seek coverage through state-funded programs, including Medicaid (known as Medical Assistance in Pennsylvania) and Pennsylvania's Family Planning Services program. Medical Assistance provides health insurance, including contraceptive coverage, for individuals and families with incomes up to 138% of the federal poverty limit. Family Planning Services provides preventive screenings and contraceptives for individuals who are not eligible for full Medicaid benefits but have incomes at or below 215% of the federal poverty limit. *See* Declaration of Leesa Allen ¶¶ 14-17 (the "Allen Decl.") (attached hereto as Exhibit K). If employers eliminate contraceptive coverage, women will seek coverage from these programs. In fact, practitioners in the field specifically direct women without contraceptive coverage to state-funded programs. *See, e.g.,* Chuang Decl., Exh. E ¶ 22 ("I direct low-income patients without insurance to the Medicaid program (if eligible).").

Others will seek contraceptive care from health clinics that receive funding from both Commonwealth sources and the federal government's Title X program. *See* Declaration of Dayle Steinberg (the "Steinberg Decl.") (attached hereto as Exhibit L); *see also* Chuang Decl., Exh. E ¶ 22 ("I direct other uninsured or underinsured women without contraceptive coverage to seek care through Planned Parenthood, or another Federally Qualified Health Center (FQHC), where they may qualify for contraceptive coverage under Title X."). In this way, the Rules will further increase the financial burden on the Commonwealth.

2.     *The Commonwealth Also Faces Additional Economic Harm Because It Will Share the Increased Economic Burden of Its Citizens Having Unintended Pregnancies and Negative Health Outcomes.*

Other women will forgo contraceptive health services altogether, because the loss of ACA-mandated coverage under the Rules will make their contraceptive care unaffordable or inaccessible. *See* Weisman Decl., Exh. D ¶¶ 45-48 ("[C]ost has been shown to be a barrier to access to contraceptive care…. For these reasons, some women who lose contraceptive coverage through their employers as a result of the Rules, will choose a less effective contraceptive option for their medical needs, will use contraception inconsistently, or will discontinue using contraceptives entirely"); Butts Decl., Exh. F ¶ 55 ("Based upon my own experience and existing scientific and empirical information that I have reviewed and am aware of, under the new Rules, cost will, again, become a barrier to women's access to and use of the contraceptive that is medically recommended for them"); and Chuang Decl., Exh. E ¶ 38 ("This harm will manifest itself in the disruption of these patients' medical treatment, whether by substituting a less effective but cheaper method of contraception or by being forced to stop using contraceptives at all, due to financial reasons").

Women who stop using contraception entirely will experience more unintended pregnancies and negative health outcomes. *See* Butts Decl., Exh. F ¶¶ 56-58 (confirming that the Rules will result in some women facing unintended pregnancy and other adverse medical consequences). These outcomes will impose additional costs on Pennsylvania's state-funded health programs. *See* Steinberg Decl., Exh. L ¶ 30 (discussing study finding that 68% of unplanned births are paid for by public insurance programs, compared to only 38% of planned births).

>    3.    *The Contraceptive Care Mandate Has Resulted in Significant Savings for*
>           *Women.*

In contrast to the new Rules, by requiring employers to provide cost-free contraception, the Contraceptive Care Mandate has saved Pennsylvania women a significant amount of money. A recent study conducted by the University of Pennsylvania found, for example, that average out-of-pocket savings from the ACA's Contraceptive Care Mandate were "$248 for the intrauterine device and $255 annually for the oral contraceptive pill." *See* Becker, Nora V. & Daniel Polsky, *Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing*, Health Affairs, July 2015, at 1204 (attached hereto as Exhibit M); *see also* Mendelsohn Decl., Exh. I ¶ 11 ("The [Insurance] Department estimates that the women in Pennsylvania who have benefitted from the Contraceptive Care Mandate have saved over $250 million annually as a result."); *see also* Weisman Decl., Exh. D ¶ 50 ("[A]t least one study has shown that, under the ACA's contraceptive mandate, women have saved approximately $1 billion dollars per year on oral contraceptives alone."). But if employers opt out under the Exemption Rules, these savings will vanish and Pennsylvania women and the Commonwealth itself will be harmed as a result.

## ARGUMENT

This Court should grant the Commonwealth's Motion and order immediate injunctive relief. In the Third Circuit, a party seeking a preliminary injunction must first satisfy two "gateway" factors: "that it can win on the merits" and "that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Satisfying the first requirement "requires a showing significantly better than negligible but not necessarily more likely than not" that the movant can prevail. *Id.* Here, the Commonwealth has a strong likelihood of prevailing on several of its claims, any one of which is sufficient to require that the Rules be struck down. To satisfy the irreparable harm requirement, a plaintiff must demonstrate "a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). The Commonwealth also satisfies this requirement: if the Rules are not struck down, it will suffer direct proprietary harm as well as harm to its quasi-sovereign interests. These damages cannot be remedied after the fact.

Once a movant has satisfied these "gateway" factors, a court should then consider the possibility of harm to other interested persons and any public interest, balancing both these and the gateway factors in deciding whether preliminary injunctive relief is appropriate. *Reilly*, 858 F.3d at 176, 179. Here, these factors tip strongly in favor of the Commonwealth: if the Rules remain in effect, substantial harm will result to women and families. If they are enjoined, the Defendants and others will be in no different position than they were before the rules were issued. The public interest, particularly the strong interest in promoting access to necessary preventive medicine, would be best served by granting the Commonwealth's Motion.

17

In sum, this Court should grant the Motion and issue an injunction for the following three

reasons: (1) the Commonwealth will prevail in this litigation; (2) if relief is not granted, the

Commonwealth will be irreparably injured; and (3) the public interest demands it.

**I.      THE COMMONWEALTH WILL PREVAIL IN THIS LITIGATION.**

The Commonwealth will prevail in this litigation because the Rules are unlawful. They

violate the Administrative Procedure Act; the Affordable Care Act; Title VII of the Civil Rights

Act (as amended by the Pregnancy Discrimination Act); the equal protection guarantee of the

Fifth Amendment to the Constitution; and the Establishment Clause of the First Amendment.

Any *one* of these flaws would justify striking down the Rules. Together, they plainly establish

that the Commonwealth "can win on the merits" of this case. *Reilly*, 858 F.3d at 179.

**A.      The Rules Violate the Administrative Procedure Act.**

The Rules violate both the procedural and substantive requirements of the Administrative

Procedure Act, 5 USC § 551 *et seq.* (the "APA").

*1.      The Rules Are Procedurally Flawed.*

The APA sets forth clear requirements that an agency must follow in issuing a new rule.

It first must publish a "[g]eneral notice of proposed rule making" in the *Federal Register*.

5 U.S.C. § 553(b). That notice "shall include (1) a statement of the time, place, and nature of

public rule making proceedings; (2) reference to the legal authority under which the rule is

proposed; and (3) either the terms or substance of the proposed rule or a description of the

subjects and issues involved." *Id*. Then, the agency "shall give interested persons an opportunity

to participate in the rule making through submission of written data, views, or arguments with or

without opportunity for oral presentation." *Id.* § 553(c). And "[a]fter consideration of the

relevant matter presented," the agency "shall incorporate" within the adopted rule a "concise

18

general statement of their basis and purpose." *Id.* Rules issued without following with this process must be held "unlawful and set aside." *Id.* § 706(2)(E).

The Defendants did *none* of these things. They did not publish a Notice of Proposed Rule Making; they did not solicit comments on the Rules they were considering; and they did not wait until after they had considered all relevant comments to finalize the Rules with a concise general statement of their basis and purpose. Instead, the Defendants announced that the Rules were effective immediately – a full week before they could be published in the *Federal Register* –and invited comments only *after* they had gone into effect.

The Defendants justify their failure to follow the proper procedures by arguing that they had "good cause" under 5 U.S.C. § 553(b)(3)(B). Under that provision, notice-and-comment rulemaking is not required if the agency "for good cause" finds the otherwise required procedures are "impracticable, unnecessary, or contrary to the public interest" and it "incorporates its reasoning into the Rules." *Id.* That exception, however, "is to be 'narrowly construed and only reluctantly countenanced.'" *Util. Solid Waste Activities Grp. v. E.P.A.*, 236 F.3d 749, 754 (D.C. Cir. 2001) (citation omitted). It is not an "'escape clause[]' that may be arbitrarily utilized at the agency's whim," but instead "should be limited to emergency situations." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) (citing S. Rep. No. 79-752). Here, it was not.

The rationale that the Defendants offer in the Rules for engaging this emergency "escape clause" falls far short of the demanding standard that is required.[10] In both Rules, the Defendants

---

[10] The Departments also claim that they need not satisfy the good cause requirement "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act," each of which authorizes, in general terms, the promulgation of Interim Final Rules or IFRs. *See* Religious Exemption, Exh. A at 88; *see also*

repeatedly claim that the "extensive litigation" surrounding the Contraceptive Care Mandate requires their refusal to follow proper procedures. *See* Religious Exemption, Exh. A at 7; Moral Exemption, Exh. B at 7. They allege, for example, that "[d]ozens of lawsuits over the Mandate have been pending for nearly 5 years," and that "Courts of Appeals have been asking the parties in those cases to submit status reports every 30 through 90 days*."* Religious Exemption, Exh. A at 80. According to the Defendants, some courts have issued even "more pressing deadlines" than one to three months. Defendants claim, for example, that they were twice unable to comply with an order of the Seventh Circuit to "set forth their specific position" on a pending case. *Id.* at 81. Therefore, Defendants assert, the Rules "provide a specific policy resolution that courts have been waiting to receive from the Departments for more than a year." *Id.* at 82.

Litigation over agency rules is a constant. The mere fact of "extensive litigation" is not "good cause" to jettison the APA's procedural requirements. If anything, the fact that courts have struggled for years to resolve disputes over the Contraceptive Care Mandate underscores the importance of *following* the APA's deliberative process in issuing such regulations. And, while the Defendants suggest they had to issue their Rules immediately to respond to pressure from the courts, they do not cite a single instance in which a court ordered them to do anything other than state their position in a lawsuit.[11] At most, Defendants have shown that improperly issuing the

---

Moral Exemption, Exh. B at 60. This argument was squarely rejected in *Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 18-19 (D.D.C. 2010). That court concluded that the three provisions relied on by the Defendants here do not neuter the APA's notice-and-comment requirements or their obligation to establish "good cause" to disregard them. Rather, the court held these provisions were merely "a factor" in determining whether an agency had established good cause. *See id.* at 20.

[11] The Defendants argue that certain earlier rules relating to the Contraceptive Care Mandate also were issued as IFRs and point to a decision by the D.C. Circuit upholding use of an IFR in one such instance. *See* Religious Exemption, Exh. A at 83-84 (discussing *Priests for Life v. U.S. Department of Health and Human Services*, 772 F.3d 229, 276 (D.C. Cir. 2014), *vacated*

Rules as IFRs lessens the burden on *them* by bringing some pending litigation to a quicker conclusion. But agencies cannot abandon the procedural requirements of the APA simply for their own convenience.

Equally dubious is Defendants' assertion that the Rules had to be issued as IFRs to resolve "uncertainty." *See* Religious Exemption, Exh. A at 84 ("Good cause is also supported by the effect of these interim final rules in bringing to a close the uncertainty caused by years of litigation and regulatory changes.") Indeed, the Third Circuit has squarely rejected this rationale, holding that it would write the APA's notice and comment requirements "out of the statute." *United States v. Reynolds*, 710 F.3d 498, 510 (3d Cir. 2013) ("The desire to eliminate uncertainty, by itself, cannot constitute good cause [under the APA]. To hold otherwise would have the effect of writing the notice and comment requirements out of the statute."). That court correctly observed that any claim that an IFR would "eliminate uncertainty" is undercut by the simultaneous request for comments in the same document. *Id.* That request, the court observed, "suggests that the rule will be reconsidered and possibly changed in light of these comments." *Id.*

---

*on other grounds*, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016)). Unlike the Rules here, however, the IFR in *Priests for Life* **was** issued in response to a specific court ruling. In July 2013, following a 15-month notice-and-comment rulemaking process, the Departments issued a rule clarifying the scope of the Original Religious Exemption and creating the Accommodation that the Supreme Court subsequently expanded in *Hobby Lobby*. *See* Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39870 (2013); *see also Hobby Lobby*, 134 S. Ct. at 2751. The Court separately issued an order allowing a nonprofit religious college to opt out of the Accommodation process altogether by notifying HHS – rather than its insurance carrier – of its objection. *See Wheaton Coll. v. Burwell*, 134 S. Ct. 2806, 2807 (2014). This process, the Court concluded, would still allow HHS to arrange contraceptive care for Wheaton's students. *Id.* In response to *Hobby Lobby*, the Departments initiated a notice-and-comment rulemaking process, *see* 79 Fed. Reg. 51118, and in response to *Wheaton College*, they issued an IFR. They did this because the process mandated by the Court had to be implemented immediately. The Defendants cite *that IFR* as precedent for their actions here notwithstanding the fact that: it followed a lengthy notice-and-comment rulemaking process on the same issue; was required to carry out a decision of the Supreme Court; and did little more than allow employers to notify HHS, rather than their insurance carrier, of their objections. *See* 79 Fed. Reg. 51092.

Here, that contradiction is even more obvious. The Defendants argue that issuing their Rules as immediate IFRs will "bring[] to a close the uncertainty" surrounding the Contraceptive Care Mandate. But they admit, *in the very next sentence*, that issuing them "with a comment period provides the public with an opportunity to comment on *whether these regulations expanding the exemption should be made permanent or subject to modification* without delaying the effective date of the regulations." Religious Exemption, Exh. A at 84 (emphasis added). As the Third Circuit explained in *Reynolds*, 710 F.3d at 510, the "uncertainty" remains.

Because there is no adequate justification or "good cause" for Defendants' failure to comply with the APA's procedural requirements, the Rules must be held unlawful and set aside.[12]

> 2. *The Rules Are "Not in Accordance with Law," Arbitrary, Capricious, and an Abuse of Discretion.*

Not only was did the Defendants disregard the APA's procedural requirements, but the Rules themselves are substantively defective. Under the APA, a reviewing court "shall … hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2)(A). Here, the Defendants' Rules violate the Women's Health Amendment as well as two additional provisions of the ACA. And because these new exemptions from the Contraceptive Care Mandate are overly broad, completely unnecessary, and have nothing to do with women's health, the Rules are arbitrary and capricious and constitute an abuse of discretion.

For all of these reasons, the Rules should be enjoined.

---

[12] *See* 5 U.S.C. § 706(2)(D) (Rules that are issued "without observance of procedure required by law" shall be set aside.).

22

i.      *The Rules Violate the Women's Health Amendment.*

The Women's Health Amendment to the ACA amended the Public Health Service Act to require that non-grandfathered group health plans and health insurance issuers offering group or individual health insurance coverage must "provide coverage" without "impos[ing] any cost sharing requirements" for "additional preventive care and screenings … provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]." 42 U.S.C. § 300gg-13(a)(4). This requirement specifically applies to coverage "with respect to women." *Id.*

The HRSA's guidelines specifically include no-cost coverage for "[c]ontraceptive methods and counseling." *See* Guidelines, Exh. G. These guidelines, which were updated on December 20, 2016, continue to identify contraception as appropriate and covered preventive care for women. *See* 2016 Guidelines, Exh. H. And even the Rules do not challenge that contraceptive care is, in fact, preventive care for women. Nor could they: the determination that contraception constitutes appropriate preventive care for women was made after a rigorous review by the 16-member Institute of Medicine Committee and is consistent with the views of numerous health professional associations. *See* Report, Exh. C at 11.

The language of the Women's Health Amendment is mandatory – a covered plan "shall" provide coverage for preventive services, without cost-sharing requirements. Nothing in the language of the ACA suggests that employers may choose not to provide the preventive care services identified by the HRSA, and nothing in the ACA or its legislative history suggests that Congress intended to give Defendants or any agency blanket authority to permit employers to opt out. To the contrary, the lead sponsor argued that the Women's Health Amendment "leaves the decision of which preventive services a patient will use between the doctor and the patient." This cannot be reconciled with the effect of these new Rules that allow *employers* – not the doctor and

23

the patient – to decide what preventive services their insured employees may receive. *See* 155 Cong. Rec. S11979, S11988 (Nov. 30, 2009) (statement of Sen. Barbara Mikulski).

The Defendants, nevertheless, claim that the broad exemptions of the Rules are justified because "Congress has a consistent history of supporting conscience protections for moral convictions alongside protections for religious beliefs, including as part of its efforts to promote access to health services." Moral Exemption, Exh. B at 5.[13] But whether Congress may have included "conscience protections" in *other* statutes is beside the point: it did *not* do so here. In fact, the Senate even *rejected* a later effort to add such conscience protections to the ACA. *See* S. Amdt. 1520, 112th Congress (2011-2012). In arguing that such an amendment was necessary, its sponsors fully acknowledged that the ACA did not, in fact, contain "conscience protections" to begin with. Rather, they admitted that the ACA "does not allow purchasers, plan sponsors, and other stakeholders with religious or moral objections to specific items or services to decline providing or obtaining coverage of such items or services." *Id.*

The Defendants do not dispute that the ACA, in fact, has no "conscience clause" that might authorize the broad exemptions they seek. That should be the end of the matter. No principle of law allows an agency to invent a statutory provision simply because similar provisions have been included in other statutes on the same topic.[14]

  ii. *The Rules Cannot Be Justified Under the Religious Freedom Restoration Act.*

Just as the ACA does not authorize the Rules, neither does RFRA. That statute provides that government may not "substantially burden a person's exercise of religion" unless it

---

[13] *See also* Religious Exemption, Exh. A at 5.

[14] Further, most of the examples of "conscience clauses" identified in the Rules are nowhere near as sweeping as those created by the Rules, themselves. *See* Religious Exemption, Exh. A at 5 n.1.

demonstrates that the act undertaken "is in furtherance of a compelling governmental interest" and is the "least restrictive means" of furthering that interest. 42 U.S.C. § 2000bb–1(a) & (b).

Here, RFRA provides no justification for the Moral Exemption Rule, and the Defendants do not claim otherwise. The Defendants seem to claim that the Religious Exemption Rule is somewhat justified under RFRA, but they make clear that they believe that Rule is also justified independently of the statute. *Compare* Religious Exemption, Exh. A at 52 ("[W]e now believe that requiring [compliance with the mandate] led to the violation of RFRA in many instances.") *with id.* at 53 ("Even if RFRA does not compel the religious exemptions provided in these interim final rules, the Departments believe they are the most appropriate administrative response to the religious objections that have been raised.").

The Defendants' excessively broad application of RFRA cannot be squared with relevant Third Circuit or Supreme Court precedent. For instance, the Religious Exemption seems to rely on the premise that the prior Religious Non-Profit Accommodation process imposes a "substantial burden" on the exercise of religion. But the Third Circuit reached the opposite conclusion in *Geneva College v. Secretary United States Department of Health and Human Services*, 778 F.3d 422, 427 (3d Cir. 2015), *vacated and remanded sub nom. Zubik*, 136 S. Ct. at 1561. While *Zubik* subsequently vacated *Geneva College*, it did not address whether the accommodation process imposed such a substantial burden – it was silent. And following *Zubik*, the Third Circuit reaffirmed the conclusion it reached in *Geneva College*: that the accommodation process did *not* impose a "substantial burden." *See Real Alternatives*, 867 F.3d at 356 n.18 (reaffirming that "the regulation at issue [in *Geneva College*] did not impose a substantial burden"). In that same opinion, the Third Circuit also rejected the argument that

merely providing an insured with unwanted contraceptive coverage can impose a substantial burden on the insured's exercise of religion. *See id.* at 366.

The Religious Exemption Rule also claims that the "Government does not have a compelling interest in applying the Mandate to employers that object to contraceptive coverage on religious grounds." Religious Exemption, Exh. A at 55; *see also id.* at 33. This position cannot be squared with the Supreme Court's opinion in *Hobby Lobby*. In *Hobby Lobby*, the majority accepted, without argument, that the Contraceptive Care Mandate served a "compelling interest" under RFRA. 134 S. Ct. at 2780. The four dissenters went even further, clearly finding that it did. *Id.* at 2799 (Ginsburg, J., dissenting) ("[T]he contraceptive coverage for which the ACA provides furthers compelling interests in public health and women's well being."). Justice Kennedy, writing separately, agreed, stating that "[i]t is important to confirm that a premise of the Court's opinion is its assumption that the [Contraceptive Care Mandate] furthers a *legitimate and compelling interest in the health of female employees.*" *Id.* at 2785-86 (emphasis added).[15] The Defendants' position that the Contraceptive Care Mandate does not serve a compelling governmental interest flies in the face of Supreme Court precedent.[16]

For these reasons, the following *cannot* be supported by RFRA: (a) the Moral Exemption; (b) abandonment of the accommodation process under the Original Religious Exemption;

---

[15] *Hobby Lobby* at 2785-86 (Kennedy, J., concurring) (HHS "makes the case that the mandate serves the Government's compelling interest in providing insurance coverage that is necessary to protect the health of female employees, coverage that is significantly more costly than for a male employee. There are many medical conditions for which pregnancy is contraindicated. It is important to confirm that a premise of the Court's opinion is its assumption that the HHS regulation here at issue furthers a legitimate and compelling interest in the health of female employees.") (citations omitted).

[16] For this reason, the Defendants' assertion that the existence of grandfathered plans supports the conclusion that the Contraceptive Care Mandate does not serve a compelling governmental interest, *see id.* at 35, is beside the point.

(c) extension of the Rules to individuals enrolled in covered plans; and (d) the conclusion that the Contraceptive Care Mandate does not serve a compelling governmental interest. RFRA simply does not justify the broad exemptions contained in the Rules.

### iii.   The Rules Are Arbitrary, Capricious, and an Abuse of Discretion.

Even if the Defendants had the broad statutory discretion they claim (and, as set forth above, they do not), they cannot use it in a way that is arbitrary and capricious. But the Defendants did that here. They issued sweeping exemptions, with no relation to the purpose of the statute they purport to implement, that were based on dubious logic and unsound factual assertions. In so doing, the Defendants abused their discretion. Because the Rules are arbitrary, capricious, and an abuse of the Defendants' discretion, they should be struck down.

Agencies do not exercise their discretion in a vacuum. Rather, a "decision in a particular case must be exercised in a manner consistent with the policy, purpose, and goals set forth in the applicable statute*." Frisby v. U.S. Dep't of Hous. & Urban Dev. (HUD)*, 755 F.2d 1052, 1057 (3d Cir. 1985) (citation and internal quotation marks omitted). Here, that applicable statute is the Women's Health Amendment. The purpose of that law is to give women greater access to necessary preventive care and more control over their own health care decisions. Indeed, the ACA itself was enacted to expand health coverage while keeping costs under control.

Yet it is hard to imagine regulations more antithetical to these goals than the Rules. Contrary to the statute, the Defendants' Rules *reduce* access to preventive care, give *employers* control over health care decisions made by female insureds, *discourage* more cost-effective services, and *increase* the overall burden on the health care system. Because the Rules run counter to the purpose of the statute, they are arbitrary and capricious and must be struck down.

The sweeping nature of the Rules only further underscores this conclusion. The Religious Exemption Rule allows shareholders of a publicly traded company to vote to deny female

employees and beneficiaries access to contraception. *See* Religious Exemption, Exh. A at 68-69. That the Defendants see such a vote as "very unlikely," *id.* at 69, does not make the Rule any more acceptable under the APA; rather, it calls into question why the Defendants so radically expanded the Original Religious Exemption to include large publicly traded companies in the first place.

Similarly, the Moral Exemption Rule contains no limit on the type of belief that can justify an employer refusing to provide contraceptive care to its employees, provided that belief is "sincerely held." *See* Moral Exemption, Exh. B at 43. Nothing in the Moral Exemption Rule prohibits, for instance, an employer from refusing to provide contraceptive coverage to women based on his "sincerely held" moral conviction that society would be better off if women did not participate in the workforce.

The Rules are arbitrary, capricious, and an abuse of discretion under the APA. They should be struck down.

**B.    The Rules Violate Title VII of the Civil Rights Act and the Pregnancy Discrimination Act.**

Title VII of the Civil Rights Act prohibits employers from discriminating on the basis of sex. *See* 42 U.S.C. § 2000e–2(a). And, under the Pregnancy Discrimination Act, discrimination "on the basis of pregnancy, childbirth, or related medical conditions" is prohibited sex discrimination under Title VII. Employers must treat women affected by pregnancy and "related medical conditions" the same as other employees "for all employment-related purposes, including receipt of benefits under fringe benefit programs." *Id.* § 2000e(k). Because the Rules permit employers to unilaterally opt out of the Contraceptive Care Mandate, and the Contraceptive Care Mandate affects only women affected by pregnancy and "related medical conditions," the Rules allow employers to discriminate on the basis of sex. The Rules, therefore,

violate Title VII and the Pregnancy Discrimination Act, are "not in accordance with law," and must be struck down under the APA. *See* 5 U.S.C. § 706(2)(A).

In 1978, Congress enacted the Pregnancy Discrimination Act. That Act amended Title VII to make clear that discrimination on the basis of "pregnancy, childbirth, or related medical conditions" is prohibited discrimination on the basis of sex, and violates Title VII. *See* 42 U.S.C. § 2000e(k).[17] The Pregnancy Discrimination Act was specifically intended to correct the Supreme Court's improper interpretation of Title VII in *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976). And, in enacting the statute, Congress expressly embraced the logic of the dissent in that case. *See* H. Rep. No. 95–948, at 2 (1978) ("It is the Committee's view that the dissenting justices correctly interpreted the [Civil Rights] Act."); *see also Newport News Shipbuilding and Dry Dock Co. v. EEOC*, 462 U.S. 669, 676–82 & n.17 (1983).

*General Electric* involved a challenge to a company rule that provided all employees with disability benefits – but specifically *excluded* disabilities related to pregnancy. *See* 429 U.S. at 125. Justice Stevens dissented, observing that, "[b]y definition, such a rule discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male." *Id.* at 161-62. Congress embraced this principle in enacting the Pregnancy Discrimination Act: *discrimination on the basis of sex-based characteristics **is** discrimination on the basis of sex*. *See* H. Rep. No. 95–948, at 2 (quoting Stevens dissent with

---

[17] 42 U.S.C. § 2000e(k) of the Pregnancy Discrimination Act provides, in relevant part:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise.

approval); *see also Newport News*, 462 U.S. at 676 ("Accordingly, we shall consider whether Congress, by enacting the Pregnancy Discrimination Act, not only overturned the specific holding in *General Electric v. Gilbert, supra,* but also rejected the test of discrimination employed by the Court in that case. We believe it did.").

Relying on this principle, the Supreme Court subsequently struck down an employer's policy that excluded women – except those determined to be infertile – from jobs involving exposure to lead. *See U.A.W. v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). The Court held that, by so targeting "women with childbearing capacity," the policy violated Title VII's prohibition on sex discrimination. *See id.* at 200. The Court noted that its conclusion was "bolstered by" the Pregnancy Discrimination Act, finding that by using "the words 'capable of bearing children' … as the criterion for exclusion, [the employer] explicitly classifies on the basis of potential for pregnancy." *Id.* at 199. The Court concluded that, "[u]nder the [Pregnancy Discrimination Act], such a classification must be regarded, for Title VII purposes, in the same light as explicit sex discrimination." *Id.*

The same logic applies here, and it prohibits employer policies from treating contraception, which is prescribed "on the basis of potential for pregnancy," differently from analogous categories of health care. For example, if an employer provides prescription drug coverage to its employees, it cannot exclude *contraceptive* prescriptions without violating Title VII. *See Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1269 (W.D. Wash. 2001) ("In light of the fact that prescription contraceptives are used only by women, [defendant's] choice to exclude that particular benefit from its generally applicable benefit plan is discriminatory"); *but*

*see In re Union Pac. R.R. Employment Practices Litigation*, 479 F.3d 936, 942 (8th Cir. 2007).[18] As the court recognized in *Erickson*, "when an employer decides to offer a prescription plan covering everything except a few specifically excluded drugs and devices, it has a legal obligation to make sure that the resulting plan does not discriminate based on sex-based characteristics and that it provides equally comprehensive coverage for both sexes." *See id.* at 1272.

That court's finding is grounded both in Title VII's prohibition of discrimination on the basis of "sex-based characteristics," *see id.*, and Congress's expressed intent that the Pregnancy Discrimination Act's protections should "extend[] to the whole range of matters concerning the childbearing process." *See* H. Rep. No. 95–948, at 5.[19] Since the capacity to become pregnant – and, therefore, the need for contraception if one wishes to prevent pregnancy – is a sex-based characteristic, differential coverage *is* discrimination on the basis of sex. Contraceptive use is also part of "the whole range of matters concerning the childbearing process." *Id.* Put otherwise,

---

[18] In *Union Pacific*, the Eighth Circuit concluded that contraception is not "related to pregnancy" because "contraception is a treatment that is only indicated prior to pregnancy." *See* 479 F.3d at 942. That conclusion is inconsistent with both the Supreme Court's holding in *Johnson Controls* that discrimination even on the "basis of *potential* for pregnancy" violates the Pregnancy Discrimination Act, *see* 499 U.S. at 199 (emphasis added), and the broader principle that Title VII's prohibition on sex discrimination precludes discrimination on the basis of sex-based characteristics. *See* H. Rep. No. 95–948, at 2 (adopting Justice Stevens' interpretation of Title VII as prohibiting pregnancy discrimination because capacity for pregnancy "primarily differentiates the female from the male"). *See Union Pacific*, 479 F.3d at 947-49 (Bye, J., dissenting) (arguing that policy excluding coverage for contraception violated Title VII because contraception is a "gender-specific, female issue because of the adverse health consequences of an unplanned pregnancy"); *see also Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 469–70 (6th Cir. 2005), *cert. denied*, 546 U.S. 1015 (2005) (holding, in light of *Johnson Controls*, that district court erred in concluding plaintiff was not protected by Pregnancy Discrimination Act because she was not pregnant when defendant refused to hire her).

[19] In fact, Congress believed that the broad plain language of the Pregnancy Discrimination Act also applied to "decisions by women who chose to terminate their pregnancies," H. Rep. No. 95–948, at 7. Wishing to carve out such decisions, it therefore included a specific exclusion for services related to abortion. *See* 42 U.S.C. § 2000e(k).

"differential treatment" of contraceptive care is unlawful discrimination that violates Title VII and the Pregnancy Discrimination Act.

Such differential, discriminatory treatment, however, is precisely what the Rules allow. An employer that refuses to provide preventive contraceptive care is still obligated to provide other preventive care as well as prescription benefits. *See* 42 U.S.C. § 300gg–13(a)(1); *id.* § 18022(b)(1)(F), § 18022(b)(1)(I). But the Rules permit such an employer to exclude a category of preventive benefits used exclusively by women. This violates the law. Because the Rules authorize this illegal conduct, they are "not in accordance with law," and they must be held unlawful and set aside. *See* 5 U.S.C. § 706(2)(A); *see also Farrington v. Johnson*, 206 F. Supp. 3d 634, 635, 644 (D.D.C. 2016) (refusing to dismiss APA claim arising under Title VII); *Pima Cty. Cmty. Coll. Dist. v. EEOC*, 1976 WL 548, at *2 (D. Ariz. 1976) (observing that Title VII is "certainly a relevant statute within the contemplation" of the APA).

### C.     The Rules Violate the Equal Protection Guarantee of the Fifth Amendment.

The Rules also violate the constitutional guarantee of equal protection under the law. The Fifth Amendment prohibits the federal government from depriving any person "of life, liberty, or property, without due process of law." U.S. Const. amend. V. Although it does not contain a specific Equal Protection Clause, the Supreme Court has long recognized that "discrimination may be so unjustifiable as to be violative of due process." *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). As a result, "the Court has construed the Fifth Amendment to contain an equal protection guarantee." *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 316 (3d Cir. 2001).

Under the Fifth Amendment, classifications based on gender are subject to heightened scrutiny. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017).[20] Successful defense of such a classification, therefore, "requires an 'exceedingly persuasive justification'" – the government must demonstrate "at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 1690 (citations and internal quotation marks omitted). This burden "is demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

Here, the President's Executive Order directed the Departments to consider allowing for additional "conscience-based objections" to services mandated by the Women's Health Amendment. *See* Executive Order, Exh. J § 3. In so doing, the President directed his subordinates to consider allowing employers to refuse to provide otherwise mandated insurance coverage for health services that are used by women *only.* And the resulting Rules, in fact, apply solely to health care used exclusively by women. Only women were targeted. By authorizing employers to opt out of providing health coverage for women only – but not for men – the Executive Order and the Rules created a gender-based classification that must receive heightened scrutiny.

In performing the analysis under the Fifth Amendment, it is plain that the Rules fall far short of providing the "exceedingly persuasive justification" necessary to survive such scrutiny. The Religious Exemption asserts merely that it serves "the Government's interests, including as reflected throughout Federal law, to provide conscience protections for individuals and entities

---

[20] Although *Morales-Santana* involved a challenge to a federal statute, the same principle applies equally to challenges to federal regulations.

with sincerely held religious beliefs in certain health care contexts, and to minimize burdens in our regulation of the health insurance market." Religious Exemption, Exh. A at 8. The Moral Exemption Rule contains a similar milquetoast justification. *See* Moral Exemption, Exh. B at 8 (justifying "the Government's interests in providing conscience protections for individuals and entities with sincerely held moral convictions in certain health care contexts, and in minimizing burdens imposed by our regulation of the health insurance market").

Even if the Rules served important governmental objectives, their gender-based classification does not have an "exceedingly persuasive justification" and is not "substantially related to the achievement of those objectives." *Morales-Santana*, 137 S. Ct. 1678, 1690. In fact, the discriminatory classification of the Rules is not related to these governmental objectives at all. Simply put, there is no reason why the government's stated "interests in providing conscience protections … in certain health care contexts" require singling out one specific category of health care that is used only by women. The Executive Order does not explain why the President directed the Defendants to target the Women's Health Amendment, and the resulting Rules contain no medical or other justification for treating women's contraceptive care differently from any other type of health care.

The complete lack of any relationship between the government's asserted interest and the gender-based classification it used to advance that purported interest here is fatal. Because there is no "exceedingly persuasive justification" for the discriminatory action encouraged by the Rules, the Rules violate the equal protection guarantee of the Fifth Amendment. They should be struck down.

### D.      The Rules Violate the Establishment Clause.

The Rules also violate the Establishment Clause of the First Amendment, which requires that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.

34

"It is an elemental First Amendment principle that the state may not coerce its citizens 'to support or participate in any religion or its exercise.'" *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1825 (2014) (plurality) (quoting *Cty. of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 659 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part)). In enacting policy, government "must not press religious observances upon their citizens." *Van Orden v. Perry*, 545 U.S. 677, 683 (2005) (plurality). Indeed, even action performed by a private actor can violate the Establishment Clause where it "bear[s] 'the imprint of the State.'" *Santa Fe Independent Sch. Dist. v. Doe*, 530 U.S. 290, 305 (2000).

Establishment Clause challenges traditionally follow the *Lemon* test: First, the statute must have a "secular legislative purpose"; second, its "principal or primary effect" must be one that "neither advances nor inhibits religion"; finally, it must not "foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (internal citation and quotation marks omitted). Although the Supreme Court has not universally applied the *Lemon* test in recent years, it has remained consistent that the government violates the Establishment Clause when it "acts with the ostensible and predominant purpose of advancing religion." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005). Therefore, to survive constitutional scrutiny, a state action must have a secular purpose that is "genuine, not a sham, and not merely secondary to a religious objective." *Id.* at 864. Further, the state's "manifest objective may be dispositive of the constitutional enquiry" and, as such, it is proper for courts to consider the history and background of the state action at issue when determining its purpose. *Id.* at 850-51.

Here, the Rules have both the purpose and effect of advancing the religious beliefs of employers and other plan sponsors over those of their employees. This purpose is clear from the language of the Executive Order, which states that it is the policy of the Executive Branch to "vigorously enforce Federal law's robust protections for religious freedom." *See* Executive Order, Exh. J; *see also* Religious Exemption, Exh. A at 7 and Moral Exemption, Exh. B at 7. Similarly, the stated purpose of the Religious Exemption Rule is to "protect religious beliefs in the context of health care and human services" and "provide conscience protections for individuals and entities with sincerely held religious beliefs in certain health care contexts." [21] *See* Religious Exemption, Exh. A at 5, 8.[22]

This stated purpose indicates that the Rules are unconstitutional. In *McCreary County,* the Supreme Court found unconstitutional two Kentucky courthouse displays of the Ten Commandments. *McCreary Cty.*, 545 U.S. at 851. But, that same day, the Court (by plurality opinion) *upheld* the constitutionality of a monument of the Ten Commandments on the Texas statehouse grounds. *Van Orden*, 545 U.S. at 681. The difference, made plain by their histories, was their respective purposes. *See Van Orden*, 545 U.S. at 703 (Breyer, J., concurring) ("[*Van Orden*] also differs from *McCreary County*, where the short (and stormy) history of the

---

[21] Any legal distinction between the purpose of the Religious Exemption Rule and the Moral Exemption Rule is meaningless because couching an obviously religious motive as secular morality cannot survive constitutional scrutiny. *See Am. Civil Liberties Union of Ohio Foundation, Inc. v. DeWeese*, 633 F.3d 424, 432-33 (6th Cir. 2011) (rejecting as a "sham" the contention that a Ten Commandments poster was hung for a secular moral purpose); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) ("Facial neutrality is not determinative" of a First Amendment challenge).

[22] The Establishment Clause issue here is not whether the government *must* require insurance companies to cover contraception or whether the Defendants could have declined to guarantee contraceptive coverage for other reasons. Rather, the issue is that the particular context and history behind the Rules clearly demonstrates that the primary, if not sole, purpose of the Rules is to advance a particular religious belief and foist it upon women who would otherwise take advantage of their no-cost preventive contraceptive coverage. This bell cannot be un-rung.

36

courthouse Commandments' displays demonstrates the substantially religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them. That history there indicates a governmental effort substantially to promote religion, not simply an effort primarily to reflect, historically, the secular impact of a religiously inspired document.").

The Defendants' abrupt change in policy regarding contraceptive coverage demonstrates their clear religious objective. The Rules do not even bother to feign a non-religious purpose, like in *McCreary County*, such as "health" or "economic" concerns.[23] And any attempt to do so now would plainly be revisionist history as it was with McCreary County's futile attempt to repackage its Ten Commandments monument into a broader display of documents with "historical and legal significance." *See McCreary Cty.*, 545 U.S. 855-56; *see also id.* at 865 (courts need not accept a government's stated intent "where the claim was an apparent sham, or the secular purpose secondary").

While the government may, under certain circumstances, seek to alleviate a burden on religious exercise without running afoul of the Establishment Clause, *see Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005), it may not do so by imposing a substantial burden on others. *See Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709 (1985). And here, the burden imposed on women goes well beyond anything that could be justified to alleviate a burden on plan sponsors' religious exercise. The government action here is similar to that in *Santa Fe*, 530 U.S. at 290 – but with far more substantial consequences. In *Santa Fe*, the Court held that prayer delivered

---

[23] Although the Rules make passing reference to "minimiz[ing] burdens in our regulation of the health insurance market," *see* Religious Exemption, Exh. A at 8, they provide no further analysis and cite no evidence that the initial regulations created any such burden on the health insurance market in the first place. In fact, it is acknowledged in the text of the Religious Exemption Rule that the Rules, themselves, may create **new** burdens on the market. *Id.* at 56.

over a public school's public address system before a football game violated the Establishment Clause even though it was delivered by a private individual. *Id*. at 302-10. Because of the overall *context* of the prayer – that it was sanctioned, facilitated, and magnified by the school – the Court held that it was impermissible state sponsorship of a religious message. *Id.* at 309-10. The Rules here similarly and explicitly sanction, facilitate, and magnify a religious belief about contraception. But, unlike in *Santa Fe*, where the only burden on football fans was listening to a religious prayer,[24] the effect of the Defendants' state-sponsored religious practice here is far more burdensome to those it reaches. Many women in Pennsylvania and around the Country will be denied access to necessary health care in deference to the religious beliefs of their employers.

Where, like here, the state gives companies the legal platform to impose their religious will on others, the Establishment Clause has been violated.

## II.   IF RELIEF IS NOT GRANTED, THE COMMONWEALTH WILL BE IRREPARABLY INJURED.

Unless the Rules are enjoined, the Commonwealth will suffer irreparable injury. Women across the Commonwealth who rely on contraception as necessary preventive medicine will no longer have insurance coverage to pay for it. They will either get contraceptives from another source or pay out of pocket; if they can do neither, they will go without.

Those who look for other options will turn to programs funded, in whole or part, by state governments. This will increase demand for the already limited resources of such programs and impose additional costs on the Commonwealth. Pennsylvania citizens who go without contraception will have more unintended pregnancies. Some will be unable to afford the children

---

[24] Even this comparatively minimal burden, the Court noted, was harmful because it told certain audience members that they were "outsiders [and] not full members of the political community." *See* 530 U.S. at 310.

they did not plan to have or the unintended medical consequences of going without contraceptive care. These extra costs, too, will frequently be borne by the Commonwealth.

In addition to the economic, medical and societal harm to Pennsylvania and its citizens, the Rules also frustrate the Commonwealth's goals of ensuring equal treatment of men and women and seeing that women can fully participate in the workforce. These injuries are real, they are serious, they are imminent, and they are irreparable.

### A.     Women Will Lose Contraceptive Care.

Under the Rules, women in Pennsylvania and other states will lose access to contraceptive coverage through their employer-provided insurance. Indeed, that is the purpose of the Rules: to allow employers to refuse to provide their employees with contraceptive coverage. Under the Rules, there are virtually no limits on the types of organizations that can claim the Religious Exemption, and few limits on the types of organizations that can claim the Moral Exemption. Nor are there any clear standards or certifications required to claim either. And since the Rules have rendered the Accommodation process optional, entities that opt out of the Contraceptive Care Mandate have no obligation to notify their insurer so that the insurer can provide coverage directly.

These women have limited choices. They can seek contraceptive care from state-funded programs such as Medical Assistance or Family Planning Services, or from clinics that receive state grant money; or they can pay the full cost of contraception, themselves – if they are able. If they can do neither, they can stop using contraception altogether. Some may be able to join the insurance plan of a spouse or other family member who has contraceptive coverage, although doing so will likely raise their premiums. But, regardless of the choices these women are forced to make, *someone* will bear additional costs when employers terminate contraceptive coverage.

In the Rules, the Defendants attempt to quantify the number of women who will lose access to contraceptive care.[25] Their own estimates, which rely on assumptions that seem calculated to underestimate the effect of the Rules, show that harm will be widespread. In trying to assess the impact of the Rules, the Defendants focus on two categories of women: (1) those whose coverage is paid directly by insurance companies because employers opted out under the Religious Non-Profit Accommodation; and (2) those who work for employers currently in litigation against the government on this issue.

These two categories, of course, ignore all of the women who work for publicly traded and other large companies that were not previously permitted to take advantage of the Religious Non-Profit Accommodation. It also ignores those who work for nonprofit and other entities that did not seek the Accommodation or bother suing the government but whose employers will now opt out with no cost, certification or oversight, and women who work for entities that will opt out under the new Moral Exemption. Defendants concede that they cannot estimate how many women will fall into these other categories but, nonetheless, assert that the number will be small. *See* Religious Exemption, Exh. A at 99 ("Overall, the Departments do not know how many entities will use the expanded exemption. We expect that some non-litigating entities will use it, but given the aforementioned considerations, we believe it might not be very many more.").

Defendants estimate that there are 1,027,000 individuals currently covered by plans that use the Religious Non-Profit Accommodation process. Religious Exemption, Exh. A at 1065. Under the Accommodation, the sponsors of these plans do not have to pay for contraception

---

[25] Their estimates are based on thin evidence, at best, and rest on a series of questionable assumptions. Given the rushed, improper manner in which they issued the Rules, it is unsurprising that Defendants were unable to quantify, with any degree of accuracy, the number of women who will be harmed. What is surprising is that they did not see their inability to produce reliable numbers as an invitation to slow down and follow the APA.

coverage, but the insurance companies or third-party administrators still do. *Id.* at 106. Relying on some questionable assumptions, the Defendants whittle this number down to just 23,000 women of childbearing age who use contraception. The Defendants admit these women will lose contraception coverage – their employers will drop the Accommodation altogether, opting out under the Rules, instead, so their employees will not get coverage even if the employers do not have to pay for it. *Id.*

Defendants also estimate that 8,700 women who work for entities currently litigating against the government will lose coverage, for a total of 31,700 women. *Id.* On a proportional basis by state, this equates to roughly 1,250 women in Pennsylvania of childbearing age who, Defendants admit, use contraception but will lose coverage as a result of their actions. And Pennsylvania may have a greater proportional share of objecting employers than other states, as many of the lawsuits challenging the Contraceptive Care Mandate have involved Pennsylvania entities. For instance, one of the two cases consolidated with *Hobby Lobby* before the Supreme Court was filed by a Pennsylvania corporation with *950* employees. *See Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 381 (3d Cir. 2013), *rev'd and remanded sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). *Zubik* was also filed by Pennsylvania plaintiffs, along with three other cases initiated in the same district, all of which challenge the Contraceptive Care Mandate. *See Zubik et al. v. Sebelius et al.*, No. 2:13-cv-01459 (W.D.P.A); *Brandt et al. v. Sebelius et al.*, No. 2:14-cv-00681 (W.D.P.A.); *Persico et al. v. Sebelius et al.*, No. 1:13-cv-00303 (W.D.P.A.); *Geneva College et al. v. Sebelius et al.*, No. 2:12-cv-00207 (W.D.P.A.). These cases all involved multiple plaintiffs, some of which stated in pleadings that their health plans covered hundreds or thousands of

individuals. *See* Complaint ¶ 36, *Zubik* (Oct. 8, 2013); Complaint ¶ 39, *Brandt* (May 27, 2014);

Complaint ¶¶ 38-39, *Geneva College* (Oct. 18, 2013).

These numbers, however, represent only a fraction of the women who will be harmed.

And if Defendants' assumptions are wrong, as they likely are, these numbers could be much

higher. For instance, Defendants assume that 75% of individuals covered by the insurer of an

employer that opts out under the Religious Non-Profit Accommodation will continue to receive

coverage through the insurer now that the Accommodation is optional. *Id.* at 106. This is

arbitrary and makes no sense: the Defendants admit they "do not have specific data on which

plans of which sizes will actually continue to opt into the accommodation." *Id.* But because some

organizations – before passage of the Rules – "indicated that they do not object to the

accommodation," the Defendants guessed that only 25% of women covered under the

Accommodation will lose coverage. But if these employers truly object to contraception based

on a sincerely held belief, why would they not opt out under the new Rules? That way their

insurers will not have to pay for their employees' contraception coverage, either. The

Defendants' assumption is too low; the number of women who will be harmed is significantly

higher than they estimate.

Harm this widespread warrants injunctive relief. By way of comparison, in a case

challenging an employer's decision to reduce health benefits and wages for only 90 employees in

Pennsylvania and 415 elsewhere, this Court issued an injunction maintaining benefits. *See Int'l*

*Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Exide Corp.*, 688 F.

Supp. 174, 176 (E.D. Pa.), *aff'd*, 857 F.2d 1464 (3d Cir. 1988). This Court found irreparable

harm "as a result of the drastic reduction in health insurance benefits and the wholesale wage

cuts implemented by the company." *Id.* at 188. In so doing, it specifically cited the "substantial

42

risk" that "workers will forego necessary medical treatment or diagnosis because of their inability to pay their share of the costs." *Id.* at 188. The Third Circuit affirmed. 857 F.2d at 1464.

Here, the risk that "workers will forego necessary treatment or diagnosis because of their inability to pay their fair share of the costs" is the same as in *Exide Corp.* But the scope of the "drastic reduction in health insurance benefits" here is far greater. Therefore, like in *Exide Corp.*, this Court should enjoin the Rules and maintain benefits.

### B.    The Commonwealth Will Suffer Direct, Irreparable Harm.

Defendants argue that women who lose employer-provided contraceptive care can always obtain contraception from somewhere else. They assert that "there are multiple Federal, State, and local programs that provide free or subsidized contraceptives for low-income women." Religious Exemption, Exh. A at 42. The Commonwealth agrees with this last statement. But who do the Defendants think *pays* for these state and local programs? The many women who lose access to contraception will undoubtedly seek care from these programs. As a result, the costs to the Commonwealth and other states will increase.

In Pennsylvania, women denied contraceptive coverage by their employers can seek similar coverage from a state-sponsored program. Women who are citizens of Pennsylvania with incomes up to 138% of the federal poverty level ($16,642 for an individual and $33,948 for a family of four) can enroll in Medicaid which, in Pennsylvania, is known as "Medical Assistance." *See* Allen Decl, Exh. K ¶ 8. Those with incomes up to 215% of the poverty level ($25,929 for an individual and $52,890 for a family of four) can participate in the Commonwealth's Family Planning Services Program. *Id.* ¶ 9. Both programs provide contraceptive care and rely on a combination of federal and Commonwealth funding.

In addition, all women who lose contraceptive coverage can get some care from Pennsylvania's network of clinics funded under the Title X grant program. Under this program,

43

clinics located throughout the Commonwealth receive funding from different sources – including

from programs funded by the Commonwealth. These Title X clinics provide services to all

women who ask, and they charge on a sliding scale based on income. They also help women

who are eligible for Commonwealth-funded health care (including Medical Assistance and

Family Planning Services) enroll in these programs to offset their own costs. As a result, only a

small portion of the revenue for these clinics actually comes from Title X funding. *See* Steinberg

Decl., Exh. L ¶ 13.

       For low income women who lose access to contraception, government-funded care is

likely the only available option – unless they give up contraception entirely. Therefore, because

of the Rules, the Commonwealth's cost to fund the Medical Assistance and Family Planning

Services programs will increase. And women who lose access to contraceptive care will

experience unplanned pregnancies and/or significant health problems as a result. They will turn

to these same state-funded sources of care, imposing additional costs on the Commonwealth.

       To be clear, all of these additional costs to the Commonwealth would not exist but for the

Rules – and all are *unrecoverable*.[26] The APA does not permit suits against the federal

---

[26] These costs *would not exist* but for the Rules. Requiring employers to provide contraceptive coverage (or, in the case of entities that opted out under the Accommodation, their insurers) *does not increase costs to the employer or insurer* because "insurance coverage of contraceptive services and supplies … actually saves money." Sonfield, Adam, "The Case for Insurance Coverage of Contraceptive Services And Supplies Without Cost-Sharing," *Guttmacher Policy Review* (Winter 2011) at 7 (attached hereto as Exhibit N). Studies show that insurers who provide contraceptive coverage see their costs *decrease* because their insureds have fewer unplanned pregnancies. *Id.* This is why the Accommodation worked in the first place: insurers could be forced to provide contraceptive care directly to plan participants because that additional coverage caused them to have a net cost *savings. See Hobby Lobby*, 134 S. Ct. at 2759 (noting that HHS asserted that the Accommodation "imposes no net economic burden on the insurance companies that are required to provide or secure the coverage."). But by forcing women to get contraceptive care from someone *other than own their health insurance provider*, the Rules upend the incentive structure of the Contraceptive Care Mandate and impose additional costs. Those additional costs are borne, by the States – here, Pennsylvania.

government for money damages, so the Commonwealth and other states will have no way of recovering the additional funds they will be forced to spend. *See* 5 U.S.C. § 702. And where a plaintiff "cannot recover damages from the defendant due to the defendant's sovereign immunity" – as is the case here – "any loss of income suffered by a plaintiff is irreparable per se." *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (citing *Bowen v. Massachusetts*, 487 U.S. 879 (1988) and *United States v. State of New York*, 708 F.2d 92, 93–94 (2d Cir.1983).

The damage to the Commonwealth goes far beyond dollars and cents, even dollars and cents that are not recoverable. As of the date of this filing, the Commonwealth of Pennsylvania has a budget deficit of approximately $2.2 Billion.[27] On September 20, 2017, Pennsylvania's bond rating was lowered by Standard & Poor's.[28] No one can deny that the Commonwealth of Pennsylvania is in dire financial shape. The additional harm to the Commonwealth caused by the Defendants' Rules is not just significant – it is economically unsustainable. The Commonwealth will suffer direct and irreparable harm.

This injury is imminent. The Exemption Rules permit an entity to opt out of providing contraceptive coverage with no more notice than required under ERISA and the ACA. *See* Religious Exemption, Exh. A at 61 ("[T]hese interim final rules do not impose any new notice requirements on [entities wishing to opt out].") As a result, employers can drop contraceptive coverage for their employees on only 60 days' notice. *See* 42 U.S.C. § 300gg–15(d)(4); *see also*

---

[27] Roper, Mark*, House vote closes Pennsylvania's budget gap*, Fox 43 News, Oct. 26, 2017, *available at* http://fox43.com/2017/10/26/house-vote-closes-pennsylvanias-budget-gap/.

[28] Couloumbis, Angela and Liz Navratil*, Pennsylvania takes credit ratings hit amid budget impasse*, Pittsburgh Post-Gazette, Sept. 20, 2017, *available at* http://www.post-gazette.com/news/politics-state/2017/09/20/Pennsylvania-budget-impasse-leads-to-credit-rating-downgrade/stories/201709200149.

26 C.F.R. § 54.9815-2715(b). And in some cases, they need only give 30 days' notice if they drop coverage at the start of a plan year. *See* Religious Exemption at 77 ("If contraceptive coverage is being offered by an issuer or third party administrator through the accommodation process, the revocation will be effective on the 1st day of the 1st plan year that begins on or after 30 days after the date of the revocation…."); *see also* 26 C.F.R. § 54.9815-2715(a)(1)(i)(C)(2).

As a result, employers, colleges and universities, and other plan sponsors that use the calendar year as their plan year can drop coverage on January 1, 2018.[29] And those that provided notice when the Exemption Rules were issued can revoke coverage even earlier.

### C.   The Commonwealth Will Be Harmed Because It Will Be Unable to Protect the Health, Safety, and Well-Being of Its Residents.

In addition to direct pecuniary harm, the Commonwealth will suffer injury to its *parens patriae* interest in protecting its own citizens. The Commonwealth, like all states, has "quasi-sovereign" interests that include "protecting the 'health and well-being – both physical and economic – of its residents in general.'" *In re Oxycontin Antitrust Litig.*, 821 F. Supp. 2d 591, 601 (S.D.N.Y. 2011) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 607 (1982)); *see also Snapp*, 458 U.S. at 607 ("[A] State has a quasi-sovereign interest in the health and well-being – both physical and economic – of its residents in general."). This bedrock principle of law is as old as the founding of the Commonwealth – even older. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 518-19 (2007); *Snapp*, 458 U.S. at 607. And "[i]t is unquestionable that a state, in its *parens patriae* capacity, does qualify as 'personally ... suffer[ing] some actual or threatened injury." *Maryland People's Counsel v. F.E.R.C.*, 760 F.2d 318, 321 (D.C. Cir. 1985) (Scalia, J.)

---

[29] As discussed above, *see supra note* 9, the University of Notre Dame recently informed participants in its plan that it would no longer provide cost-free contraceptive care. Its employees were told that they would lose their coverage on January 1, 2018. Fosmoe, Margaret, *Notre Dame to end no-cost contraceptive coverage for employees*, South Bend Tribune, Oct. 31, 2017.

(quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982) (alteration in original). Not only is this harm irreparable, but it is also unquantifiable and not subject to reparation in the form of money damages. An injunction is required to address this state harm.

The Commonwealth's interests are particularly relevant here, given its limited authority to regulate many of the plans covered by the Rules. The federal government, through ERISA, has taken over responsibility for regulating self-insured groups plans, which are used by the vast majority of large employers.[30] *See id.* 29 U.S.C. § 1144(a). Pennsylvania, like all other states, "surrender[ed] certain sovereign prerogatives" when it joined the Union. *Massachusetts v. E.P.A.*, 549 U.S. at 519. These prerogatives "are now lodged in the Federal Government," which, in this instance, has ordered the Defendants to enforce the provisions of the Women's Health Amendment to protect the interests of Pennsylvania and the other states. *See id.* at 519 ("These sovereign prerogatives are now lodged in the Federal Government, and Congress has ordered EPA to protect Massachusetts [from certain environmental harms].")*; see also See Texas v. United States*, 809 F.3d 134, 154 (5th Cir. 2015), *affirmed by an evenly divided Court*, 136 S. Ct. 2271 (2016) ("Both these plaintiff states and Massachusetts now rely on the federal government to protect their interests.").

## III.    THE PUBLIC INTEREST WEIGHS STRONGLY IN FAVOR OF AN INJUNCTION.

Finally, the public interest strongly favors issuing a preliminary injunction. The Third Circuit has stated that "[i]f a plaintiff proves 'both' a likelihood of success on the merits and

---

[30] As of 2010, approximately 80% of "large employers" (with over 1000 employees), and 50% of "mid-sized employers" (with 200-1000 employees), offered self-insured plans. See Rand Corp., "Employer Self-Insurance Decisions," at 17-18 (Mar. 2011) (prepared for United States Department of Labor and HHS).

irreparable injury, it 'almost always will be the case' that the public interest favors preliminary relief." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017) (citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc*., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)). According to the Third Circuit, then, analyzing whether an injunction favors the public interest is "often fairly routine." *Id.* (citing *Kos Pharm., Inc. v. Andrx Corp*., 369 F.3d 700, 730 (3d Cir. 2004)).

So it is here. The public interest favors an injunction in this case because the lack of contraceptive care will cause irreparable injury, in the form of medical harm to women who rely on contraceptives for a wide range of medical reasons, increased unintended pregnancy, and widespread disruption in medical care. The public interest further favors an injunction because the Rules infringe on the sovereignty of the Commonwealth, and because direct financial and other harm will befall the Commonwealth and that harm, too, is irreparable. Finally, the public interest favors an injunction because the Rules are unconstitutional. *See Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883–84 (3d Cir. 1997) ("In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights.").

## <u>CONCLUSION</u>

For the reasons set forth above, the Commonwealth's Motion for a Preliminary Injunction should be granted.

Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

November 2, 2017

<u>*s/ Jonathan Scott Goldman*</u>
JONATHAN SCOTT GOLDMAN
Executive Deputy Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
NICOLE VAN ORDER
Senior Deputy Attorney General
NICOLE J. BOLAND
PATRICK GREENE
Deputy Attorneys General

Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(717) 787-3391
jgoldman@attorneygeneral.gov