# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | |
| *Plaintiff,* | |
| v. | Civil No. 2:17-CV-4540 |
| DONALD J. TRUMP, *et al.* | **DECLARATION OF MOTHER SUPERIOR MARIE VINCENTE** |
| *Defendants,* | |
| LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME, | |
| *Proposed Defendant-Intervenors* | |

I, Mother Superior Marie Vincente, hereby declare as follows:

1.    I am over the age of 21 and am capable of making this declaration pursuant to 28 U.S.C. § 1746. I have not been convicted of a felony or crime involving dishonesty. I make this declaration based on my personal knowledge and experience of the Little Sisters, our organization, our ministry, and our religious beliefs and practices. My statements about the history of the Little Sisters, the scope of our ministry internationally, and the founding dates of our homes are drawn from organizational and historical documents that I believe to be correct.

2.    I am the Mother Superior of the Saints Peter and Paul Home of the Little Sisters of the Poor in Pittsburgh, Pennsylvania.

3.    I have been a Little Sister for 63 years, and have served as the Mother Superior of the Saints Peter and Paul Home for over 12 years.

## I.   History, Organization, and Structure of the Little Sisters of the Poor

4.   The Little Sisters of the Poor is an international Roman Catholic Congregation of Sisters that has provided loving care to needy elderly persons of any race, sex, or religion for over 175 years.

5.   The Little Sisters of the Poor were founded in France, in the winter of 1839, when St. Jeanne Jugan carried a blind elderly woman off the streets and into her home and laid the woman in her own bed.  Over time, other women joined St. Jeanne in a religious ministry designed to protect and care for the elderly poor.

6.   By the time St. Jeanne died forty years later, the Little Sisters of the Poor had established homes in eight countries, including the United States, where the first home was founded in 1868 in Brooklyn, New York.

7.   Today, there are Little Sisters homes in over thirty countries around the world serving over 13,000 poor elderly people.

8.   The Little Sisters of the Poor have founded and operate over twenty-five homes in the United States, which are located in twenty states and the District of Columbia. These homes are hosted by over 300 Little Sisters of various nationalities.

9.   All Little Sisters homes share the same fidelity to the Catholic beliefs. Every home is operated under the control of the Little Sisters, and every Little Sister takes a vow of obedience to God, which assumes obedience to the Pope, the Church's teaching, and the authority of the Church in her hierarchy.

10.   While Catholic and committed to following Church teaching, the Little Sisters' homes are not under the civil legal ownership and control of the dioceses in

1

which they are located.  Instead, the Little Sisters of the Poor own and control the homes ourselves, through local corporations that are entirely within the civil legal control of the Little Sisters.

11.    The Little Sisters' homes are not directly funded by the dioceses in which we are located.  Instead, we take responsibility for funding our own operations.  For most homes, about half of the budget comes from voluntary gifts, largely in response to the begging for funds and gifts in kind that the Little Sisters do to support our ministry.

## II. Little Sisters of the Poor Pittsburgh

12.    The Saints Peter and Paul Home of the Little Sisters of the Poor in Pittsburgh ("Little Sisters Pittsburgh"), is a Pennsylvania non-profit corporation that qualifies as a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986 ("the Code"). The Pittsburgh home is under my direct authority as Mother Superior.

13.    Little Sisters Pittsburgh currently employs about 67 full-time employees.

14.    Little Sisters Pittsburgh have adopted the Christian Brothers Employee Benefit Trust (the "Christian Brothers Trust") to provide medical benefits coverage for their employees.

15.    It is my understanding that Christian Brothers Trust is a Catholic entity designed to serve the Catholic Church and related faith-based entities. It is my understanding that, like the Little Sisters, the Christian Brothers Trust operates in a manner consistent with our mutual Catholic beliefs. One of the reasons the Little Sisters chose to use the Christian Brothers Trust for our health benefits is because it

2

shares and is administered in accordance with our religious beliefs and provide benefits accordingly.

### III. Religious Beliefs and Commitments of the Little Sisters of the Poor

16.   Jesus taught that "in so far as you did it to the least of these brothers of mine, you did it to me." *See* Matthew 25:34. This teaching is a fundamental part of who the Little Sisters are. St. Jeanne urged her fellow Little Sisters, "Never forget that the poor are Our Lord; in caring for the poor say to yourself: This is for my Jesus—what a great grace!" Thus, each Little Sister makes a vow of Hospitality, through which she promises to care for the aged as if they were Christ himself.

17.   As Little Sisters, we strive to witness to the value of the elderly by believing in their inviolable dignity, by recognizing their unique contributions to the Church and society, and by involving them in the activities of our Homes to develop their human potential.

18.   Caring for the dying is the summit of the Little Sisters' service to the elderly poor. The Little Sisters maintain a constant presence with those who have entered the dying process and their families. We try to relieve their sufferings as much as possible, which includes giving emotional and prayerful support. Our provision of spiritual support is always consistent with the faith of the person we are serving; we do not force religious observance on anyone.

19.   Because the Little Sisters care for those who are weak and dying, we strive to emphasize our respect for the uniqueness and dignity of each elderly person as they reach the end of their life. We offer this respect for two reasons. First, to treat

the individual with the dignity they are due as a person loved and created by God, with the same respect and compassion as if he or she was Jesus Christ. Second, to convey a public witness of respect for life, in the hope that we can help build a Culture of Life in our society.

20.   We care for the elderly poor of all races and religions, or of no religion at all. We do not care for people because they are Catholic, but because we are Catholic.

21.   We also hire employees of all races and religions, or of no religion at all. Because staff members are an important extension of our ministry to the elderly, they must support the Little Sisters' mission by welcoming the elderly poor, helping to make them happy and caring for them with respect or dignity until death. Failure to do so is one of the relatively few explicit grounds for staff dismissal.

22.   The Little Sisters have also taken a vow of obedience to God, which assumes obedience to the Pope. We carefully follow all of his guidance, and obey all the decisions of the Church. Thus, we develop all of our programs, policies, and procedures in accord with the teachings of the Catholic Church, including its ethical teachings on the inviolable dignity of every human life.

23.   These teachings include Catholic religious teachings about abortion, contraception, sterilization, and cooperation with acts that are intrinsically immoral.

24.   Authoritative Catholic teachings are located in sacred Scripture and sacred tradition, and are set forth and specified in the Catechism of the Catholic Church, documents of ecumenical councils (such as the Second Vatican Council), papal encyclicals, directives issued by bishops' conferences, and other teaching documents

4

of the Church. *See generally* Catechism of the Catholic Church Nos. 888-892 (describing the teaching office of the Church); *Dei Verbum* No. 10 (describing how "[s]acred tradition and Sacred Scripture form one sacred deposit of the word of God, committed to the Church").

25.   Sections 2270 and 2271 of the Catechism of the Catholic Church (1994) affirm that life begins at conception, that directly intending to take innocent human life is gravely immoral.   Thus a post-conception contraceptive is an abortifacient and "gravely contrary to moral law."  *See also* section 2274 ("Since it must be treated from conception as a person, the embryo must be defended in its integrity, cared for, and healed, as far as possible, like any other human being.")

26.   The Catholic Church also teaches that contraception and sterilization are intrinsic evils.  *Id.* at Section 2370.

27.   The Church teaches that programs of "economic assistance aimed at financing campaigns of sterilization and contraception" are "affronts to the dignity of the person and the family." *See* Section 234 of the Compendium of the Social Doctrine of the Church (2004).

28.   In a landmark encyclical, Blessed Pope John Paul II made clear that Catholics may never "encourage" the use of "contraception, sterilization, and abortion[.]" *See* Section 91 of *Evangelium Vitae* (1995).

29.   Similarly, the United States Conference of Catholic Bishops ("USCCB") has issued a series of directives to inform the provision of health services in every U.S. Catholic health institution. These directives prohibit providing, promoting,

condoning, or participating in the provision of abortions, abortion-inducing drugs, contraceptives, and sterilization. Exhibit A, USCCB Directives for Catholic Health Care Services at Nos. 45, 52, & 53.

30.   The directives specifically warn against partnering with other entities in a manner that could involve Catholic health care services in the provision of such "intrinsically immoral" services. *Id.* at Nos. 67-72.

31.   Rather, the USCCB Directives instruct us to "distinguish [ourselves] by service to and advocacy for" people who are "at the margins of society" and "particularly vulnerable to discrimination," such as "the poor, the uninsured and underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees." *Id.* at No. 3.

32.   The Little Sisters are particularly concerned about the possibility that our conduct may lead others to do evil, or think that the Little Sisters condone evil. *See* Catechism No. 2284, 86 (instructing Catholic institutions to avoid "scandal" and defining "scandal" as "an attitude or behavior which leads another to do evil"; scandal can be caused "by laws or institutions"). The Little Sisters beg for funds and goods at Catholic parishes and elsewhere to support our ministry. Thus, participating in the provision of health benefits that violate Catholic teaching poses a grave risk for the Little Sisters as they interact with Catholic faithful and others who share our beliefs.

33.   Catholic teaching also instructs us to provide our employees and their families adequate health benefits.  "In return for their labor, workers have a right to

6

wages and other benefits sufficient to sustain life in dignity." *Economic Justice For All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* ¶ 103, http://www.usccb.org/upload/economic_justice_for_all.pdf ("The dignity of workers also requires adequate health care").

34.   These religious teachings binding on how the Little Sisters carry out our religious ministry of caring for the elderly poor. We believe that the health plans that each home offers should be consistent with Catholic teaching.

**IV. The Impact of the Mandate on the Little Sisters**

35.   The HHS contraceptive mandate (the "Mandate") requires the Little Sisters to participate in the provision of contraception, abortion, and sterilization to our employees via the use of our health plans, health plan information, and health plan infrastructure. If we do not comply with the Mandate, we face massive penalties, which places enormous pressure on the Little Sisters to violate our religious beliefs.

36.   Our vow of hospitality, which asks us to treat each person in our care as if he or she were Christ himself, commits us just as much to respecting the dignity of human life at its beginning as at its end. We can no more participate in the provision of contraception, abortion, and sterilization than we could participate in the provision of euthanasia or assisted suicide.

37.   Because of the religious beliefs set forth above, the Little Sisters cannot:

  a.   participate in the Mandate's program to promote and facilitate access to the use of sterilization, contraceptives, and abortion-inducing drugs and devices,

7

b.  provide health benefits to our employees and plan beneficiaries that will include or facilitate access to sterilization, contraception, and abortion-inducing drugs and devices,

c.  designate, authorize, or incentivize any third party to provide our employees or plan beneficiaries with access to sterilization, contraception, and abortion-inducing drugs and devices,

d.  sign, execute, deliver, or otherwise file documents with a third party or with the government which could then be used to require, authorize, or incentivize that third party to provide our employees with access to sterilization, contraception, and abortion-inducing drugs;

e.  agree to refrain from speaking with a third party to ask or instruct it not to deliver contraceptives, sterilization, and abortifacients to Little Sisters' employees and plan beneficiaries in connection with Little Sisters' health plans;

f.  create or facilitate a provider-insured relationship (between the Little Sisters and Christian Brothers Services or any other third-party administrators), the sole purpose of which would be to provide contraceptives, sterilization, and abortifacients in connection with the Little Sisters' health plans;

g.  create, maintain, support, and facilitate health insurance plans, information, and infrastructure that is used to provide contraceptives,

8

sterilization, and abortifacents to Little Sisters' employees and plan

beneficiaries;

h.  take any action that would require, authorize, or incentivize Christian

Brothers Trust or Christian Brothers Services to violate their own

Catholic religious beliefs.

38.  Obeying the Mandate's requirement to participate in the provision of abortion-inducing drugs would violate our public witness to the respect for life and human dignity that we are committed to displaying at all times through our vow of hospitality and our fidelity to Church teaching. It would similarly violate our duty to "advoca[te] for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable," such as "the unborn." Exhibit A, USCCB Directives, at No. 3.

39.  The Little Sisters believe that our ministry and all of our resources— including our health insurance plans and the efforts we make to maintain those plans—are gifts from God that we must use to God's glory and for the good of all, to help bear the burdens and sufferings of others. We cannot allow those gifts to be co-opted to serve ends that we believe dishonor God and the dignity of the human person.

40.  The Mandate threatens the Little Sisters with large fines and penalties if we continue to act in accordance with our religious beliefs.

41.  For example, if we continue our practice of providing health benefits to our employees and their families without including or facilitating free access to sterilization, contraception, and abortion-inducing drugs and devices, we will face

9

fines of "$100 for each day in the noncompliance period with respect to each individual to whom such failure relates." 26 U.S.C. § 4980D(b)(1).

42.   Depending on how the I.R.S. applied this penalty, the Little Sisters homes could face tens of millions of dollars of fines *each year* for our inability to facilitate the required coverage.

43.   Little Sisters Pittsburgh currently employs about 67 full-time employees.  If the I.R.S. levies the fine on a per-full-time-employee basis, we would be facing daily fines of $6,700 and annual fines of $2,445,500. If the I.R.S. levies the fine on the basis of total number of employees and dependents receiving benefits, the fines would be orders of magnitude larger.

44.   The entire annual budget for Little Sisters Pittsburgh, which currently provides care for about 95 needy elderly individuals, is about $8 million.

45.   Nor can we avoid these fines by choosing not to provide health benefits at all. Cutting off all benefits for our employees would be unconscionable.  We love and respect our employees and are dedicated to providing adequate health benefits.

46.   Cutting off all employee benefits would also have a severe negative impact on our employees and their families, and on our ability to hire and retain qualified medical staff and other employees. Benefits plans are an important reason that many employees make choices about which jobs to pursue, to keep, and to abandon.

47.   Even if we could cut off all benefits in good conscience and without harming our employees or our homes, we would face large government fines for doing so. For

10

example, Little Sisters Pittsburgh would face annual fines of approximately $134,000 for dropping health benefits altogether.

48.   For these reasons, the Mandate imposes enormous pressure on the Little Sisters to participate in activities prohibited by our sincerely held religious beliefs.

49.   Prior to the Mandate, we engaged in conduct motivated by our sincerely held religious beliefs: providing benefits plans that do not include sterilization, contraception, and abortion-inducing drugs and devices. The Mandate penalizes our participation in that religious exercise.

50.   The Mandate also places enormous pressure on the Little Sisters to engage in conduct contrary to our sincerely held religious beliefs. I am charged with making decisions for the Little Sisters Pittsburgh. The severe threats of fines and punishment create enormous pressure on me to violate my religious beliefs as the price of continuing our mission of helping the needy elderly.

51.   We object to the Mandate not because it makes us *use* drugs or devices against our religious beliefs, but because it forces us to participate as a necessary part of the government's scheme to provide those drugs and devices.

**The Little Sisters' Litigation Against the Mandate**

52.   The Little Sisters tried to avoid having to sue the federal government to protect our ministry. We made multiple public statements and filed a detailed public comment with the federal government to inform it of our sincere religious objection to incorporating us into its scheme. But the government refused to exempt us. Which meant that on January 1, 2014, we would start facing massive penalties.

11

53.   We filed suit on September 24, 2013, and filed a motion for preliminary injunction one month later, on October 24. *Little Sisters of the Poor v. Sebelius*, No. 13-cv-2611 (D. Colo.).

54.   Over the next four years, we would remain in constant litigation with the federal government. We twice had to go to the Supreme Court to be protected from the imposition of massive financial penalties.

55.   The first time came on December 31, 2013, when just hours before the start of the penalties we filed for and received a temporary emergency injunction from Justice Sotomayor just hours. Later in January 2014, the rest of the Supreme Court would grant an injunction pending appeal without noted dissent. *Little Sisters of the Poor v. Sebelius*, 134 S. Ct. 1022 (2014).

56.   And the second time came after the Supreme Court granted certiorari in our case, when it vacated a Tenth Circuit ruling against us, remanded the case for further consideration, and ordered that "the Government may not impose taxes or penalties" on us while the case remained pending. *Zubik v. Burwell,* 136 S. Ct. 1557 (2016).

57.   Our case has remained pending at the Tenth Circuit since that time.

**The Interim Final Rule**

58.   On May 4, 2017, President Trump invited members of the Little Sisters of the Poor to the White House for the traditional proclamation of the National Day of Prayer and the signing of an Executive Order related to religious liberty.

59.   At the signing ceremony, the President made clear that the Mandate's application to the Little Sisters had been inappropriate and illegal. The President

12

described the Mandate as an "attack[ ] against the Little Sisters of the Poor" that had put them through "a long, hard ordeal," and he listed it as an example of past "abuses" of religious liberty. *See* https://www.c-span.org/video/?428059-1/president-trump-signsreligious-liberty-executive-order (starting at 28:30).

60.  The agencies issued an Interim Final Rule on October 6, 2017. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47792 (Oct. 13, 2017). The rule explicitly referred to the Little Sisters' lawsuit and the Supreme Court decision in our case as the impetus for the regulatory change: "Consistent with the President's Executive Order and the Government's desire to resolve the pending litigation and prevent future litigation from similar plaintiffs, the Departments have concluded that it is appropriate to reexamine the exemption and accommodation scheme currently in place for the Mandate." 82 Fed. Reg. 47799; *see also id.* at 47798 (describing lawsuits and *Zubik* decision).

61.  The Interim Final Rule conceded that "requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA," and that because "requiring such compliance did not serve a compelling interest and was not the least restrictive means of serving a compelling interest, we now believe that requiring such compliance led to the violation of RFRA in many instances." *Id.* at 47800, 47806.

13

**Conclusion**

62.    Being forced into four years of litigation, including two trips to the Supreme Court, has been a difficult and burdensome experience for the Little Sisters. We do not want to alarm in any way the elderly poor whom we serve, nor their families, our employees, or our benefactors. But to protect our ability to serve them as we always have, and to avoid violating and publicly rejecting our religious beliefs, our only recourse was a lawsuit.

63.    It is deeply troubling to us that, after years of respectfully seeking recourse in federal court to be protected from the *federal* government, we are being forced to defend those same rights that are threatened by a *state* government. We had never been required to provide these objectionable services by Pennsylvania, and do not understand why Pennsylvania asks this Court to force us to provide them now. We hope a day will come when government will cease threatening our ministry in this way.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 18th day of November, 2017,

*Mother Superior Marie Vincente L.S.P.*
Mother Superior Marie Vincente

# EXHIBIT A



*Issued by USCCB, November 17, 2009*

*Copyright © 2009, United States Conference of Catholic Bishops.
All rights reserved.*

*To order a copy of this statement, please visit* www.usccbpublishing.org *and click on
"New Titles."*

# Ethical and Religious Directives for Catholic Health Care Services

## *Fifth Edition*

United States Conference of Catholic Bishops

CONTENTS

Preamble

General Introduction

Part One: The Social Responsibility of Catholic Health Care Services

Part Two: The Pastoral and Spiritual Responsibility of Catholic Health Care

Part Three: The Professional-Patient Relationship

Part Four: Issues in Care for the Beginning of Life

Part Five: Issues in Care for the Seriously Ill and Dying

Part Six: Forming New Partnerships with Health Care Organizations and Providers

Conclusion

# PREAMBLE

Health care in the United States is marked by extraordinary change. Not only is there continuing change in clinical practice due to technological advances, but the health care system in the United States is being challenged by both institutional and social factors as well. At the same time, there are a number of developments within the Catholic Church affecting the ecclesial mission of health care. Among these are significant changes in religious orders and congregations, the increased involvement of lay men and women, a heightened awareness of the Church's social role in the world, and developments in moral theology since the Second Vatican Council. A contemporary understanding of the Catholic health care ministry must take into account the new challenges presented by transitions both in the Church and in American society.

Throughout the centuries, with the aid of other sciences, a body of moral principles has emerged that expresses the Church's teaching on medical and moral matters and has proven to be pertinent and applicable to the ever-changing circumstances of health care and its delivery. In response to today's challenges, these same moral principles of Catholic teaching provide the rationale and direction for this revision of the *Ethical and Religious Directives for Catholic Health Care Services.*

These Directives presuppose our statement *Health and Health Care* published in 1981.[1] There we presented the theological principles that guide the Church's vision of health care, called for all Catholics to share in the healing mission of the Church, expressed our full commitment to the health care ministry, and offered encouragement to all those who are involved in it. Now, with American health care facing even more dramatic changes, we reaffirm the Church's commitment to health care ministry and the distinctive Catholic identity of the Church's institutional health care services.[2] The purpose of these *Ethical and Religious*

3

*Directives* then is twofold: first, to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person; second, to provide authoritative guidance on certain moral issues that face Catholic health care today.

The *Ethical and Religious Directives* are concerned primarily with institutionally based Catholic health care services. They address the sponsors, trustees, administrators, chaplains, physicians, health care personnel, and patients or residents of these institutions and services. Since they express the Church's moral teaching, these Directives also will be helpful to Catholic professionals engaged in health care services in other settings. The moral teachings that we profess here flow principally from the natural law, understood in the light of the revelation Christ has entrusted to his Church. From this source the Church has derived its understanding of the nature of the human person, of human acts, and of the goals that shape human activity.

The Directives have been refined through an extensive process of consultation with bishops, theologians, sponsors, administrators, physicians, and other health care providers. While providing standards and guidance, the Directives do not cover in detail all of the complex issues that confront Catholic health care today. Moreover, the Directives will be reviewed periodically by the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops), in the light of authoritative church teaching, in order to address new insights from theological and medical research or new requirements of public policy.

The Directives begin with a general introduction that presents a theological basis for the Catholic health care ministry. Each of the six parts that follow is divided into two sections. The first section is in expository form; it serves as an introduction and provides the context in which concrete issues can be discussed from the perspective of the Catholic faith. The second section is

4

in prescriptive form; the directives promote and protect the truths of the Catholic faith as those

truths are brought to bear on concrete issues in health care.

# GENERAL INTRODUCTION

The Church has always sought to embody our Savior's concern for the sick. The gospel accounts of Jesus' ministry draw special attention to his acts of healing: he cleansed a man with leprosy (Mt 8:1-4; Mk 1:40-42); he gave sight to two people who were blind (Mt 20:29-34; Mk 10:46-52); he enabled one who was mute to speak (Lk 11:14); he cured a woman who was hemorrhaging (Mt 9:20-22; Mk 5:25-34); and he brought a young girl back to life (Mt 9:18, 23-25; Mk 5:35-42). Indeed, the Gospels are replete with examples of how the Lord cured every kind of ailment and disease (Mt 9:35). In the account of Matthew, Jesus' mission fulfilled the prophecy of Isaiah: "He took away our infirmities and bore our diseases" (Mt 8:17; cf. Is 53:4).

Jesus' healing mission went further than caring only for physical affliction. He touched people at the deepest level of their existence; he sought their physical, mental, and spiritual healing (Jn 6:35, 11:25-27). He "came so that they might have life and have it more abundantly" (Jn 10:10).

The mystery of Christ casts light on every facet of Catholic health care: to see Christian love as the animating principle of health care; to see healing and compassion as a continuation of Christ's mission; to see suffering as a participation in the redemptive power of Christ's passion, death, and resurrection; and to see death, transformed by the resurrection, as an opportunity for a final act of communion with Christ.

For the Christian, our encounter with suffering and death can take on a positive and distinctive meaning through the redemptive power of Jesus' suffering and death. As St. Paul says, we are "always carrying about in the body the dying of Jesus, so that the life of Jesus may also be manifested in our body" (2 Cor 4:10). This truth does not lessen the pain and fear, but gives confidence and grace for bearing suffering rather than being overwhelmed by it. Catholic

health care ministry bears witness to the truth that, for those who are in Christ, suffering and death are the birth pangs of the new creation. "God himself will always be with them [as their God]. He will wipe every tear from their eyes, and there shall be no more death or mourning, wailing or pain, [for] the old order has passed away" (Rev 21:3-4).

      In faithful imitation of Jesus Christ, the Church has served the sick, suffering, and dying in various ways throughout history. The zealous service of individuals and communities has provided shelter for the traveler; infirmaries for the sick; and homes for children, adults, and the elderly.[3] In the United States, the many religious communities as well as dioceses that sponsor and staff this country's Catholic health care institutions and services have established an effective Catholic presence in health care. Modeling their efforts on the gospel parable of the Good Samaritan, these communities of women and men have exemplified authentic neighborliness to those in need (Lk 10:25-37). The Church seeks to ensure that the service offered in the past will be continued into the future.

      While many religious communities continue their commitment to the health care ministry, lay Catholics increasingly have stepped forward to collaborate in this ministry. Inspired by the example of Christ and mandated by the Second Vatican Council, lay faithful are invited to a broader and more intense field of ministries than in the past.[4] By virtue of their Baptism, lay faithful are called to participate actively in the Church's life and mission.[5] Their participation and leadership in the health care ministry, through new forms of sponsorship and governance of institutional Catholic health care, are essential for the Church to continue her ministry of healing and compassion. They are joined in the Church's health care mission by many men and women who are not Catholic.

Catholic health care expresses the healing ministry of Christ in a specific way within the local church. Here the diocesan bishop exercises responsibilities that are rooted in his office as pastor, teacher, and priest. As the center of unity in the diocese and coordinator of ministries in the local church, the diocesan bishop fosters the mission of Catholic health care in a way that promotes collaboration among health care leaders, providers, medical professionals, theologians, and other specialists. As pastor, the diocesan bishop is in a unique position to encourage the faithful to greater responsibility in the healing ministry of the Church. As teacher, the diocesan bishop ensures the moral and religious identity of the health care ministry in whatever setting it is carried out in the diocese. As priest, the diocesan bishop oversees the sacramental care of the sick. These responsibilities will require that Catholic health care providers and the diocesan bishop engage in ongoing communication on ethical and pastoral matters that require his attention.

In a time of new medical discoveries, rapid technological developments, and social change, what is new can either be an opportunity for genuine advancement in human culture, or it can lead to policies and actions that are contrary to the true dignity and vocation of the human person. In consultation with medical professionals, church leaders review these developments, judge them according to the principles of right reason and the ultimate standard of revealed truth, and offer authoritative teaching and guidance about the moral and pastoral responsibilities entailed by the Christian faith.[6] While the Church cannot furnish a ready answer to every moral dilemma, there are many questions about which she provides normative guidance and direction. In the absence of a determination by the magisterium, but never contrary to church teaching, the guidance of approved authors can offer appropriate guidance for ethical decision making.

Created in God's image and likeness, the human family shares in the dominion that Christ manifested in his healing ministry. This sharing involves a stewardship over all material creation (Gn 1:26) that should neither abuse nor squander nature's resources. Through science the human race comes to understand God's wonderful work; and through technology it must conserve, protect, and perfect nature in harmony with God's purposes. Health care professionals pursue a special vocation to share in carrying forth God's life-giving and healing work.

The dialogue between medical science and Christian faith has for its primary purpose the common good of all human persons. It presupposes that science and faith do not contradict each other. Both are grounded in respect for truth and freedom. As new knowledge and new technologies expand, each person must form a correct conscience based on the moral norms for proper health care.

PART ONE

## The Social Responsibility of Catholic Health Care Services

**Introduction**

Their embrace of Christ's healing mission has led institutionally based Catholic health care services in the United States to become an integral part of the nation's health care system. Today, this complex health care system confronts a range of economic, technological, social, and moral challenges. The response of Catholic health care institutions and services to these challenges is guided by normative principles that inform the Church's healing ministry.

First, Catholic health care ministry is rooted in a commitment to promote and defend human dignity; this is the foundation of its concern to respect the sacredness of every human life from the moment of conception until death. The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care.[7]

Second, the biblical mandate to care for the poor requires us to express this in concrete action at all levels of Catholic health care. This mandate prompts us to work to ensure that our country's health care delivery system provides adequate health care for the poor. In Catholic institutions, particular attention should be given to the health care needs of the poor, the uninsured, and the underinsured.[8]

Third, Catholic health care ministry seeks to contribute to the common good. The common good is realized when economic, political, and social conditions ensure protection for the fundamental rights of all individuals and enable all to fulfill their common purpose and reach their common goals.[9]

Fourth, Catholic health care ministry exercises responsible stewardship of available health care resources. A just health care system will be concerned both with promoting equity of care—to assure that the right of each person to basic health care is respected—and with promoting the good health of all in the community. The responsible stewardship of health care resources can be accomplished best in dialogue with people from all levels of society, in accordance with the principle of subsidiarity and with respect for the moral principles that guide institutions and persons.

Fifth, within a pluralistic society, Catholic health care services will encounter requests for medical procedures contrary to the moral teachings of the Church. Catholic health care does not offend the rights of individual conscience by refusing to provide or permit medical procedures that are judged morally wrong by the teaching authority of the Church.

**Directives**

1. A Catholic institutional health care service is a community that provides health care to those in need of it. This service must be animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church.

2. Catholic health care should be marked by a spirit of mutual respect among caregivers that disposes them to deal with those it serves and their families with the compassion of Christ, sensitive to their vulnerability at a time of special need.

3. In accord with its mission, Catholic health care should distinguish itself by service to and advocacy for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable to discrimination: the poor; the uninsured and the underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees. In particular, the person

11

with mental or physical disabilities, regardless of the cause or severity, must be treated as a unique person of incomparable worth, with the same right to life and to adequate health care as all other persons.

4. A Catholic health care institution, especially a teaching hospital, will promote medical research consistent with its mission of providing health care and with concern for the responsible stewardship of health care resources. Such medical research must adhere to Catholic moral principles.

5. Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel.

6. A Catholic health care organization should be a responsible steward of the health care resources available to it. Collaboration with other health care providers, in ways that do not compromise Catholic social and moral teaching, can be an effective means of such stewardship.[10]

7. A Catholic health care institution must treat its employees respectfully and justly. This responsibility includes: equal employment opportunities for anyone qualified for the task, irrespective of a person's race, sex, age, national origin, or disability; a workplace that promotes employee participation; a work environment that ensures employee safety and well-being; just compensation and benefits; and recognition of the rights of employees to organize and bargain collectively without prejudice to the common good.

8. Catholic health care institutions have a unique relationship to both the Church and the wider community they serve. Because of the ecclesial nature of this relationship, the relevant

12

requirements of canon law will be observed with regard to the foundation of a new Catholic health care institution; the substantial revision of the mission of an institution; and the sale, sponsorship transfer, or closure of an existing institution.

9. Employees of a Catholic health care institution must respect and uphold the religious mission of the institution and adhere to these Directives. They should maintain professional standards and promote the institution's commitment to human dignity and the common good.

PART TWO

## The Pastoral and Spiritual Responsibility of Catholic Health Care

**Introduction**

The dignity of human life flows from creation in the image of God (Gn 1:26), from redemption by Jesus Christ (Eph 1:10; 1 Tm 2:4-6), and from our common destiny to share a life with God beyond all corruption (1 Cor 15:42-57). Catholic health care has the responsibility to treat those in need in a way that respects the human dignity and eternal destiny of all. The words of Christ have provided inspiration for Catholic health care: "I was ill and you cared for me" (Mt 25:36). The care provided assists those in need to experience their own dignity and value, especially when these are obscured by the burdens of illness or the anxiety of imminent death.

Since a Catholic health care institution is a community of healing and compassion, the care offered is not limited to the treatment of a disease or bodily ailment but embraces the physical, psychological, social, and spiritual dimensions of the human person. The medical expertise offered through Catholic health care is combined with other forms of care to promote health and relieve human suffering. For this reason, Catholic health care extends to the spiritual nature of the person. "Without health of the spirit, high technology focused strictly on the body offers limited hope for healing the whole person."[11] Directed to spiritual needs that are often appreciated more deeply during times of illness, pastoral care is an integral part of Catholic health care. Pastoral care encompasses the full range of spiritual services, including a listening presence; help in dealing with powerlessness, pain, and alienation; and assistance in recognizing and responding to God's will with greater joy and peace. It should be acknowledged, of course, that technological advances in medicine have reduced the length of hospital stays dramatically. It

follows, therefore, that the pastoral care of patients, especially administration of the sacraments, will be provided more often than not at the parish level, both before and after one's hospitalization. For this reason, it is essential that there be very cordial and cooperative relationships between the personnel of pastoral care departments and the local clergy and ministers of care.

Priests, deacons, religious, and laity exercise diverse but complementary roles in this pastoral care. Since many areas of pastoral care call upon the creative response of these pastoral caregivers to the particular needs of patients or residents, the following directives address only a limited number of specific pastoral activities.

**Directives**

10. A Catholic health care organization should provide pastoral care to minister to the religious and spiritual needs of all those it serves. Pastoral care personnel—clergy, religious, and lay alike—should have appropriate professional preparation, including an understanding of these Directives.

11. Pastoral care personnel should work in close collaboration with local parishes and community clergy. Appropriate pastoral services and/or referrals should be available to all in keeping with their religious beliefs or affiliation.

12. For Catholic patients or residents, provision for the sacraments is an especially important part of Catholic health care ministry. Every effort should be made to have priests assigned to hospitals and health care institutions to celebrate the Eucharist and provide the sacraments to patients and staff.

13. Particular care should be taken to provide and to publicize opportunities for patients or residents to receive the sacrament of Penance.

15

14. Properly prepared lay Catholics can be appointed to serve as extraordinary ministers of Holy Communion, in accordance with canon law and the policies of the local diocese. They should assist pastoral care personnel—clergy, religious, and laity—by providing supportive visits, advising patients regarding the availability of priests for the sacrament of Penance, and distributing Holy Communion to the faithful who request it.

15. Responsive to a patient's desires and condition, all involved in pastoral care should facilitate the availability of priests to provide the sacrament of Anointing of the Sick, recognizing that through this sacrament Christ provides grace and support to those who are seriously ill or weakened by advanced age. Normally, the sacrament is celebrated when the sick person is fully conscious. It may be conferred upon the sick who have lost consciousness or the use of reason, if there is reason to believe that they would have asked for the sacrament while in control of their faculties.

16. All Catholics who are capable of receiving Communion should receive Viaticum when they are in danger of death, while still in full possession of their faculties.[12]

17. Except in cases of emergency (i.e., danger of death), any request for Baptism made by adults or for infants should be referred to the chaplain of the institution. Newly born infants in danger of death, including those miscarried, should be baptized if this is possible.[13] In case of emergency, if a priest or a deacon is not available, anyone can validly baptize.[14] In the case of emergency Baptism, the chaplain or the director of pastoral care is to be notified.

18. When a Catholic who has been baptized but not yet confirmed is in danger of death, any priest may confirm the person.[15]

19. A record of the conferral of Baptism or Confirmation should be sent to the parish in which the institution is located and posted in its baptism/confirmation registers.

20. Catholic discipline generally reserves the reception of the sacraments to Catholics. In accord with canon 844, §3, Catholic ministers may administer the sacraments of Eucharist, Penance, and Anointing of the Sick to members of the oriental churches that do not have full communion with the Catholic Church, or of other churches that in the judgment of the Holy See are in the same condition as the oriental churches, if such persons ask for the sacraments on their own and are properly disposed.

With regard to other Christians not in full communion with the Catholic Church, when the danger of death or other grave necessity is present, the four conditions of canon 844, §4, also must be present, namely, they cannot approach a minister of their own community; they ask for the sacraments on their own; they manifest Catholic faith in these sacraments; and they are properly disposed. The diocesan bishop has the responsibility to oversee this pastoral practice.

21. The appointment of priests and deacons to the pastoral care staff of a Catholic institution must have the explicit approval or confirmation of the local bishop in collaboration with the administration of the institution. The appointment of the director of the pastoral care staff should be made in consultation with the diocesan bishop.

22. For the sake of appropriate ecumenical and interfaith relations, a diocesan policy should be developed with regard to the appointment of non-Catholic members to the pastoral care staff of a Catholic health care institution. The director of pastoral care at a Catholic institution should be a Catholic; any exception to this norm should be approved by the diocesan bishop.

17

PART THREE

**The Professional-Patient Relationship**

**Introduction**

A person in need of health care and the professional health care provider who accepts that person as a patient enter into a relationship that requires, among other things, mutual respect, trust, honesty, and appropriate confidentiality. The resulting free exchange of information must avoid manipulation, intimidation, or condescension. Such a relationship enables the patient to disclose personal information needed for effective care and permits the health care provider to use his or her professional competence most effectively to maintain or restore the patient's health. Neither the health care professional nor the patient acts independently of the other; both participate in the healing process.

Today, a patient often receives health care from a team of providers, especially in the setting of the modern acute-care hospital. But the resulting multiplication of relationships does not alter the personal character of the interaction between health care providers and the patient. The relationship of the person seeking health care and the professionals providing that care is an important part of the foundation on which diagnosis and care are provided. Diagnosis and care, therefore, entail a series of decisions with ethical as well as medical dimensions. The health care professional has the knowledge and experience to pursue the goals of healing, the maintenance of health, and the compassionate care of the dying, taking into account the patient's convictions and spiritual needs, and the moral responsibilities of all concerned. The person in need of health care depends on the skill of the health care provider to assist in preserving life and promoting

18

health of body, mind, and spirit. The patient, in turn, has a responsibility to use these physical and mental resources in the service of moral and spiritual goals to the best of his or her ability.

When the health care professional and the patient use institutional Catholic health care, they also accept its public commitment to the Church's understanding of and witness to the dignity of the human person. The Church's moral teaching on health care nurtures a truly interpersonal professional-patient relationship. This professional-patient relationship is never separated, then, from the Catholic identity of the health care institution. The faith that inspires Catholic health care guides medical decisions in ways that fully respect the dignity of the person and the relationship with the health care professional.

**Directives**

23. The inherent dignity of the human person must be respected and protected regardless of the nature of the person's health problem or social status. The respect for human dignity extends to all persons who are served by Catholic health care.

24. In compliance with federal law, a Catholic health care institution will make available to patients information about their rights, under the laws of their state, to make an advance directive for their medical treatment. The institution, however, will not honor an advance directive that is contrary to Catholic teaching. If the advance directive conflicts with Catholic teaching, an explanation should be provided as to why the directive cannot be honored.

25. Each person may identify in advance a representative to make health care decisions as his or her surrogate in the event that the person loses the capacity to make health care decisions. Decisions by the designated surrogate should be faithful to Catholic moral principles and to the person's intentions and values, or if the person's intentions are unknown, to the person's best interests. In the event that an advance directive is not executed, those who are in a position to

19

know best the patient's wishes—usually family members and loved ones—should participate in the treatment decisions for the person who has lost the capacity to make health care decisions.

26. The free and informed consent of the person or the person's surrogate is required for medical treatments and procedures, except in an emergency situation when consent cannot be obtained and there is no indication that the patient would refuse consent to the treatment.

27. Free and informed consent requires that the person or the person's surrogate receive all reasonable information about the essential nature of the proposed treatment and its benefits; its risks, side-effects, consequences, and cost; and any reasonable and morally legitimate alternatives, including no treatment at all.

28. Each person or the person's surrogate should have access to medical and moral information and counseling so as to be able to form his or her conscience. The free and informed health care decision of the person or the person's surrogate is to be followed so long as it does not contradict Catholic principles.

29. All persons served by Catholic health care have the right and duty to protect and preserve their bodily and functional integrity.[16] The functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available.[17]

30. The transplantation of organs from living donors is morally permissible when such a donation will not sacrifice or seriously impair any essential bodily function and the anticipated benefit to the recipient is proportionate to the harm done to the donor. Furthermore, the freedom of the prospective donor must be respected, and economic advantages should not accrue to the donor.

20

31. No one should be the subject of medical or genetic experimentation, even if it is therapeutic, unless the person or surrogate first has given free and informed consent. In instances of nontherapeutic experimentation, the surrogate can give this consent only if the experiment entails no significant risk to the person's well-being. Moreover, the greater the person's incompetency and vulnerability, the greater the reasons must be to perform any medical experimentation, especially nontherapeutic.

32. While every person is obliged to use ordinary means to preserve his or her health, no person should be obliged to submit to a health care procedure that the person has judged, with a free and informed conscience, not to provide a reasonable hope of benefit without imposing excessive risks and burdens on the patient or excessive expense to family or community.[18]

33. The well-being of the whole person must be taken into account in deciding about any therapeutic intervention or use of technology. Therapeutic procedures that are likely to cause harm or undesirable side-effects can be justified only by a proportionate benefit to the patient.

34. Health care providers are to respect each person's privacy and confidentiality regarding information related to the person's diagnosis, treatment, and care.

35. Health care professionals should be educated to recognize the symptoms of abuse and violence and are obliged to report cases of abuse to the proper authorities in accordance with local statutes.

36. Compassionate and understanding care should be given to a person who is the victim of sexual assault. Health care providers should cooperate with law enforcement officials and offer the person psychological and spiritual support as well as accurate medical information. A female who has been raped should be able to defend herself against a potential conception from the sexual assault. If, after appropriate testing, there is no evidence that conception has occurred

21

already, she may be treated with medications that would prevent ovulation, sperm capacitation, or fertilization. It is not permissible, however, to initiate or to recommend treatments that have as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum.[19]

37. An ethics committee or some alternate form of ethical consultation should be available to assist by advising on particular ethical situations, by offering educational opportunities, and by reviewing and recommending policies. To these ends, there should be appropriate standards for medical ethical consultation within a particular diocese that will respect the diocesan bishop's pastoral responsibility as well as assist members of ethics committees to be familiar with Catholic medical ethics and, in particular, these Directives.

PART FOUR

**Issues in Care for the Beginning of Life**

**Introduction**

The Church's commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning, and with the dignity of marriage and of the marriage act by which human life is transmitted. The Church cannot approve medical practices that undermine the biological, psychological, and moral bonds on which the strength of marriage and the family depends.

Catholic health care ministry witnesses to the sanctity of life "from the moment of conception until death."[20] The Church's defense of life encompasses the unborn and the care of women and their children during and after pregnancy. The Church's commitment to life is seen in its willingness to collaborate with others to alleviate the causes of the high infant mortality rate and to provide adequate health care to mothers and their children before and after birth.

The Church has the deepest respect for the family, for the marriage covenant, and for the love that binds a married couple together. This includes respect for the marriage act by which husband and wife express their love and cooperate with God in the creation of a new human being. The Second Vatican Council affirms:

> This love is an eminently human one. . . . It involves the good of the whole
>
> person. . . . The actions within marriage by which the couple are united intimately
>
> and chastely are noble and worthy ones. Expressed in a manner which is truly

23

human, these actions signify and promote that mutual self-giving by which

spouses enrich each other with a joyful and a thankful will.[21]

Marriage and conjugal love are by their nature ordained toward the begetting and

educating of children. Children are really the supreme gift of marriage and

contribute very substantially to the welfare of their parents. . . . Parents should

regard as their proper mission the task of transmitting human life and educating

those to whom it has been transmitted. . . . They are thereby cooperators with the

love of God the Creator, and are, so to speak, the interpreters of that love.[22]

For legitimate reasons of responsible parenthood, married couples may limit the number

of their children by natural means. The Church cannot approve contraceptive interventions that

"either in anticipation of the marital act, or in its accomplishment or in the development of its

natural consequences, have the purpose, whether as an end or a means, to render procreation

impossible."[23] Such interventions violate "the inseparable connection, willed by God . . .

between the two meanings of the conjugal act: the unitive and procreative meaning."[24]

With the advance of the biological and medical sciences, society has at its disposal new

technologies for responding to the problem of infertility. While we rejoice in the potential for

good inherent in many of these technologies, we cannot assume that what is technically possible

is always morally right. Reproductive technologies that substitute for the marriage act are not

consistent with human dignity. Just as the marriage act is joined naturally to procreation, so

procreation is joined naturally to the marriage act. As Pope John XXIII observed:

The transmission of human life is entrusted by nature to a personal and conscious

act and as such is subject to all the holy laws of God: the immutable and

24

inviolable laws which must be recognized and observed. For this reason, one cannot use means and follow methods which could be licit in the transmission of the life of plants and animals.[25]

Because the moral law is rooted in the whole of human nature, human persons, through intelligent reflection on their own spiritual destiny, can discover and cooperate in the plan of the Creator.[26]

**Directives**

38. When the marital act of sexual intercourse is not able to attain its procreative purpose, assistance that does not separate the unitive and procreative ends of the act, and does not substitute for the marital act itself, may be used to help married couples conceive.[27]

39. Those techniques of assisted conception that respect the unitive and procreative meanings of sexual intercourse and do not involve the destruction of human embryos, or their deliberate generation in such numbers that it is clearly envisaged that all cannot implant and some are simply being used to maximize the chances of others implanting, may be used as therapies for infertility.

40. Heterologous fertilization (that is, any technique used to achieve conception by the use of gametes coming from at least one donor other than the spouses) is prohibited because it is contrary to the covenant of marriage, the unity of the spouses, and the dignity proper to parents and the child.[28]

41. Homologous artificial fertilization (that is, any technique used to achieve conception using the gametes of the two spouses joined in marriage) is prohibited when it separates procreation from the marital act in its unitive significance (e.g., any technique used to achieve extracorporeal conception).[29]

42. Because of the dignity of the child and of marriage, and because of the uniqueness of the mother-child relationship, participation in contracts or arrangements for surrogate motherhood is not permitted. Moreover, the commercialization of such surrogacy denigrates the dignity of women, especially the poor.[30]

43. A Catholic health care institution that provides treatment for infertility should offer not only technical assistance to infertile couples but also should help couples pursue other solutions (e.g., counseling, adoption).

44. A Catholic health care institution should provide prenatal, obstetric, and postnatal services for mothers and their children in a manner consonant with its mission.

45. Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo. Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation. In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers.

46. Catholic health care providers should be ready to offer compassionate physical, psychological, moral, and spiritual care to those persons who have suffered from the trauma of abortion.

47. Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

26

48. In case of extrauterine pregnancy, no intervention is morally licit which constitutes a direct abortion.[31]

49. For a proportionate reason, labor may be induced after the fetus is viable.

50. Prenatal diagnosis is permitted when the procedure does not threaten the life or physical integrity of the unborn child or the mother and does not subject them to disproportionate risks; when the diagnosis can provide information to guide preventative care for the mother or pre- or postnatal care for the child; and when the parents, or at least the mother, give free and informed consent. Prenatal diagnosis is not permitted when undertaken with the intention of aborting an unborn child with a serious defect.[32]

51. Nontherapeutic experiments on a living embryo or fetus are not permitted, even with the consent of the parents. Therapeutic experiments are permitted for a proportionate reason with the free and informed consent of the parents or, if the father cannot be contacted, at least of the mother. Medical research that will not harm the life or physical integrity of an unborn child is permitted with parental consent.[33]

52. Catholic health institutions may not promote or condone contraceptive practices but should provide, for married couples and the medical staff who counsel them, instruction both about the Church's teaching on responsible parenthood and in methods of natural family planning.

53. Direct sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available.[34]

27

54. Genetic counseling may be provided in order to promote responsible parenthood and to prepare for the proper treatment and care of children with genetic defects, in accordance with Catholic moral teaching and the intrinsic rights and obligations of married couples regarding the transmission of life.

PART FIVE

## Issues in Care for the Seriously Ill and Dying

**Introduction**

Christ's redemption and saving grace embrace the whole person, especially in his or her illness, suffering, and death.[35] The Catholic health care ministry faces the reality of death with the confidence of faith. In the face of death—for many, a time when hope seems lost—the Church witnesses to her belief that God has created each person for eternal life.[36]

Above all, as a witness to its faith, a Catholic health care institution will be a community of respect, love, and support to patients or residents and their families as they face the reality of death. What is hardest to face is the process of dying itself, especially the dependency, the helplessness, and the pain that so often accompany terminal illness. One of the primary purposes of medicine in caring for the dying is the relief of pain and the suffering caused by it. Effective management of pain in all its forms is critical in the appropriate care of the dying.

The truth that life is a precious gift from God has profound implications for the question of stewardship over human life. We are not the owners of our lives and, hence, do not have absolute power over life. We have a duty to preserve our life and to use it for the glory of God, but the duty to preserve life is not absolute, for we may reject life-prolonging procedures that are insufficiently beneficial or excessively burdensome. Suicide and euthanasia are never morally acceptable options.

The task of medicine is to care even when it cannot cure. Physicians and their patients must evaluate the use of the technology at their disposal. Reflection on the innate dignity of human life in all its dimensions and on the purpose of medical care is indispensable for

formulating a true moral judgment about the use of technology to maintain life. The use of life-sustaining technology is judged in light of the Christian meaning of life, suffering, and death. In this way two extremes are avoided: on the one hand, an insistence on useless or burdensome technology even when a patient may legitimately wish to forgo it and, on the other hand, the withdrawal of technology with the intention of causing death.[37]

The Church's teaching authority has addressed the moral issues concerning medically assisted nutrition and hydration. We are guided on this issue by Catholic teaching against euthanasia, which is "an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated."[38] While medically assisted nutrition and hydration are not morally obligatory in certain cases, these forms of basic care should in principle be provided to all patients who need them, including patients diagnosed as being in a "persistent vegetative state" (PVS), because even the most severely debilitated and helpless patient retains the full dignity of a human person and must receive ordinary and proportionate care.

**Directives**

55. Catholic health care institutions offering care to persons in danger of death from illness, accident, advanced age, or similar condition should provide them with appropriate opportunities to prepare for death. Persons in danger of death should be provided with whatever information is necessary to help them understand their condition and have the opportunity to discuss their condition with their family members and care providers. They should also be offered the appropriate medical information that would make it possible to address the morally legitimate choices available to them. They should be provided the spiritual support as well as the opportunity to receive the sacraments in order to prepare well for death.

30

56. A person has a moral obligation to use ordinary or proportionate means of preserving his or her life. Proportionate means are those that in the judgment of the patient offer a reasonable hope of benefit and do not entail an excessive burden or impose excessive expense on the family or the community.[39]

57.     A person may forgo extraordinary or disproportionate means of preserving life. Disproportionate means are those that in the patient's judgment do not offer a reasonable hope of benefit or entail an excessive burden, or impose excessive expense on the family or the community.

58.     In principle, there is an obligation to provide patients with food and water, including medically assisted nutrition and hydration for those who cannot take food orally. This obligation extends to patients in chronic and presumably irreversible conditions (e.g., the "persistent vegetative state") who can reasonably be expected to live indefinitely if given such care.[40] Medically assisted nutrition and hydration become morally optional when they cannot reasonably be expected to prolong life or when they would be "excessively burdensome for the patient or [would] cause significant physical discomfort, for example resulting from complications in the use of the means employed."[41] For instance, as a patient draws close to inevitable death from an underlying progressive and fatal condition, certain measures to provide nutrition and hydration may become excessively burdensome and therefore not obligatory in light of their very limited ability to prolong life or provide comfort.

59.     The free and informed judgment made by a competent adult patient concerning the use or withdrawal of life-sustaining procedures should always be respected and normally complied with, unless it is contrary to Catholic moral teaching.

60.     Euthanasia is an action or omission that of itself or by intention causes death in order to alleviate suffering. Catholic health care institutions may never condone or participate in euthanasia or assisted suicide in any way. Dying patients who request euthanasia should receive loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death.[42]

61. Patients should be kept as free of pain as possible so that they may die comfortably and with dignity, and in the place where they wish to die. Since a person has the right to prepare for his or her death while fully conscious, he or she should not be deprived of consciousness without a compelling reason. Medicines capable of alleviating or suppressing pain may be given to a dying person, even if this therapy may indirectly shorten the person's life so long as the intent is not to hasten death. Patients experiencing suffering that cannot be alleviated should be helped to appreciate the Christian understanding of redemptive suffering.

62. The determination of death should be made by the physician or competent medical authority in accordance with responsible and commonly accepted scientific criteria.

63. Catholic health care institutions should encourage and provide the means whereby those who wish to do so may arrange for the donation of their organs and bodily tissue, for ethically legitimate purposes, so that they may be used for donation and research after death.

64. Such organs should not be removed until it has been medically determined that the patient has died. In order to prevent any conflict of interest, the physician who determines death should not be a member of the transplant team.

65. The use of tissue or organs from an infant may be permitted after death has been determined and with the informed consent of the parents or guardians.

32

66. Catholic health care institutions should not make use of human tissue obtained by direct abortions even for research and therapeutic purposes.[43]

PART SIX

**Forming New Partnerships with Health Care Organizations and Providers**

**Introduction**

Until recently, most health care providers enjoyed a degree of independence from one another. In ever-increasing ways, Catholic health care providers have become involved with other health care organizations and providers. For instance, many Catholic health care systems and institutions share in the joint purchase of technology and services with other local facilities or physicians' groups. Another phenomenon is the growing number of Catholic health care systems and institutions joining or co-sponsoring integrated delivery networks or managed care organizations in order to contract with insurers and other health care payers. In some instances, Catholic health care systems sponsor a health care plan or health maintenance organization. In many dioceses, new partnerships will result in a decrease in the number of health care providers, at times leaving the Catholic institution as the sole provider of health care services. At whatever level, new partnerships forge a variety of interwoven relationships: between the various institutional partners, between health care providers and the community, between physicians and health care services, and between health care services and payers.

On the one hand, new partnerships can be viewed as opportunities for Catholic health care institutions and services to witness to their religious and ethical commitments and so influence the healing profession. For example, new partnerships can help to implement the Church's social teaching. New partnerships can be opportunities to realign the local delivery system in order to provide a continuum of health care to the community; they can witness to a

34

responsible stewardship of limited health care resources; and they can be opportunities to provide to poor and vulnerable persons a more equitable access to basic care.

On the other hand, new partnerships can pose serious challenges to the viability of the identity of Catholic health care institutions and services, and their ability to implement these Directives in a consistent way, especially when partnerships are formed with those who do not share Catholic moral principles. The risk of scandal cannot be underestimated when partnerships are not built upon common values and moral principles. Partnership opportunities for some Catholic health care providers may even threaten the continued existence of other Catholic institutions and services, particularly when partnerships are driven by financial considerations alone. Because of the potential dangers involved in the new partnerships that are emerging, an increased collaboration among Catholic-sponsored health care institutions is essential and should be sought before other forms of partnerships.

The significant challenges that new partnerships may pose, however, do not necessarily preclude their possibility on moral grounds. The potential dangers require that new partnerships undergo systematic and objective moral analysis, which takes into account the various factors that often pressure institutions and services into new partnerships that can diminish the autonomy and ministry of the Catholic partner. The following directives are offered to assist institutionally based Catholic health care services in this process of analysis. To this end, the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops) has established the Ad Hoc Committee on Health Care Issues and the Church as a resource for bishops and health care leaders.

This new edition of the *Ethical and Religious Directives* omits the appendix concerning cooperation, which was contained in the 1995 edition. Experience has shown that the brief

articulation of the principles of cooperation that was presented there did not sufficiently forestall certain possible misinterpretations and in practice gave rise to problems in concrete applications of the principles. Reliable theological experts should be consulted in interpreting and applying the principles governing cooperation, with the proviso that, as a rule, Catholic partners should avoid entering into partnerships that would involve them in cooperation with the wrongdoing of other providers.

**Directives**

67. Decisions that may lead to serious consequences for the identity or reputation of Catholic health care services, or entail the high risk of scandal, should be made in consultation with the diocesan bishop or his health care liaison.

68. Any partnership that will affect the mission or religious and ethical identity of Catholic health care institutional services must respect church teaching and discipline. Diocesan bishops and other church authorities should be involved as such partnerships are developed, and the diocesan bishop should give the appropriate authorization before they are completed. The diocesan bishop's approval is required for partnerships sponsored by institutions subject to his governing authority; for partnerships sponsored by religious institutes of pontifical right, his *nihil obstat* should be obtained.

69. If a Catholic health care organization is considering entering into an arrangement with another organization that may be involved in activities judged morally wrong by the Church, participation in such activities must be limited to what is in accord with the moral principles governing cooperation.

70. Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization.[44]

71. The possibility of scandal must be considered when applying the principles governing cooperation.[45] Cooperation, which in all other respects is morally licit, may need to be refused because of the scandal that might be caused. Scandal can sometimes be avoided by an appropriate explanation of what is in fact being done at the health care facility under Catholic auspices. The diocesan bishop has final responsibility for assessing and addressing issues of scandal, considering not only the circumstances in his local diocese but also the regional and national implications of his decision.[46]

72. The Catholic partner in an arrangement has the responsibility periodically to assess whether the binding agreement is being observed and implemented in a way that is consistent with Catholic teaching.

CONCLUSION

Sickness speaks to us of our limitations and human frailty. It can take the form of infirmity resulting from the simple passing of years or injury from the exuberance of youthful energy. It can be temporary or chronic, debilitating, and even terminal. Yet the follower of Jesus faces illness and the consequences of the human condition aware that our Lord always shows compassion toward the infirm.

Jesus not only taught his disciples to be compassionate, but he also told them who should be the special object of their compassion. The parable of the feast with its humble guests was preceded by the instruction: "When you hold a banquet, invite the poor, the crippled, the lame, the blind" (Lk 14:13). These were people whom Jesus healed and loved.

Catholic health care is a response to the challenge of Jesus to go and do likewise. Catholic health care services rejoice in the challenge to be Christ's healing compassion in the world and see their ministry not only as an effort to restore and preserve health but also as a spiritual service and a sign of that final healing that will one day bring about the new creation that is the ultimate fruit of Jesus' ministry and God's love for us.

38

# Notes

1. United States Conference of Catholic Bishops, *Health and Health Care: A Pastoral Letter of the American Catholic Bishops* (Washington, DC: United States Conference of Catholic Bishops, 1981).

2. Health care services under Catholic auspices are carried out in a variety of institutional settings (e.g., hospitals, clinics, outpatient facilities, urgent care centers, hospices, nursing homes, and parishes). Depending on the context, these Directives will employ the terms "institution" and/or "services" in order to encompass the variety of settings in which Catholic health care is provided.

3. *Health and Health Care,* p. 5.

4. Second Vatican Ecumenical Council, *Decree on the Apostolate of the Laity* (*Apostolicam Actuositatem*) (1965), no. 1.

5. Pope John Paul II, Post-Synodal Apostolic Exhortation *On the Vocation and the Mission of the Lay Faithful in the Church and in the World* (*Christifideles Laici*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 29.

6. As examples, see Congregation for the Doctrine of the Faith, *Declaration on Procured Abortion* (1974); Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* (1980); Congregation for the Doctrine of the Faith, *Instruction on Respect for Human Life in Its Origin and on the Dignity of Procreation: Replies to Certain Questions of the Day* (*Donum Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1987).

7. Pope John XXIII, Encyclical Letter *Peace on Earth* (*Pacem in Terris*) (Washington, DC: United States Conference of Catholic Bishops, 1963), no. 11; *Health and Health Care,* pp. 5, 17-18; *Catechism of the Catholic Church,* 2nd ed. (Washington, DC: Libreria Editrice Vaticana– United States Conference of Catholic Bishops, 2000), no. 2211.

8. Pope John Paul II, *On Social Concern, Encyclical Letter on the Occasion of the Twentieth Anniversary of "Populorum Progressio"* (*Sollicitudo Rei Socialis*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

9. United States Conference of Catholic Bishops, *Economic Justice for All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* (Washington, DC: United States Conference of Catholic Bishops, 1986), no. 80.

10. The duty of responsible stewardship demands responsible collaboration. But in collaborative efforts, Catholic institutionally based health care services must be attentive to occasions when the policies and practices of other institutions are not compatible with the Church's authoritative moral teaching. At such times, Catholic health care institutions should determine whether or to what degree collaboration would be morally permissible. To make that judgment, the governing boards of Catholic institutions should adhere to the moral principles on cooperation. See Part Six.

11. *Health and Health Care,* p. 12.

12. Cf. *Code of Canon Law,* cc. 921-923.

13. Cf. ibid., c. 867, § 2, and c. 871.

14. To confer Baptism in an emergency, one must have the proper intention (to do what the Church intends by Baptism) and pour water on the head of the person to be baptized, meanwhile pronouncing the words: "I baptize you in the name of the Father, and of the Son, and of the Holy Spirit."

15. Cf. c. 883, 3º.

16. For example, while the donation of a kidney represents loss of biological integrity, such a donation does not compromise functional integrity since human beings are capable of functioning with only one kidney.

17. Cf. directive 53.

18. *Declaration on Euthanasia,* Part IV; cf. also directives 56-57.

19. It is recommended that a sexually assaulted woman be advised of the ethical restrictions that prevent Catholic hospitals from using abortifacient procedures; cf. Pennsylvania Catholic Conference, "Guidelines for Catholic Hospitals Treating Victims of Sexual Assault," *Origins* 22 (1993): 810.

20. Pope John Paul II, "Address of October 29, 1983, to the 35th General Assembly of the World Medical Association," *Acta Apostolicae Sedis* 76 (1984): 390.

21. Second Vatican Ecumenical Council, *Pastoral Constitution on the Church in the Modern World* (*Gaudium et Spes*) (1965), no. 49.

22. Ibid., no. 50.

23. Pope Paul VI, Encyclical Letter *On the Regulation of Birth* (*Humanae Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1968), no. 14.

24. Ibid., no. 12.

40

25. Pope John XXIII, Encyclical Letter *Mater et Magistra* (1961), no. 193, quoted in Congregation for the Doctrine of the Faith, *Donum Vitae,* no. 4.

26. Pope John Paul II, Encyclical Letter *The Splendor of Truth* (*Veritatis Splendor*) (Washington, DC: United States Conference of Catholic Bishops, 1993), no. 50.

27. "Homologous artificial insemination within marriage cannot be admitted except for those cases in which the technical means is not a substitute for the conjugal act but serves to facilitate and to help so that the act attains its natural purpose" (*Donum Vitae,* Part II, B, no. 6; cf. also Part I, nos. 1, 6).

28. Ibid., Part II, A, no. 2.

29. "Artificial insemination as a substitute for the conjugal act is prohibited by reason of the voluntarily achieved dissociation of the two meanings of the conjugal act. Masturbation, through which the sperm is normally obtained, is another sign of this dissociation: even when it is done for the purpose of procreation, the act remains deprived of its unitive meaning: 'It lacks the sexual relationship called for by the moral order, namely, the relationship which realizes "the full sense of mutual self-giving and human procreation in the context of true love"'" (*Donum Vitae,* Part II, B, no. 6).

30. Ibid., Part II, A, no. 3.

31. Cf. directive 45.

32. *Donum Vitae,* Part I, no. 2.

33. Cf. ibid., no. 4. (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

34. Cf. Congregation for the Doctrine of the Faith, "Responses on Uterine Isolation and Related Matters," July 31, 1993, *Origins* 24 (1994): 211-212.

35. Pope John Paul II, Apostolic Letter *On the Christian Meaning of Human Suffering* (*Salvifici Doloris*) (Washington, DC: United States Conference of Catholic Bishops, 1984), nos. 25-27.

36. United States Conference of Catholic Bishops, *Order of Christian Funerals* (Collegeville, Minn.: The Liturgical Press, 1989), no. 1.

37. See *Declaration on Euthanasia.*

38. Ibid., Part II.

39. Ibid., Part IV; Pope John Paul II, Encyclical Letter *On the Value and Inviolability of Human Life* (*Evangelium Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1995), no. 65.

41

40. See Pope John Paul II, Address to the Participants in the International Congress on "Life-Sustaining Treatments and Vegetative State: Scientific Advances and Ethical Dilemmas" (March 20, 2004), no. 4, where he emphasized that "the administration of water and food, even when provided by artificial means, always represents a *natural means* of preserving life, not a *medical act*." See also Congregation for the Doctrine of the Faith, "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration" (August 1, 2007).

41. Congregation for the Doctrine of the Faith, Commentary on "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration."

42. See *Declaration on Euthanasia*, Part IV.

43. *Donum Vitae,* Part I, no. 4.

44. While there are many acts of varying moral gravity that can be identified as intrinsically evil, in the context of contemporary health care the most pressing concerns are currently abortion, euthanasia, assisted suicide, and direct sterilization. See Pope John Paul II's *Ad Limina* Address to the bishops of Texas, Oklahoma, and Arkansas (Region X), in *Origins* 28 (1998): 283. See also "Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" (*Quaecumqu Sterilizatio*), March 13, 1975, *Origins* 6 (1976): 33-35: "Any cooperation institutionally approved or tolerated in actions which are in themselves, that is, by their nature and condition, directed to a contraceptive end . . . is absolutely forbidden. For the official approbation of direct sterilization and, *a fortiori*, its management and execution in accord with hospital regulations, is a matter which, in the objective order, is by its very nature (or intrinsically) evil." This directive supersedes the "Commentary on the Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" published by the National Conference of Catholic Bishops on September 15, 1977, in *Origins* 7 (1977): 399-400.

45. See *Catechism of the Catholic Church*: "Scandal is an attitude or behavior which leads another to do evil" (no. 2284); "Anyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged" (no. 2287).

46. See "The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry," *Origins* 26 (1997): 703.

This fifth edition of the *Ethical and Religious Directives for Catholic Health Care Services* was developed by the Committee on Doctrine of the United States Conference of Catholic Bishops (USCCB) and approved as the national code by the full body of the USCCB at its November 2009 General Meeting. This edition of the *Directives*, which replaces all previous editions, is recommended for implementation by the diocesan bishop and is authorized for publication by the undersigned.

*Msgr. David J. Malloy, STD*
*General Secretary, USCCB*

In 2001 the National Conference of Catholic Bishops and United States Catholic Conference became the United States Conference of Catholic Bishops.

Excerpts from *The Documents of Vatican II,* ed. Walter M. Abbott, SJ, copyright © 1966 by America Press are used with permission. All rights reserved.

Scripture texts used in this work are taken from the *New American Bible,* copyright © 1991, 1986, and 1970 by the Confraternity of Christian Doctrine, Washington, D.C., 20017 and are used by permission of the copyright owner. All rights reserved.

Copyright © 2009, United States Conference of Catholic Bishops, Washington, D.C. All rights reserved. No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the copyright holder.

To obtain a catalog of USCCB titles, visit *www.usccbpublishing.org* or call toll-free 800-235-8722. In the Washington metropolitan area or from outside the United States, call 202-722-8716. Para pedidos en español, llame al 800-235-8722 y presione 4 para hablar con un representante del servicio al cliente en español.