IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | |
| Plaintiff, | |
| v. | NO. 2:17-cv-04540-WB |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

## REPLY BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

JONATHAN SCOTT GOLDMAN
Executive Deputy Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
NICOLE VAN ORDER
Senior Deputy Attorney General
NICOLE J. BOLAND
Deputy Attorney General

Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(717) 787-3391
jgoldman@attorneygeneral.gov

The Commonwealth of Pennsylvania respectfully submits this reply in support of its Motion for a Preliminary Injunction. In its Motion, the Commonwealth demonstrated that the Defendants' new Rules are illegal; they will cause irreparable injury to the Commonwealth; and the public interest strongly favors a preliminary injunction. In their Response, the Defendants claim that these broad exemptions from the ACA's Contraceptive Care Mandate are not only permissible, but *required* – while also arguing that they will have a minimal impact on the Commonwealth and its citizens. Neither assertion is correct. The Defendants gloss over the Rules' many legal problems, not least that they run directly counter to the very purpose of the statute they purport to implement. And nowhere do they confront the reality that their Rules will cause significant harm to the citizens of the Commonwealth – to their health, economic security, and ability to exercise control over their own lives – and, as a result, to the Commonwealth itself. They just bury their heads in the sand. But these harms plainly establish that the only adequate remedy for the Defendants' illegal actions is injunctive relief. Therefore, the Commonwealth's Motion should be granted.

## I.     The Commonwealth Has Standing.

The Defendants' argument that the Commonwealth lacks standing is meritless. First, as a result of the Rules, the Commonwealth will suffer direct financial harm. Women who are denied contraceptive coverage through their employers will seek other options, including Commonwealth-funded health care programs, and these programs will incur additional expenses. Also as a result of the Rules, more women will experience unintended pregnancies, and the Commonwealth will bear increased costs for these pregnancies through these same programs.[1] These allegations of direct financial harm are sufficient to establish an "injury-in-fact." *See Cottrell v. Alcon Labs.,* 874 F.3d 154, 163 (3d Cir. 2017).

---

[1] *See generally* Plaintiff's Memorandum of Law in Support of Its Motion for a Preliminary Injunction (Dkt. No. 8-2) ("Mot.") at 13-16, 37-46.

The Defendants assert that these allegations are too "speculative" to establish concrete injury. But the Commonwealth's allegations are not based on speculation – they are based on concrete facts laid out in its Motion and supporting exhibits:

- Women who lose contraceptive coverage under the Rules will seek it elsewhere, including from Commonwealth-funded programs. *See* Mot. at 14.
- Many will be eligible: Family Planning Services are available to those with incomes of up to 215% of the poverty level ($52,890 for a family of four), and Medical Assistance is available to those with incomes up to 138% of the federal poverty level ($33,948 for a family of four). *Id.* at 43.
- Others will seek coverage from Title X clinics, which get funding from the Commonwealth and have no income-based eligibility requirements at all. *Id.* at 14.
- Due to the Rules, still other women will go without contraception entirely; they will face a greater risk of unintended pregnancies as a result. See *id.* at 15. And the Commonwealth will suffer injury from additional unplanned pregnancies caused by the Rules, as "68% of unplanned births are paid for by public insurance programs." *Id.*

These allegations are more than adequate to establish an injury-in-fact.[2]

In addition to direct standing based on its own injury-in-fact, the Commonwealth may assert *parens patriae* standing based on its quasi-sovereign interest in protecting the health and well-being of its residents. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007) (discussing "special solicitude" accorded states in standing analysis). Contrary to the Defendants' claim, *Massachusetts v. Mellon,* 262 U.S. 447 (1923), does not bar the Commonwealth from asserting its quasi-sovereign interests here. Under *Mellon*, a state may not ordinarily rely on *parens patriae* standing to challenge a federal statute, *id.* at 485-86, but that case does not prevent a state from asserting such standing when the statutory rights of its citizens are threatened by an administrative agency. *See Abrams v.*

---

[2] The claim that these injuries are "self-inflicted" is meritless. These programs reflect the Commonwealth's commitment to protecting the health of its citizens and predate the Rules by years or decades. An injury "cannot be deemed 'self-inflicted' when a party faces only two options: full compliance with a challenged action or a drastic restructure of a state program." *Texas v. United States*, 86 F. Supp. 3d 591, 619 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an evenly divided Court*, 136 S. Ct. 2271 (2016). That is the case here.

*Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984).[3] Here, the Defendants have abdicated their responsibilities under the ACA, and the Commonwealth has *parens patriae* standing to challenge them.

## II. Venue Is Appropriate in this Court.

Suits against officers and agencies of the federal government may be brought in any district where "(A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred…, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Based on cases involving state *agencies* and *officers*, the Defendants claim the Commonwealth does not reside in this district. But here the plaintiff is the state itself, and "[a] state is held to reside in any district within it." 14D Wright & Miller, *Fed. Prac. & Proc.* § 3815 (4th ed. 2013) (citing *Ala. v. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1327-28 (N.D. Ala. 2005)). As that court observed, "common sense dictates that a state resides *throughout* its sovereign borders." *Id.* at 1329 (emphasis added).

Venue is also proper because "a substantial part of the events or omissions giving rise to the claim occurred" in this district. § 1391(e)(1)(B). That the Rules were drafted in Washington is irrelevant: "suits challenging official acts may be brought in the district where the effects of the challenged regulations are felt even though the regulations were enacted elsewhere." *Farmland Dairies v. McGuire*, 771 F. Supp. 80, 82 n.3 (S.D.N.Y. 1991) (interpreting earlier version of § 1391 requiring action to be brought "in the judicial district … in which the claim arose").

---

[3] *Abrams* concluded: "Here, plaintiffs do not challenge any federal statute. Rather, they rely on § 953 of the Omnibus Budget Reconciliation Act of 1980, and seek to enjoin an administrative agency from violating that statute." 582 F. Supp. at 1159; *see also City of New York v. Heckler*, 578 F. Supp. 1109, 1122 (E.D.N.Y.), *aff'd*, 742 F.2d 729 (2d Cir. 1984). On the same basis, the Supreme Court allowed Massachusetts *parens patriae* standing to sue the EPA for failing to regulate greenhouse gas emissions under the Clean Air Act, thereby harming its citizens. *See Massachusetts v. E.P.A.*, 549 U.S. at 505.

### III. The Commonwealth Will Prevail on the Merits.

#### A. The Rules Violate the APA's Procedural Requirements.

The Defendants admit they failed to follow the APA's notice-and-comment provisions, but claim an "express grant of statutory authority" to disregard them. Opp. at 23-24. Their argument was rejected in *Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 18-19 (D.D.C. 2010), a case involving the same agency and statutory authority, and it should be rejected here. *See* Mot. at 19 n.10 (discussing *Coalition for Parity*). That case recognized that, to be effective in overriding the APA's notice-and-comment requirements, any subsequent statute must supersede or modify those requirements expressly.[4] But the provisions the Defendants rely on "do not mention notice and comment or any other aspect of the APA." *Coalition for Parity*, 709 F. Supp. 2d at 18. And an agency may not disregard its APA obligations unless "Congress has established procedures so clearly different from those required by the APA that it must have intended to displace the norm." *Asiana Airlines v. FAA,* 134 F.3d 393, 397 (D.C. Cir. 1998); *see also Coalition for Parity*, 709 F. Supp. 2d at 18. Here, as in *Coalition for Parity* – and unlike the other cases on which they attempt to rely[5] – the Defendants rely on nothing more than Congress's *general* grant of authority to issue interim final rules, which is insufficient to demonstrate the congressional intent required to permit agencies to ignore the APA's procedural requirements. *See id.* at 19.

For these reasons, if the Defendants want to ignore the notice-and-comment requirements of the APA, they must demonstrate "good cause" to do so. 5 U.S.C. § 553(b)(3)(B). It is well-

---

[4] *See Coalition for Parity*, 709 F. Supp. 2d 10, 18 ("Although the APA recognizes that Congress may modify the notice and comment procedures called for by § 553, it states that a '[s]ubsequent statute may not be held to supersede or modify [§ 553] ... except to the extent that it does so expressly.' 5 U.S.C. § 559.") (alterations in original).
[5] The Defendants cite *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 393, 397-98 (D.C. Cir. 1994) and *Asiana Airlines*, 134 F.3d at 397-998, as they also did in *Coalition for Parity*. *See* Opp. at 24. That court distinguished these cases at length, finding that "[t]he statutory directives at issue in *Methodist Hospital* and *Asiana Airlines* are dissimilar from the provisions [cited by the Defendants here]" 709 F. Supp. 2d at 18-19.; Opp. at 23.

4

established that the good cause exception may not be "arbitrarily utilized at the agency's whim." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981). Rather, it "should be limited to emergency situations." *Id.* And "a half decade of litigation," Opp. at 24-25, does not constitute an emergency. The fact that the Department of Justice was required "to file mandatory status reports" in some ongoing lawsuits and might need to "prepare for oral argument on the merits" in one case, *see id.* at 25, has no bearing on whether compliance with the APA is "impracticable, unnecessary, or contrary to the public interest." *See* 5 U.S.C. § 553(b)(3)(B). The Defendants have failed to establish "good cause" to ignore the APA.[6]

Furthermore, the Defendants' admitted failure to follow the APA's notice-and-comment procedures was not, as they claim, "harmless." *See* Opp. at 28. The Defendants misconstrue the required standard. Where, as here, an "agency has entirely failed to comply with notice-and-comment requirements," parties challenging the final rule need *not* "show that they would have submitted new arguments to invalidate rules in the case of certain procedural defaults." *Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991); *see also Reynolds*, 710 F.3d at 516 (distinguishing "technical failure" cases from those involving "complete failure"). Rather, an agency's failure to comply with the APA will be found harmless only under very narrow circumstances not present here, such as "when the administrative record demonstrates that the conclusion reached in the administrative rule was the only possible conclusion." *Reynolds*, 710 F.3d at 518.[7]

---

[6] The Defendants' justifications here are not meaningfully different from those offered in *United States v. Reynolds*, 710 F.3d 498 (3d Cir. 2013) – and they should be rejected for the same reasons. The Defendants' dual assertion that the Rules provide "accelerated clarity and certainty while also affording opportunity for meaningful public input" is self-contradictory. Opp. at 25. For after-the-fact public input to be truly "meaningful," agencies must be willing to modify the Rules based on that input; but such willingness would cause any "clarity and certainty" to disappear. *See Reynolds*, 710 F.3d at 510 ("Requesting comments on the Interim Rule implicitly suggests that the rule will be reconsidered and possibly changed in light of these comments. But that means the level of uncertainty is, at best, unchanged.").

[7] Contrary to the Defendants' assertions, see Opp. at 28, neither Pennsylvania nor other interested parties was able to "comment on the scope of the exemptions and accommodations" in the Rules.

B.      **The Rules Violate the APA's Substantive Requirements.**

The Rules violate the Affordable Care Act because the Women's Health Amendment requires employers to cover, without cost-sharing requirements, all preventive services identified by the HRSA. It contains no "conscience clause" and does not otherwise allow employers to opt out of this obligation. Perhaps recognizing that the Rules cannot be squared with the plain language of the ACA, the Defendants argue that the Rules do not violate the law due to what they call "implicit statutory factors" – *i.e.*, factors that are not actually in the statute. *See* Opp. at 35. But the Defendants have identified no principle that would allow them to rely on a provision that appears in other laws but *not* in the statute they are actually seeking to implement, and there is none.

In addition, the Rules are arbitrary and capricious because they frustrate – rather than advance – the purposes of the Women's Health Amendment and the ACA. The Defendants argue that the Commonwealth "takes one statutory purpose – to increase access to preventive care – and elevates it above all others." Opp. at 33. But the Commonwealth did not "elevate" this purpose – Congress did. As the Defendants point out, "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of *legislative* choice." Opp. at 33 (quoting *Rodriguez v. United States*, 480 U.S. 522, 526 (1987)) (emphasis added). In passing the Women's Health Amendment and the ACA, Congress made clear its purpose: to promote access to women's preventive services. It chose to enact a statute requiring employers to provide coverage for preventive care for women – *without exception*. The Defendants cannot

---

The agencies have never before sought comment on such sweeping proposals. The most recent opportunity to comment before the Rules were issues was the two-month period following the agencies' post-*Zubik* Request for Information, ending on September 20, 2016. *See* 81 Fed. Reg. 81 FR 47741. And that request sought comments only on a narrow set of issues relating exclusively to the "Accommodation" process. It did not, for instance, solicit comments on whether publicly traded companies should be allowed to opt out of the mandate; whether a sweeping "moral exemption" should apply to the mandate; or whether employers should be allowed to provide only minimal notice before ending contraceptive coverage for their employees.

undermine the statute they are tasked with implementing; they cannot ignore Congress's choices to further their own, contradictory objectives, instead.[8]

### C. The Rules Violate Title VII of the Civil Rights Act.

The Defendants claim that the Rules do not violate Title VII of the Civil Rights Act because they "do not draw sex-based distinctions." Opp. 46. Since "[c]ontraceptives are used by both men and women," the Defendants argue, the rules are gender-neutral. *Id.* (citing *In re Union Pac. R.R. Employment Practices Litigation*, 479 F.3d 936, 940-42 & n.1 (8th Cir. 2007)). This is silly. While men and women may both use contraception, only *women* can become pregnant. For this reason, denying women access to contraception disproportionately harms women – and authorizing employers to refuse to provide contraception to women, but no other preventive services, is discrimination on the basis of sex. As the Commonwealth explained in its Motion, *Union Pacific* is inconsistent with the Supreme Court's admonition that discrimination on the "basis of potential for pregnancy" is impermissible sex discrimination. Mot. at 31 n.18. *See Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1269 (W.D. Wash. 2001).

### D. The Rules Violate the Fifth Amendment's Guarantee of Equal Protection.

The Defendants similarly claim the Rules do not violate the principle of equal protection because they "do not draw a sex-based distinction" and men "receive no better treatment" than

---

[8] Finally, the Religious Exemption is not, as the Defendants now assert, "required by RFRA." See Opp. at 36. Their suggestion that the Contraceptive Care Mandate does not serve a compelling interest is foreclosed by *Hobby Lobby*, 134 S. Ct. 2751, in which five justices expressed the view that the mandate does serve a compelling interest, and none challenged this conclusion. Second, the argument that the Accommodation process imposes a substantial burden is foreclosed by *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.,* 867 F.3d 338, 356 n.18 (3d Cir. 2017). ("Although our judgment in Geneva [addressing whether the Accommodation process violated RFRA] was vacated by the Supreme Court, it nonetheless sets forth the view of our Court, which was based on Supreme Court precedent, that we continue to believe to be correct regarding our duty to assess substantiality as well as our conclusion that the regulation at issue there did not impose a substantial burden.") (emphasis added). And finally, Defendants have not identified any basis for applying RFRA to publicly traded companies to justify the broad sweep of the Religious Exemption Rule.

women. Opp. at 47-48.[9] But of course they do: where contraceptive coverage is denied for women, it is women (not men) who bear the risk of unplanned pregnancies. That is why contraceptive coverage was mandated in the first place under the *Women's* Health Amendment. The fact that the statutory authorization for the Contraceptive Care Mandate applies only to women does not, as the Defendants suggest, excuse this discriminatory treatment. *See* Opp. at 48 ("Any sex-based distinction is a function of the statute, not the Rules."). Rather, it confirms the Rules' discriminatory intent. Indeed, President Trump's Executive Order specifically directed the other the Defendants to consider new exemptions from the Women's Health Amendment only. *See* Opp. Exh. J § 3 (The Secretaries "shall consider issuing amended regulations … to address conscience-based objections to the preventive-care mandate promulgated under [the Women's Health Amendment]."). The Defendants issued the Rules, following the Executive Order's direction and furthering its discriminatory purpose.

### E. The Rules Violate the Establishment Clause.

The Rules violate the Establishment Clause, because they have the purpose and effect of advancing the religious beliefs of employers over their employees. In fact, Defendants themselves assert that "whether a woman has coverage under the exemptions depends on whether the woman's employer has a sincere religious or moral objection." Opp. at 47. That the Rules, on their face, do not advance a particular religion does not establish their purpose is constitutionally valid. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). To the contrary, the

---

[9] The Defendants argue that the relevant distinction for an equal protection analysis is between women whose employers provide contraception and those whose employers who opt out under the Rules. *See* Opp. at 47-48. It is not. Beginning with the Executive Order, the Rules single out a specific category of preventive medicine *for women* under the *Women's* Health Amendment and allow employers to refuse coverage for women that is otherwise legally mandated. It is no defense to argue that only "some women" will be harmed. *See Huynh v. Carlucci*, 679 F. Supp. 61, 67 (D.D.C. 1988) (rejecting argument that strict scrutiny did not apply in analyzing regulation that "discriminates against only some members of a suspect class").

8

context surrounding government action can be strong evidence of an impermissible purpose. *See* Opp. at 36-37 (discussing *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844 (2005) & *Van Orden v. Perry*, 545 U.S. 677 (2005)). And here, the context surrounding the Rules demonstrates a clear intent to favor religion.

The Rules also have the *effect* of advancing the religious beliefs of employers over those of their employees. The Defendants' attempt to distinguish *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985) and *Santa Fe Independent Sch. Dist. v. Doe*, 530 U.S. 290 (2000) misses this critical point. That the Rules "neither compel nor encourage any action on private employers' part" is irrelevant. *See* Opp. at 54. They impose a burden on *employees* by requiring them to submit to the religious beliefs of their employers. For this reason, the Rules violate the Establishment Clause.

## IV. The Commonwealth Will Suffer Irreparable Injury Without an Injunction.

If this Court does not enjoin the Rules, the Commonwealth will suffer irreparable injury. The "crucial issue" in assessing whether irreparable injury exists is "whether money damages provide an adequate remedy at law." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Here, the Rules impose significant additional costs on Commonwealth-funded health care programs that cannot be recovered. The Defendants do not dispute this; they just argue the Commonwealth's inability to recover money damages is insufficient to establish irreparable injury. But the Third Circuit has held otherwise: for purposes of an injunction, losses that cannot be recovered "due to state sovereign immunity" constitute irreparable injury. *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388 (3d Cir. 2012); *see also Transcon. Gas Pipe Line Co., LLC v. Permanent Easement for 2.59 Acres*, No. 17-1829, 2017 WL 4005011, at *3 (3d Cir. Sept. 12, 2017) ("While generally a harm that can be remedied by monetary relief is not

considered irreparable, a financial loss may be irreparable if the expenditures cannot be recouped.").[10]

The Rules will also cause irreparable injury to the citizens of the Commonwealth. Women who are denied contraceptive coverage face significant, unrecoverable additional costs. Some will suffer adverse health consequences. Some will experience unintended pregnancies, which often carry significant health risks. Again, the Defendants do not dispute that these injuries are irreparable; they just claim the Commonwealth does not have *parens patriae* standing to assert them. As discussed above, the Defendants are wrong.[11]

## CONCLUSION

For the foregoing reasons, the Commonwealth's Motion should be granted.

Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

November 27, 2017

s/ Jonathan Scott Goldman
JONATHAN SCOTT GOLDMAN
MICHAEL J. FISCHER
NICOLE VAN ORDER
NICOLE J. BOLAND
Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(717) 787-3391
jgoldman@attorneygeneral.gov

---

[10] The irreparable nature of the Commonwealth's injury is compounded by the fact that it was denied the opportunity to participate meaningfully in the rulemaking process. *See N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18 (D.D.C. 2009) ("Furthermore, if the Court ultimately decides the merits of the plaintiff's APA claim in the Commonwealth's favor, the damage done by DHS' violation of the APA cannot be fully cured by later remedial action.").

[11] Separately, "[i]t is unquestionable that a state, in its *parens patriae* capacity, does qualify as 'personally ... suffer[ing] some actual or threatened injury." *Maryland People's Counsel v. F.E.R.C.*, 760 F.2d 318, 321 (D.C. Cir. 1985). The irreparable injury the Rules will cause to the health and well-being of the residents of the Commonwealth it, itself, an injury to the Commonwealth.

**CERTIFICATE OF SERVICE**

      I hereby certify that I have caused the foregoing document, and any attachments thereto, to be electronically filed with the Clerk of the Court for the United States District Court for the Eastern District of Pennsylvania by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: November 27, 2017

                                                                */s/ Jonathan Scott Goldman*
                                                                JONATHAN SCOTT GOLDMAN