IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA,<br><br>                            **Plaintiff,**<br>v.<br><br>DONALD J. TRUMP *et al.*,<br><br>                            **Defendants.** | NO. 2:17-cv-04540-WB |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

JONATHAN SCOTT GOLDMAN
Executive Deputy Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
LAUREN E. SULCOVE
NICOLE J. BOLAND
NIKOLE N. BROCK
Deputy Attorneys General

Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(717) 787-3391
jgoldman@attorneygeneral.gov

Plaintiff Commonwealth of Pennsylvania (the "Commonwealth") respectfully submits this opposition to Defendants' Motion to Dismiss (the "Motion"[1]) and, in support thereof, states as follows:

In its Complaint, the Commonwealth explained how the Defendants' new Rules, issued without any notice or opportunity for comment, will allow virtually any employer to unilaterally opt out of its legal obligation to provide its employees and those on their plans with contraceptive coverage. It explained how the Rules violate various constitutional and statutory provisions, including the Affordable Care Act, the Administrative Procedure Act, the Civil Rights Act, and both the First and Fifth Amendments. That Complaint also demonstrated the very real harm that the Commonwealth and its residents will suffer as a result of the Rules – harm that can only be addressed through injunctive relief.

The Defendants now move to dismiss the Complaint, repeating (or relying on) many of the same arguments they made in opposing the Commonwealth's Motion for Preliminary Injunction.[2] They argue that the Commonwealth lacks standing; venue is inappropriate in this Court; and the Complaint fails to state a claim. Their arguments are meritless.

The Commonwealth has standing because it will suffer significant injury as a result of the Rules. Venue is proper because the Commonwealth resides here and a substantial part of the events giving rise to the Commonwealth's claims occurred here. And the Commonwealth has more than adequately pleaded its claims – indeed, it has demonstrated that it is likely to prevail on each.

For these reasons, the Defendants' motion should be denied.

---

[1] *See* Defendant's Motion to Dismiss, Dkt. No. 16 (Nov. 16, 2017) ("Motion" or "Mot.").
[2] Since the Court asked the parties to file and respond to these motions separately, the Commonwealth repeats its arguments herein where necessary rather than merely referring to parallel arguments it made in its Reply in support of its Motion for Preliminary Injunction.

# ARGUMENT

**I.       The Commonwealth Has Standing.**

A plaintiff has standing if it alleges a "concrete injury traceable to [the defendant] and redressable by a court." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007). The injury requirement "is very generous to claimants, demanding only that the claimant allege some specific, identifiable trifle of injury." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017) (citations, internal quotation marks, and alteration omitted).

Here, the Commonwealth has adequately alleged that it will suffer direct, financial harm as a result of the Rules. The Commonwealth has also alleged that it will suffer injury to its interest in protecting the health and well-being of its citizens. Either is sufficient to reject the Defendants' argument that the Commonwealth lacks standing.

**A.       The Commonwealth Will Suffer Direct Injury as a Result of the Rules.**

First, the Complaint sufficiently alleges that the Commonwealth will suffer direct financial harm as a result of the Rules. *See* Compl., Dkt. No. 1 (Oct. 11, 2017) ¶¶ 127-140 ("Specific Harm to the Commonwealth of Pennsylvania Caused by the New Exemption Rules."). Women who are denied contraceptive coverage under the Rules will seek other options, including Commonwealth-funded health care programs, and these Commonwealth-funded programs will incur additional expenses. *See id.* ¶ 134 ("Some women who lose their employer-sponsored health coverage for contraceptive care will seek coverage through Pennsylvania's subsidized family planning program, which provides preventive screenings and contraceptives for low-income women who are not eligible for Medicaid. This additional financial burden will be borne by the Commonwealth."). Also as a result of the Rules, more women will experience unintended pregnancies, and the Commonwealth will bear increased costs through these same programs. *See id.* ¶ 136 ("Pennsylvania will see an increase in unintended pregnancies and other negative health outcomes

2

which, in addition to other personal, social and societal burdens, will impose direct costs on the Commonwealth."). These allegations of direct financial harm are sufficient to establish an injury for standing purposes. *See Cottrell,* 874 F.3d at 163 ("Typically, a plaintiff's allegations of financial harm will easily satisfy each of these components [of injury-in-fact]."); *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005) ("Monetary harm is a classic form of injury-in-fact….Indeed, it is often assumed without discussion.").

The Defendants nevertheless argue that the Commonwealth's allegations are too "speculative" to establish concrete injury. They address their argument not merely to the Complaint, but to the Commonwealth's Motion for Preliminary Injunction as well – despite the fact that a court assessing standing should "review the facts as alleged" in the complaint. *Cottrell*, 874 F.3d at 159. Regardless, the Commonwealth's Motion for Preliminary Injunction only further establishes that the allegations in the Complaint are based on concrete facts, including facts spelled out in declarations and other exhibits submitted in support of that motion:

- Women who lose contraceptive coverage under the Rules will seek it elsewhere, including from Commonwealth-funded programs. *See* Plaintiff's Motion for a Preliminary Injunction, Dkt. No. 8-2 (Nov. 2, 2017) ("PI Mot.") at 14; *see also* Chuang Decl., Exh. E ¶ 22; Steinberg Decl. Exh. L ¶ 26; Allen Decl., Exh. K ¶ 23.
- Many will be eligible: Family Planning Services are available to those with incomes of up to 215% of the poverty level ($52,890 for a family of four), and Medical Assistance is available to those with incomes up to 138% of the federal poverty level ($33,948 for a family of four). PI Mot. at 43; *see also* Allen Decl., Exh. K ¶¶ 8-9.
- Others will seek coverage from Title X clinics, which get funding from the Commonwealth and have no income-based eligibility requirements at all. PI Mot. at 14; *see also* Steinberg Decl., Exh. L ¶ 29; Chuang Decl., Exh. E ¶ 22.
- Due to the Rules, still other women will go without contraception entirely; they will face a greater risk of unintended pregnancies as a result. See PI Mot. at 15; *see also* Butts Decl., Exh. F ¶¶ 56-58. And the Commonwealth will suffer injury from additional unplanned pregnancies caused by the Rules, as "68% of unplanned births are paid for by public insurance programs." PI Mot. at 14.

These sworn facts establish that the Commonwealth will suffer injury under the Rules.

### B. The Commonwealth's Injuries Are Not "Self-Inflicted."

The Defendants seem to acknowledge that the Commonwealth will face additional costs as a result of the Rules, but suggest that these injuries somehow do not count because they are "self-inflicted." *See* Mot. at 8. This is meritless. The programs at stake reflect the Commonwealth's commitment to protecting the health and welfare of its citizens; they predate the Rules by years or decades. And the law is clear that an injury "cannot be deemed 'self-inflicted' when a party faces only two options: full compliance with a challenged action or a drastic restructure of a state program." *Texas v. United States,* 86 F. Supp. 3d 591, 619 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an evenly divided Court*, 136 S. Ct. 2271 (2016). That is the case here.

### C. The Commonwealth Also Has *Parens Patriae* Standing.

As a sovereign state, the Commonwealth "is entitled to special solicitude in [the Court's] standing analysis." *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007). And in addition to direct standing based on its own injury-in-fact, the Commonwealth has *parens patriae* standing based on its quasi-sovereign interest in protecting the health and well-being of its residents. *See id*. The Defendants, however, argue that *Massachusetts v. Mellon,* 262 U.S. 447 (1923), bars the Commonwealth from asserting its quasi-sovereign interests here. They are wrong.

Under *Mellon*, a state may not ordinarily rely on *parens patriae* standing to challenge a federal *statute*. *Id.* at 485-86. But that case does not prevent a state from asserting such standing when the statutory rights of its citizens are threatened by an *administrative agency*. *See Abrams v. Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984). Here, as in *Abrams*, the Commonwealth "do[es] not challenge any federal statute." To the contrary, it "seek[s] to enjoin an administrative agency from violating" certain statutes, including the Affordable Care Act and the APA, through regulations that are inconsistent with those laws. *See id.*, 582 F. Supp. at 1159 ("Here, plaintiffs do not challenge any federal statute. Rather, they rely on § 953 of the Omnibus Budget Reconciliation

4

Act of 1980, and seek to enjoin an administrative agency from violating that statute."); *see also City of New York v. Heckler*, 578 F. Supp. 1109, 1122 (E.D.N.Y.), *aff'd*, 742 F.2d 729 (2d Cir. 1984).

In issuing the Rules, the Defendants "ha[ve] abdicated [their] responsibilit[ies]" under the Affordable Care Act, and the Commonwealth has *parens patriae* standing to challenge them. *Massachusetts v. E.P.A.*, 549 U.S. at 505. On the same basis, the Supreme Court held that Massachusetts had *parens patriae* standing to sue the EPA for failing to regulate greenhouse gas emissions under the Clean Air Act. *See id.* (finding that state had standing where it alleged "that the Environmental Protection Agency (EPA) has abdicated its responsibility under the Clean Air Act to regulate the emissions of four greenhouse gases"). Massachusetts argued that the EPA's failure to regulate greenhouse gas emissions harmed its citizens. *Id.* The Commonwealth makes a parallel argument here – the Defendants' unlawful promulgation of the Rules violates their statutory obligations under the Contraceptive Care Mandate and harms Pennsylvania citizens. Therefore, the Commonwealth is entitled to assert its *parens patriae* standing. *See also Maryland People's Counsel v. F.E.R.C.*, 760 F.2d 318, 321 (D.C. Cir. 1985) ("It is unquestionable that a state, in its *parens patriae* capacity, does qualify as 'personally ... suffer[ing] some actual or threatened injury.'") (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982)).

II.   **Venue Is Appropriate in this Court.**

Venue is proper in this Court. In the Third Circuit, a defendant bears the burden of establishing that a plaintiff's choice of venue is improper. *See Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724 (3d Cir. 1982) ("[O]n a motion for dismissal for improper venue under Rule 12 the movant has the burden of proving the affirmative defense asserted by it."); *see also Bristol-Myers Squibb Co. v. Mylan Pharm. Inc.*, No. CV 17-379-LPS, 2017 WL 3980155, at *3 (D. Del. Sept. 11, 2017). Because this action is brought against officers and agencies of the federal government, it may be

brought "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, … or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). This statute was enacted to establish "nationwide venue for the convenience of individual plaintiffs in actions which are nominally against an individual officer but are in reality against the Government." *Stafford v. Briggs*, 444 U.S. 527, 542 (1980). In this case, venue is proper under either § 1391(e)(1)(B) or § 1391(e)(1)(C).

Venue is appropriate because the Commonwealth resides in this district. *See* § 1391(e)(1)(C). The Defendants claim otherwise, but their analysis is based on cases involving state agencies and officers. Here, however, the plaintiff is the state itself, and "[a] state is held to reside in any district within it." 14D Wright & Miller, *Fed. Prac. & Proc.* § 3815 (4th ed. 2013) (citing *Ala. v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1327-28 (N.D. Ala. 2005)). As that court observed, "common sense dictates that a state resides *throughout* its sovereign borders." *Id.* at 1329 (emphasis added).[3]

Venue is also appropriate because "a substantial part of the events or omissions giving rise to the claim occurred" in this district. *See* § 1391(e)(1)(B). That the Rules were drafted in Washington is irrelevant: "suits challenging official acts may be brought in the district where the effects of the challenged regulations are felt even though the regulations were enacted elsewhere." *Farmland Dairies v. McGuire*, 771 F. Supp. 80, 82 n.3 (S.D.N.Y. 1991) (interpreting earlier version of § 1391 requiring action to be brought "in the judicial district … in which the claim arose"). As the Commonwealth has pleaded, the harm the Defendants' have created will be felt in this district.

---

[3] Section 1391 was amended following *Alabama v. U.S. Army Corps of Engineers*. *See* Pub L. No. 112-63 (2011). The revisions clarified that incorporated and non-incorporated entities, when acting as plaintiffs, are considered residents of the district in which they maintain their principal place of business. *See* 28 U.S.C. § 1391(c)(2). But nothing in that statute or the relevant legislative history reflects an intent to modify the "common sense" principle that "a state resides throughout its sovereign borders." *Ala. v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d at 1329.

*See, e.g.*, *Bishop v. Okla. ex rel. Edmonson*, 447 F. Supp. 2d 1239, 1254 (N.D. Okla. 2006), *rev'd in part on other grounds*, 333 F. App'x 361 ("[I]t has been held that suits challenging official acts may be brought in the district where the *effects of the challenged regulations are felt* even though the regulations were enacted elsewhere.") (citations and internal quotation marks omitted) (emphasis original); *see also Missouri Ins. Coal. v. Huff*, 2013 WL 363406, at *2 (E.D. Mo. Jan. 30, 2013).[4]

### III.     The Commonwealth Has Adequately Pleaded Its Claims.

Relying entirely on their opposition to the Commonwealth's motion for a preliminary injunction, the Defendants assert that all of the Commonwealth's claims should be dismissed under Rule 12(b)(6). *See* Mot. at 11. Nowhere do they explain how the Commonwealth fails to allege "only enough facts to state a claim to relief that is plausible on its face" such that dismissal would be warranted. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[5] In fact, not only are the Commonwealth's allegations plausible on their face – the Commonwealth is likely to prevail. Therefore, the Defendants' Motion should be denied.[6]

---

[4] *See also Sheffield v. State of Tex.*, 411 F. Supp. 709, 713 (N.D. Tex. 1976) ("The State argues that because the statute was passed and signed into law in Austin; the value data compiled and transmitted in Austin; and, the Commissioner of Education, Governor and review panel refused to equalize market evaluation in Austin, the claim therefore arose in that district. But the effect of the statute's passage and administration has been clearly felt in the Northern District….Our analysis is bottomed upon our conclusion that the injury alleged in this case has or will occur in the Northern District.").

[5] To the extent the Defendants' motion relies on the administrative record (or any other materials outside the pleadings), it should be converted to a motion for summary judgment. *Reynolds v. U.S. Dep't of Health & Human Servs.*, No. 10-5549, 2011 WL 2745817, at *1 (E.D. Pa. July 14, 2011) ("Because we consider information in the administrative record outside of the amended complaint … we will treat the motion of DHHS as one for summary judgment.").

[6] The Commonwealth has previously explained in its motion for a preliminary injunction and reply in support thereof why it will prevail. See Dkt. Nos. 8-2 (Nov. 2, 2017) & 30 (Nov. 27, 2017). It nonetheless repeats some of those arguments here, supplementing as necessary, to respond to the Defendants' Motion. See Order (Nov. 15, 2017) (directing parties to submit separate briefing on Commonwealth's motion for preliminary injunction and Defendants' motion to dismiss).

### A. The Rules Violate the APA's Procedural Requirements.

The Defendants admit they failed to follow the APA's notice-and-comment provisions but claim that their failure is justified. None of their arguments, however, excuses the Defendants' failure to comply with their obligations under that statute.

### 1. The Defendants Do Not Have an "Express Grant of Statutory Authority" to Violate the APA.

The Defendants claim an "express grant of statutory authority" to disregard the APA's procedural requirements. *See* Defendants' Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction, Dkt. No. 15 (Nov. 16, 2017) at 23-24 ("PI Opp."). This is incorrect. The Defendants' argument was rejected in *Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 18-19 (D.D.C. 2010) – a case involving the same agency and statutory authority – and should be rejected here, too. *See* Mot. at 19 n.10 (discussing *Coalition for Parity*).

*Coalition for Parity* recognized that, to override the APA's notice-and-comment requirements, any subsequent statute must supersede or modify those requirements *expressly*.[7] Though the Defendants claim this standard is satisfied here, the actual provisions they rely upon prove otherwise. Indeed, those provisions "do not mention notice and comment or any other aspect of the APA." *Coalition for Parity*, 709 F. Supp. 2d at 18.

Further, an agency may not disregard its APA obligations unless "Congress has established procedures so clearly different from those required by the APA that it must have intended to displace the norm." *Asiana Airlines v. FAA,* 134 F.3d 393, 397 (D.C. Cir. 1998); *see also Coalition for Parity*, 709 F. Supp. 2d at 18. Here, as in *Coalition for Parity* – and unlike the other cases on

---

[7] *See Coalition for Parity*, 709 F. Supp. 2d 10, 18 ("Although the APA recognizes that Congress may modify the notice and comment procedures called for by § 553, it states that a '[s]ubsequent statute may not be held to supersede or modify [§ 553] ... except to the extent that it does so expressly.' 5 U.S.C. § 559.") (alterations in original).

8

which they attempt to rely[8] – the Defendants point to nothing more than Congress's *general* grant of authority to issue interim final rules, which is insufficient to demonstrate the congressional intent required to permit agencies to ignore the APA's procedural requirements. *See id.* at 19.

### 2. The Defendants Cannot Demonstrate "Good Cause."

Lacking clear statutory authority, the Defendants must show that they had "good cause" to ignore the APA's procedural requirements. 5 U.S.C. § 553(b)(3)(B). It is well-established that the good cause exception may not be "arbitrarily utilized at the agency's whim." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981). Rather, it "should be limited to emergency situations." *Id.* And "a half decade of litigation," PI Opp. at 24-25, does not constitute an emergency. The fact that the Department of Justice was required "to file mandatory status reports" in some ongoing lawsuits and might need to "prepare for oral argument on the merits" in one case, *see id.* at 25, has no bearing on whether compliance with the APA is "impracticable, unnecessary, or contrary to the public interest." *See* 5 U.S.C. § 553(b)(3)(B).

The Defendants' justifications here are not meaningfully different from those offered in *United States v. Reynolds*, 710 F.3d 498 (3d Cir. 2013) – and they should be rejected for the same reasons they were rejected in *Reynolds*. The Defendants' dual assertion that the Rules provide "accelerated clarity and certainty while also affording opportunity for meaningful public input" is self-contradictory. PI Opp. at 25. For after-the-fact public input to be truly "meaningful," agencies must be willing to modify the Rules based on that input, but such willingness would cause any "clarity and certainty" to disappear. See *Reynolds*, 710 F.3d at 510 ("Requesting comments on the

---

[8] The Defendants cite *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 393, 397-98 (D.C. Cir. 1994) and *Asiana Airlines*, 134 F.3d at 397-998, as they also did in *Coalition for Parity*. *See* PI Opp. at 24. That court distinguished these cases at length, finding that "[t]he statutory directives at issue in *Methodist Hospital* and *Asiana Airlines* are dissimilar from the provisions [cited by the Defendants here]" 709 F. Supp. 2d at 18-19.; PI Opp. at 23.

9

Interim Rule implicitly suggests that the rule will be reconsidered and possibly changed in light of these comments. But that means the level of uncertainty is, at best, unchanged.").

### 3. *The Defendants' Error Was Not Harmless.*

The Defendants' admitted failure to follow the APA's notice-and-comment procedures was not, as they claim, "harmless." *See* PI Opp. at 28. The Defendants misconstrue the required standard. Where, as here, an "agency has entirely failed to comply with notice-and-comment requirements," parties challenging the final rule need *not* "show that they would have submitted new arguments to invalidate rules in the case of certain procedural defaults." *Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991); *see also Reynolds*, 710 F.3d at 516 (distinguishing "technical failure" cases from those involving "complete failure"). Rather, an agency's failure to comply with the APA will be found harmless only under very narrow circumstances not present here, such as "when the administrative record demonstrates that the conclusion reached in the administrative rule was the only possible conclusion." *Reynolds*, 710 F.3d at 518.

Contrary to the Defendants' assertions, see PI Opp. at 28, neither the Commonwealth nor other interested parties were able to "comment on the scope of the exemptions and accommodations" in the Rules. In fact, the agencies have never before sought comment on such sweeping proposals. The most recent opportunity to comment before the Rules were issued followed the agencies' post-*Zubik* Request for Information, and that comment period ended on September 20, 2016. *See* 81 Fed. Reg. 81 FR 47741. That request sought comment only on a narrow set of issues relating exclusively to the Accommodation process. It did not, for instance, solicit comments on whether publicly traded companies should be allowed to opt out of the mandate; whether a sweeping "moral exemption" should apply to the mandate; or whether employers should be allowed to provide only minimal notice before ending contraceptive coverage for their employees.

### B. The Rules Violate the APA's Substantive Requirements.

#### 1. *The Rules Violate the Affordable Care Act.*

The Women's Health Amendment to the Affordable Care Act requires employers to cover, without cost-sharing requirements, all preventive services identified by the Health Resources and Services Administration. The Women's Health Amendment contains no "conscience clause" and does not otherwise allow employers to opt out of this legal obligation. Perhaps recognizing that the Rules cannot be squared with the plain language of the ACA, the Defendants argue that they do not violate the law due to what they call "implicit statutory factors" – *i.e.*, factors that are not actually in the statute. *See* PI Opp. at 35. But the Defendants have identified no principle that would allow them to rely on a provision that appears in *other laws* but not in the statute they are actually seeking to implement, and there is none. *See* PI Mot. at 24.[9] If anything, the fact that such conscience provisions exist in other laws – but not in the Women's Health Amendment to the APA – supports the conclusion that Congress intentionally chose not to include a conscience clause here because it did not intend to allow employers and others to opt out of their legal obligations. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cit. 1972)).

#### 2. *The Rules Are Arbitrary and Capricious.*

In addition, the Rules are arbitrary and capricious because they frustrate – rather than advance – the purposes of the Women's Health Amendment and the ACA. The Defendants argue that the Commonwealth "takes one statutory purpose – to increase access to preventive care – and elevates it above all others." PI Opp. at 33. But the Commonwealth did not "elevate" this purpose –

---

[9] In fact, an amendment was offered to subsequent legislation to add a "conscience clause" to the ACA, but the Senate rejected it. *See* Compl. ¶¶ 77-79.

Congress did. As the Defendants point out, "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of *legislative* choice." PI Opp. at 33 (quoting *Rodriguez v. United States*, 480 U.S. 522, 526 (1987)) (emphasis added). In passing the Women's Health Amendment and the ACA, Congress made clear its purpose: to promote access to women's preventive services. 155 Cong. Rec. S11988 (Nov. 30, 2009) (statement of Sen. Barbara Mikulski) (explaining that the amendment "leaves the decision of which preventive services a patient will use between the doctor and the patient" because the "decision about what is medically appropriate and medically necessary is between a woman and her doctor"). It chose to enact a statute requiring employers to provide coverage for preventive care for women – *without exception*. The Defendants cannot undermine the statute they are tasked with implementing; they cannot ignore Congress's choices to, instead, further their own, contradictory objectives. *See Frisby v. U.S. Dep't of Hous. & Urban Dev.*, 755 F.2d 1052, 1057 (3d Cir. 1985).

        3.        *The Rules Are Not Required by the Religious Freedom Restoration Act.*

Finally, the Religious Exemption is not, as the Defendants now assert, "required by" the Religious Freedom Restoration Act ("RFRA"). *See* PI Opp. at 36. First, their suggestion that the Contraceptive Care Mandate does not serve a compelling interest is foreclosed by *Hobby Lobby*, in which five justices expressed the view that the mandate serves a compelling interest, and none challenged this conclusion. *See* 134 S. Ct. 2751, 2799 (2014) (Ginsburg, J., dissenting); *id.* at 2785-86 (Kennedy, J., concurring). Second, the argument that the Accommodation process imposes a substantial burden is foreclosed by *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338 (3d Cir. 2017). In that case, the Third Circuit considered its prior decision in *Geneva College v. Secretary United States Department of Health and Human Services*, 778 F.3d 422 (3d Cir. 2015), and concluded: "Although our judgment in *Geneva* [addressing whether the Accommodation process violated RFRA] was vacated by the Supreme Court, it nonetheless sets

forth the view of our Court, which was based on Supreme Court precedent, that *we continue to believe to be correct* regarding our duty to assess substantiality as well as our conclusion that the regulation at issue there did not impose a substantial burden." 867 F.3d at 356 n.18 (emphasis added). Finally, Defendants have not identified any basis for applying RFRA to publicly traded companies that would justify the broad sweep of the Religious Exemption Rule.

      C.      **The Rules Violate Title VII of the Civil Rights Act.**

The Defendants claim that the Rules do not violate Title VII of the Civil Rights Act because they "do not draw sex-based distinctions." PI Opp. 46. Since "[c]ontraceptives are used by both men and women," the Defendants argue, the rules are gender-neutral. *Id.* (citing *In re Union Pac. R.R. Employment Practices Litigation*, 479 F.3d 936, 940-42 & n.1 (8th Cir. 2007)). This is silly. While men and women may both use contraception, only *women* can become pregnant. For this reason, denying women access to contraception disproportionately harms women – and authorizing employers to refuse to provide contraception to women, but not other preventive services, is discrimination on the basis of sex. As the Commonwealth explained in its motion for a preliminary injunction, *Union Pacific* is inconsistent with the Supreme Court's admonition that discrimination on the "basis of potential for pregnancy" is impermissible sex discrimination. Mot. at 31 n.18. *See Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1269 (W.D. Wash. 2001).

      D.      **The Rules Violate the Fifth Amendment's Guarantee of Equal Protection.**

The Defendants similarly claim the Rules do not violate the principle of equal protection because they "do not draw a sex-based distinction" and men "receive no better treatment" than women. PI Opp. at 47-48. But when contraceptive coverage is denied for women, it is women (not men) who bear the risk of unplanned pregnancies. That is why contraceptive coverage was mandated in the first place under the *Women's* Health Amendment. The fact that the statutory authorization for the Contraceptive Care Mandate applies only to women does not, as the

13

Defendants suggest, excuse this discriminatory treatment. *See* PI Opp. at 48 ("Any sex-based distinction is a function of the statute, not the Rules."). Rather, it confirms the Rules' discriminatory intent. Indeed, President Trump's Executive Order specifically directed the other the Defendants to consider new exemptions from the Women's Health Amendment *only*. *See* PI Opp. Exh. J § 3 (The Secretaries "shall consider issuing amended regulations … to address conscience-based objections to the preventive-care mandate promulgated under [the Women's Health Amendment]."). The Defendants issued the Rules, following the Executive Order's direction and furthering its discriminatory purpose.

The Defendants try to sidestep the Commonwealth's equal protection claim entirely by arguing that the relevant distinction is between women whose employers provide contraception and those whose employers opt out under the Rules. See PI Opp. at 47-48. It is not. Following the Executive Order, the Rules single out a specific category of preventive medicine *for women* under the Women's Health Amendment and allow employers to refuse coverage for women that is otherwise legally mandated. It is no defense to argue that only "some women" will be harmed. *See Huynh v. Carlucci*, 679 F. Supp. 61, 67 (D.D.C. 1988) (rejecting argument that strict scrutiny did not apply in analyzing regulation that "discriminates against only some members of a suspect class").

      **E.**      **The Rules Violate the Establishment Clause.**

The Rules violate the Establishment Clause, because they have the purpose and effect of advancing the religious beliefs of employers over their employees. In fact, Defendants themselves assert that "whether a woman has coverage under the exemptions depends on whether the woman's employer has a sincere religious or moral objection." PI Opp. at 47. That the Rules, on their face, do not advance a particular religion does not establish their purpose is constitutionally valid. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). To the contrary, the

14

context surrounding government action can be strong evidence of an impermissible purpose. *See* PI Opp. at 36-37 (discussing *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844 (2005) & *Van Orden v. Perry*, 545 U.S. 677 (2005)). And here, the context surrounding the Rules demonstrates a clear intent to favor religion.

The Rules also have the *effect* of advancing the religious beliefs of employers over those of their employees. The Defendants' attempt to distinguish *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985) and *Santa Fe Independent Sch. Dist. v. Doe*, 530 U.S. 290 (2000) misses this critical point. That the Rules "neither compel nor encourage any action on private employers' part" is irrelevant. *See* PI Opp. at 54. They impose a burden on *employees* by requiring them to submit to the religious beliefs of their employers. For this reason, the Rules violate the Establishment Clause.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion should be denied.

Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

November 30, 2017

s/ Jonathan Scott Goldman
JONATHAN SCOTT GOLDMAN
Executive Deputy Attorney General
MICHAEL J. FISCHER
Chief Deputy Attorney General
LAUREN E. SULCOVE
NICOLE J. BOLAND
NIKOLE N. BROCK
Deputy Attorneys General
Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(717) 787-3391
jgoldman@attorneygeneral.gov

## CERTIFICATE OF SERVICE

      I hereby certify that I have caused the foregoing document, and any attachments thereto, to be electronically filed with the Clerk of the Court for the United States District Court for the Eastern District of Pennsylvania by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: November 30, 2017

                                                                       */s/ Jonathan Scott Goldman*
                                                             JONATHAN SCOTT GOLDMAN