# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA and
STATE OF NEW JERSEY,

                Plaintiffs,

            v.

DONALD J. TRUMP, *in his official capacity as
President of the United States*; ALEX M. AZAR II, *in
his official capacity as Secretary of Health and Human
Services*; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; STEVEN T.
MNUCHIN, *in his official capacity as Secretary of the
Treasury*; UNITED STATES DEPARTMENT OF THE
TREASURY; RENE ALEXANDER ACOSTA, *in his
official capacity as Secretary of Labor*; UNITED
STATES DEPARTMENT OF LABOR; and UNITED
STATES OF AMERICA,

                Defendants.

**No. 2:17-cv-04540-WB**

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Commonwealth of Pennsylvania, by and through Attorney General Josh Shapiro, and

the State of New Jersey, by and through Attorney General Gurbir S. Grewal, hereby file this

Amended Complaint against Defendants Donald J. Trump, in his official capacity as President of

the United States; Alex M. Azar II, in his official capacity as Secretary of Health and Human

Services; the United States Department of Health and Human Services (HHS); Steven T.

Mnuchin, in his official capacity as Secretary of the Treasury; the United States Department of

the Treasury; Rene Alexander Acosta, in his official capacity as Secretary of Labor; the United

States Department of Labor; and the United States of America (collectively, "Defendants") and, in support thereof, state the following:

1.      This lawsuit challenges Defendants' illegal and unjustified attempts to deny millions of women in Pennsylvania, New Jersey, and across the country access to necessary preventive healthcare. As set forth more fully below, Defendants' actions violate, among other provisions of law, the Administrative Procedure Act, the Affordable Care Act, the guarantee of equal protection enshrined in the Due Process Clause of the Fifth Amendment to the United States Constitution, Title VII of the Civil Rights Act, the Pregnancy Discrimination Act, and the Establishment Clause of the First Amendment. If Defendants are not blocked from implementing their unlawful rules, direct harm will result to the Commonwealth of Pennsylvania, the State of New Jersey, and the medical and economic health of their residents. Because these rules will cause irreparable harm and were issued in violation of law, the Commonwealth of Pennsylvania and the State of New Jersey seek declaratory and injunctive relief holding the rules unlawful and preventing their implementation.

## INTRODUCTION

2.      The Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 18001 et seq. (2010), together with its implementing regulations, requires certain health plans to cover all FDA-approved methods of contraception without imposing cost-sharing requirements on the insured. This requirement is known as the Contraceptive Care Mandate.

3.      Because of the Contraceptive Care Mandate, over 55 million women have access to birth control without paying out-of-pocket costs, including 2.5 million women in Pennsylvania and 1.7 million in New Jersey. *See* Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women: Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* 84 (2016) (the "WPSI Report"); HHS,

*The Affordable Care Act is improving access to preventive services for millions of Americans* (2015).[1] American women and their families covered by private insurance have saved an estimated 70 percent on contraceptive costs as a result. WPSI Report at 84.

4.      Contraception approved by the U.S. Food and Drug Administration is medicine, and its use has been shown to reduce the rates of unintended pregnancies and abortions. *See* Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 105 (2011) (the "IOM Report") (ECF No. 9-4).

5.      Doctors prescribe contraception to their patients for many reasons, some not having to do with birth control at all. For example, doctors frequently prescribe contraception for treatment of various menstrual disorders, acne, abnormal growth of bodily hair, and pelvic pain. According to a 2011 report, more than 1.5 million women rely on oral "birth control" pills for medical reasons unrelated to preventing pregnancy, and 58 percent of all users of birth control pills—more than half—use them, at least in part, for purposes other than pregnancy prevention. *See* Rachel K. Jones, *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills*, Guttmacher Institute 3 (2011).[2]

6.      For these and other reasons, "access to contraception improves the social and economic status of women." *Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act*, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012) (citations omitted).

---

[1] https://aspe.hhs.gov/sites/default/files/pdf/139221/The%20Affordable%20Care%20Act%20is%20Improving%20Access%20to%20Preventive%20Services%20for%20Millions%20of%20Americans.pdf.

[2] https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf.

7.      As a result of the Affordable Care Act, millions of American women enjoy a greater degree of control over their own medical health and can more fully participate in the workforce.

8.      Defendants, however, threaten to deny many of these women the contraceptive health coverage on which they have come to rely by making the Contraceptive Care Mandate effectively optional.

9.      Defendants have issued regulations that create broad exemptions from the ACA's Contraceptive Care Mandate, and they have done so in violation of the Administrative Procedure Act (APA), the ACA, the U.S. Constitution, and federal law.

10.      These regulations will allow individual employers, educational institutions, or other plan sponsors to decide whether women insured have access to contraception without out-of-pocket charges.

11.      Defendants first issued these regulations as Interim Final Rules (IFRs). *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (the "Religious Exemption IFR"); *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (the "Moral Exemption IFR") (together, "the IFRs") (ECF Nos. 9-2 & 9-3).

12.      The IFRs went into effect immediately but were subsequently enjoined by this Court for violating the APA and the ACA (ECF Nos. 59 & 60).

13.      After accepting public comment, Defendants subsequently issued rules that "finalize" the religious and moral exemptions created in the IFRs. *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*,

4

83 Fed. Reg. 57,536 (Nov. 15, 2018) (the "final Religious Exemption Rule"); *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,592 (Nov. 15, 2018) (the "final Moral Exemption Rule") (together, the "final Exemption Rules"). The final Exemption Rules are attached respectively as Exhibits A and B.

14.     The final Exemption Rules are scheduled to go into effect on January 14, 2019.

15.     The final Exemption Rules were issued in direct violation of the substantive and procedural requirements of the APA.

16.     In issuing the IFRs, Defendants failed to engage in notice and comment rulemaking as required by the APA and failed to show good cause for not doing so.

17.     Because the final Exemption Rules "finalize" the IFRs, Defendants' subsequent acceptance of public comment does not cure the final rules of this procedural violation.

18.     Defendants also failed to respond to significant comments and failed to provide adequate statements of the final rules' bases and purposes, as required by the APA.

19.     The final Exemption Rules are also arbitrary and capricious, and their promulgation constitutes an abuse of discretion.

20.     In addition, the final Exemption Rules themselves violate the requirements of the Affordable Care Act.

21.     Furthermore, the final Exemption Rules apply only to one category of health services: contraception. And the preventative health benefits of contraception apply only to women.

22.     By singling out women for such negative, differential treatment, Defendants have violated the equal protection guarantee of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

23.     Pennsylvania and New Jersey will suffer direct, proprietary harm as a result of the final Exemption Rules. When employers refuse to allow their health insurance plans to cover access to contraception, women will be forced to turn to state-funded programs that provide contraceptive services. Pennsylvania and New Jersey will also be forced to bear additional healthcare costs due to an increase in unintended pregnancies.

24.     In addition, Pennsylvania and New Jersey possess strong interests in protecting the medical and economic health of their residents, minimizing unintended pregnancies and abortions, and ensuring that all of their residents—both men and women—are free and able to fully participate in the workforce, maximize their social and economic status, and contribute to their economies without facing discrimination on the basis of sex.

25.     These interested are enshrined in the Pennsylvania Constitution, which declares, "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." PA. CONST. art. I, § 28.

26.     Likewise, Article I, Paragraph 1 of the New Jersey Constitution guarantees equal protection rights to New Jersey residents, and New Jersey's Law Against Discrimination, N.J.S.A. 10:5-12, makes it unlawful to subject people to differential treatment based on sex.

27.     Defendants' actions directly undermine these vital state interests.

28.     Because Defendants have engaged in illegal conduct that will harm Pennsylvania, New Jersey, and their citizens in these and other ways, this Court should hold that the final Exemption Rules, like the IFRs, are unlawful and set them aside. Pennsylvania and New Jersey

also seek a preliminary injunction to maintain the status quo throughout all future proceedings in this matter.

## JURISDICTION AND VENUE

29.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701–06, and the United States Constitution. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

30.     In addition, this Court has the authority to issue the declaratory relief sought pursuant to 28 U.S.C. § 2201.

31.     Venue is proper in this Court because Plaintiff the Commonwealth of Pennsylvania resides in this district and because a substantial part of the events giving rise to this action occurred in this district. *See* 28 U.S.C. § 1391(e)(1).

## THE PARTIES

32.     Plaintiff, the Commonwealth of Pennsylvania, is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1.

33.     Plaintiff, the State of New Jersey, is a sovereign state of the United States of America.  This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the State's chief legal officer. *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

34.     In filing this action, the Attorneys General seek to protect the citizens and agencies of Pennsylvania and New Jersey from harm caused by Defendants' illegal conduct, prevent further harm, and seek redress for the injuries caused to Pennsylvania and New Jersey by Defendants' actions. Those injuries include harm to Pennsylvania's and New Jersey's sovereign, quasi-sovereign, and proprietary interests.

35.     Defendant Donald J. Trump is the President of the United States of America and is sued in his official capacity. His principal address is 1600 Pennsylvania Avenue NW, Washington, D.C. 20201.

36.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services and is sued in his official capacity. His principal address is 200 Independence Avenue, SW, Washington, D.C. 20201

37.     Defendant the United States Department of Health and Humans Services is an executive agency of the United States of America. Its principal address is 200 Independence Avenue, SW, Washington, D.C. 20201

38.     Defendant Steven T. Mnuchin is the Secretary of the United States Department of the Treasury and is sued in his official capacity. His principal address is 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220.

39.     Defendant the United States Department of the Treasury is an executive agency of the United States of America. Its principal address is 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220.

40.     Defendant Rene Alexander Acosta is the Secretary of the United States Department of Labor and is sued in his official capacity. His principal address is 200 Constitution Avenue, NW, Washington DC 20210.

41.     Defendant the United States Department of Labor is an executive agency of the United States of America. Its principal address is 200 Constitution Avenue, NW, Washington DC 20210.

42.     Defendants the Department of Health and Humans Services, the Department of the Treasury, and the Department of Labor (together, the "Departments") are each responsible

for implementing various provisions of the ACA. The Departments jointly issued the IFRs and the final Exemption Rules, which gave rise to this action.

43.     Defendant the United States of America encompasses the government agencies and departments responsible for the implementation of the Affordable Care Act under the Constitution of the United States.

44.     Defendants Azar, Mnuchin, and Acosta are each responsible for carrying out the duties of their respective agencies under the Constitution of the United States of America and relevant statutes, including the Affordable Care Act.

45.     Defendant Trump is responsible for faithfully enforcing the laws of the United States of America pursuant to and in accordance with the Constitution of the United States.

## BACKGROUND

### Congress Passes the Affordable Care Act and Women's Health Amendment

46.     Access to preventive health services, including contraception, is essential for women to exercise control over their own healthcare and fully participate as members of society.

47.     Access to contraception, in particular, allows women greater control over their reproductive health choices so they can better pursue educational, career, and personal goals.

48.     Indeed, the expansion of preventive health services for women was a specific goal of the healthcare reform efforts that led to the passage of the Affordable Care Act.

49.     Recognizing this need to expand women's access to preventive health services and reduce gender disparities in out-of-pocket costs, the U.S. Senate passed the "Women's Health Amendment" during debate over the ACA. *See* S. Amdt. 2791, 111th Congress (2009–2010).

50.     This Amendment was included in the final version of the ACA, which was signed into law on March 23, 2010. *See* ACA § 1001; Public Health Service Act (as amended by the ACA) § 2713, 42 U.S.C. § 300gg-13(a)(4).

51.     The Women's Health Amendment mandated that group health plans and health insurance issuers offering group or individual health insurance cover preventive health services and screenings for women—and do so with no cost-sharing responsibilities. 42 U.S.C. § 300gg-13(a)(4). Some employer-sponsored plans that were in existence prior to passage were exempt from this requirement and most of the other requirements imposed by the ACA.  *See* 29 C.F.R. § 2590.715-1251 (2010).

52.     During Senate debate on the Women's Health Amendment, lead sponsor Senator Barbara Mikulski explained that the amendment "leaves the decision of which preventive services a patient will use between the doctor and the patient." 155 Cong. Rec. S11988 (Nov. 30, 2009) (statement of Sen. Barbara Mikulski). She further emphasized that the "decision about what is medically appropriate and medically necessary is between a woman and her doctor." *Id.*

53.     Senator Benjamin Cardin, who co-sponsored the Amendment, explained that it "extends the preventive services covered by the bill to those *evidence-based* services for women that are recommended by the Health Resources and Services Administration." 155 Cong. Rec. S12058–59 (Dec. 1, 2009) (statement of Sen. Benjamin Cardin) (emphasis added).

54.     Congress did not dictate which specific preventive services were to be covered by the Amendment. Rather, they were to be determined by guidelines issued by experts at the Health Resources and Services Administration (HRSA), an agency of Defendant the United States Department of Health and Human Services (HHS). *Id.*

**The Institute of Medicine Report on Clinical Preventive Services for Women**

55.     Following passage of the Affordable Care Act, HRSA complied with its legal responsibility to determine coverage guidelines by commissioning the then-named Institute of Medicine (IOM[3]) to issue recommendations identifying what specific preventive women's health services should be covered under the ACA's mandate. A private, nonprofit, and non-governmental institution, IOM is an "independent, evidence-based scientific advisor" operating under the 1863 congressional charter of the National Academy of Sciences. Nat'l Acad. Med., *About the National Academy of Medicine*.[4]

56.     IOM, in turn, convened a committee of sixteen members, including specialists in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines, to formulate specific recommendations. *See* IOM Report.

57.     After conducting an extensive study, that committee issued a comprehensive report, which identified several evidence-based preventive health services, unique to women, that it recommended be included as part of the HRSA's comprehensive guidelines under the ACA. *See* IOM Report.

58.     As set forth in its Report, IOM found that contraceptives are a preventive service that should be covered under the ACA's mandate. *See* IOM Report at 109–10. In making this finding, IOM cited evidence that "contraception and contraceptive counseling" are "effective at reducing unintended pregnancies" and observed that "[n]umerous health professional

---

[3] IOM was renamed the National Academy of Medicine in 2015. Press Release, National Academies of Sciences, Engineering, and Medicine, Institute of Medicine to Become National Academy of Medicine (Apr. 28, 2015), http://www.nationalacademies.org/hmd/Global/News%20Announcements/IOM-to-become-NAM-Press-Release.aspx. Because the Report was issued in the name of IOM, this Complaint refers to IOM throughout.

[4] https://nam.edu/about-the-nam/.

11

associations recommend" that such family planning services be included as part of mandated preventive care for women. *See* IOM Report at 109.

59.     Relying, in part, on recommendations from the American Academy of Pediatrics, the Society of Adolescent Medicine, the American Medical Association, the American Public Health Association, and the Association of Women's Health, Obstetric and Neonatal Nurses, IOM recommended that all employer sponsored health plans cover the "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." IOM Report at 109–10.

60.     IOM based its recommendation on several important factors, including the prevalence of unintended pregnancy in the United States. As stated in its Report, in 2001, an estimated "49 percent of all pregnancies in the United States were unintended—defined as unwanted or mistimed at the time of conception." IOM Report at 102 (internal citations omitted).

61.     IOM found that these unintended pregnancies disproportionately impact the most vulnerable: Although one in every 20 American women has an unintended pregnancy each year, unintended pregnancy is "more likely among women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority group." *Id.*

62.     Unintended pregnancies are more likely to result in abortions: "In 2001, 42 percent of … unintended pregnancies [in the United States] ended in abortion." *Id.*

63.     Moreover, women carrying babies to term are less likely to follow best health practices where those pregnancies are unintended. According to the IOM Committee on Unintended Pregnancy, "women with unintended pregnancies are more likely than those with

intended pregnancies to receive later or no prenatal care, to smoke and consume alcohol during pregnancy." IOM Report at 103.

64.     Women facing unintended pregnancies are also more likely to be "depressed during pregnancy, and to experience domestic violence during pregnancy." *Id.*

65.     IOM also found "significantly increased odds of preterm birth and low birth weight among unintended pregnancies ending in live births compared with pregnancies that were intended." *Id.*

66.     While all pregnancies carry inherent health risks, some women have serious medical conditions for which pregnancy is strictly contraindicated. IOM specifically found that "women with serious medical conditions such as pulmonary hypertension (etiologies can include idiopathic pulmonary arterial hypertension and others) and cyanotic heart disease, and . . . Marfan Syndrome," are advised against becoming pregnant. *Id.* For these women, contraception can be necessary, lifesaving medical care.

67.     Use of contraceptives also promotes medically recommended "spacing" between pregnancies. IOM found that such pregnancy spacing is important because of the "increased risk of adverse pregnancy outcomes for pregnancies that are too closely spaced (within 18 months of a prior pregnancy)" and that "[s]hort interpregnancy intervals in particular have been associated with low birth weight, prematurity, and small for gestational age births." IOM Report at 103.

68.     IOM also found that contraceptives are effective in preventing unintended pregnancies. As stated in the IOM Report, "greater use of contraception within the population produces lower unintended pregnancy and abortion rates nationally." IOM Report at 105.

13

69.     IOM specifically highlighted a study showing that, as the rate of contraceptive use by unmarried women increased in the United States between 1982 and 2002, their rates of unintended pregnancy and abortion declined. *Id.*

70.     IOM reported other studies that showed increased rates of contraceptive use by adolescents from the early 1990s to the early 2000s was associated with a "decline in teen pregnancies" and, conversely, that "periodic increases in the teen pregnancy rate are associated with lower rates of contraceptive use." IOM Report at 105.

71.     IOM also found that contraception, as a method of preventing unintended pregnancy, is highly cost-effective, citing, among other things, savings in medical costs. It reported that "the direct medical cost of unintended pregnancy in the United States was estimated to be nearly $5 billion in 2002, with the cost savings due to contraceptive use estimated to be $19.3 billion." IOM Report at 107.

72.     In addition to preventing unintended pregnancies, IOM recognized that contraceptives have other significant health benefits unrelated to preventing unintended pregnancy. IOM stated in its Report that these "non-contraceptive benefits of hormonal contraception include treatment of menstrual disorders, acne or hirsutism, and pelvic pain." IOM Report at 104. Long-term use of oral contraceptives has also been shown to "reduce a woman's risk of endometrial cancer, as well as protect against pelvic inflammatory disease and some benign breast diseases." *Id.*

73.     Indeed, a leading research and policy organization committed to advancing sexual and reproductive health and rights in the United States and globally found in a 2011 report that more than 1.5 million women rely on oral contraceptive "birth control" pills for medical reasons unrelated to preventing pregnancy and that that 58 percent of all users of birth control pills—

more than half—use them, at least in part, for purposes other than pregnancy prevention. *See*

Jones, *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills*, at 3.

74.     As of 2008, there were still "approximately 36 million U.S. women of

reproductive age (usually defined as ages 15 to 44 years)" who were "estimated to be in need of

family planning services because they were sexually active, able to get pregnant, and not trying

to get pregnant." IOM Report at 103.

75.     Importantly, IOM noted that cost is a meaningful barrier to contraceptive access,

stating that "[d]espite increases in private health insurance coverage of contraception since the

1990s, many women do not have insurance coverage or are in health plans in which copayments

for visits and for prescriptions have increased in recent years" and citing to a Kaiser Permanente

study that found "when out-of-pocket costs for contraceptives were eliminated or reduced,

women were more likely to rely on more effective long-acting contraceptive methods." IOM

Report at 109.

### The Health Resources and Services Administration Adopts the IOM Report and Promulgates Guidelines

76.     HRSA agreed with and adopted IOM's recommendation that contraceptive

services be covered under the Women's Health Amendment to the Affordable Care Act.

77.     In August 2011, pursuant to its responsibility under the ACA, HRSA promulgated

the Women's Preventive Service Guidelines (the "Guidelines"). *See* HRSA, *Women's Preventive*

*Services Guidelines* (2011).[5]

78.     These Guidelines required that, as part of their group health plans, plan sponsors

must cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization

---

[5] https://www.hrsa.gov/womens-guidelines/index.html#2.

procedures, and patient education and counseling for all women with reproductive capacity," without any cost-sharing or payment by the insureds. *Id.*

79.     As recently as December 2016, HRSA updated the Guidelines, following yet another review of relevant evidence, and determined that contraceptive care and services should remain mandated preventive services. *See* HRSA, *Women's Preventative Services Guidelines* (2016).[6]

## The Departments Grant Limited Exemptions and Accommodations to Religious Objectors

80.     The Affordable Care Act does not contain a "conscience clause" that would allow employers to opt out of providing those preventive services required by the statute.

81.     Nevertheless, in 2011, the Departments undertook regulatory action to accommodate religious objectors.

82.     The Departments first issued regulations in 2011 that exempted "churches, their integrated auxiliaries, and conventions or associations of churches" from the ACA's requirement that employers cover contraceptive services, without cost-sharing requirements, under employee group healthcare plans—provided these conscientious objectors satisfied certain criteria.[7]

83.     To qualify, the purpose of the organization had to be "[t]he inculcation of religious values"; the organization had to primarily employ and serve "persons who share the religious tenets of the organization"; and the organization had to operate as a non-profit. 76 Fed. Reg. at 46,623.

---

[6] https://www.hrsa.gov/womens-guidelines-2016/index.html.

[7] *See Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act*, 76 Fed. Reg. 46,621 (Aug. 3, 2011); *Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act*, 77 Fed. Reg. 8725 (Feb. 15, 2012).

84.     In addition, several Senators proposed amending the Affordable Care Act to allow health plans to refuse to provide coverage for certain services if doing so was "contrary to the religious beliefs or moral convictions of the sponsor, issuer, or other entity offering the plan." S. Amdt. 1520, 112th Congress (2011–2012).

85.     The proposed amendment was necessary, its sponsors argued, because the ACA "does not allow purchasers, plan sponsors, and other stakeholders with religious or moral objections to specific items or services to decline providing or obtaining coverage of such items or services, or allow health care providers with such objections to decline to provide them." *Id.*

86.     That proposed amendment was rejected and did not become law. 158 Cong. Rec. S1172-S1172 (Mar. 1, 2012).

87.     The following year, the Departments amended the original religious exemption. *Coverage of Certain Preventive Services Under the Affordable Care Act*, 78 Fed. Reg. 39,870 (July 2, 2013) (the "Second Religious Exemption"). To claim the Second Religious Exemption, an organization must simply operate as a non-profit and be a church, its integrated auxiliary, or a convention or association of churches. *Id.* at 39,874.

88.     At the same time, the Departments established an "accommodation" for religious nonprofit organizations that did not qualify for the Second Religious Exemption but still wanted to avoid the ACA's mandate of having to provide contraceptive services to their employees (the "Accommodation"). *Id.* at 39,874–82.

89.     Under the Accommodation, an objecting employer could self-certify as an eligible organization. Once it self-certified, the health insurance issuer—not the objecting employer— would have to provide the necessary and required contraceptive services directly to women covered under the sponsor's plan. *Id.* In this way, women whose employers refused to pay for the

legally mandated contraceptive coverage under the Accommodation still had access to contraceptive care.

90.     At that time, the Defendant Departments declined to create any broader exceptions to the Contraceptive Care Mandate. Instead, they struck a balance by adhering to the evidence-based approach to women's preventive health needs intended by Congress and allowing only the Second Religious Exemption and the Accommodation, two reasonable exceptions under which religious organizations and nonprofit employers with religious objections, could opt out of the ACA's Contraceptive Care Mandate.

91.     Indeed, throughout this process, the government continued to recognize that guaranteeing women's access to contraceptive services is an essential healthcare component to allowing women to participate as full members of society.

92.     For example, even while trying to accommodate the views of religious objectors, the Defendant Departments firmly articulated that barriers to contraceptive access "place[] women in the workforce at a disadvantage compared to their male co-workers" and observed that, "by reducing the number of unintended and potentially unhealthy pregnancies, [contraceptive coverage] furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force." 77 Fed. Reg. at 8728 (footnote omitted).

### Litigation Challenging the ACA's Contraceptive Care Mandate

93.     Following passage of the ACA and promulgation of the relevant implementing regulations, several employers filed lawsuits to challenge the scope of the Contraceptive Care Mandate, the Second Religious Exemption, and the Accommodation.

94.     In *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), the Supreme Court concluded that applying the ACA's Contraceptive Care Mandate to closely held

corporations that objected on the basis of sincerely held religious beliefs but that were not eligible for the Accommodation violated the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-1.

95.     That statute provides that the government may not "substantially burden a person's exercise of religion" unless it did so "in furtherance of a compelling governmental interest" and adopted "the least restrictive means of furthering that compelling governmental interest." *Id.*

96.     As a result of the ruling in *Hobby Lobby*, the Defendant Departments began allowing closely held for-profit entities to take advantage of the Accommodation process previously available only to nonprofit employers. *Coverage of Certain Preventive Services Under the Affordable Care Act*, 80 Fed. Reg. 41,318 (July 14, 2015).

97.     In *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), the Supreme Court considered several consolidated challenges to the Accommodation itself. Following oral argument, the Court sought clarification from the parties as to whether a modified accommodation process that did not require the employer to formally notify its insurance company of its objection—but would still ensure that the employer's employees received contraceptive coverage—would accommodate both the government's interests and the objections of certain religious employers. *Id.* at 1559-60.

98.     After receiving clarification from the parties, the Supreme Court remanded to provide them with "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans 'receive full and equal health coverage, including contraceptive coverage.'" *Id.* at 1560 (citation omitted).

99.     On January 9, 2017, the Department of Labor announced that "no feasible approach has been identified . . . that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage." Dep't of Labor, *FAQs about Affordable Care Act Implementation Part 36*, at 4 (Jan. 9, 2017).

100.     As such, the Department reaffirmed that the Accommodation "does not substantially burden [objecting employers'] exercise of religion." *Id.* at 4–5. Even if it did, the Department also reaffirmed that "the accommodation is the least restrictive means of furthering the government's compelling interest in ensuring that women receive full and equal health coverage, including contraceptive coverage." *Id.*

### President Trump's Executive Order "Promoting Free Speech and Religious Liberty"

101.     On May 4, 2017, President Donald Trump issued an Executive Order entitled "Promoting Free Speech and Religious Liberty."  Exec. Order No. 13798, 82 Fed. Reg. 21,675 (May 4, 2017).

102.     Among other provisions, this Executive Order directed the Defendant Departments to "consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg-13(a)(4) of Title 42, United States Code."  *Id.* § 3.

103.     This Executive Order did not specifically mention the Contraceptive Care Mandate. Rather, the President directed the Defendant Departments to consider issuing amended regulations to address conscience-based objections to services provided under the Women's Health Amendment to the Affordable Care Act only.

104.    The President did not, for example, direct the Departments to consider regulations addressing objections to similar requirements to provide other preventive services. *See* 42 U.S. Code § 300gg-13(a)(1)-(3).

105.    President Trump's Executive Order did not identify any deficiencies with the existing regulations that addressed conscience-based objections (the Second Religious Exemption and the Accommodation) or provide any guidance whatsoever as to the amended regulations that the President had directed the Departments to consider issuing.

106.    The Executive Order did not direct the agencies to comply with *Zubik*'s command that any exemptions to the Contraceptive Care Mandate "ensur[e] that women covered by … health plans 'receive full and equal health coverage, including contraceptive coverage.'" 136 S. Ct. at 1560. It stated only that any amended regulations issued must be "consistent with applicable law." *Id.* § 3.

**The Departments Issue the IFRs Without Engaging in Required Notice-and-Comment Rulemaking**

107.    On October 6, 2017, the Defendant Departments issued the Moral Exemption and Religious Exemption IFRs without any advance public notice and without inviting or providing opportunity for comment.

108.    The Religious Exemption IFR significantly expanded the scope of the existing religious exemption. Specifically, it allowed all employers—including non-profits, closely held for-profits companies, and publicly traded corporations—to opt out of providing no-cost contraceptive coverage to their employees on the basis of the employer's "sincerely held religious beliefs." 82 Fed. Reg. at 47,808–12. It also extended the exemption to institutions of higher education, insurance issuers, and individuals. *Id.*

109. The Religious Exemption IFR suggested that, if owners of a majority of a company's shares possess a religious objection to contraceptive coverage, the company can simply refuse to provide such coverage. The Religious Exemption IFR stated that "in a country as large as America comprised of a supermajority of religious persons . . . the majority of shares (or voting shares) of some publicly traded companies might be controlled by a small group of religiously devout persons so as to set forth such a religious character." *Id.* at 47,810.

110. The Moral Exemption IFR created a brand new exemption allowing employers to refuse to provide their employees with contraceptive coverage solely "based on sincerely held moral convictions" of the employer. 82 Fed. Reg. at 47,844.

111. The Moral Exemption IFR could be claimed by nonprofit entities, for-profit entities whose shares are not publicly traded, institutions of higher education, health insurance issuers, and individuals. 82 Fed. Reg. at 47,850. Unlike the Religious Exemption IFR, the Moral Exemption IFR did not allow publicly traded companies to opt out of the Mandate.

112. In the IFRs, the Departments admitted that employees of companies that objected under either IFR would lose access to the contraceptive coverage required under the ACA's Contraceptive Care Mandate. *See* 82 Fed. Reg. at 47,818-22.

113. Both IFRs allowed objecting entities to utilize the Accommodation, but eliminated any requirement that they do so. 82 Fed. Reg. at 47,812–13; 82 Fed. Reg. at 47,854.

114. Under the IFRs, objecting entities did "not need to file notices or certifications of their exemption." 82 Fed. Reg. at 47,808; 82 Fed. Reg. at 47,850.

115. The Departments estimated that between 31,700 and 120,000 women would lose access to federally mandated contraceptive services when their employers claimed the Religious Exemption. 82 Fed. Reg. at 47,816–24.

22

**This Court Enjoins the IFRs**

116.    On October 11, 2017, the Commonwealth filed its original Complaint in this matter, alleging that the IFRs were unlawfully issued in violation of the APA and other statutory and constitutional provisions (ECF No. 1).

117.    The Commonwealth further alleged that many Pennsylvania women who were denied contraceptive coverage as a result of the IFRs would be forced to rely on government-funded programs, causing the Commonwealth irreparable harm.

118.    The Commonwealth moved for a preliminary injunction of the IFRs (ECF Nos. 8 & 9).

119.    On December 15, 2017, this Court granted the Commonwealth's motion and enjoined the federal defendants (with the exception of the President) from enforcing the IFRs (ECF Nos. 59 & 60).

120.    This Court found that Defendants had issued the IFRs without notice and comment in violation of the APA, and further found that the exemptions themselves were arbitrary, capricious, and contrary to the requirements of the ACA.

121.    On December 21, 2017, the U.S. District Court for the Northern District of California also entered a preliminary injunction against the IFRs. *California v. Health & Human Servs.*, 281 F. Supp. 3d 806 (N.D. Cal. 2017). This decision was recently affirmed. *California v. Azar*, No. 18-15155, Dkt. No. 136-1 (9th Cir. Dec. 13, 2018),

**The Departments Issue the Final Exemption Rules**

122.    On November 15, 2018, the Departments issued the final Religious and Moral Exemption Rules. They are scheduled to go into effect on January 14, 2019. 83 Fed. Reg. at 57,536; 83 Fed. Reg. at 57,592.

123.    The final Exemption Rules "finalize, with changes based on public comments," the broad exemptions originally created in the IFRs. 83 Fed. Reg. at 57,536; 83 Fed. Reg. at 57,592.

124.    Like the Religious Exemption IFR, the final Religious Exemption Rule will allow all employers—including non-profits, closely held for-profits companies, and publicly traded corporations—to opt out of providing no-cost contraceptive coverage to their employees on the basis of the employer's "sincerely held religious beliefs." 83 Fed. Reg. at 57,537. It will also extend the exemption to institutions of higher education, insurance issuers, and individuals. *Id.*

125.    Like the Moral Exemption IFR, the final Moral Exemption Rule will allow entities to avoid complying with the Contraceptive Care Mandate on the basis of the employer's "sincerely held moral convictions." 83 Fed. Reg. at 57,616. The final Moral Exemption can be claimed by nonprofit entities, for-profit entities whose shares are not publicly traded, institutions of higher education, health insurance issuers, and individuals.

126.    Unlike the IFRs, however, the final Religious Exemption Rule will allow any employer—even one that does not have a sincerely held religious objection to contraception—to avoid complying with the Contraceptive Care Mandate if it adopts a group health plan "established or maintained" by an objecting organization. 83 Fed. Reg. at 57,560, 57,563–64.

127.    The final Exemption Rules will also allow any covered entity to claim the exemption if they have a sincerely held religious or moral objection to "establishing, maintaining, providing, offering, or arranging for … a plan, issuer, or third party administrator that provides or arranges such coverage or payments [for some or all contraceptive services]." 83 Fed. Reg. at 57,537; 83 Fed. Reg. at 57,593.

128.    As with the IFRs, the Departments admit that employees of companies that object under either final Exemption Rule would lose access to the contraceptive coverage required under the ACA's Contraceptive Care Mandate.

129.    The Departments estimate that between 70,500 and 126,400 women will lose access to federally mandated contraceptive services when their employers claim the final Religious Exemption. 83 Fed. Reg. at 57,575–582.

130.    To explain the more than doubled lower bound of impacted women, the Departments admit that the analysis they conducted in the IFR failed to properly account for the number of employees working for entities that had claimed the Accommodation. 83 Fed. Reg. at 57,576.

131.    The final Exemption Rules undermine the balance struck under the prior regulatory scheme and run counter to the Affordable Care Act's mandate that evidence-based preventive services be provided.

132.    As a result, millions of women potentially will be subjected to increased financial hardship and the loss of necessary contraceptive care.

**Specific Harm to the Commonwealth of Pennsylvania and the State of New Jersey Caused by the final Exemption Rules**

133.    As a result of Defendants' final Exemption Rules, it is expected that many plan sponsors will claim the newly expanded exemptions and will deny their own employees and others medical coverage that is otherwise required under the Contraceptive Care Mandate.

134.    As a result, numerous insureds—and their female dependents—will lose the medical coverage for contraceptive care required by the Affordable Care Act.

135.    Upon information and belief, many of these employers operate in Pennsylvania and New Jersey.

136.     During the course of litigation against the IFRs, Defendants revealed that they
calculated their estimates of impacted women based on the assumption that many litigating and
accommodated entities would use the religious and moral exemptions. A number of these entities
are based in Pennsylvania and New Jersey: Bingaman and Son Lumber Inc., Kreamer, PA
(number of employees unknown); Conestoga Wood Specialties Corporation, East Earl, PA (950
employees); Cummins Allison, Philadelphia, PA and Elmwood Park, NJ (number of employees
unknown); DAS Companies, Inc., Palmyra, PA (number of employees unknown); Earth Sun
Moon Trading Company, Inc., Grove City, PA (number of employees unknown); Geneva
College, Beaver Falls, PA (1,850 students, 350 employees); Hobby Lobby (13,240 total
employees, at least 25 stores in Pennsylvania and New Jersey); and Holy Ghost Preparatory
School, Bensalem, PA (number of employees unknown).

137.     Therefore, many of those losing legally-mandated coverage for contraceptive
services will be Pennsylvania and New Jersey residents. All of the women affected will face an
increased risk of medical harm or an increased economic burden if they choose to self-fund
contraception

138.     This broad loss of formerly-mandated contraceptive care will result in significant,
direct and proprietary harm to Pennsylvania and New Jersey, which will bear increased costs as a
result of the final Exemption Rules.

139.     States are generally preempted from regulating self-insured plans. Such plans are,
instead, governed by the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L.
93–406, 88 Stat. 829 (codified in part at 29 U.S.C. ch. 18), a federal law that establishes
minimum standards for pension plans in private industry and provides for extensive rules on the
federal income tax effects of transactions associated with employee benefit plans.

140.     As of 2010, approximately 80 percent of "large employers" (with over 1000 employees), and 50 percent of "mid-sized employers" (with 200-1000 employees), offered self-insured plans. *See* Rand Corp., Employer Self-Insurance Decisions, at 17-18 (Mar. 2011) (prepared for United States Department of Labor and HHS).

141.     New Jersey law requires employers who offer fully-insured plans to provide coverage for expenses incurred in the purchase of prescription female contraceptives to the same extent as any other outpatient prescription drug covered under the policy. *E.g.*, N.J. Stat. Ann. §§ 17B:26-2.1y, 17B:27:46.1ee, 17B:27A-19.15 (West 2018).

142.     Unlike the Women's Health Amendment, New Jersey's contraceptive mandate does not require insurers to offer women contraceptive services with zero out-of-pocket costs.  In addition, New Jersey's mandate only requires coverage for prescription female contraceptives, rather than all FDA-approved female contraceptive methods.  As a result, female employees of objecting entities could lose coverage entirely for certain contraceptive methods and could be forced to pay significantly higher out-of-pocket costs for those methods that are covered.

143.     These costs will impose an additional financial burden on women and will cause some women to forgo contraception entirely or to forgo their preferred method of contraception.

144.     Approximately 3,434,000 New Jersey residents who have health insurance are covered by self-insured plans. Due to ERISA's preemption provision, self-insured plans offered by private employers are exempt from New Jersey's contraceptive mandate. As a result, New Jersey residents who are employed by organizations with self-insured plans that take advantage of the expanded exemption from the Contraceptive Care Mandate may lose all coverage for the medical costs associated with contraceptive care.

145.    The complete loss of coverage (or partial loss of coverage and increased copays and deductibles for employees in non-ERISA plans) will be particularly problematic for women seeking to access long-acting reversible contraceptives, which are among the safest and most effective contraceptive methods available, but have very high initial costs, often in the range of $400 to $1,000 per person.

146.    Some women who lose their contraceptive benefits because of the expanded exemptions granted will turn to state-funded programs for their contraceptives, which will force Pennsylvania and New Jersey to absorb additional financial costs presently borne by private-insurers.

147.    In Pennsylvania, Medicaid (known as "Medical Assistance") provides contraceptive services to women in Pennsylvania with incomes up to 138 percent of the federal poverty level. The Commonwealth's Family Planning Services Program likewise provides contraceptive services to women with incomes up to 215 percent of the poverty level. The Commonwealth also funds Title X clinics, which have no income-based eligibility requirements. The additional financial burden from increased use of these programs will be borne by the Commonwealth.

148.    New Jersey's state- and federally-funded Medicaid and Children's Health Insurance Programs (collectively, known as "NJ FamilyCare") similarly provide contraceptive coverage to New Jersey women with incomes up to 138 percent of the federal poverty limit.  In addition, New Jersey's subsidized family planning clinics provide preventive screenings and contraceptives to all patients, regardless of income or insurance coverage, including financially vulnerable women who are not eligible for Medicaid. Increased use of these programs by women who lose coverage for contraceptive services under the final Exemption Rules will result in

28

additional costs to New Jersey, including the cost of providing services to low-income women who are eligible for free or reduced cost services, as well as the cost of expanding facilities to meet increased demand from all women, even those who due to their income level are required to pay fully or in part for the services they receive.

149.     Other women will forgo contraceptive health services altogether, because the loss of their employer-sponsored coverage will make their formerly-mandated care unaffordable or inaccessible. As a result of the affected women no longer receiving coverage, Pennsylvania and New Jersey will see an increase in unintended pregnancies and other negative health outcomes which, in addition to other personal, social and societal burdens, are associated with significant additional costs to state-funded programs that protect the health of women and infants.

150.     Nationally, a publicly funded birth in 2010 cost an average of $12,770 for prenatal and postnatal care, labor and delivery, and for the first year of infant care. In 2010, according to one study, New Jersey spent an estimated $186.1 million and Pennsylvania an estimated $248.2 million on unintended pregnancies. *See* Sonfield & Kathryn Kost, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care National and State Estimates for 2010*, at 13.

151.     Indeed, to date—before Defendants issued the IFRs and the final Exemption Rules—the Contraceptive Care Mandate had resulted in extraordinary savings for women.

152.     A recent study conducted by the University of Pennsylvania found, for example, that the ACA's Contraceptive Care Mandate "is saving the average [contraceptive] pill user $255 per year" and "the average woman receiving an IUD is saving $248." *See* Press Release, University of Pennsylvania School of Medicine, Affordable Care Act Results in Dramatic Drop

in Out-of-Pocket Prices for Prescription Contraceptives, Penn Medicine Study Finds (July 7, 2015).[8]

153.    Spread over an estimated 6.88 million privately insured oral contraceptive users in the United States, the University of Pennsylvania study estimates that, as a result of the ACA's Contraceptive Care Mandate, "consumer annual contribution to spending on the pill could be reduced by almost $1.5 billion annually." *Id.*

154.    In addition to the direct, proprietary harm set forth above, the final Exemption Rules impermissibly encroach on Pennsylvania's and New Jersey's quasi-sovereign interests in protecting the health, safety, and well-being of their residents, and in ensuring that they enjoy equal access to federal programs. As such, in addition to proprietary standing, Pennsylvania and New Jersey have *parens patriae* standing to vindicate these interests.

155.    By failing to follow the procedures set forth in the APA, Defendants further harmed Pennsylvania and New Jersey by denying them the right to participate meaningfully in the rulemaking process.

## CAUSES OF ACTION

### COUNT I

### Violation of Equal Protection of the Laws

156.    Pennsylvania and New Jersey incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

---

[8] https://www.pennmedicine.org/news/news-releases/2015/july/affordable-care-act-results-in.

157.     Under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, the federal government may not deny any person equal protection of the laws. U.S. Const. amend. V.

158.     Discrimination on the basis of sex violates this constitutional guarantee.

159.     The final Exemption Rules apply to only one category of preventive medical care, contraception, which is used predominantly by women.

160.     Because the final Exemption Rules are targeted at women and deny them needed preventive medical services, the Rules violate the Constitution's guarantee of equal protection under the laws.

## COUNT II

### Violation of Title VII of the Civil Rights Act and the Pregnancy Discrimination Act

161.     Pennsylvania and New Jersey incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

162.     The Exemption Rules violate Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, which prohibits discrimination based on sex. *See* 42 U.S.C. § 2000e et seq. (Title VII).

163.     The Pregnancy Discrimination Act prohibits discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e. It therefore prevents employees from discrimination based on need for contraception.

164.     Classifying employees on the basis of their childbearing capacity, regardless of whether they are, in fact, pregnant, is prohibited sex discrimination under Title VII.

165.     The Exemption Rules violate Title VII because they discriminate against women on the basis of their capacity to get pregnant.

## COUNT III

### Violation of the Procedural Requirements of the Administrative Procedure Act

166.     Pennsylvania and New Jersey incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

167.     Under the APA, a court shall "hold unlawful" and "set aside" any "agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

168.     In issuing substantive rules, federal agencies are required to follow the notice and comment process set forth in the APA unless the agency "for good cause" finds that notice and public procedure are "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(3)(B). Any such findings must be incorporated into the rules along with "a brief statement of reasons therefor." *Id.*

169.     Specifically, before issuing any rule, the agency must publish a "[g]eneral notice of proposed rule making" in the Federal Register. 5 U.S.C. § 553(b).

170.     That notice must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

171.     The agency must further provide "interested persons" an "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

172.     In issuing the IFRs, the Defendant Departments failed to follow these basic requirements.

173.     Furthermore, the justifications offered by the Departments for their failure to engage in notice and comment rulemaking did not satisfy the "good cause" standard required under section 553(b)(3)(B) of the APA.

174.     In issuing the final Exemption Rules, Defendants similarly did not follow the notice and comment procedures as set forth in the APA. Rather, Defendants accepted comments after the IFRs had already gone into effect, and purported to consider those comments in issuing the final Exemption Rules.

175.     The final Exemption Rules "finalize" the IFRs, and adopt without change most of the language in the IFRs.

176.     As a result, the final Exemption Rules are impermissibly tainted with the same procedural defects as the IFRs.

177.     In addition, when an agency does accept comments, it must respond to all significant comments and provide a statement of the "basis and purpose" of each final rule. 5 U.S.C. § 553(c).

178.     The responses to comments offered by Defendants in the final Exemption Rules are insufficient, and the statements of basis and purpose fail to satisfy APA requirements.

179.     Because the Departments failed to follow the procedural requirements of the APA, the final Exemption Rules should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(D).

## COUNT IV

### Violation of the Substantive Requirements of the Administrative Procedure Act

180.     Pennsylvania and New Jersey incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

181.     Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

182.    Both the final Moral Exemption Rule and the final Religious Exemption Rule are inconsistent with the Affordable Care Act's requirement that group health plans and insurers provide women with preventive care as provided for in guidelines issued by HRSA, without any cost-sharing requirements.

183.    The Rules also violate the civil rights protections in the ACA prohibiting discrimination on the basis of sex and other protected categories in most healthcare programs and activities. *See* 42 U.S.C. § 18116.

184.    They also violate the provisions of the ACA that prohibit the promulgation of any regulation that "[c]reates any unreasonable barrier to the ability of individuals to obtain appropriate medical care," "[i]mpedes  timely access to health care services," or "[l]imits the availability of health care treatment for the  full duration of a patient's medical needs." 42 U.S.C. § 18114.

185.    In addition, the Departments abused their discretion and acted in a manner that was arbitrary and capricious in issuing the final Exemption Rules. 5 U.S.C. § 706(2)(A).

186.    Specifically, the Departments fail to provide an adequate rationale for concluding that the Accommodation violates the Religious Freedom Restoration Act. They also fail to provide adequate reasons for why the final Religious Exemption is required or permissible under the Religious Freedom Restoration Act.

187.    Indeed, when it passed the Affordable Care Act, Congress elected not to include a "conscientious objector" or other exemption for individuals or organizations who object to any portion of the ACA on religious or moral grounds.

188.    The Departments further rely on arbitrary and capricious explanations to justify their decision to issue the Final Exemptions Rules.

189.    Because the final Exemption Rules are arbitrary, capricious, an abuse of discretion, and contrary to law, they should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT V

### Violation of the Establishment Clause

190.    Pennsylvania and New Jersey incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

191.    The final Exemption Rules violate the Establishment Clause of the First Amendment to the U.S. Constitution.

192.    The Departments have used their rulemaking authority for the primary purpose, and with the actual effect, of advancing and endorsing religious interests.

193.    The Departments have acted to promote employers' religious beliefs over the self-determination of women who may not share those beliefs and over the ACA's mandate that preventive care be provided.

194.    As a result, the final Exemption Rules violate the Establishment Clause.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commonwealth of Pennsylvania and the State of New Jersey request that this Court enter judgment in their favor and grant the following relief:

a.  Declare the final Moral Exemption Rule and the final Religious Exemption Rule unlawful;

b.  Vacate the final Moral Exemption Rule and the final Religious Exemption Rule;

c.  Preliminarily and permanently enjoin the application of the final Moral Exemption Rule and the final Religious Exemption Rule;

d.  Award Plaintiffs reasonable costs, including attorneys' fees; and

e.  Grant such other and further relief as the Court deems just and proper.

December 14, 2018                              Respectfully submitted,

GURBIR S. GREWAL                              JOSH SHAPIRO
Attorney General of New Jersey                Attorney General
GLENN J. MORAMARCO                           Commonwealth of Pennsylvania
Assistant Attorney General
ELSEPTH FAIMAN HANS                          */s/ Michael J. Fischer*
Deputy Attorney General                       MICHAEL J. FISCHER
KIMBERLY A. CAHALL                            Chief Deputy Attorney General
Deputy Attorney General                       AIMEE D. THOMSON
New Jersey Attorney General's Office          Deputy Attorney General
Richard J. Hughes Justice Complex             Office of Attorney General
25 Market Street                              1600 Arch Street
Trenton, NJ 08625                             Suite 300
(609) 376-3235                                Philadelphia, PA 19103
Glenn.Moramarco@law.njoag.gov                 (215) 560-2171
                                              mfischer@attorneygeneral.gov