# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
and STATE OF NEW JERSEY,

     *Plaintiff*,

v.

DONALD J. TRUMP, *et al.*

     *Defendants*,

LITTLE SISTERS OF THE POOR SAINTS
PETER AND PAUL HOME,

     *Defendant-Intervenors.*

Civil No. 2:17-CV-04540-WB

**DEFENDANT-INTERVENOR'S
RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ......................................................................................1

BACKGROUND .......................................................................................2

    A. The federal Mandate and its regulatory history ................................2

    B. The challenges to the Mandate and the resulting injunctions ........................6

    C. Challenges to the Final Rule ...........................................................8

ARGUMENT ........................................................................................10

I.    The States lack standing.........................................................................10

    A. The States lack standing in their own right.........................................10

        1. The States do not have standing to bring equal protection, Title VII, or Establishment Clause claims here.................................................10

        2. The States cannot show they are certain to suffer a cognizable injury as a result of the Final Rule................................................11

        3. Any injury to the States is either self-inflicted or the result of nonredressable judicial injunctions.................................................14

    B. The States cannot assert claims as *parens patriae* against the United States. .............15

II.   Pennsylvania is not likely to succeed on its APA claims. ................................16

    A. The Final Rule is substantively lawful...................................................16

        1. The States ignore existing injunctions. ...........................................16

        2. The ACA does not require contraceptive coverage. ...........................17

        3. Section 1554 does not conflict with the Final Rule. ...........................19

        4. Section 1557 does not mandate contraceptive coverage.......................19

        5. RFRA requires HHS to create religious exemptions. ..........................20

        6. RFRA authorizes HHS to lift government-created burdens on religious exercise. ........................................................................24

    B. The Final Rule is procedurally valid. .....................................................25

        1. Any procedural error in the interim rules is harmless. .........................25

        2. The Final Rule confirms that HHS carefully considered comments. ..................32

III.  The Final Rule does not violate Title VII or the Pregnancy Discrimination Act. ............33

IV.  The Final Rule does not violate the Establishment Clause. ...............................34

    A. The States misapply the Establishment Clause. .......................................34

        1. The States wrongly ignore *Town of Greece*. ...................................34

        2. The Final Rule readily passes both Establishment Clause tests. ...........................35

B.   Striking down the Final Rule under the Establishment Clause
     would endanger a swath of state and federal laws. ....................................................37

V.      The Final Rule does not violate equal protection. ............................................................40

VI.     The requested relief would violate judicial orders, the Constitution,
        and federal law.................................................................................................................41

VII.    The remaining injunction factors are not satisfied..........................................................43

CONCLUSION..................................................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advocates for Highway & Auto Safety v. Fed. Highway Admin.*,
    28 F.3d 1288 (D.C. Cir. 1994).............................................................32

*AFGE, Local 3090 v. FLRE*,
    777 F.2d 751 (D.C. Cir. 1985).............................................................29

*Belmont Abbey Coll. v. Sebelius*,
    878 F. Supp. 2d 25 (D.D.C. 2012).........................................................6

*Blackhawk v. Pennsylvania*,
    381 F.3d 202 (3d Cir. 2004)...............................................................43

*Burwell v. Hobby Lobby Stores, Inc.*,
    134 S. Ct. 2751 (2014).................................................................. *passim*

*California v. Azar*,
    No. 18-15144, 2018 WL 6566752 (9th Cir. Dec. 13, 2018)............................ 41-42

*California v. HHS*,
    No. 4:17-cv-05783-HSG (N.D. Cal., Dec. 18, 2018) .................................12

*Catholic Benefits Ass'n LCA v. Hargan*,
    No. 5:14-cv-00240-R (W.D. Okla. Mar. 7, 2018) ......................................9

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)..................................................................39, 42

*Colo. Christian Univ. v. Weaver*,
    534 F.3d 1245 (10th Cir. 2008) ..........................................................42

*Comm. for Pub. Educ. & Religious Liberty v. Regan*,
    444 U.S. 646 (1980)......................................................................34

*Corp. of Presiding Bishop of Church of Jesus Christ of
Latter-Day Saints v. Amos*,
    483 U.S. 327 (1987).................................................................. *passim*

*County of Allegheny v. ACLU Greater Pittsburgh*,
    492 U.S. 573 (1989)......................................................................35

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005)......................................................................37

*DeHart v. Horn*,
    390 F.3d 262 (3d Cir. 2004)...............................................................24

*Doe v. Bolton*,
410 U.S. 179 (1973) ................................................................41

*E. Tex. Baptist Univ. v. Sebelius*,
988 F. Supp. 2d 743 (S.D. Tex. 2013) ...........................12, 23

*Employment Div. v. Smith*,
494 U.S. 872 (1990) ................................................................24

*Eternal Word Television Network v. Sec'y of U.S. Dep't of Health & Human Servs.*
744 F. App'x 683 (11th Cir. 2018) ........................................12

*Franciscan All., Inc. v. Burwell*,
227 F. Supp. 3d 660 (N.D. Tex. 2016) ............................. 19-20

*Friends of Iwo Jima v. Nat'l Capital Planning Comm'n*,
176 F.3d 768 (4th Cir. 1999) ................................................32

*Geneva Coll. v. Azar*,
No. 2:12-cv-00207 (W.D. Pa. July 5, 2018) .........................22

*Geneva Coll. v. Secretary*,
778 F.3d 422 (3d Cir. 2015) ....................................... 21-22, 23

*GenOn REMA, LLC v. EPA*,
722 F.3d 513 (3d Cir. 2013) ..................................................27

*Green Island Power Auth. v. FERC*,
577 F.3d 148 (2d Cir. 2009) ..................................................27

*Green v. Haskell Cty. Bd. of Comm'rs*,
574 F.3d 1235 (10th Cir. 2009) .............................................35

*Guru Nanak Sikh Soc. of Yuba City v. Cty. of Sutter*,
456 F.3d 978 (9th Cir. 2006) .................................................40

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) ...................................................36, 39, 42

*Larson v. Valente*,
456 U.S. 228 (1982) ................................................................42

*Levesque v. Block*,
723 F.2d 175 (1st Cir. 1983) .................................................31

*Little Sisters of the Poor Home for the Aged v. Sebelius*,
134 S. Ct. 1022 (2014) ....................................................17, 21

*Little Sisters of the Poor v. Azar*,
No. 1:13-cv-02611 (D. Colo. May 29, 2018) ..........................9

*Locke v. Davey*,
540 U.S. 712 (2004) ........................................................................ 37

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................................................................. 10, 14

*Mack v. Warden Loretto FCI*,
839 F.3d 286 (3d Cir. 2016) .......................................................... 24

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ........................................................................ 15

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ........................................................................ 15

*McCreary Cty. v. ACLU*,
545 U.S. 844 (2005) ........................................................................ 35

*Missouri ex rel. Koster v. Harris*,
847 F.3d 646 (9th Cir.) ................................................................... 15

*NRDC v. EPA*,
683 F.2d 752 (3d Cir. 1982) .......................................................... 28

*PDK Labs. Inc. v. U.S. Drug Enforcement Admin.*,
362 F.3d 786 (D.C. Cir. 2004) ....................................................... 27

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) ........................................................................ 14

*Pennsylvania v. Porter*,
659 F.2d 306 (3d Cir. 1981) .......................................................... 15

*Pennsylvania v. Riley*,
84 F.3d 125 (3d Cir. 1996) ........................................................ 10, 40

*Pennsylvania v. Trump*,
281 F. Supp. 3d 553 (E.D. Pa. 2017) ............................................. 38

*Pennsylvania v. Trump*,
No. 17-3752 (3d Cir. docketed Dec. 21, 2017) ............................... 9

*People v. Philips*
(N.Y. Ct. Gen. Sess. 1813) ............................................................. 36

*Reaching Souls Int'l, Inc. v. Azar*,
No. CIV-13-1092-D, 2018 WL 1352186 (W.D. Okla. Mar. 15, 2018) ....... 9

*Real Alternatives v. Sec'y Dep't Health & Human Servs.*,
867 F.3d 338 (3d Cir. 2017) .......................................................... 22

*Sch. Dist. of Grand Rapids v. Ball*,
   473 U.S. 373 (1985)........................................................................................34

*Sharon Steel Corp. v. EPA*,
   597 F.2d 377 (3d Cir. 1979)......................................................................27, 28

*Sheppard v. Sullivan*,
   906 F.2d 756 (D.C. Cir. 1990) ...................................................................28-29

*Shinseki v. Sanders*,
   556 U.S. 396 (2009)...................................................................................26, 27

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ..................................................................................10-11

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ...................................................................................10

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ..........................................................................16

*Texas v. United States*,
   No. 4:18-CV-00167-O, 2018 WL 6589412 (N.D. Tex. Dec. 14, 2018)...................3

*Estate of Thornton v. Caldor*,
   472 U.S. 703 (1985)........................................................................................37

*Town of Greece v. Galloway*,
   572 U.S. 565 (2014)........................................................................................35

*In re Union Pac. R.R. Employment Practices Litigation*,
   479 F.3d 936 (8th Cir. 2007) ..........................................................................33

*United States v. Cooper*,
   750 F.3d 263 (3d Cir. 2014)............................................................................31

*United States v. Dimpfl*,
   523 F. App'x 865 (3d Cir. 2013) .....................................................................31

*United States v. Johnson*,
   632 F.3d 912 (5th Cir. 2011) ..........................................................................31

*United States v. Reynolds*,
   710 F.3d 498 (3d Cir. 2013).......................................................................28, 30

*United States v. Rutherford Cty. Tenn.*,
   No. 3:12-0737, 2012 WL 3775980 (M.D. Tenn. Aug. 29, 2012)..........................39

*Utah Highway Patrol Ass'n v. American Atheists, Inc.*,
   565 U.S. 994 (2011)........................................................................................34

*Wallace v. Jaffree*,
472 U.S. 38 (1985)................................................................................34

*Warth v. Seldin*,
422 U.S. 490 (1975)..............................................................................10

*Washington v. Trump*,
No. 2:17-cv-01510-RBL (W.D. Wash., Dec. 18, 2018) .......................12

*Wheaton Coll. v. Azar*,
No. 1:13-cv-08910 (N.D. Ill. Feb. 22, 2018) ......................................24

*Wheaton College v. Burwell*,
134 S. Ct. 2806 (2014).......................................................................5, 17

*Zorach v. Clauson*,
343 U.S. 306 (1952)..............................................................................37

*Zubik v. Burwell*,
135 S. Ct. 2924 (2015)..........................................................................17

*Zubik v. Burwell*,
136 S. Ct. 1557 (2016)..................................................................*passim*

**Statutes**

5 U.S.C. § 706..........................................................................................26

20 U.S.C. § 1681......................................................................................19

26 U.S.C. § 4980H..................................................................................2, 4

26 U.S.C. § 5000A.....................................................................................2

29 U.S.C. § 1185d......................................................................................3

42 U.S.C. § 7607......................................................................................15

42 U.S.C. § 300......................................................................................2, 13

42 U.S.C. § 300a-7...................................................................................41

42 U.S.C. § 300gg-13............................................................................3, 18

42 U.S.C. § 2000bb...........................................................................*passim*

42 U.S.C. § 18011......................................................................................4

42 U.S.C. § 18114....................................................................................19

42 U.S.C. § 18116....................................................................................19

## Regulations

45 C.F.R § 147.131 ...................................................................................................9

73 Fed. Reg. 38,030 (July 2, 2008)..........................................................................30

75 Fed. Reg. 34,538 (June 17, 2010) ...........................................................4, 11, 18

75 Fed. Reg. 41,726 (July 19, 2010).........................................................................3

75 Fed. Reg. 81,849 (Dec. 29, 2010) ......................................................................31

76 Fed. Reg. 46,621 (Aug. 3, 2011)......................................................................3, 4

77 Fed. Reg. 8,725 (Feb. 15, 2012) .......................................................................4, 5

77 Fed. Reg. 16,501 (Mar. 21, 2012) .......................................................................5

78 Fed. Reg. 8,456 (Feb. 6, 2013) .............................................................................5

78 Fed. Reg. 39,870 (July 2, 2013) ...........................................................................5

79 Fed. Reg. 51,092 (Aug. 27, 2014).........................................................................5

80 Fed. Reg. 41,318 (July 14, 2015).........................................................................6

81 Fed. Reg. 31,376 (May 18, 2016) .......................................................................20

81 Fed. Reg. 47,741 (July 22, 2016).........................................................................8

82 Fed. Reg. 47,792 (Oct. 13, 2017).........................................................................8

82 Fed. Reg. 47,838 (Oct. 13, 2017).........................................................................7

83 Fed. Reg. 25,502 (June 1, 2018) ...........................................................13, 14, 33

83 Fed. Reg. 57,536 (Nov. 15, 2018)................................................................. *passim*

## Other Authorities

111th Cong. Rec. S11987 (daily ed. Nov. 30, 2009) (Statement of Sen Mikulski)
     https://www.congress.gov/congressional-record/2009/11/30/senate-
     section/article/S11985-2 .................................................................................17

111th Cong. Rec. S12019 (daily ed. Dec. 1, 2009)
     https://www.congress.gov/congressional-record/2009/12/01/senate-
     section/article/S12019-7 .................................................................................17

Becket, *HHS Mandate Information Central*, http://www.becketlaw.org/ ......................6

DMDatabases, *USA Business List*, http://bit.ly/10yw56o..........................................4

EBSA, *Coverage of Certain Services Under the Affordable Care Act* (Aug. 27, 2014), https://www.regulations.gov/document?D=EBSA-2014-0013-0002 ............................ 6

*FAQs About Affordable Care Act Implementation Part 36*, U.S. Dep't of Labor, (Jan. 9, 2017), https://bit.ly/2iaSoHW ........................................................................ 29

U.S. Gov't Accountability Office, GAO-13-21, *Federal Rulemaking: Agencies Could Take Additional Steps to Respond to Public Comments*, (Dec. 2012), http://www.gao.gov/assets/660/651052.pdf .......................................................................... 31

Rachel Benson Gold, *Going the Extra Mile : The Difference Title X Makes*, Guttmacher Policy Rev., https://www.guttmacher.org/gpr/2012/05/going-extra-mile-difference-title-x-makes (May 16, 2012) ................................................. 33

HRSA, Women's Preventative Services Guidelines, U.S. Department of Health & Human Services (Oct. 2017), https://bit.ly/2OHsmgH ............................................................ 3

Kaiser Family Found., *Employer Health Benefits 2018 Annual Survey* (2018) ........................ 4, 11

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ............................................................... 36

Sen. Mikulski Floor Statement on Women's Healthcare Amendment, C-SPAN (Dec. 1, 2009) https://cs.pn/2RiNUVz ...................................................................................... 17

Mark L. Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J. 121 (2012) ........................ 41

Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054 (2017) ................................. 3

## INTRODUCTION

This case concerns the validity of the federal government's most recent efforts to both provide contraceptive access and protect religious liberty. The States disagree with the agencies' policy choice to try to retain a broad contraceptive mandate for virtually all previously-covered employers, while providing a religious exemption for groups like the Little Sisters of the Poor. The States say that approach is invalid both because the Final Rules were preceded by interim final rules, and because providing a religious exemption supposedly violates statutory and constitutional law. The States ask this Court to invalidate the new final rules and thus force the federal government to choose between (a) a contraceptive mandate that applies to the Little Sisters and other religious groups, or (b) no contraceptive mandate at all.

Fortunately, there is no reason for this Court to put the Administration to that all-or-nothing choice. That is both because the States lack standing to invoke this Court's jurisdiction, and because the federal agencies were legally required to provide the religious exemption in the latest final rules. While Congress gave the agencies discretion to decide whether or not to include contraception in their "guidelines" for preventative care—discretion the agencies still have— Congress did not make religious exemptions discretionary. RFRA recognizes that religious exercise is an "unalienable right," that government should find "sensible balances" between religion and other values, and that the government "shall not" force someone to violate her religious beliefs unless the government proves that such coercion is the "least restrictive means" of achieving a "compelling governmental interest." 42 U.S.C. §§ 2000bb, 2000bb-1.

The agencies were not merely balancing this mandatory statutory command against a discretionary agency policy choice. They also were subject to dozens of federal court injunctions

finding that failure to provide a religious exemption violates RFRA, and a Supreme Court decision that an available alternative they are now pursuing was actually the "most straightforward" way to achieve its goals and a "less restrictive" alternative. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2780 (2014). The agencies were not free to flout these congressional and judicial commands.

The States' procedural attack on the new final rules fares no better. The States' suggestion that the initial decision to issue the IFR always taints later rules issued *after* notice and comment is both unsupported by the caselaw and would have disruptive consequences. A decision embracing that principle would invalidate large portions of the Code of Federal Regulations, much of which was initially issued by IFR. If the States' argument is followed to its conclusion, the very contraceptive mandate the States ask this Court to re-impose would also be unlawful, because those rules were issued by IFR. In any case, because the agencies were legally obligated to provide a religious exemption, any such procedural defect would be harmless.

The federal government is trying to retain a contraceptive mandate ("Mandate") for most employers while still respecting religious liberty. There is no basis to allow states to ask federal courts to dictate to the federal government that it must provide contraceptives indirectly via nuns, rather than directly through government programs like Title X. The motion should be denied.

## BACKGROUND

### A. The federal Mandate and its regulatory history

Federal law requires a minority of employers (namely, those with over 50 employees) to offer group benefits with "minimum essential coverage." 26 U.S.C. § 5000A(f)(2), 26 U.S.C. § 4980H(a), (c)(2). That "minimum essential coverage" must include, among other things,

coverage for "preventive care and screenings" for women. 42 U.S.C. § 300gg-13(a)(4); 29 U.S.C. § 1185d. Congress did not require that "preventive care" include contraceptive coverage. Instead, Congress delegated to HHS the authority to determine what should be included as preventive care "for purposes of this paragraph." 42 U.S.C. § 300gg-13(a)(4).[1]

The preventive services mandate was first implemented in an interim-final rule on July 19, 2010, published by the departments of Health and Human Services, Labor, and Treasury (the agencies). 75 Fed. Reg. 41,726, 41,728 (July 19, 2010) ("First IFR"). The First IFR stated that the Health Resources and Services Administration ("HRSA") would produce comprehensive guidelines for women's preventive services. *Id.* This IFR was enacted without prior notice of rulemaking or opportunity for prior comment, as it came into effect on the day that comments were due. Following the comment period on the First IFR, and thirteen days after IOM issued its recommendations, HHS promulgated its second IFR. 76 Fed. Reg. 46,621 (Aug. 3, 2011) ("Second IFR"). That same day, HRSA issued guidelines—which have never been subjected to notice and comment before or since—on its website adopting the IOM recommendations in full, including all female contraceptive methods in the Mandate. HRSA, Women's Preventative Services Guidelines, U.S. Department of Health & Human Services (Oct. 2017), https://bit.ly/2OHsmgH.

---

[1] Although it has not been raised in this case, Intervenors note that one court has held that the individual mandate, as amended by the Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054 (2017), is unconstitutional. *See Texas v. United States*, No. 4:18-CV-00167-O, 2018 WL 6589412 (N.D. Tex. Dec. 14, 2018). That court held that the entire ACA was also unconstitutional, since it was not severable from the individual mandate. *Id.* at *18-*29. Because the contraceptive mandate is part of the "minimum essential coverage" required to satisfy the insurance mandate, there is particularly strong reason to believe that the women's preventive services provisions are not severable from the individual mandate.

The Second IFR stated that it "contain[ed] amendments" to the First IFR. 76 Fed. Reg. at 46,621. In particular, it recognized that Congress's grant of authority to HRSA to develop "guidelines" included the authority to consider the impact on religious objectors. *Id.* at 46,623 ("In the Departments' view, it is appropriate that HRSA, in issuing these Guidelines, takes into account the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required in the group health plans in which employees in certain religious positions participate."). The Second IFR left many gaps in the Mandate, including that the vast majority of employers—namely, those with fewer than 50 employees—were not required to provide any insurance coverage at all,[2] and that approximately a fifth of large employers are exempt through the ACA's exception for "grandfathered health plans." *See* 26 U.S.C. § 4980H(c)(2); 42 U.S.C. § 18011; 75 Fed. Reg. 34,538, 34,542 (June 17, 2010); Kaiser Family Found., *Employer Health Benefits 2018 Annual Survey* 209 (2018). The Second IFR also granted HRSA "discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. at 46,623. It defined the term "religious employer" narrowly. *Id.* at 46,626.

The Second IFR was effective immediately without prior notice or opportunity for public comment. The agencies received "over 200,000" comments on the Second IFR. 77 Fed. Reg. 8,725, 8,726 (Feb. 15, 2012). Many of the comments explained the need for a broader religious exemption than that implemented by the Second IFR. However, on February 15, 2012, HHS

---

[2] According to some estimates, more than 97% of employers have fewer than 50 employees, and therefore face no federal obligation to provide coverage at all. *See, e.g.*, DMDatabases, *USA Business List*, http://bit.ly/10yw56o.

adopted a final rule that "finaliz[ed], without change," the Second IFR. *Id.* at 8,725.

The agencies then published an Advance Notice of Proposed Rulemaking (ANPRM), 77 Fed. Reg. 16,501 (Mar. 21, 2012), and a Notice of Proposed Rulemaking (NPRM), 78 Fed. Reg. 8,456 (Feb. 6, 2013), which were later adopted in a final rule making further changes to the Mandate, 78 Fed. Reg. 39,870 (July 2, 2013). Between the ANPRM and the NPRM, the agencies received over 600,000 comments. 78 Fed. Reg. at 8,459 ("approximately 200,000 comments" submitted in response to ANPRM); 78 Fed. Reg. at 39,871 ("over 400,000 comments" submitted in response to NPRM). The agencies eventually amended the definition of a religious employer by eliminating some of the criteria from the Second IFR, limiting the definition to organizations "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 39,874. The agencies also adopted an arrangement—termed an "accommodation"—by which religious employers not covered by the exemption could offer the objected-to contraceptives on their health plans by executing a self-certification and delivering it to the organization's insurer or the plan's third-party administrator (TPA).

The system initiated by the first two IFRs did not address the concerns of many religious organizations, and many filed lawsuits seeking relief. In July 2013, one of those organizations, Wheaton College, received an emergency injunction from the Supreme Court that protected it from the penalties in the Mandate. *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014). Following that injunction, in August 2014, the agencies published a third IFR "in light of the Supreme Court's interim order" in *Wheaton College v. Burwell*, again without notice and comment. 79 Fed. Reg. 51,092 (Aug. 27, 2014) ("Third IFR"). This Third IFR amended the Mandate to allow a religious objector to "notify HHS in writing of its religious objection"

instead of notifying its insurer or third-party administrator. *Id.* at 51,094. The Third IFR received over 13,000 publicly posted comments. *See* EBSA, *Coverage of Certain Services Under the Affordable Care Act* (Aug. 27, 2014), https://www.regulations.gov/document?D=EBSA-2014-0013-0002. The Third IFR was ultimately finalized on July 14, 2015. 80 Fed. Reg. 41,318 (July 14, 2015).

The Third IFR did not accommodate the religious beliefs of the Little Sisters and other religious objectors, and the Supreme Court revisited the issue in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (discussed below).

### B.  The challenges to the Mandate and the resulting injunctions

As this history demonstrates, this lawsuit, and the preliminary injunction motion, are latecomers. Litigation concerning the proper relationship between the Mandate and religious groups has been ongoing since shortly after the promulgation of the Second IFR in 2011. *See, e.g.*, *Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 29 (D.D.C. 2012). Dozens of cases have been filed since then on behalf of religious objectors who objected to the Mandate, including the supposed "accommodation" as a substantial burden on their religious beliefs and a violation of RFRA.

These lawsuits have resulted in dozens of injunctions from federal courts across the country, and multiple such cases were consolidated at the Supreme Court. *See Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (consolidating cases from the Third, Fifth, Tenth, and D.C. Circuits).[3] Once the

---

[3] The various cases challenging the Mandate are collected at Becket, *HHS Mandate Information Central*, http://www.becketlaw.org/_research-central/hhs-info-central/ (last accessed Jan. 3, 2019).

cases reached the Supreme Court, the agencies made new concessions that changed both the arguments and the operative facts they had previously relied on to defend the Mandate.

First, the government admitted for the first time that contraceptive coverage, rather than be provided as a "separate" plan under the accommodation, must be "part of the same plan as the coverage provided by the employer," Br. for the Resp'ts at 38, *Zubik*, 136 S. Ct. 1557 (No. 14-1418) (quotations omitted), https://bit.ly/2DiCj32; Tr. of Oral Arg. at 60-61, *Zubik*, 136 S. Ct. 1557 (No. 14-1418) (Chief Justice Roberts: "You want the coverage for contraceptive services to be provided, I think as you said, seamlessly. You want it to be in one insurance package. . . . Is that a fair understanding of the case?"; Solicitor General Verrilli: "I think it is one fair understanding of the case."). The government thus removed any basis for lower courts' prior holding that the Mandate did not impose a substantial burden on the religious exercise of objecting employers because the provision of contraceptives was separate from their plans. *Cf.* Tr. of Oral Arg. at 61, *Zubik*, 136 S. Ct. 1557 (No. 14-1418) (Solicitor General Verrilli "would be content" if Court would "assume a substantial burden" and rule only on the government's strict scrutiny defense). Next, the agencies admitted to the Supreme Court that women who do not receive contraceptive coverage from their employer can "ordinarily" get it from "a family member's employer," "an Exchange," or "another government program." Br. for the Resp'ts at 65, *Zubik*, 136 S. Ct. 1557 (No. 14-1418), https://bit.ly/2DiCj32; *see also Hobby Lobby*, 134 S. Ct. at 2780 ("The most straightforward way" to guarantee cost-free access to contraceptives "would be for the Government to assume the cost . . . . This would certainly be less restrictive of the plaintiffs' religious liberty, and HHS has not shown that this is not a viable alternative."). The government also acknowledged that the Mandate "could be modified" to be more protective

of religious liberty, Suppl. Br. for the Resp'ts at 14-15, *Zubik*, 136 S. Ct. 1557 (No. 14-1418), https://bit.ly/2VjFsVb, thus admitting the Mandate was not the least restrictive means of achieving the government's interests.

The Supreme Court unanimously vacated the decisions of the Third, Fifth, Tenth, and D.C. Circuit Courts of Appeal, which had ruled in favor of the agencies. *Zubik*, 136 S. Ct. at 1561. It ordered the government not to impose taxes or penalties on petitioners for failure to comply with the Mandate and remanded the cases so that the parties could be "afforded an opportunity to arrive at an approach going forward" that would resolve the dispute. *Id.*

After the Supreme Court's order in *Zubik*, the agencies issued a "Request for Information" (RFI) in July 2016 to seek input from stakeholders on "whether there are modifications to the accommodation that would be available under current law and that could resolve the RFRA claims raised by organizations that object to the existing accommodation on religious grounds." 81 Fed. Reg. 47,741, 47,743 (July 22, 2016). The RFI received "over 54,000 public comments." 82 Fed. Reg. 47,792, 47,814 (Oct. 13, 2017).

## C. Challenges to the Final Rule

After years of unsuccessful attempts to justify the Mandate in court, and in compliance with injunctions forbidding enforcement against religious and moral objectors, the federal Defendants issued two interim final rules providing that the Mandate will not be enforced against employers with religious or moral objections. 82 Fed. Reg. 47,792 (Oct. 13, 2017); 82 Fed. Reg. 47,838 (Oct. 13, 2017) (the "IFRs").[4] The IFRs otherwise left the Mandate in place as to all employers

---

[4] Many of the arguments presented here are relevant to both the religious and moral exemption, but the Little Sisters address only the religious exemption. Singular references to "IFR" or "Final

previously covered. The IFRs also left in place the accommodation. 45 C.F.R § 147.131. The IFRs were immediately challenged in this lawsuit and in others around the country.

This Court entered a nationwide injunction preventing the implementation of the IFRs on December 15, 2017, holding that the IFRs were invalid under the Administrative Procedure Act's procedural and substantive provisions. Dkt. No. 60. That injunction remains on appeal at the Third Circuit, where the defendants and defendant-intervenors have filed opening briefs. The appeal is currently stayed pending motions to govern further proceedings following the publication of the Final Rules. *Pennsylvania v. Trump*, No. 17-3752 (docketed Dec. 21, 2017).

During the time period that the Fourth IFR has been enjoined, other courts enjoined the federal government from enforcing the Mandate against all known religious objectors. In fact, several injunctions have been entered in open-ended class or associational standing cases that allow new members to join. *See, e.g.*, *Reaching Souls Int'l, Inc. v. Azar*, No. CIV-13-1092-D, 2018 WL 1352186, at *2 (W.D. Okla. Mar. 15, 2018); *Catholic Benefits Ass'n LCA v. Hargan*, No. 5:14-cv-00240-R, Order, Dkt. 184 (W.D. Okla. Mar. 7, 2018) (granting permanent injunction of Mandate to current and future nonprofit members of Catholic Benefits Association).[5]

After receiving comments and reviewing them over a period of several months, the federal defendants finalized the IFRs in final rules that will be effective on January 14, 2019, 60 days after they were published in the Federal Register. *See* 83 Fed. Reg. 57,536 (Nov. 15, 2018)

Rule" are to that rule. The Little Sisters would only need to rely on the moral objector rule if the States argued, or the Court found, that the moral rule survives but the religious rule does not.

[5] In May 2018, the district court granted a permanent injunction in the Little Sisters' case. *Little Sisters of the Poor v. Azar*, No. 1:13-cv-02611, Dkt. 82 (D. Colo. May 29, 2018).

("Final Rule"). The Final Rules consider the comments submitted on the IFRs, and maintain the religious exemption for groups like the Little Sisters.

## ARGUMENT

### I. The States lack standing.

To establish Article III standing, the States must demonstrate injury, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The injury must be to a "legally protected interest," *id.*, and it "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (citation omitted); *Lujan*, 504 U.S. at 560 ("not conjectural or hypothetical" (citations and internal quotations marks omitted)). The injury must be "fairly traceable to the challenged conduct of defendant," and must be redressable by a favorable judicial decision. *Spokeo*, 136 S. Ct. at 1547. And the plaintiff must "'clearly . . . allege facts demonstrating' each element." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). The States fail to carry this burden, either in their own right or as *parens patriae*.

### A. The States lack standing in their own right.

#### 1. The States do not have standing to bring equal protection, Title VII, or Establishment Clause claims here.

The States cite no authority for the idea that states can sue the federal government for an alleged violation of the Establishment Clause. Particularly where, as here, the States challenge a federal government exemption rather than an expenditure, they cannot have offended observer or taxpayer standing in relation to the federal government.

Similarly, states are not "person[s]" under the Fifth Amendment capable of asserting an equal protection claim. *Pennsylvania v. Riley*, 84 F.3d 125, 130 n.2 (3d Cir. 1996) ("A State . . . is not entitled to due process protection.") (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 323

(1966)).

The States also lack standing to bring their Title VII claim, as they are not employees, and the federal government is not their employer.

### 2. The States cannot show they are certain to suffer a cognizable injury as a result of the Final Rule.

By the States' telling, many employers will drop coverage, with dramatic impacts on public health, and a severe drain on the public fisc. Dkt. No. 91-2, Mem. at 42 ("These numbers, however, represent only a fraction of the women who will be harmed."). This rhetoric is hard to square with Pennsylvania's own decision not to mandate contraceptive coverage, and New Jersey's mandate of only prescription contraceptives and without cost sharing. Dkt. No. 90-18, PI Mot. Ex. P, Mendlesohn Decl. ¶ 13; Dkt. No. 90-22, PI Mot. Ex. T, Gennace Decl. ¶ 11. Moreover, a fifth of employers are exempt from providing not only contraceptives, but *any* of the mandated women's preventive services under the grandfathering regulations. *See* 75 Fed. Reg. 34,542; Kaiser Family Found., *Employer Health Benefits 2018 Annual Survey* 209 (2018). Yet the States have not sought judicial relief from the grandfathering regulations. They apparently willingly bore those injuries, and even "imposed" them on their own citizens prior to the creation of the HHS Mandate in 2011, and they continue to impose them to this day.

The States fail—in both their amended complaint and their memorandum—to identify a single employer who will drop contraceptive coverage as a result of the Final Rules. They claim that employers who have litigated against the Mandate or used the accommodation are likely to use the religious exemption, but that fails to account for the fact that any employers who litigated against the Mandate are protected by court injunctions. *See* Dkt. No. 89, Am. Compl. ¶ 136 (listing, without citation, employers who litigated against the mandate or who supposedly used

the accommodation).[6] The Little Sisters submitted a current list of those injunctions at the Third Circuit and attach that list for this Court's reference as Exhibit A.[7] And any employers who make use of the accommodation under the Final Rule do not interfere with the States' interests at all. Neither the Final Rule nor the States present any reason to believe that employers who willingly used the accommodation—rather than filing a lawsuit—will now use the religious exemption.

Even assuming the States can find women (or, at least, one woman) who will lose contraceptive coverage *because of* the Final Rule, the States do not offer any information about who those women might be, or whether they disagree with their employers' religious views. *See* 83 Fed. Reg. at 57,576 ("the Departments do not have data indicating how many of those women agree with their employers' or educational institutions' opposition to contraception"). And even those who disagree with their employers might prefer to use a contraceptive method covered by their employers, since many of the religious objectors object to only a small subset of

---

[6] The departments included in their estimate of affected women employers who litigated but who did not achieve permanent injunctions between the IFRs and the Final Rules. 83 Fed. Reg. at 57,576. That does not take into account the fact that almost all of the litigating employers had injunctions in place before the IFRs were published.

[7] In addition to the injunctions protecting the Plaintiffs in the cases that are finalized, there are also injunctions protecting each of the Plaintiffs in the pending cases challenging the Mandate. *See, e.g.*, *E. Tex. Baptist Univ. v. Sebelius*, 988 F. Supp. 2d 743, 772 (S.D. Tex. 2013) (permanent injunction). Counsel are aware of two updates since the list was filed. *Eternal Word Television Network* is now pending in the district court rather than the Eleventh Circuit, *Eternal Word Television Network v. Sec'y of U.S. Dep't of Health & Human Servs.*, 744 F. App'x 683, 684 (11th Cir. 2018) (vacating and remanding summary judgment against plaintiffs), No. 13-0521-CG-C (S.D. Ala.). And *Washington v. Trump* has been voluntarily dismissed. Stipulation of Dismissal, *Washington v. Trump*, No. 2:17-cv-01510-RBL, Dkt. 55 (W.D. Wash., Dec. 18, 2018). The plaintiff has joined another lawsuit in California. 2d Am. Compl., *California v. HHS*, No. 4:17-cv-05783-HSG, Dkt. 170 (N.D. Cal., Dec. 18, 2018).

contraceptives and cover the rest. *See Hobby Lobby*, 134 S. Ct. at 2759. The States do not offer facts to suggest that such employees would want coverage for items not covered by their employer, much less that they would turn to the States for coverage, rather than to another family member's plan or the exchanges. They offer no evidence that the full-time employees of such employers would qualify for state aid, and no reason to believe the employees—who by supposition are fully employed with health insurance—would choose to forgo that insurance for maternity care and instead be eligible to turn to the States to fund their alleged unintended pregnancies. The States offer no reason to think that even a single resident will thread this particularly narrow needle; they have certainly failed to "clearly allege facts demonstrating" that these alleged future injuries are real and not speculative.

Indeed, the States' injury has recently become even less plausible, because more women will have access to contraceptives through federal programs. *Hobby Lobby* found that direct government provision was the "most straightforward" way of ensuring cost-free contraceptive access, that such an approach "would certainly be less restrictive" of religious liberty, and that the federal government had not shown that a direct government-funded approach was not viable. *Hobby Lobby*, 134 S. Ct. at 2780. The agencies have since found that they can use Title X, 42 U.S.C. § 300 *et seq*, to provide such access. On June 1, 2018, HHS proposed a new regulation that would expand the definition of "low income family" under Title X to include "women who are unable to obtain certain family planning services under their employer-sponsored health insurance policies due to their employers' religious beliefs or moral convictions." 83 Fed. Reg. 25,502, 25,514 (June 1, 2018). This proposed rule will ensure that if someone loses employer-sponsored contraceptive coverage under the Final Rule, she will nevertheless have access to

"free or low-cost family planning services," including contraceptives—regardless of whether she would otherwise qualify as low income. *Id*.

### 3. Any injury to the States is either self-inflicted or the result of nonredressable judicial injunctions.

Any increase in contraceptive-related costs is a result of the States' decision to subsidize contraceptive access for its citizens. Thus, the States' alleged pocketbook injury is not "fairly [] traceable" to the Final Rule. *See Lujan*, 504 U.S. at 560. HHS's decision to exempt religious entities from providing certain contraceptives to their employees only increases the States' costs because of a voluntary choice they made, and "[n]o State can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam).

In *Pennsylvania v. New Jersey*, plaintiff Pennsylvania challenged a New Jersey law that taxed income earned by non-residents in defendant New Jersey. *Id.* at 663. Because Pennsylvania offered tax credits to residents for income taxes paid to other states, New Jersey's tax effectively diverted Pennsylvania revenue to New Jersey. *Id.* This Court rejected Pennsylvania's suit because "nothing prevent[ed] Pennsylvania from withdrawing that credit for taxes paid to New Jersey." *Id.* at 664. The Court held that Pennsylvania did not have standing because "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures." *Id.* There, as here, the States are free to adjust their policies, but they should not be permitted to subsidize a service and then sue the federal government whenever a federal action supposedly means more people may claim that service.[8]

---

[8] The States also make claims regarding coverage for unintended pregnancies, but as discussed above, they allege no facts to back up the speculation that fully-insured women would forgo contraception, become pregnant, then turn to (and qualify for) state-run programs to cover their

**B. The States cannot assert claims as *parens patriae* against the United States.**

The States are also barred from asserting the rights of its citizens in *parens patriae* against the federal government. It has been hornbook law for nearly 100 years that a state cannot represent its citizens as "parens patriae" against the "federal government" because "the citizens of [the States] are also citizens of the United States." *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *see also Pennsylvania v. Porter*, 659 F.2d 306, 317 (3d Cir. 1981) (en banc) (opinion of Gibbons, J.) (same). In the amended complaint, the States seek to protect citizens from the application of RFRA, arguing that a RFRA exemption violates other laws. Dkt. No. 89, Am. Compl. ¶ 9, 160, 165, 189, 194. But, as the Supreme Court recently confirmed, a suit by a state "to protect her citizens from the operation of federal statutes" is precisely "what *Mellon* prohibits." *Massachusetts v. EPA*, 549 U.S. 497, 520, n.166 (2007).

Nor does any "special solicitude" addressed in *Massachusetts v. EPA* overcome the States' deficiencies. *Id*. In *Massachusetts*, it was "critical[ly] importan[t]" to standing that the Clean Air Act provided a unique "procedural right" to challenge an EPA denial of a petition for rulemaking on emission standards. *Id.* at 516, 518 (citing 42 U.S.C. § 7607(b)(1)). Nothing in the ACA, the Mandate, or the Final Rule provides such a procedural right to the States.

Moreover, in *Massachusetts*, the state's standing rested on a "quasi-sovereign interest" in "preserv[ing] its sovereign territory" from rising sea levels. *Id.* at 519-20. Here, instead, the States assert standing because, after voluntarily providing subsidies for contraceptives to any

---

pregnancies. *Cf. Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir.), *cert. denied sub nom. Missouri ex rel. Hawley v. Becerra*, 137 S. Ct. 2188 (2017) (state had no standing where it failed to "allege[] injury to a sufficiently substantial segment of its population").

women, they claim the Final Rule will lead to more women without contraceptives. The States' "injury" stems from the *exercise*—not loss—of their sovereign power. The States' contrary reading gets *Massachusetts* precisely backwards. *See* Dkt. No. 91-2, Mem. at 44.

Finally, special solicitude cannot overcome the States' lack of injury-in-fact to determine standing. *See Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) *aff'd*, 136 S. Ct. 2271 (2016). In *Texas*, injury-in-fact was a prerequisite to the special solicitude analysis. There, the state was able to show 500,000 people who would automatically be eligible for a $130 subsidy benefit under the challenged federal program. "Even a modest estimate would put the loss at several million dollars." *Id.* at 155 (internal quotation marks omitted). Here, the States have not identified a single actual person who would become eligible for state benefits.

For all these reasons, the States lack standing.

## II. Pennsylvania is not likely to succeed on its APA claims.

### A. The Final Rule is substantively lawful.

The States argue that the Final Rules violate the substantive provisions of the APA and incorporate their arguments that the IFRs violated substantive law and the Constitution from Pennsylvania's first PI motion. Dkt. No. 91-2, Mem. at 3-4. The Little Sisters thus respond to each of those arguments here.

#### 1. The States ignore existing injunctions.

The Final Rule cannot be fully understood apart from the federal government's long and unsuccessful record of trying to enforce the Mandate against religious objectors.

The Final Rule was motivated by the legal challenges to the various versions of the Mandate. *See* 83 Fed. Reg. at 57,539-40. The injunctions entered in those cases forbid the federal

government from enforcing the Mandate against all known religious objectors. This was not for lack of effort on the part of the federal government, which had unsuccessfully asked the Supreme Court on *five separate occasions* to allow it to force compliance by religious objectors.[9] But instead, the Supreme Court had repeatedly entered injunctions protecting objectors, and had unanimously ordered the government to find a different approach. *Zubik*, 136 S. Ct 1557 (2016). In other words, the Final Rule was not an "unexplained policy reversal," Dkt. No. 91-2, Mem. at 19, but it was required to ensure compliance with dozens of injunctions across the country. *See* Exhibit A.

### 2. The ACA does not require contraceptive coverage.

The ACA did not mandate contraceptive coverage. Instead, Congress delegated to HRSA discretion to determine the contours of the preventive services guidelines. 42 U.S.C. § 300gg-13(a)(4). In fact, the legislative history of the preventive services mandate has scant discussion of family planning and instead focuses primarily on mammograms and other screening tests.[10] The States therefore cannot escape the fact that it would have been perfectly consistent with the

---

[9] *See Little Sisters of the Poor Home for the Aged v. Sebelius*, 134 S. Ct. 1022 (2014); *Hobby Lobby*, 134 S. Ct. 2751; *Wheaton Coll.*, 134 S. Ct. 2806; *Zubik v. Burwell*, 135 S. Ct. 2924 (2015); *Zubik*, 136 S. Ct. 1557.

[10] *See, e.g.*, 111th Cong. Rec. S11987 (daily ed. Nov. 30, 2009) (Statement of Sen. Mikulski) https://www.congress.gov/congressional-record/2009/11/30/senate-section/article/S11985-2 (finding "overwhelming hurdles for women to access screening programs"); 111th Cong. Rec. S12019 (daily ed. Dec. 1, 2009) https://www.congress.gov/congressional-record/2009/12/01/senate-section/article/S12019-7 ("They are skipping screenings for cervical cancer, they are skipping screenings for breast cancer, they are skipping screenings for pregnancy.") Sen. Mikulski also stated that "[t]here are no abortion services included in the Mikulski amendment." Sen. Mikulski Floor Statement on Women's Healthcare Amendment, C-SPAN (Dec. 1, 2009) https://cs.pn/2RiNUVz. Thus, including contraceptives that the FDA says may terminate an embryo was particularly suspect.

statute for HRSA to leave contraceptives off the list entirely. And Congress left the entire preventive services mandate out of its list of "particularly significant protections" that required across-the-board compliance even for grandfathered plans. 75 Fed. Reg. at 34,540; *Hobby Lobby*, 134 S. Ct. at 2780.

Against this backdrop, it makes no sense to assume, as the States do, that Congress intended to foreclose exemptions, forcing HRSA to make a binary all-or-nothing choice. The better reading of the statute is the one the Obama Administration adopted in 2011 with the original church exemption, and in 2012 with the slightly expanded church exemption, and in 2013 with the "accommodation," and again in 2014 with the modified "accommodation," which is that the delegation of authority to HRSA included the authority to balance competing interests over coverage. Dkt. 15, Defs. Opp. at 43-46. Indeed, the statutory grant of authority specifies "comprehensive guidelines supported by the Health Resources and Services Administration," rather than merely a list of services. This shows that the authority delegated to HRSA was not merely the authority to create a list of services, but to produce "guidelines" that are "comprehensive" in scope, meaning that HRSA should provide context for the recommendations and take multiple factors into account. 42 U.S.C. § 300gg-13.

The States' all-or-nothing reading of the discretion delegated in section 2713 would foreclose any true exemption for religious organizations. That approach would not result in more contraceptive coverage but less as HHS, still subject to RFRA, would have only one legally permissible choice: deleting contraceptive coverage entirely from required preventive care under the ACA for *all* employers. The States' claimed interests are better protected by a contraceptive mandate with exemptions than with no contraceptive mandate at all. Indeed, it is difficult to see

how a ruling from this Court forcing the federal government to make that all-or-nothing decision would necessarily decrease, rather than increase, the number of women who turn to the States for contraceptive access.

### 3. Section 1554 does not conflict with the Final Rule.

Nor does section 1554 prohibit the Final Rule. As set forth above, Congress itself (a) chose not to mandate contraceptive coverage at all but instead leave the matter entirely to HRSA's discretion, and (b) chose not to require grandfathered plans covering tens of millions of people to cover preventive services. In light of these choices, it makes no sense to suggest that the ACA treats failure to extend a mandate to each and every potential employer as "creat[ing] an[] unreasonable barrier[]" or "imped[ing] timely access to health care." 42 U.S.C. § 18114. The ACA itself flunks that test far worse than the comparatively tiny Final Rule does. Furthermore, in light of (a) the existing injunctions, (b) the wide availability of contraceptives generally, and (c) Title X programs available to provide contraceptives to those who cannot afford them, the Final Rule cannot be said to create an unreasonable barrier or impede timely access.

### 4. Section 1557 does not mandate contraceptive coverage.

The States next argue that the Final Rule violates section 1557 of the ACA, which prohibits discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). But Title IX does not apply to organizations "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). Therefore, an exemption which protects religious organizations cannot be inconsistent with section 1557, since section 1557 itself incorporates the broad religious exemption scheme of Title IX. *See Franciscan All., Inc. v.*

*Burwell*, 227 F. Supp. 3d 660, 690 (N.D. Tex. 2016) (noting both religious and abortion exemptions).[11]

In 2016, HHS issued a rule interpreting section 1557. A portion of that rule has been enjoined as contrary to law. *Id.* at 691. But even that overbroad rule did not attempt to incorporate the Mandate into the strictures of 1557. *See*, 81 Fed. Reg. 31,376-401 (May 18, 2016) (no mention of "contraception"). Thus, to strike down this Final Rule under Section 1557, the Court would have to reach significantly beyond any prior judicial construction of Section 1557; beyond the previous HHS interpretation of section 1557 (which was itself deemed contrary to law); and beyond the plain language of section 1557, which incorporates religious and abortion exemptions. The States have no likelihood of success on such a claim.

**5. RFRA requires HHS to create religious exemptions.**

As the Little Sisters have long maintained, and as HHS now admits, RFRA mandates a broad religious exemption. RFRA's requirements are stringent. It applies "to all Federal law, and the implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a)-(b). RFRA thus applies to the ACA, regulations promulgated under it, and the implementation of those regulations. *Hobby Lobby*, 134 S. Ct. at 2761-62.

Under RFRA, a regulation which imposes a substantial burden on religious exercise must pass strict scrutiny. As the Supreme Court has held, "[b]ecause the contraceptive mandate forces them to pay an enormous sum of money . . . if they insist on providing insurance coverage in accordance with their religious beliefs, the mandate clearly imposes a substantial burden on those

---

[11] Notably, the Title IX abortion provision applies specifically to non-religious entities, since religious institutions are already exempt from Title IX.

beliefs." *Id.* at 2779. The Little Sisters cannot, in good conscience, provide these services on their health benefits plan or authorize others to do so for them. Dkt. 19-2, Decl. of Sr. Vincente ¶¶ 35-51. The Supreme Court has protected the Little Sisters twice. *See Little Sisters of the Poor Home for the Aged v. Sebelius*, 134 S. Ct. 1022 (2014); *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

Therefore, the Mandate must pass strict scrutiny if it is to be applied to the Little Sisters—something that the government admits it cannot do. 83 Fed. Reg. at 57,546-47. Even prior to that admission, the government's myriad exemptions from the Mandate, its ever-shifting enforcement schemes, and the vast range of alternative sources of contraception confirmed that its interest in enforcing the Mandate against religious objectors was not compelling, and that less restrictive alternatives were available. *See infra.*[12]

The States claim that the now-vacated decision in *Geneva College* controls on the question of substantial burden in this case. Dkt. No. 91-2, Mem. 33. (citing *Geneva Coll. v. Secretary*, 778 F.3d 422, 427 (3d Cir. 2015), *vacated and remanded sub nom. Zubik*, 136 S. Ct. at 1561). But that conclusion is triply flawed.

---

[12] The States are mistaken that *Hobby Lobby* "recognized" that the Mandate furthers a compelling government interest. Dkt. No. 91-2, Mem. at 27. The Court simply "assume[d] that the interest in guaranteeing cost-free access to the four challenged contraceptive methods is compelling within the meaning of RFRA." *Hobby Lobby*, 134 S. Ct. at 2780. Not only is this language not part of the Court's holding, it is also abstracted from the relevant application to religious objectors. As the Court explained, RFRA does not look to "broadly formulated interests" like in cost-free contraceptive access, but instead to "the marginal interest in enforcing the contraceptive mandate" against religious objectors "in these cases." *Id*. at 2779. It is not at all clear the Mandate had a compelling interest to override sincere religious objections because, as the Court noted, "one of the biggest exceptions" to the Mandate, for grandfathered plans, was offered simply to "avoid inconvenience." *Id*. at 2780. In any case, *Hobby Lobby* also found that the "most straightforward" way to meet that assumed interest—and the way that is less restrictive of religious liberty—is for the government to provide access directly, *id*., which is precisely what the agencies are seeking to do under Title X.

First, *Geneva College* was one of the decisions vacated by the Supreme Court in *Zubik*. 136 S. Ct. at 1561. It thus has no precedential force in this Circuit. Indeed, in the *Geneva College* case itself, the district court subsequently entered a permanent injunction on RFRA grounds. Order Granting Motion for Permanent Injunction, *Geneva Coll. v. Azar*, No. 2:12-cv-00207, Dkt. 153 (W.D. Pa. July 5, 2018). The panel decision in *Geneva College* thus is not even the law of the *case* in *Geneva College*; it is certainly not the law of the *circuit*, binding district courts or subsequent panels in other cases.

Second, nothing in *Real Alternatives* revived *Geneva College*. The only RFRA claim at issue in *Real Alternatives* concerned whether an *employee* might have a RFRA claim based on participation in a health plan that offers objectionable benefits. *Real Alternatives v. Sec'y Dep't Health & Human Servs.*, 867 F.3d 338, 354-55 (3d Cir. 2017). That RFRA claim is fundamentally different from the claim in *Geneva College* and here—that it violates RFRA to force *employers* to authorize and facilitate the provision of objectionable products on the plans they sponsor. *Id.* (calling employee claim "a question of first impression" and "distinct from an employer's RFRA claim objecting to the mandated provision" of coverage). Indeed, the majority in *Real Alternatives* specifically disclaimed treating *Geneva College* as precedential, *id*. at 356 n.18 ("*Geneva* is no longer controlling"), and specifically distinguished the RFRA claim of the employees from that of an employer. *Id.* at 362 ("There is a material difference between employers arranging or providing an insurance plan that includes contraception coverage" and an employee's act of signing up for the plan).

Finally, the vacated opinion in *Geneva College* was procured on false pretenses, which the government later admitted. In particular, to obtain the *Geneva College* opinion, the agencies

22

repeatedly told this Court that contraceptive coverage under the "accommodation" was *not* part of the religious organization's health plan. For example:

- "in all cases" contraceptive coverage "is provided separately from [the religious employer's] health coverage" (Br. for the Appellants, *Geneva Coll. v. Sebelius*, No. 14-1376, 2014 WL 2812346, at *1-2 (3d Cir. June 10, 2014), *vacated and remanded by Zubik*, 137 S. Ct. 1557);

- "separate payments" (*id.* at *8, 9, 17, 18, 22, 28, 35, 38);

- "through alternative mechanisms" (*id*. at *8);

- "through other means" (*id*. at *38).

The *Geneva College* panel accepted these representations as true and relied on them in making its substantial burden holding. *See Geneva Coll.*, 778 F.3d at 439 (coverage is "separate and apart from" religious employer's plan) (citation omitted). But, as described above, at the Supreme Court the agencies admitted that the accommodation is part of the same plan. For these reasons, nothing in *Geneva College* or *Real Alternatives* forces this Court to put itself in the bizarre position of ordering the agencies to violate RFRA and the injunctions of dozens of other federal courts.

Even if this Court were to consider *Geneva College* persuasive, it would not control the APA determination in this case. HHS must deal with not only the (since-vacated) determination of the Third Circuit, but with courts across the country, some of which did hold that the prior "accommodation" violated RFRA, and some of which entered permanent injunctions against that rule. *See, e.g.*, *E. Tex. Baptist Univ.*, 988 F. Supp. 2d at 746 (permanent injunction), *rev'd sub nom. E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 136 S. Ct. 1557 (2016); order granting permanent injunction, *Wheaton Coll. v. Azar*, No. 1:13-cv-08910, Dkt. 119 (N.D. Ill. Feb. 22, 2018). More importantly for a

regulation issued in 2018 rather than 2015, HHS needed to deal with the fact that every single court to consider an employer's RFRA challenge to the mandate after the *Zubik* concessions ruled that the mandate violated RFRA and a religious exemption was necessary. Faced with these rulings—to say nothing of the Supreme Court's *Zubik* directive to arrive at an alternative approach—HHS is well within its statutory discretion to craft an exemption responsive to the judicial determinations and injunctions entered against it elsewhere.

### 6. RFRA authorizes HHS to lift government-created burdens on religious exercise.

Congress made RFRA applicable to all federal statutes, regulations, and their implementation. 42 U.S.C. § 2000bb-3(a)-(b). RFRA "intru[des] at every level of government, displacing laws and *prohibiting official actions* of almost every description and regardless of subject matter," and its restrictions apply to "every agency *and official* of the Federal Government." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 301 (3d Cir. 2016) (emphasis in original). In RFRA, Congress provided religious exemptions beyond those mandated by the First Amendment under *Employment Div. v. Smith*, 494 U.S. 872 (1990). *DeHart v. Horn*, 390 F.3d 262, 273-76 (3d Cir. 2004) (discussing RFRA's history). RFRA also delegated authority to the agencies to create exemptions to protect religious exercise.[13] That is why RFRA authorizes the government to craft exemptions "to the extent permissible under the Establishment Clause." 42 U.S.C. § 2000bb-4.

RFRA thus contemplates that the government may choose to grant discretionary benefits or

---

[13] RFRA does not "authorize any government to burden any religious belief." 42 U.S.C. § 2000bb-3. In other words, RFRA's test for when government-imposed burdens are prohibited should not be read as an authorization—much less a requirement—to impose burdens that might be permissible.

exemptions to religious groups over and above those which are strictly required by RFRA. It authorizes the government to carve out exemptions up to the limits imposed by the Establishment Clause, and to do so in regulations and the "implementation" of the law. 42 U.S.C. § 2000bb-3(a)-(b). RFRA thus operates as a floor on religious accommodation, not a ceiling. HHS was well within its rights to use the discretion granted under RFRA to create exemptions, even if those exemptions had not been required by RFRA's substantial burden provision.

This approach is consistent with longstanding Free Exercise and Establishment Clause precedent. The Supreme Court has long permitted the government to lift burdens on religious exercise, even when such accommodations are not constitutionally required. In *Corporation of the Presiding Bishop v. Amos*, the Supreme Court unanimously upheld Title VII's exclusion of religious organizations from the prohibition on religious discrimination. 483 U.S. 327 (1987). It did so regardless of the fact that the First Amendment does not require religious organizations to be exempt in all cases. *Id.* at 334-35. As described in Part IV, the Final Rule passes Establishment Clause muster so it is within the discretion committed to HHS under the ACA and RFRA.

**B. The Final Rule is procedurally valid.**

**1. Any procedural error in the interim rules is harmless.**

The States' position that post-IFR notice and comment is categorically unable to cure a procedurally defective interim rule overreads Third Circuit precedents and, if sustained, would have destabilizing consequences.[14] The agencies created the Mandate via a series of IFRs

---

[14] The question of whether the interim rules were procedurally defective has already been addressed by this Court, but is currently on appeal in the Third Circuit.

without notice and comment. The States have not objected to those rules, and in fact have asked this Court to reinstate a prior version of the Mandate that was itself created via IFR. *See supra* at 2-6. If the States were correct that lack of prior opportunity for comment on an IFR necessarily invalidates the resulting final rule, then HHS would have no choice but to go back to the drawing board, eliminating the Mandate entirely and reconsidering the entirety of the women's preventive services regulations.

The Government had more reason to issue the current Final Rules than it had to issue the previous versions of the Mandate. After numerous courts held that the Mandate violated RFRA and entered injunctions binding the government, the agencies issued two additional IFRs that complied with the injunctions and with the positions the agencies had already taken in the Supreme Court. They simultaneously asked for public comment. The agencies then superseded those IFRs with modified final rules. The religious exemption was created in a way commensurate to the method used to create the Mandate itself and was prompted not by policy change, but by court orders. This alone defeats any claim of procedural defect.[15] But even if such a procedural defect existed, it would not, in this limited circumstance, constitute "prejudicial error." *See* 5 U.S.C. § 706; *see also Shinseki v. Sanders*, 556 U.S. 396, 406 (2009) (holding that § 706 is an administrative law "harmless error rule") (quotations omitted).

The States, of course, must carry the "burden" to "explain why" the IFR "caused harm." *Sanders*, 556 U.S. at 410. A procedural error is harmless if "the outcome of the administrative

---

[15] The Little Sisters incorporate their arguments on the procedural validity of the IFRs—and thus the Final Rules—from their Third Circuit brief. Defendant-Intervenor's Opening Brief, *Pennsylvania v. Trump*, No. 17-3752 (3d Cir. Sept. 21, 2018).

proceedings will be the same absent [the agency]'s error." *Green Island Power Auth. v. FERC*, 577 F.3d 148, 165 (2d Cir. 2009); *see also PDK Labs. Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."). The States cannot show prejudice because, even if the interim rules do not qualify for the "good cause" exception, any error could not have affected the outcome: the IFRs were issued to save the Mandate from judicial injunctions and halt an ongoing violation of federal civil rights laws. Moreover, the Final Rules were issued *after* notice and comment, and on top of a regulatory regime that was itself implemented by interim rulemaking and which had garnered hundreds of thousands of comments.

None of the States' precedents support a categorical rule that post-IFR notice and comment is meaningless for the subsequently-issued final rule if the earlier interim rule is procedurally invalid. One round of procedurally invalid rulemaking does not taint all subsequent rulemaking. Rather, each case relied on unique circumstances, absent here, to establish prejudice. In *Sharon Steel Corp. v. EPA*, the EPA administrator changed Pennsylvania's Clean Air Act implementation plan without prior notice and comment. 597 F.2d 377, 379 (3d Cir. 1979). In that context, prior notice and comment with States was essential to fulfill the Clean Air Act's commitment to "cooperative federalism." *Cf. GenOn REMA, LLC v. EPA*, 722 F.3d 513, 516 (3d Cir. 2013). Postpromulgation comment was no "substitute" after the EPA cut Pennsylvania out of the process by unilaterally amending the state's implementation plan. *Sharon Steel*, 597 F.2d at 381. Unlike *Sharon Steel*, the ACA's Mandate does not rely on state entities implementing rules for contraceptive coverage; rather, the agencies used IFRs to halt civil rights violations

caused by the Mandate, itself implemented by IFR.

Moreover, *Sharon Steel* was only focused on the validity of the original rule issued without notice and comment. The Third Circuit did not suggest that what the agencies have done here— namely, issuing a subsequent final rule after notice and an opportunity to comment—was also impermissible. To the contrary, the Third Circuit ordered the agency to "forbear" from enforcing the procedurally invalid rule and then *provide* the type of notice and comment opportunity that has already been provided here with respect to the (enjoined) IFRs. *Id.* at 381-82. *Sharon Steel* not only permitted but mandated the development a new final rule after notice and comment.

The States' extensive reliance on *NRDC v. EPA* is also misplaced. 683 F.2d 752 (3d Cir. 1982). *NRDC* arose after the Reagan administration's EPA issued an IFR to "effectively repeal" a rule that had been the product "of a lengthy and intensive development process" during the Carter administration. *Id.* at 758, 762. Given the asymmetry between using an interim rule to repeal a rule promulgated with prior notice and comment, and suspicious of the "sharp changes" in EPA policy, *id.* at 760, the Third Circuit held that postpromulgation comment did not "cure" the EPA's original procedurally invalid action. But here, HHS retained the existing Mandate while using post-IFR (but pre-final-rule) notice and comment to address civil rights violations in the Mandate, which itself was finalized by post-IFR (but pre-final-rule) notice and comment. *See United States v. Reynolds*, 710 F.3d 498, 518 (3d Cir. 2013) (noting that failure to provide notice and comment is harmless when "an agency's substantive rule is 'the only reasonable one' and that the court 'would reverse' [had the agency] 'c[o]me out the other way.'") (quoting *Sheppard v. Sullivan*, 906 F.2d 756, 762 (D.C. Cir. 1990)); *cf. AFGE, Local 3090 v. FLRE*, 777 F.2d 751, 759 (D.C. Cir. 1985) (explaining that an agency "seeking to . . . modify" a rule should

28

"undertake similar procedures to accomplish such modification").

Moreover, in marked contrast to *NRDC*, the Final Rule is not an abrupt change in federal policy. Most importantly, HHS is not rescinding anything close to the entire Mandate, leaving it in place for the vast majority of employers who were subject to it before. The narrow modifications are consistent with the previous administration's concessions regarding the Mandate. *See* Suppl. Br. for the Resp'ts at 14-15, *Zubik*, 136 S. Ct. 1557 (No. 14-1418), https://bit.ly/2VjFsVb (Mandate "could be modified" to be more protective of religious liberty). The previous administration undermined its contention that the mandate was the least restrictive means of providing contraceptive coverage by conceding that women who do not receive contraceptive coverage from their employer can "ordinarily" get it from "a family member's employer," "an Exchange," or "another government program." Br. for the Resp'ts at 65, *Zubik*, 136 S. Ct. 1557 (No. 14-1418), https://bit.ly/2DiCj32. And in briefing and at oral argument, the Solicitor General abandoned the lower court's position that the Mandate did not impose a substantial burden on religious exercise because the provision of contraceptives was separate from the objecting employers' plans. *See supra* at 7. Finally, after receiving further comments, HHS concluded that it could not modify the existing accommodation scheme. *See FAQs About Affordable Care Act Implementation Part 36*, U.S. Dep't of Labor, 4-5 (Jan. 09, 2017), https://bit.ly/2iaSoHW. It was therefore necessary to either create a complete exemption or continue to face extended litigation under RFRA. *See* 83 Fed. Reg. at 57,544 & n.14 (explaining that this conclusion necessitated a different approach).

Consistent with their concessions and the resulting Supreme Court order forbidding the government from fining the Little Sisters for not complying with the Mandate, *see Zubik*, 136 S.

Ct. at 1561, the agencies had no choice but to admit that the Mandate and accommodation as they stood violated RFRA, *see* 83 Fed. Reg. at 57,544 (Mandate "imposes a substantial burden on the exercise of religion under RFRA"). All of that makes this case readily distinguishable from *NRDC*. Here, the agencies used an interim rule to save a regulatory regime (itself issued via IFRs), creating targeted exemptions consistent with concessions made by the prior administration and in response to judicial injunctions.

The States also attempt to derive their categorical bar against post-IFR comment from *Reynolds*—an inapposite case addressing the Attorney General's authority to impose, via an interim rule, the Sex Offender Registration and Notification Act (SORNA)'s requirements on pre-Act offenders. The Third Circuit held the rule invalid and determined post-IFR comment was not harmless since the government issued the interim rule to "eliminate any dispute" about the statute's retroactive application—"the very subject matter about which [the government] was to keep an open mind." 710 F.3d at 519. Critically, *Reynolds* only addressed whether post-IFR comment could remove the prejudice from the earlier interim rule (the basis of conviction). It does not support the States' far broader claim that an invalid interim rule "fatally infect[s]" the Final Rule *despite* post-IFR comments that *precede* the Final Rule. Dkt. No. 91-2, Mem. at 12.

Any suggestion that *Reynolds* precludes the government from utilizing subsequent comment is refuted by the fact that the Third Circuit has repeatedly upheld SORNA convictions obtained after the Justice Department finalized the interim rule that *Reynolds* invalidated. *See* 73 Fed. Reg. 38,030, 38,046 (July 2, 2008) (promulgating through notice and comment the "SMART" guidelines to implement SORNA and reaffirming the interim rule applying SORNA retroactively); 75 Fed. Reg. 81,849 (Dec. 29, 2010) (finalizing the interim retroactivity rule);

*e.g.*, *United States v. Cooper*, 750 F.3d 263, 265 (3d Cir. 2014) (affirming the Attorney General's authority to issue the SMART guidelines); *United States v. Dimpfl*, 523 F. App'x 865, 866 (3d Cir. 2013). The States' position, then, could upend SORNA convictions because the Justice Department finalized the procedurally invalid interim rule with post-IFR comment.

That contention is as implausible as it sounds. Extending *Sharon*, *NRDC*, and *Reynolds* to cover all circumstances in which an allegedly procedurally invalid interim rule is finalized after subsequent comment would cast a pall on thousands of regulations. According to the GAO, 35% of all major rules were finalized with post-IFR notice and comment. *See* U.S. Gov't Accountability Office, GAO-13-21, *Federal Rulemaking: Agencies Could Take Additional Steps to Respond to Public Comments*, 3 n.6, 8 (Dec. 2012), http://www.gao.gov/assets/660 /651052.pdf. Moreover, since the States' position gives agencies zero credit for undertaking post-IFR notice and comment, agencies issuing interim rules and confident they have "good cause" will forgo notice and comment altogether—an outcome that is inconsistent with the purpose of section 553. *See, e.g.*, *Levesque v. Block*, 723 F.2d 175, 188 (1st Cir. 1983) ("[C]omment after the fact is better than none at all.").

The better understanding of the law is that post-IFR notice and comment—which of course *precedes* issuance of a final rule—is proper, in many cases, to create a finalized rule. *See, e.g.*, *United States v. Johnson*, 632 F.3d 912, 930, 932 (5th Cir. 2011) (sex-offender not prejudiced by post-IFR notice and comment "because the Attorney General nevertheless considered the arguments Johnson has asserted and responded to those arguments during the interim rulemaking."); *Friends of Iwo Jima v. Nat'l Capital Planning Comm'n*, 176 F.3d 768, 774 (4th Cir. 1999) (Wilkinson, J.) (holding harmless deficient notice because the "identical substantive

claims" to that of plaintiffs was "the main focus of each stage in the approval process," it "simply did not prevail").[16] Case-specific factors can render the error prejudicial when the relevant organic statute relies on prior notice and comment (the Clean Air Act's cooperative federalism) or where the invalid IFR attempted to repeal a prior regulation that was given prior notice and comment. No such factors exist here. Rather, the agencies' resort to an interim rule to repair the Mandate was commensurate to the promulgation of the Mandate itself via IFR and was forced not by politics but by in-court factual concessions and court orders requiring compliance with federal civil rights laws.

### 2. The Final Rule confirms that HHS carefully considered comments.

HHS reviewed 56,000 comments for about eleven months before finalizing, with changes, the interim rules. The States' criticism that HHS failed "to seriously address" evidence that exempting religious entities will harm "the health and economic security of women" does not hold water. For example, the States argue that HHS wrongly focused on the "vast majority of women" unaffected by the rule, obscuring the possibility that some women may still lose coverage and face health risks. Dkt. No. 91-2, Mem. at 15 (citing 83 Fed. Reg. at 57,551). In fact, far from "throw[ing] up their hands," *id.*, HHS not only discussed this possibility, it did so by noting it had begun the process to amend Title X so that "women who are unable to obtain certain family planning services under their employer-sponsored health coverage due to their employers' religious beliefs or moral convictions" can still obtain cost-free contraceptives. 83

---

[16] *See also, e.g.*, *Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 28 F.3d 1288, 1292 (D.C. Cir. 1994) (explaining that "tardy request for public comment, however, is not necessarily fatal" where the agency "displayed an open mind when considering the comments").

Fed. Reg. at 57,551 (citing 83 Fed. Reg. 25,502). This is precisely the "most straightforward" approach found to be a less restrictive alternative in *Hobby Lobby*, 134 S. Ct. at 2780, and therefore *required* by RFRA. 42 U.S.C. § 2000bb.[17]

Indeed, instead of "utterly fail[ing] to engage with the substance" of the comments regarding how the Final Rules will burden third parties, the government provides several pages of analysis on this issue that the States ignore, including that the ACA does not mandate contraceptive coverage at all, let alone contraceptives funded by third parties rather than the government itself. Dkt. No. 91-2, Mem. at 16. If anything, it is the States who ignore that their position would have the government violate the civil rights of religious believers and ignore the gaping holes created by other exemptions to the Mandate, all in order to have private religious groups indirectly provide access that the government concedes it can provide directly.

### III. The Final Rule does not violate Title VII or the Pregnancy Discrimination Act.

The States invite this Court to create a backdoor, nationwide contraceptive coverage mandate through Title VII. The only appeals court to have reached the question ruled that Title VII does not mandate contraceptive coverage. *See In re Union Pac. R.R. Employment Practices Litigation*, 479 F.3d 936, 942 (8th Cir. 2007). If the States were correct that failure to cover contraceptives violates Title VII, then how can they explain their own choice not to mandate contraceptive coverage for all employers, or to require it only in limited circumstances? Indeed, the States'

---

[17] Indeed, a Guttmacher article has indicated that Title X is *better* at providing family planning services than insurance plans. Rachel Benson Gold, *Going the Extra Mile: The Difference Title X Makes*, Guttmacher Policy Rev., *available at* https://www.guttmacher.org/gpr/2012/05/going-extra-mile-difference-title-x-makes (May 16, 2012) ("Title X has the flexibility [Medicaid] lacks").

argument would invalidate the grandfathering exemption and New Jersey's own exemption from its contraceptive coverage law. Dkt. No. 90-22, PI Mot. Ex. T, Gennace Decl. ¶ 11, 15. Such a sweeping conclusion would upend the orderly regulation of insurance coverage and state-level contraceptive mandates. The States cannot show a likelihood of success on such an overbroad and previously rejected legal theory.

## IV. The Final Rule does not violate the Establishment Clause.

### A. The States misapply the Establishment Clause.

The States' Establishment Clause argument misapplies, or ignores, binding precedent. Their reading of the Establishment Clause would invalidate a host of laws protecting religious minorities.

#### 1. The States wrongly ignore *Town of Greece*.

The States proceed as if the *Lemon* test exclusively governs the Establishment Clause analysis. But the Supreme Court has moved away from *Lemon* and, as outlined in *Town of Greece*, the ascendant test is the historical meaning of the Clause.

The *Lemon* test is one of the most criticized tests in constitutional law. At least ten recent Supreme Court Justices have criticized it, including four *current* Justices.[18] In the last 16 years, it

---

[18] *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 346-349 (1987) (O'Connor, J., concurring); *Wallace v. Jaffree*, 472 U.S. 38, 107-113 (1985) (Rehnquist, J., dissenting); *Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 400 (1985) (White, J., dissenting); *Comm. for Pub. Educ. & Religious Liberty v. Regan*, 444 U.S. 646, 671 (1980) (Stevens, J., dissenting); *see also Utah Highway Patrol Ass'n v. American Atheists, Inc.*, 565 U.S. 994 (2011) (Thomas, J., dissenting from denial of certiorari) (collecting criticism by Chief Justice Roberts and Justices Kennedy, Alito, Thomas, and Scalia); *Green v. Haskell Cty. Bd. of Comm'rs*, 574 F.3d 1235, 1245 (10th Cir. 2009) (Gorsuch, J., dissenting from denial of rehearing en banc) (noting that *Lemon* "leave[s] the state of the law 'in Establishment Clause purgatory.'") (citation omitted).

has applied *Lemon* only once—over 12 years ago—in a case involving a Ten Commandments display. *McCreary Cty. v. ACLU*, 545 U.S. 844, 864-866 (2005). In *Town of Greece*, which involved a challenge to a town's practice of legislative prayer, a majority of the Court made a clean break with *Lemon* and held that "the Establishment Clause *must* be interpreted 'by reference to historical practices and understandings.'" *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014) (quoting *County of Allegheny v. ACLU Greater Pittsburgh*, 492 U.S. 573, 670 (1989)). The question in *Town of Greece*, as here, is "whether the [Final Rule] fits within the tradition long followed" in our nation's history. *Id.* at 577.

### 2. The Final Rule readily passes both Establishment Clause tests.

RFRA authorizes the government to grant "exemptions, to the extent permissible under the Establishment Clause." 42 U.S.C. § 2000bb-4. Over six years of hard-fought litigation, neither the Obama Administration, nor the lower federal courts, nor any Supreme Court Justice took the view that granting relief to religious organizations would violate the Establishment Clause. And with good reason: the Final Rule easily passes Establishment Clause muster under any test, and the States' argument has been rightly rejected.

First, there is no historical evidence that an exemption designed to protect religious exercise would be an establishment of religion. To the contrary, history supports religious exemptions. For example, during the revolution, New York disestablished state support for the Church of England. It did not later establish Catholicism when it granted Catholic priests a narrow exemption from testifying against members of their parish. *See, e.g.*, *People v. Philips* (N.Y. Ct. Gen. Sess. 1813), *reported in* William Sampson, *The Catholic Question in America* 8-9 (photo. reprint 1974) (New York, Edward Gillespy 1813). Religious accommodations "fit[] within the

tradition long followed" in our nation's history.[19]

Indeed, the historical understanding of "establishments" in some cases *require* broad exemptions for religious employers. In *Hosanna-Tabor*, a unanimous Supreme Court held that historical anti-establishment interests required that churches be exempt from employment discrimination laws with regard to their ministerial employees. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). That exemption is required because "the Establishment Clause . . . prohibits government involvement in such ecclesiastical decisions." *Id.* at 189. Like the ministerial exception, the Final Rule belongs to a tradition of avoiding government interference with religious decision-making and the internal deliberations of religious groups like the Little Sisters.

Even under *Lemon*, the Supreme Court has long recognized that accommodation of religion is a permissible secular purpose, which does not advance or endorse religion, and which avoids, rather than creates, entanglement with religion. The leading case is *Amos*. There, a federal employment law prohibited discrimination on the basis of religion. But it also included a religious exemption, which permitted religious organizations to hire and fire on the basis of religion. 483 U.S. at 329 n.1. That exemption was challenged as a violation of the Establishment Clause, allegedly because it advanced religion by "singl[ing] out religious entities for a benefit." *Id.* at 338. But the Supreme Court *unanimously* upheld the religious exemption, concluding that the "government acts with [a] proper purpose" when it "lift[s] a regulation that burdens the exercise of religion." *Id.*

---

[19] *See, e.g.*, Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990).

So too here. HHS is not "advanc[ing] religion through its own activities and influence." *Id.* at 337. It would merely be lifting a severe governmental burden on private religious exercise. Such religious accommodations are not just permissible under the Establishment Clause, they "follow[] the best of our traditions." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). The Supreme Court reaffirmed this principle in RFRA's companion statute, RLUIPA, in *Cutter v. Wilkinson*, 544 U.S. 709 (2005). There, Justice Ginsburg, writing for a unanimous Court, stated "that 'there is room for play in the joints between' the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Id.* at 713 (quoting *Locke v. Davey*, 540 U.S. 712, 718 (2004)).

## B. Striking down the Final Rule under the Establishment Clause would endanger a swath of state and federal laws.

The States claim that the Final Rule violates the Establishment Clause because it "impos[es] a substantial burden on others." Dkt. 8-2, Mem. in support of First Mot. for PI at 37 (citing *Estate of Thornton v. Caldor*, 472 U.S. 703 (1985)). Their overbroad reading of *Thornton* cannot be squared with their own actions, with hundreds of other state and federal religious exemptions, or with binding Supreme Court precedent.

First, the States' overbroad reading of the Establishment Clause would undermine their own stated goals. The States' claim that religious exemptions are particularly noxious: "The Establishment Clause issue here is not whether the government *must* require insurance companies to cover contraception or whether the Defendants could have declined to guarantee contraceptive coverage for other reasons." Instead, "the primary, if not sole, purpose of the Rules is to advance a particular religious belief and foist it upon women . . . . This bell cannot be un-

rung." Dkt. 8-2, Mem. in support of First Mot. for PI at 36 & n.22. In other words, ***no*** contraceptive mandate is more constitutionally acceptable than a nationwide contraceptive mandate with religious exemptions. This reasoning, if adopted, would be more likely to prompt HHS to remove contraceptives from the list of preventive services entirely—since their inclusion is not required by statute or even rulemaking—than to continue litigating the precise scope of its exemptions.

Second, the States' reading of the Establishment Clause proves too much. The requested injunction against the Final Rule would do nothing to remedy the religious exemption for houses of worship in the prior version of the Mandate, on which the States are conspicuously silent.[20] The States' view of the Establishment Clause would mean that the exemption for houses of worship is unconstitutional too—along with hundreds of other state and federal provisions that provide religious exemptions. As Justice Ginsburg explained for a unanimous Court when rejecting the same argument in *Cutter*, "all manner of religious accommodations would fall" if the Court accepted the claim that providing religious exemptions impermissibly advances religion. 544 U.S. at 724.

That is why the Supreme Court has repeatedly and unanimously recognized a sharp distinction between laws that authorize "the *government itself* [to] advance[] religion through its own activities and influence" and laws that merely "alleviat[e] significant governmental interference with" private religious exercise. *Amos*, 483 U.S. at 337, 339; *see also Hosanna-*

---

[20] This Court previously distinguished that exemption as mandated under the First Amendment. *Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 580 (E.D. Pa. 2017). But that does not explain why it was permissible to exempt churches and their integrated auxiliaries, but impermissible to exempt religious orders of nuns.

*Tabor*, 565 U.S. at 188-89 ("the First Amendment itself . . . gives special solicitude to the rights of religious organizations"). The exemptions in *Amos* and *Hosanna-Tabor* surely impose a burden upon employees—some of whom lost their jobs. And losing your job (along with all your health insurance) is a heavier burden than losing only a subset of coverage from a health plan. Yet those exemptions were not only permissible but, in some cases, were required by the Establishment Clause. The Little Sisters are a religious organization that qualifies for the Title VII exemption upheld in *Amos*. The States' argument, if accepted, would lead to the anomalous rule that the government may authorize the Little Sisters to hire and fire people on religious grounds, but may not authorize the Little Sisters to exclude a narrow subset of services from their health care plan on religious grounds.

The idea that any religious accommodation which creates a burden is impermissible carries an ugly pedigree. This is particularly true in the case of religious minorities, whose practices are often poorly understood and challenged by speculative claims of burdens on the community. Religious ceremonies have been banned by cities who masked religious discrimination under the guise of public health. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 544-45 (1993). The construction of mosques has been challenged on the ground that they pose "elevated risks to the public safety." *See, e.g.*, *United States v. Rutherford Cty. Tenn.*, No. 3:12-0737, 2012 WL 3775980, at *2 (M.D. Tenn. Aug. 29, 2012). Gurdwaras have been excluded because they create traffic burdens in populated areas, and conversely because they create development burdens in rural ones. *Guru Nanak Sikh Soc. of Yuba City v. Cty. of Sutter*, 456 F.3d 978, 990 (9th Cir. 2006). Thus, the States' overbroad reading of the Establishment Clause, in addition to being incorrect on the law, would create easy cover for religious bigotry

masked with the neutral language of "burden."

## V. The Final Rule does not violate equal protection.

The States argue that the Final Rule violates the equal protection component of the Fifth Amendment because it "target[s]" women for worse treatment. Dkt. 8-2, Mem. in support of First Mot. for PI at 33. This argument fails for four reasons.

First, as set forth above, States are not persons under the Fifth Amendment and cannot assert Fifth Amendment claims at all. *See Riley*, 84 F.3d at 130 n.2 ("A State, however, is not entitled to due process protection.").

Second, the Final Rule makes no sex classification. It is the underlying Mandate that creates differential rights based on sex. The Little Sisters and other religious groups oppose (for example) the sterilization of men and of women. They only need a religious exemption from the latter because that is all the States seek to force them to provide.

Third, the States' position would mean the Supreme Court violated the Equal Protection Clause in *Hobby Lobby*, when it held that RFRA barred applying the same Mandate against closely-held corporations owned by persons with religious objections to providing certain contraceptive coverage. No Justice so much as mentioned an equal protection violation, nor did the Obama Administration argue that the requested relief would create one.

Finally, the States' argument would invalidate a whole host of other laws. Many state and federal laws provide similar protections related to abortion.[21] These exemptions exist because

---

[21] *See, e.g.*, 42 U.S.C. § 300a-7 (exemption from sterilization and abortion for "religious beliefs or moral convictions"); *Doe v. Bolton*, 410 U.S. 179, 197-98 (1973) (right to refrain from abortion for "moral or religious reasons" is "appropriate protection"). Virtually every state in the country has a religious or conscience-based exemption from being required to provide abortions.

abortion is a deeply important issue concerning the creation and protection of human life. These exemptions were not sought or provided because the Little Sisters, HHS, lower federal courts, or the Supreme Court disvalue women.

## VI. The requested relief would violate judicial orders, the Constitution, and federal law.

The States seek what appears to be a nationwide injunction on the grounds that the Final Rule violates the Establishment Clause, Equal Protection Clause, and APA.[22] Dkt. 8-2, Mem. in support of First Mot. for PI at 1. The States seek this relief, they say, in order to prevent the harm caused by religious objectors. But this Court cannot enter such relief, and cannot force the federal government to apply the Mandate to religious objectors, without running afoul of existing injunctions from a range of federal courts, including the Supreme Court. Simply put, many other courts have already ordered HHS *not* to enforce the very Mandate the States seek to make it enforce here. *See* Exhibit A. And in a related case, the Ninth Circuit narrowed an injunction against the IFR to apply only to the Plaintiff States, holding that a nationwide injunction was overbroad. *California v. Azar*, No. 18-15144, 2018 WL 6566752, at *15-*17 (9th Cir. Dec. 13, 2018).

In any case, the relief requested by the States would violate the First Amendment. If the States prevail, the federal government would revert to a system in which some religious

_See, e.g._, Mark L. Rienzi, _The Constitutional Right Not to Kill_, 62 Emory L.J. 121, 148-49 (2012) (also detailing exemptions related to military service, capital punishment, and assisted suicide).

[22] The States also argue the Final Rule violates Title VII and the Pregnancy Discrimination Act, but that appears to be merely a portion of its APA argument, rather than a separate claim for relief. *See* Dkt. 8-2, Mem. in support of First Mot. for PI at 28-32. Since the States are not employees and the defendants are not their employer, they do not have standing for a claim under Title VII.

organizations get exemptions (primarily churches and their "integrated auxiliaries"), and some do not. This type of discrimination among religious organizations is impermissible under the Free Exercise and Establishment Clauses, which prohibit the government from making such "explicit and deliberate distinctions between different religious organizations." *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982) (striking down laws that created differential treatment between "well-established churches" and "churches which are new and lacking in a constituency"). By preferring certain church-run organizations to other types of religious organizations, the Mandate inappropriately "interfer[es] with an internal . . . decision that affects the faith and mission" of a religious organization, *Hosanna-Tabor*, 565 U.S. at 190. Doing so also requires illegal "discrimination . . . [among religious institutions] expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations[.]" *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (applying *Larson* to invalidate distinction between "sectarian" and "pervasively sectarian" organizations).

The States' effort to thwart a small religious exemption, while never objecting to much larger and far-reaching secular exemptions, also violates the Free Exercise and Equal Protection Clauses. Simply put, governments may not single out religious conduct for special disabilities where they have taken no action to address comparable secular conduct that produces an even greater threat to the States' claimed interests. *See, e.g.*, *Lukumi*, 508 U.S. at 532 ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."); *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) (a law violates the Free Exercise Clause when it "burdens a category of religiously motivated conduct but exempts or

does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated.").

Finally, as explained above, the requested relief violates RFRA. The Supreme Court has already found that forced compliance with the Mandate constitutes a substantial burden on religion. *Hobby Lobby*, 134 S. Ct. 2775-79. The federal defendants have not, and cannot, carry their statutory burden of demonstrating that forced compliance is the least restrictive means of advancing a compelling government interest. *See* 83 Fed. Reg. at 57,546-48.

## VII. The remaining injunction factors are not satisfied.

For the reasons set forth above, the States have failed to demonstrate a likelihood of success on the merits. They have also failed to carry their burden as to the other injunction factors. In light of the existing injunctions, the States have failed to show irreparable harm, given that they cannot identify even a single employer expected to change (or employee expected to lose) coverage. Given that the States already suffer much greater "harm" from existing injunctions and the grandfathering exemption, they cannot show that the Final Rule will add anything to its alleged burdens.

The balance of the equities also requires denial of the States' motion. While the States cannot find a single actual person who will be harmed by the Final Rule, there are actual, real, known religious groups like the Little Sisters for whom the Final Rule brings the real benefit of codifying their judicially-obtained exemptions. It would be far from equitable to allow the States, who sat on the sidelines for years while the Little Sisters won protection in other courts, to collaterally attack that relief here. The public interest—both in the enforcement of federal civil

rights laws and the orderly functioning of the federal judiciary—thus forecloses the injunction.

## CONCLUSION

The States' motion should be denied.

Dated: January 3, 2019

Respectfully submitted,

/s/ Mark Rienzi
Mark Rienzi
Lori Windham
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

Nicholas M. Centrella
Conrad O'Brien PC
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-8098
Facsimile: (215) 864-0798
ncentrella@conradobrien.com

*Counsel for Intervenor-Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the forgoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: January 3, 2019

/s/ Mark Rienzi
Mark Rienzi
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095