## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, et al., | |
| Plaintiffs, | Case No. 2:17-cv-04540-WB |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

### BRIEF OF AMICI CURIAE THE NATIONAL WOMEN'S LAW CENTER, THE NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE HEALTH, THE NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM, AND SISTERLOVE, INC. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Fatima Goss Graves
Gretchen Borchelt
Sunu Chandy
Michelle Banker
**NATIONAL WOMEN'S
LAW CENTER**
11 Dupont Circle NW, Suite 800
Washington, DC 20036

Sequoia Ayala
Carolyn Calhoun
**SISTERLOVE, INC.**
P.O. Box 10558
Atlanta, GA 30310-1731

Jane Liu
**NATIONAL ASIAN PACIFIC
AMERICAN WOMEN'S FORUM**
1730 Rhode Island Ave, NW
Suite 210
Washington, DC 20036

*Of Counsel for Amici Curiae*

Michael A. Kaplan (Bar No. 323507)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Fax: (973) 597-2400
mkaplan@lowenstein.com

Jeffrey Blumenfeld, Esq. (*pro hac vice*
forthcoming)
**LOWENSTEIN SANDLER LLP**
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 753-3810
Fax: (973) 422-6849
jblumenfeld@lowenstein.com

*Attorneys for Amici Curiae the National
Women's Law Center, the National Latina
Institute for Reproductive Health,
SisterLove, Inc., and the National Asian
Pacific American Women's Forum*

*(Amici appreciate the assistance of Nina Serrianne at the National Latina Institute for
Reproductive Health for her role in the preparation of this brief)*

## <u>TABLE OF CONTENTS</u>

**Pages**

INTEREST AND IDENTITY OF AMICI ................................................................. xi

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................1

ARGUMENT .........................................................................................................3

I.     PENNSYLVANIA AND NEW JERSEY HAVE STANDING BECAUSE MANY OF THEIR RESIDENTS, INCLUDING THOSE FACING MULTIPLE AND INTERSECTING FORMS OF DISCRIMINATION, ARE LIKELY TO LOSE COVERAGE UNDER THE RULES.............................3

II.    THE RULES WILL HARM THOSE WHO LOSE COVERAGE BY REINSTATING PRE-ACA COST AND OTHER BARRIERS TO CONTRACEPTION. ....................................................................................11

      A.    The Rules Will Make Contraception Cost-Prohibitive for Many People.........................................................................................11

      B.    The Rules Will Create Logistical, Administrative, and Informational Barriers to Contraception.................................................14

III.    THE RULES WILL HARM THE HEALTH, AUTONOMY, AND ECONOMIC SECURITY OF THOSE WHO LOSE CONTRACEPTIVE COVERAGE....................................................................................15

      A.    The Rules Will Harm the Health of Individuals and Families..................15

            1.    THE RULES PLACE MORE PEOPLE AT RISK FOR UNINTENDED PREGNANCY AND ASSOCIATED HEALTH RISKS. .........................................................16

            2.    THE RULES WILL UNDERMINE HEALTH BENEFITS FROM CONTRACEPTION..........................................................18

      B.    The Rules Will Undermine Individuals' Autonomy and Control Over Their Reproductive and Personal Lives.............................................19

      C.    The Rules Undermine Individuals' Economic Security. ...........................21

            1.    ACCESS TO CONTRACEPTION PROVIDES LIFE-LONG ECONOMIC BENEFITS TO WOMEN, FAMILIES, AND SOCIETY.........................................................21

            2.    THE RULES WILL EXACERBATE ECONOMIC AND SOCIAL DISPARITIES BY IMPEDING ACCESS TO CONTRACEPTION. ...................................................22

CONCLUSION..................................................................................................................23

# TABLE OF AUTHORITIES

**Pages**

CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982)..................................................................................4

*Buck v. Bell,*
    274 U.S. 200 (1927)................................................................................19

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983)............................................................................4, 5, 7

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human*
    *Servs.,* 724 F.3d 377 (3d Cir. 2013)........................................................4

*Griswold v. Connecticut,*
    381 U.S. 479 (1965)................................................................................19

*Pennsylvania v. Trump,*
    281 F. Supp. 3d 553 (E.D. Pa. 2017) ......................................................6

*Planned Parenthood of Se. Pa. v. Casey,*
    505 U.S. 833 (1992)................................................................................19

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014).....................................................................3, 4, 5

STATUTES

8 U.S.C. § 1613(a) .....................................................................................10

42 U.S.C. § 300a-4(c)(2)............................................................................10

42 U.S.C. § 300gg-13(a)(4) ....................................................................1, 2

42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) .......................................................10

N.J. Stat. Ann. §§ 17B:26-2, 17B:27-46, 17B:27A-19.15........................5

REGULATIONS

42 C.F.R. §§ 59.2, 59.5(7), (8)...................................................................10

77 Fed. Reg. 8,725 (Feb. 15, 2012) .....................................................2, 22

82 Fed. Reg. 47,792 (Oct. 13, 2017) ..........................................................4

83 Fed. Reg. 57,536 (Nov. 15, 2018) ...................................................1, 5, 6, 7, 9, 11, 17

83 Fed. Reg. 57,592 (Nov. 15, 2018) ..........................................................1, 5, 6, 7, 9, 17

N.J. Admin. Code § 10:78-3.2(e)(1) ..............................................................................10

**OTHER AUTHORITIES**

155 Cong. Rec. S12,021 (daily ed. Dec. 1, 2009)..........................................................2

155 Cong. Rec. S12,033 (daily ed. Dec. 1, 2009)..........................................................2

A. Law et al., *Are Women Benefiting from the Affordable Care Act? A Real-World
    Evaluation of the Impact of the Affordable Care Act on Out-of-Pocket Costs for
    Contraceptives*, 93 Contraception 392 (2016) ......................................................13

Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey
    (MEPS), Pennsylvania Tables, (2017),
    https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=31&year=2017. .......................4, 8

Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey
    (MEPS), New Jersey Tables, (2017),
    https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=31&year=2017. ...................4, 5, 8

Alanna Williamson et al., Kaiser Family Found., *ACA Coverage Expansions and
    Low-Income Workers* 4 (2016), http://files.kff.org/attachment/ACA-Coverage-
    Expansions-and-Low-Income-Workers ..................................................................8

Adam Sonfield, *The Case for Insurance Coverage of Contraceptive Services and
    Supplies Without Cost-Sharing*, 14 Guttmacher Pol'y Rev. 7 (2011) ..............................12, 18

Adam Sonfield et al., Guttmacher Inst., *The Social and Economic Benefits of
    Women's Ability to Determine Whether and When to Have Children* 7-8 (2013),
    https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-
    benefits.pdf....................................................................................................21, 22

Am. Coll. of Obstetricians & Gynecologists, *Committee Opinion No. 649:  Racial
    & Ethnic Disparities in Obstetrics & Gynecology* 3 (2015),
    https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-
    Care-for-Underserved-Women/co649.pdf?dmc=1&ts=20180521T1849308146..................15

Am. Coll. of Obstetricians & Gynecologists, *Committee Opinion No. 554*,
    *Reproductive and Sexual Coercion* 2-3 (2013), https://www.acog.org/-
    /media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-
    Women/co554.pdf?dmc=1&ts=20180521T2206346190 ..................................................20, 21

Amy O. Tsui et al., *Family Planning and the Burden of Unintended Pregnancies*,
32 Epidemiologic Rev. 152 (2010) ........................................................................16

Ana Nuevo Chiquero, *The Labor Force Effects of Unplanned Childbearing*
(Boston Univ., Job Market Paper Nov. 2010),
http://www.unavarra.es/digitalAssets/141/141311_100000Paper_Ana_Nuevo_
Chiquero.pdf. ..........................................................................................................22

Ashley H. Snyder et al., *The Impact of the Affordable Care Act on Contraceptive
Use and Costs among Privately Insured Women*, 28 Women's Health Issues
219 (2018)............................................................................................................2, 13

Bearek et al., *Changes in Out-Of-Pocket Costs for Hormonal IUDs after
Implementation of the Affordable Care Act: An Analysis of Insurance Benefit
Inquiries*, 93 Contraception 139 (2016).................................................................13

Black Mamas Matter Alliance, *Black Mamas Matter Toolkit Advancing the Right to
Safe and Respectful Maternal Health Care* 21 (2018),
https://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/U
SPA_BMMA_Toolkit_Booklet-Final-Update_Web-Pages.pdf ...............................17

Carole Joffe & Willie J. Parker, *Race, Reproductive Politics and Reproductive
Health Care in the Contemporary United States*, 86 Contraception 1 (2012) .......19

Caroline Rosenzweig et al., Kaiser Family Found., *Women's Sexual and
Reproductive Health Services: Key Findings from the 2017 Kaiser Women's
Health Survey* (2018), http://files.kff.org/attachment/Issue-Brief-Womens-
Sexual-and-Reproductive-Health-Services-Key-Findingsfrom- the-2017-
Kaiser-Womens-Health-Survey ...............................................................................18

Cassandra Logan et al., Nat'l Campaign to Prevent Teen & Unplanned Pregnancy,
Child Trends, Inc., *The Consequences of Unintended Childbearing: A White
Paper* 3-5 (2007),
https://pdfs.semanticscholar.org/b353/b02ae6cad716a7f64ca48b3edae63544c03
e.pdf. ......................................................................................................................16

Catholic Benefits Ass'n, Home Page, https://catholicbenefitsassociation.org/ .............6

Catholics for Choice, *The Facts Tell the Story 2014-2015* 5 (2014),
http://www.catholicsforchoice.org/wp-
content/uploads/2014/12/FactsTelltheStory2014.pdf. ............................................7

Christine Dehlendorf et al., *Disparities in Family Planning*, 202 Am. J. Obstet.
Gynecol. 214 (2010) ...............................................................................................14

Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives
and Women's Career and Marriage Decisions*, 110 J. Pol. Econ. 730, 749
(2002)......................................................................................................................22

Debbie Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change*, 76 Contraception 360 (2007) .................................................................13

Deborah Gray White, *Ar'n't I a Woman?: Female Slaves in the Plantation South* (W.W. Norton & Co. ed., 1999) ..............................................................................19

Economic Policy Institute, *Family Budget Calculator, Monthly Costs*, https://www.epi.org/resources/budget/ ....................................................................9

Elena R. Gutiérrez, *Fertile Matters: the Politics of Mexican-Origin Women's Reproduction* 35-54 (2008)..........................................................................19

Elizabeth Miller et al., *Reproductive Coercion: Connecting the Dots Between Partner Violence and Unintended Pregnancy* ..........................................................21

Erin Armstrong et al., *Intrauterine Devices and Implants: A Guide to Reimbursement* 5 (Regents of U.C. et al. 2d ed. 2015), https://www.nationalfamilyplanning.org/file/documents .......................................12

Express Scripts, *2015 Drug Trends Report* 118 (2016), http://lab.express-scripts.com/lab/drug-trend-report/~/media/e2c9d19240e94fcf893b706e13068750.ashx.................................13

Express Scripts, *2016 Drug Trends Report* 24 (2017), http://lab.express-scripts.com/lab/drug-trend-report/~/media/29f13dee4e7842d6881b7e034fc0916a.ashx (reporting 3.0% overall increase in contraceptive use from 2015-16, and 137.6% increase in specialty contraceptives, including LARCs). ..........................................................13

Fatima Saleem & Syed W. Rizvi, *Transgender Associations and Possible Etiology: A Literature Review*, 9 Cureus 1 (2017) ...............................................................20

Guttmacher Inst., *A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions* 5 (2009), https://www.guttmacher.org/sites/default/files/report_pdf/recessionfp_1.pdf. .......................12

Guttmacher Inst., *Insurance Coverage of Contraception* (Dec. 2016), https://www.guttmacher.org/evidence-you-can-use/insurance-coverage-contraception.......................................................................................13

Guttmacher Inst., *Publicly Funded Family Planning Services in the United States* 1 (2016), https://www.guttmacher.org/sites/default/files/factsheet/fb_contraceptive_serv_0.pdf. ...................................................................................17

Health Res. & Servs. Admin., *Women's Preventive Services Guidelines*, https://www.hrsa.gov/womens-guidelines-2016/index.html ...................................1

Heinrich H. Hock, *The Pill and the College Attainment of American Women and Men*  (Fla. St. Univ., Working Paper 2007)............................................................................21

Hobby Lobby, Hobby Lobby Store Finder, https://www.hobbylobby.com/store-finder ................................................................................................................................4

Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 109 (2011)............................................................................................... 12, 16, 18

James Trussell et al., *Erratum to "Cost Effectiveness of Contraceptives in the United States" [Contraception 79 (2009) 5-14]*, 80 Contraception 229 (2009). ..................11

Jamila Taylor & Nikita Mhatre, *Contraceptive Coverage Under the Affordable Care Act*, Ctr. for Am. Progress (Oct. 6, 2017, 5:09 PM), https://www.americanprogress.org/issues/women/news/2017/10/06/440492/con traceptive-coverage-affordable-care-act/. .................................................................12

Jasmine Tucker & Kayla Patrick, Nat'l Women's Law Ctr., *Women in Low-Wage Jobs May Not Be Who You Expect* 1 (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/08/Women-in-Low-Wage-Jobs-May-Not-Be-Who-You-Expect.pdf. .......................................8, 23

Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291, 1291 (2012). ........................17

Jennifer J. Frost et al., Guttmacher Inst., *Contraceptive Needs and Services, 2014 Update* 12, 30 (2016), https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf..............................................................................................10

Jennifer J. Frost & Jacqueline E. Darroch, *Factors Associated with Contraceptive Choice and Inconsistent Method Use,* United States, 2004, 40 Persps. On Sexual & Reprod. Health 94 (2008)  ....................................................................18

Jennifer J. Frost & Laura Duberstein Lindberg, *Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics*, 87 Contraception 465 (2013)......................................................................19

Jessie Hellmann, *Trump Administration Rescinds Obama Guidance on Defunding Planned Parenthood*, The Hill (Jan. 19, 2018, 11:15 AM) ....................................10

Jo Jones et al., Ctrs. For Disease Control & Prevention, *Nat'l Health Statistics Reps.: Current Contraceptive Use in the United States 2006-2010, and Changes in Patterns of Use Since 1995* 5 (2012), https://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf...................................................14

Juno Obedin-Maliver & Harvey J. Makadon, *Transgender Men and Pregnancy*, 9 Obstetric Med. (2015)...........................................................................................20

Kimberly Daniels et al., Ctrs. For Disease Control & Prevention, *62 Nat'l Health Stats. Reps.: Contraceptive Methods Women Have Ever Used: United States, 1982–2010* 8 (2013), https://www.cdc.gov/nchs/data/nhsr/nhsr062.pdf. ................................7

Lawrence B. Finer & Mia R. Zolna, *Shifts in Intended and Unintended Pregnancies in the United States, 2001–2008*, 104 Am. J. Pub. Health (2014)...........................................16

Lisa L. Lindley & Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 Am. J. Pub. Health 1379 (2015) ..................................................................................16

Martha J. Bailey et al., *The Opt-in Revolution? Contraception and the Gender Gap in* Wages, 4 Am. Econ. J. Appl. Econ. 225 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3684076/. ....................................................21

NAPAWF calculations from U.S. Census Bureau, *2015 ACS 1-Year Estimates: Table S0201, Selected Population Profile in the United States*, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_1YR/S0201//popgroup ~031 (last visited Dec. 28, 2018). ..........................................................................23

Nat'l Latina Inst. for Reproductive Health, *Latina/o Voters' Views and Experiences Around Reproductive Health* 2 (2018), http://latinainstitute.org/sites/default/files/NLIRH%20Survey%20Report_F_0.pdf ......................................................................................................................7, 14

Nat'l Women's Law Ctr., *Collateral Damage: Scheduling Challenges for Workers in Low-Wage Jobs and Their Consequences* (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/Collateral-Damage.pdf..........................................................................................15, 23

Nat'l Women's Law Ctr., *Equal Pay for Asian and Pacific Islander Women* (2018), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2018/02/Asian-Women-Equal-Pay-Feb-2018.pdf........................................23

Nat'l Women's Law Ctr., *FAQs About the Wage Gap* (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/FAQ-About-the-Wage-Gap-2017.pdf ..................................................................................23

Nat'l Women's Law Ctr., *It Shouldn't Be a Heavy Lift: Fair Treatment for Pregnant Workers* (2016), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2015/08/pregnant_workers.pdf......................................................23

Nat'l Women's Law Ctr., *New Data Estimates 62.8 Million Women Have Coverage of Birth Control Without Out-of-Pocket Costs* (2018), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-4.pdf. ........................................................2

Nat'l Women's Law Ctr., *Sexual Harassment & Assault in Schools*,
    https://nwlc.org/issue/sexual-harassment-assault-in-schools/ ................................................20

Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket
    Spending for Contraceptives After ACA Mandate Removed Cost Sharing,* 34
    Health Affairs 1204 (2015) ...........................................................................................11, 13

Office of Disease Prevention & Health Promotion, *HealthyPeople 2020: Family
    Planning*, HealthyPeople.gov, https://www.healthypeople.gov/2020/topics-
    objectives/topic/family-planning (last visited Dec. 28, 2018). .............................................16

Pa. Dep't of Hum Servs., Medical Assistance Eligibility Handbook § 322.3 Non-
    Citizen Status & Appx. A, available at
    http://services.dpw.state.pa.us/oimpolicymanuals/ma/whnjs.htm. ......................................10

Power to Decide, *Publicly Funded Sites Offering All Birth Control Methods By
    County*, https://powertodecide.org/what-we-do/access/access-birth-control..........................10

Proud Heritage: People, Issues, and Documents of the LGBT Experience, Vol. 2
    205 (Chuck Stewart, ed. 2015) ............................................................................................19

Rachel K. Jones & Joerg Dreweke, Guttmacher Inst., *Countering Conventional
    Wisdom: New Evidence on Religion and Contraceptive Use* (2011),
    https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-
    contraceptive-use.pdf........................................................................................................7

Renee Montagne & Nina Martin, *Focus on Infants During Childbirth Leaves U.S.
    Moms In Danger*, Nat'l Pub. Radio (May 12, 2017 5:00 AM),
    https://www.npr.org/2017/05/12/527806002/focus-on-infants-during-childbirth-
    leaves-u-s-moms-in-danger...............................................................................................17

Sandy E. James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015
    U.S. Transgender Survey* 96-99 (2015),
    https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-
    FINAL.PDF. ......................................................................................................................15

SL Budge et al., *Anxiety and Depression in Transgender Individuals: The Roles of
    Transition Status, Loss, Social Support, and Coping*, 81 J. Consult Clin. Psych.
    545 (2013) .......................................................................................................................20

Stacey McMorrow, Urban Inst., *Racial and Ethnic Disparities in Use of
    Prescription Contraception: The Role of Insurance Coverage* (forthcoming),
    https://academyhealth.confex.com/academyhealth/2017arm/meetingapp.cgi/Pap
    er/17939 ..........................................................................................................................14

Steven Ruggles et al., Integrated Public Use Microdata Series, available at
    https://sda.usa.ipums.org. ...................................................................................................8

U.S. Census Bureau, *2015 ACS 1-Year Estimates: Table S0201, Selected Population Profile in the United States,* https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_1YR/S0201//popgroup ~031 ................................................................................................................................23

U.S. Dep't of Health and Human Servs., Asst. Sec'y for Planning and Education, Compilation of State Data on the Affordable Care Act, https://aspe.hhs.gov/compilation-state-data-affordable-care-act ...............................................9

U.S. Equal Employment Opportunity Commission, Coverage of Contraception (Dec 14, 2000), https://www.eeoc.gov/policy/docs/decision-contraception.html

........................................................................................................................................5

W. Canestaro et al., *Implications of Employer Coverage of Contraception: Cost-Effectiveness Analysis of Contraception Coverage Under an Employer Mandate,* 95 Contraception 77 (2017) ..................................................................................17

Zenen Jaimes et al., Generation Progress & Advocates for Youth, *Protecting Birth Control Coverage for Young People* 1 (2015) , *https://www.govinfo.gov/content/pkg/FR-2018-11-15/pdf/2018-24514.pdf* ...........................12

## INTEREST AND IDENTITY OF AMICI CURIAE

Amici the National Women's Law Center, the National Latina Institute for Reproductive Health, SisterLove, Inc., the National Asian Pacific American Women's Forum, and the 40 additional organizations listed in the Appendix, are national and regional organizations committed to obtaining racial justice, economic security, gender equity, civil rights, and reproductive justice for all, which includes ensuring that individuals who may become pregnant have access to full and equal health coverage, including contraceptive coverage without cost-sharing, as guaranteed by the Affordable Care Act ("ACA").   We submit this brief to demonstrate the irreparable harm that will result, particularly to those who face multiple and intersecting forms of discrimination, if the Administration's final rules regarding the ACA's contraceptive coverage requirement are permitted to go into effect as scheduled on January 14, 2019.[1]

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than Amici Curiae and their counsel made a monetary contribution to fund the preparation or submission of this brief.  All parties and signatories have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

At stake in this litigation are the health and livelihoods of people in Pennsylvania and New Jersey and across the United States who will suffer irreparable harm under the Administration's two final rules regarding the ACA's contraceptive coverage requirement[2]— particularly Black, Latinx,[3] Asian American and Pacific Islander ("AAPI") women and other people of color, young people, people with limited resources, transgender men and gender non-conforming people, immigrants, people with limited English proficiency, survivors of sexual and interpersonal violence, and others who face multiple and intersecting forms of discrimination.

The ACA's contraceptive coverage requirement requires employers to provide insurance coverage without cost-sharing for all FDA-approved methods of contraception for women, and related education, counseling, and services.[4,5]   Congress intended the Women's Health Amendment of the ACA to reduce gender discrimination in health insurance by ensuring that it covers women's major health needs and that women no longer pay more for health care than

---

[2] Religious Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act, 83 Fed. Reg. 57,536 (Nov. 15, 2018) (hereinafter "Religious Exemptions"); Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act, 83 Fed. Reg. 57,592 (Nov. 15, 2018) (hereinafter "Moral Exemptions").

[3] "Latinx" is a term that represents a gender-neutral alternative to Latino and Latina and encompasses the identities of transgender and gender non-conforming individuals of Latin American descent.

[4] This brief uses the term "women" because the rules target women, and the ACA was intended to end discrimination against women. As we discuss, the denial of reproductive health care and related insurance coverage also affects some gender non-conforming people and transgender men.

[5] 42 U.S.C. § 300gg-13(a)(4); Health Res. & Servs. Admin., *Women's Preventive Services Guidelines*, https://www.hrsa.gov/womens-guidelines-2016/index.html (last visited Dec. 28, 2018).

men, including by decreasing the cost of contraception.[6] The Departments of Health and Human Services, Treasury, and Labor (the "Departments") previously acknowledged this intent, explaining that Congress added the ACA Women's Health Amendment because "women have unique health care needs and burdens . . . includ[ing] contraceptive services," and that the "Departments aim to reduce these disparities by providing women broad access to preventive services, including contraceptive services."[7]

The ACA contraceptive coverage requirement has furthered these aims by eliminating the out-of-pocket costs of contraception and ensuring coverage of the full range of FDA-approved contraceptives and related services for women. Today, an estimated 62.8 million women are eligible for coverage of the contraceptive method that works best for them, irrespective of cost.[8] As a result, use of contraception—especially highly-effective long-acting reversible contraceptives ("LARCs") such as intrauterine devices ("IUDs") and contraceptive implants— has increased.[9]

The final rules would reverse these gains by establishing a sweeping exemption permitted

---

[6] 42 U.S.C. § 300gg-13(a)(4); *see also* 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski) (Women's Health Amendment intended to alleviate "punitive practices of insurance companies that charge women more and give [them] less in a benefit"); 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken) (Women's Health Amendment intended to incorporate "affordable family planning services" to "enable women and families to make informed decisions about when and how they become parents").

[7] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,727, 8,728 (Feb. 15, 2012) [hereinafter "ACA Coverage"].

[8] Nat'l Women's Law Ctr., *New Data Estimates 62.8 Million Women Have Coverage of Birth Control Without Out-of-Pocket Costs* (2018), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-4.pdf.

[9] *See* Ashley H. Snyder et al., *The Impact of the Affordable Care Act on Contraceptive Use and Costs among Privately Insured Women*, 28 Women's Health Issues 219, 222 (2018).

by neither the text nor the legislative history of the ACA allowing virtually any employer or university to deny insurance coverage for contraception and related services to employees, students, and their dependents.  These expansive exemptions would undermine gender equality by reintroducing the very inequities that Congress meant to remedy.

This brief first establishes that Pennsylvania and New Jersey have standing to challenge the final rules because many individuals in these States are likely to lose contraceptive coverage, including many people who already face multiple and intersecting forms of discrimination. Second, the brief provides data showing that the rules will make contraception cost-prohibitive and will create other non-financial barriers to contraception for many who lose coverage.  Third, the brief discusses the multiple ways the rules will irreparably harm those who lose contraceptive coverage. The rules will: (1) jeopardize health by increasing unintended pregnancies and aggravating medical conditions managed by contraception; (2) undermine individuals' autonomy and control over their lives; and (3) threaten individuals' economic security.  As highlighted throughout this brief, the rules will particularly harm people of color and others who already face systemic discrimination in Pennsylvania, New Jersey, and nationwide.

Because Plaintiffs have demonstrated a likelihood of irreparable harm absent preliminary relief, Amici urge the Court to grant Plaintiffs' requested injunctive relief.

## **ARGUMENT**

I.   **PENNSYLVANIA AND NEW JERSEY HAVE STANDING BECAUSE MANY OF THEIR RESIDENTS, INCLUDING THOSE FACING MULTIPLE AND INTERSECTING FORMS OF DISCRIMINATION, ARE LIKELY TO LOSE COVERAGE UNDER THE RULES.**

Article III requires Pennsylvania and New Jersey to demonstrate an injury-in-fact that is "concrete and particularized" and "actual or imminent."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotations omitted).  "An allegation of future injury may

suffice if . . . there is a substantial risk that the harm will occur." *Id.*; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (standing to seek injunction depends on whether plaintiff is "likely to suffer future injury" from defendant's conduct).  A state has standing when a quasi-sovereign interest is at stake, such as "the health and well-being—both physical and economic—of its residents in general."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).

Pennsylvania and New Jersey have standing.  Nearly 2.7 million employees are enrolled in private employer-sponsored plans in Pennsylvania and are at risk of losing coverage due to the rules, and this estimate does not include covered dependents.[10]  That number is over 1.6 million employees in New Jersey.[11]   At least two employers in Pennsylvania with hundreds of employees (Hobby Lobby[12] and Conestoga Woods[13]) and at least one employer in New Jersey (Hobby Lobby[14]) will certainly take advantage of the expanded exemptions, given that they vociferously litigated against the contraceptive coverage requirement.  Although New Jersey law requires coverage of contraception in state-regulated insurance plans, this does not apply to self-

---

[10] NWLC calculations from Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey (MEPS), Pennsylvania Tables II.B.1, II.B.2, and II.B.2.b (2017), https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=31&year=2017 (last visited Dec. 28, 2018).

[11]   *Id.*  New Jersey Tables II.B.1, II.B.2, and II.B.2.b (2017), https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=24&year=2017 (last visited Dec. 28, 2018).

[12] Hobby Lobby has eight Pennsylvania locations. *See* Hobby Lobby Store Finder, https://www.hobbylobby.com/store-finder (last visited Dec. 28, 2018); *see also* Interim Religious Exemptions, 82 Fed. Reg. 47,817 n. 67 (citing 13,240 Hobby Lobby employees nationwide).

[13] *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 381 (3d Cir. 2013), *rev'd and remanded sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 275 (2014) ("Conestoga is a Pennsylvania for-profit corporation that . . . has 950 employees.").

[14] *See* Hobby Lobby Store Finder, *supra* note 12.

insured plans, which are governed solely by federal law.[15]   Over 945,500 private-sector employees were enrolled in self-insured plans in New Jersey in 2017, a number which does not include covered dependents.[16]   Moreover, New Jersey law does not explicitly require fully-insured plans to cover contraception without cost-sharing as does the ACA.[17]   Pennsylvania does not have a state law requiring contraceptive coverage in fully insured plans.[18]   Thus, there is at least a "substantial risk" that Pennsylvania and New Jersey residents will lose contraceptive coverage due to the rules, rendering the injury sufficiently imminent for standing purposes. *Susan B. Anthony List*, 134 S. Ct. at 2341; *Lyons*, 461 U.S. at 105.

Of course, given the broad reach of the rules, it is error to assume that only those entities that filed litigation or requested an accommodation, and a trivial number of similar entities, will take advantage of the expanded exemptions.[19]   Indeed, the Departments vastly underestimate the likely harm in Pennsylvania, New Jersey, and nationwide due to their erroneous assumptions about the impact of the rules.   By extending the religious exemption to all non-governmental universities and employers, including publicly traded companies, the rules greatly expand the

---

[15] *See, e.g.*, N.J. Stat. Ann. §§ 17B:26-2.1y, 17B:27-46.1ee, 17B:27A-19.15; *see also* Am. Compl. ¶¶ 141-42.

[16] NWLC calculations from MEPS, New Jersey Tables II.B.1, II.B.2, II.B.2.b, and II.B.2.b(1) (2017), https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=24&year=2017 (last visited Dec. 28, 2018).

[17] *See, e.g.*, N.J. Stat. Ann. §§ 17B:26-2.1y, 17B:27-46.1ee, 17B:27A-19.15; *see also* Am. Compl. ¶¶ 141-42.

[18] Federal anti-discrimination law does offer some protection to employees. Title VII of the Civil Rights Act of 1964, which prohibits sex discrimination in employment, requires employers to provide contraceptive coverage if they otherwise provide comprehensive preventive care and prescription drug coverage. U.S. Equal Employment Opportunity Commission on Coverage of Contraception (Dec. 14, 2000), https://www.eeoc.gov/policy/docs/decision-contraception.html.

[19] Religious Exemptions, 83 Fed. Reg. 57,576–57,578, 57,581; Moral Exemptions, 83 Fed. Reg. 57,625–27.

number of eligible entities.  Moreover, some of the original litigating entities represent multiple, unidentified employers: for example, the Catholic Benefits Association alone represents more than 1,000 employers.[20]

The Departments also underestimate the likely impact of the "moral" exemption, under which any university or non-publicly-traded private entity may claim an exemption for virtually any reason given the vast nature of what could be interpreted as a "moral" objection.[21]  As this Court correctly observed about the interim rules, which are identical to the final rules in this respect, "[w]ho determines whether the expressed moral reason is sincere or not or, for that matter, whether it falls within the bounds of morality or is merely a preference choice, is not found within the terms of the Moral Exemption Rule." *Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 577 (E.D. Pa. 2017).  The rules also do not require objectors to file a statement of the basis for their objection that could permit oversight.

It is also error to assume—as the Departments do—that employees of objecting entities share their employers' moral or religious objections to contraception.[22]  Many women of faith and their dependents who rely on objecting entities for health insurance use contraception and will be impacted by loss of contraceptive coverage.  More than 99% of sexually experienced women aged 15-44 have used at least one method of contraception at some point regardless of religious affiliation.[23]  Among sexually experienced Catholic women, 98% have used a method

---

[20] Catholic Benefits Ass'n, https://catholicbenefitsassociation.org/ (last visited Dec. 28, 2018).

[21] *See* Moral Exemptions, 83 Fed. Reg. 57,625–28.

[22] *See* Religious Exemptions, 83 Fed. Reg. 57,563–64, 57,581; Moral Exemptions, 83 Fed. Reg. 57,626.

[23] Kimberly Daniels et al., Ctrs. For Disease Control & Prevention, *62 Nat'l Health Stats. Reps.: Contraceptive Methods Women Have Ever Used: United States, 1982–2010* 8 (2013), https://www.cdc.gov/nchs/data/nhsr/nhsr062.pdf.

of contraception other than natural family planning; that number is 95% for married Catholic Latinas.[24]   Over 70% of Protestant women use a "highly effective contraceptive method" (including sterilization, IUDs, the pill, and other hormonal methods).[25]   Of Latina and Latino voters, 86% consider contraception to be preventive health care and 82% do not view contraception through a religious lens.[26]   Thus, contrary to the Departments' assertions, many Pennsylvania and New Jersey residents are likely to lose a vital health benefit under the rules. *Lyons*, 461 U.S. at 105.

Additionally, a substantial number of the individuals in the Plaintiff States and nationwide who are at risk of losing coverage are those who can least afford it.   The Departments suggest that women with low incomes and women of color are less likely to be reliant upon employer-sponsored health plans, and thus the rules will have little effect on them.[27]   To the contrary, many low-wage workers—who are disproportionately women of color[28]—and their dependents rely on employer-sponsored health insurance and stand to lose coverage under the

---

[24] Rachel K. Jones & Joerg Dreweke, Guttmacher Inst., *Countering Conventional Wisdom:  New Evidence on Religion and Contraceptive Use* 4 (2011), https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf; Catholics for Choice, *The Facts Tell the Story 2014-2015* 5 (2014), http://www.catholicsforchoice.org/wp-content/uploads/2014/12/FactsTelltheStory2014.pdf.

[25] Catholics for Choice, *supra* note 24, at 5.

[26] Nat'l Latina Inst. for Reproductive Health, *Latina/o Voters' Views and Experiences Around Reproductive Health* 2 (2018), http://latinainstitute.org/sites/default/files/NLIRH%20Survey%20Report_F_0.pdf

[27] Religious Exemptions, 83 Fed. Reg. 57,551, 57,574, 57,576; Moral Exemptions, 83 Fed. Reg. 57,608.

[28] Jasmine Tucker & Kayla Patrick, Nat'l Women's Law Ctr., *Women in Low-Wage Jobs May Not Be Who You Expect* 1 (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/08/Women-in-Low-Wage-Jobs-May-Not-Be-Who-You-Expect.pdf.

rules.[29]   Among the nearly 159,000 private sector employers in Pennsylvania that offer health benefits, 20%—nearly 32,000 employers—have a predominantly low-wage workforce, and 40%—over 64,000 employers—are in the retail and non-professional services industries.[30, 31] Retail workers tend to earn lower wages:  they earn a median annual income in Pennsylvania of $34,469, compared to $45,621 for all workers in all industries.[32]

Female retail salespersons in Pennsylvania make a median hourly wage of $12.67.[33] Black female retail salespersons make even less, $12.26.[34]   These earnings equate to a median monthly income of $2,197 for all female retail salespersons and $2,125 for Black female retail salespersons.[35]   This is less than the approximately $2,700-$3,700 needed for a single person with no children to cover basic monthly expenses such as housing, food, transportation, health

---

[29] Alanna Williamson et al., Kaiser Family Found., *ACA Coverage Expansions and Low-Income Workers* 4 (2016), http://files.kff.org/attachment/ACA-Coverage-Expansions-and-Low-Income-Workers (just under one-third of low-income workers had employer-sponsored coverage in 2014).

[30] NWLC calculations from MEPS Pennsylvania Tables V.A.1., V.A.2, VII.A.1, VII.A.2 (2017), https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=31&year=2017 (last visited Dec. 28, 2018).

[31] In New Jersey, over 19,000 employers have a predominantly low-wage workforce and offer health benefits, as do 36,600 employers in the retail and non-professional services industries. *See* NWLC caclculations from MEPS New Jersey Tables V.A.1., V.A.2, VII.A.1, VII.A.2 (2017), https://meps.ahrq.gov/data_stats/state_tables.jsp?regionid=24&year=20172017 (last visited Dec. 28, 2018).

[32] NWLC calculations for full time, year round workers from 2012-2016 American Community Survey (ACS) 5-Year Estimates, using Steven Ruggles et al., Integrated Public Use Microdata Series, available at https://sda.usa.ipums.org.

[33] *Id.* Median hourly wages are for full-time, year-round workers. Calculated by dividing annual median income by 2080 hours.

[34] *Id.*

[35] *Id*. Calculated by dividing annual median income by 12 months.

care, taxes, and other necessities in Pennsylvania.[36]   Faced with out-of-pocket expenses for contraception, many female retail workers, particularly women of color, will be forced to forgo contraception or other necessities due to cost.

The same holds true for young people, who often have limited resources, large educational debt, and little ability to absorb extra costs.  Many young people rely on student health plans governed by the ACA.  Other young people are dependents in employer-sponsored plans, either from their own employment or because the ACA allows young adults to remain on their parent's or guardian's health plan until age 26.  From 2010-2013, 2.3 million dependent young adults—including 89,000 in Pennsylvania and 59,000 in New Jersey—gained or maintained coverage under this provision and stand to lose contraceptive coverage under the rules if their parents' employers object to it.[37]

The Departments also incorrectly assume that many who lose contraceptive coverage can access contraception through existing government-sponsored programs, such as Title X, Medicaid, and state-run programs.[38]   While the rules will certainly force thousands more women to seek contraceptive care from these already-strained programs, causing Pennsylvania and New Jersey fiscal harm, many who lose ACA coverage will not be able to access such care due to eligibility restrictions and capacity constraints.   In addition to income- and category-based

---

[36]   Economic   Policy   Institute,   *Family   Budget   Calculator,   Monthly   Costs*, https://www.epi.org/resources/budget/ (last visited Dec. 28, 2018) (range based on Pittsburgh and Chester County, respectively).

[37] U.S. Dep't of Health and Human Servs., Asst. Sec'y for Planning and Education, Compilation of State Data on the Affordable Care Act, https://aspe.hhs.gov/compilation-state-data-affordable-care-act (last visited Dec. 28, 2018).

[38] Religious Exemptions, 83 Fed. Reg. 57,548, 57,551; Moral Exemptions, 83 Fed. Reg. 57,605.

eligibility criteria for these programs,[39] anti-immigrant provisions in Medicaid restrict eligibility for most lawful permanent residents—many of whom are Latinx and AAPI—for five years.[40] For eligible women, Medicaid and Title X do not have the capacity to meet current needs, much less the demand from thousands who lose coverage due to the final rules.[41]  Moreover, there are regions in Pennsylvania and New Jersey without reasonable access (one clinic per 1,000 women in need) to a publicly-funded clinic offering the full range of FDA-approved contraceptive methods.[42]  The Administration's ongoing attempts to restructure Title X and Medicaid will further burden already-scarce resources.[43]

---

[39] *See, e.g.*, 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. §§ 59.2, 59.5(7), (8) (free care at Title X clinics limited to families at 100% federal poverty level [FPL]; subsidized care restricted to 250% FPL); *see also* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) (limiting Medicaid eligibility for childless, non-pregnant adults to 133% FPL).

[40] 8 U.S.C. § 1613(a); N.J. Admin. Code § 10:78-3.2(e)(1); Pa. Dep't of Hum Servs., Medical Assistance Eligibility Handbook § 322.3 Non-Citizen Status & Appx. A, available at http://services.dpw.state.pa.us/oimpolicymanuals/ma/whnjs.htm.

[41] Jennifer J. Frost et al., Guttmacher Inst., *Contraceptive Needs and Services, 2014 Update* 12, 30 (2016), https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf (publicly-funded providers met only 39% of need for publicly-supported contraceptive services in 2014).

[42] Power to Decide, *Publicly Funded Sites Offering All Birth Control Methods By County*, https://powertodecide.org/what-we-do/access/access-birth-control (last visited Dec. 28, 2018).

[43] *See, e.g.*, Jessie Hellmann, *Trump Administration Rescinds Obama Guidance on Defunding Planned Parenthood*, The Hill (Jan. 19, 2018, 11:15 AM), http://thehill.com/policy/healthcare/369723-trump-administration-rescinds-guidance-protecting-planned-parenthoods; *see also* Compliance with Statutory Program Integrity Requirements, HHS-OS-2018-0008, at 113 (proposed May 22, 2018) (to be codified at 42 C.F.R. Part 59) (proposing revisions to Title X regulations). The proposed Title X rule would redefine "low-income family" for Title X eligibility to include women who lose contraceptive coverage because of an employer's objection. This redefinition illegally defies the plain meaning and purpose of Title X, and in any event the proposed rule does nothing to ensure Title X providers actually have the capacity to meet the needs of these additional women.

## II.   THE RULES WILL HARM THOSE WHO LOSE COVERAGE BY REINSTATING PRE-ACA COST AND OTHER BARRIERS TO CONTRACEPTION.

The ACA dramatically reduced out-of-pocket expenditures on contraception, resulting in increased use.[44]  The rules threaten to reverse these gains.  Without coverage, women will again face financial, logistical, informational, and administrative barriers that make it more difficult to use the most appropriate contraceptive method.  These changes will particularly affect women of color, young people, transgender and gender non-conforming people, and others who face stark health disparities due to systemic barriers to contraceptive and other reproductive health care.

### A.   The Rules Will Make Contraception Cost-Prohibitive for Many People.

The Departments claim that contraception is "relatively low cost,"[45] but without insurance coverage, contraception is expensive.  Prior to the ACA, women spent between 30% and 44% of their total out-of-pocket health costs just on contraception.[46]  A 2009 study found oral contraception (the pill) costs, on average, $2,630 over five years, and other very effective methods such as injectables, transdermal patches, and the vaginal ring, cost women between $2,300 and $2,800 over a five-year period.[47]  Today, women without insurance can be expected to spend $850 annually—or $4,250 over five years assuming static costs—on oral contraception

---

[44] *See* Snyder, *supra* note 9, at 222.

[45] Religious Exemptions, 83 Fed. Reg. at 57,574.

[46] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 Health Affairs 1204, 1208 (2015), available at https://www.healthaffairs.org/doi/10.1377/hlthaff.2015.0127.

[47] James Trussell et al., *Erratum to "Cost Effectiveness of Contraceptives in the United States" [Contraception 79 (2009) 5-14]*, 80 Contraception 229 (2009).

and attendant care.[48]   LARCs—among the most effective contraceptives—carry the highest up-front costs: IUDs can cost up to $1,300 up front,[49] in addition to costs of ongoing care.[50]

Cost is a major determinant of whether people obtain needed health care, particularly for individuals with lower incomes.[51]   Studies confirm that "[e]ven small increments in cost sharing have been shown to reduce the use of preventive services."[52]   When finances are strained, women cease using contraception, skip pills, delay filling prescriptions, or purchase fewer packs at once.[53]   Cost is also a major determinant of contraceptive use by young people: before the ACA, 55% of young women reported experiencing a time when they could not afford contraception consistently.[54]

Cost also impacts the choice of contraceptive method.   People often use methods that are

---

[48] Jamila Taylor & Nikita Mhatre, *Contraceptive Coverage Under the Affordable Care Act*, Ctr. for Am. Progress (Oct. 6, 2017, 5:09 PM), https://www.americanprogress.org/issues/women/news/2017/10/06/440492/ contraceptive-coverage-affordable-care-act/.

[49] Erin Armstrong et al., *Intrauterine Devices and Implants: A Guide to Reimbursement* 5 (Regents of U.C. et al. 2d ed. 2015), https://www.nationalfamilyplanning.org/file/documents---- reports/LARC_Report_2014_R5_forWeb.pdf;   *IUD*, Planned Parenthood https://www.plannedparenthood.org/learn/birth-control/iud (last visited Dec. 28, 2018).

[50] Such care may include removal or replacement of the IUD or help with complications should any occur.

[51] Adam Sonfield, *The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost-Sharing*, 14 Guttmacher Pol'y Rev. 7, 10 (2011).

[52] *See* Inst. of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 109 (2011) [hereinafter "IOM Rep."].

[53] Guttmacher Inst., *A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions* 5 (2009), https://www.guttmacher.org/sites/default/files/report_pdf/recessionfp_1.pdf.

[54] Zenen Jaimes et al., Generation Progress & Advocates for Youth, *Protecting Birth Control Coverage for Young People* 1 (2015), http://www.advocatesforyouth.org/storage/advfy/documents/Factsheets/protecting%20birth%20c ontrol%20coverage%20factsheet-2-18-15.pdf.

medically inappropriate or less effective because they cannot afford more appropriate or effective methods with higher out-of-pocket costs.[55]

The ACA contraceptive coverage requirement has yielded enormous cost-savings.[56]  The mean total out-of-pocket expenses for FDA-approved contraceptives decreased approximately 70% following the ACA,[57] and women saved $1.4 billion in 2013 on oral contraception alone.[58] This has corresponded with an increase in use,[59] particularly of the most effective forms of contraception.  For example, at least one study found that "the removal of the cost barrier to IUDs and implants has increased their rate of adoption after the ACA."[60]  The rules will reverse these critical gains.

Notwithstanding the significant overall decrease in out-of-pocket expenditures on contraception under the ACA, racial and ethnic disparities in access to contraception persist,

---

[55] Debbie Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change*, 76 Contraception 360, 360, 363 (2007) (finding decrease in out-of-pocket costs of contraception increased use of more effective methods); Guttmacher Inst., *Insurance Coverage of Contraception*, (Dec. 2016), https://www.guttmacher.org/evidence-you-can-use/insurance-coverage-contraception.

[56] Snyder, *supra* note 9, at 222; *see also* Bearek et al., *Changes in Out-Of-Pocket Costs for Hormonal IUDs after Implementation of the Affordable Care Act: An Analysis of Insurance Benefit Inquiries*, 93 Contraception 139, 141 (2016) (cost of hormonal IUDs fell to $0 for most insured women following ACA).

[57] A. Law et al., *Are Women Benefiting from the Affordable Care Act? A Real-World Evaluation of the Impact of the Affordable Care Act on Out-of-Pocket Costs for Contraceptives*, 93 Contraception 392, 397 (2016).

[58] Becker & Polsky, *supra* note 46, at 1208.

[59] Express Scripts, *2015 Drug Trends Report* 118 (2016), http://lab.express-scripts.com/lab/drug-trend-report/~/media/e2c9d19240e94fcf893b706e13068750.ashx (reporting that contraceptive use increased 17.2% from 2014-15); Express Scripts, *2016 Drug Trends Report* 24 (2017), http://lab.express-scripts.com/lab/drug-trend-report/~/media/29f13dee4e7842d6881b7e034fc0916a.ashx (reporting 3.0% overall increase in contraceptive use from 2015-16, and 137.6% increase in specialty contraceptives, including LARCs).

[60] Snyder, *supra* note 9, at 222.

including access to the most effective methods.  Black, Latina, and AAPI women are less likely to use prescription contraception than their white peers due to structural barriers, such as geographically inaccessible providers and inflexible work schedules.[61]  In the past two years, four in ten Latina and Latino voters under age 45 (41%) have gone without the contraceptive method of their choice because of access issues.[62]  Insurance coverage for contraception is an important factor in reducing these disparities in contraceptive use.[63]  The rules will exacerbate existing disparities by inhibiting access to such coverage.

**B.**     **The Rules Will Create Logistical, Administrative, and Informational Barriers to Contraception.**

The rules will also impose other barriers to contraception, including logistical, informational, and administrative burdens in navigating the health care system without employer- or university-sponsored contraceptive coverage.

Navigating the health care system is complicated, requiring many resources, such as free time, regular and unlimited phone and internet access, privacy, transportation, language comprehension, and ability to read and respond to complex paperwork.  It is, therefore, particularly difficult for individuals with limited English proficiency and for people in low-wage jobs—disproportionately women of color—who often work long, unpredictable hours without

---

[61] Stacey McMorrow, Urban Inst., *Racial and Ethnic Disparities in Use of Prescription Contraception: The Role of Insurance Coverage* (forthcoming), https://academyhealth.confex.com/academyhealth/2017arm/meetingapp.cgi/Paper/17939;   Jo Jones et al., Ctrs. For Disease Control & Prevention, *Nat'l Health Statistics Reps.: Current Contraceptive Use in the United States 2006-2010, and Changes in Patterns of Use Since 1995* 5, 8 (2012), https://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf; Christine Dehlendorf et al., *Disparities in Family Planning*, 202 Am. J. Obstet. Gynecol. 214, 216 (2010).

[62] Nat'l Latina Inst. for Reproductive Health, *supra* note 26, at 2.

[63] McMorrow, *supra* note 61; Dehlendorf, *supra* note 61, at 216.

scheduling flexibility and who lack reliable access to transportation.[64]

Many who lose coverage will be forced by cost constraints to navigate switching away from providers they trust and who know their medical histories.  This interruption in continuity of care poses particular challenges for people of color, people with limited English proficiency, and LGBTQ people, who already face multiple barriers to obtaining reproductive health services, including language barriers, a lack of cultural competency among providers, providers' limited geographic availability, and implicit bias and discrimination.[65]  Having to switch from a trusted provider is particularly consequential for transgender and gender non-conforming people, who report pervasive provider discrimination and refusals to provide care, cultural insensitivity, and ignorance of transgender-related care.[66]

### III.   THE RULES WILL HARM THE HEALTH, AUTONOMY, AND ECONOMIC SECURITY OF THOSE WHO LOSE CONTRACEPTIVE COVERAGE.

### A.   The Rules Will Harm the Health of Individuals and Families.

By reinstating cost and other barriers to contraception, the rules will harm the health of individuals and families, particularly those already suffering negative health outcomes for which access to contraception is critical.  Contraception is a vital component of preventive health care: it combats unintended pregnancy and its attendant health consequences, avoids exacerbating

---

[64] Nat'l Women's Law Ctr., *Collateral Damage: Scheduling Challenges for Workers in Low-Wage Jobs and Their Consequences* 1-3 (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/Collateral-Damage.pdf.

[65] *See* Am. Coll. of Obstetricians & Gynecologists, *Committee Opinion No. 649: Racial & Ethnic Disparities in Obstetrics & Gynecology* 3 (2015), https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co649.pdf?dmc=1&ts=20180521T1849308146; Sandy E. James et al., Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 96-99 (2015), https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.

[66] James, *supra* note 65, at 96-99.

medical conditions for which pregnancy is contraindicated, and offers standalone health benefits unrelated to pregnancy.

### 1. *The Rules Place More People at Risk for Unintended Pregnancy and Associated Health Risks.*

By inhibiting access to contraception, the rules will increase the risk of unintended pregnancy, which, due to systemic barriers, is already higher for women of color and young people (including LGBTQ youth).[67]   Unintended pregnancy can have serious health consequences for individuals and their families.  People with unplanned pregnancies are more likely to experience delayed access to prenatal care, leaving potential health complications unaddressed and increasing the risk of infant mortality, birth defects, low birth weight, and preterm birth.[68]   Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, and physical violence during pregnancy.[69]   The U.S. has a higher maternal mortality rate than any other high-income country, especially for

---

[67] IOM Rep., *supra* note 52, at 103-04; Lawrence B. Finer & Mia R. Zolna, *Shifts in Intended and Unintended Pregnancies in the United States, 2001–2008*, 104 Am. J. Pub. Health S43, S47 (2014); Kashif Syed, Advocates for Youth, *Ensuring Young People's Access to Preventive Services in the Affordable Care Act* 2 (2014), http://www.advocatesforyouth.org/storage/advfy/documents/Preventive%20Services%20in%20the%20ACA-11-24-14.pdf; Lisa L. Lindley & Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 Am. J. Pub. Health 1379, 1383 (2015).

[68] IOM Rep., *supra* note 52, at 103; *see also* Cassandra Logan et al., Nat'l Campaign to Prevent Teen & Unplanned Pregnancy, Child Trends, Inc., *The Consequences of Unintended Childbearing: A White Paper* 3-5 (2007), https://pdfs.semanticscholar.org/b353/b02ae6cad716a7f64ca48b3edae63544c03e.pdf.

[69] IOM Rep., *supra* note 52, at 103; Amy O. Tsui et al., *Family Planning and the Burden of Unintended Pregnancies*, 32 Epidemiologic Rev. 152, 165 (2010); Office of Disease Prevention & Health Promotion, *HealthyPeople 2020: Family Planning*, HealthyPeople.gov, https://www.healthypeople.gov/2020/topics-objectives/topic/family-planning (last visited Dec. 28, 2018).

Black women. [70]  By creating additional barriers to contraception and preconception care, the rules threaten to increase rates of unintended pregnancy and related health risks.

The Departments question whether the availability of contraceptive coverage without cost-sharing decreases the incidence of unintended pregnancy.[71]  But as the post-ACA research corroborates, lowering the cost of contraception leads to increased use.[72]  And increased access to contraception without cost-sharing has been found to result in fewer unintended pregnancies.[73]  Denying contraceptive coverage was found to have resulted in 33 more pregnancies per 1000 women.[74]

The Departments also incorrectly assert that harm to women will be mitigated because some employers and universities with objections may voluntarily choose to cover some methods.[75]  But allowing employers or universities to pick and choose covered methods—rather than allowing the users themselves to choose—undermines people's ability to consistently use

---

[70] Black Mamas Matter Alliance, *Black Mamas Matter Toolkit Advancing the Right to Safe and Respectful Maternal Health Care* 21 (2018), https://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/USPA_BMMA_Toolkit_Booklet-Final-Update_Web-Pages.pdf; Renee Montagne & Nina Martin, *Focus On Infants During Childbirth Leaves U.S. Moms In Danger*, Nat'l Pub. Radio (May 12, 2017, 5:00 AM), https://www.npr.org/2017/05/12/527806002/focus-on-infants-during-childbirth-leaves-u-s-moms-in-danger; Guttmacher Inst., *Publicly Funded Family Planning Services in the United States* 1 (2016), https://www.guttmacher.org/sites/default/files/factsheet/fb_contraceptive_serv_0.pdf.

[71] Religious Exemptions, 83 Fed. Reg. 57,554–55; Moral Exemptions, 83 Fed. Reg. 57,611.

[72] *See supra* notes 56-60 and accompanying text.

[73] Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 Obstetrics & Gynecology 1291, 1291 (2012).

[74] W. Canestaro et al., *Implications of Employer Coverage of Contraception: Cost-Effectiveness Analysis of Contraception Coverage Under an Employer Mandate*, 95 Contraception 77, 83, 85 (2017).

[75] *See* Religious Exemptions, 83 Fed. Reg. 57,574, 57,575, 57,581.

the contraceptive that is most appropriate for them, increasing the risk of unintended pregnancy. Inconsistent or incorrect contraceptive use accounts for 41% of unintended pregnancies in the U.S.; non-use accounts for 54%.[76]  Women are more likely to use contraception consistently and correctly when they can choose the method that suits their needs.[77]

### 2.    *The Rules Will Undermine Health Benefits from Contraception.*

Contraception allows women to delay pregnancy when it is contraindicated and offers several standalone benefits unrelated to pregnancy.  Although most women aged 18-44 who use contraception do so to prevent pregnancy (59%), 13% use it solely to manage a medical condition, and 22% use it for both purposes.[78]

Contraception is necessary to control medical conditions that are complicated by pregnancy, including diabetes, obesity, pulmonary hypertension, and cyanotic heart disease.[79]  In addition, contraception treats menstrual disorders, reduces menstrual pain, reduces the risks of certain cancers, such as endometrial and ovarian cancer, and helps protect against pelvic inflammatory disease.[80]

By reinstating cost barriers to some or all contraceptive methods, the rules will aggravate medical conditions and undermine necessary health benefits.

---

[76] Adam Sonfield et al., Guttmacher Inst., *Moving Forward:  Family Planning in the Era of Health Reform* 8 (2014).

[77] Jennifer J. Frost & Jacqueline E. Darroch, *Factors Associated with Contraceptive Choice and Inconsistent Method Use, United States, 2004*, 40 Persps. on Sexual & Reprod. Health 94, 99, 101-03 (2008).

[78] Caroline Rosenzweig et al., Kaiser Family Found., *Women's Sexual and Reproductive Health Services: Key Findings from the 2017 Kaiser Women's Health Survey* (2018) at 3, http://files.kff.org/attachment/Issue-Brief-Womens-Sexual-and-Reproductive-Health-Services-Key-Findingsfrom- the-2017-Kaiser-Womens-Health-Survey.

[79] IOM Rep., *supra* note 52, at 103-04.

[80] *Id.* at 107.

**B.     The Rules Will Undermine Individuals' Autonomy and Control Over
Their Reproductive and Personal Lives.**

The Supreme Court has recognized that "[t]he ability of women to participate equally in
the economic and social life of the Nation has been facilitated by their ability to control their
reproductive lives." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992); *see also
Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965).  Women also report that the ability to
plan their lives is a main reason for their use of contraception.[81]

Contraception and the freedom it affords are particularly important for communities with
histories of subjection to the control of others in their sexual and reproductive lives.  During
slavery, when Black women were the legal chattel of their masters, they had no ability to resist
unwanted sex or childbearing.[82]  Slavery gave way to twentieth century policies and practices
that encouraged and coerced women of color, individuals with disabilities, and so-called "sexual
deviants," to refrain from reproduction; these policies culminated in forced sterilizations without
informed consent.[83]  Affordable access to the full range of contraceptive options empowers
individuals to exercise control over their reproductive futures.

Contraception is also critical to the autonomy of transgender men and gender non-
conforming individuals.  Contraception permits individuals to align their gender identity with

---

[81] Jennifer J. Frost & Laura Duberstein Lindberg, *Reasons for Using Contraception:
Perspectives of US Women Seeking Care at Specialized Family Planning Clinics*, 87
Contraception 465, 467, 470 (2013).

[82] Deborah Gray White, *Ar'n't I a Woman?: Female Slaves in the Plantation South* 68 (W.W.
Norton & Co. ed., 1999).

[83] Carole Joffe & Willie J. Parker, *Race, Reproductive Politics and Reproductive Health Care in
the Contemporary United States*, 86 Contraception 1, 1 (2012); *see also* Proud Heritage: People,
Issues, and Documents of the LGBT Experience, Vol. 2 205 (Chuck Stewart, ed. 2015); Elena R.
Gutiérrez, *Fertile Matters: the Politics of Mexican-Origin Women's Reproduction* 35-54 (2008);
*Buck v. Bell*, 274 U.S. 200, 205 (1927) (upholding law permitting coerced sterilization of
"mentally defective" people).

their physiology by enabling them to prevent pregnancy and control menstruation.[84]   Social exclusion and bias in healthcare already contribute to transgender men experiencing higher incidence of depression, anxiety, and suicide,[85] and for some, pregnancy and menstruation can increase experiences of gender dysphoria—the distress resulting from one's physical body not aligning with one's sense of self.[86]

Finally, contraception is vital for survivors of rape and interpersonal violence.[87]   Access to emergency contraception without cost-sharing empowers sexual assault survivors to prevent unwanted pregnancy, and is particularly critical for students given the high rate of sexual assault on college campuses.[88]   The shot and LARCs enable women to prevent pregnancy with reduced risk of detection by or interference from partners.[89]   Without these options, pregnancy can entrench a woman in an abusive relationship, endangering the woman, her pregnancy, and her children.   Abusive partners often engage in "reproductive coercion" behaviors to promote

---

[84] Juno Obedin-Maliver & Harvey J. Makadon, *Transgender Men and Pregnancy*, 9 Obstetric Med. 4, 6 (2015).

[85] SL Budge et al., *Anxiety and Depression in Transgender Individuals: The Roles of Transition Status, Loss, Social Support, and Coping*, 81 J. Consult Clin. Psych. 545 (2013); Fatima Saleem & Syed W. Rizvi, *Transgender Associations and Possible Etiology: A Literature Review*, 9 Cureus 1, 2 (2017) ("Forty-one % of [transgender individuals in the U.S.] reported attempting suicide as compared to 1.6% of the general population.").

[86] Obedin-Maliver & Makadon, *supra* note 84, at 6; Saleem & Rizvi, *supra* note 85, at 1.

[87] Am. Coll. of Obstetricians & Gynecologists, *Committee Opinion No. 554*, *Reproductive and Sexual Coercion* 2-3 (2013), https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co554.pdf?dmc=1&ts=20180521T2206346190 [hereinafter "ACOG No. 554"].

[88] Nat'l Women's Law Ctr., *Sexual Harassment & Assault in Schools*, https://nwlc.org/issue/sexual-harassment-assault-in-schools/ (last visited Dec. 28, 2018).

[89] ACOG No. 554, *supra* note 87, at 2-3.

unwanted pregnancy, including interfering with contraception or abortion.[90]  By impeding their access to contraceptive methods less susceptible to interference, the rules harm women's ability to resist such coercion.[91]

### C.      The Rules Undermine Individuals' Economic Security.

The rules will thwart people's ability to plan, delay, space, and limit pregnancies as is best for them, thereby undermining their ability to participate equally in society and further their educational and career goals.

### 1.      *Access to Contraception Provides Life-Long Economic Benefits to Women, Families, and Society.*

Access to contraception has life-long economic benefits: it enables women to complete high school and attain higher levels of education, improves their earnings and labor force participation, and secures their economic independence.[92]   The availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[93]  Access to oral contraceptives has improved women's educational attainment,[94] which in turn has caused large increases in women's participation in

---

[90] *Id.* at 1-2; Elizabeth Miller et al., *Reproductive Coercion: Connecting the Dots Between Partner Violence and Unintended Pregnancy*, 81 Contraception 457, 457–58 (2010).

[91] ACOG No. 554, *supra* note 87, at 2-3.

[92] Adam Sonfield et al., Guttmacher Inst., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children* 7-8 (2013), https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf.

[93] Martha J. Bailey et al., *The Opt-in Revolution? Contraception and the Gender Gap in* Wages, 4 Am. Econ. J. Appl. Econ. 225, 241 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3684076/.

[94] Heinrich H. Hock, *The Pill and the College Attainment of American Women and Men* 19 (Fla. St. Univ., Working Paper 2007).

law, medicine, and other professions.[95]   While wage disparities persist, contraception has helped advance gender equality by reducing the gap.[96]

The Departments are well aware of these significant benefits.  In previously-issued rules, they explained that before the ACA, disparities in health coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," that "[r]esearchers have shown that access to contraception improves the social and economic status of women," and that the contraceptive coverage requirement "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[97]

By inhibiting access to contraception, the rules will threaten the economic security and advancement of individuals, families, and society.

### 2.   *The Rules Will Exacerbate Economic and Social Disparities by Impeding Access to Contraception.*

The rules will most jeopardize the economic security of those facing systemic barriers to economic advancement, forcing women with limited means into an impossible situation: they will have less ability to absorb the cost of an unintended pregnancy, but will be more at risk for it due to greater difficulty affording contraception.

Unplanned pregnancy can entrench economic hardship.  Unplanned births reduce labor force participation by as much as 25%.[98]  The ability to avoid unplanned pregnancy is especially important for women in low-wage jobs, who are less likely to have parental leave or predictable

---

[95] Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. Pol. Econ. 730, 749 (2002).

[96] Sonfield, *supra* note 92, at 14.

[97] ACA Coverage, 77 Fed. Reg. 8,725, 8,728.

[98] Ana Nuevo Chiquero, *The Labor Force Effects of Unplanned Childbearing*, (Boston Univ., Job Market Paper Nov. 2010), http://www.unavarra.es/digitalAssets/141/141311_100000Paper_Ana_Nuevo_Chiquero.pdf

and flexible work schedules.[99]  Many women in low-wage jobs who become pregnant are denied pregnancy accommodations and face workplace discrimination; some are forced to quit, are fired, or are pushed into unpaid leave.[100]  Nearly 70% of those holding jobs that pay less than $10 per hour are women, and a disproportionate number of women in low-wage jobs are women of color.[101]  Women of color also experience greater wage disparities than white women: among full-time workers, Latina women make only 54¢ for every dollar paid to white men; that number is 57¢ for Native American women, 63¢ for Black women, and as low as 51¢ and 56¢ for AAPI women in some ethnic subgroups.[102]

## **CONCLUSION**

The final rules will cause substantial and irreparable harm to individuals in Pennsylvania, New Jersey, and nationwide, and particularly to those facing multiple and intersecting forms of discrimination, for the same reasons as the interim final rules.  Accordingly, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

---

[99] Nat'l Women's Law Ctr., *supra* note 64, at 1, 4.

[100] Nat'l Women's Law Ctr., *It Shouldn't Be a Heavy Lift: Fair Treatment for Pregnant Workers* 1 (2016), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2015/08/pregnant_workers.pdf; Nat'l Women's Law Ctr., *Equal Pay for Asian and Pacific Islander Women* (2018), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2018/02/Asian-Women-Equal-Pay-Feb-2018.pdf.

[101] Tucker & Patrick, *supra* note 28, at 1.

[102] Nat'l Women's Law Ctr., *FAQs About the Wage Gap* (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/FAQ-About-the-Wage-Gap-2017.pdf; NAPAWF calculations from U.S. Census Bureau, *2015 ACS 1-Year Estimates: Table S0201, Selected Population Profile in the United States,* https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_1YR/S0201//popgroup~031 (last visited Dec. 28, 2018).

Respectfully Submitted,

Date: January 7, 2019

s/ Michael A. Kaplan

Michael A. Kaplan (Bar No. 323507)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Fax: (973) 597-2400
mkaplan@lowenstein.com

Jeffrey Blumenfeld
**LOWENSTEIN SANDLER LLP**
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 753-3810
Fax: (973) 422-6849
jblumenfeld@lowenstein.com

*Attorneys for Amici Curiae the National Women's Law Center, the National Latina Institute for Reproductive Health, SisterLove, Inc., and the National Asian Pacific American Women's Forum in Support of Plaintiffs*

*Of Counsel*

Fatima Goss Graves
Gretchen Borchelt
Sunu Chandy
Michelle Banker
**NATIONAL WOMEN'S LAW CENTER**
11 Dupont Circle NW, Suite 800
Washington, DC 20036

Sequoia Ayala
Jill Heaviside
**SISTERLOVE, INC.**
P.O. Box 10558
Atlanta, GA 30310-1731

Jane Liu
**NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM**
1730 Rhode Island Ave, NW
Suite 210
Washington, DC 20036

## APPENDIX A:

## STATEMENTS OF INTEREST OF AMICI CURIAE

**Advocates for Youth** partners with youth leaders, adult allies, and youth-serving organizations to advocate for policies and champion programs that recognize young people's rights to honest sexual health services; and the resources and opportunities necessary to create sexual health equity for all youth. Young people have the right to lead healthy lives, which includes access to the resources and tools necessary to make healthy decisions about their lives. The Affordable Care Act increased access to contraception for young people and Advocates for Youth seeks to ensure that young people continue to have access to the wide range of reproductive and sexual health care services they need.

**Americans United for Separation of Church and State** is a national, nonsectarian public-interest organization that is committed to ensuring religious freedom and protecting fundamental rights, including reproductive rights, for all Americans by safeguarding the constitutional principle of church–state separation. Americans United has long supported legal exemptions that reasonably accommodate religious practice, but we oppose religious exemptions that unduly harm third parties or favor a religious practice not actually burdened by the government. Accordingly, Americans United regularly represents parties or acts as an *amicus curiae* in cases addressing the Affordable Care Act's contraceptive-coverage requirement.

**The Asian & Pacific Islander American Health Forum (APIAHF)** influences policy, mobilizes communities, and strengthens programs and organizations to improve the health of over 20 million Asian Americans, Native Hawaiians, and Pacific Islanders (AAs and NHPIs). APIAHF has supported and defended the Affordable Care Act's access provisions in two amicus briefs before the U.S. Supreme Court. Access to contraception is critical to the health and

economic security of AA and NHPI women who experience a number of barriers to good health, including inability to afford health care and quality coverage, language and immigration barriers.

**Black Women Birthing Justice** is a collective of African-American, African, Caribbean and multiracial women who are committed to transforming birthing experiences for Black women and transfolks. Our vision is that that every pregnant person should have an empowering birthing experience, free of unnecessary medical interventions. We aim to enhance Black women's faith in their strength and resilience, and empower them to make healthy choices and to stand up for the pregnancy and birth experience they envision. We believe that access to contraception is vital to reproductive justice. Part of our mission is to advocate for the right of low-income women and women on welfare to make healthy and non-coerced decisions about when and whether to get pregnant. We are signing on to this amicus brief because we believe that all women deserve accessible, no cost contraceptive coverage as outlined in the Affordable Care Act.

The **Center on Reproductive Rights and Justice at UC Berkeley** seeks to realize reproductive rights and advance reproductive justice by bolstering law and policy advocacy efforts, furthering scholarship, and influencing academic and public discourse.  Our work is guided by the belief that all people deserve the social, economic, political, and legal conditions necessary to make genuine decisions about reproduction.

Latinas continue to face disparities in access to contraception and other critical reproductive healthcare.   The **Colorado Organization for Latina Opportunity and Reproductive Rights (COLOR)** believes that we need to do more to close the gaps and ensure that people have the services they need to manage their health and plan their families.

The **Desiree Alliance** positions ourselves in the belief that reproductive access and care

must be made available to all those who seek such services. Far too long government has regulated reproductive rights/health/justice over those who seek preventative care of their bodies. Religious freedom under the guise of applicable law should never be deterrent in providing services that renders choice over legal regulation. Third party gateways should never interfere with healthcare options, and must not be allowed to withhold any healthcare choices decided by consenting and informed persons regardless of religious belief, gender, race, identity, and citizenship status.

Founded in 1974, **Equal Rights Advocates (ERA)** is a national non-profit legal advocacy organization dedicated to protecting and expanding economic and educational access and opportunities for women and girls. In concert with our commitment to securing gender equity in the workplace and in schools, ERA seeks to preserve women's right to reproductive choice and protect women's access to health care, including safe, legal contraception and abortion. In addition to litigating cases on behalf of workers and students and providing free legal advice and counseling to hundreds of women each year, ERA has participated in numerous amicus briefs in cases affecting the rights of women and girls, such as this right, and the long-term economic impacts of limited and inequitable access to opportunity and care for intersectional populations.

**EverThrive Illinois (EverThrive IL)** works to improve the health of women, children, and families over the lifespan by centering the values of health equity, diverse voices, and strong partnerships. EverThrive IL focuses on health issues of key importance to women, children, and their families including child and adolescent health, immunizations, maternal and infant mortality, and health reform. Because access to safe and voluntary contraception is a human right as declared by the United Nations, can improve the quality of life for people and their families,

and is central to alleviating gender-based violence, EverThrive IL is committed to upholding and advocating for the ACA contraceptive-coverage requirement.

**Gender Justice** is a nonprofit legal and policy advocacy organization based in the Midwest that is committed to the eradication of gender barriers through impact litigation, policy advocacy, and education. As part of its litigation program, Gender Justice represents individuals and provides legal advocacy as amicus curiae in cases involving issues of gender discrimination. Gender Justice has an interest in ensuring that the contraceptive coverage provisions of the Affordable Care Act are implemented to eliminate gender gaps in access to health care.

**Ibis Reproductive Health** is a global research and advocacy organization driving change through bold, rigorous research and principled partnerships that advance sexual and reproductive autonomy, choices, and health worldwide. We believe that research can catalyze change when the entire research process is viewed as an opportunity to shift power, is undertaken in partnership with the communities most affected, and includes a focus on how data can be most effectively used to make change. We focus on increasing access to quality abortion care, transforming access to abortion and contraception through technology and service innovations, and expanding comprehensive sexual and reproductive health information and services.

**In Our Own Voice: National Black Women's Reproductive Justice Agenda** is a national-state partnership with eight Black women's Reproductive Justice organizations: The Afiya Center, Black Women for Wellness, Black Women's Health Imperative, New Voices for Reproductive Justice, SisterLove, Inc., SisterReach, SPARK Reproductive Justice NOW, and Women with a Vision. In Our Own Voice is a national Reproductive Justice organization focused on lifting up the voices of Black women leaders on national, regional, and state policies that impact the lives of Black women and girls. Access to contraception is critical to ensuring

that all people have the human right to control our bodies, our sexuality, our gender, and our reproduction. In Our Own Voice is committed to engaging in advocacy that helps secure full access to contraceptive coverage as intended by the Affordable Care Act.

**Jobs With Justice** is dedicated to expanding the ability for men and women to come together to improve their workplaces, their communities and their lives. By leading strategic campaigns, changing the conversation, and mobilizing labor, community, student, and faith voices at the national and local levels with our network of coalitions, we create innovative solutions to the challenges faced by working people today. We sign on to this brief because women, not their employers and not the government, should be able to control their bodies.

The **Maine Women's Lobby** advocates for the well-being of Maine women and girls, with a focus on freedom from violence, freedom from discrimination, access to health care, including reproductive health care, and economic security. The ability to control her reproduction is essential to a woman's well-being.

**NARAL Pro-Choice America** is a national advocacy organization, dedicated since 1969 to supporting and protecting, as a fundamental right and value, a woman's freedom to make personal decisions regarding the full range of reproductive choices through education, organizing, and influencing public policy. NARAL Pro-Choice America works to guarantee every woman the right to make personal decisions regarding the full range of reproductive choices. Ensuring that people can get affordable birth control and have the ability to decide whether, when, and with whom to start or expand their family is crucial to that mission.

**NARAL Pro-Choice Oregon** is the leading grassroots pro-choice advocacy organization in Oregon. NARAL Pro-Choice Oregon develops and sustains a constituency that uses the political process to guarantee every person who can become pregnant the right to make personal

decisions regarding the full range of reproductive choices, including preventing unintended pregnancy, bearing healthy children, and choosing legal abortion. Because access to contraception is integral to reproductive healthcare and the ability of individuals to decide whether and when to become a parent, NARAL Pro-Choice Oregon seeks to ensure that women receive full benefits of no-cost contraceptive coverage as intended by the Affordable Care Act.

**The National Advocates for Pregnant Women (NAPW)** is a non-profit organization working to defend and advance the human and civil rights, health and welfare of pregnant and parenting women and people with the capacity for pregnancy. NAPW defends women through legal representation and support in cases throughout the United States, and advocates for policies that protect the health and welfare of pregnant and parenting people and their families.

The **National Asian Pacific American Women's Forum (NAPAWF)** is the only national, multi-issue Asian American and Pacific Islander ("AAPI") women's organization in the country. NAPAWF's mission is to build a movement to advance social justice and human rights for AAPI women, girls, and transgender and gender non-conforming people. NAPAWF approaches all of its work through a reproductive justice framework that seeks for all members of the AAPI community to have the economic, social, and political power to make their own decisions regarding their bodies, families, and communities. Its work includes advocating for the reproductive health care needs of AAPI women and ensuring AAPI women's access to reproductive health care services. Legal and institutional barriers to reproductive health care disproportionately impact women of color, low-income women, and other marginalized groups. Without legal protection to ensure meaningful, affordable access to basic reproductive health care, including contraception, many AAPI women are left without the crucial health and family planning services that they need to be able to make their own decisions regarding their bodies,

families, and communities.  Consequently, NAPAWF has a significant interest in ensuring that all people, regardless of their economic circumstances, immigration status, race, gender, sexual orientation, or other social factors, have affordable access to safe and effective contraception.

**The National Center for Law and Economic Justice** advances the cause of economic justice for low-income families, individuals, and communities. We have worked with low-income communities fighting the systemic causes of poverty for more than 50 years. In our work, we often combat injustice and fundamental unfairness in government programs, including those that provide access to health care.

The **National Center for Transgender Equality** is a national social justice organization working for life-saving change for the over 1.5 million transgender Americans and their families. NCTE has seen the harmful impact that discrimination in health care settings has on transgender people and their loved ones, including discrimination based on religious or moral disapproval of who transgender people are, how they live their lives, and their reproductive choices. Discrimination against transgender people in health care—whether it is being turned away from a doctor's office, being denied access to or coverage of basic care, or being mistreated and degraded simply because of one's transgender status—is widespread and creates significant barriers to care, including contraceptive care. NCTE works to ensure that transgender people and other vulnerable communities are protected from discrimination in health care and other settings and have autonomy over their bodies and health care needs.

Founded in 1899, the **National Consumers League (NCL)** is America's pioneering non-profit consumer advocacy organization.  For nearly 120 years, NCL has worked to ensure consumers' access to quality, affordable healthcare.  As part of our mission, NCL advocated for passage of the Women's Preventive Services provisions of the Affordable Care Act, including

coverage of contraception with no cost-sharing.  NCL is committed to ensuring that access to no-cost contraceptive coverage – a necessary component of basic health care for women – is protected.

**The National Institute for Reproductive Health (NIRH)** is a non-profit advocacy organization working to build a society in which everyone has the freedom and ability to control their reproductive and sexual lives. NIRH promotes its mission by galvanizing public support for access to reproductive health care, including abortion and contraception, and supporting public policy that ensures that women have timely, affordable access to the full range of reproductive health care in their communities.

**The National Latina Institute for Reproductive Health (NLIRH)** is the only national reproductive justice organization dedicated to advance health, dignity, and justice for 28 million Latinas, their families, and communities in the United States.  Through leadership development, community mobilization, policy advocacy, and strategic communications, NLIRH works to ensure that all Latinas are informed about the full range of options for safe and effective forms of contraception and family planning.   NLIRH believes that affordable access to quality contraception and family planning is essential to ensuring that all people, regardless of age or gender identity, can shape their lives and futures.

Since 1973, the **National LGBTQ Task Force** has worked to build power, take action, and create change to achieve freedom and justice for (LGBTQ) people and their families. As a progressive social justice organization, the Task Force works toward a society that values and respects the diversity of human expression and identity and achieves equity for all.

The **National Network to End Domestic Violence (NNEDV)** is a not-for-profit organization incorporated in the District of Columbia in 1994 (www.nnedv.org) to end domestic

violence.  As a network of the 56 state and territorial domestic violence and dual domestic violence sexual assault Coalitions and their over 2,000 member programs, NNEDV serves as the national voice of millions women, children and men victimized by domestic violence. NNEDV is committed to the wide availability of reproductive health care, including low-cost and confidential access to birth control. This is a critical need for survivors of domestic violence to protect their health and safety.

The **National Organization for Women Foundation (NOW Foundation)** is a 501(c)(3) entity affiliated with the National Organization for Women, the largest grassroots feminist activist organization in the United States with chapters in every state and the District of Columbia. NOW Foundation is committed to advancing equal opportunity, among other objectives, and works to ensure that all women have access to the full range of reproductive health care.

**The National Partnership for Women & Families (National Partnership),** formerly the Women's Legal Defense Fund, is a national advocacy organization that develops and promotes policies to help women achieve equal opportunity, quality health care, and economic security for themselves and their families. Since its founding in 1971, the National Partnership has worked to advance women's health, reproductive rights, and equal employment opportunities through several means, including by challenging discriminatory policies in the courts.

**The National Women's Health Network ("NWHN")** improves the health of all women by influencing public policy and providing health information to support decision-making by individual consumers. Founded in 1975 to give women a greater voice within the health care system, NWHN aspires to create systems guided by social justice that reflect the needs of women in all their diversities. NWHN is committed to ensuring that women have self-determination in

all aspects of their reproductive and sexual health and establishing universal access to health care. NWHN is a membership-based organization supported by thousands of individuals and organizations nationwide.

The **National Women's Law Center (the Center)** is a non-profit legal advocacy organization dedicated to the advancement and protection of women's legal rights and opportunities since its founding in 1972.  The Center focuses on issues of key importance to women and their families, including economic security, employment, education, health, and reproductive rights, with special attention to the needs of low-income women and those who face multiple and intersecting forms of discrimination.  Because access to contraception is of tremendous significance to women's health, equality, and economic security, the Center seeks to ensure that women receive the full benefits of seamless access to contraceptive coverage without cost-sharing as intended by the Affordable Care Act and has participated as amicus in numerous cases that affect this right.

**New Voices for Reproductive Justice** is a Human Rights and Reproductive Justice advocacy organization with a mission to build a social change movement dedicated to the full health and well-being of Black women, femmes, and girls in Pennsylvania and Ohio. New Voices defines Reproductive Justice as the human right of all people to have full agency over their bodies, gender identity and expression, sexuality, work, reproduction and the ability to form families.  Since 2004, the organization has served over 75,000 women of color and LGBTQIA+ people of color through community organizing, grassroots activism, civic engagement, youth mentorship, leadership development, culture change, public policy advocacy, and political education. In November of 2017, New Voices was instrumental in the passage of a Will of Council in the City of Pittsburgh calling on state and federal officials to ensure equitable access

to a full range of reproductive health services, including contraception. This call to action exemplifies crucial recognition of the fact that unhindered access to comprehensive reproductive healthcare is fundamental to the health and well-being of our families and communities.  New Voices stands in staunch opposition to discriminatory laws, policies, rules, and actions that deny people access to contraception.  These barriers disproportionately harm women of color, gender nonconforming people and low-income women.  All people should have access to a full range of reproductive health care, including contraceptive coverage through health insurance, free from outside interference.

**Nurses for Sexual and Reproductive Health** provides students, nurses and midwives with education and resources to become skilled care providers and social change agents in sexual and reproductive health and justice.  As providers, we know healthcare coverage is essential to our patients' ability to access safe and compassionate care.  We also know that contraception is a part of sexual and reproductive care, which we assert is vital to the health and well-being of our patients.

The **Oklahoma Coalition for Reproductive Justice**, founded as a 501(c)4 in 2010, is a statewide grassroots coalition of organizations and individuals focusing on the advancement of reproductive health, rights and justice in Oklahoma. OCRJ peruses its mission through legislative advocacy, community outreach and education, and litigation. We believe that reproductive justice includes the right to have or not to have a child and respect for families in all their forms. It supports access to sexual education, contraception, abortion care and pregnancy care as well as to the resources needed to raise children in safe and healthy circumstances, with good schools and healthcare and other elements necessary for bright futures regardless of immigration status. It encompasses respect for all individuals, their partners and families, and for sexuality and for

gender differences.

**People For the American Way Foundation (PFAWF)** is a nonpartisan civic organization established to promote and protect civil and constitutional rights, including religious liberty and reproductive choice. Founded in 1981 by a group of civic, educational, and religious leaders, PFAWF now has hundreds of thousands of members nationwide. Over its history, PFAWF has conducted extensive education, outreach, litigation, and other activities to promote these values. PFAWF strongly supports the principle of the Free Exercise Clause of the First Amendment as a shield for the free exercise of religion, protecting individuals of all faiths. PFAWF is concerned, however, about efforts, such as with the Administration's final rules in this case, to transform this important shield into a sword to unduly harm others. This is particularly problematic when the effort is to obtain exemptions based on religion or moral beliefs that harm women's ability to obtain crucial reproductive health care coverage, as in this case.

**Population Connection** is a grassroots non-profit organization committed to ensuring that every woman and family has access to the full range of contraceptive methods as a preventive service as intended by the Affordable Care Act.

**Raising Women's Voices for the Health Care We Need ("RWV")** is a national initiative working to ensure that the health care needs of women and families are addressed as the Affordable Care Act is implemented. It has a diverse network of thirty grassroots health advocacy organizations in twenty-nine states. RWV has a special mission of engaging women who are not often invited into health policy discussions: women of color, low-income women, immigrant women, young women, and members of the lesbian, gay, bisexual, transgender, and queer community.

The **Reproductive Health Access Project** is a national nonprofit organization dedicated to training and supporting clinicians to make reproductive health care accessible to everyone, everywhere in the United States.  We focus on three key areas: abortion, contraception, and management of early pregnancy loss.   Our work focuses on integrating full-spectrum reproductive health care in primary care settings and we are guided by the belief that everyone should be able to access basic health care, including contraceptive care, from their primary care clinician.

The **Sargent Shriver National Center on Poverty Law** (Shriver Center) has a vision of a nation free from poverty with justice, equity and opportunity for all. The Shriver Center provides national leadership to promote justice and improve the lives and opportunities of people with low income, by advancing laws and policies, through litigation and policy advocacy, to achieve justice for our clients. The Shriver Center is committed to the health and economic security and advancement of women and recognizes the importance of access to contraception to achieve those ends. The Shriver Center seeks to ensure that women receive the full benefits of seamless access to no-cost contraceptive coverage as intended by the Affordable Care Act.

The **Sexuality Information and Education Council of the United States (SIECUS)** has served as the national voice for sex education, sexual health, and sexual rights for over 50 years. SIECUS asserts that sexuality is a fundamental part of being human, one worthy of dignity and respect. We advocate for the rights of all people to accurate information, comprehensive sexuality education, and the full spectrum of sexual and reproductive health services. SIECUS works to create a world that ensures social justice inclusive of sexual and reproductive rights, and we view comprehensive sexuality education as a vehicle for social change. SIECUS envisions an equitable nation where all people receive comprehensive sexuality education and

quality sexual and reproductive health services affirming their identities, thereby ensuring their lifelong health and well-being. Specifically, access to contraceptive care is vital to SIECUS's mission, and SIECUS has participated in several amicus briefs impacting the right to contraceptive coverage.

Founded in July 1989, **SisterLove, Inc.** is an HIV/AIDS and reproductive justice nonprofit service organization focusing on women, particularly women of African descent. SisterLove's mission is to eradicate the adverse impact of HIV/AIDS and other sexual and reproductive oppressions upon all women, their families, and their communities in the United States and worldwide through education, prevention, support, and human rights advocacy. To realize this mission, SisterLove engages in advocacy, reproductive health education, and prevention. SisterLove seeks to educate and empower youth and women of color to influence the laws and policies that disparately impact them.

**SisterReach**, founded October 2011, is a Memphis, TN based grassroots 501(c)(3) non-profit supporting the reproductive autonomy of women and teens of color, poor and rural women, LGBT+ and gender non-conforming people and their families through the framework of Reproductive Justice. Our mission is to empower our base to lead healthy lives, raise healthy families and live in healthy communities. We provide comprehensive reproductive and sexual health education to marginalized women, teens and gender non-conforming people, and advocate on the local, state and national levels for public policies which support the reproductive health and rights of all women and youth.

Women of color do not need additional obstacles to obtaining the care we need to take care of ourselves and our families. We trust Black women to make our own decisions. **SisterSong: National Women of Color Reproductive Justice Collective** will speak out about

any attempts to push important services out of reach.

**URGE: Unite for Reproductive & Gender Equity (URGE)** is a non-profit grassroots advocacy organization that works to mobilize young people through a reproductive justice framework.  URGE builds infrastructure through campus chapters and city activist networks, where we invite individuals to discover their own power and transform it into action.  URGE members educate their communities and advocate for local, state, and national policies around issues of reproductive justice and sexual health.

The **Women's Institute for Freedom of the Press** is a non-profit media democracy organization dedicated to the advancement and protection of women's rights and voices since its founding in 1972. WIFP focuses on issues of importance to women and all those who do not have full rights. Without control over their health and well-being, women cannot fully participate in democracy. Women need access to no-cost contraceptive coverage as intended by the Affordable Care Act and therefore WIFP supports this amicus brief.

The **Women's Rights and Empowerment Network** (WREN) is a nonpartisan nonprofit organization whose mission is to build a movement to advance the health, economic well-being, and rights of South Carolina's women, girls and their families. WREN recognizes that the health and education of women and children is crucial in order to ensure statewide prosperity. We advocate for policies that address the barriers that families, predominantly women and mothers, face when accessing the rights and resources needed to make healthy and well informed decisions. Access to contraception is of tremendous significance to women's health, equality, and economic security. WREN seeks to ensure that women receive the full benefits of seamless access to no-cost contraceptive coverage as intended by the Affordable Care Act, and has advocated for this at the state and national level.

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2019, I electronically filed the within Brief of Amici Curiae the National Women's Law Center, the National Latina Institute for Reproductive Health, Sisterlove, Inc., the National Asian Pacific American Women's Forum, and 40 other Amici in support of Plaintiffs' motion for a preliminary injunction with the Clerk of the Court for the United States District Court for the Eastern District of Pennsylvania by using the CM/ECF system.

I certify that all participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Date:  January 7, 2019                    By:     s/ Michael A. Kaplan