## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA and
STATE OF NEW JERSEY,

        Plaintiffs,

        v.

DONALD J. TRUMP, *in his official capacity as
President of the United States*; ALEX M. AZAR II, *in
his official capacity as Secretary of Health and Human
Services*; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; STEVEN T.
MNUCHIN, *in his official capacity as Secretary of the
Treasury*; UNITED STATES DEPARTMENT OF THE
TREASURY; RENE ALEXANDER ACOSTA, *in his
official capacity as Secretary of Labor*; UNITED
STATES DEPARTMENT OF LABOR; and UNITED
STATES OF AMERICA.

        Defendants.

**No. 2:17-cv-04540-WB**

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

GURBIR S. GREWAL
Attorney General
State of New Jersey

GLENN J. MORAMARCO
Assistant Attorney General
ELSEPTH FAIMAN HANS
KIMBERLY A. CAHALL
Deputy Attorneys General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-3235
Glenn.Moramarco@law.njoag.gov

January 7, 2019

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General
AIMEE D. THOMSON
Deputy Attorney General
Office of Attorney General
1600 Arch Street
Suite 300
Philadelphia, PA 19103
(215) 560-2171
mfischer@attorneygeneral.gov

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 2

I.   The States Have Standing to Challenge the Final Rules...................................... 2

   A.   The Interim Final Rules Injure the States' Proprietary Interests. .................. 2

   B.   Pennsylvania and New Jersey have *Parens Patriae* Standing Because
        the Final Rules Threaten their Quasi-Sovereign Interests. ........................... 5

II.  Venue Is Proper in this District.............................................................................. 7

   A.   Venue is Proper Under 28 U.S.C. § 1391(e)(1)(C) Because the
        Commonwealth of Pennsylvania Resides in the District............................... 8

   B.   Venue is Proper Under 28 U.S.C. § 1391(e)(1)(B) Because a
        Substantial Part of the Events Giving Rise to Plaintiffs' Claims
        Occurred in this District.............................................................................. 10

III. The States Will Prevail on Their Claims that the Rules Are Unlawful. ........................... 11

   A.   The Final Rules Are Procedurally Invalid. ................................................. 11

   B.   The Final Rules Violate the Substantive Requirements of the APA. ........................ 15

        1.   The Rules Violate the Women's Health Amendment........................................... 15

        2.   Defendants' Reliance on RFRA Is Arbitrary and Capricious............................. 17

        3.   Defendants' Explanations are Arbitrary and Capricious. ..................................... 20

IV.  The States Have Satisfied the Other Criteria for the Issuance of an
     Injunction. ........................................................................................................... 22

   A.   The States Will Suffer Irreparable Injury in the Absence of an
        Injunction. ................................................................................................... 23

   B.   The Public Interest and the Balance of Equities Weigh Strongly in
        Favor of an Injunction.................................................................................. 24

V.   The Preliminary Injunction Factors Favor Enjoining All Implementation
     of the Final Rules.................................................................................................. 25

   A.   A Limited Injunction Would Not Adequately Protect Pennsylvania and
        New Jersey from Anticipated Irreparable Harm. ........................................ 26

   B.   A Broader Injunction is Appropriate Because Other States are
        Similarly Situated to Pennsylvania and New Jersey and Will Suffer
        Similar Harm................................................................................................ 28

   C.   The Policy Concerns Raised by Defendants are Inapplicable. .................... 29

VI.  The Contraceptive Mandate Is Constitutional ................................................... 30

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Acierno v. New Castle Cty.*, 40 F.3d 645 (3d Cir. 1994) ............................... 26

*Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301 (N.D. Ala. 2005) .................... 8, 9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982).......................................................................... 2, 5

*Atlanta & Fla. R.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790 (5th Cir. 1892)....................................... 8

*Bishop v. Oklahoma ex rel. Edmonson*, 447 F. Supp. 2d 1239 (N.D. Okla. 2006) ..................... 10

*Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987)........................................................... 26

*Burwell v. Hobby Lobby*, 134 S. Ct. 2751 (2014) ......................................................... 17

*California v. Azar*, No. 18-15144, 2018 WL 6566752 (9th Cir. Dec. 13, 2018)................... 2, 8, 9

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ........................... 17

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ...................................... 18

*Farmland Dairies v. McGuire*, 771 F. Supp. 80 (S.D.N.Y. 1991) ................................ 10

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)............................. 18, 19, 20

*Geisinger Cmty. Med. Ctr. v. Sec'y HHS*, 794 F.3d 383 (3d Cir. 2015)....................................... 17

*Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d
    Cir. 2015) ........................................................................................ 19

*Georgia v. Pa. R.R. Co*, 324 U.S. 439 (1945).................................................................. 6

*Georgia v. Tenn. Copper Co.*, 206 U.S. 230 (1907) ........................................................ 6

*Green Party of Pa. v. Aichele*, 89 F. Supp. 3d 723 (E.D. Pa. 2015)............................................. 28

*League of Women Voters of Fla. v. Browning*, No. 08-21243, 2008 WL 11332046
    (S.D. Fla. May 29, 2008) ................................................................ 10

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). ................................................... 5

*Maryland v. King*, 133 S. Ct. 1 (2012)........................................................................ 24

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .............................................................. 6, 7

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ............................................................ 7

*Merchants Nat'l Bank v. Safrabank (Cal.)*, 776 F. Supp. 538 (D. Kan. 1991) ............................ 11

*Missouri v. Illinois*, 180 U.S. 208 (1901) ...................................................................... 6

*Mo. Ins. Coalition v. Huff*, No. 12-2354, 2013 WL 363406 (E.D. Mo. Jan. 30, 2013) .......................................................................................................... 10

*Myers v. Am. Dental Ass'n*, 695 F.2d 716 (3d Cir. 1982) ................................................... 7

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) .................. 28

*NRDC v. EPA*, 683 F.2d 752 (3d Cir. 1982) .............................................................. 12, 13, 14

*Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (E.D. Pa. 2017) ............................................. passim

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338 (3d Cir. 2017) ................................................................................................. 18

*Sharon Steel Corp. v. E.P.A.*, 597 F.2d 377 (3d Cir. 1979) ............................................. 12, 13, 14

*Spokeo v. Robins*, 136 S. Ct. 1540 (2016) .................................................................... 5

*Texas v. United States*, 18-167, 2018 WL 6589412 (N.D. Tex. Dec. 14, 2018) ....................... 30

*Texas v. United States*, 809 F.2d 134 (5th Cir. 2015) ....................................................... 7

*Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017) ........................... 25, 26, 28, 29

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ........................................................... 17

*United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240 (2d Cir. 1977) .......................... 15

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .............................................. 28

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ........................................... 25

*Zubik v. Burwell*, 136 S. Ct. 1557 (2016) ................................................................... 19, 20

**Statutes**

5 U.S.C. § 553(b) .................................................................................................. 12

5 U.S.C. § 553(c) .................................................................................................. 12

5 U.S.C. § 702 ....................................................................................................... 7

5 U.S.C. § 706 ....................................................................................................... 6

5 U.S.C. § 706(2) ................................................................................................ 7

28 U.S.C. § 1391(c)(2) ........................................................................................ 9

28 U.S.C. § 1391(e)(1)(B) ......................................................................... 7, 10, 11

28 U.S.C. § 1391(e)(1)(C) ............................................................................... 7, 8

Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, *et seq.* ................... 17

    42 U.S.C. § 2000bb-4 ................................................................................. 19

42 U.S.C. § 300gg–13(a)(3) ............................................................................. 16

42 U.S.C. § 300gg–13(a)(4) ....................................................................... 15, 16, 19

42 U.S.C. § 300gg–14 ...................................................................................... 27

## Regulations

*Compliance with Statutory Requirements*, 83 Fed. Reg. 25,502 (June 1, 2018) ........................... 5

*Coverage of Certain Preventive Services Under the Affordable Care Act*, 78 Fed.
    Reg. 39,870 (July 2, 2013) ................................................................... 18, 22

*Moral Exemptions and Accommodations for Coverage of Certain Preventive
    Services Under the Affordable Care Act*, 82 Fed. Reg. 47,838 (Oct. 13, 2017) ................... 13

*Moral Exemptions and Accommodations for Coverage of Certain Preventive
    Services Under the Affordable Care Act*, 83 Fed. Reg. 57,592 (Nov. 15, 2018) ................... 23

*Religious Exemptions and Accommodations for Coverage of Certain Preventive
    Services Under the Affordable Care Act*, 83 Fed. Reg. 57,536 (Nov. 15, 2018) .. 15, 18, 22, 23

## Other Authorities

14D Charles Alan Wright & Arthur C. Miller, *Federal Practice & Procedure* (4th
    ed. 2018 update) ........................................................................................ 8, 9

Amici Curiae Br. of Mass. *et al*. in Support of Pls.' Mot. for Prelim. Inj., ECF No.
    113 (Jan. 7, 2019) ........................................................................................ 28

Comments of Governor Tom Wolf and Attorney General Josh Shapiro, *Proposed
    Rule, Compliance With Statutory Program Integrity Requirements*, Docket
    No. HHS-OS-2018-0008 (July 31, 2018) ............................................................. 5

Department of Labor, *FAQs about Affordable Care Act Implementation Part 36*
    (Jan. 9, 2017) ............................................................................................ 18

Fed. Defs.' Mem. in Response to Pls.' App. for Prelim. Inj., *Texas v. United States*, No. 18-167 (N.D. Tex.) ............................................................................. 10

Fed. Defs.' Resp. to Pls.' Mot. for Prelim. Inj., *Texas v. Nielsen*, No. 18-68 (S.D. Tex.) .............................................................................................................................. 10

Guttmacher Inst., *Fact Sheet: Publicly Funded Family Planning in the United States* (Sept. 2016) ............................................................................................... 29

H.R. Rep. No. 112-10 (2011) ......................................................................................... 9

Hobby Lobby, *Store Finder* ......................................................................................... 4

HRSA, *About HRSA* (May 2018) ............................................................................. 16

Kaiser Family Foundation, *Status of State Action on the Medicaid Expansion Decision* ....................................................................................................................... 29

Penn State, *Admissions & Univ. Statistics* ............................................................ 27

R. Fallon, D. Meltzer, & D. Shapiro, *Hart & Wechsler's The Federal Courts and the Federal System* (5th ed. 2003) .................................................................... 6

Rutgers, *Facts & Figures* ............................................................................................ 27

U.S. Census Bureau, *Out-of-State and Long Commutes: 2011*, American Community Survey Reports (Feb. 2013) ......................................................... 27

U.S. Dep't of Justice, *Welcome to the United States Attorney's Office Eastern District of Pennsylvania* ............................................................................... 11

## INTRODUCTION

Pennsylvania and New Jersey demonstrated in their opening brief that the Final Rules at issue in these proceedings suffer from the same defects as the IFRs this Court already enjoined, along with several new flaws. Since the Defendants concededly did not attempt to fix the problems with the IFRs identified by this Court, this result is unsurprising. Now, in response to the States' motion to enjoin the Final Rules, Defendants simply repeat many of the arguments this Court has already rejected. This Court should reject them again.

The new arguments offered by Defendants and Intervenors fare no better.[1] Rather, they suffer from many of the same flaws as those advanced in defense of the IFRs. Fundamentally, neither Defendants nor Intervenors try to defend the Rules on their own terms. They do not, for instance, attempt to justify the sweeping scope of the Rules, which would allow virtually any employer to opt out of providing legally required contraceptive coverage. They do not explain why publicly traded companies should be treated the same as churches under the Rules. They similarly do not explain why companies should be able to refuse to provide contraception on the basis of any "sincerely held moral conviction"—which could include, as this Court recognized, the belief "that women do not have a place in the workplace." *Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 577 (E.D. Pa. 2017). As a result, they fail to rebut the States' showing that the Rules are unlawful; that they will lead to irreparable injury; and that the public interest and balance of equities weigh in favor of injunctive relief. The States' motion should be granted and an injunction should issue.

---

[1] The federal agency and individual defendants are referred to throughout this brief as "Defendants," while the Little Sisters of the Poor, Saints Peter and Paul Home are referred to as "Intervenors."

**ARGUMENT**

## I.  The States Have Standing to Challenge the Final Rules.

This Court previously held that Pennsylvania had standing to challenge the IFRs. 281 F.

Supp. 3d at 564–69. The Ninth Circuit similarly held that California and other states likewise had

standing to challenge the IFRs. *California v. Azar*, No. 18-15144, 2018 WL 6566752, at *5 (9th

Cir. Dec. 13, 2018). By the logic of those decisions, Pennsylvania and New Jersey have standing

to challenge the Final Rules. In fact, because Defendants now concede that the Rules will harm

twice as many women as they previously estimated, *see* States' Mem. in Supp. of Mot. for a

Prelim. Inj. ("States' Mem.") 38, the justification for the States' standing has become even

stronger.

The Supreme Court has long recognized that states possess at least three distinct types of

interests—sovereign, proprietary, and quasi-sovereign—the invasion of which constitutes a

cognizable injury-in-fact. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S.

592, 601–02 (1982). Relevant here, a state's proprietary interests arise from its own property and

business relationships, *id.* at 601–02, and a state's quasi-sovereign interests include, at a

minimum, those that the state has in "the well-being of its populace" and in securing full and

equal participation in the federal system, *id.* at 602, 607–08.

The Rules invade the interests of Pennsylvania and New Jersey in at least two ways: they

will directly injure their proprietary interests through the increased use of state-funded programs

that provide contraceptive and medical services, and they will directly injure their quasi-

sovereign interests through harm to their residents' well-being and denial of their residents' full

enjoyment of federal benefits.

### A.  The Interim Final Rules Injure the States' Proprietary Interests.

The Rules will impose increased financial burdens on Pennsylvania and New Jersey

2

because the loss of ACA-mandated coverage under the Rules will make contraceptive care

unaffordable or inaccessible for many women, as cost is a significant barrier to women's access

to and use of contraception. *See* Weisman Decl. (Exh. D to States' Mem.) ¶¶ 45-48; Butts Decl.

(Exh. F) ¶ 55; Chuang Decl. (Exh. E) ¶ 38; Adelman Decl. (Exh. S) ¶¶ 19-20, 24; Coulter Decl.

(Exh. U) ¶¶ 22-32; Gennace Decl. (Exh. T) ¶¶ 18-19. The loss of access to cost-free

contraception will directly impact the States in two ways:

First, Pennsylvania and New Jersey women who lose contraceptive coverage under the

Rules will seek it elsewhere, including from state-funded programs. *See* Steinberg Decl. (Exh. R)

¶¶ 25-27; Allen Decl. (Exh. Q) ¶ 23; Coulter Decl. (Exh. U) ¶ 28. For many women who lose

access, government-funded care is likely the only available option. Women who are citizens of

Pennsylvania and New Jersey with incomes up to 138% of the federal poverty level can enroll in

Medicaid, which is known as "Medical Assistance" in Pennsylvania and "NJ FamilyCare" in

New Jersey. *See* Allen Decl. (Exh. Q) ¶ 8; Adelman Decl. (Exh. S) ¶¶ 9–11. Those with incomes

up to 215% of the poverty level ($25,929 for an individual and $52,890 for a family of four) can

participate in Pennsylvania's Family Planning Services Program, *see* Allen Decl. (Exh. Q) ¶ 9,

while, beginning this year, New Jersey residents with incomes up to 205% of the federal poverty

level will be eligible to participate in a family planning benefit program known as "Plan First."

These programs provide contraceptive care and rely on a combination of federal and states

funding. Other women will seek coverage from Title X clinics, which get funding from the

States and have no income-based eligibility requirements. Steinberg Decl. (Exh. R) ¶ 29; Chuang

Decl. (Exh. L ¶ 22); Coulter Decl. (Exh. U), ¶¶ 4–5. These clinics also help women who are

eligible for other state-funded healthcare to enroll in these programs to offset their own costs.

Therefore, because of the Rules, the States' cost to fund Medicaid, family planning programs,

and Title X clinics will increase.

Second, other women will forgo contraceptive health services altogether, and the States will bear increased costs through these same programs. Women who stop using contraception entirely will experience more unintended pregnancies and negative health outcomes. *See* Butts Decl. (Exh. F) ¶¶ 56-58; Coulter Decl. (Exh. U) ¶¶ 31-32. These outcomes will impose additional costs on Pennsylvania's and New Jersey's state-funded health programs. *See* Coulter Decl. (Exh. U) ¶ 28; Steinberg Decl. (Exh. L) ¶ 30 (discussing study finding that 68% of unplanned births are paid for by public insurance programs, compared to 38% of planned births).

Contrary to Defendants' assertions, these fears are not speculative. Defendants themselves admit that at least 70,515 women will lose contraceptive coverage due to the Final Rules. This figure purports to estimate the number of women working for employers that either litigated against the Mandate or had taken advantage of the Accommodation. A number of these entities are based in Pennsylvania and New Jersey. Among them are: Bingaman and Son Lumber Inc., Kreamer, PA (number of employees unknown); Conestoga Wood Specialties Corporation, East Earl, PA (950 employees); Cummins Allison, Philadelphia, PA (number of employees unknown); DAS Companies, Inc., Palmyra, PA (number of employees unknown); Earth Sun Moon Trading Company, Inc., Grove City, PA (number of employees unknown); Geneva College, Beaver Falls, PA (1,850 students, 350 employees); Hobby Lobby (13,240 total employees, at least 15 stores in Pennsylvania and 10 stores in New Jersey[2]); and Holy Ghost Preparatory School, Bensalem, PA (number of employees unknown). Exhs. V & W. Therefore, by the agencies' own estimates, Pennsylvania and New Jersey women will lose contraception

---

[2] Hobby Lobby, *Store Finder*, https://www.hobbylobby.com/store-finder (last visited Nov. 5, 2018).

coverage.[3]

In sum, because the States fund programs that provide contraceptive services to women who lack employer coverage, the Rules will increasingly burden these services when Pennsylvania and New Jersey employers use the Rules to exclude coverage for their female employees.

### B. Pennsylvania and New Jersey have *Parens Patriae* Standing Because the Final Rules Threaten their Quasi-Sovereign Interests.

The States' may also assert standing under the *parens patriae* doctrine based on their quasi-sovereign interests, harm to which constitutes legally cognizable injury in fact. *See Snapp*, 458 U.S. at 607–08; *see also Spokeo v. Robins*, 136 S. Ct. 1540, 1548 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992). Specifically, the Rules threaten the States' quasi-sovereign interests in the general "well-being of [their] populace" and in "ensuring that the State[s] and [their] residents are not excluded from the benefits that are to flow from participation in the federal system." *Snapp*, 458 U.S. at 602, 608. This invasion of these interests give the States

---

[3] Intervenors point to the fact that HHS has issued a separate proposed rule that would allow women denied coverage by their employers to obtain it from a Title X clinic, and argue that the States' injuries are "even less plausible" as a result. *See* Int. Opp. 13; *see also Compliance with Statutory Requirements*, 83 Fed. Reg. 25,502 (June 1, 2018). But that proposal, if enacted, will *lessen* access to Title X clinics. While the proposal contains a provision that would render women denied coverage by their employers eligible for Title X programs, the overarching purpose of the proposal is to impose a number of physical and other separation requirements on clinics that would force many—and particularly those clinics operated by Planned Parenthood—to close. For this reason, the proposal is commonly referred to as a "gag rule." *See* Comments of Governor Tom Wolf and Attorney General Josh Shapiro, *Proposed Rule, Compliance With Statutory Program Integrity Requirements*, Docket No. HHS-OS-2018-0008, at 1, 9 (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-200551 ("If adopted, the Proposed Rule would deny women, men, and families across the Commonwealth of Pennsylvania and the nation access to comprehensive, evidence-based, nondirective family planning service.") ("The inevitable – and intended – result of the Proposed Rule is that many Title X clinics will close, while others will run at diminished capacity. Patients from these clinics will be forced to turn elsewhere for family planning services, including to state-funded programs.").

standing under the *parens patriae* doctrine.

Only a decade ago, the Supreme Court reaffirmed a state's standing to protect its quasi-sovereign interests. *Massachusetts v. EPA*, 549 U.S. 497, 518–26 (2007).[4] There, Massachusetts sought to challenge the EPA's refusal to regulate greenhouse gases as required by the Clean Air Act. *Id.* at 514. The Court held that "the special position and interest of Massachusetts" as a "sovereign State" was of "considerable relevance," entitling it to "special solicitude in our standing analysis." *Id.* at 515, 520. Here, Pennsylvania and New Jersey have alleged multiple counts based in the APA.[5] *See* Amd. Compl. ¶¶ 166–89. In light of the States' position in the federal system, filing a lawsuit is their only recourse to force Defendants to comply with federal statutory and constitutional law. *See Massachusetts v. EPA*, 549 U.S. at 519; *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907); *Missouri v. Illinois*, 180 U.S. 208, 241 (1901).

Defendants and Intervenors nonetheless argue that the States may not assert *parens patriae* standing against the federal government. *See* Def. Opp. 14; Int. Opp. 15. But the cases they cite do not support this broad claim. Rather, they stand for the more limited proposition that, under principles of prudential standing, a state cannot ordinarily bring a *parens patriae* suit to "protect her citizens from the operation of federal statutes." *Massachusetts v. EPA*, 549 U.S. at 520 n.17 (quoting *Georgia v. Pa. R.R. Co*, 324 U.S. 439, 447 (1945)); *id.* at 539–40 & n.1

---

[4] Whether the holding of *Massachusetts v. EPA* ultimately rested on *parens patriae* standing is open to debate. The Court identified a legally sufficient injury in the Commonwealth's ownership of coastal property, *id.* at 522, but supported its holding by referencing a state's well-established right to bring a *parens patriae* suit, *id.* at 519–20 & n.17 (citing R. Fallon, D. Meltzer, & D. Shapiro, *Hart & Wechsler's The Federal Courts and the Federal System* 290 (5th ed. 2003)). This Court need not decide the precise holding of that case, however, because it nevertheless supports the proposition that states do have the right to bring *parens patriae* suits to protect their quasi-sovereign interests. *See id.*

[5] The APA creates a cause of action to challenge agency actions as being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706.

(Roberts, C.J., dissenting) (referring to state's inability to bring a *parens patriae* suit against a federal statute as a "prudential requirement"); *accord Massachusetts v. Mellon*, 262 U.S. 447, 484–86 (1923). Here, however, the States seek to *enforce* existing federal statutes—specifically, the APA and the ACA—in the same way Massachusetts was allowed to enforce the Clean Air Act over a decade ago. *Massachusetts v. EPA*, 549 U.S. at 520 n.17.

All counts brought by the States proceed under the APA, which allows a claim to challenge agency action that is "not in accordance with law" or "contrary to [a] constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2).[6] They do not allege that the Rules have usurped any state power, nor that the ACA or APA are unconstitutional. Because the States seek only to ensure that a federal agency complies with a duly-enacted law of Congress, no prudential limitation bars their assertion of *parens patriae* standing here.

## II. Venue Is Proper in this District.

Defendants assert that venue is not proper in this district, but they cannot carry their burden to override the Plaintiff States' choice of venue. *See Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724–25 (3d Cir. 1982) (burden lies with party challenging venue). Venue is proper in this district both because one of the plaintiffs resides here, 28 U.S.C. § 1391(e)(1)(C), and because "a substantial part of the events or omissions giving rise to the claim occurred" here, *id.* § 1391(e)(1)(B).

---

[6] The APA creates this cause of action for any "person" who is "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. The States are "'person[s]' entitled to enforce" the APA. *E.g.*, *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015) (allowing states to sue under APA), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016).

### A. Venue is Proper Under 28 U.S.C. § 1391(e)(1)(C) Because the Commonwealth of Pennsylvania Resides in the District.

Defendants are incorrect that a state containing multiple federal judicial districts "resides," for purposes of § 1391(e)(1)(C) only in the district where its capital is located. *See* Def. Opp. 16–18. Rather, a plaintiff State "is held to reside in any district within it." 14D Charles Alan Wright & Arthur C. Miller, *Fed. Practice & Procedure* § 3815 (4th ed. 2018 update) (citing *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1327–28 (N.D. Ala. 2005)); *Alabama*, 382 F. Supp. 2d at 1329 ("[C]ommon sense dictates that a state resides throughout its sovereign borders[.]").[7] The Ninth Circuit recently reaffirmed this principle in a case brought by California in the Northern District of California challenging the same IFRs at issue in this case. *California*, 2018 WL 6566752, *4. Rejecting Defendants' assertion that California can only sue in the Eastern District of California, the Ninth Circuit recognized that "[a] state is ubiquitous throughout its sovereign borders." *Id.* Therefore, § 1391 "dictates that a state with multiple judicial districts 'resides' in every district within its borders." *Id.*; *see also Atlanta & Fla. R.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) (noting that "the state government . . . resides at every point within the boundaries of the state").

No sound authority supports Defendants' argument to the contrary. Defendants cite decisions discussing a corporation's place of residence and decisions holding that Pennsylvania *state officials* and *agencies* sued in their official capacity reside in the Middle District of Pennsylvania. *See* Def. Opp. 17 & n.8. But none of these decisions addresses the residence of the Commonwealth itself or apply the venue statute to an action brought by the Commonwealth as a

---

[7] Although *Alabama* was decided before Section 1391 was amended, nothing in the language of the statute or its legislative history reflects an intent to address, much less change, the preexisting understanding of state residency.

sovereign plaintiff. *Cf. Alabama*, 382 F. Supp. 2d at 1328 (distinguishing suits brought by States from suits brought by state officials).

Equally unsupported is Defendants' reliance on 28 U.S.C. § 1391(c)(2), which provides that "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, . . . if a plaintiff, only in the judicial district in which it maintains its principal place of business." The text and history of § 1391(c)(2) make clear that the provision's reference to "an entity" does not "encompass[] a state acting as a plaintiff." *California*, 2018 WL 6566752 at *4. First, § 1391(c)(2) applies to entities "whether or not incorporated" and that have a "principal place of business"—terms that most naturally apply to corporate and business associations, not sovereign states. *See id.* (noting that reference to "the incorporation status of the 'entity[]' indicat[es] that the term refers to some organization, not a state"). Second, as originally enacted in 1948, § 1391(c) spoke only to the residency of defendant corporations. *See* Wright & Miller, *supra*, § 3811. Congress enacted § 1391(c)(2) in 2011 to resolve "a division in authority as to the venue treatment of unincorporated associations," by "restor[ing] the parity of treatment" between corporations and unincorporated associations and treating both like partnerships and labor unions. H.R. Rep. No. 112-10, at 21 (2011); *see also California*, 2018 WL 6566752 at *4. Nothing in the legislative history indicates any intent on the part of Congress for § 1391(c)(2) to limit the venues in which a plaintiff State might sue.

Defendants' interpretation of § 1391 not only "would defy common sense," *California*, 2018 WL 6566752 at *4, but also would permit federal defendants to judge-shop in cases of national importance by selectively raising or waiving this novel venue objection. While Defendants are challenging the ability of Pennsylvania and California to sue in federal districts within their borders, they are voicing no objection to Texas simultaneously pursuing litigation

9

against the federal government in the Northern and Southern Districts of Texas, neither of which is home to its state capital. *See* Fed. Defs.' Mem. in Response to Pls.' App. for Prelim. Inj., *Texas v. United States*, No. 18-167 (N.D. Tex.), ECF No. 92 (Texas challenge to Affordable Care Act); Fed. Defs.' Resp. to Pls.' Mot. for Prelim. Inj., *Texas v. Nielsen*, No. 18-68 (S.D. Tex.), ECF No. 71 (Texas challenge to immigration policies). The Court should resist a strained interpretation of § 1391 that would enable federal defendants to dictate the venue for lawsuits filed by states, and follow the precedents from other courts that have adopted the common-sense view that a State may sue the federal government in any district within its sovereign borders.

### B. Venue is Proper Under 28 U.S.C. § 1391(e)(1)(B) Because a Substantial Part of the Events Giving Rise to Plaintiffs' Claims Occurred in this District.

Venue also lies in the Eastern District of Pennsylvania because "a substantial part of the events or omissions giving rise to the claim occurred" in this district. 28 U.S.C. § 1391(e)(1)(B). That the Rules were drafted in Washington is irrelevant: "In the context of declaratory judgments or prospective injunctive relief regarding unconstitutional statutes, it has been held that suits challenging official acts may be brought in the district where the *effects of the challenged regulations are felt* even though the regulations were enacted elsewhere." *Bishop v. Oklahoma ex rel. Edmonson*, 447 F. Supp. 2d 1239, 1254 (N.D. Okla. 2006) (cleaned up), *rev'd in part on other grounds*, 333 F. App'x 361 (10th Cir. 2009); *accord Mo. Ins. Coalition v. Huff*, No. 12-2354, 2013 WL 363406, *2 (E.D. Mo. Jan. 30, 2013) (collecting cases); *League of Women Voters of Fla. v. Browning*, No. 08-21243, 2008 WL 11332046, *2 & n.2 (S.D. Fla. May 29, 2008) (finding venue proper because "the harm Plaintiffs allege . . . will occur in this district"); *Farmland Dairies v. McGuire*, 771 F. Supp. 80, 82 n.3 (S.D.N.Y. 1991) ("[S]uits challenging official acts may be brought in the district where the effects of the challenged regulations are felt even though the regulations were enacted elsewhere.").

Here, contrary to Defendants' assertion, the States have shown that the effects of the Final Rules will be felt in the Eastern District of Pennsylvania. *See* Amd. Compl. ¶ 136 (Dec. 14, 2018) (listing employers in Bensalem, East Earl, and Philadelphia—all of which are in this district—that Defendant Agencies themselves counted as likely to take advantage of the exemptions). Moreover, as the Eastern District of Pennsylvania is "one of the nation's largest districts . . . with over 5 million people residing in its nine counties" and includes the major metropolitan area of Philadelphia (which is the country's fifth largest city),[8] it is reasonable to expect that a substantial number of the women effected by the Final Rules will be residents of this district.[9] *See Merchants Nat'l Bank v. Safrabank (Cal.)*, 776 F. Supp. 538, 541 (D. Kan. 1991) (noting that § 1391 does not require court to determine where the events giving rise to the claim "were most substantial"—if events in the selected district "are 'substantial', it should make no difference that another's are more so, or the most so"). Thus, venue is also proper under § 1391(e)(1)(B).

## III.   The States Will Prevail on Their Claims that the Rules Are Unlawful.

### A.   The Final Rules Are Procedurally Invalid.

This Court previously found that the IFRs were issued in violation of the APA's procedural requirements and that the agencies had neither specific statutory authority nor good cause to do so. *See* 281 F. Supp. 3d at 572–76. Defendants provide no compelling reason for

---

[8] U.S. Dep't of Justice, *Welcome to the United States Attorney's Office Eastern District of Pennsylvania*, https://www.justice.gov/usao-edpa (last visited Dec. 29, 2018).

[9] Defendants' assertion that the States must identify "specific residents of this district" who will be affected by the Final Rules, *see* Def. Opp. 17, is specious given that the States have identified multiple employers in district who are likely to take advantage of the exemptions and the effects of the Rules will clearly be felt here. Defendants' argument that venue must be based on events that have "already occurred," *id.* at 18, is similarly unpersuasive since the States are bringing this action for injunctive relief specifically to forestall the expected harmful effects of the Final Rules here and elsewhere in Pennsylvania and New Jersey.

revisiting this determination. They nonetheless claim that their acceptance of comments on the
IFRs themselves renders the Final Rules procedurally valid. But the language of the APA and
Third Circuit precedent foreclose this argument.

The APA requires an agency to engage in notice and comment rulemaking *before* a rule
goes into effect. 5 U.S.C. § 553(b) & (c) (requiring issuance of a "notice of proposed rule
making," discussing, among other topics, "either the terms or substance of the proposed rule or a
description of the subjects and issues involved"). It makes no allowances for comments received
after a rule goes into effect, and nothing in the APA suggests that a procedurally invalid interim
final rule can serve, after the fact, as a substitute for the required "notice of proposed rule
making."

The Third Circuit has recognized as much, holding that "the period for comments after
promulgation cannot substitute for the prior notice and comment required by the APA." *Sharon
Steel Corp. v. E.P.A.*, 597 F.2d 377, 381 (3d Cir. 1979). It reiterated this conclusion in *NRDC v.
EPA*, in which the agency had postponed the effective date of several provisions by way of an
IFR, after which it went through formal notice and comment rulemaking to address whether the
provisions should be further postponed. 683 F.2d 752, 755–57 (3d Cir. 1982). The court held that
even the process of going through a formal rulemaking with respect to the subsequent action—
which the agencies undisputedly did not do here—could not cure the failure to do so in the first
instance. 683 F.2d 752, 768 (3d Cir. 1982) (rejecting the argument that "the notice and comment
procedures provided after the initial postponement can replace notice and comment procedures
before the initial postponement").

Defendants try to distinguish *NRDC* by arguing that the question presented for public
comment by the IFR "was the exact same question that would have been posed had the IFR been

an NPRM." Def. Opp. 21. This is false: the IFRs were in effect throughout the entirety of the

comment period, so the question posed was whether the exceptions they created should be

maintained, not whether they should be authorized in the first instance. *See, e.g.*, *Moral*

*Exemptions and Accommodations for Coverage of Certain Preventive Services Under the*

*Affordable Care Act*, 82 Fed. Reg. 47,838 (Oct. 13, 2017).[10] And, of course, the IFR was not an

NPRM; it was a rule that, by its own terms, became effective immediately. Defendants provide

no authority for the proposition that an IFR may be treated as an NPRM where it is convenient

for the agency to do so.

Defendants and Intervenors simply ignore the fact that, like commenters in *Sharon Steel*

*Corp.* and *NRDC*, the States were denied "effective participation in the rulemaking process while

the decisionmaker [was] still receptive to information and argument." *Sharon Steel Corp.*, 597

F.2d at 381. Instead they, like all commenters, were forced to "come hat-in-hand and run the risk

that the decisionmaker is likely to resist change." *Id.* That risk was especially high in this case, as

the agencies were litigating the validity of the IFRs in court at the same time they were

reviewing comments on those IFRs. So while they were purporting to consider arguments about

the IFRs with an open mind, they were simultaneously rejecting many of those same arguments

out of hand in their arguments presented in this Court and elsewhere.

Defendants' and Intervenors' arguments fails to grasp what the Third Circuit recognized

in *Sharon Steel Corp.* and *NRDC*: if post-promulgation comments could satisfy the procedural

requirements of the APA, then "an agency could negate at will the Congressional decision that

---

[10] The IFRs because effective October 6, 2017, and the comment period closed on December 5, 2017. This Court entered its injunction on December 15, 2017. So Defendants' claim that the IFRs "were enjoined shortly after they went into effect," Def. Opp. 21, is not accurate. And the further assertion that this Court's injunction "remedied any procedural defect from the IFRs," *id.*, makes no sense.

notice and an opportunity for comment *must precede promulgation*." *Sharon Steel Corp.*, 597 F.2d at 381; *NRDC*, 683 F.2d at 767–68 (emphasis added). As the *NRDC* court explained, Defendants' argument "would allow [the agency] to substitute post-promulgation notice and comment procedures for pre-promulgation notice and comment procedures at any time by taking an action without complying with the APA, and then establishing a notice and comment procedure on the question of whether that action should be continued." 683 F.2d at 768. Put differently, there would be no reason for an agency to ever follow the specific requirements of the APA. Rather, it could always do what the agencies did here: issue an IFR with a post-promulgation comment period and hope for the best, knowing that the worst possible outcome would leave the agency no worse than if it had followed the APA and issued an NPRM in the first instance.[11]

Finally, even if Defendants were correct that their acceptance of post-promulgation comments satisfied the procedural requirements of the APA, it would only highlight their failure to engage in a meaningful way with those comments. *See* States' Mem. 15–17; *see also infra* III.B.3. For example, the agencies casually dismissed comments expressing serious concerns about the harm that women will suffer as a result of the Rules by asserting that the Rules have "simply restored a zone of freedom where it once existed" and that the resulting loss of contraceptive coverage "is not a result the government has imposed." *Religious Exemptions and*

---

[11] Intervenors make a number of arguments in defense of the procedural validity of the Final Rules that rest on the premise that the IFRs were necessary to comply with judicial decisions. For instance, they assert, "After numerous courts held that the Mandate violated RFRA and entered injunctions binding the government, the agencies issued two additional IFRs that complied with the injunctions…." Int. Opp. 26. They cite nothing in support this point, and nowhere in their brief do they identify a single injunction that required the IFRs. The States are unaware of any injunction (much less injunctions issued by "numerous courts") that required the agencies to issue the IFRs, and the IFRs themselves do not assert that they were *required* by any particular court order. So it is unclear what basis Intervenors have for their statement.

*Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*,
83 Fed. Reg. 57,536, 57,549 (Nov. 15, 2018). They now summarily defend such assertions as
"perfectly logical, not arbitrary." Def. Opp. 25–26. But Congress passed the Women's Health
Amendment to provide women with access to necessary healthcare. 42 U.S.C. § 300gg–13(a)(4).
And the Final Rules themselves estimate that at least 70,515 women will lose access to necessary
and federally mandated healthcare. Defendants' blithe dismissal of the very real healthcare needs
of these women—the numbers of whom will continue to grow as more women are born, enter
the workforce, and change jobs—exemplifies their refusal to answer all "vital questions[] raised
by comments which are of cogent materiality." *United States v. Nova Scotia Food Prod. Corp.*,
568 F.2d 240, 252 (2d Cir. 1977).

### B.   The Final Rules Violate the Substantive Requirements of the APA.

#### 1.   The Rules Violate the Women's Health Amendment.

This Court held that the IFRs violate the Women's Health Amendment to the ACA. 281
F. Supp. 3d at 577–79. For the reasons the Court previously identified, the Final Rules do so as
well.

The language in the Women's Health Amendment is mandatory: covered plans "shall, at
a minimum provide coverage for and shall not impose any cost sharing requirements for"
preventive services for women. 42 U.S.C. § 300gg–13(a)(4). As this Court previously found,
nothing in the Amendment suggests that the agencies have broad authority to create exemptions
from this otherwise mandatory obligation.

Defendants' argument in response rests on a premise that this Court previously rejected:
that the use of the word "as" in the Amendment somehow manifests congressional intent to give
the agencies broad authority to create the challenged exemptions. Def. Opp. 28–30. The
Women's Health Amendment requires coverage for "with respect to women, such additional

preventive care and screenings not described in paragraph (1) *as* provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph." 42 U.S.C. § 300gg–13(a)(4) (emphasis added). This Court previously concluded that "as" is most naturally read as an acknowledgment of the fact that the guidelines referenced did not yet exist at the time the Amendment was enacted. 281 F. Supp. 3d at 579. By contrast, other guidelines referenced in the same section did exist at the time: for instance, the immediately preceding clause requires coverage for "with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg–13(a)(3).

Defendants recognize that HRSA had yet to issue the relevant guidelines, *see* Def. Opp. 29, but fail to draw the obvious conclusion from it: that Congress used the word "as" in clause (a)(4) precisely because those guidelines did not exist at the time of the amendment. Instead, they argue that "as" gives the agencies broad discretion to create exemptions from the otherwise mandatory language of the provision. To be clear, Congress did not grant "the agencies" the authority to do anything: it granted authority specifically to HRSA, an organization whose mission is to improve access to healthcare and to increase health equity.[12] It made perfect sense for Congress to delegate to HRSA the task of identifying which specific preventive services should be required by the Amendment. It would make no sense for Congress to delegate to HRSA the task of determining the contours of religious and moral exemptions from that requirement. And to find such an illogical delegation in the use of the word "as" strains all

---

[12] *See* HRSA, *About HRSA* (May 2018), https://www.hrsa.gov/about/index.html. For the same reason, the fact that the Women's Health Amendment does not specifically mention contraception is beside the point. Congress mandated that plans cover preventive services for women but wisely left the determination as to which preventive services were to be covered to a body much better suited for that task.

credulity.[13]

### 2.   Defendants' Reliance on RFRA Is Arbitrary and Capricious.

Contrary to claims of the Defendants, Def. Opp. 32–41, and the Intervenors, Int. Op. 20–25, RFRA neither requires nor authorizes the broad final Religious Exemption Rule.

The Defendants continue to claim, Def. Opp. 34–35, that the final Religious Exemption Rule is merely a permissible response to the Supreme Court's decision in *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2779 (2014) (holding that the Contraceptive Mandate, when applied to certain employers with sincere religious objections to contraception, substantially burdens religious exercise in violation of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et. seq.*). But this argument ignores both context and the APA. Prior to the IFRs, the Defendants did not require these employers to comply with the Contraceptive Mandate; instead, the accommodation enabled these employers to avoid the Mandate while simultaneously ensuring that women received access to necessary and federally mandated contraceptive services. For over three years, the Defendants repeatedly affirmed that the accommodation did not impose a substantial burden on religious exercise and that, even if it did, it was the least restrictive means of furthering a compelling government interesting. *See, e.g.*, Dep't of Labor, *FAQs about*

---

[13] The Defendants' passing invocation of *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), Def. Opp. 30, deserves no credence. First, the Defendant agencies lack statutory authority to issue the final Rules, making *Chevron* deference a nonissue. *See United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). Second, even if Defendants had statutory authority, they point to no ambiguity in the ACA that necessitates agency interpretation or gap-filling. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Geisinger Cmty. Med. Ctr. v. Sec'y HHS*, 794 F.3d 383, 391 (3d Cir. 2015) (quoting *Chevron*, 467 U.S. at 842–43). Finally, even if the WHA is ambiguous, Defendants' interpretation is unreasonable based on the ACA's text, structure, purpose and legislative history. States' Mem. 19–22.

*Affordable Care Act Implementation Part 36*, at 4–5 (Jan. 9, 2017);[14] *Coverage of Certain Preventive Services Under the Affordable Care Act*, 78 Fed. Reg. 39,870, 39,886–88 (July 2, 2013); *see also* States' Mem. 29. The final Religious Exemption Rule acknowledges that at least 209 employers have used the accommodation since 2013, to the benefit of approximately 587,000 women of childbearing age in 2017. 83 Fed. Reg. at 57,578.[15]

In issuing the Religious IFR and the final Religious Exemption Rule, the Defendants abruptly reversed course: they now conclude that the accommodation imposes a substantial burden on religious exercise and that they lack a compelling interested in enforcing the Contraceptive Mandate. 83 Fed. Reg. at 57,546–48. But such a change in position requires "good reasons," and "a more detailed justification" when the agencies' "prior policy has engendered serious reliance interests," as it has here for hundreds of thousands of women. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *accord Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016).

The final Religious Exemption Rule does not satisfy these basic requirements. Summarily stating that "the Agencies fully explained their conclusion" that the accommodation poses a substantial burden on religious exercise, Def. Opp. 36, does not make it so. Although the *sincerity* of an employer's religious objection cannot generally be second-guessed, the *substantiality* of the purported burden is a question of law that requires an objective evaluation of its nature and substantiality. *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 356 (3d Cir. 2017) (cleaned up). The Defendants provide no explanation for why

---

[14] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

[15] Defendants calculated that there were some 2,907,000 persons covered by accommodated plans in 2017. 83 Fed. Reg. at 57,578. Women of childbearing age comprise 20.2 percent of the population. *Id.*

the accommodation poses a substantial burden on employers; instead, they impermissibly treat

every sincere religious objection as *per se* substantially burdened. Def. Opp. 36 (citing 83 Fed.

Reg. at 57,546); *cf. Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422,

435–44 (3d Cir. 2015) (detailing the many reasons why the accommodation does not impose a

substantial burden on religious exercise), *vacated on other grounds*, *Zubik v. Burwell*, 136 S. Ct.

1557, 1560 (2016). And unless a law imposes a substantial burden, RFRA does not apply. 42

U.S.C. § 2000bb-1(a).[16] In addition, as the States have demonstrated, States' Mem. 27–28, the

Defendants' explanations for abandoning their compelling interest in enforcing the Contraceptive

Mandate (Def. Opp. 37–39) are not reasoned. *See Fox Television Stations*, 556 U.S. at 515. In

particular, the Defendants fail to demonstrate why women who work for objecting entities are

uniquely undeserving of necessary and federally mandated contraceptive services. Def. Opp. 37

("Here, the Government does not assert any compelling interest in requiring objecting employers

to provide the contraceptives at issue.").

It is true that RFRA "requires that the Agencies avoid substantially burdening religious

exercise," unless doing so is the least restrictive means of furthering a compelling government

interest. Def. Opp. 40 (emphasis omitted). But the ACA, as implemented, requires that women

receive health insurance coverage for contraceptive services and counseling. 42 U.S.C. § 300gg–

13(a)(4); 2016 Guidelines (Exh. H). Contrary to Defendants' characterization, Def. Opp. 40, the

final Religious Exemption Rule is a categorical denial: women who work for employers who

claim the exemption will not receive the necessary preventive healthcare mandated by the ACA.

---

[16] Contrary to the Intervenor's claim, RFRA does not authorize the government to craft exemptions to the extent permissible under the Establishment Clause. Int. Opp. 24-25 (citing 42 U.S.C. § 2000bb-4). Instead, that section of RFRA states that "[g]ranting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter." § 2000bb-4.

The Defendants provide no authority for protecting employers' religious beliefs at the expense of their female employees' health. *Cf. Zubik*, 136 S. Ct. at 1560 (remanding cases so the parties could "arrive at an approach going forward that accommodates petitioners' religious exercise *while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage*" (cleaned up) (emphasis added)).[17]

### 3.   Defendants' Explanations are Arbitrary and Capricious.

Defendants acknowledge that, in issuing the Final Rules, the agencies "reached a different balance than they had previously." Def. Opp. 22. In such cases, they are required to provide "a more detailed justification than what would suffice for a new policy created on a blank slate"—particularly where, as here, the "prior policy has engendered serious reliance interests that must be taken into account." *Fox Television Stations*, 556 U.S. at 515. As the States argued in their opening brief, they failed to do so. In fact, their arguments in response simply underscore the inadequacy of their justifications.

For instance, Defendants assert that "the Agencies concluded, among other reasons, that because the Rules merely withdraw the mandate's requirement from a small group of newly exempt entities and plans, and because at least one recent study showed that the contraceptive mandate did not change women's use of certain contraceptives or contraceptives in general, the exemptions are unlikely to have negative effects on the health or equality of women nationwide." Def. Opp. 25. So on the critical factual question of whether the expanded exemptions would cause harm to women's health or equality, the agencies based their determination on two claims: 1) that the Rules would likely not affect that many women, because not many plans would take

---

[17] Contrary to the Intervenor's characterization, Int. Opp. 24, *Zubik*'s directive did not envision an approach that categorically prevented women who work for objecting employers from receiving federally mandated contraceptive services free of cost-sharing.

advantage of them (although elsewhere they concede that their estimate of the number of women affected is little more than an educated guess); and 2) that "at least one recent study" found that the Mandate "did not change women's use of certain contraceptives or contraceptives in general." From these two bare claims, they apparently reached the sweeping conclusion that the Rules are "unlikely to have negative effects on the health or equality of women nationwide." Def. Opp. 25.

This argument falls well short of the "more detailed justification" required under such circumstances. For instance, the agencies do not explain why they decided to credit one or two studies over many others which reached contrary results. Nor do they acknowledge that the study they relied on in fact did find some positive benefits resulting from the Mandate. While Defendants argue that the States rely on extra-record evidence in critiquing their analysis, the fact remains that experts in the field, looking at the same body of evidence the agencies presumably considered,[18] have concluded that the agencies' determinations are simply unsupportable.

Defendants' other explanations are no more persuasive. For instance, they defend the Rules' discussion of the difference between studies showing associative and causal relationships by arguing that "[a] study that establishes a causal relationship provides stronger evidence for its hypothesis than one that demonstrates only an associative relationship, and this is no less true if the circumstances make conducting a study that would demonstrate a causal relationship infeasible." Def. Opp. 36. But in this context, a study demonstrating a causal relationship would be more than infeasible; it would be unethical. *See* States' Mem. 34; Chuang Decl. (Exh. L.) ¶ 45. And given their concession that it would be "infeasible" to conduct a study establishing a

---

[18] To date, the agencies have not produced the administrative record for the Final Rules.

causal relationship, it is hard to see what purpose is served by pointing out the superiority of such studies—other than to denigrate the very strong evidence they had before them that contradicted their preferred narrative.

Defendants' estimates of the numbers of women affected by the Rules are similarly arbitrary and capricious. The fact that their estimate more than doubled between the issuance of the IFRs and the Final Rules would seem to confirm this fact, yet Defendants make little effort to explain how an error of this magnitude occurred. Instead, they argue that they are doing the best they can with limited information, and that "commenters did not provide any better or more concrete ways to estimate the number of women impacted," so the uncertainty in their estimates is unavoidable. *See* Def. Opp. 26. But elsewhere, they point to their estimate as a proof that the Rules will have little effect without acknowledging how imprecise their estimates are. *See, e.g.*, 83 Fed. Reg. at 57,552 (discussing "limited impact" of Rules).

Some of their assumptions are plainly wrong: for instance, they justify disregarding the female dependents of plan enrollees in assessing the impact of the Rules by claiming that "the Agencies have long made the reasonable assumption that dependents are likely to share the sincere religious or moral beliefs of the policyholder or employer." Def. Opp. 27 (citing 78 Fed. Reg. at 39,874). But the provision they cite does not actually make this claim, for good reason: it is hard to see how simply ignoring the existence of interfaith families in a rule devoted to religious freedom would be anything but arbitrary and capricious.[19]

## IV.    The States Have Satisfied the Other Criteria for the Issuance of an Injunction.

Defendants and Intervenors have failed to rebut the States' strong showing that, in

---

[19] Of course, family members of the same religion may disagree on the morality of contraceptive use, among many other things.

addition to demonstrating a likelihood of success on the merits, they also will suffer irreparable harm if the Rules are implemented, and the balance of the equities weighs strongly in their favor.

### A.  The States Will Suffer Irreparable Injury in the Absence of an Injunction.

Defendants concede that unrecoverable economic harm may warrant a preliminary injunction, but they argue that the harm the States have alleged is overly speculative and not sufficiently concrete or severe. *See* Def. Opp. 12–13, 41; Int. Opp. 43. But Defendants themselves included multiple Pennsylvania and New Jersey employers in their own estimates of the number of women who will be affected by the Final Rules.[20] *See* Exhs. V & W; Amend. Compl. ¶ 136 (listing employers). And according to testimony from Pennsylvania and New Jersey officials, some of these women are likely to be eligible for and to seek contraceptive services through state-funded programs, or to forego contraception and suffer adverse health consequences. This harm to the States is "not merely speculative, it is actual and imminent." 281 F. Supp. 3d at 582. Importantly, as this Court previously noted in response these same objections by Defendants, "there is no need to wait for the axe to fall before an injunction is appropriate, particularly where Defendants have estimated that it is about to fall on tens of thousands of

---

[20] Defendants argue that the States' reliance on the charts provided by the Defendant Agencies is misguided because some of the litigating entities were likely exempt under existing rules, others may have been satisfied with the accommodation process, and still others obtained injunctions excusing them from compliance with the rules. *See* Def. Opp. 41 n.14. However, the States identified multiple local employers in their amended complaint that the Defendant Agencies had not excluded from their estimates (and as the States argued elsewhere, *see* Section I.A., *supra*, employers with injunctions should still be counted). Moreover, Defendants themselves relied on the data presented in the charts to estimate the number of women affected by the IFRs and appear to have used these same sources for the final Exemption Rules. *See, e.g.*, 83 Fed. Reg. at 57,575. Finally, Defendants themselves have admitted that nearly twice as many women will be affected by the Final Rules as they initially estimated. *See* 83 Fed. Reg. at 57,578; *id.* at 57,582; *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,592, 57,627 (Nov. 15, 2018). Although Defendants have not explained which specific entities are included in their new calculations, some of these additional women doubtless live in the Plaintiff States.

women." *Id.*

Intervenors also argue that any injury to the States from the Final Rules is dwarfed by the harm the States are already suffering from "existing injunctions and grandfathering exemptions." Int. Opp. 43. However, the grandfathering exemptions were designed to decrease over time, and Intervenors have not attempted to quantify or adequately explain their claims about the harms arising from existing injunctions. Moreover, the fact that Congress or other courts have limited application of the ACA's contraceptive mandate does not mean that the Defendant Agencies' attempts to substantially further restrict contraceptive coverage are lawful, or that the Plaintiff States and their residents will not be harmed when additional employers choose to stop offering contraceptive coverage, as they will be able to do under the Final Rules.

### B. The Public Interest and the Balance of Equities Weigh Strongly in Favor of an Injunction.

The irreparable harm that the Plaintiff States and their residents will suffer as a result of the Final Rules substantially outweighs any harm to the Defendants from a preliminary injunction. Although Defendants assert that they will "suffer an irreparable institutional injury" from a delay of Rules, Def. Opp. 42, as this Court previously found, Defendants can suffer no harm from the enjoining of an invalid regulation, and even delay of a valid regulation does not substantially prejudice the government, 281 F. Supp. 3d at 584–85. *Maryland v. King*, which Defendants cite, is inapposite, both because it concerned the implementation of a critical criminal law statute concerning collection of DNA evidence for law enforcement purposes, and because the Supreme Court had found that the statute was likely constitutional. *See* 133 S. Ct. at 2–3.

Although Defendants have an interest in protecting religious liberty, Congress, in enacting the Women's Health Amendment and RFRA, has already struck its desired balance

between ensuring women's access to contraceptive healthcare services and protecting employers'
free exercise of religion. *See* 281 F. Supp. 3d at 584; *see also Youngstown Sheet & Tube Co. v.
Sawyer*, 343 U.S. 579, 609-10 (1952) (Frankfurter, J., concurring) (noting that when Congress
"has defined the weight to be given to competing interests, a court of equity is not justified in
ignoring that pronouncement"). Indeed, all fifty states and the District of Columbia spend public
money on contraceptive services for women, and all bear the costs of unintended pregnancies.
Kost. Supp. Decl. (Supp. Exh. A) at Exh. A. Defendants—as agencies charged with
implementing the ACA—have no legitimate interest in overriding Congress' judgment as to this
balance.[21]

## V.   The Preliminary Injunction Factors Favor Enjoining All Implementation of the Final Rules.

Defendants argue that this Court should limit preliminary injunctive relief to the Plaintiff
States. And Intervenors argue that a nationwide injunction would improperly force the federal
government to violate existing injunctions from other federal courts. This Court should reject
both contentions. District courts have considerable discretion in crafting preliminary injunctions,
and there is no rule against nationwide injunctions when, as here, they are necessary to maintain
the status quo and allow the Court to afford plaintiffs complete relief at the conclusion of the
case. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087–88 (2017). In
enjoining application of the IFRs, this Court carefully preserved the status quo and the parties'

---

[21] Intervenors also argue that the "real benefit" they would receive from having their
"judicially-obtained exemptions" codified in a Final Rule tips the balance of equities against the
States. Int. Opp. 43. However, since Intervenors' religious beliefs are *already* protected by
injunction they obtained in other litigation, granting the preliminary injunction sought by the
States will protect the States and their residents from further irreparable harm without altering
the status quo for Intervenors. In any event, any benefit Intervenors might derive from
codification of the exemptions created for them by other courts is more than fully offset by the
harm to Plaintiffs of having those exemptions not only codified but expanded.

rights without undermining orders already issued by other courts. *See* 281 F. Supp. 3d at 585 ("A preliminary injunction will maintain the status quo: those with exemptions or accommodations prior to October 6, 2017 will maintain their status, those with injunctions preventing enforcement of the Contraceptive Mandate will maintain their injunctions, but those with coverage will maintain their coverage as well.") A similar preliminary injunction, enjoining the Final Rules, but not interfering with existing injunctions in other cases, is appropriate here as well.

### A. A Limited Injunction Would Not Adequately Protect Pennsylvania and New Jersey from Anticipated Irreparable Harm.

"There is no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1169 (9th Cir. 1987). Rather, in crafting a preliminary injunction, the Court should "consider the overall public interest" and "mold its decree to meet the exigencies of the particular case." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087. "A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered," which requires preventing irreparable harm to the moving party. *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994).

Here, Pennsylvania and New Jersey have demonstrated that they will suffer irreparable harm because some of their residents will lose contraceptive coverage under the Final Rules and, as a result, will seek services through state-funded programs or will forego contraceptive use and suffer adverse health consequences. Defendants argue that a "limited injunction is the appropriate relief" and this Court should "enjoin only the application of the Final Rules in Pennsylvania and New Jersey." Def. Opp. 43. But Defendants have not explained in practical terms what they mean by enjoining the Rules "in" the States, nor have they offered this Court a feasible alternative to enjoining all implementation of the Final Rules while still providing Pennsylvania and New Jersey the "complete relief" to which Defendants agree they are entitled.

26

*See id.* at 43, 45. Nor can they do so.

For example, if the Court were to enjoin application of the Final Rules as to Pennsylvania and New Jersey employers and health insurance providers, this would not protect our residents who are covered by out-of-state employer-provided health insurance plans. This includes residents and their dependents who commute across state lines or work remotely,[22] as well as college students and other young adults under age 26 who are covered under the insurance plans of parents who live out-of-state.[23]

Conversely, if the Court were to enjoin the application of the Final Rules with respect to Pennsylvania and New Jersey residents, it is unclear whether out-of-state employers who employ our residents (or in-state employers who employ many out-of-state employees) would be able to manage this in their health insurance policies. And out-of-state employers likely would not even know if their local employees' young adult dependents were Pennsylvania or New Jersey residents. Moreover, out-of-state college students and others living temporarily in Pennsylvania and New Jersey might not be considered Pennsylvania or New Jersey "residents," but might still turn to in-state publicly-funded providers like Title X clinics for contraceptive services if they lose coverage under their out-of-state insurance plans. In short, Defendants' proposed "limited

---

[22] In 2011, approximately 548,000 New Jersey residents and 300,000 Pennsylvania residents worked in other states. U.S. Census Bureau, *Out-of-State and Long Commutes: 2011*, American Community Survey Reports, at 10 & tbl. 6 (Feb. 2013), https://www2.census.gov/library/publications/2013/acs/acs-20.pdf.

[23] For example, even without counting out-of-state students at nationally-recognized private universities like Princeton and the University of Pennsylvania, there are approximately 27,600 out-of-state students at Penn State and 12,400 out-of-state students at Rutgers. Penn State, *Admissions & Univ. Statistics*, https://admissions.psu.edu/apply/statistics/; Rutgers, *Facts & Figures*, https://www.rutgers.edu/about/facts-figures. In addition, all young adults may remain on their parents' health insurance plans until age 26, and there is no requirement that these young people be financially dependent on or reside with their parents in order to do so. 42 U.S.C. § 300gg–14(a).

injection" would require the Court to engage in unworkable line-drawing, and should be rejected.

**B.  A Broader Injunction is Appropriate Because Other States are Similarly Situated to Pennsylvania and New Jersey and Will Suffer Similar Harm.**

In addition to considering the potential harms to the parties, "[i]n awarding a preliminary injunction a court must also 'consider . . . the overall public interest.'" *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087 (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008)) (cleaned up). In doing so, the court may order a preliminary injunction not only with respect to the parties to the litigation, but also "with respect to parties similarly situated to" the plaintiffs. *Id.* at 2088. Broader relief is particularly appropriate where the challenge is to the lawfulness of an agency "rule of broad applicability." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also id.* ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."); *Green Party of Pa. v. Aichele*, 89 F. Supp. 3d 723, 737 (E.D. Pa. 2015) ("The remedy for a facial challenge is the broad invalidation of the statute in question.") *aff'd*, 103 F. Supp. 3d 681 (E.D. Pa. 2015).

Here, the Final Rules have nationwide applicability and effect, and the Plaintiff States are challenging them as facially invalid under the APA rather than uniquely invalid in their application to Pennsylvania and New Jersey. Moreover, states and people across the country will be harmed by the Final Rules in the same way as Pennsylvania, New Jersey, and their residents. As the 21 Amici States have made clear, they too would suffer significant financial and non-financial harms due to women losing employer-provided contraceptive coverage and seeking contraceptive services from state-funded programs or foregoing contraception. *See* Amici Curiae Br. of Mass. *et al.* in Support of Pls.' Mot. for Prelim. Inj., ECF No. 113, at 3–15 (Jan. 7, 2019).

28

Nor will these harms be limited solely to the states that are participating in this litigation. In 2010, over 75% of public funding for family planning and contraceptive services came from Medicaid, which is funded jointly by the Federal Government and the states, and another 12% came from direct state appropriations.[24] All states make Medicaid coverage available to adults at very low income levels, and 37 states (including Pennsylvania and New Jersey) have expanded Medicaid to provide coverage for adults without dependents at levels well above 100% of the federal poverty line.[25] Enjoining all implementation of the Final Rules is therefore not only necessary to provide complete relief to Pennsylvania and New Jersey, but also appropriate because the other states the injunction will cover are "similarly situated" to Pennsylvania and New Jersey.

### C.  The Policy Concerns Raised by Defendants are Inapplicable.

In arguing for a limited injunction, Defendants raise policy concerns about "nationwide injunctions" relating to the "toll on the federal court system," inequities between the federal government and potential plaintiffs, "end-run[s] around the class action procedure," and potential inability of some beneficiaries to demonstrate standing. Def. Opp. 44–45. However, despite some courts' discussion of these issues, it is well-established—and Defendants freely admit— that plaintiffs are entitled to "full" and "complete" relief." *Id.* at 43, 45. It is also well-established that, in appropriate cases, injunctive relief may and should extend beyond the plaintiffs to similarly situated parties. *See Int'l Refugee Assistance Project*, 137 S. Ct. at 2087–88. For all the

---

[24] Guttmacher Institute, *Fact Sheet: Publicly Funded Family Planning in the United States* (Sept. 2016), https://www.guttmacher.org/fact-sheet/publicly-funded-family-planning-services-united-states (last visited Dec. 30, 2018).

[25] Kaiser Family Foundation, *Status of State Action on the Medicaid Expansion Decision*, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/ (last visited Dec. 30, 2018).

reasons discussed above, enjoining any implementation of the Final Rules is necessary to preserve the status quo for Pennsylvania and New Jersey and is appropriate given the facial challenge to rules of nationwide applicability whose effects throughout the country will be similar to those felt in the Plaintiff States. Therefore, considering the severity of the harm that will result from depriving women of access to free, safe, and effective contraceptive care in the Plaintiff States and elsewhere, this Court should exercise its discretion to preliminarily enjoin all implementation of the Final Rules.

## VI.    The Contraceptive Mandate Is Constitutional

Finally, Intervenors mention in a footnote that a district court in Texas recently held that the ACA's individual mandate, as amended in 2017, is unconstitutional, and that the remainder of the ACA is not severable from that mandate and therefore invalid. *See* Int. Op. 3 n.1; *Texas v. United States*, 18-167, 2018 WL 6589412 (N.D. Tex. Dec. 14, 2018). Intervenors do not directly advance this argument here, and the Texas court's decision is not binding on this Court. That decision is also wrong: the individual mandate, which now lacks an enforcement mechanism, remains constitutional, and even if it were not there is no basis for finding that an alleged infirmity created by Congress in 2017 justifies invalidating the ACA (or any part of it) as enacted seven years beforehand. If the Court believes it necessary to address this issue, the States are prepared to submit further briefing or discuss it at oral argument.

## CONCLUSION

For the reasons set forth above, the States' Motion for a Preliminary Injunction should be granted.

January 7, 2019                                   Respectfully submitted,

GURBIR S. GREWAL                                 JOSH SHAPIRO
Attorney General                                 Attorney General
State of New Jersey                              Commonwealth of Pennsylvania

GLENN J. MORAMARCO                                 /s/ Michael J. Fischer
Assistant Attorney General                       MICHAEL J. FISCHER
ELSEPTH FAIMAN HANS                              Chief Deputy Attorney General
KIMBERLY A. CAHALL                               AIMEE D. THOMSON
Deputy Attorneys General                         Deputy Attorney General
New Jersey Attorney General's Office             Office of Attorney General
Richard J. Hughes Justice Complex               1600 Arch Street
25 Market Street                                 Suite 300
Trenton, NJ 08625                                Philadelphia, PA 19103
(609) 376-3235                                   (215) 560-2171
Glenn.Moramarco@law.njoag.gov                   mfischer@attorneygeneral.gov

31