```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4
     COMMONWEALTH OF                      :  CIVIL ACTION
 5   PENNSYLVANIA, et al.,                :
                                          :
 6                Plaintiffs,             :
                                          :
 7                vs.                     :
                                          :
 8   DONALD J. TRUMP, et al.,             :  NO. 17-4540
                                          :
 9                Defendants,             :
                                          :
10   LITTLE SISTERS OF THE POOR           :
     SAINT PETER AND PAUL HOME            :
11                                        :
                  Intervenor-Defendant.   :
12

13
                           PHILADELPHIA, PA
14
                           JANUARY 10, 2019
15

16
     BEFORE:        THE HONORABLE WENDY BEETLESTONE, J.
17
                           ORAL ARGUMENT
18

19   APPEARANCES:

20               OFFICE OF THE ATTORNEY GENERAL
                 COMMONWEALTH OF PENNSYLVANIA
21               BY:  MICHAEL J. FISCHER, ESQUIRE
                 Chief Deputy Attorney General
22               AIMEE D. THOMSON, ESQUIRE
                 Deputy Attorney General
23               1600 Arch Street, Suite 300
                 Philadelphia, PA  19103
24               For the Commonwealth of Pennsylvania

25
                      (CONT.)
```

```
 1
    APPEARANCES:   (CONT.)
 2

 3                    ATTORNEY GENERAL STATE OF NEW JERSEY
                      DEPARTMENT OF LAW AND PUBLIC SAFETY
 4                    BY:  GLENN J. MORAMARCO, ESQUIRE
                      Assistant Attorney General
 5                    R.J. Hughes Justice Complex
                      25 Market St. P.O. Box 112
 6                    Trenton, NJ  08625-0112
                      For the State of NJ
 7

 8                    U.S. DEPARTMENT OF JUSTICE
                      BY:  JUSTIN MICHAEL SANDBERG, ESQUIRE
 9                    REBECCA M. KOPPLIN, ESQUIRE
                      20 Massachusetts Avenue NW
10                    Room 7302
                      Washington, DC  20530
11                    For the Federal Defendants

12
                      BECKET FUND FOR RELIGIOUS LIBERTY
13                    BY:  MARK RIENZI, ESQUIRE
                      President
14                    LORI WINDHAM, ESQUIRE
                      Senior Counsel
15                    1200 New Hampshire Ave. NW, Suite 700
                      Washington, DC  20036
16                    For the Defendant Intervenor

17

18                    KATHLEEN FELDMAN, CSR, CRR, RPR, CM
                      Official Court Reporter
19                    Room 1234 - U.S. Courthouse
                      601 Market Street
20                    Philadelphia, PA  19106
                      (215)779-5578
21
            (Transcript produced by machine shorthand via C.A.T.)
22

23

24

25
```

```
 1                    (Deputy Clerk opened court)

 2            THE COURT:  Good morning.  Have a seat.

 3            ALL COUNSEL:  Good morning, Your Honor.

 4            THE COURT:  Okay, we're here in the Commonwealth of

 5   Pennsylvania versus Trump, 17-4540, on the second motion for

 6   preliminary injunction this time on the Final Rules.

 7            Can I have some introductions on this side, please.

 8            (Indicating)

 9            MR. FISCHER:  Good morning, Your Honor.  Michael

10   Fischer for the Commonwealth of Pennsylvania.

11            MS. THOMSON:  Aimee Thomson for the Commonwealth of

12   Pennsylvania.

13            MR. MORAMARCO:  Glenn Moramarco for the State of New

14   Jersey.

15            THE COURT:  Okay.

16            MR. SANDBERG:  Good morning, Your Honor.  Justin

17   Sandberg for the Federal Defendants.

18            MS. KOPPLIN:  Rebecca Kopplin for the Federal

19   Defendants.

20            MR. RIENZI:  Mark Rienzi for the Little Sisters of

21   the Poor.

22            MS. WINDHAM:  Lori Windham for the Little Sisters of

23   the Poor.

24            THE COURT:  Okay, I have Little Sisters of the Poor

25   or some members of the Little Sisters of the Poor in the
```

```
 1    courtroom.  I also have other people in the courtroom.  Are

 2    there any amici, other amici in the courtroom?

 3            Okay, so who's taking the lead?

 4            MR. FISCHER:  Good morning, Your Honor.  I will be

 5    speaking first.

 6            THE COURT:  Fine.

 7            MR. FISCHER:  Your Honor, with the Court's

 8    permission, we would like to divide the argument up on our

 9    side.

10            Ms. Thomson will be speaking to issues arising out

11    of the Administrative Procedure Act, specifically, the

12    substantive and procedural violations that we allege.

13            I will be speaking to the remaining issues involving

14    standing, venue, and the scope of any injunction as well as

15    irreparable harm.

16            THE COURT:  Okay.

17            MR. FISCHER:  And before I begin, I would like to

18    acknowledge that the Third Circuit issued an order yesterday

19    relating to this case essentially staying the current appeal

20    while this Court resolved the pending injunction.

21            We don't think that necessarily changes anything.

22            The one aspect of the ruling that was perhaps

23    relevant is that it noted this Court could perhaps issue an

24    indicative ruling if it wished to modify the previous

25    injunction.
```

1          Given the timing, we do not think that is the best

2     approach.  As the rules go into effect on Monday, the

3     indicative ruling takes some time, has to go back to the Court

4     of Appeals, come back here, and we would prefer just a new

5     injunction which is what we moved for.

6          THE COURT:  I will be issuing a ruling.

7          I also note that the Honorable Judge Krause

8     indicated that she trusts that I will resolve Pennsylvania's

9     second motion for a preliminary injunction expeditiously and I

10    intend to do that.

11         MR. FISCHER:  Yes, thank you very much, Your Honor.

12         We're here, as the Court indicated, because we have

13    filed a new injunction motion to challenge the Final Rules.

14         Approximately one year ago, this Court entered an

15    injunction blocking the Interim Final Rules, the IFRs in this

16    case, on the ground that they violated both the procedural

17    aspects of the APA and the substantive aspects of the APA and,

18    in particular, that they were inconsistent with the Women's

19    Health Amendment of the Affordable Care Act.

20         Since that time, the Agencies have issued Final

21    Rules that comport to, in their words, finalize the IFRs, but

22    very little has changed in other respects.

23         The harm that women of Pennsylvania, New Jersey, and

24    across the country will suffer remains the same.  The

25    procedural and substantive infirmities of the Rules have not

1   been fixed.  Pennsylvania and now New Jersey's standing is

2   very real.  And for all of those reasons, we think that a

3   preliminary injunction of the Final Rules, like the one the

4   Court issued of the IFRs, is the only correct outcome of this

5   motion.

6           So I'd first like to talk about standing as well as

7   the issue of the irreparable harm that the states will suffer

8   because I think those two issues are inextricably linked in a

9   number of ways.

10          As I indicated at the beginning, not much has

11  changed since this Court's prior decision.  There are,

12  however, a few relevant facts that have changed.

13          For one thing, New Jersey has now joined

14  Pennsylvania as a plaintiff in a lawsuit.

15          The second thing, we now have the benefit of the

16  Ninth Circuit's decision involving a similar challenge to the

17  Rules which held that the states there had standing, that

18  venue was proper, that the injunction was proper, although

19  limited in scope, which I will address later on.

20          And then finally, with respect to the Final Rules,

21  the Agencies have now found that their previous estimate of

22  the number of women who will be harmed was off by a factor of

23  over 100 percent.

24          As this Court noted originally, the Agencies

25  previously estimated that 31,700 women would be at risk.  They

1    now estimate the number to be closer to 70,500.

2          Now, we think that goes to a number of issues that

3    are relevant to that case including the arbitrary nature of

4    the Rules, the failure to consider relevant background

5    information and to conduct a thorough investigation, but it

6    certainly more than anything shows that the states have

7    standing and the states will suffer irreparable injury in the

8    event these rules go into effect.

9          This Court previously found that the state has

10    standing.  I won't belabor the arguments we made before, but

11    just to briefly summarize, we assert standing under two

12    theories.

13          The first is that women in Pennsylvania and New

14    Jersey and across the country will lose employer-sponsored

15    and, in some cases, college and university-sponsored

16    contraceptive coverage as a result of these rules.  We don't

17    think there can be any real dispute about that given the

18    numbers the Defendants themselves have asserted, the numbers

19    of women they estimate will be at risk as a result.

20          Some number of those women will turn to

21    government-funded plans, whether they be Medicaid, whether

22    they be Family Planning Services Programs, or whether they be

23    Title X clinics.  They'll turn to those programs in

24    Pennsylvania, New Jersey.  And we submitted a number of

25    declarations from officials in both states outlining how those

1  plans work and the eligibility criteria and why it is

2  reasonable to expect that women who lose coverage under their

3  employer's plans will turn to the state-funded plans.

4          And then, finally, some number of women will be

5  forced to go without contraception entirely as we have argued

6  before and as our declarants, particularly, Professors Chuang

7  and Weisman, saying in declarations that for some women,

8  pregnancy is a life-threatening condition.  For many, it's

9  contraindicated.  For some, it is potentially life

10  threatening.  So for them, acts of contraception is lifesaving

11  medical care.

12          But, in addition, for the women for whom pregnancy

13  is not necessarily life threatening, there will still be an

14  increase in unintended pregnancies as a result of these Rules.

15          The majority of unintended pregnancies in this

16  country, the costs are borne by public-funded programs, and,

17  in particular, I would direct the Court to the supplemental

18  declaration we submitted with our reply brief from the

19  Guttmacher Institute which goes down state by state and lists

20  the percentage of costs associated with unintended pregnancies

21  that are borne by state-funded programs in every single state.

22  And in virtually every state, the number is higher than

23  50 percent and in many states it's as high as 80 percent.

24          So if women lose coverage as a result of the Rules,

25  which we think is the inevitable result, we will see an

1    increase in unplanned pregnancies, many of those, the cost of

2    those pregnancies will be borne by Medicaid and other

3    state-funded programs that will cause harm to the states.

4           We think on that basis, both standing and the

5    existence of irreparable injury is clear.

6           THE COURT:  Now, is it your position that if I

7    decide the issue in your favor on the direct injury theory of

8    standing, I don't have to address sovereign or parens patriae

9    standing?

10          MR. FISCHER:  That is correct, Your Honor.  And I

11   will say as the Court indicated in Your Honor's previous

12   opinion, there's this issue of special solicitude which arises

13   in Massachusetts v EPA which affects both direct standing and

14   parens patriae standing.

15          We think that direct standing in this case is very

16   clear.  We also think parens patriae standing is very clear,

17   but it's not necessary to issue the second one, to address the

18   second issue particularly in light of the special solicitude

19   that the Supreme Court has directed courts to take into

20   account in addressing state standing.

21          So with that, I will now turn to the issue of venue

22   unless the Court has questions about standing.

23          THE COURT:  No, that's fine.

24          MR. FISCHER:  On the question of venue, the Ninth

25   Circuit reached the right result.  It found that a state

1    resides everywhere throughout its borders.  That's the only

2    natural understanding of the notion of state residency.  Even

3    though it was a bit of an open question before the Ninth

4    Circuit ruled, we would submit that that is because there is

5    no other logical residency for a state other than across the

6    entirety of its borders.

7              As we noted in 2005, an Alabama court, the Northern

8    District of Alabama issued a ruling finding that common sense

9    dictates that a state resides throughout its sovereign

10   borders.

11             We think that makes sense and that because

12   Pennsylvania is the Plaintiff in this suit, it can file suit

13   in the Eastern District of Pennsylvania.

14             The Defendants argue that venue is not proper

15   because 28 U.S.C. § 1391 was subsequently amended with this

16   provision providing for entity residency for certain -- for

17   venue purposes.

18             The Ninth Circuit correctly rejected that argument,

19   finding that if you look at the legislative history, that that

20   provision was enacted to ensure that partnerships and similar

21   organizations were treated the same way as corporations.

22   Essentially, Congress wanted to correct this discrepancy that

23   some courts have found that partnerships -- that

24   unincorporated associations were treated differently.

25             There's nothing in the legislative history

1    indicating that that provision was intended to apply to the

2    states.  And, frankly, common sense and principles of

3    federalism, which we think are at play here, would dictate

4    that it doesn't, that Congress cannot tell a state where it

5    resides.  That would raise interesting constitutional

6    questions, but that, moreover, particularly without a clear

7    expression of Congressional intent, there's no reason to read

8    that statute as applying to the states.  And the Ninth

9    Circuit, as I said, reached the right result on that decision.

10             As we've also argued, venue is proper because the

11   harm for the Rules will be felt in the states.

12             There are three avenues for venue against a suit

13   involving the Federal Government:

14             One, where the Plaintiffs resides.

15             Second, where the Defendant resides.

16             And then, third, where a substantial portion of the

17   events giving rise to the cause of action have occurred.

18             Because the harm will be felt in Pennsylvania, in

19   the Eastern District specifically, venue is proper in this

20   district.

21             In addition to being proper, it's because the

22   Plaintiff, Commonwealth of Pennsylvania, resides throughout

23   its borders.

24             And, finally, I would add that if the Federal

25   Government were correct that the narrow residency definition

1   under 1391 applies to the states, presumably it would also

2   apply to the United States, as well, and the United States

3   would be a resident of this district because under 1391,

4   Defendant residency is tied to personal jurisdiction in the

5   case at issue.  Personal jurisdiction has not been challenged

6   here.  So to the extent the United States asserts personal

7   jurisdiction of this Court, it would also be proper to assert

8   a venue under 1391(e)(1)(A).

9            That's not our primary argument.  Our primary

10   argument is that the Plaintiff resides here, the Ninth Circuit

11   ruled correctly, but I think that it's worth considering that

12   if the Defendants arguably are correct, there would be this

13   anomaly where the United States would also be subject to the

14   same reasoning.

15            THE COURT:  Okay.

16            MR. FISCHER:  Your Honor, I'd also like to talk

17   about this issue of the scope of any injunction the Court

18   issues today.

19            I'm happy to do that now or to let Ms. Thomson

20   address the APA issues first if the Court has a preference.

21            THE COURT:  I think that is an argument that should

22   be at the end.

23            MR. FISCHER:  Okay.

24            THE COURT:  I think it's a very important argument,

25   but why don't we turn now to the defense to address the

1    standing and the venue argument.

2              MR. FISCHER:  Okay.  Thank you, Your Honor.

3              THE COURT:  Thank you.

4              MR. SANDBERG:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. SANDBERG:  I'll just state at the outset, and

7    then move to the specific questions the Court wanted us to

8    address, but, obviously, we think for a whole host of reasons

9    that the Court should deny the preliminary injunction in that

10   they can't establish the merits or any of the other factors

11   and I'll happily turn to the two issues the Court wanted me to

12   address.

13             As to standing, I think in the interest of brevity,

14   we're content to rest on our briefs.  We continue to assert

15   and believe all the arguments in those briefs, but --

16             THE COURT:  Why doesn't the law of the case apply

17   here?

18             MR. SANDBERG:  Well, standing --

19             THE COURT:  You're way beyond a motion for

20   reconsideration and the law of the case would generally say

21   that if I've decided the issue, absent extraordinary

22   circumstances, I shouldn't disturb that finding.

23             MR. SANDBERG:  I don't think the law of the case

24   applies to the district court's rulings.

25             I think a couple of things.

1          One, it was decided at the preliminary injunction

2     stage.  And courts ordinarily review the issues that they

3     decided at preliminary injunction because they're usually

4     decided in haste and there's much case law on that.

5          I'd say the second thing is jurisdiction is not

6     something that I think law of the case would normally apply to

7     because the Court is always obligated to reevaluate its

8     jurisdiction.  So the Court can't say, Oh, I've decided

9     jurisdiction so I don't have to look at it again.

10          THE COURT:  Okay.

11          MR. SANDBERG:  Then, as I said, we're content to

12     rest on our briefs unless Your Honor -- with regard to

13     standing unless Your Honor has more specific questions.

14          THE COURT:  No.

15          MR. SANDBERG:  With regard to venue, I'll start with

16     the residency basis that the state alleges.

17          We think that's flawed.  1391(c)(2) states that an

18     entity, which the state certainly is, is a resident where its

19     principal place of business is when it's in the Plaintiff

20     capacity.

21          We think there's no doubt that the principal place

22     of business for the State of Pennsylvania is Harrisburg.

23     That's where the Governor sits, it's where the Legislature

24     meets, it's where many of the federal agencies are

25     headquartered.  So we don't think there's any dispute about

1   that.

2         We don't think it's necessarily a matter of common

3   sense where the residency of a Plaintiff is for purposes of

4   federal venue.  The venue statutes are devised for purposes of

5   a Defendant's fairness.  So it's entirely in that vein, it's

6   entirely common sense to believe that it was limited.  It

7   would limit Plaintiffs to its principal place of business and

8   not allow them to look around the state and pick whatever

9   venue they choose.

10         The Plaintiffs also argue in their brief that

11   permitting this argument would permit us to forum shop because

12   we could selectively assert or not assert a venue objection,

13   but that argument runs against any venue limitation, any venue

14   limitation is waived.  So that would say there should be no

15   venue limitation because Defendants can always choose to waive

16   them or not waive them.

17         Clearly that's not the case.  We have venue

18   limitations and it is waivable at the Defendants' discretion

19   and that's again because the venue statute is designed for the

20   fairness to Defendants.

21         And I'd like to quickly address a couple of the

22   arguments that they've raised here that I don't believe were

23   in their brief, frankly.

24         THE COURT:  The federalism argument and the

25   1391(e)(1)(A) argument?

1          MR. SANDBERG:  Correct.

2          THE COURT:  Yes, I'd like to hear about that.

3          MR. SANDBERG:  Yes.  So my first objection would be

4    they don't raise those arguments in their brief.

5          My second would be -- certainly I think there's at

6    least the notion that the United States could not tell

7    Pennsylvania to move its capital.  As a little physical

8    matter, it couldn't say, Pennsylvania, move your capital from

9    Harrisburg to Philadelphia.  But venue is really controlled in

10   federal courts and what litigants can raise claims in what

11   federal courts.  So certainly the Federal Government can

12   control sort of its federal courts.

13         And the second thing I would say is if that

14   argument's right, then if the Federal Government can't tell

15   the Plaintiff where it resides, then Pennsylvania in a case in

16   which California is not a Plaintiff could go up to San

17   Francisco and file suit saying, We reside here because the

18   Federal Government can't tell us where we reside and, you

19   know, we have -- there is somebody from the State of

20   Pennsylvania who, you know, is out in California who is an

21   emissary to the state and they do work out of here and,

22   therefore, Pennsylvania resides in California.  That clearly

23   can't be the case so I think that argument fails.

24         As to the residency point, that the Federal

25   Government would be a resident, I would say there's a separate

1    statutory provision, 1391(e), that addresses the Federal

2    Government under the venue provision.  There is no separate

3    provision that addresses states.  And so I think for that

4    reason, I don't think it makes sense to assume that 1391(c)

5    defines necessarily where the Federal Government resides in

6    the Defendant capacity.  But, again, this is an argument that

7    was not in their briefs and so if the Court would like further

8    briefing on that after we've had a chance to more fully

9    consider it, we'd be happy to provide it.

10             THE COURT:  Okay.  Where are we going next?  Oh, I'm

11   sorry.

12             MR. RIENZI:  Briefly on standing, Your Honor?

13             THE COURT:  Yes.  Go ahead.

14             MR. RIENZI:  Thank you, Your Honor.

15             On the two issues you asked for, first, to be clear,

16   we take no position on the venue argument.  That's between the

17   two sovereigns as they fight.

18             On Article III, I would just like to make a few

19   brief points since we weren't here to argue about it last

20   year.

21             The states are trying to enlist this Court in what

22   is essentially a political fight.  It's a policy disagreement

23   between the states and the federal government about coverage

24   of contraception.

25             THE COURT:  The courts have pretty much been

1   enlisted at this point.  They've been enlisted for many years

2   so I --

3           MR. RIENZI:  Well, yes, Your Honor, but I think it's

4   quite different.

5           Here there's a pretty extraordinary claim about the

6   impact on the states that is quite different from the first

7   five or six -- the first five or six years, there was no

8   standing challenge, there was no Article III question, no one

9   doubted it because the Little Sisters and other groups were

10  being directly commanded, You must do X.

11          Here the claim is, I would say, quite different.

12  The claim is that the states have the ability to enlist an

13  Article III Court to order the Federal Government to order

14  somebody else to indirectly provide contraceptives instead of

15  either the states doing it directly or the Federal Government

16  doing it directly.  That's an odd proposition and it's one for

17  which they have not established the Article III standing that

18  they need.

19          And just a few brief points on why they don't have

20  the Article III standing that they need.

21          First, we're now 13 or 14 months into this case.

22  They still cannot find the first person or the first employer

23  who's planning to change their coverage based on this Final

24  Rule.  That actually makes a lot of sense because the

25  religious objectors who had religious objections filed

1  lawsuits before.  It's not that it's impossible that there

2  couldn't be some new religious entity that gets created or

3  something like that, but they ought to have to prove that

4  there's one.  They can't find one.

5        To the extent that there are people who work for

6  these religious employers, for the most part, those employers

7  are already protected by injunctions.  In other words, the

8  issuance of the Interim Rule or the Final Rule is not going to

9  suddenly yank away somebody's coverage that we need a

10  preliminary injunction if there were injunctions in place

11  before there were injunctions placed now.  There's no sudden

12  rush of people who are going to show up on the state rolls.

13        The way that you know that that's true is that this

14  isn't the first time there's going to be a gap like this,

15  right.  The contraceptive mandate doesn't cover -- the federal

16  contraceptive mandate doesn't cover every employer.  It covers

17  the big ones.  Those who have more than 50 employees are

18  required to provide this health care.  It doesn't cover the

19  grandfather plans.  It doesn't cover the religious employers

20  who met the Obama Administration's narrow definition of

21  religious employers.  If those types of gaps were going to

22  lead to a bunch of people showing up on the state's rolls,

23  you'd see that in the declarations that are in front of you.

24  They submitted a stack of declarations that big (indicating),

25  but what they don't say and what they can't say is that as a

1  result of the injunction, Hobby Lobby, for example, they

2  suddenly had a new rush of people showing up on the rolls as

3  the result of the grandfather provision.  If you like your

4  health plan, you can keep your health plan, right.  That was,

5  you know, the big argument about the law over the line in the

6  first place.  There's no argument that that -- even though

7  that covers millions and millions of people, no argument that

8  that landed people on the state rolls.

9           So the idea that suddenly putting into the Final

10  Rules this Religious Exemption is now -- this is the one thing

11  that's going to land people on the state rolls is farfetched

12  and the fact is they can't find a single employer, they can't

13  find a single employee.  Even if they found one of those

14  things, they'd have to then connect the dots and say that

15  those people will end up on state aid programs, that they

16  qualify for state aid programs.  If they have an unintended

17  pregnancy, even though these are people who, by supposition,

18  have full health coverage, we're supposed to assume that they

19  have full health insurance, but they're going to turn to the

20  state to finance their unintended pregnancy and their

21  childbirth.  That's a pretty out-there kind of suggestion.

22  They ought to be required to show some proof and I'd suggest

23  they've shown no proof even though they've had lots of other

24  situations where people could have been in that position.

25           THE COURT:  You talk about the Religious Exemption.

1          MR. RIENZI:  Yes.

2          THE COURT:  You have yet to refer to the Moral

3     Exemption.

4          Do your clients take any position with respect to

5     the Moral Exemption?

6          MR. RIENZI:  Very narrowly to this extent, Your

7     Honor.  If the Court were to say that the Moral Exemption is

8     valid and the Religious Exemption is invalid, then my clients

9     would show up and say, Okay, well, we also have a moral

10    objection.  It's religious and moral.

11         We're not here principally to defend the moral

12    objection.  I will say that we've had six or seven years of

13    this mandate so we have some pretty good evidence of the scope

14    of how many moral objectors there are out there.  And to my

15    knowledge, I think there are only two in the whole United

16    States.  There may be three.  And I think it's one or two

17    pro-life pregnancy centers that are nonreligious pro-life

18    centers and the March for Life.  That's it.  In other words,

19    there is no other group.

20         On the religious side, there were dozens, if not

21    more than 100, lawsuits and probably several hundred

22    Plaintiffs in those cases nationwide.  We know they're

23    religious objectors.

24         Moral objectors who aren't religious, really, really

25    narrow category we know from experience, and it's essentially

1    only openly pro-life groups.

2           So I would just say that it's presented as a very,

3    very big exemption.  I would suggest to you that all the

4    experience we have shows it's going to be extremely tiny and

5    for validly pro-life groups.

6           The last one I would make on the standing and this

7    will eventually get more to the merits and I'll talk about it

8    more later, but Mr. Fischer said not much has changed in the

9    past year.

10          One thing that's changed is there have been either

11   10 or 12 additional Final Orders from other federal judges

12   across the country telling the Government that their old rule

13   violates RFRA.

14          So after Your Honor's injunction put the IFR, you

15   know, on hold so the IFR was invalid and couldn't be enforced,

16   though the Rule that took its place, the Rule I think the

17   states are going to continue arguing for today, is the older

18   Interim Final Rules and Rules from the Obama Administration.

19          What happened --

20          THE COURT:  So lower courts have said that.  The

21   Supreme Court has not.

22          MR. RIENZI:  The Supreme Court has not, I agree.

23          THE COURT:  Is there anything before the Supreme

24   Court addressing any of those cases?

25          MR. RIENZI:  Not at present, no, Your Honor.

1          THE COURT:  Any cert petitions?  Any cert granted?

2          MR. RIENZI:  No.  There's no cert displayed because

3    we've won them all.  In other words, there's really nothing to

4    fight about.  The government -- Federal Government now admits

5    it violates RFRA.  Federal judges across the country have

6    repeatedly found that there is a substantial burden, that the

7    Government has other ways to do this.

8          And I would just suggest that the more and more

9    injunctions shows there is less and less likelihood that

10   anybody is suddenly turning to the states because of the Final

11   Rule.  If they're turning to the states, they'd be turning to

12   the states because there's grandfathering because the

13   contraceptive mandate doesn't cover everybody because there's

14   injunctions.  They don't make any claim that any of that has

15   happened.  The idea that there's somebody who slips through

16   the gap now and they are going to show up on the state rolls

17   is farfetched and I would say they have not proven it.

18         Let me stop there.  I think the rest of what I have

19   to say is more merit based.

20         So if Your Honor has no questions --

21         THE COURT:  I just need you to put a final point on

22   your point about the other cases have ruled that -- you said

23   prior Rules violate RFRA.

24         MR. RIENZI:  Yes.

25         THE COURT:  Can you describe, when you say prior

1  Rules --

2            MR. RIENZI:  Sure.

3            THE COURT:  -- there are many.

4            MR. RIENZI:  Understood, Your Honor.  I've been

5  living with the prior Rules for a very long time.

6            THE COURT:  Yes.  Just tell me which ones you're

7  talking about.

8            MR. RIENZI:  Sure.  The Rules that the IFR

9  changed -- that is the best way.

10            So the accommodation.  What was at issue in Geneva

11  College.  What was at issue in Geneva College.

12            THE COURT:  Okay, the accommodation.

13            MR. RIENZI:  The accommodation, that that set of

14  Rules was invalid, was --

15            THE COURT:  For various reasons.

16            MR. RIENZI:  All for the same reasons, really.  All

17  for the violation of RFRA.

18            THE COURT:  Okay.  No, but I mean the violation of

19  RFRA was premised on different components of what one had to

20  do under the Rules.

21            MR. RIENZI:  Yes.  I would say the Hobby Lobby era

22  of cases for the for-profit employers was one version of it

23  and the accomodation --

24            THE COURT:  And Wheaton was another and Zubik was

25  don't think about it.

1          MR. RIENZI:  Yes.  Everything I'm telling you about,

2     Your Honor, there's certainly plenty before Zubik, but when I

3     say 10 or 12 new ones, I'm talking about since your injunction

4     like a year ago, 10 or 12 new ones.  So those were all post

5     Zubik.  Essentially, there's no court in the country that

6     after the Federal Government admitted the things it admitted

7     in Zubik, there's no court in the country that has not found a

8     RFRA violation.

9          THE COURT:  All right.  Okay.

10          MR. RIENZI:  Thank you, Your Honor.

11          MR. SANDBERG:  Your Honor, I neglected in my

12     excitement to talk about residency, to discuss the substantial

13     part of the acts and omissions part of venue.

14          Could I briefly address that?

15          THE COURT:  Okay.  This is the last time you get

16     grace and favor, though.

17          MR. SANDBERG:  Okay.  Maybe I shouldn't use it now.

18     It's like a coach's challenge in football.

19          I will say that in their reply brief, the Plaintiff

20     cited a number of cases saying that where the effects are felt

21     provides a basis for a venue under the substantial part of

22     events giving rise to the claim aspect of the statute, and

23     they cite a number of cases in their reply brief, but I think

24     it's notable they don't cite any cases from this district and

25     that's because this district, the courts have repeatedly found

1   that where an effect is felt is not a sufficient basis for

2   standing under the acts and omissions part of the statute.

3           And I'm happy to provide a cite if the Court would

4   like it, but --

5           THE COURT:  Okay, thank you.

6           MR. SANDBERG:  -- that's my moment for grace.

7           THE COURT:  Okay.  So what are we moving to now?

8           MR. FISCHER:  Your Honor, Ms. Thomson is going to

9   address the APA violations.

10          THE COURT:  The APA violations?

11          MR. FISCHER:  Yes.

12          THE COURT:  And you're starting with process and

13  moving to substance, is that -- or what are we doing?

14          MS. THOMSON:  Good morning, Your Honor.  I'm happy

15  to go in whatever order you prefer.  I was going to start with

16  the procedural violations and then turn to the substantive

17  violations.

18          THE COURT:  Let's do that.

19          MS. THOMSON:  Great.

20          So we believe that there are many reasons why the

21  Final Exemption Rules are unlawful and should be enjoined.

22  We're going to focus in this oral argument and we focused in

23  our motion on the APA violation, but we also retain our other

24  claims as well.

25          First of all, the Final Exemption Rule violates the

1   APA's procedural requirements because they were promulgated to

2   finalize IFRs that Your Honor previously found to violate the

3   APA.  You previously held the Agency has lacked authority to

4   issue -- to bypass the APA's notice and comment requirements.

5   They were not authorized under the APA to do so, HIPPA did not

6   provide them express or implied authority, and they lacked

7   good cause.

8          Now, the APA requires in almost all circumstances

9   for Agencies to put forward proposals to the public for

10  comments, not final decisions, and this is -- and the only

11  narrow exceptions that allow an Agency to go around it are the

12  ones I just mentioned, either express statutory authority or

13  good cause, which this Court has already found the Agencies

14  lacked to issue the IFRs.

15         THE COURT:  Let me just sort of set the stage

16  briefly here.  I just want to clear away some brush.

17         Your argument is that the Agencies failed to respond

18  to significant comments adequately, correct?

19         MS. THOMSON:  That's our second procedural argument,

20  Your Honor.

21         THE COURT:  Okay.

22         MS. THOMSON:  We raised two procedural arguments.

23         THE COURT:  But there's no challenge to the notice

24  or any other -- or to the actual notice itself?

25         MS. THOMSON:  We would argue we think that the IFRs

1    were issued without regard to notice and comment and that is

2    the law of the case as Your Honor held previously.

3          We're not challenging the specific notice aspect as

4    it relates to the comment.  What we do believe, though, is

5    that the Final Rules were functionally issued in violation of

6    the APA because they did not take notice and comment as the

7    APA requires.  Because what they put forward to the public was

8    a Final Decision for comment, not a proposal for comment.

9          So as you had previously held or as you recognized

10   in your prior opinion, the reason why the APA requires

11   Agencies to put forward proposals is because participants are

12   less likely to influence Agencies' thinking later in the

13   decision-making process.

14         So the APA requires Agencies to have an open mind,

15   they must put forward their thinking, take public comment, and

16   then issue a Final Decision.

17         But what happened here is the Agencies took public

18   comment on a Final Decision.  As a result, the public,

19   including the Commonwealth, approached the Agencies hat in

20   hand and basically asked them to reconsider something that

21   they had already decided.

22         And I'd note that also during that time, the

23   Agencies were actually litigating in defense of the IFRs.  So

24   they particularly lacked the open mind that the APA requires

25   when considering public comments.

```
 1          Now, we think that there are several points of

 2   authority that support the unlawfulness of the Final Rules.

 3   Particularly, the Third Circuit case, NRDC v. EPA, in which

 4   the Third Circuit functionally found that Final Rules that

 5   were issued after unlawfully-issued -- not Interim Final

 6   Rules, but an order issued in the absence of notice and

 7   comment did not cure that violation.  And the remedy that the

 8   Third Circuit ordered in NRDC v. EPA wasn't -- required that

 9   the Final Rule was invalidated.  And we think the same

10   circumstance of NRDC v. EPA also applies here.

11          Here the Agencies issued a Final Decision, took

12   public comment on that Final Decision, and then issued a

13   second Final Decision.  And that second Final Decision, which

14   we are challenging here, is still procedurally invalid under

15   the APA.

16          And, in fact, as the Third Circuit recognized in

17   NRDC v. EPA, this actually speaks to the function of what the

18   APA is supposed to do.  A contrary holding here would allow

19   any Agency to issue a Final Rule in every case, take comment

20   on that Final Rule, and then -- or on whether that action

21   should continue and then issue a second Final Rule that cures

22   the process because they have taken public comment.

23          As you recognized a year ago in your prior opinion,

24   permitting post issuance commentary carte blanche would simply

25   write the notice and comment requirements out of the APA and
```

1   that is what we are concerned about here.  So, for that

2   reason, we believe that the Final Rules are procedurally

3   improper, first, because they did not take notice and comment

4   as required by the APA.

5          We also have, as Your Honor mentioned, a second

6   procedural claim which has to do with the adequacy of their

7   consideration of public comment.

8          Now, the APA required Agencies to respond to

9   significant comments, to consider comments are all vital

10  questions of cogent materiality, to remain open-minded, and

11  engage with the substantive responses.

12         We just got the administrative record last night,

13  but we still think that there are several things on the face

14  of the Final Rules themselves that evidence the failure to

15  comply with the APA requirement.

16         Amongst other things, the Commonwealth in its

17  comments that it submitted discussed, along with many other

18  commentators, how pregnancy is contraindicated and, in fact,

19  can be fatal for some women and the Final Rules failed to at

20  all address this point.

21         More broadly, they -- the number of commentators,

22  including the Commonwealth and others, discussed how the Final

23  Rules would have a negative impact on women, whether women

24  would lose access to contraceptive coverage, and instead the

25  Final -- instead of actually engaging with the loss that women

1    will have -- that some women, at least 70,000, if not more,

2    certainly more -- they simply either minimize it by saying

3    that those women constitute simply .01 percent of the

4    nation's population or they say those women aren't actually

5    using anything.  There's actually no burden on them at all.

6    It's really about relieving a burden on employers.

7            So that to us demonstrates a failure to really

8    engage with the substance of what will happen if these women

9    lose access to contraception.

10           So now those are our two procedural points.  Unless

11   Your Honor has any more questions, I'll move on to the

12   substantive.

13           To Your Honor's substantive point, first and

14   foremost, the Final Exemption Rules are unlawful because they

15   violate the Women's Health Amendment of the Affordable Care

16   Act.

17           As Your Honor ruled a year ago, the ACA contains no

18   statutory authority allowing the Agencies to create sweeping

19   exemptions to the requirements to cover preventive services.

20           THE COURT:  Okay, let me stop you right there

21   because this is puzzling me.

22           So on August the 1st, 2011, the Agencies issued an

23   IFR with respect to Religious Employer Exemptions, and then on

24   July 2nd, 2013, they issued the Final Rule.  And there was

25   litigation about those Rules.  So what you're asking me to do

1    right now is to say that there is no authority of the Agencies

2    to develop exemptions, but they've already been doing that for

3    many years and there's been a lot of litigation.  So what is

4    different about this case?  Has this issue been addressed

5    before by another court?  Has it been decided before?  You

6    know, if I write an opinion just on -- like a match to the

7    Chevron analysis and ignore everything that has gone before,

8    how does that play out in this context?

9          MS. THOMSON:  Certainly I think I have two responses

10   to that, Your Honor.

11         First, this case is not about those prior

12   exemptions.  I realize that that --

13         THE COURT:  Well, that wouldn't really help me.

14         MS. THOMSON:  Yes, I understand, but to the extent

15   that there is nothing that -- there's no order that you could

16   issue that would invalidate the prior exemptions because the

17   only thing that we are challenging are the Final Religious and

18   Moral Exemptions.

19         But more broadly we believe, as I think you found a

20   year ago, those Initial Religious Exemptions are required

21   under RFRA and so the Agencies had authority to issue those

22   exemptions from RFRA.

23         THE COURT:  And those exemptions were specifically

24   made under RFRA?  They were not made under any other

25   authority?

1          Was that a specific finding of the Agencies in

2    issuing the August 1st, 2011 IFRs and the July 2nd, 2013 Final

3    Rules?

4          MS. THOMSON:  I can't answer that question, Your

5    Honor.

6          THE COURT:  That's an important question.

7          MS. THOMSON:  Certainly.

8          THE COURT:  So I need someone to think about that

9    question and come up with the answer before we end here today.

10         MS. THOMSON:  Okay, we'll get back to you on that.

11         THE COURT:  Okay.

12         MS. THOMSON:  But as to the authority of -- I'm

13   sorry, as to -- I would say that what the Supreme Court

14   recognized in Hobby Lobby is that there are certain things

15   that the Agencies are required to do.

16         I think it's reasonable to conclude that the

17   Agencies lack a compelling or have a less-than-compelling

18   interest with regard to women who work for churches.  I

19   believe what they found in the original issuance of the

20   Final -- of those Final Religious Exemptions is that it's very

21   likely that women who work for churches and their integrated

22   auxiliaries are likely to share the religious views of their

23   employers.

24         I think that's a far cry from what we have here

25   where the exemptions extend to publicly-traded corporations

1    and so it is much less likely to think that women who work for

2    a publicly-traded corporation share the religious views of

3    their employers and I believe that informed the decision

4    making about the original Religious Exemption and differs from

5    the circumstance here and that differs in -- and that changes

6    the analysis which is always a case-specific situation.

7             I can continue with the discussion with the Women's

8    Health Amendment.

9             THE COURT:  Go ahead.

10            MS. THOMSON:  But I believe it's -- what we believe

11   is that Your Honor ruled correctly a year ago and the

12   reasoning that applied to the IFRs applies equally to the

13   Final Rules here for all the reasons that were identified

14   before that the Agencies lack authority to issue them.

15            Turning to RFRA, though, which is really, I think,

16   the crux of the Government's case here --

17            THE COURT:  Well, let me talk about the -- I'm going

18   back a little bit about the taint issue.

19            Is it your understanding that no Third Circuit case

20   has presented the question of whether the procedural defect

21   that taints the original Interim Final Rule carries over to

22   the succeeding Final Rule as squarely as this one does?

23            MS. THOMSON:  As squarely as NRDC does or as

24   squarely as --

25            THE COURT:  As this one does.  NRDC addresses it,

1    but is that the closest case or is there a closer case than

2    NRDC?

3              MS. THOMSON:  I believe NRDC is what we believe is

4    our strongest authority on this point and I do think that the

5    Third Circuit was not exactly explicit, but their remedy is

6    absolutely consistent with the continuing existence of the

7    Final Rule in that case because the Final Rule that was issued

8    after taking public comment required that some amendments

9    would go into effect at a date later in time than when they

10   were supposed to and some other amendments would be

11   continually -- or further postponed.

12             What the Third Circuit ordered was that all of the

13   amendments would go into effect as of their original March 30,

14   1981 date and that is absolutely inconsistent with the

15   continued existence of the Final Rule that the EPA issued

16   there.  So, by necessity, the Third Circuit invalidated the

17   Final Rule in that case.

18             THE COURT:  Okay.

19             MS. THOMSON:  If Your Honor has any more questions

20   about our initial argument, I can turn to RFRA.

21             THE COURT:  All right.  Actually, let's put RFRA on

22   hold for now.  Let's go over to the defense.

23             MS. THOMSON:  Absolutely.  Thank you, Your Honor.

24             THE COURT:  Mr. Sandberg.

25             MR. SANDBERG:  So I'll start with the procedural APA

1    argument.

2              The Plaintiffs here raise a challenge under 553 that

3    they lack notice and comment.  They clearly had notice.  In

4    fact, the State of Pennsylvania provided a comment.

5              They argue that that notice is somehow infirm and

6    one of the things they say is that the Agency is less likely

7    to change its mind.

8              On that score, it's not clear how the Interim Final

9    Rule here and a Notice of Proposed Rulemaking differ.

10             Now, maybe if the Interim Final Rule hadn't been

11   enjoined, you could say, well, there's sort of a bureaucratic

12   inertia and reliance is built up so the Agency's going to be

13   reluctant to walk back from that.

14             Here, of course, the Interim Final Rule was enjoined

15   nearly at the outset so there's no reason to believe that the

16   Interim Final Rule here -- for some reason, the Agency is

17   going to be any less willing to change from the Interim Final

18   Rule than it would be from a Notice of Proposed Rulemaking.

19             THE COURT:  Well, how do you respond to the point

20   that defense were fighting, that they went to the Third

21   Circuit, and so how could you fight a Rule and at the same

22   time remain open-minded?

23             MR. SANDBERG:  Well, I will say this.  To me, that's

24   akin to an argument that you sometimes see in cases about

25   whether a Plaintiff has to exhaust administrative remedies

1    before the Federal Government.  And Plaintiffs have

2    occasionally, before they finished exhausting, have filed

3    cases in court and the Government's defended and the

4    Plaintiffs have said, See, the exhaustion was futile because

5    the Government rejected my argument.

6             And my understanding of those cases is that on the

7    whole, they've said you can't sort of invite the Federal

8    Government into court and then when it naturally defends

9    itself say, See, you had a closed mind and you were never

10   willing to consider my comment.

11            We can provide you in a subsequent briefing with

12   information about those cases, but my understanding is that

13   it's akin to that argument that you can't sort of drag the

14   Government into federal court and then say, See, you had a

15   closed mind because you defended against our federal court

16   too.  I don't think that's true.  In any case, the Rule itself

17   demonstrates that the Agency considered the comments, and this

18   gets more to the second part of their APA claim, which I'll

19   get to, to let them bleed into each other right now.  The Rule

20   itself demonstrates that they considered the comments.  They

21   didn't just say, We rejected this in federal court so we're

22   rejecting it here.  They gave their reasoned basis for

23   rejecting the comments.

24            I'd like to next turn to the NRDC case, which is

25   obviously central to the Court's inquiry into Plaintiffs'

1    argument.

2              In NRDC, there were a number of Rules that were

3    postponed, but there were four that are essentially the heart

4    of the case because they continued to be postponed.

5              In that case, the NRDC issued an Interim Final Rule

6    and it postponed these four Rules.  It then accepted comment

7    about whether these four Rules should continue to be

8    postponed.  And then it issued a Final Rule saying, Yes, we're

9    going to continue to postpone these Rules.  And what the Third

10   Circuit said was that was invalid because you were asking the

11   wrong question.  You were asking about whether the Rule should

12   continue to be postponed, whereas if you had asked the right

13   question, if you had done this properly, the right question

14   would be should these Rules be postponed at all.  So, in

15   essence, what the Agency had done is again injected reliance

16   interests into the decision in the way it otherwise wouldn't

17   have been.  If the Rules had been allowed to go into effect as

18   they appropriately should have according to the Third Circuit,

19   they would have been in effect for several years and reliance

20   interests would have been built up and that would have

21   affected the analysis.  Because they had postponed them, they

22   never -- those reliance interests never built up and so the

23   Agency was, in effect, answering a different question than it

24   would have had it done it appropriately the first time.

25              That's not the case here.  As we've noted, the

1   Interim Final Rule asked for comment.  It asked for comment on

2   the very same thing that -- what that issue in the Final Rule

3   was, whether there should be exemptions -- I'm sorry, whether

4   the Religious Exemptions should be expanded or whether there

5   should be a Moral Exemption.  And there's no mismatch of

6   reliance interests for sort of the reasons I had referred to

7   earlier in that, you know, whether this ends up being an act

8   of grace or not, the Court had enjoined it so no reliance

9   interests had built up in favor of these IFRs that then put, I

10  guess in the view through the NRDC lens, an impermissible

11  thumb on the scale.  If the Agency had sort of "done it right"

12  by issuing an NPRM and did it the way they did here, it would

13  have been the same thing.  There was notice of the proposed

14  changes, they took comments, and then they made a decision,

15  and there were no sort of improper reliance interests that had

16  built up.

17          So as to the consideration of comments, unless Your

18  Honor has any further questions about this sort of notice

19  aspect, I would say that the Rule -- to take an example, they

20  say the Rule sort of doesn't address the impact on women and

21  there's several pages from, I think, 83 Fed. Reg. 57,555 to

22  556 or beyond where they address the sort of efficacy of the

23  mandate and what effect this will have they say more generally

24  on the women who would be subject -- who might be affected by

25  the exemption.  So it's not something that wasn't addressed.

1  They clearly -- they took in the comments, they thought about

2  them, and the fact they didn't agree with the Pennsylvania

3  doesn't mean they didn't consider the comments.

4        And I think that's the strain of the argument that

5  runs through this, because they reached a different

6  conclusion, that means that they didn't adequately consider

7  the arguments, and clearly that's not what the law says.

8        Unless you have any further questions on that, I'm

9  happy to turn to the sort of substantive APA argument.

10        As to the substantive APA, I'll start with it's our

11  position that there were two bases for the enactment of the

12  extended Religious Exemption and Moral Exemption.

13        One is RFRA, which I guess we'll put off to the side

14  for now.

15        And the second is the discretion accorded to HRSA

16  through the ACA.

17        The statutory provision 42 U.S.C. § 300gg, I think

18  it's 13(a)(4), delegates, as the Supreme Court recognized in

19  Hobby Lobby, it delegates the important and sensitive task of

20  determining the scope of additional preventive care to HRSA,

21  and as we've talked about in previous briefing and the

22  hearing, it says, As provided for in guidelines supported by

23  HRSA.

24        THE COURT:  Again, I just want to clear some brush

25  away here.

1              MR. SANDBERG:  Sure.

2              THE COURT:  It's the Defendants' position that the

3    Agency's authority to promulgate the Moral Exemption Rule

4    comes solely from the APA and not from RFRA, right?

5              MR. SANDBERG:  Correct, Your Honor.

6              THE COURT:  Okay.

7              MR. SANDBERG:  So the Congress and the statute

8    delegated to HRSA to promulgate the Rule, and as Your Honor

9    noted, since 2011, the Agency has recognized a form of

10   Religious Exemption which has expanded over the years.  And

11   the initial exemptions we cited, I think it's page 3 of our

12   brief, we cite a couple of places where the -- I think it's

13   the previous Administration created the original Religious

14   Exemption and then explained it and it did not rely on RFRA.

15             THE COURT:  In any of the litigation -- I'll ask you

16   the same question I asked the Plaintiffs.  Were there any

17   challenges brought under 7062(a) or 7062(c), the APA arbitrary

18   and capricious abuse of discretion?  Were they all RFRA

19   challenges?

20             And, Mr. Rienzi, I know you know the answer to that.

21             I'm just asking everyone so I can get --

22             MR. SANDBERG:  Can I call a friend?

23             My understanding is that they were RFRA challenges,

24   but I'm not certain about that.

25             THE COURT:  Okay.

1          MR. SANDBERG:  I am certain that the Agency did not

2     rely on RFRA when it enacted these original Religious

3     Exemptions.

4          As we cited in our brief, it relied on the

5     discretion afforded to it in the ACA and we, frankly, think

6     that there's no basis to distinguish in terms of the authority

7     between the authority to create the original Religious

8     Exemption and to create -- to extend this Religious Exemption

9     and create the Moral Exemption.

10          THE COURT:  So the original, the August 1st, 2011

11     and the July 2, 2013 were not only RFRA, but also the

12     discretion, or just the discretion --

13          MR. SANDBERG:  Just the discretion.  They were not

14     RFRA.

15          THE COURT:  Okay, and there was no challenge --

16     there was no legal challenge under the APA substantive

17     provisions?

18          MR. SANDBERG:  That's the part I'm not certain

19     about.

20          THE COURT:  Okay.

21          MR. SANDBERG:  And it's entirely consistent with the

22     delegation that Congress gave the Agencies because, as the

23     Rules recite, Congress has a long history of recognizing

24     Religious and Moral Exemption in the field of health care.

25     This is something that Congress commonly does.  So it's

1    entirely consistent with the delegation from Congress to make
2    regulations pertaining to health care, for the Agency to do
3    the same thing, for the Agency to recognize, you know, the
4    sort of special place that religion and objections of
5    conscience have in our country with respect to health care and
6    do the same thing.
7              And there is, frankly, no real principal basis in
8    our view to distinguish the Religious Rule exemption
9    previously granted and this one in terms of saying, Well, that
10   one was okay, but this one is not.
11             We certainly don't think, and the state doesn't
12   raise here now, we don't think there's a First Amendment basis
13   because the original one did not turn on whether any of the
14   Churches actually objected.  So it couldn't -- there's no
15   plausible free exercise basis because it didn't turn on that
16   at all.  And when you look to RFRA, we also don't think
17   there's a basis to distinguish between the two.
18             I think Plaintiffs here primarily relied on the
19   argument that women who work for Churches and integrated
20   auxiliaries are more likely to share the sort of religious
21   tenets of their employer than women covered by this exemption.
22   But as the Agency said in this rulemaking, they don't think
23   there's evidence to support that.  The Agency looked at that
24   and concluded there isn't evidence to support that.  And, you
25   know, anecdotally, you can think of religious broadcasters or

1   other entities like that which wouldn't have fallen within the

2   old exemption, but it surely seems logical to believe that

3   many of the women who worked for a small closely-held, you

4   know, religious -- for-profit religious broadcaster are going

5   to share their employer's views.  So I don't think that's a

6   basis.

7           I don't think there's any basis on RFRA to say that

8   the compelling interest is different based on the likelihood

9   of shared beliefs.  There's no evidence of that, certainly,

10  and the Agency found quite to the contrary.

11          So that I don't have to use grace again, I'm going

12  to turn to my colleague to make sure -- I'm told I didn't

13  screw up this time.

14          THE COURT:  Mr. Rienzi, if you could answer that

15  second question I have first, that would be good.

16          MR. RIENZI:  Yes.

17          THE COURT:  The question is, one, the reliance of

18  the Agencies and, two, any challenges under the substantive

19  provisions of the APA.

20          MR. RIENZI:  Yes.  Sure.

21          So reliance of the Agency, I agree with Mr.

22  Sandberg, although I was just pulling it up on the computer

23  and it didn't get all the way there.

24          My memory of it also is that the Agencies said --

25  the Agencies did not say it would violate the free exercise

1    clause or it would violate RFRA if we applied this to churches

2    and integrated auxiliaries.  Instead, they said, Well,

3    HRSA's understanding -- the one quote I have is, "In the

4    Department's view, it is appropriate that HRSA issuing

5    guidelines takes into account the effects on the religious

6    beliefs of certain religious employers."  And that's 76 Fed.

7    Reg. 46,623.  I believe that's from the 2011 Rule.

8            THE COURT:  So they just said it's just the

9    authority that's delegated to us.  We have the authority to do

10   this.

11           MR. RIENZI:  Yes, and I think they were doing that

12   against the backdrop where HRSA had the discretion to not put

13   contraceptives in the basket at all.  I mean, the entire

14   question was left to HRSA.  So I think their view was

15   HRSA's allowed to come up with guidelines about how we're

16   going to do this, but it was completely discretionary.  It

17   still remains completely discretionary what HRSA does with

18   that.  I would point out, actually, HRSA's inclusion of

19   contraceptives was never the subject -- I mean, forget Interim

20   Final Rules.  It was never the subject of any rulemaking.

21   It's posted on a website.  That's what it was back in 2011.

22   That's what it remains today.

23           THE COURT:  And so is it your position that at any

24   point, the Agency could take contraceptive services out of the

25   definition of preventive care?

1        MR. RIENZI:  Yes, absolutely.  I mean, I think

2   that's both straight from the ACA.  That's from Hobby Lobby.

3   Your Honor's opinion from last year acknowledges that the

4   discretion was granted to HRSA to decide this.

5        They could act, for example, like Pennsylvania.

6   Pennsylvania doesn't have a contraceptive mandate for

7   employers.  The Federal Government could decide, well, we have

8   lots of other ways to do this.  We do it through Title X, we

9   do it through our exchanges where people can go get health

10  care.  There's nothing that says the world must be the way

11  that the last Administration decided to make it in 2012 or

12  2013.  They have complete discretion to do that.

13        THE COURT:  Okay, so have there been any legal

14  challenges to the Rules other than on a RFRA basis?

15        MR. RIENZI:  So, yes.  Let me tell you what I know

16  and then be clear about what I do not know.

17        THE COURT:  Yes.

18        MR. RIENZI:  So the only APA decision -- at least

19  the only APA decision from a Court of Appeals that I know of

20  is the Priest for Life decision from the D.C. Circuit in

21  2000 -- probably late 2014 or it might be late 2015, actually,

22  but in the Priest for Life decision, the D.C. Circuit said

23  that third Interim Final Rule, which is the one after the

24  Wheaton College decision of the Supreme Court, they said that

25  one was fine.  And I believe that was the subject of -- I

1    believe that would have been in the briefing before Your Honor

2    last year on the Interim Final Rule question.

3              THE COURT:  So was there an analysis of the APA

4    substantive --

5              MR. RIENZI:  Yes, but it was not -- yes.  So it was

6    not on the substantive point to my knowledge.  It was only on

7    is there good cause, is it a procedural cause?

8              THE COURT:  Right.  So as far as you're aware, there

9    has been no challenge under the substantive provisions of the

10   APA?

11             MR. RIENZI:  So I'm not aware of any rulings by

12   courts on the substantive provisions.  I will say that the

13   Complaints challenging those Rules tend to be long Complaints

14   with a dozen counts.  They were all litigated essentially as

15   RFRA free exercise cases.

16             THE COURT:  Right, but no analysis by any court on

17   that particular point?

18             MR. RIENZI:  Not that I can recall.

19             THE COURT:  Okay.  That's what I think, but I just

20   wanted to make sure.

21             MR. RIENZI:  Yes.  So far as I know, no.

22             So if I can start with the -- follow the pattern

23   you've been doing, start with the procedural issues.

24             THE COURT:  Go ahead.

25             MR. RIENZI:  Then do the substance and then save

1    RFRA for -- it sounds like the final round.

2             THE COURT:  Yes.

3             MR. RIENZI:  First, let me just make a point about

4    the procedural questions before Your Honor.  Does the IFR

5    taint everything after?  Was it good enough looking at

6    comments and so forth?

7             Just as a threshold point, and I said a version of

8    this at the status conference, but just to reiterate it, I'm

9    obviously going to take my best run at convincing you that the

10   substantive ruling Your Honor entered last year about the IFR

11   isn't right, frankly, and shouldn't be applied here.  So I'm

12   certainly going to make that argument.  But if I don't change

13   your mind, if nobody changes your mind and you come away

14   firmly convinced that what you already decided is that this is

15   substantively invalid under the APA, it can't happen, can I

16   just suggest one possible path for Your Honor is to say that

17   the procedural stuff is stuff that in some ways then would

18   almost be advisory.  In other words, if you've already reached

19   a conclusion that the states are entitled to an injunction

20   based on the substantive invalidity and if they're asking you

21   to reach out to relatively new, relatively unclear areas of

22   procedural law, one possible path for the Court is to say,

23   Well, based on the substantive invalidity that I already found

24   before and that I'm still convinced of, and I hope you're not,

25   but if you are, that that would be a ground to not reach out

1    and do the procedural stuff.

2              THE COURT:  You've never been subject to the Third

3    Circuit's searing analysis of one of your opinions, obviously.

4              MR. RIENZI:  I have not, Your Honor.

5              THE COURT:  Okay.

6              MR. RIENZI:  On the procedural claims, first, just a

7    note about terminology in the briefs.  The states repeatedly

8    talk about post promulgation notice and comment and they cite

9    some cases that talk about post promulgation.

10             I'll just point out, I think that's a confusing term

11   in this context because if you look at the cases, what I think

12   the cases are saying, and NRDC versus EPA, I agree, is sort of

13   the outlier of the bunch, but, generally speaking, I think

14   what the cases the state cites are saying is that the post IFR

15   notice and comment doesn't make the IFR okay.  In other words,

16   that the comment after the fact doesn't make the old thing

17   okay.  That's what I think when courts are talking about the

18   post promulgation is not good enough, I think they're talking

19   about it's not good enough to revive the old IFR.

20             Here it's a different question because what we're

21   talking about is a comment that was after the IFR, but is

22   before the Final Rule, right?

23             So if we're looking at the Final Rule, this is not

24   post promulgation notice and comment.  It's notice and comment

25   that came before a Final Rule.

1        As to the argument about how the Court should think

2   about that, I would suggest that, and you raised this a little

3   bit, if you go back and look at the transcript of everything

4   the state argued about why this Final Rule is invalid, it

5   would also invalidate the contraceptive mandate and the

6   accommodation.  In other words, all of the analysis is the

7   same.  You had IFRs.  Those went into effect right away.  They

8   were challenged in court.  The Government took comments after

9   the IFRs and then said, Yes, we finalized the IFR.  The Rule

10  was still effective immediately.  The Government was still

11  litigating it.  We, the Little Sisters, my clients, were

12  showing up hat in hand saying, Hey, guys, you issued this

13  Rule, but it's wrong.  You should do something different.

14        So if that's really the Rule of Law, and I don't

15  think it is, but if that were really the Rule of Law, I don't

16  see how as the Court sitting in equity you could possibly

17  enter a ruling that says, Well, the new Rule that did that is

18  invalid and, therefore, Federal Government, I order you to

19  operate under the old Rule that came into effect by the exact

20  same process.  If that process is no good, then the whole

21  thing is no good and then we've got to go back to start.  But

22  it can't possibly be the case that when you're putting in a

23  contraceptive mandate, you can have IFR comment and finalizing

24  and, Hey, that's fine, but when you want to tweak it and

25  create a Religious Exemption to it, now that process is no

1   good so we're going to enforce it.

2           THE COURT:  Well, but the court is a court of

3   limited jurisdiction.  We deal with cases that are presented

4   to us.  So if no one was presented with the earlier case --

5           MR. RIENZI:  Well, I mean, I'm presenting it to you

6   now, Your Honor.  You're a court of equity and they're asking

7   you to enforce that Rule.

8           THE COURT:  Right, you're presenting an argument.

9   The issue of the validity of the earlier IFR is not in front

10  of me or whether the contraceptive mandate should be in or out

11  should be included in the definition of preventive services,

12  that's not in front of me, and I think that it has not been

13  challenged in this litigation.

14          I understand your clients take a different position,

15  but just maybe give me a guess from all the parties, that is

16  not at issue in this litigation?

17          MR. RIENZI:  I'll just say no to the extent I'm

18  being asked -- and I'm happy to explain why I think it is at

19  issue.

20          THE COURT:  Okay.  Yes.  Okay.

21          MR. RIENZI:  I don't want to interrupt your poll.

22          MR. FISCHER:  Yes, from the Commonwealth.

23          THE COURT:  Right.

24          MR. SANDBERG:  Just to be clear, the question is

25  whether the previous Rules not in the Complaint are at issue

1    in this case?

2              THE COURT:  Correct.

3              MR. SANDBERG:  Yes, our position is you'd be

4    correct, those Rules are not at issue.

5              THE COURT:  They're not at issue in this case, okay.

6              So, Mr. Rienzi, you're arguing that they are and I

7    understand why.  I mean, if you wanted to give me a legal

8    theory as to why --

9              MR. RIENZI:  Sure.

10             THE COURT:  -- an Intervenor can assert its view of

11   what the Complaint is on the Plaintiff and the Defendant, I'm

12   happy to listen.

13             MR. RIENZI:  Sure, and I don't think I'm actually

14   asserting my view of what the Complaint is.

15             The Complaint asks you to reinstate a set of Rules.

16   If you don't reinstate the old set of Rules, right, if you

17   don't reinstate the old set of Rules, they don't get the

18   relief that they want.

19             The only way they get the relief that they want is

20   if you reinstate Rules that were superseded by the IFR and now

21   the Final Rules.

22             So they're asking you to enter an injunction that

23   makes the Federal Government operate by a set of Rules.  I'm

24   saying that the set of Rules that they're asking you to tell

25   the Federal Government to follow is subject to all the same

1    criticisms that they're making to get you to issue that

2    ruling.

3            THE COURT:  Well, I am under the impression they are

4    not asking me to issue a mandatory injunction, they're asking

5    me to issue a protective injunction.  So you're reading it

6    entirely different than I am.  They're saying, Stop these

7    Rules.  As I understand it, they're not saying, Reimpose these

8    Rules, they're just saying, Stop these Rules.

9            MR. RIENZI:  So at least as I understand it, I don't

10   think they could possibly get the relief that they're telling

11   you is irreparable, the stuff that they need done.  I don't

12   think that could happen unless your order to the Federal

13   Government reinstated those Rules.

14           So I think you're sitting in equity, you're being

15   asked to issue an injunction.  I don't see how you can write

16   an opinion that says, IFR Final Rules, no good, therefore, I'm

17   going to reinstate a set of Rules as IFR by filing my Final

18   Rules.  I think -- I'm not sure how that works.

19           Ultimately, I would say the state's problems -- you

20   know, they say the Federal Government didn't consider the

21   comments and, again, I think the answer is the Federal

22   Government obviously considered them.  They came to a

23   different conclusion than Pennsylvania in this litigation.

24   I'd say they came to a more pro-contraceptive conclusion than

25   Pennsylvania in terms of their own policies.  Again, the

1   Federal Government chose to keep in place a contraceptive
2   mandate as to 99 percent of the employers in the country.
3   They could have said, Oh, the heck with it, no contraceptive
4   mandate at all.  They didn't.  They kept the contraceptive
5   mandate in place for 99-plus percent of employers.  They did
6   create a Religious Exemption that matches a bunch of
7   injunctions that they're subject to, but the idea that that's
8   not permissible consideration out of the mouths of states, you
9   know, New Jersey does have a contraceptive mandate, but they
10  also have a Religious Exemption in their contraceptive
11  mandate.  So the idea that the Plaintiffs can argue to you
12  that that sort of consideration, it could never possibly be
13  right, when they're doing it themselves strikes me as tough to
14  swallow.
15          The states also can't, on their procedural argument,
16  they can't explain how any error that they're complaining
17  about isn't harmless.
18          There's two versions of their argument, one of which
19  I'll suggest I should probably save.
20          But, first, they don't explain how the world would
21  really be different if the Government had issued a Notice of
22  Proposed Rulemaking.
23          In other words, the Federal Government has received
24  like a million comments by now on what should the scope of
25  Religious Employer Exemption be.  Right, it is maybe slightly

1   off, maybe 8 or 900,000, but it is a lot of comments over the

2   past six or seven years.  They've litigated the thing coast to

3   coast multiple times to the Supreme Court and never winning

4   their argument at the Supreme Court.  The idea that something

5   would be different if they slapped the title Notice of

6   Proposed Rulemaking instead of IFR on the top of it doesn't

7   make any sense.  They commented, everybody else commented,

8   there were comments on things the Agencies have heard a long

9   time.  This is probably one of the most commented-on issues

10  any of us will ever see.

11          The argument that they are presenting that the IFR

12  taints everything that comes after would invalidate -- you

13  know, would be a very far-reaching argument.  So they say you

14  can look at NRDC versus EPA and you can sort of assume that

15  what they must have been doing is killing the Final Rule.  And

16  I would just say if you read it that way, then you have to

17  deal with the SORNA cases, too, Reynolds and the cases that

18  come after it, the sex offender registration cases, Reynolds

19  and the other SORNA cases that come after it, where in

20  Reynolds, the Third Circuit says, Well, the Interim Final

21  Rule, that was invalid.  But then there's a bunch of cases

22  after Reynolds in which the Third Circuit upholds SORNA

23  convictions based on the Final Rule that issues after the

24  Interim Final Rule.  And so that's the SORNA litigation, the

25  Reynolds case that they cite, and the ones that follow it.

 1   It's also the contraceptive mandate that they are asking to
 2   have reinstated here, right?  It was the same thing.  It was
 3   Interim Final Rules finalized later.  It's also, according to
 4   the Government Accountability Office, about 35 percent of the
 5   major regulations in the Code of Federal Regulations.  In
 6   other words, Agencies do this quite regularly where they do
 7   Interim Final Rule, take comments, and then they finalize it.
 8   If the Court were to issue a ruling that says that is invalid,
 9   that would end up being a pretty far-reaching ruling.  They
10   don't have anything directly that says that and that's a
11   little bit odd given how often the Federal Government does it.
12   I would suggest that that means it's probably not the Rule.
13   And, again, I don't see how we could get to a ruling that says
14   it's the Rule for parts of the contraceptive mandate, but not
15   other parts.
16          On the NRDC case, if I could just suggest two
17   distinctions from that case, two reasons why I don't think it
18   applies here.  I think that was a pretty unique specific
19   situation the Court was dealing with in that case.
20          First, the time lag, and Mr. Sandberg got to this a
21   little bit, but the time lag there was really different.  In
22   this case, Your Honor enjoined the IFRs I think probably
23   before they affected a single person's insurance plan.  You
24   did it very promptly when the states came in and asked -- you
25   did it before January 1st which is when the plan years for

1   most people turn over.  And so that interim, the effectiveness

2   of that was taken away immediately.

3          In the NRDC case, the Rules were supposed to take

4   effect in January of 1981.  The Interim Final Rule on that

5   wasn't invalidated until 18 months later in July 1982 and they

6   didn't even ask for comments until like October 1981.  So

7   there was a much longer period of time in which the effect of

8   these things were felt and in which they were built up and

9   ongoing in a way that's not the case here because of Your

10  Honor's swift action the last time.

11         But two other differences that the Court in the NRDC

12  case talked about that I think matter here.

13         One is in NRDC versus EPA, it was a complete

14  reversal.  It was a complete reversal of policy.  In other

15  words, the Rule's going to go into effect and they pulled it

16  out entirely, right, 100 percent we took away the old policy.

17         Here I would suggest that's not the case at all,

18  right?  The main piece of the policy, Will contraceptive

19  coverage be required for most employers covered by this

20  mandate?  Yes.  They kept it in place.  They kept 99 point

21  something percent of this policy in place.  They did create

22  Religious Exemption, but it's nothing like the wholesale

23  taking out of another Rule that happened in NRDC and the Third

24  Circuit said that that was a reason for them to be extra --

25  I'm paraphrasing -- extra concerned or stare extra closely at

1    it because it's such a stark reversal.

2            Here I would suggest it's not a stark reversal on

3    the main policy.  The main policy, they could have said no

4    contraceptive mandate, but they haven't said that.  They kept

5    99 percent of it.  They got the small Religious Exemption.

6            The second thing at issue in the NRDC case, there

7    was a mismatch between how the Rule got in and how the Rule

8    got out.  In the NRDC case, you had a Rule that was fully

9    subject to notice and comment rulemaking and that they had

10   issued a Final Rule and it was almost at the effective date,

11   and then they killed a sort of full Notice and Comment Final

12   Rule with a quick Interim Final Rule.  Right, so there was a

13   mismatch.  You have something that really had been through the

14   process yanked out by something sort of quick and slapped at

15   you.

16           In this case, you have a contraceptive mandate that

17   was built on IFR after IFR after IFR, right, so you don't

18   really have that mismatch.  That is the process by which the

19   thing came to be.  And so the idea that the process by which

20   the thing came to be is insufficient to change it a little

21   bit, I don't think makes a lot of sense, and I think makes it

22   quite different from NRDC versus EPA.

23           And, again, I would just suggest that if the

24   Government's argument is right and the SORNA cases are wrong,

25   the contraceptive mandate itself is invalid.  And even if Your

1    Honor doesn't think it's before the Court in this case, I

2    suppose we or somebody else will go bring that case here or

3    elsewhere, but it's quite an extraordinary claim by people

4    arguing that they want the federal contraceptive mandate to be

5    in place to say that you should issue a ruling that legally

6    would say that that one doesn't work either.

7            Let me pause there before moving on to the

8    substance.  Is there anything else Your Honor would like me to

9    address on the procedure?

10           THE COURT:  Go ahead.

11           MR. RIENZI:  Okay, on the substance and, again, I

12   think I understood the Court to be saying you want us to leave

13   the RFRA arguments for the end?  Okay.

14           The states have -- I'm sorry, the Federal Government

15   has discretion under the ACA.  I read you that quote from the

16   Obama Administration before.  2011, '12, '13, '14.  This is

17   not like a new Trump Administration invention.  This is the

18   way people in the Agency on, you know, both pretty far sides

19   of the spectrum interpreting this have all understood that

20   they had some discretion to do that.  They did not take the

21   view that the state said here that it was required by RFRA.

22   They didn't take the view that it was required by the free

23   exercise clause.  They just said, Hey, Congress gave us

24   discretion.  They said, We get to come up with the guidelines.

25   When we're doing that, we're going to take into account

1    important things.  One of them is the impact on religions and

2    we're going to do that.

3         So that was sort of a unified position from Obama to

4    Trump that they had the authority to do that.

5         The idea that it would be required by something

6    else, Your Honor in your opinion last year, you said that you

7    thought it was required by the free exercise clause, that that

8    was what justified the original Religious Employer Exemption

9    that was part of the contraceptive mandate or the claim that

10   it's required by RFRA.

11        The problem with all those arguments -- I actually,

12   to be clear, I actually agree that RFRA requires these things.

13   Free exercise clause requires them not just for those

14   employers, for my clients as well.  I think they require them

15   for everybody.  But what you can't get to is a view of RFRA

16   and the free exercise clause that require them for integrated

17   auxiliaries and houses of worship, but not for the Little

18   Sisters and other religious employers who weren't covered and

19   here's why.

20        The argument that the free exercise clause requires

21   it is based on the idea there's some burden that the

22   Government is lifting.  Well, if it were really true that the

23   accommodation is no burden at all, there would be nothing to

24   lift, right, and if it were really true that the accommodation

25   is no substantial burden at all, I don't understand how the

1    state could have the view that RFRA requires exempting

2    somebody else from it.

3            In other words, if the accommodation's no big deal,

4    you just fill out a form, Sister, hand it to somebody else,

5    and it's not your plan, right -- I don't think that's

6    accurate, but that's how it was proposed for a long time.  If

7    that's not a burden, well, it's not a burden on anybody.

8    Anybody else could do the same thing.  If you can't do that,

9    that's a burden for some, but not for others, depending on how

10   you're financed or how you're organized.  That doesn't make

11   sense.

12           The Obama Administration's argument from the

13   beginning I think is clearly right.  I think -- there's more I

14   would say, but it's clearly right that they had the

15   discretion.  And the Agency here is dealing with a situation

16   -- I'll table most of this for the RFRA argument -- they're

17   dealing with a situation where they've got a discretionary

18   thing which is, Are we going to include contraceptives, on one

19   hand, and a mandatory thing, RFRA, on the other hand.  And the

20   question that they have to wrestle with in this Rule is how am

21   I going to balance those two things?  And the current

22   Administration has come up with what they think is the right

23   balance, which is, I'll require contraceptives for almost

24   everybody, but for people who have a valid RFRA claim, I'm not

25   going to do that, right.  So their view is that instead of

1    losing these cases court by court and case by case all across

2    the country, we're just going to say people who have got a

3    religious objection don't have to do that.

4         I would say in terms of, Is that a valid way to

5    respond to comments -- I think absolutely.  I think that

6    actually they had to do it, right?  So I think this is the

7    other reason, it's procedurally valid.

8         Whatever you might think of any of these procedural

9    arguments, at the end of the analysis, the answer I think is

10   that RFRA required this.  And since RFRA required it, you'd

11   have whatever process you want.

12        THE COURT:  Don't go into RFRA.

13        MR. RIENZI:  Yes.  My point is just to --

14        THE COURT:  I understand.

15        MR. RIENZI:  -- draw the connection that --

16        THE COURT:  I understand.

17        MR. RIENZI:  -- the substantive argument bolsters

18   the procedural one at hand.

19        Thank you, Your Honor.

20        THE COURT:  Okay, quick response from Plaintiff.

21        MS. THOMSON:  Okay, Your Honor, I'll just first --

22   we've done some preliminary research into looking into the

23   2011 and 2013 in response to your question.

24        My understanding is in 2013, they did a search that

25   was not based on RFRA.  In 2011, it appears to be as the

1   intervenors.

2          We would need -- if you would like a greater

3   discussion of this, we'd request the opportunity to file a

4   short supplemental brief that discusses it.  However, I do not

5   think that it is necessary to your decision or really

6   necessary to the holding to the RFRA resolution in this case

7   for several reasons.

8          One, as I stated before, we're not challenging the

9   prior Religious Exemption or the accommodation.  We are

10  challenging the current Moral and Religious Exemption.  So

11  nothing that Your Honor can do can affect -- can order those

12  to be invalidated in any way.  That's for a future lawsuit, if

13  one at all.

14         Second, Agencies assert authority all the time in

15  the things that they issue, and as you've observed and as

16  appears to be the case, no one has ever challenged a prior

17  Religious Exemption for an excess -- for being outside of the

18  Agency's statutory authority.  So whether or not they claimed

19  that authority in the regulations is not necessarily

20  indicative of whether they actually had the authority because

21  no Court has ruled that they had or did not have the

22  authority.

23         However, it seems clear from the Supreme Court in

24  Hobby Lobby that RFRA does require the Agencies to take steps

25  where -- because the mandate imposed a substantial burden on

1    certain religious objectors, to seek out the least restrictive

2    means of satisfying a compelling Government interest.

3           For most people, the Government decided that was the

4    accommodation.  For churches and their integrated auxiliaries,

5    the exemption seemed to be the choice that they made.

6    However, we're not here to defend those choices because we're

7    here to challenge the decision made by the current

8    Administration to issue the Religious and Moral Exemption.

9           So although we're happy to brief those things --

10          THE COURT:  No, I don't need any briefing on it.

11          MS. THOMSON:  Okay.

12          THE COURT:  Because I agree, it's the elephant in

13   the room and I just have to understand it.

14          MS. THOMSON:  Absolutely.

15          Second, so speaking to the numerous points made by

16   the defense intervenors about the NRDC opinion, I would first

17   note that we are not asserting that all IFRs are per se

18   invalid.  We're saying that IFRs that are issued that do

19   not -- either in the absence of statutory authority or the

20   absence of good cause would therefore impermissibly taint a

21   Final Rule.  However, impermissibly tainting a Final Rule is

22   also one way of looking at it.  We're challenging the Final

23   Rules from the point that the Final Rules fail to go through

24   the notice and comment procedure required by the APA, which is

25   that an Agency put forward a proposal, accept comment, and

1    then issue a Final Rule.  So it's not simply that they took

2    comment.  What they take comment on has to be something about

3    which the Agency has an open mind because it's a proposed

4    change.

5              And I would note here, as you observed a year ago,

6    the Final Rules like the IFRs are a sweeping change compared

7    to what had existed previously.  There had -- yes, there were

8    hundreds of thousands of comments on Religious Exemptions

9    before, but nowhere had the Federal Defendants previously

10   indicated that they planned to exempt for-profit

11   publicly-traded companies, for example, or that they planned

12   to create a Moral Exemption.  They instead dropped that in

13   October 2017 without a chance for comment and those went into

14   effect immediately.  And those Interim Final Rules were in

15   effect for about three months until you enjoined them.  That

16   was for almost the entire duration of the comment period.  The

17   entire time the public approached the Agencies to issue

18   comment, the Rules were in effect and that's really what the

19   Third Circuit in NRDC was concerned about.  They were

20   concerned about writing the notice of comment provision out of

21   the APA because the APA envisioned giving the public an

22   opportunity to approach an Agency that hasn't yet made up its

23   mind.  And here by issuing an IFR and not taking comment, the

24   public was deprived of that opportunity and the Final Rules,

25   by finalizing that, did not follow the process.

1          I think that actually -- unless you have any further

2     questions.

3          THE COURT:  No, I'm fine.

4          Okay, so what we're going to do, we've been going

5     for about an hour and 20 minutes.  We're going to take a

6     ten-minute break.

7          When we come back, we'll talk about RFRA, we'll talk

8     about the remedy, the national injunction, the scope of the

9     injunction, and if you want to talk about irreparable harm,

10    balance of the equities and public interest, that's fine, but

11    my focus is going to be on RFRA and the scope of the

12    injunction.

13         (After recess:)

14         THE DEPUTY CLERK:  All rise.

15         THE COURT:  Have a seat.  Okay, let's move to RFRA.

16         Before we get there, I have just one

17    clearing-the-brush question.

18         Ms. Thomson, in Count Two of your Complaint, you

19    allege the Rules violate Title VII of the Civil Rights Act and

20    the Pregnancy Discrimination Act.  In your briefing, though,

21    you argue, "Because the Rule authorized illegal conduct,

22    meaning conduct that violates Title VII and the PDA, the Rules

23    are not in accordance with law and they must be held unlawful

24    and set aside," and then you cite the APA.

25         Is Count Two then an independent cause of action

1    under Title VII or the PDA or an alternative argument as to

2    why the Rule violates the APA, or both?

3              MR. FISCHER:  Your Honor, if I may respond to that?

4              THE COURT:  Yes.

5              MR. FISCHER:  It is an independent count.  We have

6    today focused on other counts, the two primary counts being

7    our procedural APA count and then our substantive count as it

8    relates to authority to issue the injunction -- I'm sorry, the

9    authority to issue the exception as well as to the arbitrary

10   nature of some of the changes.

11             We have not focused on that.  We did include it in

12   our earlier briefing.  And, again, as we indicated at the

13   prior hearing, we don't believe it's necessary to get into the

14   constitutional or, in that case, the Title VII claim if the

15   Court focuses on the two primary --

16             THE COURT:  Okay, but you do in your briefing

17   suggest that it adds weight to your argument.

18             MR. FISCHER:  Yes.  Absolutely.

19             THE COURT:  Okay.  Okay.

20             MR. FISCHER:  Thank you, Your Honor.

21             THE COURT:  Go ahead.

22             I notice my sign was not up so you probably had no

23   idea who you were speaking to.

24             Go ahead.

25             MS. THOMSON:  Thank you, Your Honor.

1          So as the Government has admitted, only the

2     Religious Exemption Rule can be justified by RFRA.  However,

3     RFRA provides no support because the Final Religious Rule is

4     neither required nor authorized by RFRA.

5          Now, in Hobby Lobby, the Supreme Court held that the

6     contraceptive mandate violates RFRA only because it is not the

7     least -- it was not the least restrictive means of

8     accomplishing a compelling Government interest and Justice

9     Alito in that opinion looked to the accommodation as a lesser

10    restrictive means that satisfied the compelling Government

11    interest, but also would have not been as burdensome on the

12    religious objections of the Plaintiffs in that case.

13         Now, the Agencies up until the issuance of the IFRs

14    had consistently concluded that the accommodation did not

15    impose a substantial burden at all on religious practice.

16         Eight out of nine Courts of Appeal had agreed with

17    them, including the Third Circuit in Geneva College, and

18    although that opinion was vacated, it was not vacated on the

19    merits, and the reasoning of that opinion I think is

20    persuasive as to why the accommodation, which simply requires

21    an entity to say, I am not going to provide coverage, does not

22    actually involve a burden, much less a substantial burden.

23         However, in issuing the Final Rule, the Agencies

24    reversed their position and determined -- and concluded that

25    the accommodation does now pose a substantial burden under

1   RFRA.

2          Now, we have agreed Agencies are allowed to change

3   their policy position, however, the Supreme Court has held in

4   Navarro and Fox Television Stations that the APA requires the

5   Agency to give good reason to do so, and when there are

6   reliance issues engendered by the prior policy position, the

7   Agency must give an even more reasoned explanation.

8          Here, pursuant to the Final Rules, more than half a

9   million women were working for entities that used the

10   accommodation in 2017.  That is a significant reliance

11   interest.  So they're required to provide not simply an

12   explanation, but a more reasoned one.  However, in the Final

13   Rules, they provide no explanation at all.  They simply say

14   that because some people have a sincerely-held religious

15   objection to the accommodation, that is per se a substantial

16   burden.  However, this -- the Third Circuit has held in Geneva

17   College, but also in Real Alternatives, which is still binding

18   on this Court, that whether or not something is a substantial

19   burden is a question of law.  And in Geneva College, it spoke

20   whether or not it's a burden and whether that burden is

21   substantial.  These are both questions of law.

22          And while the Court must defer to the sincerity of

23   someone, of an entity to religious beliefs, they do not have

24   to defer to that entity's claims that the burden exists or is

25   substantial.  That requires an objective analysis of the

1    nature of the burden.

2        The Agencies in reversing their position made no

3    attempt to engage at all with that position to engage with the

4    analysis that Geneva College and eight of the nine other

5    Courts of Appeals had done in determining that the

6    accommodation was not a substantial burden.  And so as a

7    result, under Navarro, I think is the most on point, because

8    they reversed their position so abruptly without any

9    explanation, that invalidates the Final Rule.  They have to

10   provide something to do that.

11       However, we also believe that they reversed their

12   position -- they also reversed their position on whether or

13   not they had a compelling interest to enforce the mandate.

14   They did provide reasons, however, the reasons don't match up

15   with what it is that they reversed their position on.  They

16   say they actually haven't reversed position on whether the

17   entire mandate generally is a compelling Government interest,

18   but simply on whether they have a compelling interest in

19   enforcing the mandate against objecting entities.  However,

20   none of the reasons that they offer, that HRSA has discretion

21   or that there were prior gaps, et cetera, none of those match

22   on to why a lack of compelling interest in enforcing the

23   mandate against objecting entities and why the women who work

24   for those objecting entities, which, again, can be a

25   publicly-traded corporation or an organization that has a

1    moral objection, why those women do not deserve access to

2    federally-mandated preventive health care or should not get

3    access to federally-mandated necessary preventive health care.

4    And so their failure to offer reasons on that reversal is also

5    a violation of the APA substantive requirements and also shows

6    that their invocation of RFRA generally is arbitrary and

7    capricious.  And we would note that contrary to what the

8    Intervenor said earlier, the Agencies were not faced with a

9    choice between whether to cover contraception and whether to

10   respect the religious views of objectors.

11        HRSA has included contraception in its Guidelines

12   since 2011.  They reaffirmed that in 2016.  Contraceptive

13   coverage is the law.  It is required.

14        In Zubik, the Supreme Court in Zubik recognized this

15   when they ordered the Agencies to come to a solution that both

16   tried to accommodate the religious objections of the lawyers

17   and also ensure that women had access to full and equal health

18   coverage including contraceptive care.

19        The Agencies here in issuing the moral religious

20   Final Rules have claimed RFRA, but they have done so only

21   taking -- only following one side of the Supreme

22   Court's order.  They have completely issued any opportunity to

23   try to ensure that the women who work for objecting entities,

24   who will claim the religious objection, will have any access

25   to contraceptive coverage as required by the Women's Health

1    Amendment.

2           So, for that reason, we believe that -- for those

3    reasons, we believe the Agencies' attempt to justify the

4    Religious Exemption Rule with RFRA is invalid.

5           THE COURT:  Okay.  Let me hear from the Government

6    on RFRA, and before you start, I have a question designed to

7    try to understand what the baseline for the Government's

8    position is.

9           Is it Defendants' position that RFRA is an

10   affirmative grant of authority to Agencies to promulgate

11   generally applicable regulations such as the Final Rules?

12          MR. SANDBERG:  Let me think of the best way to

13   answer that.

14          I think the best way to answer that is that RFRA is,

15   in a sense, integrated into all federal statutes.  Congress

16   had -- the way Congress enacted RFRA was that it applied

17   unless specifically exempted.

18          So you can think of RFRA as a part of every federal

19   statute that the Agencies have to comply with.  Just like when

20   they issue a Rule, they can't violate the First Amendment or

21   the Fourth Amendment or the Sixth Amendment.  It's a

22   background norm that the Agencies have to comply with.

23          It's not our position that RFRA independently gives

24   an Agency the ability to necessarily make Rules, but that in

25   making the Rules that it's authorized to do so, it has to

1    comply with RFRA, like I said, just like it has to comply with

2    the Constitution or any other sort of federal statutes that

3    there are like RFRA that may sort of be background norms, for

4    lack of a better term.

5            THE COURT:  Okay, so RFRA speaks explicitly in terms

6    of being a judicial remedy.  So given that it speaks in terms

7    of judicial remedy, I would at least on the surface read that

8    as if an entity has a concern with an Agency Rule, it would

9    seek a judicial remedy in order to change that Rule.

10           So given that reading, and I'm not suggesting that

11   that is the final reading that I will reach, it's just a

12   possible reading, if that were the reading, where is the

13   authority for regulatory bodies to issue Rules based on RFRA?

14           MR. SANDBERG:  Well, I mean, if -- like to the

15   extent that assumes the conclusion, if you're going to say

16   RFRA only allows courts to do something and doesn't allow --

17           THE COURT:  Well, I'm just looking at the language

18   of RFRA.

19           MR. SANDBERG:  Yes.

20           THE COURT:  It speaks explicitly in terms of a

21   judicial remedy.  So that would suggest that rather than it be

22   a grant of authority to the Agencies, it is a remedial statute

23   which can be taken advantage of if someone objects to a

24   particular Agency Rule.

25           MR. SANDBERG:  It certainly is that, but I guess our

1    position is it's not only that.  We don't think that

2    Agencies -- that it makes sense that Agencies should be able

3    to issue or should go around issuing regulations without

4    considering RFRA, thinking, Oh, I'll wait until someone sues

5    me under RFRA.

6              We do think that RFRA provides Agencies the

7    authority to certainly -- and requires them to take it into

8    consideration and to not impose regulations that, you know,

9    impose a substantial burden unless the other two parts of the

10   RFRA analysis are met.

11             THE COURT:  Okay.  So let's keep along this pathway.

12   If Agencies are required to take into account the RFRA rubric,

13   at some point presumably there has to be an analysis of

14   whether a RFRA violation has occurred or an analysis of how to

15   draft a particular Rule in order to avoid a RFRA violation.

16   Is that fair to say?

17             MR. SANDBERG:  Yeah, I mean it's fair to say if

18   you're going to consider RFRA, you have to consider RFRA.

19             THE COURT:  Right.  So as a court, I must take into

20   account an Agency's expertise in determining how to view a

21   particular Agency Rule.  But what expertise do any of the

22   Agencies here have on RFRA?

23             MR. SANDBERG:  Well, I mean, on that score, I don't

24   know that any Agency -- I mean, that would be an argument that

25   every Agency should go around, you know, ignoring RFRA.

 1          There may be some.  There may be some sort of small
 2   agencies, you know, designed for the point of their religious
 3   fluidity.  But on that score, there would be definitely scores
 4   of Agencies that would be, I guess, empowered or designated to
 5   go around violating RFRA.  I mean, if you think about the
 6   Constitutional backdrop, like presumably Agencies can't issue
 7   Rules that violate the Constitution.  Like are these Agencies
 8   experts in the Constitution.
 9          THE COURT:  Well, I accept that --
10          MR. SANDBERG:  That's --
11          THE COURT:  -- yes, that's a different issue.
12          MR. SANDBERG:  I don't know that it is.  I mean, the
13   Constitution, the First Amendment, raises speech issues,
14   religion issues.  I don't know that it is a different issue
15   to the extent RFRA is written in by Congress as a background
16   norm that Agencies have to consider.
17          And Agencies, of course, have many lawyers and
18   access to the Department of Justice so I don't think that it
19   makes sense to say -- especially in the realm of health care,
20   frankly, where Congress has recognized that it raises -- that
21   it repeatedly recognizes it raises religious and moral issues
22   and has created exemptions.  So I don't think it's in any way
23   anomalous to say that HHS, which is obviously charged with
24   making recommendations about vast swatches of this
25   nation's health care system, sort of lacks the necessary

1    expertise to consider those kinds of issues.

2          THE COURT:  So let's say tomorrow the EPA issued an

3    exemption to the Clean Air Act, which is based solely on RFRA,

4    because they determined that climate change is something that

5    is a God-ordained situation, and that for the Rule, they're

6    going to take into account the fact that it is God either

7    showing us a different way or punishing us for whatever we

8    have done.  Would that be appropriate?

9          MR. SANDBERG:  Well, you'd have to -- as you said,

10   if you're going to consider RFRA, you have to consider RFRA.

11         So if there were a reason to believe that there were

12   individuals whose religious beliefs had been substantially

13   burdened as a result of some government action or some

14   government program, then you would move through the next steps

15   of the analysis.

16         So, you know, I can't say in the abstract whether --

17   I can't say in the abstract the EPA can never issue a Rule

18   that, you know, creates an exemption, for lack of a better

19   term, on the basis of RFRA.

20         THE COURT:  So let me just get the terms right.

21   It's either a background norm or -- RFRA is either a

22   background norm or an affirmative grant of authority.

23         Is it -- and, well, let's put that on a continuum.

24         Let's put on one end of the continuum the background

25   norm and on the other end of the continuum affirmative grant

1    of authority.

2              Where in your view does RFRA fall?

3              MR. SANDBERG:  Well, I -- and I use background norms

4    just to the extent that I mean it's sort of woven into the

5    fabric of every statute given that Congress says it applies

6    unless it is specifically exempted by that statute.

7              And as to affirmative grant of authority, I think

8    it's an affirmative grant to the authority to the extent an

9    Agency issuing a Rule certainly can consider its obligations

10   under RFRA and what could occur under RFRA.

11             I don't take the position that it independently

12   authorizes rulemaking.

13             I mean, here the Agencies have authority to

14   implement the ACA and part of implementing the ACA was

15   devising the meaning of preventive, additional preventive

16   services.  So certainly they have the authority to promulgate

17   Rules about the meaning of additional preventive services.

18   And so our position is simply that given that they have that

19   authority to do that, it's entirely consistent with the way

20   RFRA is drafted and it's, in fact, their obligation to

21   consider the terms of RFRA and what it requires of Agencies.

22             THE COURT:  Okay.  So can the Agencies point to any

23   instance outside the Women's Health Amendment where an Agency

24   has relied on RFRA alone to issue a generally applicable

25   regulation?

1         MR. SANDBERG:  Well, again, they don't rely on RFRA

2    alone despite the hypothetical.  Again, they rely on the

3    rulemaking ability to --

4         THE COURT:  Okay, well, thank you for that friendly

5    amendment.

6         Can you think of any instance where outside this,

7    the Women's Health Amendment and the regs, where an Agency has

8    relied on RFRA at least in part to issue a generally

9    applicable regulation?

10        MR. SANDBERG:  I'm not -- but, again, two important

11   notes to that.

12        One is, as you know, the number of federal

13   regulations are copious and I'm not going to stand up here and

14   pretend to be an expert in every federal regulation that's

15   been issued.

16        And the second here is that the history of this case

17   gave them particularly good reason to do so.  You know, the

18   original exemption was issued and then the accommodation and

19   then there was years of litigation about who the accommodation

20   would apply to.  And, you know, Hobby Lobby comes down and

21   says it applies to closely held for-profit companies and then

22   there's more litigation and dispute about how that

23   accommodation should work and whether folks should have to

24   send their sort of notices directly to the Government or

25   whether they have to send it to insurers or they have to send

1    it to the Government.  So there's litigation about that.  And

2    there's more litigation about are people substantially

3    burdened by the accommodation itself, which we think they are,

4    but then there was litigation about that which resulted in the

5    Zubik case and the related cases.

6            So here there was, I mean, special reason for the

7    Agency to do that and I'm not aware of any instance -- it

8    doesn't mean it hasn't happened before and that if it hasn't

9    happened before doesn't mean it's appropriate.  I mean, I

10   think this case demonstrates why it's appropriate.

11           And just a note on the Zubik order, the Zubik order,

12   I think contrary to the suggestion of counsel on the other

13   side, did not dictate any results on the merits.  It didn't

14   say that, you know, any broader exemption was inappropriate.

15   It was a remand to try to get the -- in the hopes that the

16   parties could find an accommodation that would work for sort

17   of everyone, for lack of a better term.

18           And as this Court I'm sure knows, in January 2017,

19   the previous Administration essentially said, you know, We

20   thought about this.  We tried really hard.  We're not aware of

21   any other accommodation that's going to suit everyone's needs.

22           And so I think that goes a long way to supporting

23   our argument that RFRA authorizes what happened here.  If it

24   doesn't, you have Agencies in this untenable position where

25   they have to try to hit the exact right target and then face

1    years of litigation as they try to find that exact right

2    target.

3             I know we had a colloquy about this at the last

4    hearing I recall extensively so I won't go too much into that,

5    but that's the very reason why the RFRA authorizes argument

6    makes sense.

7             As the Court recognized in Ricci, and I remember

8    there was an extended colloquy about the applicability of

9    Ricci, but we think that the Court recognized in Ricci that

10   entities should have some leeway in determining the best way

11   out of navigating these conflicting legal obligations and they

12   would be conflicting here if the Court rejected our argument

13   that the ACA gave the authority for HRSA to create the

14   exemption just purely out of delegation and there would be

15   this conflict between what the ACA requires and, in our view,

16   what RFRA requires.  And the Court said for that framework to

17   apply, you have to have at least a strong basis in evidence to

18   believe in this case that you'd be subject to liability under

19   RFRA.

20            And we think that certainly is the case here as to

21   substantial burden.  There is one Court of Appeals certainly

22   that has found it a substantial burden, and while that opinion

23   was vacated on -- for reasons other than the merits, certainly

24   there's a reason to believe at least in those seven or eight

25   states in the Eighth Circuit the Government would face

1    liability and we think that's more than enough to say that

2    there's a strong basis or at least there would be substantial

3    burden.  We think that's more than enough reason to believe

4    that they have a strong basis to believe that they face

5    liability under RFRA.

6          And an additional fact is if you look at the

7    reasoning of Hobby Lobby, there was an argument there about

8    whether the Plaintiffs there were properly understanding the

9    religion in terms of innocent -- whether acts are innocent and

10   when they're complicit in bad behavior.  And the Court said,

11   Hey, it's not our job to draw that line to determine, you

12   know, when people are appropriately drawing the line between

13   innocent acts and acts that enmesh them, make them complicit

14   in behavior they think violates their religious tenets.

15         So given that line of reasoning which, contrary to

16   my friend's argument, is certainly in the Rule -- and I want

17   to mention as an aside, that argument backs a little more into

18   APA arguments about whether the Agency sort of had properly

19   addressed certain comments or made certain findings.  We

20   certainly think they had so I'm trying to focus more here

21   specifically on the RFRA sort of as an objective matter and

22   not on the extent to which the Agency made the necessary

23   findings for RFRA.  We think they did and I'm happy to address

24   that, that sort of aspect.

25         So that goes to the substantial burden point and

1    that applies both -- you know, we think there's a strong basis

2    in evidence with a substantial burden which relates to our

3    RFRA authorizes argument.

4              As to our RFRA requires argument, we think, in fact,

5    there is a substantial burden for the reasons I've said.

6              And then the other portion of our analysis is that

7    the Agency concluded that there was no compelling interest in

8    applying the mandate to this -- to these objecting religious

9    employers.  And I think a key component of that analysis is

10   the number of exemptions that already exist to contraceptive

11   coverage under the Affordable Care Act.

12             The Affordable Care Act did not require

13   contraceptive grandfathered plans to cover contraceptive

14   coverage, and I don't know exact numbers, but based on the

15   Rule suggests that there's millions -- there's millions of

16   women covered by plans that do not require contraceptive

17   coverage.

18             The ACA still doesn't require it and I will back

19   step and say the ACA did, however, require grandfather plans

20   to cover certain other aspects of reform that it thought were

21   particularly important, but it did not include concept of

22   coverage as one of those sort of reform provisions that needed

23   to be included in grandfathered plans.

24             There's also a small employer exemption.  So if

25   there's a woman who works for an employer with less than 50

1    employees that does not offer health care coverage, and

2    they're not obligated to offer health care coverage, then that

3    woman also does not have contraceptive coverage.

4           And then the Rules refer to basically an indirect

5    exemption, which is if they're self-insured church plans, they

6    -- so called self-insured church plans that use the

7    accommodation, the only way to enforce the accommodation is

8    under ERISA, and under ERISA, self-insured church plans are

9    sort of exempt from that.

10          So there was, in a sense, no way to enforce the

11   accommodation against self-insured church plans so they had

12   sort of a de facto exemption.

13          So there's just a number of -- there's a number of

14   categories in which women aren't covered, which the estimate

15   is probably that covers millions of women.  Millions.  Those

16   exemptions cover millions of women.  So there's millions of

17   women who are not covered by the contraceptive coverage

18   mandate.  And the Supreme Court has recognized that when

19   there's a supposedly compelling interest, you have to look at

20   the scope of that coverage and whether there are significant

21   swatches of behavior of people that are not covered.  And here

22   having millions of women covered certainly makes it --

23   certainly we think decimates the argument that there's a

24   compelling interest.

25          The Agency laid out other bases for its conclusion

1     that there's no compelling interest.

2               Congress, as I said, did not obligate HRSA to cover

3     contraceptives.  It did not state explicitly that

4     contraceptives need to be covered.

5               And then the Agency evaluated evidence and

6     determined, based on its review of evidence, that there was no

7     compelling evidence to require the coverage of contraceptives

8     and that it was a compelling interest with regard to these

9     objecting employers.

10              And the last point I would make, hopefully at my

11    colleague's suggestion, is that we're not aware of any Court

12    that has found a compelling interest when the Government has

13    not articulated a compelling interest in the case.

14              If the Court has no further questions.

15              THE COURT:  Okay.

16              Mr. Rienzi.

17              MR. RIENZI:  Thank you, Your Honor.

18              If I could just work backwards from a couple of

19    things that came up in your questioning of the two lawyers for

20    the different governments.

21              One, on what RFRA says, Your Honor's correct that in

22    2000bb-1(c), there's a provision for judicial relief, but I

23    don't think there is any way you could read the statute to

24    only be about the judicial relief.

25              Section (a) of that says, Government shall not

1   substantially burden the person's exercise of religion even if

2   it's from a rule of general applicability.  And then in the

3   next part of the definitions, it defines Government to include

4   a branch, department, agency, instrumentality or official.

5          So I think the best reading of RFRA and the one that

6   I believe the Federal Government, again, across

7   Administrations on all sides of the spectrum has always had is

8   that RFRA is Congress telling the Agencies there are certain

9   things you can't do.  You have to avoid doing these things.

10  And that's an affirmative obligation that they have and I

11  would say whether it's EPA -- I think your hypothetical about

12  the climate change thing I think is pretty unlikely to happen,

13  but you can imagine the EPA having some regulation of a piece

14  of land that, you know, someone could point to a cathedral is

15  on and there would be some question of that.  All right, so I

16  don't know that that's happened.  I would assume it's

17  happened.  I would say it certainly probably happens in prison

18  contexts.

19         It happens with RLUIPA, right, which is the prison

20  equivalent of RFRA.

21         I'm sure it happens in the drug context.  If you

22  think about a case like O Centro.  Both before and after

23  Gonzales v. O Centro, the Federal Government created Religious

24  Exemptions for certain drug use because, obviously, RFRA was,

25  in part, designed to overturn Smith.

1          I don't think there's any RFRA requirement or much

2     sense in the idea that under RFRA, the Federal Government is

3     just supposed to keep running into RFRA violations, wait until

4     they get sued and lose, and kind of lose them retail all

5     across the country instead of fixing it wholesale and just not

6     burdening the religion.  The command from Congress is don't do

7     that and I think they have an obligation to not do that.

8          THE COURT:  Okay.

9          MR. RIENZI:  There's also a brief mention of Title

10    VII which, for the most part, I'm happy to stand on what we

11    said about it in the briefs, but I would simply say to the

12    extent that it's Title VII as an APA argument, which is what I

13    think I heard the state to be saying, well, this violates

14    Title VII because it authorizes illegal conduct, again, I

15    would just suggest it's pretty hard to believe that the states

16    actually think that's true given that Pennsylvania doesn't

17    have a contraceptive mandate.  So is Pennsylvania authorizing

18    illegal conduct?

19         New Jersey has a broader Religious Exemption than

20    the one they're saying the Feds can have here.  Is New Jersey

21    authorizing illegal conduct?  New Jersey's mandate only works

22    if you've already covered prescriptions and it doesn't cover

23    sterilization.  And it's not no costs, it involves costs

24    sharing.  Are they engaged in illegal behavior?  I don't think

25    they really think that.

1          And so the only federal court to ever consider the

2    Title VII question is the Eighth Circuit one that we cited to

3    Your Honor, but it's a pretty farfetched argument to say that

4    having a Religious Exemption here is sex discrimination

5    against women.  If that were true, then Hobby Lobby, for

6    example, the Supreme Court's decision in Hobby Lobby would be

7    sex discrimination against women.  None of the nine Justices

8    suggested that it was.

9          Okay, on to RFRA.  RFRA, as Your Honor knows, says

10   that if there is a -- the Government cannot impose a

11   substantial burden on religion.  Most of the litigation over

12   the many years has been over is there a substantial burden on

13   religion imposed by the mandate and then by the accommodation.

14         What Hobby Lobby said in 2014 is that it is a

15   substantial burden on someone's religion to tell them that

16   they have to give out a health plan that includes things that

17   violate their religion.  That was Hobby Lobby.

18         There was a short period of time in 2014 and '15

19   when the Government had a particular argument that it no

20   longer has where it said, Well, the accommodation is not like

21   Hobby Lobby because you don't have to give somebody a plan

22   that comes with the stuff that violates your religion.

23   Somebody else is going to give that out and it's not your

24   plan.

25         So if you look at the cases, the words that are all

1   over it are separate, independent, elsewhere.  We cited the

2   ones that were used in the Geneva College briefing in our

3   brief to Your Honor.

4          But the point is that the argument at the time was,

5   the reason this is not Hobby Lobby, the reason Hobby Lobby

6   didn't end the whole thing is that for the religious

7   nonprofits, we've got this accommodation, and under the

8   accommodation, you don't have to give somebody the plan that

9   comes with the stuff that violates religion because that's

10  happening someplace else.  And that was the state of the

11  Federal Government's argument at the time of Geneva College.

12         What happened after Geneva College, though, is

13  really important, which is in the Zubik litigation, the

14  Government acknowledged, in fact, that it is the same plan.

15  And as Mr. Sandberg said -- well, Mr. Sandberg said that ERISA

16  is necessary to make the system work in a lot of contexts and

17  it has to be the same plan for ERISA to control it.  And the

18  Government admitted that and this is not a Trump versus Obama

19  thing.  The Obama Administration admitted that to the Supreme

20  Court in 2015 and 2016 that it actually is the same plan.

21         Well, once they did that, they could never win

22  another RFRA claim, and actually once they did that, there's

23  not a court in the country anyplace who said they could win a

24  RFRA claim.  Why?  Because the whole basis of the Geneva

25  College opinion was, in fact, this claim that under the

1    accommodation, it's not the Hobby Lobby thing where you've got

2    to give a plan and this is part of the plan.  It's different.

3    You give your plan over here and it's not part of your plan

4    and it's something else that happens over there.  That was a

5    fiction and the Federal Government eventually admitted it

6    wasn't so.  The Federal Government eventually admitted it's

7    actually the same plan.

8              So that the Sisters and all the other religious

9    nonprofits actually are being asked by the old version of the

10   mandate to give out a plan that will include the things that

11   violate their religion.

12             Under Hobby Lobby, that's a substantial burden.

13             And once the Government had acknowledged that, they

14   could never win another case.  It was over.  And, in fact,

15   that's been borne out.

16             And in every case where it's been litigated since

17   Zubik and every Court to consider the issue since Zubik, every

18   single one of them has found that the accommodation imposes a

19   substantial burden.

20             Now, Your Honor pointed out before, and this is

21   true, that those were all district courts and I agree with

22   that.  They're all district courts.  There's no split.

23   There's no Court of Appeals or Supreme Court decision on it.

24             But I would suggest that if you were the Agency and

25   you're making Rules, you have to care what other Article III

1    Courts say.  In other words, I don't think the Agency can just

2    say, Oh, well, it was just district court that told me I was

3    wrong, therefore, I'm just going to forge ahead.  That's not

4    really a government of laws and it's not a very good

5    government of laws to just say that we don't care what federal

6    judges have told us because they sit in Oklahoma or Colorado

7    or Chicago or Philly -- they apparently want to sit in

8    D.C. -- so I'm going to ignore them.

9          That's not the way I think we expect the Federal

10   Government to act.  To their credit, it's not the way the

11   Federal Government acted here.  What they've said here is now

12   that they have acknowledged that it really is the same plan,

13   well, then the "accomodation" doesn't solve anybody's problem

14   because you're still telling the Little Sisters you have to

15   give out a plan that includes the things that violate your

16   beliefs.

17         Under Hobby Lobby, the substantial burden question

18   is over.  It's done.  That is a substantial burden.  The

19   Supreme Court already decided it.  It's binding on HHS.  It's

20   binding on lower courts.  It's done.

21         And so, one, it's after those concessions, after

22   they acknowledge that fact -- which is different from what

23   they told the Third Circuit in Geneva College.  Once they

24   acknowledged that fact, they couldn't win a RFRA case, right.

25         So what could they do?  Well, they could either do

1    what they've done for the past year, which is go on and just

2    keep losing RFRA cases, right, and that's kind of fun for me

3    and I'll sue them everyplace else and my clients will keep

4    winning.

5            But that's no way to make law, right?  That's not

6    what Congress told them.  Congress told them don't

7    substantially burden religion.

8            One, two, three, four -- ten courts now have said

9    this substantially burdens religion.  Was the Agency really

10    supposed to say, I don't care.  I'm going to keep doing it

11    anyway.  I'll keep getting sued.  I'll just keep losing.  I

12    don't have the authority to fix it.  Or should they say, Well,

13    enough courts have told me I'm violating people's federal

14    civil rights.  I'll obey the law and I'm going to fix it.

15            And that's what they did and I'd say that's the

16    right thing to do.  I would say that's the only option they

17    had.  In other words, I don't think legally they had the

18    option to say, I don't care that everyone keeps saying this

19    was a substantial burden on religion, I'm going to keep doing

20    it anyway.

21            RFRA says, Government shall not do that.  They're

22    the Government.  They are duty bound to obey RFRA.  They're

23    not free to just say, I'd rather not, right?  That's not one

24    of the choices that they had.

25            And so the choice the states want to put them to is

1   a mandate that applies to people like the Little Sisters of

2   the Poor, which the Government has now conceded violates RFRA,

3   and lots of courts have found that, or, frankly, no mandate at

4   all, right, because those are the two choices they're being

5   given.

6          The states are saying you can't possibly have a

7   mandate that applies to just about everybody on the planet,

8   but exempts the people who beat you under RFRA.

9          I don't think there's anything in the law that tells

10  the Government to behave that way.  I think it's pretty

11  bizarre to think that the APA or that Congress intends for the

12  Agencies to just forge right ahead losing the cases and that

13  they can't fix what they've done.  They can't stop losing the

14  cases by just changing the Rule.  What benefit is there to

15  having them lose each of these cases retail, to make the

16  religious nonprofits go get lawyers and show up in court and

17  drag the DOJ lawyers who, I think, right now aren't even

18  getting paid, right, drag these people around court to court

19  for losing these cases.  For what?  There's no benefit.  No

20  one benefits from that.

21         And so the state's argument, I would say, requires

22  you to ignore the fact that the Agencies face these

23  injunctions.  It's not clear what they should have done with

24  that.  It's not clear what the states think they should do

25  with that.  But it would be odd, I think, for one Article III

1   Court to say, Oh, Agency, what you really should have done is

2   stop caring so much about those other ten judges who said that

3   it was a substantial burden and you should just forge ahead

4   with the reg.  I think that would be odd.  I'm not aware of

5   other courts who have said things like that.

6            At times I read the state's briefs to be saying that

7   RFRA perhaps authorizes one and only one solution and you can

8   go for that one solution, but anything else, RFRA doesn't

9   authorize it.

10           I don't think that's right.  I think that's a

11  particularly bizarre way to read RFRA.  You can't reconcile it

12  with Hobby Lobby, right?  Hobby Lobby, the Court said, There's

13  a substantial burden.  And then the Court says, Let me think

14  about a few less restrictive alternatives you could use.

15           Right, they start with what they say was the "most

16  straightforward" thing, which is, Hey, Government, if you want

17  to get everybody free contraceptives, I've got an idea, why

18  don't you give people free contraceptives instead of making

19  other people give people free contraceptives.  The Federal

20  Government, if that's important to you, you can do it

21  yourself.  That's the most straightforward way.  And the Court

22  said that that was obviously less restrictive, a less

23  restrictive alternative that they could have tried under RFRA.

24           Then the Court went on to talk about the

25  accommodation as it was presented to them then, that it's some

1    separate plan, and they said, Well, that looks less

2    restrictive too.  Right?  If RFRA was -- there was only one

3    possible solution, you can do that one and otherwise you lose,

4    that type of approach from the Court doesn't make sense.

5            And RFRA is designed to be very protective of

6    religion.  That's the whole point of RFRA.  To look at RFRA

7    and say that, Well, RFRA's going to say you'd better hit --

8    you'd better get the bulls eye.  You'd better get it exactly

9    right.  If you get it exactly right, fine.  If you get it at

10   all wrong in one direction, you'll go lose a bunch of RFRA

11   cases.  And if you overshoot the mark by being a little too

12   protective of religion, nationwide injunctions are against

13   you.

14           That's a pretty strict way to read RFRA and it's not

15   a terribly protective-of-religion way.

16           I would say the better way and the way the Supreme

17   Court was discussing in Hobby Lobby is to say, Well, under

18   RFRA, when you're imposing a substantial burden, you've got to

19   go do something else and the Court threw out a couple of

20   different possibilities.  I think it's pretty odd to look at

21   this world -- like this particular set of accommodations,

22   right?  So, no, we don't cover grandfathers, it's only for

23   people under 50.  I think the state still wants the Obama-era

24   Religious Exemption.  So an accommodation with the Obama-era

25   Religious Exemption that doesn't work for anybody on church

1  plans that requires this handoff of the piece of paper, that's
2  the one thing RFRA allows.

3          That's weirdly path dependent, Your Honor.  That's
4  strangely path dependent to say that's the one.

5          That's the one that the Obama Administration came
6  upon and perhaps in entirely good faith, right, in 2013.
7  That's what they came up with.

8          But the idea that that's the only thing?  That's the
9  only way the Federal Government could decide to get people
10  contraceptives that would comply with their obligations under
11  RFRA?  That's odd.

12          The Supreme Court again didn't think Hobby Lobby
13  when they said there was a different more straightforward way.

14          Again, the obligation of RFRA is mandatory.  It's
15  not discretionary.  Putting contraceptives into the preventive
16  services mandate, that is discretionary.  That's just done on
17  a website.

18          RFRA is a statute.  RFRA binds them.  They have no
19  choice but to follow it.  They have to follow it.  Federal
20  civil rights laws are obligatory.

21          In Your Honor's 2017 opinion, you addressed RFRA
22  and, you know, we certainly were in front of you to make the
23  arguments we're making, so I don't feel like I'm presenting
24  something new to you, but when you addressed RFRA, you did it
25  through the lens of Geneva College and Real Alternatives.

1          We laid out in the brief and I'd just like to spend

2     a couple of minutes explaining why I don't think those cases

3     can actually resolve the RFRA claim.

4          Geneva College, as Your Honor pointed out, that's

5     been vacated.

6          Real Alternatives specifically said that they

7     weren't saying Geneva College was binding.  So Real

8     Alternatives did not revive Geneva College.  Certainly not for

9     this particular claim, the employer's claim.

10          In other words, in Real Alternatives, the only RFRA

11     claim on the table was whether an employee has a RFRA claim to

12     not have to have an insurance policy that gives them access to

13     something else.  There was no religious employer claim at

14     issue in Real Alternatives.

15          So Geneva College, you know, is vacated, was not

16     revived by Real Alternatives.  You know, to just give you one

17     data point, the Geneva College case itself is one in which the

18     trial judge has since entered a RFRA injunction saying that

19     there's a substantial burden on religion.  So in Geneva

20     College, Geneva College is not even law of the case.  I mean,

21     in that case, the trial judge went back and said, Oh, based on

22     what's presented to me now, yes, that is a substantial burden.

23     So I don't think Geneva College is in any way binding on this

24     Court.  It's also not persuasive in light of what the

25     Government has conceded since then and we lay out what they

1    claimed in their briefs to the Court and what the Court had

2    found in Geneva College.  But, again, Geneva College is based

3    on the fiction that it's not your plan and the reality which

4    they have since conceded is that, in fact, it is your plan.

5    And once they conceded that reality, I don't see how you can

6    say Geneva College is persuasive authority because Geneva

7    College is analyzing a state of facts that I don't think

8    anybody in the courtroom now can claim is true.  Nobody can

9    say it's not your plan because what they eventually had to

10   acknowledge is that, well, to make the thing work, we need

11   ERISA and we need to order your plan administrator to

12   administer the plan in a certain way.  And so once they did

13   that, they had to acknowledge it was the same plan.  To their

14   credit, they told the truth, they said it was the same plan.

15   But once they did that, the RFRA case was sealed.  And, again,

16   every Court considering it since then has found that it was a

17   RFRA violation.

18          The states argued that there was no reasoned

19   explanation for why the Agencies have switched their position.

20   They didn't explain why they now do think it's a substantial

21   burden.  In the IFR, and I believe they incorporated the IFR

22   by reference in the Final Rules, they do say, Now that we have

23   acknowledged that it is the same plan, we realize that it

24   actually wasn't accommodating anybody's religion and it's

25   still a substantial burden.  So they do explain why that's so.

1         Again, it's very public record.  They've done it in
2    open court.  There's no mystery as to what happened.  They've
3    explained that it's the same plan.  Once you do that, they've
4    lost that argument.
5         Two last points and I'll sit down, Your Honor.
6         One, the states, again, as I heard them, were making
7    the argument that they think the Obama-era Religious Employer
8    Exemption was required by RFRA.  If it's required by RFRA,
9    it's because there is a burden.  And it can't be that there's
10   a burden on those employers, but not on these.  So if you
11   think that it's RFRA, the free exercise clause that requires
12   it, it's because you think there's a burden.  There's no world
13   in which you can say RFRA and free exercise required this
14   thing that I like because I don't really want to say I'm going
15   after churches, but they don't impose a burden on these other
16   people.  Like either there's a burden here to fill out the
17   form and hand it to somebody or there's not.  I think the
18   answer pretty clearly is, yes, there is, because it means your
19   plan is covering something that you have religious objection
20   to and Hobby Lobby already answered that question.
21        And then, lastly, I would just make a brief plea to
22   the Court, which is, this has been a long and, frankly,
23   unnecessary fight.  There are a lot of ways to get people
24   contraceptives.
25        The Federal Government's pretty good at it.  State

1   governments are actually pretty good at it too.  They all do

2   it.  The idea that these two governments should be fighting

3   over whether the Constitution or federal law requires the

4   Federal Government to indirectly make nuns or somebody else do

5   it as opposed to these two governments doing it themselves

6   doesn't make a whole lot of sense.  And RFRA, frankly, exists

7   to say, Hey, guys, if you all can do it yourselves, you can't

8   go burden somebody else.  That's precisely what we've got

9   here.

10          All of the state's declarations talk about all of

11  the great programs that they have to do this.  Well, given

12  that they all have all these great programs to do it, it can

13  never be this compelling interest in dragging nuns into the

14  process.

15          So we'd ask Your Honor to rule against the state's

16  motion for an injunction and hopefully put us on the path of

17  being done with this unnecessary fight.

18          Thank you, Your Honor.

19          THE COURT:  Response briefly.

20          MS. THOMSON:  Thank you, Your Honor.  A few brief

21  points.

22          First of all, I would note that the law under the

23  ACA Women's Health Amendment as implemented by HRSA is that

24  all employers must include contraceptive services and

25  counseling in their insurance program.  So that is the law

1    that exists.  This idea of a tortured path dependence thing is

2    I think not relevant because the law is that.  This is what

3    insurance employers -- employers must provide to their

4    insurees.

5            All RFRA does is prevent the Government from

6    enforcing the law against certain people where there's not a

7    least restrictive means to further the compelling Government

8    interests.

9            So with regards to what Hobby Lobby held and with

10   regards to Geneva College, there is a difference between

11   whether someone's religious objections are sincere and whether

12   they do impose a substantial burden.

13           With regards to whether Geneva College was procured

14   on false pretenses, I would point that the law under Third

15   Circuit and under RFRA is that a Court must look to what the

16   parties actually are obligated to do, not what third parties

17   are obligated to do.

18           So what the Third Circuit held in Geneva College is

19   that the actual people who were claiming this a burden were

20   not -- were only obligated to say they were not going to cover

21   contraception.  That was it.  The fact that the law stepped in

22   and required third parties to follow the law and provide

23   federally-mandated contraceptive services to other third

24   parties, the employees of the objecting entities, was not

25   something that could constitute a burden because the only

1   burden is on the action that the actual objecting person is

2   seeking.  So the logic of Geneva College still controls.

3           I would note that all of the Courts to consider the

4   accommodation post this purported concession in Zubik have

5   been uncontested decisions, at least the ones in the district

6   court, and I would note that the Supreme Court in Zubik did

7   not actually find that the accommodation violated RFRA or make

8   any decision about the accommodation.  So there is actually

9   no -- that Court, despite this purported concession, did not

10  recognize that it was somehow a fatal flaw to the

11  accommodation.  And every Court to look at it after has been

12  looking at uncontested circumstances, about whether or not the

13  accommodation posed a substantial burden.

14          Finally, I would note that with regards to

15  Government providing services, there's been talk in the

16  briefing about Title X and an issue with the Government

17  potentially allowing women whose employers claim the exemption

18  to go to a Title X clinic to get access to those

19  federally-mandated contraceptive services.

20          I would note that simultaneously, the Government is

21  promulgating a new Rule to be issued in their Notice of

22  Proposed Rulemaking and they're actually set probably to issue

23  the Final Rule any day now which will substantially limit

24  funding for Title X clinics.  It's also not clear how exactly

25  this would function because all it says in the Title X Rule is

1    that women whose employers claim the exemption will be

2    considered low income families for the purposes of Title X

3    clinics.  But given that employers don't have to actually do

4    anything affirmative to claim the exemption, it's not at all

5    clear how this would function in reality.  And, moreover, this

6    is not a solution to the real issue which is -- the real

7    interests which is giving women seamless access to

8    contraception as part of all of their other services because

9    contraception is, at the end of the day, health care and it

10   should be included in all of women's other health care

11   services with their doctor instead of having to go to a

12   different place, go through a different process to get this

13   particular form of health care.

14           If Your Honor has no further questions.

15           THE COURT:  No.

16           MS. THOMSON:  Thank you.

17           THE COURT:  Okay, we're going to move to national

18   injunction, but I have a series of questions that I just need

19   quick answers to.

20           Defendants, is it your position that the Final Rules

21   make no substantive changes to the IFRs?  That is, the Final

22   Rules have the same substantive effect as would the IFRs had

23   they not been enjoined?

24           Put differently, are there any changes to the IFRs

25   embodied in the Final Rules?  Are they all technical revisions

1    to clarify the meaning of the IFRs or is there anything that

2    makes substantive changes?

3              MR. SANDBERG:  Would you like me to answer here or

4    there?

5              THE COURT:  Yes.

6              MR. SANDBERG:  So to avoid any confusion about

7    labels, I'll do the best I can to explain it.

8              I think the one that sort of might be termed

9    substantive change is that the Rule discusses the meaning as

10   supported by -- in the Women's Health Amendment in terms of

11   HRSA's delegation, which, to the extent the Agency therefore

12   adopts that rationale, that may factor into Chevron.

13             But in terms of --

14             THE COURT:  Sorry, spell that out a bit more.

15             MR. SANDBERG:  Yes, sure.

16             So the Agency sort of takes the position that

17   the -- which I don't recall that it did in the IFR -- that the

18   part of the ACA that says, you know, the additional preventive

19   service shall be those -- shall be required as provided by

20   guidelines supported by HRSA.  The Rule goes into what the

21   Agency thinks "as provided by" means.

22             THE COURT:  Ah, okay, so this is the "as", what does

23   "as" mean --

24             MR. SANDBERG:  Correct.

25             THE COURT:  Essentially, in the Rules, the Agency

1   has taken a position on what "as" means in a statute.

2           MR. SANDBERG:  Correct.

3           THE COURT:  Isn't that a judicial function?  Quite

4   clearly a judicial function?

5           MR. SANDBERG:  No, I mean, not if -- under Chevron

6   Step One, if Congress is clear, then the meaning is what

7   Congress says.

8           Under Step Two, if there's ambiguity, then you defer

9   to the Agency's reasonable interpretation.

10          THE COURT:  Okay, where can I find that discussion

11  in the Final Rules?

12          MR. SANDBERG:  I can get you that.  Did you have any

13  other questions that you --

14          THE COURT:  Well --

15          MR. SANDBERG:  And just I think, I mean, otherwise,

16  generally, I would say the changes are sort of technical and

17  sort of housecleaning and clarifying things from the IFR.

18          There's a couple of places where the Agency says,

19  you know, We said this in the IFR.  People asked what we

20  meant.  What we meant was, you know, A, B, C.

21          So they don't say they're changing anything.

22  They're just clarifying what's in there.

23          THE COURT:  Okay, so to keep on this line, you're

24  going to provide me with the "as" supported by a pinpoint

25  cite, but I do have a question about the change that the IFRs

1    and Final Rules make to the existing accommodation exemption

2    framework.  That hasn't gotten much attention.

3          It's my understanding that the IFRs and now the

4    Final Rules changed the level at which the exemption is to be

5    applied.  So whereas before, the availability of the exemption

6    was to be determined on an employer-by-employer basis, the

7    IFRs provide that the exemption will be determined on a plan

8    basis.

9          MR. SANDBERG:  To my understanding, that's correct.

10          THE COURT:  And do you have any information about

11    how often an insured's health care plan sponsor will be a

12    different entity than the insured's employer?

13          MR. SANDBERG:  I don't standing up here.  It's not

14    saying the Agency doesn't.  I don't standing up here.

15          THE COURT:  Okay.  So we just got the administrative

16    record here.  The fact that I just received the administrative

17    record, do you think that that makes any difference?  Do you

18    think I need to -- that the Plaintiff should have another

19    opportunity to look at the administrative record?  Do you

20    think that we need to -- is there anything that we need to do

21    here in this court with respect to that?

22          MR. SANDBERG:  Well, I would say this.  To the

23    extent the Court, which we would think is incorrect, would

24    say, I can look to these outside declarants, these people

25    outside the Agency to determine the correctness of what the

1    Agency did, we think the Court's previous ruling in our motion

2    in limine which said you could rely on sort of extra record

3    information for a limited purpose -- but that limited purpose

4    did not include assessing the correctness of what the Agency

5    did.  So the only thing I would say would be if the Court were

6    inclined to say, Because I got the record just today or

7    yesterday, I'm going to rely on extra record evidence, we

8    think that would be incorrect and that, you know, if the Court

9    wants to take additional time or permit additional briefing on

10   what's in the record, we would prefer that certainly as

11   opposed to --

12              THE COURT:  Well, yes, that wasn't the question.

13              The issue is -- well, I suppose it's for the

14   Plaintiff.

15              Have you had access to the administrative record

16   before yesterday or whatever?

17              MR. FISCHER:  Your Honor, we received -- no, not

18   before.  We received it by FedEx, I believe --

19              THE COURT:  Do you think it makes a difference here?

20              MR. FISCHER:  It does certainly because I think it

21   heightens the burden on Defendants to justify their reversals

22   of position here.

23              If they're relying on what's in the administrative

24   record to justify, for instance, their reinterpretation of the

25   word "as", the fact is we have not had the chance to go

1    through and analyze exactly what they relied on.

2         Now, the only thing we found related to that,

3    someone printed out the OED definition of the word "as" two

4    weeks after the Rules were issued and they threw it to us in

5    the record, but I think it makes the burden higher on

6    Defendants.

7         I also think it may inform -- regardless of what

8    happens today, it may inform how the case proceeds and I'll

9    talk about this a little bit more when we get into

10   injunctions, but perhaps it's an argument for all parties that

11   are moving expeditiously toward a final judgment.  If there's

12   a preliminary injunction entered or if there is not, but one

13   that will give everybody the opportunity to take full account

14   of the administrative record rather than resting on a decision

15   on a PI that was the basis of a record that we have only had a

16   day to look at and not even a day, frankly --

17        THE COURT:  So do you think I can make a decision

18   without any further briefing with respect to the

19   administrative record?

20        MR. FISCHER:  Yes, I believe Your Honor can because

21   we think that the conclusions in the Rule are in many ways

22   arbitrary and capricious on their face.  We think that, for

23   instance, the reversal on benefits of contraception, which is

24   justified by a statement that they've identified, one study

25   that's ambiguous on the benefits, that by itself simply

1     doesn't carry their burden.  We think that there's enough in

2     there right now to show that the conclusions that the

3     Government's reaching are simply not justified.  The same as I

4     think with this "as" issue.

5           There's been a lot of discussion about, you know,

6     does the ACA give the Agency the authority to create

7     exemptions.  Well, they're resting the authority on the word

8     "as".  But that's the only argument I've heard as to where

9     this authority comes from.  They say, well, because it says as

10    provided for, HRSA can do more than just identify services

11    which is what HRSA did.  They're saying HRSA -- which has no

12    expertise in religious exercise identifying a burden on

13    religious beliefs -- they're saying HRSA, nonetheless, has the

14    authority to create broad-sweeping exemptions and they're

15    resting all of that on the use of the word "as".

16          So, frankly, I think it's unlikely there's anything

17    in the history of the record that will show that to be

18    justified.  On its face, I think it's, frankly, just wrong and

19    Your Honor could rule on that basis.

20          THE COURT:  Okay.  Have you got the "as" cite now?

21          MR. SANDBERG:  Yes.  The cites are the Religious

22    Rule.  It's 83 Fed. Reg --

23          THE COURT:  83 Fed. Reg.

24          MR. SANDBERG:  -- 57,540 to 41.

25          THE COURT:  57,540 to 41.

 1          MR. SANDBERG:  And the parallel citation in the

 2    Moral Rule, would you like that?

 3          THE COURT:  Yes.

 4          MR. SANDBERG:  83 Fed. Reg. 57,597 --

 5          THE COURT:  57,597.

 6          MR. SANDBERG:  -- to 98.

 7          THE COURT:  Okay.

 8          MR. SANDBERG:  I do want to point out, our only

 9    basis is not the word "as".

10          We've had argument here this morning, we've provided

11    other bases entirely tendentious to their only basis for --

12          THE COURT:  I understand.  I understand.  I just

13    want to focus on the "as" argument.

14          MR. SANDBERG:  And it's also entirely tendentious to

15    say that we rely on one study for the benefit.  There's -- I

16    think there's four or five pages in the Federal Register

17    regarding sort of the Agency's assessment of the efficacy of

18    contraceptives and it doesn't rely on one study.

19          THE COURT:  Okay, so let's now turn to the scope of

20    the remedy.

21          MR. SANDBERG:  Okay.

22          MR. FISCHER:  Thank you, Your Honor.

23          The states believe that the only remedy that will

24    fully address the harm that they and the residents are likely

25    to suffer is an injunction preventing the Agencies from

1    enforcing the Rules nationwide.  That is what the Court issued

2    before and we believe it's also warranted under the facts of

3    the Final Rules.

4         Now, the question of what remedy is appropriate

5    depends on a variety of factors.  It involves looking at the

6    nature of the violation, it involves looking at the nature of

7    the harm, it involves balancing the equities, looking at the

8    public interest.  And I think the Supreme Court's decision in

9    the -- one of your early travel ban cases where the Court

10   granted a stay of a nationwide injunction in some respects,

11   but allowed the nationwide injunction to go forward in other

12   respects, particularly with individuals who were similarly

13   situated to the Plaintiffs in that case.  So while the Court

14   stayed some aspects of the injunction, it did not say a

15   nationwide injunction was improper.

16        THE COURT:  Well, Justice Thomas did.

17        MR. FISCHER:  Justice Thomas did.

18        THE COURT:  In his dissent, he put forth five

19   reasons why they were totally improper.

20        MR. FISCHER:  Exactly.  It was his dissent and I

21   believe he was writing for himself and either one or two

22   other Justices so it didn't carry the day.  The remainder of

23   the Court felt that a nationwide injunction at least in some

24   respects was appropriate.

25        And, frankly, you're going to think if we look at

1    the concerns that Justice Thomas raised, they're not

2    appropriate in this case or they certainly are not a reason to

3    not issue an injunction which we think is necessary to give

4    the states the full relief that we believe they made a case

5    for.  You know, Justice Thomas talks about issues need to

6    percolate among the circuits.  This issue clearly is.  There's

7    a case pending in California, there's a case pending in

8    Massachusetts where the Commonwealth of Massachusetts lost on

9    standing ground.  It continued to press ahead with that case.

10   That's before the First Circuit.  There are other cases

11   brought by private entities or organizations that are also

12   pending.

13          This issue will be addressed by a number of

14   circuits.  So -- and, frankly, I think the fact of whether or

15   not Your Honor issues a nationwide injunction isn't going to

16   have much significant impact on whether those other cases

17   proceed.  Those are decisions being made by the litigants in

18   those cases.  So it's not as if the Supreme Court, if this

19   issue ultimately reaches the Court, will be deprived of the

20   benefit of many, many courts looking at this issue.  In fact,

21   I think it's inevitable that many courts will have considered

22   this issue by the time that it comes before the Court.

23          I also think it's important to understand the harm

24   that we are asserting, which is that residents of Pennsylvania

25   and New Jersey will be deprived of contraceptive coverage and

1    will turn to state-funded plans.

2              Now, the Defendants have said Your Honor can just

3    issue an injunction that applies in Pennsylvania and New

4    Jersey.  I don't really understand what that means.

5              When you've got a situation where college students

6    in Pennsylvania may be on a health plan from their parents,

7    that their parents pay for, the parents live across the

8    country, is that college student then allowed -- is that

9    parents' plan then required to cover contraception or are they

10   exempt from the injunction?

11             If the answer is because that plan is located in

12   another state, they're not required to cover contraception,

13   then that's a harm that Pennsylvania will suffer.

14             So given the highly integrated nature of insurance,

15   achieving full relief for the states will require an

16   injunction that goes well beyond our borders.

17             THE COURT:  So in your brief, you talk about -- you

18   provide me with two categories of people who may come from

19   outside of Pennsylvania, but may use Pennsylvania's services.

20   One are the folks who commute into either New Jersey or

21   Pennsylvania.  So I suppose there you would have the

22   neighboring or nearby states.  So the question I would have

23   there is why would an injunction cover, let's say, New Mexico

24   when it's highly unlikely that someone is commuting to

25   Pennsylvania and New Jersey from New Mexico, but then I hear

1    you talk about students who come from around the country.  Is

2    there any indication, do you have any evidence to suggest that

3    there are students in Pennsylvania from every state in the

4    union or any reason to believe that that is the case, any

5    evidence?

6             MR. FISCHER:  I am fairly confident that is the

7    case.  I can't point to specific, you know, pieces of evidence

8    in the record.

9             I'll note in the amicus brief that was submitted by

10   20 states and the District of Columbia, there's a reference to

11   Pennsylvania I think having the second highest number of

12   first-year students of any colleges -- of any --

13            THE COURT:  This is the American Association of

14   College --

15            MR. FISCHER:  No, this is the one from other states,

16   from the Commonwealth of Massachusetts and 19 other states as

17   well as D.C.  I believe it's on page 14 of that brief.

18   There's a reference to, essentially, how significant a role

19   education plays in Pennsylvania, that Pennsylvania has a large

20   number of colleges and universities, and I'm confident that --

21   well, I'm reasonably confident that some individual college in

22   Pennsylvania could probably say they have students from every

23   state and certainly the state -- the Commonwealth as a whole,

24   I would be very surprised if that were not the case.  I will

25   say that and I'm happy to submit something for the record

1   later.

2         This is sort of the complicated nature and this kind

3   of shows why this case is different from other cases where

4   courts have put the brakes on nationwide injunctions.

5         There's a citation to the Chicago case which

6   involved the dispute over so-called sanctuary cities laws.

7         Well, the issue there was whether the Justice

8   Department had to give grant money to states and to cities

9   that it was trying to withhold.  Now, it's very easy to sever

10  Chicago's grant from Philadelphia's grant from your grant and

11  say, Okay, Chicago, you have shown you should prevail,

12  therefore, you get your grant money, but it doesn't matter

13  whether California, San Francisco, whether anybody else gets

14  the grant money to remedy the violation that you have alleged.

15        This is a very different situation here.  Saying

16  that the Rules should not harm anybody in Pennsylvania or

17  should not cause injury in Pennsylvania or New Jersey requires

18  much broader relief than was available in that case and

19  requires broader relief than just simply an order saying the

20  Defendants may not enforce the injunction within the borders

21  of Pennsylvania or New Jersey.  We believe that would prove to

22  be unworkable and that, therefore, something broader is

23  necessary in this case.

24        I also think it's relevant to the analysis, and this

25  is, again, I think the Court's -- the Supreme Court's decision

1    in the IRAP travel ban case touches on issues of public

2    interest and balance of equities.  It's relevant that these

3    Rules are harming women across the country.

4          There's a great deal of evidence in the record on

5    this.  We've submitted the supplemental declaration from Ms.

6    Kost from the Guttmacher Institute which breaks down per state

7    essentially the percentage of women who are -- who need

8    publicly-funded Family Planning benefits and who actually get

9    it and what that shows is there's a gap in every single state.

10   No state is able to meet all of the needs of women who need

11   Family Planning benefits.  So that if the pool of women who

12   have to rely on the state is expanded, the burden on the

13   states everywhere is going to increase.

14         It also, as I mentioned earlier, noted the fact that

15   well over half of the unplanned pregnancies in this country

16   end up imposing costs on the states.  That's true across the

17   board with the exception of a few states where the percentage

18   is just under 50 percent.  But, regardless, increasing the

19   number of women who do not have access to contraception will

20   increase the number of unplanned pregnancies and will impose

21   costs on every state in the country.

22         These again are factors that go into the equities

23   that the Court should consider in fashioning appropriate

24   relief.

25         THE COURT:  Do you think there's a perfect solution?

1    I mean, I sort of have to go between the concept of providing

2    complete relief, but also providing relief that is no broader

3    than necessary to provide full relief.  So is there a perfect

4    solution here?

5         MR. FISCHER:  Well, there is in that a nationwide

6    injunction is in many ways the least restrictive form of

7    relief that would give the states full relief for what harms

8    they've alleged.  And, frankly, if the analysis were to be

9    more restrictive than that, the Supreme Court in the IRAP case

10   would have done something different and would have said we're

11   only allowing the injunction to move forward as to the named

12   Plaintiffs, not as to individuals who are similarly situated.

13        The Supreme Court considered issues like public

14   interest, balance of equities and said it was not an abuse of

15   discretion to allow that, to allow that class of individuals

16   the benefit of the injunction.

17        So I think where there may be some tension between

18   fashioning relief that gives the Plaintiffs, you know, full

19   remedy for their harms versus fashioning a relief that is

20   broader than necessary, the Third Circuit I think has made

21   clear that the injunction to be crafted must give the

22   Plaintiffs -- must address the Plaintiffs' injury that they

23   have alleged.

24        So that, therefore, to the extent what -- you know,

25   to the extent addressing the injury that Pennsylvania and New

1    Jersey have suffered requires nationwide injunction, that is

2    the least restrictive way of addressing this claim.

3           And I would also note I think it is relevant again

4    that other states have weighed in.  There's an amicus brief

5    from 20 other states and D.C. that talk about the importance

6    of this issue to their states.  It is not as if this is a harm

7    being felt in Pennsylvania and New Jersey alone and other

8    states do not have an interest in this.  I think that goes to

9    some of these other issues that are relevant.

10          And then, finally, I think that the Court should

11   consider the sweeping nature of the Rule itself in fashioning

12   relief.  You know, I think we sometimes -- I think the

13   arguments sort of drifted away from what's actually at issue

14   here.

15          We're not trying to reinstate the mandate on the

16   Little Sisters of the Poor.  Let me make absolutely clear

17   about that.  They are protected by an injunction from the

18   District Court of Colorado that says the Government cannot

19   require them to pay for contraception.  We are in no way

20   challenging that.  We're not challenging the earlier

21   exemption, we're not challenging the earlier accommodation.

22          We are challenging these Rules which allow for the

23   first time publicly-traded companies to opt out of the

24   exemption, which it's clear got opted out of the contraceptive

25   mandate, which completely do away with the accommodation and

1   render it totally optional even in the cases of the companies

2   that never asserted that it violated their religious beliefs

3   to fill out the form and send it to their insurance company.

4          And then, of course, there's the Moral Exemption

5   which, as Your Honor correctly held earlier, could allow a

6   company to say, It is our moral belief that women should not

7   be in the workplace and we're not going to offer

8   contraception.

9          Now, I was frankly surprised that in light of that

10   decision, the Agencies did not at least go back and say they

11   were going to withdraw this Rule, issue a new NPRM, go through

12   the process and try to address some of these concerns.

13          I don't see any real discussion of those concerns

14   and I think, as the earlier colloquy indicated, there's very

15   little substantively different about the Rules.  They

16   essentially are the IFRs with a few tweaks and a few things

17   that were true earlier sort of explained a little better.

18          So I think with all of those factors considered,

19   that the scope of the Rules that we are challenging, the harm

20   to women across the country, the integrated nature of

21   insurance in this country, the difficulty of providing

22   complete relief for Pennsylvania and New Jersey without

23   imposing a nationwide injunction and, finally, the fact that

24   this issue is going to percolate, we think a nationwide

25   injunction is the only appropriate remedy.

1          And I also have just one final thing.  I think the

2   Ninth Circuit, as Your Honor's aware, remanded that case for

3   consideration of the appropriateness of the nationwide

4   injunction.  One of the factors that it turned on, which was

5   interesting, was that the case had been stayed after the

6   preliminary injunction was issued.  We think that that perhaps

7   should inform how our case proceeds afterwards.  And as I

8   indicated earlier, given the issue with the administrative

9   record, we likely would not agree to a further stay following

10  a preliminary injunction and we are certainly prepared to move

11  this case forward to a final remedy.

12          But in the interim, what is necessary to preserve

13  the status quo as it existed really prior to the IFRs on

14  October 5th, 2017, is a nationwide injunction that prevents

15  the Agencies from enforcing the Rule.  Okay, that's what we

16  request.

17          THE COURT:  Thank you.  Just off the record for a

18  second.

19                    (Recess taken)

20                    (After recess:)

21          THE COURT:  Okay.  Have a seat.  Okay, let's hear

22  from the defense on the nationwide injunction issue.

23          MR. SANDBERG:  Thank you, Your Honor.

24          I think the well-understood backdrop to this is we

25  don't think an injunction is appropriate.

1          Forging on from there, our first argument is that

2     Plaintiffs need standing for every form of relief sought and

3     Plaintiffs do not have standing to seek relief for a state

4     just because of similarly situated and the sort of recent --

5     Supreme Court's recent decision in Gill versus Whitford, which

6     is admittedly a different context, it has to do with voting

7     rights, the Supreme Court there found that residents of one

8     district didn't have standing to challenge how the state had

9     set up other districts because they weren't injured by it.  So

10    in terms of getting an injunction, getting an injunction that

11    covers the whole state, they could only get an injunction that

12    related to the districts they were in and that's because they

13    don't have standing under Article III.

14          We think the same law clearly applies here.

15          Another argument against a nationwide injunction is

16    the sort of traditional equitable limits of injunctions.

17          Injunction is an equitable remedy.  And as a

18    traditional matter, injunctions were given only to the extent

19    necessary to provide the relief to Plaintiffs.  And so unless

20    Plaintiffs can establish that a nationwide injunction is

21    necessary, and it's their burden as Plaintiff, I think, to

22    establish the scope of the necessary injunction, unless they

23    can establish a nationwide injunction is necessary, they

24    haven't met the threshold of that traditional equitable

25    principle and I'd like to pick up a little bit on the sort of

1   the college student example.

2           So if you have a college student from Idaho that

3   goes to Penn State and the idea is, well, maybe they're on

4   their parents' plan.

5           One question:  Are they on their parents' plan?

6           Second question:  You know, did their parents' plan

7   in Idaho, did it previously cover contraceptives?

8           Maybe; maybe not.

9           Are they now invoking the exemption?

10          Maybe; maybe not.

11          Are they invoking the exemption as to contraceptives

12   this college student uses because some employers and providers

13   are willing to cover certain things?  So are they covering it

14   as to a contraceptive used by this woman?

15          Maybe; maybe not.

16          Will this woman then qualify for state coverage?

17          Maybe; maybe not.

18          Will she choose to use state coverage?

19          Maybe; maybe not.

20          So the fact that you have a student from Idaho,

21   certainly even if you had 1 or 10 or 20, that's not

22   dispositive of whether, in fact, the State of Pennsylvania is

23   going to be harmed because it relies on a long causal chain

24   and to just -- I think partly because, and I don't want to

25   devolve too much in that, but partly because their standing is

1    in the realm of maybes, now their injunction is in the realm

2    of maybe, too.

3           It's like, Well, because, you know, maybe this

4    person's harmed, maybe this will happen, maybe that will

5    happen, and then maybe we'll need a nationwide injunction.

6           So I certainly think that as an equitable matter,

7    there's no basis for a nationwide injunction based on a series

8    of maybes, a chain of reasoning that relies on many maybes

9    across many different potential individuals affected.

10          And as to the interference of development of law, I

11   think it's likely true unless, you know, this Court's decision

12   somehow stands in the way of Judge Gilliam in the Ninth

13   Circuit deciding something, that there at least will be a

14   couple of decisions on this, but I think in terms of the

15   percolation of issues and interference and development of law,

16   you have to look at the cases that aren't filed and decided as

17   well.  You can't just say, Oh, there's two cases so it's not

18   going to interfere with the development of the law.

19          Well, maybe the issuance of a nationwide injunction

20   prevents other cases from being filed and decided.

21          And I think that's a key question when talking about

22   the interference of development of law.

23          And on this point, I would like to add, a nationwide

24   injunction would presumably extend to Massachusetts and I

25   believe Massachusetts has filed an amicus brief here.

1   Massachusetts, of course, lost their case in the District of

2   Massachusetts so I think that sort of brings into sharp relief

3   parts of the problem of issuing a nationwide injunction.  And

4   this case includes potentially giving someone a win they

5   didn't get when they litigated in a court in their district.

6           I would like to cover a few other points somewhat

7   more briefly.

8           I think Plaintiffs are overreading the International

9   Refugee Assistance Plan case.  That case certainly doesn't

10  squarely decide the scope of preliminary injunctions and when

11  national injunctions are appropriate.  And, in particular,

12  Plaintiffs discuss language that the Court says that you have

13  to consider the overall public interest, and that's true, and

14  it's a long-held principle that when courts are issuing

15  injunctions, they consider it's a public interest.  It's one

16  of the factors when the Court's balancing it, it balances the

17  parties' interest and then it also balances the public

18  interest.  But I don't think that's ever, at least in my -- I

19  don't think that's appropriately understood as meaning you can

20  give the Plaintiff an injunction broader than that necessary

21  to provide them relief.  So sort of, as I view it, when the

22  Court said consider the public interest, it meant something

23  like this:  If the Government has a building project that's

24  going to impose irreparable harm of $5,000 on a Plaintiff and,

25  you know, ceasing that project will impose some harm on the

1   Defendant, you consider that, but then you also consider maybe

2   that building project has brought 500 jobs to the area that

3   wouldn't otherwise be there.  So if you grant the Plaintiff an

4   injunction that would be sort of necessary to provide them

5   relief, it would, you know, maybe cost those 500 jobs.  So

6   that's the kind of public interest you consider.  In the

7   course of granting an injunction of appropriate scope

8   sufficient to provide the Plaintiff relief, you consider the

9   public interest in that injunction.  I don't think it means

10  anything more than that.  I don't think it means, Oh, we can

11  consider whether there are other states that might be kind of

12  similar and therefore give Plaintiff a broader injunction than

13  is necessary to provide them the remedy they need.  And I

14  certainly don't think that's what the Supreme Court was

15  saying.

16          There were a couple brief asides that I thought were

17  sort of tangentially related to the scope of the injunction.

18  I'd like to comment briefly on the publicly-traded companies

19  aspect.

20          As the Rule points out, it seems possible, but

21  unlikely, that there are going to be many publicly-traded

22  companies that will invoke the Religious -- that will invoke

23  the Religious or Moral Exemptions.  They certainly created an

24  exemption for publicly-traded companies on the Religious Rule,

25  but the Rule itself says they think this is limited and

1 unlikely to occur.  And, in fact, Hobby Lobby, I believe, the

2 Supreme Court said a similar thing about the likely effect of

3 publicly-traded companies getting exemptions and

4 accommodations.

5        And the other thing would be that the Moral

6 Exemption is some sort of open invitation to gender

7 discrimination.  This was addressed, as I recall, in the last

8 hearing and I think we provided responses including there

9 might be other potential remedies.

10        But I would also like to say, as Mr. Rienzi has

11 pointed out, the states have their own exemptions and they

12 clearly don't think that the potential for some bad actors in

13 some small number of cases to misuse those exemptions is a

14 basis to not have Moral Exemptions to health care, otherwise

15 applicable health care law.  They haven't seen this as an

16 insuperable barrier for their own exemptions.  It's hard to

17 understand why the fact that there might be a few bad actors

18 through whom, as we say, there might be other remedies somehow

19 becomes an insuperable barrier to the basis of the Moral

20 Exemption here.

21        If the Court has no further questions.

22        THE COURT:  Mr. Rienzi.

23        MR. RIENZI:  Just three brief points for Your Honor.

24        One, on the publicly -- I'm sorry --

25        THE COURT:  On the what, sir?

1          MR. RIENZI:  On the publicly-traded point, I would

2     just point out that most of us were probably paying attention

3     when Hobby Lobby was litigated.  And when the claim was, Oh,

4     if you let Hobby Lobby exercise religion, we're going to see a

5     rash of these claims of for-profit businesses coming in and

6     making all sorts of outlandish religious liberty claims.  That

7     claim's getting kind of stale.  Frankly, it's 2019.  It was

8     four and a half years ago.  It hasn't happened.  There's no

9     reason to believe it will happen.

10          The reason the Rule has to cover publicly-tradeds is

11     the same reason in Hobby Lobby that they said you couldn't

12     exclude corporations generally, which the Dictionary Act says,

13     Person includes corporation.  And so it's pretty farfetched,

14     it's pretty unlikely, we still haven't seen the first such

15     case, even though Hobby Lobby was almost five years ago, but

16     it certainly should make the Rules invalid.  Congress said

17     person.

18          Secondly, you heard a bunch of times really, but, in

19     particular, the nationwide injunction argument references to

20     the sweeping nature of this Rule, to the great deal of

21     evidence of the problems.  We heard about all the amici who

22     filed briefs and the 20-some states that filed briefs.

23          I would just point out the more you hear that, I

24     would just ask Your Honor to think about the fact that, Well,

25     gosh, it's pretty weird to have a sweeping, but imperceptible

1    Rule, right?  Like it's sweeping, it covers all these people,

2    all these amici are in the case, the 20 states, everyone

3    showed up.  Nobody can find a soul.  Nobody can find one.

4    There's not one employer who said they're going to change.

5    There's not one employee who said they're going to lose it.

6    Maybe it's all fake.

7             I suggest to Your Honor it is all fake.  There's

8    actually not some huge group of people who are about to lose

9    coverage.  Why?  Because the actual objectors have their RFRA

10   suits.  Because the states and the feds have all of their

11   programs.  From the modern era through 2013, women got

12   contraceptives through a zillion different programs and they

13   didn't need nuns.

14            And so the idea that this is going to cause some

15   huge problem is just really farfetched and the more you talk

16   about how sweeping the relief needs to be and all these people

17   who are showing up tell you, yes, it's a problem in my state,

18   too, the more you should pause and say, Gosh, and none of you

19   people can find a soul, not one?  That's odd.  That's

20   consistent with the fact that it's not really the big problem

21   that they're claiming it's going to be.

22            Lastly, Your Honor, you said, you know, you're

23   wondering if there's a perfect solution on the nationwide

24   injunction point.  To be clear, The Little Sisters, we don't

25   take a position either way on scope of relief, on whether

1    nationwide injunctions are okay or not okay.

2         But I will say if you're looking for the perfect

3    solution, RFRA gave it to you.  RFRA gives you the solution

4    that lets you have a contraceptive mandate and lets a small

5    number of religious objectors not do it and lets all the other

6    ways that people can get contraceptives continue forward,

7    including changing Title X to make them more accessible.

8    That's your perfect solution.  Not a solution that instead

9    asks this Court to issue an order that puts the Administration

10   to an all-or-nothing choice, that either you have no

11   contraceptive mandate or you have one that gets Little Sisters

12   of the Poor.  That is the furthest from perfect kind of

13   solution you can have.

14        So I would just suggest that the RFRA solution, the

15   live and let live solution that says, We're big enough to both

16   have a lot of people that want contraceptives and a pretty

17   small minority to say, Hey, I can't have something to do with

18   that, the Government's got to do it another way, that's the

19   RFRA solution.  That's actually the perfect solution that

20   would get everything done.

21        Thank you, Your Honor.

22        THE COURT:  Okay.  Anything else from the

23   Plaintiffs?

24        MR. FISCHER:  Real briefly, Your Honor?

25        THE COURT:  Okay.

1            MR. FISCHER:  Just to be clear, Mr. Rienzi just

2       acknowledged that many of the objectors are protected by

3       injunction.  So if the Rule is not for the benefit of the

4       people who have objected, then whose benefit is it for?

5            To be clear, we do not know exactly how many women

6       will be affected because the way the Rule is written, the

7       notice provisions are almost seemingly designed to make it

8       difficult to figure out whether your employer is going to

9       withhold contraception.  There is just simply no additional

10      notice is required beyond that which is required by ERISA.  So

11      it's not like employers need to publicly announce that we are

12      not going to provide contraception any more.

13           I'm aware of a case where the college did publicly

14      announce, and it was met with significant backlash, and then

15      changed its mind which is probably a lesson to others that

16      perhaps they should not make a big deal out of the fact that

17      they're going to deny contraception.  That's not to say that

18      there are not entities that are planning to do it.

19           Finally, just to the nationwide injunction point,

20      although there are certainly laws restricting insurance to --

21      you know, the interstate sale of insurance, there is still a

22      nationwide market for insurance.  That's why ERISA exists.

23      There are companies that provide coverage for their employees

24      nationwide that are governed under ERISA.  As we mentioned

25      earlier, there are students in Pennsylvania who receive

1    coverage from their parents' plans up until age 26.  There's

2    just simply no clean way of carving out the harm to

3    Pennsylvania and New Jersey without leaving our states somehow

4    short of full relief than a nationwide injunction and that's

5    why we think it's appropriate here.

6              We think that the IRAP case does give some

7    direction.

8              I also would refer to the Texas versus United States

9    challenge to the DOPA Program which we discussed at length the

10   last time.  Now, again, that was a 4 to 4 decision, but

11   obviously four Justices agreed on standing, on the merits, and

12   on relief.  And the relief in that case was not limited to

13   Texas and the other Plaintiffs.  The relief was to strike down

14   the DOPA Program nationwide.  So four Justices of the Supreme

15   Court felt that was appropriate frankly on, I would submit,

16   much weaker evidence of harm.  There the harm in Texas was the

17   cost of providing driver's licenses to undocumented immigrants

18   who would be allowed to stay in the states.

19             We would submit the harm here is much more

20   significant.

21             So, at the very least, four Justices of the Supreme

22   Court gave pretty clear direction.

23             So with that, Your Honor we would again repeat our

24   request for nationwide injunction.

25             THE COURT:  Okay, thank you.

1          So the Final Rules are expected to go or scheduled

2     to go into effect on the 14th, is that correct?

3          MR. RIENZI:  Correct, Your Honor.

4          THE COURT:  Okay, I know you've told me before that

5     it doesn't really matter whether I rule before or after

6     because nothing's going to really happen for what, 30 to 60

7     days, but I am going to rule before the 14th or on the 14th.

8          So what is that?  When is the 14th?  Tuesday?

9          MR. FISCHER:  Monday, Your Honor.

10         THE COURT:  Monday.  So I'll be working on Sunday.

11         Okay, anything else before I get off the bench?

12         MR. FISCHER:  Nothing further, Your Honor.

13         MR. RIENZI:  Nothing from us, Your Honor.

14         MR. SANDBERG:  Nothing further, Your Honor.

15         THE COURT:  Great.  Thank you.

16              (Court adjourned)

17              C E R T I F I C A T E

18     I certify that the foregoing is a correct transcript

19     from the record of the proceedings in the above-entitled

20     matter.          _____

21                      Kathleen Feldman, CSR, CRR, RPR, CM
       DATE:            Official Court Reporter
22

23

24

25

## $

**$5,000** [1] - 123:24

## '

**'12** [1] - 59:16
**'13** [1] - 59:16
**'14** [1] - 59:16
**'15** [1] - 87:18

## 0

**01** [1] - 31:3
**08625-0112** [1] - 2:6

## 1

**1** [1] - 121:21
**10** [5] - 1:14, 22:11, 25:3, 25:4, 121:21
**100** [3] - 6:23, 21:21, 57:16
**112** [1] - 2:5
**12** [3] - 22:11, 25:3, 25:4
**1200** [1] - 2:15
**1234** [1] - 2:19
**13** [1] - 18:21
**13(a)(4** [1] - 40:18
**1391** [3] - 10:15, 12:1, 12:3
**1391(c** [1] - 17:4
**1391(c)(2** [1] - 14:17
**1391(e** [1] - 17:1
**1391(e)(1)(A** [1] - 15:25
**1391(e)(1)(A)** [1] - 12:8
**14** [2] - 18:21, 113:17
**14th** [4] - 131:2, 131:7, 131:8
**1600** [1] - 1:23
**17-4540** [2] - 1:8, 3:5
**18** [1] - 57:5
**19** [1] - 113:16
**19103** [1] - 1:23
**19106** [1] - 2:20
**1981** [3] - 35:14, 57:4, 57:6
**1982** [1] - 57:5
**1st** [4] - 31:22, 33:2, 42:10, 56:25

## 2

**2** [1] - 42:11
**20** [6] - 2:9, 66:5, 113:10, 117:5, 121:21, 127:2
**20-some** [1] - 126:22
**2000** [1] - 46:21
**2000bb-1(c** [1] - 84:22
**20036** [1] - 2:15
**2005** [1] - 10:7
**2011** [10] - 31:22, 33:2, 41:9, 42:10, 45:7, 45:21, 59:16, 62:23, 62:25, 71:12
**2012** [1] - 46:11
**2013** [8] - 31:24, 33:2, 42:11, 46:12, 62:23, 62:24, 95:6, 127:11
**2014** [3] - 46:21, 87:14, 87:18
**2015** [2] - 46:21, 88:20
**2016** [2] - 71:12, 88:20
**2017** [5] - 65:13, 69:10, 79:18, 95:21, 119:14
**2019** [2] - 1:14, 126:7
**20530** [1] - 2:10
**215)779-5578** [1] - 2:20
**25** [1] - 2:5
**26** [1] - 130:1
**28** [1] - 10:15
**2nd** [2] - 31:24, 33:2

## 3

**3** [1] - 41:11
**30** [2] - 35:13, 131:6
**300** [1] - 1:23
**300gg** [1] - 40:17
**31,700** [1] - 6:25
**35** [1] - 56:4

## 4

**4** [2] - 130:10
**41** [2] - 108:24, 108:25
**42** [1] - 40:17
**46,623** [1] - 45:7

## 5

**50** [5] - 8:23, 19:17, 82:25, 94:23, 115:18
**500** [2] - 124:2, 124:5
**553** [1] - 36:2
**556** [1] - 39:22
**57,540** [2] - 108:24, 108:25
**57,555** [1] - 39:21
**57,597** [2] - 109:4, 109:5
**5th** [1] - 119:14

## 6

**60** [1] - 131:6
**601** [1] - 2:19

## 7

**70,000** [1] - 31:1
**70,500** [1] - 7:1
**700** [1] - 2:15
**7062(a** [1] - 41:17
**7062(c** [1] - 41:17
**7302** [1] - 2:10
**76** [1] - 45:6

## 8

**8** [1] - 55:1
**80** [1] - 8:23
**83** [4] - 39:21, 108:22, 108:23, 109:4

## 9

**900,000** [1] - 55:1
**98** [1] - 109:6
**99** [3] - 54:2, 57:20, 58:5
**99-plus** [1] - 54:5

## A

**ability** [3] - 18:12, 72:24, 78:3
**able** [3] - 74:2, 115:10
**above-entitled** [1] - 131:19
**abruptly** [1] - 70:8
**absence** [3] - 29:6, 64:19, 64:20
**absent** [1] - 13:21
**absolutely** [8] - 35:6, 35:14, 35:23, 46:1, 62:5, 64:14, 67:18, 117:16
**abstract** [2] - 76:16, 76:17
**abuse** [2] - 41:18, 116:14
**ACA** [14] - 31:17, 40:16, 42:5, 46:2, 59:15, 77:14, 80:13, 80:15, 82:18, 82:19, 99:23, 103:18, 108:6
**accept** [2] - 64:25, 75:9
**accepted** [1] - 38:6
**access** [12] - 30:24, 31:9, 71:1, 71:3, 71:17, 71:24, 75:18, 96:12, 101:18, 102:7, 106:15, 115:19
**accessible** [1] - 128:7
**accommodate** [1] - 71:16
**accommodating** [1] - 97:24
**accommodation** [40] - 24:10, 24:12, 24:13, 50:6, 60:23, 60:24, 63:9, 64:4, 68:9, 68:14, 68:20, 68:25, 69:10, 69:15, 70:6, 78:18, 78:19, 78:23, 79:3, 79:16, 79:21, 83:7, 83:11, 87:13, 87:20, 88:7, 88:8, 89:1, 89:18, 93:25, 94:24, 101:4, 101:7, 101:8, 101:11, 101:13, 105:1, 117:21, 117:25
**accommodation's** [1] - 61:3
**accommodations** [2] - 94:21, 125:4
**accomodation** [2] - 24:23, 90:13
**accomplishing** [1] - 68:8
**accordance** [1] - 66:23
**accorded** [1] - 40:15
**according** [2] - 38:18, 56:3
**account** [7] - 9:20, 45:5, 59:25, 74:12, 74:20, 76:6, 107:13
**Accountability** [1] - 56:4

**absolutely** ...

**accurate** [1] - 61:6
**achieving** [1] - 112:15
**acknowledge** [4] - 4:18, 90:22, 97:10, 97:13
**acknowledged** [6] - 88:14, 89:13, 90:12, 90:24, 97:23, 129:2
**acknowledges** [1] - 46:3
**Act** [9] - 4:11, 5:19, 31:16, 66:19, 66:20, 76:3, 82:11, 82:12, 126:12
**act** [3] - 39:7, 46:5, 90:10
**acted** [1] - 90:11
**ACTION** [1] - 1:4
**action** [6] - 11:17, 29:20, 57:10, 66:25, 76:13, 101:1
**actors** [2] - 125:12, 125:17
**acts** [6] - 8:10, 25:13, 26:2, 81:9, 81:13
**actual** [4] - 27:24, 100:19, 101:1, 127:9
**add** [2] - 11:24, 122:23
**addition** [2] - 8:12, 11:21
**additional** [9] - 22:11, 40:20, 77:15, 77:17, 81:6, 103:18, 106:9, 129:9
**address** [18] - 6:19, 9:8, 9:17, 12:20, 12:25, 13:8, 13:12, 15:21, 25:14, 26:9, 30:20, 39:20, 39:22, 59:9, 81:23, 109:24, 116:22, 118:12
**addressed** [7] - 32:4, 39:25, 81:19, 95:21, 95:24, 111:13, 125:7
**addresses** [3] - 17:1, 17:3, 34:25
**addressing** [4] - 9:20, 22:24, 116:25, 117:2
**adds** [1] - 67:17
**adequacy** [1] - 30:6
**adequately** [2] - 27:18, 40:6
**adjourned** [1] - 131:16
**administer** [1] - 97:12
**Administration** [11] -

22:18, 41:13, 46:11, 59:16, 59:17, 61:22, 64:8, 79:19, 88:19, 95:5, 128:9

**Administration's** [2] - 19:20, 61:12

**Administrations** [1] - 85:7

**Administrative** [1] - 4:11

**administrative** [10] - 30:12, 36:25, 105:15, 105:16, 105:19, 106:15, 106:23, 107:14, 107:19, 119:8

**administrator** [1] - 97:11

**admits** [1] - 23:4

**admitted** [7] - 25:6, 68:1, 88:18, 88:19, 89:5, 89:6

**admittedly** [1] - 120:6

**adopts** [1] - 103:12

**advantage** [1] - 73:23

**advisory** [1] - 48:18

**affect** [1] - 63:11

**affected** [5] - 38:21, 39:24, 56:23, 122:9, 129:6

**affects** [1] - 9:13

**Affordable** [4] - 5:19, 31:15, 82:11, 82:12

**afforded** [1] - 42:5

**afterwards** [1] - 119:7

**age** [1] - 130:1

**Agencies** [62] - 5:20, 6:21, 6:24, 27:9, 27:13, 27:17, 28:11, 28:14, 28:17, 28:19, 28:23, 29:11, 30:8, 31:18, 31:22, 32:1, 32:21, 33:1, 33:15, 33:17, 34:14, 42:22, 44:18, 44:24, 44:25, 55:8, 56:6, 63:14, 63:24, 65:17, 68:13, 68:23, 69:2, 70:2, 71:8, 71:15, 71:19, 72:10, 72:19, 72:22, 73:22, 74:2, 74:6, 74:12, 74:22, 75:4, 75:6, 75:7, 75:16, 75:17, 77:13, 77:21, 77:22, 79:24, 85:8, 92:12, 92:22, 97:19, 109:25, 118:10, 119:15

**agencies** [2] - 14:24, 75:2

**Agencies'** [2] - 28:12, 72:3

**Agency** [54] - 27:3, 27:11, 29:19, 36:6, 36:16, 37:17, 38:15, 38:23, 39:11, 41:9, 42:1, 43:2, 43:3, 43:22, 43:23, 44:10, 44:21, 45:24, 59:18, 61:15, 64:25, 65:3, 65:22, 69:5, 69:7, 72:24, 73:8, 73:24, 74:21, 74:24, 74:25, 77:9, 77:23, 78:7, 79:7, 81:18, 81:22, 82:7, 83:25, 84:5, 89:24, 90:1, 91:9, 93:1, 103:11, 103:16, 103:21, 103:25, 104:18, 105:14, 105:25, 106:1, 106:4, 108:6

**agency** [1] - 85:4

**Agency's** [6] - 36:12, 41:3, 63:18, 74:20, 104:9, 109:17

**ago** [9] - 5:14, 25:4, 29:23, 31:17, 32:20, 34:11, 65:5, 126:8, 126:15

**agree** [8] - 22:22, 40:2, 44:21, 49:12, 60:12, 64:12, 89:21, 119:9

**agreed** [3] - 68:16, 69:2, 130:11

**ahead** [10] - 17:13, 34:9, 47:24, 59:10, 67:21, 67:24, 90:3, 92:12, 93:3, 111:9

**aid** [2] - 20:15, 20:16

**AIMEE** [1] - 1:22

**Aimee** [1] - 3:11

**Air** [1] - 76:3

**akin** [2] - 36:24, 37:13

**al** [2] - 1:5, 1:8

**Alabama** [2] - 10:7, 10:8

**Alito** [1] - 68:9

**ALL** [1] - 3:3

**all-or-nothing** [1] - 128:10

**allege** [2] - 4:12, 66:19

**alleged** [3] - 114:14, 116:8, 116:23

**alleges** [1] - 14:16

**allow** [8] - 15:8, 27:11, 29:18, 73:16, 116:15, 117:22, 118:5

**allowed** [6] - 38:17, 45:15, 69:2, 110:11, 112:8, 130:18

**allowing** [3] - 31:18, 101:17, 116:11

**allows** [2] - 73:16, 95:2

**almost** [7] - 27:8, 48:18, 58:10, 61:23, 65:16, 126:15, 129:7

**alone** [1] - 77:24, 78:2, 117:7

**alternative** [2] - 67:1, 93:23

**Alternatives** [7] - 69:17, 95:25, 96:6, 96:8, 96:10, 96:14, 96:16

**alternatives** [1] - 93:14

**ambiguity** [1] - 104:8

**ambiguous** [1] - 107:25

**amended** [1] - 10:15

**Amendment** [13] - 5:19, 31:15, 34:8, 43:12, 72:1, 72:20, 72:21, 75:13, 77:23, 78:7, 99:23, 103:10

**amendment** [1] - 78:5

**amendments** [3] - 35:8, 35:10, 35:13

**American** [1] - 113:13

**amici** [4] - 4:2, 126:21, 127:2

**amicus** [3] - 113:9, 117:4, 122:25

**analysis** [18] - 32:7, 34:6, 38:21, 47:3, 47:16, 49:3, 50:6, 62:9, 69:25, 70:4, 74:10, 74:13, 74:14, 76:15, 82:6, 82:9, 114:24, 116:8

**analyze** [1] - 107:1

**analyzing** [1] - 97:7

**AND** [2] - 1:10, 2:3

**anecdotally** [1] - 43:25

**announce** [2] - 129:11, 129:14

**anomalous** [1] - 75:23

**anomaly** [1] - 12:13

**answer** [11] - 33:4,

33:9, 41:20, 44:14, 53:21, 62:9, 72:13, 72:14, 98:18, 103:3, 112:11

**answered** [1] - 98:20

**answering** [1] - 38:23

**answers** [1] - 102:19

**anyplace** [1] - 88:23

**anyway** [2] - 91:11, 91:20

**APA** [43] - 5:17, 12:20, 26:9, 26:10, 26:23, 27:3, 27:5, 27:8, 28:6, 28:7, 28:10, 28:14, 28:24, 29:15, 29:18, 29:25, 30:4, 30:8, 30:15, 35:25, 37:18, 40:9, 40:10, 41:4, 41:17, 42:16, 44:19, 46:18, 46:19, 47:3, 47:10, 48:15, 64:24, 65:21, 66:24, 67:2, 67:7, 69:4, 81:18, 86:12, 92:11

**APA's** [2] - 27:1, 27:4

**appeal** [1] - 4:19

**Appeal** [1] - 68:16

**Appeals** [5] - 5:4, 46:19, 70:5, 80:21, 89:23

**APPEARANCES** [2] - 1:19, 2:1

**applicability** [2] - 80:8, 85:2

**applicable** [4] - 72:11, 77:24, 78:9, 125:15

**applied** [5] - 34:12, 45:1, 48:11, 72:16, 105:5

**applies** [12] - 12:1, 13:24, 29:10, 34:12, 56:18, 77:5, 78:21, 82:1, 92:1, 92:7, 112:3, 120:14

**apply** [6] - 11:1, 12:2, 13:16, 14:6, 78:20, 80:17

**applying** [2] - 11:8, 82:8

**approach** [3] - 5:2, 65:22, 94:4

**approached** [2] - 28:19, 65:17

**appropriate** [14] - 45:4, 76:8, 79:9, 79:10, 110:4, 110:24, 111:2, 115:23,

118:25, 119:25, 123:11, 124:7, 130:5, 130:15

**appropriately** [4] - 38:18, 38:24, 81:12, 123:19

**appropriateness** [1] - 119:3

**arbitrary** [5] - 7:3, 41:17, 67:9, 71:6, 107:22

**Arch** [1] - 1:23

**area** [1] - 124:2

**areas** [1] - 48:21

**arguably** [1] - 12:12

**argue** [7] - 10:14, 15:10, 17:19, 27:25, 36:5, 54:11, 66:21

**argued** [4] - 8:5, 11:10, 50:4, 97:18

**arguing** [3] - 22:17, 52:6, 59:4

**argument** [69] - 4:8, 10:18, 12:9, 12:10, 12:21, 12:24, 13:1, 15:11, 15:13, 15:24, 15:25, 16:23, 17:6, 17:16, 20:5, 20:6, 20:7, 26:22, 27:17, 27:19, 35:20, 36:1, 36:24, 37:5, 37:13, 38:1, 40:4, 40:9, 43:19, 48:12, 50:1, 51:8, 54:15, 54:18, 55:4, 55:11, 55:13, 58:24, 60:20, 61:12, 61:16, 62:17, 67:1, 67:17, 74:24, 79:23, 80:5, 80:12, 81:7, 81:16, 81:17, 82:3, 82:4, 83:23, 86:12, 87:3, 87:19, 88:4, 88:11, 92:21, 98:4, 98:7, 107:10, 108:8, 109:10, 109:13, 120:1, 120:15, 126:19

**ARGUMENT** [1] - 1:17

**argument's** [1] - 16:14

**arguments** [12] - 7:10, 13:15, 15:22, 16:4, 27:22, 40:7, 59:13, 60:11, 62:9, 81:18, 95:23, 117:13

**arises** [1] - 9:12

**arising** [1] - 4:10

**Article** [8] - 17:18, 18:8, 18:13, 18:17, 18:20, 89:25, 92:25,

120:13
**articulated** [1] - 84:13
**as"** [3] - 108:8, 108:15, 109:9
**aside** [2] - 66:24, 81:17
**asides** [1] - 124:16
**aspect** [6] - 4:22, 25:22, 28:3, 39:19, 81:24, 124:19
**aspects** [4] - 5:17, 82:20, 110:14
**assert** [7] - 7:11, 12:7, 13:14, 15:12, 52:10, 63:14
**asserted** [2] - 7:18, 118:2
**asserting** [3] - 52:14, 64:17, 111:24
**asserts** [1] - 12:6
**assessing** [1] - 106:4
**assessment** [1] - 109:17
**Assistance** [1] - 123:9
**Assistant** [1] - 2:4
**associated** [1] - 8:20
**Association** [1] - 113:13
**associations** [1] - 10:24
**assume** [4] - 17:4, 20:18, 55:14, 85:16
**assumes** [1] - 73:15
**attempt** [2] - 70:3, 72:3
**attention** [2] - 105:2, 126:2
**ATTORNEY** [2] - 1:20, 2:3
**Attorney** [3] - 1:21, 1:22, 2:4
**August** [3] - 31:22, 33:2, 42:10
**authority** [43] - 27:3, 27:6, 27:12, 29:2, 31:18, 32:1, 32:21, 32:25, 33:12, 34:14, 35:4, 41:3, 42:6, 42:7, 45:9, 60:4, 63:14, 63:18, 63:19, 63:20, 63:22, 64:19, 67:8, 67:9, 72:10, 73:13, 73:22, 74:7, 76:22, 77:1, 77:7, 77:8, 77:13, 77:16, 77:19, 80:13, 91:12, 97:6, 108:6, 108:7, 108:9,

108:14
**authorize** [1] - 93:9
**authorized** [4] - 27:5, 66:21, 68:4, 72:25
**authorizes** [6] - 77:12, 79:23, 80:5, 82:3, 86:14, 93:7
**authorizing** [2] - 86:17, 86:21
**auxiliaries** [5] - 33:22, 43:20, 45:2, 60:17, 64:4
**availability** [1] - 105:5
**available** [1] - 114:18
**Ave** [1] - 2:15
**Avenue** [1] - 2:9
**avenues** [1] - 11:12
**avoid** [3] - 74:15, 85:9, 103:6
**aware** [4] - 47:8, 47:11, 79:7, 79:20, 84:11, 93:4, 119:2, 129:13

### B

**backdrop** [3] - 45:12, 75:6, 119:24
**background** [8] - 7:4, 72:22, 73:3, 75:15, 76:21, 76:22, 76:24, 77:3
**backlash** [1] - 129:14
**backs** [1] - 81:17
**backwards** [1] - 84:18
**bad** [3] - 81:10, 125:12, 125:17
**balance** [5] - 61:21, 61:23, 66:10, 115:2, 116:14
**balances** [2] - 123:16, 123:17
**balancing** [2] - 110:7, 123:16
**ban** [2] - 110:9, 115:1
**barrier** [2] - 125:16, 125:19
**based** [15] - 18:23, 23:19, 44:8, 48:20, 48:23, 55:23, 60:21, 62:25, 73:13, 76:3, 82:14, 84:6, 96:21, 97:2, 122:7
**baseline** [1] - 72:7
**bases** [3] - 40:11,

83:25, 109:11
**basis** [28] - 9:4, 14:16, 25:21, 26:1, 37:22, 42:6, 43:7, 43:12, 43:15, 43:17, 44:6, 44:7, 46:14, 76:19, 80:17, 81:2, 81:4, 82:1, 88:24, 105:6, 105:8, 107:15, 108:19, 109:9, 109:11, 122:7, 125:14, 125:19
**basket** [1] - 45:13
**beat** [1] - 92:8
**BECKET** [1] - 2:12
**becomes** [1] - 125:19
**BEETLESTONE** [1] - 1:16
**BEFORE** [1] - 1:16
**begin** [1] - 4:17
**beginning** [2] - 6:10, 61:13
**behave** [1] - 92:10
**behavior** [4] - 81:10, 81:14, 83:21, 86:24
**belabor** [1] - 7:10
**belief** [1] - 118:6
**beliefs** [7] - 44:9, 45:6, 69:23, 76:12, 90:16, 108:13, 118:2
**bench** [1] - 131:11
**benefit** [8] - 6:15, 92:14, 92:19, 109:15, 111:20, 116:16, 129:3, 129:4
**benefits** [5] - 92:20, 107:23, 107:25, 115:8, 115:11
**best** [5] - 5:1, 24:9, 48:9, 72:12, 72:14, 80:10, 85:5, 103:7
**better** [8] - 73:4, 76:18, 79:17, 94:7, 94:8, 94:16, 118:17
**between** [11] - 17:16, 17:23, 42:7, 43:17, 58:7, 71:9, 80:15, 81:12, 100:10, 116:1, 116:17
**beyond** [4] - 13:19, 39:22, 112:16, 129:10
**big** [8] - 19:17, 19:24, 20:5, 22:3, 61:3, 127:20, 128:15, 129:16
**binding** [5] - 69:17, 90:19, 90:20, 96:7, 96:23
**binds** [1] - 95:18

**bit** [9] - 10:3, 34:18, 50:3, 56:11, 56:21, 58:21, 103:14, 107:9, 120:25
**bizarre** [2] - 92:11, 93:11
**blanche** [1] - 29:24
**bleed** [1] - 37:19
**blocking** [1] - 5:15
**board** [1] - 115:17
**bodies** [1] - 73:13
**bolsters** [1] - 62:17
**borders** [6] - 10:1, 10:6, 10:10, 11:23, 112:16, 114:20
**borne** [4] - 8:16, 8:21, 9:2, 89:15
**bound** [1] - 91:22
**Box** [1] - 2:5
**brakes** [1] - 114:4
**branch** [1] - 85:4
**break** [1] - 66:6
**breaks** [1] - 115:6
**brevity** [1] - 13:13
**brief** [24] - 8:18, 15:10, 15:23, 16:4, 17:19, 18:19, 25:19, 25:23, 41:12, 42:4, 63:4, 64:9, 86:9, 88:3, 96:1, 98:21, 99:20, 112:17, 113:9, 113:17, 117:4, 122:25, 124:16, 125:23
**briefing** [12] - 17:8, 37:11, 40:21, 47:1, 64:10, 66:20, 67:12, 67:16, 88:2, 101:16, 106:9, 107:18
**briefly** [8] - 7:11, 17:12, 25:14, 27:16, 99:19, 123:7, 124:18, 128:24
**briefs** [10] - 13:14, 13:15, 14:12, 17:7, 49:7, 86:11, 93:6, 97:1, 126:22
**bring** [1] - 59:2
**brings** [1] - 123:2
**broad** [1] - 108:14
**broad-sweeping** [1] - 108:14
**broadcaster** [1] - 44:4
**broadcasters** [1] - 43:25
**broader** [9] - 79:14, 86:19, 114:18, 114:19, 114:22, 116:2, 116:20,

123:20, 124:12
**broadly** [2] - 30:21, 32:19
**brought** [3] - 41:17, 111:11, 124:2
**brush** [2] - 27:16, 40:24, 66:17
**building** [2] - 123:23, 124:2
**built** [7] - 36:12, 38:20, 38:22, 39:9, 39:16, 57:8, 58:17
**bulls** [1] - 94:8
**bunch** [6] - 19:22, 49:13, 54:6, 55:21, 94:10, 126:18
**burden** [62] - 23:6, 31:5, 31:6, 60:21, 60:23, 60:25, 61:7, 61:9, 63:25, 68:15, 68:22, 68:25, 69:16, 69:19, 69:20, 69:24, 70:1, 70:6, 74:9, 80:21, 80:22, 81:3, 81:25, 82:2, 82:5, 85:1, 87:11, 87:12, 87:15, 89:12, 89:19, 90:17, 90:18, 91:7, 91:19, 93:3, 93:13, 94:18, 96:19, 96:22, 97:21, 97:25, 98:9, 98:10, 98:12, 98:15, 98:16, 99:8, 100:12, 100:19, 100:25, 101:1, 101:13, 106:21, 107:5, 108:1, 108:12, 115:12, 120:21
**burdened** [2] - 76:13, 79:3
**burdening** [1] - 86:6
**burdens** [1] - 91:9
**burdensome** [1] - 68:11
**bureaucratic** [1] - 36:11
**business** [3] - 14:19, 14:22, 15:7
**businesses** [1] - 126:5
**BY** [4] - 1:21, 2:4, 2:8, 2:13
**bypass** [1] - 27:4

### C

**C.A.T** [1] - 2:21
**California** [5] - 16:16, 16:20, 16:22,

111:7, 114:13
**cannot** [4] - 11:4,
18:22, 87:10, 117:18
**capacity** [2] - 14:20,
17:6
**capital** [2] - 16:7,
16:8
**capricious** [3] -
41:18, 71:7, 107:22
**Care** [4] - 5:19,
31:15, 82:11, 82:12
**care** [25] - 8:11,
19:18, 40:20, 42:24,
43:2, 43:5, 45:25,
46:10, 71:2, 71:3,
71:18, 75:19, 75:25,
83:1, 83:2, 89:25,
90:5, 91:10, 91:18,
102:9, 102:10,
102:13, 105:11,
125:14, 125:15
**caring** [1] - 93:2
**carries** [1] - 34:21
**carry** [2] - 108:1,
110:22
**carte** [1] - 29:24
**carving** [1] - 130:2
**case** [98] - 4:19,
5:16, 7:3, 9:15, 12:5,
13:16, 13:20, 13:23,
14:4, 14:6, 15:17,
16:15, 16:23, 18:21,
28:2, 29:3, 29:19,
32:4, 32:11, 34:6,
34:16, 34:19, 35:1,
35:7, 35:17, 37:16,
37:24, 38:4, 38:5,
38:25, 50:22, 51:4,
52:1, 52:5, 55:25,
56:16, 56:17, 56:19,
56:22, 57:3, 57:9,
57:12, 57:17, 58:6,
58:8, 58:16, 59:1,
59:2, 62:1, 63:6,
63:16, 67:14, 68:12,
78:16, 79:5, 79:10,
80:18, 80:20, 84:13,
85:22, 89:14, 89:16,
90:24, 96:17, 96:20,
96:21, 97:15, 107:8,
110:13, 111:2, 111:4,
111:7, 111:9, 113:4,
113:7, 113:24, 114:3,
114:5, 114:18,
114:23, 115:1, 116:9,
119:2, 119:5, 119:7,
119:11, 123:1, 123:4,
123:9, 126:15, 127:2,
129:13, 130:6, 130:12
**case-specific** [1] -

34:6
**cases** [44] - 7:15,
21:22, 22:24, 23:22,
24:22, 25:20, 25:23,
25:24, 36:24, 37:3,
37:6, 37:12, 47:15,
49:9, 49:11, 49:12,
49:14, 51:3, 55:17,
55:18, 55:19, 55:21,
58:24, 62:1, 79:5,
87:25, 91:2, 92:12,
92:14, 92:15, 92:19,
94:11, 96:2, 110:9,
111:10, 111:16,
111:18, 114:3, 118:1,
122:16, 122:17,
122:20, 125:13
**categories** [2] -
83:14, 112:18
**category** [1] - 21:25
**cathedral** [1] - 85:14
**causal** [1] - 121:23
**ceasing** [1] - 123:25
**centers** [2] - 21:17,
21:18
**central** [1] - 37:25
**Centro** [2] - 85:22,
85:23
**cert** [3] - 23:1, 23:2
**certain** [15] - 10:16,
33:14, 41:24, 42:1,
42:18, 45:6, 64:1,
81:19, 82:20, 85:8,
85:24, 97:12, 100:6,
121:13
**certainly** [37] - 7:6,
14:18, 16:5, 16:11,
25:2, 31:2, 32:9, 33:7,
43:11, 44:9, 48:12,
73:25, 74:7, 77:9,
77:16, 80:20, 80:21,
80:23, 81:16, 81:20,
83:22, 83:23, 85:17,
95:22, 96:8, 106:10,
106:20, 111:2,
113:23, 119:10,
121:21, 122:6, 123:9,
124:14, 124:23,
126:16, 129:20
**certify** [1] - 131:18
**cetera** [1] - 70:21
**chain** [2] - 121:23,
122:8
**challenge** [12] - 5:13,
6:16, 18:8, 25:18,
27:23, 36:2, 42:15,
42:16, 47:9, 64:7,
120:8, 130:9
**challenged** [4] -
12:5, 50:8, 51:13,

63:16
**challenges** [5] -
41:17, 41:19, 41:23,
44:18, 46:14
**challenging** [12] -
28:3, 29:14, 32:17,
47:13, 63:8, 63:10,
64:22, 117:20,
117:21, 117:22,
118:19
**chance** [3] - 17:8,
65:13, 106:25
**change** [14] - 18:23,
36:7, 36:17, 48:12,
58:20, 65:4, 65:6,
69:2, 73:9, 76:4,
85:12, 103:9, 104:25,
127:4
**changed** [8] - 5:22,
6:11, 6:12, 22:8,
22:10, 24:9, 105:4,
129:15
**changes** [9] - 4:21,
34:5, 39:14, 48:13,
67:10, 102:21,
102:24, 103:2, 104:16
**changing** [3] - 92:14,
104:21, 128:7
**charged** [1] - 75:23
**Chevron** [3] - 32:7,
103:12, 104:5
**Chicago** [3] - 90:7,
114:5, 114:10
**Chicago's** [1] -
114:10
**Chief** [1] - 1:21
**childbirth** [1] - 20:21
**choice** [5] - 64:5,
71:9, 91:25, 95:19,
128:10
**choices** [3] - 64:6,
91:24, 92:4
**choose** [3] - 15:9,
15:15, 121:18
**chose** [1] - 54:1
**Chuang** [1] - 8:6
**church** [5] - 83:5,
83:6, 83:8, 83:11,
94:25
**churches** [5] - 33:18,
33:21, 45:1, 64:4,
98:15
**Churches** [2] -
43:14, 43:19
**Circuit** [34] - 4:18,
9:25, 10:4, 10:18,
11:9, 12:10, 29:3,
29:4, 29:8, 29:16,
34:19, 35:5, 35:12,
35:16, 36:21, 38:10,

38:18, 46:20, 46:22,
55:20, 55:22, 57:24,
65:19, 68:17, 69:16,
80:25, 87:2, 90:23,
100:15, 100:18,
111:10, 116:20,
119:2, 122:13
**Circuit's** [2] - 6:16,
49:3
**circuits** [2] - 111:6,
111:14
**circumstance** [2] -
29:10, 34:5
**circumstances** [3] -
13:22, 27:8, 101:12
**citation** [1] - 109:1,
114:5
**cite** [9] - 25:23,
25:24, 26:3, 41:12,
49:8, 55:25, 66:24,
104:25, 108:20
**cited** [5] - 25:20,
41:11, 42:4, 87:2,
88:1
**cites** [2] - 49:14,
108:21
**cities** [2] - 114:6,
114:8
**civil** [2] - 91:14,
95:20
**CIVIL** [1] - 1:4
**Civil** [1] - 66:19
**claim** [27] - 18:5,
18:11, 18:12, 23:14,
25:22, 30:6, 37:18,
59:3, 60:9, 61:24,
67:14, 71:24, 88:22,
88:24, 88:25, 96:3,
96:9, 96:11, 96:13,
97:8, 101:17, 102:1,
102:4, 117:2, 126:3
**claim's** [1] - 126:7
**claimed** [1] - 63:18,
71:20, 97:1
**claiming** [2] -
100:19, 127:21
**claims** [6] - 16:10,
26:24, 49:6, 69:24,
126:5, 126:6
**clarify** [1] - 103:1
**clarifying** [2] -
104:17, 104:22
**class** [1] - 116:15
**clause** [7] - 45:1,
59:23, 60:7, 60:13,
60:16, 60:20, 98:11
**Clean** [1] - 76:3
**clean** [1] - 130:2
**clear** [24] - 9:5, 9:16,
11:6, 17:15, 27:16,

36:8, 40:24, 46:16,
51:24, 60:12, 63:23,
92:23, 92:24, 101:24,
102:5, 104:6, 116:21,
117:16, 117:24,
127:24, 129:1, 129:5,
130:22
**clearing** [1] - 66:17
**clearing-the-brush**
[1] - 66:17
**clearly** [12] - 15:17,
16:22, 36:3, 40:1,
40:7, 61:13, 61:14,
98:18, 104:4, 111:6,
120:14, 125:12
**Clerk** [1] - 3:1
**CLERK** [1] - 66:14
**clients** [6] - 21:4,
21:8, 50:11, 51:14,
60:14, 91:3
**climate** [2] - 76:4,
85:12
**clinic** [1] - 101:18
**clinics** [3] - 7:23,
101:24, 102:3
**closed** [2] - 37:9,
37:15
**closely** [3] - 44:3,
57:25, 78:21
**closely-held** [1] -
44:3
**closer** [2] - 7:1, 35:1
**closest** [1] - 35:1
**CM** [2] - 2:18, 131:21
**coach's** [1] - 25:18
**coast** [2] - 55:2, 55:3
**Code** [1] - 56:5
**cogent** [1] - 30:10
**colleague** [1] - 44:12
**colleague's** [1] -
84:11
**college** [8] - 7:15,
112:5, 112:8, 113:21,
121:1, 121:2, 121:12,
129:13
**College** [30] - 24:11,
46:24, 68:17, 69:17,
69:19, 70:4, 88:2,
88:11, 88:12, 88:25,
90:23, 95:25, 96:4,
96:7, 96:8, 96:15,
96:17, 96:20, 96:23,
97:2, 97:6, 97:7,
100:10, 100:13,
100:18, 101:2, 113:14
**colleges** [2] -
113:12, 113:20
**colloquy** [3] - 80:3,
80:8, 118:14
**Colorado** [2] - 90:6,

117:18
**Columbia** [1] - 113:10
**coming** [1] - 126:5
**command** [1] - 86:6
**commanded** [1] - 18:10
**Comment** [1] - 58:11
**comment** [40] - 27:4, 28:1, 28:4, 28:6, 28:8, 28:15, 28:18, 29:7, 29:12, 29:19, 29:22, 29:25, 30:3, 30:7, 35:8, 36:3, 36:4, 37:10, 38:6, 39:1, 49:8, 49:15, 49:16, 49:21, 49:24, 50:23, 58:9, 64:24, 64:25, 65:2, 65:13, 65:16, 65:18, 65:20, 65:23, 124:18
**commentary** [1] - 29:24
**commentators** [2] - 30:18, 30:21
**commented** [3] - 55:7, 55:9
**commented-on** [1] - 55:9
**comments** [24] - 27:10, 27:18, 28:25, 30:9, 30:17, 37:17, 37:20, 37:23, 39:14, 39:17, 40:1, 40:3, 48:6, 50:8, 53:21, 54:24, 55:1, 55:8, 56:7, 57:6, 62:5, 65:8, 81:19
**common** [4] - 10:8, 11:2, 15:2, 15:6
**commonly** [1] - 42:25
**COMMONWEALTH** [2] - 1:4, 1:20
**Commonwealth** [12] - 1:24, 3:4, 3:10, 3:11, 11:22, 28:19, 30:16, 30:22, 51:22, 111:8, 113:16, 113:23
**commute** [1] - 112:20
**commuting** [1] - 112:24
**companies** [9] - 65:11, 78:21, 117:23, 118:1, 124:18, 124:22, 124:24, 125:3, 129:23
**company** [2] - 118:3, 118:6

**compared** [1] - 65:6
**compelling** [20] - 33:17, 44:8, 64:2, 68:8, 68:10, 70:13, 70:17, 70:18, 70:22, 82:7, 83:19, 83:24, 84:1, 84:7, 84:8, 84:12, 84:13, 99:13, 100:7
**complaining** [1] - 54:16
**Complaint** [5] - 51:25, 52:11, 52:14, 52:15, 66:18
**Complaints** [2] - 47:13
**complete** [5] - 46:12, 57:13, 57:14, 116:2, 118:22
**completely** [4] - 45:16, 45:17, 71:22, 117:25
**Complex** [1] - 2:5
**complicated** [1] - 114:2
**complicit** [2] - 81:10, 81:13
**comply** [6] - 30:15, 72:19, 72:22, 73:1, 95:10
**component** [1] - 82:9
**components** [1] - 24:19
**comport** [1] - 5:21
**computer** [1] - 44:22
**conceded** [4] - 92:2, 96:25, 97:4, 97:5
**concept** [2] - 82:21, 116:1
**concern** [1] - 73:8
**concerned** [4] - 30:1, 57:25, 65:19, 65:20
**concerns** [3] - 111:1, 118:12, 118:13
**concession** [2] - 101:4, 101:9
**concessions** [1] - 90:21
**conclude** [1] - 33:16
**concluded** [4] - 43:24, 68:14, 68:24, 82:7
**conclusion** [6] - 40:6, 48:19, 53:23, 53:24, 73:15, 83:25
**conclusions** [2] - 107:21, 108:2
**condition** [1] - 8:8
**conduct** [6] - 7:5,

66:21, 66:22, 86:14, 86:18, 86:21
**conference** [1] - 48:8
**confident** [3] - 113:6, 113:20, 113:21
**conflict** [1] - 80:15
**conflicting** [2] - 80:11, 80:12
**confusing** [1] - 49:10
**confusion** [1] - 103:6
**congress** [1] - 72:15
**Congress** [21] - 10:22, 11:4, 41:7, 42:22, 42:23, 42:25, 43:1, 59:23, 72:16, 75:15, 75:20, 77:5, 84:2, 85:8, 86:6, 91:6, 92:11, 104:6, 104:7, 126:16
**Congressional** [1] - 11:7
**connect** [1] - 20:14
**connection** [1] - 62:15
**conscience** [1] - 43:5
**consider** [28] - 7:4, 17:9, 30:9, 37:10, 40:3, 40:6, 53:20, 74:18, 75:16, 76:1, 76:10, 77:9, 77:21, 87:1, 89:17, 101:3, 115:23, 117:11, 123:13, 123:15, 123:22, 124:1, 124:6, 124:8, 124:11
**consideration** [6] - 30:7, 39:17, 54:8, 54:12, 74:8, 119:3
**considered** [7] - 37:17, 37:20, 53:22, 102:2, 111:21, 116:13, 118:18
**considering** [4] - 12:11, 28:25, 74:4, 97:16
**consistent** [5] - 35:6, 42:21, 43:1, 77:19, 127:20
**consistently** [1] - 68:14
**constitute** [2] - 31:3, 100:25
**Constitution** [5] - 73:2, 75:7, 75:8, 75:13, 99:3
**constitutional** [2] - 11:5, 67:14
**Constitutional** [1] - 75:6

**CONT** [1] - 1:25, 2:1
**contains** [1] - 31:17
**content** [2] - 13:14, 14:11
**context** [4] - 32:8, 49:11, 85:21, 120:6
**contexts** [2] - 85:18, 88:16
**continually** [1] - 35:11
**continue** [8] - 13:14, 22:17, 29:21, 34:7, 38:7, 38:9, 38:12, 128:6
**continued** [3] - 35:15, 38:4, 111:9
**continuing** [1] - 35:6
**continuum** [3] - 76:23, 76:24, 76:25
**contraception** [18] - 8:5, 8:10, 17:24, 31:9, 71:9, 71:11, 100:21, 102:8, 102:9, 107:23, 112:9, 112:12, 115:19, 117:19, 118:8, 129:9, 129:12, 129:17
**contraceptive** [43] - 7:16, 19:15, 19:16, 23:13, 30:24, 45:24, 46:6, 50:5, 50:23, 51:10, 53:24, 54:1, 54:3, 54:4, 54:9, 54:10, 56:1, 56:14, 57:18, 58:4, 58:16, 58:25, 59:4, 60:9, 68:6, 71:12, 71:18, 71:25, 82:10, 82:13, 82:16, 83:3, 83:17, 86:17, 99:24, 100:23, 101:19, 111:25, 117:24, 121:14, 128:4, 128:11
**contraceptives** [20] - 18:14, 45:13, 45:19, 61:18, 61:23, 84:3, 84:4, 84:7, 93:17, 93:18, 93:19, 95:10, 95:15, 98:24, 109:18, 121:7, 121:11, 127:12, 128:6, 128:16
**contraindicated** [2] - 8:9, 30:18
**contrary** [5] - 29:18, 44:10, 71:7, 79:12, 81:15
**control** [2] - 16:12, 88:17
**controlled** [1] - 16:9
**controls** [1] - 101:2

**convictions** [1] - 55:23
**convinced** [2] - 48:14, 48:24
**convincing** [1] - 48:9
**copious** [1] - 78:13
**corporation** [3] - 34:2, 70:25, 126:13
**corporations** [3] - 10:21, 33:25, 126:12
**correct** [17] - 6:4, 9:10, 10:22, 11:25, 12:12, 16:1, 27:18, 41:5, 52:2, 52:4, 84:21, 103:24, 104:2, 105:9, 131:2, 131:3, 131:18
**correctly** [4] - 10:18, 12:11, 34:11, 118:5
**correctness** [2] - 105:25, 106:4
**cost** [3] - 9:1, 124:5, 130:17
**costs** [6] - 8:16, 8:20, 86:23, 115:16, 115:21
**counsel** [1] - 79:12
**Counsel** [1] - 2:14
**COUNSEL** [1] - 3:3
**counseling** [1] - 99:25
**Count** [2] - 66:18, 66:25
**count** [3] - 67:5, 67:7
**country** [19] - 5:24, 7:14, 8:16, 22:12, 23:5, 25:5, 25:7, 43:5, 54:2, 62:2, 86:5, 88:23, 112:8, 113:1, 115:3, 115:15, 115:21, 118:20, 118:21
**counts** [3] - 47:14, 67:6
**couple** [9] - 13:25, 15:21, 41:12, 84:18, 94:19, 96:2, 104:18, 122:14, 124:16
**course** [5] - 36:14, 75:17, 118:4, 123:1, 124:7
**COURT** [156] - 1:1, 3:2, 3:4, 3:15, 3:24, 4:6, 4:16, 5:6, 9:6, 9:23, 12:15, 12:21, 12:24, 13:3, 13:5, 13:16, 13:19, 14:10, 14:14, 15:24, 16:2, 17:10, 17:13, 17:25, 20:25, 21:2, 22:20,

22:23, 23:1, 23:21,
23:25, 24:3, 24:6,
24:12, 24:15, 24:18,
24:24, 25:9, 25:15,
26:5, 26:7, 26:10,
26:12, 26:18, 27:15,
27:21, 27:23, 31:20,
32:13, 32:23, 33:6,
33:8, 33:11, 34:9,
34:17, 34:25, 35:18,
35:21, 35:24, 36:19,
40:24, 41:2, 41:6,
41:15, 41:25, 42:10,
42:15, 42:20, 44:14,
44:17, 45:8, 45:23,
46:13, 46:17, 47:3,
47:8, 47:16, 47:19,
47:24, 48:2, 49:2,
49:5, 51:2, 51:8,
51:20, 51:23, 52:2,
52:5, 52:10, 53:3,
59:10, 62:12, 62:14,
62:16, 62:20, 64:10,
64:12, 66:3, 66:15,
67:4, 67:16, 67:19,
67:21, 72:5, 73:5,
73:17, 73:20, 74:11,
74:19, 75:9, 75:11,
76:2, 76:20, 77:22,
78:4, 84:15, 86:8,
99:19, 102:15,
102:17, 103:5,
103:14, 103:22,
103:25, 104:3,
104:10, 104:14,
104:23, 105:10,
105:15, 106:12,
106:19, 107:17,
108:20, 108:23,
108:25, 109:3, 109:5,
109:7, 109:12,
109:19, 110:16,
110:18, 112:17,
113:13, 115:25,
119:17, 119:21,
125:22, 125:25,
128:22, 128:25,
130:25, 131:4,
131:10, 131:15
    **Court** [112] - 2:18,
4:20, 4:23, 5:3, 5:12,
5:14, 6:4, 6:24, 7:9,
8:17, 9:11, 9:19, 9:22,
12:7, 12:17, 12:20,
13:7, 13:9, 13:11,
14:7, 14:8, 17:7,
17:21, 18:13, 21:7,
22:21, 22:22, 22:24,
26:3, 27:13, 33:13,
39:8, 40:18, 46:19,
46:24, 48:22, 50:1,

50:16, 55:3, 55:4,
56:8, 56:19, 57:11,
59:1, 59:12, 63:21,
63:23, 67:15, 68:5,
69:3, 69:18, 69:22,
71:14, 79:18, 80:7,
80:9, 80:12, 80:16,
80:21, 81:10, 83:18,
84:11, 84:14, 88:20,
89:17, 89:23, 90:19,
93:1, 93:12, 93:13,
93:21, 93:24, 94:4,
94:17, 94:19, 95:12,
96:24, 97:1, 97:16,
98:22, 100:15, 101:6,
101:9, 101:11,
105:23, 106:5, 106:8,
110:1, 110:9, 110:13,
110:23, 111:18,
111:19, 111:22,
115:23, 116:9,
116:13, 117:10,
117:18, 120:7,
123:12, 123:22,
124:14, 125:2,
125:21, 128:9,
130:15, 130:22,
131:16, 131:21
    **court** [28] - 3:1, 10:7,
25:5, 25:7, 32:5, 37:3,
37:8, 37:14, 37:15,
37:21, 47:16, 50:8,
51:2, 51:6, 62:1,
74:19, 87:1, 88:23,
90:2, 92:16, 92:18,
98:2, 101:6, 105:21,
123:5
    **Court's** [12] - 4:7,
6:11, 37:25, 71:22,
87:6, 106:1, 110:8,
114:25, 120:5,
122:11, 123:16
    **court's** [1] - 13:24
    **Courthouse** [1] -
2:19
    **courtroom** [4] - 4:1,
4:2, 97:8
    **Courts** [4] - 68:16,
70:5, 90:1, 101:3
    **courts** [23] - 9:19,
10:23, 14:2, 16:10,
16:11, 16:12, 17:25,
22:20, 25:25, 47:12,
49:17, 73:16, 89:21,
89:22, 90:20, 91:8,
91:13, 92:3, 93:5,
111:20, 111:21,
114:4, 123:14
    **cover** [21] - 19:15,
19:16, 19:18, 19:19,

23:13, 31:19, 71:9,
82:13, 82:20, 83:16,
84:2, 86:22, 94:22,
100:20, 112:9,
112:12, 112:23,
121:7, 121:13, 123:6,
126:10
    **coverage** [29] - 7:16,
8:2, 8:24, 17:23,
18:23, 19:9, 20:18,
30:24, 57:19, 68:21,
71:13, 71:18, 71:25,
82:11, 82:14, 82:17,
82:22, 83:1, 83:2,
83:3, 83:17, 83:20,
84:7, 111:25, 121:16,
121:18, 127:9,
129:23, 130:1
    **covered** [10] - 43:21,
57:19, 60:18, 82:16,
83:14, 83:17, 83:21,
83:22, 84:4, 86:22
    **covering** [2] - 98:19,
121:13
    **covers** [5] - 19:16,
20:7, 83:15, 120:11,
127:1
    **crafted** [1] - 116:21
    **create** [11] - 31:18,
42:7, 42:8, 42:9,
50:25, 54:6, 57:21,
65:12, 80:13, 108:6,
108:14
    **created** [5] - 19:2,
41:13, 75:22, 85:23,
124:23
    **creates** [1] - 76:18
    **credit** [2] - 90:10,
97:14
    **criteria** [1] - 8:1
    **criticisms** [1] - 53:1
    **CRR** [2] - 2:18,
131:21
    **crux** [1] - 34:16
    **cry** [1] - 33:24
    **CSR** [2] - 2:18,
131:21
    **cure** [1] - 29:7
    **cures** [1] - 29:21
    **current** [4] - 4:19,
61:21, 63:10, 64:7

**D**

    **D.C** [5] - 46:20,
46:22, 90:7, 113:17,
117:5
    **data** [1] - 96:17
    **DATE** [1] - 131:21

date [3] - 35:9,
35:14, 58:10
    **days** [1] - 131:7
    **DC** [2] - 2:10, 2:15
    **de** [1] - 83:12
    **deal** [6] - 51:3, 55:17,
61:3, 115:4, 126:20,
129:16
    **dealing** [3] - 56:19,
61:15, 61:17
    **decide** [5] - 9:7,
46:4, 46:7, 95:9,
123:10
    **decided** [13] - 13:21,
14:1, 14:3, 14:4, 14:8,
28:21, 32:5, 46:11,
48:14, 64:3, 90:19,
122:16, 122:20
    **deciding** [1] - 122:13
    **decimates** [1] -
83:23
    **Decision** [7] - 28:8,
28:16, 28:18, 29:11,
29:12, 29:13
    **decision** [25] - 6:11,
6:16, 11:9, 28:13,
34:3, 38:16, 39:14,
46:18, 46:19, 46:20,
46:22, 46:24, 63:5,
64:7, 87:6, 89:23,
101:8, 107:14,
107:17, 110:8,
114:25, 118:10,
120:5, 122:11, 130:10
    **decision-making** [1]
- 28:13
    **decisions** [4] -
27:10, 101:5, 111:17,
122:14
    **declarants** [2] - 8:6,
105:24
    **declaration** [2] -
8:18, 115:5
    **declarations** [5] -
7:25, 8:7, 19:23,
19:24, 99:10
    **defect** [1] - 34:20
    **defend** [2] - 21:11,
64:6
    **Defendant** [7] - 1:11,
2:16, 11:15, 12:4,
17:6, 52:11, 124:1
    **Defendant's** [1] -
15:5
    **Defendants** [15] -
1:9, 2:11, 3:17, 3:19,
7:18, 10:14, 12:12,
15:15, 15:20, 65:9,
102:20, 106:21,
107:6, 112:2, 114:20

**Defendants'** [3] -
15:18, 41:2, 72:9
    **defended** [2] - 37:3,
37:15
    **defends** [1] - 37:8
    **defense** [6] - 12:25,
28:23, 35:22, 36:20,
64:16, 119:22
    **defer** [3] - 69:22,
69:24, 104:8
    **defines** [2] - 17:5,
85:3
    **definitely** [1] - 75:3
    **definition** [5] - 11:25,
19:20, 45:25, 51:11,
107:3
    **definitions** [1] - 85:3
    **delegated** [2] - 41:8,
45:9
    **delegates** [2] -
40:18, 40:19
    **delegation** [4] -
42:22, 43:1, 80:14,
103:11
    **demonstrates** [4] -
31:7, 37:17, 37:20,
79:10
    **deny** [2] - 13:9,
129:17
    **department** [1] -
85:4
    **Department** [2] -
75:18, 114:8
    **DEPARTMENT** [2] -
2:3, 2:8
    **Department's** [1] -
45:4
    **dependence** [1] -
100:1
    **dependent** [2] - 95:3,
95:4
    **deprived** [3] - 65:24,
111:19, 111:25
    **Deputy** [2] - 1:21, 3:1
    **DEPUTY** [1] - 66:14
    **deputy** [1] - 1:22
    **describe** [1] - 23:25
    **deserve** [1] - 71:1
    **designated** [1] - 75:4
    **designed** [6] - 15:19,
72:6, 75:2, 85:25,
94:5, 129:7
    **despite** [2] - 78:2,
101:9
    **determine** [2] -
81:11, 105:25
    **determined** [5] -
68:24, 76:4, 84:6,
105:6, 105:7
    **determining** [4] -

40:20, 70:5, 74:20,
80:10
**develop** [1] - 32:2
**development** [4] -
122:10, 122:15,
122:18, 122:22
**devised** [1] - 15:4
**devising** [1] - 77:15
**devolve** [1] - 121:25
**dictate** [2] - 11:3,
79:13
**dictates** [1] - 10:9
**Dictionary** [1] -
126:12
**differ** [1] - 36:9
**difference** [3] -
100:10, 105:17,
106:19
**differences** [1] -
57:11
**different** [35] - 18:4,
18:6, 18:11, 24:19,
32:4, 38:23, 40:5,
44:8, 49:20, 50:13,
51:14, 53:6, 53:23,
54:21, 55:5, 56:21,
58:22, 75:11, 75:14,
76:7, 84:20, 89:2,
90:22, 94:20, 95:13,
102:12, 105:12,
114:3, 114:15,
116:10, 118:15,
120:6, 122:9, 127:12
**differently** [2] -
10:24, 102:24
**differs** [2] - 34:4,
34:5
**difficult** [1] - 129:8
**difficulty** [1] - 118:21
**direct** [4] - 8:17, 9:7,
9:13, 9:15
**directed** [1] - 9:19
**direction** [3] - 94:10,
130:7, 130:22
**directly** [5] - 18:10,
18:15, 18:16, 56:10,
78:24
**disagreement** [1] -
17:22
**discrepancy** [1] -
10:22
**discretion** [16] -
15:18, 40:15, 41:18,
42:5, 42:12, 42:13,
45:12, 46:4, 46:12,
59:15, 59:20, 59:24,
61:15, 70:20, 116:15
**discretionary** [5] -
45:16, 45:17, 61:17,
95:15, 95:16

**discrimination** [3] -
87:4, 87:7, 125:7
**Discrimination** [1] -
66:20
**discuss** [2] - 25:12,
123:12
**discussed** [3] -
30:17, 30:22, 130:9
**discusses** [2] - 63:4,
103:9
**discussing** [1] -
94:17
**discussion** [5] -
34:7, 63:3, 104:10,
108:5, 118:13
**displayed** [1] - 23:2
**dispositive** [1] -
121:22
**dispute** [4] - 7:17,
14:25, 78:22, 114:6
**dissent** [2] - 110:18,
110:20
**distinctions** [1] -
56:17
**distinguish** [3] -
42:6, 43:8, 43:17
**district** [11] - 11:20,
12:3, 13:24, 25:24,
25:25, 89:21, 89:22,
90:2, 101:5, 120:8,
123:5
**DISTRICT** [2] - 1:1,
1:2
**District** [6] - 10:8,
10:13, 11:19, 113:10,
117:18, 123:1
**districts** [2] - 120:9,
120:12
**disturb** [1] - 13:22
**divide** [1] - 4:8
**doctor** [1] - 102:11
**DOJ** [1] - 92:17
**DONALD** [1] - 1:8
**done** [20] - 38:13,
38:15, 38:24, 39:11,
53:11, 62:22, 70:5,
71:20, 76:8, 90:18,
90:20, 91:1, 92:13,
92:23, 93:1, 95:16,
98:1, 99:17, 116:10,
128:20
**DOPA** [2] - 130:9,
130:14
**dots** [1] - 20:14
**doubt** [1] - 14:21
**doubted** [1] - 18:9
**down** [5] - 8:19,
78:20, 98:5, 115:6,
130:13
**dozen** [1] - 47:14

**dozens** [1] - 21:20
**draft** [1] - 74:15
**drafted** [1] - 77:20
**drag** [3] - 37:13,
92:17, 92:18
**dragging** [1] - 99:13
**draw** [2] - 62:15,
81:11
**drawing** [1] - 81:12
**drifted** [1] - 117:13
**driver's** [1] - 130:17
**dropped** [1] - 65:12
**drug** [2] - 85:21,
85:24
**duration** [1] - 65:16
**during** [1] - 28:22
**duty** [1] - 91:22

___

# E

**early** [1] - 110:9
**Eastern** [2] - 10:13,
11:19
**EASTERN** [1] - 1:2
**easy** [1] - 114:9
**education** [1] -
113:19
**effect** [20] - 5:2, 7:8,
26:1, 35:9, 35:13,
38:17, 38:19, 38:23,
39:23, 50:7, 50:19,
57:4, 57:7, 57:15,
65:14, 65:15, 65:18,
102:22, 125:2, 131:2
**effective** [2] - 50:10,
58:10
**effectiveness** [1] -
57:1
**effects** [2] - 25:20,
45:5
**efficacy** [2] - 39:22,
109:17
**eight** [3] - 68:16,
70:4, 80:24
**Eighth** [2] - 80:25,
87:2
**either** [15] - 18:15,
22:10, 27:12, 31:2,
59:6, 64:19, 76:6,
76:21, 90:25, 98:16,
110:21, 112:20,
127:25, 128:10
**elephant** [1] - 64:12
**eligibility** [1] - 8:1
**elsewhere** [2] - 59:3,
88:1
**embodied** [1] -
102:25
**emissary** [1] - 16:21

**employee** [3] -
20:13, 96:11, 127:5
**employees** [4] -
19:17, 83:1, 100:24,
129:23
**employer** [13] - 7:14,
18:22, 19:16, 20:12,
43:21, 82:24, 82:25,
96:13, 105:6, 105:12,
127:4, 129:8
**Employer** [4] -
31:23, 54:25, 60:8,
98:7
**employer's** [3] - 8:3,
44:5, 96:9
**employer-by-
employer** [1] - 105:6
**employer-
sponsored** [1] - 7:14
**employers** [26] -
19:6, 19:19, 19:21,
24:22, 31:6, 33:23,
34:3, 45:6, 46:7, 54:2,
54:5, 57:19, 60:14,
60:18, 82:9, 84:9,
98:10, 99:24, 100:3,
101:17, 102:1, 102:3,
121:12, 129:11
**empowered** [1] -
75:4
**enacted** [3] - 10:20,
42:2, 72:16
**enactment** [1] -
40:11
**end** [11] - 12:22,
20:15, 33:9, 56:9,
59:13, 62:9, 76:24,
76:25, 88:6, 102:9,
115:16
**ends** [1] - 39:7
**enforce** [6] - 51:1,
51:7, 70:13, 83:7,
83:10, 114:20
**enforced** [1] - 22:15
**enforcing** [5] -
70:19, 70:22, 100:6,
110:1, 119:15
**engage** [4] - 30:11,
31:8, 70:3
**engaged** [1] - 86:24
**engaging** [1] - 30:25
**engendered** [1] -
69:6
**enjoined** [7] - 26:21,
36:11, 36:14, 39:8,
56:22, 65:15, 102:23
**enlist** [2] - 17:21,
18:12
**enlisted** [2] - 18:1
**enmesh** [1] - 81:13

**ensure** [3] - 10:20,
71:17, 71:23
**enter** [2] - 50:17,
52:22
**entered** [4] - 5:14,
48:10, 96:18, 107:12
**entire** [4] - 45:13,
65:16, 65:17, 70:17
**entirely** [11] - 8:5,
15:5, 15:6, 42:21,
43:1, 53:6, 57:16,
77:19, 95:6, 109:11,
109:14
**entirety** [1] - 10:6
**entities** [10] - 44:1,
69:9, 70:19, 70:23,
70:24, 71:23, 80:10,
100:24, 111:11,
129:18
**entitled** [2] - 48:19,
131:19
**entity** [7] - 10:16,
14:18, 19:2, 68:21,
69:23, 73:8, 105:12
**entity's** [1] - 69:24
**envisioned** [1] -
65:21
**EPA** [14] - 9:13, 29:3,
29:8, 29:10, 29:17,
35:15, 49:12, 55:14,
57:13, 58:22, 76:2,
76:17, 85:11, 85:13
**equal** [1] - 71:17
**equally** [1] - 34:12
**equitable** [4] -
120:16, 120:17,
120:24, 122:6
**equities** [5] - 66:10,
110:7, 115:2, 115:22,
116:14
**equity** [3] - 50:16,
51:6, 53:14
**equivalent** [1] -
85:20
**era** [5] - 24:21,
94:23, 94:24, 98:7,
127:11
**ERISA** [8] - 83:8,
88:15, 88:17, 97:11,
129:10, 129:22,
129:24
**error** [1] - 54:16
**especially** [1] - 75:19
**ESQUIRE** [7] - 1:21,
1:22, 2:4, 2:8, 2:9,
2:13, 2:14
**essence** [1] - 38:15
**essentially** [12] -
4:19, 10:22, 17:22,
21:25, 25:5, 38:3,

47:14, 79:19, 103:25, 113:18, 115:7, 118:16
**establish** [4] - 13:10, 120:20, 120:22, 120:23
**established** [1] - 18:17
**estimate** [4] - 6:21, 7:1, 7:19, 83:14
**estimated** [1] - 6:25
**et** [3] - 1:5, 1:8, 70:21
**evaluated** [1] - 84:5
**event** [1] - 7:8
**events** [2] - 11:17, 25:22
**eventually** [4] - 22:7, 89:5, 89:6, 97:9
**everyplace** [1] - 91:3
**everywhere** [2] - 10:1, 115:13
**evidence** [17] - 21:13, 30:14, 43:23, 43:24, 44:9, 80:17, 82:2, 84:5, 84:6, 84:7, 106:7, 113:2, 113:5, 113:7, 115:4, 126:21, 130:16
**exact** [4] - 50:19, 79:25, 80:1, 82:14
**exactly** [7] - 35:5, 94:8, 94:9, 101:24, 107:1, 110:20, 129:5
**example** [6] - 20:1, 39:19, 46:5, 65:11, 87:6, 121:1
**exception** [2] - 67:9, 115:17
**exceptions** [1] - 27:11
**excess** [1] - 63:17
**exchanges** [1] - 46:9
**excitement** [1] - 25:12
**exclude** [1] - 126:12
**exempt** [3] - 65:10, 83:9, 112:10
**exempted** [2] - 72:17, 77:6
**exempting** [1] - 61:1
**exemption** [26] - 22:3, 39:25, 43:8, 43:21, 44:2, 64:5, 76:3, 76:18, 78:18, 79:14, 80:14, 82:24, 83:5, 83:12, 101:17, 102:1, 102:4, 105:1, 105:4, 105:5, 105:7, 117:21, 117:24, 121:9, 121:11, 124:24
**Exemption** [42] -

20:10, 20:25, 21:3, 21:5, 21:7, 21:8, 26:21, 26:25, 31:14, 34:4, 39:5, 40:12, 41:3, 41:10, 41:14, 42:8, 42:9, 42:24, 50:25, 54:6, 54:10, 54:25, 57:22, 58:5, 60:8, 63:9, 63:10, 63:17, 64:8, 65:12, 68:2, 72:4, 86:19, 87:4, 94:24, 94:25, 98:8, 118:4, 125:6, 125:20
**exemptions** [18] - 31:19, 32:2, 32:12, 32:16, 32:22, 32:23, 33:25, 39:3, 41:11, 75:22, 82:10, 83:16, 108:7, 108:14, 125:3, 125:11, 125:13, 125:16
**Exemptions** [10] - 31:23, 32:18, 32:20, 33:20, 39:4, 42:3, 65:8, 85:24, 124:23, 125:14
**exempts** [1] - 92:8
**exercise** [13] - 43:15, 44:25, 47:15, 59:23, 60:7, 60:13, 60:16, 60:20, 85:1, 98:11, 98:13, 108:12, 126:4
**exhaust** [1] - 36:25
**exhausting** [1] - 37:2
**exhaustion** [1] - 37:4
**exist** [1] - 82:10
**existed** [2] - 65:7, 119:13
**existence** [3] - 9:5, 35:6, 35:15
**existing** [1] - 105:1
**exists** [4] - 69:24, 99:6, 100:1, 129:22
**expanded** [3] - 39:4, 41:10, 115:12
**expect** [2] - 8:2, 90:9
**expected** [1] - 131:1
**expeditiously** [2] - 5:9, 107:11
**experience** [2] - 21:25, 22:4
**expert** [1] - 78:14
**expertise** [4] - 74:20, 74:21, 76:1, 108:12
**experts** [1] - 75:8
**explain** [6] - 51:18, 54:16, 54:20, 97:20, 97:25, 103:7
**explained** [3] -

41:14, 98:3, 118:17
**explaining** [1] - 96:2
**explanation** [5] - 69:7, 69:12, 69:13, 70:9, 97:19
**explicit** [1] - 35:5
**explicitly** [3] - 73:5, 73:20, 84:3
**express** [2] - 27:6, 27:12
**expression** [1] - 11:7
**extend** [3] - 33:25, 42:8, 122:24
**extended** [2] - 40:12, 80:8
**extensively** [1] - 80:4
**extent** [16] - 12:6, 19:5, 21:6, 32:14, 51:17, 73:15, 75:15, 77:4, 77:8, 81:22, 86:12, 103:11, 105:23, 116:24, 116:25, 120:18
**extra** [5] - 57:24, 57:25, 106:2, 106:7
**extraordinary** [3] - 13:21, 18:5, 59:3
**extremely** [1] - 22:4
**eye** [1] - 94:8

---

**F**

**fabric** [1] - 77:5
**face** [7] - 30:13, 79:25, 80:25, 81:4, 92:22, 107:22, 108:18
**faced** [1] - 71:8
**fact** [31] - 20:12, 29:16, 30:18, 36:4, 40:2, 49:16, 76:6, 77:20, 81:6, 82:4, 88:14, 88:25, 89:14, 90:22, 90:24, 92:22, 97:4, 100:21, 105:16, 106:25, 111:14, 111:20, 115:14, 118:23, 121:20, 121:22, 125:1, 125:17, 126:24, 127:20, 129:16
**facto** [1] - 83:12
**factor** [2] - 6:22, 103:12
**factors** [6] - 13:10, 110:5, 115:22, 118:18, 119:4, 123:16
**facts** [3] - 6:12, 97:7, 110:2
**fail** [1] - 64:23

failed [2] - 27:17, 30:19
**fails** [1] - 16:23
**failure** [4] - 7:4, 30:14, 31:7, 71:4
**fair** [2] - 74:16, 74:17
**fairly** [1] - 113:6
**fairness** [2] - 15:5, 15:20
**faith** [1] - 95:6
**fake** [2] - 127:6, 127:7
**fall** [1] - 77:2
**fallen** [1] - 44:1
**false** [1] - 100:14
**families** [1] - 102:2
**Family** [3] - 7:22, 115:8, 115:11
**far** [6] - 33:24, 47:8, 47:21, 55:13, 56:9, 59:18
**far-reaching** [2] - 55:13, 56:9
**farfetched** [5] - 20:11, 23:17, 87:3, 126:13, 127:15
**fashioning** [4] - 115:23, 116:18, 116:19, 117:11
**fatal** [2] - 30:19, 101:10
**favor** [3] - 9:7, 25:16, 39:9
**Fed** [5] - 39:21, 45:6, 108:22, 108:23, 109:4
**Federal** [43] - 2:11, 3:17, 3:18, 11:13, 11:24, 16:11, 16:14, 16:18, 16:24, 17:1, 17:5, 18:13, 18:15, 23:4, 25:6, 37:1, 37:7, 46:7, 50:18, 52:23, 52:25, 53:12, 53:20, 53:21, 54:1, 54:23, 56:5, 56:11, 59:14, 65:9, 85:6, 85:23, 86:2, 88:11, 89:5, 89:6, 90:9, 90:11, 93:19, 95:9, 98:25, 99:4, 109:16
**federal** [23] - 14:24, 15:4, 16:10, 16:11, 16:12, 17:23, 19:15, 22:11, 23:5, 37:14, 37:15, 37:21, 59:4, 72:15, 72:18, 73:2, 78:12, 78:14, 87:1, 90:5, 91:13, 95:19, 99:3
**federalism** [2] - 11:3,

15:24
**federally** [4] - 71:2, 71:3, 100:23, 101:19
**federally-mandated** [4] - 71:2, 71:3, 100:23, 101:19
**FedEx** [1] - 106:18
**feds** [1] - 127:10
**Feds** [1] - 86:20
**Feldman** [1] - 131:21
**FELDMAN** [2] - 2:18
**felt** [8] - 11:11, 11:18, 25:20, 26:1, 57:8, 110:23, 117:7, 130:15
**few** [10] - 6:12, 17:18, 18:19, 93:14, 99:20, 115:17, 118:16, 123:6, 125:17
**fiction** [2] - 89:5, 97:3
**field** [1] - 42:24
**fight** [6] - 17:17, 17:22, 23:4, 36:21, 98:23, 99:17
**fighting** [2] - 36:20, 99:2
**figure** [1] - 129:8
**file** [3] - 10:12, 16:17, 63:3
**filed** [8] - 5:13, 18:25, 37:2, 122:16, 122:20, 122:25, 126:22
**filing** [1] - 53:17
**fill** [3] - 61:4, 98:16, 118:3
**final** [7] - 23:21, 27:10, 48:1, 73:11, 107:11, 119:1, 119:11
**Final** [101] - 3:6, 5:13, 5:15, 5:20, 6:3, 6:20, 18:23, 19:8, 20:9, 22:11, 22:18, 23:10, 26:21, 26:25, 28:5, 28:8, 28:16, 28:18, 29:2, 29:4, 29:5, 29:9, 29:11, 29:12, 29:13, 29:19, 29:20, 29:21, 30:2, 30:14, 30:19, 30:22, 30:25, 31:14, 31:24, 32:17, 33:2, 33:20, 34:13, 34:21, 34:22, 35:7, 35:15, 35:17, 36:8, 36:10, 36:14, 36:16, 36:17, 38:5, 38:8, 39:1, 39:2, 45:20, 46:23, 47:2, 49:22, 49:23, 49:25,

50:4, 52:21, 53:16, 53:17, 55:15, 55:20, 55:23, 55:24, 56:3, 56:7, 57:4, 58:10, 58:11, 58:12, 64:21, 64:22, 64:23, 65:1, 65:6, 65:14, 65:24, 68:3, 68:23, 69:8, 69:12, 70:9, 71:20, 72:11, 97:22, 101:23, 102:20, 102:21, 102:25, 104:11, 105:1, 105:4, 110:3, 131:1

**finalize** [3] - 5:21, 27:2, 56:7

**finalized** [2] - 50:9, 56:3

**finalizing** [2] - 50:23, 65:25

**finally** [7] - 6:20, 8:4, 11:24, 101:14, 117:10, 118:23, 129:19

**finance** [1] - 20:20

**financed** [1] - 61:10

**findings** [2] - 81:19, 81:23

**fine** [7] - 4:6, 9:23, 46:25, 50:24, 66:3, 66:10, 94:9

**finished** [1] - 37:2

**firmly** [1] - 48:14

**First** [4] - 43:12, 72:20, 75:13, 111:10

**first** [30] - 4:5, 6:6, 7:13, 12:20, 16:3, 17:15, 18:6, 18:7, 18:21, 18:22, 19:14, 20:6, 26:25, 30:3, 31:13, 32:11, 38:24, 44:15, 48:3, 49:6, 54:20, 56:20, 62:21, 64:16, 99:22, 113:12, 117:23, 120:1, 126:14

**first-year** [1] - 113:12

**FISCHER** [31] - 1:21, 3:9, 4:4, 4:7, 4:17, 5:11, 9:10, 9:24, 12:16, 12:23, 13:2, 26:8, 26:11, 51:22, 67:3, 67:5, 67:18, 67:20, 106:17, 106:20, 107:20, 109:22, 110:17, 110:20, 113:6, 113:15, 116:5, 128:24, 129:1, 131:9, 131:12

**Fischer** [2] - 3:10,

22:8

**five** [5] - 18:7, 109:16, 110:18, 126:15

**fix** [3] - 91:12, 91:14, 92:13

**fixed** [1] - 6:1

**fixing** [1] - 86:5

**flaw** [1] - 101:10

**flawed** [1] - 14:17

**fluidity** [1] - 75:3

**focus** [4] - 26:22, 66:11, 81:20, 109:13

**focused** [3] - 26:22, 67:6, 67:11

**focuses** [1] - 67:15

**folks** [2] - 78:23, 112:20

**follow** [7] - 47:22, 52:25, 55:25, 65:25, 95:19, 100:22

**following** [2] - 71:21, 119:9

**football** [1] - 25:18

**FOR** [2] - 1:2, 2:12

**for-profit** [5] - 24:22, 44:4, 65:10, 78:21, 126:5

**forced** [1] - 8:5

**foregoing** [1] - 131:18

**foremost** [1] - 31:14

**forge** [1] - 90:3, 92:12, 93:3

**forget** [1] - 45:19

**forging** [1] - 120:1

**form** [7] - 41:9, 61:4, 98:17, 102:13, 116:6, 118:3, 120:2

**forth** [2] - 48:6, 110:18

**forum** [1] - 15:11

**forward** [9] - 27:9, 28:7, 28:11, 28:15, 64:25, 110:11, 116:11, 119:11, 128:6

**four** [9] - 38:3, 38:6, 38:7, 91:8, 109:16, 126:8, 130:11, 130:14, 130:21

**Fourth** [1] - 72:21

**Fox** [1] - 69:4

**framework** [2] - 80:16, 105:2

**Francisco** [2] - 16:17, 114:13

**frankly** [18] - 11:2, 15:23, 42:5, 43:7, 48:11, 75:20, 92:3, 98:22, 99:6, 107:16,

108:16, 108:18, 110:25, 111:14, 116:8, 118:9, 126:7, 130:15

**free** [14] - 43:15, 44:25, 47:15, 59:22, 60:7, 60:13, 60:16, 60:20, 91:23, 93:17, 93:18, 93:19, 98:11, 98:13

**friend** [1] - 41:22

**friend's** [1] - 81:16

**friendly** [1] - 78:4

**front** [4] - 19:23, 51:9, 51:12, 95:22

**full** [11] - 20:18, 20:19, 58:11, 71:17, 107:13, 111:4, 112:15, 116:3, 116:7, 116:18, 130:4

**fully** [3] - 17:8, 58:8, 109:24

**fun** [1] - 91:2

**function** [5] - 29:17, 101:25, 102:5, 104:3, 104:4

**functionally** [2] - 28:5, 29:4

**FUND** [1] - 2:12

**funded** [7] - 7:21, 8:3, 8:16, 8:21, 9:3, 112:1, 115:8

**funding** [1] - 101:24

**furthest** [1] - 128:12

**futile** [1] - 37:4

**future** [1] - 63:12

## G

**gap** [3] - 19:14, 23:16, 115:9

**gaps** [2] - 19:21, 70:21

**gender** [1] - 125:6

**general** [1] - 85:2

**GENERAL** [2] - 1:20, 2:3

**General** [3] - 1:21, 1:22, 2:4

**generally** [10] - 13:20, 39:23, 49:13, 70:17, 71:6, 72:11, 77:24, 78:8, 104:16, 126:12

**Geneva** [28] - 24:10, 24:11, 68:17, 69:16, 69:19, 70:4, 88:2, 88:11, 88:12, 88:24, 90:23, 95:25, 96:4,

96:7, 96:8, 96:15, 96:17, 96:19, 96:20, 96:23, 97:2, 97:6, 100:10, 100:13, 100:18, 101:2

**Gill** [1] - 120:5

**Gilliam** [1] - 122:12

**given** [15] - 5:1, 7:17, 56:11, 73:6, 73:10, 77:5, 77:18, 81:15, 86:16, 92:5, 99:11, 102:3, 112:14, 119:8, 120:18

**Glenn** [1] - 3:13

**GLENN** [1] - 2:4

**God** [2] - 76:5, 76:6

**God-ordained** [1] - 76:5

**Gonzales** [1] - 85:23

**gosh** [1] - 126:25

**Gosh** [1] - 127:18

**governed** [1] - 129:24

**government** [7] - 7:21, 17:23, 23:4, 76:13, 76:14, 90:4, 90:5

**Government** [75] - 11:13, 11:25, 16:11, 16:14, 16:18, 16:25, 17:2, 17:5, 18:13, 18:15, 22:12, 23:4, 23:7, 25:6, 37:1, 37:5, 37:8, 37:14, 46:7, 50:8, 50:10, 50:18, 52:23, 52:25, 53:13, 53:20, 53:22, 54:1, 54:21, 54:23, 56:4, 56:11, 59:14, 60:22, 64:2, 64:3, 68:1, 68:8, 68:10, 70:17, 72:5, 78:24, 79:1, 80:25, 84:12, 84:25, 85:3, 85:6, 85:23, 86:2, 87:10, 87:19, 88:14, 88:18, 89:5, 89:6, 89:13, 90:10, 90:11, 91:21, 91:22, 92:2, 92:10, 93:16, 93:20, 95:9, 96:25, 99:4, 100:5, 100:7, 101:15, 101:16, 101:20, 117:18, 123:23

**Government's** [8] - 34:16, 37:3, 58:24, 72:7, 88:11, 98:25, 108:3, 128:18

**government-funded** [1] - 7:21

**governments** [4] -

84:20, 99:1, 99:2, 99:5

**Governor** [1] - 14:23

**grace** [4] - 25:16, 26:6, 39:8, 44:11

**grandfather** [3] - 19:19, 20:3, 82:19

**grandfathered** [2] - 82:13, 82:23

**grandfathering** [1] - 23:12

**grandfathers** [1] - 94:22

**grant** [13] - 72:10, 73:22, 76:22, 76:25, 77:7, 77:8, 114:8, 114:10, 114:12, 114:14, 124:3

**granted** [4] - 23:1, 43:9, 46:4, 110:10

**granting** [1] - 124:7

**great** [6] - 26:19, 99:11, 99:12, 115:4, 126:20, 131:15

**greater** [1] - 63:2

**ground** [3] - 5:16, 48:25, 111:9

**group** [2] - 21:19, 127:8

**groups** [3] - 18:9, 22:1, 22:5

**guess** [5] - 39:10, 40:13, 51:15, 73:25, 75:4

**guidelines** [5] - 40:22, 45:5, 45:15, 59:24, 103:20

**Guidelines** [1] - 71:11

**Guttmacher** [2] - 8:19, 115:6

**guys** [2] - 50:12, 99:7

## H

**half** [3] - 69:8, 115:15, 126:8

**Hampshire** [1] - 2:15

**hand** [7] - 28:20, 50:12, 61:4, 61:19, 62:18, 98:17

**handoff** [1] - 95:1

**happily** [1] - 13:11

**happy** [11] - 12:19, 17:9, 26:3, 26:14, 40:9, 51:18, 52:12, 64:9, 81:23, 86:10, 113:25

**hard** [3] - 79:20, 86:15, 125:16
**harm** [20] - 4:15, 5:23, 6:7, 9:3, 11:11, 11:18, 66:9, 109:24, 110:7, 111:23, 112:13, 114:16, 117:6, 118:19, 123:24, 123:25, 130:2, 130:16, 130:19
**harmed** [3] - 6:22, 121:23, 122:4
**harming** [1] - 115:3
**harmless** [1] - 54:17
**harms** [2] - 116:7, 116:19
**Harrisburg** [2] - 14:22, 16:9
**haste** [1] - 14:4
**hat** [2] - 28:19, 50:12
**headquartered** [1] - 14:25
**health** [24] - 19:18, 20:4, 20:18, 20:19, 42:24, 43:2, 43:5, 46:9, 71:2, 71:3, 71:17, 75:19, 75:25, 83:1, 83:2, 87:16, 102:9, 102:10, 102:13, 105:11, 112:6, 125:14, 125:15
**Health** [8] - 5:19, 31:15, 34:8, 71:25, 77:23, 78:7, 99:23, 103:10
**hear** [5] - 16:2, 72:5, 112:25, 119:21, 126:23
**heard** [6] - 55:8, 86:13, 98:6, 108:8, 126:18, 126:21
**hearing** [4] - 40:22, 67:13, 80:4, 125:8
**heart** [1] - 38:3
**heck** [1] - 54:3
**heightens** [1] - 106:21
**held** [15] - 6:17, 27:3, 28:2, 28:9, 44:3, 66:23, 68:5, 69:3, 69:14, 69:16, 78:21, 100:9, 100:18, 118:5, 123:14
**help** [1] - 32:13
**HHS** [2] - 75:23, 90:19
**high** [1] - 8:23
**higher** [2] - 8:22, 107:5
**highest** [1] - 113:11

**highly** [2] - 112:14, 112:24
**himself** [1] - 110:21
**HIPPA** [1] - 27:5
**history** [5] - 10:19, 10:25, 42:23, 78:16, 108:17
**hit** [2] - 79:25, 94:7
**Hobby** [30] - 20:1, 24:21, 33:14, 40:19, 46:2, 63:24, 68:5, 78:20, 81:7, 87:5, 87:6, 87:14, 87:17, 87:21, 88:5, 89:1, 89:12, 90:17, 93:12, 94:17, 95:12, 98:20, 100:9, 125:1, 126:3, 126:4, 126:11, 126:15
**hold** [2] - 22:15, 35:22
**holding** [2] - 29:18, 63:6
**HOME** [1] - 1:10
**Honor** [86] - 3:3, 3:9, 3:16, 4:4, 4:7, 5:11, 9:10, 12:16, 13:2, 13:4, 14:12, 14:13, 17:12, 17:14, 18:3, 21:7, 22:25, 23:20, 24:4, 25:2, 25:10, 25:11, 26:8, 26:14, 27:2, 27:20, 28:2, 30:5, 31:11, 31:17, 32:10, 33:5, 34:11, 35:19, 35:23, 39:18, 41:5, 41:8, 47:1, 48:4, 48:10, 48:16, 49:4, 51:6, 56:22, 59:1, 59:8, 60:6, 62:19, 62:21, 63:11, 67:3, 67:20, 67:25, 84:17, 87:3, 87:9, 88:3, 89:20, 95:3, 96:4, 98:5, 99:15, 99:18, 99:20, 102:14, 106:17, 107:20, 108:19, 109:22, 111:15, 112:2, 118:5, 119:23, 125:23, 126:24, 127:7, 127:22, 128:21, 128:24, 130:23, 131:3, 131:9, 131:12, 131:13, 131:14
**Honor's** [8] - 9:11, 22:14, 31:13, 46:3, 57:10, 84:21, 95:21, 119:2
**Honorable** [1] - 5:7
**HONORABLE** [1] -

1:16
**hope** [1] - 48:24
**hopefully** [2] - 84:10, 99:16
**hopes** [1] - 79:15
**host** [1] - 13:8
**hour** [1] - 66:5
**housecleaning** [1] - 104:17
**houses** [1] - 60:17
**HRSA** [19] - 40:15, 40:20, 40:23, 41:8, 45:4, 45:12, 45:14, 45:17, 46:4, 70:20, 71:11, 80:13, 84:2, 99:23, 103:20, 108:10, 108:11, 108:13
**HRSA's** [4] - 45:3, 45:15, 45:18, 103:11
**huge** [2] - 127:8, 127:15
**Hughes** [1] - 2:5
**hundred** [1] - 21:21
**hundreds** [1] - 65:8
**hypothetical** [2] - 78:2, 85:11

**I**

**Idaho** [3] - 121:2, 121:7, 121:20
**idea** [16] - 20:9, 23:15, 54:7, 54:11, 55:4, 58:19, 60:5, 60:21, 67:23, 86:2, 93:17, 95:8, 99:2, 100:1, 121:3, 127:14
**identified** [2] - 34:13, 107:24
**identify** [1] - 108:10
**identifying** [1] - 108:12
**IFR** [27] - 22:14, 22:15, 24:8, 31:23, 48:4, 48:10, 49:14, 49:15, 49:19, 49:21, 50:9, 50:23, 51:9, 52:20, 53:16, 53:17, 55:6, 55:11, 58:17, 65:23, 97:21, 103:17, 104:17, 104:19
**IFRs** [26] - 5:15, 5:21, 6:4, 27:2, 27:14, 27:25, 28:23, 33:2, 34:12, 39:9, 50:7, 50:9, 56:22, 64:17, 64:18, 65:6, 68:13, 102:21, 102:22,

102:24, 103:1, 104:25, 105:3, 105:7, 118:16, 119:13
**ignore** [2] - 32:7, 90:8, 92:22
**ignoring** [1] - 74:25
**Ill** [8] - 17:18, 18:8, 18:13, 18:17, 18:20, 89:25, 92:25, 120:13
**illegal** [5] - 66:21, 86:14, 86:18, 86:21, 86:24
**imagine** [1] - 85:13
**immediately** [3] - 50:10, 57:2, 65:14
**immigrants** [1] - 130:17
**impact** [5] - 18:6, 30:23, 39:20, 60:1, 111:16
**imperceptible** [1] - 126:25
**impermissible** [1] - 39:10
**impermissibly** [2] - 64:20, 64:21
**implement** [1] - 77:14
**implemented** [1] - 99:23
**implementing** [1] - 77:14
**implied** [1] - 27:6
**importance** [1] - 117:5
**important** [9] - 12:24, 33:6, 40:19, 60:1, 78:10, 82:21, 88:13, 93:20, 111:23
**impose** [9] - 68:15, 74:8, 74:9, 87:10, 98:15, 100:12, 115:20, 123:24, 123:25
**imposed** [2] - 63:25, 87:13
**imposes** [1] - 89:18
**imposing** [3] - 94:18, 115:16, 118:23
**impossible** [1] - 19:1
**impression** [1] - 53:2
**improper** [4] - 30:3, 39:15, 110:15, 110:19
**IN** [1] - 1:1
**inappropriate** [1] - 79:14
**inclined** [1] - 106:6
**include** [2] - 61:18, 67:11, 82:21, 85:3, 89:10, 99:24, 106:4

**included** [4] - 51:11, 71:11, 82:23, 102:10
**includes** [4] - 87:16, 90:15, 123:4, 126:13
**including** [7] - 7:3, 28:19, 30:22, 68:17, 71:18, 125:8, 128:7
**inclusion** [1] - 45:18
**income** [1] - 102:2
**inconsistent** [2] - 5:18, 35:14
**incorporated** [1] - 97:21
**incorrect** [2] - 105:23, 106:8
**increase** [4] - 8:14, 9:1, 115:13, 115:20
**increasing** [1] - 115:18
**independent** [3] - 66:25, 67:5, 88:1
**independently** [2] - 72:23, 77:11
**indicated** [8] - 5:8, 5:12, 6:10, 9:11, 65:10, 67:12, 118:14, 119:8
**Indicating** [1] - 3:8
**indicating** [2] - 11:1, 19:24
**indication** [1] - 113:2
**indicative** [3] - 4:24, 5:3, 63:20
**indirect** [1] - 83:4
**indirectly** [2] - 18:14, 99:4
**individual** [1] - 113:21
**individuals** [5] - 76:12, 110:12, 116:12, 116:15, 122:9
**inertia** [1] - 36:12
**inevitable** [2] - 8:25, 111:21
**inextricably** [1] - 6:8
**infirm** [1] - 36:5
**infirmities** [1] - 5:25
**influence** [1] - 28:12
**inform** [3] - 107:7, 107:8, 119:7
**information** [4] - 7:5, 37:12, 105:10, 106:3
**informed** [1] - 34:3
**Initial** [1] - 32:20
**initial** [2] - 35:20, 41:11
**injected** [1] - 38:15
**injunction** [84] - 3:6, 4:14, 4:20, 4:25, 5:5, 5:9, 5:13, 5:15, 6:3,

6:18, 12:17, 13:9, 14:1, 14:3, 19:10, 20:1, 22:14, 25:3, 48:19, 52:22, 53:4, 53:5, 53:15, 66:8, 66:9, 66:12, 67:8, 96:18, 99:16, 102:18, 107:12, 109:25, 110:10, 110:11, 110:14, 110:15, 110:23, 111:3, 111:15, 112:3, 112:10, 112:16, 112:23, 114:20, 116:6, 116:11, 116:16, 116:21, 117:1, 117:17, 118:23, 118:25, 119:4, 119:6, 119:10, 119:14, 119:22, 119:25, 120:10, 120:11, 120:15, 120:17, 120:20, 120:22, 120:23, 122:1, 122:5, 122:7, 122:19, 122:24, 123:3, 123:20, 124:4, 124:7, 124:9, 124:12, 124:17, 126:19, 127:24, 129:3, 129:19, 130:4, 130:24

**injunctions** [16] - 19:7, 19:10, 19:11, 23:9, 23:14, 54:7, 92:23, 94:12, 107:10, 114:4, 120:16, 120:18, 123:10, 123:11, 123:15, 128:1

**injured** [1] - 120:9

**injury** [6] - 7:7, 9:5, 9:7, 114:17, 116:22, 116:25

**innocent** [3] - 81:9, 81:13

**inquiry** [1] - 37:25

**instance** [5] - 77:23, 78:6, 79:7, 106:24, 107:23

**instead** [11] - 18:14, 30:24, 30:25, 45:2, 55:6, 61:25, 65:12, 86:5, 93:18, 102:11, 128:8

**Institute** [2] - 8:19, 115:6

**instrumentality** [1] - 85:4

**insufficient** [1] - 58:20

**insuperable** [2] -

125:16, 125:19

**insurance** [11] - 20:19, 56:23, 96:12, 99:25, 100:3, 112:14, 118:3, 118:21, 129:20, 129:21, 129:22

**insured** [4] - 83:5, 83:6, 83:8, 83:11

**insured's** [2] - 105:11, 105:12

**insurees** [1] - 100:4

**insurers** [1] - 78:25

**integrated** [8] - 33:21, 43:19, 45:2, 60:16, 64:4, 72:15, 112:14, 118:20

**intend** [1] - 5:10

**intended** [1] - 11:1

**intends** [1] - 92:11

**intent** [1] - 11:7

**interest** [31] - 13:13, 33:18, 44:8, 64:2, 66:10, 68:8, 68:11, 69:11, 70:13, 70:17, 70:18, 70:22, 82:7, 83:19, 83:24, 84:1, 84:8, 84:12, 84:13, 99:13, 110:8, 115:2, 116:14, 117:8, 123:13, 123:15, 123:17, 123:18, 123:22, 124:6, 124:9

**interesting** [2] - 11:5, 119:5

**interests** [8] - 38:16, 38:20, 38:22, 39:6, 39:9, 39:15, 100:8, 102:7

**interfere** [1] - 122:18

**interference** [3] - 122:10, 122:15, 122:22

**interim** [2] - 57:1, 119:12

**Interim** [22] - 5:15, 19:8, 22:18, 29:5, 34:21, 36:8, 36:10, 36:14, 36:16, 36:17, 38:5, 39:1, 45:19, 46:23, 47:2, 55:20, 55:24, 56:3, 56:7, 57:4, 58:12, 65:14

**International** [1] - 123:8

**interpretation** [1] - 104:9

**interpreting** [1] - 59:19

**interrupt** [1] - 51:21

**interstate** [1] - 129:21

**intervenor** [1] - 1:11

**Intervenor** [3] - 2:16, 52:10, 71:8

**intervenor-Defendant** [1] - 1:11

**intervenors** [2] - 63:1, 64:16

**introductions** [1] - 3:7

**invalid** [14] - 21:8, 22:15, 24:14, 29:14, 38:10, 48:15, 50:4, 50:18, 55:21, 56:8, 58:25, 64:18, 72:4, 126:16

**invalidate** [3] - 32:16, 50:5, 55:12

**invalidated** [4] - 29:9, 35:16, 57:5, 63:12

**invalidates** [1] - 70:9

**invalidity** [2] - 48:20, 48:23

**invention** [1] - 59:17

**investigation** [1] - 7:5

**invitation** [1] - 125:6

**invite** [1] - 37:7

**invocation** [1] - 71:6

**invoke** [2] - 124:22

**invoking** [2] - 121:9, 121:11

**involve** [1] - 68:22

**involved** [1] - 114:6

**involves** [4] - 86:23, 110:5, 110:6, 110:7

**involving** [4] - 4:13, 6:16, 11:13

**IRAP** [3] - 115:1, 116:9, 130:6

**irreparable** [7] - 4:15, 6:7, 7:7, 9:5, 53:11, 66:9, 123:24

**issuance** [5] - 19:8, 29:24, 33:19, 68:13, 122:19

**issue** [73] - 4:23, 6:7, 9:7, 9:12, 9:17, 9:18, 9:21, 12:5, 12:17, 13:21, 24:10, 24:11, 27:4, 27:14, 28:16, 29:19, 29:21, 32:4, 32:16, 32:21, 34:14, 34:18, 39:2, 51:9, 51:16, 51:19, 51:25, 52:4, 52:5, 53:1, 53:4, 53:5, 53:15, 56:8, 58:6, 59:5, 63:15,

64:8, 65:1, 65:17, 67:8, 67:9, 72:20, 73:13, 74:3, 75:6, 75:11, 75:14, 76:17, 77:24, 78:8, 89:17, 96:14, 101:16, 101:22, 102:6, 106:13, 108:4, 111:3, 111:6, 111:13, 111:19, 111:20, 111:22, 112:3, 114:7, 117:6, 117:13, 118:11, 118:24, 119:8, 119:22, 128:9

**issued** [29] - 4:18, 5:20, 6:4, 10:8, 28:1, 28:5, 29:5, 29:6, 29:11, 29:12, 31:22, 31:24, 35:7, 35:15, 38:5, 38:8, 50:12, 54:21, 58:10, 64:18, 71:22, 76:2, 78:15, 78:18, 101:21, 107:4, 100:1, 119:6

**issues** [23] - 4:10, 4:13, 6:8, 7:2, 12:18, 12:20, 13:11, 14:2, 17:15, 47:23, 55:9, 55:23, 69:6, 75:13, 75:14, 75:21, 76:1, 111:5, 111:15, 115:1, 116:13, 117:9, 122:15

**issuing** [11] - 5:6, 33:2, 39:12, 45:4, 65:23, 68:23, 71:19, 74:3, 77:9, 123:3, 123:14

**itself** [10] - 27:24, 37:9, 37:16, 37:20, 58:25, 79:3, 96:17, 107:25, 117:11, 124:25

**J**

**January** [3] - 56:25, 57:4, 79:18

**JANUARY** [1] - 1:14

**JERSEY** [1] - 2:3

**Jersey** [18] - 3:14, 5:23, 6:13, 7:14, 7:24, 54:9, 86:19, 86:20, 111:25, 112:4, 112:20, 112:25, 114:17, 114:21, 117:1, 117:7, 118:22, 130:3

**Jersey's** [2] - 6:1, 86:21

**job** [1] - 81:11

**jobs** [2] - 124:2, 124:5

**joined** [1] - 6:13

**judge** [2] - 96:18, 96:21

**Judge** [2] - 5:7, 122:12

**judges** [4] - 22:11, 23:5, 90:6, 93:2

**judgment** [1] - 107:11

**judicial** [8] - 73:6, 73:7, 73:9, 73:21, 84:22, 84:24, 104:3, 104:4

**July** [4] - 31:24, 33:2, 42:11, 57:5

**jurisdiction** [7] - 12:4, 12:5, 12:7, 14:5, 14:8, 14:9, 51:3

**Justice** [8] - 2:5, 68:8, 75:18, 110:16, 110:17, 111:1, 111:5, 114:7

**JUSTICE** [1] - 2:8

**Justices** [5] - 87:7, 110:22, 130:11, 130:14, 130:21

**justified** [5] - 60:8, 68:2, 107:24, 108:3, 108:18

**justify** [3] - 72:3, 106:21, 106:24

**Justin** [1] - 3:16

**JUSTIN** [1] - 2:8

**K**

**Kathleen** [1] - 131:21

**kATHLEEN** [1] - 2:18

**keep** [11] - 20:4, 54:1, 74:11, 86:3, 91:2, 91:3, 91:10, 91:11, 91:19, 104:23

**keeps** [1] - 91:18

**kept** [4] - 54:4, 57:20, 58:4

**key** [2] - 82:9, 122:21

**killed** [1] - 58:11

**killing** [1] - 55:15

**kind** [8] - 20:21, 86:4, 91:2, 114:2, 124:6, 124:11, 126:7, 128:12

**kinds** [1] - 76:1

**knowledge** [2] - 21:15, 47:6

**knows** [2] - 79:18, 87:9

**Kopplin** [1] - 3:18
**KOPPLIN** [2] - 2:9,
3:18
**Kost** [1] - 115:6
**Krause** [1] - 5:7

## L

**labels** [1] - 103:7
**lack** [7] - 33:17,
34:14, 36:3, 70:22,
73:4, 76:18, 79:17
**lacked** [4] - 27:3,
27:6, 27:14, 28:24
**lacks** [1] - 75:25
**lag** [2] - 56:20, 56:21
**laid** [2] - 83:25, 96:1
**land** [2] - 20:11,
85:14
**landed** [1] - 20:8
**language** [2] - 73:17,
123:12
**large** [1] - 113:19
**last** [15] - 17:19,
22:6, 25:15, 30:12,
46:3, 46:11, 47:2,
48:10, 57:10, 60:6,
80:3, 84:10, 98:5,
125:7, 130:10
**lastly** [2] - 98:21,
127:22
**late** [2] - 46:21
**LAW** [1] - 2:3
**Law** [2] - 50:14,
50:15
**law** [31] - 13:16,
13:20, 13:23, 14:4,
14:6, 20:5, 28:2, 40:7,
48:22, 66:23, 69:19,
69:21, 71:13, 91:5,
91:14, 92:9, 96:20,
99:3, 99:22, 99:25,
100:2, 100:6, 100:14,
100:21, 100:22,
120:14, 122:10,
122:15, 122:18,
122:22, 125:15
**laws** [5] - 90:4, 90:5,
95:20, 114:6, 129:20
**lawsuit** [2] - 6:14,
63:12
**lawsuits** [2] - 19:1,
21:21
**lawyers** [5] - 71:16,
75:17, 84:19, 92:16,
92:17
**lay** [1] - 96:25
**lead** [2] - 4:3, 19:22
**least** [21] - 16:6,

31:1, 46:18, 53:9,
64:1, 68:7, 73:7, 78:8,
80:17, 80:24, 81:2,
100:7, 101:5, 110:23,
116:6, 117:2, 118:10,
122:13, 123:18,
130:21
**leave** [1] - 59:12
**leaving** [1] - 130:3
**leeway** [1] - 80:10
**left** [1] - 45:14
**legal** [4] - 42:16,
46:13, 52:7, 80:11
**legally** [2] - 59:5,
91:17
**legislative** [2] -
10:19, 10:25
**Legislature** [1] -
14:23
**length** [1] - 130:9
**lens** [2] - 39:10,
95:25
**less** [13] - 23:9,
28:12, 33:17, 34:1,
36:6, 36:17, 68:22,
82:25, 93:14, 93:22,
94:1
**less-than-
compelling** [1] - 33:17
**lesser** [1] - 68:9
**lesson** [1] - 129:15
**level** [1] - 105:4
**liability** [3] - 80:18,
81:1, 81:5
**LIBERTY** [1] - 2:12
**liberty** [1] - 126:6
**licenses** [1] - 130:17
**Life** [3] - 21:18,
46:20, 46:22
**life** [7] - 8:8, 8:9,
8:13, 21:17, 22:1,
22:5
**life-threatening** [1] -
8:8
**lifesaving** [1] - 8:10
**lift** [1] - 60:24
**lifting** [1] - 60:22
**light** [8] - 9:18,
96:24, 118:9
**likelihood** [2] - 23:9,
44:8
**likely** [10] - 28:12,
33:21, 33:22, 34:1,
36:6, 43:20, 109:24,
119:9, 122:11, 125:2
**limine** [1] - 106:2
**limit** [2] - 15:7,
101:23
**limitation** [3] - 15:13,
15:14, 15:15

**limitations** [1] -
15:18
**limited** [7] - 6:19,
15:6, 51:3, 106:3,
124:25, 130:12
**limits** [1] - 120:16
**line** [5] - 20:5, 81:11,
81:12, 81:15, 104:23
**linked** [1] - 6:8
**listen** [1] - 52:12
**lists** [1] - 8:19
**litigants** [2] - 16:10,
111:17
**litigated** [5] - 47:14,
55:2, 89:16, 123:5,
126:3
**litigating** [2] - 28:23,
50:11
**litigation** [15] -
31:25, 32:3, 41:15,
51:13, 51:16, 53:23,
55:24, 78:19, 78:22,
79:1, 79:2, 79:4, 80:1,
87:11, 88:13
**LITTLE** [1] - 1:10
**live** [3] - 112:7,
128:15
**living** [1] - 24:5
**Lobby** [30] - 20:1,
24:21, 33:14, 40:19,
46:2, 63:24, 68:5,
78:20, 81:7, 87:5,
87:6, 87:14, 87:17,
87:21, 88:5, 89:1,
89:12, 90:17, 93:12,
94:17, 95:12, 98:20,
100:9, 125:1, 126:3,
126:4, 126:11, 126:15
**located** [1] - 112:11
**logic** [1] - 101:2
**logical** [2] - 10:5,
44:2
**long-held** [1] -
123:14
**look** [19] - 10:19,
14:9, 15:8, 43:16,
49:11, 50:3, 55:14,
81:6, 83:19, 87:25,
94:6, 94:20, 100:15,
101:11, 105:19,
105:24, 107:16,
110:25, 122:16
**looked** [2] - 43:23,
68:9
**looking** [11] - 48:5,
49:23, 62:22, 64:22,
73:17, 101:12, 110:5,
110:6, 110:7, 111:20,
128:2
**looks** [1] - 94:1

**Lori** [1] - 3:22
**LORI** [1] - 2:14
**lose** [12] - 7:14, 8:2,
8:24, 30:24, 31:9,
86:4, 92:15, 94:3,
94:10, 127:5, 127:8
**losing** [6] - 62:1,
91:2, 91:11, 92:12,
92:13, 92:19
**loss** [1] - 30:25
**lost** [3] - 98:4, 111:8,
123:1
**low** [1] - 102:2
**lower** [2] - 22:20,
90:20

## M

**machine** [1] - 2:21
**main** [3] - 57:18,
58:3
**major** [1] - 56:5
**majority** [1] - 8:15
**mandate** [42] - 19:15,
19:16, 21:13, 23:13,
39:23, 46:6, 50:5,
50:23, 51:10, 54:2,
54:4, 54:5, 54:9,
54:11, 56:1, 56:14,
57:20, 58:4, 58:16,
58:25, 59:4, 60:9,
63:25, 68:6, 70:13,
70:17, 70:19, 70:23,
82:8, 83:18, 86:17,
86:21, 87:13, 89:10,
92:1, 92:3, 92:7,
95:16, 117:15,
117:25, 128:4, 128:11
**mandated** [4] - 71:2,
71:3, 100:23, 101:19
**mandatory** [3] -
53:4, 61:19, 95:14
**March** [2] - 21:18,
35:13
**mark** [1] - 94:11
**MARK** [1] - 2:13
**Mark** [1] - 3:20
**market** [1] - 129:22
**Market** [2] - 2:5, 2:19
**Massachusetts** [9] -
2:9, 9:13, 111:8,
113:16, 122:24,
122:25, 123:1, 123:2
**match** [3] - 32:6,
70:14, 70:21
**matches** [1] - 54:6
**materiality** [1] -
30:10
**matter** [9] - 15:2,

16:8, 57:12, 81:21,
114:12, 120:18,
122:6, 131:5, 131:20
**maybes** [3] - 122:1,
122:8
**mean** [24] - 24:18,
40:3, 45:13, 45:19,
46:1, 51:5, 52:7,
73:14, 74:17, 74:23,
74:24, 75:5, 75:12,
77:4, 77:13, 79:6,
79:8, 79:9, 96:20,
103:23, 104:5,
104:15, 116:1
**meaning** [7] - 66:22,
77:15, 77:17, 103:1,
103:9, 104:6, 123:19
**means** [12] - 40:6,
56:12, 64:2, 68:7,
68:10, 98:18, 100:7,
103:21, 104:1, 112:4,
124:9, 124:10
**meant** [2] - 104:20,
123:22
**Medicaid** [2] - 7:21,
9:2
**medical** [1] - 8:11
**meet** [1] - 115:10
**meets** [1] - 14:24
**members** [1] - 3:25
**memory** [1] - 44:24
**mention** [2] - 81:17,
86:9
**mentioned** [4] -
27:12, 30:5, 115:14,
129:24
**merit** [1] - 23:19
**merits** [6] - 13:10,
22:7, 68:19, 79:13,
80:23, 130:11
**met** [4] - 19:20,
74:10, 120:24, 129:14
**Mexico** [2] - 112:23,
112:25
**MICHAEL** [2] - 1:21,
2:8
**Michael** [1] - 3:9
**might** [8] - 39:24,
46:21, 62:8, 103:8,
124:11, 125:9,
125:17, 125:18
**million** [2] - 54:24,
69:9
**millions** [9] - 20:7,
82:15, 83:15, 83:16,
83:22
**mind** [10] - 28:14,
28:24, 36:7, 37:9,
37:15, 48:13, 65:3,
65:23, 129:15

**minded** [2] - 30:10, 36:22

**minimize** [1] - 31:2

**minority** [1] - 128:17

**minute** [1] - 66:6

**minutes** [2] - 66:5, 96:2

**mismatch** [4] - 39:5, 58:7, 58:13, 58:18

**misuse** [1] - 125:13

**modern** [1] - 127:11

**modify** [1] - 4:24

**moment** [1] - 26:6

**Monday** [3] - 5:2, 131:9, 131:10

**money** [3] - 114:8, 114:12, 114:14

**months** [3] - 18:21, 57:5, 65:15

**Moral** [18] - 21:2, 21:5, 21:7, 32:18, 39:5, 40:12, 41:3, 42:9, 42:24, 63:10, 64:8, 65:12, 109:2, 118:4, 124:23, 125:5, 125:14, 125:19

**moral** [9] - 21:9, 21:10, 21:11, 21:14, 21:24, 71:1, 71:19, 75:21, 118:6

**Moramarco** [1] - 3:13

**MORAMARCO** [2] - 2:4, 3:13

**moreover** [2] - 11:6, 102:5

**morning** [9] - 3:2, 3:3, 3:9, 3:16, 4:4, 13:4, 13:5, 26:14, 109:10

**most** [12] - 19:6, 55:9, 57:1, 57:19, 61:16, 64:3, 70:7, 86:10, 87:11, 93:15, 93:21, 126:2

**motion** [8] - 3:5, 5:9, 5:13, 6:5, 13:19, 26:23, 99:16, 106:1

**mouths** [1] - 54:8

**move** [9] - 13:7, 16:7, 16:8, 31:11, 66:15, 76:14, 102:17, 116:11, 119:10

**moved** [1] - 5:5

**moving** [4] - 26:7, 26:13, 59:7, 107:11

**MR** [136] - 3:9, 3:13, 3:16, 3:20, 4:4, 4:7, 4:17, 5:11, 9:10, 9:24, 12:16, 12:23, 13:2, 13:4, 13:6, 13:18,

13:23, 14:11, 14:15, 16:1, 16:3, 17:12, 17:14, 18:3, 21:1, 21:6, 22:22, 22:25, 23:2, 23:24, 24:2, 24:4, 24:8, 24:13, 24:16, 24:21, 25:1, 25:10, 25:11, 25:17, 26:6, 26:8, 26:11, 35:25, 36:23, 41:1, 41:5, 41:7, 41:22, 42:1, 42:13, 42:18, 42:21, 44:16, 44:20, 45:11, 46:1, 46:15, 46:18, 47:5, 47:11, 47:18, 47:21, 47:25, 48:3, 49:4, 49:6, 51:5, 51:17, 51:21, 51:22, 51:24, 52:3, 52:9, 52:13, 53:9, 59:11, 62:13, 62:15, 62:17, 67:3, 67:5, 67:18, 67:20, 72:12, 73:14, 73:19, 73:25, 74:17, 74:23, 75:10, 75:12, 76:9, 77:3, 78:1, 78:10, 84:17, 86:9, 103:3, 103:6, 103:15, 103:24, 104:2, 104:5, 104:12, 104:15, 105:9, 105:13, 105:22, 106:17, 106:20, 107:20, 108:21, 108:24, 109:1, 109:4, 109:6, 109:8, 109:14, 109:21, 109:22, 110:17, 110:20, 113:6, 113:15, 116:5, 119:23, 125:23, 126:1, 128:24, 129:1, 131:3, 131:9, 131:12, 131:13, 131:14

**MS** [25] - 3:11, 3:18, 3:22, 26:14, 26:19, 27:19, 27:22, 27:25, 32:9, 32:14, 33:4, 33:7, 33:10, 33:12, 34:10, 34:23, 35:3, 35:19, 35:23, 62:21, 64:11, 64:14, 67:25, 99:20, 102:16

**multiple** [1] - 55:3

**must** [13] - 18:10, 28:15, 46:10, 55:15, 66:23, 69:7, 69:22, 74:19, 99:24, 100:3, 100:15, 116:21, 116:22

**mystery** [1] - 98:2

## N

**named** [1] - 116:11

**narrow** [4] - 11:25, 19:20, 21:25, 27:11

**narrowly** [1] - 21:6

**nation's** [2] - 31:4, 75:25

**national** [3] - 66:8, 102:17, 123:11

**nationwide** [33] - 21:22, 94:12, 110:1, 110:10, 110:11, 110:15, 110:23, 111:15, 114:4, 116:5, 117:1, 118:23, 118:24, 119:3, 119:14, 119:22, 120:15, 120:20, 120:23, 122:5, 122:7, 122:19, 122:23, 123:3, 126:19, 127:23, 128:1, 129:19, 129:22, 129:24, 130:4, 130:14, 130:24

**natural** [1] - 10:2

**naturally** [1] - 37:8

**nature** [10] - 7:3, 67:10, 70:1, 110:6, 112:14, 114:2, 117:11, 118:20, 126:20

**Navarro** [2] - 69:4, 70:7

**navigating** [1] - 80:11

**nearby** [1] - 112:22

**nearly** [1] - 36:15

**necessarily** [6] - 4:21, 8:13, 15:2, 17:5, 63:19, 72:24

**necessary** [20] - 9:17, 63:3, 63:6, 67:13, 71:3, 75:25, 81:22, 88:16, 111:3, 114:23, 116:3, 116:20, 119:12, 120:19, 120:21, 120:22, 120:23, 123:20, 124:4, 124:13

**necessity** [1] - 35:16

**need** [23] - 18:18, 18:20, 19:9, 23:21, 33:8, 53:11, 63:2, 64:10, 84:4, 97:10, 97:11, 102:18, 105:18, 105:20, 111:5, 115:7, 115:10,

120:2, 122:5, 124:13, 127:13, 129:11

**needed** [1] - 82:22

**needs** [3] - 79:21, 115:10, 127:16

**negative** [1] - 30:23

**neglected** [1] - 25:11

**neighboring** [1] - 112:22

**never** [13] - 37:9, 38:22, 45:19, 45:20, 49:2, 54:12, 55:3, 76:17, 88:21, 89:14, 99:13, 118:2

**NEW** [1] - 2:3

**new** [12] - 5:4, 5:13, 19:2, 20:2, 25:3, 25:4, 48:21, 50:17, 59:17, 95:24, 101:21, 118:11

**New** [23] - 2:15, 3:13, 5:23, 6:1, 6:13, 7:13, 7:24, 54:9, 86:19, 86:20, 86:21, 111:25, 112:3, 112:20, 112:23, 112:25, 114:17, 114:21, 116:25, 117:7, 118:22, 130:3

**next** [4] - 17:10, 37:24, 76:14, 85:3

**night** [1] - 87:7

**nine** [3] - 68:16, 70:4, 87:7

**Ninth** [6] - 6:16, 9:24, 10:3, 10:18, 11:8, 12:10, 119:2, 122:12

**NJ** [2] - 2:6, 2:6

**nobody** [4] - 48:13, 97:8, 127:3

**none** [4] - 70:20, 70:21, 87:7, 127:18

**nonetheless** [1] - 108:13

**nonprofits** [3] - 88:7, 89:9, 92:16

**nonreligious** [1] - 21:17

**norm** [5] - 72:22, 75:16, 76:21, 76:22, 76:25

**normally** [1] - 14:6

**norms** [2] - 73:3, 77:3

**Northern** [1] - 10:7

**notable** [1] - 25:24

**note** [14] - 5:7, 28:22, 49:7, 64:17, 65:5, 71:7, 79:11, 99:22, 101:3, 101:6, 101:14, 101:20, 113:9, 117:3

**noted** [6] - 4:23, 6:24, 10:7, 38:25, 41:9, 115:14

**notes** [1] - 78:11

**nothing** [11] - 10:25, 23:3, 32:15, 46:10, 57:22, 60:23, 63:11, 128:10, 131:12, 131:13, 131:14

**nothing's** [1] - 131:6

**Notice** [6] - 36:9, 36:18, 54:21, 55:5, 58:11, 101:21

**notice** [24] - 27:4, 27:23, 27:24, 28:1, 28:3, 28:6, 29:6, 29:25, 30:3, 36:3, 36:5, 39:13, 39:18, 49:8, 49:15, 49:24, 58:9, 64:24, 65:20, 67:22, 129:7, 129:10

**notices** [1] - 78:24

**notion** [2] - 10:2, 16:6

**nowhere** [1] - 65:9

**NPRM** [2] - 39:12, 118:11

**NRDC** [24] - 29:3, 29:8, 29:10, 29:17, 34:23, 34:25, 35:2, 35:3, 37:24, 38:2, 38:5, 39:10, 49:12, 55:14, 56:16, 57:3, 57:11, 57:13, 57:23, 58:6, 58:8, 58:22, 64:16, 65:19

**number** [23] - 6:9, 6:22, 7:1, 7:2, 7:20, 7:24, 8:4, 8:22, 25:20, 25:23, 30:21, 38:2, 78:12, 82:10, 83:13, 111:13, 113:11, 113:20, 115:19, 115:20, 125:13, 128:5

**numbers** [3] - 7:18, 82:14

**numerous** [1] - 64:15

**nuns** [3] - 99:4, 99:13, 127:13

**NW** [2] - 2:9, 2:15

## O

**Obama** [11] - 19:20, 22:18, 59:16, 60:3, 61:12, 88:18, 88:19, 94:23, 94:24, 95:5, 98:7

**Obama-era** [3] - 94:23, 94:24, 98:7
**obey** [2] - 91:14, 91:22
**objected** [2] - 43:14, 129:4
**objecting** [8] - 70:19, 70:23, 70:24, 71:23, 82:8, 84:9, 100:24, 101:1
**objection** [9] - 15:12, 16:3, 21:10, 21:12, 62:3, 69:15, 71:1, 71:24, 98:19
**objections** [5] - 18:25, 43:4, 68:12, 71:16, 100:11
**objective** [2] - 69:25, 81:21
**objectors** [9] - 18:25, 21:14, 21:23, 21:24, 64:1, 71:10, 127:9, 128:5, 129:2
**objects** [1] - 73:23
**obligate** [1] - 84:2
**obligated** [5] - 14:7, 83:2, 100:16, 100:17, 100:20
**obligation** [4] - 77:20, 85:10, 86:7, 95:14
**obligations** [3] - 77:9, 80:11, 95:10
**obligatory** [1] - 95:20
**observed** [2] - 63:15, 65:5
**obviously** [9] - 13:8, 37:25, 48:9, 49:3, 53:22, 75:23, 85:24, 93:22, 130:11
**occasionally** [1] - 37:2
**occur** [2] - 77:10, 125:1
**occurred** [2] - 11:17, 74:14
**October** [3] - 57:6, 65:13, 119:14
**odd** [7] - 18:16, 56:11, 92:25, 93:4, 94:20, 95:11, 127:19
**OED** [1] - 107:3
**OF** [8] - 1:2, 1:4, 1:10, 1:20, 1:20, 2:3, 2:3, 2:8
**offender** [1] - 55:18
**offer** [5] - 70:20, 71:4, 83:1, 83:2, 118:7

**oFFICE** [1] - 1:20
**Office** [1] - 56:4
**official** [1] - 85:4
**Official** [2] - 2:18, 131:21
**officials** [1] - 7:25
**often** [2] - 56:11, 105:11
**Oklahoma** [1] - 90:6
**old** [9] - 22:12, 44:2, 44:19, 49:19, 50:19, 52:16, 52:17, 57:16, 89:9
**older** [1] - 22:17
**omissions** [2] - 25:13, 26:2
**once** [8] - 88:21, 88:22, 89:13, 90:23, 97:5, 97:12, 97:15, 98:3
**one** [93] - 4:22, 5:14, 6:3, 6:13, 9:17, 11:14, 14:1, 18:8, 18:16, 19:4, 20:10, 20:13, 21:16, 22:6, 22:10, 24:19, 24:22, 34:22, 34:25, 36:6, 40:13, 43:9, 43:10, 43:13, 44:17, 45:3, 46:23, 46:25, 48:16, 48:22, 49:3, 51:4, 54:18, 55:9, 57:13, 59:6, 60:1, 61:18, 62:18, 63:8, 63:13, 63:16, 64:22, 66:16, 69:12, 71:21, 76:24, 78:12, 80:21, 82:22, 84:21, 85:5, 86:20, 87:2, 89:18, 90:21, 91:23, 92:20, 92:25, 93:7, 93:8, 94:2, 94:3, 94:10, 95:2, 95:4, 95:5, 96:16, 96:17, 98:6, 103:8, 107:12, 107:24, 109:15, 109:18, 110:9, 110:21, 112:20, 113:15, 119:1, 119:4, 120:7, 121:5, 123:15, 125:24, 127:3, 127:4, 127:5, 127:19, 128:11
**One** [2] - 91:8, 104:6
**ones** [6] - 19:17, 24:6, 25:3, 25:4, 27:12, 55:25, 88:2, 101:5
**ongoing** [1] - 57:9
**open** [8] - 10:3, 28:14, 28:24, 30:10, 36:22, 65:3, 98:2,

125:6
**open-minded** [2] - 30:10, 36:22
**opened** [1] - 3:1
**openly** [1] - 22:1
**operate** [2] - 50:19, 52:23
**opinion** [14] - 9:12, 28:10, 29:23, 32:6, 46:3, 53:16, 60:6, 64:16, 68:9, 68:18, 68:19, 80:22, 88:25, 95:21
**opinions** [1] - 49:3
**opportunity** [6] - 63:3, 65:22, 65:24, 71:22, 105:19, 107:13
**opposed** [2] - 99:5, 106:11
**opt** [1] - 117:23
**opted** [1] - 117:24
**option** [2] - 91:16, 91:18
**optional** [1] - 118:1
**ORAL** [1] - 1:17
**oral** [1] - 26:22
**ordained** [1] - 76:5
**order** [17] - 4:18, 18:13, 26:15, 29:6, 32:15, 50:18, 53:12, 63:11, 71:22, 73:9, 74:15, 79:11, 97:11, 114:19, 128:9
**ordered** [3] - 29:8, 35:12, 71:15
**Orders** [1] - 22:11
**ordinarily** [1] - 14:2
**organization** [1] - 70:25
**organizations** [2] - 10:21, 111:11
**organized** [1] - 61:10
**original** [11] - 33:19, 34:4, 34:21, 35:13, 41:13, 42:2, 42:7, 42:10, 43:13, 60:8, 78:18
**originally** [1] - 6:24
**otherwise** [5] - 38:16, 94:3, 104:15, 124:3, 125:14
**ought** [2] - 19:3, 20:22
**out-there** [1] - 20:21
**outcome** [1] - 6:4
**outlandish** [1] - 126:6
**outlier** [1] - 49:13
**outlining** [1] - 7:25
**outset** [2] - 13:6,

36:15
**outside** [6] - 63:17, 77:23, 78:6, 105:24, 105:25, 112:19
**overall** [1] - 123:13
**overreading** [1] - 123:8
**overshoot** [1] - 94:11
**overturn** [1] - 85:25
**own** [3] - 53:25, 125:11, 125:16

---

## P

**P.O** [1] - 2:5
**PA** [4] - 1:13, 1:23, 2:20, 71:5
**page** [2] - 41:11, 113:17
**pages** [2] - 39:21, 109:16
**paid** [1] - 92:18
**paper** [1] - 95:1
**parallel** [1] - 109:1
**paraphrasing** [1] - 57:25
**parens** [3] - 9:8, 9:14, 9:16
**parents** [3] - 112:6, 112:7
**parents'** [5] - 112:9, 121:4, 121:5, 121:6, 130:1
**part** [18] - 19:6, 25:13, 25:21, 26:2, 37:18, 42:18, 60:9, 72:18, 77:14, 78:8, 85:3, 85:25, 86:10, 89:2, 89:3, 102:8, 103:18
**participants** [1] - 28:11
**particular** [12] - 5:18, 8:17, 47:17, 73:24, 74:15, 74:21, 87:19, 94:21, 96:9, 102:13, 123:11, 126:19
**particularly** [9] - 8:6, 9:18, 11:6, 28:24, 29:3, 78:17, 82:21, 93:11, 110:12
**parties** [7] - 51:15, 79:16, 100:16, 100:22, 100:24, 107:10
**parties'** [1] - 123:17
**partly** [2] - 121:24, 121:25

**partnerships** [2] - 10:20, 10:23
**parts** [4] - 56:14, 56:15, 74:9, 123:3
**past** [3] - 22:9, 55:2, 91:1
**path** [6] - 48:16, 48:22, 95:3, 95:4, 99:16, 100:1
**pathway** [1] - 74:11
**patriae** [3] - 9:8, 9:14, 9:16
**pattern** [1] - 47:22
**PAUL** [1] - 1:10
**pause** [2] - 59:7, 127:18
**pay** [2] - 112:7, 117:19
**paying** [1] - 126:2
**PDA** [2] - 66:22, 67:1
**pending** [4] - 4:20, 111:7, 111:12
**Penn** [1] - 121:3
**PENNSYLVANIA** [2] - 1:2, 1:20
**Pennsylvania** [48] - 1:24, 3:5, 3:10, 3:12, 5:23, 6:1, 6:14, 7:13, 7:24, 10:12, 10:13, 11:18, 11:22, 14:22, 16:7, 16:8, 16:15, 16:20, 16:22, 36:4, 40:2, 46:5, 46:6, 53:23, 53:25, 86:16, 86:17, 111:24, 112:3, 112:6, 112:13, 112:19, 112:21, 112:25, 113:3, 113:11, 113:19, 113:22, 114:16, 114:17, 114:21, 116:25, 117:7, 118:22, 121:22, 129:25, 130:3
**pENNSYLVANIA** [1] - 1:5
**Pennsylvania's** [2] - 5:8, 112:19
**people** [44] - 4:1, 19:5, 19:12, 19:22, 20:2, 20:7, 20:8, 20:11, 20:15, 20:17, 20:24, 46:9, 57:1, 59:3, 59:18, 61:24, 62:2, 64:3, 69:14, 79:2, 81:12, 83:21, 92:1, 92:8, 92:18, 93:18, 93:19, 94:23, 95:9, 98:16, 98:23, 100:6, 100:19,

104:19, 105:24,
112:18, 127:1, 127:8,
127:16, 127:19,
128:6, 128:16, 129:4
**people's** [1] - 91:13
**per** [3] - 64:17,
69:15, 115:6
**percent** [11] - 6:23,
8:23, 31:3, 54:2, 54:5,
56:4, 57:16, 57:21,
58:5, 115:18
**percentage** [3] -
8:20, 115:7, 115:17
**percolate** [2] - 111:6,
118:24
**percolation** [1] -
122:15
**perfect** [7] - 115:25,
116:3, 127:23, 128:2,
128:8, 128:12, 128:19
**perhaps** [7] - 4:22,
4:23, 93:7, 95:6,
107:10, 119:6, 129:16
**period** [3] - 57:7,
65:16, 87:18
**permissible** [1] -
54:8
**permission** [1] - 4:8
**permit** [2] - 15:11,
106:9
**permitting** [2] -
15:11, 29:24
**person** [3] - 18:22,
101:1, 126:17
**Person** [1] - 126:13
**person's** [3] - 56:23,
85:1, 122:4
**personal** [2] - 12:4,
12:5, 12:6
**persuasive** [3] -
68:20, 96:24, 97:6
**pertaining** [1] - 43:2
**PETER** [1] - 1:10
**petitions** [1] - 23:1
**Philadelphia** [3] -
1:23, 2:20, 16:9
**PHILADELPHIA** [1] -
1:13
**Philadelphia's** [1] -
114:10
**Philly** [1] - 90:7
**physical** [1] - 16:7
**PI** [1] - 107:15
**pick** [2] - 15:8,
120:25
**piece** [3] - 57:18,
85:13, 95:1
**pieces** [1] - 113:7
**pinpoint** [1] - 104:24
**place** [13] - 14:19,

14:21, 15:7, 19:10,
20:6, 22:16, 43:4,
54:1, 54:5, 57:20,
57:21, 59:5, 102:12
**placed** [1] - 19:11
**places** [2] - 41:12,
104:18
**Plaintiff** [19] - 10:12,
11:22, 12:10, 14:19,
15:3, 16:15, 16:16,
25:19, 36:25, 52:11,
62:20, 105:18,
106:14, 120:21,
123:20, 123:24,
124:3, 124:8, 124:12
**plaintiff** [1] - 6:14
**Plaintiffs** [25] - 1:6,
11:14, 15:7, 15:10,
21:22, 36:2, 37:1,
37:4, 41:16, 43:18,
54:11, 68:12, 81:8,
110:13, 116:12,
116:18, 116:22,
120:2, 120:3, 120:19,
120:20, 123:8,
123:12, 128:23,
130:13
**Plaintiffs'** [2] - 37:25,
116:22
**Plan** [1] - 123:9
**plan** [39] - 20:4,
56:23, 56:25, 61:5,
87:16, 87:21, 87:24,
88:8, 88:14, 88:17,
88:20, 89:2, 89:3,
89:7, 89:10, 90:12,
90:15, 94:1, 97:3,
97:4, 97:9, 97:11,
97:12, 97:13, 97:14,
97:23, 98:3, 98:19,
105:7, 105:11, 112:6,
112:9, 112:11, 121:4,
121:5, 121:6
**planet** [1] - 92:7
**planned** [2] - 65:10,
65:11
**Planning** [3] - 7:22,
115:8, 115:11
**planning** [2] - 18:23,
129:18
**plans** [16] - 7:21, 8:1,
8:3, 19:19, 82:13,
82:16, 82:19, 82:23,
83:5, 83:6, 83:8,
83:11, 95:1, 112:1,
130:1
**plausible** [1] - 43:15
**play** [2] - 11:3, 32:8
**plays** [1] - 113:19
**plea** [1] - 98:21

**plenty** [1] - 25:2
**point** [37] - 16:24,
18:1, 23:21, 23:22,
30:20, 31:13, 35:4,
36:19, 45:18, 45:24,
47:6, 47:17, 48:3,
48:7, 49:10, 57:20,
62:13, 64:23, 70:7,
74:13, 75:2, 77:22,
81:25, 84:10, 85:14,
88:4, 94:6, 96:17,
100:14, 109:8, 113:7,
122:23, 126:1, 126:2,
126:23, 127:24,
129:19
**pointed** [3] - 89:20,
96:4, 125:11
**points** [10] - 17:19,
18:19, 29:1, 31:10,
64:15, 98:5, 99:21,
123:6, 124:20, 125:23
**policies** [1] - 53:25
**policy** [10] - 17:22,
57:14, 57:16, 57:18,
57:21, 58:3, 69:3,
69:6, 96:12
**political** [1] - 17:22
**poll** [1] - 51:21
**pool** [1] - 115:11
**POOR** [1] - 1:10
**Poor** [7] - 3:21, 3:23,
3:24, 3:25, 92:2,
117:16, 128:12
**population** [1] - 31:4
**portion** [2] - 11:16,
82:6
**pose** [1] - 68:25
**posed** [1] - 101:13
**position** [33] - 9:6,
17:16, 20:24, 21:4,
40:11, 41:2, 45:23,
51:14, 52:3, 60:3,
68:24, 69:3, 69:6,
70:2, 70:3, 70:8,
70:12, 70:15, 70:16,
72:8, 72:9, 72:23,
74:1, 77:11, 77:18,
79:24, 97:19, 102:20,
103:16, 104:1,
106:22, 127:25
**possibilities** [1] -
94:20
**possible** [5] - 48:16,
48:22, 73:12, 94:3,
124:20
**possibly** [5] - 50:16,
50:22, 53:10, 54:12,
92:6
**post** [8] - 25:4,
29:24, 49:8, 49:9,

49:14, 49:18, 49:24,
101:4
**posted** [1] - 45:21
**postpone** [1] - 38:9
**postponed** [8] -
35:11, 38:3, 38:4,
38:6, 38:8, 38:12,
38:14, 38:21
**potential** [3] - 122:9,
125:9, 125:12
**potentially** [3] - 8:9,
101:17, 123:4
**practice** [1] - 68:15
**precisely** [1] - 99:8
**prefer** [3] - 5:4,
26:15, 106:10
**preference** [1] -
12:20
**pregnancies** [7] -
8:14, 8:15, 8:20, 9:1,
9:2, 115:15, 115:20
**Pregnancy** [1] -
66:20
**pregnancy** [6] - 8:8,
8:12, 20:17, 20:20,
21:17, 30:18
**preliminary** [12] -
3:6, 5:9, 6:3, 13:9,
14:1, 14:3, 19:10,
62:22, 107:12, 119:6,
119:10, 123:10
**premised** [1] - 24:19
**prepared** [1] -
119:10
**prescriptions** [1] -
86:22
**present** [1] - 22:25
**presented** [6] - 22:2,
34:20, 51:3, 51:4,
93:25, 96:22
**presenting** [4] -
51:5, 51:8, 55:11,
95:23
**preserve** [1] - 119:12
**President** [1] - 2:13
**press** [1] - 111:9
**presumably** [4] -
12:1, 74:13, 75:6,
122:24
**pretend** [1] - 78:14
**pretenses** [1] -
100:14
**pretty** [21] - 17:25,
18:5, 20:21, 21:13,
56:9, 56:18, 59:18,
85:12, 86:15, 87:3,
92:10, 94:14, 94:20,
98:18, 98:25, 99:1,
126:13, 126:14,
126:25, 128:16,

130:22
**prevail** [1] - 114:11
**prevent** [1] - 100:5
**preventing** [1] -
109:25
**preventive** [11] -
31:19, 40:20, 45:25,
51:11, 71:2, 71:3,
77:15, 77:17, 95:15,
103:18
**prevents** [2] -
119:14, 122:20
**previous** [8] - 4:24,
6:21, 9:11, 40:21,
41:13, 51:25, 79:19,
106:1
**previously** [10] -
6:25, 7:9, 27:2, 27:3,
28:2, 28:9, 43:9, 65:7,
65:9, 121:7
**Priest** [2] - 46:20,
46:22
**primarily** [1] - 43:18
**primary** [4] - 12:9,
67:6, 67:15
**principal** [4] - 14:19,
14:21, 15:7, 43:7
**principally** [1] -
21:11
**principle** [2] -
120:25, 123:14
**principles** [1] - 11:2
**printed** [1] - 107:3
**prison** [2] - 85:17,
85:19
**private** [1] - 111:11
**pro** [5] - 21:17, 22:1,
22:5, 53:24
**pro-contraceptive**
[1] - 53:24
**pro-life** [4] - 21:17,
22:1, 22:5
**problem** [6] - 60:11,
90:13, 123:3, 127:15,
127:17, 127:20
**problems** [2] - 53:19,
126:21
**procedural** [22] -
4:12, 5:16, 5:25,
26:16, 27:1, 27:19,
27:22, 30:6, 31:10,
34:20, 35:25, 47:7,
47:23, 48:4, 48:17,
48:22, 49:1, 49:6,
54:15, 62:8, 62:18,
67:7
**procedurally** [3] -
29:14, 30:2, 62:7
**procedure** [2] - 59:9,
64:24

**Procedure** [1] - 4:11
**proceed** [1] - 111:17
**proceedings** [1] -
131:19
**proceeds** [2] - 107:8,
119:7
**process** [14] - 26:12,
28:13, 29:22, 50:20,
50:25, 58:14, 58:18,
58:19, 62:11, 65:25,
99:14, 102:12, 118:12
**procured** [1] -
100:13
**produced** [1] - 2:21
**Professors** [1] - 8:6
**profit** [5] - 24:22,
44:4, 65:10, 78:21,
126:5
**Program** [2] - 130:9,
130:14
**program** [2] - 76:14,
99:25
**Programs** [1] - 7:22
**programs** [10] - 7:23,
8:16, 8:21, 9:3, 20:15,
20:16, 99:11, 99:12,
127:11, 127:12
**project** [3] - 123:23,
123:25, 124:2
**promptly** [1] - 56:24
**promulgate** [4] -
41:3, 41:8, 72:10,
77:16
**promulgated** [1] -
27:1
**promulgating** [1] -
101:21
**promulgation** [4] -
49:8, 49:9, 49:18,
49:24
**proof** [2] - 20:22,
20:23
**proper** [7] - 6:18,
10:14, 11:10, 11:19,
11:21, 12:7
**properly** [3] - 38:13,
81:8, 81:18
**proposal** [2] - 28:8,
64:25
**proposals** [2] - 27:9,
28:11
**Proposed** [5] - 36:9,
36:18, 54:22, 55:6,
101:22
**proposed** [3] -
39:13, 61:6, 65:3
**proposition** [1] -
18:16
**protected** [3] - 19:7,
117:17, 129:2

**protective** [4] - 53:5,
94:5, 94:12, 94:15
**protective-of-
religion** [1] - 94:15
**prove** [2] - 19:3,
114:21
**proven** [1] - 23:17
**provide** [24] - 17:9,
18:14, 19:18, 26:3,
27:6, 37:11, 68:21,
69:11, 69:13, 70:10,
70:14, 100:3, 100:22,
104:24, 105:7,
112:18, 116:3,
120:19, 123:21,
124:4, 124:8, 124:13,
129:12, 129:23
**provided** [7] - 36:4,
40:22, 103:19,
103:21, 108:10,
109:10, 125:8
**providers** [1] -
121:12
**provides** [3] - 25:21,
68:3, 74:6
**providing** [6] -
10:16, 101:15, 116:1,
116:2, 118:21, 130:17
**provision** [10] -
10:16, 10:20, 11:1,
17:1, 17:2, 17:3, 20:3,
40:17, 65:20, 84:22
**provisions** [6] -
42:17, 44:19, 47:9,
47:12, 82:22, 129:7
**public** [25] - 8:16,
27:9, 28:7, 28:15,
28:17, 28:18, 28:25,
29:12, 29:22, 30:7,
35:8, 65:17, 65:21,
65:24, 66:10, 98:1,
110:8, 115:1, 116:13,
123:13, 123:15,
123:17, 123:22,
124:6, 124:9
**PUBLIC** [1] - 2:3
**public-funded** [1] -
8:16
**publicly** [15] - 33:25,
34:2, 65:11, 70:25,
115:8, 117:23,
124:18, 124:21,
124:24, 125:3,
125:24, 126:1,
126:10, 129:11,
129:13
**publicly-funded** [1] -
115:8
**publicly-traded** [10] -
33:25, 34:2, 65:11,

70:25, 117:23,
124:18, 124:21,
124:24, 125:3, 126:1
**publicly-tradeds** [1]
- 126:10
**pulled** [1] - 57:15
**pulling** [1] - 44:22
**punishing** [1] - 76:7
**purely** [1] - 80:14
**purported** [2] -
101:4, 101:9
**purpose** [2] - 106:3
**purposes** [4] - 10:17,
15:3, 15:4, 102:2
**pursuant** [1] - 69:8
**put** [18] - 22:14,
23:21, 27:9, 28:7,
28:11, 28:15, 35:21,
39:9, 40:13, 45:12,
64:25, 76:23, 76:24,
91:25, 99:16, 102:24,
110:18, 114:4
**puts** [1] - 128:9
**putting** [3] - 20:9,
50:22, 95:15
**puzzling** [1] - 31:21

## Q

**qualify** [2] - 20:16,
121:16
**questioning** [1] -
84:19
**questions** [18] -
9:22, 11:6, 13:7,
14:13, 23:20, 30:10,
31:11, 35:19, 39:18,
40:8, 48:4, 66:2,
69:21, 84:14, 102:14,
102:18, 104:13,
125:21
**quick** [4] - 58:12,
58:14, 62:20, 102:19
**quickly** [1] - 15:21
**quite** [8] - 18:4, 18:6,
18:11, 44:10, 56:6,
58:22, 59:3, 104:3
**quo** [1] - 119:13
**quote** [2] - 45:3,
59:15

## R

**R.J** [1] - 2:5
**raise** [5] - 11:5, 16:4,
16:10, 36:2, 43:12
**raised** [4] - 15:22,
27:22, 50:2, 111:1
**raises** [3] - 75:13,

75:20, 75:21
**rash** [1] - 126:5
**rather** [3] - 73:21,
91:23, 107:14
**rationale** [1] - 103:12
**reach** [3] - 48:21,
48:25, 73:11
**reached** [4] - 9:25,
11:9, 40:5, 48:18
**reaches** [1] - 111:19
**reaching** [3] - 55:13,
56:9, 108:3
**read** [8] - 11:7,
55:16, 59:15, 73:7,
84:23, 93:6, 93:11,
94:14
**reading** [6] - 53:5,
73:10, 73:11, 73:12,
85:5
**reaffirmed** [1] -
71:12
**real** [7] - 6:2, 7:17,
43:7, 102:6, 118:13,
128:24
**Real** [7] - 69:17,
95:25, 96:6, 96:7,
96:10, 96:14, 96:16
**reality** [3] - 97:3,
97:5, 102:5
**realize** [2] - 32:12,
97:23
**really** [34] - 16:9,
21:24, 23:3, 24:16,
31:6, 31:7, 32:13,
34:15, 50:14, 50:15,
54:21, 56:21, 58:13,
58:18, 60:22, 60:24,
63:5, 65:18, 79:20,
86:25, 88:13, 90:4,
90:12, 91:9, 93:1,
98:14, 112:4, 119:13,
126:18, 127:15,
127:20, 131:5, 131:6
**realm** [3] - 75:19,
122:1
**reason** [23] - 11:7,
17:4, 28:10, 30:2,
36:15, 36:16, 57:24,
62:7, 69:5, 72:2,
76:11, 78:17, 79:6,
80:5, 80:24, 81:3,
88:5, 111:2, 113:4,
126:9, 126:10, 126:11
**reasonable** [3] - 8:2,
33:16, 104:9
**reasonably** [1] -
113:21
**reasoned** [4] - 37:22,
69:7, 69:12, 97:18
**reasoning** [6] -

12:14, 34:12, 68:19,
81:7, 81:15, 122:8
**reasons** [17] - 6:2,
13:8, 24:15, 24:16,
26:20, 34:13, 39:6,
56:17, 63:7, 70:14,
70:20, 71:4, 72:3,
80:23, 82:5, 110:19
**Rebecca** [1] - 3:18
**REBECCA** [1] - 2:9
**receive** [1] - 129:25
**received** [4] - 54:23,
105:16, 106:17,
106:18
**recent** [2] - 120:4,
120:5
**recess** [3] - 66:13,
119:19, 119:20
**recite** [1] - 42:23
**recognize** [2] - 43:3,
101:10
**recognized** [11] -
28:9, 29:16, 29:23,
33:14, 40:18, 41:9,
71:14, 75:20, 80:7,
80:9, 83:18
**recognizes** [1] -
75:21
**recognizing** [1] -
42:23
**recommendations**
[1] - 75:24
**reconcile** [1] - 93:11
**reconsider** [1] -
28:20
**reconsideration** [1] -
13:20
**record** [22] - 30:12,
98:1, 105:16, 105:17,
105:19, 106:2, 106:6,
106:7, 106:10,
106:15, 106:24,
107:5, 107:14,
107:15, 107:19,
108:17, 113:8,
113:25, 115:4, 119:9,
119:17, 131:19
**reevaluate** [1] - 14:7
**refer** [3] - 21:2, 83:4,
130:8
**reference** [3] - 97:22,
113:10, 113:18
**references** [1] -
126:19
**referred** [1] - 39:6
**reform** [2] - 82:20,
82:22
**Refugee** [1] - 123:9
**reg** [2] - 93:4, 108:23
**Reg** [4] - 39:21, 45:7,

108:22, 109:4
**regard** [5] - 14:12,
14:15, 28:1, 33:18,
84:8
**regarding** [1] -
109:17
**regardless** [2] -
107:7, 115:18
**regards** [4] - 100:9,
100:10, 100:13,
101:14
**Register** [1] - 109:16
**registration** [1] -
55:18
**regs** [1] - 78:7
**regularly** [1] - 56:6
**regulation** [4] -
77:25, 78:9, 78:14,
85:13
**Regulations** [1] -
56:5
**regulations** [7] -
43:2, 56:5, 63:19,
72:11, 74:3, 74:8,
78:13
**regulatory** [1] -
73:13
**Reimpose** [1] - 53:7
**reinstate** [6] - 52:15,
52:16, 52:17, 52:20,
53:17, 117:15
**reinstated** [2] -
53:13, 56:2
**reinterpretation** [1] -
106:24
**reiterate** [1] - 48:8
**rejected** [4] - 10:18,
37:5, 37:21, 80:12
**rejecting** [2] - 37:22,
37:23
**related** [4] - 79:5,
107:2, 120:12, 124:17
**relates** [3] - 28:4,
67:8, 82:2
**relating** [1] - 4:19
**relatively** [2] - 48:21
**relevant** [9] - 4:23,
6:12, 7:3, 7:4, 100:2,
114:24, 115:2, 117:3,
117:9
**reliance** [11] - 36:12,
38:15, 38:19, 38:22,
39:6, 39:8, 39:15,
44:17, 44:21, 69:6,
69:10
**relied** [5] - 42:4,
43:18, 77:24, 78:8,
107:1
**relief** [32] - 52:18,
52:19, 53:10, 84:22,

84:24, 111:4, 112:15,
114:18, 114:19,
115:24, 116:2, 116:3,
116:7, 116:18,
116:19, 117:12,
118:22, 120:2, 120:3,
120:19, 123:2,
123:21, 124:5, 124:8,
127:16, 127:25,
130:4, 130:12, 130:13
**relies** [2] - 121:23,
122:8
**relieving** [1] - 31:6
**religion** [21] - 43:4,
75:14, 81:9, 85:1,
86:6, 87:11, 87:13,
87:15, 87:17, 87:22,
88:9, 89:11, 91:7,
91:9, 91:19, 94:6,
94:12, 94:15, 96:19,
97:24, 126:4
**religions** [1] - 60:1
**religious** [45] -
18:25, 19:2, 19:6,
19:19, 19:21, 21:10,
21:20, 21:23, 21:24,
33:22, 34:2, 43:20,
43:25, 44:4, 45:5,
45:6, 60:18, 62:3,
64:1, 68:12, 68:15,
69:14, 69:23, 71:10,
71:16, 71:19, 71:24,
75:2, 75:21, 76:12,
81:14, 82:8, 88:6,
89:8, 92:16, 96:13,
98:19, 100:11,
108:12, 108:13,
118:2, 126:6, 128:5
**Religious** [42] -
20:10, 20:25, 21:8,
31:23, 32:17, 32:20,
33:20, 34:4, 39:4,
40:12, 41:10, 41:13,
42:2, 42:7, 42:8,
42:24, 43:8, 50:25,
54:6, 54:10, 54:25,
57:22, 58:5, 60:8,
63:9, 63:10, 63:17,
64:8, 65:8, 68:2, 68:3,
72:4, 85:23, 86:19,
87:4, 94:24, 94:25,
98:7, 108:21, 124:22,
124:23, 124:24
**RELIGIOUS** [1] -
2:12
**reluctant** [1] - 36:13
**rely** [9] - 41:14, 42:2,
78:1, 78:2, 106:2,
106:7, 109:15,
109:18, 115:12

**relying** [1] - 106:23
**remain** [2] - 30:10,
36:22
**remainder** [1] -
110:22
**remaining** [1] - 4:13
**remains** [3] - 5:24,
45:17, 45:22
**remand** [1] - 79:15
**remanded** [1] - 119:2
**remedial** [1] - 73:22
**remedies** [3] - 36:25,
125:9, 125:18
**remedy** [16] - 29:7,
35:5, 66:8, 73:6, 73:7,
73:9, 73:21, 109:20,
109:23, 110:4,
114:14, 116:19,
118:25, 119:11,
120:17, 124:13
**remember** [1] - 80:7
**render** [1] - 118:1
**repeat** [1] - 130:23
**repeatedly** [4] - 23:6,
25:25, 49:7, 75:21
**reply** [3] - 8:18,
25:19, 25:23
**Reporter** [2] - 2:18,
131:21
**request** [3] - 63:3,
119:16, 130:24
**require** [11] - 60:14,
60:16, 61:23, 63:24,
82:12, 82:16, 82:18,
82:19, 84:7, 112:15,
117:19
**required** [31] - 19:18,
20:22, 29:8, 30:4,
30:8, 32:20, 33:15,
35:8, 57:19, 59:21,
59:22, 60:5, 60:7,
60:10, 62:10, 64:24,
68:4, 69:11, 71:13,
71:25, 74:12, 98:8,
98:13, 100:22,
103:19, 112:9,
112:12, 129:10
**requirement** [2] -
30:15, 86:1
**requirements** [5] -
27:1, 27:4, 29:25,
31:19, 71:5
**requires** [24] - 27:8,
28:7, 28:10, 28:14,
28:24, 60:12, 60:13,
60:20, 61:1, 68:20,
69:4, 69:25, 74:7,
77:21, 80:15, 80:16,
82:4, 92:21, 95:1,
98:11, 99:3, 114:17,

114:19, 117:1
**research** [1] - 62:22
**reside** [2] - 16:17,
16:18
**residency** [9] - 10:2,
10:5, 10:16, 11:25,
12:4, 14:16, 15:3,
16:24, 25:12
**resident** [2] - 12:3,
14:18, 16:25
**residents** [3] -
109:24, 111:24, 120:7
**resides** [10] - 10:1,
10:9, 11:5, 11:14,
11:15, 11:22, 12:10,
16:15, 16:22, 17:5
**resolution** [1] - 63:6
**resolve** [2] - 5:8,
96:3
**resolved** [1] - 4:20
**respect** [7] - 6:20,
21:4, 31:23, 43:5,
71:10, 105:21, 107:18
**respects** [4] - 5:22,
110:10, 110:12,
110:24
**respond** [5] - 27:17,
30:8, 36:19, 62:5,
67:3
**response** [3] - 62:20,
62:23, 99:19
**responses** [3] -
30:11, 32:9, 129:16
**rest** [3] - 13:14,
14:12, 23:18
**resting** [3] - 107:14,
108:7, 108:15
**restricting** [1] -
129:20
**restrictive** [11] -
64:1, 68:7, 68:10,
93:14, 93:22, 93:23,
94:2, 100:7, 116:6,
116:9, 117:2
**result** [2] - 7:16,
7:19, 8:14, 8:24, 8:25,
9:25, 11:9, 20:1, 20:3,
28:18, 70:7, 76:13
**resulted** [1] - 79:4
**results** [1] - 79:13
**retail** [2] - 86:4,
92:15
**retain** [1] - 26:23
**reversal** [6] - 57:14,
58:1, 58:2, 71:4,
107:23
**reversals** [1] -
106:21
**reversed** [6] - 68:24,
70:8, 70:11, 70:12,

70:15, 70:16
**reversing** [1] - 70:2
**review** [2] - 14:2,
84:6
**revisions** [1] -
102:25
**revive** [2] - 49:19,
96:8
**revived** [1] - 96:16
**Reynolds** [5] - 55:17,
55:18, 55:20, 55:22,
55:25
**RFRA** [154] - 22:13,
23:5, 23:23, 24:17,
24:19, 25:8, 32:21,
32:22, 32:24, 34:15,
35:20, 35:21, 40:13,
41:4, 41:14, 41:18,
41:23, 42:2, 42:11,
42:14, 43:16, 44:7,
45:1, 46:14, 47:15,
48:1, 59:13, 59:21,
60:10, 60:12, 60:15,
61:1, 61:16, 61:19,
61:24, 62:10, 62:12,
62:25, 63:6, 63:24,
66:7, 66:11, 66:15,
68:2, 68:3, 68:4, 68:6,
69:1, 71:6, 71:20,
72:4, 72:6, 72:9,
72:14, 72:16, 72:18,
72:23, 73:1, 73:3,
73:5, 73:13, 73:16,
73:18, 74:4, 74:5,
74:6, 74:10, 74:12,
74:14, 74:15, 74:18,
74:22, 74:25, 75:5,
75:15, 76:3, 76:10,
76:19, 76:21, 77:2,
77:10, 77:20, 77:21,
77:24, 78:1, 78:8,
79:23, 80:5, 80:16,
80:19, 81:5, 81:21,
81:23, 82:3, 82:4,
84:21, 85:5, 85:8,
85:20, 85:24, 86:1,
86:2, 86:3, 87:9,
88:22, 88:24, 90:24,
91:2, 91:21, 91:22,
92:2, 92:3, 93:7, 93:8,
93:11, 93:23, 94:2,
94:5, 94:6, 94:10,
94:14, 94:18, 95:2,
95:11, 95:14, 95:18,
95:21, 95:24, 96:3,
96:10, 96:11, 96:18,
97:15, 97:17, 98:8,
98:11, 98:13, 99:6,
100:5, 100:15, 101:7,
127:9, 128:3, 128:14,

128:19
**RFRA's** [1] - 94:7
**Ricci** [3] - 80:7, 80:9
**Rienzi** [8] - 3:20,
41:20, 44:14, 52:6,
84:16, 125:10,
125:22, 129:1
**RIENZI** [49] - 2:13,
3:20, 17:12, 17:14,
18:3, 21:1, 21:6,
22:22, 22:25, 23:2,
23:24, 24:2, 24:4,
24:8, 24:13, 24:16,
24:21, 25:1, 25:10,
44:16, 44:20, 45:11,
46:1, 46:15, 46:18,
47:5, 47:11, 47:18,
47:21, 47:25, 48:3,
49:4, 49:6, 51:5,
51:17, 51:21, 52:9,
52:13, 53:9, 59:11,
62:13, 62:15, 62:17,
84:17, 86:9, 125:23,
126:1, 131:3, 131:13
**rights** [3] - 91:14,
95:20, 120:7
**Rights** [1] - 66:19
**rise** [3] - 11:17,
25:22, 66:14
**risk** [2] - 6:25, 7:19
**RLUIPA** [1] - 85:19
**role** [1] - 113:18
**rolls** [6] - 19:12,
19:22, 20:2, 20:8,
20:11, 23:16
**room** [3] - 2:10, 2:19,
64:13
**round** [1] - 48:1
**RPR** [2] - 2:18,
131:21
**rubric** [1] - 74:12
**Rule** [107] - 18:24,
19:8, 22:16, 23:11,
26:25, 29:9, 29:19,
29:20, 29:21, 31:24,
34:21, 34:22, 35:7,
35:15, 35:17, 36:9,
36:10, 36:14, 36:16,
36:18, 36:21, 37:16,
37:19, 38:5, 38:8,
38:11, 39:1, 39:2,
39:19, 39:20, 41:3,
41:8, 43:8, 45:7,
46:23, 47:2, 49:22,
49:23, 49:25, 50:4,
50:9, 50:13, 50:14,
50:15, 50:17, 50:19,
51:7, 55:15, 55:21,
55:23, 55:24, 56:7,
56:12, 56:14, 57:4,

57:23, 58:7, 58:8,
58:10, 58:12, 61:20,
64:21, 65:1, 66:21,
67:2, 68:2, 68:3,
68:23, 70:9, 72:4,
72:20, 73:8, 73:9,
73:24, 74:15, 74:21,
76:5, 76:17, 77:9,
81:16, 82:15, 92:14,
101:21, 101:23,
101:25, 103:9,
103:20, 107:21,
108:22, 109:2,
117:11, 118:11,
119:15, 124:20,
124:24, 124:25,
126:10, 126:20,
127:1, 129:3, 129:6
**rule** [6] - 22:12, 85:2,
99:15, 108:19, 131:5,
131:7
**Rule's** [1] - 57:15
**ruled** [6] - 10:4,
12:11, 23:22, 31:17,
34:11, 63:21
**rulemaking** [5] -
43:22, 45:20, 58:9,
77:12, 78:3
**Rulemaking** [5] -
36:9, 36:18, 54:22,
55:6, 101:22
**Rules** [99] - 3:6,
5:13, 5:15, 5:21, 5:25,
6:3, 6:17, 6:20, 7:4,
8:14, 8:24, 11:11,
20:10, 22:18, 23:23,
24:1, 24:5, 24:8,
24:14, 24:20, 26:21,
28:5, 29:2, 29:4, 29:6,
30:2, 30:14, 30:19,
30:23, 31:14, 31:25,
33:3, 34:13, 38:2,
38:6, 38:7, 38:9,
38:14, 38:17, 42:23,
45:20, 46:14, 47:13,
51:25, 52:4, 52:15,
52:16, 52:17, 52:20,
52:21, 52:23, 52:24,
53:7, 53:8, 53:13,
53:16, 53:17, 53:18,
56:3, 57:3, 64:23,
65:6, 65:14, 65:18,
65:24, 66:19, 66:22,
69:8, 69:13, 71:20,
72:11, 72:24, 72:25,
73:13, 75:7, 77:17,
83:4, 89:25, 97:22,
102:20, 102:22,
102:25, 103:25,
104:11, 105:1, 105:4,

107:4, 110:1, 110:3,
114:16, 115:3,
117:22, 118:15,
118:19, 126:16, 131:1
**rules** [3] - 5:2, 7:8,
7:16
**ruling** [13] - 4:22,
4:24, 5:3, 5:6, 10:8,
48:10, 50:17, 53:2,
56:8, 56:9, 56:13,
59:5, 106:1
**rulings** [2] - 13:24,
47:11
**run** [1] - 48:9
**running** [1] - 86:3
**runs** [2] - 15:13, 40:5
**rush** [2] - 19:12, 20:2

## S

**SAFETY** [1] - 2:3
**SAINT** [1] - 1:10
**sale** [1] - 129:21
**San** [2] - 16:16,
114:13
**sanctuary** [1] - 114:6
**Sandberg** [6] - 3:17,
35:24, 44:22, 56:20,
88:15
**SANDBERG** [58] -
2:8, 3:16, 13:4, 13:6,
13:18, 13:23, 14:11,
14:15, 16:1, 16:3,
25:11, 25:17, 26:6,
35:25, 36:23, 41:1,
41:5, 41:7, 41:22,
42:1, 42:13, 42:18,
42:21, 51:24, 52:3,
72:12, 73:14, 73:19,
73:25, 74:17, 74:23,
75:10, 75:12, 76:9,
77:3, 78:1, 78:10,
103:3, 103:6, 103:15,
103:24, 104:2, 104:5,
104:12, 104:15,
105:9, 105:13,
105:22, 108:21,
108:24, 109:1, 109:4,
109:6, 109:8, 109:14,
109:21, 119:23,
131:14
**satisfied** [1] - 68:10
**satisfying** [1] - 64:2
**save** [2] - 47:25,
54:19
**scale** [1] - 39:11
**scheduled** [1] -
131:1
**scope** [16] - 4:14,

6:19, 12:17, 21:13,
40:20, 54:24, 66:8,
66:11, 83:20, 109:19,
118:19, 120:22,
123:10, 124:7,
124:17, 127:25
**score** [3] - 36:8,
74:23, 75:3
**scores** [1] - 75:3
**screw** [1] - 44:13
**se** [2] - 64:17, 69:15
**sealed** [1] - 97:15
**seamless** [1] - 102:7
**search** [1] - 62:24
**searing** [1] - 49:3
**seat** [3] - 3:2, 66:15,
119:21
**second** [24] - 3:5,
5:9, 6:15, 9:17, 9:18,
11:15, 14:5, 16:5,
16:13, 27:19, 29:13,
29:21, 30:5, 37:18,
40:15, 44:15, 58:6,
63:14, 64:15, 78:16,
113:11, 119:18, 121:6
**secondly** [1] -
126:18
**section** [1] - 84:25
**See** [3] - 37:4, 37:9,
37:14
**see** [10] - 8:25,
19:23, 36:24, 50:16,
53:15, 55:10, 56:13,
97:5, 118:13, 126:4
**seek** [3] - 64:1, 73:9,
120:3
**seeking** [1] - 101:2
**seemingly** [1] -
129:7
**selectively** [1] -
15:12
**self** [4] - 83:5, 83:6,
83:8, 83:11
**self-insured** [4] -
83:5, 83:6, 83:8,
83:11
**send** [4] - 78:24,
78:25, 118:3
**Senior** [1] - 2:14
**sense** [18] - 10:8,
10:11, 11:2, 15:3,
15:6, 17:4, 18:24,
55:7, 58:21, 61:11,
72:15, 74:2, 75:19,
80:6, 83:10, 86:2,
94:4, 99:6
**sensitive** [1] - 40:19
**separate** [4] - 16:25,
17:2, 88:1, 94:1
**series** [2] - 102:18,

122:7
**service** [1] - 103:19
**Services** [1] - 7:22
**services** [14] - 31:19,
45:24, 51:11, 77:16,
77:17, 95:16, 99:24,
100:23, 101:15,
101:19, 102:8,
102:11, 108:10,
112:19
**set** [12] - 24:13,
27:15, 52:15, 52:16,
52:17, 52:23, 52:24,
53:17, 66:24, 94:21,
101:22, 120:9
**seven** [3] - 21:12,
55:2, 80:24
**sever** [1] - 114:9
**several** [6] - 21:21,
29:1, 30:13, 38:19,
39:21, 63:7
**sex** [3] - 55:18, 87:4,
87:7
**shall** [4] - 84:25,
91:21, 103:19
**share** [4] - 33:22,
34:2, 43:20, 44:5
**shared** [1] - 44:9
**sharing** [1] - 86:24
**sharp** [1] - 123:2
**shop** [1] - 15:11
**short** [3] - 63:4,
87:18, 130:4
**shorthand** [1] - 2:21
**show** [7] - 19:12,
20:22, 21:9, 23:16,
92:16, 108:2, 108:17
**showed** [1] - 127:3
**showing** [5] - 19:22,
20:2, 50:12, 76:7,
127:17
**shown** [2] - 20:23,
114:11
**shows** [6] - 7:6, 22:4,
23:9, 71:5, 114:3,
115:9
**side** [6] - 3:7, 4:9,
21:20, 40:13, 71:21,
79:13
**sides** [2] - 59:18,
85:7
**sign** [1] - 67:22
**significant** [8] -
27:18, 30:9, 69:10,
83:20, 111:16,
113:18, 129:14,
130:20
**similar** [4] - 6:16,
6:20, 124:12, 125:2
**similarly** [3] -

110:12, 116:12, 120:4

**simply** [15] - 29:24, 31:2, 31:3, 65:1, 68:20, 69:11, 69:13, 70:18, 77:18, 86:11, 107:25, 108:3, 114:19, 129:9, 130:2

**simultaneously** [1] - 101:20

**sincere** [1] - 100:11

**sincerely** [1] - 69:14

**sincerely-held** [1] - 69:14

**sincerity** [1] - 69:22

**single** [6] - 8:21, 20:12, 20:13, 56:23, 89:18, 115:9

**Sister** [1] - 61:4

**Sisters** [13] - 3:20, 3:22, 3:24, 3:25, 18:9, 50:11, 60:18, 89:8, 90:14, 92:1, 117:16, 127:24, 128:11

**SISTERS** [1] - 1:10

**sit** [3] - 90:6, 90:7, 98:5

**sits** [1] - 14:23

**sitting** [2] - 50:16, 53:14

**situated** [3] - 110:13, 116:12, 120:4

**situation** [7] - 34:6, 56:19, 61:15, 61:17, 76:5, 112:5, 114:15

**situations** [1] - 20:24

**six** [4] - 18:7, 21:12, 55:2

**Sixth** [1] - 72:21

**slapped** [2] - 55:5, 58:14

**slightly** [1] - 54:25

**slips** [1] - 23:15

**small** [1] - 44:3, 58:5, 75:1, 82:24, 125:13, 128:4, 128:17

**Smith** [1] - 85:25

**so-called** [1] - 114:6

**solely** [2] - 41:4, 76:3

**solicitude** [2] - 9:12, 9:18

**solution** [17] - 71:15, 93:7, 93:8, 94:3, 102:6, 115:25, 116:4, 127:23, 128:3, 128:8, 128:13, 128:14, 128:15, 128:19

**solve** [1] - 90:13

**someone** [8] - 33:8, 69:23, 73:23, 74:4, 85:14, 107:3, 112:24,

123:4

**someplace** [1] - 88:10

**sometimes** [2] - 36:24, 117:12

**somewhat** [1] - 123:6

**SORNA** [5] - 55:17, 55:19, 55:22, 55:24, 58:24

**sorry** [7] - 17:11, 33:13, 39:3, 59:14, 67:8, 103:14, 125:24

**sort** [51] - 16:12, 27:15, 36:11, 37:7, 37:13, 39:6, 39:11, 39:15, 39:18, 39:20, 39:22, 40:9, 43:4, 43:20, 49:12, 54:12, 55:14, 58:11, 58:14, 60:3, 73:2, 73:3, 75:1, 75:25, 77:4, 78:24, 79:16, 81:18, 81:21, 81:24, 82:22, 83:9, 83:12, 103:8, 103:16, 104:16, 104:17, 106:2, 109:17, 114:2, 116:1, 117:13, 118:17, 120:4, 120:16, 120:25, 123:2, 123:21, 124:4, 124:17, 125:6

**sorts** [1] - 126:6

**sought** [1] - 120:2

**soul** [2] - 127:3, 127:19

**sounds** [1] - 48:1

**sovereign** [2] - 9:8, 10:9

**sovereigns** [1] - 17:17

**speaking** [6] - 4:5, 4:10, 4:13, 49:13, 64:15, 67:23

**speaks** [4] - 29:17, 73:5, 73:6, 73:20

**special** [4] - 9:12, 9:18, 43:4, 79:6

**specific** [7] - 13:7, 14:13, 28:3, 33:1, 34:6, 56:18, 113:7

**specifically** [7] - 4:11, 11:19, 32:23, 72:17, 77:6, 81:21, 96:6

**spectrum** [2] - 59:19, 85:7

**speech** [1] - 75:13

**spell** [1] - 103:14

**spend** [1] - 96:1

**split** [1] - 89:22

**sponsor** [1] - 105:11

**sponsored** [2] - 7:14, 7:15

**squarely** [4] - 34:22, 34:23, 34:24, 123:10

**St** [1] - 2:5

**stack** [1] - 19:24

**stage** [1] - 14:2, 27:15

**stale** [1] - 126:7

**stand** [2] - 78:13, 86:10

**standing** [35] - 4:14, 6:1, 6:6, 6:17, 7:7, 7:10, 7:11, 9:4, 9:8, 9:9, 9:13, 9:14, 9:15, 9:16, 9:20, 9:22, 13:1, 13:13, 13:18, 14:13, 17:12, 18:8, 18:17, 18:20, 22:6, 26:2, 105:13, 105:14, 111:9, 120:2, 120:3, 120:8, 120:13, 121:25, 130:11

**stands** [1] - 122:12

**stare** [1] - 57:25

**stark** [2] - 58:1, 58:2

**start** [9] - 14:15, 26:15, 35:25, 40:10, 47:22, 47:23, 50:21, 72:6, 93:15

**starting** [1] - 26:12

**state** [53] - 7:9, 8:3, 8:19, 8:21, 8:22, 9:3, 9:20, 9:25, 10:2, 10:5, 10:9, 11:4, 13:6, 14:16, 14:18, 15:8, 16:21, 19:12, 20:8, 20:11, 20:15, 20:16, 20:20, 23:16, 43:11, 49:14, 50:4, 59:21, 61:1, 84:3, 86:13, 88:10, 94:23, 97:7, 98:25, 112:1, 112:12, 113:3, 113:23, 115:6, 115:9, 115:10, 115:12, 115:21, 120:3, 120:8, 120:11, 121:16, 121:18, 127:17

**STATE** [1] - 2:3

**State** [7] - 2:6, 3:13, 14:22, 16:19, 36:4, 121:3, 121:22

**state's** [6] - 19:22, 53:19, 92:21, 93:6, 99:10, 99:15

**state-funded** [4] - 8:3, 8:21, 9:3, 112:1

**statement** [1] - 107:24

**States** [5] - 12:6, 12:13, 16:6, 21:16, 130:8

**STATES** [1] - 1:1

**states** [60] - 6:7, 6:17, 7:6, 7:7, 7:25, 8:23, 9:3, 11:2, 11:8, 11:11, 12:1, 12:2, 14:17, 17:3, 17:21, 17:23, 18:6, 18:12, 18:15, 22:17, 23:10, 23:11, 23:12, 48:19, 49:7, 54:8, 54:15, 56:24, 59:14, 80:25, 86:15, 91:25, 92:6, 92:24, 97:18, 98:6, 109:23, 111:4, 112:15, 112:22, 113:10, 113:15, 113:16, 114:8, 115:13, 115:16, 115:17, 116:7, 117:4, 117:5, 117:6, 117:8, 124:11, 125:11, 126:22, 127:2, 127:10, 130:3, 130:18

**Stations** [1] - 69:4

**status** [2] - 48:8, 119:13

**statute** [12] - 11:8, 15:19, 25:22, 26:2, 41:7, 72:19, 73:22, 77:5, 77:6, 84:23, 95:18, 104:1

**statutes** [3] - 15:4, 72:15, 73:2

**statutory** [6] - 17:1, 27:12, 31:18, 40:17, 63:18, 64:19

**stay** [3] - 110:10, 119:9, 130:18

**stayed** [2] - 110:14, 119:5

**staying** [1] - 4:19

**step** [1] - 82:19

**Step** [2] - 104:6, 104:8

**stepped** [1] - 100:21

**steps** [2] - 63:24, 76:14

**sterilization** [1] - 86:23

**still** [16] - 8:13, 18:22, 29:14, 30:13, 45:17, 48:24, 50:10, 69:17, 82:18, 90:14, 94:23, 97:25, 101:2, 126:14, 129:21

**Stop** [2] - 53:6, 53:8

**stop** [4] - 23:18, 31:20, 92:13, 93:2

**straight** [1] - 46:2

**straightforward** [3] - 93:16, 93:21, 95:13

**strain** [1] - 40:4

**strangely** [1] - 95:4

**Street** [2] - 1:23, 2:19

**strict** [1] - 94:14

**strike** [1] - 130:13

**strikes** [1] - 54:13

**strong** [4] - 80:17, 81:2, 81:4, 82:1

**strongest** [1] - 35:4

**student** [5] - 112:8, 121:1, 121:2, 121:12, 121:20

**students** [6] - 112:5, 113:1, 113:3, 113:12, 113:22, 129:25

**study** [3] - 107:24, 109:15, 109:18

**stuff** [6] - 48:17, 49:1, 53:11, 87:22, 88:9

**subject** [10] - 12:13, 39:24, 45:19, 45:20, 46:25, 49:2, 52:25, 54:7, 58:9, 80:18

**submit** [4] - 10:4, 113:25, 130:15, 130:19

**submitted** [6] - 7:24, 8:18, 19:24, 30:17, 113:9, 115:5

**subsequent** [1] - 37:11

**subsequently** [1] - 10:15

**substance** [5] - 26:13, 31:8, 47:25, 59:8, 59:11

**substantial** [38] - 11:16, 23:6, 25:12, 25:21, 60:25, 63:25, 68:15, 68:22, 68:25, 69:15, 69:18, 69:21, 69:25, 70:6, 74:9, 80:21, 80:22, 81:2, 81:25, 82:2, 82:5, 87:11, 87:12, 87:15, 89:12, 89:19, 90:17, 90:18, 91:19, 93:3, 93:13, 94:18, 96:19, 96:22, 97:20, 97:25, 100:12, 101:13

**substantially** [6] - 76:12, 79:2, 85:1, 91:7, 91:9, 101:23

**substantive** [25] - 4:12, 5:17, 5:25, 26:16, 30:11, 31:12, 31:13, 40:9, 40:10, 42:16, 44:18, 47:4, 47:6, 47:9, 47:12, 48:10, 48:20, 48:23, 62:17, 67:7, 71:5, 102:21, 102:22, 103:2, 103:9

**substantively** [2] - 48:15, 118:15

**succeeding** [1] - 34:22

**sudden** [1] - 19:11

**suddenly** [4] - 19:9, 20:2, 20:9, 23:10

**sue** [1] - 91:3

**sued** [2] - 86:4, 91:11

**sues** [1] - 74:4

**suffer** [5] - 5:24, 6:7, 7:7, 109:25, 112:13

**suffered** [1] - 117:1

**sufficient** [2] - 26:1, 124:8

**suggest** [18] - 20:22, 22:3, 23:8, 48:16, 50:2, 54:19, 56:12, 56:16, 57:17, 58:2, 58:23, 67:17, 73:21, 86:15, 89:24, 113:2, 127:7, 128:14

**suggested** [1] - 87:8

**suggesting** [1] - 73:10

**suggestion** [3] - 20:21, 79:12, 84:11

**suggests** [1] - 82:15

**suit** [5] - 10:12, 11:12, 16:17, 79:21

**Suite** [2] - 1:23, 2:15

**suits** [1] - 127:10

**summarize** [1] - 7:11

**Sunday** [1] - 131:10

**superseded** [1] - 52:20

**supplemental** [3] - 8:17, 63:4, 115:5

**support** [4] - 29:2, 43:23, 43:24, 68:3

**supported** [4] - 40:22, 103:10, 103:20, 104:24

**supporting** [1] - 79:22

**suppose** [3] - 59:2, 106:13, 112:21

**supposed** [6] - 20:18, 29:18, 35:10, 57:3, 86:3, 91:10

**supposedly** [1] - 83:19

**supposition** [1] - 20:17

**Supreme** [33] - 9:19, 22:21, 22:22, 22:23, 33:13, 40:18, 46:24, 55:3, 55:4, 63:23, 68:5, 69:3, 71:14, 71:21, 83:18, 87:6, 88:19, 89:23, 90:19, 94:16, 95:12, 101:6, 110:8, 111:18, 114:25, 116:9, 116:13, 120:5, 120:7, 124:14, 125:2, 130:14, 130:21

**surely** [1] - 44:2

**surface** [1] - 73:7

**surprised** [2] - 113:24, 118:9

**swallow** [1] - 54:14

**swatches** [2] - 75:24, 83:21

**sweeping** [8] - 31:18, 65:6, 108:14, 117:11, 126:20, 126:25, 127:1, 127:16

**swift** [1] - 57:10

**switched** [1] - 97:19

**system** [2] - 75:25, 88:16

**T**

**table** [2] - 61:16, 96:11

**taint** [3] - 34:18, 48:5, 64:20

**tainting** [1] - 64:21

**taints** [2] - 34:21, 55:12

**talks** [1] - 111:5

**tangentially** [1] - 124:17

**target** [2] - 79:25, 80:2

**task** [1] - 40:19

**technical** [2] - 102:25, 104:16

**Television** [1] - 69:4

**ten** [3] - 66:6, 91:8, 93:2

**ten-minute** [1] - 66:6

**tend** [1] - 47:13

**tendentious** [2] - 109:11, 109:14

**tenets** [2] - 43:21, 81:14

**tension** [1] - 116:17

**term** [4] - 49:10, 73:4, 76:19, 79:17

**termed** [1] - 103:8

**terminology** [1] - 49:7

**terms** [14] - 42:6, 43:9, 53:25, 62:4, 73:5, 73:6, 73:20, 76:20, 77:21, 81:9, 103:10, 103:13, 120:10, 122:14

**terribly** [1] - 94:15

**Texas** [3] - 130:8, 130:13, 130:16

**THE** [160] - 1:1, 1:2, 1:10, 1:16, 1:20, 3:2, 3:4, 3:15, 3:24, 4:6, 4:16, 5:6, 9:6, 9:23, 12:15, 12:21, 12:24, 13:3, 13:5, 13:16, 13:19, 14:10, 14:14, 15:24, 16:2, 17:10, 17:13, 17:25, 20:25, 21:2, 22:20, 22:23, 23:1, 23:21, 23:25, 24:3, 24:6, 24:12, 24:15, 24:18, 24:24, 25:9, 25:15, 26:5, 26:7, 26:10, 26:12, 26:18, 27:15, 27:21, 27:23, 31:20, 32:13, 32:23, 33:6, 33:8, 33:11, 34:9, 34:17, 34:25, 35:18, 35:21, 35:24, 36:19, 40:24, 41:2, 41:6, 41:15, 41:25, 42:10, 42:15, 42:20, 44:14, 44:17, 45:8, 45:23, 46:13, 46:17, 47:3, 47:8, 47:16, 47:19, 47:24, 48:2, 49:2, 49:5, 51:2, 51:8, 51:20, 51:23, 52:2, 52:5, 52:10, 53:3, 59:10, 62:12, 62:14, 62:16, 62:20, 64:10, 64:12, 66:3, 66:14, 66:15, 67:4, 67:16, 67:19, 67:21, 72:5, 73:5, 73:17, 73:20, 74:11, 74:19, 75:9, 75:11, 76:2, 76:20, 77:22, 78:4, 84:15, 86:8, 99:19, 102:15, 102:17, 103:5, 103:14, 103:22, 103:25, 104:3, 104:10, 104:14, 104:23, 105:10, 105:15, 106:12, 106:19, 107:17, 108:20, 108:23, 108:25, 109:5, 109:7, 109:12, 109:19, 110:16, 110:18, 112:17, 113:13, 115:25, 119:17, 119:21, 125:22, 125:25, 128:22, 128:25, 130:25, 131:4, 131:10, 131:15

**themselves** [4] - 7:18, 30:14, 54:13, 99:5

**theories** [1] - 7:12

**theory** [2] - 9:7, 52:8

**therefore** [10] - 16:22, 50:18, 53:16, 64:20, 90:3, 103:11, 114:12, 114:22, 116:24, 124:12

**they've** [16] - 15:22, 18:1, 20:23, 32:2, 37:7, 55:2, 61:17, 90:11, 91:1, 92:13, 98:1, 98:2, 98:3, 107:24, 116:8

**thinking** [3] - 28:12, 28:15, 74:4

**thinks** [1] - 103:21

**third** [5] - 11:16, 46:23, 100:16, 100:22, 100:23

**Third** [23] - 4:18, 29:3, 29:4, 29:8, 29:16, 34:19, 35:5, 35:12, 35:16, 36:20, 38:9, 38:18, 49:2, 55:20, 55:22, 57:23, 65:19, 68:17, 69:16, 90:23, 100:14, 100:18, 116:20

**Thomas** [4] - 110:16, 110:17, 111:1, 111:5

**Thomson** [3] - 3:11, 4:10, 12:19, 26:8, 66:18

**THOMSON** [24] - 1:22, 3:11, 26:14, 26:19, 27:19, 27:22, 27:25, 32:9, 32:14, 33:4, 33:7, 33:10, 33:12, 34:10, 34:23, 35:3, 35:19, 35:23, 62:21, 64:11, 64:14, 67:25, 99:20, 102:16

**thorough** [1] - 7:5

**thousands** [1] - 65:8

**threatening** [3] - 8:8, 8:10, 8:13

**three** [5] - 11:12, 21:16, 65:15, 91:8, 125:23

**threshold** [2] - 48:7, 120:24

**threw** [2] - 94:19, 107:4

**throughout** [3] - 10:1, 10:9, 11:22

**thumb** [1] - 39:11

**tied** [1] - 12:4

**timing** [1] - 5:1

**tiny** [1] - 22:4

**title** [1] - 55:5

**Title** [16] - 7:23, 46:8, 66:19, 66:22, 67:1, 67:14, 86:9, 86:12, 86:14, 87:2, 101:16, 101:18, 101:24, 101:25, 102:2, 128:7

**today** [7] - 12:18, 22:17, 33:9, 45:22, 67:6, 106:6, 107:8

**tomorrow** [1] - 76:2

**took** [8] - 22:16, 28:17, 29:11, 39:14, 40:1, 50:8, 57:16, 65:1

**top** [1] - 55:6

**tortured** [1] - 100:1

**totally** [2] - 110:19, 118:1

**touches** [1] - 115:1

**tough** [1] - 54:13

**toward** [1] - 107:11

**traded** [10] - 33:25, 34:2, 65:11, 70:25, 117:23, 124:18, 124:21, 124:24, 125:3, 126:1

**tradeds** [1] - 126:10

**traditional** [3] - 120:16, 120:18, 120:24

**transcript** [2] - 50:3, 131:18

**Transcript** [1] - 2:21

**travel** [2] - 110:9, 115:1

**treated** [2] - 10:21, 10:24

**Trenton** [1] - 2:6

**trial** [2] - 96:18, 96:21

**tried** [3] - 71:16, 79:20, 93:23

**true** [12] - 19:13,

37:16, 60:22, 60:24, 86:16, 87:5, 89:21, 97:8, 115:16, 118:17, 122:11, 123:13
**TRUMP** [1] - 1:8
**Trump** [4] - 3:5, 59:17, 60:4, 88:18
**trusts** [1] - 5:8
**truth** [1] - 97:14
**try** [6] - 71:23, 72:7, 79:15, 79:25, 80:1, 118:12
**trying** [4] - 17:21, 81:20, 114:9, 117:15
**Tuesday** [1] - 131:8
**turn** [17] - 7:20, 7:23, 8:3, 9:21, 12:25, 13:11, 20:19, 26:16, 35:20, 37:24, 40:9, 43:13, 43:15, 44:12, 57:1, 109:19, 112:1
**turned** [1] - 119:4
**turning** [4] - 23:10, 23:11, 34:15
**tweak** [1] - 50:24
**tweaks** [1] - 118:16
**Two** [3] - 66:18, 66:25, 104:8
**two** [32] - 6:8, 7:11, 13:11, 17:15, 17:17, 21:15, 21:16, 27:22, 31:10, 32:9, 40:11, 43:17, 44:18, 54:18, 56:16, 56:17, 57:11, 61:21, 67:6, 67:15, 74:9, 78:10, 84:19, 91:8, 92:4, 98:5, 99:2, 99:5, 107:3, 110:21, 112:18, 122:17
**type** [1] - 94:4
**types** [1] - 19:21

### U

**U.S** [2] - 2:8, 2:19
**U.S.C** [2] - 10:15, 40:17
**ultimately** [2] - 53:19, 111:19
**unclear** [1] - 48:21
**uncontested** [2] - 101:5, 101:12
**under** [53] - 7:11, 8:2, 12:1, 12:3, 12:8, 17:2, 24:20, 25:21, 26:2, 27:5, 29:14, 32:21, 32:24, 36:2, 41:17, 42:16, 44:18, 47:9, 48:15, 50:19,

53:3, 59:15, 67:1, 68:25, 70:7, 74:5, 77:10, 80:18, 81:5, 82:11, 83:8, 86:2, 88:7, 88:25, 89:12, 90:17, 92:8, 93:23, 94:17, 94:23, 95:10, 99:22, 100:14, 100:15, 104:5, 104:8, 110:2, 115:18, 120:13, 129:24
**understood** [5] - 24:4, 59:12, 59:19, 119:24, 123:19
**undocumented** [1] - 130:17
**unified** [1] - 60:3
**unincorporated** [1] - 10:24
**unintended** [5] - 8:14, 8:15, 8:20, 20:16, 20:20
**union** [1] - 113:4
**unique** [1] - 56:18
**UNITED** [1] - 1:1
**United** [7] - 12:2, 12:6, 12:13, 16:6, 21:15, 130:8
**universities** [1] - 113:20
**university** [1] - 7:15
**university-sponsored** [1] - 7:15
**unlawful** [3] - 26:21, 31:14, 66:23
**unlawfully** [1] - 29:5
**unlawfully-issued** [1] - 29:5
**unlawfulness** [1] - 29:2
**Unless** [1] - 31:10
**unless** [13] - 9:22, 14:12, 14:13, 39:17, 40:8, 53:12, 66:1, 72:17, 74:9, 77:6, 120:19, 120:22, 122:11
**unlikely** [6] - 85:12, 108:16, 112:24, 124:21, 125:1, 126:14
**unnecessary** [2] - 98:23, 99:17
**unplanned** [3] - 9:1, 115:15, 115:20
**untenable** [1] - 79:24
**unworkable** [1] - 114:22
**up** [39] - 4:8, 16:16, 19:12, 19:22, 20:2, 20:15, 21:9, 23:16,

33:9, 36:12, 38:20, 38:22, 39:7, 39:9, 39:16, 44:13, 44:22, 45:15, 50:12, 56:9, 57:8, 59:24, 61:22, 65:22, 67:22, 68:13, 70:14, 78:13, 84:19, 92:16, 95:7, 105:13, 105:14, 115:16, 120:9, 120:25, 127:3, 127:17, 130:1
**upholds** [1] - 55:22
**uses** [1] - 121:12

### V

**vacated** [2] - 68:18, 80:23, 96:5, 96:15
**valid** [4] - 21:8, 61:24, 62:4, 62:7
**validity** [1] - 51:9
**validly** [1] - 22:5
**variety** [1] - 110:5
**various** [1] - 24:15
**vast** [1] - 75:24
**vein** [1] - 15:5
**venue** [26] - 4:14, 6:18, 9:21, 9:24, 10:14, 10:17, 11:10, 11:12, 11:19, 12:8, 13:1, 14:15, 15:4, 15:9, 15:12, 15:13, 15:15, 15:17, 15:19, 16:9, 17:2, 17:16, 25:13, 25:21
**version** [3] - 24:22, 48:7, 89:9
**versions** [1] - 54:18
**versus** [9] - 3:5, 49:12, 55:14, 57:13, 58:22, 88:18, 116:19, 120:5, 130:8
**via** [1] - 2:21
**view** [15] - 39:10, 43:8, 45:4, 45:14, 52:10, 52:14, 59:21, 59:22, 60:15, 61:1, 61:25, 74:20, 77:2, 80:15, 123:21
**views** [4] - 33:22, 34:2, 44:5, 71:10
**VII** [8] - 66:19, 66:22, 67:1, 67:14, 86:10, 86:12, 86:14, 87:2
**violate** [11] - 23:23, 27:2, 31:15, 44:25, 45:1, 66:19, 72:20, 75:7, 87:17, 89:11, 90:15

**violated** [3] - 5:16, 101:7, 118:2
**violates** [11] - 22:13, 23:5, 26:25, 66:22, 67:2, 68:6, 81:14, 86:13, 87:22, 88:9, 92:2
**violating** [2] - 75:5, 91:13
**violation** [12] - 24:17, 24:18, 25:8, 26:23, 28:5, 29:7, 71:5, 74:14, 74:15, 97:17, 110:6, 114:14
**violations** [6] - 4:12, 26:9, 26:10, 26:16, 26:17, 86:3
**virtually** [1] - 8:22
**vital** [1] - 30:9
**voting** [1] - 120:6
**vs** [1] - 1:7

### W

**wait** [2] - 74:4, 86:3
**waivable** [1] - 15:18
**waive** [2] - 15:15, 15:16
**waived** [1] - 15:14
**walk** [1] - 36:13
**wants** [2] - 94:23, 106:9
**warranted** [1] - 110:2
**Washington** [2] - 2:10, 2:15
**ways** [8] - 6:9, 23:7, 46:8, 48:17, 98:23, 107:21, 116:6, 128:6
**weaker** [1] - 130:16
**website** [2] - 45:21, 95:17
**weeks** [1] - 107:4
**weighed** [1] - 117:4
**weight** [1] - 67:17
**weird** [1] - 126:25
**weirdly** [1] - 95:3
**Weisman** [1] - 8:7
**well-understood** [1] - 119:24
**WENDY** [1] - 1:16
**Wheaton** [2] - 24:24, 46:24
**whereas** [2] - 38:12, 105:5
**Whitford** [1] - 120:5
**whole** [10] - 13:8, 21:15, 37:7, 50:20, 88:6, 88:24, 94:6, 99:6, 113:23, 120:11

**wholesale** [2] - 57:22, 86:5
**willing** [3] - 36:17, 37:10, 121:13
**win** [5] - 88:21, 88:23, 89:14, 90:24, 123:4
**WINDHAM** [2] - 2:14, 3:22
**Windham** [1] - 3:22
**winning** [2] - 55:3, 91:4
**wished** [1] - 4:24
**withdraw** [1] - 118:11
**withhold** [2] - 114:9, 129:9
**woman** [4] - 82:25, 83:3, 121:14, 121:16
**women** [52] - 5:23, 6:22, 6:25, 7:13, 7:19, 7:20, 8:2, 8:4, 8:7, 8:12, 8:24, 30:19, 30:23, 30:25, 31:1, 31:3, 31:4, 31:8, 33:18, 33:21, 34:1, 39:20, 39:24, 43:19, 43:21, 44:3, 69:9, 70:23, 71:1, 71:17, 71:23, 82:16, 83:14, 83:15, 83:16, 83:17, 83:22, 87:5, 87:7, 101:17, 102:1, 102:7, 115:3, 115:7, 115:10, 115:11, 115:19, 118:6, 118:20, 127:11, 129:5
**women's** [1] - 102:10
**Women's** [8] - 5:18, 31:15, 34:7, 71:25, 77:23, 78:7, 99:23, 103:10
**won** [1] - 23:3
**wondering** [1] - 127:23
**word** [5] - 106:25, 107:3, 108:7, 108:15, 109:9
**words** [15] - 5:21, 19:7, 21:18, 23:3, 48:18, 49:15, 50:6, 54:23, 56:6, 57:15, 61:3, 87:25, 90:1, 91:17, 96:10
**workplace** [1] - 118:7
**works** [3] - 53:18, 82:25, 86:21
**world** [4] - 46:10, 54:20, 94:21, 98:12

**worship** [1] - 60:17
**worth** [1] - 12:11
**woven** [1] - 77:4
**wrestle** [1] - 61:20
**write** [3] - 29:25, 32:6, 53:15
**writing** [2] - 65:20, 110:21
**written** [2] - 75:15, 129:6

---

## Y

**yank** [1] - 19:9
**yanked** [1] - 58:14
**year** [15] - 5:14, 17:20, 22:9, 25:4, 29:23, 31:17, 32:20, 34:11, 46:3, 47:2, 48:10, 60:6, 65:5, 91:1, 113:12
**years** [13] - 18:1, 18:7, 21:12, 32:3, 38:19, 41:10, 55:2, 56:25, 78:19, 80:1, 87:12, 126:8, 126:15
**yesterday** [3] - 4:18, 106:7, 106:16
**yourself** [1] - 93:21
**yourselves** [1] - 99:7

---

## Z

**zillion** [1] - 127:12
**Zubik** [14] - 24:24, 25:2, 25:5, 25:7, 71:14, 79:5, 79:11, 88:13, 89:17, 101:4, 101:6

---

## §

**§** [2] - 10:15, 40:17