IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY,<br><br>               Plaintiffs,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; ALEX M. AZAR II, in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; RENE ALEXANDER ACOSTA, in his official capacity as Secretary of Labor; and UNITED STATES DEPARTMENT OF LABOR,<br><br>               Defendants. | Civil Action No. 2:17-cv-04540 (WB) |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**INTRODUCTION**

      As part of the Patient Protection and Affordable Care Act, Congress required employers to cover some recommended preventive services without cost sharing. That law does not mention contraceptive coverage. However, the Health Resources and Services Administration, an agency within the Department of Health and Human Services (HHS), issued guidelines mandating coverage of all FDA-approved contraceptives. At the same time, the government recognized that some employers hold sincere religious objections to providing insurance coverage for some or all forms of contraception, but decided to exempt only a fraction of those employers—churches and their integrated auxiliaries—from the requirement. Other religious employers remained subject to the contraceptive mandate and were left either to violate their sincerely held religious beliefs or to be liable for significant fines.

1

On October 6, 2017, in an attempt to address serious religious and moral objections and finally bring to a close years of litigation spawned by the contraceptive mandate, the Departments of HHS, Labor, and the Treasury (collectively, the Agencies) issued interim final rules with requests for public comments (IFRs) that kept the mandate in place, but exempted religious and moral objectors.  *See* 82 Fed. Reg. 47,792 (Oct. 13, 2017); 82 Fed. Reg. 47,838 (Oct. 13, 2017). After reviewing all the comments received on the IFRs, and making some changes in response, the Agencies promulgated final rules superseding the IFRs.  *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 83 Fed. Reg. 57,536 (Nov. 15, 2018) (the Religious Exemption Rule); Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 83 Fed. Reg. 57,592 (Nov. 15, 2018) (the Moral Exemption Rule) (collectively, the Rules).

Pennsylvania and New Jersey (Plaintiffs or the States) seek to reverse this considered decision, demanding that religious and secular groups facilitate services to which they deeply object on religious or moral grounds.  The States contend that the new rules violate the Administrative Procedure Act (APA) and the ACA.  But the Court need not address the merits of these claims for two reasons.  First, Plaintiffs lack standing because they have not demonstrated that they have suffered a concrete injury in fact as a result of the Rules.  Plaintiffs offer only speculation that they will incur fiscal harm, but speculation cannot support Article III standing. And their status as sovereign states does not alter the calculus:  The Supreme Court has long held that states may not assert *parens patriae* claims against the federal government, and plaintiffs have not demonstrated that they are entitled to special solicitude (which would not matter here, in any case, as plaintiffs cannot demonstrate the existence of an injury in fact).  Second, this Court is not a proper venue.  Pennsylvania is a resident only of the Middle District of Pennsylvania, because that is where its capital is located.  Moreover, none of the events giving rise to this suit occurred in the Eastern District of Pennsylvania.  Accordingly, dismissal is appropriate under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(3).

## **BACKGROUND**

The Court is well versed in the background of this case, having already issued two preliminary injunctions., Thus, Defendants do not repeat the full history of the Rules and related litigation for purposes of this motion. A brief review of the Rules and pertinent aspects of the Amended Complaint should provide an adequate prelude to this motion.

The Religious Exemption Rule "[is] necessary to expand the protections for the sincerely held religious objections of certain entities and individuals." 83 Fed. Reg. at 57,537. It "minimize[s] the burdens imposed on their exercise of religious beliefs, with regard to the discretionary requirement that health plans cover certain contraceptive services with no cost-sharing." *Id.* The final religious exemption "do[es] not remove the contraceptive coverage requirement generally from HRSA's Guidelines." *Id*. What it does do is "finalize exemptions [for] the same types of organizations and individuals for which exemptions were provided in the Religious Interim Final Rule: Non-governmental plan sponsors including a church, an integrated auxiliary of a church, a convention or association of churches, or a religious order; a nonprofit organization; for-profit entities; an institution of higher education in arranging student health insurance coverage; and, in certain circumstances, issuers and individuals." *Id.* "In addition, the [Religious Exemption Rule] maintain[s] a previously created accommodation process that permits entities with certain religious objections voluntarily to continue to object while the persons covered in their plans receive contraceptive coverage or payments arranged by their health insurance issuers or third party administrators." *Id.*

The final Moral Exemption Rule similarly exists to "protect sincerely held moral objections of certain entities and individuals." 83 Fed. Reg. at 57,592. Importantly, like the religious exemption rule, the moral exemption rule "does not remove the contraceptive coverage requirement generally from HRSA's guidelines." Id. at 57,593. And "[t]he changes to the rule[ ] being finalized will ensure clarity in implementation of the moral exemptions so that proper respect is afforded to sincerely held moral convictions in rules governing this area of health insurance and

coverage, with minimal impact on HRSA's decision to otherwise require contraceptive coverage." *Id*.

Plaintiffs have sued to challenge these Rules. They allege that the "loss of formerly-mandated contraceptive care will result in significant, direct and proprietary harm to Pennsylvania and New Jersey, which will bear increased costs as a result of the final Exemption Rules." Am. Compl. ¶ 138. In short, Plaintiffs argue that women who work for exempt employers or attend exempt institutions of higher education will seek and receive contraceptives paid for, at least in part, through state programs. They also contend that "the final Exemption Rules impermissibly encroach on Pennsylvania's and New Jersey's quasi-sovereign interests in protecting the health, safety, and well-being of their residents" and claim on that basis to "have *parens patriae* standing." *Id.* ¶ 154.

## ARGUMENT

### I. PLAINTIFFS LACK STANDING.

To establish standing, Plaintiffs must show they have "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and … (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). Allegations of possible future injury do not suffice; "[a] threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Likewise, a party that "alleges only an injury at some indefinite future time" has not shown injury in fact; "the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Lujan*, 504 U.S. at 564 n.2. Dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction is required when a plaintiff fails to establish an injury in fact. *See Maio v. Aetna, Inc.*, 221 F.3d 472, 482 n.7 (3d Cir. 2000) ("Generally speaking, motions to dismiss on the

grounds of a failure to allege an injury in fact implicate constitutional standing principles and thus are predicated on Rule 12(b)(1) . . . .") (quotations omitted from parenthetical).[1]

Previously, this Court held that (i) Plaintiffs have standing because the Rules would impose a financial burden on the States; and (ii) the States are entitled to "special solicitude" in the standing analysis under *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007), and *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).[2] PI Op. at 15-20. Defendants respectfully request that the Court reconsider these determinations in the context of this motion to dismiss – and dismiss Plaintiffs' Amended Complaint for lack of Article III standing. Crucially, the Court's previous jurisdictional holding is not binding on it. *See Dais v. United States*, 2013 WL 6186579, at *5 (D.N.J. Nov. 26, 2013) (explaining that "questions of subject matter jurisdiction are generally exempt from law of the case principles"); 18B Wright, Miller & Cooper, § 4478, and n 49.6 (same); *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010) (recognizing the that courts have a "continuing obligation to assess [ ] subject matter jurisdiction").

---

[1] The Court may rely on materials outside of the pleadings to resolve motions to dismiss under Rule 12(b)(1). *U.S. ex rel. Schumann v. AstraZeneca Pharm. L.P.*, 769 F.3d 837, 845 (3d Cir. 2014)

[2] This Court has held that the *Texas* opinion is binding precedent, writing, "While an affirmance by an equally divided Supreme Court typically does not constitute binding precedent, *see Eaton v. Price*, 364 U.S. 263, 264 (1960), where the Supreme Court is equally divided on an issue of subject matter jurisdiction, it has determined that the proper course is to remand the issue of jurisdiction to a lower court. *See Silliman v. Hudson River Bridge Co.*, 66 U.S. 582, 584-85 (1861)."  PI Op. at 17 n. 12.   Because the Supreme Court in *Texas v. United States* did not remand on the issue of jurisdiction, this Court inferred that the Supreme Court did not divide equally on the question of jurisdiction but rather determined there was jurisdiction in that case. Respectfully, that inference was in error: *Silliman* does not represent the Supreme Court's current approach, as demonstrated by *American Electric Power Co. v. Connecticut*, 564 U.S. 410, 420 (2011). In *American Electric Power*, after the Supreme Court divided equally on whether the lower Court should have exercised jurisdiction, it proceeded to consider the merits, rather than remanding: "We therefore affirm, by an equally divided Court, the Second Circuit's exercise of jurisdiction and proceed to the merits." *Id*.  *See also Nye v. United States*, 313 U.S. 33, 44 (1941). Thus, the *Texas* opinion does not provide support for the proposition that a majority of the Court approved of the Fifth Circuit's jurisdictional holding.

### A. Plaintiffs' Allegations of Economic Injury Are Not Sufficient to Establish Standing.

Plaintiffs speculate that the Rules "will result in significant, direct and proprietary harm to Pennsylvania and New Jersey, which will bear increased costs" as women employed by entities claiming the exemption "turn to state-funded programs for their contraceptives." Am. Compl. ¶¶ 138, 146. Plaintiffs' declarants provide, at best, well-reasoned speculation about the likely impact of the exemptions on citizens whose employers avail themselves of the exemption.[3] But even an "objectively reasonable likelihood" of injury is insufficient under Article III because it is "inconsistent with [the] requirement that 'threatened injury must be *certainly impending* to constitute an injury in fact.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (quoting *Whitmore*, 495 U.S. at 158) (emphasis added). And there are too many contingencies in Plaintiffs' theory to meet that threshold.

Plaintiffs allege that some entities operating within Pennsylvania and New Jersey are likely to take advantage of the relevant exemptions, based on their decisions to pursue litigation or prior outreach to the Agencies. Am. Compl. ¶ 136. But this allegation does not take into consideration whether those entities are likely to use the exemption or whether they will rely on the preexisting accommodation, under which employees receive contraceptive coverage. In *Hobby Lobby*, the Supreme Court acknowledged that the accommodation might have satisfied the religious objections of the plaintiffs in that case (Conestoga and Hobby Lobby), *see* 134 S. Ct. at 2780-83;

---

[3] Allen Decl., Ex. Q, at ¶ 23 ("not unreasonable to expect" women will turn to state services if employers drop coverage); Steinberg Decl., Ex. R at ¶ 29 ("we expect that the new exemptions . . . will lead to an increase in the number of women" who rely upon Medicaid and Family Planning Services); Adelman Decl., Ex. S, ¶ 19 ("DMAHS anticipates that some women . . . who lose contraceptive coverage" will seek coverage from NJ FamilyCare, Plan First, and Title X); Gennace Decl., Ex. T, ¶ 17 ("Many New Jersey women are likely to lose the medical coverage for contraceptive care" under the exemptions, and "DOBI anticipates that some women" will seek coverage from state-funded programs); Coulter Decl., Ex. U, ¶ 25 ("[W]e expect that many women . . . will seek care from one of the 47 New Jersey Family Planning Clinics"); *see also* Kost Declaration, Ex. K, at ¶ 54 ("Many women who lose or lack contraceptive coverage because their employer or university objects, however, would not meet the strict income and eligibility requirements of public programs").

*id.* at 2782 (the accommodation "does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion"), and later the accommodation was made available to Hobby Lobby, Conestoga, and other for-profit companies as a result of the plaintiffs' victory in that case. Moreover, with the exception of Hobby Lobby, all of the entities listed in the Amended Complaint provided notice to HHS of their objection to providing contraceptive coverage for purposes of using the accommodation.[4] Employers that want to shift to the exemption must provide employees' sixty days' notice pursuant to the Public Health Service Act, 83 Fed. Reg. at 57,538, and Plaintiffs do not allege that any employer within their states has taken this step.

There are other shortcomings as well. Many of the named employers, including Hobby Lobby, Conestoga, Cummins Allison, Geneva College, and Bingaman & Son Lumber, only object to a subset of FDA-approved contraceptives. *See* Ex. W at 2 (Cummins Allison and Bingaman & Son object to four specific contraceptive methods); *id.* at 12 (Geneva College objects to "abortion inducing drugs"). Plaintiffs have no data to support their assumptions that any individuals will be denied coverage for their preferred contraceptive method and will meet "the strict income and eligibility requirements of public programs." Kost Decl. ¶ 54. Nor do they account for employers that need not comply with the mandate because of legal grounds separate from the final rules, like Geneva College, which obtained an injunction (quite separate from the Rules) against the Agencies preventing enforcement of the contraceptive mandate against it. *Geneva College, et al. v. Azar*, No. 2:12-cv-00207, Order Granting Permanent Injunction & Declaratory Relief, ECF No. 153 (W.D. Pa. July 5, 2018). In short, Plaintiffs' predictions do not constitute allegations of "certainly impending" harm. *Clapper*, 568 U.S. at 410.

Moreover, Plaintiffs' lack of evidence of injury is particularly telling given the mandate's history. Churches and their integrated auxiliaries, nonprofit organizations in self-insured church plans using the accommodation, grandfathered plans, and the litigating entities about which

---

[4] *Geneva College* challenged the accommodation as discussed below.

7

Plaintiffs complain, have all been left out of the contraceptive mandate for all or significant portions of the mandate's duration, because of various exemptions and injunctions. Yet Plaintiffs present no data showing how many women in those plans, if any, actually used resources from the States' fisc during that time. Plaintiffs' mere speculation about the purported impact of the Rules is not sufficient to establish Article III injury when they cannot point to any costs of state subsidized coverage due to women participating in plans not subject to the mandate since 2012.

Other entities challenging the rules have managed to identify individuals actually affected by the Agencies' policy changes. *See, e.g.*, *Irish 4 Reproductive Health v. U.S. Dep't of Health & Human Servs.*, No. 3:18-cv-00491, Compl., ECF No. 1, at ¶¶ 12-16 (N.D. Ind. June 28, 2018) (providing background on named and unnamed individual plaintiffs who assert they "will be personally harmed" by the IFRs). No less should be expected of Plaintiffs here.

While Plaintiffs at least allege that they will be harmed by the employer exemption, they make no similar allegations with respect to the individual exemption. *See* Compl. ¶¶ 133-155. (Recall, the individual exemption permits insurance issuers and health-plan sponsors that otherwise provide contraceptive coverage to furnish, to an individual who objects on religious or non-religious moral grounds to the coverage of some or all contraceptives, a plan consistent with the individual's religious or non-religious moral beliefs. 83 Fed. Reg. 57537.) Thus, Plaintiffs' challenge to the individual exemption also fails for lack of standing.

Accordingly, the Court should dismiss this case for lack of standing.

In its most recent preliminary injunction decision, the Court stated that "[t]his is not a speculative harm. As Defendants themselves noted in issuing the IFRs, 'there are multiple Federal, State, and local programs that provide free or subsidized contraceptives for low-income women.'" PI Op. at 18 (quoting 82 Fed. Reg. at 47,803). But Defendants' recognition in the Rules that there are other programs to provide free or subsidized contraceptives does not eliminate the speculative nature of Plaintiffs' claim of injury. It does not establish that (even in the absence of the preliminary injunction) use of these programs by any women in the Plaintiff states as a result of the Rules is certainly impending. Rather, it is Defendants' response to the speculation that some

women somewhere in the country will be affected by the Rules.  Many employers had already secured injunctions protecting them from the operation of the contraceptive coverage mandate, thus, reducing the pool of employers who might invoke the Rules and, similarly, the likelihood that an employer in any given state would invoke the Rules.  At bottom, a year-and-a-half after the IFRs were first introduced, Plaintiffs still offer nothing more than speculation that that they will be affected by the Rules.  More is required.

The Court also wrote, "just as Texas' estimated loss due to DAPA supported a finding that Texas suffered an injury in fact, so too does the States' estimated loss due to the Final Rules support a finding that the States have suffered an injury in fact."  Op. at 19.  As noted earlier, the *Texas* case is not binding on this Court.  Nor should it persuade this Court.  In *Texas*, the Federal Government did not dispute that the plaintiff state would incur millions of dollars in costs.  *Texas*, 809 F.3d at 155.[5]  But here the Federal Government *does* dispute that the challenged Rules will necessarily impose costs on Pennsylvania or New Jersey.  In *Texas,* the challenged rule "would [have] enable[d] at least 500,000" immigrants to impose on Texas the costs of issuing driver's licenses simply by providing "proof of lawful presence or employment authorization."  *Id.*  No similar certainly impending costs await Plaintiffs:  They have not demonstrated anything close to an equivalent likelihood of injury, given that they have not shown that they face a similarly large potential pool of women who might so easily impose harm on their fisc.

### B.  Plaintiffs' Status as Sovereign States Does Not Affect the Standing Analysis.

Plaintiffs allege that they "have *parens patriae* standing" to sue the Federal Government on behalf of their residents.  Am. Compl. ¶ 154.  But the Supreme Court has long held that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982).  And in *Pennsylvania v. Porter*, the Third Circuit concluded that Pennsylvania lacked standing on this basis because "[i]t has been settled since *Massachusetts v. Mellon*, [262 U.S. 447, 486 (1923)],

---

[5] Instead, the Federal Government argued that the costs would be offset by benefits to the state. *Texas*, 809 F.3d at 155.

that a state may not attempt as *parens patriae* to enforce rights of its citizens in respect of their relations with the Federal Government." 659 F.2d 306, 317 (3d Cir. 1981) (en banc) (citation omitted). *Massachusetts v. EPA*, 549 U.S. 497 (2007), is not to the contrary. There, the Supreme Court concluded that Massachusetts had standing to challenge the EPA's decision not to regulate greenhouse-gas emissions. But in finding standing, the Court did not invoke Massachusetts's *parens patriae* interests – i.e., its interests in protecting its citizens' well-being – as Plaintiffs' erroneously do in their Amended Complaint. Am. Compl. ¶154. Rather, the Court relied on Massachusetts' own interests in protecting its sovereign territory. *Id.* at 522; *see also Center for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 476 (D.C. Cir. 2009) (observing that Massachusetts was suing in its individual interest).

Nor does Plaintiffs' status as sovereign states otherwise rehabilitate their defective standing allegations. In its most recent decision, this Court held that Plaintiffs are entitled to special solicitude in the standing analysis because they demonstrated two required showings, including that they are protecting quasi-sovereign interests. Op. at 17. On that point, the Court stated that the reasoning of "*Texas v. United States* is persuasive here." *Id.* Specifically, the Court explained that "the Final Rules—like DAPA [the action challenged in the Texas case]—affect the States quasi-sovereign interest by imposing substantial pressure on them to change their laws." *Id*. (brackets and quotation marks omitted).

The *Texas* decision is readily distinguishable. First, "special solicitude" would be of no help to Plaintiffs, as it does not alter the requirement to demonstrate a concrete injury. Indeed, in *Massachusetts*, there was no dispute that the State was already being injured—"rising seas ha[d] already begun to swallow Massachusetts' coastal land." *Massachusetts*, 549 U.S. at 522; *see also Delaware Dep't of Nat. Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009) ("This special solicitude does not eliminate the state petitioner's obligation to establish a concrete injury, as Justice Stevens' opinion amply indicates."). As discussed, Plaintiffs have not demonstrated injury to their fisc or to the well-being of their residents, as they have not even identified a single woman who is likely to lose contraceptive coverage she wants.

Second, the court in *Texas* "stress[ed] that our decision is limited to these facts. In particular, the direct, substantial pressure directed at the states and fact that they have surrendered some of their control over immigration to the federal government mean this case is sufficiently similar to *Massachusetts v. EPA*, but pressure to change state law may not be enough—by itself—in other situations." *Texas*, 809 F.3d at 154–55. This case, of course, does not arise in the area of immigration and so is outside "the[ ] facts" of *Texas*' fact-bound holding.

Third, this case does not present one of the three situations that the *Texas* court labeled "intrusions [that] are analogous to pressure to change state law": (1) "federal assertions of authority to regulate matters [states] believe they control," (2) "federal preemption of state law," and (3) "federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law." *Id.* at 153. The Rules do not regulate matters within state control, and the states do not argue otherwise. Nor do the Rules preempt state law or interfere with the enforcement of state law: States may impose their own contraceptive coverage requirements on insured plans. 83 Fed. Reg. at 57,573 ("They [i.e., the Rules] do not regulate state contraceptive mandates or state religious exemptions."). The Rules also do not interfere with the enforcement of state law, as they do not prevent the States from providing healthcare services to their citizens. This flexibility distinguishes the circumstance here from those present in the *Texas* case: Federal law does not allow states to create their own immigration categories and, thus, it interfered with Texas's preferences with respect to the issuance of driver's licenses. *Id.* (noting that Texas "cannot establish [its] own classifications of aliens"). By its terms, then, the *Texas* decision is inapplicable, and under the rationale of that decision, special solicitude is not warranted here.

## II. VENUE IS NOT PROPER IN THIS DISTRICT.

Plaintiffs asserts that venue is proper in this district because Pennsylvania "resides in this district and because a substantial part of the events giving rise to this action occurred in this

11

district." Am. Compl. ¶ 31; 28 U.S.C. § 1391(e)(1). Plaintiffs are wrong on both counts.[6] Thus, dismissal is also warranted under Federal Rule of Civil Procedure 12(b)(3).

The Commonwealth resides in the Middle District of Pennsylvania, not here. A non-natural plaintiff (such as a State) is "deemed to reside . . . only in *the* judicial district in which it maintains its principal place of business." *Id.* § 1391(c)(2) (emphasis added). "[R]eference to 'the' and the singular 'its principal place of business' compels the conclusion that an entity plaintiff (unlike an entity defendant) can reside in only one district at a time." Wright & Miller, 14D Federal Practice and Procedure § 3805 (4th ed.). The Commonwealth resides in the Middle District of Pennsylvania because that is "the judicial district" in which its "principal place of business," Harrisburg – the state capital – is located. Harrisburg is the "permanent seat of government." *Harrisburg Sch. Dist. v. Hickok*, 762 A.2d 398, 409 (Pa. Commw. Ct. 2000), *as amended* (Nov. 15, 2000) (citing the Act of February 21, 1810, PL 30, § 1). Harrisburg is where the Pennsylvania legislature sits and where the Governor's primary office and official residence are located. It is also the home to numerous government offices. *Cf. Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010) (defining "principal place of business" for diversity-jurisdiction purposes as the place where "officers direct, control, and coordinate the corporation's activities"). Because Harrisburg must be the State's "principal place of business," the Middle District is "the" judicial district in which the State "resides" for venue purposes.[7]

---

[6] The Court previously rejected this argument in the context of Plaintiffs' second motion for a preliminary injunction. "Courts generally do not apply the law-of-the-case doctrine to matters decided in the context of a motion for a preliminary injunction." *Latuszewski v. Valic Fin. Advisors, Inc.*, 2007 WL 3356056, at *1 (W.D.Pa. Nov.11, 2007). But even if the Court concludes that the law of the case doctrine applies to its previous decision on venue, *see Bowers v. City of Philadelphia*, 2008 WL 5234357, at *3 (E.D. Pa. Dec. 12, 2008), Federal Defendants respectfully request that the Court reconsider its decision for the reasons stated below. Federal Defendants also reassert their venue arguments to ensure that they are preserved for further review.

[7] Indeed, the Commonwealth itself has previously taken that position. *E.g.*, *Stanton-Negley Drug Co. v. Pa. Dep't of Pub. Welfare*, No. 07-1309, 2008 WL 1881894, at *4 (W.D. Pa. Apr. 24, 2008). The courts agree. *See, e.g.*, *id.*; *Gaskin v. Pennsylvania*, No. 94-4048, 1995 WL 154801, at *1 (E.D. Pa. Mar. 30, 1995) (accepting Commonwealth's argument). And for good reason: "It

It is no answer to cite *Alabama v. U.S. Army Corps of Engineers*, 382 F. Supp. 2d 1301 (N.D. Ala. 2005), as Pennsylvania did earlier in the litigation, as that case involved an earlier version of the venue statute that, unlike the current version, provided that a defendant corporation resided "in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced," 28 U.S.C. § 1391(c) (2002). Nor is it persuasive to assert that the venue statute, in the provision entitled "Residency-For all venue purposes," 28 U.S.C. § 1391(c), does not address the residency of states specifically, as the Ninth Circuit recently did. *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018). The residency provision divides parties into three categories: (1) natural persons; (2) entities with the capacity to sue and be sued; and (3) foreign defendants. *See* 28 U.S.C. § 1391(c). Pennsylvania plainly is "an entity with the capacity to sue and be sued," *id.* § 1391(c)(2).

In its recent decision, the Court offered three reasons for rejecting Defendants arguments about venue. PI Op. at 21-22. All three should be reconsidered.

First, the Court stated that "the statute explicitly refers to an entity's incorporation status, indicating that the term entity refers to some organization, not a state." *Id.* at 21 (brackets and quotation marks omitted). But the statute refers to entities "whether or *not* incorporated." 28 U.S.C. § 1391(c)(2) (emphasis added). This language does not exclude unincorporated entities like states, but to the contrary, specifically includes them. The Court noted that its interpretation was supported by legislative history. But legislative history cannot override clear text, *e.g., Ratzlaf v. United States*, 510 U.S. 135, 147 (1994), and the text of the statute clearly encompasses entities, like states, that are "not incorporated," 28 U.S.C.A. § 1391(c)(2).

---

is well settled for venue purposes that the residence of a state agency or state official is the state capitol, even when branch offices of the state agency are maintained in other parts of the state." *Bentley v. Ellam*, Civ. A. No. 85-5418, 1990 WL 63734, at *1 (E.D. Pa. May 8, 1990). In its most recent decision, the Court distinguished these decisions on the basis that they discuss "the residency of state agencies or officials," PI Op. at 22 n.14. But the Commonwealth itself was a defendant in *Gaskin*, 1995 WL 154801, at *1, and the court there noted that "Defendants have moved to dismiss the action, or, in the alternative, transfer it to the Middle District of Pennsylvania, for lack of venue," *id.* Moreover, in the remainder of the opinion, the court in *Gaskin* did not treat the Commonwealth as an entity separate from its agencies or officials for residence purposes. *Id.*

13

Second, the Court wrote that, in the statute, "Congress explicitly distinguishes between States and entities within Section 1391. *Compare* 28 U.S.C. § 1391(c) (defining the residency of an 'entity'), with *id.* at § 1391(d) ('Residency of corporations in States with multiple districts")." *Id.* at 22. The statute does not, in fact, distinguish between States and entities covered by § 1391(c)(2). Rather, § 1391(c)(2) discusses generally the residency of an entity "whether or not incorporated," and § 1391(d) addresses an issue that applies to a subset of entities described in § 1391(c)(2), *i.e.*, the residency of corporations in States with multiple districts. Nothing about the text of § 1391(d) undercuts the conclusion that § 1391(c)(2) encompasses states as unincorporated entities.

Third, the Court concluded that "reading Section 1391 as Defendants suggest would yield an absurd result" because to "limit residency to a single district in the state would defy common sense" as "a state is ubiquitous throughout its sovereign borders." PI Op. at 22. Not so. Section 1391 does not address residency for abstract philosophical purposes, such that it might be considered absurd to deny that a state is "ubiquitous throughout its sovereign borders." Rather, § 1391 controls access to federal courts, defining where plaintiffs can sue and defendants can be sued. In that context, there is nothing absurd about limiting the venue in which a state can sue to the district in which its capital is located, especially as venue limitations are designed to aid defendants and protect them from forum shopping plaintiffs. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 183-86 (1979).

Finally, Plaintiffs' other theory of venue fares no better. It is not true that "a substantial part of the events giving rise to this action occurred in this judicial district." Compl. ¶ 31. Plaintiffs have filed a facial challenge to two Rules issued by federal agencies headquartered in Washington, D.C. and have not alleged that any specific residents of this district would be affected by the Rules. The only "events or omissions" that "giv[e] rise to the claim occurred" when the Agencies promulgated the Rules at their headquarters. That cannot support venue here. *See, e.g.*, *Rogers v. Civil Air Patrol*, 129 F. Supp. 2d 1334, 1339 (M.D. Ala. 2001) (noting events giving rise to facial challenge to federal law occurred where law was enacted); *Seariver Maritime Financial Holdings,*

14

*Inc. v. Pena*, 952 F. Supp. 455, 462 (S.D. Tex. 1996) (same).  Section 1391(e) refers in the past tense to events that have already "occurred," thereby pointedly excluding venue choices based on events that have not yet happened.  *See Reuben H. Donnelly Corp. v. FTC*, 580 F.2d 264, 268 (7th Cir. 1978) ("To base a venue determination on the possibility of some future administrative ruling approaches the question backwards.").  Moreover, courts should focus on the actions of the defendant, not of the plaintiff.  *Rogers*, 129 F. Supp. 2d at 1338-39.  "[T]he purpose of statutorily specified venue is to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial."  *See Leroy*, 443 U.S. at 183-84.  The only events giving rise to this suit occurred in Washington, D.C., not in the Eastern District of Pennsylvania.

## CONCLUSION

For the reasons stated above, the Court should dismiss this case for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), or in the alternative, dismiss it for improper venue under Federal Rule of Civil Procedure 12(b)(3).

DATED: March 28, 2019                Respectfully submitted,

                                                JOSEPH H. HUNT
                                                Assistant Attorney General

                                                MICHELLE R. BENNETT
                                                Assistant Director, Federal Programs Branch

                                                */s/ Justin M. Sandberg*
                                                JUSTIN M. SANDBERG (Il. Bar No. 6278377)
                                                Senior Trial Counsel
                                                MICHAEL GERARDI
                                                CHRISTOPHER R. HEALY
                                                REBECCA M. KOPPLIN
                                                DANIEL RIESS
                                                Trial Attorneys
                                                U.S. Dep't of Justice, Civil Div., Federal Programs Branch
                                                1100 L Street, NW
                                                Washington, D.C.  20001
                                                (202) 514-5838
                                                Justin.Sandberg@usdoj.gov

                                                *Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on March 28, 2019, a copy of the forgoing document was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

DATED this 28th day of March, 2019.  /s/ *Justin M. Sandberg*
JUSTIN M. SANDBERG