IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*; ALEX M. AZAR II, *in his official capacity as Secretary of Health and Human Services;* UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, *in his official capacity as Secretary of the Treasury*; UNITED STATES DEPARTMENT OF THE TREASURY; RENE ALEXANDER ACOSTA, *in his official capacity as Secretary of Labor;* and UNITED STATES DEPARTMENT OF LABOR, <br><br> Defendants, <br><br> LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME, <br><br> Intervenor-Defendant. | No. 17-CV-4540-WB |

**REPLY IN SUPPORT OF INTERVENOR-DEFENDANT'S MOTION TO DISMISS**

    The States must defend their various standing theories by showing that harm will result from in-state employees or their dependents losing contraceptive coverage as a result of the Final Rule. 83 Fed. Reg. 57,536 (Nov. 15, 2018). But the States fail to meet that burden. Rather, the landscape of injunctions and the States' arguments in this case make it clear that the States can show no concrete harm that will result from the Final Rule, and they propose no remedy for the Final Rule's alleged deficiencies that would provide them with the relief they seek.

# ARGUMENT

## I. The States lack standing.

### A. The States cannot bring Establishment Clause, Equal Protection, or Title VII claims.

The States' amended complaint brings standalone claims under the Establishment Clause, the Equal Protection Clause, and Title VII. *See* Am. Compl. Counts I, II, V, Dkt. No. 89. As the Little Sisters explained in the brief supporting their motion, (Mot.), the States lack the personal injury required for an Establishment Clause claim, are not Fifth Amendment "persons," and lack employee standing to sue under Title VII. *See* Mot. 2-3, Dkt. No. 159-1 (citing cases).

The States do not disagree. Or at least they do not disagree in their brief, where they simply decline to defend their standing to pursue any of these claims. Instead, the States recast these claims as alternative grounds for their claims under the Administrative Procedure Act ("APA"), but that is not what the States' amended complaint alleges, and they have thus forfeited the claims. The States alleged that the Final Rule was substantively contrary to law solely on the grounds that the Rule allegedly contravened other provisions of the Affordable Care Act. *See* Am. Compl. ¶¶182-84. The amended complaint nowhere relies on other laws or constitutional provisions for its claim that the APA's substantive provisions were violated. And it therefore provides no authority for the proposition that the APA allows plaintiffs to leapfrog established standing requirements for other causes of action, or that the States' interests are within the relevant zone of interests for any of these constitutional provisions. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395-96 (1987) (Section 702 of the APA was not "intended to allow suit by every person suffering injury in fact"; complainant must further demonstrate its interests are "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question" (citation omitted)).

### B. The States lack injury in fact.

The Little Sisters explained in their motion that the States do not have standing because they point to *no record evidence* that they or anyone else will be harmed by the Final Rule, and have

2

thus not met their burden to establish standing to bring this lawsuit. Mot. 3-7. The States' only allegations of injury from the Final Rule are "conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation and internal quotation marks omitted). In their opposition, the States make no effort to rehabilitate their evidence in light of the realities the Little Sisters pointed out in their motion.

The States rely on the Final Rule for estimates of the number of people who might be affected, but the burden is theirs to show that harm will result to them from the Final Rule, and they have not done so. First, the States do not take into account the fact that all known religious objectors already have preliminary, if not permanent, injunctions against the contraceptive mandate. Mot. Ex. A, Dkt. No. 159-2. Employees working for those employers would not create any additional burden on the States, because any additional cost (if any such costs actually existed) would have been borne prior to the Final Rule and prior to the States' injunction. For example, the agencies included in their estimate employers who litigated but who did not achieve permanent injunctions between the IFRs and the Final Rules. 83 Fed. Reg. at 57,575-76. That does not take into account the fact that almost all of the litigating employers had injunctions in place before the IFRs were published. *See, e.g.*, Order, *Bindon v. Sebelius*, No. 1:13-cv-01207 (D.D.C. Aug. 14, 2013), Dkt. No. 19. The States make no attempt to take those injunctions into account. Second, the States offer no evidence that employers who were satisfied with the "accommodation" enough not to bring a lawsuit will take advantage of the Final Rule. Nor do the States make any attempt to account for any costs they might have experienced as a result of larger, longer-lasting exemptions that exist in the regulations in place under the status quo ante. Without that evidence, there is no reason to believe the Final Rule will cost them a dollar now.

The States cannot overcome these deficiencies with the *parens patriae* doctrine. The Little Sisters explained in their motion that the States can have no quasi-sovereign interest in supporting a segment of their population they cannot prove exists, Mot. 7, much less in supporting one

segment of their population against another. *See Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) ("quasi-sovereign interests" are "public or governmental interests that concern the state as a whole" (citation omitted)). They make no response to this argument, stating a generalized quasi-sovereign interest in the "well-being of [their] residents," without showing that any "benefits of the federal system" would be denied to anyone, let alone to its "general population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607-08 (1982). Moreover, the States suggest that their potential injury is stronger than that identified in *Texas v. United States* because "the States face a [higher] per-user cost" than that identified for IDs in *Texas*, Opp. 7 n.9, but they ignore the fact that Texas identified 500,000 users who would be eligible for the benefits, and they have identified none. 809 F.3d 134, 155 (5th Cir. 2015).

### C. The States' claims are not redressable.

#### 1. *Any injury the States experience is self-inflicted.*

The States claim that they face a choice between "full compliance with a challenged action or a drastic restructure of a state program." Opp. 10-11 (citing *Texas v. United States*, 86 F. Supp. 3d 591, 619 (S.D. Tex. 2015)). But they face no such choice. On one hand, they aren't being forced to comply with anything—the States are not beneficiaries of any of the health plans at issue and face no obligation to change their conduct because of the religious exemption. Any state benefits the States choose to provide are voluntary. On the other hand, the most they have alleged is that they will have to "absorb additional financial costs," Am. Compl. ¶ 146. They have never alleged that their only option is to "drastically restructure" any state program as a result of the final rule. They cannot do so, because they have no evidence of any women who will actually make use of their programs as a result of the Final Rule, nor have they explained what such a "drastic restructure" would entail. They have not offered a scintilla of evidence that they have had to restructure at all—or even lift a finger or change a funding level by a penny—in response to all of

4

the prior injunctions, and all of the exemptions already incorporated into the mandate regulations. Under their own view of the law, the States' alleged injury is self-inflicted.

### 2. *This Court cannot redress any alleged harm.*

The States do not meaningfully address the Little Sisters' argument that this Court cannot redress any injury they might suffer, since they have not shown that religious objectors will be required to provide contraceptive coverage.

In their opposition, the States admit that the agency estimate of employers likely to use the Final Rule, on which they rely, properly "excluded those entities that had obtained permanent injunctions against the Mandate." Opp. 6 n.7. They also properly note that additional entities have since obtained permanent injunctions, directing the Court to the Little Sisters' motion exhibit listing "a number of these injunctions." *Id.*

But nowhere do the States respond to the Little Sisters' argument that these injunctions, and in particular, the numerous injunctions in open-ended class actions or associational standing cases that allow new members to join, provide alternative protection for religious objections even if the Final Rule is struck. *See* Mot. 5 & n.6 (citing orders). While the States name some in-state businesses they believe may avail themselves of the Final Rule, *see* Opp. 5-6, they nowhere state that even one of these businesses is neither covered by an existing injunction nor ineligible to join an injunction's protection.[1] *See, e.g.*, *Reaching Souls Int'l, Inc. v. Azar*, No. CIV-13-1092-D, 2018 WL 1352186, at *2 (W.D. Okla. Mar. 15, 2018) (protecting all "current and future participating employers in the GuideStone Plan" from any "penalties for failure to offer or facilitate access" to any objected-to contraception or related services). Likewise, the States do not respond to the Little Sisters' argument that absent the Final Rule, any relevant religious objectors could bring suit and

---

[1] In the event any of the businesses cited by the States have fewer than 50 employees, those businesses would also retain the option under the Affordable Care Act to not provide health insurance, in addition to the option of choosing a plan whose members are protected by an injunction. 26 U.S.C. § 4980H(c)(2).

obtain an injunction along the lines of those currently covering hundreds of employers. *See* Mot. 8.

The States' failures here doom their claimed redressability. Their theory requires the assumption that, absent the Final Rule, these employers will provide contraceptive coverage to their employees. Yet they cannot even muster an attempted explanation of why or how employers with religious objections would simply provide the coverage rather than avail themselves of these other options which the States acknowledge as available. *See* Opp. 6 n.7 (noting injunctions protecting the Little Sisters, Geneva College, and other entities).

As the Supreme Court has noted, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish," given that "the essential elements of standing depend[] on the unfettered choices made by independent actors not before the courts." *Lujan*, 504 U.S. at 562 (citations and internal quotation marks omitted). Because the States have not argued that in-state religious objectors would or could not readily avail themselves of a new or existing injunction, they have not shown a substantial likelihood that striking the Final Rule would cause these religious objectors to provide objected-to coverage.

Additionally, the States have not responded to the Little Sisters' argument that, absent the Final Rule, HRSA remains free to remove some or all contraceptives from its list of required services, as the list is not within the Code of Federal Regulations and has never been subject to formal rulemaking. 77 Fed. Reg. at 8,725 & n.1; see also HRSA, *Women's Preventive Services Guidelines*, U.S. Dep't of Health & Human Servs., https://bit.ly/2OHsmgH. The States' arguments only yield the relief they seek if the federal government voluntarily cooperates to create a system the federal government has already indicated would be a violation of federal law.

### *3. The Court cannot implement a remedy that violates the law.*

The Little Sisters explained in their motion that the regulations the States seek to revive feature the same purported APA problems identified by the States regarding the Final Rule, in addition to conflicts with RFRA. The States argue that this Court need not consider whether the prior rules violated the APA or RFRA, because they are "not challenging any of the rules issued" prior to the IFRs. Opp. 11-12 (citation omitted). This misunderstands the problem. Certainly, a lawsuit challenging one regulation as legally infirm does not bring all other regulations with identical infirmities into the case. But the disposition of a lawsuit necessarily requires assessing the constitutionality of its *remedy*. Here, the States' proposed remedy is the reinstatement of the prior rules, and this Court has an obligation to consider whether that proposed remedy is lawful.

By way of familiar example, courts regularly consider in defamation actions not only whether defamation has occurred, but whether the remedy actually sought is constitutional. *See, e.g.*, *Puello v. Crown Heights Shmira, Inc.*, No. 3:14-0959, 2014 WL 3115156, at *2 (M.D. Pa. July 7, 2014) (remedy sought would have been unconstitutional prior restraint on speech). Likewise, if a future administration hypothetically repealed—in an arbitrary and capricious manner—the recent final rule of the Bureau of Alcohol, Tobacco, Firearms, and Explosives prohibiting bump stock devices, a court could not remedy that APA violation by reinstating the bump-stock ban without first determining that the ban complied with the Second Amendment.[2] Here, redress for the States' purported injury—a likelihood of citizens turning to state coffers when employers deny contraceptive coverage—necessarily requires a contraceptive mandate in the first place. But the Affordable Care Act does not mandate contraceptive coverage; that mandate originates with HHS regulations and an agency website. *See* 42 U.S.C. § 300gg-13(a)(4) (delegating authority to HRSA); HRSA, *Women's Preventive Services Guidelines*, U.S. Department of Health &

---

[2] *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66514 (Dec. 26, 2018).

Human Services (Aug. 2011), https://www.hrsa.gov/womens-guidelines/index.html (list of preventive services). So the States would obtain no effective relief by simply striking the current regulations; effective relief requires reinstatement of some prior version of the regulations mandating contraceptive coverage. Without that reinstatement, nothing compels religious objectors to provide the contraceptive coverage the States seek.

It is therefore the States' burden as part of the redressability inquiry to articulate why, for example, the prior contraceptive mandate is lawful when those final rules resulted from the same IFR procedures which this Court found—on the States' urging—deficient. The States must also articulate why their arguments regarding the Final Rule would not undercut the legitimacy of the HRSA guidelines—the only authority specifying the contraceptive services that must be covered—which are outside the Federal Register and have never been subjected to notice and comment. And to the extent that the States rely on the prior religious employer exemption and further "accommodation" to correct the contraceptive mandate's conflicts with RFRA, the States must articulate why these provisions were not *ultra vires* when—according to this Court, again as urged by the States—HHS has no authority to decide "*who* must provide preventive care coverage," Op. 2d Prelim. Inj. 38, Dkt. 136. The States decline to address any of these problems.

It is no response to these objections to say the necessary remedy is outside the scope of the case. To the contrary, redressability is part of "the irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 561, and it "turns on the availability of a judicial remedy," *Jorman v. Veterans Admin.*, 830 F.2d 1420, 1422 n.2 (7th Cir. 1987). Plainly, a remedy is "available" only if legally permissible. *See, e.g.*, *Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014) (where statute precludes damages remedy, standing only available where injunctive relief would remedy an injury); *Villapando v. CDCR*, No. 1:14-CV-00823, 2015 WL 2220295, at *1 (E.D. Cal. May 11, 2015) (no redressability where "the issues are beyond the scope of available equitable relief"). Judges, like legislators, take oaths to support "the Constitution and

laws of the United States." 28 U.S.C. § 453; *see Marbury v. Madison*, 5 U.S. 137, 179-80 ("[T]he framers of the constitution contemplated that instrument, as a rule for the government of *courts,* as well as of the legislature. Why otherwise does it direct the judges to take an oath to support it? This oath certainly applies, in an especial manner, to their conduct in their official character. How immoral to impose it on them, if they were to be used as the instruments, and the knowing instruments, for violating what they swear to support?").

For all these reasons, the States lack standing, and the case must be dismissed.

Dated: April 18, 2019

Respectfully submitted,

/s/ Mark Rienzi
Mark Rienzi, *pro hac vice*
Lori Windham, *pro hac vice*
Eric Rassbach, *pro hac vice*
Diana Verm, *pro hac vice*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

Nicholas M. Centrella
Conrad O'Brien PC
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-8098
Facsimile: (215) 864-0798
ncentrella@conradobrien.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of the Court for the United States District Court for the Eastern District of Pennsylvania using the CM/ECF system, and that service will be effectuated through the CM/ECF system.

Dated: April 18, 2019

 /s/ *Mark Rienzi*  
Mark Rienzi