### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF )
PENNSYLVANIA and )
STATE OF NEW JERSEY, )
  )
           Plaintiffs, )
v. )       Civil Action No. 2:17-cv-04540 (WB)
  )
DONALD J. TRUMP, in his official )
capacity as President of the United States; )
ALEX M. AZAR II, in his official )
capacity as Secretary of Health and )
Human Services; UNITED STATES )
DEPARTMENT OF HEALTH AND )
HUMAN SERVICES; STEVEN T. )
MNUCHIN, in his official capacity as )
Secretary of the Treasury; UNITED )
STATES DEPARTMENT OF THE )
TREASURY; RENE ALEXANDER )
ACOSTA, in his official capacity as )
Secretary of Labor; and UNITED STATES )
DEPARTMENT OF LABOR, )
  )
           Defendants. )
_____ )

## FEDERAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS

## INTRODUCTION

The States' amended complaint should be dismissed for lack of jurisdiction: They have

not adequately alleged or demonstrated that they have suffered, or will imminently suffer, a

concrete injury-in-fact as a result of the challenged Religious and Moral Exemption Rules.  *See*

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under

the Affordable Care Act (ACA), 83 Fed. Reg. 57,536 (Nov. 15, 2018) (codified at 26 C.F.R. pt.

54, 29 C.F.R. pt. 2590, and 45 C.F.R. pt. 147) (Religious Exemption Rule); Moral Exemptions

and Accommodations for Coverage of Certain Preventive Services Under the ACA, 83 Fed. Reg.

57,592 (Nov. 15, 2018) (codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, and 45 C.F.R. pt. 147)

(Moral Exemption Rule) (collectively, Final Rules or Rules).  Plaintiffs offer two theories of

standing.  Neither is persuasive.  First, the States contend that they have standing to sue because

they will suffer fiscal harm as a result of the Rules.  But their allegations of harm are, quite

simply, speculative.  They depend on attenuated chains of possibilities that do not constitute certainly impending injuries.  Second, the States allege that they have standing to sue the federal government under the *parens patriae* doctrine.  This argument suffers from numerous defects, not the least of which is that the Supreme Court rejected it almost a century ago.  Thus, as explained below and in Federal Defendants' opening brief, dismissal is appropriate.

## ARGUMENT

### I.     Plaintiffs' Claims of Fiscal Harm Are Speculative

Plaintiffs' assertion that they have standing to sue on the basis of fiscal harm fails because their allegations of harm are unduly speculative.  "Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (citation omitted).  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation and internal quotation marks omitted).  Accordingly, "[a]llegations of possible future injury are not sufficient."[1]  *Id.* (citation and internal quotation marks omitted).

---

[1] Plaintiffs argue that the Court should accept their factual allegations as true, because Federal Defendants have not introduced evidence to contradict those factual allegations. Plaintiffs' Combined Resp. in Opposition to Mtn. to Dismiss (Opp.), April 12, 2019, ECF No. 162, at 2-3.  Even if the Court accepts plaintiffs' factual allegations as true, however, the amended complaint should be dismissed for lack of standing.  In *Clapper,* the Court treated plaintiffs' factual allegations as true, but nonetheless concluded that plaintiffs lacked standing because the factual allegations did not establish imminent harm.  *See Clapper*, 568 U.S. 410-12. Just so here.  Plaintiffs' factual allegations do not establish imminent harm.  Instead, as explained throughout this brief, their allegations of imminent harm are based on *assumptions, not facts*, about whether employers or schools will invoke an exemption and about what female employees or students will do in response.  *See, e.g*., Am. Compl. ¶ 23.  In any event, to the extent the Court treats Plaintiffs' assumptions as facts, Federal Defendants have identified evidence that undercuts these "facts," such as Exhibit W to Plaintiffs' Preliminary Injunction motion, which shows that many of employers highlighted by Plaintiffs object only to a subset of contraceptives, Ex. W to Plaintiffs' Mtn. for Prelim. Inj., Dec. 17, 2018, ECF No. 90, at 2 (Cummins Allison and Bingaman & Son object to four specific contraceptive methods); *id*. at 12 (Geneva College

The "imminence" requirement is the States' stumbling block:  Allegations of possible future injury are all the States have to offer.  They contend first that "Pennsylvania and New Jersey women who lose contraceptive coverage under the Rules will seek it elsewhere, including from state-funded programs."  Opp. at 3.  But Plaintiffs can identify no employers or schools in their states that not only object to contraceptive coverage, but that also plan to invoke the religious or moral exemptions under these Final Rules (and not, for example, under the previous rules, or under an injunction).  Nor do they know whether there are any women who work at these hypothetical employers or who attend these hypothetical schools who do not share their employer's or school's opposition to contraceptive coverage, *and* who use the contraceptive coverage, *and* who in its absence will turn to state-funded programs, as opposed to, for example, a spouse's or parent's insurance plan.  Nor can the States confidently predict that any of these women will also satisfy the eligibility requirements for the state-funded programs, including their stringent income requirements.  As to this last point, Plaintiffs might respond that the women could use Title X clinics that also receive state funding and that have no income eligibility requirements.  Opp. at 4.  But statute and regulations require Title X projects to focus on serving low-income individuals, *see* 42 U.S.C. § 300(a)-4(c)(1), 42 CFR § 59.5(a)(6), and whether any of these hypothetical women will use such clinics is speculation.  It is still further speculation that these hypothetical women will use Title X clinics in great enough numbers to cause the States to increase their funding of these clinics.  Plaintiffs' theory of standing, then, "relies on a highly attenuated chain of possibilities [and] does not satisfy the requirement that threatened injury must be certainly impending."  *Clapper,* 568 U.S. at 410.

---

objects to "abortion inducing drugs").  Federal Defendants have also pointed out that employers and schools may have the benefit of injunctions which, separate and apart from the Final Rules, obviate the need for them to comply with the contraceptive-coverage mandate.  *See, e.g., Geneva College, et al. v. Azar,* No. 2:12-cv-207, Order Granting Permanent Injunction & Declaratory Relief, ECF No. 153 (W.D. Pa. July 5, 2018).  And of course, as Plaintiffs' admit, Opp. at 2-3, the Court should not treat controverted factual allegations as true.

Plaintiffs next assert that "other women will forgo contraceptive health services altogether, and the States will bear increased costs through these same programs."  Opp. at 4-5. This theory fares no better, as it too resides in the realm of the speculative.  It assumes:  that there are women in Pennsylvania or New Jersey who will lose contraceptive coverage as a result of these exemptions, that they will not share the objection to contraceptive coverage of their employer or school *and* will not receive coverage from a spouse or a parent, that they will experience an unintended pregnancy, and that they will resort to a state-funded program and satisfy the eligibility requirements for the state-funded program.  That is a long list of speculative assumptions – too long, in fact, to support the conclusion that an injury is *certainly* impending. *See Clapper*, 568 U.S. at 409-10.

Plaintiffs' efforts to make these harms appear more immediate come up short.  To start, they point to estimates of the impact of the exemptions that were included in the Final Rules. Opp. at 5-6.  But – and there is no getting around this point for the States – the Agencies made it clear that they were speculating about the impact of the Final Rules.  The Agencies said that they could not know the precise impact of the Rules before they were issued, and they also stated that their speculation was deliberately overbroad in order to satisfy executive orders that require agencies to determine if a rule could possibly have an impact of at least $100 million.  *E.g.*, Religious Exemption Rule, 83 Fed. Reg. at 57,574-82 (identifying "multiple levels of uncertainty" involved in "estimat[ing]" the number of women potentially affected, nevertheless basing estimates on various "assum[ptions]," concluding the actual number affected would be "far fewer," and declaring the estimates were made "only for the purposes of determining whether the rules are economically significant under Executive Orders 12866 and 13563").  This context matters.  Whereas agencies can, and sometimes must, speculate about the impact of the rules that they issue, speculation is not a proper basis for Article III jurisdiction.  The Agencies, moreover, did not make any estimates about the number of women in Pennsylvania and New Jersey who might be affected, which is the relevant inquiry here.

The States also try to make their speculation seem more concrete by listing "employers that either litigated against the Mandate or had taken advantage of the Accommodation" and that have a presence in Pennsylvania or New Jersey. Opp. at 5-6. But, as Federal Defendants have noted before, this argument does not take into account whether those entities are likely to use the exemption, or whether they will rely on the preexisting accommodation, under which employees receive contraceptive coverage. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 730-31 (2014) (acknowledging that the accommodation might have satisfied the religious objections of the plaintiffs in that case, Conestoga and Hobby Lobby, which appear on Plaintiffs' list). Moreover, many of the named employers, including Hobby Lobby, Conestoga, Cummins Allison, Geneva College, and Bingaman & Son Lumber, only object to a subset of FDA-approved contraceptives. *See* Ex. W to Plaintiffs' Mtn. for Prelim. Inj., ECF No. 90, at 2 (Cummins Allison and Bingaman & Son object to four specific contraceptive methods); *id.* at 12 (Geneva College objects to "abortion inducing drugs"). Finally, Plaintiffs do not account for employers that need not comply with the contraceptive-coverage mandate because of legal grounds separate from the Final Rules, such as injunctions against the Agencies preventing enforcement of the mandate against them. *See, e.g., Geneva College,* No. 2:12-cv-207, Order Granting Permanent Injunction & Declaratory Relief, ECF No. 153 (injunction protecting Seneca Hardwood Lumber Co., a Pennsylvania Corp.).

Plaintiffs also erroneously argue that *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016), supports their allegations that they have standing based on fiscal harm. In *Texas*, the challenged rule "would [have] enable[d] at least 500,000" immigrants to impose on Texas the costs of issuing driver's licenses simply by providing "proof of lawful presence or employment authorization." *Id.* at 155. Federal Defendants explained in their opening brief that "[n]o similar certainly impending costs await Plaintiffs: They have not demonstrated anything close to an equivalent likelihood of injury, given that they have not shown that they face a similarly large potential pool of women who might so easily impose harm on their fisc." Federal Defendants' Memo. in Support of Mtn. to

Dismiss (MTD Memo.), March 28, 2019, ECF No. 157, at 9.   In response, the States argue that "it is the existence of an injury that is relevant for standing purposes, not the size of that injury," and that by Federal "Defendants' logic, the injury in *Texas* was entirely speculative as well: Texas pointed only to a pool of individuals eligible for DAPA, but could not demonstrate with certainty that any of these individuals would apply and be granted status under the program." Opp. at 7.

The States' first argument misses the point.  Federal Defendants did not argue in their opening brief that the size of the injury matters.  Rather, Federal Defendants' argument was – and is – that the size of the pool of individuals who could impose a cost on the States is relevant to the likelihood of injury.  If, for example, there is a 1/10,000 chance that any individual will cause an injury, then the likelihood of an injury occurring is much greater if the relevant pool of individuals contains 1,000,000 people rather than 10 people.  And Plaintiffs' second argument – that the injury in the *Texas* case too was speculative – is self-refuting.  In the *Texas* case, the basis for standing was that Texas would be injured if individuals in a very large pool, approximately 500,000 persons to be more exact, took the common step of obtaining a driver's license.  *See Texas*, 809 F.3d at 155; Federal Highway Administration, *Our Nation's Highways 2011*, Chapter 4, Figure 4-2 (2011) https://www.fhwa.dot.gov/policyinformation/pubs/hf/pl11028/chapter4.cfm (accessed April 19, 2019) (showing that there were 620 licensed drivers per 1000 residents in the State of Texas in 2009).  Here, on the other hand, the basis for standing is much more uncertain, turning as it does on unknown numbers of employers, schools, and women, as well as on unknown information about (i) beliefs with respect to contraception, (ii) insurance choices, and (iii) income, among other things.  Plaintiffs' comparison rings hollow.[2]

---

[2] Plaintiffs did not allege in their amended complaint that they are harmed by the exemptions for individuals.  *See* MTD Memo. at 8.  They now assert that they are, and in the same fashion as they are harmed by the exemptions for employers and schools.  Opp. at 3 n.4.  But this allegation does not appear in their amended complaint, which cannot be amended by a response to a motion to dismiss.  *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d

II.        **Plaintiffs Cannot Ground Standing in the *Parens Patriae* Doctrine**

The States also argue that they have standing to sue under the *parens patriae* doctrine. Specifically, they contend that they are entitled to sue to vindicate the "general physical and economic well-being of their populace and [to] ensur[e] that the States and their residents are not excluded from the benefits that are to flow from participation in the federal system."  Opp. at 7 (quotation marks and brackets omitted).

Not so.  The Supreme Court has long held that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 610 n.16 (1982) (citation omitted).  And the Third Circuit has explained that "[i]t has been settled since *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923), that a state may not attempt as *parens patriae* to enforce rights of its citizens in respect of their relations with the Federal Government."  *Pennsylvania v. Porter*, 659 F.2d 306, 317 (3d Cir. 1981) (en banc) (citation omitted) (italics added).

Plaintiffs do not accept these well-settled principles.  They contend that the prohibition on *parens patriae* standing is a narrow one, blocking a state from "bring[ing] a *parens patriae* suit to protect her citizens from the operation of federal statutes," but allowing a state to "seek to *enforce* existing federal statutes—specifically [here], the APA and the ACA."  Opp. at 9 (quotation marks omitted).   They insist that *Massachusetts v. EPA*, 549 U.S. 497, 518–26 (2007), supports this distinction.  And they maintain that *Porter* is inapplicable because it "involved Fourteenth Amendment claims against local civil and law enforcement officials, not claims brought under the APA against federal regulations," and has been effectively overruled by *Massachusetts v. EPA*, 549 U.S. at 520 n.17.  Opp. at 9, 9 n.12.

_____

173, 181 (3d Cir. 1988) ("[T]he legal theories set forth in Pennsylvania's brief are helpful only to the extent that they find support in the allegations set forth in the complaint.  It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (brackets and quotation marks omitted).  And, in any case, for the reasons explained in this memorandum, Plaintiffs' speculative allegations of injury are flawed.

The States' arguments fall flat.  In *Massachusetts v. EPA*, the Court did not base its standing holding on harm to the Commonwealth's residents, but on the loss of the "state's coastal property."  549 U.S. at 522 (quotation marks omitted).  The distinction Plaintiffs' draw – between protecting citizens from federal law and enforcing federal law – derives from dicta in a footnote.  *Id.* at 520 n.17.  But even setting that flaw aside, the distinction does not support jurisdiction in this case:  The States here are trying to prevent federal laws – namely, the challenged regulations – from applying to their citizens.  And this is precisely the sort of *parens patriae* claim that the Supreme Court prohibited in *Massachusetts v. Mellon*, 262 U.S. at 486.  Moreover, in *Porter*, the Third Circuit directly addressed the (in)applicability of the *parens patriae* doctrine to lawsuits brought by states against the federal government, 659 F.2d at 317, and that case remains good law.  Finally, the States' theory is premised on their supposed need to protect the "physical and economic well-being of their populace," Opp. at 7 (quotation marks omitted), but as demonstrated in the previous section, they have offered only speculation that the challenged Final Rules will negatively affect their populace.

## CONCLUSION

For the reasons stated above and in Federal Defendants' opening memorandum, Plaintiffs' amended complaint should be dismissed.

DATED: April 19, 2019                           Respectfully submitted,

                                                JOSEPH H. HUNT
                                                Assistant Attorney General

                                                MICHELLE R. BENNETT
                                                Assistant Director, Federal Programs Branch

                                                */s/ Justin M. Sandberg*
                                                JUSTIN M. SANDBERG (Il. Bar No. 6278377)
                                                Senior Trial Counsel
                                                MICHAEL GERARDI
                                                CHRISTOPHER R. HEALY
                                                REBECCA M. KOPPLIN
                                                DANIEL RIESS
                                                Trial Attorneys
                                                U.S. Dep't of Justice, Civil Div., Federal Programs Branch

1100 L Street, NW
Washington, D.C.  20001
(202) 514-5838
Justin.Sandberg@usdoj.gov
*Attorneys for Federal Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 19, 2019, a copy of the forgoing document was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

DATED this 19th day of April, 2019.        _/s/ Justin M. Sandberg_____
                                           JUSTIN M. SANDBERG