# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY,

      Plaintiffs,

      v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; ALEX M. AZAR II, *in his official capacity as Secretary of Health and Human Services;* UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, *in his official capacity as Secretary of the Treasury*; UNITED STATES DEPARTMENT OF THE TREASURY; RENE ALEXANDER ACOSTA, *in his official capacity as Secretary of Labor;* and UNITED STATES DEPARTMENT OF LABOR,

      Defendants,

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,

      Intervenor-Defendant.

No. 17-CV-4540-WB

**BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iv

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 2

    A.  The federal Mandate and its exceptions.............................................................. 2

    B.  The challenges to the Mandate and the resulting injunctions .............................. 6

    C.  Challenges to the IFRs ...................................................................................... 9

    D.  The Final Rule and ongoing proceedings ......................................................... 10

ARGUMENT ............................................................................................................. 10

I.    The States lack Article III standing. ..................................................................... 10

II.   The States cannot prevail on their claims that the Final Rule is substantively
    invalid. ................................................................................................................ 11

    A.  The Final Rule does not violate the ACA. ........................................................ 11

        *1.  The agencies may make exemptions from a contraceptive mandate that
           they were never obligated to create.* ......................................................... 11

        *2.  The States' reasoning, if accepted, would also invalidate the preexisting
           religious employer exemption and "accommodation."* ............................ 15

        *3.  The agencies are permitted to issue the Final Rule to comply with RFRA.* ............... 18

           a.  RFRA applies broadly to federal laws and federal agencies. ............... 19

           b.  The Mandate as it existed before the Fourth IFR violates RFRA and
               the Constitution. ............................................................................... 19

           c.  After *Zubik*, courts have unanimously found the Mandate as applied to
               religious employers violated RFRA. ................................................. 26

           d.  Where courts are divided, government at least has discretion to err on
               the side of not violating civil rights. ................................................ 27

        *4.  Section 1554 of the ACA does not prohibit the Final Rule.* ........................ 29

        *5.  Section 1557 of the ACA does not prohibit the Final Rule.* ........................ 29

        *6.  Title VII does not prohibit the Final Rule* ................................................ 30

    B.  The Final Rule is not arbitrary and capricious. ................................................ 30

    C.  The Final Rule does not violate the Establishment Clause. ............................... 32

    D.  The Final Rule does not violate the Equal Protection Clause. ........................... 35

III.  The States cannot prevail on their claims that the Final Rule is procedurally
    invalid. ................................................................................................................ 37

    A.  The agencies had good cause to issue the Fourth IFR ...................................... 37

    B.  Any procedural deficiency was cured by notice and comment. ........................ 41

C.  Any procedural error was harmless. ...................................................................43

CONCLUSION.................................................................................................................44

CERTIFICATE OF SERVICE .........................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Azar,*
No. 4:17-cv-05772 (N.D. Cal.) ......................................................................................9

*Am. Fed'n of Gov't Emps. v. Block,*
655 F.2d 1153 (D.C. Cir. 1981) ...................................................................................38

*Am. Pulverizer Co. v. HHS,*
No. 6:12-cv-03459 (W.D. Mo. Oct. 30, 2014) .............................................................7

*Annex Medical, Inc., v. Solis,*
No. 0:12-cv-02804 (D. Minn. Aug. 19, 2015) ..............................................................7

*Armstrong v. Sebelius,*
No. 1:13-cv-00563 (D. Colo. Oct. 7, 2014) ..................................................................7

*Ass'n of Christian Sch. v. Azar,*
No. 1:14-cv-02966 (D. Colo. Dec. 10, 2018) ...............................................................7

*Autocam Corp. v. Sebelius,*
No. 1:12-cv-01096 (W.D. Mich. Jan. 5, 2015) .............................................................7

*Ave Maria Sch. of Law v. Sebelius,*
No. 2:13-cv-00795 (M.D. Fla. Jul. 11, 2018) ...............................................................8

*Ave Maria Univ. v. Sebelius,*
No. 2:13-cv-00630 (M.D. Fla. Jul. 11, 2018) ...............................................................8

*Barron Indus., Inc. v. Sebelius,*
No. 1:13-cv-01330 (D.D.C. Oct. 27, 2014) ..................................................................7

*Bick Holdings, Inc. v. HHS,*
No. 4:13-cv-00462 (E.D. Mo. Nov. 18, 2014) ..............................................................7

*Brandt, Bishop of the Roman Catholic Diocese of Greensburg v. Sebelius,*
No. 2:14-cv-00681 (W.D. Pa. Aug. 20, 2014) ..............................................................7

*Briscoe v. Sebelius,*
No. 1:13-cv-00285 (D. Colo. Jan. 27, 2015) ................................................................7

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014).................................................................................................*passim*

*C.W. Zumbiel Co. v. HHS,*
No. 1:13-cv-01611 (D.D.C. Nov. 3, 2014) ...................................................................7

*California v. Azar*,
  No. 3:19-cv-01184 (N.D. Cal. Apr. 26, 2019) .......................................................................25

*Campbell v. Trump*,
  No. 1:17-cv-02455 (D. Colo.) ...........................................................................................9

*Catholic Benefits Ass'n LCA v. Hargan*,
  No. 5:14-cv-00240 (W.D. Okla. Mar. 7, 2018) ................................................................ 8-9

*Catholic Diocese of Beaumont v. Sebelius*,
  10 F. Supp. 3d 725 (E.D. Tex. 2014) ...................................................................................7

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ...........................................................................................................24

*Christian Emp's All. v. Azar*,
  No. 3:16-cv-00309 (D.N.D. May 15, 2019) ........................................................................9

*City of Riverside v. Rivera*,
  477 U.S. 561 (1986) ...........................................................................................................36

*Colo. Christian Univ. v. HHS*,
  No. 1:13-cv-02105 (D. Colo. Jul. 11, 2018) .......................................................................8

*Colo. Christian Univ. v. Weaver*,
  534 F.3d 1245 (10th Cir. 2008) .........................................................................................18

*Conestoga Wood Specialties Corp. v. Sebelius*,
  No. 5:12-cv-06744 (E.D. Pa. Oct. 2, 2014) .........................................................................7

*Corp.of Presiding Bishop v. Amos*,
  483 U.S. 327 (1987)..............................................................................................33, 34, 35

*County of Allegheny v. ACLU Greater Pittsburgh Chapter*,
  492 U.S. 573 (1989)...........................................................................................................32

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005)...........................................................................................................34

*DeOtte v. Azar*,
  No. 4:18-cv-00825 (N.D. Tex. June 5, 2019) ........................................................... *passim*

*Diocese of Fort Wayne-S. Bend, Inc. v. Sebelius*,
  988 F. Supp. 2d 958 (N.D. Ind. 2013) ...............................................................................38

*Doboszenski & Sons, Inc. v. Sebelius*,
  No. 0:13-cv-03148 (D. Minn. Nov. 18, 2014) .....................................................................7

*Dobson v. Azar*,
  No. 13-cv-03326-REB-CBS (D. Colo. Mar. 26, 2019) ........................................................8

*Domino's Farms Corp. v. Sebelius*,
No. 2:12-cv-15488 (E.D. Mich. Dec. 3, 2014) ..........................................................7

*Dordt Coll. v. Sebelius*,
No. 5:13-cv-04100 (N.D. Iowa June 12, 2018) ........................................................8

*E. Tex. Baptist Univ. v. Sebelius*,
988 F. Supp. 2d 743, No. 4:12-cv-03009 (S.D. Tex. 2013)......................................7

*Eden Foods, Inc. v. Sebelius*,
No. 2:13-cv-11229 (E.D. Mich. Feb. 12, 2015)........................................................7

*Emp't Div. v. Smith*,
494 U.S. 872 (1990).................................................................................................19

*Eternal Word Television Network v. HHS*,
No. 14-12696 (11th Cir. May 31, 2016) ...................................................................7

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).................................................................................................30

*Feltl & Co. v. Sebelius*,
No. 0:13-cv-02635 (D. Minn. Nov. 26, 2014) ..........................................................7

*Franciscan All., Inc. v. Burwell*,
227 F. Supp. 3d 660 (N.D. Tex. 2016) ...................................................................29

*Freeman v. Corzine*,
629 F.3d 146 (3d Cir. 2010).....................................................................................10

*Geneva Coll. v. Sebelius*,
No. 2:12-cv-00207 (W.D. Pa. Jul. 5, 2018) .........................................................8, 21

*Geneva Coll. v. Sec'y, HHS*,
778 F.3d 422 (3d Cir. 2015)................................................................................20, 21

*Gilardi v. HHS*,
No. 1:13-cv-00104 (D.D.C. Oct. 20, 2014) ..............................................................7

*Gonzales v. O Centro Espirita Beneficente Uniao
do Vegetal*, 546 U.S. 418 (2006)............................................................................24

*Grace Sch. v. Sebelius*,
No. 3:12-cv-00459 (N.D. Ind. June 1, 2018) ............................................................8

*Green Island Power Auth. v. FERC*,
577 F.3d 148 (2d Cir. 2009).....................................................................................43

*Green v. Haskell Cty. Bd. of Comm'rs*,
574 F.3d 1235 (10th Cir. 2009) ...............................................................................33

*Grote Indus., LLC v. Sebelius,*
    No. 4:12-cv-00134 (S.D. Ind. Apr. 30, 2015) ............................................................7

*Hall v. Sebelius,*
    No. 0:13-cv-00295 (D. Minn. Nov. 26, 2014) ...........................................................7

*Hartenbower v. HHS,*
    No. 1:13-cv-02253 (N.D. Ill. Nov. 3, 2014) .............................................................7

*Hastings Chrysler Ctr., Inc. v. Sebelius,*
    No. 0:14-cv-00265 (D. Minn. Dec. 11, 2014) ........................................................7-8

*Hobby Lobby Stores, Inc. v. Sebelius,*
    No. 5:12-cv-01000, 2014 WL 6603399 (W.D. Okla. Nov. 19, 2014) .....................8

*Holland v. HHS,*
    No. 2:13-cv-15487 (S.D. W. Va. May 29, 2015) .....................................................8

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
    565 U.S. 171 (2012) ........................................................................................ *passim*

*Idahoan Fresh v. Advantage Produce, Inc.,*
    157 F.3d 197 (3d Cir. 1998) ...................................................................................12

*Johnson Welded Products, Inc. v. Sebelius,*
    No. 1:13-cv-00609, 2014 WL 5395775 (D.D.C. Oct. 24, 2014) .............................8

*Korte v. HHS,*
    No. 3:12-cv-1072 (S.D. Ill. Nov. 7, 2014) ..............................................................8

*La. Coll. v. Azar,*
    38 F. Supp. 3d 766 (W.D. La. Aug. 13, 2014) ........................................................8

*Larson v. Valente,*
    456 U.S. 228 (1982) ..........................................................................................17, 18

*Lindsay v. HHS,*
    No. 1:13-cv-01210 (N.D. Ill. Dec. 3, 2014) ............................................................8

*Little Sisters of the Poor v. Azar,*
    No. 1:13-cv-02611 (D. Colo. May 29, 2018) .......................................................8, 27

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...............................................................................................10

*M&N Plastics, Inc. v. Sebelius,*
    No. 5:13-cv-14754 (E.D. Mich. Nov. 17, 2015) .....................................................8

*Mack v. Warden Loretto FCI,*
    839 F.3d 286 (3d Cir. 2016) ...................................................................................27

*March for Life v. Azar,*
    No. 1:14-cv-01149 (D.D.C. Aug. 31, 2015) ...................................................................8

*Massachusetts v. HHS,*
    No. 1:17-cv-11930 (D. Mass.) ........................................................................................9

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .....................................................................................................23

*Medford v. Sebelius,*
    No. 0:13-cv-01726 (D. Minn. Nov. 20, 2014) .................................................................8

*Medical Students for Choice v. Azar,*
    No. 1:17-cv-02096 (D.D.C.) ..........................................................................................9

*Mersino Dewatering Inc. v. Sebelius,*
    No. 2:13-cv-15079 (E.D. Mich. Feb. 27, 2015) ..............................................................8

*Mersino Mgmt. Co. v. Sebelius,*
    No. 2:13-cv-11296 (E.D. Mich. Feb. 4, 2015) ................................................................8

*Mid-Tex Elec. Coop., Inc. v. FERC,*
    822 F.2d 1123 (D.C. Cir. 1987) ...................................................................................37

*Midwest Fastener Corp. v. Sebelius,*
    No. 1:13-cv-01337 (D.D.C. Oct. 24, 2014) ....................................................................8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................30, 38

*Nat. Res. Def. Council, Inc. v. EPA,*
    683 F.2d 752 (3d Cir. 1982) .........................................................................................41

*Newland v. Sebelius,*
    No. 1:12-cv-01123 (D. Colo. Mar. 16, 2015) .................................................................8

*NVE Inc. v. HHS,*
    436 F.3d 182 (3d Cir. 2006) .........................................................................................39

*O'Brien v. HHS,*
    No. 4:12-cv-00476 (E.D. Mo. Nov. 12, 2014) ................................................................8

*Oregon v. Azar,*
    No. 6:19-cv-00317 (D. Or. Apr. 29, 2019) ...................................................................25

*Osorio-Martinez v. Attorney Gen.,*
    893 F.3d 153 (3d Cir. 2018) .........................................................................................36

*Paulsen v. Daniels,*
    413 F.3d 999 (9th Cir. 2005) .......................................................................................42

*PDK Labs. Inc. v. U.S. Drug Enf't Admin.*,
   362 F.3d 786 (D.C. Cir. 2004) ........................................................................43

*Pennsylvania v. Porter*,
   659 F.2d 306 (3d Cir. 1981) ..........................................................................36

*Pennsylvania v. Trump*,
   281 F. Supp. 3d 553 (E.D. Pa. 2017) .............................................................38

*Pennsylvania v. Trump*,
   351 F. Supp. 3d 791 (E.D. Pa. 2019) .......................................................41, 43

*Pennsylvania v. Trump*,
   No. 2:17-cv-4540 (E.D. Pa. Jan. 13, 2019)......................................................9

*Priests for Life v. HHS*,
   772 F.3d 229 (D.C. Cir. 2014) ..............................................................37, 38, 39

*Randy Reed Auto., Inc. v. Sebelius*,
   No. 5:13-cv-06117 (W.D. Mo. Nov. 12, 2014) ................................................8

*Rappa v. New Castle Cty.*,
   18 F.3d 1043 (3d Cir. 1994).............................................................................18

*Reaching Souls Int'l, Inc. v. Azar*,
   No. 5:13-cv-01092, 2018 WL 1352186 (W.D. Okla. Mar. 15, 2018) ...............8, 27

*Real Alternatives, Inc. v. Sec'y, HHS*,
   867 F.3d 338 (3d Cir. 2017)....................................................................*passim*

*Riverbend Farms, Inc. v. Madigan*,
   958 F.2d 1479 (9th Cir. 1992) ........................................................................44

*Roman Catholic Archdiocese of Atlanta v. Sebelius*,
   No. 1:12-CV-03489, 2014 WL 1256373 (N.D. Ga. Mar. 26, 2014) ................38

*Roman Catholic Archdiocese of N.Y. v. Sebelius*,
   No. 1:12-cv-02542 (E.D.N.Y. Dec. 16, 2013).................................................8

*S. Nazarene Univ. v. Hargan*,
   No. 5:13-cv-01015 (W.D. Okla. May 15, 2018)...............................................8

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
   363 F.3d 299 (4th Cir. 2004) ..........................................................................18

*Sharpe Holdings, Inc. v. HHS*,
   No. 2:12-cv-00092 (E.D. Mo. Mar. 28, 2018) .................................................8

*Sherbert v. Verner*,
   374 U.S. 398 (1963)........................................................................................20

*Shinseki v. Sanders*,
  556 U.S. 396 (2009)............................................................................43

*Shiraef v. Azar*,
  No. 3:17-cv-00817 (N.D. Ind.) .............................................................9

*Sioux Chief MFG. Co. v. Sebelius*,
  No. 4:13-cv-00036 (W.D. Mo. Nov. 12, 2014) ......................................8

*SMA, LLC v. Sebelius*,
  No. 0:13-cv-01375 (D. Minn. Nov. 20, 2014) ........................................8

*Stewart v. Sebelius*,
  No. 1:13-cv-01879 (D.D.C. Feb. 2, 2015) .............................................8

*Stinson Electric, Inc. v. Sebelius*,
  No. 0:14-cv-00830 (D. Minn. Nov. 18, 2014) ........................................8

*Texas Monthly, Inc. v. Bullock*,
  489 U.S. 1 (1989)...............................................................................35

*Thomas v. Review Bd.*,
  450 U.S. 707 (1981)............................................................ 19-20, 23

*Thornton v. Caldor*,
  472 U.S. 703 (1985)............................................................................34

*Tonn & Blank Constr. LLC v. Sebelius*,
  No. 1:12-cv-00325 (N.D. Ind. Nov. 6, 2014) .........................................8

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014)............................................................................32

*Tyndale House Publishers, Inc. v. Sebelius*,
  No. 1:12-cv-01635 (D.D.C. Jul. 15, 2015) .............................................8

*In re Union Pac. R.R. Employment Practices Litigation*,
  479 F.3d 936 (8th Cir. 2007) ...............................................................30

*United States v. Cooper*,
  750 F.3d 263 (3d Cir. 2014)................................................................43

*United States v. Dimpfl*,
  523 F. App'x 865 (3d Cir. 2013) .........................................................43

*United States v. Giordano*,
  416 U.S. 505 (1974)............................................................................15

*United States v. Reynolds*,
  710 F.3d 498 (3d Cir. 2013)...............................................38, 42, 44

*Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*,
   565 U.S. 994 (2011)..................................................................................33

*Washington v. Azar*,
   No. 1:19-cv-03040 (E.D. Wash. Apr. 25, 2019)..................................25

*Washington v. Trump*,
   No. 2:17-cv-01510 (W.D. Wash.)...........................................................9

*Wheaton Coll. v. Azar*,
   No. 1:13-cv-08910 (N.D. Ill. Feb. 22, 2018) .......................................8

*Wheaton Coll. v. Azar*,
   No. 1:13-cv-8910 (N.D. Ill. Feb. 22, 2018) ........................................27

*Wheaton Coll. v. Burwell*,
   134 S. Ct. 2806 (2014)..............................................................................5

*Wieland v. HHS*,
   No. 4:13-cv-01577 (E.D. Mo. Jul 21, 2016) .........................................8

*Williams v. Sebelius*,
   No. 1:13-cv-01699 (D.D.C. Nov. 5, 2014) .............................................8

*Willis & Willis PLC v. Sebelius*,
   No. 1:13-cv-01124 (D.D.C. Oct. 31, 2014) ............................................8

*Zorach v. Clauson*,
   343 U.S. 306 (1952)................................................................................35

*Zubik v. Burwell*,
   136 S. Ct. 1557 (2016) .................................................................. *passim*

*Zubik v. Sebelius*,
   No. 2:13-cv-01459 (W.D. Pa. Dec. 20, 2013) ......................................8

**Statutes**

5 U.S.C. § 553.................................................................................37, 39, 41

20 U.S.C. § 1681.....................................................................................16, 29

26 U.S.C. § 4980D....................................................................................4, 20

26 U.S.C. § 4980H..........................................................................2, 4, 15, 20

26 U.S.C. § 5000A..........................................................................................2

26 U.S.C. § 6033.......................................................................................5, 16

26 U.S.C. § 9815...........................................................................................12

29 U.S.C. § 1185d ............................................................................................. 3, 12

42 U.S.C. § 290kk ............................................................................................. 16

42 U.S.C. § 300gg-13 .................................................................................. 3, 12, 13

42 U.S.C. § 2000bb *et seq.* ......................................................................... *passim*

42 U.S.C. § 2000e-1 .......................................................................................... 16

42 U.S.C. § 18011 ............................................................................................. 4

42 U.S.C. § 18114 ............................................................................................. 29

42 U.S.C. § 18116 ............................................................................................. 29

**Regulations**

10 C.F.R. § 5.205 ............................................................................................. 16

14 C.F.R. § 1262.101 ........................................................................................ 28

14 C.F.R. § 1262.103 ........................................................................................ 28

42 C.F.R. § 54.3 ............................................................................................... 28

42 C.F.R. § 54.5 ............................................................................................... 28

45 C.F.R § 147.131 ....................................................................................... 9, 22

49 C.F.R. § 6.5 ................................................................................................. 28

68 Fed. Reg. 56,430 (Sept. 30, 2003) ............................................................... 27

73 Fed. Reg. 38,030 (July 2, 2008) ................................................................... 43

75 Fed. Reg. 34,538 (June 17, 2010) ................................................................. 4

75 Fed. Reg. 41,726 (July 19, 2010) ............................................................. 3, 40

75 Fed. Reg. 81,849 (Dec. 29, 2010) ............................................................... 43

76 Fed. Reg. 46,621 (Aug. 3, 2011) .......................................................... *passim*

77 Fed. Reg. 16,501 (Mar. 21, 2012) ................................................................. 4

77 Fed. Reg. 8725 (Feb. 15, 2012) ............................................................ 3, 4, 40

78 Fed. Reg. 39,870 (July 2, 2013) ........................................................ 4-5, 17, 22

78 Fed. Reg. 8456 (Feb. 6, 2013) ...................................................................... 4

79 Fed. Reg. 51,092 (Aug. 27, 2014) ......................................................5, 22

80 Fed. Reg. 41,318 (July 14, 2015) .......................................................5, 22

81 Fed. Reg. 91,494 (Dec. 16, 2016) ...........................................................28

82 Fed. Reg. 47,792 (Oct. 13, 2017) ..................................................... *passim*

82 Fed. Reg. 47,838 (Oct. 13, 2017) ..............................................................9

83 Fed. Reg. 57,536 (Nov. 15, 2018) ................................................... *passim*

84 Fed. Reg. 7714 (Mar. 4, 2019) ................................................................25

**Other Authorities**

*Application of the Religious Freedom Restoration Act to the Award of a Grant*
    *Pursuant to the Juvenile Justice and Delinquency Prevention Act*, 31 Op.
    O.L.C. 162 (2007) .................................................................................27

Army Command Policy*, Accommodating religious practices*, Army Reg. 600-20
    (Nov. 6, 2014) ......................................................................................28

Becket, *HHS Mandate Information Central* ...................................................6

Bright Futures/American Academy of Pediatrics, *Bright Futures Pocket Guide*
    (2017) ...................................................................................................14

Bright Futures/American Academy of Pediatrics, *Recommendations for*
    *Preventive Pediatric Health Care* (2019) .............................................13

Centers for Consumer Information & Insurance Oversight, *Affordable Care Act*
    *Implementation FAQs – Set 12*, Centers for Medicare & Medicaid Services ..................13, 14

DMDatabases, *USA Business List* ..................................................................3

EBSA, *Coverage of Certain Services Under the Affordable Care Act*
    (Aug. 27, 2014) ......................................................................................5

Fed. R. Evid. 201 ..........................................................................................38

Michael W. McConnell, *The Origins and Historical Understanding of Free*
    *Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) .............................32

Mark L. Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J. 121 (2012) .......................32

Mark L. Rienzi, *Fool Me Twice:* Zubik v. Burwell *and the Perils of Judicial Faith*
    *in Government Claims*, 2016 Cato Sup. Ct. Rev. 123 (2015-2016) .........................25

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..................15, 19

U.S. Gov't Accountability Off., GAO-13-21, *Federal Rulemaking: Agencies Could Take Additional Steps to Respond to Public Comments* (Dec. 2012) ...........................42

*Women's Preventive Services Guidelines*, U.S. Department of Health & Human Services (Oct. 2017).....................................................................................................13

## INTRODUCTION

Six months later, the States still have no answer to the question this Court asked at the preliminary injunction hearing in January. Under what authority did the agencies issue the church exemption and the accommodation? J.A. 3441-42. The States have offered no coherent theory that invalidates the Final Rule but not the prior Mandate regulations, and in their summary judgment motion, have failed to address the "elephant in the room."

The States have now abandoned the answer they gave this Court in January that RFRA required the prior church exemption and accommodation. But if the agencies did not have authority to determine "who" would provide contraceptives by exempting churches and issuing an accommodation, this Court cannot reimpose the underlying mandate regulations that did just that.

Worse still, the elephants are multiplying. Since the parties were last in court, another judge issued yet another final injunction forbidding the agencies from enforcing the version of the mandate the States seek to reimpose. Order at 8, 31, *DeOtte v. Azar*, No. 4:18-cv-00825 (N.D. Tex. June 5, 2019), Dkt. No. 76. And this time the injunction is in a class-action case, protecting any religious objector, nationwide. The States have never explained how reinstatement of the prior rules helps them in light of the dozens of earlier final injunctions, and this Court cannot issue relief unless it will actually redress the States' claimed harms. No one has explained how that might happen, and *DeOtte* magnifies the States' problem.

In light of these injunctions, the strength of the federal government's arguments grows. It turns out the federal government was exactly right that keeping the old Mandate would not serve a compelling interest; indeed it is unclear that it serves any interest at all in light of the government's straight-loss record on RFRA claims in court. Surely the agencies had authority to obey RFRA and eliminate a burden on religion in those circumstances rather than keep losing. That is particularly true where the Supreme Court has said that RFRA "surely allows" agencies to change their regulations, and the Third Circuit has agreed that "the Government has discretion to grant

certain religious accommodations subject to constitutional limitations." *Real Alternatives, Inc. v. Sec'y, HHS*, 867 F.3d 338, 352 (3d Cir. 2017).

Furthermore, the States essentially ignore the argument that the underlying mandate violates RFRA by imposing a substantial burden on religious objectors. Their entire argument is based on an attempt to revive a vacated decision that has not been reinstated by the Third Circuit, and fails to grapple with what the Supreme Court called "substantial clarification and refinement" of the government's position over the course of the *Zubik* litigation. *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016). The agencies' concessions that under the so-called accommodation, the contraceptive coverage is not actually separate at all, and that it "could be modified" so it did not use religious objectors' plans, *id.*, was an admission that what it was offering religious objectors in the accommodation was in no way an "opt out." More importantly, it was a concession that the accommodation the States seek to reimpose was never the least restrictive means—and therefore necessarily fails RFRA. And since the federal government's nerve faltered during the *Zubik* merits briefing, they haven't won a case since.

The States' other theories fare no better. The States' argument that the Final Rule is arbitrary and capricious also ignores the agencies' *Zubik* concessions—the agencies recognized that they could no longer defend the prior regulations after *Zubik* and explained as much in the Final Rule. The States' statutory, Establishment Clause and Equal Protection arguments fail because, among other reasons, they do not take into account the government's legitimate interest in protecting the free exercise of religion, and its authority and obligation to do so. Finally, the States' procedural arguments fail because the Final Rule has undergone full notice and comment.

## BACKGROUND

### A.  The federal mandate and its exceptions

Federal law requires some employers (namely, those with over 50 employees) to offer group benefits with "minimum essential coverage." 26 U.S.C. § 5000A(f), 26 U.S.C. § 4980H(a), (c)(2).

That "minimum essential coverage" must include, among other things, coverage for "preventive care and screenings" for women. 42 U.S.C. § 300gg-13(a)(4); 29 U.S.C. § 1185d. Congress did not require that "preventive care" include contraceptive coverage. Instead, Congress delegated to HHS the authority to determine what should be included as preventive care "for purposes of this paragraph." 42 U.S.C. § 300gg-13(a)(4).

The preventive services mandate was first implemented in an interim final rule on July 19, 2010, published by the Departments of Health and Human Services, Labor, and Treasury (the agencies). 75 Fed. Reg. 41,726, 41,728 (July 19, 2010) (First IFR). The First IFR stated that the Health Resources and Services Administration (HRSA), a division of HHS, would produce comprehensive guidelines for women's preventive services. *Id.* This IFR was enacted without prior notice of rulemaking or opportunity for prior comment, as it came into effect on the day that comments were due. HHS asked for recommendations of preventive services from the Institute of Medicine (IOM), 77 Fed. Reg. 8725, 8726 (Feb. 15, 2012), which proposed including, *inter alia,* all FDA-approved contraceptives and sterilization methods. J.A. 313.

Following the comment period on the First IFR, and thirteen days after IOM issued its recommendations, the agencies promulgated the second IFR. 76 Fed. Reg. 46,621 (Aug. 3, 2011) (Second IFR). That same day, HRSA issued guidelines on its website mandating coverage of all female contraceptive methods. J.A. 310-12.

The Second IFR stated that it "contain[ed] amendments" to the First IFR. 76 Fed. Reg. at 46,621. It implemented HRSA's guidelines without notice and comment. *See id.* at 46,623. Not all private employers are subject to this Mandate. First, the vast majority of employers—those with fewer than 50 employees—are not required to provide any insurance coverage at all.[1] Second,

---

[1] According to some estimates, more than 97% of employers have fewer than 50 employees, and therefore face no federal obligation to provide coverage at all. *See, e.g.*, DMDatabases, *USA Business List*, http://bit.ly/10yw56o. The *Hobby Lobby* Court estimated that "34 million workers"

approximately a fifth of large employers are exempt through the ACA's exception for "grandfathered health plans." *See* 26 U.S.C. § 4980H(c)(2); 42 U.S.C. § 18011; 75 Fed. Reg. 34,538, 34,542 (June 17, 2010); J.A. 2176. For non-exempt employers, the penalty for offering a plan that excludes coverage for even one of the FDA-approved contraceptive methods is $100 per day for each affected individual. 26 U.S.C. § 4980D(a)-(b). If an employer with more than 50 employees fails to offer a plan at all, the employer owes $2,000 per year for each of its full-time employees. 26 U.S.C. § 4980H(a), (c)(1).

The Second IFR also recognized HRSA "discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. at 46,623. It defined the term "religious employer" narrowly. *Id.* at 46,626. The Second IFR was effective immediately without prior notice or opportunity for public comment. The agencies received "over 200,000" comments on the Second IFR. 77 Fed. Reg. at 8726. Many of the comments explained the need for a broader religious exemption than that implemented by the Second IFR. However, on February 15, 2012, HHS adopted a final rule that "finaliz[ed], without change," the Second IFR. *Id.* at 8725.

The agencies then published an Advance Notice of Proposed Rulemaking (ANPRM), 77 Fed. Reg. 16,501 (Mar. 21, 2012), and a Notice of Proposed Rulemaking (NPRM), 78 Fed. Reg. 8456 (Feb. 6, 2013), which were later adopted in a final rule making further changes to the Mandate, 78 Fed. Reg. 39,870 (July 2, 2013). The agencies eventually amended the definition of a religious employer by eliminating some of the criteria from the Second IFR, limiting the definition to organizations "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code," thus exempting "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order," from the Mandate. 78 Fed.

---

are employed by firms with fewer than 50 employees. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 700 (2014) (citing The White House, Health Reform for Small Businesses: The Affordable Care Act Increases Choice and Saving Money for Small Businesses 1).

Reg. at 39,874; *see* 26 U.S.C. § 6033(a)(3)(A)(i), (iii). The agencies also adopted a regulatory mechanism for compliance with the Mandate—termed an "accommodation"—by which religious employers not covered by the exemption could offer the objected-to contraceptives on their health plans by executing a self-certification and delivering it to the organization's insurer or the plan's third-party administrator (TPA).

The system initiated by the first two IFRs did not address the concerns of many religious organizations, and many filed lawsuits seeking relief. In July 2013, one of those organizations, Wheaton College, received an emergency injunction from the Supreme Court that protected it from the penalties in the Mandate, though the injunction declined to make a RFRA finding. *Wheaton Coll. v. Burwell*, 134 S. Ct. 2806 (2014). Following that injunction, in August 2014, the agencies published a third IFR "in light of the Supreme Court's interim order" in *Wheaton*, again without notice and comment. 79 Fed. Reg. 51,092 (Aug. 27, 2014) (Third IFR). This Third IFR amended the Mandate to allow a religious objector to "notify HHS in writing of its religious objection" instead of notifying its insurer or third-party administrator. *Id.* at 51,094. The Third IFR received over 13,000 publicly posted comments. *See* EBSA, *Coverage of Certain Services Under the Affordable Care Act* (Aug. 27, 2014), https://www.regulations.gov/document?D=EBSA-2014-0013-0002. The Third IFR was ultimately finalized on July 14, 2015. 80 Fed. Reg. 41,318 (July 14, 2015). The Third IFR did not accommodate the religious beliefs of the Little Sisters and other religious objectors, and the Supreme Court revisited the issue in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (discussed below).

The federal government is also bound—in all of its actions, by any of its parts, under any statute—to obey federal religious freedom laws. *See, e.g.*, 42 U.S.C. § 2000bb *et seq.* The Religious Freedom Restoration Act prohibits federal agencies from imposing substantial burdens on religion—they "shall not" do it—unless the agency demonstrates that the burden is required by

a compelling government interest and there is no "less restrictive" means of achieving that interest. 42 U.S.C. § 2000bb-1; *Hobby Lobby*, 573 U.S. at 728.

## B. The challenges to the Mandate and the resulting injunctions

Because the Mandate required that many employers choose between violating their sincere religious beliefs and paying debilitating fines, dozens of cases were filed against it. Those lawsuits resulted in dozens of injunctions from federal courts across the country, and multiple such cases were consolidated at the Supreme Court. *See Zubik*, 136 S. Ct. at 1557 (consolidating cases from the Third, Fifth, Tenth, and D.C. Circuits).[2] Once the cases reached the Supreme Court, the agencies made new concessions that changed the facts and arguments they had previously relied on to defend the Mandate.

First, the government admitted for the first time that contraceptive coverage, rather than being provided as a "separate" plan under the accommodation, must be "part of the same plan as the coverage provided by the employer," Br. for the Resp'ts at 38, *Zubik*, 136 S. Ct. 1557 (quotations omitted), https://bit.ly/2DiCj32; Tr. of Oral Arg. at 60-61, *Zubik*, 136 S. Ct. 1557, https://bit.ly/2VklhFx (Chief Justice Roberts: "You want the coverage for contraceptive services to be provided, I think as you . . . said, seamlessly. You want it to be in one insurance package. . . . Is that a fair understanding of the case?"; Solicitor General Verrilli: "I think it is one fair understanding of the case."). The government thus removed any basis for lower courts' prior holdings that the Mandate did not impose a substantial burden on the religious exercise of objecting employers because the provision of contraceptives was separate from their plans.

Next, the agencies admitted to the Supreme Court that women who do not receive contraceptive coverage from their employer can "ordinarily" get it from "a family member's employer," "an Exchange," or "another government program." Br. for the Resp'ts at 65, *Zubik*,

---

[2] The various cases challenging the Mandate are collected at Becket, *HHS Mandate Information Central*, http://www.becketlaw.org/ research-central/hhs-info-central/ (last visited June 14, 2019).

136 S. Ct. 1557, https://bit.ly/2DiCj32. The government also acknowledged that the Mandate "could be modified" to be more protective of religious liberty, Suppl. Br. for the Resp'ts at 14-15, *Zubik*, 136 S. Ct. 1557, https://bit.ly/2VjFsVb, thus admitting the Mandate was not the least restrictive means of achieving the government's interests.

The Supreme Court unanimously vacated the decisions of the Courts of Appeals of the Third, Fifth, Tenth, and D.C. Circuits, which had ruled in favor of the agencies. *Zubik*, 136 S. Ct. at 1561. It noted the "substantial" change in the government's position and ordered that the parties should be "afforded an opportunity to arrive at an approach going forward" that would resolve the dispute. *Id.* at 1560. The Court thus ordered the government not to impose taxes or penalties on petitioners for failure to comply with the Mandate and remanded the cases. *Id.* at 1561.

Other injunctions forbid the federal government from enforcing the Mandate against all known religious objectors. Some of these were issued prior to the rules at issue in this case.[3] Some,

---

[3] *See, e.g.*, Injunction, *Am. Pulverizer Co. v. HHS*, No. 6:12-cv-03459 (W.D. Mo. Oct. 30, 2014), Dkt. 56; Injunction, *Annex Medical, Inc., v. Solis*, No. 0:12-cv-02804 (D. Minn. Aug. 19, 2015), Dkt. 76; Amended Final Judgment, *Armstrong v. Sebelius*, No. 1:13-cv-00563 (D. Colo. Oct. 7, 2014), Dkt. 82; Injunction, *Autocam Corp. v. Sebelius*, No. 1:12-cv-01096 (W.D. Mich. Jan. 5, 2015), Dkt. 76; Injunction, *Barron Indus., Inc. v. Sebelius*, No. 1:13-cv-01330 (D.D.C. Oct. 27, 2014), Dkt. 10; Consent Injunction, *Bick Holdings, Inc. v. HHS*, No. 4:13-cv-00462 (E.D. Mo. Nov. 18, 2014), Dkt. 24; Order, *Brandt, Bishop of the Roman Catholic Diocese of Greensburg v. Sebelius*, No. 2:14-cv-00681 (W.D. Pa. Aug. 20, 2014), Dkt. 43; Injunction, *Briscoe v. Sebelius*, No. 1:13-cv-00285 (D. Colo. Jan. 27, 2015), Dkt. 70; *Catholic Diocese of Beaumont v. Sebelius*, 10 F. Supp. 3d 725 (E.D. Tex. 2014) (No. 1:13-cv-00709); Permanent Injunction, *C.W. Zumbiel Co. v. HHS*, No. 1:13-cv-01611 (D.D.C. Nov. 3, 2014), Dkt. 19; Order, *Conestoga Wood Specialties Corp. v. Sebelius*, No. 5:12-cv-06744 (E.D. Pa. Oct. 2, 2014), Dkt. 82; Order, *Medford v. Sebelius*, No. 0:13-cv-01726 (D. Minn. Nov. 20, 2014), Dkt. 20; Order, *Doboszenski & Sons, Inc. v. Sebelius*, No. 0:13-cv-03148 (D. Minn. Nov. 18, 2014), Dkt. 15; Injunction, *Domino's Farms Corp. v. Sebelius*, No. 2:12-cv-15488 (E.D. Mich. Dec. 3, 2014), Dkt. 54; *E. Tex. Baptist Univ. v. Sebelius*, 988 F. Supp. 2d 743, No. 4:12-cv-03009 (S.D. Tex. 2013); Injunction, *Eden Foods, Inc. v. Sebelius*, No. 2:13-cv-11229 (E.D. Mich. Feb. 12, 2015), Dkt. 39; Order, *Eternal Word Television Network v. HHS*, No. 14-12696 (11th Cir. May 31, 2016); Order, *Feltl & Co. v. Sebelius*, No. 0:13-cv-02635 (D. Minn. Nov. 26, 2014), Dkt. 15; Order, *Gilardi v. HHS*, No. 1:13-cv-00104 (D.D.C. Oct. 20, 2014), Dkt. 49; Injunction and Judgment, *Grote Indus., LLC v. Sebelius*, No. 4:12-cv-00134 (S.D. Ind. Apr. 30, 2015), Dkt. 66; Order, *Hall v. Sebelius*, No. 0:13-cv-00295 (D. Minn. Nov. 26, 2014), Dkt. 13; Injunction, *Hartenbower v. HHS*, No. 1:13-cv-02253 (N.D. Ill. Nov. 3, 2014), Dkt. 34; Order, *Hastings Chrysler Ctr., Inc. v. Sebelius*, No. 0:14-cv-00265 (D.

however, were issued after the IFRs were enjoined.[4] Indeed, several injunctions have been entered

in open-ended class or associational standing cases that allow new members to join.[5] These

Minn. Dec. 11, 2014), Dkt. 38; Order, *Hobby Lobby Stores, Inc. v. Sebelius*, No. 5:12-cv-01000, 2014 WL 6603399 (W.D. Okla. Nov. 19, 2014), Dkt. 98; Injunction, *Holland v. HHS*, No. 2:13-cv-15487 (S.D. W. Va. May 29, 2015), Dkt. 52; *Johnson Welded Products, Inc. v. Sebelius*, No. 1:13-cv-00609, 2014 WL 5395775, (D.D.C. Oct. 24, 2014), Dkt. 11; Order of Injunction, *Korte v. HHS*, No. 3:12-cv-1072 (S.D. Ill. Nov. 7, 2014), Dkt. 89; *La. Coll. v. Azar*, 38 F. Supp. 3d 766 (W.D. La. Aug. 13, 2014) (summary judgment and permanent injunction); Injunction, *Lindsay v. HHS*, No. 1:13-cv-01210 (N.D. Ill. Dec. 3, 2014), Dkt. 50; Injunction, *M&N Plastics, Inc. v. Sebelius*, No. 5:13-cv-14754 (E.D. Mich. Nov. 17, 2015), Dkt. 10; Order, *March for Life v. Azar*, No. 1:14-cv-01149 (D.D.C. Aug. 31, 2015), Dkt. 31; Injunction and Judgment, *Mersino Dewatering Inc. v. Sebelius*, No. 2:13-cv-15079 (E.D. Mich. Feb. 27, 2015), Dkt. 9; Injunction, *Mersino Mgmt. Co. v. Sebelius*, No. 2:13-cv-11296 (E.D. Mich. Feb. 4, 2015), Dkt. 37; Order, *Midwest Fastener Corp. v. Sebelius*, No. 1:13-cv-01337 (D.D.C. Oct. 24, 2014), Dkt. 21; Stipulated Order, *MK Chambers Co. v. HHS*, No. 2:13-cv-11379 (E.D. Mich. Nov. 21, 2014), Dkt. 54; Permanent Injunction, *Newland v. Sebelius*, No. 1:12-cv-01123 (D. Colo. Mar. 16, 2015), Dkt. 70; Injunction, *O'Brien v. HHS*, No. 4:12-cv-00476 (E.D. Mo. Nov. 12, 2014), Dkt. 64; Order, *Randy Reed Auto., Inc. v. Sebelius*, No. 5:13-cv-06117 (W.D. Mo. Nov. 12, 2014), Dkt. 29; Injunction, *Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 1:12-cv-02542 (E.D.N.Y. Dec. 16, 2013), Dkt. 117; Order, *Sioux Chief MFG. Co. v. Sebelius*, No. 4:13-cv-00036 (W.D. Mo. Nov. 12, 2014), Dkt. 19; Injunction, *SMA, LLC v. Sebelius*, No. 0:13-cv-01375 (D. Minn. Nov. 20, 2014), Dkt. 16; Order, *Stewart v. Sebelius*, No. 1:13-cv-01879 (D.D.C. Feb. 2, 2015), Dkt. 9; Order for Injunction, *Stinson Electric, Inc. v. Sebelius*, No. 0:14-cv-00830 (D. Minn. Nov. 18, 2014), Dkt. 18; Order, *Tonn & Blank Constr. LLC v. Sebelius*, No. 1:12-cv-00325 (N.D. Ind. Nov. 6, 2014), Dkt. 56; Order, *Tyndale House Publishers, Inc. v. Sebelius*, No. 1:12-cv-01635 (D.D.C. Jul. 15, 2015), Dkt. 53; Injunction, *Weingartz Supply Co. v. Sebelius*, No. 2:12-cv-12061 (E.D. Mich. Dec. 31, 2014), Dkt. 98; Order, *Wieland v. HHS*, No. 4:13-cv-01577 (E.D. Mo. Jul 21, 2016), Dkt. 87; Order, *Williams v. Sebelius*, No. 1:13-cv-01699 (D.D.C. Nov. 5, 2014), Dkt. 11; Amended Order, *Willis & Willis PLC v. Sebelius*, No. 1:13-cv-01124 (D.D.C. Oct. 31, 2014), Dkt. 17; Order, *Zubik v. Sebelius*, No. 2:13-cv-01459 (W.D. Pa. Dec. 20, 2013), Dkt. 81.

[4] *See, e.g.*, Order, *Ass'n of Christian Sch. v. Azar*, No. 1:14-cv-02966 (D. Colo. Dec. 10, 2018), Dkt. 49; Order, *Ave Maria Sch. of Law v. Sebelius*, No. 2:13-cv-00795 (M.D. Fla. Jul. 11, 2018), Dkt. 68; Order, *Ave Maria Univ. v. Sebelius*, No. 2:13-cv-00630 (M.D. Fla. Jul. 11, 2018), Dkt. 72; Order, *Colo. Christian Univ. v. HHS*, No. 1:13-cv-02105 (D. Colo. Jul. 11, 2018), Dkt. 84; *Dobson v. Azar*, No. 13-cv-03326-REB-CBS (D. Colo. Mar. 26, 2019), Dkt. 61; Order, *Dordt Coll. v. Sebelius*, No. 5:13-cv-04100 (N.D. Iowa June 12, 2018), Dkt. 85; Permanent Injunction, *Geneva Coll. v. Sebelius*, No. 2:12-cv-00207 (W.D. Pa. Jul. 5, 2018), Dkt. 153; Permanent Injunction, *Grace Sch. v. Sebelius*, No. 3:12-cv-00459 (N.D. Ind. June 1, 2018), Dkt. 114; Order, *Little Sisters of the Poor v. Azar*, No. 1:13-cv-02611 (D. Colo. May 29, 2018), Dkt. 82; Permanent Injunction, *Sharpe Holdings, Inc. v. HHS*, No. 2:12-cv-00092 (E.D. Mo. Mar. 28, 2018), Dkt. 161; Order, *S. Nazarene Univ. v. Hargan*, No. 5:13-cv-01015 (W.D. Okla. May 15, 2018), Dkt. 109; Permanent Injunction, *Wheaton Coll. v. azar*, No. 1:13-cv-08910 (N.D. Ill. Feb. 22, 2018), Dkt. 119.

[5] *See, e.g.*, Order at 8, 31, *DeOtte v. Azar*, No. 4:18-cv-00825; *Reaching Souls Int'l, Inc. v. Azar*, No. 5:13-cv-01092, 2018 WL 1352186, at *2 (W.D. Okla. Mar. 15, 2018) (granting permanent injunction to "employers participating in the GuideStone Plan"); Order, *Catholic Benefits Ass'n*

injunctions continue to bind the agency defendants to this day.

## C. Challenges to the IFRs

After years of unsuccessful attempts to justify the Mandate in court, in compliance with Congress's mandate that government "shall not" impose a substantial burden on religion, and in compliance with injunctions forbidding enforcement against religious and moral objectors, *see, e.g.*, *Zubik*, 136 S. Ct. at 1561, the federal defendants issued two interim final rules providing that the Mandate will not be enforced against employers with religious or moral objections. 82 Fed. Reg. 47,792 (Oct. 13, 2017) (Fourth IFR); 82 Fed. Reg. 47,838 (Oct. 13, 2017) (Fifth IFR).[6] The IFRs otherwise left the Mandate in place as to all employers previously covered. The IFRs also left in place the accommodation. 45 C.F.R § 147.131. The IFRs were immediately challenged in this lawsuit, brought by the Commonwealth of Pennsylvania, and in others around the country.[7] This Court entered a nationwide injunction preventing the implementation of the Fourth and Fifth IFRs on December 15, 2017, holding that the IFRs were invalid under the Administrative Procedure Act's procedural and substantive provisions. Dkt. No. 60. During the time period that the Fourth IFR and the Final Rule have been enjoined, other courts enjoined the federal

---

*LCA v. Hargan*, No. 5:14-cv-00240 (W.D. Okla. Mar. 7, 2018), Dkt. 184 (granting permanent injunction of mandate to current and future nonprofit members of Catholic Benefits Association); Order, *Christian Emp's All. v. Azar*, No. 3:16-cv-00309 (D.N.D. May 15, 2019), Dkt. 53 (granting permanent injunction to current and future members of Christian Employers Alliance).

[6] Many of the arguments presented here are relevant to both the religious and moral exemption, but the Little Sisters address only the religious exemption. Singular references to "IFR" or "Final Rule" are to that rule. The Little Sisters would only need to rely on the moral objector rule if the States argued, or the Court found, that the moral rule survives but the religious rule does not.

[7] *ACLU v. Azar*, No. 4:17-cv-05772 (N.D. Cal.), *dismissed without prejudice* Nov. 2, 2018; *Campbell v. Trump*, No. 1:17-cv-02455 (D. Colo.), *dismissed* Sept. 11, 2018; *Massachusetts v. HHS*, No. 1:17-cv-11930 (D. Mass.), *summary judgment granted in favor of defendants* Mar. 12, 2018, *vacated and remanded*, 923 F.3d 209 (1st Cir. 2019); *Medical Students for Choice v. Azar*, No. 1:17-cv-02096 (D.D.C.), *dismissed without prejudice* Feb. 2, 2018; *Pennsylvania v. Trump*, No. 2:17-cv-4540 (E.D. Pa. Jan. 13, 2019), *preliminary injunction granted* Dec. 15, 2017, *preliminary injunction granted* Jan. 13, 2019, *on appeal* No. 17-3752 (3d Cir.); *Shiraef v. Azar*, No. 3:17-cv-00817 (N.D. Ind.), *dismissed without prejudice* Feb. 7, 2018; *Washington v. Trump*, No. 2:17-cv-01510 (W.D. Wash.), *dismissed without prejudice* Dec. 19, 2018.

government from enforcing the Mandate against all known religious objectors, including one injunction on June 5 that protects the class of all employers nationwide with sincere religious objections to the Mandate. *See* Order at 8, 31, *DeOtte*, No. 4:18-cv-00825.

### D.  The Final Rule and ongoing proceedings

The agencies received comments and reviewed them over a period of several months. They then finalized the religious exemption in a final rule that took effect on January 14, 2019. 83 Fed. Reg. 57,536 (Nov. 15, 2018) (Final Rule). New Jersey joined this lawsuit in an amended complaint on December 14, 2018, and both States moved for a preliminary injunction of the Final Rule. This Court granted a preliminary nationwide injunction against the Final Rule on January 14, 2019, before the rules took effect. Dkt. No. 135. The agencies and the Little Sisters appealed that injunction to the Third Circuit, where those appeals were consolidated with the appeals of the injunction against the IFRs. The Third Circuit heard argument in the consolidated appeals on May 21, 2019.

### ARGUMENT

The Little Sisters of the Poor Saints Peter and Paul Home (Little Sisters) oppose the Plaintiffs' motion for summary judgment and request that summary judgment be entered in favor of the defendants for the reasons explained below.

### I.  The States lack Article III Standing.

For the reasons set forth in the Little Sisters' pending motion to dismiss, Dkt. Nos. 159-1, 163, the States lack Article III standing, and their complaint should be dismissed. Even if the Court does not dismiss the complaint, the States have failed to show the "specific facts" required at the summary judgment level sufficient for Article III standing. At the summary judgment level, plaintiffs cannot rely on "mere allegations," but must provide "specific facts," that show an injury, fairly traceable to the challenged action, that is redressable by a decision from the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, (1992); *see also Freeman v. Corzine*, 629 F.3d 146, 153 (3d

Cir. 2010). The States present no additional evidence that they will be harmed by the Final Rules with their motion for summary judgment, much less that the alleged harms are attributable to the Rules. Instead, they continue to fail to identify any employers who are not protected by current court injunctions and who plan to take advantage of the Final Rules. And they offer no theory by which the federal government even *could* enforce the States' preferred rules against any religious objector anywhere.

Since the Little Sisters moved to dismiss the States' Amended Complaint, an additional development has made it impossible for this Court to redress any injury the States could possibly suffer as a result of the Final Rule. On June 5, 2019, an order in the Northern District of Texas granted a permanent injunction against the Mandate, protecting "[e]very current and future employer in the United States" with religious objections to the "accommodation" the States wish to reinstate here. Order at 8, 31, *DeOtte*, No. 4:18-cv-00825. Along with an order issued on May 15, 2019 in the District of North Dakota, the *DeOtte* order means that even more open-ended groups have access to judicial relief from the mandate. *See supra* note 5. How do the States think an injunction from this Court will redress their claimed harm when the federal government is barred from enforcement? They have never explained, and therefore this Court lacks Article III power to enjoin anything.

## II. The States cannot prevail on their claims that the Final Rule is substantively invalid.

### A. The Final Rule does not violate the ACA.

#### 1. *The agencies may make exemptions from a contraceptive mandate that they were never obligated to create.*

The States argue that the Final Rule is contrary to law, reasoning that the agencies lacked authority to create the religious exemption from the contraceptive mandate. But the ACA did not require any contraceptive mandate in the first place. The relevant statutory section says nothing about contraception. The ACA merely requires certain employers to offer "a group health plan"

that provides coverage for women's "preventive care and screenings." 42 U.S.C. § 300gg-13(a)(4); 26 U.S.C. § 9815; 29 U.S.C. § 1185d. Congress did not specify what "preventive care" means, but instead delegated that task to HRSA. HRSA, in turn, had discretion to articulate "guidelines" the agency wished to "support[]" for this purpose. 42 U.S.C. § 300gg-13(a)(4); *see* J.A. 310-12.

Thus, HRSA was under no obligation to include contraceptives in the preventive services regulations at all, much less all FDA-approved contraceptives. HRSA could have limited the guidelines to other preventive services such as domestic violence screening and well-woman visits, made no mention of contraceptives, and have still faithfully implemented the "preventive care" requirement. *See* 42 U.S.C. § 300gg-13(a)(4); J.A. 310-12.

The States argue that the language of the statute did not include delegation of authority to create exemptions from the preventive care mandate, Mem. 12-14, but if Congress meant for HRSA to simply create a list of covered items from which there could be no deviation, it could have said so. It did just this for subsections (1) and (2) of Section 300gg-13:

> (1) evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force;
> (2) immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved;

42 U.S.C. § 300gg-13. These provisions require coverage of all "items or services" on a particular list, or all immunizations, if recommended "with respect to the individual involved." *Id.* The language used in (4) is markedly different: "such additional preventive care and screenings . . . (1) as provided for in comprehensive guidelines" from HRSA. 42 U.S.C. § 300gg-13(4). Since "it is presumed that Congress expresses its intent through the ordinary meaning of its language," *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998), the distinction between these provisions indicates a broader grant of discretion to HRSA in crafting the regulations.

HHS has used that discretion in implementing the preventive services mandate, and not just on contraceptives. For example, in average-risk women, HPV screenings are only covered for those over 30, and mammograms are only covered for those over 40. *Women's Preventive Services Guidelines*, U.S. Department of Health & Human Services (Oct. 2017), https://bit.ly/2irrzlT. For all preventive services, HRSA has exercised discretion to "specify the frequency, method, treatment, or setting for the provision of that service," and has directed that if such information is not specified, "the plan or issuer can use reasonable medical management techniques to determine any coverage limitations." Centers for Consumer Information & Insurance Oversight, *Affordable Care Act Implementation FAQs – Set 12*, Centers for Medicare & Medicaid Services, https://go.cms.gov/2I54sZV. HRSA has been exercising its statutory discretion to frame coverage requirements for years, and the States have not claimed that it is in excess of the mandate to limit preventive services by age (a limitation not found in § 300gg-13(a)(4)), nor that it is improper to utilize "reasonable medical management techniques" to determine exclusions from coverage. *Id.*

The States argue that the use of the term "guidelines" in connection with children's preventive care, 42 U.S.C. § 300gg-13(a)(3), shows that "guidelines" refers only to a list of services. Mem. 13-14 & n.6 (citation omitted). Not so. The guidelines at issue there do not, as the States would have it, "simply define the 'what'" of covered services. Mem. 14 n.6. Instead, they provide a variety of age- and individual-circumstance-based recommendations which note that "variations, taking into account individual circumstances, may be appropriate," and "[recommended procedures] may be modified, depending on entry point into schedule and individual need."[8] They

---

[8]   Bright Futures/American Academy of Pediatrics, *Recommendations for Preventive Pediatric Health Care* (2019), https://www.aap.org/en-us/Documents/periodicity_schedule.pdf.

are accompanied by a 134-page "pocket guide" to aid practitioners in carrying out the recommendations.[9]

The upshot is that HRSA could have required coverage of some contraceptives and not others, or permitted employers to exclude coverage of some due to cost considerations (which it in fact does),[10] or determined that a contraception mandate was unnecessary due to widespread coverage pre-dating the ACA. Indeed, HRSA could edit its website tomorrow to eliminate some or all contraceptives from the list, and the States would have no recourse, since the listing of contraceptives itself is not in the Code of Federal Regulations and has never been subject to formal rulemaking. To claim that the agencies have no authority to create exemptions from their own discretionary policy choice in these circumstances is weaving new administrative law from whole cloth.

Nowhere does the statute tell HRSA to include contraceptives in the guidelines; it would be strange indeed if the agencies had the discretionary power to create a nationwide contraceptive mandate but not the discretionary power to frame that mandate to balance competing interests. Indeed, that is how HRSA has understood its discretion from Day 1. *See* 76 Fed. Reg. at 46,623 ("In the Departments' view, it is appropriate that HRSA, in issuing these Guidelines, takes into account the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required in the group health plans in which employees in certain religious positions participate.").

The States suggest that the statutory exemption for grandfathered plans means that "Congress knew how to exclude certain plans when it wished to," from which they derive the negative

---

[9]   *See* Bright Futures/American Academy of Pediatrics, *Bright Futures Pocket Guide* (2017), https://bit.ly/2OO2n8f.

[10]   Employers may exclude more expensive contraceptives if they cover a cheaper contraceptive in the same category. *See* Centers for Consumer Information & Insurance Oversight, *Affordable Care Act Implementation FAQs, Set 12*, Centers for Medicare & Medicaid Services, https://go.cms.gov/2I54sZV (last visited June 14, 2019).

implication that there are no other statutory exemptions for religious entities in the entire ACA. Mem. 13 n.5. That misapplies the negative implication canon, which applies when the exception specified can reasonably be thought to express *all* exceptions to the prohibition involved. *See, e.g.*, *United States v. Giordano*, 416 U.S. 505, 514 (1974) (executive assistant cannot exercise wiretap authority delegated to the "Attorney General" and "any Assistant Attorney General specially designated by the Attorney General"); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012). But the grandfathering exemption is nowhere near the only exception in the Affordable Care Act. *See, e.g.*, 26 U.S.C. § 4980H(c)(2) (employer mandate only applies to large employers). That Congress saw fit to craft the grandfathering exemption from its own statutory requirement hardly forbids the agencies from crafting exemptions from their own discretionary regulatory requirements.

The better reading of the statute, then—shared by both administrations to oversee the ACA—is that HRSA can decide not to impose certain coverage requirements on religious entities. That was the Third Circuit's view in *Real Alternatives*: "Even when noninterference is not strictly required, the Government has discretion to grant certain religious accommodations subject to constitutional limitations." *Real Alternatives*, 867 F.3d at 352 (3d Cir. 2017).

### 2. The States' reasoning, if accepted, would also invalidate the preexisting religious employer exemption and "accommodation."

The States' APA argument also proves too much and makes the relief they seek impossible for this Court to grant. If the agencies had authority only to determine "*which* additional preventive care services" must be covered, the agencies lacked the authority to issue the 2011 religious employer exemption and the so-called "accommodation." *See* 76 Fed. Reg. at 46,626. Indeed, the States admitted as much on appeal. States' Br. at 68-69, *Pennsylvania v. President*, Nos. 17-3752, 18-1253, 19-1129, 19-1189 (3d Cir. Mar. 18, 2019) ("[I]t is not clear what authority the Agencies used to create the church exemption."); *see also* Mem. 12 ("The plain language of the statute does

not provide HRSA with authority to create exemptions from the entities that 'shall' provide such coverage."). If HHS had no power to exempt some employers from the Mandate, then it has no choice but to impose the Mandate on houses of worship.

Under the States' theory of agency authority, the religious employer exemption cannot be cured simply because it refers to the Internal Revenue Code. Nothing in the ACA incorporates the Internal Revenue church exemption into the preventive services mandate. Nor is there anything special about the Internal Revenue Code: federal law has different ways to identify religious organizations. *See, e.g.*, 42 U.S.C. § 290kk ("a nonprofit religious organization"); 10 C.F.R. § 5.205 (educational institutions can self-identify as religious organizations). And federal law contains a variety of religious exemptions, any of which the agencies could have selected to rely upon here, such as Title VII's religious employer exemption or Title IX's exemption for religious educational institutions.[11] The States offer no reason why the agencies would have authority to create a religious employer exemption based on a snippet of unrelated tax code (which by no means purports to define religious organizations), *see* 26 U.S.C. § 6033(a)(3)(C) (referring in the same section to "religious organization" as a different category), but lack the authority to adopt the exemption in the Final Rule.

A reference to the religious employer doctrine in *Hosanna-Tabor* is a poor fit for justifying the religious exemption since it *would* cover religious orders like the Little Sisters and other groups not previously exempt, and would *not* function as a blanket exception for all church employees.

---

[11] *See, e.g.*, 42 U.S.C. § 2000e-1(a) ("This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."); 20 U.S.C. § 1681(a)(3) ("this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization"); 42 U.S.C. § 290kk(c)(6) ("The term 'religious organization' means a nonprofit religious organization.").

*See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190-94 (2012) (discussing indicia of ministerial role). And whether "houses of worship are more likely than other employers to employ people of the same faith," is irrelevant to the underlying question of authority to create a regulatory exception. Mem. 32 n. 12 (internal quotation omitted). The upshot is this: if the Mandate violates the Free Exercise Clause when applied to all employers (as the States seem to think), and if the agency has no statutory authority to make any distinctions (as the States argue), the only plausible legal result of the States' argument would be that the agencies are barred from having any contraceptive mandate at all.

Nor do the States explain how the federal government could have power to create and maintain the so-called accommodation under their theories. The agencies cannot simultaneously lack power to make exemptions from the Mandate and also offer an accommodation that allows objectors to "opt out" of that Mandate. *See infra* Part II.A.3.b (substantial burden); Mem. 5. Either the accommodation itself is an exemption (and therefore unlawful in the States' view because the agencies lack authority to create exemptions) *or* the accommodation is not an "opt out" at all but a separate obligation (and unlawful under RFRA). There is no available theory by which the agencies had authority to issue the exemption and "accommodation" the States want to reinstate, but lack authority to issue the Final Rules they want enjoined.

Further, if the States prevail, the underlying Mandate would be impermissible under the Free Exercise and Establishment Clauses, which prohibit the government from making such "explicit and deliberate distinctions between different religious organizations." *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982) (striking down laws that created differential treatment between "well-established churches" and "churches which are new and lacking in a constituency"). In that system, some religious organizations get exemptions (primarily churches and their "integrated auxiliaries"), and some do not. That rule exempts religious orders which engage in what the government deems "exclusively religious" activities. *See* 78 Fed. Reg. at 39,874 (limiting

exemption to the "exclusively religious activities of any religious order"). But it does not exempt religious orders that, because of their faith, engage in activities the government deems not "exclusively religious," such as serving the elderly poor.

By preferring certain churches and religious orders to other types of religious orders and organizations, the mandate inappropriately "interfer[es] with an internal . . . decision that affects the faith and mission" of a religious organization. *Hosanna-Tabor*, 565 U.S. at 190. Doing so also requires illegal "discrimination . . . [among religious institutions] expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations[.]" *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (applying *Larson* to invalidate distinction between "sectarian" and "pervasively sectarian" organizations). And it does all of this when discriminating *between religious organizations that all qualify for the ministerial exception upon which the States base their argument. Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 310 (4th Cir. 2004) (holding that a religious entity qualifies for the ministerial exception "whenever that entity's mission is marked by clear or obvious religious characteristics"). This Court cannot require the government to enforce an underlying regulation that, under the same reasoning by which it strikes down the current regulations, is unlawful.

The States' answer to these problems is that the Court need not decide the legality of the accommodation or the church exemption. J.A. 3472. But this Court cannot enter an order that reinstates an unlawful regime, particularly one that violates the very reasoning for striking down the final rules. *See Rappa v. New Castle Cty.*, 18 F.3d 1043, 1074 (3d Cir. 1994) (vacating an injunction because "the district court's injunction in this case itself perpetuates the constitutional infirmity of the statute by leaving in place" other unconstitutional restrictions on speech).

### 3. *The agencies are permitted to issue the Final Rule to comply with RFRA.*

Faced with dozens of injunctions and multiple Supreme Court orders preventing them from enforcing the underlying mandate—which was the exact state of play when the Supreme Court

vacated the appellate rulings in *Zubik*—the agencies could not be expected to maintain a rule that violated all of those injunctions, much less to continue advancing an affirmative defense of strict scrutiny they no longer believed. Their resulting attempt to comply with the Religious Freedom Restoration Act and stop asserting that affirmative defense is perfectly compatible with agencies' obligation and authority to interpret their own rules in accordance with Congressional commands.

> a. RFRA applies broadly to federal laws and federal agencies.

RFRA requires that the federal government "shall not substantially burden a person's exercise of religion" unless doing so is the "least restrictive means" of advancing a "compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). RFRA is not solely a judicial remedy. Instead, it constrains every "agency," "all Federal law, and the implementation of that law, whether statutory or otherwise," including the agencies' actions under the ACA. 42 U.S.C. §§ 2000bb-2, 2000bb-3. Because Congress made this requirement of the agencies, it necessarily gave them permission to lift burdens it had imposed. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 192 (2012) ("Command includes permission."). Simply put, whenever the federal government acts, it must obey RFRA.

> b. The Mandate as it existed before the Fourth IFR violates RFRA and the Constitution.

In enacting RFRA, Congress also made clear that "religious exercise" is a broad term, encompassing "any exercise of religion." 42 U.S.C. § 2000cc-5. Religious exercise includes "'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" *Hobby Lobby*, 573 U.S. at 710 (quoting *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990)).

**Substantial burden.** The substantial burden inquiry of RFRA is a simple two-part question: whether a religious belief is sincerely held and, if so, whether the government is "putting substantial pressure on an adherent" to act contrary to that belief. *Thomas v. Review Bd.*, 450 U.S.

707, 717-18 (1981); *see Sherbert v. Verner*, 374 U.S. 398, 404 (1963) ("the pressure upon [a Seventh-day Adventist] to forego [abstaining from Saturday work] is unmistakable"); *see also Hobby Lobby*, 573 U.S. at 695 n.3 (RFRA restored "*Sherbert* line of cases" and arguably "provide[s] even broader protection").

The Little Sisters and other religious groups exercise religion by providing health insurance that complies with their religious beliefs. *See* J.A. 2290-91. Here, the accommodation depends on religious objectors contracting with their insurer or TPA to provide contraceptive coverage through their own plan infrastructure. Failure to comply with the mandate, either outright or via the accommodation, would result in large fines under 26 U.S.C. § 4980D ($100/day per person) and 26 U.S.C. § 4980H(c)(1) ($2000 per employee, per year)—the same fines that constituted a substantial burden in *Hobby Lobby*. 573 U.S. at 691 ("If these consequences do not amount to a substantial burden, it is hard to see what would."). For the Little Sisters, that penalty would add up to over $2 million per year. J.A. 2294. The agencies themselves concede that forcing religious groups to comply with the accommodation "constituted a substantial burden" on religious exercise. 82 Fed. Reg. at 47,806.

The States do not dispute that the Little Sisters and others have sincere religious objections to complying with the accommodation. But rather than address the burden's magnitude—or perform any substantial burden analysis at all—the States refer only to the Third Circuit's *Real Alternatives* case as holding that the accommodation does not impose a substantial burden. Mem. 18 (citing 867 F.3d at 356 n.18). *Real Alternatives*, however, does not address the accommodation's burden on religious employers. 867 F.3d at 354 (calling employee claim "a question of first impression" and "distinct from an employer's RFRA claim objecting to the mandated provision" of coverage). By citing *Real Alternatives*, the States attempt to import the vacated decision in *Geneva College v. Secretary U.S. Department of Health & Human Services*, 778 F.3d 422, 439 (3d Cir. 2015). But the majority in *Real Alternatives* specifically disclaimed treating *Geneva College* as precedential,

*id.* at 356 n.18 ("*Geneva* is no longer controlling"), and specifically distinguished the RFRA claim of the employees from that of an employer facing the accommodation. *Id.* at 362 ("There is a material difference between employers arranging or providing an insurance plan that includes contraception coverage" and an employee's act of signing up for the plan).

Rather, the vacated opinion in *Geneva College* was procured on incorrect facts, which the government later admitted. In particular, in *Geneva College*, the agencies repeatedly told this Court that contraceptive coverage under the "accommodation" was *not* part of the religious organization's health plan. *See, e.g.*, Br. for the Appellants, *Geneva Coll. v. Sebelius*, No. 14-1376, 2014 WL 2812346, at *1-2 (3d Cir. June 10, 2014), *vacated and remanded by Zubik*, 137 S. Ct. 1557) ("in all cases" contraceptive coverage "is provided separately from [the religious employer's] health coverage"). The *Geneva College* panel accepted these representations as true and relied on them in making its substantial burden holding. *See Geneva Coll.*, 778 F.3d at 439 (coverage is "separate and apart from" religious employer's plan) (citation omitted).

At the Supreme Court, however, the agencies admitted that the accommodation "coverage" actually *is* "part of the same plan as the coverage provided by the employer." Br. for the Resp'ts at 38, *Zubik*, 136 S. Ct. 1557 (quotations omitted), https://bit.ly/2DiCj32; *see also* Tr. of Oral Arg. at 60-61, *Zubik*, 136 S. Ct. 1557, https://bit.ly/2VklhFx (admitting it is "a fair understanding of the case" that all services are "in the one insurance package"). *Real Alternatives* did not have an opportunity to take account of these facts, because it did not address the religious exercise at issue here. At least one court that has reviewed those facts has reached the opposite conclusion of *Geneva College* on whether the plans are separate. *See* Order at 13-14, *DeOtte*, No. 4:18-cv-00825.[12]

---

[12] *DeOtte* recognized the government's concessions, *id.* at 10, but made its own findings about the merits of the plaintiffs' claims, *id.* at 11 ("it is for the Court to say whether Plaintiffs prevail").

Religious objectors are required to execute Form 700, obligating their insurer to provide contraceptives to their employees through their plan infrastructure. 45 C.F.R. § 147.131(d). Or they must alternately inform HHS in writing not only of their religious objection, but also of the "name and type" of their plan, along with contact information for the health insurance issuers, and must keep HHS updated with changes to that information. 45 C.F.R. § 147.131(d)(1)(ii). In the case of religious entities with a self-insured plan—that is, a plan where the financial risk of claims is not borne by an insurance company—the notification via Form 700 or directly to HHS serves to "designate the relevant [TPA] as plan administrator," a role a TPA does not normally have, and that requires legal authority from the employer, such that the notification becomes "an instrument under which the plan is operated." 79 Fed. Reg. at 51,095. That is not simply "opt[ing] out." Mem. 5. It is using legal authority to authorize and obligate a TPA to use the religious organization's plan to provide coverage.

Regardless of the plan type, the regulations themselves announced that they relied on the employer's "coverage administration infrastructure" to achieve the Mandate's coverage goal. 80 Fed. Reg. at 41,328. The third-party administrator would contact all plan participants, identify them by "payroll location," and perform "[o]ngoing, nightly feeds" of information. Joint Appendix at 1220-22 (Guidestone Declaration), *Zubik*, 136 S. Ct. 1557, https://bit.ly/2EOf1jQ; *see also* 80 Fed. Reg. at 41,328-29 (acknowledging the plan information is used to "verify the identity" of beneficiaries and "provide formatted claims data for government reimbursement").

Religious employers making use of the accommodation are thus forced to maintain a health plan that provides the very coverage the employer finds religiously objectionable. *See* 78 Fed. Reg. at 39,876 ("plan participants and beneficiaries (and their health care providers) do not have to have two separate health insurance policies (that is, the group health insurance policy and the individual contraceptive coverage policy)"). Thus, "the coverage provided by the TPA is, as a formal ERISA

matter, part of the same 'plan' as the coverage provided by the employer." Br. for the Resp'ts at 38, *Zubik*, 136 S. Ct. 1557 (citation omitted), https://bit.ly/2DiCj32.

That is why Solicitor General Verrilli conceded that contraceptive coverage must be "part of the same plan as the coverage provided by the employer," Br. for the Resp'ts at 38, *Zubik*, 136 S. Ct. 1557 (internal quotations marks and citation omitted), https://bit.ly/2DiCj32; Tr. of Oral Arg. at 60-61, *Zubik*, 136 S. Ct. 1557, https://bit.ly/2VklhFx (Chief Justice Roberts: "You want the coverage for contraceptive services to be provided, I think as you said, seamlessly. You want it to be in one insurance package. . . . Is that a fair understanding of the case?"; Solicitor General Verrilli: "I think it is one fair understanding of the case."). The Supreme Court itself recognized the government's "substantial clarification and refinement" in its position, *Zubik*, 136 S. Ct. at 1560, which is why it makes no sense for the States to rely on pre-*Zubik* analysis of the substantial burden from a case that was vacated by *Zubik*. *See* Mem. 18.

Consistent with their concessions in *Zubik*, the agencies themselves now concede that forcing religious groups to comply with the accommodation "constituted a substantial burden" on religious exercise. 83 Fed. Reg. at 57,546. That explains why federal courts have awarded at least 15 injunctions—not consent decrees—to religious objectors since *Zubik*. *See supra* notes 4 & 5. Each injunction required an Article III judge to determine that the movant had made "*a clear showing*" that the law required that "extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; citation omitted).

The States do not challenge the Little Sisters' sincerity and have not attempted to show that the Little Sisters are *factually* mistaken that the accommodation requires their assistance. And civil courts do not decide theological questions. *See, e.g.*, *Thomas*, 450 U.S. at 715-16 ("it is not for us to say that the line [plaintiff] drew was an unreasonable one"). Accordingly, substantial burden is established.

**Strict scrutiny.** Under RFRA, Congress permitted agencies to impose substantial burdens on religion only where the federal government proves that imposing the burden on a particular person was the least restrictive means of advancing a compelling government interest. 42 U.S.C. § 2000bb-1. Here, the government cannot carry that burden and, to its credit, has finally stopped trying to assert that affirmative defense. *See* 83 Fed. Reg. at 57,546-49.

The States claim that the agencies' "RFRA justification falls apart" if the agencies are wrong "that the accommodation does not serve a compelling governmental interest." Mem. 18-19. But that flips the compelling interest analysis on its head. RFRA permits "Government" to impose a substantial burden "only if *it* demonstrates" that strict scrutiny is satisfied—not any third party. 42 U.S.C. §§ 2000bb-1(b), 2000bb-2(1) (emphasis added). When facing a RFRA challenge, once the claimant shows a substantial burden on a sincere religious exercise, RFRA places the burden on the federal government to show a compelling interest in posing that burden. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006). The States proceed as if it is the government's burden to show that there is *no* compelling interest in the Final Rules. Mem. 19. But RFRA does not *require* the government to burden religion *unless* it has no compelling interest, and, in any case, the agencies have shown that they could not carry their RFRA burden. *See, e.g.*, 82 Fed. Reg. at 47,806.

The government's interest in requiring employers to provide contraceptives cannot be "compelling" since small businesses, grandfathered plans, churches, and government-sponsored plans are exempt. These existing exemptions do "appreciable damage" to any alleged interest in universal seamless coverage, showing that it cannot be an interest "of the highest order." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546-47 (internal quotations marks and citation omitted). For example, the Obama Administration defended its decision to exempt grandfathered plans by explaining that affected women would have many other avenues to obtain coverage, including "through a family member's employer, through an individual insurance policy

purchased on an Exchange or directly from an insurer, or through Medicaid or another government program"—that is, non-seamless means. Br. for the Resp'ts at 65, *Zubik*, 136 S. Ct. 1557, https://bit.ly/2DiCj32. Similarly, the government argued that the grandfathering exemption— which has covered over 49 million people, *Hobby Lobby*, 573 U.S. at 700—did not undercut the government's interests because "*most* women currently covered under grandfathered plans likely have (and will continue to have) *some* contraceptive coverage." Br. for the Resp'ts at 64, *Zubik*, 136 S. Ct. 1557 (emphasis added), https://bit.ly/2DiCj32. These concessions are partly why the Supreme Court remanded *Zubik* and why the government subsequently lost every case.[13]

Even so, the States cannot seriously contend there is a compelling interest in prohibiting actions they themselves never prohibited. The States here either have no contraceptive mandate (Pennsylvania) or a narrower mandate that includes cost-sharing (New Jersey) and a religious exemption broader than that in the federal mandate. J.A. 3565; 3569.

And here, the government is already attempting to provide Title X funded contraceptives for women whose employers conscientiously object to contraceptive coverage. 84 Fed. Reg. 7714, 7734 (Mar. 4, 2019) ("when her employer-sponsored health insurance does not cover certain contraceptives because of her employer's religious or moral objection to such contraceptives" a woman may be considered eligible for Title X benefits) (enjoined on unrelated grounds, *see, e.g.*, Opinion and Order, *Oregon v. Azar*, No. 6:19-cv-00317 (D. Or. Apr. 29, 2019), Dkt. No. 142; Order, *Washington v. Azar*, No. 1:19-cv-03040 (E.D. Wash. Apr. 25, 2019), Dkt. No. 54; *see also* Order, *California v. Azar*, No. 3:19-cv-01184 (N.D. Cal. Apr. 26, 2019), Dkt. No. 103 (state-wide injunction)).

---

[13] S*ee* Mark L. Rienzi, *Fool Me Twice:* Zubik v. Burwell *and the Perils of Judicial Faith in Government Claims*, 2016 Cato Sup. Ct. Rev. 123 (2015-2016) (detailing concessions leading to the *Zubik* remand).

The States find fault with these efforts because they involve discretion on the part of Title X projects (some administered by the States' own *amici* like Planned Parenthood). Mem. 19-20 n.10. But this misses the mark: what matters is not whether the States agree any current program is a perfect substitute, but whether less restrictive alternatives are *available*. Mem. 19-20 n.10. The States themselves attest to a range of state programs that provide contraceptives. The very existence of those programs proves that a plan run by nuns is not the least restrictive means of distributing contraceptives (which is presumably why neither the federal government nor the States ever thought of such a scheme before 2012).

Here, any third-party harm is not the result of the religious objector seeking to have contraceptives banned, but because the government has chosen to force third parties to distribute a product. The States accuse the agencies of viewing third-party harm as "unimportant," Mem. 17, but the Little Sisters' beliefs about contraceptives are cost-free; the "cost" comes in because the government initially chose the Little Sisters, rather than some other delivery method, to provide such coverage. Per *Hobby Lobby*, the burdens on third parties are properly considered under the compelling interest test, not as a separate exception to RFRA. 573 U.S. at 731-32. As described above, that interest is not compelling here.

      c.  After *Zubik*, courts have unanimously found the Mandate as applied to religious employers violated RFRA.

Since the Supreme Court's *Zubik* order, every religious employer case that has been litigated to conclusion has resulted in a permanent injunction. Those injunctions all include conclusions of law under Rule 65 that a RFRA violation exists and forbid the agencies from enforcing the mandate. For example:

- Order at 8, 31, *DeOtte v. Azar*, No. 4:18-cv-00825 (permanent injunction protecting a class of "[e]very current and future employer in the United States" with religious objections to the "accommodation.").

- Order, at 3, *Wheaton Coll. v. Azar*, No. 1:13-cv-8910 (N.D. Ill. Feb. 22, 2018), Dkt. No. 119 ("enforcement of the contraceptive mandate against Wheaton would violate Wheaton's rights under" RFRA);

- Order at 1-2, *Little Sisters of the Poor v. Azar*, No. 1:13-cv-02611 (D. Colo. May 29, 2018), Dkt. No. 82 ("enforcement of the mandate against Plaintiffs, either through the accommodation or other regulatory means . . . violated and would violate the Religious Freedom Restoration Act");

- Order at 3-4, *Reaching Souls Int'l, Inc. v. Azar*, No. 13-cv-01092, 2018 WL 1352186 (W.D. Okla. Mar. 15, 2018), Dkt. No. 95 ("enforcement of the contraceptive mandate against Plaintiffs . . . violated and would violate RFRA").

These post-*Zubik* injunctions join dozens of pre-*Zubik* injunctions in which federal judges found, over HHS's objection, that the prior system violates RFRA. All told, more than 50 RFRA-based injunctions continue to bind the federal agencies. *See supra* notes 4 & 5.

> d. Where courts are divided, government at least has discretion to err on the side of not violating civil rights.

Since federal agencies have to implement national policy for all 50 states, it was at least a reasonable act of discretion for the agencies to comply with multiple injunctions and err on the side of not burdening religious liberty. RFRA is more than a judicial remedy; it "applies to all Federal law." 42 U.S.C. § 2000bb-3. *See also* 42 U.S.C. § 2000bb-2(1) ("the term 'government' includes a[n] agency . . . of the United States."). RFRA "intru[des] at every level of government, displacing laws"—and therefore the regulations—of "every [federal] agency." *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 301 (3d Cir. 2016) (internal quotation marks and citation omitted). When agencies implement federal law, they are necessarily implementing RFRA, and they are duty-bound to obey it. Accordingly, the Office of Legal Counsel has advised agencies that they can accommodate persons who they have reason to believe will face a substantial burden on religious exercise. *See, e.g.*, *Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice and Delinquency Prevention Act*, 31 Op. O.L.C. 162, 176-77 (2007); *cf. Charitable Choice Regulations Applicable to States Receiving Substance Abuse Prevention and Treatment Block Grants*, 68 Fed. Reg. 56,430, 56,435 (Sept. 30, 2003). Indeed,

27

practice from *every administration since RFRA's passage* confirms that RFRA authorizes modifications to federal regulations to lift burdens on religious exercise. This includes rules for agency adjudication of RFRA disputes under President Clinton,[14] charitable choice regulations under President Bush,[15] regulations governing religious accommodations in the armed forces under President Obama,[16] and the current regulations under President Trump.

So too, here, the agencies were correct to the extent they erred on the side of protecting religious exercise under RFRA. This is particularly true because more than 50 federal courts have entered RFRA-based injunctions. That is why Congress made the Establishment Clause—not judicial pronouncements on the substantial burden test—the outer limit on exemptions: "Granting . . . exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter." 42 U.S.C. § 2000bb-4. *Accord Real Alternatives*, 867 F.3d at 352 ("the Government has discretion to grant certain religious accommodations subject to constitutional limitations."). RFRA thereby expresses Congress's intent that federal agencies be allowed some leeway when accommodating religious exercise.

The States question whether the agencies have sufficient "expertise" to issue a religious exemption. Mem. 16. But the agencies don't need expertise in religious objections to understand the dozens of injunctions imposed against them. *See supra* notes 4 & 5. And it is well within an agency's competence to lift a burden that it has imposed on religious exercise and to find another way to meet its interests. *Hobby Lobby* specifically contemplated that scenario, suggesting broad

---

[14] *See* 14 C.F.R. § 1262.103(a)(4) (providing for NASA adjudication of RFRA disputes); 14 C.F.R. § 1262.101(b)(1)(iv) (providing for attorneys' fees in such adjudications); 49 C.F.R. § 6.5 (providing for attorneys' fees in Department of Transportation adjudications under RFRA).

[15] *See, e.g.*, 42 C.F.R. § 54.3 (provision on nondiscrimination against religious organizations receiving certain funding); 42 C.F.R. § 54.5 (guaranteeing independence of religious organizations receiving certain funding).

[16] *See* Army Command Policy, *Accommodating religious practices*, Army Reg. 600-20 ch. 5-6 (Nov. 6, 2014) (prescribing religious accommodations under RFRA); 81 Fed. Reg. 91,494, 91,537 (Dec. 16, 2016) (citing RFRA to accommodate Native American eagle taking).

solutions as a means of responding to objections. *See* 573 U.S. at 728-30. Thus, the Final Rule is well within the discretion committed to HHS under the ACA and RFRA.

### 4. *Section 1554 of the ACA does not prohibit the Final Rule.*

Congress itself (a) chose not to mandate contraceptive coverage at all but left the matter entirely to HRSA's discretion, and (b) chose to allow grandfathered plans serving tens of millions of women to not cover preventive services. In light of these choices, it makes no sense to suggest that the ACA treats failure to extend a mandate to each and every potential employer as "creat[ing] an[] unreasonable barrier[]" or "imped[ing] timely access to health care." 42 U.S.C. § 18114. *See* Mem. 20-21. Furthermore, in light of (a) the existing injunctions, (b) the wide availability of contraceptives generally, and (c) Title X programs available to provide contraceptives, the Final Rule does not create an unreasonable barrier or impede timely access.

### 5. *Section 1557 of the ACA does not prohibit the Final Rule.*

The States claim that the Final Rule violates section 1557 of the ACA, Mem. 24, which prohibits discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). But Title IX does not apply to organizations "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). Therefore, an exemption which protects religious organizations cannot be inconsistent with Section 1557, since Section 1557 itself incorporates the broad religious exemption scheme of Title IX. *See Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 690 (N.D. Tex. 2016) (noting both religious and abortion-related exemptions).

By the States' reasoning, every change to the women's preventive services mandate violates Section 1557, and the very Mandate itself—which treats women different from men—violates Section 1557. Such an absurd result cannot have been Congress's intent; and if the Court finds otherwise, the entire Mandate must be struck down.

### 6. *Title VII does not prohibit the Final Rule.*

The States invite this Court to create a backdoor, nationwide contraceptive coverage mandate through Title VII. The only appeals court to have reached the question ruled that Title VII does not mandate contraceptive coverage. *See In re Union Pac. R.R. Employment Practices Litigation*, 479 F.3d 936, 942 (8th Cir. 2007). If the States were correct that failure to cover contraceptives violates Title VII, then how can they explain their own choice not to mandate contraceptive coverage for all employers, or to require it only in limited circumstances? Indeed, the States' argument would invalidate the grandfathering exemption and New Jersey's own exemption from its contraceptive coverage law. J.A. 3565, 3569. Such a sweeping conclusion would upend the orderly regulation of insurance coverage and state-level contraceptive mandates. The States cannot show a likelihood of success on such an overbroad and previously rejected legal theory.

### B.  The Final Rule is not arbitrary and capricious.

Arbitrary and capricious review requires that "an agency 'examine the relevant data and articulate a satisfactory explanation for its action.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see id.* at 515 (agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one") (emphasis in original).

The agencies' rule change was fully justified by a factual finding and a logical conclusion, both of which were reasonable and explained. First, the agencies found they were mistaken to conclude previously that the "accommodation" regulatory mechanism functioned as an opt-out for religious employers. Second, the Mandate—regulatory mechanism or not—burdened religious employers, and those burdens could not be justified without clear evidence that the burdens were necessary to serve the intended interest.

**The "accommodation" as an Opt-Out.** The agencies had previously described the accommodation in litigation as simply "opting out" of contraceptive coverage. *See* Br. for the Resp'ts at 25, *Zubik*, 136 S. Ct. 1557, https://bit.ly/2DiCj32. In the Fourth IFR and the Final Rule, the agencies explained why that was mistaken. "The Departments have stated in our regulations and court briefings that the existing accommodation with respect to self-insured plans requires contraceptive coverage as part of the same plan as the coverage provided by the employer, and operates in a way 'seamless' to those plans." 82 Fed. Reg. at 47,809. The accommodation's actual structure continued to require employers to provide plans with objectionable coverage, even if payments were segregated—meaning it failed to "accommodate" any theological concerns about complicity not tied to a specific financing structure. "As a result, in significant respects, that previous accommodation process did not actually accommodate the objections of many entities, as many entities with religious objections have argued." 83 Fed. Reg. at 57,544.

**Burden Not Justified by Compelling Interest.** As the agencies recognized, employers being made to choose between "significant penalties" and involvement with contraceptive coverage in a manner "inconsistent with their religious observance or practice" was the precise "substantial burden identified by the Supreme Court in *Hobby Lobby*." 83 Fed. Reg. at 57,545-46. As such, the agencies had the burden to show a compelling interest served by enforcing the Mandate against religious objectors, and that doing so was the least restrictive means of serving the interest. They reasonably concluded that the link between the Mandate and contraceptive access and use was "not clear," and that enforcing the Mandate as a means to those goals was not a compelling interest. *See* 83 Fed. Reg. at 57,556. The agencies also recognized that any interest in denying the exception to religious objectors specifically—RFRA's "burden to the person" inquiry, 42 U.S.C. § 2000bb-1(b)—was further reduced by the fact that "many or most women potentially affected by the expanded exemptions. . . . may not be impacted by these rules at all" in light of other exceptions and a growing number of permanent injunctions that prevented the Mandate's application. 83 Fed.

Reg. at 57,550. The agencies also provided legal analysis on the substantial burden question, particularly on why an interest in "seamlessness" would likely fail the Supreme Court's standards for a compelling interest, 83 Fed. Reg. at 57,548 (detailing damage to that interest under current law). Given the agencies' factual conclusions that the benefits of denying religious exemptions were highly uncertain, the agencies' final decision to grant exemptions under RFRA was far from arbitrary. Further, the States' own declarations undercut the idea that allowing a few more employers to access a religious exemption would undercut the interests served by the Mandate, given that those declarations tout the comprehensive effectiveness of a system that has always incorporated broader exemptions. *See, e.g.*, J.A. 3577 ("Since the ACA passed, no patient has contacted me to ask for a different, cheaper method of contraception than the one I had prescribed due to the cost under private insurance plans."); J.A. 3618 ("Post-ACA, the only concern has been what is best for the patient.").

**C.  The Final Rule does not violate the Establishment Clause.**

Over six years of hard-fought litigation, not the Obama Administration, nor the lower federal courts, nor any Supreme Court Justice took the view that the States take here, Mem. 27-30, that granting relief to religious organizations would violate the Establishment Clause. And with good reason: the Final Rule easily passes Establishment Clause muster under any test.

First, under the Supreme Court's most recent precedent, "the Establishment Clause *must* be interpreted 'by reference to historical practices and understandings.'" *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014) (quoting *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 670 (1989)) (emphasis added). Religious accommodations "fit[] within the tradition long followed" in our nation's history.[17] *Town of Greece*, 572 U.S. at 577. Indeed, the historical

---

[17] *See, e.g.*, Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990); Mark L. Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J. 121 (2012) (collecting historical examples).

understanding of "establishments" in some cases *requires* broad exemptions for religious employers. In *Hosanna-Tabor*, a unanimous Supreme Court held that historical anti-establishment interests required that churches be exempt from employment discrimination laws with regard to their ministerial employees. 565 U.S. at 188-89. That exemption is required because "the Establishment Clause . . . prohibits government involvement in such ecclesiastical decisions." *Id.* at 189. Like the ministerial exception, the Final Rule belongs to a tradition of avoiding government interference with religious decision-making and the internal determinations of religious groups like the Little Sisters.

Even under the much-maligned *Lemon* test invoked by petitioners, the Supreme Court has long recognized that accommodation of religion is a permissible secular purpose, which does not advance or endorse religion, and which avoids, rather than creates, entanglement with religion.[18] The leading case on such accommodations is *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327 (1987). There, a federal employment law prohibited discrimination on the basis of religion. But it also included a religious exemption, which permitted religious organizations to hire and fire on the basis of religion. *Id.* at 329 n.1. That exemption was challenged as a violation of the Establishment Clause, allegedly because it advanced religion by "singl[ing] out religious entities for a benefit." *Id.* at 338. But the Supreme Court *unanimously* upheld the religious exemption, concluding that the "government acts with [a] proper purpose" when it "lift[s] a regulation that burdens the exercise of religion." *Id.* "It cannot be seriously contended that [a law] impermissibly entangles church and state[, where that law] effectuates a more complete separation of the two." *Id.* at 339.

---

[18] The *Lemon* test is one of the most criticized tests in constitutional law. *See, e.g.*, *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 565 U.S. 994 (2011) (Thomas, J., dissenting from denial of certiorari) (collecting criticism by Chief Justice Roberts and Justices Kennedy, Alito, Thomas, and Scalia); *Green v. Haskell Cty. Bd. of Comm'rs*, 574 F.3d 1235, 1245 (10th Cir. 2009) (Gorsuch, J., dissenting from denial of rehearing en banc) (noting that *Lemon* "leave[s] the state of the law 'in Establishment Clause purgatory.'") (citation omitted).

The States insist *Amos* does not justify these accommodations because they fail to "giv[e] due weight to the employees' interests" (Mem. 28)—even though *Amos* gave little weight to a far more dramatic burden on third parties: the loss of a job *itself*, not merely the inability to obtain one insurance benefit through one's employer. The States rely instead on the earlier case of *Thornton v. Caldor*, 472 U.S. 703 (1985). But *Amos* itself explained that the employment accommodations upheld there were distinct from the law in *Thornton*: "Undoubtedly, [the discharged employee's] freedom of choice in religious matters was impinged upon, but it was the Church . . . and not the Government, who put him to the choice of changing his religious practices or losing his job." *Amos*, 483 U.S. at 337 n. 15 (calling *Thornton*'s directives to third parties "a very different case" from where the government is lifting a burden imposed by its own laws).[19] Here, no one is being put to the choice of changing their practices or losing their job; women who do not obtain contraceptives through their employer can obtain them from a variety of different sources. Any burden on third parties is far less than that in *Thornton*. As the States' own evidence makes exceedingly clear, employees have a variety of different means to obtain contraceptives, and the employer exemption here does not coerce an employee any more than a grandfathering exemption or small business exemption. It would upend the Religion Clauses to hold that it is perfectly acceptable for the government to exempt millions of employers through grandfathering, exempt small businesses from providing any insurance coverage at all, or exempt its own government-run plans from the preventive services mandate, but it suddenly creates an Establishment Clause violation if the government exempts the Little Sisters of the Poor too.

---

[19] Petitioners also cite *Cutter*'s statement, referring to *Thornton*, that a RLUIPA accommodation should not "override other significant interests." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). But again, *Cutter* was considering incidental burdens to be *directly imposed* by the State on incarcerated persons—not those resulting from private choice. *Id.* at 723 (discussing need to preserve "safety, and security" for others in state care).

The States' citation to the three-Justice plurality in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989), fares no better. First, the arguably-narrowest ground of decision among the split opinions was that "content" discrimination in regulations governing press "is plainly forbidden by the Press Clause," so *Texas Monthly* may not apply beyond the press context. 489 U.S. at 26 (White, J., concurring in the judgment). But even the three-Justice plurality—which emphasized that the exemption at issue "targeted . . . writings that *promulgate* the teachings of religious faiths"— found that exemptions are appropriately granted to "remov[e] a significant state-imposed deterrent to the free exercise of religion." *Id.* at 15. The plurality also noted that the tax exemption would have survived if "the benefits derived by religious organizations flowed to a large number of nonreligious groups as well," or if "similar tax breaks" were available for others. *Id.* at 11, 14 n.4. Here, the Final Rule lifts a significant state-imposed burden on religious exercise, as dozens of courts have held. And the exemption is not unique: nonreligious employers have access to a variety of exemptions much larger than the exemption challenged here, including grandfathering, the small business exemption, and the moral objector exemption. Given the burdens on religious exercise and the variety of exemptions available—some of which pose far greater hurdles to employees than the Final Rule—the *Texas Monthly* plurality actually supports the agencies.

The agencies are not "advanc[ing] religion through [their] own activities and influence." *Amos*, 483 U.S. at 337. They are merely lifting a severe governmental burden on private religious exercise, a burden that over 50 federal courts have seen fit to lift for religious plaintiffs. Such religious accommodations are not just permissible under the Establishment Clause, they "follow[] the best of our traditions." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952).

### D.  The Final Rule does not violate the Equal Protection Clause.

The States' equal protection argument also fails. The Rules make no sex classification. It is the underlying mandate, which the States wish to *enforce*, that creates differential rights based on sex. By way of example, the Little Sisters and other religious groups cannot participate in or facilitate

the sterilization of either men or women. But they only need a religious exemption from the latter because that is all the States are seeking to force them to provide.

The Final Rule focuses on one portion of the women's preventive services mandate because that is the portion that was enjoined repeatedly in court. If the agencies were creating a sex-based classification when they created the Final Rule, then Congress did so as well when it passed the statute, and the courts were doing so as well when they created judicial exemptions from one portion of the preventive services mandate. The same would be true of the Supreme Court's ruling in *Hobby Lobby*. The States cite no case for the novel proposition that an exception to a rule with a sex-based classification is itself a sex-based classification—particularly where the exemption is not extended on the basis of sex. Nor have they offered any case for the even more preposterous notion that the proper judicial remedy in such a case would be to *enforce* the original sex-based classification, invalidating only the supposedly-sex-based exemption thereto.

In any case, even if the religious objector rules were subject to heightened scrutiny, they would easily pass. As discussed above, a change to the rules serves a significant government interest in protecting religious exercise. The Third Circuit has noted that government has "significant . . . interests" in preventing "violations of constitutional rights of its citizens." *Pennsylvania v. Porter*, 659 F.2d 306, 316 (3d Cir. 1981); *cf. Osorio-Martinez v. Attorney Gen.*, 893 F.3d 153, 179 (3d Cir. 2018) ("it is squarely in the public interest to enable individuals to partake of statutory and constitutional rights"); *see also City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986) (plurality opinion) ("the public as a whole has an interest in the vindication of the rights conferred by the [civil rights] statutes enumerated in [42 U.S.C.] § 1988"). Protecting the First Amendment and similar statutory rights of religious groups like the Little Sisters is unquestionably a significant government interest. The rules are also substantially related to that interest; they are based upon the known religious objectors and information gathered during the rulemaking process regarding the types of employers who might seek an exemption. *See* 83 Fed. Reg. at 57,576-78.

Having conceded previously that the church exemption is "reasonable," *e.g.*, Amended Complaint, Dkt. No. 89 ¶ 90, the States nevertheless appear to think significant interests in religious liberty go no further—but as explained at length in the Rule, the exemption for churches was too narrow and posed constitutional and statutory problems. 83 Fed. Reg. at 57,544. The Final Rule is substantially related to a significant government interest.

## III.   The States cannot prevail on their claims that the Final Rule is procedurally invalid.

### A.  The agencies had good cause to issue the Fourth IFR.

Interim final rules are either permissible modes of rulemaking to impose and modify the mandate, or they are not. Under no circumstance could the law be as the States present it: that the government can use IFRs three times to impose a mandate, create a religious exemption, and modify that exemption—but one further use violates the Administrative Procedure Act. In fact, the case for proceeding by IFR is more compelling now than it was in 2010, 2011, and 2014 because the D.C. Circuit has since sustained the prior IFRs under the good cause exception. *See Priests for Life v. HHS*, 772 F.3d 229, 276-77 (D.C. Cir. 2014), *vacated on other grounds*, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

IFRs are procedurally valid "when the agency for good cause finds" that notice and comment "are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b). Review of good cause will be "inevitably fact- or context-dependent." *Mid-Tex Elec. Coop., Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987) (Ruth Bader Ginsburg, J.). Here, the agencies "determined" that notice and comment rulemaking "would be impracticable and contrary to the public interest." 82 Fed. Reg. at 47,813. Either ground establishes good cause.

*Impracticable.* The agencies justifiably concluded that "[d]elaying the availability of the expanded exemption" was impracticable. *Id.* at 47,814. To start, "courts ha[d] issued orders setting . . . pressing deadlines," *id.*, for the agency to resolve "outstanding issues" with religious objectors, *Zubik*, 136 S. Ct. at 1560; *see also* 82 Fed. Reg. at 47,814 (noting that the IFRs "provide

a specific policy resolution that courts have been waiting to receive from the [agencies] for more than a year"). The Third Circuit has specifically held that "urgency alone" may provide good cause for dispensing with notice and comment "when a deadline imposed by . . . the judiciary requires agency action in a timespan that is too short." *United States v. Reynolds*, 710 F.3d 498, 511 (3d Cir. 2013). And in context, as the D.C. Circuit noted, the agencies could have "reasonably interpreted" that cascade of injunctions and court orders across the country as a mandate "to take action to further alleviate any burden on the religious liberty of objecting religious organizations." *Priests for Life*, 772 F.3d at 276 (upholding proceeding by IFR where a court order in one party's case suggested the need for a change, without making a RFRA finding); *see also Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981) (upholding an IFR issued in response to an injunction, even though the trial court emphasized that it "was not mandating the action to be taken by the Department to comply with [the] injunction").

The agencies also found that delay would "increase the costs of health insurance" for religious objectors with grandfathered plans who would otherwise forestall cost-saving changes in order to preserve their grandfathered status and avoid the mandate. 82 Fed. Reg. at 47,815. While this Court previously rejected Defendants' prior examples of parties raising the issue as outdated,[20] the agency's assessment of the prevalence of grandfathered status—which remains common—is the sort of factual assessment where arbitrary and capricious review precludes the court from "substitut[ing] its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

The department's weighing of impracticability was especially reasonable in light of the uniquely marginal utility in additional public comment. Under the APA, notice and opportunity to

---

[20] The agencies previously supported this proposition before this Court with two legal opinions, *see Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 574 n.9 (E.D. Pa. 2017) (discussing *Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-CV-03489, 2014 WL 1256373 (N.D. Ga. Mar. 26, 2014) and *Diocese of Fort Wayne-S. Bend, Inc. v. Sebelius*, 988 F. Supp. 2d 958 (N.D. Ind. 2013)). These legal opinions were judicially noticeable as public records. *See* Fed. R. Evid. 201(b).

comment need only be "sufficient to fairly apprise interested parties of all significant subjects and issues involved." *NVE Inc. v. HHS*, 436 F.3d 182, 191 (3d Cir. 2006). Here, "[i]nterested parties" had at least six opportunities to comment "about whether and by what extent to expand" the existing religious exemption," and hundreds of thousands of them did—just not Pennsylvania or New Jersey. 82 Fed. Reg. at 47,814.

Relying on past notice and comment periods in balancing the need for further notice and comment in light of urgency was not novel. In promulgating the Second IFR, the agencies determined that "an additional opportunity for public comment [was] unnecessary" because "the amendments made in these interim final rules in fact are based on . . . public comments" received on the First IFR—even though that IFR never mentioned contraceptives or a religious exemption. 76 Fed. Reg. at 46,624.

Given the need for speedy action—including in response to court orders—and the marginal utility in additional public comment, the agencies had good cause to implement the Fourth IFR.

**Contrary to public interest.** The agencies also had good cause because they correctly concluded that the mandate infringed fundamental rights and a broader exemption was necessary to "to cure such violations." *See* 82 Fed. Reg. at 47,814. The Fourth IFR was issued in the face of dozens of lawsuits and injunctions. *See supra* notes 3-5. Leaving an illegal mandate in place with the expectation that it will violate federal civil rights is surely "contrary to the public interest." 5 U.S.C. § 553(b). The agencies were thus "obligat[ed]" to "alleviate any burden on . . . religious liberty" by IFR rather than press on for months on end. *See Priests for Life*, 772 F.3d at 276.

While this court previously decided that litigation "uncertainty" does not justify bypassing notice and comment, dozens of injunctions create certainty, not uncertainty. In particular, the expanding number of class-wide injunctions discussed above—including the *DeOtte* injunction now covering all employers nationwide with sincere objections to the Mandate—demonstrate that

the agencies were right that the Mandate as previously constituted was violating federal civil rights in similar fashion in numerous cases and needed to be changed. *See supra* Part II.A.3.b.

Again, comparison with the prior versions of the mandate, which the States' ask to reimpose, is instructive. The mandate has included a religious exemption from day one, when the agencies saw that "it is appropriate that HRSA, in issuing these Guidelines, takes into account the effect on the religious beliefs of certain religious employers" and gave HRSA "discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. at 46,623. As discussed *supra*, if the States are correct that the agencies have no delegated authority to create exemptions from the mandate, then each subsequent version of the exemptions must be invalid too.

The Second IFR created the nation's first nationwide contraceptive coverage mandate without any preliminary opportunity for public comment. It did not solicit prior comments on the anticipated guidelines, nor issue any prior notice even mentioning contraceptives, let alone the question of conscience protections. 77 Fed. Reg. at 8726 (noting that "comments on the anticipated guidelines were not requested in the interim final regulations"). Nevertheless, as noted above, the agencies argued that "an additional opportunity for public comment is unnecessary" because "the amendments made in these interim final rules in fact are based on . . . public comments" received on the First IFR—an IFR that never specifically mentioned contraceptives or a religious exemption. 76 Fed. Reg. at 46,624; *see also* 75 Fed. Reg. 41,726. If the Second IFR could be issued based on the public comments that had already been received, it is hard to understand why the Fourth IFR would not be even more justified in relying on seven years of vigorous debate and hundreds of thousands of comments.

In short, if the Fourth IFR is invalid for failure to have pre-IFR notice-and-comment, then so too is the rest of the IFR-based regime, and this Court should decline, in equity, to reimpose an alleged *status quo ante* on a theory that invalidates that very status quo.

**B.  Any procedural deficiency was cured by notice and comment.**

This Court has previously stated that "the States are unlikely to succeed on the merits of their argument that, in promulgating the Final Rules, the Agencies' actions failed to meet the requirements of notice-and-comment rulemaking," particularly as the agencies fulfilled their duty to "consider and respond to significant comments received during the period for public comment." *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 812 (E.D. Pa. 2019).[21] In short, then, it cannot be reasonably disputed that the States had notice and an opportunity to be heard on all relevant aspects of the Final Rule prior to promulgation of the Final Rule. 5 U.S.C. § 553.

Accordingly, the States' procedural argument relies on the novel theory that an otherwise compliant notice and comment period is an irrelevant nullity whenever it follows an allegedly procedurally defective interim rule. Such a rule misconstrues Third Circuit precedent and common sense, and would call into question both common APA practice and the Mandate more broadly.

The States rely primarily on *Natural Resources Defense Council, Inc. (NRDC) v. EPA*, 683 F.2d 752 (3d Cir. 1982), where the Third Circuit—in a challenge to an interim rule—also struck the final rule as part of the remedy. But there, the final rule's procedural validity was expressly contingent on the interim rule's existence, as the question it asked—whether to "further suspend" an effective date—was contingent on the validity of the IFR. *Id.* at 757 (citation omitted); *see id.* at 768 ("Commendably, EPA did conduct a rulemaking on the question of whether its already accomplished postponement should be continued; however, that rulemaking cannot replace one on the question of whether the amendments should be postponed in the first place."). Here, the question as to the appropriateness of the Final Rule remained the same between the IFR and the

---

[21] In so ruling, this Court did not give credence to the States' assertion, Mem. 44, that agency consideration of comments before a final rule must be presumed meaningless when the agency is defending the interim final rule in court. Among other things, such a rule would suggest final rules following IFRs *found in court to be issued with good cause* could nevertheless be tainted by the fact of litigation. And it would allow bad-faith plaintiffs to essentially invalidate a Final Rule simply by challenging the IFR in court.

Final Rule; unlike in *NRDC*, the Final Rule does not rely on the IFR having already been issued. And in any event, *NRDC* dealt with the effective repeal of a regulation passed by comprehensive notice-and-comment—not a regulation itself built on IFRs. *Id.* at 754.

Extending *NRDC* and like cases to cover all circumstances in which an allegedly procedurally invalid interim rule is finalized after subsequent comment would cast a pall on thousands of regulations. According to the GAO, 35 percent of all major rules were finalized without a prior notice of proposed rulemaking, with agencies commonly requesting post-promulgation comments. *See* U.S. Gov't Accountability Off., GAO-13-21, *Federal Rulemaking: Agencies Could Take Additional Steps to Respond to Public Comments*, 3 n.6, 8, 24 (Dec. 2012), http://www.gao.gov/assets/660/651052.pdf. Adopting the States' rule would render common post-promulgation notice-and-comment procedures useless; if a court found good cause lacking for the interim rule, a later final rule with responses to the post-promulgation comments would be invalidated no matter how comprehensive. That is nonsense and it bears no relation to the actual functioning of the federal government.

It is for that reason that courts confronted with facts like these have not applied such a counterproductive rule. For example, in *Paulsen v. Daniels*, the Ninth Circuit invalidated an interim rule it found to have not complied with notice-and-comment procedures, but held the final rule "which adopted the [IFR] without change" was the effective rule, not the rule previously in force which was itself legally infirm. 413 F.3d 999, 1003 (9th Cir. 2005). This case is instructive in two ways: (1) it does not say in any way that a procedural error in an IFR taints the notice-and-comment procedure for issuing a subsequent final rule; and (2) it specifically placed a new final rule in force where—as here—the rule previously in force was illegal. *See supra* Part II.A.3.b. And the Third Circuit's own practice in applying *United States v. Reynolds*, 710 F.3d 498 (3d Cir. 2013), underscores why the *per se* interpretation of *NRDC* cannot work. While *Reynolds* struck an interim rule as invalid, 710 F.3d at 519, the Third Circuit has repeatedly upheld SORNA

convictions obtained after the Justice Department finalized the interim rule that *Reynolds* invalidated. *See* 73 Fed. Reg. 38,030, 38,046-47 (July 2, 2008) (promulgating through notice and comment the "SMART" guidelines to implement SORNA and reaffirm-ing the interim rule applying SORNA retroactively); 75 Fed. Reg. 81,849 (Dec. 29, 2010) (finalizing the interim retroactivity rule); *e.g.*, *United States v. Cooper*, 750 F.3d 263, 265 (3d Cir. 2014) (affirming the Attorney General's authority to issue the SMART guidelines); *United States v. Dimpfl*, 523 F. App'x 865, 866 (3d Cir. 2013). A *per se* taint rule would certainly suggest that all these SORNA convictions are simply invalid.

Further, even if a Final Rule could be struck simply because its notice-and-comment process was preceded by an IFR rather than a notice of proposed rulemaking, it would be particularly odd to follow that rule when the IFR was (and remains) enjoined for nearly a full year prior to the Final Rule's promulgation. *Pennsylvania*, 351 F. Supp. 3d at 830 (IFR was enjoined in December 2017 "without any specific geographic or temporal limitation").

**C.  Any procedural error was harmless.**

The Final Rule's detailed level of engagement with comments also demonstrates the States' inability to show harm from any procedural error in the Final Rule's notice-and-comment process where the only plausible "error" is the prior issuance of an interim final rule. "[T]he burden of showing that an [agency] error is harmful normally falls upon the party attacking" the agency action. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). The alleged procedural error is harmless if "the outcome of the administrative proceedings will be the same absent [the agency]'s error." *Green Island Power Auth. v. FERC*, 577 F.3d 148, 165 (2d Cir. 2009); *see also PDK Labs. Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

While "harmless error analysis in administrative rulemaking" includes "the process as well as the result," *Reynolds*, 710 F.3d at 517-18, this means simply that "the purposes" of notice must be "fully satisfied" and that "a full and fair opportunity to be heard" took place. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992) (citations omitted). In finding prejudicial error sufficient to strike an IFR (not the subsequent final rule), *Reynolds* relied on both "the complete absence of notice and comment" and the fact that "the record does not support a conclusion that the Attorney General's evaluation was truly comprehensive." 710 F.3d at 522-23. Here, as explained above, the agencies filed detailed responses to public comments, revisiting and revising the prior IFR. The States have not persuasively explained why, under the circumstances, the opportunity to be heard with regard to the Final Rule would have been qualitatively different had the IFR come in the form of a detailed Notice of Proposed Rulemaking that was substantively unaltered after comments. That is particularly true where, as here, the agencies faced dozens of injunctions and have publicly stated their understanding that continuation of the prior rules violates a federal civil rights law—no matter how many comments they received, they were duty bound to reach this result.

Further, even "the complete failure to provide for notice and comments is harmless" when "the conclusion reached in the administrative rule was the only possible conclusion." *Reynolds*, 710 F.3d at 517-18. Because the newly-promulgated exemptions were necessary under RFRA for the reasons discussed in the *DeOtte* injunction and above, any procedural violation was harmless given the actual existence of a RFRA violation.

## CONCLUSION

This Court should grant summary judgment in favor of the Defendants and deny the States' summary judgment motion. In the alternative, Defendant-Intervenors respectfully request that, if the Court accepts the States' arguments, the Court invalidate the regulations implementing the Mandate prior to October 13, 2017 pursuant to the States' arguments.

Dated: June 14, 2019                        Respectfully submitted,

/s/ Mark Rienzi
Mark Rienzi, *pro hac vice*
Lori Windham, *pro hac vice*
Eric Rassbach, *pro hac vice*
Diana Verm, *pro hac vice*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

Nicholas M. Centrella
Conrad O'Brien PC
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-8098
Facsimile: (215) 864-0798
ncentrella@conradobrien.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of the Court for the United States District Court for the Eastern District of Pennsylvania using the CM/ECF system, and that service will be effectuated through the CM/ECF system.

Dated: June 14, 2019

　　　　　　　　　　　　　/s/ *Mark Rienzi*　　　　　　
　　　　　　　　　　　　　Mark Rienzi