# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; ALEX M. AZAR II, *in his official capacity as Secretary of Health and Human Services*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, *in his official capacity as Secretary of the Treasury*; UNITED STATES DEPARTMENT OF THE TREASURY; RENE ALEXANDER ACOSTA, *in his official capacity as Secretary of Labor*; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES OF AMERICA,<br><br>Defendants,<br><br>and<br><br>LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,<br><br>Intervenor-Defendant. | **No. 2:17-cv-04540-WB** |

## STATES' OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT FILED BY DEFENDANTS AND INTERVENOR-DEFENDANT AND REPLY MEMORANDUM OF LAW IN SUPPORT OF STATES' MOTION FOR SUMMARY JUDGMENT

GURBIR S. GREWAL
Attorney General
State of New Jersey

GLENN J. MORAMARCO
Assistant Attorney General
ELSPETH FAIMAN HANS
KATHERINE GREGORY
Deputy Attorneys General

New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-3235
Glenn.Moramarco@law.njoag.gov

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General
AIMEE D. THOMSON
Deputy Attorney General

Office of Attorney General
1600 Arch Street
Suite 300
Philadelphia, PA 19103
(215) 560-2171
mfischer@attorneygeneral.gov

June 28, 2019

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ iii

TABLE OF AUTHORITIES .................................................................................... iv

INTRODUCTION .................................................................................................... 1

DISCUSSION ........................................................................................................... 1

   I.   The Rules Are Inconsistent with the ACA and not Authorized by RFRA ......................... 1

      A.  The Rules Violate the ACA ................................................................. 1

      B.  The Federal Defendants Are Estopped from Arguing that the Rules
         Are Authorized by the ACA ................................................................ 4

      C.  The Religious Exemption Rule Is Not Authorized by RFRA ..................................... 5

   II.  The Rules Create Unreasonable Barriers to Medical Care ............................... 10

   III. The Rules Violate Title VII and Section 1557 of the ACA ............................ 11

   IV. The Rules Violate the Equal Protection Guarantee of the Fifth Amendment .................. 13

   V.  The Religious exemption Rule Violates the Establishment Clause ................................ 14

   VI. The Rules Are Arbitrary and Capricious ................................................... 16

      A.  The Agencies Fail to Provide Reasoned Explanations for Reversing
         Position on the Safety, Efficacy, and Benefits of Contraception ............................... 17

      B.  The Agencies Did Not Respond to Significant Comments. ..................................... 19

      C.  The Regulatory Impact Analysis is Arbitrary and Capricious. ................................ 22

   VII.   The Rules Are Procedurally Invalid ................................................... 23

      A.  The Acceptance of Post-Promulgation Comments Does Not Render
         the Rules Procedurally Valid ............................................................. 23

      B.  The Agencies Lacked "Good Cause" to Disregard the APA's
         Requirements ................................................................................ 26

      C.  The Agencies' Errors Were Not Harmless ............................................... 28

   VIII.  The States Have Standing ........................................................... 28

   IX. The Rules Should Be Vacated ............................................................ 29

CONCLUSION ........................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Administrator of Mass. v. Feeney*, 442 U.S. 256 (1979) ......................................... 13

*Am. Coll. of Emergency Physicians v. Price*, 264 F. Supp. 3d 89 (D.D.C. 2017) ................................................................................................................ 17

*Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153 (D.C. Cir. 1981) ................... 26

*Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677 (D.C. Cir. 1984) ........................................... 21

*Berrigan v. Sigler*, 499 F.2d 514 (D.C. Cir. 1974) ................................................ 19

*Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682 (2014) ................................. 6, 9

*California v. Azar*, No. 19-1184, 2019 WL 1877392 (N.D. Cal. Apr. 26, 2019) .................. 10

*California v. Azar*, No. 19-15974, 2019 WL 2529259 (9th Cir. June 20, 2019) .................... 10

*Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015) ....................... 7

*Chevron v. NRDC*, 467 U.S. 837 (1984) ................................................................ 3

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ....................... 10

*City of Portland, Oregon v. E.P.A.*, 507 F.3d 706 (D.C. Cir. 2007) ........................ 21

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003) ..................................... 17

*Comite de Apoyo a los Trabajadores Agricolas v. Solis*, 933 F. Supp. 2d 700 (E.D. Pa. 2013) ................................................................................................ 30

*Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987) ..................................... 15

*Council Tree Comms., Inc. v. F.C.C.*, 619 F.3d 235 (3d Cir. 2010) ........................ 30

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) ................................................................ 15

*DeOtte v. Azar*, No. 18-825 (N.D. Tex. June 5, 2019) ........................................... 29

*E. Texas Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015) ............................ 7

*Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266 (W.D. Wash. 2001) ............... 11

*Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985) ................................. 14, 15

*Eternal Word Television Network, Inc. v. Sec'y HHS*, 818 F.3d 1122 (11th Cir. 2016) ............................................................................................ 7

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).................................. 16

*Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) ...... 11

*Geneva Coll. v. Sec'y HHS*, 778 F.3d 422 (3d Cir. 2015) .................................. 7, 8

*Harris v. McCrae*, 448 U.S. 297 (1980) ........................................................... 13

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012).......................................................................................... 3

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) ..................................... 13, 14

*Levesque v. Block*, 723 F.2d 175 (1st Cir. 1983) .......................................... 25, 26

*Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151 (10th Cir. 2015) ....................................................................................... 7

*McCarron v. F.D.I.C.*, 111 F.3d 1089 (3d Cir. 1997)........................................ 4

*Michigan Catholic Conference & Catholic Family Servs. v. Burwell*, 807 F.3d 738 (6th Cir. 2015)........................................................................ 7

*NRDC v. E.P.A.*, 822 F.2d 104 (D.C. Cir. 1987) ............................................ 20

*NRDC v. EPA*, 683 F.2d 752 (3d Cir. 1982)................................................... 24

*Oregon v. Azar*, No. 19-317, 2019 WL 1897475 (D. Or. Apr. 29, 2019 ............. 10

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188 (D.C. Cir. 2007)......................................... 17

*Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (E.D. Pa. 2017) .................. 1, 23, 27

*Pennsylvania v. Trump*, 351 F. Supp. 3d 791 (E.D. Pa. 2019); ..................... passim

*Pima County Community College District v. EEOC*, No. 75-210, 1976 WL 548 (D. Ariz. Apr. 7, 1976)....................................................... 12

*Priests For Life v. HHS*, 772 F.3d 229 (D.C. Cir. 2014) ................................... 7

*Priests for Life v. HHS*, 808 F.3d 1 (D.C. Cir. 2015) ....................................... 9

*Real Alternatives, Inc. v. Sec'y HHS*, 867 F.3d 338 (3d Cir. 2017)............... passim

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017)....................................... 14

*Sharon Steel Corp. v. E.P.A.*, 597 F.2d 377 (3d Cir. 1979)........................................ 24, 25, 28

*Sharpe Holdings, Inc. v. HHS*, 801 F.3d 927 (8th Cir. 2015).................................................... 6

*Telocator Network of Am. v. F.C.C.*, 691 F.2d 525 (D.C. Cir. 1982)..................................... 20

*United States v. Reynolds*, 710 F.3d 498 (3d Cir. 2013).......................................................... 27

*United States v. Vastola*, 989 F.2d 1318 (3d Cir. 1993) ........................................................... 4

*United States v. Virginia*, 518 U.S. 515 (1996) ...................................................................... 13

*Univ. of Notre Dame v. Burwell*, 786 F.3d 606 (7th Cir. 2015) ........................................... 7, 8

*Util. Solid Waste Activities Grp. v. E.P.A.,* 236 F.3d 749 (D.C. Cir. 2001) .......................... 26

*Washington v. Azar*, No. 19-3040, 2019 WL 1868362 (E.D. Wash. Apr. 25, 2019) ......................................................................................................................................... 10

*Zubik v. Burwell*, 136 S. Ct. 1557 (2016) ............................................................................ 7, 8

**Statutes**

18 U.S.C § 1681(a) ................................................................................................................... 11

18 U.S.C. § 1681(a)(6) ............................................................................................................. 11

18 U.S.C. § 1681(a)(8) ............................................................................................................. 11

18 U.S.C. § 1681(a)(9) ............................................................................................................. 11

42 U.S.C. § 18114(1) ............................................................................................................... 10

42 U.S.C. § 2000e(k) ............................................................................................................... 11

42 U.S.C. § 300gg-13(a) ............................................................................................................ 2

42 U.S.C. § 300gg-13(a)(4) .............................................................................................. 2, 3, 13

5 U.S.C. § 553(b) ..................................................................................................................... 24

5 U.S.C. § 553(c) ..................................................................................................................... 24

5 U.S.C. § 553(d) ..................................................................................................................... 24

5 U.S.C. § 701 .......................................................................................................................... 10

5 U.S.C. § 706(2) ..................................................................................................................... 29

5 U.S.C. § 706(2)(A)........................................................................................................... 12, 20

5 U.S.C. § 706(2)(E) ............................................................................ 20

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq* ............................................. 5

**Other Authorities**

Br. for the Fed. Defs., *Texas v. United States*, No. 19-1011 (5th Cir. May 1, 2019) ............................................................................ 5

Br. for the Resp'ts, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) ................................ 8

Compl., *Little Sisters of the Poor Home for the Aged v. Sebelius*, No. 13-2611 (D. Colo. Sept. 24, 2013) ............................................................ 4

S. Rep. No. 79-752 (1945) ............................................................ 26

*Such*, Merriam-Webster Dictionary ............................................... 3

**Constitutional Provisions**

U.S. Const. amend. I ............................................................ 14

## INTRODUCTION

Plaintiffs the Commonwealth of Pennsylvania and the State of New Jersey (the "States")
respectfully submit this opposition to the motions for summary judgment filed by Defendants
and Intervenor in the above matter, and reply in support of the States' motion for summary
judgment. Since its inception, this case has been about two sweeping rules that authorize
virtually any employer, college or university, or other health plan sponsor to deny women access
to necessary preventive care. These rules deny women access to the "full and equal"
contraceptive care to which Supreme Court has recognized Congress entitled them, and instead
allow employers to impose their own views on their employees. In so doing, they treat
contraception—and women's healthcare generally—as a second-class service.

Despite the best efforts of Defendants and Intervenor to focus on other matters, nothing
in their motions changes these basic realities. The Rules were invalidly issued; they violate
federal statutes; they are discriminatory; and they unlawful impose the religious views of
employers on their employees. For all these reasons, they should be struck down.

## DISCUSSION

**I.    THE RULES ARE INCONSISTENT WITH THE ACA AND NOT AUTHORIZED
BY RFRA**

### A.    The Rules Violate the ACA

This Court has twice held that the Rules are inconsistent with the requirements of the
Women's Health Amendment. *See Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 821 (E.D. Pa.
2019); *Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 579 (E.D. Pa. 2017). Defendants and
Intervenor offer no persuasive justification for disturbing those previous decisions, instead
largely repeating the same arguments the Court previously rejected. The language of the
Women's Health Amendment is mandatory: groups health plans and health insurance issuers

"shall, at a minimum, provide coverage for and shall not impose any cost sharing requirements for" preventive services for women identified by HRSA. 42 U.S.C. § 300gg-13(a)(4). As the Court has recognized, the statute grants HRSA the discretion to identify *what* preventive services must be covered, but it does not allow it to determine *who* must provide those services.[1] 351 F. Supp. 3d at 817. The *who* is clear: any "group health plan and a health insurance issuer offering group or individual health insurance coverage." And in case the use of "shall" was not clear enough, Congress added "at a minimum" to drive the point home.

Defendants fall back on their arguments that the phrases "for purposes of this paragraph" and "as provided for" confer upon the Agencies the discretion to go beyond the "what" and determine the "who." Defs. Br. 11–12. They do not explain how they read such discretion into "for purposes of this paragraph"—particularly since the "paragraph" in question only addresses the "what," while the "who" is set forth in the introductory language of 42 U.S.C. § 300gg-13(a) and applies equally to the four paragraphs that follow. Defendants and Intervenor do not dispute that the requirements of paragraphs (1) through (3) are mandatory, and offer no explanation of how the introductory language means different things applied to different provisions.

As to "as provided for," this Court has previously determined that the language simply reflected an acknowledgement that the relevant guidelines did not exist at the time Congress enacted the Women's Health Amendment, which explains why "as" was omitted from previous paragraphs in § 300gg-13(a), which referenced guidelines that *did* exist. 351 F. Supp. 3d at 820. And even if the Agencies' reading of "as" were correct, it still does not support their ultimate

---

[1] Intervenor confuses this distinction, arguing that HRSA's decision to require (for instance) coverage of mammograms only for women over 40 somehow suggests that HRSA's discretion is broader than this Court previously recognized. Int. Br. 13. But "mammograms for women over 40" is an example of *what* must be covered; it does not change the *who* in any way.

conclusion that the paragraph grants them authority to dictate the *who* as well as the *what*.
Paragraph (4) requires plans to cover "with respect to women, *such* additional preventive care
and screenings not described in paragraph (1) *as provided for* in [HRSA guidelines]" § 300gg-
13(a)(4) (emphasis added). Here, "such" means "of a kind or character to be indicated or
suggested."[2] The phrase "as provided for" and all that follows are doing the indicating—that is,
they answer the question posed by "such" of what "additional preventive care and screenings not
described in paragraph (1)" are required to be covered (i.e., those HRSA includes in guidelines).
So under any interpretation, HRSA's authority extends only to the *what*, not the *who*. And
because the statute is clear, the Agencies' reliance on *Chevron* is of no use to them. *Chevron v.
NRDC*, 467 U.S. 837 (1984). *Chevron* applies to reasonable agency interpretation of ambiguous
statutes; it is not a license to disregard the rules of grammar.

 Finally, Intervenor repeats its arguments that the States' rationale would threaten the
legality of the preexisting church exemption and accommodation, and that this fact requires the
Court to uphold the Rules. In *Real Alternatives*, the Third Circuit discussed the church
exemption at length and found that it was consistent with the "longstanding governmental
recognition of a particular sphere of autonomy for houses of worship," *Real Alternatives, Inc. v.
Sec'y HHS*, 867 F.3d 338, 350 (3d Cir. 2017) (quoting J.A. 195), relying on cases such as
*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012).
Intervenor asserts that this doctrine (often referred to as the "ministerial exception") is a "poor
fit," Int. Br. 16–17, but it never actually answers whether it believes that it provides authority for
the church exemption. In its original lawsuit challenging the mandate, however, Intervenor
argued that the doctrine *did* require exemptions for religious institutions—it just claimed that it

---

[2] *Such*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/such.

required a broader exemption than the original church exemption. *See* Compl., *Little Sisters of the Poor Home for the Aged v. Sebelius*, No. 13-2611 Count VI (D. Colo. Sept. 24, 2013) (alleging "Interference in Matters of Internal Religious Governance"); *see also id.* ¶ 243 ("The Final Mandate's narrow exemption for 'religious employers' but not others discriminates among religions on the basis of religious views or religious status."); *id.* But it ultimately chose not to press these claims.

The States do not take a position on this question, because it is completely beside the point in this lawsuit. Rather, the above discussion simply confirms the correctness of this Court's determination that"[w]hether a party could have brought a successful challenge to the procedures followed in the past is not before the Court." 351 F. Supp. 3d at 815. The States here seek vacatur of the Rules because the agencies had no authority to issue them. These repeated attempts to make this case about everything but the legality of the Rules only highlight just how weak the legal justifications provided for them actually are.

## B.  The Federal Defendants Are Estopped from Arguing that the Rules Are Authorized by the ACA

Although the Court should reject Defendants' argument on its merits, Defendants should also be estopped from continuing to defend the Rules on the ground that they are authorized by the Affordable Care Act. As the Third Circuit has long recognized, the equitable doctrine of judicial estoppel "prevents a party from assuming a position inconsistent with one which it took in a prior proceeding." *McCarron v. F.D.I.C.*, 111 F.3d 1089, 1097 (3d Cir. 1997) (citation omitted). The doctrine exists "to prevent a party from playing 'fast and loose' with courts by asserting contradictory positions." *Id.* (citing *United States v. Vastola*, 989 F.2d 1318, 1324 (3d Cir. 1993)). While asserting in this case that the ACA contains a "positive grant of authority" to

issue the Rules, Defendants have claimed elsewhere that the ACA "is invalid in its entirety." Br.

for the Fed. Defs., *Texas v. United States* at 18, No. 19-1011 (5th Cir. May 1, 2019).

To be clear, the States wholeheartedly disagree with the argument Defendants have

advanced in *Texas*. The ACA is constitutional, period. But Defendants cannot have it both ways:

while arguing in *Texas* that the ACA is invalid in its entirety, Defendants cannot simultaneously

maintain the position in this case that the ACA provides them with a "positive grant of authority"

to enact the Rules.

The States have consistently disagreed with the Agencies' prior position that the ACA

grants them authority for the Rules. Specifically, the States have argued, and the Court has

agreed, that the plain terms of the ACA do not allow the Agencies to grant broad exemptions

from Congress's clear mandate. And the Agencies, at least according to their position in *Texas*,

now apparently agree that the ACA does not grant them authority for the Rules. The fact that the

Agencies arrive at this conclusion through different logic is irrelevant: if the ACA is perfectly

valid but does not authorize the Rules (as the States contend), the Rules must be struck down; if

it is not valid (as the Agencies contend), they must also be struck down. Either way, the States

should prevail in this case.

### C. The Religious Exemption Rule Is Not Authorized by RFRA

In defending the Rules as a legitimate exercise of the Agencies' authority under the

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*. Defendants and Intervenor

disregard the fact that the mandate derives from an act of Congress, which make the provision of

preventive services to women mandatory for covered health plans. Whatever authority agencies

may derive from RFRA, it does not give them the power to create wholesale exemptions from federal law based upon their own unsupported views about what RFRA requires.[3]

### 1. The Accommodation Does Not Impose a Substantial Burden

The Agencies' assertion that the Religious Exemption Rule is required by RFRA is premised on their conclusion that the accommodation imposed a substantial burden on religious exercise. *See* Defs. Br. 16. Their analysis on this point was extremely brief—occupying slightly more than one column in the *Federal Register*, J.A. 11—and cited only two cases: *Hobby Lobby* (which took pains not to address this question), and a decision of the Eighth Circuit that the Agencies fail to mention was vacated by the Supreme Court. *See Sharpe Holdings, Inc. v. HHS*, 801 F.3d 927 (8th Cir. 2015), *cert. granted, judgment vacated sub nom. HHS v. CNS Ministries*, No. 15-775, 2016 WL 2842448, at *1 (May 16, 2016).

Defendants attempt to shore up the conclusions of the Rule by suggesting that little analysis on this point was required. They assert it is "not for the courts to question the determination by certain entities that the accommodation requires them to violate the tenets of their faith by making them complicit in the provision of contraceptive coverage." Defs. Br. 17. But the Third Circuit has reached the opposite conclusion: It has held that the existence of a substantial burden is "the threshold inquiry posed to any individual attempting to bring a successful RFRA claim, and it is undoubtedly for the court to answer whether it has been satisfied." *Real Alternatives*, 867 F.3d at 358. And in assessing whether government action imposes a substantial burden, "the connection between the conduct and the religious belief

---

[3] Even Defendants do not go so far as to advance the argument made by Intervenor that the Agencies' conclusions in the Rules can be justified based on the Agencies' own decision, following the issuance of the IFRs, not to contest RFRA challenges to the mandate, leading to unopposed injunctions entered in those cases. *See* Int. Br. 26–29.

matters, for the law distinguishes between direct participation and remote facilitation, treating the former as compelling and the latter as negligible." *Id.* at 361 (cleaned up). Thus, while plaintiffs in *Real Alternatives* alleged that their "sincerely held religious beliefs prohibit them from using, supporting, or otherwise advocating the use of abortifacients, or participating in a health insurance plan that covers such items for themselves or their families," *id.* at 346, the court nevertheless concluded that such assertions did not establish a substantial burden, *id.* at 363.

Thus, while courts may not question the reasonableness of a person's religious beliefs, they are required to assess whether the government action at issue imposes a substantial burden on those beliefs. And here, eight of nine circuits to address the issue before *Zubik* held that the accommodation did *not* impose a substantial burden.[4] They did so because, as the Third Circuit recognized in *Geneva College*, [f]ederal law, rather than any involvement by the appellees in filling out or submitting the self-certification form, creates the obligation of the insurance issuers and third-party administrators to provide coverage for contraceptive services." 778 F.3d at 437.[5]

---

[4] *Geneva Coll. v. Sec'y HHS*, 778 F.3d 422 (3d Cir. 2015); *Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151 (10th Cir. 2015); *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015); *E. Texas Baptist Univ. v. Burwell*, 793 F.3d 449, 452 (5th Cir. 2015); *Michigan Catholic Conference & Catholic Family Servs. v. Burwell*, 807 F.3d 738 (6th Cir. 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 618 (7th Cir. 2015); *Eternal Word Television Network, Inc. v. Sec'y HHS*, 818 F.3d 1122 (11th Cir. 2016); *Priests For Life v. HHS*, 772 F.3d 229 (D.C. Cir. 2014). All of these decisions were vacated by the Supreme Court in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

[5] Intervenor repeats the claim that *Geneva College* "was procured on incorrect facts, which the government later admitted." Int. Br. 21. It appears to base this assertion largely on a sentence from the government's brief in *Zubik*, which is contained in a longer description of the mechanics of the accommodation. That sentence addresses—with respect to self-insured plans only—the legal status under ERISA of the contraceptive coverage administered by the plan's third-party administrator. The longer passage reads as follows, with the language quoted by Intervenor underlined:

> Nor does the government, in fact, provide contraceptive coverage using any "plan infrastructure" belonging to petitioners. If an objecting employer has an insured plan, the regulations provide that the insurer must "[e]xpressly *exclude*

It quoted approvingly Judge Posner's conclusion in *Notre Dame* that "[f]ederal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured plans, to cover contraceptive services." 743 F.3d at 554. While *Zubik* vacated these decisions, it did nothing to call into question their logical underpinnings. If the substantial burden analysis were as Defendants suggest—and essentially

> contraceptive coverage from the group health insurance coverage provided in connection with the group health plan" and must instead "[p]rovide separate payments" for contraceptive services. If an objecting employer has a self-insured plan subject to ERISA, the Departments' authority to require the TPA to provide contraceptive coverage derives from ERISA. As a result, the <u>coverage</u> provided by the TPA is, as a formal ERISA matter, <u>part of the same "plan" as the coverage provided by the employer</u>. But an ERISA plan in this sense is simply "a set of rules that define the rights of a beneficiary and provide for their enforcement." The rules governing contraceptive coverage are established by the government, not the employer, and the employer does not fund, control, or have any other involvement in that separate coverage—instead, the TPA alone does so.

Br. for the Resp'ts, *Zubik*, 136 S. Ct. 1557. at 38-39 (footnotes and citations omitted) (cited in Int. Br. 21). It is not clear how the underlined language (or any of the other passages cited by Intervenor) can be fairly read as an admission by the government that it had "procured" an earlier judicial decision on "incorrect facts," particularly since Intervenor has not pointed to any specific earlier statements from the government contradicting the above assertion. Nor does Intervenor explain why the status of contraceptive coverage "as a formal ERISA matter" is relevant to the substantial burden analysis, particularly given the subsequent statement that "[t]he rules governing contraceptive coverage are established by the government, not the employer, and the employer does not fund, control, or have any other involvement in that separate coverage—instead, the TPA alone does so" (as well as the fact that it does not apply to self-insured plans at all). And, finally, if the government's concession was so fatal to its case (and contradicted its earlier claims to the Third Circuit), it is surprising that the Supreme Court did not even mention that fact in *Zubik*, much less rely on it to rule against the government. (Referring to this "concession," Intervenor falsely asserts, "The Supreme Court itself recognized the government's 'substantial clarification and refinement' in its position . . ." Int. Br. at 23 (quoting *Zubik*, 136 S. Ct. at 1560). But the quoted language actually referred to "the substantial clarification and refinement in the positions of *the parties*" (emphasis added), *which included Intervenor*, and it did so in reference to their responses to the Court's request for post-argument supplemental briefing and not based on any prior "concession" from the government.)

As a result, it is difficult to see how this argument is relevant to this case, which is about the legality of the Rules issued by Defendants. Regardless, Intervenor recently made the same argument to a panel of the Third Circuit, which included a member of the *Geneva College* panel. So presumably if that court agrees that it was misled by the government, it will so state.

required courts to accept plaintiffs' assertions—it is hard to see why eight circuits got the question so wrong, and why the Supreme Court in *Zubik* did not at least point out that the decisions were so off-base.

### 2. The Agencies Wrongly Concluded that the Mandate Does Not Serve a Compelling Interest

Even if the accommodation were found to impose a substantial burden, it would still be permissible under RFRA because the government has a compelling interest in providing women with "full and equal" access to contraceptive coverage, and the accommodation is the least restrictive means of doing so. Defendants offer little basis for challenging the latter conclusion, and the arguments they offer with respect to the former amount to a recitation of what they argued in the Rules. But as discussed below, *see infra* Part VI.A, the Agencies' conclusions with respect to the safety and efficacy of contraception are deeply flawed and certainly cannot justify an about-face on such a critical issue as to whether the mandate does serves a compelling interest.

In fact, prior to the IFRs, the existence of a compelling interest went largely unquestioned. The *Hobby Lobby* majority assumed without deciding that such an interest exists. *Burwell v. Hobby Lobby*, 573 U.S. 682, 728 (2014). Justice Kennedy and the four dissenters both emphasized this point. *Id.* at 737 (Kennedy, J., concurring) ("It is important to confirm that a premise of the Court's opinion is its assumption that the HHS regulation here at issue furthers a legitimate and compelling interest in the health of female employees."); *id.* at 761 (Ginsburg, J., dissenting); *see also Priests for Life v. HHS*, 808 F.3d 1, 23 (D.C. Cir. 2015) (Kavanaugh, J.) ("In light of the numerous benefits that would follow from reducing the number of unintended pregnancies, it comes as no surprise that Justice Kennedy's opinion expressly referred to a 'compelling' governmental interest in facilitating women's access to contraception."). Given this

precedent—and the lack of sufficient scientific evidence in the Rules to overturn the Agencies'

prior consensus—the Agencies' conclusion cannot be justified.

## II.     THE RULES CREATE UNREASONABLE BARRIERS TO MEDICAL CARE

Section 1554 of the ACA bars the Secretary of HHS from issuing any regulation that

"creates any unreasonable barriers to the ability of individuals to obtain appropriate medical

care." 42 U.S.C. § 18114(1).[6] As the States explained, the Rules do just that, by making it more

difficult for women to obtain care to which they are legally entitled. Pls. Br. 20–21. In response,

Defendants do not try to dispute that the Rules will make it more difficult for some women to

obtain contraceptive care. Rather, they argue that the Rules reflect a "'decision not to impose a

governmental mandate,'" and therefore do not violate this provision. Defs. Br. 19 (quoting J.A.

17).[7] Intervenor makes virtually the same argument, asserting that the Agencies merely "fail[ed]

to extend a mandate." Int. Br. 29.

But that is not what happened at all. Congress enacted the Women's Health Amendment,

which required health plans to cover preventive services for women, and it directed HRSA to

---

[6] In their opening brief, the States discussed three recent decisions relying on Section 1554 to enjoin regulations governing Title X clinics. Pls. Br. 20-21 (citing *Oregon v. Azar*, No. 19-317, 2019 WL 1897475, at *12 (D. Or. Apr. 29, 2019); *California v. Azar*, No. 19-1184, 2019 WL 1877392, at *23–26 (N.D. Cal. Apr. 26, 2019); *Washington v. Azar*, No. 19-3040, 2019 WL 1868362, at *7 (E.D. Wash. Apr. 25, 2019)). Those injunctions were stayed by the Ninth Circuit after the States filed their brief. *California v. Azar*, No. 19-15974, 2019 WL 2529259 (9th Cir. June 20, 2019). Plaintiffs-Appellees in those cases have petitioned for *en banc* review of the decision staying the injunctions.

[7] Defendants attempt to write this provision out of the law entirely by arguing that claims under section 1554 are "not reviewable under the APA at all." Defs. Br. 19. But the exception to the APA's presumption of justiciability they cite is "very narrow" and applies only when decisions are "'committed to agency discretion by law.'" *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quoting 5 U.S.C. § 701). It makes no sense to suggest that compliance with the requirements of section 1554—all of which are limits on the agency's authority—is nonetheless "committed to agency discretion by law."

determine which preventive services plans must cover. HRSA concluded that contraception was one such service. So the Rules reflect the Agencies' choice to allow certain plan sponsors to *deny* women the benefits of the Mandate—rather than a decision "not to impose" a mandate in the first place.

## III.   THE RULES VIOLATE TITLE VII AND SECTION 1557 OF THE ACA

The Rules violate Title VII of the Civil Rights Act as well as section 1557 of the ACA, both of which prohibit discrimination on the basis of sex.[8] Because discrimination on the basis of sex includes "pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000e(k), if an employer "decides to offer a prescription plan covering everything except a few specifically excluded drugs and devices, it has a legal obligation to make sure that the resulting plan does not discriminate based on sex-based characteristics and that it provides equally comprehensive coverage for both sexes." *Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1272 (W.D. Wash. 2001). But here, the Rules specifically authorize employers to exclude from coverage drugs and devices for women—and only women.

---

[8] Intervenor argues that section 1557 should be read to incorporate the exemption for religious organizations set forth in Title IX, relying on *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 690 (N.D. Tex. 2016). The district judge in that case held that section 1557's prohibition of discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972" must incorporate the exceptions set forth in Title IX, because Congress used the phrase "et seq." in a parenthetical citation to the U.S. Code. *Id.* Notwithstanding Congress's clear reference to "the ground prohibited under . . . title IX" (i.e., "on the basis of sex," 18 U.S.C § 1681(a)), the *Franciscan Alliance* court held that the use of "et seq." in the parenthetical "can only mean Congress intended to incorporate the entire statutory structure, including the abortion and religious exemptions." 227 F. Supp. 3d at 690–91. (There are several other exceptions in Title IX, including those for "fraternities and sororities," "father-son or mother-daughter activities," and "scholarship awards in 'beauty' pageants." § 1681(a)(6), (a)(8), (a)(9).) The States submit that the better reading of this provision is that Congress intended to incorporate only the "ground prohibited under" Title IX, which is why it used those precise words.

Defendants simply miss the point of the States' Title VII claim. Because the Rules allow employers to engage in such discrimination by denying women access to required preventive services, they must be invalidated under the APA. Defendants' argument to the contrary implies that they are free to issue regulations permitting employers to discriminate on the basis of sex, without being subject to legal challenge. But the APA requires courts to strike down agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A). The fact that Title VII provides a separate right of action for employees who have suffered discrimination does not preclude actions under the APA alleging that an agency has undertaken action "not in accordance" with that provision.[9] *Pima County Community College District v. EEOC*, No. 75-210, 1976 WL 548 (D. Ariz. Apr. 7, 1976), demonstrates that claims alleging violations of Title VII can be brought under the APA. In that case, the court allowed an employer to pursue an APA claim against the EEOC, arguing that the agency had not followed the requirements of Title VII in the way it handled discrimination claims brought by several of its employees. *Id.* at *2. Here, the States allege that the Rules are "not in accordance" with Title VII and therefore must be struck down under the APA.

The Women's Health Amendment was enacted to address the "fundamental inequity in the current system" and to stop the "punitive practices of insurance companies" toward women. J.A. 2437, 2378. The Institute of Medicine entitled its report "Closing the Gaps," precisely because then-existing guidelines for preventive services were not written with women in mind and therefore left out certain essential services for women. J.A 313–561. The Rules, however, deny some women the equal treatment the Amendment sought to require. In fact, the President's

---

[9] For the same reason, Defendants' claim that the States have an adequate remedy at law under Title VII itself has no merit. *See* Defs. Br. 22.

Executive Order specifically directed the Agencies to consider issuing regulations that address objections to those services provided under the Women's Health Amendment, but said nothing about any other services mandated by the ACA or any other law. J.A. 167. So Defendants' claims that the Rules do not authorize discrimination on the basis of sex ring hollow. As a result, they violate the prohibitions on such discrimination in Title VII and section 1557 of the ACA.

## IV.   THE RULES VIOLATE THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT

Equal protection jurisprudence has consistently held that all gender-based classifications require "an exceedingly persuasive justification" in order to survive heightened judicial scrutiny. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 137 (1994) (citing *Administrator of Mass. v. Feeney*, 442 U.S. 256, 273 (1979)). The government must demonstrate that "the [challenged] classification serves important governmental objectives" and that its discriminatory means are "substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Rather than trying to meet that burden, however, the Agencies ignore the clear discriminatory means employed by the Rules and twist the States' equal protection claim into what they deem a "disparate impact" argument. Defs. Br. 24.

The Rules clearly single out women with a laser-like focus that is readily apparent in the record. By explicitly referencing *only* preventive care and services for women in § 300gg-13(a)(4), the Rules noticeably leave untouched male-specific and gender-neutral healthcare services. *See Harris v. McCrae*, 448 U.S. 297, 323 n. 26, 326 (1980) (holding that the equal protection component of the Fifth Amendment prohibits "purposeful discrimination"). Despite their insistence that the Rules "do not discriminate against women on the basis of sex" (Defs. Br. 24), even now the Agencies fail to provide any meaningful justification for their targeting of women's health care to the exclusion of other services—let alone an "exceedingly persuasive"

13

justification. *See J.E.B.*, 511 U.S. at 137; *see also Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689–90 (2017) (same).

## V.     THE RELIGIOUS EXEMPTION RULE VIOLATES THE ESTABLISHMENT CLAUSE

The First Amendment's Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Religious Exemption Rule violates the Establishment Clause because it favors the religious convictions of a vast group of employers and plan sponsors by granting them absolute power to impose substantial burdens on employees who do not share their religious beliefs. *See Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (recognizing as "a fundamental principle of the Religious Clauses" that "[t]he First Amendment . . . gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities"); *Real Alternatives*, 867 F.3d at 364.

The Agencies readily emphasize the religious focus of the Religious Exemption Rule in arguing against the States' equal protection claim; yet they retreat from that position when addressing the Establishment Clause claim. Defs. Br. 26. By its own terms, the Religious Exemption Rule aims to protect "religious beliefs[] in the context of health care and human services," J.A. 3 (final Rule), and "individuals and entities with sincerely held religious beliefs in certain health care contexts." J.A. 99 (IFR). The Executive Order similarly signaled its commitment to "vigorously enforce Federal law's robust protections for religious freedom." J.A. 167. And as is clear from the record evidence, the Rules are not grounded in either evidence or science. *See* Pls. Br. 33–35. Thus, the Agencies cannot now argue that the Rules do not "promote religion in general." Defs. Br. at 26.

The Agencies suggest that there is no Establishment Clause violation resulting in an undue burden on women because the government was not obligated to impose a mandate for contraceptive coverage. *See* Defs. Br. 27. But they cite no case which suggests that a Rule permitting women to be denied necessary preventive services mandated by Congress is not a "burden" on those women who lose that coverage.[10] And the Intervenor's contention that "dozens of courts have held" that the Final Rule "lifts a significant state-imposed burden on religious exercise," Defs. Br. 35, ignores the eight of nine Circuit Courts that had found to the contrary, *see supra note* 4, and instead relies on cases that the government failed to defend.

In sum, the Religious Exemption Rule impermissibly favors religious employers and plan sponsors over employees who do not share their religious beliefs, and does so in a manner that exceeds any reasonable accommodation. *See Cutter v. Wilkinson*, 544 U.S. 709, 710 (2005) ("An accommodation must be measured so that it does not override other significant interests."); *Estate of Thornton*, 472 U.S. at 709 (holding that a State statute violated the Establishment Clause where "religious concerns automatically control[led] over all secular interests a the workplace" and the statute took no account of the interest of employees who did not share that religious view). Accordingly, the Religious Exemption Rule violates the Establishment Clause, and the States' are entitled to summary judgment on this claim.

---

[10] The Agencies' reliance on *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987), is misplaced. *Amos* upheld the grant of a religious exemption to Title VII's prohibition on religious discrimination in employment. In doing so, the Court noted that the first prong of the *Lemon* test was satisfied because the exemption alleviated "significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.* at 335. Unlike some decisions by certain religious organizations about who to hire and fire as an employee, the exemption here is not necessary to prevent significant government interference with a religious institution's ability to carry out its religious mission.

## VI.   THE RULES ARE ARBITRARY AND CAPRICIOUS

Defendants do not dispute that they have reversed their prior conclusion that
contraception is safe, effective, and beneficial for women. Defs. Br. 29–34. They do not dispute
that their prior position rested on factual findings contradicting their current conclusions, nor that
their prior position engendered serious reliance interests. *Id.* They do not dispute that the
overwhelming majority of comments, including all comments from leading medical
organizations, opposed the Rules as harmful to women's health and in contravention of science.
*Id.* 34–35. And they concede that their estimate of impacted women was "highly speculative," *id.*
36, even as they continue to defend the Rules as reasonable because they impact only "a very
small percentage of entities," *id.* 30, 33 n.13; *see also* J.A. 13–17 & n.26 (arguing that Rules will
impact "less than 0.1%" of all women in the United States and therefore will not unduly burden
third parties).[11]

Arbitrary and capricious review, though deferential, is not toothless. *See State Farm*, 463
U.S. at 43. When agencies reverse position on policies that rested on factual findings and
engendered serious reliance interests—as the Agencies did here—they must provide "a more
detailed justification," including a "reasoned explanation" for "disregarding facts and
circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television
Stations, Inc.*, 556 U.S. 502, 515 (2009).[12] The Agencies must also "respond in a reasoned
manner" to all public comments "that raise significant problems." *Am. Coll. of Emergency*

---

[11] Intervenor likewise does not dispute these points, nor any of the States' specific
arguments, Pls. Br. 31–40, as to why the Rules are arbitrary and capricious. *See* Int. Br. 30–32.
The Intervenor's affirmative arguments as to why the Rules are not arbitrary and capricious, *id.*,
are meritless. *See supra* Part I.C & n.5.

[12] The Agencies dispute that this standard even applies, Defs. Br. 29, though they do not
refute that the necessary preconditions exist.

*Physicians v. Price*, 264 F. Supp. 3d 89, 94 (D.D.C. 2017) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003)). The Agencies must also explain why they have "exercised [their] discretion in a given manner," and their explanation must enable this Court "to conclude that the agenc[ies'] action was the product of reasoned decisionmaking." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (cleaned up). The Rules fail to satisfy all three requirements.

### A. The Agencies Fail to Provide Reasoned Explanations for Reversing Position on the Safety, Efficacy, and Benefits of Contraception.

Defendants' defense of their decisionmaking, Defs. Br. 29–31, epitomizes their arbitrary and capricious reasoning. First, Defendants rely on that a 2017 study they claim found no evidence that the mandate led "to an increased use of more effective methods from less effective methods." Defs. Br. 30, 34; J.A. 20 & n.51. But the study actually showed the opposite: an increase in the use of the most effective methods from 6 percent in 2008, to 12 percent in 2012, to 14 percent in 2014. J.A. 2650, 2652. Although the study noted that the role of the mandate in these early years "remain[ed] unclear," the study concluded that contraceptive use is shifting towards the most effective methods, which "underscore the importance of ensuring full access to the broad range of methods available." J.A. 2654, 2650. The Agencies did the opposite. Second, Defendants justify the Rules because they are only "exempting a very small percentage of entities" and therefore not negatively impacting many women. Defs. Br. 30; *see also id.* 33 n.13[13]; J.A. 13–17 & n.26. But only six pages later, Defendants rebuff these estimates as grounded on "inadequate data" and using "highly speculative" assumptions. Defs. Br. 36.

---

[13] Contrary to the Agencies' statement, Defs. Br. 33 n.13, the States dispute both that the Final Rule impacts only a small number of women and that denying even a small number of women contraceptive coverage will not have negative health or equity effects.

Defendants cannot have it both ways. Finally, Defendants justify a broad, categorical moral exemption by pointing to just two nonprofit litigating employers. Defs. Br. 30–31. But the existence of two nonprofit objectors does not explain the need for a categorical moral exemption for all closely held for-profits, institutes of higher education, health insurance issuers, individuals, and nonprofits. Nor does it follow that because these two nonprofits hired employees with similar views, all potential moral objectors will likewise employ people who would, "by definition, not want contraceptive coverage." Defs. Br. 31. Even Defendants' strongest examples of reasoned decisionmaking fall flat.

In responding to the States' specific criticisms, Defendants attempt a sleight of hand: they are not actually concluding anything about the safety, efficacy, or benefits of contraception, but instead simply explaining the importance of providing conscience-based exemptions. Defs. Br. 31–33. The Court should not be fooled. In a section titled "Health Effects of Contraception and Pregnancy," the Agencies declined to "take a position on the variety of empirical questions discussed above"—empirical questions such as, are contraceptives safe, are contraceptives abortifacients, and has access to contraception helped lower teen pregnancy. J.A. 17–20, 73–75. All of these are questions on which Agencies *had previously* taken a position. Pls. Br. 31–36 (yes, no, yes). The Agencies' sudden disinterest in addressing fundamental facts about a women's preventive healthcare—and indeed, their assertion that these facts are even in dispute— is a clear divergence that requires a reasoned explanation. Federal agencies cannot manufacture a scientific debate where none existed, then used that manufactured debate to justify a policy reversal.

Defendants' more specific arguments fare no better. First, Defendants do not dispute that each method of contraception—like every medication—must be prescribed individually. *See,*

*e.g.*, J.A. 651, 2344–45. But they justify the Rules by treating all methods of contraception categorically: "the benefits of [all] contraceptives are more uncertain than previously recognized." Defs. Br. 31, 33. The fallacy of this categorical assessment is borne out by the Agencies' own citations: almost three-quarters of the cited articles address the side effects of oral contraception, which represents only three of the sixteen FDA-approved contraceptive methods. *Compare* J.A. 17–18 nn.28–34, *with* Ex. 147. The rest address hormonal contraception more broadly, which still does not cover the spectrum of contraception covered by the mandate. *Id.* Second, Defendants' post hoc claim to have considered comments about Colorado's contraceptive equity law, Defs. Br. 34, cannot supersede the Rules themselves, which justified the exemptions in part because "public commenters did not point to studies showing those state mandates reduced unintended pregnancies." J.A. 20. As the States noted, Pls. Br. 36, several commenters provided just that data. Finally, Defendants do not dispute they are contradicting their earlier conclusions that cost-free access to contraception improves the social and economic status of women. Pls. Br. 35–36. That they assume only a small number of women will lose this access, Defs. Br. 33 n.13, has no bearing on whether contraception benefits women overall.

B.     **The Agencies Did Not Respond to Significant Comments.**

At the outset, the Court should reject Defendants' argument that this Court already determined they adequately responded to all significant comments. But this Court's prior finding found the States were not likely to succeed in arguing that the Agencies failed to address the several comments the States proffered in their preliminary injunction motion—which was filed well before the Agencies provided the administrative record. *See* 351 F. Supp. 3d at 811–12. The States are not precluded from challenging, at the summary judgment stage and with the benefit of the full record, the Agencies' responses to other significant comments. *See Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974).

Defendants also attempt to sidestep the more than 99 percent of public comments opposing the Rules. But although an agency need not move in lockstep with the weight of comments, the "[p]resence in the record of substantial quantities of adverse comment may signal clear error of agency judgment." *Telocator Network of Am. v. F.C.C.*, 691 F.2d 525, 538 n.106 (D.C. Cir. 1982). The ratio of comments is particularly relevant here because the Agencies relied on the existence of conscience-objecting commenters to justify the Rules. *E.g.*, J.A. 11 ("Various entities sincerely contended . . . in public comments, that complying with either the Mandate or the accommodation was inconsistent with their religious observance or practice. The Departments have concluded that withholding an exemption from those entities has imposed a substantial burden on their exercise of religion[.]"); J.A. 59 & n.5 (noting that commenters had supported a moral exemption prior to 2017). That the Agencies finalized the exemptions even though only 17 individuals or organizations supported them more than "signal[s] clear error of agency judgment."[14] The error is particularly stark for the Final Moral Exemption Rule because the Agencies have not pointed to a single commenter who expressed a non-religious moral objection to contraception.[15]

Defendants' reliance on *NRDC v. E.P.A.*, 822 F.2d 104, 122 n.17 (D.C. Cir. 1987), is inapt. That case addressed whether the number of comments, "without more," was relevant to a substantial evidence challenge under 5 U.S.C. § 706(2)(E), which applies only when agency factfinding takes place "on the record of an agency hearing." *Id.* The States instead argue that the Agencies were arbitrary and capricious in violation of § 706(2)(A) because they failed to respond

---

[14] Neither the Agencies nor Intervenor have pointed to any supportive comments beyond the 27 comments (representing 17 unique individuals or organizations) identified by the States.

[15] Only ten comments even supported the moral exemptions. Exs. 106, 111–113, 116–120.

to the significant fact that more than 99 percent of comments opposed the Rules, treated

comments in favor and in opposition as commensurate,[16] and finalized exemptions that only 17

individuals or organizations favored but hundreds of thousands opposed. *See Ass'n of Data*

*Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683

(D.C. Cir. 1984) (noting that agency action supported by substantial evidence can still be

arbitrary and capricious).

Defendants further dispute the significance of comments from leading American medical

organizations in a rulemaking affecting women's access to preventive healthcare. Defs. Br. 35.

But as the case cited by Defendants notes, "[s]ignificant comments are those which, if true, raise

points relevant to the agency's decision *and which, if adopted, would require a change in an*

*agency's proposed rule*." *City of Portland, Oregon v. E.P.A.*, 507 F.3d 706, 715 (D.C. Cir. 2007)

(cleaned up). The American medical community[17]—with expertise in healthcare, the subject of

these exemptions—unequivocally opposed the Rules and presented detailed evidence that, if

adopted, would have required the Agencies to rescind the Rules. *See* Pls. Br. 37. The Agencies

have not reasonably explained why they chose to run counter to medical consensus and instead

rely on law review articles. *See* J.A. 19 & n.42, 20 & n.53,

Defendants do not materially dispute the States' other contentions. They do not dispute

that they failed to address comments on the importance of contraceptive counseling. Pls. Br. 37.

Nor do they dispute that they failed to address comments explaining that state- and federal-

---

[16] For example, only a handful of comments challenged the safety, efficacy, and benefits of contraception. Exs. 111–113, 115–117, 119. Many more comments defended contraception. *E.g.*, Exs. 21–22, 27–29, 31, 34, 39, 41, 44, 49, 54, 61, 65, 66–68, 73–76, 78–81, 85, 86–92, 94, 102–105. Yet the Rules imply the existence of a genuine debate by repeatedly stating that "some commenters" said one thing while "other commenters" disagreed.

[17] The Agencies do not point to any comment by a medical association or health professional that supported the Rules.

funded programs have insufficient capacity to meet existing needs, must less absorb any increase due to women denied contraceptive coverage by their employers. *Id.*

### C.     The Regulatory Impact Analysis is Arbitrary and Capricious.

Defendants' attempts to explain the unsupported assumptions and omissions in their regulatory impact analysis, Defs. Br. 35–38, should also be rejected. First, Defendants admit their estimate of 209 accommodated entities was arbitrary—indeed, any number would have done. Defs. Br. 37 (stating that the number "provides added color or context" but ultimately served no purpose). But Defendants cannot so easily dismiss this figure. They explicitly reaffirmed 209 as "the best estimate available" for accommodated entities, J.A. 41, despite the more than doubling of employees and beneficiaries covered by accommodated insurance plans from 2015 to 2017, Pls. Br. 38–39. The Agencies also used this number when explaining why the Rules would not pose additional costs on third party administrators and issuers. J.A. 39. More fundamentally, the Agencies reached this estimate by adding the number of nonprofits challenging the accommodation with the number of closely held for-profit entities challenging the mandate. J.A. 40. Extrapolating the impact on woman using the number of litigating entities is a core part of the Agencies' impact analysis. J.A. 40–43. If this number is simply "color," then Defendants have called into question their entire methodology.

Second, Defendants provide no basis for assuming that *only one third* of private, non-publicly traded employers who did not cover contraception pre-ACA, were not self-insured church plans, and could not claim the church exemption would have a religious objection to contraception. Their calculation of 379,000 women of childbearing age who use contraception and work for these employers already incorporated the six percent of employers who knew they provided no contraceptive coverage. The Agencies explained that these six percent "may be more likely to have omitted such coverage on the basis of religious beliefs than were the 31

percent . . . who did not know whether the coverage was offered." J.A. 44 & n.103. The

Agencies declined to account for this 31 percent precisely because "these employers' lack of

knowledge . . . suggests that they lacked sincerely held religious beliefs specifically objecting to

such coverage." *Id.* Having already tilted the calculation in favor of religious objectors, the

Agencies' final elimination of two-thirds of these women is arbitrary.

Third, Defendants do not dispute that they lack evidence of any accommodated entity

publicly committing to continue using the accommodation in spite of the new exemptions,

rendering this assumption "highly speculative," Defs. Br. 36. *Compare* Defs. Br. 37–38, *with* Pls.

Br. 39. And finally, contrary to Defendants' assertion in their brief, the Rules did not determine

that the economic impact from the individual exemption "would be minimal because spouses and

dependents would likely share the faith of the policy holder."[18] Defs. Br. 36 (citing J.A. 33–34).

## VII.   THE RULES ARE PROCEDURALLY INVALID

This Court has previously held that the Agencies were not granted express statutory

authority to forego the procedures set forth in the APA; that they lacked good cause to do so; and

that the subsequent acceptance of post-promulgation comments did not cure their procedural

failings. *See* 281 F. Supp. 3d at 571–76; 351 F. Supp. 3d at 812–16. These decisions were

correct, and Defendants and Intervenor have provided no basis for reconsidering them.

### A.  The Acceptance of Post-Promulgation Comments Does Not Render the Rules Procedurally Valid

While they do not challenge the first two conclusions in any meaningful way, Defendants

continue to argue that their acceptance of post-promulgation comments justifies their failure to

---

[18] The States did challenge the individual exemption. If an individual claims an exemption, his or her female dependents will lose coverage. Ex. 149 ¶ 17. Some of these women will turn to state-funded programs and some will forgo contraception altogether, leading to an increased risk of unintended pregnancy. Am. Compl. ¶¶ 124–25, 146–53.

follow the APA's procedural requirements. Defendants are trying to have it both ways: After two courts enjoined the IFRs, they nevertheless continued to litigate their validity, with the goal of having the injunctions overturned and the IFRs reinstated immediately. At the same time, they took comments on the IFRs, so that they could turn around and assert that they had complied with the APA regardless of how those cases turned out. But that is not what the APA requires. Rather, the Agency must issue a Notice of Proposed Rulemaking, accept and consider comments on the NPRM, and then issue a final rule accompanied by an explanation—all *before* the final rule may go into effect. 5 U.S.C. § 553(b)–(d). But here, the IFRs went into effect on October 6, 2017, and were never withdrawn, and the Rules made only minor changes to them.

The Third Circuit's decisions in *Sharon Steel Corp. v. E.P.A.*, 597 F.2d 377 (3d Cir. 1979), and *NRDC v. EPA*, 683 F.2d 752 (3d Cir. 1982), make clear that this procedure does not satisfy the APA. Under similar facts, the *NRDC* court invalidated *both* the initial rule and the final rule at issue in that case, notwithstanding the agency's acceptance of post-promulgation comment. 683 F.2d at 767. It did not do so because of any circumstances that were unique to that case, but rather because a contrary determination "would allow [an agency] to substitute post-promulgation notice and comment procedures for pre-promulgation notice and comment procedures at any time by taking an action without complying with the APA, and then establishing a notice and comment procedure on the question of whether that action should be continued." *Id.* at 768. Such a result "would allow EPA to substitute post-promulgation notice and comment procedures for pre-promulgation notice and comment procedures at any time by taking an action without complying with the APA, and then establishing a notice and comment procedure on the question of whether that action should be continued," which "would allow agencies to circumvent *Sharon Steel* and the APA." *Id.*

24

Here, the process the Agencies chose to follow forced commenters to "come hat-in-hand and run the risk that the decisionmaker is likely to resist change." *Sharon Steel*, 597 F.2d at 381. As a result, they denied the States the opportunity for "effective participation in the rulemaking process while the decisionmaker is still receptive to information and argument." *Id.* Defendants rely on cases from other circuits in urging this Court to revisit its previous conclusion, but even those decisions recognize the risks inherent in such an approach. For instance, in *Levesque v. Block*, the First Circuit observed, "There is, of course, a difference between, on the one hand, mandating a post-promulgation comment period when exigent circumstances foreclose prior public comment … and, on the other hand, allowing post-promulgation comment to suffice when good cause did not exist, as in our case. When pre-promulgation comment is impossible, comment after the fact is better than none at all. When pre-promulgation comment is possible, however, *one does not want to encourage the circumvention of section 553 by accepting post-promulgation procedures*." 723 F.2d 175, 177 (1st Cir. 1983). If the process utilized in this case were held to be procedurally valid, there would be no reason for an agency to ever seek comments before issuing a rule.[19]

Defendants and Intervenor ignore this Court's earlier determination that the States would likely prevail on this claim "even under the more lenient open mind standard." 351 F. Supp. 3d at 816 n.19. Despite the overwhelming opposition to the Rules expressed by commenters, the Agencies made only a few "non-substantive technical revisions," *id.* (quoting J.A. 32), and

---

[19] Defendants and Intervenor both suggest that the Agencies' failure to comply with the APA should be excused because the IFRs were enjoined. *E.g.*, Defs. Br. 40. As discussed above, however, the Agencies continued to litigate the validity of the IFRs while they were purportedly reviewing comments on them. And it would be a perverse rule that justifies an agency's failure to comply with the APA specifically because a court has determined that the agency's actions were likely illegal.

nothing in the Rules demonstrates that they kept an open mind. *See id.*; *see also Levesque*, 723 F.2d at 188 (holding that post-promulgation comments are insufficient unless the agency puts forward "evidence of a level of public participation and a degree of agency receptivity that demonstrate that a real 'public reconsideration of the issued rule' has taken place"). Regardless of what standard is applied, the Agencies' procedures here fall short.

## B.     The Agencies Lacked "Good Cause" to Disregard the APA's Requirements

Intervenor continues to argue that the Agencies had "good cause" to bypass the APA's requirements. But its argument rests largely on claims this Court has already rejected as well as inaccurate claims about the legal landscape at the time the IFRs were issued.[20]

The "good cause" exception is to be "narrowly construed and only reluctantly countenanced," *Util. Solid Waste Activities Grp. v. E.P.A.,* 236 F.3d 749, 754 (D.C. Cir. 2001) (cleaned up), and its use "should be limited to emergency situations," *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) (citing S. Rep. No. 79-752 (1945)). In the IFRs, the Agencies themselves claimed that the need to eliminate "uncertainty caused by years of litigation and regulatory changes" established "good cause" that allowed them to dispense with notice and comment. J.A. 121.[21] But as this Court previously recognized, 281 F.

---

[20] For instance, Intervenor again argues that the Agencies' previous use of IFRs (or the use of IFRs by agencies more generally) renders the process the Agencies followed here per se legitimate. Int. Br. at 37, 42; *see also* 351 F. Supp. 3d at 815 (rejecting arguments). These issues were not before the Court at that time, and they are not before the Court now.

[21] Intervenor seems to take issue with the Agencies' characterization, claiming that the legal state of affairs prior to the issuance of the IFRs reflected "certainty, not uncertainty." Int. Br. 39. But as discussed above, prior to *Zubik*, eight of the nine circuits to address the issue had rejected the RFRA argument upon which the Agencies relied in the IFRs. Although the Supreme Court vacated these decisions, it did nothing to disturb their reasoning. Notwithstanding the nearly unanimous consensus of the courts of appeal prior to *Zubik*, Intervenor claims that "a cascade of injunctions" justified the Agencies' not only rejecting the logic of those eight courts of appeals but also dispensing entirely with the procedural requirements of the APA. Int. Br. 38.

Supp. 3d at 573, the Third Circuit has rejected this argument, finding, "The desire to eliminate uncertainty, by itself, cannot constitute good cause. To hold otherwise would have the effect of writing the notice and comment requirements out of the statute." *United States v. Reynolds*, 710 F.3d 498, 510 (3d Cir. 2013).

Intervenor nonetheless claims, relying on *Reynolds*, that the Agencies were justified in arguing that the need to resolve "outstanding issues" in pending litigation allowed them to dispense with notice and comment. Int. Br. 37 (quoting 82 Fed. Reg. at 47,814 & *Zubik*, 136 S. Ct. at 1560). But the statement in *Reynolds* on which they rely was instead an acknowledgement that the Third Circuit had "recognized urgency alone as sufficient [to establish good cause] *only* when a deadline imposed by Congress, the executive, or the judiciary requires agency action in a timespan that is too short to provide a notice and comment period." 710 F.3d at 511 (emphasis added). Here, there was no "deadline . . . requir[ing] agency action" to be completed before the Agencies could complete notice and comment rulemaking. In fact, the only "deadline" the Agencies cited in the IFRs as justification for disregarding the APA was a moving deadline to file a *status report* with the Seventh Circuit, J.A. 120, which is surely not what the *Reynolds* court had in mind.[22]

---

While its brief includes several string cites listing various injunctions, it does not explain which specific injunctions it contends provided justification for the Agencies' actions. Nor does it explain how many of the injunctions it relies on raised arguments that were fully resolved by the Supreme Court in *Hobby Lobby* (and thus irrelevant to the Agencies' decision to issue the IFRs); how many were pending on appeal at the time of the IFRs; and how many were previously reversed by decisions that were subsequently vacated by *Zubik*.

[22] Intervenor repeats the argument previously made by Defendants that the possibility that some objectors might wish to switch from "grandfathered" plans established good cause. Int. Br. 38 & n.20. The Court previously questioned Defendants about this assertion, and they could point to no support in the record for it. 281 F. Supp. 3d at 574 n.9. Under normal circumstances, the Court is not obligated to accept at face value agency assertions that are without evidentiary support. In this context—where the Agencies carry the heavy burden of showing that they satisfy the APA's stringent "good cause" requirement—there is even less reason to do so.

### C. The Agencies' Errors Were Not Harmless

Finally, the Agencies' errors were in no way "harmless." The Agencies' failure to comply with the APA's requirements prejudiced the States and all potential commenters because the Agencies approached the acceptance of comments with anything but an "open mind." By their own admission, they made "largely 'non-substantial technical revisions,' [to the IFRs] that Defendants concede 'do not alter the fundamental substance of the exemptions set forth in the IFRs.'" 351 F. Supp. 3d at 816 n.19 (citation omitted). By issuing binding regulations before taking comments on them, the Agencies forced concerned parties to "come hat-in-hand and run the risk that the decisionmaker is likely to resist change"—a concern borne out here by the very limited nature of the changes made in the Rules in the wake of overwhelming opposition to them. *Sharon Steel*, 597 F.2d at 381.

## VIII. THE STATES HAVE STANDING

On two occasions, this Court has examined the evidence in the record and concluded that the States have standing because the "Rules inflict a direct injury upon the States by imposing substantial financial burdens on their coffers." 351 F. Supp. 3d at 807. The Rules will lead women to lose contraceptive coverage, requiring them to seek such coverage from state-funded programs and thus imposing a direct financial cost on the States.[23] Defendants and Intervenor have also both moved to dismiss for lack of standing, and those motions are currently pending. Defendants do not raise standing in their current motion, except in a passing reference to their motion to dismiss. Defs. Br. 10 n.5. Intervenor briefly discusses standing, but it largely repeats arguments this Court has previously rejected. Int. Br. 10–11.

---

[23] *See* Exs. 178–181; 184–189 (declarations setting forth bases for States' standing).

Intervenor does contend, however, that a recent class action decision by a court in the Northern District of Texas in *DeOtte v. Azar*, No. 18-825 (N.D. Tex. June 5, 2019), "has made it impossible for this Court to redress any injury" the States face. Int. Br. 11. *DeOtte* was only issued this month and remains subject to appeal. As with other cases challenging the Mandate, the government did not put up any substantive defense. Even so, the decision raises several serious questions. For instance, there are serious questions as to whether the court had jurisdiction at all or whether the claims are barred by the statute of limitations. The class definitions are arguably vague and overbroad, and would seem to encompass many plaintiffs whose claims are barred by *re judicata*—including some of the plaintiffs in *Real Alternatives*. The decision also relies on the same factually flawed argument Intervenor have made here regarding the government's statements in *Zubik*, *see supra* 5, which the government apparently made no effort to contest.

But even if the decision were unquestionably correct and not subject to attack on appeal or in any other forum, it still would sweep far less broadly then the Rules. For one thing, Defendants in *DeOtte* are the federal agencies, but in Pennsylvania, New Jersey and most other states, state officials enforce the mandate with respect to insurance providers. Moreover, the decision does not apply to health plans provided by colleges and universities to students, whereas the Rules do, and it does not apply to the Moral Exemption at all. And the decision at least purports to subject claims of objections to the Mandate to some degree of judicial scrutiny; nothing in the Rules does the same, however. Therefore, the *DeOtte* decision does not undermine this Court's standing analysis.

## IX.   THE RULES SHOULD BE VACATED

The APA requires a court to "set aside" agency action it deems unlawful. 5 U.S.C. § 706(2). Here, this requirement dictates that the Rules be vacated. *See Council Tree Comms.,*

*Inc. v. F.C.C.*, 619 F.3d 235, 258 (3d Cir. 2010). But Defendants nonetheless repeat the arguments they made earlier in these proceedings against the issuance of a nationwide injunction. Defs. Br. 41-42 (discussing alleged harms from nationwide injunctions and "nonparty injunctions"). This Court rightly rejected these arguments then, and they simply have no relevance at this stage of the litigation. Defendants cite no authority for limiting the States' remedy upon a final determination that the Rules are unlawful, nor do they explain how such a result can be squared with "Section 706(2)'s seemingly mandatory language." *Comite de Apoyo a los Trabajadores Agricolas v. Solis*, 933 F. Supp. 2d 700, 714 (E.D. Pa. 2013).[24]

The APA and Third Circuit precedent require that the Rules be vacated. And even if the Court had the authority to issue some sort of lesser relief, it would be inappropriate here. *See* Pls. Br. 46. The Rules violate multiple provisions of law and were issued in a procedurally invalid manner. It is not this Court's responsibility to clean up the Agencies' mess and re-fashion the Rules in a manner that somehow excises their most egregious provisions. Because the Rules are unlawful, they must be vacated.

## CONCLUSION

For the reasons set forth above, Defendants' and Intervenor's motions for summary judgment should be denied; the States' summary judgment motion should be granted; and the Rules should be vacated.

---

[24] Defendants' arguments for limiting the States' relief are factually flawed as well. For instance, they assert "the individual exemption is not challenged by Plaintiffs." Defs. Br. 42. This claim is false. *See supra* note 18. And Defendants' legal justification for the individual exemption is plainly foreclosed by *Real Alternatives*, 867 F.3d at 366.

Respectfully Submitted,

June 28, 2019

GURBIR S. GREWAL
Attorney General
State of New Jersey

/s Glenn J. Moramarco
GLENN J. MORAMARCO
Assistant Attorney General
ELSPETH FAIMAN HANS
KATHERINE GREGORY
Deputy Attorneys General

New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-3235
Glenn.Moramarco@law.njoag.gov

*Attorneys for Plaintiff*
*State of New Jersey*

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

/s Michael J. Fischer
MICHAEL J. FISCHER
Chief Deputy Attorney General
AIMEE D. THOMSON
Deputy Attorney General

Office of Attorney General
1600 Arch Street
Suite 300
Philadelphia, PA 19103
(215) 560-2171
mfischer@attorneygeneral.gov

*Attorneys for Plaintiff*
*Commonwealth of Pennsylvania*