# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; ALEX M. AZAR II, *in his official capacity as Secretary of Health and Human Services;* UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, *in his official capacity as Secretary of the Treasury*; UNITED STATES DEPARTMENT OF THE TREASURY; RENE ALEXANDER ACOSTA, *in his official capacity as Secretary of Labor;* and UNITED STATES DEPARTMENT OF LABOR,<br><br>    Defendants,<br><br>LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,<br><br>    Intervenor-Defendant. | No. 17-CV-4540-WB |

### REPLY IN SUPPORT OF INTERVENOR-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The States' brief fails to answer the central argument presented by the Little Sisters. The Little Sisters established that the Final Rules are required by RFRA because the so-called "accommodation" actually uses the religious employer's health plan to provide the objected-to coverage. Br. 20-23. That coverage is "part of the same plan" provided by the employer, with the employer executing "an instrument under which the plan is operated," so that employees do *not* have to have two plans. Br. 21-22 (citations omitted). Once those facts are understood, *Hobby Lobby's* substantial burden analysis controls, and RFRA requires the Final Rules. Br. 24-26.

The States quibble about whether the federal government conceded facts about the Mandate's operation at the *Zubik* oral argument or in supplemental briefing (answer: both), but nowhere do they actually argue that these concessions are *wrong*. Nor do they dispute that the actions required by the Mandate would force the Little Sisters to violate their religious beliefs. *See* States' Response to Statement of Undisputed Facts, Dkt. 224-1 ¶ 56. These failures are dispositive, and show why the Final Rule is necessary to comply with RFRA. The States' other arguments likewise fail.

## ARGUMENT

### I. The Final Rule is consistent with the ACA.

The States' policy disagreements with the Final Rule, however fervent, do not change the legal reality that Congress did not mandate contraception in health plans. The ACA never used the term "contraception" in reference to preventive care, even though express references to contraception exist elsewhere in the ACA. *Compare* 42 U.S.C. § 300gg-13(a)(4) ("preventive care and screenings") *with* 42 U.S.C. § 713(b)(2)(A) (sexual education program required to cover "both abstinence and contraception"). The States concede that "the statute grants HRSA the discretion" to pick the services that must be covered. Opp. 2.

Consistent with other guidelines implementing Section 300gg-13(a)(3) and (a)(4), which frequently define "who" is eligible to receive a service with no cost-sharing, both administrations to implement the ACA included exemptions in the contraceptive mandate concerning "who" must provide services. Br. 13-14. Yet according to the States, "'mammograms for women over 40' is an example of *what* must be covered; it does not change the *who* in any way." Opp. 2 n.1. This is

1

semantic quibbling. A 39-year-old woman who seeks a mammogram is not entitled to that service without cost-sharing. A 41-year-old woman is. And of course the exemption and "accommodation"—upon which the States' entire RFRA defense depends—purport to address *who* will provide services. Br. 15-18. If the ACA forbids who-but-not-what distinctions, the States' case collapses, as does every version of the contraceptive mandate ever embraced by HHS.[1]

What the States might mean is that the Guidelines *can* decide that only a subset of employees are eligible for a service without cost-sharing, but that they would prefer those subset rules be guided only by medical and insurer cost-based considerations. But unfortunately for the States, nothing in the ACA requires the agencies to limit their considerations to factors like insurer profits, especially where other federal law requires them to take religious practice into account.

**II.  The Agencies are permitted to issue the Rule to comply with RFRA.**

   **A.  Religious employers are substantially burdened by the Mandate's fines.**

In a two-page footnote, the States protest vigorously that the prior Administration did not obtain the *Geneva College* decision on "incorrect facts," arguing about whether the agencies' position changed at oral argument or in supplemental briefing. Opp. 7-8 n.5. That argument is silent, however, on the point that matters most: whether the States *disagree* with the Obama Administration's admission that "accommodation" coverage is actually "part of the same 'plan' as the coverage provided by the employer." *Id.* The States' arguments fail on at least two points.

First, the States cannot—and indeed do not even try to—deny that accommodation coverage comes from the employer's health plan, Br. 21-23; that a touted *benefit* of the "accommodation" system was precisely that women would *not* have two separate plans, Br. 22; or that the coverage depends on issuance of a plan instrument under the employer's plan, *id.*, *see* Suppl. Br. for Resp'ts, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418), 2016 WL 1445915, at *17 ("There is *no*

---

[1] Although the States profess confusion, Opp. 3, the Little Sisters' position on the legality of the religious exemption is clear. The 2011 religious exemption the States want to restore runs afoul of the First Amendment's prohibition against discriminating among religious institutions because it is too narrow. Br. 37. Both the First Amendment and RFRA require the government to eliminate preferences among religious organizational structures that interfere with the internal affairs of religious groups, particularly where so many other avenues exist to serve the States' claimed interest. Br. 25-26. It is therefore illegal for this Court to revive that version of the Rule.

*mechanism* for requiring TPAs to provide separate contraceptive coverage *without a plan instrument*; self-insured employers could not opt out of the contraceptive-coverage requirement by simply informing their TPAs that they do not want to provide coverage for contraceptives.") (emphasis added).[2] Finally, the States fail to dispute the Little Sisters' factual assertions that the Mandate requires them to take actions that violate their beliefs. *See* Dkt. 224-1 at 17-21 ("The States are without information to confirm or deny the specific factual allegations related to Little Sisters of the Poor.").

Second, having failed to dispute the substantive accuracy of the prior Administration's concessions, the States nowhere explain how the conceded facts can be reconciled with the facts as understood by the *Geneva College* panel, which erroneously thought the "accommodation" coverage was "totally disconnected" and "separate and apart from" the religious employers and their plans. *See Geneva Coll. v. Sebelius*, 778 F.3d 422, 439, 442 (3d Cir. 2015), *vacated and remanded by Zubik v. Burwell*, 136 S. Ct. 1557 (2016); *see also* Br. 21. And the States provide no explanation for why *Hobby Lobby* does not then fully control the substantial burden analysis, particularly now that the States admit the "accommodation" forces the Little Sisters to take actions that violate their religion. Dkt. 224-1 at 17-21.

Nor do the States substantively respond to *DeOtte*. *DeOtte* explains that the government's representation that contraceptive coverage occurs within the employer's plan "lends credibility to . . . the 'plans as vehicles' argument" that had been dismissed by the Fifth and Third Circuits upon adopting the government's explanation of how the accommodation worked. Order at 14, *DeOtte v. Azar*, No. 4:18-cv-00825 (N.D. Tex. June 5, 2019), Dkt. 76.[3] Ignoring *DeOtte*, the States stick to their story that it is hard to believe that "eight circuits got the question so wrong." Opp. 8-9. But they offer no explanation for why the Supreme Court would have vacated the circuit court

---

[2] The States' accusation of a "false[] assert[ion]" about *Zubik*'s recognition of the government's changing view, Opp. 8 n.5, is thus doubly wrong. The *Zubik* statement did not confine itself to the supplemental briefs. And per the language above, the Government's supplemental brief *did* further clarify—following pointed oral argument questions, Br. 23—that the accommodation requires actual employer and plan involvement rather than an "opt out" by "simply" raising an objection. Br. 31.

[3] The States say the Little Sisters have "not pointed to any specific earlier statements from the government contradicting" the "same plan" admission. Opp. 8 n.5. *But see* Br. 21.

opinions if they were so obviously correct, nor why the Court would have noted the "gravity of the dispute." 136 S. Ct. at 1560. Nor do they substantively engage with the dozens of courts that got the answer *right*—both before and after *Zubik*. Instead, the States snipe at the injunctions from footnotes. Opp. 6 n.3, 26-27 n. 21.

The States first suggest that some injunctions should not influence the agencies because they were unopposed. Opp. 6 n.3. But courts have an independent Article III obligation to discern whether a genuine case or controversy exists and weigh the merits before entering relief. "[W]hatever the Parties' positions, it is for the Court to say whether Plaintiffs prevail." Order at 11, *DeOtte v. Azar*, No. 4:18-cv-00825. That is why, for example, a district court "must first determine . . . whether the moving party has shown itself to be entitled to judgment as a matter of law" before granting summary judgment, even when no opposition has been filed. *Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990). There is no suggestion here that district courts have been derelict in their constitutional duties; nor do the States ever explain what the agencies or their lawyers were supposed to do once they realized they could not in good faith assert the affirmative defense of strict scrutiny.

Second, the States complain that the Little Sisters did not explain sufficiently which injunctions were relevant to the agencies' decisions, Opp. 26-27 n.21. While a case need not be live to be persuasive to the agencies in their decision-making process, there were numerous live injunctions in nonprofit cases not among the *Zubik* appeals at the time the IFRs were issued; injunctions that were *opposed by the government*.[4] Beyond these, nine more injunctions were in effect upon the *Zubik* vacatur. *See, e.g.*, *E. Tex. Baptist Univ. v. Sebelius*, 988 F. Supp. 2d 743 (S.D. Tex. 2013). All of these injunctions were contested and were live at the time of the IFRs. The States offer no theory by which the agencies were free to ignore them. In any event, the States' persistent focus on the exact weight of authority also ignores *Real Alternatives*' holding making clear that even were the federal government not obligated to issue the Final Rule, it is permitted to. "Even when

---

[4] *See, e.g.*, *Ave Maria Univ. v. Burwell*, 63 F. Supp. 3d 1363 (M.D. Fla. 2014); *Dobson v. Sebelius*, 38 F. Supp. 3d 1245 (D. Colo. 2014); *Brandt v. Burwell*, 43 F. Supp. 3d 462 (W.D. Pa. 2014); *La. Coll. v. Sebelius*, 38 F. Supp. 3d 766 (W.D. La. Aug. 13, 2014).

noninterference is not strictly required, the Government has discretion to grant certain religious accommodations subject to constitutional limitations." *Real Alternatives, Inc. v. Sec'y, HHS*, 867 F.3d 338, 352 (3d Cir. 2017); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728-30 (2014) ("RFRA surely allows" "modification of an existing program"). Certainly, *Zubik*'s invitation to develop a new "approach going forward" without a merits ruling demonstrates consensus that a court order is not required. 136 S. Ct. at 1560. The States make no effort to reconcile their argument with these controlling precedents.

### B. The Government cannot satisfy strict scrutiny.

In a brief page of argument, the States assert that it has been "largely unquestioned" that the government has a compelling interest in achieving "full and equal" contraceptive coverage through the insurance plans of objecting religious employers. Opp. 9.

But the States provide no authority for the proposition that they can carry the federal government's statutory burden on an affirmative defense the federal government is not asserting. *See* Br. 24 (citing RFRA's text allocating strict scrutiny burden to federal government). Moreover, the States have not really attempted to meet the burden of proving that providing contraceptive access constitutes a compelling governmental interest. Opp. 9-10. It of course does not, as indicated by the States' own lack of felt compulsion to mandate "full and equal" contraceptive access, *id.*, and the federal government's failure to do so until 2011. *See* J.A. 3565 (Pennsylvania); 3569 (New Jersey).

In addition, the States fail to understand the difference between assuming a compelling interest in ensuring access to contraception and proving a compelling interest in providing access *via the Little Sisters' plan*. The distinction is important, because as the agencies noted, the existing exemptions to the Mandate do enough "appreciable damage" to access via an employer's plan to make clear that the kind of coverage the accommodation achieves was never treated as an interest "of the highest order." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546-47 (internal quotations marks and citation omitted); *see* Br. 24-25 (noting the Mandate's exemptions were justified in *Zubik* by reference to non-seamless alternative means of

5

contraceptive access). These include the religious employer exemption—which the States now take pains to avoid taking a position on—and the grandfathering and small employer exemptions.

The States' failure to respond to evidence of less restrictive means to their goal of "'full and equal' access" is fatal. Opp. 9. That evidence includes government concessions of less restrictive means, Br. 7, a host of alternatives presented to the federal government (which the States fail to dispute), Dkt. 224-1 ¶¶ 65-67, and the States' programs themselves, Br. 26. Those means function with or without the new Title X regulation. Br. 25, Opp. 10 n.6.[5] Having chosen not to respond, the States have thus waived any contrary arguments.

### III. The Final Rule is not arbitrary and capricious or procedurally invalid.

The above arguments demonstrate that the States' arbitrary and capricious arguments—delving even into the details of the regulatory impact estimates—are misplaced. The thrust of the Final Rule is fundamentally that the prior accommodation triggered, and failed, RFRA's strict scrutiny analysis. Whether most comments opposed the rules, Opp. 21, and whether the States have better assessed the benefits of contraception than the agencies, Opp. 18, does not bear on the Final Rule's necessity. The agencies recognized: (1) the accommodation's use of religious employers' health plans meant that the "previous accommodation process did not actually accommodate the objections of many entities"; and (2) that being made to choose between "significant penalties" and involvement with contraceptive coverage "inconsistent with their religious observance or practice" was the "substantial burden identified by the Supreme Court in *Hobby Lobby*." 83 Fed. Reg. 57,536, 57,544-46 (Nov. 15, 2018). Because there was a RFRA violation that required remediation, the agencies had a duty to act. That duty created good cause to act, and any error is harmless because "the outcome of the administrative proceedings" could not be changed by better

---

[5] The Ninth Circuit has granted *en banc* review of the stay of the injunction of the new Title X regulations, but allowed the stay (and therefore the regulation) to remain in effect. Order, *California v. Azar*, No. 19-15974 (9th Cir. July 11, 2019), *available at* http://cdn.ca9.uscourts.gov/datastore/opinions/2019/07/11/19-15974_ebo.pdf.

or earlier consideration of comments. *See Green Island Power Auth. v. FERC*, 577 F.3d 148, 165 (2d Cir. 2009).[6]

### IV. The Religious Exemption Rule violates no other law.

None of the States' scattershot objections shows that the Final Rule contravenes other laws.

***Establishment Clause.*** The States continue to assert that religious exemptions are forbidden by the Establishment Clause. This is an especially silly claim given that the Supreme Court recently upheld a large Latin cross on public land in a 7-2 decision. *See Am. Legion v. Am. Humanist Ass'n*, No. 17-1717, 2019 WL 2527471 (U.S. June 20, 2019). If a large Latin cross does not establish religion, surely a religious exemption for nuns cannot either. But even before *American Legion*, the Supreme Court upheld and applied laws like RFRA and RLUIPA that benefit religion by relieving government burdens, as the "government acts with [a] proper purpose" when it "lift[s] a regulation that burdens the exercise of religion." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 338 (1987). *Amos* distinguishes direct government imposition of a burden on a third party from issues that arise when the government merely removes a burden the government itself had imposed on religious groups. Br. 24.[7] *Hobby Lobby* in turn clarifies that, because almost every religious exemption can be framed as imposing a third-party harm, those harms are considered under the compelling interest test, not as an Establishment-Clause exception to RFRA. 573 U.S. at 731-32.

***Equal Protection Clause, Title VII, and Section 1557.*** The States still have no authority for the proposition that an exception to a rule with a sex-based classification is itself a sex-based classification where that exception is offered without regard to sex. Again, the Little Sisters would object to providing male sterilization in their health care plans, but the Mandate only requires such coverage for women. Assuming every injunction against the Mandate is not judicial defiance of

---

[6] The States assert in a footnote that the Little Sisters do not dispute a host of arguments related to arbitrary-and-capricious review. Opp. 16 n.11. While the Little Sisters have focused on the agencies' RFRA duties, their initial motion contests many arguments to which the States refer, including whether there is a compelling interest in seamless access to contraception and whether serious reliance interests are endangered by the Final Rule. *See, e.g.*, Br. 30-32.

[7] The States' attempt to distinguish *Amos* by claiming that "the exemption here is not necessary to prevent significant government interference with a religious institution's ability to carry out its religious mission." Opp. 15 n.10. But the Little Sisters and many other religious employers have shown that the Mandate's fines would be devastating to their mission. *See* J.A. 2294.

the Equal Protection Clause, this argument is without merit. And the sex-based classification is the "only" ACA provision the government addressed, Opp. 11, because it is the only one that produced dozens of lawsuits, multiple Supreme Court losses, and dozens of live injunctions.

The States' Title VII and Section 1557 challenges fail for similar reasons. If taken seriously, they would invalidate *every* exemption from a state or federal contraceptive mandate—the grandfathering exception in the federal Mandate, the religious exemption in the New Jersey mandate, and so forth. *But see Doe v. Bolton*, 410 U.S. 179, 198 (1973) (religious exemption from abortion provision was "appropriate protection"). Particularly when the States offer no contrary authority to the case law rejecting analogous challenges, this Court should refrain from adopting such broad reasoning. *See In re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936, 942 (8th Cir. 2007) (Title VII does not mandate contraceptive coverage); *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 690 (N.D. Tex. 2016) (concluding Section 1557 incorporates the broad religious exemption scheme of Title IX).

**Section 1554**. The States' argument that an exemption for religious employers "creates . . . unreasonable barriers to the ability of individuals to obtain appropriate medical care" is confused. Opp. 10 (quoting 42 U.S.C. § 18114(1)). They say "the Rules reflect the Agencies' choice to allow certain plan sponsors to *deny* women the benefits of the Mandate—rather than a decision 'not to impose' a mandate in the first place." Opp. 11. But as the States note, HRSA—a division of HHS—was the body that "concluded that contraception" should be covered, creating the mandate. *Id.*; Opp. 2 ("the statute grants HRSA the discretion"). If the States are trying to suggest that a mandate may be limited initially without running afoul of Section 1554, but can never be retracted once extended, they do not provide any authority for reading Section 1554 as a one-way ratchet.

Regardless, the argument that narrowing a policy intended to promote contraception access constitutes an "unreasonable barrier" runs headlong into the Supreme Court's decision in *Rust v. Sullivan*, 500 U.S. 173 (1991). There, the Court made clear that "Congress' refusal to fund abortion counseling and advocacy," even in a policy change, "leaves a pregnant woman with the same choices as if the Government had chosen not to fund family-planning services at all," and therefore

"do not impermissibly burden" access to abortion. *Rust*, 500 U.S. at 201-02. Here, the policy change does not reduce access from the status quo. If the government can choose not to provide services, surely the government can allow nuns to choose not to provide services, just like Pennsylvania allows all employers not to provide contraception for any reason. And here, of course, the federal government is actually trying to provide those services directly. *See* 84 Fed. Reg. 7714, 7739 (Mar. 4, 2019).

### V. The States lack standing to challenge the Final Rule.

While the States disagree (without much explanation) with the injunction in *DeOtte*, they do not persuasively explain why it does not foreclose their standing to bring a challenge to the Final Rules.[8] An injunction is no less in force for being subject to appeal. And while the States say briefly that the injunction does not reach religious universities' student plans, it does not point to any objecting university, in either state, that could not be protected by another injunction. Even Geneva College eventually received a permanent injunction on remand. *See* Permanent Injunction, *Geneva Coll. v. Sebelius*, No. 2:12-cv-00207 (W.D. Pa. July 5, 2018), Dkt. 153. The States do not explain how this Court can provide any effective relief, given that the federal government is barred from enforcing the prior rules.

The States' most remarkable claim is that because "state officials enforce the mandate with respect to insurance providers," the Final Rule is more expansive than *DeOtte*. Opp. 29. It appears that the States are saying that even though *DeOtte* issued an injunction and declaratory judgment that the Mandate violates the Religious Freedom Restoration Act, the States could still enforce the federal Mandate themselves. The States provide no authority for this claim, and it is implausible that states could lawfully enforce federal regulations duly found unlawful by an Article III court. Indeed, if States have this newly-announced power, then presumably every *other* state in the

---

[8] The States' estoppel argument against the agencies, Opp. 4-5, is another reminder that the States have no way of getting effective relief from this Court. In the scenario that the ACA is unconstitutional, the States cannot receive an order from this Court requiring the government to enforce the Mandate under the ACA but not the Final Rule. If the ACA is invalid, the States cannot receive the relief they seek.

9

country remains free to this day to ignore this Court's rulings and apply the IFR and Final Rule because Pennsylvania mistakenly sued only the federal government and not other States.

## CONCLUSION

This Court should grant summary judgment in favor of the Defendants and deny the States' summary judgment motion. In the alternative, Defendant-Intervenors respectfully request that, if the Court accepts the States' arguments, the Court invalidate the regulations implementing the Mandate prior to October 13, 2017 pursuant to the States' arguments.

Dated: July 12, 2019

Respectfully submitted,

/s/ Mark Rienzi
Mark Rienzi, *pro hac vice*
Lori Windham, *pro hac vice*
Eric Rassbach, *pro hac vice*
Diana Verm, *pro hac vice*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

Nicholas M. Centrella
Conrad O'Brien PC
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-8098
Facsimile: (215) 864-0798
ncentrella@conradobrien.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of the Court for the United States District Court for the Eastern District of Pennsylvania using the CM/ECF system, and that service will be effectuated through the CM/ECF system.

Dated: July 12, 2019

                                       /s/ *Mark Rienzi*
                                       Mark Rienzi