## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 54**

[TD–9726]

RIN 1545–BJ58, 1545–BM37, 1545–BM39

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Parts 2510 and 2590**

RIN 1210–AB67

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**45 CFR Part 147**

[CMS–9940–F]

RIN 0938–AS50

**Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** This document contains final regulations regarding coverage of certain preventive services under section 2713 of the Public Health Service Act (PHS Act), added by the Patient Protection and Affordable Care Act, as amended, and incorporated into the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code. Section 2713 of the PHS Act requires coverage without cost sharing of certain preventive health services by non-grandfathered group health plans and health insurance coverage. These regulations finalize provisions from three rulemaking actions: Interim final regulations issued in July 2010 related to coverage of preventive services, interim final regulations issued in August 2014 related to the process an eligible organization uses to provide notice of its religious objection to the coverage of contraceptive services, and proposed regulations issued in August 2014 related to the definition of "eligible organization," which would expand the set of entities that may avail themselves of an accommodation with respect to the coverage of contraceptive services.

**DATES:** *Effective Date:* These final regulations are effective on September 14, 2015.

*Applicability Date:* These final regulations are applicable beginning on the first day of the first plan year (or, for individual health insurance coverage, the first day of the first policy year) that begins on or after September 14, 2015.

**FOR FURTHER INFORMATION CONTACT:** David Mlawsky, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565; Amy Turner or Elizabeth Schumacher, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; or Karen Levin, Internal Revenue Service (IRS), Department of the Treasury, at (202) 927–9639.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010. The Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152) was enacted on March 30, 2010. These statutes are collectively known as the Affordable Care Act. The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide coverage of certain specified preventive services without cost sharing. These preventive services include:

• Evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force (Task Force) with respect to the individual involved.

• Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention (Advisory Committee) with respect to the individual involved. A recommendation of the Advisory Committee is considered to be "in effect" after it has been adopted by the Director of the Centers for Disease Control and Prevention (CDC). A recommendation is considered to be for "routine use" if it appears on the Immunization Schedules of the CDC.

• With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA).

• With respect to women, preventive care and screenings provided for in comprehensive guidelines supported by HRSA (not otherwise addressed by the recommendations of the Task Force), including all Food and Drug Administration (FDA)-approved contraceptives, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[1]

The complete list of recommendations and guidelines that are required to be covered under these final regulations can be found at: *https://www. healthcare.gov/preventive-care-benefits*. Together, the items and services described in these recommendations and guidelines are referred to in this preamble as "recommended preventive services."

The Departments of Labor, Health and Human Services, and the Treasury (the Departments)[2] have issued rulemaking to implement these requirements:

---

[1] The HRSA Guidelines exclude services relating to a man's reproductive capacity, such as vasectomies and condoms.

[2] Note, however, that in sections under headings listing only two of the three Departments, the term "Departments" generally refers only to the two Departments listed in the heading.

Exhibit 10

• Interim final regulations on July 19, 2010, at 75 FR 41726 (July 2010 interim final regulations), implemented the preventive services requirements of PHS Act section 2713;

• Interim final regulations amending the July 2010 interim final regulations on August 3, 2011, at 76 FR 46621, provided HRSA with the authority to exempt group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with those plans) from the requirement to cover contraceptive services consistent with the HRSA Guidelines;[3]

• Final regulations on February 15, 2012, at 77 FR 8725 (2012 final regulations), finalized the definition of religious employer in the 2011 amended interim final regulations without modification;[4]

• An advance notice of proposed rulemaking (ANPRM) on March 21, 2012, at 77 FR 16501, solicited comments on how to provide for coverage of recommended preventive services, including contraceptive services, without cost sharing, while simultaneously ensuring that certain nonprofit organizations with religious objections to contraceptive coverage would not be required to contract, arrange, pay, or refer for that coverage;

• Proposed regulations on February 6, 2013, at 78 FR 8456, proposed to simplify and clarify the definition of ''religious employer'' for purposes of the religious employer exemption, and proposed accommodations for group health plans established or maintained

by certain nonprofit religious organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with those plans) and for insured student plans arranged by certain nonprofit religious organizations that are institutions of higher education with religious objections to contraceptive coverage;

• Final regulations on July 2, 2013, at 78 FR 39870 (July 2013 final regulations), simplified and clarified the definition of religious employer for purposes of the religious employer exemption and established accommodations for health coverage established or maintained or arranged by eligible organizations;[5]

• Interim final regulations on August 27, 2014, at 79 FR 51092 (August 2014 interim final regulations), amended the July 2013 final regulations in light of the United States Supreme Court's interim order in connection with an application for an injunction in *Wheaton College* v. *Burwell* (Wheaton interim order),[6] and provided an alternative process that an eligible organization may use to provide notice of its religious objection to the coverage of contraceptive services; and

• Proposed regulations on August 27, 2014, at 79 FR 51118 (August 2014 proposed regulations), proposed potential changes to the definition of ''eligible organization'' in light of the United States Supreme Court's decision in *Burwell* v. *Hobby Lobby Stores, Inc.*[7]

In addition to these regulations, the Departments released six sets of Frequently Asked Questions (FAQs) regarding the preventive services coverage requirements. The Departments released FAQs about Affordable Care Act Implementation Parts II, V, XII, XIX, XX, and XXVI to answer outstanding questions, including questions related to the coverage of

preventive services. These FAQs provided guidance related to compliance with the 2010 and 2014 interim final regulations, and addressed issues related to specific services required to be covered without cost sharing, subject to reasonable medical management, under recommendations and guidelines specified in section 2713 of the PHS Act. Information on related safe harbors, forms, and model notices is available at *http://www.dol.gov/ebsa/ healthreform* and *http://www.cms.gov/ cciio/resources/regulations-and- guidance/index.html*.

After consideration of the comments and feedback received from stakeholders, the Departments are publishing these final regulations,[8] which finalize the July 2010 interim final regulations related to coverage of recommended preventive services, the August 2014 interim final regulations related to the process an eligible organization uses to provide notice of its religious objection to the coverage of contraceptive services, and the August 2014 proposed regulations related to the definition of eligible organization.

## II. Overview of the Final Regulations

*A. Coverage of Recommended Preventive Services Under 26 CFR 54.9815–2713, 29 CFR 2590.715–2713, and 45 CFR 147.130*

(i) Scope of Recommended Preventive Services

Section 2713 of the PHS Act, as added by the Affordable Care Act, requires that a non-grandfathered group health plan or a health insurance issuer offering non-grandfathered group or individual health insurance coverage provide, without cost sharing, coverage for recommended preventive services, as outlined above. The July 2013 final regulations finalized the requirement to provide coverage without cost sharing with respect to those preventive services provided for in the HRSA Guidelines for women. These regulations finalize the requirement to provide coverage without cost sharing with respect to the other three categories of recommendations and guidelines specified in section 2713 of the PHS Act: Evidence-based items or services that have in effect a rating of ''A'' or ''B''

---

[3] On the same date, HRSA exercised this authority in the HRSA Guidelines to exempt group health plans established or maintained by these religious employers (and group health insurance coverage provided in connection with such plans) from the HRSA Guidelines with respect to contraceptive services.

[4] Contemporaneous with the issuance of the 2012 final regulations, HHS, with the agreement of the Departments of Labor and the Treasury, issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement for group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans) originally issued on February 10, 2012, and reissued on August 15, 2012, and June 28, 2013; available at: *http://www.cms.gov/CCIIO/Resources/ Regulations-and-Guidance/Downloads/preventive- services-guidance-6-28-2013.pdf*. The guidance clarified, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage were not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor was also available to student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that met the conditions set forth in the guidance. *See* Student Health Insurance Coverage, 77 FR 16457 (Mar. 21, 2012).

[5] A contemporaneously re-issued HHS guidance document extended the temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. This guidance included a form to be used by an organization during this temporary period to self-certify that its plan qualified for the temporary enforcement safe harbor. In addition, HHS and the Department of Labor (DOL) issued a self-certification form, EBSA Form 700, to be executed by an organization seeking to be treated as an eligible organization for purposes of an accommodation under the July 2013 final regulations. This self-certification form was provided for use with the accommodation under the July 2013 final regulations, after the expiration of the temporary enforcement safe harbor (that is, for plan years beginning on or after January 1, 2014). *See http://www.cms.gov/CCIIO/Resources/ Regulations-and-Guidance/Downloads/preventive- services-guidance-6-28-2013.pdf*.

[6] 134 S. Ct. 2806 (2014).

[7] 134 S. Ct. 2751 (2014).

[8] The Department of the Treasury/Internal Revenue Service published temporary regulations and proposed regulations with the text of the temporary regulations serving as the text of the proposed regulations as part of each of the joint rulemaking interim final rules listed above. The Departments of Labor and HHS published their rules as interim final rules and are finalizing their interim final rules. The Department of the Treasury/Internal Revenue Service is finalizing its proposed rules.

Exhibit 10                                                                 JA-0000189

in the current recommendations of the Task Force, immunizations for routine use that have in effect a recommendation from the Advisory Committee, and evidence-informed preventive care and screenings for infants, children, and adolescents, provided for in guidelines supported by HRSA. The complete list of recommendations and guidelines can be found at: *https://www.healthcare.gov/ preventive-care-benefits.*

Commenters requested additional clarity on the specific items and services required to be covered without cost sharing. The Departments previously released FAQs about Affordable Care Act Implementation Parts XII [9] and XIX [10] to provide guidance related to the scope of coverage required under the recommendations and guidelines, including coverage of aspirin and other over-the-counter medication, colonoscopies, BRCA testing, well-woman visits, screening and counseling for interpersonal and domestic violence, HIV and HPV testing, contraception, breastfeeding and lactation counseling, and tobacco cessation interventions. Moreover, on May 11, 2015, the Departments issued FAQs about Affordable Care Act Implementation [11] to address specific coverage questions related to BRCA testing, contraception, sex-specific recommended preventive services, services for dependents covered under the plan or policy, and colonoscopies. If additional questions arise regarding the application of the preventive services coverage requirements, the Departments may issue additional subregulatory guidance.

(ii) Office Visits

The July 2010 interim final regulations clarified the cost-sharing requirements applicable when a recommended preventive service is provided during an office visit through the use of the "primary purpose" test: First, if a recommended preventive service is billed separately (or is tracked as individual encounter data separately) from an office visit, a plan or issuer may impose cost sharing with respect to the

office visit. Second, if a recommended preventive service is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is the delivery of the recommended preventive service, a plan or issuer may not impose cost sharing with respect to the office visit. Finally, if a recommended preventive service is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is not the delivery of the recommended preventive service, a plan or issuer may impose cost sharing with respect to the office visit. The reference to tracking individual encounter data was included to provide guidance with respect to plans and issuers that use capitation or similar payment arrangements that do not bill individually for items and services.

Several commenters supported the primary purpose test, while other commenters were concerned that the test provides too much discretion to providers or issuers to determine the primary purpose of the visit. Some commenters stated that many individuals only seek medical care from their physician when they are sick, and physicians must be able to provide preventive services, along with other treatment, in a single office visit. Other commenters recommended that the Departments eliminate the primary purpose test. Some of these commenters recommended that cost sharing be prohibited if any recommended preventive service is provided during the visit.

These final regulations continue to provide that when a recommended preventive service is not billed separately (or is not tracked as individual encounter data separately) from an office visit, plans and issuers must look to the primary purpose of the office visit when determining whether they may impose cost sharing with respect to the office visit. Nothing in these requirements precludes a health care provider from providing preventive services, along with other treatment, in a single office visit. These rules only establish the circumstances under which an office visit that includes a recommended preventive service may be subject to cost sharing. The Departments anticipate that the determination of the primary purpose of the visit will be resolved through normal billing and coding activities, as they are for other services. If questions arise regarding the application of this rule to common medical scenarios, the

Departments may issue additional subregulatory guidance.

(iii) Out-of-Network Providers

With respect to a plan or health insurance coverage that maintains a network of providers, the July 2010 interim final regulations provided that the plan or issuer is not required to provide coverage for recommended preventive services delivered by an out-of-network provider. The plan or issuer may also impose cost sharing for recommended preventive services delivered by an out-of-network provider.

Several commenters requested the rule be amended to require that preventive services be provided without cost sharing when services are provided out-of-network in all instances. Other commenters suggested that the rule be amended to require out-of-network coverage if an in-network provider is not available to the individual, or if the services are not available to a material segment of the plan's population. One commenter asked that, in a situation where preventive services are obtained from a network provider with the assistance of medical professionals who are out-of-network, all of the services be treated as in-network services, and thus not subject to cost sharing. Several commenters stated that cost sharing for recommended preventive services received from out-of-network providers should not be higher than cost sharing for other ambulatory health services provided on an out-of-network basis.

In response to comments, the Departments issued an FAQ clarifying that, if a plan or issuer does not have in its network a provider who can provide a particular recommended preventive service, then, consistent with the statute and July 2010 interim final regulations, the plan or issuer must cover, without cost sharing, the item or service when performed by an out-of-network provider.[12] These final regulations adopt the rule of the July 2010 interim final regulations with respect to out-of-network providers, with one clarification. These final regulations incorporate the clarification that a plan or issuer that does not have in its network a provider who can provide a particular recommended preventive service is required to cover the preventive service when performed by an out-of-network provider, and may

---

[9] *See* FAQs about Affordable Care Act Implementation Part XII, available at *http://www. dol.gov/ebsa/faqs/faq-aca12.html and http://www. cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/ aca_implementation_faqs12.html.*

[10] *See* FAQs about Affordable Care Act Implementation Part XIX, available at *http://www. dol.gov/ebsa/faqs/faq-aca19.html and http://www. cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/ aca_implementation_faqs19.html.*

[11] *See* FAQs about Affordable Care Act Implementation Part XXVI, available at *www.dol.gov/ebsa/faqs/faq-FAQs/Downloads/aca_ implementation_faqs26.pdf. and http://www.cms. gov/CCIIO/Resources/Fact-Sheets-and-FAQs/ Downloads/aca_implementation_faqs26.pdf.*

[12] *See* FAQ about Affordable Care Act Implementation Part XII, Q3 at *http://www.dol.gov/ ebsa/faqs/faq-aca12.html and http://www.cms.gov/ CCIIO/Resources/Fact-Sheets-and-FAQs/aca_ implementation_faqs12.html.*

not impose cost sharing with respect to the preventive service.

(iv) Reasonable Medical Management

The July 2010 interim final regulations included a provision on reasonable medical management. Specifically, if a recommendation or guideline for a recommended preventive service does not specify the frequency, method, treatment, or setting for the provision of that service, the plan or issuer may use reasonable medical management techniques to determine any coverage limitations.

The Departments received a number of comments related to the use of reasonable medical management techniques. Some commenters were concerned that the July 2010 interim final regulations did not clearly outline what constitutes reasonable medical management techniques, and requested that the Departments provide greater clarity, particularly with respect to a situation where a patient's attending provider determines that the frequency, method, treatment, or setting of a particular item or service is medically appropriate for a particular patient. The Departments issued an FAQ clarifying that, under the July 2010 interim final regulations, to the extent not specified in a recommendation or guideline, a plan or issuer may rely on the relevant evidence base and established reasonable medical management techniques to determine the frequency, method, treatment, or setting for the provision of a recommended preventive service.[13] These final regulations incorporate the clarification of the July 2010 interim final regulations set forth in the FAQ.

On May 11, 2015, the Departments issued FAQs to provide further guidance on the extent to which plans and issuers may utilize reasonable medical management when providing coverage for recommended women's contraception services in the HRSA guidelines.[14] If further questions arise regarding the permissible application of reasonable medical management techniques, the Departments may issue additional subregulatory guidance.

Other commenters cited the importance of flexibility to permit plans and issuers to maintain programs that are cost-effective, negotiate treatments

with high-quality providers at reduced costs, and reduce fraud and abuse. Commenters requested guidance on how plans and issuers may employ value-based insurance designs (VBID) in a manner that complies with the preventive services coverage requirements.[15] Some commenters requested that the final regulations permit plans and issuers to impose cost sharing on non-preferred network tiers for VBIDs. Another commenter requested the Departments permit cost sharing for preventive care delivered at centers of excellence. On December 22, 2010, the Departments issued an FAQ to provide guidance regarding VBID related to the coverage of preventive services.[16] If questions arise regarding VBID and the preventive services coverage requirements, the Departments may issue additional subregulatory guidance. Several commenters stated that plans and issuers should be required to use and identify credible references or sources supporting their medical management techniques. The Departments recognize the importance of having access to information relating to medical management techniques that a plan or issuer may apply. Several provisions applicable to plans and issuers address these concerns. ERISA section 104 and the Department of Labor's implementing regulations[17] provide that, for plans subject to ERISA, the plan documents and other instruments under which the plan is established or operated must generally be furnished by the plan administrator to plan participants[18] upon request. In addition, the Department of Labor's claims procedure regulations[19] (applicable to ERISA plans), as well as the Departments' internal claims and appeals and external review regulations under the Affordable Care Act

(applicable to all non-grandfathered group health plans and health insurance issuers in the group and individual markets),[20] set forth rules regarding claims and appeals, including the right of claimants (or their authorized representatives), upon appeal of an adverse benefit determination (or a final internal adverse benefit determination), to be provided by the plan or issuer, upon request and free of charge, reasonable access to and copies of all documents, records, and other information relevant to the claimant's claim for benefits. Other Federal and State law requirements may also apply, as applicable.

(v) Services Not Described

The July 2010 interim final regulations clarified that a plan or issuer may cover preventive services in addition to those required to be covered by PHS Act section 2713. These final regulations continue to provide that for the additional preventive services, a plan or issuer may impose cost sharing at its discretion, consistent with applicable law. Moreover, a plan or issuer may impose cost sharing for a treatment that is not a recommended preventive service, even if the treatment results from a recommended preventive service.

(vi) Timing

The July 2010 interim final regulations provided that plans and issuers must provide coverage for new recommended preventive services for plan years (in the individual market, policy years) beginning on or after the date that is one year after the date the relevant recommendation or guideline under PHS Act section 2713 is issued. Some commenters encouraged the Departments to adopt a shorter implementation timeframe. With respect to the Advisory Committee recommendations, one commenter requested that the effective date for any new recommendation be either the publication of the committee's provisional recommendations or the publication of the official CDC immunization schedules, whichever occurs first. Other commenters expressed support for the implementation timeframe set forth in the July 2010 interim final regulations. The statute requires the Departments to establish an interval of not less than one year between when recommendations or guidelines under PHS Act section

---

[13] *See* FAQs about Affordable Care Act Implementation Part II. Q8 available at *http://www.dol.gov/ebsa/faqs/faq-aca2.html* and *http://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/aca_implementation_faqs2.html.*

[14] *See* FAQs about Affordable Care Act Implementation Part XXVI. available at *www.dol.gov/ebsa/faqs/faq-aca26.html* and *http://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/aca_implementation_faqs26.pdf.*

[15] The Departments first solicited comments on value-based insurance designs in the July 2010 interim final regulations. 75 FR 41726, 41729. Subsequently, the Departments published a request for information (RFI) related to value-based insurance design on December 28, 2010. 75 FR 81544.

[16] *See* FAQs about Affordable Care Act Implementation Part V. Q1, available at *http://www.dol.gov/ebsa/faqs/faq-aca5.html* and *http://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/aca_implementation_faqs5.html.*

[17] 29 CFR 2520.104b–1.

[18] ERISA section 3(7) defines a ''participant'' to include any employee or former employee who is or may become eligible to receive a benefit of any type from an employee benefit plan or whose beneficiaries may be eligible to receive any such benefit. Accordingly, employees who are not enrolled but are, for example, in a waiting period for coverage, or who are otherwise shopping among benefit package options during open season, generally are considered plan participants for this purpose.

[19] 29 CFR 2560.503–1(h)(2)(iii).

[20] 29 CFR 2590.715–2719(b)(2)(i) and 45 CFR 147.136(b)(2)(i).

Exhibit 10                                                                                                                                                    JA-0000191

2713(a) [21] are issued, and the plan year (in the individual market, policy year) for which coverage of the services addressed in the recommendations or guidelines must be in effect.

To provide plans and issuers adequate time to incorporate changes or updates to recommendations and guidelines, as provided in the July 2010 interim final regulations, these final regulations continue to provide that a recommendation or guideline of the Task Force is considered to be issued on the last day of the month on which the Task Force publishes or otherwise releases the recommendation; a recommendation or guideline of the Advisory Committee is considered to be issued on the date on which it is adopted by the Director of the CDC; and a recommendation or guideline in the comprehensive guidelines supported by HRSA is considered to be issued on the date on which it is accepted by the Administrator of HRSA or, if applicable, adopted by the Secretary of HHS.

Several commenters supported the policy that plans and issuers should not need to check the recommendations or guidelines for changes during the plan or policy year in order to determine coverage requirements and should not be required to implement changes during the plan or policy year. The Departments adopted this approach in the July 2010 interim final regulations with respect to new recommendations or guidelines that impose additional preventive services coverage requirements, but adopted a different standard for changes in recommendations or guidelines, allowing plans and issuers to eliminate coverage for preventive services that are no longer recommended during the plan or policy year, consistent with other

applicable federal and state law. We agree with those commenters who stated that changes in coverage should not occur during the plan or policy year, and are implementing an approach with respect to changes in recommendations or guidelines that narrow or eliminate coverage requirements for previously recommended services that is similar to the one adopted in the July 2010 interim final regulations for new recommendations or guidelines. Furthermore, participants and beneficiaries of group health plans (and enrollees and dependents in individual market coverage) may make coverage choices based on the benefits offered at the beginning of the plan or policy year. Plan years (and individual market policy years) vary and recommendations and guidelines may be issued at any time during a plan or policy year. These final regulations protect against disruption and provide certainty in coverage (including cost-sharing requirements) for the duration of the plan or policy year. Accordingly, these final regulations state that a plan or issuer that is required to provide coverage for any recommended preventive service on the first day of a plan or policy year under a particular recommendation or guideline must generally provide that coverage through the last day of the plan or policy year, even if the recommendation or guideline changes or is eliminated during the plan or policy year.

However, there are limited circumstances under which it may be inadvisable for a plan or issuer to continue to cover preventive items or services associated with a recommendation or guideline that was in effect on the first day of a plan year or policy year (for example, due to safety concerns). Therefore, these final regulations establish that if, during a plan or policy year, (1) an "A" or "B" recommendation or guideline of the Task Force that was in effect on the first day of a plan or policy year is downgraded to a "D" rating (meaning that the Task Force has determined that there is strong evidence that there is no net benefit, or that the harms outweigh the benefits, and therefore discourages the use of this service), or (2) any item or service associated with any preventive service recommendation or guideline specified in 26 CFR 54.9815–2713(a)(1) or 29 CFR. 2590.715–2713(a)(1) or 45 CFR 147.130(a)(1) that was in effect on the first day of a plan or policy year is the subject of a safety recall or is otherwise determined to pose a significant safety concern by a federal agency authorized to regulate

that item or service, there is no requirement under this section to cover these items and services through the last day of the plan or policy year. Should such circumstances arise, the Departments expect to issue subregulatory guidance to this effect with respect to such preventive item or service.

Other requirements of federal or state law may apply in connection with ceasing to provide coverage or changing cost-sharing requirements for any item or service. For example, PHS Act section 2715(d)(4) and its implementing regulations state that if a group health plan or health insurance issuer makes any material modification in any of the terms of the plan or coverage involved that would affect the content of the Summary of Benefits and Coverage (SBC), that is not reflected in the most recently provided SBC, and that occurs other than in connection with a renewal or reissuance of coverage, the plan or issuer must provide notice of the modification to enrollees not later than 60 days prior to the date on which the notification will become effective.

A list of the recommended preventive services is available at *https://www.healthcare.gov/preventive-care-benefits*. We intend to update this list to include the date on which the recommendation or guideline was accepted or adopted. New recommendations and guidelines will also be reflected on this site. Plans and issuers need not make changes to coverage and cost-sharing requirements based on a new recommendation or guideline until the first plan year (in the individual market, policy year) beginning on or after the date that is one year after the new recommendation or guideline goes into effect. Therefore, by visiting this site once per year, plans or issuers should have access to all the information necessary to identify any additional items or services that must be covered without cost sharing, or to identify any items or services that are no longer required to be covered.

*B. Accommodations in Connection With Coverage of Preventive Health Services—26 CFR 54.9815–2713A, 29 CFR 2510.3–16 and 2590.715–2713A, and 45 CFR 147.131.*

(i) The Process an Eligible Organization Uses To Provide Notice of Its Religious Objection to the Coverage of Contraceptive Services

After issuing the July 2013 final regulations, the Departments issued August 2014 interim final regulations in light of the Supreme Court's *Wheaton* interim order concerning notice to the federal government that an eligible

---

[21] Section 2713(b)(1) refers to an interval between "the date on which a recommendation described in subsection (a)(1) or (a)(2) or a guideline under subsection (a)(3) is issued and the plan year with respect to which the requirement described in subsection (a) is effective with respect to the service described in such recommendation or guideline." While the first part of this statement does not mention guidelines under subsection (a)(4), it is the Departments' view that it would not be reasonable to treat the services covered under subsection (a)(4) any differently than those in subsections (a)(1), (a)(2), and (a)(3). First, the statement refers to "the requirement described in subsection (a)," which would include a requirement under subsection (a)(4). Secondly, the guidelines under (a)(4) are from the same source as those under (a)(3), except with respect to women, rather than infants, children and adolescents; and other preventive services involving women are addressed in subsection (a)(1), so it is reasonable to treat the guidelines under subsection (a)(4) similarly. Third, without this clarification, it would be unclear when such services would have to be covered. The July 2010 interim final regulations and these final regulations accordingly apply the intervals established therein to services under section 2713(a)(4).

Exhibit 10                                                                                    JA-0000192

organization has a religious objection to providing contraceptive coverage, as an alternative to the EBSA Form 700 method of self-certification, and to preserve participants' and beneficiaries' (and, in the case of student health insurance coverage, enrollees' and dependents') access to coverage for the full range of FDA-approved contraceptives, as prescribed by a health care provider, without cost sharing.

These final regulations continue to allow eligible organizations to choose between using EBSA Form 700 or the alternative process consistent with the *Wheaton* interim order. The alternative process provides that an eligible organization may notify HHS in writing of its religious objection to covering all or a subset of contraceptive services. The notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to covering some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers.[22] A model notice to HHS that eligible organizations may, but are not required to, use is available at: *http://www.cms.gov/cciio/resources/Regulations-and-Guidance/index.html#Prevention.* If there is a change in any of the information required to be included, the organization must provide updated information to HHS.

The content required for the notice represents the minimum information necessary for the Departments to determine which entities are covered by the accommodation, to administer the accommodation, and to implement the policies in the July 2013 final regulations.[23] Comments on the August

2014 interim final regulations did not identify any way to administer the accommodation without this information, or any alternative means the Departments can use to obtain the required information. Nothing in this alternative notice process (or in the EBSA Form 700 notice process) provides for a government assessment of the sincerity of the religious belief underlying the eligible organization's objection. The notice to HHS, and any subsequent updates, should be sent electronically to: *marketreform@cms.hhs.gov,* or by regular mail to: Centers for Medicare & Medicaid Services, Center for Consumer Information and Insurance Oversight, 200 Independence Avenue SW., Washington, DC 20201, Room 739H.

When an eligible organization that establishes or maintains a self-insured plan subject to ERISA provides a notice to HHS, the Department of Labor (DOL) (working with HHS) will send a separate notification to each third party administrator of the ERISA plan. The DOL notification will inform each third party administrator of the eligible organization's religious objection to funding or administering some or all contraceptive coverage, will list the contraceptive services to which the employer objects, will describe the obligations of the third party administrator(s) under 29 CFR 2590.715–2713A and 26 CFR 54.9815–2713A, and will designate the relevant third party administrator(s) as plan administrator under section 3(16) of ERISA for those contraceptive benefits that the third party administrator would otherwise manage on behalf of the eligible organization. The DOL notification will be an instrument under which the plan is operated, and will supersede any earlier designation. In establishing and implementing this alternative process, DOL is exercising its broad rulemaking authority under title I of ERISA, which includes the ability to interpret and apply the definition of a plan administrator under ERISA section 3(16)(A).

If an eligible organization that establishes or maintains an insured group health plan or insured student health plan provides a notice to HHS under this alternative process, HHS will send a separate notification to each health insurance issuer of the plan. HHS's notification will inform each health insurance issuer of the eligible organization's religious objection to

funding or administering some or all contraceptive coverage, will list the contraceptive services to which the organization objects, and will describe the obligations of the issuer(s) under 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A, and 45 CFR 147.131. Issuers remain responsible for compliance with the statutory and regulatory requirement to provide coverage for contraceptive services without cost sharing to participants and beneficiaries of insured group health plans, and to enrollees and dependents of insured student health plans, notwithstanding that the policyholder is an eligible organization with a religious objection to contraceptive coverage that will not have to contract, arrange, pay, or refer for the coverage.

Several comments addressed oversight and enforcement to monitor the accommodation. The Departments will use their established oversight processes, applicable to all the Affordable Care Act market reforms of PHS Act title XXVII, part A to monitor compliance with the requirement to arrange for or provide separate payments for contraceptive services without cost sharing.[24]

(ii) Definition of a Closely Held for-Profit Entity

(a) General Structure of a Closely Held for-Profit Entity

After issuing the July 2013 final regulations, the Departments issued August 2014 proposed regulations in light of the Supreme Court's ruling in *Hobby Lobby,* that, under the Religious Freedom Restoration Act of 1993 (RFRA),[25] the requirement to provide contraceptive coverage could not be applied to certain closely held for-profit entities that had a religious objection to providing coverage for some or all the FDA-approved contraceptive methods. The proposed regulations solicited comments on a number of different approaches for defining a closely held for-profit entity for purposes of qualifying as an eligible organization that can avail itself of an accommodation, and solicited comments on a number of other related issues.

[22] Church plans are exempt from ERISA pursuant to ERISA section 4(b)(2). As such, a third party administrator of a self-insured church plan established or maintained by an eligible organization does not become the plan administrator by operation of 29 CFR 2510.3–16, although such third party administrators may voluntarily provide or arrange separate payments for contraceptive services and seek reimbursement for associated expenses under the process set forth in 45 CFR 156.50.

[23] An accommodation cannot be effectuated until all of the necessary information is submitted. If HHS receives a notice that does not include all of

the required information, HHS will attempt to notify the organization of the incompleteness, so the organization can submit additional information to make its notice complete.

[24] The Departments' oversight and enforcement role with respect to the market reforms under the Affordable Care Act builds upon their respective roles with respect to the market reforms under title I of HIPAA. For a description of the latter, *see* Notice of Signing of a Memorandum of Understanding among the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services at 64 FR 70165 (Dec. 15, 1999).

[25] 42 U.S.C. 2000bb *et. seq.*

Exhibit 10    JA-0000193

The Departments received more than 75,000 comments in response to the August 2014 proposed regulations. Numerous comments addressed matters outside the scope of the proposed regulations (for example, many comments expressed support for or disagreement with the Supreme Court's *Hobby Lobby* decision, contraception in general, or different methods of contraception), and are not addressed in this preamble. To the extent comments addressed matters that were within the scope of the proposed regulations, those portions of the comments were considered, and all significant comments related to matters within the scope of the proposed regulations are discussed in this preamble. Many commenters expressed support for or disagreement with the general requirement to provide coverage for contraceptive services without cost sharing. Some commenters expressed support for the notion that any employer that has religious objections to covering contraceptive services should either be exempt from doing so, or should be able to avail itself of the accommodation. Other commenters stated that women should have access to contraceptive services without cost sharing, regardless of where they work, and that employers should not be permitted to deny them coverage, whether the employer's decision is for religious or other reasons. Many commenters suggested that the set of closely held for-profit entities eligible for the accommodation be defined as narrowly as possible.

The August 2014 proposed regulations would extend the availability of the accommodation to closely held for-profit entities. The preamble proposed two possible approaches to defining a closely held for-profit entity. Under the first proposed approach, a qualifying closely held for-profit entity would be a for-profit entity where none of the ownership interests in the entity are publicly traded, and where the entity has fewer than a specified number of shareholders or owners (the Departments did not propose a specific number, but solicited comment on what the number should be). As explained in the preamble to the August 2014 proposed regulations, there is precedent in other areas of federal law for limiting the definition of closely held entities to those with a relatively small number of owners.[26] As explained in the preamble to the August 2014 proposed regulations, there is precedent in other areas of federal law for limiting the definition of closely held entities to those with a relatively small number of owners.[26] Under the second proposed approach, a qualifying closely held entity would be a for-profit entity in

which the ownership interests are not publicly traded, and in which a specified fraction of the ownership interest is concentrated in a limited and specified number of owners (the Departments did not propose a specific level of ownership concentration but solicited comment on what that level should be). As explained in the preamble to the August 2014 proposed regulations, this approach also has precedent in federal law, which limits certain tax treatment to entities that are more than 50 percent owned by or for not more than five individuals.[27] The Departments invited comments on the appropriate scope of the definition of a qualifying closely held for-profit entity.

As explained in more detail below, these final regulations extend the accommodation to a for-profit entity that is not publicly traded, is majority-owned by a relatively small number of individuals, and objects to providing contraceptive coverage based on its owners' religious beliefs. This definition includes for-profit entities that are controlled and operated by individual owners who are likely to have associational ties, are personally identified with the entity, and can be regarded as conducting personal business affairs through the entity. Those entities appear to be the types of closely held for-profit entities contemplated by *Hobby Lobby*, which involved two family-owned corporations that were operated in accordance with their owners' shared religious beliefs.[28] The Departments also believe that the definition adopted in these regulations includes the for-profit entities that are likely to have religious objections to providing contraceptive coverage. That assessment is supported by the comments received on the proposed regulation. As explained below, the Departments sought comment on a definition similar to the one adopted here, and we believe that no commenter identified an entity that would want to avail itself of the accommodation but that would be excluded by the definition. In addition, based on the available information, it appears that the definition adopted in these final regulations includes all of the for-profit entities that have as of the date of issuance of these regulations challenged the contraceptive coverage requirement in court.

The Departments believe that the definition adopted in these regulations complies with and goes beyond what is

required by RFRA and *Hobby Lobby*. The Departments have extended the accommodations to the specified class of for-profit entities in order to provide additional protection to entities that may have religious objections to providing contraceptive coverage, and because the Departments believe that eligibility for the accommodations should be based on a rule that has origins in existing law.

Under the August 2014 proposed regulations and these final regulations, the first prong that an eligible organization (whether it be a nonprofit entity or a closely held for-profit entity) must meet in order to avail itself of the accommodation is that the entity must oppose providing coverage for some or all of any contraceptive item or service required to be covered, on account of religious objections. This requirement remains unchanged in these final regulations. (In the case of a for-profit entity, the entity must be opposed to providing these services on account of its owners' religious objections).

Many commenters supported excluding publicly traded entities from the definition of a closely held for-profit entity. However, a few commenters stated that a publicly traded entity should not be disqualified from the accommodation. Although the entities in *Hobby Lobby* were not publicly traded, one commenter noted that the Court did not expressly preclude publicly traded corporations from the protections of RFRA. Another commenter stated that if a publicly traded corporation could provide evidence of a sincere religious objection to providing contraceptive coverage, it should not be precluded from the accommodation.

These final regulations exclude publicly traded entities from the definition of an eligible organization. *Hobby Lobby* did not involve RFRA's application to publicly traded companies, and the Supreme Court emphasized that "the idea that unrelated shareholders—including institutional investors with their own sets of stakeholders—would agree to run a corporation under the same religious beliefs seems improbable."[29]

Many commenters favored limiting the number of owners to "a handful," without specifying a maximum number. One commenter urged the Departments to establish a limit on the maximum number of shareholders for closely held entities of 999.

One commenter favored limiting the number of owners, but stated that any particular limit could lead to anomalous

[26] *See* discussion of definition of S corporations under section 1361 of the Tax Code, at 79 FR 51122.

[27] See discussion of several Tax code provisions, including 26 U.S.C. 856(h), 542(a)(2), and 469(j)(1), at 79 FR 51122.

[28] *See* 134 S. Ct. at 2764–2768.

[29] 134 S. Ct. at 2744.

Exhibit 10    JA-0000194

results for entities with more than the permitted number of owners that seek the accommodation. The commenter noted, for example, that if the maximum number of shareholders or owners is ten, non-publicly traded companies with eleven shareholders would have to provide contraceptive coverage, no matter how sincerely held the religious objections of the owners. Another commenter who favored the approach stated that the definition should be limited to entities that have ten or fewer shareholders, and that shareholders should be counted based upon the definitions under subchapter S—that is, individuals should be counted along with certain trusts and estates. This would account for Qualified Subchapter S Trusts, but would not allow for other partnerships or corporations to be shareholders. This commenter also urged that members of the same family be counted as separate shareholders. Another commenter explained that a closely held company is commonly understood to be one that chooses S-corporation status or has fewer than 100 shareholders, and that many are privately held and owned by family members. Beyond these characteristics, the commenter urged, the size of the company should not matter. One commenter suggested following the close corporation definition from the applicable state or, in the absence of a corporate form, following the definition of a close corporation under Delaware law.

A few commenters supported a test that would be aligned with one of the federal tax law's definitions of a "closely held corporation." For example, commenters supported a definition that provides that the corporation may not have ownership interests that are publicly traded, that more than 50 percent of the outstanding ownership interests in the corporation must be owned (directly or indirectly) by five or fewer individuals at any time during the last half of the tax year, and that the corporation may not be a personal service corporation. The commenters favored identifying closely held entities through an approach based on this definition because such an approach would be easy to apply and already familiar to corporations that apply similar concepts under the Code.

Other commenters were generally opposed to a limited ownership-concentration test. One commenter observed that under this approach, a corporation would be able to concentrate a fraction of ownership, for example 50 percent, in a specified number of owners, such as ten people. The commenter observed that those ten individuals, who might comprise fewer than half of the total number of owners, would be able to direct the corporation to seek the accommodation, potentially against the wishes of the minority shareholders.

Several commenters suggested that basing the definition either on the number of owners, or upon a concentration of ownership, would be inappropriate. One commenter stated that there is no basis in the *Hobby Lobby* decision to restrict the definition based on measures such as shareholder numbers, fractions of ownership, or tax rules. Another commenter stated that each of the proposed definitions of a "closely held corporation" is based on an arbitrary metric unrelated to the religious beliefs of the owners of the corporation. Another commenter stated that any rule that defines "closely held" in a narrow manner, such as by limiting the number, kind, or percentage control of a share of its owners, or by adopting definitions used in the Code, will violate RFRA and the *Hobby Lobby* decision. One commenter stated that a numerical test of shareholders will be both under- and over-inclusive, capturing corporations that meet the numerical test but whose shareholders are not expressing a religious belief through the corporation, and failing to capture corporations with a relatively large number of shareholders united in their religious interests. Another commenter believed that basing the definition of "closely held entity" solely on the number of owners would not limit eligibility to those types of entities addressed in the *Hobby Lobby* case.

One commenter believed that, for purposes of qualifying for the accommodation, an entity should only employ individuals who adhere to the owners' religious beliefs. The Departments do not believe this is a necessary characteristic for an entity to qualify as an eligible organization that can avail itself of the accommodation, and in *Hobby Lobby* the court granted relief to companies that did not possess this feature. Additionally, while the Departments have noted that exempting churches and their integrated auxiliaries (which the regulations refer to as "religious employers") from the requirement to provide contraceptive coverage does not impermissibly undermine the government's compelling interests in promoting public health and ensuring that women have equal access to health care because churches are more likely to hire co-religionists,[30] the exemption to the contraceptive coverage requirement was provided against the backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship, such as the special treatment given to those organizations in the Code.[31] This exemption for churches and houses of worship is consistent with their special status under longstanding tradition in our society and under federal law, and is not a mere product of the likelihood that these institutions hire coreligionists. Hiring coreligionists is not itself a determinative factor as to whether an organization should be accommodated or exempted from the contraceptive requirements.

Another commenter stated that ownership of the entity should be limited to family members. The Departments do not believe that ownership of a closely held for-profit entity eligible for the accommodation should be limited to members of one family. Although many closely held corporations are family-owned, existing state and federal definitions of closely held or close corporations do not typically include this requirement. As stated below, however, for purposes of these final regulations, an individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family, meaning brothers and sisters (including half-brothers and half-sisters), spouses, ancestors, and lineal descendants. The Departments agree with the commenters who urged us to define a closely held entity, for purposes of these regulations, based on an existing federal definition. The Departments believe that this approach will minimize confusion for entities seeking the accommodation.

At the same time, the Departments also recognize the need for flexibility in the definition for purposes of the accommodation. Therefore, the Departments are adopting in these regulations a definition that is generally based on—but is more flexible than—the definition of a closely held corporation found in the Code[32] (which we refer to as the tax-law definition). Under the tax-law definition, a closely

---

[30] 78 FR 39887.

[31] 26 U.S.C. 6033(a)(3)(A).

[32] Code section 469(j)(1) states the "term 'closely held C corporation' means any C corporation described in section 465(a)(1)(B)." Section 465(a)(1)(B) provides "a C corporation with respect to which the stock ownership requirement of paragraph (2) of section 542(a) is met." Section 542(a)(2) provides that the applicable stock ownership requirement is met if "[a]t any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals." Similarly, section 856(h)(1)(A) provides "a corporation, trust, or association is closely held if the stock ownership requirement of section 542(a)(2) is met."

Exhibit 10                                                                                                    JA-0000195

held corporation is a corporation that has more than 50 percent of the value of its outstanding stock owned (directly or indirectly) by five or fewer individuals at any time during the last half of the tax year, and is not a personal service corporation.[33] The definitions for closely held corporation in various Code provisions reference the ownership test for personal holding companies contained in Code section 542(a)(2), which generally has the effect of identifying those corporations that are controlled by a small group of individuals and closely affiliated with their owners.

Drawing on the tax-law definition, with appropriate modifications to reflect the context here, these regulations establish that to be eligible for the accommodation, a closely held, for-profit entity must, among other criteria, be an entity that is not a nonprofit entity, and have more than 50 percent of the value of its ownership interests owned directly or indirectly by five or fewer individuals, or must have an ownership structure that is substantially similar.

As previously stated, for purposes of defining a closely held for-profit entity in these regulations, the Departments are using a definition that is more flexible than the tax-law definition of closely held corporation. Because the Departments believe that the tax-law definition might exclude some entities that should be considered to be closely held for purposes of the accommodation, and because some for-profit entities may have unusual or non-traditional ownership structures not readily analyzed under the 5/50 test, the definition under these final regulations also includes, as stated above, entities with ownership structures that are "substantially similar" to structures that satisfy the 5-owner/50-percent requirement.

For example, an entity where 49 percent of the value of the outstanding ownership interests are owned directly by six individuals could also qualify as a closely held for-profit entity because it has an ownership structure that is substantially similar to one in which five or fewer individuals hold at least 50 percent of the value of the outstanding ownership interests.

As another example, an entity owned by a series of corporate parents, where among the ultimate stockholders are a nonprofit entity and a for-profit corporation with three individual owners, who collectively own 45 percent of the outstanding ownership interests, also has a substantially similar ownership structure.

We note, however, that a publicly traded entity would not qualify as having a substantially similar ownership structure.

For purposes of the accommodation, the value of the ownership interests in the entity, whether the total ownership interests or those owned by five or fewer individuals, should be calculated based on all ownership interests, regardless of whether they have associated voting rights or any other privileges. This is consistent with how the tax-law definition of a closely held corporation is applied.

Because the accommodation will be sought on a prospective basis, the Departments do not believe it appropriate to incorporate, from the tax-law definition, the time interval over which the test is measured—that the given ownership structure be in place during the last half of the tax year—and instead adopt a test that is measured as of the date of the entity's self-certification or notice of its objection to provide contraceptive services on account of religious objections.

The tax-law definition of "closely held corporation" excludes certain "personal services corporations," such as accounting firms, actuarial science firms, architecture firms, and law firms. Although there are legitimate reasons for excluding personal service firms from the definition of "closely held corporation" for purposes of taxation, the Departments do not believe the distinction is necessary in this context. Therefore, a personal services corporation may qualify as a closely held for-profit entity under these final regulations, provided it satisfies the other criteria.

Following the tax-law definition, to determine if more than 50 percent of the value of the ownership interests is owned by five or fewer individuals, the following rules apply:

• Ownership interests owned by or for a corporation, partnership, estate, or trust are considered owned proportionately by the entity's shareholders, partners, or beneficiaries. For example, if a for-profit entity is 100 percent owned by a partnership, and the partnership is owned 100 percent by four individuals, the for-profit entity, for purposes of these regulations, is considered to be owned 100 percent by those four individuals.

• An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family. The "family" includes only brothers and sisters (including half-brothers and half-sisters), a spouse, ancestors, and lineal descendants. Accordingly, the family members count as a single owner for purposes of these final regulations.

• If a person holds an option to purchase ownership interests, he or she is considered to be the owner of those ownership interests.

To assist potentially eligible for-profit entities seeking further information regarding whether they qualify for the accommodation, an entity may send a letter describing its ownership structure to HHS at *accommodation@cms.hhs.gov*. If the entity does not receive a response from HHS to a properly submitted letter describing the entity's current ownership structure within 60 calendar days, as long as the entity maintains that structure, it will be considered to meet the requirement set forth in 26 CFR 54.9815–2713A(a)(4)(iii), 29 U.S.C. 2590.715–2713A(a)(4)(iii), and 45 CFR 147.131(b)(4)(iii). However, an entity is not required to avail itself of this process in order to qualify as a closely held for-profit entity.

Based on the information available, it appears that the definition of closely held for-profit entity set forth in these final regulations includes all the for-profit corporations that have filed lawsuits alleging that the contraceptive coverage requirement, absent an accommodation, violates RFRA.

One commenter stated that the definition should include any for-profit entity that is controlled directly or indirectly by a nonprofit eligible organization. The Departments agree, because in this case the nonprofit entity will represent one shareholder that owns more than 50 percent of the ownership interests in the for-profit entity.[34] The same facts and circumstances that are considered in determining whether a given for-profit entity qualifies as an eligible for-profit organization under these final regulations will also apply when one or more of its owners is a nonprofit organization. For purposes of the ownership concentration test set forth in these final regulations that applies to for-profit entities, a nonprofit organization that has an ownership interest in a for-profit entity will be considered one individual owner of the for-profit entity, and the non-profit organization's percentage ownership in the for-profit entity will be attributed to that nonprofit organization.

---

[33] *See http://www.irs.gov/Help-&-Resources/Tools-&-FAQs/FAQs-for-Individuals/Frequently-Asked-Tax-Questions-&-Answers/Small-Business,-Self-Employed,-Other-Business-Entities/Entities-5.*

[34] *See* EBSA Form 700.

Exhibit 10

**(b) The Process for Making the Decision To Object To Covering Contraceptive Services**

The August 2014 proposed regulations proposed that a closely held for-profit entity's objection to covering some or all of the contraceptive services otherwise required to be covered on account of its owners' sincerely held religious beliefs must be made in accordance with the organization's applicable rules of governance, consistent with state law. Some comments proposed alternative or additional criteria for how the decision must be made. One criterion suggested by many commenters was unanimity among all owners regarding opposition to contraception. However, one commenter objected to this requirement, stating that the regulations should not require unanimous shareholder consent because neither the *Hobby Lobby* decision nor state corporate law imposes such a requirement.

Some commenters favored requiring each equity holder to certify, under penalty of perjury, that he or she has a religious objection to the entity providing contraceptive coverage. These final regulations do not adopt a requirement that the owners unanimously decide that the entity will not offer contraceptive coverage based on a religious objection, or that any equity holder certify under penalty of perjury that he or she has a religious objection to the entity providing the coverage. The Departments believe that either requirement would be unduly restrictive, and would unnecessarily interfere with for-profit entities' decision-making processes. Instead, these final regulations provide that the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by the owners) must adopt a resolution (or take other similar action consistent with the organization's applicable rules of governance and with state law) establishing that the organization objects to covering some or all of the contraceptive services on account of its owners' sincerely held religious beliefs.

**(c) Documentation of the Decision To Assert a Religious Objection to Contraceptive Coverage**

In the August 2014 proposed regulations, the Departments sought comments on whether a for-profit entity seeking the accommodation should be required to document its decision-making process for objecting to coverage for some or all contraceptive services on account of religious objections (as opposed to merely disclosing the fact

that it made such a decision). Many comments supported a requirement that the decision-making process be documented, and that the entity submit, to its third party administrator or health insurance issuer, as applicable, and to the federal government, documentation of the entity's decision. These final regulations require that a for-profit entity seeking the accommodation must make the decision pursuant to a resolution (or other similar action), as described above. However, the Departments are not requiring that this resolution be provided as a matter of course to the federal government or any other party. Generally, the Departments believe it is sufficient that the fact of the decision itself, as opposed to documentation of the decision, be communicated as set forth in August 2014 interim final regulations and these final regulations. However, with respect to documentation of the decision, record retention requirements under section 107 of ERISA apply directly to ERISA-covered plans and, with respect to other plans or coverage subject to these final regulations, by operation of these final regulations, which incorporate the record retention requirements under ERISA section 107 by reference. This approach is consistent with document standards for nonprofit entities seeking the accommodation.

**(d) Disclosure of the Decision To Assert a Religious Objection to Contraceptive Services**

In the August 2014 proposed regulations, the Departments sought comments on whether a for-profit entity seeking the accommodation should be required to disclose publicly or to its employees its decision not to cover some or all contraceptive services on account of religious objections. This requirement would be in addition to the requirement that an eligible organization that is a for-profit entity that seeks the accommodation make its self-certification or notice of objection to providing contraceptive coverage on account of religious objections available for examination upon request by the first day of the plan year to which the accommodation applies, and be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

Many commenters suggested that the entity should be required to notify HHS of its decision to object (even if it chooses to self-certify and send the self-certification to its issuer or third party administrator). A few commenters stated that all employees and prospective employees (or student enrollees and their covered dependents)

must be made aware of their employer's (or educational institution's) refusal to offer contraceptive coverage. One commenter stated that a closely held for-profit entity should disclose the following to its shareholders and employees: (A) The reasons the decision was made, (B) the changes that will take place as a result of the decision, and (C) the number of people that will be affected by the decision. Another commenter stated that entities availing themselves of the accommodation should be required to publicize their justifications for denying women access to coverage of medications that serve purposes other than contraception. One commenter noted the need of employees to know by the employer's annual open enrollment period whether the employer is availing itself of the accommodation.

These final regulations do not establish any additional requirements to disclose the decision. The Departments believe that the current notice and disclosure standards afford individuals eligible for or enrolled in group health plans (and students eligible for or enrolled in student health insurance) with an accommodation adequate opportunity to know that the employer (or educational institution) has elected the accommodation for its group health plan (or insurance coverage), and that they are entitled to separate payment for contraceptive services from another source without cost sharing. Those standards require that, for each plan year to which the accommodation applies, a third party administrator that is required to provide or arrange payments for contraceptive services, and a health insurance issuer required to provide payment for these services, provide to plan participants and beneficiaries (or student enrollees and their covered dependents) written notice of the availability of separate payments for these services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment or re-enrollment in health coverage. Model language for this notice is provided in the regulations.

**(e) Sincerity of the Owners' Religious Beliefs**

Many commenters suggested that, for a closely held for-profit entity to be eligible for an accommodation, it should not be sufficient that the entity's owners object to providing contraceptive coverage. Rather, the commenters proposed that owners should also be required to agree to operate the entity in a manner consistent with religious

Exhibit 10                                                                                                           JA-0000197

principles, and in fact to so operate the entity. Some commenters pointed out that the July 2013 final regulations require non-profit religious organizations that avail themselves of the accommodation to "hold themselves out" as religious organizations.

The Departments have not adopted such a criterion for for-profit entities. The Supreme Court's decision in *Hobby Lobby* discussed the application of RFRA in connection with the religious beliefs of the owners of a closely held corporation.[35] These final regulations similarly focus on the religious exercise of the owners of the closely held entity and provide that the entity, in advancing the religious objection, represent that it does so on the basis of the religious beliefs of the owners. The Departments do not believe it is also necessary that the entity itself demonstrate by its bylaws, mission statement, or other documents or practices that it has a religious character. Non-profit entities ordinarily do not have owners in the same way as do for-profit entities, and thus the religious character of a non-profit entity would be reflected in how it holds itself out.

(f) Other Steps the Departments Should Take To Ensure Contraceptive Coverage With No Cost Sharing

The August 2014 proposed regulations solicited comments on other steps the Departments should take to help ensure that participants and beneficiaries (in the case of student health insurance coverage, enrollees and dependents) in plans subject to an accommodation are able to obtain, without cost, the full range of FDA-approved contraceptives without cost sharing. Many commenters stated that a government enforcement body should be established to monitor compliance by plan sponsors, third party administrators, and health insurance issuers, of their respective obligations associated with the accommodation. At this time, the Departments do not believe that an independent body need be established, although as stated above, the Departments will use their established oversight processes, applicable to all the Affordable Care Act market reforms of title XXVII of the PHS Act to monitor compliance with the requirement to provide contraceptive services without cost sharing. As part of those processes, the Departments will work with non-compliant parties to bring them into compliance, and will take enforcement action as appropriate.

Other commenters stated that the federal government should ensure that no barriers to contraceptive coverage exist due to an enrollee's cultural background, English proficiency, disability, or sexual orientation. The Departments agree that no barriers should exist. The same federal and applicable state laws that would prohibit discrimination by employers, group health plans, third party administrators, and health insurance issuers generally would also apply with respect to the entities arranging for or providing separate payments for contraceptive services for women in group health plans and student health insurance subject to an accommodation.

Other commenters urged that the separate payments for contraceptive services be provided in the same manner in which the group health plan or student health insurance would have otherwise covered these services had they not had an accommodation, or in the same manner in which the plan or coverage subject to an accommodation covers other, non-contraceptive benefits. The Departments, however, maintain the view that reasonable differences in the way services are paid for or provided would not necessarily be inappropriate, provided those differences do not create barriers to accessing payments for contraceptive services. Another commenter stated that health insurance issuers of plans subject to an accommodation should not be permitted to require enrollees to have two insurance cards, one for contraceptive benefits, and one for other benefits. The Departments do not believe that this practice, in of itself, would constitute a barrier to accessing separate payments for contraceptive services.

(g) Other Comments That Relate to the July 2013 Final Regulations

In the August 2014 proposed regulations and interim final regulations, the Departments sought comment on other potential changes to the July 2013 final regulations in light of the proposed change to the definition of eligible organization. In particular, the Departments sought comment on applying the approach set forth in the July 2013 final regulations in the context of the expanded definition of eligible organization. The July 2013 final regulations provide for separate payments for contraceptive services for participants and beneficiaries in self-insured group health plans of eligible organizations in a manner that enables these organizations to completely separate themselves from administration and payment for contraceptive coverage.

Specifically, the third party administrator must provide or arrange the payments, and the third party administrator can seek reimbursement for the costs (including an allowance for administrative costs and margin) by making an arrangement with a participating issuer—that is, an issuer offering coverage through a Federally-facilitated Exchange (FFE). The participating issuer can receive an adjustment to its FFE user fees to finance these costs.

One commenter suggested that the federal government set up a program to dispense these services using contractors. Another commenter suggested that pharmaceutical companies could provide certain contraceptives directly by mail to persons who are told at a dispensing pharmacy that their plan has denied coverage. Additionally, the pharmaceutical companies could directly supply doctors who prescribe birth control, who in turn could dispense directly to patients who are not covered under their employer-sponsored group health plan or student health insurance coverage. One commenter suggested making contraception available for any woman free of charge through a doctor. One commenter suggested providing contraceptive care through Medicaid.

The Departments have not adopted the proposals advanced by these comments for two reasons. First, the Departments do not have the legal authority to require pharmaceutical companies or doctors to provide contraceptives directly, nor do they have the authority to implement the other alternative arrangements proposed by these commenters. Second, these alternatives raise obstacles to access to seamless coverage. Consistent with the statutory objective of promoting access to contraceptive coverage and other preventive services without cost sharing, plan beneficiaries and enrollees should not be required to incur additional costs—financial or otherwise—to receive access and thus should not be required to enroll in new programs or to surmount other hurdles to receive access to coverage. The Departments believe that the third party administrators and health insurance issuers already paying for other medical and pharmacy services on behalf of the women seeking the contraceptive services are better placed to provide seamless coverage of the contraceptive services, than are other providers that may not be in the insurance coverage network, and that lack the coverage administration infrastructure to verify the identity of women in accommodated

---

[35] *See* 134 S. Ct. at 2768.

Exhibit 10    JA-0000198

health plans and provide formatted claims data for government reimbursement.

Some commenters suggested other changes to the July 2013 regulations, with respect to how separate payments for contraceptive services provided under the accommodation are funded. One commenter expressed concern that the August 2014 proposed regulations are silent as to possible funds for reimbursement of costs incurred for contraception services where there is no FFE operating in the state. This commenter also noted that the regulations do not consider the possibility that the cost for contraceptive services may exceed the issuer's FFE user fee, nor do they address how a third party administrator would be reimbursed if the issuer is no longer a participating issuer in the FFE. The commenter suggested the Departments consider several different financing options: The user fee for the risk adjustment program; the CMS program management fund; the user fee for the Medicare Part D program; the Prevention and Public Health Fund; medical loss ratio rebates; CMS innovation funding; and the health insurance provider fee.

Another commenter recommended that HHS provide for an expedited process of adjusting FFE user fees in case the volume of contraceptive claims is greater than expected. This commenter also suggested that the Departments also consider alternative means of generating funding for this purpose, such as allowing an issuer to charge a premium of at least an amount equal to the pro rata share of the rate the eligible organization would have paid had it not elected the accommodation, or directly subsidize the cost of contraception using funding provided by the Prevention and Public Health Fund.

One commenter stated that the Departments should evaluate the limitations of current funding arrangements with respect to the current accommodation for eligible non-profit entities, given the additional demands of the proposal to expand the accommodation to certain for-profit entities. The commenter suggested allowing a separate government funded reimbursement mechanism for enrollees in both insured and self-funded plans as an alternative approach to funding the program. If the current funding approach is continued, the commenter recommended a reassessment of the limitations of the approach for third party administrators. If third party administrators remain responsible for providing or arranging separate

payments for contraceptive services, the commenter recommended a broadening of the pool available for reimbursement beyond individually negotiated arrangements with issuers participating in the FFE, including potentially establishing a single pool for reimbursement or finding an alternative, simpler financing mechanism for third party administrators, including offsets from federal income taxes, and offsets to amounts due from other lines of business operated by the third party administrator.

At this time, the Departments are not adopting an alternative approach to funding separate payments for contraceptive services with respect to costs incurred for women in plans subject to an accommodation, although the Departments will continue to explore the feasibility of different ideas, including those proposed in the comments.

One commenter suggested that issuers should be permitted to treat the cost of providing separate payments for contraceptive services for women in plans subject to an accommodation as an adjustment to claims costs for purposes of calculating their medical loss ratios, while still being allowed to treat such payments as an administrative cost spread across the issuer's entire risk pool.[36] With respect to calculating medical loss ratios, HHS has previously stated in rulemaking that an insurer of an accommodated insured group health or student plan may include the cost of the actual payments it makes for contraceptive services in the numerator of its medical loss ratio.[37]

Several commenters asked whether, in light of the fact that the accommodation was proposed to be expanded to a new set of entities, if the Department's discussion in the preamble to the July 2013 final regulations about the extent to which the accommodation has an effect on other laws, continues to apply.[38] The Departments explained in that discussion that state insurance laws that provide greater access to contraceptive coverage than federal standards are unlikely to be preempted, and that, in states with broader religious exemptions and accommodations with respect to health insurance issuers than those in the regulations, plans are still required

to comply with the federal standard. These principles continue to apply.

One commenter stated that the *Hobby Lobby* decision applies to every form of medical care, not just contraception, and that the regulations should reflect that. However, in *Hobby Lobby*, the Court stated:

> In any event, our decision in these cases is concerned solely with the contraceptive mandate. Our decision should not be understood to hold that an insurance-coverage mandate must necessarily fail if it conflicts with an employer's religious beliefs. Other coverage requirements, such as immunizations, may be supported by different interests (for example, the need to combat the spread of infectious diseases) and may involve different arguments about the least restrictive means of providing them.[39]

Regarding fully insured plans, one commenter noted that the July 2013 final regulations permit issuers that are providing separate payments for contraceptive services under the accommodation, to pay for all FDA-approved contraceptive services, or only for those services to which the eligible organization objects to covering on religious grounds. The commenter noted that this approach simplifies the operational issues associated with implementing the accommodation across multiple employers, and sought clarification that this approach is available to third party administrators as well. The Departments clarify that this option is available to third party administrators with respect to self-insured plans.

One commenter requested that notices of objection to covering contraceptive services on religious grounds be provided with at least 60 days' advance notice, and that any change in objection status based on change of ownership of the employer not be implemented until the next plan year or policy year. The Departments do not adopt this suggestion. Instead, the Departments are extending, to closely held for-profit entities, the same timeframes that have been in effect for non-profit eligible organizations, that is, a plan sponsor can provide such notice, and implement plan benefit changes associated with the accommodation, at any time. For group health plans subject to ERISA, existing notice and timeframe requirements under ERISA apply.

Another commenter stated that health insurance issuers and third party administrators should only be required to provide or arrange for separate payments for contraceptive services for eligible organizations that have invoked an accommodation no earlier than the

---

[36] *See* Discussion of how an issuer may achieve cost neutrality in the preamble to the July 2013 final regulations, at 78 FR 39878.

[37] *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2015 (Mar. 11, 2014), at 79 FR 13809.

[38] 78 FR 39888.

[39] 134 S. Ct. at 2783.

Exhibit 10                                                                                          JA-0000199

first day of the first plan year that follows publication of these final regulations. To provide employers, institutions of higher education, third party administrators, and health insurance issuers adequate time to comply, these final regulations apply beginning on the first day of the first plan year (or, in the individual market, the first policy year) after these regulations are effective. Accordingly these final regulations are effective beginning on the first day of the first plan year (or, in the individual market, the first policy year) that begins on or after September 14, 2015.

Several commenters stated that the decision to not cover some or all contraceptives on religious grounds should be made annually. The Departments do not believe such a requirement is appropriate or necessary.

One commenter asked for clarification as to how a notice of objection would be provided by employers purchasing coverage through the Small Business Health Options Program (SHOP) and whether there will be a mechanism in place that permits an eligible organization to select a small group plan and provide a notice of objection. With respect to employers purchasing coverage through the SHOP, health insurance issuers selling policies through it, and participants and beneficiaries in such plans, all of the rights and obligations that are associated with these regulations apply no differently than if the employer were to purchase coverage outside of the SHOP.

One commenter stated that providing separate payments for contraceptive services is not cost-neutral for an issuer, and that it is not appropriate for an issuer of a student health insurance plan to be required to make separate payments for contraceptive services for enrollees in student health plans subject to an accommodation, and suggested that the Marketplaces should instead offer free individual market policies covering contraception to those who desire such coverage, or that such individuals get such services through existing clinics. In the alternative, the commenter proposed an "above the line" deduction on their federal income taxes for all costs incurred for separate payments made for contraceptive services for enrollees in a student health plan subject to an accommodation. The Departments do not adopt the comment. For the reasons stated in the July 2013 final regulations, the Departments believe that covering contraceptive services is cost-neutral for an issuer at risk for the enrollees in a plan subject to an accommodation. With respect to student health insurance plans, these

regulations finalize a clarification proposed in the August 2014 proposed regulations under which a reference to the definition of "institution of higher education" found in 20 U.S.C. 1002 is added to 45 CFR 147.131(f), to clarify that both nonprofit and closely held for-profit institutions of higher education, with respect to their insured student health plans, may qualify as eligible organizations.

## III. Economic Impact and Paperwork Burden

### A. Executive Orders 12866 and 13563— Department of Health and Human Services and Department of Labor

Executive Order 12866 (58 FR 51735) directs agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects; distributive impacts; and equity). Executive Order 13563 (76 FR 3821, January 21, 2011) is supplemental to and reaffirms the principles, structures, and definitions governing regulatory review as established in Executive Order 12866.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a proposed rule—(1) having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis (RIA) must be prepared for major rules with economically significant effects ($100 million or more in any 1 year), and a "significant" regulatory action is subject to review by the Office of Management and Budget (OMB). As discussed below, the Departments anticipate that these regulations—most notably the policies first established in the 2010 interim final rule—are likely to have economic impacts of $100 million or more in any

one year, and therefore meet the definition of "significant rule" under Executive Order 12866. Therefore, the Departments have provided an assessment of the potential costs, benefits, and transfers associated with these final regulations. In accordance with the provisions of Executive Order 12866, these final regulations were reviewed by the OMB.

### 1. Need for Regulatory Action

These final regulations finalize the July 2010 interim final regulations related to coverage of recommended preventive services, the August 2014 interim final regulations related to the process an eligible organization uses to provide notice of its religious objections to the coverage of contraceptive services, and the August 2014 proposed regulations related to the definition of eligible organization.

As discussed later in the RIA, historically there has been an underutilization of preventive services, as health insurance issuers have had little incentive to cover these services. Currently, there is still an underutilization of some preventive services due to a number of barriers, including costs, ethnic/gender disparities,[40] and a general lack of knowledge by those with medical coverage.[41] While many of these factors are being addressed through the Affordable Care Act and these final regulations, the current underutilization of preventive services stems from three main factors. First, due to turnover in the health insurance market, health insurance issuers have historically lacked incentives to cover preventive services, whose benefits may only be realized in the future when an individual may no longer be enrolled with that issuer. Second, many preventive services generate benefits that do not accrue immediately to the individual that receives the services, making the individual less likely to avail themselves of the services, especially in the face of direct, immediate costs. Third, some of the benefits of preventive services accrue to society as a whole, and thus do not get factored into an individual's decision making over whether to obtain such services.

---

[40] Call, K. T., McAlpine, D. D., Garcia, C. M., Shippee, N., Beebe, T., Adeniyi, T. C., & Shippee, T. (2014). Barriers to Care in an Ethnically Diverse Publicly Insured Population. *Medical Care*.

[41] Reed, M. E., Graetz, I., Fung, V., Newhouse, J. P., & Hsu, J. (2012). In consumer-driven health plans, a majority of patients were unaware of free or low-cost preventive care. *Health Affairs*, 31(12), 2641–2648.

Exhibit 10

The July 2010 interim final regulations and these final regulations address these market failures through two avenues. First, the regulations require coverage of recommended preventive services by non-grandfathered group health plans and health insurance issuers in the group and individual markets, thereby overcoming plans' lack of incentive to invest in these services. Second, the regulations eliminate cost-sharing requirements, thereby removing a barrier that could otherwise lead an individual to not obtain such services, given the long-term and partially external nature of these benefits.

The August 2014 interim final regulations provided an alternate process that eligible organizations can use to provide notice of their religious objections to providing coverage for some or all of the contraceptive services to HHS, instead of providing the EBSA Form 700 to the issuers or third party administrators of their group health plan. The provisions of those interim final regulations are being finalized without any changes.

These final regulations also amend the definition of an eligible organization to include a closely held for-profit entity that has a religious objection to providing coverage for some or all of the contraceptive services otherwise required to be covered by the group health plan or student health insurance plan established, maintained, or arranged by the organization.

These final regulations are necessary in order to provide rules that plan sponsors and issuers can continue to use to determine how to provide coverage for certain recommended preventive services without the imposition of cost sharing, to ensure women's ability to receive those services, and to respect the religious beliefs of qualifying eligible organizations with respect to their objection to covering contraceptive services.

2. Summary of Impacts

In accordance with OMB Circular A–4, Table III.1 below depicts an accounting statement summarizing the Departments' assessment of the benefits, costs, and transfers associated with this regulatory action. It is expected that all non-grandfathered plans are already complying with the provisions of the July 2010 and August 2014 interim final regulations. Therefore, benefits related to those regulations have been experienced and costs have already been incurred. The Departments are providing an assessment of the impacts of existing provisions already experienced and expected in the future, in addition to the anticipated impacts of new provisions in these final regulations.

TABLE III.1—ACCOUNTING TABLE

| Benefits: |
| --- |
| Qualitative: |
|   * Increased access to and utilization of recommended preventive services, leading to the following benefits: |
|     (1) Prevention and reduction in transmission of illnesses as a result of immunization and screening of transmissible diseases; |
|     (2) delayed onset, earlier treatment, and reduction in morbidity and mortality as a result of early detection, screening, and counseling; |
|     (3) increased productivity and reduced absenteeism; and |
|     (4) savings from lower health care costs. |
|   * Benefits to eligible for-profit entities from not being required to facilitate access to or pay for services that contradict their owners' religious beliefs. |

| Costs: |
| --- |
| Qualitative: |
|   * New costs to the health care system when individuals increase their use of preventive services in response to the changes in coverage and cost-sharing requirements of preventive services. The magnitude of this effect on utilization depends on the price elasticity of demand and the percentage change in prices facing those with reduced cost sharing or newly gaining coverage. |
|   * Administrative cost to eligible for-profit entities to provide self-certification to issuers or third party administrators or notice to HHS. |
|   * Administrative cost to issuers and third party administrators for plans sponsored by eligible closely held for-profit entities to provide notice to enrollees. |

| Transfers: |
| --- |
|   * Costs previously paid out-of-pocket for certain preventive services are now covered by group health plans and issuers. |
|   * Risk pooling in the group market will result in sharing expected cost increases across an entire plan or employee group as higher average premiums for all enrollee. However, not all of those covered will utilize preventive services to an equivalent extent. As a result, these final regulations create a small transfer from those paying premiums in the group market utilizing less than the average volume of preventive services in their risk pool to those whose utilization is greater than average. To the extent there is risk pooling in the individual market, a similar transfer will occur. |
|   * Transfer of costs related to certain preventive services from eligible self-funded closely held for-profit entities to third party administrators and issuers that provide (or arrange) separate payments for contraceptive services. Third party administrators can make arrangements with an issuer offering coverage through an FFE to obtain reimbursement for its costs, and the issuer offering coverage through the FFE can receive an adjustment to the FFE user fee. |

3. Estimated Number of Affected Entities

For purposes of this analysis, the Departments have defined a large group health plan as an employer plan with 100 or more workers and a small group plan as an employer plan with less than 100 workers. The Departments estimate that there are approximately 140,000 large and 2.2 million small ERISA-covered group health plans with an estimated 93.2 million participants in large group plans and 36 million participants in small group plans. The Departments estimate that there are approximately 128,000 governmental plans with 39 million participants in large plans and 2.8 million participants in small plans.[42] In 2013, approximately

---

[42] All participant counts and the estimates of individual policies are from the U.S. Department of
Continued

Exhibit 10    JA-0000201

12.26 million participants were covered by individual health insurance policies.[43]

Group health plans and health insurance issuers offering group and individual health insurance coverage that are not grandfathered health plans will be affected by these regulations. There are an estimated 500 issuers offering group and individual health insurance coverage.[44] The number of employer-sponsored grandfathered plans has been decreasing steadily since 2010. Thirty-seven percent of employers offering health benefits offered at least one grandfathered health plan in 2014, compared to 54 percent in 2013 and 72 percent in 2011. Therefore, more and more enrollees in employer-sponsored plans have gained access to preventive services without cost sharing. Twenty-six percent of covered workers were enrolled in a grandfathered health plan in 2014, as compared to 36 percent in 2013 and 56 percent in 2011.[45] In the individual market, it is expected that a large proportion of individual policies are not grandfathered. In addition, enrollees in qualified health plans purchased through the Marketplaces have non-grandfathered policies. At the end of the second enrollment period, nearly 11.7 million individuals selected or were automatically reenrolled into a 2015 health insurance plan through the Marketplaces.[46]

It is uncertain how many closely held for-profit entities have religious objections to providing coverage for some or all of the contraceptive services otherwise required to be covered. Based on litigation and communication received by HHS, the Departments estimate that at least 87 closely held for-profit eligible organizations will seek the religious accommodation provided in these final regulations. Health insurance issuers (or third party administrators for self-insured plans) for the group health plans established or maintained by these eligible organizations (and health insurance issuers of closely held for-profit institutions of higher education) will assume sole responsibility for providing (or arranging) separate payments for contraceptive services directly for plan participants and beneficiaries (and for student enrollees and dependents), without cost sharing, premium, fee, or other charge to plan participants or beneficiaries (or student enrollees and dependents) or to the eligible organization or its plan. In addition, based on litigation, the Departments estimate that at least 122 non-profit eligible organizations will have the option to provide notice of their religious objections to HHS, instead of providing the EBSA Form 700 to the issuer or third party administrator of their group health plan. These numbers are likely to underestimate the number of eligible organizations that will seek the accommodation. However, these are the best estimates available to the Departments at this time.

### 4. Benefits

In the July 2010 interim final regulations, the Departments anticipated several types of benefits that will result from expanding coverage and eliminating cost sharing for recommended preventive services. First, individuals will experience improved health as a result of reduced transmission, prevention or delayed onset, and earlier treatment of disease. Second, healthier workers and children will be more productive with fewer missed days of work or school. Third, some of the recommended preventive services will result in savings due to lower health care costs.

As stated in the July 2010 interim final regulations, preventive service coverage is limited to those recommended by the Task Force (grade of A or B), an applicable Advisory Committee, and HRSA.[47] These final regulations can be expected to continue to increase access to and utilization of these services, which have been historically underutilized. For example, 27.7 percent of adults aged 50 to 75 have never been screened for colorectal cancer (such as sigmoidoscopy and/or colonoscopy).[48] In 2012, the median percentage of women over the age of 18 that have not had a pap test in the past 3 years was 22 percent.[49] The CDC recently found that in adults over 50, fewer than 30 percent are up-to-date with core preventive services.[50]

As explained in the July 2010 interim final regulations, numerous studies have shown that improved coverage, or reduced costs, of preventive services results in higher utilization of these services[51] leading to potentially substantial benefits. Research suggests there are significant health benefits associated with a number of newly covered preventive services required under the statute and these final regulations. The National Council on Preventive Priorities (NCPP) has estimated that achieving a utilization rate of 90 percent for eight clinical preventive services would save more than 150,000 lives each year in the U.S., including 42,000 if smokers were offered medication or other cessation assistance (Table III.2).[52] From an economic viewpoint, many preventive services offer high economic value[53] resulting in an estimated savings of $3.7 billion.[54] Even if a rate of 90 percent utilization is not achieved due to a variety of barriers, including financial, service accessibility, and socioeconomic disparities, the Departments expect that utilization will increase among those individuals in plans subject to the regulations because the provisions eliminate cost sharing and require coverage for these services. It is expected that the increased utilization

---

Labor, EBSA calculations using the March 2013 Current Population Survey Annual Social and Economic Supplement and the 2012 Medical Expenditure Panel Survey and the 2012 Census of Government.

[43] This estimate includes enrollment in student health insurance plans. Source: Data from Medical Loss Ratio submissions for 2013 reporting year, available at *http://www.cms.gov/CCIIO/Resources/Data-Resources/mlr.html.*

[44] Source: Data from Medical Loss Ratio submissions for 2013 reporting year.

[45] See Kaiser Family Foundation and Health Research and Education Trust, Employer Health Benefits 2014 Annual Survey (2014), available at *http://kff.org/private-insurance/report/2014-employer-health-benefits-survey/*; and Employer Health Benefits 2011 Annual Survey (2011) available at *http://kff.org/health-costs/report/employer-health-benefits-annual-survey-archives/.*

[46] This estimate represents the number of individuals who have selected, or been automatically reenrolled into a 2015 plan through the Marketplaces, with or without payment of premium. See ASPE, Health Insurance Marketplaces 2015 Open Enrollment Period: March Enrollment Report, available at *http://aspe.hhs.gov/health/reports/2015/MarketPlaceEnrollment/Mar2015/ib_2015mar_enrollment.pdf.*

[47] See *http://www.ahrq.gov/research/findings/final-reports/uspstf/uspstfeval.pdf* for details of the Task Force grading and *http://www.uspreventiveservicestaskforce.org/Page/Name/uspstf-a-and-b-recommendations/* for current recommendations.

[48] CDC. Vital Signs: colorectal cancer screening test use—United States, 2012. MMWR 2013;62:881–888.

[49] Behavioral Risk Factor Surveillance System Numbers (2012), *http://apps.nccd.cdc.gov/BRFSS/page.asp?cat=CC&yr=2012&state=All#CC.*

[50] CDC Focuses on Need for Older Adults To Receive Clinical Preventive Services, brief released by CDC (2012). *http://www.cdc.gov/aging/pdf/cps-clinical-preventive-services.pdf.*

[51] See e.g., Meeker D, Joyce GF, Malkin I, et al. Coverage and preventive screening. Health Serv Res. 2011; 46:173–184. Study found that patients responded to the exclusion of preventive services from deductibles and reducing cost sharing resulted in increased utilization of lipid screening, pap smears, and other services. See e.g., Jill Bernstein, Deborah Chollet, and C. Gregory Peterson. Encouraging Appropriate Use of Preventive Health Services, Issue Brief Mathematica Policy Research Inc., Princeton, NJ (May 2010) Number 2.

[52] National Commission on Prevention Priorities. Preventive Care: A National Profile on Use, Disparities, and Health Benefits. Partnership for Prevention. August 2007. *http://www.prevent.org/data/files/initiatives/ncpppreventivecarereport.pdf.*

[53] Woolf, Steven. A Closer Look at the Economic Argument for Disease Prevention. JAMA 2009; 301(5):536–538.

[54] Maciosek, Michael V., Coffield, Ashley B., Flottemesch, et al., Use of Preventive Services In U.S. Health Care Could Save Lives At Little Or No Cost. Health Affairs 2010, 29(9) 1656–1660.

Exhibit 10

JA-0000202

of these services will lead providers to increase their use of these services knowing that they will be covered without cost sharing.

### TABLE III.2—LIVES SAVED FROM INCREASING UTILIZATION OF SELECTED PREVENTIVE SERVICES

| Preventive service | Population group | Percent utilization (2005) | Lives saved annually if 90 percent utilization |
|---|---|---|---|
| Regular aspirin use | Men 40+/Women 50+ | 40 | 45,000 |
| Smoking cessation (medication and advice) | All adult smokers | 28 | 42,000 |
| Colorectal cancer screening | Adults 50+ | 48 | 14,000 |
| Influenza vaccination | Adults 50+ | 37 | 12,000 |
| Cervical cancer screening (in past 3 years) | Women 18–64 | 83 | 620 |
| Cholesterol screening | Men 35+/Women 45+ | 79 | 2,450 |
| Breast cancer screening (in past 2 years) | Women 40+ | 67 | 3,700 |
| Chlamydia screening | Women 16–25 | 40 | 30,000 |

**Source:** National Commission on Prevention Priorities, 2007.

Studies comparing the utilization of preventive services among adults show utilization rates range from as high as 89 percent for blood pressure checks to only 40 percent for annual flu vaccinations.[55] Under the Affordable Care Act, there have been significantly higher usage rates of several preventive services in young adults and women, including blood pressure tests, cholesterol screening, and contraceptive services.[56] Numerous studies have shown that improved coverage, or reduced costs, of preventive services results in higher utilization of these services[57] leading to potentially substantial benefits. The Departments expect that utilization of preventive services will continue to increase over time among those individuals in plans affected by these regulations because the provisions eliminate cost sharing and require coverage for these services.

Some recommended preventive services have both individual and public health value. Vaccines have reduced or eliminated serious diseases that, prior to vaccination, routinely caused serious illnesses or deaths.

Maintaining high levels of immunization in the general population protects the un-immunized from exposure so that individuals who cannot receive, or who do not have a sufficient immune response to the vaccine, are indirectly protected.[58]

A second type of benefit of these final regulations is improved workplace productivity and decreased absenteeism for school children. A study by Gallup has found that among workers working at least 30 hours a week, those considered overweight or obese with one or more chronic condition will miss one to 3.5 days of work a month.[59] With an estimated 450 million days lost to absenteeism, the cost of lost productivity due to personal health or the inability to concentrate due to their own or a family member's illness is estimated to be between $153 and $260 billion annually.[60]

Illness and poorly controlled chronic disease also contribute to increased absenteeism among school children. Recent data indicates that in the 2011–2012 academic year, 6.2 percent of children aged 6 through 17 missed 11 or more days of school.[61] Studies have shown that student health and well-

being have been positively linked to students' academic outcomes, including attendance, grades, test scores, and high school graduation.[62] As discussed in the July 2010 interim final rules, studies show that reduced cost sharing and increased access to care can improve productivity in both schools and the labor market. Thus, it is expected that these final regulations can have a substantial benefit to the children in the nation's education system and the labor market, both current and future.

A third type of benefit from some preventive services is cost savings. Increasing the provision of preventive services is expected to reduce the incidence or severity of illness, and, as a result, reduce expenditures on treatment of illness. As discussed in the July 2010 interim final regulations and elsewhere,[63] childhood vaccinations have been found to generate considerable benefit and savings to both individuals and society. Employing a decision analysis cohort model of U.S. children born during 1994–2013, researchers at CDC analyzed the economic impact of DTaP (diphtheria and tetanus toxoids and acellular Pertussis), Hib (Haemophilus influenza type b), Polio (OPV then IPV), MMR (measles, mumps and rubella), Hepatitis B, varicella, pneumococcal disease (PCV, 7-valent and 13-valent), and rotavirus vaccines in children aged ≤6

[55] The Commonwealth Fund. "Current Trends in Health Coverage and the Effects of Implementing the Affordable Care Act" (2013). http://www.commonwealthfund.org/~/media/files/publications/fund-report/2013/apr/1681_collins_insuring_future_biennial_survey_2012_final.pdf.

[56] See. e.g., Lau IS, Adams SH, Park MJ, Boscardin WJ, Irwin CE. Improvement in preventive care of young adults after the affordable care act: the affordable care act is helping. JAMA Pediatr. 2014; 168(12):1101–1106. See e.g., Sonfield, A., Tapales, A., Jones RK., Finer, LB. Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update. Contraception. 2015: 91(1): 44–48.

[57] See e.g., Meeker D, Joyce GF, Malkin J, et al. Coverage and preventive screening. Health Serv Res. 2011; 46:173–184. Study found exclusion of deductibles from, and reduced cost sharing of preventive services resulted in increased utilization of lipid screening, pap smears, and other services. See e.g., Jill Bernstein, Deborah Chollet, and G. Gregory Peterson, Issue Brief Mathematica Policy Inc., Princeton, NJ (May 2010) Number 2.

[58] See Modern Infectious Disease Epidemiology by Johan Giesecke 1994. Chapter 18, The Epidemiology of Vaccination.

[59] Unhealthy U.S. Workers' Absenteeism Costs $153 Billion. Well-Being, Gallup October 17, 2011 at http://www.gallup.com/poll/150026/Unhealthy-Workers-Absenteeism-Costs-153-Billion.aspx.

[60] Ibid, see e.g., Health and Productivity Among U.S. Workers, Karen Davis, Ph.D., Sara R. Collins. Ph.D., Michelle M. Doty, Ph.D., Alice Ho, and Alyssa L. Holmgren, The Commonwealth Fund, August 2005. http://www.commonwealthfund.org/publications/issue-briefs/2005/aug/health-and-productivity-among-u-s-workers.

[61] Children Who Missed 11 or More Days of School per Year Due to Illness or Injury, Kids Count Data Center at http://datacenter.kidscount.org/data/tables/5202-children-who-missed-11-or-more-days-of-school-per-year-due-to-illness-or-injury?loc=1&loct=2#detailed/1/any/false/1021,18,14/691,30,18/11683.

[62] Vaughn, B., Princiotta, D., Barry, M., Fish, H., & Schmitz, H. (2013). Safe Supportive Living Brief: Schools and The Affordable Care Act. https://safesupportivelearning.ed.gov/sites/default/files/1953_Schools%20Affordable%20Care%20Brief_d3%20lvr.pdf.

[63] See e.g. Maciosek, Michael V., Coffield, Ashley B., Flottemesch, et al., Use of Preventive Services In U.S. Health Care Could Save Lives At Little Or No Cost. Health Affairs 2010 29(9) 1656–1660. See eg. Zhou F, Santoli J, Messonnier ML, et al. Economic Evaluation of the 7-Vaccine Routine Childhood Immunization Schedule in the United States, 2001. Arch Pediatr Adolesc Med. 2005; 159(12):1136–1144.

Exhibit 10                                                                 JA-0000203

years. The study estimates that among the 78.6 million children born during this period, these routine immunizations will prevent 322 million illnesses and 21 million hospitalizations, averting 732,000 premature deaths over their lifetime. Furthermore, it was estimated that these routine vaccinations will potentially avert $402 billion in direct costs and $1.5 trillion in societal costs and a net savings of $295 billion and $1.38 trillion for payers and society, respectively (in 2013 dollars).[64]

As with immunizations, other preventive services have been estimated to have cost-savings benefits. As discussed in the July 2010 interim final regulations, aspirin use with high risk adults and tobacco cessation and screening can both yield net savings. For example, in Massachusetts, the availability of tobacco cessation treatments combined with promotional campaigns resulted in a ten percent decline in Medicaid enrolled smokers, a $3.12 savings for every dollar spent on the benefit.[65] As discussed in more detail in the July 2010 interim final regulations, another area where prevention can achieve savings is obesity prevention and reduction. Based on recent guidelines, up to 116.1 million American adults are candidates for both pharmaceutical and behavioral treatments for weight loss, and up to 32 million are eligible for bariatric surgery.[66] According to the CDC, from 2011–2012, 16.9 percent of children 2 through 19 years of age and 34.9 percent of adults aged 20 and over were obese (defined as having a body mass index (BMI) greater than or equal to the age and sex-specific 95th percentiles of the 2000 CDC growth charts).[67] One study used the number of obese and overweight twelve-year olds in 2005 to simulate a cohort over their lifetimes, indicating that a sustained one-percentage-point decrease in the prevalence of obesity over the lifetime of this cohort would result in an estimated savings of $260.4 million in total medical expenditures.[68] These final regulations are expected to increase the take-up rate of preventative services counseling for obesity and other conditions among patients, and lead physicians to increase appropriate referrals for such services. The effect of these final regulations is expected to be magnified due to the numerous public and private sector initiatives dedicated to combating the obesity epidemic and smoking cessation.

Eligible closely held for-profit entities that seek the accommodation to exclude coverage for contraceptive services from health coverage offered to their employees and students, and eligible organizations that opt to provide notice to HHS, will benefit from not being required to facilitate access to or pay for coverage that are contrary to their owners' religious beliefs. Women enrolled in plans under this accommodation will have continued access to contraceptive services without cost sharing.

## 5. Costs and Transfers

The changes in how plans and issuers continue to cover the recommended preventive services resulting from these final regulations will result in changes in covered benefits and premiums for individuals in plans and health insurance coverage subject to these final regulations. New costs to the health system result when individuals increase their use of preventive services in response to the changes in coverage of those services. Cost sharing, including coinsurance, deductibles, and copayments, divides the costs of health services between the plan or issuer and the enrollees. The removal of cost sharing increases the quantity of services demanded by lowering the direct cost of the service to consumers. Therefore, the Departments expect that the statute and these final regulations will continue to increase utilization of the covered preventive services. The magnitude of this effect on utilization depends on the price elasticity of demand.

Several studies have found that individuals are sensitive to prices for health services.[69] CDC researchers who studied out-of pocket costs of immunizations for privately insured children up to age 5 (in families in Georgia in 2003) found that a one percent increase in out-of-pocket costs for routine immunizations (DTaP, IPV, MMR, Hib, and Hep B) was associated with a 0.07 percent decrease in utilization.[70]

Eligible closely held for-profit entities that seek the accommodation for contraceptive services will incur administrative costs to provide self-certifications to issuers or third party administrators or notices to HHS. Issuers and third party administrators for health plans sponsored by these eligible organizations will also incur administrative costs to provide notifications to enrollees. The costs related to these information collection requirements are estimated in section D below.

Along with new costs of induced utilization, there are transfers associated with these final regulations. A transfer is a change in who pays for the services, where there is not an actual change in the level of resources used. For example, costs that were previously paid out-of-pocket for certain preventive services will now be covered by plans and issuers under these final regulations. Such a transfer of costs could be expected to lead to an increase in premiums.

In the July 2010 interim final regulations, the Departments analyzed the impact of eliminating cost sharing, increases in services covered, and induced utilization on the average insurance premium using a model to evaluate private health insurance plans against a nationally representative population. In the July 2010 interim final regulations, the Departments analyzed Medical Expenditure Panel Survey (MEPS) data and determined the average person with employer-sponsored insurance (ESI) would have $264 in covered preventive service expenses, of which $240 would be paid by insurance and $24 paid out-of-pocket.[71] When preventive services are covered with zero copayment, the Departments estimated the average preventive benefit (holding utilization constant) would increase by $24, or a 0.6 percent increase in insurance benefits and premiums for plans that have relinquished their grandfather

[64] Whitney, CG., Zhou, F., Singleton, J., Schuchat, A. Benefits from Immunization During the Vaccines of Children Program Era—United States, 1994–2013. MMWR 2014;63(16):352–355.

[65] McAfee, T.. Babb, S., McNabb. S., Fiore, MC. *N Engl J Med* 2015; 372:5–7.

[66] Stevens. J., Oakkar, EE., Cui, Z., Cai, J., Truesdale, KP. US adults recommended for weight reduction by 1998 and 2013 obesity guidelines, NHANES 2007–2012, 2015 *Obesity* 23(3) 527–531.

[67] Ogden CL, Carroll MD, Kit BK, Flegal KM. Prevalence of Childhood and Adult Obesity in the United States, 2011–2012. *JAMA*. 2014; 311(8):806–814.

[68] Trasande. L., 2010, How Much Should We Invest in Preventing Childhood Obesity? Health Affairs, 29, no. 3:372–378.

[69] Liu, S., and Chollet, D., Price and Income Elasticity of the Demand for Health Insurance and Health Care Services: A Critical Review of the Literature, *Mathematica Policy Research Inc.*, (March 2006) *http://www.mathematica-mpr.com/~/media/publications/PDFs/priceincome.pdf. See e.g.,* Ringel, JS., Hosek, SD., Vollaard, BA., and S. Mahnovski (2002), The elasticity of demand for health care; A review of the literature and its application to the military health system, National Defense Research Institute, RAND Health. *http://www.rand.org/content/dam/rand/pubs/monograph_reports/2005/MR1355.pdf.*

[70] *See e.g.,* Noelle-Angelique Molinari et al., "Out-of-Pocket Costs of Childhood Immunizations: A Comparison by Type of Insurance Plan," Pediatrics, 120(5) pp. e1148–e1156 (2007).

[71] The model does not distinguish between recommended and non-recommended preventive services, and so this likely represents an overestimate of the insurance benefits for preventive services.

Exhibit 10                                                                                              JA-0000204

status. Furthermore, in the July 2010 interim final regulations, the Departments estimated that additional coverage for genetic screening, depression screening, lead testing, autism testing, and oral health screening would result in a total average increase in insurance benefits on these services to be 0.12 percent, or just over $4 per insured person. This increase represented a mixture of new costs and transfers, dependent on whether beneficiaries previously purchased these services on their own. Impacts were expected to vary depending on baseline benefit levels, and grandfathered health plans were not expected to experience any impact from those interim final regulations.

As discussed in the July 2010 interim final regulations, the Departments used the standard actuarial "induction formula" $1/(1+alpha*P)$, where alpha is the "induction parameter" and P is the average fraction of the cost of services paid by consumers to estimate behavioral changes to estimate the induced demand for preventive services.[72] Removing cost sharing for preventive services lowers the direct cost to consumers of using preventive services, which induces additional utilization, estimated with the model above to increase covered expenses and benefits by approximately $17, or 0.44 percent in insurance benefits in group health plans. A similar, but larger, effect was anticipated in the individual market because individual health insurance policies generally had less generous benefits for preventive services than group health plans.

When eligible closely held for-profit entities seek the accommodation, health insurance issuers (or third party administrators for self-insured plans) for the group health plans established or maintained by the eligible organizations (and health insurance issuers of student health plans arranged by eligible organizations that are institutions of higher education) will assume sole responsibility for providing (or arranging) separate payments for contraceptive services directly for plan participants and beneficiaries (or student enrollees and dependents), without cost sharing, premium, fee, or other charge to plan participants or beneficiaries (or student enrollees and dependents) or to the eligible organization or its plan. The Departments continue to believe that issuers will find that providing

contraceptive coverage is at least cost neutral because they will be insuring the same set of individuals under both the group or student health insurance policies for whom they will also be making the separate payments for contraceptive services and, as a result, will experience lower costs from improvements in women's health, healthier timing and spacing of pregnancies, and fewer unplanned pregnancies. Several studies have estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's health.[73] A third party administrator can make arrangements with an issuer offering coverage through an FFE to obtain reimbursement for its costs (including an allowance for administrative costs and margin). The issuer offering coverage through the FFE can receive an adjustment to the FFE user fee, and the issuer is expected to pass on a portion of that adjustment to the third party administrator to account for the costs of providing or arranging payments for contraceptive services.

*B. Regulatory Alternatives*

Several provisions in these final regulations involved policy choices. One was whether to allow a plan or issuer to impose cost sharing for an office visit when a recommended preventive service is provided in that visit. Sometimes a recommended preventive service is billed separately from the office visit; sometimes it is not. The Departments decided that the cost-sharing prohibition of these final regulations applies to the specific preventive service as recommended by the guidelines. Therefore, if the preventive service is billed separately (or is tracked as individual encounter data separately) from the office visit, it is the preventive service that has cost sharing waived, not the entire office visit.

A second policy choice was, if the preventive service is not billed

separately (or is not tracked as individual encounter data separately) from the office visit, whether these final regulations should prohibit cost sharing for any office visit in which any recommended preventive service was administered, or whether cost sharing should be prohibited only when the preventive service is the primary purpose of the office visit. Prohibiting cost sharing for office visits when any recommended preventive service is provided, regardless of the primary purpose of the visit, could lead to an overly broad application of these final regulations; for example, a person who sees a specialist for a particular condition could end up with a zero copayment simply because his or her blood pressure was taken as part of the office visit. This could create financial incentives for consumers to request preventive services at office visits that are intended for other purposes in order to avoid copayments and deductibles. The increased prevalence of the application of zero cost sharing would lead to increased premiums compared with the chosen option, without a meaningful additional gain in access to preventive services.

A third issue involves health plans that have differential cost sharing for services provided by in-network vs. out-of-network providers. These final regulations provide that a plan or issuer generally is not required to provide coverage for recommended preventive services delivered by an out-of-network provider. The plan or issuer generally may also impose cost sharing for recommended preventive services delivered by an out-of-network provider. However, if the plan or issuer does not have in its network a provider who can provide the recommended preventive service, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost sharing with respect to the item or service. The Departments considered that requiring coverage by out-of-network providers with no cost sharing would result in higher premiums. Plans and issuers negotiate allowed charges with in-network providers as a way to promote effective, efficient health care, and allowing differences in cost sharing between in- and out-of-network enables plans to encourage use of in-network providers. Allowing zero cost sharing for out-of-network providers could reduce providers' incentives to participate in insurer networks. The Departments decided that permitting cost sharing for recommended preventive services provided by out-of-network providers

---

[72] Standard formula that described in "Quantity-Price Relationships in Health Insurance", Charles L Trowbridge, Chief Actuary, Social Security Administration (DHEW Publication No. (SSA) 73–11507, November 1972).

[73] Bertko, J., Glied, S., et al. The Cost of Covering Contraceptives Through Health Insurance (February 9, 2012), *http://aspe.hhs.gov/health/reports/2012/contraceptives/ib.shtml*; Washington Business Group on Health, Promoting Healthy Pregnancies: Counseling and Contraception as the First Step, Report of a Consultation with Business and Health Leader (September 20, 2000), Campbell, K.P., Investing in Maternal and Child Health: An Employer's Toolkit, National Business Group on Health (2007) *http://www.businessgrouphealth.org/healthtopics/maternalchild/investing/docs/ach toolkit.pdf*; Trussell, J., et al. The Economic Value of Contraception: A Comparison of 15 Methods, American Journal Public Health, 1995: 85(4):494–503, Revenues of H.R. 3162, the Children's Health and Medicare Protection Act, for the Rules Committee (August 1, 2007).

Exhibit 10

JA-0000205

**41336**    **Federal Register** / Vol. 80, No. 134 / Tuesday, July 14, 2015 / Rules and Regulations

(except in cases where the recommended service is only available from an out-of-network provider) is the appropriate option to preserve a choice of providers for individuals, while avoiding potentially larger increases in costs and transfers as well as potentially lower quality care.

As discussed previously in the preamble, the Departments also considered different ways to define a closely held for-profit entity. Under one approach, a qualifying closely held for-profit entity would have been defined as a for-profit entity where none of the ownership interests in the entity is publicly traded and where the entity has fewer than a specified number of shareholders or owners.

Under the second approach, a qualifying closely held for-profit entity would have been defined as a for-profit entity in which the ownership interests are not publicly traded, and in which a specified fraction of the ownership interest is concentrated in a limited and specified number of owners. Within the second approach, the Departments considered adopting the IRS test to define a closely held corporation. The definition adopted in these final rules, although based on the IRS test, is more flexible and ensures that it does not exclude some entities that should be considered to be closely held for the purposes of these final regulations.

Under a third approach, the Departments considered a test under which none of the ownership interests in the entity is publicly traded, without any other restrictions on the number of owners or on ownership concentration. The Departments believe, however, that such a test would be excessively broad.

*C. Special Analyses—Department of Treasury*

For purposes of the Department of the Treasury, it has been determined that this rule is not a significant regulatory action as defined in Executive Order 12866, as supplemented by Executive Order 13563. Therefore, a regulatory assessment is not required. It also has been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to this rule. Pursuant to the Regulatory Flexibility Act (5 U.S.C. chapter 6), it is hereby certified that this rule will not have a significant economic impact on a substantial number of small entities. This certification is based on the fact that the regulations merely modify the definition of eligible organization to include certain closely held for-profit entities. This modification, as adopted, will not increase costs to or burdens on the affected organizations. Pursuant to

section 7805(f) of the Code, the proposed rule preceding these regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business and no comments were received.

*D. Paperwork Reduction Act— Department of Health and Human Services*

These final regulations contain information collection requirements that are subject to review by OMB. A description of these provisions is given in the following paragraphs with an estimate of the annual burden. In order to fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 requires that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

1. Wage Estimates

To derive average costs, we used data from the U.S. Bureau of Labor Statistics' May 2014 National Occupational Employment and Wage Estimates for all salary estimates (*http://www.bls.gov/ oes/current/oes_nat.htm*).

2. Information Collection Requirements (ICRs)

a. ICRs Regarding Self-Certification (§ 147.131(b)(3))

All eligible organizations will have the option of either providing a self-certification (EBSA Form 700) to the issuers or third party administrators of the plans that would otherwise arrange for or provide coverage for the contraceptive services, or providing a notice to HHS. For the purpose of estimating burdens, HHS is assigning the burden of the self-certification to eligible for-profit entities and the burden of notice to HHS to eligible non-profit organizations.

The July 2013 final regulations require an eligible organization that seeks an accommodation to self-certify that it meets the definition of an eligible organization using the EBSA Form 700 and provide it directly to each third party administrator or issuer of the plan that would otherwise arrange for or provide coverage for the contraceptive

services. These final regulations continue to allow eligible organizations to use EBSA Form 700 to notify their third party administrators and issuers, as set forth in the July 2013 final regulations and guidance.

The Departments received comments that HHS underestimated the number of closely held for-profit eligible organizations that may seek the accommodation. Some commenters noted that it would be difficult to estimate this number. One commenter estimated that about 1.3 million S-corporations offer health insurance to their employees and, based on this data, objection rates of 1 percent of S-corporations would result in 13,000 objecting firms, an objection rate of 2 percent would result in 26,000 objecting firms and an objection rate of 5 percent would result in 65,000 objecting firms. However, the Departments have no indication that such large numbers of closely held for-profit entities would seek the accommodation. The Departments also note that the definition of a qualifying closely held for-profit entity adopted in these final regulations differs from the definition of an S-corporation. In the proposed rules, based on the number of plaintiffs that are for-profit employers in recent litigation objecting on religious grounds to the provision of contraceptive services, HHS estimated that 71 closely held for-profit entities would seek the accommodation. In the final regulations, based on updated information, HHS is revising the estimate to 87. Even though this may underestimate the number of eligible closely held for-profit entities that will seek the accommodation, this is the best estimate available to the Departments at this time.

For each eligible organization, it is assumed that clerical staff will gather and enter the necessary information, send the self-certification to the issuer(s) or third party administrator(s) or the notice to HHS, and retain a copy for recordkeeping. A manager and legal counsel will subsequently review the information, and a senior executive will execute it. It is estimated that an organization will need approximately 50 minutes (30 minutes of clerical labor at a cost of $30 per hour, 10 minutes for a manager at a cost of $102 per hour, 5 minutes for legal counsel at a cost of $127 per hour, and 5 minutes for a senior executive at a cost of $121 per hour) to execute the self-certification. Therefore, the total one-time burden for preparing and providing the information in the self-certification is estimated to be approximately $53 for each eligible organization. The certification may be electronically transmitted to the issuer

Exhibit 10

**Federal Register** / Vol. 80, No. 134 / Tuesday, July 14, 2015 / Rules and Regulations    **41337**

or third party administrator at minimal cost or mailed. For purposes of this analysis, HHS assumes that all notices will be mailed. It is estimated that mailing each notice will require $0.49 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.54.

Based on this estimate of 87 affected entities and the individual burden estimates of 50 minutes and a cost of $53, we estimate the total hour burden to be 72.5 hours with an equivalent cost of $4,611. The total paper filing cost burden for the notices is approximately $47. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 36.25 burden hours at an equivalent cost of approximately $2,306 and a paper filing cost burden of approximately $23, with approximately 44 respondents.

b. ICRs Regarding Notice to HHS (§ 147.131(b)(3))

These final regulations provide an organization seeking to be treated as an eligible organization under the August 2014 interim final regulations an alternative process, consistent with the Supreme Court's interim order in *Wheaton College,* under which an eligible organization may notify HHS of its religious objection to coverage of all or a subset of contraceptive services. The eligible organization must maintain the notice to HHS in its records. The burden related to this alternate notice is currently approved under OMB Control Number 0938–1248.

Based on litigation, HHS believes that at least 122 eligible non-profit organizations will have the option to provide the alternative notice to HHS rather than their third party administrators or issuers. Even though this likely underestimates the number of eligible non-profit organizations that will seek the accommodation, this is the best estimate available to the Departments at this time. In order to complete this task, HHS assumes that clerical staff for each eligible organization will gather and enter the necessary information and send the notice. HHS assumes that a compensation and benefits manager and inside legal counsel will review the notice and a senior executive will execute it. HHS estimates that an eligible organization will spend approximately 50 minutes (30 minutes of clerical labor at a cost of $30 per

hour, 10 minutes for a compensation and benefits manager at a cost of $102 per hour, 5 minutes for legal counsel at a cost of $127 per hour, and 5 minutes by a senior executive at a cost of $121 per hour) preparing and sending the notice and filing it to meet the recordkeeping requirement. Therefore, the total annual burden for preparing and providing the notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost burden of approximately $53 for a total hour burden of 102 hours with an equivalent cost of $6,425. As HHS and DOL share jurisdiction, they are splitting the hour burden so each will account for 51 burden hours with an equivalent cost of $3,213, with a total of 61 respondents.

Notices to HHS may be sent electronically at minimal cost or by mail. For purposes of this analysis, HHS assumes that all notices will be mailed. It is estimated that mailing each notice will require $0.49 in postage and $0.05 in materials cost (paper and ink) with a total postage and materials cost for each notice sent via mail of $0.54. The total cost burden for the notices is approximately $66. As DOL and HHS share jurisdiction, they are splitting the cost burden so each will account for $33 of the cost burden.

c. Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(d))

As required by the July 2013 final regulations, a health insurance issuer or third party administrator providing or arranging separate payments for contraceptive services for participants and beneficiaries in insured plans (or student enrollees and covered dependents in student health insurance coverage) of eligible organizations is required to provide a written notice to plan participants and beneficiaries (or student enrollees and covered dependents) informing them of the availability of such payments. The notice must be separate from but contemporaneous with (to the extent possible) any application materials distributed in connection with enrollment (or re-enrollment) in group or student coverage of the eligible organization in any plan year to which the accommodation is to apply and will be provided annually. To satisfy the notice requirement, issuers may, but are not required to, use the model language set forth in the July 2013 final

regulations or substantially similar language.

As mentioned, HHS is anticipating that at least 122 non-profit and 87 closely held for-profit entities will seek an accommodation. It is unknown how many issuers or third party administrators provide health insurance coverage or services in connection with health plans of eligible organizations, but HHS will assume at least 209. It is estimated that each issuer or third party administrator will need approximately 1 hour of clerical labor (at $30 per hour) and 15 minutes of management review (at $102 per hour) to prepare the notices. The total burden for each issuer or third party administrator to prepare notices will be 1.25 hours with an equivalent cost of approximately $56. The total burden for all issuers or third party administrators will be 261.25 hours, with an equivalent cost of $11,600. As DOL and HHS share jurisdiction, they are splitting the hour burden so each will account for 130.63 burden hours with an equivalent cost of $5,800, with approximately 105 respondents.

d. Letter to HHS Regarding Ownership Structure (§ 147.131(b)(4)(v))

To assist potentially eligible for-profit entities seeking further information regarding whether they qualify for the accommodation, an entity may send a letter describing its ownership structure to HHS at *accommodation@cms. hhs.gov.* However, an entity is not required to avail itself of this process in order to qualify as a closely held for-profit entity.

As stated earlier in the preamble, the Departments believe that the definition adopted in these regulations includes the for-profit entities that are likely to have religious objections to providing contraceptive coverage. In addition, it appears based on available information that the definition adopted in these final regulations includes all of the for-profit entities that have, as of the date of issuance of these regulations, challenged the contraceptive coverage requirement in court. Therefore, the Departments anticipate that fewer than 10 entities will submit a letter to HHS. Under 5 CFR 1320.3(c)(4), this provision is not subject to the PRA as it will affect fewer than 10 entities in a 12-month period.

3. Summary of Proposed Annual Burden Estimates

Exhibit 10                                                                                          JA-0000207

TABLE III.3—ANNUAL RECORDKEEPING AND REPORTING REQUIREMENTS

| Regulation section(s) | OMB Control No. | Respondents | Total responses | Burden per response (hours) | Total annual burden (hours) | Burden cost per respondent ($) | Total labor cost of reporting ($) | Total capital/ maintenance costs ($) | Total cost ($) |
|---|---|---|---|---|---|---|---|---|---|
| Self-Certification (§ 147.131(b)(3)). | New ......... | 44 | 44 | 0.83 | 36.25 | $53 | $2,306 | $23 | $2,329 |
| Notice to HHS (§ 147.131(b)(3)). | 0938–1248 | 61 | 61 | 0.83 | 51 | 53 | 3,213 | 33 | 3,246 |
| Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(d)). | New ......... | 105 | 105 | 1.25 | 130.63 | 56 | 5,800 | 0 | 5,800 |
| Total ..................... | ................ | 210 | 210 | ................ | 217.88 | ................ | $11,319 | $56 | $11,375 |

4. Submission of PRA-Related Comments

We have submitted a copy of this rule to OMB for its review of the rule's information collection and recordkeeping requirements. These requirements are not effective until they have been approved by OMB.

*E. Paperwork Reduction Act— Department of Labor*

In accordance with the requirements of the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)), the Department submitted an information collection request (ICR) to OMB in accordance with 44 U.S.C. 3507(d), contemporaneously with the publication of the interim final regulation, for OMB's review under the emergency PRA procedures.[74] OMB approved the ICR on August 27, 2014 under OMB Control Number 1210–0150 through February 28, 2015. Contemporaneously with the publication of the emergency ICR, the Department published a separate **Federal Register** notice informing the public that it intends to extend the approval for 3 years and soliciting comments on the ICR.[75] The Department submitted the extension request to OMB on February 27, 2015. OMB approved the ICR extension on April 14, 2015, which currently is scheduled to expire on April 30, 2018.

The Department also submitted an ICR to OMB in accordance with 44 U.S.C. 3507(d), for the ICR contained in the August 2014 proposed regulations contemporaneously with the publication of the proposal that solicited public comments on the ICR. OMB filed a comment regarding the proposed ICR on October 16, 2014, stating that it was not approving the ICR

associated with the proposed rule at the proposed rule stage and requesting the Department to resubmit the ICR at the final rule stage after taking into account public comments. OMB assigned OMB Control Number 1210–0152 to the proposed ICR.

Although no public comments were received in response to the ICRs contained in the August 2014 interim final and proposed regulations that specifically addressed the paperwork burden analysis of the information collections, the comments that were submitted, and which are described earlier in this preamble, contained information relevant to the costs and administrative burdens attendant to the proposals. The Department took into account the public comments in connection with making changes to the proposal, analyzing the economic impact of the proposals, and developing the revised paperwork burden analysis summarized below.

In connection with publication of this final rule, the Department submitted ICRs to OMB as a revision to OMB Control Number 1210–0150 for eligible non-profit organizations and under new OMB Control Number 1210–0152 for eligible for-profit organizations and received OMB approval for both ICRs.

A copy of the ICRs may be obtained by contacting the PRA addressee shown below or at *http://www.RegInfo.gov.* PRA ADDRESSEE: G. Christopher Cosby, Office of Policy and Research, U.S. Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW., Room N– 5718, Washington, DC 20210. Telephone: 202–693–8410; Fax: 202– 219–4745. These are not toll-free numbers.

1. ICRs Regarding Self-Certification (29 CFR 2590.2713A(b) or (c))

Under these final regulations, all eligible organizations will have the option of either providing (1) a self-certification (EBSA Form 700) to the issuers or third party administrators of the plans that would otherwise arrange for or provide coverage for the contraceptive services or (2) a notice to HHS. For the purpose of estimating burdens, the Department is assigning the burden of the self-certification to eligible for-profit entities and the burden of notice to HHS to eligible non-profit organizations.

The July 2013 final regulations require an eligible organization that seeks an accommodation to self-certify that it meets the definition of an eligible organization using the EBSA Form 700 and provide it directly to each third party administrator or issuer of the plan that would otherwise arrange for or provide coverage for the contraceptive services. These final regulations continue to allow eligible organizations to use EBSA Form 700 to notify their third party administrators and issuers, as set forth in the July 2013 final regulations and guidance.

In response to the public comment solicitation for the ICRs in the August 2014 proposed regulations, the Departments received comments that they underestimated the number of closely held for-profit eligible organizations that may seek the accommodation. Some commenters noted that it would be difficult to estimate this number. One commenter estimated that about 1.3 million S- corporations offer health insurance to their employees and, based on this data, objection rates of 1 percent of S- corporations would result in 13,000 objecting firms, an objection rate of 2 percent would result in 26,000 objecting firms and an objection rate of 5 percent

---

[74] 5 CFR 1320.13.
[75] 79 FR 51197 (Aug. 27, 2014).

Exhibit 10    JA-0000208

would result in 65,000 objecting firms. However, the Departments have no indication that such large numbers of closely held for-profit entities would seek the accommodation. The Departments also note that the definition of a qualifying closely held for-profit entity adopted in these final regulations differs from the definition of an S-corporation. In the proposed rules, based on the number of plaintiffs that are for-profit employers in recent litigation objecting on religious grounds to the provision of contraceptive services, the Departments estimated that 71 closely held for-profit entities would seek the accommodation. In these final regulations, based on updated information, the Departments are revising the estimate to 87. Even though this may underestimate of the number of eligible closely held for-profit entities that will seek the accommodation, this is the best estimate available to the Departments at this time.

For each eligible organization, the Departments assume that clerical staff will gather and enter the necessary information, send the self-certification to its issuer(s) or third party administrator(s) or the notice to HHS, and retain a copy for recordkeeping. A manager and legal counsel will subsequently review the information, and a senior executive will execute it. It is estimated that an organization will need approximately 50 minutes (30 minutes of clerical labor at a cost of $30 per hour,[76] 10 minutes for a manager at a cost of $102 per hour,[77] 5 minutes for legal counsel at a cost of $127 per hour.[78] and 5 minutes for a senior executive at a cost of $121 per hour [79]) to execute the self-certification. Therefore, the Departments estimate that the total one-time burden for preparing and providing the information in the self-certification is estimated to be approximately $53 for each eligible organization. The certification may be electronically transmitted to the issuer or third party administrator at minimal cost or mailed. For purposes of this analysis, the Departments assume that

[76] Secretaries. Except Legal, Medical, and Executive (43–6014): $16.13(2012 BLS Wage rate)/ 0.670(ECEC ratio) *1.2(Overhead Load Factor) *1.019(Inflation rate) − 2(Inflated 2 years from base year) = $29.60

[77] Compensation and Benefits Manager (11–3041): $50.92(2012 BLS Wage rate)/0.697(ECEC ratio) *1.35(Overhead Load Factor) *1.019(Inflation rate) − 2(Inflated 2 years from base year) = $102.41

[78] Legal Professional (23–1011): $62.93(2012 BLS Wage rate)/0.697(ECEC ratio) *1.35(Overhead Load Factor) *1.019(Inflation rate) − 2(Inflated 2 years from base year) = $126.56

[79] Financial Managers (11–3031): $59.26(2012 BLS Wage rate)/0.689(ECEC ratio) *1.35(Overhead Load Factor) *1.019(Inflation rate) − 2(Inflated 2 years from base year) = $120.57

all notices will be mailed. The Departments estimate that mailing each notice will require $0.49 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.54.

Based on this estimate of 87 affected entities and the individual burden estimates of 50 minutes and a cost of $53, the Departments estimate the total hour burden associated with the ICR to be 72.5 hours with an equivalent cost of $4,611. The total paper filing cost burden for the notices is approximately $47. The hour burden associated with the ICR is allocated equally between DOL and HHS, because the agencies share jurisdiction of preventive health services resulting in an hour burden for each agency of 36.25 burden hours at an equivalent cost of approximately $2,306 and a paper filing cost burden of approximately $23, with approximately 44 respondents.

### 2. ICRs Regarding Notice to HHS (29 CFR 2590.2713A(b) or (c))

These final regulations provide an organization seeking to be treated as an eligible organization under the August 2014 interim final regulations with an alternative process, consistent with the Supreme Court's interim order in *Wheaton College*, under which an eligible organization may notify HHS of its religious objection to coverage of all or a subset of contraceptive services. The eligible organization must maintain the notice to HHS in its records. The burden related to this alternate notice is currently approved under OMB Control Number 1210–0150.

Based on litigation, the Departments estimate that at least 122 eligible non-profit organizations will have the option to provide the alternative notice to HHS rather than their third party administrators or issuers. Even though this may underestimate the number of eligible non-profit organizations that will seek the accommodation, it is the best estimate available to the Departments at this time. In order to complete this task, the Departments assume that clerical staff for each eligible organization will gather and enter the necessary information and send the notice. The Departments assume that a compensation and benefits manager and inside legal counsel will review the notice and a senior executive will execute it. The Departments estimate that an eligible organization will spend approximately 50 minutes (30 minutes of clerical labor at a cost of $30 per hour, 10 minutes for a compensation and benefits manager at a cost of $102 per hour, 5 minutes for

legal counsel at a cost of $127 per hour, and 5 minutes by a senior executive at a cost of $121 per hour) preparing and sending the notice and filing it to meet the recordkeeping requirement. Therefore, the total annual burden for preparing and providing the notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost burden of approximately $53 for a total hour burden of 102 hours with an equivalent cost of $6,425. As HHS and DOL share jurisdiction, they are splitting the hour burden so each will account for 51 burden hours with an equivalent cost of $3,213, with a total of 61 respondents.

Notices to HHS may be sent electronically at minimal cost or by mail. For purposes of this analysis, the Departments assume that all notices will be mailed. It is estimated that mailing each notice will require $0.49 in postage and $0.05 in materials cost (paper and ink) with a total postage and materials cost for each notice sent via mail of $0.54. The total cost burden for the notices is approximately $66. As DOL and HHS share jurisdiction, they are sharing the cost burden equally and each is attributed $33 of the cost burden.

### 3. Notice of Availability of Separate Payments for Contraceptive Services (29 CFR 2590.2713A(d))

As required by the July 2013 final regulations, a health insurance issuer or third party administrator providing or arranging separate payments for contraceptive services for participants and beneficiaries (or student enrollees and covered dependents) in insured plans of eligible organizations is required to provide a written notice to plan participants and beneficiaries (or student enrollees and covered dependents) informing them of the availability of such payments. The notice must be separate from but contemporaneous with (to the extent possible) any application materials distributed in connection with enrollment (or re-enrollment) in group or student coverage of the eligible organization in any plan year to which the accommodation is to apply and will be provided annually. To satisfy the notice requirement, issuers may, but are not required to, use the model language set forth in the July 2013 final regulations or substantially similar language.

As mentioned, the Departments anticipate that at least 122 non-profit and 87 closely held for-profit entities will seek an accommodation. It is unknown how many issuers or third party administrators provide health

Exhibit 10     JA-0000209

**41340**     **Federal Register** / Vol. 80, No. 134 / Tuesday, July 14, 2015 / Rules and Regulations

insurance coverage or services in connection with health plans of eligible organizations, but that for the purposes of the analysis, the Departments assume at least 209 do. The Departments assume that each issuer or third party administrator will need approximately one hour of clerical labor (at $30 per hour) and 15 minutes of management review (at $102 per hour) to prepare the notices. Therefore, the Departments estimate that the total burden for each issuer or third party administrator to prepare notices will be 1.25 hours with an equivalent cost of approximately $56. The total burden for all issuers or third party administrators will be 261.25 hours, with an equivalent cost of $11,600. The cost burden associated with this ICR is allocated equally between DOL and HHS, because the agencies share jurisdiction under the provision. Therefore, the hour burden for each is 130.63 burden hours with an equivalent cost of $5,800 for approximately 105 respondents.

### 4. Letter to HHS Regarding Ownership Structure (29 CFR 2590.2713A(a)(4)(v))

To assist potentially eligible for-profit entities seeking further information regarding whether they qualify for the accommodation, an entity may send a letter describing its ownership structure to HHS at *accommodation@ cms.hhs.gov.* However, an entity is not required to avail itself of this process in order to qualify as a closely held for-profit entity.

As stated earlier in the preamble, the Departments believe that the definition adopted in these regulations includes the for-profit entities that are likely to have religious objections to providing contraceptive coverage. In addition, it appears based on available information that the definition adopted in these final regulations includes all of the for-profit entities that have, as of the date of issuance of these regulations, challenged the contraceptive coverage requirement in court. Therefore, the Departments anticipate that fewer than 10 entities will submit a letter to HHS. Under 5 CFR 1320.3(c)(4), this provision is not subject to the PRA as it will affect fewer than 10 entities in a 12-month period.

### F. Regulatory Flexibility Act—Department of Labor and Department of Health and Human Services

The Regulatory Flexibility Act (RFA) requires agencies that issue a rule to analyze options for regulatory relief of small businesses if a rule has a significant impact on a substantial number of small entities. The RFA generally defines a "small entity" as—

(1) a proprietary firm meeting the size standards of the Small Business Administration (SBA), (2) a non-profit organization that is not dominant in its field, or (3) a small government jurisdiction with a population of less than 50,000 (states and individuals are not included in the definition of "small entity"). The Departments use as their measure of significant economic impact on a substantial number of small entities a change in revenues of more than 3 percent to 5 percent.

As discussed in the Web Portal interim final rule with comment period published on May 5, 2010 (75 FR 24481), HHS examined the health insurance industry in depth in the Regulatory Impact Analysis we prepared for the proposed rule on establishment of the Medicare Advantage program (69 FR 46866, August 3, 2004). In that analysis it was determined that there were few, if any, insurance firms underwriting comprehensive health insurance policies (in contrast, for example, to travel insurance policies or dental discount policies) that fell below the size thresholds for "small" business established by the SBA (currently $38.5 million in annual receipts for health insurance issuers).[80] In addition, analysis of data from Medical Loss Ratio annual report submissions for the 2013 reporting year was used to develop an estimate of the number of small entities that offer comprehensive major medical coverage. It is estimated that 141 out of 500 issuers of health insurance coverage nationwide had total premium revenue of $38.5 million or less. This estimate may overstate the actual number of small health insurance companies that would be affected, since 77 percent of these small companies belong to larger holding groups, and many if not all of these small companies are likely to have non-health lines of business that would result in their revenues exceeding $38.5 million. For these reasons, the Departments expect that these final regulations will not affect a significant number of small issuers.

The provisions of these final regulations affect small employers with self-insured group health plans by requiring them to include coverage under their group health plans for recommended preventive services without cost sharing. However, small employers also benefit from having healthier employees and reduced absenteeism. Small employers are less likely to be self-insured compared to

large employers: only about 13.3 percent of employers with less than 100 employees that offer a group health plan have a self-funded plan.[81]

With respect to contraceptive coverage, some eligible organizations that seek the accommodation may be small entities and will incur costs to provide the self-certification to issuers or third party administrators or notice to HHS. However, the related administrative costs are expected to be minimal.

Third party administrators for self-insured group health plans established or maintained by eligible organizations will incur administrative costs to send notices to enrollees and arrange for separate payments for contraceptive services. It is unknown how many third party administrators impacted by this requirement have revenues below the size thresholds for "small" business established by the SBA (currently $32.5 million for third party administrators). However, a third party administrator can make arrangements with an issuer offering coverage through an FFE to obtain reimbursement for the third party administrator's costs.

### G. Federalism Statement—Department of Labor and Department of Health and Human Services

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on the states, the relationship between the national government and states, or on the distribution of power and responsibilities among the various levels of government. In the Departments' view, these final regulations have federalism implications, but the federalism implications are substantially mitigated because, with respect to health insurance issuers, 45 states are either enforcing the requirements related to coverage of specified preventive services (including contraception) without cost sharing pursuant to state law or otherwise are working collaboratively with HHS to ensure that issuers meet these standards. In five states, HHS ensures that issuers comply with these requirements. Therefore, the final regulations are not likely to require substantial additional oversight of states by HHS.

---

[80] "Table of Small Business Size Standards Matched To North American Industry Classification System Codes," effective July 14, 2014, U.S. Small Business Administration, available at *http:// www.sba.gov.*

[81] Source: Agency for Healthcare Research and Quality, Center for Financing, Access and Cost Trends. 2013 Medical Expenditure Panel Survey-Insurance Component.

Exhibit 10

In general. section 514 of ERISA provides that state laws are superseded to the extent that they relate to any covered employee benefit plan, and preserves state laws that regulate insurance, banking. or securities. ERISA also prohibits states from regulating a covered plan as an insurance or investment company or bank. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) added a new preemption provision to ERISA (as well as to the PHS Act) narrowly preempting state requirements on group health insurance coverage. States may continue to apply state law requirements but not to the extent that such requirements prevent the application of the federal requirement that group health insurance coverage provided in connection with certain group health plans (or student health insurance issuers) provide coverage for specified preventive services without cost sharing. HIPAA's Conference Report states that the conferees intended the narrowest preemption of state laws with regard to health insurance issuers (H.R. Conf. Rep. No. 104–736, 104th Cong. 2d Session 205, 1996). State insurance laws that are more stringent than the federal requirement are unlikely to "prevent the application of" the preventive services coverage provision, and therefore are unlikely to be preempted. Accordingly, states have significant latitude to impose requirements on health insurance issuers that are more restrictive than those in federal law.

Guidance conveying this interpretation was published in the **Federal Register** on April 8, 1997 (62 FR 16904) and December 30, 2004 (69 FR 78720). and these final regulations implement the preventive services coverage provision's minimum standards and do not significantly reduce the discretion given to states under the statutory scheme.

The PHS Act provides that states may enforce the provisions of title XXVII of the PHS Act as they pertain to issuers, but that the Secretary of HHS will enforce any provisions that a state does not have authority to enforce or that a state has failed to substantially enforce. When exercising its responsibility to enforce provisions of the PHS Act, HHS works cooperatively with the state to address the state's concerns and avoid conflicts with the state's exercise of its authority. HHS has developed procedures to implement its enforcement responsibilities, and to afford states the maximum opportunity to enforce the PHS Act's requirements in the first instance. In compliance with Executive Order 13132's requirement

that agencies examine closely any policies that may have federalism implications or limit the policymaking discretion of states. the Departments have engaged in numerous efforts to consult and work cooperatively with affected state and local officials.

In conclusion. throughout the process of developing these final regulations, to the extent feasible within the specific preemption provisions of ERISA and the PHS Act, the Departments have attempted to balance states' interests in regulating health insurance coverage and health insurance issuers, and the rights of individuals intended to be protected in the PHS Act, ERISA, and the Code.

### H. Unfunded Mandates Reform Act

Section 202 of the Unfunded Mandates Reform Act (UMRA) of 1995 requires that agencies assess anticipated costs and benefits before issuing any final rule that includes a Federal mandate that could result in expenditure in any one year by state, local or tribal governments, in the aggregate, or by the private sector, of $100 million in 1995 dollars, updated annually for inflation. In 2015, that threshold level is approximately $144 million.

UMRA does not address the total cost of a regulatory action. Rather, it focuses on certain categories of cost, mainly those "Federal mandate" costs resulting from—(1) imposing enforceable duties on state, local, or tribal governments, or on the private sector; or (2) increasing the stringency of conditions in, or decreasing the funding of, state, local, or tribal governments under entitlement programs. These final regulations include no mandates on state, local, or tribal governments. Health insurance issuers, third party administrators and eligible organizations would incur costs to comply with the provisions of these final regulations. However, consistent with policy embodied in UMRA, these final regulations have been designed to be the least burdensome alternative while achieving the objectives of the Affordable Care Act.

### I. Congressional Review Act

These final rules are subject to the Congressional Review Act provisions of the Small Business Regulatory Enforcement Fairness Act of 1996 (5 U.S.C. 801 *et seq.*). which specifies that before a rule can take effect. the federal agency promulgating the rule shall submit to each House of the Congress and to the Comptroller General a report containing a copy of the rule along with other specified information. and have

been transmitted to Congress and the Comptroller General for review.

### IV. Statutory Authority

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g). Public Law 104–191. 110 Stat. 1936: sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343. 122 Stat. 3881: sec. 1001. 1201, and 1562(e). Public Law 111–148, 124 Stat. 119. as amended by Public Law 111–152, 124 Stat. 1029: Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791. and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg-63, 300gg-91, and 300gg-92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Public Law 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

### List of Subjects

#### 26 CFR Part 54

Excise taxes. Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

#### 29 CFR Part 2510

Employee benefit plans, Pensions.

#### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans. Health care. Health insurance, Medical child support, Reporting and recordkeeping requirements.

#### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

Exhibit 10                                                                JA-0000211

Approved: July 8, 2015.

John Dalrymple.

*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

Approved: July 8, 2015.

Mark J. Mazur.

*Assistant Secretary of the Treasury (Tax Policy).*

Signed this 7th day of May 2015.

Phyllis C. Borzi,

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: May 7, 2015.

Andrew M. Slavitt,

*Acting Administrator, Centers for Medicare & Medicaid Services.*

Approved: May 20, 2015.

Sylvia M. Burwell,

*Secretary, Department of Health and Human Services.*

## DEPARTMENT OF THE TREASURY

### Internal Revenue Service

### 26 CFR Chapter I

Accordingly, 26 CFR part 54 is amended as follows:

## PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 continues to read in part as follows:

**Authority:** 26 U.S.C. 7805 * * *

* * * * *

Section 54.9815–2713 also issued under 26 U.S.C. 9833;

■ **Par. 2.** Section 54.9815–2713 is amended by adding paragraphs (a)(1)(i), (ii), and (iii), and revising paragraphs (a)(2), (3), (4), and (5), (b), and (c) to read as follows:

### § 54.9815–2713  Coverage of preventive health services.

(a) * * *

(1) * * *

(i) Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual involved (except as otherwise provided in paragraph (c) of this section);

(ii) Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved (for this purpose, a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention is considered in effect after it has been adopted by the Director of the Centers

for Disease Control and Prevention, and a recommendation is considered to be for routine use if it is listed on the Immunization Schedules of the Centers for Disease Control and Prevention);

(iii) With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration; and

* * * * *

(2) *Office visits*—(i) If an item or service described in paragraph (a)(1) of this section is billed separately (or is tracked as individual encounter data separately) from an office visit, then a plan or issuer may impose cost-sharing requirements with respect to the office visit.

(ii) If an item or service described in paragraph (a)(1) of this section is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is the delivery of such an item or service, then a plan or issuer may not impose cost-sharing requirements with respect to the office visit.

(iii) If an item or service described in paragraph (a)(1) of this section is not billed separately (or is not tracked as individual encounter data separately) from an office visit and the primary purpose of the office visit is not the delivery of such an item or service, then a plan or issuer may impose cost-sharing requirements with respect to the office visit.

(iv) The rules of this paragraph (a)(2) are illustrated by the following examples:

*Example 1. (i) Facts.* An individual covered by a group health plan visits an in-network health care provider. While visiting the provider, the individual is screened for cholesterol abnormalities, which has in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual. The provider bills the plan for an office visit and for the laboratory work of the cholesterol screening test.

(ii) *Conclusion.* In this *Example 1,* the plan may not impose any cost-sharing requirements with respect to the separately-billed laboratory work of the cholesterol screening test. Because the office visit is billed separately from the cholesterol screening test, the plan may impose cost-sharing requirements for the office visit.

*Example 2. (i) Facts.* Same facts as *Example 1* of this section. As the result of the screening, the individual is diagnosed with hyperlipidemia and is prescribed a course of treatment that is not included in the recommendations under paragraph (a)(1) of this section.

(ii) *Conclusion.* In this *Example 2,* because the treatment is not included in the

recommendations under paragraph (a)(1) of this section, the plan is not prohibited from imposing cost-sharing requirements with respect to the treatment.

*Example 3. (i) Facts.* An individual covered by a group health plan visits an in-network health care provider to discuss recurring abdominal pain. During the visit, the individual has a blood pressure screening, which has in effect a rating of A or B in the current recommendations of United States Preventive Services Task Force with respect to the individual. The provider bills the plan for an office visit.

(ii) *Conclusion.* In this *Example 3,* the blood pressure screening is provided as part of an office visit for which the primary purpose was not to deliver items or services described in paragraph (a)(1) of this section. Therefore, the plan may impose a cost-sharing requirement for the office visit charge.

*Example 4. (i) Facts.* A child covered by a group health plan visits an in-network pediatrician to receive an annual physical exam described as part of the comprehensive guidelines supported by the Health Resources and Services Administration. During the office visit, the child receives additional items and services that are not described in the comprehensive guidelines supported by the Health Resources and Services Administration, nor otherwise described in paragraph (a)(1) of this section. The provider bills the plan for an office visit.

(ii) *Conclusion.* In this *Example 4,* the service was not billed as a separate charge and was billed as part of an office visit. Moreover, the primary purpose for the visit was to deliver items and services described as part of the comprehensive guidelines supported by the Health Resources and Services Administration. Therefore, the plan may not impose a cost-sharing requirement with respect to the office visit.

(3) *Out-of-network providers.* (i) Subject to paragraph (a)(3)(ii) of this section, nothing in this section requires a plan or issuer that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider. Moreover, nothing in this section precludes a plan or issuer that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider.

(ii) If a plan or issuer does not have in its network a provider who can provide an item or service described in paragraph (a)(1) of this section, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost-sharing with respect to the item or service.

(4) *Reasonable medical management.* Nothing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency,

Exhibit 10                                                                                                    JA-0000212

method, treatment, or setting for an item or service described in paragraph (a)(1) of this section to the extent not specified in the relevant recommendation or guideline. To the extent not specified in a recommendation or guideline, a plan or issuer may rely on the relevant clinical evidence base and established reasonable medical management techniques to determine the frequency, method, treatment, or setting for coverage of a recommended preventive health service.

(5) *Services not described.* Nothing in this section prohibits a plan or issuer from providing coverage for items and services in addition to those recommended by the United States Preventive Services Task Force or the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention, or provided for by guidelines supported by the Health Resources and Services Administration, or from denying coverage for items and services that are not recommended by that task force or that advisory committee, or under those guidelines. A plan or issuer may impose cost-sharing requirements for a treatment not described in paragraph (a)(1) of this section, even if the treatment results from an item or service described in paragraph (a)(1) of this section.

(b) *Timing*—(1) *In general.* A plan or issuer must provide coverage pursuant to paragraph (a)(1) of this section for plan years that begin on or after September 23, 2010, or, if later, for plan years that begin on or after the date that is one year after the date the recommendation or guideline is issued.

(2) *Changes in recommendations or guidelines.* (i) A plan or issuer that is required to provide coverage for any items and services specified in any recommendation or guideline described in paragraph (a)(1) of this section on the first day of a plan year must provide coverage through the last day of the plan year, even if the recommendation or guideline changes or is no longer described in paragraph (a)(1) of this section, during the plan year.

(ii) Notwithstanding paragraph (b)(2)(i) of this section, to the extent a recommendation or guideline described in paragraph (a)(1)(i) of this section that was in effect on the first day of a plan year is downgraded to a "D" rating, or any item or service associated with any recommendation or guideline specified in paragraph (a)(1) of this section is subject to a safety recall or is otherwise determined to pose a significant safety concern by a federal agency authorized to regulate the item or service during a plan year, there is no requirement under this section to cover these items and

services through the last day of the plan year.

(c) *Recommendations not current.* For purposes of paragraph (a)(1)(i) of this section, and for purposes of any other provision of law, recommendations of the United States Preventive Services Task Force regarding breast cancer screening, mammography, and prevention issued in or around November 2009 are not considered to be current.

■ Par. 3. Section 54.9815–2713A is amended by revising paragraphs (a), (b), (c)(1), and (c)(2)(i) introductory text to read as follows:

### § 54.9815–2713A  Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 54.9815–2713(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (a)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owner's sincerely held religious beliefs.

(3) The organization must self-certify in the form and manner specified by the Secretary of Labor or provide notice to the Secretary of Health and Human Services as described in paragraph (b) or (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) A closely held for-profit entity is an entity that—

(i) Is not a nonprofit entity;

(ii) Has no publicly traded ownership interests, (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934); and

(iii) Has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto, as of the date of the entity's self-certification or notice described in paragraph (b) or (c) of this section.

(iv) For the purpose of the calculation in paragraph (a)(4)(iii) of this section, the following rules apply:

(A) Ownership interests owned by a corporation, partnership, estate, or trust are considered owned proportionately by such entity's shareholders, partners, or beneficiaries. Ownership interests owned by a nonprofit entity are considered owned by a single owner.

(B) An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family. Family includes only brothers and sisters (including half-brothers and half-sisters), a spouse, ancestors, and lineal descendants.

(C) If a person holds an option to purchase ownership interests, he or she is considered to be the owner of those ownership interests.

(v) A for profit entity that seeks further information regarding whether it qualifies for the accommodation described in this section may send a letter describing its ownership structure to the Department of Health and Human Services. An entity must submit the letter in the manner described by the Department of Health and Human Services. If the entity does not receive a response from the Department of Health and Human Services to a properly submitted letter describing the entity's current ownership structure within 60 calendar days, as long as the entity maintains that structure it will be considered to meet the requirement set forth in paragraph (a)(4)(iii) of this section.

(b) *Contraceptive coverage—self-insured group health plans.* (1) A group health plan established and maintained by an eligible organization that provides benefits on a self-insured basis complies for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) are satisfied:

Exhibit 10                                                                                                                          JA-0000213

(i) The eligible organization or its plan contracts with one or more third party administrators.

(ii) The eligible organization provides either a copy of the self-certification to each third party administrator or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in 29 CFR 2510.3–16 and this section.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Labor (working with the Department of Health and Human Services), will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under 29 CFR 2510.3–16 and this section.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i) Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(c) * * *

(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i) When a copy of the self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 54.9815–2713. An issuer may not require any further documentation from the eligible organization regarding its status as such.

(ii) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (that is, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section.

(2) * * *

(i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (c)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 54.9815–2713(a)(1)(iv) must—

* * * * *

**§ 54.9815–2713AT    [REMOVED]**

■ Par. 4. Section 54.9815–2713AT is removed.

**§ 54.9815–2713T    [REMOVED]**

■ Par. 5. Section 54.9815–2713T is removed.

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

For the reasons stated in the preamble, under the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012)

Exhibit 10                JA-0000214

the Department of Labor adopts as final the interim rules amending 29 CFR part 2590 published on July 19, 2010 (75 FR 41726) and amending 29 CFR parts 2510 and 2590 published August 27, 2014 (79 FR 51092) and further amends 29 CFR part 2590 as follows:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 6. The authority citation for part 2590 continues to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 12(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (January 9, 2012).

■ 7. Section 2590.715–2713 is amended by revising paragraphs (a)(3) and (4) and (b)(2) to read as follows:

### § 2590.715–2713  Coverage of preventive health services

(a) * * *

(3) *Out-of-network providers*—(i) Subject to paragraph (a)(3)(ii) of this section, nothing in this section requires a plan or issuer that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider. Moreover, nothing in this section precludes a plan or issuer that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider.

(ii) If a plan or issuer does not have in its network a provider who can provide an item or service described in paragraph (a)(1) of this section, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost sharing with respect to the item or service.

(4) *Reasonable medical management.* Nothing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency, method, treatment, or setting for an item or service described in paragraph (a)(1) of this section to the extent not specified in the relevant recommendation or guideline. To the extent not specified in a recommendation or guideline, a plan or issuer may rely on the relevant clinical evidence base and established reasonable medical management techniques to determine the frequency,

method, treatment, or setting for coverage of a recommended preventive health service.

*    *    *    *    *

(b) * * *

(2) *Changes in recommendations or guidelines.* (i) A plan or issuer that is required to provide coverage for any items and services specified in any recommendation or guideline described in paragraph (a)(1) of this section on the first day of a plan year must provide coverage through the last day of the plan year, even if the recommendation or guideline changes or is no longer described in paragraph (a)(1) of this section, during the plan year.

(ii) Notwithstanding paragraph (b)(2)(i) of this section, to the extent a recommendation or guideline described in paragraph (a)(1)(i) of this section that was in effect on the first day of a plan year is downgraded to a "D" rating, or any item or service associated with any recommendation or guideline specified in paragraph (a)(1) of this section is subject to a safety recall or is otherwise determined to pose a significant safety concern by a federal agency authorized to regulate the item or service during a plan year, there is no requirement under this section to cover these items and services through the last day of the plan year.

*    *    *    *    *

■ 8. Section 2590.715–2713A is amended by revising paragraph (a) to read as follows:

### § 2590.715–2713A  Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraphs (a)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 2590.715–2713(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (a)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of

the contraceptive services on account of the owners' sincerely held religious beliefs.

(3) The organization must self-certify in the form and manner specified by the Secretary or provide notice to the Secretary of Health and Human Services as described in paragraph (b) or (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) A closely held for-profit entity is an entity that—

(i) Is not a nonprofit entity;

(ii) Has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934); and

(iii) Has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto, as of the date of the entity's self-certification or notice described in paragraph (b) or (c) of this section.

(iv) For the purpose of the calculation in paragraph (a)(4)(iii) of this section, the following rules apply:

(A) Ownership interests owned by a corporation, partnership, estate, or trust are considered owned proportionately by such entity's shareholders, partners, or beneficiaries. Ownership interests owned by a nonprofit entity are considered owned by a single owner.

(B) An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family. Family includes only brothers and sisters (including half-brothers and half-sisters), a spouse, ancestors, and lineal descendants.

(C) If a person holds an option to purchase ownership interests, he or she is considered to be the owner of those ownership interests.

(v) A for-profit entity that seeks further information regarding whether it qualifies for the accommodation described in this section may send a letter describing its ownership structure to the Department of Health and Human Services. An entity must submit the letter in the manner described by the Department of Health and Human Services. If the entity does not receive

Exhibit 10                                                                                                    JA-0000215

**41346** **Federal Register** / Vol. 80, No. 134 / Tuesday, July 14, 2015 / Rules and Regulations

a response from the Department of Health and Human Services to a properly submitted letter describing the entity's current ownership structure within 60 calendar days, as long as the entity maintains that structure it will be considered to meet the requirement set forth in paragraph (a)(4)(iii) of this section.

\*    \*    \*    \*    \*

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons stated in the preamble, under the authority contained in Secs. 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92, as amended), the Department of Health and Human Services adopts as final the interim rules amending 45 CFR part 147 published on July 19, 2010 (75 FR 41726) and amending 45 CFR part 147 published August 27, 2014 (79 FR 51092) and further amends 45 CFR part 147 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 9. The authority citation for part 147 continues to read as follows:

**Authority:** Secs. 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 10. Section 147.130 is amended by revising paragraphs (a)(3) and (4) and (b)(2) to read as follows:

**§ 147.130   Coverage of preventive health services**

(a) \*    \*    \*

(3) *Out-of-network providers*—(i) Subject to paragraph (a)(3)(ii) of this section, nothing in this section requires a plan or issuer that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider. Moreover, nothing in this section precludes a plan or issuer that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider.

(ii) If a plan or issuer does not have in its network a provider who can provide an item or service described in paragraph (a)(1) of this section, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost sharing with respect to the item or service.

(4) *Reasonable medical management.* Nothing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency, method, treatment, or setting for an item or service described in paragraph (a)(1) of this section to the extent not specified in the relevant recommendation or guideline. To the extent not specified in a recommendation or guideline, a plan or issuer may rely on the relevant clinical evidence base and established reasonable medical management techniques to determine the frequency, method, treatment, or setting for coverage of a recommended preventive health service.

\*    \*    \*    \*    \*

(b) \*    \*    \*

(2) *Changes in recommendations or guidelines.* (i) A plan or issuer that is required to provide coverage for any items and services described in any recommendation or guideline described in paragraph (a)(1) of this section on the first day of a plan year (in the individual market, policy year) must provide coverage through the last day of the plan or policy year, even if the recommendation or guideline changes or is no longer described in paragraph (a)(1) of this section, during the plan or policy year.

(ii) Notwithstanding paragraph (b)(2)(i) of this section, to the extent a recommendation or guideline described in paragraph (a)(1)(i) of this section that was in effect on the first day of a plan year (in the individual market, policy year) is downgraded to a "D" rating, or any item or service associated with any recommendation or guideline specified in paragraph (a)(1) of this section is subject to a safety recall or is otherwise determined to pose a significant safety concern by a federal agency authorized to regulate the item or service during a plan or policy year, there is no requirement under this section to cover these items and services through the last day of the plan or policy year.

\*    \*    \*    \*    \*

■ 11. Section 147.131 is amended by revising paragraphs (b) and (f) to read as follows:

**§ 147.131   Exemption and accommodations in connection with coverage of preventive health services.**

\*    \*    \*    \*    \*

(b) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraphs (b)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (b)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owners' sincerely held religious beliefs.

(3) The organization must self-certify in the form and manner specified by the Secretary of Labor or provide notice to the Department of Health and Human Services as described in paragraph (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) A closely held for-profit entity is an entity that—

(i) Is not a nonprofit entity;

(ii) Has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934); and

(iii) Has more than 50 percent of the value of its ownership interest owned directly or indirectly by five or fewer individuals, or has an ownership structure that is substantially similar thereto, as of the date of the entity's self-certification or notice described in paragraph (b) or (c) of this section.

(iv) For the purpose of the calculation in paragraph (b)(4)(iii) of this section, the following rules apply:

(A) Ownership interests owned by a corporation, partnership, estate, or trust are considered owned proportionately by such entity's shareholders, partners, or beneficiaries. Ownership interests owned by a nonprofit entity are considered owned by a single owner.

Exhibit 10

(B) An individual is considered to own the ownership interests owned, directly or indirectly, by or for his or her family. Family includes only brothers and sisters (including half-brothers and half-sisters), a spouse, ancestors, and lineal descendants.

(C) If a person holds an option to purchase ownership interests, he or she is considered to be the owner of those ownership interests.

(v) A for-profit entity that seeks further information regarding whether it qualifies for the accommodation described in this section may send a letter describing its ownership structure to the Department of Health and Human Services. An entity must submit the letter in the manner described by the Department of Health and Human Services. If the entity does not receive a response from the Department of Health and Human Services to a properly submitted letter describing the entity's current ownership structure within 60 calendar days, as long as the entity maintains that structure it will be considered to meet the requirement set forth in paragraph (b)(4)(iii) of this section.

\*    \*    \*    \*    \*

(f) *Application to student health insurance coverage.* The provisions of this section apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education as defined in 20 U.S.C. 1002 in a manner comparable to that in which they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer. In applying this section in the case of student health insurance coverage, a reference to "plan participants and beneficiaries" is a reference to student enrollees and their covered dependents.

[FR Doc. 2015–17076 Filed 7–10–15; 11:15 am]

**BILLING CODE 6325–64–P; 4150–28–P; 4120–01–P**

Exhibit 10    JA-0000217

certified that the collection of information contained in this notice of proposed rulemaking will not have a significant impact on a substantial number of small entities. Accordingly, a regulatory flexibility analysis is not required. The temporary regulations will not result in any additional costs to affected entities but will provide an alternative means for eligible organizations to provide notice of their religious objection to all, or a subset of, contraceptive services. For this reason, the information collection requirement will not impose a significant impact on a substantial number of small entities. For further information and for analyses relating to the joint rulemaking, see the preamble to the joint rulemaking. Pursuant to section 7805(f) of the Internal Revenue Code, this regulation has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

**Comments and Requests for a Public Hearing**

Before these proposed regulations are adopted as final regulations, consideration will be given to any written comments (a signed original and eight (8) copies) or electronic comments that are submitted timely to the IRS. Comments are specifically requested on the clarity of the proposed regulations and how they may be made easier to understand. All comments will be available for public inspection and copying. A public hearing may be scheduled if requested in writing by a person that timely submits written comments. If a public hearing is scheduled, notice of the date, time, and place for the hearing will be published in the **Federal Register**.

**Drafting Information**

The principal author of these proposed regulations is Karen Levin, Office of the Division Counsel/Associate Chief Counsel (Tax Exempt and Government Entities), IRS. The proposed regulations, as well as the temporary regulations, have been developed in coordination with personnel from the U.S. Department of Labor and the U.S. Department of Health and Human Services.

**List of Subjects in 26 CFR Part 54**

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

**Proposed Amendments to the Regulations**

Accordingly, 26 CFR part 54 is proposed to be amended as follows:

**PART 54—PENSION EXCISE TAXES**

■ **Paragraph 1.** The authority citation for part 54 continues to read, in part, as follows:

Authority: 26 U.S.C. 7805 * * *

■ **Par. 2.** Section 54.9815–2713A is revised to read as follows:

**§ 54.9815–2713A    Accommodations in connection with coverage of preventive health services.**

[The text of proposed § 54.9815–2713A is the same as the text of § 54.9815–2713AT published elsewhere in this issue of the **Federal Register**].

John Dalrymple,
*Deputy Commissioner for Services and Enforcement.*

[FR Doc. 2014–20256 Filed 8–22–14; 3:30 pm]

**BILLING CODE 4830–01–P**

---

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**[REG 129786–14]**

**RIN 1545–BM39**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB67**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Part 147**

**[CMS–9940–P]**

**RIN 0938–AS50**

**Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCIES:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Proposed rules.

**SUMMARY:** This document proposes a change to the definition of an eligible organization that can avail itself of an accommodation with respect to coverage of certain preventive services under section 2713 of the Public Health Service Act (PHS Act), added by the

Patient Protection and Affordable Care Act, as amended, and incorporated into the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code.

Section 2713 of the PHS Act requires coverage without cost sharing of certain preventive health services by non-grandfathered group health plans and health insurance coverage. Among these services are women's preventive health services, as specified in guidelines supported by the Health Resources and Services Administration (HRSA). As authorized by the current regulations, and consistent with the HRSA Guidelines, group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the otherwise applicable requirement to cover certain contraceptive services. Additionally, under current regulations, accommodations are available with respect to the contraceptive coverage requirement for group health plans established or maintained by eligible organizations (and group health insurance coverage provided in connection with such plans), and student health insurance coverage arranged by eligible organizations that are institutions of higher education, that effectively exempt them from this requirement. The regulations establish a mechanism for separately furnishing payments for contraceptive services on behalf of participants and beneficiaries of the group health plans of eligible organizations that avail themselves of an accommodation, and enrollees and dependents of student health insurance coverage arranged by eligible organizations that are institutions of higher education that avail themselves of an accommodation.

These rules propose and seek comments on potential changes to the definition of ''eligible organization'' in the Departments' regulations in light of the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), to ensure that participants and beneficiaries in group health plans (and enrollees and dependents in student health insurance coverage arranged by institutions of higher education) obtain, without additional cost, coverage of the full range of Food and Drug Administration (FDA) approved contraceptive services, as prescribed by a health care provider, while respecting certain closely held for-profit entities' religion-based objections to contraceptive coverage. These proposed rules also seek comments on any additional steps the

Exhibit 11

government should take to help ensure coverage of the full range of FDA-approved contraceptives, as prescribed by a health care provider, without cost sharing, for participants and beneficiaries in group health plans of such entities (and enrollees and dependents in student health insurance coverage arranged by such entities that are institutions of higher education).

**DATES:** To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. on October 21, 2014.

**ADDRESSES:** In commenting, please refer to file code CMS–9940–P. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on these regulations to *http://www.regulations.gov.* Follow the "Submit a comment" instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9940–P, P.O. Box 8010, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9940–P, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* Alternatively, you may deliver (by hand or courier) your written comments ONLY to any of the following addresses prior to the close of the comment period:

a. For delivery in Washington, DC—

Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of

filing by stamping in and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD—

Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call telephone number (410) 786–9994 in advance to schedule your arrival with one of our staff members.

Comments erroneously mailed to an address indicated as appropriate for hand or courier delivery may be delayed and received after the close of the comment period.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** David Mlawsky, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565; Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service (IRS), Department of the Treasury, at (202) 927–9639.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

*Inspection of Public Comments:* All comments received before the close of the comment period will be available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *http://www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244. Monday

through Friday of each week from 8:30 a.m. to 4 p.m. To schedule an appointment to view public comments, phone 1–800–743–3951.

**I. Background**

The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010. The Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152) was enacted on March 30, 2010. These statutes are collectively known as the Affordable Care Act. The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide coverage of certain specified preventive services without cost sharing, including under paragraph (a)(4), benefits for certain women's preventive health services as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA). On August 1, 2011, HRSA adopted and released guidelines for women's preventive health services (HRSA Guidelines) based on recommendations of the independent Institute of Medicine. As relevant here, the HRSA Guidelines include all Food and Drug Administration (FDA)-approved contraceptives, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[1] Except as discussed later in this section, non-grandfathered group health plans

---

[1] The HRSA Guidelines for Women's Preventive Services do not include services relating to a man's reproductive capacity, such as vasectomies and condoms.

Exhibit 11

JA-0000219

and health insurance coverage are required to provide coverage consistent with the HRSA Guidelines, without cost sharing, for plan years (or, in the individual market, policy years) beginning on or after August 1, 2012.[2]

Interim final regulations implementing section 2713 of the PHS Act were published on July 19, 2010 (75 FR 41726) (2010 interim final regulations). On August 1, 2011, the Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, the Departments) amended the 2010 interim final regulations to provide HRSA with authority to exempt group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) from the requirement to cover contraceptive services consistent with the HRSA Guidelines (76 FR 46621) (2011 amended interim final regulations).[3] On the same date, HRSA exercised this authority in the HRSA Guidelines to exempt group health plans established or maintained by these religious employers (and group health insurance coverage provided in connection with such plans) from the HRSA Guidelines with respect to contraceptive services.[4] The 2011 amended interim final regulations specified that, for purposes of this exemption, a religious employer was one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. Final regulations issued on February 10, 2012, adopted the definition of religious employer in the 2011 amended interim final

regulations without modification (2012 final regulations).[5]

Contemporaneous with the issuance of the 2012 final regulations, HHS, with the agreement of the Departments of Labor and the Treasury, issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments for group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans).[6] The guidance provided that the temporary enforcement safe harbor would remain in effect until the first plan year beginning on or after August 1, 2013. At the same time, the Departments committed to rulemaking to achieve the goals of providing coverage of recommended preventive services, including contraceptive services, without cost sharing, while simultaneously ensuring that certain additional nonprofit organizations with religious objections to contraceptive coverage would not have to contract, arrange, pay, or refer for such coverage.

On March 21, 2012, the Departments published an advance notice of proposed rulemaking (ANPRM) that described and solicited comments on possible approaches to achieve these goals (77 FR 16501).

On February 6, 2013, following review of the comments on the ANPRM, the Departments published proposed regulations at 78 FR 8456 (proposed regulations). The regulations proposed to simplify and clarify the definition of "religious employer" for purposes of the religious employer exemption. The regulations also proposed accommodations for group health plans established or maintained or arranged

by certain nonprofit religious organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans). These organizations were referred to as "eligible organizations."

The regulations proposed that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group insurance coverage in connection with the plan would be required to assume sole responsibility for providing contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. The Departments proposed a comparable accommodation with respect to student health insurance coverage arranged by eligible organizations that are institutions of higher education.

In the case of a self-insured group health plan established or maintained by an eligible organization, the proposed regulations presented potential approaches under which the third party administrator of the plan would provide or arrange for a third party to provide contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. An issuer (or its affiliate) would be able to offset the costs incurred by the third party administrator and the issuer in the course of arranging and providing such coverage by claiming an adjustment in the Federally-facilitated Exchange (FFE) user fee.

The Departments received over 400,000 comments (many of them standardized form letters) in response to the proposed regulations. After consideration of the comments, the Departments published final regulations on July 2, 2013 at 78 FR 39870 (July 2013 final regulations). The July 2013 final regulations simplified and clarified the definition of religious employer for purposes of the religious employer exemption and established accommodations for health coverage established or maintained or arranged by eligible organizations. A contemporaneously re-issued HHS guidance document extended the temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. This guidance included a form

---

[2] Interim final regulations published by the Departments on July 19, 2010, generally provide that plans and issuers must cover a newly recommended preventive service starting with the first plan year (or, in the individual market, policy year) that begins on or after the date that is one year after the date on which the new recommendation is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

[3] The 2011 amended interim final regulations were issued and effective on August 1, 2011, and published in the **Federal Register** on August 3, 2011 (76 FR 46621).

[4] HRSA subsequently amended the HRSA Guidelines to reflect the simplified definition of "religious employer" contained in the July 2013 final regulations. 78 FR 39870 (July 2, 2013) (discussed below), effective August 1, 2013.

[5] The 2012 final regulations were published in the **Federal Register** on February 15, 2012 (77 FR 8725).

[6] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code (originally issued on February 10, 2012, and reissued on August 15, 2012 and June 28, 2013). *available at: http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/preventive-services-guidance-6-28-2013.pdf.* The guidance clarified, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage were not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor was also available to student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that met the conditions set forth in the guidance. *See* "Student Health Insurance Coverage," 77 FR16457 (Mar. 21, 2012).

Exhibit 11

to be used by an organization during this temporary period to self-certify that its plan qualified for the temporary enforcement safe harbor. In addition, HHS and the Department of Labor (DOL) issued a self-certification form, EBSA Form 700, to be executed by an organization seeking to be treated as an eligible organization for purposes of an accommodation under the July 2013 final regulations. This self-certification form was provided for use with the accommodation under the July 2013 final regulations, after the expiration of the temporary enforcement safe harbor (that is, for plan years beginning on or after January 1, 2014).

On June 30, 2014, the Supreme Court ruled in the case of *Burwell v. Hobby Lobby Stores, Inc.* that, under the Religious Freedom Restoration Act of 1993 (RFRA), the requirement to provide contraceptive coverage could not be applied to the closely held for-profit corporations before the Court because their owners had religious objections to providing such coverage, and because the Government's goal of guaranteeing coverage for contraceptive methods without cost sharing could be achieved in a less restrictive manner by offering such closely held for-profit entities the accommodation the Government already provided to religious nonprofit organizations with religious objections to contraceptive coverage. After describing that accommodation, the Court concluded that the accommodation "does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS' stated interests equally well."

On July 3, 2014, the Supreme Court issued an interim order in connection with an application for an injunction pending appeal in *Wheaton College v. Burwell,* 134 S. Ct. 2806 (2014) (the *Wheaton* order), in which Wheaton College challenged under RFRA the requirement in the July 2013 final regulations that an eligible organization invoking the accommodation send EBSA Form 700 to the insurance issuer or third party administrator. The Court's order stated that, "[i]f [Wheaton College] informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the [Departments of Labor, Health and Human Services, and the Treasury] are enjoined from enforcing against [Wheaton College]" certain provisions of the Affordable Care Act and related regulations requiring coverage without cost sharing of certain

contraceptive services "pending final disposition of appellate review." 134 S. Ct. at 2807. The order stated that Wheaton College need not use EBSA Form 700 or send a copy of the executed form to its health insurance issuers or third party administrators to meet the condition for this injunctive relief. Id. The Court also stated that its interim order neither affected "the ability of [Wheaton College's] employees and students to obtain, without cost, the full range of FDA approved contraceptives," nor precluded the Government from relying on the notice by Wheaton College "to facilitate the provision of full contraceptive coverage under the Act." Id. The Court's order further stated that it "should not be construed as an expression of the Court's views on the merits" of Wheaton College's challenge to the accommodations. Id.

This notice of proposed rulemaking proposes and invites comments on changes to the definition of an eligible organization in the Departments' regulations in light of the Supreme Court's decision in *Hobby Lobby.* It also solicits comments on any other steps the Government should take to help ensure that participants and beneficiaries in group health plans or enrollees and dependents in student health insurance coverage arranged by institutions of higher education are able to obtain, without cost, the full range of FDA-approved contraceptives, as prescribed by a health care provider, without cost sharing, if enrolled in a group health plan or insurance coverage sponsored or arranged by a closely held for-profit entity that objects on religious grounds to covering contraceptive services. Given the importance of this coverage, initiating this proposed rulemaking now allows for public input and a pathway toward helping to ensure access to contraceptive coverage.

The Departments are publishing contemporaneously with this notice of proposed rulemaking interim final regulations in light of the Supreme Court's interim order in connection with the application for an injunction in the pending case of *Wheaton College v. Burwell.* The interim final regulations are published elsewhere in this edition of the **Federal Register.**

## II. Provisions of the Proposed Regulations

As stated above, on June 30, 2014, the Supreme Court ruled in *Burwell v. Hobby Lobby Stores, Inc.* that, under RFRA, the requirement to provide contraceptive coverage could not be applied to certain closely held for-profit organizations. The individual plaintiffs in *Hobby Lobby* and the associated case

*Conestoga Wood Specialties Corp. v. Burwell* run closely held businesses that are family-owned and operated and that have adopted statements of mission or purpose to conduct the companies' affairs in accordance with the owners' shared religious beliefs and values. See 134 S. Ct. at 2764–2766.

In light of the Court's decision in *Hobby Lobby,* the Departments propose to amend the definition of an eligible organization under the July 2013 final regulations to include a closely held for-profit entity that has a religious objection to providing coverage for some or all of the contraceptive services otherwise required to be covered. Under these proposed rules, a qualifying closely held for-profit entity that has a religious objection to providing coverage for some or all of the contraceptive services otherwise required to be covered would not be required to contract, arrange, pay or refer for contraceptive coverage: instead, payments for contraceptive services provided to participants and beneficiaries in the eligible organization's plan would be provided separately by an issuer (if the qualifying entity sponsors an insured group health plan, or if the qualifying entity is an institution of higher education that arranges student health insurance coverage) or arranged separately by a third party administrator (if the qualifying entity is self-insured), consistent with the July 2013 final regulations as amended by interim final regulations published in this same edition of the **Federal Register.** This proposed change would extend to participants and beneficiaries in group health plans established or maintained by certain closely held for-profit entities with religious objections to contraceptive coverage, and to enrollees and dependents enrolled in student health insurance coverage arranged by certain closely held for-profit entities that are institutions of higher education with religious objections to contraceptive coverage, the same, separate payments for contraceptive services provided to participants and beneficiaries of group health plans (and enrollees and dependents in student health insurance) established or maintained by certain nonprofit religious entities with such objections, while similarly respecting the religious objections of the closely held for-profit entities.

*Defining a Closely Held For-Profit Entity*

In considering inclusion of certain closely held for-profit entities among the eligible organizations that may avail themselves of the accommodations, the

Exhibit 11                                                                                     JA-0000221

Departments are considering and seek comment on how to define a qualifying closely held for-profit entity. In *Hobby Lobby,* the Supreme Court noted that the companies at issue in the cases were not publicly traded and were owned and controlled by members of a single family and that the companies were operated in accordance with the owners' shared religious beliefs and values. 134 S. Ct. at 2764–2766.

In light of the Supreme Court's decision, the Departments are proposing for comment two possible approaches to defining a qualifying closely held for-profit entity, although the Departments invite comments on other approaches as well. In common understanding, a closely held corporation—a term often used interchangeably with a "close" or "closed" corporation—is a corporation the stock of which is owned by a small number of persons and for which no active trading market exists. See, for example, American Law Institute, Principles of Corporate Governances section 1.06; Black's Law Dictionary (9th ed. 2009) ("close corporation"); Del. Code Tit. 8, Ch.1, Sub. Ch. 14 ("close corporation"). The examples below are by way of illustration, and the maximum number of shareholders specified in particular examples would not necessarily be borrowed as the standard in this context.

Under the first proposed approach, a qualifying closely held for-profit entity would be an entity where none of the ownership interests in the entity is publicly traded and where the entity has fewer than a specified number of shareholders or owners.

There is precedent in other areas of federal law for limiting the definition of closely held entities in this context to those with a relatively small number of owners. For example, subchapter S treatment under section 1361 of the Code is currently limited to corporations with 100 or fewer shareholders who are generally individuals and has in the past been limited to corporations with 10 or fewer shareholders. Similarly, certain favorable estate tax treatment is limited to businesses with 45 or fewer partners or shareholders under section 6166 of the Code.

Under a second, alternative approach, a qualifying closely held entity would be a for-profit entity in which the ownership interests are not publicly traded, and in which a specified fraction of the ownership interest is concentrated in a limited and specified number of owners. This approach also has precedent in federal law. For example, certain rules governing the taxation of real estate investment trusts,

passive activity losses, and certain income from foreign entities are limited to organizations that are owned by or for not more than five individuals. See, for example, sections 856(h), 542(a)(2), and 469(j)(1) of the Code and regulations under these sections.

These approaches might serve to identify for-profit entities controlled and operated by individual owners who likely have associational ties, are personally identified with the entity, and can be regarded as conducting personal business affairs through the entity. These appear to be the types of entities the Court sought to accommodate in *Hobby Lobby.* There may also be useful definitions or principles in state laws governing close corporations, or other areas of law.

The Departments invite comments on the appropriate scope of the definition of a qualifying closely held for-profit entity, including but not limited to whether a closely held for-profit entity should be defined with reference to a maximum number of owners (and, if so, what that maximum number should be) or a minimum concentration of ownership (and if so, what that concentration should be) or with reference to additional or other criteria.

It would be helpful for comments to address how the selection of a particular approach can be informed by the purposes of the Affordable Care Act and the contraceptive coverage requirement; the range of business structures in the Nation's economy; background principles of federal and state law applicable to business entities and the relationship of the entities' owners to the entities; other related or analogous areas of the law; experience regarding accommodations of religion and religious beliefs in various contexts and the rationales for the scope and operation of such accommodations: *Hobby Lobby* and other court decisions that shed light on these issues; and any other relevant matters.

*Religious Objection To Providing Coverage for Some or All of the Contraceptive Services Required To Be Covered.*

In *Hobby Lobby,* the Supreme Court held that the closely held for-profit corporations at issue in that case could opt not to provide otherwise required contraceptive coverage if doing so runs counter to their owners' sincerely held religious beliefs. These proposed regulations would require that the qualifying closely held for-profit entity's objection, based on its owners' sincerely held religious beliefs, to covering some or all of the contraceptive services

otherwise required to be covered, be made in accordance with the entity's applicable rules of governance. As discussed by the Court in *Hobby Lobby,* state corporate law dictates how a corporation may establish its governing structure.[7]

Under the Departments' proposal, valid corporate action (or similar action by a business that is not organized as a corporation) taken in accordance with the entity's governing structure in accordance with state law, stating its owners' religious objection to providing some or all contraceptive coverage otherwise required to be provided, can serve to establish that a closely held for-profit entity has religious objections to providing such coverage. In determining whether a closely held for-profit entity's decision-making process followed the necessary rules and procedures, the laws of the state in which the entity is incorporated, or, for non-corporate entities, organized, would govern. The Departments invite comments on whether to require documentation of the decision-making process and disclosure of the decision.

The Departments seek comment on this approach to determining that a closely held for-profit entity opposes providing coverage for some or all of the contraceptive services otherwise required to be covered on account of the owners' religious objections.

*Other Potential Changes*

The Departments seek comment on other potential changes to the July 2013 final regulations in light of the proposed change to the definition of eligible organization. In particular, the Departments seek comment on applying the approach set forth in the July 2013 final regulations in the context of the expanded definition of eligible organization. The July 2013 final regulations provide for separate payments for contraceptive services for participants and beneficiaries in self-insured group health plans of eligible organizations in a manner that enables these organizations to completely separate themselves from administration and payment for contraceptive coverage. Specifically, the third party administrator must provide or arrange such payments, and can seek reimbursement for such costs (including an allowance for administrative costs and margin) by making an arrangement with a participating issuer—that is, an issuer offering coverage through a Federally-facilitated Exchange (FFE). The participating issuer can receive an

---

[7] 134 S. Ct. at 2774–2775.

Exhibit 11    JA-0000222

adjustment to its FFE user fees to finance such costs.

The Departments seek comment on the likely number of closely held for-profit entities that would seek an accommodation, the number of participants and beneficiaries (or in the case of student health insurance coverage, enrollees and dependents) in the plans of such entities, and the number of issuers and third-party administrators affected by the proposed rules. Finally, the Departments seek comment on whether any other aspects of the accommodations in the July 2013 final regulations, including relevant definitions, should be modified in light of the proposed addition of closely held for-profit entities with religious objections to contraceptive coverage to the definition of eligible organization.

These proposed regulations, if finalized as proposed, would require a small number of conforming changes to cross-references in the regulations. Any such necessary conforming changes would be incorporated into final regulations.

### III. Response to Comments

Because of the large number of public comments we normally receive on **Federal Register** documents, we are not able to acknowledge or respond to them individually. The Departments will consider all comments we receive by the date and time specified in the "DATES" section of this preamble, and, when we proceed with a subsequent document, we will respond to the comments in the preamble to that document.

### IV. Economic Impact and Paperwork Burden

*A. Executive Orders 12866 and 13563—Department of Health and Human Services and Department of Labor*

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any 1 year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any 1 year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). The Departments anticipate that these proposed regulations are not likely to have economic impacts of $100 million or more in any 1 year, and therefore, do not meet the definition of "economically significant" under Executive Order 12866.

#### 1. Need for Regulatory Action

The proposed rules would modify the July 2013 final regulations in light of the Supreme Court's decision in *Hobby Lobby*. That decision held that a closely held for-profit corporation is exempt from the requirement to provide contraceptive coverage if its owners have religious objections to such coverage, because there is a less restrictive means of furthering the law's interests, namely the accommodation the Government already provided to nonprofit religious organizations with such objections. Contraceptive coverage is crucial to women's health and equality for a number of reasons, including but not limited to the psychological toll and compromised financial position, and adverse health consequences, that can result from unplanned or unwanted pregnancies. As documented in a report of the Institute of Medicine, women experiencing an unintended pregnancy may not immediately be aware that they are pregnant, and thus delay prenatal care. They also may not be as motivated to discontinue behaviors that pose pregnancy-related risks (for example, smoking, consumption of alcohol).[8] Studies show a greater risk of preterm birth and low birth weight among unintended pregnancies compared with pregnancies that were planned.[9] Contraceptives also have medical benefits for women who are contraindicated for pregnancy, and there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy.[10] In addition, there are significant cost savings to employers from the coverage of contraceptives.[11] Providing this coverage to participants and beneficiaries affected by the Supreme Court decision is a priority.

#### 2. Anticipated Effects

The Departments expect that these proposed regulations would not result in any additional significant burden on or costs to the affected entities.

*B. Special Analyses—Department of the Treasury*

For purposes of the Department of the Treasury, it has been determined that this proposed rule is not a significant regulatory action as defined in Executive Order 12866, as supplemented by Executive Order 13563. Therefore, a regulatory assessment is not required. It also has been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to this proposed rule. Pursuant to the Regulatory Flexibility Act (5 U.S.C. chapter 6), it is hereby certified that this proposed rule will not have a significant economic impact on a substantial number of small entities. This certification is based on the fact that the regulations merely propose to modify the definition of eligible organization to include certain closely held for-profit entities. This modification, if adopted, would not increase costs to or burdens on the affected organizations. Pursuant to section 7805(f) of the Code, these regulations have been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

*C. Paperwork Reduction Act—Department of Health and Human Services*

Under the Paperwork Reduction Act of 1995, we are required to provide 60-day notice in the **Federal Register** and solicit public comment before a collection of information requirement is

---

[8] Inst. Of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash., DC: Nat'l Acad. Press, 2011, at p. 16.

[9] Gipson, J.D. et al., The Effects of Unintended Pregnancy on Infant, Child and Parental Health: A Review of the Literature, *Studies on Family Planning*, 2008, 39(1):18–38.

[10] Inst. Of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash., DC: Nat'l Acad. Press, 2011, at p. 107.

[11] See discussion at 77 FR 8727.

Exhibit 11    JA-0000223

submitted to the Office of Management and Budget (OMB) for review and approval. In order to fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 requires that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

We are soliciting public comment on each of these issues for the following sections of this document that contain information collection requirements (ICRs):

The 2013 final regulations require an eligible organization that seeks an accommodation to self-certify that it meets the definition of an eligible organization using the EBSA Form 700 and providing it directly to each third party administrator or issuer under the plan that would otherwise arrange for or provide the covered contraceptive services. The interim final regulations being published contemporaneously with these proposed regulations continue to allow such eligible organizations to use EBSA Form 700, as set forth in the 2013 final regulations and guidance. In addition, the interim final regulations permit an alternative process, consistent with the Supreme Court's interim order in *Wheaton College*, under which an eligible organization may notify HHS in writing of its religious objection to coverage of all or a subset of contraceptive services.

These proposed regulations do not change the requirement that an eligible organization that seeks accommodation self-certifies that it meets the definition of an eligible organization, either using the EBSA Form 700 method of self-certification or the alternative notice to HHS process.

HHS is anticipating that 71 for-profit organizations will seek an accommodation. This is based on the number of plaintiffs that are for-profit employers in recent litigation objecting on religious grounds to the provision of contraceptive services. We seek comments on this estimate and welcome any data that may assist us in estimating the number of entities affected by this provision. For each eligible organization it is assumed that, clerical staff will gather and enter the necessary information, send the self-certification

or the notice to its issuer(s) or third party administrator(s) or to HHS electronically and retain a copy for recordkeeping, a manager and legal counsel will review it, and a senior executive will execute it. It is estimated that an organization will need approximately 50 minutes (30 minutes of clerical labor at a cost of $30.00 per hour, 10 minutes for a manager at a cost of $102 per hour, 5 minutes for legal counsel at a cost of $127 per hour, and 5 minutes for a senior executive at a cost of $121 per hour) to execute the self-certification. The certification may be electronically transmitted to the issuer or to HHS at minimal cost, but a cost burden of $38.34 is estimated for a paper filing calculated with 5 cents per page printing and material costs and 49 cents postage costs. Therefore, the total one-time burden for preparing and providing the information in the self-certification is estimated to be approximately $53 for each eligible organization.

Based on this estimate of 71 affected entities and the individual burden estimate of $53, we estimate the hour burden to be 59.2 hours with an equivalent cost of $3736 and a paper filing cost burden of $38.34. As the Department of Labor and the Department of Health and Human Services share jurisdiction they are splitting the hour burden so each will account for 29.6 burden hours and a cost burden of $19.17. We welcome comments on any aspect of this burden estimate.

If you comment on these information collection and recordkeeping requirements, please submit your comments electronically as specified in the **ADDRESSES** section of this proposed rule.

Comments must be received on/by October 27, 2014.

### D. Paperwork Reduction Act— Department of Labor

As discussed above, the proposed regulations would revise the definition of eligible organization to include qualifying closely held for-profit entities. This action would amend the EBSA Form 700 information collection request (ICR), which is approved under OMB Control number 1210–NEW to allow qualified closely held for-profit entities to avail themselves of the accommodation by self-certifying that they meet the definition of an eligible organization, either using the EBSA Form 700 method of self-certification or the alternative notice to HHS process under the contemporaneous interim final regulations.

• Consistent with the HHS analysis presented above, DOL estimates that there will be 71 additional entities that would utilize the accommodation. The Departments are soliciting comments for 60 days regarding the likely number of additional entities seeking an accommodation, the number of participants and beneficiaries in the plans of such organizations, and the number of issuers and third party administrators impacted by the proposed regulations. The Departments will submit a copy of these proposed rules to OMB in accordance with 44 U.S.C. 3507(d) for review of the proposed ICRs. The Departments and OMB are particularly interested in comments that:

• Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

• Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

• Enhance the quality, utility, and clarity of the information to be collected; and

• Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, by permitting electronic submission of responses.

Comments should be sent to the Office of Information and Regulatory Affairs, Attention: Desk Officer for the Employee Benefits Security Administration either by Fax to (202) 395–5806 or by email to *oira_submission@omb.eop.gov*. A copy of the proposed ICRs may be obtained by contacting the PRA addressee: G. Christopher Cosby, Office of Policy and Research, Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW., Room N–5718, Washington, DC 20210; telephone: (202) 693–8410; Fax: (202) 219–4745 (please note that these numbers are not toll-free numbers); email: *ebsa.opr@dol.gov*. Proposed ICRs submitted to OMB also are available at *www.reginfo.gov (http://www.reginfo.gov/public/do/PRAMain)*.

The Departments expect that qualified closely held for-profit entities will spend the same time (and incur the same cost) to prepare and send the EBSA Form 700 or the notification to the Secretary of HHS as other eligible

Exhibit 11

organizations under the existing ICR (approximately 50 minutes in preparation time and $0.54 mailing costs). The Departments note that persons are not required to respond to, and generally are not subject to any penalty for failing to comply with, an ICR unless the ICR has a valid OMB control number. The paperwork burden estimates are summarized as follows:

*Type of Review:* Revised Collection.

*Agencies:* Employee Benefits Security Administration, Department of Labor.

*Title:* EBSA Form 700.

*OMB Number:* 1210–NEW.

*Affected Public:* Business or other for profit entity.

*Total Respondents:* 71.

*Total Responses:* 71.

*Frequency of Response:* Once, Variable.

*Estimated Total Annual Burden Hours:* 59 hours (DOL 29.5 hours, HHS 29.5 hours).

*Estimated Total Annual Burden Cost:* $38 (DOL $19, HHS $19).

## V. Unfunded Mandates Reform Act

For purposes of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4), as well as Executive Order 12875, these proposed regulations do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $100 million, adjusted for inflation, or more on the private sector.[12]

## VI. Federalism—Department of Health and Human Services and Department of Labor

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have ''substantial direct effects'' on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

In the Departments' view, these proposed regulations have federalism implications, but the federalism implications are substantially mitigated

because, with respect to health insurance issuers, 45 states are either enforcing the requirements related to coverage of specified preventive services (including contraception) without cost sharing pursuant to state law or otherwise are working collaboratively with HHS to ensure that issuers meet these standards. In five states, HHS ensures that issuers comply with these requirements. Therefore, the proposed regulations are not likely to require substantial additional oversight of states by HHS.

In general, section 514 of ERISA provides that state laws are superseded to the extent that they relate to any covered employee benefit plan, and preserves state laws that regulate insurance, banking, or securities. ERISA also prohibits states from regulating a covered plan as an insurance or investment company or bank. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) added a new preemption provision to ERISA (as well as to the PHS Act) narrowly preempting state requirements on group health insurance coverage. States may continue to apply state law requirements but not to the extent that such requirements prevent the application of the federal requirement that group health insurance coverage provided in connection with certain group health plans provide coverage for specified preventive services without cost sharing. HIPAA's Conference Report states that the conferees intended the narrowest preemption of state laws with regard to health insurance issuers (H.R. Conf. Rep. No. 104–736, 104th Cong. 2d Session 205, 1996). State insurance laws that are more stringent than the federal requirement are unlikely to ''prevent the application of'' the preventive services coverage provision, and therefore are unlikely to be preempted. Accordingly, states have significant latitude to impose requirements on health insurance issuers that are more restrictive than those in federal law.

Guidance conveying this interpretation was published in the **Federal Register** on April 8, 1997 (62 FR 16904) and December 30, 2004 (69 FR 78720), and these proposed regulations implement the preventive services coverage provision's minimum standards and do not significantly reduce the discretion given to states under the statutory scheme.

The PHS Act provides that states may enforce the provisions of title XXVII of the PHS Act as they pertain to issuers, but that the Secretary of HHS will enforce any provisions that a state does not have authority to enforce or that a

state has failed to substantially enforce. When exercising its responsibility to enforce provisions of the PHS Act, HHS works cooperatively with the state to address the state's concerns and avoid conflicts with the state's exercise of its authority. HHS has developed procedures to implement its enforcement responsibilities, and to afford states the maximum opportunity to enforce the PHS Act's requirements in the first instance. In compliance with Executive Order 13132's requirement that agencies examine closely any policies that may have federalism implications or limit the policymaking discretion of states, the Departments have engaged in numerous efforts to consult and work cooperatively with affected state and local officials.

In conclusion, throughout the process of developing these proposed regulations, to the extent feasible within the specific preemption provisions of ERISA and the PHS Act, the Departments have attempted to balance states' interests in regulating health coverage and health insurance issuers, and the rights of those individuals intended to be protected in the PHS Act, ERISA, and the Code.

## VII. Statutory Authority

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

---

[12] In 2014, that threshold level is approximately $141 million.

Exhibit 11                                                                                                    JA-0000225

**51126** **Federal Register** / Vol. 79, No. 166 / Wednesday, August 27, 2014 / Proposed Rules

Signed this 20th day of August 2014.

John Dalrymple.

*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

Signed this 20th day of August 2014.

Phyllis C. Borzi.

*Assistant Secretary. Employee Benefits Security Administration. Department of Labor.*

Dated: August 19, 2014.

Marilyn Tavenner.

*Administrator, Centers for Medicare & Medicaid Services.*

Approved: August 20, 2014.

Sylvia M. Burwell,

*Secretary, Department of Health and Human Services.*

### List of Subjects

*26 CFR Part 54*

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

*29 CFR Part 2590*

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

*45 CFR Part 147*

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

### DEPARTMENT OF THE TREASURY

*Internal Revenue Service*

Accordingly, 26 CFR part 54 is proposed to be amended as follows:

### PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 continues to read, in part, as follows:

**Authority:** 26 U.S.C. 7805 * * *

■ **Par. 2.** Section 54.9815–2713A is amended by revising paragraph (a) to read as follows:

**§ 54.9815–2713A  Accommodations in connection with coverage of preventive health services.**

(a) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraph (a)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 54.9815–2713(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and

holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (a)(4) of this section, and the entity's objection to covering some or all of the contraceptive services on account of its owners' sincerely held religious beliefs is made in accordance with the organization's applicable rules of governance, consistent with state law.

(3) The organization must self-certify in the form and manner specified by the Secretary or provide notice to the Secretary of Health and Human Services as described in paragraph (b) or (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) [Reserved]

*   *   *   *   *

### DEPARTMENT OF LABOR

*Employee Benefits Security Administration*

For the reasons stated in the preamble, the Department of Labor proposes to amend 29 CFR part 2590 as follows:

### PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 1. The authority citation for part 2590 is revised to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 11–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (January 9, 2012).

■ 2. Section 2590.715–2713A is amended by revising paragraph (a) to read as follows:

**§ 2590.715–2713A  Accommodations in connection with coverage of preventive health services.**

(a) *Eligible organizations.* An eligible organization is an organization that meets the criteria of paragraph (a)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 2590.715–2713(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (a)(4) of this section, and the entity's objection to covering some or all of the contraceptive services on account of its owners' sincerely held religious beliefs is made in accordance with the organization's applicable rules of governance, consistent with state law.

(3) The organization must self-certify in the form and manner specified by the Secretary or provide notice to the Secretary of Health and Human Services as described in paragraph (b) or (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) [Reserved]

*   *   *   *   *

### DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons stated in the preamble, the Department of Health and Human Services proposes to amend 45 CFR subtitle A, part 147 as follows:

### PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSRUANCE MARKETS

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** Secs 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Section 147.131 is amended by revising paragraphs (b) and (f) to read as follows:

**§ 147.131  Exemption and accommodation in connection with coverage of preventive health services.**

*   *   *   *   *

(b) *Eligible organizations.* An eligible organization is an organization that

Exhibit 11                                                                                                    JA-0000226

Case 2:17-cv-04540-WB    Document 253-2    Filed 09/29/20    Page 40 of 130

**Federal Register** / Vol. 79, No. 166 / Wednesday. August 27, 2014 / Proposed Rules **51127**

meets the criteria of paragraph (b)(1) through (3) of this section.

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2)(i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (b)(4) of this section, and the entity's objection to covering some or all of the contraceptive services on account of its owners' sincerely held religious beliefs is made in accordance with the organization's applicable rules of governance, consistent with state law.

(3) The organization must self-certify in the form and manner specified by the Secretary or provide notice to the Secretary of Health and Human Services as described in paragraph (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification or notice must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(4) [Reserved]

\*      \*      \*      \*      \*

(f) *Application to student health insurance coverage.* The provisions of this section apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education as defined in 20 U.S.C. 1002 in a manner comparable to that in which they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer. In applying this section in the case of student health insurance coverage, a reference to "plan participants and beneficiaries" is a reference to student enrollees and their covered dependents.

[FR Doc. 2014–20254 Filed 8–22–14; 3:30 pm]

**BILLING CODE 4830–01–P; 4510–029–P; 4120–01–P; 6325–64**

## DEPARTMENT OF DEFENSE

### Office of the Secretary

**32 CFR Part 199**

**[DOD–2006–HA–0207]**

**RIN 0720–AB15**

### Civilian Health and Medical Program of the Uniformed Services (CHAMPUS); TRICARE Reserve Select; TRICARE Dental Program; Early Eligibility for TRICARE for Certain Reserve Component Members

**AGENCY:** Office of the Secretary, DoD.

**ACTION:** Proposed rule.

**SUMMARY:** TRICARE Reserve Select (TRS) is a premium-based TRICARE health plan available for purchase worldwide by qualified members of the Ready Reserve and by qualified survivors of TRS members. TRICARE Dental Program (TDP) is a premium-based TRICARE dental plan available for purchase worldwide by qualified Service members. This proposed rule revises requirements and procedures for the TRS program to specify the appropriate actuarial basis for calculating premiums in addition to other minor clarifying administrative changes. For a member who is involuntarily separated from the Selected Reserve under other than adverse conditions this proposed rule provides a time-limited exception that allows TRS coverage in effect to continue for up to 180 days after the date on which the member is separated from the Selected Reserve and TDP coverage in effect to continue for no less than 180 days after the separation date. It also expands early TRICARE eligibility for certain Reserve Component members from a maximum of 90 days to a maximum of 180 days prior to activation in support of a contingency for more than 30 days.

**DATES:** Submit comments on or before October 27, 2014.

**ADDRESSES:** You may submit comments, identified by docket number or Regulation Identifier Number (RIN) number and title, by any of the following methods:

*Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

*Mail:* Federal Docket Management System Office, 4800 Mark Center Drive, East Tower, Suite 02G09, Alexandria, VA 22350–3100.

*Instructions:* All submissions received must include the agency name and docket number or RIN for this **Federal Register** document. The general policy for comments and other submissions from members of the public is to make these submissions available for public viewing on the Internet at *http:// www.regulations.gov* as they are received without change, including any personal identifiers or contact information.

**FOR FURTHER INFORMATION CONTACT:** Jody Donehoo, Defense Health Agency. TRICARE Health Plan Division. telephone (703) 681–0039.

Questions regarding payment of specific claims under the TRICARE allowable charge method should be addressed to the appropriate TRICARE contractor.

**SUPPLEMENTARY INFORMATION:**

### I. Introduction and Background

This proposed rule addresses provisions of the National Defense Authorization Act for Fiscal Year 2009 (NDAA–09) (Pub. L. 110–417), the National Defense Authorization Act for Fiscal Year 2010 (NDAA–10) (Pub. L. 111–84), and the National Defense Authorization Act for Fiscal Year 2013 (NDAA–13) (Pub. L. 112–239). First, section 704 of NDAA–09 specifies that the appropriate actuarial basis for calculating premiums for TRS shall utilize the actual cost of providing benefits to members and their dependents during preceding calendar years. Second, section 702 of NDAA–10 expands early eligibility for Reserve Component members issued delayed-effective-date active duty orders from a maximum of 90 days to a maximum of 180 days prior to activation in support of a contingency for more than 30 days. Third, for a member who is involuntarily separated from the Selected Reserve under other than adverse conditions as characterized by the Secretary concerned, section 701 of NDAA–13 provides a time-limited exception that allows TRS coverage already in effect at time of separation to continue for up to 180 days after the date on which the member is separated from the Selected Reserve and TDP coverage already in effect at time of separation to continue for no less than 180 days after the separation date. This exception expires December 31, 2018. Finally, additional administrative clarifications have been made to 32 CFR 199.24, which implements TRS.

### II. Provisions of the Rule Regarding Early TRICARE Eligibility

Section 199.3(b)(5) implements section 702 of NDAA–10, which specifies that, Reserve Component members issued delayed-effective-date orders for service in support of a

Exhibit 11                                                                                                          JA-0000227

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**[TD–9690]**

**RIN 1545–BM38**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Parts 2510 and 2590**

**RIN 1210–AB67**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Parts 147**

**[CMS–9939–IFC]**

**RIN 0938–AR42**

**Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Interim final rules.

**SUMMARY:** This document contains interim final regulations regarding coverage of certain preventive services under section 2713 of the Public Health Service Act (PHS Act), added by the Patient Protection and Affordable Care Act, as amended, and incorporated into the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code. Section 2713 of the PHS Act requires coverage without cost sharing of certain preventive health services by non-grandfathered group health plans and health insurance coverage. Among these services are women's preventive health services, as specified in guidelines supported by the Health Resources and Services Administration (HRSA). As authorized by the current regulations, and consistent with the HRSA Guidelines, group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the otherwise applicable requirement to cover certain contraceptive services. Additionally, under current regulations, accommodations are available with respect to the contraceptive coverage

requirement for group health plans established or maintained by eligible organizations (and group health insurance coverage provided in connection with such plans), and student health insurance coverage arranged by eligible organizations that are institutions of higher education, that effectively exempt them from this requirement. The regulations establish a mechanism for separately furnishing payments for contraceptive services on behalf of participants and beneficiaries of the group health plans of eligible organizations that avail themselves of an accommodation, and enrollees and dependents of student health coverage arranged by eligible organizations that are institutions of higher education that avail themselves of an accommodation. These interim final regulations augment current regulations in light of the Supreme Court's interim order in connection with an application for an injunction in *Wheaton College* v. *Burwell*, 134 S. Ct. 2806 (2014) (*Wheaton* order). These interim final regulations provide an alternative process that an eligible organization may use to provide notice of its religious objections to providing contraceptive coverage, while preserving participants' and beneficiaries' (and enrollees' and dependents') access to coverage for the full range of Food and Drug Administration (FDA)-approved contraceptives, as prescribed by a health care provider, without cost sharing.

**DATES:** *Effective date:* These interim final regulations are effective on August 27, 2014.

*Comments:* Written comments on these interim final regulations are invited and must be received by October 27, 2014.

**ADDRESSES:** Written comments may be submitted to the Department of Labor as specified below. Any comment that is submitted will be shared with the Department of Health and Human Services and the Department of the Treasury, and will also be made available to the public. Warning: Do not include any personally identifiable information (such as name, address, or other contact information) or confidential business information that you do not want publicly disclosed. All comments may be posted on the Internet and can be retrieved by most Internet search engines. No deletions, modifications, or redactions will be made to the comments received, as they are public records. Comments may be submitted anonymously.

Comments, identified by "Preventive Services," may be submitted by one of the following methods:

*Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

*Mail or Hand Delivery:* Office of Health Plan Standards and Compliance Assistance, Employee Benefits Security Administration, Room N–5653, U.S. Department of Labor, 200 Constitution Avenue NW., Washington, DC 20210, Attention: Preventive Services.

Comments received will be posted without change to *www.regulations.gov* and available for public inspection at the Public Disclosure Room, N–1513, Employee Benefits Security Administration, 200 Constitution Avenue NW., Washington, DC 20210, including any personal information provided.

**FOR FURTHER INFORMATION CONTACT:** David Mlawsky, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565; Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service (IRS), Department of the Treasury, at (202) 927–9639.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010. The Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152) was enacted on March 30, 2010. These statutes are collectively known as the Affordable Care Act. The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of

Exhibit 12    JA-0000228

title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide coverage of certain specified preventive services without cost sharing, including under paragraph (a)(4), benefits for certain women's preventive health services as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA). On August 1, 2011, HRSA adopted and released guidelines for women's preventive health services (HRSA Guidelines) based on recommendations of the independent Institute of Medicine. As relevant here, the HRSA Guidelines include all Food and Drug Administration (FDA)-approved contraceptives, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[1] Except as discussed later in this section, non-grandfathered group health plans and health insurance coverage are required to provide coverage consistent with the HRSA Guidelines without cost sharing for plan years (or, in the individual market, policy years) beginning on or after August 1, 2012.[2]

Interim final regulations implementing section 2713 of the PHS Act were published on July 19, 2010 (75 FR 41726) (2010 interim final regulations). On August 1, 2011, the Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, the Departments) amended the 2010 interim final regulations to provide HRSA with authority to exempt group health plans established or maintained by certain religious employers (and group health insurance

coverage provided in connection with such plans) from the requirement to cover contraceptive services consistent with the HRSA Guidelines (76 FR 46621) (2011 amended interim final regulations).[3] On the same date, HRSA exercised this authority in the HRSA Guidelines to exempt group health plans established or maintained by these religious employers (and group health insurance coverage provided in connection with such plans) from the HRSA Guidelines with respect to contraceptive services.[4] The 2011 amended interim final regulations specified that, for purposes of this exemption, a religious employer was one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. Final regulations issued on February 10, 2012, adopted the definition of religious employer in the 2011 amended interim final regulations without modification (2012 final regulations).[5]

Contemporaneous with the issuance of the 2012 final regulations, HHS, with the agreement of the Departments of Labor and the Treasury, issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments for group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans).[6] The guidance provided that the

temporary enforcement safe harbor would remain in effect until the first plan year beginning on or after August 1, 2013. At the same time, the Departments committed to rulemaking to achieve the goals of providing coverage of recommended preventive services, including contraceptive services, without cost sharing, while simultaneously ensuring that certain additional nonprofit organizations with religious objections to contraceptive coverage would not have to contract, arrange, pay, or refer for such coverage.

On March 21, 2012, the Departments published an advance notice of proposed rulemaking (ANPRM) that described and solicited comments on possible approaches to achieve these goals (77 FR 16501).

On February 6, 2013, following review of the comments on the ANPRM, the Departments published proposed regulations at 78 FR 8456 (proposed regulations). The regulations proposed to simplify and clarify the definition of ''religious employer'' for purposes of the religious employer exemption. The regulations also proposed accommodations for group health plans established or maintained or arranged by certain nonprofit religious organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans). These organizations were referred to as ''eligible organizations.''

The regulations proposed that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group health insurance coverage in connection with the plan would be required to assume sole responsibility for providing contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. The Departments proposed a comparable accommodation with respect to student health insurance coverage arranged by

---

[1] The HRSA Guidelines exclude services relating to a man's reproductive capacity, such as vasectomies and condoms.

[2] Interim final regulations published by the Departments on July 19, 2010, generally provide that plans and issuers must cover a newly recommended preventive service starting with the first plan year (or, in the individual market, policy year) that begins on or after the date that is one year after the date on which the new recommendation is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

[3] The 2011 amended interim final regulations were issued and effective on August 1, 2011, and published in the **Federal Register** on August 3, 2011 (76 FR 46621).

[4] HRSA subsequently amended the HRSA Guidelines to reflect the simplified definition of ''religious employer'' contained in the July 2013 final regulations. 78 FR 39870 (July 2, 2013) (discussed below), effective August 1, 2013.

[5] The 2012 final regulations were published in the **Federal Register** on February 15, 2012 (77 FR 8725).

[6] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code; originally issued on February 10, 2012, and reissued on August 15, 2012 and June 28, 2013;

available at: http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/preventive-services-guidance-6-28-2013.pdf. The guidance clarified, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage were not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor was also available to student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that met the conditions set forth in the guidance. See Student Health Insurance Coverage, 77 FR 16457 (Mar. 21, 2012).

Exhibit 12                                                                                                          JA-0000229

**51094**    **Federal Register** / Vol. 79, No. 166 / Wednesday, August 27, 2014 / Rules and Regulations

eligible organizations that are institutions of higher education.

In the case of a self-insured group health plan established or maintained by an eligible organization, the proposed regulations presented potential approaches under which the third party administrator of the plan would provide or arrange for a third party to provide contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. An issuer (or its affiliate) would be able to offset the costs incurred by the third party administrator and the issuer in the course of arranging and providing such coverage by claiming an adjustment in the Federally-facilitated Exchange (FFE) user fee.

The Departments received over 400,000 comments (many of them standardized form letters) in response to the proposed regulations. After consideration of the comments, the Departments published final regulations on July 2, 2013 at 78 FR 39870 (July 2013 final regulations). The July 2013 final regulations simplified and clarified the definition of religious employer for purposes of the religious employer exemption and established accommodations for health coverage established or maintained or arranged by eligible organizations. A contemporaneously re-issued HHS guidance document extended the temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. This guidance included a form to be used by an organization during this temporary period to self-certify that its plan qualified for the temporary enforcement safe harbor. In addition, HHS and the Department of Labor (DOL) issued a self-certification form, EBSA Form 700, to be executed by an organization seeking to be treated as an eligible organization for purposes of an accommodation under the July 2013 final regulations. This self-certification form was provided for use with the accommodation under the July 2013 final regulations, after the expiration of the temporary enforcement safe harbor (that is, for plan years beginning on or after January 1, 2014).

On June 30, 2014, the Supreme Court ruled in the case of Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014), that, under the Religious Freedom Restoration Act of 1993 (RFRA), the requirement to provide contraceptive coverage could not be

applied to the closely held for-profit corporations before the Court because their owners had religious objections to providing such coverage, and because the Government's goal of guaranteeing coverage for contraceptive methods without cost sharing could be achieved in a less restrictive manner by offering such closely held for-profit entities the accommodation the Government already provided to religious nonprofit organizations with religious objections to contraceptive coverage. After describing this accommodation, the Court concluded that the accommodation "does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS' stated interests equally well." *134 S. Ct. at 2782.* The Departments are publishing elsewhere in this edition of the **Federal Register** a notice of proposed rulemaking (NPRM) that proposes possible amendments to the definition of the term "eligible organization" to include closely held for-profit entities with religious objections to contraceptive coverage, in light of the *Hobby Lobby* decision.

On July 3, 2014, the Supreme Court issued an interim order in connection with an application for an injunction pending appeal in *Wheaton College* v. *Burwell,* 134 S. Ct. 2806 (2014), in which the plaintiff challenged under RFRA the requirement in the July 2013 final regulations that an eligible organization invoking the accommodation send EBSA Form 700 to the insurance issuer or third party administrator. The Court's order stated that, "[i]f the [plaintiff] informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the [Departments of Labor, Health and Human Services, and the Treasury] are enjoined from enforcing against the [plaintiff]" certain provisions of the Affordable Care Act and related regulations requiring coverage without cost sharing of certain contraceptive services "pending final disposition of appellate review." 134 S.Ct. at 2807. The order stated that Wheaton College need not use EBSA Form 700 or send a copy of the executed form to its health insurance issuers or third party administrators to meet the condition for this injunctive relief. *Id.* The Court also stated that its interim order neither affected "the ability of the [plaintiff's] employees and students to obtain, without cost, the full range of

FDA approved contraceptives," nor precluded the Government from relying on the notice by the plaintiff "to facilitate the provision of full contraceptive coverage under the Act." *Id.* The Court's order further stated that it "should not be construed as an expression of the Court's views on the merits" of the plaintiff's challenge to the accommodations. *Id.*

The Departments are issuing these interim final regulations in light of the Supreme Court's interim order in *Wheaton* concerning notice to the Federal government that an eligible organization has a religious objection to providing contraceptive coverage, as an alternative to the EBSA Form 700 method of self-certification, and to preserve participants' and beneficiaries' (and, in the case of student health insurance coverage, enrollees' and dependents') access to coverage for the full range of FDA-approved contraceptives, as prescribed by a health care provider, without cost sharing.

## II. Overview of the Interim Final Regulations

These interim final regulations amend the Departments' July 2013 final regulations to provide an alternative process for the sponsor of a group health plan or an institution of higher education to provide notice of its religious objection to coverage of all or a subset of contraceptive services, as an alternative to the EBSA Form 700 method of self-certification. These interim final regulations continue to allow eligible organizations to use EBSA Form 700, as set forth in the July 2013 final regulations and guidance.[7]

The alternative process permitted by these interim final regulations is consistent with the *Wheaton* order. It provides that an eligible organization may notify HHS in writing of its religious objection to coverage of all or a subset of contraceptive services. The notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to providing coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (i.e., whether it is a student health insurance plan within the

---

[7] The EBSA Form 700 is available at: *http://www.dol.gov/ebsa/pdf/preventiveserviceseligible organizationcertificationform.pdf.* When using the EBSA 700, the self-certification form is provided directly to each third party administrator or issuer of the plan.

Exhibit 12    JA-0000230

meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers.[8] A model notice to HHS that eligible organizations may, but are not required to, use is available at: *http://www.cms.gov/cciio/resources/ Regulations-and-Guidance/index.html# Prevention.* If there is a change in any of the information required to be included in the notice, the organization must provide updated information to HHS.

As with the process established in the July 2013 final regulations, nothing in this alternative notice process requires a government assessment of the sincerity of the religious belief underlying the eligible organization's objection. The notice to HHS, and any subsequent updates, should be sent electronically to: *marketreform@cms.hhs.gov,* or by regular mail to: Centers for Medicare & Medicaid Services, Center for Consumer Information and Insurance Oversight, 200 Independence Avenue SW., Washington, DC 20201, Room 739H. The content required for the notice represents the minimum information necessary for the Departments to determine which entities are covered by the accommodation, to administer the accommodation, and to implement the policies in the July 2013 final regulations.

When an eligible organization that establishes or maintains or arranges a self-insured plan subject to ERISA provides such a notice to HHS, DOL (working with HHS) will send a separate notification to each third party administrator of the ERISA plan. DOL's notification will inform each third party administrator of the eligible organization's religious objection to funding or administering some or all contraceptive coverage and will designate the relevant third party administrator(s) as plan administrator under section 3(16) of ERISA for those contraceptive benefits that the third party administrator would otherwise manage. The DOL notification will be an instrument under which the plan is operated and shall supersede any earlier designation. In establishing and implementing this alternative process, DOL is exercising its broad rulemaking

authority under Title I of ERISA, which includes the ability to interpret and apply the definition of a plan administrator under ERISA section 3(16)(A).

If an eligible organization that establishes or maintains an insured health plan provides a notice to HHS under this alternative process, HHS will send a separate notification to the plan's health insurance issuer(s) informing the issuer(s) that HHS has received a notice under § 2590.715–2713A(c)(1) and describing the obligations of the issuer(s) under § 2590.715–2713A. Issuers remain responsible for compliance with the statutory and regulatory requirement to provide coverage for contraceptive services to participants and beneficiaries, and to enrollees and dependents of student health plans, notwithstanding that the policyholder is an eligible organization with a religious objection to contraceptive coverage that will not have to contract, arrange, pay, or refer for such coverage.

Other questions have arisen regarding the requirement to provide coverage for contraceptive services without cost sharing and the accommodations for eligible organizations. In what has been described as the "non-interference provision," the July 2013 final regulations provided that eligible organizations that establish or maintain self-insured group health plans "must not, directly or indirectly seek to interfere with a third party administrator's arrangements to provide or arrange for separate payments for contraceptive services" and "must not, directly or indirectly, seek to influence a third party administrator's decision to make any such arrangements." 26 CFR 54.9815–2713A(b)(1)(iii); 29 CFR 2590.715–2713A(b)(1)(iii). The Departments interpret the July 2013 final regulations solely as prohibiting the use of bribery, threats, or other forms of economic coercion in an attempt to prevent a third party administrator from fulfilling its independent legal obligations to provide or arrange separate payments for contraceptive services. Because such conduct is generally unlawful and is prohibited under other state and federal laws, and to reduce unnecessary confusion, these interim final regulations delete the language prohibiting an eligible organization from interfering with or seeking to influence a third party administrator's decision or efforts to provide separate payments for contraceptive services.

### III. Interim Final Regulations and Request for Comments

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and Health (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include PHS Act sections 2701 through 2728 and the incorporation of those sections into ERISA section 715 and Code section 9815.

In addition, under Section 553(b) of the Administrative Procedure Act (APA) (5 U.S.C. 551 et seq.), a general notice of proposed rulemaking is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. The provisions of the APA that ordinarily require a notice of proposed rulemaking do not apply here because of the specific authority granted by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act. However, even if these provisions of the APA were applicable, the Secretaries have determined that it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final regulations in place until a full public notice and comment process is completed.

As discussed earlier, the Departments are issuing these interim final regulations in light of the Supreme Court's order in *Wheaton College* concerning notice to the Federal government that an eligible organization has a religious objection to providing contraceptive coverage, as an alternative to the EBSA Form 700, and to preserve participants' and beneficiaries' (and, in the case of student health insurance coverage, enrollees' and dependents') access to coverage for the full range of FDA-approved contraceptive services, as prescribed by a health care provider, without cost sharing. That order was issued and was effective on July 3, 2014.

In order to provide other eligible organizations with an option equivalent to the one the Supreme Court provided to Wheaton College on an interim basis, regulations must be published and available to the public as soon as possible. Delaying the availability of the alternative process in order to allow for a full notice and comment period would delay the ability of eligible organizations to avail themselves of this alternative process and could delay women's access to contraceptive

---

[8] Church plans are exempt from ERISA pursuant to ERISA section 4(b)(2). As such, a third party administrator of a self-insured church plan cannot become the plan administrator by operation of 29 CFR 2510.3–16, although such third party administrators may voluntarily provide or arrange separate payments for contraceptive services and seek reimbursement for associated expenses under the process set forth in 45 CFR 156.50.

Exhibit 12                                                                                           JA-0000231

coverage without cost sharing, thereby compromising their access to necessary contraceptive services. Issuing interim final regulations provides the public with an opportunity to comment on whether these regulations affording this alternative should be made permanent or subject to modification without delaying the effective date of the regulations.

For the foregoing reasons, the Departments have determined that it would be impracticable and contrary to the public interest to engage in full notice and comment rulemaking before putting these interim final regulations into effect, and that it is in the public interest to promulgate interim final regulations. For the same reasons, the Departments have determined, consistent with section 553(d) of the APA (5 U.S.C. 553(d)), that there is good cause to make these interim final regulations effective immediately upon publication in the Federal Register.

## IV. Economic Impact and Paperwork Burden

### A. Executive Orders 12866 and 13563— Department of Health and Human Services and Department of Labor

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or

the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). These interim final regulations are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866.

#### 1. Need for Regulatory Action

These interim final regulations amend the Departments' July 2013 final regulations to provide an alternative process for an eligible organization to provide notice of its religious objection to coverage of all or a subset of contraceptive services.

#### 2. Anticipated Effects

The Departments expect that these interim final regulations will not result in any additional burden on or costs to the affected entities. These interim final regulations do not change the fundamental ability of an eligible organization to exempt itself from contracting, arranging, paying, or referring for contraceptive coverage. Instead, the regulations merely provide alternative means for eligible organizations to provide notice of their religious objection to coverage of all, or a subset of, contraceptive services.

### B. Special Analyses—Department of the Treasury

For purposes of the Department of the Treasury, it has been determined that this rule is not a significant regulatory action as defined in Executive Order 12866, as supplemented by Executive Order 13563. Therefore, a regulatory assessment is not required. It also has been determined that section 553(b) of the APA does not apply to these regulations. Pursuant to the Regulatory Flexibility Act (5 U.S.C. chapter 6), it is hereby certified that this rule will not have a significant economic impact on a substantial number of small entities. This certification is based on the fact that the temporary regulations will not result in any additional costs to affected entities but will provide an alternative means for eligible organizations to provide notice of their religious objection to providing coverage of all, or a subset of, contraceptive services. Pursuant to section 7805(f) of the Code, these temporary regulations have been submitted to the Chief Counsel for Advocacy of the Small Business

Administration for comment on their impact on small business.

### C. Paperwork Reduction Act— Department of Health and Human Services

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. These interim final regulations contain an information collection request (ICR) that is subject to review by the Office of Management and Budget (OMB). A description of these provisions is given in the following section with an estimate of the annual burden. Average labor costs (including fringe benefits) used to estimate the costs are calculated using data available from the Bureau of Labor Statistics.

Each organization seeking to be treated as an eligible organization under these interim final regulations must either use the EBSA Form 700 method of self-certification or provide notice to HHS of its religious objection to coverage of all or a subset of contraceptive services. Specifically, these interim final regulations continue to allow eligible organizations to notify an issuer or third party administrator using EBSA Form 700, as set forth in the July 2013 regulations. In addition, these interim final regulations permit an alternative process, consistent with the Supreme Court's interim order in *Wheaton College*, by which an eligible organization may notify HHS of its religious objection to coverage of all or a subset of contraceptive services. HHS is aware, based on litigation, that there are approximately 122 eligible organizations that would now have the option to provide notice to HHS, rather than provide a self-certification to TPAs and/or issuers.

In order to complete this task, HHS assumes that clerical staff for each eligible organization will gather and enter the necessary information and send the self-certification to the issuer or third party administrator as appropriate, or send the notice to HHS.[9] HHS assumes that a compensation and benefits manager and inside legal counsel will review the self-certification or notice to HHS and a senior executive would execute it. HHS estimates that an eligible organization would spend approximately 45 minutes (30 minutes of clerical labor at a cost of $30 per hour, 10 minutes for a compensation

---

[9] For purposes of this analysis, the Department assumes that the same amount of time will be required to prepare the self-certification and the notice to HHS.

Exhibit 12    JA-0000232

and benefits manager at a cost of $102 per hour, 5 minutes for legal counsel at a cost of $127, and 5 minutes by a senior executive at a cost of $121) preparing and sending the self-certification or notice to HHS and filing it to meet the recordkeeping requirement. Therefore, the total annual burden for preparing and providing the information in the self-certification or notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost burden of approximately $53 for a total hour burden of 102 hours with an equivalent cost of $6,430.

As the Department of Labor and the Department of Health and Human Services share jurisdiction they are splitting the hour burden so each will account for 51 burden hours. HHS estimates that each self-certification or notice to HHS will require $0.49 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each self-certification or notice sent via mail will be $0.54. For purposes of this analysis, HHS assumes that all self-certifications or notices to HHS will be mailed. The total cost burden for the self-certifications or notices to HHS is approximately $66.

As the Department of Labor and the Department of Health and Human Services share jurisdiction they are splitting the cost burden so each will account for $33 of the cost burden.

*D. Paperwork Reduction Act—Department of Labor and Department of the Treasury*

Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and an individual is not required to respond to, a collection of information unless it displays a valid OMB control number. In accordance with the requirements of the PRA, the EBSA Form 700 ICR has been approved by OMB under control number 1210–0150. These interim final regulations amend the ICR by providing an alternative process consistent with the *Wheaton* order, as discussed earlier in this preamble. The Department of Labor submitted an ICR in order to obtain OMB approval under the PRA for the regulatory revision. The request was made under emergency clearance procedures specified in regulations at 5 CFR 1320.13. In response, OMB approved the ICR under control number 1210–0150 through January 31, 2015. A copy of the information collection request may be obtained free of charge on the RegInfo.gov Web site at *http://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201408-1210-001.*

This approval allows respondents temporarily to utilize the additional flexibility these final regulations provide, while the Department seeks public comment on the collection methods—including their utility and burden. Contemporaneously with the publication of these interim final regulations, the Department of Labor published a notice elsewhere in today's issue of the **Federal Register** informing the public of their intention to extend the OMB approval.

Consistent with the analysis in the HHS PRA section above the Department expects that each of the estimated 122 organizations will spend approximately 50 minutes in preparation time and incur $0.54 mailing cost to satisfy the requirements. The DOL information collections in this rule are found in 29 CFR 2510.3–16 and 2590.715–2713A and are summarized as follows:

*Type of Review:* Revised Collection.
*Agency:* DOL–EBSA.
*Title:* Coverage of Certain Preventive Services Under the Affordable Care Act.
*OMB Numbers:* 1210–0150.
*Affected Public:* Private Sector—businesses or other for profits.
*Total Respondents:* 61 (combined with HHS total is 122).
*Total Responses:* 61 (combined with HHS total is 122).
*Frequency of Response:* On occasion.
*Estimated Total Annual Burden Hours:* 51 (combined with HHS total is 102 hours.
*Estimated Total Annual Burden Cost:* $33 (combined with HHS total is 66).

*E. Regulatory Flexibility Act—Department of Labor and Department of Health and Human Services*

The Regulatory Flexibility Act (5 U.S.C. 601 et seq.) (RFA) imposes certain requirements with respect to Federal rules that are subject to the notice and comment requirements of section 553(b) of the APA (5 U.S.C. 551 et seq.) and that are likely to have a significant economic impact on a substantial number of small entities. Under Section 553(b) of the APA, a general notice of proposed rulemaking is not required when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. These interim final regulations are exempt from APA's prior notice and comment requirement because the Departments made a good cause finding that a general notice of proposed rulemaking is not necessary earlier in this preamble. Therefore, the RFA does not apply and the Departments are not required to either certify that the rule would not have a significant economic

impact on a substantial number of small entities or conduct a regulatory flexibility analysis.

Nevertheless, the Departments carefully considered the likely impact of the rule on small entities in connection with their assessment under Executive Order 12866. The Departments do not expect that these interim final regulations will have a significant economic effect on a substantial number of small entities, because they will not result in any additional costs to affected entities. Instead, the regulations merely provide an alternative means for eligible organizations to provide notice of their religious objection to coverage of all, or a subset of, contraceptive services.

*F. Unfunded Mandates Reform Act*

For purposes of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4), as well as Executive Order 12875, these interim final regulations do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $100 million, adjusted for inflation, or more on the private sector.[10]

*G. Federalism—Department of Health and Human Services and Department of Labor*

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

These interim final regulations do not have any Federalism implications, since they only provide an eligible organization with an alternative process to provide notice of its religious objection to coverage of all or a subset of contraceptive services.

**V. Statutory Authority**

The Department of the Treasury temporary regulations are adopted

---

[10] In 2014, that threshold level is approximately $141 million.

Exhibit 12                                                                                                        JA-0000233

pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

**List of Subjects**

*26 CFR Part 54*

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

*29 CFR Part 2510*

Employee benefit plans, Pensions.

*29 CFR Part 2590*

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

*45 CFR Part 147*

Health care, Health insurance, Reporting and recordkeeping requirements, State regulation of health insurance.

Signed this 20th day of August 2014.

**John Dalrymple,**

*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

**Mark J. Mazur,**

*Assistant Secretary of the Treasury (Tax Policy).*

Signed this 20th day of August 2014.

**Phyllis C. Borzi,**

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: August 19, 2014.

**Marilyn Tavenner,**

*Administrator, Centers for Medicare & Medicaid Services.*

Approved: August 20, 2014.

**Sylvia M. Burwell,**

*Secretary, Department of Health and Human Services.*

**DEPARTMENT OF THE TREASURY**

*Internal Revenue Service*

Accordingly, 26 CFR part 54 is amended as follows:

**PART 54—PENSION EXCISE TAXES**

■ **Paragraph 1.** The authority citation for part 54 continues to read, in part, as follows:

Authority: 26 U.S.C. 7805. * * *

■ **Par. 2.** Section 54.9815–2713A is amended by revising paragraphs (b), (c)(1), and (c)(2)(i) introductory text, and adding paragraph (f), to read as follows:

**§ 54.9815–2713A  Accommodations in connection with coverage of preventive health services.**

* * * * *

(b) [Reserved]. For further guidance, see § 54.9815–2713AT(b).

(c) *Contraceptive coverage—insured group health plans.* (1) [Reserved]. For further guidance, see § 54.9815–2713AT(c)(1).

(2) * * *

(i) [Reserved]. For further guidance, see § 54.9815–2713AT(c)(2)(i) introductory text.

* * * * *

(f) [Reserved]. For further guidance, see § 54.9815–2713AT(f).

■ **Par. 3.** Section 54.9815–2713AT is added to read as follows:

**§ 54.9815–2713AT  Accommodations in connection with coverage of preventive health services (temporary).**

(a) [Reserved]. For further guidance, see § 54.9815–2713A(a).

(b) *Contraceptive coverage—self-insured group health plans.* (1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies

for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) are satisfied:

(i) The eligible organization or its plan contracts with one or more third party administrators.

(ii) The eligible organization provides either a copy of the self-certification to each third party administrator or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in 29 CFR 2510.3–16 and this section and under § 54.9815–2713A.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Labor (working with the Department of Health and Human Services), will send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under 29 CFR 2510.3–16 and this section and under § 54.9815–2713A.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and agrees to enter into or remain in a contractual relationship with the eligible

Exhibit 12                                                                                                                                JA-0000234

organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i) Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(c) *Contraceptive coverage—insured group health plans*—(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i) When a copy of the self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 54.9815–2713. An issuer may not require any further

documentation from the eligible organization regarding its status as such.

(ii) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.,* whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section and under § 54.9815–2713A.

(2) *Payments for contraceptive services.* (i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (b)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 54.9815–2713(a)(1)(iv) must—

(ii) [Reserved] For further guidance, see § 54.9815–2713(c)(2)(ii).

(d) [Reserved] For further guidance, see § 54.9815–2713(d).

(e) [Reserved] For further guidance, see § 54.9815–2713(e).

(f) *Expiration date.* This section expires on August 22, 2017 or on such earlier date as may be provided in final regulations or other action published in the **Federal Register**.

## DEPARTMENT OF LABOR

*Employee Benefits Security Administration*

For the reasons stated in the preamble, the Department of Labor amends 29 CFR parts 2510 and 2590 as follows:

## PART 2510—DEFINITION OF TERMS USED IN SUBCHAPTERS C, D, E, F, G, AND L OF THIS CHAPTER

■ 4. The authority citation for part 2510 is revised to read as follows:

**Authority:** 29 U.S.C. 1002(2), 1002(16), 1002(21),1002(37), 1002(38), 1002(40), 1031, and 1135; Secretary of Labor's Order 1–2011, 77 FR 1088 (Jan. 9, 2012); Sec. 2510.3–101 also issued under sec. 102 of Reorganization Plan No. 4 of 1978, 43 FR 47713, 3 CFR, 1978 Comp., p. 332 and E.O. 12108. 44 FR 1065, 3 CFR, 1978 Comp., p. 275. and 29 U.S.C. 1135 note. Sec. 2510.3–102 also issued under sec. 102 of Reorganization Plan No. 4 of 1978, 43 FR 47713, 3 CFR, 1978 Comp., p. 332 and E.O. 12108, 44 FR 1065, 3 CFR, 1978 Comp., p. 275. Sec. 2510.3–38 is also issued under sec. 1, Pub. L. 105–72, 111 Stat. 1457.

■ 5. Revise the heading for part 2510 to read as set forth above.

■ 6. Section 2510.3–16 is amended by revising paragraph (b) and adding a new paragraph (c) to read as follows:

**§ 2510.3–16   Definition of "plan administrator."**

\*    \*    \*    \*    \*

(b) In the case of a self-insured group health plan established or maintained by an eligible organization, as defined in § 2590.715–2713A(a) of this chapter, if the eligible organization provides a copy of the self-certification of its objection to administering or funding any contraceptive benefits in accordance with § 2590.715–2713A(b)(1)(ii) of this chapter to a third party administrator, the self-certification shall be an instrument under which the plan is operated, shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds, and shall supersede any earlier designation. If, instead, the eligible organization notifies the Secretary of Health and Human Services of its objection to administering or funding any contraceptive benefits in accordance with § 2590.715–2713A(b)(1)(ii) of this chapter, the Department of Labor, working with the Department of Health and Human Services, shall separately provide notification to each third party administrator that such third party administrator shall be the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds, with

Exhibit 12                                                                                                                                    JA-0000235

respect to benefits for contraceptive services that the third party administrator would otherwise manage. Such notification from the Department of Labor shall be an instrument under which the plan is operated and shall supersede any earlier designation.

(c) A third party administrator that becomes a plan administrator pursuant to this section shall be responsible for—

(1) Complying with section 2713 of the Public Health Service Act (42 U.S.C. 300gg–13) (as incorporated into section 715 of ERISA) and § 2590.715–2713 of this chapter with respect to coverage of contraceptive services. To the extent the plan contracts with different third party administrators for different classifications of benefits (such as prescription drug benefits versus inpatient and outpatient benefits), each third party administrator is responsible for providing contraceptive coverage that complies with section 2713 of the Public Health Service Act (as incorporated into section 715 of ERISA) and § 2590.715–2713 of this chapter with respect to the classification or classifications of benefits subject to its contract.

(2) Establishing and operating a procedure for determining such claims for contraceptive services in accordance with § 2560.503–1 of this chapter.

(3) Complying with disclosure and other requirements applicable to group health plans under Title I of ERISA with respect to such benefits.

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 7. The authority citation for part 2590 is revised to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 12(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (January 9, 2012).

■ 8. Section 2590.715–2713A is amended by revising paragraphs (b), (c)(1), and (c)(2)(i) introductory text to read as follows:

### § 2590.715–2713A Accommodations in connection with coverage of preventive health services.

\*    \*    \*    \*    \*

(b) *Contraceptive coverage—self-insured group health plans*—(1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies for one or more plan years with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) are satisfied:

(i) The eligible organization or its plan contracts with one or more third party administrators.

(ii) The eligible organization provides either a copy of the self-certification to each third party administrator or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage of all or a subset of contraceptive services.

(A) When a copy of the self-certification is provided directly to a third party administrator, such self-certification must include notice that obligations of the third party administrator are set forth in § 2510.3–16 of this chapter and this section.

(B) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Labor (working with the Department of Health and Human Services), shall send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under § 2510.3–16 of this chapter and this section.

(2) If a third party administrator receives a copy of the self-certification from an eligible organization or a notification from the Department of Labor, as described in paragraph (b)(1)(ii) of this section, and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i) Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than a copy of the self-certification from the eligible organization or notification from the Department of Labor described in paragraph (b)(1)(ii) of this section.

(c) \*    \*    \*(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i) When a copy of the self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 2590.715–2713. An issuer may not require any further documentation from the eligible organization regarding its status as such.

Exhibit 12

JA-0000236

(ii) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section.

(2) * * * (i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (c)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 2590.715–2713(a)(1)(iv) must—

*     *     *     *     *

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons stated in the preamble, the Department of Health and Human Services amends 45 CFR part 147 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 9. The authority citation for part 147 continues to read as follows:

**Authority:** Secs 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 10. Section 147.131 is amended by revising paragraphs (c)(1) and (c)(2)(i) introductory text to read as follows:

## § 147.131  Exemption and accommodations in connection with coverage of preventive health services.

*     *     *     *     *

(c) * * * (1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage for all or a subset of contraceptive services.

(i) When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 147.130. An issuer may not require any further documentation from the eligible organization regarding its status as such.

(ii) When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (*i.e.*, whether it is a student health insurance plan within the meaning of § 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Health and Human Services will send a separate notification to each of the plan's health insurance issuers informing the issuer that the Secretary of Health and Human Services has received a notice under paragraph (c)(1) of this section and describing the obligations of the issuer under this section.

(2) * * * (i) A group health insurance issuer that receives a copy of the self-certification or notification described in paragraph (c)(1)(ii) of this section with respect to a group health plan established or maintained by an eligible

organization in connection with which the issuer would otherwise provide contraceptive coverage under § 147.130(a)(1)(iv) must—

*     *     *     *     *

[FR Doc. 2014–20252 Filed 8–22–14; 3:30 pm]

BILLING CODE 4830–01– 4510–29–P; 4120–01–P; 6325–64–P

## DEPARTMENT OF HOMELAND SECURITY

## Coast Guard

## 33 CFR Part 100

[Docket No. USCG–2014–0686]

## Annual Marine Events in the Eighth Coast Guard District, Sabine River; Orange, TX

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of enforcement of regulation.

**SUMMARY:** The Coast Guard will enforce Special Local Regulations for the Southern Professional Outboard Racing Tour (S.P.O.R.T.) boat races to be held on the Sabine River in Orange, TX from 3 p.m. on September 19, 2014, through 6 p.m. on September 21, 2014. This action is necessary to provide for the safety of the participants, crew, spectators, participating vessels, non-participating vessels and other users of the waterway. During the enforcement period, the Coast Guard Patrol Commander will enforce restrictions upon, and control the movement of, vessels in the zone established by the Special Local Regulation.

**DATES:** The regulation in 33 CFR 100.801 will be enforced from 3 p.m. to 6 p.m. on September 19, 2014; and from 9 a.m. to 6 p.m. on September 20 and 21, 2014.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this notice of enforcement, call or email Mr. Scott Whalen, U.S. Coast Guard Marine Safety Unit Port Arthur, TX; telephone 409–719–5086, email *scott.k.whalen@uscg.mil.*

**SUPPLEMENTARY INFORMATION:** The Coast Guard will enforce Special Local Regulation for the annual S.P.O.R.T. boat races in 33 CFR 100.801 (Table 3, Line 5) on September 19, 2014, from 3 p.m. to 6 p.m. and on September 20 and 21, 2014, from 9 a.m. to 6 p.m.

This Special Local Regulation encompasses all waters of the Sabine River south of latitude 30°05′33″ N and waters north of latitude 30°05′45″ N North American Datum (NAD 83).

Under the provisions of 33 CFR 100.801, a vessel may not enter the

Exhibit 12                                                                                                     JA-0000237



# FEDERAL REGISTER

Vol. 78          Tuesday,

No. 127          July 2, 2013

Part III

## Department of the Treasury

Internal Revenue Service
26 CFR Part 54

## Department of Labor

Employee Benefits Security Administration
29 CFR Parts 2510 and 2590

## Department of Health and Human Services

45 CFR Parts 147 and 156
Coverage of Certain Preventive Services Under the Affordable Care Act;
Final Rules

Exhibit 13

JA-0000238

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**[TD–9624]**

**RIN 1545–BJ60**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Parts 2510 and 2590**

**RIN 1210–AB44**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Parts 147 and 156**

**[CMS–9968–F]**

**RIN 0938–AR42**

**Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCIES:** Internal Revenue Service, Department of the Treasury: Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** This document contains final regulations regarding coverage of certain preventive services under section 2713 of the Public Health Service Act (PHS Act), added by the Patient Protection and Affordable Care Act, as amended, and incorporated into the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code. Section 2713 of the PHS Act requires coverage without cost sharing of certain preventive health services by non-grandfathered group health plans and health insurance coverage. Among these services are women's preventive health services, as specified in guidelines supported by the Health Resources and Services Administration (HRSA). As authorized by the current regulations, and consistent with the HRSA guidelines, group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the otherwise applicable requirement to cover certain contraceptive services. These final regulations simplify and clarify the religious employer exemption. These final regulations also establish accommodations with respect to the contraceptive coverage requirement for group health plans established or maintained by eligible organizations (and group health insurance coverage provided in connection with such plans), as well as student health insurance coverage arranged by eligible organizations that are institutions of higher education. These regulations also finalize related amendments to regulations concerning Affordable Insurance Exchanges.

**DATES:** *Effective date:* These final regulations are effective on August 1, 2013. *Applicability date:* With the exception of the amendments to the religious employer exemption, which apply to group health plans and health insurance issuers for plan years beginning on or after August 1, 2013, these final regulations apply to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014.

**FOR FURTHER INFORMATION CONTACT:** For inquiries related to the religious employer exemption and eligible organization accommodations: Jacob Ackerman, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565; Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service (IRS), Department of the Treasury, at (202) 927–9639.

For matters related to the Federally-facilitated Exchange user fee adjustment: Ariel Novick, CMS, HHS, at (301) 492–4309.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). Information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cms.gov/cciio*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010. The Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152) was enacted on March 30, 2010. These statutes are collectively known as the Affordable Care Act. The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans and health insurance issuers providing health insurance coverage in connection with group health plans. The sections of the PHS Act incorporated into ERISA and the Code are sections 2701 through 2728.

Section 2713(a)(4) of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide benefits for certain women's preventive health services without cost sharing, as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA). On August 1, 2011, HRSA adopted and released guidelines for women's preventive health services (HRSA Guidelines) based on recommendations of the independent Institute of Medicine. As relevant here, the HRSA Guidelines include all Food and Drug Administration (FDA)-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[1] Except as discussed later in this section, non-grandfathered group health plans and health insurance coverage are required to provide coverage consistent with the HRSA Guidelines without cost sharing for plan years (in the individual market, policy years) beginning on or after August 1, 2012.[2]

Interim final regulations implementing section 2713 of the PHS Act were published on July 19, 2010 (75 FR 41726) (2010 interim final

---

[1] The HRSA Guidelines exclude services relating to a man's reproductive capacity, such as vasectomies and condoms.

[2] Interim final regulations published by the Departments on July 19, 2010, generally provide that plans and issuers must cover a newly recommended preventive service starting with the first plan year (in the individual market, policy year) that begins on or after the date that is one year after the date on which the new recommendation is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

Exhibit 13                                                                                          JA-0000239

regulations). On August 1, 2011, the Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, the Departments) amended the 2010 interim final regulations to provide HRSA with authority that would effectively exempt group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) from the requirement to cover contraceptive services consistent with the HRSA Guidelines (76 FR 46621) (2011 amended interim final regulations) and, on the same date, HRSA exercised this authority in the HRSA Guidelines such that group health plans established or maintained by these religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the requirement to cover contraceptive services.[3] The 2011 amended interim final regulations specified that, for purposes of this exemption, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. Final regulations issued on February 10, 2012, adopted the definition of religious employer in the 2011 amended interim final regulations without modification (2012 final regulations).[4]

Contemporaneous with the issuance of the 2012 final regulations, HHS, with the agreement of the Departments of Labor and the Treasury, issued guidance establishing a temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments for group health plans established or maintained by certain nonprofit organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans).[5] The guidance provided that the

temporary enforcement safe harbor would remain in effect until the first plan year beginning on or after August 1, 2013. The Departments committed to rulemaking during the 1-year safe harbor period to ensure more women broad access to recommended preventive services, including contraceptive services, without cost sharing, while simultaneously protecting certain additional nonprofit religious organizations with religious objections to contraceptive coverage from having to contract, arrange, pay, or refer for such coverage.

On March 21, 2012, the Departments published an advance notice of proposed rulemaking (ANPRM) that described and solicited comments on possible approaches to achieve these goals (77 FR 16501).

On February 6, 2013, following review of the comments on the ANPRM, the Departments published proposed regulations at 78 FR 8456 (proposed regulations). The regulations proposed to simplify and clarify the definition of religious employer for purposes of the religious employer exemption. The regulations also proposed accommodations for health coverage established or maintained or arranged by certain nonprofit religious organizations with religious objections to contraceptive coverage. These organizations were referred to as eligible organizations.

The regulations proposed that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group health insurance coverage in connection with the plan would be required to assume sole responsibility, independent of the eligible organization and its plan, for providing contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. The Departments proposed a comparable accommodation with respect to insured

student health insurance coverage arranged by eligible organizations that are institutions of higher education.

In the case of a self-insured group health plan established or maintained by an eligible organization, the proposed regulations presented potential approaches under which the third party administrator of the plan would arrange for a health insurance issuer to provide contraceptive coverage to plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. An issuer (or its affiliate) would be able to offset the costs incurred by the third party administrator and the issuer in the course of arranging and providing such coverage by claiming an adjustment in the Federally-facilitated Exchange (FFE) user fee.

The Departments received over 400,000 comments (many of them standardized form letters) in response to the proposed regulations. After consideration of the comments, the Departments are publishing these final regulations. With the exception of the amendments to the religious employer exemption, which apply to group health plans and group health insurance issuers for plan years beginning on or after August 1, 2013, these final regulations apply to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014, which is when the majority of plan years begin.[6][7] Contemporaneously issued amendments to the HRSA Guidelines implementing the simplified and clarified religious employer exemption authorized by 45 CFR 147.131(a) of these final regulations will be effective on August 1, 2013.

---

[3] The 2011 amended interim final regulations were issued and effective on August 1, 2011, and published on August 3, 2011(76 FR 46621).

[4] The 2012 final regulations were published on February 15, 2012 (77 FR 8725).

[5] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and

Section 9815(a)(1) of the Internal Revenue Code, issued on February 10, 2012, and reissued on August 15, 2012. Available at http://www.cms.gov/CCIIO/Resources/Files/Downloads/prev-services-guidance-08152012.pdf. The guidance, as reissued on August 15, 2012, clarifies, among other things, that plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage are not precluded from eligibility for the safe harbor. The temporary enforcement safe harbor is also available to insured student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that meet the conditions set forth in the guidance. See final rule entitled "Student Health Insurance Coverage" published March 21, 2012 (77 FR 16457).

[6] Section 2713(b) of the PHS Act and the companion provisions of ERISA and the Code provide that the Secretary shall establish an interval of not less than one year between when new recommendations or guidelines under PHS Act section 2713(a) are issued and the first plan year (in the individual market, policy year) for which coverage of services addressed in such recommendations or guidelines must be in effect. Under the 2010 interim final regulations, the requirement on a non-exempt, non-grandfathered group health plan or group or individual health insurance policy to cover a newly recommended preventive service without cost sharing takes effect starting with the first plan year (in the individual market, policy year) that begins on or after the date that is one year after the new recommendation is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1). In the case of contraceptive services, this 1-year period ended on August 1, 2012, because the HRSA Guidelines including such services were issued on August 1, 2011. These final regulations do not alter this effective date.

[7] This estimate is based on the Department of Labor's analysis of Form 5500 data.

Exhibit 13                                                                                                    JA-0000240

**39872**    **Federal Register** / Vol. 78, No. 127 / Tuesday, July 2, 2013 / Rules and Regulations

Two additional guidance documents are being issued contemporaneously with these final regulations. First, HHS is issuing guidance extending the temporary safe harbor from enforcement of the contraceptive coverage requirement by the Departments to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. This guidance continues to include a form to be used by an organization during this temporary period to self-certify that its plan qualifies for the temporary enforcement safe harbor. Second, as described in more detail later in this preamble, HHS and DOL are also issuing a self-certification form to be executed by an organization seeking to be treated as an eligible organization for purposes of an accommodation under these final regulations. This self-certification form is applicable in conjunction with the accommodations under these final regulations (that is, for plan years beginning on or after January 1, 2014), after the expiration of the temporary enforcement safe harbor.

## II. Overview of the Final Regulations

These final regulations promote two important policy goals. First, the regulations provide women with access to contraceptive coverage without cost sharing, thereby advancing the compelling government interests in safeguarding public health and ensuring that women have equal access to health care. Second, the regulations advance these interests in a narrowly tailored fashion that protects certain nonprofit religious organizations with religious objections to providing contraceptive coverage from having to contract, arrange, pay, or refer for such coverage. The regulations finalize the general approach described in the proposed regulations, with modifications in response to comments that are intended primarily to simplify administration of the policy.

Section 2713 of the PHS Act reflects a determination by Congress that coverage of recommended preventive services without cost sharing by non-grandfathered group health plans and health insurance coverage is necessary to achieve access to basic health care for more Americans. Individuals are more likely to use preventive services if they do not have to satisfy cost-sharing requirements (such as a copayment, coinsurance, or a deductible). Use of preventive services results in a healthier population and reduces health care costs by helping individuals avoid preventable conditions and receive treatment earlier.[8] Further, Congress, by amending the Affordable Care Act during Senate consideration of the bill to ensure that recommended preventive services for women would be covered adequately by non-grandfathered group health plans and health insurance coverage, recognized that women have unique health care needs.[9] Such needs include contraceptive services.[10]

Some commenters asserted that contraceptive services should not be considered preventive health services, arguing that they do not prevent disease and have been shown by some studies to be harmful to women's health. The HRSA Guidelines are based on recommendations of the independent Institute of Medicine (IOM), which undertook a review of the scientific and medical evidence on women's preventive services. As documented in the IOM report, "Clinical Preventive Services for Women: Closing the Gaps," women experiencing an unintended pregnancy may not immediately be aware that they are pregnant, and thus delay prenatal care. They also may be less motivated to cease behaviors during pregnancy, such as smoking and consumption of alcohol, that pose pregnancy-related risks. Studies show a greater risk of preterm birth and low birth weight among unintended pregnancies.[11] In addition, contraceptive use helps women improve birth spacing and therefore avoid the increased risk of adverse pregnancy outcomes that comes with pregnancies that are too closely spaced. Short interpregnancy intervals in particular have been associated with low birth weight, prematurity, and small-for-gestational age births.[12] Contraceptives also have medical benefits for women who are contraindicated for pregnancy, and there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy (for example, prevention of certain cancers, menstrual disorders, and acne).[13] In addition, by reducing the number of unintended pregnancies, contraceptives reduce the number of women seeking abortions.[14] It is for a woman and her health care provider in each particular case to weigh any risks against the benefits in deciding whether to use contraceptive services in general or any particular contraceptive service.

Covering contraceptives also yields significant cost savings. A 2000 study estimated that it would cost 15 to 17 percent more not to provide contraceptive coverage in employee health plans than to provide such coverage, after accounting for both the direct medical costs of pregnancy and the indirect costs, such as employee absence.[15] Consistent with this finding, when contraceptive coverage was added to the Federal Employees Health Benefits Program, premiums did not increase because there was no resulting net health care cost increase.[16] Specific to public financing of contraceptive services, a 2010 analysis projected that expanding access to family planning services under Medicaid saves $4.26 for every $1 spent.[17] Additional research

[8] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: National Academy Press, 2011. at p. 16.

[9] S.Amdt. 2791 to S.Amdt. 2786 to H.R. 3590 (Service Members Home Ownership Tax Act of 2009), December 3, 2009.

[10] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: National Academy. Press. 2011. at p. 9; *see also* Sonfield, A., The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost Sharing. 14 *Guttmacher Policy Review*. 10 (2011), available at *www.guttmacher.org/pubs/gpr/14/1/gpr140107.html*. *See also Congressional Record*. S12025 (Dec. 1, 2009), S12114, S12271, S12277 (December 3, 2009) (statements of Senators B. Boxer, D. Feinstein, A. Franken, and B. Nelson, respectively).

[11] Gipson, J.D., *et al.*, The Effects of Unintended Pregnancy on Infant, Child and Parental Health: A Review of the Literature, *Studies on Family Planning*, 2008, 39(1):18–38.

[12] Conde-Agudelo, A., *et al.*, Birth Spacing and Risk of Adverse Perinatal Outcomes—A Meta-Analysis, *Journal of the American Medical Association*. 295(15):1809–1823 (2006); *see also* Zhu, B., Effect of Interpregnancy Interval on Birth Outcomes: Findings from Recent U.S. Studies, *International Journal of Gynecology & Obstetrics*.

89:S25–S33 (2005); Fuentes-Afflick, E., & Hessol, N., Interpregnancy Interval and the Risk of Premature Infants, *Obstetrics & Gynecology*. 95(3):383–390 (2000).

[13] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: National Academy Press, 2011, at p. 107.

[14] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: National Academy Press, 2011, at p. 105. *See also*, Peipert, J., *et al.*, Preventing Unintended Pregnancies by Providing No-Cost Contraception, *Obstetrics & Gynecology*. 120(6): 1291–1297 (2012); *see also* Bongaarts, J., & Westoff. C., The Potential Role of Contraception in Reducing Abortion, *Studies in Family Planning*. 31(3): 193–202 (2000).

[15] Testimony of Guttmacher Inst., submitted to the Comm. on Preventive Servs. for Women, Institute of Medicine, January 12, 2012, p. 11, citing Bonoan, R. & Gonen, J.S., Promoting Healthy Pregnancies: Counseling and Contraception as the First Step. Washington Business Group on Health, Family Health in Brief, Issue No. 3. August 2000; *see also* Sonfield, A., The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost Sharing. 14 *Guttmacher Pol'y Rev.* 10 (2011); Mavranezouli, I., Health Economics of Contraception, 23 *Best Practice & Res. Clinical Obstetrics & Gynecology* 187–198 (2009); Trussell, I., *et al.*, Cost Effectiveness of Contraceptives in the United States. 79 *Contraception* 5–14 (2009); Trussell, I., The Cost of Unintended Pregnancy in the United States. 75 *Contraception* 168–170 (2007).

[16] Dailard, C., Special Analysis: The Cost of Contraceptive Insurance Coverage, *Guttmacher Rep. on Public Policy* (March 2003).

[17] Sawhill, R., *et al.*. An Ounce of Prevention: Policy Prescriptions to Reduce the Prevalence of Fragile Families, *Future of Children*. 20(2):133–155.

Exhibit 13    JA-0000241

arrived at a similar conclusion and found that, in total, services provided at publicly funded family planning centers saved $5.1 billion in 2008.[18]

Further, the importance of covering contraceptive services has been recognized by many states, issuers, and employers. Twenty-eight states now have laws requiring health insurance issuers to cover contraceptives.[19] A 2002 study found that more than 89 percent of insured plans covered contraceptives.[20] And a 2010 survey of employers revealed that 85 percent of large employers and 62 percent of small employers offered coverage of FDA-approved contraceptives, with another 32 percent of small employers reporting that they did not know whether they did so.[21]

Furthermore, in directing non-grandfathered group health plans and health insurance coverage to cover preventive services and screenings for women described in HRSA Guidelines without cost sharing, the statute acknowledges that both existing health coverage and existing preventive services recommendations often did not adequately serve the unique health needs of women. This disparity placed women in the workforce at a disadvantage compared to their male coworkers. Research shows that access to contraception improves the social and economic status of women.[22]

Research also shows that cost sharing can be a significant barrier to access to contraception.[23] As IOM noted, women use preventive services more than men, generating significant out-of-pocket expenses for women.[24] Thus, eliminating cost sharing is particularly critical to addressing the gender disparity of concern here.

The Departments aim to advance these compelling public health and gender equity interests by providing more women broad access to recommended preventive services, including contraceptive services, without cost sharing, while simultaneously protecting certain nonprofit religious organizations with religious objections to contraceptive coverage from having to contract, arrange, pay, or refer for such coverage, as described in these final regulations. Moreover, through these final regulations, the Departments seek to achieve these goals in ways that take into account the responsibilities imposed on health insurance issuers and third party administrators.

*A. Amendments to Coverage of Recommended Preventive Health Services—26 CFR 54.9815–2713, 29 CFR 2590.715–2713, 45 CFR 147.130*

These sections of the final regulations finalize technical amendments to the existing preventive services coverage regulations as proposed. The final regulations amend paragraph (a) of the existing regulations so that the general requirement to provide coverage for recommended preventive services without cost sharing is subject to the religious employer exemption and eligible organization accommodations discussed later in this section.

The regulations also finalize proposed amendments to paragraph (a)(1)(iv) of the existing regulations. As amended, the authorization for HRSA to exempt religious employers from the contraceptive coverage requirement and the definition of religious employer are now located in new 45 CFR 147.131(a) of the HHS regulation and incorporated by reference in the regulations of the Departments of Labor and the Treasury.

There are no other changes to the provisions of the 2010 interim final regulations related to providing

coverage for recommended preventive services without cost sharing. Accordingly, consistent with the general rules for the provision of coverage for recommended preventive services without cost sharing set forth in the 2010 interim final regulations, nothing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency, method, treatment, or setting for an item or service to the extent not specified in a recommendation or guideline and nothing requires a plan or issuer that has a network of health care providers to provide benefits or eliminate cost sharing for items or services that are delivered out-of-network.[25]

*B. Religious Employer Exemption and Accommodations for Health Coverage Established or Maintained or Arranged by Eligible Organizations—26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A, 45 CFR 147.131*

These sections of the final regulations simplify and clarify the criteria for the religious employer exemption from the contraceptive coverage requirement. These sections also establish accommodations with respect to the contraceptive coverage requirement for group health plans established or maintained by eligible organizations (and group health insurance coverage provided in connection with such plans), as well as student health insurance coverage arranged by eligible organizations that are institutions of higher education.

1. Religious Employer Exemption

Under the 2012 final regulations, HRSA has the authority to issue guidelines in a manner that exempts group health plans established or maintained by religious employers (and group health insurance coverage provided in connection with such plans) from any requirement to cover contraceptive services consistent with the HRSA Guidelines that would otherwise apply. A religious employer was defined for this purpose as one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who

---

[18] Frost, J., et al., Contraceptive Needs and Services, National and State Data, 2008 Update. New York: Guttmacher Institute (2010).

[19] Sonfield, A., et al., U.S. Insurance Coverage of Contraceptives and the Impact of Contraceptive Coverage Mandates, *Perspectives on Sexual and Reproductive Health* 36(2):72–79, 2002.

[20] Sonfield, A., et al., U.S. Insurance Coverage of Contraceptives and the Impact of Contraceptive Coverage Mandates, *Perspectives on Sexual and Reproductive Health* 36(2):72–79, 2002.

[21] Claxton, G., et al., *Employer Health Benefits: 2010 Annual Survey*. Menlo Park, Cal.: Kaiser Family Found. & Chicago, Illinois: Health Research & Education Trust, 2010. While many employers included contraceptive coverage in their group health plans prior to the Affordable Care Act, the Departments note that the contraceptive coverage requirement promotes the government's interests with respect to even these plans' participants and beneficiaries by ensuring that these plans cover contraceptive services without cost sharing, a significant financial barrier to such services that was prevalent before the contraceptive coverage requirement. Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: National Academy Press, 2011. at p. 107. *See also* Postlethwaite, D., et al., A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change. 76 *Contraception* 360 (2007).

[22] Testimony of Guttmacher Institute, submitted to the Comm. on Preventive Services for Women, Institute of Medicine, January 12, 2012, p. 6, citing Goldin, C. & Katz, L., Career and Marriage in the Age of the Pill, *American Economic Review*, 2000, 90(2):461–465; Goldin, C. & Katz, L.F., The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, *Journal of Political Economy*, 2002, 110(4):730–770; Bailey, M.J., More

Power to the Pill: The Impact of Contraceptive Freedom on Women's Life Cycle Labor Supply. *Quarterly Journal of Economics*, 2006, 121(1):289–320.

[23] Postlethwaite, D., et al., A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change, 76 *Contraception* 360 (2007).

[24] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: National Academy Press. 2011, p. 19.

[25] *See* 26 CFR 54.9815–2713T(a)(3) and (4); 29 CFR 2590.715–2713(a)(3) and (4); 45 CFR 147.130(a)(3) and (4). Note, however, if a plan or issuer does not have in its network a provider who can provide the particular service, then the plan or issuer must cover the item or service when performed by an out-of-network provider and not impose cost sharing with respect to the item or service. *See* FAQs About Affordable Care Act Implementation (Part XII), Q3 (February 20, 2013), available at: *http://www.dol.gov/ebsa/faqs/faq-aca12.html*.

Exhibit 13                                                                                                              JA-0000242

share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order.

The Departments proposed to simplify and clarify the definition of religious employer by eliminating the first three prongs and clarifying the fourth prong of the definition. Under this proposal, an employer that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Code would be considered a religious employer for purposes of the religious employer exemption. These proposed amendments were intended to eliminate any question as to whether group health plans of houses of worship that provide educational, charitable, or social services to their communities qualify for the exemption. Specifically, they were intended to ensure that an otherwise exempt plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer hires or serves people of different religious faiths. The Departments also proposed to clarify that, for purposes of the religious employer exemption, an employer that is organized and operates as a nonprofit entity is not limited to any particular form of entity under state law. The Departments reiterate that, under this standard, it is not necessary to determine the federal tax-exempt status of the nonprofit entity in determining whether the religious employer exemption applies.[26]

The Departments received numerous comments addressing the definition of religious employer. Some commenters stated that the proposed definition of religious employer was too narrow and should be broadened to include all employers, both nonprofit and for-profit, that have a religious objection to providing contraceptive coverage in their group health plan. Some commenters requested that the definition of religious employer be expanded to exempt not only churches and other houses of worship, but also religiously affiliated hospitals and other health care organizations and other religiously affiliated ministries using the concepts of Code section 414(e). Other

commenters recommended that the requirement to cover contraceptive services be rescinded altogether.

Some commenters stated that the exemption for religious employers should be eliminated and that religious employers should instead be subject to the accommodations for eligible organizations so that their employees may also receive alternative contraceptive coverage without cost sharing. Other commenters opposed eliminating the first three prongs of the definition of religious employer, stating that only churches and other houses of worship that meet the criteria of all of the prongs should be subject to the exemption. Many commenters agreed with the Departments that the proposed definition of religious employer would not materially expand the universe of religious employers, but others felt that the proposed definition would unduly broaden it.

Based on their review of these comments, the Departments are finalizing without change the definition of religious employer in the proposed regulations. As indicated in the preamble to the proposed regulations (78 FR 8461), the simplified and clarified definition of religious employer does not expand the universe of religious employers that qualify for the exemption beyond that which was intended in the 2012 final regulations, but only eliminates any perceived potential disincentive for religious employers to provide educational, charitable, and social services to their communities. The Departments believe that the simplified and clarified definition of religious employer continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement. Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan.

Contemporaneous with the issuance of these final regulations, HRSA is issuing amended guidelines implementing the simplified and clarified religious employer exemption authorized by 45 CFR 147.131(a) of these final regulations (and incorporated by reference in 26 CFR 54.9815–2713(a)(1)(iv) and 29 CFR 2590.715–2713(a)(1)(iv)). The amendments to the

guidelines will become effective beginning August 1, 2013.

2. Accommodations for Health Coverage Established or Maintained or Arranged by Eligible Organizations

In addition to simplifying and clarifying the definition of religious employer, these final regulations establish accommodations with respect to the contraceptive coverage requirement for health coverage established or maintained or arranged by eligible organizations, as defined in these final regulations. After meeting a self-certification standard, as described in more detail in this preamble, nonprofit religious organizations that qualify for these accommodations are not required to contract, arrange, pay, or refer for contraceptive coverage; however, plan participants and beneficiaries (or student enrollees and their covered dependents) will still benefit from separate payments for contraceptive services without cost sharing or other charge in accordance with section 2713 of the PHS Act and the companion provisions of ERISA and the Code. As discussed later in this section, the accommodations established under these final regulations do not require the issuance of a separate excepted benefits individual health insurance policy covering contraceptive services, as set forth in the proposed regulations, but instead require a simpler method of providing direct payments for contraceptive services.

a. Definition of Eligible Organization

The final regulations retain the definition of eligible organization set forth in the proposed regulations. Accordingly, under these final regulations, an eligible organization is an organization that: (1) Opposes providing coverage for some or all of the contraceptive services required to be covered under section 2713 of the PHS Act and the companion provisions of ERISA and the Code on account of religious objections; (2) is organized and operates as a nonprofit entity; (3) holds itself out as a religious organization; and (4) self-certifies that it satisfies the first three criteria (as discussed in more detail later in this section).

Some commenters requested that the definition of eligible organization be broadened to include nonprofit secular employers and for-profit employers with religious objections to contraceptive coverage. Other commenters urged that the definition not be extended to for-profit employers, arguing that for-profit employers should not be accommodated because their purposes are commercial, not religious. Additionally, several

---

[26] Similarly, whether a nonprofit entity is a religious employer is determined under this definition without regard to whether the entity files Form 990 with the IRS.

Exhibit 13

commenters recommended clarifying how an eligible organization would show that it holds itself out as a religious organization. Specifically, commenters suggested clarifying that only organizations that prominently and consistently hold themselves out to the public as religious organizations may qualify for an accommodation.

The Departments decline to adopt these suggestions. The definition of eligible organization in these final regulations is the same as that in the proposed regulations, and is intended to allow health coverage established or maintained or arranged by various types of nonprofit religious organizations with religious objections to contraceptive coverage to qualify for an accommodation. Consistent with religious accommodations in related areas of federal law, such as the exemption for religious organizations under Title VII of the Civil Rights Act of 1964, the definition of eligible organization in these final regulations does not extend to for-profit organizations. The Departments are unaware of any court granting a religious exemption to a for-profit organization, and decline to expand the definition of eligible organization to include for-profit organizations.

b. Self-Certification

Each organization seeking to be treated as an eligible organization under the final regulations, to avoid contracting, arranging, paying, or referring for contraceptive coverage, is required to self-certify, prior to the beginning of the first plan year to which an accommodation is to apply, that it meets the definition of an eligible organization.[27] The self-certification (as described in these final regulations) needs to be executed once. A copy of the self-certification needs to be provided to a new health insurance issuer or a new third party administrator if the eligible organization changes issuers or third party administrators. Comments addressing this topic generally approved of the approach proposed by the Departments, but some commenters suggested that stronger protections were needed to promote oversight, enforcement, and transparency and to prevent abuse. For example, some commenters recommended requiring eligible organizations to file their self-certifications with the Departments and

making such records available to the public. Other commenters argued that the act of self-certification would infringe on the First Amendment right of free speech.

The final regulations do not require the self-certification to be submitted to any of the Departments. An eligible organization must simply maintain the self-certification (executed by an authorized representative of the organization) in its records, in a manner consistent with the record retention requirements under section 107 of ERISA, and make the self-certification available for examination upon request. The Departments believe that the requirement to make the self-certification available for examination upon request appropriately balances regulators', issuers', third party administrators', and plan participants and beneficiaries' (and student enrollees and their covered dependents') interest in verifying compliance and eligible organizations' interest in avoiding undue inquiry into their character, mission, or practices. Further, the Departments do not believe that the self-certification standard infringes on freedom of speech.

The proposed regulations provided that the self-certification would specify the contraceptive services for which the organization will not establish, maintain, administer, or fund coverage. The final regulations eliminate this requirement, pursuant to the standard exclusion policy discussed later in this section. Further, the final regulations provide that, if an organization seeks to be treated as an eligible organization under the final regulations, an issuer or third party administrator may not require any documentation from the organization beyond its self-certification as to its status as an eligible organization. The form to be used for the self-certification is being finalized contemporaneous with the issuance of these final regulations through the process provided for under the Paperwork Reduction Act of 1995.

As discussed previously, the self-certification form is applicable in conjunction with the accommodations under these final regulations (that is, for plan years beginning on or after January 1, 2014), after the expiration of the temporary enforcement safe harbor. The self-certification standard referenced in these final regulations (and the form to be executed by an eligible organization to make such self-certification, which is being issued contemporaneously with these final regulations) are different from the standard (and the form) associated with the guidance regarding the extension of the temporary

enforcement safe harbor, which is also being issued contemporaneously with these final regulations.

c. Separate Payments for Contraceptive Services for Participants and Beneficiaries in Insured Group Health Plans

The proposed regulations provided, in the case of an insured group health plan established or maintained by an eligible organization, that the health insurance issuer providing group coverage in connection with the plan be required to assume sole responsibility, independent of the eligible organization and its plan, for providing separate individual health insurance policies covering contraceptive services for plan participants and beneficiaries without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. Under this proposal, an organization seeking to be treated as an eligible organization would need only to meet the self-certification standard. The issuer, in turn, would automatically enroll plan participants and beneficiaries in separate individual health insurance policies that cover contraceptive services (and notify them of such enrollment) without the imposition of any cost-sharing requirement (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge on plan participants or beneficiaries or on the eligible organization or its plan.

Some commenters stated that the Departments should not provide a tailored accommodation for an eligible organization that objects to only some types of contraceptive services. These commenters said that customizing individual contraceptive policies for participants and beneficiaries (or students enrollees and their covered dependents) in plans of eligible organizations based on the differing religious objections to contraceptive coverage of each eligible organization would create an administrative burden for issuers and confuse plan participants and beneficiaries (or student enrollees and their covered dependents). Some commenters also noted that requiring coordination of benefits might not be feasible, because many states prohibit coordination between individual and group health insurance coverage.

In response to these comments, the final regulations provide that an issuer providing payments for contraceptive services in accordance with these final regulations may use a standard exclusion from a group health insurance policy that encompasses all recommended contraceptive services

[27] Although not required to do so by these final regulations, nothing in these final regulations prevents a religious employer from drafting and executing a self-certification regarding its status as a religious employer and sharing the self-certification with issuers, plan service providers, plan participants or beneficiaries, or others.

Exhibit 13                                                                                                    JA-0000244

**39876**    **Federal Register** / Vol. 78, No. 127 / Tuesday, July 2, 2013 / Rules and Regulations

and not violate PHS Act section 2713 and the companion provisions of ERISA and the Code with respect to the requirement to cover contraceptive services. While issuers may, at their option, choose to offer customized exclusions from group health insurance policies based on the differing religious objections to contraceptive coverage of each eligible organization (or offer several different but standardized exclusions from group health insurance policies from which eligible organizations may choose), they are not required to do so under these final regulations. Regardless of whether an issuer uses a standard or customized exclusion from a group health insurance policy, plan participants and beneficiaries (and student enrollees and their covered dependents) are assured that the issuer will make payments for any recommended contraceptive services excluded from the group health insurance policy (or student health insurance coverage).

Some commenters noted that the proposed individual health insurance policies covering contraceptive services might not be viewed as enforceable contracts under state contract law because there would be no premium associated with the coverage and no ability for an individual to decline coverage. Commenters suggested that states would need to develop new regulatory processes for reviewing forms and rates for such policies, and noted that the inability to charge a premium for such policies could raise actuarial soundness and financial reserve concerns. Commenters also noted that state laws would prevent issuers licensed to issue group health insurance policies in one state from issuing individual health insurance policies to employees of an eligible organization residing in other states, and expressed concern about the cost and administrative complexity of issuing and administering individual contraceptive coverage policies.

These final regulations achieve the same end by requiring that a health insurance issuer providing group health insurance coverage in connection with a group health plan established or maintained by an eligible organization assume sole responsibility for providing separate payments for contraceptive services directly for plan participants and beneficiaries, without cost sharing, premium, fee, or other charge to plan participants or beneficiaries or to the eligible organization or its plan. The requirement that, for plan participants and beneficiaries, issuers provide payments for contraceptive services, in lieu of individual health insurance

policies that cover contraceptive services, represents a simpler approach and responds to concerns raised by commenters, while still ensuring that eligible organizations and their plans do not contract, arrange, pay, or refer for such coverage, and that contraceptive coverage is expressly excluded from the group health insurance coverage.

Under these final regulations, as under the proposed regulations, the eligible organization need only meet the self-certification standard and provide to the issuer a copy of its self-certification. The issuer that receives the copy of the self-certification from the eligible organization must expressly exclude contraceptive coverage—either all contraceptive coverage or coverage of specific contraceptive services if the issuer chooses to customize the exclusion—from the group health insurance coverage of the eligible organization. The issuer must also notify plan participants and beneficiaries, contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year, that the issuer provides payments for contraceptive services at no cost separate from the group health plan for so long as the participant or beneficiary remains enrolled in the plan, as discussed later in this section. Unlike under the proposed regulations, the issuer is not required to issue to plan participants and beneficiaries individual health insurance policies covering contraceptive services, and, thus, there is no need to consider such coverage excepted benefits, as proposed. Instead, under these final regulations, the issuer must, as a federal regulatory requirement, provide payments for contraceptive services for plan participants and beneficiaries, separate from the group health plan, without the imposition of cost sharing, premium, fee, or other charge on plan participants or beneficiaries or on the eligible organization or its plan. Under this simplified approach, issuers will not incur the associated administrative costs of issuing individual contraceptive coverage policies.

This simpler approach to the accommodation for insured coverage does not trigger certain aspects of state insurance law. As the payments at issue derive solely from a federal regulatory requirement, not a health insurance policy, they do not implicate issues such as issuer licensing and product approval requirements under state law, and they minimize cost and

administrative complexity for issuers. At the same time, because the payments for contraceptive services are not a group health plan benefit under this approach, this policy ensures that eligible organizations and their plans do not contract, arrange, pay, or refer for contraceptive coverage, and that such coverage is expressly excluded from their group health insurance policies. This approach also minimizes barriers in access to care because plan participants and beneficiaries (and their health care providers) do not have to have two separate health insurance policies (that is, the group health insurance policy and the individual contraceptive coverage policy). Furthermore, Small Business Health Insurance Options Programs (SHOPs) (the small group market Exchanges) do not need to make operational changes as a result of the accommodation. Small employers that are eligible organizations purchasing coverage through a SHOP can simply provide a copy of their self-certification to the issuer (rather than provide it to the SHOP) to ensure that their small group market policy is provided in a manner consistent with these final regulations.

Although these payments for contraceptive services are not benefits under a health insurance policy, to fulfill an issuer's responsibilities under section 2713 of the PHS Act and the companion provisions of ERISA and the Code and consistent with the proposed regulations, an issuer must make them available in a way that meets minimum standards for consumer protection, which would ordinarily accompany coverage of recommended preventive health services without cost sharing under section 2713 of the PHS Act and the companion provisions of ERISA and the Code. Thus, issuers, in order to satisfy their regulatory obligations under these final regulations, must make these payments for contraceptive services in a manner consistent with the requirements under the following provisions of the PHS Act and the companion provisions of ERISA and the Code (and their implementing regulations): PHS Act sections 2706 (non-discrimination in health care), 2709 (coverage for individuals participating in approved clinical trials), 2711 (no lifetime or annual limits), 2713 (coverage of preventive health services), 2719 (appeals process), and 2719A (patient protections), as incorporated by reference into ERISA section 715 and Code section 9815.[28] Consistent with

---

[28] With respect to the accommodation for self-insured coverage of eligible organizations under these final regulations, a comparable requirement to

Exhibit 13    JA-0000245

these standards and as described in the 2010 interim final regulations, an issuer may apply reasonable medical management techniques and may require that contraceptive services be obtained in-network (if an issuer has a network of providers) in order for plan participants and beneficiaries to obtain such services without cost sharing.[29]

Issuers are prohibited from charging any premium, fee, or other charge to eligible organizations or their plans, or to plan participants or beneficiaries, for making payments for contraceptive services, and must segregate the premium revenue collected from eligible organizations from the monies they use to make such payments. In making such payments, the issuer must ensure that it does not use any premiums collected from eligible organizations. Issuers have flexibility in how to structure these payments, provided that the payments in no way involve the eligible organization, and provided that issuers are able to account for this segregation of funds in accordance with applicable, generally accepted accounting and auditing standards.

The Departments stated in the preamble of the proposed regulations that issuers would find that providing contraceptive coverage is at least cost neutral because they would be insuring the same set of individuals under both the group health insurance policies and the separate individual contraceptive coverage policies and, as a result, would experience lower costs from improvements in women's health, healthier timing and spacing of pregnancies, and fewer unplanned pregnancies. The Departments continue to believe, and have evidence to support, that, with respect to the accommodation for insured coverage established under these final regulations, providing payments for contraceptive services is cost neutral for issuers. Several studies have estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's

health.[30][31] The Departments are unaware of any studies to the contrary.[32]

Some commenters raised specific premium rating and accounting issues related to the proposed regulations' approach to the cost neutrality of issuers providing contraceptive coverage. These commenters generally asserted that the cost savings due to lower pregnancy-related costs and improvements in women's health would flow to employers through reduced premiums, thereby leaving issuers uncompensated for the cost of providing contraceptive coverage. Further, commenters stated that, in the case of a group health insurance policy in the small group market, the small employer's reduced claims experience attributable to contraceptive coverage (not including the issuer's direct costs of contraceptive coverage) would be spread across the issuer's single risk pool for the entire small group market in a state and result in a lower index rate for pricing all of the issuer's small group market products. Thus, according to these commenters, in both the large and small group markets, issuers would not reap the cost savings attributable to contraceptive coverage, and would need to fund the costs of a free-standing contraceptive coverage policy from some other source.

One commenter suggested that it would be possible to view the provision of contraceptive coverage as cost neutral if an issuer were to set the premium otherwise charged to an eligible organization as though plan participants and beneficiaries did not have separate contraceptive coverage. Other commenters argued that the rationale for providing Federally-facilitated Exchange (FFE) user fee adjustments in connection with the accommodation for self-insured group health plans of eligible organizations was equally applicable in the context of insured group health plans of eligible organizations and recommended that issuers be permitted to charge a premium or otherwise be compensated for providing contraceptive coverage.

In response to these comments, the Departments continue to believe that issuers have various options for achieving cost neutrality, notwithstanding that they must make payments for contraceptive services without cost sharing, premium, fee, or other charge to the eligible organization, the group health plan, or plan participants or beneficiaries.

Issuers of large group insured products have an option by which they can ensure that they accrue the cost savings from reduced pregnancy-related expenses and other health care costs. For large group market products, issuers base premiums on an employer's prior year claims cost (that is, experience rating) and other factors.[33] Some commenters asserted that this rating practice means that any cost savings from fewer pregnancies and childbirths and improvements in women's health will be passed to the employer in the large group insured market. Given that there appears to be no legal requirement that issuers use this particular rating practice, and that this practice often entails adding costs to premiums that are not based solely on the experience of the employer's group,[34] issuers reasonably could set the premium for an eligible organization's large group policy as if no payments for contraceptive services had been provided to plan participants and beneficiaries—reflecting the actual terms of the group policy, which expressly excludes contraceptive coverage. This approach would be consistent with pricing methodologies currently used in the health insurance industry.

---

[29] See 26 CFR 54.9815–2713T(a)(3) and (4); 29 CFR 2590.715–2713(a)(3) and (4); 45 CFR 147.130(a)(3) and (4).

provide separate payments for contraceptive services consistent with these consumer protections is not explicitly placed on the third party administrator. This is because, as the plan administrator for contraceptive coverage, the third party administrator is already required to comply with these consumer protections, as well as all other provisions of ERISA that are applicable to group health plans, including ERISA sections 104 and 503, and the requirements of Part 7 of ERISA.

[30] Bertko, J., Glied, S., et al. The Cost of Covering Contraceptives Through Health Insurance (February 9, 2012), http://aspe.hhs.gov/health/reports/2012/contraceptives/ib.shtml; Washington Business Group on Health, Promoting Healthy Pregnancies: Counseling and Contraception as the First Step. Report of a Consultation with Business and Health Leader (September 20, 2000). http://www.businessgrouphealth.org/pdfs/healthypregnancy.pdf; Campbell, K.P., Investing in Maternal and Child Health: An Employer's Toolkit. National Business Group on Health http://www.businessgrouphealth.org/healthtopics/maternalchild/investing/docs/mch_toolkit.pdf; Trussell, J., et al. The Economic Value of Contraception: A Comparison of 15 Methods. American Journal Public Health, 1995; 85(4):494–503. Revenues of H.R. 3162, the Children's Health and Medicare Protection Act, for the Rules Committee (August 1, 2007) http://www.cbo.gov/ftpdocs/85xx/doc8519/HR3162.pdf.

[31] The Departments believe that these same cost savings found by issuers of group health insurance would also be found by issuers of student health insurance coverage.

[32] One commenter cited two studies disputing the cost effectiveness of preventive health services, but these studies are not specific to contraceptive services. Further, these studies find that preventive care is not cost effective when a large population receives the preventive service but only a small fraction of that population would have developed the condition being prevented, a circumstance not presented here. See Cohen, J., et al. New England Journal of Medicine. 2008. 358:661–663 (February 14, 2008) http://www.nejm.org/toc/nejm/358/7; CBO Letter to Congressman Nathan Deal, (August 7, 2009). http://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/104xx/doc10492/08-07-prevention.pdf.

[33] http://www.nahu.org/consumer/GroupInsurance.cfm.

[34] http://www.actuary.org/files/Draft_Large_Group_Medical_Business_Practice_Note_Jan_2013.pdf.

Exhibit 13    JA-0000246

**39878**    **Federal Register** / Vol. 78, No. 127 / Tuesday, July 2, 2013 / Rules and Regulations

Another option is to treat the cost of payments for contraceptive services for women enrolled in insured group health plans established or maintained by eligible organizations as an administrative cost that is spread across the issuer's entire risk pool, excluding plans established or maintained by eligible organizations given that issuers are prohibited from charging any premium, fee, or other charge to eligible organizations or their plans for providing payments for contraceptive services. In the small group market, issuers are required beginning in 2014 to treat all of their non-grandfathered business within a state as a single risk pool, and administrative costs may be spread evenly across all plans in the single risk pool (although issuers are permitted to apply them on a plan basis). In the large group market, while there is no single risk pool requirement, issuers generally spread administrative costs across their entire book of business.[35] In 2011, health insurance issuers earned approximately $290 billion in premiums in the insured small and large group markets.[36] If the cost of providing payments for contraceptive services for participants and beneficiaries in insured group health plans established or maintained by eligible organizations were treated as an administrative cost spread across an issuer's entire book of business (excluding plans established or maintained by eligible organizations), the cost of providing such payments would result in an imperceptible increase in administrative load.[37] These changes in premiums would be negligible and effectively cost neutral to issuers, even before considering any reductions in claims costs that accrue to the issuer.

Under either option, after meeting the self-certification standard, the eligible organization would not contract, arrange, pay, or refer for contraceptive coverage.

HHS intends to clarify in guidance that an issuer of group health insurance coverage that makes payments for contraceptive services under these final regulations may treat those payments as an adjustment to claims costs for purposes of medical loss ratio and risk

corridor program calculations.[38] This adjustment compensates for any increase in incurred claims associated with making payments for contraceptive services.

Several commenters expressed concern that participants and beneficiaries in plans of eligible organizations would be automatically enrolled in individual contraceptive coverage policies and recommended providing an opt-out for plan participants and beneficiaries who object to contraceptive coverage on religious grounds. Other commenters stated that allowing participants and beneficiaries to opt out of such contraceptive coverage would create an administrative burden on issuers and privacy concerns for individuals because the issuers would know which individuals opted in or opted out of such coverage. The simplified approach described in these final regulations eliminates this issue altogether, because issuers are not required to issue individual contraceptive coverage policies at all.[39] Rather, they are required only to provide payments for contraceptive services for those plan participants and beneficiaries who opt to use such services. Nothing in these final regulations compels any plan participant or beneficiary to use such services, and nothing causes participants or beneficiaries to be automatically enrolled in contraceptive coverage; therefore, these concerns are addressed without the need for an opt-out mechanism. Moreover, nothing in these final regulations precludes employers or others from expressing any opposition to the use of contraceptives or requires health care providers to prescribe or provide contraceptives, if doing so is against their religious beliefs.

The Departments explained in the preamble of the proposed regulations that a health insurance issuer providing group health insurance coverage in connection with a group health plan established or maintained by an eligible organization would be held harmless if the issuer relied in good faith on a representation by the organization as to its eligibility for the accommodation and such representation was later determined to be incorrect. The Departments also explained that an

eligible organization and its plan would be held harmless if the issuer were to fail to comply with the requirement to provide separate payments for contraceptive services for plan participants and beneficiaries at no cost. Some commenters requested that the Departments codify this policy in regulation text. Accordingly, this policy is now codified in paragraph (e) of 26 CFR 54.9815–2713A, 29 CFR 2590.715–2713A, and 45 CFR 147.131 of these final regulations.

To summarize, the following are the key elements of the accommodation that is being made for eligible organizations with insured group health plans:

• An organization seeking to be treated as an eligible organization needs only to self-certify that it is an eligible organization, provide the issuer with a copy of the self-certification, and satisfy the recordkeeping and inspection requirements of the self-certification standard.

• The issuer that receives a self-certification must then expressly exclude contraceptive coverage from the eligible organization's group health insurance coverage.

• The issuer must, contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year, notify plan participants and beneficiaries that the issuer provides separate payments for contraceptive services at no cost for so long as the participant or beneficiary remains enrolled in the plan.

• The issuer must segregate premium revenue collected from the eligible organization from the monies used to make payments for contraceptive services. When it makes payments for contraceptive services used by plan participants and beneficiaries, the issuer must do so without imposing any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, its group health plan, or its plan participants or beneficiaries. In making such payments, the issuer must ensure that it does not use any premiums collected from eligible organizations. Issuers have flexibility in how to structure these payments, but must be able to account for this segregation of funds, subject to applicable, generally accepted accounting and auditing standards. Thus, an eligible organization need not contract, arrange, pay or refer for contraceptive coverage.

---

[35] Bluhm, W., ed., Group Insurance, 5th Ed. 2007), 459–460.

[36] 2011 MLR–A data, submitted to CMS in July 2012.

[37] Office of Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, "Cost-Neutrality of Contraceptive Coverage."

[38] See 45 CFR Part 158 for standards related to the medical loss ratio and 45 CFR Part 153 Subpart F for standards related to the risk corridor program.

[39] The same is true with respect to the accommodation for self-insured coverage of eligible organizations under these final regulations, given that third party administrators similarly are not required to arrange for individual contraceptive coverage policies at all.

Exhibit 13                                                                                         JA-0000247

• Plan participants and beneficiaries may refuse to use contraceptive services.

• An eligible organization and its group health plan are considered to comply with the contraceptive coverage requirement even if the issuer fails to comply with the requirement to provide separate payments for contraceptive services for plan participants and beneficiaries at no cost.

**d. Separate Payments for Contraceptive Services for Participants and Beneficiaries in Self-Insured Group Health Plans**

Comments varied as to which of the three proposed approaches to providing separate contraceptive coverage without cost sharing for participants and beneficiaries in self-insured plans of eligible organizations should be finalized. Some commenters suggested that none of the proposed approaches would enable objecting employers to separate themselves completely from the administration of contraceptive coverage. These commenters requested an unqualified exemption from the contraceptive coverage requirement for such employers. Other commenters stated that none of the proposed approaches would sufficiently ensure that participants and beneficiaries in self-insured plans of eligible organizations would receive separate contraceptive coverage without cost sharing. These commenters requested that the final regulations require that objecting employers retain legal responsibility for any failure on the part of issuers or third party administrators to provide such coverage.

A number of commenters expressed concern about the responsibilities that one or more of the proposed approaches would impose on third party administrators. Some of these commenters suggested that the proposed requirement that third party administrators arrange for separate contraceptive-only coverage through an issuer would convert third party administrators into health insurance brokers. Others suggested that third party administrators would not be willing to assume the responsibility of arranging for separate contraceptive-only coverage. These commenters also suggested that, even if a third party administrator were willing to assume such responsibility, it would pass along the resultant increase in its administrative costs to the employer.

Other commenters expressed concern about an approach that would require third party administrators to become plan administrators and fiduciaries under section 3(16) of ERISA for the

sole purpose of arranging contraceptive coverage. These commenters suggested that requiring third party administrators to serve as fiduciaries would increase their exposure to legal liability and also create conflicts of interest with their plan sponsor clients given that many agreements between third party administrators and plan sponsors prohibit third party administrators from serving as fiduciaries.

A number of commenters questioned the Department of Labor's legal authority to designate a third party administrator as the plan administrator for contraceptive coverage by virtue of the eligible organization providing a copy of its self-certification to the third party administrator. These commenters suggested that the self-certification of the eligibility of the organization for the accommodation would be insufficient to act as a designation under ERISA section 3(16)(A)(i), and questioned whether the self-certification could be defined as an instrument under which the plan is operated.

After reviewing the comments on the three proposed approaches, the Departments are finalizing the third approach under which the third party administrator becomes an ERISA section 3(16) plan administrator and claims administrator solely for the purpose of providing payments for contraceptive services for participants and beneficiaries in a self-insured plan of an eligible organization at no cost to plan participants or beneficiaries or to the eligible organization. The Departments have determined that the ERISA section 3(16) approach most effectively enables eligible organizations to avoid contracting, arranging, paying, or referring for contraceptive coverage after meeting the self-certification standard, while also creating the fewest barriers to or delays in plan participants and beneficiaries obtaining contraceptive services without cost sharing.

Under this approach, as set forth in these final regulations, with respect to the contraceptive coverage requirement, an eligible organization is considered to comply with section 2713 of the PHS Act and the companion provisions in ERISA and the Code if it provides to all third party administrators with which it or its plan has contracted a copy of its self-certification, consistent with the requirements of these final regulations.[40] The self-certification

must: (1) State that the eligible organization will not act as the plan administrator or claims administrator with respect to contraceptive services or contribute to the funding of contraceptive services; and (2) cite 29 CFR 2510.3–16 and 26 CFR 54.9815– 2713A and 29 CFR 2590.715–2713A, which explain the obligations of the third party administrator. Upon receipt of the copy of the self-certification, the third party administrator may decide not to enter into, or remain in, a contractual relationship with the eligible organization to provide administrative services for the plan.

As relevant here, a plan administrator is defined in ERISA section 3(16)(A)(i) as "the person specifically so designated by the terms of the instrument under which the plan is operated." As a document notifying the third party administrator(s) that the eligible organization will not provide, fund, or administer payments for contraceptive services, the self-certification is one of the instruments under which the employer's plan is operated under ERISA section 3(16)(A)(i). The self-certification will afford the third party administrator notice of obligations set forth in these final regulations, and will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA. Additional conditions the eligible organization must meet in order to be considered to comply with PHS Act section 2713 and the companion provisions in ERISA and the Code include prohibitions on: (1) Directly or indirectly interfering with a third party administrator's efforts to provide or arrange separate payments for contraceptive services for participants or beneficiaries in the plan and (2) directly or indirectly seeking to influence a third party administrator's

---

[40] Third party administrators are hired by plan sponsors to process claims and administer other administrative aspects of employee benefit plans. In some cases, a plan hires different third party administrator to administer claims for different classifications of benefits. (For example, one plan may contract with a pharmacy benefit manager (PBM) to handle claims administration for prescription drugs and another third party administrator to handle claims for inpatient and outpatient medical/surgical benefits.) To the extent the plan hires more than one third party administrator, each third party administrator would become the section 3(16) plan administrator with respect to the types of claims it normally processes (that is, the PBM would continue to handle claims for prescription drugs and the other third party administrator would continue to handle claims for inpatient and outpatient medical/surgical benefits); each would do so in accordance with section 2713 of the PHS Act and the companion provisions of ERISA and the Code (even if plan terms might otherwise provide differently) as plan administration that may be funded in accordance with 45 CFR 156.50(d).

Exhibit 13                                                                                                    JA-0000248

decision to provide or arrange such payments.[41]

A third party administrator that receives a copy of the self-certification and that agrees to enter into or remain in a contractual relationship with the eligible organization to provide administrative services for the plan must provide or arrange separate payments for contraceptive services for participants and beneficiaries in the plan without cost sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or its plan. The third party administrator can provide such payments on its own, or it can arrange for an issuer or other entity to provide such payments. In either case, like the payments for contraceptive services under the accommodation for insured plans of eligible organizations discussed previously, the payments are not health insurance policies. Moreover, in either case, the third party administrator can make arrangements with an issuer offering coverage through an FFE to obtain reimbursement for its costs (including an allowance for administrative costs and margin). As discussed later in this section, the issuer offering coverage through the FFE can receive an adjustment to the FFE user fee, and the issuer is required to pass on a portion of that adjustment to the third party administrator to account for the costs of providing or arranging payments for contraceptive services. A third party administrator that provides or arranges the payments is entitled to retain reimbursement for its costs for the period during which it reasonably and in good faith relied on a representation by the eligible organization that it was eligible for the accommodation. This is so even if the organization's representation was later determined to be incorrect.

The third party administrator must provide plan participants and beneficiaries with notice of the availability of the separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in coverage that is effective beginning on the first day of each applicable plan year (as discussed in more detail later in this section). Third party administrators must also take on the statutory responsibilities of a plan administrator under ERISA, including setting up and operating a claims procedure under

ERISA section 503, providing plan participants and beneficiaries with disclosures required under ERISA section 104, and complying with the requirements of Part 7 of ERISA. The Departments note that there is no obligation for a third party administrator to enter into or remain in a contract with the eligible organization if it objects to any of these responsibilities.

The Departments believe that this approach most successfully addresses both the desire of some commenters for plan participants and beneficiaries to receive contraceptive coverage without cost sharing without delays or other barriers, and the desire of other commenters for objecting employers to be separated from contracting, arranging, paying, or referring for contraceptive coverage. The third party administrator serving as the plan administrator for contraceptive benefits ensures that there is a party with legal authority to arrange for payments for contraceptive services and administer claims in accordance with ERISA's protections for plan participants and beneficiaries. At the same time, the approach enables objecting employers, after providing third party administrators with a copy of the self-certification (as described previously), to separate themselves from contracting, arranging, paying, or referring for contraceptive coverage. Additionally, by substituting payments for contraceptive services for health insurance policies, this approach avoids the complications that would be presented by requiring the creation of a contraceptive-only health insurance product, and allows third party administrators to avoid potentially becoming health insurance brokers. Accordingly, while the Departments appreciate commenters' concerns about the responsibilities that third party administrators must assume under this accommodation, they believe that this approach best ensures that plan participants and beneficiaries receive contraceptive coverage without cost sharing, and without the objecting employers paying for or administering such coverage.

Moreover, none of the comments changed the Department of Labor's view that it has legal authority to require the third party administrator to become the plan administrator under ERISA section 3(16) for the sole purpose of providing payments for contraceptive services if the third party administrator agrees to enter into or remain in a contractual relationship with the eligible organization to provide administrative services for the plan. The Department of Labor has broad rulemaking authority under Title I of ERISA, which includes

the ability to interpret the definition of plan administrator under ERISA section 3(16)(A)(i). The Department of Labor's interpretation of the self-certification described herein as one of the "instruments under which the plan is operated" is consistent with the plain meaning of the term because it identifies the limited set of plan benefits (that is, contraceptive coverage) that the employer refuses to provide and that the third party administrator must therefore provide or arrange for an issuer or another entity to provide.

e. Self-Insured Group Health Plans Without Third Party Administrators

Although some commenters addressed the solicitation for comments on whether and how to provide an accommodation for self-insured group health plans established or maintained by eligible organizations that do not use the services of a third party administrator, no comments indicated that such plans actually exist. Accordingly, the Departments continue to believe that there are no self-insured group health plans in this circumstance. However, to allow for the possibility that such a self-insured group health plan does exist, the Departments will provide any such plan with a safe harbor from enforcement of the contraceptive coverage requirement, contingent on: (1) the plan submitting to HHS information (as described later in this section) showing that it does not use the services of a third party administrator; and (2) if HHS agrees that the plan does not use the services of a third party administrator, the plan providing notice to plan participants and beneficiaries in any application materials distributed in connection with enrollment (or re-enrollment) in coverage that is effective beginning on the first day of each applicable plan year, indicating that it does not provide benefits for contraceptive services.

Such plans must submit to HHS at least 60 days prior to the first day of the first applicable plan year all of the following information:

• Identifying information for the plan, the eligible organization that acts as the plan sponsor, and an authorized representative of the organization, along with the authorized representative's telephone number and email address.

• A listing of the five most highly compensated non-clinical plan service providers (other than employees of the plan or plan sponsor), including contact information for each plan service provider, a concise description of the nature of the services provided by each service provider to the plan, and the annual amount of compensation paid to

---

[41] Nothing in these final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives.

Exhibit 13

**Federal Register** / Vol. 78, No. 127 / Tuesday, July 2, 2013 / Rules and Regulations    **39881**

each plan service provider (examples of plan services include claims processing and adjudication, appeals management, provider network development, and pharmacy benefit management).

• An attestation (executed by an authorized representative of the organization) that the plan is established or maintained by an eligible organization, and is operated in compliance with all applicable requirements of part A of title XXVII of the PHS Act, as incorporated into ERISA and the Code.

Such information must be submitted electronically to *marketreform@cms.hhs.gov.*

If any such submission demonstrates that a self-insured group health plan established or maintained by an eligible organization does not use the services of a third party administrator, the Departments will provide a safe harbor from enforcement of the contraceptive coverage requirement while an additional accommodation is considered. If the Departments discover through any such submission that a self-insured group health plan established or maintained by an eligible organization does in fact use the services of a third party administrator, the eligible organization must either follow the procedures described in these final regulations to obtain an accommodation or otherwise comply with the contraceptive coverage requirement.

f. Notice of Availability of Separate Payments for Contraceptive Services

Consistent with the proposed regulations, the final regulations direct that, for any plan year to which an accommodation is to apply, a health insurance issuer providing separate payments for contraceptive services pursuant to the accommodation, or a third party administrator arranging or providing such payments (or its agent), must provide timely written notice about this fact to plan participants and beneficiaries in insured or self-insured group health plans (or student enrollees and their covered dependents in student health insurance coverage) of eligible organizations.

Under the proposed regulations, this notice would be provided by the issuer contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment (or re-enrollment) in health coverage established or maintained or arranged by the eligible organization. Commenters noted that employers, not issuers, typically distribute plan enrollment (or re-enrollment) materials to employees and that providing this

notice contemporaneous with plan enrollment (or re-enrollment) materials would not be possible because issuers typically do not receive enrollee information prior to enrollment.

Consistent with the simplified approach described previously, these final regulations provide that this notice must be provided by either the issuer providing separate payments for contraceptive services under the accommodation, or a third party administrator arranging or providing such payments (or its agent). The notice must be provided contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in coverage that is effective beginning on the first day of each plan year to which the accommodation applies, and it must indicate that the eligible organization does not fund or administer contraceptive benefits, but that the issuer or third party administrator will provide separate payments for contraceptive services at no cost. The Departments believe that the direction that the notice be provided contemporaneous with application materials "to the extent possible" provides sufficient flexibility to address the concerns raised by commenters about the timing of the notice.

The final regulations continue to provide model language that may be used to satisfy this notice requirement. Substantially similar language may also be used to satisfy the notice requirement. Some commenters suggested additions or modifications to the model language. Other commenters stated that the Departments should not allow the use of substantially similar language. Additionally, some commenters recommended the Departments set standards to ensure that the notice is accessible to persons with limited English proficiency and person with disabilities. The Departments believe that the model language in the final regulations, along with existing guidance concerning civil rights obligations, provide sufficient notice. The Departments also believe that the flexibility afforded by the final regulations to use substantially similar language is generally consistent with other federal notice requirements.

The notice must include contact information for the issuer or third party administrator in the event plan participants and beneficiaries (or student enrollees and their covered dependents) have questions or complaints. The Departments note that issuers and third party administrators may find it useful to provide additional

written information concerning how to obtain reimbursement for contraceptive services, appeals procedures, provider and pharmacy networks, prescription drug formularies, medical management procedures, and similar issues.[42]

g. Student Health Insurance Coverage

Consistent with the HHS proposed regulation, paragraph (f) of the HHS final regulation provides that an accommodation applies to student health insurance coverage arranged by an eligible organization that is an institution of higher education in a manner comparable to that in which it applies to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer. For this purpose, any reference to plan participants and beneficiaries is a reference to student enrollees and their covered dependents.

Several commenters supported treating student health insurance like employer-sponsored group health insurance for purposes of these final regulations. Other commenters suggested that an accommodation should not extend to institutions of higher education that arrange student health insurance coverage, because student health insurance coverage is considered a type of individual rather than group health insurance coverage under federal law.[43] One commenter recommended that issuers offering coverage through the Exchanges be required to provide separate contraceptive coverage at no cost to students enrolled in nonprofit religious institutions of higher education with religious objections to contraceptive coverage (and their dependents).

Student health insurance coverage is administered differently than other individual health insurance coverage. Whereas most individual health insurance coverage is issued under a contract between an individual policyholder and a health insurance issuer, student health insurance coverage is available to student enrollees and their covered dependents pursuant to a written agreement between an institution of higher education and a health insurance issuer. Some religiously affiliated colleges and universities object to signing a written agreement or providing financial

---

[42] Furthermore, as discussed previously, with respect to self-insured coverage, third party administrators that are plan administrators must operate in accordance with Part 1 of ERISA, including ERISA section 104, which generally requires certain disclosures regarding plan benefits and limitations.

[43] 45 CFR 147.147 (77 FR 16453).

Exhibit 13

assistance for student health insurance coverage that provides benefits for contraceptive services. For these reasons, HHS believes that it is appropriate to take into account religious objections to contraceptive coverage of eligible organizations that are institutions of higher education and is finalizing the provision applicable to student health insurance coverage as proposed. HHS notes that it does not have the authority to require issuers offering coverage through the Exchanges to provide separate contraceptive coverage at no cost to students (and their dependents).

The Departments note that any accommodation specific to a nonprofit religious institution of higher education is intended to accommodate the nonprofit religious institution of higher education only with respect to its arrangement of student health insurance coverage for its students and their covered dependents. With respect to the establishment or maintenance of a group health plan by a nonprofit religious institution of higher education for its employees and their dependents, the nonprofit religious institution of higher education is intended to be accommodated in the same manner as that in which any other eligible organization that has established or maintained a group health plan for its employees and their dependents is to be accommodated.

*C. Adjustments of Federally-Facilitated Exchange User Fees—45 CFR 156.50(d) and 156.80(d)*

These sections of the final HHS regulation set forth processes and standards to fund the payments for the contraceptive services that are provided for participants and beneficiaries in self-insured plans of eligible organizations under the accommodation described previously, at no cost to plan participants or beneficiaries, eligible organizations, third party administrators, or issuers, through an adjustment in the FFE user fee payable by an issuer participating in an FFE.[44]

In response to the proposed regulations, some commenters questioned HHS's authority to establish the FFE user fee adjustment. Commenters also recommended that HHS ensure that the adjustments to user fee collections not undermine FFE operations. Commenters stated that the FFE user fee should not be increased to offset the user fee adjustment.

Commenters further stated that the FFE user fee adjustment must be adequate to provide financial incentives to ensure that women in self-insured plans of eligible organizations receive contraceptive coverage at no cost. Commenters suggested that the FFE user fee adjustment may not be an adequate long-term funding source as more states establish Exchanges over time, reducing the number of FFEs and therefore available FFE user fee revenue.

Office of Management and Budget (OMB) Circular No. A–25R establishes federal policy regarding these types of user fees. Consistent with that Circular, the revised FFE user fee calculation (which will result in an adjustment of the FFE user fee) will facilitate the accommodation of self-insured plans established or maintained by eligible organizations by ensuring that plan participants and beneficiaries are provided contraceptive coverage at no cost so that eligible organizations are not required to administer or fund such coverage. By financing the accommodation for self-insured plans of eligible organizations through the FFE user fee adjustment, participants and beneficiaries in such plans can retain their existing coverage, while gaining access to separate payments for contraceptive services at no cost. HHS does not believe that the adjustment to FFE user fee collections, as contemplated under this final regulation, will materially undermine FFE operations.

HHS notes that it is not raising the FFE user fee finalized in the 2014 Payment Notice to offset the FFE user fee adjustments, and estimates that payments for contraceptive services will represent only a small portion of total FFE user fees.

The FFE user fee adjustments support many of the goals of the Affordable Care Act, including improving the health of the population, reducing health care costs, providing access to health coverage, encouraging eligible organizations to continue to offer health coverage, and ensuring access to affordable qualified health plans (QHPs) via efficiently operated Exchanges. Moreover, as described earlier in these final regulations, there are significant benefits associated with contraceptive coverage without cost sharing. Such coverage significantly furthers the governmental interests in promoting public health and gender equality, and promotes the underlying goals of the Exchanges and the Affordable Care Act more generally.

In § 156.50(d) of the proposed regulations, HHS specified that, if an issuer were to provide contraceptive

coverage to participants and beneficiaries in self-insured plans of eligible organizations at no cost, and the issuer offers coverage through an FFE, the issuer would be able to seek an adjustment to the FFE user fee for the estimated cost of the contraceptive coverage. Moreover, HHS proposed that, if the issuer providing the contraceptive coverage did not offer coverage through an FFE—either because it was not a QHP issuer, or because it was a QHP issuer but operated in a state without an FFE—an issuer in the same issuer group that offered coverage through an FFE would have been able to seek an adjustment to the FFE user fee on behalf of the issuer providing the contraceptive coverage. HHS proposed to use the definition of issuer group in 45 CFR 156.20, that is, all entities treated under subsection (a) or (b) of section 52 of the Code as a member of the same controlled group of corporations as (or under common control with) a health insurance issuer, or issuers affiliated by the common use of a nationally licensed service mark. Several commenters expressed concern that not every issuer seeking to provide contraceptive coverage to participants and beneficiaries in self-insured plans of eligible organizations would be in the same issuer group as an issuer that offers coverage through an FFE. Commenters further noted that, even if the issuer providing the contraceptive coverage and the issuer offering coverage through an FFE were in the same issuer group, the issuers might incur significant administrative costs in establishing the necessary arrangements.

In response to these comments, and to account for the payments for contraceptive services for participants and beneficiaries in self-insured group health plans of eligible organizations under the accommodation described previously, HHS is finalizing a modification of the proposed policy. In § 156.50(d)(1), a participating issuer (defined at 45 CFR 156.50(a)[45]) offering a plan through an FFE may qualify for an adjustment to the FFE user fee to the extent that the participating issuer either: (i) made payments for contraceptive services on behalf of a third party administrator pursuant to 26 CFR 54.9815–2713A(b)(2)(ii) or 29 CFR 2590.715–2713A(b)(2)(ii); or (ii) seeks an adjustment to the FFE user fee with respect to a third party administrator

---

[44] The FFE user fee was established in the March 11, 2013 final rule entitled "Patient Protection and Affordable Care Act: HHS Notice of Benefit and Payment Parameters for 2014" (78 FR 15410) (2014 Payment Notice).

[45] Under 45 CFR 156.50(a), a participating issuer includes QHP issuers, issuers of multi-state plans, and issuers of stand-alone dental plans. We note that an issuer of a Consumer Operated and Oriented Plan (CO–OP) offered on an FFE is also considered to be a participating issuer for the purpose of the FFE user fee adjustment.

Exhibit 13                                                                                    JA-0000251

that, following receipt of a copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4). made or arranged for payments for contraceptive services pursuant to 26 CFR 54.9815–2713A(b)(2)(i) or (ii) or 29 CFR 2590.715–2713A(b)(2)(i) or (ii). Under the final regulation, neither the third party administrator, nor the participating issuer, nor any entity providing payments for contraceptive services (if neither the third party administrator nor the participating issuer is providing such payments) is required to be part of the same issuer group or otherwise affiliated. This modification allows greater flexibility in the arrangements among third party administrators, issuers, and other entities, while still ensuring that eligible organizations are not required to contract, arrange, pay, or refer for contraceptive coverage. Consistent with the proposed regulations, an allowance for administrative costs and margin in the FFE user fee adjustment accounts for the costs of arrangements among the third party administrator, the participating issuer, and any other entity providing payments for contraceptive services (if neither the third party administrator nor the participating issuer is providing such payments).

In § 156.50(d)(1) through (4) of the proposed regulations, HHS set forth a process through which an issuer seeking an FFE user fee adjustment would submit information to HHS to demonstrate the provision of contraceptive coverage and estimate the cost of such coverage. HHS further proposed that it would review this information and provide an adjustment to the issuer's monthly obligation to pay the FFE user fee in an amount equal to the approved estimated cost of the contraceptive coverage. HHS suggested that the cost of the contraceptive coverage. including administrative costs and margin, could be estimated on a per capita basis by either the issuer or HHS using either actuarial principles and methodologies or, for 2016 and beyond, previous experience. The per capita rate would then be multiplied by the monthly enrollment in the contraceptive coverage in order to calculate the total FFE user fee adjustment.

HHS sought comments on this proposed process for collecting information, calculating the cost of the contraceptive coverage, and applying the FFE user fee adjustment. HHS received several comments suggesting that issuers should be required to submit information only on an annual basis, rather than on a monthly basis. to

reduce the administrative burden. Commenters also noted that it would likely be difficult to estimate the cost of the contraceptive coverage accurately, particularly in the initial years, given that the prohibition on cost sharing could affect utilization. In addition, commenters noted that costs would likely vary considerably based on differences in utilization patterns and administrative processes.

In response to these comments, HHS is making certain modifications to the process described previously. Rather than using a monthly process, the final regulation at § 156.50(d)(2) requires a participating issuer seeking an FFE user fee adjustment to submit to HHS, in the year following the calendar year in which the contraceptive services for which payments were made under the accommodation described previously were provided, for each self-insured plan, the total dollar amount of the payments for contraceptive services that were provided during the applicable calendar year. The issuer will then receive an adjustment to its obligation to pay the FFE user fee equal to the cost of the contraceptive services that were provided during the previous year, plus an allowance, as specified by HHS, for administrative costs and margin. For example, HHS expects that issuers seeking an FFE user fee adjustment for payments for contraceptive services that were provided in calendar year 2014 will be required to submit to HHS by July 15, 2015, the total dollar amount of the payments. This timing will allow adequate time for claims run-out and data collection. The FFE user fee adjustment will be applied starting in October 2015. Although this approach delays the application of the FFE user fee adjustment, it significantly reduces the administrative burden on issuers, third party administrators, and HHS. HHS believes that tying the FFE user fee adjustment to the actual costs of payments for contraceptive services, plus an allowance for administrative costs and margin, will provide reasonable assurance that the adjustment is adequate to cover the full costs of the payments for contraceptive services, furthering the goal of providing contraceptive coverage without cost sharing, as required by PHS Act section 2713 and the companion provisions in ERISA and the Code.

As discussed later in this section, HHS is also directing third party administrators to submit to HHS a notification that the third party administrator intends for a participating issuer to seek an FFE user fee adjustment. This notification must be provided by the later of January 1, 2014.

or the 60th calendar day following the date on which the third party administrator receives a copy of a self-certification from an eligible organization. The notification must be provided whether it is intended that the participating issuer will provide payments for contraceptive services on behalf of the third party administrator, or whether it is intended that the participating issuer will seek an adjustment to the FFE user fee with respect to such payments made or arranged for by the third party administrator. HHS will provide guidance on the manner of submission of the notification, as well as guidance on the application for the FFE user fee adjustment, through the process provided for under the Paperwork Reduction Act of 1995.

HHS is also modifying the standards proposed at § 156.50(d) to align with the final regulations regarding the accommodation for self-insured group health plans of eligible organizations. As discussed previously. under these final regulations. the third party administrator may make the payments for contraceptive services itself, or it may arrange for an issuer (including an issuer that does not offer coverage through an FFE) or another entity to make the payments on its behalf. Under either scenario, a third party administrator that seeks to offset the costs of such payments through an FFE user fee adjustment must enter into an arrangement with a participating issuer offering coverage through an FFE. The participating issuer and the third party administrator must each submit information to HHS, as described in § 156.50(d)(2) of the final regulation, to verify that the payments for contraceptive services were provided in accordance with these final regulations.

Specifically. in § 156.50(d)(2)(i). HHS finalizes submission standards for a participating issuer to receive the FFE user fee adjustment. The participating issuer must submit to HHS, in the manner and timeframe specified by HHS, in the year following the calendar year in which the contraceptive services were provided: (A) Identifying information for the participating issuer and each third party administrator that received a copy of the self-certification with respect to which the participating issuer seeks an adjustment in the FFE user fee (whether or not the participating issuer was the entity that made the payments for contraceptive services); (B) identifying information for each self-insured group health plan with respect to which a copy of the self-certification was received by a third party administrator and with respect to

Exhibit 13    JA-0000252

which the participating issuer seeks an adjustment in the FFE user fee; and (C) for each such self-insured group health plan, the total dollar amount of the payments for contraceptive services that were provided during the applicable calendar year under the accommodation described previously. If such payments were made by the participating issuer directly, the total dollar amount should reflect the amount of the payments made by the participating issuer; if the third party administrator made or arranged for such payments, the total dollar amount should reflect the amount reported to the third party administrator by the third party administrator. Similarly, in § 156.50(d)(2)(ii) and (iii), HHS finalizes submission standards for the third party administrator with respect to which the participating issuer seeks an adjustment in the FFE user fee. In paragraph (d)(2)(ii), HHS finalizes a standard under which the third party administrator must notify HHS, by the later of January 1, 2014, or the 60th calendar day following the date on which it receives the applicable copy of the self-certification, that it intends to arrange for a participating issuer to seek an FFE user fee adjustment. HHS will provide guidance on the manner of this submission through the process provided for under the Paperwork Reduction Act of 1995. This notification is necessary to allow HHS to coordinate the development of the systems for administering the FFE user fee adjustment. In paragraphs (d)(2)(iii)(A) through (E), HHS specifies several other standards under which the third party administrator must submit to HHS, in the year following the calendar year in which the contraceptive services for which payments were made under the accommodation described previously were provided, the following information: (A) Identifying information for the third party administrator and the participating issuer; (B) identifying information for each self-insured group health plan with respect to which the participating issuer seeks an adjustment in the FFE user fee; (C) the total number of participants and beneficiaries in each self-insured group health plan during the applicable calendar year; [46] (D) for each self-insured group health plan with respect to which the third party administrator made payments for contraceptive services, the total dollar amount of such payments that were provided during the applicable calendar year under the accommodation described previously (if such payments

were made by the participating issuer directly, the total dollar amount should reflect the amount reported to the third party administrator by the participating issuer; if the third party administrator made or arranged for such payments, the total dollar amount should reflect the amount of the payments made by or on behalf of the third party administrator); and (E) an attestation that the payments for contraceptive services were made in compliance with 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2). If the third party administrator does not meet these standards, the participating issuer may not receive an FFE user fee adjustment to offset the costs of the payments for contraceptive services incurred by or on behalf of the third party administrator. HHS believes that it is necessary to collect this information directly from the third party administrator that has the duty to ensure that the payments for contraceptive services are made to ensure the accuracy of the data provided, without requiring the participating issuer to attest to information to which it may not have access or over which it has little control.

In § 156.50(d)(3), HHS establishes the process by which a participating issuer will be provided a reduction in its obligation to pay the FFE user fee. As long as an authorizing exception under OMB Circular No. A–25R is in effect, the reduction will be calculated as the sum of the total dollar amount of the payments for contraceptive services submitted by the applicable third party administrators, as described in paragraph (d)(2)(iii)(D), and an allowance, specified by HHS, for administrative costs and margin. In the proposed regulations, HHS requested comments on the appropriate method for determining the administrative costs associated with providing the contraceptive coverage, as well as a margin to ensure that issuers receive appropriate compensation for providing the contraceptive coverage. Commenters agreed with the proposal to reimburse for administrative costs and to provide a margin. Commenters noted that administrative costs would be incurred because of the complexities inherent in arrangements between entities seeking the FFE user fee adjustment and entities providing the contraceptive coverage, particularly when the entities operate in different states. In addition, commenters stated that administrative costs incurred by the third party administrators could vary because of variations in billing processes.

As finalized in this regulation, for the initial years of this policy, HHS will specify an allowance for administrative

costs and margin, which will be incorporated into the FFE user fee adjustment, rather than request the third party administrator or the participating issuer to submit to HHS an estimate of the third party administrator and the participating issuer's administrative costs. This approach is consistent with the general approach in these final regulations to simplify administration of the accommodations for eligible organizations, while still ensuring that no eligible organization is required to contract, arrange, pay, or refer for contraceptive coverage. HHS notes that it intends to review the methodology for determining reimbursement for administrative costs and margin in future years to ensure that HHS is accurately capturing these costs. HHS will establish the allowance as a percentage of the cost of the payments for contraceptive services because HHS believes that the majority of administrative costs will be related to processing of payments to providers for contraceptive services, and because HHS believes that it is reasonable to measure margin on this business as a percentage of the cost of the contraceptive services. HHS will establish the allowance at no less than ten percent of such cost, and will specify the allowance for a particular calendar year in the annual HHS notice of benefit and payment parameters. The specific allowance for the 2014 calendar year will be proposed for public comment in the HHS Notice of Payment and Benefit Parameters for 2015 (which is scheduled to be published in the fall of 2013). This approach will allow HHS to provide for a reasonable allowance for administrative expenses for the third party administrator, the participating issuer, and any other entity providing the payments for contraceptive services on behalf of the third party administrator, as well as a margin for each entity. HHS welcomes feedback from third party administrators, participating issuers, and other relevant stakeholders on the allowance for administrative costs and margin, including the appropriate percentage and alternative methods for future determination of the allowance for administrative costs and margin.

Section 156.50(d)(4) is similar to the corresponding proposed provision, and specifies that, as long as an exception under OMB Circular No. A–25R is in effect, if the amount of the reduction under paragraph (d)(3) is greater than the amount of the obligation to pay the FFE user fee in a particular month, the participating issuer will be provided a credit in succeeding months in the

---

[46] No personally identifiable information will be collected from participating issuers or third party administrators pursuant to § 156.50(d)(2).

Exhibit 13

amount of the excess. HHS notes that the likelihood of this occurring will depend on the relative magnitudes of the cost of payments for contraceptive services and the FFE user fee, the number of participants and beneficiaries in self-insured plans with respect to which the participating issuer seeks an adjustment in the FFE user fee, and the number of individuals enrolled in coverage offered by the issuer through the FFE. HHS also notes that it intends to provide a monthly report, for the initial month in which the FFE user fee adjustment for a particular calendar year is applied, and for succeeding months until the credit is fully applied, to issuers that receive an FFE user fee adjustment. HHS contemplates that this monthly report will include information on the issuer's user fee obligation for the month, its total adjustment for the applicable calendar year, the user fee adjustment applied to date, and the value of the adjustment to be credited to future months (so long as the exception under OMB Circular No. A–25R is in effect). Additionally, HHS intends to provide a monthly report to each applicable third party administrator detailing any FFE user fee adjustment that will be provided to a participating issuer with respect to the costs for contraceptive services incurred by or on behalf of the third party administrator, as well as the portion of the user fee adjustment applied to date.

Section 156.50(d)(5) specifies that, within 60 calendar days of receipt of any adjustment in the FFE user fee, a participating issuer must pay each third party administrator with respect to which it received any portion of such adjustment an amount no less than the portion of the adjustment attributable to the total dollar amount of the payments for contraceptive services submitted by the third party administrator, as described in paragraph (d)(2)(iii)(D). HHS expects that the participating issuer will also agree to pay each third party administrator a portion of such allowance (and that the apportionment will be negotiated between the entities); HHS does not specify such payment in this final regulation, as HHS expects the entities to work out an arrangement that best fits their situation. Finally, HHS notes that this provision does not apply if the participating issuer made the payments for contraceptive services on behalf of the third party administrator, as described in paragraph (d)(1)(i), or is in the same issuer group (as defined in 45 CFR 156.20) as the third party administrator.

In § 156.50(d)(6) and (7), HHS establishes standards relating to documentation and program integrity,

similar to those proposed in § 156.50(d)(5), but modified slightly to align with the other changes in this final regulation. In paragraph (d)(6), HHS specifies that a participating issuer receiving an adjustment in the FFE user fee under this section for a particular calendar year must maintain for 10 years following that year, and make available upon request to HHS, the HHS Office of the Inspector General, the Comptroller General, and their designees, documentation demonstrating that it timely paid each third party administrator, with respect to which it received such adjustment, any amount required under paragraph (d)(5). In paragraph (d)(7), HHS specifies documentation standards for third party administrators with respect to which an FFE user fee adjustment is received under this section for a particular calendar year. Third party administrators must maintain for 10 years following the applicable calendar year, and make available upon request to HHS, the HHS Office of the Inspector General, the Comptroller General, and their designees, all of the following: (i) A copy of the self-certification provided by the eligible organization for each self-insured plan with respect to which an adjustment is received; (ii) documentation demonstrating that the payments for contraceptive services were made in compliance with 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2); and (iii) documentation supporting the total dollar amount of the payments for contraceptive services submitted by the third party administrator, as described in paragraph (d)(2)(iii)(D). Although a commenter argued that the documentation retention standards should be shortened from 10 years to 6 years, to align with ERISA standards, we believe that the finalized standard is appropriate as it aligns with timeframes under the False Claims Act, 31 U.S.C. 3729–3733, and standards used for other Exchange programs. HHS notes that a participating issuer or a third party administrator may satisfy these standards by archiving these records and ensuring that they are accessible if needed in the event of an investigation, audit, or other review.

To summarize, costs of payments made for contraceptive services for participants and beneficiaries in self-insured group health plans of eligible organizations under the accommodation described previously will be reimbursed through an adjustment in FFE user fees as follows:

• The adjustment will be made to the FFE user fees of a participating issuer, if that participating issuer made the

payments for the contraceptive services under the accommodation on behalf of the third party administrator, or if it seeks the adjustment with respect to such payments made or arranged for by the third party administrator.

• A third party administrator must notify HHS that it intends for a participating issuer to seek the adjustment by the later of January 1, 2014, or the 60th calendar day following the date on which it received the copy of the applicable self-certification.

• For the participating issuer to receive the adjustment, the third party administrator and the participating issuer must notify HHS of the total amount of the payments made for the contraceptive services under the accommodation, and provide certain other information and documentation, including an attestation by the third party administrator that the payments for the contraceptive services were provided in compliance with 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2), by July 15 of the year following the calendar year in which the contraceptive services were provided.

• If the necessary conditions are met, and if an exception under OMB Circular No. A–25R is in effect, the participating issuer will receive an adjustment to its FFE user fee obligation equal to the total amount of the payments for the contraceptive services provided under the accommodation, plus an allowance for administrative costs and margin. If the adjustment exceeds the FFE user fees owed in the month of the initial adjustment, any excess adjustment will be carried over to later months, for so long as the exception under OMB Circular No. A–25R is in effect.

• The allowance, which will be at least ten percent of the costs of the payments for the contraceptive services under the accommodation, will be specified by HHS in the annual HHS notice of benefit and payment parameters.

• Within 60 days of receipt of any adjustment, the participating issuer must pay the third party administrator the portion of the adjustment attributable to payments for contraceptive services made by the third party administrator. No payment is required with respect to the allowance for administrative costs and margin, although it is expected that the participating issuer will agree to pay each third party administrator a portion of such allowance. In addition, no payment is required if the participating issuer made the payments for the contraceptive services under the accommodation on behalf of the third

Exhibit 13    JA-0000254

**39886**    **Federal Register** / Vol. 78, No. 127 / Tuesday, July 2, 2013 / Rules and Regulations

party administrator, or if the participating issuer and third party administrator are in the same issuer group.

Lastly, in response to comments received, HHS is finalizing a provision clarifying that participating issuers may add any amounts paid out to a third party administrator or incurred by or for the participating issuer in contraceptive claims costs under the accommodation for self-insured group health plans of eligible organizations provided in these final regulations, plus the allowance for administrative costs and margin provided under 45 CFR 156.50(d)(3)(ii), to their net FFE user fee paid to HHS, in calculations relating to the index rate for the single risk pool under 45 CFR 156.80(d), the medical loss ratio under 45 CFR part 158, and the risk corridors program under 45 CFR 153 subpart F. Several commenters noted that improperly incorporating the FFE user fee adjustment provided for under the final regulation into these calculations could lead to unintended consequences. For example, if a participating issuer were required to incorporate the FFE user fee adjustment into the calculation of the medical loss ratio, but not allowed to incorporate the cost of the accommodation for self-insured group health plans of eligible organizations, the adjustment would reduce the amount reported as licensing and regulatory fees (as described in 45 CFR 158.161(a)). This would result in a lower medical loss ratio. HHS agrees that such a result would not accurately reflect the ratio of claims to premiums, as estimated by the medical loss ratio, for the participating issuer's insurance business, because the FFE user fee adjustment occurs due to activity not directly related to the participating issuer's insurance business. Indeed, under § 156.50(d)(5), the participating issuer is required in many circumstances to pay out the greater share of the FFE user fee adjustments to third party administrators responsible for making (or arranging for another entity to make) the payments for contraceptive services. Therefore, HHS clarifies that, for purposes of the medical loss ratio and the risk corridors program, participating issuers should report the sum of: (1) The net FFE user fee paid to HHS; (2) any amounts paid out to a third party administrator or incurred by or for the participating issuer in contraceptive claims costs under the accommodation for self-insured group health plans of eligible organizations provided in these final regulations; and (3) the allowance for administrative costs and margin

provided under 45 CFR 156.50(d)(3)(ii), as licensing and regulatory fees referenced in 45 CFR 158.161(a), or taxes and regulatory fees in the case of the risk corridors program. For similar reasons, HHS is modifying the provision at 45 CFR 156.80(d) to clarify that, for the purpose of establishing a single risk pool index rate for a state market, any market-wide adjustments to the index rate for expected Exchange user fees should include: (1) The expected net FFE user fee to be paid to HHS; (2) any amounts paid out to a third party administrator or incurred by or for the participating issuer in contraceptive claims costs under the accommodation for self-insured group health plans of eligible organizations expected to be credited against user fees payable for that state market; and (3) the allowance for administrative costs and margin provided under 45 CFR 156.50(d)(3)(ii) expected to be credited against user fees payable for that state market.

HHS clarifies that, if an issuer provides payments for contraceptive services on behalf of a third party administrator, such payments are not directly linked to any of the health insurance coverage provided by the issuer, and the issuer should not incorporate the cost of such payments into their calculations for the numerator with respect to the medical loss ratio or the risk corridors program.

### D. Treatment of Multiple Employer Group Health Plans

In the case of several employers offering coverage through a single group health plan, the Departments proposed that each employer be required to independently meet the definition of religious employer or eligible organization in order to avail itself of the exemption or an accommodation with respect to its employees and their covered dependents. Several commenters supported the proposed approach of applying the exemption and the accommodation on an employer-by-employer basis. Other commenters favored a plan-based approach, allowing any employer offering coverage through the same group health plan as a religious employer or eligible organization to qualify for the exemption or the accommodation, citing administrative challenges to an employer-by-employer approach. A few commenters recommended criteria for determining whether an employer is affiliated with a religious employer or eligible organization with which it offers coverage through a single group health plan, such as the control standards in Code section 52(a) and (b),

and therefore qualified for the exemption or an accommodation.[47]

The final regulations continue to provide that the availability of the exemption or an accommodation be determined on an employer-by-employer basis, which the Departments continue to believe best balances the interests of religious employers and eligible organizations and those of employees and their dependents. The Departments are clarifying that, for purposes of these final regulations, any nonprofit organization with religious objections to contraceptive coverage that is part of the same controlled group of corporations or part of the same group of trades or businesses under common control (each within the meaning of section 52(a) or (b) of the Code) with a religious employer and/or an eligible organization, and that offers coverage through the same group health plan as such religious employer and/or eligible organization, is considered to hold itself out as a religious organization and therefore qualifies for an accommodation under these final regulations. Each such organization must independently satisfy the self-certification standard.

### E. Religious Freedom Restoration Act and Other Federal Law

Some commenters expressed concerns about the proposed accommodations for eligible organizations under the Religious Freedom Restoration Act (RFRA) (Pub. L. 103–141) 107 Stat. 1488 (1993) (codified at 42 U.S.C. 2000bb-1).[48] All such concerns were considered. But the accommodations for group health plans established or maintained by eligible organizations (and group health insurance coverage provided in connection with such plans), or student health insurance coverage arranged by eligible organizations that are institutions of higher education, are not required under RFRA. In addition, the accommodations for eligible organizations under these final regulations do not violate RFRA because

---

[47] Code section 52(a) generally provides that all employees of all corporations that are members of the same controlled group of corporations, including corporations that are at least 50 percent controlled by a common parent corporation, are treated as employed by a single employer. Code section 52(b) generally provides that all employees of trades or businesses (whether or not incorporated) that are under common control are treated as employed by a single employer.

[48] RFRA provides that the federal government generally may not "substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability," unless the burden: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest," 42 U.S.C. 2000bb–1.

Exhibit 13                                                                                    JA-0000255

they do not substantially burden religious exercise, and they serve compelling government interests and moreover are the least restrictive means to achieve those interests.

First, some commenters asserted that the proposed accommodations would substantially burden their exercise of religion by requiring their involvement in providing coverage of medical services to which they object on religious grounds. These final regulations do not require eligible organizations that provide self-certifications to their issuers or third party administrators to provide health coverage that includes benefits for contraceptive services, or to contract, arrange, pay, or refer for such coverage or services. Issuers and third party administrators cannot pass along the costs because these final regulations specifically prohibit an issuer or third party administrator from charging any premium or otherwise passing on any cost relating to payments for contraceptive services to an eligible organization. Thus, there is no burden on any religious exercise of the eligible organization. And even if the accommodations were found to impose some minimal burden on eligible organizations, any such burden would not be substantial for the purposes of RFRA because a third party pays for the contraceptive services and there are multiple degrees of separation between the eligible organization and any individual's choice to use contraceptive services.

One commenter contended that the mere act of self-certification would facilitate access to contraception, resulting in violation of its religious beliefs. But the self-certification under these final regulations simply confirms that an eligible organization is a nonprofit religious organization with religious objections to contraceptive coverage and so informs the issuer or third party administrator. Even prior to the proposed regulations, because contraceptive benefits are typically in standard product designs, many eligible organizations directed their issuers and third party administrators not to make payments for claims for medical services to which they object on religious grounds. In any event, in order for a burden on religious exercise to be "substantial" under RFRA, its effects on the objecting person cannot be as indirect and attenuated as they are here. Under these final regulations, third parties, not eligible organizations, provide the payments for contraceptive services, at no cost to eligible organizations. And whether such services will be utilized is the result of

independent choices by employees or students and their dependents, who have distinct interests and may have their own religious views that differ from those of the eligible organization.

Second, some commenters claimed that the proposed accommodations would force them to fund or subsidize contraceptive coverage because issuers or third party administrators would pass on the costs of such coverage to eligible organizations. Again, however, these final regulations specifically prohibit an issuer or third party administrator from charging any premium, or otherwise passing on any cost, to an eligible organization with respect to the payments for contraceptive services.

Third, some commenters asserted that the contraceptive coverage requirement fails to serve any compelling government interest. As noted previously, however, the contraceptive coverage requirement serves two compelling governmental interests. The contraceptive coverage requirement furthers the government's compelling interest in safeguarding public health by expanding access to and utilization of recommended preventive services for women. HHS tasked IOM with conducting an independent, science-based review of the available literature to determine what preventive services are necessary for women's health and well-being. IOM included in its recommendations for comprehensive guidelines for women's preventive services all FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity. IOM determined that lack of access to contraceptive services has proven in many cases to have serious negative health consequences for women and newborn children.

The government also has a compelling interest in assuring that women have equal access to health care services. Women would be denied the full benefits of preventive care if their unique health care needs were not considered and addressed. For example, prior to the implementation of the preventive services coverage provision, women of childbearing age spent 68 percent more on out-of-pocket health care costs than men, and these costs resulted in women often forgoing preventive care. The IOM found that this disproportionate burden on women imposed financial barriers that prevented women from achieving health outcomes on an equal basis with men. The contraceptive coverage requirement helps remedy this problem by helping to equalize the provision of preventive health care services to women and, as a

result, helping women contribute to society to the same degree as men.

Fourth, some commenters suggested that certain provisions of the Affordable Care Act that, in their view, leave some women without contraceptive coverage with no cost sharing demonstrate that the government interests in providing such coverage cannot be truly compelling. But these commenters misunderstand the effect of these provisions.[49]

Nor do the exemption for religious employers and the accommodations for eligible organizations undermine the government's compelling interests. With respect to the religious employer exemption, houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people who are of the same faith and/or adhere to the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan. Under the eligible organization accommodations, individuals in plans of eligible organizations, who are less likely than individuals in plans of religious employers (or institution of higher education's) faith and objection to contraceptive coverage on religious grounds, will still benefit from payments for contraceptive services, even though such payments will not be provided, funded, or subsidized by their employer (or institution of higher education).

[49] For example, the Affordable Care Act's grandfathering provision is only transitional in effect, and it is expected that a majority of plans will lose their grandfathered status by the end of 2013. (75 FR 34552; June 17, 2010); *see also* Kaiser Family Found. & Health Res. & Ed. Trust, Employer Health Benefits 2012 Annual Survey at 7–8, 190, available at *http://ehbs.kff.org/pdf/2012/8345.pdf*. Moreover, small employers that elect to offer non-grandfathered health coverage to their employees are not exempt from the requirement under the preventive health services coverage regulations to provide coverage for recommended preventive health services, including contraceptive services, without cost sharing (subject to the religious employer exemption and eligible organization accommodations in these final regulations). While the Affordable Care Act excludes small employers from the possibility of tax liability under the employer shared responsibility provision at Code section 4980H, it encourages such employers to offer health coverage to their employees by establishing new group health insurance options through the SHOPs, as well as new tax incentives to exercise such options. With respect to employees of small employers that do not offer health coverage to their employees, the Affordable Care Act establishes new individual health insurance options through the Exchanges, as well as new tax credits to assist the purchase of such insurance; such insurance will cover recommended preventive services, including contraceptive services, without cost sharing.

Exhibit 13                                                                 JA-0000256

Fifth, some commenters asserted that the contraceptive coverage requirement is not the least restrictive means of advancing these compelling interests, and proposed various alternatives to these regulations. All of these proposals were considered, and it was determined that they were not feasible and/or would not advance the government's compelling interests as effectively as the mechanisms established in these final regulations and the preventive services coverage regulations more generally. For example, some commenters suggested that the government could provide contraceptive services to all women free of charge (through Medicaid or another program), establish a government-funded health benefits program for contraceptive services, or force drug and device manufacturers to provide contraceptive drugs and devices to women for free. The Departments lack the statutory authority and funding to implement these proposals. Moreover, the Affordable Care Act contemplates providing coverage of recommended preventive services through the existing employer-based system of health coverage so that women face minimal logistical and administrative obstacles. Imposing additional barriers to women receiving the intended coverage (and its attendant benefits), by requiring them to take steps to learn about, and to sign up for, a new health benefit, would make that coverage accessible to fewer women. The same concern undermines the effectiveness of other commenters' suggestion that the government require the multi-state plans on the Exchanges to offer a stand-alone, contraceptive-only benefit to all women without charge.

For another example, some commenters suggested that the government should establish tax incentives for women to use contraceptive services. Again, the Departments lack the statutory authority to implement such proposal. Reliance only on tax incentives would also depart from the existing employer-based system of health coverage, would require women to pay out of pocket for their care in the first instance, and would not benefit women who do not have sufficient income to be required to file a tax return. Such barriers would make a tax incentive structure less effective than the employer-based system of health coverage in advancing the government's compelling interests.

Finally, some commenters expressed concern that the final regulations violate the Religion Clauses of the First Amendment or certain federal restrictions relating to abortion. The regulations do not violate the Free Exercise Clause because they are neutral and generally applicable. The regulations do not target religiously motivated conduct, but rather, are intended to improve women's access to preventive health care and lessen the disparity between men's and women's health care costs. And the regulations are generally applicable because they do not pursue their purpose only against conduct motivated by religious belief. The exemption and accommodations set forth in the regulations serve to accommodate religion, not to disfavor it.

The final regulations also do not violate the Establishment Clause. The exemption and accommodations set forth in the regulations are not restricted to organizations of a particular denomination or denominations. Instead, they are available on an equal basis to religious organizations affiliated with any and all religions.

Finally, the regulations do not violate federal restrictions relating to abortion because FDA-approved contraceptive methods, including Plan B, Ella, and IUDs, are not abortifacients within the meaning of federal law. (62 FR 8611; February 25, 1997) ("Emergency contraceptive pills are not effective if the woman is pregnant[.]"); 45 CFR 46.202(f) ("Pregnancy encompasses the period of time from implantation until delivery."). Further, these regulations do not require nonprofit religious organizations that object to such contraceptive methods to contract, arrange, pay, or refer for such services.

## F. No Effect on Other Law

The religious employer exemption and eligible organization accommodations under these final regulations are intended to have meaning solely with respect to the contraceptive coverage requirement under section 2713 of the PHS Act and the companion provisions of ERISA and the Code. Whether an employer or organization (including an institution of higher education) is designated as religious for this purpose is not intended as a judgment about the mission, sincerity, or commitment of the employer or organization (including an institution of higher education), or intended to differentiate among the religious merits, mission, sincerity, commitment, or public or private standing of religious entities. The use of such designation is limited solely to defining the class of employers or organizations (including institutions of higher education) that qualify for the religious employer exemption and eligible organization accommodations under these final regulations. The definition of religious employer or eligible organization in these final regulations should not be construed to apply with respect to, or relied upon for the interpretation of, any other provision of the PHS Act, ERISA, the Code, or any other provision of federal law, nor is it intended to set a precedent for any other purpose. For example, nothing in these final regulations should be construed as affecting the interpretation of federal or state civil rights statutes, such as Title VII of the Civil Rights Act of 1964 or Title IX of the Education Amendments of 1972.

Furthermore, nothing in these final regulations precludes employers or others from expressing any opposition to the use of contraceptives; requires anyone to use contraceptives; or requires health care providers to prescribe or provide contraceptives if doing so is against their religious beliefs.

The Departments received several comments requesting clarification about whether the religious employer exemption and eligible organization accommodations in these final regulations supersede state laws that require health insurance issuers to provide contraceptive coverage. The preemption provisions of section 731 of ERISA and section 2724 of the PHS Act (implemented at 29 CFR 2590.731(a) and 45 CFR 146.143(a)) apply such that the requirements of part 7 of ERISA and title XXVII of the PHS Act are not to be "construed to supersede any provision of state law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with group or individual health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement" of federal law. With respect to issuers subject to state law, insurance laws that provide greater access to contraceptive coverage than federal standards are unlikely to "prevent the application of" the preventive services coverage provision, and therefore are unlikely to be preempted by these final regulations. On the other hand, in states with broader religious exemptions and accommodations with respect to health insurance issuers than those in the final regulations, the exemptions and accommodations will be narrowed to align with those in the final regulations. This is consistent with the application of other federal health insurance standards.

Exhibit 13    JA-0000257

*G. Applicability Dates and Transitional Enforcement Safe Harbor*

These final regulations generally apply to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014, except the amendments to the religious employer exemption apply to group health plans and health insurance issuers for plan years beginning on or after August 1, 2013.

The Departments are extending the current safe harbor from enforcement of the contraceptive coverage requirement by the Departments to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014. This transitional enforcement safe harbor is intended to maintain the status quo with respect to organizations that qualify for the current safe harbor during the period that exists between the expiration of the current safe harbor[50] and the applicability date of the accommodations under these final regulations. This period is designed to provide issuers and third party administrators with sufficient time to prepare to implement the accommodations under these final regulations. Organizations that qualify under the current safe harbor are not required to execute another self-certification if one has already been executed, but are required to provide another notice to plan participants and beneficiaries in connection with plan years beginning on or after August 1, 2013, and before January 1, 2014. The guidance extending the current safe harbor can be found at: *www.cms.gov/cciio* and *www.dol.gov/healthreform*.

**IV. Economic Impact and Paperwork Burden**

*A. Executive Orders 12866 and 13563—Department of Health and Human Services and Department of Labor*

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, and public health and safety effects; distributive impacts; and equity). Executive Order 13563 emphasizes the importance of

quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a regulation: (1) Having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). The Departments have concluded that these final regulations are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866.

1. Need for Regulatory Action

As stated earlier in this preamble, the Departments previously issued amended interim final regulations authorizing an exemption for group health plans established or maintained by religious employers (and group health insurance coverage provided in connection with such plans) from certain coverage requirements under section 2713 of the PHS Act (76 FR 46621, August 3, 2011). The amended interim final regulations were finalized on February 15, 2012 (77 FR 8725). In these final regulations, the Departments are amending the definition of religious employer in the HHS regulation at 45 CFR 147.131(a) (incorporated by reference in the regulations of the Departments of Labor and the Treasury) by eliminating the first three prongs of the definition of religious employer that was established in the 2012 final regulations and clarifying the fourth prong. Accordingly, an employer that is organized and operates as a nonprofit entity and is referred to in section

6033(a)(3)(A)(i) or (iii) of the Code is a religious employer, and its group health plan qualifies for the exemption from the requirement to cover contraceptive services. In addition, the final regulations establish accommodations that provide women with access to such services, without cost sharing, while simultaneously protecting certain nonprofit religious organizations with religious objections to contraceptive coverage from having to contract, arrange, pay, or refer for such coverage (as detailed herein).

2. Anticipated Effects

The Departments expect that these final regulations will not result in any additional significant burden on or costs to the affected entities.

*B. Special Analyses—Department of the Treasury*

For purposes of the Department of the Treasury, it has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866, as amended by Executive Order 13563. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to this final regulation. It is hereby certified that the collections of information contained in this final regulation do not have a significant impact on a substantial number of small entities. Accordingly, a regulatory flexibility analysis under the Regulatory Flexibility Act (5 U.S.C. chapter 6) is not required.

These final regulations require each organization seeking to be treated as an eligible organization under the final regulations to self-certify that it meets the definition of eligible organization in the final regulations. The self-certification must be executed by an authorized representative of the organization. The organization must maintain the self-certification in its records in a manner consistent with ERISA section 107 and make it available for examination upon request. The final regulations also direct each eligible organization to provide a copy of its self-certification to the group health insurance issuer or third party administrator (as applicable) to avail itself of an accommodation. The Departments are unable to estimate the number of organizations that will seek to be treated as eligible organizations. Of the eligible organizations, some will likely be small entities. It is estimated that each eligible organization will need only approximately 50 minutes of labor to prepare and provide the information

---

[50] *See* Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code, issued on February 10, 2012, and reissued on August 15, 2012.

Exhibit 13                                                                                           JA-0000258

**39890**    **Federal Register** / Vol. 78, No. 127 / Tuesday, July 2, 2013 / Rules and Regulations

in the self-certification. This will not be a significant economic impact. For these reasons, this information collection requirement will not have a significant impact on a substantial number of small entities.

These final regulations also require health insurance issuers providing payments for contraceptive services, or third party administrators arranging or providing such payments (or their agents), to provide written notice to plan participants and beneficiaries regarding the availability of such payments. The notice will be provided contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment (or re-enrollment) in health coverage established, maintained, or arranged by the eligible organization in any plan year to which the accommodation is to apply. The final regulations contain model language for issuers and third party administrators to use to satisfy the notice requirement. It is unknown how many issuers provide health insurance coverage in connection with insured plans of eligible organizations or how many third party administrators provide plan services to self-insured plans of eligible organizations. However, the cost of preparation and distribution of the notices will not be significant. It is estimated that each issuer or third party administrator will need approximately 1 hour of clerical labor (at $31.64 per hour) and 15 minutes of management review (at $55.22 per hour) to prepare the notices for a total cost of approximately $44. It is estimated that each notice will require $0.46 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail will be $0.51. For these reasons, these information collection requirements will not have a significant impact on a substantial number of small entities.

Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding this final regulation was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small businesses.

*C. Paperwork Reduction Act—Department of Health and Human Services*

These final regulations contain information collection requirements (ICRs) that are subject to review by the Office of Management and Budget (OMB). A description of these provisions is given in the following paragraphs with an estimate of the annual burden. Average labor costs

(including fringe benefits) used to estimate the costs are calculated using data available from the Bureau of Labor Statistics.

HHS sought comments in the proposed regulations, but did not receive any information that would allow for an estimate of the number of organizations that would seek to be treated as eligible organizations, or an estimate of the number of health insurance issuers that would provide separate payments for contraceptive services. HHS is, nevertheless, seeking OMB approval for the following ICRs consistent with the Paperwork Reduction Act of 1995. The burden estimates will be updated in the future when more information is available.

1. Self-Certification (§§ 147.131(b)(4) and 147.131(c)(1))

Each organization seeking to be treated as an eligible organization under the final regulations must self-certify that it meets the definition of an eligible organization. The self-certification must be executed by an authorized representative of the organization. The self-certification will not be submitted to any of the Departments. The form that will be used by organizations for their self-certification was made available during the comment period for the proposed regulations at *http:// www.cms.gov/Regulations-and-Guidance/Legislation/ PaperworkReductionActof1995/PRA-Listing.html*. HHS is finalizing this form with updated instructions and notes, and eliminating the proposed field for listing the contraceptive services for which the organization will not establish, maintain, administer, or fund coverage. The organization must maintain the self-certification in its records in a manner consistent with ERISA section 107 and make it available for examination upon request. The eligible organization must provide a copy of its self-certification to a health insurance issuer for insured group health plans or student health insurance coverage.

HHS is unable to estimate the number of organizations that will seek to be treated as eligible organizations under the final regulations. Therefore, the burden for only one eligible organization, as opposed to all eligible organizations in total, is estimated. It is assumed that, for each eligible organization, clerical staff will gather and enter the necessary information, send the self-certification electronically to the issuer, and retain a copy for record-keeping; a manager and legal counsel will review it; and a senior executive will execute it. HHS estimates

that an organization will need approximately 50 minutes (30 minutes of clerical labor at a cost of $30.64 per hour, 10 minutes for a manager at a cost of $55.22 per hour, 5 minutes for legal counsel at a cost of $83.10 per hour, and 5 minutes for a senior executive at a cost of $112.43 per hour) to execute the self-certification. The certification may be electronically transmitted to the issuer at minimal cost. Therefore, the total annual burden for preparing and providing the information in the self-certification is estimated to be approximately $41 for each eligible organization.

2. Notice of Availability of Separate Payments for Contraceptive Services (§ 147.131(d))

The proposed regulations sought comment on a notice of availability of contraceptive coverage. The final regulations instead direct a health insurance issuer providing payments for contraceptive services for participants and beneficiaries in insured plans (or student enrollees and covered dependents in student health insurance coverage) of eligible organizations to provide a written notice to such plan participants and beneficiaries (or such student enrollees and covered dependents) informing them of the availability of such payments. The notice must be provided contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective on the first day of each applicable plan year, and must specify that contraceptive coverage will not be funded or administered by the eligible organization but that the issuer provides separate payments for contraceptive services. The notice must also provide contact information for the issuer for questions and complaints. To satisfy the notice requirement, issuers may use the model language set forth in the final regulations or substantially similar language.

It is unknown how many issuers provide health insurance coverage in connection with insured plans of eligible organizations. In the proposed regulations, HHS estimated that each issuer would need approximately 1 hour of clerical labor (at $31.64 per hour) and 15 minutes of management review (at $55.22 per hour) to prepare the notices for a total cost of approximately $44. It was estimated that each notice would require $0.46 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail would be $0.51.

Exhibit 13

One commenter stated that the cost of preparing and sending these notices may be greater than estimated, but did not provide an estimate. HHS believes that using the model language provided in the final regulations will help minimize costs and declines to revise the estimate.

### 3. Collections for FFE User Fee Adjustment (§ 156.50(d))

The final HHS regulation describes information collections with respect to the FFE user fee adjustment under § 156.50(d). The information collection instruments are under development, and HHS will seek public comments and OMB approval on the instruments at a later date, consistent with the Paperwork Reduction Act of 1995.

### 4. Collections for Self-Insured Group Health Plans Without Third Party Administrators

The final regulations provide that a self-insured group health plan established or maintained by an eligible organization that does not use the services of a third party administrator will be provided a safe harbor from enforcement of the contraceptive coverage requirement by the Departments contingent on, among other things: (1) the plan providing certain information to HHS; and (2) the plan providing participants and beneficiaries with notice that it does not provide benefits for contraceptive services. As noted earlier in these final regulations, the Departments believe that there are no self-insured group health plans in this circumstance. Therefore, because the number of respondents is likely to be fewer than 10, HHS is not seeking OMB approval for this collection.

*D. Paperwork Reduction Act—Department of Labor and Department of the Treasury*

As noted previously, as under the proposed regulations, each organization seeking to be treated as an eligible organization under the final regulations must self-certify that it meets the definition of an eligible organization. This requirement is set out at 26 CFR 54.9815–2713A(a)(4) and 29 CFR 2590.715–2713A(a)(4) of the final regulations of the Departments of Labor and the Treasury.

In addition, the final regulations include a notice of availability of separate payments for contraceptive services. This notice requirement is identical to that set forth in 45 CFR 147.131(d), but it applies to third party administrators in connection with disclosures to participants and

beneficiaries in self-insured group health plans of eligible organizations, instead of applying to health insurance issuers in connection with disclosures to participants and beneficiaries in insured group health plans of eligible organizations. Therefore, we are seeking OMB approval for this notice, relying on the same estimates noted previously.

### V. Unfunded Mandates Reform Act

For purposes of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4), as well as Executive Order 12875, these final regulations do not include any federal mandate that may result in expenditures by state, local, or tribal governments, nor do they include any federal mandates that may impose an annual burden of $100 million, adjusted for inflation, or more on the private sector.[51]

### VI. Federalism—Department of Health and Human Services and Department of Labor

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating regulations that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the regulation.

In the Departments' view, these final regulations have federalism implications, but the federal implications are substantially mitigated because, with respect to health insurance issuers, 15 states have enacted specific laws, regulations, or bulletins that meet or exceed the federal standards requiring coverage of specified preventive services without cost sharing. The remaining states, which provide oversight for these federal law requirements, do so using their general authority to enforce these federal standards. Therefore, the final regulations are not likely to require substantial additional oversight of states by HHS.

In general, section 514 of ERISA provides that state laws are superseded to the extent that they relate to any

covered employee benefit plan, and preserves state laws that regulate insurance, banking, or securities. ERISA also prohibits states from regulating a covered plan as an insurance or investment company or bank. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) added a new preemption provision to ERISA (as well as to the PHS Act) narrowly preempting state requirements on group health insurance coverage. States may continue to apply state law requirements but not to the extent that such requirements prevent the application of the federal requirement that group health insurance coverage provided in connection with group health plans provide coverage for specified preventive services without cost sharing. HIPAA's Conference Report states that the conferees intended the narrowest preemption of state laws with regard to health insurance issuers (H.R. Conf. Rep. No. 104–736, 104th Cong. 2d Session 205, 1996). State insurance laws that are more stringent than the federal requirement are unlikely to "prevent the application of" the preventive services coverage provision, and therefore are unlikely to be preempted. Accordingly, states have significant latitude to impose requirements on health insurance issuers that are more restrictive than those in federal law.

Guidance conveying this interpretation was published in the **Federal Register** on April 8, 1997 (62 FR 16904) and December 30, 2004 (69 FR 78720), and these final regulations implement the preventive services coverage provision's minimum standards and do not significantly reduce the discretion given to states under the statutory scheme.

The PHS Act provides that states may enforce the provisions of title XXVII of the PHS Act as they pertain to issuers, but that the Secretary of HHS will enforce any provisions that a state does not have authority to enforce or that a state has failed to substantially enforce. When exercising its responsibility to enforce provisions of the PHS Act, HHS works cooperatively with the state to address the state's concerns and avoid conflicts with the state's exercise of its authority.[52] HHS has developed procedures to implement its

---

[51] In 2013, that threshold level is approximately $141 million.

---

[52] This authority applies to insurance issued with respect to group health plans generally, including plans covering employees of church organizations. Thus, this discussion of federalism applies to all group health insurance coverage that is subject to the PHS Act, including those church plans that provide coverage through a health insurance issuer (but not to church plans that do not provide coverage through a health insurance issuer).

Exhibit 13                                                                JA-0000260

enforcement responsibilities, and to afford states the maximum opportunity to enforce the PHS Act's requirements in the first instance. In compliance with Executive Order 13132's requirement that agencies examine closely any policies that may have federalism implications or limit the policymaking discretion of states, the Departments have engaged in numerous efforts to consult and work cooperatively with affected state and local officials.

In conclusion, throughout the process of developing these final regulations, to the extent feasible within the specific preemption provisions of ERISA and the PHS Act, the Departments have attempted to balance states' interests in regulating health coverage and health insurance issuers, and the rights of those individuals whom Congress intended to protect in the PHS Act, ERISA, and the Code.

### VII. Statutory Authority

The Department of the Treasury regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

The Department of Health and Human Services regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

### List of Subjects

*26 CFR Part 54*

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

*29 CFR Part 2510*

Employee benefit plans, Pensions.

*29 CFR Part 2590*

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

*45 CFR Part 147*

Health care, Health insurance, Reporting and recordkeeping requirements, and State regulation of health insurance.

*45 CFR Part 156*

Administrative practice and procedure, Advertising, Advisory committees, Brokers, Conflict of interest, Consumer protection, Grant programs—health, Grants administration, Health care, Health insurance, Health maintenance organization (HMO), Health records, Hospitals, American Indian/Alaska Natives, Individuals with disabilities, Loan programs—health, Organization and functions (Government agencies), Medicaid, Public assistance programs, Reporting and recordkeeping requirements, State and local governments, Sunshine Act, Technical assistance, Women, and Youth.

### DEPARTMENT OF THE TREASURY

### Internal Revenue Service

Accordingly, 26 CFR part 54 is amended as follows:

### PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 continues to read, in part, as follows:

**Authority:** 26 U.S.C. 7805. * * *

■ **Par. 2.** Section 54.9815–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### §54.9815–2713   Coverage of preventive health services.

(a) * * *

(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 54.9815–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

*    *    *    *    *

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings

provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration, in accordance with 45 CFR 147.131(a).

*    *    *    *    *

■ **Par. 3.** Section 54.9815–2713A is added to read as follows:

### §54.9815–2713A   Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretaries of Health and Human Services and Labor, that it satisfies the criteria in paragraphs (a)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(b) *Contraceptive coverage—self-insured group health plans*—(1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) of this section are satisfied:

(i) The eligible organization or its plan contracts with one or more third party administrators.

(ii) The eligible organization provides each third party administrator that will process claims for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) with a copy of the self-certification described in paragraph (a)(4) of this section, which shall include notice that—

(A) The eligible organization will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to

Exhibit 13    JA-0000261

the funding of contraceptive services; and

(B) Obligations of the third party administrator are set forth in 29 CFR 2510.3–16 and 26 CFR 54.9815–2713A.

(iii) The eligible organization must not, directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements.

(2) If a third party administrator receives a copy of the self-certification described in paragraph (a)(4) of this section, and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i) Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such.

(c) *Contraceptive coverage—insured group health plans*—(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or

more group health insurance issuers complies for one or more plan years with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan furnishes a copy of the self-certification described in paragraph (a)(4) of this section to each issuer that would otherwise provide such coverage in connection with the group health plan. An issuer may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such.

(2) *Payments for contraceptive services*—(i) A group health insurance issuer that receives a copy of the self-certification described in paragraph (a)(4) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 54.9815–2713(a)(1)(iv) must—

(A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

(B) Provide separate payments for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 9815. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(d) *Notice of availability of separate payments for contraceptive services— self-insured and insured group health plans.* For each plan year to which the accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): ''Your employer has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of third party administrator/ health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer].''

(e) *Reliance—insured group health plans*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the issuer

Exhibit 13

complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

For the reasons stated in the preamble, the Department of Labor amends 29 CFR parts 2510 and 2590 as follows:

## PART 2510—DEFINITION OF TERMS USED IN SUBCHAPTERS C, D, E, F, G AND L OF THIS CHAPTER

■ 1. The authority citation for part 2510 is revised to read as follows:

**Authority:** 29 U.S.C. 1002(2), 1002(16), 1002(21),1002(37), 1002(38), 1002(40), 1031, and 1135; Secretary of Labor's Order 1–2003, 68 FR 5374; Sec. 2510.3–101 also issued under sec. 102 of Reorganization Plan No. 4 of 1978, 43 FR 47713, 3 CFR, 1978 Comp., p. 332 and E.O. 12108, 44 FR 1065, 3 CFR, 1978 Comp., p. 275, and 29 U.S.C. 1135 note. Sec. 2510.3–102 also issued under sec. 102 of Reorganization Plan No. 4 of 1978, 43 FR 47713, 3 CFR, 1978 Comp., p. 332 and E.O. 12108, 44 FR 1065, 3 CFR, 1978 Comp., p. 275. Sec. 2510.3–38 is also issued under sec. 1, Pub. L. 105–72, 111 Stat. 1457.

■ 2. Section 2510.3–16 is added to read as follows:

### § 2510.3–16   Definition of "plan administrator."

(a) *In general.* The term "plan administrator" or "administrator" means the person specifically so designated by the terms of the instrument under which the plan is operated. If an administrator is not so designated, the plan administrator is the plan sponsor, as defined in section 3(16)(B) of ERISA.

(b) In the case of a self-insured group health plan established or maintained by an eligible organization, as defined in § 2590.715–2713A(a) of this chapter, the copy of the self-certification provided by the eligible organization to a third party administrator (including notice of the eligible organization's refusal to administer or fund contraceptive benefits) in accordance with § 2590.715–2713A(b)(1)(ii) of this chapter shall be an instrument under which the plan is operated, shall be treated as a designation of the third party administrator as the plan administrator under section 3(16) of

ERISA for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) of this chapter to which the eligible organization objects on religious grounds, and shall supersede any earlier designation. A third party administrator that becomes a plan administrator pursuant to this section shall be responsible for—

(1) The plan's compliance with section 2713 of the Public Health Service Act (42 U.S.C. 300gg–13) (as incorporated into section 715 of ERISA) and § 2590.715–2713 of this chapter with respect to coverage of contraceptive services. To the extent that the plan contracts with different third party administrators for different classifications of benefits (such as prescription drug benefits versus inpatient and outpatient benefits), each third party administrator is responsible for providing contraceptive coverage that complies with section 2713 of the Public Health Service Act (as incorporated into section 715 of ERISA) and § 2590.715–2713 of this chapter with respect to the classification or classifications of benefits subject to its contract.

(2) Establishing and operating a procedure for determining such claims for contraceptive services in accordance with § 2560.503–1 of this chapter.

(3) Complying with disclosure and other requirements applicable to group health plans under Title I of ERISA with respect to such benefits.

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 3. The authority citation for part 2590 is revised to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 12(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119. as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 1–2011, 77 FR 1088 (January 9, 2012).

■ 4. Section 2590.715–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 2590.715–2713   Coverage of preventive health services.

(a) * * *

(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 2590.715–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide

coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

*        *        *        *        *

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration, in accordance with 45 CFR 147.131(a).

*        *        *        *        *

■ 5. Section 2590.715–2713A is added to read as follows:

### § 2590.715–2713A   Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (a)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (b) or (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

(b) *Contraceptive coverage—self-insured group health plans*—(1) A group health plan established or maintained by an eligible organization that provides benefits on a self-insured basis complies for one or more plan years with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if all of the requirements of this paragraph (b)(1) are satisfied:

(i) The eligible organization or its plan contracts with one or more third party administrators.

(ii) The eligible organization provides each third party administrator that will

Exhibit 13                                                                                         JA-0000263

Federal Register / Vol. 78, No. 127 / Tuesday, July 2, 2013 / Rules and Regulations

**39895**

process claims for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) with a copy of the self-certification described in paragraph (a)(4) of this section, which shall include notice that—

(A) The eligible organization will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services; and

(B) Obligations of the third party administrator are set forth in § 2510.3–16 of this chapter and § 2590.715–2713A.

(iii) The eligible organization must not, directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements.

(2) If a third party administrator receives a copy of the self-certification described in paragraph (a)(4) of this section, and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services using one of the following methods—

(i) Provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries; or

(ii) Arrange for an issuer or other entity to provide payments for contraceptive services for plan participants and beneficiaries without imposing any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or imposing a premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries.

(3) If a third party administrator provides or arranges payments for contraceptive services in accordance with either paragraph (b)(2)(i) or (ii) of this section, the costs of providing or arranging such payments may be reimbursed through an adjustment to the Federally-facilitated Exchange user

fee for a participating issuer pursuant to 45 CFR 156.50(d).

(4) A third party administrator may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such.

(c) *Contraceptive coverage—insured group health plans*—(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or group health plan furnishes a copy of the self-certification described in paragraph (a)(4) of this section to each issuer that would otherwise provide such coverage in connection with the group health plan. An issuer may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such.

(2) *Payments for contraceptive services*—(i) A group health insurance issuer that receives a copy of the self-certification described in paragraph (a)(4) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 2590.715–2713(a)(1)(iv) must—

(A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

(B) Provide separate payments for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act, as incorporated into section 715 of ERISA.

If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(d) *Notice of availability of separate payments for contraceptive services—self-insured and insured group health plans.* For each plan year to which the accommodation in paragraph (b) or (c) of this section is to apply, a third party administrator required to provide or arrange payments for contraceptive services pursuant to paragraph (b) of this section, and an issuer required to provide payments for contraceptive services pursuant to paragraph (c) of this section, must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the third party administrator or issuer, as applicable, provides separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your employer has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of third party administrator/health insurance issuer] will provide or arrange separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your group health plan. Your employer will not administer or fund these payments. If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer]."

Exhibit 13                                                                                                  JA-0000264

**39896**    **Federal Register** / Vol. 78, No. 127 / Tuesday, July 2, 2013 / Rules and Regulations

(e) *Reliance—insured group health plans*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies with the obligations under this section applicable to such issuer.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

For the reasons stated in the preamble, the Department of Health and Human Services amends 45 CFR Subtitle A parts 147 and 156 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** Secs. 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Section 147.130 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 147.130  Coverage of preventive health services.

(a) * * *

(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 147.131, a group health plan, or a health insurance issuer offering group or individual health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

*      *      *      *      *

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines

supported by the Health Resources and Services Administration.

*      *      *      *      *

■ 3. Section 147.131 is added to read as follows:

### § 147.131  Exemption and accommodations in connection with coverage of preventive health services.

(a) *Religious employers.* In issuing guidelines under § 147.130(a)(1)(iv), the Health Resources and Services Administration may establish an exemption from such guidelines with respect to a group health plan established or maintained by a religious employer (and health insurance coverage provided in connection with a group health plan established or maintained by a religious employer) with respect to any requirement to cover contraceptive services under such guidelines. For purposes of this paragraph (a), a "religious employer" is an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

(b) *Eligible organizations.* An eligible organization is an organization that satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

(c) *Contraceptive coverage—insured group health plans*—(1) *General rule.* A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the eligible

organization or group health plan furnishes a copy of the self-certification described in paragraph (b)(4) of this section to each issuer that would otherwise provide such coverage in connection with the group health plan. An issuer may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such.

(2) *Payments for contraceptive services*—(i) A group health insurance issuer that receives a copy of the self-certification described in paragraph (b)(4) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 147.130(a)(1)(iv) must—

(A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

(B) Provide separate payments for any contraceptive services required to be covered under § 147.130(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

(ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under § 147.130(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.

(d) *Notice of availability of separate payments for contraceptive services— insured group health plans and student health insurance coverage.* For each plan year to which the accommodation in paragraph (c) of this section is to apply, an issuer required to provide

Exhibit 13

payments for contraceptive services pursuant to paragraph (c) of this section must provide to plan participants and beneficiaries written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage that is effective beginning on the first day of each applicable plan year. The notice must specify that the eligible organization does not administer or fund contraceptive benefits, but that the issuer provides separate payments for contraceptive services, and must provide contact information for questions and complaints. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph (d): "Your [employer/institution of higher education] has certified that your [group health plan/student health insurance coverage] qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your [employer/institution of higher education] will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of health insurance issuer] will provide separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your [group health plan/student health insurance coverage]. Your [employer/institution of higher education] will not administer or fund these payments. If you have any questions about this notice, contact [contact information for health insurance issuer]."

(e) *Reliance*—(1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

(2) A group health plan is considered to comply with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the plan complies with its obligations under paragraph (c) of this section, without regard to whether the issuer complies

with the obligations under this section applicable to such issuer.

(f) *Application to student health insurance coverage.* The provisions of this section apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education in a manner comparable to that in which they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer. In applying this section in the case of student health insurance coverage, a reference to "plan participants and beneficiaries" is a reference to student enrollees and their covered dependents.

**PART 156—HEALTH INSURANCE ISSUER STANDARDS UNDER THE AFFORDABLE CARE ACT, INCLUDING STANDARDS RELATED TO EXCHANGES**

■ 4. The authority citation for part 156 continues to read as follows:

**Authority:** Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

■ 5. Section 156.50 is amended by adding paragraph (d) to read as follows:

**§ 156.50   Financial support.**

\*      \*      \*      \*      \*

(d) *Adjustment of Federally-facilitated Exchange user fee*—(1) A participating issuer offering a plan through a Federally-facilitated Exchange may qualify for an adjustment in the Federally-facilitated Exchange user fee specified in paragraph (c) of this section to the extent that the participating issuer—

(i) Made payments for contraceptive services on behalf of a third party administrator pursuant to 26 CFR 54.9815–2713A(b)(2)(ii) or 29 CFR 2590.715–2713A(b)(2)(ii); or

(ii) Seeks an adjustment in the Federally-facilitated Exchange user fee with respect to a third party administrator that, following receipt of a copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4), made or arranged for payments for contraceptive services pursuant to 26 CFR 54.9815–2713A(b)(2)(i) or (ii) or 29 CFR 2590.715–2713A(b)(2)(i) or (ii).

(2) For a participating issuer described in paragraph (d)(1) of this section to receive the Federally-

facilitated Exchange user fee adjustment—

(i) The participating issuer must submit to HHS, in the manner and timeframe specified by HHS, in the year following the calendar year in which the contraceptive services for which payments were made pursuant to 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2) were provided —

(A) Identifying information for the participating issuer and each third party administrator that received a copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4) with respect to which the participating issuer seeks an adjustment in the Federally-facilitated Exchange user fee, whether or not the participating issuer was the entity that made the payments for contraceptive services;

(B) Identifying information for each self-insured group health plan with respect to which a copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4) was received by a third party administrator and with respect to which the participating issuer seeks an adjustment in the Federally-facilitated Exchange user fee; and

(C) For each such self-insured group health plan, the total dollar amount of the payments that were made pursuant to 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2) for contraceptive services that were provided during the applicable calendar year. If such payments were made by the participating issuer directly as described in paragraph (d)(1)(i) of this section, the total dollar amount should reflect the amount of the payments made by the participating issuer; if the third party administrator made or arranged for such payments, as described in paragraph (d)(1)(ii) of this section, the total dollar amount should reflect the amount reported to the participating issuer by the third party administrator.

(ii) Each third party administrator that intends for a participating issuer to seek an adjustment in the Federally-facilitated Exchange user fee with respect to the third party administrator for payments for contraceptive services must submit to HHS a notification of such intent, in a manner specified by HHS, by the later of January 1, 2014, or the 60th calendar day following the date on which the third party administrator receives the applicable copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4).

(iii) Each third party administrator identified in paragraph (d)(2)(i)(A) of

Exhibit 13                                                                                                    JA-0000266

this section must submit to HHS, in the manner and timeframe specified by HHS, in the year following the calendar year in which the contraceptive services for which payments were made pursuant to 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2) were provided—

(A) Identifying information for the third party administrator and the participating issuer;

(B) Identifying information for each self-insured group health plan with respect to which a copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4) was received by the third party administrator and with respect to which the participating issuer seeks an adjustment in the Federally-facilitated Exchange user fee;

(C) The total number of participants and beneficiaries in each such self-insured group health plan during the applicable calendar year;

(D) For each such self-insured group health plan with respect to which the third party administrator made payments pursuant to 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2) for contraceptive services, the total dollar amount of such payments that were provided during the applicable calendar year. If such payments were made by the participating issuer directly as described in paragraph (d)(1)(i) of this section, the total dollar amount should reflect the amount reported to the third party administrator by the participating issuer; if the third party administrator made or arranged for such payments, as described in paragraph (d)(1)(ii) of this section, the total dollar amount should reflect the amount of the payments made by or on behalf of the third party administrator; and

(E) An attestation that the payments for contraceptive services were made in compliance with 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2).

(3) If the requirements set forth in paragraph (d)(2) of this section are met, and as long as an authorizing exception under OMB Circular No. A–25R is in effect, the participating issuer will be provided a reduction in its obligation to pay the Federally-facilitated Exchange user fee specified in paragraph (c) of this section equal in value to the sum of the following:

(i) The total dollar amount of the payments for contraceptive services submitted by the applicable third party administrators, as described in paragraph (d)(2)(iii)(D) of this section.

(ii) An allowance for administrative costs and margin. The allowance will be

no less than 10 percent of the total dollar amount of the payments for contraceptive services specified in paragraph (d)(3)(i) of this section. HHS will specify the allowance for a particular calendar year in the annual HHS notice of benefit and payment parameters.

(4) As long as an exception under OMB Circular No. A–25R is in effect, if the amount of the adjustment under paragraph (d)(3) of this section is greater than the amount of the participating issuer's obligation to pay the Federally-facilitated Exchange user fee in a particular month, the participating issuer will be provided a credit in succeeding months in the amount of the excess.

(5) Within 60 days of receipt of any adjustment in the Federally-facilitated Exchange user fee under this section, a participating issuer must pay each third party administrator with respect to which it received any portion of such adjustment an amount no less than the portion of the adjustment attributable to the total dollar amount of the payments for contraceptive services submitted by the third party administrator, as described in paragraph (d)(2)(iii)(D) of this section. No such payment is required with respect to the allowance for administrative costs and margin described in paragraph (d)(3)(ii) of this section. This paragraph does not apply if the participating issuer made the payments for contraceptive services on behalf of the third party administrator, as described in paragraph (d)(1)(i) of this section, or is in the same issuer group as the third party administrator.

(6) A participating issuer receiving an adjustment in the Federally-facilitated Exchange user fee under this section for a particular calendar year must maintain for 10 years following that year, and make available upon request to HHS, the Office of the Inspector General, the Comptroller General, and their designees, documentation demonstrating that it timely paid each third party administrator with respect to which it received any such adjustment any amount required to be paid to the third party administrator under paragraph (d)(5) of this section.

(7) A third party administrator with respect to which an adjustment in the Federally-facilitated Exchange user fee is received under this section for a particular calendar year must maintain for 10 years following that year, and make available upon request to HHS, the Office of the Inspector General, the Comptroller General, and their designees, all of the following documentation:

(i) A copy of the self-certification referenced in 26 CFR 54.9815–2713A(a)(4) or 29 CFR 2590.715–2713A(a)(4) for each self-insured plan with respect to which an adjustment is received.

(ii) Documentation demonstrating that the payments for contraceptive services were made in compliance with 26 CFR 54.9815–2713A(b)(2) or 29 CFR 2590.715–2713A(b)(2).

(iii) Documentation supporting the total dollar amount of the payments for contraceptive services submitted by the third party administrator, as described in paragraph (d)(2)(iii)(D) of this section.

■ 6. Section 156.80 is amended by revising paragraph (d)(1) to read as follows:

§ 156.80   Single risk pool.

\*　　\*　　\*　　\*　　\*

(d) \* \* \*

(1) *In general.* Each plan year or policy year, as applicable, a health insurance issuer must establish an index rate for a state market described in paragraphs (a) through (c) of this section based on the total combined claims costs for providing essential health benefits within the single risk pool of that state market. The index rate must be adjusted on a market-wide basis for the state based on the total expected market-wide payments and charges under the risk adjustment and reinsurance programs, and Exchange user fees (expected to be remitted under § 156.50(b) or § 156.50(c) and (d) of this subchapter as applicable plus the dollar amount under § 156.50(d)(3)(i) and (ii) of this subchapter expected to be credited against user fees payable for that state market). The premium rate for all of the health insurance issuer's plans in the relevant state market must use the applicable market-wide adjusted index rate, subject only to the plan-level adjustments permitted in paragraph (d)(2) of this section.

\*　　\*　　\*　　\*　　\*

Exhibit 13

Signed this 27th day of June 2013.

**Beth Tucker,**

*Deputy Commissioner for Operations Support, Internal Revenue Service.*

**Mark J. Mazur,**

*Assistant Secretary of the Treasury (Tax Policy).*

Signed this 26th day of June 2013.

**Phyllis C. Borzi,**

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: June 20, 2013

**Marilyn Tavenner,**

*Administrator, Centers for Medicare & Medicaid Services.*

Approved: June 25, 2013.

**Kathleen Sebelius,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2013–15866 Filed 6–28–13; 11:15 am]

**BILLING CODE 4830–01–P; 4510–029–P; 4120–01–P; 6325–64–P**

Exhibit 13                                                                              JA-0000268

**8456**    Federal Register / Vol. 78, No. 25 / Wednesday, February 6, 2013 / Proposed Rules

*24 CFR Part 203*

Hawaiian natives, Home improvement, Indians—lands, Loan programs—housing and community development, Mortgage insurance, Reporting and recordkeeping requirements, Solar energy.

Accordingly, for the reasons discussed in the preamble, HUD proposes to amend 24 CFR parts 200 and 203 to read as follows:

## PART 200—INTRODUCTION TO FHA PROGRAMS

■ 1. The authority citation for part 200 continues to read as follows:

**Authority:** 12 U.S.C. 1702–1715–z–21; 42 U.S.C. 3535(d).

■ 2. In § 200.145, add paragraph (c) to read as follows:

### § 200.145  Property and mortgage assessment.

\*    \*    \*    \*    \*

(c) For all new construction as well as structural repairs and/or renovations of existing properties, to the extent that an inspection is required to determine if construction quality of a one- to four-unit property is acceptable as security for an FHA-insured loan, the following requirements apply:

(1)(i) In areas where local jurisdictions provide building code enforcement and the requisite documentation, the lender shall provide a copy of:

(A) The building permit, or its equivalent, and a copy of the certificate of occupancy, or its equivalent; or

(B) A satisfactory inspection notice for work completed, or its equivalent.

(ii) The documentation provided under paragraph (c)(1)(i) of this section shall be considered satisfactory evidence of completion of the work.

(2) In jurisdictions that do not provide building code enforcement and requisite documentation, three inspections are required for new construction. For existing construction, only one inspection and certification of work completed for repairs and renovations is required. For both new and existing construction, the lender shall, in order to ensure compliance with FHA requirements:

(i) Select a Residential Combination Inspector (or its successor designation) certified by the International Code Council (or its successor organization) who is licensed or certified as a home inspector in accordance with the applicable State and local requirements governing the licensing or certification of those jurisdictions that license or certify such inspectors in the respective jurisdiction. The lender shall provide a certification from such inspector that the new construction and/or structural repair or renovation work is completed satisfactorily and in compliance with any applicable building code.

(ii) In the absence of such Residential Combination Inspector, the lender shall obtain an inspection performed by a third party, who is a registered architect, a professional engineer, or a tradesman or contractor, and who has met the licensing and bonding requirements of the State in which the property is located. The lender shall provide a certification from such inspector that the inspector is licensed and bonded under applicable State law, and that the new construction and/or structural repair or renovation work is completed satisfactorily and in compliance with any applicable building code.

■ 3. Remove the undesignated center heading "FHA Inspector Roster" and §§ 200.170–172.

## PART 203—SINGLE FAMILY MORTGAGE INSURANCE

■ 4. The authority citation for part 203 continues to read as follows:

**Authority:** 12 U.S.C. 1709, 1710, 1715b, 1715z–16, and 1715u; 42 U.S.C. 3535(d).

### § 203.18  [Amended]

■ 5. In § 203.18, remove paragraph (a)(3) and redesignate paragraph (a)(4) as paragraph (a)(3).

■ 6. In § 203.50, revise paragraph (f)(1) to read as follows:

### § 203.50  Eligibility of rehabilitation loans.

\*    \*    \*    \*    \*

(f) \*    \*    \*

(1)(i) The limits prescribed in § 203.18(a)(1) (in the case of a dwelling to be occupied as a principal residence, as defined in § 203.18(f)(1));

(ii) The limits prescribed in § 203.18(a)(1) and (3) (in the case of a dwelling to be occupied as a secondary residence, as defined in § 203.18(f)(2));

(iii) 85 percent of the limits prescribed in § 203.18(c), or such higher limit, not to exceed the limits set forth in § 203.18(a)(1), as Commissioner may prescribe (in the case of an eligible nonoccupant mortgagor as defined in § 203.18(f)(3));

(iv) The limits prescribed in § 203.18a, based upon the sum of the estimated cost of rehabilitation and the Commissioner's estimate of the value of the property before rehabilitation; or

\*    \*    \*    \*    \*

### §§ 203.200  through 203.209 [Removed]

■ 7. Remove the undesignated center heading "Insured Ten-Year Protection Plans (Plan)" and §§ 203.200 through 203.209.

Dated: January 8, 2013.

**Carol J. Galante**
*Assistant Secretary for Housing– Federal Housing Commissioner.*
[FR Doc. 2013–02668 Filed 2–5–13; 8:45 am]

**BILLING CODE 4210–67–P**

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 54**

**[REG–120391]**

**RIN 1545–BJ60**

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB44**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**45 CFR Parts 147, 148, and 156**

**[CMS–9968–P]**

**RIN 0938–AR42**

**Coverage of Certain Preventive Services Under the Affordable Care Act**

**AGENCY:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Proposed rules.

**SUMMARY:** This document proposes amendments to rules regarding coverage for certain preventive services under section 2713 of the Public Health Service Act, as added by the Patient Protection and Affordable Care Act, as amended, and incorporated into the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code. Section 2713 of the Public Health Service Act requires coverage without cost sharing of certain preventive health services, including certain contraceptive services, in non-exempt, group health plans and health insurance coverage. The proposed rules would amend the authorization to exempt group health plans established or maintained by certain religious employers (and group health insurance coverage provided in connection with such plans) with respect to the requirement to cover

Exhibit 14                                                                        JA-0000269

contraceptive services. The proposed rules would also establish accommodations for group health plans established or maintained by eligible organizations (and group health insurance coverage offered in connection with such plans), including student health insurance coverage arranged by eligible organizations that are religious institutions of higher education. This document also proposes related amendments to regulations concerning excepted benefits and Affordable Insurance Exchanges.

**DATES:** Comments are due on or before April 8, 2013.

**ADDRESSES:** In commenting, please refer to file code CMS–9968–P. Because of staff and resource limitations, the Departments cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments to *http:// www.regulations.gov.* Follow the "Submit a comment" instructions.

2. *By Regular Mail.* You may mail written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9968–P, P.O. Box 8013, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By Express or Overnight Mail.* You may send written comments to the following address only:

Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9968–P, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By Hand or Courier.* You may deliver (by hand or courier) your written comments to the following addresses only:

a. For delivery in Washington, DC—Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without federal government identification, commenters are encouraged to leave their comments in the Centers for Medicare & Medicaid Services drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.

b. For delivery in Baltimore, MD—Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call (410) 786–9994 in advance to schedule your arrival with one of our staff members.

Do not mail comments to the addresses indicated as appropriate for hand or courier delivery because they may be delayed and received after the close of the comment period.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Jacob Ackerman, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565. Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335.

Karen Levin, Internal Revenue Service (IRS), Department of the Treasury, at (202) 927–9639.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*www.dol.gov/ebsa*). In addition, information from HHS on private health insurance coverage can be found on CMS's Web site (*www.cciio.cms.gov*), and information on health care reform can be found at *www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. The Departments post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately three weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4:00 p.m. To schedule

an appointment to view public comments, call (800) 743–3951.

## I. Background

The Patient Protection and Affordable Care Act (Pub. L. 111–148) was enacted on March 23, 2010, and amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111–152) on March 30, 2010. These statutes are referred to collectively as the Affordable Care Act. The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act of 1974 (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and to make them applicable to group health plans. The PHS Act sections incorporated by these references are sections 2701 through 2728.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide benefits for certain preventive health services without the imposition of cost sharing. These preventive health services include, with respect to women, preventive care and screenings as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA).

The Departments of Health and Human Services (HHS), Labor, and the Treasury (collectively, the Departments) published interim final rules with a request for comments implementing section 2713 of the PHS Act in the July 19, 2010 **Federal Register** (75 FR 41726) (2010 interim final rules). Among other things, the 2010 interim final rules provide that a plan or issuer must provide coverage, without cost sharing, for certain newly recommended preventive health services starting with the first plan year (or, in the individual market, policy year) that begins on or after the date that is one year after the date on which the recommendation or guideline is issued.[1]

On August 1, 2011, HRSA adopted and released guidelines for women's preventive services based on

---

[1] 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

Exhibit 14    JA-0000270

recommendations of the independent Institute of Medicine, which had undertaken a review of the scientific and medical evidence on women's preventive services (Women's Preventive Services: Required Health Plan Coverage Guidelines, or HRSA Guidelines).[2] As relevant here, the HRSA Guidelines include all Food and Drug Administration (FDA)-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity, as prescribed by a health care provider (collectively, contraceptive services).[3] Accordingly, under section 2713 of the PHS Act and the 2010 interim final rules, non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage are required to provide coverage without cost sharing of women's preventive health services, including contraceptive services, consistent with the HRSA Guidelines in plan years (or, in the individual market, policy years) beginning on or after August 1, 2012, except as discussed later in this section.

Contemporaneous with the issuance of the HRSA Guidelines, the Departments amended the 2010 interim final rules (76 FR 46621) (2011 amended interim final rules). The amendment provided HRSA with the authority to exempt group health plans established or maintained by religious employers (and group health insurance coverage provided in connection with such plans) from the requirement to cover contraceptive services pursuant to the HRSA Guidelines.[4] The 2011 amended interim final rules specified that, for purposes of this exemption, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. HRSA exercised this authority in the HRSA Guidelines such that group health plans established or maintained by these religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the requirement to cover contraceptive services.

On February 10, 2012, the Departments issued final rules that adopted the definition of religious employer in the 2011 amended interim final rules for purposes of the exemption from the requirement to cover contraceptive services (2012 final rules).[5] Contemporaneous with the issuance of the 2012 final rules, HHS, with the agreement of the Departments of Labor and the Treasury, issued guidance establishing a temporary enforcement safe harbor for group health plans established or maintained by certain nonprofit organizations that have religious objections to contraceptive coverage (and any group health insurance coverage provided in connection with such plans).[6]

The guidance provides that, under the temporary enforcement safe harbor, the Departments will not take any enforcement action against an employer, group health plan, or health insurance issuer for failing to cover some or all recommended contraceptive services in a non-grandfathered group health plan (or any group health insurance coverage provided in connection with such a plan) where the plan is established or maintained by an organization meeting all of the following criteria:

• The organization is organized and operates as a nonprofit entity.

• From February 10, 2012, onward, the group health plan established or maintained by the organization has consistently not covered all or the same subset of recommended contraceptive services, consistent with any applicable state law, because of the religious beliefs of the organization.

• The group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third party administrator) provides to participants a notice indicating that some or all contraceptive services will not be covered under the plan for the first plan year beginning on or after August 1, 2012, as set forth in the guidance.

• The organization self-certifies that it satisfies the foregoing three criteria and documents its self-certification, as set forth in the guidance.

The temporary enforcement safe harbor is also available for insured student health insurance coverage arranged by nonprofit institutions of higher education with religious objections to contraceptive coverage that similarly meet the four criteria.[7]

The temporary enforcement safe harbor is in effect until the first plan year that begins on or after August 1, 2013. The Departments committed to rulemaking during this 1-year safe harbor period to provide women with contraceptive coverage without cost sharing as required by section 2713 of the PHS Act, while protecting certain additional organizations from having to contract, arrange, pay, or refer for any contraceptive coverage to which they object on religious grounds.

The first step toward realizing these policy goals was an advance notice of proposed rulemaking (ANPRM) published on March 21, 2012 (77 FR 16501). The ANPRM presented potential approaches and solicited comments on alternative ways to fulfill the requirements of section 2713 of the PHS Act when health coverage is established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education,[8] with religious objections to contraceptive coverage. The 90-day comment period on the ANPRM closed on June 19, 2012.

These proposed rules mark the next step in the process. The proposed rules would make two principal changes to the preventive services coverage rules to provide women contraceptive coverage without cost sharing, while taking into account religious objections to contraceptive services of eligible organizations, including eligible

---

[2] The HRSA Guidelines are available at: *http://www.hrsa.gov/womensguidelines*.

[3] This excludes services relating to a man's reproductive capacity, such as vasectomies and condoms.

[4] The 2011 amended interim final rules were issued and effective on August 1, 2011, and published on August 3, 2011.

[5] The 2012 final rules were published on February 15, 2012 (77 FR 8725).

[6] Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans, and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code, issued on February 10, 2012, and reissued on August 15, 2012. Available at: *http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf*. The guidance, as reissued on August 15, 2012, clarifies, among other things, that group health plans that took some action before February 10, 2012, to try, without success, to exclude or limit contraceptive coverage are not precluded from eligibility for the safe harbor.

[7] *See* final rule on student health insurance coverage published by HHS on March 21, 2012 (77 FR 16456 and 16457).

[8] In these proposed rules, any proposed accommodation specific to a religious institution of higher education is intended to accommodate the religious institution of higher education only with respect to its arrangement of student health insurance coverage. With respect to the establishment or maintenance of a group health plan by a religious institution of higher education, the religious institution of higher education is intended to be accommodated the same way as any other religious organization that has established or maintained a group health plan.

Exhibit 14                                                                 JA-0000271

organizations that are religious institutions of higher education, that establish or maintain or arrange health coverage. First, the proposed rules would amend the criteria for the religious employer exemption to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths. Second, the proposed rules would establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage. The proposed rules also propose related amendments to other rules, consistent with the proposed accommodations. The Departments intend to finalize all such proposed amendments before the end of the temporary enforcement safe harbor.

Comments are welcome on any aspect of the proposed rules, including on how best to provide women with contraceptive coverage without cost sharing as required by section 2713 of the PHS Act, while protecting eligible organizations from having to contract, arrange, pay, or refer for any contraceptive coverage to which they object on religious grounds.

## II. Overview of the Public Comments on the Advance Notice of Proposed Rulemaking

The Departments received approximately 200,000 comments in response to the ANPRM. Commenters represented a wide variety of stakeholders, including religious groups; religiously affiliated educational institutions, health care organizations, charities, and associations; civil rights organizations; consumer groups; group health plan sponsors and administrators; third party administrators and other plan service providers; health insurance issuers; law and public policy organizations; states; secular organizations; private citizens; and women's rights and reproductive health advocacy organizations.

Comments addressed both the religious employer exemption and the suggested accommodations, among other issues. Although the Departments do not separately address each comment received, the significant issues raised in the comments are summarized in this section. The Departments considered these comments in developing the policies in these proposed rules.

### A. Comments on the Religious Employer Exemption

Some commenters asserted that the definition of religious employer as formulated in the 2012 final rules is too narrow. Some of these commenters expressed concern that the group health plans of a number of religious employers, including houses of worship, do not qualify for the exemption because the employers' purposes extend beyond the inculcation of religious values or because the employers serve or hire people of different religious faiths. Commenters noted that employers may not know the religious beliefs of those they serve or hire, and that employment discrimination laws may prohibit them from inquiring about the religious beliefs of their employees. Other commenters expressed concern that the definition of religious employer is not broad enough to allow them to continue their current exclusion of contraceptive services from coverage under their group health plans and warned that, if the definition of religious employer is not broadened, they could cease to offer health coverage to their employees in order to avoid having to offer coverage to which they object on religious grounds.

Commenters also asserted that federal laws, including the Affordable Care Act, provide for conscience clauses and religious exemptions broader than the religious employer exemption provided for in the 2012 final rules. Other commenters asserted that the narrow scope of the exemption raises concerns under the First Amendment and the Religious Freedom Restoration Act (RFRA). Some commenters asserted that the criteria for the religious employer exemption could result in excessive government entanglement in religion. Several commenters expressed concern that the definition of religious employer sets a precedent for use in other areas of federal and state law. These commenters urged that the definition of religious employer be broadened such that more group health plans may qualify for the exemption.

Other commenters, however, disputed claims that the contraceptive coverage requirement infringes on rights protected by the First Amendment or RFRA, noting that the requirement is neutral and generally applicable. They also explained that the requirement does not substantially burden religious exercise and, in any event, serves compelling governmental interests and is the least restrictive means to achieve those interests.

Some commenters supported the inclusion of contraceptive services in the HRSA Guidelines and urged that the Departments not broaden the religious employer exemption. These commenters asserted that the definition of religious employer is appropriately targeted at houses of worship and argued that making contraceptive coverage available to as many women as possible would enhance access to important preventive health care services and would significantly reduce long-term health care costs and consequences associated with unplanned pregnancies. These commenters asserted that expanding the exemption would undermine the benefits of the law. Some commenters believed that the exemption should be eliminated entirely due to the importance of extending these benefits to as many women as possible.

Several commenters requested clarification as to whether, if employees of multiple employers are covered under a single group health plan, each employer must independently meet the definition of religious employer for the plan to qualify for the exemption.

### B. Comments on the Suggested Accommodations for Health Coverage Established or Maintained by Religious Organizations or Arranged by Religious Institutions of Higher Education

Several commenters asserted that the suggested accommodations described in the ANPRM would fail to adequately accommodate religious objections to contraceptive coverage. These commenters emphasized that, in their view, religious organizations would continue to be involved, whether directly or indirectly, in providing coverage for services that they find religiously objectionable. For example, with respect to insured group health plans, these commenters disputed the claim that contraceptive coverage is at least cost neutral and argued that plan sponsors would end up funding the coverage in the form of higher premiums or fees. These commenters generally argued that, in order to provide adequate relief, the Departments would need to rescind the contraceptive coverage requirement in its entirety, provide an exemption for the group health plan of any organization with a religious or moral objection to contraceptive coverage, or provide government funding for provision of contraceptive services.

Other commenters recommended that the Departments expand the suggested accommodations to encompass the group health plans of a broader class of religiously affiliated organizations. Several commenters stated that the rules

Exhibit 14                                                                                                                    JA-0000272

should accommodate all organizations with a religious or moral objection to contraceptive coverage, whether the organization is religious or secular, or nonprofit or for-profit, among other potential distinctions. These commenters also argued that an accommodation should be available without regard to whether an organization has covered contraceptive services in its group health plan in the past.

Some commenters recommended using criteria in other federal laws, such as the National Labor Relations Act, for determining whether the group health plan of an organization qualifies for an accommodation. Some commenters suggested accommodating the group health plans of religiously affiliated organizations recognized as tax-exempt under an IRS group ruling.

In contrast, other commenters urged that any accommodation apply only to health coverage established or maintained by a limited class of religiously affiliated organizations or arranged by a limited class of religiously affiliated institutions of higher education. For example, several commenters suggested limiting any accommodation to only health coverage established or maintained by nonprofit organizations owned or controlled by a church, association of churches, or religious order, or arranged by nonprofit institutions of higher education owned or controlled by a religious organization as defined for purposes of Title IX of the Education Amendments of 1972. These commenters also generally argued that health coverage established or maintained by for-profit organizations or arranged by for-profit institutions of higher education, or health coverage established or maintained by organizations, or arranged by institutions of higher education, that object to only some types of contraceptive services, should not qualify for an accommodation.

A number of commenters supported a self-certification process, similar to that used for the temporary enforcement safe harbor, for religious organizations seeking to avail themselves of an accommodation. Some commenters urged that the Departments adopt appropriate oversight and enforcement mechanisms to monitor compliance with the criteria for any accommodation and recommended self-certification as a tool to promote transparency and support compliance and enforcement. Other commenters suggested that the Departments consider any such self-certification to be conclusive to avoid inquiry into a religious organization's character, mission, or practices.

Comments were quite varied regarding the ANPRM's suggested approaches with respect to the provision of contraceptive coverage to participants and beneficiaries enrolled in self-insured group health plans established or maintained by religious organizations with religious objections to such coverage. Many commenters supported the general approach suggested in the ANPRM of ensuring that participants and beneficiaries enrolled in such self-insured plans receive contraceptive coverage without cost sharing. These commenters stated that any accommodation should not create delays in or barriers to contraceptive benefits, and that these benefits should be provided without participants and beneficiaries having to specifically elect such benefits.

Concerns were raised by some commenters about an objecting organization's ability to not administer, facilitate, or otherwise involve itself in the provision of contraceptive coverage to such participants and beneficiaries. Many commenters were concerned about how third party administrators would be able to fund these benefits. They noted that drug rebates, one suggested source of funds, often belong to another entity (such as the plan sponsor and/or the plan participants and beneficiaries), not the third party administrator, and stated that, in their view, costs incurred by third party administrators would ultimately be passed on to plan sponsors and/or plan participants and beneficiaries unless a separate source of funding could be found, such as some form of public funding or stand-alone contraceptive coverage with no premium or cost sharing. Others raised questions about the responsibility for communications regarding contraceptive coverage. Some third party administrators were concerned about becoming surrogate insurers, which might subject them to the application of state insurance laws. At the same time, other commenters believed that, with funding, notice, and adequate claims information, contraceptive coverage could be administered effectively by third party administrators.

### III. Provisions of the Proposed Rules

#### A. Overview

The Departments aim to secure the protections under section 2713 of the PHS Act that are designed to enhance coverage of important preventive services for women without cost sharing while accommodating the religious objections to contraceptive coverage of eligible organizations.

The Departments propose two key changes to the preventive services coverage rules codified in 26 CFR 54.9815–2713T, 29 CFR 2590.715–2713, and 45 CFR 147.130 to meet these goals. First, the proposed rules would amend the criteria for the religious employer exemption to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths. Second, the proposed rules would establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage.

Amendments to rules concerning excepted benefits and Affordable Insurance Exchanges (Exchanges) are also proposed in connection with the proposed accommodations.

#### B. Explanation of Terms

In these proposed rules, all references to "contraceptive coverage" are references to coverage of the contraceptive services that are required to be covered without cost sharing in accordance with the HRSA Guidelines (that is, all FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity, as prescribed by a health care provider).

All references to "accommodation" are references to an arrangement under which contraceptive coverage is provided without cost sharing to plan participants and beneficiaries (or, in the case of student health insurance coverage, student enrollees and their covered dependents) independent of health coverage established or maintained or arranged by an objecting religious organization, including an objecting religious institution of higher education.

Finally, all references to "religious organization" and "religious institution of higher education" are references to the class of organizations and institutions of higher education that establish or maintain or arrange health coverage that qualifies for an accommodation. These organizations are collectively referred to as "eligible organizations" in these proposed rules.

Exhibit 14                                                                                                                      JA-0000273

*C. Religious Employer Exemption and Accommodations for Health Coverage Established or Maintained or Arranged by Eligible Organizations*

For purposes of organization and clarity. proposed 45 CFR 147.130(a)[9] would provide that the requirement to provide coverage for recommended preventive services without cost sharing is subject to a new 45 CFR 147.131, which would establish standards and processes related to both the religious employer exemption and the accommodations for health coverage established or maintained or arranged by eligible organizations, as discussed in more detail later in this section.

Accordingly. the proposed rules would move to new 45 CFR 147.131[10] the language currently in 45 CFR 147.130(a)(1)(iv)(A) and (B) (incorporated by reference in the rules of the Departments of Labor and the Treasury) that authorizes HRSA to exempt group health plans of religious employers (and group health insurance coverage provided in connection with such plans) from the contraceptive coverage requirement and that defines religious employer for this purpose, and would amend the authorization and definition as discussed later in this section.

1. Religious Employer Exemption

Currently, under the 2012 final rules, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. The Departments explained in the 2011 amended interim final rules that this definition was intended to focus the religious employer exemption on ''the unique relationship between a house of worship and its employees in ministerial positions.''[11]

Some commenters brought to the Departments' attention that the group health plans of certain religious entities that meet the fourth prong of the definition of religious employer (providing that a religious employer is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code) may not qualify for the exemption because those entities provide benevolent services to their communities. For example, if a church maintains a soup kitchen that provides free meals to low-income individuals irrespective of their religious faiths, it could fail to satisfy the third prong of the definition of religious employer (providing that a religious employer primarily serves persons who share its religious tenets). The same question could arise if a church runs a parochial school that employs people of different religious faiths.

The Departments agree that the exemption should not exclude group health plans of religious entities that would qualify for the exemption but for the fact that, for example, they provide charitable social services to persons of different religious faiths or employ persons of different religious faiths when running a parochial school. Indeed. this was never the Departments' intention in connection with the 2011 amended interim final rules or the 2012 final rules. Accordingly, in 45 CFR 147.131(a) (and the related rules of the Departments of Labor and the Treasury). the Departments propose to amend the definition of religious employer that was adopted in the 2012 final rules by eliminating the first three prongs of the definition and clarifying the application of the fourth. Under this proposal, an employer that is organized and operates as a nonprofit entity and referred to in section 6033(a)(3)(A)(i) or (iii) of the Code would be considered a religious employer for purposes of the religious employer exemption. For this purpose, an organization that is organized and operates as a nonprofit entity is not limited to any particular form of entity under state law, but may include organizations such as trusts and unincorporated associations, as well as nonprofit, not-for-profit, non-stock, public benefit, and similar types of corporations. However, for this purpose, an organization is not considered to be organized and operated as a nonprofit entity if its assets or income accrue to the benefit of private individuals or shareholders. Under this standard, it is not necessary to determine the federal tax-exempt status of the nonprofit entity in determining whether the religious employer exemption applies. The Departments note that eliminating the first three prongs would avoid any inquiry into an employer's purposes, as well as any inquiry into the religious

beliefs of its employees and the religious beliefs of those it serves.

The Departments believe that this proposal would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules. As previously noted. when the Departments first defined religious employer, the primary goal was to exempt the group health plans of houses of worship. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. By restricting the exemption primarily to group health plans established or maintained by churches, synagogues, mosques, and other houses of worship, and religious orders, the fourth prong of the current definition of religious employer would alone suffice to meet the goal. By eliminating the first three prongs of the current definition, there no longer would be any question as to whether group health plans of houses of worship that provide educational. charitable, or social services to their communities qualify for the exemption.

The Departments welcome comments on this proposal, including whether it would unduly expand the universe of employer plans that would qualify for the exemption and whether additional or different language is needed to clarify the scope of the exemption.

2. Accommodations for Health Coverage Established or Maintained or Arranged by Eligible Organizations

In proposed 45 CFR 147.131(b) through (e) (and the related rules of the Departments of Labor and Treasury) and as discussed later in this section. the Departments propose policies relating to the accommodation of certain group health plans and group health insurance coverage with respect to the contraceptive coverage requirement. The Departments propose a comparable accommodation with respect to student health insurance coverage arranged by eligible organizations that are religious institutions of higher education. The Departments believe these proposed accommodations, as opposed to the exemption that is provided to religious employers, are warranted given that participants and beneficiaries in group health plans established or maintained by eligible organizations, as well as student enrollees and their covered dependents in student health insurance coverage arranged by eligible organizations. may be less likely than participants and beneficiaries in group health plans established or maintained

---

[9] For simplicity, this preamble refers only to provisions of 45 CFR 147.130. Parallel provisions to 45 CFR 147.130 are contained in 26 CFR 54.9815–2713T and 29 CFR 2590.715–2713.

[10] For simplicity, this preamble refers only to provisions of 45 CFR 147.131. Parallel provisions to 45 CFR 147.131 are contained in 26 CFR 54.9815–2713A and 29 CFR 2590.715–2713A.

[11] 76 FR 46623.

Exhibit 14                                                                                                JA-0000274

**8462**    **Federal Register** / Vol. 78. No. 25 / Wednesday, February 6, 2013 / Proposed Rules

by religious employers to share such religious objections of the eligible organizations. The proposed accommodations would provide such plan participants and beneficiaries contraceptive coverage without cost sharing while insulating their employers or institutions of higher education from contracting, arranging, paying, or referring for such coverage.

*a. Definition of Eligible Organization*

These proposed rules would provide that group health plans established or maintained by eligible organizations with religious objections to contraceptive coverage (and group health insurance coverage provided in connection with such plans), and student health insurance coverage arranged by eligible organizations that are religious institutions of higher education with such objections, comply with the requirement to provide coverage for contraceptive services under section 2713 of the PHS Act if the conditions of the accommodation are satisfied.

For purposes of these proposed rules only, the Departments propose to define an eligible organization as an organization that meets all of the following criteria:

• The organization opposes providing coverage for some or all of the contraceptive services required to be covered under section 2713 of the PHS Act on account of religious objections.
• The organization is organized and operates as a nonprofit entity.
• The organization holds itself out as a religious organization.
• The organization self-certifies that it satisfies the first three criteria, as described later in this section.

This proposed definition of eligible organization is intended to allow health coverage established or maintained or arranged by nonprofit religious organizations, including nonprofit religious institutional health care providers, educational institutions, and charities, with religious objections to contraceptive coverage to qualify for an accommodation. For this purpose, an organization that is organized and operated as a nonprofit entity is not limited to any particular form of entity under state law, but may include organizations such as trusts and unincorporated associations, as well as nonprofit, not-for-profit, non-stock, public benefit, and similar types of corporations. However, for this purpose an organization is not considered to be organized and operated as a nonprofit entity if its assets or income accrue to the benefit of private individuals or shareholders.

The Departments believe that the proposed definition of eligible organization would strike an appropriate balance because it would limit any accommodation to nonprofit organizations that hold themselves out as religious. The Departments solicit comments on whether the proposed definition of eligible organization would allow an appropriate universe of nonprofit religious organizations and institutions of higher education establishing or maintaining or arranging health coverage to qualify for an accommodation, including comments on whether it would be too broad or too narrow.

The Departments do not propose that the definition of eligible organization extend to for-profit secular employers. Religious accommodations in related areas of federal law, such as the exemption for religious organizations under Title VII of the Civil Rights Act of 1964, are available to nonprofit religious organizations but not to for-profit secular organizations. Accordingly, the Departments believe it would be appropriate to define eligible organization to include nonprofit religious organizations, but not to include for-profit secular organizations.

*b. Self-Certification*

Each organization seeking accommodation under the proposed rules would be required to self-certify that it meets the definition of eligible organization, following a self-certification process similar to that under the temporary enforcement safe harbor. The self-certification would also specify the contraceptive services for which the organization will not establish, maintain, administer, or fund coverage. The organization would not be required to submit the self-certification to any of the Departments. The organization would maintain the self-certification (executed by an authorized representative of the organization) in its records for each plan year to which the accommodation applies and make the self-certification available for examination upon request so that regulators, issuers, third party administrators, and plan participants and beneficiaries may verify that an organization has qualified for an accommodation, while avoiding any inquiry into the organization's character, mission, or practices. The Departments intend to specify in guidance the form to be used for the self-certification.

*c. Separate Contraceptive Coverage Without Cost Sharing for Plan Participants and Beneficiaries*

These proposed rules aim to provide women with contraceptive coverage without cost sharing and to protect eligible organizations from having to contract, arrange, pay, or refer for contraceptive coverage to which they object on religious grounds.

*1. Insured Plans*

To achieve these goals, under HHS's authority in section 2792 of the PHS Act to promulgate rules "necessary or appropriate" to carry out the provisions of title XXVII of the PHS Act, and the parallel authorities of the Department of Labor in section 734 of ERISA and the Department of the Treasury in section 9833 of the Code, these proposed rules would provide that, in the case of an insured group health plan established or maintained by an eligible organization, the health insurance issuer providing group coverage in connection with the plan would assume sole responsibility, independent of the eligible organization and its plan, for providing contraceptive coverage without cost sharing, premium, fee, or other charge to plan participants and beneficiaries.

The eligible organization would provide the issuer with a copy of its self-certification. If the plan uses a separate issuer for certain coverage, such as prescription drug coverage, the eligible organization may also need to provide a copy of its self-certification to the separate issuer. Nothing more would be required of the eligible organization to qualify for the accommodation.

The proposed rules would direct the issuer receiving the copy of the self-certification to ensure that the coverage for those contraceptive services identified in the self-certification is not included in the group policy, certificate, or contract of insurance; that such coverage is not reflected in the group health insurance premium; and that no fee or other charge in connection with such coverage is imposed on the eligible organization or its plan.

The proposed rules would further direct the issuer receiving the copy of the self-certification to provide contraceptive coverage under individual policies, certificates, or contracts of insurance (hereinafter referred to as individual health insurance policies) for plan participants and beneficiaries without cost sharing, premium, fee, or other charge. The coverage would not be offered by or through a group health plan. (As discussed later in this section, the Departments propose that this type

Exhibit 14                                                                                          JA-0000275

of individual health insurance policy is a new category of excepted benefits.)

The issuer would automatically enroll plan participants and beneficiaries in a separate individual health insurance policy that covers recommended contraceptive services. The Departments envision that the issuer would ensure that contraceptive coverage for plan participants and beneficiaries is effective at the beginning of the plan year of their group health plan, to the extent possible, to prevent a delay or gap in contraceptive coverage. The eligible organization would have no role in contracting, arranging, paying, or referring for this separate contraceptive coverage. Such coverage would be offered at no charge to plan participants and beneficiaries, that is, the issuer would provide benefits for such contraceptive services without the imposition of any cost sharing requirement (such as a copayment, coinsurance, or a deductible), premium, fee, or other charge, consistent with section 2713 of the PHS Act. The requirements of section 2713 of the PHS Act. its implementing regulations, and other applicable federal and state law (as well as their enforcement mechanisms) would continue to apply with respect to such coverage. For example, an issuer providing such coverage could use reasonable medical management techniques consistent with 45 CFR 147.130(a)(4).

The Departments believe that, in the case of insured group health plans. this proposed arrangement would alleviate the need for the eligible organization to contract, arrange, pay, or refer for contraceptive coverage while providing contraceptive coverage to plan participants and beneficiaries at no additional cost. Actuaries, economists, and insurers estimate that providing contraceptive coverage is at least cost neutral, and may result in cost-savings when taking into account all costs and benefits for the insurer.[12] In this instance, contraceptive coverage without cost sharing would be provided to plan participants and beneficiaries through individual health insurance policies, separate from the group policy through which all other coverage would be provided to plan participants and beneficiaries. The Departments believe that issuers generally would find that

providing such contraceptive coverage is cost neutral because they would be they would be insuring the same set of individuals under both policies and would experience lower costs from improvements in women's health and fewer childbirths.

The Departments note that a health insurance issuer providing coverage in connection with a plan established or maintained by an eligible organization would be held harmless under the accommodation if a representation by the organization to the issuer that the organization is an eligible organization on which the issuer relied in good faith were determined later to be incorrect. Conversely, the eligible organization and its plan would be held harmless if the issuer were to fail to comply with the requirement that it provide separate contraceptive coverage for plan participants and beneficiaries at no charge.

The Departments request comments on this proposed arrangement.

### 2. Self-Insured Plans

The Departments are considering alternative approaches for providing participants and beneficiaries in self-insured group health plans established or maintained by eligible organizations with contraceptive coverage at no additional cost, while protecting the eligible organizations from having to contract, arrange, pay, or refer for such coverage. Under each of these approaches. a health insurance issuer that provides individual health insurance policies for contraceptive coverage for plan participants and beneficiaries at no additional cost would be able to offset the costs of providing such coverage by claiming an adjustment in Federally-facilitated Exchange (FFE) user fees that would reduce the amount of the such fees for the issuer (or an affiliated issuer), as discussed later in this section. The Departments envision that the issuer would ensure that contraceptive coverage for plan participants and beneficiaries is effective at the beginning of the plan year of their group health plans, to the extent possible, to prevent a delay or gap in contraceptive coverage. Under each of these approaches, HHS would assist in identifying issuers offering the separate individual health insurance policies for contraceptive coverage.

Under all approaches, if there is a third party administrator for the self-insured group health plan of the eligible organization. the eligible organization would provide the third party administrator with a copy of its self-certification. If the plan uses a separate

third party administrator for certain coverage, such as prescription drug coverage, the eligible organization would also provide a copy of its self-certification to the separate third party administrator if the coverage administered by the separate third party administrator includes coverage of any contraceptive service listed in the self-certification.

Further, under all approaches, a third party administrator receiving a copy of the self-certification would automatically arrange separate individual health insurance policies for contraceptive coverage from an issuer providing such polices, as described above. The issuer providing the coverage (or an affiliated issuer) would receive an additional adjustment in the user fees that otherwise would be charged by an FFE in an amount that would offset a reasonable charge by the third party administrator for performing this service. In turn, the issuer would be required to pass the amount of this additional adjustment in FFE user fees on to the third party administrator as a condition of receiving any FFE user fee adjustment, and would be required to attest to HHS that it has in fact passed the amount of this additional adjustment on to the third party administrator. As a condition of payment of this amount by the issuer, the third party administrator would not be permitted to charge any amount to the eligible organization. its plan, or to plan participants or beneficiaries for performing the service. The Departments note that the issuer could either be affiliated with or be independent of the third party administrator.

The Departments solicit comment on which of the proposed approaches below would best provide participants and beneficiaries in self-insured group health plans established or maintained by eligible organizations with contraceptive coverage at no additional cost. while protecting eligible organizations from having to contract, arrange, pay, or refer for such coverage. The Departments also request comment on whether there are other approaches that should be considered that would achieve the same goals.

Under the first approach, a third party administrator receiving the copy of the self-certification would have an economic incentive to voluntarily arrange for the separate individual health insurance policies for contraceptive coverage for plan participants and beneficiaries because it would be compensated for a reasonable charge for automatically arranging for the contraceptive coverage through

---

[12] Bertko, John. F.S.A., M.A.A.A.. Director of Special Initiatives and Pricing. Center for Consumer Information and Insurance Oversight, Centers for Medicare & Medicaid Services, Glied. Sherry, Ph.D., Assistant Secretary for Planning and Evaluation. Department of Health and Human Services (ASPE/ HHS), *et al.*, "The Cost of Covering Contraceptives Through Health Insurance." (February 9. 2012), available at: *http://aspe.hhs.gov/health/reports/2012/contraceptives/ib.shtml.*

Exhibit 14

payment by the issuer of the contraceptive coverage. Under this approach, in automatically arranging for the contraceptive coverage, the third party administrator would be acting, not as the third party administrator to the self-insured plan of the eligible organization, but rather in its independent capacity apart from its capacity as the agent of the plan. Under this approach, the self-insured plan of the eligible organization would be treated as complying with the requirement to provide contraceptive coverage based on the third party administrator's receipt of the copy of the self-certification.

Under the second approach, coverage under the plan of the eligible organization would comply with the requirement to provide contraceptive coverage without cost sharing only if the third party administrator administering coverage in connection with the plan automatically arranges for an issuer to assume sole responsibility for providing separate individual health insurance policies offering contraceptive coverage without cost sharing, premium, fee, or other charge to plan participants and beneficiaries, the eligible organization, or its plan. As discussed above, any reasonable administrative costs of the third party administrator in performing this service would be covered through payment by the issuer of the contraceptive coverage. If the third party administrator performs the services, coverage under the plan of the eligible organization would comply with 45 CFR 147.130. While the third party administrator would not be directly responsible for assuring compliance with section 2713 of the PHS Act, the Departments expect that third party administrators would seek to assist eligible organizations such that eligible organizations would be able to avail themselves of the proposed accommodation.

Under the third approach, the third party administrator receiving the copy of the self-certification would be directly responsible for automatically arranging for contraceptive coverage for plan participants and beneficiaries. Specifically, the self-certification would have the effect of designating the third party administrator [13] as the plan

administrator under section 3(16) of ERISA solely for the purpose of fulfilling the requirement that the plan provide contraceptive coverage without cost sharing. The third party administrator would satisfy its responsibility to automatically arrange for contraceptive coverage for plan participants and beneficiaries by arranging for an issuer to assume sole responsibility for providing separate individual health insurance policies offering contraceptive coverage without cost sharing, premium, fee, or other charge to plan participants and beneficiaries, the eligible organization, or its plan. The Departments note that there would be no obligation on a third party administrator to enter into or continue a third party administration contract with an eligible organization if the third party administrator were to object to having to carry out this responsibility. Although this approach would place the legal responsibility for assuring compliance with section 2713 of the PHS Act solely on the third party administrator, it would have legal implications under ERISA's reporting, disclosure, claims processing, and fiduciary provisions for both the third party administrator and the eligible organization. The Departments seek comment specifically on potential issues arising under ERISA if the third party administrator were to become the designated plan administrator under section 3(16) of ERISA, and therefore a plan fiduciary, even for the limited purposes contemplated.

The Departments also seek comment on whether there is a need to provide an accommodation for self-insured plans of eligible organizations without third party administrators, and, if so, how best to ensure that participants and beneficiaries in such plans receive separate contraception coverage without cost sharing. No comments were submitted in response to the request in the ANPRM on the extent to which there are such plans without a third party administrator. The Departments continue to believe that there are very few, if any, self-insured plans of eligible organizations in this circumstance.

The Departments solicit comment on these alternative approaches.

### 3. Notice of Availability of Contraceptive Coverage and Coordination of Benefits

The proposed rules would direct a health insurance issuer providing separate individual health insurance policies for contraceptive coverage at no additional cost to participants and beneficiaries in plans of eligible organizations to provide a written notice to plan participants and beneficiaries regarding the availability of the separate contraceptive coverage. Issuers providing such contraceptive coverage would be responsible for providing the notice of availability of such coverage to participants and beneficiaries in both insured and self-insured group health plans of eligible organizations. The notice would be provided directly to plan participants and beneficiaries by the issuer, separate from but contemporaneous with (to the extent possible) any application materials distributed in connection with enrollment (or re-enrollment) in group coverage established, maintained, or arranged by the eligible organization in any plan year to which the accommodation is to apply. As such, this notice generally would be provided annually. To satisfy the proposed notice requirement, issuers could use the model language set forth in the proposed rules or substantially similar language. The Departments request comments on the proposed notice requirement, including ways to improve the proposed model language, the timing and delivery (including electronically) of the notice to plan participants and beneficiaries, and whether this notice requirement could be combined with other existing notice requirements to simplify administration for issuers.

The Departments also seek comment on whether there are efficient ways to limit the benefits provided under the separate individual health insurance policies for contraceptive coverage to match the contraceptive benefits identified in the self-certification or whether the separate individual health insurances policies for contraceptive coverage should simply cover the full set of recommended contraceptive services. One option would be to require coordination of benefits such that the contraceptive coverage is secondary to the coverage provided by the group health plan established or maintained by the eligible organization (and any group health insurance coverage provided in connection with the plan). The Departments solicit comment on this issue.

---

[13] To the extent the plan uses more than one third party administrator (for example, one pharmacy benefit manager (PBM) to handle claims administration for prescription drugs and another entity to handle claims for inpatient and outpatient medical/surgical benefits), each third party administrator would become the plan administrator upon receiving the copy of the self-certification with respect to the types of claims that it normally processes (that is, the PBM would continue to handle claims for prescription drugs and the other

entity would continue to handle claims for inpatient and outpatient medical/surgical benefits), and each would do so in accordance with section 2713 of the PHS Act (even if plan terms might otherwise provide differently) as plan administration with an independent funding source.

Exhibit 14

JA-0000277

### d. Adjustments of Federally-Facilitated Exchange (FFE) User Fees

To fund contraceptive coverage for participants and beneficiaries in self-insured plans established or maintained by eligible organizations at no cost to plan participants or beneficiaries. HHS proposes that the existing proposed FFE user fee calculation, set forth in the December 7, 2012 proposed rule titled "Patient Protection and Affordable Care Act: HHS Notice of Benefit and Payment Parameters for 2014" (77 FR 73213). take into account that an issuer that offers a qualified health plan (QHP) through an FFE (or an affiliated issuer in a state without an FFE) provides such contraceptive coverage by reducing the amount of the user fee.

Consistent with Office of Management and Budget (OMB) Circular No. A25–R, the proposed revised FFE user fee calculation (which would result in an adjustment of the FFE user fee) would facilitate the proposed accommodation of self-insured plans established or maintained by eligible organizations by ensuring that plan participants and beneficiaries have separate individual health insurance policies for contraceptive coverage at no additional cost such that eligible organizations are not required to administer or fund such coverage. It would thereby support many of the goals of the Affordable Care Act, including improving the health of the population. reducing health care costs. providing access to health coverage, encouraging eligible organizations to continue to offer health coverage, and ensuring access to affordable QHPs via efficiently operated Exchanges. Moreover, as described in the 2012 final rules and the ANPRM, there are significant benefits associated with contraceptive coverage without cost sharing. Such contraceptive coverage significantly furthers the governmental interests in promoting public health and in promoting gender equality.

Under this proposal, the FFE user fee calculation would take into account contraceptive coverage that is provided by an issuer in a state without an FFE so long as the issuer is affiliated with an issuer that offers a QHP through an FFE.[14] The affiliated issuer would not be required to be a QHP issuer. An issuer that provides contraceptive coverage in a state without an FFE could offset the estimated cost of such

coverage through an affiliated QHP issuer in a state with an FFE. This would encourage issuers to provide this type of coverage widely, to meet the goal of providing all plan participants and beneficiaries of self-insured plans established or maintained by eligible organizations with separate contraceptive coverage without cost sharing.

HHS proposes that, in order for the FFE user fee calculation to take into account that a QHP issuer (or an affiliated issuer) provides contraceptive coverage, the issuer providing coverage for contraceptive services for the plan participants and beneficiaries of a self-insured plan established or maintained by an eligible organization must provide coverage for all recommended contraceptive services identified in the self-certification of the eligible organization. and do so without cost sharing, premiums, fees, or other costs to the plan participants and beneficiaries. It also must pay the reasonable charge of third party administrators. The contraceptive coverage would be subject to all applicable federal and state laws. including state filing and rate review requirements. HHS seeks comment on ways to streamline the regulatory processes for, and minimize the costs of, obtaining approval of such coverage in all states.

HHS further proposes that, if an issuer provides contraceptive coverage to plan participants and beneficiaries of self-insured plans of eligible organizations at no additional cost. and it, or another issuer in the same issuer group. is required to pay an FFE user fee. an adjustment in the FFE user fee may be sought for the estimated cost of the contraceptive coverage. HHS would use the definition of issuer group proposed at 45 CFR 156.20 for this purpose. That section proposes that issuer group means all entities treated under section 52(a) or (b) of the Code as a member of the same controlled group of corporations as (or under common control with) a health insurance issuer, or issuers affiliated by the common use of a nationally licensed service mark. HHS seeks comment on whether this definition would provide the appropriate amount of flexibility in calculating the FFE user fee to correctly reflect the costs of issuers in states without an FFE, and on the advantages and disadvantages of permitting an adjustment in the FFE user fee with respect to unaffiliated issuers.

Under this proposal, the issuer providing the contraceptive coverage would provide certain information and documentation (jointly with the

affiliated QHP issuer if applicable) to HHS. First. monthly data on the number of individuals for whom the contraceptive coverage is being provided would be submitted, along with an attestation that a copy of the self-certification of the eligible organization was provided by the third party administrator that arranged for the coverage for the plan participants and beneficiaries. Second, the issuer(s) would be required to provide an attestation that coverage for all recommended contraceptive services identified in the self-certification of the eligible organization is being provided, and being provided without cost sharing. premiums, fee, or other costs to the plan participants or beneficiaries. The issuer also would attest to HHS that it passed the portion of its adjustment attributable to reasonable charges by third party administrators on to those parties. Third, the issuer(s) would be required to identify the QHP(s) being offered through an FFE with respect to which the FFE user fee adjustment is to be made. In addition, if the issuer providing the contraceptive coverage is not the QHP issuer for which the adjustment in the FFE user fee is being sought, HHS proposes to require an attestation that the issuers are from the same issuer group. Finally, the issuer(s) would be required to submit to HHS an estimate of the cost of the contraceptive coverage, along with data or documentation supporting that estimate. HHS approval of the cost estimate would be required before a QHP issuer could receive an FFE user fee adjustment. HHS solicits comment on whether additional information or attestations should be required of issuers, for example, whether issuers should be required to attest that they provided the required notice of availability of contraceptive coverage to plan participants and beneficiaries.

HHS is considering two approaches to ensuring that the cost estimate reasonably reflects the cost of the contraceptive coverage. One approach would require the issuer(s) to submit to HHS the estimated per capita cost of the contraceptive coverage, as well as an actuarial memorandum prepared by a member of the American Academy of Actuaries in accordance with generally accepted actuarial principles and methodologies validating the estimate. HHS seeks comment on appropriate standards to guide such calculations. Under this approach, HHS expects that, in 2016 and beyond, the estimated cost of providing the contraceptive coverage would be based on the issuer's experience in previous years.

---

[14] For simplicity, the discussion that follows uses the shorthand "contraceptive coverage" to refer to contraceptive coverage for participants and beneficiaries in self-insured plans established or maintained by eligible organizations at no cost to plan participants or beneficiaries.

Exhibit 14    JA-0000278

HHS also proposes that the estimate of the cost of the contraceptive coverage could include a reasonable charge for the issuer's administrative costs, including the costs of obtaining regulatory approval of the contraceptive coverage policy in the applicable state as well as a third party administrator's charge. HHS seeks comment on the magnitude of a reasonable administrative charge. HHS recognizes that the contraceptive coverage that issuers would provide under this proposed accommodation could see limited enrollment in a particular state. Given the potentially narrow markets available to the issuers of the contraceptive coverage, the per capita cost of administering this type of coverage may be higher than that for major medical coverage or other excepted benefits. On the other hand, given that a third party administrator would be connecting the plan participants and beneficiaries with the issuer, and there would therefore be reduced marketing costs, the administrative costs could be lessened. HHS seeks comment on the appropriate magnitude of these administrative costs generally, as well as ways of minimizing the administrative costs. In particular, HHS notes the issues associated with reimbursing for fixed costs, including the cost of obtaining regulatory approval for the policy in the applicable state. Fixed administrative costs could be amortized across the expected life of the policy, or could be reimbursed in the first year of operation. HHS seeks comment on the appropriate manner of compensating for such costs.

HHS also seeks comment on whether HHS should limit the number of issuers providing the contraceptive coverage in each state with respect to which an FFE user fee adjustment may be made. If HHS were to modify its proposal in this way, HHS would add that an issuer must be willing and have the ability to offer the contraceptive coverage to any participant or beneficiary in a self-insured plan of an eligible organization who resides in the state.

HHS notes that the estimate of the cost of the contraceptive coverage could include a reasonable margin. HHS seeks comment on the magnitude of a reasonable margin, and notes that the proposed HHS Notice of Benefit and Payment Parameters for 2014 proposes a presumed margin of 3 percent within allowable administrative costs for the risk corridors program.

The proposed inclusion of reasonable administrative costs and margin in the estimate of the cost of the contraceptive coverage is intended to ensure that issuers receive reasonable compensation

for providing the contraceptive coverage, as they would expect to receive in their other commercial businesses. HHS would review the submission by the issuer(s) to ensure that the cost estimate reflects reasonable assumptions and was calculated in accordance with applicable standards and generally accepted actuarial principles and methodologies. HHS would multiply the estimated per capita cost of the contraceptive coverage by the number of individuals being provided the contraceptive coverage each month in order to determine the magnitude of the FFE user fee adjustment. The amount should also take into account the reasonable administrative charges of third party administrators.

Alternatively, HHS could provide a national per capita estimate for the cost of the contraceptive coverage, which would also include adjustments for reasonable administrative costs and margin. This estimate could then be multiplied by the monthly enrollment in the contraceptive coverage in order to determine the magnitude of the FFE user fee adjustment for each QHP issuer concerned. This latter approach would provide for a more standardized approach, but could result in FFE user fee adjustments that do not fund the entire cost of the contraceptive coverage for some issuers, or that overcompensate other issuers. The former approach, however, would place a greater administrative burden on issuers, and would require a more in-depth review by HHS. HHS seeks comment on these two approaches, as well as alternative approaches for determining the estimated cost of the contraceptive coverage.

In both approaches to establishing an estimated cost of providing the contraceptive coverage described above, HHS seeks comment on the appropriate manner of accounting for a third party administrator's administrative costs of arranging for the contraceptive coverage in the issuer's estimated cost of the contraceptive coverage. For example, a flat administrative fee approved by HHS could be included in that estimated cost—with that flat administrative fee including an appropriate margin for the third party administrator. However, such an approach risks providing over- or under-incentives to the third party administrator for arranging for the contraceptive coverage, if the flat administrative fee is too high or too low. Alternatively, the third party administrator's actual reasonable charge, or actual reasonable administrative costs, for arranging the contraceptive coverage could be included in the estimated cost of the

contraceptive coverage. HHS seeks comment on these and other approaches to estimating the third party administrator's administrative costs, and how HHS may ensure that they reflect reasonable administrative costs.

HHS proposes that, if the information described previously is provided and the cost estimate is approved, the FFE user fee will be reduced for the issuer of the identified QHP(s) by the amount of the approved estimate of the cost of the contraceptive coverage (multiplied by enrollment in the coverage for the month). While a highly unlikely occurrence given the relatively small population under consideration, HHS proposes that, if the amount of the adjustment is greater than the amount of the obligation to pay the FFE user fee in a particular month, the issuer of the identified QHP(s) will be provided a credit for the FFE user fee charged in succeeding months in the amount of the excess, consistent with OMB Circular No. A25–R. HHS seeks comment on whether a QHP issuer's FFE user fee should be adjusted for any excess in succeeding months at all; whether, if a QHP issuer's FFE user fee is adjusted for any excess in succeeding months, any time limit should be placed on how much later the adjustment should take place; and alternative methods of compensating an issuer with greater contraceptive coverage costs than its (or its affiliated QHP issuer's) FFE user fees.

HHS also proposes that an issuer providing contraceptive coverage for which the FFE user fee has been adjusted (whether the adjustment was provided to the issuer or an affiliated QHP issuer) must maintain for 10 years and make available to HHS upon request: documentation demonstrating that the contraceptive coverage was provided to participants or beneficiaries in a self-insured plan of an eligible organization, as evidenced by the copy of the self-certification that was provided by the third party administrator that arranged for such coverage; documentation demonstrating that the contraceptive coverage was provided without the imposition of any cost sharing, premium, fee, or other charge; documentation or data supporting the estimate of the cost of the contraceptive coverage; and documentation or data on the actual cost of providing the contraceptive coverage. This record-keeping requirement is consistent with timeframes under the False Claims Act, 31 U.S.C. 3729–3733. HHS is considering mechanisms for ensuring program integrity with respect to the provision of the contraceptive coverage under this proposed accommodation.

Exhibit 14                JA-0000279

These mechanisms may include requiring cooperation with audits and investigations, and requiring corrective action. HHS seeks comment on the oversight requirements that should be implemented with respect to the contraceptive coverage under this proposal.

Finally, HHS is proposing that a QHP issuer that is to receive an FFE user fee adjustment as described above prior to January 1, 2014, will be provided a credit in the amount of the adjustment beginning in January 2014. HHS seeks comment on issuers' ability to fund the contraceptive coverage under the proposal between the end of the temporary enforcement safe harbor and December 31, 2013, if HHS is not able to provide the FFE user fee adjustment until January 2014.

The Departments also seek comment on alternative ways to finance separate contraceptive coverage without cost sharing with respect to participants and beneficiaries in self-insured plans of eligible organizations.

*e. Treatment of Multiple Employer Group Health Plans*

The Departments recognize that, in some instances, several affiliated employers—only some of which are eligible organizations or religious employers—offer health coverage to their employees and their covered dependents through a single group health plan. The Departments considered allowing all employers in such instances to qualify for an accommodation or the religious employer exemption if any single employer met the definition of eligible organization or religious employer. Alternatively, the Departments considered precluding all employers in such instances from qualifying for an accommodation or the religious employer exemption if any single employer failed to meet the definition of eligible organization or religious employer.

The Departments propose to make the accommodation or the religious employer exemption available on an employer-by-employer basis. That is, each employer would have to independently meet the definition of eligible organization or religious employer in order to take advantage of the accommodation or the religious employer exemption with respect to its employees and their covered dependents. Conversely, an employer that did not meet the definition of eligible organization or religious employer could not take advantage of the accommodation or the religious employer exemption with respect to its

employees and their covered dependents. This approach would prevent what could be viewed as a potential way for employers that are not eligible for the accommodation or the religious employer exemption to avoid the contraceptive coverage requirement by offering coverage in conjunction with an eligible organization or religious employer through a common plan. The Departments seek comment on this approach, including comments on the extent to which an employer-by-employer approach would pose administrative challenges for plans and issuers, as well as comments on alternative approaches.

*f. Student Health Insurance Coverage*

Many institutions of higher education administer programs that provide students and their dependents with access to health coverage. Some institutions of higher education sponsor self-insured student health plans, but the vast majority of student health plans are insured, meaning that a health insurance issuer contracts with the institution of higher education to issue a blanket health insurance policy, from which students can buy coverage. Under final rules published by HHS on March 21, 2012, student health insurance coverage is a type of individual health insurance coverage offered to students and their covered dependents under a written agreement between an institution of higher education and an issuer.[15]

Some religiously affiliated colleges and universities object to signing a written agreement for student health insurance coverage that provides benefits for contraceptive services. Such colleges and universities sometimes include funding for student health plans in their student financial aid packages and object to funding student health plans that include coverage for contraceptive services.

The proposed rules would provide for an accommodation for student health insurance coverage arranged by a nonprofit religious institution of higher education with religious objections to contraceptive coverage comparable to the proposed accommodation for group health insurance coverage provided in connection with a group health plan established or maintained by a nonprofit religious organization with religious

objections to contraceptive coverage. Accordingly, among other things, upon receiving a copy of the self-certification from an institution of higher education that meets the criteria for being an eligible organization, an issuer offering student health insurance coverage would provide contraceptive coverage, without cost sharing or additional premium, fee, or other charge, directly to student enrollees and their covered dependents, independent of the issuer's written agreement with the institution of higher education to offer the student health plan. The Departments solicit comments on this proposal.

*g. Contraceptive-Only Excepted Benefits*

In order to implement the proposed accommodations, it would be necessary and appropriate to establish a new contraceptive-only excepted benefits category. Sections 2722(c)(2) and 2763(b) of the PHS Act provide that the requirements of parts A and B of title XXVII of the PHS Act do not apply to any individual health insurance coverage in relation to its provision of excepted benefits described in section 2791(c)(2) of the PHS Act if the benefits are provided under a separate policy, certificate, or contract of insurance. Section 2791(c)(2) of the PHS Act provides that this category of excepted benefits includes limited scope dental or vision benefits, as well as benefits for long-term care, nursing home care, home health care, or community-based care, or any combination thereof. The law authorizes similar limited benefits to be specified in rule as excepted benefits. Additionally, section 2792 of the PHS Act authorizes HHS to promulgate such rules as may be necessary or appropriate to carry out the provisions of title XXVII of the PHS Act. Parallel provisions in section 734 of ERISA and section 9833 of the Code do the same with respect to the Departments of Labor and the Treasury.

Pursuant to the authority in section 2791(c)(2) of the PHS Act (and companion provisions in ERISA and the Code), the proposed rules would provide that benefits for contraceptive services only, when provided under a separate individual market health insurance policy, certificate, or contract of insurance constitute excepted benefits (subject to the conditions discussed later in this section). The Departments propose to establish this new category of excepted benefits to ensure that individual health insurance policies providing contraceptive coverage offered by an issuer pursuant to the proposed accommodations are not subject to certain generally applicable PHS Act and Affordable Care Act

[15] Because student health plans are not employment-based, they are not group health plans under federal law. Section 2791(a)(1) of the PHS Act defines "group health plan" as an employee welfare benefit plan as defined in section 3(1) of ERISA to the extent that the plan provides medical care to employees and their dependents directly or through insurance, reimbursement, or otherwise.

Exhibit 14    JA-0000280

requirements, such as guaranteed availability (section 2702 of the PHS Act) given the unique nature of this coverage. Thus. for example, while issuers would offer this coverage to plan participants and beneficiaries in plans established or maintained by eligible organizations, issuers would not be required to make this coverage available to all other individuals in a state. These proposed amendments are reflected in proposed 45 CFR 148.220(b).

Notwithstanding this proposed excepted benefits status, the Departments believe that a core set of basic consumer protection requirements should apply to individual health insurance policies providing contraceptive-only coverage. This core set of consumer protection requirements would be drawn from the broader set of requirements applicable to individual health insurance coverage under the PHS Act. This core set would include the requirements regarding guaranteed renewability of coverage (section 2703 of the PHS Act). the prohibition against lifetime and annual dollar limits on benefits (section 2711 of the PHS Act), the prohibition against rescissions of coverage (section 2712 of the PHS Act), and internal appeals and external review rights (section 2719 of the PHS Act). Accordingly, pursuant to the authority in section 2792 of the PHS Act to promulgate rules that are "necessary or appropriate" to carry out section 2713 of the PHS Act (and companion provisions in ERISA and the Code). the proposed rules would require compliance with these provisions of federal law as a condition of excepted benefits status. The Departments welcome comments on which requirements of the PHS Act, ERISA. and the Code should or should not apply to individual health insurance policies that provide contraceptive-only coverage. We also seek comments on how to simplify the establishment of these products and how best to ensure their availability in all states. including alternatives to excepted benefits in any state without any such product.

*D. No Effect on Other Law*

The religious employer exemption and accommodations in these proposed rules are intended to have meaning solely with respect to the contraceptive coverage requirement under section 2713 of the PHS Act and the companion provisions of ERISA and the Code. Whether an employer or organization (including an institution of higher education) is designated as "religious" for these purposes is not intended as a judgment about the mission, sincerity. or commitment of the employer or

organization (including an institution of higher education), or intended to differentiate among the religious merits, commitment, mission, or public or private standing of religious entities. The use of such designation is limited solely to defining the class of employers or organizations (including institutions of higher education) that would qualify for the religious employer exemption and accommodations under these proposed rules. The definition of religious employer or eligible organization in these proposed rules is not being proposed to apply with respect to, or relied upon for the interpretation of. any other provision of the PHS Act, ERISA, the Code, or any other provision of federal law, nor is it intended to set a precedent for any other purpose. For example, nothing in these proposed rules should be construed as affecting the interpretation of federal or state civil rights statutes, such as Title VII of the Civil Rights Act of 1964 or Title IX of the Education Amendments of 1972.

Furthermore, nothing in these proposed rules would preclude employers or others from expressing their opposition, if any, to the use of contraceptives; require anyone to use contraceptives; or require health care providers to prescribe contraceptives if doing so is against their religious beliefs.

Finally, the provisions of these proposed rules would not prevent states from enacting stronger consumer protections than these minimum standards. Federal health insurance regulation generally establishes a federal floor to ensure that individuals in every state have certain basic protections. State health insurance laws requiring coverage for contraceptive services that provide more access to contraceptive coverage than the federal standards would therefore continue under the proposed rules. The Departments solicit comment on the interaction between state law and these proposed rules.

## IV. Economic Impact and Paperwork Burden

*A. Executive Orders 12866 and 13563— Department of Health and Human Services and Department of Labor*

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental. and public health and safety effects; distributive impacts; and equity). Executive Order 13563

emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a rule: (1) Having an annual effect on the economy of $100 million or more in any one year, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating a serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof: or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

A regulatory impact analysis must be prepared for major rules with economically significant effects ($100 million or more in any one year), and an "economically significant" regulatory action is subject to review by the Office of Management and Budget (OMB). The Departments have concluded that these proposed rules are not likely to have economic impacts of $100 million or more in any one year, and therefore do not meet the definition of "economically significant" under Executive Order 12866.

1. Need for Regulatory Action

As stated earlier in this preamble, the Departments previously issued amended interim final rules authorizing an exemption for group health plans established or maintained by religious employers (and any group health insurance coverage provided in connection with such plans) from certain coverage requirements under section 2713 of the PHS Act (76 FR 46621, August 3. 2011). The amended interim final rules were finalized on February 15, 2012 (77 FR 8725). The Departments are proposing in these proposed rules to amend the definition of religious employer in the HHS rule at 45 CFR 147.130(a)(1)(iv)(B) (incorporated by reference in the rules of the Departments of Labor and the Treasury) by eliminating the first three prongs of the definition of religious employer that was established in the 2012 final rules and clarifying the fourth prong. Under this proposal, an employer that is an organization that is organized and operates as a nonprofit entity and

Exhibit 14    JA-0000281

is referred to in section 6033(a)(3)(A)(i) or (iii) of the Code would be considered a religious employer and its group health plan would qualify for the exemption from the requirement to cover contraceptive services. In addition, the proposed rules would establish accommodations for health coverage established or maintained or arranged by eligible organizations, which have religious objections to contraceptive coverage, while providing women contraceptive coverage without cost sharing.

### 2. Anticipated Effects

The Departments expect that these proposed rules would not result in any additional significant burden on or costs to the affected entities.

### B. Special Analyses—Department of the Treasury

For purposes of the Department of the Treasury, it has been determined that this notice of proposed rulemaking is not a significant regulatory action as defined in Executive Order 12866, as amended by Executive Order 13563. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to this proposed rule. It is hereby certified that the collections of information contained in this notice of proposed rulemaking would not have a significant impact on a substantial number of small entities. Accordingly, a regulatory flexibility analysis under the Regulatory Flexibility Act (5 U.S.C. chapter 6) is not required.

The proposed rules would require each organization seeking accommodation under the proposed rules to self-certify that it meets the definition of eligible organization in the proposed rules. Each organization must self-certify that: (1) On account of religious objections, it opposes providing coverage for some or all of the contraceptive items or services that it would otherwise be required to provide; (2) it is organized and operates as a nonprofit entity; and (3) it holds itself out as a religious organization. The self-certification must be executed by an authorized representative of the organization. The organization must maintain the self-certification in its records for each plan year to which the accommodation is to apply and make it available for examination upon request. The proposed rules would also require each eligible organization that establishes or maintains an insured group health plan to provide a copy of its self-certification to the group health insurance issuer. If the group health

plan of the eligible organization is self-insured, the proposed rules would direct the eligible organization to provide a copy of its self-certification to the third party administrator.

The Departments intend to specify in guidance the form to be used for the self-certification, similar to the form previously prescribed in guidance for the temporary enforcement safe harbor. The Departments are unable to estimate the number of eligible organizations that would seek an accommodation. The Departments seek comment on the likely number of eligible organizations seeking an accommodation. Of the eligible organizations, some would likely be small entities. It is estimated that each eligible organization would need only approximately 50 minutes of labor (30 minutes of clerical labor at a cost of $30.64 per hour, 10 minutes for a manager at a cost of $55.22 per hour, 5 minutes for legal counsel at a cost of $83.10 per hour, and 5 minutes for a senior executive at a cost of $112.43 per hour) each year to prepare and provide the information in the self-certification. This would not be a significant economic impact. For these reasons, this information collection requirement would not have a significant impact on a substantial number of small entities.

The proposed rules also would require health insurance issuers providing separate contraceptive coverage to provide written notice to plan participants and beneficiaries regarding the availability of the contraceptive coverage. The notice would be provided separate from but contemporaneous with (to the extent possible) any application materials distributed in connection with enrollment (or re-enrollment) in group coverage established, maintained, or arranged by the eligible organization in any plan year to which the accommodation is to apply. The proposed rules contain model language for issuers to use to satisfy the notice requirement. There are 446 issuers in the individual and group markets. It is believed that very few, if any, of them are small entities. Moreover, the cost for preparation and distribution of the notice would not be significant. It is estimated that each issuer would need approximately 1 hour of clerical labor (at $31.64 per hour) and 15 minutes of management review (at $55.22 per hour) to prepare the notices for a total cost of approximately $44. It is estimated that each notice would require $0.46 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail would be $0.51. For these reasons, these information collection

requirements would not have a significant impact on a substantial number of small entities.

HHS is soliciting public comment on each of these issues for purposes of the following section as well.

Pursuant to section 7805(f) of the Code, this proposed rule has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

### C. Paperwork Reduction Act— Department of Health and Human Services

Under the Paperwork Reduction Act of 1995, HHS is required to provide 60-day notice in the **Federal Register** and solicit public comment before an information collection requirement (ICR) is submitted to the Office of Management and Budget (OMB) for review and approval. These proposed rules contain proposed ICRs that are subject to review by OMB. A description of these provisions is given in the following paragraphs with an estimate of the annual burden. In order to fairly evaluate whether an ICR should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 requires that HHS solicit public comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of HHS.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

HHS is soliciting public comment on each of these issues for the following sections of these proposed rules that contain proposed ICRs. Average labor costs (including fringe benefits) used to estimate the costs are calculated using data available from the Bureau of Labor Statistics.

### 1. Self-Certification (§§ 147.131(b)(4). 147.131(c)(1), 147.131(c)(2))

Each organization seeking accommodation under the proposed rules would be required to self-certify that it meets the definition of an eligible organization. The self-certification would be executed by an authorized representative of the organization and would also specify the contraceptive services for which the organization will not establish, maintain, administer, or fund coverage. The self-certification would not be submitted to any of the Departments. The form that would be

Exhibit 14    JA-0000282

used by organizations for their self-certification would be specified. This form is available for inspection at *http://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing.html*. The organization would maintain the self-certification in its records for each plan year to which the accommodation is to apply. The eligible organization would need to provide a copy of its self-certification to a health insurance issuer (for insured group health plans or student health insurance coverage) or to a third party administrator (for self-insured group health plans).

HHS does not have an estimate for how many organizations would seek an accommodation. HHS seeks comment on the likely number of organizations seeking an accommodation or the number of participants and beneficiaries in the plans of such organizations. Therefore, the burden for only one eligible organization. as opposed to all eligible organizations in total, is estimated. It is assumed that, for each eligible organization, clerical staff would gather and enter the necessary information, send the self-certification electronically to the issuer or third party administrator, and retain a copy for record-keeping. a manager and legal counsel would review it, and a senior executive would execute it. HHS estimates that an organization would need approximately 50 minutes (30 minutes of clerical labor at a cost of $30.64 per hour, 10 minutes for a manager at a cost of $55.22 per hour, 5 minutes for legal counsel at a cost of $83.10 per hour, and 5 minutes for a senior executive at a cost of $112.43 per hour) to execute the self-certification. Therefore, the total annual burden for preparing and providing the information in the self-certification would be approximately $41 for each eligible organization.

With respect to self-insured plans of eligible organizations, the third party administrator would provide a health insurance issuer a copy of the self-certification of the eligible organization. The third party administrator would be able to provide a copy of the self-certification to the issuer electronically at minimal cost.

2. Notice of Availability of Contraceptive Coverage (§ 147.131(d))

The proposed rules would direct a health insurance issuer providing separate individual contraceptive coverage at no additional cost to participants and beneficiaries in insured plans of eligible organizations (or to student enrollees and covered

dependents in student health insurance coverage arranged by eligible organizations) and to participants and beneficiaries in self-insured plans of eligible organizations whose coverage is automatically arranged for them by a third party administrator to provide a written notice to such plan participants and beneficiaries (or to such student enrollees and covered dependents) regarding the separate contraceptive coverage. The notice would be separate from but contemporaneous with (to the extent possible) any application materials distributed in connection with enrollment (or re-enrollment) in group coverage of the eligible organization in any plan year to which the accommodation is to apply and would be provided annually. To satisfy the proposed notice requirement, issuers could use the model language set forth in the proposed rules or substantially similar language.

It is unknown how many issuers provide health insurance coverage in connection with insured plans of eligible organizations or how many third party administrators provide services to self-insured plans of eligible organizations or how many issuers would provide separate individual contraceptive coverage to plan participants and beneficiaries of self-insured plans of eligible organizations. Therefore, the burden for only one issuer, as opposed to all issuers in total, is estimated. It is estimated that each issuer would need approximately 1 hour of clerical labor (at $31.64 per hour) and 15 minutes of management review (at $55.22 per hour) to prepare the notices for a total cost of approximately $44. It is estimated that each notice would require $0.46 in postage and $0.05 in materials cost (paper and ink) and the total postage and materials cost for each notice sent via mail would be $0.51.

3. FFE User Fee Adjustments (§ 156.50(d))

In order for a QHP issuer to be eligible for the proposed FFE user fee adjustment, the proposed rules would provide that the issuer providing the contraceptive coverage would provide certain information and documentation (jointly with the affiliated QHP issuer for which the reduction in the FFE user fee is being sought, if the issuers are not the same) to HHS. First, monthly data on the number of individuals for whom the contraceptive coverage is being provided would be required, along with an attestation that a copy of the self-certification of the eligible organization was provided by the third party administrator that arranged for the coverage for the plan participants and

beneficiaries. Second, the issuer would provide an attestation that coverage for all recommended contraceptive services identified in the self-certification of the eligible organization is being provided, and being provided without cost sharing. premiums, fee, or other costs to the plan participants or beneficiaries. The issuer also would attest to HHS that it passed the portion of its adjustment attributable to reasonable charges by third party administrators on to those parties. Third, the issuer(s) would identify the QHP(s) being offered through an FFE with respect to which the FFE user fee reduction is to be applied. In addition, where the issuer providing the contraceptive coverage is not the QHP issuer for which the reduction in the FFE user fee is being sought, an attestation that the issuers are from the same issuer group would be submitted. Finally, the issuer(s) would submit to HHS an estimate of the cost of the contraceptive coverage, along with data or documentation supporting that estimate. HHS approval of the cost estimate would be required before a QHP issuer could receive an FFE user fee adjustment.

Although the number of QHP issuers that would seek an FFE user fee adjustment is unknown at this point, HHS anticipates that a small number of issuer groups would provide such contraceptive coverage nationwide, and that, for purposes of efficiency, those issuer groups would consolidate their applications for FFE user fee adjustments with fewer than 9 issuers of QHPs on FFEs. Collections from fewer than 10 persons are exempt from the Paperwork Reduction Act under 44 U.S.C. 3502(3)(A)(i). Therefore, HHS does not plan to seek OMB approval for this proposed ICR. However, in the event that, by the time of the issuance of the final rules. HHS believes that the number of QHP issuers that would seek an FFE user fee adjustment would be greater than 9. HHS would seek OMB approval for this proposed ICR.

To obtain copies of the supporting statement and any related forms for the proposed ICRs referenced above, access CMS's web site at *http://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing.html* or email your request, including your address, phone number, OMB number, and CMS document identifier, to *paperwork@cms.hhs.gov*, or call the Reports Clearance Office at (410) 786–1326.

If you comment on these proposed ICRs. please do either of the following:

1. Submit your comments electronically as specified in the

Exhibit 14    JA-0000283

ADDRESSES section of these proposed rules; or

2. Submit your comments to the Office of Information and Regulatory Affairs, Office of Management and Budget, Attention: CMS Desk Officer, 9968–P, FAX: (202) 395–5806, or email: *OIRA_submission@omb.eop.gov*.

### D. Paperwork Reduction Act— Department of Labor and Department of the Treasury

As noted above, each organization seeking accommodation under the proposed rules would be required to self-certify that it meets the definition of an eligible organization. This proposed requirement, which is the same in all three sets of proposed rules, is set out in proposed 26 CFR 54.9815–2713A(b)(4) and proposed 29 CFR 2590.715–2713A(b)(4). The Departments are soliciting public comments for 60 days concerning this record-keeping requirement. The Departments will submit a copy of these proposed rules to OMB in accordance with 44 U.S.C. 3507(d) for review of the proposed ICRs. The Departments and OMB are particularly interested in comments that:

• Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

• Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

• Enhance the quality, utility, and clarity of the information to be collected; and

• Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, for example, by permitting electronic submission of responses.

Comments should be sent to the Office of Information and Regulatory Affairs, Attention: Desk Officer for the Employee Benefits Security Administration either by Fax to (202) 395–5806 or by email to *oira_submission@omb.eop.gov*. A copy of the proposed ICRs may be obtained by contacting the PRA addressee: G. Christopher Cosby, Office of Policy and Research, Department of Labor, Employee Benefits Security Administration, 200 Constitution Avenue NW., Room N–5718, Washington, DC 20210; telephone: (202) 693–8410; Fax: (202) 219–4745 (please

note that these numbers are not toll-free numbers): email: *ebsa.opr@dol.gov*. Proposed ICRs submitted to OMB also are available at *www.reginfo.gov (http://www.reginfo.gov/public/do/PRAMain)*.

Consistent with the HHS analysis presented above, the Departments do not have an estimate for how many organizations would seek an accommodation. The Departments seek comment on the likely number of organizations seeking an accommodation and the number of participants and beneficiaries in the plans of such organizations. The Departments rely on the same estimates noted above: 50 minutes per organization to execute the self-certification (*i.e.*, approximately $41 for each eligible organization).

With respect to self-insured plans of eligible organizations, the third party administrator would provide a health insurance issuer a copy of the self-certification of the eligible organization. The third party administrator would be able to provide a copy of the self-certification to the issuer electronically at minimal cost.

The Departments note that persons are not required to respond to, and generally are not subject to any penalty for failing to comply with, an ICR unless the ICR has a valid OMB control number. The paperwork burden estimates are summarized as follows:

*Type of Review:* New collection.

*Agencies:* Employee Benefits Security Administration, Department of Labor; Internal Revenue Service, Department of the Treasury.

*Title:* Self-Certification; Preventive Services Coverage.

*OMB Number:* XXXX–XXXX; XXXX–XXXX.

*Affected Public:* Business or other for-profit; not-for-profit institutions.

*Total Respondents:* Unknown.

*Total Responses:* Unknown.

*Frequency of Response:* Once.

*Estimated Total Annual Burden Hours:* 50 minutes per respondent.

*Estimated Total Annual Burden Cost:* Unknown.

### V. Unfunded Mandates Reform Act

For purposes of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4), as well as Executive Order 12875, these proposed rules do not include any proposed federal mandate that may result in expenditures by state, local, or tribal governments, nor does it include any proposed federal mandates that may impose an annual burden of $100 million, adjusted for inflation, or more on the private sector.[16]

---

[16] In early 2013, that threshold level is approximately $139 million.

### VI. Federalism—Department of Health and Human Services and Department of Labor

Executive Order 13132 outlines fundamental principles of federalism, and requires the adherence to specific criteria by federal agencies in the process of their formulation and implementation of policies that have "substantial direct effects" on states, the relationship between the federal government and states, or the distribution of power and responsibilities among the various levels of government. Federal agencies promulgating rules that have these federalism implications must consult with state and local officials, and describe the extent of their consultation and the nature of the concerns of state and local officials in the preamble to the rules.

In the Departments' view, these proposed rules have federalism implications, but the federal implications are substantially mitigated because, with respect to health insurance issuers, 15 states have enacted specific laws, rules, or bulletins that meet or exceed the federal standards requiring coverage of specified preventive services without cost sharing. The remaining states which provide oversight for these federal law requirements are doing so using their general authority to enforce these federal standards. Therefore, the proposed rules are not likely to require substantial additional oversight of states by HHS.

In general, section 514 of ERISA provides that state laws are superseded to the extent that they relate to any covered employee benefit plan, and preserves state laws that regulate insurance, banking, or securities. ERISA also prohibits states from regulating a covered plan as an insurance or investment company or bank. HIPAA added a new preemption provision to ERISA (as well as to the PHS Act) narrowly preempting state requirements for group health insurance coverage. States may continue to apply state law requirements but not to the extent that such requirements prevent the application of the federal requirement that group health insurance coverage provided in connection with group health plans provide coverage for specified preventive services without cost sharing. HIPAA's Conference Report states that the conferees intended the narrowest preemption of state laws with regard to health insurance issuers (H.R. Conf. Rep. No. 104–736, 104th Cong. 2d Session 205, 1996). State insurance laws that are more stringent

Exhibit 14

JA-0000284

than the federal requirement are unlikely to ''prevent the application of'' the preventive services coverage provision, and therefore are not preempted. Accordingly, states have significant latitude to impose requirements on health insurance issuers that are more restrictive than those in federal law.

Guidance conveying this interpretation was published in the **Federal Register** on April 8, 1997 (62 FR 16904), and December 30, 2004 (69 FR 78720), and these proposed rules would clarify and implement the statute's minimum standards and would not significantly reduce the discretion given the states by the statute.

The PHS Act provides that the states may enforce the provisions of title XXVII of the PHS Act as they pertain to issuers, but that the Secretary of HHS will enforce any provisions that a state does not have authority to enforce or that a state has failed to substantially enforce. When exercising its responsibility to enforce provisions of the PHS Act, HHS works cooperatively with the state for the purpose of addressing the state's concerns and avoiding conflicts with the exercise of state authority.[17] HHS has developed procedures to implement its enforcement responsibilities, and to afford states the maximum opportunity to enforce the PHS Act's requirements in the first instance. In compliance with Executive Order 13132's requirement that agencies examine closely any policies that may have federalism implications or limit the policymaking discretion of states, the Departments have engaged in numerous efforts to consult and work cooperatively with affected state and local officials.

In conclusion, throughout the process of developing these proposed rules, to the extent feasible within the specific preemption provisions of ERISA and the PHS Act, the Departments have attempted to balance states' interests in regulating health plans and health insurance issuers, and the rights of those individuals that Congress intended to protect in the PHS Act.

## VII. Statutory Authority

The Department of the Treasury regulations are proposed to be adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor regulations are proposed to be adopted pursuant to the authority contained in 29 U.S.C. 1002(16), 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

The Department of Health and Human Services regulations are proposed to be adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended; and Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Public Law 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

## List of Subjects

### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping requirements, and State regulation of health insurance.

### 45 CFR Part 148

Administrative practice and procedure, Health care, Health insurance, Penalties, and Reporting and recordkeeping requirements.

### 45 CFR Part 156

Administrative practice and procedure, Advertising, Advisory committees, Brokers, Conflict of interest, Consumer protection, Grant programs—health, Grants administration, Health care, Health insurance, Health maintenance organization (HMO), Health records, Hospitals, American Indian/Alaska Natives, Individuals with disabilities, Loan programs—health, Organization

and functions (Government agencies), Medicaid, Public assistance programs, Reporting and recordkeeping requirements, State and local governments, Sunshine Act, Technical assistance, Women, and Youth.

**Department of the Treasury**

**Internal Revenue Service**

Accordingly, 26 CFR part 54 is proposed to be amended as follows:

## PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 continues to read in part as follows:

    **Authority:** 26 U.S.C. 7805. * * *

■ **Par. 2.** Section 54.9801–2 is amended by revising the definition of *excepted benefits* as follows:

### § 54.9801–2    Definitions.

\*    \*    \*    \*    \*

*Excepted benefits* means the benefits described as excepted in § 54.9831(c), or 45 CFR § 148.220 (describing when individual health insurance policies constitute excepted benefits).

\*    \*    \*    \*    \*

■ **Par. 3.** Section 54.9815–2713 is amended by adding paragraph (a)(1) introductory text and revising paragraph (a)(1)(iv) to read as follows:

### § 54.9815–2713    Coverage of preventive health services.

(a) *Services*—(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 54.9815–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

\*    \*    \*    \*    \*

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration, in accordance with 45 CFR 147.131(a).

\*    \*    \*    \*    \*

■ **Par. 4.** Section 54.9815–2713A is added to read as follows:

### § 54.9815–2713A    Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that

---

[17] This authority applies to insurance issued with respect to group health plans generally, including plans covering employees of church organizations. Thus, this discussion of federalism applies to all group health insurance coverage that is subject to the PHS Act, including those church plans that provide coverage through a health insurance issuer (but not to church plans that do not provide coverage through a health insurance issuer).

Exhibit 14    JA-0000285

satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization maintains in its records a self-certification, made in the manner and form specified by the Secretary of Health and Human Services, for each plan year to which the accommodation is to apply, executed by a person authorized to make the certification on behalf of the organization, indicating that the organization satisfies the criteria in paragraphs (a)(1) through (3) of this section, and, specifying those contraceptive services for which the organization will not establish, maintain, administer, or fund coverage, and makes such certification available for examination upon request.

(b) *Contraceptive coverage—self-insured group health plan coverage.* [Reserved.]

(c) *Contraceptive coverage—insured group health plan coverage*—(1) A group health plan established or maintained by an eligible organization and that provides benefits through one or more issuers complies with any requirement under § 54.9815–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or plan administrator furnishes each issuer that would otherwise provide coverage for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) with a copy of the self-certification described in paragraph (a)(4) of this section.

(2) A group health insurance issuer that receives a copy of the self-certification described in paragraph (a)(4) of this section with respect to a plan for which the issuer would otherwise provide coverage for any contraceptive services required to be covered under § 54.9815–2713(a)(1)(iv) must automatically provide health insurance coverage for any contraceptive services required to be covered by § 54.9815–2713(a)(1)(iv) and identified in the self-certification, through a separate health insurance policy that is excepted under 45 CFR 148.220(b)(7), for each plan participant and beneficiary. The issuer providing the individual market excepted benefits policy may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with

respect to coverage of those services, or impose any premium, fee, or other charge, or portion thereof, directly or indirectly, on the eligible organization, its group health plan, or plan participants or beneficiaries with respect to coverage of those services.

(d) *Notice of availability of contraceptive coverage.* An issuer providing contraceptive coverage arranged pursuant to paragraph (b) or (c) of this section must provide to plan participants and beneficiaries written notice of the availability of the contraceptive coverage, separate from but contemporaneous with (to the extent possible) application materials distributed in connection with enrollment (or re-enrollment) in group coverage of the eligible organization for any plan year to which this paragraph applies. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph: ''The organization that establishes and maintains, or arranges, your health coverage has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your health coverage will not cover the following contraceptive services: [contraceptive services specified in self-certification]. Instead, these contraceptive services will be covered through a separate individual health insurance policy, which is not administered or funded by, or connected in any way to, your health coverage. You and any covered dependents will be enrolled in this separate individual health insurance policy at no additional cost to you. If you have any questions about this notice, contact [contact information for health insurance issuer].''

## Department of Labor

### Employee Benefits Security Administration

For the reasons stated in the preamble, the Department of Labor proposes to amend 29 CFR part 2590 as follows:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ 1. The authority citation for part 2590 continues to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185c, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public

Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

■ 2. Section 2590.701–2 is amended by revising the definition of *Excepted benefits* as follows:

### § 2590.701–2  Definitions.

\*    \*    \*    \*    \*

*Excepted benefits* means the benefits described as excepted in § 2590.732(c), or 45 CFR § 148.220 (describing when individual health insurance policies constitute excepted benefits).

\*    \*    \*    \*    \*

■ 3. Section 2590.715–2713 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 2590.715–2713  Coverage of preventive health services.

(a) *Services*—(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 2590.715–2713A, a group health plan, or a health insurance issuer offering group health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

\*    \*    \*    \*    \*

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration, in accordance with 45 CFR 147.131(a).

\*    \*    \*    \*    \*

■ 4. A new § 2590.715–2713A is added to read as follows:

### § 2590.715–2713A  Accommodations in connection with coverage of preventive health services.

(a) *Eligible organizations.* An eligible organization is an organization that satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 2590.715–713(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

Exhibit 14                                                                                                                                                    JA-0000286

(4) The organization maintains in its records a self-certification, made in the manner and form specified by the Secretary of Health and Human Services, for each plan year to which the accommodation is to apply, executed by a person authorized to make the certification on behalf of the organization, indicating that the organization satisfies the criteria in paragraphs (a)(1) through (3) of this section, and, specifying those contraceptive services for which the organization will not establish, maintain, administer, or fund coverage, and makes such certification available for examination upon request.

(b) *Contraceptive coverage—self-insured group health plan coverage.* [Reserved.]

(c) *Contraceptive coverage—insured group health plan coverage.* (1) A group health plan established or maintained by an eligible organization and that provides benefits through one or more issuers complies with any requirement under § 2590.715–2713(a)(1)(iv) to provide contraceptive coverage if the eligible organization or plan administrator furnishes each issuer that would otherwise provide coverage for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) with a copy of the self-certification described in paragraph (a)(4) of this section.

(2) A group health insurance issuer that receives a copy of the self-certification described in paragraph (a)(4) of this section with respect to a plan for which the issuer would otherwise provide coverage for any contraceptive services required to be covered under § 2590.715–2713(a)(1)(iv) must automatically provide health insurance coverage for any contraceptive services required to be covered by § 2590.715–2713(a)(1)(iv) and identified in the self-certification, through a separate health insurance policy that is excepted under 45 CFR 148.220(b)(7), for each plan participant and beneficiary. The issuer providing the individual market excepted benefits policy may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with respect to coverage of those services, or impose any premium, fee, or other charge, or portion thereof, directly or indirectly, on the eligible organization, its group health plan, or plan participants or beneficiaries with respect to coverage of those services.

(d) *Notice of availability of contraceptive coverage.* An issuer providing contraceptive coverage arranged pursuant to paragraph (b) or (c) of this section must provide to plan participants and beneficiaries written notice of the availability of the contraceptive coverage, separate from but contemporaneous with (to the extent possible) application materials distributed in connection with enrollment (or re-enrollment) in group coverage of the eligible organization for any plan year to which this paragraph applies. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph: ''The organization that establishes and maintains, or arranges, your health coverage has certified that your group health plan qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your health coverage will not cover the following contraceptive services: [contraceptive services specified in self-certification]. Instead, these contraceptive services will be covered through a separate individual health insurance policy, which is not administered or funded by, or connected in any way to, your health coverage. You and any covered dependents will be enrolled in this separate individual health insurance policy at no additional cost to you. If you have any questions about this notice, contact [contact information for health insurance issuer].''

**Department of Health and Human Services**

For the reasons stated in the preamble, the Department of Health and Human Services proposes to amend 45 CFR Subtitle A parts 147, 148, and 156 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Section 147.130 is amended by revising paragraphs (a)(1) introductory text and (a)(1)(iv) to read as follows:

### § 147.130 Coverage of preventive health services.

(a) *Services—*(1) *In general.* Beginning at the time described in paragraph (b) of this section and subject to § 147.131, a group health plan, or a health insurance issuer offering group or individual health insurance coverage, must provide coverage for all of the following items and services, and may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with respect to those items and services:

\*    \*    \*    \*    \*

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration.

\*    \*    \*    \*    \*

■ 2. A new § 147.131 is added to read as follows:

### § 147.131 Exemption and accommodations in connection with coverage of preventive health services.

(a) *Religious employers.* In issuing guidelines under § 147.130(a)(1)(iv), the Health Resources and Services Administration may establish an exemption from such guidelines with respect to a group health plan established or maintained by a religious employer (and health insurance coverage provided in connection with a group health plan established or maintained by a religious employer) with respect to any requirement to cover contraceptive services under such guidelines. For purposes of this paragraph (a), a ''religious employer'' is an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code of 1986, as amended.

(b) *Eligible organizations.* An eligible organization is an organization that satisfies all of the following requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization maintains in its records a self-certification, made in the manner and form specified by the Secretary of Health and Human Services, for each plan year to which the accommodation is to apply, executed by a person authorized to make the certification on behalf of the organization, indicating that the organization satisfies the criteria in paragraphs (b)(1) through (3) of this section, and, specifying those contraceptive services for which the

Exhibit 14                                                                                          JA-0000287

organization will not establish, maintain, administer, or fund coverage, and makes such certification available for examination upon request.

(c) *Contraceptive coverage—insured group health plan coverage.* (1) A group health plan established or maintained by an eligible organization and that provides benefits through one or more issuers complies with any requirement under § 147.130(a)(1)(iv) to provide contraceptive coverage if the eligible organization or plan administrator furnishes each issuer that would otherwise provide coverage for any contraceptive services required to be covered under § 147.130(a)(1)(iv) with a copy of the self-certification described in paragraph (b)(4) of this section.

(2) A group health insurance issuer that receives a copy of the self-certification described in paragraph (b)(4) of this section with respect to a plan for which the issuer would otherwise provide coverage for any contraceptive services required to be covered under § 147.130(a)(1)(iv) must automatically provide health insurance coverage for any contraceptive services required to be covered by § 147.130(a)(1)(iv) and identified in the self-certification, through a separate health insurance policy that is excepted under § 148.220(b)(7) of this subtitle, for each plan participant and beneficiary. The issuer providing the individual market excepted benefits policy may not impose any cost sharing requirement (such as a copayment, coinsurance, or a deductible) with respect to coverage of those services, or impose any premium, fee, or other charge, or portion thereof, directly or indirectly, on the eligible organization, its group health plan, or plan participants or beneficiaries with respect to coverage of those services.

(d) *Notice of availability of contraceptive coverage.* An issuer providing contraceptive coverage arranged pursuant to paragraph (c) of this section must provide to plan participants and beneficiaries written notice of the availability of the contraceptive coverage, separate from but contemporaneous with (to the extent possible) application materials distributed in connection with enrollment (or re-enrollment) in group coverage of the eligible organization for any plan year to which this paragraph applies. The following model language, or substantially similar language, may be used to satisfy the notice requirement of this paragraph: "The organization that establishes and maintains, or arranges, your health coverage has certified that your [group health plan/ student health insurance coverage] qualifies for an accommodation with

respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your health coverage will not cover the following contraceptive services: [contraceptive services specified in self-certification]. Instead, these contraceptive services will be covered through a separate individual health insurance policy, which is not administered or funded by, or connected in any way to, your health coverage. You and any covered dependents will be enrolled in this separate individual health insurance policy at no additional cost to you. If you have any questions about this notice, contact [contact information for health insurance issuer]."

(e) *Application to student health insurance coverage.* The provisions of this section apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education in a manner comparable to that in which they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer. In applying this section in the case of student health insurance coverage, a reference to "plan participants and beneficiaries" is a reference to student enrollees and their covered dependents.

## PART 148—REQUIREMENTS FOR THE INDIVIDUAL HEALTH INSURANCE MARKET

■ 3. The authority citation for part 148 continues to read as follows:

**Authority:** Secs. 2741 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg–41 through 300gg–63, 300gg–91, and 300gg–92).

■ 4. Section 148.220 is amended as follows:

■ a. In the introductory text of paragraph (b), the reference "(b)(6)" is removed and the reference "(b)(7)" is added in its place.

■ b. Adding paragraph (b)(7).

The addition reads as follows:

### § 148.220  Excepted benefits.
\*    \*    \*    \*    \*

(b) \*    \*    \*

(7) Individual health insurance coverage that provides coverage only for contraceptive services pursuant to § 147.131(c) of this subtitle, 26 CFR 54.9815–2713A(b) or (c), or 29 CFR 2590.715–2713A(b) or (c), but only if such coverage complies with the requirements in the following provisions:

(i) Section 2703 of the PHS Act (relating to guaranteed renewability of coverage).

(ii) Section 2711 of the PHS Act (relating to the prohibition on lifetime and annual dollar limits on benefits).

(iii) Section 2712 of the PHS Act (relating to the prohibition on rescissions of coverage).

(iv) Section 2719 of the PHS Act (relating to internal appeals and external review).

## PART 156—HEALTH INSURANCE ISSUER STANDARDS UNDER THE AFFORDABLE CARE ACT, INCLUDING STANDARDS RELATED TO EXCHANGES

■ 5. The authority citation for part 156 continues to read as follows:

**Authority:** Title I of the Affordable Care Act, sections 1301–1304, 1311–1312, 1321–1322, 1324, 1334, 1342–1343, 1401–1402, and 1412, Pub. L. 111–148, 124 Stat. 119 (42 U.S.C. 18021–18024, 18031–18032, 18041–18042, 18044, 18054, 18061, 18063, 18071, 18082, 26 U.S.C. 36B, and 31 U.S.C. 9701).

■ 6. Section 156.150 is amended by adding paragraph (d) to read as follows:

### § 156.50  Financial support.
\*    \*    \*    \*    \*

(d) *Adjustment of Federally-facilitated Exchange user fee.* If a QHP issuer (or another issuer in the same issuer group) provides individual health insurance coverage consisting of coverage for any contraceptive services required to be covered under § 147.130(a)(1)(iv) of this subchapter, and identified in the self-certification referenced in § 147.131(b)(4) of this subchapter, to any plan participant or beneficiary with respect to whom the QHP issuer receives the written notice referenced in 26 CFR 54.9815–2713A(b) or 29 CFR 2590.715–2713A(b), the QHP issuer may qualify for a reduction in the user fee for a Federally-facilitated Exchange specified in paragraph (c) as described in this paragraph (d).

(1) In order for a QHP issuer to be eligible for the Federally-facilitated Exchange user fee reduction, in providing such contraceptive coverage to such individuals, the QHP issuer (or another issuer in the same issuer group) may not impose any cost-sharing requirement (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, directly or indirectly, with respect to such contraceptive coverage, and must satisfy the other conditions set forth in this section.

(2) If an issuer provides such contraceptive coverage to such individuals, and it, or another issuer in the same issuer group, is required to pay

Exhibit 14    JA-0000288

the Federally-facilitated Exchange user fee, a reduction in that user fee may be sought for the HHS-approved estimated cost of such contraceptive coverage.

(3) In order for a QHP issuer to be eligible for the Federally-facilitated Exchange user fee reduction, the issuer of such contraceptive coverage to such individuals must (jointly with the issuer seeking the reduction in the Federally-facilitated Exchange user fee. if not the same issuers) do all of the following:

(i) Provide monthly data on the number of individuals to whom the contraceptive coverage is being provided, and provide an attestation by the issuer providing the contraceptive coverage that the issuer received a copy of the written notice referenced in 26 CFR 54.9815–2713A(b) or 29 CFR 2590.715–2713A(b) with respect to each plan participant or beneficiary.

(ii) Provide an attestation by the issuer providing the contraceptive coverage that the issuer provided contraceptive coverage in accordance with paragraph (d) of this section and that the issuer passed the portion of the reduction in the Federally-facilitated Exchange user fee attributable to reasonable charges by third party administrators on to the third party administrators.

(iii) Identify the QHP(s) being offered through a Federally-facilitated Exchange with respect to which the user fee reduction is to be applied, and, if the issuer providing the contraceptive coverage is not the issuer seeking the user fee reduction, provide an attestation by the issuer providing the contraceptive coverage that both the issuer providing the contraceptive coverage and the issuer seeking the user fee reduction belong to the same issuer group.

(iv) Submit an estimate of the cost of the contraceptive coverage to HHS for approval, in the manner and timeframe specified by HHS, concurrent with documentation or data supporting that estimate.

(4) If the information specified under paragraphs (d)(3)(i) through (iii) of this section is provided and the estimate specified under paragraph (d)(3)(iv) of this section is submitted and approved by HHS, the issuer of the identified QHP(s) will be provided a reduction in its obligation to pay the Federally-facilitated Exchange user fee specified in paragraph (c) in an amount equal in value to the approved estimated cost of the contraceptive coverage, as long as an exception from OMB Circular No. A–25 is in effect. If the amount of the reduction is greater than the amount of the obligation to pay the Federally-facilitated Exchange user fee in a particular month. the issuer of the identified QHP(s) will be provided a credit in succeeding months in the amount of the excess. An issuer that is eligible for a user fee reduction in accordance with this paragraph (d) prior to January 1, 2014, will be provided a credit in the amount of the user fee reduction beginning January 2014.

(5) An issuer providing contraceptive coverage for which a reduction in the Federally-facilitated Exchange user fee has been provided under paragraph (d)(4) of this section (whether the reduction was provided to the issuer or another issuer in the same issuer group) must maintain for 10 years and make available to HHS upon request all of the following:

(i) Documentation demonstrating that the contraceptive coverage was provided to plan participants or beneficiaries with respect to whom the issuer received a copy of the written notice referenced in 26 CFR 54.9815–2713A(b) or 29 CFR 2590.715–2713A(b).

(ii) Documentation demonstrating that the contraceptive coverage was provided in accordance with paragraph (d) of this section.

(iii) Documentation or data supporting the estimate of the cost of the contraceptive coverage.

(iv) Documentation or data on the actual cost of providing the contraceptive coverage.

Signed this 30th day of January 2013.

**Steven T. Miller,**

*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

Signed this 30th day of January 2013.

**Phyllis C. Borzi.**

*Assistant Secretary. Employee Benefits Security Administration. Department of Labor.*

Dated: January 29, 2013.

**Marilyn Tavenner.**

*Acting Administrator. Centers for Medicare & Medicaid Services.*

Approved: January 29, 2013.

**Kathleen Sebelius,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2013–02420 Filed 2–1–13; 11:15 am]

**BILLING CODE 4830–01; 4510–029; 4120–01; 6325–64–P**

# SAINT LAWRENCE SEAWAY DEVELOPMENT CORPORATION

## 33 CFR Part 401

[Docket No. SLSDC–2013–0001; 2135–AA31]

### Seaway Regulations and Rules: Periodic Update, Various Categories

**AGENCY:** Saint Lawrence Seaway Development Corporation, DOT.

**ACTION:** Notice of Proposed Rulemaking.

**SUMMARY:** The Saint Lawrence Seaway Development Corporation (SLSDC) and the St. Lawrence Seaway Management Corporation (SLSMC) of Canada, under international agreement, jointly publish and presently administer the St. Lawrence Seaway Regulations and Rules (Practices and Procedures in Canada) in their respective jurisdictions. Under agreement with the SLSMC, the SLSDC is amending the joint regulations by updating the Seaway Regulations and Rules in various categories. The proposed changes will update the following sections of the Regulations and Rules: Condition of Vessels; Seaway Navigation; Dangerous Cargo; and. Information and Reports. These proposed amendments are necessary to take account of updated procedures and will enhance the safety of transits through the Seaway. Several of the proposed amendments are merely editorial or for clarification of existing requirements.

**DATES:** Any party wishing to present views on the proposed amendment may file comments with the Corporation on or before March 8, 2013.

**ADDRESSES:** You may submit comments identified by Docket Number SLSDC 2013–0001 by any of the following methods:

• *Web Site: http:// www.Regulations.gov* . Follow the online instructions for submitting comments/submissions.

• *Fax:* 1–202–493–2251.

• *Mail:* Docket Management Facility; U.S. Department of Transportation, 1200 New Jersey Avenue SE., West Building Ground Floor, Room W12–140, Washington, DC 20590–001.

• *Hand Delivery:* Documents may be submitted by hand delivery or courier to West Building Ground Floor, Room W12–140. 1200 New Jersey Avenue, SE., Washington, DC 20590–001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal Holidays.

*Instructions:* All submissions must include the agency name and docket number or Regulatory Identification Number (RIN) for this rulemaking. Note

Exhibit 14    JA-0000289

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Part 54**

**RIN 1545–BJ60**

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB44**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Part 147**

**[CMS–9968–ANPRM]**

**RIN 0938–AR42**

**Certain Preventive Services Under the Affordable Care Act**

**AGENCIES:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Advance notice of proposed rulemaking (ANPRM).

**SUMMARY:** This advance notice of proposed rulemaking announces the intention of the Departments of Health and Human Services, Labor, and the Treasury to propose amendments to regulations regarding certain preventive health services under provisions of the Patient Protection and Affordable Care Act (Affordable Care Act). The proposed amendments would establish alternative ways to fulfill the requirements of section 2713 of the Public Health Service Act and companion provisions under the Employee Retirement Income Security Act and the Internal Revenue Code when health coverage is sponsored or arranged by a religious organization that objects to the coverage of contraceptive services for religious reasons and that is not exempt under the final regulations published February 15, 2012. This document serves as a request for comments in advance of proposed rulemaking on the potential means of accommodating such organizations while ensuring contraceptive coverage for plan participants and beneficiaries covered under their plans (or, in the case of student health insurance plans, student enrollees and their dependents) without cost sharing.

**DATES:** Comments are due on or before June 19, 2012.

**ADDRESSES:** Written comments may be submitted as specified below. Any comment that is submitted will be shared with the other Departments. Please do not submit duplicate comments.

All comments will be made available to the public. **Please Note:** Do not include any personally identifiable information (such as name, address, or other contact information) or confidential business information that you do not want publicly disclosed. All comments are posted on the Internet exactly as received, and can be retrieved by most Internet search engines. No deletions, modifications, or redactions will be made to the comments received, as they are public records. Comments may be submitted anonymously.

In commenting, please refer to file code CMS–9968–ANPRM. Because of staff and resource limitations, the Departments cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this ANPRM to *http://www.regulations.gov.* Follow the instructions under the ''More Search Options'' tab.

2. *By regular mail.* You may mail written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9968–ANPRM, P.O. Box 8016, Baltimore, MD 21244–1850.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address only: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–9968–ANPRM, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* If you prefer, you may deliver (by hand or courier) your written comments before the close of the comment period to either of the following addresses:

a. For delivery in Washington, DC— Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201.

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD— Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call (410) 786–9994 in advance to schedule your arrival with one of our staff members.

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. The Departments post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *http:// www.regulations.gov.* Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately three weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4 p.m. EST. To schedule an appointment to view public comments, call 1–800–743–3951.

**FOR FURTHER INFORMATION CONTACT:** Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service, Department of the Treasury, at (202) 927–9639; Jacob Ackerman, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*http://www.dol.gov/ebsa*). In

Exhibit 15

**16502**    **Federal Register** / Vol. 77, No. 55 / Wednesday, March 21, 2012 / Proposed Rules

addition, information from HHS on private health insurance for consumers can be found on the CMS Web site (*www.cciio.cms.gov*), and information on health reform can be found at *http://www.HealthCare.gov*.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Patient Protection and Affordable Care Act, Public Law 111–148, was enacted on March 23, 2010; the Health Care and Education Reconciliation Act of 2010, Public Law 111–152, was enacted on March 30, 2010 (collectively, the Affordable Care Act). The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and make them applicable to group health plans.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage provide benefits for certain preventive health services without the imposition of cost sharing. These preventive health services include, with respect to women, preventive care and screening provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA) that were issued on August 1, 2011 (HRSA Guidelines).[1] As relevant here, the HRSA Guidelines require coverage, without cost sharing, for ''[a]ll Food and Drug Administration [(FDA)] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity,'' as prescribed by a provider.[2] Except as discussed below, non-grandfathered group health plans and health insurance issuers offering non-grandfathered group or individual health insurance coverage are required to provide coverage consistent with the HRSA Guidelines, without cost sharing, in plan years (or, in the individual market, policy years) beginning on or after

August 1, 2012.[3] These guidelines were based on recommendations of the independent Institute of Medicine, which undertook a review of the scientific and medical evidence on women's preventive services.

The Departments of Health and Human Services (HHS), Labor, and the Treasury (the Departments) published interim final regulations implementing section 2713 of the PHS Act on July 19, 2010 (75 FR 41726). In response to comments, the Departments amended the interim final regulations on August 1, 2011.[4] The amendment provided HRSA with discretion to establish an exemption for group health plans established or maintained by certain religious employers (and any group health insurance coverage provided in connection with such plans) with respect to any contraceptive services that they would otherwise be required to cover consistent with the HRSA Guidelines. The amended interim final regulations further specified that, for purposes of this exemption only, a religious employer is one that—(1) has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. This religious exemption is consistent with the policies in some States that currently both require contraceptive coverage and provide for some type of religious exemption from their contraceptive coverage requirement.

In the HRSA Guidelines, HRSA exercised its discretion under the amended interim final regulations such that group health plans established or maintained by these religious employers (and any group health insurance coverage provided in connection with such plans) are not required to cover any contraceptive services. In the final regulations published on February 15, 2012 (77 FR 8725), the Departments

adopted the definition of religious employer in the amended interim final regulations.

The Departments emphasize that this religious exemption is intended *solely* for purposes of the contraceptive coverage requirement pursuant to section 2713 of the PHS Act and the companion provisions of ERISA and the Code. Whether an employer is designated as ''religious'' for these purposes is not intended as a judgment about the mission, sincerity, or commitment of the employer, and the use of such designation is limited to defining the class that qualifies for this specific exemption. The designation will not be applied with respect to any other provision of the PHS Act, ERISA, or the Code, nor is it intended to set a precedent for any other purpose.

In addition, we note that this exemption is available to religious employers in a variety of arrangements. For example, a Catholic elementary school may be a distinct common-law employer from the Catholic diocese with which it is affiliated. If the school's employees receive health coverage through a plan established or maintained by the school, and the school meets the definition of a religious employer in the final regulations, then the religious employer exemption applies. If, instead, the same school provides health coverage for its employees through the same plan under which the diocese provides coverage for its employees, and the diocese is exempt from the requirement to cover contraceptive services, then neither the diocese nor the school is required to offer contraceptive coverage to its employees.

On February 10, 2012, when the final regulations concerning the exemption were posted, HHS issued a bulletin entitled ''Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code.''[5] The bulletin established a temporary enforcement safe harbor for group health plans sponsored by non-profit organizations that, on and after February 10, 2012, do not provide some or all of the contraceptive coverage otherwise required, consistent with any

---

[1] The HRSA Guidelines are available at: *http://www.hrsa.gov/womensguidelines*.

[2] **Note:** This excludes items and services such as vasectomies and condoms.

[3] The interim final regulations published by the Departments on July 19, 2010, generally provide that plans and issuers must cover a newly recommended preventive service starting with the first plan year (or, in the individual market, policy year) that begins on or after the date that is one year after the date on which the new recommendation or guideline is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

[4] The amendment to the interim final rules was published on August 3, 2011, at 76 FR 46621.

[5] The bulletin can be found at: *http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf*.

Exhibit 15    JA-0000291

applicable State law, because of the religious beliefs of the organization (and any group health insurance coverage provided in connection with such plans). The temporary enforcement safe harbor is in effect until the first plan year that begins on or after August 1, 2013. The bulletin confirmed that all three Departments will not take any enforcement action against an employer, group health plan, or health insurance issuer that complies with the conditions of the temporary enforcement safe harbor described in the bulletin.

At the same time, the Departments announced plans to expeditiously develop and propose changes to the final regulations implementing section 2713 of the PHS Act that would meet two goals—accommodating non-exempt, non-profit religious organizations' religious objections to covering contraceptive services and assuring that participants and beneficiaries covered under such organizations' plans receive contraceptive coverage without cost sharing. The Departments intend to finalize these amendments to the final regulations such that they are effective by the end of the temporary enforcement safe harbor; that is, the amended final regulations would apply to plan years starting on or after August 1, 2013. This advance notice of proposed rulemaking (ANPRM) is the first step toward promulgating these amended final regulations. Following the receipt of public comment, a notice of proposed rulemaking (NPRM) will be published, which will permit additional public comment, followed by amended final regulations.

## II. Overview of Intended Regulations

On February 10, 2012, the Departments committed to working with stakeholders to develop alternative ways of providing contraceptive coverage without cost sharing in order to accommodate non-exempt, non-profit religious organizations with religious objections to such coverage. Specifically, the Departments indicated their plans for a rulemaking to require issuers to offer group health insurance coverage without contraceptive coverage to such an organization (or its plan sponsor) and simultaneously to provide contraceptive coverage directly to the participants and beneficiaries covered under the organization's plan with no cost sharing. Under this approach, the Departments would require that, in this circumstance, there be no premium charge for the separate contraceptive coverage. Actuaries and experts have found that coverage of contraceptives is at least cost neutral, and may save money, when taking into account all

costs and benefits for the issuer.[6] If the cost of coverage is reduced, savings may accrue to employers, plan participants and beneficiaries, and the health care system. The Departments indicated their intent to develop policies to achieve the same goals with respect to self-insured group health plans sponsored by non-exempt, non-profit religious organizations with religious objections to contraceptive coverage.

In the time since this announcement, the Departments have met with representatives of religious organizations, insurers, women's groups, insurance experts, and other interested stakeholders. These initial meetings were used to help identify issues relating to the accommodation to be developed with respect to non-exempt, non-profit religious organizations with religious objections to contraceptive coverage. These consultations also began to provide more detailed information on how health coverage arrangements are currently structured, how religious accommodations work in States with contraceptive coverage requirements, and the landscape with respect to religious organizations that offer health benefits today. These discussions have informed this ANPRM.

As the consultations with interested parties continue, this ANPRM presents questions and ideas to help shape these discussions as well as an early opportunity for any interested stakeholder to provide advice and input into the policy development relating to the accommodation to be made with respect to non-exempted, non-profit religious organizations with religious objections to contraceptive coverage. The Departments welcome all points of view on how to provide women access to the important preventive services at issue without cost sharing while accommodating religious liberty interests.

The starting point for this policy development includes two goals and several ideas about how to achieve them. First, the Departments aim to maintain the provision of contraceptive coverage without cost sharing to individuals who receive coverage through non-exempt, non-profit

religious organizations with religious objections to contraceptive coverage in the simplest way possible. Second, the Departments aim to protect such religious organizations from having to contract, arrange, or pay for contraceptive coverage. As described below, the Departments intend to propose a requirement that health insurance issuers providing coverage for insured group health plans sponsored by such religious organizations assume the responsibility for the provision of contraceptive coverage without cost sharing to participants and beneficiaries covered under the plan, independent of the religious organization, as a means of meeting these goals. HHS also intends to propose a comparable requirement with respect to student health insurance plans arranged by such religious organizations. For such religious organizations that sponsor self-insured plans, the Departments intend to propose that a third-party administrator of the group health plan or some other independent entity assume this responsibility. The Departments suggest multiple options for how contraceptive coverage in this circumstance could be arranged and financed in recognition of the variation in how such self-insured plans are structured and different religious organizations' perspectives on what constitutes objectionable cooperation with the provision of contraceptive coverage. The Departments seek input on these options, particularly how to enable religious organizations to avoid such objectionable cooperation when it comes to the funding of contraceptive coverage, as well as new ideas to inform the next stage of the rulemaking process.

The following sections set forth questions the Departments believe will help inform the development of proposed regulations, including the policy options the Departments are considering and potential language related to such options. Throughout this ANPRM, the term "accommodation" is used to refer to an arrangement under which contraceptive coverage is provided without cost sharing to participants and beneficiaries covered under a plan independent of the objecting religious organization that sponsors the plan, which would effectively exempt the religious organization from the requirement to cover contraceptive services. The term "religious organization" is used to describe the class of organizations that qualifies for the accommodation. An "independent entity" is an issuer, third-party administrator, or other provider of contraceptive coverage that is not a

---

[6] Bertko, John, F.S.A., M.A.A.A., Director of Special Initiatives and Pricing, Center for Consumer Information and Insurance Oversight, Centers for Medicare & Medicaid Services, Glied, Sherry, Ph.D., Assistant Secretary for Planning and Evaluation, Department of Health and Human Services (ASPE/HHS), Miller, Erin, MPH, ASPE/HHS, Wilson, Lee, ASPE/HHS, Simmons, Adelle, ASPE/HHS, "The Cost of Covering Contraceptives Through Health Insurance," (February 9, 2012), available at: *http://aspe.hhs.gov/health/reports/2012/contraceptives/ib.shtml.*

Exhibit 15

JA-0000292

religious organization. And "contraceptive coverage" means the contraceptive coverage required under the HRSA Guidelines.

The Departments note that a number of questions have been raised about the scope and application of the contraceptive coverage requirement more generally (that is, questions apart from the religious accommodation). The Departments' interim final regulations implementing section 2713 of the PHS Act provide that "[n]othing prevents a plan or issuer from using reasonable medical management techniques to determine the frequency, method, treatment, or setting for an item or service * * * to the extent not specified in the recommendation or guideline."[7] The preamble to the interim final regulations further provides:

"The use of reasonable medical management techniques allows plans and issuers to adapt these recommendations and guidelines to coverage of specific items and services where cost sharing must be waived. Thus, under these interim final regulations, a plan or issuer may rely on established techniques and the relevant evidence base to determine the frequency, method, treatment, or setting for which a recommended preventive service will be available without cost sharing requirements to the extent not specified in a recommendation or guideline." (75 FR 41728–29).[8]

This policy applies to contraceptive coverage. The Departments plan to issue further guidance on section 2713 of the PHS Act more generally.

*A. Who qualifies for the accommodation?*

As previously described, group health plans sponsored by certain religious employers (and any group health insurance coverage provided in connection with such plans) are exempt from the requirement to offer coverage of contraceptive services that would otherwise be required under the HRSA Guidelines for plan years beginning on or after August 1, 2012. A second set of organizations qualifies for a temporary enforcement safe harbor: group health plans sponsored by non-exempt, non-profit organizations that, consistent with any applicable State law, do not, on or after February 10, 2012 (the date of the posting of the final regulations), cover some or all forms of contraceptives due to the organization's religious objections to them (and any group health insurance coverage

provided in connection with such plans). The temporary enforcement safe harbor also applies to student health insurance plans arranged by non-profit institutions of higher education that meet comparable criteria. The temporary enforcement safe harbor applies for plan years beginning on or after August 1, 2012, and before August 1, 2013.

On February 10, 2012, the Departments also announced their intention to provide an accommodation with respect to non-exempt, non-profit religious organizations with religious objections to contraceptive coverage. The final regulation concerning student health insurance plans, published elsewhere in this issue of the **Federal Register**, states that this intention extends to student health insurance plans arranged by non-profit religious institutions of higher education with such objections. This accommodation would apply to some or all organizations that qualify for the temporary enforcement safe harbor, and possibly to additional organizations. Thus, a question for purposes of the intended regulations is: What entities should be eligible for the new accommodation (that is, what is a "religious organization")?[9]

One approach would be to adopt the definition of religious organization used in another statute or regulation. For example, the definition used in one or more State laws to afford a religious exemption from a contraceptive coverage requirement could be adopted. Alternatively, the intended regulations could base their definition on another Federal law, such as section 414(e) the Code and section 3(33) of ERISA, which set forth definitions for purposes of "church plans." A definition based on these provisions may include organizations such as hospitals, universities, and charities that are exempt from taxation under section 501 of the Code and that are controlled by or associated with a church or a convention or association of churches. In developing a definition of religious organization, we are cognizant of the important role of ministries of churches and, as such, seek to accommodate their religious objections to contraceptive coverage. The Departments seek comment on which religious organizations should be eligible for the accommodation and whether, as some religious stakeholders have suggested,

for-profit religious employers with such objections should be considered as well.

The Departments underscore, as we did with respect to the definition of religious employer in the final regulations, that whatever definition of religious organization is adopted will not be applied with respect to any other provision of the PHS Act, ERISA, or the Code, nor is it intended to set a precedent for any other purpose. And, while the participants and beneficiaries covered under the health plans offered by a "religious employer" compared to those covered under the health plans offered by a "religious organization" will have differential access to contraceptive coverage, nothing in the final regulations or the forthcoming regulations is intended to differentiate among the religious merits, commitment, mission, or public or private standing of the organizations themselves.

Regardless of the definition of religious organization that is proposed, the Departments are considering proposing the same or a similar process for self-certification that will be used for the temporary enforcement safe harbor referenced in the final regulations. Under that process, an individual authorized by the organization certifies that the organization satisfies the eligibility criteria, and the self-certification is made available for examination. The Departments expect that, for purposes of the proposed accommodation, religious organizations would make a similar self-certification, and similarly make the self-certification available for examination. The self-certification would be used to put the independent entity responsible for providing contraceptive coverage on notice that the religious organization has invoked the accommodation. The future rulemaking would require that the independent entity be responsible for providing the contraceptive coverage in this case.

Under the temporary enforcement safe harbor, an organization that self-certifies must also provide (or arrange to provide) notice to plan participants and beneficiaries that its plan qualifies for the one-year enforcement safe harbor. As the Departments noted in the bulletin establishing the temporary enforcement safe harbor, nothing precludes any organization or individual from expressing opposition, if any, to the regulations or to the use of contraceptives. The Departments do not anticipate that religious organizations would be required to provide such notice to plan participants and beneficiaries beyond the one-year transition period because the

---

[7] 26 CFR 54.9815–2713T(a)(4), 29 CFR 2590.715–2713(a)(4), and 45 CFR 147.130(a)(4).

[8] See also the Departments' guidance in FAQ–8 at *http://www.dol.gov/ebsa/pdf/faq-aca2.pdf* and FAQ–1 at *http://www.dol.gov/ebsa/pdf/faq-aca5.pdf*.

[9] Note that, even if the definition of religious organization for purposes of the accommodation were to include religious employers eligible for the exemption, nothing in the proposed regulations would limit eligibility of religious employers for the exemption.

Exhibit 15                                                                                                    JA-0000293

responsibility to provide notice to plan participants and beneficiaries about the contraceptive coverage would be assumed by the independent entity. The Departments seek comment on how this notice should be provided.

The Departments also intend to propose an accommodation for religious organizations that are non-profit institutions of higher education with religious objections to contraceptive coverage with respect to the student health insurance plans that they arrange. In the final regulation published elsewhere in this issue of the **Federal Register**, "student health insurance coverage" is defined as a type of individual market health insurance coverage offered to students and their dependents under a written agreement between an institution of higher education and an issuer. Some non-profit religious colleges and universities object to signing a written agreement providing for student health insurance coverage that includes contraceptive coverage. Some non-profit religious colleges and universities include funding for their student health insurance plans in their student aid packages and would object if contraceptive coverage were included in the student health insurance plan. The preamble to the final regulation on student health insurance plans provides that the temporary enforcement safe harbor announced on February 10, 2012, with respect to certain non-exempt, non-profit organizations with religious objections to contraceptive coverage extends on comparable terms to student health insurance plans if offered through non-profit institutions of higher education with such objections. After the one-year transition period, the Departments would propose to treat student health insurance plans arranged by non-profit religious institutions of higher education that object to contraceptive coverage on religious grounds in a manner comparable to that in which insured group health plans sponsored by religious organizations eligible for the accommodation are treated. This means that the issuer of the student health insurance plan would, independent of the agreement with the institution of higher education, provide student enrollees and their dependents with contraceptive coverage without cost sharing and without charge.

The Departments seek comment on whether the definition of religious organization should include religious organizations that provide coverage for some, but not all, FDA-approved contraceptives consistent with their religious beliefs. That is, under the forthcoming proposed regulations, the

Departments could allow religious organizations to continue to provide coverage for some forms of contraceptives without cost sharing, and allow them to qualify for the accommodation with respect to other forms of contraceptives consistent with their religious beliefs.

*B. Who administers the accommodation?*

The accommodation aims to simultaneously fulfill the requirement that plan participants and beneficiaries be offered contraceptive coverage without cost sharing and without charge, and protect a non-profit religious organization that objects on religious grounds from having to provide contraceptive coverage. To achieve these goals, an independent entity is needed to assume certain functions. This entity would, separate from the religious organization and as directed by regulations and guidance, notify plan participants and beneficiaries of the availability of separate contraceptive coverage, provide this coverage automatically to participants and beneficiaries covered under the organization's plan (for example, without an application or enrollment process), and protect the privacy of participants and beneficiaries covered under the plan who use contraceptive services.

Today, in most instances, an independent entity either provides or administers health coverage for group health plans. Such group coverage falls into two categories: Insured coverage and self-insured coverage. A group that buys insured coverage pays a premium to a State-licensed and State-regulated health insurance issuer which bears the risk of claims for that coverage. A group that self-insures its coverage does not pay premiums to a health insurance issuer; instead, employer and/or employee contributions fund the health claims of participants and beneficiaries covered under the plan. Typically, self-insured plans contract with a third-party administrator, under a fee arrangement, for administrative services, such as network contracting, managed care services, and payment of claims. Insured group health plans and self-insured group health plans that are not church plans or governmental plans are generally subject to Title I of ERISA. Because there is no insurance provided by a health insurance issuer, self-insured plans are not subject to State insurance laws.

The Departments intend to propose that, when offering insured coverage to a religious organization that self-certifies as qualifying for the

accommodation, a health insurance issuer may not include contraceptive coverage in that organization's insured coverage. This means that contraceptive coverage would not be included in the plan document, contract, or premium charged to the religious organization. Instead, the issuer would be required to provide participants and beneficiaries covered under the plan separate coverage for contraceptive services, potentially as excepted benefits, without cost sharing, and notify plan participants and beneficiaries of its availability. The issuer could not charge a premium to the religious organization or plan participants or beneficiaries for the contraceptive coverage. To incorporate this proposal into regulations with respect to insured group health plans (comparable regulatory language would be developed with respect to student health insurance plans), the Departments are considering proposing new language in the existing preventive services regulations at 45 CFR 147.130, 29 CFR 2590.715–2713 and 26 CFR 54.9815–2713 providing: "In the case of an insured group health plan established or maintained by a religious organization—

• The group health plan established or maintained by the religious organization (and the group health insurance coverage provided in connection with the plan) need not comply with any requirement under this section to provide coverage for contraceptive services with respect to the insured group coverage if all of the following conditions are satisfied:

○ The organization provides the issuer with written notice that the organization is a religious organization, and will not act as the designated plan administrator or claims administrator with respect to claims for contraceptive benefits.

○ The issuer has access to information necessary to communicate with the plan's participants and beneficiaries and to act as a claims administrator and plan administrator with respect to contraceptive benefits.

• An issuer that receives the notice described above must offer to the religious organization group health insurance coverage that does not include coverage for contraceptive services otherwise required to be covered under this section. The issuer must additionally provide to the participants and beneficiaries covered under the plan separate health insurance coverage consisting solely of coverage for contraceptive services required to be covered under this section. The issuer must make such health insurance coverage for

Exhibit 15

JA-0000294

contraceptive services available without any charge to the organization, group health plan, or plan participants or beneficiaries. The issuer must notify plan participants and beneficiaries of the availability of such coverage for contraceptive services in accordance with guidance issued by the Secretary. The issuer must not impose any cost sharing requirements (such as a copayment, coinsurance, or a deductible) on such coverage for contraceptive services and must comply with all other requirements of this section with respect to coverage for contraceptive services.''

Additionally, to ensure that contraceptive coverage offered by a health insurance issuer under these circumstances does not confront obstacles due to other Federal requirements (such as the guaranteed issue requirement under section 2702 of the PHS Act, the single risk pool requirement under section 1312(c) of the Affordable Care Act, and the essential health benefits requirement under section 2707 of the PHS Act), the Departments are considering adding by regulation contraceptive coverage to the types of excepted benefits in the individual market at 45 CFR 148.220(b). In so doing, the Departments would consider preserving certain PHS Act protections such as appeals and grievances rights while ensuring relief from others such as the requirement to provide essential health benefits. The Departments seek comment on whether and how to structure such a change to the excepted benefits regulations, and what PHS Act protections should (or should not) continue to apply. In addition, the Departments seek comment on ways to structure the contraceptive-only benefit as a benefit separate from the insured group coverage other than as an excepted benefit.

Issuers would pay for contraceptive coverage from the estimated savings from the elimination of the need to pay for services that would otherwise be used if contraceptives were not covered. Typically, issuers build into their premiums projected costs and savings from a set of services. Premiums from multiple organizations are pooled in a "book of business" from which the issuer pays for services. To the extent that contraceptive coverage lowers the draw-down for other health care services from the pool, funds would be available to pay for contraceptive services without an additional premium charged to the religious organization or plan participants or beneficiaries. Actuaries, insurers, and economists estimate that covering contraceptive services is at least cost neutral.

For a religious organization that sponsors a self-insured group health plan, the Departments aim to similarly shield it from contracting, arranging, paying, or referring for contraceptive coverage. The Departments intend to propose, and invite comments on, having the third-party administrator of an objecting religious organization fulfill such responsibility. For ERISA plans,[10] the Departments are considering proposing that the self-certification of the religious organization, described above, would serve as a notice to the third-party administrator that the requirement to provide contraceptive coverage will not be fulfilled by the religious organization. The proposed regulations, in this circumstance, would set forth the circumstances and criteria under which the third-party administrator would be designated as the plan administrator for ERISA plans solely for the purpose of fulfilling the requirement to provide contraceptive coverage. As prescribed by the proposed regulations, the third-party administrator would provide or arrange for such coverage in such circumstances. The third-party administrator would notify plan participants and beneficiaries of this coverage. The religious organization would take no action other than self-certification.

To incorporate this proposal into regulations with respect to self-insured group health plans, the Departments are considering proposing new language in the existing preventive services regulations at 29 CFR 2590.715–2713 and 26 CFR 54.9815–2713 providing that: "A religious organization maintaining a self-insured group health plan is not responsible for compliance with any requirement under this section to provide coverage for contraceptive services if all of the following conditions are satisfied:

• The plan contracts with one or more third parties for processing of benefit claims,

• Before entering into each such contract, the employer provides each third party administrator (TPA) with written notice that the employer: (1) Is a religious organization, (2) will not act as the designated plan administrator or claims administrator with respect to claims for contraceptive services, (3) will not contribute to the funding of

[10] A church plan as defined under section 3(33) of ERISA is exempt from ERISA's requirements under section 4(b) of ERISA, and, therefore, any proposed ERISA regulations would not apply to church plans. Comments are sought on potential options for church plans.

contraceptive services, and (4) will not participate in claims processing with respect to claims for contraceptive services.

• With respect to contraceptive benefits, the TPAs have authority and control over the funds available to pay the benefit, authority to act as a claims administrator and plan administrator, and access to information necessary to communicate with the plan's participants and beneficiaries.''

In addition, with respect to ERISA plans, the Department of Labor is considering proposing a new regulation at 29 CFR 2510.3–16 providing: "In the case of a group health plan established or maintained by a religious organization that is not responsible for compliance with any requirement under § 2590.715–2713 of this part to provide coverage for contraceptive services, the required notice from the religious organization provided to a third party administrator (TPA) of the religious organization's refusal to provide and fund such benefits shall be an instrument under which the plan is operated and shall have the effect of designating such TPA as the plan administrator under section 3(16) of ERISA for those contraceptive benefits for which that TPA processes claims in its normal course of business. A TPA that becomes a plan administrator pursuant to this section shall be responsible for—

• The plan's compliance with section 2713 of the Public Health Service Act (as incorporated into section 715 of ERISA and § 2590.715–2713 of this part) as to those categories of contraceptive benefits for which the TPA processes claims in its normal course of business (*for example,* surgical procedures, non-surgical procedures, patient education and counseling, prescription benefits and non-prescription benefits).

• Establishing and operating a procedure for determining such claims for contraceptive benefits in accordance with § 2560.503–1 of this title.

• Complying with disclosure requirements and other requirements under Title I of ERISA for such benefits to participants and beneficiaries.''

We note that there is no obligation for a TPA to enter into such a contract if it objects to these terms.

Providing for an independent entity to assume responsibility for plan-related functions when other plan sponsors or officials fail or refuse to do so would not be unique to the instant context. For example, where certain retirement savings plans have been abandoned by their sponsors, Department of Labor regulations authorize asset custodians to

Exhibit 15    JA-0000295

distribute plan benefits and wind up the plan's affairs. 29 CFR 2578.1.

The Departments seek comment on the following possible approaches that a third-party administrator could use to fund the contraceptive coverage without using funds provided by the religious organization. The third-party administrator could use revenue that is not already obligated to plan sponsors such as drug rebates, service fees, disease management program fees, or other sources. These funds may inure to the third-party administrator rather than the plan or its sponsor and drug rebates, for example, could be larger if contraceptive coverage were provided. Additionally, nothing precludes a third-party administrator from receiving funds from a private, non-profit organization to pay for contraceptive services for the participants and beneficiaries covered under the plan of a religious organization. Comments should address the ways in which third-party administrators generally receive funding to pay benefits, other flows of funds, the extent to which funding from other sources may be available for payment of claims, and the monitoring responsibilities and oversight that would be associated with such arrangements.

Another option under consideration would be to have the third-party administrator receive a credit or rebate on the amount that it pays under the reinsurance program under Affordable Care Act section 1341 to fund contraceptive coverage for participants and beneficiaries covered under the plan of a religious organization that sponsors a self-insured plan. Section 1341 of the Affordable Care Act creates a reinsurance program to balance out risk selection from 2014 through 2016. Payments from health insurance issuers and third-party administrators on behalf of group health plans will be made to a reinsurance entity. Payments are used, among other things, to offset the cost of reinsurance for health insurance issuers. While the reinsurance program does not provide payments to group health plans, it collects payments from third-party administrators to support the program. Under this proposal, a third-party administrator that funds contraceptive coverage separate from a religious organization could offset the amount of this cost with a credit or rebate against its assessments under the reinsurance program. Such a policy could help advance the goals of the reinsurance program, which is one of many in the Act designed to make health insurance affordable, accessible, meaningful, and stable. The Departments seek comments on such an interpretation of Affordable

Care Act section 1341 and on ideas of alternative sources of funding once this temporary program ends.

An additional option would have the third-party administrator separately arrange for contraceptive coverage. In this case, an additional independent entity other than a third-party administrator would be needed. The Departments are considering having the Office of Personnel Management (OPM) identify a private insurer to provide this coverage. Under section 1334 of the Affordable Care Act, OPM is responsible for contracting with at least two insurers to offer multi-State plans in each Exchange in each State to promote choice, competition, and access to health services. The OPM Director, in consultation with the HHS Secretary, has the authority to impose appropriate requirements on the insurers that offer multi-State plans. Accordingly, OPM could incentivize or require one or more of the insurers offering a multi-State plan also to provide, at no additional charge, contraceptive coverage to participants and beneficiaries covered under religious organizations' self-insured plans. The third-party administrator would send a copy of the religious organization's self-certification to OPM along with information on plan participants and beneficiaries. One option for covering the cost of the contraceptive coverage would be a credit against any user fees such an insurer would be required to pay in order to offer coverage on the Exchanges. The Departments seek comment on the impact of this proposal on the multi-State plan program, ways to administer it, and additional funding ideas.

If adopted, the reinsurance program and multi-State plan options may require amendments to the regulations and guidance governing those programs. In addition, these programs start on January 1, 2014. There may be some religious organizations with plan years that begin on or after August 1, 2013, but before those programs begin, so, should the Departments propose these options, we would also propose a means of resolving this gap in relief. The Departments seek input on such means as well as how many religious organizations have plan years that start between August 1 and December 31.

The Departments welcome ideas on other options for the source of funds for contraceptive coverage. Some religious stakeholders have suggested, for example, the use of tax-preferred accounts that employees may in their discretion use for a range of medical services that neither precludes nor obligates funds to be used for

contraceptive services. A number of religious stakeholders have also suggested that public funding to support coverage of contraceptive services is not objectionable. The Departments seek comment on these and other proposals. Comments are also requested on additional considerations that should be taken into account with respect to these and other proposals and on suggestions for structuring the implementation of the proposals in light of these considerations.

The Departments expect that the third-party administrator could use these sources of funds individually or in combination. The Departments also note that nothing precludes a religious organization from switching from a self-insured plan to an insured plan such that a health insurance issuer rather than a third-party administrator is responsible for providing the contraceptive coverage.

The Departments also seek information on coordination when there are multiple third-party administrators and on the prevalence of multi-year contracts as well as options for addressing the application of these proposals in such instances. The Departments invite comment on the extent to which there are self-insured health plans without a third-party administrator as well as options for how the accommodation would work in these rare circumstances. One option would be to have a religious organization send its self-certification to OPM, which would be directed to independently arrange for contraceptive coverage through a private insurer. The Departments seek comment on the prevalence and number of participants and beneficiaries of health plans sponsored by religious organizations without a third-party administrator.

*C. Additional Questions*

To inform the notice of proposed rulemaking, the Departments seek information on several additional questions. One question that has arisen from religious stakeholders is whether an exemption or accommodation should be made for certain religious health insurance issuers or third-party administrators with respect to contraceptive coverage. The Departments have little information about the number and location of such issuers and administrators and whether and how such issuers operate in the 28 States with contraceptive coverage requirements.

The Departments also recognize that various denominations may offer coverage to institutions affiliated with those denominations. For example, their

Exhibit 15                                                                                          JA-0000296

**16508**    **Federal Register** / Vol. 77, No. 55 / Wednesday, March 21, 2012 / Proposed Rules

plans may be offered as "church plans" (described above) to individual churches as a means of pooling their risk. The Departments seek comment on whether different accommodations are needed for such plans.

In addition, the Departments are aware that 28 States have adopted laws requiring that certain health insurance issuers provide contraceptive coverage. Some of these laws contain exemptions related to religious organizations, but the scope of the exemptions varies among the States. Generally, Federal health insurance coverage regulation creates a floor to which States may add consumer protections, but may not subtract. This means that, in States with broader religious exemptions than that in the final regulations, the exemptions will be narrowed to align with that in the final regulations because this will help more consumers. Organizations that qualify for an exemption under State law but do not qualify for the exemption under the final regulations may be eligible for the temporary enforcement safe harbor. During this transition period, State laws that require contraceptive coverage with narrower or no religious exemptions will continue. The Departments seek comment on the interaction between these State laws and the intended regulations on which we are seeking comment in this notice and on the extent to which there is a need for consistency between any Federal regulations and these State laws. Similarly, the Departments solicit comment on what other Federal or State laws or accounting rules governing funding and accounting could affect the proposed options described herein.

In addition, the Departments solicit information on the number of potentially affected issuers and religious organizations as well as their plan participants and beneficiaries; the administrative cost of providing separate contraceptive coverage, including details regarding the nature of the costs (for example, one-time systems changes or ongoing administrative costs); and the average costs and savings to health plans, plan participants and beneficiaries, and the public of providing contraceptive coverage.

*D. Additional Input*

The 90-day comment period is designed to encourage maximum input into the development of an accommodation for religious organizations with religious objections to providing contraceptive coverage while ensuring the availability of contraceptive coverage without cost sharing for plan participants and beneficiaries. The Departments seek

comments on the ideas and questions outlined in this ANPRM as well as new suggestions to achieve its goals. The Departments also intend to hold listening sessions to ensure all voices are heard. This will not be the only opportunity for comment. The subsequent notice of proposed rulemaking will also include a public comment period. The Departments aim to ensure that the final accommodation is fully vetted and published in advance of the expiration of the temporary enforcement safe harbor.

**Steven T. Miller,**

*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

Signed this day of March 14, 2012.

**Phyllis C. Borzi.**

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: March 15, 2012.

**Marilyn Tavenner,**

*Acting Administrator, Centers for Medicare & Medicaid Services.*

Approved: March 15, 2012.

**Kathleen Sebelius,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2012–6689 Filed 3–16–12; 4:15 pm]

**BILLING CODE 4120–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 63**

**[EPA–HQ–OAR–2011–0435; FRL–9650–3]**

**RIN 2060–AR02**

## National Emission Standards for Hazardous Air Pollutant Emissions: Group IV Polymers and Resins; Pesticide Active Ingredient Production; and Polyether Polyols Production

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Reopening of public comment period.

**SUMMARY:** On January 9, 2012, the EPA proposed amendments to three national emission standards for hazardous air pollutants: National Emission Standards for Hazardous Air Pollutant Emissions: Group IV Polymers and Resins; National Emission Standards for Hazardous Air Pollutants for Pesticide Active Ingredient Production; and National Emission Standards for Hazardous Air Pollutants for Polyether Polyols Production. The EPA is reopening the comment period until March 30, 2012. The EPA received a request for this reopening from the Sierra Club. The

Sierra Club requested the reopening in order to analyze data and review the proposed amendments. EPA finds this request to be reasonable due to the multiple source categories involved in this action.

**DATES:** Comments must be received on or before March 30, 2012.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–HQ–OAR–2011–0435, by one of the following methods:

• *www.regulations.gov:* Follow the on-line instructions for submitting comments.

• *Email: a-and-r-docket@epa.gov.* Attention Docket ID No. EPA–HQ–OAR–2011–0435.

• *Fax:* (202) 566–9744. Attention Docket ID No. EPA–HQ–OAR–2011–0435.

• *Mail:* U.S. Postal Service, send comments to: EPA Docket Center, EPA West (Air Docket), Attention Docket ID No. EPA–HQ–OAR–2011–0435, U.S. Environmental Protection Agency, Mailcode: 2822T, 1200 Pennsylvania Ave. NW., Washington, DC 20460. Please include a total of two copies. In addition, please mail a copy of your comments on the information collection provisions to the Office of Information and Regulatory Affairs, Office of Management and Budget (OMB), Attn: Desk Officer for EPA, 725 17th Street NW., Washington, DC 20503.

• *Hand Delivery:* U.S. Environmental Protection Agency, EPA West (Air Docket), Room 3334, 1301 Constitution Ave. NW., Washington, DC 20004. Attention Docket ID No. EPA–HQ–OAR–2011–0435. Such deliveries are only accepted during the Docket's normal hours of operation, and special arrangements should be made for deliveries of boxed information.

*Instructions.* Direct your comments to Docket ID No. EPA–HQ–OAR–2011–0435. The EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be confidential business information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through *www.regulations.gov* or email. The *www.regulations.gov* Web site is an "anonymous access" system, which means the EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to the EPA without

Exhibit 15                                                                                        JA-0000297

## TABLE I—Continued

| Year | Limit | |
| | Auto. proj. cost limit (Col. 1) | Prior notice proj. cost limit (Col. 2) |
| --- | --- | --- |
| 2003 .. | 7,600,000 | 21,200,000 |
| 2004 .. | 7,800,000 | 21,600,000 |
| 2005 .. | 8,000,000 | 22,000,000 |
| 2006 .. | 9,600,000 | 27,400,000 |
| 2007 .. | 9,900,000 | 28,200,000 |
| 2008 .. | 10,200,000 | 29,000,000 |
| 2009 .. | 10,400,000 | 29,600,000 |
| 2010 .. | 10,500,000 | 29,900,000 |
| 2011 .. | 10,600,000 | 30,200,000 |
| 2012 .. | 10,800,000 | 30,800,000 |

\*    \*    \*    \*    \*

■ 3. Table II in § 157.215(a)(5) is revised to read as follows:

**§ 157.215   Underground storage testing and development.**

(a) \* \* \*

(5) \* \* \*

### TABLE II

| Year | Limit |
| --- | --- |
| 1982 ................................... | $2,700,000 |
| 1983 ................................... | 2,900,000 |
| 1984 ................................... | 3,000,000 |
| 1985 ................................... | 3,100,000 |
| 1986 ................................... | 3,200,000 |
| 1987 ................................... | 3,300,000 |
| 1988 ................................... | 3,400,000 |
| 1989 ................................... | 3,500,000 |
| 1990 ................................... | 3,600,000 |
| 1991 ................................... | 3,800,000 |
| 1992 ................................... | 3,900,000 |
| 1993 ................................... | 4,000,000 |
| 1994 ................................... | 4,100,000 |
| 1995 ................................... | 4,200,000 |
| 1996 ................................... | 4,300,000 |
| 1997 ................................... | 4,400,000 |
| 1998 ................................... | 4,500,000 |
| 1999 ................................... | 4,550,000 |
| 2000 ................................... | 4,650,000 |
| 2001 ................................... | 4,750,000 |
| 2002 ................................... | 4,850,000 |
| 2003 ................................... | 4,900,000 |
| 2004 ................................... | 5,000,000 |
| 2005 ................................... | 5,100,000 |
| 2006 ................................... | 5,250,000 |
| 2007 ................................... | 5,400,000 |
| 2008 ................................... | 5,550,000 |
| 2009 ................................... | 5,600,000 |
| 2010 ................................... | 5,700,000 |
| 2011 ................................... | 5,750,000 |
| 2012 ................................... | 5,850,000 |

\*    \*    \*    \*    \*

[FR Doc. 2012–3488 Filed 2–14–12; 8:45 am]

**BILLING CODE 6717–01–P**

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 54**

[TD 9578]

**RIN 1545–BJ60**

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB44**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**45 CFR Part 147**

[CMS–9992–F]

**RIN 0938–AQ74**

**Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act**

**AGENCIES:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Final rules.

**SUMMARY:** These regulations finalize, without change, interim final regulations authorizing the exemption of group health plans and group health insurance coverage sponsored by certain religious employers from having to cover certain preventive health services under provisions of the Patient Protection and Affordable Care Act.

**DATES:** *Effective date.* These final regulations are effective on April 16, 2012.

*Applicability dates.* These final regulations generally apply to group health plans and group health insurance issuers on April 16, 2012.

**FOR FURTHER INFORMATION CONTACT:** Amy Turner or Beth Baum, Employee Benefits Security Administration (EBSA), Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service, Department of the Treasury, at (202) 622–6080; Robert Imes, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services (HHS), at (410) 786–1565.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*http://www.dol.gov/ebsa*). In addition, information from HHS on private health insurance for consumers can be found on the CMS Web site (*http://cciio.cms.gov*), and on health reform can be found at *http://www.HealthCare.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Patient Protection and Affordable Care Act, Public Law 111–148, was enacted on March 23, 2010; the Health Care and Education Reconciliation Act of 2010, Public Law 111–152, was enacted on March 30, 2010 (collectively, the Affordable Care Act). The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act (ERISA) and section 9815(a)(1) to the Internal Revenue Code (Code) to incorporate the provisions of part A of title XXVII of the PHS Act into ERISA and the Code, and make them applicable to group health plans.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated into ERISA and the Code, requires that non-grandfathered group health plans and health insurance issuers offering group or individual health insurance coverage provide benefits for certain preventive health services without the imposition of cost sharing. These preventive health services include, with respect to women, preventive care and screening provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA) that were issued on August 1, 2011 (HRSA Guidelines).[1] As relevant here, the HRSA Guidelines require coverage, without cost sharing, for "[a]ll Food and Drug Administration [(FDA)] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," as prescribed by a provider. Except as discussed below, non-grandfathered group health plans and health insurance issuers are required to provide coverage consistent with the HRSA Guidelines, without cost sharing, in plan years (or,

---

[1] The HRSA Guidelines can be found at: *http://www.hrsa.gov/womensguidelines.*

Exhibit 16                                                                                                                          JA-0000298

**8726**    **Federal Register** / Vol. 77, No. 31 / Wednesday, February 15, 2012 / Rules and Regulations

in the individual market, policy years) beginning on or after August 1, 2012.[2] These guidelines were based on recommendations of the independent Institute of Medicine, which undertook a review of the evidence on women's preventive services.

The Departments of Health and Human Services, Labor, and the Treasury (the Departments) published interim final regulations implementing PHS Act section 2713 on July 19, 2010 (75 FR 41726). In the preamble to the interim final regulations, the Departments explained that HRSA was developing guidelines related to preventive care and screening for women that would be covered without cost sharing pursuant to PHS Act section 2713(a)(4), and that these guidelines were expected to be issued no later than August 1, 2011. Although comments on the anticipated guidelines were not requested in the interim final regulations, the Departments received considerable feedback regarding which preventive services for women should be covered without cost sharing. Some commenters, including some religiously-affiliated employers, recommended that these guidelines include contraceptive services among the recommended women's preventive services and that the attendant coverage requirement apply to all group health plans and health insurance issuers. Other commenters, however, recommended that group health plans sponsored by religiously-affiliated employers be allowed to exclude contraceptive services from coverage under their plans if the employers deem such services contrary to their religious tenets, noting that some group health plans sponsored by organizations with a religious objection to contraceptives currently contain such exclusions for that reason.

In response to these comments, the Departments amended the interim final regulations to provide HRSA with discretion to establish an exemption for group health plans established or maintained by certain religious employers (and any group health insurance coverage provided in connection with such plans) with respect to any requirement to cover contraceptive services that they would otherwise be required to cover without

cost sharing consistent with the HRSA Guidelines. The amended interim final regulations were issued and effective on August 1, 2011.[3] The amended interim final regulations specified that, for purposes of this exemption, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. In the HRSA Guidelines, HRSA exercised its discretion under the amended interim final regulations such that group health plans established and maintained by these religious employers (and any group health insurance coverage provided in connection with such plans) are not required to cover contraceptive services.

In the preamble to the amended interim final regulations, the Departments explained that it was appropriate that HRSA take into account the religious beliefs of certain religious employers where coverage of contraceptive services is concerned. The Departments noted that a religious exemption is consistent with the policies in some States that currently both require contraceptive services coverage under State law and provide for some type of religious exemption from their contraceptive services coverage requirement. Comments were requested on the amended interim final regulations, specifically with respect to the definition of religious employer, as well as alternative definitions.

## II. Overview of the Public Comments on the Amended Interim Final Regulations

The Departments received over 200,000 responses to the request for comments on the amended interim final regulations. Commenters included concerned citizens, civil rights organizations, consumer groups, health care providers, health insurance issuers, sponsors of group health plans, religiously-affiliated charities, religiously-affiliated educational institutions, religiously-affiliated health care organizations, other religiously-affiliated organizations, secular organizations, sponsors of group health

plans, women's religious orders, and women's rights organizations.

Some commenters recommended that the exemption for the group health plans of a limited group of religious organizations as formulated in the amended interim final regulations be maintained. Other commenters urged that the definition of religious employer be broadened so that more sponsors of group health plans would qualify for the exemption. Others urged that the exemption be rescinded in its entirety. The Departments summarize below the major issues raised in the comments that were received.

Some commenters supported the inclusion of contraceptive services in the HRSA Guidelines and urged that the religious employer exemption be rescinded in its entirety due to the importance of extending these benefits to as many women as possible. For example, one provider association commented that all group health plans and group health insurance issuers should offer the same benefits to plan participants, without a religious exemption for some plans, and that religious beliefs are more appropriately taken into account by individuals when making personal health care decisions. Others urged that the exemption be eliminated because making contraceptive services available to all women would satisfy a basic health care need and would significantly reduce long-term health care costs associated with unplanned pregnancies.

Some of the commenters supporting the elimination of the exemption argued that section 2713 of the PHS Act does not provide any explicit basis for exempting a subset of group health plans. One commenter asserted that Congress's incorporation of section 2713 of the PHS Act into ERISA and the Code indicates its intent to require coverage of recommended preventive services under section 2713 of the PHS Act in the broadest spectrum of group health plans possible.

Many commenters that opposed the exemption asked that, at a minimum, the Departments not expand the definition of religious employer. Alternatively, they asked that, if the Departments decided to base the relevant portion of the definition of religious employer on a Code section other than section 6033, the other portions of the definition of religious employer be retained to limit the exemption largely to houses of worship.

Some commenters urged the Departments not to modify the definition of religious employer. For example, some commenters asserted that the exemption is appropriately

---

[2] The interim final regulations published by the Departments on July 19, 2010, generally provide that plans and issuers must cover a newly recommended preventive service starting with the first plan year (or, in the individual market, policy year) that begins on or after the date that is one year after the date on which the new recommendation or guideline is issued. 26 CFR 54.9815–2713T(b)(1); 29 CFR 2590.715–2713(b)(1); 45 CFR 147.130(b)(1).

[3] The amendment to the interim final regulations was published on August 3, 2011, at 76 FR 46621.

Exhibit 16                                                                                                JA-0000299

targeted at houses of worship, rather than a larger set of religiously-affiliated organizations. Others argued that, while the exemption addresses legitimate religious concerns, its scope is already broader than necessary and should not be expanded.

Commenters opposing any exemption stated that, if the exemption were to be retained, clear notice should be provided to the affected plan participants that their group health plans do not include benefits for contraceptive services. In addition, they urged the Departments to monitor plans to ensure that the exemption is not claimed more broadly than permitted.

On the other hand, a number of comments asserted that the religious employer exemption is too narrow. These commenters included some religiously-affiliated educational institutions, health care organizations, and charities. Some of these commenters expressed concern that the exemption for religious employers will not allow them to continue their current exclusion of contraceptive services from coverage under their group health plans. Others expressed concerns about paying for such services and stated that doing so would be contrary to their religious beliefs.

Commenters also claimed that Federal laws, including the Affordable Care Act, have provided for conscience clauses and religious exemptions broader than that provided for in the amended interim final regulations. Some commenters asserted that the narrower scope of the exemption raises concerns under the First Amendment and the Religious Freedom Restoration Act.

Other commenters, however, disputed claims that the contraceptive coverage requirement infringes on rights protected by the First Amendment or the Religious Freedom Restoration Act. These commenters noted that the requirement is neutral and generally applicable. They also explained that the requirement does not substantially burden religious exercise and, in any event, serves compelling governmental interests and is the least restrictive means to achieve those interests.

Some religiously-affiliated employers warned that, if the definition of religious employer is not broadened, they could cease to offer health coverage to their employees in order to avoid having to offer coverage to which they object on religious grounds.

Commenters supporting a broadening of the definition of religious employer proposed a number of options, generally intended to expand the scope of the exemption to include religiously-affiliated educational institutions,

health care organizations, and charities. In some instances, in place of the definition that was adopted in the amended interim final regulations, commenters suggested other State insurance law definitions of religious employer. In other instances, commenters referenced alternative standards, such as tying the exemption to the definition of "church plan" under section 414(e) of the Code or to status as a nonprofit organization under section 501(c)(3) of the Code.

### III. Overview of the Final Regulations

In response to these comments, the Departments carefully considered whether to eliminate the religious employer exemption or to adopt an alternative definition of religious employer, including whether the exemption should be extended to a broader set of religiously-affiliated sponsors of group health plans and group health insurance coverage. For the reasons discussed below, the Departments are adopting the definition in the amended interim final regulations for purposes of these final regulations while also creating a temporary enforcement safe harbor, discussed below. During the temporary enforcement safe harbor, the Departments plan to develop and propose changes to these final regulations that would meet two goals—providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services as also discussed below.

PHS Act section 2713 reflects a determination by Congress that coverage of recommended preventive services by non-grandfathered group health plans and health insurance issuers without cost sharing is necessary to achieve basic health care coverage for more Americans. Individuals are more likely to use preventive services if they do not have to satisfy cost sharing requirements (such as a copayment, coinsurance, or a deductible). Use of preventive services results in a healthier population and reduces health care costs by helping individuals avoid preventable conditions and receive treatment earlier.[4] Further, Congress, by amending the Affordable Care Act during the Senate debate to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and

group health insurance coverage, recognized that women have unique health care needs and burdens. Such needs include contraceptive services.[5]

As documented in a report of the Institute of Medicine, "Clinical Preventive Services for Women, Closing the Gaps," women experiencing an unintended pregnancy may not immediately be aware that they are pregnant, and thus delay prenatal care. They also may not be as motivated to discontinue behaviors that pose pregnancy-related risks (e.g., smoking, consumption of alcohol). Studies show a greater risk of preterm birth and low birth weight among unintended pregnancies compared with pregnancies that were planned.[6] Contraceptives also have medical benefits for women who are contraindicated for pregnancy, and there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy (e.g., treatment of menstrual disorders, acne, and pelvic pain).[7]

In addition, there are significant cost savings to employers from the coverage of contraceptives. A 2000 study estimated that it would cost employers 15 to 17 percent more not to provide contraceptive coverage in employee health plans than to provide such coverage, after accounting for both the direct medical costs of pregnancy and the indirect costs such as employee absence and reduced productivity.[8] In fact, when contraceptive coverage was added to the Federal Employees Health Benefits Program, premiums did not increase because there was no resulting

---

[4] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash., DC: Nat'l Acad. Press, 2011, at p. 16.

[5] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash. DC: Nat'l Acad. Press, 2011, at p. 9; *see also* Sonfield, A., The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost Sharing, 14 *Guttmacher Pol'y Rev.* 10 (2011), available at *http://www.guttmacher.org/pubs/gpr/14/1/gpr140107.html.*

[6] Gipson, J.D., et al., The Effects of Unintended Pregnancy on Infant, Child and Parental Health: A Review of the Literature, *Studies on Family Planning,* 2008, 39(1):18–38.

[7] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash., DC: Nat'l Acad. Press, 2011, at p. 107.

[8] Testimony of Guttmacher Inst., submitted to the Comm. on Preventive Servs. for Women, Inst. of Med., Jan. 12, 2012, p. 11 citing Bonoan, R + Gonen, JS, "Promoting Healthy Pregnancies: Counseling and Contraception as the First Step", Washington Business Group on Health, Family Health in Brief, Issue No. 3. August 2000; *see also* Sonfield, A., The Case for Insurance Coverage of Contraceptive Services and Supplies without Cost Sharing, 14 *Guttmacher Pol'y Rev.* 10 (2011); Mavranezouli, I., Health Economics of Contraception, 23 *Best Practice & Res. Clinical Obstetrics & Gynaecology* 187–198 (2009); Trussell, J., et al., Cost Effectiveness of Contraceptives in the United States, 79 *Contraception* 5–14 (2009); Trussell, J., The Cost of Unintended Pregnancy in the United States, 75 *Contraception* 168–170 (2007).

Exhibit 16                                                                                    JA-0000300

**8728**    **Federal Register** / Vol. 77, No. 31 / Wednesday, February 15, 2012 / Rules and Regulations

health care cost increase.[9] Further, the cost savings of covering contraceptive services have already been recognized by States and also within the health insurance industry. Twenty-eight States now have laws requiring health insurance issuers to cover contraceptives. A 2002 study found that more than 89 percent of insured plans cover contraceptives.[10] A 2010 survey of employers revealed that 85 percent of large employers and 62 percent of small employers offered coverage of FDA-approved contraceptives.[11]

Furthermore, in directing non-grandfathered group health plans and health insurance issuers to cover preventive services and screenings for women described in HRSA-supported guidelines without cost sharing, Congress determined that both existing health coverage and existing preventive services recommendations often did not adequately serve the unique health needs of women. This disparity places women in the workforce at a disadvantage compared to their male co-workers. Researchers have shown that access to contraception improves the social and economic status of women.[12] Contraceptive coverage, by reducing the number of unintended and potentially unhealthy pregnancies, furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force. Research also shows that cost sharing can be a significant barrier to effective contraception.[13] As the Institute of Medicine noted, owing to reproductive and sex-specific conditions, women use preventive services more than men, generating significant out-of-pocket expenses for

women.[14] These disparities the Departments aim to reduce these disparities by providing women broad access to preventive services, including contraceptive services.

The religious employer exemption in the final regulations does not undermine the overall benefits described above. A group health plan (and health insurance coverage provided in connection with such a plan) qualifies for the exemption if, among other qualifications, the plan is established and maintained by an employer that primarily employs persons who share the religious tenets of the organization. As such, the employees of employers availing themselves of the exemption would be less likely to use contraceptives even if contraceptives were covered under their health plans.

A broader exemption, as urged by some commenters, would lead to more employees having to pay out of pocket for contraceptive services, thus making it less likely that they would use contraceptives, which would undermine the benefits described above. Employers that do not primarily employ employees who share the religious tenets of the organization are more likely to employ individuals who have no religious objection to the use of contraceptive services and therefore are more likely to use contraceptives. Including these employers within the scope of the exemption would subject their employees to the religious views of the employer, limiting access to contraceptives, and thereby inhibiting the use of contraceptive services and the benefits of preventive care.

The Departments note that this religious exemption is intended solely for purposes of the contraceptive services coverage requirement pursuant to PHS Act section 2713 and the companion provisions of ERISA and the Code.

The Departments also note that some group health plans sponsored by employers that do not satisfy the definition of religious employer in these final regulations may be grandfathered health plans [15] and thus are not subject to any of the preventive services coverage requirements of section 2713 of the PHS Act, including the contraceptive coverage requirement.

With respect to certain non-exempted, non-profit organizations with religious objections to covering contraceptive

services whose group health plans are not grandfathered health plans, guidance is being issued contemporaneous with these final regulations that provides a one-year safe harbor from enforcement by the Departments.

Before the end of the temporary enforcement safe harbor, the Departments will work with stakeholders to develop alternative ways of providing contraceptive coverage without cost sharing with respect to non-exempted, non-profit religious organizations with religious objections to such coverage. Specifically, the Departments plan to initiate a rulemaking to require issuers to offer insurance without contraception coverage to such an employer (or plan sponsor) and simultaneously to offer contraceptive coverage directly to the employer's plan participants (and their beneficiaries) who desire it, with no cost-sharing. Under this approach, the Departments will also require that, in this circumstance, there be no charge for the contraceptive coverage. Actuaries and experts have found that coverage of contraceptives is at least cost neutral when taking into account all costs and benefits in the health plan.[16] The Departments intend to develop policies to achieve the same goals for self-insured group health plans sponsored by non-exempted, non-profit religious organizations with religious objections to contraceptive coverage.

A future rulemaking would be informed by the existing practices of some issuers and religious organizations in the 28 States where contraception coverage requirements already exist, including Hawaii. There, State health insurance law requires issuers to offer plan participants in group health plans sponsored by religious employers that are exempt from the State contraception coverage requirement the option to purchase this coverage in a way that religious employers are not obligated to fund it. It is our understanding that, in practice, rather than charging employees a separate fee, some issuers in Hawaii offer this coverage to plan participants at no charge. The Departments will work with stakeholders to propose and

---

[9] Dailard, C., Special Analysis: The Cost of Contraceptive Insurance Coverage, *Guttmacher Rep. on Public Pol'y* (March 2003).

[10] Sonfield, A., et al., U.S. Insurance Coverage of Contraceptives and the Impact of Contraceptive Coverage Mandates, *Perspectives on Sexual and Reproductive Health* 36(2):72–79, 2002.

[11] Claxton, G., et al., *Employer Health Benefits: 2010 Annual Survey*, Menlo Park, Cal.: Kaiser Family Found. and Chi., Ill.: Health Research & Educ. Trust, 2010.

[12] Testimony of Guttmacher Inst., submitted to the Comm. on Preventive Servs. for Women, Inst. of Med., Jan. 12, 2012, p.6, citing Goldin C and Katz L, Career and marriage in the age of the pill, *American Economic Review*, 2000, 90(2):461–465; Goldin C and Katz LF, The power of the pill: oral contraceptives and women's career and marriage decisions, *Journal of Political Economy*, 2002, 110(4):730–770; and Bailey MJ, More power to the pill: the impact of contraceptive freedom on women's life cycle labor supply, *Quarterly Journal of Economics*, 2006, 121(1):289–320.

[13] Postlethwaite, D., et al., A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change, 76 *Contraception* 360 (2007).

[14] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, Wash., DC: Nat'l Acad. Press, 2011, p.19.

[15] See section 1251 of the Affordable Care Act and its implementing regulations at 26 CFR 54.9815–1251T; 29 CFR 2590.715–1251; 45 CFR 147.140.

[16] Bertko, John, F.S.A., M.A.A.A., Director of Special Initiatives and Pricing in the Center for Consumer Information and Insurance Oversight at the Centers for Medicare and Medicaid Services, Glied, Sherry, Ph.D., Assistant Secretary for Planning and Evaluation, U.S. Department of Health & Human Services (ASPE/HHS), Miller, Erin, MPH, (ASPE/HHS), Wilson, Lee, (ASPE/HHS), Simmons, Adelle, (ASPE/HHS), "The Cost of Covering Contraceptives through Health Insurance," (9 February 2012), available at: *http://aspe.hhs.gov/ health/reports/2012/contraceptives/ib.shtml*.

Exhibit 16

finalize this policy before the end of the temporary enforcement safe harbor.

Nothing in these final regulations precludes employers or others from expressing their opposition, if any, to the use of contraceptives, requires anyone to use contraceptives, or requires health care providers to prescribe contraceptives if doing so is against their religious beliefs. These final regulations do not undermine the important protections that exist under conscience clauses and other religious exemptions in other areas of Federal law. Conscience protections will continue to be respected and strongly enforced.

This approach is consistent with the First Amendment and Religious Freedom Restoration Act. The Supreme Court has held that the First Amendment right to free exercise of religion is not violated by a law that is not specifically targeted at religiously motivated conduct and that applies equally to conduct without regard to whether it is religiously motivated—a so-called neutral law of general applicability. The contraceptive coverage requirement is generally applicable and designed to serve the compelling public health and gender equity goals described above, and is in no way specially targeted at religion or religious practices. Likewise, this approach complies with the Religious Freedom Restoration Act, which generally requires a federal law to not substantially burden religious exercise, or, if it does substantially burden religious exercise, to be the least restrictive means to further a compelling government interest.

### III. Economic Impact and Paperwork Burden

*A. Executive Orders 13563 and 12866—Department of Labor and Department of Health and Human Services*

Executive Orders 13563 and 12866, among other things, direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. Executive Order 13563 also states that where "appropriate and permitted by law, each agency may consider (and discuss qualitatively) values that are difficult or impossible to quantify, including

equity, human dignity, fairness, and distributive impacts." These final regulations have been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, these final regulations have been reviewed by the Office of Management and Budget.

1. Need for Regulatory Action

As stated earlier in this preamble, the Departments previously issued amended interim final regulations authorizing an exemption for group health plans and health insurance coverage sponsored by certain religious employers from certain coverage requirements under PHS Act section 2713 (76 FR 46621, August 3, 2011). The Departments have determined that it is appropriate to finalize, without change, these amended interim final regulations authorizing the exemption of group health plans and health insurance coverage sponsored by certain religious employers from having to cover certain preventive health services under the Patient Protection and Affordable Care Act.

2. Anticipated Effects

The Departments expect that these final regulations will not result in any additional significant burden or costs to the affected entities.

*B. Special Analyses—Department of the Treasury*

For purposes of the Department of the Treasury, it has been determined that this Treasury decision is not a significant regulatory action for purposes of Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the APA (5 U.S.C. chapter 5) does not apply to these final regulations, and, because these regulations do not impose a collection of information on small entities, a Regulatory Flexibility Analysis under the Regulatory Flexibility Act (5 U.S.C. chapter 6) is not required.

*C. Paperwork Reduction Act*

These final regulations are not subject to the requirements of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*) because they do not contain a "collection of information" as defined in 44 U.S.C. 3502(11).

### IV. Statutory Authority

The Department of the Treasury final regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor final regulations are adopted pursuant to the authority contained in 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185c, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

The Department of Health and Human Services final regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 USC 300gg through 300gg-63, 300gg-91, and 300gg-92), as amended.

### List of Subjects

*26 CFR Part 54*

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

*29 CFR Part 2590*

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

*45 CFR Part 147*

Health care, Health insurance, Reporting and recordkeeping requirements, and State regulation of health insurance.

### DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Chapter I**

Accordingly, 26 CFR part 54 is amended as follows:

### PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 is amended by adding an entry for § 54.9815–2713 in numerical order to read in part as follows:

**Authority:** 26 U.S.C. 7805. * * *
Section 54.9815–2713 also issued under 26 U.S.C. 9833. * * *

■ **Par. 2.** Section 54.9815–2713T is amended in paragraph (a)(1)(iii) by removing "; and" and adding a period in its place, and by removing paragraph (a)(1)(iv).

■ **Par. 3.** Section 54.9815–2713 is added to read as follows:

Exhibit 16

**8730**    **Federal Register** / Vol. 77, No. 31 / Wednesday, February 15, 2012 / Rules and Regulations

**§ 54.9815–2713    Coverage of preventive health services.**

(a) *Services*—(1) *In general.* [Reserved]

(i) [Reserved]

(ii) [Reserved]

(iii) [Reserved]

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of § 54.9815–2713T, preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration and developed in accordance with 45 CFR 147.130(a)(1)(iv).

(2) *Office visits.* [Reserved]

(3) *Out-of-network providers.* [Reserved]

(4) *Reasonable medical management.* [Reserved]

(5) *Services not described.* [Reserved]

(b) *Timing.* [Reserved]

(c) *Recommendations not current.* [Reserved]

(d) *Effective/applicability date.* April 16, 2012.

**DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

**29 CFR Chapter XXV**

29 CFR part 2590 is amended as follows:

**PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS**

■ 1. The authority citation for part 2590 continues to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185c, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Public Law 104–191, 110 Stat. 1936; sec. 401(b), Public Law 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Public Law 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Public Law 111–148, 124 Stat. 119, as amended by Public Law 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

■ 2. Accordingly, the amendment to the interim final rule with comment period amending 29 CFR 2590.715–2713(a)(1)(iv) which was published in the **Federal Register** at 76 FR 46621–46626 on August 3, 2011, is adopted as a final rule without change.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**45 CFR Subtitle A**

**PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS**

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Accordingly, the amendment to the interim final rule with comment period amending 45 CFR 147.130(a)(1)(iv) which was published in the **Federal Register** at 76 FR 46621–46626 on August 3, 2011, is adopted as a final rule without change.

**Steven T. Miller,**

*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*

Approved: February 10, 2012.

**Emily S. McMahon,**

*Acting Assistant Secretary of the Treasury (Tax Policy).*

Signed this 10th day, of February 2012.

**Phyllis C. Borzi,**

*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*

Dated: February 10, 2012.

**Marilyn Tavenner,**

*Acting Administrator, Centers for Medicare & Medicaid Services.*

Dated: February 10, 2012.

**Kathleen Sebelius,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2012–3547 Filed 2–10–12; 3:45 pm]

**BILLING CODE 4120–01–P**

**PENSION BENEFIT GUARANTY CORPORATION**

**29 CFR Part 4022**

**Benefits Payable in Terminated Single-Employer Plans; Interest Assumptions for Paying Benefits**

**AGENCY:** Pension Benefit Guaranty Corporation.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends the Pension Benefit Guaranty Corporation's regulation on Benefits Payable in Terminated Single-Employer Plans to prescribe interest assumptions under the regulation for valuation dates in March 2012. The interest assumptions are used for paying benefits under

terminating single-employer plans covered by the pension insurance system administered by PBGC.

**DATES:** Effective March 1, 2012.

**FOR FURTHER INFORMATION CONTACT:**
Catherine B. Klion
(*Klion.Catherine@pbgc.gov*), Manager, Regulatory and Policy Division, Legislative and Regulatory Department, Pension Benefit Guaranty Corporation, 1200 K Street NW., Washington, DC 20005, 202–326–4024. (TTY/TDD users may call the Federal relay service toll-free at 1–800–877–8339 and ask to be connected to 202–326–4024.)

**SUPPLEMENTARY INFORMATION:** PBGC's regulation on Benefits Payable in Terminated Single-Employer Plans (29 CFR part 4022) prescribes actuarial assumptions—including interest assumptions—for paying plan benefits under terminating single-employer plans covered by title IV of the Employee Retirement Income Security Act of 1974. The interest assumptions in the regulation are also published on PBGC's Web site (*http://www.pbgc.gov*).

PBGC uses the interest assumptions in Appendix B to Part 4022 to determine whether a benefit is payable as a lump sum and to determine the amount to pay. Appendix C to Part 4022 contains interest assumptions for private-sector pension practitioners to refer to if they wish to use lump-sum interest rates determined using PBGC's historical methodology. Currently, the rates in Appendices B and C of the benefit payment regulation are the same.

The interest assumptions are intended to reflect current conditions in the financial and annuity markets. Assumptions under the benefit payments regulation are updated monthly. This final rule updates the benefit payments interest assumptions for March 2012.[1]

The March 2012 interest assumptions under the benefit payments regulation will be 1.25 percent for the period during which a benefit is in pay status and 4.00 percent during any years preceding the benefit's placement in pay status. In comparison with the interest assumptions in effect for February 2012, these interest assumptions are unchanged.

PBGC has determined that notice and public comment on this amendment are impracticable and contrary to the public interest. This finding is based on the

---

[1] Appendix B to PBGC's regulation on Allocation of Assets in Single-Employer Plans (29 CFR part 4044) prescribes interest assumptions for valuing benefits under terminating covered single-employer plans for purposes of allocation of assets under ERISA section 4044. Those assumptions are updated quarterly.

Exhibit 16

JA-0000303

*however,* no market value threshold need be satisfied in connection with non-convertible securities eligible for registration on Form F–9 (§ 239.39 of this chapter)''.

■ 34. Effective December 31, 2012, amend Form 40–F (referenced in 17 CFR 249.240f) by:

■ a. In General Instruction A.(i), removing "F–9";

■ b. Removing from paragraph (2)(iv) of General Instruction A. the phrase ''; provided, however, that no market value threshold need be satisfied in connection with non-convertible securities eligible for registration on Form F–9'' and adding in its place the phrase ''or the Registrant filed a Form F–9 with the Commission on or before December 30, 2012''; and

■ c. Revising paragraph (2) of General Instruction C. to read as follows:

(2) Any financial statements, other than interim financial statements, included in this Form by registrants registering securities pursuant to Section 12 of the Exchange Act or reporting pursuant to the provisions of Section 13(a) or 15(d) of the Exchange Act must be reconciled to U.S. GAAP as required by Item 17 of Form 20–F under the Exchange Act, unless this Form is filed with respect to a reporting obligation under Section 15(d) that arose solely as a result of a filing made on Form F–7, F–8, F–9 or F–80, in which case no such reconciliation is required.

**Note:** The text of Form 40–F does not, and this amendment will not, appear in the Code of Federal Regulations.

Dated: July 27, 2011.

By the Commission.

**Elizabeth M. Murphy,**

*Secretary.*

[FR Doc. 2011–19421 Filed 8–2–11; 8:45 am]

**BILLING CODE 8011–01–P**

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 54**

**[TD 9541]**

**RIN 1545–BJ60**

## DEPARTMENT OF LABOR

**Employee Benefits Security Administration**

**29 CFR Part 2590**

**RIN 1210–AB44**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**[CMS–9992–IFC2]**

**45 CFR Part 147**

**RIN 0938–AQ07**

**Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act**

**AGENCIES:** Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; Centers for Medicare & Medicaid Services, Department of Health and Human Services.

**ACTION:** Interim final rules with request for comments.

**SUMMARY:** This document contains amendments to the interim final regulations implementing the rules for group health plans and health insurance coverage in the group and individual markets under provisions of the Patient Protection and Affordable Care Act regarding preventive health services.

**DATES:** *Effective date.* These interim final regulations are effective on August 1, 2011.

*Comment date.* Comments are due on or before September 30, 2011.

*Applicability dates.* These interim final regulations generally apply to group health plans and group health insurance issuers on August 1, 2011.

**ADDRESSES:** Written comments may be submitted to any of the addresses specified below. Any comment that is submitted to any Department will be shared with the other Departments. Please do not submit duplicates.

All comments will be made available to the public. *WARNING:* Do not include any personally identifiable information (such as name, address, or other contact information) or

confidential business information that you do not want publicly disclosed. All comments are posted on the Internet exactly as received, and can be retrieved by most Internet search engines. No deletions, modifications, or redactions will be made to the comments received, as they are public records. Comments may be submitted anonymously.

*Department of Labor.* Comments to the Department of Labor, identified by RIN 1210–AB44, by one of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *E-mail:* E-OHPSCA2713.EBSA@dol.gov.

• *Mail or Hand Delivery:* Office of Health Plan Standards and Compliance Assistance, Employee Benefits Security Administration, Room N–5653, U.S. Department of Labor, 200 Constitution Avenue, NW., Washington, DC 20210, *Attention:* RIN 1210–AB44.

Comments received by the Department of Labor will be posted without change to *http:// www.regulations.gov* and *http:// www.dol.gov/ebsa,* and available for public inspection at the Public Disclosure Room, N–1513, Employee Benefits Security Administration, 200 Constitution Avenue, NW., Washington, DC 20210.

*Department of Health and Human Services.* In commenting, please refer to file code CMS–9992–IFC2. Because of staff and resource limitations, we cannot accept comments by facsimile (FAX) transmission.

You may submit comments in one of four ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the ''Submit a comment'' instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, *Attention:* CMS–9992–IFC2, P.O. Box 8010, Baltimore, MD 21244–8010.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, *Attention:* CMS–9992–IFC2, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

4. *By hand or courier.* Alternatively, you may deliver (by hand or courier) your written comments ONLY to the

Exhibit 17    JA-0000304

following addresses prior to the close of the comment period: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Room 445–G, Hubert H. Humphrey Building, 200 Independence Avenue, SW., Washington, DC 20201

(Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without Federal government identification, commenters are encouraged to leave their comments in the CMS drop slots located in the main lobby of the building. A stamp-in clock is available for persons wishing to retain a proof of filing by stamping in and retaining an extra copy of the comments being filed.)

b. For delivery in Baltimore, MD— Centers for Medicare & Medicaid Services, Department of Health and Human Services, 7500 Security Boulevard, Baltimore, MD 21244–1850.

If you intend to deliver your comments to the Baltimore address, call telephone number (410) 786–4492 in advance to schedule your arrival with one of our staff members.

Comments may be delayed and received after the comment period.

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following Web site as soon as possible after they have been received: *http://www.regulations.gov*. Follow the search instructions on that Web site to view public comments.

Comments received timely will also be available for public inspection as they are received, generally beginning approximately three weeks after publication of a document, at the headquarters of the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, Maryland 21244, Monday through Friday of each week from 8:30 a.m. to 4 p.m. EST. To schedule an appointment to view public comments, phone 1–800–743–3951.

*Internal Revenue Service.* Comments to the IRS, identified by REG–120391– 10, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov*. Follow the instructions for submitting comments.

• *Mail:* CC:PA:LPD:PR (REG–120391– 10), room 5205, Internal Revenue Service, P.O. Box 7604, Ben Franklin Station, Washington, DC 20044.

• *Hand or courier delivery:* Monday through Friday between the hours of 8 a.m. and 4 p.m. to: CC:PA:LPD:PR (REG–120391–10), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington DC 20224.

All submissions to the IRS will be open to public inspection and copying in room 1621, 1111 Constitution Avenue, NW., Washington, DC from 9 a.m. to 4 p.m.

**FOR FURTHER INFORMATION CONTACT:** Amy Turner or Beth Baum, Employee Benefits Security Administration, Department of Labor, at (202) 693–8335; Karen Levin, Internal Revenue Service, Department of the Treasury, at (202) 622–6080; Robert Imes, Centers for Medicare & Medicaid Services (CMS), Department of Health and Human Services, at (410) 786–1565.

*Customer Service Information:* Individuals interested in obtaining information from the Department of Labor concerning employment-based health coverage laws may call the EBSA Toll-Free Hotline at 1–866–444–EBSA (3272) or visit the Department of Labor's Web site (*http://www.dol.gov/ebsa*). In addition, information from HHS on private health insurance for consumers can be found on the Centers for Medicare & Medicaid Services (CMS) Web site (*http://cciio.cms.gov*) and information on health reform can be found at *http://www.HealthCare.gov*.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Patient Protection and Affordable Care Act, Public Law 111–148, was enacted on March 23, 2010; the Health Care and Education Reconciliation Act (the Reconciliation Act), Public Law 111–152, was enacted on March 30, 2010 (collectively known as the "Affordable Care Act"). The Affordable Care Act reorganizes, amends, and adds to the provisions of part A of title XXVII of the Public Health Service Act (PHS Act) relating to group health plans and health insurance issuers in the group and individual markets. The term "group health plan" includes both insured and self-insured group health plans.[1] The Affordable Care Act adds section 715(a)(1) to the Employee Retirement Income Security Act (ERISA) and section 9815(a)(1) to the Internal Revenue Code (the Code) to incorporate the provisions of part A of title XXVII

of the PHS Act into ERISA and the Code, and make them applicable to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans. The PHS Act sections incorporated by this reference are sections 2701 through 2728. PHS Act sections 2701 through 2719A are substantially new, though they incorporate some provisions of prior law. PHS Act sections 2722 through 2728 are sections of prior law renumbered, with some, mostly minor, changes.

Subtitles A and C of title I of the Affordable Care Act amend the requirements of title XXVII of the PHS Act (changes to which are incorporated into ERISA section 715). The preemption provisions of ERISA section 731 and PHS Act section 2724 [2] (implemented in 29 CFR 2590.731(a) and 45 CFR 146.143(a)) apply so that the requirements of part 7 of ERISA and title XXVII of the PHS Act, as amended by the Affordable Care Act, are not to be "construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with group or individual health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement" of the Affordable Care Act. Accordingly, State laws that impose requirements on health insurance issuers that are stricter than the requirements imposed by the Affordable Care Act are not superseded by the Affordable Care Act.

Section 2713 of the PHS Act, as added by the Affordable Care Act and incorporated under section 715(a)(1) of ERISA and section 9815(a)(1) of the Code, specifies that a group health plan and a health insurance issuer offering group or individual health insurance coverage provide benefits for and prohibit the imposition of cost-sharing with respect to:

• Evidence-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force (Task Force) with respect to the individual involved.[3]

---

[1] The term "group health plan" is used in title XXVII of the PHS Act, part 7 of ERISA, and chapter 100 of the Code, and is distinct from the term "health plan," as used in other provisions of title I of the Affordable Care Act. The term "health plan" does not include self-insured group health plans.

[2] Code section 9815 incorporates the preemption provisions of PHS Act section 2724. Prior to the Affordable Care Act, there were no express preemption provisions in chapter 100 of the Code.

[3] Under PHS Act section 2713(a)(5), the Task Force recommendations regarding breast cancer screening, mammography, and prevention issued in or around November of 2009 are not to be considered current recommendations on this subject for purposes of PHS Act section 2713(a)(1).

Exhibit 17                                                                                                          JA-0000305

• Immunizations for routine use in children, adolescents, and adults that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention (Advisory Committee) with respect to the individual involved. A recommendation of the Advisory Committee is considered to be "in effect" after it has been adopted by the Director of the Centers for Disease Control and Prevention. A recommendation is considered to be for routine use if it appears on the Immunization Schedules of the Centers for Disease Control and Prevention.

• With respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA).

• With respect to women, preventive care and screening provided for in comprehensive guidelines supported by HRSA (not otherwise addressed by the recommendations of the Task Force), which will be commonly known as HRSA's Women's Preventive Services: Required Health Plan Coverage Guidelines.

The requirements to cover recommended preventive services without any cost-sharing do not apply to grandfathered health plans.[4] The Departments previously issued interim final regulations implementing PHS Act section 2713; these interim final rules were published in the **Federal Register** on July 19, 2010 (75 FR 41726). For the reasons explained below, the Departments are now issuing an amendment to these interim final rules.

## II. Overview of the Amendment to the Interim Final Regulations

The interim final regulations provided that a group health plan or health insurance issuer must cover certain items and services, without cost-sharing, as recommended by the U.S. Preventive Services Task Force, the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention, and the Health Resources and Services Administration. Notably, to the extent not described in the U.S. Preventive Services Task Force recommendations, HRSA was charged with developing comprehensive guidelines for preventive care and screenings with respect to women (*i.e.*, the Women's Preventive Services: Required Health Plan Coverage Guidelines or "HRSA Guidelines"). The interim final regulations also require that changes in the required items and services be implemented no later than plan years (in the individual market, policy years) beginning on or after the date that is one year from when the new recommendation or guideline is issued.

In response to the request for comments on the interim final regulations, the Departments received considerable feedback regarding which preventive services for women should be considered for coverage under PHS Act section 2713(a)(4). Most commenters, including some religious organizations, recommended that HRSA Guidelines include contraceptive services for all women and that this requirement be binding on all group health plans and health insurance issuers with no religious exemption. However, several commenters asserted that requiring group health plans sponsored by religious employers to cover contraceptive services that their faith deems contrary to its religious tenets would impinge upon their religious freedom. One commenter noted that some religious employers do not currently cover such benefits under their group health plan due to their religious beliefs.

The Departments note that PHS Act section 2713(a)(4) gives HRSA the authority to develop comprehensive guidelines for additional preventive care and screenings for women "for purposes of this paragraph." In other words, the statute contemplated HRSA Guidelines that would be developed with the knowledge that certain group health plans and health insurance issuers would be required to cover the services recommended without cost-sharing, unlike the other guidelines referenced in section 2713(a), which pre-dated the Affordable Care Act and were originally issued for purposes of identifying the non-binding recommended care that providers should provide to patients. These HRSA Guidelines exist solely to bind non-grandfathered group health plans and health insurance issuers with respect to the extent of their coverage of certain preventive services for women. In the Departments' view, it is appropriate that HRSA, in issuing these Guidelines, takes into account the effect on the religious beliefs of certain

religious employers if coverage of contraceptive services were required in the group health plans in which employees in certain religious positions participate. Specifically, the Departments seek to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions. Such an accommodation would be consistent with the policies of States that require contraceptive services coverage, the majority of which simultaneously provide for a religious accommodation.

In light of the above, the Departments are amending the interim final rules to provide HRSA additional discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned. The amendment to the interim final rules provides HRSA with the discretion to establish this exemption. Consistent with most States that have such exemptions, as described below, the amended regulations specify that, for purposes of this policy, a religious employer is one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) refer to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. The definition of religious employer, as set forth in the amended regulations, is based on existing definitions used by most States that exempt certain religious employers from having to comply with State law requirements to cover contraceptive services. We will be accepting comments on this definition as well as alternative definitions, such as those that have been developed under Title 26 of the United States Code. The definition set forth here is intended to reasonably balance the extension of any coverage of contraceptive services under the HRSA Guidelines to as many women as possible, while respecting the unique relationship between certain religious employers and their employees in certain religious positions. The change in policy effected by this amendment to these interim final rules is intended solely for purposes of PHS Act section 2713 and the companion provisions of ERISA and the Internal Revenue Code.

Because HRSA's discretion to establish an exemption applies only to group health plans sponsored by certain

---

Thus, the recommendations regarding breast cancer screening, mammography, and prevention issued by the Task Force prior to those issued in or around November of 2009 (that is, those issued in 2002) will be considered current until new recommendations in this area are issued by the Task Force or appear in comprehensive guidelines supported by HRSA concerning preventive care and screenings for women, which will be commonly known as HRSA's Women's Preventive Services: Required Health Plan Coverage Guidelines.

[4] See 26 CFR 54.9815–1251T, 29 CFR 2590.715–1251 and 45 CFR 147.140 (75 FR 34538, June 17, 2010).

Exhibit 17

JA-0000306

religious employers and group health insurance offered in connection with such plans, health insurance issuers in the individual health insurance market would not be covered under any such exemption.

### III. Interim Final Regulations and Waiver of Delay of Effective Date

Section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act authorize the Secretaries of the Treasury, Labor, and HHS (collectively, the Secretaries) to promulgate any interim final rules that they determine are appropriate to carry out the provisions of chapter 100 of the Code, part 7 of subtitle B of title I of ERISA, and part A of title XXVII of the PHS Act, which include PHS Act sections 2701 through 2728 and the incorporation of those sections into ERISA section 715 and Code section 9815. The amendments promulgated in this rulemaking carry out the provisions of these statutes. Therefore, the foregoing interim final rule authority applies to these amendments.

Under the Administrative Procedure Act (APA) (5 U.S.C. 551, *et seq.*), while a general notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations, an exception is made when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. The provisions of the APA that ordinarily require a notice of proposed rulemaking do not apply here because of the specific authority to issue interim final rules granted by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act.

Even if the APA requirements for notice and comment were applicable to these regulations, they have been satisfied. This is because the Secretaries find that providing for an additional opportunity for public comment is unnecessary, as the July 19, 2010 interim final rules implementing section 2713 of the PHS Act provided the public with an opportunity to comment on the implementation of the preventive services requirements in this provision, and the amendments made in these interim final rules in fact are based on such public comments. Specifically, commenters expressed concerns that HRSA-supported guidelines issued under section 2713(a)(4) that included coverage of contraceptive services could impinge upon the religious freedom of certain religious employers. The flexibility that is afforded under these amendments is being provided to HRSA in order to allow HRSA the discretion

to accommodate, in a balanced way, as discussed above, these commenter concerns.

In addition, the Departments have determined that an additional opportunity for public comment would be impractical and contrary to the public interest. The requirement in section 2713(a)(4) that preventive services supported by HRSA be provided without cost-sharing took effect at the beginning of the first plan or policy year beginning on or after September 23, 2010. At that time, however, HRSA had not issued any such guidelines. Under the July 19, 2010 interim final rules, group health plans and insurance issuers do not have to begin covering preventive services supported in HRSA guidelines until the first plan or policy year that begins one year after the guidelines are issued. Thus, while the law requiring coverage of recommended women's preventive health services was enacted on March 23, 2010, and has been in effect since September 23, 2010, no such guidelines have yet been issued, and it will be at least a full year after they are issued before group health plans and issuers will be required to start covering preventive services recommended in the guidelines without cost sharing.

The July 19, 2010 interim final rules indicated that HRSA expected to issue guidelines by August 1, 2011. After considering public comments raising the issue addressed in these amendments, however, the Departments determined that HRSA should be granted the discretion to address the commenter concerns at issue prior to issuing guidelines under section 2713(a)(4). Many college student policy years begin in August and an estimated 1.5 million young adults are estimated to be covered by such policies.[5] Providing an opportunity for public comment as described above would mean that the guidelines could not be issued until after August of 2011. This delay would mean that many students could not benefit from the new prevention coverage without cost-sharing following from the issuance of the guidelines until the 2013–14 school year, as opposed to the 2012–13 school year. Similarly, 2008 data from the Department of Labor indicate that over 4 million Americans have ERISA group health plan coverage that starts in August or September; they too would experience over a year's delay in the receipt of the new benefit if the public

comment period delayed the issuance of the guidance for over a month. The Departments have determined that such a delay in implementation of the statutory requirement that women receive vital preventive services without cost-sharing would be contrary to the public interest because it could result in adverse health consequences that may not otherwise have occurred.

While the Departments have determined that, even if the APA were applicable, issuing these regulations in proposed form, so they would not become effective until after public comment, would be contrary to the public interest in the case of these amendments, the Departments are issuing these amendments as interim final rules so as to provide the public with an opportunity for public comment on these amendments.

The APA also generally requires that a final rule be effective no sooner than 30 days after the date of publication in the **Federal Register**. This 30-day delay in effective date can be waived, however, if an agency finds good cause why the effective date should not be delayed, and the agency incorporates a statement of the findings and its reasons in the rule issued.

As indicated above, many college student policy years begin in August. Delaying the effective date of this amendment by 30 days would mean that the HRSA guidelines could not be issued until after August of 2011. This delay would mean many students could not benefit from the new prevention coverage without cost-sharing following from the issuance of the guidelines until the 2013–14 school year, as opposed to the 2012–13 school year. As discussed above, all other participants, beneficiaries and enrollees in plans or policies with a plan or a policy year beginning in the months between August 1 and whenever a final rule would be published should the Departments provide a pre-promulgation opportunity for public comment would face a similar one-year delay in receiving these important health benefits. The Departments have determined that such a delay in implementation of the statutory requirement that women receive vital preventive services without cost-sharing would be impracticable and contrary to the public interest because it could result in adverse health consequences that may not otherwise have occurred. Therefore, the Departments are waiving the 30-day delay in effective date of these amendments.

---

[5] Department of Health and Human Services, Notice of Proposed Rulemaking on Student Health Insurance Coverage (76 FR 7767, February 22, 2011).

Exhibit 17

## IV. Economic Impact and Paperwork Burden

### A. Executive Orders 13563 and 12866—Department of Labor and Department of Health and Human Services

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a ''significant regulatory action,'' although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

#### 1. Need for Regulatory Action

As stated earlier in this preamble, the Departments previously issued interim final regulations implementing PHS Act section 2713 that were published in the **Federal Register** on July 19, 2010 (75 FR 41726). Comments received in response to the interim final regulations raised the issue of imposing on certain religious employers through binding guidelines the requirement to cover contraceptive services that would be in conflict with the religious tenets of the employer. The Departments have determined that it is appropriate to amend the interim final rules to provide HRSA the discretion to exempt from its guidelines group health plans maintained by certain religious employers where contraceptive services are concerned.

#### 2. Anticipated Effects

The Departments expect that this amendment will not result in any additional significant burden or costs to the affected entities.

### B. Special Analyses—Department of the Treasury

Notwithstanding the determinations of the Department of Labor and Department of Health and Human Services, for purposes of the Department of the Treasury, it has been determined that this Treasury decision is not a significant regulatory action for purposes of Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the APA (5 U.S.C.

chapter 5) does not apply to these interim final regulations. For the applicability of the RFA, refer to the Special Analyses section in the preamble to the cross-referencing notice of proposed rulemaking published elsewhere in this issue of the **Federal Register**. Pursuant to section 7805(f) of the Code, these temporary regulations have been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small businesses.

### C. Paperwork Reduction Act

As stated in the previously issued interim final regulations, this rule is not subject to the requirements of the Paperwork Reduction Act of 1980 (44 U.S.C. 3501 *et seq.*) because it does not contain a ''collection of information'' as defined in 44 U.S.C. 3502 (11).

## V. Statutory Authority

The Department of the Treasury temporary regulations are adopted pursuant to the authority contained in sections 7805 and 9833 of the Code.

The Department of Labor interim final regulations are adopted pursuant to the authority contained in 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185c, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

The Department of Health and Human Services interim final regulations are adopted pursuant to the authority contained in sections 2701 through 2763, 2791, and 2792 of the PHS Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

## List of Subjects

### 26 CFR Part 54

Excise taxes, Health care, Health insurance, Pensions, Reporting and recordkeeping requirements.

### 29 CFR Part 2590

Continuation coverage, Disclosure, Employee benefit plans, Group health plans, Health care, Health insurance, Medical child support, Reporting and recordkeeping requirements.

### 45 CFR Part 147

Health care, Health insurance, Reporting and recordkeeping requirements, and State regulation of health insurance.

## Department of the Treasury

*Internal Revenue Service*

*26 CFR Chapter 1*

Accordingly, 26 CFR part 54 is amended as follows:

## PART 54—PENSION EXCISE TAXES

■ **Paragraph 1.** The authority citation for part 54 continues to read as follows:

**Authority:** 26 U.S.C. 7805. * * *

■ **Par. 2.** Section 54.9815–2713T is amended by revising paragraph (a)(1)(iv) to read as follows:

### § 54.9815–2713T   Coverage of preventive health services (temporary).

(a) * * *

(1) * * *

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration and developed in accordance with 45 CFR 147.130(a)(1)(iv).

* * * * *

## Department of Labor

*Employee Benefits Security Administration*

*29 CFR Chapter XXV*

29 CFR part 2590 is amended as follows:

## PART 2590—RULES AND REGULATIONS FOR GROUP HEALTH PLANS

■ **1.** The authority citation for part 2590 continues to read as follows:

**Authority:** 29 U.S.C. 1027, 1059, 1135, 1161–1168, 1169, 1181–1183, 1181 note, 1185, 1185a, 1185b, 1185c, 1185d, 1191, 1191a, 1191b, and 1191c; sec. 101(g), Pub. L. 104–191, 110 Stat. 1936; sec. 401(b), Pub. L. 105–200, 112 Stat. 645 (42 U.S.C. 651 note); sec. 512(d), Pub. L. 110–343, 122 Stat. 3881; sec. 1001, 1201, and 1562(e), Pub. L. 111–148, 124 Stat. 119, as amended by Pub. L. 111–152, 124 Stat. 1029; Secretary of Labor's Order 3–2010, 75 FR 55354 (September 10, 2010).

### Subpart C—Other Requirements

■ **2.** Section 2590.715–2713 is amended by revising paragraph (a)(1)(iv) to read as follows:

### § 2590.715–2713   Coverage of preventive health services.

(a) * * *

(1) * * *

(iv) With respect to women, to the extent not described in paragraph

Exhibit 17                                                                                                    JA-0000308

(a)(1)(i) of this section, preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration and developed in accordance with 45 CFR 147.130(a)(1)(iv).

\* \* \* \* \*

**Department of Health and Human Services**

For the reasons stated in the preamble, the Department of Health and Human Services amends 45 CFR part 147 as follows:

## PART 147—HEALTH INSURANCE REFORM REQUIREMENTS FOR THE GROUP AND INDIVIDUAL HEALTH INSURANCE MARKETS

■ 1. The authority citation for part 147 continues to read as follows:

**Authority:** 2701 through 2763, 2791, and 2792 of the Public Health Service Act (42 U.S.C. 300gg through 300gg–63, 300gg–91, and 300gg–92), as amended.

■ 2. Section 147.130 is amended by revising paragraph (a)(1)(iv) to read as follows:

### § 147.130  Coverage of preventive health services.

(a) \* \* \*

(1) \* \* \*

(iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration.

(A) In developing the binding health plan coverage guidelines specified in this paragraph (a)(1)(iv), the Health Resources and Services Administration shall be informed by evidence and may establish exemptions from such guidelines with respect to group health plans established or maintained by religious employers and health insurance coverage provided in connection with group health plans established or maintained by religious employers with respect to any requirement to cover contraceptive services under such guidelines.

(B) For purposes of this subsection, a "religious employer" is an organization that meets all of the following criteria:

(1) The inculcation of religious values is the purpose of the organization.

(2) The organization primarily employs persons who share the religious tenets of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

\* \* \* \* \*

Steven T. Miller,
*Deputy Commissioner for Services and Enforcement, Internal Revenue Service.*
Approved: July 28, 2011.
Emily S. McMahon,
*Acting Assistant Secretary of the Treasury (Tax Policy).*
Signed this 29th day of July 2011.
Phyllis C. Borzi,
*Assistant Secretary, Employee Benefits Security Administration, Department of Labor.*
OCIIO–9992–IFC2

(Catalog of Federal Domestic Assistance Program No. 93.773, Medicare—Hospital Insurance; and Program No. 93.774, Medicare—Supplementary Medical Insurance Program)

Dated: July 28, 2011.
Donald M. Berwick,
*Administrator, Centers for Medicare & Medicaid Services.*
Approved: July 28, 2011.
Kathleen Sebelius,
*Secretary, Department of Health and Human Services.*
[FR Doc. 2011–19684 Filed 8–1–11; 8:45 am]
**BILLING CODE 4120–01–P**

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

**33 CFR Part 165**

**[Docket No. USCG–2011–0717]**

**RIN 1625–AA00**

### Safety Zone; Discovery World Private Wedding Firework Displays, Milwaukee, WI

**AGENCY:** Coast Guard, DHS.
**ACTION:** Temporary final rule.

**SUMMARY:** The Coast Guard is establishing a temporary safety zone on the waters of Milwaukee Harbor in Milwaukee, Wisconsin. This zone is intended to restrict vessels from a portion of Milwaukee Harbor during two separate firework displays on July 31, 2011 and August 26, 2011. This temporary safety zone is necessary to protect spectators and vessels from the hazards associated with these firework displays.

**DATES:** This rule is in the CFR on August 3, 2011 through 10:30 p.m. on August

26, 2011. This rule is effective with actual notice for purposes of enforcement at 9:30 p.m. on July 31, 2011.

**ADDRESSES:** Documents indicated in this preamble as being available in the docket are part of docket USCG–2011–0717 and are available online by going to *http://www.regulations.gov*, inserting USCG–2011–0717 in the Docket ID box, and then clicking "search." They are also available for inspection or copying at the Docket Management Facility (M–30), U.S. Department of Transportation, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this temporary rule, contact or e-mail BM1 Adam Kraft, U.S. Coast Guard Sector Lake Michigan, at 414–747–7148 or *Adam.D.Kraft@uscg.mil*. If you have questions on viewing the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone 202–366–9826.

**SUPPLEMENTARY INFORMATION:**

### Regulatory Information

The Coast Guard is issuing this temporary final rule without prior notice and opportunity to comment pursuant to authority under section 4(a) of the Administrative Procedure Act (APA) (5 U.S.C. 553(b)). This provision authorizes an agency to issue a rule without prior notice and opportunity to comment when the agency for good cause finds that those procedures are "impracticable, unnecessary, or contrary to the public interest." Under 5 U.S.C. 553(b)(B), the Coast Guard finds that good cause exists for not publishing a notice of proposed rulemaking (NPRM) with respect to this rule because waiting for a notice and comment period to run would be impracticable and contrary to the public interest. Notice of this fireworks display was not received in sufficient time for the Coast Guard to solicit public comments before the start of the event. Thus, waiting for a notice and comment period to run would be impracticable and contrary to the public interest because it would inhibit the Coast Guard's ability to protect the public from the hazards associated with these maritime fireworks displays.

Under 5 U.S.C. 553(d)(3), the Coast Guard finds that good cause exists for making this rule effective less than 30-days after publication in the **Federal Register**. For the same reasons discussed in the preceding paragraph, waiting for a 30 day notice period to run

Exhibit 17    JA-0000309

Health Resources & Services Administration                                    Explore  +



[                                            ] [🔍]

**Advanced Search**

Grants    Loans & Scholarships    Data Warehouse    About HRSA

⊕ share |  🖨 ✉ f 🐦

Home > Women's Preventive Services Guidelines

# Women's Preventive Services Guidelines



On December 20, 2016, HRSA updated the HRSA-supported Women's Preventive Services Guidelines. Read the most current version.

*Non-grandfathered plans and coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing consistent with these guidelines beginning with the first plan year (in the individual market policy year) that begins on or after December 20, 2017. Before that time, non-grandfathered plans are generally required to provide coverage without cost sharing consistent with the 2011 guidelines.*

## Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being

The Affordable Care Act – the health insurance reform legislation passed by Congress and signed into law by President Obama on March 23, 2010 – helps make prevention affordable and accessible for all Americans by requiring health plans to cover preventive services and by eliminating cost sharing for those services. Preventive services that have strong scientific evidence of their health benefits must be covered and plans can no longer charge a patient a copayment, coinsurance or deductible for these services when they are delivered by a network provider.

### Women's Preventive Services Guidelines Supported by the Health Resources and Services Administration

Under the Affordable Care Act, women's preventive health care – such as mammograms, screenings for cervical cancer, prenatal care, and other services – generally must be covered with no cost sharing. However, the law recognizes and HHS understands the need to take into account the unique health needs of women throughout their lifespan.

The HRSA-supported health plan coverage guidelines, developed by the Institute of Medicine (IOM), will help ensure that women receive a comprehensive set of preventive services without having to pay a co-payment, co-insurance or a deductible. HHS commissioned an IOM study to review what preventive services are necessary for women's health and well-being and therefore should be considered in the development of comprehensive guidelines for preventive services for women. HRSA is supporting the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines.

Health Resources and Services Administration Women's Preventive Services Guidelines

*Non-grandfathered plans (plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) generally are required to provide coverage without cost sharing consistent with these guidelines in the first plan year (in the individual market, policy year) that begins on or after August 1, 2012.*

| Type of Preventive Service | HHS Guideline for Health | Frequency |
| --- | --- | --- |

## Learn More

- Women's Preventive Services Initiative report ⧉
- 2011 IOM Report *Clinical Preventive Services for Women: Closing the Gaps* ⧉
- US Preventive Services Task Force ⧉
- Bright Futures ⧉
- Advisory Committee on Immunization Practices ⧉
- Previous Preventive Services Guidelines (August 2011)

## For Further Information

Contact
wellwomancare@hrsa.gov.

Exhibit 18                                                                    JA-0000310

| | | Insurance Coverage |
|---|---|---|
| **Well-woman visits.** | Well-woman preventive care visit annually for adult women to obtain the recommended preventive services that are age and developmentally appropriate, including preconception care and many services necessary for prenatal care. This well-woman visit should, where appropriate, include other preventive services listed in this set of guidelines, as well as others referenced in section 2713. | Annual, although HHS recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors.* (see note) |
| **Screening for gestational diabetes.** | Screening for gestational diabetes. | In pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes. |
| **Human papillomavirus testing.** | High-risk human papillomavirus DNA testing in women with normal cytology results. | Screening should begin at 30 years of age and should occur no more frequently than every 3 years. |
| **Counseling for sexually transmitted infections.** | Counseling on sexually transmitted infections for all sexually active women. | Annual. |
| **Counseling and screening for human immune-deficiency virus.** | Counseling and screening for human immune-deficiency virus infection for all sexually active women. | Annual |
| **Contraceptive methods and counseling. ** (see note)** | All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity. | As prescribed |
| **Breastfeeding support, supplies, and counseling.** | Comprehensive lactation support and counseling, by a trained provider during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment. | In conjunction with each birth |
| **Screening and counseling for interpersonal and domestic violence.** | Screening and counseling for interpersonal and domestic violence. | |

*Refer to guidance issued by the Center for Consumer Information and Insurance Oversight entitled Affordable Care Act Implementation FAQs, Set 12, Q10.*

Exhibit 18                                                                                                          JA-0000311

** The guidelines concerning contraceptive methods and counseling described above do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers. Effective August 1, 2013, a religious employer is defined as an employer that is organized and operates as a non-profit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code. HRSA notes that, as of August 1, 2013, group health plans established or maintained by religious employers (and group health insurance coverage provided in connection with such plans) are exempt from the requirement to cover contraceptive services under section 2713 of the Public Health Service Act, as incorporated into the Employee Retirement Income Security Act and the Internal Revenue Code. HRSA also notes that, as of January 1, 2014,  accommodations are available to group health plans established or maintained by certain eligible organizations (and group health insurance coverage provided in connection with such plans), as well as student health insurance coverage arranged by eligible organizations, with respect to the contraceptive coverage requirement. See Federal Register Notice: *Coverage of Certain Preventive Services Under the Affordable Care Act (PDF - 327 KB)*

HRSA, in concert with an external review committee, will review, and continually update, the *Women's Preventive Services' Guidelines*.

*Date Last Reviewed:  May 2017*

 About HRSA

 Stay Connected

 Find Health Services

- **Leadership & Org Chart**
- **Budget**
- **Strategic Plan**
- **Working at HRSA**
- **About HRSA**

   

Sign up for email updates

Health Center

HIV Medical Care and Treatment

 Locate other health services

Contact Us    |    Viewers & Players    |    Privacy Policy    |    Disclaimers    |    Accessibility    |    Freedom of Information Act    |    No Fear Act
U.S. Department of Health and Human Services    |    USA.gov    |    Whitehouse.gov

## Language Assistance Available

| | | | |
|---|---|---|---|
| Español | 繁體中文 | Tiếng Việt | 한국어 |
| Tagalog | Русский | العربية | Kreyòl Ayisyen |
| Français | Polski | Português | Italiano |
| Deutsch | 日本語 | فارسی | English |

Exhibit 18

JA-0000312

Case 2:17-cv-04540-WB　Document 253-2　Filed 09/29/20　Page 126 of 130

Health Resources & Services Administration　　　　　　　　　　　　　Explore

**Get reimbursed for COVID-19 testing and treatment of uninsured individuals.**　Learn more »



[　　　　　　　　　　　　　　　　　　　　　　　　　　] 🔍

Advanced Search

Home > Women's Preventive Services Guidelines

# Women's Preventive Services Guidelines

 On December 17, 2019, HRSA updated the HRSA-supported Women's Preventive Services Guidelines. Read the most current version.

*Non-grandfathered plans and coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing consistent with these guidelines beginning with the first plan year (in the individual market policy year) that begins on or after December 17, 2020. Before that time, non-grandfathered plans are generally required to provide coverage without cost sharing consistent with the previously issued guidelines.*

In 2018, the HRSA-supported Women's Preventive Services Initiative released the Well Woman Chart, a resource that includes age-based preventive service recommendations for women from adolescence to maturity. The chart does not include updates to the HRSA-supported comprehensive guidelines, but provides additional clarity for patients and providers, with the goal of improving women's health across the life span.

## Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being

The Affordable Care Act – the health insurance reform legislation passed by Congress and signed into law by President Obama on March 23, 2010 – helps make prevention affordable and accessible for all Americans by requiring health plans to cover preventive services and by eliminating cost sharing for those services. Preventive services that have strong scientific evidence of their health benefits must be covered and plans can no longer charge a patient a copayment, coinsurance or deductible for these services when they are delivered by a network provider.

## Women's Preventive Services Guidelines Supported by the Health Resources and Services Administration

Under the Affordable Care Act, women's preventive health care – such as mammograms, screenings for cervical cancer, prenatal care, and other services – generally must be covered with no cost sharing. However, the law recognizes and HHS understands the need to take into account the unique health needs of women throughout their lifespan.

The HRSA-supported health plan coverage guidelines, developed by the Institute of Medicine (IOM), will help ensure that women receive a comprehensive set of preventive services without having to pay a co-payment, co-insurance or a deductible. HHS commissioned an IOM study to review what preventive services are necessary for women's health and well-being and therefore should be considered in the development of comprehensive guidelines for preventive services for women. HRSA is supporting the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines.

Health Resources and Services Administration Women's Preventive Services Guidelines

## Learn More

- Women's Preventive Services Initiative report 🗗
- 2011 IOM Report *Clinical Preventive Services for Women: Closing the Gaps* 🗗
- 2016 Guidelines
- US Preventive Services Task Force 🗗
- Bright Futures 🗗
- Advisory Committee on Immunization Practices 🗗

## For Further Information

Contact
wellwomancare@hrsa.gov.

*Non-grandfathered plans (plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) generally are required to provide coverage without cost sharing consistent with these guidelines in the first plan year (in the individual market, policy year) that begins on or after August 1, 2012.*

| Type of Preventive Service | HHS Guideline for Health Insurance Coverage | Frequency |
|---|---|---|
| Well-woman visits. | Well-woman preventive care visit annually for adult women to obtain the recommended preventive services that are age and developmentally appropriate, including preconception care and many services necessary for prenatal care. This well-woman visit should, where appropriate, include other preventive services listed in this set of guidelines, as well as others referenced in section 2713. | Annual, although HHS recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors.* (see note) |
| Screening for gestational diabetes. | Screening for gestational diabetes. | In pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes. |
| Human papillomavirus testing. | High-risk human papillomavirus DNA testing in women with normal cytology results. | Screening should begin at 30 years of age and should occur no more frequently than every 3 years. |
| Counseling for sexually transmitted infections. | Counseling on sexually transmitted infections for all sexually active women. | Annual. |
| Counseling and screening for human immune-deficiency virus. | Counseling and screening for human immune-deficiency virus infection for all sexually active women. | Annual. |
| Contraceptive methods and counseling. **, *** (see note) | All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity. | As prescribed. |
| Breastfeeding support, supplies, and counseling. | Comprehensive lactation support and counseling, by a trained provider during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment. | In conjunction with each birth. |
| Screening and counseling for interpersonal and domestic | Screening and counseling for interpersonal and | Annual. |

Exhibit 18-A
JA-000312-B

9/24/2020    Women's Preventive Services Guidelines | Official web site of the U.S. Health Resources & Services Administration

Case 2:17-cv-04540-WB   Document 253-2   Filed 09/30/20   Page 128 of 130

| violence. | domestic violence. | |
|---|---|---|
| **Screening for anxiety.** | Screening for anxiety in adolescent and adult women, including those who are pregnant or postpartum. Optimal screening intervals are unknown and clinical judgement should be used to determine screening frequency. | As prescribed. |
| **Screening for breast cancer.** | Screening for breast cancer by mammography in average-risk women no earlier than age 40 and no later than age 50. Screening should continue through at least age 74 and age alone should not be the basis to discontinue screening. | Screening mammography should occur at least biennially and as frequently as annually. |
| **Screening for diabetes mellitus after pregnancy.** | Screening for diabetes mellitus in women with a history of gestational diabetes mellitus (GDM) who are not currently pregnant and who have not previously been diagnosed with type 2 diabetes mellitus . | Initial testing should ideally occur within the first year postpartum and can be conducted as early as 4–6 weeks postpartum. |
| **Screening for urinary incontinence.** | Screening for urinary incontinence. | Annual. |

_* Refer to guidance issued by the Center for Consumer Information and Insurance Oversight entitled *Affordable Care Act Implementation FAQs, Set 12, Q10*.

*\*\*(I)(a) Objecting entities—religious beliefs.*

*(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:*
*(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (I)(a)(2) of this note. Such non-governmental plan sponsors include, but are not limited to, the following entities:*
*(A) A church, an integrated auxiliary of a church, a convention or association of churches, or a religious order;*
*(B) A nonprofit organization;*
*(C) A closely held for-profit entity;*
*(D) A for-profit entity that is not closely held; or*
*(E) Any other non-governmental employer;*
*(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (I)(a)(2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and*
*(iii) A health insurance issuer offering group or individual insurance coverage to the extent the*

Women's Preventive Services Guidelines | Official web site of the U.S. Health Resources & Services Administration

*issuer objects as specified in paragraph (I)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (I)(a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.*

*(2) The exemption of this paragraph (I)(a) will apply to the extent that an entity described in paragraph (I)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.*
*(b) Objecting individuals—religious beliefs. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (I)(b), and nothing in 45 CFR 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.*

*(II)(a) Objecting entities—moral convictions.*

*(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:*
*(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent one of the following non-governmental plan sponsors object as specified in paragraph (II)(a)(2) of this note:*
*(A) A nonprofit organization; or*
*(B) A for-profit entity that has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934);*
*(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (II)(a) (2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and*
*(iii) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (II)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (II)(a)(1)(iii), the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.*

*(2) The exemption of this paragraph (II)(a) will apply to the extent that an entity described in paragraph (II)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments, based on its sincerely held moral convictions.*
*(b) Objecting individuals—moral convictions. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (II)(b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815– 2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions.*

*(III) Definition. For the purposes of this note, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of these Guidelines.*

Women's Preventive Services Guidelines | Official web site of the U.S. Health Resources & Services Administration

*See Federal Register Notice:* [Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act](#) (PDF - 488 kb).

HRSA, in concert with an external review committee, will review, and continually update, the [Women's Preventive Services' Guidelines](#).

 *** General Notice

*As a result of court decisions, the final rules (83 FR 57536 (Nov. 15, 2018); 83 FR 57592 (Nov. 15, 2018)) and the interim final rules (82 FR 47792 (Oct. 13, 2017); 82 FR 47838 (Oct. 13, 2017)) regarding exemptions for certain plans and issuers from covering certain contraceptive items and services based on religious and moral objections are not in effect. See Pennsylvania v. Trump, 351 F. Supp. 3d 791 (E.D. Pa. 2019), aff'd 930 F. Supp. 3d 543 (3d Cir. 2019); see also California v. Azar, 351 F. Supp. 3d 1267 (N.D. Cal. 2019) (enjoining the final rules with respect to plaintiff states).*

*On July 29, 2019, in a case in the Northern District of Texas, DeOtte v. Azar, No. 4:18-CV-00825-O, 2019 WL 3786545 (N.D. Tex. July 29, 2019) the court determined that the "Contraceptive Mandate, codified at 42 U.S.C. § 300gg–13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1)(iv), and 26 C.F.R. § 54.9815–2713(a)(1)(iv), violates the Religious Freedom Restoration Act" with respect to individuals and entities with religious objections to contraceptive coverage and thus enjoined enforcement of those provisions against such individuals and entities.*

*The Departments of Labor, Health and Human Services, and the Treasury are working with the Department of Justice in these on-going suits.*

*Date Last Reviewed:  December 2019*

 About HRSA      Connect with HRSA      Find Health Services

- **Bureaus & Offices**
- **Budget**
- **Strategic Plan**
- **Working at HRSA**
- **About HRSA**

    

Health Center

HIV Medical Care and Treatment

 Sign up for email updates

 Locate other health services

### Language Assistance Available

| | | | |
|---|---|---|---|
| Español | 繁體中文 | Tiếng Việt | 한국어 |
| Tagalog | Русский | العربية | Kreyòl Ayisyen |
| Français | Polski | Português | Italiano |
| Deutsch | 日本語 | فارسی | English |