

December 5, 2017

Seema Verma
Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G, Hubert H. Humphrey Building,
200 Independence Avenue SW,
Washington, DC 20201

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, CMS-9940-IFC, and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act.**

Dear Administrator Verma:

The American College of Physicians (ACP) appreciates the opportunity to submit comments regarding this interim final rule. The American College of Physicians is the largest medical specialty organization and the second-largest physician group in the United States. ACP members include 152,000 internal medicine physicians (internists), related subspecialists, and medical students. Internal medicine physicians are specialists who apply scientific knowledge and clinical expertise to the diagnosis, treatment, and compassionate care of adults across the spectrum from health to complex illness.

ACP strongly opposes the interim final rules. The Affordable Care Act's requirement that non-grandfathered individual and group health plans and issuers provide coverage of preventive services without cost sharing has substantially broadened access to a suite of evidence-based services and items that prevent chronic illness, potentially improving the health of our patients and curbing health care costs. Contraception as a preventive service is supported by a large body of evidence demonstrating individual and public health benefits.  Following a review of this evidence, the Heath Resources and Services Administration recommended that 18 Food and Drug Administration-approved female-controlled contraceptives be included in the set of women's health preventive services.

Contraception is an integral part of preventive care and a medical necessity for women during approximately 30 years of their lives. Any move to decrease access to these vital services would have damaging effects on public health. Access to no-copay contraception leads to healthier women and families. Women who can plan for pregnancy prior to conception or time their pregnancies are better positioned to address existing health problems that can adversely affect mothers and their babies such

00328178

Exhibit 26

JA-0000643

as obesity, cardiovascular disease, or diabetes (i).  When women have unintended pregnancies, they are more likely to delay prenatal care, resulting in a higher risk of birth defects, low birth weight, and poor mental and physical function in early childhood (ii).No-copay coverage of contraception is also a contributing factor in the dramatic decline of the unintended pregnancy rate in the United States, including among teens, now at a 30-year low (iii).

The interim final rules threaten that access by allowing nearly any employer to request an exemption based on religious or moral grounds. As a result, many women will be forced to pay out-of-pocket or choose to go without their medication.  Women have more interactions with the health care system than men and are more likely to be negatively impacted by the cost of care.  Prior to 2012, when the no-copay contraception coverage requirement went into effect, nearly 23% of women had to pay out of pocket for oral contraceptives. In 2015, that number dropped to 3% (iv). Patients have saved an estimated $1.4 billion dollars per year in cost-sharing for oral contraceptive pills as a result of the contraceptive coverage requirement (v).

ACP is also concerned that the broad exemptions in the interim final rules create a precedent that could allow for employers to seek exemptions of other evidence-based medical care services including but not necessarily limited to vaccinations, screening and coverage of sexually transmitted infections, substance use disorder treatments, or blood transfusions.  By allowing employers to selectively opt-out of certain benefits based on their own personal or moral beliefs, patients may not be able to receive appropriate medical care as recommended by their physician.  These exemptions could also result in discrimination against some patients with chronic or acute conditions, such as those with HIV/AIDS, and may disproportionately affect low-income individuals who do not have the financial resources to purchase these services on their own.

The interim final rules represent threats to comprehensive health insurance coverage on which millions of families rely. By broadening the exemption and relieving certain entities of their responsibility to accommodate those with health care needs, the interim final rule could shift a heavy economic burden to our patients. We urge the Administration to reconsider this harmful rule and seek an alternative that will ensure our patients have access medically-necessary coverage that is based on scientific evidence, not the personal beliefs of their employer.

Sincerely,

Jack Ende, MD, MACP

25 Massachusetts Avenue, NW, Suite 700, Washington, DC 20001-7401 | 202-261-4500, 800-338-2746 | www.acponline.org
190 N Independence Mall West, Philadelphia, PA 19106-1572 | 215-351-2400, 800-523-1546 | www.acponline.org

00328179

Exhibit 26

JA-0000644

[i] Office on Women's Health, U.S. Department of Health and Human Services. Accessed at
https://www.womenshealth.gov/pregnancy/youre-pregnant-now-what/pregnancy-complications
[ii] Guttmacher Institute. Unintended Pregnancy in the United States. September 2016. Accessed at
https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states
[iii] Finer LB, Zolna MR. Declines in Unintended Pregnancy in the United States, 2008-2011. *N Engl J Med* 2016;
374:843-852. Doi: 10.1056/NEJMsa1506575
[iv] Kaiser Family Foundation. Private Insurance Coverage of Contraception. Accessed at
https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/
[v] Becker NV, Polsky D. Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA
Mandate Removed Cost Sharing. *Health Aff (Millwood)*. 2015 Jul;34(7):1204-11. doi: 10.1377/hlthaff.2015.0127.

25 Massachusetts Avenue, NW, Suite 700, Washington, DC 20001-7401 | 202-261-4500, 800-338-2746 | www.acponline.org
190 N Independence Mall West, Philadelphia, PA 19106-1572 | 215-351-2400, 800-523-1546 | www.acponline.org

00328180

Exhibit 26

JA-0000645

December 5th, 2017

VIA ELECTRONIC SUBMISSION

Eric D. Hargan, JD
Acting Secretary
U.S. Department of Health and Human Services
Centers for Medicare and Medicaid Services
P.O. Box 8016
Baltimore, MD 21244-8016

**Re: CMS–9940–IFC; Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

Dear Acting Secretary Hargan:

The American Congress of Obstetricians and Gynecologists (ACOG), the American Academy of Pediatrics, and the Society for Adolescent Health and Medicine, write in response to the Interim Final Rule (IFR) with request for comments for Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47838 et seq. Section 2713 of the Public Health Service (PHS) Act, as passed by the Patient Protection and Affordable Care Act (ACA), requires all non-grandfathered individual and group health plans to offer coverage of women's preventive services with no cost-sharing. Contraception and contraceptive counseling are a cornerstone of effective prevention in women's health. Section 2713 of the PHS Act represents an agreement among policymakers and physicians that preventive care is critically important and helps avoid the use of costlier specialty care.

Our organizations are committed to increasing birth control access for all women, and we unequivocally oppose the Department of Health and Human Services (HHS), the Department of Labor, and the Department of the Treasury (collectively, the Departments) effort to undermine this contraception coverage requirement. The IFR interferes in the personal health care decisions of our patients, and inappropriately inserts a patient's employer into the patient-physician relationship. The IFR will result in reduced access to women's preventive health care services, and reverse the historic gains made in reducing unintended pregnancy rates. We urge the Departments to preserve guaranteed coverage of women's preventive services, including contraception, at no out-of-pocket cost in private insurance plans, and immediately withdraw the IFR. Instead, the Departments should focus their policymaking efforts on improving access to women's preventive services, including contraception, without barrier or delay.

We strongly believe that all women of reproductive age should continue to have access to affordable birth control and that insurance should cover all U.S. Food and Drug Administration (FDA)-approved female contraceptive methods with no cost-sharing – as an integral part of women's preventive care services. In their earlier efforts to implement the contraception benefit and accommodation, the Departments consistently kept women's access to care at the center of policymaking. This IFR is a dramatic departure from these earlier efforts and will jeopardize women's ability to access scientifically-based health care.

00328167

Exhibit 27

JA-0000646

The benefits of birth control have been well documented. The Centers for Disease Control and Prevention (CDC) named birth control one of the top ten public health achievements of the past century.[1] Birth control is also widely credited for contributing to women's societal, educational, and economic gains.  Under the ACA, the uninsured rate among women ages 18-64 decreased by nearly half, from 19.3% to 10.8%, and the uninsured rate for children and adolescents reached a historic low of 4.8%.[2, 3] Over 62 million women with private insurance have since gained access to vital preventive health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[4] This provision was designed to promote preventive health care, reduce future medical costs, and improve the health of women, adolescents, and families.

The Departments acknowledge that the IFR will result in less insurance coverage for contraception for women who want the coverage. The IFR thus establishes a tiered system of insurance coverage wherein some women are not granted equal access to the coverage based on their employers' beliefs. This will necessarily result in women being unable to access the health care services that they, in consultation with their provider, decide they need. The IFR will impede women's access to preventive reproductive health care, including the full range of contraceptive choices.

Policies that affect individuals' access to health care should have a positive impact on public health, and be based on science, not on falsehoods that are not supported by medical evidence. FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[5] We oppose public policy that deviates from accepted science and public health evidence, as well as any non-scientific prohibitions on essential care.

### Women's Preventive Services Are Evidence-Based

Section 2713 of the PHS Act requires all non-grandfathered individual and group health plans to offer coverage of women's preventive services with no cost-sharing. Congress tasked the Health Resources and Services Administration (HRSA) with identifying "such additional preventive care and screenings" that should be provided. These coverage guidelines were initially identified by a panel of experts convened by the Institute of Medicine (IOM, now the National Academy of Medicine), and then updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI).

---

[1] Centers for Disease Control and Prevention. Achievements in public health, 1900–1999: Family planning. MMWR Weekly. 1999 Dec 3;48(47):1073-80. *Available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm.

[2] Simmons, A et. al. The Affordable Care Act: Promoting Better Health for Women. Office of the Assistant Secretary for Planning and Evaluation Issue Brief. Department of Health and Human Services. June 14, 2016, *available at* https://aspe.hhs.gov/sites/default/files/pdf/205066/ACAWomenHealthIssueBrief.pdf.

[3] Georgetown University Health Policy Institute Center for Children and Families. Children's Health Coverage Rate Now at Historic High of 95 Percent. October 2016. *Available at* https://ccf.georgetown.edu/wp-content/uploads/2016/11/Kids-ACS-update-11-02-1.pdf.

[4] National Women's Law Center. New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs. September 2017. *Available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

[5] Brief for American College of Obstetricians and Gynecologists, Physicians for Reproductive Health, American Academy of Pediatrics, American Nurses Association, et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX 2014:No. 13-354.

00328168

Exhibit 27

JA-0000647

ACOG launched the WPSI in 2016 as part of a cooperative agreement with HRSA to coordinate the development, review, and update of recommendations for the HRSA-sponsored Women's Preventive Services Guidelines. WPSI recommended the inclusion of nine preventive services, the culmination of a multidisciplinary effort that utilized the most current evidence available to identify needed services to improve the uptake of women's preventive services and contribute to overall improved health outcomes. Contraception is a key piece of this comprehensive women's preventive services package, and maintaining access to this existing coverage is critical to ensuring American women and families can access the care that they need.

### Contraceptive Coverage Has Health Benefits and Positive Societal Impacts

Contraception enables women to control the timing of a desired pregnancy and to prevent unintended pregnancy. The goal of prevention of unintended pregnancy is to allow women to achieve their pregnancy intentions and to improve maternal, child, and family health outcomes. This is reflected in both Healthy People 2020, a set of HHS-approved "science-based, 10-year national objectives for improving the health of all Americans," and the recent HHS Draft Strategic Plan 2018-2022, which lays out a dedication to improving pregnancy outcomes and maternal and child health.[6,7]

The lack of insurance coverage prevents many women from choosing a high-cost contraceptive, even if that method is best for her, and may result in her resorting to an alternative method that places her at greater risk for medical complications or improper or inconsistent use, with the attendant increased risk of unintended pregnancy.[8] Further, multiple studies have demonstrated that when financial and logistical barriers are removed, women overwhelmingly select the most effective forms of contraception.[9,10] In addition to consequences for individual women, unintended pregnancy has a public health impact. Unintended pregnancies have higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving health complications unaddressed and increasing the risk of infant mortality, birth defects, low birth weight, and preterm birth.[11] Other long-term health consequences of unintended pregnancy include the impact on health behaviors such as breastfeeding, and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[12]

Increased use of contraception has clear benefits to women and families and has contributed to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[13] Access

---

[6] Office of Disease Prevention and Health Promotion. *Healthy People 2020.* (2016) *Available at:*
https://www.healthypeople.gov/2020/topics-objectives/topic/family-planning
[7] U.S. Department of Health and Human Services. *HHS Draft Strategic Plan FY 2018-2022.* (2017)
[8] Institute of Medicine. Clinical Preventive Services for Women: Closing the Gaps. Washington, DC: The National Academies Press. 2011. *Available at:* https://doi.org/10.17226/13181.
[9] Postlethwaite D, Trussell J, Zoolakis A, et al. A comparison of contraceptive procurement pre- and post-benefit change. Contraception. 2007;76:360–5. *Available at* https://www.ncbi.nlm.nih.gov/pubmed/17963860.
[10] Secura GM, Allsworth JE, Madden T, et al. The Contraceptive CHOICE Project: reducing barriers to long-acting reversible contraception. Am J Obstet Gynecol. 2010;203:115.e1–7. *Available at* https://www.ncbi.nlm.nih.gov/pubmed/20541171.
[11] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[12] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews.* 2010;32(1):152-174.
[13] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine,* 2016, 374(9):843–852.

3

00328169

Exhibit 27

JA-0000648

to contraception reduces unintended pregnancies and abortion rates, and saves federal and taxpayer dollars.[14,15] Yet unintended pregnancy and abortion rates remain higher in the United States than in most other developed countries, and low-income women have disproportionately high rates.[16] Instead of limiting access, we be should working to expand all women's ability to obtain the contraceptive method of their choice.

Contraception is also considered an important tool in reducing rates of maternal mortality and morbidity. The U.S. has the highest rate of maternal mortality in the developed world. A study of 172 developing countries found that use of contraception is an effective primary prevention strategy to reduce maternal mortality.[17] The Departments should focus on public policy that utilizes proven strategies to reduce rates of maternal mortality, including coverage of contraception without cost-sharing.

There are high costs associated with unintended pregnancy for families, private insurers, state and federal governments, and employers. Before the ACA, private health plans spent as much as $4.6 billion annually in costs related to unintended pregnancies.[18] In 2010, unplanned pregnancies cost approximately $21 billion in government expenditures, but had publicly funded family planning services not existed, the public costs of unintended pregnancies might have been 75% higher for the same year.[19] In the pre-ACA years, women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[20] Thanks to coverage of contraception with no cost-sharing, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[21]

Our organizations recognize that contraceptive coverage without cost-sharing is not applicable to contraception for non-contraceptive use, however, most women who use birth control do so for both contraceptive and non-contraceptive purposes.[22] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception recognized in evidence include decreased bleeding and pain with menstrual periods, decreased premenstrual syndrome and premenstrual dysphoric disorder, and reduced risk of gynecologic disorders, including, myoma, pelvic inflammatory disease, and a decreased risk of

---

[14] Peipert JF, Madden T, Allsworth JE, Secura GM. Preventing unintended pregnancies by providing no-cost contraception. Obstet Gynecol 2012;120:1291–7.
[15] Frost JJ, Frohwirth L and Zolna MR, Contraceptive Needs and Services, 2014 Update, New York: Guttmacher Institute, 2016. *Available at* https://www.guttmacher.org/report/contraceptive-needs-and-services-2014-update
[16] Ibid.
[17] Ahmed, Saifuddin et al. Maternal deaths averted by contraceptive use: an analysis of 172 countries. 2012. The Lancet , V380: Issue 9837, 111 – 125.
[18] Canestaro, W et. al. Implications of employer coverage of contraception: Cost-effectiveness analysis of contraception coverage under an employer mandate. Contraception 2017 Jan;95(1):77-89.
[19] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, http://www.guttmacher.org/pubs/public-costs-of-UP-2010.pdf.
[20] Becker, N. V., & Polsky, D. (July 2015). Women Saw Large Decrease in Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs, 34(7), pp. 1204-1211. *Available at:* http://content.healthaffairs.org/content/34/7/1204.abstract.
[21] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.
[22] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

4

00328170

Exhibit 27                                                                                                              JA-0000649

endometrial and ovarian cancer. [23,24] Non-contraceptive health benefits also include treatment for non-gynecologic conditions such as migraine, seborrhea, acne, hirsutism, and alopecia; decreased risk of rheumatoid arthritis and asthma; prevention of bone density loss; reduced risk of colon cancer; and potential reduced cervical cancer risk. [25,26]

### The Departments' Policymaking Must Be Scientifically Valid and Firmly Rooted in Medical Evidence

The Departments make several false and misleading statements in this IFR to undermine the well-established benefits of contraception and contraceptive coverage with no cost-sharing.

The IFR challenges the IOM recommendation that insurers cover the full range of FDA-approved female contraceptive methods because it includes "certain drugs and devices...that many persons and organizations believe are abortifacient—that is, as causing early abortion." [27] Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science. FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus. [28] Further, no credible research confirms the false statement that birth control causes miscarriages. [29]

The IFR cites the "formal dissenting opinion" of one IOM committee member who expressed concern with the process of evidence review used by the IOM in identifying recommendations, although this concern was disputed by all others on the panel. [30] A separate IOM 2011 report, *Clinical Practice Guidelines We Can Trust*, did note a perceived lack of transparency in some evidence review process used in the development of clinical recommendations overall, and recommended approaches to address this issue. [31] In acknowledgement of these concerns, and to avoid "provider uncertainty and patient uncertainty about needed preventive services," WPSI, which was established to develop, review, update, and disseminate recommendations for women's preventive health care services, established a process "designed to ensure a strong evidence foundation, transparency, and to minimize the impact of individual bias and conflicts of interest." [32] Both the IOM and WPSI recommend coverage of the full range of female-controlled FDA-approved female contraceptive methods, effective family planning practices, and sterilization procedures as part of contraceptive care.

[23] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7

[24] Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[25] Schindler AE. supra.

[26] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

[27] The IFR, pg. 12

[28] Brief for American College of Obstetricians and Gynecologists, Physicians for Reproductive Health, American Academy of Pediatrics, American Nurses Association, et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354).

[29] Early pregnancy loss. FAQ No. 90. American College of Obstetricians and Gynecologists. August 2015.

[30] The IFR, pg. 12

[31] Institute of Medicine. Clinical Practice Guidelines We Can Trust. Washington, DC: National Academies Press; 2011.

[32] Women's Preventive Services Initiative. Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration: Recommendations for Preventive Services for Women. American College of Obstetricians and Gynecologists. 2016.

00328171

Exhibit 27                                                                                          JA-0000650

The IFR raises concerns about the "negative health effects" of contraception.[33] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[34,35] For these and many other reasons, patients and physicians, not politicians, should determine the right contraceptive for a patients' health care needs. The IFR suggests an increased risk of venous thromboembolism (VTE). VTE among oral contraceptive users is very low.[36] In fact, it is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[37] The IFR also incorrectly suggests contraception increases the risk of breast cancer. There is no proven increased risk of breast cancer among contraceptive users, particularly those under 40. For women over 40, patients and physicians must consider both the risks of becoming pregnant at advanced reproductive age, as well as the risks of continuing contraception use until menopause.[38]

The IFR suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[39] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[40,41] Research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[42,43] Overall, increased access to and use of contraception is associated with a dramatic decline in rates of adolescent pregnancy.[44] More females are using contraception the first time they have sex.[45]

Patients and physicians must weigh the harms and benefits of every medical intervention. The IFR greatly exaggerates the harms of contraception, and undermines the clear medical benefits, prioritizing employer's beliefs over evidence-based clinical recommendations. Access to the full range of FDA-approved contraceptive methods, with no cost-sharing or other restrictions, is critical to women's health. Every woman, regardless of her insurer, employer, state of residence, or income, should have easy, affordable access to the right form of contraception for her, free from political interference into the practice of medicine.

---

[33] The IFR, pg. 46
[34] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[35] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[36] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.
[37] Ibid.
[38] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. *Available at* https://www.cdc.gov/mmwr/volumes/65/rr/rr6504a1.htm.
[39] The IFR, pg. 48
[40] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.
[41] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).
[42] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.
[43] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[44] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583.
[45] Ibid.

6

00328172

Exhibit 27

JA-0000651

**The Previous Accommodation Maintains Access to Contraceptive Care**

Deciding on the best form of contraception for any specific patient should take place within the established patient-physician relationship. The current exemption and accommodation process satisfies the Religious Freedom Restoration Act while maintaining our patients' access to contraceptive care. The patient and the physician share responsibility for the patient's health, and the well-being of the patient depends upon their collaborative efforts.[46] This is particularly true given the highly personal nature of the reproductive health and family planning services, which can require sensitive conversations as well as pelvic exams.  Women should be able to make these personal decisions — decisions that often require sharing intimate details of their sexual history and family planning—with their trusted physicians. These decisions should never involve or be influenced by a patient's employer.

By expanding the definition of religious employer to encompass any non-governmental plan sponsor and institution of higher education, and allowing individual employees and market participants to opt out of this coverage, the Departments threaten access to seamless care for a countless number of women. If an employee covered under a family plan opts out of contraception coverage, that would jeopardize contraception access for both adolescent and adult dependents covered under the same plan. Additionally, regardless of how organizations claim their exemption, making the current accommodation a voluntary option for employers with a religious objection to contraceptive coverage not only limits women's access to contraceptives without cost-sharing from their current health plan, but may restrict women's access to contraception coverage entirely. The IFR provides no additional accommodation or solution for women whose employer claims a religious objection to access contraception, aside from purchasing a separate contraceptive care plan on their own.

The expanded exemption and the modification to the current accommodation remove contraceptive care from a woman's routine health services and will require her to use a two-tiered system of access and coverage – one for her overall health needs, and one limited to contraceptive care. Access to contraception is an essential part of basic preventive health care for women, especially for the two-thirds of American women of reproductive age who wish to avoid or postpone pregnancy.[47] Access to the full array of FDA-approved contraception and contraceptive counseling is vital for women's health and well-being. The IFR ignores that reality and instead increases the regulatory burden on both individuals seeking this fundamental preventive care, and on physicians seeking to provide patients with the medically-appropriate care they need.

The ACA's contraceptive coverage requirement recognizes that women have unique health care needs and that contraception counseling and services are essential components of women's preventive health care. Decisions concerning contraception use, like all health care decisions, should be made by patients in consultation with their physicians based on the best interest of the patient. This is best accomplished when contraceptive coverage is provided within the same overall framework as a woman's other health care services and in consultation with a woman's chosen physician. The previous accommodation accomplishes this, while at the same time respecting an employer's sincerely-held religious objection to

---

[46] Am. Med. Ass'n, *Principles of Medical Ethics: I, IV, V, VII, IX*, 2016, *Available at:* https://www.ama-assn.org/sites/default/files/media-browser/code-of-medical-ethics-chapter-1.pdf. See also Elective surgery and patient choice. Committee Opinion No. 578. American College of Obstetricians and Gynecologists. Obstet Gynecol 2013;122:1134–8. ("The goal should be decisions reached in partnership between patient and physician.")

[47] Jones J, Mosher WD and Daniels K, Current contraceptive use in the United States, 2006–2010, and changes in patterns of use since 1995, National Health Statistics Reports, 2012, No. 60, *Available at* http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

7

00328173

Exhibit 27

JA-0000652

contraception. The IFR makes no similar effort to ensure women have seamless access to the preventive health care they need, and instead undermines the purposes of Section 2713 of the PHS Act.

**Other Government Programs Cannot Replace Universal Contraceptive Coverage**

The Departments argue in the IFR that there are "many other mechanisms by which the Government advances contraception coverage, particularly for low-income women."[48] While there are federal programs, including the Title X family planning program and Medicaid coverage of family planning services and supplies, that provide contraception coverage for low-income and adolescent women, the Title X program is consistently underfunded by Congress, and the Medicaid program has strict exclusionary eligibility standards. These programs do not have the capacity to, nor are they designed to, provide contraception for the approximately 57.9 million American women ages 19-64 who currently rely on employer-sponsored health coverage.[49]

Nearly all women will use contraception at some time in their reproductive lives.[50] In fact, 99% of U.S. women who have been sexually active report having used some form of contraception, and 87.5% report use of a highly effective reversible method.[51] Many of these women rely on employer-sponsored insurance plans to get their contraceptive coverage, and safety-net programs are not a viable alternative. The access to care that Title X clinics provide low-income and adolescent patients is critical to improving the health of these patients and to decreasing health care costs for all Americans, but it is not a replacement for universal coverage of contraception without cost-sharing. Further, the Departments have endeavored to limit the qualified providers who serve this population of low-income women, further reducing access to contraceptive coverage and counseling.

The IFR also falsely cites "over a dozen" Federal programs that provide or subsidize contraceptives for women.[52] Many of these programs, including the Teen Pregnancy Prevention Program (TPPP), Public Law 112-74 (125 Stat 786, 1080); the Healthy Start Program, 42 U.S.C. 254c-8; the Maternal, Infant, and Early Childhood Home Visiting Program, 42 U.S.C. 711; and the Personal Responsibility Education Program, 42 U.S.C. 713; do not provide or subsidize coverage of the full range of FDA-approved methods of contraception or offer comprehensive contraception counseling. These federally-funded programs serve a very important purpose, and their funding and structure should be preserved, but they do not replace the need for universal coverage with no cost-sharing in the private insurance market.

**Expanded Exemptions Threaten Other Essential Health Care Services**

The IFR could have concerning implications for access to other health care services that are essential to health and well-being. In offering expanded exemptions for any employer who claims a religious opposition, the Departments invite the possibility that employers may seek to opt out of offering coverage for other health care services to which they object, whether through litigation or other means.

---

[48] The IFR, pg. 29
[49] Kaiser Family Foundation. Women's Health Insurance Coverage. October 2017. *Available at*: http://files.kff.org/attachment/fact-sheet-womens-health-insurance-coverage.
[50] Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.
[51] Daniels K, Mosher WD. Contraceptive methods women have ever used: United States, 1982-2010. Natl Health Stat Report 2013;(62):1–15. *Available at* https://www.ncbi.nlm.nih.gov/pubmed/?term=Natl+Health+Stat+Report+2013%3B(62)%3A1%E2%80%9315.
[52] The IFR, pg. 79

8

00328174

Exhibit 27

JA-0000653

Our organizations oppose any efforts that would limit patient access to medically-necessary health care services or impede the provision of those services within the established patient-physician relationship.

Many religious adherents object to medical services that are essential to the health and well-being of the public, including vaccination. Vaccines are vital to the public health and have been declared one of the ten great public health achievements of the 20th Century by the CDC.[53] For individuals born in the United States between 1999 and 2013, it is estimated that vaccination will prevent approximately 322 million illnesses, 21 million hospitalizations, and 732,000 deaths over the course of their lifetimes.[54] Maintaining high vaccination rates is critical for both individual health and population health, as a high vaccination rate confers herd immunity that prevents the spread of disease and confers the benefits of vaccination to those who are unable to receive vaccines.

Religious and moral opposition to health care services extends beyond vaccines. Gelatin, which is included in "capsule shells," is manufactured using animal tissue, the ingestion of which is inconsistent with several major world religions. Still other religions oppose blood transfusions, even in situations where such a procedure is needed to save a life.

While the First Amendment protects the sincerely-held religious beliefs of these groups, the religious beliefs of some should not obstruct crucial treatments for employees who do not share their employers' beliefs. It is therefore important to note that there is no principled basis on which to distinguish religious objections to contraceptive coverage from religious objections to coverage for other health care services. Broad religious and moral exemptions to contraceptive coverage would seem to require similar exemptions for other types of health care services, an untenable result.

Because there is a range of services to which religious organizations object beyond contraception, it is critical that in attempting to provide greater conscience protections for the religious and moral beliefs of employers the government not allow the coverage of vital health care services to be jeopardized. Our organizations believe that the top priority in any federal rulemaking be ensuring access to all preventive health care services for employees and their families. This includes ensuring that employees are able to access all medically-necessary health care services seamlessly through one plan, including preventive services such as vaccinations with no cost-sharing. Quality health care coverage for individuals must not be eroded.

Contraception is a key component of the comprehensive women's preventive services package, and maintaining access to this existing coverage is critical to ensuring American women and families can access the care that they need. The IFR interferes in the personal health care decisions of our patients, and inappropriately inserts a patient's employer into the patient-physician relationship. The IFR will result in reduced access to women's preventive health care services, and reverse the recent gains made in reducing unintended pregnancy rates. We urge the Departments to preserve guaranteed coverage of women's preventive services, including contraception, at no out-of-pocket cost in private insurance plans, and withdraw the IFR. Instead, the Departments should put Americans' needs first by working with physicians, who with their patients are the experts on patient care needs, to apply the best medical and public health evidence. We look forward to working with the Departments to fulfill the promise of

---

[53] CDC, supra.

[54] Centers for Disease Control and Prevention. Occupational Ladder Fall Injuries, 2011. MMWR Weekly. 2014 Apr 25;63(16):352-55. *Available at* https://www.cdc.gov/mmwr/pdf/wk/mm6316.pdf.

9

00328175

Exhibit 27

the ACA and increase women's access to preventive care. Thank you for the opportunity to provide these comments.

Sincerely,

Haywood L. Brown, MD, FACOG
President
American Congress of Obstetricians and Gynecologists

Fernando Stein, MD, FAAP
President
American Academy of Pediatrics

Tamera Coyne-Beasley, MD, MPH, FSAHM
President
Society for Adolescent Health and Medicine

10

00328176

Exhibit 27                                                      JA-0000655



**AMERICAN PUBLIC HEALTH ASSOCIATION**
*For science. For action. For health.*

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: [CMS-9940-IFC]

Dec. 5, 2017

Dear Acting Secretary Hargan,

The American Public Health Association, a diverse community of public health professionals that champions the health of all people and communities, appreciates the opportunity to provide comments in response to the proposed interim final rule. APHA is committed to ensuring all individuals have affordable coverage of birth control. APHA unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (Rule). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this Rule will harm women and their health and well-being. By discriminating against women, it is also a step back from achieving health equity. The Rule is also based on an incorrect view of science and the federal programs and state laws regarding contraception. For these reasons APHA calls on the Departments to rescind the Rule.

### I.    Birth Control is Vital to Women's Health

Women face a unique set of health care challenges because they use more health services than men yet earn less on average than men.[3] Before the ACA, one in seven women with private

---

[1] This comment uses the term "women" because women are targeted by the Rule. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf
[3] U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2, 2009.

800 I Street, NW • Washington, DC 20001–3710
202-777-2742 • www.apha.org

00435155

Exhibit 28

JA-0000656

health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[5] In fact, the gap between men and women who struggled to access needed care was widest among adults with moderate incomes.[6] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[7] Because of the contraceptive coverage benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[8]

A goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of preventing unintended pregnancy is to help women avert pregnancy, or time and space their pregnancies in accordance with their own desires.[9] Contraception enables women to prevent unintended pregnancy and improve maternal, child, and family health. In addition, access to birth control is vital for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[10]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving health complications unaddressed and increasing the risk of infant mortality, birth defects, low birth weight, and preterm birth.[11] Other long term health effects of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during

---

[4] Kaiser Family Foundation, Women's Health Care Chartbook, 2011.

[5] Liang S. et al., Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006, 83 CONTRACEPTION 491, 531 (2010); see also Inst. of Med. of the Nat'l Acads., Clinical Preventive Services for Women: Closing the Gaps 19 (2011), available at https://www.nap.edu/read/13181/chapter/1. And Solanki G et al., The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; see also David Machledt D, Perkins J, Medicaid Premiums & Cost-Sharing 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[6] Sheila D. Rustgi et al., The Commonwealth Fund, Women at Risk: Why Many Women Are Forgoing Needed Health Care 4 (2009), available at http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf

[7] Sonfield A et al., Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update, 91 CONTRACEPTION 44, 45-47 (2014).

[8] Becker N, Polsky D, Women Saw Large Decrease In Out-of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211, available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html

[9] Women's Preventive Services Initiative, Recommendations for Preventive Services for Women 83 (2016), available at https://www.womenspreventivehealth.org/final-report/

[10] Id. at 103-104.

[11] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta A, Birth spacing and risk of adverse perinatal outcomes: a meta-analysis, JAMA 2006;295:1809–23.

00435156

Exhibit 28                                                                                                          JA-0000657

pregnancy.[12] Contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Including contraception in insurance coverage is a priority for achieving health equity. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability or discrimination based on race, ethnicity, gender identity, or sexual orientation. The ACA's requirement on insurance plans to include contraceptive coverage with no cost sharing was an important step forward for health equity that should not be reversed.

Birth control is crucial in furthering equal opportunity for women, enabling them to be equal participants in the social, political, and economic life of the nation. Studies show that access to contraception has increased women's wages and lifetime earnings.[13] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[14] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[15] which was followed by large increases in women's presence in law, medicine, and other professions.[16] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[17]

A woman and her health care providers, should determine the right course of prevention and treatment, including contraception, for her health care needs. The Rule not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

---

[12] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. Epidemiologic Reviews. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.
[13] See, e.g., Frost J. Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics. 87 CONTRACEPTION 465, 467 (2013); Sonfield A, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf
[14] See Bailey M et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), available at http://www.nber.org/papers/w17922; Goldin C, Katz L, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).
[15] Hock H. The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).
[16] Goldin C, Katz L, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), available at https://dash.harvard.edu/handle/1/2624453
[17] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

3

00435157

Exhibit 28                                                                    JA-0000658

## II.    Justifications for the Rule do not Meet Basic Scientific Standards

As the nation's primary federal agency on health policy, HHS policies and activities must be firmly based on scientifically valid evidence. The Rule does not meet the high standard of scientific evidence required for effective health policy, instead prioritizing religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. APHA opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individuals' beliefs.

### A.  Contraceptives do not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who believes them. The Rule takes issue with recommended coverage of the full range of Food and Drug Administration-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient."[18] However, the approved contraceptive methods are not abortifacients. Every approved contraceptive acts before implantation and does not interfere with pregnancy.[19]

### B.  Contraceptives are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[20] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[21, 22] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[23] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[24]

---

[18] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[19] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354), available at acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf
[20] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[21] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[22] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[23] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.
[24] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: available at http://dx.doi.org/10.15585/mmwr.rr6504a1

4

00435158

Exhibit 28                                                                                                  JA-0000659

### C. Contraceptives do not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[25] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[26,27] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[28,29] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[30] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[31]

### III.    The Departments' Explanation That Other Programs Can Meet the Need for Birth Control Coverage is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this Rule.[32] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of privately insured individuals and are currently overburdened. Further, the existence of these programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this Rule.

### A. Medicaid and Title X Programs are not Designed to Meet the Needs of the Individuals who will Lose Contraceptive Coverage and do not Have Capacity to do so.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of privately insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[33] Low-income individuals

---

[25] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).
[26] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.
[27] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).
[28] Minguez M, Santelli JS, Gibson E, Orr M. & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3), 338-344.
[29] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[30] Id.
[31] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[32] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147. pt. 147).
[33] See Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

5

00435159

Exhibit 28

JA-0000660

receive services at these health centers at low or no cost depending on their family income.[34] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[35]

Further, the Rule argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Rule. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[36] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[37] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[38] Requiring otherwise privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. Two-thirds of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[39] This is particularly true with respect to specialty providers, including OB/GYNs.[40] Given this provider shortage and Medicaid's low-income and other eligibility requirements,[41] Medicaid does not have the capacity to serve individuals who lose coverage as a result of this Rule.

---

[34] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[35] 42 U.S.C. § 300a-4(c)(2); 42 CFR § 59.5(a)(7), (9).

[36] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," American Journal of Public Health (2016), available at http://doi.org/10.2105/AJPH.2015.302928

[37] See Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, Family Planning Annual Report: 2010 National Summary, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, Family Planning Annual Report: 2016 national summary, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[38] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[39] U.S. Government Accountability Office, "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance," (Nov. 2012), available at http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General, "Access to Care: Provider Availability in Medicaid Managed Care," (Dec. 2014), available at http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[40] U.S. Department of Health and Human Services, supra at note 7.

[41] Garfield R. The Henry J. Kaiser Family Foundation. The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), available at https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

6

00435160

Exhibit 28                                                                                    JA-0000661

**B. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With no Cost-Sharing.**

Similarly, the Rule suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[42] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[43] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[44] Additionally, no state has the authority to regulate plans offered by employers that self-insure.[45]

## IV. Conclusion

As the oldest and most diverse public health organization in the world, it is APHA's responsibility to oppose laws and policies that jeopardize the health of the public. This Rule will cause people to lose contraceptive coverage, and harm their health and well-being. It harms health equity and is based on incorrect views of science and the federal programs and state laws regarding contraception. For all of these reasons APHA calls on the Departments to rescind the Rule.

Sincerely,

Georges C. Benjamin, MD
Executive Director

---

[42] Guttmacher Institute. Insurance coverage of contraceptives, State Laws and Policies (as of October 2017), 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[43] See Guttmacher Institute. Insurance coverage of contraceptives, State Laws and Policies (as of October 2017), 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[44] See Guttmacher Institute. Insurance coverage of contraceptives, State Laws and Policies (as of October 2017), 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[45] Claxton G et al., Employer Health Benefits: 2017 Annual Survey, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, available at https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00435161

Exhibit 28

JA-0000662

12/5/17

Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016
Attention: [CMS-9940-IFC]

*Submitted electronically at www.regulations.gov*

**Subject: Interim Final Rule on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act** [CMS-9940-IFC]

The American Society for Emergency Contraception (ASEC) submits the following comments in response to the Interim Final Rules ("the Rules") titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act"[1] and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act,"[2] published in the Federal Register on October 13, 2017, by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services ("the Departments").

ASEC works to ensure that U.S. policy decision-making is fully informed by scientific evidence and the best available data, and that the public has reliable access to independent scientific information and analysis produced and acquired by the federal government. The role of scientific evidence in public health decision-making is imperative, and we oppose any efforts to diminish the role of science in federal policymaking.

Unfortunately, the Rules are a prime example of regulatory decision-making that ignores scientific evidence and the best available data. The Departments' summary of the evidence is arbitrary and cherry-picked. The Departments understate the efficacy and health benefits of contraceptives and overstate the health risks of contraceptives by selectively interpreting data, overlooking well-established evidence, and promoting unfounded doubt. Further, both Rules falsely assert certain types of FDA-approved contraceptive methods to abortifacients.

The Rules thus cause dual harm by undermining women's access to essential preventive health care and undermining the integrity of science in governance. Public health policy should be informed by the best available scientific evidence. Instead, the Departments use false claims about contraception that are contrary to medical and public health evidence, misstate or ignore research, and undermine the agencies' role as a source of accurate health information.

The Departments serve a critical role in collecting and managing important information and data on issues that are vital to the public. In making policy, it is essential that the Departments enhance their credibility on issues of science and evidence, not undermine it. Thus, the Departments must take full advantage of their resources to inform their decision-making by the best available evidence and data. The Rules, however, show that the Departments did not

1

00454798

Exhibit 29

seriously consider these elements, which can only undermine the Departments' reputations as reliable sources of information.

Below we outline several ways the Rules are at odds with science and research. We urge the Departments to withdraw both Rules.

### Contraception Prevents Unintended Pregnancy and Improves the Health of Women and Children

As an example of how the Departments are not utilizing the best available science and evidence with dire consequences for public health, the Departments make several misstatements that ignore prevailing evidence regarding the efficacy, health benefits, and health risks of contraceptives. First, the Departments fail to acknowledge that contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[3] Second, the Departments falsely associate several health risks with contraceptive use, ignoring the weight of the evidence.[4] The Departments' summary of the evidence is wrong and misleading. Not only does contraception prevent unintended pregnancy,[5] but the prevention of unintended pregnancy is associated with life-long health benefits for both women and children that the Departments fully ignore. Further, the Departments' overstatement of health risks ignores the long, evidence-based list of non-contraceptive health benefits associated with contraceptives.

Contraceptive efficacy at preventing unintended pregnancy is supported by decades of rigorous evidence and by the government itself.[6] The U.S. Food and Drug Administration ("FDA") must approve all new drugs and devices by showing that they are safe and effective through rigorous scientific testing. The federal government itself has thus approved contraceptives for safely and effectively preventing unintended pregnancies.[7] The Departments' misrepresentation of "complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy"[8] is false and relies heavily on cherry-picked citations instead of accurately reflecting the weight of the evidence. For instance, the Departments point to a single pre-ACA economics paper positing that contraceptive use may be connected to an increase in teen pregnancy over the "long run."[9] This paper utilized 1997 youth survey data where the majority of respondents were using condoms or another "episodic" form of birth control,[10] the efficacy of which is irrelevant to an assessment of the efficacy of the methods of birth control covered under the ACA's contraceptive benefit, and hardly contributes to "uncertainty"[11] regarding decades of clinical data that prove otherwise.

In truth, contraception enables women, including teens, to prevent unintended pregnancy and control the timing of a desired pregnancy.[12] The Centers for Disease Control and Prevention named family planning one of the ten great public health achievements of the past century,[13] and family planning is widely credited for contributing to women's societal, educational, and economic gains.[14] The ACA's guarantee of no-copay coverage of contraception has contributed to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[15] The teen pregnancy rate is also at the lowest point in at least 80 years.[16]

Contraception improves health outcomes for women and children because unintended pregnancies have higher rates of short- and long-term health complications. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed.[17] They are also at increased risk of maternal mortality and morbidity, maternal depression, experiencing physical violence during pregnancy,[18] infant mortality, birth defects,

2

Exhibit 29

low birth weight, and preterm birth.[19] Unintended pregnancies are also associated with long-term negative physical and mental effects on children.[20] Contraception, by contrast, is considered a major factor in reducing rates of maternal mortality and morbidity. For example, a study of 172 developing countries found that use of contraception is an "effective primary prevention strategy to reduce maternal mortality . . . ."[21] The Departments' new Rules paper over this vast body of research and the clear health benefits of contraception.

## The Health Risks of Contraceptives Are Overstated and Misrepresented

The Departments go further, selectively interpreting data in order to overstate "negative health effects" associated with contraceptives.[22] This includes misleading assertions of an association between contraceptive use, breast cancer, and cervical cancer, as well as vascular events and "risky sexual behavior."[23] The Departments ignore substantial evidence to the contrary, and ignore the balance of significant non-contraceptive health benefits associated with contraceptive use. Certainly it is true that, as with any medication, some types or methods of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[24] Some women may also want to avoid side effects such as changes to menstrual flow.[25] But the Departments fail to recognize that this means that patients and health care providers, not employers and agencies, should determine the right contraceptive for an individual woman's health care needs.

The Departments' claim that contraceptive use is associated with an increased risk of breast and cervical cancers is based solely on a 2013 Agency for Healthcare Research and Quality report, when in fact the evidence is not decisive, and to say so is a misrepresentation. There is no proven increased risk of breast cancer among contraceptive users, particularly those under 40. For women over 40, health care providers must consider both the risks of becoming pregnant at an advanced reproductive age, as well as the risks of continuing contraception use until menopause, making it essential that a woman be able to discuss options with her provider without interference.[26] And, on the topic of cervical cancer, the Departments cite only a study on oral contraceptives, when a recent study found that intrauterine devices ("IUDs") are associated with a decreased risk of cervical cancer.[27]

It is especially irresponsible to misrepresent the risks of breast and cervical cancer without accurately reporting the substantial evidence of contraceptives' association with cancer prevention, since any evaluation of preventive health care should fully weigh the risks and benefits.[28] Contraceptives are associated with a reduced risk of colorectal cancer;[29] endometrial cancer is 50 percent less likely among women who use oral hormonal contraceptives for at least one year compared to women who have never used oral hormonal contraceptives;[30] oral hormonal contraceptives can reduce the risk of ovarian cancer by 27 percent, and 20 percent for every five years of additional use;[31] oral hormonal contraceptives can lower the risk of hereditary ovarian cancer in women with the BRCA1 or BRCA2 gene mutations;[32] and oral hormonal contraceptive use for more than 10 years can lower the risk of ovarian cancer among women with endometriosis, who are typically at higher risk of developing ovarian cancer.[33]

The Rules also incorrectly suggest that contraceptive use is connected to an increased risk of "vascular events" such as venous thromboembolism ("VTE"). The risk of VTE among oral contraceptive users is very low.[34] In fact, it is much lower than the risk of VTE during pregnancy or in the immediate postpartum period, so prevention of unintended pregnancy actually reduces women's risk of VTE.[35]

3

00454800

Exhibit 29                                                                                     JA-0000665

The Departments' claim that contraceptives may lead to "risky sexual behavior"[36] is similarly unfounded. Increased access to contraception is not associated with a change or increase in sexual behaviors.[37] Instead, research has shown that school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[38] In the "CHOICE Project," a large-scale U.S. study aimed at reducing unintended pregnancy by providing no-cost contraception, participants reported no change in their sexual activities after receiving contraceptives.[39]

Contraceptives are also associated with other non-contraceptive health benefits beyond the cancer prevention benefits listed above. Benefits include reduced menstrual pain, reduced risk of myoma, reduced symptoms of endometriosis, and reduced symptoms of premenstrual syndrome and premenstrual dysphoric disorder.[40] Oral hormonal contraceptives have been found to reduce the risk of pelvic inflammatory disease by 50 to 60 percent,[41] Contraceptives are also associated with lower risk of rheumatoid arthritis, preservation of bone density, and reduced symptoms of asthma.[42]

In sum, the Departments overstate the evidence of health risks and understate the evidence of contraceptive efficacy and health benefits, failing to accurately reflect the weight of evidence that shows that contraceptives are associated with a variety of short- and long-term health benefits, improving health outcomes for both women and children. And the various contraindications associated with some forms of birth control actually support the opposite finding: women should have access to the full range of FDA-approved methods and must be able to work with health care providers to choose the method that best suits their health concerns and needs without interference from an employer.

### Contraceptives Do Not Interfere with an Existing Pregnancy

Both Rules refer to the false assertion that some FDA-approved methods of contraception "prevent implantation of an embryo," and are thus abortifacients.[43] This is inaccurate and goes against longstanding medical evidence.

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of FDA-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion." [44] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins. [45]

By making the false claim that some FDA-approved methods of contraception may cause abortion, the Departments sideline science in favor of ideology.

### The Rules Should Be Withdrawn Because They Are Based on Falsehoods, Undermine Scientific Integrity, and Harm Women's Health

For the reasons stated above, ASEC objects to the Interim Final Rules titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" and "Religious Exemptions and Accommodations for Coverage of Certain Preventive

4

Exhibit 29

Services Under the Affordable Care Act." The Rules should be withdrawn due to their lack of scientific basis and their harmful impact on women's health and economic security.

---

[1] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[2] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[3] *See generally* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from
https://www.womenspreventivehealth.org/final-report/. *See also* Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception*, *83*(5), 397–404; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852.

[4] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804–05 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[5] *See, e.g.,* Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852 ("A likely explanation for the decline in the rate of unintended pregnancy is a change in the frequency and type of contraceptive use over time.").

[6] *See, e.g.,* Institute of Medicine. (2011). *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: The National Academies Press; American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/; Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception*, *83*(5), 397–404; Hatcher, R.A., Trussell, J., Nelson, A.L., Cates, W., Kowal, D., & Policar, M.S. (Eds.). (2011). *Contraceptive Technology* (20th ed.). Atlanta, GA: Bridging the Gap Communications; Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 4–5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.") (citing Sundaram, A., Vaughan, B., Bankole, A., Finer, L., Singh, S., & Trussell, J. (2017, March). Contraceptive failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health*, *49*(1), 7–16); Peipert, J.F., Madden, T., Allsworth, J.E., & Secura, G.M. (2012, December). Preventing unintended pregnancies by providing no-cost contraception. *Obstetrics & Gynecology, 120*(6), 1291–1297; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852; Harper, C.C., Rocca, C.H., Thompson, K.M., Morfesis, J., Goodman, S., Darney, P.B., . . . Speidel, J.J. (2015, June). Reductions in pregnancy rates in the USA with long-acting reversible contraception: A cluster randomised trial. *The Lancet, 386*(9993), 562–568; Speidel, J.J., Harper, C.C., & Shields, W.C. (2008, September). The potential of long-acting reversible contraception to decrease unintended pregnancy. *Contraception, 78*(3), 197–200.

[7] Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017).

[8] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804  (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[9] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147) (citing Arcidiacono, P., Khwaja, A., & Ouyang, L. (2005). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Available at http://public.econ.duke.edu/~psarcidi/teensex.pdf [sic]).

[10] Arcidiacono, P., Khwaja, A., & Ouyang, L. (2011, January 22). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Retrieved 27 November 2017, from http://public.econ.duke.edu/~psarcidi/teensex.pdf

[11] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

00454802

Exhibit 29

JA-0000667

[12] *See, e.g.,* Boonstra, H.D. (2014, September 3). What is behind the declines in teen pregnancy rates? *Guttmacher Policy Review, 17*(3), 15–21; Lindberg, L., Santelli, J., & Desai, S. (2016, November). Understanding the decline in adolescent fertility in the United States, 2007–2012. *Journal of Adolescent Health, 59*(5), 577–583.

[13] Centers for Disease Control and Prevention. (2013, April 26). *Ten Great Public Health Achievements in the 20th Century.* Retrieved 27 November 2017, from https://www.cdc.gov/about/history/tengpha.htm

[14] *See, e.g.,* Sonfield, A., Hasstedt, K., Kavanaugh, M.L., & Anderson, R. (2013, March). *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children.* Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf

[15] Guttmacher Institute. (2016, September). *Unintended Pregnancy in the United States* (p. 2). Retrieved 27 November 2017, from https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf

[16] Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 8, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("In 2013, the U.S. pregnancy rate among 15–19 year olds was at its lowest point in at least 80 years and had dropped to about one-third of a recent peak rate in 1990.") (citing Kost, K., Maddow-Zimet, I., & Arpaia, A. (2017, August). *Pregnancies, Births and Abortions Among Adolescents and Young Women in the United States, 2013: National and State Trends by Age, Race and Ethnicity.* Retrieved 27 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf).

[17] Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252. Hellerstedt, W.L., Pirie, P.L., Lando, H.A., Curry, S.J., McBride, C.M., Grothaus, L.C., & Nelson, J.C. (1998, April). Differences in preconceptional and prenatal behaviors in women with intended and unintended pregnancies. *American Journal of Public Health, 88*(4), 663–666;

[18] *See* Tsui, A.O., McDonald-Mosley, R., & Burke A.E. (2010, April). Family planning and the burden of unintended pregnancies. *Epidemiologic Reviews, 32*(1), 152–174; Joyce, T.J., Kaestner, R., & Korenman, S. (2000, February). The effect of pregnancy intention on child development. *Demography, 37*(1), 83–94; Gazmararian, J.A., Adams, M.M., Saltzman, L.E., Johnson, C.H., Bruce, F.C., Marks, J.S., & Zahniser, S.C. (1995, June). The relationship between pregnancy intendedness and physical violence in mothers of newborns. The PRAMS Working Group. *Obstetrics & Gynecology, 85*(6), 1031–1038; Goodwin, M.M., Gazmararian, J.A., Johnson, C.H., Gilbert, B.C., & Saltzman, L.E. (2000, June). Pregnancy intendedness and physical abuse around the time of pregnancy: Findings from the pregnancy risk assessment monitoring system, 1996-1997. PRAMS Working Group. Pregnancy Risk Assessment Monitoring System. *Maternal and Child Health Journal, 4*(2), 85–92.

[19] Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313; Conde-Agudelo, A., Rosas-Bermúdez, A., & Kafury-Goeta, A.C. (2006). Birth spacing and risk of adverse perinatal outcomes: A meta-analysis. *JAMA, 295*(15), 1809–1823. *See also* Goldthwaite, L.M., Duca, L., Johnson, R.K., Ostendorf, D., & Sheeder, J. (2015, September). Adverse birth outcomes in Colorado: Assessing the impact of a statewide initiative to prevent unintended pregnancy. *American Journal of Public Health, 105*(9), e60–e66 (establishing an association between use of long-acting reversible contraception and a lower risk of preterm birth).

[20] *See, e.g.,* Barber, J.S., Axinn, W.G., & Thornton, A. (1999, September). Unwanted childbearing, health, and mother-child relationships. *Journal of Health and Social Behavior, 40*(3), 231–257. *C.f.* Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252; Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313.

[21] Ahmed, S., Li, Q., Liu, L., & Tsui, A.O. (2012, July). Maternal deaths averted by contraceptive use: An analysis of 172 countries. *The Lancet, 380*(9837), 111–125.

[22] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[23] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147)).

[24] *See, e.g.,* American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 86: Progestin-Only Hormonal Birth Control: Pill and Injection.* Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Progestin-Only-Hormonal-Birth-Control-Pill-and-Injection; American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 185: Combined Hormonal Birth Control: Pill, Patch, and Ring.* Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Combined-Hormonal-Birth-Control-Pill-Patch-and-Ring.

[25] *See, e.g.,* Jones, R.K. (2011, November). *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills.* Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf

00454803

Exhibit 29

JA-0000668

[26] *See* Curtis, K.M., Jatlaoui, T.C., Tepper, N.K., Zapata, L.B., Horton, L.G., Jamieson, D.J., & Whiteman, M.K. (2016, July 29). U.S. selected practice recommendations for contraceptive use, 2016. *Morbidity and Mortality Weekly Report, 65*(4), 1–66.

[27] Cortessis, V.K., Barrett, M., Brown Wade, N., Enebish, T., Perrigo, J.L., Tobin, J., . . . McKean-Cowdin, R. (2017). Intrauterine device use and cervical cancer risk: A systematic review and meta-analysis. *Obstetrics & Gynecology*, *130*(6), 1226–1236.

[28] *C.f.* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 11). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/

[29] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[30] Ibid.

[31] Ibid.

[32] Ibid.

[33] Ibid.

[34] American College of Obstetricians and Gynecologists, Committee on Gynecologic Practice. (2016). *Committee Opinion Number 540: Risk of Venous Thromboembolism Among Users of Drospirenone-Containing Oral Contraceptive Pills*. Retrieved 27 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Gynecologic-Practice/co540.pdf?dmc=1&ts=20171127T2043082500

[35] Ibid.

[36] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[37] *See, e.g.,* Kirby, D. (2007, November). *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases*. The National Campaign to Prevent Teen and Unplanned Pregnancy Publication. Retrieved 27 November 2017, from https://thenationalcampaign.org/resource/emerging-answers-2007%E2%80%94full-report; Meyer, J.L., Gold, M.A., & Haggerty C.L. (2011, February). Advance provision of emergency contraception among adolescent and young adult women: A systematic review of literature. *Journal of Pediatric & Adolescent Gynecology*, *24*(1), 2–9.

[38] Minguez, M., Santelli, J.S., Gibson, E., Orr, M., & Samant, S. (2015, March). Reproductive health impact of a school health center. *Journal of Adolescent Health*, *56*(3), 338–344. *See also* Knopf, J.A., Finnie, R.K., Peng, Y., Hahn, R.A., Truman, B.I., Vernon-Smiley, M., . . . Fullilove, M.T. (2016, July). School-based health centers to advance health equity: A Community Guide systematic review. *American Journal of Preventive Medicine*, *51*(1), 114–126.

[39] Secura, G.M., Adams, T., Buckel, C.M., Zhao, Q., & Peipert, J.F. (2015, April). Change in sexual behavior with provision of no-cost contraception. *Obstetrics & Gynecology, 123*(4), 771–776. *See also Goldman*, G. (2017, October 11). *The Trump Administration Fakes Science to Justify Restrictions on Birth Control Access.* Union of Concerned Scientists Blog. Retrieved 27 November 2017, from http://blog.ucsusa.org/gretchen-goldman/the-trump-administration-fakes-science-to-justify-restrictions-on-birth-control-access

[40] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47. *See also* American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women. (2015, January). *Committee Opinion Number 615: Access to Contraception*. Retrieved 30 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co615.pdf?dmc=1&ts=20171130T1815539115

[41] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[42] Ibid.

[43] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838, 47,840 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[44] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[45] *See, e.g.,* Brief of *Amici Curiae* Physicians for Reproductive Health, et al. in Support of Petitioners at 12, Burwell v. Hobby Lobby Stores, Inc., 573 U.S. ___, 134 S. Ct. 2751 (2014) (No. 13-354).

00454804

Exhibit 29                                                                                                          JA-0000669



1310 L Street NW,
Suite 200
Washington, DC 20005

www.au.org
(202) 466-3234

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Hubert H. Humphrey Building
Room 445-G
200 Independence Avenue, SW
Washington, DC 20201
*Submitted via Regulations.gov*

Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services
Under the Affordable Care Act, CMS-9940-IFC

To whom it may concern:

Americans United for Separation of Church and State submits the following comments to the
Departments of Health and Human Services, Labor, and Treasury's (the Departments) Interim
Final Rules, "Religious Exemptions and Accommodations for Coverage for Certain Preventive
Services under the Affordable Care Act" and "Moral Exemptions and Accommodations for
Coverage for Certain Preventive Services under the Affordable Care Act" (IFRs), which were
published in the Federal Register on October 13, 2017.

Americans United is a nonpartisan advocacy organization dedicated to preserving the
constitutional principle of church-state separation, the foundation of religious freedom for
everyone. We support religious exemptions where they relieve real and substantial burdens on
religious exercise and do not cause harm to others.

The exemptions created by these IFRs, however, will harm women's health and well-being by
allowing virtually any employer or university to deprive women of critical insurance coverage
for contraception. Under these IFRs, women across the country will be left without seamless
access to medical coverage, and the costs and burdens of universities' and employers' religious
beliefs would be shifted onto employees and students. The IFRs discriminate against women and
violate the Constitution. They also violate the Administrative Procedure Act and the Affordable
Care Act. Accordingly, we urge the Departments to rescind the IFRs.

**Birth Control Is Vital to Women's Health and Equality**

Women clearly benefit from increased access to contraception.[1] In addition to reducing
unintended pregnancies and the need for abortion, access to contraception reduces adverse health
outcomes and allows women to best make decisions that affect everything from their education
and livelihoods to their family and relationships.

---

[1] These comments use the term "women" because women are targeted by the IFRs. We recognize, however, that
denying reproductive health care and insurance coverage for such care also affects people who do not identify as
women, including some gender non-conforming people and some transgender men.

00328184

Exhibit 30

JA-0000670

By allowing a woman to plan her pregnancies, contraception protects against the higher health risks that accompany unintended pregnancy for both her and her child.[2] Contraception also allows women to space their children, reducing risks such as birth defects and premature birth associated with multiple pregnancies within 18 months.[3] Access to contraception is especially critical for women with underlying physical or psychological conditions—such as diabetes, heart disease, or depression—for whom pregnancy may be dangerous.[4] For example, one of the 240 women we represented in an amicus brief we filed before the Supreme Court in *Zubik v. Burwell*[5] explained, "When I had cancer, my oncologists reminded me at regular intervals—as I underwent four months of chemotherapy and two months of radiation—of the importance of using a reliable form of contraception and avoiding pregnancy."[6]

But delaying or avoiding pregnancy is not the only health benefit of contraception. Studies show that contraception reduces the risk of pelvic inflammatory disease and certain cancers.[7] And birth control is often prescribed to treat many common ailments—nearly 30% of women use contraception at least in part to manage a medical condition.[8] Amici in *Zubik* told the Court that they used contraception to treat endometriosis, ovarian cysts, chronic migraines, and menstrual disorders.[9]

A large and growing body of research also links contraception to women's improved economic and social standing—it helps them to be equal participants in the social, political, and economic life of the nation. There is strong evidence that access to contraception increases the chance that women will achieve their educational and career goals, earn more money, and maintain more stable, satisfying marriages.[10]

For many women, access to contraception is crucial on many levels for their health, their lives, and their careers. For example, Mary Shiraef, a student at the University of Notre Dame, explained that contraception allows her to "focus on the quality of my relationship, without fear of unplanned pregnancy," ensures she can "focus on my task at hand—working toward a Ph.D.—in equitable measure to my male colleagues," and has "improved my overall health."[11] Another woman, Alicia Baker is married and looks forward to having children in the future, but

---

[2] Inst. of Med., *Clinical Preventive Services for Women, Closing the Gaps*, at 102-09 (July 19, 2011).
[3] *Id.* at 103.
[4] *Id.*
[5] Brief of 240 Students, Faculty, & Staff at Religiously Affiliated Universities as Amici Curiae in Support of Respondents at 13-24, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (*hereinafter* "Brief of 240 Students, Faculty, & Staff"), http://bit.ly/2A6EioP.
[6] *Id.* at 21.
[7] Adolf Schindler, *Non-Contraceptive Benefits of Oral Hormonal Contraceptives, Int. J. Endocrinol Metabolism* 41-47 (2013).
[8] A. Salganikoff, et al., Kaiser Family Found., *Women and Health Care in the Early Years of the Affordable Care Act* 35 (May 2014), http://bit.ly/2xZuNXM.
[9] Brief of 240 Students, Faculty, and Staff at 13-24.
[10] Adam Sonfield et al., Guttmacher Inst., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children* (2013), http://bit.ly/1Tyjfcu.
[11] Kimberly Larson, *After 'Egregious Attack' on Birth Control, Five Women Sue Trump Administration*, Broadly (Nov. 1, 2017), http://bit.ly/2knITfv. Americans United, along with the National Women's Law Center, represents Shiraef in a lawsuit challenging the IFRs. Complaint, *Shiraef v. Hargan*, Case 3:17-cv-00817 (N.D. Ind. Oct. 31, 2017), http://bit.ly/2jV74Ou.

2

00328185

Exhibit 30

she and her husband are not ready yet. They recently bought their first home and Alicia still has loans to pay from receiving a graduate degree from seminary. She explained, "We're so excited to have kids one day, but right now it would be irresponsible for us to try to pursue that."[12]

These benefits are among the reasons why the Affordable Care Act (ACA) ensures most insurance plans cover contraceptives without cost-sharing. Indeed, contraception is critical healthcare to nearly all women—99% of women of reproductive age who have had sexual intercourse report using at least one form of contraception at some point in their lives.[13] Cost, however, impedes women from choosing the most effective but most expensive methods (such as an intrauterine device (IUD), which can cost up to $1,000) or from accessing contraception at all. Studies show that the costs associated with contraception, even when small, lead women to forgo it completely, to choose less effective methods, or to use it inconsistently.[14] Cost barriers to contraception not only threaten the health of women and their families, but also jeopardize women's financial security, workforce participation, and educational attainment.[15] If women who need contraception cannot afford it, they will be deprived of its health, economic, and social benefits, and will suffer the ensuing harms.

Because of the ACA, over 62 million women currently have coverage for all FDA-approved contraceptive methods and related education and counseling without out-of-pocket costs.[16] The IFRs put this access at risk for countless women.

**The IFRs Violate the Establishment Clause of the First Amendment**

Religious freedom is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religion as an excuse to harm others. The IFRs will harm countless women and their families and thus, violate the Establishment Clause of the First Amendment.

The IFRs allow employers and universities to cite religious or moral objections to contraceptives as an excuse to violate the ACA requirement that they provide their employees or students insurance coverage for birth control. As explained above, contraception is critical to women's health and economic and social equality. It is also critical to the health of women's families. When women are denied coverage for this basic and essential health care, they suffer from discrimination and economic harm.

Allowing employers and universities to use religious and moral beliefs to harm others is not just bad policy. It also violates the Constitution.

---

[12] Jordan Smith, *Trump Administration Set to Defend Birth Control Rules that Pit Religion Against Women's Health*, Intercept (Nov. 21, 2017), http://bit.ly/2kn2Xib. Baker is also a plaintiff in *Shiraef v. Hargen*.

[13] Kimberly Daniels et al., Contraceptive Methods Women Have Ever Used: United States, 1982–2010, National Health Statistics Reports, No. 62 (Feb. 14, 2013), http://bit.ly/2lxZEDc.

[14] Guttmacher Inst., A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions 5 (Sept. 2009), http://bit.ly/1bGLNzX.

[15] Jennifer J. Frost & Laura Duberstein Lindberg, *Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics*, 87 *Contraception* 465, 467 (2013).

[16] *See* Nat'l Women's Law Center, *New Data Estimate 62.4 Million Women Have Coverage of Birth Control without Out-of-Pocket Costs* (Sept. 2017), http://bit.ly/2iUgDRd.

00328186

Exhibit 30                                                                                              JA-0000672

The Establishment Clause prohibits granting religious and moral exemptions that would detrimentally affect any third party.[17] When crafting such an exemption, the Departments "must take adequate account of the burdens" that it "may impose on nonbeneficiaries" and must ensure that any exemption is "measured so that it does not override other significant interests."[18]

For example, in *Estate of Thornton v. Caldor, Inc.*, the Supreme Court invalidated a statute that gave employees an unqualified right to take time off on the Sabbath day of their choosing.[19] The statute violated the Establishment Clause because it "would require the imposition of significant burdens on other employees required to work in place of the Sabbath observers."[20]

The Court acknowledged the limitations imposed by the Establishment Clause yet again in *Burwell v. Hobby Lobby Stores, Inc.*[21] In holding that the Religious Freedom Restoration Act (RFRA)[22] afforded certain employers an accommodation from the ACA's contraceptive coverage requirement, the Court concluded that the accommodation's effect on women who work at those companies "would be precisely zero."[23] And Justice Kennedy emphasized that an accommodation must not "unduly restrict other persons, such as employees, in protecting their own interests."[24]

The exemption in the IFRs clearly imposes burdens on others: it takes away seamless, no-cost insurance coverage for contraception from employees and students and compels them to pay the substantial costs for the healthcare themselves if they are able (and many are unable), or else to forgo that essential healthcare. Thus, the IFRs run afoul of the clear mandates of the Establishment Clause.

*There Are No Exceptions to this Rule that Are Relevant to the IFRs*

There have been only two cases in which the Supreme Court has upheld religious exemptions that had the effect of burdening third parties in any meaningful way—in both cases the Free Exercise Clause required the exemptions to protect the autonomy and ecclesiastical authority of religious institutions, such as a church's selection of clergy. In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,[25] the Court held that the Americans with Disabilities Act could not be enforced against a church in a way that would interfere with the church's selection of its ministers. And in *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*,[26] the Court upheld under Title VII's limited religious exemption a

---

[17] *E.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2781 n.37 (2014) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)); *Holt v. Hobbs*, 135 S. Ct. 853, 867 (2015) (Ginsburg, J., concurring); *Cutter*, 544 U.S. at 726 (may not "impose unjustified burdens on other[s]"); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989) (may not "impose substantial burdens on nonbeneficiaries").

[18] *Cutter*, 544 U.S. at 720, 722; *see also Estate of Thornton v. Caldor, Inc.* 472 U.S. 703, 709-10 (1985).

[19] *Caldor*, 472 U.S. at 705–08.

[20] *Id.* at 710.

[21] 134 S. Ct. 2751 (2014).

[22] 42 U.S.C. §§ 2000bb–2000bb-4

[23] *Hobby Lobby*, 134 S. Ct. at 2760. Prior to these IFRs, the Departments did this by ensuring employees continued to receive no-cost contraception coverage seamlessly and directly from their regular insurance plan, even if their employer objected to providing coverage.

[24] *Id.* at 2786-87 (Kennedy, J., concurring).

[25] 565 U.S. 171, 196 (2012).

[26] 483 U.S. 327, 337-39 (1987).

4

00328187

Exhibit 30                                                                          JA-0000673

church's firing of an employee who was not in religious good standing. The Court allowed exemptions because they were designed to avoid interference in how churches select their employees.

The Supreme Court has occasionally permitted accommodations when the potential consequences for third parties would be so diffuse and amorphous as to have no meaningful effect on any particular individual. For example, in *Walz v. Tax Commission*,[27] the Court held that the government may exempt houses of worship from property taxes as part of a broad exemption for nonprofit entities, because the public as a whole bore the incidence of the forgone tax revenues—and did so only in the most abstract way—while also sharing in the social benefits of a system that encouraged all nonprofits to flourish.

Neither of these exceptions are applicable here. Employee and student health insurance provided by for-profit corporations or nonprofit institutions has nothing to do with how a church selects its minister, for example. Moreover, allowing institutions to avoid providing contraception coverage will concretely harm the countless employees and students of entities that might avail themselves of the exemptions.

### Establishment Clause Limitations Apply to RFRA

The Departments cannot rely on RFRA to skirt the requirements of the Constitution. The Supreme Court has ruled that the Establishment Clause prohibits both RFRA and its sister statute, RLUIPA[28] from being used to allow exemptions that harm third parties. Thus, in *Cutter v. Wilkinson*, the Supreme Court explained that "[p]roperly applying RLUIPA"—and necessarily, therefore, RFRA as well[29]—includes taking adequate account of the burdens that an exemption may impose on others.[30] A religious exemption must not "impose unjustified burdens on other[s],"[31] because that would have the effect of preferring and supporting the religious views of the party requesting the exemption while compelling nonbeneficiaries to pay the price.[32]

The Supreme Court reiterated this rule in *Hobby Lobby*, applying the test from *Cutter* to a RFRA claim. The Court held that an accommodation was constitutionally permissible because it could

---

[27] 397 U.S. 664, 673 (1970).

[28] Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc–cc-5.

[29] RFRA and RLUIPA employ virtually identical language and serve the same congressional purposes. *Compare* 42 U.S.C. § 2000bb-1 *with* 42 U.S.C. § 2000cc-1. *See generally Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 661 (10th Cir. 2006). Accordingly, courts rely on RFRA and RLUIPA cases interchangeably in interpreting and applying the statutes. *Id.*; *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1226–27 (11th Cir. 2004).

[30] 544 U.S. at 720.

[31] *Id.* at 726.

[32] Moreover, it is clear that Congress intended that RFRA would be limited by the well-understood confines of the Establishment Clause (*see* 42 U.S.C. § 2000bb-4) and never contemplated that RFRA would afford exemptions or accommodations that impose material harms on third parties. *See, e.g.*, 139 Cong. Rec. S14,350-01 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy ("The act creates no new rights for any religious practice or for any potential litigant. Not every free exercise claim will prevail, just as not every claim prevailed prior to the Smith decision."); 139 Cong. Rec. S14,352 (daily ed. Oct. 26, 1993) (statement of Sen. Hatch) (RFRA "does not require the Government to justify every action that has some effect on religious exercise").

5

00328188

Exhibit 30

be provided without "any detrimental effect on any third party."[33] Indeed, every member of the Court reaffirmed that the burdens on third parties must be considered.[34]

*The Exemption for Moral Beliefs Also Violates the Establishment Clause*

That the IFRs contain an exemption for moral beliefs does not change the Establishment Clause analysis. It is clear from the IFRs that the moral exemption is effectively just a religious exemption by another name.

First, according to the IFRs, the scope of the exemption for moral convictions is based on *Welsh v. United States*.[35] In *Welsh*,[36] the Supreme Court held that a religious exemption must be provided equally to those who hold moral beliefs that are akin to religious beliefs. In addition, the IFRs go on to explain that "moral convictions" are those

(1) That the "individual deeply and sincerely holds"; (2) "that are purely ethical or moral in source and content"; (3) "but that nevertheless impose upon him a duty"; (4) and that "certainly occupy in the life of that individual 'a place parallel to that filled by . . . God' in traditionally religious persons," such that one could say "his beliefs function as a religion in his life."[37]

Thus, for purposes of the constitutional analysis, and as defined in the IFRs, moral beliefs are the functional equivalent of religious beliefs and therefore must be treated as such. In other words, legally, they *are* religious beliefs.

As explained above, the Constitution does not permit exemptions for religious or moral beliefs that result in discrimination or harm to others. The IFRs run afoul of the Establishment Clause.

**The IFRs Violate Other Constitutional and Statutory Protections**

By creating these exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFRs single out health insurance primarily used by women and that is essential for women's health and equality. Like Title VII and other civil rights laws, the ACA's women's preventive services provision, which includes contraceptive coverage, was intended to address longstanding discrimination and ensure women equal access to the healthcare services that allow them to be full participants in society.

For example, the preventive care provision addresses the fact that historically women tended to pay more for insurance coverage than did men.[38] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease

---

[33] 134 S. Ct. at 2781 n.37 (citing *Cutter*, 544 U.S. at 720).

[34] *See id.*; *id.* at 2786-87 (Kennedy, J., concurring); *id.* at 2790 & n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[35] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838, 47,846 (published Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pt.147).

[36] *Welsh v. United States*, 398 U.S. 333 (1970).

[37] 82 Fed. Reg. at 47,846 (citing *Welsh*, 398 U.S. at 339-40).

[38] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).

6

00328189

Exhibit 30

directly attributed to oral contraception costs newly covered by the contraceptive coverage provision.[39] It is estimated that the ACA resulted in an out-of-pocket savings of approximately $1.4 billion for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their healthcare.[40]

By permitting objecting institutions to deny coverage for contraceptives, the IFRs effectively target women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. Thus, the IFRs discriminate based on sex in violation of the Due Process Clause of the Fifth Amendment, which guarantees equal protection of the laws. They also violate Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[41]

**The IFRs Violate the Administrative Procedure Act**

The IFRs, effective immediately upon publication, violate the safeguards of the Administrative Procedure Act (APA) both procedurally and substantively.

First, when an agency is "formulating, amending or repealing" a rule, it must follow proper procedure. The agency must (a) follow notice-and-comment procedures in advance of promulgation, and (b) provide a 30-day waiting period between publication of a rule and its effective date,[42] unless the agency establishes "good cause" why it should not.

The Departments ignored these procedural requirements and have failed to offer a good cause. The Departments attempt to justify their haste in issuing the IFRs in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But these IFRs are starkly different from prior regulations and far exceed the very limited religious exemption provided by the Departments in prior rules. The IFRs dramatically expand the exemption and could leave countless women without insurance coverage for contraception based on their employer's or university's religious or moral objections. In contrast, under prior regulations, the Departments ensured all but a small number of employees continued to receive seamless, no-cost contraception coverage, even if their employer objected to providing coverage.[43] Relying on comments submitted during prior comment periods on the regulations significantly amended by the IFRs does not absolve the Departments of the APA's statutory requirements. Good cause is narrowly construed, and the Departments have not met this standard.

---

[39] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 Health Affairs 1204–11 (2015), http://bit.ly/2jfYhXF.
[40] *Id.*
[41] 42 U.S.C. § 18116.
[42] 5 U.S.C. § 553(b), (d).
[43] Under the prior rules, the Departments created an accommodation for religiously affiliated nonprofits and closely held corporations that had religious objections to providing contraception coverage in their employees' and students' insurance plans. They could refuse to provide their students and employees with insurance coverage for contraception so long as they stated their objection in writing. The government would then work with the employer's insurance company or plan administrator to ensure that employees received seamless contraceptive coverage without additional charge.

7

00328190

Exhibit 30                                                                            JA-0000676

Second, the APA contains several substantive rulemaking requirements: An agency may not adopt a rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[44] "contrary to a constitutional right,"[45] or "in excess of statutory jurisdiction."[46] The rules run afoul of the APA's substantive requirement because, as explained above, they violate the Constitution and the ACA's bar on discrimination.[47] The IFRs cannot overcome the substantive constraints of the APA.

*    *    *

These IFRs ignore the Supreme Court's directive in *Zubik v. Burwell* to "ensur[e] that women covered by [these] health plans receive full and equal health coverage, including contraceptive coverage."[48] Employers and universities should not be able to use religion as an excuse to dictate their employees' or students' health care choices. Taking away access to contraception—a core part of women's health care—is discrimination, plain and simple.

Religious freedom is a fundamental American value. So is a woman's right to make her own decisions about healthcare. These IFRs betray both. For all these reasons, we urge the Departments to rescind the IFRs.

Thank you for the opportunity to provide comments. If you should have further questions, please contact Dena Sher, (202) 466-3234 or sher@au.org.

Sincerely,

Dena Sher
Assistant Legislative Director

Maggie Garrett
Legislative Director

---

[44] 5 U.S.C. § 706(2)(A).

[45] 5 U.S.C. § 706(2)(B).

[46] 5 U.S.C. § 706(2)(C).

[47] Neither are the IFRs are in accordance with Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, because they discriminate on the basis of sex.

Additionally, the IFRs violate Section 1554 of the ACA, 42 U.S.C. § 18114(1), which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care." As noted earlier, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the IFRs erect unreasonable barriers to medical care and impede timely access to contraception.

[48] 136 S. Ct. 1557, 1560 (2016) (internal quotation marks omitted).

8

Exhibit 30

00328191

JA-0000677



**2017 BOARD OF DIRECTORS**

**Executive Committee**

Gail Mukaihata Hannemann
*Chairperson*

Walter Tsou, MD, MPH
*Vice Chairperson & Secretary*

Diane Paloma, MBA, PhD
*Treasurer*

Elizabeth M.S. Krause, ScM
*At-large*

Gayle Tang, MSN, RN
*At-large*

Kathy Ko Chin
*President & CEO*

Debbie I. Chang, MPH

Jacob Fitisemanu Jr., MPH

Mark Keam, JD

Oliver Kim, LLM, JD

Minh Thanh Nguyen

Payal Shah, Esq

Lori Villarosa

Dianne Yamashiro-Omi

**Headquarters:**
One Kaiser Plaza
Suite 850
Oakland, CA 94612
Main 415-954-9988
Fax 510-419-0263
www.apiahf.org

**Washington D.C. Office:**
1629 K Street N.W.
Suite 400
Washington, D.C. 20006
Main 202-466-7772
Fax 202-466-6444

*National Advocates for
Asian American,
Native Hawaiian &
Pacific Islander Health*

December 4, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services (RIN 0938-AT20 and 0938-AT46)**

To whom it may concern:

The Asian & Pacific Islander American Health Forum (APIAHF) writes with detailed comments on the Religious and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services. APIAHF is committed to ensuring all individuals have affordable coverage of birth control. With more than 30 community-based organization (CBO) partners in over 25 states and territories, APIAHF provides a voice in the nation's capital for Asian American (AA), Native Hawaiian and Pacific Islander (NHPI) communities, who comprise the fastest growing racial and ethnic groups in the country. APIAHF works toward health equity and health justice for all communities, from Arizona to Washington. Since 2012, APIAHF and partners have worked to outreach to, educate and enroll nearly 1 million consumers through Action for Health Justice (AHJ), a national collaborative of more than 70 AA and NHPI national and local community-based organizations and health centers.[1] We have seen how the ACA has had an important impact on reducing AA and NHPI health disparities. Since the law's passage, the percent of uninsured AAs has dropped from 15.1 percent in 2010 to 6.5 percent in 2016. For NHPIs, that drop was from 14.5 percent in 2010 to 7.7 percent in 2016.[2]

As such, we unequivocally oppose the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the ACA's contraceptive coverage requirement through this Interim Final Rule (IFR). The interim final rule would hurt AA and NHPI women's access to contraceptives in major ways. AA and NHPI women already face many barriers to birth control and reproductive health care. Language access and cultural competency barriers causes this community to have a low birth control usage rate. Almost 42% of Asian women were not using contraception from 2006 - 2010, compared to approximately 34% of white women.[3]

---

[1] for Health Justice, please see: *Improving the Road to ACA Coverage, Lessons Learned on Outreach, ...ent for Asian American, Native Hawaiian, and Pacific Islander Communities.* Asian & Pacific Islander American Health Forum, Association of Asian Pacific Community Health Organizations, Asian Americans Advancing Justice | AAJC, and Asian Americans Advancing Justice Los Angeles. 2014. Available at: http://www.apiahf.org/resources/resources-database/improving-road-aca-coverage-lessons-learned-outreach-education-and-enro

[2] APIAHF analysis of 2010 and 2016 American Community Survey 1-year estimates.

[3] Jo Jones, Ph.D, et al., *Current Contraceptive Use in the United States, 2006-2010, and Changes in Patterns of Use Since 1995*, National Health Statistics Report, October 18, 2012, *available at:* https://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

1

00435030

Exhibit 31                                                                                          JA-0000678

The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[5]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being, including many AA and NHPI women. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. And the IFR is predicated upon a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons APIAHF calls on the Departments to rescind the IFR.

## I.    Birth Control Is Critical to Women's Health

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[6] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[7] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[8] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[9] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[10] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[11]

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[5] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

[6] U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2, 2009.

[7] Kaiser Family Foundation, Women's Health Care Chartbook, 2011.

[8] *Id.*

[9] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFchNSzeQ.

[10] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[11] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

2

00435031

Exhibit 31

JA-0000679

Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[12]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[13] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[14]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[15] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[16] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[17] And, the U.S. has the highest rate of maternal mortality in the developed world.[18] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[19] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[20] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including

---

[12] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.
[13] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.
[14] *Id.* at 103-104.
[15] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[16] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.
[17] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.
[18] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.
[19] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397–404.
[20] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute. 2011.

3

00435032

Exhibit 31

JA-0000680

endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[21] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[22, 23]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[24] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[25] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[26] which was followed by large increases in women's presence in law, medicine, and other professions.[27] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[28]

A woman and her health care providers should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

---

[21] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250-5.

[22] Id.

[23] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-analysis Obstet Gynecol. 2017

[24] See. e.g., Jennifer J. Frost & Laura Duberstein Lindberg. Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics. 87 CONTRACEPTION 465. 467 (2013); Adam Sonfield, et al.. Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013). available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[25] See Martha J. Bailey et al.. The Opt-in Revolution? Contraception and the Gender Gap in Wages. 19. 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922. 2012). http://www.nber.org/ papers/w1 7922 (last visited Feb. 9. 2016); Claudia Goldin & Lawrence F. Katz. The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions. 110 J. Pol. Econ. 730. 749 (2002).

[26] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[27] Claudia Goldin & Lawrence F. Katz. The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions. 110 J. of Pol. Econ. 730. 749 (2002). https://dash.har vard.edu/handle/1 /2624453.

[28] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act. 77 Fed. Reg. 8725, 8728 (Feb. 15. 2012).

4

00435033

Exhibit 31                                                                                                JA-0000681

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## II.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.  Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[29]  Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[30]  In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access.  In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act*.[31]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services.  For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[32] And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[33] That contraception would be covered was clear.[34]

---

[29] *Id.* at 8,727.

[30] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[31] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[32] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[33] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also*, 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[34] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost

5

00435034

Exhibit 31                                                                                                JA-0000682

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[35] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[36] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[37] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

### B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exemptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify he IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[38] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[39] Additionally, although qualifying grandfathered

---

basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[35] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[36] *Id.* at 109-10.

[37] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

[38] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[39] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with

6

00435035

Exhibit 31                                                                                    JA-0000683

plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services; plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[40] This exemption is intended as a temporary means for transitioning employers to full compliance.[41] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[42]

## III.    Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. APIAHF unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

### A.    Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[43] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[44]

### B.    Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[45] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[46, 47] Specifically, the Rule suggests an

---

20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

[40] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192-72,193 (Nov. 18, 2015).

[41] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[42] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017). http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[43] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[44] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

[45] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[46] Progestin-only hormonal birth control: pill and injection, FAQ No. 86, American College of Obstetricians and Gynecologists, July 2014.

[47] Combined hormonal birth control: pill, patch, and ring, FAQ No. 185, American College of Obstetricians and Gynecologists, July 2014.

7

00435036

Exhibit 31

JA-0000684

increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[48] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[49]

## C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[50] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[51,52] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[53,54] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[55] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[56] More females are using contraception the first time they have sex.[57]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.

## IV.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[58] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

---

[48] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.
[49] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.
[50] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).
[51] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy, 2009.
[52] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).
[53] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.
[54] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[55] Id.
[56] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[57] Id.
[58] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

8

00435037

Exhibit 31

JA-0000685

### A. Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[59] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[60] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[61]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[62] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[63] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[64] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[65] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These

---

[59] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).
[60] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).
[61] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).
[62] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.
[63] *See* Fowler, CI, Lloyd, SW. Gable, J. Wang, J. and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I. Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.
[64] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).
[65] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

9

00435038

Exhibit 31                                                                      JA-0000686

individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[66] This is particularly true with respect to specialty providers, including OB/GYNs.[67] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

### B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[68] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[69] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[70]

---

[66] U.S. Government Accountability Office, "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance," (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General, "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[67] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

[68] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017). https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017). http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[69] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says,* WASH. POST (Nov. 7, 2017). https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[70] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017). https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

10

00435039

Exhibit 31

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[71] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[72] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[73]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C.  Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[74] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[75] Moreover, few state laws match the federal requirement in

---

[71] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[72] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[73] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[74] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[75] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

11

00435040

Exhibit 31                                                                                                                    JA-0000688

terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[76] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[77] The Departments are wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

As such, we unequivocally oppose the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the ACA's contraceptive coverage requirement through this IFR. Please do not hesitate to contact Amina Ferati, Senior Director of Government Relations & Policy (aferati@apiahf.org) if you have any questions.

Sincerely,

Kathy Ko Chin

President & CEO

Asian & Pacific Islander American Health Forum

---

[76] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, *Insurance coverage of contraceptives, State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[77] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

12

00435041

Exhibit 31                                                                                                    JA-0000689



December 5, 2017

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW, Room 445–G
Washington, DC 20201

**Attn:  CMS-9940-IFC**

       **Religious Exemptions and Accommodations for Coverage of Certain Preventive
       Services Under the Affordable Care Act; Proposed Rulemaking**

Thank you for the opportunity to comment on the IRS, EBSA, and HHS' (the Departments')
proposed rule, "Religious Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act."

For more than 30 years, the Black Women's Health Imperative (BWHI) has been the only
national organization dedicated solely to improving the health and wellness of our nation's 21
million Black women and girls – physically, emotionally and financially. We advance and
promote Black women's health through evidence-based programs and initiatives, policy and
advocacy, and research translation. Our bold goal is to increase the number of healthy Black
women in the U.S. from 9.5 million to 12.5 million by 2020.

By allowing virtually any employer or university to deprive their employees and students of
contraceptive coverage, this Religious Exemptions Interim Final Rule (IFR) will harm the health
and well-being of Black women[1], particularly young college-aged Black women. The IFR
ignores Congress' explicit directive that the ACA require coverage of contraceptives. It
discriminates against Black women in violation of multiple federal laws and the Constitution and
also violates the Administrative Procedure Act. For these reasons, the Black Women's Health
Imperative (BWHI) calls on the Departments to rescind the IFR.

We have provided our specific comments below.

*General Comments*

### Lack of Affordable Contraceptive Coverage Will Harm Black Women's Health and Well-Being

Black women thrive physically, emotionally, and economically when they have control over
their reproductive health. Yet, they have historically been denied access to reproductive health
care, which has resulted in higher rates of unintended pregnancies, abortion, lost educational

---

[1] This comment uses the term Black "women" because women are targeted by the IFRs. We recognize, however, that the denial
of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including
some gender non-conforming people and some transgender men.

00396756

Exhibit 32

JA-0000690

and financial opportunities, poverty and, in some instances, loss of life. Barriers to reproductive health care for Black women largely stem from lack of insurance coverage, lack of income or economic hardship, and environmental factors such as geographic location.[2]

This IFR grants broad religious exemptions to the ACA's requirement that health insurance plans include contraceptive coverage without a copay. If businesses, universities, and other employers are given broad authority to deny Black women access to contraceptives under the guise of religious freedom, the Departments' risk an increase in the disparities Black women currently face. Our organization is concerned that the implementation of these rules will reverse much of the progress made by the ACA in reducing racial disparities in adverse health outcomes and increasing access to the contraceptives. For many women, if their employer opts out of contraceptive coverage by using the religious exemption, the cost of a co-payment will simply be too expensive, and they will be forced to go without the care they need – as many did before the ACA. No woman should be forced to choose between paying for their birth control and paying for the other necessities of life.

*ACA Progress*

This particular issue – lack of insurance coverage for contraceptives – was largely addressed through the implementation of the Affordable Care Act (ACA).[3] The ACA's contraceptive coverage mandate, authorized by the Women's Health Amendment to the ACA, has had an extremely positive impact on women's lives. Since the ACA's implementation, over 55 million women in the U.S. have gained contraceptive coverage and are now less likely to forgo care because of costs. The mandate has had a significant impact on Black women: in 2010, 18.6 percent of Black women would "delay or forgo care because of cost"; by 2014, only 15.1 percent of Black women did so.[4]

The mandate has also helps women save money by requiring insurers to cover FDA-approved contraceptives without copayments, deductibles, or cost-sharing. Since the contraceptive mandate was implemented in 2012, women have saved approximately $1.4 billion per year on birth control.[5] Two-thirds of women using birth control now have no out-of-pocket cost, a dramatic increase from 15 percent prior to enactment of the benefit.[6]

The ACA contraceptive coverage mandate is also popular among women and the majority of Americans. A 2015 Kaiser Family Foundation/Washington Post survey found that 70 percent of people and 77 percent of women supported coverage of birth control with no copay.[7] When

---

[2] Jones, J., Mosher, W., & Daniels, K. (2012). Current contraceptive use in the United States, 2006-2010, and changes in patterns of use since 1995. *National health statistics reports*, (60), 1-26.

[3] Becker, N.V., & Polsky, D. (2015). Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs, 34, 71204-1211. Retrieved 19 December 2016, from http://content.healthaffairs.org/content/34/7/1204.full.pdf+html; Supra note 7.

[4] "5 Things You Need to Know About the Affordable Care Act and African Americans." Center for American Progress,https://www.americanprogress.org/issues/race/news/2017/02/28/427050/5-things-you-need-to-know-about-the-affordable-care-act-and-african-americans/.

[5] Ibid.

[6] Sonfield, A., Tapales, A., Jones, R.K., & Finer, L.B. (2014). Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives. Contraception, 91, 44-48. Retrieved 19 December 2016, from http://www.contraceptionjournal.com/article/S0010-7824(14)00687-8/pdf.

[7] Kaiser Family Foundation & The Washington Post. (2016, January). Feminism Survey. Retrieved 19 December 2016, from http://files.kff.org/attachment/topline-methodologywashington-post-kaiser-family-foundation-feminism-survey

2

00396757

Exhibit 32

polled, 90 percent of Black women and men asserted their belief that contraceptives are a part of women's basic health care and 94 percent indicated that "publicly-funded health services should include birth control for low-income people who want it." By allowing businesses, non-profit organizations, and universities to impose their religious beliefs on their employees and students, the IFR robs Black women of the health coverage that they overwhelmingly support and need and undermines the progress of the ACA regarding access to contraceptives.

### *ACA Intent*

Congress adopted the Women's Health Amendment to the ACA, which authorizes the contraceptive coverage mandate, in order to address the disadvantages women face in gaining access to health care. Congress recognized that birth control is key to unlocking economic prosperity by allowing women to participate in the workforce, pursue their educational dreams, and achieve financial security for themselves and their families. In announcing the mandate, HHS emphasized the importance of including contraceptives in the designated list of preventive services as a means of unleashing women's economic potential. The inability of women to access contraceptives, HHS noted, "places women in the workforce at a disadvantage compared to their male co-workers. Researchers have shown that access to contraceptives improves the social and economic status of women. Contraceptive coverage, by reducing the number of unintended and potentially unhealthy pregnancies, furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force....The [federal government] aim[s] to reduce these disparities by providing women broad access to preventive services, including contraceptive services."[8] The IFR directly contradicts the HHS' previously stated goal. Rather than giving women the freedom to control their reproduction and plan their families, the IFR will allow employers and university administrators to decide when and if a woman has children based on religious beliefs. Our organization urges that these rules be vacated because an employer's religious beliefs should never determine the care women receive.

### *Religious IFR Reverses ACA Progress*

The IFR creates unreasonable barriers to contraceptive care that threaten to increase disparities among Black women and reinstate the challenges Black women faced before the implementation of the ACA. Because the costs of contraceptives were prohibitive to many Black women before the ACA, Black women continue to be less likely to consistently use contraceptive methods, such as hormonal methods and intrauterine devices (IUD), compared to white women.[9] According to the Guttmacher Institute, only 54 percent of Black women of reproductive age used birth control as a contraceptive method compared to 66 percent of white women.[10] Additionally, only 83 percent of Black women at risk of an unintended pregnancy

---

[8] 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

[9] "Attack on the Affordable Care Act, Planned Parenthood and Medicaid are Attacks on Reproductive Justice for Women of Color." *National Partnership of Women and Families*, www.nationalpartnership.org/research-library/repro/the-house-republican-repeal-bill-threatens-reproductive-justice-for-women-of-color.pdf.

[10] Guttmacher Institute,"Contraceptive Use in the United States."Fact Sheet. New York. July 2015. http://www.guttmacher.org/pubs/fb_contr_use.html.

3

00396758

Exhibit 32

JA-0000692

used a contraceptive method, compared to 91 percent of white women.[11] The primary reason for low and inconsistent contraceptive utilization is cost. In fact, Black women are more likely to be low-income and 23 percent of Black women live in poverty.[12] This means that Black women disproportionately struggle with the costs of contraceptives when it is not covered by insurance. A one-month supply of birth control pills could cost anywhere from $4 to $55 and longer-acting contraceptive methods, like an IUD, could cost more than $1,000 out of pocket.[13] It is then no surprise that, according to the Centers for Disease Control and Prevention, only 6 percent of Black women use IUDs due to the devices' prohibitive costs.[14] In addition, research conducted in 2012 found that nearly half of all young women using contraceptives did not use them as directed in order to cut down on costs.[15]

According to one study by Perspective Sex Reproductive Health, Black and Latina women were 60 percent and 40 percent less likely, respectively, to receive oral contraceptives as compared to white women before the implementation of the ACA.[16] Black women were also 50 percent less likely to receive IUDs and 30 percent less likely to receive the contraceptive ring, compared to white women of the same age.[17] These disparities were a result of the lack of insurance coverage for contraceptives before the ACA. Having the ability to plan and space out pregnancies using contraceptives also reduces health disparities for women and infants .This is most salient for Black women because they experience a risk of maternal mortality that is three to four times higher that of white women.[18]

The disparities in access to affordable contraceptives also contribute to disparities in unintended pregnancies.[19] Black women experience the highest rates of unintended pregnancy, at 79 unintended pregnancies per 1,000 women aged 15 to 44 years, compared to 33 unintended pregnancies per 1,000 white women.[20] Unplanned or unintended pregnancy can lead to a number of adverse outcomes, including increased risks to a woman's health and that of her child. Women facing an unintended pregnancy "are more likely than those with intended pregnancies to receive late or no prenatal care, to smoke and consume alcohol during pregnancy, to suffer from perinatal mood disorders, and to experience domestic violence during

---

[11] Ibid.

[12] "Poverty Snapshot Factsheet," National Women's Law Center (2016) , https://nwlc.org/wp-content/uploads/2016/09/Poverty-Snapshot-Factsheet-2016.pdf.

[13]"Birth Control Benefit Helps 27 Million Women," ThinkProgress (2017) https://thinkprogress.org/as-obamacares-birth-control-benefit-hits-its-one-year-anniversary-it-s-helping-27-million-women-7a39a5dbf07b/#.i5q3ft62i; Guttmacher Institute, "Federal Contraceptive Guarantee" https://www.guttmacher.org/gpr/2017/01/what-stake-federal-contraceptive-coverage-guarantee.

[14] Center for Disease Control, "Contraceptive Methods Women Have Ever Used: United States, 1982–2010" (2013), https://www.cdc.gov/nchs/data/nhsr/nhsr062.pdf.

[15] Planned Parenthood, "Voters Support Fully Covering Prescription Birth Control." https://www.plannedparenthood.org/about-us/newsroom/press-releases/survey-nearly-three-four-voters-america-support-fully-covering-prescription-birth-control

[16] Race, Ethnicity and Differences in Contraception Among Low-Income Women: Methods Received by Family PACT Clients, California, 2001–2007.

[17] Ibid.

[18] Fact Sheet, *Unintended Pregnancy in the United* States, GUTTMACHER INSTITUTE (Sept. 2016) https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states.

[19] CHRISTINE DEHLENDORF ET AL, *Disparities in Family Planning*, Am J Obstet Gynecol. 2010 Mar; 202(3): 214–220. doi: 10.1016/j.ajog.2009.08.022; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2835625/

[20] Supra note 18.

4

00396759

Exhibit 32

JA-0000693

the pregnancy."[21] In addition, women with unintended pregnancies report higher levels of depression as well as an increased risk of preterm birth or relatively low birth weight baby, as compared with intended pregnancies.[22] Pregnancy itself can also exacerbate underlying physical and psychological conditions or trigger the onset of a serious illness or health condition. Women who experience chronic medical conditions such as obesity or diabetes may need to take particular care in planning their pregnancies to ensure that their health can support a pregnancy to term. Black women are four times more likely than white women to have type 2 diabetes and have the highest rate of obesity in the United States (82 percent).[23, 24] Thus, the lack of coverage for affordable contraceptives would jeopardize the health of Black women, who already face disproportionate risk for these adverse health outcomes.

Contraceptives should be treated like any other preventative medical care. Most women who use birth control do so for both contraceptive and noncontraceptive purposes.[25] Not only do contraceptives allow for women to plan for their pregnancies, they also reduce the risk for ovarian cancer and are used to treat conditions like uterine fibroids and heavy menstrual bleeding. Black women are nearly three times more likely to develop uterine fibroids and suffer from severe symptoms like heavy menstrual bleeding, anemia, and pelvic pain.[26] Contraceptives can be used to treat these specific symptoms. Therefore, allowing religious exemptions to strip women of access to contraceptive services that they need to alleviate non-pregnancy related conditions places women's health and lives at significant and sustained risk.

### *College-Aged Black Women*

Access to all methods of contraceptives helps women to plan when and if they have children, thus allowing them to achieve economic stability and security. This is especially important for college-aged Black women, whose economic security could be threatened by their university's decision to deny coverage of contraceptives based on religious exemptions. BWHI's My Sister's Keeper (MSK) program on university campuses was created to engage young Black women around the importance of their sexual health and how that is impacted by contraceptive access or the lack thereof. MSK students know that their sexual health and access to contraceptives are inextricably tied to their futures. Unintended pregnancy is one of the leading causes that Black women drop out of college and, conversely, access to affordable contraceptives allows them to stay in school and advance their budding careers.

With the ACA's contraceptive coverage mandate, these young Black women receive insurance coverage for contraceptives through Medicaid (if their university or residence is in a Medicaid

---

[21] Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps ("iOM Report") at 91-92 (2011).

[22] Ibid.

[23] "Diabetes in African American Communities Fact Sheet," *American Diabetes Association,*
http://main.diabetes.org/dorg/PDFs/Advocacy/fact-sheet-advocacy-african-american.pdf.

[24] Ibid.

[25] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

[26] Jacoby, V. L., Fujimoto, V. Y., Giudice, L. C., Kuppermann, M., & Washington, E. A. (2010). Racial and ethnic disparities in benign gynecologic conditions and associated surgeries. American Journal of Obstetrics and Gynecology, 202(6): 514-521. doi: 10.1016/j.ajog.2010.02.039; Stewart, E. A., Nicholson, W. K., Bradley, L., & Borah, B. J. (2013). The burden of uterine fibroids for African-American Women: Results of a national survey. Journal of Women's Health, 22(10): 807-816. doi: 10.1089/jwh.2013.4334.

5

Exhibit 32

00396760

expansion state), a marketplace insurance plan, or employer-based plans and are not required to pay extra out-of-pocket costs for FDA-approved contraceptives.[27] For those students fortunate enough to have insured parents, they too benefit from no out-of-pocket expenses. However, if universities are allowed to use expanded religious exemptions, the student health center will no longer be required to provide its students with different forms of contraceptives, including emergency contraceptives, thus negating the benefits of required insurance coverage of these services.

The IFR argues that Title X-funded health centers could fill the resulting gap in contraceptive coverage and provide care to more patients than are currently served by the program. However, with limited funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb an increase in demand that would result from the Departments' rules. Reductions in funding for Title X already limits the number of patients Title X-funded providers are able to serve.[28] Specifically, the Title X Family Planning Program funds clinics near these college campuses would not be able to provide the needed contraceptives and counseling.  Because 30 percent of Title X clients are Black women, this lack of care would jeopardize the reproductive health of a large portion of the population our organization serves.

### *The Religious Exemptions IFR is Unlawful*

In addition to subjecting Black women's access to health care to the religious veto of employers and universities, and increasing the health disparities Black women face, the IFR should also be rescinded because it violates the APA and United States Constitution.

The Religious Exemptions IFR vastly expands the universe of potential exemptions.[29] This IFR allows any employer – nonprofit or for-profit – to exclude some or all contraceptive methods and services from the health plans it sponsors if the employer has religious objections to the contraceptive method. It gives that same option to colleges and universities for health plans they sponsor for their students.

In addition, the Religious Exemptions IFR does not set any standards for how an organization might claim that it has a religious objection, nor does it provide a mechanism for employees or students to challenge that claim. Objecting employers and schools may still apply for a religious accommodation, but doing so is merely optional. The lack of clarity and transparency around this process make it more likely that employers and schools will interpret this accommodation broadly. In essence, the expanded religious exemptions leave women vulnerable to the whims of

---

[27] *Federal Policy Action Center,* THE NATIONAL CAMPAIGN TO END TEEN AND UNPLANNED PREGNANCY
https://thenationalcampaign.org/sites/default/files/resource-primary-download/federal-policy-action-center.pdf.

[28] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over \$450 million to adequately address the existing need for publicly funded contraception.

[29] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47792 *et seq.*

6

00396761

Exhibit 32                                                                     JA-0000695

their employers who have no place in these private decisions, just as they would not in any other conversations about an employee's healthcare.[30]

*APA*

The Administrative Procedure Act (APA) requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[31] "contrary to a constitutional right,"[32] or "in excess of statutory jurisdiction."[33] The IFR violates 5 U.S.C. § 706(2) because it contradicts and is not in accordance with the ACA.

The ACA and implementing regulations require all new insurance plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" without cost-sharing requirements in order to protect women's health, ensure that women do not pay more for insurance coverage than men, and advance women's equality and well-being.[34] In addition, the IFR violates several sections of the ACA, including Section 1554, which prohibits the Departments from issuing regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care,"[35] and Section 1557, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[36]

By permitting objecting institutions to deny no-cost contraceptive coverage, the IFR erects unreasonable barriers to medical care, violating Section 1554 of the ACA. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the IFR discriminates on the basis on sex, in violation of section 1557 of the ACA. The Religious Exemptions IFR discriminates against women by singling out health insurance that is essential for advancing women's equality. Because of these multiple violations, the IFR must be permanently set aside.


The Departments of Treasury, Labor, and Health and Human Services simultaneously implemented these changes through IFRs (Religious and Moral) with immediate effective dates. These rules constitute final agency action and are legislative rules within the meaning of the APA. The agencies did not observe the process set forth in the APA, which requires good

---

[30] Amy Goldstein, Juliet Eilperin and William Wan, *Trump Administration Narrows Affordable Care Act's Contraception Mandate*, THE WASHINGTON POST (Oct. 6, 2017) https://www.washingtonpost.com/national/ health-science/trump-administration-could-narrow-affordable-care-acts-contraception-mandate/2017/10/05/16139400-a9f0-11e7-92d1-58c702d2d975_story.html?utm_term=.66c07b8e74e9.

[31] 5 U.S.C. § 706(2)(A).

[32] 5 U.S.C. § 706(2)(B).

[33] 5 U.S.C. § 706(2)(C).

[34] *See* 4 2 U.S.C. § 300gg-13(a)(4); 4 5 C.F.R. § 147.130 (2013)(a)(1)(iv).

[35] 42 U.S.C. § 18114(1).

[36] 2 U.S.C. § 18116.

7

Exhibit 32

cause for foregoing notice and comment as well as waiving the 30-day waiting period between publication and effective date, nor did they provide reasoned explanation for changing policy as required by law. The agencies exceeded their statutory authority under the ACA in violation of the APA. Moreover, Section 1554 of the ACA prohibits the Secretary of Health and Human Services from promulgating regulations that create unreasonable barriers to obtaining appropriate medical care but, as discussed above, the IFR creates unreasonable barriers to contraceptive care. Thus, the IFR exceeds the statutory authority given to the agencies.

For each of these reasons, the IFR violates the APA and should be rescinded.

### *The Constitution*

Attempts to discriminate in the name of religious beliefs are nothing new. Shortly after the enactment of the Civil Rights Act of 1964, which prohibited discrimination based on race in public accommodations, the owner of a restaurant chain argued that the Act violated his religious beliefs regarding integration and that he should therefore be allowed to exclude African-Americans from his restaurant.[37] Other entities have also argued that they should be allowed to pay women less or give them inferior benefits based on religious beliefs that "the husband is the head of the house."[38] But those efforts have time and again been rejected. In passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors, including race and sex, over objections based on religion.[39]

Like Title VII and other civil rights laws, the contraceptive coverage mandate was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws.

Finally, the Constitution bars the Departments from crafting an exemption like this because it tangibly harms women. Freedom of religion and belief is a fundamental right, protected by the Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it does not give an individual the right to use religious beliefs as reason to harm others. The Constitution commands that a religious accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]." [40] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero." [41] Prior to this IFR, HHS met

---

[37] *See* Newman v. Piggie Park Enters., Inc., 256 F. Supp. 941, 944 (D. S.C. 1966), aff'd in part and rev'd in part on other grounds, 377 F.2d 433 (4th Cir. 1967), aff'd and modified on other grounds, 390 U.S. 400 (1968).

[38] *Ibid.* at 580.

[39] *Id.* at 19.

[40] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[41] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

8

00396763

Exhibit 32

JA-0000697

this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

We urge the Departments to rescind this IFR because it gives broad license for unconstitutional sex discrimination.

9

00396764

Exhibit 32

**Conclusion**

Black women should not be denied access to basic health care based on their employers' religious beliefs. The Religious Exemption IFR would bring harm to thousands of Black women, specifically young Black women and low-income Black women. If a goal of the Departments is to eliminate disparities in reproductive health care, including high rates of unintended pregnancy, this will require increasing access to affordable contraceptives and contraceptive counseling, not reducing it. It is well documented that access to affordable contraceptives allows Black women and women of color to plan whether and when they have a child, in turn providing them with greater financial stability and freedom. Restricting a woman's ability to decide whether and when to have children by allowing employers' religious objections to dictate her access to contraceptives is unacceptable, discriminatory, and unconstitutional.

We urge the Departments to vacate the Religious Exemption IFR and instead preserve and expand upon the contraceptive coverage mandate in the ACA in order to protect women's reproductive health.

Thank you for your attention to our comments.

Sincerely,

*Linda G. Blount*

Linda Goler Blount
President & CEO
Black Women's Health Imperative

For questions, please contact:
Christy M. Gamble, JD, DrPH, MPH
Director, Health Policy & Legislative Affairs
cgamble@bwhi.org
202-787-5922

55 M Street SE, Suite 940
Washington, DC 20003

**bwhi.org**



00396765

Exhibit 32                                                                                                    JA-0000699

STATE OF CALIFORNIA                                                                                      *Dave Jones, Insurance Commissioner*

**DEPARTMENT OF INSURANCE**
EXECUTIVE OFFICE
300 CAPITOL MALL, SUITE 1700
SACRAMENTO, CA 95814
(916) 492-3500
www.insurance.ca.gov



December 5, 2017

*Submitted via www.regulations.gov*

Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016

**SUBJECT:   Comments to CMS-9940-IFC: Interim Final Rule on Religious
Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act**

Dear Acting Secretary Hargan:

California is the nation's largest insurance market, where insurers collect $289 billion a year in
premiums. California also has the largest health insurance market in the United States. Health
insurers and managed care plans collect $153 billion in premium annually in California. As
California's Insurance Commissioner, I am responsible for regulating California's insurance
market, including making sure that health insurance consumers in California are afforded the
benefits of the Affordable Care Act, including the preventive items and services that insurers and
group health plans must cover without cost sharing pursuant to section 2713 of the Public Health
Service Act (PHS Act).[1]

The religious exemptions to the Affordable Care Act's (ACA) contraception mandate for private
employers and health insurers created by this interim final rule (IFR), which became effective
retroactively on October 6 without public notice and an opportunity to comment, violate the
ACA. The interim final rule will harm women and their families by allowing employers and
health insurers to remove contraceptives coverage.

The Departments were under no legal obligation whatsoever to expand the scope of the prior
exemption for religious orders, nonprofit churches, and their auxiliaries, conventions, and
associations to any other entities. On the contrary, the *Hobby Lobby* majority opinion indicated
that the accommodation process, which provided seamless coverage of contraceptives to health
plan beneficiaries of entities which objected to providing that coverage on religious grounds,
may very well not violate the right of those entities to exercise religion under the Religious
Freedom Restoration Act (RFRA).[2] Therefore, the final rule should restore the prior compulsory
accommodation process and not extend the exemption to additional entities.

---

[1] Cal. Ins. C. § 10112.2.

[2] "At a minimum, however, it [the accommodation process] does not impinge on the plaintiffs' religious belief that
providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated

Consumer Hotline (800) 927-HELP • Producer Licensing (800) 967-9331

00328192

Exhibit 33                                                                                                        JA-0000700

The Departments speciously claim that the ACA's mandate for health insurance and group health plans to cover women's contraceptive methods and related services without cost is being maintained when the reality is that the exemptions created by this IFR render the coverage requirement entirely optional. The IFR extends a no-strings-attached exemption to any private employer, institution of higher education, or health insurer that ostensibly "objects" to providing coverage for contraceptives based on religious beliefs. Shockingly, the IFR does not include a mechanism to ensure that these "objecting entities" actually possess a legitimate, sincerely held religious belief that may be substantially burdened by the contraception mandate consistent with the Religious Freedom Restoration Act (RFRA) and the Supreme Court's opinion in *Hobby Lobby*.[3] The IFR vitiates the ACA's contraception mandate under the pretense of complying with RFRA, which does not require the Departments to exempt any employers (aside from the established prior limited exemption for religious orders and nonprofit churches and associated entities), institutions of higher education, or health insurers from the mandate or make the accommodation process optional.

The Departments argue that it is necessary to grant the religious exemptions in the IFR to resolve ongoing litigation concerning whether the accommodation process is permissible under RFRA. However, the Departments acknowledge that most (more precisely, eight out of nine as of January 9 of this year[4]) courts of appeal that have considered the issue, with the exception of the Eighth Circuit, have held that the accommodation process did not impose a substantial burden on the plaintiffs' religious exercise under RFRA.[5] Given that there is clearly an impasse concerning whether the accommodation process complies with RFRA,[6] the Departments should allow this critical issue to be decided by the Supreme Court rather than short circuiting the litigation process by adopting a final rule exempting any "objecting" private employer, institution of higher education, and health insurer from complying with the mandate on the grounds that the accommodation process violates RFRA.[7]

Even if the Departments believe that they, rather than the Court, should properly decide whether the accommodation process satisfies RFRA, there is no indication that the breadth of the exemptions in the IFR are necessary. The Departments declare that "the application of the Mandate to entities with sincerely held religious objections to it does not serve a compelling

---

interests very well." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2782 (2014). The Supreme Court's subsequent orders in *Little Sisters of the Poor Home for the Aged v. Sebelius*, 134 S. Ct. 1022 (2014), and *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), which attempted to achieve modifications of the accommodation process to satisfy both litigants, also suggest it views the accommodation process favorably.

[3] In *Hobby Lobby*, the Supreme Court makes the obvious point that "[t]o qualify for RFRA's protection, an asserted belief must be "sincere"; a corporation's pretextual assertion of a religious belief in order to obtain an exemption for financial reasons would fail." 134 S. Ct. at 2774, n. 28.

[4] *FAQs About Affordable Care Act Implementation Part 36* (January 9, 2017).

[5] 82 FR at 47,798. The preamble indicates that all of the plaintiffs in the cases challenging the accommodation process are nonprofit religious organizations, including religious colleges and universities and religious orders.

[6] *FAQs About Affordable Care Act Implementation Part 36* states that the comments received from the objecting employers, including some of the *Zubik* plaintiffs, indicated that even eliminating the requirement to provide an insurer or third party administrator with written notification of a religious objection to covering contraceptives would not resolve their RFRA challenges to the accommodation process.

[7] Asserted at 82 FR 47,800.

00328193

Exhibit 33

government interest."[8] While anyone who values reproductive self-determination and is aware of the legislative history of the Women's Health Amendment in the ACA would profoundly disagree with that pronouncement, the fact is that the only entities which have brought suit for relief from the mandate are nonprofit religious organizations, including institutions of higher education, and closely-held for-profit corporations.[9] Despite the lack of any known religiously-motivated objections to the mandate from publicly traded for-profit corporations or health insurers,[10] the Departments extended the exemption to them, as well as any other non-governmental employer. This action is completely unjustified and unnecessary, and is breathtaking in its brazenness. Private employers, health insurers, and colleges and universities that educate students regardless of their religious affiliation should not be empowered by the agencies charged with implementing the ACA to deprive women of their entitlement to coverage for contraceptives.

In addition to the preceding comments, please consider and respond to the following comments on the specific provisions in the IFR when the final rule is adopted.

I.  ·  45 CFR § 147.131. Accommodations in connection with coverage of certain preventive health services

This IFR changed the prior accommodation process to make it optional rather than compulsory for the "objecting entities" described in § 147.132(a)(1)(i) or (ii) (a religious order, nonprofit church and associated entities, any private employer, including nonprofit and for-profit organizations, and institutions of higher education).

I categorically oppose making the accommodation process through which women have been assured coverage for contraceptives optional for entities that object to providing coverage for contraceptives for religious reasons. Changing the accommodation process that ensures women do not lose contraceptive coverage from mandatory to optional is simply a way of permitting employers to interfere with the ability of their employees to use their health insurance to access contraceptives.

The Departments should allow the litigation process to play out and permit the courts to decide the critical issue of whether the accommodation process complies with RFRA, and as to which types of entities. Rather than expanding the exemption beyond nonprofit churches and religious orders, the Departments should require known objectors (nonprofit religious organizations, institutions of higher education with religious character, and closely held for-profit entities with sincerely held religious beliefs) to avail themselves of the accommodation process. The accommodation process should not be extended to any other types of employers, including for-profit corporations that are not closely held, because they have not brought RFRA challenges to the accommodation.[11] Moreover, the Supreme Court did not hold in *Hobby Lobby* that the

---

[8] *Id.*

[9] 82 FR at 47,797-98, 47,801, 47,817-818.

[10] The Departments admit in the preamble numerous times that they are not aware of any lawsuits, or even religiously-motivated objections to the mandate, put forward by publicly traded for-profit corporations or health insurers. 82 FR at 47,803; 47,806; 47,810-811; 47,817.

[11] *Supra* n. 10.

00328194

Exhibit 33

JA-0000702

mandate substantially burdened any other type of employers' religious exercise under RFRA, including publicly traded for-profit corporations.[12] The mere fact that the Supreme Court determined that RFRA applies to for-profit corporations hardly means that it would also hold that the mandate substantially burdens a publicly traded corporation's exercise of religion.

## II.   45 CFR § 147.132. Religious exemptions in connection with coverage of certain preventive health services

Subsection (a) exempts the group coverage (both insured and self-insured) of *any* private employer, including nonprofit and for-profit entities, an institution of higher education in its arrangement of student health insurance coverage, and a health insurer offering group or individual insurance coverage from the ACA's requirement to cover contraceptives to the extent any of these entities object to providing that coverage based on sincerely held religious beliefs.

I categorically oppose these exemptions and urge the Departments to restore the prior limited exemption for nonprofit churches, their associated entities, and religious orders in the final rule. I find especially troubling the Administration's extension of the exemption to health insurers, which must provide coverage for women's preventive care pursuant to the ACA's express terms. Extending the exemption to health insurers, none of which have sued for relief from the mandate under RFRA[13], invites them to decline to cover contraceptives for financial reasons. This is especially true because the rule does not include a requirement for exempted entities to take any action to establish that they legitimately object to covering some or all contraceptive methods on religious grounds. Moreover, by claiming an exemption, a health insurer is also able to evade the requirement to provide an objecting employer's health insurance beneficiaries with coverage for contraceptives pursuant to the accommodation process.[14]

It seems worth noting that the near-universal use of contraception among U.S. women includes women who identify as religious. Among all Catholic women who have had sex, 98% have used some form of modern contraception at some point in their lives. Among women of all denominations, more than two-thirds of sexually active women use highly effective methods of contraception such as hormonal birth control pills or an intra-uterine device.[15] Very few in this country hold a sincere religious belief that would result in denying women access to contraceptives.

The incentives created by this rule for health insurers to decline to cover contraceptives for financial reasons are unconscionable and must be eliminated from the final rule. Of the sexually active women of reproductive age in the United States, 99% of these women report having used

---

[12] 134 S. Ct. at 2774.

[13] *Supra* n. 10.

[14] 45 CFR § 147.131(d)(2).

[15] Rachel K. Jones & Joerg Dreweke, Guttmacher Institute, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use* (2011), available online at
https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.

00328195

Exhibit 33

JA-0000703

at least one method of contraception.[16] Contraceptives are among the most commonly prescribed classes of drugs. A rule that allows insurers to ignore the ACA's requirement to cover contraceptives is invalid and should not have been allowed to go into effect.

As California's insurance regulator, I have found instances in which insurers are not providing contraceptive coverage in compliance with state and federal law. I have had to step in and enforce the law to ensure that women have a full range of contraceptive coverage options. This demonstrates that health insurers have financial motivation, and already often do not abstain from, unlawfully denying contraceptive coverage. Insurers might also attempt to use the proposed rule as a rationale to improperly evade state insurance mandates. This could seriously impair state-based regulation in an area in which state law is explicitly not preempted, and also increase the administrative burden on state regulators in responding to insurer actions that are premised on a federal rule that is inconsistent with state law. Consequently, it is imperative that the Departments eliminate the exemption for health insurers in the final rule.

## III.   Establishing Qualification for the Exemption

In the preamble, the Departments solicited comments on whether exempt entities should be required to "maintain or submit a specific form or certification to claim their exemption" or would find value in receiving guidance on "a way to document their exemption."[17]

The prior accommodation process included a requirement for the "highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners)" of a closely-held for-profit entity to have "adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owners' sincerely held religious beliefs."[18] This requirement was consistent with the *Hobby Lobby* majority opinion, which included a discussion of the means through which a publicly traded for-profit corporation could potentially establish that it held a sincere religious belief protected by RFRA.[19] The Supreme Court endorsed the view of lower courts that RFRA only protects a *sincere* religious belief, and therefore "a corporation's pretextual assertion of a religious belief in order to obtain an exemption for financial reasons would fail."[20] Therefore, and given that private employers and health insurers have a financial incentive to claim the exemption granted by this IFR in the absence of a sincerely held religious belief that conflicts with the mandate, it is vitally important for the Departments to include in the final rule, at a minimum, an express codified requirement for each type of objecting entity (not just corporations) to formally establish, through appropriate legal means, that they object to covering some or all contraceptive methods due to a sincerely held religious belief. An assertion in a footnote in the preamble that the Departments "would expect that such principles or views would have been adopted and

---

[16] Kimberly Daniels, et al., *Contraceptive Methods Women Have Ever Used: United States, 1982-2010*, National Health Statistics Reports No. 62, 1 (Feb. 14, 2013), available online at http://www.cdc.gov/nchs/data.nhsr/nhsr062.pdf.
[17] 82 FR at 47,809.
[18] Former 45 CFR § 147.131(b)(3).
[19] 134 S. Ct. at 2774.
[20] *Id.* at n. 28.

00328196

Exhibit 33
JA-0000704

Centers for Medicare & Medicaid Services, Department of Health and Human Services
December 5, 2017
Page 6

documented in accordance with the laws of the jurisdiction under which they are incorporated or organized,"[21] is hardly sufficient, especially because it is limited only to publicly traded for-profit corporations.

Further, an objecting entity that is invoking the exemption should be required to maintain and submit to CMS or DOL, as appropriate, a certification of its qualification for an exemption. CMS is statutorily responsible for enforcing the mandate and thus eligibility for the exemption, and it cannot do so effectively if it is not informed of who is claiming the exemption. The certification should include a requirement for the invoking entity to certify that it adopted, through appropriate legal means, a formal expression of an objection to providing coverage for some or all contraceptives due to a sincerely held religious belief. Handing out exemptions without including any mechanisms to keep "objectors" honest is bad policy that invites abuse. Without these safeguards, it will be difficult for the Departments, as well as beneficiaries of group health plans and health insurance consumers, to verify that the only entities which are taking advantage of the exemptions truly qualify for them under the rule. Without an effective enforcement mechanism in the rule, beneficiaries of group health plans and consumers may be forced to resort to litigation to enforce their right to coverage of contraception, which is a burden they should not have to shoulder.

In conclusion, the previous limited exemption for nonprofit churches and religious orders and the mandatory accommodation process complied with RFRA while respecting the ACA's requirement for health insurers and group health plans to cover women's preventive care. The mandatory accommodation process was serving its purpose and most likely would have withstood the outstanding RFRA challenges largely intact. Private employers that employ individuals who do not share their religious beliefs, colleges and universities that educate students regardless of their religious affiliation, and especially health insurers, should not be permitted to claim an exemption from the mandate. This IFR guts the ACA's contraception mandate and will reduce access to contraceptives and impose hardship on women and their families, all under the guise of extending the exemption to corporations and health insurers that have not asserted a religious objection to providing coverage for contraception, but who do have a profit motive to claim the exemption. The Departments should reverse course and withdraw the IFR.

Sincerely,

DAVE JONES
Insurance Commissioner

---

[21] 82 FR at 47,810 n. 60.

00328197

Exhibit 33



Planned Parenthood Affiliates of California

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201

Submitted online via http://www.regulations.gov

Re:    **Comments on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, CMS-9940-IFC [Docket ID CMS-2014-0115]**

Dear Administrator Verma:

The California Planned Parenthood Education Fund (CPPEF) and its sister organization, Planned Parenthood Affiliates of California (collectively, PPAC), appreciate the opportunity to submit comments on the interim final rules (IFRs) titled Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, CMS-9940-IFC [Docket ID CMS-2014-0115] and issued by the U.S. Departments of Health and Human Services, Labor, and Treasury (referred to as the tri-Departments) that were published in the *Federal Register* on October 13, 2017.

CPPEF and PPAC represent California's seven separately incorporated Planned Parenthood affiliates. The mission of the Planned Parenthood organizations in California is to provide comprehensive reproductive health care services, to provide educational programs relating to reproductive and sexual health and to advocate for public policies that ensure access to health services, including safe, legal abortion. Collectively, the California affiliates operate 115 health centers and serve about 800,000 patients each year. Eighty-seven percent (87%) of Planned Parenthood's patients in California have annual incomes less than two hundred percent (200%) of the Federal poverty line and, thus, are eligible to receive health care through government subsidized programs.

00427844

Exhibit 34                                    JA-0000706



Planned Parenthood Affiliates of California

Planned Parenthood Federation of America (PPFA) is separately submitting comments on the IFRs. This submission is intended to focus on the particular harm these IFRs have on the women of California.

The changes to the interim final rules will have devastating consequences and cause immediate, irreparable harm to the state of California, Medi-Cal, Planned Parenthood's patients, and public health. We strongly oppose extending a policy, such as the religious exemptions and optional accommodations described in the interim final rules, because these types of policies disrupt contraceptive coverage, limit a woman's choice of method, increase unintended pregnancy, and drastically increase state and Federal health care and social service spending.

The interim final rules should be rescinded immediately because these policies are an overreach of Federal government rulemaking authority, harm women and public health, falsely claim women will not lose access to contraception because of availability of Federal programs, will lead to a significant cost shift in the system, and are based on evidence that is not scientifically sound. Significantly, the overreach, adopted without public notice and an opportunity to comment, violates the Administrative Procedure Act. This federal overreach also violates the U.S. Constitution in multiple ways. By preferencing religious convictions of certain entities, including employers, over other compelling government interests, it violates the Establishment Clause of the First Amendment. By advancing policies that clearly discriminate against women, it violates the Equal Protection Clause. And, by compelling states to adopt policies in clear contravention of their own policies and constitutions, it violates the Spending Clause and Tenth Amendment.

**The immediate expansion of religious exemptions, the adoption of new moral exemptions and the elimination of the accommodation violate the Administrative Procedure Act (APA).**

*The Tri-Departments Provided Neither Public Notice Nor an Opportunity to be Heard.*

The tri-Departments violated the APA because, in adopting these rules effective immediately, they did not provide adequate public notice and comment to allow public participation in the rulemaking process. Without any notice, opportunity to comment, or change in the evidence-based preventive service guidelines, the tri-Departments adopted sweeping new policies under the interim final rules that would negatively affect women's access to contraception without cost sharing. The APA requires agencies to provide the public notice and an opportunity to comment

00427845

Exhibit 34                                                                                                      JA-0000707



Planned Parenthood Affiliates of California

before promulgating regulations to allow for public participation in the rulemaking process.[1] If they do not, the rules are invalid.

Although these requirements may be waived where the agencies can show "good cause,"[2] those circumstances do not exist here. The burden is on the agency to demonstrate good cause, and courts have interpreted this exception narrowly.[3] The tri-Departments did not, and cannot, demonstrate "good cause" for failing to provide a notice and comment period. Instead, they justified this reckless regulatory action "in light of the full history of relevant rulemaking."[4] However, there was no previous rule-making that provided any opportunity to comment on the greatly expanded exemptions or the optional accommodation. For this reason alone, the IFRs should be invalidated.

> *The IFRs are Invalid Because They are Arbitrary and Capricious.*

The rules are also invalid because they are arbitrary and capricious.[5] They constitute a complete reversal of prior agency policy without any detailed justification for the shift. Agencies must "articulate a 'rational connection between the facts found and the choice made.'"[6] An agency departing from a prior policy must at a minimum "demonstrate awareness that it is changing position."[7] A more "detailed justification" is necessary where the new policy "rests upon factual findings that contradicts those which underlay its prior policy."[8]

There is no dispute that the IFRs effect a significant change in policy. The prior regulations found a compelling interest in ensuring women have access to contraceptive coverage, a position confirmed by the Supreme Court.[9] The new IFRs say the direct opposite, yet provide no factual support for this complete reversal. The tri-Departments failed to justify the greatly expanded number of employers who could take advantage of the exemption or the addition of the moral

---

[1] 5 USC 553(b) and (c).

[2] 5 USC 553(b)(B).

[3] *See, e.g., Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011).

[4] 82 FR 47807.

[5] 5 USC 706(2)(A).

[6] *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974); 5 USC 553(c)(agency must provide a "concise general statement of [a regulation's] basis or purpose").

[7] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[8] *Id.; Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-51 (regulation rescinding prior regulation after change in presidential administration was arbitrary and capricious where agency failed to address prior fact findings).

[9] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2785-86 (2014)(Kennedy, J., concurring).

00427846

Exhibit 34

JA-0000708



Planned Parenthood Affiliates of California

exemption. Instead, they relied on information that was insufficient, grossly misconstrued, non-factual, and not scientifically sound (see discussion below). Basing a policy on false information and cherry-picked evidence is an inappropriate process for implementing public health policy, and should be rejected. Because the sweeping changes are not supported by any new facts, they are arbitrary and capricious and, for this reason too, invalid.[10]

**The tri-Departments erroneously rely on false and non-scientific assumptions to support the policy changes in the IFRs.**

The tri-Departments argue that there is no causal relationship between access to affordable contraception and reduction in unintended pregnancy.[11] This is false. Contraceptive use significantly reduces the risk of unintended pregnancy. As one of the top ten greatest public health achievements in the 20th century, contraception plays a vital role in advancing women's health as well as their educational and economic status.[12] Access to contraceptive methods and services directly decreases unintended pregnancy, which leads to fewer abortions, lower health care spending, and better outcomes for women and families.

The interim final rules cite an outdated study that included data from 1972 through 2002. More recent evidence demonstrates the strong link between increased access to contraception and reduced rates of unintended pregnancy.[13] This link has been strengthened with the introduction of more effective, long-acting reversible contraceptive methods.

Recent data finds the rate of unintended pregnancy is at the lowest rate in 30 years.[14] The research indicates there was no increase in risky sexual behavior, and explains that the decline is likely attributed to a change in the frequency and type of contraceptive use over time. The use of highly effective, long-acting reversible contraceptive methods, particularly intrauterine devices, among U.S. females who used contraception increased from 4% to 12% between 2007 and 2012.[15] Several peer-reviewed studies found that women and girls at high risk of unintended

---

[10] *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)(rejecting agency where it demonstrated awareness it was changing policy but provided insufficiently reasoned explanation for "why it deemed it necessary to overrule its previous position.").

[11] 82 FR 47803

[12] https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm

[13] CHBRP Report, at 15, 22; Bixby Center for Global Reproductive Health, UCSF, *Cost Benefit Analysis of the California Family PACT Program for Calendar Year 2007*, at 6-7, 20 (April 2010).

[14] Finer LB et al. Declines in unintended pregnancy in the United States, 2008-2011. N Eng J Med 2016; 374:843-852

[15] Use of highly effective contraceptives in the U.S. continues to rise, with likely implications for declines in unintended pregnancy and abortion. New York: Guttmacher Institute, 2014; *see also* Romero, et al. Trends in use of long-acting reversible

00427847

Exhibit 34

JA-0000709



Planned Parenthood Affiliates of California

pregnancy who had free access to and used the most effective, reversible methods of contraception, such as intrauterine devices, had much lower rates of unintended pregnancy than those who used less effective methods, such as the oral contraceptive pill.[16]

The tri-Departments neglected to consider the evidence and support for contraception coverage under the Health Resources and Services Administration (HRSA) guidelines, including all U.S. Food and Drug Administration (FDA)-approved contraceptive methods and implied that all methods are equally effective.[17] This is simply not true. There is a wide range of effectiveness between methods, from 99.9% effective for implants and hormonal IUDs to 74% for vaginal spermicide.[18] Freedom of choice for which contraceptive to use is paramount to a woman's choice of whether and when to become pregnant.

In addition, decreasing the rate of unintended pregnancy is directly related to decreases in abortion. In fact, abortion rates are at the lowest levels since *Roe v. Wade*.[19] Time and again, these declines have been largely attributed to greater access to more effective contraceptive methods.[20] Most of these studies predated implementation of the contraceptive coverage mandate under the Affordable Care Act (ACA), and experts anticipated that the ACA provisions will lead to greater use of contraception overall and increased use of highly effective methods among those who want them. As a consequence, the rates of unintended pregnancy and abortion should continue to decline.

Expanded access to contraception does not encourage risky behavior as the tri-Departments claim.[21] The CHOICE Project study found little evidence to support concerns of increased

---

contraception among teens aged 15-19 years seeking contraceptive services – United States, 2005-2013. *MMWR*; 2015, Vol. 64(13), pp363-369.

[16] Winner B, Peipert JF, Zhao Q, et al. Effectiveness of long-acting reversible contraceptive. N Engl J Med 2012;366:1998-2007; Lindberg L et al. Understanding the decline in adolescent fertility in the United States. 2007-2012. Journal of Adolescent Health 2016; 59:577-583; Secura GM et al. Change in sexual behavior with provision of no-cost contraceptive. Obstet Gynecol 2014; 123(4):771-778.; Secura GM et al. Provision of no-cost, long-acting contraceptive and teenage pregnancy. N Engl J Med 2014; 37 :1316-1323.

[17] 82 FR 47801.

[18] American Sexual Health Association, Birth Control Method Comparison Chart (2013), found at http://www.asexualhealth.org/pdfs/ContraceptiveOptions, last accessed Nov. 17, 2017.

[19] Jones RK et al. Abortion incidence and service availability in the United States, 2014. Pers on Sexual and Repro Health 2017; 49:17-27.

[20] Peipert JF, Madden T, Allsworth JE, et al. Preventing unintended pregnancies by providing no-cost contraceptive. Obstet Gynecol. 2012;120(6):1291-7; Harper CC, Rocca CH, Thompson KM, et al. Reductions in pregnancy rates in the USA with long-acting reversible contraceptive: a cluster randomised trial. Lancet. 2015;386(9993):562-8.

[21] 83 FR 47804.

00427848

Exhibit 34

JA-0000710



Planned Parenthood Affiliates of California

sexual risk-taking behavior subsequent to greater access to no-cost contraception.[22] Since the implementation of the contraceptive coverage without cost-sharing, the Centers for Disease Control and Prevention (CDC) has reported in the High School Youth Risk Behavior Survey that the proportion of teenagers who "ever had sex" dropped to 41 percent in 2015 from 47 percent in 2011. In addition, the proportion who were "currently sexually active" dropped significantly.[23]

The tri-Departments incorrectly assert that women can afford and access contraceptives when coverage is not available.[24] Effective, long-acting, reversible contraceptive methods can be expensive, and financial barriers limit access and exacerbate health disparities. After the contraceptive coverage under the ACA became effective, fewer than 4% of women had to pay out-of-pocket for oral birth control, down from more than 20% before the law's passage.[25] One survey found that before the ACA contraceptive coverage provision went into effect, one in three women voters struggled to afford prescription birth controls, including 57% of young women aged 18 to 34.[26] Data from a 2016 study evaluating the impact of contraceptive coverage under the ACA demonstrated a 70% decrease in mean total out-of-pocket expenses for FDA-approved contraceptives for commercially insured women from 2011 to 2013.[27]

The tri-Departments provide unsubstantiated claims that contraceptive's health benefits are outweighed by its negative health effects.[28] The evidence, however, strongly supports that the benefits of contraception greatly outweigh any negative effects – it's more than just preventing pregnancy. The inclusion of contraception as a women's preventive service is linked to the CDC's Healthy People 2020 goal to promote healthy pregnancy and prevent unintended pregnancy. The Women's Preventive Services Initiative describes contraceptives as a primary prevention that enables the routine screening of pregnancy intention and prevents unintended pregnancy. Increasing the proportion of intended pregnancy lessens the burden of closely spaced

[22] Secura GM et al. Change in sexual behavior with provision of no-cost contraceptive. Obstet Gynecol 2014: 123(4):771-778.

[23] Centers for Disease Control and Prevention. High school youth risk behavior survey. Accessed on October 29, 2017 at https://nccd.cdc.gov/youthonline/App/Results.aspx?TT=B&OUT=0&SID=HS&QID=H60&LID=LL&YID=RY&LID2=&YID2=&COL=&ROW1=&ROW2=&HT=&LCT=&FS=&FR=&FG=&FI=&FP=&FSL=&FRL=&FGL=&FIL=&FPL=&PV=&TST=&C1=&C2=&QP=&DP=&VA=CI&CS=Y&SYID=&EYID=&SC=&SO=.

[24] 82 FR 47803.

[25] Kaiser Family Foundation. Private insurance coverage of contraceptive, 2016. Accessed on October 29, 2017 at https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraceptive/.

[26] Hart Research Poll, 2014. Survey: Nearly Three in Four Voters in America Support Fully Covering Prescription Birth Control

Accessed on October 29, 2017 at https://www.plannedparenthood.org/about-us/newsroom/press-releases/survey-nearly-three-four-voters-america-support-fully-covering-prescription-birth-control.

[27] Law A, Wen L, Lin J, et al. Are women benefiting from the Affordable Care Act? A real-world evaluation of the impact of the Affordable Care Act on out-of-pocket costs for contraceptives. Contraceptive. 2016;93(5):392-7.

[28] 82 FR 47804.

00427849

Exhibit 34    JA-0000711



Planned Parenthood Affiliates of California

or unintended pregnancy. Unintended pregnancy is associated with poor health outcomes, including delayed prenatal care, premature birth, and negative physical and mental health for mother and child.[29]

Finally, the tri-Departments promote an unscientific claim that some forms of contraceptive methods are "abortifacients."[30] This unsubstantiated claim has been rejected by the medical and scientific community. Contraceptive is not abortion. ACOG and other professional medical associations have repeatedly stated that emergency contraception and intrauterine devices are not abortifacients and are safe, effective forms of contraception that prevent pregnancy from occurring.[31] The FDA agrees as it does not use either "abortifacient" or "abortion" to describe any form of contraception approved and included in the HRSA recommendation. The reason is plain. Pregnancy, as long established by the medical profession, begins at implantation, not at conception. Most notably, in 1965, the American Congress of Obstetricians and Gynecologists (ACOG) issued a statement that the establishment of a pregnancy takes several days and is not completed until a fertilized ovum is implanted in the lining of the woman's uterus.[32] Accordingly, the beginning of pregnancy occurs only *after* implantation of the fertilized egg to the uterine wall. The Federal government has long accepted this definition of pregnancy and, by extension, what constitutes its prevention. Since the 1970s, HHS has had an official definition of pregnancy for purposes of establishing certain safeguards when Federally-funded research involves pregnant women. For example, the rules promulgated by the Bush administration related to research involving human subjects, which remain in effect today, say that pregnancy "encompasses the period of time from implantation until delivery."[33]

---

[29] Women's Preventive Services Initiative. Final Report 2016. Accessed on October 29, 2017 at http://www.womenspreventivehealth.org/wp-content/uploads/2017/08/WPSI_2016FullReport.pdf.

[30] 82 FR 47794.

[31] American Congress of Obstetricians and Gynecologists. Facts are important: Emergency contraceptive and intrauterine devices are not abortifacients. Accessed on October 29, 2017 at https://www.acog.org/-/media/Departments/Government-Relations-and-Outreach/FactsAreImportantEC.pdf. ; Association of Reproductive Health Professionals. Health Matters Fact Sheet. Accessed on October 29, 2017 at https://www.acog.org/-/media/Departments/Government-Relations-and-Outreach/FactsAreImportantEC.pdf.; American College of Obstetricians and Gynecologists. (2001, accessed July 31, 2002). "Statement of the American College of Obstetricians and Gynecologists Supporting the Availability of Over-the-Counter Emergency Contraceptive." [Online]. http://www.acog.org/from_home/publications/press_ releases/nr02-14-02.htm.; American College of Obstetricians and Gynecologists. "ACOG Practice Bulletin #69: Emergency Contraceptive." *Obstetrics & Gynecology*, 106(6), 1443–5; American Medical Women's Association. (1996, accessed 2000, February 22). *Position Statement on Emergency Contraceptive*. [Online]. http:// www.amwa-doc.org/publications/Position_Papers/contraceptive.htm; Family Health International. (2005, accessed 2005, September 7). "Mechanisms of Action: Mechanisms of the Contraceptive Action of Hormonal Methods and Intrauterine Devices (IUDs)." [Online]. http://www.fhi.org/en/RH/ Pubs/factsheets/mechact.htm; Open Letter to HHS. 2012. Accessed on October 29, 2017 from http://www.aafp.org/dam/AAFP/documents/advocacy/prevention/women/LT-Sebelius-OTCAccessforPlanBOneStepEmergencyContraceptive-120712.pdf .

[32] American College of Obstetricians and Gynecologists Terminology Bulletin. Terms Used in Reference to the Fetus. No. 1. Philadelphia: Davis. September, 1965.

[33] 45 C.F.R. § 46.202(f) (2005)

00427850

Exhibit 34

JA-0000712



Planned Parenthood Affiliates of California

**As a result of the interim final rules, women will lose access to contraceptive coverage, have increased health care costs, and are more likely to experience an unintended pregnancy that would affect their educational and economic advancement.**

Starting in 2012, as part of the ACA, most group health plans and health insurers were required to cover all FDA-approved contraceptive methods without cost-sharing.[34] This requirement has had tremendous benefits. Since the contraceptive coverage requirement took effect, 62.4 million women, including 7.4 million women in California, have benefitted from these reproductive services.[35] In 2013 alone, women saved $1.4 billion on birth control pills.[36]

In drafting and implementing the ACA, Congress and the previous Administration established narrow exemptions for certain organizations that objected to contraceptive coverage, including nonprofit religious organizations[37] and closely-held for-profit entities.[38] To maintain the spirit of providing coverage for preventive health services under the Public Health Service Act section 2713, the previous Administration established an accommodation so that women employed by exempt organizations could continue to have access to all FDA-approved contraceptive methods without cost sharing and at no cost to the employer.[39] Congress did not intend that a broader group of employers be exempt from ACA protections, other than an explicit exemption for grandfathered health plans. The original exemption and accommodation were limited to religious employers and closely-held private companies contemplated by Congress. Congress' intent was to strike a balance to preserve the ability of individuals to maintain their existing coverage while ensuring access to affordable essential coverage and improving the quality of coverage.[40] As the Supreme Court recognized, the accommodation process "seeks to respect the religious liberty of religious nonprofit corporations while ensuring that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage."[41]

---

[34] 45 CFR 147.130(a)(1)(iv); 29 CFR 2590.715-2713(a)(1)(iv); 26 CFR 54.9815-2713(a)(1)(iv).

[35] National Women's Law Center. Accessed October 29, 2017 at https://nwlc.org/resources/new-data-estimate-62-4-million-women-have-coverage-of-birth-control-without-out-of-pocket-costs/.

[36] Nora v. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 health affairs 1204 (July 2015) *available at* http://content.healthaffairs.org/content/34/7/1204.abstract.

[37] 45 CFR 147.131; 29 CFR 2590.715-2713A; 26 CFR 54.9815-2713 (published July 2, 2013).

[38] 45 CFR 147.131; 29 CFR 2590.715-2713A; 26 CFR 54.9815-2713 (published July 14, 2014).

[39] 45 C.F.R. § 147.131(b) & (c)(2).

[40] 75 FR 34540.

[41] *Hobby Lobby Stores*, 134 S. Ct. at 2759.

00427851

Exhibit 34

JA-0000713



Planned Parenthood Affiliates of California

The IFRs stand Congress' intent on its head. They put contraceptive coverage in the hands of women's employers, who may decide if contraceptive methods, or a subset of them, are covered. They also eliminate the accommodation. By so doing, they convert mandatory preventive benefits into optional ones.

Moreover, the tri-Departments noted in the interim final rules that they were not aware of how many employers might exempt coverage.[42] It is unfathomable that the tri-Departments would promulgate policy without understanding the impact of that policy on the economy or public health. In California, 250 employers are self-funded and, thus, able to elect these exemptions if they choose. Indeed, 26 employers in California, employing more than 52,000 people, participated in one of the *Zubik* cases, indicating their desire to take advantage of a religious exemption to deprive their employees of contraceptive coverage. Many of these employers do not fall within the previous categories of religious organizations or closely held private corporations. Thus, we can anticipate that far more women will be impacted than the tri-Departments anticipated.

Bottomline – Without access to contraception through insurance coverage, women will face out-of-pocket costs for contraception, which will lead to women going without or not being able to select the method that is appropriate for their health needs. As a result, women will incur more health care costs and other health and economic consequences, and the rates of unintended pregnancy and abortion will increase.

Losing access to affordable contraception will have a detrimental impact on women and families. Family planning, and the consistent use of contraception, is the most cost effective way to reduce unintended pregnancies.[43] For every 1,000 unintended pregnancies, 42% will result in live births, 13% in miscarriages, and 45% in abortion.[44] Thus, reducing unintended pregnancies reduces expenses due to fewer delivery, miscarriage, or abortion costs.

In addition, there is a well-established link between contraceptive access and improved health outcomes (for women and infants) as well as educational and economic attainment. Decreases in the rate of unintended pregnancies and abortion over the long-term result in a corresponding

---

[42] 82 FR 47816.

[43] *Id.* at 15. 22; Bixby Center for Global Reproductive Health, UCSF, *Cost-Benefit Analysis of the California Family PACT Program for Calendar Year 2007*, at 6-7, 20 (April 2010).

[44] CHBRP Contraceptive Report, at 30, *citing* Kost K., *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends since 2002* (New York 2015).

00427852

Exhibit 34
JA-0000714



Planned Parenthood Affiliates of California

decrease in the risk of maternal mortality, adverse child health outcomes, behavioral problems in children, and negative psychological outcomes associated with unintended pregnancies for both mothers and children. Avoiding unintended pregnancies also helps women to delay childbearing and pursue additional education, spend additional time in their careers, and have increased earning power over the long term.[45]

**Despite the tri-Departments' statement that the IFRs would not change Federally-funded family planning services, the Administration has indicated their intention to and has already taken actions to limit access in these programs.**

The interim final rules assume women will maintain access under existing State and Federal programs.[46] These program, however, are restricted to low-income patients and by definition will not be able to provide for all who would lose access to contraceptive care through their employers. One of these programs is the Family Planning, Access, Care, and Treatment (Family PACT) program, established by California in 1996. Family PACT provides family planning, including contraceptive services, to California residents who are uninsured and have incomes at or below 200% of the Federal Poverty Level. The great majority of employees who might lose access to contraceptive coverage from their employers will simply not qualify for Family PACT or other government-funded programs.

Even if employees did qualify for government funded programs, the need for publicly funded contraception is already far greater than the supply. Recent research shows that nearly 20 million American women currently live in contraception deserts—defined by their lack of reasonable access to public health care sites offering the full range of contraceptive methods.[47] Nearly 10.5 million women live in counties without any access to a single publicly funded clinic offering the full range of contraceptive methods.

The safety net family planning system, including Title X and Medicaid, is already overburdened and underfunded. Publicly-funded systems provide contraceptive services to those that meet certain income thresholds. They were not designed, nor are they currently funded, to absorb patients who should be getting private contraceptive coverage.

---

[45] California Health Benefits Review Program, *Analysis of California Senate Bill (SB) 999 Contraceptives: Annual Supply*, A Report to the 2015-2016 California State Legislature, at 1 (March 28, 2016, revised May 3, 2016) (hereinafter CHBRP Contraceptive Report).

[46] 82 FR 47803

[47] The National Campaign to Prevent Teen and Unplanned Pregnancy, Birth Control Access by County, Accessed on October 28, 2017 at https://thenationalcampaign.org/deserts.

00427853

Exhibit 34                                                                                          JA-0000715



Planned Parenthood Affiliates of California

Title X, for example, established in the Public Health Services Act in the 1970's with strong bipartisan support, supports the delivery of family planning and related services, including the full range of contraceptive methods and breast and cervical cancer screenings, to more than four million patients nationwide. Without Title X funding, the number of unintended pregnancies, unplanned births, and abortions each year in the United States would be 68% higher.[48] Title X would need at least $737 million allocated annually to provide care to all women in need of publicly funded family planning care.[49] This estimate was developed before the tri-Departments' gross expansion of exemptions for contraceptive coverage. The estimate would be much higher now that millions of women's contraceptive coverage could be eliminated.

And, to add insult to injury, the current Administration has targeted government-funded reproductive health services for reduction or elimination. Both the Administration and Congress are attempting to limit the scope of services as well as the network of providers who are eligible to offer them.

Earlier this year, Congress and the Administration took actions to undermine the Title X program. The Administration signed a law (H.J. Res. 43) that struck down a regulation that prohibited the discrimination of certain providers, including Planned Parenthood, in the Title X program and ensured women access to the full range of family planning providers and services in their communities. The Administration next changed the Title X grant period from a three-year term to a one-year term in anticipation of administrative changes to the program. Finally, it cut funding for existing Title X grants for research to improve service delivery, quality of care, and patient satisfaction. These destructive actions will put further strain on the family planning safety net and family planning programs that the tri-Departments misguidedly claim will provide women access who lose coverage through their employer.

As to providers, the President's FY 2018 Budget to Congress prohibited any funding to Planned Parenthood, including Title X and Medicaid.[50] Congress has made repeated attempts to prohibit Planned Parenthood from receiving Medicaid reimbursement for services provided via ACA repeal efforts and the appropriations process. In California, Planned Parenthood provides 40% of government-funded family planning services. Without Planned Parenthood, women without contraceptive coverage will have difficulty finding another source of contraception that is

---

[48] Frost JJ et al., *Contraceptive Needs and Services, 2014 Update*. New York: Guttmacher Institute. 2016, https://www.guttmacher.org/report/contraceptive-needs-and-services-2014-update.

[49] August, EM et al., *Projecting the unmet need and costs for contraceptive services after the Affordable Care Act*. American Journal of Public Health. 2016 February: 106(2): 334-341.

[50] Office of Management and Budget. President's Budget Fiscal Year 2018. Appendix Budget of the U.S. Government. Accessed October 28, 2017 at https://www.gpo.gov/fdsys/pkg/BUDGET-2018-APP/pdf/BUDGET-2018-APP.pdf.

00427854

Exhibit 34                                                                                                                    JA-0000716



Planned Parenthood Affiliates of California

accessible and within a reasonable distance. Federally Qualified Health Centers (FQHCs) do not have the capacity or specialty care to fill the gap if Planned Parenthood is defunded. FQHCs in total provide less than half the number of contraceptive services than does Planned Parenthood, and individual FQHCs provide far fewer contraceptive services than does the typical Planned Parenthood clinic.[51]

Congress also has tried to block grant the Medicaid program, with the most recent effort slashing Federal funding by an estimated $61.6 billion.[52] This would significantly cut federal funding to Medi-Cal and access to affordable health insurance.

For all these reasons, the suggestion that women will be able to maintain access to contraceptive care by participating in government-funded programs if their employers elect the religious or moral exemption and refuse coverage is wrong and should be rejected.

**The interim final rules will increase use of Federal programs, shifting costs from employers to tax-payers, with a significant increase to Federal and State spending.**

The tri-Departments argue that women would not be harmed or denied access because publicly funded contraception is available to them.[53] Ironically, the interim final rules would shift the cost of providing contraceptive coverage from employers who refuse to provide it to taxpayers by increasing the costs of government-funded at both the Federal and State level. For example, California's Family PACT program delivers family planning services, including contraception, at no cost to over 1.68 million people each year in California.[54] Pursuant to California's State Medicaid Plan, the Federal government is responsible for covering a portion of the Family PACT and Medi-Cal managed care programs for reproductive health care services. The State of California covers the remainder. For every dollar spent on family planning services in California, the Federal government contributes 77.49 cents while the State spends 22.51 cents. If women who previously received contraceptive coverage through their employers were forced to seek coverage through Family PACT instead, the cost of that program to both the federal and state governments, and their taxpayers, would increase significantly.

---

[51] Congressional Research Service. Factors related to the use of Planned Parenthood affiliated health centers and Federally qualified health centers. Washington, DC: April 5, 2017.

[52] Garfield R et al. State-by-state estimates of changes in the Federal spending on health care under the Graham-Cassidy bill. Accessed on October 28, 2017 at https://www.kff.org/health-reform/issue-brief/state-by-state-estimates-of-changes-in-Federal-spending-on-health-care-under-the-graham-cassidy-bill/.

[53] 82 FR 47803.

[54] Bixby Center for Global Reproductive Health. University of California San Francisco. *Family PACT Program Report Fiscal Year 2013-2014*, at 5 (Bixby Annual Report).

00427855

Exhibit 34



Planned Parenthood Affiliates of California

For those women who lose employer coverage and have incomes greater than 200% of the federal poverty line, the cap for Family PACT participation, it can be expected that their rates of unintended pregnancy will increase dramatically. Research shows that the rate of unintended pregnancies for those who do not use contraception is 45%.[55] In the past twenty-five years, California's Family PACT Program has been responsible for causing: the rates of unintended pregnancy and unplanned births to decline 82%[56]; the teen birth rate to decline by 71%[57]; and the number of abortions to fall by 50%.

The decrease in unintended pregnancy and abortion has saved California, and both Federal and state taxpayers, enormous amounts of money. The IFRs, as published, will cause pregnancy rates to rise, and both California and the Federal government will be forced to pick up the attendant costs.[58] Sixty-four percent (64%) of all unintended births in California are paid for by public insurance through Medi-Cal, the Children's Health Insurance Program, and the Indian Health Service. California Health Benefits Review Program (CHBRP) recently estimated that each pregnancy averted saves California $15,364 in increased costs for delivery, abortion, and miscarriage management.[59] All told, unintended pregnancies cost California $689 million each year and the Federal government $1.062 billion.[60]

There are additional public sector costs stemming from unintended pregnancy. Low income pregnant women can qualify for several public health and social programs, which provide free or low-cost services before and after delivery for themselves and their children. One study, done over a decade ago, found that each unintended pregnancy cost the public sector $6,557 in medical, welfare, and other social service costs for a woman and child up to age two.[61] The savings were $14,111 from conception to age five.[62] The State's share of these costs is 33.1%,

---

[55] CHBRP Birth Control Report, at 22, *citing* Finer LB, Zolna MR, Declines in Unintended Pregnancy in the United States, 2008-2011. *New England Journal of Medicine 2016*; 374(9): 843-852.
[56] Guttmacher Institute, *State Facts on Publicly Funded Family Planning Services: California* (Sept. 2016), https://www.guttmacher.org/fact-sheet/state-facts-publicly-funded-family-planning-services-california
[57] *Id.*
[58] The Regulatory Impact Analysis and Federalism Analysis published with the interim final rules are insufficient in their analysis. A thorough analysis would have taken into consideration the cost shifting and increased spending as a result of these policies, both in how costs would shift to Federal government programs and the shift of costs or burden to States.
[59] California Health Benefits Review Program, *Analysis of California Senate Bill (SB) 999 Contraceptives: Annual Supply*, A Report to the 2015-2016 California State Legislature, at 10, 30 (March 28, 2016, revised May 3, 2016)("CHBRP Report").
[60] Guttmacher Institute, *Public costs from unintended pregnancies and the role of public insurance programs in paying for pregnancy-related care*, February 2015. Accessed on October 25, 2017 at https://www.guttmacher.org/sites/default/files/report_pdf/public-costs-of-up-2010.pdf.
[61] Bixby Center for Global Reproductive Health, UCSF, *Cost-Benefit Analysis of the California Family PACT Program for Calendar Year 2007*, at 20 (April 2010).
[62] *Id.*

00427856

Exhibit 34

JA-0000718



Planned Parenthood Affiliates of California

and the local government's share is 0.6% from conception to age two.  For conception to age five, the State's share is 33.5% and local 0.3%.[63]  It is with certainty that these interim final rules will increase the use of Federal programs, shifting costs from employers to tax-payers, with a significant increase to Federal and State spending.

\*        \*        \*

Family planning services, including contraception, is widely recognized as one of the greatest public health achievements in the 20th century.[64]  California has a long history of protecting and expanding access to reproductive and sexual health care as well as individuals' reproductive health rights.  We oppose any actions by HHS that would infringe on California's laws.  A sample of some of these laws include the recently signed Freedom of Choice in Family Planning (SB 743) that protects access of Medi-Cal beneficiaries to their preferred providers; the Contraceptive Coverage Equity Act (SB 1053) that guaranteed access to the full range of FDA-approved birth control methods without out-of-pocket costs; the Reproductive Privacy Act that protects Californians' fundamental right to choose a safe and legal abortion; and a series of laws that ensure emergency contraception is accessible, including allowing pharmacists to dispense emergency contraception under statewide protocol approved by the Medical Board of California and the Board of Pharmacy.

We strongly oppose any policy, including these interim final rules, that would undermine California protections for access to sexual and reproductive health services. We believe that the tri-Departments interim final rules expanding exemptions from contraceptive coverage are dangerous and reckless to the health and well-being of women.  An employer's religious beliefs should not be able to override a woman's own religious or moral views and her health care needs.  Women deserve insurance coverage for birth control, no matter where they work.  We encourage the tri-Departments to steer away from a pro-faith, anti-choice directive and return to implementing a vision for the Department that fosters its mission to "enhance the health and well-being of individuals by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services."

We submit these comments in support of our mission to create a personally and politically safe climate in which individuals have universal and unfettered access to sexual and reproductive

---

[63] *Id*. at 21.

[64] https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm

00427857

Exhibit 34

JA-0000719



Planned Parenthood Affiliates of California

health service and are free to follow their own beliefs, values, and moral code when making decisions about these services.

We appreciate your consideration of our comments. If you have any questions, please contact Beth Parker at 916-233-3762 or beth.parker@ppacca.org.

Sincerely,

Beth H. Parker
Chief Legal Counsel
Planned Parenthood Affiliates of California

00427858

Exhibit 34                                                                        JA-0000720

CATHOLICS
FOR
CHOICE

IN GOOD CONSCIENCE

December 5, 2017

The Honorable Seema Verma
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC, Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, MD 21244-1850

**RE: Comment in Response to "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act; Proposed Rulemaking"**

Dear Administrator Verma,

On behalf of the majority of the more than 70 million Catholics in the United States—more than 80 percent of whom believe that using contraception is a moral choice[1] —we are dismayed at the actions taken by the Departments of Health and Human Services, Internal Revenue Service and Employee Benefits Security Administration (hereinafter the "Departments") in this Interim Final Rule (hereinafter the "Rule"). This Rule dramatically expands the exemption to the Affordable Care Act's (hereinafter the "ACA") contraceptive coverage requirement to allow any employer—private or public, religious or secular—to deny coverage for contraceptives based on any religious or moral objection. While the Departments state their intent to protect religious freedom, their actions to broaden the type of employers who may utilize the exemption prioritizes illegitimate "religious liberty" claims of institutions over the true religious liberty rights and healthcare needs of individual workers and their dependents.

When determining the essential health benefits that must be covered by insurers under the ACA, the architects of the law deemed contraception and family planning services an integral component of women's healthcare. The ACA's commitment to ensure contraceptive access for all women should be realized through government prioritizing individual privacy, religious liberty and healthcare rights, not by expanding the "rights" of institutions. The original exemption for "religious institutions" already leaves out too many women. The Rule's expanded exemption would allow any employer or insurance provider to deny coverage for contraceptives, dramatically increasing the number of women who are unable to access this essential benefit. The hundreds of thousands of women who work for Catholic and other religious institutions, organizations and universities, as well as women who work for secular employers who might object, all deserve the same access to contraceptive services that the Departments have required for others.

*(continued)*

PRESIDENT

BOARD OF
DIRECTORS

Exhibit 35

Out of respect for individual conscience, religious liberty, social justice, workers' rights and the human dignity of each person, we urge the Departments to reconsider expanding the already considerable exemption from the contraceptive benefit. We offer our comments as a representation of the lived reality of everyday Catholics who need and use contraception, bolstered by our research into the devastating impact that restrictions upon reproductive healthcare services have on Catholics and non-Catholics alike. We also ask the Departments to uphold real religious liberty instead of allowing the views of one's employer or insurer to trump the beliefs of American women.

We call on the Departments to consider first and foremost the impact on employees' health needs, rights to conscience and religious liberty to ensure the benefit of this critical preventive health service is available for all, regardless of their boss' beliefs.

**Religious Liberty and Conscience Protections: Meant for the Individual**

Universal access to preventive healthcare for all women, regardless of financial circumstances or whom they work for, respects employees' individual rights—both of conscience and religious liberty. The contraceptive coverage requirements infringe on no one's conscience, demand no one change her or his religious beliefs, discriminate against no woman or man, put no additional economic burden on the poor, interfere with no one's medical decisions and compromise no one's health.

Catholic teaching compels us to listen to our individual conscience in matters of moral decision making, and to respect other people's rights to do the same. This deference for the primacy of conscience extends to all women and to their personal decisions about which family planning methods are best for them and their families. We cannot and do not presume to tell others how best to listen to their own consciences as they make important decisions about whether or when to have children. Doing so would undermine the consciences of women who seek family planning services.

Our Catholic tradition also calls on us to defend true religious liberty, which honors individuals' rights to both the freedom to hold their own religion beliefs and the freedom from the imposition of another's religious beliefs on them. At its core, religious freedom is an expansive rather than a restrictive idea. It is not about telling people what they can and cannot believe or practice but giving people the ability to follow their own conscience in what they believe or practice. The protections extend to one's personal religious beliefs and practices, but they do not give entire institutions or individuals license to obstruct or coerce the exercise of another's conscience.

Religious liberty and conscience protections are meant for individuals. The religion clauses of the First Amendment prohibit the exercise of religion in a way that unduly restricts other persons from protecting their own interests that the law deems compelling. The Departments, in concert with the Office of the President[i] and the Department of Justice,[ii] rely on a misinterpretation of the Religious Freedom Restoration Act (hereinafter "RFRA") by suggesting that an employer or insurance provider's religious objections should be permitted to trump the beliefs of their employees and beneficiaries. In fact, such an accommodation is prohibited by RFRA, which was intended to protect individuals from suffering a "substantial burden"[iii] on their personal beliefs and practices through government action.

00373038

Exhibit 35    JA-0000722

Supporters of the Rule argue that employees of religious institutions generally hold the same beliefs or conduct their lives in a manner consistent with these restrictions. Therefore, they hold that no conflict will arise with the expanded exemption. The reality is quite different. By allowing institutions to assert religious objections to certain forms of essential healthcare, the office and cleaning staff of a house of worship are held to the same religious standard as the congregational leader. This is truly a shocking proposition.

The Rule only further expands the reach of these wrongful standards by permitting nonprofit organizations, corporations, colleges and universities, health insurance issuers and any other nongovernmental employers to impose their religious beliefs on others. It stretches the bounds of reasonableness to suggest that each and every health insurance enrollee holds the same beliefs about contraceptive services as their insurer or boss. By dramatically expanding the types of entities eligible for a religious exemption, these rules only facilitate employers' and insurers' ability to supersede the decision making of their employees and beneficiaries. This is a violation of conscience and religious liberty that must be curtailed, not broadened.

Protecting the freedom of conscience for all Americans no matter what their beliefs may be is indeed the job of the government. Public policy should be implemented to further the common good and to enable people to exercise their conscience-based healthcare decisions. Neither the freedom of conscience nor the freedom from religion should be misconstrued as extending these protections to institutions. To do so would ignore the moral agency of the many women who do not share the same beliefs as their employer or insurance provider.

We urge the Departments to correct the current, misplaced deference to the false "conscience" claims of institutions, rather than the actual conscience rights of individuals, and to reconsider implementing any policies that would expand this dangerous trend.

**Catholics Support Access to Contraception**

The vast majority of Catholics support equal access to contraceptive services and oppose policies that impede upon that access. Three in four Catholic voters (74 percent) oppose laws that allow companies and other institutions to use the owners' religious beliefs as a reason to deny services to employees or customers.[iv] Seventy-nine percent of Catholics believe that health insurance companies should be required to offer health plans that include birth control.[v]

Catholics' support for the full range of comprehensive services is unsurprising, despite the rhetoric espoused by the Catholic hierarchy. Restrictions like refusal clauses or obstacles like prohibitive costs affect Catholics just as often as non-Catholics, interfering with all women's ability to make their own reproductive choices. In fact, 99 percent of sexually active Catholics have used a modern contraceptive banned by the Vatican—a rate on par with non-Catholic women in the US.[vi]

The Rule's expanded exemption leaves behind the many women, Catholics and non-Catholics alike, who use birth control for both family planning and healthcare reasons. It is also an affront to true religious freedom in which certain elements of particular religions trample the beliefs and practices of

*Catholics for Choice, 12/05/2017*
Page **3** of **8**

00373039

Exhibit 35                                                                                          JA-0000723

individual women workers. The Catholic faith holds conscience to be the final arbiter in moral decision making, including decisions around reproductive healthcare. Our faith similarly demands respect for real religious liberty, ensuring that each individual can follow their conscience according to their own beliefs. In keeping with these ideals, we ask that any regulation regarding the requirement to include contraceptive coverage defer to the consciences of individual employees and ensure that their individual beliefs and decision making abilities regarding contraceptive use are neither obstructed nor coerced.

In addition to indicating respect for conscience and religious liberty, ensuring coverage for contraceptive services and counseling for every employee demonstrates sound judgment about the common good and directly complements our faith's dedication to social justice. As Catholics, we are called to show solidarity with and compassion for the poor. Expanding access to contraception by making it more affordable for all employees, no matter whom they work for, will make a difference in the lives of many women and their families.

**One Employee's Story**

During the ongoing debates surrounding the contraceptive benefit requirement, we heard from a Catholic school teacher, "Sandra," who received her insurance coverage directly from her local diocese and who was explicitly denied contraceptive coverage under the initial exemption for "religious institutions." Not only were we disappointed that the Departments ignored her conscience by allowing her employer to refuse contraceptive coverage under the religious institution exemption, we are dismayed that the Departments are considering allowing any employer, religious or secular, the right to refuse contraceptive coverage based on religious or moral objections.

Sandra, who used a pseudonym for fear of repercussions from her employer, was a science teacher at a Catholic school in the Midwest. As with almost all Catholic schools, Sandra's employers follow diocesan rules regarding employees' insurance—meaning no contraceptive coverage, regardless of medical necessity. When she first learned of the current contraceptive coverage exemption for "religious institutions," she was outraged. As she explained it to us, it added "insult to injury" by ignoring the healthcare needs of women like her and allowing her employers to deny her coverage.

Sandra lost coverage when she began working under the jurisdiction of her local diocese. This posed a significant hardship where she had taken a salary reduction in order "to go to work every day to do what I love." With no intention of having children in the near future, she and her husband had carefully considered their insurance plans and determined that it was more economical for them to remain on separate policies. Once she had to pay out of pocket for the birth control that was best for her, a non-generic prescription, they found their financial planning was all for naught.

If the Rule is allowed to stand, experiences like Sandra's will not be the exception, but instead will be common across the country for employees of both religious and secular, nonprofit and for-profit institutions alike.

00373040

Exhibit 35

JA-0000724

**The Exemption for "Religious Institutions"**

Our respect for individual conscience and religious liberty leads us to restate concerns from previous comments on the exemption for "religious institutions" from the Rule. Sandra's story is just one of the many we heard which exemplify why the previous exemption is harmful. We ask the Departments to reconsider expanding the existing exemption to any employer, which would deny even more women their conscience and religious liberty rights. Allowing employers of any kind to dictate what services their employees may access does not respect women's right to exercise their individual conscience or their right to follow their consciences in making decisions about what is best for their own health and that of their families. This deference for the primacy of conscience should extend to all women, regardless of their employers, and to their personal decisions about family planning. We urge the Departments to focus on ensuring that contraceptive access is available to employees of both religious and secular institutions.

Prior to this Rule, the earlier exemption for "religious institutions" allowed some entities to outright refuse to cover contraception. Employees had no recourse unless they could afford to pay for services out of pocket, eliminating access to essential healthcare for the many workers of churches, diocesan offices, convents and some Catholic schools. Instead of working to ameliorate this gap, this Rule only makes it more difficult for many working Americans to get the healthcare they need at a cost they can afford. We cannot accept the idea that some women are somehow more deserving of healthcare coverage than others simply because of where they work. This is unjust and downright discriminatory for the government to decide—as it would by allowing employers to refuse coverage for any of these basic services—that some women's well-being simply does not count.

Granting institutions the right to supersede the autonomy of very real women is an affront to the Catholic ideals of conscience, worker's rights, social justice and religious freedom. We urge the Departments to protect all women's access to comprehensive reproductive services, regardless of their employer or source of insurance.

With the expanded exemption, it will not only be Catholic school teachers like Sandra who will be denied coverage of contraceptive services because their health insurance is offered by the diocese. Now, Catholic school teachers whose health insurance is not offered by the diocese, workers at Catholic hospitals, employees of religious nonprofits, school teachers at secular universities, executives at for-profit corporations and countless others stand to lose coverage of contraceptive services based on their employer's beliefs.

**The Expanded Exemption**

The Rule expands the existing exemption to any employer with a religious or moral objection to contraceptive care. We are deeply concerned that the Departments would prioritize the interests of institutions while demonstrating a profound disregard for individual employees who will be hurt by religious and moral exemptions. These women (and their dependents), unlike institutions, have tangible healthcare needs and religious liberty rights and deserve government protection for both. Allowing any employer, religious or secular, to utilize this exemption would leave countless women, as

00373041

Exhibit 35

JA-0000725

well as the spouses and dependents covered by an employee's policy, excluded from a benefit the Departments determined to be the most basic, critical service that promotes women's essential health and wellbeing.[vii]

Expanding this exemption makes it more difficult for more women to obtain coverage and denies employees equal access to the critical preventive services the government has guaranteed to employees at all other places of employment. The regulations currently in place exempt employers at certain "religious institutions" from covering contraception while providing no recourse for these affected employees. The proposed expanded exemption similarly attempts to appease the demands of objecting religious and secular organizations without offering a solution for affected employees to ensure coverage for contraception. If even one woman finds her conscience trumped because of the Departments' rules, that would be one too many.

The Departments have embarked on a slippery slope by attempting to redefine, on the basis of employment, the appropriate subject of religious freedom and conscience protections. Not only will expanding the exemption allow some employers to dictate what contraceptive services their employees may access, but it could pave the way for employers to deny any services to employees that they may object to on a religious basis. Allowing this exemption does nothing to prevent future objections to providing health insurance coverage for end-of-life care, prenatal care for an unmarried pregnant woman or coverage for the spouse of an LGBT employee. These deeply personal decisions— about medical treatment, family, and self-determination—belong with individuals, not employers or insurers.

The Departments should defer to the consciences of individual employees and ensure that their individual beliefs and reproductive decision making are neither obstructed nor coerced. We urge you to respect the consciences of all individual employees and beneficiaries—whether employed by secular organizations, "religious institutions" or "religious organizations"—by providing them with equal access to no-cost contraception. We ask the Departments to prioritize the human impact of this Rule and reconsider any expansion to the already burdensome religious exemption to the contraceptive coverage requirement.

**Estimating the Impact on Women**

Coverage for the full range of contraceptive methods approved by the Food and Drug Administration is essential for allowing women to make their own decisions about which option is best for them, no matter their circumstances. The purpose of the ACA's contraception requirement was to ensure affordable, accessible, meaningful and stable access to reproductive health services. The existing exemption does nothing to achieve this purpose, and expanding the exemption to further conform to misguided perception of religious liberty will similarly fail to fulfill this purpose.

Expanding access to contraception by making it more affordable does make a difference in the lives of many women and their families. Each woman's ability to prevent unintended pregnancies, to regulate health conditions, to prevent sexually transmitted diseases and, in some cases, to avoid potentially life-threatening pregnancies, matters. It is unethical and harmful to leave any woman without

00373042

Exhibit 35

coverage for these services simply because of where she works. There is no acceptable religious or political justification to the contrary.

The expanded exemption will put any employee or insurance beneficiary at risk of losing contraceptive coverage at the dictates of an employer's beliefs. This includes preventing more than 520,000 full-time and 215,000 part-time employees at Catholic hospitals, as well as their dependents, from accessing the contraceptive coverage that other workers are guaranteed by law.[viii] The thousands of workers at Catholic social service organizations, at businesses and nonprofits large and small, both secular and religious, could be denied equal respect for their consciences and denied their ability to make their own healthcare decisions without employer interference.

With this Rule, any employee of any institution stands to lose access to such coverage if the Departments do not ultimately ensure that their rights are always considered first and foremost, rather than continuing to bend to the will of unappeasable litigants. This includes the hundreds of thousands of employees at the 227 Catholic colleges and universities in the United States.[ix] The University of Notre Dame acted quickly to deny its students and employees access to contraception when the Rule was released in October 2017, causing great confusion for the women who depend on that benefit. The university has since revised its stance in the wake of pushback from members of their community. We wholly anticipate similar frustration for women across the country, should the Departments adopt the proposed rules.

The experience of Catholic and non-Catholic female employees and students demonstrates the government has an additional compelling interest in protecting the religious freedom of these employees regardless of their faith. The decision to use or not use contraceptive coverage should be up to each individual, according to her conscience and personal beliefs, not subject to the beliefs of her employers or those seeking to impose their ideologies on others.

We remain hopeful that the Departments will reconsider imposing undue burdens on workers by expanding the religious exemption and that the federal government will ensure that all employees, Catholics and non-Catholics alike, will be able to listen to their consciences and will, in turn, have their religious liberty protected.

**Conclusion**

This Rule dramatically expands the entities that may qualify for a religious exemption to the contraception coverage requirement, allowing an even greater number of institutions and organizations a free pass to trample employees' consciences and religious freedom. We ask that the Departments protect the tangible healthcare needs and religious liberty rights of female employees and insurance beneficiaries who stand to lose their autonomy under these rules.

Allowing any employer, religious or secular, to utilize this exemption would leave countless women, as well as the spouses and dependents who are covered by an employee's policy, excluded from a benefit the Departments determined to be the most basic, critical service that promotes women's essential health and wellbeing. The current exemption for "religious institutions" left too many

00373043

Exhibit 35                                                                                          JA-0000727

women without affordable access to the healthcare they need from the start. We encourage the Departments to reconsider the expanded exemption and avoid compounding earlier mistakes by permitting any employer, religious or secular, to impose additional barriers to care and leave many more women behind.

We hope that the Departments will demonstrate a commitment to the common good by protecting the individuals who stand to lose the most under the Rule. Deeply personal decisions about reproductive health and family should be made by individuals, not employers or their insurance provider. Rather than prioritizing what services are covered, what money is used and what institutions are granted exemptions, the Departments should focus on the human impact of these exemptions.

By reversing this Rule and promoting access to comprehensive reproductive care for all women, the Departments will ensure that contraception is "affordable, accessible, meaningful and stable."[x] On behalf of the thousands of Catholic and non-Catholic women who stand to lose access to essential care, we implore the Departments to consider the health and religious freedom of individuals first and foremost— not the religious beliefs of employers and insurers.

We urge the Departments to rescind this Interim Final Rule without delay.

Respectfully,

Jon O'Brien
President

---

[i] Promoting Free Speech and Religious Liberty, Exec. Order No. 13798, 82 Fed. Reg. 21675 (May 4, 2017), https://www.federalregister.gov/documents/2017/05/09/2017-09574/promoting-free-speech-and-religious-liberty.
[ii] US Dept. of Justice, Memorandum for All Executive Departments and Agencies: Federal Law Protections for Religious Liberty (October 6, 2017), https://www.justice.gov/opa/press-release/file/1001891/download.
[iii] Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*, http://uscode.house.gov/view.xhtml?path=/prelim@title42/chapter21B&edition=prelim.
[iv] Beldon Russonello Strategies, *Catholic Voters and Religious Exemption: A National Opinion Survey for Catholics for Choice, Call to Action, DignityUSA and Women's Alliance for Theology, Ethics and Ritual (WATER)* (October 2014).
[v] Beldon Russonello Strategies, *2016 Survey of Catholic Likely Voters, Conducted for Catholics for Choice* (September 2016).
[vi] National Survey of Family Growth, October 2012, http://www.cdc.gov/nchs/data/nhsr/nhsr062.pdf.
[vii] The Institute of Medicine of the National Academies, "Clinical Preventative Services for Women: Closing the Gaps," 2011.
[viii] Catholic Health Association of the United States, "Catholic Health Care in the United States," January 2017.
[x] P.J. Kenedy & Sons, *The Official Catholic Registry Anno Domini (2016)* (PJ Kenedy & Sons, 2016), 2035.
[x] 77 Red. Reg. 55, 16507 (March 21, 2012).

00373044

Exhibit 35                                                                                          JA-0000728

# Center for American Progress

1333 H Street, NW, 10ᵗʰ Floor
Washington, DC 20005
Tel: 202 682 1611 • Fax 202.682.1867

www.americanprogress.org

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

**RE: CMS-9940-IFC**                    Dec. 5, 2017

Dear Acting Secretary Hargan,

The Center for American Progress (Center or CAP) is committed to ensuring that all individuals have access to quality, affordable health care, including contraceptive coverage. The Center is a non-partisan think tank committed to improving the lives of all Americans through bold, progressive ideas, as well as strong leadership and concerted action. CAP's Women's Initiative is a comprehensive program to ensure that women are at the center of the national policy debates critical to the economic stability, health, and overall well-being of families. By explicitly connecting women's health, women's leadership and economic security – CAP recognizes that any policy agenda that does not lift up the importance of all issues will be incomplete.

The Center unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR) "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act." The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2] If implemented, this rule could negatively impact the millions of women who rely on affordable contraception each year to plan their families and their futures.

By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure Act (APA). Additionally, the IFR ignores Congress's explicit intent that the ACA require coverage of contraception, and the IFR is predicated upon a distorted picture of the

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

Progressive Ideas for a Strong, Just and Free America

00373046

Exhibit 36                                JA-0000729

www.americanprogress.org

science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons The Center calls on the Departments to rescind the IFR.

## I.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"[3] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[4] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[5]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving

---

[3] 5 U.S.C. § 553(b), (c).
[4] 5 U.S.C. § 553(d).
[5] 5 U.S.C. § 706.

Progressive Ideas for a Strong, Just and Free America

00373047

Exhibit 36                                                                                    JA-0000730

www.americanprogress.org

contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[6] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed the Departments' statutory jurisdiction, authority, or limitations.[7]

For each of these reasons, the rule violates the APA and should be rescinded.

## II.    Coverage of Birth Control is Vital to Women's Equality

Birth control is vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[8] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[9] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[10] which was followed by large increases in women's presence in law, medicine, and other professions.[11] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[12]

---

[6] 42 U.S.C. § 18114(1).

[7] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

[8] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[9] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012). http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[10] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[11] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.har vard.edu/handle/1 /2624453.

[12] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15. 2012).

Progressive Ideas for a Strong, Just and Free America

00373048

Exhibit 36                                                                              JA-0000731

www.americanprogress.org

## A.  Birth Control Is Critical to Women's Health

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[13] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[14] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[15] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[16] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[17] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[18] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[19]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[20] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[21]

---

[13] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.
[14] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.
[15] Ibid.
[16] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011). https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000): 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014),
http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.
[17] Sheila D. Rustgi et al., The Commonwealth Fund. *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.
[18] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).
[19] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.
[20] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.
[21] Ibid. at 103-104.

Progressive Ideas for a Strong, Just and Free America

00373049

Exhibit 36                                                    JA-0000732

www.americanprogress.org

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[22] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[23] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[24] And, the U.S. has the highest rate of maternal mortality in the developed world.[25] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[26] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non contraceptive purposes.[27] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[28] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[29, 30]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, disability, or sexual orientation. The IFR will particularly affect certain populations of women, including low-income women, women of color, and women with disabilities.

For women of color, the ACA contraceptive mandate filled a much-needed gap in access to reproductive healthcare. Women of color have historically faced insurmountable and systemic

---

[22] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[23] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.
[24] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.
[25] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.
[26] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.
[27] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.
[28] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.
[29] Ibid.
[30] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017.

Progressive Ideas for a Strong, Just and Free America

00373050

Exhibit 36

JA-0000733

www.americanprogress.org

barriers to accessing affordable contraception – and as a result, both Hispanic and black women are less likely to use effective mentions of contraception compared to white women.[31] Accordingly, the rate of unintended pregnancy for Hispanic and black women is significantly higher than for white women – 58% and 79% respectively, compared to 33% for white women.[32] As women of color are more likely to experience economic hardship than white women,[33] the cost of contraception is more likely to be prohibitive for them. The ACA mandate provided women of color with critical access to affordable contraception that they otherwise would not have been able to access. As detailed in this comment, affordable contraception is critical for women's economic security and well-being, and the gains in access made by women of color as a result of the ACA mandate help strengthen the economic security and well-being of the group as a whole.

Limiting contraception options in this manner will also be disproportionately harmful to women with disabilities. There are 15 million women with disabilities in the reproductive age groups (ages 16–50), in need of contraception.[34] They require the same options and ability to receive contraceptive care as all women.[35] As stated above, women with disabilities have a number of additional barriers than women without disabilities with respect to receiving health care, including barriers to access that are physical or structural (*e.g.*, no ramps to enter buildings, or exam tables do not lower to transfer a wheelchair user to the table),[36] socioeconomic factors, as well as educational gaps on the part of medical providers and on the part of disabled women themselves.[37] For example, women with intellectual disabilities may lack knowledge about methods of contraception and their usefulness, and clinicians may disregard achieving informed consent, "wrongly equating certain diagnoses with an inability to understand or communicate at the requisite level."[38]

Additionally, because the disabled community includes a wide variety of disabilities, it also requires a close assessment of different contraceptive needs. The term "disability" broadly includes those with physical, developmental, and/or intellectual disabilities. Some contraceptive methods help women with disabilities in unique and pertinent ways. For example, women with physical disabilities may have certain physical limitations in their ability to use some menstrual

---

[31] Christine Dehlendorf, Seo Young Park, Chetachi A. Emeremni, Diane Comer, Kathryn Vincett, Sonya Borrero, "Racial/ethnic disparities in contraceptive use: Variation by age and women's reproductive experiences," *American Journal of Obstetrics and Gynecology,* 210 (6)(2014): 526.e1-526.e9.

[32] Heidi Williamson. "ACA Repeal Would Have Disproportionately Harmed Women of Color," (Washington: Center for American Progress, 2017), available at https://www.americanprogress.org/issues/women/news/2017/08/15/437314/aca-repeal-disproportionately-harmed-women-color/.

[33] John Halpin, "A New Force for America's Families," (Washington: Center for American Progress, 2014) available at https://www.americanprogress.org/issues/race/reports/2014/01/12/81907/a-new-force-for-americas-families-2/.

[34] Sandra L. Welner, *Contraceptive Choices for Women with Disabilities,* Sexuality and Disability, Vol. 17, No.3, Sept. 1999, at 209.

[35] Ibid.

[36] Clair Kaplan, *Special Issues in Contraception: Caring for Women with Disabilities,* J. Midwifery Women's Health, 2006;51(6):450-456; Anita Silvers et al., *Medicine and Society: Reproductive Rights and Access to Reproductive Services for Women with Disabilities,* 18 American Medical Association Journal of Ethics 430 (2016).

[37] Anita Silvers et al., *Medicine and Society: Reproductive Rights and Access to Reproductive Services for Women with Disabilities,* 18 American Medical Association Journal of Ethics 430 (2016).

[38] Ibid.

Progressive Ideas for a Strong, Just and Free America

00373051

Exhibit 36

JA-0000734

www.americanprogress.org

hygiene products or contraceptive methods such as female condoms.[39] Women with cognitive disabilities may have difficulty understanding how to take care of their menstrual hygiene and may need to utilize a contraceptive method such as an IUD or implant that helps diminish that need.[40] Additionally, some women with disabilities may be allergic to latex condoms, such as women with spina bifida, and can only rely on alternative contraceptive methods.[41] Accordingly, women with disabilities depend on a full range of contraceptive methods to address the particular needs or challenges posed by individual disabilities.

There are other special considerations for women with mobility and cognitive issues. If mobility is an issue, oral contraceptive pills ("OCP") may not be the best option because it could increase their risk of deep vein thrombosis ("DVT").[42] Depo shots may not be the best option for these women because it may cause weight gain and decreased bone density.[43] Some disabled women may have difficulty swallowing, and OCPs may not be the best option; rather, the patch or vaginal ring may be a better option.[44] Women with pelvic issues should avoid using IUDs as they may not feel perforation.[45] If a woman has cognitive or memory issues, she would probably want to use the patch or vaginal ring rather than OCPs, which must be taken every day at around the same time.[46] Thus, the IFR could negatively impact these considerations within the disabled community. Not only would it widen the educational gap in recognizing that different kinds of disabilities require different kinds of contraceptive care between doctors and disabled women, but also it would increase the lack of comprehensive health care for disabled women.

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## B. Access to Birth Control Increases Women's Educational Attainment and Economic Empowerment

The costs and availability of health care, namely reproductive health care, are critical for women to be able to make sound decisions about work, education, and their lives overall. Their ability to take advantage of workplace opportunities is directly linked to their ability to access

---

[39] Clair Kaplan, *Special Issues in Contraception: Caring for Women with Disabilities*, J. Midwifery Women's Health, 2006:51(6):450-456.
[40] Ibid.
[41] Ibid.
[42] Ibid.
[43] Ibid.
[44] Ibid.
[45] Ibid.
[46] Ibid.

Progressive Ideas for a Strong, Just and Free America

00373052

Exhibit 36

JA-0000735

www.americanprogress.org

reproductive health services and plan their families. Women's early career choices, which often take place during their peak reproductive health years, affect their lifetime earnings and retirement security.

The IFR will have a deleterious impact on girls and women, possibly leading to unintended pregnancies that will make it harder for girls[47] to complete high school and college, and ultimately impacting their ability to become economically independent, contributing, fulfilled members of society. Over the past twenty years, the teen pregnancy rate has plummeted[48] and simultaneously, the high school graduation rate has climbed[49] to the highest point in history. College-going rates are at an all-time peak too.[50] Most young women aspire to finish high school and go to college. According to polls, 90% of young people want to attain a college degree.[51] Yet, the harsh reality of teenage pregnancy can set them back. Only 40 percent of teen mothers finish high school and fewer than 2 percent finish college by age 30.[52]

These young women, who become parents unexpectedly, struggle to finish their secondary education, much less fulfill their dreams of higher education and the economic self-sufficiency that comes with it. This situation has negative educational consequences not just in the near term, but also for future generations.[53] Access to birth control has particularly important consequences for educational attainment because of the timing of high school and college degrees.[54] Access to free contraception can mean the difference between completing high school and college and not.

Access to contraception also has important consequences for women's economic and career empowerment. A small body of economics research, for example, has looked at how access to reproductive health care—such as the availability of the pill—increased women's economic opportunities when women were granted legal access to birth control at different times across states. Women were better able to invest in their careers, access higher education across more fields, and increase their labor force participation over the course of their lives.[55]

---

[47] America's Promise, "Close link between teen pregnancy and high school dropouts detailed in new report," available at http://www.americaspromise.org/news/close-link-between-teen-pregnancy-and-high-school-dropouts-detailed-new-report.

[48] Guttmacher Institute, "What Is Behind the Declines in Teen Pregnancy Rates?" available at https://www.guttmacher.org/gpr/2014/09/what-behind-declines-teen-pregnancy-rates.

[49] National Center for Education Statistics, "Fast Facts: Dropout Rates," available at https://nces.ed.gov/fastfacts/display.asp?id=16.

[50] National Center for Education Statistics, "Undergraduate Enrollment," available at https://nces.ed.gov/programs/coe/indicator_cha.asp.

[51] The Atlantic, "College Is Still the Promised Land for High-School Students," available at https://www.theatlantic.com/education/archive/2016/09/college-is-still-the-promised-land-for-high-school-students/499865/.

[52] National Conference of State Legislatures, "Not Making the Grade: Academic Achievement Difficult for Teen Parents," available at http://www.ncsl.org/research/health/teen-pregnancy-affects-graduation-rates-postcard.aspx.

[53] National Conference of State Legislatures, "Teen Pregnancy Prevention," available at http://www.ncsl.org/research/health/teen-pregnancy-prevention.aspx.

[54] Ibid.

[55] Claudia Goldin and Lawrence F. Katz, "The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions," *Journal of Political Economy* 110 (4) (2002): 730-770, available at https://dash.harvard.edu/bitstream/handle/1/2624453/Goldin_PowerPill.pdf?sequence=4.

Progressive Ideas for a Strong, Just and Free America

00373053

Exhibit 36

JA-0000736

www.americanprogress.org

One study by economist Martha Bailey—"More Power to the Pill"—found that labor force participation rates are higher among women ages 26 through 30 who live in states that have longer histories of legal access to the pill.[56] The ability to plan when and how to have a family through access to contraception enabled women to remain in the labor force during these crucial years for career-building. These years are important for job experience and career development and affect lifetime earnings trajectories. Previous research by CAP found that parents who leave the workforce to provide child care face a long-term financial penalty in the form of lost wages, lost wage growth, and lost retirement savings.[57] In "Calculating the Hidden Cost of Interrupting a Career for Child Care," CAP found that "workers can expect to lose up to three or four times their annual salary for each year out of the workforce" precisely because most parents have children when they are young, and lost earnings early in a career translate into significant losses over a long-term trajectory. This is because skills beget skills, and early loss in skills-building results in depreciation of skills later on.

Furthermore, women's ability to ensure control over their reproduction affected their investments in human capital that increased their earnings, as well as how they participated in the labor force. In another paper by Martha Bailey, "The Opt-In Revolution? Contraception and the Gender Gap in Wages," she finds that states where younger women had access during the time period when laws were changing led to an 8 percent wage premium for those women by age 50.[58] Her findings imply that access to the pill accounts for 10 percent of the convergence, or closing, of the gender wage gap by 1980 and 30 percent by the 1990s. Ultimately, these factors influenced the convergence of the gender wage gap[59] in the 20 years following increased accessibility of the contraceptive pill, during the prime working years of the young women who first gained access.

We can understand how family responsibilities affect subsequent economic outcomes by looking at the difference in labor force participation based on number of children. The number of children a woman has affects her level of labor force participation, which in turn can affect her family's economic stability. For example, childless women and women with one child work nearly 10 more hours a week than women with three or more children.[60] This trend particularly

---

[56] Martha J. Bailey, "More Power to the Pill: The Impact of Contraceptive Freedom on Women's Life Cycle Labor Supply," *The Quarterly Journal of Economics* 121 (1) (2006): 289–320.

[57] Michael Madowitz, Alex Rowell, and Katie Hamm, "Calculating the Hidden Cost of Interrupting a Career for Child Care" (Washington: Center for American Progress, 2016), available at https://www.americanprogress.org/issues/early-childhood/reports/2016/06/21/139731/calculating-the-hidden-cost-of-interrupting-a-career-for-child-care/.

[58] Martha J. Bailey, Brad Hershbein, and Amalia R. Miller, "The Opt-In Revolution? Contraception and the Gender Gap in Wages" (Cambridge, MA: National Bureau of Economic Research, 2012), available at http://www.nber.org/papers/w17922.pdf.

[59] Francine D. Blau and Lawrence M. Kahn, "The US Gender Pay Gap in the 1990s: Slowing Convergence" (Cambridge, MA: National Bureau of Economic Research, 2004), available at http://www.nber.org/papers/w10853.pdf.

[60] Pew Research Center, "Paid Work Hours, by Number of Children" (2013), available at http://www.pewsocialtrends.org/2013/12/11/on-pay-gap-millennial-women-near-parity-for-now/sdt-gender-and-work-12-2013-1-07/.

Progressive Ideas for a Strong, Just and Free America

00373054

Exhibit 36

JA-0000737

www.americanprogress.org

hurts working mothers, who are more likely to work part-time to balance child care needs.[61] Not only do part-time workers earn less overall because they work fewer hours, but they also earn less per hour than full-time workers, creating a part-time wage penalty. Furthermore, a woman's gaps in employment can cause lower earnings that are never recovered. The planning and spacing of children can help reduce these gaps and protect a woman's lifetime earnings. Lower earnings compounded over time resulting in lower social security benefits can put women at greater risk for elderly poverty.[62] Planned childbearing helps women to better prepare for these transitions.

### C. Religious Liberty Must Not be Used to Justify Discrimination and Erode Women's Equality

As the nation's health policy center, the Department of Health and Human Services' (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the Institute of Medicine and the Women's Preventive Services Initiative, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The IFR allows employers to impose their personal religious beliefs on their employees and disregards the religious liberty of all women seeking access to no-cost contraception.

While the administration claims the Religious Freedom Restoration Act permits exempting companies from the ACA's contraceptive coverage requirements, this is only lawful if contraception is provided at no additional cost to employees.[63] The IFR fails to do this. It expands eligibility for the complete exemption of houses of worship and any employer, including large publicly traded for-profit corporations, going far beyond existing religious protections under the law.[64] Contrary to the IFR's assertion that it is "unlikely" that a "religious publicly traded company might have objections to contraceptive coverage," a Freedom of Information Act request filed by CAP found over 50 percent of requests for a religious accommodation made to HHS from January 2014 to March 2016 under the previous rule were from for-profit corporations.[65] This rule erodes access to contraception and undermines women's autonomy by denying them the ability to make important decisions about their health care based on their religious beliefs. It legitimizes discrimination against women under the guise of religious liberty. The Departments make several false and misleading statements in this rule to undermine the contraceptive benefit. The Center unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

---

[61] Claire Cain Miller, "How a Part-Time Pay Penalty Hits Working Mothers" *The New York Times* TheUpshot blog, August 21, 2014, available at http://www.nytimes.com/2014/08/21/upshot/how-a-part-time-pay-penalty-hits-working-mothers.html.

[62] Ibid.

[63] *See Zubik v. Burwell*, 136 S. Ct. 1557; *Hobby Lobby*, 134 S. Ct. at 2786–87.

[64] Ibid.

[65] 82 Fed. Reg. at 47, 810-11. Laura Durso, Sharita Gruberg, Jamila Taylor, Theresa Chalhoub, "Who Seeks Religious Accommodations to Providing Contraceptive Coverage?" (Center for American Progress 2017) available at https://www.americanprogress.org/issues/lgbt/news/2017/08/11/437265/seeks-religious-accommodations-providing-contraceptive-coverage/.

- 10 -

Progressive Ideas for a Strong, Just and Free America

00373055

Exhibit 36

www.americanprogress.org

### III.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[66] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

#### A.    Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[67] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[68] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[69]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[70] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to

---

[66] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[67] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[68] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[69] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[70] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

- 11 -

00373056

Exhibit 36                                                                                                    JA-0000739

www.americanprogress.org

just over 4 million.[71] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[72] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[73] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[74] This is particularly true with respect to specialty providers, including OB/GYNs.[75] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

### B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

---

[71] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[72] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[73] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[74] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[75] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

Progressive Ideas for a Strong, Just and Free America

00373057

Exhibit 36

JA-0000740

www.americanprogress.org

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[76] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[77] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[78]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[79] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[80] The administration has not only signaled its support for these

[76] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.
[77] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.
[78] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.
[79] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.
[80] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

Progressive Ideas for a Strong, Just and Free America

00373058

Exhibit 36

JA-0000741

www.americanprogress.org

efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[81]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[82] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[83] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[84] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[85]

---

[81] The White House. Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act. 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[82] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[83] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[84] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[85] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

Progressive Ideas for a Strong, Just and Free America

00373059

Exhibit 36

JA-0000742

www.americanprogress.org

The Departments are wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

## IV.    Personal Stories

In response to the release of the IFRs, the Center's Generation Progress team created a share your story tool where individuals could share their personal stories around access to contraception and the importance to their own lives. Since October 6, 2017, CAP has received nearly 300 stories from 42 states and the District of Columbia. Many of the stories were from college students or recent graduate students citing how important birth control was in allowing them to graduate college and start a career before having kids. A number of stories were also from young parents who are grateful they had extra time to wait and get financially ready before having children. Below is a small sampling of the stories received, showing the many ways access to contraception is vitally important to women's lives.

*Affordable birth control has helped me to be in control of my personal life. It has shaped me into becoming a more responsible woman and adult. Because of affordable birth control, I have been able to accomplish all of my academic goals thus far. I am only 23 years old with two degrees working toward my paralegal degree and continuing my legal education by enrolling in law school next year.  Affordable birth control has positively impacted my life and the lives of my peers who were in college with me. It helps young women to truly be in control and make rational decisions when it comes to sex. It shows we think about the long-term effects of not just our lives but the lives of those who are knowingly and unknowingly involved in the act of sex.*

*Birth control has helped me to beat the odds and complete college at a top school without becoming a teen parent like my parents were. Now that I am older and married, birth control has helped my husband and I pursue our careers so we can build a bright future for ourselves and the children we will have some day. Birth control has also helped me treat pain and other symptoms from my endometriosis, which makes huge improvements in my quality of life and productivity at work.*

*As a cardiac transplant patient my birth control is a life saving precaution. My doctors and nurses have told me about how dangerous it would be if I were to become pregnant. It would not only be dangerous to me but it would be danger to the fetus.  I believe that women should have the right to decide when they are ready for children, or for women to decide that they do not want children of their own. But for me, taking away my birth control is risking my life.*

*Before I started using birth control in high school, I was unable to sit at my desk due to immensely painful cramping and awful soreness of my back. I would miss days of school because of how much pain I was in. Since I started birth control, I haven't missed a day of anything. My pain is less and I can resume a normal life while on my period because of my birth control.*

*My family doesn't have insurance because we could never afford it. Ever since I was 11, my period always brought with it unbearable cramps. They would get so bad that I would puke, or pass out from the pain. Thanks to Planned Parenthood, since I've been on birth control (3 years now), my cramps are mild at the worst. I'm also in a long-term relationship, but neither of us are*

- 15 -

00373060

Exhibit 36

JA-0000743



# Center for American Progress

1333 H Street, NW, 10ᵗ Floor
Washington, DC 20005
Tel: 202.682.1611 • Fax: 202.682.1867

www.americanprogress.org

*ready for kids, especially not financially. Thanks to the access and resources I have, I am able to focus on my career and not have to worry. Without the current policies in place, there is no way I will be able to afford my prescribed birth control.*

*My former husband was abusive. I didn't want to have a child with him and endanger the child.*

*Birth control makes me feel in control of my body, and that feeling is something that shouldn't be taken from me or anyone else.*

## V.    Conclusion

As detailed throughout this letter, access to contraception plays a critical role in multiple aspects of individual's lives, and is vital to women's continued progress toward equality. This rule would have a negative impact on individuals across the country, reversing the progress that has been made under the ACA. The IFR from the Trump administration is a gross perversion of religious liberty used to justify sweeping taxpayer funded discrimination against individuals based on their sexual orientation, gender identity, religion, sexual orientation, race and zip code. It's clear the Administration is determined to use every tool at their disposal to undermine equality in this country - and that includes blocking women of all backgrounds and faiths from getting affordable birth control. Given all of the reasons described above, the Center calls on the Departments to rescind the IFR.

Sincerely,

Winnie Stachelberg
Executive Vice President, External Affairs

- 16 -

Progressive Ideas for a Strong, Just and Free America

00373061

Exhibit 36                                                                                    JA-0000744

December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (RIN 0938-AT20; 1210-AB83; 1545-BN92)**

To whom it may concern:

The Center for American Progress ("CAP") writes to provide comments in opposition to the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, an interim final rule ("Religious Exemptions IFR") published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47792 *et seq.* as permitted by the Internal Revenue Service, Department of the Treasury; Employee Benefits Security Administration, Department of Labor; and Centers for Medicare & Medicaid Services, Department of Health and Human Services (collectively, "the Departments").

CAP is an independent, nonpartisan policy institute that is dedicated to improving the lives of all Americans through bold, progressive ideas, as well as strong leadership and concerted action. CAP believes America should be a land of boundless opportunity, where people can climb the ladder of economic mobility. We believe an effective government can earn the trust of the American people, champion the common good over narrow self-interest, and harness the strength of our diversity.

To meet these ends, we develop new policy ideas, challenge the media to cover the issues that truly matter, and shape the national debate. With policy teams in major issue areas including criminal justice, democracy and government, disability rights, economy, education, energy and environment, foreign policy and security, guns and crime, health care, immigration, LGBT, poverty, race and ethnicity, religion and values, and women's rights, CAP thinks creatively at the cross-section of traditional boundaries to develop ideas for policymakers that lead to real change. By employing an extensive communications and outreach effort that we adapt to a rapidly changing media landscape, we promote our ideas aggressively in the national policy debate. Although CAP is a multi-issue organization, we submit this comment today specifically to address the needs and concerns of the disabled community. We strongly believe that the Religious Exemptions IFR will have a negative impact on women, especially those in the disabled community. For these reasons, we submit this comment to bring to your attention the negative impact that the Religious Exemptions IFR will have on women in the disabled community.

Women with disabilities deserve equal access to affordable and comprehensive health care, including access to all contraceptive methods approved by the U.S. Food and Drug Administration ("FDA"). However, the Religious Exemptions IFR will exacerbate the many

1

00454811

Exhibit 37                                                                      JA-0000745

barriers women with disabilities already face when accessing health care. These barriers include disproportionately higher rates of poverty and unemployment, and lower rates of health insurance. Thus, women with disabilities will be less able to afford contraception, less able to prevent unintended pregnancy or manage other health issues, and less able to select the contraception methods recommended for their particular disability and health status. For these reasons, set forth in more detail below, we urge the Departments to set aside the Religious Exemptions IFR. As an organization and community member, CAP is committed to obtaining economic security and equality for women with disabilities, including ensuring that they have full and equal health insurance coverage that encompasses contraceptive coverage without cost sharing, as guaranteed by the Affordable Care Act ("ACA"). We strongly oppose any regulation that impedes a woman's access to the contraceptive care best suited for her personal and health needs.

This comment will first discuss the impact of the ACA and how the ACA's contraceptive coverage helped increase access to and affordability of contraception. Next, this comment will illustrate the disabled community's concerns regarding contraception access and care, including poverty and access to health care for women with disabilities, the need that women with disabilities have for contraception, how limiting contraceptive choices is particularly harmful to women with disabilities, and the importance of eliminating cost sharing for contraceptive care to women with disabilities. Then, this comment will discuss the impact that the Religious Exemptions IFR will have on the disabled community and summarize why we strongly believe that this rule should be withdrawn. Finally, this comment will outline how the Religious Exemptions IFR violates the Administrative Procedures Act ("APA"), the First Amendment to the Constitution, and the Due Process Clause of the Fifth Amendment to the Constitution, all of which require the Departments to set aside the Religious Exemptions IFR.

## I. The Impact of the Affordable Care Act

The ACA is a critical source of health care coverage for America's traditionally underserved communities. The ACA reduced the number of individuals without insurance to historic lows, including a 39 percent decrease in the uninsured rate among the lowest income individuals.[1] The nation and our communities cannot afford to go back to a time without access to comprehensive, affordable coverage.

The ACA has reduced health care costs for individuals and employers while also reducing uncompensated care by more than $7.4 billion.[2] In addition, the ACA included critical provisions ensuring full and equitable access to essential services without discrimination. The ACA has also been instrumental in covering a wide range of preventive services, ensuring that

---

[1] Kelsey Avery, Kenneth Finegold and Amelia Whitman, *Affordable Care Act Has Led to Historic, Widespread Increase in Health Insurance Coverage*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ASPE ISSUE BRIEF, (Sep. 29, 2016) https://aspe.hhs.gov/system/files/pdf/207946/ACAHistoricIncrease Coverage.pdf.

[2] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, New Report Details Impact of the Affordable Care Act (Dec. 13, 2016), https://www.hhs.gov/about/news/2016/12/13/new-report-details-impact-affordable-careact.html available at http://wayback.archive-it.org/3926/20170127135924/https://www.hhs.gov/about/news/2016/12/13/new-report-details-impact-affordable-care-act.html.

00454812

Exhibit 37

individuals have access to life-saving cancer screenings and treatment and women have access to effective and affordable contraception.

Under the ACA's preventive services mandate, most private health plans in the United States—whether provided by employers, schools, or through the exchanges—must cover dozens of preventive care services without any out-of-pocket costs to patients. That list of services includes a set of recommended preventive services for women,[3] and those recommendations, first established in 2011 by an Institute of Medicine committee and reaffirmed in 2016 by an expert panel led by the American College of Obstetricians and Gynecologists, include contraceptive methods and services.

More specifically, plans must cover all 18 distinct contraceptive methods used by women, and any new methods identified by the FDA.[4] These plans also must cover all related services, including contraceptive counseling, services needed to initiate and discontinue a contraceptive method, and follow-up care. Moreover, plans may not apply copayments, deductibles, or any other out-of-pocket costs to any of these methods or services. Similarly, plans are sharply limited in their ability to impose formularies, prior authorization requirements, and other administrative barriers to contraception. Federal guidance also makes it clear that plans may try to influence only a patient's choice within a specific contraceptive method (*e.g.*, to favor one hormonal intrauterine device (IUD) over another) and not across methods (*e.g.*, to favor oral contraceptives over an IUD or contraceptive ring).[5]

### A. The ACA's Contraceptive Coverage Helped Increase Access and Affordability

Access to contraception is an essential part of shaping women's health and well-being.[6] As of September 2016, there were approximately 61 million U.S. women in their childbearing years (ages 15–44).[7] About 43 million of those women (70%) are at risk of unintended pregnancy—that is, they are sexually active and do not want to become pregnant, but could

---

[3] Health Resources & Services Administration, *Women's Preventive Services Guidelines*, (Oct. 2017) https://www.hrsa.gov/womens-guidelines-2016/index.html.

[4] "The full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration include: (1) sterilization surgery for women, (2) surgical sterilization via implant for women, (3) implantable rods, (4) copper intrauterine devices, (5) intrauterine devices with progestin (all durations and doses), (6) the shot or injection, (7) oral contraceptives (combined pill), 8) oral contraceptives (progestin only, and), (9) oral contraceptives (extended or continuous use), (10) the contraceptive patch, (11) vaginal contraceptive rings, (12) diaphragms, (13) contraceptive sponges, (14) cervical caps, (15) female condoms, (16) spermicides, and (17) emergency contraception (levonorgestrel), and (18) emergency contraception (ulipristal acetate). Additionally, instruction in fertility awareness-based methods, including the lactation amenorrhea method, although less effective, should be provided for women desiring an alternative method." *Id.*

[5] U.S. Department of Labor, *FAQS About Affordable Care Act Implementation (Part XXVI)*, (May 11, 2015) https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-xxvi.pdf.

[6] The Henry J. Kaiser Family Foundation, *Private Insurance Coverage of Contraception*, (Dec. 7, 2016) https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[7] Kimberly Daniels, Ph.D., Jill Daugherty, Ph.D., and Jo Jones, Ph.D., *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, National Health Statistics Reports, 173 (2014) http://www.cdc.gov/nchs/data/databriefs/db173.pdf.

3

00454813

Exhibit 37

JA-0000747

become pregnant if they and their partners fail to use a contraceptive method correctly and consistently.[8] Couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[9] In the United States, the average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[10]

Contraceptive use among women is widespread, with over 99% of sexually-active women using at least one method of contraception at some point during their lifetime.[11] Contraceptive use is common among women of all religious denominations.[12] Eighty-nine percent of at-risk Roman Catholics and 90% of at-risk Protestants currently use some method of contraception.[13] Among sexually experienced religious women, 99% of Roman Catholics and Protestants have ever used some form of contraception.[14] Some 68% of Roman Catholics, 73% of Mainline Protestants, and 74% of Evangelicals who are at risk of unintended pregnancy use a highly effective method (*e.g.*, the pill, other hormonal methods, or an IUD).[15]

Contraceptives make up an estimated 30–44% of out-of-pocket health care spending for women.[16] A year's worth of birth control can cost upwards of $600—the equivalent of 83 hours of work for someone earning the federal minimum wage of $7.25 an hour.[17] More permanent birth control methods, such as an IUD or contraceptive implant, would cost more than $1,000 out-of-pocket—almost one month's salary for an American earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the use of more effective methods, and a decrease in out-of-pocket costs for women.

---

[8] Jo Jones, Ph.D., William Mosher, Ph.D., and Kimberly Daniels, Ph.D., *Current Contraceptive Use In The United States, 2006 2010, And Changes In Patterns Of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS, 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.
[9] Trussell J. Contraceptive failure in the United States. Contraception. 2011, 83(5):397–404.
[10] The Alan Guttmacher Institute (AGI). Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics. New York: AGI. 2000.
[11] GUTTMACHER INSTITUTE, *Contraceptive Use in the United States*, (September 2016) https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.
[12] Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (April 2011) https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.
[13] Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (April 2011) https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.
[14] *Id.*
[15] *Id.*
[16] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs 34, no.7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.
[17] NATIONAL WOMEN'S LAW CENTER, *The Affordable Care Act's Birth Control Benefit: Too Important to Lose* (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/. *See* Elizabeth Cclms, "How much do birth-control pills cost?" CLEAR HEALTH COSTS (Apr. 29, 2013) https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

4

00454814

Exhibit 37

JA-0000748

The ACA has expanded contraceptive coverage without cost-sharing to millions of women across the nation.[18] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs covered by the contraceptive coverage provision of the ACA. Following implementation of the ACA, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[19] As a result, studies show that a majority of women tended to choose long-term contraceptives methods, such as an IUD or an implant, as the high upfront costs were removed.[20] These costs acted as a barrier for women who may have wanted access to these specific types of contraceptives.[21] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[22] Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[23]

Contraceptive use does benefit women and families. Having access to the full range of FDA-approved contraceptive methods allows women to choose the method that works best for them at a given point in their life—factoring in ease of use, side effects, contraindications, risk of sexually transmitted infections, desire for confidentiality and control, and many other considerations. Identifying the "right" method helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording women greater control over family planning.

Reducing unwanted pregnancies and affording women greater control over family planning has additional health benefits. For example, avoiding closely spaced pregnancies reduces the risk of premature birth or low birth weight. Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families. In short, contraceptive coverage matters, and taking away this coverage for any woman would be short-sighted and harmful.

## II. Women with Disabilities and Contraception

### A. Poverty and Access to Health Care for Women with Disabilities

#### 1. Care Can Be More Costly For Women with Disabilities

---

[18] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016). https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.
[19] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs 34, no.7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.
[20] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016). https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception.
[21] Id.
[22] Id.
[23] National Women's Law Center, *The Affordable Care Act's Birth Control Benefit is Working for Women* (Dec. 16, 2016) https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.

00454815

Exhibit 37    JA-0000749

Pursuant to the ACA, Medicaid beneficiaries enrolled in Alternative Benefit Plans no longer have to pay cost sharing for preventive services including mammograms and Pap smears. But women with disabilities can face difficulties in locating and accessing reproductive health care providers who have the training and facilities to accommodate meet their needs.[24] Unfortunately, the Centers for Medicare and Medicaid Services do not conduct oversight of ADA compliance by states, health plans, or medical providers.[25] Barriers to providing women with disabilities access to care include "poor reimbursement for a health care provider's services."[26] One study found that, in general, individuals with disabilities have less access to care and worse health outcomes than individuals without disabilities.[27] Additionally, women with disabilities were, "more than seven times more likely to have unmet health needs due to the cost of care or medication than men without disabilities."[28] This may be due in part to "women having lower incomes than men, or more hurdles like the lack of transportation or insufficient time to seek care due to responsibilities caring for kids or other relatives[.]"[29]

### 2. Women with Disabilities Are Less Likely To Be Able To Afford That Care Because They May Have Lower Incomes and Fewer Resources than Their Non-Disabled Counterparts

Persons with disabilities in the United States are more likely to live in poverty, including long-term poverty, than their non-disabled peers.[30] According to a 2009 survey by the Center for Economic and Policy Research, "About half of all working-age adults who experience income poverty have a disability, and . . . almost two-thirds of all such adults experiencing long-term income poverty have a disability."[31] Women with disabilities face significant barriers to

---

[24] Individuals with Disabilities Education Improvement Act of 2004, Pub. L. 108-446, 20 U.S.C. 1400 (Dec. 3, 2004), http://nichcy.org/wp-content/uploads/docs/PL108-446.pdf [hereinafter Individuals with Disabilities Education Improvement Act].
[25] Association of State and Territorial Health Officials, Access to Preventive Healthcare Services for Women with Disabilities (2013), http://www.astho.org/Access-to-Preventive-Healthcare-Services-for-Women-with-Disabilities-Fact-Sheet/ [hereinafter Access to Preventive Healthcare Services].
[26] Stephanie J. Stockburger & Hatim A. Omar, *Women with Disabilities: Reproductive Care and Women's Health*, Int. J. Child Health Hum Dev., 429 (2015).
[27] Lisa Rapaport, *Disabilities Tied to Worse Access to Care, Poorer Health*, Reuters (Oct. 26, 2017), https://www.reuters.com/article/us-health-care-disability/disabilities-tied-to-worse-access-to-care-poorer-health-idUSKBN1CV39O; *see also* Henry P. Brehm & Robert H. Cormier, *Medical Care Costs of the Disabled* (July 2017).
[28] *See* Rapaport, *supra* note 27.
[29] *Id.*
[30] Amartya Sen, *Keynote Address at the World Bank's Conference on Disability and Inclusive Development* (2007), http://documents.worldbank.org/curated/en/930491468158381717/pdf/393850WP0Socia00Box374323B00PUBLIC0.pdf (The income-based measure of poverty does not take into account the higher cost of living with a disability in the United States, including medical care, accessible transportation, durable medical equipment, and personal assistance. As Amartya Sen, a professor and economist with a particular focus on poverty, stated in his address to the World Bank's Conference on Disability and Inclusive Development, the poverty line for persons with disabilities should take into account the extra expenses they incur in translating their income into the freedom to live well. Sen also noted that studies have shown that the poverty rate for disabled people doubles if these extra costs are taken in to account.)
[31] Shawn Fremstad, "Half in Ten: Why Taking Disability into Account is Essential to Reducing Income Poverty and Expanding Economic Inclusion," Center for Economic and Policy Research (2009), http://cepr.net/documents/publications/poverty-disability-2009-09.pdf.

6

00454816

Exhibit 37

JA-0000750

employment in the United States. For instance, women with disabilities experience barriers to accessing higher education, thus lowering their employment rates and potential wages.[32] Under the Fair Labor Standards Act, employers are also permitted to pay workers with disabilities a wage that is lower than minimum wage. Furthermore, women with disabilities are less likely to receive supplemental income—such as Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI)—than men with disabilities, and even when they do receive these benefits, they receive less money than do men with disabilities. This is because the amount individuals receive under SSDI and SSI is dependent on work history and previous income, and women with disabilities are less likely to have worked and more likely to have had jobs that paid lower wages.

Furthermore, those living in poverty have a higher likelihood of acquiring a disability due to lack of access to health care, good nutrition, and safe living and working conditions, which in turn means they face increased barriers to education, employment, and public services that could help them escape poverty. Persons with intellectual and developmental disabilities are at particular risk of poverty, including food insecurity. Because women with disabilities have higher rates of unemployment and poverty than the general population, they are far less likely to have private insurance to cover reproductive health goods and services.[33]

The Religious Exemptions IFR notes that there are "multiple other Federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy." But this ignores the impact of this Administration's related health care policy decisions (*e.g.*, the cuts to Medicaid, Title X, and the defunding of Planned Parenthood), the result of which is that access to contraceptives for women has decreased greatly. Despite the common misconception that all low-income people could enroll in Medicaid, the Medicaid program has only been available to certain categories of individuals (*e.g.*, children, pregnant women, seniors, and people with disabilities) who have little to no savings or assets. Family planning services are "mandatory" benefits under Medicaid and must be provided to individuals of childbearing age free of cost-sharing.[34] However, even if women with disabilities are able to enroll in Medicaid, there is no formal federal definition of "family planning," which has given states considerable discretion to determine the specific services covered under their "family planning" benefit.[35] For example, in a survey conducted by the Henry J. Kaiser Family Foundation of 41 state's contraceptive offerings under Medicaid, researchers found five states that did not cover all methods approved

---

[32] U.S. Dep't of Labor, Women's Bureau, "Issue Brief: Key Characteristics of Working Women with Disabilities," (July 2015). https://www.dol.gov/wb/resources/women_with_disability_issue_brief.pdf [hereinafter Dep't of Labor, "Issue Brief"]. (Women with disabilities are less likely to have achieved post-high school education, which can pose a barrier to employment. Only 21.5% of women with disabilities who have some college participate in the workforce, while only 5.9% of women with disabilities who have less than a high school education do.).

[33] Center for Research on Women with Disabilities, Health Insurance, https://www.bcm.edu/research/centers/research-on-women-with-disabilities/topics/health-care/health-insurance (last visited October 3, 2017).

[34] Jenna Walls, Kathy Gifford, Usha Ranji, Alina Salganicoff, and Ivette Gomez, *Medicaid Coverage of Family Planning Benefits: Results from a State Survey*, THE HENRY J. KAISER FAMILY FOUNDATION, (Sept 2016) https://www.kff.org/womens-health-policy/report/medicaid-coverage-of-family-planning-benefits-results-from-a-state-survey/.

[35] *Id.*

7

Exhibit 37

by the FDA (two states did not cover one form of injectable and three of them did not cover an emergency contraceptive pill).[36] Researchers also found that a number of states apply utilization controls such as quantity limits on oral contraceptives and injectables.[37] In addition, a state may establish different coverage requirements for Medicaid funded family planning services for different eligibility pathways, meaning there is no guarantee that a woman's ideal contraception method would be covered without cost-sharing even as a Medicaid recipient.[38] Thus, the Department's reliance on other federal programs, like Medicaid, to close the coverage gap is unreliable.

### B. Women with Disabilities Are Equally as Dependent on Contraception as Women without Disabilities

Although women with disabilities are equally as dependent on access to affordable contraception as women without disabilities, women with disabilities face many misconceptions about their need for contraception and reproductive health care. Medical providers and policymakers often assume that women with disabilities are not interested in romantic relationships, not sexually active, or not interested in becoming sexually active.[39] Indeed, historically, women with disabilities were discouraged from having children.[40] As a result, the reproductive health needs of women with disabilities have been and remain often ignored.

The reality is that women with disabilities engage in meaningful relationships, are sexually active, and often hope to have children. Studies show that adolescent women with disabilities are just as likely to be sexually active as women without disabilities.[41] In addition, women with disabilities have similar rates of pregnancy as women without disabilities: 11% compared to 12%, respectively.[42] In recognition of this reality, the American Academy of Pediatrics recommends that medical providers discuss sexual and reproductive health—including contraception—with women with disabilities.[43]

Thus, women with disabilities are highly dependent on affordable access to contraception to maintain their general health and well-being. The Religious Exemptions IFR will harm all women by reducing access to affordable contraception, but it will impose particular harm on women with disabilities because women with disabilities already face other health issues and barriers to adequate health care.

### C. Limiting Contraceptive Choices is Particularly Harmful to Women with Disabilities

---

[36] Id.

[37] Id.

[38] Id.

[39] Willi Horner-Johnson, Blair G. Darney, Sheetal Kulkarni-Rajasekhara et al., *Pregnancy Among US Women : Differences by Presence, Type, and Complexity of Disability*, 529 AM. J. OBSTETRICS & GYNECOLOGY e1 (2016); Elisabeth H. Quint & Rebecca F. O'Brien, *Menstrual Management for Adolescents with Disabilities*, 138 AM. ACADEMY OF PEDIATRICS e1 (2016).

[40] Horner-Johnson, *supra* note 39.

[41] Quint, *supra* note 39.

[42] Horner-Johnson, *supra* note 39.

[43] Quint, *supra* note 39.

8

00454818

Exhibit 37                                                                 JA-0000752

Limiting contraception options in this manner will be disproportionately harmful to women with disabilities. There are 15 million women with disabilities in the reproductive age groups (ages 16–50), in need of contraception.[44] They require the same options and ability to receive contraceptive care as all women.[45] As stated above, women with disabilities have a number of additional barriers than women without disabilities with respect to receiving health care, including barriers to access that are physical or structural (*e.g.*, no ramps to enter buildings, or exam tables do not lower to transfer a wheelchair user to the table),[46] socioeconomic factors, as well as educational gaps on the part of medical providers and on the part of disabled women themselves.[47] For example, women with intellectual disabilities may lack knowledge about methods of contraception and their usefulness, and clinicians may disregard achieving informed consent, "wrongly equating certain diagnoses with an inability to understand or communicate at the requisite level."[48]

Additionally, because the disabled community includes a wide variety of disabilities, it also requires a close assessment of different contraceptive needs. The term "disability" broadly includes those with physical, developmental, and/or intellectual disabilities. Some contraceptive methods help women with disabilities in unique and pertinent ways. For example, women with physical disabilities may have certain physical limitations in their ability to use some menstrual hygiene products or contraceptive methods such as female condoms.[49] Women with cognitive disabilities may have difficulty understanding how to take care of their menstrual hygiene and may need to utilize a contraceptive method such as an IUD or implant that helps diminish that need.[50] Additionally, some women with disabilities may be allergic to latex condoms, such as women with spina bifida, and can only rely on alternative contraceptive methods.[51]

There are other special considerations for women with mobility and cognitive issues. If mobility is an issue, oral contraceptive pills ("OCP") may not be the best option because it could increase their risk of deep vein thrombosis ("DVT").[52] Depo shots may not be the best option for these women because it may cause weight gain and decreased bone density.[53] Some disabled women may have difficulty swallowing, and OCPs may not be the best option; rather, the patch or vaginal ring may be a better option.[54] Women with pelvic issues should avoid using IUDs as they may not feel perforation.[55] If a woman has cognitive or memory issues, she would probably

---

[44] Sandra L. Welner, *Contraceptive Choices for Women with Disabilities*, Sexuality and Disability, Vol. 17, No.3, Sept. 1999, at 209.
[45] *Id.*
[46] Clair Kaplan, *Special Issues in Contraception: Caring for Women with Disabilities*, J. Midwifery Women's Health, 2006;51(6):450-456; Anita Silvers et al., *Medicine and Society: Reproductive Rights and Access to Reproductive Services for Women with Disabilities*, 18 American Medical Association Journal of Ethics 430 (2016).
[47] Silvers, *supra* note 46.
[48] *Id.*
[49] Kaplan, *supra* note 46.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*

9

Exhibit 37

00454819

want to use the patch or vaginal ring rather than OCPs, which must be taken every day at around the same time.[56] Accordingly, women with disabilities depend on a full range of contraceptive methods to address the particular needs or challenges posed by individual disabilities.

Thus, the Religious Exemption IFR could negatively impact these considerations within the disabled community. Not only would it widen the educational gap in recognizing that different kinds of disabilities require different kinds of contraceptive care between doctors and disabled women, but also it would increase the lack of comprehensive health care for disabled women.

### III. The Impact of the Religious Exemptions IFR on Women in the Disabled Community

The Religious Exemptions IFR vastly expands the universe of potential exemptions by allowing any non-profit or for-profit employer to exclude some or all contraceptive methods and services from the health plans it sponsors if the employer has religious objections. The Religious Exemptions IFR gives that same option to colleges and universities in regard to health plans they sponsor for their students.[57] In addition, the Religious Exemptions IFR does not set any standards for how an organization might establish that it has a religious objection, nor does it provide a mechanism for employees or students to challenge that claim. Objecting employers and schools may still make use of the accommodation, but that is entirely optional. This regulation also provides limited religious exemptions for individuals and insurance companies. In essence, the expanded religious exemptions leave women vulnerable to the whims of their employers who have no place in these private decisions, just as they would not in any other conversations about a patient's health care.[58]

The full impact of this regulation depends on how many employers and schools will claim a religious; whether they will object to some or all methods and services; whether they will use the now-optional accommodation; and how many employees, students and dependents will be affected. The Religious Exemptions IFR would require women whose employers have a religious objection to pay the costs of contraceptive care out of pocket. This would have a significantly negative impact on women with disabilities.

The Departments predict that 120,000 women at most will lose access to covered contraceptives through the combined rules. Yet they also admit that they do not know how many employers or insurers that omitted contraceptive coverage before the ACA did so based on religious beliefs that now would allow them to be exempt under the IFR, or how many employers that qualify for an exemption now will no longer make use of the accommodations

---

[56] *Id.*

[57] For example, the University of Notre Dame has announced that it will no longer provide contraceptive coverage to students, employees, or their dependents and it will not make use of an accommodation either. *See* Camila Domonoske, *Notre Dame is Dropping Birth Control Coverage for Students, Employees*, NATIONAL PUBLIC RADIO (Nov. 3, 2017) http://www.npr.org/sections/thetwo-way/2017/11/03/561835233/notre-dame-is-dropping-birth-control-coverage-for-students-employees.

[58] Amy Goldstein, Juliet Eilperin and William Wan, *Trump Administration Narrows Affordable Care Act's Contraception Mandate*, THE WASHINGTON POST (Oct. 6, 2017) https://www.washingtonpost.com/national/health-science/trump-administration-could-narrow-affordable-care-acts-contraception-mandate/2017/10/05/16139400-a9f0-11e7-92d1-58c702d2d975_story.html?utm_term=.66c07b8e74e9.

10

00454820

Exhibit 37    JA-0000754

provided under the previous rule. That is, the Departments' best estimate is inaccurate and, as noted above, likely overlooks the IFR's impact on women with disabilities and other historically marginalized populations.

The clearest area of concern should be employers and schools that currently use the accommodation under the old regulations. A 2015 study from the Henry J. Kaiser Family Foundation estimated that 3% of all nonprofits and 10% of the largest nonprofits have been using the accommodation.[59] The authors were unable to estimate how many enrollees that included. They did note, however, that there are more than 1.4 million nonprofits in the United States, and that thousands of nonprofits—including hospitals, long-term care facilities, schools, and charities—are affiliated with the Roman Catholic Church, which objects to contraception.[60] The Religious Exemptions IFR now makes the accommodation optional, leaving open the question whether these nonprofits will continue to use the accommodation or instead actively deny contraceptive coverage to all of those employees, dependents, and students.

In addition, the Religious Exemptions IFR now allows for religious objections by publicly traded for-profit employers. Previously, publicly traded companies had not been included even under the accommodation. Only a handful of lawsuits have involved these types of plaintiffs and objections, but that does not necessarily mean that few companies will utilize the new exemption. Without clear standards or procedures for claiming a religious objection and without any oversight mechanisms or ways for affected employees and students to appeal such a claim, the new regulations open a door for potential abuse.

When employers and schools make use of the new religious exemptions IFR, their employees, students, and dependents will face challenges affording the contraceptive methods and services they need. That is because the federal requirement has helped to reduce cost barriers to contraceptive use by ensuring that almost every method is covered by insurance and by eliminating out-of-pocket costs that might otherwise skew women's contraceptive choices. These cost barriers can be considerable. In addition to the increased cost burden on women who wish to obtain contraceptive care, those who are unable to afford contraception may experience an increase in unintended pregnancies.[61]

## IV. The Religious Exemptions IFR Should Be Set Aside

Women with disabilities deserve equal access to affordable and comprehensive health care, including access to all FDA-approved contraceptive methods. But the Religious Exemptions IFR will exacerbate the many barriers women with disabilities already face when accessing health care: disproportionately higher rates of poverty and unemployment, and lower rates of health insurance. As a result, women with disabilities will be less able to afford

---

[59] THE HENRY J. KAISER FAMILY FOUNDATION, *The Future of Contraceptive Coverage* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.
[60] *Id.*
[61] Amy Goldstein, Juliet Eilperin and William Wan, *Trump Administration Narrows Affordable Care Act's Contraception Mandate*, THE WASHINGTON POST (Oct. 6, 2017) https://www.washingtonpost.com/national/health-science/trump-administration-could-narrow-affordable-care-acts-contraception-mandate/2017/10/05/16139400-a9f0-11e7-92d1-58c702d2d975_story.html?utm_term=.66c07b8e74e9.

11

00454821

Exhibit 37

JA-0000755

contraception, less able to prevent unintended pregnancy and manage other health issues, and less able to select the contraception methods recommended for their particular disability and health status.

## V. The Religious Exemptions IFR Violates the Administrative Procedure Act

The APA imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[62] The APA is applicable here because the Religious Exemptions IFR is a final agency action and is a legislative rule within the meaning of the APA.[63] By enacting the Religious Exemptions IFR in the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

### A. Procedural Violations of Pre-Adoption and Post-Adoption Requirements of the Administrative Procedure Act

The APA contains two procedural rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule that are at issue here.[64] This rule violates the notice and comment requirement and the 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its reasoning, the Department does not have good cause.

#### 1. What is "Good Cause"?

The APA limits good cause to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[65] Courts have found good cause in cases that involve: (1) emergencies;[66] (2) circumstances where prior notice would subvert the underlying statutory scheme;[67] and (3) situations where Congress intends to waive section 553's requirements.[68] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural

---

[62] 5 U.S.C. § 551(5).

[63] *Id.*

[64] *Id.*

[65] 5 U.S.C. § 553(b).

[66] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004).

[67] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (The court reasoned that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made.).

[68] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (Here, the courts are finding that the APA is inapplicable, rather than that good cause is established.).

00454822

Exhibit 37                                                                                JA-0000756

requirement separately.[69] This means that the Departments must have good cause to waive each requirement.

## 2. Which of the APA's Procedural Requirements are at Issue Here?

Section 553(b) of the APA requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[70] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[71] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[72]

## 3. The Departments Have Not Satisfied the "Good Cause" Standard

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[73] While these rules empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health Care Portability and Accountability Act of 1996,[74] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[75] This, however, is a declaratory argument that is conclusory in nature and does not rise to the levels described above when Courts have found that the circumstances surrounding a rulemaking rise to the standard of "good cause." This reasoning is similar to other instances in which agencies made conclusory claims of an emergency situation, unaccompanied by independent facts, which the courts determined are insufficient to constitute good cause.[76] Declaring that it would be impracticable and contrary to

---

[69] *U.S. v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

[70] 5 U.S.C. § 553(b).

[71] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[72] *Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996).

[73] 82 Fed. Reg. at 47831.

[74] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); and 42 U.S.C. § 300gg–92.

[75] 82 Fed. Reg. at 47831.

[76] *See, e.g.*, *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 707 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v. Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); *United States v. Brewer*, 766 F.3d 884, 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is

(Continued...)

13

the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed is not the same as it actually being impracticable and contrary to public interest.

The Departments further argue that "[g]ood cause is supported by providing relief for entities and individuals for whom the Mandate operates in violation of their sincerely held religious beliefs, but who would have to experience that burden for many more months under the prior regulations if these rules are not issued on an interim final basis."[77] However, this reasoning should be weighed against the burdens that many women will face if their employer or university decides to take advantage of the Religious Exemptions IFR and cease to offer contraception without cost-sharing. They will be forced to find alternative means for contraceptive coverage or to pay high prices out-of-pocket to maintain the contraceptive coverage they currently have.

As explained above, the Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and the APA's post-adoption publication requirements. They have not adequately established that the APA's procedural requirements do not apply or that they have good cause for disregarding the APA's procedural rulemaking requirements. Because the Religious Exemptions IFR was promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, the Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the Religious Exemptions IFR should be set aside.

### B. Substantive Violations of the Administrative Procedure Act

In addition to the APA's procedural requirements described above, the APA contains several substantive rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[78] The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[79] "contrary to a constitutional right,"[80] or "in excess of statutory jurisdiction."[81] The Religious Exemptions IFR violates 5 U.S.C. § 706(2) because it contradicts the Patient Protection and Affordable Care Act ("ACA")

The ACA (and implementing regulations) requires all new insurance plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" without cost-sharing in order to protect women's health, ensure that women do not pay more for insurance coverage

---

nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting *United States v. Reynolds*, 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).

[77] 82 Fed. Reg. at 47814-15.
[78] 5 U.S.C. § 551(5).
[79] 5 U.S.C. § 706(2)(A).
[80] 5 U.S.C. § 706(2)(B).
[81] 5 U.S.C. § 706(2)(C).

14

00454824

Exhibit 37

JA-0000758

than men, and advance women's equality and well-being.[82] In addition, section 1554 of the ACA prohibits the Departments from issuing regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care"[83] and Section 1557 of the ACA prohibits sex discrimination in certain health programs and activities.[84]

By permitting objecting institutions to deny no-cost contraceptive coverage, the Religious Exemptions IFR erects unreasonable barriers to medical care violating Section 1554 of the ACA. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the ACA. Because the Religious Exemptions IFR violates the ACA, this IFR also violates the APA and must be set aside on that basis.

## VI. The Religious Exemptions IFR is Unconstitutional

This comment will now discuss how the Religious Exemptions IFR is unconstitutional as it violates both the Establishment clause of the First Amendment and the Due Process Clause of the Fifth Amendment.

### A. The Religious Exemptions IFR Violates the Establishment Clause of the First Amendment

The Religious Exemption IFR impermissibly allows employers to impose their own religious viewpoint on employees, regardless of those employees' personal beliefs, and even when doing so causes employees serious harms.[85] Courts have held that the Establishment Clause of the First Amendment prevents the government from shifting the cost of religious accommodation to third parties.[86] While the administration has asserted that the Religious Freedom Restoration Act[87] allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, the government can only constitutionally achieve such an outcome by replacing the current benefit with a program that provides contraception at no additional cost to employees.[88] Instead, the Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's religious beliefs.

---

[82] *See* 4 2 U.S.C. § 300gg-13(a)(4); 4 5 C.F.R. § 147.130 (2013)(a)(1)(iv).
[83] 42 U.S.C. § 18114(1).
[84] 42 U.S.C. § 18116.
[85] *See* U.S. CONST. amend. I.
[86] *See, e.g., Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) (rejecting a facial challenge to RLUIPA, a federal statute that permits accommodation of certain religious practices in prison, stating "[s]hould inmate requests for religious accommodations become excessive, *impose unjustified burdens on other institutionalized persons*, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.") (emphasis added); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (stating, "The First Amendment . . . gives no one the right to insist that in pursuit of their own interest others must conform their conduct to his own religious necessities.");; *but see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (distinguishing the obligations imposed on churches from those imposed on other types of organizations).
[87] 42 U.S.C. § 2000bb.
[88] *See Zubik v. Burwell*, 136 S. Ct. 1557; *Hobby Lobby*, 134 S. Ct. at 2786–87.

15

00454825

Exhibit 37                                                                                    JA-0000759

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is nothing in First Amendment jurisprudence to distinguish between these federal statutory entitlements and the contraceptive coverage benefit in the ACA. The Religious Exemption IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find religiously objectionable. Such a result would impermissibly shift the cost of religious accommodation onto third parties, subjecting employees to serious harms with no recourse. For these reasons, this IFR should be set aside as it violates the Establishment Clause of the First Amendment.

### B. The Religious Exemptions IFR Violates the Due Process Clause of the Fifth Amendment to the Constitution

This rule violates the Fifth Amendment on the basis that it constitutes sex discrimination and deprives an individual of a liberty without due process of law. The Fifth Amendment explicitly prohibits the federal government from depriving individuals of their "life, liberty, or property" without due process of the law.[89] Without any notice, the Religious Exemptions IFR removes contraceptive health care coverage from the insurance plans that employers are required to offer to their employees.

Women have historically been subjected to illegal discrimination based on their gender in violation of the Fifth Amendment.[90] The ACA's contraceptive coverage was implemented to resolve the fact that women tend to pay more for insurance coverage than their male counterparts.[91] The Religious Exemptions IFR violates the Fifth Amendment because it targets women's health care access to contraception. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, this Rule discriminates based on sex. This rule imposes a disparate impact on women because it primarily affects their right to reproductive freedom concerning contraceptive care. Many of the medical treatments that are typically associated with contraceptive care regulate procedures related to the female reproductive system, which may or may not have anything to do with family planning decisions.[92] Furthermore, this rule is problematic because it allows employers and schools to deny preventive health benefits that only concern female anatomy, and thus discriminates based on sex.

---

[89] U.S. CONST. amend. V; U.S. CONST. amend. XIV.
[90] *Gender Discrimination Lawsuit against KPMG Can Move Ahead*, LEEDS BROWN LAW P.C. (Feb. 25, 2013), http://www.lmblaw.com/blog/2013/gender-discrimination-lawsuit-against-kpmg-can-move-ahead.
[91] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).
[92] THE HENRY J. KAISER FAMILY FOUNDATION, *New Regulations Broadening Employer Exemptions to Contraceptive Coverage: Impact on Women* (Oct. 6, 2017), https://www.kff.org/womens-health-policy/issue-brief/new-regulations-broadening-employer-exemptions-to-contraceptive-coverage-impact-on-women/.

16

00454826

Exhibit 37

The Supreme Court has ruled in several cases that facially neutral employment practices with an adverse impact on members of a protected class constitute discrimination.[93] The administration cites to current litigation and its need to streamline this process in hopes to cut down on pending and future litigation.[94] However, the court ruled in *Frontiero v. Richardson* that administrative convenience, although not without some importance, is not a 'shibboleth,' and any statute which draws a sharp line between sexes solely for the purpose of achieving administrative convenience is arbitrary, and violates the Due Process Clause of the Fifth Amendment.[95] Overall, by allowing objecting institutions to deny only certain women's preventative health coverage –namely, coverage for contraceptives—the rule has a greater impact on one gender solely based on one's sex.

The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[96] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs newly covered by the contraceptive coverage provision of the ACA.[97] It is estimated that the ACA created an out-of-pocket savings of approximately $1.4 billion for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their health care.[98] Under these new rules, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption. While it is unclear how many organizations will avail themselves of one of these exemptions, it is certain that many women will see a dramatic increase in their reproductive health care costs as organizations seek to decrease their own spending on employee health care.

In *Board of Regents v. Roth*, the Court stated that a property interest arises whenever a person has a legitimate claim of entitlement.[99] The right to contraceptive coverage without cost sharing is a protected property interest that can only be infringed by an act of the legislature or through a properly issued rule found in the text of the statute.  When the ACA was implemented, it established that women now have a legitimate claim of contraceptive coverage without cost

---

[93] *Griggs v. Duke Power Co.*, 401 U.S. 424, 435 (1971); *Dothard v. Rawlinson*, 433 U.S. 321, 329 (1977).
[94] "To the contrary, the Departments have been litigating RFRA challenges to the Mandate and related regulations for more than 5 years, and dozens of those challenges remain pending today. That litigation, and the related modification to the accommodation, have consumed substantial governmental resources while creating uncertainty for objection organizations, issuers, third party administrators, employees, and beneficiaries." Religious Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act, 82 Fed. Reg. 47792 et seq.
[95] *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973); Cook, John J., *Fifth Amendment — Due Process Clause — Sex Discrimination — Sex: A Suspect Classification; Frontiero v. Richardson*, 7 AKRON L. REV. 11 (1974), http://ideaexchange.uakron.edu/cgi/viewcontent.cgi?article=2223&context=akronlawreview.
[96] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.
[97] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 Health Affairs 7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.
[98] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 Health Affairs 7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.
[99] *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

17

00454827

Exhibit 37

JA-0000761

sharing.[100] Under the new rule, without an opportunity of a notice and hearing, thousands of women will be prevented from obtaining the no cost contraceptive coverage to which they would otherwise be entitled to. The Religious Exemption IFR violates the Due Process clause since it does not give notice, provide for an opportunity to be heard at a meaningful time in a meaningful way, and does not give a decision that was supported by substantial evidence.[101]

For these reasons, the Departments should find that the Religious Exemptions IFR substantially and procedurally violates APA. This rule also violates the Establishment clause of the First Amendment and the Due Process clause of the Fifth Amendment. For all these reasons, we urge the Departments to set aside the Religious Exemptions IFR.

*** 

CAP appreciates the opportunity to comment on this interim final rule. If you require additional information, please contact:

Sincerely,
The Center for American Progress

---

[100] Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 et seq. (2010).
[101] *Procedural Due Process*, EXPLORING CONSTITUTIONAL CONFLICTS (2011), http://law2.umkc.edu/faculty/ projects/ftrials/conlaw/proceduraldueprocess.html.

18

00454828

Exhibit 37                                                                                JA-0000762

December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services**
**Under the Affordable Care Act (RIN 0938-AT46; 1210-AB84; 1545-BN91)**

To whom it may concern:

The Center for American Progress ("CAP") writes to provide comments in opposition to
the Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under
the Affordable Care Act, an interim final rule ("Moral Exemptions IFR") published in the
Federal Register on October 13, 2017 at 82 Fed. Reg. 47838 *et seq.* as permitted by the Internal
Revenue Service, Department of the Treasury; Employee Benefits Security Administration,
Department of Labor; and Centers for Medicare & Medicaid Services, Department of Health and
Human Services (collectively, "the Departments"). Additional organizations signing on to the
comment include the Autistic Self-Advocacy Network, the Autism Women's Network, and the
National LGBT Task Force.

CAP is an independent, nonpartisan policy institute that is dedicated to improving the
lives of all Americans through bold, progressive ideas, as well as strong leadership and concerted
action. CAP believes America should be a land of boundless opportunity, where people can
climb the ladder of economic mobility. We believe an effective government can earn the trust of
the American people, champion the common good over narrow self-interest, and harness the
strength of our diversity.

To meet these ends, we develop new policy ideas, challenge the media to cover the issues
that truly matter, and shape the national debate. With policy teams in major issue areas including
criminal justice, democracy and government, disability rights, economy, education, energy and
environment, foreign policy and security, guns and crime, health care, immigration, LGBT,
poverty, race and ethnicity, religion and values, and women's rights, CAP thinks creatively at the
cross-section of traditional boundaries to develop ideas for policymakers that lead to real change.
By employing an extensive communications and outreach effort that we adapt to a rapidly
changing media landscape, we promote our ideas aggressively in the national policy debate.
Although CAP is a multi-issue organization, we submit this comment today specifically to
address the needs and concerns of the disabled community. We strongly believe that the Moral
Exemptions IFR will have a negative impact on women, especially those in the disabled
community. For these reasons, we submit this comment to bring to your attention the negative
impact that the Moral Exemptions IFR will have on women in the disabled community.

Women with disabilities deserve equal access to affordable and comprehensive health
care, including access to all contraceptive methods approved by the U.S. Food and Drug

1

00209083

Exhibit 38

Administration ("FDA"). However, the Moral Exemptions IFR will exacerbate the many barriers women with disabilities already face when accessing health care. These barriers include disproportionately higher rates of poverty and unemployment, and lower rates of health insurance. Thus, women with disabilities will be less able to afford contraception, less able to prevent unintended pregnancy or manage other health issues, and less able to select the contraception methods recommended for their particular disability and health status. For these reasons, set forth in more detail below, we urge the Departments to set aside the Moral Exemptions IFR. As an organization and community member, CAP is committed to obtaining economic security and equality for women with disabilities, including ensuring that they have full and equal health insurance coverage that encompasses contraceptive coverage without cost sharing, as guaranteed by the Affordable Care Act ("ACA"). We strongly oppose any regulation that impedes a woman's access to the contraceptive care best suited for her personal and health needs.

This comment will first discuss the impact of the ACA and how the ACA's contraceptive coverage helped increase access to and affordability of contraception. Next, this comment will illustrate the disabled community's concerns regarding contraception access and care, including poverty and access to health care for women with disabilities, the need that women with disabilities have for contraception, how limiting contraceptive choices is particularly harmful to women with disabilities, and the importance of eliminating cost sharing for contraceptive care to women with disabilities. Then, this comment will discuss the impact that the Moral Exemptions IFR will have on the disabled community and summarize why we strongly believe that this rule should be withdrawn. Finally, this comment will outline how the Moral Exemptions IFR violates the Administrative Procedures Act ("APA"), the First Amendment to the Constitution, and the Due Process Clause of the Fifth Amendment to the Constitution, all of which require the Departments to set aside the Moral Exemptions IFR.

## I. The Impact of the Affordable Care Act

The ACA is a critical source of health care coverage for America's traditionally underserved communities. The ACA reduced the number of individuals without insurance to historic lows, including a 39 percent decrease in the uninsured rate among the lowest income individuals.[1] The nation and our communities cannot afford to go back to a time without access to comprehensive, affordable coverage.

The ACA has reduced health care costs for individuals and employers while also reducing uncompensated care by more than $7.4 billion.[2] In addition, the ACA included critical provisions ensuring full and equitable access to essential services without discrimination. The ACA has also been instrumental in covering a wide range of preventive services, ensuring that

---

[1] Kelsey Avery, Kenneth Finegold and Amelia Whitman, *Affordable Care Act Has Led to Historic, Widespread Increase in Health Insurance Coverage*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ASPE ISSUE BRIEF, (Sep. 29, 2016) https://aspe.hhs.gov/system/files/pdf/207946/ACAHistoricIncrease Coverage.pdf.

[2] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, New Report Details Impact of the Affordable Care Act (Dec. 13, 2016), https://www.hhs.gov/about/news/2016/12/13/new-report-details-impact-affordable-careact.html available at http://wayback.archive-it.org/3926/20170127135924/https://www.hhs.gov/about/ news/2016/12/13/new-report-details-impact-affordable-care-act.html.

00209084

Exhibit 38

JA-0000764

individuals have access to life-saving cancer screenings and treatment and women have access to effective and affordable contraception.

Under the ACA's preventive services coverage, most private health plans in the United States—whether provided by employers, schools, or through the exchanges—must cover dozens of preventive care services without any out-of-pocket costs to patients. That list of services includes a set of recommended preventive services for women,[3] and those recommendations, first established in 2011 by an Institute of Medicine committee and reaffirmed in 2016 by an expert panel led by the American College of Obstetricians and Gynecologists, include contraceptive methods and services.

More specifically, plans must cover all 18 distinct contraceptive methods used by women, and any new methods identified by the FDA.[4] These plans also must cover all related services, including contraceptive counseling, services needed to initiate and discontinue a contraceptive method, and follow-up care. Moreover, plans may not apply copayments, deductibles, or any other out-of-pocket costs to any of these methods or services. Similarly, plans are sharply limited in their ability to impose formularies, prior authorization requirements, and other administrative barriers to contraception. Federal guidance also makes it clear that plans may try to influence only a patient's choice within a specific contraceptive method (*e.g.*, to favor one hormonal intrauterine device (IUD) over another) and not across methods (*e.g.*, to favor oral contraceptives over an IUD or contraceptive ring).[5]

## A. The ACA's Contraceptive Coverage Helped Increase Access and Affordability

Access to contraception is an essential part of shaping women's health and well-being.[6] As of September 2016, there were approximately 61 million U.S. women in their childbearing years (ages 15–44).[7] About 43 million of those women (70%) are at risk of unintended pregnancy—that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners fail to use a contraceptive method correctly and

---

[3] Health Resources & Services Administration, *Women's Preventive Services Guidelines*, (Oct. 2017) https://www.hrsa.gov/womens-guidelines-2016/index.html.

[4] "The full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration include: (1) sterilization surgery for women, (2) surgical sterilization via implant for women, (3) implantable rods, (4) copper intrauterine devices, (5) intrauterine devices with progestin (all durations and doses), (6) the shot or injection, (7) oral contraceptives (combined pill), 8) oral contraceptives (progestin only, and), (9) oral contraceptives (extended or continuous use), (10) the contraceptive patch, (11) vaginal contraceptive rings, (12) diaphragms, (13) contraceptive sponges, (14) cervical caps, (15) female condoms, (16) spermicides, and (17) emergency contraception (levonorgestrel), and (18) emergency contraception (ulipristal acetate). Additionally, instruction in fertility awareness-based methods, including the lactation amenorrhea method, although less effective, should be provided for women desiring an alternative method." *Id.*

[5] U.S. DEPARTMENT OF LABOR, *FAQS About Affordable Care Act Implementation (Part XXVI)*, (May 11, 2015) https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-xxvi.pdf.

[6] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception,* (Dec. 7, 2016) https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[7] Kimberly Daniels, Ph.D., Jill Daugherty, Ph.D.; and Jo Jones, Ph.D., *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, NATIONAL HEALTH STATISTICS REPORTS, 173 (2014) http://www.cdc.gov/nchs/data/databriefs/db173.pdf.

3

00209085

Exhibit 38

consistently.[8] Couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[9] In the United States, the average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[10]

Contraceptives make up an estimated 30–44% of out-of-pocket health care spending for women.[11] A year's worth of birth control can cost upwards of $600—the equivalent of 83 hours of work for someone earning the federal minimum wage of $7.25 an hour.[12] More permanent birth control methods, such as an IUD or contraceptive implant, would cost more than $1,000 out-of-pocket—almost one month's salary for an American earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the use of more effective methods, and a decrease in out-of-pocket costs for women.

The ACA has expanded contraceptive coverage without cost-sharing to millions of women across the nation.[13] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs covered by the contraceptive coverage provision of the ACA. Following implementation of the ACA, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[14] As a result, studies show that a majority of women tended to choose long-term contraceptives methods, such as an IUD or an implant, as the high upfront costs were removed.[15] These costs acted as a barrier for women who may have wanted access to these specific types of contraceptives.[16] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[17]

---

[8] Jo Jones, Ph.D., William Mosher, Ph.D., and Kimberly Daniels, Ph.D., *Current Contraceptive Use In The United States, 2006–2010, And Changes In Patterns Of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS, 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

[9] Trussell J, Contraceptive failure in the United States, Contraception, 2011, 83(5):397–404.

[10] The Alan Guttmacher Institute (AGI), Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics, New York: AGI, 2000.

[11] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs 34, no.7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

[12] NATIONAL WOMEN'S LAW CENTER, *The Affordable Care Act's Birth Control Benefit: Too Important to Lose* (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/. *See* Elizabeth Celms, "How much do birth-control pills cost?" CLEAR HEALTH COSTS (Apr. 29, 2013) https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[13] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[14] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs 34, no.7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

[15] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception.

[16] *Id.*

[17] *Id.*

4

00209086

Exhibit 38

JA-0000766

Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[18]

Contraceptive use does benefit women and families. Having access to the full range of FDA-approved contraceptive methods allows women to choose the method that works best for them at a given point in their life—factoring in ease of use, side effects, contraindications, risk of sexually transmitted infections, desire for confidentiality and control, and many other considerations. Identifying the "right" method helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording women greater control over family planning.

Reducing unwanted pregnancies and affording women greater control over family planning has additional health benefits. For example, avoiding closely spaced pregnancies reduces the risk of premature birth or low birth weight. Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families. In short, contraceptive coverage matters, and taking away this coverage for any woman would be short-sighted and harmful.

## II. Women with Disabilities and Contraception

### A. Poverty and Access to Health Care for Women with Disabilities

#### 1. Care Can Be More Costly For Women with Disabilities

Pursuant to the ACA, Medicaid beneficiaries enrolled in Alternative Benefit Plans no longer have to pay cost sharing for preventive services including mammograms and Pap smears. But women with disabilities can face difficulties in locating and accessing reproductive health care providers who have the training and facilities to accommodate meet their needs.[19] Unfortunately, the Centers for Medicare and Medicaid Services do not conduct oversight of ADA compliance by states, health plans, or medical providers.[20] Barriers to providing women with disabilities access to care include "poor reimbursement for a health care provider's services."[21] One study found that, in general, individuals with disabilities have less access to care and worse health outcomes than individuals without disabilities.[22] Additionally, women with

---

[18] National Women's Law Center, *The Affordable Care Act's Birth Control Benefit is Working for Women* (Dec. 16, 2016) https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.
[19] Individuals with Disabilities Education Improvement Act of 2004, Pub. L. 108-446, 20 U.S.C. 1400 (Dec. 3, 2004), http://nichcy.org/wp-content/uploads/docs/PL108-446.pdf [hereinafter Individuals with Disabilities Education Improvement Act].
[20] Association of State and Territorial Health Officials, Access to Preventive Healthcare Services for Women with Disabilities (2013), http://www.astho.org/Access-to-Preventive-Healthcare-Services-for-Women-with-Disabilities-Fact-Sheet/ [hereinafter Access to Preventive Healthcare Services].
[21] Stephanie J. Stockburger & Hatim A. Omar, *Women with Disabilities: Reproductive Care and Women's Health*, Int. J. Child Health Hum Dev., 429 (2015).
[22] Lisa Rapaport, *Disabilities Tied to Worse Access to Care, Poorer Health*, Reuters (Oct. 26, 2017), https://www.reuters.com/article/us-health-care-access-disabilities/disabilities-tied-to-worse-access-to-care-poorer-health-idUSKBN1CV39O; *see also* Henry P. Brehm & Robert H. Cormier, *Medical Care Costs of the Disabled* (July 2017).

00209087

Exhibit 38

JA-0000767

disabilities were, "more than seven times more likely to have unmet health needs due to the cost of care or medication than men without disabilities."[23] This may be due in part to "women having lower incomes than men, or more hurdles like the lack of transportation or insufficient time to seek care due to responsibilities caring for kids or other relatives[.]"[24]

### 2. Women with Disabilities Are Less Likely To Be Able To Afford That Care Because They May Have Lower Incomes and Fewer Resources than Their Non-Disabled Counterparts

Persons with disabilities in the United States are more likely to live in poverty, including long-term poverty, than their non-disabled peers.[25] According to a 2009 survey by the Center for Economic and Policy Research, "About half of all working-age adults who experience income poverty have a disability, and . . . almost two-thirds of all such adults experiencing long-term income poverty have a disability." [26] Women with disabilities face significant barriers to employment in the United States. For instance, women with disabilities experience barriers to accessing higher education, thus lowering their employment rates and potential wages.[27] Under the Fair Labor Standards Act, employers are also permitted to pay workers with disabilities a wage that is lower than minimum wage. Furthermore, women with disabilities are less likely to receive supplemental income—such as Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI)—than men with disabilities, and even when they do receive these benefits, they receive less money than do men with disabilities. This is because the amount individuals receive under SSDI and SSI is dependent on work history and previous income, and women with disabilities are less likely to have worked and more likely to have had jobs that paid lower wages.

Furthermore, those living in poverty have a higher likelihood of acquiring a disability due to lack of access to health care, good nutrition, and safe living and working conditions, which in turn means they face increased barriers to education, employment, and public services that could help them escape poverty. Persons with intellectual and developmental disabilities are

---

[23] *Id.*

[24] *Id.*

[25] Amartya Sen. *Keynote Address at the World Bank's Conference on Disability and Inclusive Development* (2007), http://documents.worldbank.org/curated/en/930491468158381717/pdf/393850WP0Socia00Box 374323 B00PUBLIC0.pdf (The income-based measure of poverty does not take into account the higher cost of living with a disability in the United States, including medical care, accessible transportation, durable medical equipment, and personal assistance. As Amartya Sen, a professor and economist with a particular focus on poverty, stated in his address to the World Bank's Conference on Disability and Inclusive Development, the poverty line for persons with disabilities should take into account the extra expenses they incur in translating their income into the freedom to live well. Sen also noted that studies have shown that the poverty rate for disabled people doubles if these extra costs are taken in to account.)

[26] Shawn Fremstad, "Half in Ten: Why Taking Disability into Account is Essential to Reducing Income Poverty and Expanding Economic Inclusion," Center for Economic and Policy Research (2009), http://cepr.net/documents/publications/poverty-disability-2009-09.pdf.

[27] U.S. Dep't of Labor, Women's Bureau, "Issue Brief: Key Characteristics of Working Women with Disabilities," (July 2015), https://www.dol.gov/wb/resources/women_with_disability_issue_brief.pdf [hereinafter Dep't of Labor, "Issue Brief"]. (Women with disabilities are less likely to have achieved post-high school education, which can pose a barrier to employment. Only 21.5% of women with disabilities who have some college participate in the workforce, while only 5.9% of women with disabilities who have less than a high school education do.).

00209088

Exhibit 38

JA-0000768

at particular risk of poverty, including food insecurity. Because women with disabilities have higher rates of unemployment and poverty than the general population, they are far less likely to have private insurance to cover reproductive health goods and services.[28]

The Moral Exemptions IFR suggests that there are multiple other Federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy. But the rule ignores the impact of this Administration's related health care policy decisions (*e.g.*, the cuts to Medicaid, Title X, and the defunding of Planned Parenthood), the result of which is that access to contraceptives for women has decreased greatly. Despite the common misconception that all low-income people could enroll in Medicaid, the Medicaid program has only been available to certain categories of individuals (*e.g.*, children, pregnant women, seniors, and people with disabilities) who have little to no savings or assets. Family planning services are "mandatory" benefits under Medicaid and must be provided to individuals of childbearing age free of cost-sharing.[29] However, even if women with disabilities are able to enroll in Medicaid, there is no formal federal definition of "family planning," which has given states considerable discretion to determine the specific services covered under their "family planning" coverage.[30] For example, in a survey conducted by the Henry J. Kaiser Family Foundation of 41 state's contraceptive offerings under Medicaid, researchers found five states that did not cover all methods approved by the FDA (two states did not cover one form of injectable and three of them did not cover an emergency contraceptive pill).[31] Researchers also found that a number of states apply utilization controls such as quantity limits on oral contraceptives and injectables.[32] In addition, a state may establish different coverage requirements for Medicaid funded family planning services for different eligibility pathways, meaning there is no guarantee that a woman's ideal contraception method would be covered without cost-sharing even as a Medicaid recipient.[33] Thus, the Department's reliance on other federal programs, like Medicaid, to close the coverage gap is unreliable.

## B. Women with Disabilities Are Equally as Dependent on Contraception as Women without Disabilities

Although women with disabilities are equally as dependent on access to affordable contraception as women without disabilities, women with disabilities face many misconceptions about their need for contraception and reproductive health care. Medical providers and policymakers often assume that women with disabilities are not interested in romantic

---

[28] Center for Research on Women with Disabilities, Health Insurance,

https://www.bcm.edu/research/centers/research-on-women-with-disabilities/topics/health-care/health-insurance (last visited October 3, 2017).

[29] Jenna Walls, Kathy Gifford, Usha Ranji, Alina Salganicoff, and  Ivette Gomez, *Medicaid Coverage of Family Planning Benefits: Results from a State Survey*, THE HENRY J. KAISER FAMILY FOUNDATION, (Sept 2016) https://www.kff.org/womens-health-policy/report/medicaid-coverage-of-family-planning-benefits-results-from-a-state-survey/.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

7

00209089

Exhibit 38

JA-0000769

relationships, not sexually active, or not interested in becoming sexually active.[34] Indeed, historically, women with disabilities were discouraged from having children.[35] As a result, the reproductive health needs of women with disabilities have been and remain often ignored.

The reality is that women with disabilities engage in meaningful relationships, are sexually active, and often hope to have children. Studies show that adolescent women with disabilities are just as likely to be sexually active as women without disabilities.[36] In addition, women with disabilities have similar rates of pregnancy as women without disabilities: 11% compared to 12%, respectively.[37] In recognition of this reality, the American Academy of Pediatrics recommends that medical providers discuss sexual and reproductive health—including contraception—with women with disabilities.[38]

Thus, women with disabilities are highly dependent on affordable access to contraception to maintain their general health and well-being. The Moral Exemptions IFR will harm all women by reducing access to affordable contraception, but it will impose particular harm on women with disabilities because women with disabilities already face other health issues and barriers to adequate health care.

## C. Limiting Contraceptive Choices is Particularly Harmful to Women with Disabilities

Limiting contraception options in this manner will be disproportionately harmful to women with disabilities. There are 15 million women with disabilities in the reproductive age groups (ages 16–50), in need of contraception.[39] They require the same options and ability to receive contraceptive care as all women.[40] As stated above, women with disabilities have a number of additional barriers than women without disabilities with respect to receiving health care, including barriers to access that are physical or structural (*e.g.*, no ramps to enter buildings, or exam tables do not lower to transfer a wheelchair user to the table),[41] socioeconomic factors, as well as educational gaps on the part of medical providers and on the part of disabled women themselves.[42] For example, women with intellectual disabilities may lack knowledge about methods of contraception and their usefulness, and clinicians may disregard achieving informed

---

[34] Willi Horner-Johnson, Blair G. Darney, Sheetal Kulkarni-Rajasekhara et al., *Pregnancy Among US Women : Differences by Presence, Type, and Complexity of Disability*, 529 AM. J. OBSTETRICS & GYNECOLOGY e1 (2016); Elisabeth H. Quint & Rebecca F. O'Brien, *Menstrual Management for Adolescents with Disabilities*, 138 AM. ACADEMY OF PEDIATRICS e1 (2016).

[35] Horner-Johnson, *supra* note 34.

[36] Quint, *supra* note 34.

[37] Horner-Johnson, *supra* note 34.

[38] Quint, *supra* note 34.

[39] Sandra L. Welner, *Contraceptive Choices for Women with Disabilities*, Sexuality and Disability, Vol. 17, No.3, Sept. 1999, at 209.

[40] *Id.*

[41] Clair Kaplan, *Special Issues in Contraception: Caring for Women with Disabilities*, J. Midwifery Women's Health, 2006;51(6):450-456; Anita Silvers et al., *Medicine and Society: Reproductive Rights and Access to Reproductive Services for Women with Disabilities*, 18 American Medical Association Journal of Ethics 430 (2016).

[42] Silvers, *supra* note 41.

8

Exhibit 38

00209090

consent, "wrongly equating certain diagnoses with an inability to understand or communicate at the requisite level."[43]

Additionally, because the disabled community includes a wide variety of disabilities, it also requires a close assessment of different contraceptive needs. The term "disability" broadly includes those with physical, developmental, and/or intellectual disabilities. Some contraceptive methods help women with disabilities in unique and pertinent ways. For example, women with physical disabilities may have certain physical limitations in their ability to use some menstrual hygiene products or contraceptive methods such as female condoms.[44] Women with cognitive disabilities may have difficulty understanding how to take care of their menstrual hygiene and may need to utilize a contraceptive method such as an IUD or implant that helps diminish that need.[45] Additionally, some women with disabilities may be allergic to latex condoms, such as women with spina bifida, and can only rely on alternative contraceptive methods.[46]

There are other special considerations for women with mobility and cognitive issues. If mobility is an issue, oral contraceptive pills ("OCP") may not be the best option because it could increase their risk of deep vein thrombosis ("DVT").[47] Depo shots may not be the best option for these women because it may cause weight gain and decreased bone density.[48] Some disabled women may have difficulty swallowing, and OCPs may not be the best option; rather, the patch or vaginal ring may be a better option.[49] Women with pelvic issues should avoid using IUDs as they may not feel perforation.[50] If a woman has cognitive or memory issues, she would probably want to use the patch or vaginal ring rather than OCPs, which must be taken every day at around the same time.[51] Accordingly, women with disabilities depend on a full range of contraceptive methods to address the particular needs or challenges posed by individual disabilities.

Thus, the Moral Exemptions IFR could negatively impact these considerations within the disabled community. Not only would it widen the educational gap in recognizing that different kinds of disabilities require different kinds of contraceptive care between doctors and disabled women, but also it would increase the lack of comprehensive health care for disabled women.

### III. The Impact of the Moral Exemptions IFR on Women in the Disabled Community

The Moral Exemptions IFR vastly expands the universe of potential exemptions by including all but publicly traded employers (and government employers) with moral objections to contraception as exempt from the ACA's contraceptive coverage requirement.[52] The Moral Exemptions IFR creates a new category of employers who can now qualify for an exemption or can voluntarily chooses an accommodation, nonprofit and closely held for-profit employers who

---

[43] *Id.*
[44] Kaplan, *supra* note 41.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] 82 Fed. Reg. 47838 *et seq.*

9

00209091

Exhibit 38

JA-0000771

have a moral objection to contraceptives.[53] There is now a considerably larger pool of employers than when the exemption was available only to those who were employees of a house of worship or who were eligible for an accommodation in the past. Under the Moral Exemptions IFR, if an employer decides to claim a moral exemption, the cost of contraceptives will be borne by women workers and female dependents. There will be no guarantee of contraceptive coverage for employees of an exempt organization. And the employer may choose to cover some methods, but has no obligation to cover all 18 FDA methods without cost sharing.

## IV. The Moral Exemptions IFR Should Be Set Aside

Women with disabilities deserve equal access to affordable and comprehensive health care, including access to all FDA-approved contraceptive methods. But the Moral Exemptions IFR will exacerbate the many barriers women with disabilities already face when accessing health care: disproportionately higher rates of poverty and unemployment, and lower rates of health insurance. As a result, women with disabilities will be less able to afford contraception, less able to prevent unintended pregnancy and manage other health issues, and less able to select the contraception methods recommended for their particular disability and health status.

## V. The Moral Exemptions IFR Violates the Administrative Procedure Act

The APA imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[54] The APA is applicable here because the Moral Exemptions IFR is a final agency action and is a legislative rule within the meaning of the APA.[55] By enacting the Moral Exemptions IFR in the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

### A. Procedural Violations of Pre-Adoption and Post-Adoption Requirements of the Administrative Procedure Act

The APA contains two procedural rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule that is at issue here.[56] This rule violates the notice and comment requirement and the 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its reasoning, the Departments do not have good cause.

---

[53] *Id.*
[54] 5 U.S.C. § 551(5).
[55] *Id.*
[56] *Id.*

00209092

Exhibit 38                                                                                          JA-0000772

### 1. What is "Good Cause"?

The APA limits good cause to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[57] Courts have found good cause in cases that involve: (1) emergencies;[58] (2) context where prior notice would subvert the underlying statutory scheme;[59] and (3) situations where Congress intends to waive section 553's requirements.[60] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[61] This means that the Departments must have good cause to waive each requirement.

### 2. **Which of the APA's Procedural Requirements are at Issue Here?**

Section 553(b) of the Administrative Procedure Act (APA) requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[62] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[63] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[64]

### 3. **The Departments Have Not Satisfied the "Good Cause" Standard**

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[65] While these rules empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health

---

[57] 5 U.S.C. § 553(b).

[58] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004).

[59] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (The court reasoned that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made.).

[60] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (Here, the courts are finding that the APA is inapplicable, rather than that good cause is established.).

[61] *U.S. v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

[62] 5 U.S.C. § 553(b).

[63] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[64] *Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996).

[65] 82 Fed. Reg. at 47855.

11

00209093

Exhibit 38                                                                                                    JA-0000773

Care Portability and Accountability Act of 1996,[66] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[67] This however is a declaratory argument that is conclusory in nature and does not rise to the levels described above when Courts have found that the circumstances surrounding a rulemaking rise to the standard of "good cause." This reasoning is similar to other instances in which agencies made conclusory claims of an emergency situation, unaccompanied by independent facts, which the courts determined are insufficient to constitute good cause.[68] Declaring that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed is not the same as it actually being impracticable and contrary to public interest.

The Departments further argue that good cause is supported because they have already "issued three interim final rules implementing this section of the PHS Act because of the immediate needs of covered entities and the weighty matters implicated by the HRSA Guidelines"[69] and because "[t]wo lawsuits have been pending for several years by entities raising nonreligious moral objections to the Mandate."[70] However, this reasoning should be weighed against the burdens that many women will face if their employer or university decides to take advantage of the Moral Exemptions IFR and cease to offer contraception without cost-sharing. They will be forced to find alternative means for contraceptive coverage or to pay high prices out of pocket to maintain the contraception coverage they currently have.

As explained above, the Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and the APA's post-adoption publication requirements. They have not adequately established that the APA's procedural requirements don't apply or that they have good cause for disregarding the APA's procedural rulemaking requirements. Because the Moral Exemptions IFR was promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, the

---

[66] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); and 42 U.S.C. § 300gg–92.

[67] 82 Fed. Reg. at 47855.

[68] *See, e.g.*, *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 707 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v.Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); *United States v. Brewer*, 766 F.3d 884, 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting *United States v. Reynolds*, 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).

[69] 82 Fed. Reg. at 47855.

[70] *Id.*

12

00209094

Exhibit 38

JA-0000774

Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the Moral Exemptions IFR should be set aside.

### B. Substantive Violations of the Administrative Procedure Act

In addition to the APA's procedural requirements described above, the APA contains several substantive rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[71] The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[72] "contrary to a constitutional right,"[73] or "in excess of statutory jurisdiction."[74] The Moral Exemptions IFR violates 5 U.S.C. § 706(2) because it contradicts the Patient Protection and Affordable Care Act ("ACA").

The ACA (and implementing regulations) require all new insurance plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" without cost-sharing requirements in order to protect women's health, ensure that women do not pay more for insurance coverage than men, and advance women's equality and well-being.[75] In addition, section 1554 of the ACA prohibits the Departments from issuing regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care"[76] and Section 1557 of the ACA, prohibits sex discrimination in certain health programs and activities.[77]

By permitting objecting institutions to deny no-cost contraceptive coverage, the Moral Exemptions IFR erects unreasonable barriers to medical care violating Section 1554 of the ACA. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the ACA. Because the Moral Exemptions IFR violates the ACA, this IFR also violates the APA and must be set aside on that basis.

### VI. The Moral Exemptions IFR is Unconstitutional

This comment will now discuss how the Moral Exemptions IFR does not implicate the Religious Freedom Restoration Act ("RFRA") and how it is unconstitutional as it violates the Due Process clause of the Fifth Amendment.

---

[71] 5 U.S.C. § 551(5).
[72] 5 U.S.C. § 706(2)(A).
[73] 5 U.S.C. § 706(2)(B).
[74] 5 U.S.C. § 706(2)(C).
[75] *See* 4 2 U.S.C. § 300gg-13(a)(4); 4 5 C.F.R. § 147.130 (2013)(a)(1)(iv).
[76] 42 U.S.C. § 18114(1).
[77] 42 U.S.C. § 18116.

13

Exhibit 38

00209095

## A. The Moral Exemptions IFR Does Not RFRA

While the administration has asserted that the Religious Freedom Restoration Act allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, RFRA provides no authority to craft moral exemptions. The Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's moral convictions—which RFRA neither requires nor permits.

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is no basis to distinguish between these federal statutory entitlements and the contraceptive coverage in the ACA. The Moral Exemptions IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find morally objectionable. Such a result would impermissibly shift the cost of moral objections to coverage onto the very people that the ACA was meant to protect.

## B. The Moral Exemptions IFR Violates the Due Process Clause of the Fifth Amendment to the Constitution

The Fifth Amendment explicitly prohibits the federal government from depriving individuals of their "life, liberty, or property" without due process of the law.[78] Without any notice, the Moral Exemptions IFR removes contraceptive healthcare coverage from the insurance plans that employers are required to offer to their employees. This rule violates the Fifth Amendment on the basis that it constitutes sex discrimination, and deprives an individual of a liberty without due process of law.

Women have historically been subjected to illegal discrimination based on their gender in violation of the Fifth Amendment.[79] The ACA's contraception coverage was implemented to resolve the fact that women tend to pay more for insurance coverage than their male counterparts.[80] The Moral Exemptions IFR violates the Fifth Amendment because it interferes with women's access to contraception, which is part of their healthcare. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex.

This rule imposes a disparate impact on women because it primarily affects their right to reproductive freedom concerning contraceptive care. Many of the medical treatments that are typically associated with contraceptive care regulate procedures related to female reproductive

---

[78] U.S. CONST. amend. V; U.S. CONST. amend. XIV.
[79] *Gender Discrimination Lawsuit against KPMG Can Move Ahead*, LEEDS BROWN LAW P.C. (Feb. 25,    2013), http://www.lmblaw.com/blog/2013/gender-discrimination-lawsuit-against-kpmg-can-move-ahead.
[80] *See* 4 2 U.S.C. § 300gg-13(a)(4); 4 5 C.F.R. § 147.130 (2013)(a)(1)(iv).

14

Exhibit 38

00209096

system, which may or may not have anything to do with family planning decisions.[81] Furthermore, this rule is problematic because it allows employers and schools to deny preventive health benefits that only concern female anatomy, and thus discriminates based on sex.

The Supreme Court has ruled in several cases that facially neutral employment practices with an adverse impact on members of a protected class constitute discrimination.[82] The administration cites to current litigation, and its need to streamline this process in hopes to cut down on pending and future litigation.[83] However, the court ruled in *Frontiero v. Richardson* that administrative convenience, although not without some importance is not a 'shibboleth,' and any statute which draws a sharp line between sexes solely for the purpose of achieving administrative convenience is arbitrary, and violates the Due Process Clause of the Fifth Amendment.[84] Overall, by allowing objecting institutions to deny only certain women's preventative health coverage –namely, coverage for contraceptives—the rule has a greater impact on one gender solely based on one's anatomy.

The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[85] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs newly covered by the contraceptive coverage provision of the ACA.[86] It is estimated that the ACA created an out-of-pocket savings of approximately $1.4 billion for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their healthcare.[87] Under the Moral Exemptions IFR, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption. While it is unclear how many organizations will avail themselves of one of these exemptions, it is certain that many women will see a dramatic increase in their reproductive healthcare costs as organizations seek to decrease their own spending on employee healthcare.

---

[81] THE HENRY J. KAISER FAMILY FOUNDATION, *New Regulations Broadening Employer Exemptions to Contraceptive Coverage: Impact on Women* (Oct. 6, 2017), https://www.kff.org/womens-health-policy/issue-brief/new-regulations-broadening-employer-exemptions-to-contraceptive-coverage-impact-on-women/.

[82] *Griggs v. Duke Power Co.*, 401 U.S. 424, 435 (1971); *Dothard v. Rawlinson*, 433 U.S. 321, 329 (1977).

[83] "During the period when the Departments were publishing and modifying our regulations, organizations and individuals filed dozens of lawsuits challenging the Mandate. Plaintiffs included … several non-religious organizations that opposed coverage of certain contraceptives under the Mandate on the basis of non-religious moral convictions." *Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act*, 82 F.R. 4738, 47842 (2017).

[84] *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973); Cook, John J., *Fifth Amendment – Due Process Clause – Sex Discrimination – Sex: A Suspect Classification; Frontiero v. Richardson*, 7 AKRON L. REV. 11 (1974), http://ideaexchange.uakron.edu/cgi/viewcontent.cgi?article=2223&context=akronlawreview.

[85] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[86] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 Health Affairs 7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

[87] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 Health Affairs 7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

15

00209097

Exhibit 38

In *Board of Regents v. Roth*, the Court stated that a property interest arises whenever a person has a legitimate claim of entitlement.[88] The right to contraceptive coverage without cost sharing is a protected property interest that can only be infringed by an act of the legislature or through a properly issued rule found in the text of the statute. When the ACA was implemented, it established that women now have a legitimate claim of contraceptive coverage without cost sharing.[89] Under the new rule, without an opportunity of a notice and hearing, thousands of women will be prevented from obtaining the no cost contraceptive coverage to which they would otherwise be entitled to. The Moral Exemption IFR violates the Due Process clause since it does not give notice, provide for an opportunity to be heard at a meaningful time in a meaningful way, and does not give a decision that was supported by substantial evidence.[90]

For these reasons, the Departments should find that the Moral Exemptions IFR violates the APA, both procedurally and substantively, it does not implicate RFRA and it is unconstitutional as it violates the Due Process clause of the Fifth Amendment.

For all these reasons, we urge the Departments to set aside the Moral Exemptions IFR.

\*\*\*

CAP appreciates the opportunity to comment on this interim final rule. If you require additional information, please contact:

Sincerely,

The Center for American Progress

Autistic Self-Advocacy Network
Autism Women's Network
National LGBT Task Force

---

[88] *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

[89] Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 et seq. (2010).

[90] *Procedural Due Process*, EXPLORING CONSTITUTIONAL CONFLICTS (2011), http://law2.umkc.edu/faculty/ projects/ftrials/conlaw/proceduraldueprocess.html.

16

00209098

Exhibit 38

JA-0000778




Atheists. Agnostics. Humanists.
Americans.

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9940-IFC

Dec. 5, 2017

Dear Acting Secretary Hargan,

The undersigned organizations represent the largest and fastest growing religious demographic in the United States, those without any religious belief or affiliation – the nonreligious, sometimes referred to as the "nones." This constituency includes, amongst others, atheists, agnostics, and secular humanists and encompasses one-in-four Americans, making it the single largest "religious group" in the United States.[1] Among young adults (age 18-29) nearly four-in-ten (39%) identify as nonreligious. As representatives of the nonreligious, we seek to defend a secular society. This is one where an individual's choice whether to believe in and follow a religious path is a personal one, made freely, and where the government neither prefers nor disadvantages one religion as opposed to another, nor religion in general as opposed to non-religion.[2]

The Center for Inquiry ("CFI") is a 501(c)(3) non-profit educational organization dedicated to the promotion of a secular society based on reason, science, freedom of inquiry, and humanist values. The Secular Coalition for America ("SCA") is a 501(c)(4) nonprofit advocacy organization dedicated to increasing the visibility of and respect for nontheistic viewpoints in the United States, and protecting and strengthening the secular character of our government as the best guarantee of freedom for all.

In a secular society, government decisions are made based on science-based evidence, not religious dogma. Broad and equal access to affordable birth control has been demonstrated to have significant benefits to society as a whole. CFI and SCA support the right of women, as

---

[1] Jones, Robert P., Daniel Cox, Betsy Cooper, and Rachel Lienesch. "Exodus: Why Americans Are Leaving Religion – and Why They're Unlikely to Come Back." *PRRI*. 2016. http://www.prri.org/research/prri-rns-poll-nones-atheist-leaving-religion/.

[2] *Epperson v. Ark.*, 393 U.S. 97, 104 (1968).

1

00372893

Exhibit 39

JA-0000779

guaranteed by the Affordable Care Act, to have complete access to preventive care, including contraception. It is essential that this right of women is not sacrificed to assuage the concerns of organizations and individuals who, if they oppose any particular form of contraception, are not required to utilize that method, but simply allow for coverage of it. CFI believes a woman's right to access legal forms of health care should not be dependent on the religious or moral beliefs of her employer, and that, while freedom of religion is a cherished and important principle on which the United States was founded, said freedom does not involve a right to impose one's religious beliefs on other people. Any rules should therefore start from this point: no woman should be denied access to the benefits of the contraception mandate. Any rule exempting employers and organizations must be drawn as narrowly as possible, consistent with existing laws and court rulings. The government must avoid taking the easy path of drawing broad exemptions to avoid challenges or to satisfy particular interest groups. The opponents of the Affordable Care Act, and in particular of the contraception mandate, have made clear that no exemption by the government will be broad enough to satisfy them. The cases brought to court regarding the contraception mandate have demonstrated this clearly — any proposal by the government has been met with a chorus of disapproval from certain religious groups which are inflexible in their opposition, such the United States Conference of Catholic Bishops (USCCB) and the Becket Fund for Religious Liberty (Becket Fund). They do not seek a workable accommodation under the contraception mandate; instead, they seek the abolition of the mandate itself. The Departments have a duty to craft rules subject to the restrictions of the Religious Freedom Restoration Act ("RFRA") and existing case law. But they have an equally important duty to protect the right of women to safe, affordable legal preventive care.

As a result, CFI and SCA unequivocally oppose the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[3] and families. Over 62 million women with private insurance now have coverage of these vital healthcare services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[4]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. And the IFR is predicated upon a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons the Center for Inquiry and the Secular Coalition for America call on the Departments to rescind the IFR.

---

[3] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive healthcare and insurance coverage for such care also affects people who do not identify as women, including some gender nonconforming people and some transgender men.

[4] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

00372894

Exhibit 39                                                                JA-0000780

## I.    Birth Control Is Critical to Women's Health

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[5] As a result, women face a high level of healthcare insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[6] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[7] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[8] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[9] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[10] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[11]

The goal of preventive healthcare is to help people control, track, and better manage their lifelong health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[12] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with

---

[5] U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2, 2009.

[6] Kaiser Family Foundation, Women's Health Care Chartbook, 2011.

[7] Id.

[8] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342–43 (2000); 1342–43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[9] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[10] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[11] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[12] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

00372895

Exhibit 39

JA-0000781

underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[13]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[14] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[15] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended,[16] and the U.S. has the highest rate of maternal mortality in the developed world.[17] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[18]Contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[19] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[20] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[21, 22]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing healthcare services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

[13] Id. at 103-104.

[14] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[15] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. Epidemiologic Reviews. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[16] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, New England Journal of Medicine. 2016. 374(9):843–852.

[17] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[18] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[19] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute. 2011.

[20] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015:125:250–5.

[21] Id.

[22] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

00372896

Exhibit 39

JA-0000782

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[23] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-l940s to early 1950s.[24] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[25] which was followed by large increases in women's presence in law, medicine, and other professions.[26] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[27]

A woman and her healthcare providers, not politicians, should determine the right contraceptive for her healthcare needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her healthcare provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular healthcare provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not healthcare at all.

## II.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

---

[23] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[24] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/w1 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[25] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[26] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.harvard.edu/handle/1 /2624453.

[27] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

5

00372897

Exhibit 39                                                                 JA-0000783

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.  Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique healthcare needs and burdens."[28] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[29]  In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the healthcare crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access.  In fact, more than half of women delay or avoid preventive care because of its cost.  *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[30]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services.  For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[31]  And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed healthcare system."[32]  That contraception would be covered was clear.[33]

---

[28] *Id.* at 8,727.

[29] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[30] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[31] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[32] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women.  This may include . . . family planning . . .").

[33] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

6

00372898

Exhibit 39                                                                                                  JA-0000784

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[34] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[35] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[36] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations— carried out Congress's direction.

### B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exemptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow healthcare entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain healthcare services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify the IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[37] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[38]

---

[34] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[35] *Id.* at 109-10.

[36] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

[37] *See* Priests for Life. v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[38] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.,* Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute

7

00372899

Exhibit 39

JA-0000785

Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[39] This exemption is intended as a temporary means for transitioning employers to full compliance.[40] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[41]

### III.    The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[42] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[43] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[44]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[45]

---

now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

[39] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192-72,193 (Nov. 18, 2015).

[40] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[41] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[42] *See, e.g.*, at 21 https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf

[43] *Id.* at 19.

[44] *Id.* at 24-27

[45] 2 U.S.C. § 18116.

8

00372900

Exhibit 39

JA-0000786

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]." [46] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero." [47] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation" [48] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date. [49] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. [50] The Departments further argue that the

---

[46] E.g., *Cutter v. Wilkinson*, 544 U.S. 709, 722, 726 (2005).

[47] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[48] 5 U.S.C. § 553(b), (c).

[49] 5 U.S.C. § 553(d).

[50] CFI has previously submitted comments regarding the availability of exemptions to the contraceptive mandate of the Affordable Care Act, including in response to a request for such comments from the Departments of Health and Human Services, Labor, and Treasury after the Supreme Court's decision in *Burwell v. Hobby Lobby*, 134 S. Ct. 2751 (2014). These comments are available online at

9

Exhibit 39

00372901

JA-0000787

interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[51]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[52] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[53]

For each of these reasons, the rule violates the APA and should be rescinded.

## V.    Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to

---

https://www.centerforinquiry.net/docs/opp/HHS_Comments_Full_2014OCT.pdf. Those comments, however, do not address the specific issues raised presented in these IFRs.

[51] 5 U.S.C. § 706.

[52] 42 U.S.C. § 18114(1).

[53] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

00372902

Exhibit 39                                                                    JA-0000788

undermine the contraceptive benefit. [ORGANIZATION] unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

### A. Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive healthcare should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[54] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[55]

### B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[56] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[57, 58] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[59] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[60]

### C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[61] Increased access to contraception is not associated with increased unsafe sexual

---

[54] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[55] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents. Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

[56] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[57] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[58] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[59] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[60] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use. 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[61] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

00372903

Exhibit 39

JA-0000789

behavior or increased sexual activity.[62,63] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[64,65] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[66] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[67] More females are using contraception the first time they have sex.[68]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

### VI.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[69] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

### A.    Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title

[62] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy, 2009.
[63] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9.
[64] Minguez M, Santelli JS, Gibson E, Orr M, & Samant. S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.
[65] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[56] Id.
[67] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[58] Id.
[59] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

00372904

Exhibit 39                                                                                                                    JA-0000790

X-funded health centers to give priority to "persons from low-income families."[70] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[71] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[72]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[73] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[74] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[75] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique healthcare needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[76] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any

---

[70] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[71] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[72] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[73] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

[74] *See* Fowler, Cl, Lloyd, SW, Gable, J. Wang. J, and Krieger, K. *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.l, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[75] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[76] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

00372905

Exhibit 39

JA-0000791

resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to healthcare, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[77] This is particularly true with respect to specialty providers, including OB/GYNs.[78] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

### B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[79] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[80] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and healthcare they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent

---

[77] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[78] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services. supra at note 7.

[79] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office. Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6. (Sept. 2017). https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis. Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill. (Sept. 14, 2017). http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSZlV.

[80] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC). https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017). https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

00372906

Exhibit 39                                                                                                          JA-0000792

of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[81]

Unfortunately, Medicaid is not the only healthcare program that has faced administrative and congressional attacks despite playing a critical role in the healthcare safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[82] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[83] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[84]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as fail-safes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

---

[81] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[82] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. L, Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[83] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X: Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[84] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

00372907

Exhibit 39                                                                JA-0000793

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[85] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[86] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[87] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[88]

The Departments' is wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons CFI and SCA call upon on the Departments to rescind the IFR.

Sincerely,

Nicholas J. Little, Esq.
Vice President and General Counsel
Center for Inquiry

---

[85] Guttmacher Institute. Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[86] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute. Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[87] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute. Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[88] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017. https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00372908

Exhibit 39

JA-0000794

Larry T. Decker
Executive Director
Secular Coalition for America

17

00372909

Exhibit 39

JA-0000795

December 5, 2017

<u>**For Submission Electronically**</u>

The Honorable Seema Verma
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC, Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, MD 21244-1850

**RE: Comment in Response to "Religious Exemptions and Accommodations for Coverage of
Certain Preventive Services Under the Affordable Care Act; Proposed Rulemaking"**

Dear Administrator Verma:

We, the undersigned members of the Coalition for Liberty & Justice, strongly oppose the Religious
Exemptions and Accommodations for Coverage of Certain Preventive Services, an interim final rule
published in the Federal Register on October 13, 2017, at 82 Fed. Reg. 47792 *et seq.* (IFR). These rules
broadly expand the exemption to the Affordable Care Act's contraceptive coverage requirement to allow
any employer, public or private, religious or secular, large or small, to deny coverage for contraceptives
based on any religious or moral objections. While the Department of Health and Human Services (the
Department) professes its intent to protect religious liberty, in issuing the IFR, it is in danger of enacting
regulations that do exactly the opposite. The expanded exemption prioritizes objections by employers,
administrators and insurers over the religious liberty rights and health care needs of individual workers
and their dependents.

The Coalition for Liberty & Justice represents a diverse cross-section of communities, including faith-
based and secular organizations, that are dedicated to furthering women's rights, LGBTQ rights, the
separation of church and state, civil rights and reproductive health, rights and justice. Though we bring
distinct and diverse perspectives to these comments, we are united in our belief that public policies should
both respect religious liberty and protect against the use of religious beliefs to discriminate or undermine
equality. We believe that true religious liberty respects individuals, supports the common good and
reflects the foundational principles of our nation.

As organizations dedicated to those principles, we oppose the IFR, which dramatically broadens
exemptions for corporations, organizations and other entities at the expense of individual conscience. We
support the right of all workers and their dependents to access contraceptive coverage and to make
personal decisions about using contraception based on their own beliefs. These rules sabotage the
autonomy, conscience, well-being and health of women and their families. For the sake of religious
liberty and public health, we call upon you to rescind them.

We are a pluralistic coalition and we live in a pluralistic society. The beauty of true religious liberty, a
reflection of our democratic ideals, is that it protects freedom of religion and freedom from religion. It
does not allow either principle to trample upon the other. It protects each individual's liberty, but it does
not grant permission for others to usurp another's liberty for their own. When employers demand
concessions from the government to use religion as a means to discriminate against their employees, that
constitutes a violation of the freedom from religious fiat guaranteed by the US Constitution. Indeed, a
critical function of the federal government is to prevent such discrimination and ensure that all individuals
are treated equally before the law, including in their religious liberty rights.

---

**Page 1**

00373022

Exhibit 40

Protecting individual conscience is essential in that regard, especially the right to make the most personal, intimate decisions based on that conscience, such as when and whether to have children. It is unconscionable that any organization be permitted to abuse the notion of religious freedom by privileging their business interests over the consciences of their employees. Allowing businesses, corporations, universities and essentially any public entity that claims a religious or moral objection—large or small, public or private, religious or secular—to deny women the care they need to plan their families and their futures is a mistake. The IFR will prioritize corporations over individuals, disregard individual conscience and further set back religious freedom.

Such a misrepresentation of conscience is not protecting religious liberty. Rather, it represents government sanctioning of discrimination. True religious freedom provides an individual the space to exercise their beliefs as they see fit, as well as to act on those beliefs without coercion or undue influence by powerful institutions. It does not allow one to harm another or impose one set of views on another. Nor should that harm be facilitated by federal regulation.

Inherent in that protection is a call to ensure people have access to plan their families with low-cost contraception. If these unjust rules are allowed to stand, it is everyday working women who will bear the brunt—the nurse at a Catholic hospital who is balancing late night shifts with child rearing; the young student at a faith-based university who must decide what comes first, paying for birth control or paying for books; the employee of a craft store who has to work overtime to pay for birth control she needs for her health.

It is incumbent upon the Department to protect the religious liberty rights of all, including women workers, students and their dependents. It is these individuals' right to follow their own consciences, moral codes and beliefs when making decisions about contraception; they should expect their government to protect their liberty and ability to do so. Respecting religious liberty and protecting public health are important roles of the government. Discriminatory and unreasonable demands made in the name of "religious liberty," however, are not—and, indeed, undermine both.

We deeply value religious liberty, and we recognize contraceptive coverage as part of the nation's commitment to people's healthcare. We know that religious liberty is upheld when each person is able to follow their own conscience, beliefs and moral codes regarding the decision to use contraception and has access to the benefits that help make it more affordable. The same cannot be said when an employer is allowed to trump employees' personal beliefs through the denial of insurance coverage for contraception based on the employer's beliefs.

Moreover, while this IFR targets access to contraception for broad exemptions, the regulations leave open the door to other vast exemptions that undermine civil rights and protections for LGBTQ individuals and others. This is not acceptable. Again, while individual conscience is something that legitimately deserves the utmost respect and protection, that protection cannot come at the expense and harm of another's conscience and the protection of their religious liberty and civil rights.

---

**Page 2**

---

00373023

Exhibit 40

Rather than advance religious freedom, these rules would encourage powerful institutions to dodge civil rights protections established to safeguard individuals, and they would enable the powerful to impose their idea of what is right on everyday Americans, with little oversight or checks on their power. This is far from a vision of America that defends its people's inalienable right to freedom and the pursuit of happiness. We, the undersigned organizations, ask the Department to protect contraceptive coverage and workers' religious liberty, and we urge that the IFR be rescinded.

Sincerely,

Abortion Care Network
American Atheists
American Humanist Association
Association of Reproductive Health Professionals
Call To Action USA
Catholics for Choice
Center for Inquiry
DignityUSA
In Our Own Voice: National Black Women's Reproductive Justice Agenda
Jewish Women International
Keshet
Medical Students for Choice
National Asian Pacific American Women's Forum
National Center for Lesbian Rights
National Council of Jewish Women
National Latina Institute for Reproductive Health
National LGBTQ Task Force
National Organization for Women
Religious Coalition for Reproductive Choice
Religious Institute
Secular Coalition for America
Society for Humanistic Judaism
Unitarian Universalist Women's Federation
Women's Alliance for Theology, Ethics and Ritual (WATER)

---

**Page 3**

00373024

Exhibit 40

JA-0000798


**Colorado Consumer
Health Initiative**

December 5, 2017

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9940-IFC

Dear Acting Secretary Hargan,

The Colorado Consumer Health Initiative (CCHI) is submitting the following comments in response to the Departments of Health and Human Services, Labor, and Treasury's (the Departments') Interim Final Rule (IFR) regarding the Affordable Care and Patient Protection Act's contraceptive coverage requirement. CCHI is a state based nonprofit, nonpartisan membership organization dedicated to ensuring access to quality, affordable, and equitable health care for all Coloradans. To this point, CCHI is committed to ensuring all individuals have affordable coverage of preventative services, including contraceptive services for those who wish to receive them. CCHI opposes the Departments' efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement.

The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

Colorado has seen significant success in result of our state efforts to expand access to family planning services, which has included expanding access to long-acting reversible contraception (LARC) since 2008. With the cost barrier removed, more women are choosing

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017). *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

1420 Ogden St. Ste. A1          303 563 9108          cohealthinitiative.org                    1

Denver, CO 80218          @cohealthaccess

00396708

Exhibit 41                                                                                          JA-0000799

long acting, more effective birth control methods. In Colorado's experience, expanding family planning services resulted in a reduction of birth rate, reduction of abortion rate and decreased dependence on government programs. Between 2009 and 2016, the birth rate for Colorado women ages 15 to 19 fell 54 percent, and the abortion rate for the same population fell by 64 percent. It is estimated that reductions in teen and unintended pregnancies helped the state avoid between $66,063,664 and $69,625,751 in entitlement program costs (2010-2014).[3]

We call on the Departments to rescind the IFR. By allowing virtually any employer and university to deprive women of contraceptive coverage, this rule will: (1) harm women and their health and well-being; (2) discriminate against women in violation of multiple federal laws and the Constitution; (3) legitimize a distorted picture of the science supporting contraception; and (4) place an unrealistic burden on other federal programs to support contraception services.

### I.    Birth Control Is Critical to Women's Health and Well-being

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[4] Many women choose to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[5] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[6] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[7]

Beyond alleviating discriminatory out of pocket spending for women, zero-cost coverage of contraception is critical to ensuring women can use it to live healthy lives.

---

[3] https://www.colorado.gov/pacific/sites/default/files/HPF_FP_2017-Family-Planning-Data-Report.pdf
[4] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.
[5] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.
[6] *Id.*
[7] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs. 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

00396709

Exhibit 41                                                              JA-0000800

Contraceptive efficacy in preventing unintended pregnancy is well supported in evidence.[8] Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[9] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[10] Unintended pregnancy rates are highest among those least able to afford contraception.

Moreover, most women who use birth control do so for both contraceptive and non-contraceptive purposes.[11] Non-contraceptive health benefits of contraception include decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[12]

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. Studies show that access to contraception has increased women's wages and lifetime earnings.[13] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[14]

---

[8] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.
[9] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[10] Finer LB and Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine*, 2016, 374(9):843–852.
[11] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute. 2011.
[12] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.
[13] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.
[14] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/papers/w17922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

1580 Logan St. Suite 340          303 563 9108          cohealthinitiative org          .;
Denver, CO 802033
                                  @cohealthaccess

00396710

Exhibit 41                                                                      JA-0000801

It is important to emphasize that birth control is critical to women's health and lives.

## II. The IFR Undermines Congress's Intent that Birth Control Be Covered As A Preventive Service; and Discriminates Against Care that Women Need

When Congress passed the Women's Health Amendment, it meant to ensure that recommended preventive services for women are covered adequately and to help end gender discrimination in the practices of private insurance companies.[15,16]

Like other civil rights laws, the birth control benefit was intended to address discrimination and ensure women equal access to preventive services that allow them to be full participants in society. In interfering with that access, the IFR results in health insurance that covers preventive care that men need, but not care that women need.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[17] Courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[18]

Freedom of religion is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious beliefs as an excuse to harm others. The Constitution commands that a religious accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[19] The IFR fails this constitutional do-no-harm test.

## III. Justifications for the IFRs Are Faulty

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The Departments make several misleading statements in this Rule to undermine the contraceptive benefit. To this point:

---

[15] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").
[16] *Id.* at 8,727.
[17] https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf
[18] *Id.* at 24-27
[19] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

1580 Logan St. Suite 340          303 563 9108          cohealthinitiative.org
Denver, CO 802033
                                  @cohealthaccess

00396711

Exhibit 41                                                              JA-0000802

### A. *Contraceptives Do Not Interfere with an Existing Pregnancy*

The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices... that many persons and organizations believe are abortifacient—that is, as causing early abortion."[20] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[21]

### B. *Contraceptives Are Medication and Carry Risks Like Any Other Medication*

The Rule raises concerns about the "negative health effects" of contraception.[22] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions.[23, 24] The Rule suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[25] This kind of logic is not used to offer coverage exemptions for any other FDA-medication with the potential of unwanted side effects, and should not be used to undermine the many positive benefits of oral contraception.

### C. *Contraceptives Do Not Increase Sexual Activity Among Adolescents*

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[26] Increased access to contraception is not associated with increased unsafe

---

[20] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[21] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents. Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).
[22] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[23] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[24] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[25] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use. 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.
[26] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

1580 Logan St. Suite 340
Denver, CO 802033

303 563 9108

@cohealthaccess

cohealthinitiative org

00396712

Exhibit 41

JA-0000803

sexual behavior or increased sexual activity.[27,28] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[29,30] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[31]

### IV.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[32] This assertion fails to recognize that Medicaid and Title X do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers.

With current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[33] Since 2010, the reported annual number of clients served at Title X sites has dropped by approximately 1.2 million

---

[27] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[28] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[29] Minguez M, Santelli JS, Gibson E, Orr M, & Samant. S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3), 338-344.

[30] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[31] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[32] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147. pt. 147).

[33] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act." *American Journal of Public Health* (2016). available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

1580 Logan St. Suite 340          303 563 9108          cohealthinitiative org
Denver, CO 802033
                                  @cohealthaccess

00396713

Exhibit 41                                                                      JA-0000804

patients.[34] This decline corresponds to over $30 million in cuts to Title X's annual appropriated funding.[35]

Furthermore, within the last year, as part of the numerous attempts to repeal the ACA, policymakers have continued to try to impose steep cuts to the Medicaid program, and have threatened to prohibit Planned Parenthood from receiving Medicaid payments, despite providing a porportionally greater percentage of family planning services to the counties within which it opperates.

The Departments insist Title X and Medicaid are resources for those who will lose coverage as a consequence of these IFRs, however the administration's actions relating to these programs make their future uncertain. Colorado has already begun to see the impact of federal cuts, with the end of one federal grant closing the doors to the highly regarded organization Colorado Youth Matter and its family planning and sexual health services.[36]

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting contraception. Contraception use should be a matter between the individual and her provider, not between politicians and employers. For all of these reasons CCHI calls on the Departments to rescind the IFR.

Sincerely,

Terrell Blei
Policy and Outreach Fellow
Colorado Consumer Health Initiative

---

[34] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.
[35] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).
[36] http://www.coloradotrust.org/content/story/reproductive-health-care-access-increasingly-uncertain-colorado

1580 Logan St. Suite 340        303 563 9108          cohealthinitiative.org
Denver, CO 802033
                               @cohealthaccess

00396714

Exhibit 41                                                        JA-0000805



1780 Pennsylvania St. • Denver, CO 80203 • phone: 303-953-3600 • fax: 303-322-4576

www.coloradohealth.org

November 13, 2017

DEPARTMENT OF THE TREASURY
Internal Revenue Service
Re: 26 CFR Part 54
[TD-9827]
RIN 1545-BN92

DEPARTMENT OF LABOR
Employee Benefits Security Administration
Re: 29 CFR Part 2590
RIN 1210-AB83

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Re: 45 CFR Part 147
[CMS-9940-IFC]
RIN 0938-AT20

**Religious Exemptions and Coverage of Certain Preventive Services Under the Affordable Care Act**

Thank you for the opportunity to comment on the interim final rules package regarding "Religious Exemptions and Coverage of Certain Preventive Services Under the Affordable Care Act." The Colorado Health Foundation is the state's largest private foundation and works to bring health in reach to all Coloradans. Our vision is that across Colorado each of us can say: "We have all we need to live healthy lives." We work to achieve this vision by engaging closely with communities across the state through investing, policy and advocacy, learning and capacity building.

After reviewing these interim final rules, we believe they would put health further out of reach for many Colorado women, their children and families if enacted, and we urge you to rescind the interim final rule package. The changes outlined in this proposal could reverse the tremendous progress Colorado has made in reducing both unintended pregnancies and abortions for Colorado teenagers and young women and create new barriers for women to access timely, affordable and comprehensive health care services.

Colorado has made significant improvements in the past decade to ensure affordable contraception and family planning services are within reach for more Colorado women. We have seen the benefits of this across the state: more babies are getting a healthy start in life, more women have access to the health



00326653

Exhibit 42



care services they need and more educational and economic opportunities are available for Colorado families as a result of these services. According to data from the Colorado Department of Public Health and Environment, since 2008, Colorado has seen significant benefits to expanding access to contraception and family planning services, including:

- The birth rate for young women ages 15-19 has been cut by more than half, falling 53 percent;
- A similar downward trend can be seen among women ages 20-24, with birth rates dropping 30 percent;
- The number of repeat teen births (teens giving birth for the second or third time) dropped by nearly two-thirds (63 percent);
- Births to women without a high school education fell 38 percent;
- The abortion rate among women ages 15-19 fell by 53 percent and among women ages 20-24 by 27 percent;
- The rate of rapid repeat births – which carries greater risk for women and their children – declined by 12 percent among all women;
- The average age for a first birth increase by 1.2 years among all women; and
- Other public health care costs avoided totaled more than $66 million.

Current federal and state policies have contributed to these positive trends and continue to underpin any sustained progress we hope to realize. The interim final rules expanding exemptions for mandated contraceptive coverage would have a significant and negative impact on Colorado's progress to advancing women's health. If fewer women have access to the comprehensive coverage, data shows Colorado will experience increases in teenage and young adult birth rates and abortions.

The interim final rules expanding the exemption from the contraceptive coverage requirements to non-governmental plan sponsors, institutions of higher education, health plan issuers and individuals who object to the provision of contraceptive coverage on religious or moral grounds limit health care services accessed solely by women.  As a result, the provisions in this interim final rule threaten to negatively impact the risk pool of the insurance market by permitting the creation of multiple, distinct risk pools that could make coverage more expensive for women. Distinct risk pools separating men and women, young and old, or healthy and sick works in the opposite direction of ensuring affordable access to care for all Americans.

Finally, the Colorado Health Foundation opposes the proposal to allow publicly traded corporations to claim an exemption to no-cost sharing contraceptive services for 'sincerely held moral convictions.' The

00326654

Exhibit 42



potential for abuse in use of this terminology is significant, and it could prevent women from having full access to the affordable comprehensive care they need to live healthy lives.

The Colorado Health Foundation works for all Coloradans, and the policy changes in this interim final rule would work against Colorado women and their families. As a state, Colorado has made impressive gains in reducing both teenage and young adult birthrates and abortions. This interim final rule would slow or reverse that progress. We encourage the Departments to maintain protections for the health of Colorado women by rejecting these proposed changes.

We appreciate your time and consideration. If you have any follow-up questions about these comments or the Colorado Health Foundation, please do not hesitate to contact Dustin Moyer, policy officer at the Colorado Health Foundation, at dmoyer@coloradohealth.org or 303-953-3600.

Sincerely,

Kyle Legleiter

Senior Director of Policy
The Colorado Health Foundation

00326655

Exhibit 42

JA-0000808

**COMMENTS OF
THE COUNTY OF SANTA CLARA, CALIFORNIA**

in response to

*Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under
the Affordable Care Act*, 82 Fed. Reg. 47792

and

*Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under
the Affordable Care Act*, 82 Fed. Reg. 47838

JAMES R. WILLIAMS, County Counsel
GRETA S. HANSEN, Chief Assistant County Counsel
LAURA TRICE, Lead Deputy County Counsel
LYNNETTE K. MINER, Fellow
OFFICE OF THE COUNTY COUNSEL
Attorneys for COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, Ninth Floor
San José, California 95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
Email: Lynnette.miner@cco.sccgov.org

December 5, 2017

00373530

Exhibit 43                                                                                          JA-0000809

**COMMENTS OF**
**THE COUNTY OF SANTA CLARA, CALIFORNIA**

The County of Santa Clara, California ("County"), submits these comments in opposition

to the *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services*

*Under the Affordable Care Act*, 82 Fed. Reg. 47792, and *Moral Exemptions and*

*Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act*,

82 Fed. Reg. 47838, interim final rules ("IFRs") published on October 13, 2017, by the U.S.

Department of the Treasury, the U.S. Department of Labor, and the U.S. Department of Health

and Human Services. In support of these comments, the County also submits a Resolution of the

Board of Supervisors of the County of Santa Clara Supporting Access to Contraceptives, adopted

on December 5, 2017.

## INTRODUCTION

Santa Clara County is located at the southern end of the San Francisco Bay and is home

to 1.9 million residents who rely on the County to provide essential services such as health care,

assistance for youth and the elderly, and a wide array of social services. The County also owns

and operates the Santa Clara Valley Medical Center ("SCVMC"), a comprehensive public

healthcare delivery system that provides critical healthcare services to county residents

regardless of their ability to pay. SCVMC is the only public safety-net healthcare provider in

Santa Clara County, and the second largest such provider in California. The County has a unique

interest in the IFRs informed by the role it plays as both a local government and safety-net

healthcare provider.

The County strongly opposes the IFRs' expanded exemptions to the contraceptive

coverage mandate under the Affordable Care Act ("ACA"). The IFRs contravene the ACA,

violate the Establishment Clause, and deny equal protection of the laws. The IFRs also ignore the

1

00373531

Exhibit 43

compelling governmental interests served by the mandate and are arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). The expanded exemptions established in the IFRs will significantly burden the County as a safety-net healthcare provider and threaten the public health of County residents, and they will have similar effects in communities nationwide.

## DISCUSSION

## I.     The IFRs Are Legally Flawed.

The IFRs' dramatic expansion of the employer exemptions to the contraceptive mandate is unsupported by law or fact. They violate the ACA, APA, and U.S. Constitution, and they rest on an improper disregard for the compelling governmental interests served by the broadly applicable mandate established in the ACA. The IFRs are legally flawed and should not be adopted as final rules.

### A.     The IFRs Contravene the ACA.

The ACA mandates that health insurance plans cover preventive services, including "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]."[1] This provision, known as the Women's Health Amendment, was intended to provide coverage for preventive services unique to women, including contraceptive services, and to address gender-based disparities in out-of-pocket healthcare costs.[2] By including contraceptive services as preventive services subject to mandatory coverage, HRSA acted in accordance with the ACA's intent and purpose. The IFRs, by contrast, undermine the ACA's purpose and intent, and contravene its clear directive mandating coverage for preventive services identified by

---

[1] 42 U.S.C. § 300gg-13(a)(4).
[2] *See, e.g.*, 155 Cong. Rec. 28841 (2009) (Statement of Sen. Boxer); 155 Cong. Rec. 29070 (2009) (Statement of Sen. Feinstein); 155 Cong. Reg. 29302 (Statement of Sen. Mikulski); 155 Cong. Rec. 29768 (Statement of Sen. Durbin).

00373532

Exhibit 43

JA-0000811

HRSA. The sweeping exemptions created by the IFRs will deny hundreds of thousands of women access to critical preventive care and disproportionately burden these women with the costs associated with contraception and family planning. The ACA does not authorize exemptions of this magnitude.

The IFRs are also inconsistent with the prohibition against sex discrimination under Section 1557 of the ACA.[3] The IFRs single out women for discriminatory treatment based on their gender, deny women access to medically necessary health care, and reinforce the gender-based healthcare cost disparities that the ACA sought to eliminate. For these reasons, among others, the IFRs violate the ACA and should be not be adopted as final rules.

### B.    The IFRs Violate the Constitution.

The IFRs also violate the Establishment Clause of the First Amendment and deny equal protection in violation of the Fifth Amendment of the U.S. Constitution. The Establishment Clause prohibits laws "respecting an establishment of religion,"[4] and prohibits the government from "favor[ing] one religion over another, or religion over irreligion."[5] Yet the IFRs clearly favor the religious beliefs of certain employers and promote those beliefs over the competing beliefs of their employees and the rights and autonomy of women. Indeed, the IFRs not only vastly expand the exemption for employers with religious objections to contraception, but also allow these employers to control whether employees may access separate contraceptive coverage through the accommodation process. The IFRs go much too far, enabling employers to impose their religious beliefs on their employees and deny them critical healthcare services that the law would otherwise mandate. As such, the IFRs promote and favor certain religious beliefs over

---

[3] 42 U.S.C. § 18116.
[4] U.S. CONST., amend. I.
[5] *Larson v. Valente*, 456 U.S. 228, 244 (1982).

3

00373533

Exhibit 43

JA-0000812

others, excessively entangle the government with religion, and violate the Establishment Clause of the U.S. Constitution.

The IFRs likewise violate the Due Process Clause of the Fifth Amendment, which guarantees equal protection of the laws. As discussed in Section I.A, the ACA's contraceptive mandate is intended to provide women access to critical healthcare services and reduce disparities between men and women. By targeting healthcare services for women and reinforcing the gender-based disparities the ACA sought to eliminate, the IFRs discriminate against women in violation of the Fifth Amendment.

### C.    The IFRs Improperly Ignore the Compelling Governmental Interests Served by the Contraceptive Mandate.

The IFRs assert that broad application of the ACA's mandate to certain objecting employers does not serve a compelling governmental interest and therefore the expanded exemptions are appropriate, and even necessary, under the Religious Freedom Restoration Act. But this position ignores extensive evidence that insurance coverage for contraceptive services provides significant benefits to women and society as a whole. These benefits include:

- Reducing unplanned pregnancy and the associated interference with women and men's ability to pursue their education and employment goals, which leads to increased earning power for persons of all genders, and a reduction in the wage gap between women and men;[6]
- Easing the disproportionate burden that women face, as compared to men, in covering the costs of most contraceptives absent insurance coverage;
- Reducing reliance on public assistance stemming from unplanned pregnancy;
- Reducing the number of children born into poverty, who are more likely to "experience more health problems, live in more dangerous neighborhoods[,] . . . have higher rates of

---

[6] Adam Sonfield et al., *The Social and Economic Benefits of Women's Ability To Determine Whether and When to Have Children*, GUTTMACHER INSTITUTE (Mar. 2013), https://www.guttmacher.org/report/social-and-economic-benefits-womens-ability-determine-whether-and-when-have-children.

4

00373534

Exhibit 43

delayed academic development[,] . . . [and] are less likely to complete high school or college";[7]

- Reducing mental health concerns that are associated with unplanned pregnancies, such as depression and anxiety.

Expanding access to contraceptive coverage therefore furthers significant governmental interests in, among other things, increasing access to education and improved productivity, reducing gender disparities, and easing the financial burden on taxpayers associated with unplanned pregnancies. The government has a compelling interest in ensuring that these benefits accrue as broadly as possible. By dramatically expanding the exemptions for entities with religious and moral objections and allowing employers to eliminate contraceptive coverage without even having to certify their objections, the IFRs will deprive hundreds of thousands of people of these benefits and undermine these compelling governmental interests.

### D.   The IFRs Violate the APA.

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[8] For the reasons set forth above, the IFRs are not in accordance with the ACA or the U.S. Constitution and are based on arbitrary and capricious conclusions about the governmental interests in a broadly applicable contraceptive mandate. The IFRs therefore violate the APA and should be withdrawn.

The IFRs are also arbitrary and capricious, in violation of the APA, because they reverse a prior agency decision without any reasoned explanation for the change. This policy reversal is unjustified, and cannot be justified, by any change in evidence or scientific knowledge and

---

[7] Jacoba Urist, *Social and Economic Benefits of Reliable Contraception*, THE ATLANTIC (July 2, 2014), https://www.theatlantic.com/health/archive/2014/07/the-broader-benefits-of-contraception/373856/ ("[N]ew evidence link[s] family planning programs of the 1960's and 70's with a decrease in the share of U.S. children and adults living in poverty today.").
[8] 5 U.S.C. § 706.

5

00373535

Exhibit 43

rejects scientific studies on which the Departments previously relied. By dramatically changing course without adequate factual or legal basis, the IFRs are arbitrary and capricious and constitute an abuse of discretion under the APA.

**II.    The IFRs Would Burden the County as a Safety-Net Provider and Exacerbate Public Health Concerns.**

If allowed to stand, these flawed and unlawful IFRs would cause substantial harm to the County. Thousands of Santa Clara County residents are insured through health plans that may be affected by the IFRs.[9] Under the IFRs, employers offering self-funded health plans can drop contraceptive coverage with minimal or even no notice to employees and beneficiaries, potentially leaving thousands of county residents without coverage for necessary contraceptive services. This loss of coverage would strain the County's already thinly-stretched family planning resources, requiring the County (at significant expense) to both expand its no- and low-cost contraceptive and sexually transmitted disease ("STD") services, and also absorb many of the immediate and long-term costs of unintended pregnancies on county residents, their families, and communities.

The County operates a comprehensive public healthcare system that covers the full range of contraceptive services, including many no- and low-cost contraceptive and STD services for residents. The County provides contraceptive services to county residents regardless of their ability to pay through SCVMC and the Public Health Department. SCVMC's Ambulatory Care Clinics provide a range of contraceptive services, including family planning counseling, prescriptions for birth control pills, intrauterine device and birth control implant insertions,

---

[9] Because California law independently requires state-regulated health plans—but not self-funded employer health plans—to cover certain FDA-approved contraceptives without cost-sharing, the IFRs will only affect coverage requirements for self-funded employer health plans in California. Approximately 61 percent of insured California workers, amounting to over 6 million individuals, are covered by self-funded employer plans and may therefore be affected by the IFRs.

6

00373536

Exhibit 43                                                                                        JA-0000815

emergency contraceptives, and abortion services. In addition, SCVMC performs sterilization procedures by referral from the patient's provider. Free condoms are also available through the Crane Center, the County's STD Clinic operated by the Public Health Department. The IFRs will increase demand for the County's no- and low-cost contraception and STD services as employers take advantage of the expanded exemption to eliminate coverage for contraceptive care.

The County also provides safety-net services as a provider for California's Family Planning, Access, Care, and Treatment ("PACT") Program. Through the Family PACT Program, a network of 2,200 providers—including the County—offer comprehensive family planning services at no cost to low-income people.[10] These services include all FDA-approved forms of contraception, emergency contraception, pregnancy testing and counseling, preconception counseling, sterilization, certain infertility services, STD testing and treatment, cancer screening, HIV screening, and individualized reproductive health education and counseling.[11] Funding for Family PACT services is provided by California and the federal government as part of California's Medicaid program, but the reimbursements paid to Family PACT providers do not cover the full costs of providing these services. As more employers eliminate contraceptive coverage under the IFRs, more low-income people will seek these services through Family PACT, and the costs to the State, the County, and other Family PACT providers will increase.

The IFRs are also likely to increase demand for County programs offering no- and low-cost healthcare services. For example, the County's Ability to Pay Determination ("APD") Program, run through SCVMC, provides services to certain indigent County residents in accordance with their ability to pay. Patients who lack employer-provided insurance coverage for

---

[10] WELCOME TO FAMILY PACT, http://www.familypact.org/Home/home-page (last visited Nov. 20, 2017).
[11] *Family PACT Overview*, CAL. DEP'T OF HEALTH CARE SERVS. (2015), http://www.familypact.org/Providers/provider-resources/TipSheets/Overview6-15ADA.pdf.

7

00373537

Exhibit 43

contraceptives and who are not eligible for other insurance may apply for APD services, and more are likely to do so under the IFRs, at direct cost to the County.

The County's health system already operates at a significant deficit because of the volume of uncompensated costs it incurs in serving uninsured and under-insured patients. For example, during Fiscal Year 2016-17, SCVMC received a $98 million subsidy from the County's General Fund so it could continue to provide critical healthcare services to uninsured and under-insured patients.[12]

In addition to causing direct financial strain on state and local governments, non-profit health care providers, and scores of individuals, the IFRs will also exacerbate public health concerns in the County and nationwide. When people are less able to access contraceptive services, STD rates are likely to increase,[13] and the need for STD-related services rises. Thus, the IFRs are likely to increase the need for the County's free and low-cost services for STD prevention and treatment. Through the Crane Center, the County's Public Health Department provides a range of STD-related services, including sexual health counseling, STD prevention supplies, STD screening, STD treatment, and HIV pre-exposure and post-exposure prophylaxis. The fees the clinic collects do not cover the costs of providing STD-related services, and these costs are likely to increase due to the IFRs.

The prospect of reduced coverage for contraceptives is all the more concerning considering the rates of STDs nationwide and in the County. According to the Centers for Disease Control and Prevention, "[m]ore than two million cases of chlamydia, gonorrhea and

---

[12] County of Santa Clara, Fiscal Year 2017-2018 Recommended Budget at 524, https://www.sccgov.org/sites/scc/gov/Documents/recmnded_bdgt_v8-latest-vrsn.pdf.
[13] *Clinical Prevention Guidance*, CTRS. FOR DISEASE CONTROL & PREVENTION (Oct. 10, 2017), https://www.cdc.gov/std/tg2015/clinical.htm (explaining role of contraceptives in STD prevention).

8

00373538

Exhibit 43                                                                                                        JA-0000817

syphilis were reported in the United States in 2016, the highest number ever."[14] The County has experienced a rise in chlamydia, gonorrhea, and syphilis as well. Between 2010 and 2016, cases of chlamydia increased by 34% and cases of gonorrhea increased more than twofold.[15] "Rates of early syphilis diagnoses nearly tripled from 6.2 cases per 100,000 people in 2010 to 18.4 cases in 2016, with a sharp 53% increase between 2015 and 2016."[16] HIV/AIDS is another serious public health concern; in 2015, there were 2,734 people living with HIV/AIDS in the County.[17] The IFRs are likely to exacerbate these serious public health problems and increase the burden on the County to address and prevent the spread of these diseases.

Decreased access to contraception under the IFRs is also likely to increase unintended pregnancies, triggering immediate and long-term costs to the County and communities nationwide. As the safety-net healthcare provider, the County funds many of the medical services associated with unintended pregnancies, which disproportionately affect young, low-income, minority women, without higher education[18] who are likely to rely on County-funded services if their employer eliminates contraceptive coverage. The County is also burdened by the long-term costs of unplanned pregnancies, which can limit individuals' ability to achieve in education and the workplace and to contribute as taxpayers and citizens.

## CONCLUSION

For all of the foregoing reasons, the County respectfully requests that the *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the*

---

[14] Press Release, Centers for Disease Control and Prevention, *STDs at record high, indicating urgent need for prevention* (Sept. 26, 2017), https://www.cdc.gov/media/releases/2017/p0926-std-prevention.html.
[15] SANTA CLARA CTY. PUBLIC HEALTH, Sexually Transmitted Diseases Annual Report 2 (2016).
[16] *Id.* at 3.
[17] *HIV/AIDS Epidemiology Santa Clara County*, SANTA CLARA CTY. PUBLIC HEALTH (2016), https://sccgov.iqm2.com/Citizens/FileOpen.aspx?Type=4&ID=149986.
[18] Lawrence Finer & Mia Zolna, *Declines in Unintended Pregnancy in the United States, 2008-2011*, NEW ENG. J. MED. 374, 843-52 (2016).

9

00373539

Exhibit 43

*Affordable Care Act* and *Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act* not be adopted as final rules.

Failure to address any issue related to the IFRs other than those addressed herein should not be construed as agreement with or waiver of any position related to those issues.

Dated: December 5, 2017

Respectfully submitted,

JAMES R. WILLIAMS
County Counsel

By: Lynnette Miner
Fellow

Attorneys for
COUNTY OF SANTA CLARA

Attachment:    Resolution of the Board of Supervisors of the County of Santa Clara Supporting Access to Contraceptives

10

00373540

Exhibit 43

JA-0000819

RESOLUTION NO. BOS-2017-143

## RESOLUTION OF THE BOARD OF SUPERVISORS
## OF THE COUNTY OF SANTA CLARA
## SUPPORTING ACCESS TO CONTRACEPTIVES

**WHEREAS,** Santa Clara County is home to 1.9 million residents who rely on the County to provide essential services and to protect the public health of their communities; and

**WHEREAS,** the County of Santa Clara owns and operates Santa Clara Valley Medical Center ("SCVMC"), a comprehensive public healthcare delivery system and the only public safety-net healthcare provider in Santa Clara County; and

**WHEREAS,** SCVMC provides critical healthcare services to County residents regardless of their ability to pay, including family planning counseling and a wide range of contraceptive services; and

**WHEREAS,** the Santa Clara County Public Health Department provides a range of services related to sexually transmitted diseases ("STDs"), available to all patients regardless of insurance and income; and

**WHEREAS,** under the Affordable Care Act, most employer-provided health insurance plans are required to provide no-cost coverage for contraceptive services; and

**WHEREAS,** a broadly applicable requirement of contraceptive coverage serves compelling governmental interests in, among other things, enhancing the dignity and autonomy of individuals, reducing gender disparities, and easing financial burdens on governments and taxpayers associated with lack of access to comprehensive family planning and contraceptive services; and

**WHEREAS,** on October 13, 2017, the Federal Government issued two Interim Final Rules, *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act,* 82 Fed. Reg. 47792, and *Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act,* 82 Fed. Reg. 47838; and

**WHEREAS,** the Interim Final Rules vastly and unnecessarily expand the exemptions for employers with religious objections to contraceptive coverage and create an entirely new exemption for employers with moral objections to contraceptive coverage; and

**WHEREAS,** the Interim Final Rules will likely lead to a loss of coverage for contraceptive services for many County residents and an increase in STD rates and unplanned pregnancies; and

**Adopted: 12/05/2017**

Resolution Supporting
Access to Contraceptive Services                 Page 1 of 2

89315

DEC 0 5 2017

00373541

Exhibit 43                                                    JA-0000820

WHEREAS, the Interim Final Rules will likely increase the need for the low- and no-cost contraceptive and STD-related services provided by the County, as well as health care and social services associated with unplanned pregnancies; and

WHEREAS, the Interim Final Rules will significantly burden the County as a safety-net healthcare provider and threaten the public health of Santa Clara County residents;

NOW, THEREFORE, BE IT RESOLVED by the Board of Supervisors of the County of Santa Clara, State of California, that the County of Santa Clara opposes the Interim Final Rules and opposes similar efforts expanding religious exemptions and creating moral exemptions to the Affordable Care Act's contraceptive coverage mandate.

BE IT FURTHER RESOLVED that the County of Santa Clara is committed to supporting access to contraceptive services and providing no- and low-cost contraceptive services to people who need them.

BE IT FURTHER RESOLVED that the Board of Supervisors of the County of Santa Clara supports efforts to preserve broadly applicable requirements that health insurance plans provide no-cost contraceptive coverage.

PASSED AND ADOPTED by the Board of Supervisors of the County of Santa Clara, State of California, on DEC 0 5 2017 , by the following vote:

AYES: CHAVEZ, CORTESE, SIMITIAN, WASSERMAN, YEAGER

NOES: NONE

ABSENT: NONE

ABSTAIN: NONE

DAVE CORTESE, President
Board of Supervisors

ATTEST:

MEGAN DOYLE
Clerk of the Board of Supervisors

APPROVED AS TO FORM AND LEGALITY:

JAMES R. WILLIAMS
County Counsel

Resolution Supporting
Access to Contraceptive Services          Page 2 of 2

00373542

Exhibit 43                                                                      JA-0000821

December 5, 2017
Centers for Medicare & Medicaid Services,
Department of Health and Human Services,
Room 445-G,
Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201

**VIA ELECTRONIC SUBMISSION**

Re:    **Comments on the Interim Final Rule on Religious Exemptions and
Accommodations for Coverage of Certain Preventive Services Under the Affordable
Care Act** (IFR 2017-21851; CMS-9940-IFC)

We are writing to express our deep concern and full opposition to the Interim Final Rule ("IFR"
or "the rule") on Religious Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act ("ACA"), published by the Departments of Health and
Human Services, Labor and Treasury ("the Departments") on October 13, 2017. This rule
grossly mischaracterizes the legislative history of the ACA and past rulemaking under the Act.
Moreover, the Departments blatantly disregard notice and comment requirements, misrepresent
the necessity for an Interim Final Rule, and distort the underlying legal premise for existing
religious refusals laws, including the Religious Freedom Restoration Act. These egregious
misinterpretations and mischaracterizations are used by the Departments to grant employers and
universities the ability to impose a harmful burden on their employees and students. We strongly
urge the Departments to rescind this rule in its entirety, as it represents a sudden and harmful
departure from past administrative precedent.

Since 1992, the Center for Reproductive Rights has worked towards securing the promise of
reproductive freedom enshrined in law in the United States and throughout the globe. Our
litigation and advocacy over the past twenty-five years have expanded access to reproductive
healthcare around the nation and the world. We have played a key role in securing legal victories
in the United States, Latin America, Sub-Saharan Africa, Asia, and Eastern Europe on issues
including access to life-saving obstetrics care, contraception, safe abortion services, and
comprehensive sexuality information. We envision a world in which every woman is free to
decide whether and when to have children; every woman has access to the best reproductive
healthcare available; and every woman can make medical decisions without coercion or
discrimination. In short, we envision a world in which every woman participates with full dignity
as an equal member of society.

**<u>Comment</u>**
*Background*

1

00373489

Exhibit 44

JA-0000822

Contraceptive use among women is widespread, with over 99% of sexually-active women using at least one method of contraception at some point during their lifetime.[1] Moreover, contraceptive use is common among women of all religious denominations.[2] In terms of cost, contraceptives make up an estimated 30–44% of out-of-pocket healthcare spending for women.[3] A year's worth of birth control can cost upwards of $600—the equivalent of 83 hours of work for someone earning the federal minimum wage of $7.25 an hour.[4] More permanent birth control methods, such as an IUD or contraceptive implant, can cost more than $1,000 out of pocket—almost one month's salary for an American earning the federal minimum wage.

It is therefore unsurprising that access to no-cost contraception is one of the most popular and broadly beneficial provisions under the ACA—established through a scientific and non-partisan process, and benefitting over 62 million women since its implementation. Following implementation of no-copay contraceptive coverage, women experienced a dramatic decrease in out-of-pocket costs.[5] As a result, a majority of women no longer have to choose between paying for birth control and paying for other necessities, like groceries and utilities.[6] Studies show that decreases in cost-sharing has led to better adherence to and more consistent use of the pill, which has decreased the risk of unintended pregnancies.[7]

Having access to the full range of FDA-approved contraceptive methods has allowed women to choose the method that works best for them at a given point in their life—factoring in ease of use, side effects, contraindications, risk of sexually transmitted infections, desire for confidentiality and control, and many other considerations. And identifying that "right" method has in turn helped women use contraception more consistently and correctly, reducing unwanted pregnancies and affording women greater control over family planning.[8]

No-cost contraceptive coverage is highly beneficial to women and their families, as it enables women to achieve their educational and employment goals and plan their families accordingly. Contraceptive coverage is also a tremendous benefit to American society and the American economy, as it allows women to participate equally in society, including as wage-earners.

---

[1] Guttmacher Institute, *Contraceptive Use in the United States* (September 2016) https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

[2] Rachel K. Jones & Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (April 2011), https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.

[3] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204, 1204-1211 (2015).

[4] National Women's Law Center, *The Affordable Care Act's Birth Control Benefit: Too Important to Lose* (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/; *see also* Elizabeth Celms, *How Much Do Birth-Control Pills Cost?*, CLEAR HEALTH COSTS (Apr. 29, 2013) https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[5] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204, 1204-1211 (2015).

[6] National Women's Law Center, *The Affordable Care Act's Birth Control Benefit is Working for Women* (Dec. 16, 2016) https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.

[7] Henry J. Kaiser Family Foundation, *The Future of Contraceptive Coverage* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[8] *Id.*

00373490

Exhibit 44

JA-0000823

Limiting this coverage, as the IFR does, will be burdensome and harmful to women and their families.

*The Interim Final Rule does not comport with the requirements of the Administrative Procedure Act*

The Departments' authority to promulgate rules is not limitless. Rulemaking must be guided by the underlying statute, the Administrative Procedure Act ("APA") and a balancing of interests. Despite the vast and well-documented benefits of no-cost contraceptive coverage, the Departments acted on October 6, 2017 to significantly reduce that coverage, and did so without following normal rulemaking procedures and allowing for public input beforehand. In so doing, the Departments upended the product of an exhaustive, nearly six-year deliberative process and violated the law.

Without proper procedure, the IFR made several dramatic changes to the contraceptive coverage rules. First, the IFR expands the exemption that previously applied to a narrow set of religious employers, such as churches and their integrated auxiliaries, to *all* non-profit and for-profit entities with religious objections, including publicly-held corporations. Employees and students who receive insurance through entities that invoke the broadened exemption will be denied seamless and cost-free access to contraceptive coverage. Second, the IFR makes the existing accommodation, which formerly applied to religiously-affiliated nonprofits and closely held for-profits, optional. Third, the IFR requires neither institutions that avail themselves of the exemption nor institutions availing themselves of this now-optional accommodation to self-certify their eligibility. Finally, the IFR permits insurers to make available insurance plans without contraceptive coverage to any individuals who object to contraception on religious grounds.

As a result of the sweeping exemption created by the IFR, many women may be left with no choice but to purchase a health insurance plan that excludes coverage for a service that is critical to their health and well-being. Thus, the IFR frustrates the ACA's underlying goals of improving health and increasing access to preventive care.

*Administrative Procedure Act*

The IFR violates the Administrative Procedure Act, both procedurally and substantively. The Departments argue that the APA does not apply here because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act. But these statutes merely confer to Secretaries the authority to promulgate interim final rules as necessary or appropriate; they do not exempt interim final rules from the rulemaking requirements imposed by the APA.

Under the APA, "agency action, findings, and conclusions found to be . . . without observance of procedure required by law" shall be held "unlawful and set aside."[9] Absent a showing of good cause, the APA requires an agency to follow notice and comment procedures which provide

---

[9] 5 U.S.C. § 706(2)(D).

3

00373491

Exhibit 44                                                                    JA-0000824

"interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."[10] The good cause exception applies where notice and public comment are "impracticable, unnecessary, or contrary to the public interest."[11] The courts have made it clear that notice and comment may not be considered "unnecessary" under the APA's good cause exception except under very narrow circumstances, such as a minor rule change in which the public is not especially interested.[12] Further, the APA requires that a rule be published 30 days prior to its effective date.[13]

The IFR is final agency action and is a legislative rule within the meaning of the APA and accordingly must follow these procedural rules. However, the Departments disregarded each of these requirements. The Departments did not engage in notice and comment rulemaking before issuing the IFR, did not observe the 30-day period between publication and effective date, and had no authority to disregard the APA's rulemaking requirements. Because the IFR fails to meet the APA's procedural requirements—and the Departments have no good cause for ignoring these requirements—the Interim Final Rule violates 5 U.S.C. § 706(2), and is an unnecessary and inappropriate use of the Departments' rulemaking authority.[14]

In addition to the procedural violations, the IFR violates the APA on substantive grounds as well. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[15] "contrary to a constitutional right,"[16] or "in excess of statutory jurisdiction."[17] The IFR is in violation of 5 U.S.C. § 706(2) because it is supported by no valid justification, contradicts the ACA and the U.S. Constitution, and exceeds Defendants' statutory jurisdiction, authority, and limitations. In particular, the IFR is contrary to Section 1557 of the ACA, 42 U.S.C. § 18116, which prohibits sex discrimination in certain health programs and activities. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rule discriminate based on sex.

The IFR is also contrary to Section 1554 of the ACA, which prohibits HHS from issuing regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[18] By permitting objecting institutions to deny no-cost contraceptive

[10] 5 U.S.C. § 553(b)-(c).
[11] 5 U.S.C. § 553(b).
[12] See, e.g., The Senate Report, No. 752, 79th Cong. 1st Sess. (1945) ("'Unnecessary' means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved."; Utility Solid Waste Activities Group v. E.P.A., 236 F.3d 749, 755 (D.C. Cir. 2001) (finding that a notice and comment period is required where there is great public interest and the amendment makes significant changes to the rule); Texaco, Inc. v. Federal Power Commission, 412 F.2d 740, 743 (3d Cir. 1969) (finding that the rule at issue "does not fall within the 'unnecessary' exception relied on by the Commission since it cannot be classified as either minor or emergency in character.")
[13] 5 U.S.C. § 553(d).
[14] This approach not only upends the product of an exhaustive deliberative process that has been underway for roughly six years, but violates the Administration Procedures Act both procedurally and substantively.
[15] 5 U.S.C. § 706(2)(A).
[16] Id. § 706(2)(B).
[17] Id. § 706(2)(C).
[18] 42 U.S.C. § 18114(1).

4

00373492

Exhibit 44                                                                JA-0000825

coverage, the Rule erects unreasonable barriers to medical care. Therefore, the IFR is arbitrary and capricious and contrary to law.

*Specific objections*

In the IFR, the Departments attempt to justify the dramatic expansion of the contraceptive coverage exemption on a number of grounds but, as this comment will detail, these arguments are faulty and do not support the Departments' rulemaking here. Therefore, the IFR should be rescinded in its entirety.

Our specific objections to the IFR are as follows:

**I.   The Interim Final Rule deviates from Congress' express intent to provide cost-free contraception to women under the Affordable Care Act, and is therefore contrary to law.**

In the IFR, the Departments mischaracterize the intent and legislative history of the ACA to justify their rulemaking. Specifically they argue that the IFR is a "necessary and appropriate exercise" of their authority, on the grounds that i) Congress gave no indication of the particular preventive services that they most prioritized or felt should be included in the Health Resources and Service Administration ("HRSA")'s regulatory guidelines, nor did Congress intend to require entirely uniform coverage of preventive services;[19] and ii) the new Interim Final Rule is consistent with existing federal laws and with the implementation intent of Executive Order 13535. However, as demonstrated below, each of these premises is false, and neither support nor justify the Departments' rulemaking.

A.   Congressional intent and the ACA

According to the Centers for Disease Control and Prevention ("CDC"), the development of safe and effective contraception was one of the ten greatest public health achievements of the 20th century.[20] Access to birth control has been central to improving women's health and that of their families and has given women the ability to "participate equally in the economic and social life of the Nation."[21]

An analysis of the legislative record of the ACA clearly demonstrates that Congress viewed the women's preventive care benefits, including contraceptive coverage, as essential to fulfilling their goals of advancing public health and welfare by improving Americans' access to affordable healthcare, and ending gender discrimination by reducing inequalities for women in the healthcare system.

---

[19] 76 FR 46623.

[20] Centers for Disease Control and Prevention, *Achievements in Public Health, 1900-1999: Family Planning*, 48 MORBIDITY AND MORTALITY WEEKLY REPORT 1073-1080 (1999), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm.

[21] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2787 (2014) (Ginsburg, J., dissenting) (quoting *Planned Parenthood Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992)).

00373493

Exhibit 44                                                                                JA-0000826

Early versions of the ACA included no specific provisions regarding women's health. To address this oversight, Congress adopted the Women's Health Amendment, which was intended to "expand the screening and preventive services available to women" and curtail the "punitive practices" of insurance companies "that charge women more and give [women] less in a benefit."[22] To achieve these goals, the Women's Health Amendment added a new category of preventive care to be covered at no cost-sharing, providing that "with respect to women," health plans must cover "such additional preventive care and screenings ... as provided for in comprehensive guidelines supported by HRSA for purposes of this paragraph."[23]

Congress therefore adopted the Women's Health Amendment ("WHA") to address its long-running concern that more than half of women delayed or avoided preventive healthcare due to cost[24] and that, due to discrimination, women paid substantially more in out-of-pocket costs for healthcare than men pay.[25] Increasing women's coverage would not only improve women's health but also ameliorate the disadvantages and discrimination that women have faced in obtaining healthcare and health insurance.

With respect to contraception and contraceptive services, Congress understood and intended for cost-free contraception and family planning services to be included as an integral and essential part of women's preventive care,[26] specifically passing the WHA to improve women's

---

[22] 155 CONG. REC. S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski).[22] The Amendment sought to ensure that women receive the essential benefits of early detection and preventive services, thereby reducing health impairments, "sav[ing] lives," and allowing women to, in the long run, "save[] money." 155 CONG. REC. S11,988 (daily ed. Nov. 30, 2009) (Amend. No. 2791).

[23] Id. at 11,986-87; see 42 U.S.C. 300-gg(13)(a)(4).

[24] Cf. Senator Tom Harkin (D-IA) ("far too many women are increasingly delaying or skipping preventive health care due to costs") (quoted in Senator Barbara Mikulski, Press Release: Senate Approves Mikulski Amendment Making Women's Preventive Care Affordable and Accessible, Dec. 3, 2009, http://mikulski.senate.gov/media/pressrelease/12-03-2009.cfm); Senator Barbara Mikulski (D-MD) ("Insurance companies have used every trick in the book to deny coverage to women. This amendment makes sure that the insurance companies must cover the basic preventive care that women need at no cost") (quoted in id.).

[25] According to WHA sponsor Barbara Mikulski, "[w]omen of childbearing age incur 68 percent more out of pocket health care costs than men." Senator Barbara Mikulski, Press Release: Mikulski Puts Women First in Health Care Debate (Nov. 30, 2009), http://mikulski.senate.gov/media/pressrelease/11-30-2009-2.cfm. The WHA finally addressed a concern that had been echoed for more than a decade. See, e.g., Senator Barbara Boxer (D-CA), CONG. REC. S9181-S9211 (July 29, 1998) ("[w]omen spend 68 percent more in out-of-pocket costs for health care than men. Much of this difference is due to reproductive health costs.").

[26] See 155 CONG. REC. S12026 (daily ed. Dec. 1, 2009) (statement of Sen. Boxer)(noting the importance of reforming the health care system to "[i]ncrease[] health insurance coverage for women." and "require[] coverage of comprehensive reproductive health services."); see also 77 CONG. REC.. E1199- 1200 (daily ed. May 19, 2009) (statement of former Rep. Moran) (noting an increase in women who no longer have money to pay for medical care and that "[t]hese women are literally choosing between a month of birth control and bus fare."); Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887. Congress required that "all health plans cover comprehensive women's preventive care and screenings . . . at little or no cost to women." 155 CONG. REC.. S12025 (daily ed. Dec. 1, 2009) (statement of Sen. Boxer); see also 155 CONG. REC.. S12114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[P]reventive care] may include mammograms, Pap smears, family planning, screenings to detect postpartum depression, and other annual women's health screenings.").

00373494

Exhibit 44

JA-0000827

healthcare by providing "affordable family planning services" to "enable women and families to make informed decisions about when and how they become parents."[27]

Congress's reliance on HHS and the use of the Institute of Medicine's expertise (discussed more completely below) to determine the specific services and contraceptive methods to be covered does not detract from Congress's clear intent to provide for contraceptive coverage. To the contrary, this process ensured that medical experts—rather than politics or ideology—would determine the necessary benefits and services to realize Congress's goals for all women.

Finally, the existence of the ACA's exemptions to the contraceptive coverage requirement in no way undermines the government's compelling interest in maximizing the number of women who have contraceptive coverage without cost-sharing. Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[28] For example, the exemption for qualifying grandfathered plans, which are not required to comply with some ACA requirements (including cost-free preventive care coverage), was only intended as a temporary means for employers transitioning their plans into full compliance.[29] Such plans lose their grandfathered status if their coverage as modified fails the ACA's specified minimum coverage requirements.[30] As a result, and quite in contrast with the widespread exemption that the Interim Final Rule will now allow in perpetuity, the number of employer-sponsored grandfathered plans has decreased steadily since 2010.[31] The Departments' reference to and reliance on the existence of ACA exemptions to justify the current IFR is therefore misplaced.

B. Religious exemptions under federal law

The Departments argue more broadly that because religious exemptions have been permitted or contemplated by Congress for related statutes in the past, they are contemplated, and thus, appropriate, here. However, Congress' specific adoption of conscience objections elsewhere— and their deliberate refusal to attach the same to the ACA—shows that the Departments' extrapolation of the conscience objections in the Interim Final Rule is both unanticipated and inappropriate. Further, the Interim Final Rule goes far beyond the permitted limits of law protecting religious objections. The Departments do not have the authority to expand prior laws protecting religious exemptions; in fact, attempts to do so usurp Congress' lawmaking authority.

---

[27] 155 CONG. REC. S12052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken); see also, e.g., 155 CONG. REC., S12671 (daily ed. Dec. 8, 2009) (statement of Sen. Durbin) ("Today, there are 17 million women of reproductive age in America who are uninsured. This bill will expand health insurance coverage to the vast majority of them, which . . . will reduce unintended pregnancies and reduce abortions."); 156 CONG. REC., H1893 (daily ed. Mar. 21, 2010) (statement of Rep. Kaptur) ("This legislation will help millions of women obtain health coverage and thus reduce abortion by enhancing broad coverage options for women's and children's health.").
[28] Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. at 2800 (Ginsburg, J., dissenting).
[29] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).
[30] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).
[31] Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318, 41,332 (July 14, 2015).

00373495

Exhibit 44                                                                JA-0000828

A review of the legislative history of the ACA confirms that the ACA did not—contrary to the Departments' assertion—grant the agencies implicit authority to allow broad religious or moral exemptions at the cost of women's health. While Congress has, in the past, intentionally crafted explicit exemptions for religious objections, it specifically declined to do so for the ACA. In fact, the Senate considered and rejected a 2012 amendment to the ACA which would have allowed employers to refuse to provide coverage for contraceptive services and other medical services on the basis of religious or moral beliefs.[32] Thus, there is no basis in either the ACA itself or the legislative history of the ACA for the Departments' asserted authority to enact sweeping religious exemptions.

## II.    Congress' deference to the agencies to implement women's preventive services supports, rather than diminishes, the intent to make cost-free contraception available to all women.

Congress' express goal in relying on the expertise of the federal regulatory agencies in implementing the ACA and developing the Women's Preventive Services Guidelines was to "ensure that the coverage of women's preventive services is based on a set of guidelines developed by women's health experts."[33]

In subsequently implementing the ACA, the Departments acknowledged that the inclusion of cost-free contraception coverage in their implementation of the ACA was a Congressional priority, stating that "in directing non-grandfathered group health plans and health insurance coverage to cover preventive services and screenings for women described in HRSA Guidelines without cost sharing, the statute acknowledges that both existing health coverage and existing preventive services recommendations often did not adequately serve the unique health needs of women."[34]

Specifically, the Departments noted that "access to contraception improves the social and economic status of women" and that "cost sharing can be a significant barrier to access to contraception." Thus, the Departments found it necessary to "provid[e] more women broad access to recommended preventive services, including contraceptive services, without cost sharing" in order to implement the ACA in accordance with the statute and Congressional intent.[35]

---

[32] The Blunt Amendment would have allowed not only religious groups but any employer with moral objections to opt out of the coverage requirement. Further, it would have allowed such employers to do so in the case of not only contraception but any health service required by the 2010 health-care law. Congress considered and rejected this proposed law in 2012.

[33] 155 Cong. Rec. at S12027 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand); 155 Cong. Rec. S12273 (daily ed. Dec. 3, 2009) (statement of Sen. Stabenow) (Sen. Mikulski's amendment "requires coverage of women's preventive services developed by women's health experts to meet the unique needs of women."); see also 155 Cong. Rec. S12058-S12059 (daily ed. Dec. 1, 2009) (statement of Sen. Cardin) (noting that HRSA "focuses on maternal and child health . . . [and] strives to develop 'best practices' and create uniform standards of care . . . .").

[34] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,873.

[35] Id. at 39,872-39,873.

8

00373496

Exhibit 44

JA-0000829

In subsequent rulemaking under the ACA, the Departments worked to protect Congressional intent to cover no-cost preventive services in the context of certain religious objections, through numerous opportunities for public engagement, including Requests for Information, extended notice and comment periods eliciting hundreds of thousands of individual public comments, advanced notices of proposed rulemaking, notices of proposed rulemaking, as well as three Interim Final Rules. These efforts stand in stark contrast to the Departments' haste and apparent lack of interest in public feedback in promulgating the current IFR.

Congress' reliance upon the federal regulatory agencies to determine the scope of preventive services to be covered cost-free in implementing the ACA[36] was meant to harness the expertise within the agencies. not act as a blank check. The Departments have plainly misconstrued and abused the intent behind that grant of authority here.

A. The Institute of Medicine Report

The IOM Committee's thorough and transparent process of review, their exemplary panel of specialists, multiple tiers of draft review, and their scientifically-sound, evidence-based analysis speaks strongly of the quality of the final IOM Report, which was adopted in its entirety by HRSA. Further, the collective agreement of the fifteen majority members of the IOM Panel should be given greater weight than the single dissenting panelist.

HRSA commissioned the Institute of Medicine ("IOM"), an arm of the National Academy of Sciences, Engineering and Medicine. "to review what preventive services are necessary for women's health and well-being," "identify existing coverage gaps," and make recommendations "for HHS to consider in order to fill those gaps."[37] The IOM was further tasked with evaluating and recommending the specific preventive care and screening services that should be included in the minimum coverage requirement.[38]

To prepare these recommendations, the IOM convened a diverse panel of outside experts—the Committee on Preventive Services for Women. The members of the IOM panel were exemplary, including medicine and public health researchers and practitioners, as well as experts in disease prevention, women's health issues, adolescent health issues, and the development of evidence-based guidelines. Drafts of the Committee's work benefitted from a further review by yet another distinguished group of experts, eleven additional researchers and scientists based at institutions such as Harvard Medical School and the Bloomberg School of Public Health at Johns Hopkins University. These independent reviewers "provide[d] candid and critical comments ... to ensure that the report [met] institutional standards of objectivity, evidence, and responsiveness to the study charge."[39]

---

[36] *See* 155 CONG. REC. S12026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski).
[37] Institute of Medicine. *Clinical Preventive Services for Women: Closing the Gaps* 21 (July 19, 2011). https://www.nap.edu/read/13181/chapter/1.
[38] *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,725-26 (Feb. 15, 2012).
[39] Institute of Medicine. *Clinical Preventive Services for Women: Closing the Gaps* 235 (July 19, 2011). https://www.nap.edu/read/13181/chapter/1.

00373497

Exhibit 44

JA-0000830

The process of the IOM Committee was thorough and transparent. The Committee met five times over six months, and three open meetings were held to elicit testimony from stakeholders, researchers, advocates, and the public. To develop the eventual recommendations, the Committee collected existing guidelines for women's health services, and assembled additional evidence by reviewing medical literature, federal health priority goals and objectives, federal reimbursement policies, clinical guidelines of healthcare professional organizations, and public comments.

Based on its thorough review of policies, practices, and public health research, the IOM Committee recommended no-cost coverage for services that met three criteria: (1) the condition has a broad population impact; (2) the recommended service would have a substantial potential impact on health and wellbeing; and (3) the quality and strength of evidence is supportive. Based on these criteria, the IOM Committee concluded that HRSA should include the full range of contraceptives approved by the U.S. Food and Drug Administration ("FDA") as women's preventive care, and that "eliminat[ing] ... cost sharing for contraception could ... greatly increase its use, including the use of the more effective and longer-acting methods."[40] The resulting women's preventive service requirements provided a critical new public health protection by requiring all new group health plans to cover all FDA-approved methods of contraception for women (including birth-control pills and intrauterine devices/IUDs) without cost-sharing (i.e. no co-payments or deductibles).[41]

Contrary to both common sense and well-established best practices, the Departments now inappropriately rely upon the voice of the panel's lone dissenter, Dr. LoSasso, rather than upon the shared consensus of the fifteen other scientific and medical experts on the Committee, to push back against the IOM's recommendation to provide cost-free contraceptive coverage for all women. The shared majority opinion should plainly be given substantially greater weight than a lone dissenting voice.[42] Further, the IOM Committee addressed the dissent's inaccurate characterization of Committee members promoting both objective and subjective determinations in a non-transparent evaluation process[43] and additionally clarified that Dr. LoSasso was

---

[40] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 109 (July 19, 2011), https://www.nap.edu/read/13181/chapter/1

[41] Despite the Departments' deliberate misstatement in the IFR, the FDA's approved methods of contraception do not include any abortifacients. *See, e.g.*, U.S. Food & Drug Admin., *Birth Control: Medicines to Help You*, https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm (last visited Dec. 4, 2017); American Congress of Obstetricians and Gynecologists, *Facts are Important: Emergency Contraception and Intrauterine Devices are Not Abortifacients* (June 12, 2014), https://www.acog.org/-/media/Departments/Government-Relations-and-Outreach/FactsAreImportantEC.pdf; National Catholic Reporter Online, *What an Abortifacient is - and What it Isn't* (Feb. 20, 2012), https://www.ncronline.org/blogs/grace-margins/what-aborti facient-and-what-it-isnt.

[42] The National Academies explain that their expert committees strive for and most eventually achieve a unanimous report of their conclusions. Dissenting opinions are permitted so as to explain the rationale behind areas of disagreement and prevent unanimous reports that substantially weaken their analysis and conclusions, allowing the majority's report to retain the weight of authority. The National Academies, *Getting to Know the Committee Process*, revised 2005, http://www.nationalacademies.org/site_assets/groups/nasite/documents/webpage/na_069620.pdf

[43] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 235 (July 19, 2011), https://www.nap.edu/read/13181/chapter/1 ("The dissent also includes inaccurate statements regarding the committee process and its approach to the committee charge. The committee members' expertise is diverse and

10

00373498

Exhibit 44                                                                                                    JA-0000831

attempting to include considerations beyond the charge of the Committee, namely cost.[44] The Departments' abrupt decision to abandon the careful balancing approach previously taken is particularly troubling given that HRSA adopted the IOM's recommendations for women's preventive services (including all FDA-approved contraceptives) *in full*, and has not since rejected them. To the contrary, in December 2016, HRSA updated its women's preventive services guidelines and reaffirmed that women's preventive care should include the full range of FDA-approved contraceptives.

### B. HRSA's 2011 guidelines and department's subsequent rulemaking

In the IFR, the Departments attempt to highlight prior individual requests for expanded religious exemptions to support their current rulemaking. However, their description of the history of the regulatory process only shows the thorough and proper rulemaking procedures that the Departments had previously engaged in, which the Departments have decided to eschew in promulgating this Interim Final Rule.

The prior exemption and accommodation were at least the product of an extensive administrative process. The prior regulatory scheme was developed with the input of hundreds of thousands of public comments and ensured women's seamless and no-cost access to contraceptive services while respecting the beliefs of those who object to those services.[45]

In the August 2011 IFR, published under the good cause exception,[46] the Departments determined that a limited exemption for religious employers "reasonably balance[d] the extension of... coverage of contraceptive services under the HRSA Guidelines *to as many women as possible*, while respecting the unique relationship between certain religious employers and

---

while many have different perspectives, no other member shares the opinion that report recommendations were not soundly evidence based.").

[44] *Id.* ("The dissenting committee member wanted more time and the opportunity to incorporate cost-benefit analysis. At the first committee meeting, it was agreed that cost considerations were outside the scope of the charge, and that the committee should not attempt to duplicate the disparate review processes used by other bodies, such as the USPSTF, ACIP, and Bright Futures. HHS, with input from this committee, may consider other factors including cost in its development of coverage decisions.").

[45] Notice and comment are not required by the Administrative Procedure Act when the agency for good cause finds that notice and public comment are impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. 553(b). Unlike the present IFR, previous interim final rules related to contraceptive coverage qualified for the good cause exception under the APA: Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41726 (July 19, 2010) (charging HRSA with developing the Preventive Services Guidelines; the interim final rule qualified for the good cause exception because of legislative deadlines that made notice and comment impracticable and contrary to the public interest); Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46621 (Aug. 3, 2011) (the interim final rule qualified for the good cause exception because of a finding that additional opportunities for public comment were unnecessary as the 2010 interim final rules provided an opportunity to comment on the implementation of the same requirements in this provision and the amendments are based on those public comments); Coverage of Certain Preventive Services Under the Affordable Care Act, 79 Fed. Reg. 51092 (August 27, 2014) (issued under the good cause exception in response to *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014)).

[46] *Id.*

00373499

Exhibit 44                                                                                                      JA-0000832

their *employees in certain religious positions.*"[47] Following publication, the Departments received more than 200,000 comments, including requests to broaden the range of employers, institutions and plan sponsors eligible for the exemption,[48] and chose *not* to expand the exemption on the grounds that any further expansion "would subject [] employees to the religious views of the employer, limiting access to contraceptives, and thereby inhibiting the use of contraceptive services and the benefits of preventive care."[49]

The Departments then proposed a rule establishing an accommodation for non-profit institutions that held themselves out as religious. Any entities claiming the accommodation were required to self-certify that they opposed, on religious grounds, provision of contraceptive coverage.[50]

This rule was finalized on July 2, 2013, after receiving more than 400,000 comments.[51] In establishing the accommodation, the Departments ensured that women who received coverage under those entities' plans continued to have access to contraceptives with no cost-sharing, "advancing the compelling government interests in safeguarding public health and ensuring that women have equal access to healthcare."[52] The Departments considered and once again rejected requests to expand the exemption.[53]

This deliberate and communicative rulemaking stands in deep contrast to how the Departments promulgated the current IFR. In issuing this IFR, the Departments made no effort to consider the burden of their expanded exemption—rather, without actual investigation into the IFR's impact, they estimate a minimal number of women whose coverage will abruptly be cancelled and then use this approximation to suggest that the impact of the IFR will likewise be minimal. Further, they offered no opportunities for stakeholder feedback, no notice of proposed rulemaking, no requests for information, no posted notice of an open comment period, no expert analysis or evidence-based scientific review of the Interim Final Rule's coverage changes, no public

---

[47] *Id* (emphasis added).

[48] 77 Fed. Reg. at 8726.

[49] 77 Fed. Reg. at 8728.

[50] 78 Fed. Reg. at 8456, 8462 (Feb. 6, 2013).

[51] 78 Fed. Reg. 39,870 (July 2, 2013).

[52] *Id.* at 39,872.

[53] *See id.* at 39,874. ("The Departments received numerous comments addressing the definition of religious employer. Some commenters stated that the proposed definition of religious employer was too narrow and should be broadened to include all employers, both nonprofit and for-profit, that have a religious objection to providing contraceptive coverage in their group health plan. Some commenters requested that the definition of religious employer be expanded to exempt not only churches and other houses of worship, but also religiously affiliated hospitals and other health care organizations and other religiously affiliated ministries using the concepts of Code section 414(e). Other commenters recommended that the requirement to cover contraceptive services be rescinded altogether. Some commenters stated that the exemption for religious employers should be eliminated and that religious employers should instead be subject to the accommodations for eligible organizations so that their employees may also receive alternative contraceptive coverage without cost sharing. Other commenters opposed eliminating the first three prongs of the definition of religious employer, stating that only churches and other houses of worship that meet the criteria of all of the prongs should be subject to the exemption. Many commenters agreed with the Departments that the proposed definition of religious employer would not materially expand the universe of religious employers, but others felt that the proposed definition would unduly broaden it. Based on their review of these comments, the Departments are finalizing without change the definition of religious employer in the proposed regulations.")

00373500

Exhibit 44                                                                                                    JA-0000833

statistical accounting of the numbers of women who may lose coverage, no attempt to accommodate those women, and no reasoned explanation for why they engaged in this extremely harmful and inappropriate process. Instead, the Departments make a feeble attempt to rely on past comment periods to justify the IFR's expansive exemption. But for notice and comment to be meaningful, the public must be on notice of the specific policies being contemplated. At no time during the prior administrative rulemaking efforts on this regulation was this expanded exemption referred to or contemplated. It is therefore improper for the Departments to use prior rulemaking efforts to justify this IFR, especially without even a certification process or any workaround to guarantee women retain coverage.[54]

   C.  Litigation over the Contraceptive Coverage Benefit and Accommodation Process

The Departments dramatically overstate the legal challenges to the ACA in an attempt to suggest that this IFR is necessary to resolve litigation resulting from their past rulemaking. To the contrary, the majority of challenges have already been resolved by Supreme Court orders, including those in *Hobby Lobby*[55] (extending the accommodation for non-profit organizations with religious objections to closely-held for-profit corporations) and *Wheaton College*[56] (establishing an alternative means for non-profits to notify the Departments of their objection), and subsequent related rulemaking by the Departments that incorporated those rulings. The accommodation process post-*Hobby Lobby* and -*Wheaton* resolved much of the litigation regarding the ACA's contraceptive coverage requirement, with many groups finding that the accommodation process—which allowed not only religiously-affiliated non-profits but also closely-held for profits with religious objections to opt out of covering contraception while still maintaining such coverage for their employees by filling out a simple two-page form—fulfilled their needs. Nonetheless, some non-profit organizations that were eligible for the accommodation filed additional challenges to the ACA, arguing that the accommodation's notification requirement unlawfully burdened their religious exercise. Eight of the nine U.S. Courts of Appeals that reviewed these challenges rejected them.[57] Even the *Zubik* orders, which reviewed alternative approaches to respecting religious objections while ensuring women maintain seamless coverage, direct the parties to resolve those cases in a way that ensured there would be *no* impact on women's access to seamless contraceptive coverage.[58] The IFR totally disregards that direction.

---

[54] And if the prior record were ever deemed relevant, it is worth noting that during the comment periods, the number of comments that objected broadly to any exemption or accommodation vastly outweighed those in favor.

[55] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014)

[56] *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014)

[57] *Eternal Word Television Network v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122 (11th Cir. 2016); *Dordt Coll. v. Burwell*, 801 F.3d 946 (8th Cir. 2015); *Mich. Catholic Conference v. Burwell*, 807 F.3d 738 (6th Cir. 2015); *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015); *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606 (7th Cir. 2015); *Geneva Coll. v. Sec'y US, Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 237 (D.C. Cir. 2014); *but see Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151 (10th Cir. 2015).

[58] *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016); *Catholic Health Care Sys. v. Burwell*, 195 L. Ed. 2d 260 (2016).

00373501

Exhibit 44                                                                    JA-0000834

On May 16, 2016, the Supreme Court issued its *per curiam* opinion in *Zubik v. Burwell*, vacating and remanding all of the circuit court decisions to give the parties an opportunity to develop an approach that addressed the plaintiffs' objections "while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage."[59]

As a result, the Departments subsequently sought comment to determine whether these cases could be resolved by further modifying the accommodation.[60] After receiving over 54,000 comments, including from the plaintiffs in *Zubik* and other religiously-affiliated organizations, consumer groups, women's organizations, and health insurers, among others,[61] the Departments reasonably and justifiably concluded there was "no feasible approach [that] ... would resolve the concerns of religious objectors, while still ensuring that the affected women seamlessly receive full and equal health coverage, including contraceptive coverage." [62] Accordingly, they did not modify the accommodation. Given that the Departments reviewed the proposal to expand the exemption a year prior and decided that adopting that proposal could not feasibly be implemented, their apparent reversal is, at best, baseless.

Further, it is absurd to say that the rule is justified to resolve litigation, when it has in fact prompted even more litigation. To date, Americans United for Separation of Church and State and the National Women's Law Center (NWLC),[63] the American Civil Liberties Union (ACLU),[64] several states (including California, New York, Delaware, Maryland;[65] Pennsylvania;[66] Massachusetts;[67] and Washington[68]), and an individual from Colorado have all filed suit in opposition to the IFR, as has the Center for Reproductive Rights.[69]

Thus, this IFR deviates dramatically from Congress' express intent to provide cost-free contraception to women, and deliberately disregards past rule-making without explanation or a clear implementation plan. In promulgating the Rule, the departments have sowed confusion,

---

[59] *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (internal quotation marks and citation omitted).

[60] *See* 81 Fed. Reg. 47,741 (July 22, 2016).

[61] Dep't of Labor, *FAQS About Affordable Care Act Implementation Part 36*, 5 (Jan. 9, 2017), https://www.dol.gov /sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

[62] *Id.* at 4.

[63] *Shiraef v. Hargan*, No. 17-cv-00817 (D. Ind. filed Oct. 31, 2017), https://nwlc.org/wp-content/uploads/2017/10/2017-10-31-Birth-Control-Complaint.pdf.

[64] *ACLU v. Wright*, No. 17-cv-05772 (D. Cal. filed Oct. 6, 2017), https://www.aclu.org/legal-document/american-civil-liberties-union-et-al-v-wright-et-al-complaint.

[65] *California v. Wright*, No. 17-cv-05783 (D. Cal. filed Oct. 6, 2017), https://oag.ca.gov/system/files/attachments/ press_releases/Dkt%20%2324%20-%20Amended%20Complaint.pdf.

[66] *Pennsylvania v. Trump*, No. 17-cv-04540-WB (D. Pa. filed Oct. 11, 2017), https://www.attorneygeneral.gov/uploadedFiles/MainSite/Content/Related_Content/PressReleases/ACA_Contracept ive_Mandate_Complaint.pdf.

[67] *Massachusetts v. U.S. Dep't of Health & Human Servs.*, No. 17-cv-11930 (D. Mass. filed Oct. 6, 2017). http://www.mass.gov/ago/docs/press/2017/contraception-rule-complaint.pdf.

[68] *Washington v. Trump*, No. 17-cv-01510 (D. Wash. filed Oct. 9, 2017), http://agportal-s3bucket.s3.amazonaws. com/uploadedfiles/Another/News/Press_Releases/Washington%20v%20Trump%20Contraception.pdf.

[69] *Medical Students for Choice v. Wright*, No. 17-cv-02096-RBW (D.D.C. filed Oct. 10, 2017), https://www. reproductiverights.org/sites/crr.civicactions.net/files/documents/Complaint-Medical-Students-for-Choice-v s-Wright.pdf.

14

00373502

Exhibit 44                                                                                    JA-0000835

advanced no proposals to ensure coverage for women working at newly-designated exempt organizations, incurred several lawsuits, and thus increased the burden of their regulation unjustly.

### III.    The Interim Final Rule fails to meet each element of the Religious Freedom Restoration Act.

The IFR declares that the Departments have determined that an expanded exemption is the "most appropriate administrative response to the religious objections raised by certain entities and organizations concerning the benefit." The Departments make two main arguments in support of this expanded exemption: 1) Purported lack of Congressional intent to cover contraception; and 2) Congress's history of granting religious refusals for certain healthcare matters. However, the Departments' arguments are unpersuasive and a detailed examination of the legislative record does not support the action the Departments are taking through this IFR.

   A.    The Departments argue that there was no Congressional intent to cover contraception through the ACA, and that therefore the IFR is justified based "on Congress' decision in the Affordable Care Act neither to specify that contraception must be covered nor to require inflexible across-the-board application of section 2713 of the PHS Act."[70]

This is a deliberate mischaracterization of Congressional intent, as discussed in detail in Section I(A) of this comment. As stated earlier, Congress *particularly* focused on the importance of women's preventive care, including contraception, through the passage of the Women's Health Amendment.[71]

   B.    As part of the Government's broad reasoning for expanded exemptions, the Departments cite "Congress' extensive history of protecting religious objections when certain matters in healthcare are specifically regulated—often specifically with respect to contraception, sterilization, abortion, and activities connected to abortion."

Legislative history further contradicts the Departments' claim that Congress intended for the Departments to allow broad religious or moral exemptions at the cost of women's health. While Congress has crafted explicit exemptions for religious objections when it has intended to do so in the past, it specifically refused to do so for the ACA. In fact, the Senate in 2012 considered a proposed amendment to the ACA allowing employers to refuse to provide coverage for contraceptive services and other medical services on the basis of religious or moral beliefs, and the amendment was rejected.[72]

In the face of Congress' explicit rejection of religious and moral exemptions, the Departments' other citations to Congressional intent are inadequate. The Departments cite the fact that

---

[70] 82 Fed. Reg. at 47,799.
[71] *See infra* Section I; *see also 155* CONG. REC. H1632 (daily ed. Mar. 18, 2010) (statement of Rep. Lee) ("So I stand today to be able to say to all of the moms and nurturers who happen to be women that we have listened to your call. We have actually recognized that it is important to provide for preventative care.").
[72] *See* 158 Cong. Rec. S1077-S1092 (daily ed. Feb. 28, 2012). https://www.congress.gov/congressional-record /2012/02/28/senate-section/article/S1077-1?.

15

00373503

Exhibit 44

organizations in Medicaid or Medicare Advantage are able to object on moral or religious grounds to providing coverage of certain counseling or referral services, according to 42 USC 1395w-22(j)(3)(B) and 42 USC 1396u-2(b)(3). Those provisions argue *against*, rather than in favor, of the exemption in the IFR. Plainly, if Congress had wanted to include this type of exemption in the ACA, they could have—but they did not. As explained above, Congress specifically rejected an explicit, specified moral objection with regards to the ACA contraceptive benefit.

The Departments also cite more recent Congressional measures protecting individuals who object to prescribing or providing contraceptives from discrimination, such as Pub. L. No. 115-31, Title VII Section 726(c). However, there Congress expressly sought to protect individuals, not corporations or institutions whose objections would directly impact thousands of others. In addition, the moral objection clause for individuals in Section 726(c) is situated within the broader frame of Section 726, which actually supports the contraceptive benefit. Section 726(a) states, "*None* of the funds appropriated by this Act may be used to enter into or renew a contract which includes a provision providing prescription drug coverage, *except where the contract also includes a provision for contraceptive coverage.*"[73]

Finally, the Departments state that there is "specific intent that a conscience clause be provided and it should protect religious beliefs" because Congress' recent appropriations included an intent of Congress to include a 'conscience clause' with exceptions for religious beliefs and moral convictions for the District of Columbia.[74] However, Congress' statement in Section 808 does not define what such a conscience clause should entail. Given the legislative history of ACA and the Women's Health Amendment, it is excessive for the Departments to assume that recent Congressional appropriations including a limited, undefined conscience clause would retroactively apply to the ACA to authorize the Departments to issue such overbroad exemptions, particularly when these types of exemptions were once in substance considered and rejected by a previous Congress in a proposed amendment to the ACA.

All in all, there is absolutely no statutory language from the ACA itself to support the Department's claims, while Congressional history and intent behind the ACA and Congress' past rejection of a religious and moral exemption amendment in fact highlight the importance of ensuring copay-free contraceptives as part of women's preventive services.

The Departments' IFR is not supported by the Religious Freedom Restoration Act of 1993 (RFRA). RFRA "prohibits the Federal Government from taking any action that substantially burdens the exercise of religion unless that action constitutes the least restrictive means of serving a compelling government interest."[75] The Departments previously determined that the existing accommodation process complies with the requirements under RFRA, and now they are somehow arguing that the accommodation process fails each element of RFRA. The Departments' change in position is unsupported by actual RFRA jurisprudence, Congressional history, and it comprises non-scientific, ideological policymaking. It is also arbitrary and

---

[73] Pub. L. No. 115-31, Title VII Section 726(a). https://www.congress.gov/bill/115th-congress/house-bill/244/text (emphasis added).

[74] 82 Fed. Reg. at 47,799-47,800, citing Section 808 of Pub. L. No. 115-31.

[75] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2759 (2014).

00373504

Exhibit 44                                                                                    JA-0000837

capricious because the Departments have failed to consider the relevant data and articulate a satisfactory explanation for the action they are taking in this IFR.

C.  The Departments have not shown that the current contraceptive coverage requirements substantially burden the free exercise of religion within the meaning of RFRA.

As discussed above, the United States Supreme Court held in *Hobby Lobby* that requiring a closely-held corporation to provide the contraceptive coverage benefit when it does not wish to provide coverage of certain kinds of contraceptives to which it objects constitutes a substantial burden under RFRA. In his *Hobby Lobby* concurrence, Justice Kennedy signaled that the accommodation would withstand RFRA's substantial burden test by noting, "[The] accommodation equally furthers the Government's interest but does not impinge on the plaintiffs' religious beliefs."[76] The Departments in response established a scheme allowing closely-held religious non-profit organizations to opt out of arranging or paying for contraceptive coverage while at the same time ensuring seamless coverage for women.

Following implementation of the accommodation—and the implementation of an alternative accommodation process following *Wheaton*—a handful of organizations still claimed that even the process of notifying the government or a third-party administrator of the need for an accommodation constituted a substantial burden on their free exercise of religion. Eight out of nine Circuit courts disagreed, ruling that such a notification process did not impose a substantial burden on a non-profit religiously-affiliated organization's free exercise of religion under RFRA.[77] In the IFR, however, the Departments rely on the outlier Eighth Circuit's ruling that compelling an organization to submit a two-page notification document pursuant to the accommodation process is a substantial burden on the organization's exercise of religion. The Departments give no other reason for this change of position, concluding instead "that requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA."[78] Therefore the Departments have not established that the current system substantially burdens the free exercise of religion. Moreover, although the question of whether the accommodation process constitutes a substantial burden for an objecting organization has not been resolved by the courts, the Departments simply assume that it does, and enact a scheme that plainly defies the Supreme Court's order in *Zubik* that the agencies must ensure "that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage."[79] This open disregard of the caselaw highlights the Departments' arbitrary and capricious action in issuing this IFR.

---

[76] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2786 (2014) (Kennedy, J., concurring).
[77] *Eternal Word Television Network v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122 (11th Cir. 2016); *Dordt Coll. v. Burwell*, 801 F.3d 946 (8th Cir. 2015); *Mich. Catholic Conference v. Burwell*, 807 F.3d 738 (6th Cir. 2015); *Catholic Health Care Svs. v. Burwell*, 796 F.3d 207 (2d Cir. 2015); *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606 (7th Cir. 2015); *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 237 (D.C. Cir. 2014); *but see Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151 (10th Cir. 2015).
[78] 82 Fed. Reg. at 47,800.
[79] *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (internal quotation marks and citation omitted).

17

00373505

Exhibit 44

JA-0000838

D.  The federal government plainly has a compelling interest in ensuring comprehensive coverage of contraception.

The reasons the Departments now offer for why comprehensive coverage of contraception fails to serve a compelling government interest are unsupported by, and in some cases directly contradicted by, the actual record.

    *i.    Statutory intent*

The Departments claim that Congress did not require that contraception be covered at all under the ACA, and that Congress "merely provided" for coverage of preventive care for women recommended by HRSA. Thus, the Departments argue that the contraceptive coverage benefit is not sufficiently important.

However, as explained in detail in Section I(A) of this comment, the Women's Health Amendment to the ACA was specifically intended, among other goals, to improve women's health by making sure they could access family planning services and enable them to make informed family planning and child spacing choices.[80] Thus, in enacting the Women's Health Amendment, Congress particularly focused on the importance of women's preventive care, including contraception, recognizing that it was essential to reform the healthcare system to "[i]ncrease[] health insurance coverage for women," and "require[] coverage of comprehensive reproductive health services."[81]

The Departments further argue that Congress did not make the preventive services requirement in Section 2713 of PHS Act applicable to "grandfathered plans" as opposed to other health insurance requirements that applied to all health plans immediately, and that this additionally signifies that Congress did not consider the preventive services requirement as sufficiently important.

However, as the Departments previously held, the existence of certain exemptions from the ACA's contraceptive coverage mandate does not diminish the government's compelling interest in maximizing the number of women who have cost-free access to contraception. Courts have already recognized that the existence of grandfathered plans do not undercut the government's argument for compelling interest in ensuring cost-free contraceptive coverage.[82] Furthermore, as

---

[80] 155 CONG. REC. S12052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken) ("Access to contraception is . . . a fundamental right of every adult American."); *see also, e.g.,* 155 CONG. REC. S12671 (daily ed. Dec. 8, 2009) (statement of Sen. Durbin) ("Today, there are 17 million women of reproductive age in America who are uninsured. This bill will expand health insurance coverage to the vast majority of them, which . . . will reduce unintended pregnancies and reduce abortions."); 156 CONG. REC. H1893 (daily ed. Mar. 21, 2010) (statement of Rep. Kaptur) ("This legislation will help millions of women obtain health coverage and thus reduce abortion by enhancing broad coverage options for women's and children's health.").

[81] 155 CONG. REC. S12026 (daily ed. Dec. 1, 2009) (statement of Sen. Boxer). *See also* 77 CONG. REC. E1199-1200 (daily ed. May 19, 2009) (statement of former Rep. Moran) (noting an increase in women who no longer have money to pay for medical care and that "[t]hese women are literally choosing between a month of birth control and bus fare.").

[82] *See Priests for Life, v. U.S. Dep't of Health & Human Servs.,* 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for

18

00373506

Exhibit 44

JA-0000839

discussed in Section I(A) of this comment, the "grandfathered plan" exemption is intended as a temporary means for transitioning employers to full compliance.[83] Accordingly, the number of employer-sponsored grandfathered plans has decreased steadily since 2010.[84]

Finally, the Departments argue that the ACA does not require coverage of contraceptives where they are prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition. "Therefore, the Departments conclude that the fact that some drugs that are approved for preventive contraceptive purposes can also be used for exclusively non-preventive purposes to treat existing conditions is not a sufficient reason to refrain from expanding the exemption to the Mandate."[85]

Here, the Departments neglect the fact that contraceptives treat a myriad of symptoms related to a woman's reproductive system. Ensuring copay-free contraceptives, whether it is used for contraceptive or non-contraceptive purposes, strengthens women's health and eliminates further cost burdens on women for many reproductive health problems.

      *ii.   Regulatory scheme*

The Departments argue that the existing accommodation process undermines their own case for a compelling interest in the contraceptive coverage benefit, saying HHS lacks authority to compel church plan third-party administrators to provide contraceptive coverage (when self-insured church plans use the accommodation process) because church plans are exempt from ERISA. According to the Departments, this has led to significant incongruity in terms of which religious organizations must provide coverage, and the Departments' inability to enforce the benefit uniformly is "strong evidence that the Mandate 'cannot be regarded as protecting an interest "of the highest order."'"[86]

However, the fact that HHS lacks the authority to compel some plans because they fall outside of ERISA does not mean the interest is not compelling. As stated above, the existence of certain exemptions from the ACA's contraceptive coverage requirement does not diminish the government's compelling interest in maximizing the number of women who have cost-free access to contraception. This interest was clearly outlined by Congress in its discussion around the passage of the Women's Health Amendment and in the explicit rejection of a proposed amendment granting religious and moral exemptions.

The Departments also argue that existing regulations differentiate between religious colleges that are in self-insured church plans (i.e. ERISA-exempt) versus religious colleges that are in bigger group health insurance plans, and because there may be differential treatment of various religious

---

[83] religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[83] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Burwell* v. *Hobby Lobby Stores, Inc.*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[84] Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318, 41,332 (July 14, 2015).

[85] 82 Fed. Reg. at 47,806.

[86] *Id.* at 47,801.

00373507

nonprofit organizations under the accommodation, it is appropriate to widen the exemption to other kinds of religious nonprofits.[87]

The fact that some religious entities could use the church plan exemption and some religious entities had to use the accommodation does not justify the expanded exemptions allowing all religious organizations to deny contraceptive coverage in any way. The ACA and the contraceptive coverage benefit aim to ensure that as many women as possible receive copay-free contraceptives and make healthcare choices based on their consultation with their healthcare provider—without regard for what their employer or university is willing to cover based on their religious beliefs. It is inappropriate for the Departments to encourage discrimination when there is already an accommodation process that fulfills RFRA requirements.

### iii.    Current practice

The Departments argue that the fact that various entities have been willing to provide coverage of *some* but not all FDA-approved contraceptives detracts from the Departments' interest in requiring that they provide coverage for other contraceptive methods to which they object.

It is unclear why the fact that some health plan sponsors object to some but not all contraceptives is relevant to this IFR, which allows any objecting health plan sponsor or third-party administrator to categorically refuse to provide coverage for any FDA-approved contraceptive. The Departments do not argue that certain entities should be exempt from providing coverage for some forms of birth control but not others. Instead, the IFR exempts entities from covering any contraceptives at all, if the entities religiously object to any or all forms of contraceptives. Furthermore, selective coverage of some contraceptive methods and not others does not fulfill the aim of the contraceptive coverage benefit: that women receive the contraceptive option that is best for them as determined by their healthcare provider, not by their employer or insurance issuer.

The Departments also argue that many religious nonprofits only hire those with same beliefs or require their employees adhere to a statement of faith, and that employees choose to work for these organizations with the knowledge that their employers are unwilling to provide contraceptive coverage. The Departments argue that forcing the benefit on these entities may impede health coverage in general because these entities may not provide health coverage at all.

However, many nonprofits and for-profit corporations hire people who do not necessarily share the same beliefs as the employer. Likewise, students may attend a university that espouses beliefs with which they disagree. To take away essential benefits from these employees or students at the institutions' wishes is extremely dangerous. Whether a woman should use contraceptives and which kind should be a decision left solely up to a woman and her healthcare provider, and unimpeded by co-pay requirements.

### iv.    Other

---

[87] *Id.* at 47,801–47,802.

00373508

Exhibit 44                                                          JA-0000841

The Departments now argue that the administrative record was insufficient to support the Departments initial conclusion—reiterated consistently over a nearly six-year period—that cost-free contraceptive coverage constitutes a compelling government interest. The specific arguments on the change of position are discussed below:

The Departments argue that the Departments previously unduly relied on IOM recommendations, which did not specifically look at the cost of contraceptives when it acknowledged the preventive services gap between men and women. However, the IOM Committee did conclude that HRSA should include the full range of contraceptives as women's preventive care, and that "eliminat[ing] ... cost sharing for contraception could ... greatly increase its use, including the use of the more effective and longer-acting methods."[88] This was the shared consensus of the fifteen out of sixteen scientific and medical experts on the Committee. Furthermore, it is clear that contraceptives are a crucial component of women's preventive services and Congress clearly intended through the Women's Health Amendment to close an existing gap between men and women on cost disparities for preventive services.

The Departments argue that no-cost well-woman visits and other women's preventive services under the ACA make it easier for women to afford contraceptives when their health plan sponsor refuses to cover them due to religious reasons. However, the Departments do not offer any explanation for this reasoning, let alone any empirical data or a cost-benefit analysis to support its argument. Furthermore, allowing health plan sponsors to deny coverage for contraceptives still imposes a burden on women, especially the type of financial burden that Congress explicitly sought to prevent through the contraceptive coverage benefit.

The Departments argue that there are programs for low-income women that provide free or subsidized contraceptives. However, only a certain subset of low-income women qualifies for such programs. Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of comparatively higher-income, insured individuals. With current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rule. Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program. Similarly, Medicaid is a source of coverage designed to meet the unique healthcare needs of individuals who are low-income. The majority (two-thirds) of state Medicaid programs already face challenges to securing an adequate number of providers to furnish services to patients, including OB/GYNs. Furthermore, Medicaid eligibility for women with a higher income cutoff is for pregnant women, which is exactly what women who use contraception are trying to avoid. Thus, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR. Finally, the current administration has been attempting to cut these programs, including putting forth proposals to restrict access to publicly funded family planning under Title X.[89]

---

[88] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* 109 (July 19, 2011), https://www.nap.edu/read/13181/chapter/1.
[89] The White House, *Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018* (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), https://www.whitehouse.gov/the-press-

00373509

Exhibit 44                                                                                                      JA-0000842

The Departments argue that many forms of contraception are available for just $50 a month. This obviously ignores the often-prohibitive up-front costs of contraceptives, especially long-acting reversible contraception (LARC) in particular. A study in the Journal of Adolescent Health found that "[t]he high up-front cost of contraception, and LARC methods in particular, is one of the most important barriers to use" and that "[p]rovision of no-cost contraception has been demonstrated to significantly reduce the teen birth rate, abortions, and repeat abortions."[90] The Departments' apparent dismissal of the inherent difference between paying $1,000 up front—as opposed to $50 per month—is merely one example of their failure to account for the actual impact the exemption will have on the women who are legally entitled to the contraceptive coverage benefit.

The Departments argue that the benefit does not meet its goals because women aged between 18-24 are most at risk for unplanned pregnancy and the benefit does not cover all of those women; they also argue that the benefit covers more women than just those at-risk women. But this is not a flaw; many more women are also at risk of unplanned pregnancy and the contraceptive benefit is a large step towards lowering incidences of unplanned pregnancies by ensuring cost-free access to contraceptives.

The Departments argue that rates of and reasons for unplanned pregnancy are hard to measure, and that, while contraceptive use correlates with fewer pregnancies, a causal effect has not been proven. The Departments' assertions are erroneous and irrelevant. First, all studies examining the effect of birth control rely on correlation because one *cannot* ethically do a causation-proving experiment on birth control. It would be unethical to randomly assign some women to use contraception while withholding it from the control group, and subject them to conditions inducing pregnancy. Second, multiple studies have consistently found that access and use of contraceptives are associated with a reduction in unintended pregnancies.[91] More recently, Washington University's CHOICE Project conducted a study where they gave out free contraceptives to local teenagers and observed them for up to three years. The study, published

office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, *Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X*, GUTTMACHER POLICY REVIEW, (Aug. 2017), https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, *The President's Fiscal Year 2018 Budget: Overview* (May 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).
[90] Eisenberg et al., *Cost as a Barrier to Long-Acting Reversible Contraceptive (LARC) Use in Adolescents*, 52 J. OF ADOLESCENT HEALTH S59-S63 (2013), http://www.jahonline.org/article/S1054-139X(13)00054-2/fulltext.
[91] Frost et al., *Contraceptive Needs and Services, 2014 Update*, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/report/contraceptive-needs-and-services-2014-update; Centers for Disease Control and Prevention, *Achievements in Public Health, 1900-1999: Family Planning*, 48 MORBIDITY AND MORTALITY WEEKLY REPORT 1073-1080 (1999), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm.

00373510

Exhibit 44

JA-0000843

in the New England Journal of Medicine, found that women enrolled in CHOICE had birth rates, abortion rates, and pregnancy rates that were less than half that of the average American.[92]

The Departments argue that mandating cost-free contraceptive coverage means teen sexual activity outside of marriage may increase, and that contraceptives may increase unwanted risky sexual behavior in general. However, the percentage of teens who are having sex has declined significantly over the past 25 years.[93] School-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[94] Further, the CHOICE Project study (of more than 9,000 women) found that for women and teens given free contraception, the number of women who reported recent multiple sexual partners went down, not up. The study also found that that there were no increases in the rates of sexually transmitted infections.

The Departments argue that in states that impose a statewide coverage requirement, the contraceptive benefit have not necessarily lowered the rate of unintended pregnancy or abortion overall. However, to support this assertion, the Departments only cite a single law review article—which are not peer-reviewed, unlike articles and studies published in health and science journals.

The Departments argue that they do not have a compelling interest in requiring individuals to be covered by policies that include contraceptive coverage when individuals object. However, allowing individual exemptions will likely undermine the workability of the system at large.[95]

All in all, none of the Departments' listed reasons are sufficient to justify the Departments' reversed position on whether the contraceptive coverage benefit serves a compelling interest. In fact, the Departments' arguments are not grounded in Congressional history, relevant jurisprudence, nor even an evidence-based approach.

E.  Effects of exemptions on third parties

In support of the IFR, the Departments argue that "the exemptions created here, like the exemptions created by the last Administration, do not burden third parties to a degree that counsels against providing the exemptions." The Departments hold out as analogous situations the examples of making all supermarkets sell alcohol for convenience against the Muslim faith, or making all restaurants stay open on Saturdays against the Jewish faith.

---

[92] Secura et al., *Provision of No-Cost, Long-Acting Contraception and Teenage Pregnancy*, 371 NEW ENGLAND J. MED. 1316-1323 (2014). http://www.nejm.org/doi/full/10.1056/NEJMoa1400506#t=article.

[93] Martinez and Abma, *Sexual activity, contraceptive use, and childbearing of teenagers aged 15–19 in the United States. NCHS Data Brief*, 2015, No. 209, Hyattsville, MD: National Center for Health Statistics, 2015.

[94] Minguez et al., *Reproductive health impact of a school health center*, 56 J. OF ADOLESCENT HEALTH 338, 338-344 (2015); Knopf et al., *Community Preventive Services Task Force. School-Based Health Centers to Advance Health Equity: A Community Guide Systematic Review*, 51 AM. J. OF PREVENTIVE MED. 114, 114–26 (2016).

[95] Insurance markets could not function—either administratively or financially—if insurers had to tailor each health plan to the specific needs and desires of each individual plan participant and beneficiary. If insurers started to in fact respond to every individual exemption request, it would hamper the functionality of the insurance market.

00373511

Exhibit 44                                                                                    JA-0000844

The exemptions created by this IFR burden third parties to an impermissible degree. The Departments' examples are not analogous to religious exemptions that deny individuals contraceptive coverage. Being able to obtain alcohol, or food from a restaurant, is not the same kind of benefit as being able to receive essential health benefits. Contraceptives are not a matter of convenience; contraception is health care—in fact, one of the ten greatest public health achievements of the 20th century according to the CDC—that has a tremendous impact on women's health, well-being and economic security. The woman who will now need to choose between paying a monthly utility bill and paying for contraception would argue that the burden is extreme and in fact does counsel against providing the exemptions

Furthermore, the expanded exemption includes institutions of higher education, which are especially likely to have women that are at risk of unintended pregnancies and do not hold the same religious views as the heads of the institution. Within the United States, there are over 200 Catholic colleges and universities that collectively educate more than 800,000 students, and provide insurance coverage to hundreds of thousands of employees and their families. It is estimated that 1.5 million graduate and undergraduate students are covered under university health insurance policies.[96] Thus, expanding the exemption to institutions of higher education will likely strip coverage from thousands of women aged between 18-24 that are most at risk for unplanned pregnancy but who can no longer afford necessary contraceptives due to their institutions' objection.

Finally, the Departments' argument that contraceptives are readily available and "for many low-income persons, are available at reduced cost or for free through various governmental programs," is inaccurate. As discussed extensively in Section III(D)(iv), *infra*, public programs such as Title X or Medicaid do not provide no-cost contraceptives to all women and are not designed to absorb the unmet needs of higher-income, insured individuals. The Departments cannot relegate their responsibility, or clear their conscience, by asserting that "contraceptive coverage may be available through State sources or family plans obtained through non-objecting employers"—in this IFR, the Departments are acting to withdraw healthcare coverage provided for women under the ACA, and it is not up to other agencies or entities to fill in the gap.

     *i.   RFRA jurisprudence on third-party burdens*

The Departments claim that any burdens imposed on third parties may be relevant to the RFRA analysis, but are not dispositive. The Departments are incorrect.

The Departments' actions here go against the intent and scope of RFRA. Congress enacted RFRA to act as a shield, not a sword. RFRA was intended as an important defense of religious liberties, but it does not permit employers to impose their religious beliefs on their employees and interfere with their employees' access to the important preventive care services required by the ACA.[97] When Congress enacted RFRA, Congress expected that courts would look to First Amendment cases decided prior to *Emp't Div., Dep't of Human Res. of Oregon v. Smith* to

---

[96] 76 Fed. Reg. 7767, 7768-69 (April 12, 2011).
[97] Brief of 123 Members of the U.S. Congress as Amici Curiae Supporting Respondents, Zubik v. Burwell, 136 S. Ct. 1557 (2016) (Nos. 14-1418 et al.) at 34.

00373512

Exhibit 44

JA-0000845

determine whether exercise of religion has been burdened and the least restrictive means have been employed to further a compelling government interest.[98] Those prior cases consistently held that the government is *not* required to accommodate religious beliefs if doing so imposes significant burdens on third parties.[99]

When individuals have sought exemptions from government action or requirements based on their religious beliefs, the Court has recognized the importance of balancing those interests against the interests of the government in the efficient administration of its programs and the impact any exemption would have on the rights of third parties. For example, in *United States v. Lee*, an Amish business owner claimed that the payment of social security taxes interfered with his free exercise rights because the Amish have a religious responsibility to take care of their own elderly and needy.[100] The Court did not grant an exemption from paying the tax, holding that the government had a compelling interest in the efficient and consistent application of the social security system and that "[g]ranting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees."[101]

The ACA and its implementing regulations require insurance coverage for women's preventive services, whether that coverage is provided by the employer or the health insurance issuer or third-party administrator, and thereby ensure that contraceptive services are affordable and accessible for any woman who decides to use them. These provisions were intended to "preserve[] the freedoms of conscience and religion for every American" but also "protect[] the rights of the millions of Americans who do use contraceptives, who believe family planning is the right choice for them personally, and who do not deserve to have politics or an extreme minority's ideology prevent them from getting the coverage they deserve."[102] Indeed, in *Hobby Lobby* the Supreme Court considered the accommodation acceptable because it was clear that the impact on third parties was "precisely zero," as there was a way for employees to receive seamless contraception coverage even if their employer objected.[103]

> ### ii.    *Establishment Clause Violation*

Exemptions created under RFRA are subject to the constraints of the Constitution, including the Establishment Clause. Not only is the IFR not required by RFRA, as the Departments claim, but the exemptions it creates are impermissible because they run afoul of the Establishment Clause.

---

[98] S. REP. 103-111, at 8 (1993).

[99] *See, e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 593 (1983) (rejecting university's claim that it was entitled to tax exempt status as a religious nonprofit since its policies on interracial dating were based on sincere religious beliefs because "racial discrimination in education violates deeply and widely accepted views of elementary justice"); *Braunfeld v. Brown*, 366 U.S. 599, 604 (1961) (recognizing that religious accommodations should be granted if "[t]he freedom asserted by [an objector] does not bring [the objector] into collision with rights asserted by any other individual").

[100] 455 U.S. at 254-55.

[101] 455 U.S. at 254-61 ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.").

[102] 158 CONG. REC. S376 (daily ed. Feb. 7, 2012) (statement of Sen. Murray).

[103] 134 S. Ct. at 2760; *see also id.* at 2781-82.

00373513

Exhibit 44                                                                                                    JA-0000846

The Establishment Clause prohibits the government from creating exemptions to neutral, generally applicable rules in a manner that imposes significant burdens on third parties. But that is precisely what the IFR does by shifting the burden of securing contraception, an essential healthcare service, onto the contraceptive coverage requirement's intended beneficiaries: namely, employees and students.

After repeatedly underscoring the need to balance the government's interest in advancing women's health and equality with the need to accommodate the religious beliefs of institutions that object to contraception,[104] the Departments now eschew that approach, instead choosing to privilege certain religious ideologies, and in so doing, impose significant harms on women. Shifting these burdens to third parties does not accommodate religion as the Departments claim, but rather unconstitutionally *establishes* it. The Supreme Court has repeatedly recognized and restated this principle, including in this specific context in *Hobby Lobby*.[105]

Instead of balancing the interests of religious entities and those entitled to the no-cost contraceptive benefit under the ACA, the IFR unconstitutionally promotes the religious beliefs of objecting institutions over the government's interest in eliminating discrimination, advancing women's equality, and promoting coverage for contraceptive services. By granting objecting institutions the power to deny their employees and students coverage for contraception and thereby imposing substantial harms on these third parties, the IFR violates the Establishment Clause of the U.S. Constitution and therefore should be rescinded.

## Conclusion

In conclusion, we strongly oppose this IFR. For all the reasons stated above, the Departments have plainly acted in an arbitrary and capricious manner in promulgating this IFR, and we urge the Departments to rescind this regulation in its entirety. Thank you for the opportunity to comment.

Sincerely,

The Center for Reproductive Rights

---

[104] *See, e.g.,* 77 Fed. Reg. 8725, 78 Fed. Reg. 39870, 80 Fed. Reg. 41,318.

[105] *See, e.g., Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005) (shifting unreasonable burdens onto third parties as the cost of accommodating objectors' beliefs "may devolve into 'an unlawful fostering of religion'"); *Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 708-09 (1985) (striking down under Establishment Clause state law granting employees absolute right not to work on day they observed the Sabbath, "no matter what burden or inconvenience [it] impose[d] on the employer or fellow workers"); *see also* 134 S. Ct. at 2781 n.37 ("It is certainly true that in applying RFRA courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries," (internal citation omitted)); *Id.* at 2786-87 (Kennedy, J., concurring) ("[N]either may that same exercise unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling."); *Id.* at 2759-60 (affirming religious exemption to contraceptive coverage benefit under RFRA only insofar as it would have "precisely zero" impact on objector's employees).

26

00373514

Exhibit 44

JA-0000847



**DC Health Benefit**
**Exchange Authority**

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attn: CMS-9940-IFC and CMS-9925-IFC
P.O. 8016
Baltimore, MD 21244-8016

> Re: Religious and Moral Exemptions and Accommodations for Coverage of Certain
> Preventive Services Under the Affordable Care Act - CMS-9940-IFC and CMS-9925-IFC

To Whom It May Concern:

The District of Columbia Health Benefit Exchange Authority (HBX) appreciates your consideration
of our comments on the above-cited interim final rules.

By way of background, HBX is a private-public partnership established by the District of Columbia
(District) Council to develop and operate the District's on-line health insurance marketplace, DC
Health Link (DCHealthLink.com). DC Health Link fosters competition and transparency in the
private health insurance market, enabling individuals and small businesses to compare health
insurance prices and benefits and to purchase affordable, quality health insurance. Leveraging the
Affordable Care Act (ACA) and DC Health Link, the District now has the lowest uninsured rate we
have ever had. More than 96% of District residents now have health coverage.

The interim final rules on contraception coverage impact millions of women and their access to
health care. There is significant public interest in millions of women having access to contraceptive
medication. The complete policy reversal resulting in women having less health insurance
coverage was done without any opportunity for public comment. There was no prior proposal to
establish an exemption based on a moral objection and thus no prior opportunity to comment on
such an exemption.

Furthermore, the Departments' interpretation is arbitrary and capricious. The rules contradict
legislative history. During the drafting of the ACA, Congress considered and rejected an
accommodation for individuals, plan sponsors, and insurance carriers with religious or moral
objections to any item or service.[1]

HBX requests the interim final rules be rescinded.

Sincerely,

Mila Kofman
Executive Director
DC Health Benefit Exchange Authority

---

[1] 155 CONG. REC. S13193 (daily ed. Dec. 14, 2009).



1225 Eye Street NW, 4th Floor, Washington, DC 20005