**December 5, 2017**

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (RIN 0938-AT46)**

Thank you for the opportunity to submit comments in response to the Moral Exemptions and Accommodations for Coverage of Certain Preventive Services interim final rule ("Moral Exemptions IFR" or "Rule").

On behalf of Equality California and our 800,000 members, we are writing to urge the Department of Treasury, the Department of Labor, and the Department of Health and Human Services to drop the Moral Exemptions Rule altogether for the following reasons:

- **The Moral Exemptions IFR will cause generalized harm to millions of women if they are denied contraceptive coverage under their health care plans;**

- **The Moral Exemptions IFR will cause financial harm to millions of women and their families and particularly onerous for low-income women, who have fewer resources with which to manage an unintended pregnancy or birth. The ACA has delivered out-of-pocket savings for contraception totaling $1.4 billion to newly-covered women;**

- **The Moral Exemptions IFR hits LGBTQ people particularly hard-hit by restricting their access to essential reproductive and other health care services. Unintended pregnancies are equally as common, if not more common, for lesbian and bisexual women as for heterosexual women;**

- **By allowing the denial of a health care service used almost exclusively by women, the Moral Exemptions IFR is not in accordance with Section 1557 of the ACA because it discriminates on the basis of sex.**

- **The Moral Exemptions IFR provides no guidance or definition for a moral conviction, allowing employers to claim an exemption without any accountability. Nor does it provide employees with a mechanism to challenge an employer's alleged moral belief. Without accountability and safeguards, employers will be free to exploit the moral exemption for financial and business reasons.**

- **The Moral Exemptions IFR violates both the Administrative Procedure Act and the United States Constitution.**

00454756

Exhibit 46

JA-0000849

Equality California is a civil rights organization that brings the voices of LGBTQ people and allies to institutions of power in California and across the United States, striving to create a world that is healthy, just, and fully equal for all LGBTQ people. We advance civil rights and social justice by inspiring, advocating, and mobilizing through an inclusive movement that works tirelessly on behalf of those we serve.

## I. Background

### A. The Benefits of Contraception Are Well Known

Access to contraception is an essential part of shaping women's health and well-being.[1] As of September 2016, there were approximately 61 million U.S. women in their childbearing years (ages 15–44).[2] About 43 million of those women (70%) are at risk of unintended pregnancy—that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners do not use a contraceptive method correctly and consistently.[3] Heterosexual couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[4] In the United States, the average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[5]

Contraceptive use among women is widespread, with over 99% of sexually-active women using at least one method of contraception at some point during their lifetime.[6] And contraceptive use is common among women of all religious denominations.[7] Eighty-nine percent of sexually active Roman Catholics and 90% of sexually active Protestants currently use some method of contraception.[8] Among sexually-experienced religious women, 99% of Roman Catholics and Protestants have ever used some form of contraception.[9] Approximately 68% of Roman Catholics, 73% of Mainline Protestants, and 74% of Evangelicals who are at risk of unintended pregnancy use a highly effective method (e.g., sterilization, the pill or another hormonal method, or the IUD).[10]

---

[1] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[2] Kimberly Daniels, Jill Daugherty, and Jo Jones, *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, NATIONAL HEALTH STATISTICS REPORTS 173 (2014), http://www.cdc.gov/nchs/data/databriefs/db173.pdf.

[3] Jo Jones, William Mosher, and Kimberly Daniels, *Current Contraceptive Use in the United States, 2006–2010, and Changes in Patterns of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

[4] J Trussell, *Contraceptive failure in the United States*, 83 CONTRACEPTION 297–404, (May 2011).

[5] *Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics,* THE ALAN GUTTMACHER INSTITUTE (AGI) (2000), https://www.guttmacher.org/sites/default/files/pdfs/pubs/fulfill.pdf.

[6] Guttmacher Institute, *Contraceptive Use in the United States* (September 2016), https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

[7] Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (Apr. 2011) https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.

[8] *Id.*

[9] *Id.*

[10] *Id.*

00454757

Exhibit 46

Contraceptives make up an estimated 30—44% of out-of-pocket health care spending for those who use them.[11] A year's worth of birth control can cost upwards of $370—the equivalent of 51 hours of work for someone earning the federal minimum wage of $7.25 an hour.[12] Long-acting birth control methods, such as an IUD or contraceptive implant, cost more than $1,000 out of pocket[13]—almost one month's salary for a person earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the use of more effective methods, and a decrease in out-of-pocket costs for women.[14]

The ACA has expanded contraceptive coverage without cost-sharing to millions of people across the nation.[15] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with almost 65% of the decrease directly attributed to the contraceptive coverage provision. After the implementation of the ACA, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[16] Studies show that the use of long-term contraceptives methods, such as an IUD or an implant, has increased in recent years because the high upfront costs were removed.[17] These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives.[18] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[19] Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[20]

---

[11] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11, http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[12] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose,* NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/; *See* Elizabeth Celms, *How much do birth-control pills cost?,* CLEAR HEALTH COSTS (Apr. 29, 2013), https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[13] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose,* NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/.

[14] *Insurance Coverage of Contraceptives,* GUTTMACHER INSTITUTE (Oct. 1, 2017), https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives; Adara Bearmesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception,* THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[15] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception,* THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[16] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing,* 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[17] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception,* THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[18] Alina Salganicoff, Laurie Sobel, and Caroline Rosenzweig, *The Future of Contraceptive Coverage,* THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[19] *Id.*

[20] *The Affordable Care Act's Birth Control Benefit is Working for Women,* NATIONAL WOMEN'S LAW CENTER (Dec. 16, 2016), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.

00454758

Exhibit 46

Contraceptive use benefits women and families in numerous ways. Having access to the full range of FDA-approved contraceptive methods allows women to choose the method that works best for them at a given point in their life—factoring in ease of use, side effects, risk of sexually transmitted infections, desire for confidentiality and control, as well as many other considerations. Identifying the "right" methods helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording them greater control over family planning.

Reducing unwanted pregnancies and affording women greater control over family planning has additional health benefits. For example, avoiding closely spaced pregnancies reduces the risk of premature birth or low birth weight. Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families.

Access to comprehensive family planning services, and to culturally competent providers of those services, is critically important for the LGBT community. Lesbian, gay and bisexual youth have been shown to experience more pregnancies than do youth who do not identify as a sexual minority.[21] Bisexual women and some transgender people are also at risk for pregnancy and are often over-looked when considering access to reproductive health care. Access to family planning is thus essential for this community and should be made more, not less, accessible.

It is deeply troubling that federal agencies charged with ensuring public health would seek to enact a rule that gives employers such sweeping veto power over the health care services their employees may access under their health care coverage. Health insurance is a form of compensation that employees earn, like wages. Allowing employers a vague, morally-motivated veto over how an employee uses his or her earned health care coverage is bad public health policy and represents an overemphasis on an exaggerated view of moral objections at the expense of employee health and well-being.

### B. The Affordable Care Act's Contraceptive Coverage Provision

The ACA was enacted to achieve several health care reform goals, including improving the availability of primary and preventive health care services. When preventive services coverage was written into the ACA, Congress included a provision directing the Department of Health and Human Services (HHS) to identify the preventive services that should be provided to women.

HHS undertook a thorough and evidence-based process to develop this list of women's preventive services, calling on the independent National Academy of Medicine to convene experts and determine what services should be covered. It surprised no one with a background in public health or medicine that contraception was among the essential preventive services that the Academy included in its recommendations. The Department included contraception in its final rule delineating the list of women's preventive services, exempting houses of worship from covering contraception in their health plans if they had a religious objection. Seeking a broader exemption, some employers, both for-profit and non-profit, filed lawsuits seeking to challenge the requirement to cover contraception on religious grounds

The Supreme Court resolved the for-profit challenges in 2014, in *Burwell v. Hobby Lobby*.[22] The Court ruled that the Religious Freedom Restoration Act required that a closely held for-profit company whose owners objected to contraception on religious grounds must be permitted to use the same accommodation given to non-profit entities (described below). Importantly, the Court stressed that there

---

[21] Lisa L. Lindley, Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 AM. J. OF PUBLIC HEALTH 1379–86 (July 1, 2015); Karen Schantz, *Pregnancy Risk Among Bisexual, Lesbian, and Gay Youth: What Does Research Tell Us,* ACT FOR YOUTH CENTER OF EXCELLENCE (Apr. 2015), http://www.actforyouth.net/resources/rf/rf_lgb-prg_0415.pdf.
[22] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2786–87 (2014).

00454759

Exhibit 46      JA-0000852

would be no harm to the company's workers caused by permitting the company to use the same accommodation to provide its employees with contraceptive coverage, as the employees would still receive coverage without cost sharing.

With respect to non-profit employers, the Departments developed an accommodation to permit religiously affiliated non-profit employers to certify that they objected to contraception and notify their insurer or third-party administrator (TPA), which would arrange for contraceptive coverage for the objecting employer's employees at no cost to the employer. Following the *Hobby Lobby* decision, two more rules were adopted—one creating an additional notice mechanism for objecting non-profits (to HHS rather than to the insurer/TPA), and another allowing closely-held for-profit entities to avail themselves of the same accommodation, pursuant to the holding in *Hobby Lobby*.

### C. Changes Under the Moral Exemptions IFR

The Moral Exemptions IFR now goes beyond the religiously-based objections under the ACA and Burwell v. Hobby Lobby to allow any non-profit or closely-held for-profit employer, and private institutions of higher education that issue student health plans, to apply for an accommodation or exemption from contraceptive coverage based on moral convictions. The rule provides no guidance or definition for a moral conviction, allowing employers to claim an exemption without any accountability. Moreover, the rule does not provide employees with a mechanism to challenge an employer's alleged moral belief. Without accountability and safeguards, employers will be free to exploit the moral exemption for financial and business reasons. Under this Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations. This is a potentially dramatic change in the availability of contraceptive coverage for the employees of a vast number of entities, and a significant departure from what was guaranteed to these employees under prior rulemaking.

## II. Comments on the Moral Exemptions IFR

NCLR opposes the Moral Exemptions IFR for several reasons. Allowing restrictions on the availability of health care services based on the moral convictions of others—already too prevalent in reproductive health care—sets a dangerous precedent for access to health care for LGBT people. Limiting the availability of contraceptive coverage will itself have an adverse impact on the LGBT community. Additionally, the Rule is unlawful, in violation of the APA and United States Constitution.

### A. Moral Exemptions in Health Care Cause Harm

Unlike other nations whose legal regimes have sought to balance the conscience rights of providers with the rights of persons to access health care, in the United States there is often insufficient consideration given to the impact of overly broad conscience laws on patients. In other words, the playing field is already tilted heavily in favor of those seeking to deny care. And given the nature of the services to which conscientious exemptions are most commonly applied, these refusal laws have a discriminatory impact on LGBT people and women seeking reproductive health care.

At the federal level, there are already numerous statutory protections for health care providers' conscientious objections, including both religious and moral objections. These laws include the Church,[23]

---

[23] 42 U.S.C. § 300a-7 et seq.

00454760

Exhibit 46

Weldon,[24] and Coats[25] amendments, which allow providers to refuse to perform or otherwise facilitate abortion services. The Church Amendment also reaches sterilization services.[26]

Most states have similar laws; forty-five allow individual health care providers, and forty-three allow institutions, to refuse to provide abortion services based on conscientious objections.[27] Provider conscience clauses at the state level apply not only to abortion services but also to contraceptive care. Twelve states permit some health care providers to refuse to provide contraception and related services (such as counseling).[28]  Refusal provisions targeting contraception delay access, increase costs, and may result in unintended pregnancies. Eighteen states allow providers to refuse to provide sterilization services.[29]

State conscience clauses have now expanded to end of life care, stem cell research, and to any unspecified health services to which a moral or religious objection may be raised, including counseling or providing information regarding the patient's health status.[30]  These state laws are also expanding to cover more entities.[31] Provider conscience laws exist in states where there are significant numbers of communities of color, including Texas and Florida,[32] and many of these states have enacted additional, broad constitutional or statutory religious exemptions that impact LGBT persons.[33]

While religious and moral-based objections to contraception and abortion are well known and have posed access barriers for years, less well known is how these types of refusals can also affect the LGBT community. LGBT people and people living with HIV experience pervasive discrimination in the provision of health care. According to an in-depth survey concerning health care discrimination against LGBT people and people living with HIV, more than half of all respondents reported that they have experienced at least one of the following types of discrimination in care: being refused needed care; health care professionals refusing to touch them or using excessive precautions; health care professionals using harsh or abusive language; being blamed for their health care status; or health care professionals being physically rough or abusive.[34] Many members of the LGBT community have a "high degree of anticipation and belief that they w[ill] face discriminatory care" which ultimately causes many people to not seek the essential care that they need.[35] For many transgender and gender-nonconforming people the fear of potential negative treatment from health care professionals is even more exacerbated. Undocumented transgender persons were found to be vulnerable to physical attacks in doctors' offices, hospitals, and

---

[24] Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat 786.

[25] 42 U.S.C. § 238(n).

[26] 42 U.S.C. § 300a-7 et seq.

[27] GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015),
http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.

[28] *Id.*

[29] *Id.*

[30] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2470 (2015).

[31] *Id.*

[32] For instance, Florida allows private, religious, and public institutions and individual providers to refuse abortion care to patients and allows individual providers and pharmacists to refuse contraception. GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015), http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.

[33] MOVEMENT ADVANCEMENT PROJECT, LGBT POLICY SPOTLIGHT: STATE AND FEDERAL RELIGIOUS EXEMPTIONS AND THE LGBT COMMUNITY (2015), http://www.lgbtmap.org/policy-and-issue-analysis/policy-spotlight-rfra.

[34] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV 5 (2010),
http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf  (explaining that "almost 56 percent of lesbian, gay or bisexual (LGB) respondents had at least one of these experiences; 70 percent of transgender and gender-nonconforming respondents had one or more of these experiences; and nearly 63 percent of respondents living with HIV experienced one or more of these types of discrimination in health care. In almost every category, transgender and gender-nonconforming respondents reported higher levels of discrimination by health care providers.").

[35] *Id.* at 6.

00454761

Exhibit 46

emergency rooms.[36]  There are also geographic considerations that may further exacerbate discrimination against LGBT individuals.[37] These realities have created a major barrier to health care services for LGBT people.

LGBT people of color and people with lower socioeconomic status experience even higher levels of discriminatory and substandard care.[38] Data from one report[39] show, among other things:

- Only 64 percent of LGB Latino adults had health insurance coverage compared to 77 percent of all LGB adults and 82 percent of the heterosexual adult population.

- Thirty percent of LGB African-American adults were likely to delay or not get needed medication compared to 19 percent of African-American heterosexual adults.

- Twenty-six percent of LGB Latino adults did not have a regular source for basic health care.

- Only 35 percent of LGB African-American women had a mammogram in the past two years, compared to 57 percent of all LGB women and 62 percent of all heterosexual women.

Health insurance benefits earned by employees and guaranteed under federal law should not be subject to a conscientious objection veto by employers. The regulatory regime that existed prior to this IFR was the result of several years of considered policymaking and constituted a balance between conscientious beliefs and health care access. This IFR would upend that careful balance and subjugate employee health care needs to the conscientious objections of any employer. Not only is this poor public health policy, as described further in section B below, it is contrary to numerous provisions of law, set forth in section C.

### B.    The Moral Exemptions IFR Will Increase Health Disparities Faced by LGBT People

The Moral Exemptions IFR harms the LGBT community by restricting access to contraception for those who need it, including lesbian and bisexual women and some transgender people.[40] Access to birth

---

[36] GRANT JM. ET AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY 74 (2011), http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

[37] NAT'L WOMEN'S LAW CTR., FACT SHEET: HEALTH CARE REFUSALS HARM PATIENTS: THE THREAT TO REPRODUCTIVE HEALTH CARE 2 (2014),

http://www.nwlc.org/sites/default/files/pdfs/refusals_harm_patients_repro_factsheet_5-30-14.pdf.

[38] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV, 11 (2010),

http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf ("In addition to the overall rates of substandard care, respondents (defined in this survey as having a household income under $20,000) in nearly every category experienced higher rates of discrimination and substandard care. For example, while transgender respondents as a whole reported a care-refusal rate of almost 27 percent, low-income transgender respondents reported a rate of almost 33 percent. Almost 11 percent of low-income LGB respondents and LGB respondents of color were refused care compared to almost 8 percent of LGB people overall."); *see also The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding,* INSTITUTE OF MEDICINE (2011), http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx.

[39] *Health Disparities in LGBT Communities of Color: By the Numbers,* CENTER FOR AMERICAN PROGRESS (2010), https://www.americanprogress.org/issues/lgbt/news/2010/01/15/7132/health-disparities-in-lgbt-communities-of-color

[40] *Birth Control Access for LGBTQ People,* THE NATIONAL LGBTQ TASK FORCE (2016),

http://www.thetaskforce.org/static_html/downloads/reports/fact_sheets/factsheet_birth_control_access.pdf.

00454762

Exhibit 46

control is particularly crucial for the health and well-being of lesbian and bisexual women because they are at risk for unintended pregnancies.[41]

Despite misconceptions held by policymakers and some medical providers, lesbian and bisexual women require sexual and reproductive health services similar to those needed by heterosexual women. A majority of lesbian and bisexual women have reported having had intercourse with men and at least 30% have been pregnant,[42] 50% have used oral contraceptives, and 16% reported one or more abortions.[43] Bisexual women are also subject to an increased risk of sexual violence. One study found that 46% of bisexual women have been raped as compared to 17% of heterosexual women.[44] Broadly, studies indicate that unintended pregnancies are equally as common, if not more common, for lesbian and bisexual women as for heterosexual women.[45]

Adolescent lesbian and bisexual women are at even higher risk for unintended pregnancies. Lesbian adolescent women are less likely than bisexual and heterosexual women to use contraception and bisexual adolescent women are more likely to experience teen pregnancy than are heterosexual adolescent women.[46] One study found that 12% of lesbian and bisexual adolescent women have experienced teen pregnancy, compared to only 5% of heterosexual adolescent women. And a 2016 study by the Centers for Disease Control and Prevention found that LGBT high school students are more likely than other students to experience intimate partner violence and rape, which can result in unintended pregnancy.[47]

In sum, access to contraception is essential for the health and well-being of many members of the LGBT community, and allowing a wide range of employers to withhold coverage of contraception based on ill-defined moral convictions is unsound public health policy with the potential to cause significant harm.

### C.    The Moral Exemptions IFR is Unlawful

In addition to subjecting women's and LGBT people's access to health care to the moral conviction veto of employers, and increasing health disparities faced by members of the LGBT community, the Moral Exemptions IFR should also be rescinded because it violates the APA and the U.S. Constitution.

---

[41] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

[42] J.M. Marrazzo and K. Stine, *Reproductive Health History of Lesbians: Implications for Care*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2003).

[43] Elizabeth M. Saewyc, Linda H. Bearinger, Robert Wm. Blum and Michael D. Resnick, *Sexual Intercourse, Abuse and Pregnancy Among Adolescent Women: Does Sexual Orientation Make a Difference?*, 31 FAMILY PLANNING PERSPECTIVES 127 (1999).

[44] Adara Beamesderfer, Lindsey Dawson, Jennifer Kates, Usha Ranji, and Alina Salganicoff, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, THE HENRY J. KAISER FAMILY FOUNDATION (Nov. 2016), https://www.kff.org/disparities-policy/issue-brief/health-and-access-to-care-and-coverage-for-lesbian-gay-bisexual-and-transgender-individuals-in-the-u-s.

[45] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

[46] Brittany M. Charlton, Heather L. Corliss, Stacey A. Missmer, Margaret Rosario, Donna Spiegelman, and Bryn Austin, *Sexual orientation differences in teen pregnancy and hormonal contraceptive use: An examination across 2 generations*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2013), http://www.ajog.org/article/S0002-9378(13)00652-2/pdf.

[47] *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 — United States and Selected Sites, 2015,* CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 12, 2016), https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf; *see also* Lisa L. Lindley and Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High School Students*, 105 AM. J. OF PUB. HEALTH 1379 (2015).

00454763

Exhibit 46                                                                                                                    JA-0000856

### i. The Moral Exemptions IFR Violates the APA

The Administrative Procedure Act imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[48] The APA is applicable here because the Moral Exemptions IFR is a final agency action and is a legislative rule within the meaning of the APA.[49] By enacting the Moral Exemptions IFR in the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

### 1. Procedural Violations of Pre-Adoption and Post-Adoption Requirements of the APA

The APA contains two procedural rulemaking requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[50] Section 553(b) of the APA requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[51] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[52] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[53]

The Moral Exemptions IFR violates the notice and comment requirement and the 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its stated reasoning, the Departments do not have good cause, which is limited to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[54] Courts have found good cause in cases that involve: (1) emergencies;[55] (2) context where prior notice would subvert the underlying statutory scheme;[56] and (3) situations where Congress intends to waive section 553's requirements.[57] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[58] This means that the Departments must have good cause to waive each requirement.

---

[48] 5 U.S.C. § 551(5).

[49] *Id.*

[50] *Id.*

[51] 5 U.S.C. § 553(b).

[52] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[53] *Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996).

[54] 5 U.S.C. § 553(b).

[55] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).

[56] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (reasoning that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made).

[57] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding that the APA is inapplicable, rather than that good cause is established).

[58] *United States v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

00454764

Exhibit 46

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[59] While these statutes empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health Insurance Portability and Accountability Act of 1996,[60] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[61] This conclusory statement does not meet the standard Courts have enumerated for rulemaking rise to the standard of "good cause." This reasoning is similar to other instances in which agencies made claims of an emergency situation, unaccompanied by independent facts, which the courts determined were insufficient to constitute good cause.[62] Declaring that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed is not the same as it actually being impracticable and contrary to public interest.

The Departments further argue that good cause is supported because of lawsuits that have been pending "for several years by entities raising nonreligious moral objections to the Mandate," and that "delaying the availability of the expanded exemption would require entities to bear these burdens [including a "crisis of conscience"] for many more months."[63] However, this reasoning should be weighed against the burdens that many women will face if their employer or university decides to take advantage of the Moral Exemptions IFR and cease to offer contraception without cost-sharing.

The Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and its post-adoption publication requirements. They have not adequately established that the APA's procedural requirements do not apply or that they have good cause for disregarding them. Because the Moral Exemptions IFR was promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, the Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the Moral Exemptions IFR should be rescinded.

### 2. Substantive Violations of the APA

In addition to the APA's procedural requirements described above, the APA contains several substantive rulemaking requirements that must be followed when an agency is "formulating, amending or repealing" a rule. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to a constitutional right," or "in excess of statutory jurisdiction." The Moral Exemptions IFR violates 5 U.S.C. § 706(2) because it contradicts several provision of the Patient Protection and Affordable Care Act ("ACA").

---

[59] Moral Exemptions and Accommodations for Coverage of Certain Preventable Services Under the Affordable Care Act, 82 Fed. Reg. 47838, 47855 (Oct. 13, 2017).

[60] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); 42 U.S.C. § 300gg–92.

[61] 82 Fed. Reg. at 47855.

[62] *See, e.g.*, *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v.Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); *Brewer*, 766 F.3d at 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting *United States v. Reynolds*, 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).

[63] 82 Fed. Reg. at 47855.

00454765

Exhibit 46

Section 1554 of the ACA prohibits the Departments from issuing regulations that create unreasonable barriers to individuals obtaining medical care; impede timely access to health care services; interfere with communications regarding a full range of treatment options between patient and provider; restrict the ability of providers to provide full disclosure of all relevant information for making health care decisions; violate the principles of informed consent and ethical standards of health care professionals; or limit the availability of treatment for the full duration of a patient's medical needs.[64] The Moral Exemptions IFR is not in accordance with Section 1554 of the ACA because it creates unreasonable barriers to the ability of individuals to obtain appropriate medical care and it impedes timely access to health care services.

Section 1557 of the ACA prohibits discrimination on the basis of sex.[65] The implementing regulations for this section issued by HHS state that this includes "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."[66] The regulations further state that people cannot "be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which [the rule] applies." [67] By allowing the denial of a health care service used almost exclusively by women, the Moral Exemptions IFR is not in accordance with Section 1557 of the ACA because it discriminates on the basis of sex.

By expanding eligibility for an exemption from the contraceptive coverage provision beyond houses of worship, the Moral Exemptions IFR erects unreasonable barriers to critical medical coverage, violating Section 1554 of the ACA. By permitting objecting employers to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the ACA. Because the Moral Exemptions IFR violates the ACA, this Rule also violates the APA and must be set aside.

### ii. The Moral Exemptions IFR Does Not Implicate the Religious Freedom Restoration Act (RFRA)

While the administration has asserted that the Religious Freedom Restoration Act[68] allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, RFRA provides no authority to craft moral exemptions. The Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's moral convictions—which RFRA neither requires nor permits.

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is no basis to distinguish between these federal statutory entitlements and the contraceptive coverage provision in the ACA. The Moral Exemptions IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find morally objectionable. Such a result would impermissibly shift the cost of moral objections to coverage onto the very people that the ACA was meant to protect.

### iii. The Moral Exemptions IFR Violates the Due Process Clause of the Fifth Amendment to the Constitution

---

[64] 42 U.S.C. § 18114.
[65] 42 U.S.C. § 18116.
[66] 45 CFR § 92.4.
[67] 45 CFR § 92.101.
[68] 42 U.S.C. § 2000bb.

00454766

Exhibit 46

This Rule also violates the Fifth Amendment because it constitutes impermissible sex discrimination.[69] The ACA's women's preventive services provision, which includes contraceptive coverage, was implemented in part to address the fact that women tended to pay more for insurance coverage than did men.[70] The Moral Exemptions IFR violates the Fifth Amendment because it exclusively targets coverage provided to women. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Moral Exemptions IFR discriminates based on sex.

The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[71] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs newly covered by the contraceptive coverage provision of the ACA.[72] It is estimated that the ACA created an out-of-pocket savings of approximately $1.4 billion for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their health care.[73] Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption. While it is unclear how many organizations will avail themselves of one of these exemptions, it is certain that many women will see a dramatic increase in their reproductive health care costs as employers avail themselves of the newly available moral exemption.

For all these reasons, the Departments should find that this rule violates the Administrative Procedure Act ("APA"), both procedurally and substantively, the Due Process Clause of the Fifth Amendment, and is not a valid exercise of RFRA.

### III.    Conclusion

The Moral Exemptions IFR denies coverage for health care services based on moral convictions without regard to the impact on employees, stripping from women and the LGBT community coverage for essential health care services that would otherwise be guaranteed under federal law. The Rule privileges particular moral convictions at the expense of employee health and is contrary to law. For these reasons, the Departments should rescind the Moral Exemptions IFR.

\*\*\*

Equality California appreciates the opportunity to comment on this interim final rule. If you require additional information, please do not hesitate to contact Valerie Ploumpis, National Policy Director, at (202) 365-8485 or valerie@eqca.org.

Sincerely,

Equality California

---

[69] U.S. CONST. amend. V.

[70] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).

[71] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[72] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[73] *Id.*

00454767

Exhibit 46

JA-0000860



Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016
VIA online submission to regulations.gov

December 5, 2017

RE: CMS-9940-IFC, Interim Final Rule, Religious Exemptions and Accommodations for
Coverage of Certain Preventive Services under the Affordable Care Act

Equality NC advocates for equal rights and justice for lesbian, gay, bisexual,
transgender and queer (LGBTQ) North Carolinians. We appreciate the opportunity to
provide comments to the interim final rule on religious exemptions to contraceptive
coverage published on October 13, 2017.

We oppose any measures that would give employers the ability to opt out of the
provision of contraceptive coverage to their employees. Employers cannot be given
cover for outright discrimination against women, transgender men and nonbinary people
who work as hard as people assigned male at birth who cannot get pregnant. These
employees' work is just as important, and they should have access to the full range of
benefits that they need, just like any other employee.

Discrimination against LGBTQ people in health coverage and care remains a pervasive
problem. Despite recent advances in legal protections for LGBTQ individuals, the
estimated nine million LGBTQ people living across the United States—and nearly
300,000 LGBTQ people living in North Carolina—continue to regularly encounter
discrimination on the basis of sexual orientation and gender identity when seeking
health insurance coverage and health care. As then-Secretary of Health and Human
Services Kathleen Sebelius stated in 2012, "LGBTQ Americans face numerous barriers
to health—from providers who just don't understand their unique health needs, to
difficulty getting health insurance because they can't get coverage through a partner or
a spouse. And unfortunately way too many LGBTQ individuals face discrimination and
bigotry in the health care system."[1]

Numerous surveys, studies, and reports have documented the widespread extent of the

---

[1] Liza Baskin, "LGBT Patients Find Little Patience in Health Care," *Daily Rx* (July 11, 2012), available
at: http://www.dailyrx.com/lgbt-friendly-health-care-remains-out-reach-most.

00435126

Exhibit 47

discrimination experienced by LGBTQ individuals and their families in the health system. The study "When Health Care Isn't Caring," a nationwide survey assessing the health care experiences of LGBTQ people and people living with HIV, found that the majority of the almost 5,000 respondents reported experiencing at least one of the following types of discrimination:[2]

- Health care providers refusing to touch them or using excessive precautions
- Health care providers using harsh or abusive language
- Health care providers being physically rough or abusive
- Health care providers blaming them for their health status

In the same study, 10 percent of LGB respondents and 25 percent of transgender respondents reported being refused needed medical care outright. Similarly, the 2015 U.S. Transgender Survey, the largest survey ever devoted to the lives and experiences of transgender people, found pervasive discrimination in health care among its nearly 28,000 transgender respondents within the previous year, including large numbers who had been denied coverage for transition-related care and other necessary treatments because of being transgender; being harassed, attacked, or turned away by health care providers; and postponing needed medical care because of fear of mistreatment by providers.[3] In a report specifically examining the experiences of respondents living in North Carolina, the U.S. Transgender Survey found that:[4]

- 29 percent of respondents living in North Carolina were living in poverty;
- In the past year, 21 percent experienced a problem with their insurance related to being transgender, such as being denied needed coverage for transition-related care or being denied coverage for other care because of being transgender;
- In the past year, 29 percent of those who saw a health provider had at least one negative experience related to being transgender, such as being harassed, physically assaulted, or turned away; and
- In the past year, 42 percent did not see a doctor when they needed to because they could not afford it.

These encounters with discrimination and lack of access have serious negative consequences for the health and well-being of LGBTQ individuals. They also exacerbate the significant health disparities that affect the LGBTQ population at large. Sources such as the Institute of Medicine,[5] the Centers for Disease Control and

---

[2] Lambda Legal, *When Health Care Isn't Caring: Lambda Legal's Survey on Discrimination Against LGBT People and People Living with HIV* (2010), available at:
http://www.lambdalegal.org/publications/when-health-care-isnt-caring.

[3] S.E. James et al., *2015 U.S. Transgender Survey.* Washington, DC: National Center for Transgender Equality, available at: http://www.ustranssurvey.org/report.

[4] *2015 U.S. Transgender Survey: North Carolina State Report.* (2017). Washington, DC: National Center for Transgender Equality, available at:
http://www.transequality.org/sites/default/files/docs/usts/USTS_NC_state_report.pdf.

[5] *See, e.g.,* Institute of Medicine, *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding* (2011), available at:
http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx.

Exhibit 47

Prevention, and Healthy People 2020[6] have found that discrimination threatens the health of the LGBTQ population in ways that include obstructing access to preventive screenings.[7] Many of these disparities are even greater for LGBTQ youth, LGBTQ elders, and LGBTQ people who are also members of other groups disadvantaged because of their race, ethnicity, primary language, disability, or other aspects of their identity.[8]

Because of these intersecting vectors of discrimination, LGBTQ people are less likely to be able to afford to access contraception if their employer does not provide this benefit. When women, trans men and nonbinary people cannot access essential preventive medicine, their health and their economic security is threatened. Contraception is an essential tool for people to plan for their future and their families. These rules would create a license to discriminate, allowing employers to dictate their employees' health care, and could set a dangerous precedent that affects other care, including vaccinations and LGBTQ-specific health services. No employer, health insurance provider, or university should be allowed to use religious or moral beliefs to prevent employees from planning their future and their family.

Please feel free to reach out to our Director of Transgender Policy, Ames Simmons, at ames@equalitync.org with any additional information that we can provide.

Sincerely,

Equality North Carolina

---

[6] U.S. Department of Health and Human Services, *Healthy People 2020: LGBT Health Topic Area* (2015), available at:

http://www.healthypeople.gov/2020/topics-objectives/topic/lesbian-gay-bisexual-and-transgender-health.
 [7] Fenway Institute, *Promoting Cervical Cancer Screening Among Lesbians and Bisexual Women* (2013), available at:

http://www.lgbthealtheducation.org/wp-content/uploads/Cahill_PolicyFocus_cervicalcancer_web.pdf.
 [8] Institute of Medicine, *supra* note 5; Center for American Progress, "Health Disparities in LGBT Communities of Color: By the Numbers" (2010), *available at*

https://www.americanprogress.org/issues/lgbt/news/2010/01/15/7132/health-disparities-in-lgbt-communities-of-color.

00435128

Exhibit 47



**VIA ELECTRONIC SUBMISSION**

December 5, 2017

Acting Secretary Eric Hargan
CMS Administrator Seema Verma
Center for Medicare & Medicaid Services
United States Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

Re:     **Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act (CMS-9940-IFC)**

Dear Acting Secretary Hargan and Administrator Verma:

Essential Access Health is committed to ensuring all individuals have access to affordable, high-quality family planning and sexual health services, including contraceptive services and supplies. We appreciate the opportunity to provide comments on this Interim Final Rule (IFR) released by the Department of Health and Human Services, Labor, and Treasury (the Departments).

Essential Access Health champions and promotes quality sexual and reproductive health care for all. We achieve our mission through an umbrella of programs and services including clinic support initiatives, provider training, advanced clinical research, and advocacy and consumer awareness. Essential Access Health administers the Title X program in California - the largest and most diverse Title X program in the nation. Essential Access Health's Title X network delivers quality sexual and reproductive health care at more than 350 health centers across 37 of California's 58 counties that collectively serve over 1,000,000 women, men and teens each year.

The Affordable Care Act's (ACA) women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services thanks to this provision, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

The IFR discriminates against women by allowing virtually any employer to deprive women of basic contraceptive coverage, and would create barriers and inequities for women seeking essential and time sensitive health care. For

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

Southern California
3600 Wilshire Boulevard #600
Los Angeles, California 90010
213.386.5614

Northern California
2550 Ninth Street #110
Berkeley, California 94710
415.518.4465

**shaping the future**
of sexual + reproductive health care™

essentialaccess.org

00372885

Exhibit 48                                                                                                    JA-0000864

these reasons and those provided below, Essential Access Health strongly urges the Departments to rescind the IFR and ensure equal access to cost-saving contraceptive care for all.

## I.      Birth Control Is Critical to Women's Health

Women face a unique set of health care challenges because they use more health services than men yet earn less on average than men.[3] As a result, women face a high level of health care and economic insecurity. Many women forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4]  Prior to the law's enactment, women spent between 30% and 44% of their total out-of-pocket health costs on birth control.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or prevent pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health outcomes.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and

---

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] *Id.*

[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/

Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_

Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

[11] *Id.* at 103-104.

[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

00372886

Exhibit 48

JA-0000865

negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13]

Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] The U.S. has the highest rate of maternal mortality in the developed world, and contraception is considered a major factor in reducing rates of maternal mortality and morbidity.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported by numerous research studies.[16]

Most women who use birth control do so for both contraceptive and non contraceptive purposes.[17] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[18] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[19, 20]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[21] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-l940s to early 1950s.[22] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[23] which was followed by large increases in women's presence in law, medicine, and other professions.[24] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in health care coverage "place[d] women in the workforce at a disadvantage compared

---

[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852,

[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] *Id.*

[20] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

[21] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[22] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[23] Heinrich H. Hock, The Pill and the College Attainment ofAmerican Women and Men 19 (Fla. State Univ., Working Paper 2007).

[24] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.har vard.edu/handle/1 /2624453.

00372887

Exhibit 48

to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[25]

## II.    Birth Control is Required to be Covered As A Preventive Service Under Current Law

Congress expressly intended that birth control be covered as a preventive service under the ACA.

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[26] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, undermines the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[27] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[28]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[29] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[30] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[31] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

---

[25] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

[26] *Id.* at 8,727.

[27] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]"). [28] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[29] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[30] *Id.* at 109-10.

[31] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa. gov/womensguidelines (last visited Feb. 15, 2016).

00372888

Exhibit 48

JA-0000867

**III.     Individuals with Private/Employer-Based Health Coverage Should Not be Deferred to Publicly-Funded Programs for Care**

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[32] Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not currently have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers.

Enacted in 1970, Title X is the nation's only dedicated source of federal funding for family planning services. [33] While Title X-funded health centers provide care to all patients, federal law requires them to give priority to "persons from low-income families."[34] Low-income individuals receive services at low or no cost depending on their family income.[35] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[36]

In addition, a recent study published in the *American Journal of Public Health* confirms that reductions in funding for Title X limit the number of patients Title X-funded providers are able to serve, concluding that Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded family planning services.[37] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate. Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage. Moreover, while 33 states have expanded coverage under the Medicaid expansion option of the ACA, many individuals remain ineligible for this coverage.[38] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states was $8,985 per year for a family of three in 2017.[39] In many of these states, childless adults remain ineligible for the program.[40] Medicaid already operates as a very lean program and provider shortages persist. The majority (two-thirds) of state Medicaid programs face challenges in securing an adequate number of providers to furnish services to patients.[41] This is particularly true with respect to specialty providers, including OB/GYNs and other family planning providers. A recent report from the HHS Office of the Inspector General found that many Medicaid managed care

[32] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[33] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504.

[34] 42 CFR § 59.5 (a)(6-9).

[35] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[36] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[37] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.

[38] The Henry J. Kaiser Family Foundation, Status of State Action on the Medicaid Expansion Decision, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last updated Nov. 8, 2017).

[39] Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[40] Ibid.

[41] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

00372889

Exhibit 48

JA-0000868

plans had provider shortages, with only 42% of in-network OB/GYN providers able to offer appointments to new patients.[42] As a result, many low-income women who should be eligible to enroll and access services under Medicaid, are unable to do so.

For these reasons and more, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling for the women affected by policy changes proposed in the IFR.

### IV.    Most state coverage requirements fail to guarantee coverage of the full range of contraceptive methods, services, and counseling with no cost-sharing.

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that 22 states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other 28 states.[43] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles, and other out-of-pocket costs.[44] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[45] Additionally, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[46]

Thank you for your attention to our comments. If you have any questions or need any further information, please contact Amy Moy, Vice President of Public Affairs by telephone at (510) 486-0412 or email at amoy@essentialaccess.org.

Sincerely,

Amy Moy
Vice President of Public Affairs

---

[42] U.S. Department of Health and Human Services, supra at note 7.

[43] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[44] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[45] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[46] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey,* Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00372890

Exhibit 48

JA-0000869



**FAMILY PLANNING**
**COUNCILS OF AMERICA, INC.**

December 5, 2017


**VIA ELECTRONIC SUBMISSION**


Acting Secretary Eric Hargan
CMS Administrator Seema Verma
Center for Medicare & Medicaid Services
US Department of Health and Human Services
Attention: CMS–9940–IFC
P.O. Box 8016
Baltimore, MD 21244–8016

Re:    **Religious Exemptions and Accommodations for Coverage of Certain Preventive Services**
       **Under the Affordable Care Act (CMS–9940–IFC)**

Dear Acting Secretary Hargan and Administrator Verma:

Family Planning Councils of America (FPCA) is committed to ensuring all individuals have access to affordable, high-quality family planning and sexual health services, including contraceptive services and supplies. As a result, FPCA has strongly supported the nation's efforts to ensure individuals have robust insurance coverage of contraception without cost-sharing and unequivocally opposes the Departments of Health and Human Services, Labor and Treasury's (the Departments') recent efforts that undermine the Affordable Care Act's (ACA) contraceptive coverage requirement through this interim final rule (IFR).

FPCA is a national association of private, non-profit family planning agencies devoted to keeping publicly-funded reproductive health care a national priority. FPCA serves as a forum for the educational exchange of technical and professional information.

1700 Market Street, Suite 1540 Philadelphia, PA 19103

00373025

Exhibit 49

The women's preventive services requirement of the ACA was designed to promote preventive health care, reduce future medical costs, and improve the health, equality, and economic security of women and families.[1] More than 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, screening for sexually transmitted diseases, and contraception and contraceptive counseling.[2] By allowing virtually any employer or university to claim this religious exemption and deprive women of contraceptive coverage, this IFR will harm the health and well-being of women, their partners, and their families. Furthermore, the IFR is predicated upon a distorted picture of the of the federal programs that compose the family planning safety net, the Title X family planning program and Medicaid. **For these reasons, FPCA calls on the Departments to rescind the IFR and restore equal access to contraceptive coverage regardless of employer.**

### CONTRACEPTION IS CRITICAL TO HEALTH

Women face a unique set of health care challenges because they access more health services than men, yet earn less on average than men.[3] As a result, women face a high level of health care insecurity, which in turn leads many women to forgo necessary care due to prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs on contraception alone.[5] As a result of the ACA and its contraceptive coverage benefit, women saved more than $1.4 billion in out-of-pocket costs on oral contraceptives in 2013 alone.[6]

The goal of preventive health care is to help people control, track, and better manage their lifelong health, and the health of their families. Similarly, the goal of contraception is to prevent unintended pregnancy, control the timing of a desired pregnancy and spacing between pregnancies, in accordance with patient choice and to improve maternal, child, and family health.[7] In addition, contraception is particularly critical for women with underlying physical

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] National Women's Law Center. New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs. September 2017. *Available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] Ibid.

[6] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[7] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

00373026

Exhibit 49                                                                                      JA-0000871

and psychological conditions, some of which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[8]

Unintended pregnancies have higher rates of long-term health complications for women and their infants. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[9] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, and experiencing physical violence during pregnancy.[10]

Unintended pregnancy rates are higher in the US than in most other developed countries, with approximately 45% of pregnancies unintended.[11] In addition, the US has the highest rate of maternal mortality in the developed world.[12] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[13] Contraception is considered a major factor in reducing rates of maternal morbidity and mortality.

Beyond the well-established evidence that contraception is effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[14] Non-contraceptive health benefits also include treatment for non-gynecologic conditions. [15,16]

The patient, in consultation with a trusted health care provider, should determine the right contraceptive method for her unique health care needs without interference from politicians. The IFR interferes with the patient-provider relationship, and conversations about if and when to become pregnant as well as which contraceptive method to use to avoid pregnancy.

---

[8] *Id.* at 103-104.

[9] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809-23.

[10] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[11] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008-2011, *New England Journal of Medicine*, 2016. 374(9):843-852.

[12] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[13] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[14] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1)41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250-5.

[15] Schindler AE. supra.

[16] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-analysis Obstet Gynecol. 2017

Page **3** of **12**

00373027

Exhibit 49

JA-0000872

**OTHER GOVERNMENT PROGRAMS CANNOT MEET THE NEED FOR CONTRACEPTIVE COVERAGE**

The Department of Health and Human Services (HHS) asserts that existing government-sponsored programs, such as Medicaid and the Title X family planning program, can serve as alternatives or safeguards for individuals who will lose access to contraceptive coverage without cost-sharing under their employer-sponsored or student health plans.[17] As discussed below, this assertion fails to recognize that: 1) programs such as Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals; 2) those programs do not have the capacity to meet the needs of current enrollees and those seeking care at Title X-funded health centers; and, 3) legislative and administrative proposals threaten the capacity and goals of these programs. Moreover, the claim that state coverage requirements are an alternative misconstrues the scope and protections provided by these requirements, which cannot fill in the gaps of coverage for many individuals who will lose contraceptive coverage.

**Medicaid and Title X are not designed to meet the needs of individuals who lose access to contraceptive coverage under their employer-sponsored or student health plans.**

Safety-net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Enacted in 1970, Title X is the nation's only dedicated source of federal funding for family planning services.[18] While Title X-funded health centers provide care to all patients, federal law requires them to give priority to "persons from low-income families."[19] Low-income individuals receive services at low or no cost depending on their family income.[20] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[21]

Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate. Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage. Moreover, while 33 states have expanded coverage under the Medicaid

---

[17] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[18] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504.

[19] *42 CFR § 59.5 (a)(6–9).*

[20] *42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).*

[21] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"): *42 CFR § 59.5(a)(7), (9).*

00373028

Exhibit 49

JA-0000873

expansion option of the ACA, many individuals remain ineligible for this coverage.[22] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states was $8,985 per year for a family of three in 2017.[23] In many of these states, childless adults remain ineligible for the program.[24] Due to this, many low-income women who would be eligible to enroll in Medicaid under this option, depending on where they reside, are unable to do so. For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling.

**Medicaid and Title X do not have capacity to meet the increased need.**

At a time when our nation's public health network is already burdened and under attack, it is critical to ensure that all women have access to contraceptive coverage and care. Medicaid is the nation's largest insurer, providing coverage to over 74 million people. Medicaid enrollees have robust access to comprehensive health care, and Medicaid already operates as a very lean program. Despite this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges in securing an adequate number of providers to furnish services to patients.[25] This is particularly true with respect to specialty providers, including OB/GYNs and other family planning and sexual health providers. A recent report from the HHS Office of the Inspector General found that many Medicaid managed care plans had provider shortages, with only 42% of in-network OB/GYN providers able to offer appointments to new patients.[26]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage caused by employer exemptions and would have to provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the IFR. Since 2010, the reported annual number of clients served at Title X-funded health centers has dropped from approximately 5.2 million patients to just over 4 million.[27] This decline corresponds with over $30 million in cuts

---

[22] The Henry J. Kaiser Family Foundation, Status of State Action on the Medicaid Expansion Decision, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last updated Nov. 8, 2017).

[23] Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[24] Ibid.

[25] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[26] U.S. Department of Health and Human Services, supra at note 7.

[27] See Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, Family Planning Annual Report: 2010 National Summary, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-

00373029

Exhibit 49

JA-0000874

to Title X's annual appropriated amount over the same period.[28] A recent study published in the *American Journal of Public Health* confirms that reductions in funding for Title X limit the number of patients Title X-funded providers are able to serve, concluding that Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded family planning services.[29] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program. Thus, FPCA is unconvinced that Medicaid and Title X are plausible alternatives for the individuals affected by this IFR.

**Political assault on Medicaid, Title X, and Planned Parenthood health centers have already compounded the threat to women's access to contraceptive care.**

Medicaid is a vital source of coverage for family planning and sexual health care in the United States, but political threats to the program may undermine its ability to provide the coverage that meets the needs of individuals and families. In 2010, Medicaid covered nearly 45% of all births in the US, and in many states Medicaid covers well over half of births.[30] Medicaid is also the single largest source of public funding for family planning services and supplies.[31]

Within the last year, policymakers have sought to radically alter the financial structure of Medicaid. The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars from the program over the next ten years.[32] The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per-capita cap, and permitted states to block

summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[28] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[29] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.

[30] Kathy Gifford et al., The Henry J. Kaiser Family Found., Medicaid Coverage of Pregnancy and Perinatal Benefits: Results from a State Survey, (2017), http://kff.org/womens-health-policy/report/medicaid-coverage-of-pregnancy-and-perinatal-benefits-results-from-a-state-survey/; *Births Financed by Medicaid*, The Henry J. Kaiser Family Found., http://kff.org/medicaid/state-indicator/births-financed-by-medicaid/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Nov. 6, 2017).

[31] In 2010, Medicaid accounted for 75 percent of all public funds spent on contraceptive services and supplies. Kinsey Hasstedt et al., Guttmacher Institute, Public Funding for Family Planning and Abortion Services, FY 1980-2015 (2017), https://www.guttmacher.org/report/public-funding-family-planning-abortion-services-fy-1980-2015.

[32] Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf.

00373030

Exhibit 49
JA-0000875

grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve.[33]

The administration has also made moves that could radically alter the Medicaid program. Earlier this year, then–Secretary Tom Price and CMS Administrator Seema Verma issued a letter to governors announcing HHS' intent to use existing Section 1115 waiver authority to approve changes to state Medicaid programs that could undermine the ability of individuals qualified to enroll in Medicaid—particularly non-disabled, working-age adults—to receive the coverage and health care they need.[34]

In addition to these legislative and administrative efforts to alter the Medicaid program, Congress and the administration have threatened access to trusted family planning and sexual health providers by attempting to block Planned Parenthood from participating in Medicaid despite the dominant role Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57% of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[35]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks. Title X has also been targeted. In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program. In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018.[36] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[37] For instance, the president's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even

---

[33] Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[34] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

[35] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[36] Title X, Budget & Appropriations, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget_appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[37] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018.

00373031

Exhibit 49                                                                                           JA-0000876

though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide.[38] [39]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X–funded providers and those enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ+ individuals, communities of color, and young people.

**Most state coverage requirements fail to guarantee coverage of the full range of contraceptive methods, services, and counseling with no cost-sharing.**

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that 22 states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other 28 states.[40] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles, and other out-of-pocket costs.[41] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[42] Additionally, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[43]

**The Departments' assertion that other programs and legal requirements can meet the need for contraceptive coverage created by this rule is inaccurate.**

---

[38] Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

[39] White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[40] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[41] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[42] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[43] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00373032

Exhibit 49                                                                                                    JA-0000877

**JUSTIFICATIONS FOR THE IFR DO NOT MEET BASIC SCIENTIFIC STANDARDS**

As the nation's health policy center, HHS must adopt policies and activities firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the Institute of Medicine (IOM) and the Women's Preventive Services Initiative (WPSI), instead prioritizing religious objections over evidence-based medical recommendations. The Departments make several false and misleading statements in the IFR to undermine the contraceptive coverage benefit. FPCA fundamentally disagrees with the Departments' decision to promulgate this IFR based on the religious beliefs of individuals and entities rather than science and medicine.

**Contraception does not interfere with an existing pregnancy.**

The IFR takes issue with the IOM-recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices...that many persons and organizations believe are abortifacient—that is, as causing early abortion."[44] FDA-approved contraceptive methods do not function as abortifacients. Every FDA-approved contraceptive method acts before implantation, does not interfere with an existing pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[45]

**Contraception is medication and carries risks like any medication.**

The IFR raises concerns about the "negative health effects" of contraception.[46] As with any medication, some contraceptive methods may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[47,48] Specifically, the IFR suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[49] The IFR also suggests contraception increases the risk of breast cancer, but there is no scientifically-proven increased risk of breast cancer among contraceptive users, particularly those under 40.[50]

**Contraception makes sex among adolescents healthier, not more likely to happen.**

---

[44] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[45] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?

[46] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[47] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[48] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[49] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239-42.

[50] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1-66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

00373033

Exhibit 49

JA-0000878

The IFR suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[51] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[52,53] In fact, research has shown that school-based health centers that provide access to contraception are proven to increase use of contraception by already sexually active students, not to increase onset of sexual activity.[54,55] On the other hand, young women who did not use contraception at first sexual intercourse were twice as likely to become teen mothers.[56] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[57]

**The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.**

## THE IFR UNDERMINES CONGRESSIONAL INTENT

The Departments ignore Congress' clear intent that contraception be covered as a preventive service under the ACA. When Congress passed the Women's Health Amendment, it meant to "ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[58] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[59] In enacting the

---

[51] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[52] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[53] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[54] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338–344.

[55] Knopf JA, Finnie RKC, Peng Y, et al.  Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[56] Ibid.

[57] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577–583. DOI: 10.1016/j.jadohealth.2016.06.024.

[58] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8727 (Feb. 15, 2012).

[59] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

00373034

Exhibit 49                                                                JA-0000879

amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*... In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.* [60]

In considering the amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[61] Additional statements from Senators Boxer, Feinstein, Nelson, and Durbin prove that the intent to cover contraception was clear.[62]

To meet the amendment's objectives, HHS commissioned the IOM to convene a diverse committee of experts in disease prevention, women's health and adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for HHS to consider in order to fill those gaps.[63] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[64] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM report.[65] These were updated in 2016 based on recommendations from the WPSI as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists and HRSA to coordinate the development, review, and update of recommendations. These, too, were adopted by HRSA.

---

[60] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[61] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[62] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[63] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[64] *Id.* at 109-10.

[65] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

00373035

Exhibit 49                                                                                      JA-0000880

HHS, through the adoption of the IOM's recommendations and the subsequent adoption of the WPSI recommendations, carried out Congress' intent. **The Departments should rescind the IFR to continue reflecting that intent.**

*** 

FPCA appreciates the opportunity to provide comment on the religious exemptions and accommodations for coverage of certain preventive services interim final rule. This IFR will cause people to lose contraceptive coverage and harm their health and well-being. It ignores congressional intent that contraception be covered by the ACA, and is based on a distorted picture of the science supporting contraception and the federal programs supporting contraceptive access. **For all of these reasons, FPCA calls on the Departments to rescind the IFR.**

If you require additional information about the issues raised in this letter, please contact Melissa Weiler Gerber at 215-985-2655 or melissa.weilergerber@FPCA.org.

Sincerely,

Melissa Weiler Gerber
Board President

Page **12** of **12**

00373036

Exhibit 49

JA-0000881

# FEMINIST MAJORITY FOUNDATION

*Working for Women's Equality*

December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue, SW, Room 445-G
Washington, DC 20201

**RE:**    **Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act [CMS-9940-IFC]**

To Whom It May Concern:

The Feminist Majority Foundation (FMF) appreciates the opportunity to provide written comments in response to the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services interim final rule ("Religious Exemptions IFR") published in the Federal Register on October 13, 2017.[1] FMF is a national organization dedicated to women's equality and the empowerment of women and girls in all sectors of society. We promote reproductive health, rights, and justice for all people and unequivocally support expanding access to birth control and family planning services.

For the reasons discussed below, the Feminist Majority Foundation calls on the Department of Health and Human Services, the Department of Labor, and the Department of the Treasury (collectively, "the Departments") to rescind the Religious Exemptions IFR. Far from protecting women's health and expanding access to contraceptive coverage and counseling, the Religious Exemptions IFR allows all employers, universities, and insurers who claim a religious objection to contraception to outright deny individuals access to birth control coverage. This Rule discriminates against women in violation of the U.S. Constitution and federal laws, privileges religion without regard to the burdens placed on women's health and well-being, and will harm women, some transgender men, and gender nonconforming people by restricting their access to essential reproductive healthcare services. As this IRF is unlawful, it violates the Administrative Procedure Act (APA) and should immediately by set aside.

<u>Background</u>

The Patient Protection and Affordable Care Act (ACA) contraceptive coverage requirement guarantees that all FDA-approved methods of birth control are covered as preventive services, without co-pays or other additional out-of-pocket costs. In passing

---

[1] 82 Fed. Reg. 47792 et seq.

Page 1

00427866

Exhibit 50

JA-0000882

the "Women's Health Amendment" to the ACA,[2] Congress intended to explicitly ensure coverage for all women's preventive health services—including family planning—so both men and women could have all of their respective preventive health service needs covered.[3]

Contraceptive services and supplies are critical to women's health. Birth control helps women prevent or delay pregnancy, which not only allows many women to achieve their desired family size but also helps improve maternal health. For example, many women with chronic conditions, such as cardiovascular conditions, diabetes, cancer, or seizure disorders, must take particular care to prevent or plan pregnancy. Many conditions can be exacerbated by pregnancy itself, leading to pregnancy complications, maternal morbidity, or maternal death. Some medications necessary to manage certain chronic health conditions can also have adverse effects during pregnancy and may endanger both the pregnancy and the life and health of the pregnant woman. Around one-fourth of deaths during pregnancy in the United States are among women with pre-existing medical conditions.[4] Notably, the U.S. has the highest rate of maternal mortality in the developed world, with African-American women disproportionately affected.[5]

Beyond those with chronic conditions, birth control allows women to better space their pregnancies. Short birth intervals are associated with an increased risk of anemia and can lead to negative maternal and infant health outcomes.[6] Spacing pregnancies helps lower the risk of low-birth weight and pre-term birth.[7] Finally, women who are unable to plan their pregnancies are more likely to receive delayed prenatal care, are at higher risk of depression, and can be more vulnerable to gender-based violence.[8] It is therefore imperative that women and all

---

[2] The Women's Health Amendment, sponsored by Senator Barbara Mikulski, requires all health insurance plans to cover women's preventive health services at no additional cost. At the request of the Department of Health and Human Services, the independent Institute of Medicine (IOM) convened a group of experts to recommend a list of women's preventive services. IOM recommended a list of eight services, including contraceptive coverage, which was adopted by the Health Resources and Services Administration.

[3] See 155 Cong. Rec. S12026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski) (indicating that the Women's Health Amendment would  help change "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and "end the punitive practices of the private insurance companies in their gender discrimination."); id. at S12030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski . . . to see to it that women are treated equally, and particularly in preventive care"); id. at S12025 (statement of Sen. Boxer) (noting that "comprehensive women's preventive care" includes "family planning services"); id. at S12027 (statement of Sen. Gillibrand) ("With Senator Mikulski's amendment, even more preventive screening will be covered, including for . . . family planning.").

[4] Megan L. Kavanaugh & Ragnar M. Anderson, Contraception and Beyond: The Health Benefits of Services Provided at Family Planning Centers, Guttmacher Institute (July 2013), available at https://www.guttmacher.org/sites/default/files/report_pdf/health-benefits.pdf.

[5] See Nina Martin & Renee Montagne, The Last Person You'd Expect to Die in Childbirth, ProPublica & NPR (May 12, 2017), available at https://www.propublica.org/article/die-in-childbirth-maternal-death-rate-health-care-system.

[6] Kavanaugh & Anderson, supra note 3.

[7] American Congress of Obstetricians and Gynecologists, The Importance of Contraceptive Care to Women's Medical Care (Feb. 2012), available at http://bit.ly/2jf1d7b.

[8] RJ Mercier, et al., Pregnancy Intention and Postpartum Depression: Secondary Data Analysis from a Prospective Cohort, 120 BJOG 1116 (Aug. 2013), available at http://onlinelibrary.wiley.com/doi/10.1111/1471-

Page 2

00427867

Exhibit 50                                                                JA-0000883

people who want to determine whether and when they become pregnant have access to birth control and family planning services.

In addition to preventing pregnancy, many women use birth control to achieve other health benefits, including for treatment of menstrual pain and/or heavy menstrual bleeding.[9] Birth control is also used to prevent ovarian cysts, bone loss, migraine, and endometrial hyperplasia, among other conditions.[10] In addition, use of birth control is associated with a reduced risk of ovarian, endometrial, and colon cancers.[11] At least 58 percent of birth control pill users cite both pregnancy prevention and non-contraceptive health benefits as reasons for using the pill.[12]

Birth control is basic healthcare for women and is a necessary preventive health service. Not only does birth control help prevent maternal injury and death, it also helps to prevent or manage chronic medical conditions, helps women avoid negative health conditions, and allows women to have control over their reproductive health, benefitting women and their families.

Through the Women's Health Amendment, Congress recognized that women have unique preventive service needs, but the ACA requires that the unique preventive service needs of both men and women be covered without additional out-of-pocket costs, no matter where they live or how they are insured. In other words, under the ACA, women can no longer be shortchanged by being denied coverage of their basic healthcare needs without additional out-of-pocket costs while men have all their recommended preventive services covered at no additional cost.

### The Religious Exemptions IFR is Unlawful

The Religious Exemptions IFR constitutes unlawful sex discrimination. By allowing men to receive insurance coverage of all their preventive service needs while denying the full range of preventive services to women, the Religious Exemptions IFR violates Section 1557 of the ACA, which prohibits sex discrimination in any health program or activity that receives federal financial assistance or any health program or activity administered by an Executive Agency.[13] It also runs afoul of Title VII of the Civil Rights Act of 1964, which prohibits sex discrimination in the workplace "with respect to . . . compensation, terms, conditions, or privileges of

---

0528.12255/epdf; JA Gazmararian, et al., Violence and Reproductive Health: Current Knowledge and Future Research Directions, 4 Journal of Maternal and Child Health 79 (2000), *available at* https://www.ncbi.nlm.nih.gov/pubmed/10994575.
[9] Adolf E. Schindler, Non-Contraceptive Benefits of Oral Hormonal Contraceptives, 11 International Journal of Endocrinology & Metabolism 41 (Winter 2013), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3693657/.
[10] *Id.*
[11] *Id.*
[12] The Guttmacher Institute, Fact Sheet, *Contraceptive Use in the United States* (September 2016), https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states#21a.
[13] 2 U.S.C. § 18116.

00427868

Exhibit 50                                                                                          JA-0000884

employment."[14] An employer who denies insurance coverage to women employees or targets women beneficiaries for adverse treatment by denying them health insurance coverage for certain services undermines civil rights protections against sex discrimination. The government, through this IFR, should not sanction or facilitate this type of discriminatory action.

Finally, by targeting women for adverse treatment, the Religious Exemptions IFR violates the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws, and infringes upon individuals' right to liberty, which encompasses the right to contraception. That this discrimination would be allowed under the guise of religion is as repugnant as it is unconstitutional.

Although the U.S. Constitution recognizes that freedom of religion is a fundamental right, the First Amendment does not allow the government to use "religious liberty" as a weapon to harm others. To the contrary, the U.S. Constitution forbids the government from creating religious accommodations to generally applicable laws when the accommodation would harm a third party.[15] By allowing employers, universities, and insurers to deny contraceptive coverage—and by doing so without ensuring that those employees, students, or beneficiaries would continue to receive no-cost contraceptive coverage—this IFR robs individuals of their statutorily granted rights under the ACA and harms the health and wellbeing of potentially millions of women who, as discussed above, reap considerable health benefits from contraceptives.[16]

The creation of a broad religious exemption to the ACA birth control benefit also unconstitutionally imposes significant costs on a specifically targeted group of people: women. Before the ACA, women spent between 30 to 44 percent of their total out-of-pocket healthcare costs on birth control.[17] The ACA birth control benefit, however, has saved women billions of

---

[14] 42 U.S.C. § 2000e-2(a).

[15] The Supreme Court has consistently held that religious accommodations for employers can neither impose burdens on third parties not benefitting from the accommodation nor serve to impose an employer's religious views on employees. See e.g., United States v. Lee, 455 U.S. 252 (1982) (U.S. government could require Amish employer who opposed Social Security benefits on religious grounds to pay social security tax); Estate of Thornton v. Caldor, 472 U.S. 703, 709 (1985) (finding that a Connecticut law that gave workers an absolute and unqualified right not to work on their chosen Sabbath violated the Establishment Clause of the First Amendment because "The State commands that Sabbath religious concerns automatically control over all secular interests at the workplace; the statute takes no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath. The employer and others must adjust their affairs to the command of the State whenever the statute is invoked by an employee.").

[16] Even in Burwell v. Hobby Lobby Stores, Inc., which extended a much more limited religious accommodation to closely-held for-profit corporations, the Supreme Court reaffirmed that burdens on third parties must be considered before the government can offer a religious accommodation. In making its decision, the Court noted that affected employees would still be able to access seamless coverage for birth control at no additional cost— something that the current Religious Exemptions IFR do not guarantee—meaning that the accommodation in Hobby Lobby should cause no third-party harm. 134 S.Ct. 2751 (2014).

[17] Nora V. Becker & Daniel Polsky, Women Saw Large Decrease in Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing, 34 Health Affairs 1204 (July 2015), available at https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

00427869

Exhibit 50                                                                                              JA-0000885

dollars in out-of-pocket costs—more than $1.4 billion on birth control pills alone just in 2013.[18] Over 55 million women now have access to birth control coverage without additional out-of-pocket costs.[19] The Religious Exemptions IFR shifts the cost of contraceptives back to some women and their families, a move that violates the clear intent of the ACA, which was designed specifically to provide coverage of preventive care for women without additional costs.

Without no-cost contraceptive coverage, many women who have employer-sponsored coverage would struggle to access birth control. Prior to the ACA, seemingly small co-pays deterred many women from obtaining care; many women could not use contraception consistently; and some women were forced to forgo birth control altogether because of cost. The Religious Exemptions IFR, by re-imposing these costs and forcing women to once again pay more to access comprehensive preventive health services in violation of the ACA's clear language and intent, would disadvantage women who still, because of the persistent gender and race pay gap, earn less on average than men. The rule would also cut off access to contraceptives altogether for many women who would no longer be able to afford the types of birth control most suitable for their health and family planning needs, including the most effective types of birth control, such as intrauterine devices, which has high upfront costs. The IFR therefore "creates . . . unreasonable barriers to the ability of individuals to obtain appropriate medical care," in violation of Section 1554 of the ACA.[20]

### The Religious Exemptions IFR Contains Additional Harms to Women's Well-Being

In addition to its health benefits, birth control has allowed women to access educational and economic opportunities and participate more broadly in every sector of society. By allowing women to prevent or delay pregnancy, birth control has enabled women to play a larger economic role outside of the home and increased the amount of time women spend in the paid workforce.[21] As a result, access to contraception has increased women's lifetime earnings.[22] Birth control has also increased the number of college-educated women pursuing advanced degrees, which in turn impacts women's overall earning potential.[23] These are meaningful benefits that help women achieve economic stability for themselves and their families. For women who will be denied access to birth control coverage because of this IFR, these benefits are now threatened.

Birth control has also helped women determine their own life plans. The ability to prevent or delay pregnancy has allowed women not only to control their reproduction, but to control their

---

[18] *Id.*

[19] U.S. Dep't of Health and Human Srvcs, Asst. Sec. for Planning and Evaluation, *The Affordable Care Act is Improving Access to Preventive Services for Millions of Americans* (May 14, 2015), *available at* https://aspe.hhs.gov/pdf-report/affordable-care-act-improving-access-preventive-services-millions-americans.

[20] 42 U.S.C. § 18114.

[21] Adam Sonfield, et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*, The Guttmacher Institute (March 2013), *available at* https://www.guttmacher.org/report/social-and-economic-benefits-womens-ability-determine-whether-and-when-have-children.

[22] *Id.*

[23] *Id.*

00427870

Exhibit 50                                                                                          JA-0000886

lives. With access to birth control, women are empowered to pursue paths other than, or in addition to, motherhood with greater ease. Instead of increasing access to the health, economic, and social benefits of birth control, the Religious Exemptions IFR would rollback these benefits for many women by allowing employers, universities, and insurers to impose their religious beliefs on others, forcing many women to forgo care that has improved the health and well-being of countless lives.

Despite claims to the contrary, existing government-sponsored health programs would not be able to fill the gap in coverage that individuals negatively impacted by this rule would face. Title X health centers, for example, are not designed to be a substitute for employer-sponsored health care coverage. The Title X provider network is intended to help provide family planning services to low-income individuals, yet the program is severely underfunded. Title X providers cannot meet the existing need for publically-funded family planning services and would not be able to absorb any increase in demand created by the Religious Exemptions IFR. A recent study found that to meet the current need for services, the Title X program would need $737 million per year, assuming no changes to Medicaid; yet Title X has received only $286.5 million per year since 2014 and has received no new money for service delivery for seven straight years.[24] In addition, Medicaid would not be able to absorb an increase in demand created by the IFR because the Medicaid program, which is under near constant threat of funding cuts, has both income and eligibility requirements that do not make it interchangeable with employer- or university-sponsored health coverage.

In addition to our strong objections to the Religious Exemptions IFR, the Feminist Majority Foundation would like to register our concerns regarding the process used to issue this rule as an interim final rule, without a notice and comment period. This IFR is a dramatic expansion of the religious accommodation and exemptions available to a limited set of non-profits, closely-held for-profits, and houses of worship. Good cause to skip notice and comment did not exist, especially since prior notice and comment periods did not address the expansiveness of this IFR or the specific burdens it would impose on the public. Instead, the Departments unilaterally imposed this unlawful rule on the public without any input from stakeholders. The process therefore also violated the procedural safeguards of the APA since notice and comment rulemaking was not "impracticable, unnecessary, or contrary to the public interest."[25]

## Conclusion

The Religious Exemptions IFR will cause people to lose coverage of contraceptives without additional out-of-pocket costs, creating significant economic burdens for women and making it impossible for some individuals to obtain birth control at all. The IFR is therefore bad policy, but in addition, it is unlawful. The APA requires agency actions that are "not in accordance with law," "contrary to a constitutional right," or "in excess of statutory jurisdiction," to be set

---

[24] Euna M. August, et al., Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act, 106 Am J of Public Health 334 (Feb. 2016).
[25] 5 U.S.C. § 533(b).

00427871

Exhibit 50                                                                        JA-0000887

aside.[26] This IFR violates federal anti-discrimination laws and the Fifth and First Amendments of the U.S. Constitution and harms the health and well-being of women and all people who depend upon birth control for preventive care. For these reasons, the Feminist Majority Foundation calls on the Departments to rescind the Religious Exemptions IFR.

Sincerely,

Gaylynn Burroughs
Director of Policy and Research

---

[26] 5 U.S.C. § 706(2)(A)-(C).

Page 7

00427872

Exhibit 50                                        JA-0000888



December 5, 2017

Centers for Medicare and Medicaid Services
200 Independence Avenue, SW
Washington, DC 20201

**Attention: CMS-9940-IFC**

On October 6, 2017, the Departments of Health and Human Services, Labor, and Treasury issued an interim final rule (IFR) that vastly expands the ability of health plan sponsors with religious objections to some or all contraceptive methods and services to deny coverage of those methods and services to the employees, dependents and students who rely on that coverage. A second IFR, issued on the same day, does the same thing with regards to moral objections.

The IFRs undermine a major advance under the Affordable Care Act (ACA): the federal contraceptive coverage guarantee, which has broken down cost barriers to the wide array of contraceptive methods and services that people rely on to avoid unintended pregnancies, plan and space wanted pregnancies, and reap the health, social and economic benefits that follow. In undermining this guarantee, the Departments have justified their action by distorting the scientific evidence about contraception, contraceptive coverage, and the ability of other federal programs and state laws to mitigate the harm of the IFRs.

I am pleased to submit the following comments in opposition to this IFR on behalf of the Guttmacher Institute, a nonprofit research and policy organization committed to advancing sexual and reproductive health and rights in the United States and globally.

Guttmacher has been tracking and evaluating the evidence related to insurance coverage of contraception for more than two decades. Most recently, our Vice President for Domestic Research, Lawrence Finer, provided a thorough evaluation of that evidence in a declaration in support of a lawsuit from the state of California and four other states in opposition to the October IFRs. That declaration is attached to this comment letter, to provide a more complete review of the evidence and the appropriate references. The basic facts are summarized here:

- *Contraception is widely used, and the majority of women rely on numerous contraceptive methods for decades.* More than 99% of women aged 15–44 who have ever had sexual intercourse have used at least one contraceptive method. A typical U.S. woman will spend three decades avoiding unintended pregnancy and 86% will have used three or more contraceptive methods by their early 40s.

- *People need access to the full range of contraceptive options to effectively avoid unintended pregnancies.* The Departments' effort in the IFRs to cast doubt on whether contraception reduces the risk of unintended pregnancy is unfounded. In fact, all new contraceptive drugs and devices (just like other drugs and devices) must receive approval from the U.S. Food and Drug Administration

**Good reproductive health policy starts with credible research**
1301 Connecticut Avenue NW, Suite 700 | Washington, DC 20036 | Tel 202.296.4012 | Fax 202.223.5756

00427806

Exhibit 51

JA-0000889

and must be shown to be effective in this case, at preventing pregnancy through rigorous scientific testing. Moreover, the evidence is clear that all methods of contraception greatly reduce the risk of unintended pregnancy. Choice among the full range of methods facilitates consistent and effective contraceptive use. Women who consistently use their chosen methods account for only 5% of unintended pregnancies. And unintended pregnancy rates have declined since the advent of modern contraception.

- *Contraception has positive health, social and economic benefits.* The IFRs falsely imply that contraception may have negative health consequences that outweigh its benefits. In truth, the Food and Drug Administration's approval processes require that drugs and devices, including contraceptives, be proven safe through rigorous controlled trials. In addition, the Centers for Disease Control and Prevention publish extensive recommendations to help clinicians and patients identify potential contraindications and decide which specific contraceptive methods are most appropriate for each patient's specific needs and health circumstances. Medical experts, such as the American College of Obstetricians and Gynecologists, concur that contraception is safe and has clear health benefits—such as reducing the risk of negative birth outcomes and helping to manage health conditions that pregnancy can exacerbate—that outweigh the potential side effects. In addition, by enabling them to reliably time and space wanted pregnancies, women's ability to obtain and effectively use contraception promotes their continued educational and professional advancement, contributing to the enhanced economic stability of women and their families.

- *Access to contraception does not increase adolescent sexual activity.* The IFRs incorrectly suggest that increased access to contraception may result in increased sexual behavior about adolescents. In truth, over the past several decades, adolescent pregnancy has declined dramatically, their contraceptive use has increased and improved, and their sexual activity has declined. In addition, studies of the availability of contraception in high schools provide evidence that it does not lead to more sexual activity.

- *Eliminating the cost of contraception leads to improved contraceptive use and reduces the risk of unintended pregnancy.* In the IFRs, the Departments acknowledge that without coverage, many methods would cost people $50 per month, or $600 per year, and in doing so, imply that such costs are a minimal burden. In truth, without insurance coverage to defray or eliminate such costs, many people would be unable to afford the methods of their choice and would instead rely on less expensive and less effective methods. Multiple studies provide evidence that reducing or eliminating cost barriers to contraceptive choices has a real impact on people's ability to choose and use the most effective forms of contraception.

- *The ACA's contraceptive coverage guarantee has had a positive impact.* The guarantee has dramatically increased the proportion of privately insured contraceptive users who are paying nothing out of pocket for their methods, saving each user roughly $250 in a single year and—according to contraceptive users themselves—making it easier for people to choose better methods and use them effectively. Demonstrating the guarantee's population-level impact is complicated and the evidence is not definitive, but some studies suggest the guarantee has had a positive impact on contraceptive use among key groups. Moreover, there is considerable empirical data from controlled experiments to confirm that removing cost as a barrier to contraceptive use is a major factor in reducing risk for unintended pregnancy, and the abortions and unplanned births that would otherwise follow.

- *Expanding exemptions will harm individuals, families and society.* Low-income women, women of color and women aged 18–24 are at disproportionately high risk for unintended pregnancy, and

00427807

Exhibit 51                                                                                  JA-0000890

millions of these women — and millions of other individuals at risk — rely on private insurance coverage, particularly following implementation of the ACA. The IFRs will allow their employers and schools to reinstate financial barriers to their contraceptive choice and use. That could incentivize people to select methods that are inexpensive, rather than methods that are best suited to their needs; deny people the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care; and interfere with the ability of health care providers to treat patients holistically. To the extent that expanding the exemptions will burden people's contraceptive use in these ways, it will have negative health, social and economic consequences for individuals, families and society.

- *Title X, Medicaid and state coverage requirements cannot substitute for the federal contraceptive coverage guarantee.* In the IFRs, the Departments falsely claim that the Title X national family planning program, Medicaid, and state contraceptive coverage requirements can replicate or replace the gains in access made by the federal guarantee. In truth, many women who have the benefit of the guarantee are not eligible for free or subsidized care under Title X or for Medicaid coverage. Moreover, Title X is already underfunded, and the government itself is at the same time proposing to further cut funding for Title X and Medicaid and to otherwise undermine the two programs. As for state coverage requirements, few of them match the federal guarantee in the scope of their protections for patients, and no state law can regulate self-insured employers, which account for 60% of all workers with employer-sponsored health coverage.

Ample evidence demonstrates that this IFR will interfere with people's ability to identify and consistently use the contraceptive methods that will work best for them, thus putting them at heightened risk of unintended pregnancy and the health, social and economic harms that will result. Therefore, the Guttmacher Institute urges the Departments to rescind this IFR.

If you need additional information about the issues raised in this letter, please contact Adam Sonfield in the Institute's Washington office. He may be reached by phone at 202-296-4012, or by email at asonfield@guttmacher.org.

Thank you for your consideration.

Sincerely,

Rachel Benson Gold
Vice President for Public Policy

00427808

Exhibit 51                                                                    JA-0000891

XAVIER BECERRA, SBN 118517
Attorney General of California
JULIE WENG-GUTIERREZ, SBN 179277
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
KARLI EISENBERG, SBN 281923
MICHELE L. WONG, SBN 167176
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-6046
  Fax: (916) 324-8853
  E-mail: Matthew.Wise@doj.ca.gov
*Attorneys for Plaintiff State of California, by and
through Attorney General Xavier Becerra*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF DELAWARE, STATE OF MARYLAND, STATE OF NEW YORK, STATE OF VIRGINIA,**<br><br>Plaintiffs,<br><br>v.<br><br>**DON J. WRIGHT, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; R. ALEXANDER ACOSTA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S. DEPARTMENT OF LABOR; STEVEN MNUCHIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF THE TREASURY; U.S. DEPARTMENT OF THE TREASURY; DOES 1-100,**<br><br>Defendants. | 4:17-cv-05783-HSG<br><br>**DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

00427809

Exhibit 51

I, Lawrence Finer, declare as follows:

1.     I am the Vice President for Domestic Research at the Guttmacher Institute, where I have worked since 1998. I hold an A.B. in psychology from Harvard University and a Ph.D. in population dynamics from the Johns Hopkins University School of Public Health.

2.     The Guttmacher Institute is a private, independent, nonprofit, nonpartisan corporation that advances sexual and reproductive health and rights through an interrelated program of research, policy analysis, and public education. The Institute's overarching goal is to ensure quality sexual and reproductive health for all people worldwide by conducting research according to the highest standards of methodological rigor and promoting evidence-based policies. It produces a wide range of resources on topics pertaining to sexual and reproductive health and publishes two peer-reviewed journals. The information and analysis it generates on reproductive health and rights issues are widely used and cited by researchers, policymakers, the media and advocates across the ideological spectrum.

3.     Over the course of more than 20 years, I have designed, executed, and analyzed numerous quantitative and qualitative research studies in the field of reproductive health care and the demographics of and trends in fertility behaviors in the United States. My peer-reviewed research has been published in dozens of articles, including first-authored work in the *New England Journal of Medicine*, the *American Journal of Public Health*, *Obstetrics & Gynecology*, *Contraception*, *Pediatrics*, and many other public health, medical and demographic journals. I have served as principal investigator on multiple competitively funded research grants from the National Institutes of Health. I have given dozens of presentations at meetings and conferences of social science and medical professionals on a variety of reproductive health-related topics. My education, training, responsibilities and publications are set forth in greater detail in my curriculum vitae, a true and correct copy of which is attached as Exhibit A. I submit this declaration as an expert on unintended pregnancy and the demographics of reproductive health behaviors in the United States.

-2-
DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427810

Exhibit 51

JA-0000893

4.      I understand that this lawsuit involves a challenge to the federal government's interim final rules ("IFRs") regarding the Affordable Care Act's ("ACA") contraceptive coverage mandate. As noted above and set forth in my attached curriculum vitae, I am the author of numerous studies on demographic trends in unintended pregnancy and disparities in its incidence, and on contraception, including its use, efficacy, and importance for the prevention of unintended pregnancy. I am also familiar with the research literature on the effects of increased and decreased access to various forms of contraception as well as the literature on public family planning programs. In my expert opinion, the IFRs will compromise women's ability to obtain contraceptive methods, services and counseling and, in particular, to consistently use the best methods for them, thus putting them at heightened risk of unintended pregnancy.

### Contraception Is Widely Used and the Majority of Women Rely on Numerous Contraceptive Methods for Decades of Their Lives

5.      More than 99% of women aged 15–44 who have ever had sexual intercourse have used at least one contraceptive method; this is true across a variety of religious affiliations.[1] Some 61% of all women of reproductive age are currently using a contraceptive method.[2] Among women at risk of an unintended pregnancy (i.e., women aged 15–44 who have had sexual intercourse in the past three months, are not pregnant or trying to conceive, and are not sterile for noncontraceptive reasons), 90% are currently using a contraceptive method.[3]

6.      A typical woman in the United States wishing to have only two children will, on average, spend three decades—roughly 90% of her reproductive life—avoiding unintended pregnancy.[4]

---

[1] Daniels K, Mosher WD and Jones J. Contraceptive methods women have ever used: United States, 1982–2010. *National Health Statistics Reports*. 2013. No. 62. https://www.cdc.gov/nchs/products/nhsr.htm.
[2] Kavanaugh ML and Jerman J. Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014. *Contraception*. 2017. https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.
[3] Kavanaugh ML and Jerman J. Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014. *Contraception*. 2017. https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.
[4] Sonfield A, Hasstedt K and Gold RB. *Moving Forward: Family Planning in the Era of Health Reform*. New York: Guttmacher Institute. 2014. https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.

-3-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427811

Exhibit 51

JA-0000894

7.      Women and couples rely on a wide range of contraceptive methods: In 2014, 25% of female contraceptive users relied on oral contraceptives and 15% on condoms as their most effective method. That means that six in 10 contraceptive users relied on other methods: female or male sterilization; hormonal or copper intrauterine devices (IUDs); hormonal methods including the injectable, the ring, the patch and the implant; and behavioral methods, such as withdrawal and fertility awareness methods.[5]

8.      Most women rely on multiple methods over the course of their reproductive lives, with 86% having used three or more methods by their early 40s.[6] Sometimes, women and couples may try out different methods to find one that they can use consistently or that minimizes side effects. Other times, they may switch from method to method—such as from condoms to oral contraceptives to sterilization—as their relationships, life circumstances and family goals evolve.

9.      Many people use two or more methods at once: 17% of female contraceptive users did so the last time they had sex.[7] For example, they may use condoms to prevent STIs and an IUD for the most reliable prevention of pregnancy. Or they may use multiple methods simultaneously—for instance, condoms, withdrawal and oral contraceptives—to provide extra pregnancy protection.

**Women Need Access to the Full Range of Contraceptive Options to Most Effectively Avoid Unintended Pregnancies**

10.      Using any method of contraception greatly reduces a woman's risk of unintended pregnancy. Sexually active couples using no method of contraception have a roughly 85% chance

---

[5] Kavanaugh ML and Jerman J. Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014. *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012
[6] Daniels K, Mosher WD and Jones J. Contraceptive methods women have ever used: United States, 1982–2010. *National Health Statistics Reports*, 2013, No. 62, https://www.cdc.gov/nchs/products/nhsr.htm.
[7] Kavanaugh ML and Jerman J. Concurrent multiple methods of contraception in the United States, poster presented at the North American Forum on Family Planning, Atlanta, Oct. 14–16, 2017.

-4-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427812

Exhibit 51

of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.[8,9]

11.     All new contraceptive drugs and devices (just like other drugs and devices) must receive approval from the U.S. Food and Drug Administration and must be shown to be effective through rigorous scientific testing. Thus, the federal government itself provides the oversight to ensure that contraception is effective in preventing pregnancy.

12.     The government's effort to imply in the IFRs that there is doubt about whether contraception reduces the risk of unintended pregnancy is simply unfounded, as the data above illustrate. Its assertions to the contrary are flawed. For example, the government argues, "In the longer term—from 1972 through 2002—while the percentage of sexually experienced women who had ever used some form of contraception rose to 98 percent, unintended pregnancy rates in the Unites States rose from 35.4 percent to 49 percent."[10]

13.     However, the government's assertion that unintended pregnancy rates rose between 1972 and 2002 is incorrect and based on faulty calculations and an inappropriate comparison. First, the numbers cited (35.4% and 49%) are the *percentage* of all pregnancies that were unintended, not the unintended pregnancy *rate*, which is the appropriate indicator for assessing trends in unintended pregnancy because it is not affected by changes in the incidence of *intended* pregnancy. Second, the 1972 figure includes only *births* (not all pregnancies), and then only those births that were to married women.[11] Births to unmarried women and all abortions are excluded; the proportion of both of these that were unintended were significantly higher, so excluding them results in an artificially low percentage. The 2002 figure, on the other hand,

---

[8] Sundaram A et al., Contraceptive failure in the United States: estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health*. 2017. 49(1):7–16. https://www.guttmacher.org/journals/psrh/2017/02/contraceptive-failure-united-states-estimates-2006-2010-national-survey-family.
[9] Trussell J. Contraceptive efficacy. in: Hatcher RA et al., eds., *Contraceptive Technology*, 20th ed., New York: Ardent Media, 2011. pp. 779–863.
[10] Department of the Treasury, Department of Labor and Department of Health and Human Services. Religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act. *Federal Register*. 82(197):47838–47862. https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21852.pdf.
[11] Weller RH and Heuser RL. Wanted and unwanted childbearing in the United States: 1968, 1969, and 1972 National Natality Surveys. *Vital and Health Statistics*, 1978, No. 32.

-5-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427813

Exhibit 51                                                                 JA-0000896

includes all pregnancies to all women. An appropriate comparison of rates based on pregnancies and on all women in the population shows a clear decline in the rate: In 1971, there were an estimated 2.041 million unintended pregnancies (including births and abortions, but excluding miscarriages),[12] and 43.6 million women of reproductive age (15–44),[13] for an unintended pregnancy rate (excluding miscarriages) of 47 per 1,000 women. By contrast, in 2011, the unintended pregnancy rate *including* miscarriages was 45 per 1,000.[14] Even when including miscarriages in the later rate, it is lower than the earlier rate; because miscarriages typically represent about 14% of all pregnancies,[15] excluding them from the 2011 figure for comparability would result in a rate of about 38 per 1,000, substantially lower than the 1971 rate.

14.    Although using any method of contraception is more effective in preventing pregnancy than not using a method at all, having access to a *limited* set of methods is far different than a woman being able to choose from among the full range of methods to find the *best* methods for her at a given point in her life.

15.    One important consideration for most women in a choosing a contraceptive method is how well a method works for an individual woman to prevent pregnancy.[16] IUDs and implants, for example, are effective for years after they are inserted by a health care provider, and do not require women using them to think about contraception on a day-to-day basis.[17] By contrast, birth control pills must be taken every day, at approximately the same time. Nearly half of abortion patients who were users of birth control pills reported that they had forgotten to take their pills, and another quarter reported a lack of ready access to their pills (16% were away from

---

[12] Tietze C. Unintended pregnancies in the United States, 1970–1972, *Family Planning Perspectives*, 1979, 11(3):186–188.
[13] National Center for Health Statistics, Centers for Disease Control and Prevention, Population by age groups, race, and sex for 1960–1997, no date, https://www.cdc.gov/nchs/data/statab/pop6097.pdf.
[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.
[15] Finer LB and Henshaw SK, Disparities in rates of unintended pregnancy in the United States, 1994 and 2001, *Perspectives on Sexual and Reproductive Health*, 2006, 38(2):90–96, https://www.guttmacher.org/journals/psrh/2006/disparities-rates-unintended-pregnancy-united-states-1994-and-2001.
[16] Lessard LN et al., Contraceptive features preferred by women at high risk of unintended pregnancy, *Perspectives on Sexual and Reproductive Health*, 2012, 44(2):194–200.
[17] Winner B et al., Effectiveness of long-acting reversible contraception, *New England Journal of Medicine*, 366(21):1998–2007.

-6-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427814

Exhibit 51

JA-0000897

their pills and 10% ran out).[18] Methods of contraception designed to be used during intercourse, such as condoms or spermicide, must be available, accessible, remembered, and used properly each time intercourse occurs.

16.     Beyond effectiveness, there are many other features that people say are important to them when choosing a contraceptive method.[19] These include concerns about and past experience with side effects, drug interactions or hormones; affordability and accessibility; how frequently they expect to have sex; their perceived risk of HIV and other STIs; the ability to use the method confidentially or without needing to involve their partner; and potential effects on sexual enjoyment and spontaneity. For example, methods such as male condoms, fertility awareness and withdrawal require the active and effective participation of male partners. By contrast, methods such as IUDs, implants, and oral contraceptives can be more reliably used by the woman alone in advance of intercourse.[20]

17.     Being able to select the methods that best fulfill a woman's needs and priorities is important to ensuring she is satisfied with her chosen methods. Women who are satisfied with their current contraceptive methods are more likely to use them consistently and correctly. For example, one study found that 30% of neutral or dissatisfied users had a temporal gap in use, compared with 12% of completely satisfied users.[21] Similarly, 35% of satisfied oral contraceptive users had skipped at least one pill in the past three months, compared with 48% of dissatisfied users.[22]

[18] Jones RK, Darroch JE and Henshaw SK, Contraceptive use among U.S. women having abortions in 2000–2001, *Perspectives on Sexual and Reproductive Health*, 2002, 34(6): 294–303, https://www.guttmacher.org/journals/psrh/2002/11/contraceptive-use-among-us-women-having-abortions-2000-2001.

[19] Lessard LN et al., Contraceptive features preferred by women at high risk of unintended pregnancy, *Perspectives on Sexual and Reproductive Health*, 2012, 44(2):194–200.

[20] Bailey MJ. More power to the pill: the impact of contraceptive freedom on women's life cycle labor supply, *Quarterly Journal of Economics*, 2006, 121(1): 289–320, https://academic.oup.com/qje/article-abstract/121/1/289/1849021?redirectedFrom=fulltext.

[21] Guttmacher Institute, Improving contraceptive use in the United States, *In Brief*, New York: Guttmacher Institute, 2008, https://www.guttmacher.org/report/improving-contraceptive-use-united-states.

[22] Guttmacher Institute, Improving contraceptive use in the United States, *In Brief*, New York: Guttmacher Institute, 2008, https://www.guttmacher.org/report/improving-contraceptive-use-united-states.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427815

Exhibit 51

JA-0000898

18.     Consistent contraceptive use helps women and couples prevent unwanted pregnancies and plan and space those they do want. The two-thirds of U.S. women (68%) at risk of unintended pregnancy who use contraceptives consistently and correctly throughout the course of any given year account for only 5% of all unintended pregnancies. In contrast, the 18% of women at risk who use contraceptives but do so inconsistently account for 41% of unintended pregnancies, and the 14% of women at risk who do not use contraceptives at all or have a gap in use of one month or longer account for 54% of unintended pregnancies.[23]

19.     In summary, the ability to choose from among the full range of contraceptive methods encourages consistent and effective contraceptive use, thereby helping women to avoid unintended pregnancies and to time and space wanted pregnancies.

### Access to Contraception Does Not Increase Adolescent Sexual Activity

20.     The federal government incorrectly suggests in the IFRs that increased access to contraception results in increased sexual behavior and has increased adolescent pregnancy rates in the "long term." These assertions are unfounded and ignore rigorous research findings.[24]

21.     Adolescent pregnancy has declined dramatically over the past several decades: In 2013, the U.S. pregnancy rate among 15–19-year-olds was at its lowest point in at least 80 years and had dropped to about one-third of a recent peak rate in 1990.[25] The adolescent birthrate has continued to fall sharply from 2013–2016, suggesting that the underlying pregnancy rates have

---

[23] Sonfield A, Hasstedt K and Gold RB, *Moving Forward: Family Planning in the Era of Health Reform*, New York: Guttmacher Institute, 2014, https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.
[24] The government relies on one study to argue that "[p]rograms that increase access to contraception are found to decrease teen pregnancies in the short run but increase teen pregnancies in the long run." This study is based on hypothetical models, with findings based on a set of assumptions feeding into a simulation, rather than evidence from actual programs and the resulting contraceptive behaviors. [See Arcidiacono, Khwaja A and Ouyang L, Habit persistence and teen sex: could increased access to contraception have unintended consequences for teen pregnancies? *Journal of Business and Economic Statistics*, 2012, 30(2):312–325.] By contrast, the bulk of the empirical literature demonstrates a clear connection between contraceptive use and lower rates of adolescent pregnancy. [See 21–24.]
[25] Kost K, Maddow-Zimet I and Arpaia A, Pregnancies, *Births and Abortions Among Adolescents and Young Women in the United States, 2013: National and State Trends by Age, Race and Ethnicity*, New York: Guttmacher Institute, 2017, https://www.guttmacher.org/report/us-adolescent-pregnancy-trends-2013.

-8-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427816

Exhibit 51

likely declined even further.[26] Over these decades, adolescents' sexual activity has not increased—in fact, it has declined—while their contraceptive use has increased.

22.     National data limited to adolescents attending high school document long-term increases from 1991–2015 in the share of students using contraception, and decreases over the same time period in the share of students who are sexually active.[27] Several studies have validated that contraceptive access reduces adolescent pregnancy without increasing sexual activity: The vast majority (86%) of the decline in adolescent pregnancy between 1995 and 2002 was the result of improvements in contraceptive use; only 14% could be attributed to a decrease in sexual activity.[28] Further, when examining these same two factors, all of the decline in the more recent 2007–2012 period was attributable to better contraceptive use: More adolescents were using contraception, they were using more effective methods, and they were using them more consistently, while adolescent sexual activity did not change.[29]

23.     Recent trends in adolescent contraceptive use buttress this point: During 2011–2015, 81% of adolescent girls used contraception the first time they had sex, up from 75% in 2002; the share of adolescent girls who were sexually active stayed stable.[30,31] Similarly, use of emergency contraception among sexually active female adolescents increased from 8% in 2002 to

[26] Martin JA, Hamilton BE and Osterman MJK. Births in the United States, 2016. *NCHS Data Brief*, 2017, No. 287, https://www.cdc.gov/nchs/products/databriefs.htm.
[27] National Center for HIV/AIDS, Viral Hepatitis, TD, and TB Prevention, Centers for Disease Control and Prevention (CDC). *Trends in the Prevalence of Sexual Behaviors and HIV Testing National YRBS: 1991–2015*, Atlanta: CDC, no date, https://www.cdc.gov/healthyyouth/data/yrbs/pdf/trends/2015_us_sexual_trend_yrbs.pdf.
[28] Santelli JS et al.. Explaining recent declines in adolescent pregnancy in the United States: the contribution of abstinence and improved contraceptive use. *American Journal of Public Health*, 2007, 97(1): 150–156, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1716232/.
[29] Lindberg L, Santelli J and Desai S. Understanding the decline in adolescent fertility in the United States, 2007–2012, *Journal of Adolescent Health*, 2016, 59(5): 577–583, http://www.jahonline.org/article/S1054-139X(16)30172-0/fulltext.
[30] Martinez G, Copen CE and Abma JC. Teenagers in the United States: Sexual activity, contraceptive use, and childbearing, 2006–2010 National Survey of Family Growth. *Vital Health Statistics*, 2011, Series 23, No. 31, https://www.cdc.gov/nchs/products/series/series23.htm.
[31] Abma JC and Martinez G. Sexual activity and contraceptive use among teenagers in the United States, 2011–2015, *National Health Statistics Reports*, 2017, No. 104, https://www.cdc.gov/nchs/products/nhsr.htm.

-9-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427817

Exhibit 51                                                                                                    JA-0000900

22% in 2011–2013; there was no significant change in sexual activity during this time.[32] And in a 2010 review of seven randomized trials of emergency contraception, there was no increase in sexual activity (e.g., reported number of sexual partners or number of episodes of unprotected intercourse) in adolescents given advanced access to emergency contraception.[33]

24.     Along the same lines, studies of the availability of contraception in high schools provide evidence that it does not lead to more sexual activity. Rather, while several studies of school-based health care centers that provide contraceptive methods have shown contraceptives' availability increases students' use of contraception,[34,35] other studies have not found any associated increases in sexual activity.[36] And a recent review of studies of school-based condom availability programs found condom use increased the odds of students using condoms, while none increased sexual activity.[37]

### Eliminating the Cost of Contraception Leads to Improved Contraceptive Use and Reduces Women's Risk of Unintended Pregnancy

25.     Extensive empirical evidence demonstrates what common sense would predict: eliminating costs leads to more effective and continuous use of contraception. This is because cost can be a substantial barrier to contraceptive choice. The contraceptive methods that can be purchased over the counter at a neighborhood drugstore for a comparatively low cost—male

---

[32] Martinez GM and Abma JC. Sexual activity, contraceptive use, and childbearing of teenagers aged 15–19 in the United States. *NCHS Data Brief*. 2015, No. 209. https://www.cdc.gov/nchs/products/databriefs.htm.

[33] Meyer JL, Gold MA and Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. *Journal of Pediatric and Adolescent Gynecology*. 2011, 24(1):2–9. http://www.jpagonline.org/article/S1083-3188(10)00203-2/fulltext.

[34] Minguez M et al.. Reproductive health impact of a school health center. *Journal of Adolescent Health*. 2015, 56(3): 338–344. https://www.ncbi.nlm.nih.gov/pubmed/25703321.

[35] Knopf FA et al.. School-based health centers to advance health equity: a Community Guide systematic review. *American Journal of Preventive Medicine*. 2016, 51(1): 114-126, http://www.ajpmonline.org/article/S0749-3797(16)00035-0/fulltext.

[36] Kirby D. *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases*. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2007. https://thenationalcampaign.org/sites/default/files/resource-primary-download/EA2007_full_0.pdf.

[37] Wang T et al.. The effects of school-based condom availability programs (CAPs) on condom acquisition, use and sexual behavior: a systematic review. *AIDS and Behavior*. 2017. https://www.ncbi.nlm.nih.gov/pubmed/28625012.

-10-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427818

Exhibit 51     JA-0000901

condoms and spermicide—are far less effective than methods that require a prescription and a visit to a health care provider,[38] which have higher up-front costs.[39]

26. The most effective methods of contraception are long-acting reversible contraceptives ("LARC"), such as implants and IUDs. Even with discounts for volume, the cost of these devices exceeds $500, exclusive of costs relating to the insertion procedure,[40] and the total cost of initiating one of these methods generally exceeds $1,000.[41] To put that cost in perspective, beginning to use one of these devices costs nearly a month's salary for a woman working full time at the federal minimum wage of $7.25 an hour.[42] These costs are dissuasive for many women not covered by the contraceptive coverage guarantee; one pre-ACA study concluded that women who faced high out-of-pocket IUD costs were significantly less likely to obtain an IUD than women with access to the device at low or no out-of-pocket cost. And only 25% of women who requested an IUD had one placed after learning the associated costs.[43] Even oral contraceptives, which are twice as effective as condoms in practice, require a prescription and a cost that is incurred every month. And although some stores offer certain pill formulations at steep discounts, requiring a woman to change to a different formulation because of cost has the potential for adverse health effects.

27. The government acknowledges that without coverage, many methods would cost women $50 per month, or upwards of $600 per year, and in doing so, implies that such costs are a minimal burden.[44] This is not true. About one-third of uninsured people and lower-income people

---

[38] Trussell J. Contraceptive efficacy, in: Hatcher RA et al., eds., *Contraceptive Technology*, 20th ed., New York: Ardent Media, 2011, pp. 779–863.
[39] Trussell J et al., Cost effectiveness of contraceptives in the United States, *Contraception*, 2009, 79(1):5–14.
[40] Armstrong E et al., *Intrauterine Devices and Implants: A Guide to Reimbursement*, 2015. https://www.nationalfamilyplanning.org/file/documents----reports/LARC_Report_2014_R5_forWeb.pdf.
[41] Eisenberg D et al., Cost as a barrier to long-acting reversible contraceptive (LARC) use in adolescents, *Journal of Adolescent Health*, 2013, 52(4):S59–S63. http://www.jahonline.org/article/S1054-139X(13)00054-2/fulltext.
[42] 29 U.S.C. § 206(a)(1)(C). At 40 hours a week, that amounts to $290 a week, before any taxes or deductions.
[43] Gariepy AM et al., The impact of out-of-pocket expense on IUD utilization among women with private insurance. *Contraception*, 2011, 84(6):e39–e42. https://escholarship.org/uc/item/1dz6d3cx.
[44] The government includes IUDs as one of the methods that costs $50 per month. That is not accurate because an IUD cannot be paid month to month, but instead requires a high up-front cost. Perhaps the government has confused an IUD with another method that has recurring monthly costs, such as the patch or the ring.

-11-
DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427819

Exhibit 51

would be unable to pay for an unexpected $500 medical bill, and roughly another third would have to borrow money or put it on a credit card and pay it back over time, with interest.[45]

28.     Without insurance coverage to defray or eliminate the cost, the large up-front costs of the more-effective contraceptive methods put them out of reach for many women who otherwise would want to use them, and drive women to less expensive and less effective methods. In a study conducted prior to the contraceptive coverage guarantee, almost one-third of women reported that they would change their contraceptive method if cost were not an issue.[46] This figure was particularly high among women relying on male condoms and other less effective methods such as withdrawal. A study conducted after the ACA had similar findings: among women in the study who still lacked health insurance in 2015, 44% agreed that having insurance would help them to afford and use birth control and 44% agreed that it would allow them to choose a better method; 48% also agreed that it would be easier to use contraception consistently if they had coverage.[47] Among insured women who still had a copayment using a prescription method (e.g., those in grandfathered plans), 40% agreed that if the copayment were eliminated, they would be better able to afford and use birth control, 32% agreed this would help them choose a better method, and 30% agreed this would help them to use their methods of contraception more consistently. Other studies have found that uninsured women are less likely to use the most expensive (but most effective) contraceptive methods, such as IUDs, implants, and oral

---

[45] DiJulio B et al., Data note: Americans' challenges with health care costs, 2017. https://www.kff.org/health-costs/poll-finding/data-note-americans-challenges-with-health-care-costs/?utm_campaign=KFF-2017-March-Polling-Beyond-The-ACA.
[46] Frost JJ and Darroch JE. Factors associated with contraceptive choice and inconsistent method use, United States, 2004, *Perspectives on Sexual and Reproductive Health*, 2008, 40(2):94–104. https://www.guttmacher.org/journals/psrh/2008/factors-associated-contraceptive-choice-and-inconsistent-method-use-united.
[47] Bearak JM and Jones RK. Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis. *Women's Health Issues*, 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

-12-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

00427820

Exhibit 51

JA-0000903

contraceptives,[48] and are more likely than insured women to report using no contraceptive method at all.[49,50]

29.     Reducing financial barriers is key to increasing access to effective contraception. Notably, before the ACA provision went into effect, 28 states required private insurers that cover prescription drugs to provide coverage of most or all FDA-approved contraceptive drugs and devices.[51] These programs gave women access at lower prices than if contraception were not covered, but (at the time) all states still allowed insurers to require cost-sharing. Experience from these states demonstrates that having insurance coverage matters.[52] Privately insured women living in states that required private insurers to cover prescription contraceptives were 64% more likely to use some contraceptive method during each month a sexual encounter was reported than women living in states with no such requirement, even after accounting for differences including education and income.[53]

30.     Although these state policies reduced women's up-front costs, other actions to eliminate out-of-pocket costs entirely—which is what the federal contraceptive coverage guarantee has done for most privately insured women—have even greater potential to increase effective contraceptive use. For example, when Kaiser Permanente Northern California

---

[48] Culwell KR and Feinglass J. The association of health insurance with use of prescription contraceptives. *Perspectives on Sexual and Reproductive Health*, 2007, 39(4):226–230.

[49] Culwell KR and Feinglass J. The association of health insurance with use of prescription contraceptives. *Perspectives on Sexual and Reproductive Health*, 2007, 39(4):226–230.

[50] Culwell KR and Feinglass J. Changes in prescription contraceptive use. 1995–2002: the effect of insurance coverage. *Obstetrics & Gynecology*, 2007, 110(6):1371–1378, https://www.ncbi.nlm.nih.gov/pubmed/18055734.

[51] Guttmacher Institute. Insurance coverage of contraceptives, *State Policies in Brief (as of July 2012)*, 2012.

[52] The government asserts in the IFRs that "Additional data indicates that, in 28 States where contraceptive coverage mandates have been imposed statewide, those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall." The study the government relies on for this assertion was published in a law review rather than in a peer-reviewed scientific journal. [See New MJ. Analyzing the impact of state level contraception mandates on public health outcomes. *Ave Maria Law Review*, 2015, 13(2):345–369.] One basic flaw in this article is that, at the time, none of the state contraceptive coverage laws eliminated out-of-pocket costs entirely, which is the major advance from the federal guarantee and the issue in this case. In addition, over the course of the period the article evaluated, many states enacted contraceptive coverage laws in quick succession. [Sonfield et al. U.S. insurance coverage of contraceptives and impact of contraceptive coverage mandates, 2002, *Perspectives on Sexual and Reproductive Health*, 2004, 36(2):72–79, https://www.guttmacher.org/sites/default/files/pdfs/pubs/journals/ 3607204.pdf.] Contraceptive coverage became the norm in the insurance industry—even in states without mandates—thus minimizing potential differences between states with laws and states without them.

[53] Magnusson BM et al.. Contraceptive insurance mandates and consistent contraceptive use among privately insured women. *Medical Care*, 2012, 50(7):562–568.

-13-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427821

Exhibit 51

eliminated patient cost-sharing requirements for IUDs, implants, and injectables in 2002, the use of these devices increased substantially, with IUD use more than doubling.[54] Another example comes from a study of more than 9,000 St. Louis-region women who were offered the reversible contraceptive method of their choice (i.e., any method other than sterilization) at no cost for two to three years, and were "read a brief script informing them of the effectiveness and safety of" IUDs and implants.[55] Three-quarters of those women chose long-acting methods (i.e., IUDs or implants), a level far higher than in the general population. Likewise, a Colorado study found that use of long-acting reversible contraceptive methods quadrupled when offered with no out-of-pocket costs along with other efforts to improve access.[56]

31.  Government-funded programs to help low-income people afford family planning services provide further evidence that reducing or eliminating cost barriers to women's contraceptive choices has a dramatic impact on women's ability to choose and use the most effective forms of contraception. Each year, among the women who obtain contraceptive services from publicly funded reproductive health providers, 57% select hormone-based contraceptive methods, 18% use implants or IUDs, and 7% receive a tubal ligation.[57] It is estimated that without publicly supported access to these methods at low or no cost, nearly half (47%) of those women would switch to male condoms or other nonprescription methods, and 28% would use no contraception at all.[58]

---

[54] Postlethwaite D et al., A comparison of contraceptive procurement pre- and post-benefit change. *Contraception*, 2007, 76(5): 360–365

[55] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, Contraception, 2012, 120(6):1291–1297.

[56] Ricketts S, Klinger G and Schwalberg G, Game change in Colorado: widespread use of long-acting reversible contraceptives and rapid decline in births among young, low-income women, *Perspectives on Sexual and Reproductive Health*, 2014, 46(3):125–132.

[57] Frost JJ and Finer LB, Unintended pregnancies prevented by publicly funded family planning services: Summary of results and estimation formula, memo to interested parties, New York: Guttmacher Institute, June 23, 2017, https://www.guttmacher.org/sites/default/files/pdfs/pubs/Guttmacher-Memo-on-Estimation-of-Unintended-Pregnancies-Prevented-June-2017.pdf.

[58] Frost JJ and Finer LB, Unintended pregnancies prevented by publicly funded family planning services: Summary of results and estimation formula, memo to interested parties, New York: Guttmacher Institute, June 23, 2017, https://www.guttmacher.org/sites/default/files/pdfs/pubs/Guttmacher-Memo-on-Estimation-of-Unintended-Pregnancies-Prevented-June-2017.pdf.

-14-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427822

Exhibit 51

JA-0000905

## The ACA's Contraceptive Coverage Guarantee Has Had a Positive Impact

32.    By ensuring coverage for a full range of contraceptive methods, services and counseling at no cost, the ACA's contraceptive coverage mandate has had its intended effect of removing cost barriers to obtaining contraception. Between fall 2012 and spring 2014 (during which time the coverage guarantee went into wide effect), the proportion of privately insured women who paid nothing out of pocket for the pill increased from 15% to 67%, with similar changes for injectable contraceptives, the vaginal ring and the IUD.[59] Similarly, another study found that since implementation of the ACA, the share of women of reproductive age (regardless of whether they were using contraception) who had out-of-pocket spending on oral contraceptives decreased from 21% in 2012 to just 4% in 2014.[60] These trends have translated into considerable savings for U.S. women: one study estimated that pill and IUD users saved an average of about $250 in copayments in 2013 alone because of the guarantee.[61]

33.    Prior to the ACA, contraceptives accounted for between 30–44% of out-of-pocket health care spending for women.[62] Individual women themselves say that the ACA's contraceptive coverage guarantee is working for them. In a 2015 nationally representative survey of women aged 18–39, two-thirds of those who had health insurance and were using a hormonal contraceptive method reported having no copays; among those women, 80% agreed that paying nothing out of pocket helped them to afford and use their birth control, 71% agreed this helped them use their birth control consistently, and 60% agreed that having no copayment helped them choose a better method.[63]

---

[59] Sonfield A et al. Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update. *Contraceptive*. 2015, 91(1):44–48.
[60] Sobel L, Salganicoff A and Rosenzweig C. *The Future of Contraceptive Coverage*, Kaiser Family Foundation (KFF) Issue Brief, Menlo Park, CA: KFF, 2017, https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.
[61] Becker NV and Polsky D, Women saw large decrease in out-of-pocket spending for contraceptives after ACA mandate removed cost sharing. *Health Affairs*, 2015, 34(7):1204–1211.
[62] Becker NV and Polsky D, Women saw large decrease in out-of-pocket spending for contraceptives after ACA mandate removed cost sharing. *Health Affairs*, 2015, 34(7):1204–1211.
[63] Bearak JM and Jones RK. Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis. *Women's Health Issues*, 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

-15-

00427823

Exhibit 51                                                                                    JA-0000906

34.     Demonstrating the population-level impact of the ACA's coverage provision is complicated, because the provision affects only a subset of U.S. women, and because there are so many additional variables that may have affected women's contraceptive use in a number of ways. The evidence on whether the ACA's provision has affected contraceptive use at the population level is not definitive, but some studies suggest the guarantee has had an impact on contraceptive use, among those benefiting from the provision.

35.     A study using claims data from 30,000 privately insured women in the Midwest found that the ACA's reduction in cost sharing was tied to a significant increase in the use of prescription methods from 2008 through 2014 (before and after the ACA provision went into effect), particularly long-acting methods.[64] Another study of health insurance claims from 635,000 privately insured women nationwide showed that rates of discontinuation and inconsistent use of contraception declined from 2010 to 2013 (again, before and after the ACA provision went into effect) among women using generic oral contraceptive pills after the contraceptive guarantee's implementation (among women using brand-name oral contraceptives, only the discontinuation rate declined).[65]

36.     Two other studies, looking at the broader U.S. population, found no change in overall use of contraception or an overall switch from less-effective to more-effective methods among women at risk of unintended pregnancy before and after the guarantee's implementation.[66,67] However, both studies identified some positive trends among key groups. One of them found that between 2008 and 2014, among women aged 20–24 (the age group at highest risk for unintended pregnancy), LARC use more than doubled, from 7% to 19%, without

---

[64] Carlin CS, Fertig AR and Down BE. Affordable Care Act's mandate eliminating contraceptive cost sharing influenced choices of women with employer coverage. *Health Affairs*. 2016. 35(9):1608–1615.
[65] Pace LE, Dusetzina SB and Keating NL. Early impact of the Affordable Care Act on oral contraceptive cost sharing, discontinuation, and nonadherence. *Health Affairs*. 2016. 35(9):1616–1624.
[66] Bearak JM and Jones RK. Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis. *Women's Health Issues*. 2017. 27(3):316–321. http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.
[67] Kavanaugh ML and Jerman J. Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014. *Contraception*. 2017. https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.

-16-
DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

00427824

Exhibit 51                                                                                           JA-0000907

a proportional decline in sterilization.[68] The other study showed that between 2012 and 2015, use of prescription contraceptive methods, and birth control pills in particular, increased among sexually inactive women, suggesting that more women were able to start a method before becoming sexually active or use a method such as the pill for noncontraceptive reasons after implementation of the contraceptive coverage guarantee.[69]

37.     There is also considerable empirical data from controlled experiments to confirm that the concept of removing cost as a barrier to women's contraceptive use is a major factor in reducing their risk for unintended pregnancy, and the abortions and unplanned births that would otherwise follow. For example, a study of more than 9,000 St. Louis-region women who were offered the reversible contraceptive method of their choice at no cost found that the number of abortions performed at St. Louis Reproductive Health Services declined by 21%.[70] Study participants' abortion rate was significantly lower than the rate in the surrounding St. Louis region, and less than half the national average.[71] Similarly, when access to both contraception and abortion increased in Iowa, the abortion rates actually declined.[72] Starting in 2006, the state expanded access to low- or no-cost family planning services through a Medicaid expansion and a privately funded initiative serving low-income women. Despite a simultaneous increase in access to abortion—the number of clinics offering abortions in the state actually doubled during the study period—the abortion rate dropped by over 20%.

## Expanding Exemptions Will Harm Women

38.     The IFRs will make it more difficult, once again, for those receiving insurance coverage through companies or schools that use the exemption (i.e., employees, students and

---

[68] Kavanaugh ML and Jerman J. Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014. *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.

[69] Bearak JM and Jones RK. Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis. *Women's Health Issues*, 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

[70] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, Contraception, 2012, 120(6):1291–1297.

[71] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, Contraception, 2012, 120(6):1291–1297.

[72] Biggs MA. Did increasing use of highly effective contraception contribute to declining abortions in Iowa? *Contraception*, 2015, 91(2):167–173.

-17-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427825

Exhibit 51

JA-0000908

dependents) to access the methods of contraception that are most acceptable and effective for them. That, in turn, will increase those women's risk of unintended pregnancy and interfere with their ability to plan and space wanted pregnancies. These barriers could therefore have considerable negative health, social and economic impacts for those women and their families.

39.     Allowing employers or schools to exclude all contraceptive methods, services and counseling from insurance plans—or to cover some contraceptive methods, services and information but not others—will prevent women from selecting and obtaining the methods of contraception that will work best for them. For example, Hobby Lobby objected to providing four specific contraceptive methods, including copper and hormonal IUDs, which are among the most effective forms of pregnancy prevention and also have among the highest up-front costs.

40.     Allowing employers to restrict access to the full range of contraceptive methods and to approve coverage only for those they deem acceptable places inappropriate constraints on women who depend on insurance to obtain the methods best suited to their needs. Moreover, in the absence of coverage, the financial cost of obtaining a method, and the fact that some methods have higher costs than others, would incentivize women to select methods that are inexpensive, rather than methods that are best suited to their needs and that they are therefore most likely to use consistently and effectively (see 10–19, above).

41.     Excluding coverage for some or all contraceptive methods, services and counseling could deny women the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care.[73,74] A woman going to her gynecologist for an annual examination, for example, may have to go to a different provider to be prescribed (or even discuss) contraception. This disjointed approach increases the time, effort and expense involved in getting needed contraception and interferes with her ability to obtain care from the provider of her choice.

---

[73] Leeman L. Medical barriers to effective contraception. *Obstetrics and Gynecology Clinics of North America*. 2007; 34(1):19–29.
[74] World Health Organization. Selected Practice Recommendations for Contraceptive Use, Third Ed., 2016, WHO: Geneva, Switzerland. http://apps.who.int/iris/bitstream/10665/252267/1/9789241565400-eng.pdf.

-18-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

00427826

Exhibit 51                                                                      JA-0000909

42.    Isolating contraceptive coverage in this way also would interfere with the ability of health care providers to treat women holistically. A woman's choice of contraception can be affected by her other medical conditions (e.g., diabetes, HIV, depression/mental health). and certain medications can significantly reduce the effectiveness of some methods of contraception, so a woman's chosen provider should be able to manage all health conditions and needs at the same time.[75,76]

43.    To the extent that expanding the exemptions will burden women's contraceptive use in these ways, it will be harmful to women's health. Contraception allows women to avoid unintended pregnancies and to time and space wanted pregnancies, all of which have been demonstrated to improve women's health and that of their families. Specifically, pregnancies that occur too early or too late in a woman's life, or that are spaced too closely, negatively affect maternal health and increase the risk of harmful birth outcomes, including preterm birth, low birth weight, stillbirth, and early neonatal death.[77] Closely spaced pregnancies are associated with increased risk of harmful birth outcomes.[78,79,80] Contraceptive use can also prevent preexisting health conditions from worsening and new health problems from occurring, because pregnancy can exacerbate existing health conditions such as diabetes, hypertension and heart disease.[81] Unintended pregnancy also affects women's mental health; notably, it is a risk factor for

[75] Centers for Disease Control and Prevention. *US Medical Eligibility Criteria for Contraceptive Use, 2016,* https://www.cdc.gov/reproductivehealth/contraception/mmwr/mec/summary.html.

[76] Centers for Disease Control and Prevention, U.S. medical eligibility criteria for contraceptive use. 2010, *Morbidity and Mortality Weekly Report,* May 28, 2010. Vol. 59, https://www.cdc.gov/mmwr/pdf/rr/rr59e0528.pdf.

[77] Kavanaugh ML and Anderson RM, *Contraception and Beyond: The Health Benefits of Services Provided at Family Planning Centers,* New York: Guttmacher Institute. 2013. http://www.guttmacher.org/report/contraception-and-beyond-health-benefits-services-provided-family-planning-centers.

[78] Wendt A et al., Impact of increasing inter-pregnancy interval on maternal and infant health. Paediatric and Perinatal Epidemiology. 2012. 26(Suppl. 1):239–258.

[79] Conde-Agudelo A. Rosas-Bermúdez A and Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. Journal of the American Medical Association. 2006. 295(15):1809–1823.

[80] Gipson JD, Koenig MA and Hindin MJ. The effects of unintended pregnancy on infant, child, and parental health: a review of the literature. *Studies in Family Planning.* 2008. 39(1):18–38.

[81] Lawrence HC. Testimony of American Congress of Obstetricians and Gynecologists, submitted to the Committee on Preventive Services for Women. Institute of Medicine. 2011. http://www.nationalacademies.org/hmd/~/media/8BA65BAF76894E9EB8C768C01C84380E.ashx.

-19-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

00427827

Exhibit 51                                                                                                      JA-0000910

depression in adults.[82,83] For these reasons, the Centers for Disease Control and Prevention included the development of and improved access to methods of family planning among the 10 great public health achievements of the 20th century because of its numerous benefits to the health of women and children.[84]

44.    The government implies in the IFRs that contraception may have negative health consequences that outweigh its benefits. Again, this is demonstrably false, and the government itself provides the oversight to ensure that it is false. Notably, the U.S. Food and Drug Administration's approval processes require that drugs and devices, including contraceptives, be proven safe through rigorous controlled trials. In addition, the Centers for Disease Control and Prevention publish extensive recommendations to help clinicians and patients identify potential contraindications and decide which specific contraceptive methods are most appropriate for each patient's specific needs and health circumstances.[85,86] Medical experts, such as the American College of Obstetricians and Gynecologists, concur that contraception is safe and has clear health benefits that outweigh any potential side effects.[87]

45.    Expanding the exemptions to the contraceptive coverage requirement will also have negative social and economic consequences for women, families and society. By enabling them to reliably time and space wanted pregnancies, women's ability to obtain and effectively use contraception promotes their continued educational and professional advancement, contributing to the enhanced economic stability of women and their families.[88] Economic analyses have found

---

[82] Herd P et al., The implications of unintended pregnancies for mental health in later life, *American Journal of Public Health*, 2016, 106(3):421–429.
[83] U.S. Preventive Services Task Force, Screening for depression in adults: recommendation statement, *American Family Physician*, 2016, 94(4):340A–340D, http://www.aafp.org/afp/2016/0815/od1.html.
[84] Centers for Disease Control and Prevention, Achievements in public health, 1900–1999: family planning, *Morbidity and Mortality Weekly Report*, 1999, 48(47): 1073–1080.
[85] Centers for Disease Control and Prevention, *US Medical Eligibility Criteria for Contraceptive Use, 2016*, https://www.cdc.gov/reproductivehealth/contraception/mmwr/mec/summary.html.
[86] Centers for Disease Control and Prevention, U.S. medical eligibility criteria for contraceptive use, 2010, *Morbidity and Mortality Weekly Report*, May 28, 2010, Vol. 59, https://www.cdc.gov/mmwr/pdf/rr/rr59e0528.pdf.
[87] Brief of *Amici Curiae*, American College of Obstetricians and Gynecologists, Physicians for Reproductive Health, American Academy of Family Physicians, American Nurses Association, et al., *Zubik v. Burwell*, 2016, http://www.scotusblog.com/wp-content/uploads/2016/02/Docfoc.com-Amicus-Brief-Zubik-v.-Burwell.pdf.
[88] Sonfield A et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*, New York: Guttmacher Institute, 2013, https://www.guttmacher.org/report/social-and-economic-benefits-womens-ability-determine-whether-and-when-have-children.

-20-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427828

Exhibit 51

JA-0000911

positive associations between women's ability to obtain and use oral contraceptives and their education, labor force participation, average earnings and a narrowing of the gender-based wage gap.[89] Moreover, the primary reasons women give for why they use and value contraception are social and economic: In a 2011 study, a majority of women reported that access to contraception had enabled them to take better care of themselves or their families (63%), support themselves financially (56%), stay in school or complete their education (51%), or get or keep a job or pursue a career (50%).[90]

46.     The government argues that expanding the exemption will not impose any real harm, suggesting that the women most at risk for unintended pregnancy are not likely to be covered by employer-based group health plans or by student insurance sponsored by a college or university. This argument is misleading. Low-income women, women of color and women aged 18–24 are at disproportionately high risk for unintended pregnancy,[91] and millions of these women rely on private insurance coverage—particularly following implementation of the ACA. In fact, from 2013 to 2015, the proportion of women overall and of women living below the poverty level who were uninsured each dropped by roughly one-third nationwide, declines driven by substantial increases in both Medicaid and private insurance coverage.[92] In addition, the ACA specifically expanded coverage for people aged 26 and younger, allowing them to remain covered as dependents on their parents' plans, regardless of whether the young woman is working herself or attending college or university.

[89] Sonfield A et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*. New York: Guttmacher Institute, 2013. https://www.guttmacher.org/report/social-and-economic-benefits-womens-ability-determine-whether-and-when-have-children.
[90] Frost JJ and Lindberg LD. Reasons for using contraception: perspectives of U.S. women seeking care at specialized family planning clinics. 2012. *Contraception*. http://www.guttmacher.org/pubs/journals/j.contraception.2012.08.012.pdf.
[91] Finer LB and Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine*, 2016, 374(9):843–852.
[92] Guttmacher Institute. Uninsured rate among women of reproductive age has fallen more than one-third under the Affordable Care Act. *News in Context*, Nov. 17, 2016. https://www.guttmacher.org/article/2016/11/uninsured-rate-among-women-reproductive-age-has-fallen-more-one-third-under.

-21-
DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427829

Exhibit 51                                                                JA-0000912

## **Medicaid, Title X and State Coverage Requirements Cannot Substitute for the Federal Contraceptive Coverage Guarantee**

47.     The government claims that "[i]ndividuals who are unable to obtain contraception coverage through their employer-sponsored health plans because of the exemptions created in these interim final rules … have other avenues for obtaining contraception…"[93] But the programs and laws the government highlights—the Title X national family planning program, Medicaid, and state contraceptive coverage requirements—simply cannot replicate or replace the gains in access made by the contraceptive coverage guarantee.

48.     Many women who have the benefit of the ACA's contraceptive coverage mandate are not eligible for free or subsidized care under Title X. Title X provides no-cost family planning services to people living at or below 100% of the federal poverty level ($12,060 for a single person in 2017),[94] and provides services on a sliding fee scale between 100% and 250% of poverty; women above 250% of poverty must pay the full cost of care. By contrast, the federal contraceptive coverage guarantee eliminates out-of-pocket costs for contraception regardless of income.

49.     Funding for Title X has not increased sufficiently for the program to even keep up with the increasing number of women in need of publicly funded care;[95] therefore, Title X cannot sustain additional beneficiaries as a result of the IFRs. From 2010 to 2014, even as the number of women in need of publicly funded contraceptive care grew by 5%, representing an additional 1 million women in need,[96] Congress cut funding for Title X by 10%.[97] With its current resources,

---

[93] Department of the Treasury, Department of Labor and Department of Health and Human Services, Religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act, *Federal Register*, 82(197):47838–47862, https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21852.pdf.
[94] Office of the Assistant Secretary for Planning and Evaluation, U.S. federal poverty guidelines used to determine financial eligibility for certain federal programs, 2017, https://aspe.hhs.gov/poverty-guidelines.
[95] Women in need of publicly funded contraceptive services are defined as those women who a) are younger than 20 or are poor or low-income (i.e., have a family income less than 250% of the federal poverty level) and b) are sexually active and able to become pregnant but do not want to become pregnant. See Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update*, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.
[96] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update*, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.
[97] Department of Health and Human Services, Office of Population Affairs, Funding history, 2017, https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html.

-22-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427830

Exhibit 51

JA-0000913

Title X is only able to serve one-fifth of the nationwide need for publicly funded contraceptive care.[98]

50.     Similarly, many women who would lose private insurance coverage of contraception under the federal government's expanded exemption would not be eligible for Medicaid. Eligibility for Medicaid varies widely from state to state, particularly in the 19 states that have not expanded Medicaid eligibility under the ACA. In 18 of those 19 states, nondisabled, nonelderly childless adults do not qualify for Medicaid at any income level, and eligibility for parents is as low as 18% of the federal poverty level in Texas.[99] Nine of these 19 states have expanded eligibility specifically for family planning services to people otherwise ineligible for full-benefit Medicaid; those income eligibility levels also vary considerably.[100,101] Again, the federal contraceptive coverage guarantee applies regardless of income. Notably, the U.S. Supreme Court has ruled that states cannot be compelled by the federal government to expand Medicaid eligibility, so the federal government cannot rely on Medicaid to fill in gaps in coverage that would result from expanding the exemption.

51.     The federal government's assertion that Title X and Medicaid can replace or replicate the ACA's contraception coverage guarantee is additionally problematic given that the government itself is at the same time proposing to cut funding for Title X and Medicaid or otherwise undermine the programs. For example, the government's FY 2018 budget proposal sought to exclude Planned Parenthood Federation of America and its affiliates from Title X, Medicaid and other federal programs;[102] Planned Parenthood health centers serve 32% of all

[98] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update*. New York: Guttmacher Institute, 2016. https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.
[99] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2017, State Health Facts. https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.
[100] Guttmacher Institute, Medicaid family planning eligibility expansions, *State Laws and Policies (as of October 2017)*, 2017, https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.
[101] Kaiser Family Foundation, Status of state action on the Medicaid expansion decision, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/.
[102] Hasstedt K, Beyond the rhetoric: the real-world impact of attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, 2017, 20:86–91, https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

-23-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427831

Exhibit 51                                                                                                JA-0000914

female contraceptive clients who obtain care from a safety-net family planning center, and 41% of all Title X clients.[103] Moreover, the FY 2018 budget called for massive cuts to Medicaid (somewhere between $610 billion and $1.4 trillion over a 10-year period[104]), and the Department of Health and Human Services has encouraged states to revamp their Medicaid programs in ways that would restrict program eligibility (e.g., by imposing work requirements) and thereby interfere with coverage and care.[105] In addition, a White House memo that was leaked to the press in October 2017 included a request to cut funding for Title X at least by half, which would fundamentally undermine the program's mandate to deliver affordable, high-quality contraceptive care.[106] The administration has strongly backed similar congressional proposals for cutting and limiting access to Title X and Medicaid.

52.     Policymakers in many states have also restricted publicly funded family planning programs and providers, further undermining the ability of these programs to serve those affected by the expanded exemption.[107]

53.     Neither can state-specific contraceptive coverage laws replicate or replace the increase in access to contraception provided by the ACA's contraceptive coverage guarantee. Twenty-two states and the District of Columbia, home to 43% of women of reproductive age in 2016,[108] have no such laws at all.[109] Of the 28 states that do have contraceptive coverage requirements, only four currently bar copayments and deductibles for contraception (and another four states have new requirements not yet in effect). Additionally, the federal requirement limits

---

[103] Frost JJ et al., *Publicly Funded Contraceptive Services at U.S. Clinics, 2015*, New York: Guttmacher Institute, 2017, https://www.guttmacher.org/report/publicly-funded-contraceptive-serv ices-us-clinics-2015.
[104] Luhby T, Not even the White House knows how much it's cutting Medicaid, *CNN*, May 24, 2017, http://money.cnn.com/2017/05/24/news/economy/medicaid-budget-trump/index.html.
[105] Sonfield A, Efforts to transform the nature of Medicaid could undermine access to reproductive health care, *Guttmacher Policy Review*, 2017, 20:97–102, https://www.guttmacher.org/gpr/2017/10/efforts-transform-nature-medicaid-could-undermine-access-reproductive-health-care.
[106] Beutler B, Leaked memo reveals White House wish list, *Crooked*, Oct. 19, 2017, https://crooked.com/article/leaked-memo-reveals-white-house-v2016-list/.
[107] Gold RB and Hasstedt K, Publicly funded family planning under unprecedented attack, *American Journal of Public Health*, 2017, 107(12):1895–1897, http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2017.304124.
[108] Department of Health and Human Services, National Center for Health Statistics, Bridged-Race Population Estimates, United States July 1st resident population by state, county, age, sex, bridged-race, and Hispanic origin, accessed on Nov. 3, 2017, http://wonder.cdc.gov/bridged-race-v2016.html.
[109] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

-24-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

00427832

Exhibit 51

JA-0000915

the use of formularies and other administrative restrictions on women's use of contraceptive services and supplies, by making it clear that health plans can only influence a patient's choice within a specific contraceptive method category (e.g., to favor one hormonal IUD over another) and not across methods (e.g., to favor the pill over the ring).[110] Few of the state laws include similar protections. Similarly, most of the 28 state requirements do not specifically require coverage of all 18 distinct methods that the federal requirement encompasses. For example, only three states currently require coverage of female sterilization, and few state laws make explicit distinctions between methods that some insurance plans have attempted to treat as interchangeable (such as hormonal versus copper IUDs, or the contraceptive patch versus the contraceptive ring).[111] Finally, state laws cannot regulate self-insured employers at all, and those employers account for 60% of all workers with employer-sponsored health coverage.[112]

## State-Specific Impacts

54.     The interim final rules will have public health and fiscal impacts in states across the country. If unable to access contraception coverage through their employer or university, some lower-income women who meet the strict income requirements of public programs will rely on publicly funded services to access this beneficial service. Many women who lose or lack contraceptive coverage because their employer or university objects, however, will not meet the strict income and eligibility requirements of public programs, and if as a result they are not using their preferred or the most effective methods for them, or if cost forces them to forgo contraceptive use periodically or altogether, they will be at increased risk of unintended pregnancy. The costs of the resulting unintended pregnancies often then fall to the states because the federal government cannot or will not withstand these costs.

---

[110] Department of Labor, FAQs about Affordable Care Act implementation (part XXVI), May 11, 2015, https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-xxvi.pdf.
[111] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[112] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

-25-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

00427833

Exhibit 51

JA-0000916

## California

55.     In California, some women impacted by the IFRs will not qualify for Medicaid, the state's Medicaid family planning expansion (Family PACT) or Title X because they will not meet the income eligibility requirements for coverage or subsidized care under these programs.

56.     For example, in California, childless adults and parents are only eligible for full-benefit Medicaid if they have incomes at or below 138% of the federal poverty level,[113] and individuals are eligible for coverage of family planning services specifically under Family PACT up to 200% of poverty.[114] This means that affected women who lose coverage as a result of the rules may not be eligible.

57.     As a result, some women will be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost will force them to forgo contraception use entirely.

58.     Other women will be eligible for and rely on publicly funded family planning services through programs such as Medicaid, Family PACT and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way will interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

59.     The increase in the number of women relying on publicly funded services will add additional strain to the state's family planning programs and providers, making it more difficult

---

[113] Kaiser Family Foundation. Medicaid income eligibility limits for adults as a percent of the federal poverty level. 2017. State Health Facts. https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

[114] Guttmacher Institute. Medicaid family planning eligibility expansions. *State Laws and Policies (as of October 2017)*, 2017. https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427834

Exhibit 51

JA-0000917

for them to meet the existing need for publicly funded care. In 2014, 2.6 million women were in need of publicly funded family planning in California, and the state's family planning network was only able to meet 50% of this need.[115]

60.    Another indicator of the existing unmet need for contraception in California is that substantial numbers of state residents experience unintended pregnancy each year. In 2010, 393,000 unintended pregnancies occurred among California residents, a rate of 50 per 1,000 women aged 15–44.[116]

61.    Of those unintended pregnancies that ended in birth, 64% were paid for by Medicaid and other public insurance programs. Unintended pregnancies cost the state approximately $689 million and the federal government approximately $1.06 billion in 2010.[117] The IFRs are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

62.    In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of California or its residents.

### Delaware

63.    In Delaware, some women impacted by the IFRs will not qualify for Medicaid or Title X because they will not meet the income eligibility requirements for coverage or subsidized care under these programs.

---

[115] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update*, New York: Guttmacher Institute, 2016. https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[116] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002*, New York: Guttmacher Institute, 2015. https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

[117] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015. https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

-27-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

00427835

Exhibit 51

64.     For example, in Delaware, childless adults and parents are only eligible for full-benefit Medicaid if they have incomes at or below 138% of the federal poverty level.[118] (Delaware has not expanded Medicaid eligibility specifically for family planning services.) This means that affected women who lose coverage as a result of the rules may not be eligible.

65.     As a result, some women will be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost will force them to forgo contraception use entirely.

66.     Other women will be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way will interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

67.     The increase in the number of women relying on publicly funded services will add additional strain to the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 50,000 women were in need of publicly funded family planning in Delaware, and the state's family planning network was only able to meet 30% of this need.[119]

68.     Another indicator of the existing unmet need for contraception in Delaware is that substantial numbers of state residents experience unintended pregnancy each year. In 2010,

---

[118] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level. 2017. State Health Facts. https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

[119] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services. 2014 Update*, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

-28-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427836

Exhibit 51

JA-0000919

11,000 unintended pregnancies occurred among Delaware residents, a rate of 62 per 1,000 women aged 15–44.[120]

69.     Of those unintended pregnancies that ended in birth, 71% were paid for by Medicaid and other public insurance programs. Unintended pregnancies cost the state approximately $36 million and the federal government approximately $58 million in 2010.[121] The IFRs are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

70.     In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of Delaware or its residents.

**Maryland**

71.     In Maryland, some women impacted by the IFRs will not qualify for Medicaid or Title X because they will not meet the income eligibility requirements for coverage or subsidized care under these programs.

72.     For example, in Maryland, childless adults and parents are only eligible for full-benefit Medicaid if they have incomes at or below 138% of the federal poverty level,[122] and individuals are eligible for coverage of family planning services specifically up to 200% of

---

[120] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

[121] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

[122] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

-29-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427837

Exhibit 51

JA-0000920

poverty.[123] This means that affected women who lose coverage as a result of the rules may not be eligible.

73.     As a result, some women will be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost will force them to forgo contraception use entirely.

74.     Other women will be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way will interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

75.     The increase in the number of women relying on publicly funded services will add additional strain to the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 298,000 women were in need of publicly funded family planning in Maryland, and the state's family planning network was only able to meet 25% of this need.[124]

76.     Another indicator of the existing unmet need for contraception in Maryland is that substantial numbers of state residents experience unintended pregnancy each year. In 2010,

---

[123] Guttmacher Institute. Medicaid family planning eligibility expansions. *State Laws and Policies (as of October 2017)*, 2017. https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.
[124] Frost JJ, Frohwirth L and Zolna MR. *Contraceptive Needs and Services, 2014 Update*. New York: Guttmacher Institute, 2016. https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

-30-
DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

00427838

Exhibit 51

JA-0000921

71,000 unintended pregnancies occurred among Maryland residents, a rate of 60 per 1,000 women aged 15–44.[125]

77.     Of those unintended pregnancies that ended in birth, 58% were paid for by Medicaid and other public insurance programs. Unintended pregnancies cost the state approximately $181 million and the federal government approximately $285 million in 2010.[126] The IFRs are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

78.     In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of Maryland or its residents.

### New York

79.     In New York, some women impacted by the IFRs will not qualify for Medicaid or Title X because they will not meet the income eligibility requirements for coverage or subsidized care under these programs.

80.     For example, in New York, childless adults and parents are only eligible for full-benefit Medicaid if they have incomes at or below 138% of the federal poverty level,[127] and individuals are eligible for coverage of family planning services specifically up to 223% of

---

[125] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

[126] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

[127] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

-31-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427839

Exhibit 51

JA-0000922

poverty.[128] This means that affected women who lose coverage as a result of the rules may not be eligible.

81.     As a result, some women will be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost will force them to forgo contraception use entirely.

82.     Other women will be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way will interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

83.     The increase in the number of women relying on publicly funded services will add additional strain to the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 1.2 million women were in need of publicly funded family planning in New York, and the state's family planning network was only able to meet 32% of this need.[129]

84.     Another indicator of the existing unmet need for contraception in New York is that substantial numbers of state residents experience unintended pregnancy each year. In 2010,

---

[128] Guttmacher Institute. Medicaid family planning eligibility expansions. *State Laws and Policies (as of October 2017)*, 2017. https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.
[129] Frost JJ, Frohwirth L and Zolna MR. *Contraceptive Needs and Services, 2014 Update*. New York: Guttmacher Institute, 2016. https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

-32-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427840

Exhibit 51                                                                                   JA-0000923

246,000 unintended pregnancies occurred among New York residents, a rate of 61 per 1,000 women aged 15–44.[130]

85. Of those unintended pregnancies that ended in birth, 70% were paid for by Medicaid and other public insurance programs. Unintended pregnancies cost the state approximately $601 million and the federal government approximately $938 million in 2010.[131] The IFRs are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

86. In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of New York or its residents.

**Virginia**

87. In Virginia, some women impacted by the IFRs will not qualify for Medicaid or Title X because they may not meet the income eligibility requirements for coverage or subsidized care under these programs. Virginia women may be particularly likely to be impacted by the IFRs because the state does not have its own policy requiring some level of contraceptive coverage among private insurance plans.

88. For example, in Virginia, parents are only eligible for full-benefit Medicaid if they have incomes at or below 38% of the federal poverty level and childless adults are entirely ineligible for full-benefit Medicaid;[132] individuals are only eligible for coverage of family

---

[130] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

[131] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

[132] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

-33-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427841

Exhibit 51

JA-0000924

planning services specifically up to 205% of poverty.[133] This means that affected women who lose coverage as a result of the rules may not be eligible.

89.     As a result, some women will be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost will force them to forgo contraception use entirely.

90.     Other women will be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way will interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

91.     The increase in the number of women relying on publicly funded services will add additional strain to the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 448,000 women were in need of publicly funded family planning in Virginia, and the state's family planning network was only able to meet 17% of this need.[134]

92.     Another indicator of the existing unmet need for contraception in Virginia is that substantial numbers of state residents experience unintended pregnancy each year. In 2010,

---

[133] Guttmacher Institute. Medicaid family planning eligibility expansions. *State Laws and Policies (as of October 2017)*. 2017. https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.
[134] Frost JJ, Frohwirth L and Zolna MR. *Contraceptive Needs and Services, 2014 Update*. New York: Guttmacher Institute. 2016. https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

-34-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427842

Exhibit 51

JA-0000925

84,000 unintended pregnancies occurred among Virginia residents, a rate of 51 per 1,000 women aged 15–44.[135]

93.  Of those unintended pregnancies that ended in birth, 45% were paid for by Medicaid and other public insurance programs. Unintended pregnancies cost the state approximately $195 million and the federal government approximately $312 million in 2010.[136] The IFRs are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

94.  In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of Virginia or its residents.

***

Ample evidence demonstrates that the IFRs will interfere with women's ability to identify and consistently use the contraceptive methods that will work best for them, thus putting them at heightened risk of unintended pregnancy and the health, social and economic harms that will result.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on the 9th day of November, 2017, in New York, New York.

Lawrence B. Finer
Vice President for Domestic Research
The Guttmacher Institute

---

[135] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

[136] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

-35-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

00427843

Exhibit 51



H U M A N
R I G H T S
C A M P A I G N ®

December 5, 2017

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW, Room 445–G
Washington, DC 20201

Re:     Interim Final Rule on Religious Exemptions and Accommodations for Coverage of
        Certain Preventive Services Under the Affordable Care Act (CMS-9940-IFC)

Dear Acting Secretary Hargan:

On behalf of the Human Rights Campaign's nearly 3 million members and supporters nationwide, I write in response to the Interim Final Rule (IFR) on Religious Exemptions and Accommodations for Coverage of Certain Preventative Services (CMS-9940-IFC). As the nation's largest organization working to achieve equal rights for the lesbian, gay, bisexual, transgender, and queer (LGBTQ) communities, HRC believes that LGBTQ people should be guaranteed access to essential reproductive and other health care services. Therefore, we strongly oppose the Department's efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement though this Rule.

The IFR creates a harmful and dangerous precedent by allowing the denial of health care coverage based on religious views while paying scant attention to the harm such denials cause to third parties. The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2] By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women's health and well-being, it discriminates against women in violation of multiple federal laws and the Constitution, it ignores Congress's explicit intent that the ACA require coverage of contraception, and it relies upon a distorted picture of the science supporting contraception. For all of these reasons, HRC joins with the comments filed by the National Center for Lesbian Rights, the National Women's Law Center, and other organizations to call on the Department to rescind the IFR.

---

[1] This comment uses the term "women" because women are targeted by the IFR. Note, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and transgender men.
[2] Nat'l Women's L. Ctr., *New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs* (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

Page 1 of 11

00435019

Exhibit 52

JA-0000927



HUMAN
RIGHTS
CAMPAIGN©

### I.    Birth Control Is Critical to Women's Health

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[3] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it. Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[4] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[5] In fact, the gap between men and women who struggled to access needed care was widest among adults with moderate incomes.[6] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[7] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[8]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of preventing unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[9] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take

---

[3] U.S. Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States: 2008*, Table A-2 (2009).
[4] Kaiser Family Foundation, *Women's Health Care Chartbook* (2011).
[5] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), *available at* https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 Health Servs. Research 1331, 1342-43 (2000); *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), *available at* http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.
[6] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* (2009), *available at* http://www.commonwealthfund.org/~/media/Files/Publications/ Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_ Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.
[7] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 Contraception 44, 45-47 (2014).
[8] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives after ACA Mandate Removed Cost Sharing*, Health Affairs, 34, no.7 (2015):1204-1211, *available at* http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.
[9] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* (2016), *available at* https://www.womenspreventivehealth.org/final-report/.

Page **2** of **11**

00435020

Exhibit 52



particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[10] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[11] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[12] And, the U.S. has the highest rate of maternal mortality in the developed world.[13] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence,[14] and contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[15] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and endometrial and ovarian cancer.[16] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[17]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

---

[10] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC, *Birth spacing and risk of adverse perinatal outcomes: a meta-analysis*, JAMA 295:1809–23 (2006).

[11] Tsui AO, McDonald-Mosley R, Burke AE, *Family Planning and the Burden of Unintended Pregnancies*, Epidemiologic Reviews 32(1):152-174 (2010).

[12] Finer LB and Zolna MR, *Declines in unintended pregnancy in the United States, 2008–2011*, New England Journal of Medicine 374(9):843–852 (2016).

[13] Murray, J.L., Wang, H., Kassebaum, N., *Sharp Decline in Maternal and Child Deaths Globally, New Data Show*, Institute for Health Metrics and Evaluation, University of Washington (2016).

[14] Trussell J, *Contraceptive failure in the United States*, Contraception 83(5):397-404 (2011).

[15] Jones RK, *Beyond birth control: The overlooked benefits of oral contraceptive pills*, New York: Guttmacher Institute (2011).

[16] Schindler AE, *Non-contraceptive benefits of oral hormonal contraceptives*, Int J Endocrinol Metab. 11(1):41-7 (2013); American College of Obstetricians and Gynecologists, *Access to contraception, Committee Opinion No. 615*, Obstet Gynecol 125:250–5 (2015).

[17] Cortessis VK, Barrett M, Brown W, et al., *Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis*, Obstet Gynecol. (2017).

Page **3** of **11**

HUMAN RIGHTS CAMPAIGN | 1640 RHODE ISLAND AVE., N.W., WASHINGTON, D.C. 20036
*P* 202-628-4160 | *F* 202-423-2861 | HRC@HRC.ORG

00435021

Exhibit 52



**HUMAN
RIGHTS
CAMPAIGN**

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[18] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[19] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[20] which was followed by large increases in women's presence in law, medicine, and other professions.[21] The Department has previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[22]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. This IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy. Despite these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

**II.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service**

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and

---

[18] *See, e.g.*, Jennifer J. Frost & Laura Duberstein Lindberg, *Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics*, 87 Contraception 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children* (2013), *available at* http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[19] *See* Martha J. Bailey et al., *The Opt-in Revolution? Contraception and the Gender Gap in Wages*, Nat'l Bureau of Econ. Research Working Paper o. 17922 (2012), *available at* http://www.nber.org/ papers/wl 7922.

[20] Heinrich H. Hock, *The Pill and the College Attainment of American Women and Men*, Fla. State Univ., Working Paper (2007).

[21] Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. of Pol. Econ. 730, 749 (2002), *available at* https://dash.har vard.edu/handle/1 /2624453.

[22] *Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act*, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

Page **4** of **11**

00435022

Exhibit 52



H U M A N
R I G H T S
C A M P A I G N ©

group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[23] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[24]  In enacting the Amendment, Congress intended to address the widespread failure to cover women's preventive health services including family planning services, which often meant that women were unable to obtain this care because of cost barriers.[25] That contraception would be covered was clear.[26] The Department of Health and Human Services, through promulgation of the contraception regulations, carried out Congress' direction.

Despite Congress' clear intent, this IFR expands eligibility for the complete exemption to *all* nonprofit and for-profit employers. It also retains the accommodation, formerly available to non-profit and closely-held for-profit employers, as an optional alternative for any employer. Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations. This is a potentially dramatic change in the availability of contraceptive coverage for the employees of a vast number of entities, and a significant departure from what was guaranteed to these employees under prior rulemaking and the *Hobby Lobby* decision.

In order to justify these sweeping exceptions in the IFR, the Department now looks to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services

---

[23] *Id.* at 8,727.

[24] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *Id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[25] *Id.* at S12,027 (statement of Sen. Gillibrand)("Women must shoulder the worst of the health care crisis, including outrageous discriminatory practices in care and coverage. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access."); 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand)("even more preventive screening will be covered, including for...family planning."); 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009)(statement of Sen. Franken)("[A]ffordable family planning services must be accessible to all women in our reformed health care system."); 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[26] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

Page 5 of 11

00435023

Exhibit 52                                                                        JA-0000931



provision of the Affordable Care Act, but the Department's attempt to misconstrue these existing laws further proves that there is no authority, direct or otherwise, for the Department to create this exemption.

### III.    Religious Exceptions Disproportionately Impact Health Care for Women and LGBTQ People

HRC opposes allowing restrictions on the availability of health care services based on the religious beliefs of others, as it sets a dangerous precedent for access to health care for LGBTQ people. Moreover, limiting the availability of contraceptive coverage will itself have an adverse impact on the LGBTQ community.

There is too often insufficient consideration given to the impact of overly broad conscience laws on patients. In other words, the playing field is already tilted heavily in favor of those seeking to deny care based on their religious beliefs. And given the nature of the services to which religious exemptions are most commonly applied, these refusal laws have a disproportionate discriminatory impact on LGBTQ people and women seeking reproductive health care.

At the federal level, there are already numerous statutory protections for health care providers' religious beliefs. These laws include the Church,[27] Weldon,[28] and Coats[29] amendments, which allow providers to refuse to perform or otherwise facilitate abortion services. Most states have similar laws; forty-five allow individual healthcare providers, and forty-three allow institutions, to refuse to provide abortion services.[30] Provider conscience clauses at the state level apply not only to abortion services but also to contraceptive care. Twelve states permit some healthcare providers to refuse to provide contraception and related services (such as counseling). Refusal provisions targeting contraception delay access, increase costs, and may result in unintended pregnancies.

State conscience clauses have now expanded to end of life care, stem cell research, sterilization, and to any unspecified health services to which a moral or religious objection may be raised, including counseling or providing information regarding the patient's health status.[31] These state laws are also expanding to cover more entities. Provider conscience laws exist in states where there are significant

---

[27] 42 U.S.C. § 300a-7 et seq.
[28] Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat 786.
[29] 42 U.S.C. § 238(n).
[30] Guttmacher Institute, *Refusing to Provide Health Services* (2015), *available at* http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.
[31] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 Yale L. J. 2470, 2470 (2015).

Page 6 of 11

HUMAN RIGHTS CAMPAIGN | 1640 RHODE ISLAND AVE., N.W., WASHINGTON, D.C. 20036
*P* 202-628-4160 | *F* 202-423-2861 | HRC@HRC.ORG

00435024

Exhibit 52                                                                                                    JA-0000932



H U M A N
R I G H T S
C A M P A I G N.

numbers of communities of color, including Texas and Florida,[32] and many of these states have enacted additional, broad constitutional or statutory religious exemptions that impact LGBTQ people.[33]

While religiously-based objections to contraception and abortion are well known and have posed access barriers for years, these types of refusals can also negatively impact the LGBTQ community. LGBTQ people and people living with HIV experience pervasive discrimination in the provision of health care, much of it justified by religious beliefs. According to an in-depth survey concerning health care discrimination against LGBTQ people and people living with HIV, more than half of all respondents reported that they have experienced at least one of the following types of discrimination in care: being refused needed care; health care professionals refusing to touch them or using excessive precautions; health care professionals using harsh or abusive language; being blamed for their health care status; or health care professionals being physically rough or abusive.[34] LGBTQ people of color and people with lower socioeconomic status experience even higher levels of discriminatory and substandard care. Many members of the LGBTQ community have a "high degree of anticipation and belief that they w[ill] face discriminatory care" which ultimately causes many people to not seek the essential care that they need. For many transgender and gender-nonconforming people there is even greater likelihood of negative treatment from health care professionals. Undocumented transgender persons were found to be vulnerable to physical violence in doctors' offices, hospitals, and emergency rooms.[35] There are also geographic considerations that exacerbate discrimination against LGBTQ individuals.[36] These realities have created a major barrier to health care services for LGBTQ people.

Religious objections have presented barriers even in instances involving people trying to become pregnant, rather than avoid or terminate a pregnancy. Many religious health care providers are "opposed to infertility treatments altogether or are opposed to providing it to certain groups of people"

[32] For instance, Florida allows private, religious, and public institutions and individual providers to refuse abortion care to patients and allows individual providers and pharmacists to refuse contraception. *See* Guttmacher Institute *supra*.

[33] Movement Advancement Project, *LGBT Policy Spotlight: State and Federal Religious Exemptions and the LGBT Community* (2015), *available at* http://www.lgbtmap.org/policy-and-issue-analysis/policy-spotlight-rfra.

[34] Lambda Legal, *When Health Care Isn't Caring, Lambda Legal's Survey on Discrimination Against LGBT People and People Living with HIV* (2010), *available at* http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf (explaining that "almost 56 percent of lesbian, gay or bisexual (LGB) respondents had at least one of these experiences; 70 percent of transgender and gender-nonconforming respondents had one or more of these experiences; and nearly 63 percent of respondents living with HIV experienced one or more of these types of discrimination in health care. In almost every category, transgender and gender-nonconforming respondents reported higher levels of discrimination by health care providers.").

[35] Grant JM, et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, National LGBTQ Task Force and National Center for Transgender Equality (2011), *available at* http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

[36] Nat'l Women's Law Ctr., *Fact Sheet: Health Care Refusals Harm Patients: The Threat to Reproductive Health Care* (2014), *available at* http://www.nwlc.org/sites/default/files/pdfs/refusals_harm_patients_repro_factsheet_5-30-14.pdf.

Page 7 of 11

00435025

Exhibit 52                                                                JA-0000933



HUMAN
RIGHTS
CAMPAIGN®

such as members of the LGBTQ community.[37] Health care providers have even "sought exemptions from state antidiscrimination laws to avoid providing reproductive services to lesbian parents."[38]

The problems for patients presented by the expansion of refusal provisions in state law have been compounded by the growth in health care systems owned and operated by religious orders. Mergers between Catholic and nonsectarian hospitals have continued as hospital consolidation has intensified. Catholic hospitals and health systems must follow the Ethical and Religious Directives for Catholic Health Care Services ("Directives"), which prohibit a wide range of reproductive health services, such as contraception, sterilization, abortion care, and other needed health care.[39] Nonsectarian hospitals must often agree to comply with these Directives in order to merge with Catholic hospitals.[40]

Health insurance benefits earned by employees and guaranteed under federal law should not be subject to a religious veto by employers. The regulatory regime that existed prior to this IFR was the result of several years of considered policymaking and constituted a balance between religious beliefs and health care access. This IFR would upend that careful balance and subjugate employee health care needs to the religious objections of any employer. Not only is this poor public health policy, it is contrary to the intent of Congress and numerous provisions of law.

### IV.     The Religious Exemptions IFR Will Increase Health Disparities Faced by LGBTQ People

This IFR harms LGBTQ people by restricting access to contraception for those who need it, including lesbian and bisexual women and some transgender people.[41] Access to birth control is particularly crucial for the health and well-being of lesbian, bisexual women and transgender men because they are at risk for unintended pregnancies.[42]

Despite misconceptions held by policymakers and some medical providers, lesbian and bisexual women and some transgender men require sexual and reproductive health services similar to those needed by heterosexual women. A majority of lesbian and bisexual women have reported having had intercourse

---

[37] U.S. Conf. of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Services,* 5th ed. (2009), *available at* http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf (Directive 41 of the Ethical and Religious Directives for Catholic Health Care states: "Homologous artificial fertilization is prohibited when it separates procreation from the marital act in its unitive significance.").
[38] Douglas Nejaime, et al., *Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics*, 124 Yale L.J. 2516, 2518 (2015). *See, e.g., N. Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Superior Court*, 189 P.3d 959 (Ca. 2008) (on the potential impact of healthcare refusal laws on same-sex couples).
[39] *See* U.S. Conf. of Catholic Bishops *supra*.
[40] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 Yale L. J. 2470, 2488-89 (2015).
[41] The National LGBTQ Task Force, *Birth Control Access for LGBTQ People* (2016), *available at* http://www.thetaskforce.org/static_html/downloads/reports/fact_sheets/factsheet_birth_control_access.pdf.
[42] Caroline S. Hartnett, Lisa L. Lindley, and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, Women's Health Issues Journal (2016).

Page **8** of **11**

00435026

Exhibit 52                                                                                              JA-0000934



HUMAN
RIGHTS
CAMPAIGN

with men and at least 30% have been pregnant,[43] 50% have used oral contraceptives, and 16% reported one or more abortions.[44] Bisexual women are also subject to an increased risk of sexual violence. One study found that 46% of bisexual women have been raped as compared to 17% of heterosexual women.[45] Broadly, studies indicate that unintended pregnancies are equally as common, if not more common, for lesbian and bisexual women as for heterosexual women.[46]

Adolescent lesbian and bisexual women are at even higher risk for unintended pregnancies. Lesbian adolescent women are less likely than bisexual and heterosexual women to use contraception and bisexual adolescent women are more likely to experience teen pregnancy than are heterosexual adolescent women.[47] One study found that 12% of lesbian and bisexual adolescent women have experienced teen pregnancy, compared to only 5% of heterosexual adolescent women. And a 2016 study by the Centers for Disease Control and Prevention found that LGBTQ high school students are more likely than other students to experience intimate partner violence and rape, which can result in unintended pregnancy.[48]

Access to contraception is essential for the health and well-being of many members of the LGBTQ community, and allowing a wide range of employers to withhold coverage of contraception for religious reasons is unsound public health policy with the potential to cause significant harm.

### V.    The Religious Exemptions IFR is Discriminatory and Conflicts with the ACA

Section 1557 of the ACA prohibits discrimination on the basis of sex.[49] The implementing regulations for this section issued by the Department state that this includes "pregnancy, false pregnancy, termination

---

[43] J.M. Marrazzo and K. Stine, *Reproductive Health History of Lesbians: Implications for Care*, Am. J. of Obstetrics and Gynecology (2003).

[44] Elizabeth M. Saewyc, Linda M. Bearinger, Robert Wm. Blum and Michael D. Resnick, *Sexual Intercourse, Abuse and Pregnancy Among Adolescent Women: Does Sexual Orientation Make a Difference?*, 31 Family Planning Perspectives 127 (1999).

[45] Adara Beamesderfer, Lindsey Dawson, Jennifer Kates, Usha Ranji, and Alina Salganicoff, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, The Henry J. Kaiser Family Foundation (Nov. 2016), *available at* https://www.kff.org/disparities-policy/issue-brief/health-and-access-to-care-and-coverage-for-lesbian-gay-bisexual-and-transgender-individuals-in-the-u-s.

[46] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, Women's Health Issues Journal (2016).

[47] Brittany M. Charlton, Heather L. Corliss, Stacey A. Missmer, Margaret Rosario, Donna Spiegelman, and Bryn Austin, *Sexual orientation differences in teen pregnancy and hormonal contraceptive use: An examination across 2 generations*, Am. J. of Obstetrics and Gynecology (2013), *available at* http://www.ajog.org/article/S0002-9378(13)00652-2/pdf.

[48] *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 — United States and Selected Sites, 2015*, Centers for Disease Control and Prevention (Aug. 12, 2016), *available at* https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf; *see also* Lisa L. Lindley and Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High School Students*, 105 Am. J. of Pub. Health 1379 (2015).

[49] 42 U.S.C. § 18116. Numerous courts, as well as the Department, have interpreted such protections to include gender expression and gender identity. *See, e.g., Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004); *Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015).

HUMAN RIGHTS CAMPAIGN | 1640 RHODE ISLAND AVE., N.W., WASHINGTON, D.C. 20036
*P* 202-628-4160 | *F* 202-423-2861 | HRC@HRC.ORG

00435027

Exhibit 52

JA-0000935



**HUMAN
RIGHTS
CAMPAIGN**

of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."[50] The regulations further state that people cannot "be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which [the rule] applies."[51] However, by allowing the denial of a health care service used almost exclusively by women, the IFR conflicts with Section 1557 of the ACA because it discriminates on the basis of sex. The Department must not undermine its critical role in addressing discrimination through application and enforcement of Section 1557 by condoning prohibited discrimination merely because it is predicated on religious conviction.

**VI.    The Religious Exemptions IFR is Unconstitutional**

The Religious Exemption IFR impermissibly allows employers to impose their own religious viewpoint on employees, regardless of those employees' personal beliefs, and even when doing so causes employees serious harm. Courts have held that the Establishment Clause of the First Amendment prevents the government from shifting the cost of religious accommodation to third parties.[52] While the administration has asserted that the Religious Freedom Restoration Act[53] allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, the government can only constitutionally achieve such an outcome by replacing the current benefit with a program that provides contraception at no additional cost to employees.[54] Instead, the Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's religious beliefs.

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is nothing in First Amendment jurisprudence to distinguish between these federal statutory entitlements and the contraceptive coverage benefit in the ACA. The Religious Exemption IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find religiously objectionable. Such a result would impermissibly shift the cost of

---

[50] 45 CFR § 92.4.

[51] 45 CFR § 92.101.

[52] *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) (rejecting a facial challenge to RLUIPA, a federal statute that permits accommodation of certain religious practices in prison, stating "[s]hould inmate requests for religious accommodations become excessive, *impose unjustified burdens on other institutionalized persons*, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.") (emphasis added); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (stating, "The First Amendment . . . gives no one the right to insist that in pursuit of their own interest others must conform their conduct to his own religious necessities."); *but see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (distinguishing the obligations imposed on churches from those imposed on other types of organizations).

[53] 42 U.S.C. § 2000bb.

[54] *See Zubik v. Burwell*, 136 S. Ct. 1557 (2016); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).

Page **10** of **11**

HUMAN RIGHTS CAMPAIGN | 1640 RHODE ISLAND AVE., N.W., WASHINGTON, D.C. 20036
*P* 202-628-4160 | *F* 202-423-2861 | HRC@HRC.ORG

00435028

Exhibit 52



religious accommodation onto third parties, subjecting employees to serious harms without recourse or due process in violation of the Fifth Amendment.

This Rule also violates the Equal Protection Clause of the Fourteenth Amendment because it constitutes impermissible sex discrimination. The ACA's women's preventive services benefit, which includes the contraceptive coverage provision, was implemented in part to address the fact that women tended to pay more for insurance coverage than did men.[55] The IFR discriminates against women by allowing employers to opt out of providing health care benefits that primarily affect women. Moreover, the Rule impermissibly denies benefits to some women simply because of religious claims made by their employers.

### VII.     Conclusion

The Religious Exemptions IFR will cause many women to lose contraceptive coverage, harming their health and well-being, based on others' religious objections. Without regard to the impact on employees, this IFR will strip coverage for essential health care services that would otherwise be guaranteed under federal law. The Rule unconstitutionally and in contravention of the ACA, privileges particular religious beliefs at the expense of employee health, harming women and setting a negative precedent for LGBTQ health access. For these reasons, HRC strongly urges the Department to rescind the Religious Exemptions IFR.

Sincerely,

*Sarah Warbelow*

Sarah Warbelow
Legal Director
Human Rights Campaign

---

[55] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).

HUMAN RIGHTS CAMPAIGN | 1640 RHODE ISLAND AVE., N.W., WASHINGTON, D.C. 20036
*P* 202-628-4160 | *F* 202-423-2861 | HRC@HRC.ORG

00435029

Exhibit 52                                                                        JA-0000937

350 Fifth Avenue, 34ᵗʰ Floor
New York, NY 10118-3299
Tel: 212-290-4700
Fax: 212-736-1300; 917-591-3452

WOMEN'S RIGHTS
DIVISION
Liesl Gerntholtz, Executive Director
Janet Walsh, Deputy Director
Nisha Varia, Advocacy Director
Aruna Kashyap, Senior Counsel
Agnes Odhiambo, Senior Researcher
Heather Barr, Senior Researcher
Amanda Klasing, Senior Researcher
Rothna Begum, Researcher
Hillary Margolis, Researcher
Skye Wheeler, Researcher
Juliana Nnoko-Mewanu, Researcher
Adelaida Tamayo, Associate
Agnieszka Bielecka, Associate

ADVISORY COMMITTEE
Betsy Karel, Chair
Joan Platt, Vice-Chair
Karen Ackman
Mahnaz Afkhami
Helen Bernstein
David Brown
Charlotte Bunch
Ellen Chesler
Nagin Cox

Yasmine Ergas

Lawton Fitt
Judy Gaynor
Kate Gellert
Adrienne Germain
Marina Pinto Kaufman
Hollis Kurman
Lenora Lapidus
Stephen Lewis
Samuel Murumba
Sylvia Neil
Susan Osnos
Lynn Povich
Bruce Rabb
Amy Rao
Susan Rose
Pascaline Servan-Schreiber
Lorraine Sheinberg
Donna Slaight
Donna Stanton
Ellen Stone Belic
Ellen Susman
Hilary Thomas Lake
Rita W. Warner
Sarah Zeid
Kathleen Peratis, Chair Emerita (1991– 2005)

Human Rights Watch
Kenneth Roth, Executive Director
Michele Alexander, Deputy Executive
Director, Development and Global Initiatives
Iain Levine, Deputy Executive Director,
Program
Nicholas Dawes, Deputy Executive Director,
Media
Chuck Lustig, Deputy Executive Director,
Operations
Bruno Stagno Ugarte, Advocacy

Dinah PoKempner, General Counsel
James Ross, Legal & Policy Director
Hassan Elmasry, Co-Chair
Robert Kissane, Co-Chair



December 5, 2017

Acting Secretary Eric Hargan

Department of Health and Human Services

Hubert H. Humphrey Building

200 Independence Avenue SW., Room 445–G,

Washington, DC 20201

RE: CMS-9940-IFC

Dear Acting Secretary Hargan,

Human Rights Watch unequivocally opposes the Interim Final Rule (IFR) on Religious Exemptions and Accommodations for the Coverage of Preventative Services under the ACA (CSM-9940-IFC). The IFR undermines the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement, which was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

This IFR allows any employer or university to deny its employees or students contraceptive coverage based on the employer's religious objections. By allowing nearly any employer and university to use their religious beliefs to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of international human rights standards, including the rights to non-discrimination, health and the right to decide on the number and spacing of children. Human Rights Watch calls on the Departments to rescind the IFR.

## I.  Birth Control Is Critical to Women's Health and to Realization of other Human Rights

One of the unique healthcare challenges that women in the United States face is that they use more health services than men yet earn less on average than men.[3] As a result, women are particularly likely to face financial barriers to accessing care, which may lead women to forgo necessary care because of requirements that patients pay some portion of the cost of services, i.e. cost-sharing. Before the ACA, one study found that women ages 13 to 45 were spending between 30% and 44% of their total

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] National Women's Law Center, "New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs" (Sept. 2017), https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

[3] US Census Bureau, "Income, Poverty, and Health Insurance Coverage in the United States: 2008," Table A-2 (2009).

AMSTERDAM  ·  BEIRUT  ·  BERLIN  ·  BRUSSELS  ·  CHICAGO  ·  GENEVA  ·  JOHANNESBURG  ·  LONDON  ·  LOS ANGELES  ·  MOSCOW  ·  NAIROBI
·  NEW YORK  ·  PARIS  ·

00396715

Exhibit 53

out-of-pocket health costs just on birth control.[4] Another study found that out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[5] Eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[6] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[7]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women control the time and spacing of their pregnancies, or prevent pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[8] Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[9] Unintended pregnancy also increases the risk of physical and mental health problems for the child and has a negative impact on health behaviors such as breast-feeding.[10] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[11]

Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[12] The US has the highest rate of maternal mortality in the developed world.[13]  Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[14] Additionally, contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

In the United States, insurance coverage of contraception is critical to removing financial barriers to accessing it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability for poor and low-income women and/or discrimination based on race or ethnicity for minority women.[15]

---

[4] Nora Becker and Daniel Polsky, "Women Saw Large Decrease In Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed," *Women's Health*, 34(7) (2015) p. 1204-1211.

[5] Su-Ying Liang et al., "Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006," 83 *Contraception* 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., "Clinical Preventive Services for Women: Closing the Gaps," 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., "The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services," 34 *Health Servs. Research* 1331 (2000) p. 1342-43; *see also* David Machledt & Jane Perkins, "Medicaid Premiums & Cost-Sharing" 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[6] Adam Sonfield et al., "Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update," 91 *Contraception* (2014) p. 44, 45-47.

[7] Nora Becker and Daniel Polsky, "Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing," *Health Affairs*, 34, no.7 (2015) p. 1204-1211, http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[8] Women's Preventive Services Initiative, "Recommendations for Preventive Services for Women," 83 (2016), https://www.womenspreventivehealth.org/final-report/.

[9] Conde-Agudelo A, Rosas-Bermudez A and Kafury-Goeta AC, "Birth spacing and risk of adverse perinatal outcomes: a meta-analysis," JAMA 295 (2006) p. 1809–23.

[10] Lawrence Finer and Mia Zolna, "Declines in unintended pregnancy in the United States, 2008–2011," *New England Journal of Medicine*, 374(9) (2016), p. 843–852,

[11] Amy Tsui, Raegan McDonald-Mosley and Anne Burke, "Family Planning and the Burden of Unintended Pregnancies," *Epidemiologic Reviews*, 32(1) (2010) p. 152-174, doi:10.1093/epirev/mxq012.

[12] Lawrence Finer and Mia Zolna, "Declines in unintended pregnancy in the United States, 2008–2011," *New England Journal of Medicine*, 374(9) (2016) p. 843–852.

[13] Christopher Murray, Haidong Wang and Nicholas Kassebaum, "Sharp Decline in Maternal and Child Deaths Globally, New Data Show," *Institute for Health Metrics and Evaluation*, University of Washington (2016).

[14] James Trussell, "Contraceptive failure in the United States," *Contraception* 83(5) (2011) p. 397-404.

[15] Guttmacher Institute, "Fact Sheet: Unintended Pregnancy in the United States" (2016), https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states.

00396716

Exhibit 53                                                                                                JA-0000939

Birth control is vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women equal opportunity as men to pursue professional and educational opportunities. Studies show that access to contraception has increased women's wages and lifetime earnings.[16] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid l940s to early 1950s.[17] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[18] which was followed by women's more equitable presence in law, medicine, and other professions.[19] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[20]

## II. The IFR Undermines Women's Human Rights

Realization of the right to health requires that health facilities, goods, and services be available, accessible, and of good quality, and provided without discrimination.[21] This IFR will deprive employees and students of coverage for contraception and, in doing so, undermines women's fundamental human rights to equality, health and the right to decide on the number and spacing of their children. While proponents of sweeping exemptions use the rhetoric of religious liberty, the proposed IFR goes far beyond what the freedom of religion protects by effectively permitting employers block their employees' access to contraceptive coverage.

### a. Right to Health and Access to Reproductive Health Care

The International Covenant on Economic, Social and Cultural Rights (ICESCR) specifies that everyone has the right "to the enjoyment of the highest attainable standard of physical and mental health," and obligates governments to implement the right without discrimination on the basis of sex, age, or other prohibited grounds.[22] The US has not ratified the ICESCR but, as a signatory, has an obligation not to undermine the object and purpose of the treaty.[23] The right to health is also inextricably linked to provisions on the right to life and the right to non-discrimination that are included in the International Covenant on Civil and Political Rights (ICCPR), which the US has ratified.[24]

---

[16] See, e.g., Jennifer J. Frost and Laura Duberstein Lindberg, "Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics," 87 *Contraception* 465 (2013) p. 467; Adam Sonfield, et al., "The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children," *Guttmacher Institute* (2013), http://www.guttmacher.org/pubs/social-economic-benefits.pdf.
[17] See Martha J. Bailey et al., "The Opt-in Revolution? Contraception and the Gender Gap in Wages," *American Economic Journal: Applied Economics* 4(3)(2012) p. 225-254; Claudia Goldin and Lawrence F. Katz, "The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions," 110 *J. Pol. Econ.* (2002) p. 730, 749.
[18] Heinrich H. Hock, "The Pill and the College Attainment of American Women and Men" *Florida State University Working Paper* (2005), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.594.6229&rep=rep1&type=pdf.
[19] Claudia Goldin and Lawrence F. Katz, "The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions," 110 *Journal of Political Economy* (2002) p. 730, 749, https://dash.har vard.edu/handle/1 /2624453.
[20] "Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act," 77 Fed. Reg. 8725 (2012), https://www.gpo.gov/fdsys/granule/FR-2012-02-15/2012-3547/content-detail.html.
[21] See, e.g., Report of the Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health, February 2004, E/CN.4/2004/49, para. 41.
[22] International Covenant on Economic, Social and Cultural Rights (ICESCR), adopted December 16, 1966, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 49, U.N. Doc. A/6316 (1966), 993 U.N.T.S. 3, entered into force January 3, 1976, art. 12(1). While the Covenant recognizes that developing countries are under a duty of "progressive realization" of the right, this is not true for developed countries, such as the United States, which are responsible for ensuring the Covenant rights in full.
[23] Vienna Convention on the Law of Treaties, adopted May 29, 1969, UN Doc. A/Conf.39/27, 1155 UNTS 331, entered into force January 27, 1980, art. 18(1).
[24] International Covenant on Civil and Political Rights (ICCPR), adopted December 16, 1966, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force March 23, 1976, ratified by the United States on June 8, 1992, art. 10.

00396717

Exhibit 53

JA-0000940

The Committee on Economic, Social and Cultural Rights, the body charged with interpreting and monitoring the implementation of the ICESCR, has identified four essential components to the right to health: availability, accessibility, acceptability and quality.[25] Even though the US is not a party to the ICESCR, the Committee's interpretation represents a useful and authoritative guide to the steps governments should take to realize and protect the right to health and other human rights. The IFR will reduce the economic accessibility of contraception for those women whose employers make use of the exception. The ESCR Committee in its General Comment 14 has stated that "[t]he realization of women's right to health requires the removal of all barriers interfering with access to health services, education and information, including in the area of sexual and reproductive health."[26] The IFR will limit access to contraception for some women, infringing on what the Committee has identified as a freedom encompassed in the right to health: "the right to control one's health and body, including sexual and reproductive freedom."[27]

Sexual and reproductive health and rights are addressed specifically in a number of international treaties and other authoritative sources.[28] Article 12 of the Convention on the Elimination of Discrimination Against Women (CEDAW) provides that "[s]tates parties shall take all appropriate measures to eliminate discrimination against women in the field of health care in order to ensure, on a basis of equality of men and women, access to health care services, including those related to family planning."[29] The United States has signed, but not ratified, CEDAW, a position that requires the government to refrain from taking actions that would undermine the object and purpose of the treaty. The CEDAW Committee in its General Recommendation 24 affirmed states parties' obligation to respect women's access to reproductive health services and to "refrain from obstructing action taken by women in pursuit of their health goals."[30] As with the ICESCR, even though the US is not a party to CEDAW, the Committee's interpretation represents a useful and authoritative guide to the steps governments should take to realize and protect the range of human rights addressed under the Convention.

Section I describes why access to effective methods of birth control is essential to women's sexual and reproductive health and rights. By effectively reversing the ACA's contraceptive mandate with regard to some employers, the will IFR harm women's health and lead to cost barriers that could prevent impacted women from controlling their reproductive health.

### i. Right to Information

The right to information is set forth in numerous human rights treaties.[31] CEDAW asserts that states should provide women "[t]he same rights to decide freely and responsibly on the number and spacing of their children and to have access to the information,

---

[25] Committee on Economic, Social and Cultural Rights (CESCR), "Substantive Issues Arising in the Implementation of the International Covenant on Economic, Social and Cultural Rights," General Comment No. 14, The Right to the Highest Attainable Standard of Health, E/C.12/2000/4 (2000), http://www.unhchr.ch/tbs/doc.nsf/(Symbol)/40d009901358b0e2c1256915005090be?Opendocument (accessed October 10, 2008), para. 12.
[26] Committee on Economic, Social and Cultural Rights, "General Comment No. 14, The Right to the Highest Attainable Standard of Health," U.N. Doc. E/C.12/2000/4 (2000), para. 21.
[27] Ibid., para. 8.
[28] In the 1994 Cairo Programme of Action on Population and Development, delegates from governments around the world pledged to eliminate all practices that discriminate against women and to assist women to "establish and realize their rights, including those that relate to reproductive and sexual health." In the 1995 Beijing Declaration and Platform for Action, delegates from governments around the world recognized that women's human rights include their right to have control over and decide freely and responsibly on matters related to their sexuality free of coercion, discrimination and violence. See United Nations, Programme of Action of the United Nations International Conference on Population and Development (New York: United Nations Publications, 1994), A/CONF.171/13, 18 October 1994, para. 4.4(c) and United nations, Beijing Declaration and Platform for Action (New York: United Nations Publications, 1995), A/CONF.177/20, 17 October 1995, para. 223.
[29] CEDAW, art. 12
[30] CEDAW Committee, "General Recommendation 24, Women and Health (Article 12)," U.N. Doc. No. A/54/38/Rev.1 (1999), para. 14.
[31] ICCPR, art. 19(2); American Convention on Human Rights, art. 13(1). See also Inter-American Court, Claude-Reyes and others Case, Judgment of September 19, 2006 Inter-Am Ct.H.R., Series C. No. 151, para. 264.

00396718

Exhibit 53

education and means to enable them to exercise these rights."[32] The ICESCR obliges state parties to provide complete and accurate information necessary for the protection and promotion of rights, including the right to health.[33] Furthermore, the CESCR Committee in its General Comment 14 has stated that the right to health includes the right to health-related education and information, including on sexual and reproductive health.[34] The CEDAW Committee has also noted that, under article 10(h) of CEDAW, women must have access to information about contraceptive measures, sex education and family-planning services in order to make informed decisions.[35]

The IFR allows entities to refuse to cover contraceptive counseling between woman and her health care provider about her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

## III. The Right to Non-Discrimination

Non-discrimination is a central principle of international human rights law.[36] As a party to the ICCPR, the US is obligated to guarantee effective protection against discrimination.[37] CEDAW mandates that state parties take action to "eliminate discrimination against women in the field of health care in order to ensure, on a basis of equality of men and women, access to healthcare services, including those related to family planning."[38] Prohibited discrimination can be either direct or, as in this case, indirect –where laws and policies that may appear to be neutral at face value have a disproportionate impact on the exercise of rights as distinguished by prohibited grounds of discrimination.[39]

By creating broad exemptions to the ACA's contraceptive mandate, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality. It also makes no effort ensure that the women effected will continue to have access to quality birth control at no-cost. As Section I notes, the contraceptive mandate has ensured women equal access to crucial preventive services. The IFR will impact women almost exclusively, in a way that seriously undermines their right to health.

### IV. Conclusion

This IFR will cause people to lose contraceptive coverage, making contraceptive care financially out of reach for many women and as a result will harm their health and well-being. It is discriminatory in that it impacts only women and undermines the United States' international legal commitments. For all of these reasons Human Rights Watch calls on the Departments to rescind the IFR.

---

[32] CEDAW, art. 16(e).

[33] See ICESCR, article 2(2). See also Committee on Economic, Social and Cultural Rights, "General Comment No. 14, The Right to the Highest Attainable Standard of Health," U.N. Doc. E/C.12/2000/4 (2000), paras. 12(b), 18 and 19.

[34] Committee on Economic, Social and Cultural Rights, "General Comment No. 14, The Right to the Highest Attainable Standard of Health," U.N. Doc. E/C.12/2000/4 (2000), para. 11.

[35] CEDAW Committee, "General Recommendation no. 21, on equality in marriage and family relations," HRI/GEN/1/Rev.9 (Vol.II), para. 22.

[36] International protections for the right to non-discrimination include: ICCPR , arts. 2, 4, 26; ICESCR art.2(2); CEDAW, art. 2; International Convention on the Elimination of All Forms of Racial Discrimination (ICERD), adopted December 21, 1965, G.A. Res. 2106 (XX), annex, 20 U.N. GAOR Supp. (No. 14) at 47, U.N. Doc. A/6014 (1966), 660 U.N.T.S. 195, entered into force January 4, 1969, ratified by the United States on October 21, 1994, art. 5; International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families (Migrant Workers Convention), adopted December 18, 1990, G.A. Res. 45/158, annex, 45 U.N. GAOR Supp. (No. 49A) at 262, U.N. Doc. A/45/49 (1990), entered into force July 1, 2003., art. 1(1), art. 7.

[37] ICCPR, art. 26.

[38] CEDAW, art. 12.

[39] Committee on Economic, Social and Cultural Rights, "General Comment No. 20, Non_discrimination in economic, social and cultural rights." U.N. Doc. E/C.12/GC/20 (2009), para. 10.

00396719

Exhibit 53                                                                                                      JA-0000942

Sincerely,

Amanda M. Klasing

Amanda Klasing

Senior Researcher, Women's Rights
Human Rights Watch

00396720

Exhibit 53

JA-0000943



December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016
Attention: CMS-9940-IFC

*Submitted electronically at www.regulations.gov*

### Subject: Interim Final Rule on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act CMS-9940-IFC

Ibis Reproductive Health submits the following comments in response to the Interim Final Rules ("the Rules") titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act"[1] and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act,"[2] published in the Federal Register on October 13, 2017, by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services ("the Departments").

Ibis Reproductive Health strives toward building the research base and working with advocates to ensure policies reflect the best evidence is one important facet of our work. We need to ensure that U.S. policy decision-making is fully informed by scientific evidence and the best available data, and that the public has reliable access to independent scientific information and analysis produced and acquired by the federal government. The role of scientific evidence in public health decision-making is imperative, and we oppose any efforts to diminish the role of science in federal policymaking.

Unfortunately, the Rules are a prime example of regulatory decision-making that ignores scientific evidence and the best available data. The Departments' summary of the evidence is arbitrary and cherry-picked. The Departments understate the efficacy and health benefits of contraceptives and overstate the health risks of contraceptives by selectively interpreting data, overlooking well-established evidence, and promoting unfounded doubt. Further, both Rules falsely assert certain types of FDA-approved contraceptive methods to abortifacients.

The Rules thus cause dual harm by undermining women's access to essential preventive health care and undermining the integrity of science in governance. Public health policy should be informed by the best available scientific evidence. Instead, the Departments use false claims about contraception

1

Exhibit 54

00372941

JA-0000944

that are contrary to medical and public health evidence, misstate or ignore research, and undermine the agencies' role as a source of accurate health information.

The Departments serve a critical role in collecting and managing important information and data on issues that are vital to the public. In making policy, it is essential that the Departments enhance their credibility on issues of science and evidence, not undermine it. Thus, the Departments must take full advantage of their resources to inform their decision-making by the best available evidence and data. The Rules, however, show that the Departments did not seriously consider these elements, which can only undermine the Departments' reputations as reliable sources of information.

Below we outline several ways the Rules are at odds with science and research. We urge the Departments to withdraw both Rules.

### Contraception Prevents Unintended Pregnancy and Improves the Health of Women and Children

As an example of how the Departments are not utilizing the best available science and evidence with dire consequences for public health, the Departments make several misstatements that ignore prevailing evidence regarding the efficacy, health benefits, and health risks of contraceptives. First, the Departments fail to acknowledge that contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[3] Second, the Departments falsely associate several health risks with contraceptive use, ignoring the weight of the evidence.[4] The Departments' summary of the evidence is wrong and misleading. Not only does contraception prevent unintended pregnancy,[5] but the prevention of unintended pregnancy is associated with life-long health benefits for both women and children that the Departments fully ignore. Further, the Departments' overstatement of health risks ignores the long, evidence-based list of non-contraceptive health benefits associated with contraceptives.

Contraceptive efficacy at preventing unintended pregnancy is supported by decades of rigorous evidence and by the government itself.[6] The U.S. Food and Drug Administration ("FDA") must approve all new drugs and devices by showing that they are safe and effective through rigorous scientific testing. The federal government itself has thus approved contraceptives for safely and effectively preventing unintended pregnancies.[7] The Departments' misrepresentation of "complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy"[8] is false and relies heavily on cherry-picked citations instead of accurately reflecting the weight of the evidence. For instance, the Departments point to a single pre-ACA economics paper positing that contraceptive use may be connected to an increase in teen pregnancy over the "long run."[9] This paper utilized 1997 youth survey data where the majority of respondents were using condoms or another "episodic" form of birth control,[10] the efficacy of which is irrelevant to an assessment of the efficacy of the methods of birth control covered under the ACA's contraceptive benefit, and hardly contributes to "uncertainty"[11] regarding decades of clinical data that prove otherwise.

In truth, contraception enables women, including teens, to prevent unintended pregnancy and control the timing of a desired pregnancy.[12] The Centers for Disease Control and Prevention named family planning one of the ten great public health achievements of the past century,[13] and family planning is widely credited for contributing to women's societal, educational, and economic gains.[14] The ACA's guarantee of no-copay coverage of contraception has contributed to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[15] The teen pregnancy rate is also at the lowest point in at least 80 years.[16]

2

00372942

Exhibit 54

Contraception improves health outcomes for women and children because unintended pregnancies have higher rates of short- and long-term health complications. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed.[17] They are also at increased risk of maternal mortality and morbidity, maternal depression, experiencing physical violence during pregnancy,[18] infant mortality, birth defects, low birth weight, and preterm birth.[19] Unintended pregnancies are also associated with long-term negative physical and mental effects on children.[20] Contraception, by contrast, is considered a major factor in reducing rates of maternal mortality and morbidity. For example, a study of 172 developing countries found that use of contraception is an "effective primary prevention strategy to reduce maternal mortality . . . ."[21] The Departments' new Rules paper over this vast body of research and the clear health benefits of contraception.

### The Health Risks of Contraceptives Are Overstated and Misrepresented

The Departments go further, selectively interpreting data in order to overstate "negative health effects" associated with contraceptives.[22] This includes misleading assertions of an association between contraceptive use, breast cancer, and cervical cancer, as well as vascular events and "risky sexual behavior."[23] The Departments ignore substantial evidence to the contrary, and ignore the balance of significant non-contraceptive health benefits associated with contraceptive use. Certainly it is true that, as with any medication, some types or methods of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[24] Some women may also want to avoid side effects  such as changes to menstrual flow.[25] But the Departments fail to recognize that this means that patients and health care providers, not employers and agencies, should determine the right contraceptive for an individual woman's health care needs.

The Departments' claim that contraceptive use is associated with an increased risk of breast and cervical cancers is based solely on a 2013 Agency for Healthcare Research and Quality report, when in fact the evidence is not decisive, and to say so is a misrepresentation. There is no proven increased risk of breast cancer among contraceptive users, particularly those under 40. For women over 40, health care providers must consider both the risks of becoming pregnant at an advanced reproductive age, as well as the risks of continuing contraception use until menopause, making it essential that a woman be able to discuss options with her provider without interference.[26] And, on the topic of cervical cancer, the Departments cite only a study on oral contraceptives, when a recent study found that intrauterine devices ("IUDs") are associated with a decreased risk of cervical cancer.[27]

It is especially irresponsible to misrepresent the risks of breast and cervical cancer without accurately reporting the substantial evidence of contraceptives' association with cancer prevention, since any evaluation of preventive health care should fully weigh the risks and benefits.[28] Contraceptives are associated with a reduced risk of colorectal cancer;[29] endometrial cancer is 50 percent less likely among women who use oral hormonal contraceptives for at least one year compared to women who have never used oral hormonal contraceptives;[30] oral hormonal contraceptives can reduce the risk of ovarian cancer by 27 percent, and 20 percent for every five years of additional use;[31] oral hormonal contraceptives can lower the risk of hereditary ovarian cancer in women with the BRCA1 or BRCA2 gene mutations;[32] and oral hormonal contraceptive use for more than 10 years can lower the risk of ovarian cancer among women with endometriosis, who are typically at higher risk of developing ovarian cancer.[33]

3

00372943

Exhibit 54

JA-0000946

The Rules also incorrectly suggest that contraceptive use is connected to an increased risk of "vascular events" such as venous thromboembolism ("VTE"). The risk of VTE among oral contraceptive users is very low.[34] In fact, it is much lower than the risk of VTE during pregnancy or in the immediate postpartum period, so prevention of unintended pregnancy actually reduces women's risk of VTE.[35]

The Departments' claim that contraceptives may lead to "risky sexual behavior"[36] is similarly unfounded. Increased access to contraception is not associated with a change or increase in sexual behaviors.[37] Instead, research has shown that school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[38] In the "CHOICE Project," a large-scale U.S. study aimed at reducing unintended pregnancy by providing no-cost contraception, participants reported no change in their sexual activities after receiving contraceptives.[39]

Contraceptives are also associated with other non-contraceptive health benefits beyond the cancer prevention benefits listed above. Benefits include reduced menstrual pain, reduced risk of myoma, reduced symptoms of endometriosis, and reduced symptoms of premenstrual syndrome and premenstrual dysphoric disorder.[40] Oral hormonal contraceptives have been found to reduce the risk of pelvic inflammatory disease by 50 to 60 percent,[41] Contraceptives are also associated with lower risk of rheumatoid arthritis, preservation of bone density, and reduced symptoms of asthma.[42]

In sum, the Departments overstate the evidence of health risks and understate the evidence of contraceptive efficacy and health benefits, failing to accurately reflect the weight of evidence that shows that contraceptives are associated with a variety of short- and long-term health benefits, improving health outcomes for both women and children. And the various contraindications associated with some forms of birth control actually support the opposite finding: women should have access to the full range of FDA-approved methods and must be able to work with health care providers to choose the method that best suits their health concerns and needs without interference from an employer.

### Contraceptives Do Not Interfere with an Existing Pregnancy

Both Rules refer to the false assertion that some FDA-approved methods of contraception "prevent implantation of an embryo," and are thus abortifacients.[43] This is inaccurate and goes against longstanding medical evidence.

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of FDA-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion."[44] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[45]

By making the false claim that some FDA-approved methods of contraception may cause abortion, the Departments sideline science in favor of ideology.

### The Rules Should Be Withdrawn Because They Are Based on Falsehoods, Undermine Scientific Integrity, and Harm Women's Health

4

00372944

Exhibit 54

For the reasons stated above, Ibis Reproductive Health objects to the Interim Final Rules titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act." The Rules should be withdrawn due to their lack of scientific basis and their harmful impact on women's health and economic security.

---

[1] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[2] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[3] *See generally* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/. *See also* Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception*, *83*(5), 397–404; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852.

[4] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804–05 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[5] *See, e.g.,* Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852 ("A likely explanation for the decline in the rate of unintended pregnancy is a change in the frequency and type of contraceptive use over time.").

[6] *See, e.g.,* Institute of Medicine. (2011). *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: The National Academies Press; American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/; Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception*, *83*(5), 397–404; Hatcher, R.A., Trussell, J., Nelson, A.L., Cates, W., Kowal, D., & Policar, M.S. (Eds.). (2011). *Contraceptive Technology* (20th ed.). Atlanta, GA: Bridging the Gap Communications; Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 4–5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.") (citing Sundaram, A., Vaughan, B., Bankole, A., Finer, L., Singh, S., & Trussell, J. (2017, March). Contraceptive failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health*, *49*(1), 7–16); Peipert, J.F., Madden, T., Allsworth, J.E., & Secura, G.M. (2012, December). Preventing unintended pregnancies by providing no-cost contraception. *Obstetrics & Gynecology, 120*(6), 1291–1297; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852; Harper, C.C., Rocca, C.H., Thompson, K.M., Morfesis, J., Goodman, S., Darney, P.B., . . . Speidel, J.J. (2015, June). Reductions in pregnancy rates in the USA with long-acting reversible contraception: A cluster randomised trial. *The Lancet, 386*(9993), 562–568; Speidel, J.J., Harper, C.C., & Shields, W.C. (2008, September). The potential of long-acting reversible contraception to decrease unintended pregnancy. *Contraception, 78*(3), 197–200.

[7] Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017).

[8] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804  (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[9] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147) (citing Arcidiacono, P., Khwaja, A., & Ouyang, L. (2005). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Available at http://public.econ.duke.edu/~psarcidi/teensex.pdf [sic]).

[10] Arcidiacono, P., Khwaja, A., & Ouyang, L. (2011, January 22). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Retrieved 27 November 2017, from http://public.econ.duke.edu/~psarcidi/teensex.pdf

[11] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

5

00372945

Exhibit 54                                                                                                                                                    JA-0000948

[12] *See, e.g.,* Boonstra, H.D. (2014, September 3). What is behind the declines in teen pregnancy rates? *Guttmacher Policy Review, 17*(3), 15–21; Lindberg, L., Santelli, J., & Desai, S. (2016, November). Understanding the decline in adolescent fertility in the United States, 2007–2012. *Journal of Adolescent Health, 59*(5), 577–583.

[13] Centers for Disease Control and Prevention. (2013, April 26). *Ten Great Public Health Achievements in the 20th Century.* Retrieved 27 November 2017, from https://www.cdc.gov/about/history/tengpha.htm

[14] *See, e.g.,* Sonfield, A., Hasstedt, K., Kavanaugh, M.L., & Anderson, R. (2013, March). *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*. Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf

[15] Guttmacher Institute. (2016, September). *Unintended Pregnancy in the United States* (p. 2). Retrieved 27 November 2017, from https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf

[16] Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 8, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("In 2013, the U.S. pregnancy rate among 15–19 year olds was at its lowest point in at least 80 years and had dropped to about one-third of a recent peak rate in 1990.") (citing Kost, K., Maddow-Zimet, I., & Arpaia, A. (2017, August). *Pregnancies, Births and Abortions Among Adolescents and Young Women in the United States, 2013: National and State Trends by Age, Race and Ethnicity*. Retrieved 27 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf).

[17] Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252. Hellerstedt, W.L., Pirie, P.L., Lando, H.A., Curry, S.J., McBride, C.M., Grothaus, L.C., & Nelson, J.C. (1998, April). Differences in preconceptional and prenatal behaviors in women with intended and unintended pregnancies. *American Journal of Public Health, 88*(4), 663–666;

[18] *See* Tsui, A.O., McDonald-Mosley, R., & Burke A.E. (2010, April). Family planning and the burden of unintended pregnancies. *Epidemiologic Reviews, 32*(1), 152–174; Joyce, T.J., Kaestner, R., & Korenman, S. (2000, February). The effect of pregnancy intention on child development. *Demography, 37*(1), 83–94; Gazmararian, J.A., Adams, M.M., Saltzman, L.E., Johnson, C.H., Bruce, F.C., Marks, J.S., & Zahniser, S.C. (1995, June). The relationship between pregnancy intendedness and physical violence in mothers of newborns. The PRAMS Working Group. *Obstetrics & Gynecology, 85*(6), 1031–1038; Goodwin, M.M., Gazmararian, J.A., Johnson, C.H., Gilbert, B.C., & Saltzman, L.E. (2000, June). Pregnancy intendedness and physical abuse around the time of pregnancy: Findings from the pregnancy risk assessment monitoring system, 1996-1997. PRAMS Working Group. Pregnancy Risk Assessment Monitoring System. *Maternal and Child Health Journal, 4*(2), 85–92.

[19] Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313; Conde-Agudelo, A., Rosas-Bermúdez, A., & Kafury-Goeta, A.C. (2006). Birth spacing and risk of adverse perinatal outcomes: A meta-analysis. *JAMA, 295*(15), 1809–1823. *See also* Goldthwaite, L.M., Duca, L., Johnson, R.K., Ostendorf, D., & Sheeder, J. (2015, September). Adverse birth outcomes in Colorado: Assessing the impact of a statewide initiative to prevent unintended pregnancy. *American Journal of Public Health, 105*(9), e60–e66 (establishing an association between use of long-acting reversible contraception and a lower risk of preterm birth).

[20] *See, e.g.,* Barber, J.S., Axinn, W.G., & Thornton, A. (1999, September). Unwanted childbearing, health, and mother-child relationships. *Journal of Health and Social Behavior, 40*(3), 231–257. *C.f.* Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252; Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313.

[21] Ahmed, S., Li, Q., Liu, L., & Tsui, A.O. (2012, July). Maternal deaths averted by contraceptive use: An analysis of 172 countries. *The Lancet, 380*(9837), 111–125.

[22] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[23] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147)).

[24] *See, e.g.,* American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 86: Progestin-Only Hormonal Birth Control: Pill and Injection*. Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Progestin-Only-Hormonal-Birth-Control-Pill-and-Injection; American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 185: Combined Hormonal Birth Control: Pill, Patch, and Ring*. Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Combined-Hormonal-Birth-Control-Pill-Patch-and-Ring.

[25] *See, e.g.,* Jones, R.K. (2011, November). *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills*. Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf

[26] *See* Curtis, K.M., Jatlaoui, T.C., Tepper, N.K., Zapata, L.B., Horton, L.G., Jamieson, D.J., & Whiteman, M.K. (2016, July 29). U.S. selected practice recommendations for contraceptive use, 2016. *Morbidity and Mortality Weekly Report, 65*(4), 1–66.

6

00372946

Exhibit 54                                                                 JA-0000949

[27] Cortessis, V.K., Barrett, M., Brown Wade, N., Enebish, T., Perrigo, J.L., Tobin, J., . . . McKean-Cowdin, R. (2017). Intrauterine device use and cervical cancer risk: A systematic review and meta-analysis. *Obstetrics & Gynecology*, *130*(6), 1226–1236.

[28] *C.f.* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 11). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/

[29] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[30] Ibid.

[31] Ibid.

[32] Ibid.

[33] Ibid.

[34] American College of Obstetricians and Gynecologists, Committee on Gynecologic Practice. (2016). *Committee Opinion Number 540: Risk of Venous Thromboembolism Among Users of Drospirenone-Containing Oral Contraceptive Pills*. Retrieved 27 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Gynecologic-Practice/co540.pdf?dmc=1&ts=20171127T2043082500

[35] Ibid.

[36] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[37] *See, e.g.,* Kirby, D. (2007, November). *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases*. The National Campaign to Prevent Teen and Unplanned Pregnancy Publication. Retrieved 27 November 2017, from https://thenationalcampaign.org/resource/emerging-answers-2007%E2%80%94full-report; Meyer, J.L., Gold, M.A., & Haggerty C.L. (2011, February). Advance provision of emergency contraception among adolescent and young adult women: A systematic review of literature. *Journal of Pediatric & Adolescent Gynecology*, *24*(1), 2–9.

[38] Minguez, M., Santelli, J.S., Gibson, E., Orr, M., & Samant, S. (2015, March). Reproductive health impact of a school health center. *Journal of Adolescent Health*, *56*(3), 338–344. *See also* Knopf, J.A., Finnie, R.K., Peng, Y., Hahn, R.A., Truman, B.I., Vernon-Smiley, M., . . . Fullilove, M.T. (2016, July). School-based health centers to advance health equity: A Community Guide systematic review. *American Journal of Preventive Medicine*, *51*(1), 114–126.

[39] Secura, G.M., Adams, T., Buckel, C.M., Zhao, Q., & Peipert, J.F. (2015, April). Change in sexual behavior with provision of no-cost contraception. *Obstetrics & Gynecology, 123*(4), 771–776. *See also* Goldman, G. (2017, October 11). *The Trump Administration Fakes Science to Justify Restrictions on Birth Control Access*. Union of Concerned Scientists Blog. Retrieved 27 November 2017, from http://blog.ucsusa.org/gretchen-goldman/the-trump-administration-fakes-science-to-justify-restrictions-on-birth-control-access

[40] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47. *See also* American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women. (2015, January). *Committee Opinion Number 615: Access to Contraception*. Retrieved 30 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co615.pdf?dmc=1&ts=20171130T1815539115

[41] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[42] Ibid.

[43] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838, 47,840 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[44] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[45] *See, e.g.,* Brief of *Amici Curiae* Physicians for Reproductive Health, et al. in Support of Petitioners at 12, Burwell v. Hobby Lobby Stores, Inc., 573 U.S. __, 134 S. Ct. 2751 (2014) (No. 13-354).

00372947

Exhibit 54                                                                                                                          JA-0000950



Institute *for*
Policy Integrity
NEW YORK UNIVERSITY SCHOOL OF LAW

**December 5, 2017**

**VIA ELECTRONIC SUBMISSION**

**Attn:** Centers for Medicare & Medicaid Services, Department of Health and Human Services

**Subject:** Comments on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 6, 2017)

**Docket Nos.** TD–9827, CMS-9940-IFC

The Institute for Policy Integrity at New York University School of Law[1] ("Policy Integrity") respectfully submits the following comments on the joint Department of Health and Human Services, Internal Revenue Service, Department of the Treasury, and Department of Labor (collectively "the Departments") interim final rule "Religious Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act," 82 Fed. Reg. 47,792 (Oct. 6, 2017) ("the Religious Exemption Rule").

Guidelines issued pursuant to the Patient Protection and Affordable Care Act (ACA) require certain group health plans and health insurance issuers to cover contraceptive services. The Departments previously exempted houses of worship and integrated auxiliaries from this requirement. The Religious Exemption Rule expands the exemption to nonprofits, higher education institutions, closely held for-profit corporations, and publicly traded for-profit corporations with religious objections to providing contraceptive coverage.

Policy Integrity is a non-partisan think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and public policy. We write to make the following comment:

- *The Departments' cost-benefit analysis is inadequate.*

The Departments' cost-benefit analysis is unreasonable in at least two respects. First, the Departments ignore costs that the Religious Exemption Rule may impose on women by

---

[1] No part of this document purports to present New York University School of Law's views, if any.

00373675

Exhibit 55                                                                                                       JA-0000951

reducing access to contraception. Second, the Departments obscure the economic impacts of the Religious Exemption Rule by failing to disaggregate its costs and benefits from those of the separate Moral Exemption Rule.[2]

## I.    The Departments Fail to Consider the Religious Exemption Rule's Full Costs for Women

A proper regulatory cost-benefit analysis considers all of a rule's reasonably foreseeable consequences, positive and negative.[3] Here, the Departments calculate only one of the Religious Exemption Rule's economic consequences: an increase in women's out-of-pocket expenditures for birth control that, in the absence of the Religious Exemption Rule, would have been covered by insurance.[4] The Departments fail to estimate the extent to which the Religious Exemption Rule will reduce *access* to contraception. They also fail to assess the economic consequences of that reduction in access.

### A.    The Departments Do Not Adequately Assess the Religious Exemption Rule's Potential to Reduce Access to Contraception

Although the Departments acknowledge in a footnote that the Religious Exemption Rule "can be expected to lead to some decrease in use of the affected drugs and devices," they make no effort to predict the likely magnitude of this decrease in contraception use.[5] Instead, they play down the issue's significance, noting that "there are multiple Federal, State and local programs that provide free or subsidized contraceptives for low-income women."[6] Some women, however, may lack access to such programs, either because the

---

[2] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47838 (Oct. 6, 2017).

[3] Executive Order 12,866 states that "[i]n deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives." Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993) [hereinafter E.O. 12,866]. Additionally, the Administrative Procedure Act requires agencies engaged in rulemaking to "examine the relevant data and articulate a satisfactory explanation for [their] action[s]" and precludes them from ignoring "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted); *see also Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) ("[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable.").

[4] This out-of-pocket cost is a transfer payment, as the direct cost of contraception is being shifted from exempt employers to their female employees.

[5] 82 Fed. Reg. at 47,821 n.84.

[6] 82 Fed. Reg. at 47,804.

2

00373676

Exhibit 55

JA-0000952

programs are not available in their areas, or because they do not meet relevant income criteria.[7]

Indeed, prior to the passage of the ACA, many women were unable to afford contraception, even with insurance, because of high co-pays or deductibles.[8] Post-ACA decreases in cost-sharing were associated with better adherence and more consistent use of the pill, especially among users of generic pills.[9] One study showed that even copayments as low as $6 were associated with higher levels of discontinuation and non-adherence.[10]

Furthermore, even if the Religious Exemption Rule does not deny a woman access to contraception altogether, it might lead her to choose a less effective method for financial reasons.[11] For example, instead of using a more effective, but more expensive, intrauterine device, women may choose a less effective, but cheaper, birth control pill.[12]

## B. *The Departments Fail to Acknowledge the Negative Economic Consequences of Reduced Access to Contraception*

In a 2012 rulemaking, the Departments explained that access to contraception has significant economic benefits for women:

---

[7] See *Committee Opinion on Access to Contraception*, AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Access-to-Contraception (last visited Dec. 1, 2017); *Birth Control Access Map*, THE NAT'L. CAMPAIGN TO PREVENT TEEN AND UNPLANNED PREGNANCIES, https://thenationalcampaign.org/deserts (last visited Dec. 1, 2017) (showing that 19 million women between ages 13 and 44 lack "reasonable access" to contraceptives and that 3 million of these women live in counties without a single public clinic).

[8] *See generally* Su-Ying Liang et al., *Women 's Out-of Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills Between 1996 and 2006*, 83 Contraception 528, 531 (2011). Additionally, a survey conducted by Hart Research Associates found that 34 percent of women have struggled to pay for birth control. Press Release, Planned Parenthood, Survey: Nearly Three in Four Voters in America Support Fully Covering Prescription Birth Control (Jan. 30, 2014), https://www.plannedparenthood.org/about-us/newsroom/press-releases/survey-nearly-three-four-voters-america-support-fully-covering-prescription-birth-control.

[9] Lydia E. Pace, Stacie B. Dusetzina & Nancy L. Keating, *Early Impact of the Affordable Care Act On Oral Contraceptive Cost Sharing, Discontinuation, And Nonadherence*, 35 HEALTH AFFAIRS 1616, 1616-24 (2016); *see also* KAISER FAMILY FOUNDATION, NEW REGULATIONS BROADENING EMPLOYER EXEMPTIONS TO CONTRACEPTIVE COVERAGE: IMPACT ON WOMEN (Oct. 6, 2017), https://www.kff.org/womens-health-policy/issue-brief/new-regulations-broadening-employer-exemptions-to-contraceptive-coverage-impact-on-women/.

[10] *See* Pace et al., *supra* note 9; KAISER FAMILY FOUNDATION, *supra* note 9.

[11] Caroline S. Carlin, Angela R. Fertig & Bryan E. Down, *Affordable Care Act's Mandate Eliminating Contraceptive Cost Sharing Influenced Choices of Women with Employer Coverage*, 35 HEALTH AFFAIRS, 1608, 1608-1615 (2016); Michelle Andrews, *IUD, Implant, the Pill: Cost May Play a Role in Choice of Contraceptives*, WASH. POST, Feb 17, 2012, https://www.washingtonpost.com/national/health-science/iud-implant-the-pill-cost-may-play-a-role-in-choice-of-contraceptives/2012/02/15/gIQAGnrWKR_story.html?utm_term=.a6fe6d28a429.

[12] Andrews, *supra* note 11.

00373677

Exhibit 55

JA-0000953

Researchers have shown that access to contraception improves the social and economic status of women. Contraceptive coverage, by reducing the number of unintended and potentially unhealthy pregnancies, furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force . . . . The [federal government] aim[s] to reduce these disparities by providing women broad access to preventive services, including contraceptive services.[13]

It follows that any *reduction* in contraception access resulting from the Religious Exemption Rule would impose economic costs on affected women. But the Departments' cost-benefit analysis makes no mention of these costs.

Nor do the Departments acknowledge contraception's many health benefits beyond reductions in unwanted pregnancies, such as reduction in the risk of ovarian cysts, possible protection against bone loss with estrogen-containing oral contraceptives, improvement of symptoms of endometriosis, and general improvement of negative symptoms associated with the menstrual cycle.[14] Any reduction in contraception access associated with the Religious Exemption Rule would likely entail a reduction in these benefits as well.

## II. The Departments Fail to Disaggregate the Impacts of the Religious Exemption Rule from the Impacts of a Separately Promulgated Moral Exemption Rule

The Religious Exemption Rule was issued contemporaneously with "Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the ACA" (the "Moral Exemption Rule"), which creates an exemption from contraceptive coverage requirements for employers with purely moral—not religious—objections to contraceptive care.[15] Although the rules were promulgated separately, the cost-benefit analysis for the Religious Exemption Rule appears to encompass the anticipated effects of the Moral Exemption Rule as well.[16] In other words, the Departments have not disaggregated the costs and benefits of the two rules.

---

[13] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,728 (Feb. 15, 2012).

[14] Kristina D. Chadwick et al., *Fifty Years of "the Pill": Risk Reduction and Discovery of Benefits Beyond Contraception, Reflections, and Forecast*, 125 TOXICOLOGICAL SCIENCES 2, 4(2012); *What Are the Benefits of Birth Control*, PLANNED PARENTHOOD, https://www.plannedparenthood.org/learn/birth-control/birth-control-pill/what-are-the-benefits-of-the-birth-control-pill (last visited Dec. 1, 2017).

[15] *See* 82 Fed. Reg. at 47,838.

[16] *Id.* at 47,815 ("The Departments assess this interim final rule together with a companion interim final rule concerning moral but non-religious conscientious objections to contraception.").

4

00373678

Exhibit 55

JA-0000954

Without isolating the costs and benefits of each rule, however, the Departments cannot fulfill E.O. 12,866's requirement that agencies issue a new rule only upon a finding that the benefits of that particular rule justify its costs.[17] Similarly, the Departments cannot satisfy the Administrative Procedure Act's requirement that they consider relevant data and provide a satisfactory explanation for their action.[18]

Respectfully,

Chelsea Anelli
Madison Condon
Jack Lienke
Alexandra St. Romain

*Institute for Policy Integrity*
*New York University School of Law*

---

[17] E.O. 12,866, *supra* note 3, at Sec. 1(b)(6).

[18] *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29, 43.

5

00373679

Exhibit 55

JA-0000955

December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (RIN 0938-AT20)**

To whom it may concern:


Jobs With Justice is an independent nonprofit organization dedicated to advancing workers' rights and an economy that benefits all Americans. We bring together labor, community, faith and student voices at the national and local levels through a network of coalitions across the country. With research, analysis, organizing and public advocacy, Jobs With Justice creates innovative solutions to the problems working people face today. Jobs With Justice works to ensure that working people have the tools to build their collective power at work as well as in their communities. Jobs With Justice believes that in order for working people to build collective power, their basic rights must be respected by their government and their employer, including access to affordable contraceptive coverage as intended by the Affordable Care Act (ACA).[1] Jobs With Justice also believes that working women, not the government and not the people who sign their paychecks, have the fundamental right to control their own bodies.


This comment will first discuss the compelling interests furthered by the contraception coverage requirement and regulations included in the ACA (hereinafter, the "Coverage Policy"), then discuss the flaws in the reasoning put forth by the Departments of Health and Human Services, Labor and Treasury ("the Departments") in the proposed Religious Exemptions IFR (the "IFR"),[2] and conclude with a discussion of how the IFR violates the Administrative Procedure Act ("APA") both procedurally and substantively.

I. Compelling Interests of No-Cost Contraception

---

[1] Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, amended by Pub. L. No. 111-152, 124 Stat. 1029.
[2] Religious Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act, 82 Fed. Reg. 47792 et seq.

1

Exhibit 56

00396781

Jobs With Justice believes that the Coverage Policy serves a compelling governmental interest because it protects the ability of women to control their own reproductive futures. Women's ability to control their reproductive futures is vital to their ability to finish school, remain in the workforce, control their careers, sustain their families, and protect their own health and the health of their children.[3] To this end, the Coverage Policy furthers at least three compelling interests: gender equality, vindication of working people's fundamental rights, and promoting public health.[4]

### A. Promoting Gender Equality

Unplanned pregnancy is a key contributor to women's economic inequality in the U.S. and throughout the world. Access to no cost-sharing contraception coverage through health insurance plans improves the ability of women to control whether and when they will have a child. In the first year of the Coverage Policy, the share of women with no out-of-pocket costs for certain forms of birth control increased from 15 percent to 67 percent.[5] This benefit helps place women on level footing with their male counterparts in their ability to participate in the workforce or pursue educational opportunities without the risk of unplanned pregnancies.

Empowering women through access to contraception and allowing individual women to control if and when they will have a child plays a critical role in addressing gender inequalities including the existing pay gap between men and women. This is particularly true because pregnancy and childrearing have a significant impact on the gender pay gap.[6] While access to contraception will not fully remedy existing pay gaps between men and women, there are "clear associations between the availability and diffusion of oral contraceptives[,] particularly among young women, and increases in U.S. women's education, labor force participation, and average earnings, coupled with a narrowing in the wage gap between women and men."[7] Moreover, studies focusing on the impacts of oral contraception have found that contraception is

---

[3] *See generally* Brief for the National Women's Law Center and Sixty-Eight Other Organizations as *Amicus Curiae, Sebelius v. Hobby Lobby Stores, Inc.*, Nos. 13-354, 13356 (U.S. Jan. 28, 2014) ("NWLC Hobby Lobby Brief"), *available at* https://nwlc.org/wp-content/uploads/2015/08/nwlcsupremecourtamicusbriefcontraceptivecoveragebenefit_1-28-2014.pdf.
[4] *Id.* at 3.

[5] Adam Sonfield, Athena Tapales, Rachel K. Jones, and Lawrence B. Finer  "Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update." Contraception, 91(2015): pp. 44-48.

[6] *See* Martha J. Bailey, Brad Hershbein, and Amalia R. Miller. "The Opt-In Revolution? Contraception and the Gender Gap in Wages." *American Economic Journal: Applied Economics* 4(3) (July 2012): pp. 225-54, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3684076/pdf/nihms449365.pdf ("Our main estimates, therefore, imply that 10 percent of the narrowing in the gender gap during the 1980s and 31 percent during the 1990s can be attributed to early access to the Pill . . . . the effects of the Pill may be larger than we find, but it is not clear how much larger. Even these conservative estimates, however, suggest that the Pill's power to transform childbearing from probabilistic to planned shifted women's career decisions and compensation for decades to come.")

[7] Jennifer Frost & Laura Lindberg. "Reasons for using contraception: Perspectives of US women seeking care at specialized family planning clinics." *Contraception Journal* (September 2012): pp 465-72

2

00396782

Exhibit 56

JA-0000957

connected to significant growth of women's wages.[8] For example, one study examining the advent of the availability of oral contraception found that approximately "one-third of the total wage gains for women in their forties born from the mid-1940s to early 1950s" were attributable to oral contraception.[9]

The impacts of the Religious Exemption IFR will fall heavily on women working in low-wage jobs. The most effective contraception options with the least chances of user error, such as IUDs or the ring,[10] require higher upfront costs and will once again be out of reach of many women. The ability of employers to claim a religious exemption and not cover contraception for their employees will significantly limit the ability of women working low-wage jobs to access the preventative care best suited for themselves. This is important because the ability to control when and whether to get pregnant is particularly important for women in low-wage jobs.[11] The lack of pregnancy accommodations in many workplaces, particularly in low-wage jobs, means that pregnant women may be forced out of their jobs just at the time when they most need income and health insurance.

Through its acknowledgement and inclusion of contraception as preventative care and the elimination of cost-sharing for contraception, the Coverage Policy helped address a long standing reality that women bear a disproportionate share of family planning expenses and pay substantially more to access basic health care than do men. Based on data from the Medical Expenditure Panel Survey in 2011, women between 18 and 44 had out-of-pocket expenses that averaged 68 percent higher than men of the same age range.[12] Contraception is a key contributing factor to the disparities in medical spending and although the costs have traditionally been borne by women, the cost savings benefit entire families.

Not only does the IFR undermine advances in these medical expense gender disparities, it seriously jeopardizes the likelihood that women will be able to afford contraception. The potential reintroduction of cost sharing or elimination of coverage altogether could have serious adverse impacts on the level of preventative care. Studies have shown that even moderate costs can cause individuals to forgo needed preventative care, a problem that is particularly acute among individuals with low and moderate incomes.[13] Prior to the implementation of the benefit, a survey conducted by the Guttmacher Institute in 2009 found that because of the economic recession, 23 percent of women reported having difficulty

---

[8] While research has primarily focused on oral contraception because it has been an established birth control option longer, longer-lasting contraception options that are covered by the Coverage Policy eliminate chances of user error and are more effective.

[9] Bailey, *supra*.

[10] U.S. Dep't of Health and Human Servs., CDC, "Effectiveness of Family Planning Methods," *available at* https://www.cdc.gov/reproductivehealth/unintendedpregnancy/pdf/contraceptive_methods_508.pdf.

[11] National Women's Law Center, "It Shouldn't Be a Heavy Lift: Fair Treatment for Pregnant Workers," (2013), *available at* https://nwlc.org/resources/it-shouldnt-be-heavy-lift-fair-treatment-pregnant-workers/.

[12] Louis Jacobson, "Ruth Bader Ginsburg dissent says women pay 68 percent more out of pocket for health care" Politifact (July 2, 2014), *available at* http://www.politifact.com/truth-o-meter/statements/2014/jul/02/ruth-bader-ginsburg/ruth-bader-ginsburg-dissent-says-women-pay-68-perc/.

[13] National Women's Law Center, "Denying Coverage of Contraceptives Harms Women" (Nov. 2011), *available at* https://www.nwlc.org/sites/default/files/pdfs/fs_on_the_relig_exempt_to_cc_without_cost-sharing_november_2011.pdf.

3

00396783

Exhibit 56

paying for birth control and 24 percent put off a gynecology or birth control visit because of cost.[14] Another survey found that more than half of women 18-34 reported experiencing a time in their lives when they could not afford to use birth control consistently.[15] While access to contraception is critical for women in order for them to plan their family decisions and participate in the labor force and pursue educational opportunities, maintaining this access at no cost ensures that this essential benefit is available to women of all economic backgrounds.

B. Vindicating Fundamental Rights

Women have a fundamental right to control their own bodies and as a central aspect of that right have the ability to control if and when they bear children. This right to bodily integrity has been recognized again and again by the U.S. Supreme Court over the last half century.[16] The Coverage Policy recognizes that women do not lose this right when they join the workforce. Since the ACA recognizes that health care is a fundamental right and set up a system in which employers are mandated to provide their employees with health coverage,[17] employers cannot then deny the women who work for them their fundamental right to bodily control. This is particularly true of employers who do not pay the women who work for them enough that they can purchase the contraceptive method of their choice without insurance companies. Otherwise, the fundamental right to bodily integrity that women supposedly enjoy would be a hollow right—a right enjoyed by people of means but denied to working class women.

Working people also have the fundamental right to engage in collective action.[18] This right is severely undermined when working people's right to bodily integrity is subject to the whims of their employer. Simply put, one cannot expect working people to be able to exercise their right to bargain collectively as anticipated by federal law when their employer not only controls their wages, hours, and working conditions, but has such extreme control over their employees' lives that they can decide whether the women who work for them can protect themselves from unwanted pregnancies.

B. Public Health

In addition to the government's compelling interest in promoting gender equality and enabling women to advance in the workforce and in education, Jobs With Justice believes that the government has a compelling interest in the public health benefits of no-cost access to preventative birth control.

---

[14] Guttmacher Institute, "A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions" (Sept. 2009), *available at* http://www.guttmacher.org/pubs/RecessionFP.pdf.

[15] Planned Parenthood, "Survey: Nearly Three in Four Voters in America Support Covering Prescription Birth Control" (Jan. 30, 2014), *available at* https://www.plannedparenthood.org/about-us/newsroom/press-releases/survey-nearly-three-four-voters-america-support-fully-covering-prescription-birth-control.

[16] *See, e.g., Griswold v. Connecticut* 381 U.S. 479 (1965); *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Roe v. Wade*, 410 U.S. 113 (1973); *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992); *Stenberg v. Carhart*, 530 U.S. 914 (2000); *Whole Women's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).

[17] *See* 26 U.S.C. § 4980H.

[18] *See* National Labor Relations Act §§ 1, 7, 29 U.S.C. §§ 151, 157.

4

00396784

Exhibit 56

JA-0000959

Unintended pregnancy is not a small phenomenon in our country. From 2011 to 2015, 33 percent of pregnancies were unintended.[19] Births resulting from unintended or closely spaced pregnancies are associated with adverse maternal and child health outcomes, such as delayed prenatal care, premature birth, and negative physical and mental health effects for children.[20] Compared to women who become pregnant intentionally, women who experience unintended pregnancies have a higher incidence of mental-health problems, have less stable romantic relationships, experience higher rates of physical abuse, and are more likely to have abortions or to delay the initiation of prenatal care.[21] Children whose conception was unintentional are also at greater risk than children who were conceived intentionally of experiencing negative physical- and mental-health outcomes and are more likely to drop out of high school and to engage in delinquent behavior during their teenage years.[22]

Contraception prevents unintended pregnancy. According to the researchers at the CDC, "[w]omen of all ages are more likely to choose and continue using highly effective contraceptive methods when the contraceptive methods and accompanying services (including patient education and counseling) are provided without cost."[23] The Coverage Policy ensures that contraceptives are available to millions of women without cost sharing, and the IFR has the potential to undermine that access and increase the incidence of unintended pregnancy.

## II. Flawed Reasoning in the IFR

The reasoning set forth in the IFR for permitting religious objections by employers is both misleading and ungrounded. Specifically, the IFR undermines the compelling governmental interests furthered by the Coverage Policy; the assertion that the IFR's impact would be "limited" is baseless; and any supposed benefits of the IFR are insufficient to overcome the harm that will result from eliminating the Coverage Policy.

### A. The IFR Will Undermine Compelling Government Interests

In addition to the procedural and substantive shortcomings discussed below, the IFR erroneously concludes that "the application of the [Coverage Policy] to entities with sincerely held religious objections to the Coverage Policy does not serve a compelling governmental interest." In reaching this conclusion, the Departments completely disregard the fundamental reasons why the contraceptive Coverage Policy was determined to serve a compelling governmental interest in the first place. By

---

[19] U.S. Dep't of Health and Human Servs., CDC, "Key Statistics from the National Survey of Family Growth - I Listing," *available at* https://www.cdc.gov/nchs/nsfg/key_statistics/i.htm#intended.

[20] Guttmacher Institute, "Unintended Pregnancy in the United States" (Sept. 2016), *available at* https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf.

[21] Adam Thomas and Emily Monea, "The High Cost of Unintended Pregnancy" Brookings Institution (July 2011), *available at* https://www.brookings.edu/wp-content/uploads/2016/06/07_unintended_pregnancy_thomas_monea.pdf.

[22] *Id.*

[23] Jared Fox, PhD, MPP and Wanda Barfield, MD, MPH, "Decreasing Unintended Pregnancy" (Aug. 23, 2016), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4995141/.

00396785

Exhibit 56

JA-0000960

broadening the scope of the religious exception to encompass all non-governmental plan sponsors and institutions of higher education in their arrangement of student health plans that claim a religious objection, the Departments undermine a compelling government interest and eviscerate the least restrictive means of furthering that compelling interest previously formulated by the Departments.

The Departments' suggestion that women can just access contraception through other programs or just pay for it themselves, ignores the fact that the Coverage Policy was necessary in the first place because the existing family planning safety net programs do not do enough to provide access to populations in need of contraception coverage.[24] As cost is a significant barrier to women obtaining this preventative care, any increase in organizations seeking exemptions will lead to a decrease in contraception use.

### B. The IFR's Assertion That It Will Have a "Limited Impact" is Erroneous

The IFR attempts to erase a woman's fundamental interest in making her own reproductive health decisions by allowing her employer make these decisions for her. It does so in part by making the entirely unfounded assertion that the people who work for organizations who would claim religious or moral objections to contraception are likely to share those objections. Given that the vast majority of American women who have ever had sexual intercourse use contraception at some point in their life, it is extremely likely that exempting employers from the Coverage Policy will directly affect women who do not share their employers' "beliefs."

### C. Exempting Businesses from Generally Applicable Laws is Bad Policy and Harms Workers

By prioritizing the religious views of organizations above the health and economic interests of women and their families, the rule sets a dangerous precedent both for the ACA and for other laws of general applicability.

The fact that the IFR states that one of its goals is to settle litigation suggests that if other employers or entities sue over the applicability of other parts of the ACA, or other laws of general applicability, the government's response may be to capitulate and sacrifice the important goals of those laws to the alleged interest of the objecting entities to impose their religious or moral views on others. For instance, within the health care sphere employers could object to covering vaccinations. Several states have already seen increased rates of dangerous and previously rare diseases such as measles and whooping cough following increased numbers of parents expressing religious or moral objections to vaccinating their children.[25]

---

[24] *See* Amanda J. Stevenson, M.A., Imelda M. Flores-Vazquez, Ph.D., Richard L. Allgeyer, Ph.D., Pete Schenkkan, J.D., and Joseph E. Potter, Ph.D., "Effect of Removal of Planned Parenthood from the Texas Women's Health Program," *New England Journal of Medicine* (March 3, 2016), *available at* http://www.nejm.org/doi/full/10.1056/NEJMsa1511902.

[25] Phadke VK, Bednarczyk RA, Salmon DA, Omer SB, "Association Between Vaccine Refusal and Vaccine-Preventable Diseases in the United States: A Review of Measles and Pertussis" JAMA. 2016; 315(11): 1149-58, *available at* https://jamanetwork.com/journals/jama/article-abstract/2503179.

00396786

Exhibit 56                                                                                                                          JA-0000961

Outside the health care sphere, businesses have begun asserting religious objections to serving customers based on their sexual orientation. This echoes the long history of businesses and employers asserting that race or sex discrimination was required by their religions.[26] Courts have long rejected claims that religious beliefs excused noncompliance with child labor laws, minimum wage laws, and civil rights laws.[27] The government should not, via this rule, undermine those longstanding principles.

The rule imposes a disparate impact on women because it primarily affects their right to reproductive freedom concerning contraceptive care. The Coverage Policy was implemented to resolve the fact that women tend to pay more for insurance coverage than their male counterparts. Furthermore, this rule is problematic because it allows employers and schools to deny preventive health benefits that only women use, and thus discriminates based on sex.

III. The IFR Violates the Administrative Procedure Act

The APA imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[28] The APA is applicable here because the IFR is a final agency action and is a legislative rule within the meaning of the APA.[29] By enacting the IFR in the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

A. Procedural Violations of Pre-Adoption and Post-Adoptions Requirements of the Administrative Procedure Act

The IFR violates both the APA's notice and comment requirement, and its 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its assertion to the contrary, the Department does not have good cause.

1. Procedural Requirements at Issue

Section 553(b) of the Administrative Procedure Act (APA) requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[30] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the

---

[26] *See Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968).

[27] *See* NWLC Hobby Lobby Brief at 28-32.

[28] 5 U.S.C. § 551(5).

[29] *Id.*

[30] 5 U.S.C. § 553(b).

7

Exhibit 56

00396787

agency has good cause.[31] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[32]

### 2. What is "Good Cause"?

The APA limits good cause to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[33] Courts have found good cause in cases that involve: (1) emergencies;[34] (2) contexts in which prior notice would subvert the underlying statutory scheme;[35] and (3) situations where Congress intends to waive section 553's requirements.[36] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[37] This means that the Departments must have good cause to waive each requirement.

### 3. The Departments Have Not Satisfied the "Good Cause" Standard

The Departments claim that the procedural requirements of the APA do not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[38] While these rules empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health Care Portability and Accountability Act of 1996,[39] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[40] This is a conclusory statement that does not come close to the type of

---

[31] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[32] *Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996).

[33] 5 U.S.C. § 553(b).

[34] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004).

[35] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (The court reasoned that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made.).

[36] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (Here, the courts are finding that the APA is inapplicable, rather than that good cause is established.).

[37] *U.S. v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

[38] 82 Fed. Reg. at 47831.

[39] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); and 42 U.S.C. § 300gg–92.

[40] 82 Fed. Reg. at 47831.

8

00396788

Exhibit 56

situation in which courts have found "good cause." Rather, it is similar to other instances in which agencies made conclusory claims of an emergency situation, unaccompanied by independent facts, which courts deemed insufficient to constitute good cause.[41]

The Departments further argue that "[g]ood cause is supported by providing relief for entities and individuals for whom the Coverage Policy operates in violation of their sincerely held religious beliefs, but who would have to experience that burden for many more months under the prior regulations if these rules are not issued on an interim final basis."[42] However, this reasoning should be weighed against the burdens that many women will face if their employer or university decides to take advantage of the IFR and cease to offer contraception without cost-sharing. They will be forced to find alternative means for contraceptive coverage or to pay high prices out of pocket to maintain the contraception coverage they currently have.

As explained above, the Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and the APA's post-adoption publication requirements. They have not adequately established that the APA's procedural requirements don't apply or that they have good cause for disregarding the APA's procedural rulemaking requirements. Because the IFR was promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, the Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the IFR should be repealed.

### B. Substantive Violations of the Administrative Procedure Act

In addition to the APA's procedural requirements described above, the APA contains several substantive rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[43] The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[44] "contrary to a constitutional right,"[45] or "in excess of statutory jurisdiction."[46] The IFR violates 5 U.S.C. § 706(2) because it contradicts the ACA.

_____

[41] *See, e.g., Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 707 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v.Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); *United States v. Brewer*, 766 F.3d 884, 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting *United States v. Reynolds*, 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).

[42] 82 Fed. Reg. at 47814-15.
[43] 5 U.S.C. § 551(5).
[44] 5 U.S.C. § 706(2)(A).
[45] 5 U.S.C. § 706(2)(B).
[46] 5 U.S.C. § 706(2)(C).

9

Exhibit 56

00396789

JA-0000964

The ACA requires all new insurance plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" without cost-sharing requirements in order to protect women's health, ensure that women do not pay more for insurance coverage than men, and advance women's equality and well-being.[47] In addition, section 1554 of the ACA prohibits the Departments from issuing regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care"[48] and Section 1557 of the ACA, prohibits sex discrimination in certain health programs and activities.[49]

By permitting objecting institutions to deny no-cost contraceptive coverage, the IFR erects unreasonable barriers to medical care violating Section 1554 of the ACA. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the ACA. Because the IFR violates the ACA, this IFR also violates the APA and must be set aside on that basis.

## IV. Clarifications Are Needed

If the flaws we have identified in the IFR are corrected and a new rule issued, several additional clarifications would be required to ensure that the rule protects employees and students, and does not violate existing law.

First, the rule must be clarified to make clear that employers whose employees have chosen to unionize and engage in collective bargaining follow the procedures set forth in the National Labor Relations Act if they intend to change their employees' health insurance benefits. Those benefits are a mandatory subject of collective bargaining, and cannot be changed except through the collective bargaining process.

Second, the rule must be clarified to ensure that employers, insurance issuers and third-party administrators do not violate ERISA's notification requirements when changing employees' health insurance benefits.

Third, the rule must be clarified to ensure that an appropriate governmental agency be notified of any decision to change health insurance benefits so that arrangements can be made to ensure that women have seamless access to contraceptive coverage.

## V. Conclusion

Jobs With Justice strongly believes that the Coverage Policy serves the compelling interests of advancing gender equality and mitigating the public health risks of unintended pregnancy. By eliminating the Coverage Policy, the IFR undermines these interests and creates a situation where businesses can impose their own religious views on their employees and discriminate against women generally. Furthermore, by

---

[47] *See* 4 2 U.S.C. § 300gg-13(a)(4); 4 5 C.F.R. § 147.130 (2013)(a)(1)(iv).

[48] 42 U.S.C. § 18114(1).

[49] 42 U.S.C. § 18116.

00396790

Exhibit 56

JA-0000965

failing to show good cause for not complying with the pre-adoption and post-adoption rulemaking waiting periods, the Religious Exemptions IFR violates the APA. If the flaws identified in the IFR are corrected and a new rule is issued, several clarifications are needed to ensure that employees are protected and existing laws are not violated.

11

00396791

Exhibit 56

JA-0000966

December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (RIN 0938-AT46)**

To whom it may concern:

We write to submit comments on the Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (RIN 0938-AT46) on behalf of ten labor, worker justice, citizen advocacy, immigration, and women's organizations: the Service Employees International Union ("SEIU"), the National Employment Law Project, Public Citizen, National Black Worker Center Project, Workplace Fairness, Equal Rights Advocates, Maine Women's Lobby, the National Immigration Law Center, the Coalition for Economic Justice, and Legal Aid at Work. The undersigned organizations have a strong interest in this rule because we know how vital it is for women to have seamless contraception coverage in order to be able to protect their health and their ability to work, which in turn are necessary for the economic security of families across America.

This comment will first discuss the compelling interests furthered by the contraception coverage requirement and regulations included in the Affordable Care Act (hereinafter, the "Coverage Policy"), then discuss the flaws in the reasoning put forth by the Departments of Health and Human Services, Labor and Treasury ("the Departments") in the proposed Moral Exemptions IFR (the "IFR"),[1] and conclude with a discussion of how the IFR violates the Administrative Procedure Act ("APA") both procedurally and substantively.

I. Compelling Interests of No-Cost Contraception

The Coverage Policy serves a compelling governmental interest because it protects the ability of women to control their own reproductive futures. Women's ability to control their reproductive futures is vital to their ability to finish school, remain in the workforce, control their careers, sustain their families, and protect

---

[1] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47838 et seq.

00207089

Exhibit 57

their own health and the health of their children.[2] To this end, the Coverage Policy furthers at least two compelling interests: gender equality and promoting public health.[3]

A. Promoting Gender Equality

Unplanned pregnancy is a key contributor to women's economic inequality in the U.S. and throughout the world. Access to no cost-sharing contraception coverage through health insurance plans improves the ability of women to control whether and when they will have a child. In the first year of the Coverage Policy, the share of women with no out-of-pocket costs for certain forms of birth control increased from 15 percent to 67 percent.[4] This benefit helps place women on level footing with their male counterparts in their ability to participate in the workforce or pursue educational opportunities without the risk of unplanned pregnancies.

Empowering women through access to contraception and allowing individual women to control if and when they will have a child plays a critical role in addressing gender inequalities including the existing pay gap between men and women. This is particularly true because pregnancy and childrearing have a significant impact on the gender pay gap.[5] While access to contraception will not fully remedy existing pay gaps between men and women, there are "clear associations between the availability and diffusion of oral contraceptives[,] particularly among young women, and increases in U.S. women's education, labor force participation, and average earnings, coupled with a narrowing in the wage gap between women and men."[6] Moreover, studies focusing on the impacts of oral contraception have found that contraception is connected to significant growth of women's wages.[7] For example, one study examining the advent of the availability of oral contraception found that approximately "one-third of the total wage gains for women in their forties born from the mid-1940s to early 1950s" were attributable to oral contraception.[8]

---

[2] *See generally* Brief for the National Women's Law Center and Sixty-Eight Other Organizations as *Amicus Curiae*, *Sebelius v. Hobby Lobby Stores, Inc.*, Nos. 13-354, 13356 (U.S. Jan. 28, 2014) ("NWLC Hobby Lobby Brief"), *available*                                        *at*                                        https://nwlc.org/wp-content/uploads/2015/08/nwlcsupremecourtamicusbriefcontraceptivecoveragebenefit_1-28-2014.pdf.

[3] *Id.* at 3.

[4] Adam Sonfield, Athena Tapales, Rachel K. Jones, and Lawrence B. Finer "Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update." Contraception, 91(2015): pp. 44-48.

[5] *See* Martha J. Bailey, Brad Hershbein, and Amalia R. Miller. "The Opt-In Revolution? Contraception and the Gender Gap in Wages." *American Economic Journal: Applied Economics* 4(3) (July 2012): pp. 225-54, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3684076/pdf/nihms449365.pdf ("Our main estimates, therefore, imply that 10 percent of the narrowing in the gender gap during the 1980s and 31 percent during the 1990s can be attributed to early access to the Pill . . . . the effects of the Pill may be larger than we find, but it is not clear how much larger. Even these conservative estimates, however, suggest that the Pill's power to transform childbearing from probabilistic to planned shifted women's career decisions and compensation for decades to come.")

[6] Jennifer Frost & Laura Lindberg. "Reasons for using contraception: Perspectives of US women seeking care at specialized family planning clinics." *Contraception Journal* (September 2012): pp 465-72

[7] While research has primarily focused on oral contraception because it has been an established birth control option longer, longer-lasting contraception options that are covered by the Coverage Policy eliminate chances of user error and are more effective.

[8] Bailey, *supra.*

2

00207090

Exhibit 57

JA-0000968

The impacts of the Moral Exemption IFR will fall heavily on women working in low-wage jobs. The most effective contraception options with the least chances of user error, such as IUDs or the ring,[9] require higher upfront costs and will once again be out of reach of many women. The ability of employers to claim a moral exemption and not cover contraception for their employees will significantly limit the ability of women working low-wage jobs to access the preventative care best suited for themselves. This is important because the ability to control when and whether to get pregnant is particularly important for women in low-wage jobs.[10] The lack of pregnancy accommodations in many workplaces, particularly in low-wage jobs, means that pregnant women may be forced out of their jobs just at the time when they most need income and health insurance.

Through its acknowledgement and inclusion of contraception as preventative care and the elimination of cost-sharing for contraception, the Coverage Policy helped address a longstanding reality that women bear a disproportionate share of family planning expenses and pay substantially more to access basic health care than do men. Based on data from the Medical Expenditure Panel Survey in 2011, women between 18 and 44 had out-of-pocket expenses that averaged 68 percent higher than men of the same age range. [11] Contraception is a key contributing factor to the disparities in medical spending and although the costs have traditionally been borne by women, the cost savings benefit entire families.

Not only does the IFR undermine advances in these medical expense gender disparities, it seriously jeopardizes the likelihood that women will be able to afford contraception. The potential reintroduction of cost sharing or elimination of coverage altogether could have serious adverse impacts on the level of preventative care. Studies have shown that even moderate costs can cause individuals to forgo needed preventative care, a problem that is particularly acute among individuals with low and moderate incomes.[12] Prior to the implementation of the benefit, a survey conducted by the Guttmacher Institute in 2009 found that because of the economic recession, 23 percent of women reported having difficulty paying for birth control and 24 percent put off a gynecology or birth control visit because of cost.[13] Another survey found that more than half of women ages 18-34 reported experiencing a time in their lives when they could not

---

[9] U.S. Dep't of Health and Human Servs., CDC, "Effectiveness of Family Planning Methods," *available at* https://www.cdc.gov/reproductivehealth/unintendedpregnancy/pdf/contraceptive_methods_508.pdf.

[10] National Women's Law Center, "It Shouldn't Be a Heavy Lift: Fair Treatment for Pregnant Workers," (2013), *available at* https://nwlc.org/resources/it-shouldnt-be-heavy-lift-fair-treatment-pregnant-workers/.

[11] Louis Jacobson, "Ruth Bader Ginsburg dissent says women pay 68 percent more out of pocket for health care" Politifact (July 2, 2014), *available at* http://www.politifact.com/truth-o-meter/statements/2014/jul/02/ruth-bader-ginsburg/ruth-bader-ginsburg-dissent-says-women-pay-68-perc/.

[12] National Women's Law Center, "Denying Coverage of Contraceptives Harms Women" (Nov. 2011), *available at* https://www.nwlc.org/sites/default/files/pdfs/fs_on_the_relig_exempt_to_cc_without_cost-sharing_november_2011.pdf.

[13] Guttmacher Institute, "A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions" (Sept. 2009), *available at* http://www.guttmacher.org/pubs/RecessionFP.pdf.

3

Exhibit 57

00207091

afford to use birth control consistently.[14] While access to contraception is critical for women in order for them to plan their family decisions and participate in the labor force and pursue educational opportunities, maintaining this access at no cost ensures that this essential benefit is available to women of all economic backgrounds.

### B. Public Health

In addition to the government's compelling interest in promoting gender equality and enabling women to advance in the workforce and in education, the government has a compelling interest in the public health benefits of no-cost access to preventative birth control. As an organization with more than half our members working in healthcare, we are closely attuned to the negative impacts that unintended pregnancy can have on both the mother and the child.

Unintended pregnancy is not a small phenomenon in our country. From 2011 to 2015, 33 percent of pregnancies were unintended.[15] Births resulting from unintended or closely spaced pregnancies are associated with adverse maternal and child health outcomes, such as delayed prenatal care, premature birth, and negative physical and mental health effects for children.[16] Compared to women who become pregnant intentionally, women who experience unintended pregnancies have a higher incidence of mental-health problems, have less stable romantic relationships, experience higher rates of physical abuse, and are more likely to have abortions or to delay the initiation of prenatal care.[17] Children whose conception was unintentional are also at greater risk than children who were conceived intentionally of experiencing negative physical- and mental-health outcomes and are more likely to drop out of high school and to engage in delinquent behavior during their teenage years.[18]

Contraception prevents unintended pregnancy. According to the researchers at the CDC, "[w]omen of all ages are more likely to choose and continue using highly effective contraceptive methods when the contraceptive methods and accompanying services (including patient education and counseling) are provided without cost."[19] The Coverage Policy ensures that contraceptives are available to millions of women without cost sharing, and the IFR has the potential to undermine that access and increase the incidence of unintended pregnancy.

### II. Flawed Reasoning in the IFR

---

[14] Planned Parenthood, "Survey: Nearly Three in Four Voters in America Support Covering Prescription Birth Control" (Jan. 30, 2014), *available at* https://www.plannedparenthood.org/about-us/newsroom/press-releases/survey-nearly-three-four-voters-america-support-fully-covering-prescription-birth-control.

[15] U.S. Dep't of Health and Human Servs., CDC, "Key Statistics from the National Survey of Family Growth - I Listing," *available at* https://www.cdc.gov/nchs/nsfg/key_statistics/i.htm#intended.

[16] Guttmacher Institute, "Unintended Pregnancy in the United States" (Sept. 2016), *available at* https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf.

[17] Adam Thomas and Emily Monea, "The High Cost of Unintended Pregnancy" Brookings Institution (July 2011), *available at* https://www.brookings.edu/wp-content/uploads/2016/06/07_unintended_pregnancy_thomas_monea.pdf. [18]*Id.*

[19] Jared Fox, PhD, MPP and Wanda Barfield, MD, MPH, "Decreasing Unintended Pregnancy" (Aug. 23, 2016), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4995141/.

4

00207092

Exhibit 57

JA-0000970

The reasoning set forth in the IFR for permitting moral objections by employers is both misleading and ungrounded. Specifically, the IFR undermines the compelling governmental interests furthered by the Coverage Policy; the assertion that the IFR's impact would be "limited" is baseless; and any supposed benefits of the IFR are insufficient to overcome the harm that will result from eliminating the Coverage Policy.

### A. The IFR Will Undermine Compelling Government Interests

In addition to the procedural and substantive shortcomings discussed below, the IFR erroneously concludes that the Coverage Policy does not serve a compelling governmental interest. In reaching this conclusion, the Departments completely disregard the fundamental reasons why the contraceptive Coverage Policy was determined to serve a compelling governmental interest in the first place. By expanding the scope of the existing exception to encompass any employer with a vague and ill-defined "moral objection," the Departments undermine a compelling government interest and eviscerate the least restrictive means of furthering that compelling interest previously formulated by the Departments.

The Departments' suggestion that women can just access contraception through other programs or just pay for it themselves, ignores the fact that the Coverage Policy was necessary in the first place because the existing family planning safety net programs do not do enough to provide access to populations in need of contraception coverage.[20] As cost is a significant barrier to women obtaining this preventative care, any increase in organizations seeking exemptions will lead to a decrease in contraception use.

### B. The IFR's Assertion That the Impact will be Limited is Erroneous

The IFR attempts to erase a woman's fundamental interest in making her own reproductive health decisions by allowing her employer make these decisions for her. It does so in part by making the entirely unfounded assertion that the people who work for organizations who would claim religious or moral objections to contraception are likely to share those objections. Given that the vast majority of American women who have ever had sexual intercourse use contraception at some point in their lives, it is extremely likely that exempting employers from the Coverage Policy will directly affect women who do not share their employers' "beliefs."

Furthermore, the IFR goes beyond the religious-based objections under the Affordable Care Act and Burwell v. Hobby Lobby[21] to allow any non-profit, closely-held for-profit employer, or private institutions of higher education that issue student health plans to apply for an accommodation or exemption from the Coverage Policy based on moral convictions. The rule provides no definition of the term "moral conviction," allowing employers to claim an exemption without any accountability. Moreover, the rule does not provide employees with a mechanism to challenge an employer's alleged moral belief. Without

---

[20] *See* Amanda J. Stevenson, M.A., Imelda M. Flores-Vazquez, Ph.D., Richard L. Allgeyer, Ph.D., Pete Schenkkan, J.D., and Joseph E. Potter, Ph.D., "Effect of Removal of Planned Parenthood from the Texas Women's Health Program," *New England Journal of Medicine* (March 3, 2016), *available at* http://www.nejm.org/doi/full/10.1056/NEJMsa1511902.

[21] 134 S. Ct. 2751 (2014).

5

00207093

Exhibit 57

accountability and safeguards, employers will be free to exploit the moral exemption for financial and business reasons.

## C. Exempting Businesses from Generally Applicable Laws is Bad Policy and Harms Workers

By prioritizing the moral convictions of organizations above the health and economic interests of women and their families, the rule sets a dangerous precedent both for the Affordable Care Act and for other laws of general applicability.

The fact that the IFR implies that one of its goals is to settle litigation suggests that if other employers or entities sue over the applicability of other parts of the Affordable Care Act, or other laws of general applicability, the government's response may be to capitulate and sacrifice the important goals of those laws to the alleged interest of the objecting entities to impose their religious or moral views on others. For instance, within the health care sphere employers could object to covering vaccinations. Several states have already seen increased rates of dangerous and previously rare diseases such as measles and whooping cough following increased numbers of parents expressing religious or moral objections to vaccinating their children.[22]

Outside the health care sphere, businesses have begun asserting religious objections to serving customers based on their sexual orientation. This echoes the long history of businesses and employers asserting that race or sex discrimination was required by their religions.[23] Courts have long rejected claims that religious beliefs excused noncompliance with child labor laws, minimum wage laws, and civil rights laws.[24] The government should not, via this "moral exemption" rule, undermine those longstanding principles.

The rule imposes a disparate impact on women because it primarily affects their right to reproductive freedom concerning contraceptive care. The Coverage Policy was implemented to resolve the fact that women tend to pay more for insurance coverage than their male counterparts. Furthermore, this rule is problematic because it allows employers and schools to deny preventive health benefits that only women use, and thus discriminates based on sex.

## III. The IFR Violates the Administrative Procedure Act

The APA imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[25] The APA is applicable here because the IFR is a final agency action and is a legislative rule within the meaning of the APA.[26] By enacting the IFR in

---

[22] Phadke VK, Bednarczyk RA, Salmon DA, Omer SB, "Association Between Vaccine Refusal and Vaccine-Preventable Diseases in the United States: A Review of Measles and Pertussis" JAMA. 2016; 315(11): 1149-58, *available at* https://jamanetwork.com/journals/jama/article-abstract/2503179.

[23] *See Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968).

[24] *See* NWLC Hobby Lobby Brief at 28-32.

[25] 5 U.S.C. § 551(5).

[26] *Id.*

6

00207094

Exhibit 57

JA-0000972

the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

### A. Procedural Violations of Pre-Adoption and Post-Adoptions Requirements of the Administrative Procedure Act

The IFR violates both the APA's notice and comment requirement, and its 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its assertion to the contrary, the Department does not have good cause.

#### 1. Procedural Requirements at Issue

Section 553(b) of the Administrative Procedure Act (APA) requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[27] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[28] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[29]

#### 2. What is "Good Cause"?

The APA limits good cause to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[30] Courts have found good cause in cases that involve: (1) emergencies;[31] (2) contexts in which prior notice would subvert the underlying statutory scheme;[32] and (3) situations where Congress intends to waive section 553's requirements.[33] An agency's

---

[27] 5 U.S.C. § 553(b).

[28] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[29] *Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996).

[30] 5 U.S.C. § 553(b).

[31] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004).

[32] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (The court reasoned that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made.).

[33] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hospital of Sacramento v. Shalala*, 38

7

Exhibit 57

00207095

determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[34] This means that the Departments must have good cause to waive each requirement.

### 3. The Departments Have Not Satisfied the "Good Cause" Standard

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[35] While these statutes empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health Insurance Portability and Accountability Act of 1996,[36] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[37] This conclusory statement does not meet the standard Courts have enumerated for rulemaking rise to the standard of "good cause." Rather, it is similar to other instances in which agencies made conclusory claims of an emergency situation, unaccompanied by independent facts, which courts deemed insufficient to constitute good cause.[38]

The Departments further argue that good cause is supported because of lawsuits that have been pending "for several years by entities raising nonreligious moral objections to the [Coverage Policy]," and that "delaying the availability of the expanded exemption would require entities to bear these burdens [including a "crisis of conscience"] for many more months."[39] However, this reasoning should be weighed against the burdens that many women will face if their employer decides to take advantage of the IFR and ceases to offer contraception without cost-sharing. They will be forced to find alternative means for contraceptive coverage or to pay high prices out of pocket to maintain the contraception coverage they currently have.

---

F.3d 1225, 1237 (D.C. Cir. 1998) (Here, the courts are finding that the APA is inapplicable, rather than that good cause is established.).

[34] *U.S. v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

[35] Moral Exemptions and Accommodations for Coverage of Certain Preventable Services Under the Affordable Care Act, 82 Fed. Reg. 47838, 47855 (Oct. 13, 2017).

[36] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); 42 U.S.C. § 300gg–92.

[37] 82 Fed. Reg. at 47855.

[38] *See, e.g.*, *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 707 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v.Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); *United States v. Brewer*, 766 F.3d 884, 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting *United States v. Reynolds*, 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).

[39] 82 Fed. Reg. at 47855.

00207096

Exhibit 57

JA-0000974

As explained above, the Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and the APA's post-adoption publication requirements. They have not adequately established that the APA's procedural requirements don't apply or that they have good cause for disregarding the APA's procedural rulemaking requirements. Because the IFR was promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, the Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the IFR should be repealed.

### B. Substantive Violations of the Administrative Procedure Act

In addition to the APA's procedural requirements described above, the APA contains several substantive rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[40] The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[41] "contrary to a constitutional right,"[42] or "in excess of statutory jurisdiction."[43] The IFR violates 5 U.S.C. § 706(2) because it contradicts the Affordable Care Act.

The Affordable Care Act requires all new insurance plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" without cost-sharing requirements in order to protect women's health, ensure that women do not pay more for insurance coverage than men, and advance women's equality and well-being.[44] In addition, section 1554 of the Affordable Care Act prohibits the Departments from issuing regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care"[45] and Section 1557 of the Affordable Care Act, prohibits sex discrimination in certain health programs and activities.[46]

By permitting objecting institutions to deny no-cost contraceptive coverage, the IFR erects unreasonable barriers to medical care violating Section 1554 of the Affordable Care Act. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the Affordable Care Act. Because the IFR violates the Affordable Care Act, this IFR also violates the APA and must be set aside on that basis.

### IV. Clarifications Are Needed

If the flaws we have identified in the IFR are corrected and a new rule issued, several additional clarifications would be required to ensure that the rule protects employees and students, and does not violate existing law.

---

[40] 5 U.S.C. § 551(5).

[41] 5 U.S.C. § 706(2)(A).

[42] 5 U.S.C. § 706(2)(B).

[43] 5 U.S.C. § 706(2)(C).

[44] *See* 4 2 U.S.C. § 300gg-13(a)(4); 4 5 C.F.R. § 147.130 (2013)(a)(1)(iv).

[45] 42 U.S.C. § 18114(1).

[46] 42 U.S.C. § 18116.

9

00207097

Exhibit 57

JA-0000975

First, the rule must be clarified to make clear that employers whose employees have chosen to unionize and engage in collective bargaining follow the procedures set forth in the National Labor Relations Act if they intend to change their employees' health insurance benefits. Those benefits are a mandatory subject of collective bargaining, and cannot be changed except through the collective bargaining process.

Second, the rule must be clarified to ensure that employers, insurance issuers and third-party administrators do not violate ERISA's notification requirements when changing employees' health insurance benefits.

Third, the rule must be clarified to ensure that an appropriate governmental agency be notified of any decision to change health insurance benefits so that arrangements can be made to ensure that the affected women have seamless access to contraceptive coverage.

V. Conclusion

The Coverage Policy serves the compelling interests of advancing gender equality and mitigating the public health risks of unintended pregnancy. By eliminating the Coverage Policy, the IFR undermines these interests and creates a situation in which businesses can impose their own moral views on their employees and discriminate against women. Furthermore, by failing to show good cause for not complying with the pre-adoption and post-adoption rulemaking waiting periods, the Moral Exemptions IFR violates the APA.

If the flaws identified in the IFR are corrected and a new rule is issued, several clarifications are needed in order to ensure that employees are protected and existing laws are not violated.

Sincerely,

Service Employees International Union

The National Employment Law Project

Public Citizen

National Black Worker Center Project

Workplace Fairness

Equal Rights Advocates

Maine Women's Lobby

National Immigration Law Center

Coalition for Economic Justice

10

00207098

Exhibit 57

Legal Aid at Work

11

Exhibit 57



**Lambda Legal**
making the case for equality

December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act (RIN 0938-AT20)**

Dear Secretary Hargan:

Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal") appreciates the
opportunity provided by the Department of Health and Human Services, the Department of
Labor, and the Department of the Treasury (collectively, "the Departments") to offer comments
in response to the Religious Exemptions and Accommodations for Coverage of Certain
Preventive Services interim final rule ("Religious Exemptions IFR" or "IFR") published in the
Federal Register on October 13, 2017. Lambda Legal is the oldest and largest national legal
organization dedicated to achieving full recognition of the civil rights of lesbian, gay, bisexual,
and transgender ("LGBT") people and people living with HIV through impact litigation, policy
advocacy, and public education. For decades, Lambda Legal has been a leader in the fight to
ensure access to quality health care for LGBT people and people living with HIV. Many people
in the communities Lambda Legal serves, like many in the general population, need contraceptive
services for a range of health reasons. Consequently, insurance coverage for these services is
essential.

In public comments submitted on September 20, 2017, in response to the Request for
Information, Coverage for Contraceptive Services, published in the Federal Register at 81 FR
47741 *et seq.*, Lambda Legal explained that the existing accommodation under the Patient
Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (March 23, 2010), and
the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029
(March 30, 2010) (collectively, "ACA") does not substantially burden employers' exercise of
religion, and that the accommodation constitutes the least restrictive means necessary to further
the government's compelling interest in ensuring full and equal health coverage for employees
regardless of gender. Indeed, Lambda Legal also previously briefed these points at length as
*amicus curiae* in *Zubik v. Burwell*,[1] in addition to cautioning about negative consequences for

---

[1] Brief of Amici Curiae Lambda Legal Defense and Education Fund, Inc., *et al.*, *Zubik v. Burwell*, 136 S.
Ct. 1557 (2016) (Nos. 14-1418, 14-1453, 14-1505, 15-35, 15-105, 15-119, 15-191), *available at*
http://www.lambdalegal.org/in-court/legal-docs/zubik_us_20160217_amicus.

WESTERN REGIONAL OFFICE 4221 WILSHIRE BOULEVARD, SUITE 280, LOS ANGELES, CA 90010  T 213-382-7600  F 213-351-6050
WWW.LAMBDALEGAL.ORG

00373626

Exhibit 58                                          JA-0000978


Lambda
Legal

*U.S. Dept. of Health & Human Services*
*Religious Exemptions IFR*
*RIN 0938-AT20*
*December 5, 2017 – Page 2*

LGBT people and people living with HIV, among others, if religiously-affiliated non-profits are permitted to impose religious beliefs on workers.

These same negative consequences would be aggravated by expanding the category of those employers who could refuse contraceptive health care coverage to their employees, not just through accommodations, but by claiming the right to a complete exemption from the law due to asserted religious beliefs. Of serious concern is the Religious Exemptions IFR's creation of a sweeping new exemption for "all bona fide religious objectors," described as any "non-governmental plan sponsors that object based on sincerely held religious beliefs, and institutions of higher education in their arrangement of student health plans."[2] This sweeping new exemption for virtually any employer asserting a religious belief allowing them effectively to block employee access to full preventive health coverage constitutes more than just a dangerous reversal of the Departments' previous positions that the existing accommodation offered by the ACA to eligible non-profit employers that object on religious grounds to the contraceptive coverage requirements of the ACA are adequate and consistent with the Religious Freedom Restoration Act, Pub. L. No. 103-141, 107 Stat. 1488 (Nov. 16, 1993) ("RFRA"). The unjustified reversal of that position to create a broad new exemption without meaningful limiting principles is also unwarranted and threatens serious harms both to those who would be denied contraceptive health care access under the new exemption and to constitutional and statutory protections and principles. In particular, the First and Fifth Amendments to the United States Constitution, and the protections of the Administrative Procedure Act ("APA") and the Affordable Care Act ("ACA") are all violated by the Religious Exemptions IFR.

We consequently urge the Departments to set aside this Rule. These comments address (1) how the Religious Exemptions IFR creates a harmful and dangerous precedent by allowing a potentially unlimited class of employers to assert religious beliefs to exempt themselves from required provision of health care coverage; (2) how the Religious Exemptions IFR violates statutory and constitution protections under the APA, the ACA, and the U.S. Constitution.

### LGBT People and People Living with HIV Will Be Substantially Harmed by the Proposed New Exemption.

In a stark reversal of its previous concern for protecting the health of employees in this nation reflected in the July 22, 2016 Request for Information,[3] which sought assurances that any additional accommodations under the ACA should ensure seamless coverage for approved contraceptives,[4] the focus of the new IFR is glaringly lacking in any such concern for ensuring continued seamless health care coverage for employees. The failure of the Departments to prioritize the health care needs of employees in its reversal, and its pivot instead toward creating a

---

[2] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 FR 47792 (hereinafter, "IFR"), 47806 (Proposed Oct. 13, 2017).

[3] Published in the Federal Register on July 22, 2016, at 81 FR 47741 *et seq.*

[4] *Id.* at 47742-44.

00373627

Exhibit 58                                                                                    JA-0000979


Lambda
Legal

*U.S. Dept. of Health & Human Services*
*Religious Exemptions IFR*
*RIN 0938-AT20*
*December 5, 2017 – Page 3*

sweeping exemption for "all bona fide religious objectors"[5] enabling them to deny health care to their employees, will result in substantial harms to employees nationwide, including LGBT employees and those living with HIV.

The IFR would force those in need of contraceptive coverage but who work for employers empowered to block reproductive health care coverage in the name of religion to scramble to find alternative supplemental insurance on their own. Imposing this hardship on employees across the country would be deeply injurious. The creation of such an exemption would not just interfere with the ability of employees to receive seamless health care coverage, but would completely deprive them of an essential aspect of their health insurance coverage through their employer-provided insurance policies. Not only would that denial stigmatize employees in need of contraception services, in a great many cases it very likely would result in delayed health care provision, or complete denial of health care if employees are denied even the basic accommodation the Departments previously recognized as essential to seamless coverage. The creation of a new exemption from the ACA's coverage requirements invites increased demands for other health care denials, providing the very barriers to the delivery of contraceptive services to which the Departments objected in *Zubik v. Burwell*.[6]

First, requiring employees and other insureds affirmatively to find on their own and enroll in a separate contraceptive-only insurance plan would create an additional layer of confusion, potential for miscommunication, and deterrent to treatment or delay in treatment for some patients. This is particularly true for employees and their family members who do not realize at the time of initial enrollment that they may develop a medical need for contraceptive-related care in the future. For example, an insured person who has not previously used contraceptives to prevent pregnancy may not anticipate that a physician later will determine based on the individual's specific medical history that pregnancy prevention is important for health reasons and that contraceptives constitute the best method for doing so. Additionally, contraceptives are a common form of treatment for health conditions unrelated to pregnancy prevention. An insured person who is not sexually active or of reproductive age may not anticipate being prescribed contraceptives until the patient is diagnosed with a condition such as polycystic ovary syndrome, or until the discovery of risk factors for certain types of cancer. Employees and other insureds should not be required to seek out information and affirmatively enroll in a contraceptives-only plan, particularly given the potential for delay and confusion about whether such enrollment is possible if the primary health care plan is not permitting open enrollment at the time of an unexpected diagnosis necessitating contraceptive coverage.

Second, the proposed exemption would create an unnecessary barrier to care because even if employees were able on their own to obtain such contraceptive-coverage-only policies, those policies may not have the same network of providers as the primary health plan offered by

---

[5] IFR, 82 FR at 47806.

[6] Supplemental Brief of Respondents Sylvia Burwell, Secretary of Health and Human Services, et al., *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (Nos. 14-1418, 14-1453, 14-1505, 15-35, 15-105, 15-119, 15-191) at 3-6.

00373628

Exhibit 58                                                                                    JA-0000980



Lambda
Legal

*U.S. Dept. of Health & Human Services*
*Religious Exemptions IFR*
*RIN 0938-AT20*
*December 5, 2017 – Page 4*

the employer. Employees should not be required to switch doctors or see two physicians once the need for contraceptive-related care arises, which would create the potential for delays in treatment. Third, requiring employees in need of contraceptive coverage to take steps to obtain care that other employees need not take would stigmatize these employees on the basis of their gender-related health care needs, and deter them from seeking out medically necessary treatment. Fourth, the proposed exemption leaves undetermined how, without written notice to covered employees and to the federal government, there would be meaningful oversight.

The proposed exemption concerns Lambda Legal because many members of the LGBT community need contraceptive services, and the exemption would impede their access to necessary care. A majority of lesbian and bisexual women use contraceptives at some point over the course of their lifetimes. Transgender men also may need contraceptive-related care.[7] The need for seamless contraceptive coverage is of deep concern to the communities we represent.

Lambda Legal opposes the proposed exemption for the additional reason that permitting such an exemption would invite religious non-profits to demand exemptions from the provision of health needs other than contraception, such as for medical care relating to sexual orientation, gender identity and HIV. LGBT people and people living with HIV too often experience discrimination in the workplace and in health care contexts by those who attempt to justify such discrimination on the basis of religion. Lambda Legal previously cited numerous examples of such discrimination in response to a prior request for information.[8] Just a few examples include the following:

- A counseling student challenged her expulsion from a counseling program due to her refusal to counsel patients in same-sex relationships. *Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011).

- A visiting nurse argued that she had a free-exercise right to engage in anti-gay proselytizing to a home-bound AIDS patient. *Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156 (2d Cir. 2001).

- A physician argued that his religious beliefs justified refusing to employ gay people. *Hyman v. City of Louisville*, 132 F. Supp. 2d 528 (W.D. Ky. 2001), vacated on other grounds by 53 Fed. Appx. 740 (6th Cir. 2002).

- A physician withheld infertility treatment from a lesbian patient, citing religious justifications. *North Coast Women's Care Med. Grp., Inc. v. San Diego Cty. Superior Court (Benitez)*, 189 P.3d 959 (Cal. 2008).

---

[7] *See* Camilla Taylor, "Why This Year's Reproductive Freedom Supreme Court Cases are Important for LGBT People and Those Living with HIV," available at http://www.lambdalegal.org/blog/20160301_ reproductive-freedom-scotus-cases-matter-for-lgbt- hiv (citing studies).

[8] *See* Lambda Legal Response to Request for Information Regarding Nondiscrimination in Certain Health Programs or Activities, 1557 RFI (RIN 0945-AA02 & 0945-ZA01) (submitted Sept. 30, 2013) ("Lambda Legal 1557 Response"), available at http://www.lambdalegal.org/in-court/legal-docs/ltr_hhs_20130930_ discrimination-in-health-services.

00373629

Exhibit 58



Lambda
Legal

*U.S. Dept. of Health & Human Services*
*Religious Exemptions IFR*
*RIN 0938-AT20*
*December 5, 2017 – Page 5*

- A lab technician refused to do tests on specimens labeled with HIV because he believed "AIDS is God's plague on man and performing the tests would go against God's will." *Stepp v. Review Bd. of Indiana Emp. Sec. Div.*, 521 N.E.2d 350 (Ind. 1988).

- A religiously-affiliated hospital cited religious justifications for refusing to allow a physician to perform a hysterectomy on a transgender man. *See* A. Littlefield, "Catholic Hospital Denies Transgender Man a Hysterectomy on Religious Grounds," *available at* https://rewire.news/article/2016/08/31/catholic-hospital-denies-transgender-man-hysterectomy-on-religious-grounds/.

Although courts routinely have rejected such religious objections to treating LGBT people and people living with HIV as impermissible discrimination, distressing examples of discriminatory treatment in the health care context continue to occur with regularity.[9] This discrimination contributes to persistent health disparities for LGBT people and people living with HIV.[10] As we previously explained in our September 30, 2013, submission in response to a Request for Information,[11] preventing discrimination in the provision of health care services can have significant ameliorative effects on the health of LGBT people and people living with HIV. Given this landscape, Lambda Legal is concerned that permitting the proposed exemption would

---

[9] *See* Lambda Legal Comments on Proposed Rule 1557 Re: Nondiscrimination in Health Programs and Activities, 1557 NPRM (RIN 0945-AA02) (submitted Nov. 9, 2015) ("Lambda Legal 1557 Comments"), available at https://www.lambdalegal.org/in-court/legal-docs/hhs_dc_20151117_letter-re-1557 (detailing examples and describing precedent rejecting religious objections as justification for discrimination); Brief of Amici Curiae Lambda Legal Defense and Education Fund, Inc., *et al.*, *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, No. 16-111 (filed Oct. 30, 2017), *available at* https://www.lambda legal.org/in-court/cases/masterpiece-cakes-v-co-civil-rights-commission; Brief of Amici Curiae Lambda Legal Defense and Education Fund, Inc., *et al.*, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (Nos. 14–1418, 14–1453, 14–1505, 15–35, 15–105, 15–119, 15–191), *available at* https://www.lambdalegal.org/in-court/cases/zubik-v-burwell.

[10] *See* Inst. of Med., The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding (2011) ("IOM Report") (undertaken at the request of the National Institutes of Health, and providing an overview of the public health research concerning health disparities for LGBT people and the adverse health consequences of anti-LGBT attitudes), *available at* http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx. Additionally, in 2010, Lambda Legal conducted the first-ever national survey to examine the refusals of medical care, other barriers to care, and substandard treatment confronting LGBT people and those living with HIV. The report, WHEN HEALTH CARE ISN'T CARING ("Lambda Legal, Health Care"), is available at http://www.lambdalegal.org/publications/when-health-care-isnt-caring. Because LGBT people and those living with HIV too often do experience discrimination in health care services, and are especially vulnerable to breaches of confidentiality in medical settings, and to violations of their personal autonomy regarding reproductive decisions, sexual health, gender expression, transition-related care, HIV care and other matters, Lambda Legal works to address this discrimination nationally with litigation, policy advocacy, community education, and education to ensure that medical professionals and healthcare facilities understand their responsibility to treat LGBT and HIV-positive patients fairly. *See* Lambda Legal, Health Care, *available at* http://www.lambdalegal.org/issues/health-care-fairness.

[11] *See supra* n. 8, Lambda Legal 1557 Response, 1557 RFI (RIN 0945-AA02 & 0945-ZA01).

00373630

Exhibit 58                                                                                              JA-0000982



Lambda
Legal

invite religious non-profit employers to demand similar exemptions in contexts involving sexual orientation, gender identity, or HIV. Past examples of religiously-based discrimination suggest that such employers may demand exemptions from ensuring that the following employees and other insureds receive full health care coverage:

- Employees and other insureds who have a same-sex spouse or are in a same-sex relationship, including with respect to bereavement counseling after the loss of a same-sex partner or other mental health care that involves affirmation of an employee's sexual orientation or gender identity.[12]

- Employees and other insureds with health care needs relating to HIV, including with respect to pre-exposure prophylaxis (PrEP), a highly effective medication that dramatically reduces the risk of HIV infection among those who are otherwise at high risk, including people who are in a sexual relationship with an HIV-positive partner.

- Employees and other insureds who need hormone replacement therapy, gender confirmation surgeries, or other treatments for gender dysphoria.[13]

- Employees and other insureds who are unmarried or in a same-sex relationship and who

---

[12] *See, e.g., Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2016).

[13] Such a scenario unfortunately is not far-fetched. Transgender patients frequently encounter religious objections to medically necessary care for gender dysphoria, and religious non-profit hospitals have refused medically necessary treatment to transgender patients on religious grounds—despite routinely providing such treatment to patients whose medical need for it is unrelated to gender dysphoria. For example, Lambda Legal client, Naya Taylor, a transgender woman in Mattoon, Illinois, sought hormone replacement therapy (HRT), a treatment for gender dysphoria, from the health clinic where she had received care for more than a decade. Ms. Taylor's primary care physician not only refused to treat her, but also refused to provide ongoing blood work to monitor her hormone levels. When Ms. Taylor protested to the clinic that she was being denied transition-related care, she was told that because of the religious beliefs of the clinic's doctors, they do not have to treat "people like you." In April 2014, Lambda Legal filed a claim of sex discrimination on Ms. Taylor's behalf under Section 1557 of the ACA; however, Ms. Taylor subsequently passed away and her case was voluntarily dismissed. *See* Complaint, *Taylor v. Lystila*, 2:14-cv-02072- CSB-DGB (C.D. Ill., April 15, 2014), *available at* https://www.lambdalegal.org/in-court/legal-docs/taylor_il_20140416_complaint.

In addition to secular medical providers such as the defendants in *Taylor* that discriminate on religious grounds, some religiously affiliated medical providers refuse medically necessary care to transgender patients as a matter of institutional policy. *See, e.g., Franciscan Alliance, Inc., et al. v. Burwell, et al.,* Case 7:16-cv-00108-O, U.S. Dist. Ct., W.D. Tex., Wichita Falls Div. (complaint filed Aug. 23, 2016) (objecting on religious grounds to ACA's gender identity nondiscrimination requirement). *available at* https://assets.documentcloud.org/documents/3033562/Franciscan-Alliance-v-Burwell.pdf; Comments of U.S. Conference of Catholic Bishops, *Nondiscrimination in Health Programs and Activities,* RIN 0945-AA02, p. 9, fn. 17 (Nov. 6, 2015) (quoting Pope Francis, *General Audience on Man and Woman* (Apr. 15, 2015), which rejects gender transition as an improper elimination of "the sexual difference between males and females" and as forbidden sterilization), *available at* http://www.usccb.org/about/general-counsel/rulemaking/upload/Comments-Proposal-HHS-Reg-Nondiscrimination-Federally-Funded-Health.pdf.

00373631

Exhibit 58                                                                                      JA-0000983


Lambda
Legal

*U.S. Dept. of Health & Human Services*
*Religious Exemptions IFR*
*RIN 0938-AT20*
*December 5, 2017 – Page 7*

require infertility treatment.[14]

To deny coverage to such employees and other insureds would not only constitute discrimination, but would harm them by interfering with their ability to obtain medically necessary health care and also by stigmatizing them. The Departments would give unnecessary encouragement to such efforts if it were to create the broad exemptions from ACA coverage proposed in this Rule.

Finally, the IFR's sweeping new exemption for any purported "bona fide religious objector" who wishes to block access to an employee's contraceptive health care because of the employer's subjective alleged religious or moral beliefs is dangerously broad.  Such efforts to codify religion-framed exemptions from legal requirements that have the effect of harming others, endorsed as a special exemption under law, threaten not just the wellbeing of those in need of reproductive health care, but also the rule of law itself.  This is because there is no limiting principle to temper the inevitable harms of the requested exemptions.  Consequently, all the harms described herein could be just the tip of the iceberg in the scope of health care denials effectuated by employers invoking a new religious exemption to evade complying with the ACA and providing meaningful preventive health care to their employees.

Accordingly, we strongly urge the Departments to reinforce the principle that religion cannot be used to discriminate, and to reject efforts to replace the accommodation process that already respects religious freedom and the autonomy of religious non-profit employers with the creation of sweeping exemptions with no meaningful limiting principle.  The creation of such a sweeping exemption would subordinate the health and wellbeing of American workers to the subjective religious beliefs of any given employer who seeks to block necessary reproductive health care access to employees, denying the seamless access to the reproductive health care to which employees are entitled under the law.

### The IFR Violates Constitutional and Statutory Protections Under the Affordable Care Act, the Administrative Procedure Act and the United States Constitution.

The IFR is in violation of statutory protections under the ACA, administrative requirements under the APA, and constitutional protections under the U.S. Constitution.

As to the statutory violations posed by the IFR, the issuance of the IFR fails to comply with the APA by constituting an arbitrary and capricious rulemaking process, by exceeding statutory authority, by failing to satisfy required notice and comment procedures, and by otherwise creating potential statutory and constitutional violations.

Under the Administrative Procedure Act (APA), a rule is invalid if the rulemaking processes of agencies in promulgating it is impermissibly arbitrary and capricious.[15]

---

[14] *See N. Coast Women's Care Med. Grp., Inc. v. San Diego Cty. Superior Court*, 44 Cal. 4th 1145, 189 P.3d 959 (2008).

[15] 5 U.S.C. § 706.

00373632

Exhibit 58                                                                                                    JA-0000984



Lambda
Legal

*U.S. Dept. of Health & Human Services*
*Religious Exemptions IFR*
*RIN 0938-AT20*
*December 5, 2017 – Page 8*

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[16]

The arbitrary and capricious standard articulated in *State Farm* is one that requires a "hard look" at an agency's rulemaking record, rather than employing a highly deferential form of arbitrary and capricious review.[17] Here, there is no evidence that Congress intended the Departments to implement sweeping exemptions to the ACA's coverage mandates. Rather, the IFR is directly contrary to Section 1557 of the ACA, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."

Further, when Congress passed the Women's Health Amendment to the ACA at Section 2713(a)(4), it intended "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens." The intent of Congress to include contraceptive access and other family planning services under the Amendment is further documented in the Congressional Record, which includes, for example, statements of Senator Gillibrand that "[w]ith Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning"; and Senator Franken that the Amendment was added because "affordable family planning services must be accessible to all women in our reformed health care system."

This clear intent of Congress to ensure contraceptive coverage to employees receiving health insurance under the ACA through their employers' plans would be thwarted by allowing those claiming religious objections to their employees' personal reproductive health needs to exempt themselves from the contraceptive coverage requirements of the Women's Health Amendments to the ACA. Allowing virtually anyone claiming a religious exemption to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement. By permitting a limitless number of employers to deny contraceptive coverage to their employees, the rule's proposed exemption from contraceptive coverage erects harmful and unreasonable barriers to medical care and impedes timely access to contraception. Were the proposed IFR to be promulgated, these provisions of the ACA would be contravened, in violation of the APA.

---

[16] *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[17] *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002) (*citing State Farm, id.*; *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir.1990)).

00373633

Exhibit 58

JA-0000985


Lambda
Legal

*U.S. Dept. of Health & Human Services*
*Religious Exemptions IFR*
*RIN 0938-AT20*
*December 5, 2017 – Page 9*

For purposes of the APA, the only relevant statute that establishes the permissible parameters of a regulatory promulgation is the authorizing statute, not other statutes. Thus, attempts to justify the sweeping new exemption in the IFR by reference to other statutes – i.e., federal laws allowing some health care entities to refrain from directly providing abortion care, and other federal laws allowing religious refusals – do not satisfy the requirements of the APA, under which there must be direct and clear authority under the ACA itself for the IFR. Similarly, attempts to rationalize the proposed exemption by reference to the grandfathering of some plans, temporarily exempting them from other ACA requirements, are misguided, because plans are only entitled to grandfather status on a temporary basis, until employers are able to transition into full compliance.

Consequently, not only is the IFR arbitrary and capricious, but it exceeds the authority set by, and conflicts with, the ACA.

In addition, the IFR does not meet the procedural requirements of the APA. the Departments published this rule *for the first time* as an interim final rule, effective immediately upon publication. Such an abbreviated regulatory process bypasses and violates the procedural safeguards of the APA. The APA requires that agencies must publish notice of proposed rules in the federal register and provide opportunity for public comment. Specifically, the APA provides that "[g]eneral notice of proposed rulemaking shall be published in the Federal Register, unless persons subject thereto are named and either personally served or have actual notice thereof in accordance with law," after which, a new rule must be subjected to public comment.[18] By skipping this statutory requirement and instead presenting a new sweeping exemption for the first time in the form of an interim final rule, the Departments have failed to comply with the requirements of the APA.

The previous notice and comment period accompanying the previous proposed rules (which did not include such a sweeping exemption as set forth in the IFR here) does not satisfy these requirements, because changes between a proposed rule and a final rule are governed by the "logical outgrowth test," under which the Departments failed to give required notice that would have "fairly apprise[d] interested parties" of the issues and which is only satisfied "if the final rule is a 'logical outgrowth' of the notice and comments already given." *Chocolate Mfrs. Ass'n of the U.S. v. Block*, 755 F.2d 1098, 1105 (4th Cir. 1985) (citation omitted). Here, the previous rulemaking proceeding was focused on ensuring seamless coverage of contraceptive and other preventive health care, and only contemplated potential accommodations to employers that would have ensured no interruption of that seamless preventive health care coverage. To now issue an IFR that allows employers to be completely exempted from providing such coverage is a jarring reversal of the previous approach considered and reviewed in the Departments' rulemaking process. Consequently, the IFR does not satisfy the "logical outgrowth" test and is invalid on that basis.

---

[18] 5 U.S.C. § 553(b) and (c).

00373634

Exhibit 58    JA-0000986



Lambda
Legal

*U.S. Dept. of Health & Human Services*
*Religious Exemptions IFR*
*RIN 0938-AT20*
*December 5, 2017 – Page 10*

Thus, the IFR, and the lack of required rulemaking process as set forth under the APA, violate the procedural requirements under the APA.

Finally, the failure to provide adequate notice that a new rule was being proposed that would create a new sweeping exemption from ACA coverage requirements also raises troubling constitutional concerns. In addition to those constitutional issues raised in other sets of public comments to the IFR,[19] the failure to provide adequate notice could constitute a procedural due process violation. As one federal appellate court has explained:

> Due process protects against the deprivation of "life, liberty, or property." U.S. Const. amend. V. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "To be entitled to procedural due process, a party must show a liberty or property interest in the benefit for which protection is sought." *Greenwood v. FAA*, 28 F.3d 971, 975 (9th Cir.1994) (citing *Morrissey v. Brewer*, 408 U.S. 471, 480–81 (1972)). A notice and comment period is generally required for agency rulemaking . . . . *See* 5 U.S.C. § 553; *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir.1994).[20]

While freedom of religion is a fundamental right, protected by our Constitution and federal law, it does not give anyone the right to use religious or moral beliefs as grounds for violating the rights of and harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[21] Indeed, the Supreme Court in *Hobby Lobby* described that the impact of the Religious Freedom Restoration Act accommodation affirmed in that case on third parties would be "precisely zero."[22] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive seamless no-cost contraception coverage, even if their employer objected to providing that coverage itself. The IFR fails the constitutional avoid-harm-to-others test.

### Conclusion

Lambda Legal has historically been a strong supporter of the ACA and applauds the Departments for their past work in ensuring that all people can receive affordable and high quality

---

[19] *See, e.g.,* Comments of The Leadership Conference on Civil and Human Rights, *et al.,* to this IFR, filed on December 5, 2017.

[20] *MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1151 (9th Cir. 2008).

[21] *E.g., Cutter v. Wilkinson*, 544 U.S. 709, 722, 726 (2005).

[22] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

00373635

Exhibit 58                                                                          JA-0000987


Lambda
Legal

*U.S. Dept. of Health & Human Services*
*Religious Exemptions IFR*
*RIN 0938-AT20*
*December 5, 2017 – Page 11*

health care. We are especially grateful for the Departments' work to increase access to care for LGBT people and those living with HIV because barriers to care—specifically including discrimination based on gender identity, gender expression, sexual orientation, and HIV status—have been and remain serious problems in our health care system. At Lambda Legal, we have made these problems a primary focus of our work spanning the last four decades. It is our hope that the Departments will re-evaluate their reversal from their previous positions recognizing the critical importance of ensuring seamless and equitable health care provision to all employees, balanced against the already existing accommodations provided to employers with certain religious beliefs. For all of the above reasons, the IFR should be rescinded.

We would be pleased to respond to any questions the Departments may have regarding these comments.

Sincerely,

LAMBDA LEGAL DEFENSE AND
   EDUCATION FUND, INC.

s/ Nancy Marcus

Nancy Marcus
   Law and Policy Senior Attorney

Jennifer C. Pizer Senior Counsel and
   Law and Policy Director

4221 Wilshire Boulevard, Suite 280
Los Angeles, CA 90010-3512
P: (213) 382-7600
F: (213) 351-6050
nmarcus@lambdalegal.org
jpizer@lambdalegal.org

00373636

Exhibit 58                                                                                          JA-0000988

The Leadership Conference
on Civil and Human Rights

Officers
Chair
[illegible]
Vice Chairs
[illegible]
Secretary
[illegible]
Treasurer
[illegible]

Board of Directors
[illegible names]

Policy and Enforcement
Committee Chair
[illegible]
President & CEO
[illegible]

December 5, 2017

 The Leadership
Conference

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services (RIN 0938-AT20 and 0938-AT46)**

To whom it may concern:

On behalf of The Leadership Conference on Civil and Human Rights, a coalition charged by its diverse membership of more than 200 national organizations to promote and protect the civil and human rights of all persons in the United States, and the 37 undersigned organizations, we write to provide detailed comments below in response to (1) Religious Exemptions and Accommodations for Coverage of Certain Preventive Services, an interim final rule ("Religious Exemptions IFR") published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47792 *et seq.*, and (2) Moral Exemptions and Accommodations for Coverage of Certain Preventive Services, an interim final rule ("Moral Exemptions IFR") published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47838 *et seq.* (collectively, the "IFRs"). However, we must also register our strong objection to this process of changing the rule before public input, which creates significant barriers to women's access to reproductive health services, particularly for low income women and women of color.

For the reasons set forth below, we urge the Department of the Treasury, Department of Labor, and Department of Health and Human Services (collectively, "the Departments") to revoke the broad exemptions permitted under these rules. First, the IFRs create a harmful and dangerous precedent by allowing the denial of health care coverage based on religious or moral views while paying scant attention to the harm such denials cause to the people affected. Second, the IFRs are unlawful, in violation of the Administrative Procedure Act ("APA"), the U.S. Constitution, and the ACA. Finally, these rules obstruct reproductive justice, infringe upon reproductive rights, and will disproportionately harm low-income women and women of color.

00373573

Exhibit 59                                    JA-0000989



## I. Background

### A. Health Care Disparities for Women of Color

While people of color suffer disparities in almost every area of health care, these inequities are particularly egregious for reproductive health services. Women of color face greater obstacles to obtaining sexual and reproductive health services than non-Hispanic white Americans,[1] and African-American women experience higher rates of reproductive cancers, unintended pregnancies, and sexually transmitted infections than white Americans.[2] African American patients are often diagnosed later than others with the same health problems and have less access to high quality affordable care, resulting in higher death rates from the same conditions.[3]

Similar reproductive health disparities exist in the Hispanic community. Latinas are more likely to be diagnosed with cervical cancer than women of any other racial or ethnic group[4] and are more likely to live in areas with poor access to family planning services.[5] About 31 percent of Latinas are uninsured and approximately 25 percent live in poverty.[6] One study found that "even when diagnosed at similar ages and stages and with similar tumor characteristics, Latinas are more likely to die from breast cancer than non-Latina white women."[7] Furthermore, approximately 16 percent of Latinas have not visited a physician in the last two years, and about 25 percent reported not having a regular health care provider.[8]

### 1. Disparities in Health Care Coverage

Disparities in reproductive health are undeniably linked to the disparities that women of color face in health care coverage. For example, while most private insurance providers cover reproductive health services and abortion care, African American women are 55 percent more likely to be uninsured than their white counterparts,[9] and 31 percent of African-American women and 27 percent of Hispanic women ages 15-44 are enrolled in Medicaid, which denies coverage for abortion.[10] The ongoing health disparities faced by African-American women has also resulted in an increased rate of pregnancy complications and maternal mortality. African-

---

[1] PLANNED PARENTHOOD, *Addressing Sexual and Reproductive Health Disparities among African Americans* (2015). https://www.plannedparenthood.org/files/3614/2773/6927/AA_Disparities.pdf.
[2] *Id.*
[3] *Id.*
[4] Planned Parenthood, *Addressing Sexual and Reproductive Health Disparities among Latinos* (2015). https://www.plannedparenthood.org/files/2814/2773/6927/Latino_Disparities.pdf.
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] Kaiser Family Foundation, *State Health Facts: Uninsured Rates for the Nonelderly by Race Ethnicity* (2016) https://www.kff.org/uninsured/state-indicator/rate-by-raceethnicity/.
[10] *Id.*

00373574

Exhibit 59

December 5, 2017
Page 3 of 17


The Leadership
Conference

American women are between three to four times more likely to die from pregnancy-related causes than white women.[11]

These inequities are present in contraceptive coverage as well. According to one study by Perspective Sex Reproductive Health, before the ACA, African-American women were 60 percent less likely, and Latina women were 40 percent less likely, to receive oral contraception as compared to white women.[12] African-American women were also 50 percent less likely to receive IUD contraception, and 30 percent less likely to receive the contraceptive ring, compared with white women of the same age.[13] The lack of insurance coverage for contraception significantly contributes to disparities among racial and ethnic groups regarding unintended pregnancies.[14]

### 2. Combatting Health Disparities through Reproductive Justice and Reproductive Rights

Reproductive justice, an approach developed by women of color based on their unique experiences, is centered on a woman's decision to: "become a parent, along with the conditions under which to give birth; not to become a parent, including access to all of the options for ending or preventing pregnancy and be treated with dignity; and to parent a child she already has in safe, supportive communities free from violence and oppression."[15] Reproductive rights, on the other hand, address the lack of legal protection, laws, or enforcement of laws that protect an individual woman's legal right to comprehensive reproductive health care services.[16] These closely interrelated concepts focus on strengthening women's ability to exercise self-determination in their own lives, including reproduction, notwithstanding the impact of inequities inherent in our society's institutions, environment, economics, and culture.[17] The enactment of the ACA in 2010 was a critical milestone for affirming reproductive justice and advancing reproductive rights.

### B. Progress Made Under the Affordable Care Act ("ACA")

The Patient Protection and Affordable Care Act ("ACA") is a critical source of health care coverage for the traditionally underserved communities that are the individuals and communities

---

[11] Id.
[12] Race, Ethnicity and Differences in Contraception Among Low-Income Women: Methods Received by Family PACT Clients, California, 2001–2007.
[13] Id.
[14] CHRISTINE DEHLENDORF ET AL, Disparities in Family Planning, Am J Obstet Gynecol. 2010 Mar; 202(3): 214–220. doi: 10.1016/j.ajog.2009.08.022; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2835625/
[15] Loretta Ross, What Is Reproductive Justice?, Reproductive Justice Briefing Book: A Primer on Reproductive Justice and Social Change, Berkley Law, 4 https://www.law.berkeley.edu/php-programs/courses/fileDL.php?fID=4051.
[16] Asian Communities for Reproductive Justice, A New Vision For Advancing Our Movement For Reproductive Health, Reproductive Rights and Reproductive Justice, 2005, http://strongfamiliesmovement.org/assets/docs/ACRJ-A-New-Vision.pdf.
[17] Id.

00373575

Exhibit 59

JA-0000991



our organizations represent, including individuals and families living in poverty, people of color, women, immigrants, LGBTQ individuals, individuals with disabilities, seniors, and individuals with limited English proficiency. The ACA reduced the number of people without insurance to historic lows, including a reduction of 39 percent of the lowest income individuals.[18] Although racial disparities in health care, especially reproductive health care, persist, the ACA was a step toward addressing the health care disparities that exist for people of color.

## 1. The ACA's Contraceptive Coverage Provision

The ACA consists of ten separate legislative Titles and has several health care reform goals. One of these goals is to strengthen primary health care access while bringing about longer-term changes in the availability of primary and preventive health care services. When preventive services coverage was written into the ACA, members of Congress recognized that many important services for women would not be included, as they fell outside of the national consensus guidelines upon which the coverage was to be based. Congress therefore included a provision requiring the Department of Health and Human Services (HHS) to add a set of women's preventive services following enactment of the statute.

HHS undertook a thorough and evidence-based process to develop this list of women's preventive services, calling on the independent Institute of Medicine (IOM) to convene experts and determine what should be on the list. It surprised no one with a background in public health or medicine that contraception was among the services that the Institute included in its recommendations. Anticipating objections from religious entities, when issuing the rule that would add these recommended services to the scope of preventive services coverage, the Departments included a full exemption from covering contraception for houses of worship. But before that rule even became final, employers filed suits under the guise of religious objections.

The challenges brought by for-profit entities found their way to the U.S. Supreme Court in 2014, resulting in the decision in *Burwell v. Hobby Lobby*.[19] The Court ruled that a closely-held for-profit company had religious exercise rights that were burdened by having to provide comprehensive health coverage, including contraception, because of the company owners' personal faith. It is critical to note that the Court's holding rested largely on its finding that there would be no third-party harm resulting from allowing a closely-held for-profit entity to use the accommodation workaround to achieve contraceptive coverage.

Additional challenges to the contraceptive coverage requirement were brought by *non-profit* entities, and as the Departments are well aware, several rounds of rulemaking have been undertaken in an attempt to address the religious objections of these employers.

[18] Kelsey Avery, Kenneth Finegold and Amelia Whitman, *Affordable Care Act Has Led to Historic, Widespread Increase in Health Insurance Coverage*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ASPE ISSUE BRIEF, (Sep. 29, 2016) https://aspe.hhs.gov/system/files/pdf/207946/ACAHistoricIncreaseCoverage.pdf.
[19] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2786–87 (2014).

00373576

Exhibit 59                                                                 JA-0000992

December 5, 2017
Page 5 of 17



Through an Advanced Notice of Proposed Rulemaking, and then a Notice of Proposed Rulemaking, an accommodation was finalized in July of 2013. Through this accommodation, religiously affiliated non-profit employers could self-certify that they objected to contraception, notify their insurer or third-party administrator (TPA), and then that insurer or TPA would arrange for contraceptive coverage for the objecting employer's employees at no cost to the employer or the employee. Following the *Hobby Lobby* decision, two more rules were adopted—one creating an additional notice mechanism for objecting non-profits (to HHS rather than to the insurer/TPA), and another allowing closely-held for-profit entities to avail themselves of the accommodation, pursuant to the holding in *Hobby Lobby.*

None of this satisfied the non-profit religious employers who continued to press their claims in federal court that even this accommodation was too great a burden on their religious beliefs. These cases came before the Supreme Court last year in *Zubik v. Burwell,*[20] but the eight-member Court declined to issue a decision on the merits. Rather, it first sought supplemental briefing from the parties on possible new workarounds that would satisfy the religious objections *while still ensuring access to contraception.* The Court then remanded the cases to the lower courts.

### C. Changes Under the IFRs

The administration, through the IFRs, seeks to evade the *Zubik* directive—to "ensur[e] that women covered by [employers'] health plans receive full and equal health coverage, including contraceptive coverage."[21] While the Court in *Hobby Lobby* allowed closely-held for-profit employers to forgo providing coverage for contraception under the accommodation, their employees still received the ACA-required coverage seamlessly, directly from their regular insurance plan. Even after the various lawsuits, eligibility for the full exemption was limited to houses of worship.

The IFRs expand eligibility for the exemption to *all* nonprofit and closely-held for-profit employers with religious or moral objections to coverage. The Religious IFR, however, does not stop there. All publicly traded for-profit companies with objections based on religious beliefs can also qualify for an exemption. Under these Rules, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations. By claiming to relieve the alleged burden on employers' religious beliefs, the Departments defer completely to employers' religious rights without any concern for the burden placed on women's access to health care.

This flawed outcome reflects the IFRs' internally inconsistent reasoning. On the one hand, the Departments argue that they cannot ascertain the Rules' impact on women's access to health care, but they *can* ascertain the burden of contraceptive coverage on employers' religious or moral beliefs. Similarly, while the Departments claim that the scope of contraceptive coverage

---

[20] *Zubik v. Burwell,* 136 S.Ct. 1557 (2016).
[21] *Id.*

00373577

Exhibit 59

JA-0000993



The Leadership
Conference

imposes an enormous burden on employers, they also minimize the number of employers that will request an exemption or optional accommodation.

Moreover, the Rules reveal that the Department of Health and Human Services has abandoned its mission as a public health agency charged with promoting evidence-based health care services. The health benefits of contraception are well documented and outlined above, but the Department of Health and Human Services rejects these findings and instead gives credence to beliefs not grounded in scientific evidence, including that certain methods of contraception are abortifacients and that the link between contraception use and reduced frequency of unintended pregnancy is uncertain.[22] In reality, research shows that women at risk of unintended pregnancy who use contraception correctly and consistently make up only 5 percent of all unintended pregnancies, while women at risk of unintended pregnancies who do not use contraception account for 52 percent of all unintended pregnancies.[23] In addition to health benefits, contraception also enables women to make their own economic, social, and educational decisions. In light of all of these evidence-based findings, the Centers for Disease Control and Prevention named birth control one of the top ten public health achievements in the past century.[24] The Department of Health and Human Services has chosen to dispute and ignore these facts.

Although health care disparities decreased after the ACA's contraceptive coverage provision, there is no doubt that the IFRs will disproportionately hurt communities of color by limiting access to contraceptive care without cost sharing. Studies have consistently shown that eliminating the disparities in reproductive health care involves increasing access to contraception and contraceptive counseling.[25] It is essential that access to seamless contraceptive coverage is guaranteed for all individuals, including women of color, regardless of where they work. Because they limit women's access to contraception and contraception-related counseling, the Moral and Religious Exemptions IFRs violate the principles of both reproductive justice and reproductive rights. By limiting women's access to contraceptive coverage, the Departments have hindered women's ability to plan their family, including making choices regarding what type of contraception they will use, if any. These decisions are critical to gender equality, women's empowerment, and reducing socio-economic disparities.[26]

---

[22] IFR at 12, 44–46.

[23] *Contraception Works and Publicly Funded Family Planning Programs Are Essential to Reduce Unintended Pregnancy and Abortion*, GUTTMACHER INSTITUTE (Mar. 9, 2011), https://www.guttmacher.org/article/2011/03/contraception-works-and-publicly-funded-family-planning-programs-are-essential.

[24] *Ten Great Public Health Achievements in the 20th Century*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Apr. 26, 2017), https://www.cdc.gov/about/history/tengpha.htm.

[25] ELIZABETH REINER PLATT & KIRA SHEPHERD, *Why Zubik is Especially Important for Women of Color* (Mar. 24, 2016), http://blogs.law.columbia.edu/publicrightsprivateconscience/2016/03/24/why-zubik-is-especially-important-for-women-of-color/

[26] United Nations Population Fund, Family Planning Overview, http://www.unfpa.org/family-planning.

00373578

Exhibit 59                                                                                    JA-0000994

December 5, 2017
Page 7 of 17



The Leadership
Conference

## II. Comments

Considering this evidence of the benefits of making contraception available at no cost to individuals, The Leadership Conference urges the Department to revoke these IFRs for several reasons. Allowing restrictions on the availability of health care services based on the religious or moral beliefs of others—already too prevalent in reproductive health care—sets a dangerous precedent for women of color's access to health care. Limiting the availability of contraceptive coverage will itself have an adverse and disparate impact on communities of color. Furthermore, these Rules are unlawful, in violation of the Administrative Procedure Act and the United States Constitution.

### A. The IFRs Will Have a Disparate Impact on Women of Color

Before the ACA, African-American women were 60 percent less likely, and Latina women were 40 percent less likely, to receive oral contraception as compared to white women.[27] African-American women were also 50 percent less likely to receive IUD contraception, and 30 percent less likely to receive the contraceptive ring, compared with white women of the same age.[28] The lack of insurance coverage for contraception significantly contributes to disparities among racial and ethnic groups regarding unintended pregnancies.[29] Although these disparities decreased after the contraceptive coverage provision, there is no doubt that the IFRs will disproportionately hurt communities of color by limiting access to contraceptive care without cost sharing.

#### 1. The Religious Exemptions IFR

The Religious Exemptions IFR vastly expands the universe of potential exemptions.[30] This IFR allows any employer—nonprofit or for-profit—to exclude some or all contraceptive methods and services from the health plans it sponsors if the employer has religious objections. It gives that same option to colleges and universities for health plans they sponsor for their students.

In addition, the Religious Exemptions IFR does not set any standards for how an organization might establish that it has a religious objection, nor does it provide a mechanism for employees or students to challenge that claim. Objecting employers and schools may still make use of the accommodation, but doing so is merely optional. This regulation also provides religious exemptions for individuals and insurance companies. In essence, the expanded religious exemptions leave women vulnerable to the whims of their employers who have no place in these

---

[27] Race, Ethnicity and Differences in Contraception Among Low-Income Women: Methods Received by Family PACT Clients, California, 2001–2007.
[28] Id.
[29] CHRISTINE DEHLENDORF ET AL, *Disparities in Family Planning*, Am J Obstet Gynecol. 2010 Mar; 202(3): 214–220. doi: 10.1016/j.ajog.2009.08.022; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2835625/
[30] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47792 *et seq.*

00373579

Exhibit 59                                                                      JA-0000995



private decisions, just as they would not in any other conversations about an employee's healthcare.[31]

The Departments predict that 120,000 women will lose access to contraception through the combined rules. They concede, however, that they do not know, and so did not include in their estimate, the number of women who will lose access to contraceptive coverage because: (1) an employer or insurer that did not cover contraceptive coverage on the basis of religious beliefs before the ACA now would be exempt from providing coverage under the new regulation; or (2) employers that qualify for an exemption under the Religious Exemptions IFR will no longer make use of the accommodations provided under the previous rule. The Departments underestimate the profound impact the Religious Exemptions IFR will have on women's access to contraceptives—especially because publicly traded companies previously had not been included even under the accommodation.

A 2015 study from the Henry J. Kaiser Family Foundation of non-profit organizations making use of the accommodation under the prior regulations estimated that 3% of all nonprofits and 10% of the largest nonprofits have been using the accommodation.[32] The authors were unable to estimate how many nonprofits or enrollees that included; but, they did note that there are more than 1.4 million nonprofits in the United States, and that thousands of nonprofits—including hospitals, long-term care facilities, schools, and charities—are affiliated with the Roman Catholic Church, which objects to contraception.[33] The new regulations now make the accommodation optional and allow these entities to be totally exempt, thus enabling these nonprofits to deny contraceptive coverage to all of their employees, dependents, and students. Without clear standards or procedures for claiming a religious objection and without any oversight mechanisms or ways for affected employees and students to appeal such a claim, the new regulations open a door for potential abuse.

The full impact of these regulations depends on how many employers and schools will claim a religious or moral exemption, whether they will object to some or all methods and services, whether they will use the now-optional accommodation, and how many employees, students, and dependents will be affected. The new IFR would require women whose employers have a religious objection to pay the costs of contraceptive care out of pocket. This would have a devastating impact on the indigent, people of color, immigrants, the LGBTQ community, people with disabilities, and those with limited English proficiency.

---

[31] Amy Goldstein, Juliet Eilperin and William Wan, *Trump Administration Narrows Affordable Care Act's Contraception Mandate*, THE WASHINGTON POST (Oct. 6, 2017) https://www.washingtonpost.com/national/ health-science/trump-administration-could-narrow-affordable-care-acts-contraception-mandate/2017/10/05/16139400-a9f0-11e7-92d1-58c702d2d975_story.html?utm_term=.66c07b8c74e9.
[32] THE HENRY J. KAISER FAMILY FOUNDATION, *The Future of Contraceptive Coverage* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.
[33] *Id.*

00373580

Exhibit 59

December 5, 2017
Page 9 of 17

 The Leadership Conference

The Religious Exemptions IFR notes that there are "multiple other Federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy."[34] When viewed alongside this Administration's related healthcare policies and actions (*e.g.*, the cuts to Medicaid, Title X, and the proposed defunding of Planned Parenthood) access to contraceptives for women has already decreased. Despite the common myth that all low-income people could enroll in Medicaid, the Medicaid program has only been available to certain categories of individuals (*e.g.*, children, pregnant women, seniors, and people with disabilities) that have little to no savings or assets. Parents of children and childless adults are often excluded from Medicaid or only the very lowest income individuals in these categories are eligible.

Every year, more than four million individuals access life-saving care such as birth control, cancer screenings, and testing for sexually transmitted infections (STIs)—including HIV—at Title X-funded health centers.[35] Seventy-five percent of Planned Parenthood patients are at or below 150 percent of the federal poverty level and half of their health centers are located in rural or underserved areas.[36] People of color comprise forty percent of Planned Parenthood patients.[37]

In addition to the harm the Religious Exemptions IFR will cause to women, the IFR will harm states by leaving "millions of women" without access to birth control,thus increasing contraceptive costs to state-funded programs.[38] For these reasons, we urge the Departments to repeal the Religious Exemptions IFR.

## 2. The Moral Exemptions IFR

Effective immediately, the Moral Exemptions IFR allows non-profits and for-profit employers with an objection to contraceptive coverage, based on their moral beliefs, to qualify for an exemption and eliminate contraceptive coverage from their plans.[39] Unlike the Religious Exemptions IFR, the Moral Exemptions IFR does not include publicly traded employers.[40]

The Moral Exemptions IFR creates a new category of employers who can now either qualify for an exemption or voluntarily choose an accommodation.[41] The Departments have claimed,

---

[34] 82 Fed. Reg. 47792

[35] Fowler et al. "Family Planning Annual Report: 2015 National Summary." RTI International. (Aug. 2016). available at http://www.hhs.gov/opa/pdfs/title-x-fpar-2015.pdf.

[36] Planned Parenthood, The Urgent Need for Planned Parenthood Health Centers (Dec. 7, 2016). available at https://www.plannedparenthood.org/files/4314/8183/5009/20161207_Defunding_fs_d01_1.pdf.

[37] Planned Parenthood. This is Who We Are. (July 11. 2016). https://www.plannedparenthood.org/files/6814/6833/9709/20160711_FS_General_d1.pdf.

[38] Amy Goldstein. Juliet Eilperin and William Wan. *Trump Administration Narrows Affordable Care Act's Contraception Mandate*, THE WASHINGTON POST (Oct. 6, 2017) https://www.washingtonpost.com/national/health-science/trump-administration-could-narrow-affordable-care-acts-contraception-mandate/2017/10/05/16139400-a9f0-11e7-92d1-58c702d2d975_story.html?utm_term=.66c07b8e74e9.

[39] THE HENRY J. KAISER FAMILY FOUNDATION, *New Regulations Broadening Employer Exemptions to Contraceptive Coverage: Impact on Women* (Oct. 6, 2017). https://www.kff.org/womens-health-policy/issue-brief/new-regulations-broadening-employer-exemptions-to-contraceptive-coverage-impact-on-women/.

[40] *Id.*

[41] *Id.*

00373581

Exhibit 59                                                                                                    JA-0000997

December 5, 2017
Page 10 of 17


The Leadership
Conference

without any evidence, that this will not limit a person's access to contraceptive care; but, on the contrary, this rule will create a "considerably larger pool of employers than when the exemption was available only to those who were employees of a house of worship or who were eligible for an accommodation in the past."[42] While it is unclear how many organizations will avail themselves of this new moral objection exemption, there is no doubt that more women will lose coverage as a result.

People of color experienced some of the largest gains in health coverage under the ACA. While the ACA included critical provisions ensuring full and equitable access to essential services without discrimination, the Moral Exemptions IFR threatens equal access to contraceptive coverage and will have a disproportional effect on poor families and people of color. One report found that "half of pregnancies in the United States are unintended, with the highest proportions occurring among African-Americans, Hispanics, and teenagers."[43] Therefore any expansion of the exemption, *i.e.* the Moral Exemptions IFR, may be detrimental to these employees who already face barriers to accessing comprehensive reproductive health care services.[44]

This rule is contrary to the Government's responsibility for ensuring that women covered by health plans "obtain, without cost, the full range of FDA approved contraceptives."[45] The Departments have always taken a compromise approach in accommodating opposing interests. In *Zubik v. Burwell*, the Court remanded the case so that "the parties on remand should be afforded an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans 'receive full and equal health coverage, including contraceptive coverage.'"[46] This compromise in *Zubik* essentially permits a religious group to opt out of providing coverage, but the insurer would then be obligated to help women obtain contraceptive coverage.[47] After *Zubik*, the Departments' efforts to implement the previous accommodation centered its policymaking on preserving women's health care access.

The Moral Exemptions IFR undermines the objective of the ACA's contraceptive coverage provision, the Departments past efforts, and prior judicial decisions by allowing an employer's personal beliefs to supersede a woman's access to reproductive health care and her freedom to make decisions regarding her own reproductive health. The Moral Exemptions IFR invites employers to cherry pick what type of coverage they would like to offer under the guise of a

[42] *Id.*
[43] Amaranta D. Craig et al., *Exploring Young Adults' Contraceptive Knowledge and Attitudes: Disparities by Race Ethnicity and Age*, 24 WOMEN'S HEALTH ISSUES 281 (2014). http://www.sciencedirect.com/science/article/pii/S1049386714000097.
[44] National Center for Lesbian Rights, Re: CMS-9931-NC; Coverage for Contraceptive Services (2016), available at http://www.instituteforscienceandhumanvalues.com/FP/public-policy/public-policy-pdf/CMS-9931-NC-Coverage-for-Contraceptive-Services.pdf
[45] *Zubik v. Burwell*, 136 S.Ct 1557, 1560-1561 (2016).
[46] *Id.* at 1560.
[47] Dahlia Lithwick & Mark Joseph Stern, *Our Bodies, Their Choice*, SLATE (Oct. 6, 2017). http://www.slate.com/articles/news_and_politics/jurisprudence/2017/10/assessing_the_new_exemption_to_the_affordable_care_act_s_contraceptive_mandate.html.

00373582

Exhibit 59

JA-0000998



"moral objection," at the expense of their employees. Without access to this coverage, employees and their dependents will lose their ability to plan for their families and their future, face further economic insecurity, and continue to experience health inequities. This will affect women of color on a greater scale because of the disparities that already exist in accessing quality and affordable health care.

### B. The IFRS are Unlawful

In addition to subjecting women of color's access to health care to the religious veto of employers, and increasing health disparities faced by communities of color, the IFRs should also be rescinded because they violate the APA and United States Constitution.

#### 1. The IFRs Violate the APA

The APA imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[48] The APA is applicable here because the IFRs are final agency actions and are legislative rules within the meaning of the APA.[49] By enacting the IFRs in the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

#### a. Procedural Violations of the APA

The APA contains two procedural rulemaking requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[50] Section 553(b) of the APA requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[51] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[52] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[53]

The IFRs violate the notice and comment requirement and the 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its stated reasoning, the Departments do not have good cause, which is limited to an agency finding that compliance with

---

[48] 5 U.S.C. § 551(5).
[49] *Id.*
[50] *Id.*
[51] 5 U.S.C. § 553(b).
[52] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).
[53] *Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996).

00373583

Exhibit 59

December 5, 2017
Page 12 of 17


The Leadership
Conference

notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[54] Courts have found good cause in cases that involve: (1) emergencies;[55] (2) context where prior notice would subvert the underlying statutory scheme;[56] and (3) situations where Congress intends to waive section 553's requirements.[57] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[58] This means that the Departments must have good cause to waive each requirement.

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[59] While these rules empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health Insurance Portability and Accountability Act of 1996,[60] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[61] This however is a declaratory argument that is conclusory in nature and does not rise to the levels described above when Courts have found that the circumstances surrounding a rulemaking rise to the standard of "good cause." This reasoning is similar to other instances in which agencies made conclusory claims of an emergency situation, unaccompanied by independent facts, which the courts determined are insufficient to constitute good cause.[62]

---

[54] 5 U.S.C. § 553(b).

[55] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. FAA*, 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).

[56] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (reasoning that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made).

[57] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding that the APA is inapplicable, rather than that good cause is established).

[58] *United States v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

[59] 82 Fed. Reg. at 47831.

[60] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); and 42 U.S.C. § 300gg–92.

[61] 82 Fed. Reg. at 47831.

[62] *See, e.g., Sorenson Comm'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v. Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted

00373584

Exhibit 59                                                                    JA-0001000



The Departments further argue that "[g]ood cause is supported by providing relief for entities and individuals for whom the provision operates in violation of their sincerely held moral or religious beliefs, but who would have to experience that burden for many more months under the prior regulations if these rules are not issued on an interim final basis."[63] However, this reasoning must be weighed against the burdens that many women will face if their employer or university decides to take advantage of the IFRs and cease to offer contraception without cost-sharing. They will be forced to find alternative means for contraceptive coverage or to pay high prices out of pocket to maintain the contraception coverage they currently have.

As explained above, the Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and the APA's post-adoption publication requirements. They have not adequately established that the APA's procedural requirements don't apply or that they have good cause for disregarding the APA's procedural rulemaking requirements. Because the IFRs were promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, the Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the IFRs should be repealed.

**b. Substantive Violations of the APA**

In addition to the APA's procedural requirements described above, the APA contains several substantive rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[64] The APA requires courts to "hold unlawful and set aside agency action. findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[65] "contrary to a constitutional right,"[66] or "in excess of statutory jurisdiction."[67] The IFRs violate 5 U.S.C. § 706(2) because they contradict the ACA.

The ACA (and implementing regulations) require all new insurance plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" without cost-sharing requirements in order to protect women's health, ensure that women do not pay more for insurance coverage than men, and advance women's equality and well-being.[68] The IFRs violate these requirements. In addition, section 1554 of the ACA prohibits the Departments from issuing regulations that "create[] any unreasonable barriers to the ability of individuals to obtain

---

SORNA."); *United States v. Brewer*, 766 F.3d 884, 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting *United States v. Reynolds*, 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).

[63] 82 Fed. Reg. at 47814-15.
[64] 5 U.S.C. § 551(5).
[65] 5 U.S.C. § 706(2)(A).
[66] 5 U.S.C. § 706(2)(B).
[67] 5 U.S.C. § 706(2)(C).
[68] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).

00373585

Exhibit 59



The Leadership
Conference

appropriate medical care"[69] and Section 1557 of the ACA, prohibits sex discrimination in certain health programs and activities.[70] By permitting objecting institutions to deny no-cost contraceptive coverage, the IFRs erect unreasonable barriers to medical care violating Section 1554 of the ACA. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the IFRs discriminate based on sex, in violation of section 1557 of the ACA. And as explained below, the IFRs are also contrary to the Establishment Clause and the Due Process Clause of the Fifth Amendment.

Because the IFRs violate the ACA and other constitutional provisions, they also violate the APA and must be set aside on that basis.

### 2. The IFRs Are Unconstitutional.

#### a. The Religious Exemptions IFR Violates the Establishment Clause of the First Amendment.

The Religious Exemption IFR impermissibly allows employers to impose their own religious viewpoint on employees, regardless of those employees' personal beliefs, and even when doing so causes employees serious harms.[71] Courts have held that the Establishment Clause of the First Amendment prevents the government from shifting the cost of religious accommodation to third parties[72] While the administration has asserted that the Religious Freedom Restoration Act[73] allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, the government can only constitutionally achieve such an outcome by replacing the current coverage with a program that provides contraception at no additional cost to employees.[74] Instead, the Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's religious beliefs.

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is nothing in First Amendment jurisprudence

---

[69] 42 U.S.C. § 18114(1).
[70] 42 U.S.C. § 18116.
[71] *See* U.S. CONST. amend. I.
[72] *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) (rejecting a facial challenge to RLUIPA, a federal statute that permits accommodation of certain religious practices in prison, stating "[s]hould inmate requests for religious accommodations become excessive, *impose unjustified burdens on other institutionalized persons*, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.") (emphasis added); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (stating, "The First Amendment . . . gives no one the right to insist that in pursuit of their own interest others must conform their conduct to his own religious necessities."); *but see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (distinguishing the obligations imposed on churches from those imposed on other types of organizations).
[73] 42 U.S.C. § 2000bb.
[74] *See Zubik v. Burwell*, 136 S. Ct. 1557; *Hobby Lobby*, 134 S. Ct. at 2786–87.

00373586

Exhibit 59

December 5, 2017
Page 15 of 17



to distinguish between these federal statutory entitlements and the contraceptive coverage provision in the ACA. The Religious Exemption IFR tells employers that they can reject insurance coverage for a critical health service that 99% of sexually active women have used at one point in their lives, if they find it religiously objectionable. Such a result would impermissibly shift the cost of religious accommodation onto third parties, subjecting employees to serious harms with no recourse.

### b. The IFRs Violate the Due Process Clause of the Fifth Amendment.

These Rules also violate the Fifth Amendment because they constitute impermissible sex discrimination.[75] The ACA's women's preventive services provision, which includes contraceptive coverage, was implemented in part to address the fact that women tended to pay more for insurance coverage than did men.[76] The IFRs violate the Fifth Amendment because it exclusively targets a benefit provided to women. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the IFRs discriminate based on sex.

The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[77] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs newly covered by the contraceptive coverage provision of the ACA.[78] It is estimated that the ACA created an annual out-of-pocket savings of approximately $1.4 billion for oral contraceptives for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their healthcare.[79] Under these Rules, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption. While it is unclear how many organizations will avail themselves of one of these exemptions, it is certain that many women will see a dramatic increase in their reproductive healthcare costs as employers avail themselves of the newly available exemptions.

## III. Conclusion

Under the IFRs, many women—especially low-income women and women of color—will lose their access to quality and affordable reproductive health care, including contraceptives. Extensive research has shown that the "contraception mandate was urgently necessary to protect

---

[75] U.S. CONST. amend. V.
[76] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).
[77] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.
[78] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.
[79] *Id.*

00373587

Exhibit 59

JA-0001003

December 5, 2017
Page 16 of 17



the health of women, that the cost of contraception decreased radically after the mandate was put in place, and that the millions of American women who are insured though their employers have better outcomes when they have access to affordable preventive reproductive care."[80] Access to comprehensive contraception coverage and full information about and choice of contraceptive methods are integral components to women's health care. All women should have unhindered and affordable access to all U.S. Food and Drug Administration-approved contraceptives. The IFRs impair a woman's right to make personal decisions regarding her reproductive health, and denies her right to access quality and affordable health care. For all of these reasons, we urge the Departments to revoke the broad exemptions permitted under these rules and revert to the previous standard for exemptions created by the ACA.

*** 

 If you require additional information, please do not hesitate to contact June Zeitlin, Senior Advisor, at The Leadership Conference at zeitlin@civilrights.org.

Sincerely,

Kristine Lucius, Executive Vice-President
The Leadership Conference on Civil and Human Rights

Alliance for Justice
American Academy of Nursing
American Association of University Women (AAUW)
American Bridge, Women's Rights Initiative
American Civil Liberties Union
American Federation of State, County and Municipal Employees (AFSCME)
American Federation of Teachers
Anti-Defamation League
Asian Americans Advancing Justice
Asian & Pacific Islander American Health Forum
Bend the Arc Jewish Action
Black Women's Roundtable
Feminist Majority
Hispanic Federation
Human Rights Campaign

---

[80] http://www.slate.com/articles/news_and_politics/jurisprudence/2017/10/assessing_the_new_exemption_to_the_aff ordable_care_act_s_contraceptive_mandate.html

00373588

Exhibit 59                                                                          JA-0001004

December 5, 2017
Page 17 of 17



Japanese American Citizens League
Lawyers' Committee for Civil Rights Under Law
League of United Latin American Citizens
League of Women Voters of the United States
Movement Advancement Project
NAACP
National Asian Pacific American Women's Forum (NAPAWF)
National Center for Transgender Equality
National Health Law Program
National Immigration Law Center
National Latina Institute for Reproductive Health
National Organization for Women
National Women's Law Center
NEAT - the National Equality Action Team
People For the American Way Foundation
Planned Parenthood Federation of America
Sierra Club
SisterSong
Union for Reform Judaism
Voices for Progress
Young Invincibles
YWCA USA

00373589

Exhibit 59                                                        JA-0001005

December 5, 2017

VIA ELECTRONIC SUBMISSION



Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act (RIN 0938-AT46)**

To Whom It May Concern:

Thank you for the opportunity to comment on the Moral Exemptions and Accommodations for Coverage of Certain Preventive Services interim final rule ("Rule") published in the Federal Register on October 13, 2017.[1] As an organization dedicated to advancing women's and LGBTQ populations' rights, Legal Voice is committed to supporting all families and ensuring meaningful access to health care, especially as it relates to sexual and reproductive health and family planning. We urge the Department of the Treasury, Department of Labor, and Department of Health and Human Services ("the Departments") to set aside this Rule. By allowing for the denial of health care coverage based on moral convictions, the Rule sets a harmful and dangerous precedent for health care. In restricting access to essential reproductive and other health care services, the Rule disproportionately harms women and LGBTQ communities. Further, the Rule violates both the Administrative Procedure Act ("APA") and the United States Constitution.

## I. Background

Access to contraception critically shapes an individual's health and well-being.[2] There are approximately 61 million women in their childbearing years,[3] about 43 million of whom are at risk of unintended pregnancy.[4] Heterosexual couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy

---

[1] 82 Fed. Reg. 47838 et seq.

[2] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[3] Kimberly Daniels, Jill Daugherty, and Jo Jones, *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, NATIONAL HEALTH STATISTICS REPORTS 173 (2014), http://www.cdc.gov/nchs/data/databriefs/db173.pdf.

[4] Jo Jones, William Mosher, and Kimberly Daniels, *Current Contraceptive Use in the United States, 2006–2010, and Changes in Patterns of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

*Women's rights. Nothing less.*

00207697

Exhibit 60                                                                JA-0001006

over the course of one year.[5] In order to achieve the average desired family size of two children, a woman must use contraception for about three decades.[6]

It is critical to note that usage of contraception is widespread, with over 99% of sexually active women using at least one method of contraception at some point during their lifetimes.[7] Significantly, contraception is widely used by women of all religious denominations.[8] 89% of sexually active Roman Catholics and 90% of sexually active Protestants currently use some form of contraception.[9] Contraceptives make up approximately 30–44% of out-of-pocket health care spending[10] and a single year's worth of birth control can cost around $400, or the equivalent of more than 50 work hours for an individual making the federal minimum wage of $7.25 an hour.[11] Long-acting contraception, such as a contraceptive implant, costs more than $1,000 out of pocket, or almost a full month's salary for an individual earning the federal minimum wage.[12] Research clearly illustrates that insurance coverage leads to increased contraception usage and a decrease in out-of-pocket costs for women.[13] The Affordable Care Act ("ACA") extended contraceptive coverage without cost-sharing to millions of people across the nation.[14] This has led to a significant decrease in out-of-pocket spending on prescription drugs. The majority of women had no out-of-pocket costs for their contraception, which led to out-of-pocket savings of approximately $1.4 billion for newly-covered women.[15]

---

[5] J Trussell, *Contraceptive failure in the United States*, 83 CONTRACEPTION 297–404, (May 2011).

[6] *Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics*, THE ALAN GUTTMACHER INSTITUTE (AGI) (2000), https://www.guttmacher.org/sites/default/files/pdfs/pubs/fulfill.pdf.

[7] Guttmacher Institute, *Contraceptive Use in the United States* (September 2016), https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

[8] Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (Apr. 2011) https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.

[9] *Id.*

[10] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11, http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[11] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose*, NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/; *See* Elizabeth Celms, *How much do birth-control pills cost?*, CLEAR HEALTH COSTS (Apr. 29, 2013), https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/.

[12] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose*, NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/.

[13] *Insurance Coverage of Contraceptives*, GUTTMACHER INSTITUTE (Oct. 1, 2017), https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives; Adara Bearmesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[14] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[15] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

*Women's rights. Nothing less.*

00207698

Exhibit 60

Research illustrates that as the significant costs of long-term contraception (such as implants) were reduced or removed, the usage of such contraception has increased.[16] High costs have been a tremendous barrier for individuals who may have wanted access to these contraceptive methods.[17] The expansion afforded by the ACA meant that women no longer had to choose between birth control and paying for other essentials, such as groceries.[18]

## II.    The Benefits of Contraception

Meaningful access to contraception allows individuals to choose the contraceptive method that best suits their individual circumstances. In doing so, individuals can reducing unwanted pregnancies, implement intentional family planning, and have better health outcomes. In avoiding back-to-back pregnancies, for example, the risk of premature births and low birth weights is reduced. Health conditions, such as diabetes, hypertension, and heart disease can also be better managed.

Birth control is essential in furthering equal opportunity for women, enabling them to be equal participants in the social, political, and economic spheres. In enabling women to decide if, when, and how to become parents, birth control allows individuals to access increased professional and educational opportunities. Access to birth control is thus critical to the constitutionally protected right to liberty. Research illustrates access to contraception has increased women's wages and lifetime earnings.[19] The availability of the oral contraceptive pill is specifically associated with approximately a third of the total wage gains for women born from the mid-1940's to early 1950's.[20]

Meaningful access to comprehensive and culturally-sensitive family planning services is especially important for the LGBTQ community, as lesbian, gay, and bisexual young people experience more unintended pregnancies than do their straight counterparts.[21] Transgender individuals who are also at risk for pregnancy are often completely discounted when considering access to sexual and reproductive health care. It is thus alarming that federal agencies charged with ensuring public health

---

[16] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[17] Alina Salganicoff, Laurie Sobel, and Caroline Rosenzweig, *The Future of Contraceptive Coverage*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[18] *The Affordable Care Act's Birth Control Benefit is Working for Women,* NATIONAL WOMEN'S LAW CENTER (Dec. 16, 2016), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.

[19] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[20] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[21] Lisa L. Lindley, Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 AM. J. OF PUBLIC HEALTH 1379–86 (July 1, 2015); Karen Schantz, *Pregnancy Risk Among Bisexual, Lesbian, and Gay Youth: What Does Research Tell Us,* ACT FOR YOUTH CENTER OF EXCELLENCE (Apr. 2015), http://www.actforyouth.net/resources/rf/rf_lgb-prg_0415.pdf.

*Women's rights. Nothing less.*

00207699

Exhibit 60

seek to implement a rule that decreases access to essential family planning. It is dangerous to give employers tremendous veto power over services their employees need.

### III.    Proposed Changes under the Rule

The Rule extends beyond the religiously-based objections under the ACA and *Burwell v. Hobby Lobby* to allow any non-profit or closely-held for-profit employer, and private institutions of higher education that issue student health plans, to apply for an accommodation or exemption from contraceptive coverage based on moral convictions. There is no definition for a moral conviction, allowing employers to claim an exemption without any accountability. Additionally, the Rule does not provide employees with a way to challenge an employer's alleged moral belief. Without any safeguards or accountability measures, employers can exploit the moral exemption for financial and business reasons. Drastic restrictions on access to health care services based on the moral convictions of others is already rampant in sexual and reproductive health care. Further limiting the availability of contraceptive coverage will adversely impact women and members of the LGBTQ community.

It is essential to note there are already many statutory protections for health care providers' conscientious objections, including both religious and moral objections. At a federal level, these laws include the Church,[22] Weldon,[23] and Coats[24] amendments, which allow providers to refuse to perform or otherwise facilitate abortion services. The Church Amendment also reaches sterilization services.[25] These protections are paralleled on a state level as 45 states allow individual health care providers, and 43 allow institutions, to refuse to provide abortion services based on conscientious objections.[26] State-level provider conscientious clauses additionally apply to contraceptive care; 12 states allow some health care providers to refuse to provide contraception and related services[27] and 18 states allow providers to refuse to provide sterilization services.[28]

### IV.    The Rule's Discriminatory Impact

LGBTQ communities and communities living with HIV experience ubiquitous discrimination in health care, which includes but is not limited to being refused health care, health care professionals using excessive precautions, health care professionals using abusive language, individuals being blamed for their health care status, and health care professionals being physically abusive.[29] Fear of discriminatory prevents many people from seeking the essential care they need.[30] For many transgender, gender non-binary, and gender-nonconforming people, the fear of potential negative treatment is even more exacerbated. Undocumented transgender individuals, for example, are more

---

[22] 42 U.S.C. § 300a-7 et seq.

[23] Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat 786.

[24] 42 U.S.C. § 238(n).

[25] 42 U.S.C. § 300a-7 et seq.

[26] GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015), http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.

[27] *Id.*

[28] *Id.*

[29] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV 5 (2010), http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf.

[30] *Id.* at 6.

*Women's rights. Nothing less.*

00207700

Exhibit 60

prone to receive physical attacks in doctors' offices, hospitals, and emergency rooms.[31] LGBTQ communities of color and individuals with lower socioeconomic status experience even higher levels of discriminatory and substandard care.[32] Research illustrates that only 64% of LGB Latino adults have health insurance coverage compared to 82 percent of the heterosexual adult population, 30% of LGB Black adults are likely to delay or not get needed medication compared to 19% of Black heterosexual adults, 26% of LGB Latino adults do not have a regular source for basic health care, and only 35% of LGB Black women had a mammogram in the past two years, compared to 62% of all heterosexual women.[33] A 2016 study by the Centers for Disease Control and Prevention found that LGBTQ high school students are more likely to experience intimate partner violence and rape, which can result in unintended pregnancy.[34] Access to contraception is thus critical to the health and well-being of women and the LGBTQ community, and allowing employers to withhold coverage of contraception based on ill-defined moral convictions is dangerous and harmful public health policy.

## V.    The Rule Violates the Administrative Procedure Act and the Constitution

The APA imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[35] The APA is applicable here because the Rule is a final agency action and is a legislative rule within the meaning of the APA.[36] In attempting to enact the Rule, the Departments have violated several procedural and substantive requirements of the APA.

Section 553(b) of the APA requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[37] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[38] The purpose of this waiting period is to give the affected parties a reasonable time to change their behavior before the final rule takes effect.[39]

---

[31] Grant JM. et al., Injustice at Every Turn: A Report of the National Transgender Discrimination Survey 74 (2011), http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

[32] Lambda Legal, When Health Care Isn't Caring, Lambda Legal's Survey on Discrimination Against LGBT People and People Living with HIV, 11 (2010), http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf; see also The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding, Institute of Medicine (2011), http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx.

[33] Health Disparities in LGBT Communities of Color: By the Numbers, Center for American Progress (2010), https://www.americanprogress.org/issues/lgbt/news/2010/01/15/7132/health-disparities-in-lgbt-communities-of-color

[34] Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 — United States and Selected Sites, 2015, Centers for Disease Control and Prevention (Aug. 12, 2016), https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf; see also Lisa L. Lindley and Katrina M. Walsemann, Sexual Orientation and Risk of Pregnancy Among New York City High School Students, 105 Am. J. of Pub. Health 1379 (2015).

[35] 5 U.S.C. § 551(5).

[36] Id.

[37] 5 U.S.C. § 553(b).

[38] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[39] Omnipoint Corp. v. F.C.C., 78 F.3d 620, 630 (D.C. Cir. 1996).

*Women's rights. Nothing less.*

00207701

Exhibit 60                                                                                                      JA-0001010

The Rule violates the notice and comment requirement and the 30-day waiting period between publication and effective date. An agency is granted an exception to these requirements only when the agency has "good cause" for not following them. Despite its stated reasoning, the Departments do not have good cause, which is limited to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[40] Courts have found good cause in cases that involve: (1) emergencies;[41] (2) context where prior notice would subvert the underlying statutory scheme;[42] and (3) situations where Congress intends to waive section 553's requirements.[43] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[44] This means that the Departments must have good cause to waive each requirement. While the Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act,"[45] these statutes do not allow the secretaries to dismiss the APA's procedural requirements.

The Departments also argue they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[46] This does not meet the standard Courts have enumerated for rulemaking rise to the standard of "good cause." The Departments further argue that good cause is supported because of lawsuits that have been pending "for several years by entities raising nonreligious moral objections to the Mandate," and that "delaying the availability of the expanded exemption would require entities to bear these burdens [including a "crisis of conscience"] for many more months."[47] Significantly, this reasoning should be weighed against the burdens that many women and LGBTQ populations will face if their employer or university decides to take advantage of the Rule and cease to offer contraception without cost-sharing. The Departments have thus violated 5 U.S.C. §§ 553(b) and 553(d) and the Rule should be rescinded.

Further, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to a constitutional right," or "in excess of statutory jurisdiction." The Rule violates 5 U.S.C. § 706(2) because it contradicts several provisions of the ACA. Section 1554 of the ACA prohibits the Departments from issuing regulations that create unreasonable barriers to individuals obtaining medical care, impede timely access to health care services, interfere with communications regarding a full range of treatment options between patient and provider, restrict the ability of providers to provide

---

[40] 5 U.S.C. § 553(b).

[41] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).

[42] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992).

[43] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding that the APA is inapplicable, rather than that good cause is established).

[44] *United States v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

[45] Moral Exemptions and Accommodations for Coverage of Certain Preventable Services Under the Affordable Care Act, 82 Fed. Reg. 47838, 47855 (Oct. 13, 2017).

[46] 82 Fed. Reg. at 47855.

[47] 82 Fed. Reg. at 47855.

*Women's rights. Nothing less.*

00207702

Exhibit 60                                                                                JA-0001011

full disclosure of all relevant information for making health care decisions, violate the principles of informed consent and ethical standards of health care professionals, or limit the availability of treatment for the full duration of a patient's medical needs.[48] The Rule violates Section 1554 of the ACA as it creates tremendous barriers to the ability of individuals to access appropriate and timely medical care.

Moreover, Section 1557 of the ACA prohibits discrimination on the basis of sex.[49] HHS' accompanying regulations for this section reference "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."[50] The regulations further state that people cannot "be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which [the rule] applies."[51] In denying health care services used almost exclusively by women, the Rule discriminates on the basis of sex and thus violates Section 1557 of the ACA.

### VI.    The Rule is not a Valid Exercise of the Religious Freedom Restoration Act

The Religious Freedom Restoration Act (RFRA) provides no authority to craft moral exemptions. The Rule impedes access to contraceptive coverage and the ability to make personal decisions regarding sexual and reproductive health based entirely on another's moral views, which RFRA neither requires nor permits. Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is no basis to distinguish between these federal statutory entitlements and the contraceptive coverage provision in the ACA. The Moral Exemptions IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find morally objectionable. Such a result would impermissibly shift the cost of moral objections to coverage onto the very people that the ACA was meant to protect.

### VII.    The Rule Violates the Due Process Clause of the Fifth Amendment to the Constitution

The Rule violates the Fifth Amendment as it constitutes impermissible sex discrimination.[52] The ACA's women's preventive services provision, which includes contraceptive coverage, was implemented in part to address the fact that women paid more for insurance coverage than men did.[53] The Rule exclusively targets coverage provided to women. The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[54] Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption; it is certain that many women will see a dramatic increase in their reproductive health care costs as employers avail themselves of the newly available moral exemption.

---

[48] 42 U.S.C. § 18114.
[49] 42 U.S.C. § 18116.
[50] 45 CFR § 92.4.
[51] 45 CFR § 92.101.
[52] U.S. Const. amend. V.
[53] See 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).
[54] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, The Henry J. Kaiser Family Foundation (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

*Women's rights: Nothing less.*

00207703

Exhibit 60                                                                                          JA-0001012

### VIII.    Conclusion

The Rule denies coverage for health care services based on moral convictions without regard to the impact on employees. This bad policy would strip essential health care services away from women and members of the LGBTQ community who are already disproportionately discriminated against in health care. The Rule is discriminatory, violates multiple federal statutes, and ignores Congress's intent that birth control be covered by the ACA. Legal Voice thus calls on the Departments to rescind the Rule.


Sincerely,

The Alliance: State Advocates for Women's Rights & Gender Equality

| | | |
|---|---|---|
| Betsy Butler | Pamelya Herndon | Megan Peterson |
| Executive Director | Executive Director | Executive Director |
| California Women's Law Center* | Southwest Women's Law Center* | Gender Justice* |

| | |
|---|---|
| Lisa M. Stone | Carol Tracy |
| Executive Director | Executive Director |
| Legal Voice* | Women's Law Project* |

* **The California Women's Law Center** ("CWLC") is a statewide, nonprofit law and policy center advocating for justice for women and girls through impact litigation, policy advocacy and education. CWLC's priorities include reproductive justice, gender discrimination, violence against women, and women's health. Since its inception in 1989, CWLC has fought for unburdened and equal access to reproductive health choices for all women.


* **The Southwest Women's Law Center** is a non-profit policy and advocacy Law Center founded in 2005 to advance opportunities for women and girls in the State of New Mexico. We work to ensure that women have equal access to quality, affordable healthcare, including reproductive services and information. Our work strongly supports protections for individuals without regard to sexual orientation as we advocate to eliminate stereotypes and biases that women and LGTB individuals often face.


* Based in Minnesota, **Gender Justice** serves the upper Midwest through strategic and impact litigation, policy advocacy, and public education to address the causes and consequences of gender inequality. Gender Justice expands the rights and access to justice for women, LGBTQ people, and all people who experience barriers based on gender bias and stereotypes


* **Legal Voice** is a non-profit public interest organization that works in the Pacific Northwest to advance the legal rights of women and LGBTQ people through public impact litigation, legislation, and legal rights education. Since its founding in 1978 as the Northwest Women's Law Center, Legal Voice has sought to

*Women's rights. Nothing less.*

ensure that women and LGBTQ people's rights to self-determination, access to health care, and freedom from both discrimination and violence are a reality.

**\* The Women's Law Project** (WLP) is a Pennsylvania-based nonprofit women's legal advocacy organization providing legal representation, policy advocacy, and public education on a wide range of legal issues related to women's health, well-being, and equality. Grounded in the perspective that equality for women and girls cannot be achieved without reproductive freedom, which includes equal access to the full range of reproductive healthcare, WLP has been working to protect and advance reproductive rights in Pennsylvania since it opened in 1974.

*Women's rights. Nothing less.*

00207705

Exhibit 60

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: [CMS-9940-IFC/CMS-9925-IFC]

Dec. 5, 2017

Dear Acting Secretary Hargan,

Lift Louisiana is committed to ensuring all individuals have affordable coverage of birth control. We unequivocally oppose the Departments of Health and Human Services, Labor, and Treasury's (the Departments) efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance, including nearly 800,000 in Louisiana, now have coverage of these vital health care services, such as breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. And the IFR is predicated upon a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. The harm from this rule would be especially harmful for the women in Louisiana who reside in a state that is hostile to women's health and consequently have some of the worst health outcomes and least access to services and resources in the nation.

Making effective methods of contraception available to women who want them but could not otherwise afford to use them consistently and correctly prevents a substantial number of unintended pregnancies. That, in turn, reduces the incidence of the unplanned births, abortions, miscarriages and pregnancy-related deaths that would otherwise follow.

For all of these reasons Lift Louisiana calls on the Departments to rescind the IFR.

## I. Louisiana Women Need Coverage

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf. Figure includes non-elderly adult women ages 18-64.

00435137

Exhibit 61    JA-0001015

Louisiana struggles with health care inequities in access and outcomes. These inequities are amplified for Louisiana women and become even more dire when one considers Louisiana's restrictions on reproductive rights and other systematic oppressions.

In 2016, Louisiana women had the one of the highest uninsured rates (12%) in the U.S.[3] 59 percent of Louisiana's women were covered under private health insurance, with 51 percent covered by employer-sponsored insurance and the remaining 8 percent covered by individual coverage.[4] Individuals who were uninsured were primarily low-income, in working families, and White non-Hispanic.[5] The majority of nonelderly, uninsured Louisianans in 2014 had income below 400% of the federal poverty level (FPL, 85%).[6] Almost half (49%) of nonelderly, uninsured Louisianans identified as White, over one-third (37%) identified as Black, and 15% identified as Hispanic.[7]

Louisiana ranks 47th for women's poverty & opportunity[8] and 49th for women's employment & earnings, equal pay, women's overall earning potential and labor force participation.[9] Studies have found Louisiana to be the worst state for women's equality (for example, Black women in Louisiana make $0.48 to the dollar compared to White men), as well as one of the worst states for women's health.[10] One out of every five working-age women has income below poverty. This include 49.3% of single mothers. Thirty-six percent of Black women in the state live in poverty. Nearly 30% of our children are living poverty.

Louisiana also suffers with poor access to reproductive health care access and funding. Louisiana ranks 46th for reproductive rights.[11]

Louisiana has only one OB/GYN physician per 13,136 women, ranking 43rd (of 48) in the nation with respect to the ratio of women per every OB/GYN physician.[12]

The state spends almost 2.4 times as much per pregnant woman as the national average.[13]

---

[3] Kaiser Family Foundation, Health Insurance Coverage of Women 19-64 (2016)
*available at* https://www.kff.org/other/state-indicator/nonelderly-adult-women

[4] *Id.*

[5] Kaiser Family Foundation,New Regulations Broadening Employer Exemptions to Contraceptive Coverage: Impact on Women (Oct 06, 2017), *available at*
https://www.kff.org/womens-health-policy/issue-brief/new-regulations-broadening-employer-exemptions-to-contraceptive-coverage-impact-on-women/

[6] *Id.*

[7] *Id.*

[8] Institute for Women's Policy Research, *The Status of Women in the States: 2015, available at*
http://statusofwomendata.org/wp-content/uploads/2015/02/Status-of-Women-in-the-States-2015-Full-National-Report.pdf

[9] *Id.*

[10] Anna Chu & Charles Posner, Ctr. For Am. Progress, The State Of Women In America: A 50-state Analysis Of How Women Are Faring Across The Nation, 1, 35 (2013), *available at:*
https://www.americanprogress.org/wp-content/uploads/2013/09/StateOfWomen-4.pdf.

[11] "The Status of Women in the States: 2015", Institute for Women's Policy Research, available at
http://statusofwomendata.org/wp-content/uploads/2015/02/Status-of-Women-in-the-States-2015-Full-National-Report.pdf

[12] *Id.*

[13] LDH-OPH, MCH Program, Louisiana Pregnancy-associated Mortality Review: 2008 Report 1 (2012), *available at*
http://dhh.louisiana.gov/assets/oph/Center-PHCH/Center-PH/maternal/2008PAMRreport.pdf

00435138

Exhibit 61                                                                                              JA-0001016

Maternal mortality rates in Louisiana are higher than the national average. The Louisiana Pregnancy Mortality Surveillance System (LPMSS) reported the 2001-2005 pregnancy associated mortality ratios to be between 86.3 and 89.4 maternal deaths per 100,000 live births.[14]

For these reasons, Louisiana women are in need of comprehensive contraceptive services.

## II.    Birth Control Is Critical to Women's Health

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[15] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[16] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[17] One national study estimates that for uninsured women, the average cost of these pills over a year ($370) is 68 percent of their annual out-of-pocket expenditures for health care services.[18] The average cost of a year's supply of birth control pills is the equivalent of 51 hours of work for a woman making minimum wage of $7.25 an hour, two-thirds of which are women in Louisiana.[19] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[20]

The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[21] Nationally, 13.0% of women reported not receiving health care at some point in the last 12 months due to cost in 2016; in Louisiana, 19.6% of women reported not receiving care due

[14] TRI TRAN ET AL., LDH-OPH, MCH Program, 2001-2005 Maternal & Child Health Data Book 28 (2009), *available at:* http://dhh.louisiana.gov/assets/oph/Center-PHCH/Center-PH/maternal/MCHdatabook0105.pdf

[15] U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2, 2009.

[16] *Id.*

[17] *Id.*

[18] Sonfield, A., Tapales, A., Jones, R. K., & Finer, L. B. (2015). Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update., Contraception, 91(1), 44–48. http://doi.org/10.1016/j.contraception.2014.09.006

[19] Brief of the National Women's Law Center and 68 Other Organizations as Amici Curiae Supporting Respondents, *Zubik v. Burwell*, 136 S.Ct. 1557 (May 16, 2016).

[20] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography, Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzcQ.

[21] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

00435139

Exhibit 61                                                                                                                          JA-0001017

to cost.[22] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[23] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[24]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or prevent pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[25] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[26]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[27] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[28] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[29] In 2010, 60% of all pregnancies (53,000) in Louisiana were unintended; much higher than the national rate.[30] Unintended pregnancies are also costly to the federal and state governments, resulting in $21.0 billion in public expenditures in 2010.[31]

---

[22] NWLC calculations of Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion, Division of Population Health, Behavioral Risk Factor Surveillance System Prevalence and Trends Data, 2016 Annual Survey.

[23] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[24] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211, *available at* http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[25] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available at* https://www.womenspreventivehealth.org/final-report/.

[26] *Id.* at 103-104.

[27] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[28] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*, 2010;32(1):152-174, doi:10.1093/epirev/mxq012.

[29] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.

[30] Guttmacher Institute, State Facts About Unintended Pregnancy: Louisiana (2017), *available.at:* https://www.guttmacher.org/fact-sheet/state-facts-about-unintended-pregnancy-louisiana

[31] *Id.*

00435140

Exhibit 61

And, Louisiana has one of the highest maternal mortality rates in the U.S. which has the highest rate of maternal mortality in the developed world.[32] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[33] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and noncontraceptive purposes.[34] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[35] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[36,37]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. Only 25% of working mothers in Louisiana are able to take exclusively paid parental leave, with 61% taking exclusively unpaid leave, and 7% taking no leave at all. Of women employed during their pregnancies, 44% do not have jobs that offer paid leave, 35% cannot financially afford to take leave, and 16% are afraid of losing their jobs.[38] Preventing pregnancy can have serious economic consequences for Louisiana women and their families.

Studies show that access to contraception has increased women's wages and lifetime earnings.[39] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage

[32] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show," Institute for Health Metrics and Evaluation, University of Washington, 2016.
[33] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.
[34] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.
[35] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250-5.
[36] Id.
[37] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017
[38] LDH-OPH, LA. Pregnancy Risk Assessment Monitoring System (PRAMS). Maternity Leave In Louisiana, 2015, *available at* http://dhh.louisiana.gov/assets/oph/Center-PHCH/Center-PH/maternal/LouisianaPRAMS/PRAMS_Maternity_Leave_Fact_S heet.pdf.

[39] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), *available at* http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

00435141

Exhibit 61                                                                                                    JA-0001019

gains for women born from the mid-1940s to early 1950s.[40] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[41] which was followed by large increases in women's presence in law, medicine, and other professions.[42] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in health care coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[43]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## I.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.  Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[44] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

---

[40] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012). http://www.nber.org/papers/w17922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[41] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[42] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002). https://dash.harvard.edu/handle/1/2624453.

[43] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

[44] Id. at 8,727.

00435142

Exhibit 61    JA-0001020

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[45]    In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access.  In fact, more than half of women delay or avoid preventive care because of its cost.  *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[46]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services.   For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[47]   And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[48] That contraception would be covered was clear.[49]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[50] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[51] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[52]   These were

---

[45] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[46] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[47] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[48] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women.  This may include . . . family planning . . .").

[49] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[50] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[51] *Id.* at 109-10.

[52] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

00435143

Exhibit 61                                                                                                                    JA-0001021

updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

### B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exceptions in the IFR, the Departments looks to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

### II.    The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[53] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[54] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[55]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process

---

[53] *See*, e.g., at 21
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf
[54] *Id.* at 19.
[55] *See*, e.g., at 24-27
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf

00435144

Exhibit 61                                                                                                    JA-0001022

Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[56]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[57] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero."[58] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## III.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation"[59] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[60] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Departments further argue that the interim final rule is justified by a need to

---

[56] 2 U.S.C. § 18116.
[57] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).
[58] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).
[59] 5 U.S.C. § 553(b), (c).
[60] 5 U.S.C. § 553(d).

00435145

Exhibit 61                                                                                      JA-0001023

"provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[61]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[62] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[63]

For each of these reasons, the rule violates the APA and should be rescinded.

## IV.    Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. Lift Louisiana unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

### A. Contraceptives Do Not Interfere with an Existing Pregnancy

---

[61] 5 U.S.C. § 706.

[62] 42 U.S.C. § 18114(1).

[63] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

00435146

Exhibit 61                                                                                                    JA-0001024

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[64] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[65]

If policies are being based upon American sentiment, it should also be considered that, according to The National Campaign to Prevent Teen and Unplanned Pregnancy, 94% of adults agree that everyone should have the power to decide if, when, and under what circumstances to get pregnant, 87% of adults agree that everyone deserves the power to access the full range of birth control methods, no matter who they are, where they live, and what their economic status is.[66]

## B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[67] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[68,69] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[70] Moreover, other medications covered by insurance under the ACA, such as prescription medication for erectile dysfunction, pose a risk of VTE but are not under attack.[71] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[72]

## C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

---

[64] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[65] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354), *Available at:* acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).
[66] The National Campaign to Prevent Teen and Unplanned Pregnancy, "Survey Says", *available at:* https://thenationalcampaign.org/sites/default/files/resource-primary-download/774_37_surveysays_birthcontrol_v3_letter.pdf
[67] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[68] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[69] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[70] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.
[71] The Telegraph, "Study links Viagra to increased stroke risk", *available at* http://www.telegraph.co.uk/news/uknews/1418453/Study-links-Viagra-to-increased-stroke-risk.html.
[72] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

00435147

Exhibit 61                                                                                                                    JA-0001025

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[73] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[74,75] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[76,77] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[78]

Louisiana has the 6th highest teen birth rates in the nation.[79] In 2010, the state's teen pregnancy rate remained well above national levels (69 vs. 57 pregnancies per 1,000).[80] As a result, the state spends tens of millions annually on teen childbearing.[81] As minors, teens are necessarily dependent on health insurance coverage obtained by their parents or guardians and are not likely going to be able to afford out-of-pocket expenditures for essential health benefits they may be using, such as contraception.

Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[82] More females are using contraception the first time they have sex.[83]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.

## V.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[84] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and

---

[73] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[74] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[75] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[76] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[77] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[78] Id.

[79] The National Campaign to Prevent Teen and Unplanned Pregnancy, *Teen Birth Rate Comparison, 2015 Among Girls Age 15-19, available at* https://thenationalcampaign.org/data/compare/1701

[80] Kaiser Family Foundation, *The Louisiana Health Care Landscape, available at* https://www.kff.org/health-reform/fact-sheet/the-louisiana-health-care-landscape/

[81] The National Campaign to Prevent Teen and Unplanned Pregnancy, Louisiana Data, available at: https://thenationalcampaign.org/data/state/louisiana

[82] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[83] Id.

[84] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

00435148

Exhibit 61                                                                                    JA-0001026

administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

### A. Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[85] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[86] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[87]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules.

Publicly supported family planning centers in Louisiana served 49,570 female contraceptive clients in 2014. They met 15% of Louisiana women's need for contraceptive services and supplies.[88]

Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[89] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[90] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[91] Requiring otherwise

---

[85] See Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[86] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[87] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[88] Frost JJ, Frohwirth L and Zolna MR. Contraceptive Needs and Services, 2014 Update, New York: Guttmacher Institute, 2016, available at https://www.guttmacher.org/report/contraceptive-needs-and-services-2014-update.

[89] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," American Journal of Public Health (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

[90] See Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, Family Planning Annual Report: 2010 National Summary, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B., Family Planning Annual Report: 2016 national summary, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[91] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

00435149

Exhibit 61

higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[92] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[93] This is particularly true with respect to specialty providers, including OB/GYNs.[94] There is unmet need for health care providers in Louisiana. 62 of 64 parishes in the state contain a Health Professional Shortage Area (HPSA).[95] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

### B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[96] Policymakers continue to try to impose

---

[92] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), *available at:*
https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[93] U.S. Government Accountability Office, "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General, "Access to Care: Provider Availability in Medicaid Managed Care," (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[94] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

[95] Louisiana Department Of Health, Office Of Public Health- Bureau Of Family Health, Reproductive Health Needs Assessment, 2017.

[96] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017). https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that

steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[97] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. The state of Louisiana has joined this effort, by passing a law prohibiting any organization that performs abortions, or contracts with an entity or organization that from receiving public funding. This was a direct effort to remove Planned Parenthood from being eligible to receive public funding which they receive from Medicaid reimbursements and Title X funding for family planning services. Planned Parenthood Gulf Coast's two clinics provide care to over 5200 Medicaid beneficiaries, who comprise more than half of the patients they serve in Louisiana.[98] Efforts in other states to prohibit Planned Parenthood from serving Medicaid recipients have been blocked by federal courts who have held, a state may not exclude a provider simply based on the scope of the services it provides.[99]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[100] The number of women in need of publicly funded family planning is trending upwards nationally, and in Louisiana, an estimated 321,480 adolescents and low income women are in need of publicly funded services and supplies.[101]

Further, Federally Qualified Health Centers (FQHCs) are not able to fill gaps in services because the scope and quality of these services vary greatly. While 99.8% of FQHCs in Louisiana provide one or more contraceptive methods, only 87% provide "typical" family planning, defined as STI testing and treatment; oral contraceptives; and one other contraceptive method. Only 51% of FQHCs provide

---

individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017).
http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.
[97] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says, WASH. POST (Nov. 7, 2017), available at: https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.
[98] Planned Parenthood Of Gulf Coast v. Rebekah Gee, Secretary, Louisiana Department of Health and Hospitals, Opinion of the United States Court of Appeals Fifth Circuit. Case: 15-30987, June 29, 2017.
[99] Id.
[100] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. L., Gable, J., Wang, J., & Lasater, B., Family Planning Annual Report: 2016 national summary, RTI International (Aug. 2017), available
at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.
[101] Louisiana Department Of Health, Office Of Public Health- Bureau Of Family Health, Reproductive Health Needs Assessment, 2017.

00435151

Exhibit 61                                                                                                    JA-0001029

"typical" family planning services plus one other contraceptive method, in addition to IUDs and/or hormonal implants.[102]

In Louisiana in 2010, the federal and state governments spent $651.0 million on unintended pregnancies; of this, $530.4 million (72%) was paid by the federal government and $120.6 million was paid by the state.[103] Yet the Louisiana spends less on family planning ($39 million) than unintended pregnancies ($100 million).[104]

In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[105] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[106] Publicly funded family planning centers in Louisiana helped avert 12,000 unintended pregnancies in 2014, which would have resulted in 5,800 unplanned births and 4,300 abortions.[107]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as fail safes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

---

[102] Wood, S. (2016). Scope of Family Planning Services Available in Federally Qualified Health Centers. Contraception, 89, 85–90.

[103] Sonfield A and Kost K, Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy - Related Care: National and State Estimates for 2010. New York: Guttmacher Institute, 2015. *available at:* https://www.guttmacher.org/report/publiccosts-unintended-pregnancies-and-role-public-insurance-programspaying-pregnancy .

[104] Sonfield A and Gold RB, Public Funding for Family Planning Sterilization and Abortion Services, FY 1980–2010. New York: Guttmacher Institute, 2012. *available at:* https://www.guttmacher.org/report/publicfunding-family-planning-sterilization-and-abortion-services-fy-1980-2010.

[105] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations,* Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[106] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* (Aug. 2017), *available at* https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[107] Frost JJ, Frohwirth L and Zolna MR, Contraceptive Needs and Services, 2014 Update. New York: Guttmacher Institute, 2016, *available at:* https://www.guttmacher.org/report/contraceptive-needs-and-services-2014-update.

00435152

Exhibit 61

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states, including Louisiana, do not have contraceptive coverage laws at all.[108] In fact, efforts over the last two decades in Louisiana to ensure health insurance coverage of contraceptives failed in the state legislature, leaving Louisiana's women without coverage.

The Departments are wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons Lift Louisiana calls on the Departments to rescind the IFR.

If you have any questions, please contact me at (504) 484-9636.

Sincerely,

Michelle Erenberg
Executive Director
Lift Louisiana

---

[108] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, *available at:* http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

00435153

Exhibit 61                                                                                              JA-0001031



The Commonwealth of Massachusetts
Executive Office of Health and Human Services
Office of Medicaid
One Ashburton Place, Room 1109
Boston, Massachusetts 02108



CHARLES D. BAKER
Governor

KARYN E. POLITO
Lieutenant Governor

MARYLOU SUDDERS
Secretary

DANIEL TSAI
Assistant Secretary for
MassHealth

Tel: (617) 573-1600
Fax: (617) 573-1891
www.mass.gov/eohhs

November 22, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS–9940–IFC
P.O. Box 8016
Baltimore, MD 21244–8016

Centers for Medicare & Medicaid Services,
Department of Health and Human Services
Attention: CMS–9925–IFC
P.O. Box 8016
Baltimore, MD 21244–8016

**Re:**     **Comments on Interim Final Rules (IFRs) for Religious and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act**

On behalf of the Massachusetts Executive Office of Health and Human Services (EOHHS), including the Department of Public Health (DPH) and the Medicaid program (MassHealth), I am writing with regard to the Interim Final Rules (IFRs) published on October 13, 2017. These rules allow employers to seek exemption from providing contraceptive coverage to women under either moral or religious grounds. Specifically, these rules, known as the "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act"[1] and the "Religious Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act"[2] would expand the types of employers that may claim a religious or moral objection to providing contraceptive services, allowing insurers and companies to refuse to pay for contraception coverage for their employees.

EOHHS strongly objects for the following reasons to the restrictions on contraceptive access these rules allow.

---

[1] Retrieved October 13, 2017 from: https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21852.pdf
[2] Retrieved October 13, 2017 from: https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21851.pdf

00000001

Exhibit 62

Cost is an Important Factor in Contraceptive Access

Unintended pregnancies account for nearly half of the 6.1 million pregnancies annually in the U.S. and 75% of teenage pregnancies. All taxpayers carry the burden of these costs, as two-thirds (68%) of the 1.5 million unplanned births that occurred in 2010 were paid for by public insurance programs, primarily Medicaid. Reducing costs and increasing access to contraceptive methods, particularly the most effective methods, remains a critical component to increasing the use of contraception and reducing unintended pregnancy.

Contraceptives have historically comprised a significant proportion of health care costs for young women, but the ability of women to obtain contraception is cost sensitive. For instance, a Guttmacher Institute study of low and middle income women shows that 30% had put off a visit to a health care provider for birth control in order to save money. Another study showed that copays as little as $6 prevented consistent filling of oral contraceptives. Prior to the Affordable Care Act (ACA), contraceptives made up an estimated 30-44% of out-of-pocket health care spending for women. By 2013, most women had no out-of-pocket costs for their contraception.[3]

Importantly, these IFR restrictions will differentially limit access to the most effective types of contraception. The cost of contraceptive methods is an important factor in the method a woman chooses; in one study conducted prior to the ACA, 31% of women said that they would change methods if cost were of no concern.[4] Research indicates that when offered a full-range of contraceptive methods, women are more likely to choose a highly-effective method, known as long-acting reversible contraceptive methods (LARC), and to continue using these methods after two or three years.[5] This continuity reduces gaps in contraceptive use and reduces the risk of unintended pregnancy. While these methods are preferred by individuals and are more than 99% effective at preventing pregnancy, they have high out-of-pocket costs for those without insurance coverage, which makes them difficult to access in a setting of restricted coverage. The ACA's mandate to cover contraception has increased utilization of contraception, increased use of more effective methods, and decreased out-of-pocket costs for women.[6] Modifying or eliminating that mandate risks increased costs for those women and is likely to restrict the contraceptive choices available to them because of the cost. Similarly, restricting access to contraception will pose increased costs to employers and insurers. A 2007 report from the National Business Group on Health[7] recommended that employers cover a full range of contraceptives without cost sharing because the savings from this coverage would exceed the costs.

[3] Sonfield, A., Tapales, A., Jones, R.K., and Finer, L.B. (2015). Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update. *Contraception (91)*, 44-48. https://dx.doi.org/10.1016%2Fj.contraception.2014.09.006

[4] Frost, J.J. and Darroch, J.E. (2008). Factors Associated with Contraceptive Choice and Inconsistent Method Use, United States, 2004. *Perspectives on Sexual and Reproductive Health, (40)*2, 94-104. https://doi.org/10.1363/4009408

[5] Diedrich, J.T., Zhao, Q., Madden, T., Secura, G.M., and Peipert, J.F. (2015). Three-year Continuation of Reversible Contraception. *Am J Obstet Gynecol. (213)*5:662. https://doi.org/10.1016/j.ajog.2015.08.001

[6] Becker, N.V., Polsky, D. (2015). Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing. *Health Affairs, (34)*7, 1204-1211. https://dx.doi.org/10.1377/hlthaff.2015.0127

[7] Campbell KP, editor. (2007) Investing in Maternal and Child Health: An Employer's Toolkit. Washington, DC: Center for Prevention and Health Services, National Business Group on Health. Retrieved October 23, 2017 from: https://www.businessgrouphealth.org/pub/?id=f3004374-2354-d714-5186-b5bc1885758a

Exhibit 62

Access to Contraception Improves Health and Lowers Costs

Contraception also helps women and families attain optimal family planning. Closely spaced pregnancies (an inter-pregnancy interval of less than 18 months) are at greater risk for adverse birth outcomes, including preterm birth, low birth weight, and infants small for gestational age.[8] Preterm birth accounts for 75% of all stays in the neonatal intensive care unit. Such hospitalizations are expensive; a 2013 March of Dimes study reported that birth hospitalization costs for preterm infants average approximately $54,000 per infant. Much of these costs are carried by Medicaid, as expanded categories under the Social Security Act allow Medicaid eligibility for preterm infants and those with very low birth weight, even at higher income levels.

It should also be noted that while contraceptives are most often used for family planning purposes, they may also be prescribed to control symptoms from medical disorders such as severe pain or uncontrolled bleeding associated with menstruation, endometriosis and other women's obstetrical and gynecological issues. These IFRs would similarly interfere with that coverage.

MassHealth, the Commonwealth's Medicaid and CHIP program, currently provides healthcare coverage for just under 1.9 million, 28%, of our Massachusetts residents. In addition, MassHealth provides coverage to approximately 137,000 individuals who have alternative commercial coverage, including employer-sponsored insurance and student health insurance, and acts as a secondary payer for services not covered by commercial insurance carriers. If the number of employer-sponsored insurance programs that provide coverage for contraceptive care and services decreases as a result of these new IFRs, the number of MassHealth members without contraceptive coverage could increase, shifting to MassHealth costs that would otherwise be borne by the individuals' commercial insurer and employer.

Summary

When access to contraceptives is expanded, women choose better, more reliable methods of birth control. By allowing these IFRs that restrict this access, the risk to individuals is clear—poorer health outcomes and lower economic prospects that continue to impact future generations. The consequences are higher costs due to unintended pregnancy and adverse health outcomes, as well as cost shifting from private employers to the public sector and our already constrained Medicaid budgets.

For the reasons above, I respectfully ask you to withdraw these IFRs. Thank you for consideration of these comments.

Sincerely,

Marylou Sudders

cc: Monica Bharel, MD, Commissioner, Massachusetts Department of Public Health
Daniel Tsai, Assistant Secretary of MassHealth

---

[8] Conde-Agudelo, A., Rosas-Bermúdez, A., & Kafury-Goeta, A.C. (2006). Birth Spacing and Risk of Adverse Perinatal Outcomes: A Meta-analysis. JAMA, (295)15, 1809-1823. https://dx.doi.org/10.1001/jama.295.15.1809

00000003

Exhibit 62

# Congress of the United States
## Washington, DC 20515

October 26, 2017

The Honorable Steven Mnuchin
U.S. Treasury
1500 Pennsylvania Avenue NW
Washington, DC 20220

The Honorable Alexander Acosta
U.S. Department of Labor
200 Constitution Avenue NW
Washington, DC 20210

The Honorable Eric Hargan
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

Dear Secretary Mnuchin, Secretary Acosta, and Acting Secretary Hargan:

We write today in strong opposition to two interim final rules (IFRs) released on October 6, 2017, that may leave women across the United States without access to health insurance coverage for birth control. We call on the Administration to rescind these IFRs and restore policies that facilitate access to affordable contraception for millions of women.

Birth control is health care, plain and simple. The Administration's decision to isolate contraception from other health care benefits discriminates against women by forcing them to pay more for common health care services they need. It also ignores the well-established facts about contraception's important role in women's health. The harmful policies in the IFRs also take effect immediately despite the complete absence of an urgent public need justifying the abandonment of traditional notice-and-comment rulemaking.

Birth control is vital to both the nation's public health and women's health care in particular. It empowers women and their partners to decide when and how to start and grow a family. A few examples of how access to affordable contraception improves women's health include:

- It helps ensure healthy spacing between pregnancies, enabling women to avoid the risks that arise by getting pregnant less than 18 months after giving birth. A recent study found that "the most significant health risks are associated with the shortest birth intervals."[1]
- It helps prevent poor birth outcomes and poor health conditions for women, including pregnant women. It reduces the risk of premature birth, placental abruption, low birth weight, and pre-eclampsia, among other health conditions. More than half of all women who take birth control pills rely on them for other medical purposes. Over one million of these women use birth control exclusively for non-contraceptive reasons.[2]
- It reduces the incidence of unintended pregnancy, and in turn, reduces the need for abortion. For example, the Contraceptive CHOICE Project revealed dramatic declines in unintended pregnancy among at-risk women who were given free contraception and

---

DeFranco, Emily. Influence of Interpregnancy Interval on Birth Timing. *International Journal of Obstetrics and Gynecology* (2012)
[2] Jones, Rachel. Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills. Guttmacher Institute (2011)

1

PRINTED ON RECYCLED PAPER

00651931

Exhibit 63                                                                                                    JA-0001035

counseling.[3] In addition, a 2016 study found that the rate of unintended pregnancies decreased 18 percent between 2008 and 2011, with larger declines (44 percent) occurring among women aged 15 to 17. The study's authors say those declines are likely due to increases in overall contraceptive use among women at risk of unintended pregnancy that occurred over the same period.[4]

The evidence clearly demonstrates that birth control is a public health success story. That's why Congress embraced contraception as a vital health care benefit for millions of women in the Affordable Care Act (ACA). The ACA requires health plans to cover recommended preventive services for women without cost-sharing. In response to these ACA provisions, HHS commissioned the non-partisan experts at the Institute of Medicine to identify preventive services necessary to protect women's health and well-being. Those experts recommended coverage of all contraceptive methods approved by the Food and Drug Administration.[5] The recommendations were reviewed and recommended again by the Women's Preventive Services Initiative, and adopted by Health Resources & Services Administration (HRSA), just last year.[6] Thanks to these protections in the ACA, over 62 million women now have coverage of birth control with no out-of-pocket cost, saving consumers over one billion dollars each year.[7]

The Administration's IFRs severely undermine congressional intent under the ACA. The ACA's fundamental goal is to expand access to affordable insurance that covers a core set of health benefits. Preventive services are singled out in numerous places throughout the law as especially important benefits that must be accessible and affordable. Nevertheless, the IFRs create broad exemptions that virtually any employer, insurance company, or institute of higher education can use to deny contraception coverage. Compliance with existing accommodations, which guarantee women access to affordable birth control when their employers deny contraception coverage, also becomes optional under the IFRs. And because the accommodation is now optional, many women will have no reasonable way to access birth control coverage.

The IFRs' impact on women and their families is not hypothetical. These rules threaten to reverse the progress for women's health, equality, and economic security made under the ACA. Women who lose access to contraception coverage will not only incur higher out-of-pocket costs, they will be forced to pay the *full cost* of their birth control. Without insurance coverage, birth control pills can cost as much as $50 per month, with long-acting forms of contraception costing as much as $1,000.[8] These are not trivial costs for millions of women across the United States. The reality is, for many women, these expenses could put the birth control they need out of reach. Ironically, the IFRs claim that low-income women should be able to access affordable

[3] Peipert, Jeffrey et al., Preventing Unintended Pregnancies by Providing No-Cost Contraception, *Obstetrics & Gynecology* (2012).
[4] Finer, Lawrence et al., Declines in Unintended Pregnancy in the United States, 2008-2011, *New England Journal of Medicine* (2016).
[5] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* (2011).
[6] Women's Preventive Services Guidelines. HRSA, available at: https://www.hrsa.gov/womens-guidelines-2016/index.html
[7] New Data Estimate 62.4 Million Women Have Coverage of Birth Control Without Out-of-Pocket Costs. National Women's Law Center, available at: https://nwlc.org/resources/new-data-estimate-62-4-million-women-have-coverage-of-birth-control-without-out-of-pocket-costs/; Becker, Nora. Women Saw Large Decrease In Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. *Health Affairs* (2015).
[8] Ruane, Kelsey et al., Know the Facts: IUDs and the Current Healthcare Law. National Women's Law Center. Available at: https://nwlc.org/blog/know-the-facts-iuds-and-the-current-healthcare-law/.

00651932

Exhibit 63

JA-0001036

contraception through other government programs, such as Title X and Medicaid, even though the Trump Administration and Congressional Republicans have worked tirelessly to undermine and dismantle these programs.

Employers and insurance companies should not have effective veto power over women's access to birth control coverage. We certainly agree that religious liberty is a fundamental value protected by the First Amendment. However, it does not give employers the right to discriminate and impose their beliefs on others, especially in a manner that causes harm to health, well-being, and financial security. Contraception should be treated like any other preventive health care benefit under the ACA, which remains the law of the land.

Rather than taking yet another harmful action to undermine health care access for women, we ask that the Administration rescind these misguided IFRs. Instead, the Administration should engage in an open and transparent process with all the key stakeholders prior to changing current law.

Sincerely,

DIANA DEGETTE
Member of Congress

LOUISE M. SLAUGHTER
Member of Congress

JUDY CHU
Member of Congress

NITA M. LOWEY
Member of Congress

KATHERINE CLARK
Member of Congress

GREGORY W. MEEKS
Member of Congress

GRACE F. NAPOLITANO
Member of Congress

KEITH ELLISON
Member of Congress

DONALD S. BEYER JR.
Member of Congress

BEN RAY LUJÁN
Member of Congress

3

00651933

Exhibit 63

JA-0001037

DAVID SCOTT
Member of Congress

BONNIE WATSON COLEMAN
Member of Congress

ADAM SMITH
Member of Congress

GWEN MOORE
Member of Congress

JERROLD NADLER
Member of Congress

JACKIE SPEIER
Member of Congress

ELEANOR HOLMES NORTON
Member of Congress

DANNY K. DAVIS
Member of Congress

PETER A. DeFAZIO
Member of Congress

ELIOT L. ENGEL
Member of Congress

AL GREEN
Member of Congress

SALUD O. CARBAJAL
Member of Congress

BRIAN HIGGINS
Member of Congress

ROSA DeLAURO
Member of Congress

DEBBIE DINGELL
Member of Congress

MARCY KAPTUR
Member of Congress

4

00651934

Exhibit 63                                                                JA-0001038

EARL BLUMENAUER
Member of Congress

NYDIA M. VELÁZQUEZ
Member of Congress

TONY CÁRDENAS
Member of Congress

BARBARA LEE
Member of Congress

JOSEPH P. KENNEDY, III
Member of Congress

JULIA BROWNLEY
Member of Congress

CHELLIE PINGREE
Member of Congress

SCOTT H. PETERS
Member of Congress

JACKY ROSEN
Member of Congress

PETER J. VISCLOSKY
Member of Congress

DINA TITUS
Member of Congress

JAMES P. McGOVERN
Member of Congress

PETE AGUILAR
Member of Congress

G. K. BUTTERFIELD
Member of Congress

JOAQUIN CASTRO
Member of Congress

DAVID N. CICILLINE
Member of Congress

5

00651935

Exhibit 63

JA-0001039

JOHN CONYERS, JR.
Member of Congress

CHARLIE CRIST
Member of Congress

ELIJAH CUMMINGS
Member of Congress

MARK DeSAULNIER
Member of Congress

ELIZABETH H. ESTY
Member of Congress

RUBEN GALLEGO
Member of Congress

GENE GREEN
Member of Congress

WILLIAM R. KEATING
Member of Congress

JIM COSTA
Member of Congress

JOSEPH CROWLEY
Member of Congress

SUSAN A. DAVIS
Member of Congress

LLOYD DOGGETT
Member of Congress

BILL FOSTER
Member of Congress

JOHN GARAMENDI
Member of Congress

DENNY HECK
Member of Congress

RO KHANNA
Member of Congress

6

00651936

Exhibit 63

JA-0001040

RUBEN J. KIHUEN
Member of Congress

DANIEL T. KILDEE
Member of Congress

DEREK KILMER
Member of Congress

RON KIND
Member of Congress

RAJA KRISHNAMOORTHI
Member of Congress

ANN McLANE KUSTER
Member of Congress

SANDER M. LEVIN
Member of Congress

JOHN LEWIS
Member of Congress

TED W. LIEU
Member of Congress

SEAN PATRICK MALONEY
Member of Congress

DORIS MATSUI
Member of Congress

BETTY McCOLLUM
Member of Congress

JERRY McNERNEY
Member of Congress

BETO O'ROURKE
Member of Congress

JIMMY PANETTA
Member of Congress

ED PERLMUTTER
Member of Congress

7

00651937

Exhibit 63

JA-0001041

JARED POLIS
Member of Congress

LUCILLE ROYBAL-ALLARD
Member of Congress

RAUL RUIZ
Member of Congress

KURT SCHRADER
Member of Congress

ROBERT C. "BOBBY" SCOTT
Member of Congress

JOSÉ E. SERRANO
Member of Congress

MARK TAKANO
Member of Congress

PAUL TONKO
Member of Congress

NORMA J. TORRES
Member of Congress

NIKI TSONGAS
Member of Congress

JOHN YARMUTH
Member of Congress

COLLEEN HANABUSA
Member of Congress

MICHAEL CAPUANO
Member of Congress

BRENDA L. LAWRENCE
Member of Congress

JAN SCHAKOWSKY
Member of Congress

ADRIANO ESPAILLAT
Member of Congress

8

00651938

Exhibit 63                                                                                          JA-0001042

MICHELLE LUJAN GRISHAM
Member of Congress

ANTHONY BROWN
Member of Congress

DONALD M. PAYNE, JR.
Member of Congress

DEBBIE WASSERMAN SCHULTZ
Member of Congress

RICK LARSEN
Member of Congress

RAÚL M. GRIJALVA
Member of Congress

SETH MOULTON
Member of Congress

LOIS FRANKEL
Member of Congress

JOHN B. LARSON
Member of Congress

AMI BERA
Member of Congress

CAROLYN B. MALONEY
Member of Congress

TIM RYAN
Member of Congress

JAMIE RASKIN
Member of Congress

WM. LACY CLAY
Member of Congress

TERRI A. SEWELL
Member of Congress

PRAMILA JAYAPAL
Member of Congress

9

00651939

Exhibit 63

JA-0001043

LISA BLUNT ROCHESTER
Member of Congress

HENRY C. "HANK" JOHNSON
Member of Congress

PETER WELCH
Member of Congress

STEVE COHEN
Member of Congress

BRAD S. SCHNEIDER
Member of Congress

SUZANNE BONAMICI
Member of Congress

ERIC SWALWELL
Member of Congress

A. DONALD McEACHIN
Member of Congress

FREDERICA S. WILSON
Member of Congress

JOYCE BEATTY
Member of Congress

SUZAN DELBENE
Member of Congress

JUAN VARGAS
Member of Congress

KATHY CASTOR
Member of Congress

ALCEE L. HASTINGS
Member of Congress

ANNA G. ESHOO
Member of Congress

JARED HUFFMAN
Member of Congress

10

00651940

Exhibit 63                                                                          JA-0001044

MIKE QUIGLEY
Member of Congress

ROBERT A. BRADY
Member of Congress

TOM O'HALLERAN
Member of Congress

ROBIN L. KELLY
Member of Congress

CAROL SHEA-PORTER
Member of Congress

GERALD E. CONNOLLY
Member of Congress

ALAN LOWENTHAL
Member of Congress

MIKE THOMPSON
Member of Congress

LUIS V. GUTIÉRREZ
Member of Congress

ALMA S. ADAMS
Member of Congress

ADAM B. SCHIFF
Member of Congress

FILEMON VELA
Member of Congress

HAKEEM JEFFRIES
Member of Congress

DWIGHT EVANS
Member of Congress

NANETTE DIAZ BARRAGÁN
Member of Congress

JIM HIMES
Member of Congress

11

00651941

Exhibit 63

ALBIO SIRES
Member of Congress

KATHLEEN M. RICE
Member of Congress

CEDRIC L. RICHMOND
Member of Congress

BRAD SHERMAN
Member of Congress

BOBBY L. RUSH
Member of Congress

ANDRÉ CARSON
Member of Congress

EMANUEL CLEAVER
Member of Congress

MARCIA L. FUDGE
Member of Congress

MARK POCAN
Member of Congress

STEPHEN F. LYNCH
Member of Congress

YVETTE D. CLARKE
Member of Congress

MIKE DOYLE
Member of Congress

THEODORE E. DEUTCH
Member of Congress

MARC VEASEY
Member of Congress

DAVID E. PRICE
Member of Congress

RICK NOLAN
Member of Congress

12

00651942

Exhibit 63

SHEILA JACKSON LEE
Member of Congress

Kyrsten Sinema
Member of Congress

DAVID LOEBSACK
Member of Congress

SANFORD D. BISHOP, JR.
Member of Congress

JOE COURTNEY
Member of Congress

CHERI BUSTOS
Member of Congress

TIMOTHY WALZ
Member of Congress

THOMAS R. SUOZZI
Member of Congress

LINDA T. SÁNCHEZ
Member of Congress

JOHN SARBANES
Member of Congress

JIM COOPER
Member of Congress

DARREN SOTO
Member of Congress

JAMES R. LANGEVIN
Member of Congress

BILL PASCRELL, JR.
Member of Congress

EDDIE BERNICE JOHNSON
Member of Congress

GRACE MENG
Member of Congress

13

00651943

Exhibit 63

JA-0001047

JOHN K. DeLANEY
Member of Congress

BRENDAN F. BOYLE
Member of Congress

KAREN BASS
Member of Congress

LOU CORREA
Member of Congress

ZOE LOFGREN
Member of Congress

STEPHANIE MURPHY
Member of Congress

STENY H. HOYER
Member of Congress

JOSH GOTTHEIMER
Member of Congress

MATT CARTWRIGHT
Member of Congress

VAL BUTLER DEMINGS
Member of Congress

DONALD NORCROSS
Member of Congress

BENNIE G. THOMPSON
Member of Congress

C.A. DUTCH RUPPERSBERGER
Member of Congress

RICHARD NEAL
Member of Congress

FRANK PALLONE, JR.
Member of Congress

VICENTE GONZÁLEZ
Member of Congress

14

00651944

Exhibit 63

JA-0001048

TULSI GABBARD
Member of Congress

AL LAWSON
Member of Congress

JAMES E. CLYBURN
Member of Congress

15

00651945

Exhibit 63

JA-0001049

# Congress of the United States
## House of Representatives
### Washington, DC 20515

December 5, 2017

The Honorable Eric Hargan
Acting Secretary
U.S. Department of Health and Human
Services
200 Independence Avenue, SW
Washington, DC 20201

The Honorable R. Alexander Acosta
Secretary
U.S. Department of Labor
200 Constitution Avenue, NW
Washington, DC 20210

The Honorable Steven Mnuchin
Secretary
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

RE: *Interim Final Rule on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act & Interim Final Rule on Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act* [CMS-9940-IFC/CMS-9925-IFC]

Dear Acting Secretary Hargan, Secretary Acosta, and Secretary Mnuchin:

We write to share our comments on the Interim Final Rules (IFRs) regarding coverage of certain preventive services for women.

As the Ranking Members of the Committees of jurisdiction, we are gravely concerned that the IFRs will undo the progress made by the Affordable Care Act (ACA), which ensures that women have coverage for a comprehensive set of preventive health services without any out-of-pocket costs. These sweeping new rules represent an unacceptable and unjustified attack on a basic health care service on which millions of women across the country rely.

Before the ACA's enactment, basic preventive services were often not fully covered by most insurance plans.[1] Women in particular struggled to access needed preventive services and were more likely than men to forego preventive care due to costs.[2] Recognizing this inequity, the ACA guaranteed that women have access to all necessary "preventive care and screenings," including the full range of Food and Drug Administration (FDA)-approved contraceptive methods, without copayments or any other any cost sharing requirements.[3]

---

[1] Amanda Cassidy, "Preventive Services Without Cost Sharing," *Health Affairs* (Dec. 28, 2011) available at:
http://www.healthaffairs.org/do/10.1377/hpb20101228.861785/full/.
[2] National Women's Law Center, *Women's Preventive Services in the Affordable Care Act* (Dec. 2013), available at: https://nwlc.org/wp-content/uploads/2015/08/womens_prev_services_in_aca_12-4-2013.pdf.
[3] 42 U.S.C. § 300gg-13(a)(4).

00373081

Exhibit 64

The Honorable Eric Hargan
The Honorable R. Alexander Acosta
The Honorable Steven Mnuchin
December 5, 2017
Page 2

The women's preventive services guarantee was a dramatic step forward for women's health. As a result, more than 62 million women now have coverage for contraception and other preventive services, without having to pay a deductible, co-payment, or coinsurance.[4] Some women now have coverage for contraception for the first time, and women are increasingly likely to choose long-acting, more effective methods of birth control that may have prohibitively higher upfront costs without coverage.[5] The importance of coverage for contraception in narrowing the coverage gap for women has been repeatedly affirmed, including when these preventive services were first identified by the Institute of Medicine (IOM), and most recently in December 2016 by the Women's Preventive Services Initiative. The recommendations of each of these expert panels were adopted by the Health Resources and Services Administration (HRSA) within the Department of Health and Human Services (HHS).[6]

Contraceptive coverage is essential for women to not only avoid unintended pregnancy and space pregnancies effectively for optimal birth outcomes and maternal health, but also as a critical preventive health tool that should be treated like any other preventive health service. Women have a fundamental right to determine the number, timing, and spacing of their pregnancies. Contraceptive coverage and access is essential to women's equality, and treating this care differently from other preventive services is unjustified and discriminatory.

We are dismayed that the administration is now attempting to roll back the advances made to women's health under the guise of religious liberty by providing broad exemptions for employers or institutions of higher learning that claim to have a religious or moral objection. The IFRs state that the Departments are seeking to issue these rules "to better balance the Government's interest in ensuring coverage for contraceptive and sterilization services in relation to the Government's interests…to provide conscience protections for individuals and entities with sincerely held religious beliefs in certain health care contexts."[7] However, there is no doubt that the IFRs are dramatically imbalanced in their approach, by giving employers and institutions of higher education carte blanche to use their religious or moral beliefs to deny fundamental health services to women.

In creating these sweeping exemptions that block contraceptive coverage for women and discriminate against them, the IFRs violate a number of constitutional and statutory provisions, including the Administrative Procedure Act, the Establishment Clause as well as the equal protection and due process guarantees of the U.S. Constitution, and the nondiscrimination provision of the ACA (Section 1557).

---

[4] National Women's Law Center. *New Data Estimate 62.4 Million Women Have Coverage of Birth Control without Out-of-Pocket Costs,* (Sept. 25, 2017) available at: https://nwlc.org/resources/new-data-estimate-62-4-million-women-have-coverage-of-birth-control-without-out-of-pocket-costs/.
[5] Kaiser Family Foundation, *The Future of Contraceptive Coverage,* (Jan. 2017) available at: http://files.kff.org/attachment/Issue-Brief-The-Future-of-Contraceptive-Coverage.
[6] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps,* (2011) available at:
http://www.nationalacademies.org/hmd/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx; Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration,* (Dec. 2016).
[7] 82 F.R. 47792, 47793 (Oct. 13, 2017); 82 F.R. 47838, 47839 (Oct. 13, 2017).

00373082

Exhibit 64

The Honorable Eric Hargan
The Honorable R. Alexander Acosta
The Honorable Steven Mnuchin
December 5, 2017
Page 3

The Establishment Clause of the First Amendment limits the government's ability to create an exemption from generally applicable laws for religious or moral beliefs. The constitutional requirement is straightforward: "an accommodation must be measured so that it does not override other significant interests,"[8] "impose unjustified burdens on other[s],"[9] or have a "detrimental effect on any third party."[10] The exemptions in the IFRs clearly impose burdens on others: it compels employees and students who need coverage for contraceptives to pay the substantial costs themselves (if they are able) or else to forego that essential health care altogether.

The IFR that specifically contains an exemption for *moral* beliefs does not change this Establishment Clause analysis. It is clear from the IFRs that the moral exemption is effectively just a religious exemption by another name. According to the moral exemption IFR, the scope of the exemption for moral convictions is based on *Welsh v. United States*.[11] In *Welsh*,[12] the Supreme Court held that a religious exemption must be provided equally to those who hold moral beliefs that are akin to religious beliefs. Again, the Constitution does not permit exemptions for religious or moral beliefs that result in discrimination or harm to others. Therefore, both IFRs fail the constitutional do-no-harm test.

Further, the Departments' invocation of the Religious Freedom Restoration Act (RFRA) in defense of the IFRs is misguided. Under RFRA, Congress required that government action may only substantially burden a person's exercise of religion if it is in the furtherance of a compelling government interest, and is the least restrictive means to achieve that interest.[13] It is clear that the government indeed has a compelling interest in ensuring that patients have unencumbered access to the health care they need and that women are not discriminated against in health care by being forced to pay more than men. Indeed, in *Burwell v. Hobby Lobby Stores, Inc.*, five Supreme Court justices found that the government has this compelling interest.[14] As Justice Kennedy made clear in his concurring opinion, requiring health plans to provide contraceptive coverage "serves the Government's compelling interest in providing insurance coverage that is necessary to protect the health of female employees, coverage that is significantly costlier than for a male employee."[15] However, the IFRs would shift this cost back to women by allowing virtually any employer, along with institutions of higher education, to claim a religious or moral objection to providing contraceptive coverage.

---

[8] *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005); *see also Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709-10 (1985).
[9] *Cutter*, 544 U.S. at 726; *see also Texas Monthly, Inc. v. Bullock*, 480 U.S. 1, 18 n.8 (1989).
[10] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2781 n.37 (2014) (citing *Cutter*, 544 U.S. at 720). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting); *see also Holt v. Hobbs*, 135 S. Ct. 853, 867 (2015) (Ginsburg, J., concurring).
[11] 82 Fed. Reg. 47838, 47846 (Oct. 13, 2017).
[12] *Welsh v. United States*, 398 U.S. 333 (1970).
[13] The provision of contraceptive coverage does not cause substantial burden on religious exercise. See brief of 91 Members of the United States House of Representatives in *Sebelius v. Hobby Lobby Stores, Inc.*, available at:
https://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs-v3/13-354-13-356_amcu_ushr.authcheckdam.pdf.
[14] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).
[15] *Id.* at 2785-86.

00373083

Exhibit 64

The Honorable Eric Hargan
The Honorable R. Alexander Acosta
The Honorable Steven Mnuchin
December 5, 2017
Page 4

RFRA was never intended to allow religion to supersede rights or legal obligations; RFRA was intended to provide heightened—but not unlimited—protection for religious exercise. The misapplication of RFRA improperly dilutes its original, solemn purpose to protect sincerely-held religious beliefs and opens the door to further erosion of civil rights, under the guise of religious freedom.

Additionally, we remind the Departments that most recently in *Zubik v. Burwell*, the Supreme Court explicitly instructed the federal government and the parties to the case to find a solution that would ensure women have access to seamless contraceptive coverage.[16] Not only do the IFRs fail to do this, they completely run afoul of the Court's instructed approach that would "ensur[e] that women covered by petitioners' health plans 'receive full and equal health coverage, including contraceptive coverage.'"[17]

Finally, and perhaps most importantly, as Members of Congress who served during the passage of the ACA, we can provide clarity on the Congressional intent behind the preventive services requirement. While the IFRs list other statutes that include a religious or moral exemption, we note that Congress did not include such an exemption in the ACA.[18] In fact, the inclusion of the women's preventive services provision, often referred to as the Women's Health Amendment, signals that Congress considered coverage for the preventive health services unique to women as paramount. In crafting the ACA, a core tenant was the belief that access to comprehensive care, including preventive care services and essential health benefits, would improve the lives and health of the American people. Proponents of the ACA recognized that expanding access to preventive care could result in lower costs and better health outcomes. Contraceptive coverage was then, and continues to be, a critical aspect of this overarching goal. Eviscerating this guarantee by giving employers and institutions of higher education carte blanche to opt out is contrary to the intent of Congress.

It is our responsibility to uphold the delicate balance between freedom of religion and civil rights. The IFRs as published do not accomplish this goal, and we urge the administration to rescind these harmful rules.

Sincerely,

**ROBERT C. "BOBBY" SCOTT**
Ranking Member
Committee on Education and the
Workforce

**FRANK PALLONE, JR.**
Ranking Member
Committee on Energy and
Commerce

**RICHARD E. NEAL**
Ranking Member
Committee on Ways and
Means

---

[16] *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).
[17] *Id.* at 1560 (2016).
[18] While the IFRs point to the grandfathering provision of the ACA as justification for its sweeping exemptions, the grandfathering provision of the ACA is solely a temporary means for transitioning employers to full compliance, not an exemption.

00373084

Exhibit 64



December 5, 2017

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9925-IFC

Dear Acting Secretary Hargan,

NARAL Pro-Choice America is a national advocacy organization dedicated since 1969 to supporting and protecting, as a fundamental right and value, a woman's freedom to make personal decisions regarding the full range of reproductive choices, including preventing unintended pregnancy, bearing healthy children, and choosing legal abortion. Through education, organizing, and influencing public policy, NARAL and our 1.2 million member activists work to guarantee every woman this right, regardless of her income, where she obtains her healthcare coverage, or her zip code.

NARAL is committed to ensuring all individuals have affordable coverage of birth control. NARAL unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017). *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf

00207028

Exhibit 65                                                                                                              JA-0001054

Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. And the IFR is predicated upon a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons NARAL calls on the Departments to rescind the IFR.

## I.    Birth Control Is Critical to Women's Health

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[3] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or prevent pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family

---

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008. Table A-2. 2009.

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] *Id.*

[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011). https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014). http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzcQ.

[7] Sheila D. Rustgi et al., The Commonwealth Fund. *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009). http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs. 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

1156 15th Street NW   •   Suite 700   •   Washington, D.C. 20005
ProChoiceAmerica.org   •   202-973-3000   •   202-973-3070 fax

00207029

Exhibit 65                                                                                                          JA-0001055

health.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

Unintended pregnancies are associated with higher rates of long-term health complications for the woman and the infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] And, the U.S. has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[16] Lack of contraception, gaps in contraceptive use, and inconsistent or incorrect use account for 95% of unintended pregnancies in the U.S.[17] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and noncontraceptive purposes.[18] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are also recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory

---

[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.
[11] *Id.* at 103-104.
[12] Conde-Agudelo A. Rosas-Bermudez A. Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[13] Tsui AO. McDonald-Mosley R. Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.
[14] Finer LB and Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.
[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.
[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.
[17] Guttmacher Institute, *Fact Sheet: Unintended Pregnancy in the United States* (Sept. 2016) at https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf.
[18] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

00207030

Exhibit 65                                                                                                    JA-0001056

disease, and a decreased risk of endometrial and ovarian cancer.[19] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[20, 21]

Insurance coverage of contraception is critical to ensuring women can use it.  Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation.  By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[22] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[23] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[24] which was followed by large increases in women's presence in law, medicine, and other professions.[25]  The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[26]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling

---

[19] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7. and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[20] Id.

[21] Cortessis VK. Barrett M. Brown W. et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

[22] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics. 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[23] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages. 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012). http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz. The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions. 110 J. Pol. Econ. 730, 749 (2002).

[24] Heinrich H. Hock. The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[25] Claudia Goldin & Lawrence F. Katz. The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions. 110 J. of Pol. Econ. 730, 749 (2002). https://dash.harvard.edu/handle/1 /2624453.

[26] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act. 77 Fed. Reg. 8725. 8728 (Feb. 15, 2012).

00207031

Exhibit 65                                                                          JA-0001057

during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## II. The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A. Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[27] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[28] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act*.[29]

---

[27] *Id.* at 8.727.

[28] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[29] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

1156 15th Street NW   •   Suite 700   •   Washington, D.C. 20005
ProChoiceAmerica.org   •   202-973-3000   •   202-973-3070 fax

00207032

Exhibit 65

JA-0001058

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services.  For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for . . . family planning."[30] And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[31] It was clear that contraception would be covered.[32]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[33] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[34] On August 1, 2011, the Health Resources and Services Administration (HRSA) adopted the recommendations set forth in the IOM Report.[35]  These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress's direction.

### B.  The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation.  Yet, in order to justify the sweeping exemptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a

---

[30] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[31] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women.  This may include . . . family planning . . .").

[32] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[33] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[34] *Id.* at 109-10.

[35] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

00207033

Exhibit 65

JA-0001059

woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify the IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[36] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[37] Additionally, although qualifying grandfathered plans do not have to comply with certain ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[38] This exemption is intended as a temporary means for transitioning employers to full compliance.[39] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[40]

## III.    The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[41] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred

---

[36] *See* Priests for Life. v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[37] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees. Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

[38] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).

[39] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[40] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[41] *See*, e.g., at 21 https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf

1156 15th Street NW    •    Suite 700    •    Washington, D.C. 20005
ProChoiceAmerica.org    •    202-973-3000    •    202-973-3070 fax

00207034

Exhibit 65                                                                                                      JA-0001060

workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[42] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[43]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[44]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[45] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero."[46] Prior to this IFR, the Department of Health and Human Services met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this IFR does not comply with the APA's requirements in

---

[42] *Id.* at 19.

[43] *Id.* at 24-27

[44] 2 U.S.C. § 18116.

[45] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[46] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

1156 15th Street NW    •    Suite 700    •    Washington, D.C. 20005
ProChoiceAmerica.org    •    202-973-3000    •    202-973-3070 fax

00207035

Exhibit 65

JA-0001061

two key ways: 1. the Departments do not have good cause to skip notice and comment rulemaking and 2. issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"[47] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[48]  Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity—no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Departments further argue that the IFR is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this IFR constitutes arbitrary and capricious behavior. By unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The IFR is therefore unlawful under the APA.[49]

Specifically, the IFR is in excess of statutory authority. It is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The IFR is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[50] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive

---

[47] 5 U.S.C. § 553(b), (c).
[48] 5 U.S.C. § 553(d).
[49] 5 U.S.C. § 706.
[50] 42 U.S.C. § 18114(1).

1156 15th Street NW   •   Suite 700   •   Washington, D.C. 20005
ProChoiceAmerica.org   •   202-973-3000   •   202-973-3070 fax

00207036

Exhibit 65                                                                                                          JA-0001062

coverage, the IFR erects unreasonable barriers to medical care and impedes timely access to contraception. It is therefore invalid in violation of 5 U.S.C. § 706(2) because it is supported by no valid justification, contradicts the ACA and the U.S. Constitution, and exceeds Defendants' statutory jurisdiction, authority, or limitations.[51]

For each of these reasons, the IFR violates the APA and should be rescinded.

## V.    Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services' policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this IFR to undermine the contraceptive benefit. NARAL unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual beliefs.

### A.   Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The IFR takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion."[52] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[53]

---

[51] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

[52] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[53] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

1156 15th Street NW   •   Suite 700   •   Washington, D.C. 20005
ProChoiceAmerica.org   •   202-973-3000   •   202-973-3070 fax

00207037

Exhibit 65                                                                 JA-0001063

## B.  Contraceptives Are Medication and Carry Risks Like *Any* Medication

The IFR raises concerns about the "negative health effects" of contraception.[54] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[55, 56] Specifically, the IFR suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[57]  The IFR also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[58]

## C.  Contraceptives Do Not Increase Sexual Activity Among Adolescents

The IFR suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[59] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[60,61]  In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[62,63] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become pregnant.[64] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[65] More females are using contraception the first time they have sex.[66]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

---

[54] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[55] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[56] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[57] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.
[58] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.
[59] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).
[60] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.
[61] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).
[62] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.
[63] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[64] Id.
[65] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[66] Id.

00207038

Exhibit 65                                                                                                    JA-0001064

### VI.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[67] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers as a result of the IFR. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

### A.    Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[68] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[69] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[70]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the *existing* need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[71] Since 2010,

---

[67] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[68] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[69] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[70] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[71] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.

00207039

Exhibit 65

the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[72] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[73] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[74] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[75] This is particularly true with respect to specialty providers, including OB/GYNs.[76] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have the ability to serve individuals who lose contraceptive coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling.

---

Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

[72] See Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K. *Family Planning Annual Report: 2010 National Summary*. RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B. *Family Planning Annual Report: 2016 national summary*. RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[73] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[74] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[75] U.S. Government Accountability Office, "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance," (Nov. 2012), http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General, "Access to Care: Provider Availability in Medicaid Managed Care," (Dec. 2014), http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[76] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

1156 15th Street NW  •  Suite 700  •  Washington, D.C. 20005
ProChoiceAmerica.org  •  202-973-3000  •  202-973-3070 fax

00207040

Exhibit 65

JA-0001066

### B. The Political Assaults on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[77] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[78] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[79]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net—Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[80] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[81] The administration has not only signaled its

---

[77] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017). https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mnhSzlV.

[78] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[79] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[80] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., Family Planning Annual Report: 2016 national summary, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[81] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. Title X, Budget & Appropriations, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated

00207041

Exhibit 65
JA-0001067

support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[82] Additionally, Congress's efforts to block Planned Parenthood from receiving federal funds, thereby eliminating an important source of affordable contraception from many communities, has reached the Title X program.[83]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least—that the Departments would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of the IFR given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[84] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles, and other out-of-pocket costs.[85] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[86] Furthermore, no

---

visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[82] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, Guttmacher Policy Review, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[83] Joint Resolution of Disapproval, Pub. L. No. 115-23 131 Stat. 89 (2017)

[84] Guttmacher Institute, Insurance coverage of contraceptives, State Laws and Policies (as of October 2017), 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[85] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, State Laws and Policies (as of October 2017), 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[86] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute.

00207042

Exhibit 65                                                                                                              JA-0001068

state has the authority to regulate plans offered by employers that self-insure, which accounts for 60% of covered workers nationwide.[87]

The Departments are wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

### VII.    The Departments' Proposed Changes to the Rule Do Not Fix the Above Problems

The Departments request comment on several ways the IFR could be changed to expand exemptions to the birth control benefit. Each of the questions presented by the Departments is based on an assumption that the IFR is legally sound, and in some instances, that it should be expanded. As described in detail above, these assumptions are incorrect. Other than completely striking it, there is nothing the Departments could do to make this better, and any expansion would only further violate the law. The IFR should be struck in its entirety.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons NARAL calls on the Departments to rescind the IFR.

Sincerely,
NARAL Pro-Choice America

Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*. 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[87] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*. Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust. 2017. https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

1156 15ᵗʰ Street NW  •  Suite 700  •  Washington, D.C. 20005
ProChoiceAmerica.org  •  202-973-3000  •  202-973-3070 fax

00207043

Exhibit 65          JA-0001069



December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016

Attention: CMS-9940-IFC

**Subject: Interim Final Rule on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act** CMS-9940-IFC

NARAL Pro-Choice Maryland submits the following comments in response to the Interim Final Rules ("the Rules") titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act"[i] and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act,"[ii] published in the Federal Register on October 13, 2017, by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services ("the Departments").

NARAL Pro-Choice Maryland works to ensure that public policy and legislative decision-making is fully informed by scientific evidence and the best available data, and that the public has reliable access to independent scientific information and analysis produced and acquired by the federal government. The role of scientific evidence in public health decision-making is imperative, and we oppose any efforts to diminish the role of science in federal policymaking.

Unfortunately, these Rules are a prime example of regulatory decision-making that ignores scientific evidence and the best available data. The Departments' summary of the evidence is arbitrary and cherry-picked. The Departments understate the efficacy and health benefits of contraceptives and overstate the health risks of contraceptives by selectively interpreting data, overlooking well-established evidence, and promoting unfounded doubt. Further, both Rules falsely assert certain types of FDA-approved contraceptive methods to abortifacients.

The Rules thus cause dual harm by undermining women's access to essential preventive health care and undermining the integrity of science in governance. Public health policy should be informed by the best available scientific evidence. Instead, the Departments use false claims about contraception that are contrary to medical and public health evidence, misstate or ignore research, and undermine the agencies' role as a source of accurate health information.

00396773

Exhibit 66                                                                                 JA-0001070

The Departments serve a critical role in collecting and managing important information and data on issues that are vital to the public. In making policy, it is essential that the Departments enhance their credibility on issues of science and evidence, not undermine it. Thus, the Departments must take full advantage of their resources to inform their decision-making by the best available evidence and data. The Rules, however, show that the Departments did not seriously consider these elements, which can only undermine the Departments' reputations as reliable sources of information.

Below we outline several ways the Rules are at odds with science and research. We urge the Departments to withdraw both Rules.

**Contraception Prevents Unintended Pregnancy and Improves the Health of Women and Children**

As an example of how the Departments are not utilizing the best available science and evidence with dire consequences for public health, the Departments make several misstatements that ignore prevailing evidence regarding the efficacy, health benefits, and health risks of contraceptives. First, the Departments fail to acknowledge that contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[iii] Second, the Departments falsely associate several health risks with contraceptive use, ignoring the weight of the evidence.[iv] The Departments' summary of the evidence is wrong and misleading. Not only does contraception prevent unintended pregnancy,[v] but the prevention of unintended pregnancy is associated with life-long health benefits for both women and children that the Departments fully ignore. Further, the Departments' overstatement of health risks ignores the long, evidence-based list of non-contraceptive health benefits associated with contraceptives.

Contraceptive efficacy at preventing unintended pregnancy is supported by decades of rigorous evidence and by the government itself.[vi] The U.S. Food and Drug Administration ("FDA") must approve all new drugs and devices by showing that they are safe and effective through rigorous scientific testing. The federal government itself has thus approved contraceptives for safely and effectively preventing unintended pregnancies.[vii] The Departments' misrepresentation of "complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy"[viii] is false and relies heavily on cherry-picked citations instead of accurately reflecting the weight of the evidence. For instance, the Departments point to a single pre-ACA economics paper positing that contraceptive use may be connected to an increase in teen pregnancy over the "long run."[ix] This paper utilized 1997 youth survey data where the majority of respondents were using condoms or another "episodic" form of birth control,[x] the efficacy of which is irrelevant to an assessment of the efficacy of the methods of birth control covered under the ACA's contraceptive benefit, and hardly contributes to "uncertainty"[xi] regarding decades of clinical data that prove otherwise.

In truth, contraception enables women, including teens, to prevent unintended pregnancy and control the timing of a desired pregnancy.[xii] The Centers for Disease Control and Prevention named family planning one of the ten great public health achievements of the past century,[xiii] and family planning is widely credited for contributing to women's societal, educational, and economic gains.[xiv] The ACA's guarantee of no-copay coverage of contraception has contributed

00396774

Exhibit 66

JA-0001071

to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[xv] The teen pregnancy rate is also at the lowest point in at least 80 years.[xvi]

Contraception improves health outcomes for women and children because unintended pregnancies have higher rates of short- and long-term health complications. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed.[xvii] They are also at increased risk of maternal mortality and morbidity, maternal depression, experiencing physical violence during pregnancy,[xviii] infant mortality, birth defects, low birth weight, and preterm birth.[xix] Unintended pregnancies are also associated with long-term negative physical and mental effects on children.[xx] Contraception, by contrast, is considered a major factor in reducing rates of maternal mortality and morbidity. For example, a study of 172 developing countries found that use of contraception is an "effective primary prevention strategy to reduce maternal mortality . . . ."[xxi] The Departments' new Rules paper over this vast body of research and the clear health benefits of contraception.

### The Health Risks of Contraceptives Are Overstated and Misrepresented

The Departments go further, selectively interpreting data in order to overstate "negative health effects" associated with contraceptives.[xxii] This includes misleading assertions of an association between contraceptive use, breast cancer, and cervical cancer, as well as vascular events and "risky sexual behavior."[xxiii] The Departments ignore substantial evidence to the contrary, and ignore the balance of significant non-contraceptive health benefits associated with contraceptive use. Certainly it is true that, as with any medication, some types or methods of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[xxiv] Some women may also want to avoid side effects  such as changes to menstrual flow.[xxv] But the Departments fail to recognize that this means that patients and health care providers, not employers and agencies, should determine the right contraceptive for an individual woman's health care needs.

The Departments' claim that contraceptive use is associated with an increased risk of breast and cervical cancers is based solely on a 2013 Agency for Healthcare Research and Quality report, when in fact the evidence is not decisive, and to say so is a misrepresentation. There is no proven increased risk of breast cancer among contraceptive users, particularly those under 40. For women over 40, health care providers must consider both the risks of becoming pregnant at an advanced reproductive age, as well as the risks of continuing contraception use until menopause, making it essential that a woman be able to discuss options with her provider without interference.[xxvi] And, on the topic of cervical cancer, the Departments cite only a study on oral contraceptives, when a recent study found that intrauterine devices ("IUDs") are associated with a decreased risk of cervical cancer.[xxvii]

It is especially irresponsible to misrepresent the risks of breast and cervical cancer without accurately reporting the substantial evidence of contraceptives' association with cancer prevention, since any evaluation of preventive health care should fully weigh the risks and benefits.[xxviii] Contraceptives are associated with a reduced risk of colorectal cancer;[xxix] endometrial cancer is 50 percent less likely among women who use oral hormonal contraceptives for at least one year compared to women who have never used oral hormonal contraceptives;[xxx] oral hormonal contraceptives can reduce the risk of ovarian cancer by 27 percent, and 20 percent

00396775

Exhibit 66

JA-0001072

for every five years of additional use;[xxxi] oral hormonal contraceptives can lower the risk of hereditary ovarian cancer in women with the BRCA1 or BRCA2 gene mutations;[xxxii] and oral hormonal contraceptive use for more than 10 years can lower the risk of ovarian cancer among women with endometriosis, who are typically at higher risk of developing ovarian cancer.[xxxiii]

The Rules also incorrectly suggest that contraceptive use is connected to an increased risk of "vascular events" such as venous thromboembolism ("VTE"). The risk of VTE among oral contraceptive users is very low.[xxxiv] In fact, it is much lower than the risk of VTE during pregnancy or in the immediate postpartum period, so prevention of unintended pregnancy actually reduces women's risk of VTE.[xxxv]

The Departments' claim that contraceptives may lead to "risky sexual behavior"[xxxvi] is similarly unfounded. Increased access to contraception is not associated with a change or increase in sexual behaviors.[xxxvii] Instead, research has shown that school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[xxxviii] In the "CHOICE Project," a large-scale U.S. study aimed at reducing unintended pregnancy by providing no-cost contraception, participants reported no change in their sexual activities after receiving contraceptives.[xxxix]

Contraceptives are also associated with other non-contraceptive health benefits beyond the cancer prevention benefits listed above. Benefits include reduced menstrual pain, reduced risk of myoma, reduced symptoms of endometriosis, and reduced symptoms of premenstrual syndrome and premenstrual dysphoric disorder.[xl] Oral hormonal contraceptives have been found to reduce the risk of pelvic inflammatory disease by 50 to 60 percent,[xli] Contraceptives are also associated with lower risk of rheumatoid arthritis, preservation of bone density, and reduced symptoms of asthma.[xlii]

In sum, the Departments overstate the evidence of health risks and understate the evidence of contraceptive efficacy and health benefits, failing to accurately reflect the weight of evidence that shows that contraceptives are associated with a variety of short- and long-term health benefits, improving health outcomes for both women and children. And the various contraindications associated with some forms of birth control actually support the opposite finding: women should have access to the full range of FDA-approved methods and must be able to work with health care providers to choose the method that best suits their health concerns and needs without interference from an employer.

**Contraceptives Do Not Interfere with an Existing Pregnancy**

Both Rules refer to the false assertion that some FDA-approved methods of contraception "prevent implantation of an embryo," and are thus abortifacients.[xliii] This is inaccurate and goes against longstanding medical evidence.

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of FDA-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion." [xliv] FDA-approved contraceptive methods

00396776

Exhibit 66                                                                    JA-0001073

are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins. [xlv]

By making the false claim that some FDA-approved methods of contraception may cause abortion, the Departments sideline science in favor of ideology.

**The Rules Should Be Withdrawn Because They Are Based on Falsehoods, Undermine Scientific Integrity, and Harm Women's Health**

For the reasons stated above, NARAL Pro-Choice Maryland objects to the Interim Final Rules titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act" and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act." The Rules should be withdrawn due to their lack of scientific basis and their harmful impact on women's health and economic security.

Respectfully submitted,

Diana Philip
Executive Director
NARAL Pro-Choice Maryland

---

[i] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[ii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[iii] *See generally* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/. *See also* Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception, 83*(5), 397–404; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852.

[iv] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804–05 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[v] *See, e.g.,* Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852 ("A likely explanation for the decline in the rate of unintended pregnancy is a change in the frequency and type of contraceptive use over time.").

[vi] *See, e.g.,* Institute of Medicine. (2011). *Clinical Preventive Services for Women: Closing the Gaps.* Washington, DC: The National Academies Press; American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/; Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception, 83*(5), 397–404; Hatcher, R.A., Trussell, J., Nelson, A.L., Cates, W., Kowal, D., & Policar, M.S. (Eds.). (2011). *Contraceptive Technology* (20th ed.). Atlanta, GA: Bridging the Gap Communications; Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 4–5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017)

*NARAL Pro-Choice Maryland 8905 Fairview Road, Suite 401, Silver Spring, MD 20910*
*www.prochoicemd.org 303-565-4154*
5

00396777

Exhibit 66

JA-0001074

("Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.") (citing Sundaram, A., Vaughan, B., Bankole, A., Finer, L., Singh, S., & Trussell, J. (2017, March). Contraceptive failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health, 49*(1), 7–16); Peipert, J.F., Madden, T., Allsworth, J.E., & Secura, G.M. (2012, December). Preventing unintended pregnancies by providing no-cost contraception. *Obstetrics & Gynecology, 120*(6), 1291–1297; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852; Harper, C.C., Rocca, C.H., Thompson, K.M., Morfesis, J., Goodman, S., Darney, P.B., . . . Speidel, J.J. (2015, June). Reductions in pregnancy rates in the USA with long-acting reversible contraception: A cluster randomised trial. *The Lancet, 386*(9993), 562–568; Speidel, J.J., Harper, C.C., & Shields, W.C. (2008, September). The potential of long-acting reversible contraception to decrease unintended pregnancy. *Contraception, 78*(3), 197–200.

[vii] Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017).

[viii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[ix] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147) (citing Arcidiacono, P., Khwaja, A., & Ouyang, L. (2005). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Available at http://public.econ.duke.edu/~psarcidi/teensex.pdf [sic]).

[x] Arcidiacono, P., Khwaja, A., & Ouyang, L. (2011, January 22). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Retrieved 27 November 2017, from http://public.econ.duke.edu/~psarcidi/teensex.pdf

[xi] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[xii] *See, e.g.,* Boonstra, H.D. (2014, September 3). What is behind the declines in teen pregnancy rates? *Guttmacher Policy Review, 17*(3), 15–21; Lindberg, L., Santelli, J., & Desai, S. (2016, November). Understanding the decline in adolescent fertility in the United States, 2007–2012. *Journal of Adolescent Health, 59*(5), 577–583.

[xiii] Centers for Disease Control and Prevention. (2013, April 26). *Ten Great Public Health Achievements in the 20th Century.* Retrieved 27 November 2017, from https://www.cdc.gov/about/history/tengpha.htm

[xiv] *See, e.g.,* Sonfield, A., Hasstedt, K., Kavanaugh, M.L., & Anderson, R. (2013, March). *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children.* Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf

[xv] Guttmacher Institute. (2016, September). *Unintended Pregnancy in the United States* (p. 2). Retrieved 27 November 2017, from https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf

[xvi] Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 8, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("In 2013, the U.S. pregnancy rate among 15–19 year olds was at its lowest point in at least 80 years and had dropped to about one-third of a recent peak rate in 1990.") (citing Kost, K., Maddow-Zimet, I., & Arpaia, A. (2017, August). *Pregnancies, Births and Abortions Among Adolescents and Young Women In the United States, 2013: National and State Trends by Age, Race and Ethnicity.* Retrieved 27 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf).

[xvii] Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252. Hellerstedt, W.L., Pirie, P.L., Lando, H.A., Curry, S.J., McBride, C.M., Grothaus, L.C., & Nelson, J.C. (1998, April). Differences in preconceptional and prenatal behaviors in women with intended and unintended pregnancies. *American Journal of Public Health, 88*(4), 663–666;

[xviii] *See* Tsui, A.O., McDonald-Mosley, R., & Burke A.E. (2010, April). Family planning and the burden of unintended pregnancies. *Epidemiologic Reviews, 32*(1), 152–174; Joyce, T.J., Kaestner, R., & Korenman, S. (2000, February). The effect of pregnancy intention on child development. *Demography, 37*(1), 83–94; Gazmararian, J.A., Adams, M.M., Saltzman, L.E., Johnson, C.H., Bruce, F.C., Marks, J.S., & Zahniser, S.C. (1995, June). The relationship between pregnancy intendedness and physical violence in mothers of newborns. The PRAMS Working Group. *Obstetrics & Gynecology, 85*(6), 1031–1038; Goodwin, M.M., Gazmararian, J.A., Johnson, C.H., Gilbert, B.C., & Saltzman, L.E. (2000, June). Pregnancy intendedness and physical abuse

*NARAL Pro-Choice Maryland 8905 Fairview Road, Suite 401, Silver Spring, MD 20910*
*www.prochoicemd.org 303-565-4154*

00396778

Exhibit 66

JA-0001075

around the time of pregnancy: Findings from the pregnancy risk assessment monitoring system, 1996-1997. PRAMS Working Group. Pregnancy Risk Assessment Monitoring System. *Maternal and Child Health Journal, 4*(2), 85–92.

[xix] Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313; Conde-Agudelo, A., Rosas-Bermúdez, A., & Kafury-Goeta, A.C. (2006). Birth spacing and risk of adverse perinatal outcomes: A meta-analysis. *JAMA, 295*(15), 1809–1823. *See also* Goldthwaite, L.M., Duca, L., Johnson, R.K., Ostendorf, D., & Sheeder, J. (2015, September). Adverse birth outcomes in Colorado: Assessing the impact of a statewide initiative to prevent unintended pregnancy. *American Journal of Public Health, 105*(9), e60–e66 (establishing an association between use of long-acting reversible contraception and a lower risk of preterm birth).

[xx] *See, e.g.,* Barber, J.S., Axinn, W.G., & Thornton, A. (1999, September). Unwanted childbearing, health, and mother-child relationships. *Journal of Health and Social Behavior, 40*(3), 231–257. *C.f.* Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252; Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313.

[xxi] Ahmed, S., Li, Q., Liu, L., & Tsui, A.O. (2012, July). Maternal deaths averted by contraceptive use: An analysis of 172 countries. *The Lancet, 380*(9837), 111–125.

[xxii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[xxiii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147)).

[xxiv] *See, e.g.,* American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 86: Progestin-Only Hormonal Birth Control: Pill and Injection*. Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Progestin-Only-Hormonal-Birth-Control-Pill-and-Injection; American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 185: Combined Hormonal Birth Control: Pill, Patch, and Ring*. Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Combined-Hormonal-Birth-Control-Pill-Patch-and-Ring.

[xxv] *See, e.g.,* Jones, R.K. (2011, November). *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills*. Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf

[xxvi] *See* Curtis, K.M., Jatlaoui, T.C., Tepper, N.K., Zapata, L.B., Horton, L.G., Jamieson, D.J., & Whiteman, M.K. (2016, July 29). U.S. selected practice recommendations for contraceptive use, 2016. *Morbidity and Mortality Weekly Report, 65*(4), 1–66.

[xxvii] Cortessis, V.K., Barrett, M., Brown Wade, N., Enebish, T., Perrigo, J.L., Tobin, J., . . . McKean-Cowdin, R. (2017). Intrauterine device use and cervical cancer risk: A systematic review and meta-analysis. *Obstetrics & Gynecology, 130*(6), 1226–1236.

[xxviii] *C.f.* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 11). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/

[xxix] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[xxx] Ibid.

[xxxi] Ibid.

[xxxii] Ibid.

[xxxiii] Ibid.

[xxxiv] American College of Obstetricians and Gynecologists, Committee on Gynecologic Practice. (2016). *Committee Opinion Number 540: Risk of Venous Thromboembolism Among Users of Drospirenone-Containing Oral Contraceptive Pills*. Retrieved 27 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Gynecologic-Practice/co540.pdf?dmc=1&ts=20171127T2043082500

[xxxv] Ibid.

[xxxvi] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

00396779

Exhibit 66

JA-0001076

[xxxvii] *See, e.g.,* Kirby, D. (2007, November). *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases.* The National Campaign to Prevent Teen and Unplanned Pregnancy Publication. Retrieved 27 November 2017, from https://thenationalcampaign.org/resource/emerging-answers-2007%E2%80%94full-report; Meyer, J.L., Gold, M.A., & Haggerty C.L. (2011, February). Advance provision of emergency contraception among adolescent and young adult women: A systematic review of literature. *Journal of Pediatric & Adolescent Gynecology, 24*(1), 2–9.

[xxxviii] Minguez, M., Santelli, J.S., Gibson, E., Orr, M., & Samant, S. (2015, March). Reproductive health impact of a school health center. *Journal of Adolescent Health, 56*(3), 338–344. *See also* Knopf, J.A., Finnie, R.K., Peng, Y., Hahn, R.A., Truman, B.I., Vernon-Smiley, M., . . . Fullilove, M.T. (2016, July). School-based health centers to advance health equity: A Community Guide systematic review. *American Journal of Preventive Medicine, 51*(1), 114–126.

[xxxix] Secura, G.M., Adams, T., Buckel, C.M., Zhao, Q., & Peipert, J.F. (2015, April). Change in sexual behavior with provision of no-cost contraception. *Obstetrics & Gynecology, 123*(4), 771–776. *See also* Goldman, G. (2017, October 11). *The Trump Administration Fakes Science to Justify Restrictions on Birth Control Access.* Union of Concerned Scientists Blog. Retrieved 27 November 2017, from http://blog.ucsusa.org/gretchen-goldman/the-trump-administration-fakes-science-to-justify-restrictions-on-birth-control-access

[xl] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47. *See also* American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women. (2015, January). *Committee Opinion Number 615: Access to Contraception.* Retrieved 30 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co615.pdf?dmc=1&ts=20171130T1815539115

[xli] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[xlii] Ibid.

[xliii] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838, 47,840 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[xliv] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[xlv] *See, e.g.,* Brief of *Amici Curiae* Physicians for Reproductive Health, et al. in Support of Petitioners at 12, Burwell v. Hobby Lobby Stores, Inc., 573 U.S. __, 134 S. Ct. 2751 (2014) (No. 13-354).

00396780

Exhibit 66

JA-0001077