Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9925-IFC

Dec. 5, 2017

Dear Acting Secretary Hargan,

National Asian Pacific American Women's Forum (NAPAWF) is committed to ensuring all individuals have affordable coverage of birth control. NAPAWF is the only national, multi-issue organization organizing and advocating for the human rights of Asian American Pacific Islander (AAPI) women, girls, and gender nonconforming people. Thus, NAPAWF unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. And the IFR is predicated upon a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. **For all of these reasons NAPAWF calls on the Departments to rescind the IFR.**

## I.    The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

1

00209153

Exhibit 67                                                                                                          JA-0001078

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[3] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[4] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[5]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[6]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. **But it does not give anyone the right to use religious or moral beliefs as an excuse to harm others.** The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[7] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero."[8] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## II.    Birth Control Is Critical to Women's Health

---

[3] *See, e.g.*, at 21
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_ct_al.pdf
[4] *Id.* at 19.
[5] *Id.* at 24-27
[6] 2 U.S.C. § 18116.
[7] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).
[8] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

00209154

Exhibit 67                                                                JA-0001079

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[9] While Asian American Pacific Islander (AAPI) women earn on average 85 cents for every white male dollar, disaggregating this data by ethnicity reveals that Thai women make as little as 66 cents for every white male dollar, Cambodian women make 55 cents, and Bhutanese women make 38 cents.[10] As a result, AAPI women face a high level of health care insecurity that leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[11] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[12] Out-of-pocket costs prevented many women, particularly low-income women, from accessing preventive services, including contraception.[13] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[14] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[15] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[16]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[17] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be

---

[9] U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2, 2009.
[10] U.S. Census Bureau, 2011-2013 American Community Survey 3-Year Estimates, reported in the U.S. Department of Labor, Selected Population Profile in the United States, Table S0201.
[11] Kaiser Family Foundation, Women's Health Care Chartbook, 2011.
[12] Id.
[13] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography, Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342–43 (2000); 1342–43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNS7eQ.
[14] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.
[15] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).
[16] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.
[17] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

00209155

Exhibit 67

JA-0001080

exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[18]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[19] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[20] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[21] And, the U.S. has the highest rate of maternal mortality in the developed world.[22] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[23] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non contraceptive purposes.[24] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[25] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[26, 27]

AAPI women use contraception at rates similar to other women of color. A 2012 report from the Centers for Disease Control (CDC) showed that 58.5 percent of AAPI women use any method of contraception, compared to 54.2 percent of Black women, 59.7 percent of Hispanic women, and 65.6 percent of White women.[28] Yet a closer look at these numbers indicates that AAPI women

---

[18] *Id.* at 103-104.
[19] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[20] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.
[21] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.
[22] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show," Institute for Health Metrics and Evaluation, University of Washington, 2016.
[23] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.
[24] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.
[25] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.
[26] *Id.*
[27] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-analysis Obstet Gynecol. 2017
[28] Jones, Jo., Mosher, William, and Kimberly Daniels, "Current Contraceptive Use in the United States, 2006-2010, and Changes in Patterns of Use Since 1995," *U.S. Department of Health and Human Services* 20 (2012): 1-26. http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf .

00209156

Exhibit 67

JA-0001081

use less effective contraceptive methods for preventing pregnancy or the transmission of sexually transmitted diseases at much higher rates compared to women of other races and ethnicities. On average, only 10 percent of women report relying on condoms, while AAPI women report using this method at 24 percent.[29] One in three AAPI women use the calendar method for pregnancy prevention, a rate approximately double the percentages of other racial and ethnic groups.[30]

While these methods of contraception are inexpensive, they are also the least effective, placing AAPI women at greater risk of unintended pregnancy. Only 57 percent of AAPI women have reported ever using birth control pills, a more effective pregnancy prevention method, as compared to 68 percent of Hispanic or Latina women, 78 percent of black women, and 89 percent of white women.[31] AAPI women's rates of usage of non-pill hormonal contraception are even lower. Compared to 44 percent of all black women and 38 percent of all Latinas, only 19 percent of AAPI women have ever used a hormonal method of contraception other than the pill.[32]

This data makes clear that AAPI, due to various factors such as stigma, limited English proficiency, immigration status, and the high cost of contraception, lack access to affordable contraception. The current IFR as it stands imposes yet another barrier that AAPI women face in being able to use contraceptive medication for family planning.

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[33] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[34] Access to oral contraceptives may also account for up to one-third of the

[29] Ibid.
[30] Daniels, Kimberly, Mosher, William D., and Jo Jones. "Contraceptive Methods Women Have Ever Used: United States, 1982-2010." *U.S. Department of Health and Human Services* 62 (2013): 1-16. http://www.cdc.gov/nchs/data/nhsr/nhsr062.pdf.
[31] Ibid. 7.
[32] Jones, Jo., Mosher, William, and Kimberly Daniels. "Current Contraceptive Use in the United States, 2006-2010, and Changes in Patterns of Use Since 1995." *U.S. Department of Health and Human Services* 20 (2012): 1-26. http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.
[33] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.
[34] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/w1 7922 (last visited Feb. 9,

00209157

Exhibit 67                                                                    JA-0001082

increase in college enrollment by women in the 1970s,[35] which was followed by large increases in women's presence in law, medicine, and other professions.[36] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[37]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

### III.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

#### A.    Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[38] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the

---

2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[35] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[36] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.harvard.edu/handle/1/2624453.

[37] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

[38] Id. at 8,727.

00209158

Exhibit 67                                                                 JA-0001083

private insurance companies in their gender discrimination."[39]  In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage. . . .* In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access.  In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[40]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services.  For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[41]  And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[42]  That contraception would be covered was clear.[43]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[44]  After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[45]  On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[46]  These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists

---

[39] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[40] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[41] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[42] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women.  This may include . . . family planning . . .").

[43] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[44] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[45] *Id.* at 109-10.

[46] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines,* http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

00209159

Exhibit 67

JA-0001084

(ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

### B.  The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation.  Yet, in order to jstify the sweeping exeptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify he IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[47] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[48] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[49] This exemption is intended as a temporary means for transitioning employers to full compliance.[50] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[51]

### IV.     The IFR Violates the Administrative Procedure Act

---

[47] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[48] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.,* Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

[49] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192-72,193 (Nov. 18, 2015).

[50] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby,* 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[51] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

8

00209160

Exhibit 67

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"[52] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[53] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[54]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[55] As

---

[52] 5 U.S.C. § 553(b), (c).
[53] 5 U.S.C. § 553(d).
[54] 5 U.S.C. § 706.
[55] 42 U.S.C. § 18114(1).

00209161

Exhibit 67

JA-0001086

discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. Furthermore, AAPI women face even more barriers in accessing affordable contraception due to immigration status, limited English proficiency, and disproportionately higher rates of employment in low-wage sectors. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[56]

For each of these reasons, the rule violates the APA and should be rescinded.

## V.    Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. NAPAWF unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

### A.    Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[57] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[58]

### B.    Contraceptives Are Medication and Carry Risks Like *Any* Medication

---

[56] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

[57] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[58] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

00209162

Exhibit 67    JA-0001087

The Rule raises concerns about the "negative health effects" of contraception.[59] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[60, 61] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[62] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[63]

### C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[64] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[65,66] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[67,68] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[69] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[70] More females are using contraception the first time they have sex.[71]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

---

[59] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[60] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[61] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[62] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.
[63] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.
[64] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).
[65] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.
[66] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).
[67] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3), 338-344.
[68] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[69] Id.
[70] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[71] Id.

00209163

Exhibit 67                                                                                          JA-0001088

## VI.   The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[72] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

### A.   Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[73] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[74] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[75]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[76] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to

---

[72] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).
[73] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).
[74] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).
[75] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).
[76] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928 Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

12

00209164

Exhibit 67                                                                                          JA-0001089

just over 4 million.[77] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[78] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[79] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[80] This is particularly true with respect to specialty providers, including OB/GYNs.[81] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

### B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

---

[77] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[78] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[79] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[80] U.S. Government Accountability Office, "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance," (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General, "Access to Care: Provider Availability in Medicaid Managed Care," (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf

[81] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

13

00209165

Exhibit 67

JA-0001090

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[82] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[83] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[84]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[85] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[86] The administration has not only signaled its support for these

---

[82] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9nnnhSzIV.

[83] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[84] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[85] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. L., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[86] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

00209166

Exhibit 67

JA-0001091

efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[87]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[88] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[89] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[90] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[91]

---

[87] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[88] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[89] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[90] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[91] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00209167

Exhibit 67

JA-0001092

The Departments' is wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

### VII. The Departments' Proposed Changes to the Rule Do Not Fix the Above Problems

The Departments request comment on several ways the IFR could be changed to expand exemptions to the birth control benefit. Each of the questions presented by the Departments is based on an assumption that the IFR is legally sound, and in some instances, that it should be expanded. As described in detail above, this assumption is incorrect. Other than completely striking it, there is nothing the Departments could do to make this better, and any expansion would only further violate the law. The IFR should be struck in its entirety.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons NAPAWF calls on the Departments to rescind the IFR.

Sincerely,

Jaclyn Dean
Public Policy Associate
National Asian Pacific American Women's Forum

16

00209168

Exhibit 67



Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G
Washington, DC 20201

RE: [CMS-9940-IFC/CMS-9925-IFC]

Dec. 5, 2017

Dear Acting Secretary Hargan,

Thank you for the opportunity to provide comments on the Departments of Health and Human Services, Labor and Treasury October 6, 2017 Interim Final Rules (IFR). The National Center for Health Research (NCHR) is a research center that is focused on policies and programs that affect public health. Our Center analyzes scientific and medical data and provides objective health information to patients, providers, and policymakers. We strongly oppose rules that expand exemptions to contraceptive coverage because they harm women's health.

We strongly oppose the IFR's use of religious objections to undermine essential health care for millions of women in our country. The HHS must ensure the health of all our citizens by implementing policies based on sound medical and public health science. We urge that HHS bring evidenced-based practice into the forefront of health policies, as it has for decades.

Access to free contraception has enabled 62.4 million women to stay healthy using affordable contraceptive care. The CDC estimates that the 2016 teen pregnancy rates dropped by 9 percent, and the Guttmacher Institute found that the abortion rate in 2014 had dropped by 14% since 2011. These trends are often attributed to free contraception that became available as a result of the Affordable Care Act. For these trends to continue, continued free access to contraception for those who want it cannot be denied.

By encouraging employers and universities to deprive women of free contraceptive coverage, the IFR will harm women's health and increase the rates of abortion, single mothers, financial strains

00435048

Exhibit 68

on families, and possibly abused and neglected children. The IFR is not based in the scientific evidence supporting contraception. For all of these reasons, the National Center for Health Research respectfully urges that you rescind the IFR.

### #1. Birth control is an essential preventive health service.

Preventive healthcare promotes health and well-being through disease prevention, management of disease to prevent long-term complications, and screening for conditions which threaten health. Pregnancy is a medical condition, and it increases women's risk for serious health problems, including potentially fatal blood clots, bleeding, anemia, high blood pressure, gestational diabetes, and death. Pregnancy can also worsens chronic medical conditions, such as high blood pressure or clotting disorders, which can have significant impacts on health. Prevention of pregnancy is as essential as prevention of diabetes and cancer, and much easier and less expensive to accomplish. In addition, unintended pregnancy can affect women's psychosocial health, increasing mental health disorders and threatening financial security. Women with unplanned pregnancies are more likely to delay prenatal care, which increases risk for infant death, birth defects, low birth weight, and preterm birth.

### #2. Birth control is critical to women's socioeconomic well-being and in turn that affects their health.

The Department of Health and Human Services has previously acknowledged that the contraceptive coverage benefit enables "women to achieve equal status as healthy and productive members of the job force." (77 Fed. Reg. 8725, 8728). Lower education, career level, and earnings are important social determinants of health, and can be considered social risk factors for poor health outcomes. Access to effective birth control enables women to be more financially secure, which mitigate social risk factors and improve health.

### #3. The Rule rejects scientific evidence in favor of "beliefs."

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the National Academy of Medicine and federally supported Women's Preventive Services Initiative. The Rule's statement that "many persons and organizations" are against "contraceptive methods… [they] believe are abortifacient" is not scientifically based (82 FR 47841). FDA-approved contraceptives act *before* implantation and therefore are never abortifacients. While all Americans are entitled to their religious beliefs, such beliefs are not appropriate as a basis to wrongfully deny women access to potentially life-saving services. Given the separation of Church and State that our country is based on, it is inappropriate to exempt contraceptive coverage based on religious beliefs rather than science-based evidence.

00435049

Exhibit 68

JA-0001095

**#4. Contraceptives are not a "gateway drug."**

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way." (82 FR 47841). Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity. In fact, student health centers that provide access to contraceptives increase use of contraceptives by students who are already sexually active. Providing birth control is not a gateway to an earlier sexual debut or sexual risk taking. Conversely, denying birth control will likely increase the incidence of teen pregnancy, which can post a serious physical and mental health risk to young females, and often results in abortion.

We appreciate your consideration of our views and urge you to strike the IFR and focus on strategies based on sound science and medical evidence.

Sincerely,

Diana Zuckerman, PhD
President
National Center for Health Research

00435050

Exhibit 68                                                                    JA-0001096



December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (RIN 0938-AT20)**

To whom it may concern:

The National Center for Lesbian Rights ("NCLR") is pleased to provide comments in response to the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services interim final rule ("Religious Exemptions IFR" or "Rule") published in the Federal Register on October 13, 2017.[1] For the reasons set forth below, we urge the Department of the Treasury, Department of Labor, and Department of Health and Human Services (collectively, "the Departments") to set aside this Rule. First, the Religious Exemptions IFR creates a harmful and dangerous precedent by allowing the denial of health care coverage based on religious views while paying scant attention to the harm such denials cause to third parties. Second, the rule will harm LGBT people by restricting access to essential reproductive and other health care services. And third, the Religious Exemptions IFR violates the Administrative Procedure Act ("APA") and both the First and Fifth Amendments to the United States Constitution.

NCLR is a non-profit, public interest law firm that litigates precedent-setting cases at the trial and appellate levels, advocates for equitable public policies affecting the LGBT community, provides free legal assistance to LGBT people and their advocates, and conducts community education on LGBT issues. NCLR has advanced the civil and human rights of LGBT people and their families across the United States through litigation, legislation, policy, and public education since its founding in 1977. We also seek to empower individuals and communities to assert their own legal rights and to increase public support for LGBT equality through community and public education. NCLR recognizes the critical importance of access to affordable health care—including reproductive health care—for all people.

---

[1] 82 Fed. Reg. 47792 et seq.

00436168

Exhibit 69

## I.  Background

### A.  The Benefits of Contraception Are Well Known

Access to contraception is an essential part of shaping women's health and well-being.[2] As of September 2016, there were approximately 61 million U.S. women in their childbearing years (ages 15–44).[3] About 43 million of those women (70%) are at risk of unintended pregnancy— that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners do not use a contraceptive method correctly and consistently.[4] Heterosexual couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[5] In the United States, the average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[6]

Contraceptive use among women is widespread, with over 99% of sexually-active women using at least one method of contraception at some point during their lifetime.[7] And contraceptive use is common among women of all religious denominations.[8] Eighty-nine percent of sexually active Roman Catholics and 90% of sexually active Protestants currently use some method of contraception.[9] Among sexually-experienced religious women, 99% of Roman Catholics and Protestants have ever used some form of contraception.[10] Approximately 68% of Roman Catholics, 73% of Mainline Protestants, and 74% of Evangelicals who are at risk of unintended pregnancy use a highly effective method (e.g., sterilization, the pill or another hormonal method, or the IUD).[11]

---

[2] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[3] Kimberly Daniels, Jill Daugherty, and Jo Jones, *Current Contraceptive Status Among Women Aged 15 44: United States, 2011 2013*, NATIONAL HEALTH STATISTICS REPORTS 173 (2014), http://www.cdc.gov/nchs/data/databriefs/db173.pdf.

[4] Jo Jones, William Mosher, and Kimberly Daniels, *Current Contraceptive Use in the United States, 2006 2010, and Changes in Patterns of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

[5] J Trussell, *Contraceptive failure in the United States*, 83 CONTRACEPTION 297–404, (May 2011).

[6] *Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics*, THE ALAN GUTTMACHER INSTITUTE (AGI) (2000), https://www.guttmacher.org/sites/default/files/pdfs/pubs/fulfill.pdf.

[7] Guttmacher Institute, *Contraceptive Use in the United States* (September 2016), https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

[8] Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (Apr. 2011) https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.

[9] *Id.*

[10] *Id.*

[11] *Id.*

2

00436169

Exhibit 69

JA-0001098

Contraceptives make up an estimated 30–44% of out-of-pocket health care spending for those who use them.[12] A year's worth of birth control can cost upwards of $370—the equivalent of 51 hours of work for someone earning the federal minimum wage of $7.25 an hour.[13] Long-acting birth control methods, such as an IUD or contraceptive implant, cost more than $1,000 out of pocket[14]—almost one month's salary for a person earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the use of more effective methods, and a decrease in out-of-pocket costs for women.[15]

The ACA has expanded contraceptive coverage without cost-sharing to millions of people across the nation.[16] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with almost 65% of the decrease directly attributed to the contraceptive coverage provision. After the implementation of the ACA, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[17] Studies show that the use of long-term contraceptives methods, such as an IUD or an implant, has increased in recent years because the high upfront costs were removed.[18] These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives.[19] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[20] Furthermore, the majority of women no longer

[12] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11, http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[13] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose*, NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/; *See* Elizabeth Celms, *How much do birth-control pills cost?*, CLEAR HEALTH COSTS (Apr. 29, 2013), https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[14] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose*, NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/.

[15] *Insurance Coverage of Contraceptives*, GUTTMACHER INSTITUTE (Oct. 1, 2017), https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives; Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[16] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[17] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[18] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[19] Alina Salganicoff, Laurie Sobel, and Caroline Rosenzweig, *The Future of Contraceptive Coverage*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[20] *Id.*

3

Exhibit 69

00436170

had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[21]

Contraceptive use benefits women and families in numerous ways. Having access to the full range of FDA-approved contraceptive methods allows women to choose the method that works best for them at a given point in their life—factoring in ease of use, side effects, risk of sexually transmitted infections, desire for confidentiality and control, as well as many other considerations. Identifying the "right" methods helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording them greater control over family planning.

Reducing unwanted pregnancies and affording women greater control over family planning has additional health benefits. For example, avoiding closely spaced pregnancies reduces the risk of premature birth or low birth weight. Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families.

Access to comprehensive family planning services, and to culturally competent providers of those services, is critically important for the LGBT community. Lesbian, gay and bisexual youth have been shown to experience more pregnancies than do youth who do not identify as a sexual minority.[22] Bisexual women and some transgender people are also at risk for pregnancy and are often over-looked when considering access to reproductive health care. Access to family planning is thus essential for this community and should be made more, not less, accessible.

It is deeply troubling that federal agencies charged with ensuring public health would seek to enact a rule that gives employers such sweeping veto power over the health care services their employees may access under their health care coverage. Health insurance is a form of compensation that employees earn, like wages. Allowing employers an explicit religiously-motivated veto over how an employee uses his or her earned health care coverage is bad public health policy and represents an overemphasis on an exaggerated view of religious liberty at the expense of employee health and well-being.

### B. The Affordable Care Act's Contraceptive Coverage Provision

The ACA was enacted to achieve several health care reform goals, including improving the availability of primary and preventive health care services. When preventive services coverage was written into the ACA, Congress included a provision directing the Department of Health and Human Services (HHS) to identify the preventive services that should be provided to women.

---

[21] *The Affordable Care Act's Birth Control Benefit is Working for Women,* NATIONAL WOMEN'S LAW CENTER (Dec. 16, 2016), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.
[22] Lisa L. Lindley, Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students,* 105 AM. J. OF PUBLIC HEALTH 1379–86 (July 1, 2015); Karen Schantz, *Pregnancy Risk Among Bisexual, Lesbian, and Gay Youth: What Does Research Tell Us,* ACT FOR YOUTH CENTER OF EXCELLENCE (Apr. 2015), http://www.actforyouth.net/resources/rf/rf_lgb-prg_0415.pdf.

4

00436171

Exhibit 69

JA-0001100

HHS undertook a thorough and evidence-based process to develop this list of women's preventive services, calling on the independent National Academy of Medicine to convene experts and determine what services should be covered. It surprised no one with a background in public health or medicine that contraception was among the essential preventive services that the Academy included in its recommendations. The Department included contraception in its final rule delineating the list of women's preventive services, exempting houses of worship from covering contraception in their health plans if they had a religious objection. Seeking a broader exemption, some employers, both for-profit and non-profit, filed lawsuits seeking to challenge the requirement to cover contraception on religious grounds.

The Supreme Court resolved the for-profit challenges in 2014, in *Burwell v. Hobby Lobby*.[23] The Court ruled that the Religious Freedom Restoration Act required that a closely held for-profit company whose owners objected to contraception on religious grounds must be permitted to use the same accommodation given to non-profit entities (described below). Importantly, the Court stressed that there would be no harm to the company's workers caused by permitting the company to use the same accommodation to provide its employees with contraceptive coverage, as the employees would still receive coverage without cost sharing.

With respect to non-profit employers, the Departments developed an accommodation to permit religiously affiliated non-profit employers to certify that they objected to contraception and notify their insurer or third-party administrator (TPA), which would arrange for contraceptive coverage for the objecting employer's employees at no cost to the employer. Following the *Hobby Lobby* decision, two more rules were adopted—one creating an additional notice mechanism for objecting non-profits (to HHS rather than to the insurer/TPA), and another allowing closely-held for-profit entities to avail themselves of the same accommodation, pursuant to the holding in *Hobby Lobby*.

### C. Changes Under the Religious Exemptions IFR

The Religious Exemptions IFR expands eligibility for the complete exemption—formerly reserved for houses of worship—to *all* nonprofit and for-profit employers. It also retains the accommodation, formerly available to non-profit and closely-held for-profit employers, as an optional alternative for any employer. Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations. This is a potentially dramatic change in the availability of contraceptive coverage for the employees of a vast number of entities, and a significant departure from what was guaranteed to these employees under prior rulemaking and the *Hobby Lobby* decision.

---

[23] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2786–87 (2014).

00436172

Exhibit 69                                                                                                          JA-0001101

## II. Comments on the Religious Exemptions IFR

NCLR opposes the Religious Exemptions IFR for several reasons. Allowing restrictions on the availability of health care services based on the religious beliefs of others—already too prevalent in reproductive health care   sets a dangerous precedent for access to health care for LGBT people. Limiting the availability of contraceptive coverage will itself have an adverse impact on the LGBT community. And the Rule is unlawful, in violation of the Administrative Procedure Act as well as the First and Fifth Amendments to the U.S. Constitution.

### A. Religious Exemptions in Health Care Cause Harm

Unlike other nations whose legal regimes have also sought to balance the conscience rights of providers with the rights of persons to access health care, in the United States there is often insufficient consideration given to the impact of overly broad conscience laws on patients. In other words, the playing field is already tilted heavily in favor of those seeking to deny care. And given the nature of the services to which religious exemptions are most commonly applied, these refusal laws have a discriminatory impact on LGBT people and women seeking reproductive health care.

At the federal level, there are already numerous statutory protections for health care providers' religious beliefs. These laws include the Church,[24] Weldon,[25] and Coats[26] amendments, which allow providers to refuse to perform or otherwise facilitate abortion services. The Church Amendment also reaches sterilization services.[27]

Most states have similar laws; forty-five allow individual healthcare providers, and forty-three allow institutions, to refuse to provide abortion services.[28] Provider conscience clauses at the state level apply not only to abortion services but also to contraceptive care. Twelve states permit some healthcare providers to refuse to provide contraception and related services (such as counseling).[29] Refusal provisions targeting contraception delay access, increase costs, and may result in unintended pregnancies. Eighteen states allow providers to refuse to provide sterilization services.[30]

State conscience clauses have now expanded to end of life care, stem cell research, and to any unspecified health services to which a moral or religious objection may be raised, including counseling or providing information regarding the patient's health status.[31] These state laws are also expanding to cover more entities.[32] Provider conscience laws exist in states where there are

---

[24] 42 U.S.C. § 300a-7 et seq.
[25] Consolidated Appropriations Act. 2012. Pub. L. No. 112-74, 125 Stat 786.
[26] 42 U.S.C. § 238(n).
[27] 42 U.S.C. § 300a-7 et seq.
[28] GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015).
http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.
[29] Id.
[30] Id.
[31] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2470 (2015).
[32] Id.

6

00436173

Exhibit 69

significant numbers of communities of color, including Texas and Florida,[33] and many of these states have enacted additional, broad constitutional or statutory religious exemptions that impact LGBT persons.[34]

While religiously-based objections to contraception and abortion are well known and have posed access barriers for years, less well known is how these types of refusals can also affect the LGBT community. LGBT people and people living with HIV experience pervasive discrimination in the provision of health care, much of it justified by reference to religious beliefs. According to an in-depth survey concerning health care discrimination against LGBT people and people living with HIV, more than half of all respondents reported that they have experienced at least one of the following types of discrimination in care: being refused needed care; health care professionals refusing to touch them or using excessive precautions; health care professionals using harsh or abusive language; being blamed for their health care status; or health care professionals being physically rough or abusive.[35] Many members of the LGBT community have a "high degree of anticipation and belief that they w[ill] face discriminatory care" which ultimately causes many people to not seek the essential care that they need.[36] For many transgender and gender-nonconforming people the fear of potential negative treatment from health care professionals is even more exacerbated. Undocumented transgender persons were found to be vulnerable to physical attacks in doctors' offices, hospitals, and emergency rooms.[37] There are also geographic considerations that may further exacerbate discrimination against LGBT individuals.[38] These realities have created a major barrier to health care services for LGBT people.

---

[33] For instance, Florida allows private, religious, and public institutions and individual providers to refuse abortion care to patients and allows individual providers and pharmacists to refuse contraception. GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015), http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.

[34] MOVEMENT ADVANCEMENT PROJECT, LGBT POLICY SPOTLIGHT: STATE AND FEDERAL RELIGIOUS EXEMPTIONS AND THE LGBT COMMUNITY (2015), http://www.lgbtmap.org/policy-and-issue-analysis/policy-spotlight-rfra.

[35] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV 5 (2010), http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf (explaining that "almost 56 percent of lesbian, gay or bisexual (LGB) respondents had at least one of these experiences; 70 percent of transgender and gender-nonconforming respondents had one or more of these experiences; and nearly 63 percent of respondents living with HIV experienced one or more of these types of discrimination in health care. In almost every category, transgender and gender-nonconforming respondents reported higher levels of discrimination by health care providers.").

[36] Id. at 6.

[37] GRANT JM, ET AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY 74 (2011), http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

[38] NAT'L WOMEN'S LAW CTR., FACT SHEET: HEALTH CARE REFUSALS HARM PATIENTS: THE THREAT TO REPRODUCTIVE HEALTH CARE 2 (2014), http://www.nwlc.org/sites/default/files/pdfs/refusals_harm_patients_repro_factsheet_5-30-14.pdf.

00436174

Exhibit 69

JA-0001103

LGBT people of color and people with lower socioeconomic status experience even higher levels of discriminatory and substandard care.[39] Data from one report[40] show, among other things:

- Only 64 percent of LGB Latino adults had health insurance coverage compared to 77 percent of all LGB adults and 82 percent of the heterosexual adult population.

- Thirty percent of LGB African-American adults were likely to delay or not get needed medication compared to 19 percent of African-American heterosexual adults.

- Twenty-six percent of LGB Latino adults did not have a regular source for basic health care.

- Only 35 percent of LGB African-American women had a mammogram in the past two years, compared to 57 percent of all LGB women and 62 percent of all heterosexual women.

Religious objections have presented barriers even in instances involving people trying to become pregnant, rather than avoid or terminate a pregnancy. Many religious health care providers are "opposed to infertility treatments altogether or are opposed to providing it to certain groups of people" such as members of the LGBT community.[41] Health care providers have even "sought exemptions from state antidiscrimination laws to avoid providing reproductive services to lesbian parents."[42] For example, in one case, an infertility practice group subjected Guadalupe Benitez to a year of invasive and costly treatments only to deny her the infertility treatment that she needed because she is a lesbian.[43] When doctors at the practice group recognized that Ms.

---

[39] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV, 11 (2010). http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf ("In addition to the overall rates of substandard care, respondents (defined in this survey as having a household income under $20,000) in nearly every category experienced higher rates of discrimination and substandard care. For example, while transgender respondents as a whole reported a care-refusal rate of almost 27 percent, low-income transgender respondents reported a rate of almost 33 percent. Almost 11 percent of low-income LGB respondents and LGB respondents of color were refused care compared to almost 8 percent of LGB people overall."); see also The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding, INSTITUTE OF MEDICINE (2011), http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx.

[40] Health Disparities in LGBT Communities of Color: By the Numbers, CENTER FOR AMERICAN PROGRESS (2010), https://www.americanprogress.org/issues/lgbt/news/2010/01/15/7132/health-disparities-in-lgbt-communities-of-color

[41] U.S. CONF. OF CATHOLIC BISHOPS, ETHICAL AND RELIGIOUS DIRECTIVES FOR CATHOLIC HEALTH SERVICES 25 (5th ed. 2009), http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf (Directive 41 of the Ethical and Religious Directives for Catholic Health Care states: "Homologous artificial fertilization is prohibited when it separates procreation from the marital act in its unitive significance.")

[42] Douglas NeJaime et al., Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics, 124 YALE L.J. 2516, 2518 (2015). See, e.g., N. Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Superior Court, 189 P.3d 959 (Ca. 2008) (on the potential impact of healthcare refusal laws on same-sex couples).

[43] Benitez v. N. Coast Women's Care Med. Grp., Inc., 106 Cal. App. 4th 978 (2003); see also LAMBDA LEGAL, BENITEZ V. NORTH COAST MEDICAL GROUP (Jul. 1, 2001), http://www.lambdalegal.org/in-court/cases/benitez-v-north-coast-womens-care-medical-group; The Affordable Care Act's Birth Control Benefit: Too Important to Lose, NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/.

00436175

Exhibit 69

JA-0001104

Benitez "needed in vitro fertilization to become pregnant, every doctor in the practice refused, claiming that their religious beliefs prevented them from performing the procedure for a lesbian."[44]  Since this was the only clinic covered by her health insurance plan, Ms. Benitez had to pay out-of-pocket for the treatment at another clinic, which subjected her to serious financial harm.

The problems for patients presented by the expansion of refusal provisions in state law have been exacerbated by the growth in health care systems owned and operated by religious orders. Mergers between Catholic and nonsectarian hospitals have continued as hospital consolidation has intensified. Catholic hospitals and health systems must follow the Ethical and Religious Directives for Catholic Health Care Services ("Directives"), which prohibit a wide range of reproductive health services, such as contraception, sterilization, abortion care, and other needed health care.[45] Nonsectarian hospitals must often agree to comply with these Directives in order to merge with Catholic hospitals.[46]

Health insurance benefits earned by employees and guaranteed under federal law should not be subject to a religious veto by employers. The regulatory regime that existed prior to this IFR was the result of several years of considered policymaking and constituted an effort to balance religious objections and employee health care access. This IFR would upend that careful balance and subjugate employee health care needs to the religious objections of any employer. Not only is this poor public health policy, as described further in section B below, it is contrary to numerous provisions of law, set forth in section C.

### B. The Religious Exemptions IFR Will Increase Health Disparities Faced by LGBT People

The Religious Exemptions IFR harms the LGBT community by restricting access to contraception for those who need it, including lesbian and bisexual women and some transgender people.[47] Access to birth control is particularly crucial for the health and well-being of lesbian and bisexual women because they are at risk for unintended pregnancies.[48]

Despite misconceptions held by policymakers and some medical providers, lesbian and bisexual women require sexual and reproductive health services similar to those needed by heterosexual women. A majority of lesbian and bisexual women have reported having had intercourse with men and at least 30% have been pregnant,[49] 50% have used oral contraceptives, and 16%

---

[44] *Benitez, supra* note 43.
[45] U.S. CONF. OF CATHOLIC BISHOPS, ETHICAL AND RELIGIOUS DIRECTIVES FOR CATHOLIC HEALTH SERVICES (5th ed. 2009), http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf.
[46] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2488-89 (2015).
[47] *Birth Control Access for LGBTQ People*, THE NATIONAL LGBTQ TASK FORCE (2016), http://www.thetaskforce.org/static_html/downloads/reports/fact_sheets/factsheet_birth_control_access.pdf.
[48] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).
[49] J.M. Marrazzo and K. Stine, *Reproductive Health History of Lesbians: Implications for Care*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2003).

9

00436176

Exhibit 69

JA-0001105

reported one or more abortions.[50] Bisexual women are also subject to an increased risk of sexual violence. One study found that 46% of bisexual women have been raped as compared to 17% of heterosexual women.[51] Broadly, studies indicate that unintended pregnancies are equally as common, if not more common, for lesbian and bisexual women as for heterosexual women.[52]

Adolescent lesbian and bisexual women are at even higher risk for unintended pregnancies. Lesbian adolescent women are less likely than bisexual and heterosexual women to use contraception and bisexual adolescent women are more likely to experience teen pregnancy than are heterosexual adolescent women.[53] One study found that 12% of lesbian and bisexual adolescent women have experienced teen pregnancy, compared to only 5% of heterosexual adolescent women. And a 2016 study by the Centers for Disease Control and Prevention found that LGBT high school students are more likely than other students to experience intimate partner violence and rape, which can result in unintended pregnancy.[54]

In sum, access to contraception is essential for the health and well-being of many members of the LGBT community, and allowing a wide range of employers to withhold coverage of contraception for religious reasons is unsound public health policy with the potential to cause significant harm.

### C. The Religious Exemptions IFR is Unlawful

In addition to subjecting women's and LGBT people's access to health care to the religious veto of employers, and increasing health disparities faced by members of the LGBT community, the Religious Exemptions IFR should also be rescinded because it violates the APA and First and Fifth Amendments to the Constitution.

---

[50] Elizabeth M. Saewyc, Linda H. Bearinger, Robert Wm. Blum and Michael D. Resnick, *Sexual Intercourse, Abuse and Pregnancy Among Adolescent Women: Does Sexual Orientation Make a Difference?*, 31 FAMILY PLANNING PERSPECTIVES 127 (1999).

[51] Adara Beamesderfer, Lindsey Dawson, Jennifer Kates, Usha Ranji, and Alina Salganicoff, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, THE HENRY J. KAISER FAMILY FOUNDATION (Nov. 2016), https://www.kff.org/disparities-policy/issue-brief/health-and-access-to-care-and-coverage-for-lesbian-gay-bisexual-and-transgender-individuals-in-the-u-s.

[52] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

[53] Brittany M. Charlton, Heather L. Corliss, Stacey A. Missmer, Margaret Rosario, Donna Spiegelman, and Bryn Austin, *Sexual orientation differences in teen pregnancy and hormonal contraceptive use: An examination across 2 generations*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2013), http://www.ajog.org/article/S0002-9378(13)00652-2/pdf.

[54] *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 — United States and Selected Sites, 2015*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 12, 2016), https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf; *see also* Lisa L. Lindley and Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High School Students*, 105 AM. J. OF PUB. HEALTH 1379 (2015).

00436177

Exhibit 69

### i.  The Religious Exemptions IFR Violates the APA

The Administrative Procedure Act imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[55] The APA is applicable here because the Religious Exemptions IFR is a final agency action and is a legislative rule within the meaning of the APA.[56]  By enacting the Religious Exemptions IFR in the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

### 1.  Procedural Violations of Pre-Adoption and Post-Adoption Requirements of the APA

The APA contains two procedural rulemaking requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[57] Section 553(b) of the APA requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[58] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[59] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[60]

The Religious Exemptions IFR violates the notice and comment requirement and the 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its stated reasoning, the Departments do not have good cause, which is limited to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[61] Courts have found good cause in cases that involve: (1) emergencies;[62] (2) context where prior notice would subvert the underlying statutory scheme;[63] and (3)

---

[55] 5 U.S.C. § 551(5).

[56] Id.

[57] Id.

[58] 5 U.S.C. § 553(b).

[59] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[60] Omnipoint Corp. v. F.C.C., 78 F.3d 620, 630 (D.C. Cir. 1996).

[61] 5 U.S.C. § 553(b).

[62] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. See Jifry v. F.A.A., 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).

[63] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1486 (9th Cir. 1992) (reasoning that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made).

11

00436178

Exhibit 69

JA-0001107

situations where Congress intends to waive section 553's requirements.[64] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[65] This means that the Departments must have good cause to waive each requirement.

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[66] While these statutes empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health Insurance Portability and Accountability Act of 1996,[67] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[68] This conclusory statement does not meet the standard Courts have enumerated for rulemaking rise to the standard of "good cause." This reasoning is similar to other instances in which agencies made claims of an emergency situation, unaccompanied by independent facts, which the courts determined were insufficient to constitute good cause.[69] Declaring that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed is not the same as it actually being impracticable and contrary to public interest.

The Departments further argue that "[g]ood cause is supported by providing relief for entities and individuals for whom the Mandate operates in violation of their sincerely held religious beliefs, but who would have to experience that burden for many more months under the prior regulations if these rules are not issued on an interim final basis."[70] However, this reasoning should be weighed against the burdens that many women will face if their employer or university

---

[64] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.,* 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hosp. of Sacramento v. Shalala,* 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding that the APA is inapplicable, rather than that good cause is established).

[65] *United States v. Brewer,* 766 F.3d 884, 888 (8th Cir. 2014).

[66] Religious Exemptions and Accommodations for Coverage of Certain Preventable Services Under the Affordable Care Act, 82 Fed. Reg. 47792, 47813 (Oct. 13, 2017).

[67] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); 42 U.S.C. § 300gg–92.

[68] 82 Fed. Reg. at 47813.

[69] *See, e.g., Sorenson Commc'ns Inc. v. F.C.C.,* 755 F.3d 702, 706 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v. Valverde,* 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); *Brewer,* 766 F.3d at 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale' cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting *United States v. Reynolds,* 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson,* 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain,* 583 F.3d 408, 421 (6th Cir. 2009).

[70] 82 Fed. Reg. at 47814–15.

12

00436179

Exhibit 69                                                                                                    JA-0001108

decides to take advantage of the Religious Exemptions IFR and cease to offer contraception without cost-sharing.

The Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and its post-adoption publication requirements. They have not adequately established that the APA's procedural requirements do not apply or that they have good cause for disregarding them. Because the Religious Exemptions IFR was promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, the Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the Religious Exemptions IFR should be rescinded.

## 2. Substantive Violations of the APA

In addition to the APA's procedural requirements described above, the APA contains several substantive rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to a constitutional right," or "in excess of statutory jurisdiction." The Religious Exemptions IFR violates 5 U.S.C. § 706(2) because it contradicts several provision of the Patient Protection and Affordable Care Act ("ACA").

Section 1554 of the ACA prohibits the Departments from issuing regulations that create unreasonable barriers to individuals obtaining medical care; impede timely access to health care services; interfere with communications regarding a full range of treatment options between patient and provider; restrict the ability of providers to provide full disclosure of all relevant information for making health care decisions; violate the principles of informed consent and ethical standards of health care professionals; or limit the availability of treatment for the full duration of a patient's medical needs.[71] The Religious Exemptions IFR is not in accordance with Section 1554 of the ACA because it creates unreasonable barriers to the ability of individuals to obtain appropriate medical care and it impedes timely access to health-care services.

Section 1557 of the ACA prohibits discrimination on the basis of sex.[72] The implementing regulations for this section issued by HHS state that this includes "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."[73] The regulations further state that people cannot "be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which [the rule] applies."[74] By allowing the denial of a health care service used almost exclusively by women, the Religious Exemptions IFR is not in accordance with Section 1557 of the ACA because it discriminates on the basis of sex.

By expanding eligibility for an exemption from the contraceptive coverage benefit beyond houses of worship, the Religious Exemptions IFR erects unreasonable barriers to critical medical

---

[71] 42 U.S.C. § 18114.
[72] 42 U.S.C. § 18116.
[73] 45 CFR § 92.4.
[74] 45 CFR § 92.101.

13

00436180

Exhibit 69

JA-0001109

coverage, violating Section 1554 of the ACA. By permitting objecting employers to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the ACA. Because the Religious Exemptions IFR violates the ACA, this Rule also violates the APA and must be set aside.

### ii. The Religious Exemptions IFR Violates the Establishment Clause of the First Amendment

The Religious Exemption IFR impermissibly allows employers to impose their own religious viewpoint on employees, regardless of those employees' personal beliefs, and even when doing so causes employees serious harms.[75] Courts have held that the Establishment Clause of the First Amendment prevents the government from shifting the cost of religious accommodation to third parties.[76] While the administration has asserted that the Religious Freedom Restoration Act[77] allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, the government can only constitutionally achieve such an outcome by replacing the current benefit with a program that provides contraception at no additional cost to employees.[78] Instead, the Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's religious beliefs.

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is nothing in First Amendment jurisprudence to distinguish between these federal statutory entitlements and the contraceptive coverage benefit in the ACA. The Religious Exemption IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find religiously objectionable. Such a result would impermissibly shift the cost of religious accommodation onto third parties, subjecting employees to serious harms with no recourse.

---

[75] *See* U.S. CONST. amend. I.
[76] *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) (rejecting a facial challenge to RLUIPA, a federal statute that permits accommodation of certain religious practices in prison, stating "[s]hould inmate requests for religious accommodations become excessive, *impose unjustified burdens on other institutionalized persons*, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.") (emphasis added); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (stating, "The First Amendment . . . gives no one the right to insist that in pursuit of their own interest others must conform their conduct to his own religious necessities."); *but see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (distinguishing the obligations imposed on churches from those imposed on other types of organizations).
[77] 42 U.S.C. § 2000bb.
[78] *See Zubik v. Burwell*, 136 S. Ct. 1557; *Hobby Lobby*, 134 S. Ct. at 2786–87.

14

00436181

Exhibit 69

JA-0001110

### iii. The Religious Exemptions IFR Violates the Due Process Clause of the Fifth Amendment to the Constitution

This Rule also violates the Fifth Amendment because it constitutes impermissible sex discrimination.[79] The ACA's women's preventive services benefit, which includes the contraceptive coverage provision, was implemented in part to address the fact that women tended to pay more for insurance coverage than did men.[80] The Religious Exemptions IFR violates the Fifth Amendment because it exclusively targets a benefit provided to women. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Religious Exemption IFR discriminates based on sex.

The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[81] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs newly covered by the contraceptive coverage provision of the ACA.[82] It is estimated that the ACA created an out-of-pocket savings of approximately $1.4 billion for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their healthcare.[83] Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption. While it is unclear how many organizations will avail themselves of one of these exemptions, it is certain that many women will see a dramatic increase in their reproductive healthcare costs as employers avail themselves of the newly available religious exemption.

## III.    Conclusion

The Religious Exemptions IFR denies coverage for health care services based on religious objections without regard to the impact on employees, stripping from women and the LGBT community coverage for essential health care services that would otherwise be guaranteed under federal law. The Rule privileges particular religious beliefs at the expense of employee health and is contrary to law. For these reasons, the Departments should rescind the Religious Exemptions IFR.

***

---

[79] U.S. CONST. amend. V.

[80] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).

[81] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[82] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[83] *Id.*

15

00436182

Exhibit 69

The National Center for Lesbian Rights appreciates the opportunity to comment on this interim final rule. If you require additional information, please do not hesitate to contact Julianna Gonen, Policy Director, at (202) 734-3547 or jgonen@nclrights.org.

Sincerely,


National Center for Lesbian Rights

16

00436183

Exhibit 69

December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act (RIN 0938-AT20)**

The National Center for Transgender Equality (NCTE) submits the following comments in response to the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services interim final rule published in the Federal Register on October 13, 2017.[1] NCTE urges the Department of the Treasury, Department of Labor, and Department of Health and Human Services to set aside this Rule because: (1) it allows for the denial of health care coverage without due regard to the harm caused to third parties, (2) it will harm lesbian, gay, bisexual, and transgender Americans by restricting access to essential reproductive and other health care services, and (3) it raises grave legal concerns under the Administrative Procedure Act ("APA") and the First and Fifth Amendments to the Constitution.

The benefits of access to contraception are well-known and widely documented. Access to comprehensive family planning services is critically important many people, and in particular for LGBT Americans. Lesbian and bisexual women have been shown to experience *more* pregnancies than their heterosexual peers.[2] Some transgender people are also at risk for pregnancy and often face unique barriers to accessing reproductive care. Access to family planning is thus essential for this community and should be made more, not less, accessible.

It is deeply troubling that federal agencies charged with ensuring public health would enact a rule that gives employers such sweeping veto power over the health care services their employees may access under their health care coverage. Health insurance is a form of compensation that employees earn, like wages. Giving employers sweeping powers to use religious beliefs to restrict employees' use of their earned health care coverage is bad public health policy and represents a skewed approach to religious liberty that comes at the at the expense of employee health and well-being.

**New Religious Exemptions Are Unnecessary and Harmful**

---

[1] 82 Fed. Reg. 47792 et seq.

[2] Lisa L. Lindley & Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 AM. J. OF PUBLIC HEALTH 1379–86 (July 1, 2015); Karen Schantz, *Pregnancy Risk Among Bisexual, Lesbian, and Gay Youth: What Does Research Tell Us,* ACT FOR YOUTH CENTER OF EXCELLENCE (Apr. 2015), http://www.actforyouth.net/resources/rf/rf_lgb-prg_0415.pdf.

00328202

Exhibit 70

Federal and state laws are already tilted strongly in favor of institutions seeking exemptions to deny health coverage or services to individuals who need them. Laws such as the Church,[3] Weldon,[4] and Coats[5] amendments allow providers to refuse to perform or otherwise facilitate abortion and (in the case of the Church amendment) sterilization services. Most states have similar laws, many of which also reach contraceptive care.[6] Some state conscience clauses have been expanded to end of life care, stem cell research, and to any unspecified health services to which a moral or religious objection may be raised, including counseling or providing information regarding the patient's health status.[7]

The problems for patients presented by the expansion of refusal provisions in state law have been exacerbated by the growth in health care systems owned and operated by religious orders. Mergers between Catholic and nonsectarian hospitals have continued as hospital consolidation has intensified. Catholic hospitals and health systems must follow the Ethical and Religious Directives for Catholic Health Care Services ("Directives"), which prohibit a wide range of reproductive health services, such as contraception, sterilization, abortion care, and other health care that, for many, is medically necessary.[8] Nonsectarian hospitals must often agree to comply with these Directives in order to merge with Catholic hospitals.[9]

LGBT Americans face widespread and well-documented discrimination in health care, as was recognized by a landmark 2011 Institute of Medicine (now National Academy of Medicine) report.[10] Numerous studies have documented the pervasive discrimination experienced by transgender people and their families in the health care system. For example, the U.S. Transgender Survey, a 2015 study of nearly 28,000 transgender adults in the United States, found that:

- Just in the year prior to taking the survey, one-third (33%) of respondents who saw *any health care provider* during that year were turned away because of being transgender, denied treatment, physically or sexually assaulted in a health care setting, or faced another form of mistreatment or discrimination due to being transgender.[11]
- In the year prior to taking the survey, nearly one-quarter (22%) of respondents who visited a *drug or alcohol treatment program* where staff thought or knew they were transgender

---

[3] 42 U.S.C. § 300a-7 et seq.

[4] Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat 786.

[5] 42 U.S.C. § 238(n).

[6] Guttmacher Inst., *Refusing to Provide Health Services* 2 (2015), http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.

[7] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2470 (2015).

[8] U.S. Conf. of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* (5th ed. 2009), http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf.

[9] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2488-89 (2015)..

[10] Inst. of Medicine, *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding* (2011), http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx.

[11] Sandy E. James et al., *The Report of the U.S. Transgender Survey* 96–97 (2016), www.ustranssurvey.org/report.

00328203

Exhibit 70                                                                                           JA-0001114

were denied equal treatment or service, verbally harassed, or physically assaulted there due to being transgender.[12]

- In the year prior to taking the survey, 14% of respondents who visited a *nursing home or extended care facility* where staff thought or knew they were transgender were denied equal treatment or service, verbally harassed, or physically assaulted there due to being transgender.[13]

- In the year prior to taking the survey, one-quarter (25%) of respondents *experienced a problem with their health insurance* related to being transgender. This included being denied coverage for medically prescribed treatments for gender dysphoria as well as being denied coverage for a range of unrelated conditions simply because they are transgender.[14]

- In the year prior to taking the survey, 23% of respondents *avoided seeking medical care* when they needed it because of fear of being mistreated, and 33% avoided seeking necessary health care because they could not afford it.[15]

Discrimination in access to care exacerbates the marked health disparities affecting LGBT individuals,[16] including by increasing transgender people's risk factors for poor physical and mental health[17] and driving high rates of HIV.[18]

Existing exemptions have too often been used to deny individuals access to health care and other critical services. For example, religion has been invoked to refuse to provide infertility and reproductive care,[19] treat patients with HIV,[20] treat a newborn because of her parents' same-sex relationship,[21] and provide emergency services and other care for people who are suffering miscarriages.[22] Religious objections have also been invoked to deny transgender people access to

---

[12] *Id.* at 216.

[13] *Id.* at 219.

[14] *Id.* at 95.

[15] *Id.* at 98.

[16] Joint Comm'n, *Advancing Effective Communication, Cultural Competence, and Patient- and Family-Centered Care for the LGBT Community: A Field Guide* (2011),
http://www.jointcommission.org/assets/1/18/LGBTFieldGuide.pdf.

[17] Ctr. for Disease Control and Prevention, "Lesbian, Gay, Bisexual, and Transgender Health" (July 2014),
http://www.cdc.gov/lgbthealth/about.htm.

[18] Office of Nat'l AIDS Policy, "National HIV/AIDS Strategy," (2015),
https://www.whitehouse.gov/administration/eop/onap/nhas.

[19] Nat'l Women's Law Ctr., *Health Care Refusals Harm Patients: The Threat to Reproductive Health Care* (May 2014), http://www.nwlc.org/sites/default/files/pdfs/refusals_harm_patients_repro_factsheet_5-30-14.pdf; *see also North Coast Women's Care Medical Grp, , Inc. v. San Diego County Superior Court*, 189 P.3d 959, 959 (Cal. 2008).

[20] *See, e.g.,* Complaint, *Simoes v. Trinitas Reg'l Med. Ctr.*, No. UNNL-1868-12 (N.J. Super. Ct. Law Div. May 23, 2012); Nat'l Women's Law Ctr., *Health Care Refusals Harm Patients: The Threat to LGBT People and Individuals Living with HIV/AIDS* (May 2014), http://www.nwlc.org/sites/default/files/pdfs/lgbt_refusals_factsheet_05-09-14.pdf.

[21] Abby Phillip, *Pediatrician Refuses to Treat Baby with Lesbian Parents and There's Nothing Illegal About It*, Wash. Post, Feb. 19, 2015, https://www.washingtonpost.com/news/morning-mix/wp/2015/02/19/pediatrician-refuses-to-treat-baby-with-lesbian-parents-and-theres-nothing-illegal-about-it; *see also* Amicus Brief of Lambda Legal Defense and Education Fund et al., *Masterpiece Cakeshop et al. v. Colo. Civil Rights Comm'n et al.,* No. 16-111, 17–19 (Sup. Ct. filed Oct. 30, 2017).

[22] Am. Civil Liberties Union, *Health Care Denied: Patients and Physicians Speak Out About Catholic Hospitals and the Threat to Women's Health and Lives* (2016), https://www.aclu.org/report/report-health-care-denied?redirect=report/health-care-denied [hereinafter *Health Care Denied*]; Nat'l. Women's Law Ctr., *Denied*

3

00328204

Exhibit 70                                                                                         JA-0001115

medical care—both care related and unrelated to gender transition—or subject transgender people to degrading or abusive treatment in medical settings. Consider the following example:

> As my being transgender is a relevant piece of medical information, and because the privacy of such privileged information is protected under HIPAA, I revealed this information to [the doctor] when he entered the treatment room. His immediate response was, "I believe the transgender lifestyle is wrong and sinful." . . . The rest of the time between the examination and him writing the prescription, he asked questions about how transgender women find sexual intimacy. As he had yet to hand over the prescription, I felt compelled by the power dynamic to provide answers to questions I would normally tell an asker are none of his or her business. . . . [I]t was very creepy having this conversation with this person, and I felt I had the filthy end of the stick and was being subordinated by this doctor because he felt he could. – Karen S.[23]

In addition, religious exemptions have been used to interfere with doctors' exercise of their medical judgment. Some hospitals have used their religious affiliation to not only refuse to provide emergency care related to miscarriages, transition-related care, and other needs, but also prevent doctors from providing those treatments at the hospital, in spite of those doctors' best medical judgement.[24] For example, in 2016 a New Jersey hospital approved and scheduled Jionni Conforti's hysterectomy, then abruptly cancelled the procedure at the last minute and refused to allow his surgeon to perform it when an administrator discovered the patient was transgender despite his doctor's medical judgment.[25]

For many patients, such refusals do not merely represent an inconvenience: in many cases, they can result in necessary or even emergent care being delayed or denied outright, putting their health and in some instances their lives at risk. These refusals are particularly dangerous in situations where individuals have limited options, such as in emergencies, when needing specialized services, in many rural areas, or in areas where religiously affiliated hospitals are the primary or sole hospital serving a community.[26]

Similarly, health insurance benefits earned by employees and guaranteed under federal law should not be subject to a religious veto by employers. The rule that existed prior to this IFR struck a balance between religious beliefs and health care access, allowing institutions to distance

---

*Care When Losing a Pregnancy: Pharmacies Refuse to Fill Needed Prescriptions* (Apr. 16, 2015), http://www.nwlc.org/our-blog/denied-care-when-losing-pregnancy-pharmacies-refuse-fill-needed-prescriptions. *See also* Samantha Lachman, *Lawsuits Target Catholic Hospitals for Refusing to Provide Emergency Miscarriage Management*, HUFFINGTON POST (June 10, 2016), https://www.huffingtonpost.com/entry/catholic-hospitals-miscarriage-management_us_5759bf67e4b0e39a28acccea6; Claudia Buck & Sammy Caiola, *Transgender patient sues Dignity Health for discrimination over hysterectomy denial*, SACRAMENTO BEE, (April 20, 2017), http://www.sacbee.com/news/local/health-and-medicine/article145477264.html.

[23] Amicus Brief of Transgender Legal Defense and Education Fund et al., *Masterpiece Cakeshop et al. v. Colo. Civil Rights Comm'n et al.*, No. 16-111, 11 (Oct. 30, 2017).

[24] For example, complaints have been filed against Catholic hospitals for refusing to allow doctors to provide care to transgender patients that the doctors are regularly allowed to provide for non-transgender people. *See, e.g.*, Complaint, *Hastings v. Seton Med. Ctr.*, No. CGC-07-470336 (Cal. Sf. Super. Ct. Dec. 19, 2007) (case settled). *See also Health Care Denied*, *supra* note 22.

[25] *Conforti v. St. Joseph's Healthcare System*, No. 2:17-cv-00050-JLL-JAD (D.N.J. filed Jan. 5, 2017).

[26] *See e.g., Health Care Denied*, *supra* note 22.

4

00328205

Exhibit 70                                                                                          JA-0001116

themselves from employees' private health care decisions without actually limiting employees' access to care. The IFR would upend that balance and unfairly and harmfully abridge employees' access to health care. Not only is this poor public health policy, it would set a dangerous precedent for exacerbating barriers to health care and raise grave legal questions.

**The IFR Raises Grave Legal and Constitutional Questions**

In addition to subjecting individuals' access to health care to the religious veto of employers, and increasing health disparities faced by members of the LGBT community, the IFR should also be rescinded because it violates the APA and First and Fifth Amendments to the United States Constitution.

The Departments did not have "good cause" to resort to the extraordinary step of an Interim Final Rule, which is limited to an agency finding that notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[27] No provision of law—including the general rulemaking authorizations cited by the Departments—authorizes the Departments to circumvent this APA standard. In addition, the IFR is arbitrary and capricious because it violates Section 1554 of the ACA's command that ACA regulations not create unreasonable barriers to care and Section 1557's prohibition of discrimination on the basis of sex. The harm to employees and the governments' interest in preventing discrimination and ensuring access to health care clearly outweigh any interest in such a broad and sweeping exemption under the Religious Freedom Restoration Act (RFRA).

Moreover, RFRA cannot authorize an overbroad accommodation that violates the Constitution. The IFR raises grave concerns under the Establishment Clause of the First Amendment because it strips individuals of a federal health care entitlement based on the religious views of their employer. The Supreme Court has noted that there are limits to permissible accommodations to religious beliefs, and that "at some point, accommodation may devolve into an unlawful fostering of religion."[28] To comply with the Constitution, "an accommodation must be measured so that it does not override other significant interests"[29] or "impose unjustified burdens on other[s]."[30] A blanket exemption that allows employers to completely deny employees health care coverage to which they are otherwise entitled, without any recourse for the employee, clearly fails that test.

The IFR also likely violates the constitutional requirements of Equal Protection, because it singles out for disfavored treatment health care services traditionally associated with, and overwhelmingly needed by, women. While consumers have seen substantial decreases in out-of-pocket costs for prescription drugs—including contraceptives—under the Affordable Care Act, the IFR would uniquely discriminate against the overwhelmingly female class of employees who need contraceptive coverage.

---

[27] 5 U.S.C. § 553(b).

[28] *Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 334-35 (1986) (internal quotation marks omitted).

[29] *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005); *see also Estate of Thornton v. Caldor, Inc.* 472 U.S. 703, 709-10 (1985) ("unyielding weighting" of religious interests of those taking exemption "over all other interest" violates Constitution).

[30] *Cutter*, 544 U.S. at 726; *see also Texas Monthly, Inc. v. Bullock*, 480 U.S. 1, 18 n.8 (1989) (such accommodations may not impose "substantial burdens on nonbeneficiaries").

5

00328206

Exhibit 70

JA-0001117

**Conclusion**

Protecting religious freedom is an important value—one NCTE shares and that is enshrined in our Constitution and laws. However, the prior accommodation regime struck a balance that held individual employees harmless. It is unwise and unnecessary for the Departments to abandon that considered balance—or any kind of balance at all—in favor of a complete exemption that strips employees of access to health care coverage. The Rule privileges particular religious beliefs at the expense of employee health and public health and likely cannot survive scrutiny under the APA and the Constitution. NCTE strongly urges Departments to rescind the Religious Exemptions IFR.

6

00328207

Exhibit 70



National Council of Jewish Women

To whom it may concern:

I am writing on behalf of the National Council of Jewish Women (NCJW) in response to Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, an interim final rule ("IFR") published by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services (collectively, "the Departments") in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47792 et seq. Inspired by Jewish values, NCJW strives for social justice by improving the quality of life for women, children, and families and by safeguarding individual rights and freedoms.

For the reasons detailed below, we ask that the Departments set aside the Religious Exemption IFR as it egregiously increases the burdens all women face, especially women working for religious (and other objecting) institutions, in order to receive the contraceptive care they need. In addition, this rulemaking violates the United States Constitution, the Administrative Procedure Act ("APA"), and the Patient Protection and Affordable Care Act ("ACA").

As an organization, the National Council of Jewish Women is committed to the belief that every woman, regardless of her faith, has the right to follow her own conscience on reproductive health matters. To that end, NCJW works to ensure that all women have full and equal health coverage that encompasses contraceptive services without cost sharing, as guaranteed by the ACA. We oppose any regulation that impinges on a woman's access to and choice of the contraceptive care best-suited for her own beliefs and conscience.

This comment will first illustrate the concerns of the Jewish community and broader faith community in regards to contraception access and care, including the need that women of faith and their families have for equal access to contraception and reproductive coverage; how the IFR disrespects the religious freedom of the individual; and the impact that the Religious Exemptions IFR will have on the faith-based (and larger) community; and, thereafter summarize why we strongly believe that this rule should be repealed. Next, this comment will discuss the impact of the ACA and how the ACA's contraceptive coverage helped increase access and affordability. Finally, it outlines how this IFR is in clear violation of the Establishment Clause of the First Amendment.

**The Impact of the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Interim Final Rule**

<u>Faith Communities, Including NCJW, Believe That All Women Deserve Equal Access to Contraceptive and Reproductive Care Regardless of Their Employer or the University They Attend.</u>

1

00206516

Exhibit 71

JA-0001119

A common thread running through different faiths is that we all strive for social justice and equal rights, including equal access to care.[1] Indeed, contraceptive use is commonplace among women of all religious denominations;[2] There is the fact that Judaism has no law preventing use of contraception, and — even in Orthodox communities — permits its use within marriage for couples who for financial, psychological or other reasons wish to delay having children, or having more children. When you deny couples birth control you are actively denying their religiously sanctioned obligation to make reproductive decisions for the sanctity of their marriage.

It should come as no surprise, then, that faith groups of many religions and denominations overwhelmingly support reproductive rights, even when in direct conflict with their faith leaders

For this reason, we are compelled to oppose this IFR, which intentionally singles out women with health insurance provided by an exempted institution for worse treatment, simply by virtue of their, their partners', or their guardians' place of employment or study. The IFR seems to justify this by assuming that women receiving insurance through an exempt institution are less likely than women in the general population to require such services, and that, as a result, the IFR will not affect many women. This assumption rests on two unfounded premises: (1) that women receiving insurance through organizations with a religious or faith-based component share that organization's faith and beliefs with regard to contraception, and will therefore not want to take advantage of the coverage;[3] and (2) that women receiving insurance through the exempted institutions are less likely to be at risk of unintended pregnancy, so a lack of access will not affect them.[4] Yet the IFR identifies no research (and, in fact, acknowledges that it has insufficient information) regarding the number of entities that will purport to have a religious objection to contraceptive coverage, or how many women in working for those entities will be affected. For example, the IFR acknowledges that it does not know the following:

- How many women want and would use contraceptive coverage that will be absent from now-exempt plans;
- Whether and how many women will be able to otherwise access contraceptive care now exempt;
- How many women covered by plans now exempt fall into the cohort of women at most risk of unintended pregnancy;
- How many unintended pregnancies will result from the expanded exemption; or
- How many of these unintended pregnancies could have negative health effects.[5]

More specifically, with regard to women working for objecting educational institutions, the IFR admits that it also does not know:

- How many women agree with the educational institutions' positions;
- How many women have alternate access to contraceptive care; or

---

[1] Interfaith Statement Opposing Restrictions on Women's Health Care Options, Jan. 2014.

[2] Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (April 2011) https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.

[3] Indeed, the IFR goes so far as to assert that "imposing" coverage on "families who may share objections to contraception could, among some populations, affect risky sexual behavior in a negative way." 82 Fed. Reg. at 47,805. Insurance can no more "impose" on anyone to use contraception he or she does not want than it can force someone to take a vitamin.

[4] *See* 82 Fed. Reg. at 47,803.

[5] 82 Fed. Reg. at 47,816.

2

00206517

Exhibit 71

JA-0001120

- How many of the women fall into the cohort most at risk of unintended pregnancy.[6]

The lack of support for these propositions is unsurprising for three reasons.

First, employees of faith-affiliated institutions do not necessarily share either the same faith or the same beliefs with regard to contraception as their employers. For example, at least one of the premier Catholic universities in the country has fewer than 50% Catholic faculty, some of those being Jewish (again, Judaism permits the use of contraceptives broadly).[7] At least one Catholic University — Marquette University in Milwaukee, Wisconsin — recognizes that contraceptive care is a decision left to one's own conscience, and that a significant percentage of the university's employees are not Catholic. Sensibly, the university spokesman reminded that "It is also important to point out that the availability of a benefit does not require that an employee make use of it."[8] This statement reflects that, in fact, no one's religious freedom is violated when another person does something that could be contrary to that faith tradition. And as discussed elsewhere in these comments, even if Catholic, the likelihood is that, if female, that faculty member will have used contraception at one point in her life. And yet, under this IFR, universities will be able to deny access to contraceptive care regardless of the beliefs of their employees. Additionally, approximately one in seven hospital staff in the country works for a Catholic hospital.[9] To deny 14% of the United States healthcare workforce and their families access to the full spectrum of required covered services violates the equal protection under the law every citizen deserves. Women whose mission it is to provide care to others should not be denied care themselves.

Second, the fact that other means may exist to obtain contraceptive coverage does not remedy the IFR's violation of the law. Indeed, while the IFR claims that the exception "does not affect any other Federal or State law governing the plan or coverage[,]"[10] women should not have to pursue an alternative path to obtain what should be required to be provided by every insurer. Further, the IFR's blithe commentary regarding the ability of low-income women to obtain free or subsidized contraceptives, "[m]any . . . . available for around $50 per month," 82 Fed. Reg. at 47,803, is callously ignorant of what $50 a month could mean for a low-income woman. For example, it could mean several weeks' worth of baby formula for a child she already has, a week's worth of groceries, or transportation to a job. It is also worth noting that IUDs, one of the forms of contraception the IFR mentions (but omitting cost information), is often a one-time cost that will be charged upon implementation, not monthly.[11] Moreover, the IFR exhibits no regard for the *time* involved in having to seek contraceptive care not provided through an employer, when an individual already has primary care through employer-based insurance. Additionally, the increasing costs of premiums and deductibles for the health care an employee is provided can be prohibitive in terms of seeking additional care elsewhere. Simply, no one should have to navigate two entirely different systems to accommodate another individual's or institutions religious beliefs.

Finally, whether or not a woman is at risk of an unintended pregnancy should have no bearing upon whether that woman is deserving of and receives free and full access to contraceptive and reproductive care. The right is not based on perceived risk or need; rather, contraceptive and reproductive preventive services were identified as being required by the non-partisan Institute of

---

[6] 82 Fed. Reg. at 47,820.
[7] Richard Conklin, "How Catholic the Faculty?", *Notre Dame Magazine*, Winter 2006–2007.
[8] Matthew DeLuca, "Cardinal Timothy Dolan's Belated Health-Care Conversion," *The Daily Beast*, https://www.thedailybeast.com/cardinal-timothy-dolans-belated-health-care-conversion, Feb. 22, 2012.
[9] *Id.*
[10] 82 Fed. Reg. at 47,812.
[11] An IUD can be over $1000.00. *See* https://www.washingtonian.com/2017/01/17/how-much-will-your-birth-control-cost-once-the-affordable-care-act-is-repealed/.

3

00206518

Exhibit 71

Medicine because they are applicable to the vast majority of women at some point in their lives. Our Jewish faith, first and foremost, demands that equal respect and dignity be provided to every individual; to single out women with insurance from exempted institutions and to deny them basic care is simply wrong.

The Religious Exemption IFR Tramples Individuals' Religious Liberty

One key inherent principle of religious liberty in the United States is the freedom from others' religious beliefs. Specifically, the First Amendment to the Constitution reads, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."[12] The IFR turns that principle on its head, expressly allowing businesses to impose their purported values upon their employees, and implicitly allowing businesses to pass judgment on the choices their employees seek to make for their reproductive health and family planning. The parish gardener or the temple secretary should have the same rights to health coverage as a gardener or secretary at any other business — though now, not even "ordinary" employees are safe from an employer deciding that it has a religious or moral objection to contraceptive coverage.

Compounding the error is the IFR's extension of the exception to publicly traded companies, owned by potentially millions of shareholders; the presumption that such companies have one collective conscience defies belief. And yet, the IFR does not explain how it considers it to be "unlikely" that "a religious publicly traded company might have objections to contraceptive coverage." 82 Fed. Reg. at 47,810–11. Being forced to live by another person's beliefs — not to mention the "beliefs" of a corporate entity — eviscerates religious freedom. And Americans should not have to choose between working and living by their beliefs.

The Religious Exemption IFR Has Serious Implications for Women's Health and Could Jeopardize Other Services to Which Some May Object

Contraceptive care is a vital service, as integral to a person's health as preventive medicine. Indeed, nearly 60% of women use contraception to help treat several medical conditions specific to women.[13] There is no principled reason to separate contraceptive coverage from the range of services health insurance provides. Moreover, the current rationale justifying the IFR with respect to contraceptive care could be used in the future to justify denying any number of services. Therefore, it is not just contraceptive care that is at risk due to this IFR. Patients being refused care based on religious or moral beliefs of hospitals, clinics, and doctors may suffer devastating health consequences.[14] And yet, through taxes, fees, and other charges, these same citizens of the United States pay for all types of activities that they may object to, for example, the so-called War on Terror, or foreign aid. Providing contraceptive coverage is at least as much in the interests of United States citizens as those other initiatives.

---

[12] *See U.S. CONST. amend. I.*

[13] Jones, R.K. (2011). Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills. Retrieved from http://www.guttmacher.org/pubs/Beyond-Birth-Control.pdf

[14] For documented instances where religious healthcare providers denied care to patients on the basis of religious beliefs, *see* Compl. 2, *ACLU of Mich. v. Trinity Health Corp.*, 2016 U.S. Dist. LEXIS 30690 (E.D. Mich. Mar. 10, 2016); Freedman et al., *When There's a Heartbeat: Miscarriage Management in Catholic-Owned Hospitals*, 98 AM. J. PUBLIC HEALTH 1774 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2636458/; National Women's Law Center, *Refusals to Provide Health Care Threaten the Health and Lives of Patients Nationwide*, https://nwlc.org/resources/refusals-to-provide-health-care-threaten-the-health-and-lives-of-patients-nationwide/ (last visited Oct. 20, 2017).

4

00206519

Exhibit 71

JA-0001122

Further, one of the main benefits of the Affordable Care Act is its guarantee of certain basic minimum requirements for health care policies (to the extent those policies are not able to take advantage of a grandfather clause), no matter where one is employed. Although only one step towards truly seamless health care, the ACA nevertheless was supposed to make it easier, not more difficult, for people to live their lives and work where they wanted without worrying about what services may or may not be covered. With this IFR, that is no longer the case. By singling out those who work for employers or attend a university claiming a religious objection and deeming them not as important as others with respect to their reproductive rights, HHS is violating religious rights under the guise of protecting them.

## The Impact of the Affordable Care Act

The impact of the ACA cannot be overstated. NCJW worked diligently to pass this landmark piece of legislation that helped expand health care access to tens of millions of Americans. To begin, the ACA has reduced health care costs for individuals and employers while at the same time reducing uncompensated care by more than $7.4 billion.[15] In addition, the ACA included critical provisions ensuring full and equitable access to essential services without discrimination. Indeed, the ACA is a critical source of healthcare coverage for America's traditionally underserved communities, which are the individuals and communities faith-based organizations represent and seek to lift up, including individuals and families living in poverty, people of color, women, immigrants, LGBTQ individuals, individuals with disabilities, seniors, and individuals with limited English proficiency. Moreover, the ACA reduced the number of individuals without insurance to historic lows, including a reduction of 39 percent of the lowest income individuals.[16] These gains are particularly noteworthy for Latinos, African Americans, and Native Americans. The nation and our communities cannot afford to go back to a time when they did not have access to comprehensive, affordable coverage.

Furthermore, the ACA has been instrumental in covering a wide range of preventive services, ensuring that individuals have access to life-saving cancer screenings and treatment, and that women have access to effective and affordable contraception. In this respect, under the ACA's preventive services coverage, most private health plans in the United States — whether provided by employers, schools, or through the exchanges — must cover dozens of preventive care services without any out-of-pocket costs to patients. That list of services includes a set of recommended preventive services for women,[17] and those recommendations, first established in 2011 by the non-partisan Institute of Medicine committee and reaffirmed in 2016 by an expert panel led by the American College of Obstetricians and Gynecologists, include contraceptive methods and services. More specifically, plans must cover all 18 distinct contraceptive methods used by women, and any new methods identified by the US Food and Drug Administration.[18] These plans must also cover all related services, including contraceptive

---

[15] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, New Report Details Impact of the Affordable Care Act (Dec. 13, 2016), https://www.hhs.gov/about/news/2016/12/13/new-report-details-impact-affordable-careact.html available at http://wayback.archive-it.org/3926/20170127135924/https://www.hhs.gov/about/ news/2016/12/13/new-report-details-impact-affordable-care-act.html.

[16] Kelsey Avery, Kenneth Finegold and Amelia Whitman, *Affordable Care Act Has Led to Historic, Widespread Increase in Health Insurance Coverage*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ASPE ISSUE BRIEF, (Sep. 29, 2016) https://aspe.hhs.gov/system/files/pdf/207946/ACAHistoricIncrease Coverage.pdf.

[17] Health Resources & Services Administration, *Women's Preventive Services Guidelines*, (Oct. 2017) https://www.hrsa.gov/womens-guidelines-2016/index.html.

[18] "The full range of contraceptive methods for women currently identified by the U.S. Food and Drug Administration include: (1) sterilization surgery for women, (2) surgical sterilization via implant for women, (3)

5

00206520

Exhibit 71

JA-0001123

counseling, services needed to initiate and discontinue a contraceptive method, and follow-up care. Moreover, plans may not apply copayments, deductibles, or any other out-of-pocket costs to any of these methods or services. Similarly, plans are sharply limited in their ability to impose formularies, prior authorization requirements, and other administrative barriers to contraception.

## The ACA's Contraceptive Coverage Helped Increase Access and Affordability

Access to contraception is an essential part of shaping women's health and well-being.[19] As of September 2016, there were approximately 61 million US women in their childbearing years (15–44).[20] About 43 million of those women (70%) are at risk of unintended pregnancy — that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners fail to use a contraceptive method correctly and consistently.[21] Couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[22] In the United States, the average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[23] As a result, it is not surprising that contraceptive use among women is widespread, with over 99% of sexually-active women using at least one method of contraception at some point during their lifetime.[24]

Moreover, contraceptive use is common among women of all religious denominations.[25] In fact, eighty-nine percent of at-risk Catholics and 90% of at-risk Protestants currently use some method of contraception,[26] and, among sexually experienced religious women, 99% of Catholics and Protestants have used some form of contraception.[27] Additionally, some 68% of Catholics, 73% of Mainline Protestants, and 74% of Evangelicals who are at risk of unintended pregnancy use a highly effective method (e.g., sterilization, the pill or another hormonal method, or the IUD).[28]

implantable rods, (4) copper intrauterine devices, (5) intrauterine devices with progestin (all durations and doses), (6) the shot or injection, (7) oral contraceptives (combined pill), 8) oral contraceptives (progestin only, and), (9) oral contraceptives (extended or continuous use), (10) the contraceptive patch, (11) vaginal contraceptive rings, (12) diaphragms, (13) contraceptive sponges, (14) cervical caps, (15) female condoms, (16) spermicides, and (17) emergency contraception (levonorgestrel), and (18) emergency contraception (ulipristal acetate). Additionally, instruction in fertility awareness-based methods, including the lactation amenorrhea method, although less effective, should be provided for women desiring an alternative method." HEALTH RESOURCES & SERVICES ADMINISTRATION, *Women's Preventive Services Guidelines*, (Oct. 2017) https://www.hrsa.gov/womens-guidelines-2016/index.html.
[19] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception,* (Dec. 7, 2016) https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.
[20] Kimberly Daniels, Ph.D., Jill Daugherty, Ph.D.; and Jo Jones, Ph.D., *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, NATIONAL HEALTH STATISTICS REPORTS, 173 (2014) http://www.cdc.gov/nchs/data/databriefs/db173.pdf.
[21] Jo Jones, Ph.D., William Mosher, Ph.D., and Kimberly Daniels, Ph.D., *Current Contraceptive Use In The United States, 2006–2010, And Changes In Patterns Of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS, 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.
[22] Trussell J, Contraceptive failure in the United States, Contraception, 2011, 83(5):397–404.
[23] The Alan Guttmacher Institute (AGI), Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics, New York: AGI, 2000.
[24] GUTTMACHER INSTITUTE, *Contraceptive Use in the United States,* (September 2016) https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.
[25] Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, GUTTMACHER INSTITUTE (April 2011) https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.
[26] *Id.*
[27] *Id.*
[28] *Id.*

6

00206521

Exhibit 71

JA-0001124

In terms of cost, contraceptives make up an estimated 30–44% of out-of-pocket health care spending for women.[29] A year's worth of birth control can cost upwards of $600 — the equivalent of 83 hours of work for someone earning the federal minimum wage of $7.25 an hour.[30] More permanent birth control methods, such as an IUD or contraceptive implant, would cost more than $1,000 out of pocket — almost one month's salary for an American earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the use of more effective methods, and a decrease in out-of-pocket costs for women.

The ACA has expanded contraceptive coverage without cost-sharing to millions of women across the nation.[31] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs covered by the contraceptive coverage provision of the ACA. Following the ACA's implementation, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[32] After the implementation of the ACA, studies show that majority of women tended to choose long-term contraceptives methods, such as an IUD or an implant, as the high upfront costs were removed.[33] These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives.[34] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[35] Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[36]

Stated simply, contraceptive use unquestionably benefits women and families. Indeed, having access to the full range of FDA-approved contraceptive methods allows women to choose the method that work best for them at a given point in their life — factoring in ease of use, side effects, contraindications, risk of sexually transmitted infections, desire for confidentiality and control, and many other considerations. Identifying the "right" methods helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording women greater control over family planning.

---

[29] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs 34, no.7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

[30] NATIONAL WOMEN'S LAW CENTER, *The Affordable Care Act's Birth Control Benefit: Too Important to Lose* (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/. *See* Elizabeth Celms, "How much do birth-control pills cost?" CLEAR HEALTH COSTS (Apr. 29, 2013) https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[31] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[32] Nora V. Becker and Daniel Polsky. Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs 34, no.7 (2015):1204-1211. doi: 10.1377/hlthaff.2015.0127.

[33] THE HENRY J. KAISER FAMILY FOUNDATION, *Private Insurance Coverage of Contraception* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception.

[34] *Id.*

[35] *Id.*

[36] National Women's Law Center, *The Affordable Care Act's Birth Control Benefit is Working for Women* (Dec. 16, 2016) https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.

00206522

Reducing unwanted pregnancies and affording women greater control over family planning, has additional health benefits. For example, avoiding closely spaced pregnancies reduces the risk of premature birth or low birth weight. Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families. In short, contraceptive coverage matters, and taking away this coverage for any woman would be short-sighted and harmful.

## Constitutional Violation

The Establishment Clause of the First Amendment limits the reach of religious or moral exemptions the Departments may create, including under the Religious Freedom Restoration Act: "at some point, accommodation may devolve into [something] unlawful."[37] The Constitution commands that "an accommodation must be measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[38] In *Burwell* v. *Hobby Lobby Stores, Inc.*, the Supreme Court yet again acknowledged the Establishment Clause limits.[39] When women are denied coverage for contraception, which is basic and essential health care, they suffer discrimination and economic harm. The exemption in the IFRs clearly imposes burdens on others: it compels employees and students who need coverage for birth control to pay the substantial costs for the healthcare themselves if they are able, or else to forgo that essential healthcare. Thus, the IFRs violate the Establishment Clause.

## Conclusion

Thank you for the opportunity to provide comments on the interim final rule Religious Exemptions and Accommodations for Coverage of Certain Preventive Services. We trust that these comments, along with the many others we expect the Departments will receive, will demonstrate to the Departments how vital no-cost contraceptive coverage is to women of all faiths, regardless of the views of faith leaders or faith-affiliated organizations. We hope that the Departments will come to understand that this IFR prioritizes the religious liberty of corporations over the religious liberty of individuals and their rights to make decisions based on their conscience, not based on the purported values of an employer, or whether or not they can afford coverage their employer's insurance no longer provides. In discriminating against the religious liberty of the individual, this IFR upends the protections the Constitution is supposed to provide. We believe the Departments have the ability and the duty to reverse this damaging rule and recognize once more that full access to health care should be available to all.

Respectfully submitted,

---

[37] *Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 334-35 (1986) (internal quotation marks omitted).

[38] Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005). *See also Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709-10 (1985); *Texas Monthly, Inc. v. Bullock*, 480 U.S. 1, 18 n.8 (1989).

[39] 134 S. Ct. 2751, 2760 (2014) (explaining effect of an accommodation on others would be "precisely zero"); *id.* at 2781 n.37 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (no "detrimental effect on any third party"); *id.* at 2786–87 (Kennedy, J., concurring) (accommodation must not "unduly restrict other persons, such as employees, in protecting their own interests").

8

Exhibit 71

JA-0001126

*Nancy K. Kaufman*

Nancy K. Kaufman
CEO
National Council of Jewish Women

9

00206524

Exhibit 71

JA-0001127

**Dec. 5, 2017**

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

### RE: [CMS-9940-IFC/CMS-9925-IFC]

Dear Acting Secretary Hargan,

We the undersigned members of the National Council of Jewish Women, Greater New Orleans Section believe that our government should not allow anyone's access to health care to be determined by another person's religious or moral objections. Women deserve affordable access to birth control, no matter where they work or what their employer believes. Millions of women's lives have been changed by having birth control coverage; allowing them to plan their futures and families.

There are differing religious views on the use of contraception, and it should be up to women to decide on whether and when to use contraception based on their own beliefs and needs. By allowing employers with religious or moral objections to deny coverage of birth control to its employees, the beliefs of an employer are once again being held in higher regard than the religious and moral beliefs of the employee. On this most-personal decision, no woman should be forced to abide by the religious views of her or her insured spouse's employer.

We urge you not to finalize the proposed rules allowing employers, health insurance providers, and universities that claim a religious or moral objection to deny their employees and students coverage for contraception. Thank you,

Madelyn Fireman, LA

Ina Davis, LA

Barbara Kaplinsky, LA

Sabina Barash, LA

Loel Samuel, LA

Hannah Udell, LA

Andrea Huseman, LA

Fran Dinehart, LA

Susan Kierr, LA

Margaret Moss, LA

Sandy Rhein, LA

Ellen Balkin, LA

00206840

Exhibit 72

JA-0001128

Eve Herman, TX

Susan Levin, LA

Rebecca Rau, LA

Larry Samuel, LA

Miriam Waltzer, LA

Exhibit 72

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

Acting Secretary Eric Hargan
CMS Administrator Seema Verma
Center for Medicare & Medicaid Services
US Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

Re:     **Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (CMS-9940-IFC)**

Dear Acting Secretary Hargan and Administrator Verma:

The National Family Planning & Reproductive Health Association (NFPRHA) is committed to ensuring all individuals have access to affordable, high-quality family planning and sexual health services, including contraceptive services and supplies. As a result, NFPRHA has strongly supported the nation's efforts to ensure individuals have robust insurance coverage of contraception without cost-sharing and unequivocally opposes the Departments of Health and Human Services, Labor and Treasury's (the Departments') recent efforts that undermine the Affordable Care Act's (ACA) contraceptive coverage requirement through this interim final rule (IFR).

NFPRHA is a national membership organization representing providers and administrators committed to helping people get the family planning education and care they need to make the best choices for themselves and their loved ones. NFPRHA's members operate or fund a network of more than 3,500 health centers and service sites that provide high-quality family planning and other preventive health services to millions of low-income, uninsured, or underinsured individuals in all 50 states, the District of Columbia, as well as US territories. Services are provided through state, county, and local health departments as well as hospitals, family planning councils, Planned Parenthoods, federally qualified health centers, and other private nonprofit organizations.

00435006

Exhibit 73                                                                                           JA-0001130

The women's preventive services requirement of the ACA was designed to promote preventive health care, reduce future medical costs, and improve the health, equality, and economic security of women and families.[1] More than 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, screening for sexually transmitted diseases, and contraception and contraceptive counseling.[2] By allowing virtually any employer or university to claim this religious exemption and deprive women of contraceptive coverage, this IFR will harm the health and well-being of women, their partners, and their families. Furthermore, the IFR is predicated upon a distorted picture of the federal programs that compose the family planning safety net, the Title X family planning program and Medicaid. **For these reasons, NFPRHA calls on the Departments to rescind the IFR and restore equal access to contraceptive coverage regardless of employer.**

## CONTRACEPTION IS CRITICAL TO HEALTH

Women face a unique set of health care challenges because they access more health services than men, yet earn less on average than men.[3] As a result, women face a high level of health care insecurity, which in turn leads many women to forgo necessary care due to prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs on contraception alone.[5] As a result of the ACA and its contraceptive coverage benefit, women saved more than $1.4 billion in out-of-pocket costs on oral contraceptives in 2013 alone.[6]

The goal of preventive health care is to help people control, track, and better manage their lifelong health, and the health of their families. Similarly, the goal of contraception is to prevent unintended pregnancy, control the timing of a desired pregnancy and spacing between pregnancies, in accordance with patient choice and to improve maternal, child, and family health.[7] In addition, contraception is particularly critical for women with underlying physical and

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] National Women's Law Center. New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs. September 2017. *Available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] Ibid.

[6] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[7] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

627 K Street, NW  12th Floor, Washington, D.C.  20006-1702 ▪ Phone 202 293 3114 ▪ www.nfprha.org

Exhibit 73

psychological conditions, some of which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[8]

Unintended pregnancies have higher rates of long-term health complications for women and their infants. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[9] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, and experiencing physical violence during pregnancy.[10]

Unintended pregnancy rates are higher in the US than in most other developed countries, with approximately 45% of pregnancies unintended.[11] In addition, the US has the highest rate of maternal mortality in the developed world.[12] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[13] Contraception is considered a major factor in reducing rates of maternal morbidity and mortality.

Beyond the well-established evidence that contraception is effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[14] Non-contraceptive health benefits also include treatment for non-gynecologic conditions. [15,16]

The patient, in consultation with a trusted health care provider, should determine the right contraceptive method for her unique health care needs without interference from politicians. The IFR interferes with the patient-provider relationship, and conversations about if and when to become pregnant as well as which contraceptive method to use to avoid pregnancy.

---

[8] *Id.* at 103–104.

[9] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809-23.

[10] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews.* 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[11] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008-2011, *New England Journal of Medicine*, 2016, 374(9):843-852,

[12] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[13] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[14] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250-5.

[15] Schindler AE. supra.

[16] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

1627 K Street, NW, 12th Floor, Washington, D.C. 20006-1702 • Phone 202.293.3114 • www.nfprha.org

00435008

Exhibit 73                                                                                                          JA-0001132

## OTHER GOVERNMENT PROGRAMS CANNOT MEET THE NEED FOR CONTRACEPTIVE COVERAGE

The Department of Health and Human Services (HHS) asserts that existing government-sponsored programs, such as Medicaid and the Title X family planning program, can serve as alternatives or safeguards for individuals who will lose access to contraceptive coverage without cost-sharing under their employer-sponsored or student health plans.[17] As discussed below, this assertion fails to recognize that: 1) programs such as Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals; 2) those programs do not have the capacity to meet the needs of current enrollees and those seeking care at Title X-funded health centers; and, 3) legislative and administrative proposals threaten the capacity and goals of these programs. Moreover, the claim that state coverage requirements are an alternative misconstrues the scope and protections provided by these requirements, which cannot fill in the gaps of coverage for many individuals who will lose contraceptive coverage.

### Medicaid and Title X are not designed to meet the needs of individuals who lose access to contraceptive coverage under their employer-sponsored or student health plans.

Safety-net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Enacted in 1970, Title X is the nation's only dedicated source of federal funding for family planning services.[18] While Title X-funded health centers provide care to all patients, federal law requires them to give priority to "persons from low-income families."[19] Low-income individuals receive services at low or no cost depending on their family income.[20] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[21]

Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. Unlike Title X, which is required to subsidize low-income patients but must see all patients regardless of payor source, Medicaid has income and other eligibility requirements for individuals to participate. Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage. Moreover, while 33 states have expanded coverage under the Medicaid expansion option of the ACA, many individuals remain ineligible

---

[17] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[18] See Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504.

[19] 42 CFR § 59.5 (a)(6-9).

[20] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[21] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

1627 K Street, NW, 12th Floor, Washington, D.C. 20006-1702 • Phone 202.293.3114 • www.nfprha.org

00435009

Exhibit 73                                                                                    JA-0001133

for this coverage.[22] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states was $8,985 per year for a family of three in 2017.[23] In many of these states, childless adults remain ineligible for the program.[24] Due to this, many low-income women who would be eligible to enroll in Medicaid under this option, depending on where they reside, are unable to do so. For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling.

**Medicaid and Title X do not have capacity to meet the increased need.**

At a time when our nation's public health network is already burdened and under attack, it is critical to ensure that all women have access to contraceptive coverage and care. Medicaid is the nation's largest insurer, providing coverage to over 74 million people. Medicaid enrollees have robust coverage of comprehensive health care, and Medicaid already operates as a very lean program. Despite this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges in securing an adequate number of providers to furnish services to patients.[25] This is particularly true with respect to specialty providers, including OB/GYNs and other family planning and sexual health providers. A recent report from the HHS Office of the Inspector General found that many Medicaid managed care plans had provider shortages, with only 42% of in-network OB/GYN providers able to offer appointments to new patients.[26]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage caused by employer exemptions and would have to provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the IFR. Since 2010, the reported annual number of clients served at Title X-funded health centers has dropped from approximately 5.2 million patients to just over 4 million.[27] This decline corresponds with over $30 million in cuts

---

[22] The Henry J. Kaiser Family Foundation, Status of State Action on the Medicaid Expansion Decision, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/?currentTimeframe=0&sortModel=%7B%22colId%22%22Location%22,%22sort%22%22asc%22%7D (last updated Nov. 8, 2017).

[23] Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[24] Ibid.

[25] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[26] U.S. Department of Health and Human Services, supra at note 7.

[27] See Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, Family Planning Annual Report: 2010 National Summary, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-

to Title X's annual appropriated amount over the same period.[28] A recent study published in the *American Journal of Public Health* confirms that reductions in funding for Title X limit the number of patients Title X–funded providers are able to serve, concluding that Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded family planning services.[29] Requiring otherwise higher-income, privately insured individuals to use Title X–funded health centers would deplete resources from an already overburdened and underfunded program. Thus, NFPRHA is unconvinced that Medicaid and Title X are plausible alternatives for the individuals affected by this IFR.

**Political assault on Medicaid, Title X, and Planned Parenthood health centers have already compounded the threat to women's access to contraceptive care.**

Medicaid is a vital source of coverage for family planning and sexual health care in the United States, but political threats to the program may undermine its ability to provide the coverage that meets the needs of individuals and families. In 2010, Medicaid covered nearly 45% of all births in the US, and in many states Medicaid covers well over half of births.[30] Medicaid is also the single largest source of public funding for family planning services and supplies.[31]

Within the last year, policymakers have sought to radically alter the financial structure of Medicaid. The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars from the program over the next ten years.[32] The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per-capita cap, and permitted states to block

summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title_x_fpar_2016_national.pdf.

[28] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[29] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.

[30] Kathy Gifford et al., The Henry J. Kaiser Family Found., Medicaid Coverage of Pregnancy and Perinatal Benefits: Results from a State Survey, (2017), http://kff.org/womens-health-policy/report/medicaid-coverage-of-pregnancy-and-perinatal-benefits-results-from-a-state-survey/; *Births Financed by Medicaid*, The Henry J. Kaiser Family Found., http://kff.org/medicaid/state-indicator/births-financed-by-medicaid/?currentTimeframe=0&sortModel=%7B%22colId%22%22location%22,%22sort%22%22asc%22%7D (last visited Nov. 6, 2017).

[31] In 2010, Medicaid accounted for 75 percent of all public funds spent on contraceptive services and supplies. Kinsey Hasstedt et al., Guttmacher Institute, Public Funding for Family Planning and Abortion Services, FY 1980–2015 (2017), https://www.guttmacher.org/report/public-funding-family-planning-abortion-services-fy-1980-2015.

[32] Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files_115th_congress_2017_2018_costestimate/53126-health.pdf.

1627 K Street, NW · 12th Floor, Washington, D.C. 20006-1702 · Phone 202 293 3114 · www.nfprha.org

00435011

Exhibit 73                                                                                                      JA-0001135

grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve.[33]

The administration has also made moves that could radically alter the Medicaid program. Earlier this year, then–Secretary Tom Price and CMS Administrator Seema Verma issued a letter to governors announcing HHS' intent to use existing Section 1115 waiver authority to approve changes to state Medicaid programs that could undermine the ability of individuals qualified to enroll in Medicaid—particularly non-disabled, working-age adults—to receive the coverage and health care they need.[34]

In addition to these legislative and administrative efforts to alter the Medicaid program, Congress and the administration have threatened access to trusted family planning and sexual health providers by attempting to block Planned Parenthood from participating in Medicaid despite the dominant role Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57% of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[35]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks. Title X has also been targeted. In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program. In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018.[36] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[37] For instance, the president's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even

---

[33] Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9nmhSzIV.

[34] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

[35] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[36] Title X, Budget & Appropriations, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[37] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018.

1627 K Street, NW  12th Floor, Washington, D.C.  20006-1702 • Phone 202.293.3114 • www.nfprha.org

00435012

Exhibit 73

JA-0001136

though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide.[38] [39]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ+ individuals, communities of color, and young people.

**Most state coverage requirements fail to guarantee coverage of the full range of contraceptive methods, services, and counseling with no cost-sharing.**

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that 22 states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other 28 states.[40] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles, and other out-of-pocket costs.[41] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[42] Additionally, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[43]

**The Departments' assertion that other programs and legal requirements can meet the need for contraceptive coverage created by this rule is inaccurate.**

---

[38] Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

[39] White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget. Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[40] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[41] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[42] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[43] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey,* Menlo Park, CA: Kaiser Family Foundation; and Chicago G: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00435013

Exhibit 73                                                                                              JA-0001137

**JUSTIFICATIONS FOR THE IFR DO NOT MEET BASIC SCIENTIFIC STANDARDS**

As the nation's health policy center, HHS must adopt policies and activities firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and the Women's Preventive Services Initiative (WPSI), instead prioritizing religious objections over evidence-based medical recommendations. The Departments make several false and misleading statements in the IFR to undermine the contraceptive coverage benefit. NFPRHA fundamentally disagrees with the Departments' decision to promulgate this IFR based on the religious beliefs of individuals and entities rather than science and medicine.

**Contraception does not interfere with an existing pregnancy.**

The IFR takes issue with the IOM-recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices...that many persons and organizations believe are abortifacient—that is, as causing early abortion."[44] FDA-approved contraceptive methods do not function as abortifacients. Every FDA-approved contraceptive method acts before implantation, does not interfere with an existing pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[45]

**Contraception is medication and carries risks like any medication.**

The IFR raises concerns about the "negative health effects" of contraception.[46] As with any medication, some contraceptive methods may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[47,48] Specifically, the IFR suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[49] The IFR also suggests contraception increases the risk of breast cancer, but there is no scientifically-proven increased risk of breast cancer among contraceptive users, particularly those under 40.[50]

**Contraception makes sex among adolescents healthier, not more likely to happen.**

[44] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[45] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?

[46] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[47] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[48] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[49] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239-42.

[50] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1-66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

00435014

Exhibit 73                                                              JA-0001138

The IFR suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[51] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[52,53] In fact, research has shown that school-based health centers that provide access to contraception are proven to increase use of contraception by already sexually active students, not to increase onset of sexual activity.[54,55] On the other hand, young women who did not use contraception at first sexual intercourse were twice as likely to become teen mothers.[56] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[57]

**The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.**

### THE IFR UNDERMINES CONGRESSIONAL INTENT

The Departments ignore Congress' clear intent that contraception be covered as a preventive service under the ACA. When Congress passed the Women's Health Amendment, it meant to "ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[58] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[59] In enacting the

---

[51] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[52] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[53] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2-9).

[54] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[55] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114-26.

[56] Ibid.

[57] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007-2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[58] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8727 (Feb. 15, 2012).

[59] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

1627 K Street, NW 12th Floor, Washington, D.C. 20006-1702 • Phone 202 293 3114 • www.nfprha.org

00435015

Exhibit 73                                                                                                          JA-0001139

amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*... In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[60]

In considering the amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[61] Additional statements from Senators Boxer, Feinstein, Nelson, and Durbin prove that the intent to cover contraception was clear.[62]

To meet the amendment's objectives, HHS commissioned the Institute of Medicine (IOM) to convene a diverse committee of experts in disease prevention, women's health and adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for HHS to consider in order to fill those gaps.[63] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[64] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM report.[65] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists and HRSA to coordinate the development, review, and update of recommendations. These, too, were adopted by HRSA.

---

[60] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[61] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[62] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[63] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20–21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[64] *Id.* at 109–10.

[65] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa. gov/womensguidelines (last visited Feb. 15, 2016).

1627 K Street, NW  12th Floor, Washington, D.C.  20006-1702 • Phone 202 293 3114 • www.nfprha.org

00435016

Exhibit 73                                                                                          JA-0001140

HHS, through the adoption of the IOM's recommendations and the subsequent adoption of the WPSI recommendations, carried out Congress' intent. **The Departments should rescind the IFR to continue reflecting that intent.**

\*\*\*

NFPRHA appreciates the opportunity to provide comment on the religious exemptions and accommodations for coverage of certain preventive services interim final rule. This IFR will cause people to lose contraceptive coverage and harm their health and well-being. It ignores congressional intent that contraception be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting contraceptive access. **For all of these reasons, NFPRHA calls on the Departments to rescind the IFR.**

If you require additional information about the issues raised in this letter, please contact Mindy McGrath, NFPRHA Director, Advocacy & Communications, at 202-552-0144 or at mmcgrath@nfprha.org.

Sincerely,

Clare M. Co

Clare Coleman
President & CEO

00435017

Exhibit 73

JA-0001141



Elizabeth G. Taylor
Executive Director

Board of Directors

Robert N. Weiner
Chair
Arnold & Porter, LLP

Ann Kappler
Vice Chair
Prudential Financial Inc

Miriam Harmatz
Secretary
Florida Legal Services

Nick Smirensky, CFA
Treasurer
New York State Health
Foundation

Robert B. Greifinger, MD
John Jay College of
Criminal Justice

John R. Hellow
Hooper Lundy & Bookman, PC

Michele Johnson
Tennessee Justice Center

Lourdes A. Rivera
Center for Reproductive Rights

Donald B. Verrilli, Jr.
Munger Tolles & Olson

Rep. Henry A. Waxman
Waxman Strategies

Ronald L. Wisor. Jr.
Hogan Lovells

General Counsel

Marc Fleischaker
Arent Fox LLP

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

Centers for Medicare & Medicaid Services
Department of Health and Human Services
200 Independence Avenue, S.W.
Room 445-G, Hubert H. Humphrey Building
Washington, D.C. 20201

**Attn:      CMS-9940-IFC**
**Religious Exemptions and Accommodations for**
**Coverage of Certain Preventive Services Under the**
**Affordable Care Act**

Dear Acting Secretary Hargan:

The National Health Law Program (NHeLP) appreciates the opportunity to comment on the Interim Final Rule for Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (hereafter "IFR"), from the Department of the Treasury, Department of Labor, and Department of Health and Human Services ("HHS") (collectively "Departments") published October 13, 2017.[1] NHeLP protects and advances the health rights of low-income and underserved individuals. Founded in 1969, NHeLP advocates, litigates, and educates at the federal and state levels. Consistent with this mission, NHeLP works to ensure that all people in the United States – including women – have access to comprehensive preventive health services, including contraception. NHeLP unequivocally opposes the Departments' efforts to undermine the Affordable Care Act's ("ACA") contraceptive coverage requirement through this IFR.

1444 I Street NW, Suite 1105 · Washington, DC 20005 · (202) 289-7661 · Fax (202) 289-7724
3701 Wilshire Boulevard, Suite 750 · Los Angeles, CA 90010 · (310) 204-6010 · Fax (213) 368-0774
200 N. Greensboro Street, Suite D-13 · Carrboro, NC 27510 · (919) 968-6308 · Fax (919) 968-8855
www.healthlaw.org

00435088

Exhibit 74

## I.     Introduction

The ACA seeks to address the lack of adequate and affordable health insurance coverage—and to remedy inadequate access to health care. In line with this goal, the ACA recognizes that preventive health services are critical to individual and community health and that cost is a barrier to access. The ACA builds upon existing federal laws and increases access to preventive health care services by requiring most group health plans and health insurance issuers to cover, without cost-sharing, women's preventive health care services identified in guidelines issued by the United States HHS' Health Resources and Services Administration ("HRSA").[2] These HRSA recommendations are based on an extensive evidence-based analysis by the Institutes of Medicine (IOM).[3] These guidelines were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.[4] The ACA's requirements ensure that all individuals, regardless of where they work, have seamless access to all Food and Drug Administration ("FDA")-approved methods of contraception without cost-sharing.

The IFR exempts all non-profit or for-profit employers (including publicly traded companies) and private institutions of higher education that issue student health plans from complying with the contraceptive care requirement of the ACA if these entities object on the basis of religious beliefs. In addition, the IFR gives exempted employers and institutions the authority to decide whether their employees and students receive independent contraceptive care coverage through the accommodation process. The expanded exemption applies only to the contraceptive care requirement.

We are very concerned that the IFR deprives individuals, particularly low-income women, of health care benefits that medical and health care experts recognize as critical to ensuring reproductive health and well-being. In broadly exempting universally all employers from contraceptive coverage policies, the IFR gravely threatens a person's ability to determine the contraceptive method that best suits their needs, and when and if to become pregnant. The exemption undermines the ACA's intention to ensure all women receive

---

[1] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017), https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21851.pdf (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).
[2] See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 2713(a)(4), 124 Stat. 119, 131 (codified at 42 U.S.C. § 300gg-13(a)(4)); U.S. Dep't of Health & Human Servs. (HHS), Health Res. & Servs. Admin., Women's Preventive Services: Required Health Plan Coverage Guidelines, https://www.hrsa.gov/womens-guidelines-2016/index.html (last visited Nov. 2. 2017).
[3] Inst. of Med. of the Nat'l Acads. (IOM), Clinical Preventive Services for Women: Closing the Gaps 19 (2011), http://www.nationalacademies.org/hmd/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx.
[4] HHS, Women's Preventive Services, supra note 2.

2



00435089

Exhibit 74                                                                                                    JA-0001143

comprehensive coverage of the full range of FDA-approved, contraceptive drugs and devices.

## II.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication. This violates the Administrative Procedure Act ("APA"). The APA requires an agency to follow notice and comment procedures unless the agency can establish good cause to skip that process. Good cause is narrowly construed and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." Good cause does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations and therefore has had an opportunity to engage. However, relying on comments submitted during prior comment periods on related regulations is insufficient to meet public notice requirements under the APA. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation does not create urgency and certainly does not warrant ignoring basic requirements for broad public participation (even if a handful of employers and universities are advocating for the rule).

Further, the rule is in excess of statutory authority. It is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities. Contrary to the statute, the regulation sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[5] As discussed throughout this comment, the proposed rule introduces multiple, complicated, and confusing barriers to care for women whose employers cite religion to object to cover women's health services.

## III.    Contraception Is Critical to Women's Health and Improves Women's Economic and Social Status

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[6] As a result, women face a high level of

---

[5] 42 U.S.C. § 18114(1).

[6] In 2013, per capita health care spending for women remained higher than spending for men. HEALTH CARE COST INST., 2013 HEALTH CARE COST AND UTILIZATION REPORT, 1 (Oct. 2014), available at: http://www.healthcostinstitute.org/wp-content/uploads/2014/10/2013-HCCUR-12-17-14.pdf; U.S. CENSUS BUREAU. INCOME AND POVERTY IN THE UNITED STATES: CURRENT POPULATION REPORTS 2016, TABLE 1. 2017..



3

00435090

Exhibit 74                                                                    JA-0001144

health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[7] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Access to contraception is a vital part in ensuring that individuals and families can make their own best decisions. Contraception and family planning are some of the most well-researched and proven effective methods of preventive care.[10] They are particularly important in achieving Healthy People 2020's goal to "improve pregnancy planning and spacing, and prevent unintended pregnancy."[11] Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, low birth weight, and preterm birth.[12] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] Contraception is considered a major factor in reducing rates of maternal mortality and morbidity. Barriers to post-partum contraception are strongly associated with poor health outcomes including very low birth weight, infant mortality, and maternal mortality when women cannot ensure safe intervals between pregnancies.[15]

Access to contraception and preventive care is vital to ending health disparities that women of color face, including high rates of cervical cancer incidence and mortality, and unintended pregnancy. Women of color, women between the ages of 18 and 24, and low-income women continue to face high rates of unintended pregnancy, underscoring the

---

[7] KAISER FAMILY FOUND. WOMEN'S HEALTH CARE CHARTBOOK. 2011.
[8] *Id.*
[9] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFF., 1204-1211 (2015), available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.
[10] *See* IOM, *Clinical Preventive Services for Women: Closing the Gaps*, *supra* note 3.
[11] *Healthy People 2020: Family Planning*, OFFICE OF DISEASE PREVENTION AND HEALTH PROMOTION, https://www.healthypeople.gov/2020/topics-objectives/topic/family-planning (last visited Dec. 3, 2017).
[12] Agustin Conde-Agudelo MD, MPH, et al. *Birth Spacing and Risk of Adverse Perinatal Outcomes: A Meta-Analysis*. 295 J. AM. MED. ASS'N 1809–23 (2006).
[13] AO Tsui et al. *Family Planning and the Burden of Unintended Pregnancies*. 32 EPIDEMIOLOGIC REVIEWS 152-74 (2010).
[14] Lawrence B. Finer and Mia R. Zolna, *Declines in Unintended Pregnancy in the United States, 2008–2011*, 374 N. ENG. J. MED. 843-852 (2016).
[15] Agustin Conde-Agudelo et al., *Effects of Birth Spacing on Maternal, Perinatal, Infant, and Child Health: A Systematic Review of Causal Mechanisms*, 43 STUD. FAM. PLAN. 93 (2012), https://www.k4health.org/sites/default/files/conde-agudelo_2012.pdf.

4



00435091

Exhibit 74

need for seamless access to contraception.[16] While birth rates for females aged 15-19 have declined eight percent overall, disparities persist for communities of color. In 2015, Latina teens (females ages 15 to 19) experienced birth at more than twice the rate of their non-Hispanic, white peers. For the same year, Alaska Native/American Indian teens experienced birth at more than one and a half times the rate of their non-Hispanic, white peers.[17] Unintended pregnancy is also a concern for those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation. Some studies show that, lesbian, gay, and bisexual youth are more likely to experience adolescent pregnancies than do youth who do not identify as a sexual minority.[18]

The medical and health-related standards of care for some women with chronic medical conditions or taking certain medications is to use contraception to prevent pregnancy until their conditions are under control to improve maternal health and birth outcomes. Millions of women live with chronic conditions such as cardiovascular disease, diabetes, lupus, and epilepsy, which if not properly controlled, can lead to health risks to the pregnant woman or even death during pregnancy. Denying these women access to contraceptive information and services violates medical standards that recommend pregnancy prevention for these medical conditions. For example, according to the guidelines of the American Diabetes Association, planned pregnancies greatly facilitate diabetes care.[19] Recommendations for women with diabetes of childbearing potential include the following: the incorporation of preconception counseling into routine diabetes care for all adolescents of childbearing potential, discussion of family planning, and the prescription and use of effective contraception by a woman until she is ready to become pregnant.[20]

There is also evidence that contraception provides health benefits for other medical conditions, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[21] Non-contraceptive health

---

[16] GUTTMACHER INST., UNINTENDED PREGNANCY IN THE UNITED STATES, (Sept. 2016), https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states#8.
[17] *Social Determinants and Eliminating Disparities in Teen Pregnancy*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/teenpregnancy/about/social-determinants-disparities-teen-pregnancy.htm (last updated Oct. 26, 2017).
[18] Lisa L. Lindley, Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 AM. J. OF PUBLIC HEALTH 1379–86 (July 1, 2015); Karen Schantz, *Pregnancy Risk Among Bisexual, Lesbian, and Gay Youth: What Does Research Tell Us*, ACT FOR YOUTH CENTER OF EXCELLENCE (Apr. 2015), http://www.actforyouth.net/resources/rf/rf_lgb-prg_0415.pdf.
[19] AM. DIABETES ASS'N, STANDARDS OF MEDICAL CARE IN DIABETES-2017, 40 DIABETES CARE S115, S117 (2017), available at: http://care.diabetesjournals.org/content/diacare/supp/2016/12/15/40.Supplement_1.DC1/DC_40_S1_final.pdf.
[20] *Id.* at S114.
[21] AE Schindler, *Non-Contraceptive Benefits of Oral Hormonal Contraceptives*, 11 Int. J. Endocrinol. Metab. 41-7 (2013); AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, ACCESS TO CONTRACEPTION. COMMITTEE OPINION NO. 615, 125 Obstet Gynecol 250-5 (2015), available at:

5



Exhibit 74

00435092

benefits also include treatment for non-gynecologic conditions, such as acne.[22]

By improving women's social and economic status, access to contraception promotes equal opportunities far beyond the health care realm. Contraception allows women to decide if and when to become parents, creating more professional and educational opportunities. Indeed, the U.S. Supreme Court found that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives."[23] Increased control over reproductive decisions, in turn, provides women with educational and professional opportunities that have increased gender equality over the decades since birth control was introduced. Congress understood that the Women's Health Amendment would be "a huge step forward for justice and equality in our country."[24]

Studies show that access to contraception has increased women's wages and lifetime earnings.[25] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[26] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s, which was followed by large increases in women's presence in law, medicine, and other professions.[27] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[28] The significant impact that access to birth control has on women's educational and employment opportunities – and the significant

---

https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Access-to-Contraception.

[22] Schindler *supra* note 21.

[23] *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992); see also *Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1273 (W.D. Wash. 2001) ("[T]he adverse economic and social consequences of unintended pregnancies fall most harshly on women and interfere with their choice to participate fully and equally in the marketplace and the world of ideas.") (internal quotations omitted).

[24] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken).

[25] *See. e.g.*, Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[26] *See* Martha J. Bailey et al., *The Opt-in Revolution? Contraception and the Gender Gap in Wages*, 19, 26 (NAT'L BUREAU OF ECON. RESEARCH, Working Paper no. 17922, 2012), http://www.nber.org/papers/w17922.pdf (last visited Dec. 3, 2017).

[27] Heinrich H. Hock, *The Pill and the College Attainment of American Women and Men*, Fla. State Univ., 19, 2007; Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.harvard.edu/handle/1/2624453.

[28] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,728 (Feb. 15, 2012).

6



Exhibit 74

00435093

JA-0001147

impact on women's health that educational and employment achievement have as well – makes access to contraceptive coverage even more critical.

## IV.    The IFR Imposes Financial and Nonfinancial Obstacles to Women Accessing Their Choice of Contraception

The exemptions put in place by the IFR erect significant barriers for employees and their dependents to obtain contraceptives (*e.g.*, identify and enroll in another health plan or health insurance program, receive contraceptive care from one provider and other primary and preventive care from a different provider, pay up-front costs, and hope to receive reimbursement later). The Departments dismiss the impact that these burdens would have on women. However, studies assessing the attitudes and behaviors associated with unintended pregnancy have found that women engaging in unprotected sex frequently report barriers—financial *and* nonfinancial—in accessing birth control.[29] For this reason, research recommends that policies not only make contraceptive methods affordable, but also "simple to . . . obtain."[30] The contraceptive coverage requirement is in accord with this research, and seeks to make contraception affordable and easy to access to enable women to decide when and whether to become pregnant. In contrast to the research, the IFR makes contraception unaffordable and inaccessible to many women, and creates major obstacles to avoiding unwanted pregnancy.

### a.   In Allowing Cost-Sharing, the IFR Will Reduce Use of Preventive Services

Cost is a significant barrier to utilization of preventive services.[31] Prior to enactment of the ACA, individuals used preventive services at about half the rate recommended by medical standards of care.[32] Low-income individuals and people of color used fewer preventive care

---

[29] *See, e.g.*, Geraldine Oliva et al., *What High Risk Women are Telling Us about Access to Primary and Reproductive Health Care and HIV Prevention Services*, 11 AIDS PREVENTION PREVIEW 513, 515-21 (1999) (identifying barriers to care as including cost of health care, perceived poor quality of care and experiences of discrimination and stigmatization, geographic accessibility, fear of legal/social services punitive actions, misperceptions about the efficacy of birth control methods and condom usage); Adejoke Ayoola et al., *Reasons for Unprotected Intercourse in Adult Women*, 41 J. OF WOMEN'S HEALTH 271, 304-09 (2007) (discussing multiple reasons women have unprotected sex).

[30] Diana Greene Foster et al., *Attitudes Toward Unprotected Intercourse and Risk of Pregnancy Among Women Seeking Abortion*, 22 WOMEN'S HEALTH ISSUES e149, e154 (2011).

[31] *See, e.g.*, Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1347-48 (2000); Dahlia K. Remler & Jessica Greene, *Cost-Sharing: A Blunt Instrument*, 30 ANNUAL REV. PUB. HEALTH 293, 296 (2009) ("Even modest cost-sharing may dissuade people from preventive care that might provide great value in the future."); Andrew J. Karter, et al., *Out-of-Pocket Costs and Diabetes Preventive Services: The Translating Research Into Action for Diabetes (TRIAD) Study*, 26 DIABETES CARE 2294, 2296 (2003) (recommending plans and employers evaluate impact of cost-sharing on use of preventive care); KATHLEEN N. LOHR ET AL., RAND CORP., USE OF MEDICAL CARE IN THE RAND HEALTH INSURANCE EXPERIMENT: DIAGNOSIS- AND SERVICE-SPECIFIC ANALYSES IN A RANDOMIZED CONTROLLED TRIAL 30 (1986), https://www.rand.org/content/dam/rand/pubs/reports/2006/R3469.pdf (finding that cost-sharing is more likely to reduce visits for preventive care than chronic care).

[32] P'SHIP FOR PREVENTION, PREVENTIVE CARE: A NATIONAL PROFILE ON USE, DISPARITIES, AND HEALTH BENEFITS 8 (2007), http://www.rwjf.org/content/dam/farm/reports/reports/2007/rwjf13325 ("Among the 12 preventive services examined in this report, 7 are being used by about half or less of the people who should be using

7



Exhibit 74

00435094

JA-0001148

services than non-Hispanic whites.[33] Compared to men, women were "more likely to forgo needed care because of cost and to have problems paying their medical bills, accrue medical debt, or both."[34] The Departments claim that women who are unable to obtain no-cost coverage through their employer-sponsored health plans have other avenues for obtaining preventive services, particularly government sponsored programs for low-income people.[35] However, cost barriers to obtaining preventive services are prevalent not just for individuals that would meet eligibility requirements for such programs. The "[d]ifferences between men and women who reported problems accessing needed care persisted across all income groups, but were widest among adults with moderate incomes," according to a 2009 study.[36] That study found that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.[37]

Individuals pay for their health insurance through premiums and cost-sharing.[38] Cost-sharing is the portion of health care expenses not covered by the insurer that the insured must pay out-of-pocket.[39] Cost-sharing includes deductibles, which are the amounts a person must pay out-of-pocket before the insurer will cover any expenses during a given benefit period, as well as copayments and coinsurance that insureds must pay out-of-pocket when they use a service or purchase a product (*e.g.*, for a doctor visit or prescription drug).[40] The imposition of cost-sharing at the point of service is generally justified as a means of discouraging the use of non-essential services and reducing costs, though its efficacy at achieving these goals is not established.[41]

A large body of literature concludes that cost-sharing reduces use of medically necessary, valuable services, as opposed to merely discouraging overuse of unnecessary services.[42]

---

them. Racial and ethnic minorities are getting even less preventive care than the general U.S. population."); *see also* Elizabeth A. McGlynn et al., *The Quality of Health Care Delivered to Adults in the United States*, 348 NEW ENG. J. MED. 2635, 2641 (2003) (discussing a 2003 study of adults living in 12 metropolitan areas in United States and finding "46.5% of participants did not use recommended care").

[33] Lawrence O. Gostin, *Securing Health or Just Health Care? The Effect of the Health Care System on the Health of America*, 39 ST. LOUIS U. L. J. 7, 32 (1994); P'SHIP FOR PREVENTION, *supra* note 14, at 7.

[34] SHEILA D. RUSTGI ET AL., THE COMMONWEALTH FUND, WOMEN AT RISK: WHY MANY WOMEN ARE FORGOING NEEDED HEALTH CARE 1-2 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf.

[35] 82 Fed. Reg. 47,803.

[36] RUSTGI ET AL., *supra* note 34 at 4.

[37] *Id.*

[38] David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 1 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[39] Dahlia K. Remler & Jessica Greene, *Cost-Sharing: A Blunt Instrument*, 30 ANNUAL REV. PUB. HEALTH 293, 294 (2009).

[40] *Id.*

[41] Emmett B. Keeler, RAND Corp., *Effects of Cost Sharing on Use of Medical Services and Health*, 8 MED. PRAC. MGMT 317, 318-19 (1992), https://www.rand.org/pubs/reprints/RP1114.readonline.html.

[42] *See generally* Katherine Swartz, Robert Wood Johnson Found., *Cost-Sharing: Effects on Spending and Outcomes* (2010), http://www.rwjf.org/content/dam/farm/reports/issue_briefs/2010/rwjf402103/

8



Exhibit 74

According to the Institute of Medicine ("IOM"), a division of the National Academies of Sciences, Engineering, and Medicine, "[s]tudies have . . . shown that even moderate copayments for preventive services . . . deter patients from receiving those services."[43] The RAND Health Insurance Experiment ("HIE"), conducted from 1971 to 1986, remains the longest-term randomized experiment studying the impact of cost-sharing on medical service utilization and health outcomes.[44] The HIE found that although higher cost-sharing reduced overall use of services and total health care expenditures, it also reduced use of essential health care services and produced some negative health outcomes.[45] The reductions in utilization found by the HIE were more prevalent in the context of preventive care than chronic care and particularly prevalent in the rate of care sought by low-income people.[46]

A 2001 to 2004 study of 366,745 patients enrolled in 174 Medicare managed care plans found that the imposition of cost-sharing reduced mammography screening.[47] The study concluded that "[f]or cost-effective preventive services such as mammography, exempting elderly beneficiaries from cost-sharing may increase rates of appropriate use."[48] Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography.[49] Because the IFR allows employers to eliminate cost-sharing protections for their employees, it will have the effect of decreasing preventive care utilization.

  *b. By Imposing Cost Barriers, the IFR Will Prevent Women from Accessing Contraception, Particularly the Most Effective Methods of Contraception*

High out-of-pocket costs are one of the major barriers to consistent contraceptive use by women.[50] It is not surprising, then, that lower-income women are the least likely to have the

---

subassets/rwjf402103_1; Solanki et al., *supra* note 31, at 1347-48; Robert H. Brook et al., RAND Corp., *The Health Insurance Experiment: A Classic RAND Study Speaks to the Current Health Care Reform Debate* 3 (2006), http://www.rand.org/pubs/research_briefs/RB9174.html. For example, studies have shown increased adherence to key preventive medications, such as hypertensives, when cost-sharing was reduced or eliminated. *See* Niteesh K. Choudhry et al., *Full Coverage for Preventive Medications after Myocardial Infarction*, 365 NEW ENG. J. MED. 2088, 2091-96 (2011); Niteesh K. Choudhry et al., *At Pitney Bowes, Value-Based Insurance Design Cut Copayments and Increased Drug Adherence*, 29 HEALTH AFF. 1995, 1995 (2010). Such medications are among the most cost effective treatments available, and better adherence has been consistently associated with improved health outcomes. Michael T. Eaddy et al., *How Patient Cost-Sharing Trends Affect Adherence and Outcomes: A Literature Review*, 37 PHARMACY & THERAPEUTICS 45, 47 (2012).
[43] IOM, *Clinical Preventive Services for Women: Closing the Gaps*, *supra* note 3, at 19.
[44] Keeler, *supra* note 41, at 320.
[45] *Id.* at 318-19; Brook et al., *supra* note 42, at 2.
[46] Kathleen N. Lohr et al., *supra* note 31, at 29.
[47] Amal N. Trivedi et al., *Effect of Cost-sharing on Screening Mammography in Medicare Health Plans*, 358 NEW ENG.J. MED. 375, 381-82 (Jan. 24, 2008).
[48] *Id.*
[49] Solanki et al., *supra* note 31, 1342-43; *see also* Machledt & Perkins, *supra* note 38, at 2-3.
[50] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* IOM, *Clinical Preventive Services for Women: Closing the Gaps*, *supra* note 3, at 109.

9



resources to obtain reliable methods of family planning and are the most likely to be impacted negatively by unintended pregnancy.[51]

A 2010 study found that privately insured women with prescription drug coverage paid out-of-pocket on average $14 per oral contraceptive pill pack or approximately half of the cost of the pills.[52] Studies consistently find that "[e]ven small increments in cost-sharing have been shown to reduce the use of preventive services."[53] The IOM has accordingly recognized that the "elimination of cost-sharing for contraception therefore could greatly increase its use, including use of the more effective and longer-acting methods."[54]

In this regard, the California Kaiser Foundation Health Plan's experience is informative. In 2002, the California Kaiser Foundation Health Plan eliminated copayments for the most effective contraceptive methods (intrauterine devices, injectables, and implants).[55] Prior to the change, users paid up to $300 for a five-year contraceptive method; after elimination of the copayment, use of these methods increased by 137%.[56]

Similarly, the Contraceptive CHOICE Project—a large prospective cohort study of nearly 10,000 adolescents and women in the St. Louis, Missouri area—provided participants a choice of no-cost contraception and followed them for two to three years.[57] The study concluded that providing no-cost contraception significantly allowed young women to avoid unintended pregnancy.[58] The study participant teen birth rate was 6.3 per 1,000 teens compared to the national average of 34.1 per 1,000 teens.[59] The researchers concluded that providing access to no-cost contraception greatly increased the ability of adolescents and women in the St. Louis region to select the most effective methods of contraception, thereby allowing them to reduce unintended pregnancies and abortions.[60] Based on their findings, the researchers estimated that providing no-cost contraception to all women would allow them to avoid unintended pregnancy.[61] Because the IFR allows for contraceptive cost-sharing, it will reduce contraceptive use, particularly of the most effective methods.

---

[51] *See* Rustgi et al., *supra* note 34, at 4-5 (explaining that women's lower incomes and higher demands for health care, as compared to men, put them at increased risk for accruing medical debt and likelihood of putting off care); Lawrence B. Finer & Stanley K. Henshaw, *Disparities in Rates of Unintended Pregnancy in the United States, 1994 and 2001*, 38 PERSP. ON SEXUAL & REPROD. HEALTH 90, 92-94 (2006) (finding that women with lower incomes have higher rates of unintended pregnancy as compared to women with higher incomes).

[52] Liang et al., *supra* note 50, at 530-31.

[53] See IOM, *Clinical Preventive Services for Women: Closing the Gaps*, *supra* note 3, at 109.

[54] *Id.*

[55] Kelly Cleland et al., *Family Planning as Cost-Saving Preventive Health Service*, 364 NEW ENG. J. MED. e.37(1), e.37(2) (2011).

[56] *Id.*

[57] Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120(6) OBSTETRICS & GYNECOLOGY 1291, 1291-92 (2012).

[58] *Id.* at 1295-96.

[59] *Id.* The researchers "evaluated teenage birth . . . as a proxy for unintended pregnancy, as up to 80% of these births are unintended." *Id.*

[60] *Id.* at 1295-96.

[61] *Id.* at 1291-97.

10



Exhibit 74                                                                                    JA-0001151

> c. *By Eliminating Cost Barriers, the Preventive Services Coverage Requirement in the ACA Has Been Successful in Improving Access to Contraception*

The ACA reflects the well-documented body of research that out-of-pocket costs for health care services are a problematic barrier to medication adherence.[62] By removing cost barriers, the ACA is proving to be effective at achieving this compelling governmental interest in increasing access to contraception, and in impacting women's ability to decide when and if to become pregnant. In the Guttmacher Institute's Continuity and Change in Contraceptive Use study, researchers surveyed women aged eighteen to thirty-nine years about their contraceptive use before and after the contraceptive coverage requirement went into wide-scale effect.[63] The results show that the proportion of privately insured women with no out-of-pocket cost for their oral contraceptives increased from fifteen percent to sixty-seven percent; for injectable contraception, from twenty-seven percent to fifty-nine percent; for the vaginal ring, from twenty percent to seventy-four percent; and for the intrauterine device, from forty-five percent to sixty-two percent.[64] As rates of contraceptive coverage without cost-sharing increased, so did contraceptive access.[65] A report from the IMS Institute for Healthcare Informatics found that 24.4 million more prescriptions for oral contraceptives with no copayment were filled in 2013 than in 2012.[66] According to that report, oral contraceptives accounted for the largest increases in prescriptions dispensed without a copayment.[67] Reducing the cost barrier to contraception is resulting in greater access to contraception, just as the ACA intended.

## V.    The IFR Is Inconsistent with Evidence-Based Preventive Care

Insurance coverage policies must be based on research, evidence, and medical and health-related facts, and must be responsive to individual patient and consumer needs and wishes. Consumers require medically accurate, evidence-based, unbiased comprehensive health care services so that they can use their own decision making capacity to choose health care services that comport with their individual morality and circumstances. Because the IFR promotes deviation from these scientific standards, it is inconsistent with promoting

---

[62] *See, e.g.*, Michael E. Chernew et al., *Impact of Decreasing Copayments on Medication Adherence Within a Disease Management Environment*, 27 HEALTH AFF. 103, 111 (2008) (finding that "increased cost sharing leads to decreased adherence to potentially life-saving medications, with likely serious deleterious health effects"); Niteesh K. Choudhry et al., *Should Patients Receive Secondary Prevention Medications for Free After a Myocardial Infarction? An Economic Analysis*, 26 HEALTH AFF. 186, 186 (2007) (finding that cost-sharing can cause medication underuse).
[63] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 44-45 (2014). The federal government phased in the contraceptive coverage requirement starting in August 2012, and it went into wide-scale effect in January 2013. *Id.* at 44.
[64] *Id.* at 45-47.
[65] *See* IMS Inst. for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013* (2014).
[66] *Id.* at 16.
[67] *Id.* at 13.



11

Exhibit 74

00435098

JA-0001152

preventive care and strengthening the economic and social well-being of individuals across the lifespan.

As the nation's health policy center, HHS' policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule discussed below that undermine the contraceptive coverage benefit. In the face of these facts, the IFR goes so far as to imply that birth control is not health care at all.

###### a.  Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science. The Rule takes issue with the IOM recommended coverage of the full range of FDA-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[68] Regardless of some personal beliefs. the evidence is clear. FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[69]

###### b.  Contraceptives Are Medication and Carry Risks Like Any Medication

The Rule raises concerns about the "negative health effects" of contraception.[70] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[71] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[72] The Rule also

---

[68] 82 Fed. Reg. 47,794.

[69] Brief for Physicians for Reproductive Health et al. as Amici Curiae Supporting Petitioners, Sebelius v. Hobby Lobby Stores, Inc., 573 U.S. _ 12-21 (2014) (No. 13-354), available at: https://www.scribd.com/document/187287249/Brief-of-Amici-Curiae-Physicians-for-Reproductive-Health-et-al-in-Support-of-Petitioners.

[70] 82 Fed. Reg. 47,804.

[71] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, PROGESTIN-ONLY HORMONAL BIRTH CONTROL: PILL AND INJECTION, FAQ NO. 86 (2014); AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, COMBINED HORMONAL BIRTH CONTROL: PILL, PATCH, AND RING, FAQ NO. 185 (2014).

[72] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, RISK OF VENOUS THROMBOEMBOLISM AMONG USERS OF DROSPIRENONE-CONTAINING ORAL CONTRACEPTIVE PILLS, COMM. OPINION NO. 540, 120 OBSTET GYNECOL 1239-42 (2012), available at https://www.acog.org/-/media/Committee-Opinions/Committee-on-Gynecologic-Practice/co540.pdf?dmc=1&ts=20161007T0314567246.

12



Exhibit 74                                                                                    JA-0001153

suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[73]

### c. Contraceptives Make Sex Among Adolescents Healthier, Not More Likely to Happen

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[74] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[75] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[76] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[77] More females are using contraception the first time they have sex.[78]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.

## VI.    The IFR Undermines Congress' Express Intent that Contraception Be Covered As a Preventive Service

The Departments ignore Congress's express intent that contraception be covered as a preventive service under the ACA.

### a. Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[79] Allowing more entities to deprive

---

[73] KATHRYN M. CURTIS ET AL., 65 MORBIDITY & MORTALITY WKLY REP. 1-66, U.S. SELECTED PRACTICE RECOMMENDATIONS FOR CONTRACEPTIVE USE, (2016), available at https://www.cdc.gov/mmwr/volumes/65/rr/rr6504a1.htm.

[74] 82 Fed. Reg. 47,805.

[75] Sheila Desai et al., *Understanding the Decline in Adolescent Fertility in the United States*, 59 J. ADOLESCENT HEALTH, 2007-2012, 577, 577 (2016) available at: http://www.jahonline.org/article/S1054-139X(16)30172-0/fulltext; JL Meyer et al., *Advance Provision of Emergency Contraception Among Adolescent and Young Adult Women: A Systematic Review of Literature.* 24 J. PEDIATR ADOLESC GYNECOL. 2-9 (2011).

[76] M Minguez et al., *Reproductive Health Impact of a School Health Center*, 56 J. ADOLESCENT HEALTH, 338-44 (2015); JA Knopf et al., *Community Preventive Services Task Force. School-Based Health Centers to Advance Health Equity: A Community Guide Systematic Review.* 51 AM. J. PREVENTIVE MED. 114-26 (2016).

[77] *See* Desai *supra* note 75, at 577-83.

[78] *Id.*

[79] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,727 (Feb. 15, 2012).

13



women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, in enacting the Women's Health Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> "Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access.  In fact, more than half of women delay or avoid preventive care because of its cost.  *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[80] [emphasis added]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[81] Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[82] Congress did not add any exemption to the women's preventive services provision.

>    *b.  The Departments Cannot Point to Other "Exemptions" to Justify the Rule*

The Departments look to the mere existence of exemptions in *other* statutes as well as the ACA's "grandfathering" provision to justify the sweeping exemptions in the IFR. Neither justify the exemptions.

The Departments attempt to construct a foundation for the IFR's exemptions by reference to existing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the ACA, but the Departments' attempt to misconstrue these existing laws to create a justification

---

[80] 155 CONG. REC. S12,021, S12,027 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand); *See also Id.* at S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski) (noting that the Women's Health Amendment was a response to "punitive practices of insurance companies that charge women more and give [them] less in a benefit.").
[81] 155 CONG. REC. S12,021, S12,027 (daily ed. Dec. 1, 2009).
[82] 155 CONG. REC. S12,033, S12,052 (daily ed. Dec. 1, 2009); *See also,* 155 CONG. REC. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women.  This may include . . . family planning . . .").



14

Exhibit 74                                                                                    JA-0001155

00435101

only further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also point to "grandfathered" plans as further justification for its action. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[83] Grandfathered plans were always expected to be phased out over time, and research shows the number of employees enrolled in such plans have indeed decreased steadily since 2010.[84] Grandfathered plans are intended as a temporary means for transitioning employers to full-compliance plans.[85] The Administration acknowledges that grandfathered plans will likely cease to exist within a few years of the ACA's enactment, stating that grandfathering "minimiz[es] market disruption and put[s] us on a glide path toward the competitive, patient-centered market of the future."[86] As a result of the ACA's grandfathering provision, the grandfathering regulations, other ACA constraints, and market incentives, grandfathered plans are nearly impossible to abide with in the near and long term, and are continuously moving toward total disappearance.[87] Indeed the number of employer-sponsored grandfathered plans has decreased steadily since the ACA's enactment.[88] In 2017, 17% of covered workers are enrolled in a grandfathered plan, continuing a decline from 23% in 2016, 26% in 2014, 36% in 2013, and 48% in 2012.[89] Additionally, federal statutes "often include exemptions for small employers,

---

[83] *See Priests for Life, v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[84] GARY CLAXTON ET AL., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017. *See also* Sara R. Collins, *Grandfathered vs. Non-Grandfathered Health Plans Under the Affordable Care Act: Striking the Right Balance*, THE COMMONWEALTH FUND (June 22, 2010),
http://www.commonwealthfund.org/publications/blog/grandfathered-vs-non-grandfathered-plans: Larry Levitt et al., *Assessing ACA Marketplace Enrollment*, KAISER FAMILY FOUNDATION (Mar. 4, 2016),
https://www.kff.org/health-reform/issue-brief/assessing-aca-marketplace-enrollment/; *Grandfathering Explained*, KAISER FAMILY FOUNDATION (Sep. 8, 2011), https://www.kff.org/health-reform/perspective/grandfathering-explained/; Sarah Barr, *FAQ: Grandfathered Health Plans*, KAISER HEALTH NEWS (Nov. 13, 2013), https://khn.org/news/grandfathered-plans-faq/; Elizabeth Weeks Leonard, *Can You Really Keep Your Health Care Plan? The Limits of Grandfathering under the Affordable Care Act*, 36 J. CORP. L. 753 (2011), http://digitalcommons.law.uga.edu/cgi/viewcontent.cgi?article=1684&context=fac_artchop.

[85] Coverage of Certain Preventive Services Under the Affordable Care Act. 78 Fed. Reg. 39,870, 39,887 n.49 (July 2, 2013), https://www.federalregister.gov/documents/2013/07/02/2013-15866/coverage-of-certain-preventive-services-under-the-affordable-care-act; *Hobby Lobby v. Burwell*, 134 S. Ct. 2751, 2800-01 (2014) (Ginsburg, J., dissenting). *See also Grandfathering Explained*, *supra* note 84; Collins, *supra* note 84; Levitt, *supra* note 84; Barr, *supra* note 84; Leonard, *supra* note 84.

[86] *Keeping the Health Plan You Have: The Affordable Care Act and "Grandfathered" Health Plans*, THE CENTER FOR CONSUMER INFORMATION & INSURANCE OVERSIGHT (June 14, 2010),
https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/keeping-the-health-plan-you-have-grandfathered.html. *See also* Leonard, *supra* note 84.

[87] Leonard, *supra* note 84.

[88] CLAXTON ET AL., *supra* note 84.

[89] *Id.*



Exhibit 74                                                                                      JA-0001156

and such provisions have never been held to undermine the interests served by these statutes."[90]

## VII.    The IFR Violates Other Statutory and Constitutional Protections for Women

By creating broad exemptions to the ACA's birth control benefit, the IFR singles out health insurance that is essential for women's health and equality.

Religious arguments have long been used to thwart women's equality, just as they have been used to thwart racial equality.[91] But those efforts have been rejected repeatedly. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[92] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[93]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. The IFR also violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[94]

## VIII.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

---

[90] *Hobby Lobby*, 134 S. Ct. at 2800 (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

[91] *See, e.g.*, Brief for American Civil Liberties Union et al. as Amici Curiae Supporting Respondents, Zubik v. Burwell, 578 U.S. _, 21 (2016) (Nos. 14-1418, 14-1453, 14-1505, 15-35, 15-105, 15-119, and 15-191), available at :
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf.

[92] *Id.* at 19.

[93] *Id.* at 24-27.

[94] 2 U.S.C. § 18116.



16

00435103

Exhibit 74                                                                                                JA-0001157

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives or safeguards for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[95] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws, which cannot fill in the coverage gaps caused by this IFR.

      *a. Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage*

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Enacted in 1970, Title X is the nation's only dedicated source of federal funding for family planning services.[96] While Title X-funded health centers provide care to all patients, federal law requires them to give priority to "persons from low-income families."[97] Low-income individuals receive services at low or no cost depending on their family income.[98] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[99]

Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate. Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage. Moreover, while thirty-three states have expanded coverage under the Medicaid expansion option of the ACA, many individuals remain ineligible for this coverage.[100] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states

---

[95] 82 Fed. Reg. 47803.

[96] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504.

[97] 42 CFR § 59.5 (a)(6-9).

[98] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[99] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 C.F.R § 59.5(a)(7), (9).

[100] KAISER FAMILY FOUND., STATUS OF STATE ACTION ON THE MEDICAID EXPANSION DECISION, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last updated Nov. 8, 2017).



17

Exhibit 74

00435104

that have not expanded Medicaid, childless adults remain ineligible for this program.[101] Due to this, many low-income women who would be eligible to enroll in Medicaid under this option, depending on where they reside, are unable to do so. For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling.

> b. *Medicaid and Title X Programs Do Not Have Capacity to Meet The Increased Need for Contraceptive Care and Counseling That Will Result From the IFR*

At a time when our nation's public health network is already burdened and under attack, it is critical to ensure that all women have access to contraceptive coverage and care. Medicaid is the nation's largest insurer, providing coverage to over 74 million people who are enrolled in the program, including many women of color.[102] Medicaid enrollees have robust access to comprehensive health care, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[103] This is particularly true with respect to specialty providers, including OB/GYNs. A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients.[104]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage by employer refusals, and would have to furnish care to more patients than are currently served by the program. However, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[105] This decline corresponds to over $30 million in cuts to Title X's annual

---

[101] RACHEL GARFIELD & ANTHONY DAMICO, KAISER FAMILY FOUND., THE COVERAGE GAP: UNINSURED POOR ADULTS IN STATES THAT DO NOT EXPAND MEDICAID, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.
[102] Thirty-one percent of Black women and twenty-seven percent of Latinas of reproductive age are enrolled in Medicaid. ADAM SONFIELD, GUTTMACHER INST., WHY PROTECTING MEDICAID MEANS PROTECTING SEXUAL AND REPRODUCTIVE HEALTH, 20 GUTTMACHER POL'Y REV. 39, 40 (2017), https://www.guttmacher.org/sites/default/files/article_files/gpr2003917.pdf. Nearly one-fifth (19 percent) of Asian American Pacific Islander women are enrolled in Medicaid, including women from Southeast Asian Communities. IN OUR OWN VOICE: NAT'L BLACK WOMEN'S REPROD. JUST. AGENDA ET AL., AMERICAN HEALTH CARE ACT THREATENS REPRODUCTIVE JUSTICE FOR WOMEN OF COLOR, 3 (2017), http://www.nationalpartnership.org/research-library/repro/the-house-republican-repeal-bill-threatens-reproductive-justice-for-women-of-color.pdf.
[103] U.S. GEN. ACCOUNTING OFFICE, STATES MADE MULTIPLE PROGRAM CHANGES, AND BENEFICIARIES GENERALLY ACCESS COMPARABLE TO PRIVATE INSURANCE, (Nov. 2012), available at: http://www.gao.gov/assets/650/649788.pdf; U.S. DEP'T OF HEALTH & HUMAN SERVS (HHS), OFFICE OF INSPECTOR GENERAL, ACCESS TO CARE: PROVIDER AVAILABILITY IN MEDICAID MANAGED CARE (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.
[104] HHS, Access to Care: Provider Availability in Medicaid Managed Care, *supra* note 103 at 21.
[105] *See* C FOWLER ET AL., RTI INTERNATIONAL, FAMILY PLANNING ANNUAL REPORT: 2010 NATIONAL SUMMARY, (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; CI FOWLER ET AL., RTI INTERNATIONAL, FAMILY PLANNING ANNUAL REPORT: 2016 NATIONAL SUMMARY, (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

18



00435105

Exhibit 74

appropriated amount over the same period.[106] A recent study published in the American Journal of Public Health confirms that reductions in funding for Title X limit the number of patients Title X-funded providers are able to serve, concluding that Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.[107] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Moreover, legislative and administrative proposals, if implemented, would weaken the capacity of the Title X and Medicaid programs to serve current enrollees and patients. The House has proposed to defund the Title X program once again for FY 2018.[108] The President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide.[109]

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid and continue to defund or interfere with patients' access to care under the Title X program.[110] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory and administrative measures. HHS has made clear its intent to approve waivers of existing Medicaid rules and standards.[111] These waivers may very well include provisions that undermine the ability of

---

[106] *Funding History HHS.Gov (2017)*, U.S. Dept. of Health and Human Servs., https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).
[107] Euna M. August et al., *Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act*, AM. J. PUB. HEALTH (2016), available at http://doi.org/10.2105/AJPH.2015.302928.
[108] *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").
[109] KINSEY HASSTEDT, GUTTMACHER INST., BEYOND THE RHETORIC: THE REAL-WORLD IMPACT OF ATTACKS ON PLANNED PARENTHOOD AND TITLE X, GUTTMACHER POL'Y REV., (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.;OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, THE PRESIDENT'S FISCAL YEAR 2018 BUDGET: OVERVIEW (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).
[110] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. CONG. BUDGET OFFICE, PRELIMINARY ANALYSIS OF LEGISLATION THAT WOULD REPLACE SUBSIDIES FOR HEALTH CARE WITH BLOCK GRANTS, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. MARA YOUDELMAN & KIM LEWIS, NAT'L HEALTH LAW PROGRAM, TOP 10 CHANGES TO MEDICAID UNDER THE GRAHAM-CASSIDY BILL, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.
[111] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf; Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*,



19

Exhibit 74

00435106

JA-0001160

individuals qualified to enroll in Medicaid to receive the coverage and health care they need.

Regardless of the political proposals that would severely limit access to these programs, Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals. These programs are not and cannot serve as alternatives for securing contraceptive care and counseling for individuals who will lose access because of this IFR.

> *c. State Contraceptive Parity Laws Are Insufficient to Fill in the Coverage Gaps Caused by This IFR*

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that many states do not have any contraceptive parity laws and that the federal contraceptive coverage requirement made several important advances over state laws in terms of cost-sharing protections.[112]

The major reason that state laws are insufficient is that they are preempted as applied to employers that provide self-insured health coverage; under the Employee Retirement Income Security Act of 1974, only Congress can regulate these plans, as the ACA does. These self-insured plans are estimated to cover 60% of covered workers nationwide, leaving state protections wholly irrelevant to women who access health care using these plans.[113] Further, contraceptive parity laws, which are in effect in 24 states, require insurers to cover contraceptive services as they would any other medical or prescription drug service but do not eliminate copayments, deductibles and other out-of- pocket costs; 21 states and the District of Columbia have no coverage protections at all.[114] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included, making them inadequate to protect women from the harmful effects of losing contraceptive coverage as a result of the IFR.[115]

## VI.    Conclusion

---

WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.
[112] Guttmacher Inst., INSURANCE COVERAGE OF CONTRACEPTIVES: STATE LAWS AND POLICIES, (2017), http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[113] See Claxton et al., *supra* note 84.
[114] NAT'L WOMEN'S LAW CNTR., CONTRACEPTIVE EQUITY LAWS IN YOUR STATE: KNOW YOUR RIGHTS – USE YOUR RIGHTS, A CONSUMER GUIDE, (Aug. 27, 2012), https://nwlc.org/resources/contraceptive-equity-laws-your-state-know-your-rights-use-your-rights-consumer-guide/. Only four states, California, New York, Illinois, and Vermont, currently have laws in effect that are as extensive as the federal contraceptive coverage requirement.
[115] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. *See* Guttmacher Inst., INSURANCE COVERAGE OF CONTRACEPTIVES: STATE LAWS AND POLICIES, *supra* note 112.

20



Exhibit 74

00435107

JA-0001161

Section 2713(a)(4) of the Public Health Service Act, and its implementing regulations, make access to contraception possible by ensuring that health plans in the individual and small group market adequately cover contraception without cost-sharing—cost-sharing that would otherwise reduce use of this necessary service. We strongly object to the Departments' efforts to undermine the ACA's contraceptive coverage requirement through this IFR and urge the Departments to strike the IFR in its entirety.

Thank you for your attention to our comments. If you have any questions or need any further information, please Susan Berke Fogel, Reproductive Health Director, at fogel@healthlaw.org.

Sincerely,

Elizabeth G. Taylor
Executive Director

**NHeLP**

21

00435108

Exhibit 74

JA-0001162



December 4, 2017

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW, Room 445–G
Washington, DC 20201

**VIA ELECTRONIC SUBMISSION**

**Attn:  Comments on CMS-9925-IFC – Moral Exemptions and Accommodations for
Coverage of Certain Preventative Services under the Affordable Care Act**

Dear Acting Secretary Hargan,

The National Institute for Reproductive Health is a non-profit national organization based in
New York that works across the country to increase access to reproductive health care. Our
organization supports and partners with state and local advocacy organizations and health care
providers across the country to promote access to the full range of reproductive health care for
all. In order to support the vision of a society in which each person has the freedom to control
their reproductive and sexual lives, the National Institute for Reproductive Health seeks to
preserve affordable and accessible reproductive health services, including affordable coverage of
birth control for everyone, especially low-income women and families.

The National Institute for Reproductive Health unequivocally opposes the Departments of Health
and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient
Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this
Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to
promote preventive medicine, reduce future medical costs, and improve the health, equality, and
economic security of women[1] and families. Over 62 million women with private insurance now
have coverage of these vital health care services, including breast and cervical cancer screening,
breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer and university to deprive women of contraceptive coverage,
this IFR will harm women and their health and well-being.  It discriminates against women in
violation of multiple federal laws and the Constitution.  The IFR also violates the Administrative

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the
denial of reproductive health care and insurance coverage for such care also affects people who do not identify as
women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-
Of-Pocket Costs (Sept. 2017). *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-
Estimates-3.pdf.

14 Wall Street • Suite 3B • New York, NY 10005 • 212-343-0114 • www.nirhealth.org

00208970

Exhibit 75     JA-0001163



National Institute for
**Reproductive Health**

Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. And the IFR is predicated upon a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons, the National Institute for Reproductive Health calls on the Departments to rescind the IFR.

## I.    Birth Control Is Critical to Women's Health

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[3] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

---

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008. Table A-2. 2009.
[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.
[5] *Id.*
[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342–43 (2000); 1342–43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014). http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzcQ.
[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.
[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).
[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

2

00208971

Exhibit 75

JA-0001164



National Institute for
**Reproductive Health**

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or prevent pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] And, the U.S. has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[17] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory

[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.
[11] *Id.* at 103-104.
[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*, 2010;32(1):152-174. doi:10.1093/epirev/mxq012.
[14] Finer LB and Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine*, 2016, 374(9):843–852.
[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation, University of Washington, 2016.
[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.
[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

14 Wall Street • Suite 3B • New York, NY 10005 • 212-343-0114 • www.nirhealth.org

00208972

Exhibit 75                                                                                    JA-0001165



National Institute for
**Reproductive Health**

disease, and a decreased risk of endometrial and ovarian cancer.[18] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[19, 20]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[21] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[22] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[23] which was followed by large increases in women's presence in law, medicine, and other professions.[24] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[25]

---

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] Id.

[20] Cortessis VK. Barrett M. Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

[21] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics. 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[22] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/w1 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions. 110 J. Pol. Econ. 730, 749 (2002).

[23] Heinrich H. Hock. The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[24] Claudia Goldin & Lawrence F. Katz. The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions. 110 J. of Pol. Econ. 730, 749 (2002). https://dash.harvard.edu/handle/1 /2624453.

[25] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act. 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

4

14 Wall Street • Suite 3B • New York, NY 10005 • 212-343-0114 • www.nirhealth.org

00208973

Exhibit 75                                                                                        JA-0001166



National Institute for
**Reproductive Health**

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## II.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As a Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.  Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[26] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[27] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive

---

[26] *Id.* at 8,727.
[27] 155 Cong. Rec. S12,021. S12,026 (daily ed. Dec. 1. 2009) (statement of Sen. Mikulski): *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

5

14 Wall Street • Suite 3B • New York, NY 10005 • 212-343-0114 • www.nirhealth.org

00208974

Exhibit 75



National Institute for
**Reproductive Health**

care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[28]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[29] That contraception would be covered was clear.[30]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine (IOM) "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[31] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[32] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[33] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

### B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exceptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman

---

[28] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).
[29] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).
[30] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").
[31] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.
[32] *Id.* at 109-10.
[33] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines,* http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

6

14 Wall Street • Suite 3B • New York, NY 10005 • 212 343-0114 • www.nirhealth.org

00208975

Exhibit 75                                                                                          JA-0001168



National Institute for
**Reproductive Health**

seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify he IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[34] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[35] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[36] This exemption is intended as a temporary means for transitioning employers to full compliance.[37] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[38]

### III. The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[39] But those efforts have time and again been rejected.

---

[34] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[35] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

[36] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).

[37] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[38] Gary Claxton et al., Kaiser Family Foundation, Employer Health Benefits 2017 Annual Survey 204 (2017). http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[39] *See*, e.g., at 21 https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf

7

14 Wall Street • Suite 3B • New York, NY 10005 • 212-343-0114 • www.nirhealth.org

00208976

Exhibit 75                                                                                          JA-0001169



National Institute for
**Reproductive Health**

For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[40] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[41]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[42]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[43] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero."[44] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

### IV.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act

---

[40] *Id.* at 19.
[41] *Id.* at 24-27
[42] 2 U.S.C. § 18116.
[43] E.g., *Cutter v. Wilkinson*, 544 U.S. 709, 722, 726 (2005).
[44] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

8

14 Wall Street • Suite 3B • New York, NY 10005 • 212-343-0114 • www.nirhealth.org

00208977

Exhibit 75                                                                                           JA-0001170



National Institute for
**Reproductive Health**

(APA). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"[45] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[46] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[47]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any

---

[45] 5 U.S.C. § 553(b), (c).
[46] 5 U.S.C. § 553(d).
[47] 5 U.S.C. § 706.

9

00208978

Exhibit 75                                    JA-0001171



National Institute for
**Reproductive Health**

unreasonable barriers to the ability of individuals to obtain appropriate medical care."[48]  As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers.  By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because it is supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[49]

For each of these reasons, the rule violates the APA and should be rescinded.

## V.    Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this rule to undermine the contraceptive benefit. The National Institute for Reproductive Health unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

### A.  Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[50] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[51]

---

[48] 42 U.S.C. § 18114(1).
[49] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).
[50] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[51] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

10

14 Wall Street • Suite 3B • New York, NY 10005 • 212-343-0114 • www.nirhealth.org

00208979

Exhibit 75                                    JA-0001172



National Institute for
**Reproductive Health**

### B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The rule raises concerns about the "negative health effects" of contraception.[52] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[53, 54] Specifically, the rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[55] The rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[56]

### C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[57] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[58,59] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[60,61] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[62] Overall, increased access to and use of contraception has contributed to a

---

[52] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[53] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[54] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[55] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.
[56] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.
[57] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).
[58] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.
[59] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).
[60] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3), 338-344.
[61] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[62] Id.

11

14 Wall Street • Suite 3B • New York, NY 10005 • 212-343-0114 • www.nirhealth.org

00208980

Exhibit 75                                                                          JA-0001173



National Institute for
**Reproductive Health**

dramatic decline in rates of adolescent pregnancy.[63] More females are using contraception the first time they have sex.[64]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

### VI.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[65] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

#### A.  Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[66] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[67] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers,

---

[63] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[64] *Id.*
[65] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).
[66] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).
[67] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

12

00208981

Exhibit 75                                                    JA-0001174



National Institute for
**Reproductive Health**

including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[68]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[69] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[70] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[71] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[72] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

---

[68] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[69] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

[70] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, CI, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[71] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[72] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

13

00208982

Exhibit 75                                                                                                          JA-0001175



Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[73] This is particularly true with respect to specialty providers, including OB/GYNs.[74] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

### B.    The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[75] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[76] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood

---

[73] U.S. Government Accountability Office, "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance," (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General, "Access to Care: Provider Availability in Medicaid Managed Care," (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[74] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

[75] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017). https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017). http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSz1V.

[76] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC). https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

14

00208983

Exhibit 75

JA-0001176



National Institute for
**Reproductive Health**

plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[77]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[78] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[79] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[80]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as fail-safes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

---

[77] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017). https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[78] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latino/o. Fowler, C. L., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[79] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[80] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, Guttmacher Policy Review, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

14 Wall Street • Suite 3B • New York, NY 10005 • 212-343-0114 • www.nirhealth.org

00208984

Exhibit 75



National Institute for
**Reproductive Health**

## C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[81] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[82] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[83] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[84]

The Departments are wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

## VII. The Departments' Proposed Changes to the Rule Do Not Fix the Above Problems

The Departments request comment on several ways the IFR could be changed to expand exemptions to the birth control benefit. Each of the questions presented by the Departments is based on an assumption that the IFR is legally sound, and in some instances, that it should be expanded. As described in detail above, this assumption is incorrect. Other than completely striking it, there is nothing the Departments could do to make this better, and any expansion would only further violate the law. The IFR should be struck in its entirety.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control

---

[81] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[82] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[83] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[84] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

16

00208985

Exhibit 75                                JA-0001178



be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons the National Institute for Reproductive Health calls on the Departments to rescind the IFR.


Sincerely,

Andrea Miller
President
National Institute for Reproductive Health
14 Wall Street, Suite 3B
New York, NY 10005

17

00208986

Exhibit 75                                                                                    JA-0001179

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

VIA ELECTRONIC SUBMISSION

RE: [CMS-9940-IFC/CMS-9925-IFC]

December 5, 2017

Dear Acting Secretary Hargan,

The National Latina Institute of Reproductive Health (NLIRH) unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR).

NLIRH is the only national reproductive justice organization dedicated to building Latina power to advance health, dignity, and justice for 28 million Latinas, their families, and communities in the United States though leadership development, community mobilization, policy advocacy, and strategic communications.  NLIRH works to ensure that all Latinas are informed about all their options for safe, effective, and acceptable forms of contraception and family planning.  NLIRH supports affordable, accessible, and quality contraception and counseling for all persons regardless of their age or gender identity.

The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital healthcare services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]  For decades, Latinxs[3] have been the most uninsured racial and ethnic group. Because of the ACA, from 2013 to 2016, the percentage of uninsured Latinxs has dropped from 42.3 percent to 24.8 percent, the largest decline for any ethnic group.[4]

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.
[3] NLIRH, conscious of the importance of gender equity in the production of educational materials utilizes gender-neutral terms throughout this document. "Latinx" is a term that challenges the gender binary in the Spanish language and embraces the diversity of genders that often are actively erased from spaces.  Due to the limitations of data collection, we use "Latina(s)" or "women" where research only shows findings for cisgender women, including Latinas.
[4] CommonWealth Fund, "Millions More Latino Adults Are Insured Under the Affordable Care Act." January 19, 2017. http://www.commonwealthfund.org/publications/blog/2017/jan/more-latino-adults-insured

1

00373062

Exhibit 76

JA-0001180

Latinas have the highest rates of uninsurance when compared to other groups in the U.S.,[5] therefore seeing a provider and accessing affordable contraception is not an option for many women. Additional barriers already exist for the Latinx[6] community, and cultural and linguistic differences often make Latinxs the last to know about what contraceptive options are available. Access to healthcare becomes more complex when taking into account an individual's race, ethnicity, gender identity, or sexual orientation; for example, in 2010, twenty-six percent of Lesbian, Gay, and Bisexual Latinx adults did not have a regular source for basic healthcare.[7]

A core tenet of reproductive justice is that every family needs to be able to make their own decisions about when and whether to become pregnant, give birth, and raise children. Access to safe, effective, and affordable contraception is important to protect health and support these personal decisions, including being able to access contraception without a co-pay.

By allowing virtually any employer and university to deprive individuals of contraceptive coverage, this IFR will harm Latinxs and their health and well-being. In addition to subjecting women of color's access to healthcare to the religious veto of employers and increasing health disparities faced by communities of color, it discriminates against women and violates the Administrative Procedure Act (APA), multiple other federal laws, and the United States Constitution. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. Further, the IFR is predicated upon a distorted picture of the science supporting contraception and the federal programs supporting and state laws regarding contraception. For all of these reasons NLIRH calls on the Departments to rescind the IFR.

## I.    Birth Control Is Critical to Latinx Health

Access to contraception without a co-pay improves Latinx health and well-being. Before the ACA, Latinas were 40 percent less likely to receive oral contraception as compared to white counterparts.[8] The lack of insurance coverage for contraception significantly contributes to unintended pregnancy disparities among racial and ethnic groups.[9] In light of the pervasive and severe health inequities that Latinxs face, resources and tools, such as contraception, help decide when and whether to become pregnant are necessary to achieve positive health outcomes. Without the economic support of the ACA's birth control mandate, contraceptive inequities will only continue to be exacerbated for Latinxs.

---

[5] Latinos for Planned Parenthood, "Health Equity Issues for the Latino Community." Available at:
https://www.plannedparenthoodaction.org/communities/latinos-planned-parenthood/health-equity-issues-for-the-latino-community
[6] NLIRH, conscious of the importance of gender equity in the production of educational materials utilizes gender-neutral terms throughout this document. "Latinx" is a term that challenges the gender binary in the Spanish language and embraces the diversity of genders that often are actively erased from spaces. Due to the limitations of data collection, we use "Latina(s)" or "women" where research only shows findings for cisgender women, including Latinas
[7] *Health Disparities in LGBT Communities of Color: By the Numbers*, CENTER FOR AMERICAN PROGRESS (2010).
https://www.americanprogress.org/issues/lgbt/news/2010/01/15/7132/health-disparities-in-lgbt-communities-of-color
[8] Race, Ethnicity and Differences in Contraception Among Low-Income Women  Methods Received by Family PACT Clients, California, 2001-2007.
[9] CHRISTINE DEHLENDORF ET AL, *Disparities in Family Planning*, Am J Obstet Gynecol  2010 Mar; 202(3): 214–220.
doi:  10.1016/j.ajog.2009.08.022; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2835625/

2

00373063

Exhibit 76                                                                                                           JA-0001181

Women face a high level of healthcare insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[10] Women were spending between 30 percent and 44 percent of their total out-of-pocket health costs just on birth control.[11] Out-of-pocket costs prevented many women, especially individuals with low-incomes, from accessing preventive services, including contraception.[12] Eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[13] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[14]

Hispanic women have the highest rate of unintended birth.[15] The goal of unintended pregnancy prevention is to help women time and space their pregnancies, or prevent pregnancy altogether, in accordance with their own desires; it also improves maternal, child, and family health.[16] Contraception enables individuals to decide if, when, and how to be a parent. Additionally, research shows that rate of unintended pregnancy while using contraception correctly and consistently make up only 5 percent of all unintended pregnancies, while the rate of unintended pregnancies with no use of contraception account for 52 percent of all unintended pregnancies.[17]

Access to birth control is also critical for people with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[18]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth

---

[10] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[11] Id.

[12] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342–43 (2000); 1342–43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFchNSzcQ.

[13] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[14] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs, 34, no 7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[15] Guttmacher Institute *Unintended Pregnancy in the United States*. September 2016. Available at: https://www.guttmacher.org/news-release/2013/unintended-pregnancy-remains-persistent-problem-united-states-disparities-income

[16] Women's Preventive Services Initiative. *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

[17] *Contraception Works and Publicly Funded Family Planning Programs Are Essential to Reduce Unintended Pregnancy and Abortion*, GUTTMACHER INSTITUTE (Mar. 9, 2011), https://www.guttmacher.org/article/2011/03/contraception-works-and-publicly-funded-family-planning-programs-are-essential.

[18] *Id.* at 103-104.

3

00373064

Exhibit 76

JA-0001182

defects, low birth weight, and preterm birth.[19] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[20] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45 percent of pregnancies unintended.[21] And, the U.S. has the highest rate of maternal mortality in the developed world.[22] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[23] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity, which disproportionately impacts women of color.

Individuals use birth control for a multitude of reasons.[24] Contraception is vital to the standard of care for some Latinas facing illness and chronic conditions, such as lupus, diabetes, and heart disease.[25] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[26] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[27, 28]

Insurance coverage of contraception is critical to ensuring women can use it. About 31 percent of Latinas are uninsured and approximately 25 percent live in poverty.[29] Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing healthcare services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational

[19] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[20] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[21] Finer LB and Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.

[22] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[23] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397–404.

[24] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York. Guttmacher Institute. 2011.

[25] Brief for National Health Law Program et al. as Amici Curiae Supporting Government. Sebelius v. Hobby Lobby Stores, Inc., Conestoga Wood Specialties v. Sebelius. 723 F.3d 1114 (10th Cir.), cert. granted, 134 S.Ct. 678 (2013) 724 F.3d 377 (3d Cir.), cert. granted, 134 S.Ct. 678 (2013), (2013) (Nos. 13-354, 13-356). Available at: http://www.healthlaw.org/publications/browse-all-publications/nelp-supreme-court-amicus-brief-insebelius-v-hobby-lobby#.U6nEfJRdWSo

[26] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5

[27] Id.

[28] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-analysis Obstet Gynecol. 2017

[29] Id.

4

opportunities. Latinas are paid 54 cents for every dollar paid to white, non-Hispanic men[30] and this inequity plays out in access to healthcare and contraception  In 2013, Catholic hospitals employed over 500,000 full-time employees and over 200,000 part-time workers.[31] Many of the employees whose coverage is in question are people of color who often struggle to make ends meet. For instance, Black and Latinx people are the most represented in healthcare support occupations such as medical assistants, nursing, psychiatric, and home health aides.[32] Direct care workers, which include home health aides, nursing assistants, and personal care aides,[33] have a median income of only $16,100 per year and report unpredictable and part-time hours.[34]

A person and their healthcare providers, not employers, should determine the right contraceptive for an individual's healthcare needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which an individual could discuss her specific health history and contraceptive needs in private with a healthcare provider. This interferes with the relationship individuals have with their regular healthcare provider, conversations about if and when to become pregnant, and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to an individual's health and life, but implies that birth control is not healthcare at all.

## II.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[35] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

---

[30] National Partnership for Women & Families. (2017, September). *Fact Sheet: Quantifying America's Gender Wage Gap by Race.* Retrieved 21 September 2017, from http://www.nationalpartnership.org/research-library/workplace-fairness/fair-pay/quantifying-americas-gender-wage-gap.pdf
[31] Catholic Health Association of the United States. Catholic Health Care in the United States. January 2013. https://www.chausa.org/docs/defaultsource/general-files/mini_profile-pdf.pdf?sfvrsn=0.
[32] U.S. Department of Health and Human Services, Health Resources and Services Administration, National Center for Health Workforce Analysis. Sex, Race, and Ethnic Diversity of U.S. Health Occupations (2010-2012). Rockville, Maryland; 2014; 2, 7. Available at: http://bhpr.hrsa.gov/ healthworkforce/supplydemand/usworkforce/diversityushealthoccupations.pdf.
[33] Paraprofessional Healthcare Institute. America's Direct-Care Workforce. November 2013. Available at: http://phinational.org/sites/phinational.org/ files/phi-facts-3.pdf.
[34] Abby Marquand. Too Sick to Care: Direct-Care Workers, Medicaid Expansion, and the Coverage Gap. Paraprofessional Healthcare Institute. 2015; 4. Available at: http://phinational.org/sites/phinational.org/files/research-report/toosicktocare-phi-20150727.pdf.
[35] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

5

00373066

Exhibit 76

JA-0001184

### A. Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[36] Individuals with low-income receive services at these health centers at low or no cost depending on their family income.[37] Every year, more than four million individuals access life-saving care such as birth control, cancer screenings, and testing for sexually transmitted infections (STIs)—including HIV—at Title X-funded health centers.[38] Seventy-five percent of Planned Parenthood patients are at or below 150 percent of the federal poverty level and half of their health centers are located in rural or underserved areas.[39] People of color comprise forty percent of Planned Parenthood patients.[40] Additionally, in many states, due to restrictions of the 1996 welfare laws, a Title X clinic is one of the few places uninsured, recent immigrants can access reproductive healthcare.

Importantly, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[41]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department s rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[42] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[43] This decline corresponds to over $30 million in cuts to Title X's annual

---

[36] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[37] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[38] Fowler et al, "Family Planning Annual Report: 2015 National Summary," RTI International, (Aug. 2016), available at http://www.hhs.gov/opa/pdfs/title-x-fpar-2015.pdf.

[39] Planned Parenthood, The Urgent Need for Planned Parenthood Health Centers (Dec. 7, 2016), available at https://www.plannedparenthood.org/files/4314/8183/5009/20161207_1Defunding_fs_d01_1.pdf.

[40] Planned Parenthood, This is Who We Are, (July 11, 2016), https://www.plannedparenthood.org/files/6814/6833/9709/20160711_TS_General_d1.pdf.

[41] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[42] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception

[43] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, CI, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf

6

00373067

Exhibit 76                                                                JA-0001185

appropriated amount over the same period.[44] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique healthcare needs of individuals living with low-incomes. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[45] Many individuals enrolled in Medicaid live with extremely low incomes and minimal savings at hand, unlike individuals with higher incomes and employer-sponsored coverage. More than one quarter of Latinas of reproductive age are enrolled in the Medicaid program.[46]

Medicaid enrollees have robust access to healthcare, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[47] This is particularly true with respect to specialty providers, including OB/GYNs.[48] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

### B. The Political Assault on Medicaid and Title X Health Centers Threaten Latinx Access to Contraceptive Care

Within the last year, as part of the numerous failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[49] Policymakers continue to try to

---

[44] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[45] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017). https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[46] Sonfield, A. (2017). Why Protecting Medicaid Means Protecting Sexual and Reproductive Health. *Guttmacher Policy Review, 20*, 39–40. Retrieved 16 March 2017, from https://www.guttmacher.org/sites/default/files/article_files/gpr2003917.pdf

[47] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance" (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[48] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

[49] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the

7

Exhibit 76

00373068

JA-0001186

impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[50] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and healthcare they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[51]

Unfortunately, Medicaid is not the only healthcare program that has faced administrative and congressional attacks despite playing a critical role in the healthcare safety net; Title X has also been targeted. In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[52] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[53] It must be highlighted again that Title X-funded health centers play a particularly important role in serving communities of color; in 2016, one in three (32 percent) of Title X patients identified as Latinx.[54]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including individuals with low-income, people

---

Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[50] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/see-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[51] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[52] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[53] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[54] Fowler, C. L., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

8

00373069

Exhibit 76                                                                                                                          JA-0001187

who are uninsured, members of the LGBTQ community, communities of color, and young people. Given the administration's clear record of hostility toward these programs, the Departments' mention of Title X and Medicaid as failsafe options for those who will lose coverage as a consequence of its IFRs, is contradictory in nature.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[55] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles, and other out-of-pocket costs.[56] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[57] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60 percent of covered workers nationwide.[58]

The Latinx community continues to face obstacles to achieving good health as a result of systematic barriers, including poverty, racism, and lack of insurance. As a result, Latinos and other communities of color are disproportionately affected by health inequities in comparison to non-Latino whites.   This Rule is another example of a new barrier to affordable and accessible contraception.

The Departments are wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

### III.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.  Congress Intended the ACA to Require Contraceptive Coverage

---

[55] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[56] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[57] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[58] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00373070

Exhibit 76

JA-0001188

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[59] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[60] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[61]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[62] That contraception would be covered was clearly intended by members of Congress.[63]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[64] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[65] On August 1, 2011, Health Resources and Services

---

[59] *Id.* at 8,727

[60] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[61] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[62] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[63] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[64] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[65] *Id.* at 109-10

00373071

Exhibit 76                                                                 JA-0001189

Administration (HRSA) adopted the recommendations set forth in the IOM Report.[66] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations, promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

### B.  The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exceptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow healthcare entities to refuse to treat a person seeking an abortion, and other laws that allow religious refusals to provide certain healthcare services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify the IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[67] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[68] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[69] This exemption is intended as a temporary means for transitioning employers to full compliance.[70] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[71]

---

[66] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).
[67] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").
[68] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees; Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).
[69] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).
[70] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct at 2800-01 (Ginsburg, J., dissenting)
[71] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

00373072

Exhibit 76
JA-0001190

### IV.    The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[72]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[73] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero."[74] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

### V.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views,

---

[72] 2 U.S.C. § 18116.
[73] E.g., *Cutter v. Wilkinson*, 544 U.S. 709, 722, 726 (2005).
[74] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id.* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

12

00373073

Exhibit 76                                                                                                    JA-0001191

or arguments with or without opportunity for oral presentation"[75] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[76] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[77]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[78] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[79]

---

[75] 5 U.S.C. § 553(b), (c).
[76] 5 U.S.C. § 553(d).
[77] 5 U.S.C. § 706.
[78] 42 U.S.C. § 18114(1).
[79] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

13

00373074

Exhibit 76                                                                                                    JA-0001192

For each of these reasons, the rule violates the APA and should be rescinded.

## VI.    Justifications for the IFR Do Not Meet Basic Scientific Standards

The Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. NLIRH unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

### A.  Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive healthcare should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[80] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[81]

By making the false claim that some FDA-approved methods of contraception may cause abortion, the Departments sideline science in favor of ideology.

### B.  Contraceptives Are Medication and The Health Risks of Contraceptives Are Overstated and Misrepresented

The Rule raises concerns about the "negative health effects" of contraception.[82] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[83, 84] The Department fails to recognize that this means that patients and healthcare providers, not employers and agencies, should determine the right contraceptive for an individual's healthcare needs.

---

[80] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[81] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).
[82] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[83] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[84] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

14

00373075

Exhibit 76

JA-0001193

The Department selectively interprets data in order to overstate "negative health effects" associated with contraceptives.[85] This includes misleading assertions of an association between contraceptive use, breast cancer, and cervical cancer, as well as vascular events and "risky sexual behavior."[86] This cherry-picking of evidence ignores substantial evidence to the contrary, and ignores the balance of significant non-contraceptive health benefits associated with contraceptive use.

Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[87]  The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[88]  For women over 40, healthcare providers must consider both the risks of becoming pregnant at an advanced reproductive age, as well as the risks of continuing contraception use until menopause, making it essential that a woman be able to discuss options with her provider without interference and with a full option of contraceptive methods.[89]

Intrauterine Devices ("IUDs"), according to Departments' claim, is falsely identified as an abortifacient creating another additional barrier to a method that is best for an individual's needs, a decision that should be left between the individual and the provider. Additionally, on the topic of cervical cancer, the Departments cite only a study on oral contraceptives, when a recent study found that intrauterine devices ("IUDs") are associated with a decreased risk of cervical cancer.[90] This is particularly relevant to the Latinx community because Latinas have the highest rates of cervical cancer in the United States.[91] It is especially irresponsible to misrepresent the risks of breast and cervical cancer without accurately reporting the substantial evidence of contraceptives' association with cancer prevention, as any evaluation of preventive healthcare should fully weigh the risks and benefits.[92] Contraceptives are associated with a reduced risk of colorectal cancer,[93] endometrial cancer is 50 percent less likely among women who use oral hormonal contraceptives for at least one year compared to women who have never used oral hormonal contraceptives;[94] oral

---

[85] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[86] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147)).

[87] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[88] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR–4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[89] See Curtis, K.M., Jatlaoui, T.C., Tepper, N.K., Zapata, L.B., Horton, L.G., Jamieson, D.J., & Whiteman, M.K. (2016, July 29). U.S. selected practice recommendations for contraceptive use, 2016. Morbidity and Mortality Weekly Report, 65(4), 1–66.

[90] Cortessis, V.K., Barrett, M., Brown Wade, N., Enebish, T., Perrigo, J.L., Tobin, J., . . . McKean-Cowdin, R. (2017). Intrauterine device use and cervical cancer risk: A systematic review and meta-analysis. Obstetrics & Gynecology, 130(6). 1226–1236.

[91] Centers for Disease Control and Prevention. (2016, June 16). Cervical Cancer Rates by Race and Ethnicity, 2015. Retrieved 16 March 2017, from http://www.cdc.gov/cancer/cervical/statistics/race.htm

[92] Cf. American College of Obstetricians and Gynecologists. (2016, December). Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration (p. 11). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/

[93] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. International Journal of Endocrinology and Metabolism, 11(1), 41–47.

[94] Ibid.

15

00373076

Exhibit 76                                                                                                                JA-0001194

hormonal contraceptives can reduce the risk of ovarian cancer by 27 percent, and 20 percent for every five years of additional use;[95] oral hormonal contraceptives can lower the risk of hereditary ovarian cancer in women with the BRCA1 or BRCA2 gene mutations;[96] and oral hormonal contraceptive use for more than 10 years can lower the risk of ovarian cancer among women with endometriosis, who are typically at higher risk of developing ovarian cancer.[97]

### C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[98] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[99,100] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[101,102] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[103] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[104] More females are using contraception the first time they have sex.[105] Furthermore, we know that 97 percent of Latinas who have had sex have used contraception[106] and do not want to see these numbers decline.

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.

### VII.    The Religious Exemptions IFR

The Religious Exemptions IFR vastly expands the universe of potential exemptions.[107] This IFR allows any employer—nonprofit or for-profit—to exclude some or all contraceptive methods and services from the health plans it sponsors if the employer has religious objections. It gives that same option to colleges and universities for health plans they sponsor for their students.

---

[95] Ibid.
[96] Ibid.
[97] Ibid.
[98] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).
[99] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.
[100] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9.
[101] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3), 338-344
[102] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[103] Id.
[104] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[105] Id.
[106] Centers for Disease Control and Prevention. Vital and Health Statistics Report: Use of Contraception in the United States: 1982-2008, 2010: 19. Available at: http://www.cdc.gov/nchs/data/series/sr_23/sr23_029.pdf
[107] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47792 et seq.

16

00373077

Exhibit 76                                                                                                    JA-0001195

In addition, the Religious Exemptions IFR does not set any standards for how an organization might establish that it has a religious objection, nor does it provide a mechanism for employees or students to challenge that claim. Objecting employers and schools may still make use of the accommodation, but doing so is merely optional. This regulation also provides religious exemptions for individuals and insurance companies. In essence, the expanded religious exemptions leave women vulnerable to the whims of their employers who have no place in these private decisions, just as they would not in any other conversations about an employee's healthcare.[108]

The Departments predict that 120,000 women will lose access to contraception through the combined rules. They concede, however, that they do not know, and so did not include in their estimate, the number of women who will lose access to contraceptive coverage because: (1) an employer or insurer that did not cover contraceptive coverage on the basis of religious beliefs before the ACA now would be exempt from providing coverage under the new regulation; or (2) employers that qualify for an exemption under the Religious Exemptions IFR will no longer make use of the accommodations provided under the previous rule. The Departments underestimate the profound impact the Religious Exemptions IFR will have on women's access to contraceptives—especially because publicly traded companies previously had not been included even under the accommodation.

A 2015 study from the Henry J. Kaiser Family Foundation of non-profit organizations making use of the accommodation under the prior regulations estimated that 3 to percent of all nonprofits and 10 percent of the largest nonprofits have been using the accommodation.[109] The authors were unable to estimate how many nonprofits or enrollees that included; but, they did note that there are more than 1.4 million nonprofits in the United States, and that thousands of nonprofits—including hospitals, long-term care facilities, schools, and charities—are affiliated with the Roman Catholic Church, which objects to contraception.[110] The new regulations now make the accommodation optional and allow these entities to be totally exempt, thus enabling these nonprofits to deny contraceptive coverage to all of their employees, dependents, and students. Without clear standards or procedures for claiming a religious objection and without any oversight mechanisms or ways for affected employees and students to appeal such a claim, the new regulations open a door for potential abuse.

The full impact of these regulations depends on how many employers and schools will claim a religious or moral exemption, whether they will object to some or all methods and services.

---

[108] Amy Goldstein, Juliet Eilperin and William Wan, *Trump Administration Narrows Affordable Care Act's Contraception Mandate*, THE WASHINGTON POST (Oct. 6, 2017) https://www.washingtonpost.com/national/ health-science/trump-administration-could-narrow-affordable-care-acts-contraception-mandate/2017/10/05/16139400-a9f0-11e7-92d1-58c702d2d975_story.html?utm_term=.66c07b8e74e9.

[109] THE HENRY J. KAISER FAMILY FOUNDATION, *The Future of Contraceptive Coverage* (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[110] *Id.*

17

00373078

Exhibit 76

JA-0001196

whether they will use the now-optional accommodation, and how many employees, students, and dependents will be affected. The new IFR would require women whose employers have a religious objection to pay the costs of contraceptive care out of pocket. This would have a devastating impact on indigent and communities of color, immigrants, the LGBTQ community, people with disabilities, and those with limited English proficiency.

The Religious Exemptions IFR notes that there are "multiple other Federal programs that provide free or subsidized contraceptives for women at risk of unintended pregnancy."[111] When viewed alongside this Administration's related healthcare policies and actions (e.g., the cuts to Medicaid, Title X, and the proposed defunding of Planned Parenthood) access to contraceptives for women has already decreased. Despite the common myth that all low-income people could enroll in Medicaid, the Medicaid program has only been available to certain categories of individuals (e.g., children, pregnant women, seniors, and people with disabilities) that have little to no savings or assets. Parents of children and childless adults are often excluded from Medicaid or only the very lowest income individuals in these categories are eligible.

Every year, more than four million individuals access life-saving care such as birth control, cancer screenings, and testing for sexually transmitted infections (STIs)—including HIV—at Title X-funded health centers.[112] Seventy-five percent of Planned Parenthood patients are at or below 150 percent of the federal poverty level and half of their health centers are located in rural or underserved areas.[113] People of color comprise forty percent of Planned Parenthood patients.[114]

In addition to the harm the Religious Exemptions IFR will cause to women, the IFR will harm states by leaving "millions of women" without access to birth control, thus increasing contraceptive costs to state-funded programs.[115] For these reasons, we urge the Departments to repeal the Religious Exemptions IFR.


## VIII.  Conclusion

Under the IFRs, many women—especially low-income women and women of color—will lose their access to quality and affordable reproductive healthcare, including contraceptives. It is

---

[111] 82 Fed. Reg. 47792
[112] Fowler et al, "Family Planning Annual Report: 2015 National Summary," RTI International. (Aug. 2016), available at http://www.hhs.gov/opa/pdfs/title-x-fpar-2015.pdf.
[113] Planned Parenthood. The Urgent Need for Planned Parenthood Health Centers (Dec. 7, 2016), available at https://www.plannedparenthood.org/files/4314/8183/5009/20161207_Defunding_fs_d01_1.pdf.
[114] Planned Parenthood. This is Who We Are. (July 11, 2016), https://www.plannedparenthood.org/files/6814/6833/9709/20160711_FS_General_d1.pdf.
[115] Amy Goldstein, Juliet Eilperin and William Wan, *Trump Administration Narrows Affordable Care Act's Contraception Mandate*, THE WASHINGTON POST (Oct. 6, 2017) https://www.washingtonpost.com/national/health-science/trump-administration-could-narrow-affordable-care-acts-contraception-mandate/2017/10/05/16139400-a9f0-11e7-92d1-58c702d2d975_story.html?utm_term=.66c07b8e74e9.

00373079

Exhibit 76

JA-0001197

discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, the federal family planning programs, and state laws regarding contraception.

Extensive research has shown that the "contraception mandate was urgently necessary to protect the health of women, that the cost of contraception decreased radically after the mandate was put in place, and that the millions of American women who are insured though their employers have better outcomes when they have access to affordable preventive reproductive care."[116] Access to comprehensive contraception coverage and full information about and choice of contraceptive methods are integral components to women's healthcare. All individuals should have unhindered and affordable access to all U.S. Food and Drug Administration-approved contraceptives. The IFRs impair a woman's right to make personal decisions regarding her reproductive health, and denies her right to access quality and affordable healthcare. For all of these reasons, we urge the Departments to revoke the broad exemptions permitted under these rules and revert to the previous standard for exemptions created by the ACA.

For all of these reasons NLIRH calls on the Departments to rescind the IFR.

Sincerely,

National Latina Institute for Reproductive Health

---

[116]http://www.slate.com/articles/news_and_politics/jurisprudence/2017/10/assessing_the_new_exemption_to_the_affordable_care_act_s_contraceptive_mandate.html

00373080

Exhibit 76                                                                                          JA-0001198



December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (RIN 0938-AT20)**

To whom it may concern:

The National LGBTQ Task Force is the oldest national organization advocating for the rights of lesbian, gay, bisexual, transgender, and queer (LGBTQ) people and their families. The Task Force builds power, takes action, and creates change to achieve freedom and justice for LGBTQ people and their families.

We appreciate the opportunity to provide comments in response to the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services interim final rule ("Religious Exemptions IFR" or "Rule") published in the Federal Register on October 13, 2017.[1] For the reasons set forth below, we urge the Department of the Treasury, Department of Labor, and Department of Health and Human Services (collectively, "the Departments") to set aside this Rule because it will rule will harm women, LGBTQ people and people of color by restricting access to essential reproductive and other health care services.

### A. Contraception is Essential Healthcare

Access to contraception is an essential part of shaping reproductive healthcare and well-being for women and LGBTQ people. The ACA has expanded contraceptive coverage without cost-sharing to millions of people across the nation. Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with almost 65% of the decrease directly attributed to the contraceptive coverage provision. After the implementation of the ACA, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women. Studies show that the use of long-term contraceptives methods, such as an IUD or an implant, has increased in recent years because the high upfront costs were removed. These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives. Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies. Furthermore, the majority of

---

[1] 82 Fed. Reg. 47792 et seq.

**be you.**

00373605

Exhibit 77                                         JA-0001199



women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.

### A. Changes Under the Religious Exemptions IFR Cause Harm

It is deeply troubling that federal agencies charged with ensuring public health would seek to enact a rule that gives employers such sweeping veto power over the health care services their employees may access under their health care coverage. Health insurance is a form of compensation that employees earn, like wages. Allowing employers an explicit religiously-motivated veto over how an employee uses his or her earned health care coverage is bad public health policy and represents an overemphasis on an exaggerated view of religious liberty at the expense of employee health and well-being.

The Religious Exemptions IFR expands eligibility for the complete exemption—formerly reserved for houses of worship—to *all* nonprofit and for-profit employers. It also retains the accommodation, formerly only available to non-profit and closely-held for-profit employers, as an optional alternative for any employer. Under the Interim Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations. This is a potentially dramatic change in the availability of contraceptive coverage for the employees of a vast number of entities, and a significant departure from what was guaranteed to these employees under prior rulemaking and the *Hobby Lobby* decision, where the Supreme Court ruled that the Religious Freedom Restoration Act required that a closely held for-profit company whose owners objected to contraception on religious grounds must be permitted to use the same accommodation given to non-profit entities.[2]  Importantly, the Court stressed that there would be no harm to the company's workers caused by permitting the company to use the same accommodation to provide its employees with  contraceptive coverage, as the employees would still receive coverage without cost sharing.

Unlike other nations whose legal regimes have also sought to balance the conscience rights of providers with the rights of persons to access health care, in the United States there is often insufficient consideration given to the impact of overly broad conscience laws on patients. In other words, the playing field is already tilted heavily in favor of those seeking to deny care. And given the nature of the services to which religious exemptions are most commonly applied, these refusal laws have a discriminatory impact on LGBT people and women seeking reproductive health care.

At the federal level, there are already numerous statutory protections for health care providers' religious beliefs. These laws include the Church,[3] Weldon,[4] and Coats[5] amendments, which allow providers to refuse to perform or otherwise facilitate abortion services. The Church

---

[2] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2786–87 (2014).
[3] 42 U.S.C. § 300a-7 et seq.
[4] Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat 786.

[5] 42 U.S.C. § 238(n).

**be you.**

00373606

Exhibit 77                                                                                    JA-0001200



Amendment also reaches sterilization services.[6] Refusal provisions targeting contraception delay access, increase costs, and may result in unintended pregnancies. Eighteen states allow providers to refuse to provide sterilization services.[7]

**B. The Religious Exemptions IFR Will Increase Health Disparities Faced by LGBT People**

While religiously-based objections to contraception and abortion are well known and have posed access barriers for women for years, less well known is how these types of refusals can also affect the LGBT community. LGBT people and people living with HIV experience pervasive discrimination in the provision of health care, much of it justified by reference to religious beliefs.

According to an in-depth survey concerning health care discrimination against LGBT people and people living with HIV, more than half of all respondents reported that they have experienced at least one of the following types of discrimination in care: being refused needed care; health care professionals refusing to touch them or using excessive precautions; health care professionals using harsh or abusive language; being blamed for their health care status; or health care professionals being physically rough or abusive.[8] Many members of the LGBT community have a "high degree of anticipation and belief that they w[ill] face discriminatory care" which ultimately causes many people to not seek the essential care that they need.[9] For many transgender and gender-nonconforming people the fear of potential negative treatment from health care professionals is even more exacerbated. Undocumented transgender persons were found to be vulnerable to physical attacks in doctors' offices, hospitals, and emergency rooms.[10] There are also geographic considerations that may further exacerbate discrimination against LGBT individuals.[11] These realities have created a major barrier to health care services for LGBT people.

Further, the Religious Exemptions IFR harms the LGBT community by restricting access to contraception for those who need it, including lesbian and bisexual women and some transgender

---

[6] 42 U.S.C. § 300a-7 et seq.

[7] Id.

[8] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV 5 (2010), http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf (explaining that "almost 56 percent of lesbian, gay or bisexual (LGB) respondents had at least one of these experiences; 70 percent of transgender and gender-nonconforming respondents had one or more of these experiences; and nearly 63 percent of respondents living with HIV experienced one or more of these types of discrimination in health care. In almost every category, transgender and gender-nonconforming respondents reported higher levels of discrimination by health care providers.").

[9] Id. at 6.

[10] GRANT JM, ET AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY 74 (2011), http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

[11] NAT'L WOMEN'S LAW CTR., FACT SHEET: HEALTH CARE REFUSALS HARM PATIENTS: THE THREAT TO REPRODUCTIVE HEALTH CARE 2 (2014), http://www.nwlc.org/sites/default/files/pdfs/refusals_harm_patients_repro_factsheet_5-30-14.pdf.

be you.

00373607

Exhibit 77



people.[12] Access to birth control is particularly crucial for the health and well-being of lesbian and bisexual women because they are at risk for unintended pregnancies.[13]

Despite misconceptions held by policymakers and some medical providers, lesbian and bisexual women require sexual and reproductive health services similar to those needed by heterosexual women. A majority of lesbian and bisexual women have reported having had intercourse with men and at least 30% have been pregnant,[14] 50% have used oral contraceptives, and 16% reported one or more abortions.[15] Bisexual women are also subject to an increased risk of sexual violence. One study found that 46% of bisexual women have been raped as compared to 17% of heterosexual women.[16] Broadly, studies indicate that unintended pregnancies are equally as common, if not more common, for lesbian and bisexual women as for heterosexual women.[17]

Adolescent lesbian and bisexual women are at even higher risk for unintended pregnancies. Lesbian adolescent women are less likely than bisexual and heterosexual women to use contraception and bisexual adolescent women are more likely to experience teen pregnancy than are heterosexual adolescent women.[18] One study found that 12% of lesbian and bisexual adolescent women have experienced teen pregnancy, compared to only 5% of heterosexual adolescent women. And a 2016 study by the Centers for Disease Control and Prevention found that LGBT high school students are more likely than other students to experience intimate partner violence and rape, which can result in unintended pregnancy.[19]

[12] *Birth Control Access for LGBTQ People*, THE NATIONAL LGBTQ TASK FORCE (2016), http://www.thetaskforce.org/static_html/downloads/reports/fact_sheets/factsheet_birth_control_access.pdf.
[13] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).
[14] J.M. Marrazzo and K. Stine, *Reproductive Health History of Lesbians: Implications for Care*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2003).
[15] Elizabeth M. Saewyc, Linda H. Bearinger, Robert Wm. Blum and Michael D. Resnick, *Sexual Intercourse, Abuse and Pregnancy Among Adolescent Women: Does Sexual Orientation Make a Difference?*, 31 FAMILY PLANNING PERSPECTIVES 127 (1999).
[16] Adara Beamesderfer, Lindsey Dawson, Jennifer Kates, Usha Ranji, and Alina Salganicoff, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, THE HENRY J. KAISER FAMILY FOUNDATION (Nov. 2016), https://www.kff.org/disparities-policy/issue-brief/health-and-access-to-care-and-coverage-for-lesbian-gay-bisexual-and-transgender-individuals-in-the-u-s.

[17] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).
[18] Brittany M. Charlton, Heather L. Corliss, Stacey A. Missmer, Margaret Rosario, Donna Spiegelman, and Bryn Austin, *Sexual orientation differences in teen pregnancy and hormonal contraceptive use: An examination across 2 generations*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2013). http://www.ajog.org/article/S0002-9378(13)00652-2/pdf.
[19] *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 — United States and Selected Sites, 2015*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 12, 2016). https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf; *see also* Lisa L. Lindley and Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High School Students*, 105 AM. J. OF PUB. HEALTH 1379 (2015).

**be you.**

00373608

Exhibit 77                                                                                   JA-0001202



LGBT people of color and people with lower socioeconomic status experience even higher levels of discriminatory and substandard care.[20] Data from one report[21] show, among other things:

- Only 64 percent of LGB Latino adults had health insurance coverage compared to 77 percent of all LGB adults and 82 percent of the heterosexual adult population.

- Thirty percent of LGB African-American adults were likely to delay or not get needed medication compared to 19 percent of African-American heterosexual adults.

- Twenty-six percent of LGB Latino adults did not have a regular source for basic health care.

- Only 35 percent of LGB African-American women had a mammogram in the past two years, compared to 57 percent of all LGB women and 62 percent of all heterosexual women.

In sum, access to contraception is essential for the health and well-being of many members of the LGBT community, and allowing a wide range of employers to withhold coverage of contraception for religious reasons is unsound public health policy with the potential to cause significant harm.

### C. Conclusion

The Religious Exemptions IFR denies coverage for health care services based on religious objections without regard to the impact on employees, stripping from women and the LGBT community coverage for essential health care services that would otherwise be guaranteed under federal law. The Rule privileges particular religious beliefs at the expense of employee health and is contrary to law. For these reasons, the Departments should rescind the Religious Exemptions IFR.

***

---

[20] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV, 11 (2010). http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf ("In addition to the overall rates of substandard care, respondents (defined in this survey as having a household income under $20,000) in nearly every category experienced higher rates of discrimination and substandard care. For example, while transgender respondents as a whole reported a care-refusal rate of almost 27 percent, low-income transgender respondents reported a rate of almost 33 percent. Almost 11 percent of low-income LGB respondents and LGB respondents of color were refused care compared to almost 8 percent of LGB people overall."); see also The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding, INSTITUTE OF MEDICINE (2011). http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx.
[21] Health Disparities in LGBT Communities of Color: By the Numbers, CENTER FOR AMERICAN PROGRESS (2010). https://www.americanprogress.org/issues/lgbt/news/2010/01/15/7132/health-disparities-in-lgbt-communities-of-color

**be you.**

00373609

Exhibit 77                                                                                      JA-0001203



Thank you for your consideration of our comments. If you have any questions regarding these comments, please contact Candace Bond-Theriault, Policy Counsel, Reproductive Rights/Health/Justice (202-639-6315, cbond@thetaskforce.org).

Sincerely,

National LGBTQ Task Force

**be you.**

00373610

Exhibit 77



**NATIONAL NETWORK OF**
**ABORTION FUNDS**

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016
Attention: CMS-9940-IFC

*Submitted electronically at www.regulations.gov*

**Subject: Interim Final Rule on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act** CMS-9940-IFC

The National Network of Abortion Funds submits the following comments in response to the Interim Final Rules ("the Rules") titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act"[i] and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act,"[ii] published in the Federal Register on October 13, 2017, by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services ("the Departments").

The National Network of Abortion Funds is a network of over 70 member organizations in the United States working to ensure abortion access. We engage an active grassroots base of people directly affected by such barriers to abortion access as economic inequity and lack of comprehensive health coverage to inform and implement necessary cultural and political change.  The National Network of Abortion Funds works with member funds in 38 states helping callers access abortion and building power towards a world where everyone has the autonomy to determine if, how, and when they create a family. Securing a health care system that allows individuals to affirm their bodies, identities and health for themselves and their families requires that U.S. policy decision-making is fully informed by scientific evidence and the best available data, and that the public has reliable access to independent scientific information and analysis produced and acquired by the federal government.  The role of scientific evidence in public health decision-making is imperative, and we oppose any efforts to diminish the role of science in federal policymaking.

Unfortunately, the Rules are a prime example of regulatory decision-making that ignores scientific evidence and the best available data. The Departments' summary of the evidence is arbitrary and cherry-picked. The Departments understate the efficacy and health benefits of contraceptives and overstate the health risks of contraceptives by selectively interpreting data, overlooking well-established evidence, and

00435129

Exhibit 78    JA-0001205



NATIONAL NETWORK OF
**ABORTION FUNDS**

promoting unfounded doubt. Further, both Rules falsely assert certain types of FDA-approved contraceptive methods to abortifacients.

The Rules thus cause dual harm by undermining individual's access to essential preventive health care and undermining the integrity of science in governance. Public health policy should be informed by the best available scientific evidence. Instead, the Departments use false claims about contraception that are contrary to medical and public health evidence, misstate or ignore research, and undermine the agencies' role as a source of accurate health information.

The Departments serve a critical role in collecting and managing important information and data on issues that are vital to the public. In making policy, it is essential that the Departments enhance their credibility on issues of science and evidence, not undermine it. Thus, the Departments must take full advantage of their resources to inform their decision-making by the best available evidence and data. The Rules, however, show that the Departments did not seriously consider these elements, which can only undermine the Departments' reputations as reliable sources of information.

Below we outline several ways the Rules are at odds with science and research. We urge the Departments to withdraw both Rules.

**Contraception Prevents Unintended Pregnancy and Improves Health**

As an example of how the Departments are not utilizing the best available science and evidence with dire consequences for public health, the Departments make several misstatements that ignore prevailing evidence regarding the efficacy, health benefits, and health risks of contraceptives. First, the Departments fail to acknowledge that contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[iii] Second, the Departments falsely associate several health risks with contraceptive use, ignoring the weight of the evidence.[iv] The Departments' summary of the evidence is wrong and misleading. Not only does contraception prevent unintended pregnancy,[v] but the prevention of unintended pregnancy is associated with life-long health benefits for individuals and children that the Departments fully ignore. Further, the Departments' overstatement of health risks ignores the long, evidence-based list of non-contraceptive health benefits associated with contraceptives.

Contraceptive efficacy at preventing unintended pregnancy is supported by decades of rigorous evidence and by the government itself.[vi] The U.S. Food and Drug Administration ("FDA") must approve all new drugs and devices by showing that they are safe and effective through rigorous scientific testing. The federal government itself has thus approved contraceptives for safely and effectively preventing unintended pregnancies.[vii] The Departments' misrepresentation of "complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy"[viii] is false and relies heavily on cherry-picked citations instead of accurately reflecting the weight of the evidence. For instance, the Departments point to a single pre-ACA economics paper positing that contraceptive use may be connected to an increase in teen pregnancy over the "long run."[ix] This paper utilized 1997 youth survey data where the majority of respondents were using condoms or another "episodic" form of birth control,[x] the efficacy of which is irrelevant to an assessment of the efficacy of the methods of birth control covered

00435130

Exhibit 78                                                                                                    JA-0001206



NATIONAL NETWORK OF
**ABORTION FUNDS**

under the ACA's contraceptive benefit, and hardly contributes to "uncertainty"[xi] regarding decades of clinical data that prove otherwise.

In truth, contraception enables individuals, including teens, to prevent unintended pregnancy and control the timing of a desired pregnancy.[xii] The Centers for Disease Control and Prevention named family planning one of the ten great public health achievements of the past century,[xiii] and family planning has been widely credited for contributing to women's societal, educational, and economic gains.[xiv] The ACA's guarantee of no-copay coverage of contraception has contributed to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[xv] The teen pregnancy rate is also at the lowest point in at least 80 years.[xvi]

Contraception improves health outcomes for individuals and children because unintended pregnancies have higher rates of short- and long-term health complications. Individuals with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed.[xvii] They are also at increased risk of maternal mortality and morbidity, maternal depression, experiencing physical violence during pregnancy,[xviii] infant mortality, birth defects, low birth weight, and preterm birth.[xix] Contraception, by contrast, is considered a major factor in reducing rates of maternal mortality and morbidity. For example, a study of 172 developing countries found that use of contraception is an "effective primary prevention strategy to reduce maternal mortality . . . ."[xx] The Departments' new Rules paper over this vast body of research and the clear health benefits of contraception.

**The Health Risks of Contraceptives Are Overstated and Misrepresented**

The Departments go further, selectively interpreting data in order to overstate "negative health effects" associated with contraceptives.[xxi] This includes misleading assertions of an association between contraceptive use, breast cancer, and cervical cancer, as well as vascular events and "risky sexual behavior."[xxii] The Departments ignore substantial evidence to the contrary, and ignore the balance of significant non-contraceptive health benefits associated with contraceptive use. Certainly it is true that, as with any medication, some types or methods of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[xxiii] Some women may also want to avoid side effects such as changes to menstrual flow.[xxiv] But the Departments fail to recognize that this means that patients and health care providers, not employers and agencies, should determine the right contraceptive for an individual's health care needs.

The Departments' claim that contraceptive use is associated with an increased risk of breast and cervical cancers is based solely on a 2013 Agency for Healthcare Research and Quality report, when in fact the evidence is not decisive, and to say so is a misrepresentation. There is no proven increased risk of breast cancer among contraceptive users, particularly those under 40. For women over 40, health care providers must consider both the risks of becoming pregnant at an advanced reproductive age, as well as the risks of continuing contraception use until menopause, making it essential that individuals be able to discuss options with her provider without interference.[xxv] And, on the topic of cervical cancer, the Departments

00435131

Exhibit 78

JA-0001207



**NATIONAL NETWORK OF**
**ABORTION FUNDS**

cite only a study on oral contraceptives, when a recent study found that intrauterine devices ("IUDs") are associated with a decreased risk of cervical cancer.[xxvi]

It is especially irresponsible to misrepresent the risks of breast and cervical cancer without accurately reporting the substantial evidence of contraceptives' association with cancer prevention, since any evaluation of preventive health care should fully weigh the risks and benefits.[xxvii] Contraceptives are associated with a reduced risk of colorectal cancer;[xxviii] endometrial cancer is 50 percent less likely among women who use oral hormonal contraceptives for at least one year compared to women who have never used oral hormonal contraceptives;[xxix] oral hormonal contraceptives can reduce the risk of ovarian cancer by 27 percent, and 20 percent for every five years of additional use;[xxx] oral hormonal contraceptives can lower the risk of hereditary ovarian cancer in women with the BRCA1 or BRCA2 gene mutations;[xxxi] and oral hormonal contraceptive use for more than 10 years can lower the risk of ovarian cancer among women with endometriosis, who are typically at higher risk of developing ovarian cancer.[xxxii]

The Rules also incorrectly suggest that contraceptive use is connected to an increased risk of "vascular events" such as venous thromboembolism ("VTE"). The risk of VTE among oral contraceptive users is very low.[xxxiii] In fact, it is much lower than the risk of VTE during pregnancy or in the immediate postpartum period, so prevention of unintended pregnancy actually reduces women's risk of VTE.[xxxiv]

The Departments' claim that contraceptives may lead to "risky sexual behavior"[xxxv] is similarly unfounded. Increased access to contraception is not associated with a change or increase in sexual behaviors.[xxxvi] Instead, research has shown that school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[xxxvii] In the "CHOICE Project," a large-scale U.S. study aimed at reducing unintended pregnancy by providing no-cost contraception, participants reported no change in their sexual activities after receiving contraceptives.[xxxviii]

Contraceptives are also associated with other non-contraceptive health benefits beyond the cancer prevention benefits listed above. Benefits include reduced menstrual pain, reduced risk of myoma, reduced symptoms of endometriosis, and reduced symptoms of premenstrual syndrome and premenstrual dysphoric disorder.[xxxix] Oral hormonal contraceptives have been found to reduce the risk of pelvic inflammatory disease by 50 to 60 percent,[xl] Contraceptives are also associated with lower risk of rheumatoid arthritis, preservation of bone density, and reduced symptoms of asthma.[xli]

In sum, the Departments overstate the evidence of health risks and understate the evidence of contraceptive efficacy and health benefits, failing to accurately reflect the weight of evidence that shows that contraceptives are associated with a variety of short- and long-term health benefits, improving health outcomes for individuals and children. And the various contraindications associated with some forms of birth control actually support the opposite finding: individuals should have access to the full range of FDA-approved methods and must be able to work with health care providers to choose the method that best suits their health concerns and needs without interference from an employer.

00435132

Exhibit 78                                                                                                                    JA-0001208



NATIONAL NETWORK OF
**ABORTION FUNDS**

**Contraceptives Do Not Interfere with an Existing Pregnancy**

Both Rules refer to the false assertion that some FDA-approved methods of contraception "prevent implantation of an embryo," and are thus abortifacients.[xlii] This is inaccurate and goes against longstanding medical evidence.

Policies that restrict access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of FDA-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion." [xliii] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[xliv] Moreover, contraception, as well as abortion, are legally protected services and fundamental reproductive health care that should be informed by evidence-based science and not hindered by ideology.

By making the false claim that some FDA-approved methods of contraception may cause abortion, the Departments sideline science in favor of ideology.

**The Rules Should Be Withdrawn Because They Are Based on Falsehoods, Undermine Scientific Integrity, and Harm Women's Health**

For the reasons stated above, the National Network of Abortion Funds objects to the Interim Final Rules titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act." The Rules should be withdrawn due to their lack of scientific basis and their harmful impact on health and economic security.

Respectfully submitted by the National Network of Abortion Funds

---

[i] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[ii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[iii] *See generally* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/. *See also* Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception, 83*(5), 397–404; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852.

00435133

Exhibit 78                                                                                    JA-0001209



**NATIONAL NETWORK OF**
**ABORTION FUNDS**

---

<sup>iv</sup> Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804–05 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

<sup>v</sup> *See, e.g.,* Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852 ("A likely explanation for the decline in the rate of unintended pregnancy is a change in the frequency and type of contraceptive use over time.").

<sup>vi</sup> *See, e.g.,* Institute of Medicine. (2011). *Clinical Preventive Services for Women: Closing the Gaps.* Washington, DC: The National Academies Press; American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/; Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception, 83*(5), 397–404; Hatcher, R.A., Trussell, J., Nelson, A.L., Cates, W., Kowal, D., & Policar, M.S. (Eds.). (2011). *Contraceptive Technology* (20th ed.). Atlanta, GA: Bridging the Gap Communications; Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 4–5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.") (citing Sundaram, A., Vaughan, B., Bankole, A., Finer, L., Singh, S., & Trussell, J. (2017, March). Contraceptive failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health, 49*(1), 7–16); Peipert, J.F., Madden, T., Allsworth, J.E., & Secura, G.M. (2012, December). Preventing unintended pregnancies by providing no-cost contraception. *Obstetrics & Gynecology, 120*(6), 1291–1297; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852; Harper, C.C., Rocca, C.H., Thompson, K.M., Morfesis, J., Goodman, S., Darney, P.B., . . . Speidel, J.J. (2015, June). Reductions in pregnancy rates in the USA with long-acting reversible contraception: A cluster randomised trial. *The Lancet, 386*(9993), 562–568; Speidel, J.J., Harper, C.C., & Shields, W.C. (2008, September). The potential of long-acting reversible contraception to decrease unintended pregnancy. *Contraception, 78*(3), 197–200.

<sup>vii</sup> Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017).

<sup>viii</sup> Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

<sup>ix</sup> Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147) (citing Arcidiacono, P., Khwaja, A., & Ouyang, L. (2005). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Available at http://public.econ.duke.edu/~psarcidi/teensex.pdf [sic]).

<sup>x</sup> Arcidiacono, P., Khwaja, A., & Ouyang, L. (2011, January 22). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Retrieved 27 November 2017, from http://public.econ.duke.edu/~psarcidi/teensex.pdf

<sup>xi</sup> Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

<sup>xii</sup> *See, e.g.,* Boonstra, H.D. (2014, September 3). What is behind the declines in teen pregnancy rates? *Guttmacher Policy Review, 17*(3), 15–21; Lindberg, L., Santelli, J., & Desai, S. (2016, November). Understanding the decline in adolescent fertility in the United States, 2007–2012. *Journal of Adolescent Health, 59*(5), 577–583.

<sup>xiii</sup> Centers for Disease Control and Prevention. (2013, April 26). *Ten Great Public Health Achievements in the 20th Century.* Retrieved 27 November 2017, from https://www.cdc.gov/about/history/tengpha.htm

<sup>xiv</sup> *See, e.g.,* Sonfield, A., Hasstedt, K., Kavanaugh, M.L., & Anderson, R. (2013, March). *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children.* Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf

<sup>xv</sup> Guttmacher Institute. (2016, September). *Unintended Pregnancy in the United States* (p. 2). Retrieved 27 November 2017, from https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf

<sup>xvi</sup> Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 8, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("In 2013, the U.S. pregnancy rate among 15–19 year olds was at its lowest point in at least 80 years and had dropped to

---

00435134

Exhibit 78

JA-0001210



**NATIONAL NETWORK OF**
**ABORTION FUNDS**

about one-third of a recent peak rate in 1990.") (citing Kost, K., Maddow-Zimet, I., & Arpaia, A. (2017, August). *Pregnancies, Births and Abortions Among Adolescents and Young Women In the United States, 2013: National and State Trends by Age, Race and Ethnicity.* Retrieved 27 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf).

[xvii] Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252. Hellerstedt, W.L., Pirie, P.L., Lando, H.A., Curry, S.J., McBride, C.M., Grothaus, L.C., & Nelson, J.C. (1998, April). Differences in preconceptional and prenatal behaviors in women with intended and unintended pregnancies. *American Journal of Public Health, 88*(4), 663–666;

[xviii] *See* Tsui, A.O., McDonald-Mosley, R., & Burke A.E. (2010, April). Family planning and the burden of unintended pregnancies. *Epidemiologic Reviews, 32*(1), 152–174; Joyce, T.J., Kaestner, R., & Korenman, S. (2000, February). The effect of pregnancy intention on child development. *Demography, 37*(1), 83–94; Gazmararian, J.A., Adams, M.M., Saltzman, L.E., Johnson, C.H., Bruce, F.C., Marks, J.S., & Zahniser, S.C. (1995, June). The relationship between pregnancy intendedness and physical violence in mothers of newborns. The PRAMS Working Group. *Obstetrics & Gynecology, 85*(6), 1031–1038; Goodwin, M.M., Gazmararian, J.A., Johnson, C.H., Gilbert, B.C., & Saltzman, L.E. (2000, June). Pregnancy intendedness and physical abuse around the time of pregnancy: Findings from the pregnancy risk assessment monitoring system, 1996-1997. PRAMS Working Group. Pregnancy Risk Assessment Monitoring System. *Maternal and Child Health Journal, 4*(2), 85–92.

[xix] Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313; Conde-Agudelo, A., Rosas-Bermúdez, A., & Kafury-Goeta, A.C. (2006). Birth spacing and risk of adverse perinatal outcomes: A meta-analysis. *JAMA, 295*(15), 1809–1823. *See also* Goldthwaite, L.M., Duca, L., Johnson, R.K., Ostendorf, D., & Sheeder, J. (2015, September). Adverse birth outcomes in Colorado: Assessing the impact of a statewide initiative to prevent unintended pregnancy. *American Journal of Public Health, 105*(9), e60–e66 (establishing an association between use of long-acting reversible contraception and a lower risk of preterm birth).

[xx] Ahmed, S., Li, Q., Liu, L., & Tsui, A.O. (2012, July). Maternal deaths averted by contraceptive use: An analysis of 172 countries. *The Lancet, 380*(9837), 111–125.

[xxi] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[xxii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[xxiii] *See, e.g.,* American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 86: Progestin-Only Hormonal Birth Control: Pill and Injection.* Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Progestin-Only-Hormonal-Birth-Control-Pill-and-Injection; American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 185: Combined Hormonal Birth Control: Pill, Patch, and Ring.* Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Combined-Hormonal-Birth-Control-Pill-Patch-and-Ring.

[xxiv] *See, e.g.,* Jones, R.K. (2011, November). *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills.* Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf

[xxv] *See* Curtis, K.M., Jatlaoui, T.C., Tepper, N.K., Zapata, L.B., Horton, L.G., Jamieson, D.J., & Whiteman, M.K. (2016, July 29). U.S. selected practice recommendations for contraceptive use, 2016. *Morbidity and Mortality Weekly Report, 65*(4), 1–66.

[xxvi] Cortessis, V.K., Barrett, M., Brown Wade, N., Enebish, T., Perrigo, J.L., Tobin, J., . . . McKean-Cowdin, R. (2017). Intrauterine device use and cervical cancer risk: A systematic review and meta-analysis. *Obstetrics & Gynecology, 130*(6), 1226–1236.

[xxvii] *C.f.* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 11). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/

[xxviii] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[xxix] Ibid.

[xxx] Ibid.

[xxxi] Ibid.

00435135

Exhibit 78

JA-0001211



xxxii Ibid.

xxxiii American College of Obstetricians and Gynecologists, Committee on Gynecologic Practice. (2016). *Committee Opinion Number 540: Risk of Venous Thromboembolism Among Users of Drospirenone-Containing Oral Contraceptive Pills*. Retrieved 27 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Gynecologic-Practice/co540.pdf?dmc=1&ts=20171127T2043082500

xxxiv Ibid.

xxxv Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

xxxvi *See, e.g.,* Kirby, D. (2007, November). *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases.* The National Campaign to Prevent Teen and Unplanned Pregnancy Publication. Retrieved 27 November 2017, from https://thenationalcampaign.org/resource/emerging-answers-2007%E2%80%94full-report; Meyer, J.L., Gold, M.A., & Haggerty C.L. (2011, February). Advance provision of emergency contraception among adolescent and young adult women: A systematic review of literature. *Journal of Pediatric & Adolescent Gynecology, 24*(1), 2–9.

xxxvii Minguez, M., Santelli, J.S., Gibson, E., Orr, M., & Samant, S. (2015, March). Reproductive health impact of a school health center. *Journal of Adolescent Health, 56*(3), 338–344. *See also* Knopf, J.A., Finnie, R.K., Peng, Y., Hahn, R.A., Truman, B.I., Vernon-Smiley, M., . . . Fullilove, M.T. (2016, July). School-based health centers to advance health equity: A Community Guide systematic review. *American Journal of Preventive Medicine, 51*(1), 114–126.

xxxviii Secura, G.M., Adams, T., Buckel, C.M., Zhao, Q., & Peipert, J.F. (2015, April). Change in sexual behavior with provision of no-cost contraception. *Obstetrics & Gynecology, 123*(4), 771–776. *See also* Goldman, G. (2017, October 11). *The Trump Administration Fakes Science to Justify Restrictions on Birth Control Access.* Union of Concerned Scientists Blog. Retrieved 27 November 2017, from http://blog.ucsusa.org/gretchen-goldman/the-trump-administration-fakes-science-to-justify-restrictions-on-birth-control-access

xxxix Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47. *See also* American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women. (2015, January). *Committee Opinion Number 615: Access to Contraception.* Retrieved 30 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co615.pdf?dmc=1&ts=20171130T1815539115

xl Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

xli Ibid.

xlii Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838, 47,840 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

xliii Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,747, 47,749 (Oct. 13, 2017).

xliv *See, e.g.,* Brief of *Amici Curiae* Physicians for Reproductive Health, et al. in Support of Petitioners at 12, Burwell v. Hobby Lobby Stores, Inc., 573 U.S. __, 134 S. Ct. 2751 (2014) (No. 13-354).

00435136

Exhibit 78

JA-0001212

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016
Attention: CMS-9925-IFC



*Submitted electronically at www.regulations.gov*



**Subject: Interim Final Rule on Moral Exemptions
and Accommodations for Coverage of Certain
Preventive Services Under the Affordable Care Act**
[CMS-9925-IFC]



The National Partnership for Women & Families, Jacobs Institute of Women's Health, and Union of Concerned Scientists submit the following comments in response to the Interim Final Rules ("the Rules") titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act"[1] and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act,"[2] published in the Federal Register on October 13, 2017, by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services ("the Departments").

Our organizations work to ensure that U.S. policy decision-making is fully informed by scientific evidence and the best available data, and that the public has reliable access to independent scientific information and analysis produced and acquired by the federal government. The role of scientific evidence in public health decision-making is imperative, and we oppose any efforts to diminish the role of science in federal policymaking.

Unfortunately, the Rules are a prime example of regulatory decision-making that ignores scientific evidence and the best available data. The Departments' summary of the evidence is arbitrary and cherry-picked. The Departments understate the efficacy and health benefits of contraceptives and overstate the health risks of contraceptives by selectively interpreting data, overlooking well-established evidence, and promoting unfounded doubt. Further, both Rules falsely assert certain types of FDA-approved contraceptive methods to abortifacients.

The Rules thus cause dual harm by undermining women's access to essential preventive health care and undermining the integrity of science in governance. Public health policy should be informed by the best available scientific evidence. Instead, the Departments use false claims about contraception that are contrary to medical and public health evidence, misstate or ignore research, and undermine the agencies' role as a source of accurate health information.

The Departments serve a critical role in collecting and managing important information and data on issues that are vital to the public. In making policy, it is essential that the Departments enhance their credibility on issues of science and evidence, not undermine it. Thus, the

1

Exhibit 79

Departments must take full advantage of their resources to inform their decision-making by the best available evidence and data. The Rules, however, show that the Departments did not seriously consider these elements, which can only undermine the Departments' reputations as reliable sources of information.

Below we outline several ways the Rules are at odds with science and research. We urge the Departments to withdraw both Rules.

## Contraception Prevents Unintended Pregnancy and Improves the Health of Women and Children

As an example of how the Departments are not utilizing the best available science and evidence with dire consequences for public health, the Departments make several misstatements that ignore prevailing evidence regarding the efficacy, health benefits, and health risks of contraceptives. First, the Departments fail to acknowledge that contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[3] Second, the Departments falsely associate several health risks with contraceptive use, ignoring the weight of the evidence.[4] The Departments' summary of the evidence is wrong and misleading. Not only does contraception prevent unintended pregnancy,[5] but the prevention of unintended pregnancy is associated with life-long health benefits for both women and children that the Departments fully ignore. Further, the Departments' overstatement of health risks ignores the long, evidence-based list of non-contraceptive health benefits associated with contraceptives.

Contraceptive efficacy at preventing unintended pregnancy is supported by decades of rigorous evidence and by the government itself.[6] The U.S. Food and Drug Administration ("FDA") must approve all new drugs and devices by showing that they are safe and effective through rigorous scientific testing. The federal government itself has thus approved contraceptives for safely and effectively preventing unintended pregnancies.[7] The Departments' misrepresentation of "complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy"[8] is false and relies heavily on cherry-picked citations instead of accurately reflecting the weight of the evidence. For instance, the Departments point to a single pre-ACA economics paper positing that contraceptive use may be connected to an increase in teen pregnancy over the "long run."[9] This paper utilized 1997 youth survey data where the majority of respondents were using condoms or another "episodic" form of birth control,[10] the efficacy of which is irrelevant to an assessment of the efficacy of the methods of birth control covered under the ACA's contraceptive benefit, and hardly contributes to "uncertainty"[11] regarding decades of clinical data that prove otherwise.

In truth, contraception enables women, including teens, to prevent unintended pregnancy and control the timing of a desired pregnancy.[12] The Centers for Disease Control and Prevention named family planning one of the ten great public health achievements of the past century,[13] and family planning is widely credited for contributing to women's societal, educational, and economic gains.[14] The ACA's guarantee of no-copay coverage of contraception has contributed to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[15] The teen pregnancy rate is also at the lowest point in at least 80 years.[16]

Contraception improves health outcomes for women and children because unintended pregnancies have higher rates of short- and long-term health complications. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications

2

00207184

Exhibit 79

JA-0001214

unaddressed.[17] They are also at increased risk of maternal mortality and morbidity, maternal depression, experiencing physical violence during pregnancy,[18] infant mortality, birth defects, low birth weight, and preterm birth.[19] Unintended pregnancies are also associated with long-term negative physical and mental effects on children.[20] Contraception, by contrast, is considered a major factor in reducing rates of maternal mortality and morbidity. For example, a study of 172 developing countries found that use of contraception is an "effective primary prevention strategy to reduce maternal mortality . . . ."[21] The Departments' new Rules paper over this vast body of research and the clear health benefits of contraception.

### The Health Risks of Contraceptives Are Overstated and Misrepresented

The Departments go further, selectively interpreting data in order to overstate "negative health effects" associated with contraceptives.[22] This includes misleading assertions of an association between contraceptive use, breast cancer, and cervical cancer, as well as vascular events and "risky sexual behavior."[23] The Departments ignore substantial evidence to the contrary, and ignore the balance of significant non-contraceptive health benefits associated with contraceptive use. Certainly it is true that, as with any medication, some types or methods of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[24] Some women may also want to avoid side effects such as changes to menstrual flow.[25] But the Departments fail to recognize that this means that patients and health care providers, not employers and agencies, should determine the right contraceptive for an individual woman's health care needs.

The Departments' claim that contraceptive use is associated with an increased risk of breast and cervical cancers is based solely on a 2013 Agency for Healthcare Research and Quality report, when in fact the evidence is not decisive, and to say so is a misrepresentation. There is no proven increased risk of breast cancer among contraceptive users, particularly those under 40. For women over 40, health care providers must consider both the risks of becoming pregnant at an advanced reproductive age, as well as the risks of continuing contraception use until menopause, making it essential that a woman be able to discuss options with her provider without interference.[26] And, on the topic of cervical cancer, the Departments cite only a study on oral contraceptives, when a recent study found that intrauterine devices ("IUDs") are associated with a decreased risk of cervical cancer.[27]

It is especially irresponsible to misrepresent the risks of breast and cervical cancer without accurately reporting the substantial evidence of contraceptives' association with cancer prevention, since any evaluation of preventive health care should fully weigh the risks and benefits.[28] Contraceptives are associated with a reduced risk of colorectal cancer;[29] endometrial cancer is 50 percent less likely among women who use oral hormonal contraceptives for at least one year compared to women who have never used oral hormonal contraceptives;[30] oral hormonal contraceptives can reduce the risk of ovarian cancer by 27 percent, and 20 percent for every five years of additional use;[31] oral hormonal contraceptives can lower the risk of hereditary ovarian cancer in women with the BRCA1 or BRCA2 gene mutations;[32] and oral hormonal contraceptive use for more than 10 years can lower the risk of ovarian cancer among women with endometriosis, who are typically at higher risk of developing ovarian cancer.[33]

The Rules also incorrectly suggest that contraceptive use is connected to an increased risk of "vascular events" such as venous thromboembolism ("VTE"). The risk of VTE among oral contraceptive users is very low.[34] In fact, it is much lower than the risk of VTE during pregnancy

3

Exhibit 79

00207185

or in the immediate postpartum period, so prevention of unintended pregnancy actually reduces women's risk of VTE.[35]

The Departments' claim that contraceptives may lead to "risky sexual behavior"[36] is similarly unfounded. Increased access to contraception is not associated with a change or increase in sexual behaviors.[37] Instead, research has shown that school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[38] In the "CHOICE Project," a large-scale U.S. study aimed at reducing unintended pregnancy by providing no-cost contraception, participants reported no change in their sexual activities after receiving contraceptives.[39]

Contraceptives are also associated with other non-contraceptive health benefits beyond the cancer prevention benefits listed above. Benefits include reduced menstrual pain, reduced risk of myoma, reduced symptoms of endometriosis, and reduced symptoms of premenstrual syndrome and premenstrual dysphoric disorder.[40] Oral hormonal contraceptives have been found to reduce the risk of pelvic inflammatory disease by 50 to 60 percent,[41] Contraceptives are also associated with lower risk of rheumatoid arthritis, preservation of bone density, and reduced symptoms of asthma.[42]

In sum, the Departments overstate the evidence of health risks and understate the evidence of contraceptive efficacy and health benefits, failing to accurately reflect the weight of evidence that shows that contraceptives are associated with a variety of short- and long-term health benefits, improving health outcomes for both women and children. And the various contraindications associated with some forms of birth control actually support the opposite finding: women should have access to the full range of FDA-approved methods and must be able to work with health care providers to choose the method that best suits their health concerns and needs without interference from an employer.

**Contraceptives Do Not Interfere with an Existing Pregnancy**

Both Rules refer to the false assertion that some FDA-approved methods of contraception "prevent implantation of an embryo," and are thus abortifacients.[43] This is inaccurate and goes against longstanding medical evidence.

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of FDA-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion."[44] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[45]

By making the false claim that some FDA-approved methods of contraception may cause abortion, the Departments sideline science in favor of ideology.

4

Exhibit 79

**The Rules Should Be Withdrawn Because They Are Based on Falsehoods, Undermine Scientific Integrity, and Harm Women's Health**

For the reasons stated above, the National Partnership for Women & Families, Jacobs Institute of Women's Health, and Union of Concerned Scientists object to the Interim Final Rules titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act." The Rules should be withdrawn due to their lack of scientific basis and their harmful impact on women's health and economic security.

_____

[1] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[2] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[3] *See generally* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from

https://www.womenspreventivehealth.org/final-report/. *See also* Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception*, *83*(5), 397–404; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852.

[4] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804–05 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[5] *See, e.g.,* Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852 ("A likely explanation for the decline in the rate of unintended pregnancy is a change in the frequency and type of contraceptive use over time.").

[6] *See, e.g.,* Institute of Medicine. (2011). *Clinical Preventive Services for Women: Closing the Gaps*. Washington, DC: The National Academies Press; American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/; Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception*, *83*(5), 397–404; Hatcher, R.A., Trussell, J., Nelson, A.L., Cates, W., Kowal, D., & Policar, M.S. (Eds.). (2011). *Contraceptive Technology* (20th ed.). Atlanta, GA: Bridging the Gap Communications; Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 4–5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.") (citing Sundaram, A., Vaughan, B., Bankole, A., Finer, L., Singh, S., & Trussell, J. (2017, March). Contraceptive failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health*, *49*(1), 7–16); Peipert, J.F., Madden, T., Allsworth, J.E., & Secura, G.M. (2012, December). Preventing unintended pregnancies by providing no-cost contraception. *Obstetrics & Gynecology, 120*(6), 1291–1297; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852; Harper, C.C., Rocca, C.H., Thompson, K.M., Morfesis, J., Goodman, S., Darney, P.B., . . . Speidel, J.J. (2015, June). Reductions in pregnancy rates in the USA with long-acting reversible contraception: A cluster randomised trial. *The Lancet, 386*(9993), 562–568; Speidel, J.J., Harper, C.C., & Shields, W.C. (2008, September). The potential of long-acting reversible contraception to decrease unintended pregnancy. *Contraception, 78*(3), 197–200.

[7] Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017).

[8] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804  (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[9] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147) (citing Arcidiacono, P., Khwaja, A., & Ouyang, L. (2005). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Available at http://public.econ.duke.edu/~psarcidi/teensex.pdf [sic]).

5

00207187

Exhibit 79

[10] Arcidiacono, P., Khwaja, A., & Ouyang, L. (2011, January 22). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Retrieved 27 November 2017, from http://public.econ.duke.edu/~psarcidi/teensex.pdf

[11] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[12] *See, e.g.,* Boonstra, H.D. (2014, September 3). What is behind the declines in teen pregnancy rates? *Guttmacher Policy Review, 17*(3), 15–21; Lindberg, L., Santelli, J., & Desai, S. (2016, November). Understanding the decline in adolescent fertility in the United States, 2007–2012. *Journal of Adolescent Health, 59*(5), 577–583.

[13] Centers for Disease Control and Prevention. (2013, April 26). *Ten Great Public Health Achievements in the 20th Century.* Retrieved 27 November 2017, from https://www.cdc.gov/about/history/tengpha.htm

[14] *See, e.g.,* Sonfield, A., Hasstedt, K., Kavanaugh, M.L., & Anderson, R. (2013, March). *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*. Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf

[15] Guttmacher Institute. (2016, September). *Unintended Pregnancy in the United States* (p. 2). Retrieved 27 November 2017, from https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf

[16] Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 8, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("In 2013, the U.S. pregnancy rate among 15–19 year olds was at its lowest point in at least 80 years and had dropped to about one-third of a recent peak rate in 1990.") (citing Kost, K., Maddow-Zimet, I., & Arpaia, A. (2017, August). *Pregnancies, Births and Abortions Among Adolescents and Young Women in the United States, 2013: National and State Trends by Age, Race and Ethnicity*. Retrieved 27 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf).

[17] Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252. Hellerstedt, W.L., Pirie, P.L., Lando, H.A., Curry, S.J., McBride, C.M., Grothaus, L.C., & Nelson, J.C. (1998, April). Differences in preconceptional and prenatal behaviors in women with intended and unintended pregnancies. *American Journal of Public Health, 88*(4), 663–666;

[18] *See* Tsui, A.O., McDonald-Mosley, R., & Burke A.E. (2010, April). Family planning and the burden of unintended pregnancies. *Epidemiologic Reviews, 32*(1), 152–174; Joyce, T.J., Kaestner, R., & Korenman, S. (2000, February). The effect of pregnancy intention on child development. *Demography, 37*(1), 83–94; Gazmararian, J.A., Adams, M.M., Saltzman, L.E., Johnson, C.H., Bruce, F.C., Marks, J.S., & Zahniser, S.C. (1995, June). The relationship between pregnancy intendedness and physical violence in mothers of newborns. The PRAMS Working Group. *Obstetrics & Gynecology, 85*(6), 1031–1038; Goodwin, M.M., Gazmararian, J.A., Johnson, C.H., Gilbert, B.C., & Saltzman, L.E. (2000, June). Pregnancy intendedness and physical abuse around the time of pregnancy: Findings from the pregnancy risk assessment monitoring system, 1996-1997. PRAMS Working Group. Pregnancy Risk Assessment Monitoring System. *Maternal and Child Health Journal, 4*(2), 85–92.

[19] Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313; Conde-Agudelo, A., Rosas-Bermúdez, A., & Kafury-Goeta, A.C. (2006). Birth spacing and risk of adverse perinatal outcomes: A meta-analysis. *JAMA, 295*(15), 1809–1823. *See also* Goldthwaite, L.M., Duca, L., Johnson, R.K., Ostendorf, D., & Sheeder, J. (2015, September). Adverse birth outcomes in Colorado: Assessing the impact of a statewide initiative to prevent unintended pregnancy. *American Journal of Public Health, 105*(9), e60–e66 (establishing an association between use of long-acting reversible contraception and a lower risk of preterm birth).

[20] *See, e.g.,* Barber, J.S., Axinn, W.G., & Thornton, A. (1999, September). Unwanted childbearing, health, and mother-child relationships. *Journal of Health and Social Behavior, 40*(3), 231–257. *C.f.* Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252; Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313.

[21] Ahmed, S., Li, Q., Liu, L., & Tsui, A.O. (2012, July). Maternal deaths averted by contraceptive use: An analysis of 172 countries. *The Lancet, 380*(9837), 111–125.

[22] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[23] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147)).

[24] *See, e.g.,* American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 86: Progestin-Only Hormonal Birth Control: Pill and Injection*. Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Progestin-Only-Hormonal-Birth-Control-Pill-and-Injection; American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 185: Combined Hormonal Birth Control: Pill, Patch, and Ring*. Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Combined-Hormonal-Birth-Control-Pill-Patch-and-Ring.

6

00207188

Exhibit 79

[25] *See, e.g.,* Jones, R.K. (2011, November). *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills*. Retrieved 30 November 2017, from the Guttmacher Institute website:
https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf

[26] *See* Curtis, K.M., Jatlaoui, T.C., Tepper, N.K., Zapata, L.B., Horton, L.G., Jamieson, D.J., & Whiteman, M.K. (2016, July 29). U.S. selected practice recommendations for contraceptive use, 2016. *Morbidity and Mortality Weekly Report, 65*(4), 1–66.

[27] Cortessis, V.K., Barrett, M., Brown Wade, N., Enebish, T., Perrigo, J.L., Tobin, J., . . . McKean-Cowdin, R. (2017). Intrauterine device use and cervical cancer risk: A systematic review and meta-analysis. *Obstetrics & Gynecology*, *130*(6), 1226–1236.

[28] *C.f.* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 11). Retrieved 27 November 2017, from
https://www.womenspreventivehealth.org/final-report/

[29] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[30] Ibid.

[31] Ibid.

[32] Ibid.

[33] Ibid.

[34] American College of Obstetricians and Gynecologists, Committee on Gynecologic Practice. (2016). *Committee Opinion Number 540: Risk of Venous Thromboembolism Among Users of Drospirenone-Containing Oral Contraceptive Pills*. Retrieved 27 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Gynecologic-Practice/co540.pdf?dmc=1&ts=20171127T2043082500

[35] Ibid.

[36] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[37] *See, e.g.,* Kirby, D. (2007, November). *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases*. The National Campaign to Prevent Teen and Unplanned Pregnancy Publication. Retrieved 27 November 2017, from https://thenationalcampaign.org/resource/emerging-answers-2007%E2%80%94full-report; Meyer, J.L., Gold, M.A., & Haggerty C.L. (2011, February). Advance provision of emergency contraception among adolescent and young adult women: A systematic review of literature. *Journal of Pediatric & Adolescent Gynecology*, *24*(1), 2–9.

[38] Minguez, M., Santelli, J.S., Gibson, E., Orr, M., & Samant, S. (2015, March). Reproductive health impact of a school health center. *Journal of Adolescent Health*, *56*(3), 338–344. *See also* Knopf, J.A., Finnie, R.K., Peng, Y., Hahn, R.A., Truman, B.I., Vernon-Smiley, M., . . . Fullilove, M.T. (2016, July). School-based health centers to advance health equity: A Community Guide systematic review. *American Journal of Preventive Medicine*, *51*(1), 114–126.

[39] Secura, G.M., Adams, T., Buckel, C.M., Zhao, Q., & Peipert, J.F. (2015, April). Change in sexual behavior with provision of no-cost contraception. *Obstetrics & Gynecology, 123*(4), 771–776. *See also* Goldman, G. (2017, October 11). *The Trump Administration Fakes Science to Justify Restrictions on Birth Control Access*. Union of Concerned Scientists Blog. Retrieved 27 November 2017, from http://blog.ucsusa.org/gretchen-goldman/the-trump-administration-fakes-science-to-justify-restrictions-on-birth-control-access

[40] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47. *See also* American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women. (2015, January). *Committee Opinion Number 615: Access to Contraception*. Retrieved 30 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co615.pdf?dmc=1&ts=20171130T1815539115

[41] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[42] Ibid.

[43] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838, 47,840 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[44] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[45] *See, e.g.,* Brief of *Amici Curiae* Physicians for Reproductive Health, et al. in Support of Petitioners at 12, Burwell v. Hobby Lobby Stores, Inc., 573 U.S. __, 134 S. Ct. 2751 (2014) (No. 13-354).

7

00207189

Exhibit 79                                                                                          JA-0001219



**national partnership
for women & families**
Because actions speak louder than words.

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016
Attention: CMS-9940-IFC

*Submitted electronically via regulations.gov*

**Re: Religious Exemptions and Accommodations for Coverage of Certain
Preventive Services Under the Affordable Care Act [CMS-9940-IFC]**

The National Partnership for Women & Families is dedicated to expanding opportunities
for women and improving the well-being and economic security of our nation's families. For
more than 45 years, we have promoted access to quality, affordable health care,
reproductive health and rights, policies that help women and men meet the dual demands
of work and family, and fairness in the workplace.

The National Partnership is committed to ensuring all individuals have seamless,
affordable contraception coverage. Women's ability to control their reproductive futures is
vital to their ability to finish school, remain in the workforce, control their careers, sustain
their families and protect their own health and the health of their children.[1] For this
reason, the National Partnership unequivocally opposes the Departments of Health and
Human Services, Labor, and Treasury's ("the Departments") efforts to undermine the
Patient Protection and Affordable Care Act's ("the ACA") contraceptive coverage benefit
through this Interim Final Rule ("IFR"). The ACA's women's preventive services
requirement was designed to promote preventive medicine, reduce future medical costs, and
improve the health, equality, and economic security of women and families.[2] More than 62
million women with private insurance now have coverage of these vital health care services,
including breast and cervical cancer screening, breastfeeding services and supplies, and
contraceptive care and counseling.[3]

By allowing employers or universities to deprive women of contraceptive coverage, this IFR
will harm women and their health and well-being and exacerbate existing health
disparities for marginalized communities. It discriminates against women in violation of
multiple federal laws and the Constitution. The IFR also violates the Administrative
Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of
contraception. And the IFR is predicated upon a distorted picture of the science supporting
contraception and the federal programs supporting and state laws regarding contraception.
For all of these reasons, the National Partnership calls on the Departments to rescind the
IFR.

00373637

Exhibit 80                                                                              JA-0001220

## I.    Birth Control Is Critical to Women's Health.

Women face a unique set of health care challenges because they use more health services than men yet earn less on average than men.[4] As a result, women face a high level of health care insecurity, which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either "postponed or went without needed services in the past year because they could not afford it."[5] Women were spending between 30 percent and 44 percent of their total out-of-pocket health costs just on birth control.[6] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[7] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[8] The ACA's contraceptive coverage benefit has increased access to contraception without cost-sharing for women with employer-sponsored coverage.[9] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[10]

Contraceptive use among women is widespread, with over 99 percent of sexually active women using at least one method of contraception at some point during their lifetime.[11] And contraceptive use is common among women of all religious denominations.[12] Eighty-nine percent of sexually active Catholics and 90 percent of sexually active Protestants currently use some method of contraception.[13] Approximately 68 percent of Catholics, 73 percent of Mainline Protestants, and 74 percent of Evangelicals who are at risk of unintended pregnancy use a highly effective method (e.g., sterilization, oral contraceptives or another hormonal method, or intrauterine devices ("IUDs")).[14]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity or sexual orientation. In the first year of the ACA's contraceptive coverage benefit, the share of privately-insured women with no out-of-pocket costs for certain forms of birth control increased from 15 percent to 67 percent.[15]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or prevent pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[16] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.

Unintended pregnancies are associated with higher rates of long-term health complications for women and infants. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant

2

00373638

Exhibit 80                                                                                    JA-0001221

mortality, birth defects, low birth weight, preterm birth and long-term physical and mental effects on children.[17] They are also at higher risk for maternal morbidity and mortality, maternal depression or experiencing physical violence during pregnancy.[18] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45 percent of pregnancies unintended.[19] And the United States has the highest rate of maternal mortality in the developed world.[20] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence,[21] and contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[22] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease and a decreased risk of endometrial and ovarian cancer.[23] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[24]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive efficacy and safety, as discussed in more detail below, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when trying to prevent pregnancy.

In the face of these facts, the IFR not only denies how important contraceptive care and counseling are to women's health and lives, but implies that contraceptive care and counseling are not health care at all.

## II.    Birth Control is Critical to Gender Equality.

Birth control is vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political and economic life of the nation. Unintended pregnancy is a key contributor to women's economic inequality in the United States and throughout the world. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. The ACA's contraceptive coverage benefit helps place women on level footing with their male counterparts in their ability to participate in the workforce or pursue educational opportunities without the risk of unintended pregnancies.

Empowering women through access to contraception and allowing individual women to control if and when they will have a child plays a critical role in addressing gender inequalities including the existing pay gap between men and women. This is particularly true because pregnancy and childrearing have a significant impact on the gender pay gap.[25] While access to contraception will not fully remedy existing pay gaps between men and women, there are "clear associations between the availability and diffusion of oral contraceptives, particularly among young women, and increases in U.S. women's education,

3

00373639

Exhibit 80

labor force participation, and average earnings, coupled with a narrowing in the wage gap between women and men."[26] Moreover, studies focusing on the impacts of oral contraception have found that contraception is connected to significant growth of women's wages.[27] For example, one study examining the advent of the availability of oral contraception found that approximately "one-third of the total wage gains for women in their forties born from the mid-1940s to early 1950s" were attributable to oral contraception.[28] Access to oral contraceptives also accounts for an increase in college enrollment by women in the 1970s,[29] which was followed by large increases in women's presence in law, medicine, and other professions.[30] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in health care coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[31]

The impacts of the IFR will fall heavily on women working in low-wage jobs. The most effective contraception options with the least chances of user error, such as an IUD or the contraceptive ring,[32] require higher upfront costs and will once again be out of reach of many women. The ability of employers to claim a religious exemption and not cover contraception for their employees will significantly limit the ability of women working low-wage jobs to access the preventive care best suited for themselves. This is important because the ability to control when and whether to get pregnant is particularly important for women in low-wage jobs.[33] The lack of pregnancy accommodations in many workplaces, particularly in low-wage jobs, means that pregnant women may be forced out of their jobs just at the time when they most need income and health insurance.

### III.    The IFR Will Exacerbate Existing Health Disparities Faced by LGBTQ People, People of Color, and Other Marginalized Communities.

#### A.    The IFR Will Increase Health Disparities Faced by LGBTQ People.

The IFR harms the LGBTQ community by restricting access to contraception for those who need it, including lesbian and bisexual women and some transgender people.[34] Furthermore, allowing employers and universities to deny coverage for an essential health care service based on religious or moral beliefs sets a dangerous precedent for access to health care for LGBTQ people more broadly.

Despite misconceptions held by policymakers and some medical providers, lesbian and bisexual women require sexual and reproductive health services similar to those needed by heterosexual women. A majority of lesbian and bisexual women have reported having had intercourse with men,[35] and according to one study, roughly one in four lesbian and bisexual women have been pregnant, 50 percent have used oral contraceptives, and 16 percent reported one or more abortions.[36] Bisexual women are also subject to an increased risk of sexual violence. One study found that 46 percent of bisexual women have been raped, compared to 17 percent of heterosexual women.[37] Broadly, studies indicate that unintended pregnancies are equally as common, if not more common, for lesbian and bisexual women as for heterosexual women.[38]

Adolescent lesbian and bisexual women are at even higher risk for unintended pregnancies. Lesbian adolescent women are less likely than bisexual and heterosexual women to use

4

00373640

Exhibit 80

JA-0001223

contraception,[39] and one study found that, in surveys, bisexual and lesbian adolescent women are more likely to report a pregnancy than heterosexual adolescent women.[40] And a 2016 study by the Centers for Disease Control and Prevention found that LGBTQ high school students are more likely than other students to experience intimate partner violence and rape, which can result in unintended pregnancy.[41]

In sum, access to contraception is essential for the health and well-being of many members of the LGBTQ community, and allowing employers and universities to deny coverage of contraception for religious reasons is unsound public health policy with the potential to cause significant harm.

### B. The IFR Will Increase Health Disparities Faced by People of Color.

While people of color suffer disparities in almost every area of health care, these inequities are particularly egregious for reproductive health services. Due to historic and ongoing structural racism and persistent disparities, women of color face greater barriers in accessing sexual and reproductive health services.[42] And Black women experience higher rates of reproductive cancers, unintended pregnancies,[43] and sexually transmitted infections than white women.[44] Black women are often diagnosed later than others with the same health problems and have less access to high-quality, affordable care, resulting in higher death rates from the same conditions.[45]

Similar reproductive health disparities exist in the Latina community. Latinas are more likely to be diagnosed with cervical cancer than women of any other racial or ethnic group[46] and "are more likely to live in areas with low access to family planning services."[47] One study found that "[e]ven when diagnosed at similar ages and stages and with similar tumor characteristics, Latinas are more likely to die from breast cancer than non-Latina white women."[48] Furthermore, "[a]pproximately 16 percent of Latinas have not visited a physician in the last two years," and about 25 percent reported not having a regular health care provider.[49]

Disparities in reproductive health are undeniably linked to the disparities that women of color face in health care coverage. Black women are 50 percent more likely to be uninsured than white women, and Latinas are more than twice as likely to be uninsured as white women.[50] The ongoing health disparities faced by African American women has also resulted in an increased rate of pregnancy complications and maternal mortality. Black women "are between three to four times more likely to die from pregnancy-related causes than [w]hite women."[51]

The lack of insurance coverage for contraception likely contributes to disparities among racial and ethnic groups regarding unintended pregnancies.[52] The ACA did important work in decreasing disparities, and rolling back the ACA's contraceptive coverage benefit will disproportionately hurt communities of color by limiting access to contraceptive care without cost-sharing.

5

00373641

Exhibit 80

JA-0001224

**IV.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service.**

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

**A.  Congress Intended the ACA to Require Contraceptive Coverage.**

When Congress passed the Women's Health Amendment in section 2713 of the ACA,[52] it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[53] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage benefit.

Indeed, Congress intended the Women's Health Amendment ("the Amendment"), which includes the contraceptive coverage benefit, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[55] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care, and were often unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage.* . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[56]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for . . . family planning."[57] And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[58] That contraception would be covered was clear.[59]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[60] After conducting its analysis, the IOM panel recommended eight preventive services for women, including coverage of the full range of FDA-approved contraceptives and contraceptive counseling.[61] On August 1, 2011, the Health Resources and Services Administration ("HRSA") adopted the recommendations set forth in the IOM

6

00373642

Exhibit 80

JA-0001225

Report.[52] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative ("WPSI") as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists and HRSA to coordinate the development, review and update of recommendations.[53] These too were adopted by HRSA.[54]

The Department of Health and Human Services – in adopting the IOM's recommendations and promulgating the contraception regulations, and again in adopting the WPSI recommendations – carried out Congress's direction.

## B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule.

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exemptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the ACA, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify the IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage benefit does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[55] "Federal statutes often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[56] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[57] This exemption is intended as a temporary means for transitioning employers to full compliance.[58] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[59]

## V.    The IFR Violates Statutory and Constitutional Protections.

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[70] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[71] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[72]

7

00373643

Exhibit 80                                                                                    JA-0001226

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[74]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. The Establishment Clause of the First Amendment limits the government's ability to create an exemption from generally applicable laws for religious or moral beliefs. The constitutional requirement is straightforward: "an accommodation must be measured so that it does not override other significant interests";[75] "impose unjustified burdens on other[s]";[76] or have a "detrimental effect on any third party."[76] When women are denied coverage for contraception, which is basic and essential health care, they suffer discrimination and economic harm. The exemption in the IFR clearly imposes burdens on others: it compels employees and students who need coverage for birth control to pay the substantial costs for the health care themselves if they are able (and many are unable), or else to forgo that essential health care. Thus, the IFR runs afoul of the clear mandates of the Establishment Clause.

For each of these reasons, the IFR should be rescinded.

## VI.    The IFR Violates the Administrative Procedure Act.

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("the APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures, which provide "interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation"[77] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[78] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The

8

00373644

Exhibit 80                                                                                                           JA-0001227

Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck – with input from hundreds of thousands of commenters and numerous courts – between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[79]

Specifically, the IFR is in excess of statutory authority. The IFR is contrary to Section 1557 of the ACA, 42 U.S.C. § 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The IFR is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[80] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny contraceptive coverage, the IFR erects unreasonable barriers to medical care and impedes timely access to contraception. The IFR is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed statutory jurisdiction, authority or limitations.[81]

For each of these reasons, the IFR violates the APA and should be rescinded.

## VII.    Justifications for the IFR Do Not Meet Basic Scientific Standards.

Public health policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations.

The Departments make false and misleading statements in this IFR to undermine the contraceptive benefit. The Departments understate the efficacy and health benefits of contraceptives and overstate the health risks of contraceptives by selectively interpreting data, overlooking well-established evidence and promoting unfounded doubt. Further, the IFR falsely asserts certain types of FDA-approved contraceptive methods are abortifacients. The IFR thus causes dual harm by undermining women's access to essential preventive health care and undermining the integrity of science in governance.

The Departments serve a critical role in collecting and managing important information and data on issues that are vital to the public. In making policy, it is essential that the

9

00373645

Exhibit 80                                                                           JA-0001228

Departments enhance their credibility on issues of science and evidence, not undermine it. Thus, the Departments must take full advantage of their resources to inform their decision-making by the best available evidence and data. The IFR, however, shows that the Departments did not seriously consider these elements, which can only undermine the Departments' reputations as reliable sources of information.

### A. Contraception Prevents Unintended Pregnancy and Improves the Health of Women and Children.

As an example of how the Departments are not utilizing the best available science and evidence with dire consequences for public health, the Departments make several misstatements that ignore prevailing evidence regarding the efficacy, health benefits and health risks of contraceptives. The Departments fail to acknowledge that contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[82] Not only does contraception prevent unintended pregnancy,[83] but the prevention of unintended pregnancy is associated with life-long health benefits for both women and children that the Departments fully ignore.

As described above, contraceptive efficacy at preventing unintended pregnancy is supported by decades of rigorous evidence and by the government itself.[84] The U.S. Food and Drug Administration ("FDA") must approve all new drugs and devices by showing that they are safe and effective through rigorous scientific testing. The federal government itself has thus approved contraceptives for safely and effectively preventing unintended pregnancies.[85] The Departments' misrepresentation of "complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy"[86] is false and relies heavily on cherry-picked citations instead of accurately reflecting the weight of the evidence.

In truth, contraception enables women, including teens, to prevent unintended pregnancy and control the timing of a desired pregnancy.[87] The Centers for Disease Control and Prevention named family planning one of the ten great public health achievements of the past century,[88] and family planning is widely credited for contributing to women's societal, educational and economic gains.[89] The ACA's contraceptive coverage benefit has contributed to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[90]

### B. The Health Risks of Contraceptives Are Overstated and Misrepresented.

The Departments go further, selectively interpreting data in order to overstate "negative health effects" associated with contraceptives.[91] This includes misleading assertions of an association between contraceptive use, breast cancer and cervical cancer, as well as vascular events and "risky sexual behavior."[92] The Departments ignore substantial evidence to the contrary, and ignore the balance of significant non-contraceptive health benefits associated with contraceptive use. Certainly it is true that, as with any medication, some types or methods of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus or a history of breast cancer.[93] Some women may also want to avoid side effects, such as changes to menstrual flow.[94] But the Departments fail to recognize that this means that patients and health care providers, not

10

00373646

Exhibit 80

employers and agencies, should determine the right contraceptive for an individual woman's health care needs.

## C. Contraceptives Do Not Increase Sexual Activity Among Adolescents.

The Departments' claim that contraceptives may lead to "risky sexual behavior"[95] is similarly unfounded. Increased access to contraception is not associated with a change or increase in sexual behaviors.[96] Instead, research has shown that school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase prevalence of sexual activity.[97] In the "CHOICE Project," a large-scale U.S. study aimed at reducing unintended pregnancy by providing no-cost contraception, participants reported no change in their sexual activities after receiving contraceptives.[98] Thanks in part to the ACA's contraceptive coverage benefit, the teen pregnancy rate is at its lowest point in at least 80 years.[99]

## D. Contraceptives Do Not Interfere with an Existing Pregnancy.

The IFR refers to the false assertion that some FDA-approved methods of contraception "prevent implantation of an embryo," and are thus abortifacients.[100] This is inaccurate and goes against longstanding medical evidence.

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The IFR takes issue with the ACA's coverage of the full range of FDA-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient – that is, as causing early abortion." [101] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins. [102]

By making the false claim that some FDA-approved methods of contraception may cause abortion, the Departments sideline science in favor of ideology.

## VIII.  The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty.

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost-sharing as a result of this IFR.[103] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately-insured individuals, and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of these programs is currently threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws, which cannot fill in the coverage gaps caused by this IFR.

11

00373647

Exhibit 80                                                                                                    JA-0001230

### A. Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety-net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[104] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[105] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[106]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly-funded family planning, let alone absorb the increase in demand that would result from the Departments' IFR. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[107] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[108] This decline corresponds to more than $30 million in cuts to Title X's annual appropriated amount over the same period.[109] Requiring otherwise higher-income, privately-insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[110] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also often have complex health needs and lack any resources to address these issues on their own. Medicaid was not built to fill the gaps created by this IFR.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[111] This is particularly true with respect to specialty providers, including OB/GYNs.[112] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

12

00373648

Exhibit 80                                                                    JA-0001231

### B.  The Political Assault on Medicaid, Title X and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[113] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[114] These "innovations" may very well include provisions that undermine the ability of individuals eligible to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[115]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. Title X-funded health centers play a particularly important role in serving communities of color.[116] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[117] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[118]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as fail-safes for those who will lose coverage as a consequence of its IFR given the administration's clear record of hostility toward these programs.

### C.  Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services and Counseling With No Cost-Sharing.

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminishes the need for a federal requirement. This suggestion ignores the fact that 22 states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage benefit made several important advances over laws in the other 28 states.[119] Only four state laws currently match the federal requirement to cover contraception without cost-sharing such as copayments, deductibles and other out-of-pocket costs.[120] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services and counseling that are included.[121] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60 percent of covered workers nationwide.[122]

13

00373649

Exhibit 80                                                                JA-0001232

The Departments are wrong that other programs and legal requirements can meet the gaps in contraceptive coverage created by this rule.

*** 

This IFR will cause people to lose contraceptive coverage, and harm their health and economic well-being. It will exacerbate existing health disparities for marginalized communities. It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception and the federal programs supporting and state laws regarding contraception. For all of these reasons the National Partnership for Women & Families calls on the Departments to rescind the IFR.

If you have any questions regarding these comments, please contact Sarah Lipton-Lubet, Vice President for Reproductive Health and Rights at slipton-lubet@nationalpartnership.org or (202) 986-2600.


Sincerely,

National Partnership for Women & Families

---

[1] *See generally* Brief for the National Women's Law Center and Sixty-Eight Other Organizations as *Amicus Curiae* in Support of the Government, Sebelius v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014) (Nos. 13-354, 13-356), https://nwlc.org/wp-content/uploads/2015/08/nwlcsupremecourtamicusbriefcontraceptivecoveragebenefit_1-28-2014.pdf.

[2] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[3] NAT'L WOMEN'S L. CTR., NEW DATA ESTIMATES 62.4 MILLION WOMEN HAVE COVERAGE OF BIRTH CONTROL WITHOUT OUT-OF-POCKET COSTS (2017), https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

[4] *See* CARMEN DENAVAS-WALT ET AL., U.S. CENSUS BUREAU, INCOME, POVERTY, AND HEALTH INSURANCE COVERAGE IN THE UNITED STATES: 2008 TABLE A-2, 36–37 (2009), https://www.census.gov/prod/2009pubs/p60-236.pdf.

[5] USHA RANJI ET AL., KAISER FAMILY FOUND. WOMEN'S HEALTH CARE CHARTBOOK: KEY FINDING FROM THE KAISER WOMEN'S HEALTH SURVEY 4 (2011), https://kaiserfamilyfoundation.files.wordpress.com/2013/01/8164.pdf.

[6] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFF. 1204, 1206 (2015).

[7] *See, e.g.,* Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills Between 1996 and 2006*, 83 CONTRACEPTION 528, 531 (2011). *See also* INSTITUTE OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS (Nat'l Acads. Press, 2011) [hereinafter *Closing the Gaps*]. Another study of nearly 11,000 employees with employer-sponsored coverage found that cost-sharing was associated with reduced use of Pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RES. 1331, 1342–43 (2000). *See also* DAVID MACHLEDT & JANE PERKINS, NHELP (NAT'L HEALTH L. PROGRAM), MEDICAID PREMIUMS AND COST SHARING 2–3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WiVrpkpKuUl.

14

00373650

Exhibit 80

JA-0001233

[8] Sheila D. Rustgi et al., The Commonwealth Fund, Women at Risk: Why Many Women Are Forgoing Needed Health Care 3 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf (finding that, in a given year, 65 percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost).

[9] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 Contraception 44, 45–47 (2015).

[10] Becker & Polsky, *supra* note 6, at 1206.

[11] Kimberly Daniels et al., *Contraceptive Methods Women Have Ever Used: United States, 1982–2010*, 62 Nat'l Health Stats. Rep. 1, 3 (2013)

[12] Rachel K. Jones & Joerg Dreweke, Guttmacher Institute, Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use (2011), https://www.guttmacher.org/sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.

[13] *Id.*, at 8.

[14] *Id.*

[15] Sonfield et al., *supra* note 9, at 45.

[16] *See, e.g.,* Am. Coll. of Obstetricians & Gynecologists, Women's Preventive Servs. Initiative, Recommendations for Preventive Services for Women: Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration 85 (2016), https://www.womenspreventivehealth.org/final-report/ [hereinafter *WPSI Final Report*].

[17] *See generally* Agustin Conde-Aguedelo et al., *Birth Spacing and Risk of Adverse Perinatal Outcomes: A Meta-Analysis*, 295 JAMA 1809 (2006).

[18] *See generally* Amy O. Tsui et al., *Family Planning and the Burden of Unintended Pregnancies*, 32 Epidemiologic Revs. 152 (2010).

[19] Lawrence B. Finer & Mia R. Zolna, *Declines in Unintended Pregnancy in the United States, 2008–2011*, 374 New Eng. J. Med. 843, 845 (2016).

[20] *See* Nicholas J. Kassebaum et al., *Global, Regional, and National Levels and Causes of Maternal Mortality During 1990–2013: A Systematic Analysis for the Global Burden of Disease Study 2013*, 385 Lancet 980 (2014).

[21] James Trussell, *Contraceptive Failure in the United States,* 83 Contraception 397 (2011).

[22] *E.g.,* Rachel K. Jones, Guttmacher Institute, Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills 8 (2011), https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf.

[23] Adolf E. Schindler, *Non-Contraceptive Benefits of Oral Hormonal Contraceptives*, 11 Int'l J. Endocrinology & Metabolism 41 (2013). *See also* Am. Coll. of Obstetricians & Gynecologists, *Committee Opinion No. 615: Access to Contraception*, 125 Obstetrics & Gynecology 250 (2015).

[24] *See, e.g.,* Victoria K. Cortessis et al., *Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-analysis*, 130 Obstetrics & Gynecology 1226 (2017).

[25] Martha J. Bailey et al., *The Opt-In Revolution? Contraception and the Gender Gap in Wages* 27 (Nat'l Bureau of Econ. Research, Working Paper No. 17922, 2012), http://www.nber.org/papers/w17922 ("Our main estimates, therefore, imply that 10 percent of the narrowing in the gender gap during the 1980s and 31 percent during the 1990s can be attributed to early access to the Pill . . . . [T]he effects of the Pill may be larger than we find, but it is not clear how much larger. Even these conservative estimates, however, suggest that the Pill's power to transform childbearing from probabilistic to planned shifted women's career decisions and compensation for decades to come.").

[26] Jennifer J. Frost & Laura Duberstein Lindberg, *Reasons for Using Contraception: Perspectives of U.S. Women Seeking Care at Specialized Family Planning Clinics*, 87 Contraception 465, 465 (2013) (citations omitted).

15

[27] While research has primarily focused on oral contraception because it has been an established contraceptive option longer, longer-lasting contraception options that are covered by the contraceptive coverage policy eliminate chances of user error and are generally more effective.

[28] Bailey et al., *supra* note 25, at 26.

[29] *E.g.*, Heinrich Hock, The Pill and the College Attainment of American Women and Men 19 (unpublished manuscript), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.594.6229&rep=rep1&type=pdf.

[30] Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. POL. ECON. 730, 748–51 (2002).

[31] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,728 (Feb. 15, 2012) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pr. 147).

[32] Ctrs. for Disease Control & Prevention, *Effectiveness of Family Planning Methods*, https://www.cdc.gov/reproductivehealth/unintendedpregnancy/pdf/contraceptive_methods_508.pdf.

[33] NAT'L WOMEN'S L. CTR., IT SHOULDN'T BE A HEAVY LIFT: FAIR TREATMENT FOR PREGNANCY WORKERS (2013), https://nwlc.org/wp-content/uploads/2015/08/pregnant_workers.pdf.

[34] *See, e.g.*, NAT'L LGBTQ TASK FORCE, BIRTH CONTROL ACCESS FOR LGBTQ PEOPLE: HOW EMPLOYERS WANT TO USE RELIGION TO HARM LGBTQ REPRODUCTIVE RIGHTS, http://www.thetaskforce.org/static_html/downloads/reports/fact_sheets/factsheet_birth_control_access.pdf.

35 Elizabeth M. Saewyc et al., *Sexual Intercourse, Abuse and Pregnancy Among Adolescent Women: Does Sexual Orientation Make a Difference?*, 41 FAV. P_AN. PERSPS. 127, 127 (1999) (citations omitted).

[36] Jeanne M. Marrazzo & Kathleen Stine, *Reproductive Health History of Lesbians: Implications for Care*, 190 AM. J. OBSTETRICS & GYNECOLOGY 1298 (2004).

[37] JEN KATES ET AL., KAISER FAMILY FOUND., HEALTH AND ACCESS TO CARE AND COVERAGE FOR LESBIAN, GAY, BISEXUAL, AND TRANSGENDER INDIVIDUALS IN THE U.S. 8 (2016), http://files.kff.org/attachment/Issue-Brief-Health-and-Access-to-Care-and-Coverage-for-LGBT-Individuals-in-the-US.

[38] *See, e.g.*, Caroline Sten Hartnett et al., *Congruence Across Sexual Orientation Dimensions and Risk for Unintended Pregnancy Among Adult U.S. Women*, 27 WOMEN'S HEALTH ISSUES 145 (2017).

[39] Brittany M. Charlton et al., *Sexual Orientation Differences in Teen Pregnancy and Hormonal Contraceptive Use: An Examination Across 2 Generations*, 209 AM. J. OBSTETRICS & GYNECOLOGY 204.e1, e5 (2013).

[40] *Id.* (citation omitted).

[41] Laura Kann et al., Ctrs. for Disease Control & Prevention, *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 – United States and Selected Sites, 2015*, 65 MORBIDITY & MORTAL TY WKLY. REP. 1, 17–18 (2017). *See also* Lisa L. Lindley & Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 AM. J. PUB. HEALTH 1379 (2015).

[42] PLANNED PARENTHOOD FED'N OF AM., ADDRESSING SEXUAL AND REPRODUCTIVE HEALTH DISPARITIES AMONG AFRICAN AMERICANS 1 (2015), https://www.plannedparenthood.org/files/3614/2773/6927/AA_Disparities.pdf.

[43] *Id.* (citing Lawrence B. Finer & Mia R. Zolna, *Shifts in Intended and Unintended Pregnancies in the United States, 2001–200*, 104 AM. J. PUB. HEALTH S43 (2014)).

[44] *Id.* (citations omitted).

[45] *Id.* (citations omitted)

[46] PLANNED PARENTHOOD FED'N OF AM., ADDRESSING SEXUAL AND REPRODUCTIVE HEALTH DISPARITIES AMONG LATINOS 1 (2015), https://www.plannedparenthood.org/files/2814/2773/6927/Latino_Disparities.pdf (citing AM. CANCER SOC'Y, CANCER FACTS & FIGURES 2015 (2015), https://www.cancer.org/content/dam/cancer-org/research/cancer-facts-and-statistics/annual-cancer-facts-and-figures/2015/cancer-facts-and-figures-2015.pdf).

16

00373652

Exhibit 80                                                                                   JA-0001235

[47] *Id.* at 2 (citing LIZA FUENTES ET AL., NAT'L LATINA INSTITUTE FOR REPRODUCTIVE HEALTH, REMOVING STIGMA: TOWARDS A COMPLETE UNDERSTANDING OF YOUNG LATINAS' SEXUAL HEALTH (2010), http://www.latinainstitute.org/sites/default/files/NLIRH-HPWhite-5310-F2.pdf).

[48] *Id.* at 1 (citing AM. CANCER SOC'Y, CANCER FACTS & FIGURES FOR HISPANICS/LATINOS 2012–2014 (2012), https://www.cancer.org/content/dam/cancer-org/research/cancer-facts-and-statistics/cancer-facts-and-figures-for-hispanics-and-latinos/cancer-facts-and-figures-for-hispanics-and-latinos-2012-2014.pdf).

[49] *Id.* (citing ALINA SALGANICOFF ET AL., KAISER FAMILY FOUND., WOMEN AND HEALTH CARE IN THE EARLY YEARS OF THE AFFORDABLE CARE ACT: KEY FINDINGS FROM THE 2013 KAISER WOMEN'S HEALTH SURVEY (2014), www.kaiserfamilyfoundation.files. wordpress.com/2014/05/8590-women-and-health-care-in-theearly-years-of-the-affordable-care-act.pdf).

[50] NAT'L P'SHIP FOR WOMEN & FAMILIES, WOMEN'S HEALTH COVERAGE: SOURCES AND RATES OF INSURANCE (2017), http://www.nationalpartnership.org/research-library/health-care/womens-health-coverage-sources-and-rates-of-insurance.pdf (citing *U.S. Census Bureau, Current Population Survey,* https://www.census.gov/cps/data/cpstablecreator.html; *U.S. Census Bureau, Current Population Survey Annual Social and Economic Supplement (CPS-ASEC),* https://www.census.gov/topics/health/health-insurance/guidance/cps-asec.html).

[51] BLACK MAMAS MATTER, CTR. FOR REPRODUCTIVE RIGHTS, RESEARCH OVERVIEW OF MATERNAL MORTALITY AND MORBIDITY IN THE UNITED STATES 2 (2016), https://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/USPA_MH_TO_ResearchBrief_Final_5.16. pdf (citations omitted).

[52] Christine Dehlendorf et al., *Disparities in Family Planning*, 202 AM. J. OBSTETRICS & GYNECOLOGY 214 (2010).

[53] 42 U.S.C. § 300gg–13(a)(4).

[54] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8,725, 8,727 (Feb. 15, 2012) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pr. 147).

[55] 155 CONG. REC. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) (". . . I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[56] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphasis added).

[57] *Id.* at S12,027 (statement of Sen. Gillibrand).

[58] 155 CONG. REC. S12,033, S12,052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken). *See also,* 155 CONG. REC. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[59] *See also* 155 CONG. REC. S12,021, S12,025 (daily ed. Dec. 1, 2009) (Sen. Boxer) (stating that preventive care "include[s] . . . family planning services"); 155 CONG. REC. S12,227, 12,277 (daily ed. Dec. 3, 2009) (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 CONG. REC. S12,664, S12,671 (daily ed. Dec. 8, 2009) (Sen. Durbin) (providing that under the ACA "millions more women will have access to affordable birth control and other contraceptive services.").

[60] *Closing the Gaps, supra* note 7, at 20–21.

[61] *Id.* at 109-10.

[62] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines,* https://www.hrsa.gov/womens-guidelines/index.html (last updated Oct. 2017).

[63] *See generally WPSI Final Report, supra* note 16.

[64] Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines,* https://www.hrsa.gov/womens-guidelines/index.html (last updated Oct. 2017).

[65] *See* Priests for Life v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers,

17

00373653

Exhibit 80

small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[66] Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting) (citing "Family and Medical Leave Act of 1993, 29 U. S. C. §2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U. S. C. §630(b) (originally exempting employers with fewer than 50 employees, 81 Stat. 605, the statute now governs employers with 20 or more employees); Americans With Disabilities Act, 42 U. S. C. §12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U. S. C. §2000e(b) (originally exempting employers with fewer than 25 employees, see Arbaugh v. Y & H Corp., 546 U. S. 500, 505, n. 2 (2006), the statute now governs employers with 15 or more employees).").

[67] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80, Fed. Reg. 72,192, 72,191–93 (Nov. 18, 2015) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pts. 144, 146, 147).

[68] See Coverage of Certain Preventive Services Under the Affordable Care Act, 80 Fed. Reg. 41,318, 41,319 (July 14, 2015) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pts. 2510, 2590, 45 C.F.R. pt. 147).

[69] GARY CLAXTON ET AL., KAISER FAMILY FOUND. & HEALTH RES. & EDUC. TRUST, EMPLOYER HEALTH BENEFITS: 2017 ANNUAL SURVEY (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[70] See, e.g., Brief Amicus Curiae of the American Civil Liberties Union et al., In Support of Respondents at 21, Zubik v. Burwell, 136 S. Ct. 1557 (2016) (Nos. 14-1418, 14-1453, 14-1505, 15-35, 15-105, 15-119, 15-191), https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents_aclu_et_al.pdf.

[71] Id. at 19.

[72] Id. at 24–27.

[73] 42 U.S.C. § 18116.

[74] Cutter v. Wilkinson, 544 U.S. 709, 722 (2005); see also Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 709-10 (1985).

[75] Cutter, 544 U.S. at 726; see also Texas Monthly, Inc. v. Bullock, 480 U.S. 1, 18 n.8 (1989).

[76] Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2781 n.37 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. See id. at 2786–87 (Kennedy, J., concurring); id. at 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting). See also Holt v. Hobbs, 135 S. Ct. 853, 867 (2015) (Ginsburg, J., concurring).

[77] 5 U.S.C. § 553(b), (c).

[78] Id. § 553(d).

[79] Id. § 706.

[80] Id. § 18114(1).

[81] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

[82] See generally WPSI Final Report, supra note 16. See also Trussell, supra note 21; Finer & Zolna, supra note 19.

[83] See, e.g., Finer & Zolna, supra note 19, at 851 ("A likely explanation for the decline in the rate of unintended pregnancy is a change in the frequency and type of contraceptive use over time.").

[84] See, e.g WPSI Final Report, supra note 16; Trussell, supra note 21; ROBERT A. HATCHER ET AL., CONTRACEPTIVE TECHNOLOGY (Bridging the Gap Commc'ns, 20th ed. 2011); Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 4–5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) [hereinafter Declaration of Dr. Lawrence Finer] ("Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.") (citing Aparna Sundaram et al., Contraceptive Failure in the United States: Estimates from the 2006–2010 National Survey of Family Growth, 49 PERSPS. ON SEXUAL & REPRODUCTIVE HEALTH 7 (2017)); Jeffrey F. Peipert et al., Preventing Unintended Pregnancies by Providing No-Cost Contraception, 120 OBSTETRICS & GYNECOLOGY 1291(2012);

18

00373654

Exhibit 80                                                                                                          JA-0001237

Finer & Zolna, *supra* note 19; Cynthia C. Harper et al., *Reductions in Pregnancy Rates in the USA with Long-Acting Reversible Contraception: A Cluster Randomised Trial*, 386 LANCET 562 (2015); J. Joseph Speidel & Cynthia C. Harper, *The Potential of Long-Acting Reversible Contraception to Decrease Unintended Pregnancy*, 78 CONTRACEPTION 197 (2008).

[85] *Declaration of Dr. Lawrence Finer, supra* note 84, at 5.

[86] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[87] *See, e.g.,* Heather D. Boonstra, *What is behind the declines in teen pregnancy rates?* 17 GUTTMACHER POL'Y REV. 15 (2014); Laura Lindberg et al., *Understanding the Decline in Adolescent Fertility in the United States, 2007–2012*, 59 J. ADOLESCENT HEALTH 577 (2016).

[88] Ctrs. for Disease Control & Prevention, *Ten Great Public Health Achievements in the 20th Century* (2013), https://www.cdc.gov/about/history/tengpha.htm.

[89] *See, e.g.,* ADAM SONFIELD ET AL., GUTTMACHER INSTITUTE, THE SOCIAL AND ECONOMIC BENEFITS OF WOMEN'S ABILITY TO DETERMINE WHETHER AND WHEN TO HAVE CHILDREN (2013), https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf.

[90] GUTTMACHER INSTITUTE, UNINTENDED PREGNANCY IN THE UNITED STATES 2 (2016), https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf.

[91] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. at 47,804.

[92] *Id.* at 47,805.

[93] *See, e.g.,* Am. Coll. of Obstetricians & Gynecologists. *FAQ No. 86: Progestin-Only Hormonal Birth Control: Pill and Injection* (2014), https://www.acog.org/Patients/FAQs/Progestin-Only-Hormonal-Birth-Control-Pill-and-Injection; Am. Coll. of Obstetricians & Gynecologists. *FAQ No. 185: Combined Hormonal Birth Control: Pill, Patch, and Ring* (2014), https://www.acog.org/Patients/FAQs/Combined-Hormonal-Birth-Control-Pill-Patch-and-Ring.

[94] JONES, *supra* note 22.

[95] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. at 47,805.

[96] *See, e.g.,* DOUGLAS KIRBY, NAT'L CAMPAIGN TO PREVENT TEEN & UNPLANNED PREGNANCY, EMERGING ANSWERS 2007: RESEARCH FINDINGS ON PROGRAMS TO REDUCE TEEN PREGNANCY AND SEXUALLY TRANSMITTED DISEASES (2007), https://thenationalcampaign.org/resource/emerging-answers-2007%E2%80%94full-report; Jennifer L. Mayer et al., *Advance Provision of Emergency Contraception Among Adolescent and Young Adult Women: A Systematic Review of Literature*, 24 J. PEDIATRIC & ADOLESCENT GYNECOLOGY 2 (2011).

[97] Mara Minguez et al., *Reproductive Health Impact of a School Health Center*, 56 J. ADOLESCENT HEALTH 338 (2015). *See also* John A. Knopf et al., *School-Based Health Centers to Advance Health Equity*, 51 AM. J. PREVENTIVE MED. 114 (2016).

[98] Gina M. Secura et al., *Change in Sexual Behavior with Provision of No-Cost Contraception*, 123 OBSTETRICS & GYNECOLOGY 771 (2014). *See also* Gretchen Goldman, *The Trump Administration Fakes Science to Justify Restrictions on Birth Control Access*, UNION OF CONCERNED SCIENTISTS BLOG (Oct. 11, 2017, 10:56 AM), http://blog.ucsusa.org/gretchen-goldman/the-trump-administration-fakes-science-to-justify-restrictions-on-birth-control-access.

[99] *Declaration of Dr. Lawrence Finer, supra* note 84, at 8 ("In 2013, the U.S. pregnancy rate among 15–19 year olds was at its lowest point in at least 80 years and had dropped to about one-third of a recent peak rate in 1990.") (citing KATHRYN KOST ET AL., GUTTMACHER INSTITUTE, PREGNANCIES, BIRTHS AND ABORTIONS AMONG ADOLESCENTS AND YOUNG WOMEN IN THE UNITED STATES, 2013: NATIONAL AND STATE TRENDS BY AGE, RACE AND ETHNICITY (2017), https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf).

[100] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. at 47,840.

[101] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

19

00373655

Exhibit 80                                                                                                    JA-0001238

[102] *See, e.g.,* Brief of *Amici Curiae* Physicians for Reproductive Health, et al. in Support of Petitioners at 12, Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014) (No. 13-354).

[103] *See generally* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (as incorporated by Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. at 47,848).

[104] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504; 42 C.F.R. § 59.5 (a)(6)–(9).

[105] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)–(8).

[106] *Id.* § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[107] Euna M. August et al., *Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act*, 106 Av. J. Pub. Health 334 (2016). Congress would have to increase federal funding for Title X by more than $450 million to adequately address the existing need for publicly funded contraception.

[108] *See* Christina Fowler et al., RTI Int'l., Family Planning Annual Report: 2010 National Summary (2011), https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Christina Fowler et al., RTI Int'l, Family Planning Annual Report: 2016 National Summary (2016), https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2015.pdf.

[109] Office of Population Affairs, *Funding History*, https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last updated Feb. 21, 2017).

[110] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, *The Coverage Gap: Uninsured Poor Adults in States That Do Not Expand Medicaid*, Kaiser Family Found. (Nov. 1, 2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[111] U.S. Gov't Accountability Office, Medicaid: States Made Multiple Program Changes, and Beneficiaries Generally Reported Access Comparable to Private Insurance (2012), http://www.gao.gov/assets/650/649788.pdf; U Dep't of Health & Human Servs., Office of Inspector Gen., Access to Care: Provider Availability in Medicaid Managed Care (2014), https://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[112] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. *Id.* at n.7.

[113] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting more than one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants 6 (2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & K M Lewis, NHeLP (Nat'l Health L. Program), Top 10 Changes to Medicaid Under the Graham-Cassidy Bill (2017), https://medicaid.publicrep.org/wp-content/uploads/2017/09/TenChangesMedicaidGrahamCassidy-FINAL.pdf.

[114] Letter from Thomas E. Price, Secretary, U.S. Health & Human Srvs., & Seema Verma, CMS Administrator, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf; Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, Wash. Post (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.e7af5e014934.

20

00373656

Exhibit 80                                                                                                    JA-0001239

[115] Kinsey Hasstedt, *Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net*, 20 GUTTMACHER POL'Y REV. (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[116] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, *32 percent of Title X patients identified as Hispanic or Latina/o*. FOWLER ET AL., 2016 NATIONAL SUMMARY, *supra* note 108.

[117] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. Nat'l Fam. Planning & Reproductive Health Ass'n, *Title X Budget & Appropriation*, https://www.nationalfamilyplanning.org/title-x_budget-appropriations (last visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[118] Statement of Administration Policy, White House, H.R. 3354 – Make America Secure and Prosperous Appropriations Act, 2018 (Sept. 5, 2017), https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, *Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X*, 20 GUTTMACHER POL'Y REV. (2017), https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x; WHITE HOUSE OFFICE OF MGMT. & BUDGET, THE PRESIDENT'S FISCAL YEAR 2018 BUDGET: OVERVIEW, https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov. 3, 2017).

[119] Guttmacher Institute, *State Laws and Policies: Insurance Coverage of Contraceptives* (2017), https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[120] Several additional states have enacted new requirements that will take effect in 2018 or 2019. *See id.*

[121] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. *See id.*

[122] GARY CLAXTON ET AL., KAISER FAMILY FOUND. & HEALTH RES. & EDUC. TRUST, EMPLOYER HEALTH BENEFITS: 2017 ANNUAL SURVEY (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

21

00373657

Exhibit 80                                                                                                                                    JA-0001240

**NATIONAL WOMEN'S HEALTH NETWORK**

*A Voice for Women, a Network for Change*

40 YEARS

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016
Attention: CMS-9925-IFC and CMS-9940-IFC

*Submitted electronically at www.regulations.gov*

**Subject: Interim Final Rule on Moral and Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act** [CMS-9925-IFC and CMS-9940-IFC]

The National Women's Health Network is a nonprofit advocacy organization that works to improve the health of all women. We are supported by our members and, by choice, we do not accept financial support from drug companies or medical device manufacturers. Since the NWHN's founding over 40 years ago, we have brought the voices, concerns, and needs of women consumers to policy and regulatory tables, advocating for medical products that meet women's real life needs and for a drug and device process that reflects women's lived experiences.

We submit the following comments in response to the Interim Final Rules ("the Rules") titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act"[1] and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act,"[2] published in the Federal Register on October 13, 2017, by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services ("the Departments").

For more than 40 years, the NWHN has worked to ensure that U.S. policy decision-making is fully informed by scientific evidence and the best available data, and that the public has reliable access to independent scientific information and analysis produced and acquired by the federal government. The role of scientific evidence in public health decision-making is imperative, and we oppose any efforts to diminish the role of science in federal policymaking.

Unfortunately, the Rules are a prime example of regulatory decision-making that ignores scientific evidence and the best available data. The Departments' summary of the evidence is arbitrary and cherry-picked. The Departments understate the efficacy and health benefits of contraceptives and overstate the health risks of contraceptives by selectively interpreting data, overlooking well-established evidence, and promoting unfounded doubt. Further, both Rules falsely assert that certain types of FDA-approved contraceptive methods are abortifacients.

1

00715500

Exhibit 81

JA-0001241

The Rules thus cause dual harm by undermining women's access to essential preventive health care and undermining the integrity of science in governance. Public health policy should be informed by the best available scientific evidence. Instead, the Departments use false claims about contraception that are contrary to medical and public health evidence, misstate or ignore research, and undermine the agencies' role as a source of accurate health information.

The Departments serve a critical role in collecting and managing important information and data on issues that are vital to the public. In making policy, it is essential that the Departments enhance their credibility on issues of science and evidence, not undermine it. Thus, the Departments must take full advantage of their resources to inform their decision-making by the best available evidence and data. The Rules, however, show that the Departments did not seriously consider these elements, which can only undermine the Departments' reputations as reliable sources of information.

Below we outline several ways the Rules are at odds with science and research. We urge the Departments to withdraw both Rules.

### Contraception Prevents Unintended Pregnancy and Improves the Health of Women and Children

The NWHN's founding fight was to ensure that women knew about serious and life-threatening health risks associated with early formulations of the Pill. We have had a long history of pushing for women's access to scientifically sound, medically safe drugs and devices even when that has meant disagreeing with other allies in the women's health movement, and we have never shied away from publicly sounding the alarms when we had concerns about a contraceptive method. We follow where the evidence leads us, and in the evidence here is clear. Contraceptive safety and efficacy at preventing unintended pregnancy is supported by decades of rigorous evidence and by the government itself.[3]

As an example of how the Departments are not utilizing the best available science and evidence with dire consequences for public health, the Departments make several misstatements that ignore prevailing evidence regarding the efficacy, health benefits, and health risks of contraceptives. First, the Departments fail to acknowledge that contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[4] Second, the Departments falsely associate several health risks with contraceptive use, ignoring the weight of the evidence.[5] The Departments' summary of the evidence is wrong and misleading. Not only does contraception effectively prevent most unintended pregnancy,[6] but the prevention of unintended pregnancy is associated with life-long health benefits for both women and children that the Departments fully ignore. Further, the Departments' overstatement of health risks ignores the long, evidence-based list of non-contraceptive health benefits associated with contraceptives.

The Departments' misrepresentation of "complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy"[7] is false and relies heavily on cherry-picked citations instead of accurately reflecting the weight of the evidence. For instance, the Departments point to a single pre-ACA economics paper positing that contraceptive use may be connected to an increase in teen pregnancy over the "long run."[8] This paper utilized

2

00715501

Exhibit 81                                                                                    JA-0001242

1997 youth survey data where the majority of respondents were using condoms or another "episodic" form of birth control,[9] the efficacy of which is irrelevant to an assessment of the efficacy of the methods of birth control covered under the ACA's contraceptive benefit, and hardly contributes to "uncertainty"[10] regarding decades of clinical data that prove otherwise.

In truth, contraception enables women, including teens, to prevent unintended pregnancy and control the timing of a desired pregnancy.[11] The Centers for Disease Control and Prevention named family planning one of the ten great public health achievements of the past century,[12] and family planning is widely credited for contributing to women's societal, educational, and economic gains.[13] The ACA's guarantee of no-copay coverage of contraception has contributed to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[14]

Contraception is considered a major factor in reducing rates of maternal mortality and morbidity. For example, a study of 172 developing countries found that use of contraception is an "effective primary prevention strategy to reduce maternal mortality . . . ."[15] The Departments' new Rules paper over this vast body of research and the clear health benefits of contraception.

### The Health Risks of Contraceptives Are Overstated and Misrepresented

The Departments go further, selectively interpreting data in order to overstate "negative health effects" associated with contraceptives.[16] This includes misleading assertions of an association between contraceptive use, breast cancer, and cervical cancer, as well as vascular events and "risky sexual behavior."[17] The Departments ignore substantial evidence to the contrary, and ignore the balance of significant non-contraceptive health benefits associated with contraceptive use. Certainly it is true that, as with any medication, some types or methods of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[18] Some women may also want to avoid side effects such as changes to menstrual flow.[19] But the Departments fail to recognize that this means that patients and health care providers, not employers and agencies, should determine the right contraceptive for an individual woman's health care needs.

The Departments' claim that contraceptive use is associated with an increased risk of breast and cervical cancers is based solely on a 2013 Agency for Healthcare Research and Quality report, when in fact the evidence is not decisive, and to say so is a misrepresentation. There is no proven increased risk of breast cancer among contraceptive users, particularly those under 40. For women over 40, health care providers must consider both the risks of becoming pregnant at an advanced reproductive age, as well as the risks of continuing contraception use until menopause, making it essential that a woman be able to discuss options with her provider without interference.[20] And, on the topic of cervical cancer, the Departments cite only a study on oral contraceptives, when a recent study found that intrauterine devices ("IUDs") are associated with a decreased risk of cervical cancer.[21]

It is especially irresponsible to misrepresent the risks of breast and cervical cancer without accurately reporting the substantial evidence of contraceptives' association with cancer prevention, since any evaluation of preventive health care should fully weigh the risks and benefits.[22] Contraceptives are associated with a reduced risk of colorectal cancer;[23] endometrial

3

00715502

Exhibit 81

JA-0001243

cancer is 50 percent less likely among women who use oral hormonal contraceptives for at least one year compared to women who have never used oral hormonal contraceptives;[24] oral hormonal contraceptives can reduce the risk of ovarian cancer by 27 percent, and 20 percent for every five years of additional use;[25] oral hormonal contraceptives can lower the risk of hereditary ovarian cancer in women with the BRCA1 or BRCA2 gene mutations;[26] and oral hormonal contraceptive use for more than 10 years can lower the risk of ovarian cancer among women with endometriosis, who are typically at higher risk of developing ovarian cancer.[27]

The Rules similarly fear-monger around increased risk of "vascular events" such as venous thromboembolism ("VTE"). The risk of VTE among hormonal contraceptive users, while real, is also low,[28] and much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[29] We believe that women should be informed of risks, but that again, patients and health care providers, not employers and agencies, should determine the right contraceptive for an individual woman's health care needs.

The Departments' claim that contraceptives may lead to "risky sexual behavior"[30] is similarly unfounded. Increased access to contraception is not associated with a change or increase in sexual behaviors.[31] Instead, research has shown that school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[32] In the "CHOICE Project," a large-scale U.S. study aimed at reducing unintended pregnancy by providing no-cost contraception, participants reported no change in their sexual activities after receiving contraceptives.[33]

Contraceptives are also associated with other non-contraceptive health benefits beyond the cancer prevention benefits listed above. Benefits include reduced menstrual pain, reduced risk of myoma, reduced symptoms of endometriosis, and reduced symptoms of premenstrual syndrome and premenstrual dysphoric disorder.[34] Oral hormonal contraceptives have been found to reduce the risk of pelvic inflammatory disease by 50 to 60 percent,[35] Contraceptives are also associated with lower risk of rheumatoid arthritis, preservation of bone density, and reduced symptoms of asthma.[36]

In sum, the Departments overstate the evidence of health risks and understate the evidence of contraceptive efficacy and health benefits, failing to accurately reflect the weight of evidence that shows that contraceptives are associated with a variety of short- and long-term health benefits, improving health outcomes for both women and children. And the various contraindications associated with some forms of birth control actually support the opposite finding: women should have access to the full range of FDA-approved methods and must be able to work with health care providers to choose the method that best suits their health concerns and needs without interference from an employer.

### Contraceptives Do Not Interfere with an Existing Pregnancy

Both Rules refer to the false assertion that some FDA-approved methods of contraception "prevent implantation of an embryo," and are thus abortifacients.[37] This is inaccurate and goes against longstanding medical evidence.

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with

4

Exhibit 81

the IOM recommended coverage of the full range of FDA-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion." [38]  FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins. [39]

By making the false claim that some FDA-approved methods of contraception may cause abortion, the Departments sideline science in favor of ideology.

### The Rules Should Be Withdrawn Because They Are Based on Falsehoods, Undermine Scientific Integrity, and Harm Women's Health

In conclusion, the NWHN objects to the Interim Final Rules titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act." The Rules should be withdrawn due to their lack of scientific basis and their harmful impact on women's health and economic security.

Thank you for your consideration of our comments. If you have any questions regarding these comments, please contact Sarah Christopherson, policy advocacy director for the National Women's Health Network (schristopherson@nwhn.org).

Sincerely,

The National Women's Health Network

---

[1] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[2] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[3] *See, e.g.,* Institute of Medicine. (2011). *Clinical Preventive Services for Women: Closing the Gaps.* Washington, DC: The National Academies Press; American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/; Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception*, *83*(5), 397–404; Hatcher, R.A., Trussell, J., Nelson, A.L., Cates, W., Kowal, D., & Policar, M.S. (Eds.). (2011). *Contraceptive Technology* (20th ed.). Atlanta, GA: Bridging the Gap Communications; Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 4–5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.") (citing Sundaram, A., Vaughan, B., Bankole, A., Finer, L., Singh, S., & Trussell, J. (2017, March). Contraceptive failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health*, *49*(1), 7–16); Peipert, J.F.,

5

00715504

Exhibit 81

Madden, T., Allsworth, J.E., & Secura, G.M. (2012, December). Preventing unintended pregnancies by providing no-cost contraception. *Obstetrics & Gynecology, 120*(6), 1291–1297; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852; Harper, C.C., Rocca, C.H., Thompson, K.M., Morfesis, J., Goodman, S., Darney, P.B., . . . Speidel, J.J. (2015, June). Reductions in pregnancy rates in the USA with long-acting reversible contraception: A cluster randomised trial. *The Lancet, 386*(9993), 562–568; Speidel, J.J., Harper, C.C., & Shields, W.C. (2008, September). The potential of long-acting reversible contraception to decrease unintended pregnancy. *Contraception, 78*(3), 197–200.

[4] *See generally* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from
https://www.womenspreventivehealth.org/final-report/. *See also* Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception, 83*(5), 397–404; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852.

[5] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804–05 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[6] *See, e.g.,* Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852 ("A likely explanation for the decline in the rate of unintended pregnancy is a change in the frequency and type of contraceptive use over time.").

[7] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804  (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[8] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147) (citing Arcidiacono, P., Khwaja, A., & Ouyang, L. (2005). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Available at http://public.econ.duke.edu/~psarcidi/teensex.pdf [sic]).

[9] Arcidiacono, P., Khwaja, A., & Ouyang, L. (2011, January 22). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Retrieved 27 November 2017, from
http://public.econ.duke.edu/~psarcidi/teensex.pdf

[10] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[11] *See, e.g.,* Boonstra, H.D. (2014, September 3). What is behind the declines in teen pregnancy rates? *Guttmacher Policy Review, 17*(3), 15–21; Lindberg, L., Santelli, J., & Desai, S. (2016, November). Understanding the decline in adolescent fertility in the United States, 2007–2012. *Journal of Adolescent Health, 59*(5), 577–583.

[12] Centers for Disease Control and Prevention. (2013, April 26). *Ten Great Public Health Achievements in the 20th Century.* Retrieved 27 November 2017, from https://www.cdc.gov/about/history/tengpha.htm

[13] *See, e.g.,* Sonfield, A., Hasstedt, K., Kavanaugh, M.L., & Anderson, R. (2013, March). *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children.* Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf

[14] Guttmacher Institute. (2016, September). *Unintended Pregnancy in the United States* (p. 2). Retrieved 27 November 2017, from https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf

[15] Ahmed, S., Li, Q., Liu, L., & Tsui, A.O. (2012, July). Maternal deaths averted by contraceptive use: An analysis of 172 countries. *The Lancet, 380*(9837), 111–125.

[16] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[17] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147)).

[18] *See, e.g.,* American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 86: Progestin-Only Hormonal Birth Control: Pill and Injection.* Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Progestin-Only-Hormonal-Birth-Control-Pill-and-Injection; American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 185: Combined Hormonal Birth Control: Pill, Patch, and Ring.* Retrieved 27 November 2017, from
https://www.acog.org/Patients/FAQs/Combined-Hormonal-Birth-Control-Pill-Patch-and-Ring.

[19] *See, e.g.,* Jones, R.K. (2011, November). *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills.* Retrieved 30 November 2017, from the Guttmacher Institute website:
https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf

6

00715505

Exhibit 81

[20] *See* Curtis, K.M., Jatlaoui, T.C., Tepper, N.K., Zapata, L.B., Horton, L.G., Jamieson, D.J., & Whiteman, M.K. (2016, July 29). U.S. selected practice recommendations for contraceptive use, 2016. *Morbidity and Mortality Weekly Report, 65*(4), 1–66.

[21] Cortessis, V.K., Barrett, M., Brown Wade, N., Enebish, T., Perrigo, J.L., Tobin, J., . . . McKean-Cowdin, R. (2017). Intrauterine device use and cervical cancer risk: A systematic review and meta-analysis. *Obstetrics & Gynecology, 130*(6), 1226–1236.

[22] *C.f.* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 11). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/

[23] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[24] Ibid.

[25] Ibid.

[26] Ibid.

[27] Ibid.

[28] American College of Obstetricians and Gynecologists, Committee on Gynecologic Practice. (2016). *Committee Opinion Number 540: Risk of Venous Thromboembolism Among Users of Drospirenone-Containing Oral Contraceptive Pills*. Retrieved 27 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Gynecologic-Practice/co540.pdf?dmc=1&ts=20171127T2043082500

[29] Ibid.

[30] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[31] *See, e.g.,* Kirby, D. (2007, November). *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases*. The National Campaign to Prevent Teen and Unplanned Pregnancy Publication. Retrieved 27 November 2017, from https://thenationalcampaign.org/resource/emerging-answers-2007%E2%80%94full-report; Meyer, J.L., Gold, M.A., & Haggerty C.L. (2011, February). Advance provision of emergency contraception among adolescent and young adult women: A systematic review of literature. *Journal of Pediatric & Adolescent Gynecology, 24*(1), 2–9.

[32] Minguez, M., Santelli, J.S., Gibson, E., Orr, M., & Samant, S. (2015, March). Reproductive health impact of a school health center. *Journal of Adolescent Health, 56*(3), 338–344. *See also* Knopf, J.A., Finnie, R.K., Peng, Y., Hahn, R.A., Truman, B.I., Vernon-Smiley, M., . . . Fullilove, M.T. (2016, July). School-based health centers to advance health equity: A Community Guide systematic review. *American Journal of Preventive Medicine, 51*(1), 114–126.

[33] Secura, G.M., Adams, T., Buckel, C.M., Zhao, Q., & Peipert, J.F. (2015, April). Change in sexual behavior with provision of no-cost contraception. *Obstetrics & Gynecology, 123*(4), 771–776. *See also* Goldman, G. (2017, October 11). *The Trump Administration Fakes Science to Justify Restrictions on Birth Control Access.* Union of Concerned Scientists Blog. Retrieved 27 November 2017, from http://blog.ucsusa.org/gretchen-goldman/the-trump-administration-fakes-science-to-justify-restrictions-on-birth-control-access

[34] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47. *See also* American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women. (2015, January). *Committee Opinion Number 615: Access to Contraception*. Retrieved 30 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co615.pdf?dmc=1&ts=20171130T1815539115

[35] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

[36] Ibid.

[37] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838, 47,840 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[38] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[39] *See, e.g.,* Brief of *Amici Curiae* Physicians for Reproductive Health, et al. in Support of Petitioners at 12, Burwell v. Hobby Lobby Stores, Inc., 573 U.S. __, 134 S. Ct. 2751 (2014) (No. 13-354).

7

00715506

Exhibit 81

NEW YORK STATE
DEPARTMENT*of*
FINANCIAL SERVICES

Andrew M. Cuomo
Governor

Maria T. Vullo
Superintendent

December 5, 2017

Ms. Seema Verma
Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attn: CMS–9925–IFC and CMS–9940-IFC
P.O. Box 8016
Baltimore, MD  21244-8016

### Re: Comments on Religious Exemptions and Accommodations for Contraceptive Coverage

Dear Ms. Verma:

The New York State Department of Financial Services ("NYDFS") submits the following comments on the interim final rules (the "Rules") regarding 26 CFR 54, 29 CFR 2590, 45 CFR 147, Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act [CMS-9940-IFC, TD-9827]; Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act [CMS-9925-IFC, TD-9828] that expand exemptions purportedly to protect religious beliefs and moral convictions for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act.

NYDFS opposes the Rules because they undermine women's health care and gender equality. New York law respects the compelling government interest in providing women access to contraceptive coverage to promote women's health and gender equality while respecting the beliefs of religious employers. New York law requires insurers to offer employees of religious employers the option to obtain contraceptive coverage on their own. Notably, the Rules do not preclude New York from enacting and enforcing statutes that provide a higher level of protection and access to coverage for New Yorkers.

NYDFS urges the Centers for Medicare & Medicaid Services and the Department of Health & Human Services (collectively, the "Department") to (1) reconsider its expansion of the types of organizations that may apply for exemption from coverage of contraceptives, and (2) reinstate the former accommodation process as a mandatory requirement, and not as a voluntary option. By expanding the exemption scope to include non-religious and for-profit entities, and removing the accommodation process, women will be denied access to contraceptives, which are part of comprehensive health benefits to all Americans. In fact, when the initial draft of the ACA did not adequately cover medically necessary preventive care for women, the Senate

00206993

Exhibit 82

introduced the Women's Health Amendment, and when finally enacted in 2010, the ACA required issuers to include coverage for women's preventive services at no out-of-pocket cost to women. This remains the law today. The Rules' expansion of the religious and moral exemptions is contrary to the ACA and jeopardizes women's health.

Moreover, these Rules took effect without any prior notice or opportunity for public comment. The prior rule took over six years to promulgate, included no less than six rounds of notice-and-comment rulemaking, and generated more than 725,000 comments. Quite the contrary, because these Rules create a major change in law, the Rules should first be vetted through the procedures required by the Administrative Procedures Act.

NYDFS submits that the Department should reconsider its expansion of the types of organizations that may apply for an exemption because contraceptive coverage is imperative to women's health and overall well-being. Contraceptive medications not only provide women control over personal family planning decisions, but they also are necessary to address other health concerns including a reduction of the risk of cervical and ovarian cancer. In addition, research links women's access to contraception to increases in the pursuit of professional degrees and career paths with higher pay and prestige, which leads to women's increased earning power and the narrowing of the gender pay gap. Expanding opportunities for employers to deny providing contraceptive coverage will reverse the positive trend towards achieving gender parity, and have a tremendous adverse effect on women's health and well-being.

NYDFS also strongly encourages the Department to reinstate the former accommodation process as a mandatory requirement, and not as a voluntary option. The accommodation process allows the government to achieve its goal of protecting women's health in the least restrictive manner for those with sincerely held religious beliefs.[1] The Supreme Court recognized the need to provide this coverage even where there are appropriate religious exemptions.[2] As indicated in the Rules, the accommodation process "seamlessly" shifts the obligation of providing contraceptive coverage from the employer to the issuer or the third-party administrator; therefore, it alleviates the objecting employer from any duty that is contrary to its religious beliefs, while providing the contraceptive coverage mandated by the ACA to protect women's health.

Finally, the Department has acknowledged that it is not aware of any publicly traded companies or issuers that would be interested in applying for this expanded exemption. However, by expanding the scope of the exemption and allowing the accommodation to become a voluntary action, the Department may foster situations where this essential preventive service is not provided. Without the mandatory accommodation process – in addition to the absence of a certification requirement of an organization's sincerely held religious or moral beliefs – employers would be permitted to decide for their female employees or plan participants the level

---

[1]  The Religious Freedom Restoration Act provides that the Government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000bb-1.

[2]  The Supreme Court stated that "the parties … should be afforded an opportunity to arrive at an approach going forward that accommodates [the employers'] religious exercise while at the same time ensuring that women covered by [the employers'] health plans receive full and equal health coverage, including contraceptive coverage." *Zubik v Burwell*, 136 S. Ct. 1557, 1560 (2016).

2

of access women have, if any, to contraceptive coverage. It is unconscionable for employers to substitute themselves for an employee's health care decisions.

In conclusion, New York will continue to protect women's health by retaining its robust contraceptive coverage requirements including ensuring that employees of truly religious organizations have access to coverage of contraceptives if they choose to obtain such coverage. Moreover, NYDFS respectfully urges the Department to limit the types of organizations that may apply for a religious exemption to those that truly are religious organizations, and to reinstate the former accommodation process as a mandatory requirement to be consistent with guidance from the Supreme Court.

We appreciate the Department's consideration of these comments and look forward to continuing to work with our federal partners to revise the interim final rules to meet the health care needs of American women.

Sincerely,

Maria T. Vullo
Superintendent of Financial Services

3

00206995

Exhibit 82



December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act (RIN 0938-AT20)**

To Whom It May Concern:

NMAC (formerly, the National Minority AIDS Council) is pleased to provide comments in
response to the Religious Exemptions and Accommodations for Coverage of Certain Preventive
Services interim final rule ("Religious Exemptions IFR" or "Rule") published in the Federal
Register on October 13, 2017.[1] For the reasons set forth below, we urge the Department of the
Treasury, Department of Labor, and Department of Health and Human Services (collectively,
"the Departments") to set aside this Rule. First, the Religious Exemptions IFR creates a harmful
and dangerous precedent by allowing the denial of health care coverage based on religious views
while paying scant attention to the harm such denials cause to third parties. Second, the rule will
harm women, people living with HIV (PLWH), people of color as well as LGBT people by
restricting access to essential reproductive and other health care services. Third, the Religious
Exemptions IFR violates the Administrative Procedure Act ("APA") and both the First and Fifth
Amendments to the United States Constitution.


NMAC, a 501(c) 3 organization, develops leadership in communities of color to end the HIV
epidemic. NMAC leads with race to urgently fight for health equity and racial justice to end the
HIV epidemic in America. Since 1987, NMAC has advanced this mission through a variety of
programs and services, including a public policy education program, national and regional
training conferences, treatment and research programs, numerous electronic and materials and a
website: http://www.nmac.org/. NMAC also serves as an association of HIV service
organizations providing valuable information to community-based organizations, hospitals,
clinics and other groups assisting individuals and families affected by the HIV epidemic.

---

[1] 82 Fed. Reg. 47792 et seq.

00715516

Exhibit 83                                                                                                    JA-0001251

I.    **Background**

A.    **The Benefits of Contraception Are Well Known**

The ACA has expanded contraceptive coverage without cost-sharing to millions of people across the nation.[2] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with almost 65% of the decrease directly attributed to the contraceptive coverage provision. After the implementation of the ACA, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[3] Studies show that the use of long-term contraceptives methods, such as an IUD or an implant, has increased in recent years because the high upfront costs were removed.[4] These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives.[5] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[6] Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[7]

Access to contraception is an essential part of shaping women's health and well-being.[8] As of September 2016, there were approximately 61 million U.S. women in their childbearing years (ages 15–44).[9] About 43 million of those women (70%) are at risk of unintended pregnancy— that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners do not use a contraceptive method correctly and consistently.[10] Heterosexual couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[11] In the United States, the

---

[2] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[3] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[4] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[5] Alina Salganicoff, Laurie Sobel, and Caroline Rosenzweig, *The Future of Contraceptive Coverage*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[6] *Id.*

[7] *The Affordable Care Act's Birth Control Benefit is Working for Women*, NATIONAL WOMEN'S LAW CENTER (Dec. 16, 2016), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.

[8] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[9] Kimberly Daniels, Jill Daugherty, and Jo Jones, *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, NATIONAL HEALTH STATISTICS REPORTS 173 (2014), http://www.cdc.gov/nchs/data/databriefs/db173.pdf.

[10] Jo Jones, William Mosher, and Kimberly Daniels, *Current Contraceptive Use in the United States, 2006–2010, and Changes in Patterns of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

[11] J Trussell, *Contraceptive failure in the United States*, 83 CONTRACEPTION 297–404, (May 2011).

(Continued...)

00715517

Exhibit 83

average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[12]

Contraceptive use among women is widespread, with over 99% of sexually-active women using at least one method of contraception at some point during their lifetime.[13] Contraceptives make up an estimated 30–44% of out-of-pocket health care spending for those who use them.[14] A year's worth of birth control can cost upwards of $370—the equivalent of 51 hours of work for someone earning the federal minimum wage of $7.25 an hour.[15] Long-acting birth control methods, such as an IUD or contraceptive implant, cost more than $1,000 out of pocket[16]— almost one month's salary for a person earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the use of more effective methods, and a decrease in out-of-pocket costs for women.[17]

Contraceptive use benefits women and families in numerous ways. Having access to the full range of FDA-approved contraceptive methods allows women to choose the method that works best for them at a given point in their life—factoring in ease of use, side effects, risk of sexually transmitted infections, desire for confidentiality and control, as well as many other considerations. Identifying the "right" methods helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording them greater control over family planning.

Reducing unwanted pregnancies and affording women greater control over family planning has additional health benefits. For example, avoiding closely spaced pregnancies reduces the risk of premature birth or low birth weight. Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families.

---

[12] *Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics*, THE ALAN GUTTMACHER INSTITUTE (AGI) (2000), https://www.guttmacher.org/sites/default/files/pdfs/pubs/fulfill.pdf.

[13] Guttmacher Institute, *Contraceptive Use in the United States* (September 2016), https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

[14] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11, http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[15] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose*, NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/; *See* Elizabeth Celms, *How much do birth-control pills cost?*, CLEAR HEALTH COSTS (Apr. 29, 2013), https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[16] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose*, NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/.

[17] *Insurance Coverage of Contraceptives*, GUTTMACHER INSTITUTE (Oct. 1, 2017), https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives; Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

(Continued...)

3

00715518

Exhibit 83

### B. The Affordable Care Act's Contraceptive Coverage Provision

The ACA was enacted to achieve several health care reform goals, including improving the availability of primary and preventive health care services. When preventive services coverage was written into the ACA, Congress included a provision directing the Department of Health and Human Services (HHS) to identify the preventive services that should be provided to women.

HHS undertook a thorough and evidence-based process to develop this list of women's preventive services, calling on the independent National Academy of Medicine to convene experts and determine what services should be covered. It surprised no one with a background in public health or medicine that contraception was among the essential preventive services that the Academy included in its recommendations. The Department included contraception in its final rule delineating the list of women's preventive services, exempting houses of worship from covering contraception in their health plans if they had a religious objection. Seeking a broader exemption, some employers, both for-profit and non-profit, filed lawsuits seeking to challenge the requirement to cover contraception on religious grounds.

The Supreme Court resolved the for-profit challenges in 2014, in *Burwell v. Hobby Lobby*.[18] The Court ruled that the Religious Freedom Restoration Act required that a closely held for-profit company whose owners objected to contraception on religious grounds must be permitted to use the same accommodation given to non-profit entities (described below). Importantly, the Court stressed that there would be no harm to the company's workers caused by permitting the company to use the same accommodation to provide its employees with contraceptive coverage, as the employees would still receive coverage without cost sharing.

With respect to non-profit employers, the Departments developed an accommodation to permit religiously affiliated non-profit employers to certify that they objected to contraception and notify their insurer or third-party administrator (TPA), which would arrange for contraceptive coverage for the objecting employer's employees at no cost to the employer. Following the *Hobby Lobby* decision, two more rules were adopted—one creating an additional notice mechanism for objecting non-profits (to HHS rather than to the insurer/TPA), and another allowing closely-held for-profit entities to avail themselves of the same accommodation, pursuant to the holding in *Hobby Lobby*.

### C. Changes Under the Religious Exemptions IFR

The Religious Exemptions IFR expands eligibility for the complete exemption    formerly reserved for houses of worship    to *all* nonprofit and for-profit employers. It also retains the accommodation, formerly available to non-profit and closely-held for-profit employers, as an optional alternative for any employer. Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations. This is a potentially dramatic change in the availability of contraceptive coverage for the employees of a vast number of entities, and a significant departure from what was guaranteed to these employees under prior rulemaking and the *Hobby Lobby* decision.

---

[18] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2786–87 (2014).

4

00715519

Exhibit 83                                                                                  JA-0001254

## II. Comments on the Religious Exemptions IFR

NMAC opposes the Religious Exemptions IFR for three (3) reasons. First, allowing restrictions on the availability of health care services based on the religious beliefs of others—already too prevalent in reproductive health care—sets a dangerous precedent for access to health care for women, people living with HIV (PLWH), people of color as well as LGBT people. Limiting the availability of contraceptive coverage will itself have an adverse impact on women, people living with HIV (PLWH), people of color as well as LGBT people. Third, the Rule is unlawful as it violates of the Administrative Procedure Act, the First Amendment, and the Fifth Amendment.

### A. Religious Exemptions in Health Care Cause Harm

Unlike other nations whose legal regimes have also sought to balance the conscience rights of providers with the rights of persons to access health care, in the United States there is often insufficient consideration given to the impact of overly broad conscience laws on patients. In other words, the playing field is already tilted heavily in favor of those seeking to deny care. And given the nature of the services to which religious exemptions are most commonly applied, these refusal laws have a discriminatory impact on LGBT people and women seeking reproductive health care, especially individuals from communities of color.

At the federal level, there are already numerous statutory protections for health care providers' religious beliefs. These laws include the Church,[19] Weldon,[20] and Coats[21] amendments, which allow providers to refuse to perform or otherwise facilitate abortion services. The Church Amendment also reaches sterilization services.[22]

Most states have similar laws; forty-five allow individual healthcare providers, and forty-three allow institutions, to refuse to provide abortion services.[23] Provider conscience clauses at the state level apply not only to abortion services but also to contraceptive care. Twelve states permit some healthcare providers to refuse to provide contraception and related services (such as counseling).[24] Refusal provisions targeting contraception delay access, increase costs, and may result in unintended pregnancies. Eighteen states allow providers to refuse to provide sterilization services.[25]

State conscience clauses have now expanded to end of life care, stem cell research, and to any unspecified health services to which a moral or religious objection may be raised, including counseling or providing information regarding the patient's health status.[26] These state laws are

[19] 42 U.S.C. § 300a-7 et seq.
[20] Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat 786.
[21] 42 U.S.C. § 238(n).
[22] 42 U.S.C. § 300a-7 et seq.
[23] GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015). http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.
[24] Id.
[25] Id.
[26] Elizabeth B. Deutsch. *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2470 (2015).
(Continued...)

5

00715520

Exhibit 83

also expanding to cover more entities.[27] Provider conscience laws exist in states where there are significant numbers of communities of color, including Texas and Florida,[28] and many of these states have enacted additional, broad constitutional or statutory religious exemptions that impact LGBT persons.[29]

While religiously-based objections to contraception and abortion are well known and have posed access barriers for years, less well known is how these types of refusals can also affect the LGBT community. LGBT people and people living with HIV experience pervasive discrimination in the provision of health care, much of it justified by reference to religious beliefs. According to an in-depth survey concerning health care discrimination against LGBT people and people living with HIV, more than half of all respondents reported that they have experienced at least one of the following types of discrimination in care: being refused needed care; health care professionals refusing to touch them or using excessive precautions; health care professionals using harsh or abusive language; being blamed for their health care status; or health care professionals being physically rough or abusive.[30] Many members of the LGBT community have a "high degree of anticipation and belief that they w[ill] face discriminatory care" which ultimately causes many people to not seek the essential care that they need.[31] For many transgender and gender-nonconforming people the fear of potential negative treatment from health care professionals is even more exacerbated. Undocumented transgender persons were found to be vulnerable to physical attacks in doctors' offices, hospitals, and emergency rooms.[32] There are also geographic considerations that may further exacerbate discrimination against LGBT individuals.[33] These realities have created a major barrier to health care services for LGBT people.

[27] *Id.*

[28] For instance, Florida allows private, religious, and public institutions and individual providers to refuse abortion care to patients and allows individual providers and pharmacists to refuse contraception. GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015), http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.

[29] MOVEMENT ADVANCEMENT PROJECT, LGBT POLICY SPOTLIGHT: STATE AND FEDERAL RELIGIOUS EXEMPTIONS AND THE LGBT COMMUNITY (2015), http://www.lgbtmap.org/policy-and-issue-analysis/policy-spotlight-rfra.

[30] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV 5 (2010), http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf (explaining that "almost 56 percent of lesbian, gay or bisexual (LGB) respondents had at least one of these experiences; 70 percent of transgender and gender-nonconforming respondents had one or more of these experiences; and nearly 63 percent of respondents living with HIV experienced one or more of these types of discrimination in health care. In almost every category, transgender and gender-nonconforming respondents reported higher levels of discrimination by health care providers.").

[31] *Id.* at 6.

[32] GRANT JM, ET AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY 74 (2011), http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

[33] NAT'L WOMEN'S LAW CTR., FACT SHEET: HEALTH CARE REFUSALS HARM PATIENTS: THE THREAT TO REPRODUCTIVE HEALTH CARE 2 (2014), http://www.nwlc.org/sites/default/files/pdfs/refusals_harm_patients_repro_factsheet_5-30-14.pdf.

(Continued...)

6

00715521

Exhibit 83

JA-0001256

LGBT people of color and people with lower socioeconomic status experience even higher levels of discriminatory and substandard care.[34] Data from one report[35] show, among other things:

- Only 64 percent of LGB Latino adults had health insurance coverage compared to 77 percent of all LGB adults and 82 percent of the heterosexual adult population.

- Thirty percent of LGB African-American adults were likely to delay or not get needed medication compared to 19 percent of African-American heterosexual adults.

- Twenty-six percent of LGB Latino adults did not have a regular source for basic health care.

- Only 35 percent of LGB African-American women had a mammogram in the past two years, compared to 57 percent of all LGB women and 62 percent of all heterosexual women.

The problems for patients presented by the expansion of refusal provisions in state law have been exacerbated by the growth in health care systems owned and operated by religious orders. Mergers between Catholic and nonsectarian hospitals have continued as hospital consolidation has intensified. Catholic hospitals and health systems must follow the Ethical and Religious Directives for Catholic Health Care Services ("Directives"), which prohibit a wide range of reproductive health services, such as contraception, sterilization, abortion care, and other needed health care.[36] Nonsectarian hospitals must often agree to comply with these Directives in order to merge with Catholic hospitals.[37]

Health insurance benefits earned by employees and guaranteed under federal law should not be subject to a religious veto by employers. The regulatory regime that existed prior to this IFR was the result of several years of considered policymaking and constituted a balance between religious beliefs and health care access. This IFR would upend that careful balance and subjugate employee health care needs to the religious objections of any employer. Not only is this poor

---

[34] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV, 11 (2010). http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf ("In addition to the overall rates of substandard care, respondents (defined in this survey as having a household income under $20,000) in nearly every category experienced higher rates of discrimination and substandard care. For example, while transgender respondents as a whole reported a care-refusal rate of almost 27 percent, low-income transgender respondents reported a rate of almost 33 percent. Almost 11 percent of low-income LGB respondents and LGB respondents of color were refused care compared to almost 8 percent of LGB people overall."); *see also The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding*, INSTITUTE OF MEDICINE (2011), http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx.

[35] *Health Disparities in LGBT Communities of Color: By the Numbers*, CENTER FOR AMERICAN PROGRESS (2010), https://www.americanprogress.org/issues/lgbt/news/2010/01/15/7132/health-disparities-in-lgbt-communities-of-color

[36] U.S. CONF. OF CATHOLIC BISHOPS, ETHICAL AND RELIGIOUS DIRECTIVES FOR CATHOLIC HEALTH SERVICES (5th ed. 2009), http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf.

[37] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2488-89 (2015).. (Continued...)

7

Exhibit 83

00715522

public health policy, as described further in section B below, it is contrary to numerous provisions of law, set forth in section C.

### B. The Religious Exemptions IFR Will Increase Health Disparities Faced by Women, People Living with HIV (PLWH), People of Color as well as LGBT People

The Religious Exemptions IFR harms women, people living with HIV (PLWH), people of color as well as LGBT people by restricting access to contraception for those who need it, including lesbian and bisexual women and some transgender people.[38] Access to birth control is particularly crucial for the health and well-being of lesbian and bisexual women because they are at risk for unintended pregnancies.[39]

Despite misconceptions held by policymakers and some medical providers, lesbian and bisexual women require sexual and reproductive health services similar to those needed by heterosexual women. A majority of lesbian and bisexual women have reported having had intercourse with men and at least 30% have been pregnant,[40] 50% have used oral contraceptives, and 16% reported one or more abortions.[41] Bisexual women are also subject to an increased risk of sexual violence. One study found that 46% of bisexual women have been raped as compared to 17% of heterosexual women.[42] Broadly, studies indicate that unintended pregnancies are equally as common, if not more common, for lesbian and bisexual women as for heterosexual women.[43]

Adolescent lesbian and bisexual women are at even higher risk for unintended pregnancies. Lesbian adolescent women are less likely than bisexual and heterosexual women to use contraception and bisexual adolescent women are more likely to experience teen pregnancy than are heterosexual adolescent women.[44] One study found that 12% of lesbian and bisexual adolescent women have experienced teen pregnancy, compared to only 5% of heterosexual adolescent women. And a 2016 study by the Centers for Disease Control and Prevention found

---

[38] *Birth Control Access for LGBTQ People*, THE NATIONAL LGBTQ TASK FORCE (2016), http://www.thetaskforce.org/static_html/downloads/reports/fact_sheets/factsheet_birth_control_access.pdf.

[39] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

[40] J.M. Marrazzo and K. Stine, *Reproductive Health History of Lesbians: Implications for Care*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2003).

[41] Elizabeth M. Saewyc, Linda H. Bearinger, Robert Wm. Blum and Michael D. Resnick, *Sexual Intercourse, Abuse and Pregnancy Among Adolescent Women: Does Sexual Orientation Make a Difference?*, 31 FAMILY PLANNING PERSPECTIVES 127 (1999).

[42] Adara Beamesderfer, Lindsey Dawson, Jennifer Kates, Usha Ranji, and Alina Salganicoff, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, THE HENRY J. KAISER FAMILY FOUNDATION (Nov. 2016). https://www.kff.org/disparities-policy/issue-brief/health-and-access-to-care-and-coverage-for-lesbian-gay-bisexual-and-transgender-individuals-in-the-u-s.

[43] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

[44] Brittany M. Charlton, Heather L. Corliss, Stacey A. Missmer, Margaret Rosario, Donna Spiegelman, and Bryn Austin, *Sexual orientation differences in teen pregnancy and hormonal contraceptive use: An examination across 2 generations*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2013), http://www.ajog.org/article/S0002-9378(13)00652-2/pdf.

(Continued...)

00715523

Exhibit 83

JA-0001258

that LGBT high school students are more likely than other students to experience intimate partner violence and rape, which can result in unintended pregnancy.[45]

Access to comprehensive family planning services, and to culturally competent providers of those services, is critically important for the LGBT community. Lesbian, gay and bisexual youth have been shown to experience more pregnancies than do youth who do not identify as a sexual minority.[46] Bisexual women and some transgender people are also at risk for pregnancy and are often over-looked when considering access to reproductive health care. Access to family planning is thus essential for this community and should be made more, not less, accessible.

It is deeply troubling that federal agencies charged with ensuring public health would seek to enact a rule that gives employers such sweeping veto power over the health care services their employees may access under their health care coverage. Health insurance is a form of compensation that employees earn, like wages. Allowing employers an explicit religiously-motivated veto over how an employee uses his or her earned health care coverage is bad public health policy and represents an overemphasis on an exaggerated view of religious liberty at the expense of employee health and well-being.

In sum, access to contraception is essential for the health and well-being of many women, people living with HIV (PLWH), people of color as well as LGBT people. Allowing a wide range of employers to withhold coverage of contraception for religious reasons is unsound public health policy with the potential to cause significant harm.

### C.  The Religious Exemptions IFR is Unlawful

In addition to subjecting the access of women, people living with HIV (PLWH), people of color as well as LGBT people to health care to the religious veto of employers, and increasing health disparities faced by members of the LGBT community, the Religious Exemptions IFR should also be rescinded because it violates the APA and First and Fifth Amendments to the United States Constitution.

### i.  The Religious Exemptions IFR Violates the APA

The Administrative Procedure Act imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[47]

---

[45] *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 — United States and Selected Sites, 2015*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 12, 2016), https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf; *see also* Lisa L. Lindley and Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High School Students*, 105 AM. J. OF PUB. HEALTH 1379 (2015).

[46] Lisa L. Lindley, Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 AM. J. OF PUBLIC HEALTH 1379–86 (July 1, 2015); Karen Schantz, *Pregnancy Risk Among Bisexual, Lesbian, and Gay Youth: What Does Research Tell Us*, ACT FOR YOUTH CENTER OF EXCELLENCE (Apr. 2015), http://www.actforyouth.net/resources/rf/rf_lgb-prg_0415.pdf.

[47] 5 U.S.C. § 551(5).

(Continued...)

9

00715524

Exhibit 83

JA-0001259

The APA is applicable here because the Religious Exemptions IFR is a final agency action and is a legislative rule within the meaning of the APA.[48] By enacting the Religious Exemptions IFR in the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

### 1. Procedural Violations of Pre-Adoption and Post-Adoption Requirements of the APA

The APA contains two procedural rulemaking requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[49] Section 553(b) of the APA requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[50] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[51] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[52]

The Religious Exemptions IFR violates the notice and comment requirement and the 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its stated reasoning, the Departments do not have good cause, which is limited to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[53] Courts have found good cause in cases that involve: (1) emergencies;[54] (2) context where prior notice would subvert the underlying statutory scheme;[55] and (3) situations where Congress intends to waive section 553's requirements.[56] An agency's determination of "good cause" to abstain from following the APA's procedural requirements

---

[48] *Id.*

[49] *Id.*

[50] 5 U.S.C. § 553(b).

[51] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[52] *Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996).

[53] 5 U.S.C. § 553(b).

[54] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).

[55] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (reasoning that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made).

[56] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding that the APA is inapplicable, rather than that good cause is established). (Continued...)

10

00715525

Exhibit 83

JA-0001260

applies to each procedural requirement separately.[57] This means that the Departments must have good cause to waive each requirement.

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[58] While these statutes empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health Insurance Portability and Accountability Act of 1996,[59] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[60] This conclusory statement does not meet the standard Courts have enumerated for rulemaking rise to the standard of "good cause." This reasoning is similar to other instances in which agencies made claims of an emergency situation, unaccompanied by independent facts, which the courts determined were insufficient to constitute good cause.[61] Declaring that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed is not the same as it actually being impracticable and contrary to public interest.

The Departments further argue that "[g]ood cause is supported by providing relief for entities and individuals for whom the Mandate operates in violation of their sincerely held religious beliefs, but who would have to experience that burden for many more months under the prior regulations if these rules are not issued on an interim final basis."[62] However, this reasoning should be weighed against the burdens that many women will face if their employer or university decides to take advantage of the Religious Exemptions IFR and cease to offer contraception without cost-sharing.

The Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and its post-adoption publication requirements. They have not adequately established that the APA's procedural requirements do not apply or that they have good cause for disregarding them. Because the Religious Exemptions IFR was promulgated

---

[57] *United States v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).
[58] Religious Exemptions and Accommodations for Coverage of Certain Preventable Services Under the Affordable Care Act, 82 Fed. Reg. 47792, 47813 (Oct. 13, 2017).
[59] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); 42 U.S.C. § 300gg–92.
[60] 82 Fed. Reg. at 47813.
[61] *See, e.g., Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v. Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); *Brewer*, 766 F.3d at 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting *United States v. Reynolds*, 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).
[62] 82 Fed. Reg. at 47814–15.

11

00715526

Exhibit 83                                                                                          JA-0001261

without adherence to the APA's procedural requirements, and without good cause for doing so, the Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the Religious Exemptions IFR should be rescinded.

## 2. Substantive Violations of the APA

In addition to the APA's procedural requirements described above, the APA contains several substantive rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to a constitutional right," or "in excess of statutory jurisdiction." The Religious Exemptions IFR violates 5 U.S.C. § 706(2) because it contradicts several provision of the Patient Protection and Affordable Care Act ("ACA").

Section 1554 of the ACA prohibits the Departments from issuing regulations that create unreasonable barriers to individuals obtaining medical care; impede timely access to health care services; interfere with communications regarding a full range of treatment options between patient and provider; restrict the ability of providers to provide full disclosure of all relevant information for making health care decisions; violate the principles of informed consent and ethical standards of health care professionals; or limit the availability of treatment for the full duration of a patient's medical needs.[63] The Religious Exemptions IFR is not in accordance with Section 1554 of the ACA because it creates unreasonable barriers to the ability of individuals to obtain appropriate medical care and it impedes timely access to health-care services.

Section 1557 of the ACA prohibits discrimination on the basis of sex.[64] The implementing regulations for this section issued by HHS state that this includes "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."[65] The regulations further state that people cannot "be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which [the rule] applies."[66] By allowing the denial of a health care service used almost exclusively by women, the Religious Exemptions IFR is not in accordance with Section 1557 of the ACA because it discriminates on the basis of sex.

By expanding eligibility for an exemption from the contraceptive coverage benefit beyond houses of worship, the Religious Exemptions IFR erects unreasonable barriers to critical medical coverage, violating Section 1554 of the ACA. By permitting objecting employers to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the ACA. Because the Religious Exemptions IFR violates the ACA, this Rule also violates the APA and must be set aside.

---

[63] 42 U.S.C. § 18114.
[64] 42 U.S.C. § 18116.
[65] 45 CFR § 92.4.
[66] 45 CFR § 92.101.
(Continued...)

12

00715527

Exhibit 83

JA-0001262

### ii. The Religious Exemptions IFR Violates the Establishment and Free Exercise Clauses

The Religious Exemption IFR impermissibly allows employers to impose their own religious viewpoint on employees, regardless of those employees' personal beliefs, and even when doing so causes employees serious harms.[67] Courts have held that both the Establishment and Free Exercises Clauses of the First Amendment prevent the government from shifting the cost of religious accommodation to third parties.[68] While the administration has asserted that the Religious Freedom Restoration Act[69] allows the government an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, the government can only constitutionally achieve such an outcome by replacing the current benefit with a program that provides contraception at no additional cost to employees.[70] Instead, the Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's religious beliefs.

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is nothing in First Amendment jurisprudence to distinguish between these federal statutory entitlements and the contraceptive coverage benefit in the ACA. The Religious Exemption IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find religiously objectionable. Such a result would impermissibly shift the cost of religious accommodation onto third parties, subjecting employees to serious harms with no recourse.

### iii. The Religious Exemptions IFR Violates the Due Process Clause of the Fifth Amendment to the Constitution

This Rule also violates the Fifth Amendment because it constitutes impermissible sex discrimination.[71] The ACA's women's preventive services benefit, which includes the contraceptive coverage provision, was implemented in part to address the fact that women tended

---

[67] *See* U.S. CONST. amend. I.
[68] *See, e.g., Cutter v. Wilkinson,* 544 U.S. 709, 726 (2005) (rejecting a facial challenge to RLUIPA, a federal statute that permits accommodation of certain religious practices in prison, stating "[s]hould inmate requests for religious accommodations become excessive, *impose unjustified burdens on other institutionalized persons,* or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.") (emphasis added); *Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 710 (1985) (stating, "The First Amendment . . . gives no one the right to insist that in pursuit of their own interest others must conform their conduct to his own religious necessities."); *United States v. Lee,* 455 U.S. 252, 260 (1982) ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity. Granting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees."); *but see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos,* 483 U.S. 327 (1987) (distinguishing the obligations imposed on churches from those imposed on other types of organizations).
[69] 42 U.S.C. § 2000bb.
[70] *See Zubik v. Burwell,* 136 S. Ct. 1557; *Hobby Lobby,* 134 S. Ct. at -2786–87.
[71] U.S. CONST. amend. V.

(Continued...)

13

00715528

Exhibit 83

JA-0001263

to pay more for insurance coverage than did men.[72] The Religious Exemptions IFR violates the Fifth Amendment because it exclusively targets a benefit provided to women. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Religious Exemption IFR discriminates based on sex.

The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[73] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs newly covered by the contraceptive coverage provision of the ACA.[74] It is estimated that the ACA created an out-of-pocket savings of approximately $1.4 billion for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their healthcare.[75] Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption. While it is unclear how many organizations will avail themselves of one of these exemptions, it is certain that many women will see a dramatic increase in their reproductive healthcare costs as employers avail themselves of the newly available religious exemption.

## III.    Conclusion

The Religious Exemptions IFR denies coverage for health care services based on religious objections without regard to the impact on employees, stripping from women and the LGBT community coverage for essential health care services that would otherwise be guaranteed under federal law. The Rule privileges particular religious beliefs at the expense of employee health and is contrary to law. For these reasons, the Departments should rescind the Religious Exemptions IFR.

***

NMAC appreciates the opportunity to comment on this interim final rule. If you have any questions or require any further information, please contact Matthew Rose, Policy and Advocacy Manager, at 202.834.1472 or mrose@nmac.org.


Sincerely,


Paul Kawata
Executive Director

---

[72] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).
[73] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.
[74] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.
[75] *Id.*

14

00715529

Exhibit 83

JA-0001264

**NATIONAL
WOMEN'S
LAW CENTER**
EXPANDING THE POSSIBILITIES

Acting Secretary Eric Hargan
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, D.C. 20201

December 5, 2017

*Submitted electronically via www.regulations.gov*

RE:    **Comments in Response to Interim Final Rule: Religious Exemptions and
       Accommodations for Coverage of Certain Preventive Services Under the
       Affordable Care Act (CMS–9940–IFC)**

Dear Acting Secretary Hargan:

The National Women's Law Center (the "Center") is writing in response to the interim final
rule (IFR) entitled "Religious Exemptions and Accommodations for Coverage of Certain
Preventive Services Under the Affordable Care Act,"[1] Since 1972, the Center has worked to
protect and advance the progress of women and their families in core aspects of their lives,
including employment, income security, education, and reproductive rights and health, with
an emphasis on the needs of low-income women and those who face multiple and intersecting
forms of discrimination. The Center has long worked to ensure that health care and 157health
insurance meet women's needs, and that all people have equal access to a full range of health
care regardless of income, age, race, sex, sexual orientation, gender identity, health status,
geographic location, or type of insurance coverage.  This includes affordable and seamless
coverage of contraception.

The IFR will allow employers, universities, and insurance companies to deny women birth
control coverage that they are guaranteed under the Patient Protection and Affordable Care
Act (ACA). It will harm women's health, equality, and economic security,[2] reinstating the
very barriers that Congress intended to address. The Departments of Health and Human
Services, Labor, and Treasury ("the Departments") made these changes without authority,
contrary to congressional intent, the U.S. Supreme Court's explicit instructions, and various
constitutional and statutory law, and without the required notice-and-comment procedure. The
IFR establishes and adopts one subset of religious views while denying health care to those
with different views. The IFR discriminates against women and puts obstacles and burdens in
their path to obtaining contraception, which will leave some women unable to access
contraception at all. For all of these reasons, the IFR violates numerous federal laws and
constitutional provisions, including the Administrative Procedure Act, the Establishment

---

[1] 82 Fed. Reg. 47,792 (Oct. 13, 2017).
[2] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that
the denial of reproductive health care and insurance coverage for such care also affects people who do not
identify as women, including some gender non-conforming people and some transgender men.

*With the law on your side, great things are possible.*

11 Dupont Circle ▪ Suite 800 ▪ Washington, DC 20036 ▪ 202.588.5180 ▪ 202.588.5185 Fax   www.nwlc.org

00372913

Exhibit 84                                                                    JA-0001265

Clause of the First Amendment to the U.S. Constitution, the Due Process Clause of the Fifth Amendment to the U.S. Constitution including equal protection guarantees and the right to liberty, and the ACA's non-discrimination provision. Moreover, the IFR is predicated upon false, misleading and fundamentally incorrect statements about science and medical evidence, the federal programs that provide contraception and contraceptive coverage, state laws that require insurance coverage of contraception, and the regulatory impact of the rule.

For all of these reasons the Center calls on the Departments to rescind the IFR immediately.

## I. The IFR Harms Women's Health, Equality, and Economic Security

By the Departments' own admission, the IFR will result in women losing coverage of contraception. This loss of coverage will harm women's health, equality, and economic security because without contraceptive coverage, women will face cost and other barriers that make it more difficult to use the contraceptive method of their choice as recommended by their health care provider. In some cases, women will forgo using contraception altogether. These women, and their families, will be unable to benefit from the specific health benefits contraception confers on women and children by allowing pregnancies to be delayed, planned, and spaced. Under this IFR, women will face greater barriers accessing opportunities in the workplace and school because it will be more difficult to plan and space their pregnancies.

### A. The IFR recreates cost and other barriers to contraception that will impact women's ability to use it.

The IFR forces women to find and afford birth control on their own. This not only reinstates the cost barriers to contraception, but also imposes significant other informational, administrative, and logistical burdens on women who will need to navigate finding other sources of contraceptive care. This is precisely the problem that existed before the ACA, when one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[3] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[4] And out-of-pocket costs prevented women across the income spectrum from accessing preventive services, including contraception.[5] The gap between men and women who struggled to access needed care was in fact widest among

---

[3] Kaiser Family Found., Women's Health Care Chartbook (2011) *available at* https://www.kff.org/womens-health-policy/report/womens-health-care-chartbook-key-findings-from/.

[4] *Id.*

[5] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFchNSzeQ.

00372914

Exhibit 84    JA-0001266

adults with moderate incomes.[6] The Departments are sending women back to this fate under this IFR.

Moreover, the barriers recreated by the Departments will be a particular burden on women with low wages or who are living in poverty.[7] The Departments imply that those with employer-sponsored insurance are not low-income, but in fact many are. For example, the typical median wage for an aide at a health care facility is less than $12 an hour.[8] If a woman works full time, year round at $12 per hour, her monthly pretax earnings are $2,000—earnings that fall short of the amount needed to cover typical monthly expenses such as housing, food, transportation, health care costs, and other expenses.[9] This shortfall means she cannot meet her basic needs and, when faced with out-of-pocket costs for contraception starting even at $10 as a result of the IFR, she may find that she cannot pay for this critical health care.[10]

Without insurance coverage, the most effective methods of contraception are unaffordable for most women because of their large up-front costs, such as the $1,000 out-of-pocket cost for an intrauterine device (IUD).[11] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[12] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[13]

---

[6] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.
  "The research consistently demonstrates that the low-income population is particularly sensitive to out-of-pocket costs—enrollment in health plans declines steeply as premiums increase and even low levels of cost-sharing can have adverse effects on use of health care services and health outcomes." Julie Hudman & Molly O'Malley, Kaiser Comm'n on Medicaid & the Uninsured, *Health Insurance Premiums and Cost Sharing: Findings from the Research on Low-Income Populations* 2 (Mar. 2003), https://kaiserfamilyfoundation.files.wordpress.com/2013/01/health-insurance-premiums-and-cost-sharing-findings-from-the-research-on-low-income-populations-policy-brief.pdf.
[8] U.S. Dep't of Labor, *May 2014 National Occupational Employment and Wage Estimates United States*, http://www.bls.gov/oes/current/oes_nat.htm (last modified Mar. 25, 2015) (listing the national median hourly wage for "Nursing, Psychiatric, and Home Health Aides" as $11.33).
[9] *See* Elise Gould et al., Econ. Policy Inst., *What Families Need to Get By: EPI's 2015 Family Budget Calculator* fig. A (Aug. 26, 2015), http://www.epi.org/publication/what-families-need-to-get-by-epis-2015-family-budget-calculator/ (showing that a single person in Des Moines, Iowa—the median family budget area for a two-parent, two-child family—has $2,236 in monthly expenses).
[10] Oral contraception costs women, on average, $2,630 over five years. Methods other than the pill — including injectable contraceptives, transdermal patches, and the vaginal ring—cost women between $2,300 and $2,800 over a five-year period. James Trussell et al., *Erratum to "Cost Effectiveness of Contraceptives in the United States" [Contraception 79 (2009) 5-14]*, 80 Contraception 229, 229 (2009).
[11] *See* Planned Parenthood Fed'n of Am., *IUD*, http://www.plannedparenthood.org/health-topics/birth-control/iud-4245.htm (last visited Feb. 14, 2016).
[12] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).
[13] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211, *available at* http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

3

00372915

Exhibit 84

JA-0001267

Without This IFR once again leaves women with few options when faced with the costs associated with contraception – some will forgo it completely, choose less effective methods, or use it inconsistently or incorrectly.[14]  And some women will not be able to access the education and counseling about available contraceptive methods that they need to make an informed decision about their contraception.[15]

### B. The IFR will have detrimental effects on the health of women and children.

By taking away insurance coverage of contraception and related services and reinstating cost barriers, the IFR puts more women at risk for unintended pregnancy and the associated health risks.  Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[16] Other long term harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[17]

In addition, pregnancy can exacerbate underlying physical and psychological conditions or chronic conditions, which makes controlling the timing of a desired pregnancy particularly important for women with these conditions to ensure that their health can support carrying a pregnancy to term.[18]  Women may also need contraception to prevent or delay pregnancy in other circumstances related to public health, such as to prevent the harmful effects the Zika virus is believed to have on a developing fetus.[19]

---

[14] *See, e.g.,* Guttmacher Inst., *A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions* 5 (Sept. 2009). http://www.guttmacher.org/pubs/RecessionFP.pdf (finding that to save money, women forewent contraception, skipped birth control pills, delayed filling prescriptions, went off the pill for at least a month, or purchased fewer birth control packs at once).

[15] For example, one study found a "clinically and statistically significant reduction" in unintended pregnancies when at-risk women received contraceptive counseling and reversible contraceptive methods of their choice at no cost. Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception,* 120 Obstetrics & Gynecology 1291, 1291 (2012); *see also* Nat'l Bus. Grp. on Health, *Investing in Maternal and Child Health: An Employer's Toolkit* pt. 4 at 12, 37-38 (2007), *available at* http://www.businessgrouphealth.org/pub/f3004374-2354-d714-5186-b5bc1885758a (advising employers to cover "comprehensive contraceptive coverage" and eliminate cost sharing to help prevent unintended pregnancies). Another study found that when out-of-pocket costs for contraceptives were eliminated or reduced, their use—particularly of the most effective forms of contraception—increased, and the estimated annual contraceptive failure rate decreased. *See* Debbie Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change,* 76 Contraception 360, 360, 363 (2007).

[16] A. Conde-Agudelo et al., *Birth spacing and risk of adverse perinatal outcomes: a meta-analysis,* 15 J. of Am. Med. Assn 1809 (2006).

[17] AO Tsui et al., *Family Planning and the Burden of Unintended Pregnancies,* 32 Epidemiologic Reviews 152 (2010).

[18] *Id.* at 103-104.

[19] *See* Debra Goldschmidt, *CDC Expands Zika Virus Alert: More Countries Issue Pregnancy Warnings,* CNN, Jan. 22, 2016. http://www.cnn.com/2016/01/22/health/new-zika-warnings/.

00372916

Exhibit 84                                                                                                    JA-0001268

Unintended pregnancy rates already are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[20] The fact that contraception prevents unintended pregnancy, and is factor in preventing the negative health outcomes associated with it, is well established and supported in evidence.[21] And yet, with the IFR, the Departments are putting more women in the United States at risk for unintended pregnancy and the related negative health risks and outcomes.

### C. The IFR undermines women's participation in society and their economic security.

By allowing entities to deprive women of contraceptive coverage, the IFR makes it more difficult for women to decide if and when to become parents. The ability to make this decision allows women to access more professional and educational opportunities. Studies show that access to contraception has increased women's wages and lifetime earnings.[22] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[23] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[24] which was followed by large increases in women's presence in law, medicine, and other professions.[25] These benefits are widely recognized, including by women themselves and the Departments.[26] Yet the IFR will hinder women's equal opportunity and

---

[20] Lawrence B. Finer and Mila R. Zolna, *Declines in unintended pregnancy in the United States, 2008–2011*, 374 *New England Journal of Medicine* 843 (2016).

[21] James Trussell, *Contraceptive failure in the United States*, 83 Contraception 397 (2011).

[22] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, *Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics*, 87 Contraception 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[23] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/papers/w17922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[24] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[25] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002) *available at* https://dash.harvard.edu/handle/1/2624453.

[26] In one study, when asked why they use contraceptives, a majority of women reported that "over the course of their lives, access to contraception had enabled them to take better care of themselves or their families, support themselves financially, complete their education, or get or keep a job." Adam Sonfield, *What Women Already Know: Documenting the Social and Economic Benefits of Family Planning*, 16 Guttmacher Pol'y Rev. 8, 8 (2013); *see also* Frost & Lindberg, *supra*, at 467 (study reporting that a majority of women consider the ability to better control their lives a very important reason for using contraception). The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force." Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

00372917

Exhibit 84    JA-0001269

make it more difficult for women to be equal participants in the social, political, and economic life of the nation.

By allowing entities to deprive women of contraceptive coverage, the IFR will harm women's health, equality, and economic security. For these reasons, the Departments must rescind the IFR.

## II. The Departments made these changes without authority, contrary to congressional intent, the Supreme Court's order in *Zubik v. Burwell*, and numerous constitutional and statutory provisions, and without required notice-and-comment procedure.

The Departments did not have authority to create this IFR, and the authority relied upon by the Departments is spurious. In fact, the IFR is contrary to congressional intent, the U.S. Supreme Court's clear instructions in *Zubik v. Burwell*, and the U.S. Constitution and federal law, including other provisions of the ACA. Additionally, the Departments did not follow legally-required rulemaking processes.

### A. The Departments do not have authority to issue this IFR and the authority cited is illegitimate.

The Departments do not have authority to issue this IFR. Nothing in the ACA, its language or legislative history, allows for any limitations regarding contraceptive coverage.

The authority cited by the Departments in the IFR is illegitimate and does not provide any actual authority for the IFR. For example, the Departments claim that the grandfathering provision of the ACA gives them authority to issue the IFR. But that is simply not true. First of all, the grandfathering provision is not a true exemption. Allowing grandfathering was intended as a temporary means of transitioning employers to full compliance with the ACA's requirements.[27] And the number of employer-sponsored grandfathered plans has decreased steadily since 2010.[28] Second, even if considered an exemption, it does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[29]

The Departments also rely on the mere existence of other types of religious exemption laws to justify the sweeping exemptions in the IFR, which is also false and misleading[30] The laws referred to by the Departments are not relevant to the Affordable Care Act, not about birth control, or not about insurance coverage. Just to cite one example: the Departments rely upon laws allowing health care entities to refuse to treat a woman seeking an abortion – including

---

[27] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; Hobby Lobby, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).
[28] Gary Claxton et al., Kaiser Family Found., Employer Health Benefits 2017 Annual Survey 204 (2017). http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.
[29] See Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").
[30] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,792 n.1 (Oct. 13, 2017).

6

00372918

Exhibit 84

the Church Amendment and Weldon Amendment. These harmful laws are explicitly about refusing to provide abortion and/or sterilization. They do not reach birth control, and in fact when the George W. Bush Administration considered issuing regulations that reinterpreted these laws so that they would reach birth control, that effort was quickly rejected because it went beyond the statutory language and congressional intent.[31]

### B. The IFR directly contradicts congressional intent.

The fact that the Departments must refer to irrelevant statutes in order to claim authority just further proves that there is no authority.  Indeed, the IFR directly contradicts Congressional purpose and intent. Congress added the Women's Health Amendment to the ACA in recognition of gaps in coverage of vital women's preventive services and to remedy the problems of women avoiding or delaying care because of cost and insurance companies discriminating against women.[32]  Congress specifically intended for the Women's Health Amendment to improve women's health care by providing "affordable family planning services" to "enable women and families to make informed decisions about when and how they become parents."[33] Congress understood that cost-free preventive health care services for women, including contraception, would decrease maternal mortality, reduce unintended pregnancies and pregnancy-related complications, and also protect children's health and well-being by ensuring that women become pregnant when they are healthy and able to care for their child.[34]  In addition to promoting women's health, Congress emphasized that the ACA in general, and the preventive care provisions for women in particular, were critical in combating discrimination against women.[35] Congress recognized that "[w]omen are more likely than men to neglect care or treatment because of cost."[36] With respect to contraception specifically, Congress intended to eliminate the out-of-pocket costs related to contraceptive services, as these costs were driving a significant portion of women's health care costs and preventing women from accessing the care that they needed.

---

[31] *See* Jeffrey Young, *Leavitt: 'Conscience' rule won't affect birth control*, The Hill, Aug. 21, 2008, http://thehill.com/homenews/news/15988-leavitt-conscience-rule-wont-affect-birth-control.

[32] 155 Cong. Rec. S12026 (daily ed. Dec. 1, 2009) (statement of Sen. Boxer), and at S12019-S12020 (statement of Sen. Reid).

[33] 155 Cong. Rec. S12052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken); see also, e.g., 155 Cong. Rec. S12671 (daily ed. Dec. 8, 2009) (statement of Sen. Durbin) ("Today, there are 17 million women of reproductive age in America who are uninsured. This bill will expand health insurance coverage to the vast majority of them, which . . . will reduce unintended pregnancies and reduce abortions."); 156 Cong. Rec. H1893 (daily ed. Mar. 21, 2010) (statement of Rep. Kaptur) ("This legislation will help millions of women obtain health coverage and thus reduce abortion by enhancing broad coverage options for women's and children's health.").

[34] See, e.g., 155 Cong. Rec. S12026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski) ("We know early detection saves lives, curtails the expansion of disease, and, in the long run, saves money."); id. at S12052 (statement of Sen. Franken) ("These screenings catch potential problems such as cancer as early as possible. . . . For example, cervical cancer screenings every 3 to 5 years could prevent four out of every five cases of invasive cancer."); see also Martha J. Bailey et al., Do Family Planning Programs Decrease Poverty? Evidence from Public Census Data, 60(2) CESifo Econ. Studies 312, 312–337 (2014) (children born in years following federal family planning programs are less likely to live in poverty).

[35] See 156 Cong. Rec. H1711 (daily ed. Mar. 19, 2010) (statement of Rep. Speier) ("If there ever was an issue on health care that must be addressed and is addressed in [the ACA], it is gender discrimination.").

[36] 155 Cong. Rec. S11987 (daily ed. Nov. 30, 2009) (statement of Sen. Mikulski) ("Fourteen percent of women report they delay or go without needed health care. Women of childbearing age incur 68 percent more out-of-pocket health care costs than men . . . .").

00372919

Exhibit 84                                        JA-0001271

In fact, Congress explicitly rejected an exemption of the type implemented by the IFR. In 2012, Congress considered and rejected a legislative proposal for a "conscience amendment," which would have allowed employers and insurance issuers to deny coverage for preventive care services based on religious or moral objections.[37] In rejecting this proposal, Congress reaffirmed its decision to only exempt grandfathered health plans from the ACA's contraceptive coverage requirement.

### C. The IFR goes against the U.S. Supreme Court's clear instructions in *Zubik v. Burwell*.

The Departments claim they issued the IFR in order to resolve the ongoing litigation brought against the ACA's contraceptive coverage requirement. This claim is invalid, since the content of the IFR directly contradicts the U.S. Supreme Court's order in that very litigation. In 2016, in *Zubik v. Burwell*, the U.S. Supreme Court granted certiorari in seven cases brought by non-profit employers against the contraception accommodation. The Court ultimately vacated and remanded, with the instruction that the parties "should be afforded an opportunity to arrive at an approach going forward that accommodates [the entities'] religious exercise *while at the same time ensuring that women covered by [the entities'] health plans receive full and equal health coverage, including contraceptive coverage*."[38] The IFR completely disregards this explicit instruction, allowing entities to be completely exempted, exempting new entities not before contemplated, and leaving women without the seamless contraceptive coverage to which they are entitled by law.

### D. The IFR is contrary to constitutional and statutory law.

Various provisions of constitutional and statutory law prohibit the exemption promulgated in the IFR. As explained below, the IFR is contrary to the Establishment Clause of the U.S. Constitution, the Due Process Clause of the Fifth Amendment, Sections 1554 and 1557 of the Affordable Care Act, Title VII of the Civil Right of 1964,[39] and Title IX of the Education Amendments of 1972.[40]

### E. The Departments issued the IFR without following proper rulemaking procedure.

The IFR was promulgated and went into effect without any public notice and comment or other pre-enactment mechanism for receiving input from the public, in violation of procedural requirements of the Administrative Procedure Act (APA).[41] Without express permission from Congress to sidestep notice and comment, which is not present here, the Departments can

---

[37] 158 Cong. Rec. S539 (Feb. 9, 2012) (S. Amdt. 1520).
[38] *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (citation and internal quotation marks omitted) (emphasis added).
[39] 42 U.S.C. § 2000e (2012).
[40] 20 U.S.C. § 1681 (2012).
[41] 5 U.S.C. § 553(b), (c), (d).

8

00372920

Exhibit 84

JA-0001272

only publish a rule without notice and comment if they demonstrate "good cause."[42] In publishing the IFR, the Departments have not met this high bar.

The Departments' justifications in the IFR – that notice and comment should be sidestepped to provide resolution for legal challenges and that notice and comment is unnecessary given previous comment opportunities on related rules – are not justifiable and do not reach the level of good cause required under the APA.

As explained above, the action taken in the IFR directly contradicts the explicit instructions given to the Departments by the U.S. Supreme Court in the legal challenges. It also overturns the Departments' own decision on January 9, 2017 with respect to the legal challenges. On January 9, 2017, in response to 54,000 comments received in response to a Request for Information, the Departments concluded: "the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that affected women receive full and equal health coverage, including contraceptive coverage" and that "the Departments continue to believe that the existing accommodation regulations are consistent with [the Religious Freedom Restoration Act]...."[43]

As for previous comment opportunities, there has never been an opportunity to comment on this kind of sweeping exemption. Indeed, the Center has commented at every opportunity on changes to the ACA's contraceptive coverage requirement, and the prior proposals have never contemplated such a drastic expansion of the exemption.

Rather, the exemption allowed by the IFR effectively nullifies the existing regulations requiring contraceptive coverage—regulations that took over six years to promulgate, included multiple consultations with expert committees, and involved no less than six rounds of notice-and-comment rulemaking in the form of Advanced Notices of Proposed Rulemaking, Notices of Proposed Rulemaking, Interim Final Rules with comment periods, and Requests for Information, that together involved more than 725,000 comments.

Because the Departments issued the IFR without authority; contrary to congressional intent, the Supreme Court's order in *Zubik v. Burwell*, and numerous constitutional and statutory provisions; and without required notice-and-comment procedure in violation of the Administrative Procedure Act, the IFR should be rescinded in its entirety.

### III. The IFR establishes and adopts one subset of religious views while denying health care to those with different views.

The IFR's primary purpose is to adopt and endorse one subset of religious views to the detriment of those with different views and without regard to the harm inflicted on women who lose contraceptive coverage.

---

[42] 5 U.S.C. § 553(b)(3)(B).
[43] Dept. of Labor, FAQs About Affordable Care Act Implementation Part 36, at 4-5 (Jan. 9, 2017), *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/acaUSDC1N/ND case 3:17-cv-00817 document 1 filed 10/31/17 page 16 of 26 17 part-36.pdf.

9

00372921

Exhibit 84                                                    JA-0001273

The Center currently represents five women in a lawsuit against the IFR, including a woman named Alicia Baker.[44] Alicia has been a devout Christian her entire life, participating in mission trips, attending seminary, studying the Bible regularly, and dedicating her career to her faith. At the time of her marriage, she decided to get an IUD to prevent pregnancy until she and her husband were ready to have a family – and this decision was in line with her Christian beliefs. In none of her studies has she found anything to indicate that the use of contraceptives is forbidden within her marriage. Her employer – a church – also does not oppose contraception. And yet her insurer, Guidestone, denied coverage of her IUD, and under this rule would deny coverage of services related to it when she needs them.

By providing a religious exemption from the ACA that will harm women by depriving them of or limiting their access to contraceptive services; promoting, advancing, and endorsing one religion; and excessively entangling the government with religion, the IFR violates the Establishment Clause of the U.S. Constitution.[45]

Ignoring the harm to third parties – in this case women who will be denied contraceptive coverage – also violates the requirements of the Religious Freedom Restoration Act (RFRA), as the U.S. Supreme Court made clear in *Burwell v. Hobby Lobby Stores, Inc.*[46] Indeed, that is why the U.S. Supreme Court's instructions in *Zubik* required that any resolution of the cases must ensure that women have "full and equal" coverage of contraceptives.[47] By allowing entities to deprive women of contraceptive coverage and leave women to shoulder the costs of finding and affording birth control, the IFR is not consistent with RFRA.

Because the IFR establishes one subset of religious views while harming those who hold different views and those who are entitled to contraceptive coverage, the IFR violates constitutional and statutory requirements and should be rescinded in its entirety.

#### IV. The IFR discriminates against women and puts obstacles and burdens in their path to obtaining contraception, which will leave some women unable to access contraception at all.

As described in detail above, contraception allows women to decide if and when to become parents, creating more professional and educational opportunities for women and allowing women to be equal participants in the social, political, and economic life of the nation. As explained above, Congress understood that cost-free preventive health care services for women, including contraception, were critical in combating discrimination against women. Moreover, the Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the

---

[44] Brief for Plaintiff, *Shiaref v. Hargan*, No. 3:17-cv-00817-JD (N.D. Ind. filed Oct. 31, 2017).
[45] U.S. Const. amend. I.
[46] 134 S. Ct. 2751, 2781 n.37 (2014) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)); *see also id.* at 2760 ("we certainly do not hold or suggest that RFRA demands accommodation . . . no matter the impact that accommodation may have on . . . thousands of women employed by Hobby Lobby." (internal quotation marks and alterations omitted)).
[47] *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016).

10

00372922

Exhibit 84                                                                                     JA-0001274

workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage requirement "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[48] This makes access to contraception central to women's constitutionally protected right to liberty[49] and equality.

By creating broad exemptions to the ACA's contraceptive coverage requirement, the IFR targets women for adverse treatment. This denies women the equal protection of the laws, in violation of the Fifth Amendment. The IFR also violates statutory prohibitions against discrimination, including:

- Section 1557 of the ACA, which prohibits discrimination on the basis of sex in any health program or activity administered by an Executive Agency or receiving Federal financial assistance.[50]
- Title VII of the Civil Right of 1964, which prohibits employment discrimination based on race, color, religion, sex, and national origin and has been interpreted to require that employers cover birth control in their employee plans if they otherwise cover prescription drugs and preventive care.[51]
- Title IX of the Education Amendments of 1972, which makes it illegal for schools to discriminate against students because of their sex.[52]

As explained above, the IFR also prevents or interferes with women's ability to obtain contraception. By allowing contraception to be excluded from insurance coverage entirely, the IFR recreates cost, logistical, administrative, and other barriers to contraception which result in women using less effective methods of contraception, using contraception inconsistently or incorrectly, or not using contraception at all. The Departments state that not only will women lose coverage as a result of the IFR, but that some women will experience unintended pregnancy because of it.[53] In this way, the IFR violates the constitutionally protected right to contraception. It also violates Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[54] By permitting objecting institutions to deny no-cost contraceptive coverage and placing obstacles in the way of women finding and affording it on their own, the IFR erects unreasonable barriers to medical care and impedes timely access to contraception.

---

[48] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).
[49] The Supreme Court recognized this connection in Planned Parenthood v. Casey, "The ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992).
[50] 42 U.S.C. § 18116 (2010).
[51] Erickson v. Bartell Drug Co., 141 F. Supp.2d 1266, 1273 (W.D. Wash. 2001).
[52] 20 U.S.C. § 1681 (2012).
[53] 82 Fed. Reg. at 47,816. "These interim final rules will result in some persons covered in plans of newly exempt entities not receiving coverage or payments for contraceptive services. The Departments do not have sufficient data to determine the actual effect of these rules on plan participants and beneficiaries, including for costs they may incur for contraceptive coverage, nor of unintended pregnancies that may occur."
[54] 42 U.S.C. § 18114(1).

11

00372923

Exhibit 84

JA-0001275

Because the IFR discriminates against women and denies them the ability to obtain contraception in violation of constitutional and statutory provisions, the IFR must be rescinded.

### V. The IFR is predicated upon false, misleading, and fundamentally incorrect statements.

The Departments make numerous false, misleading, and incorrect statements in the IFR to undermine the contraceptive benefit. As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR is not, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments misconstrue both the extent that federal programs, like Medicaid and Title X, can provide assistance to women who lose coverage as a result of the IFR, and the extent to which women are protected by state contraceptive laws. And the Departments incorrectly estimate the number of women who will in fact lose contraceptive coverage as a result of the IFR. This foundation of misinformation cannot be used to justify the IFR.

### A. The IFR misconstrues scientific and medical evidence.

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Departments put forth several justifications in the rule that simply do not stand up to scientific and medical evidence:

- The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it claims that this requirement includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[55] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[56]
- The rule raises concerns about the "negative health effects" of contraception, misrepresenting the available science on contraceptive safety.[57]
- The rule suggests that the contraceptive coverage benefit could "affect risky sexual behavior [in teens] in a negative way."[58] Increased access to contraception is not

---

[55] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[56] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).
[57] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017). As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer. Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[58] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

12

00372924

Exhibit 84

JA-0001276

associated with increased unsafe sexual behavior or increased sexual activity.[59,60]  In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[61,62]

The Departments willfully ignore basic scientific and medical fact in an effort to manufacture a rationale for the IFR.

### B.  Other programs, including Medicaid and Title X, cannot replace the contraceptive coverage requirement as the Departments contend.

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of the IFR.[63] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those left to find and afford contraception on their own because of the IFR.

Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[64] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[65] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[66] Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the IFR.

---

[59] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy, 2009.

[60] JL Meyer, et al., *Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature*, 24 J Pediatric Adolescent Gynecology 2 (2011).

[61] M Minguez et al., *Reproductive health impact of a school health center*, 56 Journal of Adolescent Health 338 (2015).

[62] JA Knopf et al., Community Preventive Services Task Force, *School-based health centers to advance health equity: a Community Guide systematic review*, 51 Am. J. of Preventive Medicine 114 (2016).

[63] 82 Fed. Reg. 47,803.

[64] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[65] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[66] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

13

00372925

Exhibit 84                                                                                          JA-0001277

Medicaid is a source of coverage that has income and other eligibility requirements for individuals to participate.[67] It is not true that every woman who may lose coverage because of the IFR will be eligible for the Medicaid program. And while Medicaid enrollees have robust access to health care, including family planning services and supplies, provider shortages have persisted.[68] This is particularly true with respect to specialty providers, including OB/GYNs.[69] Given this provider shortage and Medicaid's eligibility requirements, Medicaid is not a solution for all the individuals who will lose coverage as a result of this IFR.

Additionally, the existence of both the Title X and Medicaid programs is threatened by legislative and administrative proposals at both the federal and state levels. From radically altering the structure of the Medicaid program to imposing steep cuts to signaling the intent to approve "innovations" that will leave enrollees without the care they need to blocking Planned Parenthood from participating, this Congress and Administration have attempt to undermine the Medicaid program at every turn.[70] Similarly, the Title X program has been the target of congressional attacks. The Administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[71] Given this clear record of hostility, it is puzzling – to say the least –

---

[67] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid. (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[68] The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients. U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[69] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

[70] Within the last year, as part of the numerous, failed attempts to repeal the ACA, policy makers have sought to radically alter the financial structure of Medicaid. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill. (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV. And the Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program. Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e. These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need.

[71] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-

14

00372926

Exhibit 84

JA-0001278

that the Department would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFR.

## C. The Departments misconstrue the scope of state contraceptive coverage requirements.

The IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminishes the need for a federal requirement. This suggestion willfully ignores that the birth control benefit accomplished a unique aim: it created an across-the-board, nationwide requirement that all women with health insurance have coverage of all FDA-approved birth control methods and related education and counseling without any out-of-pocket costs, and did away with a patchwork system of legal protections.

Telling women who are deprived contraceptive coverage by the IFR that they should rely on state contraceptive coverage laws is a false promise. First, twenty-two states do not have contraceptive coverage laws at all.[72] Second, those states that do have laws do not reach all plans and do not provide the same level of protection. No state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[73] Additionally, only four of the states with a contraceptive coverage law currently require coverage of contraception with no cost-sharing.[74] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[75]

---

appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[72] Nat'l Women's L. Ctr., Contraceptive Equity Laws in Your State: Know Your Rights, Use Your Rights (2012).

[73] G Claxton et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

[74] California, Illinois, Maine, Maryland, Massachusetts, Nevada, New York (via regulation), Oregon, and Vermont have each enshrined the ACA's birth control benefit, but only California, Illinois, New York, and Vermont's are currently in effect. Cal. Ins. Code § 10123.196 (2016); 215 Ill. Comp. Stat. Ann. 5/356z.4 (2016); Md. Code Ann. Ins. §§ 15-826.1, 15-826.2, 15-831 (2016); Md. Code Ann. Health Gen. § 15-148 (2016); H.B. 4009, 190th Gen. Ct. (Mass. 2017)(to be codified at in scattered sections of MASS. GEN. LAWS ch. 32A, 118E, 175, 176A, 176B, 176G).; S.B. 233, 79th Leg., Reg. Sess. (Nev. 2017)(to be codified in scattered sections of NEV. REV. STAT. ch. 422, 639, 687, 689A, 869B, 695B, 695C, 695G); OR. REV. STATE ANN. ch. 721 § 2 (Or. 2017)(2017 undesignated enactments); and, Vt. Stat. Ann. tit. 8, § 4099c (2016).

[75] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

15

00372927

Exhibit 84

JA-0001279

And although other legal requirements – like federal and state non-discrimination requirements – require birth control coverage,[76] they might not reach all employers in the state. Title VII, for example, only reaches employers with 15 or more employees. So people reliant on insurance provided by small businesses that use the exemption in the IFR may not have this legal safeguard to serve as a backstop.

### D. The Departments' estimation of the IFR's impact on beneficiaries is predicated on faulty assumptions and math

The Departments estimate that between 31,700 and 120,000 women will be impacted by the IFR.[77] The Departments further estimate that the cost transferred to women will be between $18,512,800 and $70,080,000.[78] These costs are not inconsequential. As explained above, studies show that costs associated with contraception, even when small, lead women to choose less effective methods, use contraception inconsistently, or forgo it completely, undermining the purposes of the ACA's contraceptive coverage requirement.[79]

Even these estimates, which demonstrate tangible harm to women imposed by the IFR, are based on faulty assumptions and mathematical errors. The Departments estimate that 209 entities were using the accommodation prior to the IFR; counting entities that had filed suit against the accommodation process and entities that had filed suit against the contraceptive coverage requirement in general.[80] Because of the possibility of duplication, the Departments do not include any of the 63 entities that submitted notice to Department of Health and Human Services to use the accommodation nor do they include any of the 60 entities that received contraceptive user fee adjustments in the 2015 plan year. And as the Departments note, they have no way of knowing how many entities used the accommodation without notifying the government of their actions.[81] The Departments' math also ignores the fact that

---

[76] Title VII of the Civil Rights Act of 1964 requires employers with 15 or more employees to provide birth control coverage, and similar state laws against sex discrimination should be interpreted similarly. https://nwlc.org/resources/title-vii-requires-covered-employers-provide-contraceptive-coverage/ State protections against sex discrimination have already been interpreted in this way in Wisconsin, Montana, and Michigan. And some state laws reach employers with less than 15 employees. Nat'l Women's Law Ctr., Contraceptive Equity Laws in Your State: Know Your Rights – Use Your Rights, A Consumer Guide (Aug. 2012) available at https://nwlc.org/resources/contraceptive-equity-laws-your-state-know-your-rights-use-your-rights-consumer-guide/.

[77] 82 Fed. Reg. at 47,821, 47,823.

[78] 31,700 times $584 in annual expenditures on contraceptives and services; 120,000 times $584 in annual expenditures on contraceptives and services. 82 Fed. Reg. at 47,821 (estimating annual expenditures per woman on contraceptives and services).

[79] See, e.g., Guttmacher Inst., A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions 5 (Sept. 2009), https://www.guttmacher.org/sites/default/files/report_pdf/recessionfp_1.pdf.

[80] 82 Fed. Reg. at 47,817.

[81] Id. at 47,817- 47,818.

16

00372928

Exhibit 84                                                                                        JA-0001280

some of the litigating entities counted in the final number of 209 accommodated entities, like the Catholic Benefits Association, represent over 1,000 employers.[82]

Despite all of these calculations, the Departments' actually admit that they are incapable of calculating the true number of women who will lose contraceptive coverage or the amount they will spend out-of-pocket on birth control as a result.[83] But even these estimates do not adequately represent the true impact of the IFR's unprecedented expansion of the exemption to the contraceptive coverage requirement. Exempting publicly-held for-profit corporations, for example, will potentially affect additional hundreds of thousands of women.

All of the Departments' false, misleading, and fundamentally incorrect statements are used to justify the IFR, however they only serve to create a faulty foundation. When issuing regulations, the Departments should rely on evidence-based, scientific fact; true statements about government programs and law; and, verifiable facts about the regulatory impact. In issuing this IFR, the Departments did none of this.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The IFR is illegal and harmful. It allows entities to deprive women of contraceptive coverage that is guaranteed to them by law, and essential to their health, equality, and economic security. It does this despite a clear lack of authority, in contravention of congressional intent and the U.S. Supreme Court's explicit instructions, and in violation of various provisions of constitutional and statutory law. The Center unequivocally calls on the Departments to rescind the IFR in its entirety and immediately.

Sincerely,

Gretchen Borchelt
Vice President, Reproductive Rights and Health
National Women's Law Center

---

[82] Press Release, Catholic Benefits Association, Catholic Benefits Association Calls On HHS And DOJ To Drop Contraceptive Mandate Appeal Before Court's July 31 Deadline (July 27, 2017). http://www.catholicbenefitsassociation.org/cbn/en/resources/cba-press-release-7-27-2017.pdf .
[83] Rule at 47,816.

17

00372929

Exhibit 84

JA-0001281


**Department of Health and Mental Hygiene**


**Department of Social Services**

Human Resources Administration
Department of Homeless Services

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

**Re: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (CMS-9925-IFC); Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (CMS-9940-IFC)**

To Whom It May Concern:

The City of New York (NYC), with the benefit of the experience and expertise from its Human Resources Administration and the Department of Health and Mental Hygiene, respectfully submits the following comments in response to the Interim Final Rules.

The Human Resource Administration's Office of Citywide Health Insurance Access (OCHIA) has an overall mission to expand access to health insurance coverage for NYC residents and small businesses. OCHIA helps children, families, working individuals, and small business owners learn about and find coverage and care that meets their health care needs and budgets. Working with a broad network of public and private sector partners, OCHIA provides outreach, education and enrollment assistance and training on available public and private health insurance options. OCHIA also helps people over 65 years old or with a disability, including visual impairments, learn about and enroll in Medicaid programs.

The mission of the Department of Health and Mental Hygiene (DOHMH) is to improve the health of all New Yorkers and to eliminate health inequities. Throughout our network of Sexual Health Clinics and collaboration with community partners, DOHMH works to increase awareness of and access to a full continuum of sexual and reproductive health and related services, including the full range of contraceptive methods, so that all people can make informed decisions about their sexual and reproductive health, and act on those decisions.

Accordingly, the City of New York advocates for policies that promote access to coverage for all individuals and families. We have significant concerns with both the language used and certain strategies proposed in the Interim Final Rules, and offer recommendations to ensure access to insurance coverage and contraception and protect the health of women in New York and across the nation.

**Overall Concerns**

*Limiting Public Feedback*
NYC is concerned that by promulgating this policy change as an interim final rule rather than through the standard administrative procedure that would have begun with a proposed rule and a period for comment and review, HHS has curtailed its ability to gain and integrate robust feedback from states, localities, the business community and the general public into the planning and implementation of such a significant rule and policy change.

*Misrepresenting the Proven Effectiveness of Contraception*
NYC has significant concerns with misrepresentations of available data regarding the effectiveness of contraception. The supplemental information contained in the Federal Register mischaracterizes the impact of contraceptive use and understates the public health benefits of requiring coverage without cost sharing. In the discussion of the research demonstrating a relationship between increased use of

00427873

Exhibit 85

 **Department of Health and Mental Hygiene**

 **Department of Social Services**

Human Resources Administration
Department of Homeless Services

contraception and a reduction in unintended pregnancy, positive findings are dismissed because they are drawn from studies that demonstrate association but cannot definitively prove causation. While we understand that randomized control trials (RCTs) are the optimal research design to prove causation, this method is often impracticable in research of this kind (i.e., it would require withholding contraception from some while giving it to others). In the absence of RCTs, descriptive studies can provide valuable insights regarding the relationship between contraceptive use and unintended pregnancy. Such research should be used to guide future policies in this field. Additionally, where the Federal Register notes the "uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy," this references old research from the late 1990s and early 2000s that does not reflect current data and understanding of the impact of contraceptive access and contraceptive use on unintended pregnancy rates. Further, the register overstates the negative side effects of hormonal contraceptives. The Institute of Medicine recommends that hormonal contraceptives, along with other preventive health services, be covered by health plans at no cost to patients – a clear testament to the strength of the evidence supporting their safety.[i]

The supplemental information also fails to consider important research on the impact of the positive outcomes associated with reducing barriers to contraceptive access. One study not cited in the register, where over 9,000 women were provided the contraceptive method of their choice at no cost, found that eliminating cost barriers to contraception can significantly decrease the rates of teen birth, abortion rates, and repeat abortions, and also may reduce the rate of unintended pregnancies.[ii] At the same time, the Centers for Disease Control and Prevention's High School Youth Risk Behavior Survey Data shows declines in teens who have ever had sex, are currently sexually active, or have had sex with four or more partners between 2011 and 2015.[iii] These findings weaken the Administration's claim that expanded access to contraception will lead to more risk-taking behavior among women.

Finally, the supplemental information fails to note that the rate of unintended pregnancy is at a 30-year record low, an outcome strongly associated with increased contraceptive use and the move towards more effective long-acting contraceptive methods during the same time period.[iv] More current research has found that improvements in contraceptive use can be seen as determinants of declining rates of adolescent pregnancy and birth rates.[v]

### *Misrepresenting the Out-of-Pocket Costs of Contraception*

These proposed Rules will significantly expand the contraceptive coverage exemption among employers, which will result in some significant number of women and their dependents losing no-cost coverage for the full range of contraceptive methods, curbing access to contraception. We are deeply concerned that the supplemental information states that affected women will still be able to access adequate alternative sources for contraception, naming the Title X family planning program, Medicaid, Temporary Assistance for Needy Families and community health center grants. This statement is misleading and not entirely accurate because these programs, particularly Title X, have been shown to be underfunded[vi] for the population currently served, and might well be unable to meet further demand driven by these Interim Final Rules. Similarly, women receiving private health insurance through an employer would almost certainly not be enrolled in Medicaid; and therefore, are not eligible for contraception through Medicaid. Budgets proposed by the Trump Administration and Congress include dramatic cuts to all four programs; their future is uncertain and should not be proposed as a remedy for the consequences of these rules.

The supplemental information also misrepresents the out-of-pocket costs of contraception. The statement that "(m)any forms of contraception are available for around $50 per month, including long-acting methods such as the birth control shot and intrauterine devices (IUDs)" is misleading and ignores the

00427874

Exhibit 85

JA-0001283



**Department of Health and Mental Hygiene**



Human Resources Administration
Department of Homeless Services

**Department of Social Services**

significance of a $600 annual burden on many women and their families. It also fails to consider the costs associated with more expensive contraceptive options. While there are sources of subsidized contraceptives, such as the Title X family planning program, women who are employed may not qualify for this assistance based on income, and will be forced to shoulder the full cost burden of their contraceptive method of choice. Further, as stated earlier, Title X funding at its current level is insufficient to meet the anticipated additional need caused by these interim final rules.

**Recommendations**:

*NYC recommends that the Department of Health and Human Services (HHS) not expand the religious exemption standard to the contraceptive mandate to entities that are not currently exempt from the law and maintain the mandatory accommodation process for exempt entities.*

The City of New York respects and acknowledges that employers throughout NYC and nationwide hold varied interests and belief systems, which is just one of the ways in which NYC is diverse. However, this interim final rule expands exemptions to the contraceptive mandate beyond the scope necessary to protect religious beliefs, putting many women at risk of losing coverage for necessary contraceptive services. Over 55 million women now enjoy the ACA's promise of contraception without cost-sharing. This access has been found to be extremely effective in reducing rates of unintended pregnancy.

The State of New York has implemented policies that achieve the appropriate balance between the interest of employers and the rights and needs of women. In 2003, New York State enacted legislation that required State-regulated plans to cover contraceptives.[vii] In August of 2017, new requirements were effectuated when the NY State Department of Financial Services amended Insurance Regulation 62 to mandate that State-regulated plans cover a subset of in-network, FDA-approved contraceptive items without cost-sharing. The regulation further protects women's health by specifying the insurers' requirement to cover an initial 3-month supply- and subsequently- a prescribed 12-month supply of contraceptives.[viii] These policies are balanced with a specific, narrow religious exemption, which allows non-profit religious employers to opt out of providing contraceptive coverage, so long as employees have the right to directly purchase a rider from an outside entity for these services. This mandatory rider process ensures that religious employers are able to avoid directly paying for contraceptive coverage, without taking away the employees' ability to access these services. Expanding the ability to assert a religious objection to providing contraceptive coverage to organizations that are publicly traded for-profit organizations and institutions of higher education as written in this rule essentially leaves the decision regarding the availability of necessary medical coverage and care to the mere discretion of the leadership tier of these organizations.

While New York has taken the aforementioned actions to protect the rights and interests of women, it is critical for the federal government to implement policies that promote a substantially similar standard of protection for health plans not subject to state regulation. Since state laws do not govern self-insured plans, many women in New York are employed by entities that, through these Rules, are now permitted on the basis of religious or moral opposition, to stop providing their employees with access to contraceptive services. Indeed, approximately 46% of workers with health insurance were enrolled in self-insured plans as of 2013.[ix] Thus, the City of New York recommends maintaining the mandatory accommodation process to exempt entities.

Expanding the religious exemption to institutions of higher education has already proven problematic when weighed against the needs of women to access comprehensive preventive health care. As a result of

00427875

Exhibit 85



**Department of Health and Mental Hygiene**



**Department of Social Services**

Human Resources Administration

Department of Homeless Services

the Rules, The University of Notre Dame had initially announced that it would terminate contraceptive coverage for faculty, staff, and students outside of specific cases of demonstrated medical necessity. However, shortly thereafter, citing the "plurality of religious and other convictions," the University retracted this policy and will not interfere with the health coverage options of women affiliated with the institution. Notre Dame's retraction underscores that large entities, be it for-profit companies or institutions of higher education, provide compensation and benefits to people of varying belief systems, many of whom might not share the same convictions as the company or University leadership. As such, by expanding the religious exemption standard in this manner, HHS is making it easier for employers to impose their convictions on their employees, inhibiting the employees from accessing valuable contraceptive services. The Rules also create the potential for scenarios where students who began their education under the assurance that their student medical insurance would include contraceptive coverage without cost-sharing will now have significantly reduced access to these services. Without a mandatory accommodation process, these interim final rules may pave the way for many students and women of all ages to lose access to vital contraceptive services.

*NYC recommends that the Department of Health and Human Services (HHS) refrain from creating a moral exemption standard to the contraceptive mandate.*

The City of New York believes that allowing certain employers to opt out of providing contraceptive and sterilization coverage on the basis of moral opposition is detrimental to women's health. The State of New York, as mentioned above, does not currently permit entities to recuse themselves from providing their employees with contraceptive coverage on the basis of personal moral opposition.

HHS requested comments on "whether the exemption in 147.133(a)(1)(i) for plan sponsors with moral objections to the mandate should be finalized to encompass all of the types of plan sponsors covered by 147.133(a)(1)(i), including publicly traded corporations with objections based on sincerely held moral convictions, and also non-federal governmental plan sponsors that may have objections based on sincerely held moral convictions." This language is vague and may lead to insurance plan sponsors asserting arbitrary moral convictions which they may not have had prior to the implementation of this rule. Additionally, where publicly traded companies change leadership, this may add a high level of uncertainty and instability in health services that the companies' employees otherwise would have been guaranteed prior to this rule. NYC believes that further expanding the moral exemption in this manner would only further adversely impact women's health by inhibiting their access to these necessary services without having to personally shoulder the costs. As a result, many more employers will be allowed to withhold contraceptive coverage from their health plans, and this would increase the numbers of women who have to jump through significant hurdles to access contraception, and increase the number of women who lose no-cost contraceptive coverage, or who end up unable to access contraception altogether. Also, while all exempted employers would have the option to request an accommodation so their employees may receive contraceptive methods, counseling, and services directly from their insurer, they are not required to provide such an accommodation. Therefore, these services would become inaccessible to women with employers unwilling to offer this accommodation. These significant changes would result in bureaucratic and financial hurdles that would impede women's ability to access contraception, which we anticipate will lead to an increase in unwanted pregnancies and abortions.

00427876

Exhibit 85

JA-0001285

 **Department of Health and Mental Hygiene**

 **Department of Social Services**

Human Resources Administration
Department of Homeless Services

*If, despite recommendations #1 and #2, HHS decides to expand religious exemptions and create a moral exemption to the ACA's contraceptive mandate, NYC recommends that HHS continue to afford states with the flexibility to enforce the mandate in a fashion specifically tailored to their respective populations.*

If HHS elects to proceed with this reduced federal standard for the contraceptive mandate, NYC urges that the finalized rule continue to allow states to enforce the mandate and regulate exemptions thereto in a manner that protects consumers' ability to access the care they need.

Thank you for the opportunity to comment on the aforementioned Rules.

Sincerely,

Mary T. Bassett, MD, MPH
Commissioner
New York City Department of Health and Mental Hygiene

Steven Banks
Commissioner
New York City Department of Social Services

---

[i] Institute of Medicine (2011). *Clinical Preventive Services for Women*.

[ii] Peipert, J., Madden, T., Allsworth, J., & Secura G. (2012). Preventing Unintended Pregnancies by Providing No-Cost Contraception. *Obstetrics & Gynecology*, 120(6), 1291-1297.

[iii] Centers for Disease Control and Prevention (CDC). *1991-2015 High School Youth Risk Behavior Survey Data*.

[iv] Finer, L.B., & Zolna, M.R. (2016). Declines in Unintended Pregnancy in the United States, 2008-2011. *New England Journal of Medicine*, 374: 843-852. *See also*, Santelli, J.S. et al. (2007). Explaining Recent Declines in Adolescent Pregnancy in the United States: The Contribution of Abstinence and Improved Contraceptive Use. *American Journal of Public Health*, 97(1): 150-156.

[v] Lindberg, L., Santelli, J., & Desai, S. (2016). Understanding the Decline in Adolescent Fertility in the United States, 2007-2012. *Journal of Adolescent Health*, 59, 577-583.

[vi] Dreweke, J. (2016). "Fungibility": The Argument at the Center of a 40-Year Campaign to Undermine Reproductive Health and Rights. Guttmacher Policy Review, 19. Retrieved October 20, 2017, from https://www.guttmacher.org/gpr/2016/10/fungibility-argument-center-40-year-campaign-undermine-reproductive-health-and-rights

[vii] New York State Department of Financial Services. (2003). Circular Letter No. 1. Accessible at http://www.dfs.ny.gov/insurance/circltr/2003/cl03_01.htm

[viii] New York State Department of Financial Services. (2017). Minimum Standards for Form, Content and Sale of Health Insurance, Including Standards of Full and Fair Disclosure. Accessible at http://www.dfs.ny.gov/insurance/r_finala/2017/rf62a47txt.pdf

[ix] Employee Benefit Research Institute. (2013). Self-Insured Health Plans: State Variation and Recent Trends by Firm Size, 1996–2013 Accessible at https://www.ebri.org/pdf/notespdf/EBRI_Notes_06_June15_SI-AutoIRAs.pdf

00427877

Exhibit 85 — JA-0001286



Jodi Magee

BOARD OF DIRECTORS

Willie J. Parker, MD, MPH, MSc

Fredrik F. Broekhuizen, MD

Nancy J. Auer, MD

Cassing Hammond, MD

Seymour L. Romney, MD

Sarp Akse, MD

Nozanin Ahmedzeh

Curtis Boyd, MD

Michelle Desblinc, MD, PhD

Duane L. Dowell, MD, FAAP

Megan Evans, MD, MPH

Adam Jacobs, MD

Angela Janis, MD

Jill Meadows, MD

Jason Rafferty, MD, MPH, EdM

Yashica Robinson, MD

Timothy Spurrell, MD, MEd

Shayne Taylor, MD

David Turok, MD, MPH

Alyssa Yee, MD

Matthew Zerden, MD, MPH

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G
Washington, DC 20201

RE: [CMS-9940-IFC/CMS-9925-IFC]

December 5, 2017

Dear Acting Secretary Hargan:

Physicians for Reproductive Health is committed to ensuring all individuals have affordable coverage of birth control. Physicians for Reproductive Health (Physicians) is a doctor-led national advocacy organization that uses evidence-based medicine to promote sound reproductive health policies. Physicians unites the medical community and concerned supporters. Together, we work to improve access to comprehensive reproductive health care, including contraception and abortion, especially to meet the health care needs of economically disadvantaged patients. Physicians is committed to increasing birth control access, and we unequivocally support the Affordable Care Act's birth control coverage requirement. We strongly believe that all people should have access to affordable birth control and that insurance coverage should provide for all FDA-approved contraceptive methods – just as insurance coverage extends to other preventive care.

Physicians unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through the Moral Exemptions and Accommodations for Coverage of Certain Preventive Services interim final rule (IFR) published in the Federal Register on October 13, 2017.[1] The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[2] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[3]

---

[1] 82 Fed. Reg. 47838 et seq.
[2] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[3] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), available at https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

00195089

Exhibit 86                                                                 JA-0001287

The Moral Exemptions IFR creates a harmful and dangerous precedent by allowing the denial of health care coverage based on moral convictions while paying scant attention to the harm such denials cause to third parties. By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being.  It discriminates against women in violation of multiple federal laws and the Constitution.  The IFR also violates the Administrative Procedure Act.  The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. And the IFR is predicated upon a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons, Physicians for Reproductive Health calls on the Departments to rescind the IFR.

I.     **Birth Control Is Critical to Women's Health**

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[4] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[5] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[6] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[7] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[8] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[9] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[10]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with

---

[4] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

[5] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[6] Id.

[7] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342–43 (2000); 1342–43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014). http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzcQ.

[8] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[9] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[10] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs. 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

00195090

Exhibit 86                                                                                                    JA-0001288

their own desires and to improve maternal, child, and family health.[11] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[12]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[13] Other long-term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[14] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[15] And, the U.S. has the highest rate of maternal mortality in the developed world.[16] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[17] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[18] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[19] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[20, 21]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional

---

[11] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.
[12] *Id.* at 103-104.
[13] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[14] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.
[15] Finer LB and Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine*. 2016. 374(9):843–852.
[16] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation, University of Washington, 2016.
[17] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.
[18] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.
[19] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.
[20] *Id.*
[21] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-analysis Obstet Gynecol. 2017

00195091

Exhibit 86                                                                                                           JA-0001289

barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[22] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-l940s to early 1950s.[23] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[24] which was followed by large increases in women's presence in law, medicine, and other professions.[25] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[26]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## II.   The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.   Congress Intended the ACA to Require Contraceptive Coverage

---

[22] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.
[23] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/w1 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).
[24] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).
[25] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.harvard.edu/handle/1 /2624453.
[26] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

00195092

Exhibit 86

JA-0001290

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[27]  Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[28]  In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage.* . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access.  In fact, more than half of women delay or avoid preventive care because of its cost.  *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[29]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services.  For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[30] And Senator Franken also said in regard to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[31] That contraception would be covered was clear.[32]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department

---

[27] *Id.* at 8,727.

[28] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[29] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[30] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[31] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women.  This may include . . . family planning . . .").

[32] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

00195093

Exhibit 86                                                                                      JA-0001291

of Health and Human Services] to consider in order to fill those gaps."[33] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[34] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[35] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

### B.   The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation.  Yet, in order to justify the sweeping exemptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify the IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[36] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[37] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[38] This exemption is intended as a

---

[33] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.
[34] *Id.* at 109-10.
[35] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).
[36] *See* Priests for Life. v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").
[37] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).
[38] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192-72,193 (Nov. 18, 2015).

00195094

Exhibit 86

temporary means for transitioning employers to full compliance.[39] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[40]

### III.   The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[41] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[42] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[43]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society.  In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[44]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]."[45] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero."[46] Prior to this IFR, HHS met this requirement by ensuring employees continued to

---

[39] Coverage of Certain Preventive Services Under the Affordable Care Act. 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[40] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[41] *See*, e.g., at 21 https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf

[42] *Id.* at 19.

[43] *Id.* at 24-27

[44] 2 U.S.C. § 18116.

[45] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[46] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.*

00195095

Exhibit 86                                                                                               JA-0001293

receive no-cost contraception coverage, even if their employer objected to providing coverage.  The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA").  Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"[47] unless the agency can establish good cause to skip that process.  Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest."  The APA further requires that a rule be published 30 days prior to its effective date.[48]  Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage.  But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA.  The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme.  But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior.  In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation.  The rule is therefore unlawful under the APA.[49]

Specifically, the rule is in excess of statutory authority.  The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage.  The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to

---

at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).
[47] 5 U.S.C. § 553(b), (c).
[48] 5 U.S.C. § 553(d).
[49] 5 U.S.C. § 706.

1440 Broadway, Suite 1514, New York, NY 10018
Tel 646 365 1890 • Fax 646 365 1897 • www.prh.org • info@prh.org

00195096

Exhibit 86

JA-0001294

obtain appropriate medical care."[50] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[51]

For each of these reasons, the rule violates the APA and should be rescinded.

### V.    Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. Physicians for Reproductive Health unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

#### A.    Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices... that many persons and organizations believe are abortifacient—that is, as causing early abortion."[52] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[53]

#### B.    Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[54] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions,

---

[50] 42 U.S.C. § 18114(1).
[51] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).
[52] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[53] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).
[54] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

7440 Broadway, Suite 1614, New York, NY 10018
Tel 646.366.1890 · Fax 646.366.1897 · www.prh.org · info@prh.org

00195097

Exhibit 86

JA-0001295

including high blood pressure, lupus, or a history of breast cancer.[55, 56] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[57] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[58]

### C.    Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[59] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[60,61] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[62,63] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[64] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[65] More females are using contraception the first time they have sex.[66]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

### VI.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[67] This assertion fails to recognize that

---

[55] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[56] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[57] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[58] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[59] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[60] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[61] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[62] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3). 338-344.

[63] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[64] Id.

[65] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[66] Id.

[67] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

00195098

Exhibit 86                                                                    JA-0001296

Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

### A.   Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[68] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[69] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[70]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[71] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[72] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[73] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

---

[68] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[69] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[70] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[71] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928 Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

[72] *See* Fowler, Cl, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[73] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

00195099

Exhibit 86                                                                      JA-0001297

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[74] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[75] This is particularly true with respect to specialty providers, including OB/GYNs.[76] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

    **B.    The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.**

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[77] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to

---

[74] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017). https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[75] U.S. Government Accountability Office, "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General, "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[76] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

[77] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6. (Sept. 2017). https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017). http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mnhSzIV.

1430 Broadway, Suite 1614, New York, NY 10018
Tel 646 365 1890 · Fax 646 365 1897 · www.prh.org · info@prh.org

00195100

Exhibit 86                                                                                                                    JA-0001298

approve "innovations" to the Medicaid program.[78] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[79]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[80] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[81] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[82]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department

---

[78] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[79] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[80] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latino/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[81] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[82] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

00195101

Exhibit 86

JA-0001299

would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[83] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[84] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[85] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[86]

The Departments' is wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

### VII. The Departments' Proposed Changes to the Rule Do Not Fix the Above Problems

The Departments request comment on several ways the IFR could be changed to expand exemptions to the birth control benefit. Each of the questions presented by the Departments is based on an assumption that the IFR is legally sound, and in some instances, that it should be expanded. As described in detail above, this assumption is incorrect. Other than completely striking it, there is nothing the Departments could do to make this better, and any expansion would only further violate the law. The IFR should be struck in its entirety.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons Physicians for Reproductive Health calls on the Departments to rescind the IFR.

Sincerely,

---

[83] Guttmacher Institute. Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*. 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[84] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute. Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*. 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[85] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute. Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*. 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[86] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*. Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust. 2017. https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

1440 Broadway, Suite 1614, New York, NY 10018
Tel 646 366 1890 • Fax 646 366 1897 • www.prh.org • info@prh.org

00195102

Exhibit 86

Physicians for Reproductive Health, Board of Directors

1440 Broadway, Suite 1514, New York, NY 10018
Tel 646 366 1890 · Fax 646 365 1897 · www.prh.org · info@prh.org

00195103

Exhibit 86

JA-0001301

1430 Broadway, Suite 1614, New York, NY 10018
Tel 646 365 1890 · Fax 646 365 1897 · www.ppfa.org · info@ppfa.org

00195104

Exhibit 86

JA-0001302



December 5, 2017

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9925-IFC

Dear Acting Secretary Hargan,

Power to Decide, the campaign to prevent unplanned pregnancy, believes that all young people should have the opportunity to pursue the future they want, realize their full possibility, and follow their intentions. These beliefs guide our work to ensure that all young people have the power to decide if, when, and under what circumstances to get pregnant. We provide objective, evidence-based information about sexual health and contraceptive options, and we work to guarantee equitable access to and information about the full range of contraceptive methods. We are a national, non-partisan organization that is committed to common ground, common sense solutions and catalyzing innovation in the public and private sectors.

Power to Decide is committed to ensuring all individuals have affordable coverage of birth control. We oppose the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement has resulted in 62 million women with private insurance having coverage for the full range of birth control methods, without the burden of additional cost-sharing such as co-pays and deductibles. By allowing virtually any employer and university to deprive women of contraceptive coverage based on moral objections, this IFR will harm women and their health and well-being. Furthermore, the IFR makes inaccurate claims regarding contraception and the federal programs that provide it to low-income people. For all of these reasons Power to Decide calls on the Departments to rescind the IFR.

**What Coverage of Birth Control Makes Possible**

The ability to plan, prevent, and space pregnancies is directly linked to numerous benefits to women, men, children, families, and society, including more educational and economic opportunities and healthier babies. The ACA included the women's preventive benefit in recognition that women's health has long been ignored or disadvantaged in the health

---

📍 1776 Massachusetts Ave, NW, Suite 200 Washington, DC 20036   ☎ 202.478.8500   🖥 powertodecide.org

00206996

Exhibit 87

JA-0001303

care system. The Institute of Medicine (now the National Academy of Medicine) noted the importance of a woman's ability to control if or when she becomes pregnant—and the implications for the woman's health, as well as the health, wellbeing, and economic stability of her and her family—and recommended that birth control be one of the women's preventive services covered without cost-sharing. It's hardly surprising then that 85% of adults agree that birth control is an essential part of health care.[1] Eighty-seven percent also agree that birth control gives them the power to decide their future.[2] Yet despite the fact that birth control is basic health care, for many women it was out of reach due to cost.

Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[3] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[4] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[5] Thanks to the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone. There is also evidence that the provision is increasing the ability to obtain more effective contraception for those who want it.[6] This is particularly important for people who face the greatest disparities in unplanned pregnancy. For example, the unplanned pregnancy rate remains higher for black women and Hispanic women than for white women and these disparities remain, even when controlling for income.[7] Affordable access to contraception and other preventive care is vital to ending health disparities that women of color face, including unintended pregnancy and maternal mortality. Research has shown that maternal and infant health is greatly improved through adequate birth spacing, as well as timely and high quality preconception and prenatal care. In particular, very short intervals between pregnancies raise the risk of preterm birth, low birthweight, slow neonatal growth, and infant death.[8] The Department's objectives, laid out in the most recent HHS Strategic Plan released last month include improving maternal and infant health outcomes. The science is again clear that planning and spacing pregnancies through the use of contraception

---

[1] The National Campaign to Prevent Teen and Unplanned Pregnancy. (2017). *Survey Says: Thanks, Birth Control*. Washington, DC: Author. Retrieved from http://thenationalcampaign.org/resource/survey-says-november-2017 on December 1, 2017.
[2] The National Campaign to Prevent Teen and Unplanned Pregnancy. (2017). *Survey Says: Thanks, Birth Control*. Washington, DC: Author. Retrieved from http://thenationalcampaign.org/resource/survey-says-november-2017 on December 1, 2017.
[3] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.
[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.
[5] Adam Sonfield et al., Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update, 91 Contraception 44, 45-47 (2014).
[6] Caroline S. Carlin et al. Affordable Care Act's Mandate Eliminating Contraceptive Cost Sharing Influenced Choices Of Women With Employer Coverage, Health Affairs Vol. 35, No. 9 (2016). Retrieved from https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2015.1457 on December 1, 2017.
[7] Lawrence B. Finer et al. Declines in Unintended Pregnancy in the United States 2008-2011. N Engl J Med 2016; 374:843-852. Retrieved from http://www.nejm.org/doi/full/10.1056/NEJMsa1506575#t=article on December 2, 2017.
[8] The National Campaign to Prevent Teen and Unplanned Pregnancy (2014). Briefly: What Home Visitors Can Do to Help Their Clients Achieve Adequate Birth Spacing and Avoid Unplanned Pregnancy. Washington, DC: Author. Retrieved from http://thenationalcampaign.org/sites/default/files/resource-primary-download/breifly-what-home-visitors-can-do.pdf on December 2, 2017.

00206997

Exhibit 87

JA-0001304

contributes to this goal,[9] and that the use of contraception, including the most effective methods like IUDs and the Implant, is important to achieving this objective.

Insurance coverage of contraception is critical to ensuring women can use it. Unplanned pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Contraceptive coverage is an economic issue. Eight-four percent of adults agree that having the power to decide if and when to get pregnant has an impact on women's educational and economic opportunities.[10] Studies show that access to contraception has increased women's wages and lifetime earnings.[11] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-l940s to early 1950s.[12] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[13] followed by significantly more women in law, medicine, and other professions.[14] The Departments have noted these benefits, stating that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[15]

This IFR denies how important birth control is to women's health and lives—how it helps them to plan and space pregnancies to achieve their own goals. The IFR denies how critical affordable access to the full range of contraceptive methods is to the economic security of people and families. Finally, it denies the fact that without affordable access to all methods of birth control, disparities in unplanned pregnancy and its consequences will persist.

## Claims in the IFR Do Not Meet Basic Scientific Standards

As the arm of the federal government responsible for the health of hundreds of millions of people, the Department of Health and Human Services' (HHS) policies and activities must

---

[9] Kaye, K., Gootman, J., Ng, A. S., & Finley, C. (2014) *The Benefits of Birth Control in America: Getting the Facts Straight.* Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy.

[10] The National Campaign to Prevent Teen and Unplanned Pregnancy. (2016). *Survey Says: Our Story + Yours* Washington, DC: Author. Retrieved from http://thenationalcampaign.org/resource/survey-says-april-2016 on December 3, 2017.

[11] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Kaye, K., Gootman, J., Ng, A. S., & Finley, C. (2014) *The Benefits of Birth Control in America: Getting the Facts Straight.* Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy retrieved from https://thenationalcampaign.org/resource/benefits-birth-control on December 3, 2017.

[12] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[13] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[14] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002).

[15] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

00206998

Exhibit 87                                                                                           JA-0001305

be firmly rooted in science and what the evidence shows. The IFR does not meet the high standard of scientific evidence used by the National Academy of Medicine or the subsequent Women's Preventive Services Initiative, instead prioritizing the religious and moral beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. Power to Decide stands firmly on the side of evidence, and unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs. The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.

Policies regarding women's access to preventive health care should not be based on science, not moral or religious beliefs. The IFR takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[16] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[17]

The IFR also raises concerns about the "negative health effects" of contraception.[18] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[19] This ignores the relative risk of these medications versus the risks of pregnancy. Specifically, the IFR suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[20] This is why it is so important for a woman to make the decision about what method of contraception is right for her in consultation with her health care provider and based on her unique health needs, not her ability to afford the method.

The IFR also suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[21] However, the evidence shows increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual

---

[16] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[17] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354); the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017); Susan Wood, Ph.D. et al. Long Acting Reversible Contraception: Overview of Research and Policy in the United States, George Washington University (2016). Retrieved from
https://publichealth.gwu.edu/sites/default/files/downloads/projects/JIWH/LARC_White_Paper_2016.pdf on December 3, 2017.
[18] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[19] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014 and Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[20] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42 and Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. Retrieved from https://www.cdc.gov/mmwr/volumes/65/rr/rr6504a1.htm on December 3, 2017.
[21] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

00206999

Exhibit 87

JA-0001306

activity.[22] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[23] All young people deserve the power to decide if, when and under what circumstances to become pregnant. Access to contraception allows them to do this.

**The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty**

The Departments assert that existing government-sponsored programs, such as Medicaid and the Title X Family Planning Program, can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[24] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of privately insured individuals and as currently funded are unable to meet existing need among low-income people. More than 19 million women in need of publicly funded contraception live in contraceptive deserts meaning they lack "reasonable access" to a public clinic with the full range of methods. Reasonable access is defined as a county where the number of public clinics, and estimated number of providers in those clinics, are enough to meet the needs of the county's population, defined as at least one clinic/provider to every 1,000 women.[25] Not only is the current public clinic safety-net not sufficient for the need, the existence of the programs like Title X and Medicaid are threatened by legislative and administrative proposals.

Safety net programs like the Title X and Medicaid are not designed to absorb the unmet needs of privately insured individuals who would lose contraceptive coverage as a result of this IFR. For example, reduced funding for Title X over the last several years has resulted in fewer patients served and more clinic closings. For example, in 2015, Title X clinics served 4 million women and men, down 23% or 1.2 million patients from the 5.2 million patients served in 2010. While some of these individuals have since gained coverage through the ACA, many low-income people are frozen out of Medicaid if the state they live in has not chosen to expand the program, and will continue to rely on Title X.

Medicaid enrollees have access to contraceptive services and supplies, typically including a wide variety of contraceptive methods and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[26] This is particularly true with respect to specialty

---

[22] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy (2009) and Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[23] Knopf JA, Finnie RKC, Peng Y, et al.  Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[24] 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[25] Power to Decide, Contraceptive Deserts (2016). Retrieved from https://thenationalcampaign.org/deserts on December 3, 2017.

[26]  U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012).  http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

providers, including OB/GYNs.[27] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR. Furthermore, the past year has seen numerous, failed attempts to repeal the ACA, and policymakers have sought to radically alter the financial structure of Medicaid.[28] These efforts also disproportionately impact people of color who rely on these programs.[29] The IFR should be rescinded as it makes false claims about the capacity of safety-net programs to cover those people that will be left without contraceptive coverage as a result.

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[30] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[31] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[32] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[33]

**The Departments' Proposed Changes to the Rule Do Not Fix the Above Problems**

The Departments request comment on several ways the IFR could be changed to expand exemptions to the birth control benefit.  Each of the questions presented by the Departments is based on an assumption that the IFR is based on science and evidence

---

[27] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

[28] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIv.

[29] Kaiser Family Foundation, Women's health Insurance Coverage, 2016. Retrieved from https://www.kff.org/womens-health-policy/fact-sheet/womens-health-insurance-coverage-fact-sheet/ on December 3, 2017 and Hannah Katch et al., Medicaid Works for Women—But Proposed Cuts Would Have Harsh, Disproportionate Impact, Center on Budget and Policy Priorities (2017). Retrieved from https://www.cbpp.org/research/health/medicaid-works-for-women-but-proposed-cuts-would-have-harsh-disproportionate-impact on December 3, 2017.

[30] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[31] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[32] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[33] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

Exhibit 87

and should be expanded.  As described in detail above, this assumption is incorrect. Other than completely striking it, there is nothing the Departments could do to make this better, and any expansion would only exacerbate the issues described above. The IFR should be rescinded in its entirety.

**Conclusion**

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being.  It is discriminatory, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons Power to Decide calls on the Departments to rescind the IFR. If you have questions about these comments, please contact Rachel Fey, Director of Public Policy, at (202) 478-8529 or rfey@powertodecide.org. Thank you.

Sincerely,

*ginny ehrlich*

Ginny Ehrlich
Chief Executive Officer

00207002

Exhibit 87