

Planned Parenthood Federation of America

Planned Parenthood Action Fund

December 5, 2017

**VIA ELECTRONIC TRANSMISSION**

Acting Secretary Eric D. Hargan
Centers for Medicare and Medicaid Services
U.S. Department of Health and Human Services
200 Independence Avenue, SW, Room 445-G
Hubert H. Humphrey Building
Washington, DC 20201

**Re: CMS-9940-IFC; Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

Dear Acting Secretary Hargan:

Planned Parenthood Federation of America (Planned Parenthood) and Planned Parenthood Action Fund (the Action Fund) submit these comments in response to the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, released by the Department of Health and Human Services (HHS), the Department of Labor, and the Internal Revenue Service (Departments) on October 6, 2017 and published in the federal register on October 13, 2017 at 82 Fed. Reg. 47792 et. seq. Planned Parenthood seeks to ensure that all people have adequate access to health coverage and health care services, including contraception.

Planned Parenthood is the nation's leading women's health care provider and advocate and a trusted, nonprofit source of primary and preventive care for women, men, and young people in communities across the United States. Each year, Planned Parenthood's more than 600 health centers provide affordable birth control, lifesaving cancer screenings, testing and treatment for sexually transmitted diseases (STDs), and other essential care to over two million patients. We also provide abortion services and ensure that women have accurate information about all of their reproductive health care options. One in five women in the U.S. has visited a Planned Parenthood health center. The majority of Planned Parenthood patients have incomes at or below 150 percent of the Federal Poverty Level (FPL).

The importance of affordable birth control access cannot be overstated: Many of the gains women have made in recent decades — from education advancements to professional progress to improvements in health — are the direct result of increased access to birth control. Yet, instead of building on that progress, the Departments have issued two rules that will only take women backwards. These rules are especially harmful to women who already experience unfair barriers in accessing health care, including women with low-incomes, women of color, and immigrant women.

1

00373680

Exhibit 88                                                                      JA-0001310

There is no question that the Departments' rules are designed to undermine women's access to birth control, and they therefore represent an abrogation of HHS' obligation to promote prevention and wellness. Furthermore, the Departments have a duty to implement the statutory requirements of the Affordable Care Act (ACA), including access to no copay birth control coverage as part of the women's preventive services provision. The interim final rule (IFR) allowing any employer or university to deny women access to birth control on the basis of religion takes direct aim at the ACA's coverage guarantee for women. The IFR also contravenes congressional intent and violates the requirements of the Administrative Procedure Act. Importantly, Americans oppose these rules; a recent poll demonstrated that the vast majority of Americans oppose allowing employers to deny birth control coverage because of their beliefs.[1] For all of these reasons, the Departments should withdraw the rules in their entirety.

I.    **The IFR Allows Employers and Universities and Colleges to Put Their Religious Beliefs ahead of Women's Health Care**

People should not be denied access to basic health care and information — including sexual and reproductive health care — because of the religious objections of their employer, university, or college. The reality is that the previous rules already accommodated the religious beliefs of religious nonprofits and closely-held for profit companies, while still ensuring that women had the health coverage that they need and deserve. The IFR creates a new, expansive religious exemption that allows *all* universities, colleges, and employers — whether nonprofit, for-profit, or even publicly-traded — to refuse to provide birth control coverage because of their religious beliefs. The breadth and potential impact of this exemption is alarming — as is the enormous departure from existing coverage protections that people across the country rely on. Under this IFR, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations and companies. Indeed, the Departments focus solely on the alleged burden on employers' religious beliefs — putting them in the unilateral position of choosing whether their employees have access to birth control coverage, without any concern about the burden being placed on women's access to basic health are.

Birth control access is a central part of women's ability to stay healthy, allowing them to plan and space their pregnancies.[2] When women plan their pregnancies, they are more likely to seek prenatal care, which improves their own health and the health of their children. It is, thus, not surprising that women of all religious denominations use contraceptives.[3] In fact, nearly 9 in 10 women who have been sexually active have used birth control at some point in their lives.[4] It is the decision and needs of women that should guide policy decisions — not the beliefs of employers.

II.   **The Broad Exemption and Optional Accommodation created under the IFR Undermine Women's Access to Birth Control and Threaten the Progress Made under the ACA**

---

[1] PerryUndem, Results from a National Survey of Voters. Views on Birth Control (Dec. 2017), https://view.publitas.com/perryundem-research-communication/views-on-birth-control-report-pdf/page/1.
[2] American Public Health Assoc.. Universal Access to Contraception (2015), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2015/12/17/09/14/universal-acces s-to-contraception.
[3] Rachel K. Jones and Joerg Dreweke, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use*, Guttmacher Institute (April 2011) https://www.guttmacher.org/sites/default/files/ report_pdf/religion-and-contraceptive-use.pdf.
[4] Guttmacher Institute, Contraceptive Use in the United States (Sept. 2016), https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.

00373681

Exhibit 88                                                                                        JA-0001311

More than 62 million women gained access to fully covered women's preventive care — including birth control, cancer screenings, and well-woman exams — under the ACA, without copays or other out-of-pocket expenses.[5] Before the ACA, only one-third of privately insured women with individual policies had a plan that covered contraceptives.[6]

Because the ACA benefit removed barriers to coverage and cost, women have been better able to afford access to birth control. In fact, with cost barriers removed, more women have been able to newly access birth control or switch to more expensive methods that better meet their needs. Each year, a growing number of women have been able to access birth control without cost barriers.[7] In fact, when the birth control benefit went into effect, birth control pills accounted for the single largest growth among prescriptions without cost-sharing. Twenty-four million more prescriptions for oral contraceptives were filled without co-pay than the year before the benefit went into effect — indicating a significant surge of women newly able to afford birth control.[8] Related, while IUDs are the most effective form of birth control and many women prefer them over other methods, they are also very expensive, with costs as high as s $1100.[9] Because of the ACA's guarantee that women have coverage at no co-pay for the full range of contraceptive methods, more women have been able to access IUDs.[10] And as a result of improved access to birth control, our nation has seen steep declines in unintended pregnancy, with the U.S. unintended pregnancy rate at a 30-year low.[11]

Despite the essential role that birth control plays in promoting women's health, the Departments acknowledges that these rules have been promulgated without an understanding of the extent that women will be impacted. Specifically, the IFR notes that it does not have sufficient data to determine the number of organizations, and subsequently, the number of women whose health and financial security will be impacted by the newly created exemption and accommodation. However, the number of women that could be harmed by this policy could be significant and certainly the individual impact could be extremely harmful.

Allowing employers to deny their employees coverage for birth control also threatens women's financial security and ability to advance their careers. Birth control access has helped reduce economic disparities and increase financial security for women. One-third of the wage gains women have made since the 1960s are the result of access to oral contraceptives.[12] Allowing employers to deny women

---

[5] NWLC, New Data Estimate 62.4 Million Women Have Coverage of Birth Control without Out-of-Pocket Costs, https://nwlc.org/resources/new-data-estimate-62-4-million-women-have-coverage-of-birth-control-without-out-of-pocket-costs/.

[6] The Commonwealth Fund, How the Affordable Care Act has Helped Women Gain Insurance and Improved Their Ability to Get Health Care (2016), http://www.commonwealthfund.org/~/media/files/publications/issue-brief/2017/aug/gunja_women_hlt_coverage_care_biennial.pdf.

[7] Nora Becker & Daniel Polsky, Women Saw Large Decreases in Out of Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs (July 2015), https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[8] Iqvia, Medicine Use and Spending in the U.S. (2016), https://www.iqvia.com/institute/reports/medicines-use-and-spending-in-the-us-a-review-of-2016

[9] Olivia Marcus, How much does an IUD cost?, Amino Blog, https://amino.com/blog/iud-cost/.

[10] Iqvia, Medicine Use and Spending in the U.S. (2016), https://www.iqvia.com/institute/reports/medicines-use-and-spending-in-the-us-a-review-of-2016.

[11] Guttmacher, U.S. Unintended Pregnancy Rate Falls to 30-Year Low: Declines Seen in Almost All Groups, but Disparities Remain (March 2016), https://www.guttmacher.org/news-release/2016/us-unintended-pregnancy-rate-falls-30-year-low-declines-seen-almost-all-groups.

[12] Bailey, Martha J., et al. (2012). "The Opt-In Revolution? Contraception and the Gender Gap in Wages," NBER Working Paper, No. 17922.

3

00373682

Exhibit 88

JA-0001312

coverage for affordable birth control could roll back those gains. Related, allowing universities and colleges to deny birth control coverage will disproportionately impact young women, particularly students, who are most in need of affordable contraception. In fact, being able to access birth control before age 21 has been the most influential factor in enabling women already in college to stay in college.[13] When the birth control pill became more widely available, the school dropout rate among women with access to birth control was 35 percent lower than those without access.[14]

Women of color made up the majority of those who gained coverage for birth control and other preventive care without a copay under the ACA — and thus women of color are the community that is most impacted by attacks on birth control access. As of 2015, at least 17 million Latina women and 15 million African-American women gained access to no cost birth control as a result of the birth control benefit.[15] Despite those gains, there is still work to be done. Black and Latina women experience the most barriers to health care access generally and access to birth control specifically.[16] Access to a full range of contraceptive methods is necessary to addressing historic disparities in unintended pregnancy and the outcomes that are associated with it, including pregnancy complications. In particular, Black women are most at risk of dying during or from childbirth, and access to birth control can help women plan the healthiest time to become pregnant.[17] People of color already report less confidence in their ability to afford healthcare, so the reality is that undermining health coverage disproportionately impacts these communities and their families.[18] Eliminating access to care will undoubtedly add to existing health disparities given the deeply entrenched historical income inequalities for Black and Latina women.[19]

Also, barriers to contraception disproportionately impact rural communities. Even with the progress our nation has made in reducing unintended pregnancy, and with teen pregnancy at an all-time low, the unintended pregnancy rate among adolescents living in rural areas is higher, no matter the individual's race.[20] For this reason, the American College of Obstetricians and Gynecologists (ACOG) recommends increasing access to contraceptives in rural areas; there can be no doubt that rolling back women's access to birth control coverage would negatively impact rural women.[21]

---

[13] Bailey, Martha J., et al. (2012). "The Opt-In Revolution? Contraception and the Gender Gap in Wages," NBER Working Paper, No. 17922
[14] H. Hock, The Pill and the College Attainment of American Women and Men, Dep't of Economics Florida University, (2007), https://ideas.repec.org/p/fsu/wpaper/wp2007_10_01.html.
[15] ASPE, The Affordable Care Act is Improving Access to Preventive Services for Millions of Americans (May 2015), https://aspe.hhs.gov/system/files/pdf/139221/The%20Affordable%20Care%20Act%20is%20Improving%20Access%20to%20Preventive%20Services%20for%20Millions%20of%20Americans.pdf.
[16] Bixby Center for Global Reproductive Health, Women of Color Need Improved Information and Access to Effective Contraception, https://bixbycenter.ucsf.edu/news/women-color-need-improved-information-and-access-effective-contraception.
[17] Meaghan Winter, A Matter of Life and Death: Why are Black Women in the U.S. More Likely to Die During Childbirth, Essence Magazine, https://www.essence.com/news/black-women-mortality-rate-child-deaths-united-states.
[18] S. Artiga, Racial and Ethnic Disparities in Access to and Utilization of Care Among Insured Adults, Kaiser Fam. Found., https://www.kff.org/report-section/racial-and-ethnic-disparities-in-access-to-and-utilization-of-care-among-insured-adults-issue-brief/.
[19] National Partnership for Women and Families, America's Women and the Wage Gap (April 2017), http://www.nationalpartnership.org/research-library/workplace-fairness/fair-pay/americas-women-and-the-wage-gap.pdf.
[20] Guttmacher, U.S. Unintended Pregnancy Rate
[21] The American College of Obstetricians and Gynecologists, Committee Opinion: Health Disparities in Rural Women (Feb. 2014), https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Health-Disparities-in-Rural-Women.

4

00373683

Exhibit 88

JA-0001313

The Departments have an obligation to fully evaluate the impact that policies have on people in this country before implementing them. The alternative options identified by the Departments for women to access birth control coverage are completely deficient, as discussed in detail below.

### III.     The Departments Try to Justify the IFR Based on False Science.

The IFR relies on outdated studies and erroneous statements that are not only inconsistent with the views of the vast majority of Americans, but are directly contradicted by current research available regarding the health implications of birth control and evidence-based medicine.

Shockingly, the IFR suggests that birth control access does not lead to reductions in unintended pregnancy. This notion defies logic, and relies on outdated studies regarding the unintended pregnancy rate. Specifically, the IFR cites to one report and states "the report does not show that access to contraception causes decreased incidents of unintended pregnancy." In fact, according to the CDC, "unintended pregnancy mainly results from not using contraception or inconsistent or incorrect use of effective contraceptive methods."[22] The reality is that unintended pregnancy rate is currently at a 30 year low in large part due to increased access to birth control. Indeed, experts agree that a main driver of this decline is the increased use of contraceptives, particularly the most effective methods such as a long-acting reversible contraceptives.[23]

The Departments' refusal to acknowledge the scientific evidence not only belies reality but will gravely harm women. Studies show that birth control access plays an essential role in helping women plan their pregnancies, which is associated with better health outcomes for both women and their children. Women who experience unplanned pregnancy are more likely to delay prenatal care and therefore are at greater risk of unaddressed health complications, low birth weight, preterm birth, and infant mortality.[24]

In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself.[25] These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term. In fact, according to a John Hopkins study, increasing contraceptive access is one of the most effective ways to reduce maternal mortality.[26] Unfortunately, unlike most developed countries, the maternal mortality rate in the U.S. is increasing. Black women, in particular, are dying at alarming rates from childbirth and pregnancy.[27] Women also use birth control for a whole host of other health care reasons, including endometriosis, migraines, pre-menstrual pain, menstrual regulation, and pelvic inflammatory disease. This only reinforces that policies need to

---

[22] Ctrs. for Disease Cont'l and Prevention, Unintended Pregnancy Prevention.
https://www.cdc.gov/reproductivehealth/contraception/unintendedpregnancy/index.htm.
[23] Guttmacher, U.S. Unintended Pregnancy Rate Falls to 30-Year Low; Declines Seen in Almost All Groups, but Disparities Remain (March 2016),
https://www.guttmacher.org/news-release/2016/us-unintended-pregnancy-rate-falls-30-year-low-declines-seen-almost-all-group s.
[24] Conde-Agudelo A. Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.
[25] ACOG, Final Report of the Women's Preventive Services Initiative, 103 - 104 (2016).
[26] John Hopkins Bloomberg Public Health School of Health, Contraception Use Averts 272,000 Maternal Deaths Worldwide, https://www.jhsph.edu/news/news-releases/2012/ahmed-contraception.html.
[27] Meghan Winter, A Matter of Life & Death: Why are Black Women in the U.S. More Likely to Die During or After Childbirth?, Essence Magazine, https://www.essence.com/news/black-women-mortality-rate-child-deaths-united-states.

00373684

Exhibit 88                                                                                      JA-0001314

increase, not decrease, access to contraceptives.[28]

The IFR also perpetuates anti-science myths about contraception that have been repeatedly refuted by medical experts. The rule states that, "IOM's recommendation included several contraceptive methods that many persons and organizations believe are abortifacient — that is, as causing early abortion — and which they conscientiously oppose for that reason distinct from whether they also oppose contraception or sterilization." FDA-approved contraceptive methods are not abortifacients. None of the FDA-approved contraceptives interferes with a pregnancy.[29]

The IFR makes a particularly irresponsible misrepresentation about the risks of breast and cervical cancer, without accurately reporting the substantial evidence of contraceptives' association with cancer prevention. There is no proven increased risk of breast cancer among contraceptive users, particularly for those under 40. For women over 40, health care providers must consider both the risks of becoming pregnant at an advanced reproductive age, as well as the risks of continuing contraception use until menopause, making it essential that a woman be able to discuss options with her provider without interference.[30] Further, contraceptives are associated with a reduced risk of colorectal cancer and endometrial cancer is 50 percent less likely among women who use oral hormonal contraceptives for at least one year compared to women who have never used oral hormonal contraceptives. Oral hormonal contraceptives can reduce the risk of ovarian cancer by 27 percent and 20 percent for every five years of additional use. Oral hormonal contraceptives can also lower the risk of hereditary ovarian cancer in women with the BRCA1 or BRCA2 gene mutations; and oral hormonal contraceptive use for more than 10 years can lower the risk of ovarian cancer among women with endometriosis — who are typically at higher risk of developing ovarian cancer.[31]

Lastly, the rule relies on the false notion that access to birth control leads adolescents to have sex. This false correlation has been debunked repeatedly — over the span of decades. In fact, research has shown that school-based health centers providing access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[32] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[33] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of teen pregnancy.[34]

---

[28] Rachel Benson Gold, "Family Planning and Health Care Reform: The Benefits and Challenges of Prioritizing Prevention," *Guttmacher Policy Review*. Winter 2009, Volume 12, Number 1.

[29] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents. Sebelius v. Hobby Lobby, 134 S. Ct. 678 (2013, acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?

[30] *See* Curtis, K.M., Jatlaoui, T.C., Tepper, N.K., Zapata. L.B., Horton, L.G., Jamieson, D.J., & Whiteman, M.K. (2016, July 29). U.S. selected practice recommendations for contraceptive use, 2016. *Morbidity and Mortality Weekly Report*, 65(4), 1–66.

[31] Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives *International Journal of Endocrinology and Metabolism*, 11(1), 41–47.

[32] E.g. Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009; Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[33] Minguez M, Santelli JS. Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344; Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[34] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States. 2007–2012 J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

00373685

Exhibit 88                                                                                                                                              JA-0001315

### IV.    The IFR is not based on Facts about Birth Control Affordability and Access

The Departments falsely claim that even if the rule causes women to lose access to birth control, birth control is otherwise affordable and available. Specifically, the IFR states, "many forms of contraception are available for around $50 per month, including long-acting methods such as the birth control shot and intrauterine devices (IUDs). Other, more permanent forms of contraception like implantables bear a higher one-time cost, but when calculated over the duration of use, cost a similar amount." With this, the Departments radically misrepresent the costs of birth control. Without insurance, an IUD could cost more than $1,100 out-of-pocket, and birth control pills could cost up to $600 per year.[35] Given the wage inequities in this country, women are less able to absorb additional costs. A recent survey found that 4 in 10 Black women of reproductive age reported that they could not afford more than $10 a month for birth control if they had to pay out of pocket.[36]

Eliminating birth control coverage has grave financial implications for women and their families. Under the ACA benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills per year since the benefit went into effect.[37] Compared to out-of-pocket costs in 2012, women using birth control pills saved an average of $255 per year, and women using IUDs have saved an average of $248 as a result of the birth control benefit.[38] From June 2012 to June 2013, average out-of-pocket spending for the pill declined by 38 percent, and women's average out-of-pocket spending for an IUD declined by 68 percent. After the Affordable Care Act's birth control provision took effect, fewer than 4 percent of American women had to pay out of pocket for oral birth control.[39] That number was more than 20 percent before the law's passage. The idea that most women can easily afford these costs is sorely out of touch with reality.

For women who the IFR acknowledges cannot afford those costs, the Departments point to Medicaid, Title X, and other federal programs as alternative sources that could fill the gap left by eliminating this benefit for some women. First, as a factual matter, most women covered under the ACA's birth control benefit would not be eligible for the above mentioned programs. Millions of women who are enrolled in employer sponsored insurance coverage (and have guaranteed birth control coverage under the benefit) simply would not qualify for these programs. Second, social safety net programs are not designed to serve as a substitute for employer-sponsored coverage.

It is especially surprising that the Departments' point to these programs, given that this administration has been on the forefront of working to drastically limit their reach and impact. Within the last year, the administration has pushed Congress to radically alter the Medicaid program, making clear that states are encouraged to limit access to Medicaid benefits — including through work requirements which would disproportionately harm women.[40] Similarly, the administration has signaled its support for restricting

---

[35] Amino, How much does an IUD cost? (July 2017), https://amino.com/blog/iud-cost/.
[36] PerryUndem, Black American Survey Report,
https://view.publitas.com/perryundem-research-communication/black-american-survey-report_final/page/51.
[37] S. Kliff. Report: Obamacare has saved women $1.4 billion on birth control pills, Vox,
https://www.vox.com/2015/7/7/8907389/obamacare-birth-control-savings.
[38] Nora Becker & Daniel Polsky, Women Saw Large Decreases in Out of Pocket Spending for Contraceptives After ACA
Mandate Removed Cost Sharing, Health Affairs (July 2015), https://www.healthaffairs.org/do/abs/10.1377/hlthaff.2015.0127.
[39] L. Sobel, Private Insurance Coverage of Contraception, Kaiser Fam. Found. (Dec. 2016),
https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.
[40] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC),
https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to*

00373686

Exhibit 88    JA-0001316

access to publicly funded family planning under Title X.[41]Indeed, it belies reality that the Departments would specifically mention Title X and Medicaid as fail-safes for those who will lose coverage as a result of this rule — given the administration's clear record of hostility toward these programs. Likewise, the administration has made clear both through its own proposals and support for congressional proposals that it wants to eliminate federal funding for Planned Parenthood. Planned Parenthood plays an outsized role in the safety net that the Departments hold up as a backstop to the IFR. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[42]

Lastly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminishes the need for a federal requirement. First, state laws are not able to regulate all employers. The federal law Employee Retirement Income Security Act (ERISA) regulates plans offered by employers that self-insure, which covers 60 percent of workers nationwide.[43] Second, this suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement includes several important additional protections beyond those included in the state contraceptive coverage laws.[44] For instance, only four state laws currently match the federal requirement to cover contraception without copayments, deductibles, and other out-of-pocket costs.[45] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[46]

### V.    The IFR Contravenes Congressional Intent to Increase Women's Access to Preventive Health Services, including Family Planning Care

*Impose Medicaid Work Requirements, Top Federal Official Says,* Wash. Post (Nov. 7, 2017).
https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.
[41] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept 5, 2017), available at
https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* (Aug. 2017), available at
https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at
https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).
[42] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017),
https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.
[43] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey,* Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.
[44] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017,
http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[45] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017,
http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[46] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017.
http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

00373687

Exhibit 88                                                                                             JA-0001317

Congress intended for contraception to be included among the required benefits that insurers had to cover without cost-sharing. In general, the U.S. healthcare system has historically been focused on treatment over prevention.[47] Under the ACA, Congress sought to shift this focus by requiring insurers to cover without cost-sharing five categories of preventive services: evidence-based items or services the United States Preventive Services Task Force (USPSTF) recommend with an A or B rating; immunizations that have a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention; HRSA-supported, evidence-informed guidelines for infants, children, and adolescents; and HRSA-supported, comprehensive guidelines for women.[48]

Historically, too many American women were unable to access the preventive care they need because of cost. In fact, a May 2009 report by the Commonwealth Foundation found that more than half of women delayed or avoided preventive care because of its cost. While the USPSTF recommendations ensured access to some important women's health services, a limitation in their methodology fails to address other essential preventive care for women, including the yearly well-woman visits and family planning care. The Women's Health Amendment was drafted to address this limitation and called on the Health Resources and Services Administration (HRSA) to identify such "additional preventive care and screenings" that should be covered at no cost for women.

In adding via amendment the women's preventive benefit to the ACA, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and, in some instances, were unable to obtain this care at all because of cost barriers. Senator Gillibrand stated that "women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage. . .* In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access.  In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*"[49]

The floor debate made clear that addressing this inequity included expanding access to birth control. In their floor statements during the debate on the Women's Health Amendment, Senators Patty Murray, and Kirsten Gillibrand — among others — affirmatively reference family planning care as services that would be covered at no cost-sharing under the Women's Health Amendment.[50] Senator Barbara Mikulski, when introducing her amendment, clearly stated for the record: "[M]y amendment would cover family planning services."[51]  Congress chose not to include a broad religious or moral exemption to this requirement.

Thus, HRSA did not arbitrarily include contraception in the women's preventive services as a required benefit; rather, the benefit both followed a clear record of congressional intent and was endorsed by the

---

[47] F. Marvasti & R. Stafford, From Sick Care to Health Care: Reengineering Prevention into the U.S. System, New England Journal of Medicine (2012), http://www.nejm.org/doi/full/10.1056/NEJMp1206230#t=article.
[48] 42 U.S.C. 300gg-13(a)(4).
[49] 155 Cong. Rec. S12,021.
[50] Floor Statement, Senator Patty Murray, Congressional Record S12274, December 3, 2009 (stating, "Senator Mikulski's amendment will make sure this bill provides coverage for important preventive services for women at no cost.  Women will have improved access to well-women visits, important for all women; family planning services ..."). Floor Statement, Senator Ben Nelson, Congressional Record S12277, December 3, 2009 (indicating that he "strongly supports the underlying goal [of Senator Mikulski's amendment] of furthering preventive care for women, including mammograms, screenings and family planning.").
[51] Press release, Mikulski Puts Women First in Health Care Reform Debate, November 30, 2009, *available at* http://mikulski.senate.gov/Newsroom/PressReleases/record.cfm?id=320304 (includes text from Senator Mikulski's prepared remarks on the introduction of her amendment).

9

00373688

Exhibit 88

JA-0001318

medical and scientific communities. Indeed, the Obama Administration twice commissioned medical organizations (the Institute of Medicine in 2011, and the American College of Obstetricians and Gynecologists in 2016) to recommend which services should be covered by the benefit based on the public's health, medicine, and science. Both bodies identified the full-range of FDA-approved contraceptive methods and counseling among the services that should be covered as a part of promoting women's overall health and well-being.

## VI. The IFR Violates the Administrative Procedure Act which Requires a Notice and Comment Period before a Rule Becomes Effective.

The Administrative Procedure Act (APA), Section 553(b), requires that federal agencies publish notice of proposed rulemaking in the federal register, and Section 553(c) of the APA requires that the agency "give interested persons an opportunity to participate in rulemaking through submission of written data, views, or arguments."[52] Federal agencies must base their final rules, including the reasonings and conclusions on "the rulemaking record, consisting of comments, scientific data, expert opinions, and facts accumulated during the pre-rule and proposed rule stages."[53] Further, the APA Section 553(d) requires a 30-day waiting period between publication of a rule and its effective date.[54] Federal agencies are only permitted to forgo the procedural requirements, and ultimately, forgo the opportunity to hear from public stakeholders, before issuing a final rule only in cases where the agency has a "good cause," which must be explained in the preamble of the rule.[55] Courts have found good cause in cases that involve: (1) emergencies;[56] (2) context where prior notice would subvert the underlying statutory scheme;[57] and (3) situations where Congress intends to waive section 553's requirements.[58] None of those situations exists in this case.

The Departments state that delaying the rule would increase the costs of health insurance because grandfathered plans are not making changes to their plans and that the rules have deterred individuals from forming non-profit and for-profit entities or offering health insurance to their employees. The Departments offers no evidence, either anecdotal or quantitative, for any of these scenarios. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. The existence of litigation alone does not create urgency and certainly does not warrant subjugating the rights of the public at large to weigh in on such a wide-reaching regulation.

---

[52] 5 U.S. Code § 553(b) & (c).
[53] Office of the Federal Register, A Guide to the Rulemaking Process.
https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf.
[54] 5 U.S.C. § 553(d).
[55] 5 U.S. Code § 553(b)(3)(B); Office of the Federal Register, A Guide to the Rulemaking Process,
https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf.
[56] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. See Jifry v. F.A.A., 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).
[57] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1486 (9th Cir. 1992) (reasoning that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made).
[58] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. See, e.g., Asiana Airlines v. F.A.A., 134 F.3d 393, 398 (D.C. Cir. 1998); Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding that the APA is inapplicable, rather than that good cause is established).

10

00373689

Exhibit 88

The Departments cannot waive the statutorily required notice and comment period because the agency wants to implement its agenda quicker. Notice and comment periods always result in a delay; however, Congress has through the APA stated that receiving input from the public and key stakeholders is worth the delay except in very limited circumstances - not found here.

<div align="center">***</div>

Planned Parenthood strongly urges the Departments to put the health and lives of all people in this country—including women, people of color, young people, and LGBTQ communities—first and foremost and to reverse plans to allow broad exemptions to the women's preventive services.

Sincerely,

Dana Singiser
Vice President of Public Policy and Government Relations
Planned Parenthood Action Fund
Planned Parenthood Federation of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005

11

00373690

Exhibit 88                                                                                                     JA-0001320

# **Princeton University**



**Office of Population Research**
Wallace Hall
Princeton NJ 08544-2091

**James Trussell**
Professor Emeritus

{  DATE \@ "MMMM d, yyyy"  }

Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016
Attention: CMS-9925-IFC

*Submitted electronically at www.regulations.gov*

**Subject: Interim Final Rule on Moral Exemptions and Accommodations for Coverage of
Certain Preventive Services Under the Affordable Care Act** CMS-9925-IFC

James Trussell submits the following comments in response to the Interim Final Rules ("the Rules")
titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under
the Affordable Care Act"[i] and "Religious Exemptions and Accommodations for Coverage of
Certain Preventive Services Under the Affordable Care Act,"[ii] published in the Federal Register on
October 13, 2017, by the Department of the Treasury, the Department of Labor, and the
Department of Health and Human Services ("the Departments").
James Trussell works to ensure that U.S. policy decision-making is fully informed by scientific
evidence and the best available data, and that the public has reliable access to independent scientific
information and analysis produced and acquired by the federal government. The role of scientific
evidence in public health decision-making is imperative, and we oppose any efforts to diminish the
role of science in federal policymaking.
Unfortunately, the Rules are a prime example of regulatory decision-making that ignores scientific
evidence and the best available data. The Departments' summary of the evidence is arbitrary and
cherry-picked. The Departments understate the efficacy and health benefits of contraceptives and
overstate the health risks of contraceptives by selectively interpreting data, overlooking well-
established evidence, and promoting unfounded doubt. Further, both Rules falsely assert certain
types of FDA-approved contraceptive methods to abortifacients.
The Rules thus cause dual harm by undermining women's access to essential preventive health care
and undermining the integrity of science in governance. Public health policy should be informed by
the best available scientific evidence. Instead, the Departments use false claims about contraception
that are contrary to medical and public health evidence, misstate or ignore research, and undermine
the agencies' role as a source of accurate health information.
The Departments serve a critical role in collecting and managing important information and data on
issues that are vital to the public. In making policy, it is essential that the Departments enhance their

00209186

Exhibit 89                                                                                    JA-0001321

credibility on issues of science and evidence, not undermine it. Thus, the Departments must take full advantage of their resources to inform their decision-making by the best available evidence and data. The Rules, however, show that the Departments did not seriously consider these elements, which can only undermine the Departments' reputations as reliable sources of information.
Below we outline several ways the Rules are at odds with science and research. We urge the Departments to withdraw both Rules.

**Contraception Prevents Unintended Pregnancy and Improves the Health of Women and Children**

As an example of how the Departments are not utilizing the best available science and evidence with dire consequences for public health, the Departments make several misstatements that ignore prevailing evidence regarding the efficacy, health benefits, and health risks of contraceptives. First, the Departments fail to acknowledge that contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[iii] Second, the Departments falsely associate several health risks with contraceptive use, ignoring the weight of the evidence.[iv] The Departments' summary of the evidence is wrong and misleading. Not only does contraception prevent unintended pregnancy,[v] but the prevention of unintended pregnancy is associated with life-long health benefits for both women and children that the Departments fully ignore. Further, the Departments' overstatement of health risks ignores the long, evidence-based list of non-contraceptive health benefits associated with contraceptives.

Contraceptive efficacy at preventing unintended pregnancy is supported by decades of rigorous evidence and by the government itself.[vi] The U.S. Food and Drug Administration ("FDA") must approve all new drugs and devices by showing that they are safe and effective through rigorous scientific testing. The federal government itself has thus approved contraceptives for safely and effectively preventing unintended pregnancies.[vii] The Departments' misrepresentation of "complexity and uncertainty in the relationship between contraceptive access, contraceptive use, and unintended pregnancy"[viii] is false and relies heavily on cherry-picked citations instead of accurately reflecting the weight of the evidence. For instance, the Departments point to a single pre-ACA economics paper positing that contraceptive use may be connected to an increase in teen pregnancy over the "long run."[ix] This paper utilized 1997 youth survey data where the majority of respondents were using condoms or another "episodic" form of birth control,[x] the efficacy of which is irrelevant to an assessment of the efficacy of the methods of birth control covered under the ACA's contraceptive benefit, and hardly contributes to "uncertainty"[xi] regarding decades of clinical data that prove otherwise.

In truth, contraception enables women, including teens, to prevent unintended pregnancy and control the timing of a desired pregnancy.[xii] The Centers for Disease Control and Prevention named family planning one of the ten great public health achievements of the past century,[xiii] and family planning is widely credited for contributing to women's societal, educational, and economic gains.[xiv] The ACA's guarantee of no-copay coverage of contraception has contributed to a dramatic decline in the unintended pregnancy rate in the United States, now at a 30-year low.[xv] The teen pregnancy rate is also at the lowest point in at least 80 years.[xvi]

Contraception improves health outcomes for women and children because unintended pregnancies have higher rates of short- and long-term health complications. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed.[xvii] They are also at increased risk of maternal mortality and morbidity, maternal depression, experiencing physical violence during pregnancy,[xviii] infant mortality, birth defects, low birth weight, and preterm birth.[xix] Unintended pregnancies are also associated with long-term negative physical and mental effects on children.[xx] Contraception, by contrast, is considered a major factor in reducing rates of maternal mortality and morbidity. For example, a study of 172 developing countries found

2

00209187

Exhibit 89

that use of contraception is an "effective primary prevention strategy to reduce maternal mortality . . . ."[xxi] The Departments' new Rules paper over this vast body of research and the clear health benefits of contraception.

## The Health Risks of Contraceptives Are Overstated and Misrepresented

The Departments go further, selectively interpreting data in order to overstate "negative health effects" associated with contraceptives.[xxii] This includes misleading assertions of an association between contraceptive use, breast cancer, and cervical cancer, as well as vascular events and "risky sexual behavior."[xxiii] The Departments ignore substantial evidence to the contrary, and ignore the balance of significant non-contraceptive health benefits associated with contraceptive use. Certainly it is true that, as with any medication, some types or methods of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[xxiv] Some women may also want to avoid side effects such as changes to menstrual flow.[xxv] But the Departments fail to recognize that this means that patients and health care providers, not employers and agencies, should determine the right contraceptive for an individual woman's health care needs.

The Departments' claim that contraceptive use is associated with an increased risk of breast and cervical cancers is based solely on a 2013 Agency for Healthcare Research and Quality report, when in fact the evidence is not decisive, and to say so is a misrepresentation. There is no proven increased risk of breast cancer among contraceptive users, particularly those under 40. For women over 40, health care providers must consider both the risks of becoming pregnant at an advanced reproductive age, as well as the risks of continuing contraception use until menopause, making it essential that a woman be able to discuss options with her provider without interference.[xxvi] And, on the topic of cervical cancer, the Departments cite only a study on oral contraceptives, when a recent study found that intrauterine devices ("IUDs") are associated with a decreased risk of cervical cancer.[xxvii]

It is especially irresponsible to misrepresent the risks of breast and cervical cancer without accurately reporting the substantial evidence of contraceptives' association with cancer prevention, since any evaluation of preventive health care should fully weigh the risks and benefits.[xxviii] Contraceptives are associated with a reduced risk of colorectal cancer;[xxix] endometrial cancer is 50 percent less likely among women who use oral hormonal contraceptives for at least one year compared to women who have never used oral hormonal contraceptives;[xxx] oral hormonal contraceptives can reduce the risk of ovarian cancer by 27 percent, and 20 percent for every five years of additional use;[xxxi] oral hormonal contraceptives can lower the risk of hereditary ovarian cancer in women with the BRCA1 or BRCA2 gene mutations;[xxxii] and oral hormonal contraceptive use for more than 10 years can lower the risk of ovarian cancer among women with endometriosis, who are typically at higher risk of developing ovarian cancer.[xxxiii]

The Rules also incorrectly suggest that contraceptive use is connected to an increased risk of "vascular events" such as venous thromboembolism ("VTE"). The risk of VTE among oral contraceptive users is very low.[xxxiv] In fact, it is much lower than the risk of VTE during pregnancy or in the immediate postpartum period, so prevention of unintended pregnancy actually reduces women's risk of VTE.[xxxv]

The Departments' claim that contraceptives may lead to "risky sexual behavior"[xxxvi] is similarly unfounded. Increased access to contraception is not associated with a change or increase in sexual behaviors.[xxxvii] Instead, research has shown that school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[xxxviii] In the "CHOICE Project," a large-scale U.S. study aimed at reducing unintended pregnancy by providing no-cost contraception, participants reported no change in their sexual activities after receiving contraceptives.[xxxix]

3

00209188

Exhibit 89

Contraceptives are also associated with other non-contraceptive health benefits beyond the cancer prevention benefits listed above. Benefits include reduced menstrual pain, reduced risk of myoma, reduced symptoms of endometriosis, and reduced symptoms of premenstrual syndrome and premenstrual dysphoric disorder.[xl] Oral hormonal contraceptives have been found to reduce the risk of pelvic inflammatory disease by 50 to 60 percent,[xli] Contraceptives are also associated with lower risk of rheumatoid arthritis, preservation of bone density, and reduced symptoms of asthma.[xlii]
In sum, the Departments overstate the evidence of health risks and understate the evidence of contraceptive efficacy and health benefits, failing to accurately reflect the weight of evidence that shows that contraceptives are associated with a variety of short- and long-term health benefits, improving health outcomes for both women and children. And the various contraindications associated with some forms of birth control actually support the opposite finding: women should have access to the full range of FDA-approved methods and must be able to work with health care providers to choose the method that best suits their health concerns and needs without interference from an employer.

**Contraceptives Do Not Interfere with an Existing Pregnancy**
Both Rules refer to the false assertion that some FDA-approved methods of contraception "prevent implantation of an embryo," and are thus abortifacients.[xliii] This is inaccurate and goes against longstanding medical evidence.
Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of FDA-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion." [xliv] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[xlv]
By making the false claim that some FDA-approved methods of contraception may cause abortion, the Departments sideline science in favor of ideology.

**The Rules Should Be Withdrawn Because They Are Based on Falsehoods, Undermine Scientific Integrity, and Harm Women's Health**
For the reasons stated above, James Trussell objects to the Interim Final Rules titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act" and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act." The Rules should be withdrawn due to their lack of scientific basis and their harmful impact on women's health and economic security.

Sincerely,

James Trussell

James Trussell
Professor of Economics
and Public Affairs, Emeritus

4

00209189

Exhibit 89                                                                                          JA-0001324

---

[i] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[ii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[iii] *See generally* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/. *See also* Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception*, *83*(5), 397–404; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852.

[iv] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804–05 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[v] *See, e.g.,* Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852 ("A likely explanation for the decline in the rate of unintended pregnancy is a change in the frequency and type of contraceptive use over time.").

[vi] *See, e.g.,* Institute of Medicine. (2011). *Clinical Preventive Services for Women: Closing the Gaps.* Washington, DC: The National Academies Press; American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 82–91). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/; Trussell, J. (2011, May). Contraceptive failure in the United States. *Contraception*, *83*(5), 397–404; Hatcher, R.A., Trussell, J., Nelson, A.L., Cates, W., Kowal, D., & Policar, M.S. (Eds.). (2011). *Contraceptive Technology* (20th ed.). Atlanta, GA: Bridging the Gap Communications; Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 4–5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("Sexually active couples using no method of contraception have a roughly 85% chance of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.") (citing Sundaram, A., Vaughan, B., Bankole, A., Finer, L., Singh, S., & Trussell, J. (2017, March). Contraceptive failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health*, *49*(1), 7–16); Peipert, J.F., Madden, T., Allsworth, J.E., & Secura, G.M. (2012, December). Preventing unintended pregnancies by providing no-cost contraception. *Obstetrics & Gynecology*, *120*(6), 1291–1297; Finer, L.B., & Zolna, M.R. (2016, March). Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine, 374*(9), 843–852; Harper, C.C., Rocca, C.H., Thompson, K.M., Morfesis, J., Goodman, S., Darney, P.B., . . . Speidel, J.J. (2015, June). Reductions in pregnancy rates in the USA with long-acting reversible contraception: A cluster randomised trial. *The Lancet*, *386*(9993), 562–568; Speidel, J.J., Harper, C.C., & Shields, W.C. (2008, September). The potential of long-acting reversible contraception to decrease unintended pregnancy. *Contraception*, *78*(3), 197–200.

[vii] Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 5, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017).

[viii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[ix] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147) (citing Arcidiacono, P., Khwaja, A., & Ouyang, L. (2005). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Available at http://public.econ.duke.edu/~psarcidi/teensex.pdf [sic]).

[x] Arcidiacono, P., Khwaja, A., & Ouyang, L. (2011, January 22). *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?* Retrieved 27 November 2017, from http://public.econ.duke.edu/~psarcidi/teensex.pdf

[xi] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[xii] *See, e.g.,* Boonstra, H.D. (2014, September 3). What is behind the declines in teen pregnancy rates? *Guttmacher Policy Review, 17*(3), 15–21; Lindberg, L., Santelli, J., & Desai, S. (2016, November). Understanding the decline in adolescent fertility in the United States, 2007–2012. *Journal of Adolescent Health, 59*(5), 577–583.

[xiii] Centers for Disease Control and Prevention. (2013, April 26). *Ten Great Public Health Achievements in the 20th Century.* Retrieved 27 November 2017, from https://www.cdc.gov/about/history/tengpha.htm

00209190

Exhibit 89

JA-0001325

[xiv] *See, e.g.*, Sonfield, A., Hasstedt, K., Kavanaugh, M.L., & Anderson, R. (2013, March). *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*. Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/social-economic-benefits.pdf

[xv] Guttmacher Institute. (2016, September). *Unintended Pregnancy in the United States* (p. 2). Retrieved 27 November 2017, from https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us_0.pdf

[xvi] Declaration of Dr. Lawrence Finer in Support of Plaintiffs' Motion for Preliminary Injunction at 8, California v. Wright, No. 4:17-cv-05783-HSG (Nov. 9, 2017) ("In 2013, the U.S. pregnancy rate among 15–19 year olds was at its lowest point in at least 80 years and had dropped to about one-third of a recent peak rate in 1990.") (citing Kost, K., Maddow-Zimet, I., & Arpaia, A. (2017, August). *Pregnancies, Births and Abortions Among Adolescents and Young Women In the United States, 2013: National and State Trends by Age, Race and Ethnicity*. Retrieved 27 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf).

[xvii] Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252. Hellerstedt, W.L., Pirie, P.L., Lando, H.A., Curry, S.J., McBride, C.M., Grothaus, L.C., & Nelson, J.C. (1998, April). Differences in preconceptional and prenatal behaviors in women with intended and unintended pregnancies. *American Journal of Public Health, 88*(4), 663–666;

[xviii] *See* Tsui, A.O., McDonald-Mosley, R., & Burke A.E. (2010, April). Family planning and the burden of unintended pregnancies. *Epidemiologic Reviews*, *32*(1), 152–174; Joyce, T.J., Kaestner, R., & Korenman, S. (2000, February). The effect of pregnancy intention on child development. *Demography*, *37*(1), 83–94; Gazmararian, J.A., Adams, M.M., Saltzman, L.E., Johnson, C.H., Bruce, F.C., Marks, J.S., & Zahniser, S.C. (1995, June). The relationship between pregnancy intendedness and physical violence in mothers of newborns. The PRAMS Working Group. *Obstetrics & Gynecology, 85*(6), 1031–1038; Goodwin, M.M., Gazmararian, J.A., Johnson, C.H., Gilbert, B.C., & Saltzman, L.E. (2000, June). Pregnancy intendedness and physical abuse around the time of pregnancy: Findings from the pregnancy risk assessment monitoring system, 1996-1997. PRAMS Working Group. Pregnancy Risk Assessment Monitoring System. *Maternal and Child Health Journal, 4*(2), 85–92.

[xix] Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313; Conde-Agudelo, A., Rosas-Bermúdez, A., & Kafury-Goeta, A.C. (2006). Birth spacing and risk of adverse perinatal outcomes: A meta-analysis. *JAMA, 295*(15), 1809–1823. *See also* Goldthwaite, L.M., Duca, L., Johnson, R.K., Ostendorf, D., & Sheeder, J. (2015, September). Adverse birth outcomes in Colorado: Assessing the impact of a statewide initiative to prevent unintended pregnancy. *American Journal of Public Health, 105*(9), e60–e66 (establishing an association between use of long-acting reversible contraception and a lower risk of preterm birth).

[xx] *See, e.g.,* Barber, J.S., Axinn, W.G., & Thornton, A. (1999, September). Unwanted childbearing, health, and mother-child relationships. *Journal of Health and Social Behavior, 40*(3), 231–257. *C.f.* Mayer, J.P. (1997). Unintended childbearing, maternal beliefs, and delay of prenatal care. *Birth, 24*(4), 247–252; Orr, S.T., Miller, C.A., James, S.A., & Babones, S. (2000, October). Unintended pregnancy and preterm birth. *Paediatric and Perinatal Epidemiology, 14*(4), 309–313.

[xxi] Ahmed, S., Li, Q., Liu, L., & Tsui, A.O. (2012, July). Maternal deaths averted by contraceptive use: An analysis of 172 countries. *The Lancet*, *380*(9837), 111–125.

[xxii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

[xxiii] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147)).

[xxiv] *See, e.g.,* American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 86: Progestin-Only Hormonal Birth Control: Pill and Injection*. Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Progestin-Only-Hormonal-Birth-Control-Pill-and-Injection; American College of Obstetricians and Gynecologists. (2014, July). *FAQ No. 185: Combined Hormonal Birth Control: Pill, Patch, and Ring*. Retrieved 27 November 2017, from https://www.acog.org/Patients/FAQs/Combined-Hormonal-Birth-Control-Pill-Patch-and-Ring.

[xxv] *See, e.g.,* Jones, R.K. (2011, November). *Beyond Birth Control: The Overlooked Benefits of Oral Contraceptive Pills*. Retrieved 30 November 2017, from the Guttmacher Institute website: https://www.guttmacher.org/sites/default/files/report_pdf/beyond-birth-control.pdf

[xxvi] *See* Curtis, K.M., Jatlaoui, T.C., Tepper, N.K., Zapata, L.B., Horton, L.G., Jamieson, D.J., & Whiteman, M.K. (2016, July 29). U.S. selected practice recommendations for contraceptive use, 2016. *Morbidity and Mortality Weekly Report, 65*(4), 1–66.

[xxvii] Cortessis, V.K., Barrett, M., Brown Wade, N., Enebish, T., Perrigo, J.L., Tobin, J., . . . McKean-Cowdin, R. (2017). Intrauterine device use and cervical cancer risk: A systematic review and meta-analysis. *Obstetrics & Gynecology*, *130*(6), 1226–1236.

xxviii *C.f.* American College of Obstetricians and Gynecologists. (2016, December). *Women's Preventive Services Initiative: Recommendations for Preventive Services for Women Final Report to the U.S. Department of Health and Human Services, Health Resources & Services Administration* (p. 11). Retrieved 27 November 2017, from https://www.womenspreventivehealth.org/final-report/

xxix Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

xxx Ibid.

xxxi Ibid.

xxxii Ibid.

xxxiii Ibid.

xxxiv American College of Obstetricians and Gynecologists, Committee on Gynecologic Practice. (2016). *Committee Opinion Number 540: Risk of Venous Thromboembolism Among Users of Drospirenone-Containing Oral Contraceptive Pills*. Retrieved 27 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Gynecologic-Practice/co540.pdf?dmc=1&ts=20171127T2043082500

xxxv Ibid.

xxxvi Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

xxxvii *See, e.g.,* Kirby, D. (2007, November). *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases*. The National Campaign to Prevent Teen and Unplanned Pregnancy Publication. Retrieved 27 November 2017, from https://thenationalcampaign.org/resource/emerging-answers-2007%E2%80%94full-report; Meyer, J.L., Gold, M.A., & Haggerty C.L. (2011, February). Advance provision of emergency contraception among adolescent and young adult women: A systematic review of literature. *Journal of Pediatric & Adolescent Gynecology, 24*(1), 2–9.

xxxviii Minguez, M., Santelli, J.S., Gibson, E., Orr, M., & Samant, S. (2015, March). Reproductive health impact of a school health center. *Journal of Adolescent Health, 56*(3), 338–344. *See also* Knopf, J.A., Finnie, R.K., Peng, Y., Hahn, R.A., Truman, B.I., Vernon-Smiley, M., . . . Fullilove, M.T. (2016, July). School-based health centers to advance health equity: A Community Guide systematic review. *American Journal of Preventive Medicine, 51*(1), 114–126.

xxxix Secura, G.M., Adams, T., Buckel, C.M., Zhao, Q., & Peipert, J.F. (2015, April). Change in sexual behavior with provision of no-cost contraception. *Obstetrics & Gynecology, 123*(4), 771–776. *See also* Goldman, G. (2017, October 11). *The Trump Administration Fakes Science to Justify Restrictions on Birth Control Access*. Union of Concerned Scientists Blog. Retrieved 27 November 2017, from http://blog.ucsusa.org/gretchen-goldman/the-trump-administration-fakes-science-to-justify-restrictions-on-birth-control-access

xl Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47. *See also* American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women. (2015, January). *Committee Opinion Number 615: Access to Contraception*. Retrieved 30 November 2017, from https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co615.pdf?dmc=1&ts=20171130T1815539115

xli Schindler, A.E. (2013). Non-contraceptive benefits of oral hormonal contraceptives. *International Journal of Endocrinology and Metabolism, 11*(1), 41–47.

xlii Ibid.

xliii Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,838, 47,840 (Oct. 13, 2017) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147).

xliv Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

xlv *See, e.g.,* Brief of *Amici Curiae* Physicians for Reproductive Health, et al. in Support of Petitioners at 12, Burwell v. Hobby Lobby Stores, Inc., 573 U.S. ___, 134 S. Ct. 2751 (2014) (No. 13-354).

00209192

Exhibit 89

**Public Comment on Interim Final Rules on Moral and Religious Exemptions for Coverage of Certain Preventive Services Under the Affordable Care Act (82 FR 47838, 82 FR 47792)**

Submitted December 5, 2017

We, the undersigned public health practitioners and members of the faculty of the Heilbrunn Department of Population and Family Health at Columbia University Mailman School of Public Health, respectfully submit the following comments on the interim final rules on moral and religious exemptions for coverage of contraceptive coverage. The decision to allow moral and religious objections to covering contraception under the preventive services requirement of the Affordable Care Act threatens to undo recent gains and stymie further progress. These rules roll back decades of public health progress and place the lives and well-being of women and all Americans at risk.

## 1.    Women have an established right to decide how, whether, and when they want to become pregnant.

The struggle to protect women's rights to control whether, how, and when they become pregnant has a long history. The federal ban on birth control was lifted in 1938. In 1965, the Supreme Court, recognizing that couples have a right to privacy, ruled that married couples could use birth control in *Griswold v. Connecticut*. And finally, in the 1972 case *Baird v. Eisenstadt*, the Court legalized birth control for all citizens regardless of marital status. The Women's Health Amendment to the Patient Protection and Affordable Care Act of 2010 included a contraceptive mandate requiring employers to cover the cost of contraceptive methods with no cost-sharing for the patient. These interim rules threaten to dismantle this contraceptive mandate, depriving women of an established right to make decisions about whether, how, and when to become pregnant.

## 2.    Unintended pregnancy is prevalent, and it adversely affects women, children, and society.

Nearly half (45%) of the estimated 6.1 million pregnancies in the US each year are unintended[1], with significant health, social, and economic costs.[2] Unintended pregnancies are significantly

---

[1] Finer LB, Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. New England Journal of Medicine. 2016 Mar 3;374(9):843-52.

[2] Gipson JD, Koenig MA, Hindin MJ. The effects of unintended pregnancy on infant, child, and parental health: a review of the literature. Studies in family planning. 2008 Mar 1;39(1):18-38.

00209066

Exhibit 90                                                                                              JA-0001328

more likely to result in adverse birth outcomes, including low birthweight and preterm birth.[3,4] The effects of unintended pregnancy persist after birth for both the mother and child. Mothers who carry unintended pregnancies to term are less likely to breastfeed their infants and more likely to suffer from postpartum depression.[5,6] Children and young adults whose births were the result of unintended pregnancies are more likely to have low self-esteem[7] and to have siblings with behavioral problems in school.[8] Unintended births contribute to a cycle of socioeconomic disadvantage for both mothers and children as a result of deferred educational and employment opportunities.[9,10]

**3.    Programs to make contraception available without cost have been demonstrated to reduce unintended pregnancy, abortion, and unintended and teen births**

At the close of the 20th century, the Centers for Disease Control and Prevention (CDC) recognized the ability to achieve a desired family size and birth spacing made possible through contraception as a key achievement in public health.[11] In the last decade, one of the most positive public health trends has been a steep reduction in unintended pregnancy. The rate of unintended pregnancy fell by 18 percent in the time period 2008-2011 alone.[12] This decrease has been attributed to concurrent increases in contraceptive use.[13]

The cost of contraception is a barrier for many women, and the methods most effective at preventing unintended pregnancy are also the most expensive.[14] Even before the ACA expansion, numerous studies showed that when cost barriers are addressed, the use of the most

---

[3] Orr ST, Miller CA, James SA, Babones S. Unintended pregnancy and preterm birth. Paediatric and perinatal epidemiology. 2000 Oct 1;14(4):309-13.

[4] Shah PS, Balkhair T, Ohlsson A, Beyene J, Scott F, Frick C. Intention to become pregnant and low birth weight and preterm birth: a systematic review. Maternal and child health journal. 2011 Feb 1;15(2):205-16.

[5] Logan C, Holcombe E, Manlove J, Ryan S. The consequences of unintended childbearing. Washington, DC: Child Trends and National Campaign to Prevent Teen Pregnancy. 2007 May;28:142-51.

[6] Cheng D, Schwarz EB, Douglas E, Horon I. Unintended pregnancy and associated maternal preconception, prenatal and postpartum behaviors. Contraception. 2009 Mar 31;79(3):194-8.

[7] Axinn WG, Barber JS, Thornton A. The long-term impact of parents' childbearing decisions on children's self-esteem. Demography. 1998 Nov 1;35(4):435-43.

[8] Barber JS, East PL. Children's experiences after the unintended birth of a sibling. Demography. 2011 Feb 1;48(1):101-25.

[9] Allen RH. The role of family planning in poverty reduction. Obstetrics and Gynecology. 2007 Nov 1;110(5):999-1002.

[10] Sonfield A, Hasstedt K, Kavanaugh ML, Anderson R. The social and economic benefits of women's ability to determine whether and when to have children.

[11] Centers for Disease Control and Prevention. Achievements in public health, 1900–1999: Family planning. MMWR Weekly. 1999 Dec 3; 48 (47): 1073-80.

[12] Finer, L.B., and Zolna, M.R. (2016). Declines in Unintended Pregnancy in the United States, 2008-2011. *The New England Journal of Medicine*, 374(9), 843-852.

[13] Jones J, Mosher W, Daniels K. Current contraceptive use in the united states, 2006-2010, and changes in patterns of use since 1995. InSexual Statistics: Select Reports from the National Center for Health Statistics 2013. Nova Science Publishers, Inc..

[14] Pace LE, Dusetzina SB, Fendrick AM, Keating NL, Dalton VK. The impact of out-of-pocket costs on the use of intrauterine contraception among women with employer-sponsored insurance. Medical Care. 2013 Nov 1;51(11):959-63.

00209067

Exhibit 90                                                                                                          JA-0001329

effective contraceptive methods increases,[15] and the rate of unplanned pregnancies decreases—a fact the Administration is disputing as rationale for allowing a roll-back of women's access to contraception.

Programs that reduce the cost barriers to contraception have been shown to significantly reduce unintended pregnancy and abortion rates. A large prospective study in St. Louis that removed cost barriers to contraception showed significant reductions in abortion.[16] When Colorado made long-acting reversible contraception available without cost, the unintended pregnancy rate among women age 20-24 dropped by 20% and the abortion rate by 18%.[17]

Reducing access to contraception therefore has the potential to increase unintended pregnancy rates.

4.    **Employers should not be able to impose scientifically unsound, personal beliefs that affect the health and well-being of women, no matter how sincerely held these beliefs are.**

Expanding the range of objections to providing coverage of contraception with no out-of-pocket cost to include moral objections can allow employers to impose their "sincerely held" beliefs, even when they are not scientifically sound. The phrasing "This Mandate concerns contraception and sterilization services, including items believed by some citizens to have an abortifacient effect—that is, to cause the destruction of a human life at an early stage of embryonic development." (Page 47844, II. A.) [underline added] exemplifies the extent to which this interim final rule would allow employers to restrict access to contraception based on unfounded views. It has been demonstrated and agreed upon by scientific experts, including in an amicus brief in the *Hobby Lobby* case (2013), that contraception, including emergency contraception (colloquially referred to as the "morning after pill") are not abortifacients.[18]

5.    **This rule is being implemented without regard for the potential adverse public health impact.**

As shown by the language above, the potential range of objections that individuals could cite as a rationale for denying covered entities access to contraception is very broad. Yet these rules are being implemented without an understanding of the extent to which these rules would deny access for women: "The Departments acknowledge that expanding the exemption to include objections based on moral convictions might result in less insurance coverage of contraception for some women who may want the coverage. Although the Departments do not know the exact

---

[15] Postlethwaite D, Trussell J, Zoolakis A, Shabear R, Petitti D. A comparison of contraceptive procurement pre-and post-benefit change. Contraception. 2007 Nov 30;76(5):360-5.

[16] Peipert, J.R., Madden, T., Allsworth, J.E., and Secura, G.M. (2012). Preventing Unintended Pregnancies by Providing No-Cost Contraception. Obstet. Gynecol., 120(6), 1291-1297.

[17] Ricketts S, Klingler G, Schwalberg R. Game Change in Colorado: Widespread Use Of Long-Acting Reversible Contraceptives and Rapid Decline in Births Among Young, Low-Income Women. Perspectives on Sexual and Reproductive Health. 2014 Sep 1;46(3):125-32.

[18] Dreweke J. GPR. Guttmacher Policy Review. 2014;17(2):3.

Exhibit 90                                                                                                              JA-0001330

scope of that effect attributable to the moral exemption in these interim final rules, they believe it to be small." (Page 47856, V. 2.)

Given the demonstrated public health benefit of making contraception available without cost, and the potential for a broad range of objections to be cited by employers and universities covered under these rules, we urge the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services to rescind in their entirety these regulations.

**Samantha Garbers, PhD**
Assistant Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Terry McGovern, JD**
Professor and Chair
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Sara Casey, DrPH**
Director
RAISE Initiative
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Marina Catallozzi, MD, MSCE**
Assistant Professor
Department of Pediatrics
Columbia University College of Physicians and Surgeons

Assistant Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Wendy Chavkin, MD, MPH**
Professor
Department of Obstetrics and Gynecology
Columbia University College of Physicians and Surgeons

Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Joanne Csete, PhD, MPH**
Adjunct Associate Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

00209069

Exhibit 90

JA-0001331

**Linda F. Cushman, PhD**
Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Associate Dean
Office of Field Practice
Columbia University Mailman School of Public Health

**Sally E. Findley, MURP, MA, PhD**
Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Professor
Department of Sociomedical Sciences
Columbia University Mailman School of Public Health

**Melanie A. Gold, DO, DABMA, DMQ**
Professor
Department of Pediatrics
Columbia University College of Physicians and Surgeons

Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Medical Director
School Based Health Centers
New York-Presbyterian Hospital

**Debra Kalmuss, PhD**
Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Latanya Mapp Frett, MPM, JD**
Adjunct Assistant Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Executive Director
Planned Parenthood Global

Vice President
Global PPFA

00209070

Exhibit 90

**Maria Marti Castaner, PhD**
Postdoctoral Research Scientist
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**Rachel T. Moresky, MD, MPH**
Associate Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Associate Professor
Department of Emergency Medicine
Columbia University College of Physicians and Surgeons

Director
sidHARTe - Strengthening Emergency Systems

Director
Columbia University International Emergency Medicine Fellowship

**Carmen Rodriguez, PhD**
Assistant Professor at Columbia University Medical Center
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

**John Santelli, MD, MPH**
Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

Professor
Department of Pediatrics
Columbia University College of Physicians and Surgeons

**Melissa Stockwell, MD, MPH**
Associate Professor
Department of Pediatrics
Columbia University College of Physicians and Surgeons

Associate Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health

00209071

Exhibit 90



40 Worth Street                voice 646-619-6400
5th Floor                      fax 646-619-6777
New York, NY 10013-2988        www.healthsolutions.org

MERGING RESEARCH AND ACTION

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

Acting Secretary Eric Hargan
CMS Administrator Seema Verma
Center for Medicare & Medicaid Services
US Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

Re:     **Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act (CMS-9940-IFC)**

Dear Acting Secretary Hargan and Administrator Verma:

Public Health Solutions (PHS) is committed to ensuring all individuals have access to affordable, high-quality family planning and sexual health services, including contraceptive services and supplies. PHS has been the non-governmental Title X Family Planning Services Grantee for New York State for over 30 years, administering funding to five sub-recipient health centers, and providing sexual and reproductive health services at two centers in Brooklyn.  We know well the importance of the vital health services jeopardized by the Departments of Health and Human Services, Labor and Treasury's (the Departments') recent efforts that undermine the Affordable Care Act's (ACA) contraceptive coverage requirement through this interim final rule (IFR) and we can forecast the consequences of this roll-back. **We therefore unequivocally oppose the Departments' IFR.**

The impacts of the IFR will be acute in New York State. New York State has one of the highest rates of unintended pregnancy in the nation, and the risk of unintended pregnancy is greatest among the most vulnerable women: young, low-income, minority women, without high school or college education.  New York State law and regulations protect contraceptive access; in 2003, New York enacted the Women's Health and Wellness Act (WHWA), which requires plans governed by New York State law ("fully insured plans" or "state regulated plans") to cover contraceptives for female plan members.1 In January 2017, the New York State Department of Financial Services issued Regulation 62, requiring that state regulated plans not impose cost sharing for contraceptives on plan members. Nonetheless, WHWA and Regulation 62 do not apply to self-funded insurance plans, which are governed by federal law and regulated by the

---

1 N.Y. Pub. Health L. § 602 (2003).

00373562

Exhibit 91                                                                    JA-0001334

federal government under the federal Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Sections 1001 *et seq.* Therefore, as a result of these new rules, the nearly 1.2 million New York women covered by self-funded employer plans may be forced to seek state-funded access (a cost that would be borne by the state), seek services at a Title X provider such as PHS, or forego contraceptive care altogether.

The women's preventive services requirement of the ACA was designed to promote preventive health care, reduce future medical costs, and improve the health, equality, and economic security of women and families.[2] Nationwide, more than 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, screening for sexually transmitted diseases, and contraception and contraceptive counseling.[3] By allowing virtually any employer or university to claim this religious exemption and deprive women of contraceptive coverage, this IFR will harm the health and well-being of women, their partners, and their families. Furthermore, the IFR is predicated upon an inaccurate picture of the of the federal programs that compose the family planning safety net, the Title X family planning program and Medicaid. **For these reasons, Public Health Solutions calls on the Departments to rescind the IFR and restore equal access to contraceptive coverage regardless of employer.**

## CONTRACEPTION IS CRITICAL TO HEALTH

Women face a unique set of health care challenges because they access more health services than men, yet earn less on average than men.[4] As a result, women face a high level of health care insecurity, which in turn leads many women to forgo necessary care due to prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services because they could not afford it.[5] Women were spending between 30% and 44% of their total out-of-pocket health costs on contraception alone.[6] As a result of the ACA and its contraceptive coverage benefit, women saved more than $1.4 billion in out-of-pocket costs on oral contraceptives in 2013 alone.[7]

The goal of preventive health care is to help people control, track, and better manage their lifelong health, and the health of their families. Similarly, the goal of contraception is to prevent unintended pregnancy, control the timing of a desired pregnancy and spacing between pregnancies, in accordance

---

2 This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
3 National Women's Law Center. New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs. September 2017. *Available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf
4 U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.
5 Kaiser Family Foundation. Women's Health Care Chartbook. 2011.
6 Ibid.
7 Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

00373563

Exhibit 91

JA-0001335

with patient choice and to improve maternal, child, and family health.[8] In addition, contraception is particularly critical for women with underlying physical and psychological conditions, some of which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[9]

Unintended pregnancies have higher rates of long-term health complications for women and their infants. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[10] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, and experiencing physical violence during pregnancy.[11]

Unintended pregnancy rates are higher in the US than in most other developed countries, with approximately 45% of pregnancies unintended.[12] In addition, the US has the highest rate of maternal mortality in the developed world.[13] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[14] Contraception is considered a major factor in reducing rates of maternal morbidity and mortality.

Beyond the well-established evidence that contraception is effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[15] Non-contraceptive health benefits also include treatment for non-gynecologic conditions. [16,17]

The patient, in consultation with a trusted health care provider, should determine the right contraceptive method for her unique health care needs without interference from politicians. The IFR interferes with the patient-provider relationship, and conversations about if and when to become pregnant as well as which contraceptive method to use to avoid pregnancy.

8 Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

9 *Id.* at 103-104.

10 Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes. a meta-analysis. JAMA 2006;295:1809-23.

11 Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi 10.1093/epirev-mxq012.

12 Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008-2011, *New England Journal of Medicine*, 2016, 374(9):843-852,

13 Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

14 Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5).397-404.

15 Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250-5.

16Schindler AE. supra.

17 Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk, A Systematic Review and Meta-analysis Obstet Gynecol. 2017

00373564

Exhibit 91                                    JA-0001336

## OTHER GOVERNMENT PROGRAMS CANNOT MEET THE NEED FOR CONTRACEPTIVE COVERAGE

The Department of Health and Human Services (HHS) asserts that existing government-sponsored programs, such as Medicaid and the Title X family planning program, can serve as alternatives or safeguards for individuals who will lose access to contraceptive coverage without cost-sharing under their employer-sponsored or student health plans.[18] As discussed below, this assertion fails to recognize that: 1) programs such as Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals; 2) those programs do not have the capacity to meet the needs of current enrollees and those seeking care at Title X-funded health centers; and, 3) legislative and administrative proposals threaten the capacity and goals of these programs. Moreover, the claim that state coverage requirements are an alternative misconstrues the scope and protections provided by these requirements, which, as discussed earlier, cannot fill in the gaps of coverage for many individuals who will lose contraceptive coverage.

### Medicaid and Title X are not designed to meet the needs of individuals who lose access to contraceptive coverage under their employer-sponsored or student health plans.

Safety-net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Enacted in 1970, Title X is the nation's only dedicated source of federal funding for family planning services.[19] While Title X-funded health centers, such as those administered by PHS, provide care to all patients, federal law requires them to give priority to "persons from low-income families."[20] Low-income individuals receive services at low or no cost depending on their family income.[21] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[22]

Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate. Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage. Moreover, while 33 states have expanded coverage under the Medicaid expansion option of the ACA, many individuals remain ineligible

---

18 Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

19 *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504.

20 42 CFR § 59.5 (a)(6-9).

21 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

22 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

00373565

Exhibit 91                                                                                                    JA-0001337

for this coverage.[23] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states was $8,985 per year for a family of three in 2017.[24] In many of these states, childless adults remain ineligible for the program.[25] Due to this, many low-income women who would be eligible to enroll in Medicaid under this option, depending on where they reside, are unable to do so. For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling.

**Medicaid and Title X do not have capacity to meet the increased need.**

At a time when our nation's public health network is already burdened and under attack, it is critical to ensure that all women have access to contraceptive coverage and care. Medicaid is the nation's largest insurer, providing coverage to over 74 million people. Medicaid enrollees have robust access to comprehensive health care, and Medicaid already operates as a very lean program. Despite this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges in securing an adequate number of providers to furnish services to patients.[26] This is particularly true with respect to specialty providers, including OB/GYNs and other family planning and sexual health providers. A recent report from the HHS Office of the Inspector General found that many Medicaid managed care plans had provider shortages, with only 42% of in-network OB/GYN providers able to offer appointments to new patients.[27]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage caused by employer exemptions and would have to provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would from the IFR. Since 2010, the reported annual number of clients served at Title X-funded health centers has dropped from approximately 5.2 million patients to just over 4 million.[28] This decline corresponds

---

23 The Henry J. Kaiser Family Foundation, Status of State Action on the Medicaid Expansion Decision, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/?currentTimeframe=0&sortModel=%7B%22colId%22%3A%22Location%22%2C%22sort%22%3A%22asc%22%7D (last updated Nov. 8, 2017).

24 Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

25 Ibid.

26 U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

27 U.S. Department of Health and Human Services, supra at note 7.

28 See Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, Family Planning Annual Report: 2010 National Summary, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, Family Planning Annual Report: 2016 national summary, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

00373566

Exhibit 91                                                                                           JA-0001338

with over $30 million in cuts to Title X's annual appropriated amount over the same period.[29] A recent study published in the *American Journal of Public Health* confirms that reductions in funding for Title X limit the number of patients Title X–funded providers are able to serve, concluding that Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded family planning services.[30] Requiring otherwise higher–income, privately insured individuals to use Title X–funded health centers would deplete resources from an already overburdened and underfunded program.

Thus, as a Title X Grantee, Public Health Solutions is unconvinced that Medicaid and Title X are plausible alternatives for the individuals affected by this IFR.

**Political assault on Medicaid, Title X, and Planned Parenthood health centers have already compounded the threat to women's access to contraceptive care.**

Medicaid is a vital source of coverage for family planning and sexual health care in the United States, but political threats to the program may undermine its ability to provide the coverage that meets the needs of individuals and families. In 2010, Medicaid covered nearly 45% of all births in the US, and in many states Medicaid covers well over half of births.[31] Medicaid is also the single largest source of public funding for family planning services and supplies.[32]

Within the last year, policymakers have sought to radically alter the financial structure of Medicaid. The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars from the program over the next ten years.[33] The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per–capita cap, and permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve.[34]

---

29 U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

30 August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.

31 Kathy Gifford et al., The Henry J. Kaiser Family Found., Medicaid Coverage of Pregnancy and Perinatal Benefits: Results from a State Survey, (2017), http://kff.org/womens-health-policy/report/medicaid-coverage-of-pregnancy-and-perinatal-benefits-results-from-a-state-survey/; *Births Financed by Medicaid*, The Henry J. Kaiser Family Found., http://kff.org/medicaid/state-indicator/births-financed-by-medicaid/?currentTimeframe=0&sortModel=%7B%22colId%22%22Location%22,%22sort%22%22asc%22%7D (last visited Nov. 6, 2017).

32 In 2010, Medicaid accounted for 75 percent of all public funds spent on contraceptive services and supplies. Kinsey Hasstedt et al., Guttmacher Institute, Public Funding for Family Planning and Abortion Services, FY 1980-2015 (2017), https://www.guttmacher.org/report/public-funding-family-planning-abortion-services-fy-1980-2015.

33 Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf.

34 Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-

00373567

Exhibit 91

The administration has also made moves that could radically alter the Medicaid program. Earlier this year, then-Secretary Tom Price and CMS Administrator Seema Verma issued a letter to governors announcing HHS' intent to use existing Section 1115 waiver authority to approve changes to state Medicaid programs that could undermine the ability of individuals qualified to enroll in Medicaid—particularly non-disabled, working-age adults—to receive the coverage and health care they need.[35]

In addition to these legislative and administrative efforts to alter the Medicaid program, Congress and the administration have threatened access to trusted family planning and sexual health providers by attempting to block Planned Parenthood from participating in Medicaid despite the dominant role Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57% of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[36]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks. Title X has also been targeted. In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program. In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018.[37] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[38] For instance, the president's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide.[39] [40]

cassidy-bill#.Wft9mmhSzlv.

35 Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

36 Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

37 Title X, Budget & Appropriations, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

38 The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018.

39 Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, Guttmacher Policy Review, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

40 White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

7

00373568

Exhibit 91                                                                                                        JA-0001340

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ+ individuals, communities of color, and young people.

## JUSTIFICATIONS FOR THE IFR DO NOT MEET BASIC SCIENTIFIC STANDARDS

As the nation's health policy center, HHS must adopt policies and activities firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and the Women's Preventive Services Initiative (WPSI), instead prioritizing religious objections over evidence-based medical recommendations. The Departments make several false and misleading statements in the IFR to undermine the contraceptive coverage benefit. [ORGANIZTION] fundamentally disagrees with the Departments' decision to promulgate this IFR based on the religious beliefs of individuals and entities rather than science and medicine.

### Contraception does not interfere with an existing pregnancy.

The IFR takes issue with the IOM-recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices...that many persons and organizations believe are abortifacient—that is, as causing early abortion."[41] FDA-approved contraceptive methods do not function as abortifacients. Every FDA-approved contraceptive method acts before implantation, does not interfere with an existing pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[42]

### Contraception is medication and carries risks like any medication.

The IFR raises concerns about the "negative health effects" of contraception.[43] As with any medication, some contraceptive methods may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[44,45] Specifically, the IFR suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[46] The IFR also suggests contraception increases the risk of breast cancer, but there is no scientifically-proven increased risk of breast cancer among contraceptive users, particularly those under 40.[47]

41 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
42 Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at:
acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?
43 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
44 Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
45 Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
46 Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239-42.
47 Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1-66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

00373569

Exhibit 91                                                                                                    JA-0001341

**Contraception makes sex among adolescents healthier, not more likely to happen.**

The IFR suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[48] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[49,50] In fact, research has shown that school-based health centers that provide access to contraception are proven to increase use of contraception by already sexually active students, not to increase onset of sexual activity.[51,52] On the other hand, young women who did not use contraception at first sexual intercourse were twice as likely to become teen mothers.[53] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[54]

**The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.**

**THE IFR UNDERMINES CONGRESSIONAL INTENT**

The Departments ignore Congress' clear intent that contraception be covered as a preventive service under the ACA. When Congress passed the Women's Health Amendment, it meant to "ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recognize[ing] that women have unique health care needs and burdens."[55] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[56] In enacting the amendment, Congress recognized that the failure to

---

48 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

49 Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

50 Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2-9).

51 Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

52 Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1).114-26.

53 Ibid.

54 Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007-2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

55 Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8727 (Feb. 15, 2012).

56 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

00373570

Exhibit 91

JA-0001342

cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage...* In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.[57]*

In considering the amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, New York State Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[58] Additional statements from Senators Boxer, Feinstein, Nelson, and Durbin prove that the intent to cover contraception was clear.[59]

To meet the amendment's objectives, HHS commissioned the Institute of Medicine (IOM) to convene a diverse committee of experts in disease prevention, women's health and adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for HHS to consider in order to fill those gaps.[60] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[61] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM report.[62] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists and HRSA to coordinate the development, review, and update of recommendations. These, too, were adopted by HRSA.

HHS, through the adoption of the IOM's recommendations and the subsequent adoption of the WPSI recommendations, carried out Congress' intent. **The Departments should rescind the IFR to continue reflecting that intent.**

---

57 *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

58 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

59 *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

60 Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20- 21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

61 *Id.* at 109-10.

62 *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines,* http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

10

00373571

Exhibit 91                                                                                    JA-0001343

\*\*\*

Public Health Solutions appreciates the opportunity to provide comment on the religious exemptions and accommodations for coverage of certain preventive services interim final rule. This IFR will cause people to lose contraceptive coverage and harm their health and well-being. It ignores congressional intent that contraception be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting contraceptive access. **For all of these reasons, Public Health Solutions calls on the Departments to rescind the IFR.**

If you require additional information about the issues raised in this letter, please contact Marla Tepper, General Counsel and Vice President for Legal Affairs at mtepper@healthsolutions.org (646.619.6495).

Sincerely,

Lisa David
President & CEO

Marla Tepper
Vice President/General Counsel

11

00373572

Exhibit 91



December 5, 2017


Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016
Attention: CMS-9940-IFC


*Submitted electronically at www.regulations.gov*


**Subject: Interim Final Rule on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act [CMS-9940-IFC]**

Raising Women's Voices for the Health Care We Need is a national initiative with 30 regional coordinator organizations in 29 states working to ensure that the health care needs of women and our families are addressed in federal and state health policies. We have a special mission of engaging women who are not often invited into health policy discussions: women of color, low-income women, immigrant women, young women, women with disabilities, and members of the LGBTQ community. We place a priority on asking women to share their experiences navigating the health care system.

We unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's ("the Departments") efforts to undermine the Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017). *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

1

00373590

Exhibit 92                                                                                                                    JA-0001345

Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. And the IFR is predicated upon a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons, Raising Women's Voices calls on the Departments to rescind the IFR.

## I.     Birth Control Is Critical to Women's Health

Women face a unique set of health care challenges because they use more health services than men yet earn less on average than men.[3] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing

---

[3] U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2, 2009.
[4] Kaiser Family Foundation, Women's Health Care Chartbook, 2011.
[5] *Id.*
[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342–43 (2000); 1342–43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFchNSzeQ.
[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.
[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).
[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.
[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

00373591

Exhibit 92

JA-0001346

of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] And, the U.S. has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[17] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[18] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[19, 20]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

---

[11] *Id.* at 103-104.
[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295;1809–23.
[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.
[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.
[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation, University of Washington, 2016.
[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.
[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.
[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7. and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.
[19] *Id.*
[20] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

00373592

Exhibit 92

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[21] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[22] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[23] which was followed by large increases in women's presence in law, medicine, and other professions.[24] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in health care coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[25]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## II.     The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

---

[21] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.
[22] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).
[23] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).
[24] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.harvard.edu/handle/1 /2624453.
[25] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

4

00373593

Exhibit 92

JA-0001348

## A. Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[26] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[27] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[28]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[29] And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[30] That contraception would be covered was clear.[31]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based

---

[26] *Id.* at 8,727.

[27] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[28] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[29] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[30] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[31] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

Exhibit 92

00373594

JA-0001349

guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[32] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[33] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[34] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations— carried out Congress' direction.

### B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exemptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify he IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[35] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[36] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans

---

[32] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[33] *Id.* at 109-10.

[34] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa. gov/womensguidelines (last visited Feb. 15, 2016).

[35] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[36] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.,* Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

00373595

Exhibit 92

JA-0001350

lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[37] This exemption is intended as a temporary means for transitioning employers to full compliance.[38] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[39]

### III.    The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[40] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[41] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[42]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society.  In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[43]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it

---

[37] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).
[38] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).
[39] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.
[40] *See*, e.g., at 21
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf
[41] *Id.* at 19.
[42] *Id.* at 24-27
[43] 2 U.S.C. § 18116.

00373596

Exhibit 92

JA-0001351

does not override other significant interests" or "impose unjustified burdens on other[s]."[44] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero."[45] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"[46] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[47] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they

---

[44] E.g., *Cutter v. Wilkinson*, 544 U.S. 709, 722, 726 (2005).
[45] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id.* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).
[46] 5 U.S.C. § 553(b), (c).
[47] 5 U.S.C. § 553(d).

00373597

Exhibit 92                                                                                      JA-0001352

did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[48]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[49] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[50]

For each of these reasons, the rule violates the APA and should be rescinded.

## V.    Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. Raising Women's Voices unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

### A.    Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[51] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts

---

[48] 5 U.S.C. § 706.

[49] 42 U.S.C. § 18114(1).

[50] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

[51] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

00373598

Exhibit 92                                                                                      JA-0001353

before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[52]

### B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[53] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[54, 55] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). The risk of VTE among hormonal contraceptive users, while real, is also low, and much lower than the risk of VTE during pregnancy or in the immediate postpartum period. We believe that women should be informed of risks, but that patients and health care providers, not employers and agencies, should determine the right contraceptive for an individual woman's health care needs. The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[56]

### C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[57] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[58,59] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[60,61] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[62] More females are using contraception the first time they have sex.[63]

---

[52] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

[53] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[54] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[55] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[56] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[57] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[58] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy, 2009.

[59] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[60] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3), 338-344.

[61] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[62] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[63] Id.

10

Exhibit 92

00373599

JA-0001354

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

### VI.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[64] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

### A.    Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[65] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[66] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[67]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[68] Since 2010, the reported annual

---

[64] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[65] See Fam. Plan. Servs. & Population Res. Act of 1970. Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[66] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[67] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

[68] August, Euna M. et al.. "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act." *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.

11

00373600

Exhibit 92

JA-0001355

number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[69] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[70] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[71] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[72] This is particularly true with respect to specialty providers, including OB/GYNs.[73] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

---

Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

[69] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[70] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[71] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[72] U.S. Government Accountability Office, "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance," (Nov. 2012), http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services, Office of Inspector General, "Access to Care: Provider Availability in Medicaid Managed Care," (Dec. 2014), http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[73] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

00373601

Exhibit 92

JA-0001356

**B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.**

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[74] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[75] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[76]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[77] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[78] The administration has not only signaled its support for these

---

[74] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office. Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017). https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017). http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill# Wft9mmhSzIV.

[75] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[76] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[77] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[78] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

00373602

Exhibit 92    JA-0001357

efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[79]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[80] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[81] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[82] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[83]

---

[79] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).
[80] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[81] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[82] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[83] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

14

00373603

Exhibit 92

The Departments' is wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.


Thank you for your consideration of our comments. If you have any questions regarding these comments, please contact Sarah Christopherson, policy advocacy director for Raising Women's Voices and the National Women's Health Network (schristopherson@nwhn.org).

Sincerely,


Raising Women's Voices for the Health Care We Need

15

00373604

Exhibit 92                                                                                          JA-0001359

December 5, 2017
The Honorable Eric Hargan and CMS Administrator Seema Verma
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016, Baltimore, MD 21244

Dear Acting Secretary Hargan and Administrator Seema Verma:

As representatives of the education and youth development communities, we write to express opposition to the Administration's proposed rules (CMS-9925 and CMS-9940). These rules will allow employers, schools, or even individuals who object to providing birth control to deny contraceptive coverage to their employees and students. The proposal will have a deleterious impact on girls and women, possibly leading to unintended pregnancies that will make it harder for girls to complete high school and college, and ultimately impacting their ability to become economically independent, contributing, fulfilled members of society.

Over the past twenty years, the teen pregnancy rate has plummeted and simultaneously, the high school graduation rate has climbed to the highest point in history. College-going rates are at an all-time peak too. Today, the high school graduation rate is over 80% and the college enrollment rate for high school graduates is nearly 70 percent. The Trump Administration's rollback of contraception coverage endangers that progress.

Every day our members work with young people who are trying to complete their educations. Most aspire to finish high school and go to college. According to polls, 90% of young people want to attain a college degree. Yet, the harsh reality of teenage pregnancy can set them back. Only 40 percent of teen mothers finish high school and fewer than 2 percent finish college by age 30. These young women, who become parents unexpectedly, struggle to finish their secondary education, much less fulfill their dreams of higher education and the economic self-sufficiency that comes with it. This situation has negative educational consequences not just in the near term, but also for future generations.

Contraception for all girls and women should be voluntary and free. Research shows that making it so leads to dramatic declines in the teen pregnancy rate. Take the state of Colorado. Between 2009 and 2013, when the state provided free long acting reversible contraception, the teen birth rate, abortion rate, and pregnancy rate among unmarried women under age 25 who do not have a high school degree fell by 40 plus percent. Areas of the state that were concentrated with low-income people experienced the greatest declines.

Access to birth control has particularly important consequences for educational attainment because of the timing of high school and college degrees. The bottom line is access to free contraception can mean the difference between completing high school and college and not. And the returns to higher education have never been higher in this country.

As educators who are committed to helping all young people thrive, we believe strongly in the importance of allowing all girls and women to control their own childbearing decisions and to prioritize their education if they so choose. We urge the Trump administration to abandon these misguided IFRs and support access to affordable contraception for girls and women.

Sincerely,

Exhibit 93

American Association of University Women
American Federation of Teachers
Center for American Progress
Champion Women
Democrats for Education Reform
Girls Inc.
National Urban League
National Women's History Project
National Women's Political Caucus
Young Invincibles
YWCA USA

00209171

Exhibit 93

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9925-IFC

Dec. 5, 2017

Dear Acting Secretary Hargan,

The Reproductive Rights and Justice Practicum at Yale Law School ("RRJP")[1] is a legal clinic working to protect reproductive rights and justice for our clients. The undersigned members of the RRJP unequivocally oppose the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer or university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. Finally, the IFR is predicated upon a distorted picture of the science supporting the safety and efficacy of contraception, as well as the federal programs and state laws that provide some people with access to contraception. For all of these reasons RRJP calls on the Departments to rescind the IFR.

## I.    Birth Control Is Critical to Women's Health

Women face a unique set of health care challenges because they use more health services than men, yet they are paid less on average than men.[3] As a result, women face a high level of health care insecurity, which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-

---

[1] The undersigned members of the RRJP submit these comments in their personal capacities and do not purport to represent the institutional views of Yale Law School.

[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

1

00207737

Exhibit 94

JA-0001362

third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4]  Women were spending between 30% and 44% of their total out-of-pocket health costs on birth control alone.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health and the health of their families. Similarly, prevention of unintended pregnancy helps women time and space their pregnancies or prevent pregnancy altogether, and it improves maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth

---

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] *Id.*

[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/ Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_ Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

[11] *Id.* at 103-104.

2

Exhibit 94

00207738

defects, low birth weight, and preterm birth.[12] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] The U.S. also has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported by evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[17] Beyond the well-established evidence that contraceptives effectively prevent unintended pregnancy, contraception also has recognized benefits aside from family planning, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease,endometrial and ovarian cancer.[18] Contraception is also prescribed to treat non-gynecologic conditions.[19]

Insurance coverage for contraception is critical to ensuring women access. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services, including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty and equal protection of the law. Studies show that access to contraception has increased women's wages and lifetime earnings.[20] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for

---

[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852,

[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] *Id.*; Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017.

[20] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

3

Exhibit 94

00207739

women born from the mid-l940s to early 1950s.[21] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[22] which was followed by large increases in women's presence in law, medicine, and other professions.[23] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in health care coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[24]

A woman and her health care providers, not politicians and bureaucrats, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but it also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care providers and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives; it implies that birth control is not health care at all.

## II.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered as a Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.    Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[25] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

---

[21] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[22] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

[23] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.har vard.edu/handle/1 /2624453.

[24] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

[25] Id. at 8,727.

4

Exhibit 94

00207740

JA-0001365

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[26] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that, on average, women paid more in out-of-pocket costs than men for necessary preventive care and that in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act*.[27]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "[w]ith Senator Mikulski's amendment, even more preventive screening will be covered, including for . . . family planning."[28] Senator Franken also said in regards to the Women's Health Amendment, "affordable family planning services must be accessible to all women in our reformed health care system."[29] That contraception would be covered was clear.[30]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[31] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[32] On August 1, 2011, HRSA adopted the

---

[26] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[27] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[28] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[29] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[30] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[31] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[32] *Id.* at 109-10.

5

00207741

Exhibit 94

JA-0001366

recommendations set forth in the IOM Report.[33] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

## B. "Exemptions" in Other Legislation Do Not Justify the Rule

It is undisputed that Congress rejected an exemption to the women's preventive services provision of the type that the IFR now adopts. Yet, in order to justify the sweeping exceptions in the IFR, the Departments look to the exemptions in *entirely distinct* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify the IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent to maximize the number of women who have cost-free contraceptive coverage.[34] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[35] Additionally, although qualifying grandfathered plans do not have to comply with certain requirements of the ACA, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[36] This exemption is intended as a temporary means for transitioning

---

[33] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa. gov/womensguidelines (last visited Feb. 15, 2016).

[34] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[35] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

[36] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).

00207742

Exhibit 94

JA-0001367

employers to full compliance.[37] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[38]

## III.    The IFR Is Unconstitutional

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality. In so doing, it violates the equal protection and due process guarantees furnished by the Constitution and codified in the ACA.

Religious arguments have long been weaponized in attempts to thwart women's equality, just as they have been weaponized to undermine racial equality.[39] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[40] And, as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[41]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and to ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need but that does not cover care that women need. As a result, the IFR discriminates against women on the basis of sex in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. The IFR's interference with the right to contraception constitutes a separate violation of women's fundamental constitutional right to liberty, which also finds its roots in the Due Process Clause of the Fifth Amendment. Disparate treatment of women's preventive services additionally violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[42] Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women in ways not authorized under the First Amendment. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the

---

[37] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[38] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[39] *See*, e.g., Brief of the American Civil Liberties Union et al. as Amici Curiae Supporting Respondents at 21-27, Zubik v. Burwell, 578 U.S. __ (2016) (No. 14-1418),
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf.

[40] *Id.* at 19.

[41] *Id.* at 24-27

[42] 2 U.S.C. § 18116.

7

00207743

Exhibit 94

right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]." [43] In fact, in *Hobby Lobby*, which was decided under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero." [44] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments promulgated this rule as an interim final rule effective immediately upon publication. This violated the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in three key ways: (1) the Departments do not have good cause to skip notice and comment rulemaking; (2) issuing this IFR is arbitrary and capricious; and (3) the IFR exceeds the Departments' statutory authority.

The APA requires an agency to follow notice and comment procedures that provide "interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation" [45] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." [46] The APA further requires that a rule be published 30 days prior to its effective date. [47] Good cause plainly did not exist here, and the Departments violated the law by promulgating this rule as an IFR effective immediately upon publication. [48]

Further, the Departments' action in issuing this interim final rule is arbitrary and capricious. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's constitutional right to  a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA. [49]

---

[43] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[44] Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id.* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[45] 5 U.S.C. § 553(c).

[46] 5 U.S.C. § 553(b).

[47] 5 U.S.C. § 553(d).

[48] Nick Bagley, *The Trump Administration and Contraceptive Coverage*, TAKE CARE BLOG (Oct. 6, 2017), https://takecareblog.com/blog/the-trump-administration-and-contraception-coverage.

[49] 5 U.S.C. § 706.

00207744

Exhibit 94

JA-0001369

Additionally, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[50] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[51]

For each of these reasons, the rule violates the APA and should be rescinded.

## V.   Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious and moral beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. RRJP unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individuals' unfounded ideological beliefs.

### A. Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion."[52] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts

---

[50] 42 U.S.C. § 18114(1).

[51] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

[52] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

9

00207745

Exhibit 94

JA-0001370

before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[53]

## B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[54] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[55, 56] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[57] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[58]

## C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[59] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[60,61] In fact, school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[62,63] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[64] Overall,

[53] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

[54] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[55] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[56] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[57] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[58] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[59] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[60] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[61] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[62] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[63] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[64] *Id.*

10

Exhibit 94

00207746

increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[65] More females are using contraception the first time they have sex.[66]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.

## VI.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[67] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of those programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws, which cannot fill in the coverage gaps caused by this IFR.

### A.  Medicaid and Title X Programs Do Not Meet the Needs of Individuals Who Will Lose Contraceptive Coverage Under the IFR.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[68] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[69]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result

---

[65] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[66] *Id.*

[67] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[68] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[69] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

11

Exhibit 94

from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[70] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[71] This decline corresponds to over \$30 million in cuts to Title X's annual appropriated amount over the same period.[72] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income and is not equipped to address the gaps in coverage that this IFR will create. Unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[73] Privately insured individuals are by definition not eligible for Medicaid, so Medicaid cannot serve as a safety net for those who lose access to contraception as a result of the IFR.

Even absent these eligibility barriers, Medicaid is plagued by provider shortages and lacks capacity to absorb those who lose covereage as a result of this IFR. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[74] This is particularly true with respect to specialty providers, including OB/GYNs.[75] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

---

[70] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over \$450 million to adequately address the existing need for publicly funded contraception.

[71] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[72] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[73] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of \$8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[74] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[75] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

12

00207748

Exhibit 94

JA-0001373

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

## B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[76] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[77] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[78]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[79] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients'

---

[76] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[77] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[78] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[79] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

13

Exhibit 94

access to care under the program.[80] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[81]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. It is at best perplexing and at worst profoundly disingenuous that the Department would specifically highlight Title X and Medicaid as fail-safes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling with No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[82] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[83] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[84] And in any event, no state

---

[80] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[81] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[82] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[83] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[84] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute,

14

00207750

Exhibit 94

JA-0001375

has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[85]

The Departments are flatly mistaken that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

## VII. The Departments' Proposed Changes to the Rule Do Not Fix the Above Problems

The Departments request comment on several ways the IFR could be changed to expand exemptions to the birth control benefit. Each of the questions presented by the Departments is based on an assumption that the IFR is legally sound, and in some instances, that it should be expanded. As described in detail above, this assumption is incorrect. Other than completely striking it, there is nothing the Departments could do to make this better, and any expansion would only further violate the law. The IFR should be struck in its entirety.

This IFR will cause people to lose contraceptive coverage, and it will harm their health and well-being. It is discriminatory, violates multiple federal statutes and constitutional provisions, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, as well as of the federal programs supporting and state laws regarding contraception. For all of these reasons RRJP calls on the Departments to rescind the IFR.

Sincerely,

Members of The Reproductive Rights and Justice Practicum at Yale Law School

Miriam Becker-Cohen
Dana Bolger
Rebecca Chan
D'Laney Gielow
Rachel Kogan
Rachel Luban
Laura McCready
Nora Niedzielsky-Eichner
Laura Portuondo
Samantha Schnell
Emma Stone
Faren Tang
Camila Vega

---

Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[85] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

15

00207751

Exhibit 94

JA-0001376

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

Acting Secretary Eric Hargan
Centers for Medicare & Medicaid Services, Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**RE: *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act***

> Department of the Treasury
> Internal Revenue Service
> RIN 1545-BN92
>
> Department of Labor
> Employee Benefits and Security Administration
> RIN 1210-AB83
>
> Department of Health and Human Services
> Centers for Medicare and Medicaid Services
> RIN 0938-AT20

Dear Acting Secretary Hargan:

On behalf of SisterLove, Inc., an Atlanta-based sexual and reproductive justice advocacy organization dedicated to eradicating the impact of HIV, AIDS, and reproductive oppression upon all women and girls of color, including both transgender and cisgender women and girls, and their families, and the undersigned XX organizations and individuals, we write to provide detailed comments below in response to (1) Religious Exemptions and Accommodations for Coverage of Certain Preventive Services, an interim final rule published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47792 et seq., and (2) Moral Exemptions and Accommodations for Coverage of Certain Preventive Services, an interim final rule published in the Federal Register on October 13, 2017 at 82 Fed. Reg. 47838 et seq. However, we must also register our strong objection to this process of changing the rule before public input, which creates significant barriers to women's access to reproductive health services, particularly for low income women and women of color.

We at SisterLove face the crushing burden of addressing the many health inequities that disproportionately impact our communities. Georgia has higher rates of newly diagnosed cases of HIV and other STIs than most other states, which disproportionately affect low-income people of color and LGBTQ+ people. Affordable access to quality healthcare is paramount to our mission.

Because of the intersectional nature of our service provision model, we are dedicated to providing services to our communities in a manner that is respectful and upholds the autonomous decision-making power of every individual. Our community-based model allows us to interact with many folks living with and disproportionately affected by HIV and AIDs. Their experiences with barriers

1

00373665

Exhibit 95

JA-0001377

to preventative care and treatment inform our position on the Departments' interim final rules that expand the religious and/or moral exemptions and accommodations for coverage of preventive services for people under the Affordable Care Act (ACA).

**We urge the Departments to revoke these interim final rules because they harm millions of people who previously benefitted from cost-free access to preventive services such as counseling for sexual health and reproductive care, contraceptive care, sterilization, IVF and other fertility services, and abortion.**

Many of the populations we serve have limited access to sexual and reproductive healthcare, and the government cannot condone further marginalizing of these populations through expanded exemptions for religiously- or morally-biased employers. Black women are three to four times more likely to die from pregnancy complications than white women, and HIV-related and pregnancy-related complications remain within the 10 leading causes of death for Black women aged 20-54 and 15-34 years, respectively.[1] Women and girls who live in rural areas, almost 4 million of whom are estimated to be women of color, also experience worse maternal and child health outcomes than those in urban areas because there is a shortage of family planning services, OB/GYN care, and HIV and AIDs related care.[2] Furthermore, the rate of unintended pregnancy is highest among young low-income women, who are disproportionately women of color, highlighting the need for reproductive health care that includes education, counseling, and contraception.[3]

Access to contraception is an essential part of shaping women's health and well-being. As of September 2016, there were approximately 61 million U.S. women in their childbearing years (15–44). About 43 million of those women (70%) are at risk of unintended pregnancy—that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners fail to use a contraceptive method correctly and consistently. The Patient Protection and Affordable Care Act ("ACA") has expanded contraceptive coverage without cost-sharing to millions of women across the nation. Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs covered by the contraceptive coverage provision of the ACA. Following the ACA's implementation, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women. After the implementation of the ACA, studies show that majority of women tended to choose long-term contraceptives methods, such as an IUD or an implant, as the high upfront costs were removed. These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives. Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies. Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities. Continued attempts to dismantle the impact

[1] Prather, C, Fuller, TR, Marshall, KJ, Jeffries IV, WL, The Impact of Racism on the Sexual and Reproductive Health of African American Women, J Womens Health. 2016 Jul; 25(7): 664-671
<https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4939479/>.
[2] Bennett, KJ, Lopes Jr., JE, Spencer, K, Van Hecke, S. National Rural Health Association Policy Brief: Rural Women's Health, 2013 <https://www.ruralhealthweb.org/getattachment/Advocate/Policy-Documents/RuralWomensHealth-(1).pdf.aspx>.
[3] Guttmacher Institute, September 2016 Fact Sheet: Unintended Pregnancy in the United States
<https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states>.

00373666

Exhibit 95                                                      JA-0001378

and benefits associated with the ACA is an inefficient use of the Departments' resources and contrary to the Departments'' mission and purpose.

1. **Beyond entities eligible for a religious exemption under *Hobby Lobby*, corporations should not be granted religious or moral exemptions to the ACA mandate; and those seeking to claim religious exemptions should be required to demonstrate that they are qualified entities via written application to the Departments and meaningful notice to all potential plan holders.**

The Departments cannot eschew their responsibility to care for the American people under the guise of ensuring religious freedom. Requiring an application or other stringent means by which entities must prove they qualify for an exemption to the ACA mandate does not constitute a substantial burden on the exercise of religion under the Religious Freedom Restoration Act of 1994 (hereinafter referred to as "RFRA") or any other constitutionally-granted religious freedoms. Though freedom of religion is a fundamental right--protected by our Constitution and federal law, guaranteeing us all the right to believe (or not), it does not permit the use of religious or moral beliefs as a tool to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]." [4] In fact, in addressing the RFRA in *Hobby Lobby,* the Supreme Court described that the impact of the accommodation on third parties would be "precisely zero." [5] Prior to the Departments' interim final rules, HHS met this no-harm requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The interim final rules will burden people and their families by failing the constitutional do-no-harm test.

They harm more than half of our country that receives health insurance through their employers,[6] and the many students who use their schools' health insurance plans. The outcome of *Hobby Lobby*, granting closely-held for-profit corporations the ability to interfere with their employees' personal medical decisions, caused enough harm to people's affordable access to contraceptive and preventative reproductive care. Yet the Departments, through these interim final rules, expand upon and increase that harm. The result is that under these interim final rules, almost any corporation, including publicly traded for-profit entities, can claim a religious exemption. Further, any closely held for-profits and non-profits may obtain an exemption for moral objections. Religious, and especially moral exemptions, should not be granted to entities simply because the Departments' claim they cannot spend the time distinguishing between closely-held and publicly traded companies. Such due diligence is not a substantial burden on neither the institutions seeking exemptions nor the Departments.

Additionally, by creating broader exemptions to the ACA mandate these rules cause harm by singling out insurance that is essential for the health and equality of women, gender non-conforming

---

[4] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[5] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[6] Barnett, JC, Berchick, ER, Health Insurance Coverage in the United States: 2016, United States Census Bureau Report Number P60-260 < https://www.census.gov/library/publications/2017/demo/p60-260.html>.

00373667

Exhibit 95                                                                                            JA-0001379

folks, many trans men, and their families. Religious arguments have long been used in attempts to thwart equality for women, racial minorities, and sexual minorities.[7] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[8] Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women, minority populations, and their families, equal access to the preventive services that allow them to be full participants in society.  In interfering with that access, these rules target one population for adverse treatment, resulting in health insurance that covers preventive care that many men need, but not care that most women, and many gender non-conforming and trans people, need.

Finally, these rules cause harm by interfering with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the Departments discriminate against people on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And they violate Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[9]

In an attempt to mitigate the extent of these harms, the Departments assume, based on dicta in the *Hobby Lobby* decision, that "it seems unlikely that . . . corporate giants . . . will often assert RFRA claims."[10] Outside of that bare assumption, the Departments have no way of knowing how many corporations, including "corporate giants," will take advantage of this exemption to avoid covering the cost of preventive reproductive healthcare. This assumption causes concern, considering requests for accommodations from for-profit companies continued to increase after the *Hobby Lobby* decision;[11] and it especially causes concern since the new exemption requires no self-certification process, and no filing of notice or certification to the government regarding the corporation's "sincerely held religious beliefs" or "moral objections." Thus, the exemption is meaningless. Under these rules, a corporation or educational institution can claim a sincerely held religious belief or moral objection in the interest of its bottom line (rather than an actual sincerely held religious or moral belief), and at the expense of its employees or students, and their families, who need preventive reproductive services such as contraception, fertility services, sterilization, and abortion. The Departments must revoke these rules.

   **2.  In the event the religious and moral exemption is maintained for limited organizations, the Departments must maintain that exempted entities be required to**

---

[7] *See, e.g.*, Brief *Amicus Curiae* of the American Civil Liberties Union, et al., *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), at 21

<https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf>.

[8] *Id.* at 19.

[9] 2 U.S.C. § 18116.

[10] *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2774 (2014).

[11] Durso, LE, Gruberg, S, Taylor, J, Chalhoub, T, Who Seeks Religious Accommodations to Providing Contraceptive Coverage?, Center for American Progress, Aug. 11 2017 <
https://www.americanprogress.org/issues/lgbt/news/2017/08/11/437265/seeks-religious-accommodations-providing-contraceptive-coverage/>.

4

00373668

Exhibit 95

**enlist a third-party insurer to accommodate the insured policy holders have access to plans that fully cover preventative contraceptive services.**

Though the Departments leave in place the accommodations process by which entities who do not wish to cover certain contraceptives and other critical preventive care can pass the responsibility on to third party administrators, there is virtually no incentive for entities to seek or otherwise implement an accommodation. Given the voluntary nature of the accommodation process (as written in the interim final rules), this creates troubling consequences for employees or students, and their families, who were benefitting from the ACA's mandate and the previous rules. When contraception costs less (or nothing), adherence increases, and thus people using contraception and their families gain the many associated benefits including, but not limited to: reduced maternal mortality, health benefits of pregnancy spacing for maternal and child health, increased engagement in the work force, economic self-sufficiency for women and minorities, reduction of unintended pregnancy and abortion, reduced risk of gynecologic disorders and bleeding or pain with menstrual periods, and decreased risk of endometrial and ovarian cancer in some populations.[12] Despite the Departments' claim that the health risks associated with certain forms of contraception outweigh the benefits, they dangerously intrude on the doctor/provider-patient relationship. People who need contraceptive and preventive reproductive healthcare should be able to make their own medical choices after consulting with their provider, and without interference from their employer or educational institution.

These interim final rules impermissibly allow employers to impose their own religious viewpoint on employees, regardless of those employees' personal beliefs, and even when doing so causes employees serious harms.[13] Courts have held that the Establishment Clause of the First Amendment prevents the government from shifting the cost of religious accommodation to third parties[14]. While the administration has asserted that the Religious Freedom Restoration Act[15] allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, the government can only constitutionally achieve such an outcome by replacing the current benefit with a program that provides contraception at no additional cost to employees.[16] Instead, the Rule, as issued, impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's religious beliefs.

---

[12] The American College of Obstetricians and Gynecologists, Committee on Health Care for Underserved Women, Committee Opinion, 2017 <https://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Access-to-Contraception>.

[13] [13] *See* U.S. CONST. amend. I.

[14] *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) (rejecting a facial challenge to RLUIPA, a federal statute that permits accommodation of certain religious practices in prison, stating "[s]hould inmate requests for religious accommodations become excessive, *impose unjustified burdens on other institutionalized persons*, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.") (emphasis added); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (stating, "The First Amendment . . . gives no one the right to insist that in pursuit of their own interest others must conform their conduct to his own religious necessities."); *but see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (distinguishing the obligations imposed on churches from those imposed on other types of organizations).

[15] 42 U.S.C. § 2000bb.

[16] *See Zubik v. Burwell*, 136 S. Ct. 1557; *Hobby Lobby,* 134 S. Ct. at 2786–87.

5

00373669

Exhibit 95

JA-0001381

3. **The Departments have no exact estimate of how the proposed changes will impact the benefits of individuals whose employers currently claim a religious or moral exemption, or may seek to do so in the near or immediate future. This is an incorrect departure from the Departments previous position supporting the expansion of access to preventative services for all Americans, in line with congressional intent when the mandate was formed.**

The Departments contend that the people who lose their contraceptive benefits can seek free or subsidized contraceptives through Medicaid, Title X community health centers, and Temporary Assistance for Needy Families (TANF). The Departments are wrong. Such services are available only to a small section of low-income women. For example, free or subsidized care at a Title X clinic is restricted to people with incomes of less than 250 percent of the federal poverty level.[17] Because the federal poverty guidelines are unrealistically low, low-income folks above that percentage threshold likely cannot afford contraceptive and other preventive reproductive services without mandated employer or institutional coverage. Additionally, there are ongoing attempts from this administration to reduce or restructure funding for Medicaid, Title X grants, and TANF, forcing many family planning clinics to shut down, especially in rural and low-income areas where they are most needed.[18]

We demand that the Departments repeal the interim final rules expanding religious and moral exemptions to the ACA's contraception mandate. The consequences of the rules, which make the mandate virtually meaningless, will be felt hardest by low-income under-employed people—including Black women and other people of color, people living with HIV and AIDS, LGBTQ+ individuals, people facing language barriers, rural families, and low-income families. These rules further push such individuals to the margins, compromising their bodily autonomy to choose if, when, and how to create and raise their families. We cannot afford to be marginalized any further.

Sincerely,

Sequoia Ayala, Esq.
Policy and Advocacy Program Manager
SisterLove, Inc.

Carly Calhoun, Esq.
Policy Counsel
SisterLove, Inc.

Damaris Henderson, SisterLove, Inc.
Kwajelyn Jackson, Feminist Women's Health Center
Katie Mae Stewart, Feminist Women's Health Center

---

[17] NARAL Pro-Choice America, Title X Family-Planning Services: Fast Facts
<https://www.prochoiceamerica.org/wp-content/uploads/2017/01/2.-Title-X-Family-Planning-Services-Fast-Facts.pdf>.
[18] See e.g., Mohney, G., How Title X change could affect family planning in US, April 13, 2017
<http://abcnews.go.com/Health/title-change-affect-family-planning-us/story?id=46773631>; Boguhn, A., Medicaid Block Grants Could Do 'Irreparable Damage' to Safety Net of Family Planning Providers, March 3, 2017
<https://rewire.news/article/2017/03/03/medicaid-block-grants-could-do-irreparable-damage-to-safety-net-of-family-planning-providers/>.

6

00373670

Exhibit 95

Roula AbiSamra, National Asian Pacific American Women's Forum - Atlanta chapter
Jaclyn Dean, National Asian Pacific American Women's Forum (NAPAWF)
Nse Ufot, New Georgia Project Action Fund
Margaret D Bordeaux
Irvienne Goldson

7

00373671

Exhibit 95

JA-0001383

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

ERIC T. SCHNEIDERMAN                                    DIVISION OF SOCIAL JUSTICE
ATTORNEY GENERAL                                              HEALTH CARE BUREAU

\

December 5, 2017

**Via Federal eRulemaking Portal**

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G
Washington, DC 20201

> Re:    Comments on Interim Final Rules: Religious Exemptions and Accommodations
> for Coverage of Certain Preventive Services under the Affordable Care Act, and
> Moral Exemptions and Accommodations for Coverage of Certain Preventive
> Services under the Affordable Care Act
> **45 C.F.R §§ 147.130-147.133**

Dear Acting Secretary Hargan:

The undersigned State Attorneys General submit these comments in response to the
Departments of Health and Human Services, Labor, and Treasury's (the "Departments")
issuance of the proposed interim final rules ("IFRs"): the Religious Exemptions and
Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
(filed Oct. 6, 2017), and Moral Exemptions and Accommodations for Coverage of Certain
Preventive Services under the Affordable Care Act (filed Oct. 6, 2017). By creating broad new
exemptions from the Affordable Care Act's contraceptive mandate, thereby allowing employers
to deprive women of contraceptive health coverage, the IFRs will harm women and children, and
the public health in general, and result in significant financial and administrative burdens to the
States. As discussed more fully below, the IFRs violate the Administrative Procedure Act, the
equal protection guarantee of the Fifth Amendment, and the Establishment Clause of the First
Amendment, and as such, the undersigned Attorneys General urge that the IFRs be rescinded.[1]

---

[1] State Attorneys General have also filed lawsuits challenging the IFRs. *See* States' Notice Mot. & Mot. Prelim. Inj.,
with Mem. P. & A., § I.A.–E., at 11–27, California v. Eric D. Hargan, No. 4:17-cv-05783-HSG (N.D. Cal. filed
Nov. 9, 2017) (*"CA Br."*) (attached as Exhibit 1); Mem. Law Support Pls.' Mot. Prelim. Inj., § I.A., C.–D., at 18–

Eric Hargan, Acting Secretary
December 5, 2017
Page 2 of 9

## I.    Background

Before implementation of the Affordable Care Act ("ACA"), one in seven women with private health insurance, and nearly one-third of women covered by Medicaid, either postponed or went without needed health care because they could not afford it.[2]  With respect to birth control in particular, women were forced to spend between 30 percent and 44 percent of their total out-of-pocket health costs.[3]  These out-of-pocket costs prevented many women, not solely those with lower incomes, from accessing preventive services, including contraception.[4]

During this period before the ACA's passage, an estimated 49 percent of all pregnancies in the United States were unintended, and 42 percent of those unintended pregnancies ended in abortion.[5]  Unintended pregnancies are associated with increases in maternal and child morbidity, including increased odds of preterm birth, low birth weight, and the potentially life-long negative health effects of premature birth.[6]  Significantly, the risk of unintended pregnancy is greatest for the most vulnerable women: young, low-income, minority women, without high school or college education.[7]

Within this public health landscape, Congress passed the "Women's Health Amendment" ("WHA") to expand women's access to preventive health services through health plan coverage and no cost-sharing responsibilities.[8]  The Department of Health and Human Services ("HHS") commissioned the Institute of Medicine ("IOM") to issue recommendations identifying the

---

22, 32–38, Pennsylvania v. Donald J. Trump, No. 2:17-cv-04540-WB (E.D. Pa. filed Oct. 11, 2017) ("*PA Br.*") (attached as Exhibit 2); Complt. Declaratory & Injunctive Relief, Massachusetts v. U.S. Dept. of Health & Human Servs., No. 17-cv-11930-NMG (D. Mass. filed Oct. 6, 2017); Complt. Declaratory & Injunctive Relief, Washington v. Trump, No. 2:17-cv-01510-RBL (W.D. Wa. filed Oct. 9, 2017).  State Attorneys General have also submitted amicus briefs in support of plaintiffs in two lawsuits.  *See, e.g.,* Br. for Mass. & Cal. et al. as Amici Curiae in Support of Pls.' Mot. Prelim. Inj., § II, at 18–30, Pennsylvania v. Donald J. Trump, No. 2:17-cv-04540-WB (E.D. Pa. filed Oct. 11, 2017) ("*Amici Br.*") (attached as Exhibit 3).

[2] Usha Ranji & Alina Salganicoff, *Women's Health Care Chartbook: Key Findings from the Kaiser Women's Health Survey*, HENRY J. KAISER FAMILY FOUND.1, 4 (2011),
http://www.kaiserfamilyfoundation.files.wordpress.com/2013/01/8164.pdf.

[3] Laurie Sobel et al., *The Future of Contraceptive Coverage*, HENRY J. KAISER FAMILY FOUND. 1, 4 (2017), http://www.files.kff.org/attachment/Issue-Brief-The-Future-of-Contraceptive-Coverage.

[4] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* COMM. ON PREVENTIVE SERVS. FOR WOMEN & BD. ON POPULATION HEALTH & PUB. HEALTH PRACTICE, INST. OF MED. OF THE NAT'L ACADS., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 19 (Nat'l Acad. Press, 2011), *available at* https://www.nap.edu/read/13181/chapter/1 ("IOM Report").  Another study of approximately 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography.  Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000), *available at* http://www.pubmedcentralcanada.ca/pmcc/articles/PMC1089084/pdf/hsresearch00023-0075.pdf; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing*, NAT'L HEALTH LAW PROGRAM 2-3 (2014), http://www.healthlaw.org/component/jsfsubmit/showAttachment?tmpl=raw&id=00Pd000000ANrCpEAL.
[5] IOM Report at 102.

[6] *Id.* at 103.

[7] *Id.*

[8] *See* S. Amdt. 2791, 111th Congress (2009-2010); Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 et seq. (2010); Public Health Service Act (as amended by ACA) § 2713, 42 U.S.C. §300gg-13(a)(4).

00373086

Exhibit 96                                                                                                                          JA-0001385

Eric Hargan, Acting Secretary
December 5, 2017
Page 3 of 9

specific preventive women's health services that should be covered under the ACA. In 2011, the
IOM recommended, and the Health Resources and Services Administration ("HRSA") adopted,
a list that includes all FDA-approved contraceptives, sterilization procedures, and reproductive
education and counseling.[9] In 2016, the Women's Preventive Services Initiative,[10] led by the
American Congress of Obstetricians and Gynecologists ("ACOG"), updated the preventive
services guidelines and continued to include coverage of all FDA-approved contraceptive
methods, reiterating their importance to women.

The IOM, ACOG, and other experts based their decisions to include coverage of
contraception on the considerable evidence that the use of contraception has contributed to lower
unintended pregnancy and abortion rates in the United States.[11] With the decrease in unintended
pregnancies, there has been a corresponding decrease in the risk of maternal mortality, adverse
child outcomes, behavior problems in children, and negative psychological outcomes associated
with unintended pregnancies for both mothers and children.[12] Contraceptive use contributes to
longer spacing between pregnancies, which decreases the risk of adverse health outcomes for
pregnancies that are too closely spaced, and is especially critical for the health of women with
certain medical conditions.[13]

Significantly, access to contraceptive coverage has given women the option to delay
childbearing and pursue additional education, spend additional time in their careers, and increase
earning power over the long-term. One-third of the wage gains women have made since the
1960s have been attributed to access to oral contraceptives.[14] Access to birth control has helped
narrow the wage gap between women and men. The decrease in the wage gap among 25 to 49-
year-olds between men's and women's annual incomes would have been 10 percent smaller in
the 1980s and 30 percent smaller in the 1990s in the absence of widespread legal birth control
access for women.[15]

---

[9] *Women's Preventive Services Guidelines: Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being*, HEALTH RESOURCES & SERVS. ADMIN., http://www.hrsa.gov/womens-guidelines/index.html (last reviewed Oct. 2017).
[10] The Women's Preventive Services Initiative also included the American Academy of Family Physicians, the American College of Physicians, and the National Association of Nurse Practitioners in Women's Health.
[11] IOM Report at 104–05.
[12] *See* IOM Report 103–04.
[13] IOM Report at 103–04. There are additional benefits of contraceptive use for treating medical conditions, including menstrual disorders and pelvic pain, and long-term use of oral contraceptives has been shown to reduce women's risk of endometrial cancer, pelvic inflammatory disease, and some benign breast diseases. *Id.* at 107.
[14] *Birth Control Has Expanded Opportunity for Women–in Economic Advancement, Educational Attainment, and Health Outcomes*, PLANNED PARENTHOOD 1,1 (June 2015), http://www.plannedparenthood.org/files/1614/3275/8659/BC_factsheet_may2015_updated_1.pdf.
[15] *See* Martha J. Bailey et al., *The Opt-In Revolution? Contraception and the Gender Gap in Wages* 27 (Nat'l Bureau of Econ. Research, Working Paper No. 17322, 2012), http://www-personal.umich.edu/~baileymj/Opt_In_Revolution.pdf.

00373087

Exhibit 96                                                                                       JA-0001386

Eric Hargan, Acting Secretary
December 5, 2017
Page 4 of 9

Since the ACA's requirement that health plans cover contraception benefits and services, women with employer-sponsored coverage have had increased access to contraception,[16] and have saved $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[17] The share of women of reproductive age who had out-of-pocket spending on oral contraceptive pills fell sharply after the ACA's implementation; spending on oral contraceptive pills plummeted from 20.9 percent in 2012 to 3.6 percent in 2014, corresponding to the timing of the contraception provision.[18] Also during this time, the proportion of privately insured women who paid no out-of-pocket costs for oral contraception increased from 15 percent to 67 percent, with similar changes for injectable contraceptives, the vaginal ring and the intrauterine device.[19] To date, over 62.4 million women have benefited from ACA-mandated contraceptive coverage.[20]

Several of the undersigned States, in recognition that no-cost contraception is critical to women's health and autonomy, have enacted statutory schemes to require no-cost coverage for state-regulated plans.[21] However, the federal Employee Retirement Income Security Act of 1974 ("ERISA") preempts States from imposing coverage requirements on self-funded plans offered by employers.[22] Such plans cover about 58 percent of workers with employer-sponsored insurance.[23] The IFRs threaten this access by allowing virtually any employer with a self-insured plan to opt-out of the contraceptive-coverage requirement based on the employer's own religious or moral beliefs without offering any explanation or requiring any certification process

---

[16] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014), *available at* http://www.contraceptionjournal.org/article/S0010-7824(14)00687-8/pdf.

[17] *Reproductive Rights & Health: The Affordable Care Act's Birth Control Benefit Is Working for Women*, NAT'L WOMEN'S LAW CTR. (Dec. 2016), http://www.nwlc.org/wp-content/uploads/2016/06/The-ACAs-Birth-Control-Benefit-1.pdf.

[18] Laurie Sobel et al., *Private Insurance Coverage of Contraception*, HENRY J. KAISER FAMILY FOUND. (2016), http://www.files.kff.org/attachment/issue-brief-private-insurance-coverage-of-contraception.

[19] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTIVE 44, 45 (2015), *available at* http://www.contraceptionjournal.org/article/S0010-7824(14)00687-8/pdf.

[20] *Reproductive Rights & Health: New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-of-Pocket Costs*, NAT'L WOMEN'S LAW CTR. 1, 2 (2017), http://www.nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

[21] An overview of State laws and regulations is provided by Guttmacher Institute. *Insurance Coverage of Contraceptives*, GUTTMACHER INST., http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives (last updated Dec. 1, 2017). *See also* Cal. Ins. Code § 10123.196; Conn. Gen. Stat. § 38A-503e; Haw. Rev. Stat. § 432:1-604.5; 215 Ill. Comp. Stat. 5/356Z.4; Iowa Code § 514C.19; Me. Rev. Stat. tit. 24, § 2332-J, amended by Public Law, Chapter 190 (June 13, 2017); Md. Code, Ins. §§ 15-826, 15-826.1; Mass. Gen. Laws. ch. 175, § 47W, amended by Chapter 120 of the Acts of 2017; N.M. Stat. Ann. §§ 59A-22-42; 59A-46-44; N.Y. Ins. Law §§ 3216, 3221, and 4303; N.C. Gen. Stat. § 58-3-178; Or. Rev. Stat. § 743A.066; R.I. Gen. Laws §§ 27-19-48, 27-18-57, 27-20-43; Vt. Stat. tit. 8, § 4099c; Wash. Admin. Code § 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. State laws routinely include exemptions from mandatory coverage for prescription contraceptives for religious employers. *See, e.g.,* Conn. Gen. Stat. § 38A-503e; Mass. Gen. Laws. ch. 175, § 47W, amended by Chapter 120 of the Acts of 2017; N.Y. Insur. L. § 4303(cc).

[22] 29 U.S.C. § 1144(b).

[23] *Medical Expenditure Panel Survey: Percent of Private-Sector Enrollees That Are Enrolled in Self-Insured Plans at Establishments That Offer Health Insurance by Firm Size and State: United States, 2016*, U.S. DEPT. OF HEALTH & HUMAN SERVS., http://www.meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2016/tiib2b1.pdf (last visited Dec. 4, 2017) ("ARHQ Database").

00373088

Exhibit 96

Eric Hargan, Acting Secretary
December 5, 2017
Page 5 of 9

by regulators charged with enforcing the ACA's requirements. Moreover, some of the
undersigned States do not have state laws requiring no-cost contraception coverage for state-
regulated plans, and as such, the threatened harm of the IFRs extends to *all* employee insurance
plans.

## II.    The IFRs violate the Administrative Procedure Act

### (A) *The IFRs are contrary to law.*

The IFRs violate numerous requirements of the ACA. First, the IFRs stand in direct
conflict with the WHA, which mandates that employers provide health plans that cover women's
preventive care with no cost-sharing.[24] While the Religious Freedom Restoration Act (RFRA)
requires protection of religious beliefs, the ACA already provides religious exemptions that
satisfy RFRA's requirements.[25] The IFRs' vast exemptions go well beyond what is required to
avoid a substantial religious burden by permitting a broad range of employers, including
publicly-traded companies, to evade compliance with the contraceptive mandate, rather than the
narrower class of churches, religious non-profits, and closely held for-profit corporations that the
Supreme Court has held are protected by RFRA.[26] The IFRs also excuse these employers from
undertaking any steps, however minimal, to ensure that their employees retain access to
contraceptive coverage through other means, eviscerating any accommodation requirements.[27]
As such, the IFRs allow for noncompliance with a mandatory statute so long as there is *any*
religious burden, rather than a *substantial* one. Moreover, RFRA's protection of religious belief
does not authorize the IFRs' exemptions for wholly expansive moral beliefs. (*See* further
discussion in *CA Br.* § I.A.1.–2., at 11–14; *PA Br.* § I.A.2.i.–ii., at 23–27; *Amici Br.* § II.B.2., at
21–24.)

Second, the IFRs violate the ACA's nondiscrimination provision that prohibits an
individual from being "excluded from participation in," "denied the benefits of," or "subjected to
discrimination under, any health program or activity" receiving federal funds, to the extent that
the grounds for such discrimination are otherwise unlawful under federal law.[28] The IFRs
violate this nondiscrimination provision because they selectively authorize denial of coverage for
women's preventive care benefits only. Indeed, the Equal Employment Opportunity
Commission has previously held that an employer who offers coverage for preventive

---

[24] *See FAQs about Affordable Care Act Implementation Part 36*, EMPLOYEE BENEFITS SEC. ADMIN., U.S. DEPT, OF
LABOR, 1, 1 (2017), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-
part-36.pdf (explaining the effects of the Women's Health Amendment on insurance coverage of women's
preventive care).
[25] *Id.* at 4-5.
[26] *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768–69 (2014).
[27] The IFRs also eliminate the requirement for employers to notify the federal government if they choose to avail
themselves of the exemption, thereby allowing for contraceptive coverage to be quietly eliminated without oversight
or transparency.
[28] 42 U.S.C. § 18116.

00373089

Exhibit 96

JA-0001388

Eric Hargan, Acting Secretary
December 5, 2017
Page 6 of 9

prescription drugs and services but does not offer coverage for contraception violates Title VII.[29]
(*See* further discussion in *CA Br.* § I.A.3., at 14; *PA Br.* § II.B., at 43–46; *Amici Br.* § II.B.2., at
21–24.)

Third, the ACA prohibits the Secretary of Health and Human Services from
"promulgat[ing] any regulation that creates any unreasonable barriers to the ability of individuals
to obtain appropriate medical care," or "impedes timely access to health care services."[30]  The
IFRs clearly violate this provision by preventing women from accessing important and often
medically necessary contraceptive services.  (*See* further discussion in *CA Br.* § I.A.3., at 14; *PA
Br.* § I.A.2.iii., at 27–28; *Amici Br.* § I.A.1.–2., at 4–6.)

(B) *The IFRs are arbitrary and capricious.*

The IFRs radically depart from prior policy without adequate or reasonable justification,
as required by law.  First, the IFRs do not provide sufficient justification for discarding the prior
regulations' finding of a compelling government interest in ensuring that women have
contraceptive coverage even if their employers object to providing it.  Five justices of the
Supreme Court have expressly recognized such a compelling interest.[31]  The IFRs cite scant
evidence to support the assertion that access to contraception has little effect on unintended
pregnancies, and indeed, the vast majority of studies have shown precisely the opposite.[32]
Moreover, the IFRs ignore the other public health interests served by the contraceptive
mandate—including the need for some women to avoid pregnancy, which can be hazardous or
life-threatening to them due to a medical condition.  (*See* further discussion in *CA Br.* § I.C., at
19–21; *PA Br.* § I.A.2.iii., at 27–28; *Amici Br.* § II.C., at 24–26.)

Second, the IFRs provide inadequate explanation for expanding the universe of
employers who are exempt from compliance with the contraceptive mandate from churches,
houses of worship, religious non-profits, and closely held for-profit corporations, to *any and all*
non-governmental employers and *any and all* private universities.  Relatedly, the IFRs fail to
justify the creation of the broader religious employer exemption, rather than the narrower eligible
organization accommodation, to these employers.  The offered explanations for this approach is
disagreement with the former Administration; but a disagreement with the previous approach is
far from the reasoned and evidence-based explanation required for the evisceration of the relied-
upon accommodation requirements, which balanced religious exercise and full and equal health
coverage for women.  (*See* further discussion in *CA Br.* § I.C., at 19–21; *PA Br.* § I.A.2.iii., at
27–28; *Amici Br.* § II.C., at 24–26.)

Third, the IFRs extend the applicability of the religious and moral exemption to insurance
companies, without reasonable explanation for this entirely new expansion.  In fact, the IFRs

---

[29] *See* Commission Decision on Coverage of Contraception, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMM., 2000
WL 33407187 (Dec. 14, 2000), http://www.eeoc.gov/policy/docs/decision-contraception.html.
[30] 42 U.S.C. § 18114.
[31] *See Hobby Lobby*, 134 S. Ct. at 2785 (Kennedy, J., concurring); *id.* at 2799 (Ginsburg, J., dissenting).
[32] *See, e.g.*, IOM Report at 102–07 (collecting studies on effects of women's access to contraceptives).

00373090

Exhibit 96                                                                                    JA-0001389

Eric Hargan, Acting Secretary
December 5, 2017
Page 7 of 9

acknowledge that the Departments are not aware of any insurance company with such an objection—it is undoubtedly arbitrary to promulgate a rule with no intended use.

### III.    The IFRs Violate the Equal Protection Guarantee of the Fifth Amendment

Although the ACA requires coverage for many different types of preventive services, the IFRs single out only women's health benefits and services. The President's Executive Order directed the Departments to consider allowing additional "conscience-based objections" to services mandated by the WHA specifically.[33] The IFRs create vast exemptions for contraceptive coverage only, clearly targeting women's preventive services, while leaving preventive service coverage for male employees untouched. The IFRs include a gender-based classification[34] and are thus subject to heightened scrutiny.

The government interest motivating both IFRs is articulated as providing protections for "sincerely held ['religious beliefs' or 'moral convictions'] in certain health care contexts."[35] Even if an unbounded moral conviction is found to be a compelling interest, this gender-based classification does not have an "exceedingly persuasive justification" and is not "substantially related to the achievement of those objectives."[36] The IFRs fail any "means" test as the staggering breadth of the exemptions—to virtually *any* employer for virtually *any* religious or moral objection—lacks any tailoring whatsoever, and flies in the face of any reasonable interpretation of the "substantial relationship" standard. (*See* further discussion in *CA Br.* § I.E., at 25–28; *PA Br.* § I.C., at 32–34; *Amici Br.* § II.D.2., at 29–30.)

### IV.    The IFRs Violate the Establishment Clause

The IFRs violate the Establishment Clause because their purpose and effect is clearly the advancement of religious beliefs.[37] The Rules do not even bother to feign a non-religious purpose. The IFRs also violate the Establishment Clause because they allow employers to obtain religious exemptions in a manner that substantially burdens female employees who may not share the employers' faith.[38] The burdens here imposed go well beyond any justified by religious exercise—they result in the potentially dramatic loss of contraceptive coverage for millions of women, with no alternative structure to obtain care. The Supreme Court relied

---

[33] Exec. Order No. 13798, 82 Fed. Reg. 21,675 (May 4, 2017), http://www.gpo.gov/fdsys/pkg/FR-2017-05-09/pdf/2017-09574.pdf.

[34] The IFRs are also overtly discriminatory because they single out women's health care services, including benefits that are only used by women. Aside from the reference to only women's services, the IFRs are infused with overt references to purported "sensitive" areas of health, which all concern women's reproductive health and rely on overly-broad generalizations of women's health care. *See* 82 Fed. Reg. 47,838 (2017); 82 Fed. Reg. 47,813 (2017). The IFRs are also covertly discriminatory because they have a direct impact on women only. Women alone will be forced to struggle to pay for contraception themselves, forgo contraceptives, or to try to seek out services from some entity other than their employer.

[35] 82 Fed. Reg. 47,845 (2017); 82 Fed. Reg. 47,800 (2017).

[36] *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017).

[37] *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).

[38] *See* 42 U.S.C. § 2000bb–1(a) (the "government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability").

00373091

Exhibit 96

me

Eric Hargan, Acting Secretary
December 5, 2017
Page 8 of 9

heavily on the notification and accommodation mechanisms previously in place as necessary protections of women's ability to access contraception.[39] Without such accommodation, notice, and justification requirements, the burdens on women have grown dramatically, resulting in a clear violation of the Establishment Clause. (*See* further discussion in *CA Br.* § I.D., at 21–24; *PA Br.* § I.D., at 34–38; *Amici Br.* § II. D.1., at 27–28.)

## V.    Conclusion

The IFRs at issue will result in harms that are both direct and indirect, tangible and intangible. Access to contraception is fundamental to women's rights to bodily freedom and to emotional autonomy. It is a public health issue, with effects on unintended pregnancy, maternal health, and infant morbidity. It also implicates economic mobility and wage parity, educational opportunity and social equality. These far-reaching effects are too great to ignore, and are protected by the Constitution, our laws and regulations. Accordingly, we urge the Secretary to rescind the IFRs.

<div align="right">

Respectfully submitted,
ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By: */s/ Sara Haviva Mark*
SARA HAVIVA MARK
Special Counsel, Social Justice Division
LISA LANDAU
Chief, Health Care Bureau
SIKA YEBOAH-SAMPONG
Social Justice Fellow
New York State Office of the Attorney General
120 Broadway
New York, New York 10271-0332
(212) 416-8460

</div>

---

[39] In *Hobby Lobby*, for example, the Court explained that the accommodation sought by closely held for-profit corporations would not violate the Establishment Clause because it has "precisely zero" effect on the women employed by Hobby Lobby. The Court noted that "these women would still be entitled to all FDA-approved contraceptives without cost sharing." 134 S. Ct. at 2760. In his concurrence, Justice Kennedy underscored that an accommodation of religious exercise must not "unduly restrict other persons, such as employees, in protecting their own interests." *Id.* at 2786–87 (Kennedy, J., concurring). Similarly, the Court in *Wheaton College v. Burwell* expressly noted that its order allowing employers to notify the government rather than their insurer about a religious objection would not "affect[] the ability of [Wheaton's] employees and students to obtain, without cost, the full range of FDA approved contraceptives." 134 S. Ct. 2806, 2807 (2014).

Exhibit 96

Eric Hargan, Acting Secretary
December 5, 2017
Page 9 of 9

XAVIER BECERRA
Attorney General of California
1300 I Street
Sacramento, CA 95814

MATTHEW P. DENN
Attorney General of Delaware
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
Attorney General of the District of Columbia
One Judiciary Square
441 4th Street, N.W.
Washington, DC 20001

DOUGLAS S. CHIN
Attorney General of Hawaii
425 Queen Street
Honolulu, HI 96813

LISA MADIGAN
Attorney General of Illinois
100 West Randolph Street
Chicago, IL 60601

JANET T. MILLS
Attorney General of Maine
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202

MAURA HEALEY
Attorney General of Massachusetts
One Ashburton Place
Boston, MA 02108

LORI SWANSON
Attorney General of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street N.E.
Salem, OR 97301

JOSH SHAPIRO
Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120

PETER F. KILMARTIN
Attorney General of Rhode Island
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
109 State Street
Montpelier, VT 05609

MARK R. HERRING
Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219

ROBERT W. FERGUSON
Attorney General of Washington
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504

00373093

Exhibit 96



November 30, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G, Hubert H. Humphrey Building
200 Independence Avenue SW., Washington, DC 20201

RE:
Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the
Affordable Care Act. Federal Register Number: 2017-21851
Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the
Affordable Care Act. Federal Register Number: 2017-21852

As members of the Texas House Women's Health Caucus, we have committed ourselves to supporting
and implementing policies and programs that will help to improve the health of Texas women and their
families. As such, we write to express strong concern with the two interim final rules (IFRs) published
on October 13, 2017 that roll back the Affordable Care Act's (ACA) contraceptive coverage, which has
ensured access to contraceptive coverage for millions of women across Texas.

The ACA was the first federal law to have contraceptive coverage requirements for most health plans
regulated by the federal government, including employer-sponsored plans. Before the implementation of
the ACA, insurers and employers could decide whether to offer contraceptive coverage, unless state law
required contraceptive coverage. Texas does not require coverage of contraception in all private health
insurance plans. Further, Texas state law allows insurers associated with religious organizations to
refuse to offer contraceptive coverage.[1] The ACA contraceptive coverage mandate applied to most
employers, but, compromises were made to accommodate religious-affiliated employers and schools by
allowing an option to refuse to cover birth control on religious or moral grounds, while ensuring their
employees would still have health coverage provided directly by the health insurance company. Even
with the exceptions, over 55 million women nationwide gained contraceptive coverage under the
guarantee.[2]

The two IFRs published on October 13 would roll back the ACA contraceptive coverage mandate, thus
allowing virtually any employer, school, or other entity to opt out of providing contraceptive coverage
for religious or moral reasons. The rules would also eliminate the guarantee that women will continue to
receive coverage for birth control, regardless of their employer's beliefs, by making the accommodation
voluntary. These rules put at risk the contraceptive coverage that millions of women rely on. Over four

---

[1] Texas Insurance Code Sec. 1369.101-1369.109; Texas Insurance Code Chapter 1507
[2] Office of the Assistant Secretary for Planning and Evaluation. *The Affordable Care Act is Improving Access to Preventive Services for
Millions of Americans.* U.S. Department of Health and Human Services. May 14, 2015.

00208947

Exhibit 97

JA-0001393

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
November 30, 2017
Page 2

million women in Texas depend on the contraceptive coverage guarantee for no-cost contraceptive services.[3]

Nearly nine in 10 women of reproductive age will use contraception at some point in their lives, whether for family planning or other medical reasons like treating endometriosis. According to the American College of Obstetrics and Gynecology (ACOG), oral contraceptives help relieve or reduce the symptoms of severe menstrual pain, which is experienced by up to 40% of all adult women and can lead to absence from work and school. Oral contraceptives are also useful in treating excessive menstrual bleeding, which can lead to anemia, and have the potential to reduce acne and excess hair growth. Additionally, oral contraceptives are used for the prevention of menstrual-related migraines, treatment of pelvic pain that accompanies endometriosis, and bleeding due to uterine fibroids.[4] In fact, a new study from the Keck School of Medicine at the University of Southern California has found that intrauterine device (IUD) use is associated with a dramatic decrease in the incidence of cervical cancer.[5]

Contraceptives also play a key role in the ability of women to decide when they will become pregnant. Women and couples use contraceptives to help time and space births, have healthier pregnancies, and to achieve their desired family size. Family planning has health benefits for mothers, newborns, and families. Pregnancies that occur too early or too late in a woman's life, or that are spaced too closely, negatively affect maternal health and increase the risk of prematurity and low birth weight. The ability to space childbearing is also important to women's social and economic advancement.[6] The decision whether or when to have children is one of the most important economic decisions a woman will make in her lifetime; access to contraception is critical to this planning. With the expansion of exemptions to contraceptive coverage, many women may face new insurance policies that deny them access to contraceptive services.

The cost of contraceptives prevents many women, especially low-income women, from using birth control consistently or choosing the best, most effective form of contraceptive for them. The most effective forms of birth control, like Long-Acting Reversible Contraception (LARC) options such as IUDs or birth control implants, have up-front costs of up to $1,000, while some birth control pills can cost $60 a month. A recent survey found one-third of voters who are women of reproductive age would not be able to afford contraception priced at over $10 per month. The same survey found that one in seven of the same group of women would not be able to afford contraception at any price.[7] The ACA's guarantees that contraception is covered by most health insurance and is not subject to a copayment or a deductible has resulted in millions of women having financial access to the full range of reliable contraceptive methods available to prevent unintended pregnancies and have healthier pregnancies. In the years since the contraceptive coverage guarantee has been in effect, the percent of United States women with out-of-pocket expenses for oral contraceptives dropped from over 20% to less than 4%. In 2013 alone the guarantee saved women using oral contraceptives over $1.4 billion. Studies show that

---

[3] Ibid.

[4] American College of Obstetricians and Gynecologists. *Non-contraceptive uses of Hormonal Contraception*. Obstetrics and Gynecology. January 2010.

[5] Cortessis, V K, et al. *Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-Analysis*. Obstetrics and Gynecology. November 3, 2017.

[6] Sonfield A et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*, New York: Guttmacher Institute, 2013.

[7] PerryUndem. *Contraceptives + Policy Through a Gender Lens: Results from a National Survey Conducted by PerryUndem*. March 22, 2017.

00208948

Exhibit 97      JA-0001394

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
November 30, 2017
Page 3

paying full cost for contraceptives leads to reduction in contraceptive use.[8] This in turn leads to an increased risk of unintended pregnancy, and the potential health and economic risks associated with unintended pregnancy.[9][10]

If more employers stop providing contraceptive coverage, many women may have no other option but to rely on less effective methods, or no method at all. Increasing women's ability to plan and space their pregnancies leads to an array of benefits, including improved infant and maternal health, lower abortion rates, and better educational and economic opportunities for families. Without the contraceptive coverage guarantee, the four million women in Texas who gained no-cost contraceptive coverage since the implementation of the ACA will be at risk for losing contraceptive access. When women lose access to affordable contraception, financial security and social mobility can be more difficult, if not impossible, to achieve. Health insurance plans must cover basic and essential preventive health care services like contraception with no out-of-pocket costs. Insurance companies and employers should not be able to pick and choose what health care women can get at affordable prices.

Respectfully,

Jessica Farrar
Chair, Texas House Women's Health Caucus
State Representative, District 148

Ina Minjarez
Vice-Chair, Texas House Women's Health Caucus
State Representative, District 124

Roberto R. Alonzo
State Representative, District 104

Carol Alvarado
State Representative, District 145

Rafael Anchia
State Representative, District 103

Diana Arévalo
State Representative, District 116

[8] Pace L, et al. *Early Impact of the Affordable Care Act on Oral Contraceptive Cost Sharing, Discontinuation, and Nonadherence.* Health Affairs. September 2016. 35 (9) 1616-1624.
[9] *Unintended Pregnancy Prevention.* Centers for Disease Control and Prevention. Reproductive Health. January 22, 2015.
[10] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. *Birthspacing and Risk of Adverse Perinatal Outcomes: A Meta-Analysis.* JAMA. 2006. 295(15). 1809-1823.

00208949

Exhibit 97

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
November 30, 2017
Page 4



Diego Bernal
State Representative, District 123



Garnet Coleman
State Representative, District 147



Dawnna Dukes
State Representative, District 46



Roland Gutierrez
State Representative, District 119



Donna Howard
State Representative, District 48



Eric Johnson
State Representative, District 100

Victoria Neave
State Representative, District 107



César Blanco
State Representative, District 76



Nicole Collier
State Representative, District 95



Mary E. González
State Representative, District 75



Gina Hinojosa
State Representative, District 49

Celia Israel
State Representative, District 50

Armando "Mando" Martinez
State Representative, District 39

Evelina "Lina" Ortega
State Representative, District 77

00208950

Exhibit 97

JA-0001396

Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act
November 30, 2017
Page 5

Ron Reynolds
State Representative, District 27

Eddie Rodriguez
State Representative, District 51

Justin Rodriguez
State Representative, District 125

Toni Rose
State Representative, District 110

Shawn Thierry
State Representative, District 146

Senfronia Thompson
State Representative, District 141

Chris Turner
State Representative, District 101

Tomas Uresti
State Representative, District 118

00208951

Exhibit 97                                                                                                    JA-0001397





University of Texas at Austin
305 E. 23rd Street, Stop G1800
Austin, Texas 78712-1699
http://liberalarts.utexas.edu/txpep

December 5, 2017

Department of Health and Human Services
Submitted online to: https://www.regulations.gov/comment?D=CMS-2017-0133-0002

Re: **Moral exemptions to the Affordable Care Act's contraceptive mandate**

Dear Sir/Madam:

As a group of academic researchers with the Texas Policy Evaluation Project (TxPEP), we appreciate the opportunity to comment on the Trump administration's rule changes that expand who can opt out of the ACA's contraceptive mandate. Based at The University of Texas at Austin Population Research Center, TxPEP's mission is to conduct methodologically principled research that evaluates the impact of reproductive health policies and programs in the state of Texas.

In research we did in Texas on the impact of religion on women's contraceptive choices (appended), we found that religious or moral considerations have very little influence over women's decisions about whether to use contraception or about which method of birth control to use, including the intrauterine device (IUD). In the study, conducted with over 1,000 low-income Hispanic women in Texas, 87 percent were Catholic or of another Christian faith. Among these women, only 6 percent reported that religion influenced their contraceptive choices. And within this small group of women who reported any impact of faith at all, the majority reported that other considerations, including their health or the health of their children, took precedence over their religion's view of contraception.

Sometimes, women's religious convictions even compel them to use contraception. A Catholic woman using the pill describes using contraception as a way to help her follow her religious beliefs to avoid unplanned pregnancies and abortion: "If I become pregnant, I can't get an abortion. It would be a big sin. But, I can try to avoid pregnancy."

Texas women negotiate religion and contraception in very personal ways. A Catholic woman who got her tubes tied after giving birth said, "The church is against all that, but I am too old to have [more] children. I had a high-risk pregnancy, and, with the permission of God, we decided to do the surgery." Another woman who used condoms for contraception recounted, "We are not really allowed to be on birth control. As much as I love my religion and follow up with it, I think that it is up to me to decide my birth control."

As taxpayers and Americans who want better health care and want everyone's religious choices to be respected, we request that the Trump administration more appropriately balance the views of women with those of business owners and religious institutions by rescinding the rules that allow nearly all businesses to opt out of providing contraception with no cost sharing for religious or moral reasons. We believe that our government should protect women's rights to their own religious beliefs about contraception — and with that, women's access to critical reproductive health care.

00206967

Exhibit 98

We at the Texas Policy Evaluation Project appreciate the opportunity to submit comments on the administration's rule changes about the contraceptive mandate. If you would like additional information, please contact Dr. Joseph Potter at joe@prc.utexas.edu or at 512-471-8341.

Sincerely,

Joseph E. Potter, PhD
Professor
University of Texas at Austin
Principal Investigator, Texas Policy Evaluation Project (TxPEP)

Kristine Hopkins, PhD
Research Assistant Professor
University of Texas at Austin
Investigator, TxPEP

Kari White, PhD, MPH
Associate Professor
University of Alabama at Birmingham
Investigator, TxPEP

Daniel Grossman, MD
Professor
University of California, San Francisco
Investigator, TxPEP

Chloe Dillaway
MSPH/RD Candidate
Johns Hopkins Bloomberg School of Public Health
Former Assistant Project Manager, TxPEP

Sarah Baum, MPH
Associate
Ibis Reproductive Health
Investigator, TxPEP

2

00206968

Exhibit 98

Texas Policy Evaluation Project | The University of Texas at Austin          Research Brief • August, 2017

# Does Religion Influence Contraceptive Choice among Hispanic Women in Texas?

## Chloe Dillaway, Kari White, Kristine Hopkins, and Joseph E. Potter

### Introduction

Politicians continue to debate the federal mandate that employers provide free birth control coverage. The most common argument made is that the regulation infringes on the religious liberty of employers who object to the use of contraception or specific birth control methods.[1,2] Less attention is paid to the role religion plays in women's own contraceptive decisions.

We examined the role of religion in women's contraceptive choices in a sample of low-income postpartum women in Texas who were part of a larger prospective study of postpartum contraception. This brief focuses on the experiences of 1,117 Hispanic women, who comprised more than 80% of the sample.

### Key Findings

> In a sample of low-income Hispanic women in Texas, 87% were religiously affiliated, and yet only 6% reported that religion influenced their contraceptive choices.



When you choose a birth control method, does religion or faith influence your choice?

94% No

> Of this 6%, the majority reported that other considerations ultimately outweighed religion in their contraceptive decision-making.

> Among the minority of women who were not interested in using the IUD, less than 1% said religion influenced their decision.

> Religious women's reliance on rhythm and withdrawal largely reflected their difficulties accessing contraception rather than religious observance.

### Results



Religious Affiliation
Among 1,117 Hispanic women

Unaffiliated 13%
Other Christian 28%
Catholic 59%

Over half of the Hispanic women in the sample identified as Catholic. One quarter identified as mainline Protestant, Evangelical Protestant, Mormon, Jevohah's Witness, or an unspecified denomination. No Hispanic women identified with non-Christian faiths. The remaining 13% of Hispanic women in the study were not affiliated with any religion, identifying as atheist, agnostic, or as belonging to no religion.

Among women with a religious affiliation, 68% attended religious services at least monthly and 61% said that religion was very important in their lives.

Despite high levels of religious observance, only 6% of women said that their faith affected their contraceptive choices. Religion's effect on women's contraceptive choices was similarly low across all faiths.



The majority of religiously-affiliated women attend services regularly and say religion is important, yet religion does not influence their contraceptive choices.

| Religious affiliation | Attend services at least monthly | Say religion is very important | Say religion influences their contraceptive choices |
|---|---|---|---|
| Catholic 660 women | 64% | 54% | 7% |
| Other Christian 316 women | 75% | 75% | 5% |
| All affiliated women 976 women | 68% | 61% | 6% |

00206969

Exhibit 98                                                          JA-0001400

### How does religion influence women's contraceptive choices?

Among the 64 Hispanic women who answered that religion does influence their contraceptive choices, 20 women described their desire to follow their religion's teachings:

> *"God created me. He did not create methods for women to avoid pregnancy, He gave us natural methods to use and if you follow things the way he wants you to, everything is okay."*
> – Catholic using withdrawal

> *"I went to a marriage workshop before we got married and part of why I don't take birth control is because it is against the Church. Like you are supposed to let things happen, and if it happens then it is meant to be."* – Catholic using withdrawal

However, the majority of women described that even though religion weighed in their decision-making, ultimately, they made contraceptive choices based on other factors.

Many women reported making contraceptive choices based on the health of themselves and their families.

> *"[The Church] says that you should have the babies that you are meant to have, but you can't. It would be a greater sin to bring three children into the world that I can't take care of."*
> – Protestant using condoms

> *"The Church is against all that, but I am too old to have children. I had a high-risk pregnancy, and, with the permission of God, we decided to do the surgery."*
> – Catholic using female sterilization

Other women described their decision to deliberately set aside the teachings of their religion.

> *"Because in my religion, it's not aceptable to get your tubes tied. The Church still does not allow it. I spoke with the priest [and he] says it's fine. I've known many people who have done it."* – Catholic using female sterilization

> *"We are not really allowed to be on birth control... As much as I love my religion and follow up with it, I think that it is up to me to decide my birth control. [Birth control] is probably the only thing that I don't listen to the Church [about]."* – Catholic using condoms

Some women mentioned using contraception as a way to help them follow their religious beliefs and avoid unplanned pregnancies and abortion.

> *"If I become pregnant, I can't get an abortion. It would be a big sin. I became pregnant taking the pill, but I couldn't [have an abortion]... But, I can try to avoid pregnancy."*
> – Catholic using the pill

00206970

Exhibit 98                                                                                    JA-0001401

TEXAS POLICY EVALUATION PROJECT | THE UNIVERSITY OF TEXAS AT AUSTIN                    RESEARCH BRIEF • AUGUST, 2017

## Contraceptive practice is not reflective of contraceptive preference

It would be a mistake to assume that the women in this sample are using the method they would prefer to be using. Indeed, a far larger proportion would like to be using the intrauterine device (IUD), implant or female sterilization than are actually using these highly effective methods.[3]

Among all Hispanic women, 78% had a preference for the most effective methods of contraception, while only 41% were using these methods six months after delivery. In analyses that controlled for sociodemographic characteristics such as age, nativity, education, and number of children, we found that neither religious affiliation, frequency of attendance at religious services, nor importance of religion were associated with women's preference for these methods.

Although the majority of women preferred to be using the most effective methods, many could not access them due to cost, method availablity at their healthcare provider, and other barriers.

Here we compare contraceptive use and preference among two subsets of religious women.

### > Married Hispanic Catholics

Among married Catholic women, 92% said they would like to be using the most effective methods of contraception. However, nearly half of women in this group were using less effective methods, including condoms, withdrawal, rhythm and abstinence, six months after delivery.

Notably, at six months postpartum, only 11 women (<5%) were using rhythm or abstinence, the only contraceptive methods approved for regular use by the Catholic Church. However, 10 out of the 11 women wanted to use a more effective method.

Contraceptive use and preference at 6 months postpartum*



*Method use*          *Method preference*

- Sterilization
- IUD / Implant
- Injection / Pill / Patch / Ring
- Less effective methods
- None / Don't know

*Among married Hispanic Catholic women who were not currently pregnant and completed all interviews through 12 months (n=232).*

### > Hispanic women who report that religion affects their contraceptive decision-making

Similarly, among the small group of women who reported that religion influenced their contraceptive choices, half were using less effective methods six months after delivery, but 90% had a preference for more effective methods.

Contraceptive use and preference at 6 months postpartum*



*Method Use*          *Method Preference*

- Sterilization
- IUD / Implant
- Pill / Injection
- Less effective methods

*Among Hispanic women who said that religion influenced their contraceptive choices, were not currently pregnant, and completed all interviews through 12 months (n=61).*

00206971

Exhibit 98                                                                                    JA-0001402

TEXAS POLICY EVALUATION PROJECT | THE UNIVERSITY OF TEXAS AT AUSTIN    RESEARCH BRIEF • AUGUST, 2017

## Religion does not factor into most women's decisions about the IUD

Of the three highly effective methods of contraception, the IUD has generated the most controversy. Contrary to medical and scientific consensus,[4,5] some religious leaders and employers have contended that IUDs can cause abortion; therefore, they oppose this method of contraception.[6] However, we found scant evidence that religion played a role in women's decisions about using the IUD.

Approximately half of Hispanic women (47%) wanted to use an IUD or would consider using it if it were free. Of the 34% of women who were not interested in an IUD, very few gave religious reasons for their disinterest in this method.

As shown at right, the most frequently stated reasons had to do with the placement of the device and side effects, and only two women (<1%) said they would not consider the IUD for religious reasons.

**Reasons for not considering the IUD***

Among Hispanic women who would not consider using the IUD, n=265



| | |
|---|---|
| Placement of device | 54% |
| Negative side effects | 38% |
| Friend/family advice | 30% |
| Not effective | 15% |
| Prefers different method | 8% |
| Excessive duration | 5% |
| Medical condition | 5% |
| Affects fertility after removal | 4% |
| Other / Don't know | 4% |
| Causes cancer | 1% |
| Religious reasons | <1% |

*Participants could describe more than one reason*

## CONCLUSION

Despite high rates of religious affiliation and observance, Hispanic women in this study reported that religion had little influence over their contraceptive decisions. Even among the small number of women who reported that religion affected their contraceptive choices, other factors such as their own health and the well-being of their families often outweighed religious considerations.

Our findings show that regardless of religious affiliation, the majority of Hispanic women desire long-acting or permanent methods of contraception. These methods are prohibitively expensive without insurance. Women's reliance on less effective methods is not reflective of religious observance but rather of limited access to highly effective contraception. The religious exemption allowing employers to opt out of covering birth control methods in their health plans—which recent polling data found that a majority of Americans oppose[7]—limits access to the effective birth control that women desire.

## METHODS

We conducted a prospective study of contraceptive use among 1,700 women recruited after delivery from eight hospitals across six cities. The hospitals were chosen to reflect the experiences of women delivering with public insurance at larger hospitals in Texas' urban centers, including Austin, El Paso, Dallas, Houston, Odessa and Edinburg. Women in the study were between the ages of 18 and 44, had deliveries covered by public insurance (e.g., Medicaid for pregnant women), and planned to delay childbearing for at least two years. The six interviews in our ongoing study span the two years following delivery. Women were asked about their contraceptive use and preferences and reproductive and medical history, among other topics.

00206972

Exhibit 98    JA-0001403

## METHODS, CONTINUED

To capture actual contraceptive use at each interview, we asked women what method of contraception they were currently using. To capture methods that women may have not considered as birth control, we also asked women if they were using less effective methods such as condoms and withdrawal, whether they were abstinent, or whether their partners were using any methods. To assess contraceptive preferences, we asked women a series of questions about the method they would like to be using six months following delivery and their interest in using IUDs, implants and sterilization. We chose method preference at six months postpartum because by that time most women have resumed sexual relations and do not rely on exclusive breastfeeding as contraception.

At the interview one year following delivery, we successfully contacted 82% of women (1,385) and asked them a series of questions about religion, including their religious affiliation, frequency of religious service attendance, and importance of religion, using questions adapted from Pew Research Center surveys. The analysis presented in this brief is based on the reports of the 1,117 Hispanic women who answered the religion questions.

## ACKNOWLEDGEMENTS

Additional contributors to this brief include Kathleen Broussard, Laura Dixon, Lina Palomares, Katherine Strandberg, Daniela Kuhn, and Elsa Vizcarra.

## SUGGESTED CITATION

Dillaway, C, White, K, Hopkins, K, and Potter, JE. Does religion influence contraceptive choice among Hispanic women in Texas? Texas Policy Evaluation Project Research Brief 2017.

## REFERENCES

1. Wilson RF. The calculus of accommodation: contraception, abortion, same-sex marriage, and other clashes between religion and the state. Boston Coll Law Rev 2012;53:1417.
2. Gedicks FM, Van Tassell RG. RFRA exemptions from the contraception mandate: An unconstitutional accommodation of religion. BYU Law Digit Commons [Internet] 2014 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2328516).
3. Potter JE, Coleman-Minahan K, White K, et al. Contraception after delivery among publicly insured women in Texas. Obstet Gynecol 2017;130(2):393–402.
4. Hatcher RA, Trussell J, Nelson AL, Cates WJ, Kowal D, editors. Contraceptive technology. 19th ed. New York: Ardent Media, Inc.; 2011.
5. Charo RA. Alternative science and human reproduction. N Engl J Med 2017.
6. Belluck P, Eckholm E. Religious groups equate abortion with some contraceptives [Internet]. N. Y. Times. 2012 [cited 2017 Jun 30] (https://www.nytimes.com/2012/02/17/health/religious-groups-equate-some-contraceptives-with-abortion.html).
7. Kirzinger A, DiJulio B, Hamel L, Wu B. Kaiser Health tracking poll – June 2017: Women's health [Internet]. 2017 [cited 2017 Jul 7] (http://www.kff.org/womens-health-policy/poll-finding/kaiser-health-tracking-poll-june-2017-womens-health/).

 

@TxPEP    @TxPEPResearch



The Texas Policy Evaluation Project (TxPEP), based at the Population Research Center at The University of Texas at Austin, is a collaborative group of university-based investigators who evaluate the impact of legislation in Texas related to women's reproductive health. The project is supported by grants from the Susan Thompson Buffett Foundation and the Society of Family Planning. Infrastructure support for the Population Research Center is provided by a grant from the Eunice Kennedy Shriver National Institute of Child Health and Human Development. Funders of the Texas Policy Evaluation Project have no role in the design and conduct of the research, interpretation of the data, approval of the final manuscript or decision to publish.

00206973

Exhibit 98                                                                                                        JA-0001404



Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9940-IFC

December 4, 2017

Dear Acting Secretary Hargan,

On behalf of the Texas Women's Healthcare Coalition (TWHC), thank you for this opportunity to provide input on the set of temporary regulations, related to section 9815 of the Internal Revenue Code, expanding exemptions to protect entities and individuals with religious objections to the mandate of contraceptive coverage through the Affordable Care Act.

The TWHC and its 77 healthcare, faith, and community-based member organizations are dedicated to improving the health and well-being of Texas women, babies, and families by ensuring access to preventive healthcare - including contraception - for all Texas women.

We recognize the importance of exercising one's own faith, and value the free expression of religion. However, we also value the right women have to plan and space their pregnancies in the interest of the health and well-being of themselves and their families. We recognize a harmful precedent with this rule change that places an employer's personal beliefs above their employees'.

## Contraceptive Use and the Impact the New Rules Will Have on Women

Access to preventive healthcare – including contraception – is critically important to the health and well-being of women and babies. When women and couples are able to plan and space pregnancies, babies have less risk of prematurity and low birth weight, and mothers experience healthier outcomes too. Planned pregnancies have a healthier start, with earlier prenatal care, less alcohol and tobacco exposure, more folic acid to prevent birth defects, more breastfeeding, and many positive outcomes for children.

The new rule provides broad exemptions for insurers and employers to claim a moral or religious objection to providing birth control and related services. This rule puts at risk the contraceptive coverage that millions of women rely on, including the over four million women in Texas who

00715511

Exhibit 99

JA-0001405

depend on the contraceptive coverage guarantee for no-cost birth control and contraceptive services.

Prescription cost is a major barrier for many to obtain the medication they need.[i] A recent survey found one-third of voters who are women of reproductive age would not be able to afford contraception priced at over \$10 per month.[ii] The same survey found that one in seven of the same group of women would not be able to afford contraception at any price.[iii] In the years since the contraceptive coverage guarantee has been in effect, the percent of US women with out-of-pocket expenses for oral contraceptive pills (OCPs) dropped from over 20% to less than 4%.[iv] In 2013, the guarantee saved women using OCPs over \$1.4 billion.[v] Studies show that paying full cost leads to reduction in contraceptive use.[vi] This in turn leads to an increased risk of unintended pregnancy, and the potential health and economic risks associated with unintended pregnancy.[vii] [viii] [ix]

These financial challenges are even greater for women trying to access more effective forms of contraception, such as implants or intrauterine devices (IUDs). These forms of birth control can be 20 times more effective than other methods, but they are also expensive.[x] High up-front costs and insufficient contraceptive counseling have been found as significant barriers to access for women who have a preference for a LARC method.[xi] [xii] If more employers stop providing coverage, many women may have no other option but to rely on less effective methods, or no method at all.

As part of the Administration's justification for the new rules, the rules preamble suggests that existing public programs are able to meet the need for subsidized free or contraceptive care. However, it is clear that women are still in need of these services. For example, Texas is still struggling to serve the 1.8 million women in need of contraceptive care in the state. Recent state investments in family planning have been critical, but data continues to show that Texas is only serving a fraction of the women in need. Our state's fragile family planning programs will be even further strained if forced to absorb insured clients that may now require free or low-cost contraceptive services.

Increasing women's ability to plan and space their pregnancies leads to an array of benefits, including lower abortion rates, improved infant and maternal health, better educational and economic opportunities for families, and cost savings for the state. Without the contraceptive coverage guarantee, the 55 million women (including 4 million women in Texas) who gained no-cost contraceptive coverage since the implementation of the ACA will be at risk of losing contraceptive access.[xiii]

Given the importance of ensuring all women have access to preventive and contraceptive care, we urge the Department of Labor and the Department of Health and Human Services not to adopt these interim final rules.

Thank you for your consideration of these comments. Please let us know if we can provide you with any additional information.

2

Exhibit 99

Respectfully,

Janet Realini, MD, MPH
Chair, Texas Women's Healthcare Coalition

3

00715513

Exhibit 99

JA-0001407

[i] Cox C and Sawyer B. How Does Cost Affect Access to Care. Kaiser Family Foundation. Peterson-Kaiser Health System Tracker. November 29, 2016.

[ii] PerryUndem. Contraceptives + Policy Through a Gender Lens: Results from a National Survey Conducted by PerryUndem. March 22, 2017. Accessible at https://www.scribd.com/document/342699692/PerryUndem-Genderand-Birth-Control-Access-Report.

[iii] PerryUndem. Contraceptives + Policy Through a Gender Lens: Results from a National Survey Conducted by PerryUndem. March 22, 2017. Accessible at https://www.scribd.com/document/342699692/PerryUndem-Genderand-Birth-Control-Access-Report.

[iv] Becker N, Polsky D. Women Saw Large Decrease in Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing. Health Affairs. 34 (7) 1204-1211. July 2015.

[v] Cox C, et al. Examining high prescription drug spending for people with employer sponsored health insurance. Kaiser Family Foundation. October 27, 2016.

[vi] Pace L, et al. Early Impact of the Affordable Care Act on Oral Contraceptive Cost Sharing, Discontinuation, and Nonadherence. Health Affairs. September 2016. 35 (9) 1616-1624.

[vii] Unintended Pregnancy Prevention. Centers for Disease Control and Prevention. and Reproductive Health. January 22, 2015.

[viii] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birthspacing and Risk of Adverse Perinatal Outcomes: A Meta-Analysis. JAMA. 2006. 295(15). 1809-1823.

[ix] Sonfield A et al. The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children. Guttmacher Institute. 2013.

[x] Peipert J, et al. Preventing Unintended Pregnancies by Providing No-Cost Contraception. Obstetrics & Gynecology. 120 (6) 1291-1297. December 2012.

[xi] Potter J, et al. Contraception After Delivery Among Publicly Insured Women in Texas. Obstetrics and Gynecology. 130 (2) 1-10. August 2017.

[xii] Durante J, Woodhams E. Patient Education About the Affordable Care Act Contraceptive Coverage Requirement Increases Interest in Using Long-Acting Reversible Contraception. Women's Health Issues. 27 (2) 152-157. January 4 2017.

[xiii] Office of the Assistant Secretary for Planning and Evaluation. The Affordable Care Act is Improving Access to Preventive Services for Millions of Americans. U.S. Department of Health and Human Services. May 14, 2015.

4

00715514

Exhibit 99

JA-0001408

## Texas Women's Healthcare Coalition Steering Committee Members

Texas Medical Association
District XI (Texas) American Congress of Obstetricians and Gynecologists
Texas Academy of Family Physicians
Texas Association of Community Health Centers
Methodist Healthcare Ministries
Teaching Hospitals of Texas
Women's Health and Family Planning Association of Texas
Texans Care for Children
Center for Public Policy Priorities
Healthy Futures of Texas

## Texas Women's Healthcare Coalition General Members

Access Esperanza Clinics Inc.
Amistad Community Health Center
Austin Advanced Practice Nurses
Austin Physicians for Social Responsibility
AWHONN Texas
Brazos Valley Community Action Agency, Inc.
Brazos Valley Nurse Practitioner Association
Cardea
Center for Community Health, UNTHSC
Central Texas Nurse Practitioners
Children's Hospital Association of Texas
Coalition for Nurses in Advanced Practice
Coastal Bend Advanced Practice Nurses
Coastal Bend Wellness Foundation
Community Healthcare Center
Consortium of Texas Certified Nurse Midwives
Department of Ob/Gyn of UNTHSC and the ForHER Institute
El Buen Samaritano
El Centro De Corazón
El Paso Area Advanced Practice Nurse Association
Food Bank of the Rio Grande Valley
Fort Worth Region Nurse Practitioners
Gateway to Care
Good Neighbor Health Center
Haven Health
Hill Country Advanced Practice Nurses & Physicians
Assistants Association
Houston Area Chapter of NAPNAP
Houston Area Nurse Practitioners
League of Women Voters of Texas
Legacy Community Health Services
March of Dimes - Texas
Mental Health America of Greater Houston
National Council of Jewish Women—Texas State Policy
Advocacy Network

National Latina Institute for Reproductive Health
North Harris Montgomery Advanced Practice Nurse Society
North Texas Alliance to Reduce Teen Pregnancy
North Texas Nurse Practitioners
Panhandle Nurse Practitioner Association
Pasadena Health Center
People's Community Clinic
Port Arthur Housing Authority
Pregnancy and Postpartum Health Alliance of Texas
SALVERE (Striving to Achieve Literacy via Education,
Research, and Engagement)
San Antonio Metropolitan Health District
San Antonio Nurses in Advanced Practice
Schneider Communications
South Plains Nurse Practitioner Association
South Texas Family Planning & Health Corp.
Southeast Texas Nurse Practitioner Associates
Special Health Resources
St. David's Foundation
Texas Association of Obstetricians and Gynecologists
Texas Campaign to Prevent Teen Pregnancy
Texas Council on Family Violence
Texas Health Institute
Texas Hospital Association
Texas Medical Association Alliance
Texas Nurse Practitioners
Texas Nurses Association
Texas Pediatric Society
Texas Unitarian Universalist Justice Ministry
The Contraceptive Initiative
The SAFE Alliance
The Women's Fund for Health Education and Resiliency
University Health System
Valley AIDS Council
Women's & Men's Health Services of the Coastal Bend, Inc.

00715515

Exhibit 99



December 5, 2017

VIA ELECTRONIC SUBMISSION

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, Maryland 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (RIN 0938-AT20)**

To whom it may concern:

URGE: Unite for Reproductive & Gender Equity is pleased to provide comments in response to the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services interim final rule ("Religious Exemptions IFR" or "Rule") published in the Federal Register on October 13, 2017.[1] For the reasons set forth below, we urge the Department of the Treasury, Department of Labor, and Department of Health and Human Services (collectively, "the Departments") to set aside this Rule. First, the Religious Exemptions IFR creates a harmful and dangerous precedent by allowing the denial of health care coverage based on religious views while paying scant attention to the harm such denials cause to third parties. Second, the rule will harm young people, especially LGBT young people, by restricting access to essential reproductive and other health care services. And third, the Religious Exemptions IFR violates the Administrative Procedure Act ("APA") and both the First and Fifth Amendments to the United States Constitution.

URGE envisions a world where all people have agency over their own bodies and relationships, and the power, knowledge, and tools to exercise that agency. URGE builds this vision by engaging young people in creating and leading the way to sexual and reproductive justice for all by providing training, field mobilization, and national

---

[1] 82 Fed. Reg. 47792 et seq.

00373543

Exhibit 100

JA-0001410

leadership for a youth-driven agenda. URGE seeks to empower and uplift the voices of young people, especially those most impacted by oppressive rules such as this IFR such as young people of color and young queer people.

## I.  Background

### A.  The Benefits of Contraception Are Well Known

Access to contraception is an essential part of shaping women's health and well-being.[2] As of September 2016, there were approximately 61 million U.S. women in their childbearing years (ages 15–44).[3] About 43 million of those women (70%) are at risk of unintended pregnancy—that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners do not use a contraceptive method correctly and consistently.[4] Heterosexual couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[5] In the United States, the average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[6] For young people, access to affordable contraception is imperative to their ability to plan and space pregnancy and meet their desired family size.

Contraceptive use among women is widespread, with over 99% of sexually-active women using at least one method of contraception at some point during their lifetime.[7] Contraceptives make up an estimated 30–44% of out-of-pocket health care

---

[2] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[3] Kimberly Daniels, Jill Daugherty, and Jo Jones,  *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, NATIONAL HEALTH STATISTICS REPORTS 173 (2014), http://www.cdc.gov/nchs/data/databriefs/db173.pdf.

[4] Jo Jones, William Mosher, and Kimberly Daniels, *Current Contraceptive Use in the United States, 2006–2010, and Changes in Patterns of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

[5] J Trussell, *Contraceptive failure in the United States*, 83 CONTRACEPTION  297–404, (May 2011).

[6] *Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics,* THE ALAN GUTTMACHER INSTITUTE (AGI) (2000), https://www.guttmacher.org/sites/default/files/pdfs/pubs/fulfill.pdf.

[7] Guttmacher Institute, *Contraceptive Use in the United States* (September 2016), https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states.
(Continued…)

00373544

Exhibit 100

spending for those who use them.[8] A year's worth of birth control can cost upwards of $370—the equivalent of 51 hours of work for someone earning the federal minimum wage of $7.25 an hour.[9] Long-acting birth control methods, such as an IUD or contraceptive implant, cost more than $1,000 out of pocket[10]—almost one month's salary for a person earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the use of more effective methods, and a decrease in out-of-pocket costs for women.[11]

The ACA has expanded contraceptive coverage without cost-sharing to millions of people across the nation.[12] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with almost 65% of the decrease directly attributed to the contraceptive coverage provision. After the implementation of the ACA, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[13] Studies show that the use of long-term contraceptives methods, such as an IUD or an implant, has increased in recent years because the

---

[8] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11, http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[9] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose,* NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/; *See* Elizabeth Celms, *How much do birth-control pills cost?,* CLEAR HEALTH COSTS (Apr. 29, 2013), https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112/ (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[10] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose,* NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose/.

[11] *Insurance Coverage of Contraceptives,* GUTTMACHER INSTITUTE (Oct. 1, 2017), https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives; Adara Bearmesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[12] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[13] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

(Continued...)

3

00373545

Exhibit 100

high upfront costs were removed.[14] These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives.[15] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[16] Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[17]

Contraceptive use benefits women and families in numerous ways. Having access to the full range of FDA-approved contraceptive methods allows women to choose the method that works best for them at a given point in their life—factoring in ease of use, side effects, risk of sexually transmitted infections, desire for confidentiality and control, as well as many other considerations. Identifying the "right" methods helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording them greater control over family planning.

Reducing unwanted pregnancies and affording women greater control over family planning has additional health benefits. For example, avoiding closely spaced pregnancies reduces the risk of premature birth or low birth weight. Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families.

Access to comprehensive family planning services, and to culturally competent providers of those services, is critically important for the LGBT community. Lesbian, gay and bisexual youth have been shown to experience more pregnancies than do youth who do not identify as a sexual minority.[18] Bisexual women and some

---

[14] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[15] Alina Salganicoff, Laurie Sobel, and Caroline Rosenzweig, *The Future of Contraceptive Coverage*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[16] *Id.*

[17] *The Affordable Care Act's Birth Control Benefit is Working for Women,* NATIONAL WOMEN'S LAW CENTER (Dec. 16, 2016), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women/.

[18] Lisa L. Lindley, Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 AM. J. OF PUBLIC HEALTH 1379–86 (July 1, 2015); Karen Schantz, *Pregnancy Risk Among Bisexual, Lesbian, and Gay Youth: What Does Research Tell Us,* ACT FOR YOUTH CENTER OF EXCELLENCE (Apr. 2015), http://www.actforyouth.net/resources/rf/rf_lgb-prg_0415.pdf.

00373546

Exhibit 100

JA-0001413

transgender people are also at risk for pregnancy and are often over-looked when considering access to reproductive health care. Access to family planning is thus essential for this community and should be made more, not less, accessible.

It is deeply troubling that federal agencies charged with ensuring public health would seek to enact a rule that gives employers and universities such sweeping veto power over the health care services their employees or students may access under their health care coverage. Students should be free to choose their institute of higher education based on their independently determined career path, not based on whether their school will block them from necessary health care. Health insurance is a form of compensation that employees earn, like wages. Allowing employers an explicit religiously-motivated veto over how an employee uses his or her earned health care coverage is bad public health policy and represents an overemphasis on an exaggerated view of religious liberty at the expense of employee health and well-being.

### B. The Affordable Care Act's Contraceptive Coverage Provision

The ACA was enacted to achieve several health care reform goals, including improving the availability of primary and preventive health care services. When preventive services coverage was written into the ACA, Congress included a provision directing the Department of Health and Human Services (HHS) to identify the preventive services that should be provided to women.

HHS undertook a thorough and evidence-based process to develop this list of women's preventive services, calling on the independent National Academy of Medicine to convene experts and determine what services should be covered. It surprised no one with a background in public health or medicine that contraception was among the essential preventive services that the Academy included in its recommendations. The Department included contraception in its final rule delineating the list of women's preventive services, exempting houses of worship from covering contraception in their health plans if they had a religious objection. Seeking a broader exemption, some employers, both for-profit and non-profit, filed lawsuits seeking to challenge the requirement to cover contraception on religious grounds.

The Supreme Court resolved the for-profit challenges in 2014, in *Burwell v. Hobby Lobby*.[19] The Court ruled that the Religious Freedom Restoration Act required that a

---

[19] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2786–87 (2014).

5

00373547

Exhibit 100

JA-0001414

closely held for-profit company whose owners objected to contraception on religious grounds must be permitted to use the same accommodation given to non-profit entities (described below). Importantly, the Court stressed that there would be no harm to the company's workers caused by permitting the company to use the same accommodation to provide its employees with contraceptive coverage, as the employees would still receive coverage without cost sharing.

With respect to non-profit employers, the Departments developed an accommodation to permit religiously affiliated non-profit employers to certify that they objected to contraception and notify their insurer or third-party administrator (TPA), which would arrange for contraceptive coverage for the objecting employer's employees at no cost to the employer. Following the *Hobby Lobby* decision, two more rules were adopted—one creating an additional notice mechanism for objecting non-profits (to HHS rather than to the insurer/TPA), and another allowing closely-held for-profit entities to avail themselves of the same accommodation, pursuant to the holding in *Hobby Lobby.*

### C. Changes Under the Religious Exemptions IFR

The Religious Exemptions IFR expands eligibility for the complete exemption—formerly reserved for houses of worship—to *all* nonprofit and for-profit employers. It also retains the accommodation, formerly available to non-profit and closely-held for-profit employers, as an optional alternative for any employer. Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations. This is a potentially dramatic change in the availability of contraceptive coverage for the employees of a vast number of entities, and a significant departure from what was guaranteed to these employees under prior rulemaking and the *Hobby Lobby* decision.

## II. Comments on the Religious Exemptions IFR

URGE opposes the Religious Exemptions IFR for several reasons. Allowing restrictions on the availability of health care services based on the religious beliefs of others—already too prevalent in reproductive health care—sets a dangerous precedent for access to health care for young people and LGBT people. Limiting the availability of contraceptive coverage will itself have an adverse impact on young people and the LGBT community. And the Rule is unlawful, in violation of the Administrative Procedure Act, the First Amendment, and the Fifth Amendment.

6

00373548

Exhibit 100

## A. Religious Exemptions in Health Care Cause Harm

Unlike other nations whose legal regimes have also sought to balance the conscience rights of providers with the rights of persons to access health care, in the United States there is often insufficient consideration given to the impact of overly broad conscience laws on patients. In other words, the playing field is already tilted heavily in favor of those seeking to deny care. And given the nature of the services to which religious exemptions are most commonly applied, these refusal laws have a discriminatory impact on LGBT people and women seeking reproductive health care.

At the federal level, there are already numerous statutory protections for health care providers' religious beliefs. These laws include the Church,[20] Weldon,[21] and Coats[22] amendments, which allow providers to refuse to perform or otherwise facilitate abortion services. The Church Amendment also reaches sterilization services.[23]

Most states have similar laws; forty-five allow individual healthcare providers, and forty-three allow institutions, to refuse to provide abortion services.[24] Provider conscience clauses at the state level apply not only to abortion services but also to contraceptive care. Twelve states permit some healthcare providers to refuse to provide contraception and related services (such as counseling).[25] Refusal provisions targeting contraception delay access, increase costs, and may result in unintended pregnancies. Eighteen states allow providers to refuse to provide sterilization services.[26]

State conscience clauses have now expanded to end of life care, stem cell research, and to any unspecified health services to which a moral or religious objection may be raised, including counseling or providing information regarding the patient's health status.[27] These state laws are also expanding to cover more entities.[28] Provider conscience laws exist in states where there are significant numbers of

---

[20] 42 U.S.C. § 300a-7 et seq.

[21] Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat 786.

[22] 42 U.S.C. § 238(n).

[23] 42 U.S.C. § 300a-7 et seq.

[24] GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015), http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.

[25] Id.

[26] Id.

[27] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2470 (2015).

[28] Id.

(Continued...)

00373549

Exhibit 100

JA-0001416

communities of color, including Texas and Florida,[29] and many of these states have enacted additional, broad constitutional or statutory religious exemptions that impact LGBT persons.[30]

While religiously-based objections to contraception and abortion are well known and have posed access barriers for years, less well known is how these types of refusals can also affect the LGBT community. LGBT people and people living with HIV experience pervasive discrimination in the provision of health care, much of it justified by reference to religious beliefs. According to an in-depth survey concerning health care discrimination against LGBT people and people living with HIV, more than half of all respondents reported that they have experienced at least one of the following types of discrimination in care: being refused needed care; health care professionals refusing to touch them or using excessive precautions; health care professionals using harsh or abusive language; being blamed for their health care status; or health care professionals being physically rough or abusive.[31] Many members of the LGBT community have a "high degree of anticipation and belief that they w[ill] face discriminatory care" which ultimately causes many people to not seek the essential care that they need.[32] For many transgender and gender-nonconforming people the fear of potential negative treatment from health care professionals is even more exacerbated. Undocumented transgender persons were found to be vulnerable to physical attacks in doctors' offices, hospitals, and emergency rooms.[33] There are also geographic considerations that may further

---

[29] For instance, Florida allows private, religious, and public institutions and individual providers to refuse abortion care to patients and allows individual providers and pharmacists to refuse contraception. GUTTMACHER INST., REFUSING TO PROVIDE HEALTH SERVICES 2 (2015), http://www.guttmacher.org/statecenter/spibs/spib_RPHS.pdf.

[30] MOVEMENT ADVANCEMENT PROJECT, LGBT POLICY SPOTLIGHT: STATE AND FEDERAL RELIGIOUS EXEMPTIONS AND THE LGBT COMMUNITY (2015), http://www.lgbtmap.org/policy-and-issue-analysis/policy-spotlight-rfra.

[31] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV 5 (2010), http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf  (explaining that "almost 56 percent of lesbian, gay or bisexual (LGB) respondents had at least one of these experiences; 70 percent of transgender and gender-nonconforming respondents had one or more of these experiences; and nearly 63 percent of respondents living with HIV experienced one or more of these types of discrimination in health care. In almost every category, transgender and gender-nonconforming respondents reported higher levels of discrimination by health care providers.").

[32] Id. at 6.

[33] GRANT JM. ET AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY 74 (2011), http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.
(Continued...)

8

00373550

Exhibit 100

exacerbate discrimination against LGBT individuals.[34] These realities have created a major barrier to health care services for LGBT people.

LGBT people of color and people with lower socioeconomic status experience even higher levels of discriminatory and substandard care.[35] Data from one report[36] show, among other things:

- Only 64 percent of LGB Latino adults had health insurance coverage compared to 77 percent of all LGB adults and 82 percent of the heterosexual adult population.

- Thirty percent of LGB African-American adults were likely to delay or not get needed medication compared to 19 percent of African-American heterosexual adults.

- Twenty-six percent of LGB Latino adults did not have a regular source for basic health care.

- Only 35 percent of LGB African-American women had a mammogram in the past two years, compared to 57 percent of all LGB women and 62 percent of all heterosexual women.

Religious objections have presented barriers even in instances involving people trying to become pregnant, rather than avoid or terminate a pregnancy. Many religious health care providers are "opposed to infertility treatments altogether or

---

[34] NAT'L WOMEN'S LAW CTR., FACT SHEET: HEALTH CARE REFUSALS HARM PATIENTS: THE THREAT TO REPRODUCTIVE HEALTH CARE 2 (2014),
http://www.nwlc.org/sites/default/files/pdfs/refusals_harm_patients_repro_factsheet_5-30-14.pdf.
[35] LAMBDA LEGAL, WHEN HEALTH CARE ISN'T CARING, LAMBDA LEGAL'S SURVEY ON DISCRIMINATION AGAINST LGBT PEOPLE AND PEOPLE LIVING WITH HIV, 11 (2010),
http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring_1.pdf ("In addition to the overall rates of substandard care, respondents (defined in this survey as having a household income under $20,000) in nearly every category experienced higher rates of discrimination and substandard care. For example, while transgender respondents as a whole reported a care-refusal rate of almost 27 percent, low-income transgender respondents reported a rate of almost 33 percent. Almost 11 percent of low-income LGB respondents and LGB respondents of color were refused care compared to almost 8 percent of LGB people overall."); *see also The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding*, INSTITUTE OF MEDICINE (2011), http://www.iom.edu/Reports/2011/The-Health-of-Lesbian-Gay-Bisexual-and-Transgender-People.aspx.
[36] *Health Disparities in LGBT Communities of Color: By the Numbers*, CENTER FOR AMERICAN PROGRESS (2010), https://www.americanprogress.org/issues/lgbt/news/2010/01/15/7132/health-disparities-in-lgbt-communities-of-color
(Continued...)

00373551

Exhibit 100                                                                                   JA-0001418

are opposed to providing it to certain groups of people" such as members of the LGBT community.[37] Health care providers have even "sought exemptions from state antidiscrimination laws to avoid providing reproductive services to lesbian parents."[38]

The problems for patients presented by the expansion of refusal provisions in state law have been exacerbated by the growth in health care systems owned and operated by religious orders. Mergers between Catholic and nonsectarian hospitals have continued as hospital consolidation has intensified. Catholic hospitals and health systems must follow the Ethical and Religious Directives for Catholic Health Care Services ("Directives"), which prohibit a wide range of reproductive health services, such as contraception, sterilization, abortion care, and other needed health care.[39] Nonsectarian hospitals must often agree to comply with these Directives in order to merge with Catholic hospitals.[40]

Health insurance benefits earned by employees and guaranteed under federal law should not be subject to a religious veto by employers. The regulatory regime that existed prior to this IFR was the result of several years of considered policymaking and constituted a balance between religious beliefs and health care access. This IFR would upend that careful balance and subjugate employee health care needs to the religious objections of any employer. Not only is this poor public health policy, as described further in section B below, it is contrary to numerous provisions of law, set forth in section C.

---

[37] U.S. CONF. OF CATHOLIC BISHOPS, ETHICAL AND RELIGIOUS DIRECTIVES FOR CATHOLIC HEALTH SERVICES 25 (5th ed. 2009), http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf (Directive 41 of the Ethical and Religious Directives for Catholic Health Care states: "Homologous artificial fertilization is prohibited when it separates procreation from the marital act in its unitive significance.")
[38] Douglas Nejaime et al., *Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics*, 124 YALE L.J. 2516, 2518 (2015). *See, e.g., N. Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Superior Court*, 189 P.3d 959 (Ca. 2008) (on the potential impact of healthcare refusal laws on same-sex couples).
[39] U.S. CONF. OF CATHOLIC BISHOPS, ETHICAL AND RELIGIOUS DIRECTIVES FOR CATHOLIC HEALTH SERVICES (5th ed. 2009), http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf.
[40] Elizabeth B. Deutsch, *Expanding Conscience, Shrinking Care: The Crisis in Access to Reproductive Care and the Affordable Care Act's Nondiscrimination Mandate*, 124 YALE L. J. 2470, 2488-89 (2015).. (Continued...)

10

Exhibit 100

00373552

JA-0001419

### B. The Religious Exemptions IFR Will Increase Health Disparities Faced by Young People, especially within the LGBT Community

The Religious Exemptions IFR harms young people and the LGBT community by restricting access to contraception for those who need it, including lesbian and bisexual women and some transgender people. Young people's ability to begin their independent lives and determine their reproductive futures relies significantly on their access to affordable birth control. Access to birth control is particularly crucial for the health and well-being of lesbian and bisexual women because they are at risk for unintended pregnancies.[41]

Despite misconceptions held by policymakers and some medical providers, lesbian and bisexual women require sexual and reproductive health services similar to those needed by heterosexual women. A majority of lesbian and bisexual women have reported having had intercourse with men and at least 30% have been pregnant,[42] 50% have used oral contraceptives, and 16% reported one or more abortions.[43] Bisexual women are also subject to an increased risk of sexual violence. One study found that 46% of bisexual women have been raped as compared to 17% of heterosexual women.[44] Broadly, studies indicate that unintended pregnancies are equally as common, if not more common, for lesbian and bisexual women as for heterosexual women.[45]

Adolescent lesbian and bisexual women are at even higher risk for unintended pregnancies. Lesbian adolescent women are less likely than bisexual and heterosexual women to use contraception and bisexual adolescent women are more

---

[41] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

[42] J.M. Marrazzo and K. Stine, *Reproductive Health History of Lesbians: Implications for Care*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2003).

[43] Elizabeth M. Saewyc, Linda H. Bearinger, Robert Wm. Blum and Michael D. Resnick, *Sexual Intercourse, Abuse and Pregnancy Among Adolescent Women: Does Sexual Orientation Make a Difference?*, 31 FAMILY PLANNING PERSPECTIVES 127 (1999).

[44] Adara Beamesderfer, Lindsey Dawson, Jennifer Kates, Usha Ranji, and Alina Salganicoff, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, THE HENRY J. KAISER FAMILY FOUNDATION (Nov. 2016), https://www.kff.org/disparities-policy/issue-brief/health-and-access-to-care-and-coverage-for-lesbian-gay-bisexual-and-transgender-individuals-in-the-u-s.

[45] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

(Continued...)

11

00373553

Exhibit 100                                                              JA-0001420

likely to experience teen pregnancy than are heterosexual adolescent women.[46] One study found that 12% of lesbian and bisexual adolescent women have experienced teen pregnancy, compared to only 5% of heterosexual adolescent women. And a 2016 study by the Centers for Disease Control and Prevention found that LGBT high school students are more likely than other students to experience intimate partner violence and rape, which can result in unintended pregnancy.[47]

In sum, access to contraception is essential for the health and well-being of many members of the LGBT community, especially young people, and allowing a wide range of employers and universities to withhold coverage of contraception for religious reasons is unsound public health policy with the potential to cause significant harm.

### C. The Religious Exemptions IFR is Unlawful

In addition to subjecting women's and LGBT people's access to health care to the religious veto of employers, and increasing health disparities faced by members of the LGBT community, the Religious Exemptions IFR should also be rescinded because it violates the APA and First and Fifth Amendments to the United States Constitution.

### i. The Religious Exemptions IFR Violates the APA

The Administrative Procedure Act imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[48] The APA is applicable here because the Religious Exemptions IFR is a final agency action and is a legislative rule within the meaning of the APA.[49] By enacting the Religious Exemptions IFR in the manner they did, the Departments have violated several procedural and substantive requirements of the APA.

---

[46] Brittany M. Charlton, Heather L. Corliss, Stacey A. Missmer, Margaret Rosario, Donna Spiegelman, and Bryn Austin, *Sexual orientation differences in teen pregnancy and hormonal contraceptive use: An examination across 2 generations*, Am. J. of Obstetrics and Gynecology (2013), http://www.ajog.org/article/S0002-9378(13)00652-2/pdf.

[47] *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 — United States and Selected Sites, 2015*, Centers for Disease Control and Prevention (Aug. 12, 2016), https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf; *see also* Lisa L. Lindley and Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High School Students*, 105 AM. J. OF PUB. HEALTH 1379 (2015).

[48] 5 U.S.C. § 551(5).

[49] *Id*.

(Continued...)

12

00373554

Exhibit 100                                                                JA-0001421

### 1. Procedural Violations of Pre-Adoption and Post-Adoption Requirements of the APA

The APA contains two procedural rulemaking requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[50] Section 553(b) of the APA requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements—except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest.[51] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[52] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[53]

The Religious Exemptions IFR violates the notice and comment requirement and the 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. Despite its stated reasoning, the Departments do not have good cause, which is limited to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[54] Courts have found good cause in cases that involve: (1) emergencies;[55] (2) context where prior notice would subvert the underlying statutory scheme;[56] and (3)

---

[50] *Id.*

[51] 5 U.S.C. § 553(b).

[52] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[53] *Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996).

[54] 5 U.S.C. § 553(b).

[55] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).

[56] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (reasoning that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made).

(Continued...)

13

00373555

Exhibit 100

situations where Congress intends to waive section 553's requirements.[57] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[58] This means that the Departments must have good cause to waive each requirement.

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[59] While these statutes empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health Insurance Portability and Accountability Act of 1996,[60] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[61] This conclusory statement does not meet the standard Courts have enumerated for rulemaking rise to the standard of "good cause." This reasoning is similar to other instances in which agencies made claims of an emergency situation, unaccompanied by independent facts, which the courts determined were insufficient to constitute good cause.[62] Declaring that it would be impracticable and contrary to the public

---

[57] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding that the APA is inapplicable, rather than that good cause is established).

[58] *United States v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

[59] Religious Exemptions and Accommodations for Coverage of Certain Preventable Services Under the Affordable Care Act, 82 Fed. Reg. 47792, 47813 (Oct. 13, 2017).

[60] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); 42 U.S.C. § 300gg–92.

[61] 82 Fed. Reg. at 47813.

[62] *See, e.g., Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See United States v. Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); *Brewer*, 766 F.3d at 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text (Continued...)

14

00373556

Exhibit 100                                                                                    JA-0001423

interest to delay putting these provisions in place until a full public notice-and-comment process is completed is not the same as it actually being impracticable and contrary to public interest.

The Departments further argue that "[g]ood cause is supported by providing relief for entities and individuals for whom the Mandate operates in violation of their sincerely held religious beliefs, but who would have to experience that burden for many more months under the prior regulations if these rules are not issued on an interim final basis."[63] However, this reasoning should be weighed against the burdens that many women will face if their employer or university decides to take advantage of the Religious Exemptions IFR and cease to offer contraception without cost-sharing.

The Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and its post-adoption publication requirements. They have not adequately established that the APA's procedural requirements do not apply or that they have good cause for disregarding them. Because the Religious Exemptions IFR was promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, the Departments have violated 5 U.S.C. §§ 553(b) and 553(d) and the Religious Exemptions IFR should be rescinded.

## 2.  Substantive Violations of the APA

In addition to the APA's procedural requirements described above, the APA contains several substantive rule making requirements that must be followed when an agency is "formulating, amending or repealing" a rule. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to a constitutional right," or "in excess of statutory jurisdiction."  The Religious Exemptions IFR violates 5 U.S.C. § 706(2) because it contradicts several provisions of the Patient Protection and Affordable Care Act ("ACA").

Section 1554 of the ACA prohibits the Departments from issuing regulations that create unreasonable barriers to individuals obtaining medical care; impede timely access to health care services; interfere with communications regarding a full range of treatment options between patient and provider; restrict the ability of providers

---

of SORNA.'") (quoting *United States v. Reynolds*, 710 F.3d 498, 512 (3d Cir. 2013)); *see also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009).
[63] 82 Fed. Reg. at 47814–15.

15

00373557

Exhibit 100

to provide full disclosure of all relevant information for making health care decisions; violate the principles of informed consent and ethical standards of health care professionals; or limit the availability of treatment for the full duration of a patient's medical needs.[64] The Religious Exemptions IFR is not in accordance with Section 1554 of the ACA because it creates unreasonable barriers to the ability of individuals to obtain appropriate medical care and it impedes timely access to health-care services.

Section 1557 of the ACA prohibits discrimination on the basis of sex.[65] The implementing regulations for this section issued by HHS state that this includes "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."[66] The regulations further state that people cannot "be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which [the rule] applies." [67] By allowing the denial of a health care service used almost exclusively by women, the Religious Exemptions IFR is not in accordance with Section 1557 of the ACA because it discriminates on the basis of sex.

By expanding eligibility for an exemption from the contraceptive coverage benefit beyond houses of worship, the Religious Exemptions IFR erects unreasonable barriers to critical medical coverage, violating Section 1554 of the ACA. By permitting objecting employers to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex, in violation of section 1557 of the ACA. Because the Religious Exemptions IFR violates the ACA, this Rule also violates the APA and must be set aside.

---

[64] 42 U.S.C. § 18114.
[65] 42 U.S.C. § 18116.
[66] 45 CFR § 92.4.
[67] 45 CFR § 92.101.

16

00373558

Exhibit 100

JA-0001425

### ii. The Religious Exemptions IFR Violates the Establishment Clause of the First Amendment

The Religious Exemption IFR impermissibly allows employers to impose their own religious viewpoint on employees, regardless of those employees' personal beliefs, and even when doing so causes employees serious harms.[68] Courts have held that the Establishment Clause of the First Amendment prevents the government from shifting the cost of religious accommodation to third parties.[69] While the administration has asserted that the Religious Freedom Restoration Act[70] allows, or even requires, that the government create an avenue for exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, the government can only constitutionally achieve such an outcome by replacing the current benefit with a program that provides contraception at no additional cost to employees.[71] Instead, the Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's religious beliefs.

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is nothing in First Amendment jurisprudence to distinguish between these federal statutory entitlements and the contraceptive coverage benefit in the ACA. The Religious Exemption IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find religiously objectionable. Such a result

---

[68] *See* U.S. CONST. amend. I.

[69] *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) (rejecting a facial challenge to RLUIPA, a federal statute that permits accommodation of certain religious practices in prison, stating "[s]hould inmate requests for religious accommodations become excessive, *impose unjustified burdens on other institutionalized persons*, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.") (emphasis added); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (stating, "The First Amendment . . . gives no one the right to insist that in pursuit of their own interest others must conform their conduct to his own religious necessities."); *but see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (distinguishing the obligations imposed on churches from those imposed on other types of organizations).

[70] 42 U.S.C. § 2000bb.

[71] *See Zubik v. Burwell*, 136 S. Ct. 1557; *Hobby Lobby*, 134 S. Ct. at 2786–87.

(Continued...)

00373559

Exhibit 100

JA-0001426

would impermissibly shift the cost of religious accommodation onto third parties, subjecting employees to serious harms with no recourse.

### iii. The Religious Exemptions IFR Violates the Due Process Clause of the Fifth Amendment to the Constitution

This Rule also violates the Fifth Amendment because it constitutes impermissible sex discrimination.[72] The ACA's women's preventive services benefit, which includes the contraceptive coverage provision, was implemented in part to address the fact that women tended to pay more for insurance coverage than did men.[73] The Religious Exemptions IFR violates the Fifth Amendment because it exclusively targets a benefit provided to women. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Religious Exemption IFR discriminates based on sex.

The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[74] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs newly covered by the contraceptive coverage provision of the ACA.[75] It is estimated that the ACA created an out-of-pocket savings of approximately $1.4 billion for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their healthcare.[76] Under the Rule, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption. While it is unclear how many organizations will avail themselves of one of these exemptions, it is certain that many women will see a dramatic increase in their reproductive healthcare costs as employers avail themselves of the newly available religious exemption.

---

[72] U.S. CONST. amend. V.

[73] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).

[74] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception/.

[75] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015), http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[76] *Id.*

00373560

Exhibit 100

JA-0001427

### III.    Conclusion

The Religious Exemptions IFR denies coverage for health care services based on religious objections without regard to the impact on employees or students, stripping from women and the LGBT community coverage for essential health care services that would otherwise be guaranteed under federal law. The Rule privileges particular religious beliefs at the expense of employee and student health and is contrary to law. For these reasons, the Departments should rescind the Religious Exemptions IFR.

\*\*\*

URGE: Unite for Reproductive & Gender Equity appreciates the opportunity to comment on this interim final rule. If you need further information, please contact Alexis Cole, Policy Director, at (202) 965-7700 or acole@urge.org.

Sincerely,


URGE: Unite for Reproductive & Gender Equity

19

00373561

Exhibit 100                                                            JA-0001428

BEFORE THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
DEPARTMENT OF LABOR EMPLOYEE BENEFITS SECURITY ADMINISTRATION,
AND DEPARTMENT OF THE TREASURY INTERNAL REVENUE SERVICE

| | |
|---|---|
| Religious Exemptions and Accommodations ) | RIN 0938-AT20 (HHS) |
| for Coverage of Certain Preventive Services ) | RIN 1210-AB83 (DOL – EBSA) |
| Under the Affordable Care Act          ) | RIN 1545-BN92 (IRS) |
| | |
| Moral Exemptions and Accommodations    ) | RIN 0938–AT46 (HHS) |
| for Coverage of Certain Preventive Services ) | RIN 1210–AB84 (DOL – EBSA) |
| Under the Affordable Care Act          ) | RIN 1545–BN91 (IRS) |

COMMENTS OF WHITMAN-WALKER HEALTH IN OPPOSITION TO THE INTERIM
FINAL RULES

Pursuant to the *Interim Final Rules and Request for Comments*, 82 Fed. Reg. 47,792 and

47,838 (Oct. 13, 2017), Whitman-Walker Health ("WWH" or "Whitman-Walker") hereby

submits these comments.  For the reasons set forth below, we urge the Department of Health and

Human Services, Department of Labor, and Department of the Treasury (collectively, "the

Departments") to revoke the Interim Final Rules (the "IFRs").  The IFRs will harm women, their

partners and families, and lesbian, gay, bisexual and transgender ("LGBT") people by restricting

access to essential reproductive and other health care services.  In addition, they create a harmful

and dangerous precedent by allowing the denial of health care coverage based on religious views

or moral convictions while paying scant attention to the harm such denials cause to third parties.

The IFRs also violate the Administrative Procedure Act, the ACA itself, and the United States

Constitution.

**Interest of Whitman-Walker Health**

Whitman-Walker is a federally qualified health center providing primary care, mental

health and substance abuse treatment, dental care, medical adherence case management, legal

services, and community health services in the greater Washington, DC metropolitan area, with

specialties in LGBT health and wellness and in HIV prevention and treatment.  In addition to

00206860

Exhibit 101                                                                JA-0001429

caring for over 16,000 people living in the Washington metropolitan region, we are one of the oldest medical-legal partnerships in the nation, and have provided both medical and legal services to our patients for more than 30 years. The populations we serve continue to be experience disproportionally high levels of health challenges and disparities, resulting from poverty, stigma and discrimination. Sexual health services, including ready access to contraceptive methods and services, are vital to many of our patients and clients. The IFRs impose unwarranted restrictions on contraception that will prove harmful to many of them. The IFRs also create a dangerous precedent that religious views and moral convictions can justify restricting access to health care through health plans, which is likely to be particularly harmful to our LGBT patients and clients.

### The Benefits of Contraception Are Substantial; Restricting Access Is Harmful to Women, Their Partners and Families, and LGBT People

The fordable Care Act ("ACA") has expanded contraceptive coverage without cost-sharing to millions of people across the nation.[1] Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with almost 65% of the decrease directly attributed to the contraceptive coverage provision. After the implementation of the ACA, the majority of women had no out-of-pocket costs for their contraception, representing out-of-pocket savings of approximately $1.4 billion for newly covered women.[2] Studies show that the use of long-term contraceptives methods, such as an IUD or an implant, has increased in

---

[1] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016). https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception.
[2] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015). http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

00206861

Exhibit 101

JA-0001430

recent years because the high upfront costs were removed.[3]  These costs previously acted as a barrier for women who may have wanted access to these specific types of contraceptives.[4] Studies also show that decreases in cost-sharing led to better adherence to and more consistent use of the pill, which decreased the risk of unintended pregnancies.[5]  Furthermore, the majority of women no longer had to choose between paying for birth control and paying for other necessities, like groceries and utilities.[6]

Contraceptives make up an estimated 30–44% of out-of-pocket health care spending for those who use them.[7]  A year's worth of birth control can cost upwards of $370 – the equivalent of 51 hours of work for someone earning the federal minimum wage of $7.25 an hour.[8]  Long-acting birth control methods, such as an IUD or contraceptive implant, cost more than $1,000 out of pocket[9] - almost one month's salary for a person earning the federal minimum wage. Studies have shown that insurance coverage has led to an increase in the utilization of contraception, the

---

[3] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception.

[4] Alina Salganicoff, Laurie Sobel, and Caroline Rosenzweig, *The Future of Contraceptive Coverage*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage.

[5] *Id.*

[6] *The Affordable Care Act's Birth Control Benefit is Working for Women*, NATIONAL WOMEN'S LAW CENTER (Dec. 16, 2016), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-is-working-for-women.

[7] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11, http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.

[8] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose*, NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose; *see* Elizabeth Celms, *How much do birth-control pills cost?*, CLEAR HEALTH COSTS (Apr. 29, 2013). https://clearhealthcosts.com/blog/2013/04/q-how-much-do-birth-control-pills-cost-a-9-to-63-or-68-to-112 (Birth control pills can come at very different prices. According to their study, prices ranged from $9 to $63 for Tri-Sprintec 28 and from $68 to $112 for Yaz-28).

[9] *The Affordable Care Act's Birth Control Benefit: Too Important to Lose*, NATIONAL WOMEN'S LAW CENTER (May 3, 2017), https://nwlc.org/resources/the-affordable-care-acts-birth-control-benefit-too-important-to-lose.

3

00206862

Exhibit 101

JA-0001431

use of more effective methods, and a decrease in out-of-pocket costs for women.[10]  Whitman-Walker has significant numbers of low-income patients and clients in our other programs – including our HIV medical care, Community Health programs, and legal services – whose families live in poverty or near-poverty, and who are disproportionately burdened with health disparities, housing instability, and incarceration.  The financial strain and loss of autonomy this rule would impose of women and their families would have far-reaching harmful.

Contraceptive use benefits women and families in numerous ways.  Having access to the full range of FDA-approved contraceptive methods allows women to choose the method that works best for them at a given point in their life – factoring in ease of use, side effects, risk of sexually transmitted infections, desire for confidentiality and control, as well as many other considerations. Identifying the methods that work best for them helps women use contraception more consistently and correctly, reducing unwanted pregnancies and affording them greater control over family planning.

Reducing unwanted pregnancies and affording women greater control over family planning has additional health benefits.  For example, avoiding closely-spaced pregnancies reduces the risk of premature birth or low birth weight.  Preventing unintended pregnancy can help women manage certain health conditions, such as diabetes, hypertension, and heart disease. Moreover, contraceptive use helps women to meet their educational and employment goals and to support their families.

---

[10] *Insurance Coverage of Contraceptives*, GUTTMACHER INSTITUTE (Oct. 1, 2017), https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives; Adara Bearmesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception.

4

00206863

Exhibit 101

JA-0001432

The independent National Academy of Medicine (NAM), formerly called the Institute of Medicine (IoM) echoed scientific consensus that access to contraception is an essential part of shaping women's health and well-being.[11,12] As of September 2016, there were approximately 61 million U.S. women in their childbearing years (ages 15–44).[13] About 43 million of those women (70%) are at risk of unintended pregnancy – that is, they are sexually active and do not want to become pregnant, but could become pregnant if they and their partners do not use a contraceptive method correctly and consistently.[14] Heterosexual couples who do not use any method of contraception have an approximately 85% chance of experiencing a pregnancy over the course of one year.[15] In the United States, the average desired family size is two children. To achieve this family size, a woman must use contraception for roughly three decades.[16]

Access to comprehensive family planning services, and to culturally competent providers of those services, is critically important for the LGBT community. Lesbian, gay and bisexual youth have been shown to experience more pregnancies than do youth who do not identify as a sexual minority.[17] Bisexual women and some transgender people are also at risk for pregnancy

---

[11] National Research Council. Clinical Preventive Services for Women: Closing the Gaps. Washington, DC: The National Academies Press, 2011.
[12] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016), https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception.
[13] Kimberly Daniels, Jill Daugherty, and Jo Jones, *Current Contraceptive Status Among Women Aged 15–44: United States, 2011–2013*, NATIONAL HEALTH STATISTICS REPORTS 173 (2014), http://www.cdc.gov/nchs/data/databriefs/db173.pdf.
[14] Jo Jones, William Mosher, and Kimberly Daniels, *Current Contraceptive Use in the United States, 2006–2010, and Changes in Patterns of Use Since 1995*, NATIONAL HEALTH STATISTICS REPORTS 60 (2012), http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.
[15] J Trussell, *Contraceptive failure in the United States*, 83 CONTRACEPTION 297–404, (May 2011).
[16] *Fulfilling the Promise: Public Policy and U.S. Family Planning Clinics*, THE ALAN GUTTMACHER INSTITUTE (AGI) (2000), https://www.guttmacher.org/sites/default/files/pdfs/pubs/fulfill.pdf.
[17] Lisa L. Lindley, Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 AM. J. OF PUBLIC HEALTH 1379–86 (July 1, 2015); Karen Schantz, *Pregnancy Risk Among Bisexual, Lesbian, and Gay Youth: What Does Research Tell Us*, ACT FOR YOUTH CENTER OF EXCELLENCE (Apr. 2015), http://www.actforyouth.net/resources/rf/rf_lgb-prg_0415.pdf.

5

00206864

Exhibit 101

JA-0001433

and are often over-looked when considering access to reproductive health care. Access to family planning is thus essential for this community and should be made more, not less, accessible.

It is deeply troubling that federal agencies charged with ensuring public health would seek to enact a rule that gives employers such sweeping veto power over the health care services their employees may access under their health care coverage. Health insurance is a form of compensation that employees earn, like wages. Allowing employers a religiously-motivated or morally-motivated veto over how an employee uses his or her earned health care coverage is bad public health policy and represents an overemphasis on the rights of an employer or other health plan sponsor to rely or their own religious or moral views to deny employees or other health plan participants the right to access the health care that they need and want. In a religiously and moral diverse society such as ours, employers and other health plan sponsors cannot be permitted to use an exaggerated notion of "complicity" to restrict other persons' rights.

### The IFRs Constitute Remarkable, and Indefensible, Departures From the Affordable Care Act's Assurance of Access to Essential Preventive Care

The ACA was enacted to achieve several health care reform goals, including improving the availability of primary and preventive health care services. When preventive services coverage was written into the ACA, Congress included a provision directing HHS to identify the preventive services that should be provided to women.

HHS undertook a thorough and evidence-based process to develop this list of women's preventive services, calling on the independent National Academy of Medicine to convene experts and determine what services should be covered. It surprised no one with a background in public health or medicine that contraception was among the essential preventive services that the Academy included in its recommendations. HHS included contraception in its final rule delineating the list of women's preventive services, exempting houses of worship from covering

6

00206865

Exhibit 101

JA-0001434

contraception in their health plans if they had a religious objection.  Seeking a broader

exemption, some employers, both for-profit and non-profit, filed lawsuits seeking to challenge

the requirement to cover contraception on religious grounds.

The Supreme Court resolved the for-profit challenges in 2014, in *Burwell v. Hobby

Lobby*.[18]  The Court ruled that the Religious Freedom Restoration Act required that a closely

held for-profit company whose owners objected to contraception on religious grounds must be

permitted to use the same accommodation given to non-profit entities (described below).

Importantly, the Court stressed that there would be no harm to the company's workers caused by

permitting the company to use the same accommodation to provide its employees with

contraceptive coverage, as the employees would still receive coverage without cost sharing.

With respect to non-profit employers, the Departments developed an accommodation to

permit religiously affiliated non-profit employers to certify that they objected to contraception

and notify their insurer or third-party administrator (TPA), which would arrange for

contraceptive coverage for the objecting employer's employees at no cost to the employer.

Following the *Hobby Lobby* decision, two more rules were adopted – one creating an additional

notice mechanism for objecting non-profits (to HHS rather than to the insurer/TPA), and

another allowing closely-held for- profit entities to avail themselves of the same

accommodation, pursuant to the holding in *Hobby Lobby*.

The Religious Exemptions IFR, 82 Fed. Reg. 47,792, expands eligibility for the complete

exemption – formerly reserved for houses of worship – to *all* nonprofit and for-profit employers.

It also retains the accommodation, formerly available to non-profit and closely-held for-profit

employers, as an optional alternative for any employer.  This is a dramatic change in the

---

[18] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2786–87 (2014).

00206866

Exhibit 101                                                                    JA-0001435

availability of contraceptive coverage for the employees of a vast number of entities, and a significant departure from what was guaranteed to these employees under prior rulemaking and the *Hobby Lobby* decision.

The Moral Exemptions IFR, 82 Fed. Reg. 47,838, goes even further – far beyond the concerns for religious organizations that motivated Congress, the Departments, and the Supreme Court in *Hobby Lobby*. It allows any non-profit or closely-held for-profit employer, and private institutions of higher education that issue student health plans, to apply for an accommodation or exemption from contraceptive coverage based on moral convictions. The rule provides no guidance or definition for a moral conviction, allowing employers to claim an exemption without any accountability. Moreover, the rule does not provide employees with a mechanism to challenge an employer's alleged moral belief. Without accountability and safeguards, employers will be free to exploit the moral exemption for financial and business reasons. This is a huge and unprecedented change in the availability of contraceptive coverage for the employees of a vast number of entities.

Health insurance benefits earned by employees and guaranteed under federal law should not be subject to a religious veto by employers. The regulatory regime that existed prior to these IFRs was the result of several years of considered policymaking and constituted a balance between religious beliefs and health care access. These IFR overturn that careful balance and subjugate employee health care needs to the religious or even moral objections of any employer.

**The IFRs Threaten to Exacerbate Health Disparities Suffered by LGBT People**

The IFRs restrict access to contraception for those who need it, including lesbian and bisexual women and some transgender people.[19] Access to birth control is particularly crucial

---

[19] *Birth Control Access for LGBTQ People*. THE NATIONAL LGBTQ TASK FORCE (2016). http://www.thetaskforce.org/static_html/downloads/reports/fact_sheets/factsheet_birth_control_access.pdf.

00206867

Exhibit 101                                                                                           JA-0001436

for the health and well-being of lesbian and bisexual women because they are at risk for unintended pregnancies.[20]

Despite misconceptions held by policymakers and some medical providers, lesbian and bisexual women require sexual and reproductive health services similar to those needed by heterosexual women. A majority of lesbian and bisexual women have reported having had intercourse with men and at least 30% have been pregnant,[21] 50% have used oral contraceptives, and 16% reported one or more abortions.[22] Bisexual women are also subject to an increased risk of sexual violence. One study found that 46% of bisexual women have been raped as compared to 17% of heterosexual women.[23] Broadly, studies indicate that unintended pregnancies are equally as common, if not more common, for lesbian and bisexual women as for heterosexual women.[24]

Adolescent lesbian and bisexual women are at even higher risk for unintended pregnancies. Lesbian adolescent women are less likely than bisexual and heterosexual women to use contraception and bisexual adolescent women are more likely to experience teen pregnancy than are heterosexual adolescent women.[25] One study found that 12% of lesbian and bisexual

---

[20] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

[21] J.M. Marrazzo and K. Stine, *Reproductive Health History of Lesbians: Implications for Care*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2003).

[22] Elizabeth M. Saewyc, Linda H. Bearinger, Robert Wm. Blum and Michael D. Resnick, *Sexual Intercourse, Abuse and Pregnancy Among Adolescent Women: Does Sexual Orientation Make a Difference?*, 31 FAMILY PLANNING PERSPECTIVES 127 (1999).

[23] Adara Beamesderfer, Lindsey Dawson, Jennifer Kates, Usha Ranji, and Alina Salganicoff, *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, THE HENRY J. KAISER FAMILY FOUNDATION (Nov. 2016), https://www.kff.org/disparities-policy/issue-brief/health-and-access-to-care-and-coverage-for-lesbian-gay-bisexual-and-transgender-individuals-in-the-u-s.

[24] Caroline S. Hartnett, Lisa L. Lindley and Katrina M. Walsemann, *Congruence across Sexual Orientation Dimensions and Risk*, WOMEN'S HEALTH ISSUES JOURNAL (2016).

[25] Brittany M. Charlton, Heather L. Corliss, Stacey A. Missmer, Margaret Rosario, Donna Spiegelman, and Bryn Austin, *Sexual orientation differences in teen pregnancy and hormonal contraceptive use: An examination across 2 generations*, AM. J. OF OBSTETRICS AND GYNECOLOGY (2013). http://www.ajog.org/article/S0002-9378(13)00652-2/pdf.

9

00206868

Exhibit 101                                                                 JA-0001437

adolescent women have experienced teen pregnancy, compared to only 5% of heterosexual adolescent women.  A 2016 study by the Centers for Disease Control and Prevention found that LGBT high school students are more likely than other students to experience intimate partner violence and rape, which can result in unintended pregnancy.[26]

In sum, access to contraception is essential for the health and well-being of many members of the LGBT community, and allowing a wide range of employers to withhold coverage of contraception for religious reasons is unsound public health policy with the potential to cause significant harm.

### The IFRs Violate the Administrative Procedure Act

The Administrative Procedure Act ("APA") imposes procedural requirements on the actions of executive branch agencies, including when agencies are "formulating, amending or repealing" a rule.[27]  The APA is applicable here because the Religious Exemptions IFR is a final agency action and is a legislative rule within the meaning of the APA.[28]  The IFRs violate pre-adoption and post-adoption procedural requirements of the APA.

The APA contains two procedural rulemaking requirements that must be followed when an agency is "formulating, amending or repealing" a rule.[29]  Section 553(b) of the APA requires notice and comment rulemaking, involving a notice of proposed rulemaking and a comment period prior to finalization of regulatory requirements – except when an agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the

---

[26] *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 – United States and Selected Sites, 2015,* CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 12, 2016), https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf; *see also* Lisa L. Lindley and Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High School Students,* 105 AM. J. OF PUB. HEALTH 1379 (2015).
[27] 5 U.S.C. § 551(5).
[28] *Id.*
[29] *Id.*

10

00206869

Exhibit 101

JA-0001438

public interest.[30] In addition to the pre-adoption notice-and-comment requirements, section 553(d) of the APA has a post-adoption publication requirement that agencies have a 30-day period between when a final rule is published and its effective date, unless the agency has good cause.[31] "[T]he purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[32]

The IFRs violate the notice and comment requirement and the 30-day "wait" period between publication and effective date. An agency will be granted reprieve from these requirements only when the agency has "good cause" for not following them. The Departments lack good cause to depart from those requirements. Good cause is limited to situations where an agency finds that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[33] Courts have found good cause in cases that involve: (1) emergencies;[34] (2) context where prior notice would subvert the underlying statutory scheme;[35] and (3) situations where Congress intends to waive section 553's requirements.[36] An agency's determination of "good cause" to abstain from following the APA's procedural requirements applies to each procedural requirement separately.[37] This means that the

---

[30] 5 U.S.C. § 553(b).

[31] 5 U.S.C. § 553(d) (Final agency action and legislative rules must be published in the Federal Register not less than 30 days before the effective date.).

[32] *Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996).

[33] 5 U.S.C. § 553(b).

[34] For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).

[35] For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1486 (9th Cir. 1992) (reasoning that requiring the Secretary to give 30-day notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made).

[36] For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements. *See, e.g., Asiana Airlines v. F.A.A.*, 134 F.3d 393, 398 (D.C. Cir. 1998); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1998) (finding that the APA is inapplicable, rather than that good cause is established).

[37] *United States v. Brewer*, 766 F.3d 884, 888 (8th Cir. 2014).

11

00206870

Exhibit 101                                    JA-0001439

Departments must have good cause to waive each requirement.

The Departments claim that this provision of the APA does not apply "because of the specific authority granted to the Secretaries by section 9833 of the Code, section 734 of ERISA, and section 2792 of the PHS Act."[38] While these statutes empower the Secretaries to promulgate such regulations as may be necessary or appropriate to carry out the provisions of the Health Insurance Portability and Accountability Act of 1996,[39] they do not empower the secretaries to disregard the APA's procedural requirements.

In the alternative, the Departments argue that they "have determined that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed."[40] This conclusory statement does not meet the standard Courts have enumerated for rulemaking rise to the standard of "good cause." This reasoning is similar to other instances in which agencies made claims of an emergency situation, unaccompanied by independent facts, which the courts determined were insufficient to constitute good cause.[41] Declaring that it would be impracticable and contrary to the public interest to delay putting these provisions in place until a full public notice-and-comment process is completed is not the same as being impracticable and contrary to public interest.

---

[38] Religious Exemptions and Accommodations for Coverage of Certain Preventable Services Under the Affordable Care Act, 82 Fed. Reg. at 47813; Moral Exemptions and Accommodations for Coverage of Certain Preventable Services Under the Affordable Care Act, 82 Fed. Reg. at 47855.

[39] 26 U.S.C. § 9833; 29 U.S.C. § 1191(c); 42 U.S.C. § 300gg–92.

[40] Religious Exemptions, 82 Fed. Reg. at 47813; Moral Exemptions, 82 Fed. Reg. at 47855.

[41] See, e.g., Sorenson Commc'ns Inc. v. F.C.C., 755 F.3d 702, 706 (D.C. Cir. 2014) (finding that no good cause existed where the agency failed to establish facts supporting a "threat of impending fiscal peril"). In addition, a number of courts rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. See United States v. Valverde, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); Brewer, 766 F.3d at 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting United States v. Reynolds, 710 F.3d 498, 512 (3d Cir. 2013)); see also United States v. Johnson, 632 F.3d 912, 928 (5th Cir. 2011); United States v. Cain, 583 F.3d 408, 421 (6th Cir. 2009).

12

00206871

Exhibit 101

The Departments further argue that "[g]ood cause is supported by providing relief for entities and individuals for whom the Mandate operates in violation of their sincerely held religious beliefs, but who would have to experience that burden for many more months under the prior regulations if these rules are not issued on an interim final basis."[42] However, this reasoning should be weighed against the burdens that many women will face if their employer or university decides to take advantage of the Religious Exemptions IFR and cease to offer contraception without cost-sharing.

The Departments have failed to provide good cause for violating both the APA's pre-adoption notice-and-comment requirements and its post-adoption publication requirements. They have not adequately established that the APA's procedural requirements do not apply or that they have good cause for disregarding them. Because the IFRs were promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, they violate 5 U.S.C. §§ 553(b) and 553(d).

### The IFRs Also Violate Key Provisions of the ACA

Section 1554 of the ACA prohibits the Departments from issuing regulations that create unreasonable barriers to individuals obtaining medical care; impede timely access to health care services; interfere with communications regarding a full range of treatment options between patient and provider; restrict the ability of providers to provide full disclosure of all relevant information for making health care decisions; violate the principles of informed consent and ethical standards of health care professionals; or limit the availability of treatment for the full duration of a patient's medical needs.[43] The IFRs violate Section 1554 because they create

---

[42] Religious Exemptions, 82 Fed. Reg. at 47814–15; Moral Exemptions, 82 Fed. Reg. at 47855.
[43] 42 U.S.C. § 18114.

13

00206872

Exhibit 101

JA-0001441

unreasonable barriers to the ability of individuals to obtain appropriate medical care and it impedes timely access to health-care services.

Section 1557 of the ACA prohibits discrimination on the basis of sex.[44] The implementing regulations for Section 1557, issued by HHS, state correctly that sex discrimination includes discrimination based on "pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity."[45] The Section 1557 regulations further state that people cannot "be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which [the rule] applies."[46] By allowing the denial of a health care service used almost exclusively by women, the IFRs discriminate on the basis of sex.

**The Religious Exemptions IFR Violates the Establishment Clause of the First Amendment**

The Religious Exemption IFR impermissibly allows employers to impose their own religious viewpoint on employees, regardless of those employees' personal beliefs, and even when doing so causes employees serious harms.[47] Courts have held that the Establishment Clause of the First Amendment prevents the government from shifting the cost of religious accommodation to third parties.[48] While the Administration has asserted that the Religious Freedom Restoration Act[49] allows, or even requires, that the government create an avenue for

---

[44] 42 U.S.C. § 18116.
[45] 45 CFR § 92.4.
[46] 45 CFR § 92.101.
[47] See U.S. CONST. amend. I.
[48] See Cutter v. Wilkinson, 544 U.S. 709, 726 (2005) (rejecting a facial challenge to RLUIPA, a federal statute that permits accommodation of certain religious practices in prison, stating "[s]hould inmate requests for religious accommodations become excessive, *impose unjustified burdens on other institutionalized persons*, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition.") (emphasis added); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (stating, "The First Amendment . . . gives no one the right to insist that in pursuit of their own interest others must conform their conduct to his own religious necessities."); *but see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (distinguishing the obligations imposed on churches from those imposed on other types of organizations).
[49] 42 U.S.C. § 2000bb.

14

00206873

Exhibit 101

JA-0001442

exempting certain organizations from the Affordable Care Act's contraceptive coverage provision, the government can only constitutionally achieve such an outcome by replacing the current benefit with a program that provides contraception at no additional cost to employees.[50] Instead, the Rule as issued impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's religious beliefs.

Similar to benefits conferred by the Social Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, and many other federal statutes that expressly require specific employee compensation and benefits, contraceptive coverage is a legally ensured and economically valuable employee entitlement. There is nothing in First Amendment jurisprudence to distinguish between these federal statutory entitlements and the contraceptive coverage benefit in the ACA. The Religious Exemption IFR tells employers that they are empowered to reject insurance coverage for any health care service that they find religiously objectionable. Such a result would impermissibly shift the cost of religious accommodation onto third parties, subjecting employees to serious harms.

### The Religious Freedom Restoration Act Provides No Support Whatever for the Moral Exemptions IFR

While the administration has asserted that the Religious Freedom Restoration Act allows, or even requires, that the government create an avenue for exempting certain organizations from the ACA's contraceptive coverage provision, RFRA provides no authority to craft moral exemptions. The Moral Exemptions Rule impedes access to contraceptive coverage and the ability to make personal decisions regarding reproductive health solely based on another person's moral convictions – which is entirely outside the scope of RFRA.

---

[50] *See Zubik v. Burwell*, 136 S. Ct. 1557; *Hobby Lobby*, 134 S. Ct. at 2786–87.

15

00206874

Exhibit 101

### The IFRs Also Amount to Unconstitutional Sex Discrimination

The IFRs also violate the Fifth Amendment because they constitute impermissible sex discrimination.[51]  The ACA's women's preventive services benefit, which includes the contraceptive coverage provision, was implemented in part to address the fact that women tended to pay more for insurance coverage than did men.[52]  The IFRs violates the Fifth Amendment because they exclusively target benefits provided to women.

### Conclusion

The ACA has expanded contraceptive coverage without cost-sharing to millions of privately insured women across the nation.[53]  Since the implementation of the ACA, out-of-pocket spending on prescription drugs has decreased dramatically, with an almost 65% decrease directly attributed to oral contraception costs newly covered by the contraceptive coverage provision of the ACA.[54]  It is estimated that the ACA created an out-of-pocket savings of approximately $1.4 billion for newly covered women, and ensured that a majority of women had no out-of-pocket costs for their healthcare.[55]  Under the IFRs, there is no guaranteed right of contraceptive coverage for the employees, dependents, and students of these organizations who are now eligible for the exemption.  While it is unclear how many organizations will avail themselves of one of these exemptions, it is certain that many women will see a dramatic increase in their reproductive healthcare costs as employers avail themselves of the newly available religious exemption.

---

[51] U.S. CONST. amend. V.
[52] *See* 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130 (2013)(a)(1)(iv).
[53] Adara Beamesderfer, Alina Salganicoff, and Laurie Sobel, *Private Insurance Coverage of Contraception*, THE HENRY J. KAISER FAMILY FOUNDATION (Dec. 7, 2016). https://www.kff.org/womens-health-policy/issue-brief/private-insurance-coverage-of-contraception.
[54] Nora V. Becker and Daniel Polsky, *Women Saw Large Decrease in Out-Of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 HEALTH AFFAIRS 1204–11 (2015). http://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.0127.
[55] *Id.*

16

00206875

Exhibit 101

JA-0001444

The IFRs are bad public health policy, contrary to law, and create dangerous and corrosive precedents for further discrimination – against women and LGBT people – based on an employer's or health plan sponsor's particular religious beliefs or conception of morality.  They should be rescinded.

Respectfully submitted,

Daniel Bruner, JD, MPP, Senior Director of Policy

Guillaume Bagal III, MA, MHA, Public Policy Associate
WHITMAN-WALKER HEALTH
1342 Florida Avenue NW
Washington, DC  20009
(202) 939-7628
dbruner@whitman-walker.org

December 5, 2017

17

00206876

Exhibit 101                                                                                   JA-0001445


**Wisconsin Alliance** for
**Women's Health**
www.supportwomenshealth.org

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9925-IFC

Dec. 5, 2017

Dear Acting Secretary Hargan:

The Wisconsin Alliance for Women's Health (WAWH) is committed to ensuring all individuals
have affordable coverage of birth control. WAWH unequivocally opposes the Departments of
Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the
Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through
this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to
promote preventive medicine, reduce future medical costs, and improve the health, equality, and
economic security of women[1] and families. Over 62 million women with private insurance now have
coverage of these vital health care services, including breast and cervical cancer screening,
breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer and university to deprive women of contraceptive coverage, this
IFR will harm women and their health and well-being. It discriminates against women in violation
of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure
Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception.
And the IFR is predicated upon a distorted picture of the science supporting contraception, and the
federal programs supporting and state laws regarding contraception. For all of these reasons,
WAWH calls on the Departments to rescind the IFR.

## I.    Birth Control Is Critical to Women's Health

Women face a unique set of healthcare challenges because they use more health services than men
yet earn less on average than men.[3] As a result, women face a high level of health care insecurity
which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before
the ACA, one in seven women with private health insurance and nearly one-third of women covered
by Medicaid either postponed or went without needed services in the prior year because they could
not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial
of reproductive health care and insurance coverage for such care also affects people who do not identify as women,
including some gender non-conforming people and some transgender men.
[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-
Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-
Estimates-3.pdf.
[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.
[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

00206974

Exhibit 102                                                                                          JA-0001446



just on birth control.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with

---

[5] Id.

[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

[11] Id. at 103-104.

[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

00206975

Exhibit 102

JA-0001447



Wisconsin Alliance for
**Women's Health**
www.supportwomenshealth.org

approximately 45% of pregnancies unintended.[14] And, the U.S. has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non contraceptive purposes.[17] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[18] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[19, 20]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased women's wages and lifetime earnings.[21] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[22] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[23] which was followed by large increases in women's presence in

[14] Finer LB and Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine*. 2016; 374(9):843–852.

[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute. 2011.

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7. and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] Id.

[20] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-analysis Obstet Gynecol. 2017

[21] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

[22] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/papers/w17922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).

[23] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).

00206976

Exhibit 102                                                                                                JA-0001448



law, medicine, and other professions.[24]  The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[25]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs.  This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## II.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.  Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[26]  Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[27]  In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

---

[24] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002). https://dash.har vard.edu/handle/1 /2624453.
[25] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).
[26] Id. at 8,727.
[27] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); see also id. at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

P.O. B x 1726 Mad son, W 53701-1726      608-251-0139      Toll Free 866-398-9294      Fax 608-256-3004      info@wawh org

00206977

Exhibit 102


Wisconsin Alliance for
**Women's Health**
www.supportwomenshealth.org

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[28]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for…family planning."[29] And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[30] That contraception would be covered was clear.[31]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order to fill those gaps."[32] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[33] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[34] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

### B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule

---

[28] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).
[29] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).
[30] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also*, 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").
[31] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").
[32] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.
[33] *Id.* at 109-10.
[34] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

P.O. Box 1726  Madison, WI 53701-1726      608-251-0139      Toll Free 866-398-9294      Fax 608-256-3004      info@wiawh.org

00206978

Exhibit 102                                                                                                JA-0001450



It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exceptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify he IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[35] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[36] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum coverage requirements.[37] This exemption is intended as a temporary means for transitioning employers to full compliance.[38] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[39]

## III.    The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[40] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on

---

[35] *See* Priests for Life. v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[36] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.,* Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees. Age Discrimination in Employment Act of 1967. Pub. L. No. 90-202. 81 Stat. 605 (1967). the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

[37] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans. 80 Fed. Reg. 72,192. 72,192- 72,193 (Nov. 18. 2015).

[38] Coverage of Certain Preventive Services Under the Affordable Care Act. 78 Fed. Reg. at 39.887 n.49; *Hobby Lobby*. 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).

[39] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017). http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[40] *See*, e.g., at 21 https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf

00206979

Exhibit 102



religion.[41] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[42]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[43]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]." [44] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero." [45] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"[46] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public

---

[41] *Id.* at 19.
[42] *Id.* at 24-27.
[43] 2 U.S.C. § 18116.
[44] E.g., *Cutter v. Wilkinson*, 544 U.S. 709, 722, 726 (2005).
[45] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).
[46] 5 U.S.C. § 553(b), (c).

00206980

Exhibit 102                                                                JA-0001452



comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date.[47]   Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Departments further argue that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[48]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[49] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[50]

For each of these reasons, the rule violates the APA and should be rescinded.

### V.    Justifications for the IFR Do Not Meet Basic Scientific Standards

---

[47] 5 U.S.C. § 553(d).
[48] 5 U.S.C. § 706.
[49] 42 U.S.C. § 18114(1).
[50] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

P.O. Box 1726  Madison, WI 53701-1726      608-251-0139      Toll Free 866-399-9294      Fax 608-256-3004      info@wawh.org

00206981

Exhibit 102                                                                                        JA-0001453



As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. WAWH unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individual's beliefs.

### A. Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices… that many persons and organizations believe are abortifacient—that is, as causing early abortion."[51] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[52]

### B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[53] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[54, 55] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[56] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[57]

### C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

---

[51] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).
[52] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).
[53] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).
[54] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.
[55] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.
[56] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.
[57] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use. 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

P.O. Box 1726 Madison, W 53701-1726    608-251-0139    Toll Free 866-399-9294    Fax 608-256-3004    info@supportwomenshealth.org

00206982

Exhibit 102



The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[58] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[59,60] In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[61,62] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[63] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[64] More females are using contraception the first time they have sex.[65]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

## VI.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[66] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

### A.  Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded

---

[58] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).
[59] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.
[60] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).
[61] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health. 2015;56(3), 338-344.
[62] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.
[63] Id.
[64] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.
[65] Id.
[66] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

00206983

Exhibit 102

JA-0001455



Wisconsin Alliance for
**Women's Health**
www.supportwomenshealth.org

health centers to give priority to "persons from low-income families."[67] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[68] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[69]

Further, the IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[70] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[71] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[72] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[73] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages

---

[67] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).
[68] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).
[69] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).
[70] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.
[71] *See* Fowler, Cl, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, CI, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.
[72] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).
[73] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid. (2017). https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

00206984

Exhibit 102    JA-0001456



have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[74] This is particularly true with respect to specialty providers, including OB/GYNs.[75] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

### B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[76] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[77] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[78]

---

[74] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[75] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services. supra at note 7.

[76] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office. Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants. 6. (Sept. 2017). https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis. Nat'l Health Law Program. Top 10 Changes to Medicaid Under the Graham-Cassidy Bill. (Sept. 14. 2017). http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSZIV.

[77] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC). https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham. *States Will Be Allowed to Impose Medicaid Work Requirements. Top Federal Official Says*. WASH. POST (Nov. 7, 2017). https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8c.

[78] Kinsey Hasstedt. Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net. Guttmacher Policy Review. (2017). https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

00206985

Exhibit 102

JA-0001457


Wisconsin Alliance for
**Women's Health**
www.supportwomenshealth.org

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[79] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[80] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[81]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

### C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[82] Only four state laws currently match the federal requirement to cover contraception without copayments.

---

[79] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.
[80] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act. 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").
[81] The White House. Statement of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act. 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt. Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X. *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget. The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).
[82] Guttmacher Institute. Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

P.O. Box 1726  Madison, WI 53701-1726    608-251-0139    Toll Free 866-399-9294    Fax 608-256-3004    info@supportwomenshealth.org

00206986

Exhibit 102    JA-0001458



deductibles and other out-of-pocket costs.[83] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[84] And in any event, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[85]

The Departments' is wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

### VII.   The Departments' Proposed Changes to the Rule Do Not Fix the Above Problems

The Departments request comment on several ways the IFR could be changed to expand exemptions to the birth control benefit.  Each of the questions presented by the Departments is based on an assumption that the IFR is legally sound, and in some instances, that it should be expanded.  As described in detail above, this assumption is incorrect.  Other than completely striking it, there is nothing the Departments could do to make this better, and any expansion would only further violate the law. The IFR should be struck in its entirety.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being.  It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons, WAWH calls on the Departments to rescind the IFR.


Sincerely,

Sara Finger
Executive Director
Wisconsin Alliance for Women's Health


---

[83] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[84] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives. *State Laws and Policies (as of October 2017)*, 2017. http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[85] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust. 2017. https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00206987

Exhibit 102                                                                                            JA-0001459



Women's Health and Family Planning
A S S O C I A T I O N   O F   T E X A S

December 5, 2017

**VIA ELECTRONIC SUBMISSION**

Acting Secretary Eric Hargan
CMS Administrator Seema Verma
Center for Medicare & Medicaid Services
US Department of Health and Human Services
Attention: CMS-9925-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

Re:    **Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (CMS-9925-IFC)**

Dear Acting Secretary Hargan and Administrator Verma:

The Women's Health and Family Planning Association of Texas (WHFPT) is committed to ensuring all individuals have access to affordable, high-quality family planning and sexual health services, including contraceptive services and supplies. As a result, WHFPT has strongly supported the nation's efforts to ensure individuals have robust insurance coverage of contraception without cost-sharing and unequivocally opposes the Departments of Health and Human Services, Labor and Treasury's (the Departments') recent efforts that undermine the Affordable Care Act's (ACA) contraceptive coverage requirement through this interim final rule (IFR).

WHFPT is a non-profit organization dedicated to ensuring Texans have equal access to high-quality reproductive health services and control over the timing and spacing of their children. As the sole Title X Family Planning Program grantee for the state of Texas, WHFPT funds a diverse network of 28 providers—including federally qualified health centers (FQHCs), public health departments, hospital based clinics, and free-standing family planning clinics—that operates approximately 100 clinic sites throughout Texas and provides critical reproductive health care services to over 180,000 women, men, and young people each year.

1114 Lost Creek Boulevard, Suite 110 | Austin, Texas 78746 | 512.448.4857 | www.whfpt.org

00207120

Exhibit 103

JA-0001460

The women's preventive services requirement of the ACA was designed to promote preventive health care, reduce future medical costs, and improve the health, equality, and economic security of women and families.[1] More than 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, screening for sexually transmitted diseases, and contraception and contraceptive counseling.[2] By allowing virtually any employer or university to claim this moral exemption and deprive women of contraceptive coverage, this IFR will harm the health and well-being of women, their partners, and their families. Furthermore, the IFR is predicated upon a distorted picture of the of the federal programs that compose the family planning safety net, the Title X family planning program and Medicaid. **For these reasons, WHFPT calls on the Departments to rescind the IFR and restore equal access to contraceptive coverage regardless of employer.**

## CONTRACEPTION IS CRITICAL TO HEALTH

Women face a unique set of health care challenges because they access more health services than men, yet earn less on average than men.[3] As a result, women face a high level of health care insecurity, which in turn leads many women to forgo necessary care due to prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs on contraception alone.[5] As a result of the ACA and its contraceptive coverage benefit, women saved more than $1.4 billion in out-of-pocket costs on oral contraceptives in 2013 alone.[6]

The goal of preventive health care is to help people control, track, and better manage their lifelong health, and the health of their families. Similarly, the goal of contraception is to prevent unintended pregnancy, control the timing of a desired pregnancy and spacing between pregnancies, in accordance with patient choice and to improve maternal, child, and family health.[7] In addition, contraception is particularly critical for women with underlying physical and psychological conditions, some of which can be exacerbated by pregnancy itself. These

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] National Women's Law Center. New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs. September 2017. Available at https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] Ibid.

[6] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[7] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016). Available at https://www.womenspreventivehealth.org/final-report/.

00207121

Exhibit 103                                                                          JA-0001461

women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[8]

Unintended pregnancies have higher rates of long-term health complications for women and their infants. Women with unintended pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[9] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, and experiencing physical violence during pregnancy.[10]

Unintended pregnancy rates are higher in the US than in most other developed countries, with approximately 45% of pregnancies unintended.[11] In addition, the US has the highest rate of maternal mortality in the developed world.[12] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[13] Contraception is considered a major factor in reducing rates of maternal morbidity and mortality.

Beyond the well-established evidence that contraception is effective in the prevention of unintended pregnancy, non-contraceptive health benefits of contraception are recognized in evidence, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease, and a decreased risk of endometrial and ovarian cancer.[14] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[15,16]

The patient, in consultation with a trusted health care provider, should determine the right contraceptive method for her unique health care needs without interference from politicians. The IFR interferes with the patient-provider relationship, and conversations about if and when to become pregnant as well as which contraceptive method to use to avoid pregnancy.

---

[8] *Id.* at 103-104.

[9] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809-23.

[10] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews.* 2010.32(1).152-174. doi.10.1093/epirev/mxq012.

[11] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008-2011, *New England Journal of Medicine,* 2016, 374(9):843-852,

[12] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[13] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[14] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250-5.

[15] Schindler AE. supra.

[16] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk: A Systematic Review and Meta-analysis Obstet Gynecol. 2017.

00207122

Exhibit 103

JA-0001462

**OTHER GOVERNMENT PROGRAMS CANNOT MEET THE NEED FOR CONTRACEPTIVE COVERAGE**

In the accompanying IFR on religious exemptions (CMS-9940-IFC), the Department of Health and Human Services (HHS) asserts that existing government-sponsored programs, such as Medicaid and the Title X family planning program, can serve as alternatives or safeguards for individuals who will lose access to contraceptive coverage without cost-sharing under their employer-sponsored or student health plans.[17] As discussed below, this assertion fails to recognize that: 1) programs such as Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals; 2) those programs do not have the capacity to meet the needs of current enrollees and those seeking care at Title X-funded health centers; and, 3) legislative and administrative proposals threaten the capacity and goals of these programs. Moreover, the claim that state coverage requirements are an alternative misconstrues the scope and protections provided by these requirements, which cannot fill in the gaps of coverage for many individuals who will lose contraceptive coverage.

**Medicaid and Title X are not designed to meet the needs of individuals who lose access to contraceptive coverage under their employer-sponsored or student health plans.**

Safety-net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Enacted in 1970, Title X is the nation's only dedicated source of federal funding for family planning services.[18] While Title X-funded health centers provide care to all patients, federal law requires them to give priority to "persons from low-income families."[19] Low-income individuals receive services at low or no cost depending on their family income.[20] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[21]

Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate. Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-

---

[17] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[18] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504.

[19] 42 CFR § 59.5 (a)(6-9).

[20] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[21] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"): 42 CFR § 59.5(a)(7), (9).

00207123

Exhibit 103                                                                                    JA-0001463

sponsored coverage. Moreover, while 33 states have expanded coverage under the Medicaid expansion option of the ACA, many individuals remain ineligible for this coverage.[22] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states was $8,985 per year for a family of three in 2017.[23] In many of these states, childless adults remain ineligible for the program.[24] Due to this, many low-income women who would be eligible to enroll in Medicaid under this option, depending on where they reside, are unable to do so. For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be viable alternatives for securing contraceptive care and counseling.

**Medicaid and Title X do not have capacity to meet the increased need.**

At a time when our nation's public health network is already burdened and under attack, it is critical to ensure that all women have access to contraceptive coverage and care. Medicaid is the nation's largest insurer, providing coverage to over 74 million people. Medicaid enrollees have robust access to comprehensive health care, and Medicaid already operates as a very lean program. Despite this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges in securing an adequate number of providers to furnish services to patients.[25] This is particularly true with respect to specialty providers, including OB/GYNs and other family planning and sexual health providers. A recent report from the HHS Office of the Inspector General found that many Medicaid managed care plans had provider shortages, with only 42% of in-network OB/GYN providers able to offer appointments to new patients.[26]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage caused by employer exemptions and would have to provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would from the IFR. Since 2010, the reported annual number of clients served at Title X-funded health centers has dropped from approximately 5.2

---

[22] The Henry J. Kaiser Family Foundation, Status of State Action on the Medicaid Expansion Decision. Available at https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last updated Nov. 8, 2017).

[23] Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017). Available at https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[24] Ibid.

[25] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012), http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). Available at http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[26] U.S. Department of Health and Human Services, supra at note 7.

00207124

Exhibit 103

JA-0001464

million patients to just over 4 million.[27] This decline corresponds with over $30 million in cuts to Title X's annual appropriated amount over the same period.[28] A recent study published in the *American Journal of Public Health* confirms that reductions in funding for Title X limit the number of patients Title X–funded providers are able to serve, concluding that Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded family planning services.[29] Requiring otherwise higher-income, privately insured individuals to use Title X–funded health centers would deplete resources from an already overburdened and underfunded program. Thus, WHFPT is unconvinced that Medicaid and Title X are plausible alternatives for the individuals affected by this IFR.

**Political assault on Medicaid, Title X, and Planned Parenthood health centers have already compounded the threat to women's access to contraceptive care.**

Medicaid is a vital source of coverage for family planning and sexual health care in the United States, but political threats to the program may undermine its ability to provide the coverage that meets the needs of individuals and families. In 2010, Medicaid covered nearly 45% of all births in the US, and in many states Medicaid covers well over half of births.[30] Medicaid is also the single largest source of public funding for family planning services and supplies.[31]

Within the last year, policymakers have sought to radically alter the financial structure of Medicaid. The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars from the program over the next ten years.[32] The proposal would have repealed Medicaid expansion,

---

[27] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.
[28] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).
[29] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928.
[30] Kathy Gifford et al., The Henry J. Kaiser Family Found., Medicaid Coverage of Pregnancy and Perinatal Benefits: Results from a State Survey, (2017), available at http://kff.org/womens-health-policy/report/medicaid-coverage-of-pregnancy-and-perinatal-benefits-results-from-a-state-survey/; *Births Financed by Medicaid*, The Henry J. Kaiser Family Found., available at http://kff.org/medicaid/state-indicator/births-financed-by-medicaid/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Nov. 6, 2017).
[31] In 2010, Medicaid accounted for 75 percent of all public funds spent on contraceptive services and supplies. Kinsey Hasstedt et al., Guttmacher Institute, Public Funding for Family Planning and Abortion Services, FY 1980-2015 (2017), https://www.guttmacher.org/report/public-funding-family-planning-abortion-services-fy-1980-2015.
[32] Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), available at https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf.

00207125

Exhibit 103

converted Medicaid's financing structure to a per-capita cap, and permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve.[33]

The administration has also made moves that could radically alter the Medicaid program. Earlier this year, then-Secretary Tom Price and CMS Administrator Seema Verma issued a letter to governors announcing HHS' intent to use existing Section 1115 waiver authority to approve changes to state Medicaid programs that could undermine the ability of individuals qualified to enroll in Medicaid—particularly non-disabled, working-age adults—to receive the coverage and health care they need.[34]

In addition to these legislative and administrative efforts to alter the Medicaid program, Congress and the administration have threatened access to trusted family planning and sexual health providers by attempting to block Planned Parenthood from participating in Medicaid despite the dominant role Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57% of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[35]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks. Title X has also been targeted. In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program. In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018.[36] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[37] For instance, the president's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even

---

[33] Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), available at http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[34] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), available at https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

[35] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), available at https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[36] Title X, Budget & Appropriations, Nat'l Family Planning & Reprod. Health Ass'n, available at https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[37] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018.

00207126

Exhibit 103

though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide.[38, 39]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ+ individuals, communities of color, and young people.

**Most state coverage requirements fail to guarantee coverage of the full range of contraceptive methods, services, and counseling with no cost-sharing.**

Similarly, the IFR suggests that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that 22 states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other 28 states.[40] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles, and other out-of-pocket costs.[41] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[42] Additionally, no state has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[43]

**The Departments' assertion that other programs and legal requirements can meet the need for contraceptive coverage created by this rule is inaccurate.**

---

[38] Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review*, (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

[39] White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).

[40] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[41] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[42] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, available at http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[43] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, available at https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00207127

Exhibit 103                                                                 JA-0001467

## JUSTIFICATIONS FOR THE IFR DO NOT MEET BASIC SCIENTIFIC STANDARDS

As the nation's health policy center, HHS must adopt policies and activities firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and the Women's Preventive Services Initiative (WPSI), instead prioritizing moral objections over evidence–based medical recommendations. The Departments make several false and misleading statements in the IFR to undermine the contraceptive coverage benefit. WHFPT fundamentally disagrees with the Departments' decision to promulgate this IFR based on the moral beliefs of individuals and entities rather than science and medicine.

### Contraception does not interfere with an existing pregnancy.

The IFR takes issue with the IOM-recommended coverage of the full range of U.S. Food and Drug Administration (FDA)–approved contraceptive methods because it includes "certain drugs and devices…that many persons and organizations believe are abortifacient—that is, as causing early abortion."[44] FDA–approved contraceptive methods do not function as abortifacients. Every FDA–approved contraceptive method acts before implantation, does not interfere with an existing pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus.[45]

### Contraception is medication and carries risks like any medication.

The IFR raises concerns about the "negative health effects" of contraception.[46] As with any medication, some contraceptive methods may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[47,48] Specifically, the IFR suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[49] The IFR also suggests contraception

---

[44] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[45] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13–354). Available at http://acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf.

[46] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[47] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[48] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[49] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

00207128

Exhibit 103

JA-0001468

increases the risk of breast cancer, but there is no scientifically-proven increased risk of breast cancer among contraceptive users, particularly those under 40.[50]

**Contraception makes sex among adolescents healthier, not more likely to happen.**

The IFR suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[51] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[52,53] In fact, research has shown that school-based health centers that provide access to contraception are proven to increase use of contraception by already sexually active students, not to increase onset of sexual activity.[54,55] On the other hand, young women who did not use contraception at first sexual intercourse were twice as likely to become teen mothers.[56] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[57]

**The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.**

**THE IFR UNDERMINES CONGRESSIONAL INTENT**

The Departments ignore Congress' clear intent that contraception be covered as a preventive service under the ACA. When Congress passed the Women's Health Amendment, it meant to "ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[58] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

---

[50] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1-66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[51] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[52] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[53] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2-9).

[54] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[55] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114-26.

[56] Ibid.

[57] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007-2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[58] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8727 (Feb. 15, 2012).

00207129

Exhibit 103                                                                                          JA-0001469

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[59] In enacting the amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*... In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[60]

In considering the amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[61] Additional statements from Senators Boxer, Feinstein, Nelson, and Durbin prove that the intent to cover contraception was clear.[62]

To meet the amendment's objectives, HHS commissioned the Institute of Medicine (IOM) to convene a diverse committee of experts in disease prevention, women's health and adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for HHS to consider in order to fill those gaps.[63] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[64] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM report.[65] These were updated in 2016 based on

---

[59] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski), *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[60] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[61] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[62] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

[63] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), available at http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.

[64] *Id.* at 109-10.

[65] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, available at http://www.hrsa.gov/womensguidelines (last visited Feb. 15, 2016).

00207130

Exhibit 103

JA-0001470

recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists and HRSA to coordinate the development, review, and update of recommendations. These, too, were adopted by HRSA.

HHS, through the adoption of the IOM's recommendations and the subsequent adoption of the WPSI recommendations, carried out Congress' intent. **The Departments should rescind the IFR to continue reflecting that intent.**

*** 

WHFPT appreciates the opportunity to provide comment on the moral exemptions and accommodations for coverage of certain preventive services interim final rule. This IFR will cause people to lose contraceptive coverage and harm their health and well-being. It ignores congressional intent that contraception be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting contraceptive access. **For all of these reasons, WHFPT calls on the Departments to rescind the IFR.**

If you require additional information about the issues raised in this letter, please contact Kami Geoffray at kami.geoffray@whfpt.org or (512) 448-4857.

Sincerely,

Kami Geoffray
Chief Executive Officer

00207131

Exhibit 103                                                                                          JA-0001471

# ///  *Women's Law Project*

BOARD OF TRUSTEES
Catherine T. Barbieri, Esq.
Jessica Beckett-McWalter, Esq.
Valentine Brown, Esq.
David S. Cohen, Esq.
Ellen Deringer, Esq.
Dianne Coady Fisher, Esq.
Nancy Ginter
Susanne M. Gollin
Pamela S. Goodwin, Esq.
Amanda Green Hawkins, Esq.
Tomás Leal
Sophia Lee, Esq.
Karen Kainz LoDico
Debra Loggia
Joann Mitchell, Esq. (Chair)
Deborah Moretti
Eleanor Myers, Esq.
Robin Neifield
Lisa Perriera
Nancy Reese
Ariana Ornelas Smyth, Esq.
Robin Stuntebeck
Carol E. Tracy, Esq. (ex-officio)
Wanda Whitted-Smith
Thomas E. Zemaitis, Esq.

EXECUTIVE DIRECTOR
Carol E. Tracy, Esq.
MANAGING ATTORNEY
Terry L. Fromson, Esq.
ASSOCIATE DIRECTOR
Dabney Miller
SENIOR STAFF ATTORNEY
Susan Frietsche, Esq.*
STAFF ATTORNEY
Amal Bass, Esq.
IT DIRECTOR
Barbara Burgos DiTuillo
DEVELOPMENT DIRECTOR
Jennifer Nix
STRATEGIC
COMMUNICATIONS
Tara Murtha
STAFF ATTORNEY
Christine Castro*
IF/WHEN/HOW FELLOW
Mica Lee Williams*
UPENN PUBLIC INTEREST FELLOW
Margaret Zhang
DEVELOPMENT/ADMIN
COORDINATOR
Brittany Green*
OFFICE MANAGER
Kathy Eisenberg

A copy of the official registration and
financial information may be obtained
from the Pennsylvania Department of
State   by   calling   toll   free
1.800.732.0999. Registration does not
imply endorsement.

December 1, 2017

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9940-IFC

Dear Acting Secretary Hargan,

The Women's Law Project is committed to ensuring all individuals have affordable coverage of birth control. Founded in 1974, the Women's Law Project (WLP) is a Pennsylvania-based nonprofit women's legal advocacy organization providing legal representation, public education, and advocacy on a wide range of legal issues related to women's health, well-being, and equality. Because access to the full range of reproductive health care is necessary to protect women's health and critical to women's ability to participate on an equal basis in civic and professional endeavors, WLP has made access to contraceptive care in Pennsylvania a high priority.

The Women's Law Project unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women[1] and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

---

[1] This comment uses the term "women" because women are targeted by the IFRs. We recognize, however, that the denial of reproductive health care and insurance coverage for such care also affects people who do not identify as women, including some gender non-conforming people and some transgender men.

[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

**MAIN OFFICE**

Sheridan Building
125 South 9th Street, Suite 300
Philadelphia, PA 19107

215.928.5761 t • 215.928.9848 f
www.womenslawproject.org
info@womenslawproject.org

**\* WESTERN PENNSYLVANIA OFFICE**

The Pittsburgher
428 Forbes Avenue, Suite 1710
Pittsburgh, PA 15219

412.281.2892 t • 215.928.9848 f
www.womenslawproject.org
infopitt@womenslawproject.org

00433458

Exhibit 104

Women face a unique set of healthcare challenges because they use more health services than men yet earn less on average than men.[3] As a result, women face a high level of health care insecurity which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs just on birth control.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health, and the health of their families. Similarly, the goal of prevention of unintended pregnancy is to help women time and space their pregnancies, or preventive pregnancy altogether, in accordance with their own desires and to improve maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

---

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.
[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.
[5] *Id.*
[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014),
http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.
[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/
Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_
Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.
[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).
[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.
[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.
[11] *Id.* at 103-104.

00433459

Exhibit 104

JA-0001473

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Other long term health harms of unintended pregnancy include the impact on health behaviors such as breastfeeding and negative physical and mental effects on children. Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] And, the U.S. has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported in evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non contraceptive purposes.[17] Beyond the well-established evidence that contraceptives are effective in the prevention of unintended pregnancy, evidence also supports non-contraceptive health benefits of contraception, including decreased bleeding and pain with menstrual periods, reduced risk of gynecologic disorders, including endometriosis, myoma, and pelvic inflammatory disease, and decreased risk of endometrial and ovarian cancer.[18] Non-contraceptive health benefits also include treatment for non-gynecologic conditions.[19, 20]

Insurance coverage of contraception is critical to ensuring women can use it. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty. Studies show that access to contraception has increased

---

[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852,

[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] *Id.*

[20] Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017

3

00433460

Exhibit 104

JA-0001474

women's wages and lifetime earnings.[21] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-1940s to early 1950s.[22] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[23] which was followed by large increases in women's presence in law, medicine, and other professions.[24] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[25]

A woman and her health care providers, not politicians, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care provider and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives, but implies that birth control is not health care at all.

## II.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered As A Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.    Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans and group health insurance coverage, recogniz[ing] that women have unique

---

[21] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.
[22] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).
[23] Heinrich H. Hock, The Pill and the College Attainment ofAmerican Women and Men 19 (Fla. State Univ., Working Paper 2007).
[24] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.har vard.edu/handle/1 /2624453.
[25] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

4

00433461

Exhibit 104

health care needs and burdens."[26] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, undermines the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[27] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than men for necessary preventive care and in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[28]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "With Senator Mikulski's amendment, even more preventive screening will be covered, including for...family planning."[29] And Senator Franken also said in regards to the Women's Health Amendment, "[A]ffordable family planning services must be accessible to all women in our reformed health care system."[30] That contraception would be covered was clear.[31]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order

---

[26] *Id.* at 8,727.

[27] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[28] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[29] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[30] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[31] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

5

00433462

Exhibit 104

JA-0001476

to fill those gaps."[32] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[33] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[34] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

## B. The Departments Cannot Point to Other "Exemptions" to Justify the Rule

It is undisputed that Congress did not add any exemption to the women's preventive services provision of the type that it has included in other legislation. Yet, in order to justify the sweeping exceptions in the IFR, the Departments look to the mere existence of exemptions in *other* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify he IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent in maximizing the number of women who have contraceptive coverage.[35] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[36] Additionally, although qualifying grandfathered plans do not have to comply with certain of the ACA's requirements, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum

---

[32] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.
[33] *Id.* at 109-10.
[34] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa. gov/womensguidelines (last visited Feb. 15, 2016).
[35] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").
[36] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.,* Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

6

00433463

Exhibit 104

JA-0001477

coverage requirements.[37] This exemption is intended as a temporary means for transitioning employers to full compliance.[38] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[39]

## III.   The IFR Violates Other Statutory and Constitutional Protections

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality.

Religious arguments have long been used in attempts to thwart women's equality, just as they have been used to thwart racial equality.[40] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[41] And as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[42]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need, but not care that women need. It interferes with the right to contraception encompassed by the fundamental constitutional right to liberty. As a result, the IFR discriminates against women on the basis of sex, in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. And it violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[43]

Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it

---

[37] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).
[38] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).
[39] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.
[40] *See*, e.g., at 21
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf
[41] *Id.* at 19.
[42] *Id.* at 24-27
[43] 2 U.S.C. § 18116.

7

00433464

Exhibit 104                                                                                                                 JA-0001478

does not override other significant interests" or "impose unjustified burdens on other[s]." [44] In fact, in *Hobby Lobby* under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero." [45] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.   The IFR Violates the Administrative Procedure Act

The Departments published this rule as an interim final rule, effective immediately upon publication, in violation of the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in two key ways, because the Departments do not have good cause to skip notice and comment rulemaking and issuing this IFR is arbitrary and capricious.

The APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation" [46] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest." The APA further requires that a rule be published 30 days prior to its effective date. [47] Good cause plainly does not exist here.

The Departments justify their haste in part by arguing that the public previously commented on related regulations, and therefore has had an opportunity to engage. But the public has not had such opportunity – no prior regulation contemplated allowing any for-profit company to block access to contraceptive coverage for their employees. Relying on comments submitted during prior comment periods in response to those regulations does not absolve the Departments of the notice and comment requirements under the APA. The Women's Law Project has had no opportunity to comment on the specific questions posed in by this IFR.

The Departments further assert that the interim final rule is justified by a need to "provide immediate resolution" to a number of open legal challenges to the existing scheme. But the existence of litigation alone does not create urgency, and certainly does not warrant subjugating the needs of the public at large to weigh in on such a wide-reaching regulation beneath the desires of a handful of employers and universities that are advocating for this change.

Further, the Departments' action in issuing this interim final rule constitutes arbitrary and capricious behavior. In unilaterally broadening the existing exemption and making the

---

[44] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[45] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[46] 5 U.S.C. § 553(b), (c).

[47] 5 U.S.C. § 553(d).

8

00433465

Exhibit 104

JA-0001479

accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs, and they did so without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[48]

Specifically, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[49] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[50]

For each of these reasons, the rule violates the APA and should be rescinded.

## V. Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. The Women's Law Project unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based individual's beliefs instead of science and medicine.

### A. Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and

_____

[48] 5 U.S.C. § 706.

[49] 42 U.S.C. § 18114(1).

[50] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

9

00433466

Exhibit 104

JA-0001480

devices... that many persons and organizations believe are abortifacient—that is, as causing early abortion."[51] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[52]

## B.   Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[53] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[54, 55] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[56]  The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[57]

## C.   Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[58] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[59,60]  In fact, research has shown school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[61,62]  On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to

---

[51] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

[52] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

[53] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[54] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[55] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[56] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[57] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[58] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[59] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[60] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[61] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[62] Knopf JA, Finnie RKC, Peng Y, et al.  Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

10

Exhibit 104

00433467

become teen mothers.[63] Overall, increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[64] More females are using contraception the first time they have sex.[65]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny

## VI.     The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[66] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of the programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws which cannot fill in the coverage gaps caused by this IFR.

### A.     Medicaid and Title X Programs Are Not Designed to Meet The Needs of Individuals Who Will Lose Contraceptive Coverage and Do Not Have Capacity to Do So.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[67] Low-income individuals receive services at these health centers at low or no cost depending on their family income.[68] Furthermore, Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[69]

---

[63] *Id.*

[64] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[65] *Id.*

[66] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[67] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[68] 42 U.S.C. § 300a-4(c)(2); 42 C.F.R. § 59.5(a)(7)-(8).

[69] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

11

00433468

Exhibit 104                                                                                                                JA-0001482

Further, the IFR states that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[70] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[71] This decline corresponds to over $30 million in cuts to Title X's annual appropriated amount over the same period.[72] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income. However, unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[73] Many individuals enrolled in Medicaid have extremely low incomes and minimal savings at hand. These individuals also face severe health problems and lack any resources to address these issues on their own, unlike individuals with higher incomes and employer-sponsored coverage.

Medicaid enrollees have robust access to health care, including family planning services and supplies, and Medicaid already operates as a very lean program. In spite of this, provider shortages have persisted. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[74] This is particularly true with respect to specialty providers, including OB/GYNs.[75] Given this provider shortage and

---

[70] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over $450 million to adequately address the existing need for publicly funded contraception.

[71] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[72] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[73] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of $8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[74] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[75] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

12

00433469

Exhibit 104

Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

## B.   The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[76] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[77] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[78]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[79] In addition to severe cuts to Title X's budget since 2011,

---

[76] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[77] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[78] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[79] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

13

00433470

Exhibit 104

JA-0001484

political opponents of reproductive health have repeatedly sought to defund or interfere with patients' access to care under the program.[80] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[81]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. Indeed, it is puzzling – to say the least – that the Department would specifically mention Title X and Medicaid as failsafes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

## C.   Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling With No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[82] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[83] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[84] And in any event, no state

---

[80] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations*, Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").
[81] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf (last visited Nov 3, 2017).
[82] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[83] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[84] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute,

14

00433471

Exhibit 104

has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[85]

The Departments are wrong that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

This IFR will cause people to lose contraceptive coverage, and harm their health and well-being. It is discriminatory, violates multiple federal statutes, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, and the federal programs supporting and state laws regarding contraception. For all of these reasons the Women's Law Project calls on the Departments to rescind the IFR.

Sincerely,

Terry L. Fromson
Managing Attorney

---

Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[85] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

15

00433472

Exhibit 104

JA-0001486

Acting Secretary Eric Hargan
Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Avenue SW., Room 445–G,
Washington, DC 20201

RE: CMS-9940-IFC

Dec. 5, 2017

Dear Acting Secretary Hargan,

Yale Students for Reproductive Justice ("YSRJ") [1] is a cross-campus coalition of Yale students working toward a world where all people can make reproductive choices with dignity, free from discrimination, coercion, or violence. Our coalition includes students from forestry, nursing, law, medicine, public health, and Yale College. YSRJ unequivocally opposes the Departments of Health and Human Services, Labor, and Treasury's (the Departments') efforts to undermine the Patient Protection and Affordable Care Act's (ACA) contraceptive coverage requirement through this Interim Final Rule (IFR). The ACA's women's preventive services requirement was designed to promote preventive medicine, reduce future medical costs, and improve the health, equality, and economic security of women and families. Over 62 million women with private insurance now have coverage of these vital health care services, including breast and cervical cancer screening, breastfeeding services and supplies, and contraception and contraceptive counseling.[2]

By allowing virtually any employer or university to deprive women of contraceptive coverage, this IFR will harm women and their health and well-being. It discriminates against women in violation of multiple federal laws and the Constitution. The IFR also violates the Administrative Procedure Act. The IFR ignores Congress's explicit intent that the ACA require coverage of contraception. Finally, the IFR is predicated upon a distorted picture of the science supporting the safety and efficacy of contraception, as well as the federal programs and state laws that provide some people with access to contraception. For all of these reasons YSRJ calls on the Departments to rescind the IFR.

## I.    Birth Control Is Critical to Women's Health

---

[1] YSRJ and its members do not purport to represent the institutional views of Yale University, Yale School of Forestry & Environmental Studies, Yale School of Nursing, Yale Law School, Yale School of Medicine, Yale School of Public Health, Yale College, or any other department or school at Yale.

[2] Nat'l Women's L. Ctr., New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-Of-Pocket Costs (Sept. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

1

00396738

Exhibit 105

JA-0001487

Women face a unique set of health care challenges because they use more health services than men, yet they are paid less on average than men.[3] As a result, women face a high level of health care insecurity, which leads many women to forgo necessary care because of prohibitive patient cost-sharing. Before the ACA, one in seven women with private health insurance and nearly one-third of women covered by Medicaid either postponed or went without needed services in the prior year because they could not afford it.[4] Women were spending between 30% and 44% of their total out-of-pocket health costs on birth control alone.[5] Out-of-pocket costs prevented many women, not just low-income women, from accessing preventive services, including contraception.[6] The gap between men and women who struggled to access needed care was in fact widest among adults with moderate incomes.[7] By contrast, eliminating cost barriers has helped increase access to contraception for women with employer-sponsored coverage.[8] Because of the birth control benefit, women saved more than $1.4 billion in out-of-pocket costs on birth control pills in 2013 alone.[9]

The goal of preventive health care is to help people control, track, and better manage their life-long health and the health of their families. Similarly, prevention of unintended pregnancy helps women time and space their pregnancies or prevent pregnancy altogether, and it improves maternal, child, and family health.[10] Contraception enables women to prevent unintended pregnancy and control the timing of a desired pregnancy. In addition, access to birth control is particularly critical for women with underlying physical and psychological conditions or chronic conditions which can be exacerbated by pregnancy itself. These women may need to take particular care in planning their pregnancies to ensure that their health can support carrying a pregnancy to term.[11]

---

[3] U.S. Census Bureau. Income, Poverty, and Health Insurance Coverage in the United States: 2008, Table A-2. 2009.

[4] Kaiser Family Foundation. Women's Health Care Chartbook. 2011.

[5] *Id.*

[6] Su-Ying Liang et al., *Women's Out-of-Pocket Expenditures and Dispensing Patterns for Oral Contraceptive Pills between 1996 and 2006*, 83 CONTRACEPTION 491, 531 (2010); *see also* Inst. of Med. of the Nat'l Acads., *Clinical Preventive Services for Women: Closing the Gaps* 19 (2011), https://www.nap.edu/read/13181/chapter/1. Another study of 11,000 employees with employer-sponsored coverage found that cost-sharing reduced use of pap smears, preventive counseling, and mammography. Geetesh Solanki et al., *The Direct and Indirect Effects of Cost-Sharing on the Use of Preventive Services*, 34 HEALTH SERVS. RESEARCH 1331, 1342-43 (2000); 1342-43; *see also* David Machledt & Jane Perkins, *Medicaid Premiums & Cost-Sharing* 2-3 (2014), http://www.healthlaw.org/publications/search-publications/Medicaid-Premiums-Cost-Sharing#.WgCFehNSzeQ.

[7] Sheila D. Rustgi et al., The Commonwealth Fund, *Women at Risk: Why Many Women Are Forgoing Needed Health Care* 4 (2009), http://www.commonwealthfund.org/~/media/Files/Publications/ Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_risk_issue_brief_ Final.pdf. Finding that sixty-five percent of women with incomes between $20,000 and $39,999 experienced problems accessing health care services because of cost.

[8] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 CONTRACEPTION 44, 45-47 (2014).

[9] Nora V. Becker and Daniel Polsky, Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing, Health Affairs, 34, no.7 (2015):1204-1211. Available at http://content.healthaffairs.org/content/34/7/1204.full.pdf+html.

[10] Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* 83 (2016), *available for download at* https://www.womenspreventivehealth.org/final-report/.

[11] *Id.* at 103-104.

2

00396739

Exhibit 105

JA-0001488

Unintended pregnancies are associated with higher rates of long-term health complications for mother and infant. Women with unplanned pregnancies are more likely to delay prenatal care, leaving their health complications unaddressed and increasing risk of infant mortality, birth defects, low birth weight, and preterm birth.[12] Women with unintended pregnancies are also at higher risk for maternal morbidity and mortality, maternal depression, or experiencing physical violence during pregnancy.[13] Unintended pregnancy rates are higher in the United States than in most other developed countries, with approximately 45% of pregnancies unintended.[14] The U.S. also has the highest rate of maternal mortality in the developed world.[15] Contraceptive efficacy in preventing unintended pregnancy is well established and supported by evidence.[16] And contraception is considered a major factor in reducing rates of maternal mortality and morbidity.

Most women who use birth control do so for both contraceptive and non-contraceptive purposes.[17] Beyond the well-established evidence that contraceptives effectively prevent unintended pregnancy, contraception also has recognized benefits aside from family planning, including decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including endometriosis, myoma, pelvic inflammatory disease,endometrial and ovarian cancer.[18] Contraception is also prescribed to treat non-gynecologic conditions.[19]

Insurance coverage for contraception is critical to ensuring women access. Unintended pregnancy rates are highest among those least able to afford contraception, particularly those who face additional barriers to accessing health care services, including economic instability and/or discrimination based on race, ethnicity, gender identity, or sexual orientation.

Birth control is also vital in furthering equal opportunity for women, enabling women to be equal participants in the social, political, and economic life of the nation. By enabling women to decide if and when to become parents, birth control allows women to access more professional and educational opportunities. This makes access to birth control central to women's constitutionally protected right to liberty and equal protection of the law. Studies show that access to

---

[12] Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23.

[13] Tsui AO, McDonald-Mosley R, Burke AE. Family Planning and the Burden of Unintended Pregnancies. *Epidemiologic Reviews*. 2010;32(1):152-174. doi:10.1093/epirev/mxq012.

[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852,

[15] Murray, J.L., Wang, H., Kassebaum, N., "Sharp Decline in Maternal and Child Deaths Globally, New Data Show." Institute for Health Metrics and Evaluation. University of Washington. 2016.

[16] Trussell J. Contraceptive failure in the United States. Contraception. 2011;83(5):397-404.

[17] Jones RK. Beyond birth control: The overlooked benefits of oral contraceptive pills. New York: Guttmacher Institute, 2011.

[18] Schindler AE. Non-contraceptive benefits of oral hormonal contraceptives. Int J Endocrinol Metab. 2013;11(1):41-7, and Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:250–5.

[19] *Id.*; Cortessis VK, Barrett M, Brown W, et. Al. Intrauterine Device Use and Cervical Cancer Risk; A Systematic Review and Meta-analysis Obstet Gynecol. 2017.

3

00396740

Exhibit 105

JA-0001489

contraception has increased women's wages and lifetime earnings.[20] In fact, the availability of the oral contraceptive pill alone is associated with roughly one-third of the total wage gains for women born from the mid-l940s to early 1950s.[21] Access to oral contraceptives may also account for up to one-third of the increase in college enrollment by women in the 1970s,[22] which was followed by large increases in women's presence in law, medicine, and other professions.[23] The Departments have previously acknowledged these significant benefits, noting that prior to the ACA's passage, disparities in health care coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force."[24]

A woman and her health care providers, not politicians and bureaucrats, should determine the right contraceptive for her health care needs. The IFR not only misrepresents the available science on contraceptive safety, but it also allows entities to refuse to cover the contraceptive counseling during which a woman and her health care provider could discuss her specific health history and contraceptive needs. This interferes with the relationship women have with their regular health care providers and conversations about if, and when, to become pregnant and which contraceptive to use when not seeking pregnancy.

In the face of these facts, the IFR not only denies how important birth control is to women's health and lives; it implies that birth control is not health care at all.

## II.    The IFR Undermines Congress's Express Intent that Birth Control Be Covered as a Preventive Service

The Departments ignore Congress's express intent that birth control be covered as a preventive service under the ACA.

### A.  Congress Intended the ACA to Require Contraceptive Coverage

When Congress passed the Women's Health Amendment, it meant "to ensure that recommended preventive services for women are covered adequately by non-grandfathered group health plans

---

[20] See, e.g., Jennifer J. Frost & Laura Duberstein Lindberg, Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, et al., Guttmacher Inst., The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children (2013), available at http://www.guttmacher.org/pubs/social-economic-benefits.pdf.
[21] See Martha J. Bailey et al., The Opt-in Revolution? Contraception and the Gender Gap in Wages, 19, 26 (Nat'l Bureau of Econ. Research Working Paper o. 17922, 2012), http://www.nber.org/ papers/wl 7922 (last visited Feb. 9, 2016); Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. Pol. Econ. 730, 749 (2002).
[22] Heinrich H. Hock, The Pill and the College Attainment of American Women and Men 19 (Fla. State Univ., Working Paper 2007).
[23] Claudia Goldin & Lawrence F. Katz, The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions, 110 J. of Pol. Econ. 730, 749 (2002), https://dash.har vard.edu/handle/1 /2624453.
[24] Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

4

Exhibit 105

00396741

JA-0001490

and group health insurance coverage, recogniz[ing] that women have unique health care needs and burdens."[25] Allowing more entities to deprive women of contraceptive coverage, as the IFR does, strikes at the very purpose of the contraceptive coverage requirement.

Indeed, Congress intended the Women's Health Amendment, which includes the contraceptive coverage requirement, to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination."[26] In enacting the Amendment, Congress recognized that the failure to cover women's preventive health services meant that, on average, women paid more in out-of-pocket costs than men for necessary preventive care and that in some instances were unable to obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including *outrageous discriminatory practices in care and coverage*. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. *This fundamental inequity in the current system is dangerous and discriminatory and we must act.*[27]

In considering the Amendment, Congress expressed its expectation that the preventive services covered would include family planning services. For example, Senator Gillibrand stated, "[w]ith Senator Mikulski's amendment, even more preventive screening will be covered, including for . . . family planning."[28] Senator Franken also said in regards to the Women's Health Amendment, "affordable family planning services must be accessible to all women in our reformed health care system."[29] That contraception would be covered was clear.[30]

To meet the Amendment's objectives, the Department of Health and Human Services commissioned the Institute of Medicine ("IOM") "to convene a diverse committee of experts in disease prevention, women's health issues, adolescent health issues, and evidence-based guidelines to review existing guidelines, identify existing coverage gaps, and recommend services and screenings for [the Department of Health and Human Services] to consider in order

---

[25] *Id.* at 8,727.

[26] 155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care[.]").

[27] *Id.* at S12,027 (statement of Sen. Gillibrand) (emphases added).

[28] 155 Cong. Rec. S12,021, S12,027 (daily ed. Dec. 1, 2009).

[29] 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009). *See also,* 155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen. Feinstein) ("[The Amendment] will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include . . . family planning . . .").

[30] *See also* 155 Cong. Rec. S12025 (Dec. 1, 2009) (Sen. Boxer) (preventative care "include[s] . . . family planning services"); 155 Cong. Rec. S12114 (Dec. 2, 2009) (Sen. Feinstein) ("The amendment . . . will require insurance plans to cover at no cost basic preventive services" including "family planning."); id. at 12277 (Sen. Nelson) ("I strongly support the underlying goal of furthering preventive care for women, including . . . family planning."); 155 Cong. Rec. S12671 (Dec. 8, 2009) (Sen. Durbin) (under the ACA "millions more women will have access to affordable birth control and other contraceptive services").

5

00396742

Exhibit 105

JA-0001491

to fill those gaps."[31] After conducting its analysis, the IOM panel recommended eight preventive services for women, including contraceptive coverage.[32] On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report.[33] These were updated in 2016 based on recommendations from the Women's Preventive Services Initiative (WPSI) as part of a five-year cooperative agreement between the American College of Obstetricians and Gynecologists (ACOG) and HRSA to coordinate the development, review, and update of recommendations. These too were adopted by HRSA.

The Department of Health and Human Services—in adopting the IOM's recommendations and promulgating the contraception regulations, and again adopting the WPSI recommendations—carried out Congress' direction.

### B. "Exemptions" in Other Legislation Do Not Justify the Rule

It is undisputed that Congress rejected an exemption to the women's preventive services provision of the type that the IFR now adopts. Yet, in order to justify the sweeping exceptions in the IFR, the Departments look to the exemptions in *entirely distinct* statutes, referencing federal laws that allow health care entities to refuse to treat a woman seeking an abortion, and other laws that allow religious refusals to provide certain health care services. Not only are these laws irrelevant to the women's preventive services provision of the Affordable Care Act, but the Departments' attempt to misconstrue these existing laws further proves that there is no direct and clear authority for the Departments to create this exemption.

The Departments also attempt to justify the IFR by pointing to "grandfathered" plans. But, the existence of plans that are grandfathered from the ACA's contraceptive coverage requirement does not diminish Congress's intent to maximize the number of women who have cost-free contraceptive coverage.[34] Federal statutes "often include exemptions for small employers, and such provisions have never been held to undermine the interests served by these statutes."[35] Additionally, although qualifying grandfathered plans do not have to comply with certain requirements of the ACA, including but not limited to coverage of preventive care services, plans lose grandfathered status if coverage is modified so that it no longer meets specified minimum

---

[31] Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 20-21 (2011), *available at* http://www.iom.edu/reports/2011/clinical-preventive-services-forwomen-closing-the-gaps.aspx.
[32] *Id.* at 109-10.

[33] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Women's Preventive Services Guidelines*, http://www.hrsa. gov/womensguidelines (last visited Feb. 15, 2016).

[34] *See* Priests for Life, v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 266 (D.C. Cir. 2014) ("The government's interest in a comprehensive, broadly available system is not undercut by . . . the exemptions for religious employers, small employers and grandfathered plans. The government can have an interest in the uniform application of a law, even if that law allows some exceptions.").

[35] Hobby Lobby v. Burwell, 134 S. Ct. 2751, 2800 (2014) (Ginsburg, J., dissenting); *see, e.g.*, Family and Medical Leave Act of 1993, 29 U.S.C. § 2611(4)(A)(i) (applicable to employers with 50 or more employees); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 630(b) (originally exempting employers with fewer than 50 employees, Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 605 (1967), the statute now governs employers with 20 or more employees); Americans with Disabilities Act, 42 U.S.C. § 12111(5)(A) (applicable to employers with 15 or more employees); Title VII, 42 U.S.C. § 2000e(b) (originally exempting employers with fewer than 25 employees).

6

00396743

Exhibit 105

JA-0001492

coverage requirements.[36] This exemption is intended as a temporary means for transitioning employers to full compliance.[37] The number of employer-sponsored grandfathered plans has decreased steadily since 2010.[38]

## III.    The IFR Is Unconstitutional

By creating broad exemptions to the ACA's birth control benefit, which has expanded access to contraception for millions of women, the IFR singles out health insurance that women use and that is essential for women's health and equality. In so doing, it violates the equal protection and due process guarantees furnished by the Constitution and codified in the ACA.

Religious arguments have long been weaponized in attempts to thwart women's equality, just as they have been weaponized to undermine racial equality.[39] But those efforts have time and again been rejected. For example, in passing Title VII of the Civil Rights Act of 1964, Congress barred workplace discrimination based on a variety of factors including race and sex, over objections based on religion.[40] And, as society has evolved beyond a religiously imbued vision of women as mothers and wives, courts have rejected efforts to allow religious exemptions to undermine civil rights protections for women.[41]

Like Title VII and other civil rights laws, the birth control benefit was intended to address longstanding discrimination and to ensure women equal access to the preventive services that allow them to be full participants in society. In interfering with that access, the IFR targets women for adverse treatment, resulting in health insurance that covers preventive care that men need but that does not cover care that women need. As a result, the IFR discriminates against women on the basis of sex in violation of the Due Process Clause of the Fifth Amendment, which guarantees people equal protection of the laws. The IFR's interference with the right to contraception constitutes a separate violation of women's fundamental constitutional right to liberty, which also finds its roots in the Due Process Clause of the Fifth Amendment. Disparate treatment of women's preventive services additionally violates Section 1557 of the ACA, which prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."[42] Finally, the Constitution bars the Departments from crafting an exemption like this because it harms women in ways not authorized under the First Amendment. Freedom of religion and belief is a fundamental right, protected by our Constitution and federal

---

[36] 42 U.S.C. § 18011; Final Rules for Grandfathered Plans, 80 Fed. Reg. 72,192, 72,192- 72,193 (Nov. 18, 2015).
[37] Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. at 39,887 n.49; *Hobby Lobby*, 134 S. Ct. at 2800-01 (Ginsburg, J., dissenting).
[38] Gary Claxton et al., KAISER FAMILY FOUNDATION, EMPLOYER HEALTH BENEFITS 2017 ANNUAL SURVEY 204 (2017), http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.
[39] *See*, e.g., Brief of the American Civil Liberties Union et al. as Amici Curiae Supporting Respondents at 21-27, Zubik v. Burwell, 578 U.S. __ (2016) (No. 14-1418),
https://www.aclu.org/sites/default/files/field_document/02.17.16_amicus_brief_in_support_of_respondents-_aclu_et_al.pdf.
[40] *Id.* at 19.
[41] *Id.* at 24-27
[42] 2 U.S.C. § 18116.

7

00396744

Exhibit 105                                                                                                          JA-0001493

law. It guarantees us all the right to believe (or not) as we see fit. But it doesn't give anyone the right to use religious or moral beliefs as an excuse to harm others. The Constitution commands that a religious or moral accommodation must be "measured so that it does not override other significant interests" or "impose unjustified burdens on other[s]." [43] In fact, in *Hobby Lobby*, which was decided under the Religious Freedom Restoration Act, the Court described that the impact of the accommodation on third parties would be "precisely zero." [44] Prior to this IFR, HHS met this requirement by ensuring employees continued to receive no-cost contraception coverage, even if their employer objected to providing coverage. The IFR fails the constitutional do-no-harm test.

## IV.    The IFR Violates the Administrative Procedure Act

The Departments promulgated this rule as an interim final rule effective immediately upon publication. This violated the procedural safeguards of the Administrative Procedure Act ("APA"). Specifically, the issuance of this interim final rule does not comply with the APA's requirements in three key ways: (1) the Departments do not have good cause to skip notice and comment rulemaking; (2) issuing this IFR is arbitrary and capricious; and (3) the IFR exceeds the Departments' statutory authority.

The APA requires an agency to follow notice and comment procedures that provide "interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation"[45] unless the agency can establish good cause to skip that process. Good cause is narrowly construed, and exists only where public comment is "impracticable, unnecessary, or contrary to the public interest."[46] The APA further requires that a rule be published 30 days prior to its effective date.[47] Good cause plainly did not exist here, and the Departments violated the law by promulgating this rule as an IFR effective immediately upon publication.[48]

Further, the Departments' action in issuing this interim final rule is arbitrary and capricious. In unilaterally broadening the existing exemption and making the accommodation optional, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's constitutional right to  a critical preventive service and certain institutions' religious beliefs, and they did so

---

[43] E.g., Cutter v. Wilkinson, 544 U.S. 709, 722, 726 (2005).

[44] Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2760 (2014). Indeed, every member of the Court, whether in the majority or in dissent, reaffirmed that the burdens on third parties must be considered. *See id.* at 2781 n.37.; *id.* at 2786–87 (Kennedy, J., concurring); *id.* at 2790, 2790 n.8 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ., dissenting).

[45] 5 U.S.C. § 553(c).

[46] 5 U.S.C. § 553(b).

[47] 5 U.S.C. § 553(d).

[48] Nick Bagley, *The Trump Administration and Contraceptive Coverage*, TAKE CARE BLOG (Oct. 6, 2017), https://takecareblog.com/blog/the-trump-administration-and-contraception-coverage.

8

00396745

Exhibit 105

JA-0001494

without any statutory authority or even a reasoned explanation. The rule is therefore unlawful under the APA.[49]

Additionally, the rule is in excess of statutory authority. The rule is contrary to Section 1557 of the ACA, 42 U.S.C. 18116, which prohibits sex discrimination in certain health programs and activities, because it sanctions sex discrimination by allowing employers and universities to direct health insurance companies to prevent their employees and students from receiving contraceptive coverage. The rule is also contrary to Section 1554 of the ACA, which prohibits the Secretary of Health and Human Services from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care."[50] As discussed throughout this comment, some women have historically been unable to obtain contraception because of cost barriers. By permitting objecting institutions to deny no-cost contraceptive coverage, the rule erects unreasonable barriers to medical care and impedes timely access to contraception. The rule is therefore invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.[51]

For each of these reasons, the rule violates the APA and should be rescinded.

## V.    Justifications for the IFR Do Not Meet Basic Scientific Standards

As the nation's health policy center, the Department of Health and Human Services (HHS) policies and activities must be firmly based on scientifically valid and appropriate terms and evidence. The IFR does not meet the high standard of scientific evidence used by the IOM and WPSI, instead prioritizing the religious and moral beliefs of individuals over evidence-based medical recommendations. The Departments make several false and misleading statements in this Rule to undermine the contraceptive benefit. YSRJ unequivocally opposes the Departments' effort to undermine the contraceptive coverage requirement based not on science and medicine, but on individuals' unfounded ideological beliefs.

## A.    Contraceptives Do Not Interfere with an Existing Pregnancy

Policies that restrict women's access to preventive health care should not be based on falsehoods that are not supported by science, regardless of who "believes" them. The Rule takes issue with the IOM recommended coverage of the full range of U.S. Food and Drug Administration (FDA)-approved contraceptive methods because it includes "certain drugs and devices . . . that many persons and organizations believe are abortifacient—that is, as causing early abortion."[52] FDA-approved contraceptive methods are not abortifacients. Every FDA-approved contraceptive acts

---

[49] 5 U.S.C. § 706.

[50] 42 U.S.C. § 18114(1).

[51] Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," id. § 706(2)(B), or "in excess of statutory jurisdiction," id. § 706(2)(C).

[52] 82 Fed. Reg. 47,792, 47,749 (Oct. 13, 2017).

00396746

Exhibit 105

JA-0001495

before implantation, does not interfere with a pregnancy, and is not effective after a fertilized egg has implanted successfully in the uterus, which is when pregnancy begins.[53]

## B. Contraceptives Are Medication and Carry Risks Like *Any* Medication

The Rule raises concerns about the "negative health effects" of contraception.[54] As with any medication, certain types of contraception may be contraindicated for patients with certain medical conditions, including high blood pressure, lupus, or a history of breast cancer.[55, 56] Specifically, the Rule suggests an increased risk of venous thromboembolism (VTE). In fact, VTE among oral contraceptive users is very low and is much lower than the risk of VTE during pregnancy or in the immediate postpartum period.[57] The Rule also suggests contraception increases the risk of breast cancer, but there is no proven increased risk of breast cancer among contraceptive users, particularly those under 40.[58]

## C. Contraceptives Do Not Increase Sexual Activity Among Adolescents

The Rule suggests the contraceptive coverage benefit could "affect risky sexual behavior in a negative way."[59] Increased access to contraception is not associated with increased unsafe sexual behavior or increased sexual activity.[60,61] In fact, school-based health centers that provide access to contraceptives are proven to increase use of contraceptives by already sexually active students, not to increase onset of sexual activity.[62,63] On the other hand, young females who did not use birth control at first sexual intercourse were twice as likely to become teen mothers.[64] Overall,

---

[53] Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?. Moreover, the Department of Health and Human Services defines pregnancy as beginning at implantation. 45 C.F.R. § 46.202(f) (2017).

[54] 82 Fed. Reg. 47,792, 47,804 (Oct. 13, 2017).

[55] Progestin-only hormonal birth control: pill and injection. FAQ No. 86. American College of Obstetricians and Gynecologists. July 2014.

[56] Combined hormonal birth control: pill, patch, and ring. FAQ No. 185. American College of Obstetricians and Gynecologists. July 2014.

[57] Risk of venous thromboembolism among users of drospirenone-containing oral contraceptive pills. Committee Opinion No. 540. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1239–42.

[58] Curtis KM, Jatlaoui TC, Tepper NK, et al. U.S. Selected Practice Recommendations for Contraceptive Use, 2016. MMWR Recomm Rep 2016;65(No. RR-4):1–66. DOI: http://dx.doi.org/10.15585/mmwr.rr6504a1.

[59] 82 Fed. Reg. 47,792, 47,805 (Oct. 13, 2017).

[60] Kirby D. Emerging answers 2007: Research findings on programs to reduce teen pregnancy and sexually transmitted diseases. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy. 2009.

[61] Meyer JL, Gold MA, Haggerty CL. Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature. J Pediatr Adolesc Gynecol. 2011;24(1):2–9).

[62] Minguez M, Santelli JS, Gibson E, Orr M, & Samant, S. Reproductive health impact of a school health center. Journal of Adolescent health, 2015;56(3), 338-344.

[63] Knopf JA, Finnie RKC, Peng Y, et al. Community Preventive Services Task Force. School-based health centers to advance health equity: a Community Guide systematic review. American Journal of Preventive Medicine 2016;51(1):114–26.

[64] *Id.*

10

00396747

Exhibit 105

JA-0001496

increased access to and use of contraception has contributed to a dramatic decline in rates of adolescent pregnancy.[65] More females are using contraception the first time they have sex.[66]

The Departments should rescind the IFR because it is not evidence-based and does not withstand basic scientific scrutiny.

### VI.    The Departments' Explanation that Other Programs Can Meet the Need for Birth Control Coverage Is Faulty

The Departments assert that existing government-sponsored programs, such as Medicaid and Title X, and state coverage requirements can serve as alternatives for individuals who will lose access to contraceptive coverage without cost sharing as a result of this IFR.[67] This assertion fails to recognize that Medicaid and Title X are not designed to absorb the needs of higher income, privately insured individuals and do not have the capacity to meet the needs of current enrollees *and* those seeking care at Title X health centers. Further, the existence of those programs is threatened by legislative and administrative proposals. With respect to the state laws, the Departments' claim misconstrues the scope and protections of state contraceptive coverage laws, which cannot fill in the coverage gaps caused by this IFR.

### A.    Medicaid and Title X Programs Do Not Meet the Needs of Individuals Who Will Lose Contraceptive Coverage Under the IFR.

Safety net programs like the Title X family planning program and Medicaid are not designed to absorb the unmet needs of higher-income, insured individuals. Title X is the nation's only dedicated source of federal funding for family planning services, and federal law requires Title X-funded health centers to give priority to "persons from low-income families."[68] Congress did not design Title X as a substitute for employer-sponsored coverage. The Title X statute and regulations contemplate how Title X and third-party payers, including employer-sponsored coverage, will work together to pay for care, directing Title X-funded agencies to seek payment from such third-party payers.[69]

The IFR argues that Title X-funded health centers could fill the gap in contraceptive coverage it creates, and provide care to more patients than are currently served by the program. However, with current funding and resources, the Title X provider network cannot meet the existing need for publicly funded family planning, let alone absorb the increase in demand that would result

---

[65] Lindberg L, Santelli J, Desai S. Understanding the Decline in Adolescent Fertility in the United States, 2007–2012. J Adolesc health. 2016;59(5):577-583. DOI: 10.1016/j.jadohealth.2016.06.024.

[66] *Id*.

[67] Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47803 (Oct. 13, 2017) (to be codified at 45 C.F.R. 147, pt. 147).

[68] *See* Fam. Plan. Servs. & Population Res. Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504, and 42 CFR § 59.5 (a)(6-9).

[69] 42 U.S.C. § 300a-4(c)(2) (prohibiting charging persons from a "low-income family" for family planning services "except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge"); 42 CFR § 59.5(a)(7), (9).

00396748

Exhibit 105

from the Department's rules. Reductions in funding for Title X already limit the number of patients Title X-funded providers are able to serve.[70] Since 2010, the reported annual number of clients served at Title X sites has dropped from approximately 5.2 million patients to just over 4 million.[71] This decline corresponds to over \$30 million in cuts to Title X's annual appropriated amount over the same period.[72] Requiring otherwise higher-income, privately insured individuals to use Title X-funded health centers would deplete resources from an already overburdened and underfunded program.

Similarly, Medicaid is a source of coverage designed to meet the unique health care needs of individuals who are low-income and is not equipped to address the gaps in coverage that this IFR will create. Unlike Title X, which requires the health centers it funds to take all patients, Medicaid has income and other eligibility requirements for individuals to participate.[73] Privately insured individuals are by definition not eligible for Medicaid, so Medicaid cannot serve as a safety net for those who lose access to contraception as a result of the IFR.

Even absent these eligibility barriers, Medicaid is plagued by provider shortages and lacks capacity to absorb those who lose covereage as a result of this IFR. The majority (two-thirds) of state Medicaid programs face challenges to securing an adequate number of providers to furnish services to patients.[74] This is particularly true with respect to specialty providers, including OB/GYNs.[75] Given this provider shortage and Medicaid's eligibility requirements discussed above, Medicaid does not have capacity to serve individuals who lose coverage as a result of this IFR.

---

[70] August, Euna M. et al., "Projecting the Unmet Need and Costs for Contraception Services After the Affordable Care Act," *American Journal of Public Health* (2016), available at http://doi.org/10.2105/AJPH.2015.302928. Congress would have to increase federal funding for Title X by over \$450 million to adequately address the existing need for publicly funded contraception.

[71] *See* Fowler, CI, Lloyd, SW, Gable, J, Wang, J, and Krieger, K, *Family Planning Annual Report: 2010 National Summary*, RTI International (Sept. 2011), available at https://www.hhs.gov/opa/sites/default/files/fpar-2010-national-summary.pdf; Fowler, C.I, Gable, J., Wang, J., & Lasater, B, *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[72] U.S. Dept. of Health and Human Servs., Funding History HHS.Gov (2017), available at https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html (last visited Nov 3, 2017).

[73] In states that have not expanded Medicaid, income eligibility for this program is quite limited. The median income limit for parents in these states is an annual income of \$8,985 a year for a family of three in 2017, and in most states that have not expanded Medicaid, childless adults remain ineligible for this program. Rachel Garfield & Anthony Damico, The Henry J. Kaiser Family Foundation, The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid, (2017), https://www.kff.org/uninsured/issue-brief/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid/.

[74] U.S. Government Accountability Office. "States Made Multiple Program Changes, and Beneficiaries Generally Access Comparable to Private Insurance." (Nov. 2012). http://www.gao.gov/assets/650/649788.pdf; U.S. Department of Health and Human Services. Office of Inspector General. "Access to Care: Provider Availability in Medicaid Managed Care." (Dec. 2014). http://oig.hhs.gov/oei/reports/oei-02-13-00670.pdf.

[75] A recent report from the HHS Office of Inspector General found that many Medicaid managed care plans had provider shortages, with only 42 percent of in-network OB/GYN providers able to offer appointments to new patients. U.S. Department of Health and Human Services, supra at note 7.

12

00396749

Exhibit 105                                                                                              JA-0001498

For many women who will lose access to the contraceptive coverage benefit, Title X and Medicaid will not be real alternatives for securing contraceptive care and counseling.

## B. The Political Assault on Medicaid, Title X, and Planned Parenthood Health Centers Threaten Women's Access to Contraceptive Care.

Within the last year, as part of the numerous, failed attempts to repeal the ACA, policymakers have sought to radically alter the financial structure of Medicaid.[76] Policymakers continue to try to impose steep cuts to the Medicaid program through the budget process and to undermine the program through regulatory measures. The Department of Health and Human Services has made clear its intent to approve "innovations" to the Medicaid program.[77] These "innovations" may very well include provisions that undermine the ability of individuals qualified to enroll in Medicaid to receive the coverage and health care they need. Finally, Congress and the Trump Administration have blatantly threatened women's health by attempting to block Planned Parenthood from participating in Medicaid despite the outsized role that Planned Parenthood plays in delivering family planning care to people with Medicaid coverage. In fact, in 57 percent of counties with a Planned Parenthood health center, Planned Parenthood serves at least half of all safety-net family planning patients with Medicaid coverage.[78]

Unfortunately, Medicaid is not the only health care program that has faced administrative and congressional attacks despite playing a critical role in the health care safety net; Title X has also been targeted. In fact, Title X-funded health centers play a particularly important role in serving communities of color.[79] In addition to severe cuts to Title X's budget since 2011, political opponents of reproductive health have repeatedly sought to defund or interfere with patients'

---

[76] The most recent legislative proposal sponsored by Senators Lindsey Graham and Bill Cassidy would have decimated the Medicaid program by cutting over one trillion dollars to the program over the next ten years. Cong. Budget Office, Preliminary Analysis of Legislation That Would Replace Subsidies for Health Care with Block Grants, 6, (Sept. 2017), https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/53126-health.pdf. The proposal would have repealed Medicaid expansion, converted Medicaid's financing structure to a per capita cap, and would have permitted states to block grant their Medicaid programs for certain communities, resulting in drastic cuts to coverage and services that individuals enrolled in Medicaid need and deserve. Mara Youdelman & Kim Lewis, Nat'l Health Law Program, Top 10 Changes to Medicaid Under the Graham-Cassidy Bill, (Sept. 14, 2017), http://www.healthlaw.org/publications/browse-all-publications/top-10-changes-to-medicaid-under-graham-cassidy-bill#.Wft9mmhSzIV.

[77] Letter from Secretary Tom E. Price and CMS Administrator, Seema Verma, to Governors (on file with NHeLP-DC), https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf and Paige Winfield Cunningham, *States Will Be Allowed to Impose Medicaid Work Requirements, Top Federal Official Says*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/powerpost/wp/2017/11/07/states-will-be-allowed-to-impose-medicaid-work-requirements-top-federal-official-says/?utm_term=.0513a6c28c8e.

[78] Kinsey Hasstedt, Understanding Planned Parenthood's Critical Role in the Nation's Family Planning Safety Net, Guttmacher Policy Review, (2017), https://www.guttmacher.org/gpr/2017/01/understanding-planned-parenthoods-critical-role-nations-family-planning-safety-net.

[79] In 2016, 21 percent of Title X clients identified as Black or African American, 3 percent identified as Asian, and 1 percent identified as either Native Hawaiian, Pacific Islander, American Indian or Alaska Native. Also, 32 percent of Title X patients identified as Hispanic or Latina/o. Fowler, C. I., Gable, J., Wang, J., & Lasater, B., *Family Planning Annual Report: 2016 national summary*, RTI International (Aug. 2017), available at https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

13

00396750

Exhibit 105

JA-0001499

access to care under the program.[80] The administration has not only signaled its support for these efforts, but has also put forth its own proposals to restrict access to publicly funded family planning under Title X.[81]

Needless to say, these dangerous proposals would severely limit access to high-quality family planning care for the populations that turn to Title X-funded providers and those who provide care to individuals enrolled in the Medicaid program, including low-income and uninsured women, LGBTQ individuals, communities of color, and young people. It is at best perplexing and at worst profoundly disingenuous that the Department would specifically highlight Title X and Medicaid as fail-safes for those who will lose coverage as a consequence of its IFRs given the administration's clear record of hostility toward these programs.

## C. Most State Coverage Requirements Fail to Guarantee the Full Range of Contraceptive Methods, Services, and Counseling with No Cost-Sharing.

Similarly, the IFRs suggest that the existence of state-level contraceptive coverage requirements somehow diminish the need for a federal requirement. This suggestion ignores the fact that twenty-two states do not have contraceptive coverage laws at all, and that the federal contraceptive coverage requirement made several important advances over laws in the other twenty-eight states.[82] Only four state laws currently match the federal requirement to cover contraception without copayments, deductibles and other out-of-pocket costs.[83] Moreover, few state laws match the federal requirement in terms of the breadth and specificity of the contraceptive methods, services, and counseling that are included.[84] And in any event, no state

---

[80] In 2011, the House voted for the first time in the history of the Title X program to defund the program and the House has proposed to defund it once again for FY 2018. *Title X, Budget & Appropriations,* Nat'l Family Planning & Reprod. Health Ass'n, https://www.nationalfamilyplanning.org/title-x_budget-appropriations, (last updated visited Nov. 3, 2017); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, 115th Cong. (2017) ("None of the funds appropriated in this Act may be used to carry out title X of the PHS Act.").

[81] The White House, Statement Of Administration Policy: H.R. 3354 — Make America Secure and Prosperous Appropriations Act, 2018 (Rep. Frelinghuysen, R-NJ) (Sept. 5, 2017), available at https://www.whitehouse.gov/the-press-office/2017/09/05/hr-3354-make-america-secure-and-prosperous-appropriations-act-2018. For instance, the President's FY 2018 budget plan proposed blocking low-income and uninsured patients from obtaining federally-funded health care services, including Title X-funded care, at Planned Parenthood health centers, even though Planned Parenthood health centers currently serve 41 percent of patients that access contraception through Title X nationwide. Kinsey Hasstedt, Beyond the Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* (Aug. 2017), available at https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x, and White House, Office of Management and Budget, The President's Fiscal Year 2018 Budget: Overview (May 2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/fact_sheets/2018%20Budget%20Fact%20Sheet_Budget%20Overview.pdf  (last visited Nov 3, 2017).

[82] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[83] Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

[84] For example, only three states currently require coverage of female sterilization, and only two states currently require coverage of methods sold over the counter (such as some types of emergency contraception). Several additional states have enacted new requirements that will take effect in 2018 or 2019. See Guttmacher Institute,

14

Exhibit 105                                          00396751                                          JA-0001500

has the authority to regulate plans offered by employers that self-insure, which cover 60% of covered workers nationwide.[85]

The Departments are flatly mistaken that other programs and legal requirements can meet the need for contraceptive coverage created by this rule.

This IFR will cause people to lose contraceptive coverage, and it will harm their health and well-being. It is discriminatory, violates multiple federal statutes and constitutional provisions, ignores Congress's intent that birth control be covered by the ACA, and is based on a distorted picture of the science supporting contraception, as well as of the federal programs supporting and state laws regarding contraception. For all of these reasons YSRJ calls on the Departments to rescind the IFR.


Sincerely,

Yale Students for Reproductive Justice

---

Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017,
http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[85] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey,* Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

00396752

Exhibit 105                                                                        JA-0001501



**Archdiocese of New Orleans**

7887 Walmsley Avenue
New Orleans, LA 70125-3496
Office: (504) 861-9521
Fax (504) 314-9614
Email: archbishop@arch-no.org

Office of the Archbishop

December 5, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 816
Baltimore, MD 21244-8016

**Subject:**    **Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

Dear Sir or Madam:

As Archbishop of the Archdiocese of New Orleans, I write on behalf of the Archdiocese and its many Roman Catholic ministries to submit the following comments on the interim final rules, published at 82 Fed. Reg. 47838 (Oct. 13, 2017), on moral exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act ("ACA").[1]

In accord with Roman Catholic teaching and morals, I oppose any contraception, especially any drugs or devices that can cause abortion.

First, as set forth in my comments on the companion interim rule on religious exemptions and for the reasons set forth there, I believe HHS should reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans. My comments on the companion interim rule are attached here for convenience.

Second, in regard to the list of those eligible for an exemption for moral reasons as set forth in this final interim rule, that list is slightly narrower than the list of those who are exempt for religious reasons in the companion rule. HHS asks whether the list of those who are exempt for moral reasons should be the same as those exempt for religious reasons in the companion interim rule. I urge HHS to answer that question "YES"! The list of stakeholders who are exempt for

---

[1] Today I have also filed comments on the companion interim final rule, published at 82 Fed Reg. 47792 (Oct. 13, 2017), concerning exemptions and accommodations for religious objections to contraceptives. The two sets of comments should be considered together, and each set of comments includes the other as an attachment which we incorporate by reference. Unless context indicates otherwise, the use of the term "contraceptives" refers to contraceptives, sterilization, and related education and counseling, and "contraceptive coverage" refers to coverage of these items. The "mandate" refers to the requirement to cover these items.

00207050

Exhibit 106

moral reasons should be at least as broad as the list of those who are exempt for religious reasons. The reasons that HHS has offered for those with religious exemptions exist in parallel for those with moral reasons for the exemption.

Therefore, in conclusion, I urge HHS to reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans as part of "preventive services." In addition, the list of exemptions for those with moral objections should be as broad as the list of the exemptions for those with religious objections. This interim final rule should be adjusted so that it parallels the list of stakeholders with religious objections in the companion interim final rule.

I hope and pray you give this reflection and attention.

Sincerely,

Most Reverend Gregory M. Aymond
Archbishop of New Orleans

00207051

Exhibit 106                                                                                                              JA-0001503



**Archdiocese of New Orleans**                    Office of the Archbishop

7887 Walmsley Avenue
New Orleans, LA 70125-3496
Office: (504) 861-9521
Fax (504) 314-9614
Email: archbishop@arch-no.org

December 5, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 816
Baltimore, MD 21244-8016

**Subj:  Religious Exemptions and Accommodations for Coverage of Certain Preventive
Services Under the Affordable Care Act**

Dear Sir or Madam:

As Archbishop of the Archdiocese of New Orleans, I write on behalf of the Archdiocese and its many Roman Catholic ministries to submit the following comments on the interim final rules, published at 82 Fed. Reg. 47792 (Oct. 13, 2017), on religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act ("ACA").[1]

In accord with Roman Catholic teaching and morals, I oppose any contraception, especially any drugs or devices that can cause abortion.

Therefore, first, I would urge the Department of Health and Human Services("HHS") to reconsider and rescind the mandate requiring contraception and sterilization in health plans because these are not "preventive services" and do not prevent disease or illness. Instead, the drugs, devices and procedures impair the healthy condition known as fertility and pose health risks of their own to women. In addition, the mandate is at odds with the preventive-services provision of the Affordable Care Act ("ACA") upon which the mandate is purportedly based. Further, to the extent that the mandate requires coverage of all drugs and devices that can cause an abortion, it violates the ACA provisions addressing abortion coverage, non-preemption of state law and other laws.

_____

[1] Today I have also filed comments on the companion interim final rule, published at 82 Fed Reg. 447838 (Oct. 13, 2017), concerning exemptions and accommodations for moral objections to contraceptives. The two sets of comments should be considered together, and each set of comments includes the other as an attachment which we incorporate by reference. Unless context indicates otherwise, the use of the term "contraceptives" refers to contraceptives, sterilization, and related education and counseling, and "contraceptive coverage" refers to coverage of these items. The "mandate" refers to the requirement to cover these items.

00207052

Exhibit 106                    JA-0001504

Second, in the present interim final rule and the companion rule in regard to moral convictions, HHS leaves to the discretion of the Health Resources and Services Administration ("HRSA") to decide whether to include contraceptives in women's preventive services Guidelines. Yet, those guidelines have never been the subject of notice and comment rulemaking and significant questions remain whether contraceptives are an appropriate subject for inclusion in the list of preventive services in the first place. For reasons that have been explained previously, especially in comments made on this interim final rule and other rules by the United States Conference of Catholic Bishops, HHS could reasonably conclude that contraceptives are not preventive services. At the very least, HHS should clarify that the mandate does not apply to any drug or device that can disrupt an existing pregnancy to comply with the abortion and non-preemption provisions of applicable law.

Third, I commend HHS in regard to the exemptions crafted in this interim final rule and the companion rule for those with religious objections to contraceptive coverage.

The last point that I make centers around the HHS indication that exempt entities will not be required to comply with self-certification. At the same time, HHS asks whether the exempt entities or others would find value in maintaining or submitting a certification. While I agree with not requiring self-certification, I see no need or value in any certification since any such certification raises religious, moral and legal concerns.

In conclusion, I ask that HHS reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans as part of "preventive services" or, at a minimum, consistent with the abortion and non-preemption provisions of the ACA and with the Weldon amendment, not mandate coverage of any drug or device that can disrupt an existing pregnancy. While the mandate or any portion of it remain in effect, I support the exemptions that this rule and the companion rule together provide to those with religious and moral objections.

I hope and pray you give this reflection and attention.

Sincerely,

Most Reverend Gregory M. Aymond
Archbishop of New Orleans

00207053

Exhibit 106                                    JA-0001505

[intentionally omitted]



**ARCHDIOCESE OF ST. LOUIS**
*Cardinal Rigali Center*
*20 Archbishop May Drive*
*Saint Louis, Missouri 63119*

General Counsel
*p) 314.792.7075*
*f) 314.792.7079*
*tombuckley@archstl.org*

December 4, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8010
Baltimore, MD 21244-8010

  **Re:** <u>**Religious Exemptions and Accomodations for Coverage of Certain**</u>
     <u>**Preventive Services under the Affordable Care Act, RIN 0928-AT20**</u>

Dear Sir or Madam:

  On behalf of the Archdiocese of St. Louis, its agencies and parishes, we respectfully submit the following comments on the interim final rules, published at 82 Fed. Reg. 47792 (Oct. 13, 20170, on religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act ("ACA").

  We agree with HHS that the contraceptive mandate and accommodations, as applied to religious objectors, violated the Religious Freedom Restoration Act ("RFRA"), and we commend HHS and the other Departments for their concession of this point, and for the exemptions that the interim final rules provide to avoid further violations of RFRA. We also agree with the Department's indication that exempt entities should not be required to comply with a self-certification process, and we recommend that no such form or process be developed or necessary to claim the exemption.

  We concur in and adopt as if more fully set forth herein the comments provided by the Office of the General Counsel for the United States Conference of Catholic Bishops filed on November 21, 2017.

      Respectfully submitted,

      *Thomas M. Buckley*

      Thomas M. Buckley

00207139

Exhibit 107