

ASSOCIATION OF CATHOLIC COLLEGES AND UNIVERSITIES
One Dupont Circle NW, Suite 650, Washington, DC 20036
ph 202-457-0650 · fax 202-728-0977 · accu@accunet.org · www.accunet.org

November 28, 2017

Submitted electronically to http://www.regulations.gov

Centers for Medicare & Medicaid Services
U.S. Department of Health and Human Services
Room 445-G, Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

Attention:

Jeff Wu, Centers for Medicare & Medicaid Services, U.S. Department of Health and Human Services
Amber Rivers and Matthew Litton, Employee Benefits Security Administration, U.S. Department of Labor
Karen Levin, Internal Revenue Service, U.S. Department of the Treasury

Re: **Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, RIN 0938-AT20**

Dear Mr. Wu, Ms. Rivers, Mr. Litton, and Ms. Levin:

The Association of Catholic Colleges and Universities ("ACCU" or the "Association") appreciates the opportunity to comment on the interim final rules with request for comments on Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (the "Interim Final Rules").[1] In brief, ACCU is pleased that the new definition of "religious employer" will expand its members' options by recognizing them as exempt from the so-called "contraceptive mandate" as nonprofit organizations and, with respect to student health insurance coverage, as institutions of higher education. ACCU agrees with the Departments that the regulations should continue to treat student health insurance coverage in the same manner as employee health plans.

ACCU and its members and their interest in the Interim Final Rules

*ACCU*

Founded in 1899, ACCU serves as the collective voice of U.S. Catholic higher education. The Association represents **93%** of the **210** Catholic colleges and universities in the United States that offer undergraduate degree programs and are also regionally accredited and independently chartered.

Through programs and services, ACCU strengthens and promotes the Catholic identity and mission of its member institutions so that all associated with Catholic higher education can contribute to the

[1] 82 Fed. Reg. 47792 (Oct. 13, 2017).

greater good of the world and the Roman Catholic Church. ACCU's principal purposes are to help member institutions strengthen their stated Catholic mission and to foster collaboration among Catholic colleges and universities.

ACCU maintains contact with the leadership of the Catholic Church principally through the United States Conference of Catholic Bishops ("USCCB") and the Congregation for Catholic Education of the Holy See. The Association also actively works with other Catholic organizations, such as the Association for Student Affairs at Catholic Colleges and Universities, and other higher education associations, including those with religious-affiliated members, such as the National Association of Independent Colleges and Universities.

*Interest in the Interim Final Rules*

As an association of Catholic colleges and universities, ACCU supports healthcare for all as an aspect of human dignity,[2] but also is concerned that its members not be legally required to cover or arrange for coverage of medical services that are inconsistent with the teachings of the Catholic Church.[3] The interpretation of the Affordable Care Act ("ACA") by the Health Resources and Services Administration ("HRSA") to include coverage of all Food and Drug Administration ("FDA")-approved contraceptives, sterilization procedures, and related education and counseling for women of child-bearing age (the "contraceptive mandate"), coupled with the narrow exemption for "religious employers" under the prior rule, gave rise to such concerns.[4]

As the preamble to the Interim Final Rules notes more generally,[5] the contraceptive mandate has affected ACCU members in varying ways. For example, some ACCU members have health plans that are "grandfathered" under the ACA and are not currently subject to the contraceptive mandate. Some ACCU members participate in "church plans," as to which the Departments lack authority to enforce the contraceptive mandate against third-party administrators pursuant to the so-called "accommodation." Some ACCU members that would have been eligible for the "accommodation" were among the plaintiffs challenging the contraceptive mandate and the accommodation in cases culminating in the U.S. Supreme Court's decision in Zubik v. Burwell.[6] Some ACCU members were among the institutions of higher education that "stop[ped] arranging student plans rather than comply with the contraceptive mandate or be subject to the accommodation with respect to such populations."[7] All ACCU members share an interest in the manner in which the federal government defines religious institutions and the extent to which rules of the federal government would require ACCU members to engage in activities inconsistent with their religious mission.

---

2 See, e.g., Letter from His Eminence Timothy Cardinal Dolan et al. to U.S. Senate and House of Representatives (Mar. 8, 2017), available at http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/joint-letter-to-congress-on-health-care-reform-2017-03-07.cfm.

3 It is well known that the Catholic Church teaches respect for and protection of human life from the moment of conception, as well as openness of marriage to procreation, and therefore opposes abortion and artificial contraception on religious grounds. E.g., Libreria Editrice Vaticana, Catechism of the Catholic Church ¶¶ 1652, 2270-2271, 2370 (1st. Ed. 1994).

4 As you know, the current version of the HRSA guidelines is available at https://www.hrsa.gov/womens-guidelines-2016/index.html, and the current list of FDA-approved contraceptives is available at https://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm522453.htm.

5 82 Fed. Reg. at 47801-47802.

6 136 S. Ct. 1557 (2016).

7 82 Fed. Reg. at 47803.

ACCU's comments focus on issues of particular importance to Catholic higher education.[8]

1. ACCU supports the Departments' expansion of the definition of "religious employer" to cover, among others, ACCU members.

ACCU supports the Departments' broadening of the definition of a "religious employer" exempt from the contraceptive mandate. The prior definition of "religious employer" included only nonprofit entities that are churches; integrated auxiliaries of churches; conventions or associations of churches; or the exclusively religious activities of religious orders.[9] That restrictive view of a "religious employer" was too narrow to encompass ACCU members.

ACCU urged a broader definition of "religious employer" in its comments on the 2013 Notice of Proposed Rulemaking on preventive services under the ACA ("2013 comments").[10] As explained in that letter, under Church law Catholic colleges and universities are required to "make known [their] Catholic identity."[11] All Catholic colleges and universities are recognized by the Catholic Church, and some are also sponsored by Catholic religious orders. Canon law requires a Catholic college or university to obtain "the consent of competent ecclesiastical authority"—typically, the Bishop—before bearing the title or name of Catholic university.[12] In 1990 Pope John Paul II issued the Apostolic Constitution on Catholic Universities Ex corde Ecclesiae ("Ex corde Ecclesiae") as the "magna carta" for Catholic higher education around the world.[13] The Catholic Church defines a "Catholic University" as having four essential characteristics: (1) "a Christian inspiration not only of individuals but of the university community as such"; (2) "a continuing reflection in the light of the Catholic faith upon the growing treasury of human knowledge, to which it seeks to contribute by its own research"; (3) "fidelity to the Christian message as it comes to us through the Church"; and (4) "an institutional commitment to the service of the people of God and of the human family in their pilgrimage to the transcendent goal which gives meaning to life."[14] USCCB subsequently approved The Application of Ex corde Ecclesiae for the United States to implement Ex corde Ecclesiae in this country.[15] For Catholic colleges and universities, the "essential elements of Catholic identity" include a commitment to be faithful to the teachings of the Catholic Church; to adhere to Catholic ideals, principles, and attitudes in carrying out research, teaching, and all other university activities; and to create a campus culture and environment that are expressive and supportive of a Catholic way of life.[16]

Catholic higher education institutions fulfill one of their core religious functions by serving as "a primary

---

[8] USCCB has submitted comments on the Interim Final Rules addressing broader Church concerns. See Letter from A. Picarello et al. to Centers for Medicare and Medicaid Services (Nov. 21, 2017).

[9] 45 C.F.R. § 147.131(a) (as in effect before October 6, 2017).

[10] Letter from M. Galligan-Stierle, ACCU to M. Tavener et al., U.S. Department of Health and Human Services (April 8, 2013), available at https://www.facos.org/Public/Files/Gov%20Affairs/Reg/ACOSAOAO.pdf.

[11] John Paul II, Ex corde Ecclesiae art. 2, § 3 (1990), available at http://w2.vatican.va/content/john-paul-ii/en/apost_constitutions/documents/hf_jp-ii_apc_15081990_ex-corde-ecclesiae.html; accord, USCCB, The Application of Ex corde Ecclesiae to the United States, art. 2(5) (2000) ("Application") ("A responsibility of every Catholic university is to affirm its essential characteristics, in accord with the principles of Ex corde Ecclesiae, through public acknowledgement in its mission statement and/or its other official documentation of its canonical status and its commitment to the practical implications of its Catholic identity . . . ."), available at http://www.usccb.org/beliefs-and-teachings/how-we-teach/catholic-education/higher-education/the-application-for-ex-corde-ecclesiae-for-the-united-states.cfm.

[12] 1983 Codex Iuris Canonici, c.808, available at http://www.vatican.va/archive/ENG1104/__P2O.HTM.

[13] Available at http://w2.vatican.va/content/john-paul-ii/en/apost_constitutions/documents/hf_jp-ii_apc_15081990_ex-corde-ecclesiae.html.

[14] Id. ¶ 13.

[15] See USCCB, Application.

[16] Id. pt. 1, § 7.

\\DC - 082203/000009 - 10869690 v3

and privileged place for a fruitful dialogue between the Gospel and culture."[17] The decision of Catholic colleges and universities to employ non-Catholic faculty and staff and admit non-Catholic students does not diminish the institutions' commitment to their religious mission. To the contrary, it strengthens their commitment to the "continuous quest for truth," which is an integral part of their religious mission.[18] Moreover, as one commentator explains,

> [n]ot every religious school can or will insist that every teacher actively promote religion. But nearly all will at least require every teacher not to interfere. A religious school might hire a nonbelieving math teacher, but it is not likely to permit him to flaunt his nonbelief, to denigrate the church that runs the school, or to set a bad moral example. Thus, even the nonbelieving math teacher has some intrinsically religious responsibilities.[19]

USCCB calls for a "[c]ommitment of witness of the Catholic faith by Catholic administrators and teachers, especially those teaching the theological disciplines, and acknowledgement and respect on the part of non-Catholic teachers and administrators of the university's Catholic identity and mission."[20]

The expanded definition of "religious employer" under the Interim Final Rules includes, among other entities, "nonprofit organizations" and, with respect to student health insurance, "institutions of higher education."[21] All ACCU members are nonprofit organizations and institutions of higher education and generally provide health plans for their employees and students. ACCU is pleased that the Departments have adopted a definition of "religious employer" that is sufficiently broad to cover ACCU members.

2. *ACCU supports the continuing parity of treatment of employee and student health plans.*

Like the prior regulation, the Interim Final Rules treat student health plans in a manner comparable to employee health plans.[22] As expressed in our 2013 comments, ACCU agrees that the same exemption that applies to employee health plans should apply to student health plans as well. As described above, ACCU members have a religious mission that pertains to all aspects of their operations, including health plans for their employees and students. There would be no principled basis to make a distinction between employee and student health plans with respect to application of the religious exemption. ACCU is pleased that the expansion of the exemption will allow religious-affiliated institutions that discontinued student and/or employee health plans under the prior regulation to reinstitute such plans in a manner consistent with their religious beliefs.[23]

---

[17] Ex corde Ecclesiae ¶ 43 (emphasis in original); see also id. at ¶ 26 ("[t]he university community of many Catholic institutions includes members of other Churches, ecclesial communities and religions, and also those who profess no religious belief"); Application intro. (Catholic colleges and universities, as places "where culture and faith intersect," present an opportunity to "bring diversity to American higher education").

[18] Id. ¶ 30.

[19] Douglas Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1411 (1981).

[20] Application pt. 1, § 7.

[21] 82 Fed. Reg. at 47835 (to be codified at 45 C.F.R. § 147.132(a)).

[22] 82 Fed. Reg. at 47834-35 (to be codified at 45 C.F.R. § 147.131(e), 147.132(a)(ii)).

[23] To the extent that employees or students of ACCU member institutions want to obtain contraceptive services that health plans provided by ACCU members do not cover, those employees or students may have other options, such as being covered under a plan of their spouse or their parents; purchasing coverage on the individual market, including on an ACA exchange; or obtaining such services through various governmental programs described in the preamble to the Interim Final Rules. See 82 Fed. Reg. at 47803.

We appreciate your consideration of these comments.

Sincerely,

Michael Galligan-Stierle, Ph.D.
President and CEO

\\DC - 082203/000009 - 10869690 v3

00434988

Exhibit 108

JA-0001522

CHRISTIAN LEGAL SOCIETY

*Seeking Justice with the Love of God*

December 5, 2017

**Submitted Electronically**

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G
Hubert H. Humphrey Building
200 Independence Avenue S.W.
Washington, D.C. 20201

**Re: "Preventive Services" - Comments on Interim Final Rules, Religious Exemptions and Accommodations for Coverage of Certain Preventative Services under the Affordable Care Act**

Dear Sir or Madam:

Christian Legal Society ("CLS") submits the following comments on the Interim Final Rules, Religious Exemptions and Accommodations for Coverage of Certain Preventive Services, 82 Fed. Reg. 47792 (October 13, 2017). Comments were invited on the interim final rules, which set out expanded exemptions for certain entities and individuals who have religious objections to providing insurance coverage for contraceptives under the Affordable Care Act ("ACA"). The final interim rules also leave in place the "accommodation" process for certain exempt entities that wish to use it voluntarily.

Since the enactment of the ACA in 2010, CLS filed comments each time the Department of Health and Human Services ("HHS") issued a regulatory proposal on contraceptive coverage.[1] A recurring concern in CLS' earlier comments regarding the ACA's contraceptive coverage requirement and regulations (hereinafter "the Mandate") focused on the continued insistence of bifurcating religious organizations into two categories: 1) houses of worship that qualified for the exemption and 2) religious ministries or nonprofits that did not qualify for the exemption. CLS argued that if coverage of contraceptives was to be mandated, then all entities with religious objections should be exempt. Indeed, CLS argued that the previous exemption from the Mandate

[1] On June 19, 2012, CLS filed comments on the Advanced Notice of Proposed Rulemaking on Preventive Services, 77 Fed. Reg. 16501 (Mar. 21, 2012), *available at* http://www.clsnet.org/document.doc?id=368. On April 8, 2013, CLS filed comments on the Advanced Notice of Proposed Rulemaking on Preventive Services, 78 Fed. Reg. 8456 (Feb. 6, 2013), *available at* http://www.clsnet.org/document.doc?id=476. On October 21, 2014, CLS filed comments on the Notice of Proposed Rulemaking on Coverage of Certain Preventive Services under the Affordable Care Act, 79 Fed. Reg. 51118 (Aug. 27, 2014), *available at* http://clsnet.org/document.doc?id=805. On October 27, 2014, CLS filed comments on the Interim Final Rules, Coverage of Certain Preventative Services under the Affordable Care Act, 79 Fed. Reg. 51092 (Aug. 27, 2014), *available at* https://www.clsnet.org/document.doc?id=1109.

8001 Braddock Rd, Ste. 302 - Springfield, VA 22151 - (703) 642-1070 - fax (703) 642-1075 – clshq@clsnet.org - www.clsnet.org

was too narrow and that the accommodation HHS created as relief for non-exempt entities was insufficient to relieve the substantial burden the Mandate placed on them.

A second concern CLS also outlined in its earlier comment letters was that the Mandate, despite inclusion of the accommodation, violated the constitutional and federal statutory rights of religious nonprofits, particularly the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* (2012) ("RFRA"). CLS pointed out that a broad exemption for religious objectors was required under RFRA, the exemption being prudent as a matter of public policy and consistent with longstanding traditions protecting conscience in the country.

These interim final rules appropriately respond to the many concerns that CLS and countless other churches, ministries, and religious nonprofits previously raised in past comment letters or through lawsuits. CLS is pleased to join other commentators in applauding these interim final rules.

As CLS previously noted, the contraceptive coverage requirement and regulations, despite inclusion of the accommodation, violated the constitutional and federal statutory rights of religious nonprofits, including RFRA. By extending the exemption, HHS has now included all entities that object to establishing, offering, maintaining, providing, or arranging coverage for some or all contraceptive services based upon sincerely held religious beliefs. By finally including all religious nonprofits that have continually objected to providing life-destroying drugs, HHS is finally recognizing the Constitutional rights of these entities.

CLS praises HHS for acknowledging that the Mandate and accommodation, as applied to religious objectors, violated RFRA. CLS further praises HHS for the expanded exemption the interim final rules provide, thereby avoiding further RFRA violations.

RFRA requires the federal government to demonstrate an actual compelling interest, unachievable by less restrictive means before it may restrict a citizen's religious practice. 42 U.S.C. § 2000bb-1(b). *See Burwell v. Hobby Lobby*, 573 U.S. ___ (2014). HHS now concedes that "application of the Mandate to entities with sincerely held religious objections … does not serve a compelling governmental interest." 82 Fed. Reg. at 47800. Accordingly, HHS rightfully "created a broader exemption, rather than simply adjusting the accommodation process." *Id.*

The interim final rules are in step with the tradition of bipartisan protection of religious tolerance. Respect for this tradition of bipartisan protection of citizens' rights not to participate in the Mandate on religious grounds required, at a minimum, the action HHS has now taken – namely, expanding the exemption to include all non-governmental entities that object to providing insurance coverage for contraceptives based upon sincerely held religious beliefs.

Respectfully submitted,

/s/ Kimberlee Wood Colby
Kimberlee Wood Colby
Director, Center for Law and Religious Freedom
Christian Legal Society

00436209

**Chair:**
Ms. Barbara A. Boigegrain

**Secretary/Treasurer:**
Mr. Andrew Q. Hendren, Esquire

Wespath Benefits and Investments
1901 Chestnut Avenue
Glenview, Illinois 60025
(847) 866-4200

**Chair Emeritus:**
Mr. John G. Kapanke

**Members:**
Rev.Dr. Todd Adams
*Disciples of Christ*
Mr. David Anderson
*Community of Christ*
Mr. Louis Barbarin*
*American Baptist Churches*
Mr. Brian Bodager
*United Church of Christ*
Ms. Barbara A. Boigegrain*
*United Methodist Church*
Mr. John H. Bolt
*Christian Reformed Church in North America*
Mr. John Brummitt
*National Association of Free Will Baptists*
Mr. Gary D. Campbell
*Presbyterian Church in America*
Mr. Nevin Dulabaum
*Church of the Brethren*
Dr. Craig A. Dunn
*Wesleyan Church*
Dr. O. S. Hawkins *
*Southern Baptist Convention*
Mr. Paul Hawkinson
*Evangelical Covenant Church*
Mr. Reggie Hundley
*Christian Churches Pension Plan*
Mr. Jeffrey A. Jenness*
*Board of Pensions of the Church of God (IN)*
Rev. Dr. Jeffrey J. Jeremiah
*Evangelical Presbyterian Church*
Mr. Raymond Jimenenz
*General Conference of Seventh-Day Adventists*
Mr. Marlo J. Kauffman
*Mennonite Church*
Mr. Michael Kimmel
*Reform Pension Board*
Rev. Ross I. Morrison
*Evangelical Free Church of America*
Rev. Richard Nugent
*Unitarian Universalist Association*
Ms. Kelly Oliveira
*Reformed Church in America*
Mr. Joshua Peterman
*Wisconsin Evangelical Lutheran Synod*
Mr. Jonathan Phillips
*International Church of the Foursquare Gospel*
Mr. John M. Preis *
*Young Men's Christian Association*
Br. Michael F. Quirk, FSC*
*Christian Brothers Services*
Mr. Arthur D. Rhodes
*Church of God Benefits Board (TN)*
Mr. Larry Roberts
*Free Methodist Church of North America*
Mr. James F. Sanft*
*Lutheran Church-Missouri Synod*
Mr. Stephen Schultz
*Baptist General Conference–Converge Worldwide*
Mr. Mitchell J. Smilowitz*
*Joint Retirement Board for Conservative Judaism*
Rev. Frank C. Spencer *
*Presbyterian Church (U.S.A.) Board of Pensions*
Rev. Jeffrey Thiemann*
*Evangelical Lutheran Church in America*
Mr. James P. Thomas, CPA
*Churches of God, General Conference*
Rev. Bruce Verkruyse, Jr.
*Association of Unity Churches International*
Rev. Don L. Walter
*Church of the Nazarene*
Mr. Roger Wiles
*Associate Reformed Presbyterian Church*
Ms. Mary Kate Wold*
*Episcopal Church*

** Steering Committee Members*

# CHURCH ALLIANCE
Acting on Behalf of Church Benefits Programs

**Counsel:**
**K&L Gates LLP**
1601 K Street NW
Washington D.C. 20006
Tel (202) 778-9000
Fax (202) 778-9100

December 5, 2017

By electronic submission (http://www.regulations.gov)

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS–9940–IFC
P.O. Box 8016
Baltimore, MD 21244–8016

Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA

To Whom It May Concern:

The Church Alliance submits this comment in response to the interim final rules (the "Rules") regarding religious exemptions and accommodations for coverage of certain preventive services under the Patient Protection and Affordable Care Act ("ACA") issued jointly by the Department of the Treasury, the Department of Labor, and the Department of Health and Human Services (together, the "Departments") and published at 82 Fed. Reg. 47,792 (Oct. 13, 2017).

The Church Alliance is a coalition of the chief executive officers of 37 church benefits organizations, shown on the left side of this letterhead. As discussed in more detail below, the Church Alliance supports the religious liberty principle that no church plan should be forced to violate its religious beliefs in the provision of health benefits. Therefore, even though many Church Alliance members have no religious objection to providing the wide range of preventive services required by section 2713 of the ACA, the Church Alliance applauds the expansion of the religious exemption in the Rules, consistent with that religious liberty principle.

By way of background, the Church Alliance has submitted comments on five separate occasions regarding the ACA's preventive services coverage requirement (the "Coverage Requirement"):

- on September 28, 2011, on the interim final rules published at 76 Fed. Reg. 46,621 (Aug. 3, 2011);[1]
- on June 19, 2012, on the advance notice of proposed rulemaking published at 77 Fed. Reg. 16,501 (Mar. 21, 2012);[2]

[1] Letter from Church Alliance to Ctrs. for Medicare and Medicaid Servs. (Sept. 28, 2011), *available at* http://church-alliance.org/sites/default/files/images/u2/Comment_Letter_Contraceptive_Religious_Employer_09_28_11.pdf.

[2] Letter from Church Alliance to Ctrs. for Medicare and Medicaid Servs. (Jun. 19, 2012), *available at* http://church-alliance.org/sites/default/files/images/u2/Church_Alliance_Comment_on_ANPRM_on_Preventive_Services_June_2012.pdf.

- on April 8, 2013, on the notice of proposed rulemaking published at 78 Fed. Reg. 84,566 (Feb. 6, 2013);[3]
- on October 27, 2014, on the notice of proposed rulemaking published at 79 Fed. Reg. 51,092 (Aug. 27, 2014);[4] and
- on September 20, 2016, in response to the request for information on coverage for contraceptive services published at 81 Fed. Reg. 47,741 (Jul. 22, 2016).[5]

We appreciate this opportunity to build on our previous comments as the Departments consider religious exemptions and accommodations for coverage of certain preventive services under the ACA.

## I. BACKGROUND ON THE CHURCH ALLIANCE

The Church Alliance represents 37 church benefits boards, covering mainline and evangelical Protestant denominations, two branches of Judaism, and Catholic schools and institutions. The Church Alliance members provide employee benefit plans, including in many cases, medical coverage, to approximately one million participants (clergy and lay workers) serving over 155,000 churches, synagogues, and affiliated organizations. These medical programs are defined as "church plans" under section 3(33) of the Employee Retirement Income Security Act of 1974 ("ERISA") and section 414(e) of the Internal Revenue Code (the "Code").

The contraceptive services requirement of section 2713 of the ACA has created challenges for some Church Alliance members. The plans of a few Church Alliance members, reflecting the religious beliefs of the churches with which they are associated, exclude coverage for all contraceptives. Other programs whose associated churches do not object to contraception, but hold fundamental convictions against abortion, exclude coverage for contraceptives that are or could be abortifacients, such as so-called "morning-after pills" or "emergency contraceptives." Many of the health care plans associated with the members of the Church Alliance do not impose any specific restrictions on contraceptive coverage. However, the Church Alliance agrees that its members should not have to risk significant penalties in order to follow the religious beliefs of the churches with which they are associated.

## II. INTERIM FINAL RULES

The Church Alliance is very grateful that the Departments have expanded the religious exemption in the Rules. As contrasted with earlier versions of regulations on the Coverage Requirement, the Rules no longer require a church or an employer associated with the church to choose between violating its religious beliefs and violating the law. The preamble to the Rules states that the exemption was expanded "among other reasons, to provide for participation in the health insurance market by certain entities or individuals free from penalties for violating sincerely held religious beliefs opposed to providing or receiving coverage of contraceptive services . . . ."[6] The Church Alliance supports that reasoning. We also commend the Departments for moving to a plan-based exemption, which the Church Alliance recommended in its prior comments.

As the Departments continue to work on the Rules, we would like to raise a few questions and technical suggestions for consideration.

[3] Letter from Church Alliance to Ctrs. for Medicare and Medicaid Servs. (Apr. 8, 2013), *available at* http://church-alliance.org/sites/default/files/images/u2/comment-letter-4-8-13.pdf.
[4] Letter from Church Alliance to Employee Benefits Security Admin. (Oct. 27, 2014), *available at* http://church-alliance.org/sites/default/files/images/u2/Comment-Letter-ACA-Preventive-Services-IFR-10-27-14.pdf.
[5] Letter from Church Alliance to Ctrs. for Medicare and Medicaid Servs. (Sept. 20, 2016), *available at* http://church-alliance.org/sites/default/files/images/u2/CA-Response-RFI-09-20-16.pdf.
[6] 82 Fed. Reg. 47,792, 47,815 (Oct. 13, 2017).

### A. Clarify that an Employer Adopting an Exempt Plan Cannot Be Penalized

The preamble to the Rules makes clear that if a plan is exempt under 45 C.F.R. § 147.132, neither the plan sponsor, the plan, nor an issuer providing coverage in connection with the plan will be penalized as a result of the plan not providing contraceptive coverage:

> Section 147.132(a)(1) introductory text and (a)(1)(i), by specifying that ''[a] group health plan and health insurance coverage provided in connection with a group health plan'' is exempt ''to the extent the plan sponsor objects as specified in paragraph (a)(2),'' exempt the group health plans the sponsors of which object, and exempt their health insurance issuers from providing the coverage in those plans (whether or not the issuers have their own objections).[7]

While the Rules recognize that exempt plans may cover multiple employers, the Rules do not recognize that employers adopting such plans that are not themselves "plan sponsors" can be penalized $100 per day for each employee not provided contraceptive coverage.[8] Employers that are "so closely associated" with an exempt plan sponsor that they are permitted to participate in the sponsor's health plan should not be penalized.[9] Perhaps such employers avoid a penalty on account of Section 54.9815-2713T, which is added to 26 C.F.R. Part 54, but this is not clear. We suggest this be recognized (or clarified) in guidance.

### B. Revocation of Accommodation

The preamble to the Rules states:

> If an eligible organization wishes to revoke its use of the accommodation, it can do so under these interim final rules and operate under its exempt status.[10]

However, it is unclear how such a revocation is to be accomplished, and whether the objecting organization must notify the applicable issuer and third party administrator in a particular way. The Church Alliance would appreciate the Departments' guidance on this question.

### C. Certification or Documentation of Exemption

The preamble to the Rules states:

> The Departments invite public comment on whether exempt entities, or others, would find value either in being able to maintain or submit a specific form of certification to claim their exemption, or in otherwise receiving guidance on a way to document their exemption.[11]

The Church Alliance respectfully requests that the Departments refrain from specifying forms of certification to claim or maintain an exemption. It is our understanding, as stated in the preamble to the Rules, that "exempt entities will not be required to comply with a self-certification process."[12] Moreover, the Rules state that "the exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section [45 C.F.R. § 147.132] objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its

[7] *Id.* at 47,808.
[8] *See* 26 U.S.C. §§ 4980D(b) and (e)(1) (imposing the $100 per day tax for any failure of a group health plan to meet the requirements of chapter 100 (relating to group health plan requirements) on the employer).
[9] 82 Fed. Reg. at 47,810.
[10] *Id.* at 47,813.
[11] *Id.* at 47,809.
[12] *Id.* at 47,808.

sincerely held religious beliefs."[13] We urge the Departments to refrain from issuing guidance on "a specific form of certification," because this guidance could be interpreted as setting a rigid standard or requirement, which may create Religious Freedom Restoration Act[14] concerns for some exempt entities. Such guidance would appear to us to be contrary to both the preamble to the Rules and the Rules themselves, which appear to condition exemption only on meeting the description in paragraph (a)(1) and objecting to certain coverage or payments based on religious beliefs, and do not include a certification.

However, the Church Alliance would find value in receiving guidance that is flexible on ways to document the religious exemption.

The Church Alliance is grateful for the expanded religious exemption in the Rules, but would welcome additional guidance on the issues we have described above. Should you have any questions or wish to discuss these issues further, please contact the undersigned at (202) 778-9000.

Sincerely,

Karishma S. Page
Partner,
K&L Gates LLP
On Behalf of the Church Alliance

[13] *Id.* at 47,835.
[14] 42 U.S.C. § 2000BB-1.



THE ETHICS & RELIGIOUS
LIBERTY COMMISSION
OF THE SOUTHERN BAPTIST CONVENTION

Contact us:
202-547-8105
dc@erlc.com

_Submitted Electronically_

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9925-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, RIN 0938-AT20**

Dear Sir or Madam:

In response to the request for written comment as a part of the interim final rules issued by by the U.S. Department of Health and Human Services (HHS), the Ethics & Religious Liberty Commission (ERLC) of the Southern Baptist Convention (SBC) respectfully submits the following comments.[1]

The Southern Baptist Convention is America's largest Christian protestant denomination with more than 15.2 million members in over 46,000 churches nationwide. As the Convention's ethics and public policy entity, the ERLC represents Southern Baptists before the U.S. government.

The ERLC has been involved in HHS's regulatory action on this matter for many years. Among other agency actions, the ERLC submitted comments on April 8, 2013, in response to HHS's Notice of Proposed Rulemaking (NPRM) regarding Coverage of Certain Preventive Services under the Affordable Care Act.[2] This remains an issue of great concern for millions of Southern Baptists. ERLC commends HHS's interim final rules issued October 13, 2017, to resolve this important conflict by finally providing an exemption from HHS's preventive services mandate for religious reasons, published at 82 Fed. Reg. 47792 (Oct. 13, 2017).

[1] The ERLC also submitted comments on the companion interim final rule, published at 82 Fed. Reg. 47838 (Oct. 13, 2017), relating to moral exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act. These two letters should be considered together, and each letter is included as an attachment to the other letter, incorporated by reference.

[2] 78 Fed. Reg. 8456 (February 6, 2013).

The ERLC's comments filed in 2013 laid out three main points of concern with the implementation of the preventive care mandate.

First, the mandate represented a fundamental breach of constitutional and statutory rights. The First Amendment prohibits the federal government from burdening the free exercise of religion. Further, under the Religious Freedom Restoration Act (RFRA), the federal government may not substantially burden the free exercise of religious without a compelling interest and then may only do so using the least restrictive means possible. The ERLC argued in 2013 and maintains today that HHS's 2013 mandate and its so-called religious accommodation effected a substantial burden on the free exercise of religion, lacked a compelling governmental interest, and used means other than the least restrictive possible.

Second, the preventive care mandate substantially burdened the free exercise of religion of millions of Southern Baptists because the preventive care mandate offended specific tenets of faith and conscience. Southern Baptists do not necessarily have doctrinal objections to the use of contraception in the context of monogamous marriage. The overwhelming majority do, however, object to the use of contraceptives with abortifacient properties. In the nearly 50 years since Roe v. Wade, the previous Administration's preventive care mandate represented the first time the government had forced pro-life citizens to directly pay for insurance coverage that includes drugs with abortifacient properties.

Third, the ERLC objected to the fact that the accommodation in the 2013 rules was far too narrow in their scope and applicability in that many religious organizations and companies were not covered. In fact, HHS stated that, "this proposal would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." Houses of worship and their integrated auxiliaries deemed religious by HHS are not the only institutions and individuals that possess protection of their freedoms of conscience and religious expression. The freedom of conscience is a God-ordained human principle not subject to the political aims of a government agency.

With respect to the new interim final rules, ERLC commends HHS for providing a religious exemption to the preventive care mandate regarding contraception consistent with HHS's obligations under the U.S. Constitution and RFRA. In particular, ERLC commends HHS for acknowledging that the original preventive care mandate and accommodation violated the RFRA

rights of many entities.[3] ERLC also commends HHS for extending this exemption to the full range of entities, including churches, nonprofit organizations, and for-profit entities which have religious objections. Americans with deeply held religious objections to abortion who were forced by their government to violate those beliefs by paying for products that caused abortions welcome this relief.

The ERLC respectfully urges finalization of the rules as written because they provides a true religious exemption to the preventive care mandate. On behalf of millions of Southern Baptists, the ERLC is grateful for HHS action to preserve the fundamental principle of the free exercise of religious liberty.

We are grateful for the opportunity to comment.

Respectfully submitted,

Russell Moore
President
Ethics & Religious Liberty Commission
of the Southern Baptist Convention

Travis Wussow
Vice President of Public Policy & General Counsel
Ethics & Religious Liberty Commission
of the Southern Baptist Convention

[3] "Upon further examination of the relevant provisions of the Affordable Care Act and the administrative record on which the Mandate was based, the Departments have concluded that the application of the Mandate to entities with sincerely held religious objections to it does not serve a compelling governmental interest." 82 Fed. Reg. at 47800

*Addendum*

00373661

Exhibit 111

JA-0001532

THE ETHICS & RELIGIOUS LIBERTY COMMISSION
OF THE SOUTHERN BAPTIST CONVENTION

Contact us:
202-547-8105
dc@erlc.com

*Submitted Electronically*

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-9925-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Re: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, RIN 0938-AT46**

Dear Sir or Madam:

In response to the request for written comment as a part of the interim final rules issued by by the U.S. Department of Health and Human Services (HHS), the Ethics & Religious Liberty Commission (ERLC) of the Southern Baptist Convention (SBC) respectfully submits the following comments.[1]

The Southern Baptist Convention is America's largest Christian protestant denomination with more than 15.2 million members in over 46,000 churches nationwide. As the Convention's ethics and public policy entity, the ERLC represents Southern Baptists before the U.S. government.

The ERLC has been involved in HHS's regulatory action on this matter for many years. The ERLC submitted comments on April 8, 2013, in response to HHS's Notice of Proposed Rulemaking (NPRM) regarding Coverage of Certain Preventive Services under the Affordable Care Act.[2] This remains an issue of great concern for millions of Southern Baptists. ERLC commends HHS's interim final rules issued October 13, 2017, to resolve this important conflict by finally providing an exemption from HHS's preventive services mandate for religious reasons, published at 82 Fed. Reg. 47838 (Oct. 13, 2017).

[1] The ERLC also submitted comments on the companion interim final rule, published at 82 Fed. Reg. 47792 (Oct. 13, 2017), relating to religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act. These two letters should be considered together, and each letter is included as an attachment to the other letter, incorporated by reference.

[2] 78 Fed. Reg. 8456 (February 6, 2013).

The ERLC's comments filed in 2013 laid out three main points of concern with the implementation of the preventive care mandate.

First, the mandate represented a fundamental breach of constitutional and statutory rights of religious freedom and conscience. The First Amendment prohibits the federal government from burdening the free exercise of religion. As HHS points out in the preamble to the interim final rules, Congress has a long history of protecting conscience rights related to abortion for both religious and moral reasons.[3]

Second, the preventive care mandate substantially burdened the free exercise of religion and consciences of millions of Southern Baptists because the preventive care mandate offended specific tenets of faith and conscience. Southern Baptists do not necessarily have doctrinal objections to the use of contraception in the context of monogamous marriage. The overwhelming majority do, however, object to the use of contraceptives with abortifacient properties for religious and moral reasons. In the nearly 50 years since Roe v. Wade, the previous Administration's preventive care mandate represented the first time the government had forced pro-life citizens to directly pay for insurance coverage that includes drugs with abortifacient properties.

Third, the ERLC objected to the fact that the accommodation in the 2013 rules was far too narrow in their scope and applicability in that many organizations and companies were not covered. In fact, HHS stated that, "this proposal would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." Houses of worship and their integrated auxiliaries deemed religious by HHS are not the only institutions and individuals that possess protection of their freedoms of conscience. The freedom of conscience is a God-ordained human principle not subject to the political aims of a government agency.

With respect to the new interim final rules, ERLC commends HHS for providing a moral exemption to the preventive care mandate regarding contraception consistent with HHS's discretion under the Affordable Care Act and consistent with federal law, federal regulation, and founding principles. In particular, ERLC commends HHS for acknowledging that "Congress did not set forth—and [HHS and the Departments] do not possess—interest that require [them] to violate sincerely held moral convictions in the course of generally requiring contraceptive coverage."[4] ERLC also commends HHS for extending this exemption to a broad range of entities, including churches, nonprofit organizations, and some for-profit entities which have moral objections. Americans with deeply held

---

[3] 82 Fed. Reg. at 47838 n.1, 47844-46.

[4] 82 Fed. Reg. at 47848.

moral objections to abortion who were forced by their government to violate their consciences by paying for products that caused abortions welcome this relief.

The ERLC respectfully urges finalization of the rules for a range of entities at least as broad as proposed because they finally provides a true moral exemption to the preventive care mandate.

On behalf of millions of Southern Baptists, the ERLC is grateful for HHS action to preserve the fundamental principle of the freedom to live according to one's own conscience.

We are grateful for the opportunity to comment.

Respectfully submitted,

Russell Moore
President
Ethics & Religious Liberty Commission
of the Southern Baptist Convention

Travis Wussow
Vice President of Public Policy & General Counsel
Ethics & Religious Liberty Commission
of the Southern Baptist Convention



ADVANCING FAITH, FAMILY AND FREEDOM

December 4, 2017

*Submitted Electronically*
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G
200 Independence Avenue SW.
Washington, DC 20201

Re: Public Comments in Regard to Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act
**ID: CMS-2014-0115-13773**

Dear Sir or Madam:

The Family Research Council (FRC) respectfully submits the following comments on the Interim Final Rules (82 Fed. Reg. 47792, October 13, 2017) entitled "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act".

On October 6, 2017, the Departments of Health and Human Services (HHS), Treasury, and Labor issued two companion interim final rules that provide conscience protections to Americans who have a religious or moral objection to being forced by the federal government under the "HHS contraceptive mandate" to pay for healthcare insurance coverage that includes sterilization or contraception in their employee health insurance plans, especially since some of those drugs and devices can kill a human embryo. On behalf of the Family Research Council (FRC), which represents hundreds of thousands of American families, we strongly support these interim final rules.

The Religious Exemption (45 CFR § 147.132) applies to any objecting employer or health insurance issuer. The Moral Exemption (45 CFR § 147.133) applies to any objecting nonprofit organization or for-profit entity that is not publicly traded, and objecting health insurance issuers. Objecting entities may also choose the now-optional accommodation process previously imposed by the Obama Administration.

These new rules provide much-needed relief from the HHS contraceptive mandate, which violated current religious freedom law. Religious freedom is protected in the First Amendment of the Constitution and statutes such as the Religious Freedom Restoration Act (RFRA). Congress has also enacted, in addition, laws such as the Church Amendments, Coats Amendment, and the Weldon Amendment over the past 35 years to protect the conscience rights of healthcare workers from government discrimination based on their objections to abortion and other services.

FAMILY RESEARCH COUNCIL
801 G STREET NW, WASHINGTON, D.C. 20001 • 202-393-2100 • 202-393-2134 FAX • (800) 225-4008 ORDER LINE • FRC.ORG

**Background on the Obama-era HHS Contraception Mandate**

The *Patient Protection and Affordable Care Act* (PPACA, P.L. 111-148, "Obamacare") contains a federal mandate for private health insurance plans to cover "preventive care" services "with respect to women" without a direct cost to the patient (42 USC § 300gg–13(a)(4)), as determined by HHS' Health Resources and Services Administration (HRSA). This provision of Obamacare triggered guidance by HRSA that mandated coverage in group health insurance plans that bypass federal conscience laws and violates the First Amendment and RFRA.

Specifically, HRSA's guidance among other things, required all health insurance plans to include "all FDA approved contraceptives and sterilization services," including drugs that can destroy a human embryo, sterilization services and contraception, without a direct cost to the patient. This meant that HRSA was mandating in guidance a variety of drugs and devices that have modes of action that can be destructive of human life rather than preventive of the creation of human life.

The first of these drugs is Levonorgestral, or Plan B, which was approved by the FDA as an Emergency Contraceptive (EC). One extensive review of the available literature on Levonorgestral revealed as many as seven mechanisms of action that could potentially prevent implantation of an embryo.[1] It works by making implantation unlikely because the uterus becomes inhospitable to the embryo. In another literature review of the mechanisms of action of Levonorgestral, the authors concluded, "The evidence to date supports the contention that use of EC does not always inhibit ovulation even if used in the preovulatory phase, and that it may unfavorably alter the endometrial lining regardless of when in the cycle it is used, with the effect persisting for days."[2] Plan B's labeling information also admits this scientific reality. "[Plan B] may inhibit implantation (by altering the endometrium)."[3] The second problematic FDA drug approved as an EC, and which is covered by the mandate, is ulipristal acetate. It is marketed as Ella® by Watson Pharmaceuticals. Ella is contra-indicated for pregnancy.[4] A recent article published in Annals of Pharmacotherapy stated "[t]he mechanism of action of ulipristal in human ovarian and endometrial tissue is identical to that of its parent compound, mifepristone."[5] Numerous other research studies confirm ulipristal's abortifacient mechanism of action.[6] In one

---

[1] H. Croxatto, et al., "Mechanism of Action of Hormonal Preparations Used for Emergency Contraception: a Review of the Literature." Contraception 63 (2001): 111.
[2] C. Kahlenborn, et al., "Postfertilization Effect of Hormonal Emergency Contraception," Annals of Pharmacotherapy (2002): 468.
[3] U.S. Department of Health and Human Services Food and Drug Administration, "Plan B One Step Labeling Information" (July 2009): p. 4 http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021998lbl.pdf.
[4] U.S. Department of Health and Human Services Food and Drug Administration, "Ella Labeling Information" (August 2010): p.1 (http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022474s000lbl.pdf).
[5] D. Harrison and J. Mitroka, "Defining Reality: The Potential Role of Pharmacists in Assessing the Impact of Progesterone Receptor Modulators and Misoprostol in Reproductive Health," Annals of Pharmacotherapy 45 (Jan. 2011): 115-9. RU-486 (mifepristone; Mifeprex®) was approved in 2000 by the FDA as an "abortifacient."
[6] Reel et al., "Antiovulatory and Postcoital Antifertility Activity of the Antiprogestin CDB-2914 When Administered as Single, Multiple, or Continuous Doses to Rats," 58 Contraception (1998): 129-136, p. 129; VandeVoort et al., "Effects of Progesterone Receptor Blockers on Human Granulosa-Luteal Cell Culture Secretion of Progesterone, Estradiol, and Relaxin," 62 Biology of Reproduction (2000): 200-205, 200. In this article, ulipristal is referred to as "HRP-2000." Hild et al., "CDB-2914: Anti-progestational/antiglucocorticoid Profile and Post-coital

such study involving ulipristal's action in macaques (monkeys), 4 out of 5 fetuses were aborted.[7] In filings required for ulipristal acetate's Europe approval, the European Medicines Agency noted that "Ulipristal, mifepristone and lilopristone were approximately equipotent at the dose levels of 10 and 30 mg/day in terminating pregnancies in guinea-pigs…"[8] The authors of the Annals article noted: "[E]xisting studies in animals are instructive in terms of the potential abortive effects of the drug in humans."[9] Their analysis led them to conclude "it can be reasonably expected that the prescribed dose of 30 mg of ulipristal will have an abortive effect on early pregnancy in humans."[10] Thirty milligrams is the precise dose of ulipristal now provided in a single package of Ella when purchased as an emergency contraceptive in the United States.[11] These studies provide sufficient evidence for one to reasonably conclude that Ella can kill an implanted embryo, and the induced demise of an embryo post-implantation is agreed by all, even the FDA, to be an abortion.[12] Ella's inclusion among those drugs that must be covered by the HHS mandate went beyond preventing conception to destroying human life by chemical or pharmaceutical means.

**Background on the insufficient Obama-era regulations**

On August 1, 2011, HRSA issued guidance ("the Mandate") which, as stated above, required coverage of all FDA approved contraceptives and sterilization services, and HHS issued regulations which only exempted churches from the Mandate but which mandated such coverage for other non-profit organizations. Religious organizations such as religious universities, non-profit charities and businesses run from a faith perspective were not exempt.

On June 28, 2013 HHS issued a "final rule" that did nothing to expand the religious employer exemption beyond churches and their auxiliaries. It also finalized the accounting gimmick proposed as a so-called "accommodation" in which that religious non-profit employers must fill out a form "self-certifying" that they had conscience objections to certain benefits, and provide

---

Anti-fertility Activity in Rats and Rabbits." 15 Human Reproduction (2000): 822-829, 824; G. Teutsch and D. Philibert, "History and Perspectives of Antiprogestins from the Chemist's Point of View." 9 Human Reproduction (1994)(suppl 1):12-31; B. Attardi, J. Burgenson, S. Hild, and J. Reel, "In vitro Antiprogestational/Antiglucocorticoid Activity and Progestin and Glucocorticoid Receptor Binding of the Putative Metabolites and Synthetic Derivatives of CDB-2914, CDB- 4124, and mifepristone." Journal of Steroid Biochemistry and Molecular Biology 88 (2004): 277-88.

7 A.F. Tarantal, A.G. Hendrickx, S.A. Matlin, et. al., "Effects of Two Antiprogestins on Early Pregnancy in the Long-tailed Macaque (Macaca fascicularis)." 54 Contraception 1996: 107-15; European Medicines Agency, "CHMP Assessment Report for EllaOne." (Doc.Ref.: EMEA/261787/2009).

8 European Medicines Agency, "CHMP Assessment Report for EllaOne." (Doc.Ref.: EMEA/261787/2009): p. 10.

9 Harrison and Mitroka, supra.

10 Ibid

11 Plan B and Ella are not the only FDA-approved contraceptive drugs or devices (e.g., IUDs) that are potentially embryocidal. However, we have focused on them because the medical evidence is most clear in these two cases that HHS's regulatory mandate includes embryo destructive items. Therefore, it is clear that the mandate will create a conflict with the moral and religious beliefs of individuals and organizations who will be forced to provide such coverage or participate in such plans.

12 Christopher M. Gacek, "Conceiving 'Pregnancy': U.S. Medical Dictionaries and Their Definitions of 'Conception' and 'Pregnancy.'" National Catholic Bioethics Quarterly (Autumn 2009): 542-557.

that "form" to the insurer. The insurer in turn would notify the employees of the objections of their employer, and provide them the questionable benefits which the employer objected to in the first place. Supposedly, the insurer would cover the cost of the "free" contraceptive drugs and devices. However, under this rule, religious employers' health plans remained the legal mechanism by which the insurer will "automatically" provide these drugs, devices and services even if the employer objects to such coverage.

In June 2014, the Supreme Court ruled in *Burwell v. Hobby Lobby Stores* that under RFRA, the government could not force family businesses to violate their religious beliefs as a condition of earning a living, under threat of crippling fines. This landmark ruling for religious liberty applies to all closely held corporations.

On August 27, 2014, the Administration issued an "interim final rule" (79 Fed. Reg. 51092) addressing the so-called nonprofit "accommodation." Per the rule, non-profits that object for moral or religious reasons to the HHS Mandate could notify HHS directly of their objection in writing and HHS would then notify the employer's health insurance company or Third Party Administrator (TPA), who would then provide the health care plan recipients with the drugs and devices required by the HHS Mandate.

Non-profits could notify HHS of their objection to the HHS Mandate, or they could still fill out the self-certification form, as specified by the July 28, 2013 final rule, to their insurance company. HHS had issued a similar proposed rule regarding for-profit organizations and solicited comments on how a so-called "accommodation" to the HHS Mandate could apply to closely held for-profit corporations.

In whatever way the mandated notification was to take place, the end result of the various "accommodations" was the same: the notification by the objecting party of its objection triggers HHS or the TPA to step in and alert the employer's insurer which in turn will provide the same contraceptives, sterilization, and drugs and devices that can kill an embryo on behalf of the employer and through the employer's health insurance company at the employer's expense.

These proposals were finalized on July 10, 2015. Again, under this accounting gimmick, religious non-profit and for-profit employers still remained the legal gateway for, and were forced to pay for, objectionable items and services for their employees. The HHS mandate still affected charities, universities, hospitals or others with moral or religious objections that violate their conscience.

On May 16, 2016, the Supreme Court of the United States issued a ruling in *Zubik v. Burwell*, consolidated with *Little Sisters of the Poor v. Burwell* and other similar cases, which did not resolve the dispute of whether the "accommodation" or the HHS mandate itself violated RFRA. However, noting that the religious challengers and the Obama administration both agreed that contraceptive coverage could be provided to female employees through the insurance companies,

without any notice from the religious employers, the Court vacated the lower court rulings and told the parties to work out a mutually-agreeable solution to the case.

**Why the Obama-era HHS Mandate Still Violated Religious Freedom and Was Opposed by Most Americans**

Businesses and non-profit employers and their employees should be able to choose what health plan is right for them without the federal government requiring they provide coverage, even with a so-called "accommodation," for contraceptives, sterilization, and drugs and devices that can kill an embryo—drugs and services that violate their religious or moral beliefs. Employers are forced to choose between dropping healthcare coverage for their employees and their families altogether or paying heavy penalties that could put them out of business.

This Mandate put the jobs, livelihood and healthcare of millions of Americans at risk. At stake was whether the federal government could require individuals to violate their moral beliefs and force them to provide items or services they morally oppose and which can kill human life.

The majority of Americans are not in favor of the HHS Contraception Mandate. A May 2014 FRC/ADF poll showed that the majority of Americans oppose the Obama Administration's mandate for religious employers to cover drugs which can destroy a human embryo, sterilization services and contraception: 53% disagree, while 43% agree and 4% are undecided. In April 2016, a Marist poll found that 53% of registered voters believe the HHS contraceptive mandate applied to religious non-profits is unfair, while only 32% believed it is fair.

**Conclusion:**

The principle of a right of conscience is embedded in the fabric of American democracy and law. Undermining it poses a grave threat by which the government can, for whatever culturally changing reasons, deem something to be a compelling government interest to the extent it can use the full force of the federal government to require people to choose between violating the law and facing penalties or violating their deeply held beliefs. In the case of the Obamacare preventive care services mandate, and the subsequent regulations implementing the HHS contraceptive mandate, the precise mechanism by which the various proposed accounting gimmicks were implemented for religious employers is irrelevant. The fact remained, under each variation of the regulations, that the federal government was forcing employers to cover drugs and devices that violated their conscience. This created a Hobson's choice. Employers are forced to choose between either violating their conscience or paying fines for non-compliance, and worse, facing the option of dropping health coverage altogether which is bad for their employees and their families (which in turn would violate the employer coverage mandate). The HHS interim final rule exempting employers with moral or religious convictions against the HHS contraceptive mandate brings the regulatory framework implementing the Obamacare preventive care services requirements into conformity with long-standing conscience and religious freedom laws. We object to the inclusion of contraceptives and embryo destroying drugs being mandated by HRSA's guidance to begin with, believing such drugs and devices are not required by the statute and are readily available in the private market to those who choose them. Moreover, the

federal government pays over $2 billion per year for contraceptives for low-income people. However, at the very least, HHS should exempt religious and moral objectors from the HHS contraceptive mandate. Leaving in place the "accommodation" for those non-profit entities who agree with this accounting arrangement is fair, while exempting those for whom such an arrangement is unacceptable is completely warranted. HHS's new interim final rule protecting both religious belief and moral conviction is right to restore the central and long-standing principle of conscience to the healthcare system.

/s/ David Christensen
Vice President
Government Affairs

/s/ Travis S. Weber, Esq.
Director, Center for Religious Liberty

FAMILY RESEARCH COUNCIL
801 G Street, NW
Washington, DC 20001
(202) 393-2100

FAMILY RESEARCH COUNCIL
801 G STREET NW, WASHINGTON, D.C. 20001 • 202-393-2100 • 202-393-2134 FAX • (800) 225-4008 ORDER LINE • FRC.ORG

00435056

Exhibit 112 JA-0001541



ADVANCING FAITH, FAMILY AND FREEDOM

December 5, 2017

*Submitted Electronically*
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G
200 Independence Avenue SW.
Washington, DC 20201

Re: Public Comments in Regard to Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act
**ID: CMS-2017-0133-0002**

Dear Sir or Madam:

The Family Research Council (FRC) respectfully submits the following comments on the Interim Final Rules (82 Fed. Reg. 47838, October 13, 2017) entitled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act".

On October 6, 2017, the Departments of Health and Human Services (HHS), Treasury, and Labor issued two companion interim final rules that provide conscience protections to Americans who have a religious or moral objection to being forced by the federal government under the "HHS contraceptive mandate" to pay for healthcare insurance coverage that includes sterilization or contraception in their employee health insurance plans, especially since some of those drugs and devices can kill a human embryo. On behalf of the Family Research Council (FRC), which represents hundreds of thousands of American families, we strongly support these interim final rules.

The Religious Exemption (45 CFR § 147.132) applies to any objecting employer or health insurance issuer. The Moral Exemption (45 CFR § 147.133) applies to any objecting nonprofit organization or for-profit entity that is not publicly traded, and objecting health insurance issuers. Objecting entities may also choose the now-optional accommodation process previously imposed by the Obama Administration.

These new rules provide much-needed relief from the HHS contraceptive mandate, which violated current religious freedom law. As religious freedom is protected in the First Amendment of the Constitution and statutes such as the Religious Freedom Restoration Act (RFRA), conscience rights based on moral convictions are also protected under numerous laws and the Constitution of the United States. Congress has also provided health care conscience protections on the basis of "moral objections" in the Church Amendments, pertaining to sterilization,

contraception, and other health care services and practices, or any objection pertaining to abortion in the context of the Weldon Amendment.

Numerous non-religious entities, such as the March for Life Education and Defense Foundation, oppose contraceptives, and especially drugs and devices that can destroy a human embryo, on the basis of their moral convictions rather than religious beliefs. Like religious convictions, moral convictions warrant similar protection by the federal government.

In the preamble to these regulations, "the Departments seek public comment on whether the exemption in § 147.133(a)(1)(i) for plan sponsors with moral objections to the Mandate should be finalized to encompass all of the types of plan sponsors covered by § 147.132(a)(1)(i), including publicly traded corporations with objections based on sincerely held moral convictions, and also non-federal governmental plan sponsors that may have objections based on sincerely held moral convictions." We support parity in the scope of plan sponsors covered by the exemptions provided on the basis of moral and religious objections, respectively.

The regulation's exclusion of publicly traded corporations from being allowed an exemption on the basis of a moral objection is without statutory basis. Simply because there have been no *lawsuits* against HHS by publicly traded companies with moral objections to the Mandate does not serve as a basis for excluding such entities from conscience protections. Some publicly traded corporations who would otherwise seek a moral exemption may be deterred from doing so due to concerns that such litigation may create problems from a public relations standpoint. Regardless, there is no statutory reason why publicly traded companies who have moral objections should be required to comply with the Mandate any more than a closely-held company would if they have a conscience objection to doing so.

In fact, most publicly traded companies have health policies that include contraceptive coverage, and many other publicly traded companies, such as ExxonMobil, Chevron, Visa Inc. and PepsiCo are already exempt from the Mandate due to their grandfathered status. It should not be the job of the federal government to pick winners and losers when it comes to conscience rights. Indeed, existing federal laws, such as the Church and Coats-Snowe Amendments, do not create such a distinction between small businesses, closely-held, or publically traded companies. Profit-making should not preclude publicly traded or closely-held companies from having their conscience rights protected, nor should conscience regulations assume that publicly traded entities cannot assert moral objections. While long-standing conscience laws specifically create protections in federally funded programs, the Mandate goes further in applying mandates against entities in the private sector, even when not participating in a federally funded program. The Mandate, as applied to such companies, clearly violates the spirit of existing federal conscience laws. Indeed, these laws provide equal protections for any entity, whether they are non-profit or for-profit, publicly-traded or not.

Therefore, while we applaud the Departments for providing a moral exemption from the Mandate for all nonprofits and health insurance issuers, we urge the Departments to allow an exemption for *all* for-profit entities which have sincere moral objections to the Mandate.

**Background on the Obama-era HHS Contraception Mandate**

The *Patient Protection and Affordable Care Act* (PPACA, P.L. 111-148, "Obamacare") contains a federal mandate for private health insurance plans to cover "preventive care" services "with respect to women" without a direct cost to the patient (42 USC § 300gg–13(a)(4)), as determined by HHS' Health Resources and Services Administration (HRSA). This provision of Obamacare triggered guidance by HRSA that mandated coverage in group health insurance plans that bypass federal conscience laws and violates the First Amendment and RFRA.

Specifically, HRSA's guidance among other things, required all health insurance plans to include "all FDA approved contraceptives and sterilization services," including drugs that can destroy a human embryo, sterilization services and contraception, without a direct cost to the patient. This meant that HRSA was mandating in guidance a variety of drugs and devices that have modes of action that can be destructive of human life rather than preventive of the creation of human life.

The first of these drugs is Levonorgestral, or Plan B, which was approved by the FDA as an Emergency Contraceptive (EC). One extensive review of the available literature on Levonorgestral revealed as many as seven mechanisms of action that could potentially prevent implantation of an embryo.[1] It works by making implantation unlikely because the uterus becomes inhospitable to the embryo. In another literature review of the mechanisms of action of Levonorgestral, the authors concluded, "The evidence to date supports the contention that use of EC does not always inhibit ovulation even if used in the preovulatory phase, and that it may unfavorably alter the endometrial lining regardless of when in the cycle it is used, with the effect persisting for days."[2] Plan B's labeling information also admits this scientific reality. "[Plan B] may inhibit implantation (by altering the endometrium)."[3] The second problematic FDA drug approved as an EC, and which is covered by the mandate, is ulipristal acetate. It is marketed as Ella® by Watson Pharmaceuticals. Ella is contra-indicated for pregnancy.[4] A recent article published in Annals of Pharmacotherapy stated "[t]he mechanism of action of ulipristal in human ovarian and endometrial tissue is identical to that of its parent compound, mifepristone."[5] Numerous other research studies confirm ulipristal's abortifacient mechanism of action.[6] In one

---

1 H. Croxatto, et al., "Mechanism of Action of Hormonal Preparations Used for Emergency Contraception: a Review of the Literature," Contraception 63 (2001): 111.
2 C. Kahlenborn, et al., "Postfertilization Effect of Hormonal Emergency Contraception," Annals of Pharmacotherapy (2002): 468.
3 U.S. Department of Health and Human Services Food and Drug Administration, "Plan B One Step Labeling Information" (July 2009): p. 4 http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021998lbl.pdf.
4 U.S. Department of Health and Human Services Food and Drug Administration, "Ella Labeling Information" (August 2010): p.1 (http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022474s000lbl.pdf).
5 D. Harrison and J. Mitroka, "Defining Reality: The Potential Role of Pharmacists in Assessing the Impact of Progesterone Receptor Modulators and Misoprostol in Reproductive Health," Annals of Pharmacotherapy 45 (Jan. 2011): 115-9. RU-486 (mifepristone; Mifeprex®) was approved in 2000 by the FDA as an "abortifacient."
6 Reel et al., "Antiovulatory and Postcoital Antifertility Activity of the Antiprogestin CDB-2914 When Administered as Single, Multiple, or Continuous Doses to Rats," 58 Contraception (1998): 129-136, p. 129; VandeVoort et al., "Effects of Progesterone Receptor Blockers on Human Granulosa-Luteal Cell Culture Secretion of Progesterone, Estradiol, and Relaxin," 62 Biology of Reproduction (2000): 200-205, 200. In this article, ulipristal is referred to as "HRP-2000." Hild et al., "CDB-2914: Anti-progestational/antiglucocorticoid Profile and Post-coital

such study involving ulipristal's action in macaques (monkeys), 4 out of 5 fetuses were aborted.[7] In filings required for ulipristal acetate's Europe approval, the European Medicines Agency noted that "Ulipristal, mifepristone and lilopristone were approximately equipotent at the dose levels of 10 and 30 mg/day in terminating pregnancies in guinea-pigs…"[8] The authors of the Annals article noted: "[E]xisting studies in animals are instructive in terms of the potential abortive effects of the drug in humans."[9] Their analysis led them to conclude "it can be reasonably expected that the prescribed dose of 30 mg of ulipristal will have an abortive effect on early pregnancy in humans."[10] Thirty milligrams is the precise dose of ulipristal now provided in a single package of Ella when purchased as an emergency contraceptive in the United States.[11] These studies provide sufficient evidence for one to reasonably conclude that Ella can kill an implanted embryo, and the induced demise of an embryo post-implantation is agreed by all, even the FDA, to be an abortion.[12] Ella's inclusion among those drugs that must be covered by the HHS mandate went beyond preventing conception to destroying human life by chemical or pharmaceutical means.

**Background on the insufficient Obama-era regulations**

On August 1, 2011, HRSA issued guidance ("the Mandate") which, as stated above, required coverage of all FDA approved contraceptives and sterilization services, and HHS issued regulations which only exempted churches from the Mandate but which mandated such coverage for other non-profit organizations. Religious organizations such as religious universities, non-profit charities and businesses run from a faith perspective were not exempt.

On June 28, 2013 HHS issued a "final rule" that did nothing to expand the religious employer exemption beyond churches and their auxiliaries. It also finalized the accounting gimmick proposed as a so-called "accommodation" in which that religious non-profit employers must fill out a form "self-certifying" that they had conscience objections to certain benefits, and provide

---

Anti-fertility Activity in Rats and Rabbits." 15 Human Reproduction (2000): 822-829, 824; G. Teutsch and D. Philibert, "History and Perspectives of Antiprogestins from the Chemist's Point of View." 9 Human Reproduction (1994)(suppl 1):12-31; B. Attardi, J. Burgenson, S. Hild, and J. Reel, "In vitro Antiprogestational/Antiglucocorticoid Activity and Progestin and Glucocorticoid Receptor Binding of the Putative Metabolites and Synthetic Derivatives of CDB-2914, CDB-4124, and mifepristone." Journal of Steroid Biochemistry and Molecular Biology 88 (2004): 277-88.

7 A.F. Tarantal, A.G. Hendrickx, S.A. Matlin, et. al., "Effects of Two Antiprogestins on Early Pregnancy in the Long-tailed Macaque (Macaca fascicularis)." 54 Contraception 1996: 107-15; European Medicines Agency, "CHMP Assessment Report for EllaOne." (Doc.Ref.: EMEA/261787/2009).

8 European Medicines Agency, "CHMP Assessment Report for EllaOne." (Doc.Ref.: EMEA/261787/2009): p. 10.

9 Harrison and Mitroka, supra.

10 Ibid.

11 Plan B and Ella are not the only FDA-approved contraceptive drugs or devices (e.g., IUDs) that are potentially embryocidal. However, we have focused on them because the medical evidence is most clear in these two cases that HHS's regulatory mandate includes embryo destructive items. Therefore, it is clear that the mandate will create a conflict with the moral and religious beliefs of individuals and organizations who will be forced to provide such coverage or participate in such plans.

12 Christopher M. Gacek, "Conceiving 'Pregnancy': U.S. Medical Dictionaries and Their Definitions of 'Conception' and 'Pregnancy.'" National Catholic Bioethics Quarterly (Autumn 2009): 542-557.

that "form" to the insurer. The insurer in turn would notify the employees of the objections of their employer, and provide them the questionable benefits which the employer objected to in the first place. Supposedly, the insurer would cover the cost of the "free" contraceptive drugs and devices. However, under this rule, religious employers' health plans remained the legal mechanism by which the insurer will "automatically" provide these drugs, devices and services even if the employer objects to such coverage.

In June 2014, the Supreme Court ruled in *Burwell v. Hobby Lobby Stores* that under RFRA, the government could not force family businesses to violate their religious beliefs as a condition of earning a living, under threat of crippling fines. This landmark ruling for religious liberty applies to all closely held corporations.

On August 27, 2014, the Administration issued an "interim final rule" (79 Fed. Reg. 51092) addressing the so-called nonprofit "accommodation." Per the rule, non-profits that object for moral or religious reasons to the HHS Mandate could notify HHS directly of their objection in writing and HHS would then notify the employer's health insurance company or Third Party Administrator (TPA), who would then provide the health care plan recipients with the drugs and devices required by the HHS Mandate.

Non-profits could notify HHS of their objection to the HHS Mandate, or they could still fill out the self-certification form, as specified by the July 28, 2013 final rule, to their insurance company. HHS had issued a similar proposed rule regarding for-profit organizations and solicited comments on how a so-called "accommodation" to the HHS Mandate could apply to closely held for-profit corporations.

In whatever way the mandated notification was to take place, the end result of the various "accommodations" was the same: the notification by the objecting party of its objection triggers HHS or the TPA to step in and alert the employer's insurer which in turn will provide the same contraceptives, sterilization, and drugs and devices that can kill an embryo on behalf of the employer and through the employer's health insurance company at the employer's expense.

These proposals were finalized on July 10, 2015. Again, under this accounting gimmick, religious non-profit and for-profit employers still remained the legal gateway for, and were forced to pay for, objectionable items and services for their employees. The HHS mandate still affected charities, universities, hospitals or others with moral or religious objections that violate their conscience.

On May 16, 2016, the Supreme Court of the United States issued a ruling in *Zubik v. Burwell*, consolidated with *Little Sisters of the Poor v. Burwell* and other similar cases, which did not resolve the dispute of whether the "accommodation" or the HHS mandate itself violated RFRA. However, noting that the religious challengers and the Obama administration both agreed that contraceptive coverage could be provided to female employees through the insurance companies,

without any notice from the religious employers, the Court vacated the lower court rulings and told the parties to work out a mutually-agreeable solution to the case.

**Why the Obama-era HHS Mandate Still Violated Religious Freedom and Was Opposed by Most Americans**

Businesses and non-profit employers and their employees should be able to choose what health plan is right for them without the federal government requiring they provide coverage, even with a so-called "accommodation," for contraceptives, sterilization, and drugs and devices that can kill an embryo—drugs and services that violate their religious or moral beliefs. Employers are forced to choose between dropping healthcare coverage for their employees and their families altogether or paying heavy penalties that could put them out of business.

This Mandate put the jobs, livelihood and healthcare of millions of Americans at risk. At stake was whether the federal government could require individuals to violate their moral beliefs and force them to provide items or services they morally oppose and which can kill human life.

The majority of Americans are not in favor of the HHS Contraception Mandate. A May 2014 FRC/ADF poll showed that the majority of Americans oppose the Obama Administration's mandate for religious employers to cover drugs which can destroy a human embryo, sterilization services and contraception: 53% disagree, while 43% agree and 4% are undecided. In April 2016, a Marist poll found that 53% of registered voters believe the HHS contraceptive mandate applied to religious non-profits is unfair, while only 32% believed it is fair.

**Conclusion:**

The principle of a right of conscience is embedded in the fabric of American democracy and law. Undermining it poses a grave threat by which the government can, for whatever culturally changing reasons, deem something to be a compelling government interest to the extent it can use the full force of the federal government to require people to choose between violating the law and facing penalties or violating their deeply held beliefs. In the case of the Obamacare preventive care services mandate, and the subsequent regulations implementing the HHS contraceptive mandate, the precise mechanism by which the various proposed accounting gimmicks were implemented for religious employers is irrelevant. The fact remained, under each variation of the regulations, that the federal government was forcing employers to cover drugs and devices that violated their conscience. This created a Hobson's choice. Employers are forced to choose between either violating their conscience or paying fines for non-compliance, and worse, facing the option of dropping health coverage altogether which is bad for their employees and their families (which in turn would violate the employer coverage mandate).

The HHS interim final rule exempting employers with moral or religious convictions against the HHS contraceptive mandate brings the regulatory framework implementing the Obamacare preventive care services requirements into conformity with long-standing conscience and religious freedom laws. We object to the inclusion of contraceptives and embryo destroying drugs among those mandated by HRSA's guidance to begin with, believing such drugs and

devices are not required by the statute and are readily available in the private market to those who choose them. Moreover, the federal government pays over $2 billion per year for contraceptives for low-income people. However, at the very least, HHS should exempt religious and moral objectors from the HHS contraceptive mandate. Leaving in place the "accommodation" for those non-profit entities who agree with this accounting arrangement is fair, while exempting those for whom such an arrangement is unacceptable is completely warranted.

Finally, we urge HHS to allow *all* for-profit entities to qualify for a moral exemption from the Mandate, irrespective of such an entity's publicly traded status, consistent with the treatment of for-profit entities which seek religious exemptions. HHS's new interim final rule protecting both religious belief and moral conviction is right to restore the central and long-standing principle of conscience to the healthcare system.

/s/ David Christensen
Vice President
Government Affairs

/s/ Travis S. Weber, Esq.
Director, Center for Religious Liberty

FAMILY RESEARCH COUNCIL
801 G Street, NW
Washington, DC 20001
(202) 393-2100



111 South Wacker Drive
Chicago, IL 60606
Telephone: 312-443-0700
Fax: 312-443-0336
www.lockelord.com

Laurence A. Hansen
Direct Telephone: 312-443-0456
Direct Fax: 312-896-6456
lhansen@lockelord.com

November 22, 2017

BY ELECTRONIC DELIVERY

Centers for Medicare & Medicaid Services
Department of Health and Human Resources
Room 445-G, Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201

Re: CMS-9940

Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act

Dear Sir or Madam:

We submit this comment in response to the interim final rules and temporary regulations (the "Rules") issued jointly by the Internal Revenue Service (IRS), the Department of Labor (DOL) and the Department of Health and Human Services (HHS) (together, the "Departments") and published at 82 Fed. Reg. 47792 (Oct. 13, 2017).

We commend the agencies for moving to a plan-based exemption. However, we suggest that the Rules be revised in several respects to clarify the application of the Rules to multiple employer church plans.

**I. Expand the Religious Exemption in Section 147.132**

While the Rules provide for only one exemption, the exemption appears to have two parts. One part applies at the plan level and exempts the plan and any issuer providing coverage under the plan. The other part exempts certain employers that adopt an exempt plan. The two parts may be merged in the case of single-employer plan. But it is unclear how the two parts operate in the case of a multiple employer plan adopted by an employer who neither sponsors nor maintains the plan.

The preamble to the Rules makes clear that the employer exemption applies to employers that adopt certain religious plans established by other religious organizations:

> Under these interim final Rules, however, the Departments intend that, when this regulation text exempts a plan "established or maintained by" a house of worship

Atlanta | Austin | Boston | Chicago | Cincinnati | Dallas | Hartford | Hong Kong | Houston | London | Los Angeles
Miami | Morristown | New Orleans | New York | Providence | San Francisco | Stamford | Washington DC | West Palm Beach

00433402

Exhibit 114

JA-0001549

> or integrated auxiliary, such exemption will no longer "be determined on an employer by employer basis," but will be determined on a plan basis—that is, by whether the plan is a "plan established or maintained by" a house of worship or integrated auxiliary.

82 Fed. Reg. at 47810 (emphasis added).

The phrase "house of worship or integrated auxiliary" appears to be a shorthand reference to "a church, an integrated auxiliary of a church, a convention or association of churches, or a religious order" under Section 147.132(a)(1)(i)(A). We note, for example, that the preamble to the Rules describes "houses of worship and integrated auxiliaries" as being covered by Code sections 6033(a)(3)(A)(i) ("churches, their integrated auxiliaries, and conventions or associations of churches") and 6033(a)(3)(A)(iii) ("the exclusively religious activities of any religious order"). 82 Fed. Reg. at 47796. If so, the employer exemption is too narrow, as not all church plans are "established or maintained" by a church or an integrated auxiliary of a church. Many are established and maintained by church-affiliated organizations that are not churches themselves. They may not be integrated auxiliaries either.

The current narrow exemption leads to disparate results for similarly situated organizations. Consider, for example, a social service agency that is "associated with" a church, but is neither a church itself nor an integrated auxiliary of a church. It appears that if the agency established its own plan, the plan and the agency would be exempt. However, if the agency adopted a plan sponsored and maintained by another organization that was "associated with" the church but not an integrated auxiliary of the church, the agency would not be exempt. Such a result is not consistent with the agencies' purported respect "internal employment practices" and "choice of organizational form" of religious organizations. 82 Fed. Reg. at 47810.

Accordingly, we suggest that the final Rules expand the exemption to cover any employer that: (i) adopts an exempt plan; and (ii) objects to providing its employees and their dependents with contraception coverage on account of its sincerely held religious beliefs.

## II. Clarify that an Employer Adopting an Exempt Plan Cannot Be Penalized

The preamble to the Rules makes clear that if a plan is exempt under 45 C.F.R. § 147.132, neither the plan sponsor, the plan or an issuer providing coverage in connection with the plan will be penalized as a result of the plan not providing contraception coverage:

> Section 147.132(a)(1) introductory text and (a)(1)(i), by specifying that "[a] group health plan and health insurance coverage provided in connection with a group health plan" is exempt "to the extent the plan sponsor objects as specified in paragraph (a)(2)," exempt the group health plans the sponsors of which object, and exempt their health insurance issuers from providing the coverage in those plans (whether or not the issuers have their own objections).

82 Fed. Reg. at 47808.

As noted above, while the Rules recognize that exempt plans may cover multiple employers, the Rules fail to recognize that employers that adopt such plans that are not themselves "plan

00433403

sponsors" can be penalized $100 per day for each employee not provided contraception coverage. Code sections 4980D(b) and (e)(1) [26 U.S.C. § 4980D(b) and (e)(1)]. Employers that are "so closely associated" with an exempt plan sponsor that they are permitted to participate in the sponsor's health plan should not be penalized. 82 Fed. Reg. at 47810. Perhaps such employers avoid a penalty on account of Section 54.9815-2713T, but this is not clear. We suggest this be recognized (or clarified) in the final Rules.

Please contact the undersigned at 312-443-0456 if you have any questions or wish to discuss this matter further.

Very truly yours,

Laurence A. Hansen

LAH:lg



*where NURSING, MINISTRY and CATHOLIC MISSION meet*

December 5, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Subj: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, RIN 0938-AT20**

Dear Sir or Madam:

The National Association of Catholic Nurses U.S.A. (NACN-USA) is the national professional organization for Catholic nurses in the United States. Representing hundreds of nurses of different backgrounds, the NACN-USA promotes education in Catholic nursing ethics, nurtures spiritual growth, provides guidance, support and networking for Catholic nurses, nursing students, and others who support our mission and objectives. The NACN-USA is approved by the U.S. Conference of Catholic Bishops and is a part of the International Catholic Committee of Nurses & Medico-Social Assistants, which collaborates with the Holy See and its Dicastery for Promoting Integral Human Development. The NACN-USA submits the following comments on the interim final rules, published at 82 Federal Register 47792 (October 13, 2017), on religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act (ACA).

The NACN-USA is pleased to see the expansion in these interim final rules of exemptions to protect religious beliefs for certain entities and individuals whose health plans are subject to the contraceptive mandate issued pursuant to the ACA. This is consistent with the free exercise of religion in the First Amendment, the Religious Freedom and Restoration Act of 1993, and Congress' history of providing protections for religious beliefs regarding contraception, sterilization and abortion. For this we are grateful.

The NACN-USA, however, is concerned that the present interim final rules allow the Health Resources and Services Administration the option to include contraceptives as a preventive service. The NACN-USA finds this puzzling. That is because to consider contraception a preventive service indicates a misunderstanding of the meaning of prevention in health care.

It has been the long-standing goal of nursing and medicine to prevent disease and disability and to promote normal functions of the human body. Pregnancy, which is what contraception is intended to prevent, is neither a disease nor a disability and, thus, should not be treated as such. Furthermore, contraceptives that have the capacity to disrupt an existing pregnancy and act as abortifacients should never be included as a preventive service, or a service of any kind, for it is the birth of a living child that is being prevented which, again, is neither a disease nor a disability. Granted, there may be times when a woman may wish to delay or avoid pregnancy but this desire does not change the normal condition of pregnancy into a disease or disability nor does it make normal the condition of infertility, which is the direct effect of contraception.

Mailing Address: Richard Zazycki, NACN-USA Treasurer | c/o Circles of Mercy | 11 Washington St. | Rensselaer, NY 12144
Business Address: NACN-USA, c/o Diocese of Joliet | Blanchette Catholic Center | 16555 Weber Rd. | Crest Hill, IL 60403
*catholicnurses@nacn-usa.org* --- ***Unity in Charity*** --- *www.nacn-usa.org*

Some argue that contraception qualifies as a preventive service because it prevents abortion. However, the facts do not bear this out. As reported by the Guttmacher Institute, "a substantial proportion of unintended pregnancies occur despite women's and their partners' use of contraceptives… [with] about half of pregnancies that are terminated by induced abortion having occurred during use of contraceptives."[1] Even if it were true that contraception prevented abortion, it is not disease or disability that is being prevented but a procedure that terminates the life of an innocent person, who in no way could ever be considered a disease or a disability.

What the facts do support is that contraceptives pose risks of serious and even life-threatening side effects that can result in such devastating and disabling conditions as cardiovascular disease and cancer.[2] In fact, as reported by the World Health Organization and the American Cancer Society, combined hormonal contraceptives are classified as carcinogenic to human beings, on par with tobacco.[3] Women who use combined hormonal contraceptives have a two to four-fold increased risk of venous thromboembolism,[4] thrombotic stroke[5] and myocardial infarction,[6] all which can be deadly. Moreover, contraceptives do not promote normal functions of the body, namely fertility, but instead attempt to render them non-functional. In short, contraception is not a preventive service but is, in fact, a disservice.

The NACN-USA is pleased to see the expansion of exemptions in these interim final rules to protect the religious beliefs of those having objections to the contraceptive mandate. However, given that the goal of nursing and medicine is to prevent disease and disability and to promote normal healthy functioning of the body and, given that the facts show that contraceptives do neither, we recommend that contraceptives not be included among preventive services and that any mandate requiring such coverage in health plans be rescinded.

---

1. The Guttmacher Institute, *Contraceptive Failure in the United States: Estimates from the 2006-2010 National Survey of Family Growth*, Perspectives on Sexual and Reproductive Health, 49, 1 (March 2017) 7-16. https://www.guttmacher.org/journals/psrh/2017/02/contraceptive-failure-united-states-estimates-2006-2010-national-survey-family

2. Peck R. & Norris, CW, *Significant Risks of Oral Contraceptives (OCPs): Why This Drug Class Should Not Be Included in a Preventive Care Mandate*, 79 Linacre Quarterly 41, 42 (Feb. 2012), https://familyplanning.net/sites/default/files/Significan-Risks-of-Oral-Contraceptives-OCPs-Why-This-Drug-Should-Not-Be-Included-In-a-Preventive-Care-Mandate.pdf.

3. The World Health Organization Department of Reproductive Health and Research, *The Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment*, September 2005, http://www.who.int/reproductivehealth/topics/ageing/cocs_hrt_statement.pdf. The American Cancer Society, *Known and Probably Human Carcinogens*, 2017, https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html

4. Lidegaard, Ø., Løkkegaard, E., Svendsen, A. L., & Agger, C. (2009). Hormonal contraception and risk of venous thromboembolism: national follow-up study. *The BMJ*, *339*, b2890. http://www.bmj.com/content/bmj/339/bmj.b2890.full.pdf.
Van Hylckama Vlieg, A., Helmerhorst, F. M., Vandenbroucke, J. P., Doggen, C. J. M., & Rosendaal, F. R. (2009). The venous thrombotic risk of oral contraceptives, effects of oestrogen dose and progestogen type: results of the MEGA case-control study. *The BMJ*, *339*, b2921. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726929/
Vinogradova, Y., Coupland, C., & Hippisley-Cox, J. (2015). Use of combined oral contraceptives and risk of venous thromboembolism: nested case-control studies using the QResearch and CPRD databases. *The BMJ*, *350*, h2135. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4444976/
de Bastos, M., Stegeman, BH., Rosendaal, FR., Van Hylckama Vlieg, A., Helmerhorst, FM., Stijnen, T., Dekkers, OM. (2014). *Combined oral contraceptives: venous thrombosis*. Cochrane Database Syst Rev. 2014, Mar 3; (3) CD010813. doi: 10.1002/14651858.CD010813.pub2. https://www.ncbi.nlm.nih.gov/pubmed?term=24590565

5. Gillum, LA., Mamidipudi, SK., Johnston, SC., (2000). *Ischemic stroke risk with oral contraceptives: A meta analysis.* JAMA 2000 Jul; 284(1), 72-78. https://www.ncbi.nlm.nih.gov/pubmed?term=10872016

6. Lidegaard, Ø., Løkkegaard, E., Jensen, A., Skovlund, CW., Keiding, N. (2012). *Thrombotic stroke and myocardial infarction with hormonal contraception*. N Eng J Med. 2012; 366(24):2257. https://www.nejm.org/doi/pdf/10.1056/NEJMoa1111840

We encourage evidence-based services that prevent disease and disability not produce them. Efforts should be focused on services that genuinely promote normal healthy functioning of the body and optimal flourishing of the person and not on those that do the opposite

Thank you for the opportunity to comment.

In His Holy Name,

Diana L. Ruzicka

Diana Ruzicka, RN, MSN, MA, MA, CNS-BC
Colonel, U.S. Army Retired
President, National Association of Catholic Nurses, U.S.A



*where NURSING, MINISTRY and CATHOLIC MISSION meet*

December 5, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Subj: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, RIN 0938-AT46**

Dear Sir or Madam:

The National Association of Catholic Nurse U.S.A (NACN-USA) is the national professional organization for Catholic nurses in the United States. Representing hundreds of nurses of different backgrounds, the NACN-USA promotes education in Catholic nursing ethics, nurtures spiritual growth, provides guidance, support and networking for Catholic nurses, nursing students, and others who support our mission and objectives. The NACN-USA is approved by the U.S. Conference of Catholic Bishops and is a part of the International Catholic Committee of Nurses and Medico-Social Assistants, which collaborates with the Holy See and its Dicastery for Promoting Integral Human Development. The NACN-USA submits the following comments on the interim final rules, published at 82 Federal Register 47838 (October 13, 2017), on moral exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act (ACA).

The NACN-USA is pleased to see the expansion in these interim final rules of exemptions to protect the moral convictions for certain entities and individuals whose health plans are subject to the contraceptive mandate issued pursuant to the ACA. This is consistent with Congress' history of supporting moral convictions alongside protection for religious beliefs regarding contraception, sterilization and abortion, as evidenced by long-standing laws such as the Church and Weldon Amendments. For this we are grateful.

However, as explained in NACN-USA's comments on the interim final rules published at 82 Federal Register 47792 (October 13, 2017) on religious exemptions, we are again concerned that the present interim final rules allow the Health Resources and Services Administration (HRSA) the option to include contraceptives as a preventive service when, in fact, they are not.

As directed by the Department's interim final rules, HRSA was charged with developing guidelines with respect to preventive care and screenings authorized by section 2713(a)(4) of the Public Health Service Act. In developing those guidelines, HRSA looked to a report on women's

Mailing Address: Richard Zazycki, NACN-USA Treasurer | c/o Circles of Mercy | 11 Washington St. | Rensselaer, NY 12144
Business Address: NACN-USA, c/o Diocese of Joliet | Blanchette Catholic Center | 16555 Weber Rd. | Crest Hill, IL 60403
*catholicnurses@nacn-usa.org* --- ***Unity in Charity*** --- *www.nacn-usa.org*

preventive services issued July 19, 2011 by the Institute of Medicine (IOM) which recommended coverage of the full range of FDA approved contraceptive methods, including methods with abortifacient potential, sterilization procedures, and patient education and counseling for women with reproductive capacity. It is important to note that this recommendation was not unanimous among members of the IOM, as described at 82 Fed. Reg. at 47841, who voiced concern over the safety and lack of evidence of the preventive nature of contraceptives. Still, HRSA proceeded to authorize contraceptives as mandated preventive services despite the objections.

The NACN-USA is baffled as to why the Government would ignore legitimate concerns and mandate that a Group 1 carcinogen that is also associated with life-threatening cardiovascular complications would be made available to the public.[1] Surely, once a woman is diagnosed with cancer or paralyzed by a stroke it comes as no consolation to know that this came about with no cost sharing on her part other than her own tax dollars.

The NACN-USA is further perplexed by the statement that the Government wishes to better balance its interest in promoting coverage for contraceptive and sterilization services with its interest in providing conscience protections for individuals and entities with sincerely held moral convictions. While it is clearly appropriate for the Government to provide conscience protection for the public, it is clearly inappropriate for the Government to promote services that place the public at risk of disease and disability. Why would the Government have an interest in promoting contraception and sterilization among the public in the first place?

---

[1] Rebecca Peck & Charles W. Norris, *Significant Risks of Oral Contraceptives (OCPs): Why This Drug Class Should Not Be Included in a Preventive Care Mandate*, 79 Linacre Quarterly 41, 42 (Feb. 2012), https://familyplanning.net/sites/default/files/Significan-Risks-of-Oral-Contraceptives-OCPs-Why-This-Drug-Should-Not-Be-Included-In-a-Preventive-Care-Mandate.pdf.
The World Health Organization Department of Reproductive Health and Research, *The Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment*, September 2005, http://www.who.int/reproductivehealth/topics/ageing/cocs_hrt_statement.pdf.
The American Cancer Society, *Known and Probably Human Carcinogens*, 2017, https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html
Lidegaard, Ø., Løkkegaard, E., Svendsen, A. L., & Agger, C. (2009). Hormonal contraception and risk of venous thromboembolism: national follow-up study. *The BMJ*, *339*, b2890. http://www.bmj.com/content/bmj/339/bmj.b2890.full.pdf.
Van Hylckama Vlieg, A., Helmerhorst, F. M., Vandenbroucke, J. P., Doggen, C. J. M., & Rosendaal, F. R. (2009). The venous thrombotic risk of oral contraceptives, effects of oestrogen dose and progestogen type: results of the MEGA case-control study. *The BMJ*, *339*, b2921. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726929/
Vinogradova, Y., Coupland, C., & Hippisley-Cox, J. (2015). Use of combined oral contraceptives and risk of venous thromboembolism: nested case-control studies using the QResearch and CPRD databases. *The BMJ*, *350*, h2135. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4444976/
de Bastos, M., Stegeman, BH., Rosendaal, FR., Van Hylckama Vlieg, A., Helmerhorst, FM., Stijnen, T., Dekkers, OM. (2014). *Combined oral contraceptives: venous thrombosis*. Cochrane Database Syst Rev. 2014, Mar 3; (3) CD010813. doi: 10.1002/14651858.CD010813.pub2. https://www.ncbi.nlm.nih.gov/pubmed?term=24590565
Gillum, LA., Mamidipudi, SK., Johnston, SC., (2000). *Ischemic stroke risk with oral contraceptives: A meta analysis.* JAMA 2000 Jul; 284(1), 72-78. https://www.ncbi.nlm.nih.gov/pubmed?term=10872016
Lidegaard, Ø., Løkkegaard, E., Jensen, A., Skovlund, CW., Keiding, N. (2012). *Thrombotic stroke and myocardial infarction with hormonal contraception*. N Eng J Med. 2012; 366(24):2257. https://www.nejm.org/doi/pdf/10.1056/NEJMoa1111840

Except for contraception, all the other services listed by HRSA under the Women's Preventive Services Guidelines are evidence-based and pose no risk to the health and well-being of women.[2] This is as it should be. At the risk of appearing naive, the NACN-USA can come to no other conclusion than that the decision to include contraceptives as a preventive service is based not on scientific fact but on ideology. Governance of health care that adheres to ideology and ignores scientific fact places the health and well-being of the public at risk.

The NACN-USA is grateful to see the expansion of exemptions in these interim final rules to protect the moral convictions of those having objections to the contraceptive coverage mandate. For as it can be seen from the dissent of members of the IOM itself, as expert advisors to HRSA, objections are not restricted to those that are religiously based but can and should be based on science and reason. The mandate should be rescinded.

Thank you for the opportunity to comment.

In His Holy Name,

Diana L. Ruzicka

Diana Ruzicka, RN, MSN, MA, MA, CNS-BC
Colonel, U.S. Army Retired
President, National Association of Catholic Nurses, U.S.A

[2] Health Resources and Services Administration (October 2017). *Women's Preventive Service Guidelines*. https://www.hrsa.gov/womens-guidelines-2016/index.html

NCBC

THE NATIONAL CATHOLIC BIOETHICS CENTER

6399 Drexel Road, Philadelphia, PA 19151 • Tel 215-877-2660 • Fax 215-877-2688 • www.ncbcenter.org

December 4, 2017

Submitted Electronically

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Subj: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, RIN 0938-AT20; and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act, RIN 0938-AT46**

Dear Sir or Madam:

I am writing on behalf of The National Catholic Bioethics Center to comment on the "Interim Final Rules"[1] on religious and moral "exemptions" and "accommodations" for certain "preventive services" under the Affordable Care Act ("ACA"), known as the "Contraceptive Mandate." Specifically, the U.S. Department of Health and Human Services, the U.S. Department of Labor, and the U.S. Internal Revenue Service seek comment on their "Interim Final Rules" regarding mandatory coverage of certain so-called preventive services for women, including contraceptive and abortifacient drugs and devices. The "Interim Final Rules" modify the existing "accommodation" designed for religious ministries such as Catholic charities, universities, and hospitals, as well as closely held for-profit employers, allowing them to choose to remain accommodated or be exempt from the mandate. Furthermore, publically traded for-profit companies with a religious objection may

---

[1] 82 FR 47838 (October 13, 2017).

avail themselves of these options, as can non-publicly traded for-profit companies with moral objections. We welcome these expansions and are grateful for them, but seek further relief for those not eligible for the new "exemptions."

The National Catholic Bioethics Center (NCBC) is a nonprofit research and educational institute committed to applying the moral teachings of the Catholic Church to ethical issues arising in health care and the life sciences. The Center has 2500 members throughout the United States, many of whom employ and/or serve thousands of person, and thus its collective membership is significant. The Center provides consultation to thousands of institutions and individuals seeking its opinion on the appropriate application of Catholic moral teaching to these ethical issues. The issue of the "Contraceptive Mandate," has had far-reaching negative implications for our membership who regularly seek our ethical advice on the moral quandaries in which it has placed them.

## Introductory Summary

The "Final Rules" of July 14, 2015,[2] mandated that virtually all employers provide in their employee benefit packages coverage of certain so-called preventive services for women, including contraceptive and abortifacient drugs and devices. The "Final Rules" did not provide for any new "exemption" to the Contraceptive Mandate. They did expand the definition of "eligible organization" so that "closely held" for-profit organizations with a religious objection qualified for the "accommodation," which was previously limited to religious non-profit organizations. However, the "Final Rules" did not change the limited scope of the "exemption" for most religious organizations. As before, only churches, their integrated auxiliaries, conventions and associations of churches, and the "exclusively religious activities" of religious orders were exempt from the "Contraceptive Mandate." No "exemption" was available for other religious organizations, or even for the caring ministries provided by religious orders themselves. The resulting differentiation of those religious organizations and activities deemed "religious enough," and those deemed "not religious enough," to qualify for the "exemption" is entirely arbitrary and not supported by any legitimate, let alone compelling, government interest. Religion is not limited to worship, and the freedom of religion is not limited to the freedom of worship. Religious freedom must also include the freedom to abide by Church teachings, outside of as well as inside of the four walls of the sanctuary. By limiting the "exemption" predominantly

[2] 80 FR 41317.

to houses of worship, the "exemption" represented the narrowest protection of conscience in health care anywhere in federal law.

As noted in our prior comments (September 27, 2011; June 18, 2012; April 8, 2013; October 27, 2014), federal conscience protections in the health care context are typically robust. Among such protections is the Church Amendment of 1973, which protects against government coercion of conduct that "would be contrary to [the] religious beliefs or moral convictions" of individuals and organizations. Such protections of the right to religious freedom have enjoyed broad bipartisan support and have been repeated in numerous federal conscience laws over the forty years since its original passage. Historical and legal precedents were being violated by the "Final Rules." Furthermore, religious organizations that were deemed non-exempt based on the redefinition of a religious organization, which include those that contribute most visibly to the common good through the provision of health, educational, and social services, were being unjustly coerced to violate the very beliefs that cause them to exist. Even the processes for self-certifying eligibility for an "accommodation" involved these organizations in facilitating coverages for employees that violated the employer's religious freedom.

Cases such as that of the Little Sisters of the Poor,[3] who received a permanent injunction by the US Supreme Court from having to comply with such an "accommodation," have demonstrated that such an "accommodation" does nothing to correct the violations of religious liberty imposed by the Contraceptive Mandate. This conclusion also is borne out by the U.S. Supreme Court's decision in *Burwell v. Hobby Lobby Stores*,[4] as well as lower court decisions, the majority of which have granted some form of injunctive relief to parties with a religious objection to contraceptive coverage. This mandate as presented in the "Final Rules" continued to substantially burden the religious liberty of all persons with religious objections to the mandated coverage. To be eligible for the "accommodation," employers must self-certify their religious objection, either through EBSA Form 700 or through an alternative mechanism by providing to the federal government information that ensures that the very coverage to which the employer objects is extended to its own employees. Thus, an "eligible organization" is still required to facilitate payments and coverage for the contraceptives to which it objects. The "accommodated" organization's own plan becomes a mechanism which ensures that contraceptives are made available to enrollees, preventing the organization from maintaining a plan consonant with its religious or moral beliefs. Thus, self-certification for those

---

[3] *Zubik v. Burwell*, 578 US __ (2016).
[4] 134 S. Ct. 2751 (2014).

seeking an "accommodation" remains problematic; and currently those organizations that are exempt have no such requirement (except to have in their files documentation of the criteria upon which the claim of an "exemption" is supported). Thus, the expanded types of organizations eligible for an "exemption" should not be required to engage in a self-certification process.

Furthermore, claims that the "accommodation" creates a "cost-neutral" plan for the employer, thus exonerating the employer from moral culpability is just not true. Notwithstanding the regulatory prohibition against directly or indirectly charging the employer or employee for contraceptives, the employer still will be contributing to the objectionable payments. The former Administration argued that cost reduction will occur by the reduction in maternity care costs. However, there are no reductions in plan premiums. If there are actually reduced maternity claims against the employer's plan as a result of its employees receiving coverage for contraceptives, those cost savings should result in the "accommodated" employers paying a reduced premium in subsequent years. But under the existing regulatory scheme, if claims against the plan are reduced, the employer would not pay a reduced premium for that plan. Instead, the employer's premium would remain as high as it was previously, even though its claims experience should result in a lower premium. And it is precisely that increment of the premium over the actual experience-based cost that would pay for contraceptives, in violation of the religious freedom of the employer.

In the case of insured plans, the Administration claimed in the preamble to its 2013 final rule that the cost of contraceptives could be treated as "an administrative cost that is spread across the issuer's entire risk pool, excluding plans established or maintained by eligible organizations ...."[5] In the case of self-insured plans, funding for contraceptives is purportedly available through a reduction in the exchange user fee, but this assumes that the Third Party Administrator (TPA) will be able to find an insurer willing to make these payments and that the reduction will keep pace with the actual cost of contraceptives. Even if they kept pace, contraceptive payments would not be recovered until months after the payments are made, which raises the question of what source of funds are to be used in the meantime to make such payments. These questions give reasons for concern that the attempted segregation of those contributions from contraceptive payments will likewise turn out to be ineffective. Furthermore, insofar as the insurer/TPA is providing or arranging payments for contraceptives based on an enrollee's participation in the "eligible organization's" group plan, such

---

[5] 78 FR 39870 (July 2013).

payments are facilitated by the plan which the religious objector has offered to, and purchased for, its employees. By requiring the "eligible organization's" own health plan to be used as the mechanism or vehicle for ensuring that contraceptive coverage is made to plan enrollees, the government denies this organization the right to establish and maintain a health plan for its employees that is consistent with its religious beliefs and commitments.

In the end, the objecting but "accommodated" employer and any non-exempt employer is prevented from offering its employees a plan that comports with the provider's religious convictions. It is evident that suppression of religious freedom can take at least two forms. It can take the form of making conscientious objectors actively cooperate with what they see as morally forbidden. And it can also take the form of depriving those objectors of the right (a right that others continue to exercise) to do what they see as morally required. Objecting employers will lose that right, because any plan they offer will be turned into a conduit for the objectionable coverage.

Finally, the practical outcome for employees and their children is exactly the same: the objectionable coverage is obtained by virtue of their enrollment in the employer-provided health plan. Employees who share the objecting organization's religious tenets are similarly deprived of the freedom to choose an insurance plan organized according to their own values, and are forced to accept coverage for their families to which they have their own religious or moral objection. In this way, the "Contraceptive Mandate" completely fails to acknowledge the religious freedom of both individual and institutional conscientious objectors. Because it is not narrowly tailored to accomplish a compelling government interest, the Contraceptive Mandate violates the Religious Freedom Restoration Act (RFRA), as most courts addressing the issue have either held or found likely in granting some form of injunctive relief.

<u>Current Status</u>

While these "Interim Final Rules" do much to address these violations of religious freedom, and in expanding "exemption" eligibility they are to be lauded and supported, the "Contraceptive Mandate" should be rescinded in its entirety. Specifically, both of these "Interim Final Rules" and the "Final Rules" retain a regulatory scheme in which "preventive" health services are defined to include items that do not prevent disease, but rather are intended to render a woman temporarily or permanently infertile, and may be associated with adverse health outcomes. Designating contraceptives as "preventive services" does not constitute good

clinical medicine. An extensive body of evidence shows hormonal contraceptives pose substantial threats to women, including myocardial infarction, cerebrovascular accidents, deep venous thrombosis, pulmonary emboli,[6] as well as breast cancer, cervical cancer, and liver cancer. The relationship between hormonal contraception use and breast cancer—and in particular the disturbing connection between oral contraception use and triple-negative breast cancer (for which oral contraceptives raise the risk by 2.5 to 4.2 times)—should cause caution and concern.[7] Furthermore, it is a scientific fact that contraceptive drugs and devices also are associated with an increased risk of AIDS and sexually transmitted diseases.[8] Designating contraceptives as "preventive services" gives the false impression that these are safe and standard medications. Thus, such contraceptives are not "preventive services," but put the very women they are purported to protect at significant health risk.

Furthermore, as not all employers' religious freedoms are protected, those that are not exempt or accommodated must continue to provide coverage for surgical sterilizations and drugs and devices approved by the United States Food and Drug Administration (FDA) as contraceptives, including drugs and devices that potentially are abortifacients, inappropriately under the guise of "preventive services." Thus, the "Contraceptive Mandate" as presented in the "Interim Final Rules" continues to substantially burden the religious liberty of all employers with moral objections to the mandated coverage, who are not eligible for an "exemption" or "accommodation," for example, if they are employers of publicly traded companies. The nature of one's business holdings does not dictate who is eligible for protections of conscience. If a company is not sponsored by a faith-based community but has moral objections consistent with those companies that do have such sponsors, the fact that the company is publicly traded in no way should allow its right to protections under the RFRA to be violated. Identical moral objections to abortifacients can be held by persons of faith, agnostics, and atheists. Furthermore, whether their company is publicly traded or not should have no bearing on the protections of rights of conscience. The U.S. Supreme Court has made it clear in the *Hobby Lobby* decision, that it is not the role of government to second guess a person's religious beliefs, or what does or does not violate those

[6] For specific cautions and risks see: "Ortho Tri-Cyclen / Ortho-Cyclen." *RxList: The Internet Drug Index.* Available at http://www.rxlist.com/ortho_tri-cyclen-drug.htm.

[7] Jessica M. Dolle, Janet R. Daling, Emily White, et al., "Risk Factors for Triple-Negative Breast Cancer in Women under the Age of 45 Years." *Cancer Epidemiol Biomarkers Prev.* 2009; 18:1157-1166.

[8] "Hormonal contraception doubles HIV risk, study suggests." *Science Daily*, October 4, 2011, at http://www.sciencedaily.com/releases/2011/10/111003195253.htm.

beliefs. Moral objections are often grounded in religious beliefs. As long as the individual's or organization's religious beliefs are sincerely held, the government may not substitute its judgment for that of the conscientious objector.[9]

Abortifacient Drugs and Devices are Not "Contraception."

The "Interim Final Rules" require non-exempt employer coverage of *abortifacient* drugs and devices. Thus, the "Contraceptive Mandate" departs from a longstanding tradition in federal law of protecting rights of conscience with regard to respect for unborn human life. A number of so-called contraceptives are in fact abortifacients, capable of preventing the implantation of the fertilized human being after fertilization (conception). This is documented by descriptors, provided by the FDA which states publicly concerning *Plan B* "emergency contraception:"

> "Plan B One-Step is believed to act as an emergency contraceptive principally by preventing ovulation or fertilization (by altering tubal transport of sperm and/or ova). In addition, it may inhibit implantation (by altering the endometrium)."[10]

The FDA did not arrive at this conclusion because there is no credible evidence that this drug prevents implantation; it arrived at this conclusion from an analysis of the relevant scientific data. Likewise, the manufacturer of *Plan B*, Teva Pharmaceuticals, states that *Plan B* may work "by preventing attachment (implantation) to the uterus (womb)."[11] In addition, another FDA-approved emergency contraceptive is even capable of dislodging the embryo after implantation. Specifically, ulipristal (*ellaOne*) may prevent ovulation but is clearly abortifacient. Its chemical structure is similar to that of mifepristone (*RU-486*), which blocks natural progesterone receptors in three critical areas: destroying receptivity of the endometrial glands to embryo implantation;[12] destroying the capacity of the corpus luteum to produce progesterone for initial support of the implanted embryo;[13] and destroying the

[9] 134 S. Ct. at 2777-79 (discussing *Thomas v. Review Board*, 450 U.S. 707 (1981)).

[10] U.S. Food and Drug Administration. "Labeling Information" (07/10/2009). http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021998lbl.pdf.

[11] Teva Pharmaceuticals. "Plan B. One-Step FAQ" (last accessed October 27. 2014). http://www.planbonestep.com/faqs.aspx.

[12] Jerry R. Reel. Sheri Hild-Petito. and Richard P. Blye. "Antiovulatory and Postcoital Antifertility Activity of the Antiprogestin CDB-2914 When Administered as Single. Multiple. or Continuous Doses to Rats." *Contraception* 58.2 (August 1998): 129.

[13] Catherine A. VandeVoort et al.. "Effects of Progesterone Receptor Blockers on Human Granulosa-Luteal Cell Culture Secretion of Progesterone. Estradiol. and Relaxin." *Biology of Reproduction* 62.1 (January 2000): 200.

endometrial stromal tissues necessary for the survival of the embryo.[14] However, the FDA has taken the position that "conception" only occurs upon implantation in the womb. It claims that these drugs and devices are therefore nothing but "contraceptives." However, biology textbooks are clear that a new member of the human species is alive from the time of fertilization.[15] Just because the American College of Obstetricians and Gynecologists has chosen to redefine the beginning of pregnancy as after implantation of the human embryo has occurred,[16] does not change the status of that human embryo. Furthermore, millions of Americans hold religious and moral convictions about the need to respect and protect human life from its earliest stages.

Thus, the "Contraceptive Mandate" encompasses "abortion," clearly in violation of the "ACA." Specifically, the "ACA" states that "nothing" in title I of "ACA," which includes the provision dealing with preventive services, "shall be construed to require a qualified health plan to provide coverage of [abortion] services ... as part of its essential health benefits for any plan year," and also stating that it is the "issuer" of a plan, not the government, that "shall determine whether or not the plan provides coverage of [abortion] services".[17] Thus, the very law cited as being the foundation of the "Interim Final Rules" is violated by these same rules.

## Conclusion

The "Interim Final Rules" continue to retain a regulatory scheme in which "preventive" health services are defined to include items that do not prevent disease, but rather are intended to render a woman temporarily or permanently infertile, and may be associated with adverse health outcomes. The "Contraceptive Mandate" should be rescinded in its entirety. However, the revoking of the artificially and arbitrarily differentiated definitions of the religious community, into those that are deemed "religious enough" for the "exemption" and those that are not, is sound, welcomed and lauded. Such an artificial differentiation excludes those who exercise their faith by a most visible service to the common good consistent with mandates of faith. Likewise the expansion of organizations that are

---

[14] Sheri Ann Hild et al., "CDB-2914: Anti-progestational/Anti-glucocorticoid Profile and Postcoital Anti-fertility Activity in Rats and Rabbits." *Human Reproduction* 15.4 (April 2000): 824.

[15] "Development of the embryo begins at Stage 1 when a sperm fertilizes an oocyte and together they form a zygote." [England, Marjorie A. *Life Before Birth*. 2nd ed. England: Mosby-Wolfe, 1996, p.31].

[16] See Christopher M. Gacek, "Conceiving Pregnancy: U.S. Medical Dictionaries and Their Definitions of *Conception* and *Pregnancy*," *National Catholic Bioethics Quarterly* 9.3 (Autumn 2009): 543–557, originally published by Family Research Council.

[17] 42 U.S.C. § 18023(b)(1)(A).

exempt from the Contraceptive Mandate, to all religiously objecting organizations, is constitutionally sound and welcomed. However, the denial of such rights to a publicly traded for-profit company, that has moral objections to such coverage, is a violation of their rights of conscience. Such companies should not lose their constitutional protections merely because they are publicly traded. Lastly, since even the "Final Rules" of 2015 did not require self-certification of those limited religious organizations that were exempt, no such self-certification should be required of those organizations deemed to be exempt by the "Interim Final Rules."

We thank you for considering our prior public comment on this matter of religious freedom, and welcome the changes contained herein. We ask you to consider the more far-reaching provisions that are needed to protect women from a false understanding of what will promote their health and prevent disease, as well as to protect the religious freedom of all organizations and employers.

Sincerely yours,

Marie T. Hilliard

Marie T. Hilliard, JCL, PhD., RN
Director of Bioethics and Public Policy



***VIA ELECTRONIC DELIVERY***

December 4, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
ATTN: CMS–9940–IFC
PO Box 8016
Baltimore, MD 21244-8016

To Whom It May Concern:

On behalf of Solidarity HealthShare, a health sharing ministry created to allow Americans to remain true to their religious and moral beliefs while meeting the healthcare needs of their families, I am writing to offer the following comments on the interim final rule entitled: ***Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act.*** Solidarity applauds the Departments for issuing these regulations to liberate Americans from the multiple burdens contained in the prior administration's implementation of the Guidelines for women's preventive services, commonly referred to as the ACA's contraception coverage mandate.

**About Solidarity HealthShare**

Before offering our comments on the RFI, I wish to introduce the Department to Solidarity HealthShare. Officially launched just one year ago, Solidarity HealthShare today counts 2,000 families as members. Inspired by the growth and potential of health sharing ministries, we provide an alternative to unaffordable, inflexible Affordable Care Act-era health insurance. Solidarity is building an authentic Catholic healthcare system that is faithful to the religious and ethical teachings of the Catholic Church. While Solidarity has similarities to peer health sharing ministries, we focus on the following three attributes as we build our organization:

- **Conscience:** Solidarity was founded partly to fill the tremendous need that exists to provide alternatives to health insurance coverage because of laws and regulations like the contraception coverage mandate. We are faithful to the teachings of the Catholic Church and require our members to remain faithful to these tenets as well.

- **Community**: Solidarity is committed to building an authentic community of members who are deeply committed to our mission and who desire to build an authentic Catholic community today. This includes the commitment of our members to maintaining healthy lifestyles to help limit care and expenses associated with unhealthy lifestyles. We are constantly working on ways to foster a legitimate sense of community and sharing as we know such traits are essential for our long-term success.

- **Costs**: Because the ministry member – who is a self-pay patient – is central to our mission, Solidarity focuses extensive amounts of time and energy in negotiating the lowest possible costs for high-quality care. We scrutinize all costs submitted and seek ways to limit unnecessary expenditures and to advocate for the greatest discounts possible. Additionally, because we share actual costs and not estimates or projections, we fight each and every day for the lowest possible price and are increasingly focusing on negotiating directly with providers, particularly in states or regions where we have a critical mass of members.

**Comments on the Interim Final Rule**

With this mission and vision, Solidarity is pleased to offer the following comments on the interim final rules.

As noted in our introduction, Solidarity is very pleased overall with the interim final rule (and its companion interim final rule published concurrently in the Federal Register regarding moral exemptions). As the final rule clearly laid out, the United States has a long history of protecting the religious and moral concerns of healthcare personnel dating more than 40 years to shortly after the Supreme Court's *Roe vs. Wade* and *Doe vs. Bolton* rulings. As noted in the rules, these protections have been expanded over time and today pertain to a number of specific issues including provision of abortion, sterilization or other services; education and training in such medical procedures and payment or referral for abortions and for assisted suicide.

Unfortunately, the prior administration took a significant step backward in interpreting and implementing the preventive services guidelines included in the ACA by requiring certain group health plans and health insurance issuers to cover the full range of FDA-approved methods of contraception. We agree with the Departments that such a mandate unduly burdens the religious liberties and moral concerns of those impacted by the rule and applaud the decision to expand the protections provided under the revised policy. And we agree with the related interim final rule that "the Government's interest in applying contraceptive coverage requirements to the plans of certain entities and individuals does not outweigh the sincerely held moral objections of those entities and individuals."

With regard to the specific provisions of the interim final rules, Solidarity is pleased to see that the rules cover moral objections in addition to religious beliefs and that this new policy will not require submitting any self-certification. Solidarity is also pleased that the interim final rule broadens the exemption to include certain for-profit entities, including for-profit companies that object to such coverage because of the religious beliefs of their owners. Additionally, as an organization that is driven by our members who are motivated by the ability to protect their conscience rights, Solidarity is pleased that the interim final rule includes an individual exemption whereby an employee with sincerely held moral objections to contraception coverage may obtain a plan that omits coverage of such products.

We note that the interim final rules surmise that the new policy may help boost insurance coverage by making it less likely that individuals would forgo coverage because the only options available would require them to accept a plan that covers contraceptives. While not challenging this assertion,

we do wish to note the significant growth that has occurred in health sharing ministries more broadly over the seven years since the ACA has been enacted. In the case of Solidarity, which is a relatively new entrant to the space, I can note that many of our members have turned to us primarily because of their interests in following their conscience rights with regard to such issues.

In toto, Solidarity believes the interim final rule strongly improves upon the situation American employers and employees have found themselves facing over the past several years. At the same time, we must note that even with implementation of these new protections, entities and individuals may still face situations in which they are forced into a conflict between their religious beliefs or moral convictions and easing the burden of out-of-pocket medical expenses. For example, the interim final rule protects entities from plans that cover FDA-approved forms of contraception, including some products that act as abortifacients, but it does not provide any protections for employers or individuals regarding abortion. Similarly, the interim final rule offers no exemptions for plans that cover services related to gender reassignment, including surgery. Both elective abortions and services related to gender reassignment are in serious conflict with the moral and ethical teachings of the Catholic Church and many other faith traditions. But even under the broadened protections included in the interim final rules, entities will not have any guaranteed recourse from these threats.

Just this past summer, the state of Oregon enacted a law that requires health plans to cover elective abortions.[1] This extreme new law includes only a very narrow exemption for religious employers, one that does not apply to those obtaining relief under the interim final rules. These threats against conscience are, sadly, significant and very real, demonstrating the need for further protections at all levels of government.

Solidarity HealthShare believes the optimal response to these threats lies in health sharing ministries like ours that are organized around religious ethics and morals and that seek to build authentic communities while helping our members pay for their healthcare expenses. As the administration considers its overall healthcare agenda including ways to build upon the interim final rules to better protect the conscience rights of all Americans and to help drive access to affordable and meaningful healthcare coverage, we urge you to fully consider the alternatives offered through robust and authentic health sharing ministries. While health sharing ministries are not and should not be treated as health insurance, ministries like Solidarity are able to fulfill similar needs and are able to do so in ways to drive high-value care in accordance with the ethical and religious beliefs of our members. We welcome the opportunity to engage with the Departments on this issue and others as needed.

Sincerely,

/S/

Bradley Hahn
CEO
Solidarity HealthShare

---

[1] See: https://olis.leg.state.or.us/liz/2017R1/Downloads/MeasureDocument/HB3391

*Office of the General Counsel*

3211 FOURTH STREET NE • WASHINGTON DC 20017-1194 • 202-541-3300 • FAX 202-541-3337

*Submitted Electronically*

November 21, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9925-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Subj: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, RIN 0938-AT46**

Dear Sir or Madam:

On behalf of the United States Conference of Catholic Bishops ("USCCB"), we submit the following comments on the interim final rules, published at 82 Fed. Reg. 47838 (Oct. 13, 2017), on moral exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act ("ACA").[1]

## I. The Mandate

As set out in our comments on the companion interim final rule on religious exemptions, we believe HHS should reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans as part of "preventive services." These drugs, devices and procedures prevent not a disease condition, but the healthy condition known as fertility, and they pose significant risks of their own to women's life and health. For these reasons, and for reasons set out more fully in our comments on the companion interim final rule on religious exemptions, we request that the mandate be rescinded.

[1] Today we have also filed comments on the companion interim final rule, published at 82 Fed Reg. 47792 (Oct. 13, 2017), concerning exemptions and accommodations for religious objections to contraceptives. The two sets of comments should be considered together, and each set of comments includes the other as an attachment which we incorporate by reference. Unless context indicates otherwise, our use of the term "contraceptives" refers to contraceptives, sterilization, and related education and counseling, and "contraceptive coverage" refers to coverage of these items. The "mandate" refers to the requirement to cover these items.

## II. The Exemptions

### A. A Moral Exemption is Appropriate.

HHS has given very thorough and persuasive reasons for adopting a moral-based exemption from the mandate. Among other things, the Department cites federal statutory protections for moral-based exemptions, including many that are applicable in the health care context generally and to contraceptives specifically; the legislative history of the Church amendment, a longstanding statute that protects moral as well as religious objectors; court precedents relevant to moral exemptions; conscience protections in regulations and among the states; broadly-framed principles of freedom of conscience embraced by the Founders; executive orders relevant to moral exemptions; and litigation surrounding the mandate. 82 Fed. Reg. at 47844-48.

We agree with the Department that there should be exemptions for those with moral objections, and we agree with the reasons that the Department has given for adopting exemptions for stakeholders with moral objections.

### B. The List of Plan Sponsors Eligible for an Exemption on Moral Grounds Should Be at Least as Broad as the List of Plan Sponsors Eligible for an Exemption on Religious Grounds.

Currently the list of stakeholders eligible for an exemption for *moral* reasons, though commendably broad, is slightly narrower than the list of stakeholders eligible for an exemption for *religious* reasons.[2] The Department seeks public comment specifically on "whether the exemption ... for plan sponsors with moral objections to the Mandate should be finalized to encompass all of the types of plan sponsors covered by [the exemption for plan sponsors with religious objections]...." 82 Fed. Reg. at 47851.

The answer, in our view, is yes. That is, the range of plan sponsors eligible for an exemption if they have a moral objection should be no less broad than the range of plan sponsors eligible for an exemption on religious grounds. We take this position for five reasons.

*First*, in the preamble to the companion interim final rule on religious exemptions, HHS states that a publicly-traded company may have a religious objection to the mandate, even if such

---

[2] For example, the companion interim final rule on religious exemptions provides a *non-exhaustive* list of plan sponsors that are exempt from the mandate if they have a religious objection. 82 Fed. Reg. at 47835 (setting out a list of plan sponsors that "include, but are not limited to," certain specified entities). The interim final rule on moral exemptions, however, lacks the language "include, but are not limited to," *see* 82 Fed. Reg. at 47861-62, and therefore presents what is a list that is arguably exhaustive rather than illustrative.

To take another example, the companion interim final rule states that a "for-profit entity that is not closely held" may obtain an exemption on religious grounds. 82 Fed. Reg. at 47835. But the present interim final rule states that a for-profit entity that is not closely held may obtain an exemption on moral grounds only if it is not publicly-traded. 82 Fed. Reg. at 47862.

an objection is unlikely, so HHS *allows* an exemption. 82 Fed. Reg. at 47810-11. In the preamble to the present interim final rule on moral exemptions, however, HHS states that a publicly-traded company could have a moral objection, but that such an objection is unlikely, so HHS *disallows* an exemption. 82 Fed. Reg. at 47851-52. These two arguments are inconsistent. If the possibility of a religious objection is sufficient in the case of the companion rule on religious exemptions to justify an exemption, as HHS correctly states, then the possibility of a moral objection should also be sufficient in the case of the present interim final rule to justify an exemption.

*Second*, we think the thorough, persuasive reasons HHS has offered for having a moral exemption in the first place justifies an exemption on moral grounds that is at least as broad as that provided for religious objectors.

*Third*, one can reasonably conclude that this particular mandate will generate moral as well as religious objections. That is because the locus of the objection, as evidenced by past litigation on the mandate, is very often on drugs and devices that prevent implantation and are therefore regarded by the objector as abortifacient irrespective of the objector's particular religious tradition. Indeed, in the case of a publicly-traded corporation, it is arguably *more* likely that some block of shareholders will share a common moral opposition to abortifacients than that they will share common religious traditions opposing such drugs or devices. *See Valley Hosp. Ass'n v. Mat-Su Coalition for Choice*, 948 P.2d 963 (Alaska 1997) (non-religious community hospital had moral objections to providing abortions, even though it had no religious objection); 42 U.S.C. § 300a-7 (recognizing the possibility of moral but non-religious objections to abortion, and therefore protecting such objectors). Indeed, moral objections are sometimes religiously grounded, sometimes they are not. So, the universe of moral objectors, it would seem, is almost always going to be larger than the universe of religious objectors because the former arguably includes the latter as a subset.

*Fourth*, while the current religious and moral exemptions, as written, easily pass muster under the Establishment Clause, and while the presence of a religious exemption in our view does not constitutionally *require* a parallel moral exemption, the Department, as a practical matter, may find it easier to defend against an Establishment Clause challenge a religious exemption that has a perfect parallel in a regulation providing an identical exemption for moral reasons.

*Fifth*, religious and moral exemptions that parallel each other will be easier for the public to understand and simpler for the federal government to administer.

For all these reasons, we think it would be prudent for the Department to broaden the exemption for plan sponsors with a moral objection to the mandate to include any plan sponsor that, if it had a religious objection, would be exempt under the companion rule.

**C. <u>No Self-Certification Should be Required.</u>**

The Department states that "exempt entities will not be required to comply with a self-certification process." 82 Fed. Reg. at 47850. The Department asks, however, "whether exempt entities, or others, would find value either in being able to maintain or submit a specific form of certification to claim their exemption. . . ." *Id.* at 47850.

We agree with the Department's decision not to require exempt entities to comply with a self-certification process, and we recommend that no special form or other process be developed or required to claim the exemption, especially since these have been used in the past as a mechanism for ensuring compliance with the mandate and therefore have themselves raised religious and moral concerns for many stakeholders.

**<u>Conclusion</u>**

HHS should reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans as part of "preventive services." These drugs, devices and procedures prevent not a disease condition, but the healthy condition known as fertility, and they pose significant risks of their own to women's life and health. As long as the mandate is in place, we fully support the exemptions for those individuals and entities with religious and moral objections to the mandate. The exemptions for moral objections should apply to a list of stakeholders that is at least as broad as that for religious objections. Accordingly, we recommend that the interim final rule be adjusted so that it parallels the list of stakeholders with religious objections in the companion interim final rule.

Thank you for the opportunity to comment.

Sincerely,

Anthony R. Picarello, Jr.
Associate General Secretary &
General Counsel

Michael F. Moses
Associate General Counsel

Hillary E. Byrnes
Assistant General Counsel

Addendum

00000008

Exhibit 119

JA-0001574



*Office of the General Counsel*

3211 FOURTH STREET NE • WASHINGTON DC 20017-1194 • 202-541-3300 • FAX 202-541-3337

*Submitted Electronically*

November 21, 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

**Subj: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, RIN 0938-AT20**

Dear Sir or Madam:

On behalf of the United States Conference of Catholic Bishops ("USCCB"), we submit the following comments on the interim final rules, published at 82 Fed. Reg. 47792 (Oct. 13, 2017), on religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act ("ACA").[1]

Since the ACA's enactment in 2010, we have filed comments each time the Department has issued a regulatory proposal on contraceptive coverage.[2] Our earlier comments raised two overarching themes.

[1] Today we have also filed comments on the companion interim final rule, published at 82 Fed Reg. 47838 (Oct. 13, 2017), concerning exemptions and accommodations for moral objections to contraceptives. The two sets of comments should be considered together, and each set of comments includes the other as an attachment which we incorporate by reference. Unless context indicates otherwise, our use of the term "contraceptives" refers to contraceptives, sterilization, and related education and counseling, and "contraceptive coverage" refers to coverage of these items.

[2] *See* USCCB Comments on Interim Final Rules on Preventive Services (Aug. 31, 2011), http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-to-hhs-on-preventive-services-2011-08-2.pdf; USCCB Comments on Advance Notice of Proposed Rulemaking on Preventive Services (May 15, 2012), http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-on-advance-notice-of-proposed-rulemaking-on-preventive-services-12-05-15.pdf, USCCB Comments on Notice of Proposed Rulemaking on Preventive Services (Mar. 20, 2013), http://www.usccb.org/about/general-counsel/rulemaking/upload/2013-NPRM-Comments-3-20-final.pdf; USCCB Comments on Proposed Rules on Coverage of Certain Preventive Services Under the Affordable Care Act (Oct. 8, 2014), http://www.usccb.org/about/general-

*First*, we argued that contraceptives should not be mandated as "preventive" services because, unlike genuinely preventive services, they do not prevent disease or illness. Instead, they are associated with an increased risk of adverse health outcomes, such as breast cancer, that other "preventive services" are designed to prevent. The contraceptive mandate is therefore at odds with the purpose of the preventive services provision of the ACA upon which the mandate purports to be based. In addition, insofar as it requires coverage of drugs and devices that can cause an abortion, the mandate violates ACA provisions dealing with abortion coverage and non-preemption of state law, as well as the Weldon amendment.

*Second*, we argued that if coverage of contraceptives were to be mandated, all stakeholders with religious or moral objections should be exempt. We argued that the previous exemption from the mandate for churches was too narrow, and that the device HHS had created for the purpose of "accommodating" non-exempt entities was insufficient to relieve non-exempt entities of the substantial burden that the mandate placed upon them. We argued that a broad exemption for religious objectors was required under the Religious Freedom Restoration Act ("RFRA"), and that an exemption for religious and moral objectors was both prudent as a matter of public policy and consistent with longstanding traditions protecting conscience in this country.

In the present interim final rule and companion rule regarding moral convictions, HHS does not address the first of these two overarching issues, but instead leaves it to the discretion of its Health Resources and Services Administration ("HRSA") "to decide whether to include contraceptives in the women's preventive services Guidelines...."[3] Because the Guidelines themselves have never been the subject of notice and comment rulemaking, however, and because there is no indication that they ever will be, we raise the issue here, as we have in all our past rulemaking comments on contraceptive coverage, because significant questions remain whether contraceptives are an appropriate subject for inclusion in a list of preventive services in the first instance. For reasons set out in these comments, HHS could reasonably conclude that they are not. We urge HHS, whether in this rulemaking or in some other appropriate forum, to reconsider and rescind the mandate. At a minimum, to ensure compliance with the abortion and non-preemption provisions of the ACA and with the Weldon amendment, HHS should clarify that the mandate does not apply to any drug or device that can disrupt an existing pregnancy.

On the second issue, HHS is to be commended. Consistent with the position that we and others have long urged, the Department, in these two interim final rules, has crafted exemptions that together protect all stakeholders with religious or moral objections to contraceptive

---

counsel/rulemaking/upload/2014-hhs-comments-on-proposed-rule-on-for-profits-10-8.pdf; USCCB Comments on Interim Final Rules on Coverage of Certain Preventive Services Under the Affordable Care Act (Oct. 8, 2014). http://www.usccb.org/about/general-counsel/rulemaking/upload/2014-hhs-comments-on-interim-final-rules-10-8.pdf. *See also* USCCB comments on Interim Final Rules Relating to Coverage of Preventive Services (Sept. 17, 2010) (discussing why contraceptives should not be included in the list of mandated preventive services under the ACA). http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-to-hhs-on-preventive-services-2010-09.pdf.

[3] *See, e.g.*, 82 Fed. Reg. at 47799 ("These interim final rules leave unchanged HRSA's authority to decide whether to include contraceptives in the women's preventive services Guidelines for entities that are not exempted by law, regulation, or the guidelines.").

coverage, for reasons that are well articulated and persuasive. The exemptions are, as the bishops noted when first apprised of them, "a return to common sense"[4] and, in the Department's words, consistent with "a long history of providing conscience protections in the regulation of health care for entities and individuals with objections based on religious beliefs and moral convictions." 82 Fed. Reg. at 47792.

## I. The Mandate

Contraceptives are inappropriate candidates for inclusion under mandated "preventive services" for several reasons.

### A. The Meaning and Purpose of "Preventive Services"

The justification for mandating coverage for preventive services can be determined from the plain language of the statute and its legislative history. In section 2713(a)(4) of the ACA, 42 U.S.C. § 300gg-13(a)(4), Congress gave HRSA the discretion to specify that certain group health plans shall cover, "with respect to women, such additional *preventive* care and screenings ... as provided for in comprehensive guidelines" supported by HRSA. The plain meaning of "preventive" is an item or service that prevents disease or illness. Naturally, congressional debate on this provision centered almost entirely on services to prevent life-threatening illness such as breast cancer. 111 Cong. Rec. S11986-88 (Nov. 30, 2009); 111 Cong. Rec. S12025-28, S12058-60 (Dec. 1, 2009); 111 Cong. Rec. S12113-14, S12119-23, S12126-31, S12143-44, S12151-52 (Dec. 2, 2009); 111 Cong. Rec. S12267-77 (Dec. 3, 2009).

For the most part, the list of "preventive" services developed by HRSA is consistent with this meaning and with Congress's intent. HRSA has decided that covered services shall include breast cancer screening, breastfeeding services and supplies, screening for cervical cancer, screening for gestational diabetes mellitus, screening for human immunodeficiency virus infection, screening for interpersonal and domestic violence, counseling for sexually transmitted infections, and well-woman preventive visits. HRSA, Women's Preventive Services Guidelines (Dec. 20, 2016), https://www.hrsa.gov/womens-guidelines-2016/index.html. Coverage of these services is mandated because they can prevent serious illnesses or life-threatening conditions that, once they occur, will demand treatment to cure or reverse or, at the very least, can provide an early warning so these conditions can be treated more quickly and with a greater likelihood of success.

This rationale does not apply to contraceptives. Contraceptives do not prevent disease, but instead disrupt the healthy functioning of the human reproductive system, temporarily or permanently creating the condition of infertility, which is commonly seen as a health problem. Most drugs and devices in this area have a significant "failure" rate, but when they do succeed, what they most often "prevent" is a healthy pregnancy in a healthy woman of childbearing age. At various times, women may have serious personal reasons for wanting to avoid or delay a pregnancy. However, these personal reasons do not transform a temporary or permanent

---

[4] Statement of Cardinal Daniel N. DiNardo, Archbishop of Galveston-Houston and President of the USCCB, and Archbishop William E. Lori of Baltimore, Chairman of the USCCB's Ad Hoc Committee for Religious Liberty (Oct. 6, 2017), http://www.usccb.org/news/2017/17-180.cfm.

condition of infertility into a prerequisite for health, or turn a healthy pregnancy into a disease condition.

Indeed, if contraception and sterilization were comparable to the other items listed as preventive by HRSA, the federal government would be mandating coverage in order to obviate the need for providing the "cure" or treatment later (or in order to ensure that such cure or treatment is provided early, to enhance the likelihood of success). But the condition prevented by contraceptives is pregnancy, which has its own natural course ending in live birth if not interrupted by medical intervention or spontaneous miscarriage. The "cure" or "treatment" to eliminate this condition would have to be an abortion. But the ACA *prohibits* any federal mandate to cover abortion as an essential health benefit in *any* circumstances.[5] Indeed, the Act not only leaves health plans free to exclude abortion, but explicitly allows each state to forbid coverage of abortion on or off its exchange.[6] Finally, with regard to the multi-state qualified health plans established under the ACA, at least one of these plans must exclude most abortions. 42 U.S.C. § 18054(a)(6). The ACA does not treat any other procedure this way.

In these provisions, the ACA treats pregnancy as a healthy condition and does not treat the existence of an unborn human life as an illness or condition requiring the "treatment" of abortion. It is inconsistent to *require* health plans to commit themselves to preventing this same condition.

Some may claim that contraception and sterilization are "preventive services" in the sense that they "prevent" abortion. But this is implausible for several reasons. First, abortion is not itself a disease, but a separate procedure that is performed only by agreement between a woman and a health professional. Second, most pregnancies, including unintended pregnancies, end in live birth rather than abortion, so it would be arbitrary to claim that preventing such pregnancies primarily prevents abortion rather than live birth. Third, studies have shown that the percentage of unintended pregnancies that are ended by abortion is *higher* if the pregnancy occurred during use of a contraceptive.[7] Finally, numerous studies have shown that contraceptive programs do not reliably or consistently reduce abortion rates.[8] For example, one

---

[5] 42 U.S.C. § 18023(b)(1)(A) (stating that "nothing" in title I of the ACA, which includes the provision dealing with preventive services, "shall be construed to require a qualified health plan to provide coverage of [abortion] services ... as part of its essential health benefits for any plan year"); *id.* (stating that it is the "issuer" of a plan, not the government, that "shall determine whether or not the plan provides coverage of [abortion]"); *see also* 42 U.S.C. § 18023(c)(1) (stating that nothing in the ACA preempts or has any effect on State law regarding abortion coverage).

[6] 42 U.S.C. § 18023(a)(1) (providing that "A State may elect to prohibit abortion coverage in qualified health plans offered through an Exchange in such State if such State enacts a law to provide for such prohibition"); 42 U.S.C. § 18023(c)(1) (providing that "Nothing in this Act [i.e., the ACA] shall be construed to preempt or otherwise have any effect on State laws regarding the prohibition of ... coverage ... [of] abortions").

[7] While 40% of unintended pregnancies end in abortion, this percentage rises to 51% for women who used a contraceptive during the month they became pregnant. Guttmacher Institute, "Fact Sheet: Induced Abortion in the United States," Oct. 2017, at https://www.guttmacher.org/sites/default/files/factsheet/fb_induced_abortion.pdf.

[8] See fact sheets by the USCCB Secretariat of Pro-Life Activities, "Greater Access to Contraception Does Not Reduce Abortions," http://www.usccb.org/issues-and-action/human-life-and-dignity/contraception/fact-sheets/greater-access-to-contraception-does-not-reduce-abortions.cfm, and "Emergency Contraception Fails to

review summarizing 23 separate studies found that not one of the studies could show a reduction in abortion rates from programs expanding access to so-called "emergency contraception."[9] An evidence-based approach to health care does not permit the claim that mandating contraceptive coverage will reduce abortions or even unintended pregnancies.

One particular drug approved by the Food and Drug Administration ("FDA") for "emergency contraception" poses an especially obvious problem in this regard. Ulipristal (trade name "Ella") is a close analogue to the abortion drug RU-486, with the same biological effect – that is, it can disrupt an established pregnancy after conception has taken place.[10] Therefore, it is contraindicated for women who are or may be pregnant. To characterize this drug as a "contraceptive" is misleading at best and deprives women of the opportunity for genuine informed consent. To the extent that the contraceptive mandate requires coverage of drugs that can cause an abortion after implantation, the mandate would encompass abortion even as previous administrations have defined it. Such coverage runs afoul of the ACA provisions discussed above (see notes 5 & 6, *supra*, and accompanying text), as well as the Weldon amendment.[11]

### B. Medical Realities of Contraceptive Drugs and Devices

The *non*-contraceptive items listed by HRSA as preventive services share a basic medical profile: they pose little or no medical risk themselves, and they help prevent or ameliorate identifiable conditions that would pose known risks to life and health in the future. *See* HRSA, Women's Preventive Services Guidelines, www.hrsa.gov/womens-guidelines/index.html.

Oral contraceptives present the opposite profile, posing their own serious risks and side-effects, some of which can be life-threatening.

Oral contraceptives "fail the most important test of preventive medicine: they increase [the] risk of disease instead of decreasing it."[12] HHS acknowledges many of these risks. 82 Fed.

---

Reduce Unintended Pregnancy and Abortion," June 5, 2014, at http://www.usccb.org/issues-and-action/human-life-and-dignity/contraception/fact-sheets/emergency-contraception-fails-to-reduce-unintended-pregnancy-abortion.cfm.

[9] E.G. Raymond, et al., *Population Effect of Increased Access to Emergency Contraceptive Pills*, 109 OBSTETRICS & GYNECOLOGY 181 (2007), https://www.ncbi.nlm.nih.gov/pubmed/17197603.

[10] Documentation on this and other medical aspects of the drug is cited in testimony submitted to the FDA by the American Association of Pro-Life Obstetricians and Gynecologists, available at http://aaplog.org/aaplog-testimony-to-fdas-advisory-committee-for-reproductive-health-drugs-regarding-the-emergency-contraceptive-ella/ .

[11] Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. H, § 507(d) (stating that no Labor/HHS funds may be made available to any government agency that discriminates against any health plan on the basis that the plan does not provide abortion coverage). The previous administration concluded that the Weldon amendment "remain[s] intact" after enactment of the ACA. Executive Order 13535 (Mar. 24, 2010), quoted in 82 Fed. Reg. at 47793 (preamble).

[12] Rebecca Peck & Charles W. Norris, *Significant Risks of Oral Contraceptives (OCPs): Why This Drug Class Should Not Be Included in a Preventive Care Mandate*, 79 LINACRE QUARTERLY 41, 42 (Feb. 2012), https://familyplanning.net/sites/default/files/Significan-Risks-of-Oral-Contraceptives-OCPs-Why-This-Drug-Should-Not-Be-Included-In-a-Preventive-Care-Mandate.pdf.

Reg. at 47804. Women who use oral contraceptives may have an increased risk of heart-related side effects such as stroke, heart attacks and blood clots, especially if they also smoke cigarettes. The publishers of the *Physicians' Desk Reference* warn women of these "[s]erious, and possibly life-threatening, side effects," adding:

> Seek medical attention immediately if you have any of the following: chest pain, coughing up blood, or shortness of breath (indicating a possible blood clot in the lung); pain in the calf (indicating a possible blood clot in the leg); crushing chest pain or heaviness (indicating a possible heart attack); sudden, severe headache or vomiting, dizziness, fainting, vision or speech problems, weakness, or numbness in an arm or leg (indicating a possible stroke); sudden partial or complete loss of vision (indicating a possible blood clot in the eye); breast lumps (indicating possible breast cancer or fibrocystic breast disease); severe pain or tenderness in the stomach (indicating a possible liver tumor); difficulty sleeping, lack of energy, fatigue, change in mood (possibly indicating depression); yellowing of the skin or whites of the eyes (jaundice), sometimes accompanied by fever, fatigue, loss of appetite, dark-colored urine, or light-colored bowel movements (indicating possible liver problems).[13]

According to other sources, oral contraceptives have been associated with—

- Increased risk of depression.[14]
- Increased risk of venous thromboembolism.[15]
- Increased risk of thrombotic stroke and myocardial infarction.[16]

---

[13] PDR Network, "Oral contraceptives," at *PDRhealth* (2009).

[14] Charlotte Wessel Skovlund, et al., *Association of Hormonal Contraception with Depression*, JAMA PSYCHIATRY (published online Sept. 28, 2016) ("Use of hormonal contraception, especially among adolescents, was associated with subsequent use of antidepressants and a first diagnosis of depression, suggesting depression as a potential adverse effect of hormonal contraceptive use.").

[15] Peck & Norris, *supra*, at 43 ("Oral contraceptives are associated with a three to five times higher risk of VTE"); *see also* Yana Vinogradova, et al., *Use of Combined Oral Contraceptives and Risk of Venous Thromboembolism: Nested Case-Control Studies Using the QResearch and CPRD Databases*, BMJ (Mar. 19, 2015) ("Current exposure to any combined oral contraceptive was associated with an increased risk of venous thromboembolism … compared with no exposure in the previous year."); *see also* Robert A. Hatcher et al., *Contraceptive Technology*, 18th rev. ed. (New York: Ardent Media, 2004), at 405-07.

[16] Ojvind Lidegaard, et al., *Thrombotic Stroke and Myocardial Infarction with Hormonal Contraception*, 366 N. ENGL. J. MED. 2257 (2012) (finding that risks of thrombotic stroke and myocardial infarction were "increased by a factor of 0.9 to 1.7 with oral contraceptives that included ethinyl estradiol at a dose of 20 mg and by a factor of 1.3 to 2.3 with those that included ethinyl estradiol at a dose of 30 to 40 mg"); Peck & Norris, *supra*, at 45 (reporting a 200 percent increase in the risk of myocardial infarction among users of low-dose oral contraceptives); *see also* Hatcher, *supra*, at 404-05, 445.

•Increased risk of HIV-1 acquisition and transmission.[17]

•Increased risk of breast, cervical, and liver cancer.[18]

•Increased risk of hypertension.[19]

It is important to recall in this context that most contraceptive drugs and devices are available only by prescription not primarily because they are medically indicated for any particular illness, but because they pose sufficient risks that it would be irresponsible to distribute them without medical supervision. Indeed, even with a physician's oversight, use of oral contraceptives has given rise to a virtual cottage industry among the plaintiffs' bar seeking recovery, and obtaining multi-million dollar judgments, for resulting injuries.[20] In short, while media outlets and some advocates continue to talk about contraceptives as if they are an unmitigated boon to women's health, there is ample evidence that they can and do injure women, sometimes fatally.[21]

---

[17] Renee Heffron, et al., *Use of Hormonal Contraceptives and Risk of HIV-1 Transmission: A Prospective Cohort Study*, 12 THE LANCET (Jan. 2012) ("Use of hormonal contraceptives was associated with a two-times increase in the risk of HIV-1 acquisition by women and HIV-1 transmission from women to men."); *see also Hormonal Contraception Doubles HIV Risk, Study Suggests*, SCIENCE DAILY (Oct. 4, 2011), https://www.sciencedaily.com/releases/2011/10/111003195253.htm.

[18] NIH Fact Sheet, *Oral Contraceptives and Cancer Risk* (Mar. 21, 2012), https://www.cancer.gov/about-cancer/causes-prevention/risk/hormones/oral-contraceptives-fact-sheet. One study showed that users of oral contraceptives have a 50% higher risk of invasive breast cancer, and that users of triphasic oral contraceptives have three time the risk of breast cancer, compared to women who are not on hormonal contraceptives. Richard J. Fehring, *Nurses' Health Study Provides Risks and Benefits of Exogenous Reproductive Hormone Use*, 28 CURRENT MEDICAL RESEARCH, 9, 10 (Winter/Spring 2017), http://www.usccb.org/issues-and-action/marriage-and-family/natural-family-planning/medical-research/upload/CMR-WinterSpring-2017-FINAL.pdf. Mandating contraceptive cover under the preventive services provision of the ACA is ironic given that sponsors of that provision cited the *prevention* of breast and cervical cancer as one of its key goals. Cong. Rec. S11986-91 (Nov. 30, 2009).

[19] Hatcher, *supra*, at 407, 445.

[20] *See, e.g.*, *Bayer Says It's Paid $142M Over Birth Control Lawsuits*, CHICAGO TRIB. (Apr. 26, 2012) ("Bayer says settlements of U.S. lawsuits over its Yasmin birth control pill have risen to $142 million. Bayer says it has resolved more than 600 suits claiming that Yaz causes blood clots, some of which were fatal."), http://articles.chicagotribune.com/2012-04-26/business/chi-bayer-says-its-paid-142m-over-birth-control-lawsuits--20120426_1_bayer-lawsuits-yaz; Randi Kaye & Shawna Shepherd, *Families, Lawsuits, Raise Questions About NuvaRing*, CNN (Apr. 7, 2015) www.cnn.com/2015/04/06/us/families-lawsuits-raise-questions-about-nuvaring/; Julie Deardorff, *Lawsuits Pile Up Over Popular Birth Control Pill*, CHICAGO TRIB. (Sept. 15, 2013), articles.chicagotribune.com/2013-09-15/health/ct-met-birth-control-risks-20130915_1_drospirenone-clots-pills/; Natasha Singer, *Health Concerns Over Popular Contraceptives*, N.Y. TIMES (Sept. 25, 2009), http://www.nytimes.com/2009/09/26/health/26contracept.html.

[21] There is some evidence (and HHS alludes to it) that the recommendation to list contraceptives as a preventive service did not seriously evaluate these risks. *See* 82 Fed. Reg. at 47795 (noting that the IOM's committee's recommendation, which formed the basis of HRSA's decision to list contraceptives as a preventive service, was not based on "high quality, systematic evidence," as recounted by one dissenting IOM member, and that the process that led to its recommendation was, in his words, "filtered through a lens of advocacy"). Fertility-based means of spacing births—means that are both morally licit and, if practiced, as effective as artificial contraceptives—are, of course, free of these health risks because they do not rely for their mode of action upon introducing prescribed

Our recommendation to rescind the mandate is also supported by the controversy and the litigation that the mandate has generated and continues to generate. The mandate provoked the largest single wave of religious freedom litigation in the history of the United States: over 100 lawsuits, including 56 suits on behalf of more than 300 plaintiffs with various denominational commitments, extending over half a decade. It appears that a second generation of litigation will be pursued by those opposed to the exemptions that the new rules create.[22] Thus, having devoted substantial time and resources defending an unprecedented volume of litigation seeking exemptions, the government now finds itself in the position of having to expend yet *more* time and resources to defend the exemptions—time and resources that could be directed to other ends if HHS would take the simple step of rescinding the mandate. On an issue as divisive as this one, the prudent course, in our view, and the one that is best in keeping with the advancement of women's health, would be to rescind the mandate. Rescission would also be consistent with HHS's expressed intention to protect human life from conception,[23] as at least some purported "contraceptives" can work post-conception.

At a minimum, to avoid violation of the Weldon amendment and the abortion provisions of the ACA, HHS should not require coverage of any drug or device that disrupts an existing pregnancy.

## II. <u>The Exemptions</u>

We agree with HHS that the contraceptive mandate and accommodations, as applied to religious objectors, violated the Religious Freedom Restoration Act ("RFRA"), and we

---

substances into a woman's body. Michael D. Manhart, et al., *Fertility Awareness-Based Methods of Family Planning: A Review of Effectiveness for Avoiding Pregnancy Using SORT*, 5 OSTEOPATHIC FAMILY PHYSICIAN 2 (2013) (finding that fertility-based means of spacing births show an unintended pregnancy rate "comparable to those of commonly used contraceptives"); Richard J. Fehring, et al., *Randomized Comparison of Two Internet-Supported Fertility-Awareness-Based Methods of Family Planning*, 88 CONTRACEPTION 24-30 (2013) (noting that, unlike contraceptive methods, which are discontinued often due to side effects, fertility-based methods of family planning are "free of side effects").

[22] *ACLU v. Wright*, No. 4:17-cv-5772 (N.D. Cal.) (complaint filed Oct. 6, 2017); *Commonwealth of Massachusetts v. U.S. Dep't of Health and Human Servs.*, No. 1:17-cv-11930 (D. Mass.) (complaint filed Oct. 6, 2017); *State of California v. Wright*, No. 3:17-cv-05783 (N.D. Cal.) (complaint filed Oct. 6, 2017); *State of Washington v. Trump*, No. 2:17-cv- 01510 (W.D. Wash.) (complaint filed Oct. 9, 2017); *Med. Students for Choice v. Wright*, No. 1:17-cv-02096 (D. D.C.) (complaint filed Oct. 10, 2017); *Commonwealth of Pennsylvania v. Trump*, No. 2:17-cv-04540 (E.D. Pa.) (complaint filed Oct. 11, 2017); *Campbell v. Trump*, No. 1:17-cv-02455 (D. Colo.) (complaint filed Oct. 13, 2017); *Sharaef v. Hargan*, No. 3:17-cv-0081 (N.D. Ind.) (complaint filed Oct. 31, 2017).

[23] *See* proposed HHS Strategic Plan, FY 2018-22, lines 60-61 (stating that HHS programs and initiatives serve and protect Americans "at every stage of life, beginning at conception"); *id.* at lines 846-48 (stating as a core component of HHS's missions its dedication "to serve all Americans from conception to natural death"); *id.* at lines 830-31 (promoting measures that will advance global health by "respecting the inherent dignity of persons from conception to natural death"); *id.* at lines 1143-44 (supporting the protection of human subjects in research "from conception to natural death"). The draft Strategic Plan is posted at https://cmda.org/library/doclib/hhs-strategic-plan-fy2018-2022.pdf.

commend HHS and the other Departments for their concession of this point,[24] and for the exemptions that the interim final rules provide to avoid further violations of RFRA.

RFRA has three components. It forbids the government to take an action that (a) substantially burdens free exercise unless (b) the action serves a compelling government interest (c) by the means least restrictive of free exercise. To its credit, the Department concedes that, as applied to religious objectors, the mandate and accommodation substantially burden free exercise, do not serve a compelling government interest, and are not the least restrictive means.[25] For this reason, as HHS acknowledges (82 Fed. Reg. at 47800), the government is required by law to alleviate the substantial burden that the mandate and the accommodation create.

There are several reasons, as the government is correct to point out, why the mandate and accommodation violate RFRA.

First, it is settled that the mandate imposes a substantial burden on religious objectors. *Burwell v. Hobby Lobby Stores*, 134 S. Ct. 2751, 2775-79 (2014). HHS had developed an alternative means for objecting religious entities to comply with the mandate, which it characterized as an "accommodation," but the Department now correctly concedes, 82 Fed. Reg. at 47800, as the court of appeals held in *Sharpe Holdings v. U.S. Dep't of Health & Human Services*, 801 F.3d 927 (8th Cir. 2015), that this alternative means of complying with the mandate, like the mandate itself, substantially burdens the free exercise of religious objectors.

Second, the mandate and accommodation are neither supported by a compelling government interest, nor are they the means least restrictive of free exercise. Among other things—

• Congress did not require, and has not required, coverage of contraceptives.

• Congress did not require, and has not required, across-the board coverage of preventive services generally. As HHS notes, over 25 million grandfathered plans are exempt from the requirement to cover preventive services, 82 Fed. Reg. at 47794, and "there is no legal requirement" that these plans "ever be phased out." *Hobby Lobby Stores*, 134 S. Ct. at 2764 n.10, quoted in 82 Fed. Reg. at 47794.

[24] "The Departments [of Treasury, Labor, and HHS] have … determined that requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance violates their rights under RFRA." 82 Fed. Reg. at 47800. *See also id.* at 47806 ("[R]equiring … compliance [with the mandate or accommodation] led to the violation of RFRA in many instances").

[25] *See, e.g.*, 82 Fed. Reg. at 47800 ("We have concluded that requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA."); *id.* ("Although the Departments previously took the position that the application of the Mandate to certain objecting employers was necessary to serve a compelling governmental interest, the Departments have now concluded, after reassessing the relevant interests and for the reasons stated below, that it does not."); *id.* ("the Departments have concluded that the application of the Mandate to entities with sincerely held religious objections to it does not serve a compelling governmental interest."); *id.* at 47806 ("[W]e have concluded that requiring … compliance through the Mandate or accommodation has constituted a substantial burden on the religious exercise of many … entities or individuals, and … requiring such compliance did not serve a compelling interest, and was not the least restrictive means of serving a compelling interest").

As HHS also concedes, the government lacks the authority to compel self-insured church plans to cover preventive services. 82 Fed. Reg. at 47801. And under the prior regulations, churches themselves have always been exempt from the contraceptive mandate, regardless of the type of plan they offer. That the mandate leaves such appreciable damage to the previously claimed interest in ensuring contraceptive coverage is "strong evidence" (82 Fed. Reg. at 47801) that the mandate does not serve an interest of the highest order, as would be required to comply with RFRA. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 535 (1993).

• HHS's earlier decision to exempt churches but not church-affiliated charities from the contraceptive mandate was based on the supposition that employees of the latter were less inclined than employees of the former to support their church's position on contraceptives. HHS now acknowledges, however, that this supposition was "not supported by any specific data or other source." 82 Fed. Reg. at 47802. In addition, earlier attempts to gerrymander religious organizations, as HHS rightly acknowledges (*id.*), were in conflict with the right of such organizations to employ persons who will "advance the organization's goals and ... be respectful of [its] beliefs even if they do not share all of those beliefs."

• The ACA was intended to *expand* health coverage, but the mandate has the perverse effect of causing some entities and individuals to *drop* health coverage. 82 Fed. Reg. at 47802-03 (noting that "some institutions of higher education that object to the Mandate appear to have chosen to stop arranging student plans rather than comply with the Mandate or be subject to the accommodation"); *id.* at 47812 (noting that the individual exemption "will reduce the incidence of certain individuals choosing to forego health coverage because the only coverage available would violate their sincerely held religious beliefs").

• There are "multiple Federal, State, and local programs that provide free or subsidized contraceptives for low-income women," and for those who do not qualify for these programs, the cost of contraceptives is relatively low (about $50 per month on average). 82 Fed. Reg. at 47803. These facts "significantly diminish[] the Government's interest in applying the Mandate to employers over their sincerely held religious objections." *Id.*

• Even if contraceptives were a benefit to women's health, which we dispute, the exemptions created by the interim final rule are, in HHS's best estimate, likely to affect the contraceptive costs of approximately 31,700 women, which is "less than 0.1 percent of the 55.6 million women in private plans" that HHS estimates receive preventive services coverage under the preventive services requirement. 82 Fed. Reg. at 47821. This number is remarkably small when compared with the 25 million persons enrolled in grandfathered plans.

RFRA is, of course, a requirement that the government has no discretion to ignore, as HHS has acknowledged. 82 Fed. Reg. at 47800. Having concluded that RFRA has been violated, as it has, the government is required to take action to ensure compliance with the statute. But even if the mandate and accommodation did not violate RFRA, HHS, as it points out (*id.* at 47806), would still have the discretion to create exemptions. We agree with HHS's decision to exercise that discretion in favor of the expanded exemptions that this interim final rule creates, even if RFRA did not require it. And we agree with the decision to exempt a broad range of stakeholders with religious objections, including churches, nonprofit organizations, closely held for-profit entities, for-profit entities that are not closely held, and any other non-governmental employer, as well as institutions of higher education, health insurance issuers, and individuals.[26]

The Department indicates "exempt entities will not be required to comply with a self-certification process." 82 Fed. Reg. at 47808. The Department asks, however, "whether exempt entities, or others, would find value either in being able to maintain or submit a specific form of certification to claim their exemption…." *Id.* at 47809. We agree with the Department's decision not to require exempt entities to comply with a self-certification process, and we recommend that no special form or other process be developed or required to claim the exemption, especially since these have been used in the past as a mechanism for ensuring compliance with the mandate and therefore have themselves raised religious and moral concerns for many stakeholders.

## Conclusion

HHS should reconsider and rescind the mandate requiring coverage of contraception or sterilization in health plans as part of "preventive services." These drugs, devices and procedures prevent not a disease condition, but the healthy condition known as fertility, and they pose significant risks of their own to women's life and health. At a minimum, consistent with the abortion and non-preemption provisions of the ACA and with the Weldon amendment, HHS should not mandate coverage of any drug or device that can disrupt an existing pregnancy. As long as the mandate, or any portion of the mandate, remains in place, we fully support the exemptions that this rule and the companion rule together provide to stakeholders with religious and moral objections, and we commend HHS for adopting these exemptions.

[26] We raise one technical matter. The preamble to the regulation suggests that the exemption "will no longer 'be determined on an employer by employer basis,' but will be determined on a plan basis." yet the language in 45 C.F.R. § 147.132(a) does not, on its face, protect an objecting organization which is an employer that *adopts* (rather than sponsors or maintains) a plan sponsored or maintained by an objecting organization. Such organizations should be protected. A similar issue may affect objecting entities under the moral exemption.

Thank you for the opportunity to comment.

Sincerely,

Anthony R. Picarello, Jr.
Associate General Secretary &
General Counsel

Michael F. Moses
Associate General Counsel

Hillary E. Byrnes
Assistant General Counsel

A b.h.o. appointee no surprise.Artificial cotraception,most of it,has very serious side affects,for the women.More importantly,in too many cases it prevents nidation,causing what some doctors call a {MICRO-ABORTION} when the tiny human being is sloughed-off,and perishes,dies.Please practice N.F.P. natural-family-planning,girls ,to space your children.



Judy Smith 10-10-17

Dear Medicare + Medicaid,

Abortion is "Murder" not Birth Control. Take precautions before, not after having sex + call it birth control!

It is Murder, 100%.

planned Parenthood is a hideous organization.

Thank you,

Judy

P.S. My sister-in-law was adopted. NOT Aborted. my brother's wife!



5885 Times Square

6 October 2017

Thank you for res[illegible] protections for religious freedom in the implementation of national healthcare law. "No American should be forced to choose between the dictates of the government and their faith." Amen! - American citizen

RIO GRANDE DISTRICT 07 OCT 2017 PM 3 L

Centers for Medicare & Medicaid Svcs
Department of Health & Human Svcs
Attention: CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244-8016

CITY MERCHANDISE INC. 228 40TH STREET, BROOKLYN, NY 11232
TEL 718-832-2931 FAX 718-832-2939 www.citymerchandise.com

SPACE RESERVED FOR U.S. POSTAL SERVICE

Printed in Canada

00326663

*VIA www.regulations.gov*

5 December 2017

Centers for Medicare and Medicaid Services
Department of Health and Human Services
Room 445-G
Hubert H. Humphrey Building
200 Independence Avenue, SW
Washington, District of Columbia 20201

Re: Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act [RIN 0938-AT46] (the "Interim Final Rules")

Gentlemen and Ladies:

I support the Interim Final Rules, which are intended "to expand exemptions to protect moral convictions for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage through guidance issued pursuant to the Patient Protection and Affordable Care Act."[1]

The expanded conscious protections incorporated into the Interim Final Rule are consistent with the President's Executive Order,[2] as well as "[conform] with Congress' long history of providing or supporting conscience protections in the regulation of sensitive health-care issues, cognizant that Congress neither

[1] Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act [CMS-9925-IFC; RIN 0938-AT46], 82 Fed. Reg. 47,838 (Oct. 13, 2017).

[2] Presidential Executive Order 13,798, "Promoting Free Speech and Religious Liberty" (May 4, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/05/04/presidential-executive-order-promoting-free-speech-and-religious-liberty.

required the Departments to impose the Mandate[3] nor prohibited them from providing conscience protections if they did so."[4]

Indeed, the Interim Final Rule respects Americans' Constitutionally-guaranteed right to freely exercise their religious beliefs and sincerely-held moral convictions. The Department of Health and Human Services, the Department of Labor, and the Department of the Treasury noted these broad principles predate the U.S. Constitution, as exemplified in statements of our Founding Fathers commending "respect for conscience against government coercion."[5] Thus, the re-balancing of the interests of the government *vis-à-vis* individuals and entities that have religious and moral objections to the Mandate is entirely justified and reasonable because the government has other, less burdensome alternatives to provide contraceptives to those who want contraceptives *without* seeking to compel those who in good conscience object to the Mandate to violate their deeply-held religious or moral convictions.

Thank you for the opportunity to comment on the Interim Final Rules.

RESPECTFULLY SUBMITTED,

/Felicia Smith/

---

3 The Mandate refers to the "contraceptive coverage requirement and regulations" of the Affordable Care Act. *See* Interim Final Rule, 82 Fed. Reg. at 47,839.

4 *Id.* at 47,844.

5 *Id.* at 47,847. *See also* Interim Final Rule at nn. 25-27 and accompanying text.

To Whom It May Concern:

I stand to defend the protection of religious organizations who are seeking exemption from the ACA's Contraceptive Mandate to provide contraceptive coverage within their insurance plans. As a Registered Nurse, and Advanced Practice Nursing Student, I respect the HHS recommendation that insurance plans should cover contraception as it is a vital part of a woman's overall health and helps increase access. However, I believe that the protection of religious beliefs is of equal importance, and that the government has a great responsibility to provide this protection. The document released by the Department of Treasury emphasizes the importance of religious freedom and the duty of the government to protect and uphold the First Amendment. Furthermore, when the ACA was implemented, Executive Order 13535 was subsequently signed in effect protecting religious beliefs and moral convictions (Federal Register, 2017, p. 11).

A survey conducted before the ACA was put in place, showed that only about 6% of employers were not providing contraceptive coverage through their insurance plans. Taking this small number into account, the literature shows that it is highly probable that women who do not hold the same beliefs as their religious institution or employer, will still be able to find the coverage they need through Medicaid, government assistance programs, and grants that are provided across the country. Furthermore, we were already seeing a decline in the rate of unintended pregnancies and an increase in the use of contraceptives before the ACA was implemented. In a study conducted by Finer & Zolna (2016), an increase in contraceptive use over time was seen from 2007-2012. They particularly saw and increase in usage of long-acting methods from 4% to 12% in just that five-year period. Unintended pregnancy rates are highest amongst poor and low-income women, who are not suspected to be greatly affected by the new exemption. From 2008-2011, this rate has dropped from 137 per 1,000 women to 112 per 1,000 women, a drop by 18% in just three years (Guttmacher Institute, 2016). Once again, these numbers are not a result of the implemented ACA a year later.

I believe that the most important aspect of this exemption rule is to ensure that the employer providing insurance coverage has a valid religious or moral opposition to contraceptive use. Could an example of the process of proof of this religious or moral opposition be provided to the public to ensure proper adherence to the exemption? It would also be appropriate to encourage women who are affected by this change to see out their local clinics to find out information about free or subsidized contraceptive coverage. I will follow-up with your department in two weeks and would be willing to discuss this issue further through e-mail or telephone at your convenience.

Thank you for your time and consideration.

Sincerely,

Jessica Radmall, RN, SNM-SWHNP

00336209

References

Federal Register. (2017, May). Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act. Retrieved from https://s3.amazonaws.com/public-inspection.federalregister.gov/2017-21851.pdf

Finer, L.B. & Zolna, M.R. (2016). Declines in unintended pregnancy in the United States, 2008-2011. *New England Journal of Medicine. 374.* 843-852. Doi: 10.1056/NEJMsa1506575

Guttmacher Institute (2016). Unintended Pregnancy in the United States. Retrieved from https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states.

Jost, T. & Keith, K. (2017). Trump Administration Regulatory Rebalancing Favors Religious and Moral Freedom Over Contraceptive Access. *Health Affairs Blog.* Retrieved from http://healthaffairs.org/blog/2017/10/07/trump-administration-regulatory-rebalancing-favors-religious-and-moral-freedom-over-contraceptive-access/

America's Health
Insurance Plans

601 Pennsylvania Avenue, NW
South Building
Suite Five Hundred
Washington, DC 20004

202.778.3200
www.ahip.org

December 4, 2017

The Honorable R. Alexander Acosta
Secretary
U.S. Department of Labor
200 Constitution Ave., N.W.
Washington, DC 20210

The Honorable Steven Mnuchin
Secretary
U.S. Department of Treasury
1500 Pennsylvania Ave., N.W.
Washington, DC 20220

The Honorable Eric D. Hargan
Acting Secretary
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

*Submitted electronically via http://www.regulations.gov*

**Re: [CMS–9925–IFC] RIN 0936-AT46 - Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act; and [CMS-9940-IFC] RIN 0938-AT20 – Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

On behalf of America's Health Insurance Plans (AHIP), thank you for the opportunity to comment on the two Interim Final Rules (IFRs) related to coverage of contraceptive services under the preventive service requirements of the Affordable Care Act (ACA).

As the national trade association representing health insurance providers, AHIP is committed to ensuring that every American has access to affordable coverage and quality care that helps improve their health and financial stability. AHIP's members provide health and supplemental benefits through employer-sponsored coverage, the individual insurance market, and public programs such as Medicare and Medicaid. AHIP advocates for public policies that expand access to affordable health care coverage to all Americans through a competitive marketplace that fosters choice, quality, and innovation.

Patients should have access to effective, quality, evidence-based care they need without concern or fear of discrimination. Our comments are based on several key principles:

1. Insurance providers continue to be committed to covering contraceptives for other medically necessary uses.
2. New rules should consider the impact of state-level contraceptive mandates and religious freedom restoration laws.
3. New rules should consider the impact of an optional accommodation process for covering a subset of contraceptive methods.
4. New rules should clarify notification processes for exempting organizations so insurance providers have adequate time to update coverage policies and notify members.
5. Insurance providers should have implementation deadlines that are appropriate and enable them to serve patients.

**1. Insurance providers continue to be committed to covering contraceptives for other medically necessary uses.**

***We ask the Departments to acknowledge that the IFRs do not permit employers to exclude from their plan design medically necessary prescription drugs used for non-preventive services.***

The IFRs include discussion about contraceptive drugs that can be used to treat conditions such as menstrual disorders, acne, and pelvic pain. The Departments clarified that non-contraceptive and non-preventive uses to treat these conditions "did not mean that the Guidelines require coverage of such uses." The Departments also state the position that when an FDA-approved drug for contraceptive use is prescribed for both a contraceptive and non-contraceptive use, the Guidelines (to the extent they apply) would require its coverage.

Health insurance plans are committed to providing consumers with comprehensive medical care as part of their benefits regardless of an employer's religious or moral objections to providing contraceptive coverage as a preventive benefit. We want to recognize that in many cases, contraceptives are prescribed for the treatment of a diagnosed medical condition (e.g., endometriosis) *and* not for preventive care. In these cases, contraceptive use is *not* preventive care and plans will continue to provide coverage to patients, subject to the plan benefit design and thus, cost sharing may apply.

We note that pharmacy claims do not include a medical diagnosis code so health plans are unable to discern whether the drug is medically necessary. In previous rulemakings the Departments have recognized that due to operational processes, health plans may design other methods of

processing such claims "as long as the process is not overly burdensome and provides timely access to care,"[1] and it is our understanding the similar processes will be utilized here.

**2. <u>New rules should consider the impact of state-level contraceptive mandates and religious freedom restoration laws.</u>**

***We ask the Departments to clarify the impact of state-level contraceptive mandates on the implementation of the new rules and restate guidance from the July 2013 Final Rule regarding contraceptive coverage and religious exemptions.***

Under the prior accommodation process, health plans were required to provide access to contraceptive services for members at no cost-sharing for those eligible organizations. With this rulemaking, this accommodation process becomes optional. However, the IFRs do not speak to the complicated interactions between state law contraceptive mandates and states with either narrower or broader religious exemptions and accommodations. The preamble of the July 2013 Final Rule provided the following guidance concerning the impact of the non-profit accommodation on state law:

> With respect to issuers subject to state law, insurance laws that provide greater access to contraceptive coverage than federal standards are unlikely to 'prevent the application of' the preventive services coverage provision, and therefore are unlikely to be preempted by these final regulations. On the other hand, in states with broader religious exemptions and accommodations with respect to health insurance issuers than those in the final regulations, the exemptions and accommodations will be narrowed to align with those in the final regulations. 78 Fed. Reg. at 39888 (July 2, 2013).

To provide clarity and guidance to employers and issuers, we ask the Departments to restate this principle and describe how it relates to the proposed expansion of organizations eligible for the exemption and transition to an optional accommodation process.

**3. <u>New rules should consider the impact of an optional accommodation process for covering a subset of contraceptive methods.</u>**

***We note that the "cafeteria-style" approach for contraceptive coverage may result in unintended administrative burdens for plans as they work across multiple employer groups who may opt for inclusion of different subsets of the approved contraceptive methods.***

---

[1] See 81 Fed. Reg at 31436, first column (May 18, 2016) in the response to the comment regarding issuer's technological capabilities.

Within the IFRs, an entity may object to covering *some*, but not all, of the 18 Food and Drug Administration (FDA)-approved methods for contraceptive services (§147.131(d)). This could result in employers requesting to design their own contraceptive coverage policy in a "cafeteria-style" approach, with a varied inclusion of the different 18 FDA-approved options. In response, plans would need to tailor contraceptive coverage policies to each employer, regardless of whether the employer or issuer is supporting the accommodation. We note that the existing flexibility defined in §147.131(d)(2)(ii) allows for issuers to provide payments for all contraceptive services, at the issuer's option. We strongly support this approach and appreciate this flexibility as it provides health plans with the option to provide the standard package of contraceptive services. This flexibility may simplify operational issues and avoid high administrative costs that may result from tailored policies that vary per employer. We recommend this approach also apply when a health plan is working with employers not utilizing the accommodation.

Additionally, while the intent of the rules is to provide employers with an opportunity to claim an exemption based on a religious or moral objection, there is concern that some employers may choose to opt out of coverage for specific forms of contraceptive methods because of cost. In these cases, the "cafeteria-style" approach may result in unintended consequences, such as economic gaming of the system that is unrelated to any religious or moral beliefs. Thus, continued flexibility is critical.

**4. New rules should clarify notification processes for exempting organizations so insurance providers have adequate time to update coverage policies and notify members.**

***We ask the Departments to clarify that exemptions will only be effective on the first day of the next plan year. Further, we ask that the Departments restate their good faith compliance standard to protect issuers from potential compliance risks regarding the eligibility for an organization's religious or moral objection.***

Within the IFRs, the Departments have requested feedback on whether it would be helpful if organizations claiming an exemption maintain or submit a specific form of certification to claim the exemption. We do not support a standardized, uniform form to document exemptions. A mandatory form would cause additional operational burdens for plans who have existing processes in place to handle exemptions. We recommend that health plans be allowed to continue to maintain these existing processes to achieve the notification objectives.

Additionally, the language of the IFRs is vague regarding the timeframes for when an organization can invoke an exemption. If an employer chooses to invoke an exemption in the

middle of a plan year, plans will face operational and administrative burdens in updating their plan documents, modifying contracts, and notifying members. Further, some states do not allow for midyear changes, and plans may be subject to compliance violations if they attempt to make modifications to coverage policies. Additionally, the rules should stipulate that exemptions will only be effective on the first date of the next plan year to provide plans with adequate time to make changes and ensure compliance with state filing requirements.

Further, we recommend that the Departments restate language in prior regulations at §147.131(e) that issuers are not required to verify that an eligible organization meets the definition as outlined in proposed §147.132, nor are issuers subject to any compliance risk if it is later determined by the Departments that the entity was not an eligible organization. Relevant language is outlined in prior §147.131(e):

> (e) Reliance— (1) If an issuer relies reasonably and in good faith on a representation by the eligible organization as to its eligibility for the accommodation in paragraph (c) of this section, and the representation is later determined to be incorrect, the issuer is considered to comply with any requirement under §147.130(a)(1)(iv) to provide contraceptive coverage if the issuer complies with the obligations under this section applicable to such issuer.

The preamble (82 Fed. Reg. 47813) states that this language was removed because "the Departments believe there is minimal opportunity for mistake or misrepresentation by the organization." However, there may be some instances when it can be difficult to determine if an organization holds these religious or moral objections (e.g., a publicly traded company for-profit entity that is not closely held). Therefore, we recommend that the language above be restated.

5. **Insurance providers should have implementation deadlines that are appropriate and enable them to serve patients.**

***We ask the Departments to consider an implementation date of January 1, 2019 for those organizations requesting to revoke their accommodation.***

The IFRs stipulate that an eligible organization may revoke its use of the accommodation process and operate under an exempt status. In this case, no coverage of contraceptive services would be provided to plan participants. As part of the revocation, the issuer or third-party administrator must provide plan participants with written notice of the revocation, as specified in guidance to be issued by HHS. The revocation is effective the first day of the first plan year that begins on or after 30 days after the date of revocation.

While the IFRs were released in early October, guidance from HHS on the written notice has not yet been released. Although these IFRs were effective immediately, these deadlines and processes have caused confusion for insurers, employers, and consumers. Plans have received requests for updates to coverage policies from employers with religious and moral objections, without the necessary guidance from HHS to implement these changes. Given this delay in guidance, we recommend that plans be given an option to implement the revocation by January 1, 2019.

Thank you for the opportunity to provide comments. We look forward to continuing to work with your Departments in the national effort to transition to value-based health care.

Sincerely,

Richard A. Bankowitz, MD, MS, MBA, FACP
Chief Medical Officer
America's Health Insurance Plans



BlueCross
BlueShield
Association

1310 G Street, N.W.
Washington, D.C. 20005
202.626.4800
www.BCBS.com

**Submitted via the Federal eRulemaking Portal: http://www.regulations.gov**

December 5, 2017

Seema Verma
Administrator, Centers for Medicare & Medicaid Services Addressee's Company
U.S. Department of Health and Human Services
Washington, DC 20201

Attention: CMS-9940-IFC / CMS-9925-IFC

**Re: Comments on the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act; and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act**

Dear Administrator Verma:

The Blue Cross Blue Shield Association – a national federation of 36 independent, community-based and locally-operated Blue Cross and Blue Shield companies ("Plans") that collectively provide healthcare coverage for one-in-three Americans – appreciates the opportunity to submit these comments in response to the interim final rules with request for comments (IFCs) issued by CMS; the Employee Benefits Security Administration, Department of Labor; and Internal Revenue Service, Department of the Treasury, on Religious Exemptions and Accommodations concerning contraceptive services (as published in the *Federal Register* on October 13, 2017, 82 Fed. Reg.47792) and on Moral Exemptions and Accommodations (as published in the *Federal Register* on October 13, 2017, 82 Fed. Reg.47838).

In the spirit of furthering the workability of the insurance system, we offer these comments concerning the exemptions and accommodations. We recommend the Departments:

- *Clarify that exemptions correspond with a plan year*—invoking exemptions in the middle of a plan year is neither operationally workable nor consistent with many states' regulatory requirements.

- *Set a good faith complance standard for issuers and TPAs*—providing issuers and TPAs assurance that they will not be subject to sanctions for non-compliance is needed because of uncertainties about when objecting entities will invoke exemptions or how states will regulate new insurance offerings.

00207003

- *Clarify that the exemption may cover all contraceptive services*—issuers and TPAs need certainty that they may provide or pay for no contraceptive services in lieu of a "cafeteria-style" approach.

- *Align the operation of the moral exemption / accommodation with the religious exemption / accommodation*—whether an individual objects to covering or paying for contraceptive services based on sincerely held religious beliefs or moral convictions, the rules should be the same in not preventing a willing health insurance issuer, and as applicable, a willing plan sponsor of a group health plan, from offering (in total) a separate benefit package, or a separate policy, certificate or contract of insurance.

- *Clarify state preemption*—the Preamble explains that the individual exemption does not affect any other Federal or State law governing the plan or coverage [82 FR 47812]: doing the same for the exemption for objecting entities will avoid inadvertent conflicts between state and federal requirements.

- *Add back a safe harbor for accommodations*—the safe harbor in the previous accommodation is still needed because the opportunity for mistakes, though minimized in the new rules, is not eliminated.

The section below offers a detailed description of these issues and our recommendations for your consideration.

* * *

## DETAILED COMMENTS ON THE RELIGIOUS EXEMPTIONS AND ACCOMMODATIONS AND THE MORAL EXEMPTIONS AND ACCOMMODATIONS FOR COVERAGE OF CONTRACEPTIVE PREVENTIVE SERVICES

### 1. Issue. Invoking the Exemption for Objecting Entities

Objecting entities who want to invoke an exemption – whether or not they currently have an accommodation under the previous rules – are not required to comply with a self-certification process: the IFCs do not require that objecting entities file notices or certifications for their exemptions.

Churches, religious orders, nonprofit organizations, institutions of higher education, and all non-governmental employers are exempt from the Health Resources & Services Administration (HRSA) contraceptive guidelines to the extent they object to covering or paying for some or all contraceptive

services based on their sincerely held religious beliefs or (except for publicly-traded for-profit entities and churches) sincerely held moral convictions.

However, the rules say nothing about the date of invocation for entities without an accommodation (it is as if the rules assume the objection simply exists); for entities with a current accommodation, the rules specify the effective date of the revocation, but they do not specify the date of the revocation itself (i.e., the revocation is effective 30 days after the date of revocation). Nor is it clear whether an entity may invoke an exemption (including in combination with revoking an accommodation) only in connection with a renewal or reissuance of coverage or in the middle of a plan year.

In the case of an entity revoking a current accommodation, the Preamble notes that consistent with other applicable laws, the issuer or TPA of that entity must promptly notify plan participants and beneficiaries of the change of status to the extent such participants and beneficiaries are currently being offered contraceptive coverage at the time the accommodated organization invokes its exemption. However, neither the Preamble nor the rule indicates when the clock starts ticking (i.e., how does one determine that the accommodated organization has invoked its exemption?).

Nor do the IFCs address a major operational issue for fully-insured objecting entities: state filing requirements. Although the IFCs took effect immediately, insurance issuers must follow state regulatory processes to comply with the invocation of an exemption.

These uncertainties may create problems for issuers and TPAs in meeting statutory and regulatory requirements. Perhaps for this reason, the Departments ask whether exempt entities, or others, would find value either in being able to maintain or submit a specific form of certification to claim their exemption, or in otherwise receiving guidance on a way to document their exemption.

**Recommendation 1.**

BCBSA recommends the Departments clarify that exemptions correspond with a plan year (e.g., entities will invoke an exemption in connection with a renewal or reissuance of coverage). It would also be helpful to define the date of invocation (or, for those with an accommodation, revocation) as the date the issuer or TPA is informed by the objecting entity.

**Rationale**.

Allowing invocation of exemption in the middle of a plan year would create serious administrative and legal problems. Insurance issuers and TPAs would face daunting operational challenges in revising insurance contracts or plan documents to exclude contraceptive services, reprogram claims systems

(e.g., EDI processes, benefit tables, subrogation software), and prepare and send required notices to participants and beneficiaries as to the availability of contraceptive coverage. Moreover, in some states issuers would be challenged because alteration of small group market plans may occur only once a year, in coordination with the annual filing requirements; and changes to large group insured contracts may require filing amendments with state regulators.

**Recommendation 2**.

To hold issuers and TPAs harmless from events outside their control, the Departments should add a good faith compliance standard so that an issuer or TPA is deemed to have complied with its legal or contractual requirements where an entity wishes to elect an exemption but has not timely informed the issuer or TPA, or where the state's regulatory processes impede compliance.

**Rationale**.

A good faith safe harbor would provide issuers and TPAs with assurances that, if they act in good faith, they will not be subject to sanctions for non-compliance that may occur because of issues related to the timeliness of invocation by objecting entities, or to conflicting state regulatory requirements.

**2. Issue. Revoking the Accommodation Process**

The rules keep the previous accommodation largely intact (see issue 7 for one key difference), but make it optional. Eligible organizations who were included in an accommodation prior to the effective date of the IFCs, and eligible organizations who in the future avail themselves of the optional accommodation, may revoke their use of the accommodation.

As part of this revocation, the issuer or TPA of the eligible organization must provide participants and beneficiaries written notice of such revocation as specified in guidance issued by the Secretary of the Department of Health and Human Services. However, this guidance has not yet been issued.

**Recommendation**.

The Secretary should provide guidance (i.e., model language, or allowing of similar language, for the written notice) as soon as possible.

**Rationale.**

Eligible organizations that were included in the accommodation prior to the effective date of the IFCs are already revoking, or expressing interest in revoking, their use of the accommodation process. Therefore, time is of the essence to ensure a smooth transition and minimize confusion for the affected entities, issuers, TPAs, and individuals.

**3. Issue. <u>Exemption from Some or All Contraceptive Services—Objecting Entities</u>**

The previous rule allowed HRSA to establish an exemption from its guidelines for contraceptive services for religious employers (i.e., churches and their integrated auxiliaries) who objected to providing coverage for some or all of any items or services under those guidelines.

The IFCs direct HRSA to exempt entities – including religious, non-profit, and for-profit employers – from any HRSA guidelines requiring coverage for contraceptive services if the entities object to providing coverage for some or all contraceptive services based on sincerely held religious beliefs or (except for publicly-traded for-profit employers) sincerely held moral convictions.

For objecting entities, the exemption seems to be constructed as all or nothing; that is, even if an entity objects to providing coverage or payment for some (not all) contraceptive services, HRSA must exempt the entity from its guidelines' requirements that relate to providing contraceptive services. However, the Preamble creates some ambiguity when explaining why there is not a compelling government interest in mandating contraceptive coverage when it notes that "[V]arious entities that brought legal challenges to the Mandate (including some of the largest employers) have been willing to provide coverage of some, though not all, contraceptives. For example, the plaintiffs in Hobby Lobby were willing to provide coverage with no cost sharing of 14 of 18 FDA-approved women's contraceptive and sterilization methods."

**Recommendation**.

The Departments should eliminate ambiguity by clarifying in regulatory language that issuers and TPAs who provide or pay for health care coverage for objecting entities may provide or pay for no contraceptive services in lieu of a "cafeteria-style" approach. For example, revise § 147.132 (a) (2) as follows :

> The exemption of this paragraph (a) will apply to the extent that an entity described in paragraph (a)(1) of this section objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all

contraceptive services, based on its sincerely held religious beliefs. The entity's group health plan and health insurance coverage provided in connection with that group health plan may, at the issuer's option, not provide payment or coverage for any contraceptive services included in guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration.

**Rationale**.

Eliminating ambiguity will create logical consistency with the optional accommodation. In the 2013 proposed rule concerning the accommodation of certain employers with religious objections to contraceptive coverage, the Departments proposed that Eligible Organizations could specify the contraceptive services to which they objected. In response to comments that customizing individual contraceptive policies based on differing objections to contraceptive coverage of each eligible organization would create an administrative burden for issuers and confuse plan participants, the Departments decided instead in the final rule to allow issuers providing payments for contraceptive services to use a standard exclusion from a group health insurance policy that encompasses all recommended contraceptive services. In keeping this provision in the IFC's optional accommodation, the Departments confirm the government's continued compelling interest in minimizing administrative burden and confusion. It stands to reason this compelling interest applies to the exemption as well as to the accommodation.

Moreover, a position to the contrary would raise serious logistical issues for exempt entities because, unlike entities electing an optional accommodation for whom issuers provide separate payments for contraceptive services, not separate policies, issuers for exempt entities will provide separate insurance policies that require state review and approval. Considering the multiple possible permutations of coverage, it would be difficult to impossible for issuers to develop, file, and obtain state review and approval for potentially dozens or hundreds of combinations. For example, some objecting entities may object to covering all contraceptive services that are recognized in the preventive services guidelines, while others may object to covering only "morning after pills" (e.g., Plan B). Other entities may object to covering all contraceptive services except sterilization, while still others may object to covering all oral drugs and devices but not over-the-counter contraceptives (such as contraceptive sponges and spermicides prescribed to a woman by her health care provider). And some may object to covering all contraceptive services except patient education.

**4. Issue. Exemption from Some or All Contraceptive Services—Objecting Individuals**

The IFCs direct HRSA to exempt individuals from HRSA guidelines for contraceptive services who object to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs or moral convictions (subject to the willingness, as applicable, of issuers or group health plan sponsors).

As in the issue above, it is not clear whether individuals may take a cafeteria-style approach to a separate benefit package, policy, certificate, or contract of insurance for some contraceptive services.

**Recommendation.**

The Departments should eliminate ambiguity by clarifying in regulatory language that issuers and TPAs who provide or pay for health care coverage for objecting entities and individuals may provide or pay for no contraceptive services in lieu of a "cafeteria-style" approach. For example, revise § 147.132 (b) as follows:

> *Objecting individuals.* Guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration must not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a)(1)(iv), or 29 CFR 2590.715–2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs. The individual's group health plan and health insurance coverage provided in connection with that group health plan or the individual's health insurance coverage may, at the issuer's option, not provide payment or coverage for any contraceptive services included in guidelines issued under § 147.130(a)(1)(iv) by the Health Resources and Services Administration.

**Rationale.**

This recommendation preserves the symmetry of the exemption for entities and individuals. The benefits of eliminating ambiguity for objecting individuals are substantially similar to those for objecting entities.

**5. Issue: Individual Moral Exemption**

In the IFC for religious exemptions, a willing health insurance issuer and, as applicable, a willing group health plan sponsor may offer objecting individuals separate benefit package options, policies, certificates, or contracts of insurance [§ 147.132(b)]: without question, this will (as noted in the Preamble) impose no burdens on the insurance market because such burdens may be factored into the willingness of an employer or issuer to offer such coverage (i.e., for fully-insured group health plans, only the issuer, not the sponsor, offers separate benefit package options, policies, etc.)

In contrast, the IFC for moral exemptions allows a willing health insurance issuer and, as applicable, a willing group health plan sponsor to offer objecting individuals not only separate benefit package options, policies, certificates, or contracts of insurance, but also a separate group health plan [§ 147.133(b)] – something only the plan sponsor can do. This seems to be why the Preamble to the IFC for moral exemptions indicates that "the individual exemption only operates when the employer *and/or* [emphasis added] issuer, as applicable, are willing. . . "; the Preamble to the IFC for religious exemptions indicates "the individual exemption will only apply where the employer *and* [emphasis added] issuer are willing."

**Recommendation.**

The Departments should align the provisions of the religious and moral exemptions by removing the unique reference in the moral exemption to a separate group health plan.

**Rationale.**

Allowing a sponsor of a fully-insured group health plan to offer individuals who object to coverage or payments for some or all contraceptive services based on sincerely held moral convictions a separate group health plan could have problematic effects on the workability of the insurance market. For example, if the sponsor has already contracted for insurance, the issuer has based that contract on the number and type of covered individuals: by offering objecting individuals a new group health plan, the sponsor would upset the issuer's calculations. Further, if a different issuer provides coverage for the separate group health plan offered to objecting individuals, then bifurcating responsibility for the sponsor's employees and their dependents between two issuers would complicate issuers' efforts to coordinate care, manage value-based contracts with providers, and so on. Administering separate plans would create an unnecessary burden for health plans.

These problems would be exacerbated by the difference from the religious exemption: giving group health plan sponsors one set of rules for religious exemptions and another for moral exemptions will be confusing to employers and issuers and do little to promote the workability of the insurance market.

**6. Issue. State Preemption**

Many of the 28 states that have passed contraceptive coverage laws (both equity and no-cost coverage) have a provision for exemptions, but the laws vary from state to state. This means that there may be a conflict between the state and federal requirements when it comes to religious exemptions. In some states with a contraceptive coverage requirement, some employers who are eligible for an exemption under federal law will not qualify for an exemption under state law. Employers in those states will have to meet the standards established by their state even though they may qualify for an exemption based on the new federal regulations.

**Recommendation.**

The Departments should explicitly provide that neither the exemption nor the optional accommodation applies to group health plans in states that mandate contraceptive coverage and that do not exempt or accommodate objecting entities.

**Rationale:**

The IFC only addresses preemption in the context of the individual exemption: it “cannot be used to force a plan (or its sponsor) or an issuer to provide coverage omitting contraception, or, with respect to health insurance coverage, to prevent the application of State law that requires coverage of such contraceptives or sterilization. . . This individual exemption is limited to the requirement to provide contraceptive coverage under section 2713(a)(4) of the PHS Act, and does not affect any other Federal or State law governing the plan or coverage. Thus, if there are other applicable laws or plan terms governing the benefits, these interim final rules do not affect such other laws or terms.”

The fact that the Departments are silent on the effect of the interim final rules on state laws outside of the individual exemption could be construed as implying that the Departments believe the IFCs could affect state laws regarding employer exemptions.

**7. Issue: Safe Harbor for Accommodation**

The Departments have eliminated the provision in the previous accommodation [then 45 CFR 147.131(e)] under which an issuer is deemed to have complied with the Mandate where the issuer relied reasonably and in good faith on a representation by an eligible organization as to its eligibility for the accommodation, even if that representation was later determined to be incorrect. The Departments removed this provision, believing it no longer necessary because there is minimal opportunity for mistake or

misrepresentation by an eligible organization since any organization with a sincerely held religious objection to contraceptive coverage that is eligible for the optional accommodation is also exempt.

**Recommendation**.

Restore the provision under which an issuer is deemed to have complied with the Mandate where the issuer relied reasonably and in good faith on a representation by an eligible organization as to its eligibility for the accommodation, even if that representation was later determined to be incorrect.

**Rationale**.

The opportunity for mistake or misrepresentation is not necessarily minimal. For example, a publicly-traded for-profit entity that is not closely held is exempt to the extent it objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs. In the Preamble, the Departments explain that the mechanisms for determining whether a company has adopted and holds such principles or views is a matter of well-established State law with respect to corporate decisionmaking, so that they expect that application of such laws would cabin the scope of this exemption. But if a particular State does not have clear and unambiguous mechanisms for determining whether a for-profit company that is not closely held has objections based on sincerely held religious, or if such a company does not adopt and document such objections in accordance with the laws of the jurisdiction under which it is incorporated or organized, then it is possible that it may be determined later that the company is not actually exempt.

* * *

We appreciate your consideration of our comments. If you have any questions or want additional information, please contact Joel Slackman at 202.626.8614 or joel.slackman@bcbsa.com..

Sincerely,

Kris Haltmeyer
Vice President, Legislative and Regulatory Policy
Office of Policy & Representation



1275 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004

***Submitted electronically via* www.regulations.gov**

December 5, 2017

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS–9925-IFC and CMS-9940-IFC
P.O. Box 8016
Baltimore, MD 21244–8016

**Re: Interim Final Rules on Religious and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act (CMS-9925-IFC and CMS-9940-IFC)**

CVS Health, on behalf of its subsidiaries and affiliated entities, appreciates the opportunity to comment on the Interim Final Rules (IFRs) issued by the Departments of Treasury, Labor and Health and Human Services on Religious and Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act.

CVS Health is a pharmacy innovation company helping people on their path to better health. Through its more than 9,600 retail drugstores, more than 1,100 walk-in medical clinics, a leading pharmacy benefit manager (PBM) with more than 70 million plan members, a dedicated senior pharmacy care business serving more than one million patients per year, and expanding specialty pharmacy services, the Company enables people, businesses and communities to manage health in more affordable, effective ways. This unique integrated model increases access to quality care, delivers better health outcomes, and lowers overall health care costs.

Our PBM provides a full range of services to clients, consisting of employers, insurance companies, unions, government employee groups, managed care organizations, and other sponsors of health benefit plans and individuals throughout the United States. CVS Health has 2.3 million lives under PBM management in the Exchanges, or 18% of the total Exchange population.

As the Departments note, under the IFRs, the accommodation that allows an eligible organization (EO) that objects on religious—and now moral—grounds to providing coverage for contraceptive services to avoid doing so remains in place. This means that for those EOs with self-insured plans (and that are not exempt from ERISA) that invoke the accommodation by self-certifying their eligibility, the third party administrator (TPA) becomes responsible for providing or arranging payments for contraceptive services for the EO's employees. This responsibility is bestowed on the TPA without imposing any cost-sharing requirements on the EO, its insurance plan, or its employee beneficiaries.[1]

[1] 26 CFR §54.9815– 2713A(b)(2) and 78 Fed. Reg. 39893.



While the regulation does currently provide a mechanism for TPAs to seek reimbursement for providing contraceptive coverage in these circumstances as long as the Secretary for the Department of Health and Human Services (HHS) requests an exception under OMB Circular No. A-25R, the process is complicated, onerous, and operationally challenging. As the preamble to the IFR notes, if the TPA is not itself an issuer that participates in a Federally-facilitated Exchange (FFE), it must find a participating issuer with whom to contract that is willing to submit a request to HHS for a reduction in its user fee payments to the FFE equal to the contraceptive service costs plus a 10% allowance for administrative costs.

The request may only be submitted during a narrow window in the fall of a given plan year for the prior year's contraceptive costs, and must be accompanied by required documentation of the expenses. If the amount of the requested adjustment is greater than the FFE user fee owed by the issuer that year, the issuer will be provided a monthly credit in succeeding months until the full amount of the adjustment is credited to the issuer. Even when reimbursement is successfully secured, in many cases it is insufficient to fully reimburse the TPA for its costs. Moreover, reimbursement is received almost two years after the close of the plan year for which the expenses are incurred, requiring TPAs to carry these costs without compensation for between 20-24 months. For some PBMs these amounts are in the millions of dollars per plan year, and cumulatively in the region of $10 -$20 million and growing with each plan year.

In practice, it has taken some TPAs many months every year to find an issuer, negotiate a reimbursement arrangement, and then collect and submit the necessary information to HHS. This process will only become more difficult as more issuers exit the market, leaving fewer entities with which a TPA can enter into a reimbursement arrangement In addition, as the overall enrollment in qualified health plans declines, so does the total pool of available user fee credits from which all TPAs hope to obtain reimbursement. Finally, issuers will often retain the allowance for administrative costs and margin in order to compensate them for the time and effort involved in the submission, with the result that TPAs often receive only partial compensation (*i.e.* only for the cost of the contraceptives themselves ), and typically well over two years after the costs were incurred. The costs borne by TPAs and issuers under this inefficient and burdensome process increase their operating costs, which in turn increase the costs borne by their clients and ultimately consumers without any commensurate benefit.

The Departments estimate that the IFRs will not result in any additional burdens or costs on TPAs because they believe that more entities will use their newly exempt status than continue to seek accommodations, which will more than offset the fewer number of entities that it believes will newly opt into the accommodation. Even if these estimates prove to be accurate, TPAs will still be involved in paying for contraceptive services as long as self-insured EOs seek the optional accommodation since, as the Departments note, their only alternative would be to terminate their relationship entirely with a self-certifying self-insured EO seeking the optional accommodation.

We believe it would benefit all stakeholders if the reimbursement process for TPAs could be simplified and streamlined, such as by allowing TPAs to seek reimbursement directly from HHS,



and paying the TPA on a quarterly basis for all its reasonable costs of providing the mandated contraceptive services. Quarterly reimbursement windows would alleviate the multi-year backlog that quickly has grown in some cases to millions of dollars spent by and owed to the TPA.

In addition, given the current backlog, we recommend that during the annual submission window CMS allow for the submission of all the TPA's unreimbursed costs for not only the prior plan year, but also for costs for the current plan year-to-date. Thus, instead of allowing the submission of only the costs for the period January-December 2016 in the fall of 2017, CMS should allow the submission of costs for the period January 2016 to the month prior to the submission window, or at least, through June 2017. This step, which can be taken immediately by CMS, should help to some extent in reducing the time period that TPAs would have to wait for reimbursement for 2017 plan year costs. Then, for 2018 onward, the quarterly submission process could be implemented.

The significant costs, well into the multi-millions of dollars, that are being incurred under the current process are growing and unsustainable, and these monies could be better spent to improve infrastructure and member program and services, thereby enhancing affordability of coverage for consumers and small businesses alike.

CVS Health appreciates the opportunity to provide comments on the IFRs, and we hope these comments are helpful. If you have any questions or require additional information, please contact Donald Dempsey, Vice President, Policy and Regulatory Affairs at donald.dempsey@cvshealth.com or (202) 772-3534.

Sincerely,

Don Dempsey
Vice President
Policy and Regulatory Affairs



December 3, 2017

The Honorable Alexander Acosta
Secretary of Labor
200 Constitution Avenue, NW
Washington, DC 20210

The Honorable Steven Mnuchen
Secretary of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

The Honorable Eric Hargen
Acting Secretary
Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

Submitted electronically via www.regulations.gov

Dear Secretaries Acosta and Mnuchen and Acting Secretary Hargen:

I am writing on behalf of the National Association of Health Underwriters (NAHU), a professional association representing more than 100,000 licensed health insurance agents, brokers, general agents, consultants and employee benefits specialists. We are pleased to have the opportunity to provide comments in response to the two interim final rules titled "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act" and "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act." These interim final rules were issued by the Departments of Labor, Treasury and Health and Human Services ("the Departments") and published in the Federal Register on October 13, 2017.

The members of NAHU work on a daily basis to help millions of individuals and employers purchase, administer and utilize health insurance coverage. Over the past seven years since the passage of the Patient Protection and Affordable Care Act (ACA), our members have worked directly and tirelessly with millions of employers of all sizes to help them implement health-plan design and compliance changes related to the ACA. Our expertise lies in the technicalities of health-plan administration and the real-world challenges employers face with plan administration. As such, our comments on the interim final



rules focus on practical concerns our members have identified, as well as questions that employers and employees have already posed concerning the rules' implementation and procedures.

NAHU recommends that the Departments supplement these two interim final rules with detailed implementation guidance for employer plan sponsors and their potentially affected employees as soon as possible. Since these two interim final rules were released, NAHU members have been contacted by group benefit plan clients and individual employees who want to fully understand how the expanded exemptions could impact them and their group benefit plan. In particular, based on questions our members have received, the Departments need to specify a more explicit process for individual employees who want to object to a benefit embedded in their employer's plan options. Employees need access to simple-language guidance to inform them what their rights and opportunities may be, and employers need to know what their options are and how to handle employee questions and specific moral and religious objections. Without comprehensive guidance, employers are unsure about how to handle these situations and employees may not be able to access the full realm of religious protections that are potentially available to them. To make the guidance as meaningful as possible to both employers and employees, NAHU suggests that it be explicit and include many examples so that employers and employees know if X is true, then the option is to do Y or Z.

Another concern identified by NAHU members is that the interim final rules do not create a process for employers that want to exercise the optional accommodation for employees, but merely expand the scope of employer plans eligible to access the existing exemption and optional accommodation process. The accommodation process created by the Obama Administration has been fraught with difficulties for some health insurance issuers, particularly those employer groups that use independent third-party administrators (TPAs) that are not also health insurance carriers to administer their self-funded benefit plans. The process for such plans to enable their TPAs to pay claims covered by the exemption independently is nonexistent. Requests by our members and their employer clients to rectify this issue and get clarification and guidance from the Department of Health and Human Services under the Obama Administration were not answered. Given that the new interim final rules exponentially expand the number of employers that may be eligible to access the optional accommodation process, the gaps in current procedures for companies that utilize independent TPAs need to be filled and clarified via guidance right away. Not only is a process critical for employers to access the accommodation generally, but if there is not a distinct mechanism for the separate payment of these claims, then accessing plans are placed in in legal jeopardy. Affected plan sponsors may have fiduciary responsibility and liability relative to claims procedures as per ERISA, as well as potentially under state laws. If the plan actually/accidentally pays affected claims due to procedural errors and shortfalls caused by the TPA relying on the current incomplete federal process, yet the plan's governing legal documents and structure says they will not be, then a liability risk is created relative to claims procedures. In this legally charged climate, it is irresponsible for the Departments to put plans seeking an accommodation at risk.



The Departments requested comment as to whether employers should be required to provide more notice relative to contraceptive plan changes then what they already legally required to do via the Public Health Services Act (PHSA) and ERISA. NAHU members believe that both employers and employees would benefit from clear notice procedures specific to these interim final rules, including sample language and a clear distribution timeframe. NAHU also thinks that electronic distribution of notice rules needs to be addressed and modernized and the final versions of these two regulations could be an opportunity to start the process.

Clear notice procedures will be helpful for businesses in the long run. NAHU members report that employer plans want to do the right thing by their employees and that employers value having a compliant employee benefit plan. However, employee health plan compliance issues are very complex, and even the most diligent of plans can make mistakes. To expect that every employer that might want to take advantage of these expanded exemptions will have all plan compliance documentation in order and be fully versed in all embedded notification requirements is unrealistic. By merely addressing employee notifications in ERISA plan documents and summary of benefits and coverage (SBC) documents, the Departments are exposing well-intentioned employers to unnecessary liability and undue scrutiny of their plan documents over what is a very politically charged issue that is already being litigated.

On the individual employee and dependent side of the equation, most group plan participants find plan options and design elements confusing. Group health plan beneficiaries rely on clear and simple materials from their employer to understand what their plan covers and why. Plan participants generally do not access or read a plan's full summary description that ERISA requires each plan maintain, so they would be unlikely to see and fully comprehend plan changes that are merely covered in changes to the plan's governing documents. The SBC document provided to beneficiaries during open enrollment and in advance of a material plan modification (like a change in the coverage of contraceptives) is much more consumer-accessible. However, the template employers and issuers are required to use for SBC production doesn't address modification of an employer plan's coverage of contraceptives due to the expanded exemption process. NAHU suggests that the SBC template be updated to serve as an information source for affected employees consistently. We also believe that a separate notice requirement directly addressing contraceptive coverage changes is warranted so that everyone involved in the plan is clear on what benefits will be, when and how coverage will be offered, and when and how claims will be paid.

Finally, the notification requirement question in the interim final rules raises questions for the group benefit plans that are not subject to ERISA and the PHSA and related plan beneficiaries. In particular, ERISA's church plan exemption is relevant, as there is likely overlap between those employer group health plans that claim the exemption and those plans that are interested in the provisions of the interim final rules. The Departments need to address how employees of exempt organizations will be notified about the scope of their coverage and the way related claims may be paid in any final rule. As a related



point, NAHU notes that the applicability of the church plan exemption is confusing and it has been unclear for decades as to what extent a related organization has to be under direct control of the church for ERISA's church plan exemption to apply. Organizations that may have unintentionally but inappropriately taken advantage of the church plan exemption over the years could find themselves in legal situations that they may not have been in otherwise due to scrutiny posed by these interim final rules. NAHU urges church plan clarification, beyond what has been provided in IRS information letters over the years, in any final version of these regulations.

NAHU is grateful for the opportunity to provide comments on both interim final rules. If you have any questions or need additional information, please do not hesitate to contact me at either (202) 595-0787 or jtrautwein@nahu.org.

Sincerely,

Janet Stokes Trautwein
Executive Vice President and CEO
National Association of Health Underwriters

PCMA

December 5, 2017

Submitted electronically via: www.regulations.gov

Department of Labor
200 Constitution Ave., NW
Washington, D.C. 20710

Department of Health and Human Services
The Hubert H. Humphrey Building
200 Independence Ave., SW
Washington, D.C. 20201

U.S. Department of Treasury
1500 Pennsylvania Ave., NW
Washington, D.C. 20220

**Re: Religious and Moral Exemptions and Accommodations for Coverage of Preventive Services Under the Affordable Care Act Interim Final Rules (CMS-9940-IFC, CMS-9925-IFC)**

To Whom It May Concern:

The Pharmaceutical Care Management Association (PCMA) appreciates the opportunity to respond to both the Religious Exemptions and Accommodations for Coverage of Certain Preventive Services and the Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act (hereinafter, IFRs) issued on October 13, 2017 by the Departments of Labor (DOL), Health and Human Services (HHS), and the Treasury (collectively, the Departments).

PCMA is the national association representing America's pharmacy benefit managers (PBMs), which administer prescription drug plans and operate specialty pharmacies for more than 266 million Americans with health coverage through *Fortune* 500 companies, health insurers, labor unions, Medicare, Medicaid, the Federal Employees Health Benefits Program, and the Health Insurance Marketplaces established by the Affordable Care Act (ACA).

## 1. Background

In the IFRs, the Departments retain the accommodation process but revise it so as to make it optional. The Departments also retain without modification the fees adjustment process for third party administrators (TPAs) pursuant to section 156.50, but state that while TPAs are not exempt from the accommodation process, they cannot be required to contract with an entity that invokes that process.

As the Departments know, PBMs act as TPAs to our self-insured group health plan clients desiring to provide access to contraceptive coverage through the accommodation process. While we appreciate that TPAs are not technically required to contract with an entity that invokes that process, many TPAs act in accordance with their clients' needs to provide such services if requested as part of their contract. Under these situations, TPAs make arrangements with an issuer offering coverage through a federally-facilitated

Pharmaceutical Care Management Association
325 7th Street, NW, 9th Floor
Washington, DC 20004
www.pcmanet.org



exchange (FFE) to obtain reimbursement for these costs through an adjustment to the FFE user fee paid by the issuer.

**2. FFE User Fee Adjustments**

As we have noted in prior comments, our membership is very concerned about the availability of FFE user fee adjustments to cover the full costs a PBM acting as a TPA will incur to cover contraceptives for the 2016, 2017, and 2018 plan years, as well as for future years.

We are concerned that the existing regulations related to contraceptives already expose TPAs to the risk of substantial financial losses and that future changes to these regulations may significantly increase exposure to losses. Currently, TPAs receive payment two years or later after incurring the expenses and they are not reimbursed for the time value of this financial outlay.

Furthermore, because there will be a decrease in the number of issuers participating on the FFE and/or an increase in entities claiming entitlement to an accommodation next year, this will put a strain on FFEs' budgets. We are concerned that the user fees will not be sufficient, and that there will be no opportunity for TPAs to recover the costs of covering contraceptive services. For example, our members have experienced that because there are fewer issuers on the FFE, obtaining partners to submit the costs on behalf of PBMs is challenging. This situation is exacerbated because FFE issuers do not have sufficient user fees to cover the amounts PBMs submit for reimbursement. To encourage FFE issuers to engage in this partnership, PBMs often forgo the administration fee, which means that in many cases, PBMs are reimbursed only for the actual ingredient cost of the medications provided, and not their administrative costs in arranging for and delivering the services. As a result, many PBMs operate this TPA function at a financial loss.

The accommodation program also prevents PBMs from charging extra for administering the program, resulting in PBMs absorbing these additional costs. It is not reasonable for PBMs to subsidize services based on their clients' moral and/or religious beliefs or to provide a service without payment.

**3. Alternative Payment Mechanism**

We are extremely concerned that given the expansion of the accommodation program and the decline of FFE issuers year-over-year, costs to administer the program will increase exponentially, making the already difficult process of partnering with an FFE issuer with sufficient user fees even more difficult.

The uncertainty around the availability of the user fee makes it all the more important that the Departments facilitate the establishment of an alternative payment mechanism, should the user fees be unavailable in whole or in part, detailing how the transfer of payment to TPAs will work. As an immediate measure to ameliorate the payment backlog, the Departments should allow TPAs to submit at least 18 months of costs (instead of only the prior plan year's costs) during the annual submission window this fall. For example, for the submission window this fall, costs for the period January 2016 through at least June 2017 would be permitted to be submitted. This would be a positive step towards reducing the long payment delay, by allowing the current year-to-date costs to be submitted 12 months earlier than otherwise.



**4. Process**

Finally, we are concerned that these rules were issued as IFRs rather than as proposed rules. We believe that these provisions should have been subject to the normal comment and hearing procedures under the Administrative Procedures Act. Instead, the Departments have implemented the rules immediately, claiming there is "good cause."

***PCMA Recommendations*: 1) W*e urge the Departments to ensure the availability of funds to cover the costs a PBM functioning as a TPA incurs to provide contraceptive services; 2) The Departments should also establish an appropriate alternative payment mechanism, beyond user fees, to cover the costs incurred by TPAs to arrange and pay for certain preventive services and expand the permitted costs that may be submitted to include current year costs for the first six months of the year; and 3) PCMA urges the Departments to provide a notice and comment process to fully assess future rules.***

***

We appreciate the opportunity to share this feedback and we look forward to working in partnership with the Departments. Please feel free to contact me at (202) 756-5731 or wkrasner@pcmanet.org, or Mona Mahmoud at (202)756-5738 or mmahmoud@pcmanet.org.

Sincerely,

Wendy Krasner

Wendy Krasner
Vice President, Regulatory Affairs

Karen
10/18/17
IL
60625

No coverage for Viagra or Cialis!!!

00206719

Exhibit 126

JA-0001620

The religious exemption for preventative services should be determined by criteria like that of exemption for the military draft requested by "conscientious objectors". No less rigor would be appropriate.

For women who happen to be employed by those eligible for the religious exemption for preventative services, the right to access chosen medical care should be considered of equal significance. Planned Parenthood should be accessible. Freedom of choice involves the right to each individuals' moral construct and should not be denied on the basis of available employment options.

November 17, 2017

Internal Revenue Service
1111 Constitution Ave., NW
Washington, DC 20224
Re: IRS-2017-0016-0002

Dear Karen Levin,

While I wholeheartedly support the decision to notify employees that their employer has chosen to seek an accommodation to provide for contraceptive coverage, the model language proposed in § 54.9815-2713AT (d) is written in a way which might cause stress and confusion to the average reader. Rather than leading with language suggesting the employee will *not* be covered, I suggest amending and rearranging the language so that it is clear from the start that employees *will* be covered, they simply will not be covered by their employer. This new language will put employees at ease rather than causing any temporary confusion or dismay.

The model language proposed in § 54.9815-2713AT (d) makes it unclear who or what qualifies for an accommodation. Thus, rather than stating that the "*group health plan* qualifies for an accommodation" (emphasis added), it would be more clear to emphasize that the *employer* qualifies for an accommodation. In its current form, the language might suggest that there is something wrong with the plan itself that qualifies it for an accommodation.

Additionally, the order of information leaves the reader vulnerable to confusion. By first stating that employer will not pay for contraceptive coverage, the current language could invoke both confusion and temporary panic. Instead, the language should first inform the employee that he or she *will* be receiving contraceptive services and only *then* explain who will be paying for

the services. Not only is this proposed language more clear, it will immediately put the employee at ease instead of inducing any worry or confusion.

I propose that the model language in § 54.9815-2713AT (d) appear as follows:

> Your employer has certified that ~~your group health plan~~ [*name of employing organization*] qualifies for ~~an~~ *a religious* accommodation with respect to the Federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. ~~This means that your employer will not contract, arrange, pay, or refer for contraceptive coverage. Instead~~ *Therefore*, [name of third party administrator/health insurance issuer] will provide or arrange separate payments for contraceptive services that you use *instead. These contraceptive services will be provided* without cost sharing and at no other cost *to you*, for so long as you are enrolled in your group health plan *with* [*name of employing organization*]. Your employer will not administer or fund these payments. *Your employer does not contract, arrange, pay, or refer for contraceptive coverage.* If you have any questions about this notice, contact [contact information for third party administrator/health insurance issuer].

These small changes will make it clear from the outset that (a) the employee *will* receive contraceptive care without cost sharing and at no other cost, (b) it is the *employer* who qualifies for the accommodation and not the plan itself, and (c) the employer will not be the one providing, paying, or contracting for these contraceptive services. The amendments will help prevent any temporary panic or confusion on the part of the employee receiving the notice.

Sincerely,

Rebecca Duncan

00715510

November 28, 2017

Jeff Wu
Department of Health and Human Services ("HHS")
Baltimore, MD 21244-8016

Re: Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act (82 FR 47838).

Dear Jeff Wu:

I thank you for the opportunity to comment on the final rules for expansion exemptions to protect religious beliefs for certain entities and individuals whose health plans are subject to a mandate of contraceptive coverage under the Patient Protection and Affordable Care Act ("ACA").

This letter will discuss the subject matter from a perspective of the Catholic Church ("Church") by addressing (i) religious freedom, (ii) actions that require responsibility, (iii) concerns of the Church, and in general the (iv) legal issues of respecting religion.

**I. Background of Religious Freedom**

The Constitution expounds the concept of religious freedom. The founders recognized the significance of ensuring religious freedom and therefore drafted an amendment declaring that Congress shall enact "no law respecting an establishment of religion, or prohibiting the free exercise thereof."[1] Religious freedom guarantees a citizen the opportunity to worship and practice religious activity.

The principle argument with this law entails discerning the definition for what exactly constitutes religion. For some it is a Sunday only thing. Praying in the church and conducting church services; being part of a friendly, and helpful congregation of people who share similar moral beliefs. For others it entails activity Monday through Friday, exercised while at work or play.[2]

The proponents of the exemption rule argue their religious freedom suffers from a mandate requiring they provide services to others in enabling an activity contrary to their religious beliefs. [3] This argument comes primarily from the notion that facilitation of immorality itself constitutes immoral behavior - even where a non-participant commits no immorality or coercive force. For those who believe that exercise of religion requires practice Monday through Friday, the rule stands in direct conflict with their ability to exercise of their faith. And, religious belief typically grounds morality, an area judicial opinion prudently avoids.[4]

**II. Why Pay for Another's Action?**

The counter argument derives its force from the notion that religious beliefs of others should not be imposed upon someone else. And, if the ACA's modifications curtail coverage for contraceptives, then those who use them, in effect, stand limited in essential services. They must

pay for the expense out of pocket, [5] without the coverage in their employer provided health care plan. [6]

But the proponents of the rule stand on the ground that people who choose to conduct their personal affairs in a certain way must bear responsibility for their own choices. The argument requires a person's own acts, freely conducted, require they pay the associated consequential costs. Simply put, an individual should not be paying for someone else's activity.

However, the issue cannot resolve itself exclusively on the grounds of paying for another. Consider the whole notion of the ACA. The system carries its strength by the idea that we are all in this together.[7] People who do not take care of themselves in failing to exercise and maintain a proper diet, expose themselves to health risks. And, such health risks add to the financial burden of all. [8] Also, think of those who pursue high risk of injury endeavors such a mountain gliding, deep sea scuba diving, or auto racing may incur physical injury. There is argument the law should also account for such extreme behavior. Nevertheless, the fact remains that the ACA's foundation stands within the interconnected social relationships derived from freedom of behavior. The argument for mandating coverage for all, regardless of their chosen activity, serves the whole purpose of the law in the first place.[9]

And, compare unhealthy eating with people who assert freedom choose to engage in reproductive activity. They may decide to mitigate the effects with contraceptives. The argument that the acts bears similarity in comparison with high speed auto racing merits attention. And, it may implicate a social burden no different from any other freely chosen activity.[10]

**III. So, what Concerns the Catholic Church?**

A major issue with the Catholic Church stems from that notion the co-contribution to immoral behavior remains a sin. And, sin according to the Church stands as a departure from its teachings. The sin occurs when putting into practice the act of facilitating the other evil side. The Church perceives itself as waging a moral war against evil.[11] And, those who act contrary to its teachings join the other side. For the Church itself declares that religious "faith without works is dead."[12] The earliest church writings expounded upon this principle.[13] Thus for the Church, spiritual war rages Monday thru the weekend.

More recently the Church in the 1960s, with the advent of the conceptive pharmaceutical, pronounced the act of birth control contrary to its teachings. The Catholic Pope at that time, declared those who put into practice the reproductive activity, and preclude the opportunity for child birth by use of "the pill," commit immoral behavior.[14] The Church itself cannot rescind the rule. Under the doctrine of dogmatic proclamation, once a Pope issues such a decree, no one thereafter can alter it, it becomes moral law for all time.[15] His decree defines morality, in the course of waging the spiritual war on evil, from generation to generation.

So, today the Church's private schools,[16] by adopting health coverage to enable procurement of contraceptives for its teachers and other employees, would consider itself a member of its enemy, the other side. Therefore, the ACA impacts directly its exercise of religion.

The other organizations would likely fit the pattern for departing from their religious practices; even for-profit. Moreover, many of these institutions maintain direct relation to the Church as charitable societies in distribution of gifts to support for the underprivileged. And, most of the employees practice Catholicism, and usually attend regularly the weekend services. If they fall under the mandate to provide contraceptive, then they perforce contravene their religious practice.

**IV. What Argument for Respecting Religion?**

Chief Justice Ruth Ginsberg communicated in a recent opinion that a religious entity cannot evoke the First Amendment to abate a law that applies "incidental effect" to religion.[17] In addition, it could well be argued that precluding certain non-profit, and for-profit organizations from the mandate, weakens the opportunity to live life that accords with their own freedom. Certain employee's implementation of their reproductive freedom now would come at additional cost. Paying for contraceptive use can run from $5 to $50 a month.[18] Therefore, individuals with religious beliefs not grounded in Catholic principles suffer impairment of their own capacity, or with limitation for putting their religious reproductive beliefs into practice.

But, many other situations take a similar place in American life. Consider the freedom to live in a larger house by adding a room. The homeowner incurs additional taxes for adding a room to the home; payment with each tax season. And, it could still be argued that the homeowner maintains freedom to do as he or she wishes: add an additional room, or not too add. Nevertheless, the addition to living space comes at a price of recurring property tax costs every year, for the life of the house.

Similarly, the act of personal conduct in reproductive activity may still be practiced, but it may too come at a cost to the individual. Freedom still exists to engage in the reproductive activity, just the same way that freedom exists to building an addition to a home. It just comes at a price. Unfortunately, this scenario seems common place in American life.

Moreover, any regulation respecting the freedom of reproductive activity comports with Americanism.[19] But the counter argument remains compelling in that compromising laws force those institutions embracing Catholic principles to put into practice an act opposing their religion. The notion they must pay for, or provide an avenue to immoral behavior, contravenes their moral beliefs, and per force eliminates their practice. Co-contribution to immorality,[20] as defined by the Church, remains contrary to its doctrine. In effect it forces the adherents to abandon their religion altogether, thus hardly incidental in effect.

The recommendation stands that HHS maintain the exemptions for those organizations with sincere religious convictions. Mixing religion with legislation or regulation creates a difficult situation.

Sincerely,

Marco Pagnanelli

**Notes**:

---

1. U.S. CONST. amend. I (applies to Freedom of Religion, Speech, Press, Assembly, and Petition; passed by Congress September 25, 1789, then ratified December 15, 1791).

2. *Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751, 2761 (2014) ("In order to ensure broad protection for religious liberty, RFRA [Freedom of Religion Restoration Act] provides that 'Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability.'") (citation omitted).

3. *Id.* at 2778 (The parties "believe that providing the coverage demanded by the HHS regulations is connected to the destruction of an embryo in a way that is sufficient to make it immoral for them to provide the coverage.").

4. *Id.* at 2757 (The Supreme Court noted, the belief "implicates a difficult and important question of religion and moral philosophy, namely, the circumstances under which it is immoral for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another. It is not for the Court to say that the religious beliefs of the plaintiffs are mistaken or unreasonable.").

5. *Id.* at 2803 (The petitioner (plaintiff) made a counter suggestion that "if its employees had to acquire and pay for the contraceptives (to which the corporation objects) on their own, a tax credit would qualify as a less restrictive alternative.").

6. Linda Greenhouse, *On Contraception, It's Church Over State*, N.Y. Times, Sunday Review, Oct. 11, 2017 (There are some other people who argue, "[t]he problem they have is with what birth control signifies: empowering women — in school, on the job, in the home — to determine their life course.") *available at* https://www.nytimes.com/2017/10/11/opinion/contraception-religious-exemption.html.

7. *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 539 (2012) ("[T]hose who do not comply with the mandate must make a '[s]hared responsibility payment' to the Federal Government.") (quoting § 5000A(b)(1) of the ACA).

8. *Id.* at 553-54 ("The annual medical burden of obesity has risen to almost 10 percent of all medical spending and could amount to $147 billion per year in 2008." And the "increased costs are borne in part by other Americans who must pay more, just as the uninsured shift costs to the insured.") (citation omitted).

9. *Id.* at 538 ("In 2010, Congress enacted the Patient Protection and Affordable Care Act, 124 Stat. 119. The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care.").

10. *Id.* at 553 (The Court in *Sebelius* further opined "many Americans do not eat a balanced diet. That group makes up a larger percentage of the total population than those without health insurance. . . . The failure of that group to have a healthy diet increases health care costs, to a greater extent than the failure of the uninsured to purchase insurance.").

11. Pope Benedict XIV, *Peregrinantes*, May 5, 1749 ("[T]herefore, you priests, [and] ministers . . . [s]ound the trumpets and declare a *spiritual war* against the enemies of the cross . . . . Strengthen the languid hands of your soldiers and straighten their bent knees."); Pope Benedict XVI, *Spe Salvi*, 22,

November 30, 2007 ("We have all witnessed the way in which progress, in the wrong hands, can become and has indeed become a terrifying progress in *evil*.").

12. Catholic Church, *Catechism of the Catholic Church,* Vatican: Libreria Editrice Vaticana, (2nd ed. 2012) § 1815 (quoting the Bible, James, 2:26).

13. James Gibbons, *Introductory Remarks to the Pope's Encyclical*, 19 The American Catholic Quarterly Review, 771, 773 (1894) (discussion of Pope Leo XIII's encyclical and the importance of religious faith in that principles must precede action).

14. https://www.catholic.com/tract/birth-control ("In 1968, Pope Paul VI issued his landmark encyclical letter *Humanae Vitae* (Latin, "Human Life"), which reemphasized the Church's constant teaching that it is always intrinsically wrong to use contraception to prevent new human beings from coming into existence. Contraception is 'any action which, either in anticipation of the conjugal act [sexual intercourse], or in its accomplishment, or in the development of its natural consequences, proposes, whether as an end or as a means, to render procreation impossible.'") (quoting *Humanae Vitae* 14).

15. P. J. Toner, *Infallibility*, Catholic Encyclopedia, 1910 (Papal "[i]nfallibility means more than exemption from actual error; it means exemption from the possibility of error."); Catholic Church, *Code of Cannon Law* 749 §1. ("By virtue of his office, the Supreme Pontiff possesses infallibility in teaching when as the supreme pastor and teacher of all the Christian faithful, who strengthens his brothers and sisters in the faith, he proclaims by definitive act that a doctrine of faith or morals is to be held.").

16. Dale McDonald & Margaret Schultz, *United States Catholic Elementary and Secondary Schools 2016-2017: The Annual Statistical Report on Schools, Enrollment, and Staffing* (March 2017) (total U.S. Catholic school student enrollment for the current academic year is 1,878,824; there are 5,224 elementary and 1,205 secondary schools).

17. *Hobby Lobby*, at 2790 ("Any First Amendment Free Exercise Clause claim [petitioners] might assert is foreclosed by this Court's decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990). The First Amendment is not offended, *Smith* held, when 'prohibiting the exercise of religion ... is not the object of [governmental regulation] but merely the incidental effect of a generally applicable and otherwise valid provision.'" *Id*. at 878.) (J. Ginsburg dissenting opinion).

18. Linda Greenhouse, *supra* note 6 (The administration claims "[t]here are multiple federal, state, and local programs that provide free or subsidized contraceptives for low-income women," and "many forms of contraception are available for around $50 per month.") (quotations omitted).

19. *Hobby Lobby,* at 2785 ("For those who choose this course, free exercise is essential in preserving their own dignity and in striving for a self-definition shaped by their religious precepts. Free exercise in this sense implicates more than just freedom of belief.").

20. Catholic Church, *supra* note 12 at § 1869 ("Thus sin makes men accomplices of one another and causes concupiscence, violence, and injustice to reign among them. Sins give rise to social situations and institutions that are contrary to the divine goodness. . . .They lead their victims to do evil in their turn. In an analogous sense, they constitute a 'social sin.'") (citations omitted).

# MORE POWER TO THE PILL: THE IMPACT OF CONTRACEPTIVE FREEDOM ON WOMEN'S LIFE CYCLE LABOR SUPPLY*

MARTHA J. BAILEY

The release of *Enovid* in 1960, the first birth control pill, afforded U. S. women unprecedented freedom to plan childbearing and their careers. This paper uses plausibly exogenous variation in state consent laws to evaluate the causal impact of the pill on the timing of first births and extent and intensity of women's labor-force participation. The results suggest that legal access to the pill before age 21 significantly reduced the likelihood of a first birth before age 22, increased the number of women in the paid labor force, and raised the number of annual hours worked.

## I. INTRODUCTION

*The movement she [Margaret Sanger] started will grow to be, a hundred years from now, the most influential of all time. When the history of our civilization is written, it will be a biological history, and Margaret Sanger will be its heroine.*[1]

—H. G. Wells, 1931

The release of *Enovid* in 1960, the first birth control pill, afforded U. S. women unprecedented freedom to plan childbearing and their careers. For college women, Goldin and Katz [2002] find that access to oral contraception led to a later age at first marriage and greater representation in nontraditional, professional occupations. But "the pill" may have had durable and far-reaching effects on women's labor market work across levels of attainment.

Relatively little work in economics, either theoretical or empirical, has explicitly examined the impact of oral contraception on women's paid work. Indeed, this line of research may seem relatively unimportant given the compendium of historical, cross-country, and scholarly research that suggests that birth control

* Research on this project was generously supported by the Vanderbilt University Summer Research Awards Program in Arts and Science and the NBER. I am grateful to Jeremy Atack, Kathryn Anderson, Dale Ballou, William J. Collins, Andrew Daughety, T. Aldrich Finegan, Claudia Goldin, Melanie Guldi, Theodore Joyce, Derek Laing, Robert A. Margo, Walter Oi, Jennifer Reinganum, John Siegfried, Gary Solon, and workshop participants at Vanderbilt and Harvard Universities and the NBER Summer Institute. I also thank three anonymous referees and the editors for helpful comments and suggestions. Dan Taylor provided outstanding research assistance.

1. Margaret Sanger (1879–1966) is known as the founder of the twentieth century's birth control movement.

*The Quarterly Journal of Economics,* February 2006

mattered very little (cf. Becker [1991, ch. 4]). Well before the advent of the pill, the United States witnessed steady increases in women's labor-force participation and dramatic swings in fertility. In light of this fact, Becker's conclusion summarizes a view held by many scholars: "the 'contraceptive revolution' . . . ushered in by the pill has probably not been a major cause of the sharp drop in fertility in recent decades" [p. 143]. But even if the pill did reduce fertility, recent quasi-experimental research suggests that declining numbers of children can explain remarkably little of the longer-term changes in women's market work [Bronars and Grogger 1994; Jacobsen, Pearce, and Rosenbloom 1999; Hotz, McElroy, and Sanders 1997; Angrist and Evans 1998].[2]

The relative scarcity of empirical evidence on the impact of oral contraception relates to the difficulty of the empirical problem. The pill's introduction in 1960 and subsequent diffusion corresponded to the resurgence of the women's movement, the spread of labor-saving household technologies, the enactment and increasing enforcement of antidiscrimination legislation, and the social unrest associated with the Civil Rights Movement and Vietnam. Moreover, abortion became increasingly available around the time many young women gained access to the pill and may have had comparable effects on their fertility and labor market decisions. Similar to the strategy used by Goldin and Katz [2002], I exploit a source of plausibly exogenous variation to isolate the pill's impact on women's life cycle labor-force participation. This variation arises from broad, state-level changes from 1960 to 1976 that expanded the legal rights of individuals ages 18 to 21. The indirect effect of these legal revisions, however, was to empower unmarried women under the age of 21 to consent to medical care and, by extension, obtain oral contraception without parental consent.

These laws facilitate two types of analysis of the pill's impact. First, they shaped the diffusion of the pill to younger women from 1960 to 1976 and provide a rough time frame over which to look for relevant changes in behavior. Figure I displays trends in first-birth rates by age category since 1940. Although first births

2. Angrist and Evans [1998, p. 474] conclude that since 1950, "the increase in female labor-force participation has been so large that declining fertility can explain only a small fraction of the overall change." Between 1970 and 1990 the same authors suggest that the decline in childbearing beyond the second child among women ages 21 to 35 can account for roughly two percentage points (of the total 16.8 increase) in employment.

Exhibit 127

FIGURE I
Live First-Birth Rates by Age of Mother, 1940–1995
First-birth rates are computed as the number of live first births per 1000 women in the appropriate age group.
*Source:* Division of Vital Statistics, National Center for Health Statistics, Statistical Tables on Births, Table 1 and 2: First-birth rates by Age of Mother, According to Race and Hispanic Origin: United States, Specified Years 1940–1955 and Each Year 1960–1994 [2003].

0000066

JA-0001631

among younger women increased during the Baby Boom, a marked decline in early childbearing began when the pill was introduced and lasted until 1976, when all unmarried minors in the United States could obtain contraceptives under the law. Notably the largest absolute declines occurred during this period among 18 to 19 year olds, the group of women most likely to benefit from liberalized access laws. In contrast, first-birth rates among 15 to 17 year olds, individuals who were generally too young to benefit, underwent almost no discernible changes.

Changes in the distribution of the age at first birth also correspond closely to the diffusion of the pill. Figure II plots the fraction of women first giving birth in three-year age bins by cohort. For example, the point above age 18 denotes the fraction of women with a first birth within the age bin of 17 to 19. Among women born before 1940 who were too old to benefit from early access, approximately 62 percent of those ever having children report a first birth by age 22. For women born around 1955—almost all of whom had access to the pill under the law—the fraction giving birth by age 22 had declined by 16 percentage points, or roughly 25 percent.[3] Stark differences between cohorts with (1955 to 1960) and without (1933 to 1940) early access to the pill suggest that these changes are not due to preexisting trends. Moreover, there appear to be almost no visible changes in the distributions after 1955, when all young women would have had early access.[4]

A rapid transformation in women's life cycle labor-force participation profiles occurred between the cohorts of 1940 and 1955 as well. As shown in Figure III, women born during the first 40 years of the century tended to withdraw from the labor force during the ages of high fertility. As more women returned to work after their children had grown, increases in the market participation of women over 30, especially married women, drove increases in aggregate participation rates until the 1960s. This pattern reverses with cohorts born after 1940 (cf. Goldin [1990]).

3. The cohort of 1955 is relevant because the U. S. Supreme Court decision, *Planned Parenthood of Central Missouri v. Danforth,* in 1976 ruled against a state's compelling interest to regulate access to contraception based on age alone.

4. The oldest women observed in the 1955 to 1960 birth cohorts were ages 40 and 35, respectively, in the 1995 June *CPS,* the last survey to ask about the year the first child was born. To the extent that women in these cohorts delayed their first births beyond ages 35 and 40, the fraction of women born between 1955 and 1960 giving birth at earlier ages should be overstated and those delaying understated. Therefore, the inability to observe younger cohorts at older ages tends to make the shift between 1940 and 1955 appear smaller than it is.

Exhibit 127

FIGURE II
The Distribution of Age at First Birth, by Cohort

The figure plots the fraction of women (vertical axis) with a first birth at a particular age (horizontal axis). Synthetic birth cohorts are generated by computing the year of birth (reported age from the year of the survey). Sample includes women who were ages 35 to 44 at the time of the survey who had ever given birth.

*Source:* June *CPS* 1977–1995.

00000068

JA-0001633

FIGURE III

Age-Specific Labor-Force Participation Rates, by Cohort and Age 1900–1970

Pre-1964 data are averaged over cohorts as in Smith and Ward [1985, Table 1]. For instance, the participation rate for women ages 14 to 19 in 1950 is plotted in this figure as the cohort of 1930 at those ages. Data after 1963 represent participation rates for a single year of birth cohort at the reported age. Synthetic birth cohorts are computed by subtracting the reported age from the year of the survey. Bold lines depict the 1940 and 1955 cohorts. The March sample includes all women not in the military or inmates ages 16 to 60.

*Source:* 1964–2001 March *CPS;* for years before 1964, data are from Smith and Ward [1985, Table 1].

For those born in 1955, the "fertility dip" in labor-force participation had completely disappeared. Participation rates were 24 percentage points higher at age 25, and 20 percentage points higher at age 30, than those of women born in 1940.[5] This rapid, intercohort shift in young women's labor market participation during the twentieth century occurred over the same period as younger and unmarried women gained legal access to oral contraceptives.

While cross-cohort trends are suggestive, the remainder of this paper examines average *within*-cohort effects of early access using implied legal variation by year of birth and state for women

5. Smith and Ward [1985, p. S65] also note that for women born after 1950, there is no observable employment decline over the childbearing years. Goldin [forthcoming, Figures 4 and 5] notes that these trends are borne out for married women as well, although the labor market integration of college graduate women appears to have begun earlier.

born from 1940 to 1955. The estimates suggest that access to the pill before age 21 reduced the likelihood of becoming a mother before age 22 by 14 to 18 percent and increased the extent of 26 to 30 year old women's labor-force participation by approximately 8 percent. At the intensive margin, women with early access worked at least 68 more annual hours at ages 26 to 30. These findings do not challenge the validity of past research on the relationship between the number of children and women's labor supply. Rather, they are consistent with the notion that the pill catalyzed changes in labor-force participation through the mechanism of birth timing. By providing a low cost means of delaying childbearing, oral contraception allowed women to remain in school, pursue longer-term careers, and work more in the paid labor force during ages historically associated with childrearing.

## II. The Theoretical Impact of Early Access to the Pill on Women's Life Cycle Labor Supply

While a number of relatively effective contraceptive methods were available well before the introduction of *Enovid* in 1960, oral contraception revolutionized the technology of birth control in three important ways.[6] First, the pill constituted the first female contraceptive. A woman could independently decide to take the pill; it did not require the consent or knowledge of men or discomfort to either party during sex. The pill transferred control of contraception, which had long resided with men, to women who bore the high physical and opportunity costs of childbearing. Second, the pill divorced the decision to use contraception from the time of intercourse. This lowered the marginal costs of preventing births during sex to zero and shifted decisions about contraception to times separate from the act of intimacy. Third, the pill's effectiveness far exceeded that of all other methods available in 1960.[7] Whereas most couples regarded pregnancy

6. The withdrawal method, or *coitus interruptus,* had been used well before it was popularized in the United States in Robert Dale Owen's 1831 pamphlet, *Moral Physiology*. A number of other contraceptive methods, such as the condom and diaphragm, had also been adopted before the pill was available [Brodie 1994; Tone 2001]. For a thorough history of the condom, see Brandt [1985] and Valdiserri [1988].

7. From the beginning, *Enovid*'s advocates promoted the pill as 99 percent effective. Although numbers on the effectiveness of contraception are dubious at best, Planned Parenthood estimates the failure rates associated with *typical use* of the condoms available today at around 15 percent and the failure rates of today's modern diaphragms at around 16 percent. It is unclear how much of this figure is

risk as part of the cost of intercourse, oral contraception virtually eliminated concerns about unwanted conception [Michael and Willis 1972; Willis 1973; Marks 2001]. By reducing the costs of preventing and timing childbirth, improvements in the technology of birth control may have mitigated the constraints imposed by fecundity on women's labor-force participation. As a result, more women may have entered and remained in the paid workforce.

One might infer from recent studies that the potential effect of the pill on women's fertility and labor-force participation is small. Using biological events to identify the impact of an additional child on women's labor supply, the bulk of compelling research finds only a modest effect (twinning [Bronars and Grogger 1994; Jacobsen, Pearce, and Rosenbloom 1999], miscarriages [Hotz, McElroy, and Sanders 1997], or the sex of children already born [Angrist and Evans 1998]). Using variation in the *number* of births may understate the pill's impact for two reasons. First, only women who chose to become pregnant (or for whom prevention was too costly) enter the sample. The impact of an unexpected birth may be considerably smaller for these women than for those who are childless or are not expecting a child. Second, these studies abstract from the pill's potential effect on labor supply through birth timing.[8] Because couples were fairly accurate at reaching their target fertility before the pill, fairly costless birth timing may be among the pill's most important contributions.[9]

The empirical exercise in this paper allows one to assess the importance of the pill through birth timing using "early access to the pill," defined as unrestricted legal access for unmarried, childless women between ages 18 and 20. This focus may seem narrow,

attributable to inappropriate use. Less effective spermicides and materials imply that failure rates of these methods would have been much higher in 1960.

8. Klepinger, Lundberg, and Plotnick [1999] provide an excellent review of studies that relate early childbearing to women's outcomes including education, experience, labor-force participation and wages. Most find that early childbearing has a negative effect on each of these outcomes. Miller [2005] and Vere [2004] also examine the impact of birth timing.

9. The pill revolutionized a couple's ability to time childbearing. Primitive methods of birth control included delay of first marriage, longer breast-feeding to delay the return of menses, withdrawal, and the reduced frequency of coitus. Modern alternatives were condoms and diaphragms. Couples anticipated periodic failure of any of these methods, and most employed a variety of methods to hit their target fertility. Before the pill, no method—save abstinence—facilitated the deliberate timing of childbearing.

but decisions at ages 18 to 20 strongly influence young women's career path. Not only do women make choices about human capital investment and occupation, but among women reaching that age before the pill was released, roughly 50 percent had married, and more than 40 percent had conceived by their twenty-first birthdays.[10] During these ages, the risk of pregnancy (for married and unmarried women) not only threatened to disrupt human capital investments in the immediate term [Goldin and Katz 2002] but may have reduced their initial career investments as they expected unplanned, future spells out of the labor market.

Early access to the pill potentially affected women's life cycle labor supply by reducing the costs and increasing the returns to pursuing careers.[11] First, early access reduced the cost of delaying pregnancy in order to make career investments. Young women could stay in the labor market, invest in careers (through formal schooling or training or on-the-job experience), *and* be sexually active (or marry) without the risk of pregnancy. Second, early access increased the expected lifetime returns to career investments by making the timing and number of spells out of the market a deterministic process.[12] Finally, early access may have increased labor supply even among women with no career aspirations per se. For instance, women may have worked more to help their husbands gain more education or reach a certain career stage so as to increase lifetime consumption [Happel, Hill, and Low 1984].

While past empirical studies have emphasized the impact of changes in the number of children on labor supply, the argument here is that early access to the pill may have affected women's work behavior *without* affecting completed fertility. In fact, variation in early access may produce weak, if any, effects on the number of children ever born. After the pill was introduced in 1960, almost all women born later than 1940 obtained access to

10. These figures are based on the author's computations using a sample of women who had married at least once by age 35 and who were born from 1935 to 1940 in the June *CPS*.

11. The intuition laid out here is consistent with the theoretical models in which rational agents make choices at the outset of their adult lives, given their preferences and abilities, which effectively determine the sequence of childbearing, labor-force participation, and wage outcomes. See Hotz, Klerman, and Willis [1997].

12. Weiss [1986] outlines why expected career interruptions reduce pre-interruption career investments. Mincer and Polachek [1974] cite the expectation of career interruptions as one reason, even after accounting for past interruptions, earnings differ between men and women.

the pill at age 21, by legal emancipation by marriage, or first birth. An ill-timed, early pregnancy could be offset by using contraception to reduce births at ages beyond 21. Thus, women with early access should be equally likely to achieve their target number of children.[13]

## III. Identifying the Effect of Early Access to the Pill Using Variation in State Laws

The nature of the birth control pill as a prescription pharmaceutical renders variation in legal access a convenient tool for studying its impact. While it is questionable whether restrictive state laws were enforced for other forms of contraception, obtaining the pill required a prescription from a licensed physician and sale by a licensed pharmacist.[14] Violations of state laws could be punished with heavy fines, jail time, and possibly the loss of one's professional license [Garrow 1994]. For this reason, restrictions that required a young woman to be a legal adult (over the age of twenty in most states); married, pregnant, or a mother (most states granted "legal emancipation" under any of these conditions); or the legal consent of a guardian imposed binding constraints on young women's decision to obtain the pill.[15]

### *III.A. The History of Liberalization of Access to Oral Contraception for Younger Women*

During the 1960s and 1970s, the age of legal consent was lowered at different times in different states for reasons largely

13. The exception to this statement is for women who desired no children. A more difficult question is whether early access (not the pill itself) alters the target number of children. Becker argues that birth control should not affect the demand for children [1991, p. 143], for which an empirical proxy is completed fertility. This is also consistent with theoretical models of life cycle fertility, which unambiguously predict that wealth-constant changes in the prices of preventing childbirth or working in any given period will affect the life-cycle timing of births but not necessarily completed fertility (cf. Hotz, Klerman, and Willis [1997, pp. 309–317]).

14. Effective regulation of condoms, for instance, required only that distributors (often gas station clerks) check the age or marital status of those making purchases. A substantial amount of evidence suggests that the illicit distribution of nonhazardous contraceptives over the counter or in vending machines was common before they were legal (cf. Garrow [1994, p. 188]).

15. One final feature of legislative history makes state legal changes a particularly apt quasi experiment. The Comstock Act, which was passed by Congress in 1873, declared the interstate transport or mailing of contraceptives a federal offense. Although the *One Package* U. S. Supreme Court ruling struck down federal bans on the interstate shipping of contraception to licensed physicians in 1936, federal law continued to prohibit individuals from obtaining oral contraceptives by mail from out-of-state. Individuals seeking to obtain the pill would have had to drive across state lines regularly to refill prescriptions and for checkups.

unrelated to issues surrounding contraception or women's rights. Most of these legal changes, in fact, were due either to the expanding rights of legal minors or to changes in the definition of legal "minority."

The trend toward the legal empowerment of minors began well before the introduction of the pill. In 1956 an early Ohio case recognized a "mature minor" doctrine, waiving the requirement of parental consent for medical care if the minor was "intelligent and mature enough to understand the nature and consequences of the treatment" [Paul, Pilpel, and Wechsler 1976, p. 16]. After the pill was introduced, many of these decisions gave physicians latitude to prescribe oral contraception to young women without consulting their parents [Paul, Pilpel, and Wechsler 1974].

As judicial precedents extended the legal rights of minors, the war in Vietnam catalyzed changes in the definition of legal adulthood, or age of legal "majority." Under federal law, one could be drafted for Vietnam at age 18 but could not vote until age 21. This discrepancy in rights and obligations of young men reached national prominence during the 1968 national presidential election. After coming to office, Nixon's support of lowering the federal voting age to eighteen culminated in the ratification of the Twenty-Sixth Amendment to the U. S. Constitution in 1971. At the state level, legislatures began extending the privileges and responsibilities of legal adulthood to eighteen-year old men and women as well.[16] Although extending the right to obtain contraception to younger women had little, if anything, to do with these legislative changes, a lower age of majority empowered them to consent to medical treatment and, by extension, obtain the pill.[17] (In the subsequent discussion I will refer to these states as "age of majority" states.)

During the same period, equally visible and controversial issues were decided in the U. S. Supreme Court. Beginning with the *Griswold* decision in 1965, the Court struck down Connecticut's ban on the use and distribution of contraceptives and declared a realm of "procreative privacy" for married individuals. In subsequent rulings, the right to privacy was held to apply to

16. Several states regarded 18 year old women as legal adults much earlier than the 1970s, while retaining 21 as the age of majority for men. I take these laws to apply to medical consent and obtaining contraceptives.

17. These rights generally included signing contracts; suing and being sued; making wills; inheriting property; holding public office; serving as jurors, policemen, and firemen; marrying and divorcing without parental consent; qualifying for welfare benefits; and attending X-rated movies. In many states, court cases challenged specific provisions of the lower age of majority, but none that I am aware of challenged a young woman's right to consent to medical care.

TABLE I
DATES OF LEGAL CHANGE GRANTING EARLY ACCESS TO THE PILL

| State | Year law effective | Law type |
|---|---|---|
| Alabama | 1971 | MM |
| Alaska | 1960 | AOM |
| Arizona | 1972 | AOM |
| Arkansas | 1960 | AOM |
| California | 1972 | AOM |
| Colorado | 1971 | MM |
| Connecticut | 1972 | MM |
| Delaware | 1972 | AOM |
| District of Columbia | 1971 | CFP |
| Florida | 1974 | AOM |
| Georgia | 1968 | CFP |
| Hawaii | 1970 | MM |
| Idaho | 1963 | FAM |
| Illinois | 1971 | MM |
| Indiana | 1973 | AOM |
| Iowa | 1973 | AOM |
| Kansas | 1970 | MM |
| Kentucky | 1968 | AOM |
| Louisiana | 1972 | AOM |
| Maine | 1971 | AOM |
| Maryland | 1967 | MM |
| Massachusetts | 1974 | AOM |
| Michigan | 1972 | AOM |
| Minnesota | 1973 | AOM |
| Mississippi | 1966 | MM |
| Missouri | 1976 | SC |
| Montana | 1971 | AOM |
| Nebraska | 1972 | AOM |
| Nevada | 1969 | FAM |
| New Hampshire | 1971 | MM |
| New Jersey | 1973 | AOM |
| New Mexico | 1971 | AOM |
| New York | 1971 | MM |
| North Carolina | 1971 | AOM |
| North Dakota | 1972 | AOM |
| Ohio | 1965 | SC |
| Oklahoma | 1966 | FAM |
| Oregon | 1971 | MM |
| Pennsylvania | 1971 | MM |
| Rhode Island | 1972 | AOM |
| South Carolina | 1972 | MM |
| South Dakota | 1972 | AOM |
| Tennessee | 1971 | AOM |
| Texas | 1974 | AOM |
| Utah | 1962 | FAM |

TABLE I
(CONTINUED)

| State | Year law effective | Law type |
|---|---|---|
| Vermont | 1972 | AOM |
| Virginia | 1971 | MM |
| Washington | 1971 | AOM |
| West Virginia | 1972 | AOM |
| Wisconsin | 1973 | AOM |
| Wyoming | 1969 | CFP |

The date of legal change is coded as the earliest year, in which an unmarried, childless woman under age 21 could legally obtain medical treatment without parental or spousal consent. AOM denotes a statutory change in the legal age of majority from 21 to 18 or 19. FAM denotes a change in age of majority (or an existing law) applying to women only. MM denotes a mature minor doctrine that allowed legal infants to consent to medical care as long as they were mature enough to understand "the nature and the consequences of the treatment." CFP refers to a comprehensive family planning statute that allowed or did not expressly restrict physicians from treating legal minors. SC denotes changes at the Supreme Court level: the 1965 *Griswold* and the 1976 *Danforth* decisions. Legal citations available from the author upon request.

*Sources:* Author's coding using state statutes, DHEW [1974], and Paul, Pilpel, and Wechsler [1974, 1976] and Pilpel and Wechsler [1971].

unmarried individuals in *Eisenstadt v. Baird* and finally, in 1976, to minors. In 1976 *Planned Parenthood of Central Missouri v. Danforth,* the Supreme Court ruled that states lacked a "compelling interest" in using age as the sole criterion under which to regulate contraceptive access. This decision, by no act of popular opinion, rendered the higher age of legal majority inapplicable to the prescription of oral contraception.

I have collected the earliest state laws which empowered unmarried women under the age of 21 to obtain the pill without parental consent.[18] Table I lists the date and source of legal change for each of the 50 states and the District of Columbia. To the extent that these legal changes do not capture changes in women's ability to pay or physician's willingness to prescribe the pill, they are only proxies for early access in practice.

### *III.B. The Validity and Relevance of Liberalization as a Natural Experiment*

In order to use these laws to make inferences about the pill's causal effect, the timing of liberalization should not reflect pre-

18. Liberalization often occurred through the interaction of different legal changes. For instance, liberalization did not occur in Ohio until the U. S. Supreme Court decided *Griswold* which, in practice, struck down Connecticut's Comstock law. However, because Connecticut's statute was more restrictive than Ohio's restrictions on contraception, *Griswold* enjoined Ohio's statute as well. In conjunction with Ohio's mature minor doctrine of 1956, therefore, *Griswold* effectively granted early legal access to contraception.

Case 2:17-cv-04540-WB Document 253-8 Filed 09/29/20 Page 125 of 159

existing differences in state-level characteristics. The legal history of the liberalization of access suggests little connection to state-level characteristics relating to women's fertility and employment choices.[19] Nevertheless, I evaluate this assumption empirically by generating state-level characteristics for each of the 50 U. S. states and the District of Columbia from the 1960 Public Use Microsample [Ruggles and Sobek 2004], the Survey of Churches and Church Membership [National Council of Churches of Christ 1956], and the record of Casualties in Southeast Asia [National Archives 1997]. For each state, I construct a dependent variable, "time to liberalization," as the number of years that elapsed from 1960, the year the pill was released, until unmarried women under the age of 21 could obtain oral contraception without parental consent in the particular state.

Table II reports point-estimates and robust standard errors from cross-state regressions of "time to liberalization" on selected 1960 state characteristics. The panels group the correlations into four broad categories. Panel A includes the demographic characteristics such as the fraction of the state's population who work in agriculture, is Black, or in different age groups. Panel B includes proxies for education, state fertility norms such as the mean age at first marriage and completed fertility of the older cohorts, poverty rates, fraction Catholic, and the number of Vietnam casualties from 1965 to 1970 as a fraction of the state population.[20] Panel C reports the results of regressions on proxies for household technology such as washers, dryers, and freezers as well as the fraction of households with two or more cars. Panel D includes labor market characteristics for men and women such as labor-force participation, unemployment, and mean wages among 22 to 30 year olds.

The striking feature of Table II is that none of the characteristics is statistically significant, with the exception of the fraction Catholic. A larger fraction of Catholic parish membership in 1952 is associated with a statistically significant delay in liber-

19. Three states that passed comprehensive family planning laws are the exception. By 1972 Georgia, Wyoming, and the District of Columbia passed laws that either explicitly allowed for the treatment of "every patient desiring services" or were broad enough that physicians could treat patients of any age or marital status without liability.

20. The number of casualties in Vietnam is intended to proxy for state-level political pressure to change the age of majority. The date range 1965 to 1970 is chosen because the Twenty-sixth Amendment was ratified in 1971, but the results are not sensitive to small changes in the dates.

TABLE II
1960 State-Level Predictors of Liberalization

A. Demographic characteristics

| | Fraction of population | | | Fraction of women in age group | | |
|---|---|---|---|---|---|---|
| | Living on farm | Black | South | 15–21 | 22–30 | 31–45 |
| Point estimate | −0.804 | −2.10 | −0.673 | 10.6 | 13.9 | 12.4 |
| *S.e.* | [5.077] | [3.65] | [1.06] | [7.51] | [9.85] | [24.0] |
| $R^2$ | 0.000 | 0.005 | 0.009 | 0.059 | 0.033 | 0.016 |

B. Social characteristics

| | Mean years of education for women | Women born 1920–29 | | Fraction of the population | | |
|---|---|---|---|---|---|---|
| | | Age of first marriage | Children ever born | In poverty | Catholic | Casualty rate in Vietnam |
| Point estimate | 0.485 | −0.217 | −18.0 | −2.346 | 5.34 | −1.17 |
| *S.e.* | [0.666] | [0.487] | [12.1] | [3.74] | [2.57] | [1.47] |
| $R^2$ | 0.009 | 0.003 | 0.042 | 0.010 | 0.056 | 0.008 |

C. Household technology

| | Fraction of households with | | | | | |
|---|---|---|---|---|---|---|
| | Radio | Washer | Dryer | Freezer | ≥1 car | ≥2 cars |
| Point estimate | −5.58 | 1.05 | −2.75 | −1.94 | −3.91 | 12.8 |
| *S.e.* | [8.16] | [4.09] | [4.70] | [3.69] | [5.89] | [13.9] |
| $R^2$ | 0.009 | 0.003 | 0.010 | 0.011 | 0.023 | 0.006 |

D. Labor markets

| | Men ages 22–30 | | | Women ages 22–30 | | |
|---|---|---|---|---|---|---|
| | In labor force | Unemployment | Wages | In labor force | Unemployment | Wages |
| Point estimate | −12.2 | −4.74 | 0.000 | 1.80 | 3.23 | −0.001 |
| *S.e.* | [12.3] | [10.6] | [0.001] | [4.47] | [2.36] | [0.001] |
| $R^2$ | 0.020 | 0.004 | 0.001 | 0.002 | 0.021 | 0.051 |

The dependent variable is the year in each state, in which unmarried women under the age of 21 could legally obtain contraceptives without parental consent, minus 1960, the year the pill was introduced. Regressors are population weighted state aggregates. The point estimates are obtained by regressing the dependent variable on each state characteristic individually. Results from regressions including all the variables in a given panel do not alter the results. All regressions are unweighted. Robust standard errors are reported in brackets. There are 51 observations in each regression with two exceptions. In Panel B, 49 states are included for the regression with fraction Catholic because the 1952 Survey of Churches and Church Membership only included the 48 contiguous U. S. states and the District of Columbia. In Panel C, Alaska is omitted from the fourth regression, "Freezer," as every household in Alaska reported 1 or more freezers.

*Sources:* 1960 PUMS [Ruggles and Sobek 2004]. Data on church membership obtained from the National Council of the Churches of Christ in the U.S.A. [1956]. Data on Vietnam casualties obtained from the National Archives [1997].

0000078

Case 2:17-cv-04540-WB Document 253-8 Filed 09/29/20 Page 127 of 159

alization. According to the political history described in Garrow [1994], this relationship might be driven by a strong Catholic lobby against statutes or judicial decisions that *directly* liberalized access to contraception. Because I cannot control directly for fraction Catholic in the analysis (the variable is only available for a handful of years), I include state fixed effects and linear state trends in the analysis and test the robustness of my results by running the analysis on age of majority states only.[21] The lack of a statistical relationship with other potential correlates lends credibility to an empirical strategy that treats legal changes as a valid quasi experiment. It seems fair to conclude that idiosyncratic differences in the regional judiciary and legislatures, the regional politics of minors' rights, and the war in Vietnam resulted in considerable variation in the timing of adoption across states.

Whereas the legal changes appear to be a valid natural experiment to evaluate the effects of early pill access, little direct information exists on their relevance for pill use in practice. As noted in Goldin and Katz [2002], only one publicly available data set in existence, the National Survey of Young Women (1971), contains information on both state of residence and contraceptive use among unmarried teenage women during the appropriate time period. With these data Goldin and Katz find that, in states with liberalized access, pill use was 36 to 40 percent greater among unmarried 17 to 19 year old women.[22] To bolster further the argument that liberalized access to the pill is, indeed, gener-

21. The history of these laws suggests that they were least likely to be influenced by Catholic, anticontraception political interests. For states changing through age of majority, the coefficient on fraction Catholic falls to 1.77 with a robust standard error of 1.70. Repeating the analysis presented in Table II for the age of majority states only yields one statistically significant relationship. A higher fraction of a state's population killed from 1965 to 1970 in Southeast Asia tended to hasten a reduction in the age of majority (correlation = −2.24, *s.e.* = 1.23). This provides empirical support for the political history: higher casualty rates increased pressure to change the legal age of majority, but the timing of these legal changes is not predicted using other state correlates.

22. Qualitative evidence also supports this claim. The journal of *Family Planning Perspectives* provided regular updates from 1968 to 1978 on changes in the age of majority and mature minor doctrines to inform physicians and family planning organizations of the permissiveness of often ambiguous state laws. Moreover, the Department of Health Education and Welfare commissioned a study in 1971 of differences in state laws with respect to fertility control [DHEW 1974]. Subsections of this report on young women's access to contraception regularly begin with references to the legal age of majority in a particular state as well as the other laws. It is also clear from these reports that state welfare agencies and public health departments developed rules regarding contraceptive access based upon legal restrictions in a given state.

ating the observed labor market effects through the mechanism of fertility control, I provide additional evidence that early access facilitated a delay in the age at first birth and that *only* women who delayed childbearing worked more in the paid labor market.

## IV. Data and Estimation Results

The June and March Supplements to the *CPS* consist of repeated cross sections (not annual in the case of the June Supplements) and contain detailed information on individual characteristics including retrospective information on the age at first birth and completed fertility (June Supplements); labor market participation including hours worked in the reference week, and weeks worked in the previous calendar year (March Supplements); and information on current residence (both surveys). For the June sample, I restrict my attention to women ages 36 to 44 at the time of observation as they are most likely to have begun (and completed) their childbearing.[23] The March sample is restricted to women between ages 18 and 44 years old who were not working in the military or incarcerated. I additionally omit observations with allocated values on the dependent variable (cf. Hirsch and Schumacher [2004]) and limit the analysis to women born between 1935 and 1960.

The June *CPS* provide an advantage over the decennial census, because in most years women were surveyed about the year in which their first child was born. The advantage of the March *CPS* lies in their annual collection that allows cohort behavior (defined by year of birth) to be tracked across ages.[24] Several features of these data, however, may minimize the estimated effects. First, the distribution of the pill for reasons other than birth control (e.g., to prevent cramps or regulate menses), otherwise unenforced legislation, the lack of financial accessibility, and cross-state travel to obtain the pill should bias my results toward zero. Neither the *CPS* nor other sources provide a way to account

23. Observing women in each cohort at age 44 would be ideal, but the first birth year is observed for the 1956 and younger cohorts in two years. I have chosen age 36 as a cutoff to retain a reasonable number of observations on year of first birth from these younger cohorts.

24. The decennial census only asks about children currently in the household, so the age at first birth cannot be computed for women with children living out of the household. For the labor-force estimates, decennial census provides snapshots only every ten years of labor-force participation for women born in a given year and, therefore, less information on age-specific labor-force participation by cohort.

for these possibilities or gauge the magnitude of attenuation they introduce, so the estimates should be regarded as conservative. Second, the *CPS* provide no information on a woman's state of birth nor the location of her residence around her twenty-first birthday. It is, therefore, necessary to assume that changes in legal access in the observed residence were relevant to the individual's decisions before age 21.[25] As time passes, women are less likely to be observed in the state where they resided at age 21, and, thus, this source of measurement error may be larger for older women.[26] However, a separate analysis using state of birth and state of residence in the decennial census suggests that the inability to observe state of residence around age 21 leads only to slight attenuation of the estimates.[27]

### *IV.A. The Impact of Early Access to the Pill on Age at First Birth*

Cross-state heterogeneity in legal access by year of birth facilitates estimation of the pill's average within-cohort effect on childbearing. I estimate equations of the following general form,

$$Y_{ics} = \alpha_0 + \alpha_1 ELA_{ics} + f_s + g_c + \varepsilon_{ics}, \quad (1)$$

where $Y$ denotes a fertility outcome, and $f_s$ and $g_c$ denote a set of state and individual year of birth dummy variables. State linear time trends ($f_s \cdot c$), included in some specifications, capture gradually evolving, unobserved state characteristics. Early legal access to the pill, *ELA*, is equal to one if women born in year $c$ would have had access to oral contraception before age 21 in their

25. For example, a 35-year-old woman observed in Massachusetts in 1985 would have been 24 when the Massachusetts liberalized access. Therefore, I code her as without early access, although I do not know where she was living before her twenty-first birthday.

26. Specifically, the estimated long-term effects of early access are based upon the sample of nonmovers. If nonmovers are women who do not take advantage of labor market opportunities in other states, the long-term effects of early access will also be underestimated.

27. Estimates obtained from the 1960 to 1990 Integrated Public Use Micro Samples suggest that measurement error is random and *not* due to, for instance, differential migration of career-minded women to states where they would have had early legal access, or *ELA* [Ruggles and Sobek 2004]. Using specifications comparable to those in Table IV and V, I generate two measures of *ELA:* one based on state of residence and one based on state of birth. While neither measure provides perfect information on state of residence around age 21, birth state may be a better proxy for the legal environment at that age. Moreover, birth state is not subject to migration bias induced by career decisions. Consistent with attenuation, using state of birth slightly increases the point estimates.

TABLE III
THE EFFECT OF EARLY LEGAL ACCESS TO THE PILL ON FERTILITY

| Dependent variable | 1 = First birth before age 22[a] | | | 1 = Before 19[b] | 1 = Before 36[c] | Children ever born[d] |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Mean dependent variable | | 0.497 | | 0.201 | 0.973 | 2.38 |
| ELA to pill | −0.071 | −0.076 | −0.093 | −0.011 | −0.001 | −0.062 |
| | [0.039] | [0.039] | [0.043] | [0.037] | [0.031] | [0.086] |
| Early legal access to abortion | | | −0.074 | −0.086 | −0.006 | 0.242 |
| | | | [0.057] | [0.045] | [0.006] | [0.120] |
| ELA to pill and abortion | | | 0.057 | 0.002 | 0.005 | −0.186 |
| | | | [0.082] | [0.065] | [0.008] | [0.114] |
| Fixed effects | S, C[e] | S, C, SxC[e,f] | S, C, SxC[e,f] | S, C, SxC[e,f] | S, C, SxC[e,f] | S, C, SxC[e,f] |
| Observations | 91791 | 91791 | 91791 | 91791 | 91791 | 91791 |
| Log-likelihood | −62118 | −61885 | −61866 | −43968 | −9892 | −145419 |

Synthetic birth cohorts are computed by using either the reported year of birth or, when this value is missing, subtracting the reported age in years from the year of the survey. Probits are used for the estimation for columns (1) through (5) and a least squares regression in column (7). The reported numbers are marginal effects evaluated at the mean. Robust standard errors are reported in brackets and are corrected for clustering on state of residence and year of birth cells. All computations are weighted. [a] The dependent variable is equal to one for individuals who had a first birth before age 22 conditional upon giving birth. [b] The dependent variable is equal to one for individuals who had a first birth before age 19 conditional upon giving birth. [c] The dependent variable is equal to one for individuals who had a first birth before age 36 conditional upon giving birth. [d] The dependent variable the reported number of children ever born to women with any children. [e] S and C denote sets of fixed effects for state of residence and year of birth. [f] SxC is a set of dummy variables for state interacted with a linear trend in year of birth. The results for columns (4), (5), and (6) without abortion controls are reported in footnote 32.

Sample: Women ages 36 to 44 who were born between 1935 and 1960.

*Source:* 1977–1995 June *CPS* (not including the years 1978, 1984, 1989, 1991, 1993, and 1994 when the survey or information on first birth was not collected).

current state of residence, $s$. *ELA* varies by year of birth, $c$, and state of residence, $s$, for women born from 1940 to 1956, but I also include cohorts born from 1935 to 1960 in order to control for preexisting trends.

Table III reports the marginal effects of early access on various measures of fertility. Probit specifications are used for the binary dependent variables in the first five columns, and the standard errors are corrected for clustering on state of residence and year of birth cells. Columns (1) through (3) present the estimates for the dependent variable equal to one for women giving birth before age 22 (or conceived by age 21) and zero for those having children at 22 or later. The baseline estimate in column (1) (without state trends) implies that early access to the

**0000082**

pill reduced the likelihood of a birth before age 22 by roughly 14 percent (−0.071/0.497).[28]

But is the effect causal? Identification of $\alpha_1$ in this framework comes from variation by year of birth and state of residence. With the inclusion of state and cohort fixed effects, identification is threatened if unobservable factors vary across states and within birth cohorts *or* within states and across birth cohorts with the proximate pattern of *ELA*. Moreover, in contrast to studies which use cross-state variation in the enactment of laws at the *same* level or branch of government which target a *specific* policy outcome, the laws used in this analysis were enacted at *different* levels of government and targeted *different* policy outcomes. Only indirectly did most of these laws extend access to oral contraception. Precisely this heterogeneity makes it difficult to come up with an alternative omitted variable, correlated with the timing of liberalization, which is not related to early legal access to the pill.

Nevertheless, it is instructive to consider several potential threats to the validity of a causal interpretation. For instance, gradual changes in the fraction Catholic, the growth in the women's movement, or other unobserved trends may have tipped legislators in favor of liberalization and induced women to delay childbearing independently of early legal access. Controlling for these forces directly is not possible in a state-cohort panel. However, the inclusion of state-specific linear time trends should capture unobserved factors within states that evolve smoothly across cohorts. Adding state trends in column (2), however, changes the results negligibly.

Another concern is that the effect of greater early access to abortion from 1970 to 1973 may be confounded with the effect of the pill among the younger cohorts. Directly controlling for early access to abortion in column (3), however, actually strengthens the magnitude and statistical significance of $\alpha_1$ among cohorts in states without early access to abortion (−0.093, *s.e.* = 0.043). In this specification, those with early legal access to abortion are 14 percent less likely (−0.074/0.497) to give birth before age 22, although the estimate is not statistically significant. As captured in the interaction of early legal access to the pill and abortion, the

28. The inclusion of women without children (zeros for the binary variable for first birth before 22) implies a 16 percent decline in the likelihood of a first birth before age 22.

effects are not appreciably different in states with both types of fertility control. This does not imply that abortion was unimportant, but early access to abortion does not appear to drive the results reported here.[29]

Yet another concern is that the development of a strong women's movement or the diffusion of labor-saving technologies in the household may be related to both legal changes and women's desire to have children and work. One way to test this hypothesis is to examine the correlation of these laws with proxies of a cohort's attitudes about motherhood and childrearing as revealed in their behavior. For instance, because the laws considered in the analysis generally lowered the age of pill access to eighteen, first births by age eighteen (conceptions at seventeen) should not be affected. Finding an effect of *ELA* on a group that should *not* have benefited from liberalization would suggest that *ELA* is picking up changes in other unobservables rather than earlier pill access. The very small and statistically insignificant estimate in column (4) bolsters the case that *ELA* did not affect women who were not generally "treated" with liberalization.

Another way to examine the effect of *ELA* on women's attitudes about motherhood uses measures of completed fertility. Women with and without *ELA* should be equally likely to achieve their target fertility levels, because, as noted previously, virtually every woman after 1960 obtained access to contraception at marriage, at age 21, or after bearing one child.[30] An ill-timed or unwanted birth among those without early access could be easily offset by reducing subsequent births with the pill. Therefore, a strong effect of *ELA* on completed fertility would suggest that *ELA* altered target fertility levels *or* that *ELA* is really capturing underlying changes in women's attitudes about motherhood and career. The data reject this hypothesis. By age 36, the marginal effect of *ELA* on the likelihood of bearing a child by age 36 among

29. For results on the importance of abortion for general fertility rates (not first birth rates), see Levine et al. [1999], or for labor-force outcomes see Angrist and Evans [1999]. Guldi [2005] provided careful research on legal access to abortion for unmarried women under the age of 21. Early access to abortion is coded as 1970 for Alaska, California, Hawaii, New York, and Washington, and 1972 is coded for Vermont and New Jersey. All other states permitted early legal access with *Roe v. Wade* in 1973.

30. See, for instance, Becker [1991, p. 143] who argues that fertility control should have little effect on the demand for children.

those ever having children falls very close to zero as presented in column (5).[31] Column (6) presents estimates of *ELA* on the number of children at the same age. In states without early access to abortion, the *ELA* appears unrelated to the number of children ever born by age 36.[32]

Finally, because *ELA* varies only for 18 to 20 year olds, one might argue that an effect should appear only for women in that age group. That is, *ELA* should have no effect on the likelihood of first birth by age 24 (conception at age 23). But if relaxing the constraints on young women's choices allowed them to select into different career trajectories, *ELA* may affect optimal birth timing well beyond age 21. The magnitude of this effect should erode, however, as more women select into motherhood. Consistent with this prediction, the effect of *ELA* on first births before age 23 is smaller, but still large and statistically significant (−0.086, *s.e.* = 0.044). The effect on first births before age 25, however, is relatively and absolutely smaller in magnitude and no longer statistically significant (−0.049, *s.e.* = 0.039). The effect on first births by age 27 is even smaller in magnitude and far from statistically significant (−0.021, *s.e.* = 0.034). Therefore, the labor market effects reported later in the paper should be viewed as arising from improvements in the timing of motherhood rather than through reductions in the number of children.

### *IV.B. The Effect of Early Access on Life Cycle Labor Supply*

The employment data in the March *CPS* provide annual work information from 1964 to 2001 and allow within-cohort, age-specific labor-force participation effects to be separated from the secular growth in women's market work. One shortcoming of the March data is that smaller states are grouped with others from 1968 to 1976. For this reason, the analysis examines 21 *CPS* regions (some individual states or D. C.) in order to capture consistent geographic units over the entire period. With this limitation, I redefine *ELA* in *CPS* region $r$ in year $t$ for a woman $j$ years beyond her twentieth birthday as

$$ELA_{r,t-j} = [P_{r,t-j}]^{-1} \sum_{s \in r} P_{s,t-j} \times 1(Law_{s,t-j}), \quad (2)$$

31. In results not reported here, I find that *ELA* also does not have a discernible effect on selection into childlessness.

32. Without controls for abortion, the point estimate in column (4) becomes −0.007 (*s.e.* = 0.018) and in column (5) becomes 0.009 (*s.e.* = 0.027). The point estimate in column (6) becomes −0.119 (*s.e.* = 0.072).

where $P_{r,t-j}$ denotes the population of region $r$ in year $t-j$ and $P_{s,t-j}$ denotes the population of state $s$ in region $r$ in the year $t-j$, the date of the woman's twentieth birthday [U.S. Census Bureau, 1967, 1968, 1971, 1981, 1983, 1991, 2001]; and 1( ) is an indicator function equal to one if state $s$ had a liberal access law in year $t-j$.[33] Thus, this variable can be interpreted as the probability that a woman currently residing in region $r$ in year $t$ would have had access to contraception before her twenty-first birthday, assuming that she had not moved. This probabilistic approach introduces yet more error into the measurement of *ELA*.[34]

The base specification allows *ELA* to alter the shape of women's labor-force participation profiles through its interaction with a set of categorical age dummies denoted by vector $\boldsymbol{A}$.[35] I estimate equations of the general form,

$$(3) \qquad Y_{icar} = \beta_0 + \boldsymbol{A}_{icar}\beta_1 + ELA_{cr} \times \boldsymbol{A}_{icar}\beta_2 + f_r + g_c + h_{c+a} + \varepsilon_{icar},$$

where $c$ refers to the year of birth, $r$ to the *CPS* region, and $a$ to the age of individual $i$. The fixed-effects $f_r$, $g_c$, and $h_{c+a}$ denote dummies for *CPS* region, year of birth (cohort), and year of observation, respectively. I include region-specific linear time trends ($f_r \cdot c$) in some specifications to capture gradually evolving, unobserved state characteristics that may have changed labor-force outcomes independently of the pill. In this specification, each element of $\beta_2$ captures the average, age-group specific, within-cohort, within-state impact of early legal access to the pill.

Table IV reports estimates of the marginal effects of *ELA* on the extent of labor-force participation. A probit specification is used for the binary dependent variable for labor-force participation, i.e., worked or looked for work for most of the week prior to the survey. The estimates in columns (1) and (2) (the base-line specification with and without region-specific linear time trends, respectively) are quite similar. With early legal access, the par-

33. *ELA* varies by birth year and *CPS* region, since $t$ and $j$ uniquely define a birth cohort. Year of birth is $t - j - 20$.

34. I examine aggregation error by limiting the analysis to the years 1977–2001, a period over which the *CPS* individually identifies all the states. Controlling for individual state fixed effects rather than *CPS* region fixed effects does not substantially alter the estimates.

35. The elements of $\boldsymbol{A}$ are five dummy variables equal to one if a woman falls in the particular age category. The categories are 21 to 25, 26 to 30, 31 to 35, 36 to 40, and 41 to 45. The category 16 to 20 is omitted.

TABLE IV
THE EFFECT OF EARLY ACCESS TO CONTRACEPTION ON LABOR MARKET PARTICIPATION

| Dependent variable | Mean dependent variable[a] | 1 = In the labor force | | | | |
|---|---|---|---|---|---|---|
| | | March *CPS* | | | | June *CPS* |
| | | (1) | (2) | (3) | (4) | (5) |
| ELA to pill × 21–25 | 0.605 | 0.003<br>[0.006] | 0.005<br>[0.006] | −0.003<br>[0.008] | 0.009<br>[0.009] | −0.048<br>[0.059] |
| ELA to pill × 26–30 | 0.580 | 0.039<br>[0.007] | 0.042<br>[0.006] | 0.040<br>[0.009] | 0.028<br>[0.010] | 0.005<br>[0.022] |
| ELA to pill × 31–35 | 0.640 | 0.016<br>[0.006] | 0.019<br>[0.006] | 0.022<br>[0.009] | 0.019<br>[0.010] | 0.004<br>[0.021] |
| ELA to pill × 36–40 | 0.711 | −0.002<br>[0.007] | 0.002<br>[0.006] | 0.004<br>[0.010] | 0.007<br>[0.008] | 0.001<br>[0.023] |
| ELA to pill × 41–44 | 0.752 | −0.006<br>[0.008] | −0.003<br>[0.008] | −0.007<br>[0.012] | −0.007<br>[0.008] | 0.091<br>[0.042] |
| Fixed effects | | R, Y, C[b] | R, Y, C, RxYear[c] | R, Y, C, RxYear[c] | R, Y, C, RxYear[c] | S, Y, C, SxYear[d] |
| Age of majority states | | | | X | | |
| Abortion controls[e] | | | | | X | X |
| First birth before 22[f] | | | | | | Yes |
| Observations | | 733419 | 733419 | 245943 | 733419 | 103972 |
| Log likelihood | | −454635 | −454359 | −150263 | −454341 | −59671 |

Synthetic birth cohorts are computed by subtracting the reported age from the year of the survey. The dependent variable is equal to one if a woman worked in the reference week, looked for a job, or was with a job but not at work. The reported numbers are marginal effects evaluated at the mean. Robust standard errors are reported in brackets and are corrected for clustering on state of residence and year of birth cells. [a] This is the mean of the dependent variable for the estimation sample in each age group in the March *CPS*. [b] R, Y, and C denote sets of fixed effects for *CPS* region, year of observation, and year of birth. [c] RxYear is a set of dummy variables for *CPS* region interacted with a linear time trend. [d] S denotes a set of dummy variables for state of residence. SxYear denotes the interaction of state dummies with linear time trends. [e] Abortion controls are generated in the same manner as in Table III. Early access to abortion is interacted with dummies for the age categories presented in the analysis and triple interaction terms, ELA × early access to abortion × age dummies are included as well. [f] A sample of women from the June *CPS* who reported a first birth before age 22.

Sample: Women ages 16 to 45 not in the military or inmates born from 1935 to 1960.

*Source:* 1964–2001 March *CPS*, 1977–1995 June *CPS*.

ticipation rates of women ages 26 to 30 were around four percentage points higher (an increase of 7 percent) and approximately two percentage points higher at ages 31 to 35 at the mean. However, there are no discernible effects for women ages 21 to 25 or among women over age 35. Columns (3) and (4) examine the robustness of these results within the sample of age of majority

states and to the inclusion of measures of early abortion access.[36] The estimates presented in column (4) can be interpreted as the marginal effects of early access to the pill for cohorts reaching the age of 21 for cohorts without early legal access to abortion. In both cases, the results remain within a 95 percent confidence interval of those obtained from the baseline specification.[37]

The paper's evidence, thus far, suggests that the mechanism responsible for changes in women's labor-force participation is the delay in childbearing. If this is correct, then women *with ELA* who did *not* delay childbearing should *not* be observed working more. Said another way, if the labor market participation rates of these women are greater than women without *ELA,* one would suspect that the estimated effects reflect unobserved factors rather than the treatment effects of early access. Column (5) of Table IV uses the limited labor-force information in the June *CPS* to test this.[38] The absence of an effect among women who gave birth before age 22 across ages provides strong evidence for the delay of childbearing as the mechanism linking increased labor-force participation to the pill.

The lack of an effect at ages 21 to 25 is consistent with Goldin and Katz [2002], who argue that *ELA* facilitated greater human capital investment, as well as with the literature linking teenage childbearing to reductions in human capital acquisition through

36. Early access to abortion is defined using the same methodology as *ELA*. The regressions with abortion control include the measure of abortion described in footnote 29 interacted with *A*.

37. I also investigate the effect of Vietnam on women's outcomes independent of changes in the age of majority. If coming of age during Vietnam held different reasons for women to defer marriage, childbearing, or to invest more in formal market work, then changes in the age of majority related to mobilization may be related to women's decisions for reasons other than pill access. On the other hand, draft deferments for being a father or married may have worked to promote earlier marriage or childbearing. After allowing for an age-specific effect of the number of casualties in Vietnam as a fraction of the region's population in a given year (this variable is nonzero from 1965 to 1976), the effect of early access for 26 to 30 year olds and 31 to 35 year olds is quite comparable to the marginal effects presented.

38. The June *CPS* only contain information on state of residence and age of first birth for the years 1977 to 1995 (not including 1978, 1984, 1989, 1991, 1993, and 1994). Because there are fewer cross sections in the June *CPS*, the point estimates for younger age groups represent effects among the younger cohorts, and the point estimates for older age groups represent the effects among the older cohorts (rather than an average over all of the cohorts in each age group as in the March *CPS* estimates). For women with a first birth after age 22 conditioning on age of first birth, the point estimates and standard errors on *ELA* interacted with each age group dummies in column (5) of Table IV are −0.011 (*s.e.* = 0.043) for ages 21–25, 0.027 (*s.e.* = 0.016) for ages 26–30, 0.015 (*s.e.* = 0.015) for ages 31–35, 0.016 (*s.e.* = 0.016) for ages 36–40, −0.002 (*s.e.* = 0.018) for ages 41–44.

0000088

labor-force participation (cf. Klepinger, Lundberg, and Plotnick [1999]). If younger women with early access spent more time in school, then they may not work more. This is supported using a *CPS* question about what the respondent was doing "most of last week." From 1964 to 1988 an individual not in the labor force could respond that the reason for not working for pay was that she was "in school." For women ages 16 to 30, I estimate a probit model using the baseline specification in Table IV with a binary dependent variable equal to 1 if a woman reported being "in school" rather than being in the paid labor force. I replace the five-year age dummies with six, two-year age dummies and their interaction with *ELA* for women ages 18 to 20, 21 to 22, and so forth. *ELA* is associated with a 0.043 (*s.e.* = 0.008) percentage point increase in enrollment among women 18 to 20, 0.047 percentage point increase at ages 21 to 22 (*s.e.* = 0.008), and 0.023 percentage point increase at ages 23 to 24 (*s.e.* = 0.005).[39] There appears to be no effect on enrollment over age 24.

The lack of a difference in labor-force participation between women with and without *ELA* at older ages is more difficult to assess using the *CPS*. First, women who bore their children during their twenties may be returning to the labor market during their later thirties. Thus, the econometrician would observe a falling difference in labor force outcomes between the two groups as more women without ELA reenter the labor force. Second, as women age, they are less likely to reside in the same state as at age 21, so measurement error due to migration may obscure the effect as women age.

Changes in the intensity of labor supply underscore the possibility of changing career investment in the form of market work as well. Table V presents the regression results for three dependent variables: hours worked, weeks worked, and the product of the two that provides a proxy for annual hours worked.[40] Across the three dependent variables, the pattern of results is quite similar to those at the extensive margin. The impact on the three measures is largest at ages 26 to 30, when women with early legal access appear to be working 68 to 107 more annual hours (or 1.7

39. The cell means for the dependent variable "In school" among workers not working for pay is .258 for women ages 18 to 20, 0.096 for ages 21 to 22, 0.029 for ages 23 to 24, 0.018 for ages 25 to 26, 0.014 for ages 27 to 28, and 0.011 for ages 29 to 30.

40. As the March *CPS* reports intervals for weeks worked before 1976, I use the interval means suggested by Unicon in the estimation.

Exhibit 127

TABLE V
THE EFFECT OF EARLY ACCESS TO CONTRACEPTION ON INTENSITY OF MARKET WORK

| Dependent variable | Hours worked last week[a] | | | Weeks worked last year[b] | | | Implied annual hours[c] | | |
|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| ELA × 21–25 | 0.206 | −0.442 | 0.535 | −0.257 | −0.625 | 0.044 | 7.81 | −19.3 | 28.3 |
| | [0.229] | [0.389] | [0.361] | [0.257] | [0.427] | [0.396] | [10.4] | [17.5] | [17.9] |
| ELA × 26–30 | 2.34 | 1.68 | 1.5 | 2.34 | 1.66 | 1.43 | 107 | 73.5 | 68.5 |
| | [0.285] | [0.497] | [0.411] | [0.320] | [0.525] | [0.481] | [13.4] | [23.8] | [20.8] |
| ELA × 31–35 | 1.51 | 1.63 | 0.975 | 1.73 | 1.54 | 1.33 | 71.2 | 72.1 | 50.3 |
| | [0.270] | [0.441] | [0.425] | [0.308] | [0.494] | [0.493] | [13.4] | [22.6] | [21.3] |
| ELA × 36–40 | 0.555 | 0.905 | 0.422 | 0.544 | 1.01 | 0.233 | 29.1 | 47.0 | 18.2 |
| | [0.268] | [0.457] | [0.334] | [0.309] | [0.507] | [0.412] | [14.1] | [25.0] | [17.3] |
| ELA × 41–44 | 0.464 | 0.871 | 0.512 | 0.316 | 0.332 | 0.203 | 29.4 | 46.9 | 31.2 |
| | [0.298] | [0.497] | [0.352] | [0.358] | [0.614] | [0.371] | [15.6] | [26.8] | [18.3] |
| Fixed effects | R, Y, C, RxYear[d] | R, Y, C, RxYear[d] | R, Y, C, RxYear[d] | R, Y, C, RxYear[d] | R, Y, C, RxYear[d] | R, Y, C, RxYear[d] | R, Y, C, RxYear[d] | R, Y, C, RxYear[d] | R, Y, C, RxYear[d] |
| Age of majority states | | X | | | X | | | X | |
| Abortion controls | | | X | | | X | | | X |
| Observations | 730384 | 244661 | 730384 | 733419 | 245943 | 733419 | 730384 | 244661 | 730384 |
| Adjusted $R^2$ | 0.066 | 0.056 | 0.066 | 0.073 | 0.058 | 0.073 | 0.088 | 0.079 | 0.088 |

Synthetic birth cohorts are computed by subtracting the reported age from the year of the survey. All computations are weighted. Robust standard errors are reported in brackets and are corrected for clustering on state of residence and year of birth cells. [a] The number of hours that were worked in the *CPS* reference week. [b] The number of weeks that were worked in the previous calendar year. [c] The product of [a] and [b]. [d] R, Y, and C denote sets of fixed effects for *CPS* region, year of observation, and year of birth. RxYear denotes a set of dummy variables for *CPS* region interacted with a linear time trend.

Sample: Women ages 16 to 45 not in the military or inmates born 1935 to 1960.

*Source:* 1964–2001 March *CPS*.

a. The number of hours that were worked in the CPS reference week. The variable mean at ages 21–25 is 19.2, at ages 26–30 is 18.6, at ages 31–35 is 20.7, at ages 36–40 is 23.7, and at ages 41–44 is 26.7.

b. The number of weeks that were worked in the previous calendar year. The variable mean at ages 21–25 is 27.0, at ages 26–30 is 26.5, at ages 31–35 is 29.4, at ages 36–40 is 32.2, and at ages 41–44 is 35.9.

c. The product of hours worked last week and weeks worked last year. The variable mean at ages 21–25 is 800, at ages 26–30 is 819, at ages 31–35 is 944, at ages 36–40 is 1117, and at ages 41–44 is 1283.

0000090

JA-0001655

to 2.7 more full-time weeks per year). This suggests that cohorts with early legal access acquired at least 650 more hours of work experience per person by age 35 than their peers without early access.[41] *ELA* appears to have no effect on work intensity at ages under 24 or above 36. Because these estimates are conditional upon being in the workforce, selection makes them difficult to interpret. On the one hand, negative selection into the labor force at the extensive margin would tend to bias the estimates for hours and weeks worked downwards for younger women (as the most productive and educated women were already working). On the other hand, early access may have affected selection in a less straightforward manner, as women reorganized the traditional sequence of childbearing and work to suit the pursuit of both family and career. While the *CPS* data do not allow me to weigh the relative importance of these possibilities, more research on the changing age structure of women's employment and child-bearing and its relationship to contraception is certainly warranted.

### *IV.C. The Effect of Early Access through Career Choice and Human Capital Accumulation*

Labor market participation effects at the extensive and intensive margins are consistent with the notion that *ELA* to the pill changed women's lifetime career paths. Economic theory suggests that these effects may arise from greater human capital investments and changing career choices [Goldin and Katz 2002]. Using the limited information on occupation in the *CPS,* I generate eight, crude but comparable career dummies as well as a set of dummy variables for highest grade attended in school before 1992. The inclusion of only occupation dummies interacted with **A** in equation (3) reduces the size of the effect on *ELA* at ages 26 to 30 on women's labor-force participation by around two-thirds (extent: 0.013, *s.e.* = 0.008, annual hours: 46.0, *s.e.* = 23.1).[42] The inclusion of only education dummies interacted with **A** reduces the point estimates for the same age group by approximately

41. Cohorts of women who would have been in the labor force without *ELA* should have gained 68.5 additional annual hours for five years during their late twenties and 50.3 during their early thirties for a total of 594 hours. In addition, the number of women working in cohorts with *ELA* was larger because labor-force participation increased at the extensive margin as well adding another 58 hours.

42. These figures are obtained by running the specification in column (4) of Table IV and column (9) of Table V.

Case 2:17-cv-04540-WB Document 253-8 Filed 09/29/20 Page 140 of 159

one-third (extent: 0.026, *s.e.* = 0.009, annual hours: 56.0, *s.e.* = 18.7). The inclusion of both occupational and education dummies interacted with ***A*** drives the effect of *ELA* on being in the labor market to zero, and the effect on annual hours worked remains only marginally statistically significant at 43.0 (*s.e.* = 22.4).[43] It seems fair to conclude that net of changes in occupation and education, *ELA* appears to have had little effect on women's market work. These results reinforce the claim that changing career trajectories, resulting from delay in childbearing, constitute the primary mechanism connecting early access to the pill to increases in labor-force participation.

## V. More Power to the Pill

Economists have been hesitant to credit fertility control with shaping women's postwar labor supply. Instead, studies have emphasized real wage growth for women [Smith and Ward 1985, 1989; Goldin 1990], falling discrimination including the elimination of marriage bars [Goldin 1988, 1990], rising demand for labor in the clerical sector [Goldin 1984; Smith and Ward 1985], the growing demand for highly skilled workers [Black and Juhn 2000; Welch 2000], and the diffusion of labor-saving technologies within the household [Greenwood, Seshadri, and Yorukoglu 2005]. This paper's results do not discount the importance of these factors in reshaping women's employment decisions. On the contrary, oral contraceptives might have mattered very little in the absence of these changes. It was, however, within the social, legal, and economic context of the 1960s and 1970s that the pill provided a powerful tool for women wishing to capitalize on the emerging labor market opportunities.

While this analysis can provide only a rough approximation of its importance, oral contraception appears to have had large and permanent effects on young women's fertility and labor market activity. Using plausibly exogenous changes in laws restricting the age at which young women could consent to medical care, I find that cohorts with earlier legal access to the pill had fewer births before age 21 and worked more for pay during their late twenties and early thirties. The estimates are surprisingly strong

43. The remaining effect on annual hours worked may be due to imprecise proxies for occupation in the *CPS*.

0000092

Exhibit 127 JA-0001657

and quite robust, despite the fact that data limitations—including the inability to observe whether laws were enforced, whether young women could pay for the pill, and whether doctors actually prescribed pills to younger women—tend to attenuate the estimates.

There are other reasons to believe that the estimates of the pill's impact are conservative. Reliance on variation in *early access* to the pill does not allow the effects of access to the pill at age 21 (or later) to be estimated. Furthermore, within-cohort comparisons do not account for the possibility that greater access to the pill had spillover effects across cohorts within states or within cohorts across states. For instance, early access to the pill may have altered norms governing women's labor market roles in addition to its effects on individual women's decisions. In the estimation, however, these effects are captured in the year of birth fixed effects and state-trends. Yet even these conservative estimates suggest that from 1970 to 1990 early access to the pill can account for 3 of the 20 percentage point increase (14 percent) in labor-force participation rates and 67 of the 450 increase in annual hours worked (15 percent) among women ages 16 to 30 year olds.[44]

Broadly speaking, this paper advances the hypothesis that greater fertility control contributed to the boom in young women's market work from 1970 to 1990. More importantly, the findings provoke larger questions about the influence of better birth control on many other outcomes of interest, including family formation, childrearing, education, and wage growth. Further study of the importance of oral contraceptives—as well as other methods of reliable contraception—may advance our understanding of the origins of the second demographic transition and the epochal changes in women's work over the course of the twentieth century.

UNIVERSITY OF MICHIGAN

44. Using the estimates from the baseline model in equation (3) (including abortion controls), I generate counterfactuals of labor-force participation by assuming that no state had a law that permitted early legal access. That is, I replace *ELA* with zero and predict the baseline model. This allows me to capture how changing cohort size or year specific effects (like *Roe v. Wade* or the U. S. business cycle), state trends and the secular increase in cohort participation would have affected women's participation in the absence of liberalization. I then attribute the difference in the simulated and the observed participation rates to early access. As with any counterfactual computation, these numbers should be viewed cautiously.

## References

Angrist, Joshua D., and William N. Evans, "Children and Their Parents' Labor Supply: Evidence from Exogenous Variation in Family Size," *American Economic Review,* LXXXVIII (1998), 450–477.

Angrist, Joshua D., and William N. Evans, "Schooling and Labor Market Consequences of the 1970 State Abortion Reforms," *Research in Labor Economics,* XVIII (1999), 75–113.

Becker, Gary S. *A Treatise on the Family, enlarged edition* (Cambridge, MA: Harvard University Press, 1991).

Black, Sandra, and Chinhui Juhn, "The Rise in Female Professionals: Are Women Responding to Skill Demand?" *American Economic Review,* CX (2000), 450–455.

Brandt, Allan M., *No Magic Bullet: A Social History of Veneral Disease in the United States Since 1880* (New York, NY: Oxford University Press, 1985).

Brodie, Janet Farrell, *Contraception and Abortion in 19th Century America* (Ithaca, NY: Cornell University Press, 1994).

Bronars, Steven G., and Jeffrey Grogger, "The Economic Consequences of Unwed Motherhood: Using Twin Births as a Natural Experiment," *American Economic Review,* LXXXIV (1994), 1141–1156.

*Current Population Surveys,* March 1964–2001 [machine readable data files]/ conducted by the Bureau of the Census for the Bureau of Labor Statistics (Washington, DC: Bureau of the Census [producer and distributor], 1984–2001; Santa Monica, CA: Unicon Research Corporation [producer and distributor of *CPS* Utilities], 2003).

Department of Health and Economic Welfare (DHEW) Center for Family Planning Program Development (Planned Parenthood—World Population), *Family planning, contraception, and voluntary sterilization: an analysis of laws and policies in the United States, each State and jurisdiction (as of September 1971): a report of the National Center for Family Planning Services, Health Services and Mental Health Administration* (Rockville, MD: U. S. DHEW, Publication No. 74-16001, 1974).

Division of Vital Statistics, Center for Health Statistics, "Table 1–2 First Birth Rates by Age of Mother, According to Race and Hispanic Origin: United States, Specified Years 1940–1955 and Each Year 1960–1994," in *National Statistical Tables on Births* (2003).

Garrow, David, *Liberty and Sexuality: The Right to Privacy and the Making of Roe v. Wade* (New York, NY: Macmillan, 1994).

Goldin, Claudia, "The Historical Evolution of Female Earnings Functions and Occupations," *Explorations in Economic History,* XXI (1984), 1–27.

——, "Marriage Bars: Discrimination against Married Women Workers, 1920 to 1950," National Bureau of Economic Research Working Paper No. 2747, 1988.

——, *Understanding the Gender Gap: An Economic History of American Women* (New York, NY: Oxford University Press, 1990).

——, "The Rising (and then Declining) Significance of Gender," in F. Blau, M. Brinton, and D. Grusky, eds., *The Declining Significance of Gender*? (New York, NY: The Russell Sage Press, forthcoming).

Goldin, Claudia, and Lawrence Katz, "The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions," *Journal of Political Economy,* CX (2002), 730–770.

Greenwood, Jeremy, Anath Seshadri, and Mehmet Yorukoglu, "Engines of Liberation," *Review of Economic Studies,* LXXII (2005), 109–133.

Guldi, Melanie, "Abortion or the Pill—Which Matters More? The Impact of Access on the Birthrates of Young Women," mimeo, University of California, Davis, 2005.

Happel, S., J. Hill, and S. Low, "An Economic Analysis of the Timing of Childbirth," *Population Studies,* XXXVIII (1984), 299–311.

Hirsch, Barry T., and Edward J. Schumacher, "Match Bias in Wage Gap Estimates Due to Earnings Imputation," *Journal of Labor Economics,* XXII (2004), 689–722.

Hotz, V. Joseph, Susan McElroy, and Seth Sanders, "The Impact of Teenage Childbearing on the Mothers and the Consequences of those Impacts for

Government," in R. Maynard, ed., *Kids Having Kids: Economic Costs and Social Consequences of Teen Pregnancy* (Washington, DC: The Urban Institute Press, 1997).

Hotz, V. J., Jacob Alex Klerman, and Robert J. Willis, "The Economics of Fertility in Developed Countries," in M. R. Rosezweig and O. Stark, eds., *Handbook of Population and Family Economics* (Amsterdam: Elsevier, 1997), pp. 275–342.

Jacobsen, Joyce P., James Wishart Pearce III, and Joshua L. Rosenbloom, "The Effects of Childbearing on Married Women's Labor Supply and Earnings: Using Twin Births as a Natural Experiment," *Journal of Human Resources,* XXXIV (1999), 449–474.

Klepinger, Daniel, Shelly Lundberg, and Robert Plotnick, "How Does Adolescent Fertility Affect Human Capital and Wages of Young Women?" *Journal of Human Resources,* XXXIV (1999), 421–448.

Levine, Phillip, Douglas Staiger, Thomas J. Kane, David J. Zimmerman, "Roe v. Wade and American Fertility," *American Journal of Public Health,* LXXXIX (1999), 199–203.

Marks, Lara V., *Sexual Chemistry: A History of the Contraceptive Pill* (New Haven, CT: Yale University Press, 2001).

Michael, Robert T., and Robert J. Willis, "Contraception and Fertility: Household Production under Uncertainty," in *Demographic Behavior of the Household* (Cambridge, MA: National Bureau of Economic Research, 1972).

Miller, Amalia, "Effects of Motherhood Timing on Career Path," manuscript, University of Virginia, 2005.

Mincer, Jacob, and Solomon Polachek, "Family Investments in Human Capital: Earnings of Women," *Journal of Political Economy,* LXXXII (1974), S76–S108.

National Council of the Churches of Christ in the U.S.A., *Churches and Church Membership in the United States: An Enumeration,* Series A, No. 3, 1956.

National Archives at College Park, "[Southeast Asia] Combat Area Casualties Current File (CACCF), as of November 1997" (Washington, DC: Records of the Office of the Secretary of Defense, Record Group 330, electronic record, 1997).

Paul, Eve, Harriet Pilpel, and Nancy Wechsler, "Pregnancy, Teenagers and the Law, 1974," *Family Planning Perspectives,* VI (1974), 142–147.

Paul, Eve, Harriet Pilpel, and Nancy Wechsler, "Pregnancy, Teenagers and the Law, 1976," *Family Planning Perspectives,* VIII (1976), 16–21.

Pilpel, Harriet, and Nancy Wechsler, "Birth Control, Teenagers and the Law: A New Look, 1971," *Family Planning Perspectives,* III (1971), 37–45.

Ruggles, Steven, Matthew Sobek, et al., *Integrated Public Use Microdata Series* (Minneapolis, MN: Historical Census Projects, University of Minnesota, 2004).

Smith, James P., and Michael Ward, "Time Series Growth in the Female Labor Force," *Journal of Labor Economics,* III (1985), S59–S90.

Smith, James P., and Michael Ward, "Women in the Labor Market and in the Family," *Journal of Economic Perspectives,* III (1989), 9–23.

Tone, Andrea, *Devices and Desires: A History of Contraceptives in America* (New York, NY: Hill and Wang, 2001).

U. S. Census Bureau, *Statistical Abstract of the United States* (Washington, DC: U. S. Department of Commerce, Economics and Statistics Administration, Bureau of the Census, Data User Services Division, 1967, 1968, 1971, 1981, 1983, 1991, 2001).

Valdiserri, Ron O., "*Cum Hastis Sic Clypeatis:* The Turbulent History of the Condom," *Bulletin of the New York Academy of Medicine,* LIV (1988), 237–245.

Vere, James P., "Dragon Children: Identifying the Causal Effect of the First Child on Female Labor Supply with the Chinese Lunar Calendar," Economics Working Paper Archive at WUSTL No. 407003, October 18, 2004.

Weiss, Yoram, "The Determination of Life-Time Earnings: A Survey," in O. Ashenfelter and R. Layard, eds., *Handbook of Labor Economics* (Amsterdam: North-Holland, 1986).

Welch, Finis, "Growth in Women's Relative Wages and in Inequality among Men: One Phenomenon or Two?" *American Economic Review,* XC (2000), 444–449.

Willis, Robert J., "A New Approach to the Economic Theory of Fertility Behavior," *Journal of Political Economy,* LXXXI (1973), S14–S64.

Copyright of Quarterly Journal of Economics is the property of MIT Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

■■ REVIEW

# Birth Spacing and Risk of Adverse Perinatal Outcomes
## A Meta-analysis

Agustin Conde-Agudelo, MD, MPH

Anyeli Rosas-Bermúdez, MPH

Ana Cecilia Kafury-Goeta, MD

B OTH SHORT AND LONG INTER-
vals between pregnancies have
been associated with in-
creased risk of several adverse
perinatal outcomes, such as preterm
birth, low birth weight (LBW), small for
gestational age (SGA), and perinatal
death.[1-3] However, there has been dis-
agreement on whether the relation-
ship is due to confounding by other risk
factors. For example, some research-
ers have argued that short intervals be-
tween pregnancies merely designate
women already at higher reproductive
risk, either because of underlying dis-
orders, socioeconomic status, or life-
style factors.[4,5] Furthermore, previous
research in this area has several meth-
odological limitations, such as small
sample size, lack of control for poten-
tial confounding factors, dichotomiza-
tion of the measure of birth spacing on
the basis of an arbitrarily defined cut
point, and use of birth interval (time
elapsed between the woman's last de-
livery and the birth of the index child)
instead of interpregnancy interval (time
elapsed between the woman's last de-
livery and the conception of the next
pregnancy) as the measure of birth
spacing. The use of birth intervals over-
estimates the risk of adverse perinatal
outcomes for very short intervals be-
tween pregnancies.

**For editorial comment see p 1837.**

**Context** Both short and long interpregnancy intervals have been associated with an increased risk of adverse perinatal outcomes. However, whether this possible associa-
tion is confounded by maternal characteristics or socioeconomic status is uncertain.

**Objective** To examine the association between birth spacing and relative risk of ad-
verse perinatal outcomes.

**Data Sources** Studies published in any language were retrieved by searching MEDLINE
(1966 through January 2006), EMBASE, ECLA, POPLINE, CINAHL, and LILACS, pro-
ceedings of meetings on birth spacing, and bibliographies of retrieved articles, and by
contact with relevant researchers in the field.

**Study Selection** Included studies were cohort, cross-sectional, and case-control stud-
ies with results adjusted for at least maternal age and socioeconomic status, reporting risk
estimates and 95% confidence intervals (or data to calculate them) of birth spacing and
perinatal outcomes. Of 130 articles identified in the search, 67 (52%) were included.

**Data Extraction** Information on study design, participant characteristics, measure
of birth spacing used, measures of outcome, control for potential confounding fac-
tors, and risk estimates was abstracted independently by 2 investigators using a stan-
dardized protocol.

**Data Synthesis** A random-effects model and meta-regression analyses were used to
pool data from individual studies. Compared with interpregnancy intervals of 18 to 23
months, interpregnancy intervals shorter than 6 months were associated with increased
risks of preterm birth, low birth weight, and small for gestational age (pooled adjusted
odds ratios [95% confidence intervals]: 1.40 [1.24-1.58], 1.61 [1.39-1.86], and 1.26 [1.18-
1.33], respectively). Intervals of 6 to 17 months and longer than 59 months were also
associated with a significantly greater risk for the 3 adverse perinatal outcomes.

**Conclusions** Interpregnancy intervals shorter than 18 months and longer than 59
months are significantly associated with increased risk of adverse perinatal outcomes.
These data suggest that spacing pregnancies appropriately could help prevent such
adverse perinatal outcomes.

*JAMA. 2006;295:1809-1823*                                    www.jama.com

This issue is relevant to public health
and clinical practice because if short
and/or long interpregnancy intervals are
found to be independently associated
with increased risk of adverse perina-
tal outcomes, birth spacing might then
be considered an intervention to pre-
vent such adverse outcomes, mainly in
the developing world. Therefore, we
performed a systematic review, includ-
ing meta-analysis, of the relationship

between birth spacing and the risk of
adverse perinatal outcomes that pro-
vided an overall summary of the effect

**Author Affiliations:** Centro de Estudios e Investiga-
ción en Salud and Department of Obstetrics and Gy-
necology, Fundación Santa Fe de Bogotá, Bogotá, Co-
lombia (Dr Conde-Agudelo); Department of Biostatistics,
Universidad Autonoma de Occidente, Cali, Colombia
(Ms Rosas-Bermúdez); and Clínica Materno-Infantil Los
Farallones, Cali, Colombia (Dr Kafury-Goeta).
**Corresponding Author:** Agustin Conde-Agudelo, MD,
MPH, Calle 58 No. 26-60, Palmira-Valle, Colombia
(condeagu@uniweb.net.co).

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

Exhibit 128                                    **000559**                                    JA-0001662

measure and determined both the riskiest and the optimal interpregnancy intervals. In addition, we determined whether estimates of the effect measure depend on dimensions of study quality of the primary studies and whether the relationship differs in subgroups defined by the characteristics of women, and we highlight deficits that need to be addressed in future studies.

## METHODS

We used a prospective protocol prepared specifically for this purpose. The systematic review was conducted following this protocol and reported using the checklist proposed by the Meta-analysis of Observational Studies in Epidemiology (MOOSE) group for reporting of systematic reviews of observational studies.[6]

### Identification of Studies

A search was conducted by the investigators in MEDLINE (1966 through January 2006), EMBASE (1980 through January 2006), ECLA (1980 through January 2006), POPLINE (1980 through January 2006), CINAHL (1982 through January 2006), and LILACS (1982 through January 2006), using a combination of Medical Subject Headings or key word terms for birth spacing and adverse perinatal outcomes. Terms for birth spacing included *interpregnancy interval*, *birth interval*, *interbirth interval*, *pregnancy spacing*, *pregnancy interval*, *birth spacing*, *intergenesic interval*, *birth to birth interval*, *birth to conception interval*, *delivery to conception interval*, and *interdelivery interval*. Terms for adverse perinatal outcomes included *perinatal outcomes*, *infant outcomes*, *pregnancy outcomes*, *adverse outcomes*, *low birth weight*, *preterm delivery*, *preterm birth*, *small for gestational age*, *intrauterine growth retardation*, *intrauterine growth restriction*, *Apgar scores*, *neonatal depression*, *neonatal intensive care unit*, *fetal death*, *stillbirth*, *perinatal death*, *fetal mortality*, *perinatal mortality*, *perinatal morbidity*, *perinatal outcomes*, *neonatal death*, *neonatal mortality*, and *neonatal outcomes*. Proceedings of several international meetings on birth spacing and bibliographies of the retrieved articles were also searched by hand. No language restrictions were imposed. In the case of studies discussing more than 1 outcome, each outcome was considered independently. To find unpublished studies, we contacted relevant researchers in the field. Twelve authors were contacted as well, in an attempt to obtain additional data.

### Inclusion Criteria

Studies were included if (1) they were cohort, cross-sectional, or case-control studies that evaluated the relationship between birth or interpregnancy interval and any adverse perinatal outcome; (2) the definition of interpregnancy interval corresponded to the period between delivery of the previous infant and conception of the current pregnancy. Although the use of birth-to-birth interval overestimates the risks of adverse perinatal outcomes for very short intervals, studies using birth interval were included and analyzed separately; and (3) the authors of the studies adjusted their results for at least maternal age and socioeconomic status (measured indirectly by occupation and work status, educational level, income, housing, or other variables), because we considered these variables to be the most important confounding factors in the association between birth spacing and adverse perinatal outcomes. Studies were excluded from the systematic review if they were case series or reports, editorials, letters to the editor, or reviews without original data; if they exclusively used univariate analysis; if they did not adjust for at least maternal age and socioeconomic status; or if they did not provide data. Studies included in the systematic review were also included in the meta-analyses if they met the following additional criteria: (1) used interpregnancy interval as measure of birth spacing; (2) provided data for 4 or more interpregnancy interval strata; and (3) reported odds ratio (OR) or relative risk estimates and 95% confidence intervals (CIs) or data to calculate them. Studies of different designs and different measures of birth spacing that are included in the systematic review were analyzed separately because of different threats to their internal validity.

All published studies deemed suitable were retrieved and reviewed independently by 2 authors (A.C.-A., A.R.-B.) to determine inclusion. Disagreements were resolved through consensus. The degree of agreement was expressed as percentage agreement and κ statistics.

### Study Quality Assessment

Study methodological quality was judged by the following 6 validated criteria believed to be important for the quality of observational studies evaluating the relationship between birth spacing and adverse perinatal outcomes[7,8]: (1) pregnancy interval used (adequate if the study used interpregnancy interval; inadequate if the study used birth interval); (2) categorization of exposure (adequate if the study examined ≥4 categories of pregnancy intervals; inadequate if the study examined <4); (3) birth spacing measurement and inquiry of outcomes (adequate if birth spacing measurement and ascertainment of outcomes were made by medical records or direct measurement; inadequate if not); (4) blinding of both birth spacing status and ascertainment of outcomes (adequate if assessment of both birth spacing status and outcomes was blinded; inadequate if not blinded or unreported); (5) loss to follow-up or exclusions (only for cohort and cross-sectional studies) (adequate if loss to follow-up or nonvalid exclusions [eg, improper elimination of records] was <10%; inadequate if ≥10% or unreported); and (6) control for confounding factors (adequate if the study additionally controlled for ≥2 of 5 confounding factors [parity, outcome of the most recent recognized pregnancy, access to prenatal care, breastfeeding, and maternal nutritional status]; inadequate if additionally controlled for <2).

Assessment of methodological quality of each study was carried out by 2 of the authors (A.C.-A., A.R.-B.) work-

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

ing independently. Differences of opinion were resolved through discussion.

**Data Abstraction**

Data were extracted independently from each article by 2 investigators (A.C.-A., A.C.K.-G.) by means of a standardized and pilot-tested data collection form. The following information was sought from each article: title, first author's name, year, geographic location of the study (country and region), study design, characteristics and source of the study population, sample size, measures of outcome, measure of birth spacing used, categorization of intervals, method of data collection, exposure measurement and ascertainment of outcome(s), blinding of birth spacing status and ascertainment of outcome(s), loss to follow-up or invalid exclusions, confounding factors controlled for by matching or adjustment, and unadjusted and adjusted relative risks or ORs and their 95% CIs for individual adverse perinatal outcomes associated with all pregnancy intervals.

**Statistical Analysis**

The studies included in our meta-analyses differed in the units used for measurement of the interpregnancy interval (days, weeks, months, or years). Therefore, we converted these different units of interpregnancy interval to months. We used 3 different meta-analytical techniques to investigate whether a relationship exists between interpregnancy interval and the risk of adverse perinatal outcomes.

**Meta-regression Analysis.** We first examined the shape of the dose-response relation between interpregnancy interval and risk of adverse perinatal outcomes. For this purpose, we used the method proposed by Greenland and Longnecker[9] and Berlin et al[10] for meta-analysis of epidemiologic dose-response data. The dose-specific confounder-adjusted natural logarithms of the ORs from all studies were pooled, and a curve using weighted quadratic spline meta-regression with no intercept term was fitted. This method was chosen because several studies have reported finding a nonlinear, J-shaped relationship between interpregnancy interval and the risk of adverse perinatal outcomes such as preterm birth, LBW, and SGA. The main fields in the data set were the value $x$ of exposures (expressed in months) assigned as the midpoints for the ranges of the reported categories of interpregnancy intervals and as 1.2 times for the lower bound of the open-ended upper categories as suggested by Berlin et al,[10] and the y-axis estimates of natural logarithm of the adjusted OR for each exposure level.

**Pooled ORs.** Depending on data availability in the original studies, we categorized interpregnancy interval into 6 groups: shorter than 6 months, 6 to 11, 12 to 17, 18 to 23, 24 to 59, and 60 months or longer. Odds ratios were used as the measure of the relation between interpregnancy interval and adverse perinatal outcomes. The interval of 18 to 23 months was used as the referent category, because this was the interval with the lowest risk for preterm birth, LBW, and SGA. Data abstracted from each study were arranged in 2 × 2 tables. Then, ORs with their 95% CIs for each adverse perinatal outcome considered were calculated separately for 5 predefined categories of interpregnancy interval. Separate analyses of the associations in 2 × 2 tables were combined to produce pooled unadjusted ORs and corresponding 95% CIs. We also calculated pooled adjusted ORs within each category using the estimated adjusted effect and its estimated standard error (often obtained indirectly from the CI) reported in each study.

**Dose-Response Regression Slopes.** Under the assumption of independence of the dose-specific OR, we estimated the dose-response regression slopes of each study using the OR, 95% CIs, and the midpoint of the exposure interval.[9] For open-ended intervals, a point 20% higher than the low end of the interval was used. Pooled dose-response slopes and estimates of risks were then obtained from random-effects models applied to the study-specific slopes. The exponentiation of the slope gave the OR for a unit increase or decrease of the interpregnancy interval (1 month). To overcome the problem of assuming independence of dose-specific ORs (which is incorrect, as they have a common reference group), we adjusted the standard error of the within-study slopes estimating the covariance.

Heterogeneity of the results between the studies was formally tested with the quantity $I^2$, which describes the percentage of total variation across studies that is due to heterogeneity rather than chance. The $I^2$ can be calculated from basic results obtained from a typical meta-analysis as

$$I^2 = 100\% \times (Q - df)/Q$$

where $Q$ is the Cochran heterogeneity statistic.[11] We pooled results from individual studies using DerSimonian and Laird random-effects models[12] because moderate to high heterogeneity ($I^2 \geq 50\%$) was present in the majority of results.

To further explore the origin of heterogeneity, we restricted the analyses to subgroups of studies defined by study characteristics such as study quality, date of publication, and sample size. Moreover, we calculated separate estimates according to race/ethnicity and study setting (developed vs developing countries). Since a number of the largest studies were multinational, we could not analyze by country. Subgroup and sensitivity analyses were performed pooling adjusted ORs provided by the studies.

To detect publication and location biases, we explored asymmetry in funnel plots. This was examined visually, and the degree of asymmetry was measured using the Egger unweighted regression asymmetry test, with $P < .10$ indicating significant asymmetry.[13] All statistical analyses were performed using STATA version 8.0 (StataCorp, College Station, Tex).

## RESULTS

One hundred thirty studies were considered relevant, and the complete manuscripts were obtained. Of the 130 studies, 122 were published in En-

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

glish, 4 in Spanish, 3 in French, and 1 in Portuguese. Sixty-three studies were excluded, the main reasons being lack of adjustment for confounding factors at statistical analysis (46%) and lack of data on the relationship between birth spacing and adverse outcomes considered (35%). (The list of excluded studies is available from the corresponding author on request.) A total of 67 studies (52 cohort or cross-sectional studies[14-65] and 15 case-control studies[66-80]), including 11 091 659 pregnancies, met the inclusion criteria. The computerized search located 64 of the studies, 2 were found in proceedings of meetings on birth spacing, and the remaining 1 was found through contact with a relevant researcher in the field.

Twenty studies (30%) were conducted in the United States. The remaining 47 were conducted in 61 countries from Latin America (22 countries), Asia (20 countries), Africa (11 countries), Europe (7 countries), and Australia. Overall agreement on the inclusion of studies was 97% (κ=0.84).

The characteristics and main findings of the cohort and cross-sectional studies included in the systematic review are presented in TABLE 1 (developed countries) and TABLE 2 (developing countries); those of the case-control studies are presented in TABLE 3. The sample size in the cohort or cross-sectional studies ranged from 201[44] to 4 841 418.[43] The number of case participants enrolled in case-control studies ranged from 36[71] to 416,[69] and the corresponding number of controls ranged from 50[71,79] to 1710.[67] Thirty studies provided data on preterm birth, 26 on LBW, 24 on SGA, 10 on fetal death, 4 on early neonatal death, 6 on perinatal death, and 2 on low Apgar scores. Twenty-four studies (36%) reported more than 1 adverse perinatal outcome. Among the 52 cohort or cross-sectional studies, 37 (71%) used birth-to-conception interval, 14 (27%) used birth-to-birth interval, and the remaining 1 used both intervals. Of the 15 case-control studies, 9 (60%) used birth-to-conception interval and 6 (40%) birth-to-birth interval as measures of birth spacing. The studies varied in methodological quality, with 21 cohort or cross-sectional studies (40%) meeting 5 or more criteria and only 3 case-control studies (20%) meeting 4 or more criteria. The most common shortcomings were failure to blind investigators to both exposure status and ascertainment of outcome, the report of loss to follow-up or exclusions, and the categorization of pregnancy intervals.

Overall, among the studies that provided data on preterm birth, 21 (18 cohort or cross-sectional and 3 case-control) reported an association with short intervals, 6 (5 cohort or cross-sectional and 1 case-control) an association with long intervals, and 9 (8 cohort or cross-sectional and 1 case-control) found no association. With regard to studies that reported data on LBW, 20 (18 cohort or cross-sectional and 2 case-control) found an association with short intervals, 7 (6 cohort or cross-sectional and 1 case-control) an association with long intervals, and 6 (all cohort or cross-sectional) found no association. Among the studies that provided data on SGA, 14 (13 cohort or cross-sectional and 1 case-control) reported an association with short intervals, 6 cohort or cross-sectional studies reported an association with long intervals, and 10 (6 cohort or cross-sectional and 4 case-control) found no association. Two studies did not find an association between birth spacing and low Apgar scores. With regard to perinatal mortality (fetal death, early neonatal death, and perinatal death), 10 studies reported an association with short intervals, 8 with long intervals, and 7 found no association.

It was not possible to perform a meta-analysis of the case-control studies because only 3 met the minimal inclusion criteria. Moreover, different categories of intervals and reference categories were used in the few studies. Twenty-six cohort and cross-sectional studies provided data for meta-analyses. Sixteen studies provided data for preterm birth,* 10 for LBW,† 13 for SGA,‡ 7 for fetal death,[14,27,34,55,57,63,64] and 4 for early neonatal death.[34,57,63,64]

The dose-response association between interpregnancy interval and the natural logarithm of the OR of the 5 adverse perinatal outcomes in cohort and cross-sectional studies was J-shaped (FIGURE). For preterm birth, LBW, and SGA, the highest risk was for intervals shorter than 20 months and longer than 60 months. For both fetal and early neonatal death, the highest risk was for intervals shorter than 6 months and longer than 50 months.

Infants born to women with interpregnancy intervals shorter than 6 months had pooled unadjusted ORs (95% CIs) of 1.77 (1.54-2.04), 2.12 (1.98-2.26), and 1.39 (1.20-1.61) for preterm birth, LBW, and SGA, respectively, compared with infants born to women with intervals of 18 to 23 months (TABLE 4). Likewise, women with intervals of 6 to 17 months were 8% to 23% more likely to give birth to infants with these adverse outcomes. Infants conceived 60 months or more after a birth had ORs (95% CIs) of 1.27 (1.17-1.39) for preterm birth, 1.49 (1.17-1.89) for LBW, and 1.36 (1.20-1.54) for SGA. The minimal increase in the risk for adverse perinatal outcomes associated with intervals of 24 to 59 months (3%-7%) was not statistically significant. It was not possible to estimate pooled ORs for the relation between interpregnancy interval and both fetal and early neonatal death, because the categories of intervals used and the reference categories did not coincide in all studies.

The estimates of pooled adjusted ORs were lower than estimates of pooled unadjusted ORs (Table 4). Nevertheless, the associations between intervals of shorter than 6, 6 to 11, 12 to 17, and longer than 59 months and preterm birth, LBW, and SGA remained statistically significant. Compared with infants of mothers with interpregnancy intervals of 18 to

*References 25, 27, 29, 33, 36, 39, 40, 45-47, 49, 50, 52, 55, 61, 64.

†References 16, 21, 27, 33, 36, 40, 47, 49, 56, 64.

‡References 21, 22, 24, 29, 33, 35, 36, 39, 45, 49, 52, 55, 64.

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

**Table 1.** Characteristics of Cross-sectional and Cohort Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes—Developed Countries

| | | | | Methodological Quality* | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Source | Country (Region) | Outcome | Sample Size | Interval Used | Interval Categories, mo† | Blinding | Lost to Follow-up/ Nonvalid Exclusions, % | Confounders‡ | Main Findings |
| Fedrick and Adelstein,[14] 1973 | England, Scotland, Wales | Late fetal death (≥28 wk) | 8356 | IPI | ≤6; 7-12§; 13-24; 25-36; 37-72; 73-108; >108 | Not reported | Not reported | 1, 2, 6, 7 | No relationship between interval and late fetal death |
| Eisner et al,[16] 1979 | United States (nation-based [1974]) | LBW | 1 118 963 | IPI | <6; 6-11; 12-23; ≥24 [>6]§ | Adequate | 54.8 | 1-8 | Intervals <6 mo associated with increased risk of LBW for both white and black women |
| Spratley and Taffel,[17] 1981 | US (nation-based) | LBW | Not reported | BI | <12; 12-17; 18-23; 24-35; 36-47; 48-59; ≥60‖ | Adequate | Not reported | 1, 3, 5-7, 15 | Intervals <24 mo and >59 mo associated with increased risk of LBW |
| Brody and Bracken,[20] 1987 | US (New Haven, Conn) | LBW | 1683 | IPI | <5; 5-8; ≥9§ | Not reported | 5.6 | 1-7, 12 | Intervals <9 mo associated with increased risk of LBW |
| Klebanoff,[21] 1988 | US (multicenter) | LBW, IUGR | 5938 | IPI | <3§; 3-5.9; 6-8.9; 9-11.9; 12-14.9; 15-17.9; 18-20.9; 21-23.9; ≥24 | Not reported | Not reported | 1, 3, 5-7, 10, 12 | No relationship between interval and LBW or IUGR |
| Lieberman et al,[22] 1989 | US (Boston, Mass) | SGA | 4489 | IPI | ≤3; 3-6; 6-12; 12-18; 18-24; 24-36§; 36-48; 48-60; 60-72; 72-96; >96 | Not reported | Not reported | 1-3, 5, 6, 9, 10, 12, 13 | Intervals <18 mo and >72 mo associated with increased risk of SGA |
| Miller,[24] 1989 | Sweden | IUGR | 54 725 | IPI | <12; 12-17; 18-23; 24-35; 36-47; 48-59; ≥60; [18-59]§ | Adequate | Not reported | 1, 2, 6, 7, 15 | Intervals <12 mo associated with increased risk of IUGR |
| Lang et al,[25] 1990 | US (Boston, Mass) | Preterm birth | 4467 | IPI | ≤3; 4-6; 7-12; 13-18; 19-24; 25-36§; 37-48; ≥49 | Not reported | Not reported | 1, 3-6, 8-10, 12 | No relationship between interval and preterm birth |
| Miller,[27] 1991 | Hungary, Sweden, US | LBW, preterm birth, late fetal death (>6 mo gestation) | Hungary (77 256) Sweden (51 096) US (4290) | For Hungary and Sweden BI, and for the USA IPI | <12; 12-17; 18-23; 24-35§; 36-47; 48-59; ≥60; | Adequate | Not reported | 1, 3-8, 10 | Birth intervals <12 mo associated with increased risk of LBW and preterm birth. No relationship between interval and late fetal death |
| Kallan,[29] 1992 | US | Preterm-LBW, IUGR-LBW, fetal loss (miscarriage and stillbirths) | 2104 | IPI | <7; 7-12; 13-24; 25-48; ≥49§ | Not reported | Not reported | 1-3, 5-7, 12 | Intervals <12 mo and >48 mo associated with increased risk of IUGR-LBW and fetal loss but not with preterm-LBW |

*(continued)*

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

**Table 1.** Characteristics of Cross-sectional and Cohort Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes—Developed Countries (cont)

| | | | | Methodological Quality* | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Source | Country (Region) | Outcome | Sample Size | Interval Used | Interval Categories, mo† | Blinding | Lost to Follow-up/ Nonvalid Exclusions, % | Confounders‡ | Main Findings |
| Rawlings et al,[36] 1995 | US | LBW, preterm birth, IUGR | 1922 | IPI | <3; 3-5.9; 6-8.9§; ≥9 | Not reported | 9.1 | 1, 4, 6-8, 12 | Intervals <3 mo and <9 mo associated with an increased risk of LBW and preterm birth among white and black women, respectively. No relationship between interval and IUGR |
| Ochoa Sangrador et al,[38] 1996 | Spain | LBW, preterm birth | 279 | IPI | <3§; 3-5; 6-8; 9-11; ≥12 | Not reported | Not reported | 1, 4, 6, 7, 12 | No relationship between interval and LBW and preterm birth |
| Kallan,[39] 1997 | US (nation-based [1981]) | Preterm birth, IUGR | 1 045 393 | IPI | <7; 7-12; 13-18; 19-24; 25-36§; 37-48; 49-60; >60 | Adequate | Not reported | 1-4, 6-10, 12 | Intervals <7 mo and >60 mo associated with increased risk of preterm birth and IUGR for both black and white women |
| Adams et al,[40] 1997 | US (Georgia) | LBW, preterm birth | 28 273 | IPI | <3; 3-5; 6-8; 9-11; 12-17; 18-23; 24-35§; 36-47; ≥48 | Adequate | Not reported | 1, 3, 6, 8 | For white women, intervals <3 mo and >47 mo associated with increased risk of LBW, whereas intervals <6 mo and >47 mo associated with increased risk of preterm birth. For black women, intervals <6 mo and >47 mo associated with increased risk of LBW, whereas intervals <6 mo were associated with increased risk of preterm birth |
| Bakewell et al,[41] 1997 | US (Missouri) | LBW | 182 285 | IPI | <9; ≥9§ | Adequate | 10.0 | 1, 3-8, 10, 12 | For both women with prior LBW and women with prior normal birth weight, intervals <9 mo associated with increased risk of LBW |
| Khoshnood et al,[43] 1998 | US (nation-based [1989-1991]) | LBW, preterm birth | 4 841 418 | IPI | <6; 6-12; >12§ | Adequate | 0.0 | 1-3, 6-8, 12 | Intervals <6 mo and <12 mo associated with increased risk of LBW and preterm birth, respectively |
| Klerman et al,[45] 1998 | US (Alabama) | Preterm birth, IUGR | 4400 | IPI | <3; 3-5; 6-11; 12-23; ≥24 [≥6]§ | Adequate | Not reported | 1, 2, 5-8, 10, 12, 19 | Interval <6 mo associated with increased risk of preterm birth. No association between interval and IUGR |
| Ekwo and Moawad,[46] 1998 | US (Chicago) | Preterm birth | 761 | IPI | ≤3; 4-6; 7-9§; 10-24; ≥25 | Adequate | Not reported | 1, 5-8, 12, 14 | Intervals ≤6 mo not significantly associated with increased risk of preterm birth |
| Basso et al,[47] 1998 | Denmark | LBW, preterm birth | 10 187 | IPI | ≤4; 4.01-8; 8.01-12; 12.01-24; 24.01-36§; >36 | Adequate | 6.2 | 1, 2, 6 | Intervals <8.01 mo associated with an increased risk of preterm birth. No association between interval and LBW |
| Shults et al,[48] 1999 | US (North Carolina) | Preterm birth, SGA | Preterm birth (34 569) SGA (27 651) | IPI | <4; 4-12; 13-24§ | Adequate | Not reported | 1-8, 12 | Women with intervals <4 mo had higher risks for preterm birth and SGA |

*(continued)*

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

**Table 1.** Characteristics of Cross-sectional and Cohort Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes—Developed Countries (cont)

| | | | | Methodological Quality* | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Source | Country (Region) | Outcome | Sample Size | Interval Used | Interval Categories, mo† | Blinding | Lost to Follow-up/ Nonvalid Exclusions, % | Confounders‡ | Main Findings |
| Zhu et al,[49] 1999 | US (Utah) | LBW, SGA, preterm birth | 173 205 | IPI | <6; 6-11; 12-17; 18-23§; 24-59; 60-119; ≥120 | Adequate | 10.7 | 1-8, 10, 12, 13 | The risk for LBW, preterm birth, and SGA increased with intervals <6 mo. Intervals >59 mo associated with increased risks for LBW and SGA |
| Fuentes-Afflick and Hessol,[50] 2000 | US (California) | Preterm birth | 289 842 | IPI | <6; 6-11; 12-17; 18-23§; 24-59; >59 | Adequate | Not reported | 1-3, 5-8, 11, 19 | Intervals <18 mo and >59 mo associated with increased risk of preterm birth |
| Zhu et al,[52] 2001 | US (Michigan) | Preterm birth, SGA | 435 327 | IPI | <6; 6-11; 12-17; 18-23§; 24-59; 60-119; ≥120 | Adequate | 5.1 | 1-8, 12, 13 | Among white women, the risk for preterm birth increased with intervals <12 mo and >59 mo, whereas the risk for SGA increased with intervals <12 mo and >23 mo. Among black women, the risk for preterm birth increased with intervals <12 mo and >119 mo, while the risk for SGA increased with intervals <6 mo and >119 mo |
| Rousham and Gracey,[53] 2002 | Australia (Kimberley) | Birth weight, birth length | 782 | BI | <24; ≥24§ | Not reported | 1.8 | 1, 5, 6, 10, 11 | Birth interval not significantly associated with birth weight or birth length |
| Dafopoulos et al,[54] 2002 | Greece | Preterm birth | 1 230 | IPI | <6; ≥6§ | Not reported | Not reported | 1, 5, 6, 8, 12 | Intervals of <6 mo associated with greater risk of preterm birth |
| Smith et al,[55] 2003 | Scotland | Preterm birth, IUGR, fetal death (≥24 wk gestation) | 89 143 | IPI | <6; 6-11; 12-17; 18-23; 24-59 | Adequate | 13.8 | 1, 4, 6, 7, 10, 12 | Interval <6 mo an independent risk factor for preterm birth. No relationship between intervals <6 mo and IUGR or fetal death |
| Zhu and Le,[56] 2003 | US (Michigan) | LBW | 565 816 | IPI | <6; 6-11; 12-17; 18-23§; 24-59; 60-95; 96-136 | Adequate | 21.7 | 1-3, 5-8, 12, 13 | Intervals <6 mo and >59 mo associated with an increased risk of LBW |
| Stephansson et al,[57] 2003 | Sweden | Late fetal death (≥28 wk gestation), early neonatal death (≤7 d of life) | 410 021 | IPI | <4; 4-7; 8-11; 12-35§; 36-71; ≥72 | Adequate | 12.0 | 1, 3, 4, 6, 7, 9, 11, 12, 17 | Intervals ≥72 mo associated with an increased risk of late fetal death. Intervals <12 mo not associated with an increased risk of late fetal death or early neonatal death |

Abbreviations: BI, birth interval; IPI, interpregnancy interval; IUGR, intrauterine growth restriction; LBW, low birth weight; SGA, small for gestational age.
*See "Methods" section for definitions of methodological quality criteria. Interval and outcomes inquiries were determined to be "adequate" for all studies.
†Intervals in square brackets indicate the reference group in the studies that did not use as a reference one of the intervals originally categorized.
‡For multivariate adjustments, 1 indicates maternal age; 2, parity; 3, education; 4, marital status; 5, ethnic group or race; 6, factors related to socioeconomic status; 7, previous pregnancy outcome; 8, factors relating to prenatal care; 9, medical risk factors; 10, maternal nutritional status; 11, region; 12, smoking; 13, alcohol use; 14, illicit drug use; 15, gestational age or birth weight; 16, type of hospital; 17, year of delivery; 18, religion; 19, sex of the child.
§Reference group.
‖Reference group not specified.

23 months, those born to women with intervals shorter than 6 months had a 40% increased risk of preterm birth, a 60% increased risk of LBW, and an approximately 25% increased risk of SGA. Intervals of 6 to 17 months were associated with a significantly greater risk for the 3 adverse perinatal outcomes (adjusted ORs, 1.05-1.14). On the other hand, infants born to mothers with intervals longer than 59 months faced a 20% to 43% increase

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

**Table 2.** Characteristics of Cross-sectional and Cohort Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes—Developing Countries

| | | | | Methodological Quality* | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Source | Country (Region) | Outcome | Sample Size | Interval Used | Interval Categories, mo† | Blinding | Lost to Follow-up/ Nonvalid Exclusions, % | Confounders‡ | Main Findings |
| Swenson and Harper,[15] 1978 | Bangladesh | Late fetal death (≥28 wk) | 9295 | IPI | <12; 12-24; >24§ | Not reported | Not reported | 1, 2, 6, 7 | No relationship between interval and late fetal death |
| Fortney and Higgins,[18] 1984 | Iran | LBW, early neonatal death | 12 995 | BI | ≤12; 13-24; 25-36§; 37-48; 49-60; 61-72; ≥73 | Not reported | Not reported | 1, 2, 6, 7 | Intervals <12 mo associated with increased risk of LBW and early neonatal death |
| DaVanzo et al,[19] 1984 | Malaysia | Birth weight | 2171 | BI | <15; 15-23; 24-35; 36-47; 48-59; 60-71; 72-83; ≥84 | Adequate | Not reported | 1, 2, 5, 6, 11, 17 | Intervals <15 mo significantly associated with reduced birth weight |
| Casterline,[23] 1989 | Ivory Coast, Tunisia, Syria, Korea, Philippines, Costa Rica, Mexico, Guyana | Fetal losses (miscarriages plus stillbirths) | 74 916 | IPI | <9; 9-15; 16-23; 24-35§; ≥36 | Adequate | Not reported | 1-3, 6 | Intervals <9 mo and >35 mo associated with increased risk of fetal death |
| Neel and Alvarez,[26] 1991 | Guatemala | IUGR | 306 | BI | <18; 18-35; 36-47§; 48-59; ≥60 | Not reported | Not reported | 1, 6 | Intervals <18 mo associated with increased risk of IUGR |
| Huttly et al,[28] 1992 | Brazil (Pelotas) | LBW, perinatal death | 3587 | BI | <18; 18-23; 24-35; 36-47; 48-71; >71 | Adequate | 2.0 | 1-3, 6, 10, 12 | Intervals <24 mo associated with increased risk of LBW. Intervals longer than 71 mo associated with increased risk of LBW and perinatal death |
| Barros et al,[30] 1992 | Brazil (Pelotas) | Preterm birth, IUGR | 4747 | BI | <24§; 24-35; 36-48; >48 | Adequate | 0.9 | 1-3, 6, 10, 12 | Intervals <24 mo associated with increased risk of IUGR. No relationship between interval and preterm birth |
| Leong et al,[31] 1993 | Singapore | Preterm birth | 11 085 | BI | <20; 20-39; ≥40 | Not reported | Not reported | 1-3, 5-8 | No relationship between interval and preterm birth |
| Gribble,[32] 1993 | Mexico | LBW | 2234 | BI | ≤12; 13-21; 22-30; 31-39; 40-48; 49-57; ≥58 [22-58]§ | Not reported | Not reported | 1-3, 6, 7, 10 | Intervals <22 mo associated with increased risk of LBW |
| Miller,[33] 1994 | Philippines | LBW, preterm birth, SGA | 1155 | IPI | <6; 6-11; 12-17; 18-23; 24-47; ≥48 | Not reported | Not reported | 1, 3, 6-8, 10, 12 | Intervals <6 mo associated with increased risk of LBW, preterm birth, and SGA in fifth or higher birth order infants. No excess risk among lower-order infants |
| Greenwood et al,[34] 1994 | Jamaica | Perinatal death | 7512 | IPI | <12; 12-23; 24-59; ≥60 | Not reported | 15.0 | 1-3, 6, 7, 9 | No relationship between interval and perinatal death |
| Fikree and Berendes,[35] 1994 | Pakistan | IUGR | 624 | IPI | <13; 13-24§; 25-36; ≥37 | Not reported | Not reported | 1-3, 6, 7, 10, 18 | Intervals <13 mo associated with increased risk of IUGR |
| Fourn et al,[37] 1996 | Benin | IUGR, preterm birth | 2862 | BI | <12; 12-23; 24-35; >35§ | Not reported | Not reported | 1-4, 6, 7, 10 | No relationship between interval and preterm birth or IUGR |

(continued)

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

**Table 2.** Characteristics of Cross-sectional and Cohort Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes—Developing Countries (cont)

| | | | | Methodological Quality* | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Source | Country (Region) | Outcome | Sample Size | Interval Used | Interval Categories, mo† | Blinding | Lost to Follow-up/ Nonvalid Exclusions, % | Confounders‡ | Main Findings |
| Şener et al,[42] 1997 | Turkey | SGA | 420 | IPI | <12;13-24; 25-48§; >48 | Not reported | 2.1 | 1-3, 6-8, 10, 12 | Intervals <12 mo associated with increased risk of SGA |
| Deshmukh et al,[41] 1998 | India | LBW | 201 | BI | Not reported | Not reported | 1.0 | 1, 2, 6, 10, 12 | "Short interval" associated with increased risk of LBW |
| Sachar and Soni,[51] 2000 | India (Punjab) | Perinatal death (deaths from the 28th week gestation through first week of life) | 2424 | IPI | <23; ≥24§ | Not reported | Not reported | 1-3, 6-8, 10, 11 | Intervals <23 mo associated with an increased risk of perinatal death |
| van Eijk et al,[58] 2004 | Kenya | LBW, preterm birth, SGA | 2218 | IPI | <6; 6-23; ≥24 | Not reported | 6.5 | 1-3, 6, 19 | No association between interval and LBW, preterm birth, and SGA |
| Arafa et al,[59] 2004 | Egypt | Preterm birth | 1202 | IPI | <12; 12-36; 37-48; 49-60; >60§ | Not reported | 0.0 | 1, 2, 6, 8-10 | No relationship between intervals <12 mo and preterm birth |
| Pedroso et al,[60] 2004 | Brazil (Campinas) | LBW, preterm birth | 15 314 | BI | <25; 25-36; ≥37§ | Not reported | Not reported | 1-8, 10, 12, 13 | Intervals <24 mo associated with increased risk of LBW and preterm birth |
| Hsieh et al,[61] 2005 | Taiwan | Preterm birth | 4072 | IPI | <6; 6-11; 12-18; 18-48§ ; >48 | Adequate | Not reported | 1-4, 6, 7, 12 | Intervals <12 mo associated with increased risk of preterm birth |
| DaVanzo et al,[62] 2005 | Bangladesh (Matlab) | Early neonatal death (≤7 d) | 125 720 | BI | <15; 15-17; 18-23; 24-35; 36-59§; 60-83; ≥84 | Adequate | Not reported | 1, 2, 6, 7, 11, 17, 18 | Intervals <24 mo and ≥84 mo associated with increased risk of early neonatal death |
| Rutstein,[63] 2005 | 9 Asian countries, 7 Latin American countries, and 4 African countries | Perinatal death (deaths from the 28th week of pregnancy through first week of life) | 267 261 | IPI | <6; 6-11; 12-17; 18-23; 24-29§; 30-35; 36-41; 42-47; 48-53; 54-59 | Adequate | Not reported | 1-3, 6, 7, 11 | Intervals <18 mo and ≥42 mo significantly associated with increased risk of perinatal death |
| Conde-Agudelo et al,[64] 2005 | 18 Latin American countries | LBW, preterm birth, SGA, fetal death, early neonatal death, low Apgar scores at 5 min | 1 080 650 | IPI | <6; 6-11; 12-17; 18-23§; 24-35; 36-47; 48-59; ≥60 | Adequate | 10.7 | 1-4, 6-12, 15-17 | Intervals <12 mo and >59 mo significantly associated with increased risks of LBW, preterm birth, SGA, fetal death, and early neonatal death |
| Hosain et al,[65] 2005 | Bangladesh | LBW | 227 | BI | <24; ≥24§ | Not reported | 16.4 | 1-3, 6, 8, 10, 12 | No relationship between intervals <24 mo and LBW |

Abbreviations: BI, birth interval; IPI, interpregnancy interval; IUGR, intrauterine growth restriction; LBW, low birth weight; SGA, small for gestational age.
*See "Methods" section for definitions of methodological quality criteria. Interval and outcomes inquiries were determined to be "adequate" for all studies except Swenson and Harper (not reported).
†Intervals in square brackets indicate the reference group in the studies that did not use as a reference one of the intervals originally categorized.
‡For multivariate adjustments, 1 indicates maternal age; 2, parity; 3, education; 4, marital status; 5, ethnic group or race; 6, factors related to socioeconomic status; 7, previous pregnancy outcome; 8, factors relating to prenatal care; 9, medical risk factors; 10, maternal nutritional status; 11, region; 12, smoking; 13, alcohol use; 14, illicit drug use; 15, gestational age or birth weight; 16, type of hospital; 17, year of delivery; 18, religion; 19, sex of the child.
§Reference group.

in risk of the 3 adverse perinatal outcomes. There were no differences in the risk of adverse perinatal outcomes between women with intervals of 24 to 59 months and those with intervals of 18 to 23 months. All funnel plots showed no asymmetry, either visually (funnel plots available from the corresponding author on request) or in

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

**Table 3.** Characteristics of Case-Control Studies Included in the Systematic Review of Birth Spacing and Adverse Perinatal Outcomes

| Source | Country (Region) | No. of Cases, Source | No. of Controls, Source | Methodological Quality*: Interval Used | Intervals Categories, mo | Blinding | Confounders† | Main Findings |
|---|---|---|---|---|---|---|---|---|
| Ruelas-Orozco et al,[66] 1985 | Mexico | 104 perinatal deaths (from the 27th week of pregnancy through first week of life), community | 208 live births, community | IPI | <7; 7-46‡; >46 | Not reported | 1-4, 6, 7, 9, 10, 12, 13 | Intervals <7 mo and >46 mo significantly associated with increased risk of perinatal death |
| Ferraz et al,[67] 1988 | Brazil (Natal) | 303 infants with birth weight <10th percentile for gestational age, 282 preterm infants, hospital | 1710 term infants with birth weight ≥2500 g and appropriate for gestational age, hospital | IPI | ≤6; 7-12; ≥13‡ | Not reported | 1-3, 6, 7, 10, 12 | Intervals ≤6 mo associated with increased risk of IUGR. No relationship between interval and preterm birth |
| Bartlett and Paz de Bocaletti,[68] 1991 | Guatemala | 42 Mayan Indian infants who died during birth or in the first month of life, community | 54 Mayan Indian infants who survived the first month of life, community | BI | <14; ≥14‡ | Not reported | 1-4, 6, 8, 11 | Interval <14 mo associated with increased risk of intrapartum and neonatal deaths |
| Mavalankar and Gray,[69] 1991 | India | 416 preterm-LBW infants, hospital | 926 normal birth weight infants, hospital | IPI | ≤6; 7-12; 13-24; 25-48‡; ≥49 | Not reported | 1-4, 6-12, 15, 18, 19 | Intervals <13 mo and >48 mo significantly associated with increased risk of preterm LBW |
| Dechering and Perera,[70] 1991 | Sri Lanka | 245 LBW infants | 399 with birth weight ≥2500 g | BI | <12; 12-48‡; >48 | Not reported | 1-3, 6-8, 10, 19 | Intervals <12 mo and >48 mo significantly associated with increased risk of LBW |
| Kumar and Singhi,[71] 1992 | India | 36 late fetal deaths, community | 50 live birth infants, community | BI | <24; ≥24‡ | Not reported | 1-3, 6 | Intervals <24 mo not associated with increased risk of late fetal death |
| Mavalankar et al,[72] 1992 | India | 343 term-LBW (IUGR) infants | 926 normal birth weight infants, hospital | IPI | ≤6; 7-12; 13-48‡; ≥49 | Not reported | 1-4, 6-12, 15, 18, 19 | No relationship between interval and IUGR |
| Arif et al,[73] 1998 | Pakistan | 236 LBW-SGA infants, hospital | 293 infants with birth weight ≥2500 g, hospital | BI | <24; ≥24‡ | Not reported | 1, 3, 6, 10 | Intervals <24 mo not associated with risk of LBW-SGA birth |
| Grau et al,[74] 1999 | Cuba | 202 preterm infants, hospital | 319 term infants, hospital | IPI | <24; ≥24‡ | Not reported | 1, 3, 4, 6-8, 10, 12 | Intervals <24 mo associated with increased risk of preterm birth |
| Wang and Lin,[75] 1999 | Taiwan | 208 perinatal deaths (from the 22nd week of pregnancy through first week of life), hospital | 619 live births, hospital | BI | <12; 12-24; >24‡ | Not reported | 1-3, 6, 8-10, 14 | Intervals <24 mo associated with increased risk of perinatal death |
| Mafina-Mienandi et al,[76] 2002 | Congo | 247 infants with birth weight <10th percentile for gestational age, hospital | 293 infants with birth weight appropriate for gestational age, hospital | IPI | <12; 12-24; >24‡ | Not reported | 1-4, 6, 10 | No relationship between interval and IUGR |
| Al-Jasmi et al,[77] 2002 | United Arab Emirates | 128 preterm infants, hospital | 128 term infants, hospital | IPI | 2.8-8.9; 9.0-15.9; 16.0-22.9‡; 23.0-82.7 | Not reported | 1, 2, 6-8, 10 | Intervals <16 mo associated with increased risk of preterm birth |
| Khan and Jamal,[78] 2003 | Pakistan | 190 LBW infants, hospital | 760 normal birth weight infants, hospital | IPI | <5; 5-10; >10‡ | Not reported | 1-3, 6, 8, 10 | Risk for LBW increased with intervals <5 mo |
| Orji et al,[79] 2004 | Nigeria | 50 women with intervals ≥72 months, hospital | 50 women with intervals 24 to 60 months, hospital | BI | 24-60‡; ≥72 | Not reported | 1, 2, 6 | No difference in Apgar scores between the study groups |
| Kleijer et al,[80] 2005 | Australia (Adelaide) | 233 infants with birth weight <10th percentile for gestational age, hospital | 241 infants with birth weight between the 25th and 75th percentile | IPI | <48; ≥48‡ | Not reported | 1, 2, 4-7, 10, 12, 14 | No relationship between interval <48 mo and IUGR |

Abbreviations: BI, birth interval; IPI, interpregnancy interval; IUGR, intrauterine growth restriction; LBW, low birth weight; SGA, small for gestational age.
*See "Methods" section for definitions of methodological quality criteria. Interval and outcomes inquiries were determined to be "adequate" for all studies except Bartlett and Paz de Bocaletti (inadequate).
†For multivariate adjustments, 1 indicates maternal age; 2, parity; 3, education; 4, marital status; 5, ethnic group or race; 6, factors related to socioeconomic status; 7, previous pregnancy outcome; 8, factors relating to prenatal care; 9, medical risk factors; 10, maternal nutritional status; 11, region; 12, smoking; 13, alcohol use; 14, illicit drug use; 15, gestational age or birth weight; 16, type of hospital; 17, year of delivery; 18, religion; 19, sex of the child.
‡Reference group.

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

**Figure.** Scatterplot of Natural Logarithm Odds Ratio and Meta-regression Curves of Adverse Perinatal Outcomes According to Interpregnancy Interval in Cohort and Cross-sectional Studies

The dose-response curve line represents estimates from a smoothed spline regression. The horizontal line at y=0 represents no effect. Most studies provided ≥1 odds ratio estimate for several categories of interpregnancy intervals.

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

terms of statistical significance ($P>.10$ for all, by Egger test).

Important statistical heterogeneity among studies was present, as confirmed by $I^2$ values greater than 50% in half of meta-analyses, and this remained in the prespecified subgroups. An examination for sources of heterogeneity among studies found that a significant portion of the heterogeneity in studies evaluating the relation between intervals shorter than 6 months and both preterm birth and LBW was explained by the study by our group[64] since the estimates of pooled adjusted ORs were significantly lowered when this study was excluded (1.30; 95% CI, 1.23-1.38; and 1.48; 95% CI, 1.40-1.57, respectively). Study quality, date of publication, sample size, and study setting provided no explanation for heterogeneity in studies evaluating the relationship between intervals of 6 to 11, 12 to 17, and 24 to 59 months and both preterm birth and LBW, because the CIs in the subgroups overlapped (data available from corresponding author on request). Compared with the overall results, the summary ORs calculated from sensitivity and subgroup analyses were almost identical. Pooled adjusted ORs calculated from subgroups evaluating intervals of 60 months or longer and preterm birth were similar to the overall adjusted OR calculated from all studies. With regard to studies evaluating the association between intervals longer than 59 months and LBW, studies from developed countries were significantly associated with higher pooled adjusted ORs. There were no significant differences in pooled adjusted ORs obtained from subgroups of studies and the overall estimates obtained from all studies assessing the association between interpregnancy interval and SGA. In general, there were no significant differences in estimates of summary adjusted ORs between white and black women in subgroups that evaluated the effects of interpregnancy interval on adverse perinatal outcomes according to race/ethnicity.[39,40,52]

For each month that interpregnancy interval was shortened from 18 months, the risk increase for preterm birth, LBW, and SGA was 1.9%, 3.3%, and 1.5%, respectively (TABLE 5). On the other hand, the risk for the 3 adverse perinatal outcomes increased by 0.6%, 0.9%, and 0.8%, respectively, for each month that interpregnancy interval was lengthened from 59 months.

**Table 4.** Odds Ratios for the Association Between Interpregnancy Interval and Adverse Perinatal Outcomes in Cohort and Cross-sectional Studies

| Interpregnancy Interval, mo | Preterm Birth | Low Birth Weight | Small for Gestational Age |
|---|---|---|---|
| **Pooled Unadjusted Results** | | | |
| <6 | | | |
| No. of Studies | 8[25,33,40,49,50,52,55,64] | 6[21,33,40,49,56,64] | 7[21,22,33,49,52,55,64] |
| OR (95% CI) | 1.77 (1.54-2.04) | 2.12 (1.98-2.26) | 1.39 (1.20-1.61) |
| $I^2$, %* | 95 | 63 | 93 |
| 6-11 | | | |
| No. of studies | 9[25,27,33,40,49,50,52,55,64] | 6[21,33,40,49,56,64] | 8[21,22,24,33,49,52,55,64] |
| OR (95% CI) | 1.23 (1.16-1.31) | 1.23 (1.15-1.32) | 1.18 (1.14-1.23) |
| $I^2$, %* | 85 | 73 | 39 |
| 12-17 | | | |
| No. of studies | 9[25,27,33,40,49,50,52,55,64] | 7[21,27,33,40,49,56,64] | 8[21,22,24,33,49,52,55,64] |
| OR (95% CI) | 1.11 (1.03-1.20) | 1.08 (1.02-1.14) | 1.08 (1.06-1.11) |
| $I^2$, %* | 56 | 51 | 14 |
| 18-23† | | | |
| No. of studies | 9[25,27,33,40,49,50,52,55,64] | 7[21,27,33,40,49,56,64] | 8[21,22,24,33,49,52,55,64] |
| OR | 1.00 | 1.00 | 1.00 |
| 24-59 | | | |
| No. of studies | 6[27,49,50,52,55,64] | 6[27,33,40,49,56,64] | 7[22,24,33,49,52,55,64] |
| OR (95% CI) | 1.03 (1.00-1.07) | 1.07 (0.99-1.15) | 1.07 (0.98-1.18) |
| $I^2$, %* | 28 | 78 | 93 |
| ≥60 | | | |
| No. of studies | 5[27,49,50,52,64] | 4[27,49,56,64] | 5[22,24,49,52,64] |
| OR (95% CI) | 1.27 (1.17-1.39) | 1.49 (1.17-1.89) | 1.36 (1.20-1.54) |
| $I^2$, %* | 93 | 98 | 96 |
| **Pooled Adjusted Results** | | | |
| <6 | | | |
| No. of studies | 8[25,39,40,49,50,52,55,64] | 4[40,49,52,64] | 6[22,39,49,52,55,64] |
| OR (95% CI) | 1.40 (1.24-1.58) | 1.61 (1.39-1.86) | 1.26 (1.18-1.33) |
| $I^2$, %* | 69 | 87 | 89 |
| 6-11 | | | |
| No. of studies | 8[25,39,40,49,50,52,55,64] | 4[40,49,52,64] | 7[22,24,39,49,52,55,64] |
| OR (95% CI) | 1.14 (1.10-1.17) | 1.14 (1.10-1.18) | 1.11 (1.04-1.19) |
| $I^2$, %* | 87 | 91 | 32 |
| 12-17 | | | |
| No. of studies | 8[25,39,40,49,50,52,55,64] | 4[40,49,52,64] | 7[22,24,39,49,52,55,64] |
| OR (95% CI) | 1.07 (1.03-1.11) | 1.05 (1.01-1.09) | 1.06 (1.01-1.10) |
| $I^2$, %* | 26 | 34 | 0 |
| 18-23† | | | |
| No. of studies | 8[25,39,40,49,50,52,55,64] | 4[40,49,52,64] | 7[22,24,39,49,52,55,64] |
| OR | 1.00 | 1.00 | 1.00 |
| 24-59 | | | |
| No. of studies | 8[25,39,40,49,50,52,55,64] | 4[40,49,52,64] | 7[22,24,39,49,52,55,64] |
| OR (95% CI) | 0.99 (0.97-1.02) | 1.01 (0.98-1.03) | 1.02 (0.99-1.05) |
| $I^2$, %* | 0 | 0 | 0 |
| ≥60 | | | |
| No. of studies | 7[25,39,40,49,50,52,64] | 4[40,49,52,64] | 6[22,24,39,49,52,64] |
| OR (95% CI) | 1.20 (1.17-1.24) | 1.43 (1.27-1.62) | 1.29 (1.20-1.39) |
| $I^2$, %* | 95 | 84 | 88 |

Abbreviations: CI, confidence interval; OR, odds ratio.
*Heterogeneity test (see "Methods" section).
†Reference category.

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

**Table 5.** Meta-analysis of Dose-Response Regression Slopes and Prediction of the Risk of Adverse Perinatal Outcomes for Interpregnancy Intervals <18 Months and >59 Months

| Risk Increase | Increase, % (95% CI) | | |
|---|---|---|---|
| | Preterm Birth (12 Studies) | LBW (7 Studies) | SGA (12 Studies) |
| Per month for intervals <18 mo* | 1.92 (1.80-3.04) | 3.25 (3.09-3.41) | 1.52 (1.40-1.64) |
| Per month for intervals >59 mo† | 0.55 (0.49-0.61) | 0.91 (0.83-0.99) | 0.76 (0.71-0.81) |
| Predicted by the model | | | |
| Interpregnancy interval, mo | | | |
| 3 | 28.8 (27.0-30.6) | 48.8 (46.4-51.2) | 22.8 (21.0-24.6) |
| 6 | 23.0 (21.6-24.5) | 39.0 (37.1-40.9) | 18.2 (16.8-19.7) |
| 9 | 17.3 (16.2-18.4) | 29.3 (27.8-30.7) | 13.7 (12.6-14.8) |
| 12 | 11.5 (10.8-12.2) | 19.5 (18.5-20.5) | 9.1 (8.4-9.8) |
| 15 | 5.8 (5.4-6.1) | 9.8 (9.3-10.2) | 4.6 (4.2-4.9) |
| 18-59‡ | 1.00 | 1.00 | 1.00 |
| 72 | 6.6 (5.9-7.3) | 10.9 (10.0-11.9) | 9.1 (8.5-9.7) |
| 96 | 19.8 (17.6-22.0) | 32.8 (29.9-35.6) | 27.4 (25.6-29.2) |
| 120 | 33.0 (29.4-36.6) | 54.6 (49.8-59.4) | 45.6 (42.6-48.6) |
| 144 | 46.2 (41.2-51.2) | 76.4 (69.7-83.2) | 63.8 (59.6-68.0) |

Abbreviations: CI, confidence interval; LBW, low birth weight; SGA, small for gestational age.
*Risk increase per each month that interpregnancy interval is shortened from 18 months.
†Risk increase per each month that interpregnancy interval is lengthened from 59 months.
‡Reference category.

## COMMENT

Using 3 different meta-analytical techniques, we show that birth to conception intervals shorter than 18 months and longer than 59 months are significantly associated with increased risk of several adverse perinatal outcomes, such as preterm birth, LBW, and SGA. Infants can have LBW either because they are born early (preterm birth) or are born SGA. Thus, the association between interpregnancy interval and LBW could be due to the independent effect of interval on both preterm birth and SGA. Less clear is the association between birth spacing and the risk of fetal and early neonatal death, although results from meta-regression curves suggest that interpregnancy intervals shorter than 6 months and longer than 50 months are associated with increased risk of these adverse perinatal outcomes. The strength of our inferences is based on compliance with stringent criteria for performing a rigorous systematic review. These included the use of a prospective protocol designed to address a research question; the methods used in the identification of relevant studies; no language restrictions; the exclusion of studies that did not adjust for at least maternal age and socioeconomic status; the strict assessment of methodological quality of included studies; the use of several techniques of meta-analysis (both unadjusted and adjusted analyses); the exploration of sources of heterogeneity; the quantitative summarization of the evidence; and the inclusion of a large number of women from different populations throughout the world.

The reasons for the association between a short interval between pregnancies and adverse perinatal outcomes are unclear. A plausible explanation is the maternal nutritional depletion hypothesis,[27,81] which states that a close succession of pregnancies and periods of lactation worsen the mother's nutritional status because there is not adequate time for the mother to recover from the physiological stresses of the preceding pregnancy before she is subjected to the stresses of the next. This results in depletion of maternal nutrient stores, with the subsequent increased risk of adverse perinatal outcomes.[81] The folate depletion hypothesis claims that maternal serum and erythrocyte concentrations of folate decrease from the fifth month of pregnancy onward and remain low for a fairly long time after delivery. Women who become pregnant before folate restoration is complete have an increased risk of folate insufficiency at the time of conception and during pregnancy. As a consequence, their offspring have higher risks of neural tube defects, intrauterine growth restriction, preterm birth, and LBW.[82] Some investigators have attributed the higher risk of poor pregnancy outcomes to several factors associated with having short intervals, such as socioeconomic status, unstable lifestyles, failure to use health care services or inadequate use of such services, unplanned pregnancies, and other behavioral or psychological determinants.[4,5] However, the fact that the birth spacing effects are not strongly attenuated when socioeconomic and maternal characteristics are controlled for suggests that the effects are not caused by these confounding factors.

Some hypotheses have also been proposed to explain the relationship between long intervals and adverse perinatal outcomes. Zhu et al[49] have hypothesized that, after delivery, a woman's physiologic reproductive capacities gradually decline, becoming similar to those of primigravid women (ie, "the physiological regression hypothesis"). This hypothesis is supported by the observation that perinatal outcomes for infants conceived after an excessively long interpregnancy interval are similar to outcomes of infants born to primigravid women. Another possibility is that unmeasured factors, such as sexually transmitted infections or maternal illnesses, may cause both adverse fertility and pregnancy outcomes.[5,49] These factors could differ for women in developed and developing countries. Finally, residual confounding may still be an explanation for at least part of the reported associations.

Several potential limitations of our review must also be considered. First, like any systematic review, it is limited by the quality of original data. The great majority of studies calculated the interpregnancy interval using mother's recall of her previous child's date of birth and her last menstrual period,

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

instead of birth dates recorded on the birth records and gestational age estimated from ultrasonography. In most studies the intervals were calculated as the time elapsed between 2 consecutive live births, ignoring induced or spontaneous abortions or fetal deaths between them, which can produce even longer intervals between live births. Nevertheless, this problem would not affect the findings for short intervals. In addition, several studies did not properly address the potential confounding effects of factors other than maternal age and socioeconomic status. Second, because there was considerable statistical heterogeneity in most of the meta-analyses performed, our findings should be interpreted with caution. Nevertheless, in the great majority of comparisons the estimates showed the same direction of effect, which could suggest the absence of clinical heterogeneity among the studies. Investigation of possible sources of heterogeneity provided no plausible explanations. In addition, it is possible that the $I^2$ heterogeneity test could have excessive power when there are studies with large sample size, as was the case with some of the ones included in our meta-analyses. Third, the number of studies available for analysis on the relationship between birth spacing and some adverse perinatal outcomes is still too small to provide conclusive evidence.

The effects of birth spacing on perinatal health found in our study, as well as the effects of both short and long intervals on infant, child, and maternal health,[1,2] should furnish a strong motivating force for health personnel to provide family planning. The health sector should supply such care not only to those wishing to limit their fertility for personal, social, or economic reasons, but should also provide the needed services to those practicing family planning for health reasons. The results of our systematic review could be used by reproductive clinicians around the world to advise women on the benefits of delaying a subsequent pregnancy for approximately 2 to 5 years to improve the health of both mother and the next infant.

Despite the advances during the last 2 decades in understanding the relationship between birth spacing and adverse pregnancy outcomes, little information is available to explain the mechanisms by which birth spacing might improve the health of mothers and their children. Also, more studies are needed on whether the effects of birth spacing on perinatal health differ in developed vs developing nations. Finally, it is imperative to understand the causes for both short and long intervals in any population to interpret the data on health risks. The consequence of this may be that family planning policies and messages may need to be tailored to different populations.

**Author Contributions:** Dr Conde-Agudelo had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* Conde-Agudelo.
*Acquisition of data:* Conde-Agudelo, Rosas-Bermúdez.
*Analysis and interpretation of data:* Conde-Agudelo, Rosas-Bermúdez, Kafury-Goeta.
*Drafting of the manuscript:* Conde-Agudelo, Rosas-Bermúdez, Kafury-Goeta.
*Critical revision of the manuscript for important intellectual content:* Conde-Agudelo, Rosas-Bermúdez, Kafury-Goeta.
*Statistical analysis:* Conde-Agudelo, Rosas-Bermúdez, Kafury-Goeta.
*Obtained funding:* Conde-Agudelo.
*Administrative, technical, or material support:* Rosas-Bermúdez, Kafury-Goeta.
*Study supervision:* Conde-Agudelo.
**Financial Disclosures:** None reported.
**Funding/Support:** This work was supported by the Office of Population and Reproductive Health, Bureau for Global Health, US Agency for International Development, under the terms of Cooperative Agreements HRN-A-00-00-00003-00 and GPO-A-00-05-00027-0 awarded to the CATALYST Consortium.
**Role of the Sponsor:** The funding organization had no role in the design and conduct of the study; the collection, analysis, and interpretation of the data; or the preparation, review, or approval of the manuscript.
**Disclaimer:** The author's views expressed herein do not necessarily reflect the views of the US Agency for International Development or the US government.
**Acknowledgment:** We thank Maureen Norton, PhD (Office of Population and Reproductive Health, Bureau for Global Health, USAID, Washington, DC), Taroub Faramand, MD, MPH (CATALYST Consortium, Washington, DC), José Belizán, MD, PhD, and Eduardo Bergel, PhD (Institute for Clinical Effectiveness and Health Policy, Buenos Aires, Argentina), Bao-Ping Zhu, MD, MS (Missouri Department of Health and Senior Services, Jefferson City), Julie DaVanzo, PhD (RAND Corporation, Santa Monica, Calif), Roger Rochat, PhD (Rollins School of Public Health, Atlanta, Ga), Linda Adair, PhD (University of North Carolina at Chapel Hill), and Stan Becker, PhD (Johns Hopkins University School of Hygiene and Public Health, Baltimore, Md), for their relevant contributions to previous versions of the article; Eileen D'Andrea, MLS, Jennifer Gelman, MLS, and Juan Carlos Toscano, BS (Academy for Educational Development, Washington, DC) and Laurel Suiter, MA (CATALYST Consortium), for their assistance in conducting the computerized literature search and obtaining the articles; and Ed Abel, MPA, Elsa Berhane, MPH, and Caroline Tran, MA (CATALYST Consortium), and Paula Hollerbach, PhD, Amy Uccello, MA, and Margaret McGunnigle, MPH (Academy for Educational Development), for their administrative support in the organization of the review.

## REFERENCES

1. Winikoff B. The effects of birth spacing on child and maternal health. *Stud Fam Plann*. 1983;14:231-245.
2. Rousso D, Panidis D, Gkoutzioulis F, Kourtis A, Mavromatidis G, Kalahanis I. Effect of the interval between pregnancies on the health of mother and child. *Eur J Obstet Gynecol Reprod Biol*. 2002;105:4-6.
3. King JC. The risk of maternal nutritional depletion and poor outcomes increases in early or closely spaced pregnancies. *J Nutr*. 2003;133:1732S-1736S.
4. Erickson JD, Bjerkedal T. Interval between pregnancies. *Lancet*. 1979;1:52.
5. Klebanoff MA. The interval between pregnancies and the outcome of subsequent births. *N Engl J Med*. 1999;340:643-644.
6. Stroup DF, Berlin JA, Morton SC, et al; Meta-analysis Of Observational Studies in Epidemiology (MOOSE) Group. Meta-analysis of observational studies in epidemiology: a proposal for reporting. *JAMA*. 2000;283:2008-2012.
7. Levine M, Walter S, Lee H, Haines T, Holbrook A, Moyer V; Evidence-Based Medicine Working Group. Users' guides to the medical literature, IV: how to use an article about harm. *JAMA*. 1994;271:1615-1619.
8. Downs SH, Black N. The feasibility of creating a checklist for the assessment of the methodological quality both of randomised and non-randomised studies of health care interventions. *J Epidemiol Community Health*. 1998;52:377-384.
9. Greenland S, Longnecker MP. Methods for trend estimation from summarized dose-response data, with applications to meta-analysis. *Am J Epidemiol*. 1992;135:1301-1309.
10. Berlin JA, Longnecker MP, Greenland S. Meta-analysis of epidemiologic dose-response data. *Epidemiology*. 1993;4:218-228.
11. Higgins JPT, Deeks JJ, Altman DG. Measuring inconsistency in meta-analyses. *BMJ*. 2003;327:557-560.
12. DerSimonian R, Laird N. Meta-analysis in clinical trials. *Control Clin Trials*. 1986;7:177-188.
13. Egger M, Davey Smith G, Schneider M, Minder C. Bias in meta-analyses detected by a simple graphical test. *BMJ*. 1997;315:629-634.
14. Fedrick J, Adelstein P. Influence of pregnancy spacing on outcome of pregnancy. *BMJ*. 1973;4:753-756.
15. Swenson I, Harper PA. The relationship between fetal wastage and pregnancy spacing in Bangladesh. *Soc Biol*. 1978;25:251-257.
16. Eisner V, Brazie JV, Pratt MW, Hexter AC. The risk of low birthweight. *Am J Public Health*. 1979;69:887-893.
17. Spratley E, Taffel S. Interval between births: United States, 1970-77. *Vital Health Stat 21*. 1981;39:1-47.
18. Fortney JA, Higgins JE. The effect of birth interval on perinatal survival and birth weight. *Public Health*. 1984;98:73-83.
19. DaVanzo J, Habicht JP, Butz WP. Assessing socioeconomic correlates of birthweight in peninsular Malaysia: ethnic differences and changes over time. *Soc Sci Med*. 1984;18:387-404.
20. Brody DJ, Bracken MB. Short interpregnancy in-

©2006 American Medical Association. All rights reserved.

Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013

terval: a risk factor for low birthweight. *Am J Perinatol.* 1987;4:50-54.
21. Klebanoff MA. Short interpregnancy interval and the risk of low birthweight. *Am J Public Health.* 1988; 78:667-670.
22. Lieberman E, Lang JM, Ryan KJ, Monson RR, Schoenbaum SC. The association of inter-pregnancy interval with small for gestational age births. *Obstet Gynecol.* 1989;74:1-5.
23. Casterline JB. Maternal age, gravidity, and pregnancy spacing effects on spontaneous fetal mortality. *Soc Biol.* 1989;36:186-212.
24. Miller JE. Determinants of intrauterine growth retardation: evidence against maternal depletion. *J Biosoc Sci.* 1989;21:235-243.
25. Lang JM, Lieberman E, Ryan KJ, Monson RR. Interpregnancy interval and risk of preterm labor. *Am J Epidemiol.* 1990;132:304-309.
26. Neel NR, Alvarez JO. Risk factors of fetal malnutrition in a group of Guatemalan mothers and neonates [in Spanish]. *Bol Oficina Sanit Panam.* 1991;110: 93-107.
27. Miller JE. Birth intervals and perinatal health: an investigation of three hypotheses. *Fam Plann Perspect.* 1991;23:62-70.
28. Huttly SR, Victora CG, Barros FC, Vaughan JP. Birth spacing and child health in urban Brazilian children. *Pediatrics.* 1992;89:1049-1054.
29. Kallan JE. Effects of interpregnancy intervals on preterm birth, intrauterine growth retardation, and fetal loss. *Soc Biol.* 1992;39:231-245.
30. Barros FC, Huttly SR, Victora CG, Kirkwood BR, Vaughan JP. Comparison of the causes and consequences of prematurity and intrauterine growth retardation: a longitudinal study in southern Brazil. *Pediatrics.* 1992;90:238-244.
31. Leong WP, Viegas OA, Ratnam SS. Premature childbirth: social and behavioural risks in Singapore. *J Biosoc Sci.* 1993;25:465-472.
32. Gribble JN. Birth intervals, gestational age, and low birth weight: are the relationships confounded? *Popul Stud.* 1993;47:133-146.
33. Miller JE. Birth order, interpregnancy interval and birth outcomes among Filipino infants. *J Biosoc Sci.* 1994;26:243-259.
34. Greenwood R, Samms-Vaughan M, Golding J, Ashley D. Past obstetric history and risk of perinatal death in Jamaica. *Paediatr Perinat Epidemiol.* 1994;8(suppl 1):40-53.
35. Fikree FF, Berendes HW. Risk factors for term intrauterine growth retardation: a community-based study in Karachi. *Bull World Health Organ.* 1994;72: 581-587.
36. Rawlings JS, Rawlings VB, Read JA. Prevalence of low birth weight and preterm delivery in relation to the interval between pregnancies among white and black women. *N Engl J Med.* 1995;332:69-74.
37. Fourn L, Goulet L, Seguin L. Birth intervals and birth of low weight infants in Benin [in French]. *Med Trop (Mars).* 1996;56:163-166.
38. Ochoa Sangrador C, Luque Benlloch C, Carrascal Tejado A. Prematurity, low birth weight and the interval between pregnancies [in Spanish]. *An Esp Pediatr.* 1996;45:67-70.
39. Kallan JE. Reexamination of interpregnancy intervals and subsequent birth outcomes: evidence from U.S. linked birth/infant death records. *Soc Biol.* 1997; 44:205-212.
40. Adams MM, Delaney KM, Stupp PW, McCarthy BJ, Rawlings S. The relationship of interpregnancy interval to infant birthweight, and length of gestation among low-risk women, Georgia. *Paediatr Perinat Epidemiol.* 1997;11(suppl 1):48-62.
41. Bakewell JM, Stockbauer JW, Schramm WF. Factors associated with repetition of low birthweight: Missouri longitudinal study. *Paediatr Perinat Epidemiol.* 1997;11(suppl 1):119-129.
42. Sener T, Gürel SA, Gürel H, Özalp S, Hassa H, Enünlü T. Risk factors associated with small for gestational age infants in a Turkish population. *J Matern Fetal Invest.* 1997;7:145-151.
43. Khoshnood B, Lee KS, Wall S, Hsieh HL, Mittendorf R. Short interpregnancy intervals and the risk of adverse birth outcomes among five racial/ethnic groups in the United States. *Am J Epidemiol.* 1998;148:798-805.
44. Deshmukh JS, Motghare DD, Zodpey SP, Wadhva SK. Low birth weight and associated maternal factors in an urban area. *Indian Pediatr.* 1998;35:33-36.
45. Klerman LV, Cliver SP, Goldenberg RL. The impact of short interpregnancy intervals on pregnancy outcomes in a low-income population. *Am J Public Health.* 1998;88:1182-1185.
46. Ekwo EE, Moawad A. The relationship of interpregnancy interval to the risk of preterm births to black and white women. *Int J Epidemiol.* 1998;27:68-73.
47. Basso O, Olsen J, Knudsen LB, Christensen K. Low birth weight and preterm birth after short interpregnancy intervals. *Am J Obstet Gynecol.* 1998;178:259-263.
48. Shults RA, Arndt V, Olshan AF, Martin CF, Royce RA. Effects of short interpregnancy intervals on small-for gestational age and preterm births. *Epidemiology.* 1999;10:250-254.
49. Zhu BP, Rolfs RT, Nangle BE, Horan JM. Effect of the interval between pregnancies on perinatal outcomes. *N Engl J Med.* 1999;340:589-594.
50. Fuentes-Afflick E, Hessol NA. Interpregnancy interval and the risk of premature infants. *Obstet Gynecol.* 2000;95:383-390.
51. Sachar RK, Soni RK. Perinatal mortality in rural Punjab—a population-based study. *J Trop Pediatr.* 2000; 46:43-45.
52. Zhu BP, Haines KM, Le T, McGrath-Miller K, Boulton ML. Effect of the interval between pregnancies on perinatal outcomes among white and black women. *Am J Obstet Gynecol.* 2001;185:1403-1410.
53. Rousham EK, Gracey M. Factors affecting birth-weight of rural Australian Aborigines. *Ann Hum Biol.* 2002;29:363-372.
54. Dafopoulos KC, Galazios GC, Tsikouras PN, Koutlaki NG, Liberis VA, Anastasiadis PG. Interpregnancy interval and the risk of preterm birth in Thrace, Greece. *Eur J Obstet Gynecol Reprod Biol.* 2002;103:14-17.
55. Smith GC, Pell JP, Dobbie R. Interpregnancy interval and risk of preterm birth and neonatal death: retrospective cohort study [published correction appears in *BMJ.* 2003;327:851]. *BMJ.* 2003;327:313.
56. Zhu BP, Le T. Effect of interpregnancy interval on infant low birth weight: a retrospective cohort study using the Michigan Maternally Linked Birth Database. *Matern Child Health J.* 2003;7:169-178.
57. Stephansson O, Dickman PW, Cnattingius S. The influence of interpregnancy interval on the subsequent risk of stillbirth and early neonatal death. *Obstet Gynecol.* 2003;102:101-108.
58. van Eijk AM, Ayisi JG, ter Kuile FO, et al. Effectiveness of intermittent preventive treatment with sulphadoxine-pyrimethamine for control of malaria in pregnancy in western Kenya: a hospital-based study. *Trop Med Int Health.* 2004;9:351-360.
59. Arafa MA, Alkhouly A, Youssef ME. Influence of inter-pregnancy interval on preterm delivery. *Paediatr Perinat Epidemiol.* 2004;18:248-252.
60. Pedroso de Barros E, Avelar WM, Cecatti JG, Besteti Pires HM. Associação entre intervalo interpartal e situações maternas e perinatais. In: *Simposio Internacional "Cesárea; avaliação e propostas de ação."* Campinas, Brazil: CEMICAMP; 2004.
61. Hsieh TT, Chen SF, Shau WY, Hsieh CC, Hsu JJ, Hung TH. The impact of interpregnancy interval and previous preterm birth on the subsequent risk of preterm birth. *J Soc Gynecol Investig.* 2005;12:202-207.
62. DaVanzo J, Razzaque A, Rahman M, et al. The effects of birth spacing on infant and child mortality, pregnancy outcomes, and maternal morbidity and mortality in Matlab, Bangladesh. In: *Technical Consultation and Review of the Scientific Evidence for Birth Spacing.* Geneva, Switzerland: World Health Organization; 2005.
63. Rutstein O. Effect of preceding pregnancy interval on fetal and perinatal mortality: multivariate cross-country analyses. In: *Technical Consultation and Review of the Scientific Evidence for Birth Spacing.* Geneva, Switzerland: World Health Organization; 2005.
64. Conde-Agudelo A, Belizán JM, Norton M, Rosas-Bermúdez A. Effect of the interpregnancy interval on perinatal outcomes in Latin America. *Obstet Gynecol.* 2005;106:359-366.
65. Hosain GM, Chatterjee N, Begum A, Saha SC. Factors associated with low birthweight in rural Bangladesh [pushed online ahead of print October 19, 2005]. *J Trop Pediatr.* 2005:662.
66. Ruelas-Orozco G, Guzman J, Malacara JM. Perinatal mortality risk factors in a case-control study [in Spanish]. *Bol Med Hosp Infant Mex.* 1985;42:153-158.
67. Ferraz EM, Gray RH, Fleming PL, Maia TM. Interpregnancy interval and low birth weight: findings from a case-control study. *Am J Epidemiol.* 1988;128: 1111-1116.
68. Bartlett AV, Paz de Bocaletti ME. Intrapartum and neonatal mortality in a traditional indigenous community in rural Guatemala. *Acta Paediatr Scand.* 1991; 80:288-296.
69. Mavalankar DV, Gray RH. Re: "Interpregnancy interval and risk of preterm labor. *Am J Epidemiol.* 1991;133:958-959.
70. Dechering WH, Perera RS. A secondary analysis of determinants of low birth weight. *Ceylon Med J.* 1991;36:52-62.
71. Kumar R, Singhi S. Risk factors for stillbirths in a rural community. *Indian J Pediatr.* 1992;59:455-461.
72. Mavalankar DV, Gray RH, Trivedi CR. Risk factors for preterm and term low birthweight in Ahmedabad, India. *Int J Epidemiol.* 1992;21:263-272.
73. Arif MA, Qureshi AH, Jafarey SN, Alam SE, Arif K. Maternal sociocultural status: a novel assessment of risk for the birth of small for gestational age, low birth weight infants. *J Obstet Gynaecol Res.* 1998;24: 215-222.
74. Grau Espinosa MA, Saenz Darias L, Cabrales Escobar JA. Risk factors of low birth weight: Provincial Gynecologic-Obstetric Hospital of Sancti Spiritus, Cuba [in Spanish]. *Rev Panam Salud Publica.* 1999; 6:95-98.
75. Wang PD, Lin RS. Perinatal mortality in Taiwan. *Public Health.* 1999;113:27-33.
76. Mafina-Mienandi MC, Ganga-Zandzou PS, Makoumbou P, Malonga H, Ekoundzola JR, Mayanda HF. Risk factors of intrauterine growth retardation in Congo [in French]. *J Gynecol Obstet Biol Reprod (Paris).* 2002; 31:500-505.
77. Al-Jasmi F, Al-Mansoor F, Alsheiba A, Carter AO, Carter TP, Hossain MM. Effect of interpregnancy interval on risk of spontaneous preterm birth in Emirati women, United Arab Emirates. *Bull World Health Organ.* 2002;80:871-875.
78. Khan N, Jamal M. Maternal risk factors associated with low birth weight. *J Coll Physicians Surg Pak.* 2003;13:25-28.
79. Orji EO, Shittu AS, Makinde ON, Sule SS. Effect of prolonged birth spacing on maternal and perinatal outcome. *East Afr Med J.* 2004;81:388-391.
80. Kleijer ME, Dekker GA, Heard AR. Risk factors for intrauterine growth restriction in a socio-economically disadvantaged region. *J Matern Fetal Neonatal Med.* 2005;18:23-30.
81. Winkvist A, Rasmussen KM, Habicht JP. A new definition of maternal depletion syndrome. *Am J Public Health.* 1992;82:691-694.
82. Smits LJM, Essed GGM. Short interpregnancy intervals and unfavourable pregnancy outcome: role of folate depletion. *Lancet.* 2001;358:2074-2077.

**©2006 American Medical Association. All rights reserved.**

**Downloaded From: http://jama.jamanetwork.com/ by a Centers for Medicare & Medicaid Services User on 07/24/2013**