# Interpregnancy Interval and the Risk of Premature Infants

*ELENA FUENTES-AFFLICK, MD, MPH, AND NANCY A. HESSOL, MSPH*

*Objective*: Interpregnancy intervals are associated with the risk of low birth weight (LBW) infants, but the association between interpregnancy interval and prematurity is unknown. Our objective was to determine whether interpregnancy intervals were associated with the risk of premature infants and to define the degree of risk according to interpregnancy interval.

*Methods*: We analyzed 289,842 singleton infants born to parous Mexican-origin Hispanic and non-Hispanic white women in the United States who resided in the same county and delivered between January 1, 1991 and September 30, 1991. Interpregnancy interval was defined as the number of months between the previous live birth and conception of the index pregnancy. Multivariate logistic regression analysis was used to estimate odds ratios and 95% confidence intervals for the risk of interpregnancy interval on very premature (23–32 weeks), moderately premature (33–37 weeks), and term gestation (38–42 weeks).

*Results*: Nearly 37% of women had interpregnancy intervals less than 18 months, 45.5% of women had intervals of 18–59 months, and 17.6% of women had intervals over 59 months. After adjusting for confounding variables, women with intervals less than 18 months were 14–47% more likely to have very premature and moderately premature infants than women with intervals of 18–59 months. Women with intervals over 59 months were 12–45% more likely to have very premature and moderately premature infants than women with intervals of 18–59 months.

*Conclusion*: Women with interpregnancy intervals from 18–59 months had the lowest risk of very premature and moderately premature infants. Further study is needed to define the mechanisms through which interpregnancy interval influences pregnancy outcome. (Obstet Gynecol 2000;95:

383–90. © 2000 by The American College of Obstetricians and Gynecologists.)

Premature infants have higher morbidity and mortality rates than infants born at term.[1] The prevention of prematurity is a priority for public health in the United States,[2] but prematurity rates increased by 8% in the past decade.[3–13]

Interpregnancy interval is the interval between the end of one pregnancy and conception of the next pregnancy.[14,15] Short interpregnancy intervals are associated with a higher risk of low birth weight (LBW) infants,[16,17] but the relationship between interpregnancy intervals and prematurity is unknown. Some studies found that women with short intervals have a higher risk of having premature infants than women with longer intervals,[14,15,17–20] whereas other studies found no association between short intervals and prematurity.[21–23] Long interpregnancy intervals might also be important, but few studies have analyzed the relationship between long intervals and prematurity.[14,18,20,21,24] Finally, it is not known whether interpregnancy interval is an independent risk factor for perinatal outcomes or whether interpregnancy interval is associated with maternal characteristics that affect perinatal outcome.[25,26] The objectives of the present study were to determine the relationship between the interpregnancy interval length, confounding variables, and prematurity and to define the degree of risk according to interpregnancy interval.

## Methods

From the 1991 United States linked birth-infant death dataset, we selected singleton infants born from January 1, 1991, to September 30, 1991, to Mexican-origin Hispanic (Hispanic) and non-Hispanic white (white) women who had at least one previous live birth. We selected only infants born to Hispanic and white women because women from these ethnic groups have

*From the Departments of Pediatrics, Epidemiology and Biostatistics, Medicine, and Obstetrics, Gynecology and Reproductive Sciences, the Medical Effectiveness Research Center for Diverse Populations, and the Institute for Health Policy Studies, School of Medicine, University of California, San Francisco, San Francisco, California.*

*This study was supported by a grant from UC MEXUS and the Medical Effectiveness Research Center for Diverse Populations, University of California, San Francisco (AHCPR grant #HS07373).*

0029-7844/00/$20.00   **383**
PII S0029-7844(99)00583-9

**000544**

Exhibit 129

JA-0001677

similar prematurity rates.[13] To account for community and temporal factors, we matched Hispanic and white women who resided in the same county and delivered during the same month in a one-to-one ratio. We restricted the analysis to the first 9 months of 1991 to minimize the chance of counting a birth mother more than once. The Committee on Human Research at the University of California, San Francisco approved this study.

The primary independent variable was interpregnancy interval, ie, the number of months between delivery of the previous infant and conception of the current pregnancy.[15,19] To calculate interpregnancy interval, we used birth certificate data to compute the interval between the date of last live birth and the date of birth of the index infant and then subtracted the gestational age of the index infant.[15,17,20,23] For bivariate comparisons, we created the following nine categories of interpregnancy intervals: less than 6 months, 6–11 months, 12–17 months, 18–23 months, 24–29 months, 30–35 months, 36–47 months, 48–59 months, and more than 59 months. For multivariate comparisons, we combined the 18–59 month intervals and used this group as the reference category.

We defined the following mutually exclusive dependent variables: extremely premature (less than 23 weeks' gestation), very premature (23–32 weeks' gestation), moderately premature (33–37 weeks' gestation), term (38–42 weeks' gestation, reference category), and postterm (longer than 42 weeks' gestation). We excluded births with missing data for any study variable (7.0% of all births). For the multivariate analyses of prematurity outcomes, we excluded extremely premature infants (0.07% of births) and postterm infants (7.6% of births).

We also analyzed other maternal and infant factors, including maternal age (14 years old or less, 15–17, 18–26, 27–34, and over 34 years), education (under 9, 9–11, 12, 13–15, over 15 years), birthplace (50 states and the District of Columbia compared with United States territories or other countries), parity (number of children born alive, including the current pregnancy: two, three, or more than three), previous premature or small for gestational age (SGA) infant, utilization of prenatal care, and infant sex. Utilization of prenatal care was categorized according to the Kotelchuck Adequacy of Prenatal Care Utilization index[27] (inadequate, intermediate, adequate, and adequate plus). We were unable to analyze marital status because information on marital status was not reported for every state in the dataset. Similarly, we were unable to analyze maternal tobacco use because more than half of births (56.2%) were missing that information.

We used $\chi^2$ statistics to compare maternal character-istics and prematurity outcomes across all categories of interpregnancy interval. We used logistic regression to estimate unadjusted and adjusted odds ratios (OR) and 95% confidence intervals (CI) for the association between interpregnancy interval and very premature and moderately premature outcomes. In the multivariate logistic regression models, we included maternal ethnicity, age, education, birthplace, parity, previous premature or SGA infant, utilization of prenatal care, and infant sex. Commercially available software (SAS Institute, Inc., Cary, NC) was used for all statistical analyses.

## Results

A total of 289,842 births were selected using the study criteria. Women with interpregnancy intervals over 59 months were more likely to have missing data on maternal education, parity, and utilization of prenatal care than women from the other categories of interpregnancy intervals ($P < .001$). Women with interpregnancy intervals less than 6 months had the highest proportion of missing data on gestational age relative to women in the other categories of interpregnancy intervals ($P < .001$).

Nearly thirty-seven percent (36.9%) of women had interpregnancy intervals less than 18 months (Table 1). Nine percent of women had intervals less than 6 months, 14.3% had intervals of 6–11 months, and 13.6% had intervals of 12–17 months.

Women with interpregnancy intervals less than 18 months had more demographic, obstetric, and health-service risk factors than women with intervals of 18–59 months (Table 1). Women with intervals less than 12 months were more likely to be Hispanic than women with intervals of 18–59 months. Women with interpregnancy intervals less than 18 months were younger, less educated, had higher parity, and had less adequate utilization of prenatal care than women with intermediate intervals.

Women with interpregnancy intervals less than 18 months had higher rates of very premature and moderately premature infants than women with intervals of 18–59 months (Table 2, Figures 1 and 2). For all subsequent comparisons, we used interpregnancy intervals of 18–59 months as the reference category. In unadjusted logistic regression analyses, women with intervals less than 6 months were almost twice as likely to have very premature infants as women with intervals of 18–59 months (Table 3). Similarly, women with interpregnancy intervals of 6–11 and 12–17 months were 30–53% more likely to have very premature infants than women with intervals of 18–59 months. In unadjusted analyses of moderate prematurity, women with interpregnancy intervals less than 18 months were

000545

Exhibit 129                                                                        JA-0001678

Exhibit 129

**Table 1.** Distribution of Selected Maternal Characteristics by Interpregnancy Intervals Among Hispanic and White Women in the United States, 1991

| Characteristic | Interpregnancy interval (mo) | | | | | | | | | $\chi^2 P$ |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | <6 (n = 26,022) | 6–11 (n = 41,454) | 12–17 (n = 39,390) | 18–23 (n = 32,172) | 24–29 (n = 26,568) | 30–35 (n = 21,111) | 36–47 (n = 30,874) | 48–59 (n = 21,301) | >59 (n = 50,950) | |
| Ethnicity* | | | | | | | | | | .001 |
| Hispanic | 62.7 | 51.8 | 44.8 | 43.1 | 43.9 | 47.4 | 49.1 | 52.6 | 52.3 | |
| White | 37.3 | 48.2 | 55.2 | 56.9 | 56.1 | 52.6 | 50.9 | 47.5 | 47.7 | |
| Age (y)* | | | | | | | | | | .001 |
| <15 | 0.10 | 0.02 | 0.02 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| 15–17 | 4.5 | 2.4 | 1.4 | 0.7 | 0.3 | 0.2 | 0.05 | 0.01 | 0.0 | |
| 18–26 | 62.3 | 54.4 | 48.2 | 45.0 | 42.9 | 42.3 | 39.0 | 33.3 | 14.4 | |
| 27–34 | 28.3 | 36.0 | 41.8 | 44.7 | 46.8 | 46.9 | 49.0 | 52.8 | 58.5 | |
| >34 | 4.9 | 7.1 | 8.6 | 9.6 | 10.0 | 10.6 | 11.9 | 13.9 | 27.1 | |
| Education (y) | | | | | | | | | | .001 |
| <9 | 23.3 | 18.7 | 15.8 | 15.0 | 15.8 | 16.7 | 18.5 | 20.4 | 21.5 | |
| 9–11 | 29.3 | 22.8 | 19.2 | 17.6 | 16.6 | 17.3 | 17.5 | 17.2 | 16.4 | |
| 12 | 27.6 | 29.2 | 29.3 | 29.5 | 29.4 | 30.9 | 31.2 | 32.6 | 33.3 | |
| 13–15 | 11.3 | 15.1 | 16.9 | 17.8 | 18.2 | 17.5 | 17.3 | 16.9 | 17.9 | |
| >15 | 8.6 | 14.3 | 18.8 | 20.2 | 20.0 | 17.6 | 15.5 | 12.9 | 10.9 | |
| Birthplace | | | | | | | | | | .001 |
| Non-United States | 40.1 | 34.3 | 30.0 | 29.6 | 30.5 | 33.6 | 35.3 | 37.8 | 37.1 | |
| United States | 59.9 | 65.7 | 70.0 | 70.4 | 69.5 | 66.4 | 64.7 | 62.2 | 62.9 | |
| Parity (no. of children born alive) | | | | | | | | | | .001 |
| 2 | 47.5 | 50.8 | 53.9 | 56.2 | 56.4 | 55.9 | 53.0 | 49.7 | 46.2 | |
| 3 | 26.8 | 26.2 | 25.5 | 25.3 | 26.0 | 26.8 | 28.7 | 30.7 | 33.6 | |
| >3 | 25.7 | 23.0 | 20.7 | 18.6 | 17.6 | 17.3 | 18.3 | 19.6 | 20.2 | |
| Previous preterm or SGA infant | | | | | | | | | | .039 |
| Yes | 1.5 | 1.4 | 1.4 | 1.3 | 1.2 | 1.2 | 1.2 | 1.3 | 1.4 | |
| No | 98.5 | 98.7 | 98.6 | 98.7 | 98.8 | 98.8 | 98.8 | 98.7 | 98.6 | |
| Use of prenatal care | | | | | | | | | | .001 |
| Inadequate | 41.6 | 29.9 | 23.7 | 20.1 | 18.9 | 18.6 | 18.4 | 18.6 | 17.8 | |
| Intermediate | 15.2 | 16.2 | 16.0 | 16.4 | 16.2 | 16.5 | 17.0 | 17.4 | 16.2 | |
| Adequate | 27.3 | 34.6 | 38.9 | 41.9 | 42.2 | 41.5 | 41.5 | 41.1 | 40.5 | |
| Adequate plus | 16.0 | 19.3 | 21.5 | 21.6 | 22.7 | 23.4 | 23.1 | 22.9 | 25.5 | |

SGA = small for gestational age.
Data are given as percentages, and may not total 100% because of rounding.

000546

JA-0001679

Table 2. Distribution of Infant Outcomes (%) by Interpregnancy Intervals Among Hispanic and White Women in the United States, 1991

| Characteristic | Interpregnancy interval (mo) | | | | | | | | | $\chi^2$ P |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | <6 (n = 26,022) | 6–11 (n = 41,454) | 12–17 (n = 39,390) | 18–23 (n = 32,172) | 24–29 (n = 26,568) | 30–35 (n = 21,111) | 36–47 (n = 30,874) | 48–59 (n = 21,301) | >59 (n = 50,950) | |
| Gestational age (wk) | | | | | | | | | | .001 |
| <23 | 0.07 | 0.05 | 0.07 | 0.05 | 0.03 | 0.03 | 0.06 | 0.08 | 0.10 | |
| 23–32 | 1.9 | 1.6 | 1.4 | 1.0 | 1.1 | 1.1 | 1.2 | 1.2 | 1.7 | |
| 33–37 | 14.6 | 13.6 | 13.4 | 11.8 | 11.8 | 12.2 | 12.6 | 12.4 | 14.0 | |
| 38–42 | 72.7 | 76.0 | 77.8 | 80.5 | 80.1 | 79.7 | 79.3 | 79.3 | 77.7 | |
| >42 | 10.7 | 8.8 | 7.3 | 6.6 | 6.9 | 6.9 | 6.9 | 7.0 | 6.5 | |
| Sex | | | | | | | | | | .213 |
| Male | 50.6 | 50.9 | 51.0 | 51.6 | 51.2 | 51.5 | 51.1 | 50.6 | 51.3 | |
| Female | 49.4 | 49.1 | 49.0 | 48.4 | 48.8 | 48.5 | 48.9 | 49.4 | 48.7 | |

Data are given as percentages and may not total 100% because of rounding.



**Figure 1.** Incidence (%) of very premature infants (23–32 weeks' gestation) by interpregnancy interval.

14–31% more likely to have moderately premature infants than women with intervals of 18–59 months.

A total of 246,726 infants whose gestation was 23–42 weeks and had complete information for all study variables were included in the multivariate analyses of very premature and moderately premature outcomes (very premature, $n = 3406$; moderately premature, $n = 34,353$; term gestation, $n = 208,967$). After adjusting for demographic, obstetric, and health-service factors, women with interpregnancy intervals less than 18 months were 14–47% more likely to have very premature and moderately premature infants than women with intervals of 18–59 months (Table 3).

One fifth of women had interpregnancy intervals over 59 months (Table 1). Women with interpregnancy intervals over 59 months were more likely to be Hispanic and older than women with intervals of 18–59 months.



**Figure 2.** Incidence (%) of moderately premature infants (33–37 weeks' gestation) by interpregnancy interval.

000547

Exhibit 129                                                                          JA-0001680

**Table 3.** Unadjusted and Adjusted Odds Ratios (95% Confidence Intervals) for the Association of Interpregnancy Intervals with Very Premature and Moderately Premature Outcomes Among Hispanic and White Women in the United States, 1991

| Characteristic | Very premature ($n = 3406$) | | Moderately premature ($n = 34,353$) | |
|---|---|---|---|---|
| | Unadjusted | Adjusted | Unadjusted | Adjusted |
| Interpregnancy interval (mo) | | | | |
| <6 | 1.85 (1.65, 2.07) | 1.47 (1.30, 1.65) | 1.31 (1.26, 1.37) | 1.20 (1.15, 1.26) |
| 6–11 | 1.53 (1.39, 1.69) | 1.39 (1.25, 1.54) | 1.17 (1.13, 1.21) | 1.14 (1.10, 1.18) |
| 12–17 | 1.30 (1.17, 1.44) | 1.26 (1.13, 1.41) | 1.14 (1.10, 1.18) | 1.15 (1.10, 1.19) |
| 18–59 | 1.00 | 1.00 | 1.00 | 1.00 |
| >59 | 1.55 (1.41, 1.70) | 1.45 (1.31, 1.60) | 1.18 (1.14, 1.21) | 1.12 (1.08, 1.15) |
| Maternal ethnicity | | | | |
| Hispanic | | 1.30 (1.19, 1.42) | | 1.26 (1.22, 1.30) |
| White | | 1.00 | | 1.00 |
| Maternal age (y) | | | | |
| <15 | | 1.25 (0.17, 9.34) | | 0.92 (0.37, 2.27) |
| 15–17 | | 2.03 (1.61, 2.55) | | 1.50 (1.35, 1.66) |
| 18–26 | | 1.00 | | 1.00 |
| 27–34 | | 0.81 (0.75, 0.89) | | 0.90 (0.87, 0.93) |
| >34 | | 1.04 (0.92, 1.18) | | 0.99 (0.95, 1.04) |
| Maternal education (y) | | | | |
| <9 | | 1.08 (0.96, 1.22) | | 1.15 (1.10, 1.20) |
| 9–11 | | 1.24 (1.12, 1.36) | | 1.16 (1.12, 1.21) |
| 12 | | 1.00 | | 1.00 |
| 13–15 | | 0.76 (0.68, 0.85) | | 0.90 (0.87, 0.94) |
| >15 | | 0.61 (0.53, 0.70) | | 0.82 (0.79, 0.86) |
| Maternal birthplace | | | | |
| Non-United States | | 0.82 (0.74, 0.90) | | 0.92 (0.89, 0.95) |
| United States | | 1.00 | | 1.00 |
| Parity (no. of children born alive) | | | | |
| 2 | | 1.00 | | 1.00 |
| 3 | | 1.07 (0.98, 1.16) | | 1.04 (1.01, 1.07) |
| >3 | | 1.34 (1.22, 1.47) | | 1.14 (1.10, 1.18) |
| Previous premature or SGA infant | | | | |
| Yes | | 4.90 (4.17, 5.76) | | 2.61 (2.40, 2.84) |
| No | | 1.00 | | 1.00 |
| Use of prenatal care | | | | |
| Inadequate | | 4.02 (3.56, 4.54) | | 2.17 (2.10, 2.26) |
| Intermediate | | 1.08 (0.90, 1.29) | | 0.88 (0.84, 0.93) |
| Adequate | | 1.00 | | 1.00 |
| Adequate plus | | 11.35 (10.17, 12.67) | | 6.92 (6.70, 7.14) |
| Infant sex | | | | |
| Male | | 1.13 (1.05, 1.21) | | 1.16 (1.12, 1.17) |
| Female | | 1.00 | | 1.00 |

SGA = small for gestational age.

Women with interpregnancy intervals over 59 months had higher rates of very premature and moderately premature infants than women with intervals of 18–59 months (Table 2, Figures 1 and 2). In unadjusted analyses, women with intervals over 59 months were 18–55% more likely to have very premature and moderately premature infants than women with intervals of 18–59 months (Table 3). After adjusting for demographic, obstetric, and health-service factors, women with interpregnancy intervals over 59 months were 12–45% more likely to have very premature and moderately premature infants than women with intervals of 18–59 months (Table 3).

Maternal demographic, obstetric, and health-service factors were associated with the risk of premature infants (Table 3). Relative to women from the reference categories, the odds of very premature and moderately premature infants were higher among women who were Hispanic, 15–17 years old, who had 9–11 years of education, high parity, previous premature or SGA infants, and inadequate or adequate plus utilization of prenatal care. Conversely, women who were 27–34 years old, foreign-born, and had more than 12 years of education were less likely to have very premature and moderately premature infants than women from the reference categories.

000548

Exhibit 129                                                                                          JA-0001681

## Discussion

In this study of Hispanic and white women in the United States, we found that interpregnancy intervals less than 18 months and more than 59 months were independently associated with the risk of premature infants. The distribution of maternal demographic, obstetric, and health-service factors varied by interpregnancy interval, but the relationship between interpregnancy intervals and prematurity outcomes persisted after adjusting for those factors. In our analyses, adjustment for maternal characteristics resulted in a slight (3–21%) reduction in the odds of very premature infants and a minimal (0–8%) reduction in the odds of moderately premature infants. Our results are consistent with those of a recent study that reported that adjusting for maternal characteristics reduced the odds of premature infants (less than 37 weeks' gestation) by approximately 10%.[17] The effect of interpregnancy interval on prematurity in our study was not the result of confounding by maternal characteristics, but our results cannot prove that the association between interpregnancy intervals and prematurity outcomes is causal.

In our study, women with interpregnancy intervals of 18–59 months had the lowest risk of very premature and moderately premature infants. However, 44% of the women in our study had interpregnancy intervals in this optimal category. In a recent study of Utah births, an interpregnancy interval of 18–23 months was recommended as the optimal interpregnancy interval,[20] which is substantially shorter than our finding of 18–59 months. Our findings suggest that if the proportion of women with interpregnancy intervals from 18–59 months increases, the prematurity rates at the population level might decrease.

Women in this study with interpregnancy intervals less than 18 months were more likely to have premature infants than women with intervals of 18–59 months. Furthermore, we found that interpregnancy intervals less than 18 months were more strongly associated with very premature infants than with moderately premature infants, which is consistent with a recent study of births in the United States.[17] Among women in our study with intervals less than 18 months, there was a gradient of risk for prematurity outcomes, and women with interpregnancy intervals less than 6 months had the highest risk of having premature infants. Several studies found that women with short interpregnancy intervals are more likely to have premature infants than women with longer intervals,[14,15,17,19] although most studies have used more stringent definitions of short intervals than we used (eg, less than 3 months, less than 6 months, or less than 12 months).[15,17,18,22] Some studies did not find a relationship between short interpreg-

nancy intervals and prematurity,[18,22–24,28] but most of those studies analyzed small, hospital- or clinic-based samples.

There are three hypotheses to explain the risk of short interpregnancy intervals on pregnancy outcomes. First, women with short intervals are hypothesized to have more nutritional deficiencies than women with longer intervals, because of a shortened period of replenishment between pregnancies.[15,22,23,29] Second, women with short interpregnancy intervals are believed to have more behavioral risk factors, such as tobacco or alcohol use, than women with longer intervals.[23] Finally, women with short intervals are hypothesized to experience more psychological or emotional stress than women with longer intervals.[23] We were unable to test the hypothesis that women with short interpregnancy intervals have more nutritional deficiencies because such information is not on the birth certificate. However, if the adverse effect of short interpregnancy intervals is related to nutritional factors, our results suggest that the period of recovery between pregnancies lasts up to 18 months, which is substantially longer than others have suggested.[22] We were unable to test the hypothesis that women with short interpregnancy intervals have higher rates of tobacco use than women with longer intervals, but previous studies have reported conflicting findings on the relationship between tobacco use and interpregnancy interval. Several studies found that women with short intervals were more likely to smoke than women with longer intervals,[20,22] but other studies did not find a difference in smoking rates according to interpregnancy interval.[15,21,30] Finally, the pattern of utilization of prenatal care could be an indication of maternal stress or a stressful lifestyle, and women in our study with interpregnancy intervals less than 18 months had higher rates of inadequate utilization of prenatal care than women with intermediate intervals. To understand the relationship between short interpregnancy intervals and prematurity, future studies should analyze behavioral, nutritional, and psychological factors.

Women in our study with interpregnancy intervals longer than 59 months had a higher risk of premature infants than women with intervals of 18–59 months. Although the risk of a long interval on prematurity was modest, one fifth of the women in our study had interpregnancy intervals more than 59 months. Many studies of interpregnancy intervals overlooked the issue of long intervals.[15,17,19,22,23,28,31] However, previous studies of the risk of long interpregnancy intervals on prematurity have reported conflicting findings. Among four studies that analyzed the relationship between long intervals and prematurity,[18,20,24,31] only one study found long intervals to be associated with an increased

**000549**

Exhibit 129                                                                              JA-0001682

risk of prematurity.[20] In Utah, women with interpregnancy intervals more than 120 months were 50% more likely to have premature infants than women with an interval of 18–23 months.[20] Our finding that women in the United States with interpregnancy intervals more than 59 months were more likely to have very premature and moderately premature infants conflicts with these results, but further study is needed to define the risk of long interpregnancy interval on perinatal outcomes.

Interpregnancy intervals were independently associated with the risk of prematurity in our study, but two other factors were associated more strongly with the risk of premature infants, namely, previous premature or SGA infant and utilization of prenatal care. Our results are consistent with several studies that reported that women with a history of adverse pregnancy outcomes have a higher risk of adverse outcomes, as well as shorter interpregnancy intervals, than women with favorable outcomes.[14,15,20–24,32–35] Previous studies also reported that inadequate utilization of prenatal care is a stronger predictor of adverse pregnancy outcomes than interpregnancy interval.[14,15,23]

Several limitations must be considered. First, our sample of Hispanic and white women might not be nationally representative because we matched Hispanic to white women according to county of residence and month of delivery. Second, our estimates of interpregnancy intervals could have a misclassification bias because of unrecorded abortions or miscarriages, which would result in underestimating the effect of short interpregnancy intervals and overestimating the effect of long intervals. Third, the information on gestational age that was recorded on the birth certificate may have been based on ultrasound examination, date of last menstrual period, or physical assessment of the newborn. It is possible that the method used to determine gestational age varies by interpregnancy interval, and future studies should determine whether there are systematic differences in the assignment of gestational age according to interpregnancy interval. Fourth, we were unable to analyze marital status and tobacco use because of missing data in the birth certificate dataset. If the distribution of these characteristics or other unmeasured factors varies by interpregnancy interval, then we might have overestimated the effect of interpregnancy intervals on prematurity outcomes. Finally, successive pregnancies and interpregnancy intervals might be influenced by fertility, pregnancy wantedness, access to family planning, or other socioeconomic or cultural factors.

Interpregnancy intervals are a potentially modifiable risk factor for low birth weight,[16] and our results show that interpregnancy intervals are also associated with risk of premature infants. Although prospective studies are needed to determine whether the relationship between interpregnancy intervals and pregnancy outcomes is causal, childbearing women and health care providers should be informed about the importance of family planning and pregnancy spacing.

## References

1. Goldenberg R, Rouse D. Prevention of preterm birth. N Engl J Med 1998;339:313–20.
2. Public Health Service, U.S. Department of Health and Human Services. Healthy People 2000. National Health Promotion and Disease Prevention Objectives. Washington, DC: U.S. Government Printing Office, DHHS Publication No. (PHS) 91-50212, 1991.
3. National Center for Health Statistics. Advance report of final natality statistics, 1986. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1988; 37 (Suppl.):1–47.
4. National Center for Health Statistics. Advance report of final natality statistics, 1987. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1989; 38 (Suppl.):1–47.
5. National Center for Health Statistics. Advance report of final natality statistics, 1988. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1990; 39 (Suppl.):1–47.
6. National Center for Health Statistics. Advance report of final natality statistics, 1989. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1991; 40 (Suppl.):1–55.
7. National Center for Health Statistics. Advance report of final natality statistics, 1990. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1993; 41 (Suppl.):1–52.
8. National Center for Health Statistics. Advance report of final natality statistics, 1991. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1993; 42 (Suppl.):1–48.
9. Ventura SJ, Martin JA, Taffel SM, Mathews TJ, Clarke SC. Advance report of final natality statistics, 1992. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1994;43 (Suppl.):1–88.
10. Ventura SJ, Martin JA, Taffel SM, Mathews TJ, Clarke SC. Advance report of final natality statistics, 1993. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1995;44 (Suppl.):1–88.
11. Ventura S, Martin J, Mathews T, Clarke S. Advance report of final natality statistics, 1994. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1996;44 (Suppl.):1–88.
12. Ventura S, Martin J, Curtin S, Mathews T. Report of final natality statistics, 1995. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1997; 45:1–84.
13. Ventura S, Martin J, Curtin S, Mathews T. Report of final natality statistics, 1996. Washington DC: United States Department of Health and Human Services, Monthly Vital Statistics Report 1998;46 (Suppl.):1–100.
14. Miller J. Birth intervals and perinatal health: An investigation of three hypotheses. Fam Plann Perspect 1991;23:62–70.
15. Rawlings JS, Rawlings VB, Read JA. Prevalence of low birth weight

**Fuentes-Afflick et al**    *Pregnancy Interval and Prematurity*    **389**

**000550**

Exhibit 129    JA-0001683

and preterm delivery in relation to the interval between pregnancies among white and black women. N Engl J Med 1995;332:69–74.

16. Committee to Study the Prevention of Low Birthweight. Preventing low birthweight. Washington, DC: National Academy Press, 1985.

17. Khoshnood B, Lee KS, Wall S, Hsieh HL, Mittendorf R. Short interpregnancy intervals and the risk of adverse birth outcomes among five racial/ethnic groups in the United States. Am J Epidemiol 1998;148:798–805.

18. Lang J, Lieberman E, Ryan K, Monson R. Interpregnancy interval and risk of preterm labor. Am J Epidemiol 1990;132:304–9.

19. Klerman L, Cliver S, Goldenberg R. The impact of short interpregnancy intervals on pregnancy outcomes in a low-income population. Am J Public Health 1998;88:1182–5.

20. Zhu BP, Rolfs R, Nangle B, Horan J. Effect of the interval between pregnancies on perinatal outcomes. N Engl J Med 1999;340:589–94.

21. Fedrick J, Adelstein P. Influence of pregnancy spacing on outcome of pregnancy. BMJ 1973;4:753–6.

22. Brody D, Bracken M. Short interpregnancy interval: A risk factor for low birthweight. Am J Perinatol 1987;4:50–4.

23. Ekwo E, Moawad A. The relationship of interpregnancy interval to the risk of preterm births to black and white women. Int J Epidemiol 1998;27:68–73.

24. Kallan J. Effects of interpregnancy intervals on preterm birth, intrauterine growth retardation, and fetal loss. Soc Biol 1992;39:231–45.

25. Erickson J, Bjerkedal T. Interpregnancy interval: Association with birth weight, stillbirth, and neonatal death. J Epidemiol Community Health 1978;32:124–30.

26. Klebanoff M. Short interpregnancy interval and the risk of low birthweight. Am J Public Health 1988;78:667–70.

27. Kotelchuck M. An evaluation of the Kessner adequacy of prenatal care index and a proposed adequacy of prenatal care utilization index. Am J Public Health 1994;84:1414–20.

28. Ferraz E, Gray R, Fleming P, Maia T. Interpregnancy interval and low birth weight: Findings from a case-control study. Am J Epidemiol 1988;128:1111–6.

29. Winkvist A, Rasmussen K, Habicht JP. A new definition of maternal depletion syndrome. Am J Public Health 1992;82:691–4.

30. Hebert C, Bouyer J, Collin D, Menger I. Spontaneous abortion and interpregnancy interval. Eur J Obstet Gynecol Reprod Biol 1986;22:125–32.

31. Farahati M, Bozorgi N, Luke B. Influence of maternal age, birth-to-conception intervals and prior perinatal factors on perinatal outcomes. J Reprod Med 1993;38:751–6.

32. Creasy R, Gummer B, Liggins G. System for predicting spontaneous preterm birth. Obstet Gynecol 1980;55:692–5.

33. Juntunen K, Kirkinen P, Kauppila A. Natural interpregnancy interval of fertile couples: A longitudinal survey of grand grand multiparous women. Fertil Steril 1994;62:722–5.

34. Albrechtsen S, Rasmussen S, Dalaker K, Irgens L. Reproductive career after breech presentation: Subsequent pregnancy rates, interpregnancy interval, and recurrence. Obstet Gynecol 1998;92:345–50.

35. Zimmer B. Consequences of the number and spacing of pregnancies on outcome, and of pregnancy outcome on spacing. Soc Biol 1979;26:161–78.

Reprints are not available.
Address correspondence to:
Elena Fuentes-Afflick, MD, MPH
Deptartment of Pediatircs, San Francisco General Hospital
University of California, San Francisco
1001 Potrero Avenue, Mail Stop 6E
San Francisco, CA 94110

Received May 20, 1999.
Received in revised form September 8, 1999.
Accepted September 15, 1999.

Copyright © 2000 by The American College of Obstetricians and Gynecologists. Published by Elsevier Science Inc.

**000551**

Exhibit 129                                                                                JA-0001684

# The Effects of Unintended Pregnancy on Infant, Child, and Parental Health: A Review of the Literature

Jessica D. Gipson, Michael A. Koenig, and Michelle J. Hindin

*This article provides a critical review of studies assessing the effects of unintended pregnancy on the health of infants, children, and parents in developed and developing countries. A framework for determining and measuring the pathways between unintended pregnancy and future health outcomes is outlined. The review highlights persistent gaps in the literature, indicating a need for more studies in developing countries and for further research to assess the impact of unintended pregnancy on parental health and long-term health outcomes for children and families. The challenges in measuring and assessing these health impacts are also discussed, highlighting avenues in which further research efforts could substantially bolster existing knowledge.* (STUDIES IN FAMILY PLANNING 2008; 39[1]: 18–38)

In the United States, nearly one-half of all pregnancies are unintended; 42 percent of these end in abortion (Finer and Henshaw 2006). Similarly, high levels of unintended pregnancy are found in developing countries. Recent data from the Demographic and Health Surveys (DHS) indicate that 14 to 62 percent of recent births were unintended, the highest levels being found in the Latin American–Caribbean and South–Southeast Asia regions (ORC Macro 2007).

Unintended pregnancy is a concern from both a human rights and a public health perspective. At the 1994 International Conference on Population and Development (ICPD) held in Cairo, the Programme of Action stated that "[a]ll couples and individuals have the basic right to decide freely and responsibly the number and spacing of their children and to have the information, education and means to do so" (ICPD 1994: Principle 8). A similar sentiment emerged from the Committee on Unintended Pregnancy of the Institute of Medicine. In 1995, the Committee concluded that "the consequences of unintended pregnancy are serious, imposing appreciable burdens on children, women, men, and families" (Brown and Eisenberg 1995:1).

In light of the prevalence of unintended pregnancy and its potential impact on the health and well-being of families, this review is intended to provide a comprehensive and critical summary of studies assessing the consequences of unintended pregnancy on infant, child, and parental health. The measurement of and analytical challenges to studying the effects of pregnancy intention on health outcomes are discussed, and a conceptual framework is provided to illustrate the mechanisms through which unintended pregnancy may influence health outcomes. Our framework serves to structure the subsequent review of studies, highlighting the existing knowledge and persistent gaps in the literature. Promising directions for future research are highlighted.

## Methods

This literature review summarizes peer-reviewed publications and published reports that were identified via PubMed and SCOPUS search engines through July 2007. In addition, publication references were cross-checked to ensure that all pertinent literature was identified and included. Searches were conducted using the terms "pregnancy intention," "unintended pregnancy," "unplanned pregnancy," "unintended childbearing," "unintended fertility," "unintended births," and "unwanted pregnan-

*Jessica D. Gipson is Ellertson Postdoctoral Fellow, Johns Hopkins Bloomberg School of Public Health, Department of Population, Family and Reproductive Health, 615 North Wolfe Street Room E4008, Baltimore, MD 21205. E-mail: jgipson@jhsph.edu. Michael A. Koenig is Professor and Michelle J. Hindin is Associate Professor, Johns Hopkins Bloomberg School of Public Health, Department of Population, Family and Reproductive Health.*

001279

Exhibit 130    JA-0001685

cy." Studies were identified that assessed the relationship between pregnancy intention and health outcomes, focusing specifically on investigations with at least one of the following criteria: (1) data were derived from a population-based sample; (2) the study employed a longitudinal design in which fertility preferences were ascertained prior to the health outcome; or (3) the study investigators employed multivariate analyses to control for potentially confounding variables in their analyses. Although we provide an overview of all of the studies found that met at least one of the criteria, we focus predominantly on studies that were considered to be more rigorous. Appendix Table A1 provides a summary of this subset of studies.

## Measurement and Analytical Concerns

Assessing the relationship between pregnancy intention and its potential health consequences is fraught with a number of measurement and analytical concerns. We highlight some of the key challenges below; further discussion of these issues can be found elsewhere (see, for example, Lloyd and Montgomery 1996; Santelli et al. 2003; and Chalasani et al. 2007).

### Contextual Influences on Unintended Pregnancy

The characterization of a pregnancy as "unintended," as well as a family's (or society's) ability to respond to and to compensate for the potential repercussions of an unintended pregnancy, vary across social and cultural settings. At the societal level, the magnitude of the consequences of unintended childbearing is likely to differ according to the level of economic development, the stage of demographic transition, kinship and family norms, and social expenditure on families and children (Lloyd 1994; Chalasani et al. 2007). Because of this variation, comparing studies from different locations or temporal periods is difficult.

Anthropological ethnographies have contributed to our understanding of the meaning of unintended pregnancy at the family level. These studies provide insight into such issues as why pregnancies are deemed unintended, how unintended pregnancies and the children that result from these pregnancies are viewed and treated by the family and caregivers, and what the physical and mental manifestations of being unintended may be for both the child and the child's family (Levine 1987; Scrimshaw and Scrimshaw 1990; Scheper-Hughes 1992). The greater level of detail provided in anthropological studies is needed in order to understand the role that sociocultural context plays, both in the conceptualization and in the

measurement of unintended pregnancy and in assessing associated health outcomes.

### Definition and Measurement of Unintended Pregnancy

As illustrated in Appendix Table A1, substantial variation exists in the way studies have measured pregnancy intention, in terms of the questions asked and the timing of these questions with respect to the pregnancy. Most surveys ask women to classify their pregnancies according to distinct response categories (wanted, unwanted, or mistimed), despite concerns that intentions may be better captured by a continuum, or range of feelings (Bachrach and Newcomer 1999; Luker 1999).[1] Moreover, the terms used to characterize pregnancy intention vary across settings and by study participants (Fischer et al. 1999; Barrett and Wellings 2002; Kendall et al. 2005).

Although most survey instruments ask women to make the distinction between mistimed pregnancies (wanted later) and unwanted pregnancies (not wanted at all), most studies combine these categories for analysis, usually because of limitations in sample size. The distinctions between and within these two pregnancy-intention classifications can be substantial, however, in terms of women's characteristics, the extent of pregnancy mistiming, and the severity of the effects on children who are considered to be mistimed versus unwanted (Pulley et al. 2002; D'Angelo et al. 2004). The characterization of a pregnancy as mistimed versus unwanted is also likely to vary across study settings and populations. From an analytical perspective, studies that lump these two categories may blur the individual effects of these distinct classifications of pregnancy intention, thereby underestimating the true effect of "unwantedness," and overestimating the effect of being "mistimed."

### Timing of Pregnancy-intention Measurements

Most studies rely on cross-sectional, retrospective reports of pregnancy intention by asking mothers to think back to their feelings at the time of conception or to report on their feelings regarding their most recent live birth. Retrospective reports are problematic, however, because women may rationalize an unwanted pregnancy as a wanted birth (McClelland 1983; Bankole and Westoff 1998; Williams and Abma 2000; Koenig et al. 2006). Evidence from panel studies in Morocco and India found that women were more likely to shift to a more positive response in retrospective reports of pregnancy intention, reclassifying a child from being "unwanted" to "wanted" (Bankole and Westoff 1998; Koenig et al. 2006). Other researchers contend, however, that parents may also shift from a "wanted" pregnancy to an "unwanted" one if the child's

001280

Exhibit 130

JA-0001686

attributes differ from those that the parent was expecting (McClelland 1983; Rosenzweig and Wolpin 1993).

Given the inherently dynamic nature of childbearing decisions, prospective measurements also present challenges. Studies conducted in the United States have found that fertility preferences are relatively stable over time (Westoff and Ryder 1977; Schoen 1999); however, some women may experience changes in their personal situations or living conditions that influence fertility intentions (Williams et al. 1999). In developing country settings, particularly those in the midst of a rapid fertility transition, fertility preferences are considered to be less stable and more dependent on external influences such as family-composition preferences, child mortality, and partners' differential motivations for childbearing (Lloyd and Montgomery 1996; Bankole and Singh 1998; Montgomery and Cohen 1998; Gipson and Hindin 2007).

### Participants in Studies of Unintended Pregnancy

More than one-fifth of the known pregnancies that occurred worldwide in 1999 were aborted (AGI 1999). The likelihood that a woman will have an abortion is highly dependent on her acceptance of induced abortion as a means of terminating an unintended pregnancy, the availability of abortion services, and her ability to access these abortion services (AGI 1999). These characteristics vary greatly across countries and even within countries; thus, unwanted pregnancies may be resolved in different ways, depending on the woman's characteristics and the setting. The variation in induced abortion across study settings complicates assessments of the consequences of unintended pregnancy because many of the existing study designs recruit women from antenatal care facilities or ask women to report their pregnancy intentions for recent live births (for example, Demographic and Health Surveys). In both cases, these samples are highly selective, omitting women who do not seek antenatal care and women who terminate their pregnancies.

A second limitation regarding the selection of study participants concerns the use of individuals' versus couples' reports. Historically, surveys have elicited fertility preferences from women because of the primary focus on women within family planning and reproductive health programs. Women have typically been asked to report their own preferences and, in some instances, to report on the perceived preferences of their partner (proxy reports). Despite the acknowledged influence that men have on reproductive decisionmaking (see Ezeh 1993; Lasee and Becker 1997; Bankole and Singh 1998; and Mason and Smith 2000), relatively few studies have collected and incorporated the fertility preferences of both partners.

In the few studies that do collect them, the health consequences associated with unintended pregnancy appear to be more pronounced among children who were considered unwanted by both parents, compared with those whom only one parent reported as unwanted (Frenzen and Hogan 1982; Sangi-Haghpeykar et al. 2005; Shapiro-Mendoza et al. 2005). Another study, however, found no effect on health outcomes when the mothers' proxy reports of fathers' pregnancy intentions were included (Korenman et al. 2002).

### Causal Inferences and Unobserved Heterogeneity Biases

Another issue that plagues this research is the problem of establishing causality between unintended pregnancy and subsequent health outcomes. Although a randomized, controlled trial is often considered the "gold standard" with respect to research designs, pregnancy intentions are not something that can be randomly assigned. Moreover, as noted above, women's and men's intentions are likely to change throughout a pregnancy and may be dependent on the birth outcome. Although longitudinal data may provide some inferences about the observed associations, causality is difficult if not impossible to show (Moffit 2005; Ní Bhrolcháin and Dyson 2007).

An additional concern is that both health outcomes and pregnancy intentions may be jointly determined by a single, often unobserved factor. A variety of study designs have attempted to control for both measured and unmeasured confounders between unintended pregnancy and health outcomes. Some of the earliest studies of this issue were conducted in Europe among women who were denied abortion in Sweden and in the Czech Republic (Forssman and Thuwe 1966; David 2006). In these studies, children who were born to these women (considered to be unintended) were matched with intended children with similar sociodemographic characteristics. Other study designs have used twin babies or compared unintended and intended children who are siblings in an attempt to control for measured and unmeasured family characteristics (Rosenzweig and Wolpin 1980; Joyce et al. 2000b; Chalasani et al. 2007). These approaches, however, generally do not provide an easy solution to sorting out causal associations under normal circumstances. Moreover, they rely on data abstracted from specific populations, or segments of the population, limiting the generalizability of the findings.

An important consideration in the measurement of unintended pregnancy is to determine who is affected when a pregnancy or birth is unintended. The effects of unintended pregnancy may extend beyond the index pregnancy or child to other siblings or to parents. In some

001281

Exhibit 130

JA-0001687

contexts, specific children may be considered unwanted according to their sex or birth order (for example, the youngest daughter), and may be particularly likely to suffer neglect or maltreatment (Das Gupta 1987). Although son preference may be the best-documented manifestation of this phenomenon, "differential care can proceed against any less desirable child, as moderated by family circumstances and existing family composition" (Levine 1987:282). In her ethnographic work, Scheper-Hughes (1984:535) describes the conflict that parents and particularly women, as caregivers, face amidst poverty and the increasing pressure of a growing family: essentially, being "cast in the role of family strategists, necessarily allocating scarce resources so that some of their children may be more or less favored for survival."

In impoverished settings, not only the children but also the mother is likely to be malnourished, so that she has less energy to care for the demands of an increasingly large family (Graves 1976; Scrimshaw and Scrimshaw 1990). Other parental situations related to health could be exacerbated by the occurrence of an unintended pregnancy (for example, intimate partner violence), whereas other conditions (for example, anxiety and depression) may arise as a direct consequence of the unintended pregnancy.

An additional concern in the measurement of the consequences of unintended pregnancy is how the impact of being unintended may be influenced by family size. Desai (1995) analyzed DHS data from 1986–90 for 15 countries to assess siblings' impact on younger children's nutritional status (Desai 1995). Findings from this analysis indicated that unintended pregnancy and family size have independent effects on children's health. Desai found a significant effect of family size among all planned and unplanned families; however, "the negative impact of family size was greater among families which had exceeded their desired size than among families that were planned" (page 208). Overall, Desai's and others' findings (for example, those of Lloyd 1994) highlight the importance of considering the potential interaction between family size and pregnancy intention and of accounting for contextual factors, an aspect that has received only limited attention in studies assessing the impact of unintended pregnancy on health outcomes.

## Schematic Framework

Figure 1 illustrates the potential pathways by which pregnancy intention may influence health outcomes. A body of literature from both developed and developing country settings has shown that a variety of individual, family, community, and programmatic factors are associated with the occurrence of an unintended pregnancy (for example, Brown and Eisenberg 1995; Adetunji 1998). Subsequently, an unintended pregnancy may lead to a range of health consequences with respect to maternal behavior during pregnancy, birth outcomes, maternal postpartum behaviors, and infant and child well-being.

As noted in this framework, the impacts of unintended pregnancy may affect health outcomes within one particular time period (for example, the prenatal period). The health impacts of unintended pregnancy may also be persistent and cumulative, extending into childhood.[2] Additionally, the framework includes the potential for deleterious health outcomes of unintended pregnancies for the index children, their siblings, and their parents.

## Consequences of Unintended Pregnancy: A Review of Studies

### Maternal Behavior During Pregnancy

A few developed country studies have found a positive association between unintended pregnancies and maternal risk behaviors, including alcohol and illicit drug use, cigarette smoking, and caffeine intake (Weller et al. 1987; Altfeld et al. 1997; Than et al. 2005). Most studies, however, have found mixed or no effects (McCormick et al. 1987; Marsiglio and Mott 1988; Bitto et al. 1997; Hellerstedt et al. 1998; Kost et al. 1998b; Rubin and East 1999; Joyce et al. 2000a and 2000b; Korenman et al. 2002; Wells et al. 2006). Two population-based studies by Joyce and his colleagues (2000b) and Korenman and his colleagues (2002) analyzed data from the National Longitudinal Survey of Youth (NLSY) (1979–92), finding mixed effects of pregnancy intention on maternal behavior. The Joyce study first employed cross-sectional models to compare unintended with intended pregnancies and fixed-effects models to compare unintended and intended pregnancies from the same family to control for family-background variables that could confound the relationship between pregnancy intention and maternal behavior. Although significant associations were found between unintended (unwanted and mistimed) pregnancies and heavy smoking in the cross-sectional models with exogenous controls, these effects diminished in models that controlled for potentially endogenous variables and in the fixed-effects models.

Korenman and his colleagues (2002) used the same data from the NLSY; however, they incorporated the woman's report of her partner's fertility preference in the analyses. They found no significant effects of having an unintended pregnancy on maternal risk behavior among

001282

Exhibit 130                                                                                       JA-0001688

**Figure 1**   Potential effects of unintended pregnancy on infant, child, and parental health outcomes



unmarried women. Among married women, they found significant effects for smoking during pregnancy when either the woman or her partner reported the pregnancy as unintended, but this relationship disappeared in the fixed-effects model.

Kost and her colleagues (1998b) explored the relationship between maternal risk behaviors and pregnancy intention in the 1988 National Maternal and Infant Health Survey and the 1988 National Survey of Family Growth. After adjusting for pregnancy intention, women's characteristics, and pregnancy experience, they found no significant effects for alcohol or vitamin use or for recommended weight gain. Significant effects of smoking behavior were limited to women reporting mistimed pregnancies; these women were 26 percent less likely to quit smoking during pregnancy, compared with women who had intended pregnancies.

The evidence from three large, rigorous studies conducted in the United States suggests that maternal risk behaviors are not strongly related to pregnancy intention, once family-background variables are controlled. Research from other countries is needed, however, to assess whether the effects of pregnancy intention on maternal risk behaviors vary by context.

*Antenatal and Delivery Care*

Numerous United States and European studies have found a significant positive association between pregnancy intention and delayed initiation of antenatal care and / or decreased number of antenatal care visits (Weller et al.

1987; Marsiglio and Mott 1988; Sable et al. 1990; Bitto et al. 1997; Delgado-Rodriguez et al. 1997; Kost et al. 1998b; Hulsey et al. 2000; Joyce et al. 2000a; Pagnini and Reichman 2000; Korenman et al. 2002; Sangi-Haghpeykar et al. 2005). Inconsistent or no effects were found in a few studies, however (Joyce and Grossman 1990; Altfeld et al. 1997; Joyce et al. 2000b). Comparisons among studies are complicated by the variety of ways in which antenatal care is measured: whether the woman sought any antenatal care, whether she initiated care before the first or second trimester, or whether she obtained a certain number of visits.

The three United States studies reviewed concerning maternal risk behaviors also considered pregnancy intention and antenatal care. Joyce and his colleagues' analysis (2000b) of NLSY data showed significant effects between intentions and antenatal care in cross-sectional models, but these effects diminished once observed family-background variables and fixed-effects models were used. Marginally significant effects were found indicating that women with unwanted pregnancies were more likely to receive later antenatal care (at six months' or longer gestation), compared with women who experienced wanted pregnancies. Korenman and his colleagues (2002) found more persistent effects on antenatal care. Using fixed-effects modeling, they found that unmarried women who had an unintended pregnancy (according to the woman or her partner) were nearly two times more likely than unmarried women with a wanted pregnancy to delay seeking antenatal care until after the first trimester. Among married women, the effects found for delayed ini-

Exhibit 130                                                                                          JA-0001689

tiation of antenatal care among women with unintended pregnancies diminished in the fixed-effects models, with a marginally significant association between unintended pregnancy and late initiation of antenatal care (after the first trimester).

The study by Kost and her colleagues (1998b) found that women with unintended (mistimed and unwanted) pregnancies were less likely to recognize their pregnancies within the first six weeks, and were significantly less likely than women with wanted pregnancies to obtain an antenatal care visit in the first eight weeks of pregnancy, after controlling for recognition of the pregnancy (odds ratio [OR] = 0.69 for mistimed; OR = 0.67 for unwanted). Despite delays for first antenatal care visits, no significant difference was found in the total number of antenatal care visits that women with unintended pregnancies received, compared with women having intended pregnancies. Kost and her colleagues highlighted the importance of controlling for women's recognition of pregnancy in assessing the impact of pregnancy intention on antenatal care adherence. The inability to distinguish a significant difference in the number of visits after controlling for recognition of the pregnancy suggests that women with unintended pregnancies may not seek antenatal care as early as do women with intended pregnancies, either because of late recognition of the pregnancy or because they delay in deciding whether to terminate the pregnancy. At least within the United States, however, women who continue with their pregnancies appear to be equally compliant in terms of seeking the adequate number of antenatal care visits.

Developing country studies on pregnancy intention and antenatal care have yielded inconsistent results. Some studies have found a positive association between unintended pregnancy and antenatal or delivery care (Eggleston 2000; Magadi et al. 2000), and others have found no association or mixed effects (Ni and Rossignol 1994; Gage 1998; Marston and Cleland 2003). Most of these studies were based on DHS data and, therefore, relied on women's retrospective recall of the timing of their antenatal care visits and on their retrospective assessments of pregnancy intention.

Two studies using DHS data from sub-Saharan Africa explored the relationship between pregnancy intention and initiation of antenatal care and total number of antenatal visits. Data from Kenya showed that women experiencing unwanted or mistimed births had, on average, fewer antenatal care visits and were more likely to delay the timing of the initial visit than women with wanted births (Magadi et al. 2000). In contrast, DHS data on premarital childbearing in Kenya and Namibia found no significant relationship between pregnancy intention

and initiation of antenatal care within the first trimester (Gage 1998).

In a more recent five-country DHS study by Marston and Cleland (2003), the effect of pregnancy intention was assessed for four health outcomes for births occurring three to five years prior to the survey, including receipt of antenatal care before the sixth month of gestation. In Peru and the Philippines, women experiencing unwanted pregnancies were significantly more likely to delay antenatal care (Peru: OR = 1.39; 95 percent confidence interval [CI]: 1.24–1.56; the Philippines: OR = 1.21; 95 percent CI: 1.01–1.46); Egyptian women with unwanted pregnancies were significantly less likely, however, to delay antenatal care (OR = 0.79; 95 percent CI: 0.66–0.95), compared with women with wanted pregnancies. Mistimed births were also associated with a significantly higher risk of late antenatal care in Kenya, Peru, and the Philippines. The authors subsequently compared the regression results from all births and from births of parity three and higher, finding that "birth order [had] a stronger and more pervasive influence than wantedness" (page 91). They argued that to assess adequately the effect of pregnancy intention on health outcomes, the interaction of birth order and family size must be considered.

Eggleston (2000) used retrospective, cross-sectional data from the 1994 Ecuador Demographic and Maternal Child Health Survey (ENDEMAIN) to assess the impact of mistimed and unwanted pregnancy on three measures of antenatal care: any antenatal care, initiation of antenatal care within the first trimester of pregnancy, and receipt of the recommended number of visits (four or more, according to World Health Organization guidelines). After controlling for sociodemographic characteristics, mothers with unwanted pregnancies were significantly less likely to have received antenatal care (OR = 0.68; 95 percent CI: 0.57–0.82), less likely to have initiated antenatal care in the first trimester (OR = 0.75; 95 percent CI: 0.60–0.92), and less likely to have received an adequate number of antenatal care visits, compared with women who reported wanted pregnancies (OR = 0.71; 95 percent CI: 0.57–0.89). No effects were found for mistimed pregnancies, however.

In general, findings from the developing country studies indicate that pregnancy intention affects both the initiation and the frequency of antenatal care visits, but as indicated by the five-country DHS study, the effects are likely to vary according to country context. Lessons learned from the United States studies, including the need to control for pregnancy recognition and to employ more sophisticated modeling, have yet to be widely incorporated. Moreover, most studies continue to rely on retrospective measures of pregnancy intention.

001284

Exhibit 130

JA-0001690

### Birth Outcomes

An extensive literature exists on the effect of unintended pregnancy on birth outcomes in developed countries. Although some United States and European studies have found an increased risk of congenital anomalies, spontaneous abortion, premature delivery, and low birth weight among unwanted pregnancies (Blomberg 1980d; Sable et al. 1997; Kost et al. 1998a; Orr et al. 2000; Sable and Wilkenson 2000), other studies have found mixed results (Keeton and Hayward 2007; Mohllajee et al. 2007), or weak or nonsignificant associations (Matějček et al. 1978; Blomberg 1980a and 1980c; Laukaran and van den Berg 1980; Marsiglio and Mott 1988; Bitto et al. 1997; Joyce et al. 2000b; Ahluwalia et al. 2001; Korenman et al. 2002).

In the study by Joyce and his colleagues (2000b), the authors assessed the effect of pregnancy intention on low birth weight, finding only marginally significant effects in cross-sectional models for unwanted births after controlling for exogenous variables (for example, the child's sex and maternal race, education, and residence), and no significant effect in fixed-effects models. In their analysis comparing families with and without unintended births, small but significant effects of pregnancy intention on low birth weight were found for mistimed births. In the study by Korenman and his colleagues (2002), after controlling for covariates including maternal characteristics and birth order, the authors found no effect of pregnancy intention on birth weight. In another study, Kost and her colleagues (1998a) analyzed data from the National Maternal and Infant Health Survey (NMIHS) and the National Survey of Family Growth (NSFG) to assess the effect of pregnancy intention on birth outcomes and infant care. The authors constructed a summary variable of adverse birth outcomes: prematurity, low birth weight, and infant's small size for gestational age. Mothers with unwanted births had higher odds of having one or more adverse birth outcomes, after controlling for physical and socioeconomic characteristics. When the mother's behaviors during pregnancy, such as smoking, alcohol use, and antenatal care, were added to the model, however, the effect of pregnancy intention disappeared, indicating that the relationship between pregnancy intention and health outcomes is mediated by the antenatal maternal behaviors. Overall, these more rigorous United States studies point to weak or no effects of pregnancy intention on birth outcomes.

Findings for birth outcomes were mixed from the matched case-control studies in Europe (Czech Republic, Finland, and Sweden). In the Czech (Matějček et al. 1978; David 2006) and Swedish (Hook 1963; Blomberg 1980a and 1980c) studies, children born to women who applied

for and were refused therapeutic abortion were matched with "wanted" children and mothers of similar sociodemographic characteristics. These studies found no effect of being unwanted on birth outcomes. The Finnish study (Myhrman 1988) recruited women who sought antenatal care in two northern provinces and followed the children who resulted from unintended pregnancies (1966–82). Children born to mothers who considered their pregnancies to be unwanted were later matched with children from wanted pregnancies according to sociodemographic characteristics. This study, in contrast to the Czech and Swedish studies, found that children resulting from unwanted pregnancies were more likely to be of low birth weight and to be born prematurely than were children who were wanted.

In the only developing country study, ENDEMAIN data in Ecuador were used to examine the association between unwanted pregnancy and the risk of low birth weight (Eggleston et al. 2001). After controlling for pregnancy and delivery characteristics and sociodemographic characteristics, low birth weight ($\leq 2,500$ grams) was found to be significantly more frequent among births that were considered unwanted (OR = 1.64; 95 percent CI: 1.22–2.20); this association was not found for mistimed births, however. An important caveat to this study is that birth weight was determined by means of the mother's self-report and intentions were measured based on cross-sectional retrospective reports.

### Maternal Postpartum Behavior

#### Breastfeeding

Nearly all United States and European studies assessing the effect of pregnancy intention on breastfeeding have concluded that children who are born from unintended pregnancies are less likely to be breastfed or are more likely to be breastfed for a shorter duration, compared with children whose birth was intended (Matějček et al. 1978; Kost et al. 1998a; Joyce et al. 2000b; Korenman et al. 2002; Taylor and Cabral 2002). Only one exception to this finding was observed, in an analysis of primiparous women aged 19–27 who participated in the 1979 National Longitudinal Survey of Labor Market Experience of Youth (Marsiglio and Mott 1988). Even in studies in which fixed-effects models were employed to compare unwanted with wanted siblings within the same family, unwanted siblings were significantly less likely to be breastfed, after controlling for other sociodemographic characteristics (Joyce et al. 2000b; Korenman et al. 2002). Using couple data concerning pregnancy intention, Korenman and his colleagues found that both married and unmarried wom-

001285

Exhibit 130

JA-0001691

en with unintended pregnancies were much less likely to breastfeed, compared with women whose pregnancies were intended.

In an analysis of DHS data from 18 countries, Hromi-Fiedler and Pérez-Escamilla (2006) assessed whether women with unintended pregnancies were less likely to engage in prolonged breastfeeding (for 13 to 36 months). In the within-country analyses, they found a negative effect of unintended pregnancy on prolonged breastfeeding in only three of the 18 countries; in the pooled data analysis, however, they found that women with unintended pregnancies were 10 percent less likely to continue breastfeeding beyond the first year of life (OR = 0.90; 95 percent CI: 0.85–0.96). A handful of other developing country studies found that women with unplanned pregnancies were less likely to breastfeed and to continue breastfeeding, compared with women with planned pregnancies (Pérez-Escamilla et al. 1999; Berra et al. 2001; Chinebuah and Pérez-Escamilla 2001). Again, these studies generally rely on cross-sectional data with retrospective self-reports on pregnancy intention and breastfeeding duration. Differences in the classifications of pregnancy-intention groups (for example, "unplanned" versus "unintended") further complicate the comparison of these studies.

*Preventive and Curative Care*

No effects were found in the few studies assessing the association between pregnancy intention and well-baby care, child immunization, or curative care in the United States and Europe (Matějček et al. 1978; Marsiglio and Mott 1988; Rosenzweig and Wolpin 1993; Kost et al. 1998a; Hulsey et al. 2000). Marsiglio and Mott (1988) focused on young primiparous women who participated in the NLSY, finding no significant effects of pregnancy intention on breastfeeding or well-baby care in multivariate models. For Kost and her colleagues (1998a), the analysis of the infant care variables revealed that, after controlling for physical and socioeconomic characteristics, birth outcome, and pregnancy behaviors, mothers who considered their pregnancies to be unwanted were no less likely than mothers with wanted pregnancies to seek well-baby care within three months.

Published studies from developing countries in this area are limited. The five-country DHS analysis by Marston and Cleland (2003) found significantly higher risks of incomplete child vaccination by one year of age for mistimed births in Egypt (OR = 1.40; 95 percent CI: 1.08–1.82) and for unwanted births in Kenya (OR = 1.60; 95 percent CI: 1.12–2.28) and Peru (OR = 1.24; 95 percent CI: 1.09–1.41). Similar to their findings on antenatal care, the authors found that higher-order births were more disadvantaged with respect to health outcomes; they found no

difference in outcomes by sex of the child, however. No significant effects were found for the other two countries in the analysis, Bolivia and the Philippines.

Two studies by Jensen and Ahlburg assessed the effect of pregnancy intention on the incidence and treatment of acute respiratory infection and diarrhea. In their study using DHS data from 11 countries and one Indian state, the authors found that unwanted children were more likely than wanted children to become ill; once they were ill, however, unwanted and wanted children were equally likely to be taken for treatment (Jensen and Ahlburg 1999). Their later study, conducted with data from the 1991 Indonesia DHS, found that unwanted children were more likely to become ill and less likely to receive treatment, compared with wanted children (Jensen and Ahlburg 2002).

Overall, studies conducted in the United States indicate no effect of unintended pregnancy on preventive and curative care, whereas findings from developing countries find mixed effects. Children resulting from unintended pregnancies may be disadvantaged with respect to vaccinations, illness, and curative care; these effects seem to be highly context specific, however.

### Infant and Child Health

*Infant and Child Mortality*

Some of the earliest evidence on the effects of pregnancy intention on child mortality—most notably, elevated mortality risk for female offspring—comes from societies characterized by a strong preference for sons. Excess female mortality during early childhood has been reported in a number of South Asian countries in terms of absolute mortality differences (D'Souza and Chen 1980; Dyson and Moore 1983; Koenig and D'Souza 1986) and relative differences, after adjusting for the biological survival advantage of females (Hill 1995). Further support for selective mortality among female offspring comes from a study conducted in the Punjab, India, which found that sex bias in survival was not generalized; rather, it was pronounced only among higher-order female births (Das Gupta 1987). More recent evidence has documented the continued differential treatment of sons and daughters, as well as the increased use of sex-selective abortion in some regions of the world (Arnold et al. 2002; Hesketh and Xing 2006). In a band of countries from East Asia through South Asia to the Middle East and North Africa, discrimination against females—through sex-selective abortion, female infanticide, abandonment of newborn girls, and neglect of daughters through differential allocation of food and care-seeking behavior—has resulted

001286

Exhibit 130

JA-0001692

in severely imbalanced sex ratios (Li 2004; Yount 2004; Hesketh and Xing 2006).

Evidence of the direct relationship between unintended childbearing and childhood mortality is derived from studies from both the developed and developing world. Two longitudinal studies in the United States (1959–66) followed a cohort of married, pregnant women in San Francisco who were enrolled in a particular health maintenance organization. Although the authors used limited control variables, the results indicated adverse outcomes for births that occurred to women who felt "negative" about their pregnancies, including increased risk of neonatal mortality (Bustan and Coker 1994: RR = 2.4; CI: 1.5–4.0; Laukaran and van den Berg 1980: RR = 1.80 [p = 0.003] and RR = 1.78 [p = 0.002]). The findings from these studies should be interpreted cautiously; the analytical models do not control for the mother's health status, nor is an attempt made in these studies to explain the intervening mechanisms that may have led to higher mortality rates for children from unwanted pregnancies. These findings, particularly among a "low-risk" cohort of women with health insurance who received early prenatal care, warrant further investigation into the potential association between unintended pregnancy and infant death.

Several developing country studies have assessed the direct effects of pregnancy intention on child mortality. Frenzen and Hogan (1982) analyzed data collected through the Northern Thailand Fertility Study in the Chiang Mai and Chiang Rai provinces (1976–77). Ever-married women aged 15–44 (N = 1,921) and husbands (N = 1,615) provided information on pregnancy and contraceptive history and on individual and family-level sociodemographic characteristics. Births reported as wanted by one or neither parent experienced significantly higher risks of infant mortality (OR = 1.15), after controlling for a substantial number of sociodemographic characteristics. As a consequence, however, of the cross-sectional design of this study and the simultaneous ascertainment of both infant death and pregnancy intention, these findings may be affected by recall bias and also should be interpreted cautiously.

Montgomery and his colleagues (1997b) analyzed retrospective DHS data from five developing countries to assess the effects of unintended fertility (births considered to be either unwanted or mistimed at the time of conception) and excess fertility (when a woman's parity at the time of the survey exceeded her reported ideal family size). The multivariate models controlled for children's characteristics, parents' characteristics, and cluster characteristics (for example, access to health-care facilities, size of cluster, and so forth). The authors found

that in three of the countries (Egypt, the Philippines, and Thailand), babies born to women who reported excess fertility at the time of the DHS survey experienced higher neonatal and postneonatal mortality. The retrospective measure of unintended fertility, in contrast, showed weak or inconsistent effects on mortality.

Surveillance data from rural Bangladesh were used to investigate the relationship between pregnancy intention and childhood mortality among a sample of 9,869 births that occurred over the 1982–93 period (Montgomery et al. 1997a). The authors found no significant relationship between pregnancy wantedness and childhood mortality. The authors noted, however, that focusing on an intermediate outcome of child mortality (that is, postneonatal mortality) might have affected the results by separating the effect of birth interval from the effect of pregnancy wantedness on mortality.

Chalasani and colleagues (2007) address this concern by assessing the impact of child wantedness on neonatal, postneonatal, and early childhood death in their analysis of longitudinal surveillance data from the Maternal-Child Health Extension Project (1982–2002) in rural Bangladesh. Fixed-effects models were used to compare unwanted and wanted siblings within families. The authors assessed the effects of (1) sex-specific unwantedness, based on mother's prospective reports of a specific preference for a male or female child, and (2) general unwantedness, based on whether the woman wanted another child at all. They find higher odds of neonatal (OR = 1.30) and postneonatal (OR = 2.08) mortality among children who were unwanted because they were the "wrong" sex. The additional negative effect of being "excess quantity" was apparent in the neonatal case (OR = 1.72). Lastly, the authors conducted a natural experiment analysis on a subset of women who indicated a desire for additional children of one sex but not the other, assuming that desire for a child of a specific sex was not conditional on the number or sex composition of existing children. The natural experiment analysis, however, found no significant effect on any of the mortality outcomes.

Overall, the existing evidence for child mortality suggests a disadvantage for unintended children. The study by Chalasani and colleagues, indicating that unwanted infants may be significantly more likely to die in the neonatal or postneonatal periods than wanted infants, is remarkable in light of its rigor in incorporating prospective measures of pregnancy intention, employing longitudinal data, and using fixed-effects analyses of siblings' outcomes. Future studies are needed, however, to assess this relationship in other settings and to explore further the mechanisms through which unintended pregnancy may result in the increased risk of infant mortality.

001287

Exhibit 130

JA-0001693

### Nutritional Status

Studies focusing on nutritional status are generally conducted in developing countries, where malnutrition remains a major problem. Stunting can be caused by chronic malnutrition or repeated illness, or both, and is typically measured by comparing the child's height-for-age to international standards. Marston and Cleland (2003) found that stunting was 15 percent more likely for children born as a result of unwanted pregnancies in Peru (OR = 1.15; 95 percent CI: 1.02–1.29) but significantly less likely for children born as a result of both mistimed and unwanted births in Egypt (mistimed OR = 0.81; 95 percent CI: 0.68–0.96; unwanted OR = 0.84; 95 percent CI: 0.71–0.99). In the DHS analysis by Montgomery and his colleagues (1997a), excess and unwanted fertility were found to be associated with significantly lower height-for-age in only one of the five countries studied, the Dominican Republic. A recent study using data from the 1998 Bolivia DHS also found that children aged 12–35 months who were considered to be either mistimed or unwanted were approximately 30 percent more likely to be stunted, compared with wanted children (Shapiro-Mendoza et al. 2005).

### Child Development

All of the identified studies assessing the impact of pregnancy intention on child development before the age of five have been conducted in the United States. An additional set of studies have looked at long-term effects of pregnancy intention on development in later childhood, adolescence, and early adulthood; these studies are not reviewed here (Forssman and Thuwe 1966 and 1981; Myhrman 1988; Axinn et al. 1998; Barber et al. 1999; Joyce et al. 2000b; David 2006).

Baydar (1995) analyzed data from a sample of 1,327 mothers and their children (younger than two) who participated in the National Longitudinal Survey of Youth. Children's resources and developmental outcomes (for example, motor and social development, vocabulary, attachment) were assessed at two time points (1986 and 1988) according to their wantedness status. Although the bivariate results indicated disadvantages for unwanted and mistimed children, these effects mostly diminished once family-environment characteristics were included in the model. The only significant finding from the multivariate analysis was that children resulting from mistimed pregnancies experienced less favorable (that is, nonauthoritarian) parenting styles, compared with those resulting from wanted pregnancies.

Hummer and his colleagues (2004) and Crissey (2005), using nationally representative data from the 1988 National Maternal and Infant Health Survey and the 1991 Longitudinal Follow-Up, found mixed effects of pregnancy intention on maternal reports of child health, activity level, and overall development. Because of the scarcity of studies that have assessed child development as associated with pregnancy intention, further research in this area is warranted and would benefit from the inclusion of objective measures of child development and sufficient control of potentially confounding variables in the causal pathway.

### Child Abuse and Violence

Assessments of the impact of pregnancy intention on subsequent child abuse and violence are limited; only a handful of studies have been conducted in the United States, Europe, and Japan, and no studies identified from developing country settings have examined this relationship. The developed country studies suggest a positive association between unintended pregnancy and child abuse (Hunter et al. 1978; Zuravin 1987 and 1991; Sidebotham et al. 2003; Goto et al. 2005 and 2006), with one exception (Zuravin 1988).

The only population-based study, conducted by Sidebotham and his colleagues (2003), analyzed data from the Avon Longitudinal Study of Parents and Children in the United Kingdom for 14,256 children. In addition to information on hospital admission, infant health and development, and child characteristics, the pregnancy intention of the mother was ascertained at 12 weeks' gestation. Children from the cohort who were registered with the child protection agency by the age of six (n = 115) were nearly three times more likely than others to have resulted from a pregnancy that the mother considered to be unintended (OR = 2.92; 95 percent CI: 1.83–4.64), after controlling for birth weight, child health, developmental problems, and reported positive attributes of the child.

Because the existing studies on the relationship between pregnancy intention and subsequent child abuse are extremely limited in number and geographic focus, additional population-based, longitudinal studies from other countries are needed to foster a better understanding of this association.

## Parental Health and Well-being

### Maternal Mortality

Each year an estimated 529,000 maternal deaths occur throughout the world (Ronsmans and Graham 2006). Many factors contribute to maternal mortality, including poor maternal nutrition, deficient health systems, and a lack of skilled providers. The highest risk of death is with-

001288

Exhibit 130                                                                                            JA-0001694

in impoverished developing country settings, where one in six women will die as a result of pregnancy or child-birth (Ronsmans and Graham 2006). Although very few studies (for example, Ni and Rossignol 1994 and Czeizel et al. 1999) have directly investigated whether unintended pregnancies increase the risk of maternal mortality, an association is suggested by the following observations. First, every pregnancy brings increased exposure to the risk of maternal death; thus, every unintended pregnancy, but particularly those in high-maternal-mortality settings, subjects the woman to a life-threatening event not of her choosing. Second, unintended pregnancies are more likely to be of higher parity and/or to be experienced by very young or older women, for whom the risks of maternal death are inherently greater (Campbell and Graham 2006). A recent analysis by the Guttmacher Institute and UNFPA found that by averting the 52 million unintended pregnancies that occur worldwide each year, 22 million induced abortions, 1.4 million infant deaths, and 142,000 maternal deaths could also be prevented (Singh et al. 2003).

### Unsafe Abortion

According to estimates from the Guttmacher Institute, 210 million pregnancies occurred worldwide in 1999, of which 22 percent were terminated by means of induced abortion (AGI 1999). Although induced abortion is a relatively common means of terminating an unintended pregnancy, one in four of the world's women live in countries that ban the procedure or permit it only to save the woman's life.

Differences in legal status, accessibility, and provision of abortion and postabortion services result in substantial variation in the risks of abortion to maternal health in different settings. In the United States, induced abortion results in an estimated 50 deaths per 100,000 procedures, compared with 100–1,000 deaths per 100,000 procedures in developing countries (the number varies depending on the safety of procedure used, the severity of complications, and the woman's access to postabortion care) (Ahman and Shah 2004). According to estimates from 1995, 26 million legal and 20 million illegal abortions were performed worldwide; nearly all unsafe abortions occurred in developing countries (Henshaw et al. 1999; Ahman and Shah 2004).

An estimated 74,000 women die every year from unsafe abortion (UNFPA 2007); these procedures account for 13 percent of all maternal deaths worldwide and are responsible for an estimated five million person-years of productive life lost due to death and illness (Singh et al. 2003; Ahman and Shah 2004; Grimes et al. 2006).

Morbidity is a far more common consequence of unsafe abortion, manifested both in short-term and potentially long-term complications. An estimated 20–30 percent of unsafe abortions result in reproductive tract infections, of which 20–40 percent result in infection of the upper reproductive tract and infertility (Ahman and Shah 2004). Long-term complications include infertility, chronic infections, and risks to subsequent pregnancies. An estimated 2 percent of women of reproductive age become infertile as a result of unsafe abortion, and 5 percent suffer from chronic infections (Ahman and Shah 2004).

### Maternal Mental Health

Evidence suggests a link between unintended childbearing and a significantly increased risk of maternal depression (Najman et al. 1991; Barber et al. 1999; Lara et al. 2006; Nakku et al. 2006; Lau and Keung 2007), of anxiety (Najman et al. 1991), and of a decline in psychological well-being or psychosocial conditions (Laukaran and van den Berg 1980; Hardee et al. 2004). The evidence, however, especially from developing countries, is limited.

Barber and her colleagues (1999) used longitudinal data from the National Survey of Families and Households to examine maternal depression, happiness, and overall perception of health. After controlling for maternal characteristics, total number of children in the family, and presence in the household of a child aged 5–18, mothers who had experienced any unwanted births reported higher levels of depression and lower levels of happiness; no effects on physical health were found, however. The authors also found that mothers who had experienced unwanted births were more likely to spank or slap their children and to have spent less leisure time with them, compared with other mothers. These negative outcomes were significantly exacerbated by the mother's mental health status: mothers with unwanted births who were also depressed were even more likely to have negative outcomes.

Najman and colleagues (1991) found significantly higher rates of anxiety and depression among a sample of Australian mothers when measured at three timepoints—before, shortly after, and six months after the birth of a child from an unwanted pregnancy—after controlling for mother's age, income, marital status, and parity. No measure was available for the mental health status of mothers prior to the pregnancy, however, indicating that these conditions may have preceded the unwanted pregnancy.

In the only developing country study identified, Hardee and her colleagues (2004) assessed psychosocial well-being in Indonesia among women with and without unintended pregnancies. Women were grouped into three clusters, according to their scores on five scales of

001289

Exhibit 130    JA-0001695

psychosocial well-being. After controlling for sociodemographic variables, the authors found that women who had reported ever experiencing an unintended pregnancy were nearly three times more likely to be in the low well-being than in the high well-being cluster (OR = 2.8; 95 percent CI: 1.5–5.1)

In light of the paucity of studies investigating the impact of unintended pregnancy on psychosocial health and well-being, and their limitations in terms of establishing causality, the existing research should only be considered to be suggestive of such an impact.

### Childrearing and Domestic Violence

Some studies have found unwanted pregnancy to be associated with increased risks of negative childrearing outcomes and parenting difficulty (Goto et al. 2005 and 2006), and physical abuse and violence (Gazmararian et al. 1995; Goodwin et al. 2000; Lau 2005), although the studies are few and are unable to determine causality as a result of their design or the inclusion of limited control variables. Goto et al. (2006) surveyed women in Japan during their pregnancies and at six weeks postpartum to determine whether unintended pregnancy was associated with childrearing outcomes. Although their multivariate analyses indicated that mothers of unintended children were more likely to report lower mother-to-child attachment, increased negative feelings of mothers, and a lower level of participation by fathers in childrearing, their sample size was relatively small, especially for the follow-up (N = 140), and likely to be highly select.

The relationship between pregnancy intention and physical violence was assessed in two studies using US data from the Pregnancy Risk Assessment Monitoring System (PRAMS). In the Gazmararian et al. (1995) and Goodwin et al. (2000) studies, the authors found higher odds of physical abuse among women who reported retrospectively that their most recent pregnancy was unintended. Several limitations of both studies are noted by the authors, however, including their inability to establish the direction of causality between pregnancy intention and physical abuse, as well as the exclusion of women with non-live birth outcomes.

In a study of Chinese women in Hong Kong, Lau (2005) found that women with unplanned pregnancies experienced higher risks of physical and sexual abuse than those having planned pregnancies. Women with unplanned pregnancies were more than two times more likely than those whose pregnancies were planned to experience sexual coercion, after controlling for socioeconomic, demographic, and cultural variables (OR: 2.13; 95 percent CI: 1.18–3.84). Like the studies of maternal mental health, this study does not control for any history of domestic violence that may have preceded the pregnancy. Moreover, because of the study's cross-sectional design, determining the causal pathway between violence and unintended pregnancy is not possible; domestic violence may have precipitated an unintended pregnancy or may have resulted from an unintended pregnancy.

## Conclusions

The existing evidence on the impact of unintended pregnancy on child and parental health outcomes is mixed and is limited by an insufficient number of studies for some outcomes and by the aforementioned measurement and analytical concerns. Differences in the measurement and classification of pregnancy intention further complicate the comparison of studies. Among the studies that incorporated both mistimed and unwanted pregnancies/births, the impact of pregnancy intention on health consequences was inconsistent, with some studies finding unwanted pregnancies particularly disadvantaged (for example, Eggleston 2000) and others finding significant negative effects only for mistimed pregnancies (for example, Gage 1998 and Kost et al. 1998b). These inconsistencies point to the need for improved understanding and measurement of pregnancy intention across study settings. In addition, the broader acknowledgment and incorporation of the degrees of "unintendedness" into analytic models would better represent the heterogeneity of this concept and the severity of associated health outcomes.

Despite a considerable number of studies (often conducted in the United States) on some outcomes, evidence for other outcomes is limited or nonexistent. That so few studies are available from developing country settings is particularly striking, considering that the financial, social, and physical costs of unintended pregnancy are likely to be greater in resource-poor settings. The scarcity of studies on this topic is surprising, given that the prevention of unintended pregnancy has been a major rationale for the funding and provision of family planning, both in the United States and internationally.

The evidence of the impact of unintended pregnancy on abortion-related morbidity and mortality points to the need for primary and secondary prevention efforts. Primary prevention, through the increased provision and use of effective contraceptive methods, can reduce levels of unintended pregnancy. In the event of an unintended pregnancy, secondary prevention efforts can help to ensure safe abortion and postabortion services to prevent

001290

Exhibit 130

JA-0001696

ongoing illness and death for the estimated 46 million women around the world who have abortions each year (AGI 1999).

Among studies that have assessed antenatal care, breastfeeding behavior, and child nutrition, the evidence is relatively consistent, showing a negative effect of unintended pregnancy. The developed country studies found more pronounced effects on the timing, rather than the frequency, of antenatal care and found persistent negative effects on the breastfeeding of children who resulted from unintended pregnancies. For developing countries, the evidence of these outcomes is more limited, yet what evidence there is suggests that the effects of pregnancy intention on antenatal care may be even more severe than it is in developed countries, and that unintended pregnancy also may affect negatively the breastfeeding and nutritional status of children who resulted from unwanted pregnancies.

For other outcomes, such as maternal risk behaviors, pregnancy outcomes, and curative care, developed country studies failed to find a significant association with pregnancy intention; the paucity of studies from developing countries precludes an overall assessment of such an impact. The few existing studies suggest that the children who result from unintended pregnancies may, in fact, be disadvantaged with respect to low birth weight and incomplete vaccinations; additional investigation is needed to substantiate or contradict these findings.

Although studies conducted in developed countries are limited, findings from rigorous developing country studies suggest that children who are the result of unintended pregnancies are at an increased risk of infant mortality, compared with children resulting from intended pregnancies. Consistent evidence shows higher levels of mortality and malnutrition for female children as a result of son preference. Differentiation of the effects of being unintended versus the effect of the child's sex could help to broaden the understanding of differential treatment and underinvestment in children, particularly within developing country settings.

The scarcity of studies on the effects of unintended pregnancy on the physical and mental health of men and women also must be noted. Beyond maternal and abortion-related mortality, relatively few studies have assessed the effects of unintended pregnancy on women's health and well-being. The studies that have been conducted indicate a positive association between unintended pregnancy and depression, anxiety, and abuse. Several of these studies are cross-sectional, however, and do not include baseline measures of psychosocial well-being. An additional concern is the absence of studies designed to assess the potential consequences to fathers of unintended pregnancies. Because the role of fathers is that of principal or sole wage earner in many contexts throughout the world, the pressure to provide adequately for a family increases with the number of children in the household. Research is needed to assess whether unintended pregnancy results in adverse physical and mental health outcomes for both men and women.

Although they are not reviewed here, a few studies have attempted to measure the long-term social and health impacts on older children, adolescents, and adults that result from unintended pregnancies. As Lloyd and Montgomery (1996) point out in their discussion of the methodological limitations of research on unintended childbearing, the potential long-term and cumulative consequences of unwantedness necessitate longitudinal study designs and a focus on health outcomes beyond the early childhood years. Efforts by Axinn and his colleagues (1998) and Barber and her colleagues (1999) corroborate this argument; their findings of the impact of pregnancy intention into late adolescence and early adulthood suggest that future work in this area is warranted.

In their design and analysis, future studies should incorporate strategies to isolate and to estimate accurately the independent effects of being "unintended" on children's health outcomes. Longitudinal cohort studies provide an opportunity to assess such temporal associations and could provide a means of assessing the cumulative effects of unintended pregnancy. The use of hierarchical models or matched sibling analyses could allow for the comparison of both wanted and unwanted siblings, thereby controlling for both observable and unobservable family-level characteristics.

Although this literature review identifies specific gaps in existing knowledge of the effects of unintended pregnancy, the most recent studies also indicate a shift toward more rigorous methodologies and research designs. Future research in this area must continue to evolve by overcoming methodological limitations and by embracing a broader view of the potential impacts of unintended pregnancy for children and their families.

001291

Exhibit 130

JA-0001697

# Appendix

**Table A1**    Measures of pregnancy intention employed in selected studies

| Study | Measure of pregnancy intention |
|---|---|
| Barber et al (1999) | "Thinking back to shortly before your recent pregnancy began, did you really want to have a(nother) child sometime, or would you rather not have had any(more)?" Unwanted birth: Mother reported they did not want any additional children Wanted birth: Mother reported that they wanted at least one (more) child  Any unwanted births: Assessed across study waves if mother had any unwanted births  Mother had more children than she wanted: Compared actual with preferred childbearing, "If you could start life over again, knowing that things would turn out just about the way they have for you and your husband, what number of children would you want to have when your family is complete?" |
| Baydar (1995) | Wanted pregnancy: One for which the mother had planned or one that she had not planned, but nevertheless had wanted. Mistimed pregnancy: One that occurred at a time the woman would rather have postponed childbearing, whether or not she was practicing contraception  Unwanted pregnancy: One that a woman would have preferred not to have had at any time  (Measured before birth and within 90 days postpartum ) |
| Bustan and Coker (1994) | "How do you feel about having a baby now?" (asked during first trimester)  Unwanted pregnancy: If the woman indicated that she or her husband was unhappy, resentful, or upset about the pregnancy or did not want the pregnancy, or that the pregnancy was mistimed  Accepted pregnancy: If the woman indicated that she and her husband were happy about the pregnancy or stated that they had wanted, accepted, or planned the pregnancy |
| Chalasani et al (2007) | "Do you want any more children?" (overall wantedness)  "How many children (of each sex) do you want?" (sex-specific wantedness), asked via periodic surveys before birth of the child. |
| Eggleston (2000) | "At the time you became pregnant, did you want to become pregnant, did you want to wait until later, or did you not want this pregnancy?" |
| Frenzen and Hogan (1982) | Was birth wanted by both parents, by only one parent, or by neither parent? (Question not specified). |
| Gage (1998) | DHS question: "At the time you became pregnant, did you want to become pregnant then, did you want to wait until later, or did you want no (more) children at all?" (Asked of all women who had had a live birth in the preceding five years ) |
| Hrom-Fiedler and Pérez-Escamilla (2006) | DHS question: Combined mistimed and unwanted into "unintended " |
| Jensen and Ahlburg (1999) | DHS question: Compared unwanted with wanted/mistimed. |
| Jensen and Ahlburg (2002) | DHS question: Compared unwanted with wanted/mistimed |
| Joyce et al (2000b) | Same as Baydar (1995). (Women were asked a series of four questions before the birth [29 percent], or within one year of child's birth ) (For approximately 11 percent of the children in the sample, child outcomes were not linked to pregnancy intention questions and were classified as "not determined ") |
| Korenman et al (2002) | Same as Baydar (1995). (Mistimed and unwanted pregnancies were combined into one category [unintended] for multivariate analyses ) |
| Kost et al (1998a) and (1998b) | Intended births: Births occurring to women who had wanted to become pregnant when they did  Mistimed births: Births occurring to women who had not wanted to conceive at that time but who had wanted to have a child in the future. Unwanted births: Births occurring to women who had not wanted to have any, or any more, children  National Survey of Family Growth measure asks whether, just before the woman became pregnant, she had wanted to become pregnant, would have preferred the pregnancy to occur earlier or later, or had not wanted to be pregnant at all  National Maternal and Infant Health Survey measure asks whether the woman had wanted to become pregnant at the time she conceived, would have preferred it to happen later, or had not wanted to become pregnant ever again |
| Laukaran and van den Berg (1980) | "How do you feel about having a baby now?" (asked during first trimester)  Wanted pregnancy: Woman gave strong favorable response (delighted, pleased, excited, wanted it, very happy, glad)  Unwanted pregnancy: Woman gave strong negative response (unhappy, resentful, upset, did not want). |
| Magadi et al (2000) | DHS question |
| Marsiglio and Mott (1988) | "Was the reason you were not/stopped using any contraceptive methods because you yourself wanted to become pregnant?" If no, "Just before you became pregnant, did you want to become pregnant when you did?" If no, "Did you want a baby, but not at that time, or did you want none at all?" Wanted pregnancy: "Yes" to initial question, or "yes/didn't matter" to second item. |
| Marston and Cleland (2003) | DHS question |
| Montgomery et al (1997a) | DHS question |
| Montgomery et al (1997b) | "Do you want any more children?" (overall wantedness)  "How many children (of each sex) do you want?" (sex-specific wantedness, asked via periodic surveys before birth of child). |
| Najman et al (1991) | Unwanted pregnancy: Women reported negatively to following two items: "How well do the following statements describe how you felt when you found out you were pregnant?" (Likert-scale range: 1–5 for four possible responses: I felt overjoyed, I would have preferred not to become pregnant, I felt unhappy, I felt it was the worst thing that could have happened to me ) "Choose one of the following: I planned to get pregnant at this time, I meant to avoid pregnancy at this time, I wanted to get pregnant at this time, My method of family planning failed." |

001292

Exhibit 130                                                                      JA-0001698

Exhibit 130

**Table A2**   Summary of studies on the health effects of unintended pregnancy

| Study | Sample | Outcomes | Significant findings | Comments |
|---|---|---|---|---|
| Barber et al. (1999) | 882 white, married mothers and their children from 1961 Detroit birth records, Intergenerational Panel Study of Mothers and Children (IPSMC), 2,162 white women aged 19+ with at least one child younger than 18 who participated in National Survey of Families and Households (NSFH) (Wave 1) in 1987–88 | IPSMC: Parent–child relationships (affection, social support, financial support), NSFH: Mother's health (depression, happiness, overall health), mother–child interaction (leisure time spent with children, frequency of spanking children) | IPSMC: Family-level, unwanted childbearing negatively related to mother–child affection in early adulthood. Women with excess childbearing had significant declines in relationships and gave less social support to adult children. No effect on financial support. NSFH: Mothers with unwanted births had higher levels of depression, lower levels of happiness, less involvement in children's leisure, and were more likely to use physical punishment than other mothers. No effect on physical health. | IPSMC controls: sex of child, mother's age, birth order, total number of children in the family in 1977, parental education, family income, and mother's participation in the labor force. NSFH controls: total number of children in the family, mother's age, mother's education, parental income, whether mother was working outside the home, and whether household included a child aged 5–18 |
| Baydar (1995) | 1,327 mothers with children younger than two in 1986 who participated in the National Longitudinal Survey of Youth (NLSY) | Developmental resources, child developmental outcomes | Mistimed children were more likely to experience authoritarian parenting. No other effects found. | Controls: maternal sociodemographic characteristics, maternal self-esteem, and child's characteristics (sex, age, birth order, low-birth-weight status, at risk of having birth defects) |
| Bustan and Coker (1994) | 8,823 married HMO patients enrolled (1959–66), San Francisco | Fetal, neonatal, and postneonatal death | Unwanted pregnancies had higher neonatal death rate. No effects for fetal or postneonatal death. | Limited controls: mother's age, race, parity, and husband's education only. Excluded couples who had contradictory feelings about the pregnancy |
| Chalasani et al (2007) | 21,920 children (n = 3,283 for fixed-effects models, 1,008 sets of siblings) from Maternal-Child Health Extension Project, Bangladesh (1982–2002) | Neonatal, postneonatal, and early childhood mortality | Higher odds of neonatal and postneonatal mortality among children born to mothers who wanted a child of the opposite sex. Higher odds of neonatal and postneonatal mortality among children born to mothers who did not want a child. Children who were "up to God" or not wanted attained less schooling than wanted children | Controls: sex and birth year of child, birth order, maternal age, parental education, religion, and thana (county). Prospective measurement of overall and sex-specific wantedness. Pregnancy intentions: wanted, "up to God," and unwanted. Used fixed-effects models of sets of siblings |
| Eggleston (2000) | 3,988 women aged 15–49, 1994 Ecuador Demographic and Maternal-Child Health Survey | More than 1 antenatal care visit, initiate care in first trimester, 4+ antenatal care visits | Women with unwanted pregnancies were less likely to: obtain antenatal care, initiate care in first trimester, receive 4+ visits. No effect for mistimed pregnancies. | Controls: maternal age, parity, education, socioeconomic status, geographic region, marital status, and previous use of family planning methods |
| Frenzen and Hogan (1982) | 1,921 ever-married women (aged 15–44) and 1,615 husbands; Northern Thailand Fertility Study (1976–77) | Infant mortality | Higher odds of infant mortality among births wanted by only one or neither parent | Controls: social class, maternal education, district development, parents' feelings toward wealth transfer in family, health information, maternal age, parity, birth interval, and year of birth |
| Gage (1998) | Women aged 15–49 who participated in 1993 Kenya DHS (n = 3,700) or 1992 Namibia DHS (n = 2,294) and who had a live birth within the past five years | First antenatal care visit at less than three months' gestation, institutional delivery | No effects on initiation of antenatal care. Mistimed births in Kenya were less likely to have institutional delivery | Controls: education, urban residence, presence of child younger than three, distance to nearest health facility, ethnic group, premarital status, and maternal age |
| Hromi-Fiedler and Perez-Escamilla (2006) | 41,353 women who had a live child aged 13–36 months; 18 DHS Surveys (1995–2000) | Mother-reported breastfeeding child aged between 13 and 36 months | Women with unintended pregnancies in three countries were less likely to breastfeed for more than 12 months. In pooled analysis, women with unintended pregnancies were less likely to breastfeed for more than 12 months | Controls: child's age (months), sex, place of residence, maternal employment, parity, maternal age, pregnancy status of the respondent at time of interview, maternal education, and marital status |
| Jensen and Ahlburg (1999) | DHS data from 11 countries and one Indian state | Child ill with fever or diarrhea at less than 2 weeks, modern treatment for fever or diarrhea, number of vaccinations received | Wanted children had lower incidence of acute respiratory infection (all countries) and lower incidence of diarrhea (seven countries). No consistent effects on treatment. Wanted children had higher levels of vaccination in countries where vaccination levels are low | Controls: child's sex and age, maternal education and age, father's education, assets, household facilities, and areal prevalence of disease at cluster level. Assessed children born in the survey window who have at least one surviving sibling. Estimated effects on children and family. |
| Jensen and Ahlburg (2002) | 14,393 children born to women who participated in 1991 Indonesian DHS | Child ill with fever/cough or diarrhea, use of curative care | Unwanted children had higher incidence of illness and lower levels of curative care. | Controls: sex and age of child, number of siblings, maternal age, education of mother and father, household assets and condition, residence, and province mean. |

(continued)

Exhibit 130

**Table A2**    (continued)

| Study | Sample | Outcomes | Significant findings | Comments |
|---|---|---|---|---|
| Joyce et al. (2000b) | Children born to 3,038 women who had had at least two births and who participated in the NLSY (1979–92) | Initiated antenatal care at more than six months, smoked more than a pack a day, low birth weight, ever breastfed, cognitive development, social development | Cross-sectional models (model A). Unwanted and mistimed pregnancies associated with late antenatal care, heavy smoking, lower likelihood of breastfeeding, and negative effects on child development. Fixed-effect, within-mother models (models A and B). Unwanted children less likely to be breastfed, marginal effects on late antenatal care, no effects on child development. Between-family models (model A). Families with unwanted or mistimed pregnancies associated with heavy smoking, lower likelihood of breastfeeding, negative effects on child development (model B). Mistimed pregnancies less likely to result in low-birth-weight child; marginally less likely to be breastfed; negative effects on child development | Model A (exogenous) controls child's sex, region, urban residence, mother's race/ethnicity, and characteristics of mother's household when she was 14 years old. Model B (exogenous and potentially endogenous controls): Model A + child's birth order, number of siblings at time of birth, mother's religious attendance, year of child's birth, mother's marital status. Aid to Families with Dependent Children participation in year following the birth, mother's education, age at birth, family income in year following birth, mother's 1980 Armed Forces Qualifications Test (AFQT) score, 1979 self-efficacy (Rotter) score, and 1980 self-esteem score. |
| Korenman et al. (2002) | Children born to 5,514 married and 2,614 unmarried women who participated in the NLSY (1979–92) | Initiation of antenatal care after first trimester and after second trimester, smoked at all or more than one pack a day during pregnancy, ever breastfed, low birth weight | Cross-sectional models: Unmarried women more likely to initiate antenatal care after first trimester. Married women with unintended pregnancy more likely to initiate antenatal care after first trimester, more likely to smoke, and less likely to breastfeed. Fixed-effects, within-mother models. Unmarried women more likely to initiate antenatal care after first trimester and less likely to breastfeed, marginal effects on antenatal care and breastfeeding for married women | Controls, undetermined pregnancy intention, region and urban residence, mother's race and ethnicity, child's sex, birth order, year of birth, characteristics of mother's household at age 14, mother's score on the AFQT (1980), and timing of pregnancy-intention report. Mother proxy-reported the father's intention. |
| Kost et al. (1998a) | 9,122 births reported in the 1988 National Maternal and Infant Health Survey and 2,548 births reported in the 1988 National Survey of Family Growth | Any of following: birth < 37 weeks, birth weight < 2,500 grams, > 42 weeks' gestational age weighing < 2,500 grams, well-baby care in first three months, first six months, ever breastfed | No effects on birth outcome when adjusted for pregnancy behaviors. No effect found on well-baby care. Children from unwanted pregnancies less likely to be breastfed (NMIHS). No effect found for NSFG | Controls, mother's health and sociodemographic characteristics, socioeconomic characteristics, and pregnancy behaviors. Births occurring before 25 weeks' gestation were omitted from small-for-gestational-age analyses. NSFG: self-reported behaviors. NMIHS: self-reported behaviors and infant's birth certificate. Excluded multiple live births. |
| Kost et al. (1998b) | 9,122 births reported in the 1988 National Maternal and Infant Health Survey and 2,586 births reported in the 1988 National Survey of Family Growth | Recognized pregnancy in six weeks, received antenatal care in eight weeks, made recommended number of visits, quit smoking, stopped or reduced use of alcohol, took vitamins, gained weight within five pounds of advice | Mistimed and unwanted pregnancies less likely to receive antenatal care in first eight weeks (NMIHS). No effect on number of antenatal care visits. Women with mistimed pregnancies less likely to quit smoking (NMIHS). No effect for alcohol use, vitamin use or adequate weight gain | Controls, maternal age and race/ethnicity, marital status, mother's education, poverty status, received public assistance, worked during pregnancy, number of previous live births, prior negative pregnancy experience, and recognized pregnancy in first six weeks. NMIHS: self-reported behaviors and infant's birth certificate. Excluded multiple live births. |
| Laukaran and van den Berg (1980) | 7,901 live births to married, pregnant Caucasian patients enrolled from 1959 to 1966 in Child Health and Development Study through Kaiser HMO, San Francisco | Perinatal death, congenital anomalies, postpartum hemorrhage or infection, antenatal visit for accidental injury, three or more doses of analgesics, psychosocial conditions, birth outcomes and obstetric complications | Unwanted status associated with increased risk of perinatal death, congenital anomalies, postpartum hemorrhage or infection, antenatal visit for accidental injury, three or more doses of analgesics, and psychosocial conditions. No significant differences in birth weight, duration of gestation, length of labor, or antenatal and intrapartum obstetric complications | Controls were employed using two models: husband's occupation and parity, and mother's age and parity. Included random-effects models to control for woman-level and community variance. |
| Magadi et al. (2000) | 5,104 births occurring within previous five years to women aged 15–49 who participated in the 1993 Kenya DHS and who received antenatal care | Frequency and timing of antenatal care visits | Women with unwanted or mistimed pregnancies had fewer antenatal visits and delayed first visit | Controls: maternal sociodemographic variables, preceding birth interval, age at first birth, ideal number of children, use of family planning methods, distance and time to nearest health facility, and birth order. |

(continued)

001294

JA-0001700

Exhibit 130

34  Studies in Family Planning

**Table A2** (continued)

| Study | Sample | Outcomes | Significant findings | Comments |
|---|---|---|---|---|
| Marsiglio and Mott (1988) | Mothers of firstborn children from 1979 NLSY, reinterviewed in 1984 at age 19–27 (n = 6,015 women) | Antenatal care at less than three months, never smoked during pregnancy, one or no alcoholic drinks per month during pregnancy, ever breastfed, well-baby care at less than one month, weight gain of ≤ 15 or ≥ 50 pounds, low or high birth weight (less than 5.5 pounds; more than nine pounds) | Women with wanted pregnancies more likely to seek early antenatal care, to gain more than 50 pounds during pregnancy, and to have a baby weighing more than nine pounds. No significant effects for alcohol use, smoking, insufficient weight gain, low birth weight, breastfeeding, or well-baby care | Controls: race/ethnicity, residence at age 14, education of respondent's mother, and age at birth. Restricted to relatively young mothers who did not quickly repeat the childbearing process |
| Marston and Cleland (2003) | Women who had live births within five years of marriage and who participated in DHS surveys: Bolivia (1998), Egypt (1995), Kenya (1998), Peru (1996), Philippines (1998) | Received antenatal care at less than six months of pregnancy, supervised delivery, received full vaccination, stunting | Antenatal care: Women with mistimed pregnancies were less likely to receive antenatal care in the first six months of pregnancy (Kenya, Peru, Philippines). Women with unwanted pregnancies were less likely (Peru, Philippines) and more likely (Egypt) to receive antenatal care in the first six months of pregnancy. Supervised delivery: Women with unwanted pregnancies were more likely (Egypt) and less likely (Peru) to have a supervised delivery. Full vaccination by one year: Children who resulted from mistimed pregnancies were more likely to have their full vaccinations (Egypt). Children who resulted from unwanted pregnancies were less likely to have their full vaccinations (Kenya, Peru). Stunting: Children who resulted from mistimed pregnancies were less likely to be stunted (Egypt). Children who resulted from unwanted pregnancies were less likely to be stunted (Egypt) and more likely to be stunted (Peru) | Controls: birth order, maternal education, household wealth, type of residence, ethnic group, language (postnatal outcomes). For multiple births, only firstborn child is included. Vaccination and growth data are available only for those children who survived one year. |
| Montgomery et al. (1997a) | 9,869 children from demographic surveillance households in rural Bangladesh (1982–93) | Child survival 0–5 years | Unwantedness was not associated with child mortality | Controls: child sex, birth order, parity, mother's education, father's education, family background (house size, assets, religion), thana (county), and time period. |
| Montgomery et al. (1997b) | DHS data from Dominican Republic (1991), Egypt (1988), Kenya (1993), Philippines (1993), and Thailand (1987) | Child survival 0–5 years, nutritional status | Excess fertility was associated with higher mortality (Egypt, Philippines, Thailand), excess and unwanted fertility was negatively associated with height-for-age (Dominican Republic only). Child-specific variables of excess fertility had weak or inconsistent effects. | Controls: child characteristics (sex, age, birth interval, birth order, parity, twin, premature, antenatal care, tetanus vaccination), parents' characteristics (mother's age at birth, mother's schooling, union status, spouse's schooling, standard of living index, index squared), and cluster characteristics (cluster size, distance to and number of hospital/health center[s], number of health services provided at health centers, community has health worker/trained midwife/mobile health clinic). |
| Najman et al. (1991) | 6,642 pregnant women enrolled at first antenatal-care visit and followed postpartum (1981–84; Mater-University of Queensland Study of Pregnancy) | Anxiety, depression | Anxiety and depression were associated with unwanted pregnancy | Controls: mother's age, income, marital status, and parity. Lack of measurement of mental health prior to pregnancy |

## Notes

1 The exception among the reviewed studies is the measure employed by Bustan and Coker (1994) and Laukaran and van den Berg (1980), in which women were asked, "How do you feel about having a baby now?" The participants' responses were noted and coded in seven distinct categories, ranging from "strongly favorable" (for example, delighted, pleased) to a "negative response" (for example, unhappy, resentful).

2 Health outcomes for children until age five are addressed in this review; however, some evidence suggests that the cumulative effects of unintended pregnancy may persist into adolescence and early adulthood (Hook 1963; Blomberg 1980b; Myhrman 1988; David 1992; Axinn et al. 1998; Barber et al. 1999).

## References

Adetunji, Jacob A. 1998. "Unintended Childbearing in Developing Countries: Levels, Trends, and Determinants." *Demographic and Health Surveys Analytical Reports* No. 8. Calverton, MD: Macro International.

Ahluwalia, Indu B., Rob Merritt, Laurie F. Beck, and Mary Rogers. 2001. "Multiple lifestyle and psychosocial risks and delivery of small for gestational age infants." *Obstetrics & Gynecology* 97(1): 649–656.

Ahman, Elisabeth and Iqbal Shah. 2004. *Unsafe Abortion: Global and Regional Estimates of the Incidence of Unsafe Abortion and Associated Mortality in 2000.* Fourth edition. Geneva: World Health Organization.

Alan Guttmacher Institute (AGI). 1999. *Sharing Responsibility: Women, Society, and Abortion Worldwide.* New York: AGI.

Altfeld, Susan, Arden Handler, Dee Burton, and Leatrice Berman. 1997. "Wantedness of pregnancy and prenatal health behaviors." *Women & Health* 26(4): 29–43.

Arnold, Fred, Sunita Kishor, and T.K. Roy. 2002. "Sex-selective abortions in India." *Population and Development Review* 28(4): 759–785.

Axinn, William G., Jennifer S. Barber, and Arland Thornton. 1998. "The long-term impact of parents' childbearing decisions on children's self-esteem." *Demography* 35(4): 435–443.

Bachrach, Christine A. and Susan Newcomer. 1999. "Intended pregnancies and unintended pregnancies: Distinct categories or opposite ends of a continuum?" Forum on contraceptive failure and unintended pregnancy. *Family Planning Perspectives* 31(5): 251–252.

Bankole, Akinrinola and Susheela Singh. 1998. "Couples' fertility and contraceptive decision-making in developing countries: Hearing the man's voice." *International Family Planning Perspectives* 24(1): 15–24.

Bankole, Akinrinola and Charles F. Westoff. 1998. "The consistency and validity of reproductive attitudes: Evidence from Morocco." *Journal of Biosocial Sciences* 30(4): 439–455.

Barber, Jennifer S., William G. Axinn, and Arland Thornton. 1999. "Unwanted childbearing, health, and mother-child relationships." *Journal of Health and Social Behavior* 40(3): 231–257.

Barrett, Geraldine and Kaye Wellings. 2002. "What is a 'planned' pregnancy? Empirical data from a British study." *Social Science & Medicine* 55(4): 545–557.

Baydar, Nazli. 1995. "Consequences for children of their birth planning status." *Family Planning Perspectives* 27(6): 228–234, 245.

Berra, S., L. Rajmil, R. Passamonte, E. Fernandez, and J. Sabulsky. 2001. "Premature cessation of breastfeeding in infants: Development and evaluation of a predictive model in two Argentinian cohorts: The CLACYD study, 1993–1999." *Acta Paediatrica* 90(5): 544–551.

Bitto, Adenike, Ronald H. Gray, Joe L. Simpson, et al. 1997. "Adverse outcomes of planned and unplanned pregnancies among users of natural family planning: A prospective study." *American Journal of Public Health* 87(3): 338–343.

Blomberg, Stig. 1980a. "Influence of maternal distress during pregnancy on complications in pregnancy and delivery." *Acta Psychiatrica Scandinavica* 62(5): 399–404.

———. 1980b. "Influence of maternal distress during pregnancy on postnatal development." *Acta Psychiatrica Scandinavica* 62(5): 405–417.

———. 1980c. "Influence of maternal distress during pregnancy on fetal development and mortality." *Acta Psychiatrica Scandinavica* 62(4): 298–314.

———. 1980d. "Influence of maternal distress during pregnancy on fetal malformations." *Acta Psychiatrica Scandinavica* 62(4): 315–330.

Brown, Sarah S. and Leon Eisenberg (eds.). 1995. *The Best Intentions: Unintended Pregnancy and the Well-Being of Children and Families.* Washington, DC: National Academies Press.

Bustan, M.N. and A.L. Coker. 1994. "Maternal attitude toward pregnancy and the risk of neonatal death." *American Journal of Public Health* 84(3): 411–414.

Campbell, Oona M. and Wendy J. Graham. 2006. "Strategies for reducing maternal mortality: Getting on with what works." *Lancet* 368(9,543): 1,284–1,299.

Chalasani, Satvika, John B. Casterline, and Michael A. Koenig. 2007. "Consequences of unwanted childbearing: A study of child outcomes in Bangladesh." Paper presented at the Annual Meeting of the Population Association of America, New York, 29–31 March.

Chinebuah, Bridget and Rafael Pérez-Escamilla. 2001. "Unplanned pregnancies are associated with less likelihood of prolonged breastfeeding among primiparous women in Ghana." *Journal of Nutrition* 131: 1,247–1,249.

Crissey, Sarah R. 2005. "Effect of pregnancy intention on child well-being and development: Combining retrospective reports of attitude and contraceptive use." *Population Research and Policy Review* 24(6): 593–615.

Czeizel, A.E., L. Timar, et al. 1999. "Timing of suicide attempts by self-poisoning during pregnancy and pregnancy outcomes." *International Journal of Gynaecology and Obstetrics* 65(1): 39–45.

D'Angelo, Denize V., Brenda Colley Gilbert, Roger W. Rochat, John S. Santelli, and Joan M. Herold. 2004. "Differences between mistimed and unwanted pregnancies among women who have live births." *Perspectives on Sexual and Reproductive Health* 36(5): 192–197.

Das Gupta, Monica. 1987. "Selective discrimination against female children in rural Punjab, India." *Population and Development Review* 13(1): 77–100.

David, Henry P. 1992. "Born unwanted: Long-term developmental effects of denied abortion." *Journal of Social Issues* 48(3): 163–181.

———. 2006. "Born unwanted, 35 years later: The Prague study." *Reproductive Health Matters* 14(27): 181–190.

Delgado-Rodriguez, Miguel, Montserrat Gómez-Olmedo, Aurora Bueno-Cavanillas, and Ramón Galvez-Vargas. 1997. "Unplanned pregnancy as a major determinant in inadequate use of prenatal care." *Preventive Medicine* 26(6): 834–838.

**001296**

Exhibit 130

Desai, Sonalde. 1995. "When are children from large families disadvantaged? Evidence from cross-national analyses." *Population Studies* 49(2): 195–210.

D'Souza, Stan and Lincoln C. Chen. 1980. "Sex differentials in mortality in rural Bangladesh." *Population and Development Review* 6(2): 257–270.

Dyson, Tim and Mick Moore. 1983. "On kinship structure, female autonomy, and demographic behavior in India." *Population and Development Review* 9(1): 35–60.

Dytrych, Zdenek, Zdenek Matějček, Vratislav Schuller, Henry P. David, and Herbert L. Friedman. 1975. "Children born to women denied abortion." *Family Planning Perspectives* 7(4): 165–171.

Eggleston, Elizabeth. 2000. "Unintended pregnancy and women's use of prenatal care in Ecuador." *Social Science & Medicine* 51(2): 1,011–1,018.

Eggleston, Elizabeth, Amy Ong Tsui, and Milton Kotelchuck. 2001. "Unintended pregnancy and low birthweight in Ecuador." *American Journal of Public Health* 91(5): 808–810.

Ezeh, Alex C. 1993. "The influence of spouses over each other's contraceptive attitudes in Ghana." *Studies in Family Planning* 24(3): 163–174.

Finer, Lawrence B. and Stanley K. Henshaw. 2006. "Disparities in rates of unintended pregnancy in the United States, 1994 and 2001." *Perspectives on Sexual and Reproductive Health* 38(2): 90–96.

Fischer, Rachel C., Joseph B. Stanford, Penny Jameson, and M. Jann DeWitt. 1999. "Exploring the concepts of intended, planned, and wanted pregnancy." *Journal of Family Practice* 48(2): 117–122.

Forssman, Hans and Inga Thuwe. 1966. "One hundred and twenty children born after application for therapeutic abortion refused: Their mental health, social adjustement and educational level up to the age of 21." *Acta Psychiatrica Scandinavica* 42(1): 71–88.

———. 1981. "Continued follow-up study of 120 persons born after refusal of application for therapeutic abortion." *Acta Psychiatrica Scandinavica* 64(2): 142–149.

Frenzen, Paul D. and Dennis P. Hogan. 1982. "The impact of class, education, and health care on infant mortality in a developing society: The case of rural Thailand." *Demography* 19(3): 391–408.

Gage, Anastasia J. 1998. "Premarital childbearing, unwanted fertility and maternity care in Kenya and Namibia." *Population Studies* 52(1): 21–34.

Gazmararian, Julie A., Melissa M. Adams, Linda E. Saltzman, et al. 1995. "The relationship between pregnancy intendedness and physical violence in mothers of newborns. The PRAMS Working Group." *Obstetrics and Gynecology* 85(6): 1,031–1,038.

Gipson, Jessica D. and Michelle J. Hindin. 2007. "'Marriage means having children and forming your family, so what is the need of discussion?' Communication and negotiation of childbearing preferences among Bangladeshi couples." *Culture, Health & Sexuality* 9(2): 185–198.

Goodwin, Mary M., Julie A. Gazmararian, Christopher H. Johnson, Brenda Colley Gilbert, Linda E. Saltzman, and PRAMS Working Group. 2000. "Pregnancy intendedness and physical abuse around the time of pregnancy: Findings from the pregnancy risk assessment monitoring system, 1996–1997." *Maternal and Child Health Journal* 4(2): 85–92.

Goto, Aya, Seiji Yasumura, Junko Yabe, Yukiko Anazawa, and Yuko Hashimoto. 2005. "Association of pregnancy intention with parenting difficulty in Fukushima, Japan." *Journal of Epidemiology* 15(6): 244–246.

Goto, Aya, Seiji Yasumura, Junko Yabe, and Michael R. Reich. 2006. "Addressing Japan's fertility decline: Influences of unintended pregnancy on child rearing." *Reproductive Health Matters* 14(27): 191–200.

Graves, Pirkko Lauslahti. 1976. "Nutrition, infant behavior, and maternal characteristics: A pilot study in West Bengal, India." *American Journal of Clinical Nutrition* 29(3): 305–319.

Grimes, David A., Janie Benson, Susheela Singh, et al. 2006. "Unsafe abortion: The preventable pandemic." *Lancet* 368(9,550): 1,908–1,919.

Hardee, Karen, Elizabeth Eggleston, Emelita L. Wong, Irwanto, and Terrence H. Hull. 2004. "Unintended pregnancy and women's psychological well-being in Indonesia." *Journal of Biosocial Science* 36(5): 617–626.

Hellerstedt, Wendy L., Phyllis L. Pirie, Harry A. Lando, et al. 1998. "Differences in preconceptional and prenatal behaviors in women with intended and unintended pregnancies." *American Journal of Public Health* 88(4): 663–666.

Henshaw, Stanley K., Susheela Singh, and Trevor Haas. 1999. "The incidence of abortion worldwide." *International Family Planning Perspectives* 25(Supplement): S30–S38.

Hesketh, Therese and Zhu Wei Xing. 2006. "Abnormal sex ratios in human populations: Causes and consequences." *Proceedings of the National Academy of Sciences of the United States of America* 103(36): 13,271–13,275.

Hill, Kenneth. 1995. "Age patterns of child mortality in the developing world." *Population Bulletin of the United Nations* (39): 112–132.

Hook, Kerstin. 1963. "Refused abortion: A follow-up study of 249 women whose applications were refused by the National Board of Health in Sweden." *Acta Psychiatrica Scandinavica* 37(Supplement 168): 1–156.

Hromi-Fiedler, Amber J. and Rafael Pérez-Escamilla. 2006. "Unintended pregnancies are associated with less likelihood of prolonged breastfeeding: An analysis of 18 Demographic and Health Surveys." *Public Health Nutrition* 9(3): 306–312.

Hulsey, Tara McComb, Marilyn Laken, Virginia Miller, and Joel Ager. 2000. "The influence of attitudes about unintended pregnancy on use of prenatal and postpartum care." *Journal of Perinatology* 20(8): 513–519.

Hummer, Robert A., Kimberly A. Hack, and R. Kelly Raley. 2004. "Retrospective reports of pregnancy wantedness and child well-being in the United States." *Journal of Family Issues* 25(3): 404–428.

Hunter, Rosemary S., Nancy Kilstrom, Ernest N. Kraybill, and Frank Loda. 1978. "Antecedents of child abuse and neglect in premature infants: A prospective study in a newborn intensive care unit." *Pediatrics* 61(4): 629–635.

International Conference on Population and Development (ICPD). 1994. "International Conference on Population and Development Programme of Action." <http://www.un.org/popin/icpd/conference/offeng/poa.html>. Accessed 19 December 2002.

Jensen, Eric R. and Dennis A. Ahlburg. 1999. *A Multicountry Analysis of the Impact of Unwantedness and Number of Children on Child Health and Preventive and Curative Care.* Washington, DC: POLICY Project, Futures Group International.

———. 2002. "Family size, unwantedness, and child health and health care utilisation in Indonesia." *Bulletin of Indonesian Economic Studies* 38(1): 43–59.

Joyce, Theodore J. and Michael Grossman. 1990. "Pregnancy wantedness and the early initiation of prenatal care." *Demography* 27(1): 1–17.

001297

Exhibit 130

JA-0001703

Joyce, Ted, Robert Kaestner, and Sanders Korenman. 2000a. "The stability of pregnancy intentions and pregnancy-related maternal behaviors." *Maternal and Child Health Journal* 4(3): 171–178.

———. 2000b. "The effect of pregnancy intention on child development." *Demography* 37(1): 83–94.

———. 2002. "On the validity of retrospective assessments of pregnancy intention." *Demography* 39(1): 199–213.

Keeton, Kristie and Rodney A. Hayward. 2007. "Pregnancy intention and birth outcomes: Does the relationship differ by age or race?" *Journal of Women's Health* 16(4): 510–516.

Kendall, Carl, Aimee Afable-Munsuz, Ilene Speizer, Alexis Avery, Norine Schmidt, and John Santelli. 2005. "Understanding pregnancy in a population of inner-city women in New Orleans—Results of qualitative research." *Social Science & Medicine* 60(2): 297–311.

Koenig, Michael A. and Stan D'Souza. 1986. "Sex differences in childhood mortality in rural Bangladesh." *Social Science & Medicine* 22(1): 15–22.

Koenig, Michael A., Rajib Acharya, Sagri Singh, and Tarun K. Roy. 2006. "Do current measurement approaches underestimate levels of unwanted childbearing? Evidence from rural India." *Population Studies* 60(3): 243–256.

Korenman, Sanders, Robert Kaestner, and Ted Joyce. 2002. "Consequences for infants of parental disagreement in pregnancy intention." *Perspectives on Sexual and Reproductive Health* 34(4): 198–205.

Kost, Kathryn, David J. Landry, and Jacqueline E. Darroch. 1998a. "The effects of pregnancy planning status on birth outcomes and infant care." *Family Planning Perspectives* 30(5): 223–230.

———. 1998b. "Predicting maternal behaviors during pregnancy: Does intention status matter?" *Family Planning Perspectives* 30(2): 79–88.

Lara, Ma. Asunción, Claudia Navarro, Laura Navarrete, et al. 2006. "Depressive symptoms in pregnancy and associated factors in patients of three health institutions in Mexico City (Síntomas depresivos en el embarazo y factores asociados, en pacientes de tres instituciones de salud de la ciudad de México)." *Salud Mental* 29(4): 55–62.

Lasee, Ashraf and Stan Becker. 1997. "Husband-wife communication about family planning and contraceptive use in Kenya." *International Family Planning Perspectives* 23(1): 15–20, 33.

Lau, Ying. 2005. "Does pregnancy provide immunity from intimate partner abuse among Hong Kong Chinese women?" *Social Science & Medicine* 61(2): 365–377.

Lau, Ying and Daniel Wong Fu Keung. 2007. "Correlates of depressive symptomatology during the second trimester of pregnancy among Hong Kong Chinese." *Social Science & Medicine* 64(9): 1,802–1,811.

Laukaran, V.H. and B.J. van den Berg. 1980. "The relationship of maternal attitude to pregnancy outcomes and obstetric complications: A cohort study of unwanted pregnancy." *American Journal of Obstetrics and Gynecology* 136(3): 374–379.

Levine, Nancy E. 1987. "Differential child care in three Tibetan communities: Beyond son preference." *Population and Development Review* 13(2): 281–304.

Li, Jiali. 2004. "Gender inequality, family planning, and maternal and child care in a rural Chinese county." *Social Science & Medicine* 59(4): 695–708.

Lloyd, Cynthia B. 1994. "Investing in the next generation: The implications of high fertility at the level of the family." In *Population and Development: Old Debates, New Conclusions.* Ed. Robert Cassen. New Brunswick, NJ: Transaction Publishers. Pp. 181–202.

Lloyd, Cynthia B. and Mark R. Montgomery. 1996. "The Consequences of Unintended Fertility for Investments in Children: Conceptual

and Methodological Issues." *Policy Research Division Working Paper* No. 89. New York: Population Council.

Luker, Kristin C. 1999. "A reminder that human behavior frequently refuses to conform to models created by researchers. Forum: Contraceptive failure and unintended pregnancy." *Family Planning Perspectives* 31(5): 248–249.

Magadi, Monica Akinyi, Nyovani Janet Madise, and Roberto Nascimento Rodrigues. 2000. "Frequency and timing of antenatal care in Kenya: Explaining the variations between women of different communities." *Social Science & Medicine* 51(4): 551–561.

Marsiglio, William and Frank L. Mott. 1988. "Does wanting to become pregnant with a first child affect subsequent maternal behaviors and infant birth weight?" *Journal of Marriage and the Family* 50(4): 1,023–1,036.

Marston, Cicely and John Cleland. 2003. "Do unintended pregnancies carried to term lead to adverse outcomes for mother and child? An assessment in five developing countries." *Population Studies* 57(1): 77–93.

Mason, Karen Oppenheim and Herbert L. Smith. 2000. "Husbands' versus wives' fertility goals and use of contraception: The influence of gender context in five Asian countries." *Demography* 37(3): 299–311.

Matějček, Z., Z. Dytrych, and V. Schuller. 1978. "Children from unwanted pregnancies." *Acta Psychiatrica Scandinavica* 57(1): 67–90.

McClelland, Gary H. 1983. "Family size desires as measures of demand." In *Determinants of Fertility in Developing Countries: Supply and Demand for Children.* Volume 1. Eds. Rodolfo A. Bulatao and Ronald D. Lee. New York: Academic Press. Pp. 288–343.

McCormick, M.C., J. Brooks-Gunn, T. Shorter, C.Y. Wallace, J.H. Holmes, and M.C. Heagarty. 1987. "The planning of pregnancy among low-income women in central Harlem." *American Journal of Obstetrics and Gynecology* 156(1): 145–149.

Moffit, Robert. 2005. "Remarks on the analysis of causal relationships in population research." *Demography* 42(1): 91–108.

Mohllajee, A.P., K.M. Curtis, B. Morrow, and P.A. Marchbanks. 2007. "Pregnancy intention and its relationship to birth and maternal outcomes." *Obstetrics and Gynecology* 109(3): 678–686.

Montgomery, Mark R. and Barney Cohen. 1998. *From Death to Birth: Mortality Decline and Reproductive Change.* Washington, DC: National Academy of Sciences.

Montgomery, Mark R., Mian Bazle Hossain, J. Zhao, and Barkat-e-Khuda. 1997a. "Unwanted fertility and investments in children's human capital: The Bangladesh case." Unpublished.

Montgomery, Mark R., Cynthia B. Lloyd, Paul C. Hewett, and Patrick Heuveline. 1997b. "The Consequences of Imperfect Fertility Control for Children's Survival, Health, and Schooling." *Demographic and Health Surveys Analytical Reports* No.7. Calverton, MD: Macro International.

Myhrman, Antero. 1988. "The Northern Finland cohort, 1966–82: A follow-up study of children unwanted at birth." In *Born Unwanted: Developmental Effects of Denied Abortion.* Eds. Henry P. David, Zdenek Dytrych, Zdenek Matějček, and Vratislav Schuller. New York: Springer Publishing. Pp. 103–110.

Najman, J.M., J. Morrison, G. Williams, M. Andersen, and J.D. Keeping. 1991. "The mental health of women 6 months after they give birth to an unwanted baby: A longitudinal study." *Social Science & Medicine* 32(3): 241–247.

Nakku, J.N., G. Nakasi, and F. Mirembe. 2006. "Postpartum major depression at six weeks in primary health care: Prevalence and associated factors." *African Health Sciences* 6(4): 207–214.

001298

Exhibit 130

JA-0001704

Ni, Hanyu and Annette MacKay Rossignol. 1994. "Maternal deaths among women with pregnancies outside of family planning in Sichuan, China." *Epidemiology* 5(5): 490–494.

Ní Bhrolcháin, Máire and Tim Dyson. 2007. "On causation in demography: Issues and illustrations." *Population and Development Review* 33(1): 1–36.

ORC Macro. 2007. MEASURE DHS STATCompiler. <http://www.measuredhs.com>. Accessed 26 June 2007.

Orr, Suezanne T., C. Arden Miller, Sherman A. James, and Salvatore I. Babones. 2000. "Unintended pregnancy and preterm birth." *Paediatric and Perinatal Epidemiology* 14(4): 309–313.

Pagnini, Deanna L. and Nancy E. Reichman. 2000. "Psychosocial factors and the timing of prenatal care among women in New Jersey's HealthStart program." *Family Planning Perspectives* 32(2): 56–64.

Pérez-Escamilla, Rafael, José A. Cobas, Hector Balcazar, and Mary Holland Benin. 1999. "Specifying the antecedents of breast-feeding duration in Peru through a structural equation model." *Public Health Nutrition* 2(4): 461–467.

Pulley, LeaVonne, Lorraine V. Klerman, Hao Tang, and Beth A. Baker. 2002. "The extent of pregnancy mistiming and its association with maternal characteristics and behaviors and pregnancy outcomes." *Perspectives on Sexual and Reproductive Health* 34(4): 206–211.

Ronsmans, Carine and Wendy J. Graham. 2006. "Maternal mortality: Who, when, where, and why." *Lancet* 368(9,542): 1,189–1,200.

Rosenzweig, Mark R. and Kenneth I. Wolpin. 1980. "Testing the quantity-quality fertility model: The use of twins as a natural experiment." *Econometrica* 48(1): 227–240.

———. 1993. "Maternal expectations and ex post rationalizations: The usefulness of survey information on the wantedness of children." *Journal of Human Resources* 28(2): 205–229.

Rubin, Valerie and Particia L. East. 1999. "Adolescents' pregnancy intentions: Relations to life situations and caretaking behaviors prenatally and two years postpartum." *Journal of Adolescent Health* 24(5): 313–320.

Sable, Marjorie R. and Deborah Schild Wilkinson. 2000. "Impact of perceived stress, major life events and pregnancy attitudes on low birth weight." *Family Planning Perspectives* 32(6): 288–294.

Sable, Marjorie R., John C. Spencer, Joseph W. Stockbauer, Wayne F. Schramm, Vicky Howell, and Allen A. Herman. 1997. "Pregnancy wantedness and adverse pregnancy outcomes: Differences by race and Medicaid status." *Family Planning Perspectives* 29(2): 76–81.

Sable, Marjorie R., Joseph W. Stockbauer, Wayne F. Schramm, and Garland H. Land. 1990. "Differentiating the barriers to adequate prenatal care in Missouri, 1987–88." *Public Health Reports* 105(6): 549–555.

Sangi-Haghpeykar, Haleh, Mina Mehta, Sam Posner, and Alfred N. Poindexter. 2005. "Paternal influences on the timing of prenatal care among Hispanics." *Maternal and Child Health Journal* 9(2): 159–163.

Santelli, John, Roger Rochat, Kendra Hatfield-Timajchy, et al. 2003. "The measurement and meaning of unintended pregnancy." *Perspectives on Sexual and Reproductive Health* 35(2): 94–101.

Scheper-Hughes, Nancy. 1984. "Infant mortality and infant care: Cultural and economic constraints on nurturing in Northeast Brazil." *Social Science & Medicine* 19(5): 535–546.

———. 1992. *Death Without Weeping: The Violence of Everyday Life in Brazil.* Berkeley: University of California Press.

Schoen, Robert, Nan Marie Astone, Young J. Kim, Constance A. Nathanson, and Jason M. Field. 1999. "Do fertility intentions affect fertility behavior?" *Journal of Marriage and the Family* 61(3): 790–799.

Scrimshaw, M.W. and S.C.M. Scrimshaw. 1990. "Maternal management strategies on a Guatemalan coastal plantation: Differential success in maintaining child health." Los Angeles: University of California, Los Angeles. Unpublished.

Shapiro-Mendoza, Carrie, Beatrice J. Selwyn, David P. Smith, and Maureen Sanderson. 2005. "Parental pregnancy intention and early childhood stunting: Findings from Bolivia." *International Journal of Epidemiology* 34(2): 387–396.

Sidebotham, Peter, Jon Heron, and the ALSPAC Study Team. 2003. "Child maltreatment in the 'children of the nineties': The role of the child." *Child Abuse and Neglect* 27(3): 337–352.

Singh, Susheela, Jacqueline E. Darroch, Michael Vlassoff, and Jennifer Nadeau. 2003. *Adding It Up: The Benefits of Investing in Sexual and Reproductive Health Care.* New York and Washington, DC: Alan Guttmacher Institute and United Nations Population Fund.

Taylor, Julie Scott and Howard I. Cabral. 2002. "Are women with an unintended pregnancy less likely to breastfeed?" *Journal of Family Practice* 51(5): 431–436.

Than, Lara C., Margaret A. Honein, Margaret L. Watkins, Paula W. Yoon, Katherine Lyon Daniel, and A. Adolfo Correa. 2005. "Intent to become pregnant as a predictor of exposures during pregnancy: Is there a relation?" *Journal of Reproductive Medicine* 50(6): 389–396.

United Nations Population Fund (UNFPA). 2007. *Facts about Safe Motherhood.* <http://www.unfpa.org/mothers/facts.htm>. Accessed 6 February 2008.

Weller, Robert H., Isaac W. Eberstein, and Mohamed Bailey. 1987. "Pregnancy wantedness and maternal behavior during pregnancy." *Demography* 24(3): 407–412.

Wells, Chris S., Renee Schwalberg, Gretchen Noonan, and Vivian Gabor. 2006. "Factors influencing inadequate and excessive weight gain in pregnancy: Colorado, 2000–2002." *Maternal and Child Health Journal* 10(1): 55–62.

Westoff, Charles F. and Norman B. Ryder. 1977. "The predictive validity of reproductive intentions." *Demography* 14(4): 431–453.

Williams, Lindy and Joyce Abma. 2000. "Birth wantedness reports: A look forward and a look back." *Social Biology* 47(3–4): 147–163.

Williams, Lindy, Joyce Abma, and Linda J. Piccinino. 1999. "The correspondence between intention to avoid childbearing and subsequent fertility: A prospective analysis." *Family Planning Perspectives* 31(5): 220–227.

Yount, Kathryn M. 2004. "Maternal resources, proximity of services, and curative care of boys and girls in Minya, Egypt 1995–97." *Population Studies* 58(3): 345–355.

Zuravin, Susan J. 1987. "Unplanned pregnancies, family planning problems, and child maltreatment." *Family Relations* 36(2): 135–139.

———. 1988. "Fertility patterns: Their relationship to child physical abuse and child neglect." *Journal of Marriage and the Family* 50(4): 983–993.

———. 1991. "Unplanned childbearing and family size: Their relationship to child neglect and abuse." *Family Planning Perspectives* 23(4): 155–161.

## Acknowledgments

Jessica Gipson would like to acknowledge financial support from USAID/Dhaka and the Charlotte Ellertson Social Science Postdoctoral Fellowship in Abortion and Reproductive Health in the research and writing phases of this manuscript. The authors are indebted to John Casterline for his insightful comments on an earlier version of this manuscript.

**001299**

Exhibit 130

JA-0001705

# Career and Marriage in the Age of the Pill

*By* CLAUDIA GOLDIN AND LAWRENCE F. KATZ*

Genuine change in the economic and social status of U.S. women did not emanate simply from their increased labor-force participation, but rather, from their increase in professions and as "career women." Those changes first began in the late 1960's and early 1970's. We examine here one factor of momentous importance in this break with the past. *The Economist* (31 December 1999) recently named it the greatest science and technology advance in the twentieth century. It is the oral contraceptive, known worldwide by its moniker "the pill."

In 1960, 18.4 percent of professionals were women, as were 4.7 percent of "high-powered professionals."[1] By 1998, 36.4 percent of professionals and 25.1 percent of the high-powered subset were women. We explore in this article a series of connections that link the birth-control pill to the increase of women in professional occupations.

Our evidence for the impact of the pill relies largely on the timing of various changes. Changes in laws giving minors certain adult rights and lowering the age of majority enabled young and unmarried women to obtain the pill. Young women's control over their fertility directly reduced the costs to them of engaging in long-term career investments. The pill also served to increase the age at first marriage and thus indirectly reduced a potential penalty of delaying marriage to pursue professional education and training. All of these changes began in the late 1960's and early 1970's.

The late 1960's and early 1970's were years

* Department of Economics, Harvard University, Cambridge, MA 02138 and the National Bureau of Economic Research. Detailed information on the data sources, citations, and references is in Goldin and Katz (2000), and all acknowledgments given in that paper apply here as well.

[1] Professionals are all those in professional specialty occupations (based on the 1990 Census classification) excluding teachers below the college level and health-assessment occupations such as nurses. "High-powered professionals" includes lawyers, judges, physicians, dentists, architects, engineers, scientists, and college and university teachers.

of tumultuous social and political change. How can we separate the impacts of affirmative action, the resurgence of feminism, changes in social norms, and abortion reform from the impact of the pill? The simple answer is that the timing of several of these changes is far less convincing than is that of the pill in affecting career investment. But that is not the complete answer. The economic impact of the pill did not occur in isolation. Legal change made it possible for young women to obtain contraceptives. These changes, paradoxically, did not stem primarily from concerns regarding access to contraception. They were, instead, part of the larger political movement of the 1960's. The pill, moreover, unleashed social change by enabling an increase in the age at first marriage. There is also no doubt that the rebirth of feminism, long in the making, served to complement and reinforce the pill's impact.

Our argument for the importance of the pill in affecting women's career decisions relies on the correspondence among breaks in various time series and in the logic of the relationships among the pill, career, and marriage. We will begin with the time series on career and marriage, which can be viewed as the dependent variables. The evidence on the diffusion of the pill (the independent variable) is taken up next. The logic of our argument relating pill use, career, and marriage follows, and finally we present our defense for why we believe the pill packed considerable power in altering the social and economic status of American women.

## I. Career and Marriage

The break with the past in women's career investment can be seen most clearly in the time series for female relative to male first-year professional students. Figure 1 provides the ratio of female to male first-year students in medical, law, and dental schools, and in masters in business administration (MBA) programs. The ratios for all programs show a sharp break around 1970. Whereas throughout the 1960's the ratio

**Copyright © 2000. All rights reserved.**

**001300**

Exhibit 131

JA-0001706



FIGURE 1. RATIO OF FEMALE TO MALE FIRST-YEAR
MEDICAL, LAW, DENTAL, AND MBA STUDENTS

*Note:* See Goldin and Katz (2000) for details and sources.

of women to men was around 0.1 in medicine, 0.04 in law, 0.01 in dentistry, and 0.03 in business administration, by 1980 it was 0.42 in medicine, 0.57 in law, 0.24 in dentistry, and 0.39 in business. (In the 1970's, law and MBA programs were the largest among the four, each having between 35 percent and 45 percent of the total, whereas medicine had about 15 percent and dentistry just 5 percent.)

The age at first marriage for college graduate women soared from 1972 to 1979, when the fraction marrying before age 22 plummeted from 0.38 for the cohort born in 1950 to 0.21 for the cohort born in 1957. Similarly, the fraction marrying before age 26 declined from 0.70 for the cohort born in 1950 to 0.54 for that born in 1957. In sharp contrast, there was virtually no change in the age at first marriage of college graduate women born from 1940 to 1950. Thus, starting with the cohorts of college-graduate women born in 1950 there began a strong secular trend toward greater mar-

riage delay. Similar, although less pronounced, changes occurred for women with no college.

Fertility expectations also plunged from the mid-1960's to the early 1970's. Among non-Catholic female college students in 1963, 80 percent desired three or more children, and 44 percent wanted at least four. By 1973, just 29 percent wanted three or more, and almost 10 percent wanted no children. None of these cohorts had as many children as they "desired," but their desires reflected what they perceived the trade-offs were between family and career.

What can account for these sudden changes in marriage, fertility, birth expectations, and career? Abrupt shifts in fertility and marriage were not new to American women, but such change had not previously been associated with major change in women's careers. The timing of these changes corresponds remarkably well with greater access to the pill by young single women. The pill, because of its reliability, ease of use, and female control, enabled young women to plan their reproductive lives almost flawlessly and to delay marriage to pursue career training. The pill had been available to married women since 1960, but for legal reasons and in accordance with prevailing social norms, it was often denied to women below the age of majority and those who were unmarried.

## II. The Age of the Pill

The Food and Drug Administration (FDA) approved the pill for contraceptive use in 1960, and its diffusion was so rapid that, by 1965, 40 percent of young married women, using some form of contraception, were "on the pill." But if the pill was released in 1960 and was immediately taken up by married women, why do we claim that it was instrumental in the change in women's professional training that began around 1970? The reason is that young unmarried women were not enabled to obtain the pill until the late 1960's and early 1970's, when almost all states lowered the age of majority and granted to youth the rights of adults through "mature minor" decisions. These law changes, moreover, did not largely emanate from a desire *to extend family-planning services*. Rather, they were often motivated by factors similar to those that led to the speedy ratification of the 26th

**Copyright © 2000. All rights reserved.**

001301

Exhibit 131

Amendment (1971), which lowered the voting age to 18. Due in part to the national debate over the Vietnam War, a consensus was formed that young people matured earlier than in past generations and deserved increased rights.

The pill altered women's career decisions, beginning with the cohorts of young unmarried women in the mid- to late-1960's who were enabled to obtain the pill. We emphasize young and unmarried women because their changed perceptions of marriage and fertility enabled them to plan lives that were different from those of previous cohorts and to do so early in their personal development. Women in professional education programs, moreover, were and still are disproportionately unmarried.

Because there are no surveys of pill usage that also contain information on the age at first marriage for the birth cohorts of interest here, we use a data set (the National Survey of Family Growth, Cycle III, 1982 [Inter-university Consortium for Political and Social Research, 1985]) giving the earliest age at which family-planning services were obtained by unmarried college graduate women (see Fig. 2). We have also compiled data (not presented here) on young women's take-up rate for the pill. These series taken together show that the diffusion of the pill among young unmarried women occurred more than five years later than it did among married women.

The timing of the change for unmarried women coincided with legal shifts concerning the rights of minors and the age of majority. Only three states in 1969 had a clear and unambiguous law enabling females younger than age 17 to obtain contraceptives; such laws existed in 12 states in 1971, and in 27 states in 1974. The age of majority for women was younger than 20 years old in just seven states in 1969; it was younger than age 20 in 18 states in 1971, and in 43 states in 1974. University family-planning clinics that provided students with contraceptives without regard to age and marital status were first opened in 1969. The determined unmarried and young woman probably could have obtained the pill before these legal changes in any state. But we have demonstrated, in a cross-sectional analysis for 1971, that pill use among young women was considerably higher in states having more lenient laws regarding the rights of minors.



FIGURE 2. FRACTION OF COLLEGE-GRADUATE WOMEN FIRST RECEIVING FAMILY-PLANNING SERVICES, BY VARIOUS AGES, AMONG THOSE NOT MARRIED BY AGE 22

*Source:* National Survey of Family Growth, Cycle III, 1982 (Inter-university Consortium for Political and Social Research, 1985).

Thus far, we have established that the rapid increase in the education of women for professional careers began in about 1970 (i.e., for cohorts born around 1948), that the diffusion of the pill among young unmarried women increased greatly starting with the 1946–1948 birth cohorts, and that the increase in pill use was correlated with legal changes across states. We have also shown that the age at first marriage began to soar with cohorts born in 1950, and we have elsewhere related the diffusion of the pill (as proxied by the state-law changes) to cross-state differences in the increase in the age at first marriage. But how do these facts fit together? How did the pill affect career decisions?

### III. Direct and Indirect Effects of the Pill

The diffusion of the pill among young single women may have altered their career decisions

Copyright © 2000. All rights reserved.

001302

Exhibit 131

through two routes, which we term the *direct* and the *indirect* effects (see Goldin and Katz [2000] for a more explicit and complete model).

The pill greatly increased the reliability of contraception and its ease of use. In the absence of reliable contraception, a young woman embarking on a lengthy professional education would have to pay the penalty of abstinence or cope with considerable uncertainty regarding pregnancy. The pill, therefore, enabled a larger group of women to invest in expensive, long-duration training and not pay as high a price. This direct effect of the pill lowers the price to women of long-duration education.

The pill affected all women, not just career women, and it affected men as well. The pill, moreover, affected women who were never "on the pill." With the advent of the pill, some men and women could decide to delay marriage yet not pay as large a penalty as previously. Marriage delay, in turn, could affect the career decisions of young women through the marriage market. Women who invest in a lengthy education often delay marriage until completing their initial career preparation. If in the interim others marry, the pool of eligible bachelors will be reduced, and career women may have to settle for a lesser match at the end of the career-training period. If, instead, the pill enables others to delay marriage long enough, the career women will pay a smaller penalty. Thus the pill, by encouraging the delay of marriage for youth, may have enabled more women to opt for careers by indirectly lowering the cost of a lengthy career-investment period. This effect results from the creation of a "thicker marriage market" for women with career potential. Even women not taking the pill can benefit from the pill if they want to delay marriage to invest in long-duration training.

### IV. The Power of the Pill

Our empirical argument for the role of the pill in the increase of women in professions relies primarily on the timing of various changes. Legal changes in the late 1960's and early 1970's enabled the diffusion of the pill among young single women, and their pill use began to increase with cohorts born around 1948. Beginning in 1972, and continuing to 1979, the fraction of college women marrying a year or two after graduation plummeted. The pill encouraged the delay of marriage through routes such as reducing the necessity of marrying to have sex and lowering the incidence of shotgun marriages. (In our longer paper we further establish, through cross-state panel-data regressions, the connection between the access of young women to the pill and the age at first marriage.)

The pill directly and immediately lowered the costs to women of engaging in long-term career investments by giving them almost complete certainty and safety regarding the pregnancy consequences of sexual activity. The delay of marriage, beginning a year or two later, endowed the pill with an indirect effect by reducing the costs in the marriage market to women who delayed marriage to invest in careers. The ratio of women relative to men in professional programs began its rapid ascent in 1970, just as the first pill cohorts graduated from college. The case for the pill in affecting women's careers through the direct and indirect routes is strong. But it is not the only possible factor.

There is also abortion, legalized nationwide in 1973 and earlier in several states. However, we have found that abortion was not as powerful as was the pill in encouraging later marriage, although its impact on careers may have complemented that of the pill (see also George A. Akerlof et al. [1996] on abortion and marriage). The case of Japan is instructive. Japan had an increased age at first marriage and a reduced birth rate but no pill, until 1999, and no wide-ranging career change. Japanese women did have legal abortion, however. Fertility reduction and later marriage ages do not require the pill. But the reliability and general safety of the pill enable women to better plan for careers at an early stage and be taken more seriously by mentors, schools, and employers (see Nancy Birdsall and Lauren A. Chester, 1987).

The late 1960's and early 1970's were times of great ferment in U.S. society. Just as the war in Vietnam was a catalyst for change in the age of majority and mature-minor decisions, it and the Civil Rights movement were catalysts for the resurgence of feminism. Young women in 1968 had hoped to follow in their mothers' footsteps, but in just a few years their aspirations had changed radically. How much of this change was due to the resurgence of feminism,

Copyright © 2000. All rights reserved.

001303

Exhibit 131

general social change, and the legacy of the Civil Rights movement (all reinforced later with policy changes such as affirmative action), and how much was due to a little pill? We have concluded that there is considerable evidence that the pill had a surprisingly large effect on career and marriage, but there are a host of interactions and feedback mechanisms that must also be considered.

## REFERENCES

**Akerlof, George A.; Yellen, Janet L. and Katz, Michael L.** "An Analysis of Out-of-Wedlock Childbearing in the United States." *Quarterly Journal of Economics*, May 1996, *111*(2), pp. 277–317.

**Birdsall, Nancy and Chester, Lauren A.** "Contraception and the Status of Women: What Is the Link?" *Family Planning Perspectives*, January–February 1987, *19*(1), pp. 14–18.

***The Economist.*** "Oral Contraceptives: The Liberator." 31 December 1999, *353*(8151), p. 102.

**Goldin, Claudia and Katz, Lawrence F.** "The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions." National Bureau of Economic Research (Cambridge, MA) Working Paper No. 7527, 2000.

**Inter-university Consortium for Political and Social Research.** *National survey of family growth, cycle III, 1982* (ICPSR 8328). Ann Arbor, MI: Inter-university Consortium for Political and Social Research, 1985.

**Copyright © 2000. All rights reserved.**        **001304**

Exhibit 131                                                          JA-0001710

# The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions

Claudia Goldin and Lawrence F. Katz

*Harvard University and National Bureau of Economic Research*

The fraction of U.S. college graduate women entering professional programs increased substantially just after 1970 and the age at first marriage among all U.S. college graduate women began to soar around the same year. We explore the relationship between these two changes and the diffusion of the birth control pill ("the pill") among young, unmarried college graduate women. Although the pill was approved in 1960 by the Food and Drug Administration and spread rapidly among married women, it did not diffuse among young, single women until the late 1960s after state law changes reduced the age of majority and extended "mature minor" decisions. We present both descriptive time series and formal econometric evidence that exploit cross-state and cross-cohort variation in pill availability to young, unmarried women, establishing the "power of the pill" in lowering the costs of long-duration professional education for women and raising the age at first marriage.

The careers of college graduate women and their age at first marriage both changed significantly in the United States with cohorts born around 1950. Women were 10 percent of first-year law students in 1970

We have benefited from conversations and communications with Joshua Angrist, John Bound, Judith Chevalier, Edward Glaeser, Michael Kremer, David Laibson, David I. Levine, Steven Levitt, Rhona Mahony, Ellen Meara, Casey Mulligan, Ahin Roth, Kathryn Shaw, and Andrei Shleifer and from seminar participants at University of California at Berkeley, University of Chicago, Harvard, Massachusetts Institute of Technology, University of Michigan, NBER, Ohio State University, Uppsala University, and University of Wisconsin. John Donohue and Steven Levitt generously provided the abortion data. An earlier version was improved by the comments of two anonymous referees. For research assistance we thank Anne Berry and, especially, Lara Watson and acknowledge the Spencer Foundation in providing that funding.

*Journal of Political Economy,* 2002, vol. 110, no. 4
© 2002 by The University of Chicago. All rights reserved. 0022-3808/2002/11004-0013$10.00

001305

Exhibit 132

JA-0001711

but were 36 percent in 1980. Among the cohort of female college grad-uates born in 1950, almost 50 percent married before age 23, but fewer than 30 percent did for those born in 1957. We ask whether the birth control pill and the legal environment that enabled young, unmarried women to obtain "the pill" altered women's career plans and their age at first marriage. Our answer is that they did.

The pill directly lowered the costs of engaging in long-term career investments by giving women far greater certainty regarding the preg-nancy consequences of sex. In the absence of an almost infallible con-traceptive method, young women embarking on a lengthy professional education would have to pay the penalty of abstinence or cope with considerable uncertainty regarding pregnancy. The pill had an indirect effect, as well, by reducing the marriage market cost to women who delayed marriage to pursue a career. With the advent of the pill, *all* individuals could delay marriage and not pay as large a penalty. The pill, by encouraging the delay of marriage, created a "thicker" marriage market for career women. Thus the pill may have enabled more women to opt for careers by indirectly lowering the cost of career investment.

Our empirical argument relies on the timing of various changes and on formal econometric analyses of the age at first marriage and career change by taking advantage of the differential effect of legal changes by cohort and state. Legal changes by states lowered the age of majority and expanded the rights of minors in the late 1960s and early 1970s and, by doing so, facilitated the diffusion of the pill among young, single women.

The first issue we explore is the diffusion of the pill among single women and the legal reasons for its delayed dissemination. We then formally model the potential effects of the pill on marriage and career. Next, we use cross-section data for 1971 to establish that the timing of the pill's diffusion among young, unmarried women was, at least in part, caused by legal changes in the age of majority and mature minor statutes. We then present both descriptive time series and formal econometric evidence showing the relationship between pill use, on the one hand, and the age at first marriage and career investment, on the other. Al-ternative explanations, including legalization of abortion, feminism, and antidiscrimination laws, are considered.

---

Contraceptive methods are rated by the probability of a pregnancy per year occurring to the average woman (or couple) who uses the method "perfectly" and who uses it "typically" (Kelly 1998). The oral contraceptive (with estrogen and progestin) has a rating of 0.1 percent and 3 percent, respectively; the diaphragm (used with a spermicide) has a rating of 6 percent and 20 percent, and the condom is rated 3 percent and 12 percent. In comparison with the pill, therefore, the diaphragm is 60 times more risky in perfect use and seven times typically, whereas the condom is 30 times more risky when perfectly used and four times in typical use.

001306

Exhibit 132                                                                JA-0001712

## I.   The Pill and Single Women

### A.   Diffusion of the Pill among Single Women

In 1960 the Food and Drug Administration (FDA) approved the use of norethynodrel, a synthetic progesterone, as an oral contraceptive for women.[1] The product was christened Enovid by its manufacturer, but nearly everyone else called it and its successors "the pill." Oral contraceptives—also known as "the pill"—remain among the greatest miracle drugs.[2] (See table 1 for the history of the birth control pill and landmark decisions regarding contraception.)

The pill diffused rapidly among married women in the United States. By 1965, only five years after its release, 41 percent of "contracepting" married women younger than 30 years were "on the pill" (Westoff and Ryder 1977, table II-3).[3] The fraction of *married* women using the pill peaked around 1967, but it was then only just beginning to be used by young, *single* women.

Both legal and social factors were responsible for the delayed dissemination of the pill among unmarried women.[4] Until the late 1960s, single women who were below the age of majority and did not have parental consent were often denied access to the pill and other forms of contraception.[5] Before the late 1960s, it was not legal in any state for a physician to prescribe an oral contraceptive to an unmarried minor without consent of her parents.[6] But by 1972, on the heels of the Twenty-sixth Amendment (1971), the "age of majority" had been lowered to 18 years old in most states. Beginning in the late 1960s, "mature minors" in many states were enabled, by judicial decision and statute, to obtain contraceptive services. The extension of family planning services to minors and changes in community norms were reinforcing.

---

[1] A closely related drug, norethindrone, had already been approved for medical uses, not contraception, two years before. On the history of the pill see Asbell (1995) and Watkins (1998).

[2] The *Economist* ("Oral Contraceptives: The Liberator" 1999) named the pill the greatest advance in science and technology in the twentieth century.

[3] This figure includes only couples using any form of contraception, including sterilization, rhythm, and withdrawal. Of all married women younger than 30 years old, 26 percent were on the pill in 1965, but many who did not use contraceptives were trying to get pregnant, were pregnant, or recently had a baby.

[4] The fraction of all women who ever used the pill reached a peak of 80 percent with the cohort born in 1948 and then declined to around 50 percent, calculated from the 1987 National Health Interview Survey [Inter-university Consortium for Political and Social Research 1990].

[5] Massachusetts and Wisconsin even had legislative proscriptions against the sale of contraceptive devices to any unmarried individual. Not until 1972 was the Massachusetts law overturned by the U.S. Supreme Court in *Eisenstadt v. Baird*.

[6] No record exists of a doctor's successful prosecution under a criminal statute regarding provision of contraceptive services to minors (U.S. Department of Health, Education, and Welfare 1974, p. 79).

001307

Exhibit 132                                                              JA-0001713

TABLE 1

LANDMARK EVENTS AND DECISIONS REGARDING THE PILL AND CONTRACEPTIVE USE

| Year | Event or Landmark Decision |
|------|----------------------------|
| 1873 | Congressional passage of the Act for the Suppression of Trade in, and Circulation of Obscene Literature and Articles of Immoral Use, also known as the "Comstock Law" |
| 1916 | In direct violation of state law, Margaret Sanger opens the first birth control clinic in the United States |
| 1936 | U.S. Circuit Court of Appeals modifies the Comstock Law to allow the dissemination of birth control information and devices |
| 1937 | Researchers discover the function of progesterone in inhibiting ovulation |
| 1949 | Russell Marker synthesizes inexpensive cortisone for the treatment of rheumatoid arthritis |
| 1950 | Margaret Sanger convinces the heiress Katherine Dexter McCormick to fund research on the pill |
| 1951 | Carl Djerassi at Syntex synthesizes norethindrone, an orally active progestational hormone |
| 1952 | Chemist Frank Colton at G. D. Searle develops norethynodrel, chemically similar to norethindrone |
| 1953 | Katherine Dexter McCormick promises Gregory Pincus, researcher and Searle consultant, to fund his project to develop a birth control pill through its completion |
| 1953 | Researchers John Rock and Gregory Pincus conduct the first tests using norethynodrel and norethindrone to prevent ovulation |
| 1956 | Searle's Frank Colton awarded a patent on norethynodrel |
| 1956 | Large-scale trials begin to assess the drug's effectiveness as a contraceptive |
| 1956 | Syntex's Carl Djerassi awarded a patent on norethindrone |
| 1957 | The FDA approves Syntex's Norlutin (norethindrone) and Searle's Enovid (norethynodrel) for treatment of hormonal and other medical disorders |
| 1960 | The FDA approves the use of norethynodrel (Enovid) as an oral contraceptive for women |
| 1961 | The first reports of thromboembolism attributed to the pill surface in Britain |
| 1962 | Ortho Pharmaceutical Corp. enters the oral contraceptive market |
| 1963 | The FDA concludes that there is no connection between Enovid and thromboembolism |
| 1964 | Parke-Davis and Syntex enter the oral contraceptive market |
| 1965 | The U.S. Supreme Court in *Griswold v. Connecticut* overturns a Connecticut law prohibiting the use of contraceptives on the grounds that it violates a married couple's right to privacy |
| 1968 | Papal encyclical is issued enjoining Catholics from using the pill |
| 1969 | Yale University opens one of the first college family planning clinics with access to all students |
| 1970 | Senator Gaylord Nelson holds hearings investigating the health risks of oral contraceptives |
| 1970 | The FDA requires informational pamphlet on health risks in every package of birth control pills |
| 1971 | July 1, 1971, the 26th Amendment is ratified; most states also lower the age of majority |
| 1972 | The U.S. Supreme Court in *Eisenstadt v. Baird* overturns the Massachusetts law prohibiting the sale of contraceptives to unmarried persons |
| 1973 | In Wisconsin Federal District Court, *Baird v. Lynch* overturns a law prohibiting the sale of contraceptives to unmarried individuals (Civ. No. 71-C254 W.D. Wis.) |

Source — Djerassi 1972; Asbell 1995; and Watkins 1998.

001308

Exhibit 132

After they were enabled to obtain it, the pill diffused rapidly among single women. In 1976, 73 percent of all ever-contracepting single women 18 and 19 years old had used the drug (Zelnik and Kantner 1977, p. 63).[4] Despite numerous "pill scares" concerning its medical complications, the pill has remained the contraceptive method of choice among fertile women independent of marital status.[5]

State laws did not prevent the determined single woman from obtaining contraceptive devices and information. Physicians routinely prescribed the pill to patients who said they were engaged because the pill is ineffective unless taken a month or two before sexual relations. Pretending to be engaged was one method of obtaining the pill (see, e.g., Scrimshaw 1981). The pill was also used to regulate menses, and some women obtained the pill by convincing a physician that they had irregular periods.[6] Single women used the pill before state laws enabled them to, but their numbers were small, and the increase with the changes in state laws was substantial

State laws in the 1960s were also in force to directly regulate the sale of contraceptives. These laws were the legacies of a federal antivice law passed in 1873, known as the Comstock Law. That law was relatively unimportant, but it served to fuel state "Comstockery" so that even by 1960, 30 states prohibited advertisements regarding birth control and 22 had some general prohibition on contraceptive sales. These laws reflected social norms and must have had a larger effect on minors, whose ability to obtain contraceptives was constrained in other ways.

The laws and social norms that prevented single women from obtaining the pill are barriers as well to our obtaining information on their use of the pill. A major survey of fertility and contraception taken in 1970—the National Fertility Survey (NFS)—excluded unmarried women.[7] We know of only two surveys, prior to the 1980s, that inquired

---

[4] Among single 18- and 19-year-old females in 1976, 30 percent had taken the pill, and among nonvirgins, 60 percent had (Inter-university Consortium for Political and Social Research 1982)

[5] In 1988, 48.3 percent of 25–34-year-old women who were nonsurgical contraceptors were on the pill and 51.5 percent of those 15–24 years old were. Among never-married women (15–44 years old), 49 percent of the nonsurgical contraceptors were on the pill (U.S. Department of Commerce 1991, p. 89)

[6] Pretending to be engaged and lying about a medical condition are demeaning acts. Because pill prescriptions had to be renewed, the demeaning act would have to be repeated regularly

[7] According to the authors of the 1965 and 1970 NFS (Westoff and Ryder 1977), "The ideal, of course, would be to include all women of reproductive age, but the problems inherent in asking questions about fertility and contraception of never-married young girls have deterred us. The first such national study of teenaged girls has since been conducted by John Kantner and Melvin Zelnik . . . . The profession may be close to reconsidering this whole question" (p. 4). The 1970 NFS asked pill usage retrospectively, but only for women who were married a month before the date of the question.

**001309**

Exhibit 132                                                                                                JA-0001715

of the contraceptive use of young and unmarried women. These surveys have limited use, however, because they each cover 15–19-year-olds for only a year

Just two data sets exist that enable the calculation of pill usage or family planning services for a large national sample of women regardless of current and prior marital status. Both give retrospective answers on use of the pill or family planning services. Each has the virtue that it enables the tracking of cohorts born from the late 1930s to the late 1960s and contains information on education and religion, among other relevant variables. Because our interest is in professional career choice, we concentrate on the diffusion of the pill among college graduate women. (Appendix table A1 describes data sets with contraceptive information.)

One of the surveys is the Cancer risk factor supplement to the National Health Interview Study (NHIS) (Inter-university Consortium for Political and Social Research 1990). The almost 13,000 women interviewed in 1987 were asked, among other questions, their history of birth control pill usage. They were not asked their age at first marriage but did record the age at which they had their first birth.

Because the age at first marriage rose beginning with cohorts born around 1950, pill usage levels for unmarried women will be overstated in the NHIS, especially for the earliest cohorts considered. That is, we overstate the fraction of single women on the pill for all cohorts, but since a 21-year-old born in 1945 was more likely to be married than a 21-year-old born in 1950, the bias will be greater for the older group. To minimize the fraction of women who were already married we include only those without a first birth before age 23. The fraction of these college graduate women first using the pill at various ages is graphed in figure 1.[15]

According to these data, the fraction of women who began taking the pill after age 18 but before 20, that is, during college but before the usual age of majority, reached about 10 percent for cohorts born in 1945 (see fig. 1). Some of these women were married and, thus, able to obtain the pill. But even with this potential bias, a discernible increase in pill use can be seen for those born after 1946. First pill use in the

<hr />

[14] Zelnik and Kantner (1972, 1980), Kantner and Zelnik (1977), and Inter-university Consortium for Political and Social Research (1982). We later use both surveys (1971 and 1976)

[15] The bias in fig. 1 could still be significant. Among college graduate women born from 1940 to the early 1950s, about 25 percent had no births before age 23 but were already married by age 22. This figure is only about 15 percent for those born from the late 1950s to the early 1960s. (Estimates are derived from the merged 1990 and 1995 Current Population Survey Fertility and Marital History Supplements.) If pill usage were 30 percentage points higher for married than for single women, the overstatement for the older, relative to the younger, cohorts would be about three percentage points

001310

Exhibit 132                                                    JA-0001716



Fig. 3.—Fraction of college graduate women first taking the pill at various ages (among those with no births before age 23). Source: Inter-university Consortium for Political and Social Research (1990). Three-year centered moving averages are shown.

18–20-year interval reached 30 percent by the cohort born in 1950. For cohorts born after 1950, the increase in pill use among women younger than 21 years came about entirely from those obtaining the pill before age 18, a group with negligible use before. By the cohorts born in 1952, pill usage before age 21 was about 35 percent.

The absence of data in the NHS on the age at first marriage is an obvious drawback. Therefore, we also use a survey that asked the age at first marriage and the year family planning services were first used, although it did not directly ask about first pill use.[14] Birth control is just one family planning service, and the levels will, in consequence, be somewhat higher than for first pill use.[15] The source is the National Survey of Family Growth, Cycle III, 1982 (Inter-university Consortium

[14] Akerlof, Yellen, and Katz (1996) use the 1982 National Survey of Family Growth Cycle III (NSFG82) to construct a time series on the fraction of unmarried women on the pill at first sexual intercourse.

[15] More than 74 percent of first family planning visits for those who were younger than 25 years in 1982 were for birth control (NSFG82), most of which were for the pill, which we can infer from the 1971 National Survey of Young Women (NSYW71).

**001311**

Exhibit 132

737



Fig. 2.—Fraction of college graduate women receiving first family planning services at various ages (among those not married by age 22). Source: Inter-university Consortium for Political and Social Research (1985). Three-year centered moving averages are shown.

for Political and Social Research 1985), which contains the responses of almost 8,000 women.

In figure 2 we graph the fraction of college graduate women receiving their first family planning services before and between various ages, among those not married before age 22. The fraction receiving services between ages 18 and 19 was 5 percent for the 1943–48 cohorts but subsequently rose to 27 percent by the 1956 cohort. Similarly, whereas only a small fraction of those younger than 18 received family planning services until the birth cohort of 1952, 20 percent did by the 1955 cohort. Likewise, the fraction receiving services between ages 18 and 20 rose gradually prior to the 1948 cohort but then rose steeply for the 1951 cohort.

The two data sets give relatively consistent results. Among women who would eventually graduate from college, the increase in contraceptive services for those of college age began with cohorts born around 1948, and among the pre-college aged, the increase began for cohorts born around 1952. Not surprisingly, the levels are somewhat higher for first family planning services than for first pill use, and the increase occurs

001312

Exhibit 132                                                                    JA-0001718

somewhat earlier for the pill use series, which inadvertently includes more married women.

Because the surveys on which we rely for the timing of first pill use or family planning services are retrospective, there may be skepticism regarding their reliability. Do women reliably recall the year they first took the pill? There is overwhelming evidence that they do.

We compare the retrospective answers on first pill use in the NHIS with the nearly contemporaneous responses of women 15–19 years old in the National Survey of Young Women 1971 and the National Survey of Adolescent Female Sexual Behavior 1976 (NSAF76). The NSYW71 is a nationally based survey of 4,611 young women 15–19 years old in 1971. Because we do not know whether those in the NSYW71 eventually graduated from college, we compare all 19-year-olds in the NSYW71 born in 1951 with all women in the NHIS born in 1952. Among those in the NHIS, 33 percent reported having taken the pill before age 20; among the group in the NSYW71, 34 percent claimed to have ever used birth control pills.[4] The NSAF76 is also a nationally based survey of 15–19 year-olds but about half the size of its predecessor version. We perform a similar comparison with it and the NHIS using women born in 1957. In the NHIS, among those born in 1957, 48.2 percent took the pill prior to age 20; in the NSAF76, among those born in 1957, 51.2 percent had ever taken the pill.[5] This comparison offers strong evidence that women accurately recall when they first took the pill.

In sum, pill use by unmarried, college-educated women between 18 and 21 years old accelerated with cohorts born around 1948. For those younger than 18 years, pill use increased greatly with cohorts born around 1952. Although pill use among young, unmarried women greatly increased, peak usage among married women occurred about a half decade before rapid diffusion began for single women. One reason for the difference concerns state laws regarding the age of majority and mature minor statutes. The period of most rapid increase for unmarried women occurred when state laws changed.

The figure using NSYW71 is computed for 19-year-olds born April–December 1951. Since the survey was taken in March 1971, none had completed their nineteenth year. If we instead use 19-year-olds born April–August 1951, the figure rises to 39 percent. Sample weights are used.

The figure using NSAF76 is computed for 19-year-olds born March–December 1956. If we instead use 19-year-olds born March–July 1951, the figure rises to 36.3 percent. Sample weights are used.

001313

Exhibit 132                                                                     JA-0001719

POWER OF THE PILL                                                    739

*B.   State Variation in Laws Affecting Contraceptive Services*

The provision of contraceptive services to unmarried women younger
than 21 years was highly circumscribed before the late 1960s.[17] The
majority of physicians understood that the law in most states required
minors to obtain parental consent before nonemergency procedures,
including contraceptive services, could be given. In 1969 the age of
majority for females was 21 years old in all but nine states and was 18
years old in only six states (see table 2). State laws providing family
planning services to young women were altered after 1969 in three ways.
The age of majority was lowered in almost all states between 1969 and
1974. Statutes and judicial decisions began to classify minors as "mature"
enough to make decisions, and laws were passed that allowed family
planning services to be used by minors without parental consent.

In addition to the six states in 1969 having an age of majority for
women of 18 years, three states (California, Georgia, and Mississippi)
recognized the "mature minor" doctrine or provided family planning
services to minors without parental consent. Thus in just nine states a
woman of 18 years old could legally obtain the pill in 1969.[18] Just two
years later, in 1971, 16 states had an age of majority of 18 years and 17
(an additional 14) had laws that allowed women below the age of ma-
jority to obtain contraceptive services. Thus, in 1971, a woman of 18
years could, without legal hindrance, obtain the pill in 30 states. Females
16 years and younger could obtain it in 12 states (see table 2). In 1974,
three years after the Twenty-sixth Amendment was ratified, just two states
had an age of majority that exceeded 18 years and did not have legis-
lation emancipating minors.[19]

The legal changes of the late 1960s and early 1970s regarding the
age of majority and the mature minor doctrine were not generally mo-
tivated by demands for teenage contraception. Rather, the war in
Vietnam was the main reason for the passage of the Twenty-sixth Amend-
ment and the changes in the age of majority that preceded and followed
its ratification.[20] Reductions in the age of majority, in turn, often led to

[17] The same was true for unmarried women older than 21 or isolated areas, in college
towns, or anywhere doctors felt constrained by social mores or personal morals.

[18] In five of the states (Arkansas, Idaho, Nevada, Oklahoma, and Utah), the age of
majority for females was traditionally lower than it was for males, possibly because women
married younger in these states.

[19] Today three states have an age of majority exceeding 18 years old (Alaska 19, Mississippi
21, and Pennsylvania 21), but no state, it appears, has any binding legislation preventing
a minor from obtaining contraceptives. See the web site of the Alan Guttmacher Institute
(http://www.agi-usa.org/pubs/fb21.html).

[20] According to Paul Pilpel and Wechsler (1974, p. 119), "The past five years have seen
a marked expansion of the legal rights of teenagers. Most significant has been the re-
duction of the age of majority . . . In the majority of cases, this development followed the
adoption of the 26th Amendment to the U.S. Constitution which permits 18-year-olds to
vote."

001314

Exhibit 132                                                    JA-0001720

TABLE 2
STATE LAWS REGARDING CONTRACEPTIVE SERVICES TO MINORS AND THE AGE OF MAJORITY, 1969–74

| | Age of Majority | | | Earliest Legal Age to Obtain Contraceptive Services without Parental Consent | | |
|---|---|---|---|---|---|---|
| STATE | 1969 (1) | 1971 (2) | 1974 (3) | 1969 (4) | 1971 (5) | 1974 (6) |
| Ala. | 21 | 21 | 21 | 21 | 17 | 17 |
| Alaska | 19 | 19 | 19 | 19 | 19 | 14 or 19* |
| Ariz. | 21 | 18 | 18 | 21 | 18 | 18 |
| Ark. | 18 | 18* | 18* | 18 | 14 | 14 |
| Calif. | 21 | 21 | 18 | 15 | 15 | 15 |
| Colo. | 21 | 21 | 21 | 21 | 14 | 14 |
| Conn. | 21 | 21 | 18 | 21 | 18 | 18 |
| Del. | 21 | 21 | 18 | 21 | 21 | 18 |
| D.C. | 21 | 21 | 21 | 21 | 14 | 14 |
| Fla. | 21 | 21 | 18 | 21 | 21 | 14 |
| Ga. | 21 | 21 | 18 | 14 | 14 | 14 |
| Hawaii | 20 | 20 | 20 | 20 | 20 | 20 |
| Idaho | 18* | 18* | 18 | 18 | 18 | 14 |
| Ill. | 21 | 18 | 18 | 21 | 14 | 14 |
| Ind. | 21 | 21 | 18 | 21 | 21 | 18 |
| Iowa | 21 | 21 | 18 | 21 | 21 | 14 or 18* |
| Kans. | 21 | 21 | 18 | 21 | 21 | 14 |
| Ky. | 18 | 18 | 18 | 18 | 18 | 14 or 18* |
| La. | 21 | 21 | 18 | 21 | 21 | 14 |
| Maine | 21 | 18 | 18 | 21 | 18 | 18 |
| Md. | 21 | 21 | 18 | 21 | 18 | 14 |
| Mass. | 21 | 21 | 18 | 21 | 21 | 18 |
| Mich. | 21 | 21 | 18 | 21 | 18 | 14 |
| Minn. | 21 | 21 | 18 | 21 | 18 | 18 |
| Miss. | 21 | 21 | 21 | 14 | 14 | 14 |
| Mo. | 21 | 21 | 21 | 21 | 21 | 21 |
| Mont. | 21 | 19 | 18 | 21 | 14 | 18 |
| Nebr. | 20 | 20 | 19 | 20 | 20 | 19 |
| Nev. | 18* | 18 | 18 | 18 | 18 | 18 |
| N.H. | 21 | 21 | 18 | 21 | 14 | 14 |
| N.J. | 21 | 21 | 18 | 21 | 21 | 18 |
| N.M. | 21 | 18 | 18 | 21 | 18 | 14 or 18* |
| N.Y. | 21 | 21 | 18 | 21 | 16 | 16 |
| N.C. | 21 | 18 | 18 | 21 | 18 | 18 |
| N.D. | 21 | 18 | 18 | 21 | 18 | 18 |
| Ohio | 21 | 21 | 18 | 21 | 21 | 14 |
| Okla. | 18* | 18* | 18 | 18 | 18 | 14 or 18* |
| Ore. | 21 | 21 | 18 | 21 | 15 | 15 |
| Pa. | 21 | 21 | 21 | 21 | 18 | 18 |
| R.I. | 21 | 21 | 18 | 21 | 21 | 18 |
| S.C. | 21 | 21 | 21 | 21 | 21 | 16 |
| S.D. | 21 | 21 | 18 | 21 | 21 | 18 |
| Tenn. | 21 | 18 | 18 | 21 | 14 | 14 |
| Texas | 21 | 21 | 18 | 21 | 21 | 18 |
| Utah | 18* | 18* | 18* | 18 | 18 | 18 |
| Vt. | 21 | 18 | 18 | 21 | 18 | 18 |
| Va. | 21 | 21 | 18 | 21 | 21 | 14 |
| Wash. | 21 | 18 | 18 | 21 | 18 | 18 |
| W.Va. | 21 | 21 | 18 | 21 | 21 | 14 or 18* |

001315

Exhibit 132

POWER OF THE PILL

74[1]

TABLE 2
(Continued)

| | AGE OF MAJORITY | | | EARLIEST LEGAL AGE TO OBTAIN CONTRACEPTIVE SERVICES WITHOUT PARENTAL CONSENT | | |
| | 1969 | 1971 | 1974 | 1969 | 1971 | 1974 |
| STATE | (1) | (2) | (3) | (4) | (5) | (6) |
| Wisc | 21 | 18 | 18 | 21 | 18 | 18 |
| Wyo | 21 | 21 | 19 | 21 | 21 | 14 or 19* |
| Summary | States <20: 7 | States <20: 18 | States <20: 43 | States ≤16: 8 | States ≤16: 12 | States ≤16: 27 |

SOURCE.— 1969: Pilpel and Wechsler (1969, 1971). U.S. Department of Health, Education, and Welfare (1974, 1974). Paul, et al. (1974). The coding of the laws is as of June 1974. 1974: U.S. Department of Health, Education, and Welfare (1976).

NOTE.—[degraded footnote text] Obtaining contraceptive services means the ability to get the birth control pill. Some states had a different age for voluntary sterilization and abortion, not covered here; defined as well. Note: the age of 21 when the law was interpreted to mean, but we assume would treat a minor against choices without parental consent. Va: Law allowed although school graduates and married so not took contraceptives. If a contraceptives female under the age of majority therefore as age of 21 coded. Ark: Age of majority 18 but in certain cases all women to get state funds plan any services were provided, women in a college grace long hour who should get to a private sector Contr. Age of majority was reduced to 18 in 1972. As earlier law enabled any minor 18 or older to obtain health services. Kans: Legislation in 1969 allowed a girl minor to prevent birth control to a woman of majority. June, but the law was not universal. See however the statute under Baker (1972) which discusses the case of Lorene Kaas. Ky: A Statute that [illegible] decision was effective in 1972. Mass: Physician must get probable health because the law was not universal. Md: Age of majority 18 but contraceptives given to those 15 years and older for contraceptive services. Mich: Age of majority abortion to 18 in 1972. Minn: Law states that minors living apart from their parents can get contraceptive health services thus license in 1971 age given to 18 states it does not provide Medicaid coverage for 14-17 year olds. NJ: Age of majority is covered to 18 in 1976. NY: Physicians may sell contraceptives to 17 and older. The law was ambiguous with regard to physicians and sterilization and Ohio Ohio. Rx: vasectomy minor statute abolished in 1969 but no statute on birth control. Ore: law in 1971. Pa: Minor 18 years and older for high school graduates but consent in any medical of care. Va: Age of majority is lowered to 18 and any to bona fide under age 18 may consent to birth control services except abortion and sterilization exercise. J.A. 1972. Wisc: The restriction on contraceptives to unmarried individuals was per se unconstitutional. The law was struck down by the Eisenstadt decision regarding a similar Massachusetts law.

* This state has a contraceptive family planning program but does not exclude the provision of contraceptive services to minors, but there is evidence that the state on the statute can state for needs clear as to whether the statute states general concerning the legality of such a provision.
Age of majority is 18 but may is coded as 21 in its rules.
States states at the given age.

extensions of the mature minor doctrine. Of the 21 states that changed their regulations between 1969 and 1971, 10 reduced the age of majority, 10 instituted a mature minor doctrine, and one instituted a family planning act.[20]

Some ambiguity surrounds the meaning of these legal changes. In no state was it per se illegal in 1972, for example, to prescribe or sell contraceptives to a minor.[21] Rather, the legality both before and after

[20] The 1967 amendment to Title IV of the Social Security Act (Aid to Families with Dependent Children) requires state and local welfare agencies to provide contraceptive services to eligible individuals without regard to marital status and age. But this law would not have affected the "ineligible population," and it is unclear how it affected teenagers in states without a mature minor doctrine.

[21] Until 1966 it was illegal in Massachusetts to sell contraceptives. The law was modified after Griswold v. Connecticut (1965). From 1966 to 1972, it was illegal to sell contraceptives to unmarried persons, and sale to married persons required a prescription. That law was struck down by the U.S. Supreme Court in Eisenstadt v. Baird (March 1972). A similar Wisconsin law was overturned in Baird v. Lynch (1974, Civ No 71-C-254 W.D. Wis.). See U.S. Department of Health, Education, and Welfare (1974, 1976). There is no evidence that these laws were rigorously enforced.

001316

Exhibit 132                                                     JA-0001722

1972 hinged on whether the minor was "emancipated" by marriage, parental consent, or statute. But even then, medical services depended on whether the physician believed that it was in the best interests of the patient and was consistent with local practice.

Universities and colleges viewed the legal ambiguity in the late 1960s as good reason *not* to provide family planning services and certainly not to advertise the availability of services offered on an individual basis. Only after the age of majority was lowered and the mature minor doctrine was established did university health services offer family planning to undergraduates and advertise its availability.[1] The availability of family planning services to women *when they are in college* is a critical input to career change because it occurs when career, marriage, and family decisions are being made. The point is central to our analysis since access to the pill was not a major issue for most women after they were in professional and graduate school.[2]

According to the American College Health Association (ACHA), just 12 institutions in 1966 (3.6 percent of those reporting) would prescribe the pill to unmarried students (Barbato et al.1968, Barbato 1971).[3] In 1973, according to an extensive survey of colleges, 19 percent would provide family planning services to students regardless of age and marital status.[4] Because larger schools had a higher fraction providing services, about 42 percent of undergraduates would have been able to obtain such services (Hollis and Lashman 1974).[5] Thus, although in 1966 few student health services would prescribe the pill to unmarried women, by 1973 more than two-fifths of all undergraduates, regardless

[1] Yale University was in the forefront and opened a family planning clinic in 1969, prompted by a change in student needs with coeducation (Sarrel and Sarrel 1971). Other institutions rapidly followed.

[2] Many people have told us that after the pill's diffusion, college mentors and those on professional and graduate school acceptance committees took female students more seriously.

[3] In the 1970 ACHA survey, about 35 percent of member institutions claimed that they would prescribe the pill to unmarried minors (although a low reporting rate biases this statistic upward). The nonmember institutions had far lower fractions prescribing to all students (12 percent) and even lower reporting rates than member institutions (Hollis and Lashman 1974).

No extant records of the 1973 survey exist, so institutional identities are not known. The *Wall Street Journal* ("The Pill on Campus," 1970) reported that various universities—among them the University of California at Berkeley, Davis, Los Angeles, Santa Barbara, and San Diego, the Universities of Michigan, Chicago, Illinois and Washington, and Cornell, Yale, and Northwestern Universities—had recently established or were about to open, unrestricted family planning clinics for all students.

[4] The 1973 survey was done by the National Center for Health Statistics and the ACHA and it covered 2,984 institutions (95 percent response rate). The 42 percent figure is our estimate based on a table in Hollis and Lashman (1974). Only the 1973 ACHA survey is sufficiently complete to provide an estimate of the fraction of undergraduates who could obtain family planning services on campus.

001317

Exhibit 132                                                                    JA-0001723

of marital status and age, could receive family planning services on campus, and others could obtain them locally without parental consent.

### C.  The Impact of State Laws on Pill Use

Did states with more lenient laws regarding access to contraceptive services by minors have higher pill use by young unmarried women? The NSYW71 is the only data set, of which we are aware, that pertains to the most relevant time period (the very early 1970s) and has information on pill use and state of residence for female teenagers.[?] We have coded the respondent's state of residence according to whether the state was governed by the mature minor doctrine or had a comprehensive family planning statute, both of which would have enabled young women (16 years and older) to obtain the pill. Twelve states fit that description in 1971, with seven states having a minimum age of 14 or 15 years (see col. 5 of table 2).

The estimation in table 3 is given for all never-married women (cols. 1, 3, and 5) and for those who ever had sexual relations (cols. 2, 4, and 6). The effect on pill use of being in one of the nonrestrictive states, relative to the mean of the dependent variable, is quite similar for the two estimations. Included in the regressions are covariates for age, education, current school attendance, religion, race, and census division.

States with more lenient regulations regarding minors had greater pill use by young unmarried women. For 15–19-year-olds, pill use was 33–35 percent greater in less restrictive states (cols. 1 and 2), for the 17–19-year-olds, it was 36–40 percent greater (cols. 3 and 4). The increase was largest for all college women (col. 5), perhaps because most university health services carefully followed the law and offered family planning services when the law changed.[20]

In states with more permissive laws, young women appear to have had greater access to the pill. But despite our emphasis on changes in laws, we also recognize the porosity of the laws and the role of social norms. Even before 1970, change was "in the air" regarding the rights of young people. The 1967 social security amendment allowing poor women to obtain family planning services without regard to marital status or age was a signal to physicians. States often had ambiguous laws that enabled county health departments to extend contraceptive services to all women

---

[?] The NSAE70 does not have state of residence, and, even if it did, it would be too late.

[20] The magnitudes of the estimated effects of a nonrestrictive state law in cols. 1–4 of table 5 are not much affected by adding state per capita income to the regressions. The coefficients on the state law variable for the subsample of college women in cols. 5 and 6 are reduced in magnitude, and the standard errors increased substantially, by the inclusion of state per capita income. For nonsouthern states, the income and the state law variables are highly correlated.

**001318**

Exhibit 132                                                                      JA-0001724

TABLE 3

STATE LAWS AND PILL USE AMONG NEVER-MARRIED FEMALE YOUTHS IN THE NATIONAL SURVEY OF YOUNG WOMEN, 1971

Dependent Variable: 1 = Ever Taken the Birth Control Pill

| | 17–19 YEARS OLD | | 17–19 YEARS OLD | | 17–19 YEARS OLD AND ATTENDS COLLEGE | |
|---|---|---|---|---|---|---|
| | All (1) | Sexually Active (2) | All (3) | Sexually Active (4) | All (5) | Sexually Active (6) |
| Mean of dependent variable | .0652 | .245 | .106 | .304 | .145 | .406 |
| State law: 1 = income structure for minors | .0232 (.06870) | .0807 (.0286) | .0422 (.0153) | .103 (.0373) | .0704 (.0307) | .128 (.0889) |
| Age variables: | | | | | | |
| 15 | .130 (.2210) | .259 (.0641) | | | | |
| 16 | .119 (.0186) | .277 (.0521) | | | | |
| 17 | .0846 (.0166) | .196 (.0443) | −.0780 (.0202) | .0847 (.0470) | .211 (.0491) | −.103 (.146) |
| 18 | .0615 (.0618) | .294 (.0344) | .9641 (.0370) | .0836 (.0871) | .9602 (.0206) | .0632 (.0664) |
| Education variables: | | | | | | |
| College | | | .0680 (.0177) | .177 (.0430) | | |
| Currently attends school | .0620 (.0158) | .0695 (.0304) | −.0714 (.0186) | −.0845 (.0407) | .211 (.0546) | −.323 (.161) |
| Catholic | .0126 (.00845) | .0272 (.0287) | .0246 (.0149) | .0425 (.0371) | .0256 (.0344) | .0864 (.0818) |
| African-American | .9773 (.0112) | .0656 (.0284) | .191 (.0193) | .0495 (.0370) | .0276 (.0505) | .186 (.0958) |
| Observations | 1,214 | 1,311 | 2,226 | 890 | 647 | 245 |
| $R$ | .0834 | .113 | .0645 | .0856 | .0558 | .103 |

Source: Authors' analysis of Young Women, 1971.

Note: Standard errors are in parentheses. The main least-squares estimates are given at the column-level, showing the original data estimated against the National Survey of Young Women. All regressions include controls for marital status, and whether the respondent is sexually active. Columns 3 and 4 restrict the group to women who are or have been sexually active. Columns 5 and 6 restrict the group to women who are attending or have attended college. All variables are coded as one if the respondent fits the group and as zero otherwise. The constant term is also estimated. A value has been assigned to each sample point based on the survey weighting according to the clustered design of the survey and estimates at the women's college level.

* State law variables take the value one if the individual resides in a state with a reduced age of majority.

(see Bailey [1997] for a case study of Kansas). Thus pill use by young, single women began to rise about a year before the sea change in the laws regarding the age of majority.

## II. Frameworks to Understand the Effect of the Pill on Marriage and Career

We have established that the birth control pill diffused rapidly among young, unmarried women beginning in the late 1960s and that the

001319

Exhibit 132                                                                    JA-0001725

timing was related to changes in state laws and a growing notion that young people could make their own decisions. But how could the diffusion of the pill have affected professional career investments by young women?

The diffusion of the pill among young, single women may have altered career decisions through two routes: *direct* and *indirect*. By the direct effect of the pill, we mean the reduction in the cost of marriage delay. The pill makes marriage delay and thus career investment cheaper, and women with greater "career ability" become more attractive marriage partners. By the indirect effect of the pill, we mean the lowering of the cost of a career through the marriage market. This effect, in contrast, operates through a thickening of the marriage market for those who delay marriage and leads to better matches for career women and some others. To simplify the discussion, we formally model the direct effect and give the intuition behind the indirect effect.[7]

Consider a cohort of $n$ women and $n$ men, each initially unmarried, in a two-period context with no discounting. Members of each sex agree on the ranking of the other in terms of marriage partners. Each man brings $Y$ (e.g., income), known to all, to marriage. Each woman brings $N$ (e.g., nurturing), known to all, to marriage and can also contribute $\alpha$, through a career. $\alpha$ is treated as a household public good. We make the simplifying assumption that career investment is not possible if a woman marries in period 1. Marriage delay reduces utility by $\lambda$ for each partner. The reduction is assumed to be the same for all men and women and $\lambda = \lambda_0$ prior to the introduction of the pill. We interpret $\lambda$ as the utility lost from abstinence as well as from forgone home production and term $\lambda$ the "impatience factor" to encompass both. The attributes $Y$, $N$, and $\alpha$ are distributed among the $n$ men and women such that $Y \sim [\underline{Y}, \overline{Y}]$, $N \sim [\underline{N}, \overline{N}]$, and $\alpha \sim [\underline{\alpha}, \overline{\alpha}]$, where $Y$, $N$, $\alpha \geq 0$. The distributions of $Y$, $N$, and $\alpha$ are known by all participants, and each individual's attributes are perfectly observable.

Consider a match between male $i$ and female $j$. If they marry in period 1, then the male gets $N$ and the female gets $Y$. If they delay marriage to period 2 and the woman invests in a career, then the male gets $N + \alpha_i - \lambda$, and the female gets $Y + \alpha_i - \lambda$. If $\alpha_i > \lambda_0$, then both benefit from delay and the woman will invest in a career in period 1. If, instead, $\alpha_i < \lambda_0$, they marry in period 1 and the woman has no career. Since there are no disagreements, we can unambiguously match men and women on the basis of their value in marriage to the other sex.

Men's attractiveness to women is completely summarized by $Y$,

[7] See Bergstrom and Bagnoli (1993) for a related model of decisions to delay marriage by men and the determinants of marriage age differences by sex. We consider models of single age cohorts of males and females and thereby abstract from the possible impact of the pill on sex differences in the age at marriage.

001320

Exhibit 132                                                              JA-0001726

746                                                   JOURNAL OF POLITICAL ECONOMY



FIG. 3.—Distribution of career ability $\alpha$ and shifts in the "impatience" factor $\lambda$, with the pill.

Women's attractiveness to men, on the other hand, depends on $F = \max[N, N + \alpha - \lambda_0]$. The marriage market operates at the start of period 1 by matching men and women by their ranking in terms of $Y$ and $F$. The highest-ranked male gets matched to the highest-ranked female, and so on down the distribution. As depicted in figure 3, all women with $\alpha \geq \lambda_0$ invest in careers and delay marriage until period 2; all others marry in period 1.

The pill reduces $\lambda$, say from $\lambda_0$ to $\lambda_1$, and shifts down the cutoff point in the $\alpha$ distribution for careers. The fraction of women with careers and the fraction of women delaying marriage increase by the same amount. Even with no change in matching there will be an increase in marriage delay and in career investment. But matching will, in general, change because the pill enhances the relative attractiveness of women with high career values (high $\alpha$). Thus the $F$ distribution will shift with the decline in $\lambda$.

Three groups of women can be distinguished. Group I women, those for whom $\alpha > \lambda_1$, delay marriage and have a career with or without the pill. The pill increases the value in marriage of each woman in this group by $\Delta F = \lambda_0 - \lambda_1$. Group II women, those for whom $\lambda_0 > \alpha > \lambda_1$, marry in period 1 in the absence of the pill but delay marriage and have a career with the pill. The pill increases the marriage value of each

by $\Delta E = \alpha_c - \lambda_f$. Group III includes those for whom $\alpha_c < \lambda_f$. These women do not have a career with or without the pill, and they lose from the pill since some become matched to worse partners.[32] Men are unambiguous winners from the introduction of the pill. Women are, on average, winners, but those in group III lose.

In our modeling of the direct effect, the pill lowers the price of delay and thus encourages later marriage and greater career investment. But the increase in the number of women who delay marriage has no effect on the decisions of other women. The pill, however, probably also had a "social multiplier" effect in the following manner. Assume that, in the absence of a highly effective form of contraception, couples marry "too early," that is, before their true type is revealed even to them. The pill could then produce a new equilibrium in which marriages are later, careers are more numerous, and matches are "better." When marriage is delayed, mismatch in the marriage market, a potential career cost, is reduced. As people marry later, even more will be enticed to do so to obtain a better match. Women and men who delay marriage because of the pill can thereby give rise to a social multiplier effect.[33] Careers will be fostered indirectly through a thicker marriage market and will be fostered even for women who do not take the pill. The improvement in the quality of marriage matches from delay in marriage and better information at the time of marriage could also potentially lead to a reduction in the divorce rate.

Our framework illustrates how the introduction of the pill may have altered women's career and marriage choices. Because up-front, time-intensive career investments are difficult for women with child care responsibilities, the pill encouraged women's careers by virtually eliminating the risk of pregnancy. But the pill did far more than control the number and timing of births. It also altered the marriage market.

The pill enabled young men and women to put off marriage while not having to put off sex. Sex no longer had to be packaged with commitment devices, many of which encouraged early marriage. Before the pill was widely available, young people devised means to secure commitments that enabled sexual relations. They "went steady," fraternity men "pinned" coeds, and couples got "engaged." If a pregnancy resulted, the couple generally got married (Akerlof et al. 1996).

The decrease in the cost of marriage delay altered the rankings of women as potential marriage partners and favored those with good career prospects. The greater number of individuals delaying marriage,

---

[32] Akerlof et al. (1996) develop related models of how the legalization of abortion (and availability of contraceptives) changes norms concerning shotgun marriages and out-of-wedlock births. Some women benefit. But those unwilling (or unable) to get an abortion or use the pill are adversely affected.

[33] For a formal modeling of the social multiplier effect, see Goldin and Katz (2009).

001322

Exhibit 132                                                                JA-0001728

in turn, created a thicker marriage market for others. The indirect effect of a thicker marriage market for career women led even more women to opt for careers and delay marriage. An increase in the age at first marriage may also have led to higher-quality matches, if preferences are not fully formed at younger ages.

The key empirical predictions of the framework are that the introduction of the pill should have been associated with an increase in professional careers for women, the age at first marriage, and the age at first birth. Positive assortative mating on earnings capacity and compatibility among marriage partners should also have increased. The new equilibrium, however, is not completely "win-win." Women with poorer labor market prospects may suffer a decrease in their rankings as marriage partners and be the losers in the era of the pill. The framework does not produce unambiguous predictions with respect to divorce. Better matches should result from the pill, but increased career prospects for women outside marriage, decreased division of labor in the home, and potentially fewer children could all increase divorce.

## III.   Evidence for the Power of the Pill

We present both descriptive time-series and formal econometric evidence to examine the notion that the pill had meaningful social and economic consequences. The descriptive time-series evidence is a set of coincident turning points in pill use among young, single women, career investment, and the age at first marriage, among other indicators. The formal econometric analyses using cross-cohort variation in pill usage at college ages and cross-state variation in changes in state laws affecting pill access for young, unmarried women are suggestive of a causal relationship between pill use and changes in college women's career investment and marriage.

### A.   *Time Series: Career Investment, Marriage, Sex, and Fertility Expectations*

#### 1.   Career Investment

The most relevant careers to study in the context of our framework are those that require extensive, up-front education, such as the professions of law, medicine, dentistry, and business administration. We express the time-series data on the professional school enrollments of women in two ways, as a share of women receiving the bachelor of arts (B.A.)

001323

Exhibit 132                                                                                        JA-0001729

degree in the same year and as a share of total first-year enrollments in professional schools (fig. 4).

As a fraction of B.A.'s, female entrants to law and medical schools began a steep climb around 1970. The increase, moreover, peaked in about a decade. The female share of first-year students in four major professional degree programs (medicine, law, dentistry, and business) also shows a sharp break around 1970. Throughout the 1960s the ratio of women to all students was around 0.1 in medicine, 0.04 in law, 0.01 in dentistry, and 0.03 in business administration. By 1980 it was 0.3 in medicine, 0.36 in law, 0.19 in dentistry, and 0.28 in business.

Career decisions of young women changed abruptly around 1970. The shift, moreover, did not arise from an increase in the fraction of female applicants admitted, at least not in the case of medical students. The change in the sex composition resulted almost entirely from an increase in applications by women to medical school.

The large increases in women's enrollment in lengthy professional training programs, starting around 1970, resulted in a sharp rise in women's presence in law, medicine, and other professions across the past three decades. The percentage of all lawyers and judges who are women more than doubled in the 1970s (from 5.1 percent in 1970 to 13.6 percent in 1980) and was 29.7 percent in 2000. The share of female physicians increased from 9.1 percent in 1970 to 14.1 percent in 1980 and was 27.9 percent in 2000. Similar patterns are apparent for occupations such as dentists, architects, veterinarians, economists, and most of the engineering fields.

---

The vast majority of first-year professional students are recent B.A.'s. We have also examined the change in undergraduate majors from the mid-1960s to the late 1970s. The fraction of female B.A.'s majoring in traditionally female concentrations (e.g., education and English) decreased from the mid-1960s, but with far greater speed after 1971. The fraction majoring in the physical and biological sciences, math, and engineering decreased a bit until 1971 but subsequently rose steeply.

The ratio of female to male professional school students continues to rise even when the percentage of female B.A.'s who enter professional school does not. The reason is beyond the scope of this paper and concerns the decrease in the share of male B.A.'s, and of all B.A.'s, entering professional school.

See Cole (1986) and Goldin and Katz (2000) for evidence that virtually all of the increase in female medical students, beginning around 1970, resulted from an increase in applications from women.

Overall, the female share of employment in professional occupations (excluding teachers of kindergarten through grade 12 and health assessment occupations such as nurses) increased from 19.9 percent in 1970 to 27.4 percent in 1980, and to 37.5 percent in 2000. The female share of these occupations barely changed from 1950 to 1970. (The 1950–80 data are tabulated from the Integrated Public Use Microdata Series [Ruggles and Sobek 1997], those for 2000 are taken from U.S. Department of Labor [2001, table 11].) Furthermore, cohort-based analyses show large increases in the share of women younger than 40 years gaining employment in high wage professional and managerial occupations starting with cohorts born in the late 1940s to early 1950s (Bisci and Juhn 2000).

001324

Exhibit 132                                                                    JA-0001730



FIG. 1.— First-year female professional students as a percentage of female B.A.'s (panel A) and as a fraction of first-year students (panel B). Source: B.A. degrees: U.S. Department of Education (1998), table 244. First-year medical students: *Journal of the American Medical Association* (various years 1975–98). First-year law students: American Bar Association web site (http://www.abanet.org/legaled/femstats.html). First professional degrees in dentistry: U.S. Department of Education (1998), table 259. Earned degrees in business: U.S. Department of Education (1997), table 281. Note: Data for first-year dental and business students are derived from first professional degrees lagged two years for dental students and three years for business students. The data, for years of overlap, are similar to those for first-year students from *Students Enrolled for Advanced Degrees*, U.S. Department of Health, Education, and Welfare, various years. The procedure, moreover, produces values similar to those for medicine and law for which the first-year student-time series exists.

001325

Exhibit 132    JA-0001731

754



Fig. 5.—Fraction of college graduate women married before various ages. Source: Current Population Survey, Fertility and Marital History Supplement, 1990 and 1995. Three-year centered moving averages are shown.

### 2.  Age at First Marriage, Sex, and Fertility Expectations

According to our framework, the pill loosened constraints and lowered the impatience factor, $\lambda$. Couples could engage in sex without commitments; marriage could be delayed. But did it happen? Marriages were delayed considerably beginning with the birth cohorts of the late 1940s, precisely those affected by the pill, and the age at first sexual relations among the never-married also decreased, again in line with the cohorts affected by the availability of the pill.

In figure 5, we graph the fraction of college graduate women married before ages ranging from 20 to 30 years. About 50 percent of those born from 1941 to 1949 married before age 23 (the median age of a college graduate is 22 years). After 1949, however, the fraction married before age 23 or 24 plummeted. By the cohort born in 1957, the fraction married before age 23 was 30 percent, or fully 20 percentage points lower than in 1950. Thus the fraction of women who married about a year after college graduation declined precipitously after 1972 and fol-

001326

Exhibit 132                                                                    JA-0001732

lowing changes in most states regarding laws governing access to contraceptives for youth.

Our argument concerning the impact of the age at first marriage on career requires that women who invest in careers generally delay marriage. We have examined registration cards for Harvard University Law School students in the entering classes of 1962–75. Because the cards were used for diplomas, recorded names were routinely updated. We find that for classes graduating from 1970 to 1972 (born from 1945 to 1947) the fraction married at the time of law school graduation was about one-third the national average by age and birth year, but was about the national average for those graduating between 1964 and 1966 (born from 1941 to 1943). Thus the marriage rate for the cohorts that greatly increased their numbers in law school was significantly below the average for college graduate women.

The fraction engaging in sex before various ages is given in figure 6, for which we analyze all women, not just college women, because of small sample sizes. The evidence is strikingly consistent with the timing of pill availability to young, unmarried women. Sexual activity among the group under 20 years increased with cohorts born after 1947, and even for the younger group (under 18 years) the increase began with cohorts born around 1952.

Fertility expectations of college women plunged from the mid-1960s to the early 1970s. In 1963, 80 percent of non-Catholic female college students desired three or more children and 14 percent wanted at least four. Ten years later, in 1973, just 29 percent wanted three or more and almost 10 percent wanted none. Neither cohort had as many children as "desired," but their desires reflected trade-offs they were willing to make between family and career.

We cannot use the records after it became more common for women to keep their maiden names. Until 1972, the cards requested information on marital status at time of registration. We also created whether a woman's last name matched her father's. Since some women in the 1970–72 classes married but did not change their names, we may understate the fraction marrying while in law school.

Entering marriage rates are much lower than the national average for college graduate women in all years. The marriage rates in law school are extremely high for the classes in the mid-1960s, when there were only about 20 women in each class and, thus, about 18 male students for every female.

The source of the data is the NSFG 82. Similar patterns are found when the sample is restricted to women with some college. To assess the accuracy of the information, we also use a more contemporaneous measure from the NSYW73 and NSM76, given as solid markers. The two measures are, with one exception, remarkably consistent.

For the 1963 data, see Westoff and Potvin (1967), table 7. We use only non-Catholic women in nonsectarian schools since Westoff and Potvin oversampled religious institutions, but do not give the population weights. The 1973 data are tabulated from the National Longitudinal Survey of Women 14–25 (Ohio State University 1968–70) and include all who corr graduated from a fo-year institution of higher education and who were of approximate college age in 1973.

001327

Exhibit 132                                                              JA-0001733



Fig. 6—Fraction of never-married women having sex before various ages. Source: All but the solid markers: Inter-university Consortium for Political and Social Research (1985). Solid markers for birth cohorts of 1952, 1953, and 1954: Zelnik and Kantner (1980). Solid markers for birth cohorts of 1957 and 1958: Inter-university Consortium for Political and Social Research, 1989. Three-year centered moving averages are shown. Solid markers of the same shape as the open markers give the values for contemporaneous data.

### B.  *Formal Econometric Analyses: Marital States and Professional Career Outcomes*

#### 1.  Age at First Marriage and State Law Changes in Pill Access

Although we have made a case for the coincident turning points in the various series, we have not yet directly established whether pill availability altered the age at first marriage. To assess this connection, we examine the relationship between pill access and the age at first marriage for college women by exploiting the substantial cross-state variation in the timing of the enactment of laws giving minors access to birth control services without parental consent (see table 2). In particular, we examine the impact of state laws regarding birth control access for minors on the likelihood of getting married before age 23, for college-educated women born in the United States from 1935 to 1957. Because major changes in access to abortion also affected cohorts of women entering college in the early 1970s (abortion bans were repealed in five states in

001328

Exhibit 132                                                                      JA-0001734

1970 and everywhere in 1973 with *Roe v. Wade*) and could alter marriage and career decisions similarly to improved pill access, we also include controls for abortion reform.

We use a standard differences-in-differences specification that includes controls for both state of birth and year of birth fixed effects. Our basic estimating equation includes dummy variables to account for state laws regarding birth control and abortion access, in each woman's state of birth, when she was 18 years, around the age at college entrance.[12] We use the 1 percent sample of the 1980 *Census of Population* from the Integrated Public Use Microdata Series (IPUMS).[13]

The basic specification we estimate has the form

$$M_{cs} = \alpha_c + \delta_s + X_{is}\beta + P_{cs}\gamma + A_{cs}\pi + \epsilon_{cs}$$

where $i$ indexes individuals; $c$ indexes state of birth; $s$ indexes year of birth; the dependent variable $M_{cs}$ is a dummy variable equal to one if individual $i$ was married before age 23; $X_{is}$ contains demographic controls (race dummies); $P_{cs}$ is a dummy variable equal to one if $i$'s state of birth had a nonrestrictive birth control law for minors at the time $i$ was 18 years old; $A_{cs}$ is a dummy variable equal to one if abortion was legal in $i$'s state of birth at the time $i$ was 18 years old; the $\alpha_c$ are state of birth dummies; and the $\delta_s$ are year of birth dummies.

Because we are concerned with the possible endogeneity of birth control access laws to state trends in feminist views and attitudes toward women's careers, we examine the robustness of our results to including controls for state of birth linear time trends. The earliest states providing minors access to birth control without parental consent were California and Georgia in 1968; Mississippi in 1969; Arkansas in 1970; and Colorado, District of Columbia, Illinois, Michigan, New Hampshire, New York, Oregon, and Tennessee in 1971 (see table 2). The wide array of states suggests that idiosyncratic factors affected the passage of mature minor and family planning laws and not, for example, the strength of the women's movement in the state.

Table 4 presents our estimates of the effect of various state laws on the age at first marriage for cohorts of college women born before and

[12] Ideally, we would like to know the legal environment concerning birth control and abortion for each individual in her state of residence as a teenager and in college. The census provides information on state of birth and current residence only. Since the vast majority of college-going women reside in their state of birth at 18 and go to college in their state of birth, measures of the legal environment in the state of birth should be a reasonable proxy for the actual laws affecting these women.

[13] We cannot extend the analysis to examine the impact of pill access laws on age at first marriage for cohorts born after 1957 since the 1980 census does not include information on the age at first marriage and more recent Current Population Survey fertility supplements do not include state of birth information.

001329

Exhibit 132                                                                    JA-0001735

after the diffusion of the pill to single women.[33] The estimates in column 1 indicate that the adoption of a nonrestrictive birth control law for minors was associated with a modest (but statistically significant) two-percentage-point decline in the probability that a college graduate women was married before age 23. The estimates in column 2 show roughly similar effects of both access to birth control and legalization of abortion. The estimates in column 3 indicate that the impact of access to birth control is robust to (and even modestly increased by) including controls for state of birth linear trends, although the same is not the case for the abortion law variable.

Since an indicator variable for state legalization of abortion is likely to be a crude indicator of access to abortion, we also explore the impacts of a continuous measure, the average abortion rate (abortions/live births) in an individual's state of birth when the individual was 18–21 years of age.[34] The specification in column 4 parallels that of column 2, with the abortion rate variable replacing the abortion legalization dummy variable.

The estimates in column 4 show a large negative and statistically significant impact of the state abortion rate on the likelihood a college woman marries by age 23. The mean of the abortion rate variable increased from zero through the 1948 birth cohort to 0.4 for the 1957 birth cohort. Thus the abortion rate coefficient (−0.0653) in column 4 implies that changes in access to abortion can explain a 2.6 percentage-point decrease in the fraction marrying by age 23, from the pre-1949 to the 1957 birth cohorts. The inclusion of the measure of continuous access to abortion in column 4 reduces the magnitude and significance of the dummy variable measuring nonrestrictive access to birth control for minors from the specification in column 2. But column 5 shows that a substantial and statistically significant effect of access to birth control reemerges once state of birth linear time trends are included and the abortion rate effect becomes small and insignificant.

We also explore the robustness of our findings to alternative measures of state laws concerning pill access for minors. Columns 6 and 7 include two dummy variables indicating the earliest age of legal access to birth control for each state of birth and year of birth group. Pill access by age 17 has a substantial negative effect on the likelihood of being married before age 23 in models with and without state of birth trends and

[33] We follow the usual approach of reporting Huber-White standard errors adjusted for clustering within state/year of birth cells. Because there could be serial dependence in errors across birth cohorts but within states, we also report (in brackets) the more conservative Huber-White standard errors with clustering at the more aggregate state of birth level following the suggestions of Bertrand, Duflo, and Mullainathan (2003) and Kézdi (2004).

[34] This approach parallels Donohue and Levitt's (2001) use of such an abortion rate measure in analyzing the impact of legalized abortion on crime rates.

001330

Exhibit 132                                                              JA-0001736

TABLE 4

001331

Exhibit 132                                                                 JA-0001737

| | | | | | | |
|---|---|---|---|---|---|---|
| Average abortion rate of ages 18-21 | | | | | | −.00.53 (.0168) [.01146] | −.00.23 (.0267) [.01180] | .00.260 (.0267) [.02581] | |
| Race dummies | yes | yes | yes | yes | yes | yes | yes |
| State of birth dummies | yes | yes | yes | yes | yes | yes | yes |
| Year of birth dummies | yes | yes | yes | yes | yes | yes | yes |
| State-specific linear trends | no | no | no | no | no | no | no |
| Observations | 60,714 | 60,714 | 60,714 | 60,714 | 60,714 | 60,714 | 130,355 | 130,872 |
| $R^2$ | .0458 | .0468 | .0458 | .0469 | .0359 | .0469 | .0431 | .0451 |

001332

Exhibit 132

JA-0001738

controls for access to abortion.[15] And column 8 shows modestly attenuated results for the impact of a nonrestrictive birth control law at age 18 when the sample is expanded to include all women with a year or more of college (to address the possible endogeneity of college graduation decisions to pill access). Column 9 shows substantial negative effects of pill access by age 17 and from ages 18 to 20 on the share married by 23 when the sample contains all with at least some college.

Using the column 3 results, we find that nonrestrictive laws decreased the fraction married by age 23 by 0.021. Using the column 7 results, we find that pill access by age 17 decreased the fraction married before 23 by 0.032. Relative to the total change from the 1940s cohorts to the early 1950s cohorts, these point estimates imply that improved pill access for minors in a state generated a change of 24–37 percent of the 8.7 percentage-point total decline.[16] Our estimates of the effect of state laws on the age at first marriage may be attenuated, relative to the overall impact of pill access, given our crude measure of state laws. Furthermore, some of the effects of increased accessibility of the pill after the late 1960s are likely to be absorbed by the full set of year of birth dummies included in all our specifications.

Further robustness checks reveal the following. Results similar to those in table 4 are found when the dependent variable is an indicator for marriage before age 22. A parallel analysis to table 4, for a sample restricted to white college graduates, yields qualitatively similar findings but with modestly larger effects of pill access laws.

## 2.   Career and Marital Status Outcomes: Aggregate Cohort Analysis

We next formally examine the extent to which changes in long-run career and marital status outcomes (from ages 30 to 49 years) for successive cohorts of U.S. college women are related to their pill access when they were young (under 21 years), unmarried college students. Ideally, we would like to analyze a longitudinal data set that tracked college women in successive cohorts and had information on their pill access and usage, their educational investments, and their life cycle career attainment and marital status. Given the absence of such ideal data, we rely on a cruder aggregate cohort analysis based on data from the 1970, 1980, and 1990 U.S. population censuses to relate snapshot

---

[15] The estimated impact of the pill access age variables on the age at first marriage is similar in models that control for either the abortion (legalization) dummy or the continuous average abortion rate variable.

[16] The share of U.S.-born female college graduates married before age 23 declined from 47.0 percent for those born from 1940 to 1949 to 38.3 percent for those born from 1950 to 1954 (1980 IPUMS). See also fig. 5, which uses Current Population Survey data and is not restricted to the native born.

001333

Exhibit 132                                                                                           JA-0001739

measures of career and marital status outcomes for single year of birth cohorts of college women to their access to the pill and abortion when young.

The unit of observation in our empirical analysis is an age/year cell (or, equivalently, a year of birth/calendar year cell). We examine 20 age groups (ages 30–49) across the three census years (1970, 1980, and 1990), yielding 60 observations (derived from 133,126 micro observations in the three censuses) and covering the 1921–60 birth cohorts of U.S.-born college graduate women.

Our basic estimating equation has the form

$$Y_{a} = \alpha_{a} + \delta_{t} + X_{a}\beta + P_{a}\gamma + A_{a}\pi + \epsilon_{a}$$

where $a$ indexes age and $t$ census year; the dependent variable $Y_{a}$ measures the share of age group $a$ (or, equivalently, of year of birth cohort $y$, where $a + y = t$) experiencing a particular career or marital status outcome in year $t$; $X_{a}$ contains controls for race; $P_{a}$ is a measure of access to or usage of birth control for cohort members as young women; $A_{a}$ is a measure of access to or usage of abortion for cohort members as young women; the $\alpha_{a}$ are a full set of age dummies; and the $\delta_{t}$ are a full set of census year dummies.

The basic idea behind the specification is to observe successive cohorts at the same age to examine whether between-cohort changes in career and marital status outcomes are related to between-cohort changes in access to the pill and abortion for young single women, controlling for preexisting trends in these outcomes across cohorts. The specification is equivalent to controlling for a set of unrestricted single year of age (life cycle) effects, a preexisting linear time trend in outcomes across birth cohorts, and a discrete aggregate jump (time effect) for 1990.

We relate the career and marital status outcomes of a birth cohort to their actual pill usage (proxied by the fraction of college women in a cohort taking the pill before age 21 among those with no births before age 23, as in fig. 1) and their pill access (proxied by the fraction in a cohort born in a state with a nonrestrictive birth control access law when they were younger than 21 years). We include similar controls for the abortion rate (for all women rather than college women) when each cohort was in college (aged 18–21 years) and the abortion legalization environment they faced at college entrance (at age 18).

Columns 1 and 2 of table 5 examine how pill and abortion access affected the fraction of college women employed in professional occupations (excluding nursing and noncollege teaching). The estimates in column 1 show that the pill usage and abortion rate measures have similar strong positive effects on the share of college women employed

001334

Exhibit 132                                                                          JA-0001740

TABLE 5

Impact of the Access and Abortion Legalization of Career and Career and Career and Career Women, 30–49 Years Old (U.S. Native Born 1920–60)

| | Professional Occupation, Excluding Teachers, RNs, Nurses | Lawyer, Doctor | Never Married | Currently Married | Currently Divorced | Currently Ever Married |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| Mean of dependent variable | .127 | 1.7 | .0441 | .0441 | .121 | .749 | .1016 | .104 | .104 |
| Fraction using pill before age 21 | .0480 (.0275) | .0410 (.0148) | .0452 (.0550) | .0150 (.03825) | .0608 (.0180) | .00843 (.0230) | .0506 (.0107) | .0725 (.0257) | .0558 (.0121) |
| Fraction with pill access law before age 21 | | | | | | | | | |
| Average abortion rate from ages 18 to 20 | .0457 (.0540) | .0410 (.0148) | .0806 (.03611) | .00235 (.03882) | .0443 (.01941) | .0808 (.02301) | .0327 (.0110) | .0113 (.0213) | .0133 (.0124) |
| Fraction with legalized abortion at age 18 | .0946 (.0148) | | | | | | | | |

001335

Exhibit 132                                                                 JA-0001741

| Census year = 1980 | .0178 | 0.302 | .00149 | .30103 | .00303 | −.0521 | .0361 | .0822 | .0627 |
| | (.00531) | (.04495) | (.00775) | (.01128) | (.00655) | (.007.99) | (.00571) | (.00408) | (.04329) |
| Census year 1990 | .9381 | .9396 | .00568 | .9104 | .0118 | .0547 | .195 | .112 | .116 |
| | (.00064) | (.00725) | (.00177) | (.00192) | (.0104) | (.0127) | (.00582) | (.00848) | (.00869) |
| Age dummies | yes | yes | yes | yes | yes | yes | yes | yes | yes |
| Observations | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 |
| R² | .864 | .856 | .9652 | .936 | .923 | .886 | .964 | .9579 | .985 |

001336

Exhibit 132

JA-0001742

in nontraditional professional occupations from ages 30 to 49 years.[15] The estimates suggest that the growth in pill usage, from nonexistent for the pre-1940 birth cohorts to 0.35 by birth cohorts born in the mid 1950s, accounts for a 1.7-percentage-point (0.048 × 0.35) increase in the share of women working in professional occupations across these cohorts out of an overall increase of five percentage points for these age groups from 1970 to 1990. The implied effect of changes in the abortion rate (from zero in pre-1940s cohorts to 0.4 by the late 1940s cohorts) is about the same. The estimates in column 2, however, show an insignificant impact of the pill access proxy and a marginally significant impact of abortion legalization status on the share of women in professional occupations. But, as we emphasized before, we expect the pill to have been most effective in enabling women to engage in professions requiring substantial up-front investments.

Thus in columns 3 and 4 we examine the impact of pill and abortion access on the fraction of college women employed as lawyers and doctors (physicians, veterinarians, and dentists), all professional careers requiring long-term investments. Both measures of pill access have strong positive and statistically significant impacts on the movement of college women into these professions. Improved pill access from the pre-1940 to the mid-1950s birth cohorts, according to columns 3 and 4, can explain an increase in the share of college women as lawyers and doctors of 1.2 (0.0352 × 0.35) to 1.6 (0.0159 × 0.98) percentage points as compared with an overall increase of 1.7 percentage points from 1970 to 1990. The impact of abortion is less robust to the choice of abortion access measure.[16]

With respect to marital status outcomes, the estimates in columns 5–7 indicate that access to birth control is associated with an increase in the share never married (consistent with the results in table 4 on the age at first marriage using within-state variation in pill access laws). Access has a trivial impact on the share currently married but a substantial negative effect on the share currently divorced. Legalization of abortion has similar (but modestly smaller) positive effects on the share never married and a smaller (and less significant) negative impact on the share currently divorced.[17]

---

[15] We report conventional standard errors in table 5 which are almost identical to Huber-White robust standard errors clustered by year of birth cohorts to account for multiple (three) observations for birth cohorts born from 1931 to 1956.

[16] We also find in analogous (unreported) specifications that increased pill access is associated with a lower share of college women employed in nursing and (noncollege) teaching occupations and a higher share with graduate or professional training (at least one year of postcollege education).

[17] Specifications analogous to those of cols. 5–7, with pill and abortion access proxied by the noncontrol (more endogenous) actual pill usage and abortion rate variables, generate qualitatively similar results on current marital outcomes but with somewhat larger estimated magnitudes.

001337

The negative effect of pill access on divorce is not caused by an increase in the share who never married (see cols. 8 and 9). Rather, improved pill access and greater pill usage for young women are negatively related to divorce even among the ever married. Although the overall divorce rate skyrocketed from 1970 to 1990, the rise in divorce actually slowed as birth cohorts with greater pill access moved into the 30–49 year age group.[51] The effect suggests that pill access improved the quality of marriage matches by increasing the age at first marriage. Individuals marrying later have a better sense of their preferences, and the effect outweighed the possible spur to divorce from improved careers and lower birth rates from the pill.[52]

We have explored the robustness of the results presented in table 5 along several dimensions. The impact of pill usage is invariant to various measures, for example, using the figure 2 data on first family planning visits before age 21 rather than those given by the fraction taking the pill before age 21. The findings are also not much affected by using measures for pill access at different ages (e.g., age 17 or younger and ages 18–20) and from looking at a narrower range of cohorts (e.g., women aged 35–44 years for the birth cohorts from 1926 to 1955). Finally, the qualitative findings for the outcomes in table 5 are similar if the sample is expanded to include women with any college and all women regardless of education to account for the possible dependence of college graduation on pill and abortion access.

## IV. The Case for the Power of the Pill

We have built a case for the power of the pill based on the timing of changes in pill access, career change, and the age at first marriage, and we have estimated formal econometric relationships exploiting cross-state and cross-cohort variation.

Despite FDA approval of the pill in 1960 for contraceptive use and its rapid diffusion among married women, young, unmarried women did not greatly increase pill usage until the late 1960s to early 1970s,

---

[51] The estimates in col. 8 indicate that improved access to abortion, as proxied by the actual abortion rate from ages 18 to 21, is associated with a large reduction in divorce. But the impact of abortion access on reducing divorce is much smaller (and not statistically significant) in specifications using the (arguably more exogenous) abortion legalization variable as shown in cols. 7 and 9.

[52] Michael (1988) presents an annual time-series analysis of the U.S. divorce rate from 1920 to 1974. He finds that an index of the overall diffusion of new contraceptive technologies (pill and intrauterine devices) helps explain the acceleration in growth of the U.S. divorce rate in the 1960s. This contrasts with our finding that greater pill access is associated with a reduction in the growth of divorce across successive cohorts of college women. Our approach differs by examining individual year of birth cohorts, controlling for aggregate year effects, and looking at the impact of pill access for young, single college women.

001338

Exhibit 132                                                                      JA-0001744

The primary reason was legal barriers. Beginning in the late 1960s, states lowered the age of majority and increased the rights of minors. These legal changes were largely independent of demands for contraceptive services and were generated by an enhanced awareness, due in part to the Vietnam War, that young people had earned greater rights. Many physicians, to be sure, had not been in compliance before the changes, but university health services generally did comply. The timing of greater pill use among cohorts of college graduate women coincided with the increase in the age at first marriage and the initial increase of female first year students in professional programs, such as law, medicine, dentistry, and business administration. More lenient laws led to a greater use of oral contraceptives and directly produced an increase in the age at first marriage and also led to an increase in the fraction of women entering professional school and ending up in professional careers.

## V.   Alternative Explanations

We have offered a supply-driven explanation for the change in the career plans of young college graduate women. A related and complementary supply-side explanation is abortion reform. We showed, in table 4, that a dummy variable for the five states that underwent early abortion reform and a variable measuring abortion rates in a woman's state of birth when she was 18–21 years old were negatively related to the age at first marriage, but the variables for the nonrestrictive birth control states were more robust to the inclusion of state-specific trends. The estimates in table 5 indicate that measures of access to both birth control and abortion help explain changes among successive cohorts of college women in the share employed in professional careers when in their thirties and forties.

The case for the greater importance of the pill is mainly that oral contraceptives had a far wider impact than abortion. College women did not depend on abortion, as they did on the pill, for safe, reliable, effective, convenient, and painless contraception. Yet, even though the fraction of women who ever took the pill vastly exceeded that who ever had an abortion (by more than eight to one for nonvirgins), the rate of abortion use among young women was high by 1976 and moderate even in 1971 (see table 6). Its effect must have served to reinforce the pill's impact.

Another supply-side explanation concerns changes in the "sex ratio," the ratio of men to women of marriageable age (Grossbard-Shechtman 1993). The sex ratio may affect female marriage rates and their incentives to invest in careers (Becker 1974). Because women typically marry

Two populous states (California and New York) should be noted, one in both groups.

001339

Exhibit 132                                                                          JA-0001745

POWER OF THE PILL                                                                765

TABLE 6
ABORTION AND PILL USE AMONG 18- AND 19-YEAR-OLD WOMEN, 1971 AND 1976

|  | ALL | NONVIRGINS | NEVER MARRIED | |
|---|---|---|---|---|
|  |  |  | All | Nonvirgins |
|  | A. Women 18 and 19 Years Old Attending College in 1971 | | | |
| As of 1971 |  |  |  |  |
| % ever had an abortion | 2.2 | 5.8 | 2.0 | 5.3 |
|  | (990) | (283) | (569) | (222) |
| % ever took the pill | 17.3 | 42.2 | 15.5 | 41.3 |
|  | (590) | (283) | (584) | (222) |
|  | B. Women 18 and 19 Years Old Attending College in 1976 | | | |
| As of 1976 |  |  |  |  |
| % ever had an abortion | 3.7 | 7.9 | 3.0 | 6.0 |
|  | (177) | (109) | (160) | (87) |
| % ever took the pill | 32.5 | 61.7 | 29.0 | 58.3 |
|  | (177) | (109) | (160) | (87) |

Source — National Survey of Young Women, 1971, National Survey of Adolescent Females Sexual Behavior.
Note. — Number of observations are in parentheses.

men two to three years older, women born early in the baby boom (the mid to late 1940s) should have faced poorer marriage market conditions than those born in the 1950s and 1960s. Yet marriage rates for college women did not increase until cohorts born from the late 1940s to early 1950s and did not decrease for later ones facing more favorable sex ratios.[54]

The most difficult supply-side explanation to assess is the resurgence of feminism in America. Feminism empowered young women to see themselves as the equal of their male peers, and it was complementary to the pill by increasing the number of young women who believed they could aim for the top.

Demand-side explanations involving a change in the relative demand for women by employers and educational institutions can also be offered. They include sex discrimination legislation and the ending of Vietnam-era draft deferments.

Although the Civil Rights Act of 1964 covered discrimination by "sex," the Equal Employment Opportunity Commission (EEOC) set up to investigate charges did little about sex discrimination until the early 1970s.[55] Affirmative action in the form of Executive Order 11246 was amended in 1967 by Executive Order 11375 to cover women, but it took

[54] An interaction between marriage market effects, driven by sex ratio changes, and the pill may help account for this anomaly (Heer and Grossbard-Shechtman 1981).

[55] The National Organization for Women was formed in 1966 to pressure the EEOC to consider discrimination by sex. Sex discrimination complaints rose from about 3,150 in 1970 to 18,150 in 1973, peaking at 29,450 in 1976 (Goldin 1990, fig. 7.1).

001340

Exhibit 132                                                                JA-0001746

many years to be put into effect (Freeman 1975). Title IX, guaranteeing women equal access to federally funded colleges and universities, was passed in 1972, but its guidelines were not formulated until 1975. Antidiscrimination legislation had effects complementary to that of the pill, but its timing appears to have been a bit too late for it to have been the spark.

Draft deferments for graduate and some professional students ended in 1967, but those for various health professionals continued until the draft was abolished in 1973 (Singer 1989; Angrist and Krueger 1992). One would have expected a draft-induced surge in male applicants to medical and dental schools through 1973 that would have squeezed out female applicants. But the upsurge in female medical and dental students began around 1970.[4]

An additional problem with the demand-side explanations mentioned is that they cannot account for other related changes. The increased age at first marriage could have stemmed from more career investment, but the rise in sexual activity among single women, beginning in 1970, would appear entirely unrelated.

## VI. Summary: A Collage of Evidence on Career, Marriage, and the Pill

We have presented a collage of evidence for the impact of the pill on young women's career decisions and on marriage rates in the 1970s. The direct effect of the pill decreased the cost to women of remaining unmarried while investing in a professional career. The pill further reduced the cost of career investment for women by serving to increase the age at first marriage for a large fraction of all young people. The power of the pill in affecting women's careers was magnified by its impact on the age at first marriage.

But not all increases in the age at first marriage and decreases in fertility have involved genuine social change for women. Marriage and fertility rates decreased at other times in U.S. demographic history but did not lead to vast increases in the fraction of women in professional occupations. Similarly, Japanese women experienced a substantial decline in fertility and an increase in the age at first marriage from the early 1970s. Yet women's economic status in Japan has seen little change, and, until 1999, oral contraceptives were not legally available.

The pill is not necessary for demographic change. But a virtually foolproof, easy-to-use, and female-controlled contraceptive having low

---

[4] The same exemption did not apply to law students. The draft may have increased the acceptance rate for women applying to law school, but we have not been able to obtain data on law school applications and acceptances.

**001341**

Exhibit 132                                                                JA-0001747

health risks little pain, and few annoyances does appear to have been
important in promoting real change in the economic status of women
(Birdsall and Chester 1987). Moreover, women in the United States were
well positioned to take advantage of the pill's side benefit. By the time
the pill was available to unmarried women, about 28 percent were grad-
uating from four-year institutions of higher education.[57] In most other
rich countries, the fraction of young women capable of continuing to
professional schools was small since college graduation rates were low
compared with those of the United States.

The most persuasive evidence for a role of the pill is that its initial
diffusion among single women coincided with, and is analytically related
to, the increase in the age at first marriage and the increase in women
in professional degree programs. Other factors were involved in these
changes, to be sure. No great social movement is caused by a single
factor.

### Appendix

TABLE A1
Data Sets Containing Information on Contraceptive Use, 1965–87

| Data Set, Year(s), and Observations | Sample Characteristics |
|---|---|
| National Fertility Surveys (NFS) 1965 ($N = 5,617$), 1970 ($N = 6,752$), and 1975 followup ($N = 3,050$) | Currently married women, married prior to age 25; retrospective information on contraceptive use was taken only for periods in which respondent was married |
| National Survey of Young Women (NSYW71) 1971 ($N = 4,611$) | Young women, never married and ever married, 15–19 years old; contains current state of residence |
| National Survey of Adolescent Female Sexual Behavior (NSAF76) 1976 ($N = 2,193$) | Young women, never married and ever married, 15–19 years old; does not contain current state of residence |
| National Health Interview Survey (NHIS) 1987 ($N = 12,747$) | Women born 1929–63 (aged 18–67); contains information on age at first pill use, but none on age at first marriage |
| National Survey of Family Growth, Cycle III (NSFG) 1982 ($N = 7,969$) | Women 15–44 years old; contains information on age at first family planning visit and age at first marriage |

[57] See Goldin (1997, app. table 2.1) for data based on the Current Population Survey,
series P-20. The fraction graduating from college or university is about 28 percent for
cohorts born in the late 1940s.

001342

Exhibit 132                                                      JA-0001748

## References

Akerlof, George A.; Yellen, Janet L.; and Katz, Michael L. "An Analysis of Out-of-Wedlock Childbearing in the United States." *Q.J.E.* 111 (May 1996): 277–317.

Angrist, Joshua D., and Krueger, Alan B. "Estimating the Payoff to Schooling Using the Vietnam Era Draft Lottery." Working Paper no. 4067. Cambridge, Mass.: NBER, May 1992.

Asbell, Bernard. *The Pill: A Biography of the Drug That Changed the World.* New York: Random House, 1995.

Bailey, Beth. "Prescribing the Pill: Politics, Culture, and the Sexual Revolution in America's Heartland." *J. Soc. Hist.* 30 (Summer 1997): 827–56.

Barbato, Louis. "Study of the Prescription and Dispensing of Contraceptive Medications at Institutions of Higher Education." *J. American Coll. Health Assoc.* 19 (June 1971): 305–9.

Barbato, Louis, et al. "Dispensing of Birth Control Information, Devices and Medications in College Health Services: A Panel Discussion." *J. American Coll. Health Assoc.* 16 (February 1968): 235–37.

Becker, Gary S. "A Theory of Marriage." In *Economics of the Family: Marriage, Children, and Human Capital*, edited by Theodore W. Schultz. Chicago: Univ. Chicago Press (for NBER), 1974.

Bergstrom, Theodore C., and Bagnoli, Mark. "Courtship as a Waiting Game." *J.P.E.* 101 (February 1993): 185–202.

Bertrand, Marianne; Duflo, Esther; and Mullainathan, Sendhil. "How Much Should We Trust Differences in Differences Estimates?" Manuscript. Cambridge: Massachusetts Inst. Tech., July 2001.

Birdsall, Nancy, and Chester, Lauren A. "Contraception and the Status of Women: What Is the Link?" *Family Planning Perspectives* 19 (January–February 1987): 14–18.

Black, Sandra E., and Juhn, Chinhui. "The Rise of Female Professionals: Are Women Responding to Skill Demands?" *A.E.R. Papers and Proc.* 90 (May 2000): 450–55.

Cole, Stephen. "Sex Discrimination and Admission to Medical School, 1929–1984." *American J. Sociology* 92 (November 1986): 549–67.

Dienes, C. Thomas. *Law, Politics, and Birth Control.* Urbana: Univ. Illinois Press, 1972.

Donohue, John J., III, and Levitt, Steven D. "The Impact of Legalized Abortion on Crime." *Q.J.E.* 116 (May 2001): 379–420.

Freeman, Jo. *The Politics of Women's Liberation: A Case Study of an Emerging Social Movement and Its Relation to the Policy Process.* New York: Longman, 1975.

Goldin, Claudia. *Understanding the Gender Gap: An Economic History of American Women.* New York: Oxford Univ. Press, 1990.

———. "Career and Family: College Women Look to the Past." In *Gender and Family Issues in the Workplace*, edited by Francine Blau and Ronald G. Ehrenberg. New York: Sage Found., 1997.

Goldin, Claudia, and Katz, Lawrence F. "The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions." Working Paper no. 7527. Cambridge, Mass.: NBER, February 2000.

Grossbard-Shechtman, Shoshana. *On the Economics of Marriage: A Theory of Marriage, Labor, and Divorce.* Boulder, Colo.: Westview Press, 1993.

Heer, David M., and Grossbard-Shechtman, Amyra. "The Impact of the Female Marriage Squeeze and the Contraceptive Revolution on Sex Roles and the

001343

Exhibit 132    JA-0001749

Women's Liberation Movement in the United States, 1960 to 1975." *J. Marriage and Family* 43 (February 1981): 49–65.

Hollis, Gloria, and Lashman, Karen. "Family Planning Services in U.S. Colleges and Universities." *Family Planning Perspectives* 6 (Summer 1974), 173–75.

Inter-university Consortium for Political and Social Research. *National Survey of Adolescent Female Sexual Behavior, 1976* (ICPSR 8043). Principal investigators: John F. Kantner and Melvin Zelnick. Ann Arbor, Mich.: Inter-university Consortium Polit. and Soc. Res., 1982.

——. *National Survey of Family Growth, Cycle III, 1982* (ICPSR 8328). Ann Arbor, Mich. Inter-university Consortium Polit. and Soc. Res., 1985.

——. *National Health Interview Survey, 1987: Cancer Risk Factor Supplement, Epidemiology Study* (ICPSR 9341). Ann Arbor, Mich.: Inter-university Consortium Polit. and Soc. Res., 1990.

Kantner, John F. and Zelnik, Melvin. "Sexual and Contraceptive Experience of Young Unmarried Women in the United States, 1976 and 1971." *Family Planning Perspectives* 9 (March–April 1977), 55–71.

Kelly, Gary F. *Sexuality Today: The Human Perspective* 6th ed. New York: McGraw Hill, 1998.

Kézdi, Gábor. "Robust Standard Error Estimation in Fixed-Effects Panel Models." Manuscript. Ann Arbor: Univ. Michigan, July 2001.

Levine, Phillip B.; Staiger, Douglas; Kane, Thomas J.; and Zimmerman, David J. "*Roe v. Wade* and American Fertility." Working Paper no. 5615. Cambridge, Mass.: NBER, June 1996.

Michael, Robert T. "Why Did the U.S. Divorce Rate Double within a Decade?" In *Research in Population Economics*, vol. 6, edited by T. Paul Schultz. Greenwich, Conn.: JAI, 1988.

Ohio State University. *National Longitudinal Survey of Women 14–24 in 1968.* CD-ROM. Columbus: Ohio State Univ., Center Human Resource Res., 1968–1991.

"Oral Contraceptives: The Liberator." *Economist* (December 11, 1999), p. 102.

Paul, Eve W.; Pilpel, Harriet F.; and Wechsler, Nancy F. "Pregnancy, Teenagers and the Law, 1974." *Family Planning Perspectives* 6 (Summer 1974): 142–47.

"The Pill on Campus." *Wall Street J.* (January 19, 1970).

Pilpel, Harriet F. and Wechsler, Nancy F. "Birth Control, Teenagers and the Law." *Family Planning Perspectives* 1 (Spring 1969): 29–36.

Ruggles, Steven, and Sobek, Matthew. *Integrated Public Use Microdata Series, IPUMS-98 Version 2.0.* Minneapolis: Univ. Minnesota, Dept. Hist., Soc. Hist. Res. Lab., 1997. http://www.hist.umn.edu/ipums/.

Sarrel, Philip M., and Sarrel, Lorna J. "Birth Control Services and Sex Counseling at Yale." *Family Planning Perspectives* 3 (July 1971): 33–36.

Scrimshaw, Susan C. M. "Women and the Pill: From Panacea to Catalyst." *Family Planning Perspectives* 13 (November–December 1981): 254–62.

Singer, Allen. "The Effect of the Vietnam War on Numbers of Medical School Applicants." *Academic Medicine* 64 (October 1989): 567–73.

U.S. Department of Commerce. *Statistical Abstract of the United States, 1990.* Washington: Government Printing Off., 1989.

U.S. Department of Education. *Digest of Education Statistics.* Washington: Government Printing Off., 1997, 1998.

U.S. Department of Health, Education, and Welfare. *Family Planning, Contraception, and Voluntary Sterilization: An Analysis of Laws and Policies in the United States, Each State and Jurisdiction (as of September 1971).* Washington: Government Printing Off., 1974.

——. *Family Planning, Contraception, and Voluntary Sterilization. An Analysis of*

**001344**

Exhibit 132                                                                      JA-0001750

*Laws and Policies in the United States, Each State and Jurisdiction (as of October 1, 1976) with 1978 addenda.* Washington: Government Printing Off., 1978.

U.S. Department of Labor, Bureau of Labor Statistics. *Employment and Earnings.* Vol. 48. Washington: Bur. Labor Statis., January 2001.

Watkins, Elizabeth Siegel. *On the Pill: A Social History of Oral Contraceptives, 1950–1970.* Baltimore: Johns Hopkins Univ. Press, 1998.

Westoff, Charles F., and Potvin, Raymond H. *College Women and Fertility Values.* Princeton, N.J.: Princeton Univ. Press, 1967.

Westoff, Charles F., and Ryder, Norman B. *The Contraceptive Revolution.* Princeton, N.J.: Princeton Univ. Press, 1977.

Zelnik, Melvin, and Kantner, John F. "Sexual Experience of Young Unmarried Women in the United States." *Family Planning Perspectives* 4 (October 1972): 9–18.

——— "1971 U.S. National Survey of Young Women." Machine-readable data file. In *Data Archive on Adolescent Pregnancy and Pregnancy Prevention.* Los Altos, Calif.: Sociometrics Corp., 1989. http://www.socio.com.

**001345**

Exhibit 132                                                              JA-0001751

Copyright of Journal of Political Economy is the property of University of Chicago Press. The copyright in an individual article may be maintained by the author in certain cases. Content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.



**ELSEVIER**

Contraception 76 (2007) 360–365

Contraception

Original research article

# A comparison of contraceptive procurement pre- and post-benefit change[☆]

Debbie Postlethwaite[a,*], James Trussell[b,c], Anthony Zoolakis[d], Ruth Shabear[a], Diana Petitti[e]

[a]*Kaiser Permanente, Northern California, Women's Health Research Institute, Oakland, CA 94612, USA*
[b]*Office of Population Research, Princeton University, Wallace Hall, Princeton University, Princeton, NJ 08544, USA*
[c]*The Hull York Medical School, Hertford Building, University of York, York HU6 7RX, United Kingdom*
[d]*Pharmacy Materials Services, Kaiser Permanente, California, Downey, CA 90242, USA*
[e]*Department of Preventive Medicine, University of Southern California, Keck School of Medicine, Los Angeles, CA 90089, USA*

Received 30 May 2007; revised 18 July 2007; accepted 19 July 2007

**Abstract**

**Background:** In 2002, the Kaiser Foundation Health Plan in California changed its coverage policy to include 100% universal coverage for the most effective forms of contraception and for emergency contraceptive pills (ECPs). This study sought to evaluate whether removing the cost of contraception as a potential barrier to utilization would lead to a change in the mix of contraceptive methods prescribed and purchased by a large health plan and whether those changes could theoretically result in averting a greater number of unintended pregnancies.

**Study Design:** A retrospective observational study was conducted to describe the mix of reversible contraceptives procured before and after the benefit change at Kaiser Permanente Northern California. We then estimated couple-years of protection (CYP) to examine whether the contraceptive mix changed to more effective reversible methods.

**Results:** After the contraceptive benefit change, CYP increased by 28% (from 2001–2002 to 2003–2004), while the number of females aged 15–44 enrolled in this health plan fell by 1%. CYP for intrauterine contraceptives (IUCs) and injectables rose by 137% and 32%, respectively, while CYP for the pill, patch and ring rose only by 16%. The estimated average annual contraceptive failure rate among women using hormonal contraceptives and IUCs declined from 7.0% to 6.4%. Purchasing of the ECP rose by 88%.

**Conclusion:** Removal of the cost of contraception may result in increased utilization of more effective methods and ECPs.
© 2007 Elsevier Inc. All rights reserved.

*Keywords:* Universal contraception coverage; Contraceptive procurement; Couple-years of protection

## 1. Introduction

Half of all pregnancies in the United States are unintended [1]. This percentage has not changed since 1994 despite an increase in the variety of contraceptive methods available. Mandates to include contraceptive coverage in insurance benefit packages have been recently passed in 26 of the 50 states in this country [2], but the impact on contraceptive use and unintended pregnancy is not proven. In 2002, 27% of women at risk for unintended pregnancy were using oral contraceptives (OCs), 5% were using injectables and only 2% were using intrauterine contraceptives (IUCs) [3]. However, the annual risk of pregnancy for OCs is 8%, as compared with 3% for injectables and less than 1% for IUCs [4]. Among women having abortions, 28% reported using male condoms in the month pregnancy occurred and 14% reported using OCs; in contrast, only 0.1% of women reported IUC use [5]. IUCs, contraceptive implants and injectables have been well documented to be the most cost-effective reversible methods of contraception [6–8].

In 2002, the Kaiser Foundation Health Plan in California changed its coverage policy to include universal 100% coverage (no co-payment) for the most effective forms of contraception (copper and levonorgestrel IUCs, injectables and implants but not OCs) and for emergency contraceptive pills (ECPs). The benefit change was advocated by Kaiser

───────────
[☆] Financial support for the study was provided by Kaiser Permanente, Women's Health Research Institute.
* Corresponding author. Tel.: +1 510 987 3257; fax: +1 510 873 5089.
*E-mail addresses:* debbie.a.postlethwaite@kp.org (D. Postlethwaite),
ruth.shaber@kp.org (R. Shaber).

0010-7824/$ – see front matter © 2007 Elsevier Inc. All rights reserved.
doi:10.1016/j.contraception.2007.07.006

Permanente Medical Group physician leaders throughout the system as an effort to promote more effective contraceptive use and thereby reduce unintended pregnancies. Prior to this coverage change, contraceptive devices and injections were stocked in the pharmacy and had large co-payments. For example, if the co-payment for a monthly contraceptive was US$5, then a 5-year contraceptive method (e.g., levonorgestrel IUC or contraceptive implant) would cost the member US$300 (60 months in 5 years×US$5/month). A second appointment was often necessary for the member to receive these services because of the inconvenience of purchasing the device from the pharmacy. This requirement would lead to additional visits with an additional co-payment as well as inconvenience. After the change in coverage, other system changes resulted from the removal of the need to collect payment for contraceptives. Injections and devices were stocked in the medical offices and there was no pharmacy co-pay; hence, same-day administration of these methods was made possible and encouraged.

In 2002, the California Department of Managed Care issued a mandate to health maintenance organizations that ECPs be made more widely available [9]. In addition to removing the financial barrier imposed by the pharmacy co-pay, stocking ECPs in the medical offices for direct dispensing increased the likelihood that women would get them in a timely manner.

In this article, we assessed the impact of the contraceptive benefit change by analyzing pharmacy procurement data before and after the change using a novel evaluation approach. Pharmaceutical procurement at Kaiser Permanente is based on several factors including current and projected utilization patterns, as well as strict protocols concerning expiration dating of items to be purchased. These factors minimize overstock or drug destruction due to expired product.

Kaiser Permanente Northern California (KPNC) has over 3 million members, approximately 660,000 of whom are women of reproductive age. Traditionally, 96% of all members have KPNC pharmacy benefits, an incentive to have prescriptions filled at KPNC pharmacies. Overall, female members aged 20–44 are primarily employed (89%), middle income and educated (38% with some college or more); approximately 55% are White non-Hispanic, 7% African American, 16% Latino, 19% Asian, 1.3% Native American and less than 1% Pacific Islander [10].

The research questions were the following: (a) does removing the cost of contraception as a potential barrier to utilization lead to change in the mix of contraceptive methods purchased by a large health plan? and (b) could the changes in prescribing that are reflected in contraceptive procurement theoretically result in averting a greater number of unintended pregnancies?

The measurable study objectives included the following:

- Identifying the portfolio of contraceptive medications and devices procured each year by KPNC from 2000 through 2004
- Estimating the couple-years of protection (CYP) for hormonal methods and IUCs for the years 2000–2004
- Estimating unintended pregnancies averted per year based on the estimated CYP

## 2. Methods

This study was approved by the Kaiser Permanente Institutional Review Board (IRB) for Human Subjects. Funding for the project was provided by the Kaiser Permanente Women's Health Research Institute.

### 2.1. Procurement data

Inventory control for pharmacy procurement for the KPNC region is a stock-keeping unit (SKU) system based on an item master catalog containing all drug items that can be purchased by Kaiser Permanente pharmacies. Drug groupings or therapeutic classes (e.g., contraception) are not available in this system and had to be abstracted from two commercial databases (Medispan and First Data Bank). These commercial databases contain both the therapeutic classification for drug items as well as the National Drug Code (NDC). The NDC is a unique identifying drug number maintained by the Food and Drug Administration. The NDC for each drug item is included in the KPNC item master catalog. In order to identify all contraceptives, an NDC list containing all contraceptive NDC numbers was linked to the KPNC item master by cross-checking the NDC numbers with the two commercial databases and with Kaiser Permanente's Pharmacy Information Management System. From this, a cumulative contraceptive SKU list was developed.

In order to capture procurement data from 2000 through 2004, contraceptive SKU data were used to collect data on all contraceptives purchased for each year. Drug items with a blank or inconclusive NDC were separated and manually searched for inclusion in the cumulative contraceptive NDC list by item description. Once contraceptive drug items in the item master were identified, purchasing data were obtained for these items over the years required.

The quantity base was defined as a 1-month supply for all OCs, patches, vaginal rings and 1-month injectables. IUCs and 3-month injectables were counted in appropriate method-specific supply increments.

### 2.2. Analysis plan

There were two steps in the analysis. The first was converting the procurement data into CYP for hormonal and IUC methods for each year from 2000 to 2004. The second step was estimating the change in unintended pregnancies resulting from contraceptive failure and the use of ECPs from the period 2000–2001 to 2003–2004 (we omitted 2002, the year of implementation of the new policy).

Table 1
Procurement data for contraceptives

| Method | Year | | | | |
|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 |
| OCs | 1,969,497 | 2,304,506 | 1,899,434 | 2,313,048 | 2,600,731 |
| Patch | 0 | 0 | 0 | 12,840 | 33,390 |
| Ring | 0 | 0 | 0 | 583 | 2131 |
| 3-month injectable | 62,561 | 70,652 | 69,545 | 70,744 | 105,943 |
| 1-month injectable | 0 | 3446 | 16,947 | 254 | 15 |
| Copper IUC | 4140 | 4540 | 4775 | 4615 | 4225 |
| Levonorgestrel IUC | 0 | 1015 | 3746 | 5156 | 7081 |
| Progesterone IUC | 492 | 258 | 0 | 0 | 0 |
| Implant | 252 | 16 | 0 | 0 | 0 |
| Spermicides | 2191 | 2776 | 3585 | 3627 | 3566 |
| Diaphragm | 2683 | 2618 | 2599 | 1936 | 1571 |
| Cervical cap | 138 | 124 | 68 | 123 | 64 |
| Female condom | 372 | 549 | 270 | 219 | 150 |
| Male condom | 263,269 | 349,399 | 244,754 | 216,565 | 205,991 |
| Levonorgestrel ECPs | 13,898 | 16,342 | 20,444 | 24,997 | 31,818 |

*2.2.1. Estimating CYP*

We assumed that all contraceptives purchased in a calendar year were used in that year. We assumed that 13 cycles of OC pills, contraceptive patches, monthly contraceptive injections, 13 contraceptive vaginal rings and 4 1/3 twelve-week contraceptive injections provide 1 CYP. We assumed that copper and levonorgestrel IUCs and the 5-year implant are inserted midyear and provide 1/2 CYP in that year and 1 CYP in each subsequent year in our 5-year window; the 1-year levonorgestrel-releasing IUC provides 1/2 CYP in both the year of insertion and the following year. We then examined whether the mix by method of CYP changed from 2000–2001 to 2003–2004.

*2.2.2. Estimating change in pregnancies*

We estimated the number of contraceptive failures as the product of the number of CYP for each method and the failure rate during typical use of that method as presented in the 2007 edition of *Contraceptive Technology* (and earlier editions for methods that are no longer available) [4,11,12]. Next, we computed the estimated change in the contraceptive failure rate between 2000–2001 and 2003–2004. Finally, we estimated the number of unintended pregnancies avoided by use of ECPs. This was computed as the difference in the number of uses of ECPs in 2003–2004 and 2000–2001 times

the number of pregnancies averted per each use of ECPs. This number was estimated from the latest WHO clinical trial of emergency contraceptives, in which 4136 healthy women from 15 family planning clinics in 10 countries who requested emergency contraception within 120 h of unprotected intercourse were randomly assigned to one of three treatment arms. The number who became pregnant was compared with the number expected to have become pregnant without treatment based on external estimates of conception probabilities by cycle day of intercourse. Among 10,000 women treated with a single 1.5-mg dose of levonorgestrel ECPs within 120 h after unprotected intercourse, 148 become pregnant despite treatment, whereas 822 would have become pregnant without treatment. Thus, 674 pregnancies are avoided among every 10,000 women treated — an 82% reduction in the risk of pregnancy [13].

**3. Results**

Procurement data for the period 2000 to 2004 are shown in Table 1. Membership of women aged 15–44 remained relatively level over the 5-year study period; there was a decline of 1% between 2001–2002 and 2004–2005 (Table 2). In contrast, there was a 28% increase in CYP

Table 2
CYP provided by hormonal contraceptives and IUCs

| Method | Year | | | | | Percentage of increase[a] |
|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | |
| OCs, patch, ring | 151,500 | 177,270 | 146,110 | 178,959 | 202,789 | 16 |
| Injectables | 14,437 | 16,569 | 17,352 | 16,345 | 24,450 | 32 |
| IUCs | 14,356 | 19,333 | 26,125 | 35,142 | 44,855 | 137 |
| Implant | 126 | 260 | 268 | 268 | 268 | 39 |
| Total | 180,419 | 213,432 | 189,855 | 230,714 | 272,361 | 28 |
| Women aged 15–44 | 661,586 | 675,545 | 685,004 | 664,695 | 661,349 | −1 |

[a] Percentage of increase from 2000–2001 to 2003–2004.

Exhibit 133                                                                                     JA-0001755





Fig. 1. CYP provided by hormonal and IUCs, 2003–2004. The area of the 2003–2004 pie is 28% larger than the area of the 2001–2002 pie to reflect a 28% increase in CYP.

from hormonal methods and IUCs: an increase of 137% from IUCs, 32% from injectables and 16% from OCs, patch and ring (Table 2). The estimated annual contraceptive failure rate among users of these methods fell from 7.0% to 6.4% due to a shift in the mix toward IUCs from OCs (Fig. 1). Additionally, with the 88% increase in procurement of ECPs (from 30,242 in 2001–2002 to 56,815 in 2003–2004), we estimate that there could have been an additional 1791 pregnancies averted.

## 4. Discussion

This study provides evidence that a change in benefit structure to include 100% coverage of long-acting reversible contraceptive methods and removal of other barriers to their use resulted in increased procurement of these methods (which reflects increased prescribing of the methods).

Several factors affected the available contraceptive options over the 5-year period of study. Distribution of the monthly injectable, the 1-year IUC and the 5-year implant

was discontinued. The contraceptive patch and ring became available starting in 2003 but were not added to the KPNC formulary and, thus, were not a covered benefit. In general, there was a shift away from the combination reversible hormonal contraceptives toward the methods covered 100% by the health plan. The levonorgestrel IUC became available at KPNC starting in the third quarter of 2001. Demand was initially low in 2001 due to high up-front costs for the member and lack of clinician experience with its use. Procurement of the copper IUC remained fairly level, but there was a very dramatic increase in the purchase of the levonorgestrel IUC. Procurement of the 3-month injectable increased substantially in the last year of our study period. Throughout the study period, OCs remained the most commonly used reversible method purchased.

Our study has several limitations:

1. We were missing data on CYP during 2000–2004 for 5-year implants inserted before 2000 and during 2000 for the 1-year progesterone-releasing IUC inserted in 1999.
2. We have procurement data for the 10-year copper IUD for the years 1997 through 2004. Thus, we underestimate CYP in, for example, 2000 for those IUCs inserted before 1997 but still in place.
3. The estimated absolute number of contraceptive failures among users of hormonal methods and IUCs rose after the change in benefits because the number of CYP from these methods increased by 28%. For that reason, we estimated the change in the contraceptive failure rate for these methods. The rise in CYP was not due to an increase in the number of women at risk. If the increase in CYP is due to a switch from use of barrier contraceptives, withdrawal or fertility-awareness-based methods or no method at all, then the decline in the contraceptive failure rate among users of hormonal methods or IUCs understates the decrease in the unintended pregnancy rate among all members. A decline in sterilization, in contrast, would have the opposite effect. The values in Table 1 suggest a decline in barrier methods, although it is not possible to know the extent to which condoms were obtained by males whose partner is not enrolled in Kaiser Permanente or the extent to which condoms were used for protection against sexually transmitted diseases in combination with another contraceptive.
4. If women were continuously using OCs, rings or patches to avoid bleeding episodes, then we overestimated CYP. (Superior effectiveness with extended use has not been demonstrated [14,15].)
5. We have almost certainly overestimated the number of pregnancies averted by increased use of ECPs because no intervention has demonstrated a population-level impact on unintended pregnancy [16,17], although one demonstration project [18] and three clinical trials [19–21] were specifically designed to address this issue. The explanation for this result is that even when

**001362**

Exhibit 133                                                                                                    JA-0001756

364 *D. Postlethwaite et al. / Contraception 76 (2007) 360–365*

provided with ECPs at no cost in advance, women do not use the treatment often enough after the most risky incidents to result in a substantial population impact.

6. We do not have direct information on the incidence or rate of unintended pregnancy (or abortion) before and after the change in benefits.

In 2002, KPNC conducted outreach through a quarterly publication to all members to make them aware of the contraceptive benefit change. There was also another KPNC IRB-approved research study evaluating clinician knowledge, attitudes and practice patterns about IUCs, followed by an evidence-based IUC clinician education intervention delivered to half of the medical centers. The evidence-based educational intervention was developed by KPNC clinicians involved in the research study and was designed to dispel common misperceptions about IUC safety and to highlight the noncontraceptive benefits of the levonorgestrel IUC. IUC utilization was tracked across the region before and after the intervention, followed by a survey to assess changes in clinician knowledge, attitudes and practice patterns. This intervention resulted in statistically significant reported changes in clinician attitudes and practice patterns, as well as higher IUC utilization for the intervention group [22]. The IUC utilization study may be a confounder, which resulted in the increased prescribing of IUC. There were also region-wide activities to increase member and clinician awareness about emergency contraception, partly in response to the California State mandate. The IUC intervention study and emergency contraception regional activities were intentionally designed to increase the use of these contraceptive methods because they were both underutilized. However, we can assume that these interventions do not fully account for all changes in utilization of the most effective methods because there was no such system-wide program to increase utilization of the injectable contraceptives except the member outreach activities discussed above, but still there was a 32% increase in CYP provided by injectables following the benefit change.

Along with removal of cost, other barriers to the prescribing of the most effective contraceptive methods were also removed. KPNC achieved direct and timely access to the covered methods in the medical office. Injectables, IUCs, ECPs and sometimes implants could be provided the same day as contraceptive counseling or preventive medical services were provided, just as with OCs. The removal of cost for the reversible, long-acting methods also allowed clinicians to offer a wider range of appropriate contraceptive choices to all women. OCs continued to be a covered benefit, with varied pharmacy co-pay depending on the plan purchased by the member or employer group.

We cannot be certain that the changes in procurement were solely due to the removal of cost to the patient, but there was a shift toward prescribing the most effective methods (IUCs and injectable contraceptives) and a substantial increase in prescribing of ECPs. The KPNC region-wide

informational and research activities designed to boost awareness about specific contraceptive options as well as changes in the available contraceptive options and other national and community trends may have also played a role in the prescribing and procurement changes. At a minimum, our results suggest strongly that an intervention to increase IUC use can work.

## References

[1] Finer LB, Henshaw SK. Disparities in rates of unintended pregnancy in the United States, 1994 and 2001. Perspect Sex Reprod Health 2006; 38:90–6.

[2] Insurance coverage of contraceptives. State policies in brief. New York NY: Guttmacher Institute; 2007. http://www.guttmacher.org/statecenter/spibs/spib_ICC.pdf [accessed 7/11/07].

[3] Mosher WD, Martinez GM, Chandra A, Abma JC, Wilson SJ. Use of contraception and use of family planning services in the United States: 1982–2002. Advance data from vital and health statistics, no 350. Hyattsville (Md): National Center for Health Statistics; 2004.

[4] Trussell J. Contraceptive efficacy. In: Hatcher RA, Trussell J, Nelson AL, Cates W, Stewart FH, Kowal D, editors. Contraceptive technology: nineteenth revised edition. New York: Ardent Media; 2007. p. 745–826.

[5] Jones RK, Darroch JE, Henshaw SK. Contraceptive use among U.S. women having abortions in 2000–2001. Perspect Sex Reprod Health 2002;34:294–303.

[6] Trussell J, Leveque JA, Koenig JD, et al. The economic value of contraception: a comparison of 15 methods. Am J Public Health 1995; 85:494–503.

[7] Trussell J, Koenig J, Stewart F, Darroch JE. Medical care cost savings from adolescent contraceptive use. Fam Plann Perspect 1997;29: 248–55, 195.

[8] Chiou CF, Trussell J, Reyes E, et al. Economic analysis of contraceptives for women. Contraception 2003;68:3–10.

[9] Higa J. Memo dated March 27, 2002. San Francisco (Calif): California Department of Managed Care; 2002. http://www.dmhc.ca.gov/hpp/memos/2002/020327.pdf [accessed 2/9/07].

[10] Gordon NP. Kaiser Permanente Member Health Survey, 2002. http://www.dor.kaiser.org/dor/mhsnet/public/ [accessed 7/16/07].

[11] Trussell J. Contraceptive efficacy. In: Hatcher RA, Trussell J, Stewart F, Nelson A, Cates W, Guest F, Kowal D, editors. Contraceptive technology: eighteenth revised edition. New York: Ardent Media; 2004. p. 773–845.

[12] Trussell J. Contraceptive efficacy. In: Hatcher RA, Trussell J, Stewart F, Cates W, Stewart GK, Guest F. et al, editors. Contraceptive technology: seventeenth revised edition. New York: Ardent Media; 1998. p. 779–844.

[13] von Hertzen H, Piaggio G, Ding J, et al. Low dose mifepristone and two regimens of levonorgestrel for emergency contraception: a WHO multicentre randomized trial. Lancet 2002;360:1803–10.

[14] Audet MC, Moreau M, Koltun WD, et al. Evaluation of contraceptive efficacy and cycle control of a transdermal contraceptive patch vs an oral contraceptive. JAMA 2001;285:2347–54.

[15] Oddsson K, Leifels-Fischer B, de Melo NR, et al. Efficacy and safety of a contraceptive vaginal ring (NuvaRing) compared with a combined oral contraceptive: a 1-year randomized trial. Contraception 2005;71: 176–82.

[16] Raymond EG, Trussell J, Polis C. Population effect of increased access to emergency contraceptive pills: a systematic review. Obstet Gynecol 2007;109:181–8.

[17] Polis CB, Schaffer K, Blanchard K, Glasier A, Harper CC, Grimes DA. Advance provision of emergency contraception for pregnancy prevention (full review). Cochrane Database Syst Rev 2007;(2): CD005497.

001363

Exhibit 133

JA-0001757

[18] Glasier A, Fairhurst K, Wyke S, et al. Advanced provision of emergency contraception does not reduce abortion rates. Contraception 2004;69:361–6.

[19] Raine TR, Harper CC, Rocca CH, et al. Direct access to emergency contraception through pharmacies and effect on unintended pregnancy and STIs: a randomized controlled trial. JAMA 2005;293:54–62.

[20] Hu X, Cheng L, Hua S, Glasier A. Advanced provision of emergency contraception to postnatal women in China makes no difference in abortion rates: a randomized controlled trial. Contraception 2005;72: 111–6.

[21] Raymond EG, Stewart F, Weaver M, Monteith C, Van Der Pol B. Impact of increased access to emergency contraceptive pills: a randomized controlled trial. Obstet Gynecol 2006;108:1098–106.

[22] Postlethwaite DA, Shaber R, Mancuso V, et al. Intrauterine contraception: study to evaluate clinician practice patterns in Kaiser Permanente, Northern California. Contraception 2007;75:177–84.

**001364**

Exhibit 133                                                                                                                              JA-0001758



Guttmacher Policy Review
Winter 2011 | Volume 14 | Number 1

# The Case for Insurance Coverage of Contraceptive Services And Supplies Without Cost-Sharing

By Adam Sonfield

A provision in the 2010 health reform legislation, the Affordable Care Act (ACA), requires all new private health plans to cover certain specified preventive health services without any out-of-pocket costs to consumers, such as copayments or deductibles. An initial list of such services, based on three sets of existing guidelines, began affecting insurance plans in September 2010. Reproductive health services on that list include cervical cancer screening, screening and counseling for HIV and several other sexually transmitted infections, and vaccination for human papillomavirus (HPV).

In November 2010, an advisory panel convened by the Institute of Medicine (IOM) began to develop a fourth set of guidelines—for women's preventive health care—as required under an amendment to the ACA authored by Sen. Barbara Mikulski (D-MD). Debate on the Senate floor made clear that the Mikulski amendment was intended by its supporters to include contraceptive counseling, services and supplies, as well as an annual well-woman gynecologic exam and other key services. The IOM panel is scheduled to make its recommendations in the spring to the Department of Health and Human Services (DHHS), which is

charged with adopting a final set of guidelines and has set a goal of doing so by August.

Supported by a strong, long-standing body of evidence, contraceptive services have long been recognized by both government bodies and a wide range of private-sector experts as a vital and effective component of preventive and public health care. Contraceptive use helps women avoid unintended pregnancy and improve birthspacing, which in turn have substantial positive consequences for infants, women, families and society. Moreover, although cost can be a daunting barrier to effective contraceptive use on the part of individual women, the evidence strongly suggests that insurance coverage of contraceptive services and supplies without cost-sharing is a low-cost or even cost-saving means of helping women overcome this obstacle.

## Preventive Benefits

### Planning and Spacing Pregnancies

The range of contraceptive methods approved by the U.S. Food and Drug Administration are all highly effective for the prevention of pregnancy. Contraceptive methods such as sterilization, the IUD and the implant have failure rates of 1% or less. For injectable and oral contraceptives, typical-use failure rates, which account for the difficulties many women experience using contraception consistently and correctly over long periods, are 7% and 9%, respectively, because some women miss or delay receiving an injection or taking a pill. But use of any method is far more effective than using no method at all: Couples who do not practice contraception have approximately an 85% chance of an unintended pregnancy within a year.

*This article is adapted from testimony submitted by the Guttmacher Institute to the IOM's Committee on Preventive Services for Women in January 2011 and from a comprehensive literature review on which the testimony was based. The testimony was drafted by Adam Sonfield, Rachel Benson Gold and Cory L. Richards, and the literature review was conducted by Kathryn Kost and Isaac Maddow-Zimet. Both efforts were aided by the input and review of numerous other members of the Guttmacher Institute staff. A complete set of references for the information and research findings cited in this article may be found on the Guttmacher Institute's web site, at http://www.guttmacher.org/pubs/CPSW-testimony.pdf*

7

Exhibit 134

JA-0001759

Cross-country comparisons provide some evidence that contraceptive use at the individual level translates into lower national rates of unintended pregnancy and subsequent abortion. For example, according to a 2005 analysis of trends in central Asia and eastern Europe, as use of modern contraceptive methods increased rapidly in those regions during the 1990s, abortion rates declined significantly, even as fertility rates and the number of children desired also declined.

In the United States, increased contraceptive use—particularly among unmarried women and among teenagers—has paralleled substantial declines in unintended pregnancy and abortion. Notably, increased contraceptive use has been found to be responsible for 77% of the sharp decline in pregnancy among 15–17-year-olds between 1995 and 2002, and for all the decline among 18–19-year-olds over that period.

Contraception's impact on unintended pregnancy may also be seen in the accomplishments of publicly funded family planning services, which in 2006 helped women avoid 1.94 million unintended pregnancies, 810,000 of which would have ended in abortion. In the absence of this public effort, levels of unintended pregnancy and abortion would be nearly two-thirds higher among U.S. women overall and close to twice as high among poor women.

Similar results have been found through evaluations of specific state programs, including those that expand eligibility for family planning services under Medicaid. California's expansion helped women avoid 287,000 unintended pregnancies and 118,000 abortions in 2007. In Arkansas, repeat births within 12 months dropped 84% between 2001 and 2005 for women enrolled in the family planning expansion. And in Rhode Island, the proportion of mothers on Medicaid with birth intervals of less than 18 months fell from 41% in 1993 to 28% in 2003, and the gap between privately insured and publicly insured women narrowed from 11 percentage points to less than one point over that time.

## Maternal and Child Health

The most direct, positive effects of helping women and couples plan the number and timing of their pregnancies and births are those related to improving maternal and child health outcomes. According to U.S. and international studies, a causal link exists between the interpregnancy interval (the time between a birth and a subsequent pregnancy) and three major birth outcomes measures: low birth weight, preterm birth and small size for gestational age.

In addition, according to a 2008 literature review, numerous U.S. and European studies have found an association between pregnancy intention and delayed initiation of prenatal care. This stems in part from the fact that women are less likely to recognize a pregnancy early if it is unplanned; early recognition of pregnancy also affects the frequency of prenatal care visits. Furthermore, compared with children born from intended pregnancies, those born from unintended pregnancies are less likely to be breastfed at all or for a long duration. Breastfeeding, in turn, has been linked with numerous positive outcomes throughout a child's life.

Moreover, although evidence is limited, several studies from the United States, Europe and Japan suggest an association between unintended pregnancy and subsequent child abuse. There is also some evidence of an association between unintended pregnancy and maternal depression and anxiety.

The father's intention status appears to have significant effects on his involvement during pregnancy and following the birth. This, in turn, is associated both with the mother's receipt of prenatal care and her likelihood of reducing smoking during pregnancy. In addition, infants born to mothers and fathers who differed in their pregnancy intention face significantly higher risks of several adverse maternal behaviors and birth outcomes than those born to parents both intending the birth.

**001366**

Exhibit 134                                                                                              JA-0001760

### Social and Economic Benefits

Both married and cohabiting couples are more likely to separate after an unintended first birth than after an intended first birth. Moreover, compared with those who have had a planned birth, women and men who have had an unplanned birth report less happiness and more conflict in their relationship, and women report having more symptoms of depression.

Several studies have examined the role that contraceptive use—particularly the use of oral contraceptives—has played in improvements in social and economic conditions for women. The advent of the pill allowed women greater freedom in career decisions, by allowing them to invest in higher education and a career with far less risk of an unplanned pregnancy. Several studies have found that legal access to the pill led to increased pill use, fewer first births to high school- and college-aged women, increased age at first marriage, increased participation by women in the workforce and more children born to mothers who were married, college-educated and had pursued a professional career.

### Additional Health Benefits

Contraceptive methods have additional health benefits beyond those related to preventing and timing pregnancy. A 2010 analysis of the literature found that hormonal contraceptives can help address several menstrual disorders, including dysmenorrhea (severe menstrual pain) and menorrhagia (excessive menstrual bleeding). Hormonal contraceptives can also prevent menstrual migraines, treat pelvic pain due to endometriosis and treat bleeding due to uterine fibroids. Perhaps most notably, oral contraceptives have been shown to have long-term benefits in reducing a woman's risk of developing endometrial and ovarian cancer, and short-term benefits in protecting against colorectal cancer.

And, of course, the male and female condom can help prevent sexually transmitted infections, including HIV, among sexually active women and men. According to the most recent summary of the evidence by the Centers for Disease Control and Prevention (CDC), consistent and correct use of latex condoms is highly effective in preventing the sexual transmission of HIV. It also reduces the risk of other sexually transmitted infections, particularly those transmitted by genital secretions, and may reduce the risk for HPV infection.

### Financial Barriers

Contraceptive use is essentially universal in the United States: Ninety-eight percent of sexually experienced American women have used a method at some point in their lives. However, many women face problems in using contraceptives or using them consistently. Among the 43 million women at risk of an unintended pregnancy in 2002, 6% did not use a method all year, 10% had a gap in use of at least one month and 19% reported inconsistent use (e.g., skipped pills). This behavior has clear consequences: The one-third of women who do not use a method or who use one inconsistently account for 95% of unintended pregnancies.

Although there are myriad reasons behind these distressing statistics, cost is one important barrier. Brand-name versions of the pill, patch or ring can cost a woman upwards of $60 per month if paid entirely out-of-pocket, not including the cost of a visit to a health care provider. Long-acting or permanent methods, such as the IUD, implant or sterilization, are most effective and cost-effective, but can entail hundreds of dollars in up-front costs.

These costs affect individual women's behavior. A national survey from 2004 found that one-third of women using reversible contraception would switch methods if they did not have to worry about cost; these women were twice as likely as others to rely on lower-cost, less effective methods. According to another recent study of 10,000 women in the St. Louis area, when offered the choice of any contraceptive method at no cost, two-thirds chose long-acting methods—a level far higher than in the general population. Findings like this help explain why rates of unintended pregnancies are far higher among poor and low-income women than among their higher-income counterparts.

001367

Exhibit 134

JA-0001761

Insurance coverage is designed to help people overcome these financial barriers. One-quarter of uninsured Americans went without needed care in 2009 because of cost, versus 4% of privately insured adults. And according to three recent studies, lack of insurance is significantly associated with reduced use of prescription contraceptives.

Yet, cost-sharing poses a significant problem even for women who are insured. A 2010 study found that women with private insurance that covers prescription drugs paid 53% of the cost of their oral contraceptives, amounting to $14 per pack on average. What they would pay for a full year's worth of pills amounts to 29% of their annual out-of-pocket expenditures for all health services.

Numerous studies have demonstrated that even seemingly small cost-sharing requirements can dramatically reduce preventive health care use, particularly among lower-income Americans. And removing these barriers can have a real impact: A recent study found that when a California health insurer eliminated cost-sharing for IUDs, implants and injectables, enrollees' use of these highly effective methods increased substantially, and their risk of contraceptive failure decreased as a result.

### Costs and Cost-Savings

Yet, although the costs of contraception can be daunting for individual women, insurance coverage of contraceptive services and supplies—both public and private—actually saves money. Guttmacher Institute research finds that every public dollar invested in contraception saves $3.74 in short-term Medicaid expenditures for care related to births from unintended pregnancies. In total, services provided at publicly funded family planning centers saved $5.1 billion in 2008. (Significantly, these savings do not account for any of the broader health, social or economic benefits to women and families from contraceptive services and supplies and the ability to time, space and prepare for pregnancies.) A 2010 Brookings Institution analysis came to the same conclusion, and projected that expanding access to family planning services under Medicaid saves $4.26 for every $1 spent.

In terms of costs and savings for the private sector, multiple studies over the past two decades have compared the cost-effectiveness of the various methods of contraception, finding that all of them are cost-effective when taking into account the costs of unintended pregnancies averted. The federal government, the nation's largest employer, reported that it experienced no increase in costs at all after Congress mandated coverage of contraceptives for federal employees. Moreover, a 2000 study by the National Business Group on Health, a membership group for large employers to address their health policy concerns, estimated that it costs employers 15–17% more to not provide contraceptive coverage in their health plans than to provide such coverage, after accounting for both the direct medical costs of pregnancy and indirect costs such as employee absence and reduced productivity. Mercer, the employee benefits consulting firm, reached a similar conclusion. And a more recent National Business Group on Health report, drawing on actuarial estimates by PricewaterhouseCoopers, concluded that even if contraception were exempted from cost-sharing, the savings from its coverage would exceed the costs.

### An Obvious Conclusion

In short, the scientific evidence and the balance of costs and benefits all point to the same conclusion: As the IOM panel and DHHS work to establish guidelines for women's preventive care and screenings, they have every reason to incorporate family planning. Such incorporation should include the full range of reversible and permanent contraceptive drugs, devices and procedures; related clinical services necessary to appropriately supply those methods, such as injections and the insertion and removal of an IUD or implant; and the counseling and patient education necessary to help women and men gauge their contraceptive needs and practice contraception most effectively.

Doing so would be consonant with a wide array of precedents for promoting contraception as preventive care (related article, Spring 2010, page 2). These include precedents from federal agencies
Continued on page 15

001368

Exhibit 134

JA-0001762

## Insurance Coverage of Contraceptive Services and Supplies

continued from page 10

and programs, including the CDC, the federally qualified health centers program and Medicaid. They include precedents from numerous respected health care provider associations, ranging from the American Medical Association to the American Academy of Pediatrics, as well as from prominent health promotion organizations such as the American Public Health Association, the March of Dimes and the National Governors Association.

Such a recommendation would be in line with current insurance industry standards, as the vast majority of private insurance plans today cover a comprehensive array of contraceptive services and supplies. And such a recommendation would be in line with previous recommendations of the IOM itself, including those in its 1995 report, *The Best Intentions: Unintended Pregnancy and the Well-Being of Children and Families,* which included one of the earliest calls for insurance coverage of contraceptive services and supplies without cost-sharing. www.guttmacher.org

001369

Exhibit 134

JA-0001763



**Testimony of**
**Guttmacher Institute**

**Submitted to the**
**Committee on Preventive Services for Women**
**Institute of Medicine**
**January 12, 2011**

The Guttmacher Institute is a private, nonprofit organization dedicated to advancing sexual and reproductive health in the United States and worldwide through research, policy analysis and public education. We are pleased to have the opportunity to submit this testimony on women's preventive health services and the provision of the Patient Protection and Affordable Care Act known commonly as the Women's Health Amendment.

The Women's Health Amendment will allow the Department of Health and Human Services, with this panel's assistance, to address critical gaps in the package of preventive services currently required to be covered without cost-sharing by all new private health plans. We will focus on one such gap that falls within the Guttmacher Institute's primary areas of expertise: family planning. Specifically, we urge this panel to recommend that the Department comprehensively incorporate under the rubric of women's preventive care and screenings the full range of reversible and permanent contraceptive drugs, devices and procedures; related clinical services necessary to appropriately supply those methods, including injections, insertion and removal of an IUD or implant, and fitting for a diaphragm or cervical cap; and the contraceptive counseling needed to promote optimal method choice and effective use.

Contraceptive services and supplies fit any reasonable definition of preventive care, and their effectiveness is supported by a strong body of evidence. Contraception helps women avoid unintended pregnancy and improve birthspacing, with substantial, positive consequences for infants, women, families and society. Although cost can be a daunting barrier to effective contraceptive use for an individual woman, insurance coverage of contraceptive services and supplies without cost-sharing is a low-cost—or even cost-saving—means of helping women overcome this obstacle. For all these reasons, contraceptive services have long been recognized by government bodies and a wide range of other experts, including leading health care professional organizations, as a vital and effective component of preventive and public health care.

**001378**

Exhibit 135                                                                                                JA-0001764

## The Preventive Benefits of Contraceptive Services and Supplies

This is not the first time that the Institute of Medicine has considered contraception and unintended pregnancy in the United States. In a 1995 report, *The Best Intentions: Unintended Pregnancy and the Well-Being of Children and Families*, the Institute's Committee on Unintended Pregnancy described in detail the potential consequences of unintended pregnancy and the importance of contraceptive use for preventing them.[1] That report linked unintended pregnancy to a wide array of health, social and economic consequences, from delayed prenatal care and poor birth outcomes to maternal depression and family violence to a failure to achieve educational and career goals. And, indeed, one of its key recommendations for addressing unintended pregnancy was the same as our recommendation today: to reduce "financial barriers" to contraceptive use by "increasing the proportion of all health insurance policies that cover contraceptive services and supplies, including both male and female sterilization, with no copayments or other cost-sharing requirements, as for other selected preventive health services."

A 2009 report from another Institute of Medicine panel, this one assigned to review the Title X national family planning program, echoed the 1995 report's findings about the risks of unintended pregnancy and also emphasized the importance of birthspacing in preventing such complications as low birth weight and premature birth.[2] A considerable amount of new research on these subjects has been published since the 1995 report, and the overall conclusions are well established: Contraceptive services and supplies are effective in helping women and couples time and space their pregnancies, and that in turn has important health, social and economic benefits.

### Preventing Unintended Pregnancy and Helping Women Plan and Space Pregnancies

- *Contraceptive methods are highly effective for the prevention of pregnancy.*

  The Food and Drug Administration has approved a wide range of contraceptive methods for preventing unintended pregnancy. All of these methods, if used perfectly, would have negligible failure rates. In practice, methods vary in how effective they are, with methods that require more user involvement having higher "typical use" failure rates than those that require less. Still the use of any method is still far more effective than using no method at all, since couples using no method of contraception have approximately an 85% chance of an unintended pregnancy within 12 months.[3,4]

  Female and male sterilization, the IUD and the implant all have typical use failure rates of 1% or less, meaning that couples have a 1% or less change of an unintended pregnancy within the first 12 months of using them.[3,5] The typical use failure rates for injectable and oral contraceptives are 7% and 9%, respectively, due to some women missing or delaying an injection or pill.[6] The probability of failure for couples using condoms (17%) is somewhat higher, again primarily due to imperfect use of the method. And, the failure rate for couples using fertility-awareness-based methods results is even higher (25%), although use of such methods is still far more effective than using no method at all.

**001379**

Exhibit 135                                                                                    JA-0001765

- *Contraceptive use reduces the occurrence of unintended pregnancy and abortion.*

The effectiveness of contraceptive use for individual women and couples translates into lower rates of unintended pregnancy and subsequent abortion among the broader population. Cross-country comparisons provide some evidence for this relationship: Unintended pregnancy in the United States is higher than in other developed countries, and contraceptive use is lower. Whereas 49% of pregnancies in the United States are unintended, the corresponding percentage in France is only 33%, and in Edinburgh, Scotland, it is only 28%.[7] Compared with the United States, these countries have much lower proportions of women at risk for unintended pregnancy who use no contraception at all; while this figure is 11% in the United States, it is only 3% in France and 3% in the United Kingdom.

International comparisons also provide evidence that contraceptive use reduces women's recourse to abortion. A 2005 analysis of trends in central Asia and eastern Europe, for example, found that as use of modern contraceptive methods increased rapidly in those regions during the 1990s, abortion rates declined significantly, even as fertility rates and the number of children desired also declined.[8] A 2010 study focusing on the nation of Georgia found that the increased use of modern contraception was a significant contributor to that country's drop in abortion rates between 1999 and 2005, explaining 54% of the decline.[9]

Trends in unintended pregnancy rates in the United States provide further evidence of the effectiveness of contraceptive use. The proportion using contraceptives among unmarried women at risk of unintended pregnancy increased from 80% in 1982 to 86% in 2002; this increase was accompanied by a decline in unmarried women's unintended pregnancy and abortion rates over the same period, with the abortion rate for unmarried women falling from 50 per 1,000 women in 1981 to 34 per 1,000 in 2000.[10]

Similarly, increased contraceptive use led to a decline in the risk of pregnancy among adolescents. One study found that from 1991 to 2003, contraceptive use improved among sexually active U.S. high school students, with an increase in the proportion reporting condom use at last sex (from 38% to 58%), and declines in the proportions using withdrawal (from 19% to 11%) and no method (18% to 12%); these adolescents' risk of pregnancy declined 21% over the 12 years.[11] Another study found that increased contraceptive use was responsible for 77% of the sharp decline in pregnancy among 15–17-year-olds between 1995 and 2002 (decreased sexual activity was responsible for the other 23%); and increased contraceptive use was responsible for all of the decline in pregnancy among 18–19-year-olds.[12]

Contraception's impact on unintended pregnancy can be seen in the accomplishments of federal and state programs providing public funding for family planning services. More than nine million clients received publicly funded contraceptive services in 2006, and that national effort helped women avoid 1.94 million unintended pregnancies, including 810,000 abortions.[13] By facilitating access to a more effective mix of contraceptive methods, publicly funded family planning centers enable their clients to have 78% fewer unintended pregnancies than are expected among similar women who do not use or do not have access to these services. Indeed, in the absence of this public effort, levels of unintended pregnancy and abortion would be nearly two-thirds higher among U.S. women overall and close to twice as high among poor women. Similar results have been found through evaluations of specific state programs. For example, California's Family PACT program, which provides expanded access to family planning services under Medicaid,

001380

Exhibit 135                                                                          JA-0001766

provided contraceptives to nearly one million women in 2007, and helped them avoid 287,000 unintended pregnancies, including 79,000 to teenagers, and as a result, 118,200 abortions.[14]

- *Contraceptive use helps women and couples time and space their births.*

  Medicaid family planning eligibility expansions that have been implemented in about half the states also provide evidence of the effectiveness of contraceptive use in helping women avoid short intervals between births, thereby reducing the risk of poor birth outcomes (see **Improving Maternal and Child Health**, below). In Arkansas, repeat births within 12 months dropped 84% between 2001 and 2005 for women enrolled in the family planning expansion, and the proportion having a repeat delivery within 48 months fell by 31%.[15] In New Mexico, women accessing family planning services under the expansion were less likely to have a repeat delivery within 24 months than were women who did not access expansion services, 35% compared with 50%.[16] In Rhode Island, the proportion of mothers on Medicaid with birth intervals of less than 18 months fell from 41% in 1993 to 28% in 2003, and the gap between privately insured and publicly insured women narrowed from 11 percentage points to less than one point.[17] And in Texas, 18% of expansion participants had a repeat birth within 24 months, compared with 29% of Medicaid-eligible women who did not participate in the program.[18]

- *Contraceptive counseling can help women and couples improve contraceptive use.*

  There have been few robustly designed studies of the effectiveness of contraceptive counseling, and some had large losses to follow up and other methodological problems.[19,20,21] Yet, there are several strong findings in this area. A recent literature review found moderately strong evidence that postpartum counseling increased contraceptive use and decreased unplanned pregnancy rates, particularly for longer-term, more intensive counseling interventions.[22] There is also strong evidence of the effectiveness of one-on-one contraceptive counseling for teens at family planning clinics in increasing method use and decreasing risky behavior in the short term.[23]

  In addition, there is strong evidence that interventions that target contraceptive knowledge are effective, particularly among teens. Literature reviews of sex education and contraceptive education programs targeting teens have found very strong, positive effects on contraceptive use and unintended pregnancy risk.[23,24]

## Improving Maternal and Child Health

- *Helping women and couples time and space their pregnancies improves birth outcomes.*

  The most direct, positive effects of helping women and couples plan the number and timing of their pregnancies and births are those related to improving birth outcomes. Short birth intervals have been linked with numerous negative perinatal outcomes. U.S. and international studies have found a causal link between the interpregnancy interval (the time between a birth and a subsequent pregnancy) and three major measures of birth outcomes: low birth weight, preterm birth and small size for gestational age.[25,26] For this reason, contraceptive use to help women achieve optimal spacing is important to help them improve their infants' health.

001381

Exhibit 135                                                                        JA-0001767

- *Planned and wanted pregnancies improve pregnancy-related behavior and outcomes.*

Unintended pregnancy has also been linked with a range of negative outcomes, particularly in regard to maternal behavior. A comprehensive review of the literature from 2008 reports that numerous U.S. and European studies have found a significant association between pregnancy intention and delayed initiation of prenatal care.[27] This stems in part from the fact that women are less likely to recognize a pregnancy early (within the first six weeks) if it is unplanned. Early recognition of pregnancy also affects the frequency of prenatal care visits, although after controlling for early recognition, pregnancy intention itself does not.

According to the same literature review, nearly all the relevant U.S. and European studies have found that children who are born from unintended pregnancies are less likely to be breastfed and are more likely to be breastfed for a shorter duration, compared with children whose births were intended.[27] Breastfeeding, in turn, has been linked with numerous positive outcomes throughout a child's life.

Moreover, although evidence is limited, several studies from the United States, Europe and Japan suggest an association between unintended pregnancy and subsequent child abuse. There is also some evidence of an association between unintended pregnancy and maternal depression and anxiety, although the strength of this finding is limited by poor study design.[27]

By contrast, maternal risk behaviors, receipt of preventive and curative care during infancy and childhood, and birth outcomes (e.g., low birth weight and premature delivery) are not strongly related to pregnancy intention, as measured by the mother's preferences, once family-background variables are included.[27]

There is some evidence, however, that the father's intention status has significant effects on prenatal behaviors and some measures of child health. Several studies have found that unintendedness of the pregnancy by the father has negative effects on the father's involvement during pregnancy and post-birth.[28,29,30] The level of father involvement during pregnancy, in turn, is associated both with the mother's receipt of prenatal care and the likelihood of the mother reducing smoking during pregnancy. And parental discordance in pregnancy intentions can have adverse effects. In particular, infants born to mothers and fathers who differed in their pregnancy intention face significantly higher risks of several adverse maternal behaviors and birth outcomes than those born to parents both intending the birth.[31]

## Securing Additional Health, Social and Economic Benefits

- *Preventing unintended pregnancy can reduce risks to relationship stability.*

There is also some evidence that unintended pregnancy has significant negative effects on relationship stability. Both marriages and cohabitations are more likely to dissolve after an unintended first birth than after an intended first birth, even after controlling for a range of socio-demographic variables.[32]

Moreover, mothers and fathers who have an unplanned birth report less happiness and more conflict in their relationship and more depressive symptoms for the mother, compared with

001382

Exhibit 135

JA-0001768

similar women and men who have a planned birth.[33] Unintendedness of the pregnancy by the father, in particular, is associated with greater relationship conflict and has very slight (though statistically significant) negative effects on children's attachment security and mental proficiency.[30]

- *Prevention of unintended pregnancy with increased access to effective contraception improves social and economic conditions for women and society.*

  Several studies have examined the role that contraceptive use has played in improvements in social and economic conditions for women. These studies have focused on oral contraceptives, the introduction of which in the 1960s marked the beginning of the era of modern contraceptive use. The pill remains the most popular form of reversible contraception in the United States today.

  The advent of the pill allowed women greater freedom in career decisions in two main ways. The first is that having a reliable form of contraception allowed women to invest in higher education and a career with far less risk of an unplanned pregnancy. Secondly, the pill led to an increase in the age at first marriage across the total population; as a result, a woman could pursue a career or education before marrying while facing less of a risk that she would be unable to find a desirable husband later.[34]

  Researchers have been able to study these phenomena by looking at data over time and across states, taking advantage of changes in state policies during the late 1960s and early 1970s that lifted restrictions on access to the pill for young, unmarried women. One study found that legal access to the pill led to increased pill use and age at first marriage in these states, and in turn, increased these women's participation in the workforce.[35] A second study concluded that legal access to the pill before age 21 significantly reduced the likelihood of a first birth before age 22, increased the number of women in the paid labor force and raised the number of annual hours worked.[36] And a third study found that early legal access to the pill led to more children born to mothers who were married, college-educated and had pursued a professional career.[37]

- *Contraceptive methods have additional health benefits unrelated to preventing and timing pregnancy.*

  A 2010 practice bulletin from the American College of Obstetricians and Gynecologists summarizes a large body of literature discussing the noncontraceptive benefits of hormonal contraceptive methods.[38] It finds that hormonal methods can help address several menstrual disorders, including dysmenorrhea (severe menstrual pain) and menorrhagia (excessive menstrual bleeding, which can lead to anemia if untreated). Methods that contain both estrogen and progesterone can address excess hair growth and acne. Hormonal contraceptives can also prevent menstrual migraines, treat pelvic pain due to endometriosis and treat bleeding due to uterine fibroids. Perhaps most notably, oral contraceptives have been shown to have clear, long-term benefits in reducing a woman's risk of developing endometrial and ovarian cancer, and to provide short-term protection against colorectal cancer.

001383

Exhibit 135                                                                                                    JA-0001769

And, of course, the male and female condom can help prevent sexually transmitted infections, including HIV, among sexually active women and men.[39,40] According to the most recent summary of the evidence by the Centers for Disease Control and Prevention (CDC):

> Latex condoms, when used consistently and correctly, are highly effective in preventing the sexual transmission of HIV, the virus that causes AIDS. In addition, consistent and correct use of latex condoms reduces the risk of other sexually transmitted diseases (STDs), including diseases transmitted by genital secretions, and to a lesser degree, genital ulcer diseases. Condom use may reduce the risk for genital human papillomavirus (HPV) infection and HPV-associated diseases, e.g., genital warts and cervical cancer.[41]

## Financial Barriers to Contraceptive Use

Contraceptive use is an essentially universal experience in the United States; 98% of sexually experienced American women have used a contraceptive method at some point in their lives.[42] But many women face problems in doing so. Only two-thirds of the 43 million sexually active women at risk of an unintended pregnancy in 2002 were practicing contraception consistently and correctly all year. Six percent did not use a method all year, 10% had a gap in use of at least one month and 19% reported inconsistent use, such as skipping pills. This behavior has clear consequences: The one-third of women reporting nonuse or inconsistent use account for 95% of unintended pregnancies.[43]

As the Institute of Medicine, among many others, has itself acknowledged, there are myriad reasons why women and couples do not practice contraception or make imperfect use of a method.[1] No one intervention will eliminate unintended pregnancy and ensure that all births are planned ones. Nevertheless, it is clear that the financial costs of contraceptive services and supplies are one important barrier to effective use. Requiring insurance plans to cover contraception without cost-sharing would help women overcome this barrier.

- *The costs of contraceptive services and supplies can be considerable.*

  Methods of contraception vary not only in their effectiveness, but also in their costs and the timing of those costs. Condoms are relatively inexpensive on an individual basis, but 50 cents or a dollar per use can add up to substantial amounts of money over a year, much less the 30 years that the typical woman spends trying to avoid pregnancy. Brand-name versions of the pill, patch or ring can cost upwards of $60 per month if paid for entirely out-of-pocket, although generic oral contraceptives can cost considerably less; these methods also require periodic visits to a health care provider, at additional cost. Long-acting or permanent methods, such as the IUD, implant or sterilization, are most effective and cost-effective, but all can entail hundreds of dollars in up-front costs.[43]

  For many women, including the 11 million women of reproductive age (15–44) with incomes below the federal poverty level in 2009,[44] these can be daunting expenses. That can be true even for those women with insurance coverage: Average copayments in employer-sponsored insurance have increased considerably over the past decade, to $49 in 2010 for "nonpreferred" brand-name drugs, $28 for preferred drugs and $11 for generics, for plans with a three-tier formulary (the industry standard).[45] With copayments so high, private insurance is in many cases

001384

Exhibit 135                                                                    JA-0001770

today providing only a marginal discount from what a woman would pay out-of-pocket at a drug store without insurance. In fact, a 2010 study found that privately insured women using oral contraceptives whose plan covered prescription drugs paid half (53%) of the cost of the pills, amounting to $14 per pack, on average. The same study found that the out-of-pocket expenditures for a full year's worth of pills amounted to 29% of the women's annual out-of-pocket expenditures for all health services.[46]

- *Cost concerns are an important factor in contraceptive method choice and use.*

Several studies indicate that costs play a key role in the contraceptive behavior of substantial numbers of U.S. women. A national survey from 2004 of women 18–44 who were using reversible contraception found that one-third of them would switch methods if they did not have to worry about cost; only four in 10 of those women were using a hormonal method or an IUD, and nearly half were relying on condoms. In fact, women citing cost concerns were twice as likely as other women to rely on condoms or less effective methods like withdrawal or periodic abstinence.[47]

Similarly, in a nationally representative survey from 2005 of private family practice physicians and obstetrician-gynecologists, two-thirds of the providers believed that at least 10% of their clients experienced difficulty paying for visits or services, including 7% of providers who believed this was the case for at least half their clients. Six in 10 of the family practice physicians and seven in 10 of the obstetrician-gynecologists believed that reducing costs for insured patients by improving coverage of contraceptive care would be very important for improving their patients' contraceptive method use. A parallel survey of providers at publicly supported clinics found similar results, although more of them (22%) reported having at least 50% of their clients experiencing cost barriers.[48]

The current recession, more severe in depth and length than any in this country in decades, has provided further evidence. A 2009 study of low- and middle-income sexually active women found that 52% of them were worse off financially than the year before. Of those who were worse off, three-quarters said that they could not afford to have a baby right then. And while nearly four in 10 of those worse off reported being more careful in their contraceptive use in the current economic climate, many of the financially challenged women reported barriers to contraceptive use: 34% said they had a harder time paying for birth control, 30% had put off a gynecology or birth control visit to save money, 25% of pill users saved money through inconsistent use and 56% of those with jobs worried about having to take time off from work to visit a doctor or clinic.[49]

A recent study of 10,000 women in the St. Louis area provides clear evidence of the impact that removing financial barriers can have on contraceptive use. When study participants were offered the choice of any contraceptive method, including long-acting reversible methods of contraception such as the IUD and implant, at no cost, two-thirds chose long-acting methods, a level far higher than in the general population.[50]

All of this helps explain why, according to the most recent data, rates of unintended pregnancies are far higher among poor women (112 per 1,000 women under 100% poverty in 2001) and low-income women (81 per 1,000 women at 100–199% poverty) than among higher-income women

001385

Exhibit 135                                                                                          JA-0001771

(29 per 1,000 women at or above 200% poverty).[51] Indeed, that disparity increased substantially between 1994 and 2001, as the unintended pregnancy rate declined among higher-income women but grew among poor and lower-income women.

- *Insurance coverage improves use of needed care, including contraceptive care.*

  Insurance coverage is designed to help people afford the care they need, and there is ample evidence that it does so. One-quarter of uninsured adults say they went without needed care in 2009 because of its cost, compared to 4% of adults with private coverage. Similar numbers said they could not afford to fill a prescription. More than half reported having no usual source of health care, versus only 10% among the privately insured. The uninsured have also been shown to be less likely to receive timely preventive care and screenings.[52]

  Researchers have found similar results specifically related to insurance coverage and contraceptive use. Comparing publicly or privately insured women with uninsured women, three recent studies have found that lack of insurance is significantly associated with reduced use of prescription contraceptives, even when controlling for a range of sociodemographic factors.[53,54,55] One of these studies also indicated that prescription contraceptive use increased between 1995 and 2002 among privately insured women because of state contraceptive coverage mandates enacted during that period, although the evidence on this point is less strong.[53]

  In addition, there is some evidence from states' Medicaid family planning eligibility expansions that coverage of contraceptive services and supplies has helped women improve their use of contraceptives. In Washington state, for example, the proportion of clients using a more effective method (defined as hormonal methods, IUDs and sterilization) increased from 53% at enrollment to 71% one year later, according to the state's program evaluation.[56] Similarly, program clients in California were both more likely to use any method and to use a more effective method than they were before enrolling in the program.[14]

- *Removing cost-sharing barriers can further improve use of needed care.*

  Numerous studies have demonstrated that even seemingly small cost-sharing requirements can dramatically reduce use of health care, particularly among lower-income Americans. According to the most recent synthesis of this research, from December 2010, this is true for preventive care and prescription drugs, and most people do not distinguish between essential and nonessential care.[57] It is largely because of such findings that Congress has acted to eliminate cost-sharing for preventive services.

  There is evidence that the impact of cost-sharing would specifically apply to contraceptive services and supplies. A recent study looked at the impact of a 2002 change in benefits at Kaiser Permanente Northern California to eliminate cost-sharing for the most effective forms of contraception (IUDs, implants and injectables). It found sizable increases in use of these methods—by 137% for IUDs and 32% for injectables—and a resulting reduction in women's likelihood of contraceptive failure.[58]

001386

Exhibit 135                                                                    JA-0001772

A study from the early 1980s looked at a policy change in California under which the state began charging copayments for state-funded family planning services. The study, commissioned by the state department of health, found that  nearly one in four clinics that charged copayments saw a decrease in their client population, and a similar proportion reported a decrease in necessary follow-up visits.[59]

## Costs and Cost-Savings of Contraceptive Coverage

As with almost any attempt to mandate coverage of specific services in private insurance, a primary objection to designating contraception as preventive care under the Women's Health Amendment may be concerns that doing so would lead to increased premiums and more costs for the entire health care system. The evidence on that front may be mixed for preventive care in general, but that is not the case for contraception.

- *Public-sector services are highly cost-effective.*

Publicly funded contraceptive services and supplies have been demonstrated repeatedly to be highly cost-effective. For example, every dollar invested by the government for contraception saves $3.74 in Medicaid expenditures for pregnancy-related care related to births from unintended pregnancies. In total, the services provided at publicly funded family planning clinics resulted in a net savings of $5.1 billion in 2008.[60] Significantly, these savings do not account for any of the broader health, social or economic benefits to women and families from contraceptive services and supplies, and the ability to time, space and prepare for pregnancies.

Similar results have been found in program evaluations for states' Medicaid family planning expansions, and the Centers for Medicare and Medicaid Services recently noted that states have been allowed to initiate these expansions precisely because of their cost-effectiveness.[61] For example, according to a federally funded evaluation of states' expansions completed in 2003, all of the programs studied yielded significant savings to the federal and state governments, with states as diverse as Alabama, Arkansas, California, Oregon and South Carolina each saving more than $15 million in a single year.[62] More recently, Wisconsin estimated that its program generated net savings of $159 million in 2006,[63] and Texas estimated that its program yielded net savings of $42 million in 2008.[64]

A 2010 review of policy interventions designed to address unintended pregnancy found that publicly funded family planning efforts have been effective and "would be even more so if they could increase the use not just of contraceptives, but of long-acting, reversible contraceptive methods."[65] That same review presents simulations of the costs and benefits of three policy initiatives: a condom-promotion mass media campaign, a teen pregnancy prevention program addressing both abstinence and contraceptive use and a Medicaid family planning expansion. It found that all three would save substantial amounts of public dollars, with the Medicaid expansion saving $4.26 for every $1 spent.

001387

Exhibit 135                                                                    JA-0001773

- *Private insurance coverage of contraception is also cost-effective.*

  Multiple studies over the past two decades have compared the cost-effectiveness of the various methods of contraception, finding that all of them are cost-effective for private or public payers when taking into account the costs of unintended pregnancies averted.[43,66,67] Long-acting methods in particular are extremely cost effective when looking at a longer-term perspective (at least five years). According to the most recent analysis, from 2009, the copper IUD and vasectomy are most cost-effective.[43]

  Some studies have looked at cost-savings for private insurers specifically. Notably, the federal government, the nation's largest employer, reported that it experienced no increase in costs at all after Congress required coverage of contraceptives for federal employees in 1998.[68] A 2000 study by the National Business Group on Health, a membership group for large private- and public-sector employers to address their health policy concerns, estimated that it costs employers 15–17% more to *not* provide contraceptive coverage in employee health plans than to provide such coverage, after accounting for both the direct medical costs of pregnancy and indirect costs such as employee absence and reduced productivity.[69] Mercer, the employee benefits consulting firm, conducted a similar analysis that year and also concluded that contraceptive coverage should be cost-saving for employers.[70]

  These savings in private health insurance from covering contraception should only increase as a result of the Affordable Care Act, with its new requirements that will close gaps in the coverage of maternity care, prevent insurers from excluding coverage for preexisting conditions and encourage greater and more stable levels of insurance coverage overall.

- *Savings from covering contraceptive services and supplies—even without cost-sharing—can be expected to exceed the costs.*

  A more recent National Business Group on Health report—a 2007 guide for employers providing a recommended minimum set of benefits for maternal and child health—calls for coverage of the full range of prescription contraceptive methods, sterilization services, lab tests, counseling services and patient education. For all of the included preventive services, including those to prevent unintended pregnancy, the guide "recommends zero cost-sharing…to avoid real or perceived financial barriers, and to increase utilization."[71] The report includes actuarial estimates by PricewaterhouseCoopers for its recommendations. It found that the addition of the full range of contraceptive services and supplies without cost-sharing to a plan that currently includes no coverage at all would cost about $37 per member per year for an HMO and $41 for a PPO. Notably, the study estimates that PPO enrollees today pay about one-third of this amount in cost-sharing.

  Roughly $40 per member per year is miniscule when compared with overall insurance premiums: In 2010, average annual premiums in employer-sponsored coverage were $5,049 for an individual employee and $13,770 for family coverage.[45] Moreover, because most plans already include at least some of those benefits, the actual cost of meeting these recommendations would be considerably lower.

001388

Exhibit 135                                                                    JA-0001774

These actuarial estimates do not take into account the potential cost-savings from contraceptive care. Yet, based on prior research on the cost-effectiveness of covering contraception, the guide predicts that the savings from cost sharing–free coverage of contraceptive services and supplies will exceed the costs.[71]

## Precedents for Recommending Contraception as Preventive Care

Given the wealth of evidence supporting the effectiveness of contraception as preventive care, it may be surprising to some that this panel must consider the topic at all. It is doing so, however, because of limitations in the three other, existing sets of government-supported guidelines that Congress used as the basis for the preventive health coverage requirement it established as part of the Affordable Care Act. Two of those guidelines are limited in scope to immunizations and to pediatric care. The third— items or services currently recommended by the U.S. Preventive Services Task Force—has the potential to include contraceptive services and supplies, but does not do so currently. In fact, however, among the task force's roughly three dozen current A or B recommendations, only two recommend a specific type of preventive medication for some adult populations: aspirin to prevent cardiovascular disease and folic acid supplementation.[72]

The Women's Health Amendment, authored by Sen. Barbara Mikulski of Maryland, was designed to address these limitations by adding women's preventive care and screenings as a fourth category of mandated preventive services. Although much of the floor debate over the amendment centered on mammography, the provision itself was intended to guarantee coverage without cost-sharing of a far broader group of preventive services, notably including family planning.

Based on an analysis of the *Congressional Record*, at least six senators joined Mikulski in praising the amendment's inclusion of family planning. According to Sen. Al Franken of Minnesota, for example, "several crucial women's health services are omitted" from the U.S. Preventive Services Task Force's recommendations and "Senator Mikulski's amendment closes this gap" by including other key services, "such as the well woman visit, prenatal care, and family planning."[73] Similarly, Sen. Barbara Boxer of California asserted that "these health care services include annual mammograms for women at age 40, pregnancy and postpartum depression screenings, screenings for domestic violence, annual women's health screenings, and family planning services."[74] Her state colleague, Sen. Dianne Feinstein, also included family planning in describing the scope of the amendment, and then summed it up succinctly: "In other words, the amendment increases access to the basic services that are a part of every woman's health care needs at some point in her life."[75] Even Sen. Ben Nelson of Nebraska, who voted against the amendment because of spurious claims that it could mandate coverage of abortion, said he did so "with regret because I strongly support the underlying goal of furthering preventive care for women, including mammograms, screenings, and family planning."[76]

This recognition in the amendment's legislative history of family planning as preventive care was not revolutionary. Rather, these services have long been recognized by government bodies and other expert organizations as a vital, effective component of preventive and public health care. In including contraceptive services and supplies in its recommendations for women's preventive services, this panel would be following a wide array of precedents.

001389

Exhibit 135                                                                JA-0001775

**Precedents from the Federal and State Governments**

- *Family planning was designated one of the top 10 public health achievements of the 20th century by the Centers for Disease Control and Prevention.*

  Along with such other preventive care breakthroughs as the smallpox and polio vaccines, and the public health campaigns that have greatly reduced tobacco use, the CDC included the development of and improved access to effective contraception among the 10 great public health achievements of the 20th century. CDC described its decision-making process for including topics on this list as "based on the opportunity for prevention and the impact on death, illness, and disability in the United States."[77]

  According to the CDC report, access to family planning services has led to smaller families and improved birthspacing, which in turn have "contributed to the better health of infants, children, and women, and have improved the social and economic role of women."[78] The report also highlights the role of condoms in preventing STIs, and notes that the "noncontraceptive health benefits of oral contraceptives include lower rates of pelvic inflammatory disease, cancers of the ovary and endometrium, recurrent ovarian cysts, benign breast cysts and fibroadenomas, and discomfort from menstrual cramps."

- *Expanding access to family planning services to improve pregnancy planning and spacing and to prevent unintended pregnancy is a national goal under Healthy People 2020.*

  The federal *Healthy People* series is updated every decade by the Department of Health and Human Services to set the nation's prevention agenda through a set of science-based objectives for health promotion and disease prevention. Family planning was one of the five priority areas listed under "preventive health services" in the first *Healthy People* in 1979 and has been a major focus area in every edition.[79]

  In the current iteration of these goals, *Healthy People 2020*, there are 15 objectives within the family planning focus area, mostly related to preventing unintended pregnancy, improving birthspacing and improving contraceptive access and use. Notably for this panel, one of those objectives is to "increase the proportion of health insurance plans that cover contraceptive supplies and services."[80] That objective was first introduced in the 2010 iteration, which described it as important "because in the absence of comprehensive coverage, many women may opt for whatever method may be covered by their health plan rather than the method most appropriate for their individual needs and circumstances. Other women may opt not to use contraception if it is not covered under their insurance plan."[81]

  In describing why its family planning objectives are important, *Healthy People 2020* echoes the research findings laid out earlier in this testimony. Specifically, it highlights "negative outcomes associated with unintended pregnancy," including "delays in initiating prenatal care; reduced likelihood of breastfeeding; poor maternal mental health; lower mother-child relationship quality; [and] increased risk of physical violence during pregnancy." It also notes that "the negative outcomes associated with unintended pregnancies are compounded for adolescents. Teen mothers...are less likely to graduate from high school or attain a GED by the time they reach age

001390

Exhibit 135                                                                      JA-0001776

30; earn an average of approximately $3,500 less per year, when compared with those who delay childbearing; [and] receive nearly twice as much Federal aid for nearly twice as long."[82]

- *Contraceptive services and supplies are provided as preventive care under federal public health and insurance programs.*

Federal health programs provide additional precedents for recognizing contraception as preventive care. A key example is in the federal law authorizing funding for federally qualified health centers, Sec. 330 of the Public Health Service Act. Within the list of services that centers are required to make available is a collection of "preventive health services" that specifically includes family planning, alongside such others as prenatal and perinatal care, cancer screening, immunizations and well-child care.[83]

Similarly, states have for many years provided funding for family planning services under a variety of federal block grants with a preventive care focus, including the Maternal and Child Health Block Grant and the Preventive Health and Health Services Block Grant.[84] In fact, the maternal and child health program, which dates to the 1930s, was one of the first federal funding sources for contraception.

The most recent federal precedent for including contraception as preventive care is from the Medicaid program. A regulation issued in April 2010, in describing options for states in designing alternative Medicaid benefit packages under a 2006 law, includes a requirement for "family planning services and supplies and other appropriate preventive services, as designated by the Secretary [of Health and Human Services]."[85]

Medicaid also provides a different type of precedent: The program has for decades not only required family planning in all state programs, but also has exempted family planning services and supplies from all cost-sharing requirements. Those Medicaid requirements—along with the establishment of the Title X national family planning program around the same time in the early 1970s—were designed in large part to address the then-new research findings that closely spaced births and childbearing very early or late in a woman's reproductive years could lead to adverse health outcomes for both mothers and their children.

## Precedents from Nongovernmental Organizations

- *Contraceptive services and supplies are recommended as preventive care by numerous respected health care provider associations.*

A wide range of health care provider associations, including the American Medical Association, the American Academy of Family Physicians, the American Academy of Pediatrics, the American College of Obstetricians and Gynecologists (ACOG) and the Society for Adolescent Health and Medicine, have recommended the use and coverage of contraceptive services and supplies, including clinical contraceptive counseling.[86,87,88,89,90,9]

For example, ACOG has long argued that "contraception is basic, preventive health care and should be readily available and treated the same as prophylactic therapies for other medical

001391

Exhibit 135                                                                                    JA-0001777

conditions." Beyond their primary purpose of preventing unplanned pregnancies and promoting planned, healthy ones, hormonal contraceptives have for years been prescribed "to alleviate heavy bleeding, irregular periods, and acne and to protect against a number of other health problems that affect women, such as ovarian cysts, bone loss, benign breast disease, the symptoms of polycystic ovary syndrome, and anemia."[92]

The American Academy of Pediatrics, similarly, has promulgated preventive care standards for minors that include family planning services. Its 2010 list of insurance billing codes for pediatric preventive care, for example, include those for contraceptive management, as well as the routine gynecologic examination and pelvic exams that are often a part of a family planning visit.[93] Its *Bright Futures* guidelines—one of the other federally supported guidelines upon which the Affordable Care Act's preventive coverage requirement is based—include "promoting healthy sexual development and sexuality" as one of its 10 health promotion themes, asserting that "information about contraception, including emergency contraception and STIs, should be offered to all sexually active adolescents and those who plan to become sexually active."[94]

- *Access to contraceptive services and supplies is supported by health promotion organizations.*

Family planning has also been a long-standing focus area for a number of other key health promotion organizations. That includes the American Public Health Association (APHA), perhaps the nation's preeminent umbrella group for public health and preventive care. As early as the 1950s, APHA position statements highlighted "the healthful effects of family planning and spacing of births,"[95] and the APHA's Population, Reproductive and Sexual Health section—one of 27 sections within the association—was founded in 1975. APHA has been an active supporter of increased access to contraception to help women and couples time, space and limit the number of their children.[96]

The March of Dimes has lent its support to expanded access to contraceptive services and supplies, noting that a "central purpose of family planning is to promote healthy births," by improving birthspacing and helping women obtain timely prenatal care.[97] The organization argues that timing a pregnancy can help a woman prevent potential pregnancy complications, such as gestational diabetes, and appropriately manage preexisting conditions that may be exacerbated by pregnancy, such as hypertension. The National Governors Association, similarly, has taken the position that expanding Medicaid eligibility for family planning is an important step states can take to improve birth outcomes because of the demonstrated ability of these programs to increase spacing between births.[98]

The National Business Group on Health has published two major reports in the past several years that recommend insurance coverage of contraceptive services and supplies as effective and cost-effective preventive care. As noted above, its 2007 guide for employers on maternal and child health, created in partnership with the Health Resources and Services Administration, recommends coverage without cost-sharing of a comprehensive set of unintended pregnancy prevention services as part of a recommended minimum set of benefits for preventive care.[71] And its 2006 guide for employers on clinical preventive services, created in partnership with the CDC, includes recommendations for covering counseling on contraceptive use and the full range of

001392

Exhibit 135                                                                        JA-0001778

reversible and permanent contraceptive methods, citing an extensive body of research evidence and provider guidelines.[99]

- *Comprehensive coverage of contraceptive services and supplies is the current insurance industry standard.*

According to the last in-depth study of insurance coverage of contraception—a nationally representative survey of private U.S. health insurers in 2002—almost every reversible and permanent contraceptive method available was covered by 89% or more of typical insurance plans, with similarly strong coverage of both the methods themselves and related services (such as the insertion and removal of a long-acting method). Eighty-six percent were covering all five of the leading reversible methods at the time, and only 2% were covering none of them.[100] More recent surveys of employers' health plans have found similarly high levels of coverage for oral contraceptives or prescription contraceptives generally.[45,101]

However, current coverage is likely to be less common and comprehensive than those data indicate for some types of plans, especially those offered by small employers and those sold to individuals. Moreover, studies have demonstrated little about whether plans are adequately covering the time that health care providers need for contraceptive counseling services, but anecdotal reports indicate that such reimbursement is limited at best and is a major disincentive for providers.

The high levels of current coverage are in marked contrast to coverage levels in 1993, when only 28% of typical insured plans covered the five leading reversible contraceptive methods, and the same percentage covered none at all.[100] The increase during the late 1990s was driven in part by the advent of state laws requiring insurance plans that cover other prescription drugs to cover the full range of prescription contraceptive drugs and devices. Today, 27 states have such a legal requirement in place for the plans they regulate.[102] Congress has included a similar requirement for plans participating in the Federal Employees Health Benefits Program in every annual appropriations law since 1998. Moreover, the Equal Employment Opportunity Commission in December 2000 issued a finding that an employer's failure to cover prescription contraceptive drugs and devices in a health plan that covers other drugs, devices and preventive care is discrimination against women in violation of Title VII of the Civil Rights Act.[103]

*********

In conclusion, the scientific evidence, the public- and private-sector precedents, and the balance of costs and benefits all point to the same conclusion: As this panel establishes its recommendations for women's preventive care and screenings, it has every reason to comprehensively incorporate family planning services. This must include coverage for the full range of reversible and permanent contraceptive drugs, devices and procedures; related clinical services necessary to appropriately supply those methods, such as insertion and removal; and the counseling and patient education that health care providers should routinely provide to help women and men gauge their own contraceptive needs and practice contraception most effectively.

**001393**

Exhibit 135                                                                                    JA-0001779

[1] Brown SS and Eisenberg LE, eds., *The Best Intentions: Unintended Pregnancy and the Well-Being of Children and Families*, Washington, DC: National Academy Press, 1995.

[2] Butler AS and Clayton EW, eds., *A Review of the HHS Family Planning Program: Mission, Management, and Measurement of Results*, Washington, DC: National Academies Press, 2009.

[3] Hatcher RA et al., eds., *Contraceptive Technology*, 19th ed., New York: Ardent Media, 2007.

[4] Trussell J and Kost K. Contraceptive failure in the United States: A critical review of the literature. *Studies in Family Planning* 18(5):237-283, September/October 1987.

[5] Fu H et al., Contraceptive failure rates: new estimates from the 1995 National Survey of Family Growth, *Family Planning Perspectives*, 1999, 31(2):56–63.

[6] Kost K et al., Estimates of contraceptive failure from the 2002 National Survey of Family Growth, *Contraception*, 2008, 77(1):10–21.

[7] Trussell J, Reducing unintended pregnancy in the United States, *Contraception*, 2008, 77(1):1–5.

[8] Westoff CF, Recent trends in abortion and contraception in 12 countries, *DHS Analytical Studies*, Calverton, Maryland: ORC Macro, 2005, No. 8.

[9] Serbanescu F, Stupp P and Westoff CF, Contraception matters: two approaches to analyzing evidence of the abortion decline in Georgia, *International Perspectives on Sexual and Reproductive Health*, 2010, 36(2):99–110.

[10] Boonstra HD et al., *Abortion in Women's Lives*, New York: Guttmacher Institute, 2006.

[11] Santelli JS et al., Contraceptive use and pregnancy risk among U.S. high school students, 1991–2003, *Perspectives on Sexual and Reproductive Health*, 2006, 38(2):106–111.

[12] Santelli JS et al., Explaining recent declines in adolescent pregnancy in the United States: the contribution of abstinence and improved contraceptive use, *American Journal of Public Health*, 2007, 97(1):1–7.

[13] Gold RB et al., *Next Steps for America's Family Planning Program: Leveraging the Potential of Medicaid and Title X in an Evolving Health Care System*, New York: Guttmacher Institute, 2009.

[14] Biggs MA, et al., *Cost-Benefit Analysis of the California Family PACT Program for Calendar Year 2007*, San Francisco: Bixby Center for Global Reproductive Health, University of California, San Francisco, 2010, <http://bixbycenter.ucsf.edu/publications/files/FamilyPACTCost-BenefitAnalysis2007_2010Apr.pdf>, accessed Nov. 21, 2010.

[15] Fay W, Boozman College of Public Health, University of Arkansas for Medical Services (UAMS), *Evaluation of the Women's Health Waiver*, unpublished evaluation submitted to Arkansas Department of Health and Human Services, revised June 2007.

[16] New Mexico Medical Review Association, *Family Planning Waiver Evaluation: July 1, 1998–June 30, 2006*, unpublished evaluation submitted to New Mexico Human Services Department, revised Dec. 2006.

[17] Unpublished tabulations of data from the RIte Care Research and Evaluation Project, 2005.

[18] Texas Health and Human Services Commission, *Women's Health Program Annual Report 2008*, no date, <http://www.hhsc.state.tx.us/reports/2010/WHP_2008AnnualReport.pdf>, accessed Dec. 15, 2010.

[19] Moos MK, Bartholomew NE and Lohr KN, Counseling in the clinical setting to prevent unintended pregnancy: an evidence-based research agenda, Contraception, 2003, 67(2):115–132.

[20] Ferreira AL et al., Effectiveness of contraceptive counselling of women following an abortion: a systematic review and meta-analysis, *European Journal of Contraception and Reproductive Health Care*, 2009, 14(1):1–9.

[21] Langston AM, Rosario L and Westhoff CL, Structured contraceptive counseling—a randomized controlled trial, *Patient Education and Counseling*, 2010, 81(3):362–367.

[22] Lopez LM, Hiller JE and Grimes DA, Education for contraceptive use by women after childbirth, *Cochrane Database of Systematic Reviews*, 2010, Issue 1, CD001863.

[23] Kirby D, *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases*, Washington, DC: National Campaign to Prevent Teen and Unplanned Pregnancy, 2007, <http://www.thenationalcampaign.org/EA2007/EA2007_full.pdf>, accessed Dec. 28, 2010.

[24] Suellentrop K, *What Works 2010: Curriculum-Based Programs That Help Prevent Teen Pregnancy*, Washington, DC: National Campaign to Prevent Teen and Unplanned Pregnancy, 2010, <http://www.thenationalcampaign.org/resources/pdf/pubs/WhatWorks.pdf>, accessed Dec. 28, 2010.

[25] Conde-Agudelo A, Rosas-Bermúdez A and Kafury-Goeta AC, Birthspacing and risk of adverse perinatal outcomes: a meta-analysis, *JAMA*, 2006, 295(15):1809–1823

[26] Zhu BP, Effect of interpregnancy interval on birth outcomes: findings from three recent US studies, *International Journal of Gynecology and Obstetrics*, 2005, 89(supplement 1):S25–S33.

**001394**

Exhibit 135                                                                    JA-0001780

[27] Gipson JD, Koenig MA and Hindin MJ, The effects of unintended pregnancy on infant child and parental health: a review of the literature, *Studies on Family Planning*, 2008, 39(1):18–38.

[28] Martin LT et al., The effects of father involvement during pregnancy on receipt of prenatal care and maternal smoking, *Maternal and Child Health Journal*, 2007, 11(6):595–602.

[29] Bronte-Tinkew J et al., Resident father's pregnancy intentions, prenatal behaviors, and links to involvement with infants, *Journal of Marriage and Family*, 2007, 69(4):977–990.

[30] Bronte-Tinkew J, Scott ME and Horowitz A, Male pregnancy intendedness and children's mental proficiency and attachment security during toddlerhood, *Journal of Marriage and Family*, 2009, 71(4):1001–1025.

[31] Korenman S, Kaestner R and Joyce T, Consequences for infants of parental disagreement in pregnancy intention, *Perspectives on Sexual and Reproductive Health*, 2002, 34(4):198–205.

[32] Guzzo KB, Hayford SR, Relationship stability following an unintended birth, paper presented at the Population Association of America meeting, Dallas, TX, April 2010.
<http://paa2010.princeton.edu/download.aspx?submissionId=100221>

[33] National Campaign to Prevent Teen and Unplanned Pregnancy, Unplanned pregnancy and family turmoil, *Science Says*, 2008, Washington, DC: National Campaign to Prevent Teen and Unplanned Pregnancy, No. 34.

[34] Goldin C and Katz L, Career and marriage in the age of the pill, *American Economic Review*, 2000, 90(2):461–465.

[35] Goldin C and Katz LF, The power of the pill: oral contraceptives and women's career and marriage decisions, *Journal of Political Economy*, 2002, 110(4):730–770.

[36] Bailey MJ, More power to the pill: the impact of contraceptive freedom on women's life cycle labor supply, *Quarterly Journal of Economics*, 2006, 121(1):289–320.

[37] Annnat E O and Hungerman DM, The power of the pill for the next generation, *National Bureau of Economic Research Working Paper*, 2007, Cambridge, MA: National Bureau of Economic Research, No. 13402.

[38] American College of Obstetricians and Gynecologists, Practice bulletin no. 110: noncontraceptive uses of hormonal contraceptives, *Obstetrics & Gynecology*, 2010, 115(1):206–218.

[39] Weller SC and Davis-Beaty K, Condom effectiveness in reducing heterosexual HIV transmission, *Cochrane Database of Systematic Reviews*, 2002, Issue 1, No. CD003255.

[40] Best K, Family planning and the prevention of mother-to-child transmission of HIV: a review of the literature, *Working Paper Series*, Chapel Hill, NC: FHI, 2004, No. WP04-01.

[41] Centers for Disease Control and Prevention, *Condoms and STDs: Fact Sheet for Public Health Personnel*, 2010, <http://www.cdc.gov/condomeffectiveness/docs/Condoms_and_STDS.pdf>, accessed Dec. 31, 2010.

[42] Chandra A et al., Fertility, family planning and reproductive health of U.S. women: data from the 2002 National Survey of Family Growth, *Vital Health Statistics*, 2005, Series 23, No. 25.

[43] Trussell J et al., Cost effectiveness of contraceptives in the United States, *Contraception*, 2009, 79(1):5–14.

[44] Jones R, special tabulations of data from the 2010 Current Population Surveys, 2010.

[45] Claxton G et al., *Employer Health Benefits: 2010 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation and Chicago, IL: Health Research and Educational Trust, 2010, <http://ehbs.kff.org/pdf/2010/8085.pdf>, accessed Dec. 30, 2010.

[46] Liang SY, Grossman D and Phillips KA, Women's out-of-pocket expenditures and dispensing patterns for oral contraceptive pills between 1996 and 2006, *Contraception*, 2010, doi:10.1016/j.contraception.2010.09.013, accessed Jan. 7, 2011.

[47] Frost JJ and Darroch JE, Factors associated with contraceptive choice and inconsistent method use, United States, 2004, *Perspectives on Sexual and Reproductive Health*, 2008, 40(2):94–104.

[48] Landry D, Wei J and Frost JJ, Public and private providers' involvement in improving their patients' contraceptive use, *Contraception*, 2008, 78(1):42–51.

[49] Guttmacher Institute, *A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions*, 2009, <http://www.guttmacher.org/pubs/RecessionFP.pdf>, accessed Dec. 3, 2010.

[50] Secura GM et al., The Contraceptive CHOICE Project: reducing barriers to long-acting reversible contraception, *American Journal of Obstetrics and Gynecology*, 2010, 203(2):115.e1–115.e7.

[51] Finer LB et al., Disparities in unintended pregnancy in the United States, 1994 and 2001, *Perspectives on Sexual and Reproductive Health*, 2006, 38(2):90–96.

[52] Kaiser Family Foundation, *The Uninsured: A Primer: Key Facts About Americans Without Health Insurance*, 2010, <http://www.kff.org/uninsured/upload/7451-06.pdf>, accessed Dec. 30, 2010.

[53] Culwell KR and Feinglass J, Changes in prescription contraceptive use, 1995–2002: the effect of insurance status, *Obstetrics & Gynecology*, 2007, 110(6):1371–1378.

001395

Exhibit 135                                                            JA-0001781

[54] Culwell KR and Feinglass J, The association of health insurance with use of prescription contraceptives, *Perspectives on Sexual and Reproductive Health*, 2007, 39(4): 226–230.

[55] Nearns J, Health insurance coverage and prescription contraceptive use among young women at risk for unintended pregnancy, *Contraception*, 2009, 79(2):105–110.

[56] Research and Data Analysis Division, Washington Department of Social and Health Services, *Take Charge: Final Evaluation, First Five Years: July 2001–June 2006*, 2006, <http://www.dshs.wa.gov/pdf/ms/rda/research/9/83.pdf>, accessed Dec. 15, 2010.

[57] Swartz K, Cost-sharing: effects on spending and outcomes, *Research Synthesis Report*, Princeton, NJ: Robert Wood Johnson Foundation, 2010, no. 20.

[58] Postlethwaite D et al., A comparison of contraceptive procurement pre- and post-benefit change, *Contraception*, 2007, 76(5) 360–365.

[59] Aved BM and Harp V, Assessing the impact of copayment on family planning services: a preliminary analysis in California, *American Journal of Public Health*, 1983, 73(7):763–65.

[60] Frost JJ, Henshaw SK and Sonfield A, *Contraceptive Needs and Services: National and State Data, 2008 Update*, New York: Guttmacher Institute, 2010.

[61] Centers for Medicare and Medicaid Services, Family planning services option and new benefit rules for benchmark plans, *State Medicaid Director Letter*, July 2, 2010, SMDL #10-013, ACA #4, <http://www.cms.gov/smdl/downloads/SMD10013.pdf>, accessed July 15, 2010.

[62] Edwards J, Bronstein J and Adams K, *Evaluation of Medicaid Family Planning Demonstrations*, Alexandria, VA: CNA Corp., 2003.

[63] Office of Policy Initiatives and Budget, Wisconsin Department of Health and Family Services, *The Wisconsin Family Planning Waiver: Final Evaluation Report for 2003–2007*, 2008, <http://www.dhs.wisconsin.gov/aboutdhs/opib/policyresearch/FamilyPlanningWaiverFinalEvaluationReport2003-2007.pdf>, accessed Dec. 15, 2010.

[64] Texas Health and Human Services Commission, *Rider 64 Report: Annual Savings and Performance Report for the Women's Health Program*, 2010, <http://www.hhsc.state.tx.us/reports/2010/Rider64-Oct2010.pdf>, accessed Dec. 15, 2010.

[65] Sawhill I, Thomas A and Monea E, An ounce of prevention: policy prescriptions to reduce the prevalence of fragile families, *Future of Children*, 2010, 20(2):133–155.

[66] Trussell J et al., The economic value of contraception: a comparison of 15 methods, *American Journal of Public Health*, 1995, 85(4):494–503.

[67] Trussell J et al., Medical care cost savings from adolescent contraceptive use, *Family Planning Perspectives*, 1997, 29(6):248–255 & 295.

[68] Letter from Janice R. Lachance, Director, U.S. Office of Personnel Management to Marcia D. Greenberger, Co-President, National Women's Law Center, Jan. 16, 2001.

[69] Bonoan R and Gonen JS, Promoting health pregnancies: counseling and contraception as the first step, *Family Health in Brief*, Washington, DC: Washington Business Group on Health, 2000, No. 3.

[70] William M. Mercer, *Women's Health Care Issues: Contraception as a Covered Benefit*, New York: William M. Mercer, 2000.

[71] Campbell KP, ed., *Investing in Maternal and Child Health: An Employer's Toolkit*, Washington, DC: National Business Group on Health, 2007, <http://www.businessgrouphealth.org/healthtopics/maternalchild/investing/docs/mch_toolkit.pdf>, accessed Dec. 29, 2010.

[72] U.S. Preventive Services Task Force, USPSTF A and B recommendations, Aug. 2010, <http://www.uspreventiveservicestaskforce.org/uspstf/uspsabrecs.htm>, accessed Dec. 29, 2010.

[73] Sen. A. Franken, *Congressional Record*, Dec. 3, 2009, p. S.12271.

[74] Sen. B. Boxer, *Congressional Record*, Dec. 1, 2009, p. S.12025.

[75] Sen. D. Feinstein, *Congressional Record*, Dec. 3, 2009, p. S. 12114.

[76] Sen. B. Nelson, *Congressional Record*, Dec. 3, 2009, p. S.12277.

[77] Centers for Disease Control and Prevention, Ten great public health achievements—United States, 1900–1999, *Morbidity and Mortality Weekly Report*, 1999, 48(12):241–243.

[78] Centers for Disease Control and Prevention, Achievements in public health, 1900–1999: family planning, *Morbidity and Mortality Weekly Report*, 1999, 48(47): 1073–1080.

[79] U.S. Public Health Service, *Healthy People: The Surgeon General's Report on Health Promotion and Disease Prevention*, Washington, DC: Department of Health, Education and Welfare, 1979.

001396

Exhibit 135                                                                    JA-0001782

[80] Department of Health and Human Services, Healthy People 2020 topics and objectives: family planning, objectives, <http://www.healthypeople.gov/2020/topicsobjectives2020/objectiveslist.aspx?topicid=13>, accessed Dec. 29, 2010.

[81] Department of Health and Human Services, *Healthy People 2010: Objectives for Improving Health*, 2nd ed., vol. 1, Washington, DC: Government Printing Office, 2000.

[82] Department of Health and Human Services, Healthy People 2020 topics and objectives: family planning, overview, < http://www.healthypeople.gov/2020/topicsobjectives2020/overview.aspx?topicid=13>, accessed Dec. 29, 2010.

[83] 42 U.S. 254b.

[84] Sonfield A, Alrich C and Gold RB, Public funding for family planning, sterilization and abortion services, FY 1980–2006, *Occasional Report*, New York: Guttmacher Institute, 2008. No. 38.

[85] *Federal Register*, 75: 23068, 2010.

[86] American Medical Association, *AMA-MSS Digest of Policy Actions*, June 2010, <http://www.ama-assn.org/ama1/pub/upload/mm/15/digest_of_actions.pdf>. accessed Dec. 31, 2010.

[87] American Academy of Family Physicians, Contraceptive advice, policy statement, 2007, <http://www.aafp.org/online/en/home/policy/policies/c/contraceptiveadvice.html>, accessed Dec. 31, 2010.

[88] American Academy of Family Physicians, Gender equity on prescription drug and diagnostic testing coverage, policy statement, 2010, <http://www.aafp.org/online/en/home/policy/policies/g/genderequity.html>, accessed Dec. 31, 2010.

[89] American Academy of Pediatrics, Contraception and adolescents, *Pediatrics*, 1990, 86(1): 134–138.

[90] American College of Obstetricians and Gynecologists, The adolescent obstetric-gynecologic patient, *Technical Bulletin*, Washington, DC: American College of Obstetricians and Gynecologists, 1990, no. 145.

[91] Society for Adolescent Medicine, Position papers on reproductive health care for adolescents, *Journal of Adolescent Health*, 1991, 12(8):657–661.

[92] American Congress of Obstetricians and Gynecologists, Contraception—a basic health necessity, news release, May 8, 2007, <http://www.acog.org/from_home/publications/press_releases/nr05-08-07-2.cfm>, accessed Dec. 29, 2010.

[93] American Academy of Pediatrics, *Coding for Pediatric Preventive Care*, 2010, <http://brightfutures.aap.org/pdfs/Preventive%20Care%20Coding%20Manual%202010.pdf>, accessed Dec. 29, 2010.

[94] American Academy of Pediatrics, *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents*, 3rd ed., <http://brightfutures.aap.org/pdfs/Guidelines_PDF/11_8_Sexuality.pdf >, accessed Dec. 29, 2010.

[95] American Public Health Association, The population problem, policy statement, 1959, <http://www.apha.org/advocacy/policy/policysearch/default.htm?id=438>, accessed Jan. 5, 2011.

[96] American Public Health Association, Population, reproductive and sexual health, <http://www.apha.org/membergroups/sections/aphasections/population/>, accessed Dec. 29, 2010.

[97] March of Dimes, Medicaid family planning state option, no date, <http://www.marchofdimes.com/advocacy/healthcoverage_medicaid.html>, accessed Dec. 29, 2010.

[98] National Governors Association, Center for Best Practices, *Healthy Babies: Efforts to Improve Birth Outcomes and Reduce High Risk Births*, 2004, <http://www.nga.org/cda/files/0406births.pdf>, accessed Nov. 21, 2010.

[99] Campbell KP et al., eds., *A Purchaser's Guide to Clinical Preventive Services: Moving Science into Coverage*, Washington (DC): National Business Group on Health, 2006, <http://www.businessgrouphealth.org/benefitstopics/topics/purchasers/fullguide.pdf>, accessed Dec. 29, 2010.

[100] Sonfield A et al., U.S. insurance coverage of contraceptives and the impact of contraceptive coverage mandates, 2002, *Perspectives in Sexual and Reproductive Health*, 2004, 36(2):72–79.

[101] Mercer, *Hot Topics in Health Care: Pharmacy Benefits*, New York: Mercer, 2008.

[102] Guttmacher Institute, Insurance coverage of contraceptives, *State Policies in Brief (as of December 2010)*, 2010, <http://www.guttmacher.org/statecenter/spibs/spib_ICC.pdf>, accessed Dec. 30, 2010.

[103] U.S. Equal Employment Opportunity Commission, Decision on coverage of contraception, 2000, <http://www.eeoc.gov/policy/docs/decision-contraception.html>, accessed Dec. 30, 2010.

001397

Exhibit 135                                                            JA-0001783

International Journal of Gynecology and Obstetrics (2005) **89**, S25—S33



International Journal of
GYNECOLOGY
& OBSTETRICS

www.elsevier.com/locate/ijgo

ARTICLE

# Effect of interpregnancy interval on birth outcomes: findings from three recent US studies

## B.-P. Zhu*

*State Epidemiologist and Chief, Office of Epidemiology, Missouri Department of Health and Senior Services, 920 Wildwood Drive, P.O. Box 570, Jefferson City, MO 65102, USA*

**KEYWORDS**
Birth intervals;
Low birth weight;
Prematurity;
Small for gestational age;
Pregnancy outcome

**Abstract**

The relationship between interpregnancy interval and adverse birth outcomes (i.e., low birth weight, preterm birth, and small size for gestational age) was examined in three recent studies conducted in Utah and Michigan of the United States. These studies were conducted among different populations, used different study designs (i.e., cross-sectional and retrospective cohort designs), and addressed several other methodological limitations in the previously published literature. In addition, the data were stratified by, and controlled for, several maternal reproductive risk factors. A J-shaped relationship between interpregnancy interval and adverse birth outcomes was observed in all three studies. The risk for adverse birth outcomes is lowest when the interpregnancy interval was 18—23 months and increased when the interval departed from 18—23 months. This J-shaped relationship existed at levels of maternal reproductive risk factors and after these risk factors were controlled for using logistic regression. Based on the consistency of the findings from all three studies, it appears that the J-shaped relationship between interpregnancy interval and adverse birth outcomes is causal. This information can be used by health care providers and public health programs to counsel and educate women who recently gave births on reducing the risk for adverse birth outcomes by means of appropriate pregnancy spacing.
© 2004 International Federation of Gynecology and Obstetrics. Published by Elsevier Ireland Ltd. All rights reserved.

"*If two or more instances of the phenomenon under investigation have only one circumstance in common, the circumstance in which alone all the instances agree is the cause (or effect) of the given phenomenon.*"—John Stuart Mill [1]

* Tel.: +1 573 751 6128; fax: +1 573 522 6003.
  *E-mail address:* ZhuB@dhss.mo.gov.

## 1. Introduction

Low birth weight and preterm birth combined are the second leading cause of death for all U.S. infants, and the leading cause of death for African-American infants [2—5]. In addition, low birth weight and preterm birth may lead to serious and costly sequelae, such as cerebral palsy, for the

0020-7292/$ - see front matter © 2004 International Federation of Gynecology and Obstetrics. Published by Elsevier Ireland Ltd. All rights reserved.
doi:10.1016/j.ijgo.2004.08.002

**000535**

Exhibit 136                                                                                                    JA-0001784

affected infant. Little progress has been made in recent years in reducing the prevalence of low birth weight and preterm birth. In fact, during the past two decades, the prevalence of low birth weight and preterm birth in the U.S. has steadily increased [6]. Although many studies have been conducted on the causes of low birth weight and preterm birth, the etiology remains largely unknown.

Since the early 1920s, many researchers have investigated the relationship between pregnancy spacing (i.e., the time lapsed between two consecutive pregnancies) and various adverse birth outcomes, including low birth weight, preterm birth, small size for gestational age, and infant mortality. Most studies have found that a short interpregnancy interval was associated with increased risk for various adverse birth outcomes [7—13]. However, a review of the literature revealed a number of methodological limitations in previously published literature. First, many earlier studies used birth interval (i.e., the time between two consecutive live births) to measure pregnancy spacing. It has been demonstrated that using birth interval overestimates the adverse effect of very short birth intervals [8]. Therefore, interpregnancy interval is preferred over birth interval in this kind of research. Second, extreme interpregnancy intervals (e.g., <3 months or >10 years) are rare. Thus a large sample size, which most of the previously published studies lacked, is needed to study their effects. Third, many maternal reproductive risk factors are associated with both interpregnancy interval and adverse birth outcomes. The potential confounding effect of these risk factors needs to be carefully examined through stratified and multivariable analyses. However, many of the previously published studies lacked the sample size to perform detailed stratified and multivariable analyses. Fourth, most of the previously published studies arbitrarily categorized interpregnancy interval into "short" and "non-short," using various cutoff points (e.g., <3, <6, <9, or <12 months). As will be seen later in this paper, the underlying association between interpregnancy interval and adverse birth outcomes is J-shaped; hence such arbitrary categorization of the interpregnancy interval may underestimate the risk of short interpregnancy interval. Therefore, one needs to examine the association over the entire range of interpregnancy interval. Fifth, most of the previously published studies used cross-sectional design. The findings of those studies need to be verified using the longitudinal design. Sixth, many studies used the combined birth records data in the same jurisdiction over several years. These data contain birth records for siblings born to the same

biological mother, which are correlated with each other. Therefore, appropriate statistical techniques are needed to account for this correlation [14,15].

Those methodological limitations in the published literature have led many researchers to suspect that the association between interpregnancy interval and adverse birth outcomes may be artificial. Therefore, the author of this paper, in collaboration with his colleagues, conducted a series of three studies in various settings and used different study designs (Table 1). This paper summarizes the findings of those studies.

## 2. The Utah Study [16]

The first study was conducted in Utah [16]. The study used the birth certificate data for singleton infants born during 1989—1996 to multiparous Utah women (i.e., those who had at least one previous live birth). The study examined three adverse birth outcomes—low birth weight (<2500 g), preterm birth (gestational age <37 weeks), and small size for gestational age (birth weight <10th percentile for the infant's gestational age and sex compared with all singleton births in Utah from 1989 to 1996). The interpregnancy interval was defined as the period between the delivery of a live birth and the conception of the subsequent live birth, and was computed as the interval between two consecutive deliveries minus the gestational age of the second infant. To examine the question whether the relationship was due to confounding, 16 maternal reproductive risk factors were evaluated: Maternal age at delivery, outcome of the most recent recognized pregnancy, number of previous live-born infants who were still alive, number of previous live-born infants who had died, number of previous spontaneous or induced abortions, height, prepregnancy weight, weight gain during pregnancy, trimester at which prenatal care was started, number of prenatal care visits, marital status, education, race or ethnic group, residence (rural or urban), tobacco use during pregnancy, and alcohol use during pregnancy.

These data offered an excellent opportunity for evaluating the relationship between interpregnancy intervals and adverse birth outcomes because of the relatively high average parity of mothers in Utah. Also, the association can be examined with less potential for confounding because other reproductive risk factors, notably tobacco and alcohol use, are substantially less prevalent among Utah women than among women elsewhere in the U.S. The relationship between

000536

Exhibit 136
JA-0001785

**Table 1**  Summary of three recent U.S. studies on the effect of interpregnancy interval on birth outcomes

| Study | Sample size | Study design | Adverse birth outcomes examined[a] | Use of IPI vs. BI[b] | Other maternal risk factors examined | Main conclusions | Comments |
|---|---|---|---|---|---|---|---|
| Utah Study (1999) [16] | 173,205 singleton live births to multiparous women in Utah, 1989–1996 | Cross-sectional study | LBW; PTB; SGA[c] | Used IPI; 0–5; 6–11; 12–17; 18–23; 24–59; 60–119; 120+ months | Age at delivery; outcome of preceding pregnancy; no. of previous infants still alive; no. of previous infants deceased; no. of previous spontaneous or induced abortions; height; prepregnancy weight; weight gain during pregnancy; trimester prenatal care started; no. of prenatal care visits; marital status; education; ethnicity; rural or urban residence; tobacco/alcohol use during pregnancy. | The optimal IPI appears to be 18–23 months; both short and long IPIs were associated with increased risk for adverse birth outcomes; risk increased in a linear fashion as IPI departs from optimal IPI in either direction; the association between IPI and adverse birth outcomes was not due to confounding by other risk factors. | Used vital records data in the same state compiled over several years; unable to examine the relationship by race. |
| Michigan Cross-Sectional Study (2001) [17] | 435,327 singleton live births (346,250 to white women, 89,077 to black women), Michigan, 1993–1998 | Cross-sectional study | LBW; PTB; SGA[d] | Used IPI; 0–5; 6–11; 12–17; 18–23; 24–59; 60–119; 120+ months | Race (white, black); age at delivery; marital status; education; adequacy of prenatal care; outcome of the preceding pregnancy (live birth or stillbirth); total number of previous pregnancies; tobacco/alcohol use during pregnancy. | Upheld findings of the Utah Study; an IPI of 18–23 months was optimal for both white and black women; risk for adverse birth outcomes increased appreciably when IPI was <6 months or >5 years. | Data were analyzed separately by race; used vital records data in the same state compiled over several years. |
| Michigan Retrospective Cohort Study (2003) [20] | 565,911 singleton live births to Michigan women, 1993–2000, linked to biological mothers | Retrospective cohort study using maternally linked birth data | LBW (data on PTB and SGA available but not published) | <6; 6–11; 12–17; 18–23; 24–59; 60–95; 96–136 months | Preceding infant's birth weight; mother's age, race, education, prenatal care utilization, tobacco/alcohol use during pregnancy; outcome of preceding pregnancy; number of previous live births; paternal acknowledgment on the birth certificate. | Upheld findings from the Utah Study and Michigan Cross-Sectional Study; population attributable risk (PAR)=9.4% if optimal IPI is defined as 18–23 months; PAR=5.1% if optimal IPI is defined as 6–59 months. | Data were analyzed separately by pairs of births. Stratified by, and controlled for birth weight of preceding sibling. |

[a] LBW=low birth weight; PTB=preterm birth; SGA=small-for-gestational-age birth.

[b] IPI: interpregnancy interval; BI: birth interval.

[c] SGA=birth weight below the 10th percentile for the infant's gestational age and sex among singleton births in Utah from 1989 to 1996.

[d] SGA=birth weight <10th percentile of the referent population of U.S. newborns for the infant's gestational age, race, sex, and parity [18].

000537

Exhibit 136

JA-0001786

interpregnancy interval and the three adverse birth outcomes was examined at each level of the 16 maternal risk factors. In addition, the logistic regression technique was used to simultaneously control for all 16 risk factors.

A total of 173,205 singleton infants were included in the study. When the risk for the three adverse birth outcomes was examined according to interpregnancy interval, a J-shaped pattern emerged: The risk for all three outcomes was high when the interpregnancy interval was very short (e.g., <3 months). The risk declined sharply as the interpregnancy interval increased, and reached the lowest point when the interpregnancy interval was approximately 18–23 months. After that point, the risk for all three adverse birth outcomes slowly increased in a linear fashion as the interpregnancy interval further increased. This J-shaped pattern was observed at each level of the 16 maternal reproductive risk factors wherever data were sufficient to support the stratified analysis. (Fig. 1 shows the relationship between interpregnancy interval and low birth weight in all three U.S. studies. Although not shown in the figure, the relationship between interpregnancy interval and the other two adverse birth outcomes is similar.)

When all 16 maternal reproductive risk factors were simultaneously controlled for, the J-shaped pattern persisted. For example, as compared with an interpregnancy interval of 18–23 months, the adjusted odds ratios for an interpregnancy interval shorter than 6 months were 1.4 for low birth weight, 1.4 for preterm birth, and 1.3 for small size for gestational age; the adjusted odds ratios for an interpregnancy interval of 120 months or longer were 2.0 for low birth weight, 1.5 for preterm birth, and 1.8 for small size for gestational age (Table 2).

The Utah Study addressed several methodological limitations in previously published studies. It used the interpregnancy interval instead of the birth interval. Also, it assembled the birth records of a large number of infants, enabling the researchers to perform extensive stratified and multivariable analyses. Additionally, it examined the association over the full range of interpregnancy interval rather than arbitrarily categorizing the interpregnancy interval into "short" and "non-short" intervals. However, several issues remained unaddressed. The study was based on a cross-sectional design using a data set compiled of the birth records in Utah over 8 years, and the correlation between biological siblings was not appropriately accounted for. Concerns were also raised by other researchers as to whether a study con-



**Figure 1**   Relationship between interpregnancy interval and low birth weight (LBW): summary of three recent U.S. studies [16,17,20].

000538

Exhibit 136                                                       JA-0001787

**Table 2**  Adjusted odds ratios (OR) of adverse birth outcomes and their 95% confidence intervals (CI) associated with various interpregnancy intervals from two cross-sectional studies conducted in Utah [16] and Michigan [17]

| Interpregnancy interval (months) | Low birth weight[a] | | Preterm birth[a] | | Small size for gestational age[b] | |
|---|---|---|---|---|---|---|
| | OR | 95% CI | OR | 95% CI | OR | 95% CI |
| *Utah Study[c]* | | | | | | |
| 0—5 | 1.4 | 1.3—1.6 | 1.4 | 1.3—1.5 | 1.3 | 1.2—1.4 |
| 6—11 | 1.1 | 1.0—1.2 | 1.0 | 0.9—1.1 | 1.1 | 1.0—1.2 |
| 12—17 | 1.1 | 1.0—1.2 | 1.0 | 0.9—1.1 | 1.1 | 1.0—1.1 |
| 18—23 | referent | | referent | | referent | |
| 24—59 | 1.1 | 1.0—1.1 | 1.0 | 0.9—1.1 | 1.1 | 1.1—1.2 |
| 60—119 | 1.5 | 1.3—1.6 | 1.1 | 1.0—1.2 | 1.4 | 1.3—1.5 |
| 120+ | 2.0 | 1.7—2.4 | 1.5 | 1.3—1.7 | 1.8 | 1.6—2.0 |
| | | | | | | |
| *Michigan Cross-Sectional Study[d]* | | | | | | |
| White | | | | | | |
| 0—5 | 1.5 | 1.4—1.6 | 1.3 | 1.2—1.4 | 1.3 | 1.3—1.4 |
| 6—11 | 1.1 | 1.0—1.2 | 1.2 | 1.1—1.2 | 1.1 | 1.1—1.2 |
| 12—17 | 1.0 | 1.0—1.1 | 1.1 | 1.0—1.1 | 1.0 | 1.0—1.1 |
| 18—23 | referent | | referent | | referent | |
| 24—59 | 1.1 | 1.0—1.2 | 1.0 | 1.0—1.1 | 1.1 | 1.1—1.2 |
| 60—119 | 1.3 | 1.2—1.4 | 1.2 | 1.1—1.2 | 1.3 | 1.3—1.4 |
| 120+ | 1.9 | 1.7—2.1 | 1.4 | 1.3—1.5 | 1.7 | 1.6—1.8 |
| Black | | | | | | |
| 0—5 | 1.5 | 1.3—1.6 | 1.2 | 1.1—1.3 | 1.3 | 1.2—1.4 |
| 6—11 | 1.2 | 1.1—1.3 | 1.1 | 1.1—1.2 | 1.1 | 1.0—1.3 |
| 12—17 | 1.0 | 0.9—1.1 | 1.0 | 1.0—1.1 | 1.0 | 0.9—1.1 |
| 18—23 | referent | | referent | | referent | |
| 24—59 | 1.0 | 1.0—1.1 | 0.9 | 0.9—1.0 | 1.1 | 1.0—1.2 |
| 60—119 | 1.2 | 1.1—1.3 | 1.0 | 0.9—1.1 | 1.1 | 1.0—1.2 |
| 120+ | 1.6 | 1.4—1.7 | 1.3 | 1.2—1.4 | 1.4 | 1.2—1.6 |

[a] Low birth weight=birth weight <2500 g; preterm birth=gestational age <37 weeks.

[b] Small size for gestational age: In Utah Study was defined as birth weight <10th percentile for infant's gestational age and sex among singleton birth in Utah from 1989 to 1996; in Michigan Cross-Sectional Study was defined as birth weight <10th percentile of referent population of U.S. newborns for the infant's gestational age, race, sex, and parity [18].

[c] Controlled for maternal age at delivery, outcome of most recent recognized pregnancy, number of previous live-born children who were still alive, number of previous live-born children who had died, number of previous spontaneous or induced abortions, height, weight before pregnancy, weight gain during pregnancy, trimester when prenatal care started, number of prenatal care visits, marital status, education, race or ethnic group, rural or urban residence, tobacco use during pregnancy, and alcohol use during pregnancy.

[d] Controlled for maternal age at delivery, marital status, education, adequacy of prenatal care, outcome of the preceding birth (live birth or still birth), total number of previous pregnancies, tobacco use during pregnancy, and alcohol use during pregnancy.

ducted in a largely homogeneous, mostly white middle-income population can be generalized to other populations. Of special concern was the unavailability of data on whether the relationship between interpregnancy interval and adverse birth outcomes among other racial and ethnic groups differed from that among white non-Hispanics.

## 3. The Michigan Cross-Sectional Study [17]

The Michigan Cross-Sectional Study [17] was designed to address the questions on whether the Utah Study was generalizable to other populations, and whether there was any racial differences in the

relationship between interpregnancy interval and adverse birth outcomes. The three adverse birth outcomes examined in this study were the same as in the Utah Study: Low birth weight (<2500 g), preterm birth (gestational age <37 weeks); and small-for-gestational-age birth, which was defined as birth weight <10th percentile of the referent population of U.S. newborns for the infant's gestational age, race, sex, and parity [18]. Of note, this definition used the U.S. national population as the reference population, which is slightly different from that in the Utah Study; the latter used the internal Utah population as the reference.

The population in Michigan is more similar to the general U.S. population than the Utah population. Also, there is a sizable (approximately 18%) African-American population in Michigan, enabling the researchers to examine the relationship between

000539

Exhibit 136                                                                                                          JA-0001788

interpregnancy interval and adverse birth out-comes among both white and African-American women. The study compiled the birth records of 435,927 singleton infants born in Michigan during 1993–1998 to multiparous white and African-American women. Separate analyses were performed for white (*N*=346,250) and African-American (*N*= 89,077) women. Within each racial group, the relationship between interpregnancy interval and adverse birth outcomes was examined at each level of eight maternal reproductive risk factors: age at delivery, marital status, education, adequacy of prenatal care, outcome of the preceding pregnancy (i.e., live birth or stillbirth), total number of previous pregnancies, tobacco use during pregnancy, and alcohol use during pregnancy.

All three adverse birth outcomes were more prevalent among newborns in Michigan than among those in Utah because the percent of African-American women was higher in Michigan than in Utah, and infants born to African-American women are at greater risk for adverse birth outcomes [19]. However, the relationship between interpregnancy interval and adverse birth outcomes was very similar in the Michigan Cross-Sectional Study as compared to that in the Utah Study. (Fig. 1 shows the relationship between interpregnancy interval and low birth weight in the three studies.) Both short and long interpregnancy intervals were associated with an increased risk for adverse birth outcomes. When the association was examined for white and African-American women separately, the J-shaped relationship between interpregnancy interval and the three adverse birth outcomes existed in both racial groups. Moreover, the J-shaped relationship persisted at each level of other maternal reproductive risk factors within each racial group, and after controlling for those risk factors simultaneously by logistic regression (Table 2).

The Michigan Cross-Sectional Study observed a similar J-shaped relationship in a population resembling the average population in the U.S., and among both white and African-American women. Therefore, the findings from the Utah Study appeared to be generalizable to other populations. However, both the Michigan Cross-Sectional Study and the Utah Study were based on compiled vital records data registered in the same state over several years. Both data sets likely contained many sets of siblings born to the same biological mothers. The data for these siblings are statistically correlated. Theoretically, this type of cross-sectional study designs may produce correct point estimates of the risks and odds ratios. However, the estimated variances, as well as the resulting confidence interval estimates as well as statistical inferences, may be incorrect [14,15].

## 4. The Michigan Retrospective Cohort Study [20]

The Michigan Retrospective Cohort Study [20] was designed to verify the findings from the Utah Study and the Michigan Cross-Sectional Study, and to address the statistical problem regarding the correlation among biological siblings in the data. The published paper only included data on the relationship between interpregnancy interval and low birth weight (<2500 g). The researchers also examined preterm birth and small size for gestational age in relation to interpregnancy interval, and found similar results in comparison with the findings regarding low birth weight. These data are available from the author of this paper upon request.

The data for the Michigan Retrospective Cohort Study were the birth records for infants born in Michigan and out of state births to Michigan resident women between January 1, 1989 and December 31, 2000. The data for the infants born to the same biological mother were linked, using the mother's social security number, first name, last name, middle initial, maiden name, and birth date. When a link is in question, the mother's address, the infant's birth date, and other information on the birth certificate were used for verification.

By linking the birth records of the infants born to the same biological mother, the reproductive histories of cohorts of women who delivered live births in Michigan from 1989 to 2000 were re-created. This design allowed the researchers to conduct retrospective cohort analyses, and verify the findings from the previously published cross-sectional studies. Also, because the researchers were able to identify the biological siblings through this design, they were able to use appropriate statistical techniques to address the statistical problems caused by the correlation among the siblings in the data. Additionally, this approach enabled the researchers to calculate the interpregnancy interval directly from the recorded birth dates of two consecutive live births rather than relying on the self-reported date of the previous live birth; thus, the accuracy of the estimated interpregnancy interval was improved. Moreover, the researchers were able to evaluate and control for the birth weight of the preceding sibling. Previously, researchers have raised concerns about the potential confounding effect of this variable,

**000540**

Exhibit 136                                                                                      JA-0001789

because it is a powerful predictor for the birth weight of the subsequent sibling.

The overall relationship between interpregnancy interval and low birth weight was examined. The data were then stratified into pairs of births by the birth order of the biological siblings (i.e., first-second, second–third, third–fourth, and forth–fifth), and the relationship was examined by pairs of births. The potential confounding effect of other reproductive risk factors was examined through stratified and multivariable analysis within the pairs of births.

The birth records of 565,816 infants born during 1989 and 2000 in Michigan who had at least one biological sibling born during the same time period in Michigan or to a Michigan resident woman were identified and linked to their biological mothers. These infants were born to 422,590 mothers, of whom 79.6% were whites, 18.2% were African-Americans, 1.3% were Asians or Pacific Islanders, 0.5% were Native Americans, and 0.4% were women of other racial groups or whose racial group was not identified on the birth certificate. A similar J-shaped relationship between interpregnancy interval and low birth weight was found overall (Fig. 1), and among both white and African-American women in this study. When the data were stratified by pairs of birth, a J-shaped relationship existed among the first–second, second–third, third–fourth, and forth–fifth pairs of births, and persisted after controlling for other risk factors, most notably the birth weight of the preceding sibling (Table 3). Also, the study estimated the adjusted population attributable risk for low birth weight due to "non-optimal" interpregnancy intervals. It was found that the adjusted population attributable risk was 5.1% if the optimal interpregnancy interval was defined as 6–59 months, and 9.4% if the optimal interval was defined as 18–23 months.

## 5. Discussion

The three studies conducted in various populations, using different study designs, stratified by, and controlling for various maternal reproductive risk factors addressed a number of methodological limitations regarding previously published studies. It was gratifying to observe a consistent J-shaped relationship between interpregnancy interval and adverse birth outcomes in all three studies. It is noteworthy that all three studies meticulously stratified the data by 5-year maternal age groups. A J-shaped relationship between interpregnancy interval and adverse birth outcomes persisted in all age groups wherever the data supported the stratified analysis. Hence these studies adequately demonstrated that the relationship between a long interpregnancy interval and adverse birth outcomes is not due to confounding by maternal age. Therefore, short of a proof from a randomized controlled trial, one may conclude, with due caution, that there is a causal relationship between interpregnancy interval and adverse birth outcomes. The optimal interpregnancy interval for preventing adverse birth outcomes appeared to be approximately 18–23 months, departing from which the risk for adverse birth outcomes increased, although the increase was not appreciable unless the interpregnancy interval was shorter than 6 months or longer than 5 years.

Prior to these studies, researchers had mostly examined the relationship between a short interpregnancy interval (albeit arbitrarily defined) and the risk for adverse birth outcomes, and proposed various theories about the mechanisms to explain the relationship. The most widely accepted theories involved postpartum nutritional depletion (especially folate deficiency) and stress [21–23].

Two hypotheses were proposed to explain the relationship between a long interpregnancy inter-

Table 3    Adjusted[a] odds ratios (OR) of low birth weight (<2500 g) and their 95% confidence intervals (CI) associated with various interpregnancy intervals, by birth pairs, from the Michigan Retrospective Cohort Study [19]

| Interpregnancy interval (months) | First–second birth pairs | | Second–third birth pairs | | Third–fourth birth pairs | | Fourth–fifth birth pairs | |
|---|---|---|---|---|---|---|---|---|
| | OR | 95% CI | OR | 95% CI | OR | 95% CI | OR | 95% CI |
| <6 | 1.4 | 1.3–1.5 | 1.5 | 1.3–1.6 | 1.2 | 1.1–1.4 | 1.3 | 1.1–1.6 |
| 6–11 | 1.1 | 1.0–1.1 | 1.1 | 1.0–1.2 | 1.0 | 0.9–1.2 | 1.0 | 0.9–1.3 |
| 12–17 | 1.0 | 0.9–1.1 | 1.0 | 0.9–1.1 | 1.0 | 0.8–1.1 | 1.0 | 0.8–1.3 |
| 18–23 | referent | | referent | | referent | | referent | |
| 24–59 | 1.1 | 1.0–1.1 | 1.1 | 1.0–1.1 | 1.0 | 0.9–1.1 | 1.1 | 1.0–1.4 |
| 60–95 | 1.5 | 1.3–1.6 | 1.3 | 1.2–1.4 | 1.3 | 1.1–1.5 | 1.2 | 0.9–1.5 |
| 96–136 | 1.5 | 1.3–1.8 | 1.6 | 1.3–2.0 | 1.4 | 1.0–2.0 | 1.3 | 0.8–2.3 |

[a] Controlled for the preceding infant's birth weight, paternal acknowledgment on birth certificate, mother's age at delivery, race, education, adequacy of prenatal care utilization, outcome of preceding pregnancy (live birth, stillbirth), tobacco use and alcohol use during pregnancy.

000541

Exhibit 136

JA-0001790

val and adverse birth outcomes by the researchers of the three studies [16,17,20]. One is the "physiological regression hypothesis," i.e., the mother's physiologic processes are primed for fetal growth during pregnancy. This benefit gained during pregnancy would decline gradually postpartum if the mother is not pregnant again. This hypothesis is supported by the observation that perinatal outcomes for infants conceived after an excessively long interpregnancy interval are similar to outcomes of infants born to primigravid women [16]. Another hypothesis is that the increased risk of adverse perinatal outcomes after a long interpregnancy interval is due to reproductive wastage, i.e., long interpregnancy intervals may involve factors that cause both secondary infertility and adverse perinatal outcomes.

An interesting point of note is that the median interpregnancy interval in all three studies and among all racial groups was approximately 20 months, which coincides with the optimal interval associated with the lowest risk for adverse birth outcomes (18—23 months). These findings suggest that there may be adaptive advantages for the humans to space their pregnancies for approximately 20 months.

Although these three studies have made some advancement in understanding the relationship between interpregnancy interval and adverse birth outcomes, there are still many unanswered questions. For example, more studies are needed on the effects of interpregnancy interval on infant mortality, especially in developing nations. Additionally, more research is needed to understand the relationship between interpregnancy interval and other health outcomes, e.g., maternal morbidity and mortality, and long-term health and development (including physical, behavioral, social, and intellectual development) of the children affected. Also, studies are needed on whether the effects of interpregnancy interval differ between developing and developed nations. On a methodological note, researchers should consider unifying the categorization of interpregnancy interval in their studies to facilitate comparison between studies and meta-analysis. Journals which publish such studies and their reviewers can play an important role in this respect by discouraging the practice of arbitrarily categorizing the interpregnancy interval into "short" and "non-short" interpregnancy intervals, and encouraging researchers to examine the relationship over the full spectrum of the interpregnancy interval.

The findings of these three studies suggest various strategies for preventing adverse birth outcomes through pregnancy spacing. For example, health care providers, especially obstetricians, gynecologists, family practice physicians, pediatricians, nurses, and midwives could use the information from these studies to counsel women who have recently given birth about the risk of delivering infants with adverse birth outcomes if the pregnancies are spaced excessively short or long. Public health programs serving low-income, minority, immigrant, and other vulnerable populations of women could consider developing educational materials about the benefit of optimal pregnancy spacing, and referring clients to family planning services.

## References

[1] Mills JS. A system of logic: ratiocinative and inductive. London: Spottiswoode, Ballantyne and Co.; 1949. p. 255. New impression.
[2] Committee to Study the Prevention of Low Birthweight, Division of Health Promotion and Disease Prevention, Institute of Medicine. Preventing low birthweight. Washington (DC): National Academy Press; 1985.
[3] McCormick MC. The contribution of low birth weight to infant mortality and childhood morbidity. N Engl J Med 1985;312:82—90.
[4] Copper RL, Goldenberg RL, Creasy RK, DuBard MB, Davis RO, Entman SS, et al. A multicenter study of preterm birth weight and gestational age-specific neonatal mortality. Am J Obstet Gynecol 1993;168:78—84.
[5] Guyer B, Martin JA, MacDorman MF, Anderson RN, Strobino DM. Annual summary of vital statistics—1996. Pediatrics 1997;100:905—18.
[6] Arias E, MacDorman MF, Strobino DM, Guyer B. Annual summary of vital statistics—2002. Pediatrics 2003;112: 1215—30.
[7] Woodbury RM. Causal factors in infant mortality: a statistical study based on investigations in eight cities. Washington (DC): Government Printing Office; 1925. Children's Bureau publication no. 142.
[8] Eastman NJ. The effect of interval between births on maternal and fetal outlook. Am J Obstet Gynecol 1944;47: 445—66.
[9] Fedrick J, Adelstein P. Influence of pregnancy spacing on outcome of pregnancy. BMJ 1973;4:753—6.
[10] Erickson JD, Bjerkedal T. Interpregnancy interval: association with birthweight, stillbirth, and neonatal death. J Epidemiol Community Health 1978;32:124—30.
[11] Bakketeig LS, Hoffman HJ, Titmuss Oakley AR. Perinatal mortality. In: Bracken MB, editor. Perinatal epidemiology. New York: Oxford University Press, 1984. p. 99—151.
[12] Adams MM, Delaney KM, Stupp PW, McCarthy BJ, Rawlings JS. The relationship of interpregnancy interval to infant birthweight and length of gestation among low-risk women, Georgia. Paediatr Perinat Epidemiol 1997;11(Suppl. 1): 48—62.
[13] Klerman LV, Cliver SP, Goldenberg RL. The impact of short interpregnancy intervals on pregnancy outcomes in a low-income population. Am J Public Health 1998;88:1182—5.
[14] Watier L, Richardson S. Accounting for pregnancy dependence in epidemiologic studies of reproductive outcomes. Epidemiology 1997;8:629—36.
[15] Diggle PJ, Liang K-Y, Zeger SL. Analysis of longitudinal data. Oxford: Oxford University Press; 1994.

**000542**

Exhibit 136                                                                              JA-0001791

[16] Zhu BP, Rolfs RT, Nangle BE, Horan JM. Effect of the interval between pregnancies on perinatal outcomes. N Engl J Med 1999;340:589−94.

[17] Zhu BP, Haines KM, Le T, McGrath-Miller K, Boulton M. Effect of the interval between pregnancies on perinatal outcomes among white and black women. Am J Obstet Gynecol 2001;185:1403−10.

[18] Zhang J, Bowes Jr WA. Birth-weight for gestational-age patterns by race, sex, and parity in the United States population. Obstet Gynecol 1995;86:200−8.

[19] CDC. Infant mortality and low birth weight among black and white infants—United States, 1980−2000. MMWR Morb Mortal Wkly Rep 2002;51:589−92.

[20] Zhu BP, Le T. Effect of interpregnancy interval on low birthweight: a retrospective cohort study using the Michigan maternally linked birth data. MCH J 2003;7:169−78.

[21] Miller JE. Birth intervals and perinatal health: an investigation of three hypotheses. Fam Plann Perspect 1991;23:62−70.

[22] Winkvist A, Rasmussen KM, Habicht J-P. A new definition of maternal depletion syndrome. Am J Public Health 1992;82:691−4.

[23] Smits LJ, Essed GG. Short interpregnancy intervals and unfavourable pregnancy outcome: role of folate depletion. Lancet 2001;358:2074−7.

000543

Exhibit 136                                                                                          JA-0001792

**1**

```
              IN THE UNITED STATES DISTRICT COURT

            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


COMMONWEALTH OF PENNSYLVANIA    :    CIVIL ACTION NUMBER
                                          17-4540
        VS.

DONALD J. TRUMP, ET AL


        _____

                        THURSDAY, DECEMBER 14, 2017
                        COURTROOM 3B
                        PHILADELPHIA, PA 19106

        _____

        BEFORE THE HONORABLE WENDY BEETLESTONE, ESQUIRE, J.



                   PRELIMINARY INJUNCTION HEARING


        _____



                SUZANNE R. WHITE, RPR, FCRR, CM
                    OFFICIAL COURT REPORTER
                  FIRST FLOOR U  S  COURTHOUSE
                        601 MARKET STREET
                    PHILADELPHIA, PA 19106
                        (215) 627-1882



    PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
    TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

**2**

```
1   APPEARANCES:

2   OFFICE OF THE ATTORNEY GENERAL
    JONATHAN SCOTT GOLDMAN, ESQUIRE
3   NICOLE J. BOLAND, ESQUIRE
    STRAWBERRY SQUARE, 16TH FLOOR
4   HARRISBURG, PA 17120

5        AND

6   MICHAEL J. FISCHER, ESQUIRE
    NICOLE BROCK, ESQUIRE
7   21 S. 12TH STREET, 3RD FLOOR
    PHILADELPHIA, PA. 19107

8
    COUNSEL FOR THE COMMONWEALTH OF PENNSYLVANIA
9

10
    UNITED STATES DEPARTMENT OF JUSTICE
11  CIVIL DIVISION
    ETHAN PRICE DAVIS, ESQUIRE
12  950 PENNSYLVANIA AVENUE, NW
    ROOM 3133
13  WASHINGTON, DC 20530

14       AND

15  U.S. DEPARTMENT OF JUSTICE
    ELIZABETH L. KADE, ESQUIRE
16  JUSTIN MICHAEL SANDBERG, ESQUIRE
    REBECCA M. KOPPLIN, ESQUIRE
17  BRIAN STIMSON, ESQUIRE
    CHRISTOPHER HEALY, ESQUIRE
18  20 MASSACHUSETTS AVENUE, NW
    WASHINGTON, DC 20530
19
    COUNSEL FOR DONALD TRUMP, ET AL.
20
21
22
23
24
25
```

**3**

```
1        (THE CLERK OPENS COURT.)

2            THE COURT:  WE ARE HERE IN THE MATTER OF

3   COMMONWEALTH OF PENNSYLVANIA VERSUS DONALD TRUMP; DONALD

4   WRIGHT, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN

5   SERVICES; STEVE MNUCHIN, UNITED STATES DEPARTMENT OF THE

6   TREASURY, RENE ALEXANDER ACOSTA, UNITED STATES

7   DEPARTMENT OF LABOR.  THIS IS CASE NUMBER 17-4540.

8            TODAY WE HAVE A HEARING ON THE

9   COMMONWEALTH'S MOTION FOR A PRELIMINARY INJUNCTION.

10           LET ME TELL -- MOSTLY FOR THE FOLKS IN

11  THE COURTROOM, I HAVE ALREADY DETERMINED HOW THIS WILL

12  PROCEED.  WE WILL BE WORKING FROM NOW UNTIL 6.  IF THE

13  PARTIES FINISH BEFORE 6, THEN WE WILL FINISH BEFORE 6.

14           THE PARTIES HAVE REQUESTED OPENING

15  STATEMENTS. I HAVE ALLOWED THEM 15 MINUTES EACH FOR

16  OPENING STATEMENTS.  THE PARTIES HAVE ALSO ASKED FOR

17  CLOSING STATEMENTS AND I HAVE ALLOWED THEM 15 MINUTES

18  EACH FOR CLOSING STATEMENTS.

19           IN THE INTERIM, IT IS MY VIEW THAT THIS

20  IS THE PLAINTIFF'S HEARING.  I AM NOT GOING TO IMPOSE

21  ANY PARTICULAR RULES.  I'M GOING TO ALLOW THEM TO DO

22  WHAT THEY THINK THEY NEED TO DO IN ORDER TO PROCEED.

23           WITH THAT, PLEASE CAN WE HAVE THE

24  INTRODUCTIONS ON THE PLAINTIFFS' SIDE, MOVING TO THE

25  DEFENSE SIDE.
```

**4**

```
1            MR. GOLDMAN:  YOUR HONOR, MY NAME IS

2   JONATHAN GOLDMAN, THE EXECUTIVE DEPUTY ATTORNEY GENERAL

3   FOR THE COMMONWEALTH OF PENNSYLVANIA IN CHARGE OF THE

4   CIVIL LAW DIVISION.

5            MS. BOLAND:  GOOD MORNING, YOUR HONOR.

6   MY NAME IS NICOLE BOLAND. I'M THE DEPUTY ATTORNEY

7   GENERAL WITH THE OFFICE OF ATTORNEY GENERAL.

8            MR. FISCHER:  GOOD MORNING, YOUR HONOR.

9   MY NAME IS MICHAEL FISCHER, DEPUTY ATTORNEY GENERAL WITH

10  THE OFFICE OF ATTORNEY GENERAL.

11           THE COURT:  AND NICOLE BROCK, IS SHE

12  HERE?

13           MS. BROCK:  YES, YOUR HONOR. I'M NICOLE

14  BROCK, DEPUTY ATTORNEY GENERAL FROM THE OFFICE OF

15  ATTORNEY GENERAL.

16           MR. DAVIS:  GOOD MORNING, YOUR HONOR.  I

17  AM ETHAN DAVIS.  I'M A DEPUTY ASSISTANT ATTORNEY GENERAL

18  WITH THE U.S. DEPARTMENT OF JUSTICE.

19           MS. KADE:  GOOD MORNING, YOUR HONOR.  MY

20  NAME IS ELIZABETH KADE.  I'M A TRIAL ATTORNEY WITH THE

21  DEPARTMENT OF JUSTICE.

22           MR. SANDBERG:  GOOD MORNING, YOUR HONOR.

23  I'M JUSTIN SANDBERG.  I'M A CHIEF TRIAL COUNSEL WITH THE

24  DEPARTMENT OF JUSTICE.

25           MR. HEALY:  GOOD MORNING, YOUR HONOR.  MY
```

Exhibit 137

JA-0001793

5

1   NAME IS CHRISTOPHER HEALY. I'M A TRIAL ATTORNEY FOR THE

2   U.S. DEPARTMENT OF JUSTICE.

3            MS. KOPPLIN:  GOOD MORNING, YOUR HONOR.

4   MY NAME IS REBECCA KOPPLIN.  I'M ALSO A TRIAL ATTORNEY

5   WITH THE DEPARTMENT OF JUSTICE.

6            THE COURT:  MR. GOLDMAN.

7            MR. GOLDMAN:  MAY I APPROACH, YOUR HONOR?

8            THE COURT:  YOU MAY.

9            MR. GOLDMAN:  BEFORE I BEGIN, YOUR HONOR,

10  IF WE CAN CLARIFY ONE THING.  I BELIEVE WE HAD SPOKEN

11  ABOUT ON THE PHONE IN CONFERENCE THAT WE WOULD EACH HAVE

12  A HALF-HOUR FOR OPENINGS AND A HALF-HOUR FOR CLOSINGS.

13           THE COURT:  I DID NOT RECALL IT THAT WAY,

14  BUT IF THAT IS HOW YOU WANT TO USE YOUR TIME, THAT IS

15  FINE.  YOU SHOULD OF COURSE ASSUME THAT I HAVE READ ALL

16  THE BRIEFS AND THAT I'M VERY FAMILIAR WITH THE ARGUMENTS

17  THAT YOU MADE IN YOUR BRIEFS AND ALSO THE ATTACHMENTS

18  THERETO.  SO TO THE EXTENT THAT IT'S POSSIBLE THAT YOU

19  NOT REPEAT WHAT IS IN THOSE DOCUMENTS, THAT WOULD

20  PROBABLY BE A GOOD THING.

21           GO AHEAD.

22           MR. GOLDMAN:  THANK YOU, YOUR HONOR.  AS

23  I SAID, MY NAME IS JONATHAN GOLDMAN.  I'M HERE FOR THE

24  COMMONWEALTH OF PENNSYLVANIA.

25           IF I MAY ASK THE COURT'S INDULGENCE,

6

1   FOLLOWING OUR CONFERENCE ON TUESDAY EVENING AT WHICH

2   YOUR HONOR URGED THE PARTIES NOT TO BRING LIVE WITNESSES

3   TO REPEAT THE ALLEGATIONS ALREADY MADE UNDER OATH IN

4   THEIR DECLARATIONS, THERE ARE OTHER FACTS THAT ARE

5   ALREADY IN THE RECORD, WE SIGNIFICANTLY RESTRUCTURED OUR

6   CASE.  AND SEEKING TO FOLLOWING YOUR HONOR'S GUIDANCE,

7   WE REDUCED THE NUMBER OF WITNESSES FROM SIX TO LIKELY

8   THREE, AND WE SCALED BACK THE TESTIMONY OF THOSE

9   WITNESSES.

10           THE LAWYERS BESIDE ME AT COUNSEL TABLE

11  AND ALSO BACK THERE ARE MEMBERS OF THE TEAM.  WE HAVE

12  ALL WORKED TOGETHER, AND HAD WE HAD ALL SIX WITNESSES

13  HERE, EVERYBODY WOULD HAVE HAD A WITNESS, A SPEAKING

14  ROLE HERE.  SOME MEMBERS OF COUNSEL MAY NOT, BUT I JUST

15  WANTED TO ACKNOWLEDGE THEIR HARD WORK FOR THE COURT.

16           THIS CASE IS ABOUT TWO NEW REGULATIONS

17  PROMULGATED BY THE DEFENDANTS, THE RELIGIOUS EXEMPTION

18  RULE AND THE MORAL EXEMPTION RULE.  THESE ARE EXEMPTIONS

19  TO THE CONTRACEPTIVE MANDATE UNDER THE AFFORDABLE CARE

20  ACT, WHICH IS THE LAW OF THE LAND.  AND THEY ARE

21  INCREDIBLY BROAD.  THEY ARE THE EXCEPTIONS THAT SWALLOW

22  THE RULE.  THEY WERE PROMULGATED OUTSIDE THE CONSTRAINTS

23  OF THE ADMINISTRATIVE PROCEDURE ACT AND ON TOP OF

24  ALREADY EXISTING EXCEPTIONS, A RELIGIOUS EXCEPTION AND

25  ACCOMMODATION, WHICH WERE MUCH NARROWER IN SCOPE.  THEY

7

1   REQUIRE MORE ACCOUNTABILITY.  AND IN THE CASE OF THE

2   ACCOMMODATION, THEY REQUIRE AN EMPLOYER'S INSURER TO

3   STEP IN AND PROVIDE CONTRACEPTIVE CONFERENCE FOR WOMEN

4   IF THE EMPLOYER OPTS OUT.  THESE NEW RULES DO NOT DO

5   THAT.

6            AS A RESULT OF THESE NEW RULES, WOMEN IN

7   PENNSYLVANIA AND ACROSS THE COUNTRY TOO WILL LOSE THEIR

8   INSURANCE COVERAGE FOR CONTRACEPTIVE CARE.  THIS WILL

9   COST THE COMMONWEALTH TO SUFFER ECONOMIC DAMAGES AS IT'S

10  FORCED TO STEP INTO THE BREACH, AND -- UNDER THE CURRENT

11  LAWS, AND COVER THE COST OF ADDITIONAL CONTRACEPTIVE

12  CARE FOR THE ADDITIONAL WOMEN WHO WILL NEED IT.  AND

13  WHERE WOMEN ARE NOT ABLE TO GET CONTRACEPTIVE COVERAGE

14  THROUGH THE COMMONWEALTH OR ELSEWHERE, THERE WILL BE AN

15  INCREASE IN UNINTENDED PREGNANCIES, WHICH WILL CAUSE THE

16  COMMONWEALTH FURTHER ECONOMIC HARM.

17           IN ADDITION TO THESE ECONOMIC HARMS, THE

18  NEW RULES WILL CAUSE WOMEN IN THIS COMMONWEALTH AND

19  BEYOND TO SUFFER ECONOMIC HARM AND MEDICAL HARM, WHICH

20  FOR SOME WOMEN MAY BE CATASTROPHIC.

21           ON TOP OF THIS, THE RULES PLAINLY VIOLATE

22  THE LAW, AS WE HAVE LAID OUT IN OUR MOTION.  THE

23  COMMONWEALTH TODAY ASKS ONLY THAT THE COURT ENFORCE THE

24  LAW AND ISSUE A PRELIMINARY INJUNCTION TO MAINTAIN THE

25  STATUS QUO UNTIL WE CAN HAVE A FULL TRIAL.

8

1            THE COURT:  MR. GOLDMAN, GIVEN THE

2   ADMONITION THAT A COURT SHOULD NOT REACH CONSTITUTIONAL

3   ISSUES WHEN IT CAN RESOLVE A MATTER ON STATUTORY CLAIMS,

4   ARE YOU, IN THE CONTEXT OF THIS PRELIMINARY INJUNCTION,

5   PURSUING THE CONSTITUTIONAL CLAIMS OR ARE YOU FOCUSING

6   YOUR EFFORTS ON THE APA PROCEDURAL AND SUBSTANTIVE

7   CLAIMS?

8            MR. GOLDMAN:  WE ARE, AS WE DID ON OUR

9   BRIEF, YOUR HONOR, WE'RE FOCUSING ON ALL OF THE CLAIMS.

10  THE REASON WHY IS THIS -- AND TO BE VERY CLEAR, THE

11  PROCEDURAL APA CLAIMS ARE VALID AND THE DEFENDANTS

12  VIOLATED THE PROCEDURAL APA.  IF YOU WERE TO ENJOIN THE

13  RULES BASED ON THAT, PRESUMABLY IT WOULD NOT BE VERY

14  EFFICIENT.  PRESUMABLY THE DEFENDANTS WOULD GO BACK,

15  TAKE THE SAME RULES, PUT THEM UP FOR NOTICE AND COMMENT

16  FOR 30 DAYS, AND THEN WE WOULD BE RIGHT BACK HERE BEFORE

17  YOUR HONOR ON THE MORE SUBSTANTIVE CLAIMS.

18           THE COURT:  WELL, YOU HAVE TWO APA

19  CLAIMS.  ONE IS A PROCEDURAL CLAIM AND ONE IS A

20  SUBSTANTIVE CLAIM UNDER THE APA.  I THINK WHAT YOU SAID

21  WOULD OCCUR IF I DETERMINED IT ONLY UNDER THE PROCEDURAL

22  PRONG.  BUT IF I ALSO DECIDED IT UNDER THE SUBSTANTIVE

23  PRONG, WOULD THAT SAME ISSUE OCCUR?

24           MR. GOLDMAN:  NO, YOUR HONOR.  IF YOU

25  DECIDED IT UNDER THE SUBSTANTIVE APA CLAIM, YOU COULD

Exhibit 137                                                                                              JA-0001794

9

1  ACTUALLY GET TO ALL OF THE CONSTITUTIONAL ISSUES THROUGH
2  THE APA CLAIM BECAUSE IT WOULD SHOW THAT THE LAW -- THE
3  APA WAS SUBSTANTIVELY VIOLATED BECAUSE THE RULES VIOLATE
4  THE LAW ON THE CONSTITUTIONAL GROUNDS, NOT THE GROUNDS
5  WE LAID OUT.
6          THE COURT:  OKAY.  GO AHEAD.
7          MR. GOLDMAN:  SO TO YOUR POINT, YOUR
8  HONOR, WE DO HAVE FIVE CLAIMS HERE AND WE ARE URGING
9  YOUR HONOR TO CONSIDER ALL FIVE OF THEM:  EQUAL
10  PROTECTION, TITLE VII UNDER THE CIVIL RIGHTS ACT; AND
11  THE PREGNANCY DISCRIMINATION ACT ESTABLISHMENT CLAUSE;
12  AND THEN THE PROCEDURAL AND SUBSTANTIVE APA CLAIMS.
13          I KNOW WE ARE WELL AWARE OF THE STANDARD
14  FOR AN INJUNCTION.  IT'S LAID OUT ON PAGE 17 OF OUR
15  MOTION.  AND WE BELIEVE, YOUR HONOR, THAT WE HAVE SOME
16  WITNESSES TODAY TO ADD PRIMARILY ADDITIONAL TESTIMONY
17  AND COLOR AND NUANCE.  WE BELIEVE THAT YOUR HONOR IS IN
18  GOOD STEAD TO ISSUE AN INJUNCTION ALREADY, BASED ON THE
19  FINDINGS OF FACT AND THE FACTS THAT ARE IN OUR MOTION
20  AND OUR PAPERS.
21          AND IF I MAY, I WOULD LIKE TO LIST THOSE
22  OUT, SINCE THEY ARE ALREADY IN THE RECORD, UNLESS YOUR
23  HONOR WOULD PREFER ME TO MOVE ON.
24          THE COURT:  GO AHEAD.
25          MR. GOLDMAN:  IN THE RECORD, THE FACTS

10

1  INCLUDE THE FOLLOWING.  UNINTENDED PREGNANCY IS
2  PREVALENT IN THE UNITED STATES.  THAT IS IN THE WEISMAN
3  DECLARATION AT PARAGRAPHS 22 THROUGH 23.
4          PREVENTING UNINTENDED PREGNANCY RESULTS
5  IN FINANCIAL SAVINGS FOR WOMEN.  THAT IS IN THE WEISMAN
6  DECLARATION AT PARAGRAPHS 49 THROUGH 50 AND THE
7  STEINBERG DECLARATION AT PARAGRAPH 30.
8          UNINTENDED PREGNANCY IS A PREVENTABLE
9  HEALTH CONDITION FOR WOMEN, IN THE WEISMAN DECLARATION,
10  PARAGRAPHS 19 THROUGH 20, AND THE CHUANG DECLARATION AT
11  PARAGRAPHS 15 AND 41.
12          CONTRACEPTIVES ARE ALSO EFFECTIVE IN
13  PREVENTING UNINTENDED PREGNANCY.  NOT ONLY IS THAT ON
14  TABLE 5-3 ON PAGE 106 OF THE COMMITTEE'S REPORT ITSELF,
15  IT'S ALSO IN THE WEISMAN DECLARATION AT PARAGRAPH 30,
16  THE CHUANG DECLARATION AT PARAGRAPHS 41 THROUGH 43, AND
17  THE STEINBERG DECLARATION AT PARAGRAPHS 30 AND THE BUTTS
18  DECLARATION AT PARAGRAPH 36.
19          WOMEN WHO FOREGO CONTRACEPTION OR USE
20  LESS EFFECTIVE CONTRACEPTION ARE AT RISK OF UNINTENDED
21  PREGNANCY.  THAT IS ALREADY IN THE RECORD AT WEISMAN
22  DECLARATION, PARAGRAPH 48, CHUANG DECLARATION PARAGRAPH
23  39, STEINBERG DECLARATION PARAGRAPH 30, AND THE BUTTS
24  DECLARATION AT PARAGRAPH 58.
25          THE COURT:  THERE IS NO NEED TO REFER TO

11

1  THE RECORD.  I KNOW THE RECORD.  JUST SAY WHAT YOU NEED
2  TO SAY, AND I WILL BELIEVE YOU THAT IT'S IN THE RECORD.
3          MR. GOLDMAN:  THANK YOU.
4          THE COURT:  UNLESS OPPOSING COUNSEL SAYS
5  IT'S NOT IN THE RECORD, AND THEN WE WILL HAVE A LITTLE
6  FIGHT ON IT.
7          MR. GOLDMAN:  FAIR ENOUGH.
8          COST IS A BARRIER TO ASSESSING
9  CONTRACEPTION CARE.  BEFORE THE ACA'S CONTRACEPTION
10  MANDATE, PATIENTS WOULD NOT FILL THEIR CONTRACEPTIVE
11  PRESCRIPTIONS, OPTING INSTEAD TO ASK THEIR PHYSICIANS
12  FOR LESS EFFECTIVE BUT CHEAPER METHODS OF CONTRACEPTION
13  AT LEAST UP FRONT, ULTIMATELY NOT CHEAPER IN THE LONG
14  RUN.  BEFORE THAT CONTRACEPTIVE MANDATE, PATIENTS WOULD
15  NOT FILL THEIR CONTRACEPTIVE PRESCRIPTIONS, OPTING
16  INSTEAD TO FAIL TO USE CONTRACEPTION SOMETIMES
17  ALTOGETHER BECAUSE OF THE COST.  BEFORE THE ACA
18  CONTRACEPTIVE MANDATE, IUDS WERE ONE OF THE MOST
19  EXPENSIVE FORMS OF CONTRACEPTIVES FOR PATIENTS IN TERMS
20  OF THE INITIAL COST WHICH HAS TO BE PAID UP FRONT.  AND
21  YET IUDS ARE A MUCH MORE EFFECTIVE METHOD OF
22  CONTRACEPTIVE CARE THAN ARE BIRTH CONTROL PILLS AND
23  OBVIOUSLY THAN ARE NOTHING.
24          THE CONTRACEPTION MANDATE HAS RESULTED IN
25  MORE WOMEN USING CONTRACEPTIVES GENERALLY AND MORE

12

1  EFFECTIVE METHODS OF CONTRACEPTIVES SPECIFICALLY.  MORE
2  WOMEN ARE USING IUDS, FOR EXAMPLE, THAN ORAL BIRTH
3  CONTROL PILLS OR NO METHOD OF CONTRACEPTION AT ALL, SUCH
4  THAT AFTER THE CONTRACEPTIVE MANDATE PATIENTS WERE FREE
5  TO MAKE CONTRACEPTIVE CHOICES PURELY ON THE BASIS OF
6  MEDICAL NEEDS, LISTENING TO THE RECOMMENDATIONS OF THEIR
7  DOCTORS, WITHOUT HAVING TO WEIGH THE COST OF CARE, WHICH
8  IS EXACTLY WHAT THE AFFORDABLE CARE ACT INTENDED.  AND
9  AS A RESULT, AFTER THE CONTRACEPTIVE MANDATE, PATIENTS
10  HAD MADE MORE MEDICALLY INFORMED CONTRACEPTIVE CHOICES,
11  WHICH HAVE BEEN BETTER FOR THE HEALTH OF THEM AND THEIR
12  FAMILIES.
13          THE PENNSYLVANIA DEPARTMENT OF HEALTH AND
14  HUMAN SERVICES HAS ENCOURAGED THE USE OF LARCS,
15  LONG-ACTING CONTRACEPTION, AS POST PARTUM CONTRACEPTION
16  TO REDUCE THE RATE OF UNINTENDED PREGNANCIES BY CHANGING
17  ITS FEE FOR SERVICE PAYMENT POLICIES FOR HOSPITAL
18  PROVIDERS, A POLICY OF THE COMMONWEALTH.
19          MORE THAN 2.5 MILLION WOMEN IN
20  PENNSYLVANIA COULD BENEFIT FROM THE CONTRACEPTIVE CARE
21  MANDATE AND OVER 700,000 PENNSYLVANIANS HAVE ENROLLED IN
22  MEDICAID AS A RESULT OF THE EXPANSION UNDER THE
23  CONTRACEPTIVE CARE MANDATE.
24          THE DEPARTMENT OF INSURANCE ESTIMATES
25  THAT THE WOMEN IN PENNSYLVANIA WHO HAVE BENEFITED FROM

Exhibit 137                                                                        JA-0001795

13

1  THE CONTRACEPTIVE CARE MANDATE HAVE SAVED OVER
2  $250 MILLION ANNUALLY, AND THOSE ARE JUST THE DOLLARS.
3  THAT IS NOT THE HEALTH BENEFITS.
4         HOWEVER, YOUR HONOR, PENNSYLVANIA HAS NO
5  STATUTE OR REGULATION REQUIRING EMPLOYERS OFFERING PLANS
6  REGULATED BY THE PENNSYLVANIA DEPARTMENT OF INSURANCE
7  THAT OPT OUT OF THE CONTRACEPTIVE CARE MANDATE TO
8  PROVIDE CONTRACEPTIVE COVERAGE TO ITS EMPLOYEES OR
9  BENEFICIARIES.  OTHER STATES MAY HAVE A LAW LIKE THAT.
10 THIS ONE DOESN'T.  AND SIMILARLY, PENNSYLVANIA HAS NO
11 STATUTE OR REGULATION REQUIRING EMPLOYERS OFFERING PLANS
12 REGULATED BY ERISA THAT OPT OUT TO PROVIDE CONTRACEPTIVE
13 COVERAGE TO ITS EMPLOYEES OR BENEFICIARIES.
14        THEREFORE, DUE TO THE NEW RULES AND
15 REGULATIONS, THESE EXEMPTIONS, WOMEN WILL LOSE
16 CONTRACEPTIVE COVERAGE WHEN THEIR EMPLOYERS OPT OUT OF
17 PROVIDING IT, OR IN SOME CASES THE EMPLOYERS OF THEIR
18 SPOUSES THROUGH WHOM THEY HAVE COVERAGE.  AS A RESULT
19 SOME OF THESE WOMEN WILL FAIL TO USE CONTRACEPTIVES OR
20 WILL USE LESS EFFECTIVE CONTRACEPTIVE METHODS DUE TO THE
21 COST.  WE HAVE SEEN THIS ALREADY.
22        MANY WOMEN WHOSE EMPLOYERS REFUSE TO
23 PROVIDE COVERAGE FOR THEIR CONTRACEPTIVE COSTS WILL SEEK
24 FINANCIAL ASSISTANCE THROUGH STATE GOVERNMENT PROGRAMS.
25 THIS GETS TO THE ISSUE OF STATE HARM.  THE AMOUNT OF

15

1  NEGATIVE EFFECT ON THE HEALTH OF PENNSYLVANIA WOMEN.
2  THAT IS IN ADDITION TO THE ECONOMIC HARM AND OTHER HARM
3  TO THE COMMONWEALTH AS A WHOLE.
4         THE COURT:  MR. GOLDMAN, I JUST NEED
5  TO -- I NEED TO ROLL YOU BACK TO THE VERY BEGINNING, AND
6  THAT ISSUE IS STANDING.  I THINK SOME OF THE BRIEFING IS
7  ABOUT STANDING.  AND THE QUESTION IS, DOES THE
8  COMMONWEALTH HAVE STANDING TO CHALLENGE AN AFFIRMATIVE
9  ACTION OF AN AGENCY, AND IF SO, WHAT IS YOUR SUPPORT FOR
10 THAT POSITION?
11        MR. GOLDMAN:  THE COMMONWEALTH ABSOLUTELY
12 DOES HAVE THAT STANDING.  IT IS STANDING BOTH IN TERMS
13 OF REAL ECONOMIC HARM.  IT HAS SUFFERED HARM AND WILL
14 SUFFER HARM.  AND THEN ALSO UNDER THE PARENS PATRIAE
15 DOCTRINE WHERE IT IS ABLE TO ASSERT STANDING ON BEHALF
16 OF ITS CITIZENS IN A MORE GLOBAL SENSE.
17        THE COURT:  WHICH CASE ARE YOU RELYING ON
18 OR WHICH SET OF CASES?
19        MR. GOLDMAN:  FORGIVE ME, JUDGE.  THE
20 CASES ARE IN OUR BRIEF.
21        THE COURT:  WHO IS THE STANDING ATTORNEY
22 WHO DID THE ANALYSIS FOR THAT?  WHY DON'T YOU COME UP
23 AND TELL ME ABOUT THAT.
24        MR. FISCHER:  THANK YOU, YOUR HONOR.
25        MR. GOLDMAN:  MAY I STAND HERE, YOUR

14

1  MONEY THE COMMONWEALTH SPENDS ON MEDICAID AND THE FAMILY
2  PLANNING SERVICES PROGRAM IS CONTINGENT UPON ENROLLMENT
3  SO THAT THE MORE PEOPLE HAVE TO HERE ENROLL IN THESE
4  STATE PROGRAMS, THE MORE MONEY THE COMMONWEALTH MUST
5  SPEND ON THEM.  THE NEW RULES WILL IMPOSE ADDITIONAL
6  ECONOMIC AND OTHER BURDENS ON FAMILY PLANNING CLINICS
7  AROUND PENNSYLVANIA, AND THE COMMONWEALTH OF
8  PENNSYLVANIA WILL BEAR MUCH OF THAT BURDEN.  LOW INCOME
9  WOMEN WHO ARE NOT ELIGIBLE FOR FUNDING THROUGH STATE
10 GOVERNMENT PROGRAMS WILL BE FORCED TO CHOOSE BETWEEN
11 PAYING OUT OF POCKET, IF THEY CAN, OR GOING WITHOUT
12 CONTRACEPTION ALTOGETHER.  WOMEN WHO STOP USING
13 CONTRACEPTION ARE MORE LIKELY TO HAVE UNPLANNED
14 PREGNANCIES AND TO REQUIRE ADDITIONAL MEDICAL ATTENTION.
15 THESE THINGS ARE IN MANY WAYS TRUISMS.
16        BECAUSE PATIENTS WILL LOSE CONTRACEPTIVE
17 COVERAGE UNDER THE NEW RULES, THEY WILL THEN MAKE LESS
18 MEDICALLY SOUND CONTRACEPTIVE CHOICES AND THEREFORE THEY
19 WILL BE HARMED.
20        MANY WOMEN WHO NO LONGER RECEIVE
21 CONTRACEPTIVE COVERAGE WILL NOT ONLY FACE FINANCIAL HARM
22 BUT WILL ALSO FACE MEDICAL HARM.  AND AGAIN, SOME CASES
23 YOU WILL HEAR AND IT'S ALREADY IN THE RECORD, THAT CAN
24 BE CATASTROPHIC, EVEN FATAL HARM.
25        IN SUM, THE NEW RULES WILL HAVE A

16

1  HONOR?
2         THE COURT:  YOU MAY.
3         MR. FISCHER:  GOOD MORNING, YOUR HONOR.
4  MICHAEL FISCHER FOR THE COMMONWEALTH.
5         AS MR. GOLDMAN SAID, THE COMMONWEALTH
6  DOES HAVE STANDING, BOTH DIRECT STANDING AS A RESULT OF
7  THE FINANCIAL HARM, AS WELL AS PARENS PATRIAE STANDING
8  TO ASSERT ITS INTEREST IN PROTECTING THE HEALTH AND
9  WELFARE OF ITS RESIDENTS.  AS WE DISCUSSED IN OUR BRIEF,
10 WE THINK MASSACHUSETTS VERSUS EPA IS A TEXTBOOK EXAMPLE
11 OF WHEN A STATE CAN ASSERT STANDING BASED BOTH ON A
12 DIRECT INJURY AS WELL AS A PARENS PATRIAE THEORY.
13        THE COURT:  WASN'T MASSACHUSETTS A CASE
14 INVOLVING INACTION RATHER THAN AFFIRMATIVE ACTION?
15        MR. FISCHER:  IT WAS AN INACTION CASE,
16 YOU ARE RIGHT.  TEXAS VERSUS UNITED STATES IS AN ACTION
17 CASE.  NOW AS THE COURT INDICATED IN THE DIRECTION WE
18 WERE SENT, THAT CASE WAS AFFIRMED BY AN EVENLY DIVIDED
19 SUPREME COURT.  SO IT IS NOT -- THE COURT'S DECISION IS
20 NOT BINDING ON YOUR HONOR.
21        HOWEVER, THE FIFTH CIRCUIT'S DECISION WE
22 THINK IS INSTRUCTIVE.  THE FIFTH CIRCUIT LOOKED AT THE
23 GOVERNMENT'S POLICY, THE DAPA PROGRAM IN THAT CASE THAT
24 HAD BEEN IMPLEMENTED, DECIDED IT WOULD CAUSE THE STATE
25 OF TEXAS AND OTHER STATES DIRECT FINANCIAL HARM, FOUND

Exhibit 137                                                                                              JA-0001796

17

1   THAT THAT WAS SUFFICIENT TO ESTABLISH STATE STANDING.
2   THAT DECISION AGAIN WAS AFFIRMED BY AN EVENLY DIVIDED
3   COURT.  SO AT LEAST FOUR JUSTICES OF THE COURT AT THE
4   TIME WERE CONVINCED THAT THE STATE DID HAVE STANDING.
5            WE THINK THIS IS REALLY NO DIFFERENT FROM
6   ANY OTHER STANDING ANALYSIS INVOLVING OTHER -- INVOLVING
7   PRIVATE PLAINTIFFS, INVOLVING OTHER GOVERNMENT
8   PLAINTIFFS.  THE COMMONWEALTH HERE ALLEGES A DIRECT
9   FINANCIAL HARM.  THAT IS INJURY IN FACT.  THAT IS
10  TEXTBOOK INJURY IN FACT.  IT IS CLEARLY TRACEABLE TO THE
11  DEFENDANT'S ACTIONS.  IT IS CLEARLY REDRESSABLE THROUGH
12  RELIEF IN THIS COURT.  SO WE BELIEVE IT'S FAIRLY CLEAR
13  THAT WE SATISFY THE ELEMENTS OF STANDING UNDER A DIRECT
14  THEORY.
15           AND IN ADDITION, UNDER PARENS PATRIAE
16  THEORY, THERE IS SOME, I WILL ADMIT, SOMEWHAT CONFUSING
17  CASE LAW ON PARENS PATRIAE THEORY.  BUT ONE THEME THAT
18  EMERGES, AND THIS IS ACTUALLY DISCUSSED AT LENGTH IN THE
19  DISTRICT COURT DECISION IN TEXAS VERSUS UNITED STATES,
20  IS THAT WHERE A STATE IS ASSERTING ITS QUASI SOVEREIGN
21  INTEREST IN PROTECTING THE HEALTH AND WELFARE OF ITS
22  CITIZENS, IT MAY DO SO IN CHALLENGING FEDERAL AGENCY
23  ACTION THAT IT ALLEGES IS IN VIOLATION OF A FEDERAL
24  STATUTE.  THAT IS WHAT WE ARE ALLEGING HERE.
25           THERE ARE CASES GOING BACK TO I BELIEVE

18

1   MASSACHUSETTS VERSUS MELLON THAT SAY A STATE CANNOT
2   ASSERT PARENS PATRIAE STANDING AGAINST THE FEDERAL
3   GOVERNMENT IN CHALLENGING A FEDERAL STATUTE.
4            THE COURT:  WELL, IS THIS -- THIS CONCEPT
5   CALLED SPECIAL SOLICITUDE?
6            MR. FISCHER:  YES.
7            THE COURT:  AND I HAVE TO SAY THAT THE
8   CONCEPT OF SPECIAL SOLICITUDE IS, SHALL WE SAY, NOT AS
9   CRYSTAL CLEAR AS IT COULD BE IN THE JURISPRUDENCE.
10           MR. FISCHER:  ABSOLUTELY.
11           THE COURT:  TELL ME, HOW DOES IT APPLY,
12  WHEN DOES IT APPLY, HOW DO I USE IT?
13           MR. FISCHER:  IT APPLIES -- AND THE
14  SPECIAL SOLICITUDE IS DISCUSSED IN MASSACHUSETTS VS.
15  EPA, ALTHOUGH ACTUALLY, THE PHRASE APPEARS FIRST IN, I
16  BELIEVE, THE D.C. CIRCUIT DECISION THAT WE CITED -- I
17  APOLOGIZE, I FORGET THE NAME -- BUT AUTHORED BY THEN
18  JUDGE SCALIA, WHERE HE TALKED AT LENGTH ABOUT PARENS
19  PATRIAE STANDING AND QUASI-SOVEREIGN STANDING.
20           THE ESSENCE OF THE SPECIAL SOLICITUDE, WE
21  BELIEVE, IS THAT A STATE HAS -- THAT THE COURT SHOULD
22  GIVE ADDITIONAL DEFERENCE TO STATES IN ANALYZING THE
23  EXTENT OF ANY INJURY THAT IS SUFFERED TO WHETHER OR NOT
24  THAT INJURY CONFERS STANDING.
25           NOW, HERE -- FRANKLY, WE -- AS I SAID

19

1   EARLIER, I DON'T THINK IT'S NECESSARY TO EVEN RELY ON
2   SPECIAL SOLICITUDE, BUT IN MASSACHUSETTS VERSUS EPA, THE
3   COURT ESSENTIALLY SAID THE STATE OF MASSACHUSETTS,
4   COMMONWEALTH OF MASSACHUSETTS, CAN ASSERT ITS INTEREST
5   IN PROTECTING ITS CITIZENS FROM ENVIRONMENTAL HARM.
6   THAT RESPONSIBILITY WAS ACTUALLY DELEGATED TO EPA.
7            EPA, UNDER THE SUPREMACY CLAUSE, COULD
8   PROHIBIT MASSACHUSETTS FROM ACTING.  SO SINCE EPA HAD
9   THAT RESPONSIBILITY, MASSACHUSETTS, BECAUSE IT SIMILARLY
10  HAD A DUTY TO PROTECT ITS CITIZENS, COULD CHALLENGE
11  EPA'S INACTION IN THAT CASE UNDER THIS THEORY THAT AS A
12  SOVEREIGN STATE, IT COULD INITIATE LITIGATION TO PROTECT
13  THE -- IN THAT CASE, THE INTEREST OF ITS CITIZENS, A
14  CLEAN ENVIRONMENT AND PROTECTION FROM THE HARMFUL
15  EFFECTS OF CLIMATE CHANGE.
16           WE BELIEVE THAT DOES -- THAT EXPLAINS THE
17  CONCEPT OF SPECIAL SOLICITUDE, THAT THERE IS ADDITIONAL
18  DEFERENCE GIVEN TO A STATE WHEN IT'S ASSERTING AN
19  INTEREST IN PROTECTING BOTH ITS OWN SOVEREIGN
20  PREROGATIVES.  THERE YOU HAD COASTLINE THAT
21  MASSACHUSETTS ARGUED WAS BEING ERODED, AS WELL AS THE
22  INTEREST OF ITS STATE -- INTEREST OF ITS RESIDENTS.
23           THE COURT:  SO IS THE SPECIAL SOLICITUDE,
24  IS IT, FOR WANT OF A BETTER TERM, A GLOSS OVER THE
25  STANDING INQUIRY THAT I MUST UNDERTAKE OR DOES IT IMPACT

20

1   ON ANY OF THE PRONGS OF THE STANDING ANALYSIS IN
2   PARTICULAR?
3            MR. FISCHER:  YOUR HONOR, I BELIEVE -- I
4   WOULD SAY THAT IT'S BOTH TO SOME EXTENT.  IT IS A GLOSS,
5   BUT I THINK IT IS PARTICULARLY DIRECTED TO THE INJURY
6   PRONG.  IT IS LESS RELEVANT TO I THINK THE CAUSATION AND
7   REDRESSABILITY PRONGS, BUT IT DOES ALLOW THE
8   COMMONWEALTH OR STATE TO ASSERT INJURIES THAT MAY BE IN
9   SOME CASES, FOR A PRIVATE LITIGANT, WOULD NOT BE
10  SUFFICIENT.
11           IT'S HARD TO THINK OF AN ANALOGOUS
12  SITUATION INVOLVING A PRIVATE LITIGANT TO MASSACHUSETTS
13  VERSUS EPA, BUT IT SEEMS LIKE THE COURT IS SAYING THAT
14  TO THE EXTENT THERE IS ANY AMBIGUITY OR DOUBT HERE ABOUT
15  WHETHER THIS IS A SUFFICIENT INJURY, WE ARE GOING TO
16  RECOGNIZE THE STATE'S SOVEREIGN PREROGATIVE AND
17  QUASI-SOVEREIGN INTEREST IN PROTECTING ITS CITIZENS AND
18  FIND THAT THERE IS SUFFICIENT INTEREST HERE.
19           THE COURT:  OKAY.  THANK YOU,
20  MR. FISCHER.
21           MR. FISCHER:  THANK YOU, YOUR HONOR.
22           THE COURT:  MR. GOLDMAN, YOU HAVE MORE
23  TIME IF YOU WANT TO.
24           MR. GOLDMAN:  IF I MAY ASK MR. FISCHER TO
25  STAY HERE FOR ONE MOMENT, BECAUSE I WOULD LIKE TO TRY TO

Exhibit 137                                                        JA-0001797

21

1  MARRY UP A LITTLE BIT MASSACHUSETTS V EPA WITH THE CASE
2  HERE.
3          THE COURT: OKAY.
4          MR. GOLDMAN: AND THAT IS MASSACHUSETTS
5  VERSUS EPA, THERE WAS A LAW PROTECTING THE ENVIRONMENT
6  WHICH ALSO PROTECTED THE CITIZENS OF MASSACHUSETTS. THE
7  AGENCIES FAILED TO ENFORCE THAT LAW IN A WAY THAT HARMED
8  MASSACHUSETTS. MASSACHUSETTS THEREFORE HAD STANDING.
9          SIMILARLY HERE, THERE IS A LAW THAT
10  PROTECTS WOMEN AND PEOPLE AROUND THE COUNTRY; THAT'S THE
11  AFFORDABLE CARE ACT AND THE CONTRACEPTIVE CARE MANDATE.
12  THAT ALSO PROTECTS THE CITIZENS OF PENNSYLVANIA, MEN AND
13  WOMEN, AND HERE, THE AGENCIES ARE NOT ENFORCING THE
14  CONTRACEPTIVE CARE ACT. AND IN FACT, THE REGULATIONS AT
15  ISSUE HERE HAVE UNDERMINED THE ACT, AND THAT IS -- IT'S
16  VERY MUCH ON PAR AND IT REINFORCES THE STANDING THAT THE
17  COMMONWEALTH HAS HERE.
18          THE COURT: OKAY, THANK YOU. PROCEED.
19          MR. GOLDMAN: SO ALL OF THAT IS ALREADY
20  IN THE RECORD, YOUR HONOR. AND AGAIN, WE BELIEVE YOUR
21  HONOR CAN SAFELY ISSUE AN INJUNCTION RIGHT NOW, AND IF
22  YOU ARE INCLINED TO DO THAT, WE WOULD SIT DOWN, BUT I
23  ASSUME WE WILL KEEP ARGUING OUR CASE.
24          ON TOP OF THAT, YOUR HONOR, WE ARE POISED
25  TO BRING THREE WITNESSES TO THE COURT TODAY. THE FIRST

22

1  IS DR. CAROL WEISMAN. SHE WILL ADD -- THERE'S A
2  DECLARATION IN THE RECORD, AS YOU WELL KNOW. SHE WILL
3  ADD ADDITIONAL PERSPECTIVE TODAY AS ONE OF ONLY 16
4  MEMBERS OF THE INSTITUTE OF MEDICINES COMMITTEE ON
5  PREVENTATIVE SERVICES FOR WOMEN THAT WAS CONVENED BY THE
6  HEALTH RESOURCES SERVICES ADMINISTRATION, THE HRSA, IN
7  CONNECTION WITH THE AFFORDABLE CARE ACT.
8          SHE WILL ALSO SPEAK ABOUT HER ROLE IN A
9  STUDY PERFORMED SINCE THE ACA HAS GONE INTO EFFECT THAT
10  DEMONSTRATES THAT THE CONTRACEPTIVE MANDATE HAS IN FACT
11  RESULTED IN WOMEN MAKING BETTER, SAFER, MORE EFFECTIVE
12  AND MORE COST-EFFECTIVE HEALTH CHOICES.
13          THE COURT: IN PENNSYLVANIA?
14          MR. GOLDMAN: YES, YOUR HONOR.
15          DR. SAMANTHA BUTTS WILL ALSO SPEAK TODAY,
16  YOUR HONOR. SHE HAS, AS YOU KNOW, HAS A DECLARATION IN
17  THIS CASE AS WELL. SHE IS GOING TO ADD ADDITIONAL
18  PERSPECTIVE AS A MEDICAL DOCTOR, TEACHER AND RESEARCHER
19  WHO USES A VARIETY OF CONTRACEPTIVES TO TREAT PATIENTS
20  AS PART OF HER PRACTICE, WHICH INCLUDES INFERTILITY,
21  HELPING WOMEN CONCEIVE.
22          AND YES, YOU WILL HEAR HOW SHE IS USING
23  CONTRACEPTIVES AS PART OF HER PRACTICE AT THE UNIVERSITY
24  OF PENNSYLVANIA SCHOOL OF MEDICINE IN WEST PHILADELPHIA.
25  AND SHE WILL ALSO PROVIDE TESTIMONY ABOUT HOW

23

1  HER ABILITY TO PRESCRIBE THE BEST CONTRACEPTIVE
2  PRESCRIPTIONS FOR PATIENTS CHANGED PRE AND POST
3  CONTRACEPTIVE CARE MANDATE AND WHAT THAT WILL MEAN THEN
4  FOR HOW WOMEN WILL BE HARMED UNDER THE NEW RULES AS
5  THEIR EMPLOYERS OPT OUT OF PROVIDING COVERAGE.
6          AND LAST, DR. CYNTHIA CHUANG WILL ALSO
7  TESTIFY TODAY.
8          THE COURT: CHUANG, T-U-O-N-G?
9          MR. GOLDMAN: I'M SORRY, IT'S
10  C-H-U-A-N-G.
11          THE COURT: OKAY.
12          MR. GOLDMAN: AND IT'S PRONOUNCED CHUANG.
13  SHE WILL ADD ADDITIONAL PERSPECTIVE AS A MEDICAL DOCTOR,
14  TEACHER AND RESEARCHER WHO TREATS PATIENTS AT THE
15  HERSHEY MEDICAL CENTER IN HERSHEY, PENNSYLVANIA.
16          SHE WILL ALSO PROVIDE SOME TESTIMONY
17  ABOUT SOME OF HER OWN RESEARCH THAT HAS DEMONSTRATED
18  THAT SINCE THE ACA'S CONTRACEPTIVE MANDATE HAS GONE INTO
19  EFFECT IT ALSO HAS IN FACT RESULTED IN WOMEN MAKING
20  BETTER, SAFER, MORE EFFECTIVE AND MORE COST-EFFECTIVE
21  HEALTH CHOICES.
22          WE WILL DO OUR BEST AS WE RAISE THEM TO
23  NOT BE DUPLICATIVE OF WHAT IS IN THE RECORD, AND YOU
24  HAVE MADE VERY CLEAR, YOUR HONOR, YOUR COUNSEL TO DO
25  THAT. WE HAVE RESTRUCTURED OUR WITNESS OUTLINES. WE DO

24

1  HAVE SOME LAYING OF FOUNDATION. IF AT ANY POINT YOU
2  FEEL LIKE YOU HAVE ALREADY HEARD THAT, BY ALL MEANS,
3  SHEPHERD US ALONG, AND WE WILL DO OUR BEST TO DO THAT TO
4  OURSELVES SO YOU DON'T HAVE TO.
5          THE COURT: I'M ASSUMING THAT THE
6  DEFENDANTS WILL NOT PUT YOU THROUGH THE PROCESS OF
7  SETTING FORTH A DEEP FOUNDATION FOR EVERYTHING THAT IS
8  TO BE ELICITED.
9          MS. KADE: YOUR HONOR, WE HAVE STIPULATED
10  TO THE ADMISSIBILITY OF EVERYTHING EXCEPT FOR THE
11  DEMONSTRATIVE EXHIBITS.
12          THE COURT: THANK YOU. OKAY.
13          MR. GOLDMAN: IN CONCLUSION, YOUR HONOR,
14  WE BELIEVE THAT YOU CAN ISSUE THIS INJUNCTION NOW. WE
15  HOPE THAT YOU WILL DO SO AS SOON AS YOUR HONOR IS READY,
16  AND WILL DO SO CONSIDERING ALL OF THE DIFFERENT CLAIMS
17  TO KEEP THE STATUS QUO IN PLACE AND PROTECT THE CITIZENS
18  OF THE COMMONWEALTH.
19          THE COURT: SO I UNDERSTAND THERE IS A
20  DATE BY WHICH PENNSYLVANIA THINKS IT WOULD BE USEFUL FOR
21  ME TO HAVE DECIDED THIS MATTER.
22          MR. GOLDMAN: THERE IS, YOUR HONOR. I
23  WOULD SAY BEYOND USEFUL, I WOULD SAY EVEN NECESSARY.
24  THAT DATE IS JANUARY 1ST, 2018. THE REASON WHY THAT
25  DATE IS IMPORTANT IS BECAUSE MANY ERISA HEALTHCARE PLANS

Exhibit 137                                                                                    JA-0001798

25

1  HAVE AN OPEN ENROLLMENT WHERE THE NEW PLANS START ON THE
2  FIRST OF THE YEAR.  NOT ALL OF THEM, BUT MANY.  SO THAT
3  WILL BE A -- WE BELIEVE A LARGE WINDOW WHERE POLICIES
4  WILL CHANGE, EMPLOYERS WILL START TAKING ADVANTAGE OF
5  THESE NEW RULES.
6          THE COURT:  OKAY.  SO YOU ARE SAYING THAT
7  BECAUSE THE EXEMPTIONS WERE PUT IN PLACE EFFECTIVE
8  IMMEDIATELY THAT WHILE THERE MAY BE NO CHANGE IN PLANS
9  RIGHT NOW, AS OF JANUARY THE 1ST, BECAUSE THERE IS THIS
10 OPEN ENROLLMENT PERIOD, IT IS LIKELY THAT THE PLANS WILL
11 CHANGE AT THAT POINT?
12         MR. GOLDMAN:  CORRECT, YOUR HONOR.  AND
13 BY THE WAY, IT IS CERTAINLY POSSIBLE THAT PLANS HAVE
14 ALREADY CHANGED IF APPROPRIATE NOTICE HAS BEEN GIVEN.
15 WE JUST DON'T KNOW THAT YET.  WE HAVE NOT SEEN THAT YET.
16         THE COURT:  OKAY.  THANK YOU VERY MUCH.
17         MR. GOLDMAN:  THANK YOU, YOUR HONOR.
18         THE COURT:  DEFENSE.
19         MR. DAVIS:  MAY I APPROACH, YOUR HONOR?
20         THE COURT:  YOU MAY.
21         MR. DAVIS:  GOOD MORNING, YOUR HONOR.
22 ETHAN DAVIS FOR THE UNITED STATES.
23         IF THERE IS ONE THEME WE WOULD ASK YOUR
24 HONOR TO KEEP IN MIND TODAY AS WE HEAR FROM THE
25 WITNESSES, IT IS THAT THIS COURT IS NOT WRITING ON A

26

1  BLANK SLATE.  OVER THE PAST SIX YEARS, DOZENS OF
2  ENTITIES WITH RELIGIOUS AND MORAL OBJECTIONS HAVE SUED
3  OVER THE CONTRACEPTIVE COVERAGE REQUIREMENT.
4          THOSE LAWSUITS PRODUCED A PATCHWORK OF
5  PRELIMINARY AND PERMANENT INJUNCTIONS THROUGHOUT THE
6  UNITED STATES, MANY OF WHICH ARE STILL IN EFFECT TODAY.
7  THE SUPREME COURT ALSO WEIGHED IN ON THESE ISSUES FOUR
8  TIMES, FIRST IN HOBBY LOBBY, THEN IN LITTLE SISTERS,
9  THEN IN WHEATON COLLEGE, AND FINALLY IN ZUBIK.
10         AND THE FEDERAL GOVERNMENT HAS CHANGED
11 THE RULES GOVERNING CONTRACEPTIVE COVERAGE MULTIPLE
12 TIMES SINCE 2011.  THERE IS A LOT OF WATER UNDER THE
13 BRIDGE AND THIS POINT MATTERS TO VIRTUALLY ALL OF THE
14 ISSUES IN THIS CASE.
15         FIRST ON STANDING.  THE COMMONWEALTH'S
16 PAPERS GIVE THE IMPRESSION THAT THE NEW RULES ARE GOING
17 TO WITHDRAW CONTRACEPTIVE COVERAGE FROM MILLIONS OF
18 WOMEN WHO ARE CURRENTLY RECEIVING COVERAGE AND THAT THEY
19 ARE THE EXCEPTION THAT WILL SWALLOW THE RULE, BUT IT
20 SHOULD NOT ESCAPE YOUR NOTICE, YOUR HONOR, THAT NONE OF
21 THOSE MILLIONS OF WOMEN WHO WILL SUPPOSEDLY BE AFFECTED
22 BY THESE RULES IS A PLAINTIFF IN THIS CASE, NOR DID ANY
23 OF THEM SUBMIT A DECLARATION EXPLAINING THAT AN EMPLOYER
24 IS ABOUT TO DROP CONTRACEPTIVE COVERAGE.
25         AND WHY DON'T WE SEE ANY INDIVIDUALS IN

27

1  THIS CASE, YOUR HONOR?  IT'S BECAUSE YOUR HONOR IS NOT
2  WRITING ON A BLANK SLATE.  MANY AND MAYBE ALL OF THE
3  RELIGIOUS EMPLOYERS WHO OBJECT TO PROVIDING
4  CONTRACEPTIVE COVERAGE HAVE ALREADY SUED.  MANY ARE
5  ALREADY PROTECTED BY INJUNCTIONS.  SO EMPLOYEES WHO WORK
6  FOR THOSE RELIGIOUS ORGANIZATIONS HAVE NOT BEEN
7  RECEIVING CONTRACEPTIVE COVERAGE FOR YEARS.
8          TAKE THE LITTLE SISTERS AS AN EXAMPLE.
9  AS YOUR HONOR RECOGNIZED IN DENYING THE LITTLE SISTERS
10 MOTION TO INTERVENE, GRANTING AN INJUNCTION IN THIS CASE
11 WOULD NOT CHANGE THE FACT THAT THE LITTLE SISTERS ARE
12 NOT CURRENTLY PROVIDING CONTRACEPTIVE COVERAGE TO THEIR
13 EMPLOYEES.
14         THE COURT:  WELL, I AGREE WITH YOU WITH
15 RESPECT TO THE RELIGIOUS EXEMPTION.  QUITE CLEARLY THERE
16 HAS BEEN A LOT OF LITIGATION ABOUT THIS, BUT THE MORAL
17 EXEMPTION IS SOMETHING NEW, ISN'T IT?
18         MR. DAVIS:  THE MORAL EXEMPTION IS NEW,
19 YOUR HONOR, BUT THERE'S ALSO BEEN LITIGATION OVER THAT.
20 THERE WAS A CASE HERE IN PENNSYLVANIA, THE REAL
21 ALTERNATIVES CASE, AND THERE WAS ALSO A CASE IN D.C.
22 CALLED MARCH FOR LIFE.  SO I DON'T THINK THE LITIGATION
23 OVER THAT IS NEW.
24         THE COURT:  WELL, BUT IN THE CONTEXT OF
25 THE AFFORDABLE CARE ACT, IT IS NEW, BECAUSE THE MORAL

28

1  EXEMPTION WAS ONLY ISSUED A FEW WEEKS AGO.  SO THERE HAS
2  BEEN NO LITIGATION IN THE CONTEXT OF THE MORAL EXEMPTION
3  OR A MORAL EXEMPTION AS IT APPLIES TO THE ACA, CORRECT?
4          MR. DAVIS:  I AGREE WITH THAT, YOUR
5  HONOR.  THERE HAS BEEN DISCUSSIONS OF CONSCIENCE ISSUES
6  DURING THE RULEMAKINGS, BUT THERE HAS NOT BEEN
7  LITIGATION OVER THIS MORAL EXEMPTION RULE, THIS ONE THAT
8  WAS JUST PASSED IN 2017, UNTIL NOW.
9          THE COURT:  SO I'M A LITTLE PUZZLED BY
10 WHAT THE MORAL EXEMPTION MEANS.  HOW DOES ONE
11 DETERMINE -- WELL, A COUPLE OF QUESTIONS.  HOW DOES AN
12 ENTITY DETERMINE THAT IT HAS A MORAL CONVICTION?  HOW IS
13 THAT CONVICTION INSTANTIATED THROUGHOUT THE ENTIRE
14 ORGANIZATION?  WHO MAKES -- IN OTHER WORDS, WHO MAKES
15 THE DETERMINATION?  AND HOW DOES ONE DECIDE WHAT IS
16 MORAL AND WHAT IS NOT MORAL?
17         I UNDERSTAND IN THE CONTEXT OF RELIGION
18 THAT THERE ARE QUITE CLEAR MORAL PRECEPTS, BUT WE ARE A
19 COUNTRY WHERE, RIGHTLY OR WRONGLY, WHETHER YOU AGREE
20 WITH IT OR NOT, PEOPLE HAVE VERY DIFFERENT VIEWS ABOUT
21 WHAT MORALITY IS.  SO HELP ME UNDERSTAND THE MORALITY
22 EXEMPTION IN THE CONTEXT OF THOSE QUESTIONS.
23         MR. DAVIS:  SURE.  YOUR HONOR, THE FIRST
24 THING I SAY ABOUT THAT IS THAT THE MORAL EXEMPTION RULE
25 DOES NOT APPLY TO PUBLICLY TRADED COMPANIES, UNLIKE THE

Exhibit 137                                                              JA-0001799

29

1  RELIGIOUS EXEMPTION RULE, SO WE ARE TALKING ONLY ABOUT
2  CLOSELY-HELD ENTITIES. SO IN TERMS OF DECIDING WHO CAN
3  ASSERT THE MORAL CLAIM, I THINK IT WOULD JUST BE THE
4  OWNERS OF A CLOSELY-HELD ORGANIZATION OR A NONPROFIT.
5          THE COURT: ARE YOU POSITIVE OF THAT?
6          MR. DAVIS: YES, YOUR HONOR.
7          THE COURT: OKAY.
8          MR. DAVIS: THAT'S NOT TRUE FOR
9  RELIGIOUS.
10         THE COURT: I'LL HAVE TO REREAD THE MORAL
11 EXEMPTION, BECAUSE I THOUGHT IT SAID SOMETHING CONTRARY
12 TO THAT.
13         MR. DAVIS: IT DOES NOT, YOUR HONOR.
14         THE COURT: I WILL TAKE A LOOK AT IT.
15         MR. DAVIS: SO THE ONLY QUESTION IS WHO
16 CAN ASSERT IT. I THINK THAT WOULD BE JUST THE SAME
17 PEOPLE WHO CAN ASSERT THE CLAIM IN A CONTEXT OF THE
18 RELIGIOUS EXEMPTION, WHICH WOULD BE THE OWNERS OF THE
19 CLOSELY HELD COMPANY OF WHOEVER RUNS A NONPROFIT. SO
20 THAT'S THAT QUESTION.
21         AS TO YOUR OTHER QUESTION ABOUT WHAT DOES
22 IT LOOK LIKE TO ASSERT THIS KIND OF CLAIM, I THINK IT
23 LOOKS VERY SIMILAR TO WHAT HAPPENS WITH A RELIGIOUS
24 EXEMPTION. I MEAN, THE EMPLOYER WILL JUST ASSERT A
25 SINCERELY-HELD MORAL CONVICTION, AND THEN THAT EMPLOYER

30

1  IS EXEMPT.
2          I WILL SAY I DOUBT THAT THIS WILL BE
3  WIDELY USED, BECAUSE AS THE RULES POINT OUT, PROVIDING
4  CONTRACEPTIVE COVERAGE IS COST NEUTRAL. SO THERE REALLY
5  WOULDN'T BE A REASON TO ASSERT THIS UNLESS AN EMPLOYER
6  ACTUALLY DID HAVE A SINCERE --
7          THE COURT: WELL, WHAT IF A -- WHAT IF
8  THE CEO OF THE COMPANY HAD A SINCERELY-HELD MORAL
9  CONVICTION THAT WOMEN SHOULD REMAIN AT HOME AND THAT --
10 AND MADE A DETERMINATION, THEREFORE, NOT TO PROVIDE
11 CONTRACEPTIVE SERVICES IN THE INSURANCE PLAN OF THE
12 COMPANY IN ORDER TO IMPOSE HIS NORMATIVE CONSTRUCT ON
13 HIS WORKFORCE, BUT THE BOARD OF DIRECTORS DOES NOT AGREE
14 WITH THAT. IN FACT, THEY BELIEVE THAT THERE IS A MORAL
15 IMPERATIVE THAT WOMEN BE ALLOWED TO MAKE THEIR OWN
16 CHOICES. HOW DO YOU DETERMINE, ONE, WHAT IS AN
17 APPROPRIATE MORAL CONVICTION, AND TWO, WHO PREVAILS IN
18 THAT CONTEXT?
19         MR. DAVIS: WELL, A COUPLE OF ANSWERS TO
20 THAT, YOUR HONOR. THE FIRST IS THAT I THINK GENERAL
21 PRINCIPLES OF CORPORATE LAW WOULD ANSWER THE QUESTION
22 ABOUT WHO IS ENTITLED TO ADVANCE THAT KIND OF OBJECTION
23 ON BEHALF OF THE COMPANY. BUT IF YOUR HONOR'S
24 HYPOTHETICAL POSES A SITUATION WHERE THE EMPLOYER
25 ACTUALLY DOES NOT HAVE A SINCERE OBJECTION, IT'S REALLY

31

1  A PRETEXT FOR COVERING --
2          THE COURT: NO, I'M NOT SUGGESTING IT'S A
3  PRETEXT. THE CEO REALLY DOES BELIEVE, AS A MORAL
4  MATTER, THAT WOMEN SHOULD STAY AT HOME.
5          MR. DAVIS: BUT THE CEO DOES NOT HAVE A
6  MORAL OBJECTION TO PROVIDING CONTRACEPTIVE COVERAGE.
7  THE REAL OBJECTION IS TO -- THE REAL --
8          THE COURT: HE HAS A MORAL OBJECTION TO
9  PROVIDING COVERAGE BECAUSE HE THINKS THAT WOMEN SHOULD
10 STAY AT HOME AND HE BELIEVES THAT WOMEN SHOULD STAY AT
11 HOME -- IF THEY ARE PREGNANT ALL THE TIME, THEY ARE
12 GOING TO STAY AT HOME.
13         MR. DAVIS: YOUR HONOR, AGAIN, I THINK --
14         THE COURT: DON'T BUCK THE HYPOTHETICAL.
15 JUST ANSWER THE QUESTION.
16         MR. DAVIS: UNDER THAT HYPOTHETICAL, YOUR
17 HONOR, I ASSUME THAT EMPLOYEES WOULD COMPLAIN ABOUT IT
18 TO IRS OR TREASURY OR LABOR, AND THE LABOR DEPARTMENT
19 DOES HAVE A ROLE IN POLICING THE SINCERITY OF
20 RELIGIOUS -- OR NOT -- NOT THE SINCERITY.
21         THE COURT: THE DEPARTMENT OF LABOR
22 WOULD BE POLICING THE MORAL CONVICTIONS OF AN ENTITY?
23         MR. DAVIS: NO. THE DEPARTMENT OF LABOR
24 COULD CONCEIVABLY, IN THAT CIRCUMSTANCE, ASK WHETHER A
25 PARTICULAR -- POLICE THAT KIND OF SITUATION TO A DEGREE.

32

1  IT PROBABLY WOULDN'T --
2          THE COURT: SO WHO WOULD BE POLICING
3  WHETHER A MORAL CONVICTION IS APPROPRIATELY HELD?
4          MR. DAVIS: I THINK, AGAIN, IT WOULD
5  DEPEND ON THE CIRCUMSTANCES. IF AN EMPLOYEE WERE TO SAY
6  TO THE GOVERNMENT THAT THERE IS NOT IN FACT A SINCERE
7  MORAL OBJECTION TO PROVIDING CONTRACEPTIVE COVERAGE,
8  THAT IN FACT, WHAT IS GOING ON HERE IS IT'S
9  DISCRIMINATION AGAINST WOMEN, AND THAT IS -- THEN I
10 THINK THAT THE LABOR DEPARTMENT COULD INVESTIGATE THAT.
11         THE COURT: SO THE LABOR DEPARTMENT WOULD
12 HAVE TO BE DETERMINING WHAT A MORAL CONVICTION --
13 WHETHER A MORAL CONVICTION IS APPROPRIATE OR NOT?
14         MR. DAVIS: I WOULD NOT PUT IT THAT
15 BROADLY, YOUR HONOR. I WOULD SAY IF THERE IS A -- AS
16 LONG AS THERE IS A SINCERE MORAL OBJECTION TO PROVIDE
17 CONTRACEPTIVE COVERAGE, THEN THAT EMPLOYER IS EXEMPT,
18 PERIOD. AND ONLY IF THAT --
19         THE COURT: WELL, YOU ARE STILL BUCKING
20 THE HYPOTHETICAL. IF THERE IS A MORAL CONVICTION RULE
21 OUT THERE, SOMEONE IS GOING TO HAVE TO DETERMINE WHETHER
22 IT IS AN APPROPRIATE MORAL CONVICTION OR NOT, CORRECT?
23         MR. DAVIS: NO, I DON'T AGREE WITH THAT,
24 YOUR HONOR.
25         THE COURT: SO IS IT JUST SORT OF A

Exhibit 137                                                                                    JA-0001800

1  FREE-FLOATING CONCEPT THAT EVERYBODY DECIDES THEMSELVES

2  AND NOBODY POLICES IT?

3          MR. DAVIS:  YOUR HONOR, I WOULDN'T CALL

4  IT A FREE-FLOATING CONCEPT THAT IS TOTALLY UNPOLICED.  I

5  WOULD SAY THAT, LIKE THE RELIGIOUS EXEMPTION, THE ONLY

6  QUESTION THAT IS ASKED IS WHETHER AN EMPLOYER HAS A

7  SINCERE RELIGIOUS OR MORAL OBJECTION TO PROVIDING

8  CONTRACEPTIVE COVERAGE, AND IF THAT IS TRUE, THEN THAT

9  EMPLOYER IS EXEMPT.

10          THE COURT:  OKAY.  SO WHAT YOU'RE TELLING

11  ME IS IF THE CEO SAYS I HAVE A SINCERE MORAL CONVICTION

12  TO NOT PROVIDE CONTRACEPTIVES TO WOMEN BECAUSE I WANT

13  THEM TO STAY AT HOME, THAT IS FINE?

14          MR. DAVIS:  I WOULD NOT SAY THAT IS FINE,

15  YOUR HONOR.  I WOULD SAY THAT IN THAT CIRCUMSTANCE,

16  AGAIN, AN EMPLOYEE MIGHT COMPLAIN TO THE LABOR

17  DEPARTMENT AND THERE IS SOME ROLE FOR THE LABOR

18  DEPARTMENT --

19          THE COURT:  THE LABOR DEPARTMENT, OKAY.

20          MR. DAVIS:  WE CAN FOLLOW UP ON THAT.

21          THE COURT:  MOVE ON.

22          MR. DAVIS:  I WOULD SAY, RETURNING TO

23  STANDING, YOUR HONOR, BECAUSE THE LITTLE SISTERS ARE

24  PROTECTED BY THE ZUBIK INJUNCTION WHICH PROHIBITS THE

25  FEDERAL GOVERNMENT FROM ENFORCING THE MANDATE AGAINST

1  THEM.  THE SAME IS TRUE OF MANY OTHER RELIGIOUS

2  ORGANIZATIONS.  AND THAT IS WHY THE ONLY SPECIFIC

3  EXAMPLE OF AN EMPLOYER WHO'S GOING TO DROP COVERAGE THAT

4  PENNSYLVANIA WAS ABLE TO GIVE WAS THE UNIVERSITY OF

5  NOTRE DAME, BUT AS THE COURT KNOWS, NOTRE DAME LATER

6  ANNOUNCED THAT ITS THIRD-PARTY ADMINISTRATOR WOULD

7  CONTINUE TO OFFER NO COST CONTRACEPTIVE COVERAGE.

8          I'M NOT SAYING THAT IT'S IMPOSSIBLE THAT

9  ANYONE WOULD EVER HAVE STANDING TO CHALLENGE THESE

10  RULES, YOUR HONOR.  WHAT I'M SAYING IS THAT IT'S

11  PENNSYLVANIA'S BURDEN TO SHOW YOUR HONOR SOMEONE WHO IS

12  GOING TO LOSE COVERAGE, AND THEY HAVEN'T BEEN ABLE TO DO

13  THAT, EVEN AFTER CLAIMING THAT MILLIONS OF WOMEN COULD

14  BE AFFECTED BY THIS.

15          I SUSPECT YOU WILL HEAR TODAY FROM THE

16  COMMONWEALTH'S WITNESS ABOUT THEIR CONCERNS ABOUT THE

17  IMPACT THAT THE NEW RULES WILL HAVE ON WOMEN'S ACCESS TO

18  CONTRACEPTION.  WE HAVE NOT DEPOSED THESE WITNESSES.  WE

19  DON'T KNOW WHAT THEY ARE GOING TO SAY, BUT I URGE YOUR

20  HONOR TO LISTEN TO WHETHER ANY OF THEM CAN POINT TO A

21  SINGLE PENNSYLVANIA EMPLOYER OR ANY EMPLOYER OR A SINGLE

22  EMPLOYEE WHO IS GOING TO LOSE COVERAGE AS OF

23  JANUARY 1ST.

24          I WOULD ALSO LIKE TO TALK A LITTLE ABOUT

25  THE PARENS PATRIAE THEORY THAT CAME UP EARLIER.  YOUR

1  HONOR, IT HAS BEEN WELL SETTLED SINCE MASSACHUSETTS

2  VERSUS MELLON, 1923, THAT A STATE CANNOT REPRESENT ITS

3  CITIZENS PARENS PATRIAE AGAINST THE FEDERAL GOVERNMENT.

4  AS MELLON EXPLAINED IT, IT HAS NO POWER -- IT IS NO PART

5  OF ITS DUTY OR POWER TO ENFORCE THEIR RIGHTS IN RESPECT

6  OF THEIR RELATIONS WITH THE FEDERAL GOVERNMENT.  AND

7  THAT FIELD IS THE UNITED STATES AND NOT THE STATE WHICH

8  REPRESENTS THEM AS PARENS PATRIAE.  THERE IS NO

9  EXCEPTION TO THAT RULE IN MELLON FOR CASES WHERE THE

10  STATE IS CHALLENGING A FEDERAL AGENCY ACTION INSTEAD OF

11  A STATUTE.

12          AND MASSACHUSETTS VERSUS EPA, YOUR HONOR,

13  THE SPECIAL SOLICITUDE DISCUSSION THAT WE HAD EARLIER, I

14  THINK THE BEST WAY TO UNDERSTAND THE SPECIAL SOLICITUDE

15  POINT IS THAT IT APPLIES WHEN THE STATE IS ABLE TO SHOW

16  AN INJURY TO ITS CONCRETE SOVEREIGN INTEREST.  AND IN

17  MASSACHUSETTS VERSUS EPA, THAT WAS AN INJURY TO THE

18  TERRITORY OF THE STATE ITSELF.  AND THAT IS WHAT THIS

19  CASE SAYS.  I HAVE IT HERE.  IT SAYS:  GIVEN

20  MASSACHUSETTS STATE IN PROTECTING ITS QUASI SOVEREIGN

21  INTEREST, THE COMMONWEALTH IS ENTITLED TO SPECIAL

22  SOLICITUDE IN ITS STANDING ANALYSIS.  I DON'T THINK WE

23  HAVE ANYTHING LIKE THAT HERE.  WE DON'T HAVE ANY DAMAGE

24  TO THE STATE'S TERRITORY.  ALL WE HAVE IS SPECULATION

25  THAT SOME EMPLOYERS WILL ULTIMATELY SHIFT FROM CURRENTLY

1  PROVIDING COVERAGE TO NOT PROVIDING COVERAGE.

2          THE COURT:  LET ME TALK TO YOU ABOUT THE

3  TEXAS VERSUS UNITED STATES CASE IN THE CONTEXT OF

4  STANDING.  SO IN THAT CASE THE SUPREME COURT CERTIFIED A

5  NUMBER OF ISSUES, INCLUDING WHETHER OR NOT TEXAS HAD

6  STANDING.  AND THEN IT AFFIRMED BY AN EQUALLY DIVIDED

7  COURT WITHOUT OPINION.

8          NOW ONE OF THE QUESTIONS THAT I ASKED YOU

9  TO LOOK AT IS, GIVEN SILLIMAN VERSUS HUDSON RIVER BRIDGE

10  COMPANY, WHICH I KNOW IS AN OLD CASE, 1861.  DON'T TELL

11  ME IT'S OLD SO THEREFORE IT DOES NOT APPLY.  WHAT IS THE

12  IMPACT IN YOUR VIEW OF SILLIMAN ON TEXAS VERSUS THE

13  UNITED STATES, PARTICULARLY THE STANDING ANALYSIS THAT

14  THE COURT IN TEXAS VERSUS UNITED STATES IN THE 5TH

15  CIRCUIT DID.

16          MR. DAVIS:  YOUR HONOR, I THINK THAT

17  SINCE HUDSON BRIDGE, THE COURT HAS SAID REPEATEDLY THAT

18  AN AFFIRMANCE BY AN EQUALLY DIVIDED COURT IS NOT

19  ENTITLED TO PRECEDENTIAL WEIGHT.

20          THE COURT:  WELL, EXCEPT SILLIMAN TALKED

21  ABOUT THE JURISDICTIONAL CONTEXT, WHICH IS WHY IT IS

22  DIFFERENT.

23          MR. DAVIS:  I DON'T SEE ANY CASE SINCE

24  SILLIMAN THAT SAYS THAT THE JURISDICTIONAL CONTEXT WOULD

25  BE DIFFERENT, THAT SOMEHOW BECAUSE IT'S A JURISDICTIONAL

Exhibit 137

JA-0001801

37

1  DECISION THAT THE COURT'S AFFIRMANCE WOULD BE ENTITLED

2  TO --

3          THE COURT:  NO.  I THINK THE POINT IS

4  THAT SILLIMAN WAS A JURISDICTIONAL DECISION.  AND AS FAR

5  AS WE CAN FIND, THE ONLY ISSUE WHEN THERE WAS AN EQUALLY

6  DIVIDED COURT THAT CONCERNED A JURISDICTIONAL ANALYSIS.

7  SO EVEN THOUGH SUBSEQUENT CASES HAVE SAID GENERALLY

8  EQUALLY DIVIDED COURTS ARE NOT BINDING PRECEDENT,

9  SILLIMAN SUGGESTS THAT THERE IS THIS CARVEOUT IN THE

10  CONTEXT OF STANDING.

11          AND SO MY QUESTION TO YOU IS, DO I JUST

12  IGNORE SILLIMAN OR DO I SAY THAT IT IS TOO OLD OR DO I

13  SAY THAT SOMEHOW IT HAS BEEN MOOTED AT THIS POINT?

14          MR. DAVIS:  YOUR HONOR, I WOULD SAY YOU

15  SHOULD READ SILLIMAN IN LIGHT OF THE CASES THAT CAME

16  LATER.  AND THE CASES THAT CAME LATER SAID FLATLY,

17  WITHOUT CARVING OUT JURISDICTION OR ANYTHING ELSE, THOSE

18  CASES SAID AN AFFIRMANCE BY AN EQUALLY DIVIDED COURT IS

19  NOT ENTITLED TO PRECEDENTIAL EFFECT.  I'M NOT AWARE -- I

20  HAVE NOT EXHAUSTIVELY LOOKED AT EVERY CASE SINCE 1861,

21  BUT I'M NOT AWARE OF ANY CASE SINCE THEN THAT HAS HELD

22  THAT A JURISDICTIONAL DECISION -- THAT AFFIRMANCE BY AN

23  EQUALLY DIVIDED COURT OF A JURISDICTIONAL DECISION IS

24  ENTITLED TO PRECEDENTIAL FORCE, OF THE SUPREME COURT.

25          THE CASES I WOULD CITE TO YOUR HONOR,

38

1  NEIL VERSUS BIGGERS, THAT'S N-E-I-L VERSUS

2  B-I-G-G-E-R-S, 409 U.S. 188 AT 192.  THAT IS A 1972

3  SUPREME COURT DECISION.

4          AND ARKANSAS WRITERS' PROJECT VERSUS

5  RAGLAND, 481 U.S. 221.  THAT'S A 1987 SUPREME COURT

6  DECISION THAT HELD:  OF COURSE, AN AFFIRMANCE BY AN

7  EQUALLY DIVIDED COURT IS NOT ENTITLED TO ANY

8  PRECEDENTIAL WEIGHT.

9          THE COURT:  I WILL TAKE A LOOK AT THOSE

10  CASES.

11          MOVE ON.

12          MR. DAVIS:  I WOULD LIKE TO TALK A LITTLE

13  ABOUT THE PROCEDURAL APA ISSUE, YOUR HONOR.

14          HERE AGAIN, YOUR HONOR IS NOT WRITING ON

15  A BLANK SLATE.  LIKE THE LAST ADMINISTRATION DID THREE

16  TIMES IN 2010, 2011 AND 2014, THE AGENCIES ISSUED THE

17  NEW RULES AS INTERIM FINAL RULES.  LIKE THOSE PRIOR

18  IFRS, THREE SEPARATE LAWS PROVIDE STATUTORY AUTHORITY:

19  26 U.S.C. 9833; 29 U.S.C. --

20          THE COURT:  ARE YOU TALKING ABOUT --

21  YOU'RE CONNECTING WITH THE ORIGINAL RELIGIOUS EXEMPTION,

22  THE SECOND RELIGIOUS EXEMPTION?  IS THAT WHAT WE ARE

23  TALKING ABOUT HERE?

24          MR. DAVIS:  NO, YOUR HONOR.  WE ARE

25  TALKING ABOUT JUST THE BASIS OF STATUTORY AUTHORITY TO

39

1  DO THIS AS AN IFR INSTEAD OF THROUGH NOTICE AND COMMENT.

2  I THINK EVEN APART FROM THE APA, THERE ARE THREE

3  SEPARATE STATUTES THAT GIVE THE AGENCIES INDEPENDENT

4  AUTHORITY TO DO THIS.

5          THE COURT:  OKAY.

6          MR. DAVIS:  AND THOSE STATUTES SAY THAT

7  THE SECRETARY MAY PROMULGATE ANY INTERIM FINAL RULES AS

8  THE SECRETARY DETERMINES ARE APPROPRIATE.  THAT IS THE

9  SAME AUTHORITY THAT THE PRIOR ADMINISTRATION RELIED ON

10  TO DO THESE AS INTERIM FINAL RULES, AND WE ARE RELYING

11  ON IT AS WELL.

12          IF YOUR HONOR DID NOT THINK THAT WAS

13  SUFFICIENT, THERE WAS ALSO GOOD CAUSE DIRECTLY UNDER THE

14  APA, AND THE D.C. CIRCUIT EXPRESSLY UPHELD ONE OF THE

15  LAST ADMINISTRATION'S CONTRACEPTIVE COVERAGE IFRS IN

16  PRIESTS FOR LIFE DECISION.  AND THERE, LIKE HERE, THE

17  AGENCY MADE A GOOD CAUSE FINDING IN THE RULE THAT IT

18  ISSUED.  THERE, LIKE HERE, THE IFR WAS MODIFYING

19  REGULATIONS THAT HAD RECENTLY BEEN ENACTED UNDER NOTICE

20  AND COMMENT RULE MAKING.  THERE, LIKE HERE, THE ISSUES

21  THE IFR HAD ADDRESSED HAD ALREADY BEEN SUBJECTED TO

22  THOUSANDS AND THOUSANDS OF COMMENTS.  THERE, LIKE HERE,

23  HHS EXPOSED ITS INTERIM FINAL RULE TO COMMENTS BEFORE

24  PERMANENT IMPLEMENTATION.  AND THERE, LIKE HERE, THE

25  GOVERNMENT WAS -- THERE THE GOVERNMENT WAS RESPONDING TO

40

1  THE SUPREME COURT'S DECISION IN WHEATON COLLEGE.  HERE

2  THE GOVERNMENT WAS RESPONDING TO THE SUPREME COURT'S

3  DECISION IN ZUBIK.  THERE DELAY AND IMPLEMENTATION OF

4  THE RULE WOULD DELAY THE IMPLEMENTATION OF THE

5  ALTERNATIVE OPT-OUT FOR RELIGIOUS OBJECTORS.  AND HERE

6  DELAY WOULD INTERFERE WITH THE IMPLEMENTATION OF THE

7  RELIGIOUS AND MORAL EXEMPTIONS.  SO I THINK IF THERE WAS

8  GOOD CAUSE IN PRIESTS FOR LIFE, I THINK THERE IS GOOD

9  CAUSE HERE.

10          THE COURT:  WELL, IN PRIESTS FOR LIFE,

11  THE NEW IFRS WERE PRETTY MUCH IDENTICAL TO PRIOR

12  REGULATIONS, WEREN'T THEY?

13          MR. DAVIS:  I DON'T THINK THEY WERE

14  VIRTUALLY IDENTICAL, YOUR HONOR.  THE IFR EXPANDED THE

15  WAY THE ACCOMMODATION COULD BE INVOKED.

16          THE COURT:  WELL, BUT THEY DIDN'T MAKE

17  SIGNIFICANT CHANGES IN THE LAW, DID THEY?

18          MR. DAVIS:  WELL, I DON'T KNOW IF I WOULD

19  EVEN DESCRIBE THIS AS A MORE SIGNIFICANT CHANGE THAN THE

20  ONE AT ISSUE, PRIESTS FOR LIFE, YOUR HONOR.

21          THE COURT:  SO YOU WOULD SAY THAT THE

22  RELIGIOUS EXEMPTION AND THE MORAL EXEMPTIONS ARE NOT

23  SIGNIFICANT CHANGES.

24          MR. DAVIS:  I WOULD NOT SAY IT THAT WAY,

25  YOUR HONOR.  I WOULD SAY THEY ARE ARGUABLY NOT MORE

Exhibit 137

JA-0001802

41

1    SIGNIFICANT THAN THE CHANGE AT ISSUE IN THE IFR THAT WAS
2    RESPONDING TO WHEATON COLLEGE.  THAT IS BECAUSE, LIKE I
3    HAVE DISCUSSED, THERE IS NO INDICATION HERE THAT ANYONE
4    IS GOING TO LOSE CONTRACEPTIVE COVERAGE AS A RESULT OF
5    THESE NEW RULES.  BACK THEN IT WAS A -- THERE WAS A
6    RELATIVELY SIGNIFICANT CHANGE TO THE RULES TO EXPAND THE
7    WAY THAT THE ENTITIES COULD INVOKE THE ACCOMMODATION.
8         BUT I WOULD SAY EVEN IF YOUR HONOR DOES
9    NOT SEE IT THAT WAY AND THINKS THAT THIS CHANGE IS MORE
10   SIGNIFICANT THAN THE ONE BACK IN 2014, THAT IS ONLY ONE
11   OF THE FACTORS IN THE PRIESTS FOR LIFE DECISION.
12        THE COURT:  WELL, THE OTHER ONE WAS GOOD
13   CAUSE.  BUT IN PRIESTS FOR LIFE I THINK THE COURT MADE A
14   DETERMINATION THAT THERE WAS GOOD CAUSE AND THUS SAID --
15   PUTTING ASIDE WHETHER THERE WAS -- THEY WERE IDENTICAL
16   OR WHETHER THERE WAS A SIGNIFICANT CHANGE, THEN SAID IT
17   WAS APPROPRIATE.  BUT IN THIS CASE I HAVE TO -- ARE
18   YOU -- DO YOU AGREE THAT I HAVE TO MAKE A THRESHOLD
19   DETERMINATION OF GOOD CAUSE BEFORE I CAN GET INTO THE
20   SAME SPACE THAT PRIESTS FOR LIFE -- THE PRIESTS FOR LIFE
21   COURT WAS OR IS IT YOUR VIEW THAT I DON'T HAVE TO MAKE
22   THAT DETERMINATION OF GOOD CAUSE BEFORE GOING ALONG WITH
23   THE HOLDING IN THAT CASE?
24        MR. DAVIS:  YOUR HONOR, IF I UNDERSTAND
25   THE QUESTION CORRECTLY, I THINK THAT ALL OF THOSE --

42

1    THESE FACTORS WE HAVE BEEN DISCUSSING GO TO WHETHER OR
2    NOT THERE WAS GOOD CAUSE TO DO THE IFR IN THAT CASE AS
3    AN IFR INSTEAD OF THROUGH NOTICE AND COMMENT.  I THINK
4    THE SIGNIFICANCE OF THE CHANGE IS ALL UNDER THAT HEADING
5    OF WHETHER OR NOT THERE IS GOOD CAUSE.  I WOULD SAY YOU
6    DON'T EVEN HAVE TO REACH THE GOOD CAUSE ISSUE AT ALL IN
7    OUR VIEW BECAUSE OF THE SEPARATE BASES OF STATUTORY
8    AUTHORITY.  BUT IN THE EVENT YOU WERE TO REACH THE GOOD
9    CAUSE ISSUE, I THINK IF YOU READ THAT PART OF THAT -- OF
10   THE D.C. CIRCUIT'S DECISION, I THINK WE ARE ALMOST ON
11   ALL FOURS WITH IT HERE.
12        THE COURT:  GO AHEAD.
13        MR. DAVIS:  I WOULD LIKE TO MOVE TO THE
14   STATUTORY AUTHORITY FOR THE EXEMPTIONS.
15        THE COURT:  GO AHEAD.
16        MR. DAVIS:  YOUR HONOR, IN OUR VIEW WE
17   HAVE THREE SEPARATE BASES OF STATUTORY AUTHORITY.
18        THE FIRST IS THE AFFORDABLE CARE ACT
19   ITSELF.  HERE AGAIN, YOUR HONOR IS NOT WRITING ON A
20   BLANK SLATE.  THIS IS THE SOURCE OF AUTHORITY THAT THE
21   LAST ADMINISTRATION USED TO CRAFT THE ORIGINAL RELIGIOUS
22   EMPLOYER EXEMPTION.  THE STATUTE IS A BROADLY WORDED
23   DELEGATION OF AUTHORITY TO THE AGENCIES.  IT PROVIDES
24   THAT COVERED GROUP HEALTH PLANS SHALL PROVIDE -- OR
25   SHALL COVER WHATEVER HRSA SPECIFIES IN ITS GUIDELINES.

43

1         THE BREADTH OF THE STATUTE IS APPARENT
2    WHEN COMPARED TO THE OTHER THREE SUBSECTIONS OF THAT
3    STATUTE.  THOSE SUBSECTIONS ADDRESS EVIDENCE BASED ITEMS
4    OF SERVICES, IMMUNIZATIONS AND SERVICES FOR CHILDREN,
5    ADDRESS GUIDELINES THAT WERE ALREADY IN EXISTENCE AT THE
6    TIME THE AFFORDABLE CARE ACT WAS ENACTED.  AND
7    SUBSECTION (A)(4) WAS A GRANT OF AUTHORITY TO DEVELOP
8    GUIDELINES THAT DID NOT ALREADY EXIST.
9         AND ON PAGE 23 OF ITS BRIEF, PENNSYLVANIA
10   ARGUES THAT NOTHING IN THE LANGUAGE OF THE ACA OR ITS
11   LEGISLATIVE HISTORY SUGGESTS THAT CONGRESS INTENDED TO
12   GIVE DEFENDANTS OR ANY AGENCY BLANKET AUTHORITY TO
13   PERMIT EMPLOYEES TO OPT-OUT.  IF THAT IS TRUE, THE
14   ORIGINAL EXEMPTION FOR CHURCHES HAS TO FALL AS WELL,
15   WHICH WOULD EXPOSES CHURCHES AND HOUSES OF WORSHIP TO
16   THE MANDATE FOR THE FIRST TIME.  AND THAT RESULT WOULD
17   IMPERIL THE MANDATE ITSELF BECAUSE WE KNOW FROM HOBBY
18   LOBBY THAT IT IMPOSES A SUBSTANTIAL BURDEN.
19        SO PENNSYLVANIA ALSO ARGUES THAT THE
20   RULES CONFLICT WITH THE PURPOSE OF THE STATUTE, WHICH IS
21   TO INCREASE COVERAGE FOR PREVENTIVE SERVICES.  AND THAT
22   ARGUMENT WOULD ALSO WIPE AWAY THE ORIGINAL CHURCH
23   EXEMPTION.  IT'S ALSO INCONSISTENT WITH THE BEST
24   EVIDENCE OF A STATUTE'S PURPOSE, WHICH IS ITS TEXT.  AND
25   THE ACA DOES NOT REQUIRE GROUP HEALTH PLANS TO COVER

44

1    CONTRACEPTION.  IT DOES NOT MENTION CONTRACEPTION.
2    INSTEAD IT DELEGATES AUTHORITY TO THE AGENCIES TO DECIDE
3    WHAT KINDS OF PREVENTIVE SERVICES SHOULD BE COVERED.
4         THE COURT:  WELL, THE CONTRACEPTIVE
5    MANDATE WAS ADOPTED.  WELL, THE HRSA ADOPTED THE
6    INSTITUTE'S RECOMMENDATION IN AUGUST OF 2011.  AND THE
7    CONTRACEPTIVE MANDATE WAS ENACTED OR PROMULGATED UNDER
8    THE AUTHORITY GIVEN BY THE ACA TO THE AGENCY.  SO IN
9    THIS CASE DOES THE -- DO THE EXEMPTIONS, THE MORAL AND
10   RELIGIOUS EXEMPTIONS, IMPACT ON THE CONTRACEPTIVE
11   MANDATE?  DON'T THEY CARVE OUT EXCEPTIONS TO THE
12   CONTRACEPTIVE MANDATE?  SO YOU HAVE AN AGENCY CARVING
13   OUT EXCEPTIONS TO AN AGENCY'S RULES.
14        MR. DAVIS:  THAT'S CORRECT.
15        THE COURT:  THAT IS CORRECT.
16        MR. DAVIS:  YES.
17        THE COURT:  WHAT AUTHORITY IS THERE FOR
18   AN AGENCY TO CARVE OUT AN EXCEPTION TO AN AGENCY'S
19   PREVIOUSLY PROMULGATED RULES?
20        MR. DAVIS:  YOUR HONOR, I THINK IT IS
21   JUST GENERAL REGULATORY AUTHORITY THAT ALL AGENCIES HAVE
22   TO CHANGE THEIR RULES, CARVE OUT EXEMPTIONS TO THEM.  I
23   THINK THE STATUTES THAT I MENTIONED EARLIER PROVIDE THAT
24   AUTHORITY.  I THINK IT'S JUST INHERENT IN THE APA THAT
25   AGENCIES HAVE THAT ABILITY.  AND I THINK IF THE QUESTION

Exhibit 137                                                                                        JA-0001803

45

1  IS WHETHER THERE IS STATUTORY AUTHORITY FOR AGENCIES TO
2  DO THAT, I WOULD JUST POINT YOUR HONOR AGAIN TO THE ACA,
3  42 U.S.C. 300 GG-13(A)(4), WHICH PROVIDES DISCRETION, A
4  BROAD GRANT OF DISCRETION FOR THE AGENCIES TO DEVELOP
5  RULES GOVERNING WHAT TYPES OF PREVENTIVE SERVICES WILL
6  BE COVERED AND WHO WILL BE COVERED BY THEM. THERE IS
7  NOTHING IN THAT STATUTE THAT PROHIBITS THE AGENCY FROM
8  DOING THAT.
9         AND HERE I WOULD LIKE TO ADDRESS ANOTHER
10  ONE OF YOUR HONOR'S QUESTIONS, WHICH IS WHETHER THE
11  AGENCIES ARE ENTITLED TO DEFERENCE IN INTERPRETING THE
12  AFFORDABLE CARE ACT. THE ANSWER TO THAT QUESTION IS
13  YES. IT'S CLEAR THAT CONGRESS HAS DELEGATED TO THE
14  AGENCIES THE AUTHORITY TO MAKE RULES CARRYING THE FORCE
15  OF LAW IN THIS CONTEXT AND THE AGENCIES WERE EXERCISING
16  THAT AUTHORITY IN CRAFTING THESE RULES.
17         THE COURT: BUT IF THE INTERPRETATION
18  CONFLICTS WITH THE STATUTE'S PLAIN LANGUAGE, IT IS NOT
19  ENTITLED TO JUDICIAL DEFERENCE, CORRECT?
20         MR. DAVIS: THAT'S CORRECT. BUT HERE I
21  DON'T THINK THAT IS TRUE HERE, TO BE CLEAR, YOUR HONOR.
22  I THINK THE STATUTE IS A BROAD GRANT OF AUTHORITY.
23  THERE IS NOTHING IN IT THAT PROHIBITS THE AGENCIES FROM
24  DOING THIS.
25         THE COURT: I UNDERSTAND.

46

1         MR. DAVIS: THE SECOND BASIS OF STATUTORY
2  AUTHORITY FOR THESE EXEMPTIONS, YOUR HONOR, IS RFRA.
3         THE COURT: BEFORE YOU GO INTO THAT, AS I
4  UNDERSTAND IT, YOU ARE NOT MAKING AN ARGUMENT WITH
5  RESPECT TO THE MORAL EXEMPTION UNDER RFRA. YOUR RFRA
6  ARGUMENT IS FOCUSED SOLELY ON THE RELIGIOUS EXEMPTION.
7         MR. DAVIS: THAT'S CORRECT, YOUR HONOR.
8  AND THE SOURCE OF STATUTORY AUTHORITY FOR THE MORAL
9  EXEMPTION IS THE ACA.
10         AS I SAID, THE SECOND BASIS OF STATUTORY
11  AUTHORITY FOR THE EXEMPTIONS IS RFRA. HERE YOU DON'T
12  HAVE TO INCLUDE THAT RFRA ACTUALLY REQUIRES THE
13  EXEMPTIONS. BECAUSE EVEN IF RFRA DOES NOT REQUIRE THEM,
14  RFRA AUTHORIZES THE RELIGIOUS EXEMPTION. AND AGAIN ON
15  THIS POINT, YOUR HONOR, YOU ARE NOT WRITING ON A BLANK
16  SLATE. WE KNOW FROM HOBBY LOBBY AND YEARS OF LITIGATION
17  THAT THE UNADORNED MANDATE IMPOSES A SUBSTANTIAL BURDEN.
18  THE AGENCIES HAVE DISCRETION IN DETERMINING HOW TO
19  ALLEVIATE THAT BURDEN, AND IN EXERCISING THAT
20  DISCRETION, THE AGENCIES REASONABLY DECIDED TO RESPOND
21  WITH AN EXEMPTION RATHER THAN AN ACCOMMODATION.
22         THE COURT: WELL, LET ME ASK YOU A
23  QUESTION. DOES ANY OF THE AGENCIES HERE HAVE ANY
24  SPECIFIC EXPERTISE WITH RESPECT TO RFRA?
25         MR. DAVIS: YOUR HONOR, WE ARE NOT

47

1  ARGUING THAT THE AGENCIES ARE ENTITLED TO CHEVRON
2  DEFERENCE UNDER RFRA WRIT LARGE. WE DO THINK THAT THE
3  AGENCIES ARE ENTITLED TO DEFERENCE ON SOME OF THE
4  SUBSIDIARY QUESTIONS THAT TRIGGER THEIR EXPERTISE, SUCH
5  AS WHETHER THERE IS A COMPELLING INTEREST UNDER RFRA. A
6  LOT OF THOSE ISSUES ACTUALLY INVOLVE INTERPRETATIONS OF
7  THE AFFORDABLE CARE ACT AND THEY FALL SQUARELY WITHIN
8  THE AGENCY'S TECHNICAL EXPERTISE. BUT RFRA IS A
9  GENERALLY APPLICABLE STATUTE LIKE THE FREEDOM OF
10  INFORMATION ACT OR OTHERS THAT ARE NOT GENERALLY
11  CONSIDERED TO CONFER CHEVRON DEFERENCE.
12         AND BACK TO MY POINT ABOUT RFRA
13  AUTHORIZING THE AGENCIES TO DO THIS, THE SUPREME COURT
14  HAS RECOGNIZED THAT AN ENTITY FACED WITH CONFLICTING
15  LEGAL OBLIGATIONS SHOULD BE AFFORDED SOME LEEWAY. SO IN
16  THE RICCI VERSUS DESTEFANO CASE IN THE SUPREME COURT,
17  THE CITY OF NEW HAVEN ADMINISTERED AN EXAM FOR
18  FIREFIGHTERS. THE EXAM PRODUCED RACIALLY DISPARATE
19  RESULTS. THE MINORITY FIREFIGHTERS TOLD THE CITY THAT
20  IF IT CERTIFIED THE RESULTS, THEY WOULD SUE THE CITY FOR
21  VIOLATING TITLE VII'S DISPARATE IMPACT PROVISION. AND
22  THE WHITE FIREFIGHTERS TOLD THE CITY THAT IF IT DID NOT
23  CERTIFY THE RESULTS, THEY WOULD SUE THE CITY FOR
24  VIOLATING TITLE VII'S DISPARATE TREATMENT PROVISION. SO
25  THE CITY WAS CAUGHT BETWEEN THE DISPARATE IMPACT

48

1  PROVISION ON THE ONE HAND AND THE DISPARATE TREATMENT
2  PROVISION ON THE OTHER HAND. INSTEAD OF REQUIRING THE
3  CITY TO HIT A PERFECT BULLSEYE IN BETWEEN THOSE TWO
4  STATUTES, THE SUPREME COURT GAVE SOME LEEWAY. IT HELD
5  THAT AN EMPLOYER MAY ENGAGE IN INTENTIONAL
6  DISCRIMINATION FOR THE ASSERTED PURPOSE OF AVOIDING OR
7  REMEDYING AN UNINTENTIONAL DISPARATE IMPACT IF THE
8  EMPLOYER HAS A STRONG BASIS IN EVIDENCE TO BELIEVE THAT
9  IT WILL BE SUBJECT TO DISPARATE IMPACT LIABILITY IF IT
10  FAILS TO TAKE THE RISK CONSCIOUS DISCRIMINATORY ACTION.
11  SO THE SAME IS TRUE HERE.
12         THE COURT: SO YOU ARE TAKING -- YOU ARE
13  BORROWING LAW FROM THE DISCRIMINATORY -- DISCRIMINATION
14  JURISPRUDENCE THAT PERTAINS TO A MUNICIPALITY AND
15  APPLYING IT TO -- WHICH IS A STATE ENTITY, AND APPLYING
16  IT TO A FEDERAL AGENCY THAT FALLS UNDER THE EXECUTIVE
17  FUNCTION, IS THAT CORRECT?
18         MR. DAVIS: I WOULD NOT PUT IT LIKE THAT.
19  AGAIN, YOUR HONOR --
20         THE COURT: WELL, THAT IS WHAT YOU ARE
21  DOING, WHETHER YOU PUT IT LIKE THAT OR NOT. SO THE
22  QUESTION IS WHY WOULD YOU TAKE -- WHY WOULD YOU BORROW
23  FROM ONE LINE OF JURISPRUDENCE WHICH HAS NOTHING TO DO
24  WITH WHAT WE ARE TALKING ABOUT HERE. AND IF YOU ARE
25  GOING TO DO THAT, YOU HAVE TO PROVIDE ME WITH SOME

Exhibit 137                                                                      JA-0001804

49

1 PRETTY STRONG RATIONALE BACKED UP BY APPLICABLE
2 PRECEDENT, SO THAT MEANS THIRD CIRCUIT OR SUPREME COURT
3 PRECEDENT, TO TELL ME THAT THAT IS APPROPRIATE.
4          MR. DAVIS: YOUR HONOR, I THINK IF YOU
5 LOOK AT THE REASONING OF THIS CASE --
6          THE COURT: NO, I -- NO, NO. YOU CAN
7 TAKE ANY KIND OF LOGICAL SYLLOGISM IN PRETTY MUCH ANY
8 CASE IN THE LAW AND JUST SAY WELL, IT APPLIES HERE. BUT
9 THAT IS NOT WHAT WE DO WHEN WE ANALYZE CASE LAW. WHAT
10 WE DO IS TAKE A LOOK AT THE JURISPRUDENCE AND DETERMINE
11 WHETHER IT IS APPROPRIATE TO APPLY A PARTICULAR SET OF
12 JURISPRUDENCE IN ONE CONTEXT WHEN IT HAS BEEN DEVELOPED
13 IN ANOTHER CONTEXT.
14          SO WHAT I NEED IF YOU WANT TO MAKE THAT
15 COMPARISON IS TO DRAW A JURISPRUDENTIAL LINE BETWEEN THE
16 CASE -- THE NEW HAVEN CASE THAT YOU MENTIONED, WHICH
17 CONCERNS DISCRIMINATION, AND THE CASE HERE --
18 DISCRIMINATION IN THE CONTEXT OF A STATE ENTITY TO HERE,
19 WHICH CONCERNS AN AGENCY'S DETERMINATION AS TO WHETHER
20 IT CAN OR CANNOT ENACT A PARTICULAR REGULATION. IF YOU
21 CAN DRAW -- IF YOU CAN DRAW THAT CONNECTION, FINE, I'M
22 HAPPY TO CONSIDER IT. BUT YOU CAN'T JUST SAY IT.
23          MR. DAVIS: YOUR HONOR, I RESPECTFULLY
24 DISAGREE WITH HOW YOU CHARACTERIZE THAT. I THINK IT IS
25 APPROPRIATE IN REASONING ON THE BASIS OF CASES NOT TO

50

1 USE CASES IN THE EXACT SAME CONTEXT BUT INSTEAD TO USE
2 REASON BY ANALOGY TO CASES THAT MAY INVOLVE A DIFFERENT
3 CONTEXT, IN THAT CASE, THE MUNICIPALITY INSTEAD OF THE
4 FEDERAL GOVERNMENT. BUT STILL THE GENERAL LEGAL
5 PRINCIPLE THAT THAT CASE RECOGNIZES, THAT AN ENTITY
6 FACED WITH CONFLICTING LEGAL OBLIGATIONS SHOULD BE
7 AFFORDED SOME LEEWAY. AND THAT PRINCIPLE FROM THAT CASE
8 APPLIES EQUALLY HERE. EVEN THOUGH IT IS IN A DIFFERENT
9 CONTEXT IN THAT CASE, IT'S THE SAME THING HERE.
10          THE EXEMPTION RECOGNIZES THE REALITY THAT
11 THE AGENCIES WOULD LIKELY BE SUBJECT TO UNDER RFRA.
12 WELL, IT COULD BE SUBJECT TO LIABILITY UNDER RFRA THAT
13 THE AGENCIES CHOSE THE ACCOMMODATIONS THAT -- BUT EVEN
14 IF YOUR HONOR IS NOT PERSUADED BY THAT POSITION, WHICH I
15 --
16          THE COURT: I CAN TELL YOU I'M NOT
17 PERSUADED BY THAT.
18          MR. DAVIS: I UNDERSTAND, YOUR HONOR.
19 THE OTHER BASIS FOR STATUTORY AUTHORITY HERE IS THAT
20 RFRA DOES REQUIRE THE RELIGIOUS RULE, EVEN IF YOU THINK
21 IT DOES NOT AUTHORIZE IT. AND HERE THE AGENCIES HAVE
22 CONCLUDED THAT REQUIRING OBJECTING ENTITIES TO CHOOSE
23 BETWEEN THE MANDATE, THE ACCOMMODATION, OR PENALTIES FOR
24 NONCOMPLIANCE IMPOSES A SUBSTANTIAL BURDEN IN THE
25 AGENCY'S VIEW THE ACCOMMODATION, THE PREVIOUS

51

1 ACCOMMODATION WAS NOT ENOUGH TO ALLEVIATE THAT
2 SUBSTANTIAL BURDEN BECAUSE MANY ENTITIES OBJECTED TO THE
3 ACT OF SUBMITTING A SELF-CERTIFICATION FORM. THOSE
4 ENTITIES SINCERELY BELIEVE THAT SUBMITTING THE FORM MADE
5 THEM COMPLICIT IN PROVIDING CONTRACEPTIVE COVERAGE.
6 EVEN IF A COURT WERE TO DISAGREE WITH THAT BELIEF, HOBBY
7 LOBBY PROHIBITS QUESTIONING IT, AND AS THE SUPREME COURT
8 EXPLAINED, I BELIEVE, IMPLICATES A DIFFICULT AND
9 IMPORTANT QUESTION OF RELIGION AND MORAL PHILOSOPHY THAT
10 COURTS SHOULD NOT BE WADING INTO.
11          ON COMPELLING INTEREST, THE AGENCIES HAVE
12 NOW TAKEN THE POSITION THAT THE MANDATE DOES NOT SERVE A
13 COMPELLING GOVERNMENT INTEREST. AND THIS GOES TO THE
14 LAST OF YOUR HONOR'S QUESTIONS, WHICH I PREVIOUSLY
15 ADDRESSED. EVEN THOUGH THE AGENCIES DON'T GET CHEVRON
16 DEFERENCE UNDER RFRA, ON THE SUBSIDIARY QUESTIONS UNDER
17 RFRA, I THINK THEY DO ON THE COMPELLING INTEREST ISSUE,
18 AND THAT IS BECAUSE THE COMPELLING INTEREST ISSUE IS
19 TIED IN PART TO THE AGENCY'S INTERPRETATION OF THE
20 AFFORDABLE CARE ACT AND IT GOES RIGHT TO THE AREAS WHERE
21 THE AGENCIES HAVE DEFERENCE.
22          AND BEFORE I GO FURTHER, YOUR HONOR, I
23 JUST WANT TO MAKE SURE I'M NOT GOING OVER TIME.
24          THE COURT: NO, I THINK YOU ARE
25 ACTUALLY -- YOU STARTED ABOUT EIGHT MINUTES PAST AND IT

52

1 IS NOW 20 MINUTES TO, SO YOU ARE EXACTLY ON TIME. I
2 THINK I DID GIVE THE OTHER SIDE A LITTLE BIT MORE. SO
3 IF YOU HAVE ANYTHING ELSE YOU NEED TO SAY, FEEL FREE.
4          MR. DAVIS: I'LL JUST SAY THAT ON THE
5 COMPELLING INTEREST ISSUE, THE AGENCIES MADE A VARIETY
6 OF DIFFERENT CONCLUSIONS IN A WELL-REASONED PART OF THE
7 RULE THAT SPANS SEVERAL PAGES. AND FIRST CONGRESS DID
8 NOT MANDATE THAT CONTRACEPTION BE COVERED AT ALL. AS AN
9 INTERPRETATION OF THE AFFORDABLE CARE ACT, THAT IS
10 ENTITLED TO DEFERENCE. SECOND, CONGRESS EXPRESSLY
11 DECIDED NOT TO APPLY THE PREVENTIVE SERVICES REQUIREMENT
12 TO GRANDFATHER PLANS COVERING TENS OF MILLIONS OF
13 EMPLOYEES.
14          THE COURT: LET ME TALK TO YOU ABOUT
15 THOSE GRANDFATHERED HEALTH PLANS. I THINK ONE OF THE
16 REASONS THAT WERE GIVEN IN THE IFRS FOR BYPASSING THE
17 NOTICE AND COMMENT RULE MAKING WAS, I THINK IT WAS:
18 DELAYING AVAILABILITY OF THE EXEMPTION WOULD ALSO
19 INCREASE THE COST OF HEALTH INSURANCE BECAUSE GROUPS
20 WITH GRANDFATHERED HEALTH PLANS WISH TO MAKE CHANGES TO
21 THEIR HEALTH PLANS THAT WILL REDUCE THE COST OF
22 INSURANCE COVERAGE FOR THEIR BENEFICIARIES OR POLICY
23 HOLDERS BUT WHICH COULD CAUSE THE PLANS TO LOSE
24 GRANDFATHERED STATUS.
25          DO YOU RECALL THAT --

Exhibit 137                                                                                    JA-0001805

53

1          MR. DAVIS: YES, YOUR HONOR.

2          THE COURT: -- RATIONALE?

3          SO THERE WERE 54,000 COMMENTS, AND I

4 THINK YOU PROVIDED THEM TO US. WE HAVE THEM IN THE

5 RECORD. SO IN ORDER TO MAKE SURE THAT THAT WAS BACKED

6 UP BY THE RECORD, BECAUSE IT WAS JUST A BOLD STATEMENT,

7 IT WAS A CONCLUSION, WE SEARCHED ALL THOSE 54,000

8 COMMENTS, AND WE COULD NOT LOCATE A SINGLE COMMENT THAT

9 REFERENCED A GRANDFATHERED HEALTH PLAN. SO WE WONDER IS

10 THERE ANY WAY THAT THEY COULD POSSIBLY BE IN THE

11 COMMENTS UNDER A DIFFERENT TERMINOLOGY THAN

12 GRANDFATHERED HEALTH PLAN.

13          MR. DAVIS: IF YOUR HONOR DOES NOT MIND,

14 WE WILL GET BACK TO YOU ON THAT QUESTION.

15          THE COURT: WELL, IF YOU COULD, I

16 THINK -- I'M SURE YOU HAVE SOMEONE THAT CAN DO IT NOW,

17 BUT IF YOU COULD GET BACK TO ME BEFORE THE END OF THE

18 DAY. WHAT I WOULD LIKE YOU TO DO IS TO SEARCH THE

19 54,000 COMMENTS AND TELL ME -- AND PROVIDE ME A LIST OF

20 THE CASE -- OF THE INSTANCES IN WHICH THERE WAS SOME

21 COMMENTARY FROM A GRANDFATHERED HEALTH PLAN WHICH

22 SUGGESTED THAT THEY WISH TO MAKE CHANGES TO THEIR HEALTH

23 PLANS IN A FASTER FASHION THAN WOULD OTHERWISE BE THE

24 CASE. I THINK YOU CAN DO THAT OVER LUNCH AND GET BACK

25 TO ME.

54

1          MR. DAVIS: YES.

2          THE COURT: OKAY. ANYTHING ELSE?

3          MR. DAVIS: I WILL STOP THERE, YOUR

4 HONOR.

5          THE COURT: OKAY. SO WHAT WE ARE GOING

6 TO DO NOW -- ARE YOU NOW READY TO GO TO YOUR WITNESSES?

7          MR. GOLDMAN: I AM, YOUR HONOR.

8          THE COURT: WELL, I THINK WE SHOULD TAKE

9 A QUICK BREAK IN ORDER TO GET EVERYONE SORTED. WE WILL

10 BE BACK HERE IN TEN MINUTES, SO THAT IS JUST ABOUT EIGHT

11 MINUTES TO.

12          THE CLERK: ALL RISE.

13          (BREAK TAKEN.)

14          THE COURT: ARE YOU READY TO GO?

15          MR. GOLDMAN: YES, YOUR HONOR. MAY I

16 APPROACH?

17          THE COURT: YOU MAY APPROACH. AND THE

18 WITNESS MAY TAKE THE WITNESS STAND.

19          (CAROL WEISMAN, COMMONWEALTH'S WITNESS,

20 SWORN.)

21          THE CLERK: STATE AND SPELL YOUR FULL

22 NAME FOR THE RECORD, PLEASE.

23          THE WITNESS: CAROL WEISMAN, C-A-R-O-L

24 W-E-I-S-M-A-N.

25          DIRECT EXAMINATION

55

1 BY MR. GOLDMAN:

2 Q.    WHERE ARE YOU FROM, DR. WEISMAN?

3 A.    ORIGINALLY FROM PITTSBURGH, PENNSYLVANIA.

4 Q.    AND WHAT DO YOU DO FOR A LIVING?

5 A.    I'M A PROFESSOR AT THE PENN STATE COLLEGE OF

6 MEDICINE.

7 Q.    AND IF I MAY, YOU HAVE AN EXHIBIT BINDER BEFORE

8 YOU.

9          MR. DAVIS: AND, YOUR HONOR, IF I

10 UNDERSTAND YOUR RULES, YOU WOULD LIKE THE EXHIBITS MOVED

11 INTO EVIDENCE BEFORE THE WITNESS IS QUESTIONED?

12          THE COURT: IT DOES NOT REALLY MATTER

13 BECAUSE WE DON'T HAVE A JURY, SO JUST DO IT -- IT WOULD

14 BE BETTER IF YOU DID NOT QUESTION HER.

15          BUT HAVE YOU STIPULATED TO EVERYTHING?

16          MS. KADE: EVERYTHING EXCEPT FOR

17 DEMONSTRATIVE.

18          THE COURT: OKAY. SO CAN WE JUST

19 STIPULATE THAT EXHIBITS 1 THROUGH -- WHICH ONE IS THE

20 DEMONSTRATIVE?

21          MS. KADE: IT IS 18, YOUR HONOR.

22          THE COURT: CAN WE JUST STIPULATE AT THIS

23 POINT THAT EVERYTHING EXCEPT EXHIBIT 18 IS ADMITTED?

24          MR. GOLDMAN: YES, YOUR HONOR.

25          MS. KADE: YES, YOUR HONOR.

56

1          THE COURT: THEY ARE ALL ADMITTED, AND

2 THEREFORE YOU DO NOT HAVE TO LAY A FOUNDATION OR

3 AUTHENTICATION.

4          (GOVERNMENT EXHIBIT 18 ADMITTED INTO

5 EVIDENCE.)

6 BY MR. GOLDMAN:

7 Q.    IF YOU WOULD TURN, DR. WEISMAN, TO TAB 4, WHICH

8 WOULD BE EXHIBIT 4.

9          DO YOU KNOW WHAT THAT DOCUMENT IS?

10 A.    YES. THAT IS MY CV.

11 Q.    AND IF YOU WOULD JUST FLIP THROUGH IT BRIEFLY.

12 CAN YOU CONFIRM THAT THE CONTENTS OF THAT ARE ACCURATE?

13 A.    YES.

14 Q.    AND EXHIBIT 3 OF THE TAB, IF YOU CAN FLIP

15 THROUGH THAT.

16 A.    YES.

17 Q.    ARE YOU FAMILIAR WITH THAT DOCUMENT?

18 A.    YES. THAT IS MY DECLARATION.

19 Q.    AND IF YOU COULD REVIEW THAT BRIEFLY AND IF YOU

20 CAN CONFIRM IF YOU ARE COMFORTABLE WITH THE STATEMENTS

21 CONTAINED THERE?

22 A.    YES, I AM.

23 Q.    I WOULD LIKE TO ASK YOU BRIEFLY ABOUT YOUR

24 EDUCATION. WHERE DID YOU GO TO COLLEGE -- AND BY THE

25 WAY, YOUR HONOR, IF YOU WOULD PREFER US NOT TO GO

Exhibit 137                                                                JA-0001806

57

1  THROUGH THIS, WE CAN STIPULATE OVER IT.
2          THE COURT: I DON'T NEED IT.
3          DO YOU NEED IT?
4          MS. KADE: NO, YOUR HONOR.
5          THE COURT: WE DON'T NEED IT.
6  BY MR. GOLDMAN:
7  Q.      I MAY ASK SOME TARGETED QUESTIONS IN THERE, IF I
8  MAY. WHAT WAS THE FOCUS OF YOUR ACADEMIC WORK AT
9  WELLESLEY AND THEN JOHNS HOPKINS UNIVERSITY?
10 A.      I STUDIED SOCIOLOGY.
11 Q.      AND WAS THERE A FOCUS WITHIN THAT?
12 A.      AT THE UNDERGRADUATE LEVEL, NOT REALLY AT THE
13 GRADUATE LEVEL, I BECAME INTERESTED IN GENDER RELATED
14 ISSUES.
15 Q.      AND DID THAT INCLUDE HEALTHCARE AT THAT TIME?
16 A.      YES.
17 Q.      YOU ARE NOT A MEDICAL DOCTOR, ARE YOU?
18 A.      I AM NOT.
19          MR. DAVIS: YOUR HONOR, MAY I HAVE
20 PERMISSION TO LEAD FOR SOME OF THESE FOUNDATIONAL
21 QUESTIONS.
22          THE COURT: ARE YOU OKAY WITH THAT?
23          MS. KADE: UNTIL I SEE WHAT THE QUESTIONS
24 ARE, YOUR HONOR, I'M NOT SURE, BUT AT THIS POINT, YES.
25          THE COURT: OKAY. PERMISSION TO LEAD FOR

58

1  THE MOMENT -- I'M SORRY, WHAT IS YOUR NAME?
2          MS. KADE: ELIZABETH, YOUR HONOR.
3          THE COURT: ELIZABETH WHAT?
4          MS. KADE: KADE.
5          THE COURT: THE MOMENT MS. KADE OBJECTS,
6  THEN WE MAY HAVE TO CHANGE TASKS.
7  BY MR. GOLDMAN:
8  Q.      AM I CORRECT THAT YOU -- AFTER YOU GOT YOUR
9  PH.D. FROM JOHNS HOPKINS, YOU WORKED AS AN ASSOCIATE
10 RESEARCH SCIENTIST THERE?
11 A.      YES.
12 Q.      AND WHY DID YOU CHOOSE TO WORK AT JOHNS HOPKINS
13 UNIVERSITY?
14 A.      I WAS OFFERED A FACULTY POSITION IN WHICH I
15 COULD CONDUCT RESEARCH AS WELL AS TEACH AT THE GRADUATE
16 LEVEL.
17 Q.      AND DID THEY HAVE A PRETTY GOOD PROGRAM?
18 A.      OH, THEY HAVE THE TOP PROGRAM IN PUBLIC HEALTH
19 IN THE COUNTRY.
20 Q.      DID YOU WORK IN THE -- YOU WORKED IN RESEARCH
21 HEALTH SERVICES. AT THE TIME YOU JOINED JOHNS HOPKINS
22 UNIVERSITY, DID THAT INCLUDE THE FIELD OF WOMEN'S
23 HEALTHCARE?
24 A.      THE FIELD OF HEALTH SERVICES RESEARCH WAS JUST
25 BEING ESTABLISHED AT THAT TIME. IT'S AN

59

1  INTERDISCIPLINARY FIELD, PEOPLE FROM DIFFERENT TRAINING
2  BACKGROUNDS STUDYING HOW HEALTHCARE IS DELIVERED, THE
3  COST OF CARE, THE QUALITY OF CARE. AND I BECAME
4  INVOLVED WITH THOSE RESEARCHERS SPECIFICALLY TO LOOK AT
5  WOMEN'S HEALTHCARE.
6  Q.      IS IT FAIR TO SAY THAT YOU PLAYED A PART IN THE
7  CREATION OF WOMEN'S HEALTHCARE AS A FIELD WITHIN
8  RESEARCH HEALTH SERVICES?
9  A.      YES.
10 Q.      AND YOU WORKED AT JOHNS HOPKINS UNIVERSITY FOR
11 24 YEARS?
12 A.      YES.
13 Q.      AND I'M NOT GOING TO ASK YOU ABOUT YOUR
14 PROMOTIONS DURING THAT TIME, BUT GENERALLY SPEAKING, CAN
15 YOU DESCRIBE THE WORK THAT YOU DID WHILE AT JOHNS
16 HOPKINS UNIVERSITY?
17 A.      I DESIGNED AND LED A NUMBER OF RESEARCH PROJECTS
18 ON DIFFERENT TOPICS. I TAUGHT MASTERS LEVEL STUDENTS.
19 I SUPERVISED DOCTORAL STUDENTS, ESPECIALLY IN THEIR
20 DISSERTATION PROJECTS, AND I CO-LED A COUPLE OF ACADEMIC
21 PROGRAMS.
22 Q.      AND IS ALL THAT TEACHING WORK? DID YOU ALSO DO
23 RESEARCH DURING THAT TIME?
24 A.      YES, RESEARCH WAS A GREAT PART OF MY
25 RESPONSIBILITIES.

60

1  Q.      AND DID YOU ALSO GIVE PRESENTATIONS AND MAKE
2  PUBLICATIONS AS WELL?
3  A.      YES.
4  Q.      SO AFTER JOHNS HOPKINS UNIVERSITY YOU WENT TO
5  UNIVERSITY OF MICHIGAN AFTER 24 YEARS?
6  A.      CORRECT.
7  Q.      AND THEN YOU WENT TO PENN STATE COLLEGE OF
8  MEDICINE, CORRECT?
9  A.      CORRECT.
10 Q.      AND WHEN DID YOU GO TO PENN STATE COLLEGE OF
11 MEDICINE?
12 A.      IN 2003, SO I HAVE BEEN THERE 15 YEARS.
13 Q.      AND IS THAT YOUR CURRENT JOB?
14 A.      YES.
15 Q.      WHAT IS YOUR POSITION THERE?
16 A.      A DISTINGUISHED PROFESSOR OF PUBLIC HEALTH
17 SCIENCES AND OBSTETRICS AND GYNECOLOGY IN THE COLLEGE OF
18 MEDICINE.
19 Q.      AND YOU ARE NOT A DOCTOR?
20 A.      I AM NOT.
21 Q.      A MEDICAL DOCTOR.
22 A.      NOT A PHYSICIAN.
23 Q.      ARE THERE MANY NON-DOCTORS WHO ARE DISTINGUISHED
24 PROFESSORS IN THAT PROGRAM WITHIN THE MEDICAL SCHOOL?
25 A.      YES. MEDICAL SCHOOLS TYPICALLY HAVE M.D.'S AND

Exhibit 137

JA-0001807

61

1  PH.D.'S ON FACULTY.

2  Q.        WHAT IS THE FOCUS OF YOUR WORK AT PENN STATE?

3  A.        AGAIN, THE FOCUS OF MY WORK IS CONDUCTING

4  RESEARCH ON WOMEN'S HEALTHCARE TOPICS. I ALSO TEACH

5  MASTERS LEVEL STUDENTS, PARTICULARLY IN THE MPH PROGRAM,

6  AND DOCTORAL STUDENTS IN THE DOCTOR OF PUBLIC HEALTH

7  PROGRAM.

8          I ALSO SPEND PART OF MY TIME AS ASSOCIATE

9  DEAN FOR FACULTY AFFAIRS.

10 Q.        DO YOU, IN ADDITION TO TEACHING AND RESEARCHING,

11 DO YOU PUBLISH ARTICLES?

12 A.        YES.

13 Q.        AND GIVE PRESENTATIONS?

14 A.        YES.

15 Q.        IN THE CONTEXT OF YOUR RESEARCH, ARE THOSE

16 CLINICAL INVESTIGATIONS?

17 A.        SOMETIMES THEY ARE CLINICAL INVESTIGATIONS,

18 SOMETIMES THEY ARE POPULATION-BASED STUDIES. SO IT'S A

19 VARIETY OF DIFFERENT KINDS OF STUDIES.

20 Q.        AND WHEN IT IS A CLINICAL INVESTIGATION, DO YOU

21 EVER SERVE AS WHAT'S CALLED AN INVESTIGATOR IN THOSE

22 STUDIES?

23 A.        YES.

24 Q.        WHAT IS AN INVESTIGATOR? WHAT METHODS DOES AN

25 INVESTIGATOR USE?

62

1  A.        AN INVESTIGATOR IS RESPONSIBLE FOR OVERSEEING

2  THE CONDUCT OF A RESEARCH PROJECT. THE METHODS THAT WE

3  USE CAN BE QUITE DIVERSE. THE RESEARCH I DO SOMETIMES

4  INVOLVES SURVEY RESEARCH, IN WHICH WE ASK PEOPLE

5  QUESTIONS IN A SYSTEMATIC WAY. SOMETIMES IT INVOLVES

6  ANALYSIS OF HEALTH CLAIMS DATA TO LOOK AT COST OF CARE.

7  SOMETIMES WE TEST INTERVENTIONS TO SEE IF THEY WORK WITH

8  PATIENTS OR OTHERS.

9  Q.        IS IT FAIR TO SAY THAT WHEN DO YOU THAT KIND OF

10 WORK, THE WORK YOU DO IS BASED ON SCIENCE AND EVIDENCE?

11 A.        YES.

12 Q.        HAVE ANY OF THE INVESTIGATIONS THROUGHOUT YOUR

13 CAREER BEEN RELATED TO CONTRACEPTIVE USE?

14 A.        YES.

15 Q.        YOU DON'T HAVE TO COUNT. I KNOW YOUR RÉSUMÉ IS

16 VERY EXTENSIVE, BUT CAN YOU ESTIMATE ROUGHLY HOW MANY

17 INVESTIGATIONS HAVE INVOLVED CONTRACEPTIVE USE?

18 A.        WELL, I ESTIMATE I HAVE DONE OVER 40 PROJECTS IN

19 MY CAREER, AND I WOULD SAY A THIRD TO A HALF OF THEM

20 HAVE TO DO WITH WOMEN'S REPRODUCTIVE HEALTH GENERALLY.

21 Q.        AND HAVE YOU AUTHORED ANY PUBLICATIONS

22 SPECIFICALLY RELATING TO ACCESS TO CONTRACEPTIVE CARE?

23 A.        YES.

24 Q.        CAN YOU GIVE SOME EXAMPLES OF SPECIFIC AREAS IN

25 WHICH YOU HAVE PUBLISHED ARTICLES RELATED TO

63

1  CONTRACEPTIVE CARE?

2  A.        YES. SO I'VE CONDUCTED STUDIES OF ADOLESCENTS'

3  CONTRACEPTIVE DECISION-MAKING. I HAVE CONDUCTED WORK ON

4  WOMEN'S RECEIPT OF CONTRACEPTIVE COUNSELING IN THE

5  CONTEXT OF MANAGED CARE PLANS. I HAVE CONDUCTED STUDIES

6  IN INTEGRATION OF REPRODUCTIVE HEALTH SERVICES INTO

7  WOMEN'S PRIMARY CARE SETTINGS, AND I HAVE CONDUCTED

8  STUDIES OF WOMEN'S PRECONCEPTION HEALTHCARE, WHICH

9  INCLUDES CONTRACEPTIVE USE BUT NOT EXCLUSIVELY.

10        AND THEN MORE RECENTLY I HAVE BEEN

11 INVOLVED IN SOME STUDIES LOOKING AT WOMEN'S

12 CONTRACEPTIVE BEHAVIOR FOLLOWING THE AFFORDABLE CARE

13 ACT.

14 Q.        SO IS IT FAIR TO SAY THAT YOU ARE FAMILIAR WITH

15 THE AFFORDABLE CARE ACT?

16 A.        YES.

17 Q.        AND HAVE YOU TAUGHT, RESEARCHED, WRITTEN AND

18 GIVEN PRESENTATIONS ON IT?

19 A.        I HAVE.

20 Q.        AND ARE YOU ALSO FAMILIAR WITH THE CONTRACEPTIVE

21 MANDATE CONTAINED IN THE AFFORDABLE CARE ACT?

22 A.        YES.

23 Q.        AND HAVE YOU TAUGHT, RESEARCHED, WRITTEN AND

24 GIVEN PRESENTATIONS ABOUT THAT AS WELL?

25 A.        YES.

64

1  Q.        HAS ANY OF THE SCHOLARLY WORK YOU HAVE DONE ON

2  THIS TOPIC RELATED TO PEOPLE IN PENNSYLVANIA?

3  A.        YES.

4  Q.        AND HAS ANY OF THE SCHOLARLY WORK YOU'VE

5  PERFORMED ON THIS TOPIC ALSO RELATED TO PEOPLE OUTSIDE

6  OF PENNSYLVANIA AS WELL?

7  A.        YES, BOTH NATIONAL STUDIES AND SOME STUDIES IN

8  PENNSYLVANIA.

9  Q.        AM I CORRECT THAT YOU WERE CHOSEN AS ONE OF ONLY

10 16 MEMBERS OF THE INSTITUTE OF MEDICINE'S COMMITTEE ON

11 PREVENTATIVE SERVICES FOR WOMEN THAT WAS CONVENED BY THE

12 HEALTH RESOURCES SERVICES ADMINISTRATION IN CONNECTION

13 WITH THE AFFORDABLE CARE ACT?

14 A.        YES.

15        MR. GOLDMAN: YOUR HONOR, IF I MAY AT

16 THIS TIME, I WOULD LIKE TO PROFFER THIS WITNESS, DR.

17 CAROL WEISMAN, BASED ON HER KNOWLEDGE, EDUCATION,

18 EXPERIENCE AND TRAINING, AS AN EXPERT IN THE AREA OF

19 PREVENTATIVE MEDICAL CARE FOR WOMEN, INCLUDING

20 CONTRACEPTIVE CARE.

21        THE COURT: ANY OBJECTIONS?

22        MS. KADE: YOUR HONOR, WE OBJECT UNDER

23 FEDERAL RULE 26(A) REQUIRES DISCLOSURE OF EXPERT

24 TESTIMONY UNDER FEDERAL RULE 702, 703, AND 705. THE

25 PLAINTIFF HAS NOT PROVIDED US WITH THE REQUIRED

Exhibit 137

JA-0001808

65

1  DISCLOSURE OF THIS PERSON AS AN EXPERT OR THE SUBJECT
2  MATTER ON WHICH THE WITNESS IS EXPECTED TO PRESENT
3  EXPERT TESTIMONY.
4          MR. GOLDMAN:  OBVIOUSLY, YOUR HONOR, THIS
5  IS THE CONTEXT OF AN INJUNCTION PROCEEDING.  THERE HAVE
6  NOT BEEN ANY DEPOSITIONS, THERE'S NO TIME FOR THAT.  AND
7  IN FACT, MUCH OF DR. WEISMAN'S CONTENT OF HER TESTIMONY
8  HAS BEEN DISCLOSED IN THE FORM OF HER DECLARATION WHICH
9  IS ATTACHED TO OUR MOTION OVER A MONTH AGO.
10         MS. KADE:  YOUR HONOR, THEY WERE NOT
11 DISCLOSED AS AN EXPERT TESTIMONY.
12         THE COURT:  OKAY.  I OVERRULE YOUR
13 OBJECTION.  SHE IS ADMITTED AS AN EXPERT IN PREVENTATIVE
14 MEDICAL CARE INCLUDING CONTRACEPTION.  IS THAT WHAT YOU
15 WANTED?
16         MR. GOLDMAN:  YES, YOUR HONOR.  AND JUST
17 FOR THE RECORD, COUNSEL HAD OBJECTED TO DR. WEISMAN AS
18 AN EXPERT, SO IT SEEMS THAT THEY MUST HAVE KNOWN FROM
19 THE DECLARATION THAT SHE WAS BEING OFFERED AS AN EXPERT.
20         THE COURT:  YOU JUST WON, YOU DIDN'T HAVE
21 TO MAKE AN ARGUMENT.
22         MR. GOLDMAN:  I'M SORRY?
23         THE COURT:  YOU JUST WON, YOU DIDN'T HAVE
24 TO MAKE ANOTHER ARGUMENT.
25         MR. GOLDMAN:  THANK YOU, YOUR HONOR.  I

66

1  UNDERSTAND.
2          THE COURT:  IT'S OVER.
3  BY MR. GOLDMAN:
4  Q.     WHAT IS THE INSTITUTE OF MEDICINE?
5          THE COURT:  MS. KADE, WHAT'S UP?
6          MS. KADE:  YOUR HONOR, TO THE EXTENT THAT
7  THIS EXPERT TESTIMONY IS GOING TO BE OFFERED IN ORDER TO
8  DETERMINE THE CORRECTNESS OR WISDOM OF THE AGENCY'S
9  DECISION, IT SHOULD NOT BE PERMITTED, AND THAT IS A
10 QUOTE FROM ASARCO V EPA AT 1160.  IT'S A 9TH CIRCUIT
11 1980 DECISION THAT THE COURT REFERRED TO IN HER MOTION
12 IN LIMINE THAT WAS ISSUED YESTERDAY.
13         THE COURT:  OKAY, YOUR OBJECTION IS
14 TAKEN.
15         GO AHEAD.
16 BY MR. GOLDMAN:
17 Q.     WHAT IS THE INSTITUTE OF MEDICINE AND WHAT DO
18 THEY DO?
19 A.     THE INSTITUTE OF MEDICINE IS NOW CALLED THE
20 NATIONAL ACADEMY OF MEDICINE AND IT IS A NONGOVERNMENTAL
21 PRIVATE GROUP OF MEDICAL AND SCIENTIFIC EXPERTS WHO
22 CONDUCT STUDIES AND PROVIDE RECOMMENDATIONS TO
23 GOVERNMENT AND POLICYMAKERS AND OTHERS, WHEN ASKED.
24 Q.     AND THIS SPECIFIC COMMITTEE THAT YOU WERE ONE OF
25 16 MEMBERS OF, WHAT WAS THE PURPOSE OF THAT COMMITTEE?

67

1  A.     THAT COMMITTEE WAS CHARGED WITH MAKING
2  RECOMMENDATIONS TO THE DEPARTMENT OF HEALTH AND HUMAN
3  SERVICES FOR SPECIFIC PREVENTIVE SERVICES FOR WOMEN THAT
4  WERE NOT MENTIONED IN THE AFFORDABLE CARE ACT BUT MIGHT
5  HAVE SUBSTANTIAL EVIDENCE TO SUPPORT THEIR PROVISION AS
6  PART OF WOMEN'S PREVENTIVE CARE.
7  Q.     AND WAS THE PURPOSE OF THAT COMMITTEE, WAS IT
8  LIMITED TO RECOMMENDATIONS INVOLVING CONTRACEPTIVE CARE
9  OR WAS IT BROADER THAN THAT?
10 A.     OH, NO.  OUR CHARGE WAS TO SCAN THE EXISTING
11 RECOMMENDATIONS FOR WOMEN'S PRIMARY CARE AND WHAT WE
12 KNEW OF THE SCIENTIFIC LITERATURE AROUND SPECIFIC
13 PREVENTIVE SERVICES AND MAKE RECOMMENDATIONS FOR WHAT
14 OUGHT TO BE INCLUDED IN ROUTINE PREVENTIVE CARE FOR
15 WOMEN IN GENERAL.
16 Q.     AND DID THE COMMITTEE ULTIMATELY ISSUE
17 RECOMMENDATIONS?
18 A.     YES, WE ISSUED EIGHT RECOMMENDATIONS.
19 Q.     AND HOW MANY OF THEM, IF ANY, INVOLVED
20 CONTRACEPTIVE CARE?
21 A.     ONE OF THE EIGHT.
22 Q.     DID THE COMMITTEE ULTIMATELY ISSUE A REPORT WITH
23 ITS RECOMMENDATIONS?
24 A.     YES.
25 Q.     I WOULD LIKE TO TURN YOUR ATTENTION TO

68

1  EXHIBIT 5, IT SHOULD BE TAB 5 IN YOUR BINDER, AND ASK IF
2  YOU HAVE EVER SEEN THIS DOCUMENT BEFORE?
3  A.     YES, THIS IS THE REPORT OF THE COMMITTEE.
4  Q.     AND THAT IS ALREADY IN EVIDENCE.  THROUGHOUT
5  YOUR TESTIMONY, I MAY BE REFERRING TO IT BRIEFLY.
6          IF YOU COULD FIRST, WOULD YOU TURN TO
7  PAGE 223 OF THE REPORT.  IT IS APPENDIX C.  AND IT
8  GOES -- THAT SECTION GOES THROUGH PAGE 230.
9  A.     YES, I'M THERE.
10 Q.     ARE THOSE THE BIOGRAPHIES OF THE PEOPLE ON THE
11 COMMITTEE?
12 A.     YES, THEY ARE.
13 Q.     IF YOU'D TURN TO THE LAST PAGE, ON PAGE 230, THE
14 LAST BIOGRAPHY, IS THAT YOUR BIOGRAPHY?
15 A.     YES.
16 Q.     DO YOU KNOW WHY YOU WERE LAST?
17 A.     IT IS ALPHABETICAL.  I THINK EXCEPT FOR THE
18 CHAIR, SHE IS FIRST.
19 Q.     UNDERSTOOD.
20         IN FORMING ITS RECOMMENDATIONS, WHAT WAS
21 THE COMMITTEE ASKED TO CONSIDER?
22 A.     WE WERE ASKED FIRST TO SCAN THE SOURCES OF
23 PREVENTIVE CARE GUIDELINES THAT ARE NAMED IN THE
24 AFFORDABLE CARE ACT.  THOSE INCLUDE THE U.S. PREVENTIVE
25 SERVICES TASK FORCE RECOMMENDATIONS, THE ADVISORY

Exhibit 137                                                                JA-0001809

69

1  COMMITTEE ON IMMUNIZATION PRACTICE RECOMMENDATIONS AND
2  THE BRIGHT FUTURES RECOMMENDATIONS.
3          AND WE WERE ASKED TO LOOK FOR GAPS:  IS
4  THERE ANY ASPECT OF WOMEN'S PREVENTIVE CARE THAT IS NOT
5  COVERED ALREADY BY THOSE EXISTING GUIDELINES.  AND THEN
6  WE WERE ASKED TO REVIEW THE SCIENTIFIC LITERATURE AND
7  LISTEN TO SOME EXPERT TESTIMONY AND COME TO SOME
8  CONCLUSIONS ABOUT WHAT SERVICES IN ADDITION TO THOSE
9  ALREADY COVERED IN THOSE THREE SOURCES OUGHT TO BE PART
10 OF WOMEN'S ROUTINE PREVENTIVE CARE.
11 Q.      WAS THE COMMITTEE ASKED TO CONSIDER COSTS?
12 A.      NO.  WE WERE IN FACT SPECIFICALLY TOLD NOT TO
13 CONSIDER COSTS.
14 Q.      DID THE COMMITTEE, AS PART OF ITS STUDY AND
15 RECOMMENDATION, DID IT FOCUS AT ALL ON THE ISSUE OF
16 UNINTENDED PREGNANCY?
17 A.      YES, THAT WAS ONE OF THE TOPIC AREAS IDENTIFIED
18 AS A GAP BECAUSE IT WAS NOT ADDRESSED IN EXISTING
19 GUIDELINES.
20 Q.      DO YOU KNOW ROUGHLY HOW COMMON UNINTENDED
21 PREGNANCY IS IN WOMEN?
22 A.      UNINTENDED PREGNANCY IN THE UNITED STATES IS
23 QUITE PREVALENT.  AT THE TIME THE COMMITTEE WAS MEETING,
24 49 PERCENT OF ALL U.S. PREGNANCIES WERE UNINTENDED, AND
25 THAT MEANS THEY WERE EITHER MISTIMED OR NOT WANTED BY

70

1  THE WOMAN AT THE TIME THAT SHE BECAME PREGNANT.
2  Q.      YOU SAID THAT IT WAS 49 PERCENT AT THE TIME THE
3  COMMITTEE MET.  DO YOU KNOW IF IT HAS CHANGED TODAY?
4  A.      IT CHANGED.  IT WENT UP TO 51 PERCENT IN 2008,
5  AND THEN SINCE 2008, IT HAS DECLINED.  IT IS NOW AT
6  45 PERCENT.
7  Q.      AND IS THAT -- THE 45 PERCENT NUMBER, IS THAT AS
8  OF TODAY?  DO YOU KNOW WHEN THAT NUMBER --
9  A.      THAT IS AS OF 2011.  THERE IS ALWAYS A GAP
10 BETWEEN DATA COLLECTION AND WHEN WE KNOW THE EXACT
11 RATES.  SO THAT IS THE MOST RECENT DATA THAT WE HAVE.
12 Q.      AM I CORRECT THAT IN 2011 THAT 45 PERCENT NUMBER
13 HAD GONE DOWN BEFORE THE CONTRACEPTIVE CARE MANDATE WENT
14 INTO EFFECT?
15 A.      CORRECT.
16 Q.      DO YOU KNOW WHY THE 45 -- THE NUMBER DECREASED
17 BEFORE THE CONTRACEPTIVE CARE MANDATE?
18 A.      THERE WAS AN ARTICLE PUBLISHED IN THE NEW
19 ENGLAND JOURNAL OF MEDICINE IN 2016 BY FINER AND ZOLNA
20 THAT ANALYZED THAT DECLINE IN THE UNINTENDED PREGNANCY
21 RATE FROM THE HIGH OF 51 PERCENT TO 45 PERCENT, AND IT
22 ATTRIBUTED THE DECLINE TO IMPROVED ACCESS TO
23 CONTRACEPTION AND WOMEN USING MORE EFFECTIVE
24 CONTRACEPTION.
25 Q.      BUT HOW WAS THAT SO GIVEN THAT THAT WAS BEFORE

71

1  THE CONTRACEPTIVE CARE MANDATE WENT INTO EFFECT?
2  A.      BECAUSE IN THAT PERIOD OF TIME, INCREASING
3  NUMBERS OF EMPLOYER-BASED PLANS AND OTHER PLANS WERE
4  BEGINNING TO COVER CONTRACEPTION AS A RESULT, IT'S MY
5  UNDERSTANDING, OF STATE LEGISLATION AND CASES INVOLVING
6  DISCRIMINATION IN PRESCRIPTION DRUG COVERAGE.
7  Q.      SO THEN INCREASED ACCESS TO CONTRACEPTION
8  LOWERED THE RATE OF UNINTENDED PREGNANCY?
9  A.      THAT WAS THE INTERPRETATION OF THESE AUTHORS,
10 YES.
11 Q.      IS AN UNINTENDED PREGNANCY A BAD THING?  DOES IT
12 MATTER?
13 A.      UNINTENDED PREGNANCY HAS A NUMBER OF NEGATIVE
14 CONSEQUENCES.  TO BEGIN WITH, 42 PERCENT OF UNINTENDED
15 PREGNANCIES RESULT IN ABORTION.  OF THOSE PREGNANCIES
16 THAT CONTINUE, THERE IS A LOT OF EVIDENCE OF NEGATIVE
17 HEALTH CONSEQUENCES FOR THE WOMAN AND FOR THE BABIES.
18         WOMEN, FOR EXAMPLE, CAN BECOME DEPRESSED
19 DURING AN UNINTENDED PREGNANCY.  THEY MIGHT NOT HAVE
20 GONE INTO THE PREGNANCY WITH OPTIMAL HEALTH STATUS.  FOR
21 EXAMPLE, A DIABETIC WOMAN WHO HAS AN UNINTENDED
22 PREGNANCY MIGHT NOT HAVE HAD HER GLUCOSE LEVELS UNDER
23 CONTROL AT THE TIME THAT SHE BECAME PREGNANT, LEADING TO
24 POTENTIAL CONSEQUENCES DURING THE PREGNANCY.
25         UNINTENDED PREGNANCIES OFTEN RESULT IN

72

1  DELAYED ENTRY INTO PRENATAL CARE BECAUSE THE WOMAN WAS
2  NOT EXPECTING TO BECOME PREGNANT, MAY NOT HAVE REALIZED
3  SHE WAS PREGNANT IN TIME TO GET OPTIMAL PRENATAL CARE.
4          THERE ARE ALSO A NUMBER OF STUDIES THAT
5  SHOW THAT BABIES BORN OF UNINTENDED PREGNANCIES ARE MORE
6  LIKELY TO BE BORN PRETERM OR WITH LOW BIRTH WEIGHT.
7          AND IN ADDITION TO THE HEALTH
8  CONSEQUENCES, UNINTENDED PREGNANCIES ARE KNOWN TO BE
9  DISRUPTIVE OF WOMEN'S PLANS FOR EDUCATION, FOR WORK, AND
10 FOR SPACING THEIR CHILDREN, AND THEREFORE, CAN HAVE
11 NEGATIVE ECONOMIC CONSEQUENCES FOR THE WOMAN AND HER
12 FAMILY.
13 Q.      SO WHO IS AT RISK FOR HAVING AN UNINTENDED
14 PREGNANCY?
15 A.      SO REALLY, ANY WOMAN OF REPRODUCTIVE CAPACITY
16 WHO IS HAVING SEXUAL RELATIONS WITH MEN IS AT RISK OF AN
17 UNINTENDED PREGNANCY.
18 Q.      ARE THERE SOME WHO ARE MORE IMPACTED THAN
19 OTHERS?  ARE THERE CERTAIN RISK GROUPS?
20 A.      UNINTENDED PREGNANCIES TEND TO BE MORE COMMON IN
21 YOUNGER WOMEN AND LOW INCOME WOMEN AND WOMEN WITH LOWER
22 EDUCATIONAL LEVELS.
23 Q.      AM I AT RISK FOR UNINTENDED PREGNANCY?
24 A.      NO, YOU ARE NOT.
25 Q.      SORRY, I'M A LAWYER, BUT WHY IS THAT?

Exhibit 137                                                                          JA-0001810

73

1    A.    BECAUSE YOU ARE NOT A WOMAN.

2    Q.    SO?

3    A.    YOU DO NOT HAVE THE CAPACITY TO BECOME PREGNANT.

4    Q.    AND CAN UNINTENDED PREGNANCY BE ADDRESSED

5    THROUGH MEDICAL CARE AND PREVENTIVE MEDICAL SERVICES?

6    A.    YES.  95 PERCENT OF UNINTENDED PREGNANCIES OCCUR

7    IN WOMEN WHO ARE EITHER NOT USING CONTRACEPTION OR ARE

8    USING CONTRACEPTION INCONSISTENTLY.  AND WE HAVE VERY

9    EFFECTIVE CONTRACEPTIVE METHODS AVAILABLE TODAY.

10   Q.    LET ME TAKE A BRIEF STEP ASIDE FOR A MOMENT AND

11   ASK YOU YOUR SPECIFIC ROLE ON THE COMMITTEE.  DID YOU

12   HAVE A SPECIFIC FOCUS WITHIN THE COMMITTEE?

13   A.    NO.  AS A MEMBER OF THE COMMITTEE, I

14   PARTICIPATED IN ALL OF THE COMMITTEE DISCUSSIONS AND

15   DELIBERATIONS.  AND WHAT WE DID WAS IDENTIFY SOME KEY

16   TOPICS FOR FURTHER INVESTIGATION AND BROKE UP INTO

17   SUBGROUPS TO INVESTIGATE THOSE TOPICS.

18   Q.    WERE YOU PART OF ONE OF THOSE SUBGROUPS OR ONE

19   OR MORE?

20   A.    I WAS PART OF TWO SUBGROUPS, ONE OF WHICH WAS

21   THE SUBGROUP ON CONTRACEPTION AND UNINTENDED PREGNANCY.

22   Q.    WHAT WAS THE OTHER?

23   A.    IT WAS A SUBGROUP ON PRECONCEPTION CARE.

24   Q.    ROUGHLY HOW MANY MEMBERS OF THE COMMITTEE WERE

25   ON THE SUBGROUP INVOLVING CONTRACEPTION?

74

1    A.    I DON'T REALLY REMEMBER.  I WOULD SAY THREE TO

2    FIVE.

3    Q.    AND WAS THERE A ROBUST DISCUSSION ON THE ISSUE

4    OF PREVENTATIVE CARE RECOMMENDATIONS ABOUT

5    CONTRACEPTION?

6    A.    OH, YES.

7    Q.    WERE ANY NEGATIVE SIDE EFFECTS OF CONTRACEPTION

8    CONSIDERED?

9    A.    OH, YES.  WE CONSIDERED ALL OF THE LITERATURE

10   BOTH ON EFFECTIVENESS OF CONTRACEPTION, SIDE EFFECTS OF

11   CONTRACEPTION, OTHER BENEFITS OF TAKING CONTRACEPTION

12   THAN PREVENTING PREGNANCY, BECAUSE ALL OF THOSE FACTORS

13   ARE IMPORTANT IN DECISIONS ABOUT USING CONTRACEPTION.

14   Q.    AND IS CONTRACEPTION, IN FACT, EFFECTIVE AT

15   PREVENTING UNINTENDED PREGNANCY?

16   A.    YES, IT IS.

17   Q.    I WOULD LIKE TO DIRECT YOU BACK TO THE REPORT AT

18   EXHIBIT 5 TO PAGE 105.  THAT'S TABLE 5.3.  AND I'M GOING

19   TO PUT THAT UP ON THE ELMO IF YOU'LL GIVE ME ONE QUICK

20   MOMENT.  BUT MY FIRST QUESTION IS, ARE YOU FAMILIAR WITH

21   THIS TABLE?

22   A.    YES.  IT'S PAGE 106.

23   Q.    106.  I'M SORRY.

24   A.    YES, I AM.  THAT IS IT.

25   Q.    I WAS HOPING YOU COULD BRIEFLY WALK US THROUGH

75

1    THAT CHART AND EXPLAIN IT TO US.

2    A.    SURE.  SO THESE ARE DATA FROM CONTRACEPTIVE

3    TECHNOLOGY, WHICH IS THE DEFINITIVE SOURCE ABOUT

4    CONTRACEPTIVE EFFECTIVENESS USED BY PHYSICIANS.

5         AND THESE ARE THE DATA OF AVAILABLE -- ON

6    CONTRACEPTIVE EFFECTIVENESS AT THE TIME THAT THE

7    COMMITTEE WAS MEETING.  AND WHAT THIS DOES IS SHOW ALL

8    OF THE METHODS OF CONTRACEPTION AVAILABLE AT THE TIME

9    INCLUDING NONE, AT THE TOP.  AND THEN IT DESCRIBES THE

10   EFFECTIVENESS OF EACH CONTRACEPTIVE METHOD BASED ON

11   DATA.  AND THE WAY EFFECTIVENESS OF CONTRACEPTION IS

12   LOOKED AT IS BY LOOKING AT FAILURES, WHICH MEANS THE

13   NUMBER OF PREGNANCIES THAT OCCUR IN A YEAR WITH USE OF

14   THAT CONTRACEPTIVE METHOD.

15        SO THERE ARE TWO COLUMNS IN THE TABLE,

16   THERE IS ONE CALLED TYPICAL USE AND ONE CALLED PERFECT

17   USE.  PERFECT USE IS IN A PERFECT WORLD WHERE PEOPLE

18   DON'T MAKE MISTAKES.  SO WHAT WE REALLY LOOK AT IS THE

19   TYPICAL USE COLUMN, WHICH IS BASED ON DATA OF ACTUAL

20   BEHAVIOR AND OUTCOMES OF PEOPLE USING CONTRACEPTION.

21   AND WHAT THIS COLUMN SHOWS YOU IS THE NUMBER OF EXPECTED

22   PREGNANCIES IN A YEAR PER 100 WOMEN USING THAT METHOD

23   UNDER THE CONDITIONS OF TYPICAL USE.

24   Q.    SORRY.  GO ON.

25   A.    SO IF NO CONTRACEPTION IS USED, WHICH IS THE TOP

76

1    ROW, WE WOULD EXPECT TO SEE 85 WOMEN BECOME PREGNANT IN

2    A YEAR.

3    Q.    SO THEN IF WITHDRAWAL WAS USED, AM I CORRECT

4    THAT YOU WOULD EXPECT TO SEE 27 WOMEN GET PREGNANT

5    WITHIN ONE YEAR IF THE WITHDRAWAL METHOD WAS USED?

6    A.    CORRECT.  AND THEN GOING DOWN THE COLUMN, WE GET

7    TO THE MOST EFFECTIVE METHODS OF CONTRACEPTION TOWARD

8    THE BOTTOM.  AT THE VERY BOTTOM ARE MALE AND FEMALE

9    STERILIZATION, BUT JUST ABOVE THAT ARE IMPLANTS AND

10   INTRAUTERINE DEVICES, WHICH RESULT IN ONE LESS THAN ONE

11   PREGNANCY PER YEAR.

12   Q.    IF I UNDERSTAND THIS CHART CORRECTLY, UNDER

13   INTRAUTERINE DEVICES -- AND THAT IS AN IUD, RIGHT,

14   THAT'S THE SAME THING?

15   A.    CORRECT.

16   Q.    THERE IS ONE CALLED A MIRENA IUD.  THAT LOOKS

17   LIKE OUT OF 100 WOMEN WHO ARE USING THAT IN A YEAR,

18   THERE WOULD BE A .2 CHANCE OF GETTING PREGNANT, CORRECT?

19   A.    CORRECT.

20   Q.    AND THAT IS ACTUALLY LESS THAN FEMALE

21   STERILIZATION, CORRECT --

22   A.    YES.

23   Q.    -- ON THE CHART?

24   A.    THAT IS CORRECT.

25   Q.    AND IMPLANTED, WHAT IS THAT?

Exhibit 137                                                                              JA-0001811

77

1  A.      THAT IS THE IMPLANT.  THAT IS A HORMONAL
2  CONTRACEPTIVE THAT IS IMPLANTED UNDER THE SKIN.
3  Q.      THERE THAT IS OUT OF A HUNDRED WOMEN, YOU WOULD
4  HAVE .05?
5  A.      RIGHT.  THE BOTTOM LINE IS WITH THESE MOST
6  EFFECTIVE METHODS AT THE BOTTOM, YOU WOULD EXPECT TO SEE
7  LESS THAN ONE PREGNANCY IN A YEAR OF USE.
8  Q.      AND --
9  A.      OUT OF 100 WOMEN.
10 Q.      SO THE ONES AT THE BOTTOM, ARE THEY PRESCRIPTION
11 CONTRACEPTIVES?
12 A.      ALL OF THE METHODS OF CONTRACEPTION ARE
13 PRESCRIPTION METHODS WITH THE EXCEPTION OF SPERMICIDES,
14 WITHDRAWAL, FERTILITY AWARENESS METHODS, AND THE SPONGE
15 AND THE CONDOM.  ALL THE OTHERS ARE PRESCRIPTION
16 METHODS.
17 Q.      AND NONE I ASSUME ALSO?
18 A.      AND NONE, YES.  THANK YOU.
19 Q.      AM I CORRECT, FOR STERILIZATION YOU WOULD NEED A
20 PRESCRIPTION?  IS THAT CONSIDERED A PRESCRIPTION?
21 A.      WELL, IT IS A SURGICAL PROCEDURE, SO IT
22 HAS TO BE PROVIDED BY A HEALTHCARE PROFESSIONAL WHO
23 AGREES TO PROVIDE THE SERVICE.
24 Q.      GIVEN THE STUDIES -- SORRY.  GIVEN THE COMMITTEE
25 STUDY OF CONTRACEPTION, INCLUDING NEGATIVE HEALTH

78

1  EFFECTS AND EFFICACY AS YOU EXPLAINED FROM THAT TABLE,
2  DID THE COMMITTEE MAKE ANY RECOMMENDATION REGARDING
3  CONTRACEPTION?
4  A.      THE COMMITTEE RECOMMENDED THAT ALL FDA, THAT IS
5  FOOD AND DRUG ADMINISTRATION, APPROVED CONTRACEPTIVES
6  SHOULD BE PROVIDED AS PART OF WOMEN'S PREVENTIVE CARE,
7  ALONG WITH COUNSELING REGARDING CONTRACEPTION.
8  Q.      WHAT WAS THE COSTS TO WOMEN SUPPOSED TO BE FOR
9  THIS EXPANDED CARE?
10 A.      WELL, THE COMMITTEE DID NOT DISCUSS THE COST TO
11 WOMEN, BUT WE WERE MAKING RECOMMENDATIONS TO THE
12 DEPARTMENT OF HEALTH AND HUMAN SERVICES THAT WOULD THEN
13 DECIDE WHETHER TO ADOPT THESE RECOMMENDATIONS, WHICH WE
14 KNEW WOULD THEN MEAN IF THEY WERE ADOPTED THAT THEY
15 WOULD BECOME PART OF WOMEN'S PREVENTIVE CARE WITHOUT
16 COST SHARING UNDER THE AFFORDABLE CARE ACT.
17 Q.      I WANT TO MAKE SURE I UNDERSTAND THAT CORRECTLY.
18 DID I UNDERSTAND YOU TO SAY THAT BY MAKING THE
19 RECOMMENDATIONS THAT THE FULL RANGE OF THIS
20 CONTRACEPTIVE CARE BE MADE AVAILABLE, INHERENT IN THE
21 RECOMMENDATIONS THAT WOULD BE RECOMMENDED WITHOUT
22 ADDITIONAL COSTS TO WOMEN?
23 A.      WHAT THE COMMITTEE WAS ASKED TO DO WAS RECOMMEND
24 EFFECTIVE PREVENTIVE SERVICES FOR WOMEN THAT OUGHT TO BE
25 PART OF ROUTINE PREVENTIVE CARE.  SO WE DETERMINED THAT

79

1  CONTRACEPTION IS HIGHLY EFFECTIVE AT PREVENTING
2  UNINTENDED PREGNANCY, WHICH IS A MAJOR WOMEN'S HEALTH
3  PROBLEM, AND THEREFORE OUGHT TO BE PART OF PREVENTIVE
4  CARE.
5  Q.      ARE YOU AWARE WHETHER OR NOT THE COST OF
6  CONTRACEPTION AFFECTS WOMEN'S USE OF CONTRACEPTION?
7  A.      YES.
8  Q.      AND HOW DOES THAT WORK?
9  A.      PRIOR TO THE AFFORDABLE CARE ACT, SOME WOMEN HAD
10 CONTRACEPTIVE COVERAGE, SOME DID NOT.  THOSE WHO DID
11 HAVE CONTRACEPTIVE COVERAGE ALWAYS HAD COST SHARING, SO
12 THAT MEANS IF THEY WERE IN AN EMPLOYER-BASED OR OTHER
13 PRIVATE HEALTH PLAN, THEY EITHER PAID A CO-PAY FOR
14 CONTRACEPTIONS, CONTRACEPTIVE SERVICES SUCH AS
15 STERILIZATION WOULD BE APPLIED TO THEIR DEDUCTIBLE.  SO
16 TYPICALLY WOMEN WOULD HAVE TO PAY SOMETHING OUT OF
17 POCKET FOR THEIR CONTRACEPTIVE SERVICES.
18 Q.      CO-PAYS ARE GENERALLY PRETTY SMALL, RIGHT?
19 A.      THAT DEPENDS ON THE HEALTH PLAN, AND IT ALSO
20 WOULD DEPEND ON THE NATURE OF THE CONTRACEPTION BEING
21 USED.  IF IT IS A MONTHLY METHOD LIKE ORAL
22 CONTRACEPTIVES, THAT MEANS THERE WOULD BE A CO-PAY EVERY
23 TIME A PRESCRIPTION WAS REFILLED.  THERE IS AN ABUNDANT
24 BODY OF LITERATURE SHOWING THAT EVEN VERY SMALL CO-PAYS
25 AS SMALL AS $6 CAN DISCOURAGE PEOPLE FROM USING HEALTH

80

1  SERVICES.
2  Q.      DO I UNDERSTAND THAT RIGHT, THAT EVEN A $6
3  CO-PAY COULD MAKE WOMEN OR CAUSE SOME WOMEN TO NOT USE
4  CONTRACEPTION THAT WAS PRESCRIBED BY THEIR DOCTOR THAT
5  THEY WOULD USE OTHERWISE?
6  A.      YES.
7          MS. KADE:  OBJECTION, LEADING.
8          THE COURT:  SUSTAINED.
9          GO AHEAD.  REASK THE QUESTION.
10 BY MR. GOLDMAN:
11 Q.      IS -- SO WHAT COULD BE THE EFFECT OF EVEN A
12 SMALL $6 CO-PAY?
13 A.      A SMALL $6 CO-PAY TO A LOW INCOME WOMAN COULD
14 MEAN THAT SHE DIDN'T HAVE -- WOULD NOT HAVE THE MONEY TO
15 RENEW A PRESCRIPTION FOR BIRTH CONTROL PILLS, FOR
16 EXAMPLE.
17 Q.      SO BASED ON THE CHART THEN ON PAGE 106 OF
18 TABLE 5.3, IS THAT IF A WOMAN HAD A $6 CO-PAY, DID NOT
19 RENEW THE PRESCRIPTION AND DID NOT USE CONTRACEPTION, AM
20 I RIGHT THAT HER RATE OF UNINTENDED PREGNANCY WITHIN ONE
21 YEAR WOULD GO TO AN 85 PERCENT CHANCE?
22 A.      WELL, IF SHE USED ORAL CONTRACEPTIVES
23 INCONSISTENTLY BECAUSE SHE DID NOT RENEW A PRESCRIPTION
24 OR IF SHE DISCONTINUED USE OF ORAL CONTRACEPTIVES
25 BECAUSE SHE COULD NOT AFFORD TO RENEW HER PRESCRIPTIONS,

Exhibit 137                                                                                JA-0001812

81

1    A.    HER RISK OF UNINTENDED PREGNANCY WOULD INCREASE, YES.

2    Q.    TO 85 PERCENT IF NO CONTRACEPTION WAS USED?

3    A.    THAT I DON'T KNOW.

4    Q.    I WOULD LIKE TO REFER YOU TO PAGE 107 ON THE

5    CHART, SPECIFICALLY THE LAST FULL PARAGRAPH.

6    A.    YES.

7    Q.    I'M GOING TO PLACE THAT UP ON THE ELMO.  I WOULD

8    LIKE YOU TO TAKE A MOMENT TO READ THAT PARAGRAPH.  AND

9    IF I MAY, I WILL SORT OF READ IT ALONG WITH YOU:

10   ALTHOUGH IT IS BEYOND THE SCOPE OF THE COMMITTEE'S

11   CONSIDERATION, IT SHOULD BE NOTED THAT CONTRACEPTION IS

12   HIGHLY COST EFFECTIVE.  THE DIRECT MEDICAL COSTS OF

13   UNINTENDED PREGNANCY IN THE UNITED STATES WAS ESTIMATED

14   TO BE NEARLY 5 BILLION IN 2002 WITH COST SAVINGS DUE TO

15   CONTRACEPTIVE USE ESTIMATED TO BE AT 19.3 BILLION.  THEN

16   IT SAYS IN PARENTHESES TRUSSELL 2007.

17         WHAT DOES THAT REFER TO?

18   A.    WELL, THAT REFERS TO A STUDY OF THE POTENTIAL

19   SAVINGS IN PUBLIC AND PRIVATE DOLLARS TO AVERTING

20   UNINTENDED PREGNANCIES AT THE NATIONAL LEVEL.

21   Q.    SO THAT IS A CITATION TO BACK UP THE PREMISE?

22   A.    CORRECT.  TRUSSELL IS THE AUTHOR, YES.

23   Q.    AND THEN IT SAYS:  THE COST EFFECTIVENESS OF

24   FAMILY PLANNING IS ALSO DOCUMENTED IN AN EVALUATION OF

25   FAMILY PACT, CALIFORNIA'S 1115 MEDICAID FAMILY PLANNING

82

1    WAIVER PROGRAM.  THE UNINTENDED PREGNANCIES AVERTED IN

2    THIS PROGRAM IN 2002 WOULD HAVE COST THE STATE

3    $1.1 BILLION WITHIN TWO YEARS AND $2.2 BILLION WITHIN

4    FIVE YEARS FOR PUBLIC SECTOR HEALTH AND SOCIAL SERVICES

5    THAT OTHERWISE WOULD HAVE BEEN NEEDED.

6          AND IS THAT ANOTHER CITATION TO PROVE

7    THAT PREMISE?

8    A.    YES.  THAT IS A STATE LEVEL STUDY.

9    Q.    SO YOU HAD TOLD THE COURT THAT YOU WERE

10   INSTRUCTED TO NOT CONSIDER COSTS, AND YET THIS PARAGRAPH

11   SEEMS TO TALK ABOUT COSTS, AND I WAS WONDERING WHY THAT

12   IS?

13   A.    THE COMMITTEE DECIDED, SINCE THERE WAS A BODY OF

14   LITERATURE ASSESSING THE COST EFFECTIVENESS OF

15   CONTRACEPTION, TO PUT THE INFORMATION INTO OUR REPORT

16   FOR THE DECISION-MAKERS WHO WERE GOING TO LOOK AT THE

17   REPORT AND DECIDE WHETHER TO APPROVE THE RECOMMENDATIONS

18   OR NOT.  WE WANTED THE INFORMATION TO BE AVAILABLE TO

19   THE DECISION-MAKERS.

20   Q.    IF I MAY DIRECT YOU TO PAGE 109.  I WOULD LIKE

21   TO, IF I MAY, DIRECT YOU TO THAT MIDDLE PARAGRAPH?

22   A.    DESPITE INCREASES?

23   Q.    YES, THAT IS THE ONE.

24         THAT PARAGRAPH ALSO TALKS ABOUT COSTS,

25   DOESN'T IT?

83

1    A.    YES, IT DOES.

2    Q.    AND WITHOUT READING THE WHOLE THING BECAUSE I

3    KNOW THE COURT HAS IT, DOES THAT TALK ABOUT WHAT YOU

4    WERE JUST TELLING THE COURT BEFORE ABOUT THE EFFECT OF

5    CO-PAYMENTS IN AFFECTING WOMEN'S CONTRACEPTIVE CHOICES?

6    A.    YES.  AND IT SPECIFICALLY POINTS OUT TOWARD THE

7    BOTTOM OF THE PARAGRAPH THAT IT WAS KNOWN AT THE TIME

8    BECAUSE OF RECENT STUDIES THAT COST SHARING WAS A

9    BARRIER TO WOMEN CHOOSING THE MOST EFFECTIVE FORMS OF

10   CONTRACEPTION, THE IUD'S AND THE IMPLANTS.

11   Q.    AND AM I CORRECT THAT THERE ARE CITATIONS TO

12   EVIDENCE IN THIS PARAGRAPH AS WELL, TO HUDMAN AND

13   O'MALLEY, A 2003, I ASSUME IT'S A PAPER; TRIVEDI,

14   ET AL., 2008; AND THEN A RECENT STUDY CONDUCTED BY

15   KAISER PERMANENTE?

16   A.    CORRECT.

17   Q.    WAS ALL THAT OBJECTIVE EVIDENCE THAT THE

18   COMMITTEE BASED ITS FINDINGS ON?

19   A.    YES.  THIS EVIDENCE DOES NOT HAVE TO DO WITH THE

20   EFFECTIVENESS OF CONTRACEPTION.  THIS EVIDENCE HAS TO DO

21   WITH HOW WOMEN'S CONTRACEPTIVE CHOICES MIGHT BE AFFECTED

22   IF COST SHARING WERE ELIMINATED.

23   Q.    I WANT TO TURN YOUR ATTENTION TO SORT OF THE

24   FINALIZATION OF THE REPORT.  BEFORE THE COMMITTEE

25   FINALIZED ITS REPORT, DID ANYONE NOT ON THE COMMITTEE

84

1    REVIEW IT?

2    A.    YES.  WHEN THE COMMITTEE HAD FORMALIZED ITS

3    FINAL DRAFT OF THE REPORT, IT WAS REVIEWED BY A GROUP OF

4    OUTSIDE EXPERTS WHOSE NAMES ARE LISTED IN THIS DOCUMENT.

5    DO YOU KNOW THE PAGE?

6    Q.    I DO.  IF I MAY DIRECT YOU AND THE COURT TO THE

7    BEGINNING OF ROMAN -- SMALL ROMAN 7 THROUGH SMALL ROMAN

8    8.

9          THE COURT:  WHAT PAGES ARE WE ON?

10         THE WITNESS:  ROMAN NUMERAL 7 AND 8, AT

11   THE VERY BEGINNING.

12   BY MR. GOLDMAN:

13   Q.    SO ARE THERE APPROXIMATELY 11 OUTSIDE REVIEWERS

14   WHO REVIEWED THIS --

15   A.    YES.

16   Q.    -- REPORT.

17         I WOULD ALSO LIKE TO DIRECT YOU TO

18   PAGE 231 OF THE REPORT, IF I MAY.  IT'S APPENDIX D.

19   IT'S ENTITLED DISSENT AND RESPONSE.  DO YOU SEE THAT?

20   A.    YES.

21   Q.    AM I CORRECT THAT A MEMBER OF THE COMMITTEE

22   DISSENTED FROM THE REPORT?

23   A.    YES.

24   Q.    DO YOU KNOW WHY -- WAS THAT PERSON A MR. SASSO

25   OR DR. SASSO MAYBE?

Exhibit 137                                                                              JA-0001813

85

1   A.      YES. DR. LO SASSO.

2   Q.      DO YOU KNOW WHY HE DISSENTED?

3   A.      DR. LO SASSO IS AN ECONOMIST, AND AS HIS DISSENT

4   DESCRIBES, HIS MAIN OBJECTION TO THE REPORT WAS THAT HE

5   WOULD HAVE PREFERRED THAT THE COMMITTEE CONSIDER COSTS

6   AND COST EFFECTIVENESS IN MAKING ITS RECOMMENDATIONS.

7            HE ALSO WOULD HAVE PREFERRED THAT THE

8   COMMITTEE HAD MORE TIME, AND HE CRITICIZES THE

9   COMMITTEE'S DECISION-MAKING AS BEING NOT EVIDENCE-BASED.

10           MS. KADE: OBJECTION, YOUR HONOR. THE

11  QUESTION DOES NOT NECESSARILY ASK FOR HEARSAY BUT THE

12  ANSWER HAS PROVIDED HEARSAY.

13           THE COURT: SUSTAINED. I WILL NOT TAKE

14  THAT INTO ACCOUNT.

15  BY MR. GOLDMAN:

16  Q.      DID THAT DISSENT, WAS THAT FOCUSED ON ONE OF THE

17  EIGHT RECOMMENDATIONS INVOLVING CONTRACEPTION OR DID IT

18  APPLY TO THE ENTIRE COMMITTEE REPORT?

19  A.      THE DISSENT APPLIED TO THE ENTIRE REPORT.

20  Q.      AND WHAT, IF ANYTHING, DID YOU THINK OF

21  DR. LOSASSO'S DISSENT?

22  A.      WELL, I AND THE OTHER COMMITTEE MEMBERS

23  DISAGREED WITH THE DISSENT.

24  Q.      AND WHY IS THAT?

25  A.      WELL, ON THE FIRST POINT, WE HAD SPECIFICALLY

86

1   BEEN TOLD IN OUR CHARGE THAT OUR JOB WAS NOT TO CONSIDER

2   COST EFFECTIVENESS OF THESE SERVICES BUT TO LOOK ONLY AT

3   EFFECTIVENESS, IN OTHER WORDS, DO THEY IMPROVE HEALTH.

4            AND OF COURSE, THE AMOUNT OF TIME THAT

5   THE COMMITTEE HAD TO WORK WAS OUT OF OUR CONTROL, AND WE

6   FELT THAT WE HAD BEEN VERY EVIDENCE BASED IN OUR

7   DELIBERATIONS.

8            MS. KADE: YOUR HONOR, WE OBJECT TO THE

9   EXTENT THAT DR. WEISMAN IS SPEAKING FOR ANYONE OTHER

10  THAN HERSELF.

11           THE COURT: SUSTAINED.

12  BY MR. GOLDMAN:

13  Q.      IF I MAY DIRECT YOU TO PAGE 235, A FEW PAGES IN

14  AT THE BOTTOM, IT SAYS "RESPONSE TO DISSENTING

15  STATEMENT."

16           DO YOU SEE THAT?

17  A.      YES.

18  Q.      AND THERE ARE A BUNCH OF NAMES AT THE TOP.

19           WHO ARE THOSE PEOPLE?

20  A.      THOSE ARE ALL THE MEMBERS OF THE COMMITTEE OTHER

21  THAN DR. LO SASSO, AND THAT IS OUR RESPONSE TO HIS

22  DISSENT.

23  Q.      YOUR NAME IS LAST AGAIN, HUH?

24  A.      YEP.

25  Q.      SO WHAT HAPPENED TO THIS REPORT AFTER THE

87

1   COMMITTEE WAS FINISHED WITH IT?

2   A.      THE COMMITTEE'S REPORT WENT TO THE DEPARTMENT OF

3   HEALTH AND HUMAN SERVICES, WHO ACCEPTED THE

4   RECOMMENDATIONS.

5   Q.      ALL EIGHT OF THEM?

6   A.      YES.

7   Q.      IF YOU KNOW, WHEN YOU SAY THAT HRSA ACCEPTED THE

8   RECOMMENDATIONS, DO YOU KNOW IF THAT HAD ANY EFFECT ON

9   THE AFFORDABLE CARE ACT?

10  A.      IT IS MY UNDERSTANDING THAT WHEN THE DEPARTMENT

11  OF HEALTH AND HUMAN SERVICES ACCEPTED THESE

12  RECOMMENDATIONS, THEY THEN BECAME PART OF THE AFFORDABLE

13  CARE ACT DESIGNATED PREVENTIVE SERVICES TO BE COVERED

14  WITHOUT COST SHARING.

15  Q.      AND THAT IS THE LAW THEN, CORRECT?

16  A.      THAT IS MY UNDERSTANDING.

17  Q.      I'D LIKE TO TURN YOUR ATTENTION NOW TO THE RULES

18  WHICH ARE AT ISSUE IN THIS PARTICULAR MATTER. ARE YOU

19  GENERALLY FAMILIAR WITH THESE NEW RULES?

20           THE COURT: BEFORE YOU GO THERE,

21  MR. GOLDMAN. IF YOU ARE GOING TO GET INTO THIS EITHER

22  LATER ON WITH THIS WITNESS OR WITH ANOTHER WITNESS,

23  PLEASE STOP ME. I WANT TO FOCUS IN ON PENNSYLVANIA. IS

24  THAT SOMETHING THAT YOU INTEND TO RAISE WITH THIS

25  WITNESS LATER ON?

88

1            MR. GOLDMAN: IT IS IN SOME WAY, BUT IF

2   YOUR HONOR HAS QUESTIONS --

3            THE COURT: WELL, LET'S TALK ABOUT -- YOU

4   TALKED ABOUT DATA, AND YOU SAID, I THINK, THAT THE

5   LATEST DATA YOU COULD GET WAS 2011 BECAUSE THE DATA

6   TAKES SOME TIME TO ROLL IN, CORRECT?

7            THE WITNESS: THE DATA ON UNINTENDED

8   PREGNANCIES?

9            THE COURT: UNINTENDED PREGNANCIES, OKAY.

10  SO HAVE YOU, EITHER IN THIS CONTEXT OR OUTSIDE OF THIS

11  CONTEXT, LOOKED INTO DATA WITH RESPECT TO UNINTENDED

12  PREGNANCIES IN PENNSYLVANIA?

13           THE WITNESS: YES.

14           THE COURT: AND TELL ME THE PERCENTAGE.

15  WHAT IS THE PERCENTAGE OF UNINTENDED PREGNANCIES IN

16  PENNSYLVANIA?

17           THE WITNESS: IT'S CLOSE TO THE NATIONAL

18  AVERAGE. IT MIGHT BE A LITTLE BIT LOWER, AND I CANNOT

19  REMEMBER THE CURRENT NUMBER.

20           THE COURT: FAIR TO SAY SOMEWHERE BETWEEN

21  45 AND 49 PERCENT?

22           THE WITNESS: THE NATIONAL RATE CURRENTLY

23  IS 45 PERCENT. WE ARE A LITTLE BIT LOWER IN

24  PENNSYLVANIA.

25           THE COURT: SO SOMEWHERE BETWEEN 40 AND

Exhibit 137

JA-0001814

89

1   45 PERCENT?

2           THE WITNESS: I THINK SO.

3           THE COURT: AND WHEN YOU SAY YOU THINK

4   SO, WHAT DEGREE OF CERTAINTY DO YOU BRING TO THAT "I

5   THINK SO"?

6           THE WITNESS: PRETTY CERTAIN. THE

7   GUTTMACHER INSTITUTE PUBLISHES THE STATE-BY-STATE DATA.

8   SO IT WOULD BE EASY TO CHECK ON.

9           THE COURT: IS THERE ANY POSSIBILITY THAT

10  IT IS BELOW 40 PERCENT?

11          THE WITNESS: IT COULD BE IN THE HIGH

12  THIRTIES, I'M NOT TOTALLY SURE.

13          THE COURT: SO IF I WERE TO SAY IT'S

14  SOMEWHERE BETWEEN 35 PERCENT AND 45 PERCENT, THAT WOULD

15  BE ABOUT RIGHT?

16          THE WITNESS: YES.

17          THE COURT: OKAY. HAVE YOU DONE ANY

18  RESEARCH INTO THE COSTS OF UNINTENDED PREGNANCIES IN

19  PENNSYLVANIA?

20          THE WITNESS: I HAVE INVESTIGATED

21  ESTIMATES OF COSTS, BUT NOT RECENTLY.

22          THE COURT: OKAY. AND WHAT ABOUT HAVE

23  YOU INVESTIGATED THE IMPACT OF PROVIDING NO COST

24  CONTRACEPTION TO WOMEN IN PENNSYLVANIA?

25          THE WITNESS: YES.

90

1           THE COURT: TELL ME ABOUT THAT.

2           THE WITNESS: SO WE AT PENN STATE DID A

3   RECENT STUDY OF A COHORT OF PRIVATELY-INSURED WOMEN WHO

4   HAD EMPLOYER-BASED HEALTH INSURANCE IN PENNSYLVANIA, AND

5   IN A TWO-YEAR PERIOD FOLLOWING THE PASSAGE OF THE

6   AFFORDABLE CARE ACT, WHICH MEANT THAT THEY ALL HAD

7   CO-PAY -- NO CO-PAYS FOR CONTRACEPTION, THEIR USE OF

8   IUD'S AND IMPLANTS, WHICH ARE THE MOST EFFECTIVE

9   REVERSIBLE FORMS OF CONTRACEPTION, MORE THAN DOUBLED.

10          THE COURT: SO LOOKING AT YOUR CHART THAT

11  SHOWED THE EFFECTIVENESS OF VARIOUS FORMS OF

12  CONTRACEPTION, IUD'S ARE --

13          MR. GOLDMAN: PAGE 106, AND IT IS ON THE

14  ELMO, YOUR HONOR.

15          THE COURT: WHERE DOES IT SAY -- I DON'T

16  SEE THE WORDS IUD.

17          THE WITNESS: INTRAUTERINE DEVICES, SIX

18  LINES UP.

19          THE COURT: OKAY. SO DEPENDING ON

20  WHETHER IT'S PARAGARD OR MIRENA --

21          THE WITNESS: CORRECT.

22          THE COURT: -- IT'S EITHER -- UNDER

23  "TYPICAL USE," IT'S EITHER .8 OR .20.

24          THE WITNESS: CORRECT.

25          THE COURT: AND --

91

1           THE WITNESS: AND THE IMPLANT IS RIGHT

2   BELOW THAT.

3           THE COURT: OKAY. WAS THERE ANY

4   INDICATION, WAS THERE ANY CONTROL DATA SHOWING WHAT

5   THESE WOMEN HAD USED PRIOR TO USING IUD'S?

6           THE WITNESS: YES, WE KNEW THAT FROM THE

7   STUDY, AND MOST OF THEM HAD BEEN USING BIRTH CONTROL

8   PILLS, BUT SOME HAD BEEN USING NOTHING OR A COMBINATION.

9           THE COURT: WHEN YOU SAY "MOST," DO YOU

10  RECALL APPROXIMATELY HOW MANY PERCENTAGE WERE USING

11  BIRTH CONTROL PILLS?

12          THE WITNESS: NO, I DON'T.

13          THE COURT: BUT THERE IS A DISTINCTION --

14  I LOOK AT THE BIRTH CONTROL PILLS, IS THAT -- WHERE DO I

15  FIND THAT?

16          THE WITNESS: SO THAT IS THE "COMBINED

17  PILL AND PROGESTIN-ONLY PILL" WHICH WOULD PRODUCE EIGHT

18  PREGNANCIES PER YEAR OUT OF 100 WOMEN.

19          THE COURT: SO THERE IS A REDUCTION IN --

20  TO THE EXTENT YOU CAN HAVE A .2 PREGNANCY, EITHER YOU

21  ARE PREGNANT OR YOU ARE NOT PREGNANT, BUT IT IS, WHAT, A

22  7.2 REDUCTION --

23          THE WITNESS: YEAH. I MEAN, ESTIMATING,

24  IT'S ALMOST AN EIGHTFOLD INCREASE, SLIGHTLY LESS THAN

25  THAT RISK.

92

1           THE COURT: IF ONE WERE TO USE BIRTH

2   CONTROL RATHER THAN IUD'S?

3           THE WITNESS: CORRECT.

4           THE COURT: SO LOOKING AT --

5           THE WITNESS: IN REDUCING THE RISK.

6           THE COURT: REDUCING THE RISK BY ABOUT

7   EIGHT PERCENT IF ONE WERE TO USE INTRAUTERINE DEVICES.

8           THE WITNESS: CORRECT.

9           THE COURT: SO WHY -- DID YOU REACH ANY

10  CONCLUSIONS AS TO WHY THESE WOMEN WOULD MOVE TO USING

11  IUD'S RATHER THAN OTHER FORMS OF BIRTH CONTROL?

12          THE WITNESS: YES. BECAUSE HISTORICALLY,

13  COST HAS BEEN A BARRIER TO ADOPTING THESE MOST EFFECTIVE

14  METHODS BECAUSE THE UPFRONT COST OF GETTING AN IUD OR AN

15  IMPLANT IS CONSIDERABLE. AN IUD CAN COST UP TO A

16  THOUSAND DOLLARS, WHEN YOU CONSIDER THE COST OF THE

17  DEVICE ITSELF AND THE VISIT TO HAVE THE DEVICE

18  IMPLANTED. AND AN IMPLANT I BELIEVE COSTS UP TO $500 UP

19  FRONT, AND MANY WOMEN SIMPLY DON'T HAVE THAT KIND OF

20  MONEY TO PAY OUT OF POCKET.

21          THE COURT: YOU INDICATED THAT THIS STUDY

22  WAS PERFORMED RECENTLY. HOW RECENTLY?

23          THE WITNESS: BETWEEN 2012 AND 2014.

24          THE COURT: AND WHAT WAS THE COHORT OF

25  WOMEN IN THE STUDY?

Exhibit 137                                                                                JA-0001815

93

```
1          THE WITNESS:  IT WAS ABOUT -- OVER 900
2   PRIVATELY-INSURED WOMEN IN PENNSYLVANIA.
3          THE COURT:  AND YOU AND WHO ELSE DID THE
4   STUDY?
5          THE WITNESS:  COLLEAGUES AT PENN STATE
6   COLLEGE OF MEDICINE, DR. CYNTHIA CHUANG AND OTHERS.
7          THE COURT:  WAS IT PUBLISHED?
8          THE WITNESS:  SOME RESULTS FROM THAT
9   STUDY HAVE BEEN PUBLISHED.  THE RESULT I JUST CITED TO
10  YOU HAS NOT YET BEEN PUBLISHED BECAUSE THAT PAPER IS
11  STILL IN PREPARATION.
12         THE COURT:  IF YOU WANT TO FOLLOW UP ON
13  THE QUESTIONS I HAVE ASKED IN THIS PARTICULAR AREA, FEEL
14  FREE IF YOU THINK I'VE MISSED SOMETHING.
15         MR. GOLDMAN:  I THOUGHT YOU DID AN
16  EXCELLENT JOB.
17         THE COURT:  WELL, I APPRECIATE IT.
18  BY MR. GOLDMAN:
19  Q.     IF I MAY, THE STUDY YOU JUST SPOKE ABOUT
20  CONCERNED ONLY WOMEN IN PENNSYLVANIA.
21         HAVE YOU BEEN INVOLVED IN ANOTHER STUDY
22  OF LATE INVOLVING -- BASED ON CLAIMS DATA WITH A LARGER
23  COHORT OF WOMEN, NOT JUST IN PENNSYLVANIA BUT AROUND THE
24  COUNTRY?
25  A.     YES.  WE HAVE JUST RECENTLY CONCLUDED A NATIONAL
```

94

```
1   STUDY OF PRIVATELY-INSURED WOMEN USING A HEALTH CLAIMS
2   DATABASE CALLED MARKETSCAN.  AND WE WERE ABLE TO LOOK AT
3   TRENDS IN CONTRACEPTIVE USE FROM 2006 THROUGH 2014.  AND
4   AS PART OF THAT ANALYSIS, WE FIRST OF ALL LOOKED AT
5   COSTS TO WOMEN, WHICH DECLINED PRECIPITOUSLY TO ZERO,
6   BASICALLY, AFTER THE AFFORDABLE CARE ACT MANDATE WENT
7   INTO EFFECT.
8          WE ALSO LOOKED AT THE METHODS OF
9   CONTRACEPTION THAT THEY USED OVER THIS TIME PERIOD, AND
10  WE WERE ABLE TO SHOW THAT AFTER THE AFFORDABLE CARE ACT
11  MANDATE WENT INTO EFFECT, THERE WAS A SIGNIFICANT
12  INCREASE IN THE USE OF IUD'S AND IMPLANTS AMONG THESE
13  INSURED WOMEN.
14  Q.     AND THAT STUDY WAS BASED ON CLAIMS DATA?
15  A.     CORRECT.
16  Q.     IS CLAIMS DATA A RELIABLE WAY TO STUDY THIS SORT
17  OF THING?
18  A.     SOME PEOPLE THINK IT'S THE MOST RELIABLE WAY TO
19  STUDY THE USE OF PRESCRIPTION MEDICATIONS IN GENERAL
20  BECAUSE EVERY TIME A PRESCRIPTION IS PROVIDED THERE IS A
21  CLAIM GENERATED, AND SO IT IS A GOOD WAY TO FOLLOW
22  PATTERNS OF PRESCRIBING AND USE OF MEDICATIONS.
23  Q.     AND WHAT STATES WAS THE CLAIMS DATA FROM THE
24  STUDY FROM, IF YOU KNOW?
25  A.     IT'S A NATIONAL DATABASE, SO EMPLOYER-BASED
```

95

```
1   INSURERS FROM ALL OVER THE COUNTRY PUT THEIR CLAIMS INTO
2   THIS DATABASE.  AND I THINK IT IS MOST STATES BUT I
3   CAN'T SAY DEFINITIVELY.
4   Q.     DO YOU KNOW IF PENNSYLVANIA WAS ONE OF THE
5   STATES INCLUDED?
6   A.     YES, IT WAS.
7   Q.     IF I MAY TAKE YOU TO THE RULES NOW THAT ARE AT
8   ISSUE BEFORE THE COURT.  AND I WILL -- I DON'T THINK WE
9   HAVE TO LOOK AT THEM SPECIFICALLY HERE, BUT I WOULD LIKE
10  TO NOTE THAT THE RELIGIOUS EXEMPTION RULE IS MARKED AND
11  ADMITTED AS EXHIBIT 1.  THE MORAL EXEMPTION RULE IS
12  EXHIBIT 2.
13         I KNOW THEY ARE LONG, BUT HAVE YOU HAD
14  OCCASION TO READ THE RELIGIOUS EXEMPTION RULE?
15  A.     YES.
16  Q.     AND DO YOU BELIEVE YOU UNDERSTAND IT?
17  A.     I UNDERSTAND PARTS OF IT.
18  Q.     DO YOU UNDER -- DO YOU BELIEVE YOU UNDERSTAND IT
19  SO FAR AS IT WOULD AFFECT WOMEN'S CONTRACEPTIVE CARE?
20  A.     YES.
21  Q.     DO YOU -- HAVE YOU ALSO SIMILARLY READ THE MORAL
22  EXEMPTION RULE?
23  A.     YES.
24  Q.     AND DO YOU SIMILARLY BELIEVE THAT YOU UNDERSTAND
25  IT AS IT AS IT WOULD IMPACT WOMEN'S CONTRACEPTIVE CHOICES?
```

96

```
1   A.     YES.
2   Q.     IN YOUR CAPACITY AS AN EXPERT IN THE FIELD OF
3   PREVENTIVE MEDICAL CARE FOR WOMEN, INCLUDING
4   CONTRACEPTIVE CARE, DO YOU HAVE AN OPINION TO A
5   REASONABLE DEGREE OF CERTAINTY AS TO THE LIKELY EFFECT
6   OF THE RULES ON THE HEALTH OF WOMEN IN PENNSYLVANIA?
7   A.     YES.
8   Q.     AND WHAT IS THAT OPINION?
9   A.     THESE RULES OPEN UP THE OPPORTUNITY FOR MORE
10  EMPLOYERS TO OPT OUT OF CONTRACEPTIVE COVERAGE WITHOUT
11  CO-PAYS BY WOMEN.  AND WE KNOW FROM A LARGE BODY OF
12  RESEARCH INVOLVING USE OF HEALTHCARE IN GENERAL AND
13  CONTRACEPTION IN PARTICULAR THAT EVEN VERY SMALL CO-PAYS
14  CAN DISCOURAGE USE.
15         SO IF WOMEN WHO HAVE HAD CO-PAYS UNDER
16  THE AFFORDABLE CARE ACT WERE -- SUDDENLY HAD THAT
17  BENEFIT REMOVED, I FEEL BASED ON WHAT I KNOW OF THIS
18  LITERATURE THAT WE WOULD SEE MORE WOMEN FAILING TO RENEW
19  THEIR PILL PRESCRIPTIONS, NOT OPTING FOR A MORE
20  EFFECTIVE METHOD THAT WOULD HAVE HIGHER UPFRONT COSTS,
21  AND AS A RESULT OF THAT, WE WOULD EXPECT TO SEE AN
22  INCREASE IN THE UNINTENDED PREGNANCY RATE AND MORE
23  ABORTIONS.
24  Q.     DID THAT OPINION YOU SO CLEARLY EXPRESSED, DOES
25  THAT ALSO HOLD TRUE FOR WOMEN OUTSIDE OF PENNSYLVANIA
```

Exhibit 137                                                                                 JA-0001816

1  AND AROUND THE COUNTRY?

2  A.    YES.

3  Q.    DO YOU HOLD ALL OF YOUR OPINIONS THAT YOU HAVE

4  SHARED WITH THE COURT TODAY WITHIN A REASONABLE DEGREE

5  OF CERTAINTY FOR AN EXPERT IN PREVENTIVE MEDICAL CARE

6  FOR WOMEN, INCLUDING CONTRACEPTIVE CARE?

7  A.    YES.

8         MR. GOLDMAN:  YOUR HONOR, IF I MAY HAVE

9  ONE MOMENT TO CONSULT WITH MY CO-COUNSEL.

10        THE COURT:  YES.

11        MR. GOLDMAN:  YOUR HONOR, NOTHING FURTHER

12  WITH THIS WITNESS.

13        THE COURT:  MS. KADE.

14        MS. KADE:  THANK YOU, YOUR HONOR.

15        PERMISSION TO APPROACH, YOUR HONOR.

16        THE COURT:  YOU MAY.

17        MS. KADE:  THANK YOU, YOUR HONOR.

18             CROSS EXAMINATION

19  BY MS. KADE:

20  Q.    DR. WEISMAN, GOOD MORNING.

21  A.    GOOD MORNING.

22  Q.    MY NAME IS ELIZABETH KADE.  HOW ARE YOU DOING

23  THIS MORNING?

24  A.    GOOD, THANKS.

25  Q.    FIRST, WHAT DOCUMENTS DID YOU REVIEW IN ORDER TO

1  PROVIDE YOUR DECLARATION -- TO PREPARE YOUR DECLARATION?

2  A.    MY CV, AND I REREAD THE IOM COMMITTEE REPORT,

3  AND RE-FAMILIARIZED MYSELF WITH SOME OF THE REFERENCES

4  IN THAT REPORT.

5  Q.    IS THAT EVERYTHING?

6  A.    I BELIEVE SO.

7  Q.    AND WHO DID YOU MEET WITH IN ORDER TO PREPARE

8  YOUR DECLARATION?

9  A.    I SPOKE ON THE PHONE WITH JONATHAN AND NICOLE.

10  THAT'S IT.

11        THE COURT:  AND BY JONATHAN AND NICOLE,

12  YOU MEAN JONATHAN GOLDMAN AND NICOLE BOLAND?

13        THE WITNESS:  YES.

14        THE COURT:  THANK YOU.  MAKING SURE THE

15  RECORD IS CLEAN.

16  BY MS. KADE:

17  Q.    TURNING TO YOUR DECLARATION, LOOKING AT

18  PARAGRAPH 44, YOU HAVE TESTIFIED THAT IT IS YOUR OPINION

19  THAT THE NEW RULES WILL CAUSE IMMEDIATE AND IRREVERSIBLE

20  HARM BECAUSE THEY WILL CAUSE WOMEN TO LOSE PREVENTIVE

21  CONTRACEPTIVE CARE UNDER THEIR EMPLOYER GROUP --

22        I APOLOGIZE.  YOU TESTIFIED THAT IT IS

23  YOUR OPINION THAT THE NEW RULES WILL CAUSE IMMEDIATE AND

24  IRREVERSIBLE HARM BECAUSE THEY WILL CAUSE WOMEN TO LOSE

25  PREVENTIVE CONTRACEPTION CARE UNDER THEIR EMPLOYER GROUP

1  HEALTH PLANS, CORRECT?

2  A.    YES.

3  Q.    DO YOU KNOW HOW MANY RELIGIOUS EMPLOYERS ARE

4  CURRENTLY PROTECTED BY INJUNCTION?

5  A.    I DO NOT.  I HAVE SEEN AN ESTIMATE THAT 10

6  PERCENT OF NONPROFITS HAVE CLAIMED THE EXEMPTION UNDER

7  THE EXISTING RULES.

8  Q.    SO THIS IS BEFORE THE NEW RULES THAT JUST WENT

9  INTO EFFECT.  CORRECT?

10  A.    YES, CORRECT.

11  Q.    DO YOU -- AND SO YOU KNOW THAT THE EMPLOYERS

12  THAT ARE PROTECTED BY INJUNCTIONS ARE NOT CURRENTLY

13  PROVIDING CONTRACEPTIVE COVERAGE, CORRECT?

14  A.    YES.

15  Q.    DO YOU KNOW ABOUT THE 2016 ZUBIK INJUNCTION?

16  A.    ONLY IN VERY GENERAL TERMS.  I AM NOT A LAWYER.

17  Q.    I APPRECIATE THAT, THANK YOU.

18        DO YOU HAVE ANY REASON TO DOUBT THAT

19  THERE WAS ANOTHER INJUNCTION IN 2016 THAT WE'RE

20  REFERRING TO COLLECTIVELY AS THE ZUBIK INJUNCTION?

21  A.    NO.

22  Q.    DO YOU KNOW THAT THE ENTITIES PROTECTED BY THE

23  ZUBIK INJUNCTION ARE ALSO NOT CURRENTLY PROVIDING

24  CONTRACEPTIVE COVERAGE?

25  A.    YES.

1  Q.    WHEN WAS THE "MY NEW OPTIONS" STUDY THAT YOU

2  WERE REFERRING TO EARLIER, WHEN WAS THAT CONDUCTED?

3  A.    THAT WAS CONDUCTED IN 2012 -- 2012 THROUGH 2014.

4  Q.    CAN YOU IDENTIFY A SINGLE WOMAN IN PENNSYLVANIA

5  WHO HAS LOST COVERAGE AS A RESULT OF THE NEW RULES?

6  A.    NO.

7  Q.    CAN YOU IDENTIFY A SINGLE WOMAN IN THE UNITED

8  STATES WHO HAS LOST COVERAGE AS A RESULT OF THE NEW

9  RULES?

10  A.    NO.

11  Q.    YOU HAVE NOT BEEN PRESENTED TO THIS COURT AS AN

12  EXPERT ON INSURANCE MARKETPLACES, RIGHT?

13  A.    CORRECT.

14  Q.    AND YOU HAVE NOT BEEN PRESENTED TO THIS COURT AS

15  AN EXPERT ON THE GOVERNMENT'S DECISION-MAKING PROCESS

16  UNDER THE ADMINISTRATIVE PROCEDURE ACT, CORRECT?

17  A.    CORRECT.

18  Q.    I WANT TO TURN TO ANOTHER PARAGRAPH IN YOUR

19  DECLARATION, PARAGRAPH 22.  YOU HAVE TESTIFIED THAT IT

20  IS YOUR OPINION THAT THE NEW RULES ARE NOT BASED UPON

21  SOUND SCIENTIFIC OR EMPIRICAL EVIDENCE; IS THAT RIGHT?

22  A.    CORRECT.

23  Q.    AND HAVE YOU READ THE RULES THAT ARE AT ISSUE IN

24  THIS CASE IN THEIR ENTIRETY?

25  A.    YES, ALTHOUGH I FOCUSED ON THE SECTIONS HAVING

Exhibit 137                                                                    JA-0001817

101

1 TO DO WITH CONTRACEPTION EFFECTIVENESS AND THE IOM
2 REPORT.
3 Q.    HAVE YOU READ ALL OF THE EVIDENCE THAT THE RULES
4 RELY UPON AND CITE?
5 A.    I WOULD NOT SAY ALL OF IT, BUT SOME OF IT.
6 Q.    I'M GOING TO TURN TO A SPECIFIC PAGE, 47804 OF
7 THE FEDERAL REGISTER, SO THIS IS EXHIBIT 1, AND IT
8 SHOULD BE PAGE 46 OF THAT EXHIBIT.
9 A.    WHAT TAB IS THAT?
10 Q.    IT IS THE FIRST TAB. I'M ALSO GOING TO PUT IT
11 ON THE ELMO FOR EVERYONE.
12          THIS IS TAB 1, PAGE 47804 OF THE FEDERAL
13 REGISTER.
14 A.    GOT IT.
15 Q.    YOU HAVE SERVED ON THE EDITORIAL BOARD OF
16 WOMEN'S HEALTH ISSUES SINCE 1990, CORRECT?
17 A.    CORRECT.
18 Q.    SO WOULD YOU SAY THAT IS A PUBLICATION THAT IS
19 GENERALLY ACCEPTED IN THE RELEVANT SCIENTIFIC COMMUNITY?
20 A.    YES.
21 Q.    AND THE RULES SAY -- I'M LOOKING AT THE FIRST --
22 START OF THE FIRST FULL PARAGRAPH THAT STARTS WITH
23 "SIMILARLY" ON THE LEFT-HAND SIDE: SIMILARLY, AT A
24 STUDY INVOLVING OVER 8,000 WOMEN BETWEEN 2012 AND 2015
25 CONDUCTED TO DETERMINE WHETHER CONTRACEPTIVE COVERAGE

102

1 UNDER THE MANDATE CHANGED CONTRACEPTIVE USE PATTERNS,
2 THE GUTTMACHER INSTITUTE CONCLUDED THAT WE HAVE OBSERVED
3 NO CHANGES IN CONTRACEPTIVE USE PATTERNS AMONG SEXUALLY
4 ACTIVE WOMEN. AND THAT CITES FOOTNOTE 31, WHICH IS AN
5 ARTICLE ENTITLED: DID CONTRACEPTIVE USE HABITS CHANGE
6 AFTER THE AFFORDABLE CARE ACT? A DESCRIPTIVE ANALYSIS,
7 WHICH WAS PUBLISHED IN THE MAY TO JUNE 2017 ISSUE OF
8 WOMEN'S HEALTH ISSUES; IS THAT CORRECT?
9 A.    YES.
10 Q.    YOU WERE ON THE COMMITTEE THAT PRODUCED THE 2011
11 IOM REPORT, CORRECT?
12 A.    YES.
13 Q.    SO LOOKING JUST BELOW WHERE THE REFERENCE TO
14 PARAGRAPH 31, THE SENTENCE THAT STARTS WITH "WITH," THE
15 RULES SAY: WITH RESPECT TO TEENS, THE SANTELLI AND
16 MELNIKAS STUDY CITED BY IOM IN 2011 OBSERVES THAT
17 BETWEEN 1960 AND 1990 AS CONTRACEPTIVE USE INCREASED,
18 TEEN SEXUAL ACTIVITY OUTSIDE OF MARRIAGE LIKEWISE
19 INCREASED, ALTHOUGH THE STUDY DID NOT ASSERT A CAUSAL
20 RELATIONSHIP. IS THAT CORRECT?
21 A.    YES.
22 Q.    THE NATIONAL INSTITUTES OF HEALTH IS A
23 ORGANIZATION THAT IS GENERALLY ACCEPTED IN THE
24 SCIENTIFIC COMMUNITY; IS THAT CORRECT?
25 A.    YES.

103

1 Q.    THE RULES ALSO CITE IN THIS MIDDLE PARAGRAPH,
2 JUST AGAIN, CONTRACEPTION'S ASSOCIATION, BUT I WILL
3 START READING FROM THE SECOND SENTENCE IN THAT
4 PARAGRAPH: THE RULES SAY, IN 2013, THE NATIONAL
5 INSTITUTES OF HEALTH INDICATED IN FUNDING OPPORTUNITY
6 ANNOUNCEMENT FOR THE DEVELOPMENT OF NEW CLINICALLY
7 USEFUL FEMALE CONTRACEPTIVE PRODUCTS --
8          THE COURT: I'M SORRY. I'M NOT FOLLOWING
9 YOU. WHERE ARE YOU IN THIS PARAGRAPH?
10          MS. KADE: I'M SORRY, YOUR HONOR. I'M
11 IN THE MIDDLE COLUMN, THE PARAGRAPH THAT STARTS WITH
12 CONTRACEPTION'S ASSOCIATION.
13          THE COURT: GOT IT.
14          MS. KADE: AND IN 2013, THE NATIONAL
15 INSTITUTES OF HEALTH.
16          THE COURT: OKAY.
17 BY MS. KADE:
18 Q.    SO THEY INDICATED THAT HORMONAL CONTRACEPTIVES
19 HAVE THE DISADVANTAGE OF HAVING MANY UNDESIRABLE SIDE
20 EFFECTS, ARE ASSOCIATED WITH ADVERSE EVENTS, AND OBESE
21 WOMEN ARE AT HIGHER RISK FOR SERIOUS COMPLICATIONS SUCH
22 AS DEEP VENOUS THROMBOSIS; IS THAT CORRECT?
23 A.    YES.
24 Q.    JAMA PSYCHIATRY IS A PUBLICATION THAT IS
25 GENERALLY ACCEPTED IN THE RELEVANT SCIENTIFIC COMMUNITY,

104

1 CORRECT?
2 A.    YES.
3 Q.    IT'S PUBLISHED BY THE AMERICAN MEDICAL
4 ASSOCIATION?
5 A.    CORRECT.
6 Q.    IT IS PEER REVIEWED?
7 A.    YES.
8 Q.    I'M GOING TO FOCUS EVERYONE'S ATTENTION TO
9 FOOTNOTE 39. I REALIZE THE FONT IS GETTING SMALLER.
10 BUT FOOTNOTE 39 CITES A 2016 JAMA PSYCHIATRY PUBLICATION
11 ON THE ASSOCIATION OF HORMONAL CONTRACEPTION WITH
12 DEPRESSION; IS THAT CORRECT?
13 A.    YES.
14 Q.    I WANT TO TURN TO THE 2011 IOM REPORT. THE 2011
15 IOM REPORT DID NOT STUDY THE EFFECT OF RELIGIOUS
16 EXEMPTIONS, CORRECT?
17 A.    CORRECT.
18 Q.    AND THE 2011 IOM REPORT DID NOT STUDY THE EFFECT
19 OF MORAL EXEMPTIONS, CORRECT?
20 A.    YES.
21 Q.    AND THE IOM PANEL DID NOT INVITE ANY SPEAKERS TO
22 TESTIFY CONCERNING EXEMPTIONS FROM THE MANDATE, CORRECT?
23 A.    CORRECT.
24          MS. KADE: THANK YOU, DR. WEISMAN.
25          THANK YOU, YOUR HONOR. I HAVE NOTHING

Exhibit 137                                                      JA-0001818

1  FURTHER.

2          THE COURT:  OKAY.  THANK YOU VERY MUCH.

3          DO YOU HAVE ANY RECROSS?

4          MR. GOLDMAN:  VERY BRIEFLY, IF I MAY

5  APPROACH, YOUR HONOR.

6          RECROSS EXAMINATION

7  BY MR. GOLDMAN:

8  Q.     COUNSEL ASKED YOU IF YOU HAD READ ALL OF THE

9  SOURCES CITED IN THE COMMITTEE'S REPORT.  I WANT TO ASK

10 YOU, ARE YOU FAMILIAR WITH ALL OF THE SOURCES CITED IN

11 THE COMMITTEE'S REPORT, SPECIFICALLY IN THE AREA OF

12 CONTRACEPTION?

13 A.     I AM FAMILIAR WITH REFERENCES 30 AND 31.

14 Q.     I'M SORRY, DR. WEISMAN.  I BELIEVE COUNSEL WAS

15 REFERRING TO THE COMMITTEE'S REPORT AND NOT THE FEDERAL

16 REGISTER.

17 A.     WELL, I'M CONFUSED BECAUSE SHE ASKED ABOUT BOTH.

18         THE COURT:  AS I UNDERSTAND IT, THE

19 QUESTION WAS ABOUT HAVE YOU READ THE FEDERAL REGISTER.

20 YOU SAID YES, I HAVE AND I FOCUSED ON THE CONTRACEPTIVE

21 AND PREVENTIVE CARE COMPONENTS.

22         THE WITNESS:  YES.

23 BY MR. GOLDMAN:

24 Q.     ARE YOU FAMILIAR WITH THE SOURCES THAT COUNSEL

25 ASKED YOU ABOUT?

1  A.     YES.  MOST OF THEM.

2  Q.     AND DO YOU AGREE WITH THEM FOR THE PREMISES THEY

3  ARE CITED FOR HERE?

4  A.     NO.

5  Q.     AND WHY IS THAT?

6  A.     BECAUSE I THINK THEY ARE SELECTIVE COMMENTS

7  WHICH DO NOT FULLY REFLECT THE BODY OF EVIDENCE THAT IS

8  AVAILABLE.  DO YOU WANT ME TO SAY MORE?

9  Q.     PLEASE.  GO ON.

10 A.     SO THE FIRST REFERENCE THAT I WAS ASKED ABOUT

11 WAS THIS FOOTNOTE 31, BEARAK AND JONES FOOTNOTE, THE

12 PUBLICATION FROM THE GUTTMACHER INSTITUTE.  AND IT IS

13 CORRECT THAT THE ABSTRACT FOR THAT ARTICLE SAYS WE

14 OBSERVE NO CHANGES IN CONTRACEPTIVE USE PATTERNS AMONG

15 SEXUALLY ACTIVE WOMEN, BUT THAT STUDY FOUND AN

16 IMPROVEMENT IN CONTRACEPTIVE USE, AN INCREASED USE OF

17 CONTRACEPTION AMONG YOUNG WOMEN WHO WERE NOT SEXUALLY

18 ACTIVE IN THE LAST MONTH, WHICH SUGGESTS THAT YOUNGER

19 WOMEN WERE RESPONSIBLY -- MORE RESPONSIBLY USING

20 CONTRACEPTION IN THAT STUDY.  THAT IS NOT NOTED HERE.

21 Q.     AND HOW ABOUT THE OTHER SOURCES?

22 A.     SO THE SANTELLI REFERENCE WHICH COMES NEXT

23 REGARDING TEEN PREGNANCIES, SANTELLI AND CO-AUTHORS JUST

24 PUBLISHED A PAPER IN 2016 SHOWING THAT TEEN PREGNANCIES

25 HAVE DECLINED MORE RECENTLY AND THAT THERE HAS BEEN NO

1  CONCOMITANT INCREASE IN SEXUAL ACTIVITY AMONG TEENS.

2  Q.     DO YOU HAVE ANY OTHER EXAMPLES OF REASONS WHY

3  YOU DISAGREE WITH THE CONCLUSIONS DRAWN FROM THE STUDIES

4  THAT WERE CITED?

5  A.     WELL, THE POINT ABOUT RISKS OF HORMONAL

6  CONTRACEPTION AND THE POINT ABOUT RISK OF DEPRESSION IN

7  CONTRACEPTIVE USE, I WOULD SAY THAT THE IMPLICATION IS

8  THAT THIS IS SOMETHING NEW OR IMPORTANT, WHEN, IN FACT,

9  THE MEDICAL COMMUNITY IS AWARE OF SIDE EFFECTS OF ALL

10 KINDS OF CONTRACEPTION, AND THAT IS TAKEN INTO ACCOUNT

11 IN COUNSELING WOMEN ABOUT THE APPROPRIATENESS OF THE

12 METHODS THAT THEY CHOOSE, AND IT'S ANOTHER REASON WHY

13 THE INSTITUTE OF MEDICINE COMMITTEE RECOMMENDED THAT ALL

14 METHODS BE MADE AVAILABLE TO WOMEN SO THAT THEY CAN

15 OPTIMALLY CHOOSE A METHOD THAT IS APPROPRIATE FOR THEM.

16 Q.     AND, IN FACT, YOU TESTIFIED BEFORE THAT THE

17 COMMITTEE TOOK NEGATIVE EFFECTS OF CONTRACEPTION INTO

18 ACCOUNT IN MAKING ITS RECOMMENDATIONS, CORRECT?

19 A.     YES.

20 Q.     IF I MAY, ARE YOU FAMILIAR WITH A NEW REPORT

21 INVOLVING MODERN HORMONAL CONTRACEPTION THAT WAS

22 PERFORMED IN DANISH WOMEN THAT WAS RECENTLY IN THE FRONT

23 PAGE -- IN THE NEW YORK TIMES?

24 A.     YES.

25 Q.     AND CAN YOU TELL US ABOUT THAT STUDY?

1  A.     THAT STUDY WAS JUST PUBLISHED, AND IT'S BASED ON

2  A LARGE SAMPLE OF DANISH WOMEN, AND IT FOUND A 1.2

3  RELATIVE RISK FOR BREAST CANCER AMONG WOMEN WHO USED

4  HORMONAL METHODS OF CONTRACEPTION OVER TIME.  WHAT THIS

5  STUDY CONTRIBUTES IS THAT IT OBSERVED WOMEN WHO WERE

6  USING THE MORE MODERN HORMONAL METHODS OF CONTRACEPTION

7  AS OPPOSED TO OLDER ONES, BUT ITS FINDING OF A SMALL

8  ELEVATED RISK FOR BREAST CANCER ASSOCIATED WITH USE OF

9  HORMONAL METHODS IS NOT NEW.  THAT HAS BEEN KNOWN FOR

10 SOME TIME BASED ON STUDIES OF THE OLDER HORMONAL

11 METHODS.  AND IT IS TAKEN INTO ACCOUNT IN COUNSELING

12 WOMEN ABOUT THE RISKS AND SIDE EFFECTS OF CONTRACEPTION.

13 AND IT NEEDS TO BE BALANCED AGAINST OTHER STUDIES THAT

14 SHOW HORMONAL METHODS OF CONTRACEPTION TO BE PROTECTIVE,

15 THAT IS TO REDUCE THE RISKS OF OTHER CANCERS, OVARIAN

16 CANCER, ENDOMETRIAL CANCER AND COLORECTAL CANCER.  SO

17 THERE ARE -- THERE IS A BALANCING REQUIRED IN MAKING A

18 DECISION ABOUT A CONTRACEPTIVE CHOICE.

19         MS. KADE:  YOUR HONOR, WITH THIS ANSWER,

20 WE APPEAR TO BE BEYOND THE SCOPE OF CROSS.

21         THE COURT:  WELL, I DON'T THINK WE ARE,

22 BECAUSE YOU TALKED SPECIFICALLY ABOUT THOSE IMPACTS OF

23 CONTRACEPTION.

24         BUT I DO THINK YOU SHOULD MOVE ON BECAUSE

25 THIS IS NOT A FOCUS OF MY CONCERN.

Exhibit 137                                                    JA-0001819

109

1    MR. GOLDMAN: NOTHING FURTHER, YOUR
2  HONOR.
3        THE COURT: OKAY. LET ME TALK TO YOU
4  ABOUT A FOCUS OF MY CONCERN. I WANT YOU -- YOU SAID YOU
5  HAD READ THE GUTTMACHER INSTITUTE STUDY SET FORTH IN
6  FOOTNOTE 31.
7        THE WITNESS: BEARAK AND JONES, YES.
8        THE COURT: RIGHT. YOU ALSO TOLD ME
9  ABOUT A STUDY WHICH IS CURRENTLY UNPUBLISHED THAT YOU
10  PERFORMED. I WANT TO COMPARE AND CONTRAST THEM TO SEE
11  WHETHER WE ARE TALKING ABOUT APPLES AND ORANGES OR JUST
12  APPLES.
13        SO THE GUTTMACHER INSTITUTE STUDY WAS TO
14  DETERMINE WHETHER CONTRACEPTIVE COVERAGE UNDER THE
15  MANDATE CHANGED CONTRACEPTIVE USAGE PATTERNS. WAS THAT
16  THE SAME PROPOSITION THAT YOU WERE ANALYZING IN YOUR
17  STUDY?
18        THE WITNESS: YES, ALTHOUGH OUR STUDY
19  LOOKED AT BOTH COSTS AND CONTRACEPTIVE USE PATTERNS.
20        THE COURT: AND DO YOU KNOW WHEN -- THIS
21  IS -- THIS IS WOMEN BETWEEN 2012 AND 2015 IN THIS
22  GUTTMACHER STUDY, IS THAT CORRECT?
23        WELL, THAT IS WHAT IT SAYS HERE.
24        THE WITNESS: THAT IS -- YES.
25        THE COURT: SO WHEN WAS YOUR STUDY DONE,

110

1  WHAT COHORT? WHAT WAS THE TIME FRAME OF YOURS?
2        THE WITNESS: THE PENNSYLVANIA STUDY?
3        THE COURT: YES.
4        THE WITNESS: 2012 THROUGH 2014.
5        THE COURT: AND HERE IT SAYS THE
6  GUTTMACHER FOLKS DID 8,000 WOMEN. AND YOU TOLD ME YOU
7  HAD HOW MANY WOMEN?
8        THE WITNESS: IN OUR PENNSYLVANIA STUDY,
9  900-SOME.
10        THE COURT: SO DO YOU KNOW WHETHER IN
11  THOSE 8,000 WOMEN THERE WERE ANY PENNSYLVANIA WOMEN?
12        THE WITNESS: I DON'T, BECAUSE THESE WERE
13  TWO SURVEYS DONE BY THE GUTTMACHER INSTITUTE, AND I
14  DON'T KNOW HOW THEY SELECTED THOSE PARTICIPANTS.
15        THE COURT: WHAT IS THE GUTTMACHER
16  INSTITUTE?
17        THE WITNESS: THE GUTTMACHER INSTITUTE IS
18  A PRIVATE NOT-FOR-PROFIT RESEARCH INSTITUTE THAT FOCUSES
19  ON REPRODUCTIVE HEALTH ISSUES IN THE UNITED STATES AND
20  GLOBALLY.
21        THE COURT: IS IT AFFILIATED WITH ANY
22  POLITICAL VIEWPOINT?
23        THE WITNESS: NO.
24        THE COURT: DO YOU KNOW WHETHER THIS
25  PAPER, THE BEARAK AND JONES PAPER WAS PEER REVIEWED?

111

1        THE WITNESS: YES, IT WAS.
2        THE COURT: WHAT I HAVE BEEN TRYING TO
3  ESTABLISH WAS SIMILARITIES AND DIFFERENCES. ARE THERE
4  ANY DIFFERENCES THAT I HAVE NOT IDENTIFIED AT THIS POINT
5  BETWEEN YOUR STUDY AND THE GUTTMACHER INSTITUTE STUDY
6  APART FROM THE CONCLUSION AS SET FORTH IN THE FEDERAL
7  REGISTER AS MODIFIED BY YOUR TESTIMONY WITH RESPECT TO
8  THE CONCLUSION?
9        THE WITNESS: I DON'T THINK SO.
10        THE COURT: OKAY. THANK YOU.
11  BY MR. GOLDMAN:
12  Q.   VERY BRIEFLY. IS THIS GUTTMACHER INSTITUTE
13  STUDY, DO YOU KNOW IF THIS WAS BASED ON CLAIMS DATA IN
14  THE WAY THE OTHER STUDY YOU SPOKE ABOUT?
15  A.   IT WAS NOT. IT WAS BASED ON SURVEY DATA.
16  Q.   AND IS THERE A DIFFERENCE IN RELIABILITY BETWEEN
17  SURVEY DATA AND CLAIMS DATA?
18  A.   THERE ARE THOSE WHO THINK THAT SURVEY DATA ARE
19  LESS RELIABLE IN STUDYING CONTRACEPTIVE USE PATTERNS
20  BECAUSE PEOPLE HAVE RECALL PROBLEMS AND MAY NOT RESPOND
21  ACCURATELY. BUT HAVING SAID THAT, OUR MOST DEFINITIVE
22  SOURCE OF INFORMATION ABOUT CONTRACEPTIVE USE AND
23  UNINTENDED PREGNANCY IS THE NATIONAL SURVEY OF FAMILY
24  GROWTH WHICH IS AN ONGOING NATIONAL SURVEY OF WOMEN
25  ACROSS THE COUNTRY CONDUCTED BY THE FEDERAL GOVERNMENT.

112

1  Q.   AND YOU HAD REFERRED BEFORE WHEN WE WERE
2  SPEAKING TO A NATIONAL STUDY INCLUDING PENNSYLVANIA
3  WOMEN THAT WAS BASED ON CLAIMS DATA?
4  A.   CORRECT.
5  Q.   AND HOW DO THE FINDINGS YOU HAVE FOUND FROM THAT
6  STUDY COMPARE WITH THE GUTTMACHER INSTITUTE STUDY?
7  A.   SO THE GUTTMACHER STUDY WAS NOT LOOKING AT
8  COSTS. I BELIEVE IT WAS ONLY LOOKING AT CONTRACEPTIVE
9  USE PATTERNS. OUR STUDY LOOKED AT BOTH, BUT WE FOUND,
10  AS I MENTIONED BEFORE, A STATISTICALLY SIGNIFICANT
11  INCREASE IN USE OF IUD'S AND IMPLANTS IN THE YEARS
12  FOLLOWING THE AFFORDABLE CARE ACT. AND UNLIKE THE
13  GUTTMACHER STUDY, WE HAD DATA BEFORE THE AFFORDABLE CARE
14  ACT WENT INTO EFFECT AND AFTER THE AFFORDABLE CARE ACT
15  WENT INTO EFFECT. THEIR DATA ARE ALL POST, POST
16  AFFORDABLE CARE ACT.
17        MR. GOLDMAN: NOTHING FURTHER, YOUR
18  HONOR, UNLESS YOU HAVE ANYTHING ELSE.
19        THE COURT: I HAVE NOTHING.
20        ANY RECROSS?
21        MS. KADE: NO, YOUR HONOR. JUST FOR THE
22  RECORD, WE WOULD RENEW OUR OBJECTION TO THE EXPERT
23  TESTIMONY TO THE EXTENT IT IS BEING OFFERED TO DETERMINE
24  THE CORRECTNESS OF THE WISDOM OF THE AGENCY'S DECISION
25  IN THIS APA CASE, YOUR HONOR.

Exhibit 137                                                                JA-0001820

113

1    THE COURT: YES, I UNDERSTAND.

2    YOU CAN LEAVE THE BENCH. THANK YOU.

3    WE WILL TAKE A BRIEF BREAK, AND WE WILL

4  BE BACK IN TEN MINUTES.

5    THE CLERK: ALL RISE.

6    (WITNESS EXCUSED.)

7    (BREAK TAKEN.)

8    MR. GOLDMAN: THE COMMONWEALTH WOULD LIKE

9  TO CALL DR. SAMANTHA BUTTS TO THE STAND, PLEASE.

10    MAY I APPROACH, YOUR HONOR.

11    THE COURT: YOU MAY.

12    SWEAR THE WITNESS.

13    THE CLERK: PLEASE RAISE YOUR RIGHT HAND

14  AND STATE YOUR NAME FOR THE RECORD.

15    THE WITNESS: SAMANTHA BUTTS.

16    (DR. SAMANTHA BUTTS, COMMONWEALTH'S

17  WITNESS, SWORN.)

18    THE CLERK: STATE AND SPELL YOUR FULL

19  NAME FOR THE RECORD, PLEASE.

20    THE WITNESS: FIRST NAME IS

21  S-A-M-A-N-T-H-A. LAST NAME IS BUTTS, B-U-T-T-S.

22    DIRECT EXAMINATION

23  BY MR. GOLDMAN:

24  Q.    WILL YOU PLEASE STATE YOUR NAME FOR THE RECORD,

25  DR. BUTTS?

114

1  A.    SAMANTHA BUTTS.

2  Q.    AND WHAT DO YOU DO FOR A LIVING?

3  A.    I AM AN OBSTETRICIAN GYNECOLOGIST. I SPECIALIZE

4  IN THE AREA OF REPRODUCTIVE ENDOCRINOLOGY AND

5  INFERTILITY.

6  Q.    THERE IS A WITNESS EXHIBIT BINDER IN FRONT OF

7  YOU. IF I COULD DIRECT YOU TO EXHIBITS 8 AND 9 WHICH

8  ARE ALREADY ADMITTED INTO EVIDENCE, I'D LIKE YOU JUST TO

9  LOOK AT THOSE AND TELL ME IF YOU RECOGNIZE THEM, AND ASK

10  YOU WHAT THEY ARE?

11  A.    THESE ARE MY DECLARATIONS PURSUANT TO THIS CASE.

12  Q.    AND THE WAY THE COPY IS ON TAB 9, IF YOU LOOK TO

13  THE BACK OF THAT FIRST PAGE, WHAT IS THAT DOCUMENT?

14  A.    THIS LOOKS LIKE MY CURRICULUM VITAE.

15  Q.    OKAY. THE QUESTIONS ARE NOT HARD. I JUST

16  WANTED YOU TO IDENTIFY.

17    ARE YOU ABLE TO BRIEFLY LOOK THROUGH

18  THOSE DOCUMENTS AND JUST CONFIRM IF THERE ARE ANY

19  INACCURACIES IN THEM OR IF YOU BELIEVE THEY ARE

20  ACCURATE?

21  A.    THE DOCUMENTS LOOK ACCURATE AND CURRENT.

22  Q.    THANK YOU.

23    I WANTED TO ASK YOU BRIEFLY ABOUT YOUR

24  EDUCATION. WHERE DID YOU GO TO COLLEGE?

25  A.    I WENT TO HARVARD COLLEGE.

115

1  Q.    AND WHEN DID YOU GRADUATE?

2  A.    IN 1994.

3  Q.    AND WHAT DID YOU DO AFTER THAT?

4  A.    I WENT TO MEDICAL SCHOOL, ALSO AT HARVARD.

5  Q.    AND WHEN DID YOU GRADUATE FROM THERE?

6  A.    IN 1998.

7  Q.    DID YOU DO A RESIDENCY AFTER THAT?

8  A.    I DID. I DID A RESIDENCY IN OBSTETRICS AND

9  GYNECOLOGY AT THE UNIVERSITY OF PENNSYLVANIA.

10  Q.    AND DURING WHAT YEARS DID YOU DO YOUR RESIDENCY?

11  A.    FROM 1992 -- PARDON ME, 1998 TO 2002.

12  Q.    AND DID YOU DO A FELLOWSHIP ALSO?

13  A.    I DID A SUBSPECIALTY FELLOWSHIP IN REPRODUCTIVE

14  ENDOCRINOLOGY AND INFERTILITY FROM 2002 UNTIL 2005, ALSO

15  AT THE UNIVERSITY OF PENNSYLVANIA.

16  Q.    SO YOU'VE USED THE PHRASE REPRODUCTIVE

17  ENDOCRINOLOGY AT LEAST TWICE.

18  A.    YES.

19  Q.    WHAT DOES THAT MEAN?

20  A.    SO REPRODUCTIVE ENDOCRINOLOGY IS THE FIELD OF

21  MEDICINE THAT INVESTIGATES HOW HORMONES AFFECT

22  REPRODUCTIVE FUNCTIONING AND DISORDERS IN WOMEN.

23  Q.    DO YOU HAVE ANY OTHER RELEVANT EDUCATION HERE

24  TODAY?

25  A.    I RECEIVED A MASTERS IN CLINICAL EPIDEMIOLOGY

116

1  AND BIOSTATISTICS AT THE UNIVERSITY OF PENNSYLVANIA

2  DURING MY FELLOWSHIP IN REPRODUCTIVE ENDOCRINOLOGY.

3  Q.    HOW MANY YEARS WAS THAT MASTERS PROGRAM?

4  A.    THREE YEARS, 2003 UNTIL 2006.

5  Q.    ARE YOU BOARD CERTIFIED?

6  A.    I AM BOARD CERTIFIED BOTH IN GENERAL OBSTETRICS

7  AND GYNECOLOGY AND IN REPRODUCTIVE ENDOCRINOLOGY AND

8  INFERTILITY.

9  Q.    WAS THE REPRODUCTIVE ENDOCRINOLOGY AND

10  FERTILITY, IS THAT PART OF YOUR BOARD CERTIFICATION OR

11  IS THAT A SUBSPECIALITY?

12  A.    IT'S SUBSPECIALTY BOARD CERTIFICATION.

13  Q.    I WOULD LIKE TO ASK YOU BRIEFLY ABOUT YOUR

14  CURRENT WORK. WHERE DO YOU CURRENTLY WORK?

15  A.    I AM ON -- I WORK AT THE UNIVERSITY OF

16  PENNSYLVANIA HOSPITAL AS A REPRODUCTIVE ENDOCRINOLOGIST

17  THERE, AND I'M ON THE FACULTY OF THE MEDICAL SCHOOL AT

18  THE UNIVERSITY OF PENNSYLVANIA.

19    MR. GOLDMAN: YOUR HONOR, JUST IN THE

20  INTEREST OF TIME FOR THESE BACKGROUND QUESTIONS, MAY I

21  ASK FOR PERMISSION TO LEAD?

22    THE COURT: YOU CAN GO AHEAD, AND IF YOU

23  ARE GOING TO OBJECT -- AT A POINT YOU FEEL IT IS

24  OBJECTIONABLE, YOU'RE GOING TO GET UP AND TELL ME.

25    MS. KADE: THANK YOU, YOUR HONOR.

Exhibit 137                                                        JA-0001821

117

```
1    BY MR. GOLDMAN:
2    Q.      AT THE UNIVERSITY OF PENNSYLVANIA MEDICAL SCHOOL
3    AND HOSPITAL, DO YOU WORK AS A DOCTOR?
4    A.      YES.
5    Q.      DO YOU ALSO WORK AS A PROFESSOR?
6    A.      I DO.
7    Q.      DO YOU ALSO DO CLINICAL RESEARCH?
8    A.      I DO.
9    Q.      DO YOU ALSO PUBLISH ARTICLES AND SPEAK?
10   A.      I DO.
11   Q.      GENERALLY SPEAKING, WHAT KIND OF DOCTOR ARE YOU?
12   WHAT DO YOU DO FOR YOUR PATIENTS?
13   A.      I SEE PATIENTS WHO COME FOR THE EVALUATION OF
14   INFERTILITY, SO HAVING DIFFICULTY ACHIEVING A PREGNANCY.
15   IN THE REPRODUCTIVE ENDOCRINE COMPONENT OF WHAT I DO, I
16   SEE WOMEN WHO SUFFER FROM A VARIETY OF DISORDERS,
17   INCLUDING DISORDERS OF MENSTRUATION, CHRONIC PELVIC PAIN
18   AND OTHER REPRODUCTIVE DISORDERS THAT I TREAT.
19   Q.      IN YOUR FERTILITY WORK, YOU ACTUALLY HELP WOMEN
20   HAVE BABIES?
21   A.      THAT'S CORRECT.
22   Q.      IN YOUR ROLE AS PROFESSOR, IS YOUR TITLE
23   ASSOCIATE PROFESSOR?
24   A.      YES.
25   Q.      AND ARE YOU TENURED?
```

118

```
1    A.      YES, I AM.
2    Q.      AND DO YOU TEACH AND RESEARCH AS PART OF THAT
3    ROLE AS PROFESSOR?
4    A.      I DO.
5    Q.      WHO DO YOU TEACH?
6    A.      I TEACH MEDICAL STUDENTS, RESIDENTS IN
7    OBSTETRICS AND GYNECOLOGY, AND FELLOWS TRAINING IN
8    REPRODUCTIVE ENDOCRINOLOGY AND INFERTILITY.
9    Q.      I WILL COME BACK TO YOUR MEDICAL PRACTICE WITH
10   PATIENTS, BUT YOUR PROFESSORIAL DUTIES, ROUGHLY HOW MANY
11   HOURS A WEEK DOES THAT TAKE?
12   A.      APPROXIMATELY 5 TO 10 HOURS PER WEEK.
13   Q.      MOVING ON TO YOUR WORK AS A CLINICAL RESEARCHER,
14   ROUGHLY HOW MANY HOURS A WEEK DOES THAT TAKE?
15   A.      THERE IS OVERLAP WITH MY RESPONSIBILITIES AS AN
16   ASSOCIATE PROFESSOR, BUT I WOULD SAY APPROXIMATELY 5 TO
17   10 HOURS PER WEEK, WITH SOME OVERLAP BETWEEN THEM.
18   Q.      SO THAT NUMBER INCLUDES THE OVERLAP, CORRECT?
19   A.      CORRECT.
20   Q.      HAS ANY OF YOUR RESEARCH BEEN FUNDED BY GRANTS?
21   A.      YES.
22   Q.      AND COULD YOU NAME A FEW OF THE GRANTS YOU HAVE
23   BEEN FUNDED BY?
24   A.      I HAVE BEEN FUNDED BY THE NATIONAL INSTITUTES OF
25   HEALTH, THE NATIONAL INSTITUTES OF ENVIRONMENTAL HEALTH
```

119

```
1    SERVICES, AND OTHER FOUNDATIONS AND INTRAMURAL SOURCES
2    AT THE UNIVERSITY OF PENNSYLVANIA.
3            MR. GOLDMAN:  YOUR HONOR, I'M GOING TO
4    SKIP OVER QUESTIONS ABOUT HER -- THE DOCTOR'S CURRENT
5    PROJECTS AND PUBLICATIONS, SINCE THEY ARE IN THE RECORD,
6    BUT I JUST WANTED TO POINT OUT THAT THEY ARE AVAILABLE.
7    BY MR. GOLDMAN:
8    Q.      BUT I WOULD LIKE TO FOCUS ON YOUR WORK AS A
9    MEDICAL DOCTOR.  ROUGHLY HOW MANY HOURS A WEEK DO YOU
10   WORK?
11   A.      ROUGHLY 50 TO 70 HOURS PER WEEK IS THE RANGE.
12   Q.      AND WHY IS THERE THAT RANGE?
13   A.      THERE IS A RANGE THAT DEPENDS ON PROCEDURES THAT
14   I ALSO DO.  I FAILED TO MENTION BEFORE THAT AS PART OF
15   MY WORK I ALSO DO SURGICAL PROCEDURES FOR WOMEN, AND I
16   ALSO TAKE CALL ON AN APPROXIMATELY MONTHLY BASIS.  SO
17   THAT REQUIRES WORK AT NIGHTS AND ON THE WEEKENDS WHEN I
18   AM ON CALL.
19   Q.      AND THAT 50 TO 70 HOURS A WEEK, THAT IS ON TOP
20   OF YOUR TEACHING AND RESEARCH?
21   A.      CORRECT.
22   Q.      DO YOU PRESCRIBE CONTRACEPTION WHEN YOU TREAT
23   YOUR PATIENTS?
24   A.      I DO.
25   Q.      AND ARE YOU FAMILIAR WITH THE AFFORDABLE CARE
```

120

```
1    ACT?
2    A.      I AM.
3    Q.      ARE YOU FAMILIAR WITH THE CONTRACEPTIVE MANDATE
4    THAT IS PART OF THE AFFORDABLE CARE ACT?
5    A.      YES.
6    Q.      ARE YOU FAMILIAR WITH THE NEW MORAL EXEMPTION
7    RULE AND RELIGIOUS EXEMPTION RULE --
8    A.      I AM.
9    Q.      -- WHICH ARE AT ISSUE BEFORE THE COURT TODAY?
10           MR. GOLDMAN:  BEFORE I PROCEED FURTHER,
11   YOUR HONOR, I WOULD LIKE TO PROFFER THIS WITNESS, DR.
12   SAMANTHA BUTTS, BASED ON HER KNOWLEDGE, EDUCATION,
13   TRAINING AND EXPERIENCE, AS AN EXPERT IN THE AREA OF
14   WOMEN'S REPRODUCTIVE HEALTH.
15           THE COURT:  ANY OBJECTION?
16           MS. KADE:  YES, YOUR HONOR.  WE OBJECT
17   FOR FAILURE TO DISCLOSE AS AN EXPERT AS WELL AS TO HER
18   EXPERT TESTIMONY TO THE EXTENT IT IS BEING OFFERED TO
19   DETERMINE THE CORRECTNESS OR WISDOM OF THE AGENCY'S
20   DECISION IN THIS ACA CASE, YOUR HONOR.
21           THE COURT:  I UNDERSTAND.
22           IS THE SCOPE AS NARROW OR -- THAN
23   DESCRIBED BY MS. KADE OR IS IT --
24           MR. GOLDMAN:  THE TESTIMONY WILL BE ABOUT
25   WHAT SHE HAS SEEN IN HER OWN PRACTICE AS IT APPLIES TO
```

Exhibit 137

JA-0001822

121

1  WOMEN'S REPRODUCTIVE HEALTH.
2          THE COURT: OKAY. SO SHE IS NOT GOING TO
3  TESTIFY SPECIFICALLY ABOUT WHETHER OR NOT THE TWO
4  EXEMPTIONS ARE APPROPRIATE?
5          MR. GOLDMAN: NO.
6          THE COURT: OKAY. SO THAT IS ONE OF YOUR
7  OBJECTIONS, CORRECT?
8          MS. KADE: YES, YOUR HONOR.
9          THE COURT: AND THE OTHER ONE I OVERRULE.
10         MS. KADE: THANK YOU, YOUR HONOR.
11         THE COURT: GO AHEAD.
12 BY MR. GOLDMAN:
13 Q.      RETURNING TO YOUR PATIENT WORK, DOCTOR, WHERE DO
14 YOU -- WHERE DO YOUR PATIENTS COME FROM?
15 A.      MY PATIENTS -- I HAVE A DIVERSE PATIENT
16 POPULATION. THEY COME FROM MANY SOURCES. MANY ARE
17 SELF-REFERRED. SOME ARE REFERRED FROM OTHER PHYSICIANS
18 IN THE HEALTH SYSTEM AND SOME ARE EMPLOYEES IN THE
19 UNIVERSITY OF PENNSYLVANIA -- AT THE UNIVERSITY OF
20 PENNSYLVANIA, BUT THEY COME FROM MANY SOURCES.
21 Q.      DO PATIENTS COME TO SEE YOU FROM AROUND THE
22 WORLD?
23 A.      YES.
24 Q.      DO YOU ALSO SERVE AS A WEST PHILADELPHIA
25 COMMUNITY HOSPITAL DOCTOR?

122

1  A.      I DO.
2  Q.      AND YOU ALSO HAVE PATIENTS WHO ARE STUDENTS AND
3  PROFESSORS AT PENN, CORRECT?
4  A.      YES.
5  Q.      ROUGHLY HOW MANY PATIENTS DO YOU SEE A YEAR?
6  A.      APPROXIMATELY 1500 PATIENTS PER YEAR, AND THERE
7  CAN BE SOME VARIATION WHERE THAT IS CONCERNED.
8  Q.      ARE THOSE INDIVIDUAL PATIENTS OR PATIENT VISITS?
9  A.      WHEN I CALCULATE BOTH INDIVIDUAL PATIENTS THAT I
10 SEE FROM A VARIETY OF SOURCES IN MY OWN PATIENT
11 PRACTICE, WORKING IN OUR GROUP INFERTILITY PRACTICE,
12 TAKING CALL AND DOING SURGICAL PROCEDURES, THAT NUMBER
13 REPRESENTS INDIVIDUAL PATIENTS.
14 Q.      AND DOES THAT NUMBER INCLUDE THE SURGERIES THAT
15 YOU PERFORM?
16 A.      IT DOES.
17 A.      IT DOES. AND DOES IT INCLUDE PATIENTS YOU WOULD
18 SEE WHEN YOU WERE ON CALL?
19 A.      IT DOES.
20 Q.      AND DOES IT INCLUDE PATIENTS YOU WOULD SEE IN
21 CONNECTION WITH YOUR TEACHING OF RESIDENTS AND FELLOWS?
22 A.      IT DOES.
23 Q.      HAVE YOU KEPT UP THIS PACE OF SEEING PATIENTS
24 OVER THE MORE THAN 12 YEARS YOU HAVE BEEN SEEING
25 PATIENTS?

123

1  A.      GENERALLY, WITH SOME VARIATION FROM
2  YEAR TO YEAR, YES.
3  Q.      I WOULD LIKE TO ASK YOU A LITTLE BIT MORE ABOUT
4  YOUR SPECIFIC MEDICAL PRACTICE. YOU MENTIONED THAT YOU
5  TREAT WOMEN FOR DISORDERS OF MENSTRUATION, CHRONIC
6  PELVIC PAIN AND PREMATURE OVARIAN FAILURE; IS THAT
7  CORRECT?
8  A.      THAT IS CORRECT.
9  Q.      CAN YOU DESCRIBE BRIEFLY WHAT IS A DISORDER OF
10 MENSTRUATION?
11 A.      THE DISORDERS OF MENSTRUATION THAT I SEE INCLUDE
12 MENSTRUATION THAT IS EXCESSIVELY HEAVY, EXCESSIVELY
13 FREQUENT OR IRREGULAR IN FREQUENCY. AND SO THIS CAN
14 SIGNIFICANTLY IMPACT QUALITY OF LIFE, AND TO THE EXTENT
15 AND THE DEGREE OF THE CHRONICITY OF THE CONDITION CAN
16 SIGNIFICANTLY IMPACT HEALTH OUTCOMES, RISKS AND SEVERE
17 CONDITIONS FOR A WOMAN, AND IMPACT HER ABILITY TO BE A
18 PRODUCTIVE MEMBER OF THE WORKFORCE IF SHE IS IMPAIRED IN
19 HER ABILITY TO DO THAT BECAUSE SHE NEEDS TO ATTEND TO
20 THE SERIOUS MEDICAL DISORDER.
21 Q.      FORGIVE ME, DOCTOR, I WOULD BE LYING IF I TOLD
22 YOU I HAD FIRSTHAND KNOWLEDGE OF WHAT THIS MEANS. AND
23 YOU ARE USING WORDS LIKE CHRONICITY.
24         CAN YOU TELL ME IN PRACTICAL TERMS HOW
25 THESE DISORDERS AFFECT WOMEN? WHAT DOES IT MEAN FOR

124

1  THEM IF YOU HAVE A MENSTRUATION DISORDER?
2  A.      SO WHAT IT MEANS IS THAT A WOMAN HAS A MENSTRUAL
3  PERIOD THAT IS SIGNIFICANTLY MORE LONG IN DURATION OR
4  HEAVIER IN VOLUME THAN WE CONSIDER TO BE NORMAL, AND
5  THIS CAN OBVIOUSLY BE INCREDIBLY JARRING AND UPSETTING
6  FOR A PATIENT AND CREATE AN IMPACT ON QUALITY OF LIFE.
7          BUT TO THE EXTENT THAT THAT PROBLEM LASTS
8  FOR A SIGNIFICANT AMOUNT OF TIME, IT CAN LEAD TO CHRONIC
9  PROBLEMS, ONE OF THE MOST SEVERE OF WHICH IS MODERATE TO
10 SEVERE ANEMIA, WHICH CAN ALSO LEAD TO SIGNIFICANT
11 PROBLEMS FOR A PATIENT. IN THE MOST SEVERE CASE, SEVERE
12 ANEMIA CAN REQUIRE A PATIENT TO NEED TO BE HOSPITALIZED
13 AND RECEIVE A BLOOD TRANSFUSION.
14 Q.      HAVE YOU EVER HAD TO PERFORM A BLOOD TRANSFUSION
15 ON A PATIENT WITH MENSTRUATION DISORDER?
16 A.      YES.
17 Q.      AND ROUGHLY HOW MANY TIMES IN YOUR CAREER --
18 A.      IN MY CAREER, I WOULD SAY AT LEAST 50 TIMES.
19 Q.      AND DOES THIS SORT OF THING CAUSE WOMEN TO LOSE
20 WORK?
21 A.      YES.
22 Q.      SORRY, HAVE TO MISS WORK?
23 A.      YES.
24 Q.      CAN IT AFFECT THEIR JOBS?
25 A.      YES.

Exhibit 137                                                                                    JA-0001823

125

1  Q.    TURNING TO THE DISORDERS OF CHRONIC PELVIC PAIN,
2  ROUGHLY HOW MANY WOMEN FACE THIS TYPE OF DISORDER?
3  A.    SO IT'S BEEN SUGGESTED THAT UP TO 10 PERCENT OF
4  PATIENT VISITS TO THE GYNECOLOGIST HAVE TO DO WITH
5  CHRONIC PELVIC PAIN. THERE ARE A NUMBER OF CAUSES OF
6  CHRONIC PELVIC PAIN, BUT IT IS SOMETHING THAT I SEE
7  COMMONLY IN MY PRACTICE BECAUSE IT'S SOMETHING THAT IS
8  REFERRED TO ME ON A REGULAR BASIS.
9  Q.    AND IS THAT THE SAME AS ENDOMETRIOSIS?
10 A.    ENDOMETRIOSIS IS A COMMON CAUSE OF CHRONIC
11 PELVIC PAIN AND SEVERE PAIN WITH PERIODS. THEY ARE VERY
12 SIMILAR THINGS.
13 Q.    ARE THERE TYPES OF CHRONIC PELVIC PAIN THAT ARE
14 NOT CAUSED BY ENDOMETRIOSIS?
15 A.    THERE ARE SOME, AND WE SEE THOSE NOT UNCOMMONLY
16 AS WELL, BUT ENDOMETRIOSIS IS ONE OF THE MOST COMMON.
17 Q.    IN PLAIN LANGUAGE, HOW DOES CHRONIC PELVIC PAIN
18 AFFECT THE REAL LIVES OF WOMEN WHO SUFFER FROM THAT
19 DISORDER?
20 A.    SO I SEE PATIENTS WHO HAVE SEVERE DEBILITATING
21 PELVIC PAIN, EITHER WITH THEIR PERIODS OR OUTSIDE OF
22 THEIR PERIODS. WHEN PATIENTS COME TO SEE ME, IT'S
23 USUALLY DEBILITATING TO THE POINT THAT OVER-THE-COUNTER
24 MEDICATIONS HAVE NOT HELPED THEM AND THEY ARE LOOKING
25 FOR ADDITIONAL LEVELS OF ASSESSMENT AND CARE. SO THESE

126

1  ARE WOMEN WHO SOMETIMES CANNOT GO TO WORK AND CANNOT
2  FUNCTION ALONG THEIR ACTIVITIES OF DAILY LIVING BECAUSE
3  THEY ARE DEBILITATED BY PAIN AND SOMETIMES CAN'T GET OUT
4  OF BED.
5  Q.    I'M GOING TO RETURN TO YOUR TREATMENT OF THESE
6  DISORDERS, BUT I WANTED TO FIRST ASK YOU ABOUT THE
7  DISORDER OF PREMATURE OVARIAN FAILURE. WHAT IS THAT?
8  A.    IT'S A DISORDER WHERE THERE IS PREMATURE
9  DEPLETION OF NORMAL OVARIAN FUNCTIONING RESULTING IN
10 SIGNIFICANTLY DECREASED PRODUCTION OF NORMAL FEMALE
11 HORMONES THAT THE OVARIES ARE SUPPOSED TO PRODUCE, AND
12 SIGNIFICANTLY DECREASED ODDS OF BECOMING PREGNANT.
13 Q.    IS THAT LIKE EARLY MENOPAUSE?
14 A.    IT'S A SIMILAR CONDITION, YES.
15 Q.    AND IF THERE IS AN AGE, ROUGHLY HOW OLD ARE YOUR
16 PATIENTS WHO SUFFER FROM PREMATURE OVARIAN FAILURE?
17 A.    THE STRICT DEFINITION MEANS THAT THE ONSET OF
18 SYMPTOMS ARE HAPPENING BEFORE THE AGE OF 40. I SEE
19 PATIENTS WHO SUFFER FROM THIS DISEASE ANYWHERE FROM
20 THEIR 20S, 30S AND UP TO THE AGE OF 40.
21 Q.    AND ROUGHLY HOW COMMON IS PREMATURE OVARIAN
22 FAILURE?
23 A.    IT AFFECTS APPROXIMATELY ONE PERCENT OF WOMEN.
24 Q.    SO IT'S ONE OUT OF A HUNDRED WOMEN?
25 A.    CORRECT.

127

1  Q.    AND IS THAT ONE OUT OF A HUNDRED WOMEN IN
2  PENNSYLVANIA OR IN THE COUNTRY OR --
3  A.    THAT IS A NATIONAL PREVALENCE.
4  Q.    AND AM I CORRECT THAT WITH THAT DISORDER,
5  WOMEN'S OVARIES DON'T PRODUCE ESTROGEN?
6  A.    THAT'S CORRECT.
7  Q.    CAN THEY STILL GET PREGNANT?
8  A.    THEY HAVE A DIMINISHED ODDS OF BECOMING PREGNANT
9  BUT THEY CAN STILL ACHIEVE A PREGNANCY IN SOME CASES.
10 Q.    WHAT HAPPENS TO WOMEN WHOSE OVARIES DO NOT
11 PRODUCE ESTROGEN?
12 A.    SO IF A WOMAN IS DIAGNOSED WITH THIS DISEASE IN
13 HER 20S, FOR INSTANCE, AND WE KNOW THAT THE AVERAGE AGE
14 OF NATURAL MENOPAUSE WHEN THESE CHANGES ARE SUPPOSED TO
15 HAPPEN IS 51 YEARS OLD, THAT MEANS THAT SHE CAN STAND TO
16 EXPERIENCE 30 YEARS OF HER ADULT LIFE WITHOUT ONE OF THE
17 MOST CRITICAL HORMONES THAT HER BODY PRODUCES.
18         SO THE SHORT-TERM CONSEQUENCES OF THAT
19 ARE SIGNIFICANT IMPAIRMENT OF QUALITY OF LIFE; HOT
20 FLASHES, NIGHT SWEATS AND SYMPTOMS OF LOW ESTROGEN.
21 SOME OF THE MORE SERIOUS LONG-TERM CONSEQUENCES INCLUDE
22 INCREASED RISK OF CARDIOVASCULAR DISEASE. WHEN WOMEN
23 ARE PREMATURELY DEPRIVED OF ESTROGEN, INCREASED RISK OF
24 BONE LOSS AND HIP FRACTURE. AND THOSE ARE TWO OF THE
25 MOST COMMON SERIOUS CONSEQUENCES THAT WE SEE.

128

1  Q.    CAN WOMEN WHO SUFFER FROM LOSS OF ESTROGEN DIE
2  FROM THAT?
3  A.    WELL, I WOULD ARGUE THAT SINCE HEART DISEASE AND
4  HEART ATTACK IS THE NUMBER ONE KILLER OF WOMEN AND ALL
5  AMERICANS, ANYTHING THAT PUTS YOU AT GREATER RISK OF
6  EXPERIENCING THAT INCREASES YOUR RISK OF DEATH.
7  Q.    IN ADDITION TO THOSE THREE CATEGORIES OF
8  DISORDERS, YOU ALSO TREAT INFERTILITY, CORRECT?
9  A.    YES.
10 Q.    I THINK WE ALL KNOW GENERALLY WHAT THAT IS, NOT
11 TO YOUR DEGREE OF KNOWLEDGE, BUT I WOULD JUST LIKE TO
12 INCLUDE THAT IN THE CONVERSATION.
13         SO HOW DO YOU TREAT YOUR PATIENTS WITH
14 THOSE THREE DISORDERS AND THE PATIENTS SUFFERING FROM
15 INFERTILITY?
16 A.    SO FOR THE PATIENTS WE DESCRIBED, THE THREE
17 DISORDERS OF ABNORMAL MENSTRUATION, CHRONIC PELVIC PAIN,
18 SEVERE PAIN WITH PERIODS AND PREMATURE OVARIAN FAILURE,
19 THERE ARE INDICATIONS FOR ALL THREE OF THOSE TO
20 INCORPORATE HORMONAL CONTRACEPTION TO MANAGE THOSE
21 DISORDERS AND TO MITIGATE SOME OF THE ASSOCIATED RISKS
22 THAT WE TALKED ABOUT THAT ARE ASSOCIATED WITH THEM.
23 Q.    WHEN YOU SAY HORMONAL CONTRACEPTION, DOES THAT
24 MEAN THE BIRTH CONTROL PILL OR CAN THAT ALSO REFER TO
25 IUD'S?

Exhibit 137

JA-0001824

129

1   A.     IT REFERS TO BOTH.

2   Q.     AND DO YOU ALSO USE CONTRACEPTIVES ON PATIENTS

3 WHO SUFFER FROM INFERTILITY?

4   A.     WE INTEGRATE HORMONAL CONTRACEPTION TO HELP WITH

5 THE PROTOCOLS THAT ARE BUILT INTO THE TREATMENTS THAT WE

6 OFFER. IT HELPS MANAGE THE CYCLES THAT WE BUILD FOR

7 PATIENTS WHEN WE ARE DOING TREATMENTS LIKE IN VITRO

8 FERTILIZATION, FOR INSTANCE.

9   Q.     I FEEL LIKE I'M A LITTLE BIT IN A SCIENCE CLASS.

10 IT'S OKAY, IT'S BEEN A WHILE, BUT I'M GETTING THERE.

11         WHEN YOU TREAT WOMEN WITH -- WHO ARE

12 SUFFERING FROM INFERTILITY WITH CONTRACEPTIVES, TO ME

13 THAT SEEMS COUNTERINTUITIVE.

14   A.     WE USE THE MEDICATIONS TO ACHIEVE SEVERAL THINGS

15 WITH THE INFERTILITY TREATMENTS THAT WE HAVE TO OFFER.

16 IN A CERTAIN POPULATION OF WOMEN, IT HELPS CREATE A

17 SAFER PROCESS FOR THE PATIENT, SO BIRTH CONTROL PILLS,

18 WE TAKE ADVANTAGE OF SOME OF THEIR NONCONTRACEPTIVE

19 BENEFITS TO HELP PERFORM INFERTILITY TREATMENTS IN A WAY

20 THAT IS -- ENHANCES THE SAFETY AND EFFICACY OF THOSE

21 TREATMENTS OVERALL.

22         IT HELPS US WITH THE TIMING OF INITIATING

23 THOSE TREATMENTS AS WELL. IT CAN ALSO HELP IN CERTAIN

24 WOMEN WHO HAVE ENDOMETRIOSIS, WHICH IS ONE OF THE

25 CONDITIONS I MENTIONED. IT CAN HELP THOSE WOMEN WITH

---

130

1 CONTROLLING SOME OF THEIR SYMPTOMS PRIOR TO TREATMENT

2 AND MAY IN SOME WOMEN INCREASE THE LIKELIHOOD THAT THOSE

3 TREATMENTS WILL WORK FOR THEM.

4   Q.     SO WHEN YOU PRESCRIBE CONTRACEPTIVES TO THESE

5 CATEGORIES OF YOUR PATIENTS, FOR SOME PATIENTS DO YOU

6 PRESCRIBE THEM PURELY TO PREVENT PREGNANCY?

7   A.     YES.

8   Q.     AND IN OTHERS, DO YOU PRESCRIBE THEM NOT AT ALL

9 TO PREVENT PREGNANCY?

10   A.     THAT IS CORRECT.

11   Q.     THAT MIGHT BE, FOR EXAMPLE, SOMEONE WHO IS

12 POSTMENOPAUSAL BUT HAS CHRONIC PELVIC PAIN?

13   A.     SOMETHING LIKE THAT, YES.

14   Q.     AND ARE THERE TIMES WHEN YOU PRESCRIBE

15 CONTRACEPTION FOR BOTH PURPOSES, TO PREVENT PREGNANCY

16 BUT ALSO FOR NONPREGNANCY-PREVENTION PURPOSES?

17   A.     YES.

18   Q.     GENERALLY SPEAKING, WHAT TYPES OF CONTRACEPTIVES

19 DO YOU PRESCRIBE TO YOUR PATIENTS?

20   A.     THE CONTRACEPTIVES THAT I USE MOST REGULARLY

21 INCLUDE THE ORAL CONTRACEPTIVE PILL AND THE MIRENA

22 INTRAUTERINE DEVICE.

23   Q.     I WOULD LIKE TO ASK YOU ABOUT YOUR EXPERIENCE IN

24 PRESCRIBING CONTRACEPTIVES TO YOUR PATIENTS.

25         DO YOU HAVE EXPERIENCE PRESCRIBING

---

131

1 CONTRACEPTIVES TO YOUR PATIENTS BEFORE THE AFFORDABLE

2 CARE ACT AND ITS CONTRACEPTIVE MANDATE WERE THE LAW?

3   A.     YES.

4   Q.     HAVE YOU ALSO PRESCRIBED CONTRACEPTIVES TO

5 PATIENTS SINCE THE AFFORDABLE CARE ACT AND ITS

6 CONTRACEPTIVE MANDATE BECAME THE LAW?

7   A.     YES.

8   Q.     SO YOU HAVE EXPERIENCE IN BOTH WORLDS, PRE-ACA

9 AND POST?

10   A.     YES, I DO.

11   Q.     HAVE YOU SEEN ANY DIFFERENCES IN YOUR PRACTICE

12 OF PRESCRIBING CONTRACEPTIVES TO PATIENTS DURING THESE

13 TWO TIME PERIODS?

14   A.     I HAVE EXPERIENCED THAT, YES.

15   Q.     AND CAN YOU DESCRIBE FIRST, WHAT IT WAS LIKE

16 PRESCRIBING CONTRACEPTIVES BEFORE THE CONTRACEPTIVE

17 MANDATE WAS IN PLACE?

18   A.     SO PRIOR TO THE MANDATE, THERE WAS FAR LESS

19 CERTAINTY ABOUT PATIENT ABILITY TO ACCESS SOME OF THESE

20 TREATMENTS FOR THE STATED PURPOSES WE DISCUSSED, DUE TO

21 CONCERN ABOUT AFFORDABILITY AND COVERAGE AND WHETHER

22 PATIENTS WOULD BE ABLE TO GET ACCESS ON THAT BASIS.

23   Q.     SO AM I CORRECT THAT AS A DOCTOR, YOU WOULD

24 ACCESS THE PATIENTS' NEEDS --

25   A.     YES.

---

132

1   Q.     -- MEDICAL NEEDS, AND THEN YOU WOULD PRESCRIBE

2 THE BEST MEDICATION FOR THEM AND THEIR CONDITION; IS

3 THAT RIGHT?

4   A.     THAT'S CORRECT.

5         MS. KADE: OBJECTION, LEADING.

6         THE COURT: SUSTAINED. ASK THE QUESTION

7 AGAIN.

8 BY MR. GOLDMAN:

9   Q.     HOW WOULD YOU -- HOW DO YOU CHOOSE WHICH KIND OF

10 PRESCRIPTION TO PRESCRIBE TO PATIENTS?

11   A.     SO I PERFORM A THOROUGH AND COMPREHENSIVE

12 EVALUATION OF THE PATIENT'S SYMPTOMS AND THE

13 UNDERPINNINGS FOR THEIR CONDITION. I CONSIDER THE

14 INDIVIDUAL CHARACTERISTICS OF THE PATIENT IN TERMS OF

15 PRIOR ASSESSMENTS, PRIOR TREATMENTS, WHAT HAS WORKED,

16 WHAT HAS NOT WORKED, AND ANY SPECIFIC RISK THEY MAY HAVE

17 FOR ANY MEDICAL TREATMENT THAT I MAY OFFER.

18         AND I INDIVIDUALIZE THE CARE FOR THEIR

19 PARTICULAR UNIQUE SET OF DIAGNOSES AND NEEDS, MAKING THE

20 BEST DECISION THAT I CAN IN CONSULTATION WITH THE

21 PATIENT.

22   Q.     PRE-ACA, ONCE YOU DO YOUR ANALYSIS AND YOU MAKE

23 YOUR PRESCRIPTION OF THE BEST MEDICATION FOR A PATIENT,

24 WERE PATIENTS ALWAYS FILLING IT?

25   A.     NOT ALWAYS.

---

Exhibit 137

JA-0001825

133

1  Q.    WERE THERE TIMES WHEN THEY WOULD COME BACK TO
2  YOU AND ASK YOU FOR A DIFFERENT PRESCRIPTION OR NO
3  PRESCRIPTION?
4            MS. KADE: OBJECTION, LEADING.
5            THE COURT: SUSTAINED. REASK THE
6  QUESTION IN A NONLEADING WAY.
7  BY MR. GOLDMAN:
8  Q.    WHEN PATIENTS WOULD NOT FILL THE PRESCRIPTION
9  YOU GAVE THEM, WHAT WOULD HAPPEN?
10 A.    WE WOULD -- I WOULD TRY TO GET AN UNDERSTANDING
11 OF THE LACK OF COMPLIANCE FROM MY PERSPECTIVE OF NOT
12 TAKING OR FILLING THE PRESCRIPTION, AND IN GETTING TO
13 THE BOTTOM OF THIS, FOR MANY PATIENTS IT HAD TO DO WITH
14 SIGNIFICANT COSTS AND INAFFORDABILITY OF THOSE
15 TREATMENTS.
16 Q.    AND DID THAT REASONING TAKE PLACE WHEN YOU
17 PRESCRIBED ORAL BIRTH CONTROL PILLS?
18 A.    IN SOME CASES, YES.
19 Q.    CAN YOU ESTIMATE ROUGHLY WHAT PERCENTAGE OF YOUR
20 PATIENTS WOULD REFUSE A PRESCRIPTION FOR ORAL BIRTH
21 CONTROL PILLS PRE-ACA?
22 A.    IN MY EXPERIENCE DURING THAT TIME, MY ESTIMATE
23 WOULD BE ROUGHLY 10 TO 20 PERCENT OF PATIENTS WOULD HAVE
24 A FINANCIAL BARRIER TO THOSE TYPES OF PRESCRIPTIONS.
25 Q.    AND HOW ABOUT WHEN YOU WOULD PRESCRIBE AFTER

134

1  YOUR ANALYSIS IUD'S, WHAT WAS THE PERCENTAGE OF YOUR
2  PATIENTS WHO WOULD REJECT THAT PRESCRIPTION?
3  A.    IT WAS APPROXIMATELY AT LEAST 30 PERCENT.
4  Q.    IS THAT BECAUSE IUDS ARE MORE EXPENSIVE THAN
5  BIRTH CONTROL PILLS?
6  A.    IT HAS TO DO WITH THE COSTS, TOTAL COSTS AROUND
7  THE IUD DEVICE AND THE INSERTION, WHICH HAS A
8  SIGNIFICANT ONE-TIME UP-FRONT COST WHICH, WHEN COMPARED
9  TO THE INTERVAL COST OF THE BIRTH CONTROL PILL, IS
10 SIGNIFICANTLY GREATER. BUT BECAUSE THE IUD THAT I
11 PRESCRIBE REGULARLY, THE MIRENA, LASTS FOR FIVE YEARS,
12 WHEN YOU EXTEND THAT ONE-TIME COST OVER FIVE YEARS, IT
13 ACTUALLY ENDS UP BECOMING LESS EXPENSIVE, ESPECIALLY IF
14 YOU COMPARE IT TO SOME PREPARATIONS WHERE THERE IS A
15 MONTHLY COST THAT, OVER TIME, CAN BE SIGNIFICANTLY
16 ADDITIVE.
17 Q.    SO I WOULD LIKE TO DIG INTO THAT JUST A LITTLE
18 BIT MORE.
19       YOU SAID THAT A MIRENA LASTS FIVE YEARS?
20 A.    YES.
21 Q.    AND WHAT IS THE UP-FRONT COST?
22 A.    ALL FEES, THE DEVICE AND THE INSERTION, CAN BE
23 ANYWHERE FROM ABOUT 800 TO $1,000.
24 Q.    AND AFTER THE DEVICE IS PURCHASED AND INSERTED
25 FOR 800 TO $1,000, ARE THERE ANY FURTHER COSTS OVER THE

135

1  FIVE-YEAR LIFE OF THE MIRENA IUD?
2  A.    IF THE PATIENT HAS NO ISSUES AND DECIDES TO KEEP
3  THE DEVICE IN PLACE FOR FIVE YEARS, THERE ARE NO
4  ADDITIONAL COSTS.
5  Q.    BY CONTRAST, THE ORAL BIRTH CONTROL PILL, YOU
6  HAD SAID THAT IS A MONTHLY PRESCRIPTION?
7  A.    YES.
8  Q.    ROUGHLY HOW MUCH DOES THAT COST?
9  A.    IT DEPENDS, OBVIOUSLY, ON THE PREPARATION. YOU
10 KNOW, THERE ARE SOME PATIENTS WHO CAN PAY ON AVERAGE $30
11 PER MONTH OR MORE FOR A MONTHLY PRESCRIPTION. SO YOU
12 CAN SEE HOW OVER TIME THE NUMBERS CAN CHANGE.
13 Q.    SO ROUGHLY -- $30 A MONTH IS ROUGHLY, ROUGHLY
14 $360 A YEAR?
15 A.    YES.
16 Q.    AND THEN OVER FIVE YEARS, WHICH IS THE TERM OF
17 THE MIRENA IUD, IT WOULD COST ROUGHLY FIVE TIMES THAT?
18 A.    YES.
19 Q.    AND THAT IS ROUGHLY $1,800, IS THAT CORRECT?
20 A.    YES.
21 Q.    SO WHICH OF THOSE DEVICES IS MORE EFFECTIVE, OR
22 PRESCRIPTION IS MORE EFFECTIVE?
23 A.    THE INTRAUTERINE DEVICE IS A MORE EFFECTIVE
24 CONTRACEPTIVE AND CAN BE MORE EFFECTIVE IN TERMS OF
25 MANAGING HEAVY MENSTRUAL PERIODS FOR SOME WOMEN COMPARED

136

1  HEAD TO HEAD TO THE BIRTH CONTROL PILL.
2  Q.    AM I CORRECT THEN TO UNDERSTAND YOU CORRECTLY
3  THAT BECAUSE OF THE COST, WOMEN END UP PAYING MORE MONEY
4  FOR LESS GOOD CARE?
5  A.    THAT IS POTENTIALLY THE CASES FOR SOME WOMEN,
6  YES.
7            MR. GOLDMAN: COURT'S INDULGENCE, YOUR
8  HONOR.
9            (PAUSE.)
10 BY MR. GOLDMAN:
11 Q.    WHEN YOU -- STRIKE THAT.
12       SO ALL THAT WAS BEFORE THE ACA. AFTER
13 THE ACA AND THE CONTRACEPTIVE MANDATE WENT INTO EFFECT,
14 DID ANYTHING CHANGE?
15 A.    YES. SIGNIFICANT NOTABLE CHANGE IN MY OWN
16 PRACTICE I CAN SPEAK TO WITH THE MOST AUTHORITY IN
17 ACCESS TO THE IUD BASED ON AFFORDABILITY OF THE IUD.
18 Q.    AFTER THE ACA, HOW OFTEN DID YOUR PATIENTS PUSH
19 BACK ON YOUR PRESCRIPTIONS TO THEM?
20 A.    FOR BOTH FORMS OR FOR EITHER?
21 Q.    EITHER.
22 A.    OKAY. FAR LESS. I CAN, YOU KNOW, TRY TO GIVE
23 YOU A NUMBER IN TERMS OF THE ESTIMATE, BUT I'M VERY
24 HARD-PRESSED TO THINK OF A PATIENT THAT I HAVE MANAGED
25 IN RECENT MEMORY FOR WHOM I HAVE RECOMMENDED A MIRENA

Exhibit 137                                                                    JA-0001826

137

1  IUD WHO HAS HAD DIFFICULTY ACQUIRING IT.
2  Q.     LET ME MAKE SURE I UNDERSTAND THAT.  SINCE THE
3  ACA WENT INTO EFFECT, YOU CANNOT THINK OF A SINGLE
4  PATIENT WHO HAS REJECTED YOUR PRESCRIPTION OF A MIRENA
5  IUD?
6  A.     I CAN'T THINK OF ONE THAT EASILY COMES TO
7  MEMORY.
8  Q.     AND BEFORE THE ACA, ROUGHLY 30 PERCENT WERE
9  REJECTING THE MIRENA?
10  A.     YES.
11  Q.     DO YOU TREAT PATIENTS FOR WHOM IT IS DANGEROUS
12  TO GET PREGNANT?
13  A.     I DO.
14  Q.     WHAT HAPPENS TO THEM IF THEY GET PREGNANT
15  ANYWAY?
16  A.     WELL, THERE ARE A VARIETY OF DISORDERS FOR WHICH
17  PREGNANCY CAN BE INCREDIBLY COMPLICATED IF YOU GO INTO
18  PREGNANCY WITH THOSE DISORDERS.  THEY CAN BECOME MORE
19  SEVERE AND POTENTIALLY LIFE-THREATENING TO A WOMAN WHO
20  BECOMES PREGNANT IF SHE CARRIES THAT DISORDER INTO
21  PREGNANCY.
22  Q.     I WOULD LIKE TO TURN YOUR ATTENTION TO THE
23  RULES, AND THEY ARE -- I DON'T THINK WE HAVE TO GO
24  THROUGH THEM SPECIFICALLY, BUT IF YOU'D LIKE TO LOOK AT
25  THEM, THEY ARE IN YOUR EXHIBIT BINDER.  THE RELIGIOUS

138

1  EXEMPTION RULE IS MARKED AS EXHIBIT 1 AND THE MORAL
2  EXEMPTION RULE I BELIEVE IS EXHIBIT 2.
3          ARE YOU GENERALLY FAMILIAR WITH THESE NEW
4  RULES THAT ARE AT ISSUE IN THIS PROCEEDING?
5  A.     YES.
6  Q.     AND I KNOW IT'S A LONG DOCUMENT, BUT HAVE YOU
7  READ THE RELIGIOUS EXEMPTION RULE?
8  A.     I HAVE.
9  Q.     AND DO YOU BELIEVE YOU UNDERSTAND THAT RULE
10  INSOFAR AS IT WOULD AFFECT PATIENTS LIKE THE ONES YOU
11  TREAT IN PENNSYLVANIA?
12  A.     I BELIEVE I DO.
13  Q.     AND THE MORAL EXEMPTION RULE IS SIMILARLY LONG,
14  BUT HAVE YOU READ IT?
15  A.     YES.
16  Q.     DO YOU BELIEVE YOU UNDERSTAND IT AND CAN
17  UNDERSTAND THE IMPACT IT MIGHT HAVE ON THE PATIENTS YOU
18  TREAT?
19  A.     I DO.
20  Q.     IN YOUR CAPACITY AS AN EXPERT IN WOMEN'S
21  REPRODUCTIVE HEALTH, DO YOU HAVE AN OPINION TO A
22  REASONABLE DEGREE OF CERTAINTY AS TO WHETHER THESE SAME
23  RULES WOULD AFFECT THE REPRODUCTIVE HEALTH OF WOMEN IN
24  PENNSYLVANIA.
25          MS. KADE:  OBJECTION, YOUR HONOR.  THIS

139

1  GOES BEYOND THE SCOPE OF HER EXPERTISE.  WE ARE NOW
2  GETTING INTO STATISTICS.
3          THE COURT:  THAT WAS THE BASIS OF YOUR
4  OBJECTION, ESSENTIALLY.  THE OBJECTION THAT YOU LODGED
5  AT BEGINNING INCORPORATES, I THINK, THE OBJECTION YOU
6  ARE MAKING NOW.
7          MS. KADE:  WELL, MY CURRENT OBJECTION IS
8  TO HIS CURRENT QUESTION AND WHAT HE IS ASKING FOR, WHICH
9  IS A STATISTICAL QUESTION ASKING FOR A STATISTICAL
10  ANSWER, AND SHE HAS NOT BEEN QUALIFIED AS THAT TYPE OF
11  AN EXPERT, YOUR HONOR.
12          THE COURT:  SUSTAINED.
13          MR. GOLDMAN:  IF I MAY RESPOND TO THAT,
14  YOUR HONOR, I DON'T ACTUALLY THINK THAT IS WHAT I'M
15  ASKING FOR.
16          THE COURT:  THAT IS -- OKAY.  SO WHY
17  DON'T YOU ASK THE QUESTION AGAIN SO THAT WE CAN MAKE
18  SURE IT IS NOT WHAT YOU --
19          MR. GOLDMAN:  SURE.
20  BY MR. GOLDMAN:
21  Q.     YOU'VE TESTIFIED BASED ON YOUR EXPERIENCE THAT
22  BEFORE THE AFFORDABLE CARE ACT WOMEN WERE NOT UNIFORMLY
23  ACCEPTING YOUR PRESCRIPTION CARE, CORRECT?
24  A.     CORRECT.
25  Q.     AND THEN YOU ALSO TESTIFIED THAT AFTER THE

140

1  AFFORDABLE CARE ACT, THAT YOU CAN'T RECALL A SINGLE
2  PATIENT WHO HAS REFUSED A PRESCRIPTION FOR AN IUD,
3  CORRECT?
4  A.     BASED ON -- BASED ON AFFORDABILITY ISSUES, YES.
5  Q.     AND I BELIEVE YOU TESTIFIED THAT THE BASIS FOR
6  THE CHANGES THAT -- POST-ACA CONTRACEPTIVE MANDATE, YOUR
7  PATIENTS HAVE COVERAGE SO THEY DON'T HAVE TO PAY OUT OF
8  POCKET FOR THESE PRESCRIPTIONS, CORRECT?
9  A.     YES.
10  Q.     UNDER THE RULES AS YOU UNDERSTAND THEM, DO YOU
11  BELIEVE THE RULES WILL CHANGE THE NUMBER OF WOMEN IN
12  PENNSYLVANIA WHO HAVE CONTRACEPTIVE CARE COVERAGE?
13          MS. KADE:  OBJECTION, YOUR HONOR.  AGAIN,
14  SINCE SHE HAS NO PERSONAL KNOWLEDGE OF ANY OF HER
15  PATIENTS THAT ARE AFFECTED BY THE NEW RULES, THIS IS
16  ASKING FOR STATISTICAL PREDICTION.
17          THE COURT:  IF YOU CAN ANSWER THE
18  QUESTION WITHOUT A STATISTICAL PREDICTION, YOU ARE FREE
19  TO ANSWER.
20          THE WITNESS:  I CAN ANSWER THIS QUESTION
21  SPEAKING TO MY EXPERIENCE OVER 12 YEARS OF PRACTICING
22  WOMEN'S HEALTH IN MY CURRENT POSITION AND MY EXPERIENCE
23  OF MORE DIFFICULT ACCESS AND UTILIZATION PRIOR TO THE
24  MANDATE, AND MY SENSE THAT ANY THREAT TO ACCESS BASED ON
25  RULES SUCH AS THESE MAY CHALLENGE THAT ACCESS AGAIN IN

Exhibit 137                                                                                                    JA-0001827

141

1  WAYS THAT I PERSONALLY HAVE EXPERIENCE WITH IN MY
2  PATIENT POPULATION.
3  BY MR. GOLDMAN:
4  Q.    SO BASED ON THAT EXPERIENCE THAT YOU DESCRIBED,
5  DO YOU HAVE AN OPINION AS TO THE RULES WHICH ALLOW MORE
6  EXEMPTIONS TO THE MANDATORY COVERAGE, WHAT EFFECT THEY
7  WOULD HAVE ON WOMEN IN PENNSYLVANIA?
8        MS. KADE:  SAME OBJECTION, YOUR HONOR.
9  TO THE EXTENT THAT SHE IS BEING ASKED TO PROVIDE HER
10  SENSE OF WHAT MIGHT HAPPEN NOT BASED ON ANY ACTUAL WOMEN
11  IN PENNSYLVANIA THAT SHE KNOWS ABOUT, IS OUTSIDE THE
12  SCOPE OF HER EXPERTISE.
13        THE COURT:  OVERRULED.
14        YOU CAN ANSWER.
15        THE WITNESS:  SO I JUST WANT TO MAKE SURE
16  I UNDERSTAND THE QUESTION ONE MORE TIME.  SPEAK TO THE
17  CONSEQUENCES OF THE EXEMPTIONS?
18  BY MR. GOLDMAN:
19  Q.    SURE.  THE RULES WHICH CREATE EXEMPTIONS TO
20  CARE, WHAT EFFECT IF ANY DO YOU BELIEVE THEY WILL HAVE
21  ON WOMEN IN PENNSYLVANIA?
22  A.    MY SENSE IS THAT IT WILL MAKE AN IMPACT
23  NEGATIVELY ON THE ABILITY OF WOMEN TO ACCESS THESE
24  TREATMENTS, AND IN SO DOING LIMIT OUR ABILITY TO TREAT
25  THE TYPES OF DISORDERS THAT I HAVE DISCUSSED WHICH

142

1  WILL -- COULD INCREASE PAIN AND SUFFERING FOR WOMEN WHO
2  HAVE THOSE DISORDERS, WORSENING OF SOME OF THE SERIOUS
3  MEDICAL CONSEQUENCES OF THOSE DISORDERS, AND RESULT IN
4  UNINTENDED PREGNANCIES IN GENERAL.  AND TO THE EXTENT
5  THAT SOME OF THOSE UNINTENDED PREGNANCIES ARE IN WOMEN
6  WITH VERY SERIOUS MEDICAL DISORDERS FOR WHOM PREGNANCY
7  MAY BE CONTRA -- EXCUSE ME, PREGNANCY MAY BE RELATIVELY
8  OR ABSOLUTELY CONTRAINDICATED, THAT CAN INCREASE RISKS
9  IN A LIFE-THREATENING WAY FOR SOME WOMEN.
10  Q.    PATIENTS MAY DIE?
11  A.    YES.
12  Q.    DOES THAT OPINION HOLD, IF YOU HAVE ONE, FOR
13  WOMEN OUTSIDE OF PENNSYLVANIA AS WELL BECAUSE OF THE
14  RULES?
15        MS. KADE:  YOUR HONOR, WE ARE SO FAR
16  OUTSIDE THIS WITNESS' EXPERTISE, WE CONTINUE TO OBJECT
17  TO THIS LINE OF QUESTIONING.
18        THE COURT:  SUSTAINED.
19        MR. GOLDMAN:  NOTHING FURTHER.
20        THE COURT:  YOUR WITNESS.
21        MS. KADE:  THANK YOU, YOUR HONOR.
22              CROSS-EXAMINATION
23  BY MS. KADE:
24  Q.    GOOD MORNING, DR. BUTTS.
25  A.    GOOD MORNING.

143

1  Q.    MY NAME IS ELIZABETH KADE.
2  A.    HELLO.
3  Q.    FIRST, WHAT DOCUMENTS DID YOU REVIEW IN ORDER TO
4  PREPARE YOUR DECLARATION?
5  A.    TO PREPARE THE DECLARATION I REVIEWED MY OWN
6  CURRICULUM VITAE.  THAT WAS THE PRIMARY DOCUMENT THAT I
7  REVIEWED AND -- PRIMARILY, YES.
8  Q.    WAS THERE ANYTHING ELSE YOU CAN REMEMBER RIGHT
9  NOW?
10  A.    OFF THE TOP OF MY HEAD, NO OTHER DOCUMENTS.
11  Q.    WHO DID YOU MEET WITH IN ORDER TO PREPARE YOUR
12  DECLARATION?
13  A.    I MET WITH COUNSEL SITTING BEFORE ME FROM THE
14  ATTORNEY GENERAL'S OFFICE TO DISCUSS PROCESS AND THE
15  DECLARATION.
16  Q.    ANYBODY ELSE?
17  A.    NO.
18  Q.    TURNING TO YOUR DECLARATION, YOU HAVE TESTIFIED
19  IN PARAGRAPH 53 OF YOUR DECLARATION THAT --
20        THE COURT:  CAN YOU JUST TELL ME WHAT TAB
21  THAT IS AGAIN?
22        MS. KADE:  SURE, I BELIEVE IT IS TAB 8.
23        THE COURT:  I SEE IT.  8, YES.
24  BY MS. KADE:
25  Q.    I'M AT PARAGRAPH 53, WHICH IS PAGE 9 OF 35 AT

144

1  THE TOP, IF THAT IS HELPFUL, AND PAGE 8 AT THE BOTTOM?
2  A.    OKAY.
3  Q.    SO YOU HAVE TESTIFIED THAT AS A RESULT OF THE
4  RULES, SOME WOMEN WILL LOSE COVERAGE, INSURANCE
5  COVERAGE, FOR PREVENTIVE CONTRACEPTIVE CARE, CORRECT?
6  A.    YES.
7  Q.    DO YOU KNOW HOW MANY RELIGIOUS EMPLOYERS ARE
8  CURRENTLY PROTECTED BY INJUNCTION?
9  A.    I DO NOT.
10  Q.    DO YOU KNOW THAT THOSE EMPLOYERS THAT HAVE
11  INJUNCTIONS ARE NOT CURRENTLY PROVIDING CONTRACEPTIVE
12  COVERAGE?
13  A.    I DO NOT.
14  Q.    ARE YOU AWARE OF THE 2016 ZUBIK INJUNCTION?
15  A.    I'M NOT AWARE OF THAT INJUNCTION.
16  Q.    DO YOU KNOW THAT ENTITIES PROTECTED BY THAT
17  INJUNCTION ARE NOT CURRENTLY PROVIDING CONTRACEPTIVE
18  COVERAGE THEN?
19  A.    AGAIN, NOT FAMILIAR WITH THAT CASE.
20  Q.    DO YOU KNOW THAT THERE WERE EXEMPTIONS TO THE
21  MANDATE BEFORE THE NEW RULE WENT INTO EFFECT?
22  A.    CAN YOU REPHRASE THAT QUESTION?
23  Q.    ARE YOU AWARE THAT EVEN BEFORE THE NEW RULES
24  WENT INTO EFFECT, CERTAIN EMPLOYERS WERE NOT REQUIRED TO
25  PROVIDE CONTRACEPTIVE COVERAGE PURSUANT TO THE MANDATE

Exhibit 137                                                                                    JA-0001828

---

145

```
 1   BECAUSE THEY FELL UNDER ANY ONE OF A NUMBER OF
 2   EXEMPTIONS, LIKE THEY WERE A GRANDFATHERED PLAN, THEY
 3   WERE A CHURCH PLAN, SOMETHING LIKE THAT?
 4   A.      I AM AWARE OF THAT PHENOMENON TO AN EXTENT.
 5   Q.      NONE OF YOUR PATIENTS HAS HAD TO ASK FOR A
 6   CHEAPER FORM OF CONTRACEPTION SINCE THE MANDATE WENT
 7   INTO EFFECT?
 8   A.      I'M NOT SURE THAT THAT IS WHAT I TESTIFIED.
 9           MY TESTIMONY WAS THAT SINCE THE MANDATE
10   WENT INTO EFFECT, THERE HAS BEEN OVERALL MUCH BROADENED
11   ACCESS AND FAR LESS PUSHBACK AGAINST ACCESSING THESE
12   TREATMENTS BASED PURELY ON AFFORDABILITY.
13   Q.      SO SOME OF YOUR PATIENTS HAVE STILL ASKED FOR A
14   CHEAPER FORM OF CONTRACEPTION SINCE THE MANDATE WENT
15   INTO EFFECT?
16   A.      I CAN RECALL SOME, BASED ON SOME OF THE
17   INDIVIDUAL VARIATION IN COVERAGE IN TERMS OF GENERIC
18   FORMS OF THE BIRTH CONTROL PILL OR VERSUS BRAND NAMES,
19   BUT IN GENERAL AND ON BALANCE, THIS HAS BEEN FAR LESS OF
20   A PROBLEM POST MANDATE THAN PRE MANDATE.
21   Q.      SO POST MANDATE, IN A POST MANDATE WORLD, WERE
22   ANY OF THE PATIENTS THAT YOU HAD THAT WERE PUSHING BACK
23   ON COST CONCERNS, WERE ANY OF THEM CONCERNED ABOUT THIS
24   BECAUSE OF A DIFFERENCE IN CONTRACEPTIVE COVERAGE FROM
25   THEIR INSURANCE BECAUSE OF AN EXEMPTION?
```

146

```
 1   A.      I DON'T THINK WE HAD THAT LEVEL OF CONVERSATION,
 2   AND I CAN'T -- I COULD NOT SPEAK TO THAT SPECIFICALLY.
 3   Q.      SO YOU ALSO WOULD NOT KNOW IF ANY OF THEM WERE
 4   CONCERNED BECAUSE THEIR EMPLOYER WAS SUBJECT TO AN
 5   INJUNCTION?
 6   A.      I HAVE -- I DO NOT KNOW.
 7   Q.      DR. BUTTS, CAN YOU IDENTIFY A SINGLE WOMAN IN
 8   PENNSYLVANIA WHO HAS LOST CONTRACEPTIVE COVERAGE AS A
 9   RESULT OF THE NEW RULES?
10   A.      AS A RESULT OF THE NEW RULES. I CANNOT IDENTIFY
11   A SPECIFIC INDIVIDUAL PERSON AT THIS MOMENT.
12   Q.      AND CAN YOU IDENTIFY A SINGLE WOMAN IN THE
13   UNITED STATES WHO HAS LOST COVERAGE AS A RESULT OF THE
14   NEW RULES?
15   A.      NOT AT THIS MOMENT, NO.
16   Q.      SO JUST LOOKING BACK AT YOUR DECLARATION,
17   LOOKING AT PARAGRAPH 54 OF YOUR DECLARATION, YOU CANNOT
18   IDENTIFY A SINGLE WOMAN IN PENNSYLVANIA WHOSE COST OF
19   CONTRACEPTIVE CARE WILL RISE AS A RESULT OF THE RULES,
20   RIGHT?
21   A.      NOT A SPECIFIC INDIVIDUAL PERSON AT THIS
22   MOVEMENT IN TIME, NO.
23   Q.      AND LOOKING AT PARAGRAPH 55, YOU CANNOT IDENTIFY
24   A SINGLE WOMAN IN PENNSYLVANIA WHO WILL HAVE THIS
25   BARRIER TO WOMEN'S ACCESS TO AND USE OF THE
```

147

```
 1   CONTRACEPTIVE THAT IS MEDICALLY RECOMMENDED FOR THEM?
 2   A.      WELL, I CAN'T IDENTIFY AT THIS MOMENT, BUT I
 3   THINK CERTAINLY A CONCERN AS A PROVIDER IS THE
 4   POTENTIALLY EXPANDING NATURE OF THESE BARRIERS. SO THE
 5   REASON THAT I CAN'T IDENTIFY SOMEBODY TODAY DOES NOT
 6   MEAN THAT IT MAY NOT BE APPLICABLE TO FUTURE PATIENTS.
 7   Q.      BUT AGAIN, SITTING HERE TODAY, YOU CAN'T
 8   IDENTIFY A SINGLE WOMAN IN PENNSYLVANIA WHO HAS LOST
 9   COVERAGE AS A RESULT OF THE NEW RULES, RIGHT?
10   A.      NOT AT THIS MOMENT.
11   Q.      AND SO ALL OF THE HARMS THAT YOU DESCRIBE IN
12   PARAGRAPHS 54 THROUGH 58 OF YOUR DECLARATION, YOU CANNOT
13   IDENTIFY A SINGLE WOMAN IN PENNSYLVANIA WHO WILL SUFFER
14   THOSE HARMS, CORRECT?
15   A.      AS I SAID BEFORE --
16           MR. GOLDMAN: OBJECTION, YOUR HONOR. THE
17   QUESTION IS A QUESTION ABOUT WHETHER THE DOCTOR CAN
18   IDENTIFY SOMETHING THAT HAS NOT HAPPENED YET. IT'S
19   IMPOSSIBLE TO ANSWER.
20           THE COURT: SUSTAINED.
21   BY MS. KADE:
22   Q.      DR. BUTTS, FOR ALL OF THE HARMS THAT YOU LIST IN
23   PARAGRAPHS 54 THROUGH 58, YOU CANNOT IDENTIFY A SINGLE
24   WOMAN IN PENNSYLVANIA WHO HAS CURRENTLY SUFFERED ANY OF
25   THOSE HARMS, CORRECT?
```

148

```
 1   A.      I'M JUST LOOKING AT THE DOCUMENT AS I CONSIDER
 2   MY ANSWER TO YOUR QUESTION.
 3           MR. GOLDMAN: OBJECTION, YOUR HONOR.
 4   SORRY IT'S LATE, BUT IT'S VAGUE BECAUSE IT'S NOT CLEAR
 5   IF COUNSEL IS ASKING AS A RESULT OF THE RULES OR IN
 6   GENERAL PEOPLE HAVE SUFFERED THOSE CONSEQUENCES.
 7           THE COURT: WELL, THE PROBLEM IS IT'S
 8   COMPOUND. IF ALL OF THE AREAS LISTED IN PARAGRAPH 53,
 9   54 THROUGH 58 -- THAT IS A LOT OF AREAS.
10           MS. KADE: I'M HAPPY TO WALK THROUGH THEM
11   INDIVIDUALLY, YOUR HONOR.
12           THE COURT: GO AHEAD.
13           MS. KADE: OKAY.
14   BY MS. KADE:
15   Q.      OKAY. SO LOOKING AT PARAGRAPH 54, YOU CAN'T
16   IDENTIFY A SINGLE WOMAN IN PENNSYLVANIA WHOSE COSTS FOR
17   CONTRACEPTIVE CARE HAS RISEN, CORRECT?
18           MR. GOLDMAN: OBJECTION. AGAIN, HAS
19   RISEN AT ALL OR AS A RESULT OF ANYTHING ELSE?
20           MS. KADE: AS A RESULT OF THE NEW RULES,
21   CORRECT?
22           THE WITNESS: NO.
23   BY MS. KADE:
24   Q.      AND IN PARAGRAPH 55, YOU CANNOT IDENTIFY A
25   SINGLE WOMAN IN PENNSYLVANIA WHO HAS HAD A BARRIER TO
```

Exhibit 137

JA-0001829

149

1  WOMEN'S ACCESS TO AND USE OF CONTRACEPTIVES THAT IS
2  MEDICALLY RECOMMENDED FOR THEM AS A RESULT OF THE NEW
3  RULES, CORRECT?
4  A.    NO.
5  Q.    AND IN PARAGRAPH 56, YOU CANNOT IDENTIFY A
6  SINGLE WOMAN IN PENNSYLVANIA WHO HAS FACED FINANCIAL
7  HARM OR HAS FACED MEDICAL HARM AS A RESULT OF THE NEW
8  RULES, CORRECT?
9  A.    NO.
10  Q.    AND IN PARAGRAPH 57, YOU CAN'T IDENTIFY A SINGLE
11  WOMAN IN PENNSYLVANIA WHO HAS HAD DISRUPTIONS OF THEIR
12  MEDICAL TREATMENT AS A RESULT OF THE NEW RULES, CORRECT?
13  A.    CORRECT.
14  Q.    AND IN PARAGRAPH 58, YOU CANNOT IDENTIFY A
15  SINGLE WOMAN IN PENNSYLVANIA WHO HAS FACED UNINTENDED
16  PREGNANCY AND OTHER ADVERSE MEDICAL CONSEQUENCES AS A
17  RESULT OF THESE NEW RULES, CORRECT?
18  A.    CORRECT.
19  Q.    SO ZOOMING OUT A LITTLE BIT TO CONTRACEPTIVES IN
20  GENERAL, CONTRACEPTIVES ARE USED BY BOTH MEN AND WOMEN,
21  CORRECT?
22  A.    YES.
23  Q.    ARE YOU AWARE THAT SOME EMPLOYERS ONLY HAVE
24  SINCERE RELIGIOUS OR MORAL OBJECTIONS TO JUST A SUBSET
25  OF THE RANGE OF AVAILABLE BIRTH CONTROL METHODS?

150

1              MR. GOLDMAN:  OBJECTION, YOUR HONOR.  I
2  DON'T KNOW HOW THE WITNESS WOULD KNOW WHETHER SOMEONE'S
3  OBJECTION IS SINCERE OR NOT.
4              THE COURT:  SUSTAINED.  SUSTAINED.  IT'S
5  ALSO BEYOND THE SCOPE.
6  BY MS. KADE:
7  Q.    DR. BUTTS, THE COST OF PREGNANCIES THAT USE
8  PRENATAL CARE, THOSE ARE TYPICALLY COVERED BY INSURANCE;
9  IS THAT RIGHT?
10  A.    YES.
11  Q.    AND THAT COVERAGE DOES NOT VARY DEPENDING ON
12  WHETHER IT IS AN INTENDED OR UNINTENDED PREGNANCY,
13  RIGHT?
14  A.    WHETHER -- YOU ARE ASKING ME WHETHER INSURANCE
15  COVERAGE VARIES WHETHER THE PERSON INTENDED OR DID NOT
16  INTEND TO BECOME PREGNANT?
17  Q.    CORRECT.
18              MR. GOLDMAN:  JUDGE, IF I MAY OBJECT, I
19  BELIEVE THIS IS BEYOND THE SCOPE OF THE DIRECT.
20              THE COURT:  SUSTAINED.
21              MS. KADE:  IT IS WITHIN THE SCOPE OF HER
22  DECLARATION.  SHE TALKS ABOUT THE COSTS OF UNINTENDED
23  PREGNANCIES.
24              THE COURT:  WHERE IS -- POINT ME TO THAT.
25              MS. KADE:  PARAGRAPH 58:  SOME OF THESE

151

1  WOMEN WILL FACE UNINTENDED PREGNANCY AND OTHER ADVERSE
2  MEDICAL CONSEQUENCES, AND THE COST OF THESE UNINTENDED
3  PREGNANCIES IS THE BASIS OF --
4              THE COURT:  WAIT, WAIT, STOP.
5              MS. KADE:  I APOLOGIZE.
6              THE COURT:  WHICH PARAGRAPH ARE YOU
7  READING?
8              MS. KADE:  IN PARAGRAPH 58, DR. BUTTS
9  SAYS:  SOME OF THESE WOMEN WILL FACE UNINTENDED
10  PREGNANCIES AND OTHER ADVERSE MEDICAL CONSEQUENCES.
11              THE COURT:  THAT IS ALL IT SAYS.
12              MS. KADE:  AND THE HARM THAT PLAINTIFFS
13  ARE ALLEGING IN THEIR COMPLAINT IS -- THE COST OF
14  UNINTENDED PREGNANCIES IS ONE OF THEIR ALLEGATIONS.
15              THE COURT:  YOUR QUESTION WAS ABOUT
16  INSURANCE COVERAGE.
17              MS. KADE:  MY NEXT QUESTION IS GOING TO
18  BE ABOUT THE COST OF COVERING UNINTENDED PREGNANCIES ARE
19  COVERED BY AN EMPLOYEE'S HEALTH PLAN.  SO IT WOULD NOT
20  BE BORNE BY THE STATE, YOUR HONOR.
21              MR. GOLDMAN:  YOUR HONOR, THIS GOES FAR
22  BEYOND THE DIRECT OR THE DECLARATION.
23              THE COURT:  SUSTAINED.  MOVE ON.
24  BY MS. KADE:
25  Q.    DR. BUTTS, HAVE YOU READ THE RULES THAT ARE AT

152

1  ISSUE IN THIS CASE IN THEIR ENTIRETY?
2  A.    I HAVE REVIEWED THE RULES, YES.
3  Q.    HAVE YOU READ ALL OF THE EVIDENCE THAT THE RULES
4  RELY UPON?
5  A.    CAN YOU CLARIFY THAT QUESTION?
6  Q.    SO THE RULES CITE DIFFERENT EVIDENCE AND STUDIES
7  THROUGHOUT THE RULES.  HAVE YOU READ ALL OF THOSE
8  STUDIES?
9  A.    NO.
10  Q.    AND YOU HAVE NOT BEEN PRESENTED TO THIS COURT AS
11  AN EXPERT ON INSURANCE MARKETPLACES, RIGHT?
12  A.    NO, I HAVE NOT.
13  Q.    AND I HAVE NOT BEEN PRESENTED TO THIS COURT AS
14  AN EXPERT ON THE GOVERNMENT'S DECISION-MAKING PROCESS
15  UNDER THE ADMINISTRATIVE PROCEDURE ACT, RIGHT?
16  A.    NO, I HAVE NOT.
17  Q.    THANK YOU, DR. BUTTS.
18              MS. KADE:  THANK YOU, YOUR HONOR.
19              THE WITNESS:  THANK YOU.
20              THE COURT:  ANY REDIRECT?
21              MR. GOLDMAN:  YES, YOUR HONOR.
22              REDIRECT EXAMINATION
23  BY MR. GOLDMAN:
24  Q.    DR. BUTTS, IF -- SINCE THE RULES WENT INTO
25  EXISTENCE, IF A PATIENT CAME TO YOU AND TOLD YOU THAT

Exhibit 137                                                                                      JA-0001830

153

1   THEY COULD NOT AFFORD THE PRESCRIPTION YOU GAVE THEM,
2   WOULD YOU NECESSARILY KNOW THAT IT WAS BECAUSE THEY LOST
3   COVERAGE UNDER THE RULES?
4   A.      I WOULD NOT NECESSARILY KNOW THAT WITHOUT A
5   SIGNIFICANT INVESTIGATION INTO THE REASON FOR THE LOSS,
6   WHICH USUALLY INVOLVES SOMEBODY WITH EXPERTISE IN
7   BILLING AND COVERAGE TO HELP WITH THAT INVESTIGATION.
8   Q.      DO YOU KNOW IF A PATIENT WHO CAME TO YOU WOULD
9   EVEN KNOW THAT THE REASON THEIR PRESCRIPTION ALL OF A
10  SUDDEN HAD A CO-PAY WAS BECAUSE OF THESE NEW RULES?
11  A.      I'M NOT SURE THEY WOULD.
12  Q.      YOU AGREED WITH COUNSEL THAT CONTRACEPTIVES ARE
13  USED FOR BOTH MEN AND WOMEN.  ARE PRESCRIPTION
14  CONTRACEPTIVES USED BY BOTH MEN AND WOMEN?
15  A.      NO.  JUST WOMEN.
16  Q.      THE WOMEN WHO -- AGAIN, ONLY IF YOU KNOW, WHO
17  CAME BACK TO YOU POST ACA, OR MAY HAVE, WHO HAD CONCERNS
18  AND HAD TO REJECT THEIR PRESCRIPTIONS, DO YOU KNOW IF
19  THOSE WOMEN WERE PRIVATELY INSURED?
20  A.      POST ACA OR --
21  Q.      YES.
22  A.      POST ACA WITH CONCERNS.  I BELIEVE, AGAIN, TO
23  THE BEST OF MY RECOLLECTION THAT MANY WERE.
24  Q.      DO YOU KNOW THE PERCENT OF WOMEN WHO SUFFER FROM
25  UNINTENDED PREGNANCY IN PENNSYLVANIA?

154

1   A.      I BELIEVE THAT NUMBER IS 53 PERCENT.
2   Q.      AND DO YOU KNOW IF THAT IS HIGHER OR LOWER THAN
3   THE NATIONAL AVERAGE?
4   A.      ACCORDING TO DATA FROM THE GUTTMACHER INSTITUTE,
5   WHICH IS A CLEARINGHOUSE FOR INFORMATION ABOUT
6   REPRODUCTIVE HEALTH AND PREGNANCY, IT IS HIGHER, AS THE
7   NUMBER IN THE UNITED STATES IS 45 PERCENT.
8   Q.      AND IS THAT INFORMATION AVAILABLE ON THE WEBSITE
9   OF THE GUTTMACHER INSTITUTE?
10  A.      IT IS.
11  Q.      ONE OTHER LAST LINE OF QUESTIONING I JUST WANT
12  TO CLARIFY.
13          COUNSEL ASKED YOU WHAT YOU REVIEWED PRIOR
14  TO YOUR TESTIMONY.  IN ADDITION TO YOUR RÉSUMÉ, DID YOU
15  ALSO REVIEW YOUR PATIENT RECORDS?
16  A.      I REVIEWED MY PATIENT RECORDS IN AN ATTEMPT TO
17  GET AN UNDERSTANDING OF PRACTICE PATTERNS OVER TIME AND
18  FLUCTUATIONS, BASED ON THE NATURE OF THIS CASE.
19  Q.      AND DID YOU LOOK AT THOSE PATIENT RECORDS FOR A
20  TIME PERIOD BEFORE THE AFFORDABLE CARE ACT?
21  A.      I DID.
22  Q.      DID YOU ALSO LOOK AT THE RECORDS FOR AFTER THE
23  AFFORDABLE CARE ACT?
24  A.      I DID.
25  Q.      DID YOU NOTICE ANY TRENDS WITH RESPECT TO WHAT

155

1   PRESCRIPTIONS PATIENTS WERE FILLING?
2   A.      SO THE DATA THAT I CAN SPEAK TO WITH THE MOST --
3   IN THE MOST DEPTH WOULD PERTAIN TO THE MIRENA IUD.  AND
4   I CAN TELL YOU, IN MY OWN INDIVIDUAL PRACTICE, WHICH I
5   THINK REFLECTS OTHERS, BUT I CERTAINLY CANNOT SPEAK TO
6   ANYONE ELSE'S PRACTICE WITH AS MUCH ACCURACY AS MY OWN,
7   IN MY OWN PRACTICE, PRIOR TO THE ACA AND AFTER, THERE
8   HAS BEEN A FIVEFOLD INCREASE IN THE NUMBER OF MIRENA
9   IUD'S I HAVE INSERTED INTO -- INSERTED IN PATIENTS IN MY
10  PRACTICE.  SO A SIGNIFICANTLY ELEVATED INCREASE OVER
11  TIME.
12  Q.      SO PRE AND POST ACA, THE NUMBER OF PATIENTS WHO
13  HAVE HAD A MIRENA IUD IMPLANTED INCREASED FIVE TIMES?
14  A.      YES, IN MY PRACTICE.
15  Q.      AND HAVE YOUR PRESCRIBING PRACTICES CHANGED
16  SIGNIFICANTLY OVER THOSE YEARS?
17  A.      MY MANAGEMENT OF THE CONDITIONS FOR WHICH I
18  UTILIZE THIS TREATMENT HAS NOT CHANGED, NOR HAS THE
19  EVIDENCE SUPPORTING THE USE OF A MIRENA IUD FOR THESE
20  TREATMENTS.  THE BULK OF THE EVIDENCE SUPPORTING THIS AS
21  AN EXCELLENT AND OUTSTANDING TREATMENT FOR CHRONIC
22  PELVIC PAIN AND HAVING MENSTRUAL BLEEDING WAS WELL
23  ESTABLISHED PRIOR TO THE MANDATE.  SO MY PRACTICE
24  APPROACH AND THE EVIDENCE WERE ESTABLISHED WELL BEFORE
25  THE MANDATE.

156

1   Q.      SO TO WHAT DO YOU ATTRIBUTE THIS FIVEFOLD
2   INCREASE IN YOUR PATIENTS WHO ARE NOW USING MIRENA IUD'S
3   MORE EFFECTIVE FORM OF BIRTH CONTROL SINCE THE ACA WENT
4   INTO EFFECT?
5   A.      OF COURSE, IT CAN BE MULTIFACTORIAL.  I THINK
6   ONE OF THE FACTORS THAT WE HAVE TO CONSIDER AS
7   INCREDIBLY INFLUENTIAL IS THE ACCESS GRANTED TO WOMEN TO
8   UTILIZE THIS TREATMENT AS A BYPRODUCT OF THE MANDATE.
9   Q.      COST?
10  A.      YES.  SIGNIFICANT REDUCTION, ELIMINATION OF
11  COSTS SUCH THAT WOMEN CAN NOW GET ACCESS TO SOMETHING
12  THAT I HAVE ALWAYS HAD IN MY MIND TO UTILIZE FOR THEIR
13  CARE, JUST HAVE A GREATER ABILITY TO DO SO.
14  Q.      DO YOU KNOW IF THAT IS THE PRIMARY REASON FOR
15  THE FIVEFOLD INCREASE, DO YOU KNOW?
16  A.      I MEAN, AGAIN, I THINK IT IS CERTAINLY
17  MULTIFACTORIAL, BUT IN MY OPINION, BASED ON THE THINGS I
18  MENTIONED ABOUT MY APPROACH TO CARE FOR THESE PATIENTS
19  AND THE EVIDENCE, NOT SIGNIFICANTLY CHANGING SINCE THE
20  MANDATE, I WOULD HAVE TO CONCEDE THAT THE MANDATE IS A
21  PRIMARY DRIVING FORCE FOR THE FIVEFOLD INCREASED
22  UTILIZATION OF MIRENA IUDS IN MY PRACTICE.
23          MR. GOLDMAN: NOTHING FURTHER, YOUR
24  HONOR.
25          THE COURT:  OKAY.  ONE QUESTION, I HAVE

Exhibit 137                                                                          JA-0001831

157

1  ONE QUESTION. WHAT PERCENTAGE OF YOUR PATIENTS ARE FROM
2  PENNSYLVANIA?
3          THE WITNESS: THE MAJORITY. IF I COULD
4  GIVE YOU A NUMBER, I WOULD SAY PROBABLY 80 PERCENT OR
5  MORE.
6          THE COURT: OKAY. THANK YOU, YOU CAN
7  LEAVE THE STAND.
8          THE WITNESS: THANK YOU.
9          (WITNESS EXCUSED.)
10          THE COURT: IT IS NOW 12:30, WHICH IS A
11  PERFECT TIME FOR LUNCH. WHAT WE WILL DO IS WE WILL HAVE
12  LUNCH BREAK FOR AN HOUR AND WE WILL BE BACK AT 1:30, AND
13  WHEN WE COME BACK, I UNDERSTAND THAT YOU HAVE BEEN DOING
14  THE RESEARCH ON THE GRANDFATHERING. I HAVE SEEN YOU
15  RUNNING AROUND.
16          MR. HEALY: APOLOGIZE FOR THE RUNNING
17  AROUND.
18          THE COURT: NOT A PROBLEM. I'M HAPPY TO
19  SEE THAT YOU'RE DOING IT. SO I WILL TALK TO YOU AFTER
20  THE THIRD AND FINAL WITNESS FROM THE COMMONWEALTH.
21  THANK YOU.
22          THE CLERK: ALL RISE.
23          (LUNCHEON BREAK TAKEN.)
24          MS. BOLAND: OUR NEXT WITNESS IS CYNTHIA
25  CHUANG.

158

1          MR. GOLDMAN: YOUR HONOR, IF I MAY
2  ADDRESS A QUICK PROCEDURAL MATTER WITH THE COURT. MAY I
3  APPROACH, YOUR HONOR?
4          THE COURT: YOU MAY.
5          MR. GOLDMAN: I HAVE A DOCUMENT THAT I
6  WOULD LIKE TO BE ABLE TO PASS UP TO YOUR HONOR. THIS IS
7  A DOCUMENT THAT IS CITED IN OUR COMPLAINT WITH A
8  HYPERLINK AT PARAGRAPH 99.
9          THE COURT: OKAY.
10          MR. GOLDMAN: SO THE COMMONWEALTH WOULD
11  LIKE TO MOVE THIS DOCUMENT INTO EVIDENCE ALONG WITH THE
12  ATTACHMENT WHICH IS PART OF THE ARTICLE. WE APPROACHED
13  THE GOVERNMENT DURING BREAK, AND I BELIEVE THEY WILL
14  STIPULATE TO THE AUTHENTICITY AND ADMISSIBILITY OF THE
15  ARTICLE, BUT NOT TO THE ATTACHMENT.
16          THE COURT: WHAT DO YOU THINK THE
17  ATTACHMENT IS?
18          MR. GOLDMAN: THE ARTICLE SAYS THAT IT IS
19  A LEAKED COPY OF THE RULES, THE DRAFT RULES THAT ARE
20  BEFORE US NOW.
21          THE COURT: SO LET ME -- LET'S ASSUME --
22          LET ME HEAR FROM YOU JUST ON THE
23  PROCEDURAL MATTER OF WHAT YOU'RE OBJECTING TO HERE. YOU
24  ARE OKAY WITH THE ARTICLE BUT NOT THE ATTACHMENT.
25          MS. KADE: THANK YOU, YOUR HONOR. YES.

159

1  THE ATTACHMENT, WE WERE JUST HANDED THIS, YOU KNOW,
2  125-PAGE DOCUMENT, SO WE ARE NOT ABLE TO STIPULATE AS TO
3  THE AUTHENTICITY OF IT AT THIS POINT, BUT WE ALSO ARE
4  NOT ABLE TO STIPULATE TO THE ADMISSIBILITY OF IT BECAUSE
5  IT'S CLEARLY LABELED CONFIDENTIAL DRAFT AND COVERED BY
6  PRIVILEGES. SO WE ARE NOT ABLE TO STIPULATE TO EITHER
7  THE AUTHENTICITY OR THE ADMISSIBILITY AT THIS POINT.
8          THE COURT: I ACCEPT THAT YOU ARE NOT
9  ABLE TO DO IT. I'M NOT SURE WHETHER YOU ARE RIGHT WITH
10  RESPECT TO THE CONFIDENTIALITY AND DRAFT, THAT COMPONENT
11  OF WHAT YOU JUST SAID.
12          SO WHAT IS THE POINT OF THIS IN THE
13  CONTEXT OF THIS PRELIMINARY INJUNCTION HEARING? I MEAN,
14  IT'S NOT THE REGULATIONS. I DON'T KNOW WHAT IT IS. AND
15  THEN THERE IS A VOX ARTICLE. SO HOW DOES IT PERTAIN TO
16  WHAT WE ARE DOING HERE?
17          MR. GOLDMAN: RIGHT. SO -- AND THIS IS
18  PART OF THE REASON WHY WE STATED IT IN OUR COMPLAINT, WE
19  CITED IT. SO THIS -- IT'S A PUBLIC DOCUMENT NOW, NO
20  MATTER WHAT IT SAYS ON IT. WE DIDN'T CHANGE IT. IT IS
21  EXACTLY WHAT WAS ATTACHED TO THE ARTICLE, BUT IT
22  PURPORTS TO BE A DRAFT OF THE REGULATIONS WHICH WAS
23  LEAKED. IT IS -- I HAVE NOT LINED IT UP AGAINST THE
24  ACTUAL FINAL REGULATIONS, BUT THEY ARE REMARKABLY
25  SIMILAR. AND SO IF YOU ARE LOOKING AT WHAT THE AGENCIES

160

1  WERE DOING IN TERMS OF RULE MAKING AND CONSIDERATION,
2  YOU CAN LOOK -- WELL, AT THIS MOMENT IN TIME, THIS IS
3  WHAT PURPORTS TO BE A DRAFT. LATER IN TIME, THERE IS
4  THESE -- THERE HAS BEEN NO -- THERE WERE NO DRAFT RULES
5  PUT FORTH FOR COMMENT, FOR NOTICE OR COMMENT. SO YOU
6  CAN LOOK AT WHAT CHANGES, IF ANY, TOOK PLACE BETWEEN
7  THIS POINT IN TIME, THE ARTICLE IS MAY 31, AND WHEN THE
8  RULES WERE ACTUALLY PROMULGATED.
9          THE COURT: THAT IS AN INTERESTING
10  EXERCISE, BUT I STILL DON'T UNDERSTAND WHY IT IS
11  RELEVANT HERE, BECAUSE YOUR POINT IS THAT THE NEW RULES
12  WERE ISSUED WITHOUT NOTICE AND COMMENT AND WITHOUT GOOD
13  CAUSE. SO HOW DOES -- HOW DOES THIS -- I MEAN, ASSUMING
14  THAT THIS IS A DRAFT VERSION OF THE RULES ISSUED SOME
15  MONTHS BEFORE THE FINAL VERSION WAS ISSUED, HOW DOES IT
16  IMPACT ON WHAT WE ARE DOING HERE TODAY, WHICH IS
17  DECIDING THE PRELIMINARY INJUNCTION MOTION?
18          MR. GOLDMAN: COURT'S INDULGENCE, YOUR
19  HONOR, JUST TO CLARIFY.
20          (PAUSE.)
21          MR. GOLDMAN: YES, SO THE BEARAK ARTICLE
22  FROM THE GUTTMACHER INSTITUTE WAS A FOOTNOTE TO THE
23  RULES IN THE IFRS, AND THE GOVERNMENT IS TAKING THE
24  POSITION THAT THE RULES HAVE RELIED HEAVILY ON THIS
25  ARTICLE, WHICH IS IN THE FOOTNOTE OF THE FINAL.

Exhibit 137                                                                JA-0001832

161

1  THE ISSUE HERE IS, IN THIS DRAFT, IT'S
2  NOT IN HERE BUT THE RULES ARE THE SAME.
3  THE COURT:  OKAY.  WELL, I DON'T THINK I
4  CAN ADMIT THE ATTACHMENT BECAUSE WE DON'T KNOW WHERE IT
5  CAME FROM, WE DON'T -- IT SAYS "DRAFT" ON IT.  IT SAYS
6  "DEPARTMENT OF THE TREASURY" BUT IT CERTAINLY DOES NOT
7  LOOK LIKE THE FORM THE RULES USUALLY TAKE.  I DON'T KNOW
8  WHETHER ONCE THE DOCUMENT IS FINISHED IN THE AGENCY IT
9  THEN GOES OFF TO SOME DEPARTMENT AND GETS TRANSFORMED
10 INTO WHAT THE RULES USUALLY LOOK LIKE, SO I JUST DON'T
11 KNOW WHAT IT IS.  WE DON'T HAVE ANYONE HERE TO TELL US
12 WHAT IT IS, SO I CAN'T ADMIT THAT.
13 AND I THINK THAT THE GOVERNMENT HAS NOT
14 OBJECTED TO THE ARTICLE BEING ADMITTED, CORRECT?
15 MS. KADE:  CORRECT, YOUR HONOR.
16 THE COURT:  I'M HAPPY TO ADMIT THE
17 ARTICLE, BUT I HAVE TO TELL YOU, I DON'T THINK I'M GOING
18 TO RELY ON IT BECAUSE IT'S A NEWSPAPER ARTICLE SAYING
19 THINGS THAT I -- THERE IS JUST NO TESTIMONY TO DETERMINE
20 WHETHER IT IS IN FACT THE CASE.
21 MR. GOLDMAN:  I UNDERSTAND.  MAY I JUST
22 TRY ONE OTHER LINE AND THEN --
23 THE COURT:  GO AHEAD.
24 MR. GOLDMAN:  AND THAT IS JUST THAT WE
25 DON'T KNOW -- WE ARE NOT SAYING THAT THIS IS IN FACT A

162

1  DRAFT OF THE RULES AT THAT TIME.  THIS IS JUST WHATEVER
2  THE ARTICLE SAID.
3  THE COURT:  I UNDERSTAND.  SO WE ARE JUST
4  GOING TO -- WE WILL PUT IT IN THE RECORD IN THE LIMITED
5  WAY THAT IT IS.  WE WILL PUT IT IN THE RECORD, BUT I CAN
6  TELL YOU NOW THAT I WON'T BE RELYING ON IT.
7  MR. GOLDMAN:  FAIR ENOUGH, YOUR HONOR.
8  THE COURT:  OKAY.  YOUR NEXT WITNESS.
9  MS. BOLAND:  MAY I APPROACH?
10 THE COURT:  YOU MAY.
11 MS. BOLAND:  GOOD AFTERNOON, YOUR HONOR.
12 IT'S NICOLE BOLAND AGAIN FROM THE COMMONWEALTH, AND WE
13 CALL DR. CYNTHIA CHUANG.
14 MS. KOPPLIN:  YOUR HONOR, WE WOULD OBJECT
15 TO THIS WITNESS AS CUMULATIVE.
16 THE COURT:  OKAY.  HOLD ON A SEC AND LET
17 ME -- BEFORE YOU DO, LET ME JUST HAVE HER SWORN.
18 (CYNTHIA CHUANG, COMMONWEALTH'S WITNESS,
19 SWORN.)
20 THE CLERK:  PLEASE STATE AND SPELL YOUR
21 NAME FOR THE RECORD.
22 THE WITNESS:  CHUANG IS SPELLED
23 C-H-U-A-N-G.
24 THE COURT:  OKAY.  BEFORE I ADDRESS YOUR
25 OBJECTION, GIVE ME IN A NUTSHELL WHAT YOU INTEND TO

163

1  ELICIT FROM THIS WITNESS.
2  MS. BOLAND:  SURE, YOUR HONOR.
3  DR. CHUANG WAS ACTUALLY THE LEAD AUTHOR ON THE "MY NEW
4  OPTIONS" STUDY THAT DR. WEISMAN PREVIOUSLY TESTIFIED
5  ABOUT, SO SHE CAN OFFER ADDITIONAL INFORMATION ABOUT
6  THAT STUDY.  AND WE ALSO HAVE A DEMONSTRATIVE EXHIBIT
7  REFLECTING THOSE FINDINGS.
8  THE COURT:  IS THE "MY NEW" STUDY THE
9  PENNSYLVANIA STUDY THAT WEISMAN TALKED ABOUT?
10 MS. BOLAND:  YES.
11 THE COURT:  OKAY.  THE ONE THAT IS NOT
12 PUBLISHED YET.
13 MS. BOLAND:  CORRECT, YOUR HONOR.  AND
14 DR. CHUANG IS ACTUALLY THE LEAD, AND THERE'S A FEW
15 POINTS TO CLARIFY WITH RESPECT TO THE PRIOR TESTIMONY.
16 AND ALSO, DR. CHUANG IS A PRACTICING PHYSICIAN SO SHE
17 HAS THE CLINICAL PERSPECTIVE THAT DR. WEISMAN DID NOT
18 OFFER PREVIOUSLY.
19 THE COURT:  OKAY.  DO YOU INTEND TO GO
20 OVER ALL THE FACTS THAT YOU HAVE ALREADY GONE OVER WITH
21 PROFESSOR WEISMAN?
22 MS. BOLAND:  REGARDING THE "MY NEW
23 OPTIONS" STUDY?
24 THE COURT:  YES.
25 MS. BOLAND:  TO A SMALL DEGREE, JUST FOR

164

1  CLARIFICATION OF SOME DATES OF THE STUDY.  SHE IS MORE
2  PREPARED TO SPEAK TO MORE OF THE DETAILS OF THE STUDY.
3  I WON'T GO IN DEPTH AND REPEAT EVERYTHING THAT
4  DR. WEISMAN SAID, BUT JUST A VERY GENERAL OVERVIEW OF
5  THE STUDY AND JUST TO CLARIFY THE TIME FRAMES OF THE
6  STUDY FOR THE RECORD.
7  THE COURT:  OKAY.  WHAT IS YOUR
8  RATIONALE FOR --
9  MS. KOPPLIN:  YOUR HONOR, AS PLAINTIFFS'
10 COUNSEL ALLUDES TO, THE TESTIMONY WOULD BE HIGHLY
11 DUPLICATIVE OF WHAT PROFESSOR WEISMAN AND DR. BUTTS HAVE
12 ALREADY TESTIFIED TO.  BASED ON THE WITNESS'
13 DECLARATION, SHE REACHES MANY OF THE SAME CONCLUSIONS
14 AND RELIES ON MUCH OF THE SAME EVIDENCE.
15 SPECIFICALLY I WOULD POINT YOU TOWARDS,
16 IN THE THIRD CIRCUIT, ROBERT V STETSON SCHOOL INC.,
17 THAT'S 256 F.3D 159, WHERE THE EXCLUSION OF AN EXPERT
18 WAS UPHELD ON CUMULATIVE GROUNDS WHEN TWO OTHER EXPERTS
19 HAD ALREADY TESTIFIED AT LENGTH ON THE SAME ISSUE.
20 THE COURT:  OKAY.  I UNDERSTAND THAT
21 PRECEDENT, BUT, YOU KNOW, THERE IS NO REASON WHY IT
22 APPLIES HERE.  AND WE ARE ALL HERE, WE ARE ALL FRIENDS
23 HERE.  YOU KNOW, WE MIGHT AS WELL JUST GO FOR IT.  WE
24 DON'T HAVE A JURY SO THEY CAN'T BE PREJUDICED BY WHAT WE
25 ARE ABOUT TO HEAR.  IT'S ONLY ME.

Exhibit 137                                                                                    JA-0001833

165

1    OKAY. GO AHEAD.

2    MS. BOLAND: THANK YOU, YOUR HONOR.

3    DIRECT EXAMINATION

4    BY MS. BOLAND:

5    Q.    JUST A FEW HOUSEKEEPING MATTERS TO START OFF.

6    DR. CHUANG, WILL YOU KINDLY REFER TO

7    TAB 6 IN THE BINDER?

8    A.    YES.

9    Q.    CAN YOU IDENTIFY THAT DOCUMENT FOR THE COURT,

10   PLEASE?

11   A.    YES, THAT IS MY DECLARATION.

12   Q.    WILL YOU JUST KINDLY FLIP THROUGH AND TELL US IF

13   IT APPEARS TO BE COMPLETE AND ACCURATE?

14   A.    YES.

15   Q.    GREAT. I WOULD LIKE TO POINT YOU NOW TO TAB 7.

16   WILL YOU KINDLY IDENTIFY THAT DOCUMENT FOR THE COURT?

17   A.    YES, THAT IS MY CV.

18   Q.    AND WILL YOU KINDLY JUST FLIP THROUGH AND

19   CONFIRM THAT IT IS COMPLETE AND ACCURATE.

20   A.    YES.

21   Q.    GREAT. THANK YOU, DOCTOR.

22   SO THE COURT HAS YOUR CV TO CONSIDER.

23   I'M NOT GOING TO REVIEW EVERYTHING ON IT BUT I DO WANT

24   TO HIGHLIGHT A FEW POINTS.

25   TO START OFF, WHO'S YOUR EMPLOYER?

166

1    A.    I WORK AT THE PENN STATE HERSHEY MEDICAL CENTER.

2    Q.    AND HOW ARE YOU EMPLOYED AT PENN STATE HERSHEY?

3    A.    I'M A PHYSICIAN THERE. I'M A GENERAL INTERNIST.

4    I'M CHIEF OF THE DIVISION OF GENERAL INTERNAL MEDICINE

5    AND I'M A PROFESSOR OF MEDICINE AND PUBLIC HEALTH

6    SCIENCES.

7    Q.    SO YOU ARE A PRACTICING DOCTOR AND A PROFESSOR?

8    A.    CORRECT.

9    Q.    DO YOU ALSO CONDUCT RESEARCH?

10   A.    I DO.

11   Q.    ARE YOU FAMILIAR WITH THE CONTRACEPTIVE MANDATE?

12   A.    YES, I AM.

13   Q.    WHAT IS YOUR UNDERSTANDING OF THE CONTRACEPTIVE

14   MANDATE?

15   A.    THE MANDATE SAYS THAT FOR MOST PRIVATELY INSURED

16   WOMEN, THAT CONTRACEPTION -- FDA-APPROVED CONTRACEPTION

17   WOULD BE COVERED WITH NO OUT-OF-POCKET COSTS.

18   Q.    AND HAVE YOU RESEARCHED THE CONTRACEPTIVE

19   MANDATE AS PART OF YOUR WORK?

20   A.    YES, I HAVE.

21   Q.    AND BEFORE WE GET INTO THAT RESEARCH, JUST A

22   COUPLE OF QUESTIONS ON YOUR BACKGROUND. WILL YOU JUST

23   VERY BRIEFLY DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR

24   THE COURT?

25   A.    SURE. I COMPLETED MY UNDERGRADUATE TRAINING AT

167

1    THE UNIVERSITY OF MICHIGAN, WHERE I GRADUATED WITH

2    HONORS. I THEN SPENT A YEAR LIVING IN NORTHERN

3    CALIFORNIA WHERE I WORKED IN A FAMILY PLANNING CLINIC

4    FOR A YEAR, PROVIDING REPRODUCTIVE HEALTHCARE SERVICES

5    AT A FAMILY PLANNING CLINIC.

6    I THEN STARTED MEDICAL SCHOOL AT NEW YORK

7    UNIVERSITY, AND FOLLOWING MY MEDICAL DEGREE, I COMPLETED

8    MY INTERNAL MEDICINE RESIDENCY TRAINING AT TEMPLE

9    HOSPITAL HERE IN PHILADELPHIA AS WELL AS MY CHIEF

10   RESIDENCY. THAT WAS IN 2001, AND THEN FOLLOWING THAT, I

11   DID A GENERAL INTERNAL MEDICINE FELLOWSHIP AT BOSTON

12   UNIVERSITY. I DID A GENERAL INTERNAL MEDICAL

13   FELLOWSHIP, WHICH INCLUDED A MASTERS OF EPIDEMIOLOGY AS

14   WELL AS A RESIDENCY IN PREVENTIVE MEDICINE.

15   Q.    DID YOU CONDUCT RESEARCH AS PART OF YOUR

16   FELLOWSHIP?

17   A.    I DID. THE PRIMARY PURPOSE OF THE FELLOWSHIP

18   WAS RESEARCH TRAINING, YES.

19   Q.    AND WHAT WAS THE FOCUS OF YOUR RESEARCH?

20   A.    I HAD ALREADY HAD A STRONG INTEREST IN WOMEN'S

21   HEALTH AND REPRODUCTIVE HEALTHCARE. THE PRIMARY FOCUS

22   OF MY RESEARCH THERE WAS EMERGENCY CONTRACEPTION.

23   Q.    THANK YOU, DOCTOR.

24   I CAN SEE FROM YOUR RÉSUMÉ THAT YOU'VE

25   AUTHORED NUMEROUS SCHOLARLY ARTICLES. DO YOU MIND

168

1    GIVING THE JUDGE JUST A BALLPARK IDEA OF HOW MANY

2    SCHOLARLY ARTICLES YOU HAVE WRITTEN THROUGHOUT YOUR

3    CAREER?

4    A.    I BELIEVE THERE'S 70 PUBLICATIONS RIGHT NOW.

5    Q.    HAVE YOU AUTHORED ANY PUBLICATIONS REGARDING

6    CONTRACEPTION?

7    A.    YES, THAT'S -- PROBABLY THE MAJORITY OF THE

8    PUBLICATIONS ARE ABOUT CONTRACEPTION.

9    Q.    AND CAN YOU JUST KINDLY GIVE SOME EXAMPLES OF

10   SOME OF THE TOPICS THAT WOULD INCLUDE?

11   A.    YEAH, SURE. SO LIKE I SAID, WHEN I STARTED IN

12   MY FELLOWSHIP TRAINING, THE BULK OF ARTICLES AROUND THAT

13   TIME WERE ABOUT EMERGENCY CONTRACEPTION. FOLLOWING

14   THAT, WHEN I CAME TO PENN STATE, MY FOCUS TURNED TOWARD

15   UNINTENDED PREGNANCY AND CONTRACEPTIVE USE IN WOMEN WITH

16   CHRONIC MEDICAL CONDITIONS.

17   THERE IS ALSO SOME PUBLICATIONS ABOUT

18   GESTATIONAL WEIGHT GAIN DURING PREGNANCY, AND THEN MORE

19   RECENTLY, MY PUBLICATIONS ARE ABOUT CONTRACEPTIVE

20   BEHAVIOR AND REPRODUCTIVE LIFE PLANNING AS A TOOL TO

21   ASSIST WITH CONTRACEPTIVE DECISION-MAKING.

22   Q.    AND ARE SOME OF THOSE ARTICLES SPECIFICALLY

23   ABOUT THE CONTRACEPTIVE MANDATE?

24   A.    SEVERAL OF THEM ARE IN THE CONTEXT OF THE

25   CONTRACEPTIVE MANDATE, YES.

Exhibit 137                                                                                                    JA-0001834

169

1  Q.       AND ARE ALL THOSE PUBLICATIONS THE PRODUCT OF
2  RESEARCH THAT YOU'VE PERSONALLY CONDUCTED?
3  A.       YES.
4  Q.       AND SEPARATE FROM THAT WORK, DO YOU ALSO SERVE
5  AS A PEER REVIEWER FOR ARTICLES IN OTHER PUBLICATIONS?
6  A.       YES. I AM FREQUENTLY ASKED TO PEER REVIEW FOR
7  JOURNALS. I'M ON THE EDITORIAL BOARD OF A JOURNAL
8  CALLED WOMEN'S HEALTH ISSUES, SO I REVIEW FOR THEM
9  REGULARLY. AND I'M ALSO FREQUENTLY ASKED BY OTHER
10 JOURNALS TO REVIEW, USUALLY AROUND TOPICS RELATED TO
11 WOMEN'S HEALTH OR PREVENTIVE HEALTHCARE.
12 Q.       I NOTICE FROM YOUR CV THAT YOU ARE AN
13 INVESTIGATOR. AND WHAT DOES IT MEAN TO BE AN
14 INVESTIGATOR?
15 A.       IT MEANS YOU ARE A RESEARCHER.
16 Q.       AND HOW ARE YOUR PROJECTS FUNDED WHEN YOU DO
17 INVESTIGATIONS?
18 A.       SO RESEARCH CAN BE FUNDED IN ANY NUMBER OF WAYS.
19 THEY CAN BE FUNDED THROUGH THE FEDERAL GOVERNMENT LIKE
20 THROUGH THE NATIONAL INSTITUTES OF HEALTH OR THE CDC,
21 FOR EXAMPLE. THERE'S ALSO SOME NONFEDERAL AGENCIES LIKE
22 PCORI, WHICH IS THE PATIENT-CENTERED OUTCOMES RESEARCH
23 INSTITUTE WHERE SOME OF MY WORK WAS BEEN FUNDED, AS WELL
24 AS THE NIH. IT CAN BE FUNDED BY PRIVATE FOUNDATIONS.
25 IT CAN BE FUNDED ALSO BY INSTITUTIONS, BUT SO --

170

1  ACADEMIC INSTITUTIONS.
2  Q.       ABOUT HOW MANY PROJECTS HAVE YOU BEEN INVOLVED
3  IN AS AN INVESTIGATOR THROUGHOUT YOUR CAREER?
4  A.       I THINK ABOUT 20.
5  Q.       AND HAVE THOSE PROJECTS BEEN FUNDED BY GRANTS?
6  A.       YES, THOSE ARE ALL THE ONES THAT ARE FUNDED.
7  Q.       DO YOU HAVE ANY OFFICIAL ROLES AT HERSHEY WITH
8  REGARD TO RESEARCH?
9  A.       LIKE I MENTIONED EARLIER, I'M THE CHIEF OF THE
10 DIVISION OF GENERAL INTERNAL MEDICINE SO I OVERSEE ALL
11 ASPECTS OF THE DIVISION, INCLUDING THE RESEARCH
12 ACTIVITIES IN THE DIVISION.
13           PRIOR TO BECOMING DIVISION CHIEF TWO
14 YEARS AGO, I WAS THE ASSOCIATE DIRECTOR FOR RESEARCH FOR
15 THE DIVISION. I'M ALSO THE RESEARCH DIRECTOR FOR THE
16 PENN STATE BIRCWH PROGRAM. BIRCWH STANDS FOR BUILDING
17 INTERDISCIPLINARY RESEARCH CAREERS IN WOMEN'S HEALTH,
18 WHICH IS AN NIH-FUNDED PROGRAM TO HELP PROVIDE SUPPORT
19 FOR JUNIOR INVESTIGATORS TRYING TO BUILD THEIR CAREERS
20 IN WOMEN'S HEALTH RESEARCH.
21 Q.       HAVE ANY OF YOUR PROJECTS INVOLVED THE IMPACT OF
22 THE CONTRACEPTIVE MANDATE?
23 A.       YES.
24 Q.       CAN YOU TELL US ABOUT A PROJECT TO THAT EFFECT?
25 A.       SURE. SO THE PROJECT THAT WAS REFERRED TO

171

1  EARLIER, THE "MY NEW OPTIONS" STUDY, IS A STUDY THAT WAS
2  FUNDED BY PCORI, THE PATIENT-CENTERED OUTCOMES RESEARCH
3  INSTITUTE. AND THE "MY NEW OPTIONS" STUDY WAS A
4  TWO-YEAR STUDY WHERE WE LOOKED AT THE EFFECT OF
5  WEB-BASED CONTRACEPTIVE INTERVENTIONS TO SEE IF THEY
6  HELPED WOMEN WITH THEIR CONTRACEPTIVE DECISION-MAKING.
7  Q.       OKAY. WE WILL DISCUSS THAT PROJECT A LITTLE BIT
8  MORE AT LENGTH IN A FEW MINUTES.
9            I WANTED TO TURN NOW TO YOUR MEDICAL
10 PRACTICE. IN ADDITION TO YOUR WORK AS A PROFESSOR, YOU
11 TESTIFIED THAT YOU ALSO MAINTAIN AN ACTIVE MEDICAL
12 PRACTICE; IS THAT RIGHT, DOCTOR?
13 A.       CORRECT.
14 Q.       WHERE IS YOUR PRACTICE LOCATED?
15 A.       I PRACTICE AT THE HERSHEY MEDICAL CENTER, AT THE
16 INTERNAL MEDICINE EAST CLINIC, WHICH IS LOCATED AT 35
17 HOPE DRIVE IN HERSHEY.
18 Q.       AND WHAT KIND OF PRACTICE DO YOU HAVE?
19 A.       IT'S AN INTERNAL MEDICINE PRACTICE, SO IT'S
20 ADULT PRIMARY CARE. MY PRACTICE HAS MOSTLY WOMEN
21 PATIENTS, AND SO ADULT WOMEN.
22 Q.       HOW LONG HAVE YOU BEEN PRACTICING MEDICINE?
23 A.       WELL, I GRADUATED FROM MEDICAL SCHOOL 20 YEARS
24 AGO, SO 20 YEARS.
25 Q.       AND ARE CONTRACEPTIVES PART OF YOUR MEDICAL

172

1  PRACTICE?
2  A.       YES.
3  Q.       HOW SO?
4  A.       ANY TIME I HAVE A FEMALE PATIENT WHO'S OF
5  REPRODUCTIVE AGE WHO'S CAPABLE OF PREGNANCY, IT'S A PART
6  OF EVERY VISIT TO DISCUSS WHAT HER DESIRES ARE AROUND
7  PREGNANCY OR -- EITHER ACHIEVING PREGNANCY OR AVOIDING
8  PREGNANCY, AND SO OBVIOUSLY, CONTRACEPTION BECOMES AN
9  IMPORTANT PART OF THAT CONVERSATION.
10 Q.       THANK YOU.
11           MS. BOLAND: AT THIS TIME, YOUR HONOR, I
12 WOULD LIKE TO OFFER DR. CHUANG AS AN EXPERT IN THE AREAS
13 OF PREVENTATIVE MEDICAL CARE FOR WOMEN, INCLUDING
14 CONTRACEPTIVE CARE.
15           MS. KOPPLIN: WE WOULD OBJECT TO THAT,
16 YOUR HONOR.
17           THE COURT: REASON?
18           MS. KOPPLIN: FIRST, FOR THE SAME REASONS
19 AS THE OTHER EXPERTS. THIS EXPERT WAS NOT DISCLOSED TO
20 US AS REQUIRED BY FEDERAL RULE OF CIVIL PROCEDURE 26(A)
21 OR FEDERAL RULES OF EVIDENCE 702, 703 AND 705. AND
22 SECOND, FOR THE SAME AS THE OTHER EXPERTS, IT'S IMPROPER
23 TO ADMIT EXPERT EVIDENCE TO THE EXTENT THAT IT IS BEING
24 USED TO DETERMINE THE CORRECTNESS OR WISDOM OF AN
25 AGENCY'S DECISION IN AN APA CASE.

Exhibit 137                                                                                                    JA-0001835

173

1    THE COURT: ARE YOU GOING TO USE HER --
2  IS SHE GOING TO ISSUE AN OPINION ON THE CORRECTNESS OF
3  THE AGENCY IN COMING UP WITH THE EXEMPTIONS?
4    MS. BOLAND: NO, YOUR HONOR.
5    THE COURT: SO THAT PARTICULAR OBJECTION
6  IS MOOT, I THINK, AND THEN WITH RESPECT TO THE RULE 26
7  OBJECTION, OVERRULING YOU ON THAT ONE.
8    GO AHEAD.
9  BY MS. BOLAND:
10  Q.    DR. CHUANG, SINCE CONTRACEPTIVES PLAY A ROLE IN
11  YOUR PRACTICE, DO YOU COUNSEL PATIENTS REGARDING
12  CONTRACEPTIVE OPTIONS?
13  A.    YES, I DO.
14  Q.    AND WHAT ARE SOME CONSIDERATIONS THAT GO INTO
15  RECOMMENDING A PARTICULAR CONTRACEPTION?
16  A.    WELL, THERE IS MANY THINGS TO CONSIDER, AND SO,
17  LIKE I MENTIONED EARLIER, IF A WOMAN IS INTENDING TO
18  BECOME PREGNANT OR TRYING TO AVOID PREGNANCY AND WHAT
19  HER TIMING IS FOR THAT; WHEN DOES SHE THINK SHE MIGHT
20  WANT TO BE PREGNANT IN THE FUTURE.
21    I CERTAINLY ALSO ASK HER ABOUT HER
22  EXPERIENCE WITH PRIOR CONTRACEPTIVE METHODS IN THE PAST;
23  WHAT HAS WORKED WELL OR NOT WORKED WELL FOR HER
24  PERSONALLY. CERTAINLY CONSIDERING HER HEALTH SITUATION,
25  IF SHE HAS ANY CHRONIC MEDICAL ISSUES, OTHER MEDICATIONS

174

1  SHE IS TAKING THAT MAY AFFECT THE SAFETY OF ANY
2  CONTRACEPTIVE METHODS, THAT IS OBVIOUSLY VERY IMPORTANT
3  TO DISCUSS.
4    SIDE EFFECTS OF DIFFERENT CONTRACEPTIVE
5  METHODS, WHAT A PARTICULAR WOMAN IS WILLING TO TOLERATE
6  OR NOT TOLERATE IN TERMS OF SIDE EFFECTS. AND ALSO
7  JUST, YOU KNOW, HER OWN PERSONAL PREFERENCE. WOMEN
8  SOMETIMES HAVE VERY STRONG OPINIONS ABOUT WHAT KIND OF
9  METHODS THEY WANT TO USE OR NOT USE, AND THOSE ARE VERY
10  IMPORTANT PARTS OF THE DECISION FOR HER.
11  Q.    AND DO -- THE EFFECTIVENESS OF A PARTICULAR
12  CONTRACEPTION, DOES THAT PLAY INTO YOUR COUNSELING HOW
13  EFFECTIVE A PARTICULAR METHOD OF CONTRACEPTION IS?
14  A.    ABSOLUTELY. BUT INTERESTINGLY, IT CAN VARY FROM
15  WOMAN TO WOMAN. THERE ARE SOME WOMEN WHO ARE WILLING TO
16  TOLERATE LESS EFFECTIVE METHODS BECAUSE OF ALL THE OTHER
17  CONSIDERATIONS THAT SHE HAS. BUT YES, TALKING ABOUT
18  CONTRACEPTIVE EFFECTIVENESS IS VERY IMPORTANT.
19  Q.    AND WHAT ARE THE MOST EFFECTIVE FORMS OF
20  CONTRACEPTION?
21  A.    SURE. SO THE MOST EFFECTIVE REVERSIBLE METHODS
22  ARE WHAT WE COMMONLY CALL LARCS, L-A-R-C-S, WHICH STANDS
23  FOR LONG-ACTING REVERSIBLE CONTRACEPTIVE. THE LARCS
24  INCLUDE THE CONTRACEPTIVE IMPLANT, WHICH IS A ROD THAT
25  GETS IMPLANTED ON THE INNER PART OF THE ARM, AS WELL AS

175

1  THE INTRAUTERINE DEVICE OR THE IUD.
2  Q.    THEY ARE THE MOST EFFECTIVE. AND THEN WHAT
3  WOULD YOU SAY WOULD BE THE NEXT LEVEL DOWN?
4  A.    RIGHT. SO THE LARCS ARE THE HIGHEST TIER OF
5  EFFICACY. THE NEXT TIER DOWN ARE OTHER HORMONAL
6  METHODS, SO THAT INCLUDES THE BIRTH CONTROL PILL, THE
7  BIRTH CONTROL PATCH, THE CONTRACEPTIVE VAGINAL RING, THE
8  CONTRACEPTIVE INJECTABLE OR DEPO-PROVERA. THAT WOULD BE
9  IN THE NEXT TIER OF EFFECTIVENESS. AND THEN THE LOWEST
10  TIER OF EFFECTIVENESS ARE METHODS SUCH AS WITHDRAWAL,
11  NATURAL FAMILY PLANNING, BARRIER METHODS SUCH AS
12  CONDOMS. THOSE ARE IN THE LOWEST TIER OF EFFECTIVENESS.
13  Q.    DO YOU USE ANY PARTICULAR TEACHING TOOLS IN
14  COUNSELING PATIENTS REGARDING THE VARIOUS METHODS?
15  A.    I COMMONLY USE -- THERE IS A CHART THAT IS
16  AVAILABLE ON THE CDC WEBSITE. SO I USUALLY HAVE THAT
17  HANDY IN MY EXAMINATION ROOM SO WE CAN LOOK AT THE
18  EFFECTIVENESS TOGETHER.
19  Q.    THANK YOU, DOCTOR.
20    I WOULD LIKE TO POINT YOU TO TAB 17 OF
21  THE BINDER.
22  A.    OKAY.
23  Q.    WILL YOU KINDLY IDENTIFY THAT DOCUMENT.
24  A.    YEAH, THIS IS THE CDC CHART I WAS JUST REFERRING
25  TO.

176

1  Q.    ALL RIGHT, DOCTOR. JUST VERY BRIEFLY, IF YOU
2  CAN WALK THROUGH WHAT THIS CHART REFLECTS.
3  A.    SURE. SO THE CHART IS ORGANIZED IN THREE ROWS
4  SEPARATED BY THOSE BLACK LINES, SO AT THE VERY TOP ROW,
5  THOSE ARE THE MOST EFFECTIVE METHODS, THE HIGHEST TIER.
6  SO THAT IS WHERE THE LARCS ARE. YOU CAN SEE THE
7  CONTRACEPTIVE IMPLANT AND THE IUD UP THERE, AND YOU CAN
8  SEE THEIR EFFECTIVENESS RATES THERE. IT IS LISTED AS
9  LESS THAN ONE PREGNANCY PER 100 WOMEN PER YEAR. THEY
10  ARE LINED UP RIGHT NEXT TO THE PERMANENT STERILIZATION
11  METHODS. YOU MIGHT BE INTERESTED TO SEE THAT THE
12  IMPLANT AND THE IUD ARE ACTUALLY MORE EFFECTIVE THAN
13  THOSE PERMANENT STERILIZATION METHODS.
14    THE NEXT TIER AFTER THAT IS WHERE YOU SEE
15  THE SHOT, THE PILL, THE PATCH, THE RING, AND THOSE ARE
16  THE ONES THAT ARE THE NEXT LEVEL EFFECTIVENESS, SO YOU
17  CAN SEE ON THE LEFT SIDE OF THE CHART IT SAYS 6 TO 12
18  PREGNANCIES PER 100 WOMEN IN A YEAR. WOMEN ARE OFTEN
19  SURPRISED THAT THE PILL IS ASSOCIATED WITH THAT MANY
20  PREGNANCIES.
21    AND THEN IN THE LOWEST TIER AT THE BOTTOM
22  ARE THAT -- THE BARRIER METHODS WE TALKED ABOUT BEFORE,
23  THE CONDOMS, WITHDRAWAL, SPERMICIDE AND THE NATURAL
24  FAMILY PLANNING METHOD.
25  Q.    ARE SOME CONTRACEPTIVES MORE EXPENSIVE THAN

Exhibit 137                                                    JA-0001836

177

1  OTHERS?

2  A.     YES. IT SO HAPPENS THAT THE MOST EFFECTIVE

3  METHODS, SO THE LARCS AT THE TOP ROW, ARE THE MOST

4  EXPENSIVE METHODS, AND THEN THE SECOND TIER AND THEN THE

5  LOWEST TIER.

6  Q.     THANK YOU, DOCTOR.

7         DO CONTRACEPTIVES ALSO PLAY A ROLE IN

8  PLANNING CHILDREN?

9  A.     YEAH. SO I THINK CONTRACEPTION CAN BE VERY

10  HELPFUL, IMPORTANT IN HELPING WOMEN TIME THEIR

11  PREGNANCIES AND THE SPACING BETWEEN THEIR PREGNANCIES,

12  SO THERE ARE SEVERAL GUIDELINES THAT SUGGEST THAT WOMEN

13  SHOULD WAIT AT LEAST 18 MONTHS AFTER THE BIRTH OF A

14  CHILD BEFORE GETTING PREGNANT AGAIN, AND THAT IS BECAUSE

15  MORE CLOSELY-SPACED PREGNANCIES ARE ASSOCIATED WITH

16  PRE-TERM BIRTH AND LOW BIRTH WEIGHT. SO BEING ABLE TO

17  CONTROL THE SPACING OF THE PREGNANCIES CAN BE VERY

18  IMPORTANT.

19         BUT AS IMPORTANT IS ALLOWING WOMEN TO BE

20  EMPOWERED TO COMPLETE THEIR GOALS IN LIFE, SO BE ABLE TO

21  FINISH SCHOOL, BE ABLE TO ACHIEVE THEIR JOB AND CAREER

22  GOALS, REACH THEIR FINANCIAL GOALS SO THEY CAN HAVE

23  THEIR CHILDREN WHEN THEY FEEL FINANCIALLY STABLE. SO I

24  THINK BEING ABLE TO HAVE THE CHILDREN, THE NUMBER OF

25  CHILDREN THEY WANT AND WHEN IT'S RIGHT FOR THEM IS VERY

178

1  IMPORTANT, AND WITHOUT CONTRACEPTION, THEY WOULD NOT BE

2  ABLE TO DO THAT.

3  Q.     DO MOST OF YOUR PATIENTS HAVE HEALTH INSURANCE?

4  A.     YES. MY PRACTICE IN HERSHEY IS A MOSTLY INSURED

5  POPULATION, YES.

6  Q.     PRIOR TO THE CONTRACEPTIVE CARE MANDATE, WAS

7  COST SOMETHING THAT YOU COUNSELED ABOUT IN THE

8  CONVERSATION ABOUT CONTRACEPTION?

9  A.     YES. SO WHEN I WOULD PULL OUT THIS CHART, I

10  WOULD ALSO TALK ABOUT THE COSTS OF THE DIFFERENT METHODS

11  AND OBVIOUSLY FOR SOME WOMEN, THERE WERE SOME METHODS

12  THAT WE COULD NOT TALK ABOUT BEYOND COSTS BECAUSE THEY

13  WERE COST-PROHIBITIVE.

14  Q.     AND SINCE THE AFFORDABLE CARE ACT, DO YOU STILL

15  COUNSEL YOUR PRIVATELY-INSURED PATIENTS REGARDING COSTS?

16  A.     I'M ABLE TO TELL WOMEN WHO HAVE PRIVATE HEALTH

17  INSURANCE THAT THEIR HEALTH INSURANCE COVERS ALL THE

18  FDA-APPROVED METHODS WITH NO OUT-OF-POCKET COSTS, SO I'M

19  ABLE TO PUT THIS CHART IN FRONT OF THEM AND REASSURE

20  THEM THAT THEY WOULD HAVE NO CO-PAYS OR DEDUCTIBLES AND

21  WE CAN TALK ABOUT THE DIFFERENT METHODS WITHOUT COSTS.

22  Q.     IN YOUR EXPERIENCE IN YOUR PRACTICE PRIOR TO THE

23  CONTRACEPTIVE MANDATE, DID YOU HAVE ANY EXPERIENCE WHERE

24  PATIENTS WOULD RETURN TO YOU AND DECIDE NOT TO CHOOSE

25  THE CONTRACEPTION THAT YOU RECOMMENDED OR TO FORGO

179

1  CONTRACEPTION ALTOGETHER BECAUSE OF COST?

2  A.     YES, ABSOLUTELY. THERE WERE MANY OCCASIONS I

3  CAN THINK OF WHERE A WOMAN MIGHT REALLY DESIRE TO GET AN

4  IUD BUT IT WAS COST PROHIBITIVE SO SHE WOULD HAVE TO

5  CHOOSE A DIFFERENT METHOD.

6  Q.     HAVE YOU EXPERIENCED THAT PHENOMENON WITH ANY

7  PATIENTS SINCE THE CONTRACEPTIVE MANDATE,

8  PRIVATELY-INSURED PATIENTS?

9  A.     NO, I HAVE NOT.

10  Q.     WHAT DO YOU DO WHEN YOU ENCOUNTER A WOMAN WHO

11  DOES NOT HAVE INSURANCE AND IS NEEDING CONTRACEPTIVE

12  CARE?

13  A.     IN OUR PRACTICE WE HAVE A SOCIAL WORKER, WE HAVE

14  A FINANCIAL DEPARTMENT AT THE HERSHEY MEDICAL CENTER, SO

15  IF SOMEONE IS UNINSURED, I AM ABLE TO REFER THEM TO

16  THOSE SERVICES. IF THE PATIENT QUALIFIES FINANCIALLY,

17  THEY MAY BE ABLE TO HELP THAT PATIENT APPLY FOR MEDICAID

18  OR FIND OTHER ASSISTANCE, BUT IF THE PATIENT DOES NOT

19  QUALIFY FOR MEDICAID OR IS UNABLE TO OBTAIN INSURANCE IN

20  ANY OTHER WAY, I PERSONALLY WOULD REFER THAT PERSON TO

21  PLANNED PARENTHOOD OR A FEDERALLY-QUALIFIED HEALTH

22  CENTER FOR THEM TO RECEIVE THEIR CONTRACEPTIVE SERVICES.

23         THE COURT: DID YOU SAY

24  FEDERALLY-QUALIFIED HEALTH CENTER?

25         THE WITNESS: YEAH.

180

1  BY MS. BOLAND:

2  Q.     OKAY, DOCTOR. I WOULD NOW LIKE TO TURN YOUR

3  ATTENTION TO THE "MY NEW OPTIONS" STUDY, WHICH WAS

4  REFERENCED BEFORE. CAN YOU TELL US GENERALLY ABOUT THIS

5  STUDY? I UNDERSTAND YOU BEGAN TO EXPLAIN, BUT IF YOU

6  CAN TELL THE COURT EXACTLY WHAT WERE THE PARAMETERS OF

7  THE STUDY AND WHAT WAS YOUR GOAL IN CONDUCTING THE

8  STUDY?

9  A.     SURE. SURE. SO THE "MY NEW OPTIONS" STUDY WAS

10  FUNDED THROUGH PCORI, THE PATIENT-CENTERED OUTCOMES

11  RESEARCH INSTITUTE. WE RECEIVED FUNDING IN THE FALL OF

12  2013 AND WE STARTED RECRUITING THE RESEARCH PARTICIPANTS

13  IN THE SPRING OF 2014. IT WAS A TWO-YEAR STUDY, SO IT

14  RAN UNTIL THE MIDDLE OF 2016.

15         THE PURPOSE OF THE STUDY WAS TO RECRUIT

16  REPRODUCTIVE-AGE WOMEN WHO ARE PRIVATELY INSURED, AND WE

17  RECRUITED PRIVATELY-INSURED WOMEN BECAUSE WE WANTED THEM

18  TO HAVE COVERAGE FOR CONTRACEPTION. AND WE RECRUITED

19  THEM AND THEY WERE RANDOMIZED INTO THREE DIFFERENT

20  GROUPS IN ORDER TO SEE DIFFERENT -- AND SOME OF THE

21  GROUPS RECEIVED CERTAIN WEB-BASED COUNSELING

22  INTERVENTIONS TO SEE IF IT WOULD HELP THEM WITH THEIR

23  CONTRACEPTIVE DECISION-MAKING.

24  Q.     OKAY. AND SO TO CLARIFY, THE TIME FRAME FOR

25  THIS STUDY WAS 2014 THROUGH 2016?

Exhibit 137                                                        JA-0001837

181

1  A.    THAT'S CORRECT.

2  Q.    SO IF DR. WEISMAN TESTIFIED EARLIER IT WAS 2012

3  THROUGH 2014, WAS THAT MISTAKEN?

4  A.    THAT WAS MISTAKEN, YES.

5  Q.    OKAY. AND WHAT DID YOU FIND AS A RESULT OF THIS

6  STUDY?

7  A.    YES, SO WE ACTUALLY FOUND THAT OUR WEB-BASED

8  INTERVENTIONS DID NOT MAKE A DIFFERENCE; THEY DID NOT

9  PARTICULARLY HELP WOMEN OR CHANGE WOMEN IN THEIR

10  CONTRACEPTIVE DECISION-MAKING. HOWEVER, WE WERE ABLE TO

11  TAKE THE OPPORTUNITY TO SEE THAT WE WERE ABLE TO FOLLOW

12  THESE WOMEN FROM PENNSYLVANIA OVER THE COURSE OF TWO

13  YEARS, AND AS A PARTICIPANT IN THE STUDY, THEY COMPLETED

14  A LOT OF SURVEYS FOR US AND THE SURVEYS HAD A LOT OF

15  QUESTIONS ABOUT CONTRACEPTIVE USE AND BEHAVIOR. SO WE

16  WERE ABLE TO SEE WHAT WOMEN REPORTED THEY WERE DOING

17  ABOUT CONTRACEPTION AT THE BEGINNING OF THE STUDY,

18  THROUGHOUT THE STUDY, AND AT THE END OF THE STUDY.

19  Q.    AND THE CONTRACEPTIVE MANDATE WAS ALREADY IN

20  PLACE --

21        MS. KOPPLIN: YOUR HONOR, I'M SORRY, WE

22  WOULD OBJECT TO THIS LINE OF QUESTIONING. WE HAVE NOT

23  HAD ANY DISCLOSURE ABOUT THE METHODOLOGY THAT WAS USED

24  IN THIS STUDY OR WHERE THIS DATA CAME FROM.

25        THE COURT: OVERRULED.

182

1        ARE YOU GOING TO TALK ABOUT THAT?

2        MS. BOLAND: YES.

3  BY MS. BOLAND:

4  Q.    WILL YOU SPEAK TO THE METHODOLOGY BEHIND THIS

5  STUDY, PLEASE, DR. CHUANG?

6  A.    SURE. THIS WAS A RANDOMIZED TRIAL. WE

7  RECRUITED -- YOU WANT TO HEAR THE DETAILS OF THE

8  RECRUITMENT METHODS? OKAY.

9        SO WE PARTNERED WITH HIGHMARK, A PRIVATE

10  INSURANCE PROVIDER. FOR THE REASON I STATED EARLIER, WE

11  WERE SPECIFICALLY INTERESTED IN RECRUITING PRIVATELY

12  INSURED WOMEN WHO LIVED IN THE STATE OF PENNSYLVANIA,

13  AND SO WE SENT OUT INVITATIONS TO WOMEN WHO HAD HEALTH

14  INSURANCE, WERE BETWEEN THE AGES OF 18 AND 40, AND

15  INVITED THEM TO PARTICIPATE IN THE STUDY.

16        AND FOR WOMEN WHO CONSENTED, ENROLLED IN

17  THE STUDY, THEY COMPLETED A SURVEY AT THE BEGINNING OF

18  THE STUDY AND THEY WERE RANDOMIZED INTO ONE OF THREE

19  GROUPS. ONE GROUP WAS A CONTROL GROUP; THEY DID NOT GET

20  ANY PARTICULAR INTERVENTION AT ALL. AND THE OTHER TWO

21  GROUPS WERE TWO DIFFERENT GROUPS WHERE THEY WOULD SEE

22  TWO DIFFERENT TYPES OF WEBSITES THAT PROVIDED

23  INFORMATION ABOUT CONTRACEPTION TO SEE IF THOSE WEBSITES

24  WOULD HELP THEM WITH THEIR DECISION-MAKING.

25        HOWEVER AT THE END OF THE STUDY, AT THE

183

1  END OF THE TWO YEARS, WE FOUND THAT ALL THREE GROUPS

2  BEHAVED SIMILARLY AND THERE WAS NO DIFFERENCE BETWEEN

3  THE GROUPS THAT GOT THE WEBSITE INTERVENTION AND THE

4  GROUP THAT DID NOT. SO UNFORTUNATELY FOR ME, WE DIDN'T

5  SEE ANY DIFFERENCES WITH OUR WEBSITE INTERVENTION, BUT

6  WE WERE ABLE TO SEE WHAT THE CONTRACEPTIVE BEHAVIORS

7  WERE AMONGST THE WOMEN WHO WERE PARTICIPATING IN THE

8  STUDY.

9        AND I DON'T THINK I SAID BEFORE, THERE

10  WERE 984 WOMEN WHO WERE IN THE STUDY.

11  Q.    AND WHAT DID YOU LEARN THAT THE CONTRACEPTIVE

12  BEHAVIORS WERE OVER THIS PERIOD OF TIME FOR ALL THREE

13  GROUPS INCLUDING THE CONTROL GROUP, RIGHT?

14  A.    SURE. YES. SO WE WERE ABLE TO SEE WHAT TYPES

15  OF CONTRACEPTIVE METHODS WERE BEING USED THROUGHOUT THE

16  STUDY. SO IN THE BEGINNING OF THE STUDY, THERE WERE

17  RELATIVELY FEW WOMEN USING LARCS, THE LONG-ACTING

18  REVERSIBLE CONTRACEPTIVES. THERE WERE ABOUT 8 PERCENT

19  OF WOMEN USING LARCS, AND BY THE END OF THE STUDY THERE

20  WERE ALMOST 18 PERCENT OF WOMEN USING LARCS IN THE

21  STUDY. AND SO WE THOUGHT THAT WAS AN INTERESTING

22  FINDING.

23  Q.    DOCTOR, I WOULD LIKE TO POINT YOU TO TAB 18 IN

24  THE BINDER.

25  A.    OKAY.

184

1  Q.    WILL YOU PLEASE IDENTIFY THIS DOCUMENT FOR THE

2  COURT?

3  A.    SURE. THIS IS A RESULTS TABLE THAT IS TAKEN

4  FROM SOME OF OUR -- TAKEN FROM A PRESENTATION THAT WE

5  HAD DONE PRESENTING THE "MY NEW OPTIONS" STUDY AT A

6  NATIONAL CONFERENCE.

7  Q.    THANK YOU. IF YOU PUT --

8        MS. KOPPLIN: YOUR HONOR -- I'M SORRY --

9  WE WOULD OBJECT. WHAT IS THE SOURCE OF THIS DATA?

10        THE COURT: WELL, WHY DON'T YOU -- OFFER

11  OF PROOF. WHAT IS THE SOURCE OF DATA?

12        MS. BOLAND: DR. CHUANG HERSELF DRAFTED

13  THIS CHART AND SHE PUT IN THE DATA HERSELF. SHE HAS

14  ALREADY TESTIFIED AS TO THE METHODOLOGY BEHIND IT. THIS

15  IS JUST PUTTING HER TESTIMONY IN CHART FORM TO

16  DEMONSTRATE FOR THE COURT.

17        THE COURT: SO MS. -- MS. CHUANG, DID YOU

18  CREATE THIS FOR THIS PARTICULAR PROCEEDING OR YOU

19  CREATED IT FOR THE STUDY?

20        THE WITNESS: I CREATED IT FOR THE STUDY.

21  THIS TABLE IS ACTUALLY TAKEN FROM A PRESENTATION WE DID

22  AT THE SOCIETY OF GENERAL INTERNAL MEDICINE MEETING BACK

23  IN THE SPRING. I ALSO GAVE A PRESENTATION AT THE

24  SOCIETY FOR FAMILY PLANNING MEETING, AND THIS TABLE WAS

25  TAKEN FROM THOSE PRESENTATIONS.

Exhibit 137

JA-0001838

185

1    THE COURT:  AND THE DATA INCLUDED IN THE
2  TABLE IS TAKEN FROM WHERE?
3         THE WITNESS:  THIS IS FROM THE "MY NEW
4  OPTIONS" RESULTS.
5         THE COURT:  OKAY.  OVERRULED.
6         GO AHEAD.
7  BY MS. BOLAND:
8  Q.     IF YOU FLIP TO THE NEXT PAGE, CAN YOU JUST TELL
9  US WHAT THAT IS?
10  A.     THAT IS ANOTHER TABLE FROM THE SAME
11  PRESENTATIONS.
12  Q.     REFLECTING THE SAME DATA?
13  A.     YES.
14  Q.     IS IT JUST REPACKAGED A DIFFERENT WAY?
15  A.     YES.  SO THE FIRST TABLE SHOWS THE CONTRACEPTIVE
16  TYPES THAT ARE USED IN THE STUDY DIVIDED INTO THE FOUR
17  CATEGORIES THAT ARE SIMILAR TO THOSE TIERS THAT WE
18  LOOKED AT ON THE CDC WEBSITE.  SO THE FIRST ROW IS
19  LARCS, THE SECOND ROW IS OTHER PRESCRIPTION METHODS,
20  THIRD ROW IS NONPRESCRIPTION METHODS, AND THE LAST ROW
21  IS NO METHOD.  THE SECOND TABLE REALLY IS THE SAME DATA
22  BUT IT'S JUST LOOKING AT WOMEN WHO WERE ON ANY
23  CONTRACEPTIVE METHOD AT ALL VERSUS NO METHOD.  SO IN THE
24  SECOND TABLE, IT JUST REALLY COLLAPSES THOSE FIRST THREE
25  ROWS INTO ONE ROW, SO IT IS REALLY SHOWING THE SAME DATA

186

1  IN TWO DIFFERENT FORMATS.
2  Q.     AND I THINK YOU JUST TESTIFIED THAT YOU SAW A
3  STATISTICAL JUMP FROM THE NUMBER OF WOMEN USING LARCS AT
4  THE BEGINNING OF THE STUDY TO THE NUMBER OF WOMEN USING
5  LARCS AT THE END OF THE STUDY.  IS THAT REFLECTED
6  SOMEWHERE ON THESE DOCUMENTS?
7  A.     SO I'M LOOKING AT TABLE 1, AND SO IN THAT FIRST
8  ROW WHERE IT SAYS LARCS, AND THEN IF YOU LOOK AT THE
9  NEXT COLUMN WHERE IT SAYS BASELINE, THAT IS THE
10  BEGINNING OF THE STUDY WHERE THERE ARE 984 WOMEN
11  ENROLLED IN THE STUDY.
12         SO 83 WOMEN AT THE BEGINNING OF THE
13  STUDY, WHICH WAS 8.4 PERCENT OF THE SAMPLE, AT THAT TIME
14  WERE USING LARCS.  AND THEN IF YOU GO OVER TO THE NEXT
15  ROW, WHERE IT SAYS 24 MONTHS, THERE WERE 130 WOMEN OUT
16  OF 727 WOMEN USING LARCS AT THE END OF THE STUDY, WHICH
17  WAS 17.9 PERCENT.
18         IF YOU LOOK AT THE NEXT TWO ROWS, THERE
19  ARE REALLY NO DIFFERENCES.  IF YOU LOOK AT THE
20  PERCENTAGES OF OTHER PRESCRIPTION METHODS IT WAS
21  49.7 PERCENT BOTH AT BASELINE AND 24 MONTHS.  AND THEN
22  IN THE THIRD ROW, NOT MUCH DIFFERENCE EITHER IN THE
23  NONPRESCRIPTION METHOD.  BUT THEN IF YOU LOOK AT THE
24  LAST ROW, THE NO-METHOD ROW, YOU WILL SEE THAT BASELINE
25  THERE WERE 11.5 PERCENT OF WOMEN NOT USING ANY METHOD

187

1  AND THAT HAD DROPPED TO 5.1 PERCENT BY THE END OF THE
2  STUDY.
3         AND THEN IN THE THIRD COLUMN WHERE IT
4  SAYS P VALUE.  THE P VALUE IS OUR TEST OF STATISTICAL
5  SIGNIFICANCE, AND IN BIOMEDICAL RESEARCH WE GENERALLY
6  ACCEPT A P VALUE OF LESS THAN .05 TO INDICATE
7  STATISTICAL SIGNIFICANCE.  SO THE P VALUE WE HAD FOR
8  THESE RESULTS WAS LESS THAN .001, WHICH SHOWS THAT THERE
9  WAS A STATISTICALLY SIGNIFICANT CHANGE IN THESE NUMBERS
10  THAT I JUST REVIEWED.
11  Q.     AND JUST A COUPLE OF POINTS OF CLARIFICATION.
12  IT LOOKS LIKE ALTHOUGH THE PERCENTAGE IS THE SAME FOR
13  OTHER PRESCRIPTION METHODS, THE NUMBER OF -- THE OTHER
14  NUMBER CHANGED.  CAN YOU EXPLAIN WHAT WE ARE SEEING HERE
15  AND WHY THE PERCENTAGE IS THE SAME BUT THE NUMBER OF
16  PEOPLE DIFFERS?
17  A.     SURE.  SO I WILL TAKE YOU BACK UP TO THE HEADER
18  ROW WHERE IT SAYS BASELINE, N EQUALS 984, AND 24 MONTHS,
19  N EQUALS 727.  SO IT MIGHT SEEM PECULIAR THAT THERE WAS
20  SUCH A DIFFERENT -- A DROP IN THE NUMBERS BETWEEN THE
21  BEGINNING AND THE END OF THE STUDY.
22         HOWEVER, WE JUST INCLUDED WOMEN IN THE
23  STUDY WHO WERE ACTIVELY TRYING TO AVOID PREGNANCY.  SO I
24  SHOULD HAVE MENTIONED BEFORE WHEN I WAS DESCRIBING THE
25  STUDY THAT WE ENROLLED WOMEN WHO SAID THEY WERE TRYING

188

1  TO AVOID PREGNANCY FOR THE NEXT YEAR.
2         OVER THE COURSE OF THE TWO-YEAR STUDY,
3  WOMEN CHANGED THEIR MIND AND SOME WOMEN THEN DECIDED
4  THEY WERE TRYING TO GET PREGNANT.  AND SO THOSE WOMEN
5  WERE NO LONGER COUNTED BECAUSE THEY DIDN'T HAVE AN
6  INDICATION TO USE BIRTH CONTROL ANYMORE.  SO THAT IS WHY
7  THERE WAS ONLY 727 WOMEN AT 24 MONTHS.
8         THERE WERE SOME OTHER REASONS THAT WOMEN
9  WERE EXCLUDED TOO.  THERE WERE SOME WHO GOT A
10  HYSTERECTOMY DURING THAT TIME FRAME OR THEY GOT THEIR
11  TUBAL STERILIZATION DURING THAT TIME FRAME, SO THAT
12  ACCOUNTED FOR SOME OF THE REDUCED NUMBERS AS WELL.
13  Q.     DOES THE FACT THAT SOME WOMEN DROPPED OUT, DID
14  THAT AFFECT THE RELIABILITY OF YOUR FINDINGS?
15  A.     NO, BECAUSE THAT IS ACCOUNTED FOR WHEN YOU DO
16  THE STATISTICAL TEST AND GENERATE THE P VALUE.  IT
17  CONSIDERS THE SAMPLE SIZE NUMBER.
18  Q.     SO WHAT IS YOUR OPINION WITH A REASONABLE DEGREE
19  OF CERTAINTY AS TO WHY WOMEN CHANGED THEIR BEHAVIOR OVER
20  THIS TIME FRAME?
21  A.     WELL, WHAT I CAN SAY IS THAT THE STUDY, SINCE WE
22  STARTED THE STUDY IN 2014, IT OCCURRED PRETTY SHORTLY
23  AFTER THE CONTRACEPTIVE MANDATE WENT INTO EFFECT.  WE
24  DIDN'T SEE AN EFFECT OF OUR STUDY INTERVENTION AND
25  REALLY THE ONLY OTHER THING THAT WAS GOING ON AT THE

Exhibit 137

JA-0001839

189

1  TIME WAS THIS CHANGE IN CONTRACEPTIVE -- IN THE
2  CONTRACEPTIVE MANDATE.
3          SO MY HYPOTHESIS WOULD BE THAT WHAT WE
4  ARE SEEING IS THE CHANGE IN CONTRACEPTIVE BEHAVIOR THAT
5  COULD HAVE RESULTED FROM THE CONTRACEPTIVE MANDATE.
6  Q.    AND IS THAT CONSISTENT WITH OTHER RESEARCH OUT
7  THERE, TO YOUR KNOWLEDGE?
8  A.    YEAH.  ACTUALLY THERE HAS BEEN SEVERAL OTHER
9  STUDIES IN THE LITERATURE THAT HAVE SHOWN THAT SINCE THE
10 CONTRACEPTIVE MANDATE, WE DO KNOW THAT OUT-OF-POCKET
11 COSTS FOR WOMEN HAVE GONE DOWN SINCE THE CONTRACEPTIVE
12 MANDATE.  THERE'S BEEN SOME STUDIES TO SHOW THAT THERE
13 MAY BE SOME CHANGES IN METHODS THAT WOMEN ARE CHOOSING
14 WITH MORE LARCS BEING USED.  SO I THINK THIS IS
15 CONSISTENT WITH THOSE OTHER STUDIES.
16 Q.    IS THIS CONSISTENT WITH YOUR EXPERIENCE IN YOUR
17 OWN PRACTICE IN TERMS OF WOMEN'S DECISION-MAKING AFTER
18 THE MANDATE WAS PUT IN PLACE?
19 A.    WELL, I CAN SAY THAT I CERTAINLY HAD SOME
20 PATIENTS WHO, AFTER LEARNING ABOUT THE MANDATE, HAVE
21 RETHOUGHT THEIR CONTRACEPTIVE DECISION-MAKING.  SOME OF
22 THEM THAT HAS HELPED THEM CHANGE THEIR MIND.  I HAVE HAD
23 SOME WOMEN WHO WERE PREVIOUSLY NOT USING A METHOD OR
24 USING A LESS-EFFECTIVE METHOD THAT HAVE THEN CHOSEN TO
25 USE A MORE-EFFECTIVE METHOD, WHETHER THAT BE A LARC OR

190

1  PILL OR SOMETHING ELSE, YES.
2  Q.    IN YOUR OPINION, DOCTOR, HAS THE CONTRACEPTIVE
3  MANDATE BENEFITED WOMEN?
4  A.    YES, I THINK IT HAS.
5  Q.    AND FOR WHAT REASON?
6  A.    I THINK BECAUSE IT HAS ALLOWED WOMEN TO HAVE
7  THAT FULL RANGE OF CHOICES THAT ARE ON THAT CDC CHART WE
8  LOOKED AT.  SO INSTEAD OF ONLY HAVING A COUPLE OF THOSE
9  AVAILABLE TO WOMEN TO CONSIDER, THEY HAVE THE WHOLE
10 SPECTRUM OF CHOICES TO CONSIDER, AND IT GIVES THE
11 PATIENT A LOT MORE FREEDOM TO TALK WITH THEIR PROVIDER
12 ABOUT WHAT METHODS ARE REALLY BEST SUITED FOR THEM AS AN
13 INDIVIDUAL.  WHEN THEY CONSIDER WHAT THEIR OWN HEALTH
14 CONDITIONS ARE, WHAT THEIR OWN PREFERENCES ARE, WHAT
15 SIDE EFFECTS ARE OKAY OR NOT OKAY FOR THEM, IT REALLY
16 ALLOWS THEM TO CONSIDER THE FULL SET OF OPTIONS.
17 Q.    HAVE YOU HAD THE OPPORTUNITY TO READ THE
18 RELIGIOUS AND MORAL EXEMPTION RULES AT ISSUE IN THIS
19 CASE?
20 A.    YES, I HAVE READ THEM.
21 Q.    WHAT DO YOU BELIEVE THE IMPACT OF THOSE RULES
22 WILL BE ON PRIVATELY-INSURED WOMEN -- ON SOME
23 PRIVATELY-INSURED WOMEN IN PENNSYLVANIA?
24        MS. KOPPLIN:  OBJECTION, YOUR HONOR.
25 THIS IS NOT AN OPINION THAT IS GOING TO BE -- THAT THERE

191

1  IS ANY EVIDENCE IT'S GOING TO BE THE PRODUCT OF RELIABLE
2  PRINCIPLES AND METHODS BY THE WITNESS.
3          THE COURT:  OVERRULED.
4          THE WITNESS:  I --
5          THE COURT:  WHAT YOU KNOW FROM YOUR
6  EXPERIENCE.
7          THE WITNESS:  SURE.  SO BASED ON MY
8  EXPERIENCE, I WOULD IMAGINE THAT IT WOULD BE SIMILAR TO
9  BEFORE THE CONTRACEPTIVE MANDATE WHEN CONTRACEPTIVE
10 COUNSELING HAD TO INCLUDE COSTS.  SO I WOULD IMAGINE
11 THAT WOULD BE THE CASE AGAIN.
12 BY MS. BOLAND:
13 Q.    IS IT YOUR OPINION THAT COST IS A BARRIER TO
14 ACCESS TO CONTRACEPTIVE CARE, OR CAN BE A BARRIER TO
15 CONTRACEPTIVE CARE?
16 A.    YES, I HAVE SEEN THAT BE THE CASE.
17 Q.    AND IN YOUR OPINION, WHAT WILL HAPPEN IF WOMEN
18 FORGO CONTRACEPTIVE CARE BECAUSE OF COST?
19 A.    I THINK THAT IF WOMEN CAN'T CHOOSE FROM THE FULL
20 SET OF OPTIONS, THEY MAY BE MORE LIKELY TO CHOOSE THE
21 LESS EXPENSIVE OPTIONS, WHICH ARE, UNFORTUNATELY, THE
22 LESS EFFECTIVE OPTIONS.  AND SO MY FEAR WOULD BE THAT WE
23 WOULD SEE A RISE IN UNINTENDED PREGNANCIES AND
24 CONCOMITANTLY A RISE IN ABORTIONS.
25 Q.    THANK YOU, DR. CHUANG.

192

1          MS. BOLAND:  BEAR WITH ME ONE MOMENT,
2  YOUR HONOR.
3          THE COURT:  OKAY.
4  BY MS. BOLAND:
5  Q.    TWO POINTS FOR CLARIFICATION, DOCTOR.  EARLIER I
6  ASKED YOU ABOUT THE MOST EXPENSIVE METHODS OF
7  CONTRACEPTION.  SPEAKING IN TERMS OF UP-FRONT COST, WHAT
8  IS THE MOST EXPENSIVE METHOD OF CONTRACEPTION?
9  A.    THE LARCS ARE THE MOST EXPENSIVE WITH UP-FRONT
10 COSTS, BECAUSE YOU HAVE TO PAY FOR THE DEVICE AND THE
11 INSERTION FEE ALL AT ONCE UP FRONT.
12 Q.    IN REGARD TO THE "MY NEW OPTIONS" STUDY, WHY WAS
13 THERE A DELAY IN THE CHANGES OVER TIME IF THE MANDATE
14 WENT INTO EFFECT IN 2012?  IN OTHER WORDS, WHY WASN'T IT
15 INSTANTANEOUS THAT YOU WOULD SEE CHANGES IN WOMEN'S
16 BEHAVIOR?
17 A.    WELL, A COUPLE OF THINGS.
18        WOMEN MAY NOT HAVE BEEN AWARE OF THE
19 CHANGES IN THEIR CONTRACEPTIVE COVERAGE RIGHT AWAY.  IN
20 FACT, I HAD PATIENTS COME TO ME AND SAY, OH, I THINK
21 THEY MADE A MISTAKE AT THE PHARMACY, THEY DID NOT CHARGE
22 ME A CO-PAY THIS MONTH.  SO THEY DID NOT REALIZE THAT
23 THERE WAS A CHANGE IN POLICY.  SO THAT IS NUMBER ONE.
24        SECONDLY, YOU KNOW, WOMEN DON'T RUSH TO
25 THE DOCTOR EVERY DAY, SO THEY MIGHT -- MOST WOMEN WHO

Exhibit 137                                                                    JA-0001840

193

1    ARE HEALTHY REPRODUCTIVE-AGE WOMEN MIGHT ONLY SEE THEIR

2    PHYSICIAN ONCE A YEAR, SO PROBABLY JUST THE TIMING OF

3    WHEN THEY WERE SEEING THEIR PROVIDERS AND MAKING CHANGES

4    IN THEIR CONTRACEPTION IS WHAT I WOULD GUESS.

5        MS. BOLAND: THANK YOU VERY MUCH, DOCTOR.

6    I HAVE NO FURTHER QUESTIONS.

7        THE COURT: MS. KOPPLIN.

8        MS. KOPPLIN: YOUR HONOR, MAY I APPROACH?

9        THE COURT: YOU MAY.

10        CROSS-EXAMINATION

11   BY MS. KOPPLIN:

12   Q.    GOOD AFTERNOON. DR. CHUANG, MY NAME IS REBECCA

13   KOPPLIN. I'M JUST GOING TO ASK YOU A COUPLE QUESTIONS.

14        HOW ARE YOU DOING?

15   A.    GOOD, THANK YOU.

16   Q.    DR. CHUANG, WHAT DOCUMENTS DID YOU CONSIDER IN

17   PREPARING YOUR DECLARATION? COULD YOU LIST THE

18   DOCUMENTS?

19   A.    I'M NOT SURE WHAT TYPES OF DOCUMENTS YOU MIGHT

20   BE REFERRING TO.

21   Q.    LET'S SAY ALL TYPES OF DOCUMENTS.

22   A.    WELL, BEING A PRIMARY CARE PROVIDER AND BEING A

23   RESEARCHER IN THIS FIELD AND A LECTURER IN THIS AREA,

24   THE DECLARATION INCLUDED YEARS OF READING MANY

25   SCIENTIFIC ARTICLES AND DOING YEARS OF RESEARCH AND THE

194

1    BODY OF KNOWLEDGE THAT HAS ACCUMULATED FROM THAT.

2    Q.    OTHER THAN THE GENERAL BODY OF KNOWLEDGE YOU HAD

3    WHEN YOU STARTED WORKING AND PREPARING THE DECLARATION,

4    WHAT SPECIFIC SOURCES DID YOU SEEK OUT AND REVIEW?

5    A.    I'M NOT SURE I UNDERSTAND THE QUESTION.

6    Q.    FOR EXAMPLE, DID YOU READ THE RULES WHEN YOU

7    WERE PREPARING YOUR DECLARATION?

8    A.    AT THE TIME THAT I PREPARED MY DECLARATION --

9    I'M ACTUALLY -- I CANNOT PRECISELY REMEMBER IF I HAD

10   ALREADY READ THE RULES AT THE TIME OF THE DECLARATION.

11   Q.    SO YOU DO NOT RECALL IF YOU HAD READ THE RULES

12   OR NOT WHEN YOU WROTE YOUR DECLARATION?

13   A.    I DO NOT RECALL.

14   Q.    DID YOU READ ANY OF THE ARTICLES THAT ARE CITED

15   IN THE RULES?

16   A.    IN READING -- WHEN I DID READ THE RULES, A LOT

17   OF THE ARTICLES ARE COMMONLY-CITED ARTICLES IN FAMILY

18   PLANNING LITERATURE, SO MANY OF THEM I WAS ALREADY

19   FAMILIAR WITH AND SINCE SOME OF THEM I READ SUBSEQUENT

20   TO READING THE RULES, BUT I DID NOT READ EVERY SINGLE

21   ONE OF THEM, NO.

22   Q.    DO YOU RECALL ANY OTHER THINGS THAT YOU WOULD

23   HAVE LOOKED AT IN PREPARING YOUR DECLARATION, FOR

24   EXAMPLE, NEWSPAPER ARTICLES, BLOG POSTS?

25   A.    I WOULD NOT HAVE REFERRED TO THE LAY PRESS FOR

195

1    MY INFORMATION, NO.

2    Q.    DO YOU RECALL IN PARTICULAR ANY STUDIES THAT YOU

3    READ OTHER THAN THOSE CITED IN THE RULES?

4    A.    I CONSIDER AS PART OF MY DAILY WORK TO BE

5    READING RESEARCH ARTICLES ABOUT CONTRACEPTION, SO YES, I

6    READ ARTICLES ON A NEAR-DAILY BASIS ABOUT THIS FIELD.

7    Q.    SURE. MY QUESTION WAS IF YOU RECALLED IN

8    PARTICULAR ANY ARTICLES THAT YOU READ TO PREPARE FOR THE

9    DECLARATION?

10   A.    SURE. I HAVE READ MANY ARTICLES IN THE LAST

11   COUPLE OF WEEKS, PERHAPS MAYBE MORE FREQUENCY THAN USUAL

12   BECAUSE I KNEW THAT I WOULD BE HERE TODAY.

13   Q.    SURE. IF YOU RECALL ANY IN PARTICULAR, WHO WAS

14   THE AUTHOR OF THAT STUDY AND WHAT WAS ITS TITLE?

15   A.    SO I KNOW, FOR EXAMPLE, THAT YOU GUYS HAVE THE

16   BEARAK AND JONES ARTICLES, SO I HAVE READ -- I READ THAT

17   AGAIN IN PREPARATION FOR TODAY. THERE ARE SEVERAL OTHER

18   ARTICLES THAT -- AS I MENTIONED BEFORE, THERE'S OTHER

19   RESEARCH THAT HAS DOCUMENTED A -- CHANGES IN

20   CONTRACEPTIVE BEHAVIOR AND UPTAKE OF MORE EFFECTIVE

21   METHODS, SO I READ, REVIEWED SOME OF THOSE ARTICLES.

22   THERE WAS AN ARTICLE BY LYDIA PACE THAT WAS PUBLISHED IN

23   HEALTH AFFAIRS LAST YEAR. THERE WAS ANOTHER ARTICLE

24   PUBLISHED IN HEALTH AFFAIRS LAST YEAR REGARDING THE SAME

25   TOPIC. THERE IS AN ARTICLE BY KAVANAUGH AND COLLEAGUES

196

1    THAT WAS PUBLISHED IN CONTRACEPTION THIS YEAR THAT ALL

2    RELATE TO INCREASES IN MORE EFFECTIVE CONTRACEPTIVE USE

3    FOLLOWING THE CONTRACEPTIVE MANDATE. THOSE ARE ALL

4    ARTICLES THAT I REREAD RECENTLY IN PREPARATION FOR THIS.

5    Q.    WHO DID YOU MEET WITH TO PREPARE FOR YOUR

6    DECLARATION?

7    A.    I MET WITH THE LAWYERS HERE.

8    Q.    ANYONE ELSE?

9    A.    NO.

10   Q.    SO YOU ARE HERE TODAY TO TESTIFY ABOUT THE NEW

11   EXEMPTION TO THE CONTRACEPTIVE COVERAGE MANDATE,

12   CORRECT?

13   A.    YES.

14   Q.    NOW, BEFORE THESE NEW EXEMPTIONS EXISTED, YOU

15   ARE AWARE THAT THERE WERE SOME GRANDFATHERED PLANS THAT

16   WERE ALREADY EXEMPT FROM THE COVERAGE MANDATE?

17   A.    YES.

18   Q.    AND YOU'RE AWARE THAT SOME OF THESE PLANS WERE

19   THEREFORE NOT PROVIDING COVERAGE FOR CONTRACEPTIVES?

20   A.    COULD YOU REPEAT THAT? SORRY.

21   Q.    SO YOU WOULD AGREE WITH ME THAT BECAUSE SOME OF

22   THESE PLANS WERE GRANDFATHERED, THOSE PLANS WERE NOT

23   PROVIDING COVERAGE FOR CONTRACEPTIVES?

24   A.    YES.

25   Q.    DO YOU HAVE AN IDEA OF HOW MANY OF THOSE PLANS

Exhibit 137                                                                    JA-0001841

197

1   THERE WERE IN PENNSYLVANIA?

2   A.      I DO NOT PRECISELY KNOW THE NUMBER, BUT I KNOW

3   THE NUMBER HAS BEEN DECLINING WITH EVERY YEAR.

4   Q.      BUT YOU COULD NOT EVEN GIVE ME AN ESTIMATE OF A

5   NUMBER?

6   A.      I KNOW AT THE TIME THE CONTRACEPTIVE MANDATE

7   WENT INTO PLACE, I RECALL THAT MAYBE THE NUMBER OF

8   GRANDFATHERED PLANS WAS AROUND 20 PERCENT, AND I

9   UNDERSTAND THAT IT HAS DECLINED IN EVERY YEAR SINCE

10  THEN, BUT I DON'T KNOW WHAT THE PRECISE NUMBER IS NOW.

11  Q.      AND YOU ARE AWARE THAT PRIOR TO THE CURRENT

12  EXEMPTIONS, THERE WAS ALREADY AN EXEMPTION FOR HOUSES OF

13  WORSHIP?

14  A.      YES.

15  Q.      AND SO THEREFORE THERE WERE SOME HOUSES OF

16  WORSHIP THAT WERE NOT PROVIDING CONTRACEPTIVE COVERAGE?

17  A.      CORRECT.

18  Q.      ARE YOU AWARE ABOUT HOW MANY OF THOSE THERE WERE

19  IN PENNSYLVANIA?

20  A.      NO, I DON'T KNOW HOW MANY.

21  Q.      AND YOU ARE AWARE THAT PRIOR TO THIS LITIGATION,

22  THERE WAS OTHER LITIGATION CHALLENGING THE CONTRACEPTIVE

23  MANDATE, AND AS A RESULT OF THAT, SOME ENTITIES OBTAINED

24  INJUNCTIONS SO THEY DID NOT HAVE TO PROVIDE

25  CONTRACEPTION COVERAGE, CORRECT?

198

1   A.      SO IF YOU ARE REFERRING TO ACCOMMODATIONS, YES,

2   I'M FAMILIAR WITH THAT.

3   Q.      AND DO YOU KNOW HOW MANY OF THOSE ACCOMMODATED

4   ENTITIES WERE IN PENNSYLVANIA?

5   A.      NO, I DO NOT KNOW. I DO KNOW THAT THE COMPANIES

6   THAT WERE INVOLVED, LIKE HOBBY LOBBY, ARE PENNSYLVANIA

7   COMPANIES, BUT I DO NOT KNOW BEYOND THAT HOW MANY ARE

8   FROM PENNSYLVANIA.

9   Q.      SO I'M LOOKING AT YOUR DECLARATION NOW, WHICH IS

10  AT TAB 6 IN THE BINDER. AT PARAGRAPH 31, YOU STATED

11  THAT: SINCE THE ACA HAS PASSED, NO PATIENT HAS

12  CONTACTED ME TO ASK FOR A DIFFERENT, CHEAPER METHOD OF

13  CONTRACEPTION THAN THE ONE I HAD PRESCRIBED DUE TO THE

14  COST UNDER PRIVATE INSURANCE PLANS.

15          DID I READ THAT CORRECTLY?

16  A.      YOU DID.

17  Q.      SO YOU WOULD AGREE WITH ME THEN THAT SINCE THE

18  ACA PASSED, NONE OF YOUR PATIENTS ASKED FOR CHEAPER

19  METHODS OF CONTRACEPTION EVEN THOUGH ALL OF THESE

20  EXEMPTIONS THAT WE JUST TALKED ABOUT WERE IN EXISTENCE?

21  A.      THAT'S RIGHT.

22  Q.      NOW, LET'S TURN TO THE NEW EXEMPTIONS THAT ARE

23  AT ISSUE HERE. THE NEW EXEMPTIONS ARE FOR ENTITIES WITH

24  SINCERE RELIGIOUS AND MORAL OBJECTIONS, CORRECT?

25  A.      YES.

199

1   Q.      BUT YOU ARE NOT AWARE OF ANY EMPLOYERS IN

2   PENNSYLVANIA THAT HAVE INVOKED THE NEW EXEMPTIONS SO

3   FAR, CORRECT?

4   A.      I'M NOT AWARE, NO.

5   Q.      SO YOU ARE NOT AWARE OF ANY INDIVIDUALS IN

6   PENNSYLVANIA WHO HAVE LOST THEIR CONTRACEPTIVE COVERAGE

7   DUE TO THE NEW EXEMPTIONS?

8   A.      NO, I'M NOT. I DON'T KNOW.

9   Q.      AND NOT JUST IN PENNSYLVANIA, BUT YOU ARE NOT

10  AWARE OF ANY PEOPLE NATIONALLY EITHER WHO HAVE LOST

11  COVERAGE BECAUSE OF THE EXEMPTION?

12  A.      I'M NOT AWARE OF ANY, NO.

13  Q.      AND YOU DON'T KNOW OF ANY PEOPLE EITHER IN

14  PENNSYLVANIA OR IN THE ENTIRE COUNTRY WHO WILL LOSE

15  COVERAGE, LIKE THEIR PLANS HAVE ALREADY ANNOUNCED THAT

16  THEY ARE GOING TO CHANGE, FOR EXAMPLE?

17  A.      NO.

18  Q.      LOOKING AT YOUR DECLARATION AT PARAGRAPH 23, YOU

19  STATED: SOME OF MY PATIENTS ALSO WORK FOR AND RECEIVE

20  THEIR HEALTH INSURANCE THROUGH CATHOLIC SCHOOLS AND

21  OTHER INSTITUTIONS WHICH PROVIDE THEM

22  CONTRACEPTIVE COVERAGE THROUGH THEIR EMPLOYER-SPONSORED

23  PLANS UNDER THE NEW RELIGIOUS AND MORAL EXEMPTIONS.

24          DID I READ THAT CORRECTLY?

25  A.      YES, YOU DID.

200

1   Q.      SO NOW HERE TODAY IN DECEMBER, YOU STILL CAN'T

2   IDENTIFY ANY ACTUAL PATIENTS WHO WILL LOSE COVERAGE,

3   CORRECT?

4   A.      I HAVE PATIENTS WHO ARE EMPLOYED OR -- AND HAVE

5   HAD PATIENTS WHO HAVE BEEN EMPLOYED AT THESE

6   INSTITUTIONS, SO THEY MAY ALREADY NOT HAVE COVERAGE.

7   Q.      DO YOU KNOW OF ANY THAT HAVE ALREADY LOST

8   COVERAGE?

9   A.      NOT AS A RESULT OF THE NEW RULES, NO.

10  Q.      SO ALTHOUGH YOU DO HAVE SOME PATIENTS WHO ARE

11  EMPLOYED AT THESE, AS OF RIGHT NOW YOU DON'T KNOW ANY OF

12  THEM WHO ARE ACTUALLY GOING TO LOSE THEIR COVERAGE

13  BECAUSE OF THE NEW RULES?

14  A.      THEY MAY ALREADY HAVE NOT HAD COVERAGE, BUT I DO

15  NOT KNOW OF ANY PATIENTS WHO MAY BE LOSING COVERAGE.

16  Q.      RIGHT. AND YOU DO KNOW OF ANY PATIENTS WHOSE

17  SITUATION IS CHANGING FOR THE WORSE BECAUSE OF THE

18  RULES?

19  A.      I DO NOT KNOW INDIVIDUALS IN THAT CASE RIGHT

20  NOW, NO.

21  Q.      NOW, IN PARAGRAPH 34, YOU STATED THAT: AS A

22  RESULT OF THESE RULES, SOME WOMEN WILL LOSE

23  CONTRACEPTIVE -- SORRY -- SOME WOMEN WILL LOSE INSURANCE

24  COVERAGE FOR PREVENTATIVE CONTRACEPTIVE CARE.

25          DID I READ THAT CORRECTLY?

Exhibit 137                                                                              JA-0001842

201

1    A.    YES.

2    Q.    BUT AS OF TODAY, YOU CAN'T IDENTIFY ANY ACTUAL

3    WOMEN WHO HAVE LOST COVERAGE BECAUSE OF THE NEW RULES,

4    CORRECT?

5    A.    CORRECT.

6    Q.    IN PARAGRAPH 35, REFERRING TO THESE WOMEN WHO

7    WOULD LOSE COVERAGE, YOU STATED:  AS A RESULT THEIR

8    COSTS FOR CONTRACEPTIVE CARE WILL RISE.

9          DID I READ THAT CORRECTLY?

10   A.    YES.

11   Q.    BUT STILL WE CAN'T IDENTIFY ANY ACTUAL WOMEN WHO

12   COSTS HAVE RISEN BECAUSE OF THE EXEMPTION?

13   A.    NO.

14   Q.    AND IN PARAGRAPH 36, YOU STATED THAT:  UNDER THE

15   NEW RULES, COSTS WILL AGAIN BECOME A BARRIER TO WOMEN'S

16   ACCESS TO AND USE OF THE CONTRACEPTIVE THAT IS MEDICALLY

17   RECOMMENDED FOR THEM.

18         BUT TODAY YOU CAN'T IDENTIFY ANY ACTUAL

19   WOMEN WHO ARE EXPERIENCING SUCH A BARRIER BECAUSE OF THE

20   NEW RULES, CORRECT?

21   A.    CORRECT.

22   Q.    AND IN PARAGRAPH 37, REFERRING TO THE SAME

23   WOMEN, YOU STATED THAT THEY WOULD FACE MEDICAL HARM, BUT

24   AS OF TODAY, YOU CAN'T IDENTIFY ANY ACTUAL WOMEN WHO ARE

25   FACING THAT MEDICAL HARM BECAUSE OF THE RULES, CORRECT?

202

1    A.    CORRECT.

2    Q.    AND IN PARAGRAPH 38, REFERRING TO THESE SAME

3    WOMEN, YOU STATED THAT THERE WOULD BE A DISRUPTION OF

4    THESE PATIENTS' MEDICAL TREATMENT, BUT AS OF TODAY, WE

5    DON'T KNOW -- YOU DON'T KNOW OF ANY ACTUAL WOMEN WHOSE

6    MEDICAL TREATMENT HAS BEEN DISRUPTED BY THE RULES,

7    CORRECT?

8    A.    CORRECT.

9    Q.    IN PARAGRAPH 39, YOU STATED THAT:  SOME OF THESE

10   WOMEN WILL FACE UNINTENDED PREGNANCIES AND OTHER ADVERSE

11   MEDICAL CONSEQUENCES, BUT AS OF TODAY, YOU DON'T KNOW OF

12   ANY ACTUAL WOMEN WHO ARE FACING UNINTENDED PREGNANCIES

13   OR OTHER ADVERSE MEDICAL CONSEQUENCES BECAUSE OF THE

14   RULES, CORRECT?

15   A.    CORRECT.

16   Q.    AND IN PARAGRAPH 45, YOU STATED THAT YOU

17   BELIEVED AN INJUNCTION OF THE RULES IS NECESSARY TO

18   PREVENT IMMEDIATE AND IRREPARABLE HARM TO WOMEN IN

19   PENNSYLVANIA AND AROUND THE COUNTRY WHO WILL LOSE

20   ONGOING PREVENTATIVE CARE COVERAGE UNDER THEIR GROUP

21   HEALTH PLANS DUE TO THE RULES, BUT AS OF TODAY, YOU

22   DON'T KNOW OF ANY ACTUAL WOMEN WHO HAVE LOST THEIR

23   ONGOING PREVENTATIVE CARE COVERAGE DUE TO THE RULES,

24   CORRECT?

25   A.    IT SAY "PREVENTIVE," NOT "PREVENTATIVE," BUT

203

1    OTHERWISE, CORRECT.

2    Q.    APOLOGIES.  THANK YOU.

3          HAVE YOU HEARD FROM -- I'M SORRY.  IN

4    YOUR MEDICAL PRACTICE, DO YOU PRACTICE WITH OTHER

5    DOCTORS?

6    A.    I DO.

7    Q.    HAVE YOU HEARD FROM ANY OF THEM THAT LIKE THEY

8    DON'T -- HAVE YOU LEARNED THROUGH ANY OTHER MEANS ABOUT

9    ANY OTHER PATIENTS IN YOUR PRACTICE WHO MIGHT HAVE THIS

10   PROBLEM?

11   A.    I HAVE NOT HAD THOSE CONVERSATIONS WITH MY

12   COLLEAGUES.

13   Q.    HAVE YOU LEARNED, FOR EXAMPLE, THROUGH CALLS

14   FROM PHARMACIES OR PHARMACISTS ABOUT ANY PATIENTS WHO

15   ARE HAVING PROBLEMS GETTING THEIR PRESCRIPTIONS BECAUSE

16   OF THE NEW RULES?

17         MS. BOLAND:  OBJECTION, CALLS FOR

18   HEARSAY.

19         THE COURT:  SUSTAINED.

20         MS. KOPPLIN:  IF I MIGHT CONFER WITH MY

21   COLLEAGUES FOR JUST A MOMENT, YOUR HONOR.

22         (PAUSE.)

23         MS. KOPPLIN:  THANK YOU FOR YOUR

24   TESTIMONY.

25         YOUR HONOR, NO FURTHER QUESTIONS.

204

1          THE COURT:  ANY REDIRECT?

2          MS. BOLAND:  NO REDIRECT, YOUR HONOR.

3          THE COURT:  THANK YOU VERY MUCH.  YOU ARE

4    EXCUSED.

5          OKAY.  WHAT I THINK WHAT WE WILL DO NOW

6    IF YOU ARE READY, YOU ARE UP.  TELL US WHAT YOU FOUND.

7          MR. HEALY:  PERMISSION TO APPROACH, YOUR

8    HONOR?

9          THE COURT:  YES.  AND YOU ARE MR. HEALY.

10         MR. HEALY:  CHRISTOPHER HEALY.

11         THE COURT:  OKAY.

12         MR. HEALY:  THANK YOU, YOUR HONOR.  I

13   APOLOGIZE AGAIN FOR THE SCRAMBLING BACK AND FORTH.

14         THE COURT:  NOT A PROBLEM.  I THINK I

15   ASKED YOU TO DO IT.  YOU WERE PERFECTLY WITHIN YOUR

16   RIGHTS.

17         MR. HEALY:  SO I LOOKED INTO THE AGENCY'S

18   RATIONALE BEHIND THE STATEMENT YOUR HONOR READ FROM THE

19   BENCH THIS MORNING, WHICH I BELIEVE, IF I HAVE IT

20   CORRECT, I PUT ON THE SCREEN HERE.

21         THE COURT:  WHAT ARE WE LOOKING AT HERE?

22         MR. HEALY:  THIS IS THE STATEMENT I

23   BELIEVE -- IF YOU COULD CONFIRM FOR ME, THE STATEMENT

24   THAT YOU READ FROM THE BENCH THIS MORNING THAT WAS:  AS

25   REFLECTED IN LITIGATION PERTAINING TO THE MANDATE --

Exhibit 137                                                                                    JA-0001843

205

1    THE COURT:  YES.

2         MR. HEALY:  -- THEY WISH TO MAKE CHANGES

3    TO THEIR HEALTH PLANS THAT WILL REDUCE THE COST OF

4    INSURANCE COVERAGE FOR THE BENEFICIARIES, ET CETERA.

5         SO THIS STATEMENT READS:  AS REFLECTED IN

6    LITIGATION PERTAINING TO THE MANDATE, SOME ENTITIES ARE

7    IN GRANDFATHERED HEALTH PLANS THAT DO NOT COVER

8    CONTRACEPTION.  THEY WISH TO MAKE CHANGES TO THEIR

9    HEALTH PLANS THAT WILL REDUCE THE COST OF INSURANCE

10   COVERAGE FOR THEIR BENEFICIARIES OR POLICYHOLDERS BUT

11   WHICH WOULD CAUSE THE PLANS TO LOSE GRANDFATHERED

12   STATUS.  THEY ARE REFRAINING FROM MAKING THOSE CHANGES

13   AND THEREFORE ARE CONTINUING TO INCUR AND PASS ON HIGHER

14   INSURANCE COSTS TO PREVENT THE MANDATE FROM APPLYING TO

15   THEIR PLANS IN VIOLATION OF THEIR CONSCIENCES.

16        THE COURT:  SO WHEN I ASKED YOU -- I SAID

17   WE HAD GONE THROUGH 58,000 COMMENTS, AND WE HAD PUT IN

18   THE WORD "GRANDFATHER" OR "GRANDFATHERED" AND HAVE FOUND

19   NOTHING THAT WENT DIRECTLY TO THAT FINDING.  SO WHAT YOU

20   WERE GOING TO DO WAS FIND ME -- PERHAPS THERE WAS A

21   DIFFERENT WORD THAT WAS USED IN THE COMMENTS.

22        MR. HEALY:  SO THOSE 54,000 COMMENTS THAT

23   YOUR HONOR MENTIONED WERE COMMENTS WITH REGARD TO THE

24   2016 REQUEST FOR INFORMATION, WHICH HAD TO DO WITH WAYS

25   THAT THE DEPARTMENT MIGHT AMEND THE ACCOMODATION, NOT

206

1    THE GRANDFATHERED HEALTH PLANS, SO THAT MAY HAVE BEEN

2    THE REASON.

3         WE'VE ASKED THE AGENCY, AND THE AGENCY

4    POINTED OUT TWO PARTICULAR PREVIOUS COURT CASES THAT THE

5    AGENCY RELIED ON.  AS THEY MENTION IN THE RULE -- THEY

6    WROTE -- THEN IT SAYS:  AS REFLECTED IN LITIGATION

7    PERTAINING TO THE MANDATE.

8         SO THOSE TWO CASES THAT THE AGENCY --

9         THE COURT:  WHICH CASES ARE THOSE?

10        MR. HEALY:  THOSE ARE THE DIOCESE OF FORT

11   WAYNE VERSUS SEBELIUS.  THAT'S 988 F.SUPP.2D 958.  AND

12   ALSO ARCHDIOCESE OF ATLANTA.  SO ARCHDIOCESE OF ATLANTA,

13   THIS IS THE COMPLAINT FROM THAT CASE.  THAT IS CASE

14   NUMBER 1:12-CV-3489 IN THE NORTHERN DISTRICT OF GEORGIA.

15   I APOLOGIZE THAT I DON'T HAVE A FEDERAL CITATION FOR

16   THAT, BUT THAT IS THE CASE NUMBER.

17        AND THIS IS FROM THE COMPLAINT IN THAT

18   CASE.  IT SAYS:  BASED ON THE LEGAL OPINION OF COUNSEL,

19   PLAINTIFFS BELIEVE THAT THE ATLANTA PLAN AND SAVANNAH

20   PLAN CURRENTLY MEET THE AFFORDABLE CARE ACT'S DEFINITION

21   OF GRANDFATHERED PLAN.  AND LATER ON:  PLAINTIFFS WILL

22   LOSE THEIR GRANDFATHERED STATUS IN THE NEAR FUTURE FOR

23   REASONS THAT CANNOT BE AVOIDED --

24        THE COURT:  WHICH CASE IS THIS?

25        MR. HEALY:  THIS IS THE ARCHDIOCESE OF

207

1    ATLANTA CASE.

2         THE COURT:  WHAT DATE WAS THIS DOCUMENT

3    YOU ARE SHOWING ME?

4         MR. HEALY:  THAT WAS FROM 2012.

5         THE COURT:  SINCE THE CONTRACEPTIVE

6    MANDATE -- SINCE THE NEW IFR HAS BEEN PUT INTO PLACE,

7    HAVE THESE FOLKS CHANGED THEIR PLAN?

8         MR. HEALY:  I'M NOT AWARE WHETHER THESE

9    FOLKS HAVE CHANGED THEIR PLAN.

10        THE SECOND CASE THAT THE AGENCY RELIED ON

11   IS THIS, WHICH IS THE DIOCESE OF FORT WAYNE CASE, WHICH

12   HAS THIS HIGHLIGHTED PORTION HERE ON THE SCREEN.  MAYBE

13   I CAN ZOOM OUT SO EVERYONE CAN SEE IT.  THIS WAS ONE OF

14   THE PREVIOUS CHALLENGES TO THE CONTRACEPTIVE COVERAGE

15   MANDATE.  IT SAYS THAT -- THIS IS FROM THE COURT'S

16   OPINION IN THAT CASE FROM THE NORTHERN DISTRICT OF

17   INDIANA.

18        THE COURT:  WHAT IS THE CITE?

19        MR. HEALY:  THAT WAS THE ONE I READ

20   BEFORE FROM 2013.  AND THAT SAYS:  CURRENTLY THE

21   DIOCESAN HEALTH PLAN ALSO MEETS THE ACA'S DEFINITION OF

22   A GRANDFATHERED PLAN AND INCLUDES A STATEMENT IN PLAN

23   MATERIALS PROVIDED TO PARTICIPANTS OR BENEFICIARIES THAT

24   IT BELIEVES IS A GRANDFATHERED PLAN AS IT IS REQUIRED TO

25   MAINTAIN ITS GRANDFATHERED STATUS.  BUT IN ORDER TO

208

1    MAINTAIN ITS GRANDFATHERED STATUS, THE DIOCESE FORGOES

2    APPROXIMATELY $180,000 A YEAR IN INCREASED PREMIUMS SO

3    THAT IT CAN PROTECT CATHOLIC CHARITIES FROM THE

4    CONTRACEPTIVE MANDATE.

5         ABSENT MAINTAINING ITS GRANDFATHERED

6    STATUS AT A GREAT EXPENSE, THE ONLY OTHER OPTIONS WOULD

7    BE EITHER, ONE, SPONSOR A PLAN THAT WOULD PROVIDE THE

8    EMPLOYEES OF CATHOLIC CHARITIES WITH ACCESS TO FREE

9    CONTRACEPTION, ABORTION, INDUSTRY PRODUCTS,

10   STERILIZATION, AND RELATED COUNSELING; OR TWO, NO LONGER

11   EXTEND ITS PLAN TO CATHOLIC CHARITIES, SUBJECTING IT TO

12   MASSIVE FINES IF IT DOES NOT CONTRACT WITH ANOTHER

13   INSURANCE PROVIDER THAT WILL PROVIDE THE OBJECTIONABLE

14   COVERAGE.

15        THE COURT:  DO WE KNOW WHETHER THE

16   PLAINTIFF IN THIS CASE HAS -- SUBSEQUENT TO THE

17   ENACTMENT OF THE NEW -- RATHER THE ISSUANCE OF THE NEW

18   IFRS HAS CHANGED THEIR PLAN?

19        MR. HEALY:  I DO NOT KNOW THAT THEY HAVE.

20        THE COURT:  SO APART FROM THESE TWO

21   CASES, THAT IS -- THAT IS WHAT YOU GOT?

22        MR. HEALY:  THERE MAY BE OTHER COMMENTS.

23   WE HAD LOOKED THROUGH AS MANY OF THEM AS WE COULD IN THE

24   TIME WE HAD.  HOWEVER, WE HAVE IDENTIFIED NO PARTICULAR

25   COMMENTS.  THAT SAID, ALTHOUGH THESE TWO CASES WERE NOT

Exhibit 137

JA-0001844

209

1  IN THE ADMINISTRATIVE RECORD, IT'S NOT GENERALLY THE
2  PRACTICE TO INCLUDE PRIOR COURT CASES IN ADMINISTRATIVE
3  RECORDS.  HOWEVER -- BASICALLY BECAUSE OF THE FACT THAT
4  THEY ARE ALREADY JUDICIALLY NOTICEABLE.  HOWEVER, THEY
5  WERE CITED IN THE RULES AND IT WAS SOMETHING THAT THE
6  AGENCY RELIED ON.
7          THE COURT:  SO TO THE EXTENT THAT THIS
8  ISSUE, THE GRANDFATHER HEALTH PLANS WANTING TO MAKE
9  CHANGES AND NOT LOSE THEIR GRANDFATHER STATUS, TO THE
10 EXTENT THAT THAT WAS A UNDERLYING RATIONALE FOR THE NEW
11 IFRS, WE HAVE TWO PLANS RIGHT NOW?  TWO COURT CASES THAT
12 YOU HAVE BEEN UNABLE TO IDENTIFY, WHICH WARRANTED THE
13 CONCLUSION THAT THERE WAS GOOD LAW?
14         MR. HEALY:  YES, THAT IS CORRECT, YOUR
15 HONOR, AND WE ARE HAPPY TO CONTINUE LOOKING THROUGH
16 OTHER COMMENTS THAT HAVE COME SINCE THEN.  WE HAD AN
17 OPEN COMMENT PERIOD THAT ENDED ON DECEMBER 5TH.
18 HOWEVER, AT THIS TIME WE HAVE NOT BEEN ABLE TO IDENTIFY
19 FURTHER COMMENTS.
20         THE COURT:  WELL, I THINK THAT THE ISSUE
21 IS WHAT COMMENTS HAD COME IN AT THE TIME THE NEW IFRS
22 WERE ISSUED, BECAUSE THAT WAS THE REASON THAT THE
23 AGENCIES WERE SAYING THEY HAD GOOD CAUSE WAS BECAUSE OF
24 THOSE.  SO TO THE EXTENT THAT THINGS HAVE HAPPENED
25 SUBSEQUENTLY, I DON'T THINK IT'S RELEVANT TO MY

210

1  ANALYSIS.
2          MR. HEALY:  THAT MAKES SENSE.  THAT'S
3  CORRECT, YOUR HONOR.
4          THE COURT:  OKAY.  LET'S TAKE A BRIEF
5  BREAK AND THEN -- DID YOU WANT HALF AN HOUR TO CLOSE OR
6  15 MINUTES TO CLOSE?
7          MR. FISCHER:  YOUR HONOR, HALF AN HOUR,
8  ALTHOUGH I WILL TRY NOT TO TAKE ALL OF IT.
9          MR. DAVIS:  I THINK HALF AN HOUR IS FINE.
10 I WILL ALSO TRY NOT TO TAKE ALL OF IT.
11         THE COURT:  OKAY.  WE'RE DOING VERY WELL.
12 IT'S ONLY QUARTER TO 3.  I HAD GIVEN YOU UNTIL 6 SO WE
13 CAN PROBABLY GET OUT EARLIER THAN WE ANTICIPATED.
14         THE CLERK:  ALL RISE.
15         (BREAK TAKEN.)
16         THE COURT:  WHO'S DOING CLOSINGS FOR THE
17 COMMONWEALTH?
18         MR. FISCHER:  YOUR HONOR, I'M GOING TO DO
19 CLOSING FOR THE COMMONWEALTH.
20         THE COURT:  OKAY.
21         MR. FISCHER:  GOOD AFTERNOON, YOUR HONOR.
22         THE COURT:  GOOD AFTERNOON.
23         MR. FISCHER:  I THINK IT IS IMPORTANT TO
24 START BY REMEMBERING EXACTLY WHAT WE ARE CHALLENGING AND
25 WHAT WE ARE NOT CHALLENGING IN THESE PROCEEDINGS.

211

1          MR. DAVIS SAID IN THE BEGINNING THAT
2  THESE RULES WERE NOT ISSUED ON A BLANK SLATE, AND THAT
3  IS ABSOLUTELY CORRECT.  A LOT HAS HAPPENED IN THIS AREA
4  BEFORE WE GET TO THIS POINT.
5          WE ARE NOT CHALLENGING THE ORIGINAL
6  EXEMPTION FOR CHURCHES AND CLOSELY-RELATED INSTITUTIONS.
7  WE ARE NOT CHALLENGING THE ACCOMMODATION PROCESS THAT
8  WAS ORIGINALLY CREATED AND THEN EXPANDED AS A RESULT OF
9  THE SUPREME COURT'S HOBBY LOBBY DECISION.
10         WHAT WE ARE CHALLENGING ARE TWO RULES
11 THAT ARE SWEEPING IN THEIR SCOPE.  THERE ARE A LOT OF
12 CONCERNS WE HAD ABOUT THESE RULES, BUT THERE ARE THREE
13 ASPECTS IN PARTICULAR THAT I WANT TO FOCUS ON.
14         THE FIRST IS THAT FOR THE FIRST TIME, THE
15 RELIGIOUS EXEMPTION RULE ALLOWS PUBLICLY-TRADED
16 COMPANIES TO OPT OUT OF THE CONTRACEPTIVE MANDATE.  THAT
17 WAS NEVER THE CASE BEFORE.  THERE IS A LIMITED
18 JUSTIFICATION FOR THAT DECISION IN THE RULES, AND IT
19 POTENTIALLY THREATENS CONTRACEPTIVE COVERAGE FOR A
20 SIGNIFICANT NUMBER OF WOMEN.
21         THE SECOND FACTOR THAT I'D LIKE TO
22 MENTION IS THAT AS A RESULT OF THESE TWO RULES, THE
23 ACCOMMODATION PROCESS IS NOW OPTIONAL.
24         THE COURT:  IS NOW WHAT?
25         MR. FISCHER:  OPTIONAL.  THERE IS NO

212

1  REQUIREMENT THAT COMPANIES THAT WISH TO OPT OUT NOTIFY
2  THEIR INSURANCE COMPANY OR THEIR THIRD-PARTY
3  ADMINISTRATOR OF THEIR DECISION SO THAT THEIR EMPLOYEES
4  CAN GET COVERAGE.  SO AS A RESULT OF THAT, WOMEN
5  EMPLOYED BY THE COMPANIES THAT ARE CURRENTLY USING THAT
6  PROCESS FACE A LOSS OF COVERAGE.
7          AND THEN FINALLY, THE THIRD ISSUE I WOULD
8  LIKE TO TOUCH ON, WHICH YOUR HONOR DISCUSSED EARLIER, IS
9  THE MORAL EXEMPTION.  THE MORAL EXEMPTION IS INCREDIBLY
10 VAGUE, DOES NOT DEFINE EXACTLY WHAT'S MEANT BY A
11 SINCERELY-HELD MORAL BELIEF, AND AS I THINK YOUR HONOR'S
12 QUESTIONING REFLECTED, OPENS UP ALL SORTS OF POTENTIAL
13 PROBLEMS OF HOW DO FEDERAL AGENCIES DETERMINE WHETHER A
14 BELIEF IS SINCERELY HELD, WHAT THE NATURE OF THE BELIEF
15 IS, WHAT BELIEFS DO QUALIFY TO ALLOW SOMEBODY TO OPT
16 OUT, WHAT BELIEFS MAY NOT QUALIFY.  SO I THINK THAT RULE
17 BY ITSELF IS SIGNIFICANTLY PROBLEMATIC.
18         WHAT WE ARE SEEKING AS A RESULT OF THIS
19 IS AN INJUNCTION THAT WOULD ESSENTIALLY TAKE US BACK TO
20 THE STATUS QUO BEFORE THESE RULES WERE ISSUED, BACK TO
21 OCTOBER 5TH OF THIS YEAR.
22         IT IS OUR HOPE THAT AS A RESULT, AT THE
23 VERY LEAST, THE AGENCIES WILL FOLLOW THE CORRECT PROCESS
24 IF THEY TRY TO DO THIS AGAIN, BECAUSE WHAT WE HAVE HERE
25 IS A FLAWED PROCESS THAT PRODUCED A FLAWED RESULT.

Exhibit 137                                                                                    JA-0001845

213

1    WE THINK IT IS CLEAR THAT THE AGENCY HAS
2 VIOLATED THE PROCEDURAL REQUIREMENTS OF THE APA AND CAME
3 UP WITH A RESULT THAT VIOLATES THE SUBSTANTIVE
4 REQUIREMENTS OF THE APA, IS ARBITRARY AND CAPRICIOUS,
5 VIOLATES THE AFFORDABLE CARE ACT, AND HAS OTHER
6 SIGNIFICANT PROBLEMS.
7        THE COURT:  LET ME FOLLOW UP WITH YOU ON
8 THAT ONE.
9        WHEN YOUR COLLEAGUE OPENED, I ASKED HIM
10 WHETHER -- THERE CLEARLY IS A DISTINCTION BETWEEN THE
11 CLAIMS THAT ARE BROUGHT UNDER THE APA AND THE CLAIMS
12 THAT ARE THE CONSTITUTIONAL CLAIMS.
13       THE FISCHER:  YES, THAT'S CORRECT.
14       THE COURT:  AND AS YOU KNOW, WHEN A COURT
15 CAN REACH A STATUTORY CLAIM RATHER THAN A CONSTITUTIONAL
16 CLAIM, THE ADMONITION AT ALL LEVELS ALL OF THE WAY UP TO
17 THE SUPREME COURT AND THE THIRD CIRCUIT IS THAT THE
18 COURT SHOULD NOT REACH THE CONSTITUTIONAL ISSUES BUT
19 SHOULD PROCEED WITH THE PROCEDURAL ISSUES.
20       SO IF I WERE TO PROCEED WITH THE
21 PROCEDURAL ISSUES ALONE, AND ASSUMING THAT I WOULD DO IT
22 UNDER BOTH THE PROCEDURAL COMPONENT, THE NOTICE OF
23 COMMENT, AND THE SUBSTANTIVE COMPONENT, THE LACK OF GOOD
24 CAUSE, WHAT KIND OF INJUNCTION WOULD THE COMMONWEALTH BE
25 LOOKING FOR?

214

1        IN THOSE CIRCUMSTANCES, I THINK YOUR
2 COLLEAGUE SAID IF IT WAS ONLY THE PROCEDURAL, THEY WOULD
3 JUST GO BACK AND GO THROUGH THE PROCEDURE AND STILL HAVE
4 THE SAME RULES.
5        SO WHAT INJUNCTION WOULD YOU BE ASKING
6 FOR IN THOSE LIMITED CIRCUMSTANCES?
7        MR. FISCHER:  WE WOULD BE SEEKING AN
8 INJUNCTION PREVENTING THEM FROM ENFORCING THESE RULES,
9 AND OUR HOPE IS THAT, PARTICULARLY IF THERE IS A
10 SUBSTANTIVE COMPONENT TO YOUR HONOR'S RULING, IT WOULD
11 BE TAKEN BY THE AGENCIES -- AGENCIES AS AN INDICATION
12 THAT THE NEXT RULE THEY COME OUT WITH BETTER EITHER HAVE
13 MORE SUBSTANTIVE SUPPORT BEHIND IT OR ADDRESS THESE
14 ISSUES DIFFERENTLY, PARTICULARLY THE THREE THAT I
15 MENTIONED.
16       THE COURT:  SO HOW DOES THAT ISSUE -- HOW
17 IS THAT ISSUE LINED UP IN AN ORDER?  BECAUSE YOU ARE
18 NOT, YOU HAVE NOT ASKED FOR A MANDATORY INJUNCTION, YOU
19 HAVE NOT ASKED ME TO TELL THEM TO DO RULES IN A
20 PARTICULAR WAY, SO HOW WOULD AN ORDER LOOK THAT DEALS
21 WITH THE GOOD CAUSE COMPONENT IF I WERE TO RULE IN THAT
22 WAY.
23       MR. FISCHER:  AN ORDER COULD SIMPLY
24 PRECLUDE THEM FROM ENFORCING THESE TWO SPECIFIC RULES,
25 WHICH WOULD THEN REQUIRE THEM TO, AT THE VERY LEAST, GO

215

1 THROUGH THE PROCESS AGAIN, AND DEPENDING ON WHAT COMES
2 OUT OF THAT PROCESS, WE MAY BE BACK HERE AGAIN.  OUR
3 HOPE WOULD BE THAT THEY WOULD COME UP WITH A DIFFERENT
4 RESULT.
5        BUT I DON'T BELIEVE THERE IS ANYTHING
6 THIS COURT CAN DO TO ENJOIN THE NEXT RULE.  AND, YOU
7 KNOW, MAYBE WE ARE BACK HERE.  I HOPE THAT IS NOT THE
8 CASE.  HOPEFULLY THEY WILL GET THE MESSAGE AND MAKE SOME
9 CHANGES TO THE RULES THAT ADDRESS THE REAL ISSUES.
10       BUT I THINK THAT THE INJUNCTION WE HAVE
11 REQUESTED IS OF THESE TWO RULES AS THEY ARE CURRENTLY
12 MADE.
13       THE COURT:  OKAY.
14       MR. FISCHER:  SO LET ME TALK A LITTLE
15 MORE ABOUT THE PROCEDURAL VIOLATION OF THE APA.  THE
16 GOVERNMENT HAS ARGUED THAT THEY HAVE STATUTORY AUTHORITY
17 TO WAIVE NOTICE AND COMMENT.  WE ADDRESS THIS IN OUR
18 BRIEFS.  THE APA IS VERY CLEAR ABOUT THIS.  SECTION 559
19 SAYS:  SUBSEQUENT STATUTE MAY NOT HOLD -- MAY NOT BE
20 HELD TO SUPERSEDE OR MODIFY THIS SUBCHAPTER, AND SEVERAL
21 OTHERS, EXCEPT TO THE EXTENT IT DOES SO EXPRESSLY.
22       AND THE D.C. DISTRICT COURT IN COALITION
23 FOR PARITY VERSUS SEBELIUS LOOKED AT THE VERY SAME
24 AUTHORITY THAT THE AGENCIES ARE RELYING ON HERE,
25 ANALYZED IT UNDER SECTION 549 OF THE APA, AND SAID IT

216

1 CLEARLY DOES NOT EXPRESSLY MODIFY THE REQUIREMENTS OF
2 THE APA.
3        THE SECOND -- THE LANGUAGE THEY ARE
4 RELYING ON IS SIMPLY A GENERAL GRANT THAT SAYS:  THE
5 SECRETARY MAY PROMULGATE ANY INTERIM FINAL RULES AS THE
6 SECRETARY DETERMINES ARE APPROPRIATE TO CARRY OUT THIS
7 PART.
8        NOTHING ABOUT WAIVING NOTICE AND COMMENT,
9 NOTHING ABOUT PREEMPTING THE APA.  GIVEN THE CLEAR
10 REQUIREMENT IN THE APA THAT MODIFICATIONS HAVE TO BE
11 DONE EXPRESSLY, WE THINK IT'S CLEAR THAT THAT DOES NOT
12 GIVE THEM THE AUTHORITY THEY CLAIM IT DOES.
13       WE ALSO THINK IT IS FAIRLY CLEAR THEY
14 DON'T HAVE GOOD CAUSE.  THE GOOD CAUSE ARGUMENT, AS I
15 UNDERSTAND, IS ESSENTIALLY, WELL, THERE IS A LOT OF
16 LITIGATION GOING ON.  WE WANT TO WRAP IT UP, SO WE WANT
17 THESE RULES TO BE EFFECTIVE IMMEDIATELY.
18       NOW, IT IS INTERESTING, THEY HAVE ARGUED
19 THAT MANY OF THE PLAINTIFFS IN THOSE CASES ARE PROTECTED
20 BY INJUNCTIONS, WHICH IS TRUE.  SO IF THE ARGUMENT IS --
21 THE ARGUMENT IS WE NEED TO PROTECT THESE PEOPLE
22 IMMEDIATELY, WELL, BY THEIR OWN ADMISSION, MANY OF THEM
23 ALREADY DO HAVE PROTECTION.
24       WE TALKED EXTENSIVELY IN OUR BRIEF ABOUT
25 THE THIRD CIRCUIT'S DECISION IN UNITED STATES VERSUS

Exhibit 137                                                                                                JA-0001846

217

1   REYNOLDS BECAUSE IT SQUARELY REJECTS THE ARGUMENT THAT
2   RESOLVING UNCERTAINTY IS AN ADEQUATE JUSTIFICATION FOR
3   ISSUING IFRS.  THE THIRD CIRCUIT THERE SAID VERY CLEARLY
4   THAT THERE IS ALWAYS UNCERTAINTY IN THE RULEMAKING
5   PROCESS, AND PARTICULARLY IF AN IFR IS ISSUED AS THIS
6   ONE WAS, WITH A REQUEST FOR SUBSTANTIVE COMMENTS AND THE
7   STATEMENT FROM THE AGENCY THAT THEY MAY BE MAKING
8   FURTHER CHANGES TO THE RULE.  THERE IS SIMPLY NO
9   CERTAINTY THAT IS ACHIEVED AS A RESULT OF THAT.
10          AND FINALLY, I THINK THERE IS AN ARGUMENT
11  THAT THEY MADE A FEW TIMES, WHICH IS THAT, WELL, IFR'S
12  WERE ISSUED EARLIER IN APPLYING THE AFFORDABLE CARE ACT
13  WOMEN'S HEALTH AMENDMENT, SO IT IS OKAY THIS TIME.
14          BUT I THINK IF THE COURT LOOKS BACK TO
15  PRIESTS FOR LIFE, WHICH ADDRESSED THE PRIOR IFR THAT
16  THEY ARE TALKING ABOUT, THE SPECIFIC IFR THAT THEY CITED
17  TO YOU, WHICH IS AVAILABLE AT 79 FEDERAL REGISTER 51092,
18  WAS ISSUED FOLLOWING THE WHEATON COLLEGE DECISION, WHICH
19  CAME RIGHT AFTER HOBBY LOBBY.
20          ON THE SAME DAY, THE AGENCIES ISSUED A
21  NOTICE OF PROPOSED RULEMAKING CALLED THE HOBBY LOBBY --
22  AND AN IFR THAT WAS BASED ON WHEATON COLLEGE.  HERE IS
23  WHAT THE WHEATON COLLEGE IFR SAID:  THESE INTERIM FINAL
24  REGULATIONS PROVIDED AN ALTERNATIVE PROCESS THAT AN
25  ELIGIBLE ORGANIZATION MAY USE TO PROVIDE NOTICE OF ITS

218

1   RELIGIOUS OBJECTIONS TO PROVIDING CONTRACEPTIVE COVERAGE
2   WHILE PRESERVING PARTICIPANTS' AND BENEFICIARIES' ACCESS
3   TO COVERAGE OF THE FULL RANGE OF FDA-APPROVED
4   CONTRACEPTIVES.
5           ALL THAT DID IS IT SAID, UNDER THE
6   ACCOMMODATION BEFORE, YOU HAD TO PROVIDE NOTICE TO YOUR
7   INSURANCE COMPANY OR YOUR THIRD-PARTY ADMINISTRATOR.
8   THE COURT IN WHEATON COLLEGE ESSENTIALLY SAID, YOU WILL
9   HAVE TO ALSO LET THEM PROVIDE NOTICE TO HHS, AND THEN
10  YOU DO THE LEGWORK AND CONTACT THE THIRD-PARTY
11  ADMINISTRATOR OR INSURANCE COMPANY.
12          SO ALL THIS REGULATION DID IS IT
13  ESSENTIALLY IMPLEMENTED WHAT THE COURT DIRECTED.  IT
14  SAID, WE ARE GOING TO CREATE ANOTHER PROCESS WHERE YOU
15  CAN SEND THE FORM TO US.  THAT IS A FAR CRY FROM THE
16  SWEEPING CHANGES THAT ARE AT ISSUE IN THIS CASE.
17          YOUR HONOR, I WOULD LIKE TO GET INTO THE
18  SUBSTANTIVE APA DISCUSSION A LITTLE BIT BECAUSE I THINK
19  THAT IS IN MANY WAYS THE MOST IMPORTANT -- YOU KNOW, ONE
20  OF THE MOST IMPORTANT ISSUES IN THIS CASE.
21          YOUR HONOR HAD ASKED ABOUT CHEVRON
22  DEFERENCE AND WHETHER THAT APPLIED HERE.  CHEVRON DOES
23  NOT APPLY EITHER TO THEIR INTERPRETATION OF THE
24  AFFORDABLE CARE ACT OR TO THEIR INTERPRETATION OF RFRA.
25          WITH RESPECT TO RFRA, I THINK COUNSEL

219

1   CONCEDED EARLIER THAT -- THAT THEY DO NOT GET CHEVRON
2   DEFERENCE UNDER RFRA, AND CERTAINLY IN THE HOBBY LOBBY
3   DECISION, THERE WAS NOT EVEN A MENTION OF CHEVRON OR
4   WHETHER THE GOVERNMENT'S INTERPRETATION OF RFRA WAS
5   ENTITLED TO --
6           THE COURT:  SO STEP ZERO ON RFRA.
7           MR. FISCHER:  YES, IT'S A ZERO ON RFRA.
8   AND ACTUALLY, I BELIEVE IT'S STEP ZERO ON THE ACA TOO.
9   AND I WOULD REFER TO --
10          THE COURT:  SO -- WELL, WHY IT WOULD BE
11  STEP 1 BUT YOU WOULD BE ARGUING THAT THEY HAVE TAKEN
12  ULTRA VIRES ACTIONS UNDER STEP 1?
13          MR. FISCHER:  I BELIEVE IT COULD BE
14  FRANKLY ANY OF THE STEPS, I THINK.  BUT I JUST WANT TO
15  START AT STEP ZERO AND SAY THE SUPREME COURT DECISION IN
16  KING VERSUS BURWELL I THINK IS A GOOD EXAMPLE.  THAT WAS
17  THE CASE INVOLVING THE LANGUAGE IN THE ACA ABOUT TAX
18  CREDITS BEING AVAILABLE TO PEOPLE WHO PURCHASED HEALTH
19  COVERAGE ON AN EXCHANGE RUN BY THE STATE.  AND THE
20  QUESTION WAS WHETHER THAT APPLIED TO THE HEALTHCARE.GOV
21  OR BY THE FEDERAL GOVERNMENT.
22          CHIEF JUSTICE ROBERTS REJECTED THE
23  ARGUMENT THAT CHEVRON DEFERENCE APPLIED, AND HIS
24  REASONING WAS -- WAS THIS:  THE TAX CREDITS ARE AMONG
25  THE ACT'S KEY REFORMS INVOLVING BILLIONS OF DOLLARS IN

220

1   SPENDING EACH YEAR AND AFFECTING THE PRICE OF HEALTH
2   INSURANCE FOR MILLIONS OF PEOPLE.  WHETHER THOSE CREDITS
3   ARE AVAILABLE UNDER FEDERAL EXCHANGES IS THUS A QUESTION
4   OF DEEP ECONOMIC AND POLITICAL SIGNIFICANCE THAT IS
5   CENTRAL TO THE STATUTORY SCHEME.  HAD CONGRESS WISHED TO
6   ASSIGN THAT QUESTION TO AN AGENCY, IT SURELY WOULD HAVE
7   DONE SO EXPRESSLY.  IT IS ESPECIALLY UNLIKELY THAT
8   CONGRESS WOULD HAVE DELEGATED THIS DECISION TO THE IRS,
9   WHICH HAS NO EXPERTISE IN CRAFTING HEALTH INSURANCE
10  POLICY OF THIS SORT.
11          NOW HERE, THE STATUTE HAS A CLEAR
12  DELEGATION OF AUTHORITY TO IDENTIFY APPROPRIATE
13  PREVENTIVE SERVICES.  THAT IS TO THE HEALTH RESOURCES
14  AND SERVICE ADMINISTRATION.  HRSA HAS SIGNIFICANT
15  EXPERTISE ON PREVENTIVE MEDICINE, ON INCREASING ACCESS
16  TO HEALTHCARE, ON PROMOTING HEALTHCARE FOR UNDERSERVED
17  COMMUNITIES.  THERE IS NO EXPERTISE THERE IN DEFINING
18  EXEMPTIONS FOR EXISTING MANDATORY REQUIREMENTS.
19          IN FACT, THAT ACTUALLY RUNS COUNTER TO
20  THEIR MISSION.  THEIR MISSION IS TO INCREASE ACCESS TO
21  HEALTHCARE.  SO IT STRAINS CREDULITY TO SAY THAT
22  CONGRESS WOULD HAVE DELEGATED TO HRSA THE RESPONSIBILITY
23  TO INTERPRET THIS PROVISION IN A WAY THAT ALLOWED FOR
24  SIGNIFICANT EXEMPTIONS.
25          REGARDLESS, IF WE DO GET INTO THE CHEVRON

Exhibit 137                                                                                                    JA-0001847

221

1  FRAMEWORK, THE GOVERNMENT NEEDS TO IDENTIFY THE LANGUAGE
2  IN THE ACA THAT THEY ARE INTERPRETING AND WHAT THEIR
3  INTERPRETATION IS SO THE COURT CAN ASSESS WHETHER THEIR
4  INTERPRETATION IS PRECLUDED BY THE LANGUAGE, AND IF NOT,
5  WHETHER IT'S REASONABLE.
6          AS I READ THE GOVERNMENT'S ARGUMENTS,
7  THEY REFER TO THE SECTION WHICH WE REFER TO.  IT SAYS:
8  A GROUP HEALTH PLAN AND HEALTH INSURANCE ISSUER OFFERING
9  GROUP OR INDIVIDUAL HEALTH INSURANCE COVERAGE SHALL, AT
10 A MINIMUM, PROVIDE COVERAGE FOR AND SHALL NOT IMPOSE ANY
11 CAUTIONARY REQUIREMENTS FOR -- AND THEN SUBSECTION 4 IS:
12 WITH RESPECT TO WOMEN, SUCH ADDITIONAL PREVENTIVE CARE
13 AND SCREENINGS NOT DESCRIBED IN PARAGRAPH 1 AS PROVIDED
14 FOR IN COMPREHENSIVE GUIDELINES SUPPORTED BY THE HRSA.
15         THE ONLY ARGUMENT I HAVE HEARD FROM THE
16 GOVERNMENT AS TO HOW THEY ARE INTERPRETING THAT UNDER
17 CHEVRON IS THAT SOMEHOW THE USE OF THE WORD "AS" BEFORE
18 "PROVIDED FOR" IMPLIES THAT HRSA -- AND THEIR QUOTE IS:
19 MAY DETERMINE NOT ONLY THE SERVICES COVERED BUT THE
20 MANNER OR REACH OF THAT COVERAGE.
21         AND THEN THEY GO ON TO SAY:  THE AGENCIES
22 READ THE STATUTE TO AUTHORIZE THEM TO CRAFT OR MODIFY
23 EXEMPTIONS FOR ANY CONTRACEPTIVE COVERAGE MANDATE AND
24 THAT REASONABLE CONSTRUCTION MUST PREVAIL.  AND THAT
25 PUTS A LOT OF -- THE WORD "AS" IS DOING A LOT OF WORK

222

1  THERE.  THAT IS THE INTERPRETATION THEY COME UP WITH.
2          HRSA HAS NO EXPERTISE IN THIS AREA AND
3  THERE IS SIMPLY NO WAY THAT I CAN SEE THAT THAT LANGUAGE
4  CAN REASONABLY BE READ TO SAY HRSA OR THE AGENCIES UNDER
5  WHICH HRSA IS WORKING CAN CREATE THESE SIGNIFICANT
6  CARVE-OUTS.
7          THE COURT:  SORRY, GO ON.
8          MR. FISCHER:  NO.
9          THE COURT:  SO I ASKED THE GOVERNMENT --
10 THE DEFENSE -- YOU ARE BOTH THE GOVERNMENT -- WHETHER --
11 JUST TO TALK ME THROUGH THIS NOTION THAT THERE IS THE --
12 THE ACA SAYS TO HRSA:  PROVIDES SOME GUIDELINES.  THE
13 GUIDELINES THAT ARE CREATED ON THE CONTRACEPTIVE
14 MANDATE.  AND THEN THE RULES, THE NEW IFR'S, ARE CREATED
15 AS AN EXCEPTION TO THE GUIDELINES, SO IT'S AN AGENCY
16 MODIFYING A GUIDELINE OR A RULE OF AN AGENCY.
17         AND I THINK THE RESPONSE OF THE
18 DEFENDANTS WAS PERFECTLY FINE, IT HAPPENS ALL THE TIME.
19 SO CAN YOU RESPOND TO THAT PARTICULAR POINT AND TELL
20 ME -- IT SEEMS A LITTLE ODD, AND TELL ME WHETHER IT'S
21 JUST ODD OR WHETHER THERE IS SOMETHING PROBLEMATIC ABOUT
22 IT.
23         MR. FISCHER:  WE BELIEVE IT'S SERIOUSLY
24 PROBLEMATIC.  THE AGENCY CANNOT MODIFY GUIDELINES IN A
25 WAY THAT CONFLICTS WITH THE STATUTORY DIRECTION THAT

223

1  CREATED THOSE GUIDELINES, AND THE DELEGATION WAS TO HRSA
2  AND IT WAS TO HRSA FOR A REASON, BECAUSE THEY HAVE
3  EXPERTISE IN IDENTIFYING PREVENTIVE MEDICINE.
4          THERE HAS BEEN A LOT OF DISCUSSION ABOUT
5  HOW CONTRACEPTIVE COVERAGE IS NOT SPECIFICALLY MENTIONED
6  IN THE ACA.  WELL, I DON'T THINK WE WANT CONGRESS TO
7  IDENTIFY THE SPECIFIC PREVENTIVE CARE THAT INSURANCE
8  COMPANIES MUST PROVIDE.  CONGRESS, I BELIEVE, MADE A
9  WISE DECISION THAT THAT DECISION WAS GOING TO BE
10 DELEGATED TO HRSA, WHICH HAS EXPERTISE AND THEN COULD
11 MODIFY THE SERVICES THAT IT RECOMMENDED ON AN AS-NEEDED
12 BASIS, AS MEDICINE CHANGED, AS SCIENTIFIC ADVANCES MOVED
13 US FORWARD.
14         SO THE IDEA THAT AN AGENCY CAN SIMPLY
15 TAKE A GRANT OF AUTHORITY THAT IS FAIRLY CLEARLY LIMITED
16 TOWARD IDENTIFYING THE SERVICES THAT HAVE TO BE PROVIDED
17 AND BLOW THAT UP INTO, WELL, WE CAN CREATE ENTIRE
18 EXEMPTIONS, BROAD EXEMPTIONS FROM THIS RULE THAT SAYS --
19 AND I REFER BACK TO THE PREFATORY LANGUAGE IN 42 U.S.C.
20 30GG-13, WHICH SAYS PROVIDERS OF HEALTH COVERAGE SHALL,
21 AT A MINIMUM, PROVIDE COVERAGE AND SHALL NOT IMPOSE ANY
22 COST SHARING REQUIREMENTS FOR.  THAT LANGUAGE IS ABOUT
23 AS MANDATORY AS YOU CAN GET.
24         AND THEN IT LISTS THE FOUR THINGS.  AT
25 THE VERY BOTTOM IS THE WOMEN'S HEALTH AMENDMENT.  THE

224

1  GOVERNMENT SOMEHOW READS THE LANGUAGE IN THE WOMEN'S
2  HEALTH AMENDMENT TO APPLY BACK TO THE MANDATORY LANGUAGE
3  IN THE BEGINNING AND ALLOW HRSA, WHICH AGAIN, HAS NO
4  EXPERTISE HERE, TO CREATE BROAD EXEMPTIONS FROM IT.
5          WE THINK THAT SIMPLY CAN'T BE SQUARED
6  WITH LANGUAGE OF THE STATUTE, AND IN ADDITION, FLIES
7  DIRECTLY IN THE FACE OF THE PURPOSE OF THE WOMEN'S
8  HEALTH AMENDMENT, WHICH WAS INTENDED TO IMPROVE WOMEN'S
9  ACCESS TO PREVENTIVE CARE.
10         THE GOVERNMENT ALSO RELIES A LOT ON THE
11 EXISTENCE OF GRANDFATHER PLANS.  I THINK YOUR HONOR
12 DISCUSSED THAT.  THERE IS VERY LITTLE EVIDENCE IN THE
13 RECORD THAT GRANDFATHERED PLANS ARE CLAMORING FOR THE
14 ABILITY TO CHANGE, AND THIS -- THE CONTRACEPTIVE MANDATE
15 IS SOMEHOW BLOCKING THEM.
16         BUT ALSO, AS YOU HEARD FROM DR. CHUANG,
17 THE NUMBER OF GRANDFATHER PLANS CONTINUES TO DECLINE.
18 IT WAS LIMITED TO BEGIN WITH.  AND THE FACT THAT
19 CONGRESS MADE WHAT APPARENTLY WAS A NECESSARY COMPROMISE
20 TO GET THE ACA PASSED DOES NOT UNDERMINE THE ARGUMENT
21 THAT THE CONTRACEPTIVE COVERAGE HERE SERVES A COMPELLING
22 AND IMPORTANT GOVERNMENT INTEREST.
23         I ALSO THINK IT IS IMPORTANT TO REMEMBER
24 THAT THE ACA DOES NOT HAVE A CONSCIENCE CLAUSE.  ONE WAS
25 PROPOSED AND IT WAS REJECTED.  THROUGHOUT THE RULES, THE

225

1 ARGUMENT THE GOVERNMENT MAKES IS, WELL, OTHER STATUTES
2 HAVE THEM SO WE CAN RELY ON THAT HERE. THAT IS SIMPLY
3 NOT THE CASE. YOU CAN'T TAKE LANGUAGE FROM ANOTHER
4 STATUTE AND APPLY IT WHERE IT DOES NOT EXIST.
5         AND WHAT'S MORE IS THE FACT THAT CONGRESS
6 REJECTED IT IS A PRETTY GOOD INDICATION THAT CONGRESS
7 DOES NOT BELIEVE THERE IS AN IMPLICIT CONSCIENCE CLAUSE
8 THAT IS ALREADY THERE.
9         NOW, IN THEIR BRIEFING, AND THE
10 GOVERNMENT TO SOME EXTENT THE RULES SAID ALL OF THIS IS
11 REQUIRED UNDER RFRA, THAT WE'RE ALL THIS -- EXCEPT FOR
12 THE MORAL EXCEPTION, WHICH IS NOT A LAW REQUIRED UNDER
13 RFRA.
14         AGAIN, THAT IS A MUCH BROADER READING OF
15 RFRA THAN ANY COURT HAS EVER ADOPTED. AT THE VERY
16 LEAST, I'M NOT AWARE OF ANY DECISION HOLDING THAT RFRA
17 APPLIES TO PUBLICLY-TRADED COMPANIES. I THINK IN SOME
18 WAYS THE IDEA THAT A PUBLICLY-TRADED COMPANY COULD
19 ENGAGE IN THE FREE EXERCISE OF RELIGION IS A LITTLE
20 QUESTIONABLE. CERTAINLY THE SUPREME COURT HAS NEVER
21 HELD THAT.
22         AND FOR THE AGENCIES TO UNILATERALLY SAY
23 WE THINK THIS IS WHAT RFRA MEANS I THINK GOES WELL
24 BEYOND THE SCOPE OF THEIR AUTHORITY. THEY HAVE ALSO
25 DECIDED APPARENTLY THAT THE CONTRACEPTIVE MANDATE DOES

226

1 NOT SERVE A COMPELLING INTEREST.
2         WELL, FIVE JUSTICES IN THE SUPREME COURT
3 IN HOBBY LOBBY SEEM TO DISAGREE. THE FOUR CENTERS
4 CLEARLY SAID THAT IT SERVES A COMPELLING INTEREST, AND
5 JUSTICE KENNEDY DISCUSSED THE COMPELLING INTEREST, NEVER
6 ACTUALLY SAID SPECIFICALLY "I BELIEVE IT SERVES A
7 COMPELLING GOVERNMENT INTEREST," BUT MADE IT PRETTY
8 CLEAR THAT THAT WAS HIS BELIEF. AND FRANKLY, THE
9 MAJORITY IN HOBBY LOBBY NEVER EVEN QUESTIONED THAT.
10 THEY JUST ASSUMED IT FOR PURPOSES OF THE OPINION.
11         SO THE IDEA THAT RFRA SOMEHOW REQUIRES
12 WHAT THE GOVERNMENT IS DOING, THAT IT REQUIRES APPLYING
13 THIS TO PUBLICLY-TRADED COMPANIES, THAT IT REQUIRES
14 MAKING THE ACCOMMODATION PROCESS OPTIONAL IS NOT
15 SUPPORTED BY ANY OF THE CASE LAW THAT IS RELEVANT HERE.
16 AND IT'S NOT SUPPORTED BY A FAIR READING OF THE STATUTE.
17         AND I THINK TO SEE THAT THAT IS THE CASE,
18 WE DON'T NEED TO LOOK ANY FURTHER THAN THE ZUBIK
19 DECISION, WHERE THE SUPREME COURT CLEARLY STRUGGLED WITH
20 APPLYING RFRA IN THE CONTEXT OF AN ENTITY WHO DID OBJECT
21 TO THE ACCOMMODATION PROCESS. IF THE GOVERNMENT WAS
22 CORRECT AND THIS WAS A SLAM DUNK UNDER RFRA, ZUBIK WOULD
23 HAVE BEEN AN EASY DECISION FOR THE SUPREME COURT.
24         IT WAS NOT. ZUBIK EMPHASIZED THE NEED TO
25 BALANCE WHAT IT SAW AS LEGITIMATE EXERCISE OF RELIGION

227

1 AND THE NEEDS OF WOMEN AND THE COMPELLING GOVERNMENT
2 INTEREST IN SERVING AND PROVIDING ACCESS TO CARE --
3 WELL, ZUBIK DID NOT SPECIFICALLY FIND THAT IT WAS A
4 COMPELLING INTEREST, BUT I THINK THE FACT THAT THAT
5 DECISION CAME OUT THE WAY IT DID IS A SIGN -- IS A CLEAR
6 INDICATION THAT RFRA SIMPLY DOES NOT SAY WHAT THE
7 GOVERNMENT HERE BELIEVES IT SAYS.
8         I THINK -- I'M HAPPY TO COME BACK TO THE
9 CONSTITUTIONAL CLAIMS. I WOULD ALSO LIKE TO GET INTO
10 THE HARM THAT PENNSYLVANIA WILL SUFFER, BECAUSE I THINK
11 THAT IS IMPORTANT AS WELL. IT GOES BOTH TO THE
12 IRREPARABLE INJURY PRONG OF THE INJUNCTION AS WELL AS
13 STANDING THAT THE COMMONWEALTH HAS IN THIS CASE.
14         THERE HAS BEEN A LOT OF QUESTIONING TODAY
15 SUGGESTING, WELL, THE COMMONWEALTH CAN'T POINT TO ANY
16 SPECIFIC EMPLOYER WHO IS GOING TO TAKE ADVANTAGE OR WHO
17 HAS ANNOUNCED THEY ARE TAKING ADVANTAGE OF THIS.
18 WELL --
19         THE COURT: WELL, ALSO, THEY CAN'T POINT
20 TO ANY PARTICULAR WOMAN. SO TELL ME WHY -- GIVE ME A
21 RESPONSE TO THAT.
22         MR. FISCHER: WELL, THAT IS A FUNCTION IN
23 MANY RESPECTS OF THE WAY THE RULES ARE DRAFTED. THE
24 RULES ARE DRAFTED SO THAT EMPLOYERS CAN DO THIS QUIETLY.
25 THERE IS NO REQUIREMENT TO NOTIFY HHS. THERE'S NO

228

1 REQUIREMENT TO MAKE A PUBLIC ANNOUNCEMENT. THERE IS NOT
2 EVEN A REQUIREMENT TO CLEARLY COMMUNICATE TO ALL PLAN
3 MEMBERS WE ARE DROPPING YOUR CONTRACEPTION COVERAGE.
4         AN EMPLOYER CAN DO THIS BY SIMPLY
5 INCLUDING IN THE SUMMARY OF BENEFITS OF COVERAGE THAT
6 THEY PROVIDE ON AN ANNUAL BASIS, THAT WE ALL GET, AND
7 PROBABLY MOST OF US DON'T NECESSARILY READ THAT
8 THOROUGHLY. AS LONG AS SOMEWHERE IN THAT DOCUMENT THERE
9 IS AN INDICATION THAT CONTRACEPTION COVERAGE IS NOT
10 PROVIDED AND THAT DOCUMENT IS PROVIDED 30 DAYS PRIOR TO
11 THE START OF THE PLAN YEAR, THAT SATISFIES THE NOTICE
12 REQUIREMENTS.
13         SO THE IDEA THAT SOMEHOW WE WOULD KNOW
14 ABOUT THIS, THAT IT WOULD BE WIDESPREAD KNOWLEDGE WHO IS
15 OPTING OUT, IS NOT CONSISTENT WITH THE WAY THE RULES ARE
16 WRITTEN. NOW, THEY COULD HAVE WRITTEN THE RULES IN SUCH
17 A WAY THAT IT WOULD BE CLEAR HOW MANY COMPANIES ARE
18 TAKING ADVANTAGE, HOW MANY WOMEN ARE AFFECTED. THEY
19 COULD HAVE REQUIRED -- THIS IS HHS -- THEY COULD HAVE
20 REQUIRED NOTICE TO STATE REGULATORS. THEY DID NOT.
21         AND HERE WE ARE IN A SITUATION WHERE IT
22 IS EXTREMELY DIFFICULT FOR ANYONE TO ESTIMATE EXACTLY
23 HOW MANY WOMEN ARE AFFECTED. IN FACT, THE GOVERNMENT
24 CONCEDES THAT. THEY SAY THEY DON'T EVEN KNOW HOW MANY
25 WOMEN ARE AFFECTED BY THE CURRENT ACCOMMODATION PROCESS.

Exhibit 137

JA-0001849

1  THE ONLY NUMBERS THEY COME UP WITH ARE BASED ON THE
2  COMPANIES THAT HAVE NOTIFIED HHS UNDER THAT SPECIFIC
3  OPTION, AS WELL AS SOME COMPANIES THAT ARE SELF-INSURERS
4  WHERE THE THIRD-PARTY ADMINISTRATOR HAS BEEN IN CONTACT
5  WITH HHS.
6           NOW, DESPITE NOT FULLY KNOWING HOW MANY
7  PEOPLE USE THE ACCOMMODATION, THEY DO TRY TO COME UP
8  WITH ESTIMATES IN THE RULES AS TO HOW MANY WOMEN WILL BE
9  AFFECTED.  THEY ESTIMATE THAT OVER 1 MILLION INDIVIDUALS
10  ARE COVERED BY PLANS THAT CURRENTLY USE THE
11  ACCOMMODATION PROCESS.  AND THEY GET THAT DOWN TO AN
12  ESTIMATE OF ROUGHLY 32,000 WOMEN NATIONWIDE WHO MAY LOSE
13  COVERAGE -- WHO WILL LOSE COVERAGE AS A RESULT OF THESE
14  RULES.
15           NOW, WE BELIEVE THAT THERE ARE PROBLEMS
16  WITH THE WAY THEY ESTIMATED THOSE NUMBERS, BUT
17  REGARDLESS, THEIR OWN ESTIMATES TELL YOU THAT LARGE
18  NUMBERS OF WOMEN WILL BE AFFECTED, AND THAT WILL INCLUDE
19  LARGE NUMBERS OF WOMEN HERE IN PENNSYLVANIA.  AS WE
20  DETAIL IN OUR BRIEF, MANY OF THE PLAINTIFFS IN THESE
21  CASES WERE PENNSYLVANIA ENTITIES.
22           YOU HAVE SEEN EVIDENCE OR YOU HAVE SEEN
23  ARGUMENTS IN SOME OF THE AMICUS BRIEFS ABOUT HOW THIS
24  RULE WILL AFFECT WOMEN IN DIFFERENT STATES ACROSS THE
25  COUNTRY.  I BELIEVE IN THE AMICUS BRIEFS SUBMITTED BY

1  WHERE THERE IS A STATE LAW THAT WOULD REQUIRE THEIR
2  EMPLOYER TO CONTINUE COVERING CONTRACEPTION.  SO THE
3  HARM IN PENNSYLVANIA WILL BE MORE SIGNIFICANT THAN IT IS
4  IN SOME OTHER STATES LIKE NEW YORK AND MASSACHUSETTS,
5  CALIFORNIA, WHERE THEY DO HAVE CONTRACEPTION PARITY
6  STATUTES.
7           SO THE RESULT OF ALL OF THIS IS THAT
8  WOMEN WILL LOSE COVERAGE, THERE WILL BE COSTS IMPOSED ON
9  THE STATE BECAUSE SIGNIFICANT NUMBERS OF THESE WOMEN
10  WILL BE ELIGIBLE FOR STATE-FUNDED PROGRAMS OR WILL GO TO
11  CLINICS THAT RECEIVE STATE FUNDING, AND ULTIMATELY THE
12  STATE AND OTHER ENTITIES WILL BE PAYING THOSE COSTS.
13           AGAIN, THAT IS NOT SOMETHING WE ARE JUST
14  SPECULATING ABOUT.  THERE IS EVIDENCE IN THE RECORD
15  ABOUT HOW THOSE PROGRAMS WORK AND IT'S ALSO REFLECTED IN
16  THE GOVERNMENT'S RULES.  WHEN THEY ARGUE THAT THE RULES
17  WILL NOT IMPOSE A SIGNIFICANT IMPACT ON WOMEN, ONE OF
18  THE POINTS THEY MAKE IS, WELL, THERE ARE ALL THESE OTHER
19  PROGRAMS OUT THERE, ALL THESE OTHER STATE-FUNDED
20  PROGRAMS, STATE AND FEDERAL GOVERNMENT-FUNDED PROGRAMS
21  THAT CAN PROVIDE COVERAGE, AND THEY POINT SPECIFICALLY
22  TO TITLE 10 CLINICS.
23           SO EVEN THE GOVERNMENT ACKNOWLEDGES THAT
24  THERE WILL BE A SHIFT FROM EMPLOYERS TO PUBLICLY-FUNDED
25  PROGRAMS AS A RESULT OF THESE RULES.

1  THE OTHER STATES, THERE WAS AN ESTIMATE THAT OVER HALF A
2  MILLION WOMEN IN PENNSYLVANIA WHO CURRENTLY RECEIVE
3  EMPLOYER-SPONSORED COVERAGE WOULD BE ELIGIBLE FOR
4  STATE-FUNDED PROGRAMS IF THEY LOST THEIR COVERAGE AND
5  THEREFORE COULD WIND UP POSING A DIRECT COST TO THE
6  STATES.
7           AND YOU HAVE ALSO HEARD TESTIMONY FROM
8  OUR EXPERTS ABOUT THEIR EXPERIENCE WITH THE AFFORDABLE
9  CARE ACT, WHAT THAT HAS MEANT TO PENNSYLVANIA WOMEN, AND
10  THEREFORE WHAT THEY BELIEVE WILL HAPPEN IF WOMEN ARE
11  DENIED COVERAGE.
12           SO BECAUSE OF THIS 30-DAY OPTION THAT
13  ALLOWS AN EMPLOYER TO -- AN EMPLOYER OR ANY PLAN ENTITY,
14  ANY PLAN SPONSOR TO MODIFY OR ELIMINATE ITS
15  CONTRACEPTIVE BENEFITS AT THE BEGINNING OF A PLAN YEAR
16  WITH ONLY 30 DAYS' NOTICE, THAT IS WHY WE BELIEVE AN
17  INJUNCTION BY JANUARY 1ST IS IMPORTANT.  JANUARY 1ST IS
18  THE START OF THE PLAN YEAR FOR MANY EMPLOYERS, AND
19  THEREFORE WE BELIEVE ON THAT DAY MANY WOMEN WILL BE AT A
20  RISK OF LOSING THEIR COVERAGE.
21           PENNSYLVANIA IS ACTUALLY IN A UNIQUE
22  SITUATION AS WELL, BECAUSE UNLIKE A LOT OF OTHER STATES,
23  WE DO NOT HAVE A CONTRACEPTIVE PARITY STATUTE.  SO WOMEN
24  WHO ARE COVERED BY FULLY-INSURED PLANS THAT ARE NOT
25  REGULATED UNDER ERISA DO NOT HAVE A FALLBACK OPTION

1           FINALLY, YOUR HONOR, IN GETTING INTO
2  PENNSYLVANIA ENTITIES THAT MAY TAKE ADVANTAGE OF THE
3  EXEMPTION, WE HAVE INCLUDED IN EXHIBIT 20, WHICH IS IN
4  THE RECORD, A SUBSET OF DOCUMENTS FROM A FOIA REQUEST
5  THAT WAS A MADE OF THE GOVERNMENT, OF THE FEDERAL
6  AGENCIES, AND WHAT THESE DOCUMENTS ARE ARE SOME OF THE
7  NOTICES TO HHS AND SUBSEQUENT RESPONSES ABOUT ENTITIES,
8  AND MOST OF THE ONES IN EXHIBIT 20 ARE PENNSYLVANIA
9  ENTITIES, ENTITIES THAT WERE USING THE ACCOMMODATION
10  PROCESS.
11           NOW, AS I SAID EARLIER, THE GOVERNMENT
12  DOES NOT KNOW EVERYBODY WHO USES THE ACCOMMODATION
13  PROCESS BECAUSE NOT EVERYBODY NOTIFIES THE GOVERNMENT,
14  BUT HERE ARE SOME OF THE EXAMPLES OF PENNSYLVANIA
15  ENTITIES THAT HAVE USED THE ACCOMMODATION PROCESS, WHICH
16  AS A RESULT OF THESE RULES IS NOW OPTIONAL, AND IT'S
17  CERTAINLY A REASONABLE INFERENCE THAT ENTITIES THAT HAVE
18  A SINCERELY-HELD RELIGIOUS OBJECTION TO PROVIDING
19  CONTRACEPTIVE COVERAGE WILL CHOOSE, IF GIVEN THE
20  OPPORTUNITY, TO OPT OUT ENTIRELY RATHER THAN TO
21  PARTICIPATE IN A PROCESS WHICH SOME ENTITIES HAVE
22  ARGUED -- AND THIS HAS BEEN THE SUBJECT OF ZUBIK
23  LITIGATION -- SOME ENTITIES HAVE ARGUED NEVERTHELESS
24  STILL IMPOSES A SUBSTANTIAL BURDEN ON THEIR RELIGIOUS
25  BELIEFS.

Exhibit 137                                                                    JA-0001850

233

1        SO FOR ALL OF THOSE REASONS, WE THINK IT
2  IS FAIRLY CLEAR THAT THE RULES VIOLATE THE APA. THEY
3  ARE ARBITRARY AND CAPRICIOUS, THEY ARE INCONSISTENT WITH
4  THE AFFORDABLE CARE ACT AND THE PROCESS THAT WAS
5  FOLLOWED WAS NOT LEGITIMATE, AND BECAUSE OF THAT HARM,
6  BECAUSE OF THAT ILLEGALITY, SUBSTANTIAL INJURY WILL
7  OCCUR IN THE COMMONWEALTH.
8        I WANT TO RETURN TO JUST ONE ISSUE ON
9  STANDING BEFORE I WILL CONCLUDE, BUT THE COURT ASKED
10  EARLIER ABOUT THE EXTENT OF PENNSYLVANIA'S INJURY AND
11  HOW, AS A STATE, PENNSYLVANIA CAN BRING THIS ACTION. WE
12  THINK IT IS FAIRLY CLEAR THAT MASSACHUSETTS VS. EPA
13  CONTROLS AND ALLOWS THE COMMONWEALTH TO BRING AN ACTION
14  CHALLENGING THE DECISIONS HERE IN THE FEDERAL
15  GOVERNMENT. THE COURT POINTED OUT THAT THAT WAS THE
16  CASE INVOLVING INACTION RATHER THAN ACTION, BUT IN MANY
17  WAYS THIS CASE, ALTHOUGH IT IS CHALLENGING THE SPECIFIC
18  REGULATIONS THAT WERE ISSUED, ULTIMATELY IS ABOUT THE
19  GOVERNMENT CHOOSING NOT TO ENFORCE THE REQUIREMENTS OF
20  THE AFFORDABLE CARE ACT AND THE CONTRACEPTIVE MANDATE
21  AGAINST ENTITIES THAT OBJECT. AS A RESULT OF THESE
22  RULES, THOSE LAWS, THOSE REQUIREMENTS WILL NO LONGER BE
23  ENFORCED.
24        WHAT IS MORE, I DON'T THINK THAT FOR
25  STANDING ANALYSIS PURPOSES THERE IS A SIGNIFICANT

234

1  DIFFERENCE BETWEEN ACTION AND INACTION. EITHER WAY,
2  PENNSYLVANIA'S HARMED, PENNSYLVANIA'S RESIDENTS ARE
3  HARMED, THE COMMONWEALTH'S QUASI-SOVEREIGN INTEREST IN
4  PROTECTING THE HEALTH AND SAFETY OF ITS RESIDENTS IS
5  GOING TO BE HARMED, AND FOR ALL OF THOSE REASONS, WE
6  BELIEVE THAT THE COMMONWEALTH DOES HAVE STANDING IN THIS
7  CASE.
8
9        THE COURT: OKAY, I THINK YOUR COLLEAGUE
10  WANTS YOU TO TELL ME ONE MORE THING.
11        MR. FISCHER: YOUR HONOR, I APOLOGIZE. I
12  DO NOT BELIEVE I RESERVED ANY TIME FOR REBUTTAL. WOULD
13  THAT BE POSSIBLE? IF I HAVE TIME LEFT --
14        THE COURT: THAT IS FINE.
15        MR. FISCHER: OKAY.
16        THE COURT: AS I SAID, IT'S ME AND YOU.
17  THERE IS NO ONE HERE SO IT'S FINE. WE HAVE UNTIL
18  6 O'CLOCK SO LET'S --
19        MR. FISCHER: SO -- YEAH.
20        THE COURT: ARE YOU DONE NOW?
21        MR. FISCHER: I JUST HAVE ONE MORE --
22        THE COURT: GO AHEAD.
23        MR. FISCHER: ON THIS QUESTION OF WHETHER
24  THE COMMONWEALTH WILL BE HARMED, IT REALLY COMES DOWN TO
25  COMMON SENSE. WHAT THE GOVERNMENT IS SAYING IS THAT

235

1  DESPITE THESE SWEEPING NEW RULES THAT THEY ARGUE ARE SO
2  IMPORTANT THAT THEY HAVE TO BE IMPLEMENTED IMMEDIATELY
3  TO PROTECT PEOPLE THAT ARE SUFFERING, NEVERTHELESS,
4  NOBODY IN PENNSYLVANIA IS GOING TO BE HARMED BECAUSE NO
5  EMPLOYER IS GOING TO TAKE ADVANTAGE OF THEM.
6        NOW THAT JUST DEFIES LOGIC. IT IS FAIRLY
7  CLEAR THAT THERE WILL BE WOMEN ACROSS THE COUNTRY AND IN
8  PENNSYLVANIA, BASED ON THEIR OWN ESTIMATES, BASED ON
9  PRIOR LITIGATION, BASED ON SOME OF THE DOCUMENTS IN THE
10  RECORD, THERE WILL BE WOMEN WHO ARE HARMED. THAT WILL
11  CAUSE HARM TO THE COMMONWEALTH, AND CLEARLY WE BELIEVE
12  THAT THAT NOT ONLY GIVES US STANDING, BUT ALSO
13  ESTABLISHES INJURY FOR PURPOSES OF OUR INJUNCTION.
14        THANK YOU, YOUR HONOR.
15        THE COURT: THANK YOU.
16        WHO WILL BE ARGUING ON BEHALF OF THE
17  DEFENDANTS?
18        MR. DAVIS: I WILL, YOUR HONOR.
19        MAY I APPROACH, YOUR HONOR?
20        THE COURT: YOU MAY.
21        MR. DAVIS: IF YOUR HONOR WOULD INDULGE
22  ME AT THE BEGINNING, I WOULD LIKE TO MAKE A RECORD ON
23  CERTAIN EVIDENTIARY ISSUES. SPECIFICALLY WE WOULD LIKE
24  TO MOVE TO STRIKE THE TESTIMONY OF DRS. WEISMAN, BUTTS
25  AND CHUANG TO THE EXTENT THEY TESTIFIED ABOUT THE IMPACT

236

1  OF THE NEW RULES ON WOMEN'S ACCESS.
2        THE COURT: THE HORSE HAS LEFT THE BARN
3  ON THAT. YOU HAD AN OPPORTUNITY, YOU HAD A LAWYER WHO
4  WAS HANDLING THAT ISSUE. I RULED.
5        MR. DAVIS: YOUR HONOR, CERTAIN THINGS
6  CAME UP THROUGH THE TESTIMONY AFTER THE OBJECTION WAS
7  MADE THAT I'D JUST LIKE TO PUT ON THE RECORD, IF YOU
8  DON'T MIND.
9        THE COURT: I RULED AGAINST YOU. I DO
10  MIND. YOU DON'T GET TO HAVE A SECOND BITE AT THE APPLE.
11        GO AHEAD. THIS IS NOW THE CLOSING
12  ARGUMENT PORTION OF THE PROCEEDING.
13        MR. DAVIS: OKAY. ON STANDING, YOUR
14  HONOR, YOU HEARD FROM DRS. WEISMAN, BUTTS AND CHUANG
15  THAT THEY ARE NOT AWARE OF A SINGLE INDIVIDUAL WHO WILL
16  BE AFFECTED BY THE NEW RULES AND THEY ARE NOT AWARE OF A
17  SINGLE EMPLOYER WHO WILL BE TAKING ADVANTAGE OF THE NEW
18  RULES. I THINK IT WOULD BE EXTRAORDINARY TO GRANT AN
19  INJUNCTION THAT WOULD NOT BENEFIT A SINGLE IDENTIFIABLE
20  INDIVIDUAL. I THINK THAT TESTIMONY WAS VERY TELLING.
21        THE COURT: IF THEY HAD BEEN ABLE TO
22  IDENTIFY ONE PERSON, WOULD YOUR RESPONSE HAVE BEEN
23  DIFFERENT?
24        MR. DAVIS: YOUR HONOR, I THINK IT MIGHT
25  HAVE BEEN DIFFERENT WITH RESPECT TO STANDING BUT NOT

Exhibit 137                                                                              JA-0001851

237

1  WITH RESPECT TO IRREPARABLE INJURY. I THINK IRREPARABLE
2  INJURY REQUIRES SOME SORT OF DAMAGE MORE THAN A MINOR
3  AMOUNT, AND IT WOULD NOT BE DIFFERENT IN A SENSE -- WITH
4  RESPECT TO STANDING, IN THE SENSE THAT THEY WOULD ALSO
5  HAVE TO SHOW THAT THAT EMPLOYEE WOULD ACTUALLY QUALIFY
6  FOR A STATE-FUNDED PROGRAM AND WOULD ACTUALLY GO SEEK
7  COVERAGE FROM THAT STATE-FUNDED PROGRAM. SO IF THEY
8  COULD SHOW ALL OF THAT, MAYBE IT WOULD CHANGE THE
9  STANDING ANALYSIS.
10         THE COURT: WELL, LET'S FOCUS IN ON
11 STANDING THEN.
12         SO I'M LOOKING AT FEDERAL REGISTER 82-197
13 AND THERE IS A SECTION, THE RELIGIOUS EXEMPTION. IT'S
14 THE DISCUSSION OF THE PEOPLE WHO WOULD BE IMPACTED OR
15 THE WOMEN WHO WOULD BE IMPACTED. IT SAYS: BASED ON OUR
16 LIMITED INFORMATION FROM THE LITIGATION AND
17 ACCOMMODATION NOTICES, WE EXPECT THAT THE OVERLAP IS
18 SIGNIFICANT. NEVERTHELESS, IN ORDER TO ESTIMATE THE
19 POSSIBLE EFFECTS OF THESE RULES WE ASSUME THERE IS NO
20 OVERLAP BETWEEN THESE TWO NUMBERS AND THEREFORE -- AND
21 HERE IS THE IMPORTANT PART -- THAT THESE INTERIM FINAL
22 RULES WOULD AFFECT THE CONTRACEPTIVE COSTS OF
23 APPROXIMATELY 31,700 WOMEN.
24         SO I THINK THAT YOUR RULES ALONE SUGGEST
25 THAT -- WELL, THEY DON'T SUGGEST, THEY SAY THAT 31,700

238

1  WOMEN WILL BE AFFECTED. AM I READING THAT CORRECTLY?
2          MR. DAVIS: YOUR HONOR, THE RULES
3  ESTIMATE THAT SOME WOMEN WILL BE AFFECTED BY THIS. THAT
4  ESTIMATE STANDARD IS LOWER THAN THE CERTAINLY IMPENDING
5  STANDARD NECESSARY TO SHOW STANDING. IN A COURTROOM, I
6  THINK THE STANDARD IS CERTAINLY IMPENDING, REASONABLY
7  CERTAIN, AND I THINK THAT IS WHAT THEY FAILED TO SHOW
8  HERE. AND AGAIN, YOU'D HAVE THAT --
9          THE COURT: SO INSTEAD OF STEPPING AWAY
10 FROM MY QUESTION, ANSWER MY QUESTION. SO IN THE
11 REGULATIONS THERE IS A STATEMENT IS THAT THESE INTERIM
12 FINAL RULES WOULD AFFECT THE CONTRACEPTIVE COSTS OF
13 APPROXIMATELY 31,700 WOMEN. IS THAT A CORRECT STATEMENT
14 OF WHAT THE RULES SAY?
15         MR. DAVIS: YOUR HONOR, I DON'T HAVE THAT
16 STATEMENT RIGHT IN FRONT OF ME. I ASSUME YOUR HONOR IS
17 READING IT CORRECTLY.
18         THE COURT: SO GIVEN THE FACT THAT THE
19 RULES THEMSELVES HAVE SAID 31,700 WOMEN WILL BE -- THE
20 COST OF SEVEN -- 31,700 WOMEN WILL BE AFFECTED, HOW DOES
21 THAT IMPACT HERE ON THE STANDING ANALYSIS?
22         MR. DAVIS: AGAIN, YOUR HONOR, IN THE
23 CONTEXT OF THE RULES, THAT IS AN ESTIMATE. THAT IS NOT
24 A BLANKET STATEMENT THAT 31,000 WOMEN ARE DEFINITELY
25 GOING TO BE AFFECTED BY THESE RULES. I FUNDAMENTALLY

239

1  DISAGREE WITH THE IDEA THAT THAT IS AN IRONCLAD
2  PREDICTION OF WHAT WILL HAPPEN. THAT IS AN ESTIMATE.
3          THE RULES IN OTHER PLACES SAY THAT
4  THEY -- THAT IT'S -- THIS ENDEAVOR IS FRAUGHT WITH
5  UNCERTAINTY, IT'S NOT CLEAR WHAT EFFECT THESE WILL HAVE,
6  THAT MANY EMPLOYERS ARE ALREADY PROTECTED BY
7  INJUNCTIONS. I DON'T THINK THERE IS ANY WAY TO READ
8  THAT STATEMENT AS AN IRONCLAD PREDICTION THAT THIS IS
9  WHAT WILL HAPPEN.
10         THE COURT: GO AHEAD.
11         MR. DAVIS: I WOULD ALSO LIKE TO -- YOU
12 ALSO HEARD, ALSO ON THE STANDING QUESTION, YOUR HONOR,
13 YOU HEARD FROM THE WITNESSES THAT ACCESS TO
14 CONTRACEPTIVE COVERAGE HAS INCREASED IN THE YEAR AFTER
15 THE AFFORDABLE CARE ACT, THAT NO LONGER ARE THEY
16 BEING -- ARE DOCTORS BEING ASKED ABOUT COST-FREE
17 CONTRACEPTION. I JUST WANTED TO POINT OUT THAT THIS NEW
18 WORLD THAT THEY ARE TALKING ABOUT AFTER THE AFFORDABLE
19 CARE ACT IS A WORLD WHERE EVERY KNOWN RELIGIOUS OBJECTOR
20 WAS ALREADY EXEMPT. IT WAS ALREADY NOT PROVIDING
21 CONTRACEPTIVE COVERAGE, SO IT'S NOT CLEAR THEN WHY THESE
22 NEW RULES WOULD RETURN US BACK TO THE WORLD OF THE
23 PRE-ACA ERA.
24         I'D ALSO LIKE TO RETURN TO WHAT WE TALKED
25 ABOUT EARLIER THIS MORNING, YOUR HONOR, ON THE MORAL

240

1  OBJECTORS WHO COULD -- WHETHER OR NOT THERE IS A WAY TO
2  POLICE SINCERITY IN THAT CONTEXT. JUST TO ELABORATE ON
3  WHAT I SAID EARLIER, IT'S POSSIBLE FOR AN EMPLOYEE OF A
4  COMPANY WHO BELIEVES THAT HER EMPLOYER IS IMPROPERLY
5  ASSERTING A MORAL OBJECTION TO FILE A COMPLAINT UNDER
6  ERISA WITH THE DEPARTMENT OF LABOR. LABOR HAS THE
7  AUTHORITY TO ENFORCE UNDER ERISA.
8          LABOR ALSO HAS THE AUTHORITY TO REFER TO
9  THE TREASURY DEPARTMENT, FOR IRS TO INVESTIGATE THE
10 COMPANY FOR FAILING TO PAY EXCISE TAXES, IN OTHER WORDS
11 FOR FAILING TO COMPLY WITH THE MANDATE. AND SINCE
12 SINCERITY IS AN ELEMENT OF THE EXEMPTION, THAT WOULD BE
13 A LIVE ENFORCEMENT ISSUE IN THIS CONTEXT.
14         AND I ALSO ADD THAT AN EMPLOYEE IN THAT
15 CONTEXT WOULD CONCEIVABLY HAVE A TITLE VII REMEDY
16 AVAILABLE AGAINST HER EMPLOYER.
17         I WOULD ALSO, ALTHOUGH I KNOW YOUR HONOR
18 WAS NOT ENAMORED WITH THIS ARGUMENT, I WOULD JUST LIKE
19 TO ADD JUST A COUPLE OF QUICK WORDS ON THE RICCI VERSUS
20 DESTEFANO ARGUMENT. YOUR HONOR HAD EXPRESSED CONCERN
21 THAT THAT CASE WAS NOT SUFFICIENTLY ON ALL FOURS WITH
22 THIS CASE BECAUSE IT INVOLVED A CITY AND NOT THE FEDERAL
23 GOVERNMENT FOR OTHER REASONS. IF IT GIVES YOU ANY
24 SOLACE, YOUR HONOR, THERE ARE -- THERE IS AN ANALOGOUS
25 PRINCIPLE IN THE CONTEXT OF CHEVRON DEFERENCE THAT MAY

Exhibit 137                                                                      JA-0001852

241

1  BE CLOSER TO THIS CASE.

2          AND THERE IS A SUPREME COURT CASE CALLED

3  SCIALABBA, S-C-I-A-L-A-B-B-A, VERSUS CUELLAR DE OSORIO,

4  C-U-E-L-L-A-R D-E O-S-O-R-I-O, 134 S.CT 2191:  WHEN AN

5  AGENCY THUS RESOLVES STATUTORY TENSION, ORDINARY

6  PRINCIPLES OF ADMINISTRATIVE DEFERENCE REQUIRE US TO

7  DEFER.

8          ANOTHER CASE -- I WILL GIVE YOU THE CITE

9  IN A SECOND -- SAYS THAT WHEN A STATUTORY SCHEME

10 CONTAINS A FUNDAMENTAL AMBIGUITY ARISING FROM THE

11 DIFFERENT MANDATES OF TWO PROVISIONS, IT IS APPROPRIATE

12 TO LOOK TO THE IMPLEMENTING AGENCY'S EXPERT

13 INTERPRETATION.

14         SO I THINK THAT MIGHT BE CLOSER TO WHAT

15 YOUR HONOR WAS LOOKING FOR.

16         THE COURT:  THAT IS BETTER.

17         MR. DAVIS:  AND THAT CASE IS NATIONAL

18 ASSOCIATION OF HOMEBUILDERS VERSUS DEFENDERS OF

19 WILDLIFE.  551 U.S. 644-666.

20         THE COURT:  SCIALABBA, WHAT YEAR WAS

21 SCIALABBA?

22         MR. DAVIS:  I NEGLECTED TO WRITE DOWN THE

23 YEAR.  I THOUGHT I HAD THAT.

24         ONE SECOND, YOUR HONOR.  I WILL GET THAT

25 FOR YOU.

242

1          THE COURT:  OKAY.

2          MR. DAVIS:  2014.

3          THE COURT:  2014.

4          MR. DAVIS:  YES.

5          THE COURT:  OKAY.  I WILL TAKE A LOOK AT

6  THAT CASE.

7          MR. DAVIS:  I WOULD LIKE TO RESPOND TO A

8  FEW THINGS THAT MY COLLEAGUE ON THE OTHER SIDE JUST

9  SAID.  HE SUGGESTED THAT RECOGNITION OF MORAL OBJECTIONS

10 IS UNPRECEDENTED, IF I HEARD HIM CORRECTLY.  THAT IS NOT

11 TRUE.  MORAL OBJECTIONS HAVE BEEN STANDARD IN THE LAW

12 FOR QUITE A LONG TIME.  IN FACT, PENNSYLVANIA HAS ITS

13 OWN CONSCIENCE CLAUSE PERMITTING MEDICAL PROFESSIONALS

14 TO OPT OUT OF PROVIDING ABORTIONS, FOR EXAMPLE, AND

15 THERE HAS BEEN THE CONSCIENCE CLAUSE EXEMPTING

16 CONSCIENTIOUS OBJECTORS FROM THE DRAFT.

17         I WOULD ALSO LIKE TO ADDRESS THE KING

18 VERSUS BURWELL ISSUE THAT CAME UP, YOUR HONOR, IN THE

19 CONTEXT OF WHETHER OR NOT THE AGENCY'S INTERPRETATION IS

20 ENTITLED TO -- OF THE AFFORDABLE CARE ACT IS ENTITLED TO

21 CHEVRON DEFERENCE.  YOUR HONOR, IN KING VERSUS BURWELL

22 THE COURT HELD THAT WHETHER TAX CREDITS ARE AVAILABLE ON

23 FEDERAL EXCHANGES IS A MAJOR QUESTION, THAT IT WOULD BE

24 INCONCEIVABLE THAT CONGRESS WOULD HAVE DELEGATED THAT TO

25 -- IMPLICITLY DELEGATED THAT TO THE AGENCIES.

243

1          SO KING WAS ABOUT IMPLICIT DELEGATIONS

2  BUT THIS CASE IS ABOUT AN EXPLICIT DELEGATION OF

3  AUTHORITY AT 42 U.S.C. 300GG-13(A)(4).

4          ANOTHER POINT I'D LIKE TO CLARIFY THAT

5  CAME UP WAS THE QUESTION ABOUT WHETHER THE AGENCIES HAVE

6  AUTHORITY TO CREATE EXEMPTIONS FROM THE GUIDELINES,

7  WHICH WE DISCUSSED EARLIER.  I JUST WANTED TO CLARIFY

8  THAT THE EXEMPTIONS THEMSELVES ARE IN THE HRSA

9  GUIDELINES, SO IT'S NOT LIKE THESE RULES ARE CREATING

10 EXEMPTIONS TO HRSA'S GUIDELINES; THE GUIDELINES

11 THEMSELVES SPELL OUT THE RELIGIOUS AND MORAL EXEMPTIONS.

12         AND THAT IS TRUE NOT ONLY OF THESE RULES

13 OF THE GUIDELINES IN 2016, IT'S ALSO TRUE OF THE

14 GUIDELINES IN 2011, WHEN THE LAST ADMINISTRATION DID THE

15 RELIGIOUS EMPLOYER EXEMPTION.  THE HRSA GUIDELINES THERE

16 THEMSELVES INCORPORATED THE EXEMPTION, SO I DON'T THINK

17 THIS QUESTION ABOUT WHETHER AGENCIES CAN CREATE

18 EXCEPTIONS TO THE GUIDELINES IS REALLY PRESENTED HERE.

19         THERE WAS ALSO A REFERENCE TO ALL OF THE

20 PENNSYLVANIA ENTITIES THAT ARE USING THE ACCOMMODATION.

21 I JUST POINT OUT THERE, YOUR HONOR, THAT THERE IS NO

22 INDICATION THAT ANY OF THOSE ENTITIES ARE GOING TO

23 SWITCH FROM USING THE ACCOMMODATION TO USING THE

24 EXEMPTION.  IT MAY BE, LIKE FOR MANY ENTITIES, THAT THE

25 ACCOMMODATION SATISFIES THEIR RELIGIOUS EXEMPTIONS AND

244

1  THEY WON'T SWITCH TO ANYTHING ELSE.

2          AND, FINALLY, YOUR HONOR, I THINK THIS

3  POINT ABOUT HOW -- ON IRREPARABLE INJURY, ABOUT HOW THE

4  EXCLUSION MUST BE CLEAR ON THE FACE OF THE PLAN DOCUMENT

5  AND THAT IS WHY MAYBE THESE WITNESSES DID NOT KNOW ABOUT

6  ANYONE WHO KNEW ABOUT ANYONE WHO WAS GOING TO LOSE

7  CONTRACEPTIVE COVERAGE, WELL, THERE IS ALSO A

8  REQUIREMENT THAT AN EMPLOYER WHO PLANS TO TAKE THIS

9  EXEMPTION NOTIFY ITS EMPLOYEES 30 DAYS BEFOREHAND AND

10 SEND OUT A PLAN DOCUMENT THAT -- WHERE THE EXCLUSION OF

11 COVERAGE IS APPARENT FROM THE FACE OF THE PLAN DOCUMENT.

12 AND WE HAVE HEARD NOTHING ABOUT ANY OF THOSE NOTICES

13 BEING SENT OUT.  NO WITNESS HAS TESTIFIED THAT THEY ARE

14 AWARE OF ANY OF THOSE NOTICES.  AND YOU WOULD THINK IF

15 THIS IMPACT WAS GOING TO BE AS WIDESPREAD AS THE

16 COMMONWEALTH SUGGESTS, WE WOULD HAVE HEARD SOME INKLING

17 OF THAT.  AND THE FACT IS THAT WE HAVE NOT.

18         SO I JUST -- THE LAST POINT I WOULD JUST

19 LIKE TO MAKE, YOUR HONOR, IS THAT AGAIN, YOU ARE NOT

20 WRITING ON A BLANK SLATE HERE.  THERE IS A LOT OF WATER

21 UNDER THE BRIDGE.  THERE IS A LOT OF EXISTING

22 PRELIMINARY INJUNCTIONS AND PERMANENT INJUNCTIONS OUT

23 THERE THAT HAVE MEANT THAT THE STATE OF THE WORLD BEFORE

24 THESE NEW RULES CAME OUT WERE THAT MOST, MAYBE EVEN ALL

25 OF THE EMPLOYERS WHO OBJECTED TO PROVIDING CONTRACEPTIVE

Exhibit 137                                                                                        JA-0001853

245

1    COVERAGE WERE EXEMPT FROM THIS REQUIREMENT ALREADY.  SO
2    THERE IS NOT -- IT'S NOT CLEAR WHAT IMPACT AN INJUNCTION
3    WOULD HAVE.  AND IN THAT CIRCUMSTANCE, IT'S BLACK-LETTER
4    LAW THAT THE AGENCY SHOULD STAY ITS HAND -- OR THE COURT
5    SHOULD STAY ITS HAND.  IT'S BLACK-LETTER LAW THAT THE
6    COURT SHOULD STAY ITS HAND.
7              YOUR HONOR, ON ONE MORE ISSUE, ON THE
8    APA, I JUST WOULD LIKE TO ADD THAT THIS CASE IS SUPPOSED
9    TO BE LIMITED TO THE ADMINISTRATIVE RECORD, AND THAT
10   WHILE I RECOGNIZE WHAT YOUR HONOR SAID ABOUT SOME OF
11   THESE WITNESSES' TESTIMONY --
12             THE COURT:  I DON'T THINK THAT IS THE
13   CASE.  IF YOU READ MY ORDER ON THE MOTION IN LIMINE,
14   THAT IS NOT THE CASE.
15             MR. DAVIS:  WELL --
16             THE COURT:  DID YOU READ THE ORDER ON
17   MOTION IN LIMINE?
18             MR. DAVIS:  I DID, YOUR HONOR.
19             THE COURT:  THEREFORE, THE CASE IS NOT
20   SUPPOSED TO BE DECIDED ON THE ADMINISTRATIVE RECORD
21   ONLY.
22             MR. DAVIS:  YOUR HONOR, I'M RESPECTFULLY
23   DISAGREEING WITH YOUR HONOR'S MOTION.
24             THE COURT:  YOU CAN SAY THAT YOU BELIEVE
25   THAT THAT IS THE CASE, BUT I DON'T THINK YOU CAN SAY

246

1    SUPPOSED TO, BECAUSE THERE IS AN ORDER OF THIS COURT
2    WHICH PARTICULARLY DESCRIBES WHAT RECORD THIS DECISION
3    IS BEING MADE ON.  DO YOU UNDERSTAND THAT?
4              MR. DAVIS:  FAIR ENOUGH, YOUR HONOR.  I
5    WILL PHRASE IT DIFFERENTLY.  I BELIEVE THAT THIS CASE
6    SHOULD BE DECIDED ON THE BASIS OF THE ADMINISTRATIVE
7    RECORD.  I DON'T BELIEVE THAT THE COURT'S RULING ON THE
8    MOTION IN LIMINE WAS CORRECT.  I THINK THAT THE WITNESS
9    TESTIMONY IN THIS CASE WENT FAR BEYOND THE
10   ADMINISTRATIVE RECORD.  I THINK IT WENT INTO QUESTIONING
11   THE CORRECTNESS AND WISDOM OF THE AGENCY'S DECISION.  I
12   THINK IT'S BLACK-LETTER LAW THAT THAT STUFF IS NOT
13   PROPER.
14             THE COURT:  MOVE ON.  THAT WAS ON A
15   MOTION IN LIMINE.  WE ARE DOING THE CLOSING IN THIS CASE
16   RIGHT NOW.
17             MR. DAVIS:  YOUR HONOR, THAT IS ALL I
18   HAVE, UNLESS YOU HAVE FURTHER QUESTIONS.
19             THE COURT:  I HAVE NO FURTHER QUESTIONS.
20   REBUTTAL.
21             MR. FISCHER:  THANK YOU, YOUR HONOR.  I
22   WILL TRY TO KEEP THIS BRIEF.
23             THE DISCUSSION THAT WE ARE HAVING ABOUT
24   THE MORAL EXEMPTION I THINK IS A GOOD METAPHOR FOR ALL
25   THE PROBLEMS WITH BOTH RULES.  THE FACT THAT WE ARE NOW

247

1    IN POSITION WHERE WE ARE HAVING A DEBATE ABOUT WHETHER
2    THE DEPARTMENT OF LABOR SHOULD BE INVESTIGATING WHETHER
3    EMPLOYERS' PROFESSED MORAL BELIEFS ARE SINCERE OR NOT,
4    AND THEY FEEL AN EMPLOYEE DENIED CONTRACEPTIVE COVERAGE
5    HAS TO FILE A TITLE VII CLAIM BECAUSE HER EMPLOYER, AS
6    THE COURT HYPOTHESIZED, MAY DECIDE THAT HE OBJECTS TO
7    WOMEN BEING IN THE WORKFORCE AND HE IS GOING TO DENY
8    CONTRACEPTIVE COVERAGE AS A RESULT OF THAT.  I THINK
9    THAT IS A WORLD WE DON'T WANT TO BE IN.
10             THE RELIGIOUS FREEDOM RESTORATION ACT
11   ADDRESSED THE TENSION INHERENT IN THAT ISSUE IN THE
12   CONTEXT OF RELIGIOUS BELIEFS AND STRUCK A BALANCE WHERE
13   COURTS GENERALLY DO NOT GET INTO THE SINCERITY OF
14   BELIEFS, NOR SHOULD THEY.  WHAT THEY CAN LOOK AT IS
15   WHETHER THOSE BELIEFS OR THE EXERCISE OF THOSE BELIEFS
16   IS SUBSTANTIALLY BURDENED BY GOVERNMENT PROGRAMS.  THAT
17   IS WHERE RFRA STRUCK THE BALANCE.  WHAT WE HAVE NOW IS
18   TWO RULES FROM THE GOVERNMENT THAT WOULD ESSENTIALLY
19   UPSET THAT BALANCE AND PUT EMPLOYEES AT THE WHIM OF THE
20   MORAL BELIEFS, WHATEVER THEY MAY BE, OF THEIR EMPLOYERS.
21   AND I THINK THE GOVERNMENT IS SUGGESTING AT LEAST THAT
22   AN EMPLOYER WHO HAD A MORAL BELIEF THAT WOMEN SHOULD NOT
23   BE IN THE WORKFORCE, THAT THAT WOULD NOT BE A
24   SINCERELY-HELD OR LEGITIMATE MORAL BELIEF.  THERE IS
25   NOTHING IN THE RULES THAT SAYS THAT.  THERE IS NOTHING

248

1    IN THE RULES THAT LIMITS THE TYPES OF MORAL BELIEFS THAT
2    AN ENTITY CAN PROFESS.
3              I WOULD LIKE TO THINK THAT HAD THIS GONE
4    THROUGH THE RIGHT PROCESS, THERE WOULD HAVE BEEN SOME
5    THOUGHT GIVEN TO THAT AND MAYBE THERE WOULD HAVE BEEN A
6    DIFFERENT RESULT AND WE WOULD NOT HAVE THIS SWEEPING
7    EXEMPTION, WE WOULD NOT HAVE THE PUBLICLY-TRADED COMPANY
8    OPTION UNDER THE RELIGIOUS EXEMPTION RULE, AND WE WOULD
9    NOT HAVE THE PROVISION MAKING THE ACCOMMODATION
10   OPTIONAL.  I THINK IN SOME WAYS THOSE ARE ALL THE
11   RESULTS OF A FLAWED PROCESS AS I SAID THAT LED TO A
12   FLAWED RESULT, BUT I ALSO THINK THAT BECAUSE THE RESULT
13   IS SO FLAWED, IT IS IMPORTANT TO GET THAT ON THE RECORD
14   AND MAKE CLEAR THAT IF WE ARE FORTUNATE, IF THE COURT
15   DOES GRANT AN INJUNCTION AND THE GOVERNMENT GOES BACK TO
16   THE DRAWING BOARD, ONE WOULD HOPE THAT THEY WOULD COME
17   UP -- IF THEY DECIDE THERE'S A NEED FOR FURTHER RULE
18   MAKING, ONE WOULD HOPE THAT THEY WOULD COME UP WITH A
19   RULE THAT IS MUCH NARROWER THAN THIS, THAT DOES NOT
20   ALLOW FOR SUCH SWEEPING OBJECTIONS, THAT IS MUCH MORE
21   JUSTIFIABLE UNDER THE AFFORDABLE CARE ACT AND UNDER
22   RFRA.
23             THE GOVERNMENT SAID -- TURNING BRIEFLY TO
24   THE HARM, AGAIN, THE GOVERNMENT HAS SAID WELL, EVERY
25   KNOWN RELIGIOUS OBJECTOR IS EXEMPT.  NOW, THAT IS SIMPLY

Exhibit 137                                                                JA-0001854

249

1 NOT THE CASE.

2          RELIGIOUS -- MANY RELIGIOUS OBJECTORS ARE
3 STILL OPERATING UNDER THE ACCOMMODATION PROCESS UNDER
4 WHICH THEIR EMPLOYEES DO GET HEALTH COVERAGE. AND, IN
5 FACT, EVEN IF YOU LOOK AT WHAT IS REFERRED TO AS THE
6 ZUBIK INJUNCTION, THE ORDER FROM THE SUPREME COURT, THE
7 COURT DID NOT SAY YOUR EMPLOYEES DO NOT GET COVERAGE.
8 WHAT THEY SAID IS, HHS NOW KNOWS BY VIRTUE OF THIS
9 LITIGATION YOU OBJECT, SO THEY CAN GO AHEAD AND ARRANGE
10 FOR COVERAGE, AND THEY CAN'T FINE YOU FOR NOT PROVIDING
11 THE NOTICE. NOW, SOME OF THOSE ENTITIES ARE COVERED BY
12 CHURCH PLANS, WHICH IS A SIDE ISSUE, AND THEIR
13 EMPLOYERS -- THEIR EMPLOYEES MAY NOT BE GETTING
14 COVERAGE. BUT CERTAINLY TO STAY THAT ALL KNOWN
15 RELIGIOUS OBJECTORS ARE EXEMPT IS NOT CONSISTENT WITH
16 THE RECORD IN THIS CASE.

17          YOUR HONOR, THE GOVERNMENT COUNSEL HAS
18 TALKED A LITTLE BIT ABOUT THE NEED TO DEFER TO THEIR
19 INTERPRETATION AND CITED THE TWO CASES. IN THOSE CASES
20 IT SOUNDS LIKE AT LEAST THERE WAS LEGITIMATE TENSION IN
21 ONE OR AMBIGUITY IN ANOTHER THAT ALLOWED THE GOVERNMENT
22 TO SAY WE ARE ADOPTING A REASONABLE INTERPRETATION.
23 HERE THERE SIMPLY ISN'T. THERE'S NOT A BASIS FOR
24 READING INTO THE WOMEN'S HEALTH AMENDMENT THIS BROAD
25 AUTHORITY TO CARVE OUT EXEMPTIONS FROM WHAT IS A CLEAR

250

1 MANDATORY OBLIGATION THAT CONGRESS PASSED THAT THESE
2 PLAN SPONSORS HAVE TO PROVIDE AND HAVE TO NOT IMPOSE
3 COST SHARING REQUIREMENTS FOR THE NECESSARY PREVENTIVE
4 MEDICINE AS DEFINED BY HRSA, THIS IDEA THAT HR -- THE
5 GUIDELINES INCLUDE THE EXEMPTIONS. WELL, THE AGENCIES
6 PROMULGATE THE EXEMPTIONS AND THEN THEY GIVE HRSA THE
7 AUTHORITY, AND THEY APPEAR ON THE WEB PAGE. SO I DON'T
8 THINK IT'S THE CASE THAT HRSA IS EXERCISING ITS
9 INDEPENDENT AUTHORITY TO IMPLEMENT THESE GUIDELINES --
10 OR IMPLEMENT THESE EXCEPTIONS.

11          YOUR HONOR, LET'S RETURN TO THE THREE
12 MOST PROBLEMATIC ASPECTS THAT I MENTIONED IN THE
13 BEGINNING. THE MORAL EXEMPTION RULE IS SIMPLY NOT
14 SUPPORTED BY THE RECORD. THIS EXPANSION OF PUBLICLY
15 TRADED COMPANY IS NOT SUPPORTED. AND THE RENDERING OF
16 THE ACCOMMODATION PROCESS OPTIONAL REALLY DOES THREATEN
17 TO TAKE AWAY COVERAGE FOR MANY WOMEN WHO WORK FOR
18 RELIGIOUS EMPLOYERS BUT WHO ARE NONETHELESS GETTING
19 CONTRACEPTIVE COVERAGE TODAY.

20          AND WITH RESPECT TO ALL OF THESE IN SOME
21 WAY, AT LEAST CERTAINLY THE MORAL EXEMPTION AND THE
22 PUBLIC-TRADED COMPANY EXPANSION, THE GOVERNMENT'S
23 RESPONSE IS, WELL, WE JUST DON'T THINK THAT MANY PEOPLE
24 ARE GOING TO TAKE ADVANTAGE OF IT. THAT IN SOME WAYS IS
25 KIND OF A PERFECT EXAMPLE OF ARBITRARY AND CAPRICIOUS

251

1 RULEMAKING. TO ALLOW FOR A SUCH SWEEPING EXEMPTION, BUT
2 THEN TO SAY WE ARE DOING THIS BECAUSE WE DON'T ACTUALLY
3 THINK THERE IS MUCH DEMAND FOR IT, WE DON'T THINK THERE
4 IS MUCH NEED FOR IT, THAT IS SIMPLY NOT HOW THE AGENCY
5 RULEMAKING PROCESS IS SUPPOSED TO WORK AND IT'S NOT THE
6 KIND OF RESULT THAT IS ENTITLED TO DEFERENCE OR ENTITLED
7 TO BE AFFIRMED BY A COURT.

8          AND FOR ALL OF THOSE REASONS WE BELIEVE
9 THE RULES ARE ILLEGAL, THAT THEY WILL CAUSE IRREPARABLE
10 HARM TO THE COMMONWEALTH, TO THE COMMONWEALTH'S
11 RESIDENTS. PUBLIC INTEREST STRONGLY FAVORS AN
12 INJUNCTION HERE, AND WE WOULD ASK THE COURT TO GRANT THE
13 COMMONWEALTH'S MOTION. THANK YOU.

14          THE COURT: OKAY. AS I SAID AT THE
15 BEGINNING OF THIS HEARING, I CONSIDERED ALL THE
16 BRIEFINGS SUBMITTED BY THE PARTIES WITH RESPECT TO THIS
17 PRELIMINARY INJUNCTION, INCLUDING THE COMMONWEALTH'S
18 MOTION FOR PRELIMINARY INJUNCTION AND ITS SUPPORTING
19 EXHIBITS, THE DEFENDANT'S RESPONSE IN OPPOSITION TO THE
20 MOTION FOR PRELIMINARY INJUNCTION, AND THE
21 COMMONWEALTH'S REPLY. I HAVE ALSO CONSIDERED THE
22 ADMINISTRATIVE RECORD SUBMITTED BY THE DEFENDANTS. I
23 ALSO WISH TO THANK THE AMICI FOR SUBMITTING THEIR
24 THOUGHTFUL BRIEFS IN THIS CASE.

25          BASED ON THESE DOCUMENTS AND AS WELL AS

252

1 THE DOCUMENTS I HAVE RECEIVED AT TODAY'S HEARING, THE
2 TESTIMONY I HAVE HEARD AT TODAY'S HEARING, AND THE
3 ARGUMENT I HAVE HEARD, I WILL BE ABLE TO ISSUE AN
4 OPINION IN THE TIME SCALE REQUESTED BY PENNSYLVANIA,
5 WHICH IS PRIOR TO THE BEGINNING OF THE YEAR, AND WILL
6 ENDEAVOR TO GET THAT OPINION OUT AS SOON AS POSSIBLE.

7          THANK YOU. ANYTHING ELSE?

8          MR. FISCHER: NOTHING FURTHER FROM THE
9 COMMONWEALTH, YOUR HONOR.

10          MR. DAVIS: NOTHING FURTHER, YOUR HONOR.

11          MR. GOLDMAN: YOUR HONOR, I'M SORRY. YOU
12 HAD SUGGESTED ON TUESDAY EVENING THAT YOU WANTED
13 FINDINGS OF FACT AND CONCLUSIONS OF LAW.

14          THE COURT: BASED ON WHAT I HAVE READ AND
15 WHAT I HAVE, I DON'T NEED YOU TO DO THAT. I WILL -- WE
16 WILL BE ABLE TO DO THAT INTERNALLY. I THINK YOU WERE
17 VERY CLEAR IN YOUR BRIEFS, AND I APPRECIATE THAT FROM
18 ALL SIDES. SO TO THE EXTENT THAT MY PREVIOUS ORDER
19 INDICATES A TIME FOR POST-HEARING BRIEFING AND
20 POST-HEARING SUBMISSION OF FINDINGS OF FACT, I'M
21 ABROGATING THAT PORTION IN MY ORDER. IT IS NOT
22 NECESSARY THAT YOU DO THAT. SO INSTEAD OF HAVING TO GO
23 HOME RIGHT NOW AND START WRITING, YOU CAN, I DON'T KNOW,
24 GO AND HAVE A DRINK OR SOMETHING.

25          ALL COUNSEL: THANK YOU, YOUR HONOR.

Exhibit 137                                                                                JA-0001855

253

```
1          (HEARING CONCLUDED.)

2

3          I CERTIFY THAT THE FOREGOING IS A CORRECT

4    TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

5    ABOVE-ENTITLED MATTER.

6

7

8    DATE              OFFICIAL COURT REPORTER

9                      SUZANNE R. WHITE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

254

```
1              INDEX PAGE

2

3    WITNESSES        DIRECT  CROSS REDIRECT RECROSS

4    CAROL WEISMAN

5      BY MR. GOLDMAN    55    --   105    --

6      BY MS. KADE       --    97    --    --

7

8    SAMANTHA BUTTS

9      BY MR. GOLDMAN    113   --   152    --

10     BY MS. KADE       --   146    --    --

11

12   CYNTHIA CHUANG

13     BY MS. BOLAND     165   --    --    --

14     BY MS. KOPPLIN    --   193    --    --

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 137                                                                    JA-0001856

**$**

**$1,000** [2] - 134:23, 134:25
**$1,800** [1] - 135:19
**$180,000** [1] - 208:2
**$250** [1] - 13:2
**$30** [2] - 135:10, 135:13
**$360** [1] - 135:14
**$500** [1] - 92:18

**0**

**001** [1] - 187:8
**05** [2] - 77:4, 187:6

**1**

**1** [10] - 55:19, 95:11, 101:7, 101:12, 138:1, 186:7, 219:11, 219:12, 221:13, 229:9
**1.1** [1] - 82:3
**1.2** [1] - 108:2
**10** [6] - 99:5, 118:12, 118:17, 125:3, 133:23, 231:22
**100** [6] - 75:22, 76:17, 77:9, 91:18, 176:9, 176:18
**105** [2] - 74:18, 254:5
**106** [5] - 10:14, 74:22, 74:23, 80:17, 90:13
**107** [1] - 81:4
**109** [1] - 82:20
**11** [1] - 84:13
**11.5** [1] - 186:25
**1115** [1] - 81:25
**113** [1] - 254:9
**1160** [1] - 66:10
**12** [3] - 122:24, 140:21, 176:17
**125-PAGE** [1] - 159:2
**12:30** [1] - 157:10
**12TH** [1] - 2:7
**130** [1] - 186:15
**134** [1] - 241:4
**14** [1] - 1:8
**146** [1] - 254:10
**15** [5] - 3:15, 3:17, 10:11, 60:12, 210:6
**1500** [1] - 122:6
**152** [1] - 254:9
**159** [1] - 164:17
**16** [3] - 22:3, 64:10, 66:25
**165** [1] - 254:13
**16TH** [1] - 2:3

**17** [2] - 9:14, 175:20
**17-4540** [2] - 1:4, 3:7
**17.9** [1] - 186:17
**17120** [1] - 2:4
**18** [7] - 55:21, 55:23, 56:4, 177:13, 182:14, 183:20, 183:23
**1861** [2] - 36:10, 37:20
**188** [1] - 38:2
**19** [1] - 10:10
**19.3** [1] - 81:15
**19106** [2] - 1:9, 1:21
**19107** [1] - 2:7
**192** [1] - 38:2
**1923** [1] - 35:2
**193** [1] - 254:14
**1960** [1] - 102:17
**1972** [1] - 38:2
**1980** [1] - 66:11
**1987** [1] - 38:5
**1990** [2] - 101:16, 102:17
**1992** [1] - 115:11
**1994** [1] - 115:2
**1998** [2] - 115:6, 115:11
**1:12-CV-3489** [1] - 206:14
**1:30** [1] - 157:12
**1ST** [5] - 24:24, 25:9, 34:23, 230:17

**2**

**2** [4] - 76:18, 91:20, 95:12, 138:2
**2.2** [1] - 82:3
**2.5** [1] - 12:19
**20** [11] - 2:18, 10:10, 52:1, 90:23, 133:23, 170:4, 171:23, 171:24, 197:8, 232:3, 232:8
**2001** [1] - 167:10
**2002** [4] - 81:14, 82:2, 115:11, 115:14
**2003** [3] - 60:12, 83:13, 116:4
**2005** [1] - 115:14
**2006** [2] - 94:3, 116:4
**2007** [1] - 81:16
**2008** [3] - 70:4, 70:5, 83:14
**2010** [1] - 38:16
**2011** [12] - 26:12, 38:16, 44:6, 70:9, 70:12, 88:5, 102:10, 102:16, 104:14, 104:18, 243:14

**2012** [9] - 92:23, 100:3, 101:24, 109:21, 110:4, 181:2, 192:14, 207:4
**2013** [4] - 103:4, 103:14, 180:12, 207:20
**2014** [12] - 38:16, 41:10, 92:23, 94:3, 100:3, 110:4, 180:13, 180:25, 181:3, 188:22, 242:2, 242:3
**2015** [2] - 101:24, 109:21
**2016** [10] - 70:19, 99:15, 99:19, 104:10, 106:24, 144:14, 180:14, 180:25, 205:24, 243:13
**2017** [3] - 1:8, 28:8, 102:7
**2018** [1] - 24:24
**20530** [2] - 2:13, 2:18
**20S** [2] - 126:20, 127:13
**21** [1] - 2:7
**215)627-1882** [1] - 1:21
**2191** [1] - 241:4
**22** [2] - 10:3, 100:19
**221** [1] - 38:5
**223** [1] - 68:7
**23** [3] - 10:3, 43:9, 199:18
**230** [2] - 68:8, 68:13
**231** [1] - 84:18
**235** [1] - 86:13
**24** [6] - 59:11, 60:5, 186:15, 186:21, 187:18, 188:7
**256** [1] - 164:17
**26** [2] - 38:19, 173:6
**26(A** [2] - 64:23, 172:20
**27** [1] - 76:4
**29** [1] - 38:19

**3**

**3** [2] - 56:14, 210:12
**30** [12] - 8:16, 10:7, 10:15, 10:17, 10:23, 105:13, 127:16, 134:3, 137:8, 228:10, 230:16, 243:14
**30-DAY** [1] - 230:12
**300** [1] - 45:3

**300GG-13(A)(4)** [1] - 243:3
**30GG-13** [1] - 223:20
**30S** [1] - 126:20
**31** [7] - 102:4, 102:14, 105:13, 106:11, 109:6, 160:7, 198:10
**31,000** [1] - 238:24
**31,700** [5] - 237:23, 237:25, 238:13, 238:19, 238:20
**3133** [1] - 2:12
**32,000** [1] - 229:12
**34** [1] - 200:21
**35** [4] - 89:14, 143:25, 171:16, 201:6
**36** [2] - 10:18, 201:14
**37** [1] - 201:22
**38** [1] - 202:2
**39** [4] - 10:23, 104:9, 104:10, 202:9
**3B** [1] - 1:9
**3RD** [1] - 2:7

**4**

**4** [3] - 56:7, 56:8, 221:11
**40** [6] - 62:18, 88:25, 89:10, 126:18, 126:20, 182:14
**409** [1] - 38:2
**41** [2] - 10:11, 10:16
**42** [4] - 45:3, 71:14, 223:19, 243:3
**43** [1] - 10:16
**44** [1] - 98:18
**45** [11] - 70:6, 70:7, 70:12, 70:16, 70:21, 88:21, 88:23, 89:1, 89:14, 154:7, 202:16
**46** [1] - 101:8
**47804** [2] - 101:6, 101:12
**48** [1] - 10:22
**481** [1] - 38:5
**49** [4] - 10:6, 69:24, 70:2, 88:21
**49.7** [1] - 186:21

**5**

**5** [6] - 68:1, 74:18, 81:14, 118:12, 118:16
**5-3** [1] - 10:14
**5.1** [1] - 187:1
**5.3** [2] - 74:18, 80:18
**50** [4] - 10:6, 119:11, 119:19, 124:18

**51** [3] - 70:4, 70:21, 127:15
**51092** [1] - 217:17
**53** [4] - 143:19, 143:25, 148:8, 154:1
**54** [6] - 146:17, 147:12, 147:23, 148:9, 148:15
**54,000** [4] - 53:3, 53:7, 53:19, 205:22
**549** [1] - 215:25
**55** [3] - 146:23, 148:24, 254:5
**551** [1] - 241:19
**559** [1] - 215:18
**56** [1] - 149:5
**57** [1] - 149:10
**58** [7] - 10:24, 147:12, 147:23, 148:9, 149:14, 150:25, 151:8
**58,000** [1] - 205:17
**5TH** [3] - 36:14, 209:17, 212:21

**6**

**6** [13] - 3:12, 3:13, 79:25, 80:2, 80:12, 80:13, 80:18, 165:7, 176:17, 198:10, 210:12, 234:18
**601** [1] - 1:20
**644-666** [1] - 241:19

**7**

**7** [3] - 84:7, 84:10, 165:15
**7.2** [1] - 91:22
**70** [3] - 119:11, 119:19, 168:4
**700,000** [1] - 12:21
**702** [2] - 64:24, 172:21
**703** [2] - 64:24, 172:21
**705** [2] - 64:24, 172:21
**727** [3] - 186:16, 187:19, 188:7
**79** [1] - 217:17

**8**

**8** [8] - 84:8, 84:10, 90:23, 114:7, 143:22, 143:23, 144:1, 183:18
**8,000** [3] - 101:24, 110:6, 110:11
**8.4** [1] - 186:13
**80** [1] - 157:4

**800** [2] - 134:23, 134:25
**82-197** [1] - 237:12
**83** [1] - 186:12
**85** [3] - 76:1, 80:21, 81:2

# 9

**9** [3] - 114:7, 114:12, 143:25
**900** [1] - 93:1
**900-SOME** [1] - 110:9
**95** [1] - 73:6
**950** [1] - 2:12
**958** [1] - 206:11
**97** [1] - 254:6
**9833** [1] - 38:19
**984** [3] - 183:10, 186:10, 187:18
**988** [1] - 206:11
**99** [1] - 158:8
**9TH** [1] - 66:10

# A

**A)(4** [1] - 43:7
**ABILITY** [9] - 23:1, 44:25, 123:17, 123:19, 131:19, 141:23, 141:24, 156:13, 224:14
**ABLE** [32] - 7:13, 15:15, 34:4, 34:12, 35:15, 94:2, 94:10, 114:17, 131:22, 158:6, 159:2, 159:4, 159:6, 159:9, 177:16, 177:20, 177:21, 177:24, 178:2, 178:16, 178:19, 179:15, 179:17, 181:10, 181:11, 181:16, 183:6, 183:14, 209:18, 236:21, 252:3, 252:16
**ABNORMAL** [1] - 128:17
**ABORTION** [2] - 71:15, 208:9
**ABORTIONS** [3] - 96:23, 191:24, 242:14
**ABOUT** [164] - 5:11, 6:16, 15:7, 15:23, 18:18, 20:14, 22:8, 22:25, 23:17, 26:24, 27:16, 28:20, 28:24, 29:1, 29:21, 30:22,

31:17, 34:16, 34:24, 36:2, 36:21, 38:13, 38:20, 38:23, 38:25, 47:12, 48:24, 51:25, 52:14, 54:10, 56:23, 59:13, 63:24, 69:8, 74:4, 74:13, 75:3, 82:11, 82:24, 83:3, 83:4, 88:3, 88:4, 89:15, 89:22, 90:1, 92:6, 93:1, 93:19, 99:15, 105:17, 105:19, 105:25, 106:10, 106:21, 107:5, 107:6, 107:11, 107:25, 108:12, 108:18, 108:22, 109:4, 109:9, 109:11, 111:14, 111:22, 114:23, 116:13, 119:4, 120:24, 121:3, 123:3, 126:6, 128:22, 130:23, 131:19, 131:21, 133:25, 134:23, 141:11, 145:23, 147:17, 150:22, 151:15, 151:18, 154:5, 156:18, 163:5, 163:9, 164:25, 168:8, 168:13, 168:17, 168:19, 168:23, 170:2, 170:4, 170:24, 173:21, 174:8, 174:17, 176:22, 178:7, 178:8, 178:10, 178:12, 178:21, 180:4, 181:15, 181:17, 181:23, 182:1, 182:23, 183:18, 189:20, 190:12, 192:6, 195:5, 195:6, 196:10, 197:18, 198:20, 203:8, 203:14, 211:12, 215:15, 215:18, 216:8, 216:9, 216:24, 217:16, 218:21, 219:17, 222:21, 223:4, 223:22, 228:14, 229:23, 230:8, 231:14, 231:15, 232:7, 233:10, 233:18, 235:25, 239:16, 239:18, 239:25, 243:1,

243:2, 243:5, 243:17, 244:3, 244:5, 244:6, 244:12, 245:10, 246:23, 247:1, 249:18
**ABOVE** [2] - 76:9, 253:5
**ABOVE-ENTITLED** [1] - 253:5
**ABROGATING** [1] - 252:21
**ABSENT** [1] - 208:5
**ABSOLUTELY** [6] - 15:11, 18:10, 142:8, 174:14, 179:2, 211:3
**ABSTRACT** [1] - 106:13
**ABUNDANT** [1] - 79:23
**ACA** [34] - 11:17, 22:9, 28:3, 43:10, 43:25, 44:8, 45:2, 46:9, 120:20, 131:8, 132:22, 133:21, 136:12, 136:13, 136:18, 137:3, 137:8, 140:6, 153:17, 153:20, 153:22, 155:7, 155:12, 156:3, 198:11, 198:18, 219:8, 219:17, 221:2, 222:12, 223:6, 224:20, 224:24, 239:23
**ACA'S** [3] - 11:9, 23:18, 207:21
**ACADEMIC** [3] - 57:8, 59:20, 170:1
**ACADEMY** [1] - 66:20
**ACCEPT** [2] - 159:8, 187:6
**ACCEPTED** [6] - 87:3, 87:7, 87:11, 101:19, 102:23, 103:25
**ACCEPTING** [1] - 139:23
**ACCESS** [27] - 34:17, 62:22, 70:22, 71:7, 131:19, 131:22, 131:24, 136:17, 140:23, 140:24, 140:25, 141:23, 145:11, 146:25, 149:1, 156:7, 156:11, 191:14, 201:16, 208:8, 218:2, 220:15, 220:20, 224:9,

227:2, 236:1, 239:13
**ACCESSING** [1] - 145:11
**ACCOMMODATED** [1] - 198:3
**ACCOMMODATION** [26] - 6:25, 7:2, 40:15, 41:7, 46:21, 50:23, 50:25, 51:1, 211:7, 211:23, 218:6, 226:14, 226:21, 228:25, 229:7, 229:11, 232:9, 232:12, 232:15, 237:17, 243:20, 243:23, 243:25, 248:9, 249:3, 250:16
**ACCOMMODATIONS** [2] - 50:13, 198:1
**ACCOMODATION** [1] - 205:25
**ACCORDING** [1] - 154:4
**ACCOUNT** [4] - 85:14, 107:10, 107:18, 108:11
**ACCOUNTABILITY** [1] - 7:1
**ACCOUNTED** [2] - 188:12, 188:15
**ACCUMULATED** [1] - 194:1
**ACCURACY** [1] - 155:6
**ACCURATE** [5] - 56:12, 114:20, 114:21, 165:13, 165:19
**ACCURATELY** [1] - 111:21
**ACHIEVE** [3] - 127:9, 129:14, 177:21
**ACHIEVED** [1] - 217:9
**ACHIEVING** [2] - 117:14, 172:7
**ACKNOWLEDGE** [1] - 6:15
**ACKNOWLEDGES** [1] - 231:23
**ACOSTA** [1] - 3:6
**ACQUIRING** [1] - 137:1
**ACROSS** [4] - 7:7, 111:25, 229:24, 235:7
**ACT** [59] - 6:20, 6:23, 9:10, 9:11, 12:8, 21:11, 21:14, 21:15, 22:7, 27:25, 42:18,

43:6, 45:12, 47:7, 47:10, 51:3, 51:20, 52:9, 63:13, 63:15, 63:21, 64:13, 67:4, 68:24, 78:16, 79:9, 87:9, 87:13, 90:6, 94:6, 94:10, 96:16, 100:16, 102:6, 112:12, 112:14, 112:16, 120:1, 120:4, 131:2, 131:5, 139:22, 140:1, 152:15, 154:20, 154:23, 178:14, 213:5, 217:12, 218:24, 230:9, 233:4, 233:20, 239:15, 239:19, 242:20, 247:10, 248:21
**ACT'S** [2] - 206:20, 219:25
**ACTING** [4] - 12:15, 19:8, 174:23, 183:17
**ACTION** [11] - 1:3, 15:9, 16:14, 16:16, 17:23, 35:10, 48:10, 233:11, 233:13, 233:16, 234:1
**ACTIONS** [2] - 17:11, 219:12
**ACTIVE** [4] - 102:4, 106:15, 106:18, 171:11
**ACTIVELY** [1] - 187:23
**ACTIVITIES** [2] - 126:2, 170:12
**ACTIVITY** [2] - 102:18, 107:1
**ACTUAL** [11] - 75:19, 141:10, 159:24, 200:2, 201:2, 201:11, 201:18, 201:24, 202:5, 202:12, 202:22
**ACTUALLY** [29] - 9:1, 17:18, 18:15, 19:6, 30:6, 30:25, 46:12, 47:6, 51:25, 76:20, 117:19, 134:13, 139:14, 160:8, 163:3, 163:14, 176:12, 181:7, 184:21, 189:8, 194:9, 200:12, 219:8, 220:19, 226:6, 230:21, 237:5, 237:6, 251:2
**ADD** [8] - 9:16, 22:1,

Exhibit 137                                                                                                    JA-0001858

22:3, 22:17, 23:13, 240:14, 240:19, 245:8
**ADDITION** [10] - 7:17, 15:2, 17:15, 61:10, 69:8, 72:7, 128:7, 154:14, 171:10, 224:6
**ADDITIONAL** [15] - 7:11, 7:12, 9:16, 14:5, 14:14, 18:22, 19:17, 22:3, 22:17, 23:13, 78:22, 125:25, 135:4, 163:5, 221:12
**ADDITIVE** [1] - 134:16
**ADDRESS** [9] - 43:3, 43:5, 45:9, 158:2, 162:24, 214:13, 215:9, 215:17, 242:17
**ADDRESSED** [6] - 39:21, 51:15, 69:18, 73:4, 217:15, 247:11
**ADEQUATE** [1] - 217:2
**ADMINISTERED** [1] - 47:17
**ADMINISTRATION** [8] - 22:6, 38:15, 39:9, 42:21, 64:12, 78:5, 220:14, 243:14
**ADMINISTRATION 'S** [1] - 39:15
**ADMINISTRATIVE** [11] - 6:23, 100:16, 152:15, 209:1, 209:2, 241:6, 245:9, 245:20, 246:6, 246:10, 251:22
**ADMINISTRATOR** [5] - 34:6, 212:3, 218:7, 218:11, 229:4
**ADMISSIBILITY** [4] - 24:10, 158:14, 159:4, 159:7
**ADMISSION** [1] - 216:22
**ADMIT** [5] - 17:16, 161:4, 161:12, 161:16, 172:23
**ADMITTED** [7] - 55:23, 56:1, 56:4, 65:13, 95:11, 114:8, 161:14
**ADMONITION** [2] - 8:2, 213:16
**ADOLESCENTS '** [1] - 63:2
**ADOPT** [1] - 78:13
**ADOPTED** [4] - 44:5,

78:14, 225:15
**ADOPTING** [2] - 92:13, 249:22
**ADULT** [3] - 127:16, 171:20, 171:21
**ADVANCE** [1] - 30:22
**ADVANCES** [1] - 223:12
**ADVANTAGE** [9] - 25:4, 129:18, 227:16, 227:17, 228:18, 232:2, 235:5, 236:17, 250:24
**ADVERSE** [6] - 103:20, 149:16, 151:1, 151:10, 202:10, 202:13
**ADVISORY** [1] - 68:25
**AFFAIRS** [3] - 61:9, 195:23, 195:24
**AFFECT** [12] - 95:19, 115:21, 123:25, 124:24, 125:18, 138:10, 138:23, 174:1, 188:14, 229:24, 237:22, 238:12
**AFFECTED** [14] - 26:21, 34:14, 83:21, 140:15, 228:18, 228:23, 228:25, 229:9, 229:18, 236:16, 238:1, 238:3, 238:20, 238:25
**AFFECTING** [2] - 83:5, 220:1
**AFFECTS** [2] - 79:6, 126:23
**AFFILIATED** [1] - 110:21
**AFFIRMANCE** [5] - 36:18, 37:1, 37:18, 37:22, 38:6
**AFFIRMATIVE** [2] - 15:8, 16:14
**AFFIRMED** [4] - 16:18, 17:2, 36:6, 251:7
**AFFORD** [2] - 80:25, 153:1
**AFFORDABILITY** [4] - 131:21, 136:17, 140:4, 145:12
**AFFORDABLE** [50] - 6:19, 12:8, 21:11, 22:7, 27:25, 42:18, 43:6, 45:12, 47:7, 51:20, 52:9, 63:12, 63:15, 63:21, 64:13,

67:4, 68:24, 78:16, 79:9, 87:9, 87:12, 90:6, 94:6, 94:10, 96:16, 102:6, 112:12, 112:13, 112:14, 112:16, 119:25, 120:4, 131:1, 131:5, 139:22, 140:1, 154:20, 154:23, 178:14, 206:20, 213:5, 217:12, 218:24, 230:8, 233:4, 233:20, 239:15, 239:18, 242:20, 248:21
**AFFORDED** [2] - 47:15, 50:7
**AFTER** [30] - 12:4, 12:9, 34:13, 58:8, 60:4, 60:5, 86:25, 94:6, 94:10, 102:6, 112:14, 115:3, 115:7, 133:25, 134:24, 136:12, 136:18, 139:25, 154:22, 155:7, 157:19, 176:14, 177:13, 188:23, 189:17, 189:20, 217:19, 236:6, 239:14, 239:18
**AFTERNOON** [4] - 162:11, 193:12, 210:21, 210:22
**AGAIN** [41] - 14:22, 17:2, 21:20, 31:13, 32:4, 33:16, 38:14, 42:19, 45:2, 46:14, 48:19, 61:3, 86:23, 103:2, 132:7, 139:17, 140:13, 140:25, 143:21, 144:19, 147:7, 148:18, 153:16, 153:22, 156:16, 162:12, 177:14, 191:11, 195:17, 201:15, 204:13, 212:24, 215:1, 215:2, 224:3, 225:14, 231:13, 238:8, 238:22, 244:19, 248:24
**AGAINST** [10] - 18:2, 32:9, 33 25, 35:3, 108:13, 145:11, 159:23, 233:21, 236:9, 240:16
**AGE** [7] - 126:15,

126:18, 126:20, 127:13, 172:5, 180:16, 193:1
**AGENCIES** [44] - 21 7, 21:13, 38:16, 39:3, 42:23, 44:2, 44:21, 44:25, 45:1, 45:4, 45:11, 45:14, 45:15, 45:23, 46:18, 46:20, 46:23, 47:1, 47:3, 47:13, 50:11, 50:13, 50:21, 51:11, 51:15, 51:21, 52:5, 159:25, 169:21, 209:23, 212:13, 212:23, 214:11, 215:24, 217:20, 221:21, 222:4, 225:22, 232:6, 242:25, 243:5, 243:17, 250:5
**AGENCY** [28] - 15:9, 17:22, 35:10, 39:17, 43:12, 44:8, 44:12, 44:18, 45:7, 48:16, 161:8, 173:3, 206:3, 206:5, 206:8, 207:10, 209:6, 213:1, 217:7, 220:6, 222:15, 222:16, 222:24, 223:14, 241:5, 245:4, 251:4
**AGENCY'S** [14] - 44:13, 44:18, 47:8, 49:19, 50:25, 51:19, 66:8, 112 24, 120:19, 172 25, 204:17, 241:12, 242:19, 246:11
**AGES** [1] - 182:14
**AGO** [4] - 28:1, 65 9, 170:14, 171 24
**AGREE** [9] - 27:14, 28:4, 28:19, 30:13, 32:23, 41:18, 106:2, 196:21, 198 17
**AGREED** [1] - 153:12
**AGREES** [1] - 77:23
**AHEAD** [18] - 5:21, 9 6, 9:24, 42:12, 42:15, 66:15, 80:9, 116:22, 121:11, 148:12, 161:23, 165:1, 173:8, 185:6, 234:22, 236:11, 239:10, 249:9
**AIDED** [1] - 1:24
**AL** [3] - 1:5, 2:19, 83:14
**ALEXANDER** [1] - 3 6
**ALL** [113] - 5:15, 6:12,

8:9, 9:1, 9:9, 12:3, 21:19, 24:2, 24:16, 25:2, 26:13, 27:2, 31:11, 35:24, 41:25, 42:4, 42:6, 42:11, 44:21, 52:8, 53:7, 54:12, 56:1, 59:22, 69:15, 69:24, 73:14, 74:9, 74:12, 75:7, 77 12, 77:15, 78:4, 83:17, 86:20, 87:5, 90:6, 94:4, 95:1, 97:3, 101:3, 101:5, 105:8, 105:10, 107:9, 107:13, 112:15, 113:5, 128:4, 128:10, 128:19, 130:8, 134:22, 136:12, 147:11, 147:22, 148:8, 148 19, 151:11, 152:3, 152:7, 153:9, 157:22, 163:20, 164:22, 169:1, 170:6, 170:10, 174:16, 176:1, 178:17, 182:20, 183:1, 183:12, 185:23, 192:11, 193:21, 196:1, 196:3, 198:19, 210:8, 210:10, 210:14, 212:12, 213:16, 218:5, 218:12, 222:18, 225:10, 225:11, 228:2, 228 6, 231:7, 231:18, 231:19, 233:1, 234:5, 237:8, 240:21, 243:19, 244:24, 246:17, 246:24, 248:10, 249:14, 250:20, 251:8, 251:15, 252:18, 252:25
**ALLEGATIONS** [2] - 6:3, 151:14
**ALLEGES** [2] - 17:8, 17.23
**ALLEGING** [2] - 17 24, 151 13
**ALLEVIATE** [2] - 46:19, 51:1
**ALLOW** [7] - 3:21, 20 7, 141:5, 212:15, 224:3, 248 20, 251:1
**ALLOWED** [6] - 3:15, 3:17, 30:15, 190:6, 220:23, 249:21

Exhibit 137

JA-0001859

**ALLOWING** [1] - 177:19
**ALLOWS** [4] - 190:16, 211:15, 230:13, 233:13
**ALLUDES** [1] - 164:10
**ALMOST** [3] - 42:10, 91:24, 183:20
**ALONE** [2] - 213:21, 237:24
**ALONG** [6] - 24:3, 41:22, 78:7, 81:9, 126:2, 158:11
**ALPHABETICAL** [1] - 68:17
**ALREADY** [42] - 3:11, 6:3, 6:5, 6:24, 9:18, 9:22, 10:21, 13:21, 14:23, 21:19, 24:2, 25:14, 27:4, 27:5, 39:21, 43:5, 43:8, 68:4, 69:5, 69:9, 114:8, 163:20, 164:12, 164:19, 167:20, 181:19, 184:14, 194:10, 194:18, 196:16, 197:12, 199:15, 200:6, 200:7, 200:14, 209:4, 216:23, 225:8, 239:6, 239:20, 245:1
**ALSO** [115] - 3:16, 5:4, 5:17, 6:11, 8:22, 10:12, 10:15, 14:22, 15:14, 21:6, 21:12, 22:8, 22:15, 22:25, 23:6, 23:16, 23:19, 26:7, 27:19, 27:21, 34:24, 39:13, 43:19, 43:22, 43:23, 52:18, 59:22, 60:1, 61:4, 61:8, 63:20, 64:5, 72:4, 77:17, 79:19, 81:24, 82:24, 84:17, 85:7, 94:8, 95:21, 96:25, 99:23, 101:10, 103:1, 109:8, 115:4, 115:12, 115:14, 117:5, 117:7, 117:9, 119:14, 119:15, 119:16, 121:24, 122:2, 124:10, 128:8, 128:24, 129:2, 129:23, 130:16, 131:4, 139:25, 146:3, 150:5, 154:15, 154:22, 159:3,

163:6, 163:16, 166:9, 168:17, 169:4, 169:9, 169:21, 169:25, 170:15, 171:11, 173:21, 174:6, 177:7, 178:10, 184:23, 199:19, 206:12, 207:21, 210:10, 216:13, 218:9, 224:10, 224:16, 224:23, 225:24, 227:9, 227:19, 230:7, 231:15, 235:12, 237:4, 239:11, 239:12, 239:24, 240:8, 240:14, 240:17, 242:17, 243:13, 243:19, 244:7, 248:12, 251:21, 251:23
**ALTERNATIVE** [2] - 40:5, 217:24
**ALTERNATIVES** [1] - 27:21
**ALTHOUGH** [11] - 18:15, 81:10, 100:25, 102:19, 109:18, 187:12, 200:10, 208:25, 210:8, 233:17, 240:17
**ALTOGETHER** [3] - 11:17, 14:12, 179:1
**ALWAYS** [6] - 70:9, 79:11, 132:24, 132:25, 156:12, 217:4
**AM** [33] - 3:20, 4:17, 54:7, 56:22, 57:18, 58:8, 60:20, 64:9, 70:12, 72:23, 74:24, 76:3, 77:19, 80:19, 83:11, 84:21, 99:16, 105:13, 114:3, 116:6, 116:15, 118:1, 119:18, 120:2, 120:8, 127:4, 131:23, 136:2, 145:4, 166:12, 169:6, 179:15, 238:1
**AMBIGUITY** [3] - 20:14, 241:10, 249:21
**AMEND** [1] - 205:25
**AMENDMENT** [5] - 217:13, 223:25, 224:2, 224:8, 249:24
**AMERICAN** [1] - 104:3

**AMERICANS** [1] - 128:5
**AMICI** [1] - 251:23
**AMICUS** [2] - 229:23, 229:25
**AMONG** [7] - 94:12, 102:3, 106:14, 106:17, 107:1, 108:3, 219:24
**AMONGST** [1] - 183:7
**AMOUNT** [4] - 13:25, 86:4, 124:8, 237:3
**AN** [205] - 7:2, 7:14, 9:14, 9:18, 15:8, 15:9, 16:15, 16:16, 16:18, 17:2, 19:18, 20:11, 21:21, 25:1, 26:23, 27:8, 27:10, 28:11, 30:5, 30:16, 31:22, 32:5, 32:22, 33:6, 33:16, 34:3, 35:16, 35:17, 36:6, 36:10, 36:18, 37:5, 37:18, 37:22, 38:6, 39:1, 42:3, 44:12, 44:13, 44:18, 46:4, 46:21, 47:14, 47:17, 48:5, 48:7, 49:19, 50:5, 52:8, 55:7, 58:9, 58:25, 61:21, 61:24, 62:1, 64:18, 65:1, 65:5, 65:11, 65:13, 65:18, 65:19, 65:21, 70:18, 71:11, 71:19, 71:21, 72:13, 72:16, 76:13, 79:12, 79:23, 80:21, 81:24, 85:3, 91:24, 92:14, 92:15, 92:18, 93:15, 96:2, 96:4, 96:21, 97:5, 99:5, 100:11, 100:15, 102:4, 106:15, 106:16, 111:24, 114:3, 118:15, 119:16, 120:13, 120:17, 124:6, 126:15, 133:10, 138:20, 138:21, 139:11, 140:2, 141:5, 141:22, 145:4, 145:25, 146:4, 150:12, 151:19, 152:11, 152:14, 154:16, 154:17, 155:21, 157:12, 160:9, 164:17, 169:12, 169:13, 170:3, 170:18, 171:11, 171:19,

172:8, 172:12, 172:24, 172:25, 173:2, 179:3, 183:21, 188:5, 188:24, 190 12, 190:25, 195:22, 195:25, 196:25, 197:4, 197:12, 202:17, 209:16, 210:5, 210:7, 210 9, 212:19, 214:7, 214:11, 214:17, 214:20, 214:23, 217:2, 217:5, 217:10, 217:22, 217:24, 219 19, 220:6, 222:15, 222:16, 223:11, 223:14, 225:7, 226:20, 226:23, 228:4, 228:6, 228 9, 229:11, 230:1, 230:13, 230:16, 233:13, 236:3, 236:18, 238:23, 239:1, 239:2, 239:8, 240:3, 240:12, 240:14, 240:24, 241:4, 243:2, 244:8, 245:2, 246:1, 247 4, 247:22, 248:2, 248:15, 251 11, 252:3
**ANALOGOUS** [2] - 20:11, 240:24
**ANALOGY** [1] - 50:2
**ANALYSIS** [15] - 15:22, 17:6, 20:1, 35:22, 36:13, 37:6, 62:6, 94:4, 102:6, 132:22, 134:1, 210:1, 233:25, 237:9, 238:21
**ANALYZE** [1] - 49:9
**ANALYZED** [2] - 70:20, 215:25
**ANALYZING** [2] - 18:22, 109:16
**AND** [1047] - 2:5, 2:14, 3 4, 3:17, 4:11, 5:12, 5 16, 5:17, 6:6, 6:8, 6 11, 6:12, 6:18, 6:20, 6:23, 6:24, 7:1, 7 3, 7:7, 7:10, 7:11, 7 12, 7:18, 7:19, 7 24, 8:6, 8:10, 8:11, 8:15, 8:16, 8:19, 9:8, 9:10, 9:12, 9:15, 9:17, 9:19, 9:20, 9:21, 10:6, 10:10,

10:11, 10:16, 10:17, 10:23, 11:2, 11:5, 11:20, 11:22, 11:25, 12:8, 12:11, 12:13, 12:21, 13:2, 13:10, 13:14, 14:1, 14:6, 14:7, 14:14, 14:18, 14:22, 14:23, 15:2, 15:5, 15:7, 15:9, 15:13, 15:14, 15:23, 16:8, 16:25, 17:15, 17:18, 17:21, 18:7, 18:13, 18:19, 19:14, 20:6, 20:16, 20:17, 21:4, 21:10, 21:11, 21:12, 21:13, 21:14, 21:15, 21:16, 21:20, 21:21, 22:12, 22:18, 22:22, 22:25, 23:2, 23:3, 23:6, 23:12, 23:14, 23:20, 23:23, 24:3, 24:16, 24:17, 25:12, 26:2, 26:5, 26:9, 26:10, 26:13, 26:18, 26:25, 27:2, 27:21, 28:15, 28:16, 29:25, 30:9, 30:10, 30:17, 31:10, 31:18, 32:9, 32:18, 33:2, 33:8, 33:17, 34:2, 34:12, 35:6, 35:7, 35:12, 35:16, 35:18, 36:6, 37:4, 37:11, 37:16, 38:4, 38:16, 39:1, 39:6, 39:10, 39:14, 39:16, 39:20, 39:22, 39:24, 40:3, 40:5, 40:7, 40:22, 41:9, 41:14, 42:3, 43:4, 43:6, 43:9, 43:15, 43:16, 43:21, 43:24, 44:6, 44:9, 44:25, 45:6, 45:9, 45:15, 46:8, 46:14, 46:16, 46:19, 47:7, 47:12, 47:21, 48:1, 48:14, 48:15, 48:24, 49:8, 49:10, 49:17, 50:7, 50:21, 51:7, 51:8, 51:9, 51:13, 51:18, 51:20, 51:22, 51:25, 52:7, 52:17, 53:3, 53:8, 53:19, 53:24, 54:17, 54:21, 55:4, 55:7, 55:9, 56:1, 56:11, 56:14, 56:19, 56:24, 57:9, 57:11, 57:15, 58:12, 58:17, 59:3, 59:10, 59:13, 59:17, 59:20, 59:22, 60:1, 60:7,

Exhibit 137    JA-0001860

60:10, 60:13, 60:17,
60:19, 60:25, 61:6,
61:10, 61:13, 61:20,
62:10, 62:19, 62:21,
63:7, 63:10, 63:17,
63:20, 63:23, 64:4,
64:7, 64:18, 64:24,
65:6, 65:16, 66:9,
66:17, 66:20, 66:21,
66:22, 66:23, 66:24,
67:2, 67:7, 67:11,
67:13, 67:16, 67:19,
68:1, 68:4, 68:7,
69:1, 69:3, 69:5,
69:6, 69:7, 69:14,
69:24, 70:5, 70:7,
70:10, 70:19, 70:21,
70:23, 71:3, 71:5,
71:17, 72:7, 72:9,
72:10, 72:11, 72:21,
73:4, 73:5, 73:8,
73:10, 73:14, 73:15,
73:16, 73:21, 74:3,
74:14, 74:18, 75:1,
75:5, 75:7, 75:9,
75:11, 75:16, 75:20,
75:21, 76:6, 76:8,
76:9, 76:13, 76:20,
76:25, 77:8, 77:14,
77:15, 77:17, 77:18,
78:1, 78:5, 78:12,
79:3, 79:8, 79:19,
80:19, 81:8, 81:19,
81:23, 82:3, 82:4,
82:6, 82:10, 82:11,
82:17, 83:2, 83:6,
83:10, 83:11, 83:12,
83:14, 84:6, 84:10,
84:19, 85:3, 85:6,
85:8, 85:20, 85:22,
85:24, 86:4, 86:5,
86:18, 86:21, 87:3,
87:11, 87:15, 88:4,
88:14, 88:18, 88:21,
88:25, 89:3, 89:14,
89:22, 90:4, 90:8,
90:13, 90:25, 91:1,
91:7, 91:17, 92:17,
92:18, 92:19, 92:23,
92:24, 93:3, 93:6,
94:2, 94:3, 94:9,
94:12, 94:14, 94:21,
94:22, 94:23, 95:2,
95:8, 95:10, 95:16,
95:24, 96:8, 96:11,
96:12, 96:21, 96:22,
97:1, 98:2, 98:3,
98:7, 98:9, 98:11,
98:12, 98:19, 98:23,
99:11, 100:14,
100:23, 101:1,

101:4, 101:7,
101:21, 101:24,
102:4, 102:15,
102:17, 103:14,
103:20, 104:18,
104:21, 105:13,
105:15, 105:20,
105:21, 106:2,
106:5, 106:11,
106:12, 106:21,
106:23, 106:25,
107:6, 107:10,
107:12, 107:16,
107:25, 108:1,
108:2, 108:11,
108:12, 108:13,
108:16, 109:7,
109:10, 109:11,
109:19, 109:20,
109:21, 110:5,
110:6, 110:13,
110:19, 110:25,
111:3, 111:5,
111:16, 111:17,
111:20, 111:22,
112:1, 112:5,
112:11, 112:12,
112:14, 113:3,
113:14, 113:18,
114:2, 114:4, 114:7,
114:9, 114:12,
114:18, 114:21,
115:1, 115:3, 115:5,
115:8, 115:10,
115:12, 115:14,
115:22, 116:1,
116:7, 116:9,
116:17, 116:22,
116:24, 117:3,
117:9, 117:18,
117:25, 118:2,
118:7, 118:8,
118:22, 119:1,
119:5, 119:12,
119:15, 119:17,
119:19, 119:20,
119:25, 120:7,
120:13, 121:9,
121:18, 122:2,
122:6, 122:12,
122:14, 122:17,
122:20, 122:21,
123:6, 123:13,
123:14, 123:15,
123:16, 123:17,
123:22, 124:4,
124:5, 124:6,
124:13, 124:17,
124:19, 125:9,
125:11, 125:15,
125:24, 125:25,

126:1, 126:3,
126:11, 126:15,
126:20, 126:21,
127:1, 127:4,
127:13, 127:20,
127:24, 128:3,
128:4, 128:14,
128:18, 128:21,
129:2, 129:20,
130:2, 130:8,
130:14, 130:21,
131:2, 131:5, 131:9,
131:15, 131:21,
132:1, 132:2,
132:11, 132:12,
132:16, 132:18,
132:19, 132:22,
133:2, 133:12,
133:14, 133:16,
133:25, 134:7,
134:21, 134:22,
134:24, 135:2,
135:16, 135:19,
135:24, 136:13,
137:8, 137:19,
137:23, 138:1,
138:6, 138:9,
138:13, 138:16,
139:8, 139:10,
139:25, 140:5,
140:22, 140:23,
140:24, 141:24,
142:1, 142:3, 142:4,
143:7, 143:14,
144:1, 145:11,
145:19, 146:2,
146:12, 146:23,
146:25, 147:11,
148:24, 149:1,
149:5, 149:10,
149:14, 149:16,
149:20, 150:11,
151:1, 151:2,
151:10, 151:12,
152:6, 152:10,
152:13, 152:25,
153:7, 153:13,
153:14, 153:18,
154:2, 154:6, 154:8,
154:17, 154:19,
155:3, 155:7,
155:12, 155:15,
155:21, 155:22,
155:24, 156:19,
157:12, 157:20,
158:13, 158:14,
159:5, 159:10,
159:14, 159:17,
159:25, 160:1,
160:7, 160:12,
160:23, 161:9,

161:13, 161:22,
161:24, 162:12,
162:16, 162:20,
163:6, 163:13,
163:14, 163:16,
164:3, 164:5,
164:11, 164:14,
164:22, 165:12,
165:13, 165:18,
165:19, 166:2,
166:5, 166:7,
166:18, 166:21,
167:7, 167:10,
167:19, 167:21,
168:9, 168:15,
168:18, 168:20,
168:22, 169:1,
169:4, 169:9,
169:13, 169:16,
170:5, 171:3,
171:18, 171:21,
171:25, 172:8,
172:21, 173:6,
173:14, 173:16,
173:18, 174:6,
174:9, 174:11,
174:19, 175:2,
175:9, 176:7,
176:12, 176:15,
176:21, 176:23,
177:4, 177:11,
177:14, 177:16,
177:21, 177:25,
178:1, 178:11,
178:14, 178:19,
178:20, 178:24,
179:11, 180:7,
180:12, 180:16,
180:18, 180:19,
180:20, 180:24,
181:5, 181:13,
181:14, 181:15,
181:18, 181:19,
182:13, 182:14,
182:16, 182:18,
182:20, 183:2,
183:3, 183:9,
183:11, 183:19,
183:21, 184:13,
184:24, 185:1,
185:20, 186:2,
186:7, 186:8,
186:14, 186:21,
187:1, 187:3, 187:5,
187:11, 187:15,
187:18, 187:21,
188:3, 188:4,
188:16, 188:24,
189:6, 190:5,
190:10, 190:18,
191:2, 191:17,

191:22, 191:23,
192:10, 192:20,
193:3, 193:22,
193:23, 193:25,
194:3, 194:4,
194:19, 195:14,
195:16, 195:20,
195:25, 196:18,
197:8, 197:11,
197:15, 197:21,
197:23, 198:3,
198:24, 199:9,
199:13, 199:19,
199:20, 199:23,
200:4, 200:16,
201:14, 201:16,
201:22, 202:2,
202:10, 202:16,
202:18, 202:19,
204:9, 204:13,
205:13, 205:17,
205:18, 206:3,
206:11, 206:17,
206:19, 206:21,
207:20, 207:22,
208:10, 209:5,
209:9, 209:15,
210:5, 210:24,
211:2, 211:6, 211:8,
211:18, 212:7,
212:11, 213:2,
213:4, 213:5,
213:11, 213:14,
213:17, 213:21,
213:23, 214:3,
214:9, 215:1, 215:6,
215:8, 215:17,
215:20, 215:22,
215:25, 216:8,
217:5, 217:6,
217:10, 217:22,
218:2, 218:9,
218:10, 218:22,
219:2, 219:8, 219:9,
219:15, 219:19,
219:23, 220:1,
220:4, 220:14,
221:2, 221:4, 221:8,
221:10, 221:11,
221:13, 221:18,
221:21, 221:23,
221:24, 222:2,
222:14, 222:17,
222:19, 222:20,
223:1, 223:2,
223:10, 223:17,
223:19, 223:21,
223:24, 224:3,
224:6, 224:14,
224:18, 224:22,
224:25, 225:4,

Exhibit 137                                                                 JA-0001861

225:5, 225:9,
225:22, 226:4,
226:8, 226:16,
226:17, 226:22,
227:1, 227:2, 228:6,
228:10, 228:21,
229:11, 229:18,
230:4, 230:7, 230:9,
230:18, 231:4,
231:11, 231:12,
231:15, 231:20,
231:21, 232:6,
232:7, 232:8,
232:16, 232:22,
233:3, 233:4, 233:5,
233:10, 233:13,
233:20, 234:1,
234:4, 234:5,
234:16, 235:7,
235:11, 235:25,
236:14, 236:16,
237:3, 237:6,
237:13, 237:16,
237:20, 238:7,
238:8, 240:11,
240:14, 240:22,
241:2, 241:17,
242:14, 243:11,
243:12, 243:25,
244:2, 244:5, 244:9,
244:12, 244:14,
244:17, 244:22,
245:3, 245:9,
246:11, 247:4,
247:7, 247:12,
247:19, 247:21,
248:5, 248:6, 248:8,
248:14, 248:15,
248:21, 249:4,
249:9, 249:10,
249:12, 249:19,
250:2, 250:6, 250:7,
250:15, 250:20,
250:21, 250:25,
251:5, 251:8,
251:12, 251:18,
251:20, 251:25,
252:2, 252:5,
252:13, 252:14,
252:17, 252:19,
252:23, 252:24
**ANEMIA** [2] - 124:10,
124:12
**ANNOUNCED** [3] -
34:6, 199:15, 227:17
**ANNOUNCEMENT** [2]
- 103:6, 228:1
**ANNUAL** [1] - 228:6
**ANNUALLY** [1] - 13:2
**ANOTHER** [17] - 45:9,

49:13, 65:24, 82:6,
87:22, 93:21, 99:19,
100:18, 107:12,
185:10, 195:23,
208:12, 218:14,
225:3, 241:8, 243:4,
249:21
**ANSWER** [13] - 30:21,
31:15, 45:12, 85:12,
108:19, 139:10,
140:17, 140:19,
140:20, 141:14,
147:19, 148:2,
238:10
**ANSWERS** [1] - 30:19
**ANTICIPATED** [1] -
210:13
**ANY** [129] - 3:21, 17:6,
18:23, 20:1, 20:14,
24:1, 26:22, 26:25,
34:20, 34:21, 35:23,
36:23, 37:21, 38:7,
39:7, 43:12, 46:23,
49:7, 53:10, 62:12,
62:21, 64:1, 64:4,
64:21, 65:6, 67:19,
69:4, 72:15, 74:7,
78:2, 87:8, 89:9,
89:17, 91:3, 91:4,
92:9, 99:18, 104:21,
105:3, 107:2,
110:11, 110:21,
111:4, 112:20,
114:18, 115:23,
118:20, 120:15,
131:11, 132:16,
132:17, 134:25,
140:14, 140:24,
141:10, 141:20,
145:1, 145:22,
145:23, 146:3,
147:24, 152:20,
154:25, 160:6,
168:5, 169:18,
170:7, 170:21,
172:4, 173:25,
174:1, 175:13,
178:23, 179:6,
179:20, 181:23,
182:20, 183:5,
185:22, 186:25,
191:1, 194:14,
194:22, 195:2,
195:8, 195:13,
199:1, 199:5,
199:10, 199:12,
199:13, 200:2,
200:7, 200:11,
200:15, 200:16,
201:2, 201:11,
201:18, 201:24,

202:5, 202:12,
202:22, 203:7,
203:8, 203:9,
203:14, 204:1,
216:5, 219:14,
221:10, 221:23,
223:21, 225:15,
225:16, 226:15,
226:18, 227:15,
227:20, 230:13,
230:14, 234:12,
239:7, 240:23,
243:22, 244:12,
244:14
**ANYBODY** [1] -
143:16
**ANYMORE** [1] - 188:6
**ANYONE** [10] - 34:9,
41:3, 83:25, 86:9,
155:6, 161:11,
196:8, 228:22, 244:6
**ANYTHING** [13] -
35:23, 37:17, 52:3,
54:2, 85:20, 112:18,
128:5, 136:14,
143:8, 148:19,
215:5, 244:1, 252:7
**ANYWAY** [1] - 137:15
**ANYWHERE** [2] -
126:19, 134:23
**APA** [27] - 8:6, 8:11,
8:12, 8:18, 8:20,
8:25, 9:2, 9:3, 9:12,
38:13, 39:2, 39:14,
44:24, 112:25,
172:25, 213:2,
213:4, 213:11,
215:15, 215:18,
215:25, 216:2,
216:9, 216:10,
218:18, 233:2, 245:8
**APART** [3] - 39:2,
111:6, 208:20
**APOLOGIES** [1] -
203:2
**APOLOGIZE** [7] -
18:17, 98:22, 151:5,
157:16, 204:13,
206:15, 234:11
**APPARENT** [2] - 43:1,
244:11
**APPARENTLY** [2] -
224:19, 225:25
**APPEAR** [2] - 108:20,
250:7
**APPEARANCES** [1] -
2:1
**APPEARS** [2] - 18:15,
165:13
**APPENDIX** [2] - 68:7,

84:18
**APPLE** [1] - 236:10
**APPLES** [2] - 109:11,
109:12
**APPLICABLE** [3] -
47:9, 49:1, 147:6
**APPLIED** [5] - 79:15,
85:19, 218:22,
219:20, 219:23
**APPLIES** [8] - 18:13,
28:3, 35:15, 49:8,
50:8, 120:25,
164:22, 225:17
**APPLY** [11] - 18:11,
18:12, 28:25, 36:11,
49:11, 52:11, 85:18,
179:17, 218:23,
224:2, 225:4
**APPLYING** [6] - 48:15,
205:14, 217:12,
226:12, 226:20
**APPRECIATE** [3] -
93:17, 99:17, 252:17
**APPROACH** [14] - 5:7,
25:19, 54:16, 54:17,
97:15, 105:5,
113:10, 155:24,
156:18, 158:3,
162:9, 193:8, 204:7,
235:19
**APPROACHED** [1] -
158:12
**APPROPRIATE** [14] -
25:14, 30:17, 32:13,
32:22, 39:8, 41:17,
49:3, 49:11, 49:25,
107:15, 121:4,
216:6, 220:12,
241:11
**APPROPRIATELY** [1]
- 32:3
**APPROPRIATENES
S** [1] - 107:11
**APPROVE** [1] - 82:17
**APPROVED** [4] - 78:5,
166:16, 178:18,
218:3
**APPROXIMATELY**
[11] - 84:13, 91:10,
118:12, 118:16,
119:16, 122:6,
126:23, 134:3,
208:2, 237:23,
238:13
**ARBITRARY** [3] -
213:4, 233:3, 250.25
**ARCHDIOCESE** [3] -
206:12, 206:25
**ARE** [441] - 3:2, 6:4,
6:11, 6:18, 6:20,

6:21, 7:13, 8:4, 8:5,
8:8, 8:11, 9:8, 9:13,
9:19, 9:22, 10:12,
10:20, 11:21, 11:22,
11:23, 12:2, 13:2,
14:9, 14:13, 14:15,
15:17, 15:20, 16:16,
17:24, 17:25, 20:15,
21:13, 21:22, 21:24,
25:6, 26:6, 26:16,
26:18, 26:19, 27:4,
27:11, 28:18, 29:1,
29:5, 31:11, 32:19,
33:23, 34:19, 37:8,
38:20, 38:22, 38:24,
39:2, 39:8, 39:10,
40:22, 40:25, 41:17,
42:10, 45:11, 46:4,
46:15, 46:25, 47:1,
47:3, 47:10, 48:12,
48:20, 48:24, 51:24,
52:1, 54:5, 54:6,
54:14, 55:2, 56:1,
56:12, 56:17, 56:20,
57:17, 57:22, 57:24,
60:19, 60:23, 61:15,
61:17, 61:18, 63:14,
63:20, 68:10, 68:12,
68:23, 72:4, 72:5,
72:8, 72:18, 72:19,
72:24, 73:1, 73:7,
74:13, 74:20, 75:2,
75:5, 75:15, 76:8,
76:9, 76:17, 77:10,
77:12, 77:15, 79:5,
79:18, 83:11, 84:4,
84:9, 84:13, 86:18,
86:19, 86:20, 87:18,
87:21, 88:23, 90:8,
90:12, 91:21, 95:7,
95:13, 97:22, 99:3,
99:12, 99:23,
100:20, 100:23,
103:9, 103:20,
103:21, 105:10,
105:24, 106:3,
106:6, 107:20,
108:17, 108:21,
109:11, 111:3,
111:18, 112:15,
114:8, 114:10,
114:11, 114:15,
114:17, 114:18,
114:19, 116:5,
116:23, 117:11,
117:25, 119:5,
119:6, 119:25,
120:3, 120:6, 120:9,
121:4, 121:16,
121:17, 121:18,
122:2, 122:8,

Exhibit 137                                                                                  JA-0001862

123:23, 125:5,
125:11, 125:13,
125:15, 125:24,
126:1, 126:3,
126:11, 126:15,
126:18, 127:14,
127:19, 127:23,
127:24, 128:19,
128:22, 129:5,
129:7, 129:11,
130:14, 134:4,
134:25, 135:3,
135:10, 137:16,
137:23, 137:25,
138:3, 138:4, 139:1,
139:6, 140:15,
140:18, 142:5,
142:15, 144:7,
144:11, 144:14,
144:17, 144:23,
149:20, 149:23,
150:8, 150:14,
151:6, 151:13,
151:18, 151:25,
153:12, 153:13,
156:2, 157:1,
158:19, 158:24,
159:2, 159:3, 159:6,
159:8, 159:9,
159:16, 159:24,
159:25, 160:16,
161:2, 161:25,
162:3, 164:22,
164:25, 166:2,
166:7, 166:11,
168:8, 168:19,
168:22, 168:24,
169:1, 169:12,
169:15, 169:16,
170:6, 171:25,
172:6, 173:1,
173:14, 174:9,
174:15, 174:19,
174:22, 175:2,
175:4, 175:5,
175:10, 175:12,
176:5, 176:6,
176:10, 176:12,
176:15, 176:16,
176:18, 176:22,
176:25, 177:3,
177:12, 177:15,
180:16, 182:1,
185:16, 185:17,
186:10, 186:19,
187:14, 189:4,
189:13, 190:7,
190:12, 190:14,
190:15, 191:21,
192:9, 193:1,
193:14, 194:14,

194:17, 195:17,
196:3, 196:10,
196:15, 197:11,
197:18, 197:21,
198:1, 198:6, 198:7,
198:22, 198:23,
199:1, 199:5, 199:9,
199:16, 200:4,
200:10, 200:12,
201:19, 201:24,
202:12, 203:15,
204:3, 204:6, 204:9,
204:21, 205:6,
205:12, 205:13,
206:9, 206:10,
207:3, 209:4,
209:15, 210:24,
210:25, 211:5,
211:7, 211:10,
211:11, 211:12,
212:5, 212:18,
213:11, 213:12,
214:17, 215:7,
215:11, 215:24,
216:3, 216:6,
216:19, 217:16,
218:14, 218:16,
219:24, 220:3,
221:2, 221:16,
222:10, 222:13,
222:14, 224:13,
227:17, 227:23,
227:24, 228:3,
228:15, 228:17,
228:18, 228:21,
228:23, 228:25,
229:1, 229:3,
229:10, 229:15,
230:10, 230:24,
231:13, 231:18,
232:6, 232:8,
232:14, 233:3,
234:2, 234:20,
235:1, 235:3,
235:10, 236:15,
236:16, 238:24,
239:6, 239:15,
239:16, 239:18,
240:24, 242:22,
243:8, 243:9,
243:20, 243:22,
244:13, 244:19,
246:15, 246:23,
246:25, 247:1,
247:3, 248:10,
248:14, 249:2,
249:11, 249:15,
249:22, 250:18,
250:24, 251:2, 251:9
**AREA** [8] - 64:18,
93:13, 105:11,

114:4, 120:13,
193:23, 211:3, 222:2
**AREAS** [6] - 51:20,
62:24, 69:17, 148:8,
148:9, 172:12
**ARGUABLY** [1] -
40:25
**ARGUE** [3] - 128:3,
231:16, 235:1
**ARGUED** [5] - 19:21,
215:16, 216:18,
232:22, 232:23
**ARGUES** [2] - 43:10,
43:19
**ARGUING** [4] - 21:23,
47:1, 219:11, 235:16
**ARGUMENT** [18] -
43:22, 46:4, 46:6,
65:21, 65:24,
216:14, 216:20,
216:21, 217:1,
217:10, 219:23,
221:15, 224:20,
225:1, 236:12,
240:18, 240:20,
252:3
**ARGUMENTS** [3] -
5:16, 221:6, 229:23
**ARISING** [1] - 241:10
**ARKANSAS** [1] - 38:4
**ARM** [1] - 174:25
**AROUND** [14] - 14:7,
21:10, 67:12, 93:23,
97:1, 121:21, 134:6,
157:15, 157:17,
168:12, 169:10,
172:6, 197:8, 202:19
**ARRANGE** [1] - 249:9
**ARTICLE** [19] - 70:18,
102:5, 106:13,
158:12, 158:15,
158:18, 158:24,
159:15, 159:21,
160:7, 160:21,
160:25, 161:14,
161:17, 161:18,
162:2, 195:22,
195:23, 195:25
**ARTICLES** [21] -
61:11, 62:25, 117:9,
167:25, 168:2,
168:12, 168:22,
169:5, 193:25,
194:14, 194:17,
194:24, 195:5,
195:6, 195:8,
195:10, 195:16,
195:18, 195:21,
196:4
**AS** [279] - 5:22, 7:6,

7:9, 7:22, 8:8, 12:9,
12:15, 12:22, 13:18,
15:3, 16:5, 16:6,
16:7, 16:9, 16:12,
16:17, 18:8, 18:9,
18:25, 19:11, 19:21,
22:2, 22:3, 22:16,
22:17, 22:18, 22:20,
22:23, 23:4, 23:13,
23:22, 24:15, 25:9,
25:24, 27:8, 27:9,
28:3, 29:21, 30:3,
31:3, 32:15, 32:16,
34:5, 34:22, 35:4,
35:8, 37:4, 37:5,
38:17, 39:1, 39:7,
39:10, 39:11, 40:19,
41:4, 42:2, 43:14,
46:3, 46:10, 47:5,
49:19, 51:7, 52:8,
58:9, 58:15, 59:7,
60:2, 61:8, 61:21,
63:24, 64:6, 64:9,
64:18, 65:1, 65:11,
65:13, 65:17, 65:19,
67:5, 69:14, 69:18,
70:7, 70:9, 71:4,
73:13, 78:1, 78:6,
79:14, 79:25, 83:12,
85:3, 85:9, 92:10,
94:4, 95:11, 95:19,
95:25, 96:2, 96:5,
96:21, 99:20, 100:5,
100:8, 100:11,
100:14, 102:17,
103:22, 105:18,
108:7, 111:6, 111:7,
112:10, 116:16,
117:3, 117:5,
117:22, 118:2,
118:3, 118:13,
118:15, 119:8,
119:14, 120:13,
120:17, 120:22,
120:25, 121:24,
125:9, 125:16,
129:23, 131:23,
138:1, 138:10,
138:20, 138:22,
139:10, 140:10,
140:25, 141:5,
142:13, 144:3,
146:8, 146:10,
146:13, 146:19,
147:3, 147:9,
147:15, 148:1,
148:5, 148:19,
148:20, 149:2,
149:7, 149:12,
149:16, 152:10,
152:13, 154:6,

155:6, 155:20,
156:6, 156:8, 159:2,
162:15, 164:9,
164:23, 166:19,
167:9, 167:13,
167:14, 167:15,
168:20, 169:5,
169:23, 169:24,
170:3, 171:10,
172:12, 172:19,
172:20, 172:22,
174:25, 175:10,
175:11, 176:8,
177:19, 181:5,
181:13, 184:14,
188:12, 188:19,
190:12, 195:4,
195:18, 197:23,
200:9, 200:11,
200:21, 201:2,
201:7, 201:24,
202:4, 202:11,
202:21, 204:24,
205:5, 206:5, 206:6,
207:24, 208:23,
211:8, 211:22,
212:4, 212:11,
212:18, 212:22,
213:14, 214:11,
215:11, 216:5,
216:14, 217:5,
217:9, 221:6,
221:13, 221:16,
221:17, 221:25,
222:15, 223:11,
223:12, 223:23,
224:16, 226:25,
227:11, 227:12,
228:8, 229:3, 229:8,
229:13, 229:19,
230:22, 231:25,
232:11, 232:16,
233:11, 233:21,
234:16, 239:8,
244:15, 247:5,
247:8, 248:11,
249:5, 250:4,
251:14, 251:25,
252:6
**AS-NEEDED** [1] -
223:11
**ASARCO** [1] - 66:10
**ASIDE** [2] - 41:15,
73:10
**ASK** [29] - 5:25, 11:11,
20:24, 25:23, 31:24,
46:22, 56:23, 57:7,
59:13, 62:4, 68:1,
73:11, 85:11, 105:9,
114:9, 114:23,
116:13, 116:21,

123:3, 126:6, 130:23, 132:6, 133:2, 139:17, 145:5, 173:21, 193:13, 198:12, 251:12

**ASKED** [32] - 3:16, 33:6, 36:8, 66:23, 68:21, 68:22, 69:3, 69:6, 69:11, 78:23, 93:13, 105:8, 105:17, 105:25, 106:10, 141:9, 145:13, 154:13, 169:6, 169:9, 192:6, 198:18, 204:15, 205:16, 206:3, 213:9, 214:18, 214:19, 218:21, 222:9, 233:9, 239:16

**ASKING** [7] - 139:8, 139:9, 139:15, 140:16, 148:5, 150:14, 214:5

**ASKS** [1] - 7:23

**ASPECT** [1] - 69:4

**ASPECTS** [3] - 170:11, 211:13, 250:12

**ASSERT** [13] - 15:15, 16:8, 16:11, 18:2, 19:4, 20:8, 29:3, 29:16, 29:17, 29:22, 29:24, 30:5, 102:19

**ASSERTED** [1] - 48:6

**ASSERTING** [3] - 17:20, 19:18, 240:5

**ASSESS** [1] - 221:3

**ASSESSING** [2] - 11:8, 82:14

**ASSESSMENT** [1] - 125:25

**ASSESSMENTS** [1] - 132:15

**ASSIGN** [1] - 220:6

**ASSIST** [1] - 168:21

**ASSISTANCE** [2] - 13:24, 179:18

**ASSISTANT** [1] - 4:17

**ASSOCIATE** [5] - 58:9, 61:8, 117:23, 118:16, 170:14

**ASSOCIATED** [6] - 103:20, 108:8, 128:21, 128:22, 176:19, 177:15

**ASSOCIATION** [5] - 103:2, 103:12, 104:4, 104:11, 241:18

**ASSUME** [8] - 5:15, 21:23, 31:17, 77:17, 83:13, 158:21, 237:19, 238:16

**ASSUMED** [1] - 226:10

**ASSUMING** [3] - 24:5, 160:13, 213:21

**AT** [253] - 6:1, 6:10, 10:3, 10:6, 10:7, 10:10, 10:15, 10:16, 10:17, 10:18, 10:20, 10:21, 10:24, 11:13, 12:3, 16:22, 17:3, 17:18, 18:18, 21:14, 22:23, 23:14, 24:1, 25:11, 29:14, 30:9, 31:4, 31:10, 31:12, 33:13, 36:9, 37:13, 37:20, 38:2, 38:9, 40:20, 41:1, 42:6, 43:5, 49:5, 49:10, 52:8, 55:5, 55:22, 57:8, 57:12, 57:15, 57:24, 58:12, 58:15, 58:21, 58:25, 59:4, 59:10, 59:15, 61:2, 62:6, 63:11, 64:15, 66:10, 69:15, 69:23, 70:1, 70:2, 70:5, 71:23, 72:13, 72:16, 72:23, 74:14, 74:17, 75:6, 75:8, 75:9, 75:12, 75:18, 76:8, 77:6, 77:10, 79:1, 81:15, 81:20, 82:16, 83:7, 84:10, 86:2, 86:14, 86:18, 87:18, 90:2, 90:10, 91:14, 92:4, 93:5, 94:2, 94:4, 94:8, 95:7, 95:9, 98:17, 100:23, 101:21, 101:23, 103:21, 109:19, 111:4, 112:7, 112:8, 112:9, 114:9, 115:4, 115:9, 115:15, 115:17, 116:1, 116:15, 116:17, 116:23, 117:2, 119:2, 119:17, 120:9, 121:19, 122:3, 124:18, 128:5, 130:8, 134:3, 137:24, 138:4, 139:5, 143:25, 144:1, 146:11, 146:15, 146:16, 146:17, 146:21, 146:23, 147:2, 147:10, 148:1,

148:15, 148:19, 151:25, 154:19, 154:22, 157:12, 158:8, 159:3, 159:7, 159:25, 160:2, 160:6, 162:1, 164:19, 166:1, 166:2, 166:25, 167:5, 167:6, 167:8, 167:11, 170:7, 171:4, 171:8, 171:15, 171:16, 172:11, 175:17, 176:4, 176:21, 177:3, 177:13, 179:14, 181:17, 181:18, 182:17, 182:20, 182:25, 184:5, 184:22, 184:23, 185:18, 185:22, 185:23, 186:3, 186:5, 186:7, 186:8, 186:12, 186:13, 186:16, 186:18, 186:19, 186:21, 186:23, 188:7, 188:25, 190:8, 190:18, 192:11, 192:21, 194:8, 194:10, 194:23, 197:6, 198:9, 198:10, 198:23, 199:18, 200:5, 200:11, 204:21, 208:6, 209:18, 209:21, 212:22, 213:16, 214:25, 215:23, 217:17, 218:16, 219:15, 221:9, 223:21, 223:24, 225:15, 230:15, 230:19, 235:22, 236:10, 237:12, 242:5, 243:3, 247:14, 247:19, 247:21, 249:5, 249:20, 250:21, 251:14, 252:1, 252:2

**ATLANTA** [4] - 206:12, 206:19, 207:1

**ATTACHED** [2] - 65:9, 159:21

**ATTACHMENT** [6] - 158:12, 158:15, 158:17, 158:24, 159:1, 161:4

**ATTACHMENTS** [1] - 5:17

**ATTACK** [1] - 128:4

**ATTEMPT** [1] - 154:16

**ATTEND** [1] - 123:19

**ATTENTION** [7] - 14:14, 67:25, 83:23, 87:17, 104:8, 137:22, 180:3

**ATTORNEY** [14] - 2:2, 4:2, 4:6, 4:7, 4:9, 4:10, 4:14, 4:15, 4:17, 4:20, 5:1, 5:4, 15:21, 143:14

**ATTRIBUTE** [1] - 156:1

**ATTRIBUTED** [1] - 70:22

**AUGUST** [1] - 44:6

**AUTHENTICATION** [1] - 56:3

**AUTHENTICITY** [3] - 158:14, 159:3, 159:7

**AUTHOR** [3] - 81:22, 163:3, 195:14

**AUTHORED** [4] - 18:17, 62:21, 167:25, 168:5

**AUTHORITY** [38] - 38:18, 38:25, 39:4, 39:9, 42:8, 42:14, 42:17, 42:20, 42:23, 43:7, 43:12, 44:2, 44:8, 44:17, 44:21, 44:24, 45:1, 45:14, 45:16, 45:22, 46:2, 46:8, 46:11, 50:19, 136:16, 215:16, 215:24, 216:12, 220:12, 223:15, 225:24, 240:7, 240:8, 243:3, 243:6, 249:25, 250:7, 250:9

**AUTHORIZE** [2] - 50:21, 221:22

**AUTHORIZES** [1] - 46:14

**AUTHORIZING** [1] - 47:13

**AUTHORS** [2] - 71:9, 106:23

**AVAILABILITY** [1] - 52:18

**AVAILABLE** [11] - 73:9, 75:5, 75:8, 78:20, 82:18, 106:8, 107:14, 119:6, 149:25, 154:8, 175:16, 190:9, 217:17, 219:18, 220:3, 240:16, 242:22

**AVENUE** [2] - 2:12, 2:18

**AVERAGE** [4] - 88:18, 127:13, 135:10, 154:3

**AVERTED** [1] - 82:1

**AVERTING** [1] - 81:19

**AVOID** [3] - 173:18, 187:23, 188:1

**AVOIDED** [1] - 206:23

**AVOIDING** [2] - 48:6, 172:7

**AWARE** [26] - 9:13, 37:19, 37:21, 79:5, 107:9, 144:14, 144:15, 144:23, 145:4, 149:23, 192:18, 196:15, 196:18, 197:11, 197:18, 197:21, 199:1, 199:4, 199:5, 199:10, 199:12, 207:8, 225:16, 236:15, 236:16, 244:14

**AWARENESS** [1] - 77:14

**AWAY** [4] - 43:22, 192:19, 238:9, 250:17

---

**B**

**B-U-T-T-S** [1] - 113:21

**BABIES** [3] - 71:17, 72:5, 117:20

**BACK** [39] - 6:8, 6:11, 8:14, 8:16, 15:5, 17:25, 41:5, 41:10, 47:12, 53:14, 53:17, 53:24, 54:10, 74:17, 81:21, 113:4, 114:13, 118:9, 133:1, 136:19, 145:22, 146:16, 153:17, 157:12, 157:13, 184:22, 187:17, 204:13, 212:19, 212:20, 214:3, 215:2, 215:7, 217:14, 223:19, 224:2, 227:8, 239:22, 248:15

**BACKED** [2] - 49:1, 53:5

**BACKGROUND** [3] - 116:20, 166:22, 166:23

**BACKGROUNDS** [1] - 59:2

Exhibit 137

JA-0001864

**BAD** [1] - 71:11
**BALANCE** [5] - 145:19, 226:25, 247:12, 247:17, 247:19
**BALANCED** [1] - 108:13
**BALANCING** [1] - 108:17
**BALLPARK** [1] - 168:1
**BARN** [1] - 236:2
**BARRIER** [12] - 11:8, 83:9, 92:13, 133:24, 146:25, 148:25, 175:11, 176:22, 191:13, 191:14, 201:15, 201:19
**BARRIERS** [1] - 147:4
**BASED** [52] - 8:13, 9:18, 16:11, 43:3, 61:18, 62:10, 64:17, 71:3, 75:10, 75:19, 79:12, 80:17, 83:18, 85:9, 86:6, 90:4, 93:22, 94:14, 94:25, 96:17, 100:20, 108:1, 108:10, 111:13, 111:15, 112:3, 120:12, 136:17, 139:21, 140:4, 140:24, 141:4, 141:10, 145:12, 145:16, 154:18, 156:17, 164:12, 171:5, 180:21, 181:7, 191:7, 206:18, 217:22, 229:1, 235:8, 235:9, 237:15, 251:25, 252:14
**BASELINE** [4] - 186:9, 186:21, 186:24, 187:18
**BASES** [2] - 42:7, 42:17
**BASICALLY** [2] - 94:6, 209:3
**BASIS** [18] - 12:5, 38:25, 46:1, 46:10, 48:8, 49:25, 50:19, 119:16, 125:8, 131:22, 139:3, 140:5, 151:3, 195:6, 223:12, 228:6, 246:6, 249:23
**BE** [220] - 3:12, 5:20, 7:14, 7:20, 8:10, 8:13, 8:16, 11:20,

14:10, 14:19, 14:24, 18:9, 20:8, 20:9, 23:4, 23:23, 24:8, 24:20, 25:3, 25:8, 26:21, 29:3, 29:16, 29:18, 30:2, 30:5, 30:15, 31:22, 32:2, 32:12, 34:14, 36:25, 37:1, 40:15, 44:3, 45:6, 45:21, 47:15, 48:9, 50:6, 50:11, 50:12, 51:10, 52:8, 53:10, 53:23, 54:10, 55:14, 56:8, 62:3, 66:7, 66:9, 67:14, 68:1, 68:5, 69:9, 72:6, 72:8, 72:20, 73:4, 76:18, 77:22, 78:6, 78:8, 78:20, 78:21, 78:24, 79:3, 79:15, 79:22, 80:11, 81:11, 81:14, 81:15, 82:18, 83:21, 87:13, 88:18, 89:8, 89:11, 89:15, 101:8, 107:14, 108:13, 108:14, 108:20, 113:4, 120:24, 122:7, 123:17, 123:21, 124:4, 124:5, 124:12, 130:11, 131:22, 133:23, 134:15, 134:22, 135:24, 137:17, 142:7, 147:6, 151:18, 151:20, 156:5, 157:12, 158:6, 159:22, 160:3, 162:6, 164:10, 164:24, 165:13, 166:17, 169:13, 169:18, 169:19, 169:24, 169:25, 173:20, 175:3, 175:8, 176:11, 177:9, 177:17, 177:19, 177:20, 177:21, 178:1, 179:17, 189:3, 189:13, 189:25, 190:22, 190:25, 191:1, 191:8, 191:11, 191:14, 191:16, 191:20, 191:22, 193:20, 195:4, 195:12, 200:15, 202:3, 206:23, 208:7, 208:22, 213:24, 214:5, 214:7,

214:11, 215:2, 215:3, 215:19, 216:10, 216:17, 217:7, 219:10, 219:11, 219:13, 222:4, 223:9, 223:16, 224:5, 228:14, 228:17, 229:8, 229:18, 230:3, 230:19, 231:3, 231:8, 231:10, 231:12, 231:24, 233:22, 234:5, 234:13, 234:24, 235:2, 235:4, 235:7, 235:10, 235:16, 236:16, 236:17, 236:18, 237:3, 237:14, 237:15, 238:1, 238:3, 238:19, 238:20, 238:25, 240:12, 241:1, 241:14, 242:23, 243:24, 244:4, 244:15, 245:9, 245:20, 246:6, 247:2, 247:9, 247:20, 247:23, 249:13, 251:7, 252:3, 252:16
**BEAR** [2] - 14:8, 192:1
**BEARAK** [5] - 106:11, 109:7, 110:25, 160:21, 195:16
**BECAME** [6] - 57:13, 59:3, 70:1, 71:23, 87:12, 131:6
**BECAUSE** [108] - 9:2, 9:3, 11:17, 14:16, 19:9, 20:25, 24:25, 25:7, 25:9, 27:1, 27:25, 29:11, 30:3, 31:9, 33:12, 33:23, 36:25, 41:2, 42:7, 43:17, 46:13, 51:2, 51:18, 52:19, 53:6, 55:13, 69:18, 71:2, 72:1, 73:1, 74:12, 80:23, 80:25, 83:2, 83:8, 88:5, 92:12, 92:14, 93:10, 94:20, 98:20, 98:24, 105:17, 106:6, 108:22, 108:24, 110:12, 111:20, 123:19, 125:7, 126:2, 134:4, 134:10, 136:3, 142:13, 145:1, 145:24, 145:25,

146:4, 148:4, 153:2, 153:10, 159:4, 160:11, 161:4, 161:18, 174:16, 177:14, 178:12, 179:1, 180:17, 188:5, 188:15, 190:6, 191:18, 192:10, 195:12, 196:21, 199:11, 200:13, 200:17, 201:3, 201:12, 201:19, 201:25, 202:13, 203:15, 209:3, 209:22, 209:23, 212:24, 214:17, 217:1, 218:18, 223:2, 227:10, 230:12, 230:22, 231:9, 232:13, 233:5, 233:6, 235:4, 240:22, 246:1, 247:5, 248:12, 251:2
**BECOME** [9] - 71:18, 72:2, 73:3, 76:1, 78:15, 137:18, 150:16, 173:18, 201:15
**BECOMES** [2] - 137:20, 172:8
**BECOMING** [4] - 126:12, 127:8, 134:13, 170:13
**BED** [1] - 126:4
**BEEN** [75] - 12:11, 16:24, 25:14, 27:6, 27:16, 27:19, 28:2, 28:5, 28:6, 34:12, 35:1, 37:13, 39:19, 39:21, 42:1, 49:12, 60:12, 62:13, 63:10, 65:6, 65:8, 82:5, 86:1, 86:6, 91:7, 91:8, 92:13, 93:9, 93:10, 93:21, 100:11, 100:14, 106:25, 108:9, 111:2, 118:20, 118:23, 118:24, 122:24, 125:3, 129:10, 139:10, 145:10, 145:19, 152:10, 152:13, 155:8, 157:13, 160:4, 169:23, 170:2, 170:5, 171:22, 189:8, 189:12, 192:18, 197:3, 200:5, 202:6,

206:1, 207:6, 209:12, 209:18, 223:4, 226:23, 227:14, 229:4, 232:22, 236:21, 236:22, 236:25, 242:11, 242:15, 248:4, 248:5
**BEETLESTONE** [1] - 1:11
**BEFORE** [65] - 1:11, 3:13, 5:9, 8:16, 11:9, 11:14, 11:17, 39:23, 41:19, 41:22, 46:3, 51:22, 53:17, 55:7, 55:11, 68:2, 70:13, 70:17, 70:25, 83:4, 83:24, 87:20, 95:8, 99:8, 107:16, 112:1, 112:10, 112:13, 119:14, 120:9, 120:10, 126:18, 131:1, 131:16, 136:12, 137:8, 139:22, 143:13, 144:21, 144:23, 147:15, 154:20, 155:24, 158:20, 160:15, 162:17, 162:24, 166:21, 176:22, 177:14, 180:4, 183:9, 187:24, 191:9, 195:18, 196:14, 207:20, 211:4, 211:17, 212:20, 218:6, 221:17, 233:9, 244:23
**BEFOREHAND** [1] - 244:9
**BEGAN** [1] - 180:5
**BEGIN** [3] - 5:9, 71:14, 224:18
**BEGINNING** [19] - 15:5, 71:4, 84:7, 84:11, 139:5, 181:17, 182:17, 183:16, 186:4, 186:10, 186:12, 187:21, 211:1, 224:3, 230:15, 235:22, 250:13, 251:15, 252:5
**BEHALF** [3] - 15:15, 30:23, 235:16
**BEHAVED** [1] - 183:2
**BEHAVIOR** [8] - 63:12, 75:20, 168:20, 181:15, 188:19, 189:4,

Exhibit 137

JA-0001865

192:16, 195:20
**BEHAVIORS** [2] -
183:6, 183:12
**BEHIND** [4] - 182:4,
184:14, 204:18,
214:13
**BEING** [22] - 19:21,
58:25, 65:19, 79:20,
85:9, 112:23,
120:18, 141:9,
161:14, 172:23,
177:16, 177:24,
183:15, 189:14,
193:22, 219:18,
239:16, 244:13,
246:3, 247:7
**BELIEF** [7] - 51:6,
212:11, 212:14,
226:8, 247:22,
247:24
**BELIEFS** [10] -
212:15, 212:16,
232:25, 247:3,
247:12, 247:14,
247:15, 247:20,
248:1
**BELIEVE** [62] - 5:10,
9:15, 9:17, 11:2,
17:12, 17:25, 18:16,
18:21, 19:16, 20:3,
21:20, 24:14, 25:3,
30:14, 31:3, 48:8,
51:4, 51:8, 92:18,
95:16, 95:18, 95:24,
98:6, 105:14, 112:8,
114:19, 138:2,
138:9, 138:12,
138:16, 140:5,
140:11, 141:20,
143:22, 150:19,
153:22, 154:1,
158:13, 168:4,
190:21, 204:19,
204:23, 206:19,
215:5, 219:8,
219:13, 222:23,
223:8, 225:7, 226:6,
229:15, 229:25,
230:10, 230:16,
230:19, 234:6,
234:12, 235:11,
245:24, 246:5,
246:7, 251:8
**BELIEVED** [1] -
202:17
**BELIEVES** [4] - 31:10,
207:24, 227:7, 240:4
**BELOW** [3] - 89:10,
91:2, 102:13
**BENCH** [3] - 113:2,

204:19, 204:24
**BENEFICIARIES** [6] -
13:9, 13:13, 52:22,
205:4, 205:10,
207:23
**BENEFICIARIES '** [1] -
218:2
**BENEFIT** [3] - 12:20,
96:17, 236:19
**BENEFITED** [2] -
12:25, 190:3
**BENEFITS** [5] - 13:3,
74:11, 129:19,
228:5, 230:15
**BESIDE** [1] - 6:10
**BEST** [10] - 23:1,
23:22, 24:3, 35:14,
43:23, 132:2,
132:20, 132:23,
153:23, 190:12
**BETTER** [7] - 12:11,
19:24, 22:11, 23:20,
55:14, 214:12,
241:16
**BETWEEN** [24] -
14:10, 47:25, 48:3,
49:15, 50:23, 70:10,
88:20, 88:25, 89:14,
92:23, 101:24,
102:17, 109:21,
111:5, 111:16,
118:17, 160:6,
177:11, 182:14,
183:2, 187:20,
213:10, 234:1,
237:20
**BEYOND** [12] - 7:19,
24:23, 81:10,
108:20, 139:1,
150:5, 150:19,
151:22, 178:12,
198:7, 225:24, 246:9
**BIGGERS** [2] - 38:1,
38:2
**BILLING** [1] - 153:7
**BILLION** [4] - 81:14,
81:15, 82:3
**BILLIONS** [1] - 219:25
**BINDER** [8] - 55:7,
68:1, 114:6, 137:25,
165:7, 175:21,
183:24, 198:10
**BINDING** [2] - 16:20,
37:8
**BIOGRAPHIES** [1] -
68:10
**BIOGRAPHY** [2] -
68:14
**BIOMEDICAL** [1] -
187:5

**BIOSTATISTICS** [1] -
116:1
**BIRCWH** [2] - 170:16
**BIRTH** [26] - 11:22,
12:2, 72:6, 80:15,
91:7, 91:11, 91:14,
92:1, 92:11, 128:24,
129:17, 133:17,
133:20, 134:5,
134:9, 135:5, 136:1,
145:18, 149:25,
156:3, 175:6, 175:7,
177:13, 177:16,
188:6
**BIT** [11] - 21:1, 52:2,
88:18, 88:23, 123:3,
129:9, 134:18,
149:19, 171:7,
218:18, 249:18
**BITE** [1] - 236:10
**BLACK** [4] - 176:4,
245:3, 245:5, 246:12
**BLACK-LETTER** [3] -
245:3, 245:5, 246:12
**BLANK** [6] - 26:1,
27:2, 38:15, 42:20,
46:15, 211:2, 244:20
**BLANKET** [2] - 43:12,
238:24
**BLEEDING** [1] -
155:22
**BLOCKING** [1] -
224:15
**BLOG** [1] - 194:24
**BLOOD** [2] - 124:13,
124:14
**BLOW** [1] - 223:17
**BOARD** [8] - 30:13,
101:15, 116:5,
116:6, 116:10,
116:12, 169:7,
248:16
**BODY** [7] - 79:24,
82:13, 96:11, 106:7,
127:17, 194:1, 194:2
**BOLAND** [30] - 2:3,
4:5, 4:6, 98:12,
157:24, 162:9,
162:11, 162:12,
163:2, 163:10,
163:13, 163:22,
163:25, 165:2,
165:4, 172:11,
173:4, 173:9, 180:1,
182:2, 182:3,
184:12, 185:7,
191:12, 192:1,
192:4, 193:5,
203:17, 204:2,
254:13

**BOLD** [1] - 53:6
**BONE** [1] - 127:24
**BORN** [2] - 72:5, 72:6
**BORNE** [1] - 151:20
**BORROW** [1] - 48:22
**BORROWING** [1] -
48:13
**BOSTON** [1] - 167:11
**BOTH** [24] - 15:12,
16:6, 16:11, 19:19,
20:4, 64:7, 74:10,
105:17, 109:19,
112:9, 116:6, 122:9,
129:1, 130:15,
131:8, 136:20,
149:20, 153:13,
153:14, 186:21,
213:22, 222:10,
227:11, 246:25
**BOTTOM** [11] - 76:8,
77:5, 77:6, 77:10,
83:7, 86:14, 133:13,
144:1, 176:21,
223:25
**BRAND** [1] - 145:18
**BREACH** [1] - 7:10
**BREADTH** [1] - 43:1
**BREAK** [9] - 54:9,
54:13, 113:3, 113:7,
157:12, 157:23,
158:13, 210:5,
210:15
**BREAST** [2] - 108:3,
108:8
**BRIAN** [1] - 2:17
**BRIDGE** [4] - 26:13,
36:9, 36:17, 244:21
**BRIEF** [10] - 8:9,
15:20, 16:9, 43:9,
73:10, 113:3, 210:4,
216:24, 229:20,
246:22
**BRIEFING** [3] - 15:6,
225:9, 252:19
**BRIEFINGS** [1] -
251:16
**BRIEFLY** [14] - 56:11,
56:19, 56:23, 68:5,
74:25, 105:4,
111:12, 114:17,
114:23, 116:13,
123:9, 166:23,
176:1, 248:23
**BRIEFS** [7] - 5:16,
5:17, 215:18,
229:23, 229:25,
251:24, 252:17
**BRIGHT** [1] - 69:2
**BRING** [5] - 6:2,
21:25, 89:4, 233:11,

233:13
**BROAD** [6] - 6:21,
45:4, 45:22, 223:18,
224:4, 249:24
**BROADENED** [1] -
145:10
**BROADER** [2] - 67:9,
225:14
**BROADLY** [2] - 32:15,
42:22
**BROCK** [4] - 2:6, 4:11,
4:13, 4:14
**BROKE** [1] - 73:16
**BROUGHT** [1] -
213:11
**BUCK** [1] - 31:14
**BUCKING** [1] - 32:19
**BUILD** [2] - 129:6,
170:19
**BUILDING** [1] - 170:16
**BUILT** [1] - 129:5
**BULK** [2] - 155:20,
168:12
**BULLSEYE** [1] - 48:3
**BUNCH** [1] - 86:18
**BURDEN** [8] - 14:8,
34:11, 43:18, 46:17,
46:19, 50:24, 51:2,
232:24
**BURDENED** [1] -
247:16
**BURDENS** [1] - 14:6
**BURWELL** [3] -
219:16, 242:18,
242:21
**BUT** [161] - 5:14, 6:14,
8:22, 11:12, 14:22,
17:17, 18:17, 19:2,
20:5, 20:7, 20:13,
21:22, 25:2, 26:19,
27:16, 27:19, 27:24,
28:6, 28:18, 30:13,
30:23, 31:5, 34:5,
34:19, 37:21, 40:16,
41:8, 41:13, 41:17,
42:8, 45:17, 45:20,
47:8, 49:8, 49:22,
50:1, 50:4, 50:13,
52:23, 53:17, 55:15,
57:24, 59:14, 62:16,
63:9, 67:4, 70:25,
72:25, 74:20, 76:9,
78:11, 85:11, 86:2,
88:1, 89:21, 91:8,
91:13, 91:21, 93:23,
95:2, 95:9, 95:13,
101:5, 103:2,
104:10, 106:15,
108:7, 108:24,
111:21, 112:9,

Exhibit 137

JA-0001866

118:10, 118:16, 119:6, 119:8, 121:20, 124:7, 125:6, 125:16, 126:6, 127:9, 128:11, 129:10, 130:12, 130:16, 134:10, 136:23, 137:24, 138:6, 138:14, 145:19, 147:2, 147:7, 148:4, 155:5, 156:17, 158:15, 158:24, 159:3, 159:21, 159:24, 160:10, 161:2, 161:6, 161:17, 162:5, 164:4, 164:21, 165:23, 169:25, 174:14, 174:17, 177:19, 179:4, 179:18, 180:5, 183:5, 185:22, 186:23, 187:15, 194:20, 197:2, 197:4, 197:10, 198:7, 199:1, 199:9, 200:14, 201:2, 201:11, 201:18, 201:23, 202:4, 202:11, 202:21, 202:25, 205:10, 206:16, 207:25, 211:12, 213:18, 215:5, 215:10, 217:14, 219:11, 219:14, 221:19, 224:16, 226:7, 227:4, 229:16, 232:14, 233:9, 233:16, 235:12, 236:25, 243:2, 245:25, 248:12, 249:14, 250:18, 251:1

**BUTTS** [22] - 10:17, 10:23, 22 15, 113:9, 113:15, 113:16, 113:21, 113:25, 114:1, 120:12, 142:24, 146:7, 147:22, 150:7, 151:8, 151:25, 152:17, 152:24, 164:11, 235:24, 236:14, 254:8

**BY** [165] - 1:24, 1:24, 6:17, 12:16, 13:6, 13:12, 16:18, 17:2, 18:17, 22 5, 24:2, 24:20, 25.13, 26:22,

27:5, 28:9, 33:24, 34:14, 36:6, 36:18, 37:18, 37:22, 38:6, 44:8, 45:6, 49:1, 50:2, 50:14, 50 17, 53:6, 55:1, 56:6, 56:24, 57:6, 58:7, 64:11, 66:3, 66:16, 69:5, 69:25, 70:19, 75:4, 75:12, 77 22, 78:18, 80:4, 80:10, 83:14, 84:3, 84:12, 85:15, 86:12, 89:7, 92:6, 93:18, 96:11, 97:19, 98:11, 98:16, 99:4, 99:12, 99:22, 102:16, 103:17, 104:3, 105:7, 105:23, 110:13, 111:7, 111:11, 111:25, 113:23, 117:1, 118:20, 118:23, 118:24, 119:7, 120:23, 121:12, 125:14, 126:3, 132 8, 133:7, 135:5, 136:10, 139:20, 140:15, 141:3, 141:18, 142:23, 143:24, 144:8, 144:16, 147:21, 148:14, 148:23, 149:20, 150:6, 150:8, 151:19, 151:20, 151:24, 152:23, 153:14, 159:5, 164:24, 165:4, 169:9, 169:24, 169:25, 170:5, 171:2, 172:20, 173:9, 176:4, 180:1, 182:3, 183:19, 185:7, 187:1, 191:2, 191:12, 192:4, 193:11, 195:22, 195:25, 202:6, 210:24, 212:5, 212:10, 212:17, 214:11, 216:20, 216:22, 219:19, 219:21, 221:4, 221:14, 226:15, 226:16, 228:4, 228:25, 229:10, 229:25, 230:17, 230:24, 236:16, 238:3, 238 25, 239:6, 247:16, 249:8, 249:11, 250:4, 250:14,

251:7, 251:16, 251:22, 252:4, 254:5, 254:6, 254:9, 254:10, 254:13, 254:14

**BYPASSING** [1] - 52:16

**BYPRODUCT** [1] - 156:8

## C

**C-H-U-A-N-G** [2] - 23:10, 162:23

**CALCULATE** [1] - 122:9

**CALIFORNIA** [2] - 167:3, 231:5

**CALIFORNIA'S** [1] - 81:25

**CALL** [8] - 33:3, 113:9, 119:16, 119:18, 122:12, 122:18, 162:13, 174:22

**CALLED** [11] - 18:5, 27:22, 61:21, 66 19, 75:16, 76:16, 94:2, 169:8, 217:21, 241:2

**CALLS** [2] - 203:13, 203:17

**CAME** [16] - 34:25, 37:15, 37:16, 152:25, 153:8, 153:17, 161:5, 168:14, 181:24, 213:2, 217:19, 227:5, 236:6, 242:18, 243:5, 244:24

**CAN** [155] - 3 23, 5:10, 7:25, 8:3, 14:11, 14:23, 16:11, 19:4, 21:21, 24:14, 29:2, 29:16, 29:17, 33 20, 34:20, 37:5, 41:19, 49:6, 49:20, 49:21, 50:16, 53:16, 53:24, 55:18, 55:22, 56:12, 56:14, 56:20, 57 1, 59:14, 62:3, 62:16, 62:24, 71:18, 72:10, 73:4, 79:25, 91:20, 92:15, 96:14, 100:4, 100:7, 107:14, 107:25, 113:2, 116:22, 122:7, 123:9, 123:13, 123:15, 123:24, 124:5, 124:8, 124:10, 124:12,

124:24, 127:7, 127:9, 127:15, 128:1, 128:24, 129:23, 129:25, 131:15, 132 20, 133:19, 134:15, 134:22, 135:10, 135:12, 135:24, 136:16, 136:22, 137:17, 137:18, 138:16, 139 17, 140:17, 140 20, 141:14, 142:8, 143:8, 143:20, 144:22, 145:16, 146:7, 146:12, 147:17, 152:5, 155:2, 155:4, 156:5, 156:11, 157:6, 160:2, 160:6, 161 4, 162:5, 163:5, 165 9, 167:24, 168:9, 169:18, 169:19, 169:24, 169:25, 170:24, 174:14, 175:17, 176 2, 176:6, 176:7, 176:17, 177:9, 177:17, 177:22, 178:21, 179:3, 180:4, 180:6, 185 8, 187:14, 188 21, 189:19, 191:14, 207:13, 208:3, 210:13, 212:4, 213:15, 215:6, 218:15, 221 3, 222:3, 222:4, 222:5, 222:19, 223:14, 223:17, 223:23, 225:2, 227:24, 228:4, 231:21, 233:11, 243:17, 245:24, 245:25, 247:14, 248:2, 249:9, 252:23

**CAN'T** [24] - 49:22, 95:3, 126:3, 137:6, 140:1, 146:2, 147:2, 147:5, 147:7, 148:15, 149:10, 161:12, 164:24, 191:19, 200:1, 201:2, 201:11, 201:18, 201:24, 224:5, 225:3, 227:15, 227 19, 249:10

**CANCER** [5] - 108:3, 108:8, 108:16

**CANCERS** [1] -

108:15

**CANNOT** [19] - 18:1, 35 2, 49:20, 88:18, 126:1, 137:3, 146:10, 146:17, 146:23, 147:12, 147:23, 148:24, 149:5, 149:14, 155:5, 194:9, 206:23, 222:24

**CAPABLE** [1] - 172:5

**CAPACITY** [4] - 72:15, 73 3, 96:2, 138:20

**CAPRICIOUS** [3] - 213:4, 233 3, 250:25

**CARDIOVASCULAR** [1] - 127:22

**CARE** [131] - 6:19, 7.8, 7:12, 11:9, 11:22, 12 7, 12:8, 12:20, 12:23, 13:1, 13:7, 21:11, 21:14, 22:7, 23 3, 27:25, 42:18, 43 6, 45:12, 47:7, 51 20, 52:9, 59:3, 62:6, 62:22, 63:1, 63:5, 63:7, 63:12, 63:15, 63:21, 64:13, 64 19, 64:20, 65:14, 67 4, 67:6, 67:8, 67 11, 67:14, 67:20, 68:23, 68:24, 69:4, 69:10, 70:13, 70:17, 71 1, 72:1, 72:3, 73 5, 73:23, 74:4, 78 6, 78:9, 78:15, 78:16, 78:20, 78:25, 79:4, 79:9, 87:9, 87:13, 90:6, 94:6, 94:10, 95:19, 96:3, 96 4, 96:16, 97:5, 97:6, 98:21, 98:25, 102:6, 105:21, 112:12, 112:13, 112:14, 112:16, 119:25, 120:4, 125:25, 131:2, 131:5, 132:18, 136 4, 139:22, 139:23, 140:1, 140:12, 141:20, 144 5, 146:19, 148:17, 150:8, 154:20, 154:23, 156:13, 156:18, 171:20, 172:13, 172:14, 178:6, 178:14, 179:12, 191:14, 191:15, 191:18, 193:22,

200:24, 201:8, 202:20, 202:23, 206:20, 213:5, 217:12, 218:24, 221:12, 223:7, 224:9, 227:2, 230 9, 233:4, 233:20, 239:15, 239:19, 242:20, 248:21

**CAREER** [7] - 62:13, 62:19, 124:17, 124:18, 168:3, 170:3, 177:21

**CAREERS** [2] - 170:17, 170:19

**CAROL** [6] - 22:1, 54:19, 54:23, 64:17, 254:4

**CARRIES** [1] - 137:20

**CARRY** [1] - 216:6

**CARRYING** [1] - 45:14

**CARVE** [5] - 44:11, 44:18, 44 22, 222:6, 249:25

**CARVE-OUTS** [1] - 222:6

**CARVEOUT** [1] - 37:9

**CARVING** [2] - 37:17, 44:12

**CASE** [103] - 3:7, 6:6, 6:16, 7:1, 15:17, 16:13, 16 15, 16:17, 16:18, 16 23, 17:17, 19:11, 19:13, 21:1, 21:23, 22:17, 26:14, 26:22, 27:1, 27:10, 27:20, 27:21, 35:19, 36:3, 36:4, 36:10, 36:23, 37:20, 37:21, 41:17, 41:23, 42:2, 44:9, 47:16, 49:5, 49:8, 49:9, 49:16, 49:17, 50 3, 50:5, 50:7, 50:9, 53:20, 53:24, 100:24, 112:25, 114:11, 120:20, 124:11, 144:19, 152:1, 154:18, 161:20, 172:25, 190:19, 191:11, 191:16, 200:19, 206:13, 206:16, 206:18, 206:24, 207:1, 207:10, 207:11, 207:16, 208:16, 211:17, 215:8, 218:16, 218:20, 219:17, 225:3, 226:15, 226:17,

227:13, 233:16, 233:17, 234:7, 240:21, 240:22, 241:1, 241:2, 241:8, 241:17, 242:6, 243:2, 245:8, 245:13, 245:14, 245:19, 245:25, 246:5, 246 9, 246:15, 249:1, 249:16, 250:8, 251:24

**CASES** [31] - 13:17, 14:22, 15:18, 15:20, 17:25, 20:9, 35 9, 37:7, 37:15, 37 16, 37:18, 37:25, 38:10, 49:25, 50:1, 50:2, 71:5, 127:9, 133:18, 136:5, 206:4, 206:8, 206:9, 208:21, 208:25, 209:2, 209:11, 216:19, 229:21, 249:19

**CATASTROPHIC** [2] - 7:20, 14:24

**CATEGORIES** [3] - 128:7, 130:5, 185:17

**CATHOLIC** [4] - 199:20, 208:3, 208:8, 208:11

**CAUGHT** [1] - 47:25

**CAUSAL** [1] - 102:19

**CAUSATION** [1] - 20:6

**CAUSE** [32] - 7:15, 7:18, 16:24, 39:13, 39:17, 40:8, 40:9, 41:13, 41:14, 41:19, 41:22, 42:2, 42 5, 42:6, 42:9, 52:23, 80:3, 98:19, 98:20, 98:23, 98:24, 124:19, 125:10, 160:13, 205:11, 209:23, 213:24, 214:21, 216:14, 235:11, 251:9

**CAUSED** [1] - 125:14

**CAUSES** [1] - 125:5

**CAUTIONARY** [1] - 221:11

**CDC** [5] - 169:20, 175:16, 175:24, 185:18, 190:7

**CENTER** [6] - 23:15, 166:1, 171:15, 179:14, 179:22, 179:24

**CENTERED** [3] - 169:22, 171:2,

180:10

**CENTERS** [1] - 226:3

**CENTRAL** [1] - 220:5

**CEO** [4] - 30 8, 31:3, 31:5, 33:11

**CERTAIN** [9] - 72:19, 89:6, 129:16, 129:23, 144:24, 180:21, 235:23, 236:5, 238:7

**CERTAINLY** [15] - 25:13, 147:3, 155:5, 156:16, 161:6, 173:21, 173:24, 189:19, 219:2, 225:20, 232:17, 238:4, 238:6, 249:14, 250:21

**CERTAINTY** [7] - 89:4, 96:5, 97:5, 131:19, 138:22, 188:19, 217:9

**CERTIFICATION** [3] - 51:3, 116:10, 116:12

**CERTIFIED** [4] - 36:4, 47:20, 116:5, 116:6

**CERTIFY** [2] - 47:23, 253:3

**CETERA** [1] - 205:4

**CHAIR** [1] - 68:18

**CHALLENGE** [4] - 15:8, 19:10, 34:9, 140:25

**CHALLENGES** [1] - 207:14

**CHALLENGING** [11] - 17:22, 18:3, 35:10, 197:22, 210:24, 210:25, 211:5, 211:7, 211:10, 233:14, 233:17

**CHANCE** [2] - 76:18, 80:21

**CHANGE** [28] - 19:15, 25:4, 25:8, 25:11, 27:11, 40:19, 41 1, 41:6, 41:9, 41:16, 42:4, 44 22, 58:6, 102:5, 135:12, 136:14, 136:15, 140:11, 159:20, 181:9, 187:9, 189:1, 189:4, 189:22, 192:23, 199:16, 224:14, 237:8

**CHANGED** [16] - 23:2, 25:14, 26:10, 70 3, 70:4, 102:1, 109 15, 155:15, 155:18, 187:14, 188:3,

188:19, 207 7, 207:9, 208:18, 223:12

**CHANGES** [22] - 40:17, 40 23, 52:20, 53:22, 102:3, 106:14, 127:14, 140:6, 160:6, 189:13, 192 13, 192:15, 192:19, 193:3, 195:19, 205:2, 205:8, 205:12, 209:9, 215:9, 217:8, 218:16

**CHANGING** [3] - 12:16, 156:19, 200:17

**CHARACTERISTICS** [1] - 132:14

**CHARACTERIZE** [1] - 49:24

**CHARGE** [4] - 4:3, 67:10, 86:1, 192:21

**CHARGED** [1] - 67:1

**CHARITIES** [3] - 208:3, 208:8, 208:11

**CHART** [16] - 75:1, 76:12, 76:23, 80:17, 81:5, 90:10, 175:15, 175:24, 176 2, 176:3, 176:17, 178:9, 178:19, 184:13, 184:15, 190:7

**CHEAPER** [6] - 11:12, 11:13, 145:6, 145:14, 198:12, 198:18

**CHECK** [1] - 89:8

**CHEVRON** [12] - 47:1, 47:11, 51:15, 218:21, 218:22, 219:1, 219:3, 219:23, 220 25, 221:17, 240:25, 242:21

**CHIEF** [6] - 4:23, 166:4, 167:9, 170 9, 170:13, 219 22

**CHILD** [1] - 177:14

**CHILDREN** [6] - 43:4, 72:10, 177:8, 177:23, 177 24, 177:25

**CHOICE** [1] - 108:18

**CHOICES** [11] - 12:5, 12:10, 14:18, 22:12, 23:21, 30 16, 83:5, 83:21, 95:25, 190:7, 190:10

**CHOOSE** [11] - 14:10, 50:22, 58:12, 107:12, 107:15, 132:9, 178:24, 179:5, 191 19, 191:20, 232:19

**CHOOSING** [3] - 83:9, 189 13, 233:19

**CHOSE** [1] - 50:13

**CHOSEN** [2] - 64 9, 189:24

**CHRISTOPHER** [3] - 2.17, 5:1, 204:10

**CHRONIC** [14] - 117:17, 123:5, 124:8, 125:1, 125:5, 125:6, 125:10, 125:13, 125:17, 128:17, 130:12, 155:21, 168:16, 173:25

**CHRONICITY** [2] - 123:15, 123:23

**CHUANG** [27] - 10:10, 10:16, 10:22, 23:6, 23:8, 23:12, 93:6, 157:25, 162:13, 162:18, 162:22, 163:3, 163 14, 163:16, 165:6, 172:12, 173:10, 182:5, 184:12, 184:17, 191:25, 193:12, 193:16, 224:16, 235:25, 236:14, 254:12

**CHURCH** [3] - 43:22, 145:3, 249:12

**CHURCHES** [3] - 43 14, 43:15, 211:6

**CIRCUIT** [9] - 16:22, 18:16, 36:15, 39:14, 49 2, 66:10, 164:16, 213:17, 217:3

**CIRCUIT'S** [3] - 16:21, 42:10, 216:25

**CIRCUMSTANCE** [3] - 31 24, 33:15, 245:3

**CIRCUMSTANCES** [3] - 32:5, 214:1, 214:6

**CITATION** [3] - 81:21, 82 6, 206:15

**CITATIONS** [1] - 83:11

**CITE** [6] - 37:25, 101:4, 103:1, 152:6, 207:18, 241:8

**CITED** [15] - 18 16, 93 9, 102:16, 105:9, 105:10, 106:3, 107:4, 158:7,

159:19, 194:14,
194:17, 195:3,
209:5, 217:16,
249:19
**CITES** [2] - 102:4,
104:10
**CITIZENS** [10] - 15:16,
17:22, 19:5, 19:10,
19:13, 20:17, 21:6,
21:12, 24:17, 35:3
**CITY** [8] - 47:17,
47:19, 47:20, 47:22,
47:23, 47:25, 48:3,
240:22
**CIVIL** [5] - 1:3, 2:11,
4:4, 9:10, 172:20
**CLAIM** [12] - 8:19,
8:20, 8:25, 9:2, 29:3,
29:17, 29:22, 94:21,
213:15, 213:16,
216:12, 247:5
**CLAIMED** [1] - 99:6
**CLAIMING** [1] - 34:13
**CLAIMS** [24] - 8:3, 8:5,
8:7, 8:9, 8:11, 8:17,
8:19, 9:8, 9:12,
24:16, 62:6, 93:22,
94:1, 94:14, 94:16,
94:23, 95:1, 111:13,
111:17, 112:3,
213:11, 213:12,
227:9
**CLAMORING** [1] -
224:13
**CLARIFICATION** [3] -
164:1, 187:11, 192:5
**CLARIFY** [9] - 5:10,
152:5, 154:12,
160:19, 163:15,
164:5, 180:24,
243:4, 243:7
**CLASS** [1] - 129:9
**CLAUSE** [6] - 9:11,
19:7, 224:24, 225:7,
242:13, 242:15
**CLEAN** [2] - 19:14,
98:15
**CLEAR** [27] - 8:10,
17:12, 18:9, 23:24,
28:18, 45:13, 45:21,
148:4, 213:1,
215:18, 216:9,
216:11, 216:13,
220:11, 226:8,
227:5, 228:17,
233:2, 233:12,
235:7, 239:5,
239:21, 244:4,
245:2, 248:14,
249:25, 252:17

**CLEARINGHOUSE** [1]
- 154:5
**CLEARLY** [13] - 17:10,
17:11, 27:15, 96:24,
159:5, 213:10,
216:1, 217:3,
223:15, 226:4,
226:19, 228:2,
235:11
**CLERK** [9] - 3:1,
54:12, 54:21, 113:5,
113:13, 113:18,
157:22, 162:20,
210:14
**CLIMATE** [1] - 19:15
**CLINIC** [3] - 167:3,
167:5, 171:16
**CLINICAL** [7] - 61:16,
61:17, 61:20,
115:25, 117:7,
118:13, 163:17
**CLINICALLY** [1] -
103:6
**CLINICS** [3] - 14:6,
231:11, 231:22
**CLOSE** [3] - 88:17,
210:5, 210:6
**CLOSELY** [5] - 29:2,
29:4, 29:19, 177:15,
211:6
**CLOSELY -HELD** [2] -
29:2, 29:4
**CLOSELY -RELATED**
[1] - 211:6
**CLOSELY -SPACED**
[1] - 177:15
**CLOSER** [2] - 241:1,
241:14
**CLOSING** [5] - 3:17,
3:18, 210:19,
236:11, 246:15
**CLOSINGS** [2] - 5:12,
210:16
**CM** [1] - 1:19
**CO** [20] - 59:20, 79:13,
79:18, 79:22, 79:24,
80:3, 80:12, 80:13,
80:18, 83:5, 90:7,
96:11, 96:13, 96:15,
97:9, 106:23,
153:10, 178:20,
192:22
**CO-AUTHORS** [1] -
106:23
**CO-COUNSEL** [1] -
97:9
**CO-LED** [1] - 59:20
**CO-PAY** [9] - 79:13,
79:22, 80:3, 80:12,
80:13, 80:18, 90:7,

153:10, 192:22
**CO-PAYMENTS** [1] -
83:5
**CO-PAYS** [7] - 79:18,
79:24, 90:7, 96:11,
96:13, 96:15, 178:20
**COALITION** [1] -
215:22
**COASTLINE** [1] -
19:20
**COHORT** [4] - 90:3,
92:24, 93:23, 110:1
**COLLAPSES** [1] -
185:24
**COLLEAGUE** [4] -
213:9, 214:2, 234:9,
242:8
**COLLEAGUES** [4] -
93:5, 195:25,
203:12, 203:21
**COLLECTION** [1] -
70:10
**COLLECTIVELY** [1] -
99:20
**COLLEGE** [15] - 26:9,
40:1, 41:2, 55:5,
56:24, 60:7, 60:10,
60:17, 93:6, 114:24,
114:25, 217:18,
217:22, 217:23,
218:8
**COLOR** [1] - 9:17
**COLORECTAL** [1] -
108:16
**COLUMN** [6] - 75:19,
75:21, 76:6, 103:11,
186:9, 187:3
**COLUMNS** [1] - 75:15
**COMBINATION** [1] -
91:8
**COMBINED** [1] -
91:16
**COME** [22] - 15:22,
69:7, 117:13, 118:9,
121:14, 121:16,
121:20, 121:21,
125:22, 133:1,
157:13, 192:20,
209:16, 209:21,
214:12, 215:3,
222:1, 227:8, 229:1,
229:7, 248:16,
248:18
**COMES** [4] - 106:22,
137:6, 215:1, 234:24
**COMFORTABLE** [1] -
56:20
**COMING** [1] - 173:3
**COMMENT** [13] - 8:15,
39:1, 39:20, 42:3,

52:17, 53:8, 160:5,
160:12, 209:17,
213:23, 215:17,
216:8
**COMMENTARY** [1] -
53:21
**COMMENTS** [17] -
39:22, 39:23, 53:3,
53:8, 53:11, 53:19,
106:6, 205:17,
205:21, 205:22,
205:23, 208:22,
208:25, 209:16,
209:19, 209:21,
217:6
**COMMITTEE** [44] -
22:4, 64:10, 66:24,
66:25, 67:1, 67:7,
67:16, 67:22, 68:3,
68:11, 68:21, 69:1,
69:11, 69:14, 69:23,
70:3, 73:11, 73:12,
73:13, 73:14, 73:24,
75:7, 77:24, 78:2,
78:4, 78:10, 78:23,
82:13, 83:18, 83:24,
83:25, 84:2, 84:21,
85:5, 85:8, 85:18,
85:22, 86:5, 86:20,
87:1, 98:2, 102:10,
107:13, 107:17
**COMMITTEE'S** [7] -
10:14, 81:10, 85:9,
87:2, 105:9, 105:11,
105:15
**COMMON** [7] - 69:20,
72:20, 125:10,
125:16, 126:21,
127:25, 234:25
**COMMONLY** [4] -
125:7, 174:22,
175:15, 194:17
**COMMONLY -CITED**
[1] - 194:17
**COMMONWEALTH**
[42] - 1:3, 2:8, 3:3,
4:3, 5:24, 7:9, 7:14,
7:16, 7:18, 7:23,
12:18, 14:1, 14:4,
14:7, 15:3, 15:8,
15:11, 16:4, 16:5,
17:8, 19:4, 20:8,
21:17, 24:18, 35:21,
113:8, 157:20,
158:10, 162:12,
210:17, 210:19,
213:24, 227:13,
227:15, 233:7,
233:13, 234:6,
234:24, 235:11,

244:16, 251:10,
252:9
**COMMONWEALTH 'S**
[11] - 3:9, 26:15,
34:16, 54:19,
113:16, 162:18,
234:3, 251:10,
251:13, 251:17,
251:21
**COMMUNICATE** [1] -
228:2
**COMMUNITIES** [1] -
220:17
**COMMUNITY** [5] -
101:19, 102:24,
103:25, 107:9,
121:25
**COMPANIES** [12] -
28:25, 198:5, 198:7,
211:16, 212:1,
212:5, 223:8,
225:17, 226:13,
228:17, 229:2, 229:3
**COMPANY** [14] -
29:19, 30:8, 30:12,
30:23, 36:10, 212:2,
218:7, 218:11,
225:18, 240:4,
240:10, 248:7,
250:15, 250:22
**COMPARE** [3] -
109:10, 112:6,
134:14
**COMPARED** [3] -
43:2, 134:8, 135:25
**COMPARISON** [1] -
49:15
**COMPELLING** [13] -
47:5, 51:11, 51:13,
51:17, 51:18, 52:5,
224:21, 226:1,
226:4, 226:5, 226:7,
227:1, 227:4
**COMPLAIN** [2] -
31:17, 33:16
**COMPLAINT** [6] -
151:13, 158:7,
159:18, 206:13,
206:17, 240:5
**COMPLETE** [3] -
165:13, 165:19,
177:20
**COMPLETED** [4] -
166:25, 167:7,
181:13, 182:17
**COMPLIANCE** [1] -
133:11
**COMPLICATED** [1] -
137:17
**COMPLICATIONS** [1]

Exhibit 137                                                                                    JA-0001869

- 103:21
COMPLICIT [1] - 51:5
COMPLY [1] - 240:11
COMPONENT [6] -
117:15, 159:10,
213:22, 213:23,
214:10, 214:21
COMPONENTS [1] -
105:21
COMPOUND [1] -
148:8
COMPREHENSIVE [2]
- 132:11, 221:14
COMPROMISE [1] -
224:19
COMPUTER [2] - 1:24,
1:24
COMPUTER -AIDED
[1] - 1:24
CONCEDE [1] -
156:20
CONCEDED [1] -
219:1
CONCEDES [1] -
228:24
CONCEIVABLY [2] -
31:24, 240:15
CONCEIVE [1] - 22:21
CONCEPT [5] - 18:4,
18:8, 19:17, 33:1,
33:4
CONCERN [5] -
108:25, 109:4,
131:21, 147:3,
240:20
CONCERNED [5] -
37:6, 93:20, 122:7,
145:23, 146:4
CONCERNING [1] -
104:22
CONCERNS [7] -
34:16, 49:17, 49:19,
145:23, 153:17,
153:22, 211:12
CONCLUDE [1] -
233:9
CONCLUDED [4] -
50:22, 93:25, 102:2,
253:1
CONCLUSION [5] -
24:13, 53:7, 111:6,
111:8, 209:13
CONCLUSIONS [6] -
52:6, 69:8, 92:10,
107:3, 164:13,
252:13
CONCOMITANT [1] -
107:1
CONCOMITANTLY [1]
- 191:24

CONCRETE [1] -
35:16
CONDITION [5] - 10:9,
123:15, 126:14,
132:2, 132:13
CONDITIONS [6] -
75:23, 123:17,
129:25, 155:17,
168:16, 190:14
CONDOM [1] - 77:15
CONDOMS [2] -
175:12, 176:23
CONDUCT [5] - 58:15,
62:2, 66:22, 166:9,
167:15
CONDUCTED [10] -
63:2, 63:3, 63:5,
63:7, 83:14, 100:2,
100:3, 101:25,
111:25, 169:2
CONDUCTING [2] -
61:3, 180:7
CONFER [2] - 47:11,
203:20
CONFERENCE [4] -
5:11, 6:1, 7:3, 184:6
CONFERS [1] - 18:24
CONFIDENTIAL [1] -
159:5
CONFIDENTIALITY
[1] - 159:10
CONFIRM [3] - 56:12,
56:20, 114:18,
165:19, 204:23
CONFLICT [1] - 43:20
CONFLICTING [2] -
47:14, 50:6
CONFLICTS [2] -
45:18, 222:25
CONFUSED [1] -
105:17
CONFUSING [1] -
17:16
CONGRESS [14] -
43:11, 45:13, 52:7,
52:10, 220:5, 220:8,
220:22, 223:6,
223:8, 224:19,
225:5, 225:6,
242:24, 250:1
CONNECTING [1] -
38:21
CONNECTION [4] -
22:7, 49:21, 64:12,
122:21
CONSCIENCE [5] -
28:5, 224:24, 225:7,
242:13, 242:15
CONSCIENCES [1] -
205:15

CONSCIENTIOUS [1]
- 242:16
CONSCIOUS [1] -
48:10
CONSENTED [1] -
182:16
CONSEQUENCES
[16] - 71:14, 71:17,
71:24, 72:8, 72:11,
127:18, 127:21,
127:25, 141:17,
142:3, 148:6,
149:16, 151:2,
151:10, 202:11,
202:13
CONSIDER [21] - 9:9,
49:22, 68:21, 69:11,
69:13, 82:10, 85:5,
86:1, 92:16, 124:4,
132:13, 148:1,
156:6, 165:22,
173:16, 190:9,
190:10, 190:13,
190:16, 193:16,
195:4
CONSIDERABLE [1] -
92:15
CONSIDERATION [2]
- 81:11, 160:1
CONSIDERATIONS
[2] - 173:14, 174:17
CONSIDERED [6] -
47:11, 74:8, 74:9,
77:20, 251:15,
251:21
CONSIDERING [2] -
24:16, 173:24
CONSIDERS [1] -
188:17
CONSISTENT [5] -
189:6, 189:15,
189:16, 228:15,
249:15
CONSTITUTIONAL [8]
- 8:2, 8:5, 9:1, 9:4,
213:12, 213:15,
213:18, 227:9
CONSTRAINTS [1] -
6:22
CONSTRUCT [1] -
30:12
CONSTRUCTION [1] -
221:24
CONSULT [1] - 97:9
CONSULTATION [1] -
132:20
CONTACT [2] -
218:10, 229:4
CONTACTED [1] -
198:12

CONTAINED [2] -
56:21, 63:21
CONTAINS [1] -
241:10
CONTENT [1] - 65:7
CONTENTS [1] -
56:12
CONTEXT [33] - 8:4,
27:24, 28:2, 28:17,
28:22, 29:17, 30:18,
36:3, 36:21, 36:24,
37:10, 45:15, 49:12,
49:13, 49:18, 50:1,
50:3, 50:9, 61:15,
63:5, 65:5, 88:10,
88:11, 159:13,
168:24, 226:20,
238:23, 240:2,
240:13, 240:15,
240:25, 242:19,
247:12
CONTINGENT [1] -
14:2
CONTINUE [5] - 34:7,
71:16, 142:16,
209:15, 231:2
CONTINUES [1] -
224:17
CONTINUING [1] -
205:13
CONTRA [1] - 142:7
CONTRACEPTION
[115] - 10:19, 10:20,
11:9, 11:12, 11:16,
11:24, 12:3, 12:15,
14:12, 14:13, 34:18,
44:1, 52:8, 65:14,
70:23, 70:24, 71:4,
71:7, 73:7, 73:8,
73:21, 73:25, 74:5,
74:7, 74:10, 74:11,
74:13, 74:14, 75:8,
75:11, 75:20, 75:25,
76:7, 77:12, 77:25,
78:3, 78:7, 79:1,
79:6, 79:20, 80:4,
80:19, 81:2, 81:11,
82:15, 83:10, 83:20,
85:17, 89:24, 90:7,
90:9, 90:12, 94:9,
96:13, 98:25, 101:1,
104:11, 105:12,
106:17, 106:20,
107:6, 107:10,
107:17, 107:21,
108:4, 108:6,
108:12, 108:14,
108:23, 119:22,
128:20, 128:23,
129:4, 130:15,

145:6, 145:14,
166:16, 167:22,
168:6, 168:8,
168:13, 172:8,
173:15, 174:12,
174:13, 174:20,
177:9, 178:1, 178:8,
178:25, 179:1,
180:18, 181:17,
182:23, 192:7,
192:8, 193:4, 195:5,
196:1, 197:25,
198:13, 198:19,
205:8, 208:9, 228:3,
228:9, 231:2, 231:5,
239:17
CONTRACEPTION 'S
[2] - 103:2, 103:12
CONTRACEPTIONS
[1] - 79:14
CONTRACEPTIVE
[216] - 6:19, 7:3, 7:8,
7:11, 7:13, 11:10,
11:14, 11:15, 11:18,
11:22, 12:4, 12:5,
12:9, 12:10, 12:20,
12:23, 13:1, 13:7,
13:8, 13:12, 13:16,
13:20, 13:23, 14:16,
14:18, 14:21, 21:11,
21:14, 22:10, 23:1,
23:3, 23:18, 26:3,
26:11, 26:17, 26:24,
27:4, 27:7, 27:12,
30:4, 30:11, 31:6,
32:7, 32:17, 33:8,
34:7, 39:15, 41:4,
44:4, 44:7, 44:10,
44:12, 51:5, 62:13,
62:17, 62:22, 63:1,
63:3, 63:4, 63:9,
63:12, 63:20, 64:20,
67:8, 67:20, 70:13,
70:17, 71:1, 73:9,
75:2, 75:4, 75:6,
75:10, 75:14, 77:2,
78:20, 79:10, 79:11,
79:14, 79:17, 81:15,
83:5, 83:21, 94:3,
95:19, 95:25, 96:4,
96:10, 97:6, 98:21,
99:13, 99:24,
101:25, 102:1,
102:3, 102:5,
102:17, 103:7,
105:20, 106:14,
106:16, 107:7,
108:18, 109:14,
109:15, 109:19,
111:19, 111:22,
112:8, 120:3,

Exhibit 137

130:21, 131:2,
131:6, 131:16,
135:24, 136:13,
140:6, 140:12,
144:5, 144:11,
144:17, 144:25,
145:24, 146:8,
146:19, 147:1,
148:17, 166:11,
166:13, 166:18,
168:15, 168:19,
168:21, 168:23,
168:25, 170:22,
171:5, 171:6,
172:14, 173:12,
173:22, 174:2,
174:4, 174:18,
174:23, 174:24,
175:7, 175:8, 176:7,
178:6, 178:23,
179:7, 179:11,
179:22, 180:23,
181:10, 181:15,
181:19, 183:6,
183:11, 183:15,
185:15, 185:23,
188:23, 189:1,
189:2, 189:4, 189:5,
189:10, 189:11,
189:21, 190:2,
191:9, 191:14,
191:15, 191:18,
192:19, 195:20,
196:2, 196:3,
196:11, 197:6,
197:16, 197:22,
199:6, 199:22,
200:23, 200:24,
201:8, 201:16,
207:5, 207:14,
208:4, 211:16,
211:19, 218:1,
221:23, 222:13,
223:5, 224:14,
224:21, 225:25,
230:15, 230:23,
232:19, 233:20,
237:22, 238:12,
239:14, 239:21,
244:7, 244:25,
247:4, 247:8, 250:19
**CONTRACEPTIVES**
[37] - 10:12, 11:19,
11:25, 12:1, 13:19,
22:19, 22:23, 33:12,
77:11, 78:5, 79:22,
80:22, 80 24,
103:18, 129:2,
129:12, 130:4,
130:18, 130:20,
130:24, 131:1,

131:4, 131:12,
131:16, 149:1,
149:19, 149:20,
153:12, 153:14,
171:25, 173:10,
176:25, 177:7,
183:18, 196:19,
196:23, 218:4
**CONTRACT** [1] -
208:12
**CONTRAINDICATED**
[1] - 142:8
**CONTRARY** [1] -
29:11
**CONTRAST** [2] -
109:10, 135:5
**CONTRIBUTES** [1] -
108:5
**CONTROL** [28] -
11:22, 12:3, 71:23,
80:15, 86:5, 91:4,
91:7, 91:11, 91:14,
92:2, 92:11, 128:24,
129:17, 133:17,
133:21, 134:5,
134:9, 135:5, 136:1,
145:18, 149:25,
156:3, 175:6, 175:7,
177:17, 182:19,
183:13, 188:6
**CONTROLLING** [1] -
130:1
**CONTROLS** [1] -
233:13
**CONVENED** [2] - 22:5,
64:11
**CONVERSATION** [4] -
128:12, 146:1,
172:9, 178:8
**CONVERSATIONS** [1]
- 203:11
**CONVICTION** [11] -
28:12, 28:13, 29:25,
30:9, 30:17, 32:3,
32:12, 32:13, 32:20,
32:22, 33:11
**CONVICTIONS** [1] -
31:22
**CONVINCED** [1] -
17:4
**COPY** [2] - 114:12,
158:19
**CORPORATE** [1] -
30:21
**CORRECT** [131] -
25:12, 28:3, 32:22,
44:14, 44:15, 45:19,
45:20, 46:7, 48:17,
58:8, 60:6, 60:8,
60:9, 64:9, 70:12,

70:15, 76:3, 76:6,
76:15, 76:18, 76:19,
76:21, 76:24, 77:19,
81:22, 83:11, 83:16,
84:21, 87:15, 88 6,
90:21, 90:24, 92:3,
92:8, 94:15, 99:1,
99:9, 99:10, 99:13,
100:13, 100:16,
100:17, 100:22,
101:16, 101:17,
102:8, 102:11,
102:20, 102:24,
103:22, 104:1,
104:5, 104:12,
104:16, 104:17,
104:19, 104:22,
104:23, 106:13,
107:18, 109:22,
112:4, 117:21,
118:18, 118:19,
119:21, 121:7,
122:3, 123:7, 123:8,
126:25, 127:4,
127:6, 128:8,
130:10, 131:23,
132:4, 135:19,
136:2, 139:23,
139:24, 140:3,
140:8, 144:5,
147:14, 147:25,
148:17, 148:21,
149:3, 149:8,
149:12, 149:13,
149:17, 149:18,
149:21, 150:17,
161:14, 161:15,
163:13, 166:8,
171:13, 181:1,
196:12, 197:17,
197:25, 198:24,
198:25, 199:3,
200:3, 201:4, 201:5,
201:20, 201:21,
201:25, 202:1,
202:7, 202:8,
202:14, 202:15,
202:24, 203:1,
204:20, 209:14,
210:3, 211:3,
212:23, 213:13,
226:22, 238:13,
246:8, 253:3
**CORRECTLY** [11] -
41:25, 76:12, 78:17,
136:2, 198:15,
199:24, 200:25,
201:9, 238:1,
238:17, 242:10
**CORRECTNESS** [6] -
66:8, 112:24,

120:19, 172:24,
173:2, 246:11
**COST** [64] - 7:9, 7:11,
11:8, 11:17, 11:20,
12:7, 13:21, 22:12,
23:20, 30:4, 34:7,
52:19, 52:21, 59:3,
62:6, 78:10, 78:16,
79:5, 79:11, 81:12,
81:14, 81:23, 82:2,
82:14, 83:8, 83:22,
85:6, 86:2, 87:14,
89:23, 92:13, 92:14,
92:15, 92:16, 134:8,
134:9, 134:12,
134:15, 134:21,
135:8, 135:17,
136:3, 145:23,
146:18, 150:7,
151:2, 151:13,
151:18, 156:9,
178:7, 178:13,
179:1, 179:4,
191:13, 191:18,
192:7, 198:14,
205:3, 205:9,
223:22, 230:5,
238:20, 239:16,
250:3
**COST-EFFECTIVE** [2]
- 22:12, 23:20
**COST-FREE** [1] -
239:16
**COST-PROHIBITIVE**
[1] - 178:13
**COSTS** [42] - 13:23,
69:11, 69:13, 78:8,
78:22, 81:12, 82:10,
82:11, 82:24, 85:5,
89:18, 89:21, 92:18,
94:5, 96:20, 109:19,
112:8, 133:14,
134:6, 134:25,
135:4, 148:16,
150:22, 156 11,
166:17, 178:10,
178:12, 178:15,
178:18, 178:21,
189:11, 191:10,
192:10, 201:8,
201:12, 201:15,
205:14, 231:8,
231:12, 237:22,
238:12
**COULD** [50] - 8:25,
12:20, 18 9, 19:7,
19:10, 19:12, 31:24,
32:10, 34:13, 40:15,
41:7, 50:12, 52:23,
53:8, 53:10, 53:15,

53:17, 56:19, 58:15,
68:6, 74:25, 80:3,
80:11, 80:13, 80:25,
88 5, 89:11, 114:7,
118:22, 142:1,
146:2, 153 1, 157:3,
178:12, 189:5,
193:17, 196:20,
197:4, 204:23,
208:23, 214:23,
219:13, 223:10,
225:18, 228:16,
228:19, 230:5,
237:8, 240:1
**COUNSEL** [23] - 2:8,
2:19, 4:23, 6:10,
6:14, 11:4, 23:24,
65:17, 97:9, 105:8,
105:14, 105:24,
143:13, 148:5,
153:12, 154:13,
164:10, 173:11,
178:15, 206:18,
218:25, 249:17,
252:25
**COUNSELED** [1] -
178:7
**COUNSELING** [9] -
63 4, 78:7, 107 :11,
108:11, 174:12,
175:14, 180:21,
191:10, 208:10
**COUNT** [1] - 62:15
**COUNTED** [1] - 188:5
**COUNTER** [2] -
125:23, 220:19
**COUNTERINTUITIVE**
[1] - 129:13
**COUNTRY** [13] - 7:7,
21:10, 28:19, 58:19,
93:24, 95:1, 97:1,
111:25, 127:2,
199:14, 202:19,
229:25, 235:7
**COUPLE** [10] - 28:11,
30:19, 59:20,
166:22, 187:11,
190:8, 192:17,
193:13, 195:11,
240:19
**COURSE** [6] - 5:15,
38:6, 86:4, 156:5,
181:12, 188:2
**COURT** [382] - 1:1,
1:19, 3:1, 3:2, 4:11,
5:6, 5:8, 5:13, 6:15,
7:23, 8:1, 8:2, 8:18,
9:6, 9:24, 10:25,
11 4, 15:4, 15:17,
15 21, 16:2, 16:13,

Exhibit 137                                                                                          JA-0001871

16:17, 16:19, 17:3, 17:12, 17:19, 18:4, 18:7, 18:11, 18:21, 19:3, 19:23, 20:13, 20:19, 20 22, 21:3, 21:18, 21 25, 22:13, 23:8, 23:11, 24:5, 24:12, 24:19, 25:6, 25:16, 25:18, 25:20, 25:25, 26 7, 27:14, 27:24, 28 9, 29:5, 29:7, 29:10, 29:14, 30:7, 31:2, 31:8, 31:14, 31 21, 32:2, 32:11, 32 19, 32:25, 33:10, 33 19, 33:21, 34:5, 36:2, 36:4, 36:7, 36:14, 36:17, 36:18, 36 20, 37:3, 37:6, 37:18, 37:23, 37.24, 38 3, 38:5, 38:7, 38:9, 38:20, 39:5, 40:10, 40:16, 40:21, 41.12, 41:13, 41:21, 42 12, 42:15, 44:4, 44:15, 44:17, 45:17, 45 25, 46:3, 46:22, 47:13, 47:16, 48:4, 48:12, 48:20, 49:2, 49:6, 50:16, 51:6, 51:7, 51:24, 52:14, 53:2, 53:15, 54:2, 54:5, 54:8, 54:14, 54:17, 55:12, 55:18, 55.22, 56:1, 57:2, 57:5, 57:22, 57:25, 58 3, 58:5, 64:21, 65:12, 65:20, 65:23, 66:2, 66:5, 66:11, 66:13, 80:8, 82:9, 83:3, 83:4, 84:6, 84:9, 85:13, 86:11, 87 20, 88:3, 88:9, 88:14, 88:20, 88:25, 89:3, 89:9, 89:13, 89:17, 89:22, 90:1, 90:10, 90:15, 90:19, 90:22, 90:25, 91:3, 91:9, 91:13, 91:19, 92:1, 92:4, 92:6, 92:9, 92:21, 92:24, 93 3, 93:7, 93:12, 93:17, 95:8, 97:4, 97:10, 97:13, 97:16, 98:11, 98:14, 100:11, 100:14, 103:8, 103:13, 103:16, 105:2, 105:18, 108:21, 109:3, 109:8, 109:20, 109:25,

110:3, 110:5, 110:10, 110:15, 110:21, 110:24, 111:2, 111:10, 112:19, 113:1, 113:11, 116:22, 120:9, 120:15, 120:21, 121:2, 121:6, 121 9, 121:11, 132:6, 133:5, 139:3, 139:12, 139:16, 140:17, 141:13, 142:18, 142:20, 143:20, 143.23, 147:20, 148:7, 148:12, 150:4, 150:20, 150:24, 151:4, 151:6, 151:11, 151:15, 151:23, 152:10, 152:13, 152:20, 156:25, 157:6, 157:10, 157:18, 158:2, 158:4, 158 9, 158:16, 158:21, 159:8, 160 9, 161:3, 161:16, 161:23, 162:3, 162:8, 162:10, 162:16, 162:24, 163:8, 163:11, 163:19, 163:24, 164:7, 164:20, 165:9, 165:16, 165:22, 166:24, 172:17, 173:1, 173 5, 179:23, 180:6, 181:25, 184:2, 184:10, 184:16, 184:17, 185:1, 185:5, 191:3, 191:5, 192:3, 193:7, 193:9, 203:19, 204:1, 204:3, 204:9, 204:11, 204:14, 204:21, 205:1, 205:16, 206:4, 206:9, 206:24, 207:2, 207:5, 207:18, 208:15, 208:20, 209:2, 209:7, 209:11, 209:20, 210:4, 210:11, 210:16, 210:20, 210:22, 211:24, 213:7, 213:14, 213:17, 213:18, 214:16, 215:6, 215:13, 215:22, 217:14,

218:8, 218:13, 219:6, 219:10, 219:15, 221:3, 222:7, 222:9, 225:15, 225:20, 226:2, 226:19, 226:23, 227:19, 233:9, 233:15, 234:9, 234:14, 234:16, 234:20, 234:22, 235:15, 235:20, 236:2, 236:9, 236:21, 237:10, 238:9, 238:18, 239:10, 241:2, 241:16, 241:20, 242:1, 242:3, 242:5, 242:22, 245:4, 245:6, 245:12, 245:16, 245:19, 245:24, 246:1, 246:14, 246:19, 247:6, 248:14, 249:6, 249:7, 251:7, 251:12, 251:14, 252:14, 253:8

**COURT'S** [10] - 5:25, 16:19, 37:1, 40:1, 40:2, 136:7, 160 18, 207 15, 211:9, 246 7

**COURTHOUSE** [1] - 1:20

**COURTROOM** [3] - 1:9, 3.11, 238:5

**COURTS** [3] - 37:8, 51:10, 247:13

**COVER** [5] - 7:11, 42:25, 43:25, 71 4, 205:7

**COVERAGE** [131] - 7:8, 7:13, 13:8, 13:13, 13:16, 13:18, 13:23, 14:17, 14:21, 23:5, 26 3, 26:11, 26:17, 26:18, 26 24, 27:4, 27:7, 27:12, 30:4, 31:6, 31:9, 32:7, 32:17, 33:8, 34:3, 34:7, 34:12, 34:22, 36:1, 39:15, 41:4, 43 21, 51:5, 52:22, 71:6, 79:10, 79:11, 96:10, 99:13, 99:24, 100:5, 100:8, 101:25, 109 14, 131:21, 140:7, 140:12, 141:6, 144:4, 144:5, 144:12, 144:18,

144:25, 145:17, 145:24, 146:8, 146:13, 147 9, 150:11, 150:15, 151:16, 153 3, 153:7, 180:18, 192:19, 196:11, 196:16, 196:19, 196:23, 197:16, 197:25, 199:6, 199:11, 199 15, 199:22, 200 2, 200:6, 200:8, 200:12, 200 14, 200:15, 200 24, 201:3, 201:7, 202:20, 202:23, 205:4, 205:10, 207:14, 208:14, 211:19, 212:4, 212:6, 218:1, 218 3, 219:19, 221 9, 221:10, 221:20, 221:23, 223:5, 223:20, 223:21, 224:21, 228 3, 228:5, 228:9, 229:13, 230:3, 230:4, 230:11, 230:20, 231:8, 231:21, 232:19, 237:7, 239:14, 239:21, 244:7, 244:11, 245:1, 247:4, 247:8, 249:4, 249:7, 249:10, 249:14, 250 17, 250:19

**COVERED** [16] - 42:24, 44.3, 45:6, 52:8, 69:5, 69:9, 87:13, 150:8, 151:19, 159 5, 166:17, 221:19, 229:10, 230:24, 249:11

**COVERING** [4] - 31:1, 52:12, 151:18, 231:2

**COVERS** [1] - 178:17

**CRAFT** [2] - 42:21, 221:22

**CRAFTING** [2] - 45 16, 220:9

**CREATE** [10] - 124:6, 129:16, 141.19, 184:18, 218:14, 222:5, 223:17, 224:4, 243:6, 243 17

**CREATED** [6] - 184:19, 184:20,

211:8, 222:13, 222:14, 223:1

**CREATING** [1] - 243:9

**CREATION** [1] - 59:7

**CREDITS** [4] - 219:18, 219:24, 220:2, 242.22

**CREDULITY** [1] - 220:21

**CRITICAL** [1] - 127:17

**CRITICIZES** [1] - 85:8

**CROSS** [5] - 97:18, 108:20, 142:22, 193:10, 254:3

**CROSS-EXAMINATION** [2] - 142.22, 193:10

**CRY** [1] - 218:15

**CRYSTAL** [1] - 18:9

**CUELLAR** [2] - 241:3, 241:4

**CUMULATIVE** [2] - 162:15, 164:18

**CURRENT** [11] - 7:10, 60.13, 88:19, 114:21, 116:14, 119:4, 139 7, 139:8, 140:22, 197:11, 228:25

**CURRENTLY** [19] - 26:18, 27:12, 35:25, 88 22, 99:4, 99:12, 99 23, 109:9, 116:14, 144:8, 144:11, 144:17, 147:24, 206:20, 207:20, 212:5, 215:11, 229:10, 230:2

**CURRICULUM** [2] - 114:14, 143:6

**CV** [5] - 56:10, 98:2, 165:17, 165:22, 169:12

**CYCLES** [1] - 129:6

**CYNTHIA** [6] - 23:6, 93 6, 157:24, 162:13, 162:18, 254:12

**D**

**D.C** [5] - 18:16, 27:21, 39:14, 42:10, 215:22

**DAILY** [3] - 126 2, 195.4, 195:6

**DAMAGE** [2] - 35 23, 237:2

**DAMAGES** [1] - 7:9

**DAME** [2] - 34:5

Exhibit 137                                                                                      JA-0001872

DANGEROUS [1] - 137:11
DANISH [2] - 107:22, 108:2
DAPA [1] - 16:23
DATA [36] - 62:6, 70:10, 70:11, 75:2, 75:5, 75:11, 75:19, 88:4, 88:5, 88:7, 88:11, 89:7, 91:4, 93:22, 94:14, 94:16, 94:23, 111:13, 111:15, 111:17, 111:18, 112:3, 112:13, 112:15, 154:4, 155:2, 181:24, 184:9, 184:11, 184:13, 185:1, 185:12, 185:21, 185:25
DATABASE [3] - 94:2, 94:25, 95:2
DATE [5] - 24:20, 24:24, 24 25, 207:2, 253:8
DATES [1] - 164:1
DAVIS [77] - 2:11, 4:16, 4:17, 25:19, 25:21, 25 22, 27:18, 28:4, 28:23, 29:6, 29:8, 29:13, 29:15, 30:19, 31:5, 31:13, 31:16, 31 23, 32:4, 32:14, 32 23, 33:3, 33:14, 33 20, 33:22, 36:16, 36:23, 37:14, 38:12, 38:24, 39:6, 40:13, 40:18, 40:24, 41:24, 42 13, 42:16, 44:14, 44:16, 44:20, 45:20, 46:1, 46:7, 46:25, 48:18, 49:4, 49:23, 50 18, 52:4, 53:1, 53:13, 54:1, 54:3, 55:9, 57:19, 210:9, 211:1, 235:18, 235:21, 236:5, 236:13, 236:24, 238:2, 238:15, 238:22, 239:11, 241:17, 241:22, 242:2, 242:4, 242:7, 245:15, 245:18, 245:22, 246:4, 246:17, 252:10
DAY [4] - 53:18, 192:25, 217:20, 230.19
DAYS [3] - 8:16,

228:10, 244:9
DAYS' [1] - 230:16
DC [2] - 2:13, 2.18
DE [2] - 241:3, 241:4
DEALS [1] - 214:20
DEAN [1] - 61:9
DEATH [1] - 128:6
DEBATE [1] - 247 1
DEBILITATED [1] - 126:3
DEBILITATING [2] - 125:20, 125:23
DECEMBER [3] - 1:8, 200:1, 209:17
DECIDE [7] - 28:15, 44:2, 78:13, 82 17, 178:24, 247:6, 248:17
DECIDED [11] - 8:22, 8:25, 16:24, 24.21, 46:20, 52:11, 82:13, 188:3, 225:25, 245:20, 246:6
DECIDES [2] - 33:1, 135:2
DECIDING [2] - 29:2, 160:17
DECISION [53] - 16:19, 16:21, 17:2, 17:19, 18:16, 37:1, 37:4, 37:22, 37.23, 38:3, 38:6, 39:16, 40:1, 40:3, 41:11, 42:10, 63:3, 66:9, 66:11, 82:16, 82:19, 85:9, 100:15, 108:18, 112:24, 120:20, 132:20, 152:14, 168:21, 171:6, 172:25, 174:10, 180:23, 181:10, 182:24, 189:17, 189:21, 211:9, 211:18, 212:3, 216:25, 217:18, 219:3, 219:15, 220:8, 223:9, 225:16, 226:19, 226:23, 227:5, 246:2, 246:11
DECISION -MAKERS [2] - 82:16, 82:19
DECISION -MAKING [11] - 63:3, 85:9, 100:15, 152:14, 168:21, 171:6, 180:23, 181:10, 182:24, 189:17, 189:21
DECISIONS [2] -

74:13, 233:14
DECLARATION [49] - 10:3, 10:6, 10:7, 10:9, 10.10, 10:15, 10:16, 10:17, 10:18, 10:22, 10:23, 10 24, 22:2, 22:16, 26:23, 56:18, 65:8, 65:19, 98:1, 98.8, 98:17, 100:19, 143:4, 143:5, 143:12, 143:15, 143:18, 143:19, 146:16, 146.17, 147:12, 150:22, 151:22, 164:13, 165 11, 193:17, 193:24, 194:3, 194:7, 194:8, 194:10, 194:12, 194:23, 195:9, 196:6, 198:9, 199:18
DECLARATIONS [2] - 6:4, 114:11
DECLINE [3] - 70:20, 70:22, 224:17
DECLINED [4] - 70:5, 94:5, 106:25, 197:9
DECLINING [1] - 197:3
DECREASED [3] - 70:16, 126:10, 126:12
DEDUCTIBLE [1] - 79:15
DEDUCTIBLES [1] - 178:20
DEEP [3] - 24:7, 103:22, 220:4
DEFENDANT'S [2] - 17:11, 251:19
DEFENDANTS [8] - 6:17, 8:11, 8:14, 24:6, 43.12, 222 18, 235:17, 251:22
DEFENDERS [1] - 241:18
DEFENSE [3] - 3:25, 25:18, 222:10
DEFER [2] - 241:7, 249:18
DEFERENCE [17] - 18:22, 19:18, 45 11, 45:19, 47:2, 47:3, 47:11, 51:16, 51:21, 52:10, 218:22, 219:2, 219:23, 240:25, 241.6, 242:21, 251:6
DEFIES [1] - 235:6
DEFINE [1] - 212:10

DEFINED [1] - 250:4
DEFINING [1] - 220:17
DEFINITELY [1] - 238:24
DEFINITION [3] - 126:17, 206:20, 207:21
DEFINITIVE [2] - 75:3, 111:21
DEFINITIVELY [1] - 95:3
DEGREE [10] - 31:25, 89:4, 96:5, 97:4, 123:15, 128:11, 138:22, 163:25, 167:7, 188:18
DELAY [4] - 40:3, 40:4, 40:6, 192:13
DELAYED [1] - 72:1
DELAYING [1] - 52:18
DELEGATED [7] - 19:6, 45:13, 220:8, 220:22, 223:10, 242:24, 242:25
DELEGATES [1] - 44:2
DELEGATION [4] - 42:23, 220:12, 223:1, 243:2
DELEGATIONS [1] - 243:1
DELIBERATIONS [2] - 73:15, 86:7
DELIVERED [1] - 59:2
DEMAND [1] - 251.3
DEMONSTRATE [1] - 184:16
DEMONSTRATED [1] - 23:17
DEMONSTRATES [1] - 22:10
DEMONSTRATIVE [4] - 24:11, 55:17, 55:20, 163:6
DENIED [2] - 230:11, 247:4
DENY [1] - 247:7
DENYING [1] - 27:9
DEPARTMENT [32] - 2 10, 2:15, 3:4, 3:5, 3 7, 4:18, 4:21, 4:24, 5:2, 5:5, 12:13, 12:24, 13.6, 31:18, 31:21, 31.23, 32:10, 32:11, 33:17, 33:18, 33:19, 67 2, 78:12, 87:2, 87:10, 161:6, 161:9, 179:14, 205:25, 240.6, 240:9, 247:2

DEPEND [2] - 32:5, 79:20
DEPENDING [3] - 90 19, 150:11, 215:1
DEPENDS [3] - 79:19, 119:13, 135:9
DEPLETION [1] - 126:9
DEPO [1] - 175:8
DEPO-PROVERA [1] - 175:8
DEPOSED [1] - 34:18
DEPOSITIONS [1] - 65:6
DEPRESSED [1] - 71.18
DEPRESSION [2] - 104:12, 107:6
DEPRIVED [1] - 127:23
DEPTH [2] - 155:3, 164:3
DEPUTY [5] - 4:2, 4:6, 4:9, 4:14, 4:17
DESCRIBE [6] - 40 19, 59:15, 123:9, 131:15, 147:11, 166:23
DESCRIBED [4] - 120:23, 128:16, 141:4, 221.13
DESCRIBES [3] - 75 9, 85:4, 246:2
DESCRIBING [1] - 187.24
DESCRIPTIVE [1] - 102:6
DESIGNATED [1] - 87.13
DESIGNED [1] - 59:17
DESIRE [1] - 179:3
DESIRES [1] - 172:6
DESPITE [3] - 82:22, 229:6, 235:1
DESTEFANO [2] - 47 16, 240:20
DETAIL [1] - 229:20
DETAILS [2] - 164:2, 182:7
DETERMINATION [6] - 28:15, 30:10, 41.14, 41:19, 41:22, 49.19
DETERMINE [14] - 28:11, 28:12, 30:16, 32:21, 49:10, 66:8, 101:25, 109:14, 112:23, 120:19, 161:19, 172:24, 212:13, 221:19

Exhibit 137    JA-0001873

DETERMINED [3] -
3:11, 8:21, 78:25
DETERMINES [2] -
39:8, 216 6
DETERMINING [2] -
32:12, 46:18
DEVELOP [2] - 43:7,
45:4
DEVELOPED [1] -
49:12
DEVELOPMENT [1] -
103:6
DEVICE [10] - 92:17,
130:22, 134:7,
134:22, 134:24,
135:3, 135:23,
175:1, 192:10
DEVICES [5] - 76:10,
76:13, 90:17, 92:7,
135:21
DIABETIC [1] - 71:21
DIAGNOSED [1] -
127:12
DIAGNOSES [1] -
132:19
DID [122] - 5:13, 8:8,
15:22, 17 4, 26:22,
30:6, 36:15, 38:15,
39:12, 40:17, 43:8,
47:22, 52:2, 52:7,
55:14, 56:24, 57:15,
58:12, 58 17, 58:20,
58:22, 59 15, 59:22,
60:1, 60:10, 67:16,
67:22, 69:14, 69:15,
73:11, 73:15, 78:2,
78:10, 78:18, 79:10,
80:18, 80 19, 80:23,
83:25, 85:16, 85:17,
85:20, 90:2, 92:9,
93:3, 93:15, 96:24,
97:25, 98 7, 102:5,
102:19, 104:15,
104:18, 104:21,
110:6, 114:24,
115:1, 115:3, 115:5,
115:7, 115:8,
115:10, 115:12,
115:13, 133:16,
136:14, 136:18,
143:3, 143:11,
150:15, 154:14,
154:19, 154:21,
154:22, 154:24,
154:25, 163:17,
167:11, 167:12,
167:15, 167:17,
178:23, 179:23,
181:5, 181:8,
182:19, 183:4,

183:11, 184:17,
184:21, 188:13,
192:21, 192:22,
193:16, 194:4,
194:6, 194 14,
194:16, 194:20,
196:5, 197:24,
198:15, 198:16,
199:24, 199:25,
200:25, 201:9,
210:5, 218:5,
218:12, 226:20,
227:3, 227:5,
228:20, 243:14,
244:5, 245:16,
245:18, 249:7
DIDN'T [8] - 40 16,
65:20, 65:23, 80:14,
159:20, 183:4,
188:5, 188:24
DIE [2] - 128:1, 142:10
DIFFERENCE [6] -
111:16, 145:24,
181:8, 183:2,
186:22, 234:1
DIFFERENCES [5] -
111:3, 111:4,
131:11, 183:5,
186:19
DIFFERENT [34] -
17:5, 24:16, 28 20,
36:22, 36:25, 50:2,
50:8, 52:6, 53:11,
59:1, 59:18, 61:19,
133:2, 152 6, 174:4,
178:10, 178:21,
179:5, 180:19,
180:20, 182:21,
182:22, 185:14,
186:1, 187:20,
198:12, 205:21,
215:3, 229:24,
236:23, 236:25,
237:3, 241:11, 248:6
DIFFERENTLY [2] -
214:14, 246:5
DIFFERS [1] - 187:16
DIFFICULT [3] - 51:8,
140:23, 228:22
DIFFICULTY [2] -
117:14, 137:1
DIG [1] - 134:17
DIMINISHED [1] -
127:8
DIOCESAN [1] -
207:21
DIOCESE [3] - 206:10,
207:11, 208:1
DIRECT [20] - 16:6,
16:12, 16:25, 17:8,

17:13, 54:25, 74 17,
81:12, 82:20, 82:21,
84:6, 84:17, 86:13,
113:22, 114:7,
150:19, 151:22,
165:3, 230:5, 254:3
DIRECTED [2] - 20:5,
218:13
DIRECTION [2] -
16:17, 222:25
DIRECTLY [3] - 39:13,
205:19, 224:7
DIRECTOR [2] -
170:14, 170:15
DIRECTORS [1] -
30:13
DISADVANTAGE [1] -
103:19
DISAGREE [5] -
49:24, 51:6, 107:3,
226:3, 239:1
DISAGREED [1] -
85:23
DISAGREEING [1] -
245:23
DISCLOSE [1] -
120:17
DISCLOSED [3] -
65:8, 65:11, 172 19
DISCLOSURE [3] -
64:23, 65:1, 181:23
DISCONTINUED [1] -
80:24
DISCOURAGE [2] -
79:25, 96:14
DISCRETION [4] -
45:3, 45:4, 46:18,
46:20
DISCRIMINATION [7]
- 9:11, 32:9, 48:6,
48:13, 49:17, 49:18,
71:6
DISCRIMINATORY [2]
- 48:10, 48:13
DISCUSS [5] - 78:10,
143:14, 171:7,
172:6, 174:3
DISCUSSED [10] -
16:9, 17:18, 18:14,
41:3, 131:20,
141:25, 212:8,
224:12, 226 5, 243:7
DISCUSSING [1] -
42:1
DISCUSSION [6] -
35:13, 74:3, 218 18,
223:4, 237:14,
246:23
DISCUSSIONS [2] -
28:5, 73:14

DISEASE [4] - 126:19,
127:12, 127:22,
128:3
DISORDER [10] -
123:9, 123:20,
124:1, 124:15,
125:2, 125:19,
126:7, 126:8, 127:4,
137:20
DISORDERS [19] -
115:22, 117:16,
117:17, 117:18,
123:5, 123:11,
123:25, 125:1,
126:6, 128:8,
128:14, 128:17,
128:21, 137:16,
137:18, 141:25,
142:2, 142:3, 142 6
DISPARATE [7] -
47:18, 47:21, 47:24,
47:25, 48:1, 48:7,
48:9
DISRUPTED [1] -
202:6
DISRUPTION [1] -
202:3
DISRUPTIONS [1] -
149:11
DISRUPTIVE [1] - 72:9
DISSENT [7] - 84:19,
85:3, 85:16, 85:19,
85:21, 85 23, 86:22
DISSENTED [2] -
84:22, 85:2
DISSENTING [1] -
86:14
DISSERTATION [1] -
59:20
DISTINCTION [2] -
91:13, 213:10
DISTINGUISHED [2] -
60:16, 60 23
DISTRICT [6] - 1:1,
1:2, 17:19, 206:14,
207:16, 215:22
DIVERSE [2] - 62:3,
121:15
DIVIDED [10] - 16:18,
17:2, 36:6, 36:18,
37:6, 37:8, 37:18,
37:23, 38 7, 185:16
DIVISION [8] - 2:11,
4:4, 166:4, 170:10,
170:11, 170:12,
170:13, 170:15
DO [250] - 3:21, 3:22,
7:4, 9:8, 17:22,
18:12, 21:22, 23:22,
23:24, 23:25, 24:3,

24:15, 24:16, 30:16,
34:12, 37:11, 37:12,
39:1, 39:4, 39:10,
41:18, 42:2, 44:9,
45 2, 47:2, 47:13,
48 23, 48:25, 49:9,
49:10, 51:17, 52:25,
53:16, 53:18, 53:24,
54:6, 55:4, 55:13,
56 2, 56:9, 57:3,
59:22, 61:10, 61:11,
61:20, 62:3, 62:9,
62:10, 62:20, 66:17,
66:18, 68:16, 69:20,
70 3, 70:8, 70:16,
73 3, 78:23, 80:2,
83:19, 83:20, 84:5,
84:6, 84:19, 84:24,
85:2, 86:3, 86:16,
87:8, 89:4, 91:9,
91 14, 95:4, 95:16,
95:18, 95:21, 95:24,
96 4, 97:3, 99:3,
99:5, 99:11, 99:15,
99 18, 99:22, 101:1,
105:3, 106:2, 106:7,
106:8, 107:2,
108:24, 109:20,
110:10, 110:24,
111:13, 112:5,
114:2, 115:3, 115:7,
115:10, 115:12,
115:23, 116:14,
117:3, 117:5, 117:6,
117:7, 117:8, 117:9,
117:10, 117:12,
117:15, 118:2,
118:4, 118:5, 119:9,
119:14, 119:15,
119:22, 119:24,
121:13, 121:14,
121:21, 121:24,
122:1, 122:5,
123:19, 125:4,
127:10, 128:13,
129:2, 130:5, 130:8,
130:19, 130:25,
131:10, 132:9,
132:22, 133:13,
134:6, 137:11,
137:13, 138:9,
138:12, 138:16,
138:19, 138:21,
140:10, 141:5,
141:20, 144:7,
144:9, 144 10,
144:13, 144:16,
144:20, 146:6,
153:8, 153 18,
153:24, 154:2,
156:1, 156:13,

156:14, 156:15,
157:11, 158:16,
159:9, 162:17,
163:19, 165:23,
166:9, 166:10,
167:25, 169:4,
169:16, 170:7,
171:18, 173:11,
173:13, 174:11,
175:13, 177:7,
178:2, 178:3,
178:14, 179:10,
188:15, 189:10,
190:21, 194:11,
194:13, 194:22,
195:2, 196:25,
197:2, 198:3, 198:5,
198:7, 200:7,
200:10, 200:14,
200:16, 200:19,
203:4, 203:6, 204:5,
204:15, 205:7,
205:20, 205:24,
208:15, 208:19,
210:18, 212:13,
212:15, 212:24,
213:21, 214:19,
215:6, 216:23,
218:10, 219:1,
220:25, 227:24,
228:4, 229:7,
230:23, 230:25,
231:5, 234:12,
236:9, 246:3,
247:13, 249:4,
249:7, 252:15,
252:16, 252:22
**DOCTOR** [28] - 22:18,
23:13, 57:17, 60:19,
60:21, 61:6, 80:4,
117:3, 117:11,
119:9, 121:13,
121:25, 123:21,
131:23, 147:17,
165:21, 166:7,
167:23, 171:12,
175:19, 176:1,
177:6, 180:2,
183:23, 190:2,
192:5, 192:25, 193:5
**DOCTOR 'S** [1] - 119:4
**DOCTORAL** [2] -
59:19, 61:6
**DOCTORS** [4] - 12:7,
60:23, 203:5, 239:16
**DOCTRINE** [1] - 15:15
**DOCUMENT** [24] -
56:9, 56:17, 68:2,
84:4, 114:13, 138:6,
143:6, 148:1, 158:5,

158:7, 158:11,
159:2, 159:19,
161:8, 165:9,
165:16, 175:23,
184:1, 207 2, 228:8,
228:10, 244:4,
244:10, 244:11
**DOCUMENTED** [2] -
81:24, 195:19
**DOCUMENTS** [16] -
5:19, 97:25, 114:18,
114:21, 143:3,
143:10, 186:6,
193:16, 193:18,
193:19, 193:21,
232:4, 232:6, 235:9,
251:25, 252:1
**DOES** [91] - 15:7,
15:12, 16:6, 18 11,
18:12, 19:16, 19:25,
20:7, 28:10, 28:11,
28:15, 28:25, 29:13,
29:21, 30:13, 30:25,
31:3, 31:5, 31:19,
36:11, 41:8, 43 25,
44:1, 44 9, 46:13,
46:23, 50:20, 50:21,
51:12, 53:13, 55:12,
61:24, 71:11, 75:7,
79:8, 81:17, 83 1,
83:3, 83:19, 85:11,
90:15, 96:24,
115:19, 118:11,
118:14, 122:14,
122:16, 122:17,
122:19, 122:20,
122:22, 123:25,
124:19, 125:17,
128:23, 135:8,
142:12, 147:5,
150:11, 159:15,
160:13, 160:15,
161:6, 169:13,
173:19, 174:12,
179:11, 179:18,
188:13, 208:12,
212:10, 214:16,
215:21, 216:1,
216:11, 216:12,
218:22, 224:20,
224:24, 225:4,
225:7, 225:25,
227:6, 232:12,
234:6, 238:20,
248:15, 248:19,
250:16
**DOESN'T** [2] - 13 10,
82:25
**DOING** [21] - 45:8,
45:24, 48:21, 97:22,

122:12, 129:7,
141:24, 157:13,
157:19, 159:16,
160:1, 160:16,
181:16, 193:14,
193:25, 210:11,
210:16, 221:25,
226:12, 246:15,
251:2
**DOLLARS** [4] - 13:2,
81:19, 92:16, 219:25
**DON'T** [92] - 15:22,
19:1, 24 4, 25:15,
26:25, 27:22, 31 14,
32:23, 34:19, 35 22,
35:23, 36:10, 36 23,
40:13, 40:18, 41:21,
42:6, 44:11, 45:21,
46:11, 51:15, 55:13,
57:2, 57:5, 62:15,
74:1, 75 18, 81:3,
90:15, 91:12, 92:19,
95:8, 108:21,
110:12, 110:14,
111:9, 127:5,
137:23, 139:14,
139 17, 140:7,
146:1, 150:2,
159:14, 160:10,
161:3, 161:4, 161:5,
161:7, 161:10,
161:11, 161:17,
161:25, 164:24,
183:9, 184:10,
192:24, 197:10,
197:20, 199:8,
199:13, 200:11,
202:5, 202:11,
202:22, 203:8,
206:15, 209:25,
215:5, 216:14,
223:6, 226:18,
228:7, 228:24,
233:24, 236:8,
236:10, 237:25,
238:15, 239:7,
243:16, 245:12,
245:25, 246:7,
247:9, 250:7,
250:23, 251:2,
251:3, 252:15,
252:23
**DONALD** [4] - 1:5,
2:19, 3:3
**DONE** [9] - 62:18,
64:1, 89 17, 109 25,
110:13, 184:5,
216:11, 220:7,
234:20
**DOUBLED** [1] - 90:9

**DOUBT** [3] - 20:14,
30:2, 99:18
**DOWN** [9] - 21:22,
70:13, 76 6, 175:3,
175:5, 189:11,
229:11, 234:24,
241:22
**DOZENS** [1] - 26:1
**DR** [48] - 22:1, 22:15,
23:6, 55:2, 56:7,
64:16, 65:7, 65:17,
84:25, 85:1, 85:3,
85:21, 86:9, 86:21,
93:6, 97:20, 104:24,
105:14, 113:9,
113:16, 113:25,
120:11, 142:24,
146:7, 147:22,
150:7, 151:8,
151:25, 152:17,
152:24, 162:13,
163:3, 163:4,
163:14, 163:16,
163:17, 164:4,
164:11, 165:6,
172:12, 173:10,
181:2, 182:5,
184:12, 191:25,
193:12, 193:16,
224:16
**DRAFT** [12] - 84:3,
158:19, 159:5,
159:10, 159:22,
160:3, 160:4,
160:14, 161 1,
161:5, 162:1, 242:16
**DRAFTED** [3] -
184:12, 227:23,
227:24
**DRAW** [3] - 49:15,
49:21
**DRAWING** [1] - 248:16
**DRAWN** [1] - 107:3
**DRINK** [1] - 252:24
**DRIVE** [1] - 171:17
**DRIVING** [1] - 156:21
**DROP** [3] - 26:24,
34:3, 187:20
**DROPPED** [2] - 187 1,
188:13
**DROPPING** [1] - 228:3
**DRS** [2] - 235:24,
236:14
**DRUG** [2] - 71 6, 78:5
**DUE** [8] - 13:14,
13:20, 81:14,
131:20, 198:13,
199:7, 202:21,
202:23
**DUNK** [1] - 226:22

**DUPLICATIVE** [2] -
23:23, 164:11
**DURATION** [1] - 124:3
**DURING** [13] - 28:6,
59 14, 59:23, 71:19,
71:24, 115:10,
116:2, 131:12,
133:22, 158:13,
168:18, 188:10,
188:11
**DUTIES** [1] - 118:10
**DUTY** [2] - 19:10, 35:5

## E

**EACH** [5] - 3:15, 3:18,
5:11, 75:10, 220:1
**EARLIER** [20] - 19:1,
34 25, 35:13, 44:23,
100:2, 170 9, 171:1,
173:17, 181:2,
182:10, 192:5,
210:13, 212:8,
217:12, 219:1,
232:11, 233:10,
239:25, 240:3, 243:7
**EARLY** [1] - 126:13
**EASILY** [1] - 137 6
**EAST** [1] - 171.16
**EASTERN** [1] - 1:2
**EASY** [2] - 89:8,
226:23
**ECONOMIC** [9] - 7:9,
7:16, 7:17, 7:19,
14 6, 15:2, 15:13,
72:11, 220:4
**ECONOMIST** [1] -
85 3
**EDITORIAL** [2] -
101:15, 169:7
**EDUCATION** [6] -
56 24, 64:17, 72:9,
114:24, 115:23,
120:12
**EDUCATIONAL** [2] -
72.22, 166:23
**EFFECT** [34] - 15:1,
22 9, 23:19, 26:6,
37 19, 70:14, 71:1,
80:11, 83:4, 87:8,
94:7, 94:11, 96:5,
99 9, 104:15,
104:18, 112:14,
112:15, 136:13,
137:3, 141:6,
141:20, 144:21,
144:24, 145:7,
145:10, 145:15,
156:4, 170:24,
171:4, 188:23,

Exhibit 137                                                                                                       JA-0001875

188:24, 192:14, 239:5
**EFFECTIVE** [42] - 10:12, 10 20, 11:12, 11:21, 12 1, 13:20, 22 11, 22 12, 23:20, 25:7, 70:23, 73:9, 74:14, 76:7, 77:6, 78:24, 79:1, 81:12, 83:9, 90:8, 92 13, 96:20, 135:21, 135:22, 135:23, 135:24, 156:3, 174:13, 174:16, 174:19, 174:21, 175:2, 176:5, 176:12, 177:2, 189:24, 189:25, 191:22, 195:20, 196:2, 216:17
**EFFECTIVENESS** [21] - 74:10, 75:4, 75:6, 75:10, 75:11, 81:23, 82:14, 83.20, 85:6, 86:2, 86:3, 90:11, 101:1, 174:11, 174:18, 175:9, 175:10, 175:12, 175:18, 176:8, 176:16
**EFFECTS** [12] - 19:15, 74:7, 74:10, 78:1, 103:20, 107 9, 107:17, 108:12, 174:4, 174:6, 190:15, 237:19
**EFFICACY** [3] - 78:1, 129:20, 175:5
**EFFICIENT** [1] - 8:14
**EFFORTS** [1] - 8:6
**EIGHT** [8] - 51:25, 54:10, 67:18, 67:21, 85:17, 87:5, 91:17, 92:7
**EIGHTFOLD** [1] - 91:24
**EITHER** [20] - 69:25, 73:7, 79:13, 87:21, 88.10, 90 22, 90:23, 91:20, 125:21, 136:20, 136:21, 159:6, 172:7, 186:22, 199:10, 199:13, 208:7, 214:12, 218:23, 234:1
**ELABORATE** [1] - 240:2
**ELEMENT** [1] - 240:12
**ELEMENTS** [1] - 17:13

**ELEVATED** [2] - 108:8, 155:10
**ELICIT** [1] - 163:1
**ELICITED** [1] - 24:8
**ELIGIBLE** [4] - 14:9, 217:25, 230:3, 231:10
**ELIMINATE** [2] - 199:21, 230:14
**ELIMINATED** [1] - 83:22
**ELIMINATION** [1] - 156:10
**ELIZABETH** [6] - 2:15, 4.20, 58:2, 58:3, 97:22, 143:1
**ELMO** [4] - 74:19, 81:7, 90:14, 101:11
**ELSE** [12] - 37:17, 52:3, 54:2, 93:3, 112:18, 143:8, 143:16, 148:19, 190:1, 196 8, 244:1, 252:7
**ELSE'S** [1] - 155:6
**ELSEWHERE** [1] - 7:14
**EMERGENCY** [2] - 167:22, 168:13
**EMERGES** [1] - 17:18
**EMPHASIZED** [1] - 226:24
**EMPIRICAL** [1] - 100:21
**EMPLOYED** [5] - 166:2, 200:4, 200:5, 200:11, 212:5
**EMPLOYEE** [7] - 32:5, 33:16, 34:22, 237:5, 240:3, 240:14, 247:4
**EMPLOYEE 'S** [1] - 151:19
**EMPLOYEES** [15] - 13:8, 13:13, 27:5, 27:13, 31:17, 43:13, 52:13, 121:18, 208:8, 212:3, 244:9, 247:19, 249:4, 249:7, 249:13
**EMPLOYER** [38] - 7 4, 26:23, 29:24, 29:25, 30:5, 30.24, 32:17, 33:6, 33:9, 34:3, 34:21, 42:22, 48:5, 48:8, 71:3, 79:12, 90:4, 94:25, 98 21, 98:25, 146:4, 165:25, 199:22, 227:16, 228:4, 230:3, 230:13,

231:2, 235:5, 236:17, 240:4, 240:16, 243:15, 244:8, 247:5, 247:22
**EMPLOYER 'S** [1] - 7:2
**EMPLOYER -BASED** [4] - 71:3, 79:12, 90:4, 94.25
**EMPLOYER - SPONSORED** [2] - 199:22, 230:3
**EMPLOYERS** [25] - 13:5, 13:11, 13:16, 13:17, 13:22, 23 5, 25:4, 27:3, 35:25, 96:10, 99:3, 99:11, 144:7, 144:10, 144:24, 149:23, 199:1, 227:24, 230:18, 231:24, 239:6, 244:25, 247:20, 249:13, 250.18
**EMPLOYERS '** [1] - 247:3
**EMPOWERED** [1] - 177:20
**ENACT** [1] - 49:20
**ENACTED** [3] - 39:19, 43:6, 44 7
**ENACTMENT** [1] - 208:17
**ENAMORED** [1] - 240:18
**ENCOUNTER** [1] - 179:10
**ENCOURAGED** [1] - 12:14
**END** [10] - 53 17, 136:3, 181:18, 182:25, 183:1, 183:19, 186:5, 186:16, 187:1, 187:21
**ENDEAVOR** [2] - 239:4, 252:6
**ENDED** [1] - 209:17
**ENDOCRINE** [1] - 117:15
**ENDOCRINOLOGIST** [1] - 116:16
**ENDOCRINOLOGY** [8] - 114:4, 115:14, 115:17, 115:20, 116:2, 116:7, 116:9, 118:8
**ENDOMETRIAL** [1] - 108:16
**ENDOMETRIOSIS** [5] - 125.9, 125:10,

125:14, 125 16, 129:24
**ENDS** [1] - 134:13
**ENFORCE** [5] - 7:23, 21:7, 35:5, 233:19, 240:7
**ENFORCED** [1] - 233:23
**ENFORCEMENT** [1] - 240:13
**ENFORCING** [4] - 21:13, 33:25, 214.8, 214:24
**ENGAGE** [2] - 48:5, 225:19
**ENGLAND** [1] - 70:19
**ENHANCES** [1] - 129:20
**ENJOIN** [2] - 8:12, 215:6
**ENOUGH** [4] - 11:7, 51:1, 162 7, 246:4
**ENROLL** [1] - 14:3
**ENROLLED** [4] - 12:21, 182:16, 186:11, 187.25
**ENROLLMENT** [3] - 14:2, 25:1, 25:10
**ENTIRE** [5] - 28:13, 85:18, 85:19, 199:14, 223:17
**ENTIRELY** [1] - 232:20
**ENTIRETY** [2] - 100:24, 152:1
**ENTITIES** [27] - 26:2, 29:2, 41:7, 50:22, 51:2, 51:4, 99:22, 144:16, 197:23, 198:4, 198:23, 205:6, 229:21, 231:12, 232 2, 232:7, 232:9, 232:15, 232:17, 232:21, 232:23, 233:21, 243:20, 243:22, 243:24, 249:11
**ENTITLED** [20] - 30:22, 35:21, 36:19, 37:1, 37:19, 37:24, 38:7, 45:11, 45:19, 47:1, 47:3, 52:10, 84:19, 102:5, 219 5, 242:20, 251:6, 253:5
**ENTITY** [9] - 28:12, 31:22, 47 14, 48:15, 49:18, 50:5, 226:20, 230:13, 248:2
**ENTRY** [1] - 72:1

125:14, 125 16, 129:24
**ENVIRONMENT** [2] - 19:14, 21:5
**ENVIRONMENTAL** [2] - 19:5, 118:25
**EPA** [13] - 16 10, 18:15, 19:2, 19:6, 19 7, 19:8, 20:13, 21 1, 21:5, 35:12, 35 17, 66:10, 233 12
**EPA'S** [1] - 19 11
**EPIDEMIOLOGY** [2] - 115:25, 167:13
**EQUAL** [1] - 9.9
**EQUALLY** [8] - 36:6, 36:18, 37:5, 37:8, 37:18, 37:23, 38:7, 50.8
**EQUALS** [2] - 187:18, 187:19
**ERA** [1] - 239.23
**ERISA** [5] - 13:12, 24 25, 230.25, 240 6, 240:7
**ERODED** [1] - 19:21
**ESCAPE** [1] - 26:20
**ESPECIALLY** [3] - 59 19, 134 13, 220:7
**ESQUIRE** [11] - 1:11, 2:2, 2:3, 2:6, 2:6, 2:11, 2 :15, 2:16, 2:16, 2:17, 2:17
**ESSENCE** [1] - 18:20
**ESSENTIALLY** [7] - 19:3, 139:4, 212:19, 216 15, 218:8, 218:13, 247:18
**ESTABLISH** [2] - 17:1, 111:3
**ESTABLISHED** [3] - 58 25, 155.23, 155:24
**ESTABLISHES** [1] - 235:13
**ESTABLISHMENT** [1] - 9:11
**ESTIMATE** [16] - 62:16, 62:18, 99:5, 133:19, 133:22, 136:23, 197:4, 228:22, 229:9, 229 12, 230:1, 237:18, 238:3, 238:4, 238:23, 239:2
**ESTIMATED** [3] - 81 13, 81:15, 229:16
**ESTIMATES** [5] - 12 24, 89:21, 229:8, 229:17, 235:8
**ESTIMATING** [1] - 91 23

**ESTROGEN** [5] - 127:5, 127:11, 127:20, 127:23, 128:1

**ET** [4] - 1:5, 2:19 83:14, 205:4

**ETHAN** [3] - 2:11, 4:17, 25:22

**EVALUATION** [3] - 81:24, 117:13, 132:12

**EVEN** [30] - 14:24, 19:1, 24:23, 34:13, 37:7, 39:2, 40:19, 41:8, 42:6, 46:13, 50:8, 50:13, 50:20, 51:6, 51:15, 79:24, 80:2, 80:11, 96:13, 144:23, 153:9, 197:4, 198:19, 219:3, 226:9, 228:2, 228:24, 231:23, 244:24, 249:5

**EVENING** [2] - 6:1, 252:12

**EVENLY** [2] - 16:18, 17:2

**EVENT** [1] - 42:8

**EVENTS** [1] - 103:20

**EVER** [5] - 34:9, 61:21, 68:2, 124:14, 225:15

**EVERY** [10] - 37:20, 79:22, 94:20, 172:6, 192:25, 194:20, 197:3, 197:9, 239:19, 248:24

**EVERYBODY** [4] - 6:13, 33:1, 232:12, 232:13

**EVERYONE** [3] - 54:9, 101:11, 207:13

**EVERYONE 'S** [1] - 104:8

**EVERYTHING** [8] - 24:7, 24:10, 55:15, 55:16, 55 23, 98:5, 164:3, 165:23

**EVIDENCE** [33] - 43:3, 43:24, 48:8, 55:11, 56:5, 62:10, 67:5, 68:4, 71:16, 83:12, 83:17, 83:19, 83:20, 85:9, 86:6, 100:21, 101:3, 106:7, 114:8, 152:3, 152:6, 155:19, 155:20, 155:24, 156:19, 158:11, 164:14, 172:21, 172:23,

191:1, 224:12, 229:22, 231:14

**EVIDENCE -BASED** [1] - 85:9

**EVIDENTIARY** [1] - 235:23

**EXACT** [2] - 50:1, 70:10

**EXACTLY** [7] - 12 8, 52:1, 159:21, 180:6, 210:24, 212:10, 228:22

**EXAM** [2] - 47:17, 47:18

**EXAMINATION** [9] - 54:25, 97:18, 105:6, 113:22, 142:22, 152:22, 165:3, 175:17, 193:10

**EXAMPLE** [17] - 12:2, 16:10, 27:8, 34:3, 71:18, 71:21, 80:16, 130:11, 169:21, 194:6, 194 24, 195:15, 199:16, 203:13, 219:16, 242:14, 250:25

**EXAMPLES** [4] - 62:24, 107:2, 168:9, 232:14

**EXCELLENT** [2] - 93:16, 155:21

**EXCEPT** [7] - 24:10, 36:20, 55:16, 55:23, 68:17, 215:21, 225:11

**EXCEPTION** [7] - 6:24, 26:19, 35 9, 44:18, 77:13, 222:15, 225:12

**EXCEPTIONS** [6] - 6:21, 6:24, 44:11, 44:13, 243:18, 250:10

**EXCESSIVELY** [2] - 123:12

**EXCHANGE** [1] - 219:19

**EXCHANGES** [2] - 220:3, 242:23

**EXCISE** [1] - 240:10

**EXCLUDED** [1] - 188:9

**EXCLUSION** [3] - 164:17, 244:4, 244:10

**EXCLUSIVELY** [1] - 63:9

**EXCUSE** [1] - 142:7

**EXCUSED** [3] - 113:6,

157:9, 204:4

**EXECUTIVE** [2] - 4:2, 48:16

**EXEMPT** [8] - 30:1, 32:17, 33:9, 196:16, 239:20, 245:1, 248:25, 249:15

**EXEMPTING** [1] - 242:15

**EXEMPTION** [64] - 6:17, 6:18, 27:15, 27:17, 27:18, 28:1, 28:2, 28:3, 28:7, 28:10, 28:22, 28 24, 29:1, 29:11, 29:18, 29:24, 33:5, 38:21, 38:22, 40:22, 42:22, 43:14, 43:23, 46:5, 46:6, 46:9, 46:14, 46:21, 50:10, 52 18, 95:10, 95:11, 95:14, 95:22, 99:6, 120:6, 120:7, 138:1, 138:2, 138:7, 138:13, 145:25, 190:18, 196:11, 197:12, 199:11, 201:12, 211:6, 211:15, 212:9, 232:3, 237 13, 240:12, 243:15, 243:16, 243:24, 244:9, 246:24, 248:7, 248:8, 250:13, 250:21, 251:1

**EXEMPTIONS** [44] - 6:18, 13:15, 25:7, 40:7, 40:22, 42:14, 44:9, 44:10, 44:22, 46:2, 46:11, 46:13, 104:16, 104:19, 104:22, 121:4, 141:6, 141:17, 141:19, 144:20, 145:2, 173:3, 196:14, 197:12, 198:20, 198:22, 198:23, 199:2, 199:7, 199:23, 220:18, 220:24, 221:23, 223:18, 224:4, 243:6, 243:8, 243:10, 243:11, 243:25, 249:25, 250:5, 250:6

**EXERCISE** [4] - 160:10, 225:19, 226:25, 247:15

**EXERCISING** [3] - 45:15, 46:19, 250:8

**EXHAUSTIVELY** [1] - 37:20

**EXHIBIT** [18] - 55:7, 55:23, 56 4, 56:8, 56:14, 68 1, 74:18, 95:11, 95:12, 101:7, 101:8, 114:6, 137:25, 138:1, 138:2, 163:6, 232 3, 232:8

**EXHIBITS** [5] - 24:11, 55:10, 55:19, 114:7, 251:19

**EXIST** [2] - 43:8, 225:4

**EXISTED** [1] - 196:14

**EXISTENCE** [4] - 43:5, 152:25, 198:20, 224:11

**EXISTING** [7] - 6:24, 67:10, 69:5, 69:18, 99:7, 220:18, 244:21

**EXPAND** [1] - 41:6

**EXPANDED** [3] - 40:14, 78 9, 211:8

**EXPANDING** [1] - 147:4

**EXPANSION** [3] - 12:22, 250:14, 250:22

**EXPECT** [5] - 76:1, 76:4, 77:6, 96:21, 237:17

**EXPECTED** [2] - 65 2, 75:21

**EXPECTING** [1] - 72:2

**EXPENSE** [1] - 208 6

**EXPENSIVE** [9] - 11:19, 134:4, 134:13, 176:25, 177:4, 191:21, 192:6, 192:8, 192:9

**EXPERIENCE** [19] - 64:18, 120:13, 127:16, 130:23, 130:25, 131:8, 133:22, 139:21, 140:21, 140:22, 141:1, 141:4, 173:22, 178:22, 178:23, 189:16, 191:6, 191:8, 230:8

**EXPERIENCED** [2] - 131:14, 179:6

**EXPERIENCING** [2] - 128:6, 201:19

**EXPERT** [27] - 64:18, 64:23, 65:1, 65:3, 65:11, 65:13, 65:18, 65:19, 66:7, 69:7, 96:2, 97:5, 100:12,

100:15, 112:22, 120:13, 120:17, 120:18, 138:20, 139:11, 152:11, 152:14, 164:17, 172:12, 172:19, 172:23, 241:12

**EXPERTISE** [14] - 46:24, 47:4, 47:8, 139:1, 141 12, 142:16, 153:6, 220:9, 220:15, 220:17, 222:2, 223:3, 223:10, 224:4

**EXPERTS** [6] - 66:21, 84 4, 164:18, 172:19, 172:22, 230:8

**EXPLAIN** [3] - 75:1, 180:5, 187 14

**EXPLAINED** [3] - 35:4, 51:8, 78:1

**EXPLAINING** [1] - 26 23

**EXPLAINS** [1] - 19:16

**EXPLICIT** [1] - 243:2

**EXPOSED** [1] - 39:23

**EXPOSES** [1] - 43:15

**EXPRESSED** [2] - 96:24, 240:20

**EXPRESSLY** [6] - 39 14, 52:10, 215:21, 216:1, 216:11, 220:7

**EXTEND** [2] - 134:12, 208:11

**EXTENSIVE** [1] - 62:16

**EXTENSIVELY** [1] - 216:24

**EXTENT** [23] - 5:18, 18 23, 20:4, 20:14, 66 6, 86:9, 91:20, 112:23, 120:18, 123:14, 124:7, 141:9, 142:4, 145:4, 172:23, 209:7, 209:10, 209:24, 215:21, 225:10, 233:10, 235:25, 252:18

**EXTRAORDINARY** [1] - 236:18

**EXTREMELY** [1] - 228:22

**F**

**F.3D** [1] - 164:17

**F.SUPP .2D** [1] -

Exhibit 137

JA-0001877

206:11
**FACE** [11] - 14:21, 14:22, 125:2, 151:1, 151:9, 201:23, 202:10, 212:6, 224:7, 244:4, 244:11
**FACED** [5] - 47:14, 50:6, 149:6, 149:7, 149:15
**FACING** [2] - 201:25, 202:12
**FACT** [32] - 9:19, 17:9, 17:10, 21:14, 22:10, 23:19, 27:11, 30:14, 32:6, 32:8, 65:7, 69:12, 74:14, 107:8, 107:16, 161:20, 161:25, 188:13, 192:20, 209:3, 220:19, 224:18, 225:5, 227:4, 228:23, 238:18, 242:12, 244:17, 246:25, 249:5, 252:13, 252:20
**FACTOR** [1] - 211:21
**FACTORS** [4] - 41:11, 42:1, 74:12, 156:6
**FACTS** [4] - 6:4, 9:19, 9:25, 163:20
**FACULTY** [4] - 58:14, 61:1, 61:9, 116:17
**FAIL** [2] - 11:16, 13:19
**FAILED** [3] - 21:7, 119:14, 238:7
**FAILING** [3] - 96:18, 240:10, 240:11
**FAILS** [1] - 48:10
**FAILURE** [6] - 120:17, 123:6, 126:7, 126:16, 126:22, 128:18
**FAILURES** [1] - 75:12
**FAIR** [8] - 11:7, 59:6, 62:9, 63:14, 88:20, 162:7, 226:16, 246:4
**FAIRLY** [6] - 17:12, 216:13, 223:15, 233:2, 233:12, 235:6
**FALL** [3] - 43:14, 47:7, 180:11
**FALLBACK** [1] - 230:25
**FALLS** [1] - 48:16
**FAMILIAR** [18] - 5:16, 56:17, 63:14, 63:20, 74:20, 87:19, 105:10, 105:13, 105:24, 107:20, 119:25, 120:3,

120:6, 138:3, 144:19, 166:11, 194:19, 198:2
**FAMILIARIZED** [1] - 98:3
**FAMILIES** [1] - 12:12
**FAMILY** [13] - 14:1, 14:6, 72:12, 81:24, 81:25, 111:23, 167:3, 167:5, 175:11, 176:24, 184:24, 194:17
**FAR** [1] - 37:4, 95:19, 131:18, 136:22, 142:15, 145:11, 145:19, 151:21, 199:3, 218:15, 246:9
**FASHION** [1] - 53:23
**FASTER** [1] - 53:23
**FATAL** [1] - 14:24
**FAVORS** [1] - 251:11
**FCRR** [1] - 1:19
**FDA** [4] - 78:4, 166:16, 178:18, 218:3
**FDA-APPROVED** [3] - 166:16, 178:18, 218:3
**FEAR** [1] - 191:22
**FEDERAL** [33] - 17:22, 17:23, 18:2, 18:3, 26:10, 33:25, 35:3, 35:6, 35:10, 48:16, 50:4, 64:23, 64:24, 101:7, 101:12, 105:15, 105:19, 111:6, 111:25, 169:19, 172:20, 172:21, 206:15, 212:13, 217:17, 219:21, 220:3, 231:20, 232:5, 233:14, 237:12, 240:22, 242:23
**FEDERALLY** [2] - 179:21, 179:24
**FEDERALLY- QUALIFIE D** [2] - 179:21, 179:24
**FEE** [2] - 12:17, 192:11
**FEEL** [8] - 24:2, 52:3, 93:13, 96:17, 116:23, 129:9, 177:23, 247:4
**FEES** [1] - 134:22
**FELL** [1] - 145:1
**FELLOWS** [2] - 118:7, 122:21
**FELLOWSHIP** [8] - 115:12, 115:13,

116:2, 167:11, 167:13, 167:16, 167:17, 168:12
**FELT** [1] - 86:6
**FEMALE** [5] - 76:8, 76:20, 103:7, 126:10, 172:4
**FERTILITY** [3] - 77:14, 116:10, 117:19
**FERTILIZATION** [1] - 129:8
**FEW** [10] - 28:1, 86:13, 118:22, 163:14, 165:5, 165:24, 171:8, 183:17, 217:11, 242:8
**FIELD** [9] - 35:7, 58:22, 58:24, 59:1, 59:7, 96:2, 115:20, 193:23, 195:6
**FIFTH** [2] - 16:21, 16:22
**FIGHT** [1] - 11:6
**FILE** [2] - 240:5, 247:5
**FILL** [3] - 11:10, 11:15, 133:8
**FILLING** [3] - 132:24, 133:12, 155:1
**FINAL** [13] - 38:17, 39:7, 39:10, 39:23, 84:3, 157:20, 159:24, 160:15, 160:25, 216:5, 217:23, 237:21, 238:12
**FINALIZATION** [1] - 83:24
**FINALIZED** [1] - 83:25
**FINALLY** [5] - 26:9, 212:7, 217:10, 232:1, 244:2
**FINANCIAL** [10] - 10:5, 13:24, 14:21, 16:7, 16:25, 17:9, 133:24, 149:6, 177:22, 179:14
**FINANCIALLY** [2] - 177:23, 179:16
**FIND** [7] - 20:18, 37:5, 91:15, 179:18, 181:5, 205:20, 227:3
**FINDING** [4] - 39:17, 108:7, 183:22, 205:19
**FINDINGS** [7] - 9:19, 83:18, 112:5, 163:7, 188:14, 252:13, 252:20
**FINE** [9] - 5:15, 33:13, 33:14, 49:21, 210:9,

222:18, 234:14, 234:17, 249:10
**FINER** [1] - 70:19
**FINES** [1] - 208:12
**FINISH** [3] - 3:13, 177:21
**FINISHED** [2] - 87:1, 161:8
**FIREFIGHTERS** [3] - 47:18, 47:19, 47:22
**FIRST** [34] - 1:20, 18:15, 21:25, 25:2, 26:8, 26:15, 28:23, 30:20, 42:18, 43:16, 52:7, 68:6, 68:18, 68:22, 74:20, 85:25, 94:4, 97:25, 101:10, 101:21, 101:22, 106:10, 113:20, 114:13, 126:6, 131:15, 143:3, 172:18, 185:15, 185:18, 185:24, 186:7, 211:14
**FIRSTHAND** [1] - 123:22
**FISCHER** [35] - 2:6, 4:8, 4:9, 15:24, 16:3, 16:4, 16:15, 18:6, 18:10, 18:13, 20:3, 20:20, 20:21, 20:24, 210:7, 210:18, 210:21, 210:23, 211:25, 213:13, 214:7, 214:23, 215:14, 219:7, 219:13, 222:8, 222:23, 227:22, 234:11, 234:15, 234:19, 234:21, 234:23, 246:21, 252:8
**FIVE** [13] - 9:8, 9:9, 74:2, 82:4, 134:11, 134:12, 134:19, 135:1, 135:3, 135:16, 135:17, 155:13, 226:2
**FIVE-YEAR** [1] - 135:1
**FIVEFOLD** [4] - 155:8, 156:1, 156:15, 156:21
**FLASHES** [1] - 127:20
**FLATLY** [1] - 37:16
**FLAWED** [5] - 212:25, 248:11, 248:12, 248:13
**FLIES** [1] - 224:6
**FLIP** [5] - 56:11, 56:14, 165:12,

165:18, 185:8
**FLOATING** [2] - 33:1, 33:4
**FLOOR** [3] - 1:20, 2:3, 2:7
**FLUCTUATIONS** [1] - 154:18
**FOCUS** [16] - 57:8, 57:11, 61:2, 61:3, 69:15, 73:12, 87:23, 104:8, 108:25, 109:4, 119:8, 167:19, 167:21, 168:14, 211:13, 237:10
**FOCUSED** [4] - 46:6, 85:16, 100:25, 105:20
**FOCUSES** [1] - 110:18
**FOCUSING** [2] - 8:5, 8:9
**FOIA** [1] - 232:4
**FOLKS** [4] - 3:10, 110:6, 207:7, 207:9
**FOLLOW** [6] - 33:20, 93:12, 94:21, 181:11, 212:23, 213:7
**FOLLOWED** [1] - 233:5
**FOLLOWING** [12] - 6:1, 6:6, 10:1, 63:12, 90:5, 103:8, 112:12, 167:7, 167:10, 168:13, 196:3, 217:18
**FONT** [1] - 104:9
**FOOD** [1] - 78:5
**FOOTNOTE** [8] - 102:4, 104:9, 104:10, 106:11, 109:6, 160:22, 160:25
**FOR** [377] - 1:2, 2:8, 2:19, 3:9, 3:10, 3:15, 3:16, 3:18, 4:3, 5:1, 5:12, 5:23, 6:15, 7:3, 7:8, 7:12, 7:20, 8:15, 8:16, 9:14, 10:5, 10:9, 11:12, 11:19, 12:2, 12:11, 12:17, 13:23, 14:9, 15:9, 15:22, 16:4, 19:24, 20:9, 20:25, 22:5, 23:2, 23:4, 24:7, 24:10, 24:20, 25:22, 27:6, 27:7, 27:22, 29:8, 31:1, 33:17, 35:9, 39:16, 40:5, 40:8, 40:10, 40:20,

Exhibit 137

JA-0001878

41:11, 41:13, 41:20, 42:14, 43:4, 43:14, 43:16, 43:21, 44:17, 45:1, 45:4, 46:2, 46:8, 46:11, 47:17, 47:20, 47:23, 48:6, 50:19, 50:23, 52:16, 52:22, 54:22, 55:4, 55:16, 57:20, 57:25, 59:10, 61:9, 62:1, 64:11, 64:19, 65:6, 65:17, 67:3, 67:11, 67:13, 67:14, 68:17, 69:3, 71:17, 71:18, 71:20, 72:9, 72:10, 72:11, 72:13, 72:23, 73:10, 73:16, 77:19, 78:8, 78:24, 79:13, 79:17, 80:15, 82:4, 82:16, 85:11, 86:9, 90:7, 96:3, 96:9, 96:19, 96:25, 97:5, 97:6, 101:11, 103:6, 103:21, 106:2, 106:3, 106:13, 107:15, 108:3, 108:8, 108:9, 110:18, 112:21, 113:14, 113:19, 113:24, 114:2, 116:20, 116:21, 117:12, 117:13, 119:15, 120:17, 123:5, 123:17, 123:25, 124:6, 124:8, 124:11, 125:25, 127:13, 128:16, 128:19, 129:6, 129:8, 129:17, 130:3, 130:5, 130:11, 130:15, 130:16, 131:20, 132:2, 132:13, 132:17, 132:18, 132:23, 133:2, 133:13, 133:20, 134:11, 134:25, 135:3, 135:11, 135:25, 136:4, 136:5, 136:20, 136:25, 137:11, 137:16, 139:8, 139:9, 139:15, 140:2, 140:5, 140:8, 140:16, 142:1, 142:6, 142:9, 142:12, 144:5, 145:5, 145:13, 147:1, 147:22, 148:16, 149:2,

153:5, 153:13, 154:5, 154:19, 154:22, 155:17, 155:19, 155:21, 156:12, 156:14, 156:18, 156:21, 157:11, 157:12, 157:16, 160:5, 162:21, 163:25, 164:6, 164:8, 164:23, 165:9, 165:16, 166:15, 166:23, 167:4, 169:5, 169:6, 169:8, 169:21, 170:14, 170:15, 170:16, 170:19, 172:13, 172:18, 172:22, 173:19, 173:23, 174:10, 174:23, 177:25, 178:11, 179:17, 179:19, 179:22, 180:18, 180:24, 181:14, 182:10, 182:16, 183:4, 183:12, 184:1, 184:16, 184:18, 184:19, 184:20, 184:24, 187:7, 187:12, 188:1, 188:12, 188:15, 189:11, 190:5, 190:12, 190:15, 192:5, 192:10, 194:6, 194:23, 194:25, 195:8, 195:15, 195:17, 196:4, 196:5, 196:19, 196:23, 197:12, 198:12, 198:18, 198:23, 199:16, 199:19, 200:17, 200:24, 201:8, 201:17, 203:13, 203:17, 203:21, 203:23, 204:13, 204:23, 205:4, 205:10, 205:24, 206:15, 206:22, 209:10, 210:16, 210:19, 211:6, 211:14, 211:18, 211:19, 213:25, 214:6, 214:18, 215:23, 217:2, 217:6, 217:15, 220:2, 220:16, 220:18, 220:23, 221:10, 221:11, 221:14, 221:18,

221:23, 223:2, 223:22, 224:13, 225:11, 225:22, 226:10, 226:23, 228:22, 230:3, 230:18, 231:10, 233:1, 233:24, 234:5, 234:12, 235:13, 237:6, 240:3, 240:9, 240:10, 240:11, 240:23, 241:15, 241:25, 242:12, 242:14, 243:24, 246:24, 248:17, 248:20, 249:10, 249:23, 250:3, 250:17, 251:1, 251:3, 251:4, 251:8, 251:18, 251:20, 251:23, 252:19
**FORCE** [4] - 37:24, 45:14, 68:25, 156:21
**FORCED** [2] - 7:10, 14:10
**FOREGO** [1] - 10:19
**FOREGOING** [1] - 253:3
**FORGET** [1] - 18:17
**FORGIVE** [2] - 15:19, 123:21
**FORGO** [2] - 178:25, 191:18
**FORGOES** [1] - 208:1
**FORM** [9] - 51:3, 51:4, 65:8, 145:6, 145:14, 156:3, 161:7, 184:15, 218:15
**FORMALIZED** [1] - 84:2
**FORMATS** [1] - 186:1
**FORMING** [1] - 68:20
**FORMS** [8] - 11:19, 83:9, 90:9, 90:11, 92:11, 136:20, 145:18, 174:19
**FORT** [2] - 206:10, 207:11
**FORTH** [5] - 24:7, 109:5, 111:6, 160:5, 204:13
**FORTUNATE** [1] - 248:14
**FORWARD** [1] - 223:13
**FOUND** [9] - 16:25, 106:15, 108:22, 112:5, 112:9, 181:7, 183:1, 204:6, 205:18
**FOUNDATION** [3] -

24:1, 24:7, 56:2
**FOUNDATIONAL** [1] - 57:20
**FOUNDATIONS** [2] - 119:1, 169:24
**FOUR** [5] - 17:3, 26:7, 185:16, 223:24, 226:3
**FOURS** [2] - 42:11, 240:21
**FRACTURE** [1] - 127:24
**FRAME** [5] - 110:1, 180:24, 188:10, 188:11, 188:20
**FRAMES** [1] - 164:5
**FRAMEWORK** [1] - 221:1
**FRANKLY** [3] - 18:25, 219:14, 226:8
**FRAUGHT** [1] - 239:4
**FREE** [9] - 12:4, 33:1, 33:4, 52:3, 93:14, 140:18, 208:8, 225:19, 239:16
**FREE-FLOATING** [2] - 33:1, 33:4
**FREEDOM** [3] - 47:9, 190:11, 247:10
**FREQUENCY** [2] - 123:13, 195:11
**FREQUENT** [1] - 123:13
**FREQUENTLY** [2] - 169:6, 169:9
**FRIENDS** [1] - 164:22
**FROM** [145] - 3:12, 4:14, 6:7, 12:20, 12:25, 17:5, 19:5, 19:8, 19:14, 25:24, 26:17, 33:25, 34:15, 35:25, 39:2, 43:17, 45:7, 45:23, 46:16, 48:13, 48:23, 50:7, 53:21, 55:2, 55:3, 58:9, 59:1, 65:18, 66:10, 70:21, 75:2, 78:1, 79:25, 84:22, 91:6, 93:8, 94:3, 94:23, 94:24, 95:1, 96:11, 103:3, 104:22, 106:12, 107:3, 111:6, 112:5, 115:5, 115:11, 115:14, 117:16, 121:14, 121:16, 121:17, 121:20, 121:21, 122:10, 123:1, 125:18, 126:16, 126:19,

128:1, 128:2, 128:14, 129:3, 129:12, 133:11, 134:23, 143:13, 145:24, 153:24, 154:4, 157:1, 157:20, 158:22, 160:22, 161:5, 162:12, 163:1, 167:24, 169:4, 169:12, 171:23, 174:14, 181:12, 181:24, 184:4, 184:21, 184:25, 185:2, 185:3, 185:10, 186:3, 189:5, 191:5, 191:19, 194:1, 196:16, 198:8, 203:3, 203:7, 203:14, 204:18, 204:24, 205:12, 205:14, 206:13, 206:17, 207:4, 207:15, 207:16, 207:20, 208:3, 208:20, 214:8, 214:24, 217:7, 218:15, 221:15, 223:18, 224:4, 224:16, 225:3, 230:7, 231:24, 232:4, 236:14, 237:7, 237:16, 238:10, 239:13, 241:10, 242:16, 243:6, 243:23, 244:11, 245:1, 247:18, 249:6, 249:25, 252:8, 252:17, 253:4
**FRONT** [12] - 11:13, 11:20, 92:19, 107:22, 114:6, 134:8, 134:21, 178:19, 192:7, 192:9, 192:11, 238:16
**FULL** [10] - 7:25, 54:21, 78:19, 81:5, 101:22, 113:18, 190:7, 190:16, 191:19, 218:3
**FULLY** [3] - 106:7, 229:6, 230:24
**FULLY-INSURED** [1] - 230:24
**FUNCTION** [3] - 48:17, 126:2, 227:22
**FUNCTIONING** [2] -

115:22, 126:9
**FUNDAMENTAL** [1] - 241:10
**FUNDAMENTALLY** [1] - 238:25
**FUNDED** [21] - 118:20, 118:23, 118:24, 169:16, 169:18, 169:19, 169:23, 169:24, 169:25, 170:5, 170:6, 170:18, 171:2, 180:10, 230:4, 231:10, 231:19, 231:20, 231:24, 237:6, 237:7
**FUNDING** [4] - 14:9, 103:5, 180:11, 231:11
**FURTHER** [21] - 7:16, 51:22, 73:16, 97:11, 105:1, 109:1, 112:17, 120:10, 134:25, 142:19, 156:23, 193:6, 203:25, 209:19, 217:8, 226:18, 246:18, 246:19, 248:17, 252:8, 252:10
**FUTURE** [3] - 147:6, 173:20, 206:22
**FUTURES** [1] - 69:2

# G

**GAIN** [1] - 168:18
**GAP** [2] - 69:18, 70:9
**GAPS** [1] - 69:3
**GAVE** [4] - 48:4, 133:9, 153:1, 184:23
**GENDER** [1] - 57:13
**GENERAL** [30] - 2:2, 4:2, 4:7, 4:9, 4:10, 4:14, 4:15, 4:17, 30:20, 44:21, 50:4, 67:15, 94:19, 96:12, 99:16, 116:6, 142:4, 145:19, 148:6, 149:20, 164:4, 166:3, 166:4, 167:11, 167:12, 170:10, 184:22, 194:2, 216:4
**GENERAL 'S** [1] - 143:14
**GENERALLY** [20] - 11:25, 37:7, 47:9, 47:10, 59:14, 62:20, 79:18, 87:19,

101:19, 102:23, 103:25, 117:11, 123:1, 128:10, 130:18, 138:3, 180:4, 187:5, 209:1, 247:13
**GENERATE** [1] - 188:16
**GENERATED** [1] - 94:21
**GENERIC** [1] - 145:17
**GEORGIA** [1] - 206:14
**GESTATIONAL** [1] - 168:18
**GET** [45] - 7:13, 9:1, 41:19, 51:15, 53:14, 53:17, 53:24, 54:9, 72:3, 76:4, 76:6, 87:21, 88:5, 116:24, 126:3, 127:7, 131:22, 133:10, 137:12, 137:14, 154:17, 156:11, 166:21, 179:3, 182:19, 188:4, 210:13, 211:4, 212:4, 215:8, 218:17, 219:1, 220:25, 223:23, 224:20, 227:9, 228:6, 229:11, 236:10, 241:24, 247:13, 248:13, 249:4, 249:7, 252:6
**GETS** [3] - 13:25, 161:9, 174:25
**GETTING** [11] - 76:18, 92:14, 104:9, 129:10, 133:12, 139:2, 177:14, 203:15, 232:1, 249:13, 250:18
**GG-13(A)(4** [1] - 45:3
**GIVE** [19] - 18:22, 26:16, 34:4, 39:3, 43:12, 52:2, 60:1, 61:13, 62:24, 74:19, 136:22, 157:4, 162:25, 168:9, 197:4, 216:12, 227:20, 241:8, 250:6
**GIVEN** [17] - 8:1, 19:18, 25:14, 35:19, 36:9, 44:8, 52:16, 63:18, 63:24, 70:25, 77:24, 210:12, 216:9, 232:19, 238:18, 248:5
**GIVES** [3] - 190:10, 235:12, 240:23

**GIVING** [1] - 168:1
**GLOBAL** [1] - 15:16
**GLOBALLY** [1] - 110:20
**GLOSS** [2] - 19:24, 20:4
**GLUCOSE** [1] - 71:22
**GO** [49] - 5:21, 8:14, 9:6, 9:24, 42:1, 42:12, 42:15, 46:3, 51:22, 54:6, 54:14, 56:24, 56:25, 60:10, 66:15, 75:24, 80:9, 80:21, 87:20, 106:9, 114:24, 116:22, 121:11, 126:1, 137:17, 137:23, 148:12, 161:23, 163:19, 164:3, 164:23, 165:1, 173:8, 173:14, 185:6, 186:14, 214:3, 214:25, 221:21, 222:7, 231:10, 234:22, 236:11, 237:6, 239:10, 249:9, 252:22, 252:24
**GOAL** [1] - 180:7
**GOALS** [3] - 177:20, 177:22
**GOES** [10] - 51:13, 51:20, 68:8, 139:1, 151:21, 161:9, 225:23, 227:11, 248:15
**GOING** [62] - 3:20, 3:21, 14:11, 17:25, 20:15, 22:17, 26:16, 31:12, 32:8, 32:21, 34:3, 34:12, 34:19, 34:22, 41:4, 41:22, 48:25, 51:23, 54:5, 59:13, 66:7, 74:18, 76:6, 81:7, 82:16, 87:21, 101:6, 101:10, 104:8, 116:23, 116:24, 119:3, 121:2, 126:5, 151:17, 161:17, 162:4, 165:23, 173:1, 173:2, 182:1, 188:25, 190:25, 191:1, 193:13, 199:16, 200:12, 205:20, 210:18, 216:16, 218:14, 223:9, 227:16, 234:5, 235:4, 235:5, 238:25, 243:22,

244:6, 244:15, 247:7, 250:24
**GOLDMAN** [105] - 2:2, 4:1, 4:2, 5:6, 5:7, 5:9, 5:22, 5:23, 8:1, 8:8, 8:24, 9:7, 9:25, 11:3, 11:7, 15:4, 15:11, 15:19, 15:25, 16:5, 20:22, 20:24, 21:4, 21:19, 22:14, 23:9, 23:12, 24:13, 24:22, 25:12, 25:17, 54:7, 54:15, 55:1, 55:24, 56:6, 57:6, 58:7, 64:15, 65:4, 65:16, 65:22, 65:25, 66:3, 66:16, 80:10, 84:12, 85:15, 86:12, 87:21, 88:1, 90:13, 93:15, 93:18, 97:8, 97:11, 98:12, 105:4, 105:7, 105:23, 109:1, 111:11, 112:17, 113:8, 113:23, 116:19, 117:1, 119:3, 119:7, 120:10, 120:24, 121:5, 121:12, 132:8, 133:7, 136:7, 136:10, 139:13, 139:19, 139:20, 141:3, 141:18, 142:19, 147:16, 148:3, 148:18, 150:1, 150:18, 151:21, 152:21, 152:23, 156:23, 158:1, 158:5, 158:10, 158:18, 159:17, 160:18, 160:21, 161:21, 161:24, 162:7, 252:11, 254:5, 254:9
**GONE** [8] - 22:9, 23:18, 70:13, 71:20, 163:20, 189:11, 205:17, 248:3
**GOOD** [46] - 4:5, 4:8, 4:16, 4:19, 4:22, 4:25, 5:3, 5:20, 9:18, 16:3, 25:21, 39:13, 39:17, 40:8, 41:12, 41:14, 41:19, 41:22, 42:2, 42:5, 42:6, 42:8, 58:17, 94:21, 97:20, 97:21, 97:24, 136:4, 142:24, 142:25, 160:12, 162:11, 193:12, 193:15, 209:13, 209:23, 210:21,

210:22, 213:23, 214:21, 216:14, 219:16, 225:6, 246:24
**GOT** [7] - 58:8, 101:14, 103:13, 183:3, 188:9, 188:10, 208:21
**GOVERNING** [2] - 26:11, 45:5
**GOVERNMENT** [55] - 13:24, 14:10, 17:7, 18:3, 26:10, 32:6, 33:25, 35:3, 35:6, 39:25, 40:2, 50:4, 51:13, 56:4, 66:23, 111:25, 158:13, 160:23, 161:13, 169:19, 215:16, 219:21, 221:1, 221:16, 222:9, 222:10, 224:1, 224:10, 224:22, 225:1, 225:10, 226:7, 226:12, 226:21, 227:1, 227:7, 228:23, 231:20, 231:23, 232:5, 232:11, 232:13, 233:15, 233:19, 234:25, 240:23, 247:16, 247:18, 247:21, 248:15, 248:23, 248:24, 249:17, 249:21
**GOVERNMENT 'S** [7] - 16:23, 100:15, 152:14, 219:4, 221:6, 231:16, 250:22
**GOVERNMENT - FUNDED** [1] - 231:20
**GRADUATE** [4] - 57:13, 58:15, 115:1, 115:5
**GRADUATED** [2] - 167:1, 171:23
**GRANDFATHER** [5] - 52:12, 205:18, 209:9, 224:11, 224:17
**GRANDFATHERED** [23] - 52:15, 52:20, 52:24, 53:9, 53:12, 53:21, 145:2, 196:15, 196:22, 197:8, 205:7, 205:11, 205:18, 206:1, 206:21,

Exhibit 137

JA-0001880

206:22, 207:22,
207:24, 207:25,
208:1, 208:5, 209:8,
224:13
**GRANDFATHERING**
[1] - 157:14
**GRANT** [8] - 43:7,
45:4, 45:22, 216:4,
223:15, 236:18,
248:15, 251:12
**GRANTED** [1] - 156:7
**GRANTING** [1] - 27:10
**GRANTS** [3] - 118:20,
118:22, 170:5
**GREAT** [4] - 59:24,
165:15, 165:21,
208:6
**GREATER** [3] - 128:5,
134:10, 156:13
**GROUNDS** [3] - 9:4,
164:18
**GROUP** [14] - 42:24,
43:25, 66:21, 84:3,
98:21, 98:25,
122:11, 182:19,
183:4, 183:13,
202:20, 221:8, 221:9
**GROUPS** [10] - 52:19,
72:19, 180:20,
180:21, 182:19,
182:21, 183:1,
183:3, 183:13
**GROWTH** [1] - 111:24
**GUESS** [1] - 193:4
**GUIDANCE** [1] - 6:6
**GUIDELINE** [1] -
222:16
**GUIDELINES** [23] -
42:25, 43:5, 43:8,
68:23, 69:5, 69:19,
177:12, 221:14,
222:12, 222:13,
222:15, 222:24,
223:1, 243:6, 243:9,
243:10, 243:13,
243:14, 243:15,
243:18, 250:5, 250:9
**GUTTMACHER** [18] -
89:7, 102:2, 106:12,
109:5, 109:13,
109:22, 110:6,
110:13, 110:15,
110:17, 111:5,
111:12, 112:6,
112:7, 112:13,
154:4, 154:9, 160:22
**GUYS** [1] - 195:15
**GYNECOLOGIST** [2] -
114:3, 125:4
**GYNECOLOGY** [4] -

60:17, 115:9, 116:7,
118:7

**H**

**HABITS** [1] - 102:5
**HAD** [59] - 5:10, 6:12,
6:13, 12:10, 16:24,
19:8, 19:10, 19:20,
21:8, 30:8, 35:13,
36:5, 39:19, 39:21,
65:17, 70:13, 71:22,
79:9, 79:11, 80:18,
82:9, 84:2, 85:8,
85:25, 86:5, 86:6,
87:8, 90:4, 90:6,
91:5, 91:7, 91:8,
95:13, 96:15, 96:16,
105:8, 109:5, 110:7,
112:1, 112:13,
123:22, 124:14,
133:13, 135:6,
137:1, 145:5,
145:22, 146:1,
148:25, 149:11,
153:10, 153:17,
153:18, 155:13,
156:12, 164:19,
167:20, 181:14,
181:23, 182:13,
184:5, 187:1, 187:7,
189:19, 189:22,
190:17, 191:10,
192:20, 194:2,
194:9, 194:11,
198:13, 200:5,
200:14, 203:11,
205:17, 205:24,
208:23, 208:24,
209:16, 209:21,
209:23, 210:12,
211:12, 218:6,
218:21, 220:5,
236:3, 236:21,
240:20, 241:23,
247:22, 248:3,
252:12
**HALF** [7] - 5:12, 62:19,
210:5, 210:7, 210:9,
230:1
**HALF-HOUR** [2] - 5:12
**HAND** [7] - 48:1, 48:2,
101:23, 113:13,
245:4, 245:5, 245:6
**HANDED** [1] - 159:1
**HANDLING** [1] - 236:4
**HANDY** [1] - 175:17
**HAPPEN** [7] - 127:15,
133:9, 141:10,
191:17, 230:10,

239:2, 239:9
**HAPPENED** [4] -
86:25, 147:18,
209:24, 211:3
**HAPPENING** [1] -
126:18
**HAPPENS** [5] - 29:23,
127:10, 137:14,
177:2, 222:18
**HAPPY** [6] - 49:22,
148:10, 157:18,
161:16, 209:15,
227:8
**HARD** [4] - 6:15,
20:11, 114:15,
136:24
**HARD-PRESSED** [1] -
136:24
**HARM** [30] - 7:16,
7:19, 13:25, 14:21,
14:22, 14:24, 15:2,
15:13, 15:14, 16:7,
16:25, 17:9, 19:5,
98:20, 98:24, 149:7,
151:12, 201:23,
201:25, 202:18,
227:10, 231:3,
233:5, 235:11,
248:24, 251:10
**HARMED** [9] - 14:19,
21:7, 23:4, 234:2,
234:3, 234:5,
234:24, 235:4,
235:10
**HARMFUL** [1] - 19:14
**HARMS** [5] - 7:17,
147:11, 147:14,
147:22, 147:25
**HARRISBURG** [1] -
2:4
**HARVARD** [2] -
114:25, 115:4
**HAS** [140] - 11:20,
11:24, 12:14, 13:4,
13:10, 15:13, 18:21,
21:17, 22:9, 22:10,
22:16, 23:17, 23:18,
23:19, 25:14, 26:10,
27:16, 28:1, 28:5,
28:6, 28:12, 31:8,
33:6, 35:1, 35:4,
36:17, 37:13, 37:21,
43:14, 45:13, 47:14,
48:8, 48:23, 49:12,
64:1, 64:4, 64:25,
65:8, 70:3, 70:5,
71:13, 71:21, 77:22,
83:3, 83:20, 85:12,
88:2, 92:13, 93:10,
100:5, 100:8,

106:25, 108:9,
118:20, 120:25,
124:2, 130:12,
132:15, 132:16,
134:6, 134:7, 135:2,
137:1, 137:4,
139:10, 140:2,
140:14, 145:5,
145:10, 145:19,
146:8, 146:13,
147:8, 147:18,
147:24, 148:17,
148:18, 148:25,
149:6, 149:7,
149:11, 149:15,
155:8, 155:18,
160:4, 161:13,
163:17, 165:22,
171:20, 173:23,
173:25, 174:17,
184:13, 189:8,
189:22, 190:2,
190:4, 190:6, 194:1,
195:19, 197:3,
197:9, 198:11,
202:6, 207:6,
207:12, 208:16,
208:18, 211:3,
213:1, 213:5,
215:16, 220:9,
220:11, 220:14,
222:2, 223:4,
223:10, 224:3,
225:15, 225:20,
227:13, 227:14,
227:17, 229:4,
230:9, 232:22,
236:2, 239:14,
240:6, 240:8,
242:12, 242:15,
244:13, 247:5,
248:24, 249:17
**HAVE** [417] - 3:8, 3:11,
3:14, 3:15, 3:16,
3:17, 3:23, 5:11,
5:15, 6:11, 6:13,
7:22, 7:25, 8:18, 9:8,
9:15, 11:5, 12:11,
12:21, 12:25, 13:1,
13:9, 13:18, 13:21,
14:3, 14:13, 14:25,
15:8, 15:12, 16:6,
17:4, 18:7, 20:22,
21:15, 23:24, 23:25,
24:1, 24:2, 24:4,
24:9, 24:21, 25:1,
25:13, 25:15, 26:2,
27:4, 27:6, 28:20,
29:10, 30:6, 30:25,
31:5, 31:19, 32:12,
32:21, 33:11, 34:9,

34:17, 34:18, 35:19,
35:23, 35:24, 37:7,
37:20, 41:3, 41:17,
41:18, 41:21, 42:1,
42:6, 42:17, 44:12,
44:21, 44:25, 46:12,
46:18, 46:23, 48:25,
50:21, 51:11, 51:21,
52:3, 53:4, 53:16,
55:7, 55:13, 55:15,
56:2, 57:19, 58:6,
58:17, 58:18, 60:12,
60:25, 62:12, 62:15,
62:17, 62:18, 62:20,
62:21, 62:25, 63:3,
63:5, 63:7, 63:10,
63:17, 63:19, 63:23,
64:1, 65:5, 65:18,
65:20, 65:23, 67:5,
68:2, 70:11, 71:19,
71:22, 72:2, 72:10,
73:3, 73:8, 73:12,
77:4, 79:11, 79:16,
80:14, 82:2, 82:5,
83:19, 85:5, 85:7,
88:10, 89:17, 89:20,
89:22, 91:20, 92:17,
92:19, 93:9, 93:13,
93:21, 93:25, 95:9,
95:13, 95:21, 96:4,
96:15, 96:20, 97:3,
97:8, 98:18, 99:5,
99:6, 99:18, 100:11,
100:14, 100:19,
100:23, 101:3,
101:15, 102:2,
103:19, 104:25,
105:3, 105:19,
105:20, 106:25,
107:2, 111:2, 111:4,
111:20, 112:5,
112:18, 112:19,
115:23, 117:20,
118:22, 118:24,
121:15, 122:2,
122:23, 122:24,
124:1, 124:14,
124:22, 125:4,
125:20, 125:24,
127:8, 129:15,
129:24, 130:25,
131:4, 131:8,
131:11, 131:14,
132:16, 133:23,
136:24, 136:25,
137:23, 138:6,
138:8, 138:14,
138:17, 138:21,
140:7, 140:12,
141:1, 141:5, 141:7,
141:20, 141:25,

Exhibit 137

JA-0001881

142:2, 142:12,
143:18, 144:3,
144:10, 145:13,
146:6, 146:24,
148:6, 149:23,
151:25, 152:2,
152:3, 152:7,
152:10, 152:12,
152:13, 152:16,
153:17, 155:9,
155:13, 155:15,
156:6, 156:12,
156:13, 156:20,
156:25, 157:11,
157:13, 157:14,
158:5, 159:23,
160:24, 161:11,
161:17, 162:17,
163:6, 163:20,
164:11, 164:24,
166:18, 166:20,
168:2, 168:5, 170:2,
170:5, 170:7,
170:21, 171:18,
171:22, 172:4,
174:8, 175:16,
177:22, 177:24,
178:3, 178:16,
178:20, 178:23,
179:4, 179:6, 179:9,
179:11, 179:13,
180:18, 181:22,
187:24, 188:5,
189:5, 189:9,
189:11, 189:20,
189:22, 189:24,
190:6, 190:9,
190:17, 190:20,
191:16, 192:10,
192:18, 193:6,
194:23, 194:25,
195:10, 195:15,
195:16, 196:25,
197:24, 199:2,
199:6, 199:10,
199:15, 200:4,
200:5, 200:6, 200:7,
200:10, 200:14,
201:3, 201:12,
202:22, 203:3,
203:7, 203:8, 203:9,
203:11, 203:13,
204:19, 205:18,
206:1, 206:15,
207:7, 207:9,
208:19, 208:24,
209:11, 209:12,
209:16, 209:18,
209:24, 212:24,
214:3, 214:12,
214:18, 214:19,

215:10, 215:16,
216:10, 216:14,
216:18, 216:23,
218:9, 219:11,
220:6, 220:8,
220:22, 221:15,
223:2, 223:16,
224:24, 225:2,
225:24, 226:23,
228:16, 228:19,
229:2, 229:22,
230:7, 230:23,
230:25, 231:5,
232:3, 232:15,
232:17, 232:21,
232:23, 234:6,
234:13, 234:17,
234:21, 235:2,
236:10, 236:22,
236:25, 237:5,
238:15, 238:19,
239:5, 240:15,
242:11, 242:24,
243:5, 244:12,
244:16, 244:17,
244:23, 245:3,
246:18, 246:19,
247:17, 248:4,
248:5, 248:6, 248:7,
248:9, 250:2,
251:21, 252:1,
252:2, 252:3,
252:14, 252:15,
252:20

**HAVEN** [2] - 47:17,
49:16
**HAVEN'T** [1] - 34:12
**HAVING** [13] - 12:7,
72:13, 72:16,
100:25, 103:19,
111:21, 117:14,
155:22, 190:8,
203:15, 246:23,
247:1, 252:22
**HE** [12] - 18:18, 31:8,
31:9, 31:10, 85:2,
85:4, 85:7, 85:8,
139:8, 242:9, 247:6,
247:7
**HEAD** [3] - 136:1,
143:10
**HEADER** [1] - 187:17
**HEADING** [1] - 42:4
**HEALTH** [106] - 3:4,
10:9, 12:11, 12:13,
13:3, 15:1, 16:8,
17:21, 22:6, 22:12,
23:21, 42:24, 43:25,
52:15, 52:19, 52:20,
52:21, 53:9, 53:12,

53:21, 53:22, 58:18,
58:21, 58:24, 59:8,
60:16, 61:6, 62:6,
62:20, 63:6, 64:12,
67:2, 71:17, 71:20,
72:7, 77:25, 78:12,
79:2, 79:13, 79:19,
79:25, 82:4, 86:3,
87:3, 87:11, 90:4,
94:1, 96:6, 99:1,
101:16, 102:8,
102:22, 103:5,
103:15, 110:19,
118:25, 120:14,
121:1, 121:18,
123:16, 138:21,
138:23, 140:22,
151:19, 154:6,
166:5, 167:21,
169:8, 169:11,
169:20, 170:17,
170:20, 173:24,
178:3, 178:16,
178:17, 179:21,
179:24, 182:13,
190:13, 195:23,
195:24, 199:20,
202:21, 205:3,
205:7, 205:9, 206:1,
207:21, 209:8,
217:13, 219:18,
220:1, 220:9,
220:13, 221:8,
221:9, 223:20,
223:25, 224:2,
224:8, 234:4, 249:4,
249:24
**HEALTHCARE** [16] -
24:25, 57:15, 58:23,
59:2, 59:5, 59:7,
61:4, 63:8, 77:22,
96:12, 167:4,
167:21, 169:11,
220:16, 220:21
**HEALTHCARE .GOV**
[1] - 219:20
**HEALTHY** [1] - 193:1
**HEALY** [22] - 2:17,
4:25, 5:1, 157:16,
204:7, 204:9,
204:10, 204:12,
204:17, 204:22,
205:2, 205:22,
206:10, 206:25,
207:4, 207:8,
207:19, 208:19,
208:22, 209:14,
210:2
**HEAR** [7] - 14:23,
22:22, 25:24, 34:15,

158:22, 164:25,
182:7
**HEARD** [14] - 24:2,
203:3, 203:7,
221:15, 224:16,
230:7, 236:14,
239:12, 239:13,
242:10, 244:12,
244:16, 252:2, 252:3
**HEARING** [10] - 1:14,
3:8, 3:20, 159:13,
251:15, 252:1,
252:2, 252:19,
252:20, 253:1
**HEARSAY** [3] - 85:11,
85:12, 203:18
**HEART** [2] - 128:3,
128:4
**HEAVIER** [1] - 124:4
**HEAVILY** [1] - 160:24
**HEAVY** [2] - 123:12,
135:25
**HELD** [16] - 29:2, 29:4,
29:19, 29:25, 30:8,
32:3, 37:21, 38:6,
48:4, 212:11,
212:14, 215:20,
225:21, 232:18,
242:22, 247:24
**HELLO** [1] - 143:2
**HELP** [12] - 28:21,
117:19, 129:4,
129:19, 129:23,
129:25, 153:7,
170:18, 179:17,
180:22, 181:9,
182:24
**HELPED** [3] - 125:24,
171:6, 189:22
**HELPFUL** [2] - 144:1,
177:10
**HELPING** [2] - 22:21,
177:10
**HELPS** [3] - 129:6,
129:16, 129:22
**HER** [43] - 22:8, 22:20,
22:23, 23:1, 23:17,
55:14, 64:17, 65:7,
65:8, 66:11, 71:22,
72:11, 80:20, 80:25,
81:1, 119:4, 120:12,
120:17, 120:25,
123:17, 123:19,
127:13, 127:16,
127:17, 139:1,
140:14, 141:9,
141:12, 150:21,
162:17, 172:6,
173:1, 173:19,
173:21, 173:23,

173:24, 174:7,
174:10, 184:15,
240:4, 240:16, 247:5
**HERE** [103] - 3:2, 4:12,
5:23, 6:13, 6:14,
8:16, 9:8, 14:3,
15:25, 17:8, 17:24,
18:25, 20:14, 20:18,
20:25, 21:2, 21:9,
21:13, 21:15, 21:17,
27:20, 32:8, 35:19,
35:23, 38:14, 38:23,
39:16, 39:18, 39:20,
39:22, 39:24, 40:1,
40:5, 40:9, 41:3,
42:11, 42:19, 45:9,
45:20, 45:21, 46:11,
46:23, 48:11, 48:24,
49:8, 49:17, 49:18,
50:8, 50:9, 50:19,
50:21, 54:10, 95:9,
106:3, 106:20,
109:23, 110:5,
115:23, 147:7,
158:23, 159:16,
160:11, 160:16,
161:1, 161:2,
161:11, 164:22,
164:23, 167:9,
187:14, 195:12,
196:7, 196:10,
198:23, 200:1,
204:20, 204:21,
207:12, 212:24,
215:2, 215:7,
215:24, 217:22,
218:22, 220:11,
224:4, 224:21,
225:2, 226:15,
227:7, 228:21,
229:19, 232:14,
233:14, 234:17,
237:21, 238:8,
238:21, 243:18,
244:20, 249:23,
251:12
**HERSELF** [3] - 86:10,
184:12, 184:13
**HERSHEY** [9] - 23:15,
166:1, 166:2, 170:7,
171:15, 171:17,
178:4, 179:14
**HHS** [8] - 39:23,
218:9, 227:25,
228:19, 229:2,
229:5, 232:7, 249:8
**HIGH** [2] - 70:21,
89:11
**HIGHER** [5] - 96:20,
103:21, 154:2,

Exhibit 137                                                                                          JA-0001882

154:6, 205:13
**HIGHEST** [2] - 175:4, 176:5
**HIGHLIGHT** [1] - 165:24
**HIGHLIGHTED** [1] - 207:12
**HIGHLY** [3] - 79:1, 81:12, 164:10
**HIGHMARK** [1] - 182:9
**HIM** [2] - 213:9, 242:10
**HIP** [1] - 127:24
**HIS** [8] - 30:12, 30:13, 85:3, 85:4, 86:21, 139:8, 219:23, 226:8
**HISTORICALLY** [1] - 92:12
**HISTORY** [1] - 43:11
**HIT** [1] - 48:3
**HOBBY** [11] - 26:8, 43:17, 46 16, 51:6, 198:6, 211:9, 217:19, 217:21, 219:2, 226:3, 226:9
**HOLD** [5] - 96:25, 97:3, 142 12, 162:16, 215:19
**HOLDERS** [1] - 52:23
**HOLDING** [2] - 41:23, 225:16
**HOME** [7] - 30:9, 31:4, 31:10, 31:11, 31:12, 33:13, 252:23
**HOMEBUILDERS** [1] - 241:18
**HONOR** [231] - 4:1, 4:5, 4:8, 4:13, 4:16, 4:19, 4:22, 4:25, 5:3, 5:7, 5:9, 5:22, 6:2, 8:9, 8:17, 8 24, 9:8, 9:9, 9:15, 9 17, 9:23, 13:4, 15:24, 16:1, 16:3, 16:20, 20:3, 20:21, 21:20, 21:21, 21:24, 22 14, 22:16, 23:24, 24 9, 24:13, 24:15, 24 22, 25:12, 25:17, 25:19, 25:21, 25:24, 26:20, 27:1, 27:9, 27:19, 28:5, 28:23 29 6, 29:13, 30:20, 31:13, 31:17, 32:15, 32:24, 33:3, 33:15, 33:23, 34:10, 34:11, 34:20, 35:1, 35:12, 36:16, 37:14, 37:25, 38:13, 38:14, 38:24, 39:12, 40:14, 40:20, 40:25, 41:8,

41:24, 42:16, 42:19, 44:20, 45:2, 45:21, 46:2, 46:7, 46:15, 46:25, 48:19, 49:4, 49:23, 50:14, 50:18, 51:22, 53:1, 53:13, 54:4, 54:7, 54:15, 55:9, 55:21, 55:24, 55:25, 56:25, 57:4, 57:19, 57:24, 58:2, 64:15, 64:22, 65:4, 65:10, 65:16, 65:25, 66:6, 85:10, 86:8, 88:2, 90:14, 97:8, 97:11, 97:14, 97:15, 97:17, 103:10, 104:25, 105:5, 108:19, 109:2, 112:18, 112:21, 112:25, 113:10, 116:19, 116:25, 119:3, 120:11, 120:16, 120:20, 121:8, 121:10, 136:8, 138:25, 139:11, 139:14, 140:13, 141:8, 142:15, 142:21, 147:16, 148:3, 148:11, 150:1, 151:20, 151:21, 152:18, 152:21, 156:24, 158:1, 158:3, 158:6, 158:25, 160:19, 161:15, 162:7, 162:11, 162:14, 163:2, 163:13, 164:9, 165:2, 172:11, 172:16, 173:4, 181:21, 184:8, 190:24, 192:2, 193:8, 203:21, 203:25, 204:2, 204:8, 204:12, 204:18, 205:23, 209:15, 210:3, 210:7, 210:18, 210:21, 212:8, 218:17, 218:21, 224:11, 232:1, 234:11, 235:14, 235:18, 235:19, 235:21, 236:5, 236:14, 236:24, 238:2, 238:15, 238:16, 238:22, 239:12, 239:25, 240:17, 240:20, 240:24, 241:15, 241:24,

242:18, 242:21, 243:21, 244:2, 244:19, 245:7, 245:10, 245:18, 245:22, 246:4, 246:17, 246:21, 249:17, 250:11, 252:9, 252:10, 252:11, 252:25
**HONOR'S** [7] - 6 6, 30:23, 45:10, 51:14, 212:11, 214:10, 245:23
**HONORABLE** [1] - 1:11
**HONORS** [1] - 167:2
**HOPE** [8] - 24:15, 171:17, 212:22, 214:9, 215:3, 215:7, 248:16, 248:18
**HOPEFULLY** [1] - 215:8
**HOPING** [1] - 74:25
**HOPKINS** [7] - 57:9, 58:9, 58:12, 58:21, 59:10, 59:16, 60:4
**HORMONAL** [14] - 77:1, 103:18, 104:11, 107:5, 107:21, 108:4, 108:6, 108:9, 108:10, 108:14, 128:20, 128:23, 129:4, 175:5
**HORMONES** [3] - 115:21, 126:11, 127:17
**HORSE** [1] - 236:2
**HOSPITAL** [5] - 12:17, 116:16, 117:3, 121:25, 167:9
**HOSPITALIZED** [1] - 124:12
**HOT** [1] - 127:19
**HOUR** [6] - 5:12, 157:12, 210:5, 210:7, 210:9
**HOURS** [7] - 118:11, 118:12, 118:14, 118:17, 119:9, 119:11, 119:19
**HOUSEKEEPING** [1] - 165:5
**HOUSES** [3] - 43:15, 197:12, 197:15
**HOW** [87] - 3:11, 5:14, 18:11, 18:12, 22:22, 22:25, 23:4, 28:10, 28:11, 28:12, 28:15, 30:16, 46:18, 49:24,

59:2, 62:16, 67:19, 69:20, 70:25, 73:24, 79:8, 83:21, 91:10, 92:22, 97:22, 99:3, 106:21, 110 7, 110:14, 112:5, 115:21, 116:3, 118:10, 118:14, 119:9, 122:5, 123:24, 124:17, 125:2, 125:17, 126:15, 126:21, 128:13, 132:9, 133:25, 135:8, 135:12, 136:18, 144:7, 150:2, 159:15, 160:13, 160:15, 166:2, 168:1, 169:16, 170:2, 171:22, 172:3, 174:12, 193:14, 196:25, 197:18, 197:20, 198:3, 198:7, 212:13, 214:16, 214:20, 221 16, 223:5, 228:17, 228:18, 228:23, 228:24, 229:6, 229:8, 229:23, 231:15, 233:11, 238:20, 244 3, 251:4
**HOWEVER** [9] - 13:4, 16:21, 181:10, 182:25, 187:22, 208:24, 209 3, 209:4, 209:18
**HR** [1] - 250:4
**HRSA** [21] - 22:6, 42:25, 44:5, 87:7, 220:14, 220:22, 221:14, 221:18, 222:2, 222:4, 222:5, 222:12, 223:1, 223:2, 223:10, 224:3, 243:8, 243:15, 250:4, 250:6, 250:8
**HRSA'S** [1] - 243:10
**HUDMAN** [1] - 83:12
**HUDSON** [2] - 36:9, 36:17
**HUH** [1] - 86:23
**HUMAN** [6] - 3:4, 12:14, 67 2, 78:12, 87:3, 87:11
**HUNDRED** [1] - 77:3, 126:24, 127:1
**HYPERLINK** [1] - 158:8

**HYPOTHESIS** [1] - 189:3
**HYPOTHESIZED** [1] - 247:6
**HYPOTHETICAL** [4] - 30:24, 31:14, 31:16, 32 20
**HYSTERECTOMY** [1] - 188:10

---

**I**

**I'D** [6] - 87:17, 114:8, 211:21, 236:7, 239:24, 243:4
**I'LL** [2] - 29:10, 52:4
**I'M** [93] - 3:21, 4:6, 4:13, 4:17, 4:20, 4:23, 5:1, 5:4, 5:16, 5:23, 23:9, 24:5, 28 9, 31:2, 34:8, 34:10, 37:19, 37:21, 49:21, 50:16, 51:23, 53 16, 55:5, 57:24, 58 1, 59:13, 65:22, 68:9, 72:25, 74:18, 74:23, 81:7, 89:12, 101:6, 101:10, 101:21, 103:8, 103:10, 104:8, 105:14, 105:17, 116:17, 119:3, 126:5, 129:9, 129:10, 136:23, 139:14, 143:25, 144:15, 145:8, 148:1, 148:10, 153:11, 157:18, 159:9, 161:16, 161:17, 165:23, 166:3, 166 4, 166:5, 169:7, 169:9, 170:9, 170:15, 178:16, 178:18, 181:21, 184:8, 186 7, 193:13, 193:19, 194:5, 194 9, 198:2, 198:9, 199:4, 199:8, 199:12, 203:3, 207:8, 210:18, 225:16, 227:8, 237:12, 245:22, 252:11, 252:20
**I'VE** [2] - 63:2, 93:14
**IDEA** [8] - 168:1, 196:25, 223:14, 225:18, 226:11, 228:13, 239:1, 250:4
**IDENTICAL** [3] - 40 11, 40:14, 41:15

**IDENTIFIABLE** [1] - 236:19
**IDENTIFIED** [3] - 69:17, 111:4, 208:24
**IDENTIFY** [35] - 73:15, 100:4, 100:7, 114:16, 146:7, 146:10, 146:12, 146:18, 146:23, 147:2, 147:5, 147:8, 147:13, 147:18, 147:23, 148:16, 148:24, 149:5, 149:10, 149:14, 165:9, 165:16, 175:23, 184:1, 200:2, 201:2, 201:11, 201:18, 201:24, 209:12, 209:18, 220:12, 221:1, 223:7, 236:22
**IDENTIFYING** [2] - 223:3, 223:16
**IF** [207] - 3:12, 5:10, 5:14, 5:25, 7:4, 8:12, 8:21, 8:22, 8:24, 9:21, 14:11, 15:9, 20:23, 20:24, 21:21, 24:1, 25:14, 25:23, 30:7, 30:23, 31:11, 32:5, 32:15, 32:18, 32:20, 33:8, 33:11, 39:12, 40:7, 40:18, 41:8, 41:24, 42:9, 43:13, 44:25, 45:17, 46:13, 47:20, 47:22, 48:7, 48:9, 48:24, 49:4, 49:14, 49:20, 49:21, 50:14, 50:20, 51:6, 52:3, 53:13, 53:15, 53:17, 55:7, 55:9, 55:14, 56:7, 56:11, 56:14, 56:19, 56:20, 56:25, 57:7, 62:7, 64:15, 67:19, 68:1, 68:6, 68:13, 70:3, 74:19, 75:25, 76:3, 76:5, 76:12, 78:14, 79:12, 79:21, 80:18, 80:22, 80:24, 81:2, 81:9, 82:20, 82:21, 83:22, 84:6, 84:18, 85:20, 86:13, 87:7, 87:8, 87:21, 88:1, 89:13, 92:1, 92:7, 93:12, 93:14, 93:19, 94:24, 95:4, 95:7, 96:15, 97:8, 105:4, 105:8, 107:20, 111:13,

114:7, 114:9, 114:12, 114:18, 114:19, 116:22, 123:18, 123:21, 124:1, 126:15, 127:12, 134:13, 135:2, 137:14, 137:17, 137:20, 137:24, 139:13, 140:17, 141:20, 142:12, 144:1, 146:3, 148:5, 148:8, 150:18, 152:24, 152:25, 153:8, 153:16, 153:18, 154:2, 156:14, 157:3, 158:1, 159:25, 160:6, 165:12, 171:5, 173:17, 173:25, 176:1, 179:15, 179:16, 179:18, 180:5, 180:22, 181:2, 182:23, 184:7, 185:8, 186:8, 186:14, 186:18, 186:19, 186:23, 191:17, 191:19, 192:13, 194:9, 194:11, 195:7, 195:13, 198:1, 203:20, 204:6, 204:19, 204:23, 208:12, 212:24, 213:20, 214:2, 214:9, 214:21, 216:20, 217:5, 217:14, 220:25, 221:4, 226:21, 230:4, 230:10, 232:19, 234:13, 235:21, 236:7, 236:21, 237:7, 240:23, 242:10, 244:14, 245:13, 248:14, 248:17, 249:5
**IFR** [13] - 39:1, 39:18, 39:21, 40:14, 41:1, 42:2, 42:3, 207:6, 217:5, 217:15, 217:16, 217:22, 217:23
**IFR'S** [2] - 217:11, 222:14
**IFRS** [9] - 38:18, 39:15, 40:11, 52:16, 160:23, 208:18, 209:11, 209:21, 217:3
**IGNORE** [1] - 37:12

**ILLEGAL** [1] - 251:9
**ILLEGALITY** [1] - 233:6
**IMAGINE** [2] - 191:8, 191:10
**IMMEDIATE** [3] - 98:19, 98:23, 202:18
**IMMEDIATELY** [4] - 25:8, 216:17, 216:22, 235:2
**IMMUNIZATION** [1] - 69:1
**IMMUNIZATIONS** [1] - 43:4
**IMPACT** [24] - 19:25, 34:17, 36:12, 44:10, 47:21, 47:25, 48:7, 48:9, 89:23, 95:25, 123:14, 123:16, 123:17, 124:6, 138:17, 141:22, 160:16, 170:21, 190:21, 231:17, 235:25, 238:21, 244:15, 245:2
**IMPACTED** [3] - 72:18, 237:14, 237:15
**IMPACTS** [1] - 108:22
**IMPAIRED** [1] - 123:18
**IMPAIRMENT** [1] - 127:19
**IMPENDING** [2] - 238:4, 238:6
**IMPERATIVE** [1] - 30:15
**IMPERIL** [1] - 43:17
**IMPLANT** [7] - 77:1, 91:1, 92:15, 92:18, 174:24, 176:7, 176:12
**IMPLANTED** [5] - 76:25, 77:2, 92:18, 155:13, 174:25
**IMPLANTS** [5] - 76:9, 83:10, 90:8, 94:12, 112:11
**IMPLEMENT** [2] - 250:9, 250:10
**IMPLEMENTATION** [4] - 39:24, 40:3, 40:4, 40:6
**IMPLEMENTED** [3] - 16:24, 218:13, 235:2
**IMPLEMENTING** [1] - 241:12
**IMPLICATES** [1] - 51:8
**IMPLICATION** [1] - 107:7

**IMPLICIT** [2] - 225:7, 243:1
**IMPLICITLY** [1] - 242:25
**IMPLIES** [1] - 221:18
**IMPORTANT** [22] - 24:25, 51:9, 74:13, 107:8, 172:9, 174:2, 174:10, 174:18, 177:10, 177:18, 177:19, 178:1, 210:23, 218:19, 218:20, 224:22, 224:23, 227:11, 230:17, 235:2, 237:21, 248:13
**IMPOSE** [7] - 3:20, 14:5, 30:12, 221:10, 223:21, 231:17, 250:2
**IMPOSED** [1] - 231:8
**IMPOSES** [4] - 43:18, 46:17, 50:24, 232:24
**IMPOSSIBLE** [2] - 34:8, 147:19
**IMPRESSION** [1] - 26:16
**IMPROPER** [1] - 172:22
**IMPROPERLY** [1] - 240:4
**IMPROVE** [2] - 86:3, 224:8
**IMPROVED** [1] - 70:22
**IMPROVEMENT** [1] - 106:16
**IN** [831] - 1:1, 3:2, 3:10, 3:19, 3:22, 4:3, 5:11, 5:17, 5:19, 6:3, 6:5, 6:25, 7:1, 7:3, 7:6, 7:15, 7:17, 7:18, 7:22, 8:4, 9:17, 9:19, 9:22, 9:25, 10:2, 10:5, 10:9, 10:12, 10:15, 10:21, 11:2, 11:5, 11:13, 11:19, 11:24, 12:19, 12:21, 12:25, 13:17, 14:3, 14:15, 14:23, 14:25, 15:2, 15:12, 15:16, 15:20, 16:8, 16:9, 16:17, 16:23, 17:9, 17:10, 17:12, 17:15, 17:18, 17:19, 17:21, 17:22, 17:23, 18:3, 18:9, 18:14, 18:15, 18:22, 19:2, 19:5, 19:11, 19:13, 19:19, 20:1, 20:8, 20:17, 21:7, 21:14, 21:20,

22:2, 22:6, 22:8, 22:10, 22:11, 22:13, 22:16, 22:24, 23:15, 23:19, 23:23, 24:13, 24:17, 25:7, 25:8, 25:24, 26:6, 26:7, 26:8, 26:9, 26:14, 26:22, 26:25, 27:9, 27:10, 27:20, 27:21, 27:24, 28:2, 28:8, 28:14, 28:17, 28:22, 29:2, 29:17, 30:11, 30:12, 30:14, 30:17, 31:19, 31:24, 32:6, 32:8, 33:15, 35:5, 35:9, 35:16, 35:20, 35:22, 36:3, 36:4, 36:12, 36:14, 37:9, 37:15, 38:16, 39:15, 39:17, 40:1, 40:3, 40:8, 40:10, 40:17, 41:1, 41:10, 41:11, 41:13, 41:17, 41:23, 42:2, 42:6, 42:8, 42:16, 42:25, 43:5, 43:10, 44:6, 44:8, 44:24, 45:7, 45:11, 45:15, 45:16, 45:23, 46:18, 46:19, 47:15, 47:16, 48:3, 48:5, 48:8, 49:7, 49:8, 49:12, 49:13, 49:18, 49:25, 50:1, 50:3, 50:8, 50:9, 50:24, 51:5, 51:19, 52:6, 52:16, 53:4, 53:5, 53:10, 53:20, 53:23, 54:9, 54:10, 57:7, 57:13, 58:14, 58:18, 58:19, 58:20, 59:6, 59:19, 60:12, 60:17, 60:24, 61:5, 61:6, 61:10, 61:15, 61:21, 62:4, 62:5, 62:18, 62:24, 63:4, 63:6, 63:11, 63:21, 64:2, 64:7, 64:12, 64:18, 65:7, 65:8, 65:13, 66:7, 66:11, 66:12, 67:4, 67:14, 67:15, 68:1, 68:4, 68:20, 68:23, 69:8, 69:9, 69:12, 69:18, 69:21, 69:22, 70:4, 70:12, 70:18, 70:19, 70:20, 71:2, 71:6, 71:15, 71:25, 72:3, 72:7, 72:20, 73:7, 73:14, 74:13, 74:14, 75:13, 75:15, 75:17, 75:22, 76:1, 76:10, 76:17,

77:7, 78:20, 79:12, 81:13, 81:14, 81:16, 81:19, 81.24, 82:1, 82:2, 83:5, 83.12, 84:4, 85:6, 86:1, 86:3, 86:6, 86:13, 87:18, 87:23, 88:1, 88:6, 88:10, 88:12, 88:15, 88.23, 89:11, 89.18, 89 24, 90:4, 90:5, 91:19, 92:5, 92:25, 93 2, 93:11, 93:13, 93:20, 93:21, 93:23, 94 3, 94:12, 94:19, 96 2, 96:6, 96:12, 96 13, 96:22, 97:5, 97:25, 98:4, 98:7, 99:16, 99:19, 100:3, 100:4, 100:7, 100:18, 100:23, 100:24, 101:19, 102:3, 102:7, 102:16, 102:23, 103:1, 103:3, 103:4, 103:5, 103:9, 103:10, 103:14, 103:25, 105:9, 105:10, 105:11, 106:14, 106:16, 106:18, 106:20, 106:24, 107:1, 107:6, 107:8, 107:11, 107:16, 107:18, 107:22, 107:23, 108:11, 108:17, 109:5, 109:16, 109:21, 110:8, 110:10, 110:19, 111:6, 111:13, 111:16, 111:19, 112:11, 112:25, 113:4, 114:4, 114:6, 114:19, 115:2, 115:6, 115:8, 115:13, 115:22, 115:25, 116:2, 116:6, 116:7, 116:19, 117:15, 117:19, 117:22, 118:6, 118:7, 119:5, 120:13, 120:20, 120:25, 121:18, 122:10, 122:11, 122:20, 123:13, 123:18, 123:24, 124:3, 124:4, 124:11, 124:17, 124:18, 125:7, 125:17, 126:9, 127:1, 127:2, 127:9,

127:12, 128:7, 128:12, 129:7, 129:9, 129:16, 129:19, 129:23, 130:2, 130 8, 130:23, 131:8, 131:11, 131:17, 132:14, 132:20, 133:6, 133.12, 133:18, 133:22, 135:3, 135.24, 136:15, 136:16, 136:23, 136:25, 137:25, 138:4, 138:11, 138:20, 138:23, 140:11, 140:22, 140:25, 141:1, 141:7, 141:11, 141:21, 141:24, 142:3, 142:4, 142:5, 142:9, 143:3, 143:11, 143:19, 145:17, 145:19, 145:21, 145:24, 146:7, 146:12, 146:18, 146:22, 146:24, 147:8, 147:11, 147:13, 147:22, 147:24, 148:5, 148:8, 148:16, 148:24, 148:25, 149:5, 149:6, 149:10, 149:11, 149:14, 149:15, 149:19, 151:8, 151:13, 152:1, 153:6, 153:25, 154:7, 154:14, 154:16, 155:3, 155:4, 155:7, 155:8, 155:9, 155:14, 156:2, 156:12, 156:17, 156:22, 158:7, 159:12, 159:18, 160:1, 160:2, 160:3, 160:7, 160:23, 160:25, 161:1, 161:2, 161:8, 161:20, 161:25, 162:4, 162:5, 162:25, 164:3, 164:16, 165:7, 167:2, 167:3, 167:9, 167:10, 167:14, 167:20, 168:11, 168:15, 168:24, 169:5, 169:18, 170:3, 170:12, 170:17, 170:20, 171:8, 171:10,

171:17, 172:12, 172:25, 173:3, 173:10, 173:20, 173 22, 174:6, 175:9, 175:12, 175:13, 175:17, 176:3, 176:18, 176:21, 177:7, 177:10, 177:20, 178:4, 178:7, 178:19, 178:22, 179:13, 179:19, 180:7, 180:11, 180:13, 180:20, 181:9, 181:13, 181:19, 181:24, 182:11, 182:12, 182:15, 182:16, 183:7, 183:10, 183:16, 183:20, 183:23, 184:13, 184:15, 184:23, 185:1, 185:16, 185:23, 186:1, 186:7, 186:11, 186:22, 187:3, 187:5, 187:9, 187:20, 187:22, 188:22, 189:1, 189:4, 189:9, 189:13, 189:16, 189:17, 189:18, 190:2, 190:18, 190:23, 191:17, 191:23, 191:24, 192:7, 192:12, 192:13, 192:14, 192:15, 192:19, 192:23, 193:4, 193:16, 193:23, 194:15, 194:16, 194 17, 194:23, 195:2, 195:3, 195:7, 195:10, 195:13, 195:17, 195:19, 195:22, 195:24, 196:1, 196:2, 196:4, 197:1, 197:9, 197:19, 198:4, 198:10, 198:20, 199:1, 199:5, 199:9, 199:13, 199:14, 200:1, 200:19, 200:21, 201:6, 201:14, 201:22, 202:2, 202:9, 202:16, 202:18, 203:3, 203:9, 204:25, 205:5, 205:7, 205:15, 205:17, 205:21,

206:5, 206:6, 206:14, 206:17, 206:22, 207:16, 207:22, 207:25, 208:2, 208:16, 208:23, 209:1, 209:2, 209:5, 209:21, 210:25, 211:1, 211:3, 211:11, 211:13, 211:18, 214 1, 214:6, 214:17, 214:19, 214:21, 215:17, 215:22, 216:10, 216:19, 216:24, 216 25, 217:4, 217:12, 218:8, 218:16, 218:19, 218:20, 219:2, 219:15, 219:17, 219:25, 220:9, 220:17, 220:19, 220:23, 221:2, 221:13, 221:14, 222:2, 222:24, 223 3, 223:6, 223:19, 224:1, 224:3, 224:6, 224:7, 224:12, 225:9, 225:17, 225:19, 226:2, 226:3, 226:9, 226:20, 227:2, 227:13, 227:22, 228:5, 228:8, 228:16, 228:21, 228:23, 229 4, 229:8, 229:19, 229:20, 229:23, 229:24, 229:25, 230:2, 230:21, 231:3, 231:4, 231:14, 231:15, 232:1, 232:3, 232:8, 232:21, 233:7, 233:14, 233:16, 234:3, 234:6, 235:4, 235:7, 235:9, 237:3, 237:4, 237:10, 237:18, 238:5, 238:10, 238:16, 238:22, 239:3, 239:14, 240:2, 240:10, 240:13, 240:14, 240:25, 241:9, 242:11, 242:12, 242:18, 242:21, 243 8, 243:13, 243:14, 245:3, 245:13, 245:17, 246:8,

246:9, 246:15, 247:1, 247 7, 247:9, 247:11, 247:23, 247:25, 248:1, 248:10, 249:4, 249:16, 249:19, 249:20, 249:21, 250:12, 250:20, 250:24, 251:19, 251:24, 252:4, 252:17, 252:21, 253:4

**INACCURACIES** [1] - 114:19

**INACTION** [5] - 16:14, 16:15, 19:11, 233:16, 234:1

**INAFFORDABILITY** [1] - 133 14

**INC** [1] - 164:16

**INCLINED** [1] - 21:22

**INCLUDE** [18] - 10:1, 46:12, 57:15, 58:22, 68 24, 122:14, 122:17, 122:20, 123:11, 127:21, 128:12, 130:21, 168:10, 174:24, 191:10, 209:2, 229:18, 250:5

**INCLUDED** [7] - 67:14, 95:5, 167:13, 185:1, 187.22, 193:24, 232:3

**INCLUDES** [5] - 22:20, 63:9, 118:18, 175:6, 207 22

**INCLUDING** [14] - 36 5, 64:19, 65:14, 75 9, 77:25, 96:3, 97:6, 112:2, 117:17, 170:11, 172:13, 183:13, 228:5, 251:17

**INCOME** [3] - 14 8, 72:21, 80:13

**INCONCEIVABLE** [1] - 242:24

**INCONSISTENT** [2] - 43 23, 233:3

**INCONSISTENTLY** [2] - 73:8, 80:23

**INCORPORATE** [1] - 128:20

**INCORPORATED** [1] - 243:16

**INCORPORATES** [1] - 139:5

**INCREASE** [17] - 7:15, 43:21, 52:19, 81:1,

91:24, 94:12, 96:22,
107:1, 112:11,
130:2, 142:1, 142:8,
155:8, 155:10,
156:2, 156:15,
220:20
**INCREASED** [10] -
71:7, 102:17,
102:19, 106:16,
127:22, 127:23,
155:13, 156:21,
208:2, 239:14
**INCREASES** [3] -
82:22, 128:6, 196:2
**INCREASING** [2] -
71:2, 220:15
**INCREDIBLY** [5] -
6:21, 124:5, 137:17,
156:7, 212:9
**INCUR** [1] - 205:13
**INDEPENDENT** [2] -
39:3, 250:9
**INDEX** [1] - 254:1
**INDIANA** [1] - 207:17
**INDICATE** [1] - 187:6
**INDICATED** [4] -
16:17, 92:21, 103:5,
103:18
**INDICATES** [1] -
252:19
**INDICATION** [8] -
41:3, 91:4, 188:6,
214:11, 225:6,
227:6, 228:9, 243:22
**INDICATIONS** [1] -
128:19
**INDIVIDUAL** [12] -
122:8, 122:9,
122:13, 132:14,
145:17, 146:11,
146:21, 155:4,
190:13, 221:9,
236:15, 236:20
**INDIVIDUALIZE** [1] -
132:18
**INDIVIDUALLY** [1] -
148:11
**INDIVIDUALS** [4] -
26:25, 199:5,
200:19, 229:9
**INDULGE** [1] - 235:21
**INDULGENCE** [3] -
5:25, 136:7, 160:18
**INDUSTRY** [1] - 208:9
**INFERENCE** [1] -
232:17
**INFERTILITY** [13] -
22:20, 114:5,
115:14, 116:8,
117:14, 118:8,

192:11
**INSOFAR** [1] - 138:10
**INSTANCE** [2] -
127:13, 129:8
**INSTANCES** [1] -
53:20
**INSTANTANEOUS** [1]
- 192:15
**INSTANTIATED** [1] -
28:13
**INSTEAD** [12] - 11:11,
11:16, 35:10, 39:1,
42:3, 44:2, 48:2,
50:1, 50:3, 190:8,
238:9, 252:22
**INSTITUTE** [24] - 22:4,
64:10, 66:4, 66:17,
66:19, 89:7, 102:2,
106:12, 107:13,
109:5, 109:13,
110:13, 110:16,
110:17, 110:18,
111:5, 111:12,
112:6, 154:4, 154:9,
160:22, 169:23,
171:3, 180:11
**INSTITUTE'S** [1] -
44:6
**INSTITUTES** [6] -
102:22, 103:5,
103:15, 118:24,
118:25, 169:20
**INSTITUTIONS** [5] -
169:25, 170:1,
199:21, 200:6, 211:6
**INSTRUCTED** [1] -
82:10
**INSTRUCTIVE** [1] -
16:22
**INSURANCE** [36] -
7:8, 12:24, 13:6,
30:11, 52:19, 52:22,
90:4, 100:12, 144:4,
145:25, 150:8,
150:14, 151:16,
152:11, 178:3,
178:17, 179:11,
179:19, 182:10,
182:14, 198:14,
199:20, 200:23,
205:4, 205:9,
205:14, 208:13,
212:2, 218:7,
218:11, 220:2,
220:9, 221:8, 221:9,
223:7
**INSURED** [15] - 90:3,
93:2, 94:1, 94:13,
153:19, 166:15,
178:4, 178:15,

179:8, 180:16,
180:17, 182:12,
190:22, 190:23,
230:24
**INSURER** [1] - 7:2
**INSURERS** [2] - 95:1,
229:3
**INTEGRATE** [1] -
129:4
**INTEGRATION** [1] -
63:6
**INTEND** [4] - 87:24,
150:16, 162:25,
163:19
**INTENDED** [5] - 12:8,
43:11, 150:12,
150:15, 224:8
**INTENDING** [1] -
173:17
**INTENTIONAL** [1] -
48:5
**INTERDISCIPLINAR
Y** [2] - 59:1, 170:17
**INTEREST** [28] - 16:8,
17:21, 19:4, 19:13,
19:19, 19:22, 20:17,
20:18, 35:16, 35:21,
47:5, 51:11, 51:13,
51:17, 51:18, 52:5,
116:20, 167:20,
224:22, 226:1,
226:4, 226:5, 226:7,
227:2, 227:4, 234:3,
251:11
**INTERESTED** [3] -
57:13, 176:11,
182:11
**INTERESTING** [3] -
160:9, 183:21,
216:18
**INTERESTINGLY** [1] -
174:14
**INTERFERE** [1] - 40:6
**INTERIM** [9] - 3:19,
38:17, 39:7, 39:10,
39:23, 216:5,
217:23, 237:21,
238:11
**INTERNAL** [8] - 166:4,
167:8, 167:11,
167:12, 170:10,
171:16, 171:19,
184:22
**INTERNALLY** [1] -
252:16
**INTERNIST** [1] - 166:3
**INTERPRET** [1] -
220:23
**INTERPRETATION**
[14] - 45:17, 51:19,

52:9, 71:9, 218:23,
218:24, 219:4,
221:3, 221:4, 222:1,
241:13, 242:19,
249:19, 249:22
**INTERPRETATIONS**
[1] - 47:6
**INTERPRETING** [3] -
45:11, 221:2, 221:16
**INTERVAL** [1] - 134:9
**INTERVENE** [1] -
27:10
**INTERVENTION** [4] -
182:20, 183:3,
183:5, 188:24
**INTERVENTIONS** [4] -
62:7, 171:5, 180:22,
181:8
**INTO** [67] - 7:10, 22:9,
23:18, 41:19, 46:3,
51:10, 55:11, 56:4,
63:6, 70:14, 71:1,
71:20, 72:1, 73:16,
82:15, 85:14, 87:21,
88:11, 89:18, 94:7,
94:11, 95:1, 99:9,
107:10, 107:17,
108:11, 112:14,
112:15, 114:8,
129:5, 134:17,
136:13, 137:3,
137:17, 137:20,
139:2, 144:21,
144:24, 145:7,
145:10, 145:15,
152:24, 153:5,
155:9, 156:4,
158:11, 161:10,
166:21, 173:14,
174:12, 180:19,
182:18, 185:16,
185:25, 188:23,
192:14, 197:7,
204:17, 207:6,
218:17, 220:25,
223:17, 227:9,
232:1, 246:10,
247:13, 249:24
**INTRAMURAL** [1] -
119:1
**INTRAUTERINE** [7] -
76:10, 76:13, 90:17,
92:7, 130:22,
135:23, 175:1
**INTRODUCTIONS** [1]
- 3:24
**INVESTIGATE** [3] -
32:10, 73:17, 240:9
**INVESTIGATED** [2] -
89:20, 89:23

122:11, 128:8,
128:15, 129:3,
129:12, 129:15,
129:19
**INFLUENTIAL** [1] -
156:7
**INFORMATION** [11] -
47:10, 82:15, 82:18,
111:22, 154:5,
154:8, 163:5,
182:23, 195:1,
205:24, 237:16
**INFORMED** [1] - 12:10
**INHERENT** [3] - 44:24,
78:20, 247:11
**INITIAL** [1] - 11:20
**INITIATE** [1] - 19:12
**INITIATING** [1] -
129:22
**INJECTABLE** [1] -
175:8
**INJUNCTION** [41] -
1:14, 3:9, 7:24, 8:4,
9:14, 9:18, 21:21,
24:14, 27:10, 33:24,
65:5, 99:4, 99:15,
99:19, 99:20, 99:23,
144:8, 144:14,
144:15, 144:17,
146:5, 159:13,
160:17, 202:17,
212:19, 213:24,
214:5, 214:8,
214:18, 215:10,
227:12, 230:17,
235:13, 236:19,
245:2, 248:15,
249:6, 251:12,
251:17, 251:18,
251:20
**INJUNCTIONS** [9] -
26:5, 27:5, 99:12,
144:11, 197:24,
216:20, 239:7,
244:22
**INJURIES** [1] - 20:8
**INJURY** [16] - 16:12,
17:9, 17:10, 18:23,
18:24, 20:5, 20:15,
35:16, 35:17,
227:12, 233:6,
233:10, 235:13,
237:1, 237:2, 244:3
**INKLING** [1] - 244:16
**INNER** [1] - 174:25
**INQUIRY** [1] - 19:25
**INSERTED** [3] -
134:24, 155:9
**INSERTION** [3] -
134:7, 134:22,

Exhibit 137                                                                                    JA-0001886

INVESTIGATES [1] - 115:21

INVESTIGATING [1] - 247:2

INVESTIGATION [4] - 61:20, 73:16, 153:5, 153:7

INVESTIGATIONS [5] - 61:16, 61:17, 62:12, 62:17, 169:17

INVESTIGATOR [7] - 61:21, 61:24, 61:25, 62:1, 169:13, 169:14, 170:3

INVESTIGATORS [1] - 170:19

INVITATIONS [1] - 182:13

INVITE [1] - 104:21

INVITED [1] - 182:15

INVOKE [1] - 41:7

INVOKED [2] - 40:15, 199:2

INVOLVE [2] - 47:6, 50:2

INVOLVED [9] - 59:4, 62:17, 63:11, 67:19, 93:21, 170:2, 170:21, 198:6, 240:22

INVOLVES [3] - 62:4, 62:5, 153:6

INVOLVING [16] - 16:14, 17:6, 17:7, 20:12, 67:8, 71:5, 73:25, 85:17, 93:22, 96:12, 101:24, 107:21, 219:17, 219:25, 233:16

IOM [8] - 98:2, 101:1, 102:11, 102:16, 104:14, 104:15, 104:18, 104:21

IRONCLAD [2] - 239:1, 239:8

IRREGULAR [1] - 123:13

IRREPARABLE [6] - 202:18, 227:12, 237:1, 244:3, 251:9

IRREVERSIBLE [2] - 98:19, 98:24

IRS [3] - 31:18, 220:8, 240:9

IS [881] - 3:7, 3:19, 3:20, 4:1, 4:6, 4:9, 4:11, 4:20, 5:1, 5:4, 5:14, 5:19, 5:23, 6:16, 6:20, 8:10, 8:19, 9:17, 10:1,

10:2, 10:5, 10:8, 10:13, 10:21, 10:25, 11:8, 12:8, 13:3, 14:2, 15:2, 15:6, 15:7, 15:9, 15:12, 15:15, 15:21, 16:10, 16:16, 16:19, 16:22, 17:5, 17:9, 17:10, 17:11, 17:16, 17:18, 17:20, 17:23, 17:24, 18:4, 18:8, 18:14, 18:21, 18:23, 19:17, 19:23, 19:24, 20:4, 20:5, 20:6, 20:13, 20:14, 20:15, 20:18, 21:4, 21:9, 21:15, 21:19, 22:1, 22:17, 22:22, 23:23, 24:7, 24:15, 24:19, 24:22, 24:24, 24:25, 25:9, 25:10, 25:13, 25:23, 25:25, 26:12, 26:22, 26:24, 27:1, 27:17, 27:18, 27:23, 27:25, 28:12, 28:15, 28:16, 28:21, 28:24, 29:15, 30:1, 30:4, 30:14, 30:16, 30:20, 30:22, 31:7, 32:3, 32:6, 32:8, 32:9, 32:13, 32:15, 32:16, 32:17, 32:20, 32:21, 32:22, 32:25, 33:4, 33:6, 33:8, 33:9, 33:11, 33:13, 33:14, 33:17, 34:1, 34:2, 34:10, 34:11, 34:22, 35:4, 35:7, 35:8, 35:10, 35:15, 35:18, 35:21, 35:24, 36:9, 36:10, 36:11, 36:18, 36:21, 37:3, 37:9, 37:11, 37:12, 37:18, 37:23, 38:2, 38:7, 38:14, 38:22, 39:8, 40:8, 41:2, 41:3, 41:4, 41:9, 41:10, 41:21, 42:4, 42:5, 42:18, 42:19, 42:20, 42:22, 43:1, 43:13, 43:20, 43:24, 44:15, 44:17, 44:20, 45:1, 45:6, 45:10, 45:12, 45:18, 45:21, 45:22, 45:23, 46:2, 46:6, 46:9, 46:11, 47:5, 47:8, 48:11, 48:15, 48:17, 48:20, 48:22, 49:3, 49:9, 49:10, 49:11, 49:15, 49:24, 50:8, 50:14, 50:19, 51:18,

52:1, 52:9, 53:9, 53:18, 54:10, 55:11, 55:19, 55:21, 55:23, 56:9, 56:10, 56:18, 58:1, 59:2, 59:6, 59:22, 60:13, 60:15, 61:2, 61:3, 61:20, 61:24, 62:1, 62:9, 62:10, 62:15, 63:14, 65:2, 65:5, 65:9, 65:13, 65:14, 66:4, 66:7, 66:9, 66:13, 66:17, 66:19, 66:20, 68:3, 68:4, 68:7, 68:14, 68:17, 68:18, 69:3, 69:4, 69:21, 69:22, 70:5, 70:7, 70:9, 70:11, 71:11, 71:16, 72:13, 72:16, 72:25, 74:14, 74:16, 74:20, 74:24, 75:3, 75:7, 75:11, 75:12, 75:16, 75:17, 75:18, 75:19, 75:21, 75:25, 76:13, 76:16, 76:20, 76:24, 76:25, 77:1, 77:2, 77:3, 77:5, 77:20, 77:21, 78:4, 79:1, 79:2, 79:21, 79:23, 80:11, 80:18, 81:10, 81:11, 81:21, 81:22, 81:24, 82:6, 82:8, 82:12, 82:23, 85:3, 85:24, 86:9, 86:21, 86:23, 87:10, 87:15, 87:16, 87:23, 88:1, 88:15, 88:23, 89:9, 89:10, 90:13, 91:1, 91:13, 91:14, 91:16, 91:19, 91:21, 92:15, 93:10, 94:16, 94:20, 94:21, 95:2, 95:10, 95:11, 96:8, 97:22, 98:5, 98:15, 98:18, 98:22, 99:8, 100:20, 100:21, 101:7, 101:9, 101:10, 101:12, 101:18, 102:4, 102:8, 102:20, 102:22, 102:23, 102:24, 103:22, 103:24, 104:6, 104:9, 104:12, 106:5, 106:7, 106:12, 106:20, 107:7, 107:8, 107:9, 107:10, 107:15, 108:5, 108:9, 108:11, 108:15, 108:17, 108:25,

109:9, 109:21, 109:22, 109:23, 109:24, 110:15, 110:17, 110:21, 111:12, 111:16, 111:23, 111:24, 112:23, 113:20, 113:21, 114:6, 114:12, 114:13, 115:20, 116:10, 116:11, 116:23, 117:22, 118:15, 119:11, 119:12, 119:13, 119:19, 120:4, 120:18, 120:22, 120:23, 121:2, 121:6, 122:7, 123:6, 123:8, 123:9, 123:12, 123:18, 124:2, 124:3, 124:9, 125:6, 125:7, 125:9, 125:10, 125:16, 126:7, 126:8, 126:13, 126:15, 126:21, 127:1, 127:3, 127:12, 127:15, 128:4, 128:10, 129:20, 129:24, 130:10, 130:11, 132:2, 134:4, 134:9, 134:14, 134:21, 134:24, 135:6, 135:13, 135:16, 135:19, 135:21, 135:22, 135:23, 136:5, 137:11, 138:1, 138:2, 138:13, 139:7, 139:8, 139:9, 139:14, 139:16, 139:18, 140:15, 141:9, 141:11, 141:22, 143:1, 143:21, 143:22, 143:25, 144:1, 145:8, 147:1, 147:3, 147:17, 148:5, 148:7, 148:9, 149:1, 150:3, 150:9, 150:12, 150:19, 150:21, 150:24, 151:3, 151:11, 151:13, 151:14, 151:17, 154:1, 154:2, 154:5, 154:6, 154:7, 154:8, 154:10, 156:7, 156:14, 156:16, 156:20, 157:10, 157:11, 157:24,

158:6, 158:7, 158:12, 158:17, 158:18, 159:12, 159:14, 159:15, 159:17, 159:20, 159:23, 160:2, 160:3, 160:7, 160:9, 160:10, 160:11, 160:14, 160:16, 160:23, 160:25, 161:1, 161:8, 161:11, 161:12, 161:19, 161:20, 161:24, 161:25, 162:1, 162:5, 162:22, 163:8, 163:11, 163:14, 163:16, 164:1, 164:7, 164:21, 165:11, 165:17, 165:19, 166:13, 168:17, 169:22, 170:18, 171:1, 171:12, 171:14, 171:16, 172:23, 173:2, 173:6, 173:16, 173:17, 173:19, 174:1, 174:2, 174:5, 174:13, 174:18, 174:24, 175:15, 175:24, 176:3, 176:6, 176:8, 176:14, 176:19, 177:14, 177:19, 177:25, 178:4, 179:11, 179:15, 179:19, 184:3, 184:9, 184:11, 184:15, 184:21, 185:2, 185:3, 185:9, 185:10, 185:14, 185:18, 185:19, 185:20, 185:21, 185:25, 186:5, 186:9, 187:4, 187:12, 187:15, 188:6, 188:15, 188:18, 188:21, 189:4, 189:6, 189:14, 189:16, 190:25, 191:1, 191:13, 192:8, 192:23, 193:4, 193:12, 195:25, 197:10, 198:9, 200:17, 201:16, 202:17, 204:22, 206:13, 206:16, 206:17, 206:24, 206:25, 207:11,

Exhibit 137                                                                                    JA-0001887

207:15, 207:18, 207:24, 208:21, 209:14, 209:21, 210:9, 210:23, 211:3, 211:14, 211:17, 211:22, 211:23, 211:24, 211:25, 212:8, 212:9, 212:14, 212:15, 212:17, 212:19, 212:22, 212:25, 213:1, 213:4, 213:10, 213:17, 214:9, 214:17, 215:5, 215:7, 215:11, 215:18, 216:4, 216:13, 216:15, 216:18, 216:20, 216:21, 217:2, 217:4, 217:5, 217 8, 217:9, 217:10, 217:11, 217:13, 217:17, 217:22, 218:5, 218:12, 218:15, 218:19, 219:16, 220:3, 220:4, 220:7, 220:13, 220:17, 220:20, 221:3, 221:4, 221:11, 221:17, 221:18, 221:25, 222:1, 222:3, 222:5, 222:11, 222:21, 223:5, 223:15, 223:22, 223:25, 224:12, 224:15, 224:23, 225:1, 225:2, 225:5, 225:6, 225:7, 225:8, 225:10, 225:12, 225:14, 225:19, 225:23, 226:12, 226:14, 226:15, 226:17, 227:5, 227:11, 227:16, 227:22, 227:25, 228:1, 228:9, 228:10, 228:14, 228:15, 228:19, 228:22, 230:16, 230:17, 230:21, 231:1, 231:3, 231:7, 231:13, 231:14, 231:18, 232:3, 232:16, 233:2, 233:12, 233:17, 233:18, 233:24, 233:25, 234:4, 234:14, 234:17,

234:25, 235:4, 235:5, 235:6, 236:11, 237:13, 237:17, 237:19, 237:21, 238:4, 238:6, 238:7, 238:11, 238:13, 238:16, 238:23, 239:1, 239:2, 239:4, 239:7, 239:8, 239:19, 240:1, 240:4, 240:12, 240:24, 241:2, 241:11, 241:16, 241:17, 242:10, 242:19, 242:20, 242:23, 243:2, 243:12, 243:18, 243:21, 244:5, 244:7, 244:11, 244:17, 244:19, 244:20, 244:21, 245:2, 245:8, 245:12, 245:14, 245:19, 245:25, 246:1, 246 3, 246:12, 246:17, 246:24, 247:7, 247:9, 247:14, 247:16, 247:17, 247:21, 247:24, 247:25, 248:13, 248:19, 248:20, 248:25, 249:5, 249:8, 249:12, 249:15, 249:25, 250:8, 250 13, 250:15, 250:23, 250:24, 251:3, 251:4, 251:5, 251:6, 252:5, 252:21, 253:3

**ISN'T** [2] - 27:17, 249:23

**ISSUANCE** [1] - 208:17

**ISSUE** [47] - 7:24, 8:23, 9:18, 13:25, 15:6, 21:15, 21:21, 24:14, 37:5, 38:13, 40:20, 41:1, 42:6, 42:9, 51:17, 51 18, 52:5, 67:16, 67 22, 69:15, 74:3, 87:18, 95:8, 100:23, 102:7, 120:9, 138:4, 152:1, 161:1, 164:19, 173:2, 190:18, 198:23, 209:8, 209:20, 212:7, 214:16, 214:17, 218:16, 233:8,

236:4, 240:13, 242:18, 245:7, 247:11, 249:12, 252:3

**ISSUED** [16] - 28:1, 38:16, 39:18, 66 12, 67:18, 160:12, 160:14, 160:15, 209:22, 211:2, 212:20, 217:5, 217:12, 217:18, 217:20, 233:18

**ISSUER** [1] - 221:8

**ISSUES** [23] - 8:3, 9:1, 26:7, 26 14, 28:5, 36:5, 39:20, 47:6, 57:14, 101:16, 102:8, 110:19, 135:2, 140:4, 169:8, 173 25, 213:18, 213:19, 213:21, 214:14, 215:9, 218:20, 235:23

**ISSUING** [1] - 217:3

**IT** [445] - 3:19, 5:13, 7:12, 8:3, 8:13, 8:21, 8:22, 8:25, 9:2, 11:6, 13:17, 15:12, 15:13, 15:15, 16:15, 16 19, 16:24, 17:10, 17 11, 17:22, 17:23, 18 9, 18:11, 18:12, 18:13, 19:9, 19:12, 19:24, 19:25, 20:4, 20:5, 20:6, 20 7, 20:13, 21:16, 23:19, 24:20, 25:10, 25:13, 25:25, 26:19, 27:17, 27:25, 28:3, 28:12, 28:20, 29:3, 29:11, 29:13, 29:14, 29:16, 29 22, 31:17, 32:1, 32:4, 32:14, 32:22, 32:25, 33:2, 33:4, 35:1, 35:4, 35 15, 35:19, 36:6, 36:11, 36:21, 37:12, 37:13, 39:11, 39:17, 40:24, 41:5, 41:9, 41 16, 41:21, 42:11, 42:23, 43 18, 44:1, 44:2, 44:20, 45:18, 45:23, 46 4, 47:20, 47:22, 48:4, 48:9, 48:15, 48:16, 48:18, 48:21, 49:8, 49:11, 49:12, 49 20, 49:22, 49:24, 50:8, 50:12, 50:21, 51 7, 51:20, 51:25, 52:17, 53:6, 53:7, 53:16,

55:12, 55:13, 55:21, 56:11, 57:1, 57:2, 57:3, 57:5, 59:6, 61:20, 62:5, 62:9, 63:14, 63 18, 65:18, 66:9, 66:20, 67:7, 67:9, 68:1, 68:5, 68:7, 68:17, 69:15, 69:18, 70 2, 70:3, 70:4, 70:5, 70 21, 71:11, 73:23, 74:16, 74:24, 75:1, 75:9, 77:21, 79:19, 79:21, 81:9, 81:10, 81:11, 81:16, 81 23, 82:25, 83:1, 83:3, 83:6, 83:7, 84:1, 84:3, 85:17, 86:14, 87:1, 87:10, 88:1, 88:18, 89:8, 89:10, 89:11, 90:13, 90:15, 91:21, 93:1, 93:7, 93:17, 94:21, 95 2, 95:6, 95:16, 95:17, 95:18, 95:19, 95:25, 98:10, 98:18, 98 22, 100:19, 101:5, 101:7, 101:10, 101:14, 103:13, 104:6, 105:18, 106:12, 108:2, 108:5, 108:11, 108:13, 109:23, 110:5, 110:21, 111:1, 111:15, 112:8, 112:23, 116:23, 120 18, 120:23, 120:25, 122:16, 122:17, 122:19, 122:20, 122:22, 123:25, 124:2, 124:8, 124:24, 125 6, 126:23, 129:1, 129:6, 129:16, 129:22, 129:23, 129:25, 131 15, 132:24, 133:13, 134:3, 134:6, 134:12, 134:14, 135:9, 135:17, 137:1, 137:11, 138:10, 138:14, 138:16, 138:17, 139:18, 141:22, 143:22, 143:23, 147:6, 150:12, 150:21, 151 11, 151:19, 153:2, 154:6, 154:10, 156:5, 156:16,

157:10, 157:19, 158:18, 159:3, 159:4, 159:9, 159:14, 159:15, 159:18, 159:19, 159:20, 159:21, 159:23, 160:10, 160:15, 161:4, 161:5, 161:6, 161:8, 161:11, 161:12, 161:18, 161:20, 162:4, 162:5, 162:6, 164:21, 164:23, 165:13, 165:19, 165:23, 169:13, 169:15, 169:24, 169:25, 172:23, 174:14, 176:8, 176:17, 177:2, 179:4, 180:13, 180:22, 181:2, 184:14, 184:19, 184:20, 185:14, 185:24, 185:25, 186:8, 186:9, 186:15, 186:20, 187:3, 187 12, 187:18, 187:19, 188:16, 188:22, 190 4, 190:6, 190:10, 190:15, 191:8, 191:13, 192:14, 197:9, 202:25, 204:15, 204:19, 206:6, 206:18, 207:13, 207:15, 207:24, 208:3, 208 11, 208:12, 209:5, 210:8, 210:10, 210:23, 211:18, 212:22, 213:1, 213:21, 214:2, 214:10, 214:13, 215:21, 215:25, 216:12, 216:13, 216:16, 216:18, 217:1, 217 13, 218:5, 218:12, 218:13, 219:10, 219:13, 220:6, 220:7, 220:21, 221:7, 222 18, 222:20, 222:22, 223:2, 223:11, 223:24, 224:4, 224:18, 224:23, 224:25, 225:4, 225:6, 226:4, 226:6, 226:7, 226:10, 226:12, 226:13,

Exhibit 137                                                                                                              JA-0001888

226:24, 226:25, 227:3, 227:5, 227:7, 227:11, 228:14, 228:17, 228:21, 231:3, 233:1, 233:12, 233:17, 234:24, 235:6, 236:18, 236:24, 237:3, 237:8, 237:15, 238:17, 239:20, 240:22, 240:23, 241:11, 242:23, 243:24, 246:5, 246:10, 248:13, 249:20, 250:24, 251:3, 251:4, 252:21

**IT'S** [105] - 5:18, 7:9, 9:14, 10:15, 11:2, 11:5, 14:23, 17:12, 19:1, 19:18, 20:4, 20:11, 21:15, 23:9, 23:12, 27:1, 30:25, 31:2, 32:8, 34:8, 34:10, 36 11, 36:25, 43:23, 44 24, 45:13, 50:9, 58:25, 61:18, 66:2, 66:10, 71:4, 74:22, 83:13, 84:18, 84:19, 88:17, 89:13, 90:20, 90 22, 90:23, 91:24, 94:18, 94:25, 104:3, 107:12, 108:1, 116:12, 125:3, 125:7, 125:22, 126:8, 126:14, 126:24, 129:10, 138:6, 147:18, 148:4, 148:7, 150:4, 159:5, 159:14, 159:19, 161:1, 161:18, 162:12, 164:25, 171:19, 172:5, 172:22, 177:25, 185:22, 191:1, 209:1, 209:25, 210:12, 216:11, 219:7, 219:8, 221:5, 222:15, 222:20, 222:23, 226:16, 231:15, 232:16, 234:16, 234:17, 237:13, 239:4, 239:5, 239:21, 240:3, 243:9, 243:13, 245:2, 245:3, 245:5, 246:12, 250:8, 251:5

**ITEMS** [1] - 43:3

**ITS** [53] - 12:17, 13 8,

13:13, 15:16, 16:8, 16:9, 17:20, 17:21, 19:4, 19:5, 19:10, 19:13, 19:19, 19:22, 20:17, 34:6, 35 2, 35:5, 35:16, 35:20, 35:22, 39:23, 42:25, 43:9, 43:10, 43:24, 67:23, 68:20, 69:14, 83:18, 83:25, 84:2, 85:6, 107:18, 108:7, 131:2, 131:5, 195:14, 207:25, 208:1, 208:5, 208:11, 217:25, 230:14, 234:4, 242:12, 244:9, 245:4, 245:5, 245:6, 250:8, 251:18

**ITSELF** [6] - 10:14, 35:18, 42:19, 43:17, 92:17, 212:17

**IUD** [21] - 76:13, 76:16, 90:16, 92:14, 92:15, 134 7, 134:10, 135:1, 135:17, 136:17, 137:1, 137:5, 140:2, 155:3, 155:13, 155:19, 175:1, 176:7, 176:12, 179:4

**IUD'S** [12] - 83:10, 90:8, 90:12, 91:5, 92:2, 92:11, 94 12, 112:11, 128:25, 134:1, 155 9, 156:2

**IUDS** [5] - 11:18, 11:21, 12:2, 134:4, 156:22

## J

**JAMA** [2] - 103:24, 104:10

**JANUARY** [5] - 24:24, 25 9, 34:23, 230:17

**JARRING** [1] - 124:5

**JOB** [4] - 60:13, 86:1, 93:16, 177:21

**JOBS** [1] - 124 24

**JOHNS** [7] - 57:9, 58:9, 58:12, 58:21, 59:10, 59:15, 60:4

**JOINED** [1] - 58:21

**JONATHAN** [6] - 2:2, 4:2, 5:23, 98 9, 98:11, 98:12

**JONES** [4] - 106:11, 109:7, 110:25, 195:16

**JOURNAL** [2] - 70 19, 169:7

**JOURNALS** [2] - 169:7, 169:10

**JUDGE** [4] - 15:19, 18:18, 150:18, 168:1

**JUDICIAL** [1] - 45:19

**JUDICIALLY** [1] - 209:4

**JUMP** [1] - 186:3

**JUNE** [1] - 102:7

**JUNIOR** [1] - 170:19

**JURISDICTION** [1] - 37:17

**JURISDICTIONAL** [7] - 36:21, 36:24, 36:25, 37:4, 37:6, 37:22, 37:23

**JURISPRUDENCE** [5] - 18:9, 48:14, 48:23, 49:10, 49:12

**JURISPRUDENTIAL** [1] - 49:15

**JURY** [2] - 55:13, 164:24

**JUST** [118] - 6:14, 11:1, 13:2, 15:4, 25:15, 28:8, 29:3, 29:16, 29:24, 31:15, 32:25, 37:11, 38:25, 44:21, 44:24, 45 2, 49:8, 49 22, 51:23, 52:4, 53:6, 54:10, 55:13, 55:18, 55:22, 56:11, 58:24, 65:16, 65:20, 65:23, 76 9, 83:4, 93:9, 93:19, 93:23, 93:25, 99 8, 102:13, 103:2, 106:23, 108:1, 109:11, 112:21, 114:8, 114:15, 114:18, 116:19, 119:6, 128:11, 134:17, 141:15, 143:20, 146:16, 148:1, 149:24, 153:15, 154:11, 156:13, 158:22, 159:1, 159:11, 160:19, 161:10, 161:19, 161:21, 161:24, 162:1, 162:3, 162:17, 163:25, 164:4, 164:5, 164:23, 165:5, 165:12, 165:18, 166:21, 166:22, 168:1, 168:9, 174:7,

175:24, 176:1, 184:15, 185:8, 185:14, 185:22, 185:24, 186:2, 187:10, 187 11, 187:22, 193:2, 193:13, 198:20, 199:9, 203:21, 214:3, 219:14, 222:11, 222:21, 226:10, 231 13, 233:8, 234:21, 235:6, 236:7, 239:17, 240:2, 240:18, 240 19, 242:8, 243:7, 243:21, 244:18, 245:8, 250:23

**JUSTICE** [9] - 2:10, 2 15, 4:18, 4:21, 4:24, 5:2, 5:5, 219:22, 226 5

**JUSTICES** [2] - 17:3, 226:2

**JUSTIFIABLE** [1] - 248:21

**JUSTIFICATION** [2] - 211:18, 217:2

**JUSTIN** [2] - 2:16, 4 23

## K

**KADE** [68] - 2:15, 4 19, 4:20, 24:9, 55:16, 55 21, 55:25, 57:4, 57:23, 58:2, 58:4, 58:5, 64:22, 65:10, 66:5, 66:6, 80:7, 85:10, 86:8, 97:13, 97 14, 97:17, 97:19, 97 22, 98:16, 103:10, 103:14, 103:17, 104:24, 108:19, 112:21, 116:25, 120 16, 120:23, 121:8, 121:10, 132:5, 133:4, 138:25, 139:7, 140:13, 141:8, 142:15, 142:21, 142 23, 143:1, 143:22, 143:24, 147 21, 148:10, 148:13, 148:14, 148:20, 148:23, 150 6, 150:21, 150:25, 151:5, 151:8, 151:12, 151:17, 151:24, 152:18,

158:25, 161:15, 254:6, 254:10

**KAISER** [1] - 83:15

**KAVANAUGH** [1] - 195:25

**KEEP** [5] - 21:23, 24 17, 25:24, 135:2, 246 22

**KENNEDY** [1] - 226:5

**KEPT** [1] - 122:23

**KEY** [2] - 73:15, 219:25

**KILLER** [1] - 128:4

**KIND** [13] - 29:22, 30 22, 31:25, 49:7, 62 9, 92:19, 117:11, 132:9, 171:18, 174:8, 213 24, 250:25, 251:6

**KINDLY** [6] - 165:6, 165:12, 165:16, 165:18, 168:9, 175 23

**KINDS** [3] - 44:3, 61:19, 107:10

**KING** [4] - 219:16, 242:17, 242:21, 243:1

**KNEW** [5] - 67:12, 78 14, 91:6, 195:12, 244:6

**KNOW** [106] - 9:13, 11 1, 22:2, 22:16, 25 15, 34:19, 36:10, 40:18, 43:17, 46:16, 56 9, 62:15, 68:16, 69 20, 70:3, 70:8, 70 10, 70:16, 81:3, 83 3, 84:5, 84:24, 85:2, 87:7, 87:8, 94:24, 95:4, 95:13, 96 11, 96:17, 99:3, 99 11, 99:15, 99:22, 109:20, 110:10, 110:14, 110:24, 111:13, 127:13, 128:10, 135:10, 136:22, 138:6, 144:7, 144:10, 144:16, 144:20, 146:3, 146:6, 150:2, 153:2, 153:4, 153:8, 153:9, 153:16, 153:18, 153:24, 154:2, 156:14, 156:15, 159:1, 159:14, 161:4, 161:7, 161 11, 161:25, 164:21, 164:23, 174:7,

189:10, 191:5, 192:24, 195:15, 197:2, 197:6, 197:10, 197:20, 198:3, 198:5, 198:7, 199:8, 199:13, 200:7, 200:11, 200:15, 200:16, 200:19, 202:5, 202:11, 202:22, 208:15, 208:19, 213:14, 215:7, 218:19, 228:13, 228:24, 232:12, 240:17, 244:5, 252:23

**KNOWING** [1] - 229:6
**KNOWLEDGE** [9] - 64:17, 120:12, 123:22, 128:11, 140:14, 189:7, 194:1, 194:2, 228:14
**KNOWN** [7] - 65:18, 72:8, 83:7, 108:9, 239:19, 248:25, 249:14
**KNOWS** [3] - 34:5, 141:11, 249:8
**KOPPLIN** [17] - 2:16, 5:3, 5:4, 162:14, 164:9, 172:15, 172:18, 181:21, 184:8, 190:24, 193:7, 193:8, 193:11, 193:13, 203:20, 203:23, 254:14

**L**

**LABELED** [1] - 159:5
**LABOR** [14] - 3:7, 31:18, 31:21, 31:23, 32:10, 32:11, 33:16, 33:17, 33:19, 240:6, 240:8, 247:2
**LACK** [2] - 133:11, 213:23
**LAID** [3] - 7:22, 9:5, 9:14
**LAND** [1] - 6:20
**LANGUAGE** [14] - 43:10, 45:18, 125:17, 216:3, 219:17, 221:1, 221:4, 222:3, 223:19, 223:22, 224:1, 224:2, 224:6, 225:3
**LARC** [1] - 189:25

**LARCS** [18] - 12:14, 174:22, 174:23, 175:4, 176:6, 177:3, 183:17, 183:19, 183:20, 185:19, 186:3, 186:5, 186:8, 186:14, 186:16, 189:14, 192:9
**LARGE** [6] - 25:3, 47:2, 96:11, 108:2, 229:17, 229:19
**LARGER** [1] - 93:22
**LAST** [20] - 23:6, 38:15, 39:15, 42:21, 51:14, 68:13, 68:14, 68:16, 81:5, 86:23, 106:18, 113:21, 154:11, 185:20, 186:24, 195:10, 195:23, 195:24, 243:14, 244:18
**LASTS** [3] - 124:7, 134:11, 134:19
**LATE** [2] - 93:22, 148:4
**LATER** [7] - 34:5, 37:16, 87:22, 87:25, 160:3, 206:21
**LATEST** [1] - 88:5
**LAW** [29] - 4:4, 6:20, 7:22, 7:24, 9:2, 9:4, 13:9, 17:17, 21:5, 21:7, 21:9, 30:21, 40:17, 45:15, 48:13, 49:8, 49:9, 87:15, 131:2, 131:6, 209:13, 225:12, 226:15, 231:1, 242:11, 245:4, 245:5, 246:12, 252:13
**LAWS** [3] - 7:11, 38:18, 233:22
**LAWSUITS** [1] - 26:4
**LAWYER** [3] - 72:25, 99:16, 236:3
**LAWYERS** [2] - 6:10, 196:7
**LAY** [2] - 56:2, 194:25
**LAYING** [1] - 24:1
**LEAD** [7] - 57:20, 57:25, 116:21, 124:8, 124:10, 163:3, 163:14
**LEADING** [4] - 71:23, 80:7, 132:5, 133:4
**LEAKED** [2] - 158:19, 159:23
**LEARN** [1] - 183:11
**LEARNED** [2] - 203:8,

203:13
**LEARNING** [1] - 189:20
**LEAST** [12] - 11:13, 17:3, 115:17, 124:18, 134:3, 177:13, 212:23, 214:25, 225:16, 247:21, 249:20, 250:21
**LEAVE** [2] - 113:2, 157:7
**LECTURER** [1] - 193:23
**LED** [3] - 59:17, 59:20, 248:11
**LEEWAY** [3] - 47:15, 48:4, 50:7
**LEFT** [4] - 101:23, 176:17, 234:13, 236:2
**LEFT-HAND** [1] - 101:23
**LEGAL** [4] - 47:15, 50:4, 50:6, 206:18
**LEGISLATION** [1] - 71:5
**LEGISLATIVE** [1] - 43:11
**LEGITIMATE** [4] - 226:25, 233:5, 247:24, 249:20
**LEGWORK** [1] - 218:10
**LENGTH** [4] - 17:18, 18:18, 164:19, 171:8
**LESS** [23] - 10:20, 11:12, 13:20, 14:17, 20:6, 76:10, 76:20, 77:7, 91:24, 111:19, 131:18, 134:13, 136:4, 136:22, 145:11, 145:19, 174:16, 176:9, 187:6, 187:8, 189:24, 191:21, 191:22
**LESS-EFFECTIVE** [1] - 189:24
**LET** [14] - 3:10, 36:2, 46:22, 52:14, 73:10, 109:3, 137:2, 158:21, 158:22, 162:16, 162:17, 213:7, 215:14, 218:9
**LET'S** [8] - 88:3, 158:21, 193:21, 198:22, 210:4, 234:18, 237:10, 250:11

**LETTER** [3] - 245:3, 245:5, 246:12
**LEVEL** [10] - 57:12, 57:13, 58:16, 59:18, 61:5, 81:20, 82:8, 146:1, 175:3, 176:16
**LEVELS** [4] - 71:22, 72:22, 125:25, 213:16
**LIABILITY** [2] - 48:9, 50:12
**LIFE** [19] - 27:22, 39:16, 40:8, 40:10, 40:20, 41:11, 41:13, 41:20, 123:14, 124:6, 127:16, 127:19, 135:1, 137:19, 142:9, 168:20, 177:20, 217:15
**LIFE-THREATENING** [2] - 137:19, 142:9
**LIGHT** [1] - 37:15
**LIKE** [96] - 9:21, 13:9, 20:13, 20:25, 24:2, 29:22, 33:5, 34:24, 35:23, 38:12, 38:15, 38:17, 39:16, 39:18, 39:20, 39:22, 39:24, 41:2, 42:13, 45:9, 47:9, 48:18, 48:21, 53:18, 55:10, 56:23, 64:16, 67:25, 74:17, 76:17, 79:21, 81:4, 81:8, 82:20, 84:17, 87:17, 95:9, 113:8, 114:8, 114:14, 116:13, 119:8, 120:11, 123:3, 123:23, 126:13, 128:11, 129:7, 129:9, 130:13, 130:23, 131:15, 134:17, 137:22, 137:24, 138:10, 145:2, 145:3, 158:6, 158:11, 161:7, 161:10, 165:15, 168:11, 169:19, 169:21, 170:9, 172:12, 173:17, 175:20, 180:2, 183:23, 187:12, 198:6, 199:15, 203:7, 211:21, 212:8, 218:17, 227:9, 231:4, 235:22, 235:23, 236:7, 239:11, 239:24, 240:18,

242:7, 242:17, 243:4, 243:9, 243:24, 244:19, 245:8, 248:3, 249:20
**LIKELIHOOD** [1] - 130:2
**LIKELY** [7] - 6:7, 14:13, 25:10, 50:11, 72:6, 96:5, 191:20
**LIKEWISE** [1] - 102:18
**LIMINE** [5] - 66:12, 245:13, 245:17, 246:8, 246:15
**LIMIT** [1] - 141:24
**LIMITED** [8] - 67:8, 162:4, 211:17, 214:6, 223:15, 224:18, 237:16, 245:9
**LIMITS** [1] - 248:1
**LINE** [7] - 48:23, 49:15, 77:5, 142:17, 154:11, 161:22, 181:22
**LINED** [3] - 159:23, 176:10, 214:17
**LINES** [2] - 90:18, 176:4
**LIST** [4] - 9:21, 53:19, 147:22, 193:17
**LISTED** [3] - 84:4, 148:8, 176:8
**LISTEN** [2] - 34:20, 69:7
**LISTENING** [1] - 12:6
**LISTS** [1] - 223:24
**LITERATURE** [8] - 67:12, 69:6, 74:9, 79:24, 82:14, 96:18, 189:9, 194:18
**LITIGANT** [2] - 20:9, 20:12
**LITIGATION** [17] - 19:12, 27:16, 27:19, 27:22, 28:2, 28:7, 46:16, 197:21, 197:22, 204:25, 205:6, 206:6, 216:16, 232:23, 235:9, 237:16, 249:9
**LITTLE** [24] - 11:5, 21:1, 26:8, 27:8, 27:9, 27:11, 28:9, 33:23, 34:24, 38:12, 52:2, 88:18, 88:23, 123:3, 129:9, 134:17, 149:19, 171:7, 215:14, 218:18, 222:20, 224:12, 225:19,

249:18
LIVE [2] - 6:2, 240:13
LIVED [1] - 182:12
LIVES [1] - 125:18
LIVING [4] - 55:4, 114:2, 126:2, 167:2
LO [3] - 85:1, 85:3, 86:21
LOBBY [11] - 26:8, 43:18, 46:16, 51:7, 198:6, 211:9, 217:19, 217:21, 219:2, 226:3, 226:9
LOCATE [1] - 53:8
LOCATED [2] - 171:14, 171:16
LODGED [1] - 139:4
LOGIC [1] - 235:6
LOGICAL [1] - 49:7
LONG [13] - 11:13, 12:15, 32 16, 95:13, 124:3, 127:21, 138:6, 138:13, 171:22, 174:23, 183:17, 228:8, 242:12
LONG -ACTING [3] - 12:15, 174:23, 183:17
LONG -TERM [1] - 127:21
LONGER [5] - 14 20, 188:5, 208:10, 233:22, 239:15
LOOK [37] - 29:14, 29:22, 36 9, 38:9, 49:5, 49:10, 59:4, 62:6, 69:3, 75:18, 82:16, 86:2, 91:14, 94:2, 95:9, 114:9, 114:12, 114:17, 114:21, 137:24, 154:19, 154:22, 160:2, 160:6, 161:7, 161:10, 175:17, 186:8, 186:18, 186:19, 186:23, 214:20, 226:18, 241:12, 242:5, 247:14, 249:5
LOOKED [15] - 16:22, 37:20, 75 12, 88:11, 94:4, 94:8, 109:19, 112:9, 171:4, 185:18, 190:8, 194:23, 204:17, 208:23, 215:23
LOOKING [25] - 63:11, 75:12, 90:10, 92:4, 98:17, 101:21,

102:13, 112:7, 112:8, 125:24, 146:16, 146:17, 146:23, 148:1, 148:15, 159:25, 185:22, 186:7, 198:9, 199:18, 204:21, 209:15, 213:25, 237:12, 241:15
LOOKS [5] - 29:23, 76:16, 114:14, 187:12, 217:14
LOSASSO'S [1] - 85:21
LOSE [25] - 7:7, 13:15, 14:16, 34:12, 34:22, 41:4, 52:23, 98 20, 98:24, 124:19, 144:4, 199:14, 200:2, 200:12, 200:22, 200:23, 201:7, 202:19, 205:11, 206:22, 209:9, 229:12, 229:13, 231:8, 244:6
LOSING [2] - 200:15, 230:20
LOSS [4] - 127:24, 128:1, 153:5, 212:6
LOST [12] - 100:5, 100:8, 146:8, 146:13, 147:8, 153:2, 199:6, 199:10, 200:7, 201:3, 202:22, 230:4
LOT [20] - 26:12, 27:16, 47:6, 71:16, 148:9, 181:14, 190:11, 194:16, 211:3, 211:11, 216:15, 221:25, 223:4, 224:10, 227:14, 230:22, 244:20, 244:21
LOW [6] - 14:8, 72:6, 72:21, 80:13, 127:20, 177:16
LOWER [5] - 72:21, 88:18, 88:23, 154:2, 238:4
LOWERED [1] - 71:8
LOWEST [4] - 175:9, 175:12, 176:21, 177:5
LUNCH [3] - 53:24, 157:11, 157:12
LUNCHEON [1] - 157:23
LYDIA [1] - 195:22

LYING [1] - 123:21

## M

M.D.'S [1] - 60:25
MADE [20] - 5:17, 6:3, 12:10, 23:24, 30:10, 39:17, 41:13, 51:4, 52:5, 78.20, 107.14, 192:21, 215:12, 217:11, 223:8, 224:19, 226:7, 232:5, 236:7, 246:3
MAIN [1] - 85:4
MAINTAIN [4] - 7:24, 171:11, 207:25, 208:1
MAINTAINING [1] - 208:5
MAJOR [2] - 79:2, 242:23
MAJORITY [3] - 157:3, 168:7, 226:9
MAKE [35] - 12:5, 14:17, 30:15, 40:16, 41:18, 41:21, 45:14, 49:14, 51:23, 52:20, 53:5, 53:22, 60:1, 65:21, 65:24, 67:13, 75:18, 78:2, 78:17, 80:3, 132:22, 137:2, 139:17, 141:15, 141:22, 181:8, 205:2, 205:8, 209:8, 215:8, 228:1, 231:18, 235:22, 244:19, 248:14
MAKERS [2] - 82:16, 82:19
MAKES [4] - 28:14, 210:2, 225:1
MAKING [32] - 22:11, 23:19, 39:20, 46.4, 52:17, 63:3, 67:1, 78:11, 78:18, 85:6, 85:9, 98:14, 100:15, 107:18, 108:17, 132:19, 139:6, 152:14, 160:1, 168:21, 171:6, 180:23, 181:10, 182:24, 189:17, 189:21, 193:3, 205:12, 217:7, 226:14, 248:9, 248:18
MALE [1] - 76:8
MANAGE [2] - 128.20, 129:6
MANAGED [2] - 63:5,

136:24
MANAGEMENT [1] - 155:17
MANAGING [1] - 135:25
MANDATE [97] - 6:19, 11:10, 11:14, 11:18, 11:24, 12.4, 12:9, 12:21, 12:23, 13:1, 13:7, 21:11, 22:10, 23:3, 23:18, 33:25, 43:16, 43:17, 44:5, 44:7, 44:11, 44:12, 46:17, 50 23, 51:12, 52:8, 63:21, 70:13, 70:17, 71:1, 94:6, 94:11, 102:1, 104:22, 109:15, 120:3, 131:2, 131 6, 131:17, 131:18, 136:13, 140:6, 140:24, 144:21, 144:25, 145:6, 145:9, 145:14, 145:20, 145 21, 155:23, 155:25, 156:8, 156:20, 166:11, 166:14, 166:15, 166:19, 168:23, 168:25, 170:22, 178:6, 178:23, 179:7, 181:19, 188:23, 189:2, 189:5, 189:10, 189:12, 189:18, 189 20, 190:3, 191:9, 192:13, 196:3, 196:11, 196:16, 197:6, 197:23, 204:25, 205:6, 205:14, 206 7, 207:6, 207:15, 208:4, 211:16, 221:23, 222:14, 224:14, 225 25, 233:20, 240:11
MANDATES [1] - 241:11
MANDATORY [6] - 141:6, 214:18, 220:18, 223 23, 224:2, 250:1
MANNER [1] - 221:20
MANY [66] - 13:22, 14:15, 14 20, 24:25, 25:2, 26:6, 27:2, 27:4, 34:1, 51:2, 60:23, 62:16, 67:19, 73.24, 91.10, 92:19,

99:3, 103:19, 110:7, 116:3, 118:10, 118:14, 119:9, 121:16, 121:20, 122:5, 124:17, 125:2, 133 13, 144:7, 153:23, 164:13, 168:1, 170:2, 173:16, 176:19, 179:2, 193:24, 194:18, 195:10, 196:25, 197:18, 197:20, 198:3, 198.7, 208:23, 216:19, 216:22, 218:19, 227:23, 228:17, 228:18, 228:23, 228:24, 229:6, 229:8, 229 20, 230:18, 230:19, 233:16, 239:6, 243:24, 249:2, 250:17, 250:23
MARCH [1] - 27:22
MARKED [2] - 95:10, 138:1
MARKET [1] - 1:20
MARKETPLACES [2] - 100:12, 152:11
MARKETSCAN [1] - 94:2
MARRIAGE [1] - 102:18
MARRY [1] - 21:1
MASSACHUSETTS [23] - 2:18, 16:10, 16:13, 18:1, 18:14, 19 2, 19:3, 19:4, 19 8, 19:9, 19:21, 20:12, 21:1, 21:4, 21 6, 21:8, 35:1, 35:12, 35:17, 35:20, 231:4, 233:12
MASSIVE [1] - 208:12
MASTERS [5] - 59:18, 61 5, 115:25, 116:3, 167:13
MATERIALS [1] - 207:23
MATTER [12] - 3:2, 8:3, 24:21, 31:4, 55 12, 65:2, 71:12, 87 18, 158:2, 158:23, 159:20, 253:5
MATTERS [2] - 26:13, 165:5
MAY [93] - 5:7, 5:8, 5:25, 6:14, 7:20,

9:21, 13:9, 15:25, 16:2, 17:22, 20:8, 20:24, 25:8, 25:19, 25:20, 39:7, 48:5, 50:2, 54:15, 54:17, 54:18, 55:7, 57:7, 57:8, 57:19, 58:6, 64:15, 68:5, 72:2, 81:9, 82:20, 82:21, 84:6, 84:18, 86:13, 93:19, 95:7, 97:8, 97:16, 102:7, 105:4, 107:20, 111:20, 113:10, 113:11, 116:20, 130:2, 132:16, 132:17, 139:13, 140:25, 142:7, 142:10, 147:6, 150:18, 153:17, 158:1, 158:2, 158:4, 160 7, 161:21, 162:9, 162:10, 174:1, 179:17, 189:13, 191:20, 192:18, 193:8, 193:9, 200:6, 200:14, 200:15, 206:1, 208:22, 212:16, 215:2, 215:19, 216:5, 217:7, 217:25, 221:19, 229:12, 232:2, 235:19, 235:20, 240:25, 243:24, 247:6, 247:20, 249:13

**MAYBE** [10] - 27:2, 84:25, 195:11, 197:7, 207:12, 215:7, 237:8, 244:5, 244:24, 248:5

**ME** [71] - 3:10, 6:10, 9:23, 15:19, 15:23, 18:11, 24:21, 28:21, 33:11, 36:2, 36:11, 46:22, 48 25, 49:3, 52:14, 53 17, 53:19, 53:25, 73:10, 74:19, 87:23, 88:14, 90:1, 106:8, 109:3, 109:8, 110:6, 114:9, 115:11, 116:24, 123:21, 123:24, 125:8, 125:22, 129:12, 137:2, 142:7, 143:13, 143:20, 150:14, 150:24, 158:21, 158:22, 162:17, 162:25, 164:25, 183:4, 192:1,

192:20, 192:22, 196:21, 197:4, 198:12, 198:17, 204:23, 205:20, 207:3, 213 7, 214:19, 215:14, 222:11, 222:20, 227:20, 234:10, 234:16, 235:22, 238:16

**MEAN** [14] - 23:3, 29:24, 78:14, 80:14, 91:23, 98:12, 115:19, 123:25, 128:24, 147:6, 156:16, 159:13, 160:13, 169:13

**MEANS** [14] - 24:2, 28:10, 49:2, 69:25, 75:12, 79:12, 79:22, 123:22, 124:2, 126:17, 127:15, 169:15, 203:8, 225:23

**MEANT** [4] - 90 6, 212:10, 230:9, 244:23

**MEDICAID** [5] - 12:22, 14:1, 81:25, 179:17, 179:19

**MEDICAL** [59] - 7 19, 12:6, 14:14, 14:22, 22:18, 23:13, 23:15, 57:17, 60:21, 60:24, 60:25, 64:19, 65:14, 66:21, 73:5, 81:12, 96:3, 97:5, 104:3, 107:9, 115:4, 116:17, 117:2, 118:6, 118:9, 119:9, 123:4, 123:20, 132:1, 132:17, 142:3, 142:6, 149:7, 149:12, 149:16, 151:2, 151:10, 166:1, 167:6, 167:7, 167:12, 168:16, 171:9, 171:11, 171:15, 171:23, 171:25, 172:13, 173:25, 179:14, 201:23, 201:25, 202:4, 202:6, 202:11, 202:13, 203:4, 242:13

**MEDICALLY** [5] - 12:10, 14:18, 147:1, 149:2, 201:16

**MEDICATION** [2] - 132:2, 132:23

**MEDICATIONS** [5] - 94:19, 94:22, 125:24, 129:14, 173:25

**MEDICINE** [27] - 22:24, 55:6, 60:8, 60:11, 60:18, 66:4, 66:17, 66:19, 66:20, 70:19, 93:6, 107 13, 115:21, 166:4, 166:5, 167:8, 167:11, 167:14, 170:10, 171:16, 171:19, 171:22, 184:22, 220:15, 223:3, 223:12, 250:4

**MEDICINE'S** [1] - 64:10

**MEDICINES** [1] - 22:4

**MEET** [4] - 98:7, 143:11, 196:5, 206:20

**MEETING** [4] - 69:23, 75:7, 184:22, 184:24

**MEETS** [1] - 207 21

**MELLON** [4] - 18:1, 35:2, 35:4, 35:9

**MELNIKAS** [1] - 102:16

**MEMBER** [3] - 73:13, 84:21, 123:18

**MEMBERS** [9] - 6:11, 6:14, 22 4, 64:10, 66:25, 73:24, 85:22, 86:20, 228:3

**MEMORY** [2] - 136:25, 137:7

**MEN** [5] - 21:12, 72:16, 149:20, 153:13, 153:14

**MENOPAUSE** [2] - 126:13, 127:14

**MENSTRUAL** [3] - 124:2, 135:25, 155:22

**MENSTRUATION** [8] - 117:17, 123:5, 123:10, 123:11, 123:12, 124:1, 124:15, 128:17

**MENTION** [5] - 44:1, 119:14, 206:5, 211:22, 219:3

**MENTIONED** [15] - 44:23, 49:16, 67:4, 112:10, 123:4, 129:25, 156:18, 170:9, 173:17, 187:24, 195:18, 205:23, 214:15,

223:5, 250:12

**MESSAGE** [1] - 215:8

**MET** [3] - 70:3, 143:13, 196:7

**METAPHOR** [1] - 246:24

**METHOD** [23] - 11:21, 12:3, 75:10, 75:14, 75:22, 76:5, 79:21, 96:20, 107:15, 174:13, 176:24, 179:5, 185:21, 185:23, 186:23, 186:24, 186 25, 189:23, 189:24, 189:25, 192:8, 198:12

**METHODOLOGY** [3] - 181:23, 182:4, 184:14

**METHODS** [55] - 11:12, 12:1, 13:20, 61:24, 62 2, 73:9, 75:8, 76:7, 77:6, 77:12, 77:13, 77:14, 77:16, 92:14, 94:8, 107:12, 107:14, 108:4, 108:6, 108:9, 108:11, 108:14, 149:25, 173:22, 174:2, 174:5, 174:9, 174:16, 174:21, 175:6, 175:10, 175:11, 175:14, 176:5, 176:11, 176:13, 176:22, 177:3, 177:4, 178:10, 178:11, 178:18, 178:21, 182:8, 183:15, 185:19, 185:20, 186:20, 187:13, 189:13, 190:12, 191:2, 192:6, 195:21, 198 19

**MICHAEL** [4] - 2:6, 2:16, 4:9, 16:4

**MICHIGAN** [2] - 60:5, 167:1

**MIDDLE** [4] - 82:21, 103:1, 103:11, 180:14

**MIGHT** [23] - 33:16, 67:4, 71:19, 71:22, 83:21, 88 18, 130:11, 138:17, 141:10, 164:23, 173:19, 176:11, 179:3, 187:19, 192:25, 193:1,

193:19, 199:21, 203:9, 203:20, 205:25, 236:24, 241:14

**MILLION** [4] - 12:19, 13 2, 229:9, 230:2

**MILLIONS** [5] - 26:17, 26:21, 34:13, 52:12, 220:2

**MIND** [8] - 25:24, 53:13, 156:12, 167:25, 188:3, 189:22, 236:8, 236:10

**MINIMUM** [2] - 221:10, 223:21

**MINOR** [1] - 237:2

**MINORITY** [1] - 47:19

**MINUTES** [9] - 3:15, 3:17, 51:25, 52:1, 54:10, 54:11, 113:4, 171:8, 210:6

**MIRENA** [16] - 76:16, 90 20, 130:21, 134:11, 134:19, 135:1, 135:17, 136:25, 137:4, 137:9, 155:3, 155:8, 155:13, 155:19, 156:2, 156:22

**MISS** [1] - 124:22

**MISSED** [1] - 93:14

**MISSION** [2] - 220:20

**MISTAKE** [1] - 192:21

**MISTAKEN** [2] - 181:3, 181:4

**MISTAKES** [1] - 75:18

**MISTIMED** [1] - 69:25

**MITIGATE** [1] - 128:21

**MNUCHIN** [1] - 3:5

**MODERATE** [1] - 124:9

**MODERN** [2] - 107:21, 108:6

**MODIFICATIONS** [1] - 216:10

**MODIFIED** [1] - 111:7

**MODIFY** [6] - 215:20, 216:1, 221:22, 222:24, 223:11, 230:14

**MODIFYING** [2] - 39:18, 222:16

**MOMENT** [14] - 20:25, 58 1, 58:5, 73:10, 74 20, 81:8, 97:9, 146:11, 146:15, 147:2, 147:10, 160:2, 192:1, 203:21

**MONEY** [5] - 14 1,

14:4, 80:14, 92:20,
136:3
**MONTH** [5] - 65:9,
106:18, 135:11,
135:13, 192:22
**MONTHLY** [5] - 79:21,
119:16, 134:15,
135:6, 135:11
**MONTHS** [6] - 160:15,
177:13, 186:15,
186:21, 187:18,
188:7
**MOOT** [1] - 173:6
**MOOTED** [1] - 37:13
**MORAL** [66] - 6:18,
26:2, 27:16, 27:18,
27:25, 28:2, 28:3,
28:7, 28:10, 28:12,
28:16, 28:18, 28:24,
29:3, 29:10, 29:25,
30:8, 30:14, 30:17,
31:3, 31:6, 31:8,
31:22, 32:3, 32:7,
32:12, 32:13, 32:16,
32:20, 32:22, 33:7,
33:11, 40:7, 40:22,
44:9, 46:5, 46:8,
51:9, 95:11, 95:21,
104:19, 120:6,
138:1, 138:13,
149:24, 190:18,
198:24, 199:23,
212:9, 212:11,
225:12, 239:25,
240:5, 242:9,
242:11, 243:11,
246:24, 247:3,
247:20, 247:22,
247:24, 248:1,
250:13, 250:21
**MORALITY** [2] - 28:21
**MORE** [79] - 7:1, 8:17,
11:21, 11:25, 12:1,
12:10, 12:19, 14:3,
14:4, 14:13, 15:16,
20:22, 22:11, 22:12,
23:20, 40:19, 40:25,
41:9, 52:2, 63:10,
70:23, 72:5, 72:18,
72:20, 73:19, 85:8,
90:9, 96:9, 96:18,
96:19, 96:22, 106:8,
106:19, 106:25,
108:6, 122:24,
123:3, 124:3,
127:21, 134:4,
134:18, 135:11,
135:21, 135:22,
135:23, 135:24,
136:3, 137:18,

140:23, 141:5,
141:16, 156:3,
157:5, 164:1, 164:2,
168:18, 171:8,
176:12, 176:25,
177:15, 189:14,
189:25, 190:11,
191:20, 195:11,
195:20, 196:2,
214:13, 215:15,
225:5, 231:3,
233:24, 234:10,
234:21, 237:2,
245:7, 248:20
**MORE-EFFECTIVE** [1]
- 189:25
**MORNING** [17] - 4:5,
4:8, 4:16, 4:19, 4:22,
4:25, 5:3, 16:3,
25:21, 97:20, 97:21,
97:23, 142:24,
142:25, 204:19,
204:24, 239:25
**MOST** [40] - 11:18,
70:11, 76:7, 77:5,
83:9, 90:8, 91:7,
91:9, 92:13, 94:18,
95:2, 106:1, 111:21,
124:9, 124:11,
125:16, 127:17,
127:25, 130:20,
136:16, 155:2,
155:3, 166:15,
174:19, 174:21,
175:2, 176:5, 177:2,
177:3, 178:3, 192:6,
192:8, 192:9,
192:25, 218:19,
218:20, 228:7,
232:8, 244:24,
250:12
**MOSTLY** [3] - 3:10,
171:20, 178:4
**MOTION** [16] - 3:9,
7:22, 9:15, 9:19,
27:10, 65:9, 66:11,
160:17, 245:13,
245:17, 245:23,
246:8, 246:15,
251:13, 251:18,
251:20
**MOVE** [10] - 9:23,
33:21, 38:11, 42:13,
92:10, 108:24,
151:23, 158:11,
235:24, 246:14
**MOVED** [2] - 55:10,
223:12
**MOVEMENT** [1] -
146:22

**MOVING** [2] - 3:24,
118:13
**MPH** [1] - 61:5
**MR** [227] - 4:1, 4:8,
4:16, 4:22, 4:25, 5:6,
5:7, 5:9, 5:22, 8:1,
8:8, 8:24, 9:7, 9:25,
11:3, 11:7, 15:4,
15:11, 15:19, 15:24,
15:25, 16:3, 16:5,
16:15, 18:6, 18:10,
18:13, 20:3, 20:20,
20:21, 20:22, 20:24,
21:4, 21:19, 22:14,
23:9, 23:12, 24:13,
24:22, 25:12, 25:17,
25:19, 25:21, 27:18,
28:4, 28:23, 29:6,
29:8, 29:13, 29:15,
30:19, 31:5, 31:13,
31:16, 31:23, 32:4,
32:14, 32:23, 33:3,
33:14, 33:20, 33:22,
36:16, 36:23, 37:14,
38:12, 38:24, 39:6,
40:13, 40:18, 40:24,
41:24, 42:13, 42:16,
44:14, 44:16, 44:20,
45:20, 46:1, 46:7,
46:25, 48:18, 49:4,
49:23, 50:18, 52:4,
53:1, 53:13, 54:1,
54:3, 54:7, 54:15,
55:1, 55:9, 55:24,
56:6, 57:6, 57:19,
58:7, 64:15, 65:4,
65:16, 65:22, 65:25,
66:3, 66:16, 80:10,
84:12, 84:24, 85:15,
86:12, 87:21, 88:1,
90:13, 93:15, 93:18,
97:8, 97:11, 105:4,
105:7, 105:23,
109:1, 111:11,
112:17, 113:8,
113:23, 116:19,
117:1, 119:3, 119:7,
120:10, 120:24,
121:5, 121:12,
132:8, 133:7, 136:7,
136:10, 139:13,
139:19, 139:20,
141:3, 141:18,
142:19, 147:16,
148:3, 148:18,
150:1, 150:18,
151:21, 152:21,
152:23, 156:23,
157:16, 158:1,
158:5, 158:10,
158:18, 159:17,

160:18, 160:21,
161:21, 161:24,
162:7, 204:7, 204:9,
204:10, 204:12,
204:17, 204:22,
205:2, 205:22,
206:10, 206:25,
207:4, 207:8,
207:19, 208:19,
208:22, 209:14,
210:2, 210:7, 210:9,
210:18, 210:21,
210:23, 211:1,
211:25, 214:7,
214:23, 215:14,
219:7, 219:13,
222:8, 222:23,
227:22, 234:11,
234:15, 234:19,
234:21, 234:23,
235:18, 235:21,
236:5, 236:13,
236:24, 238:2,
238:15, 238:22,
239:11, 241:17,
241:22, 242:2,
242:4, 242:7,
245:15, 245:18,
245:22, 246:4,
246:17, 246:21,
252:8, 252:10,
252:11, 254:5, 254:9
**MS** [106] - 4:5, 4:13,
4:19, 5:3, 24:9,
55:16, 55:21, 55:25,
57:4, 57:23, 58:2,
58:4, 58:5, 64:22,
65:10, 66:5, 66:6,
80:7, 85:10, 86:8,
97:13, 97:14, 97:17,
97:19, 98:16,
103:10, 103:14,
103:17, 104:24,
108:19, 112:21,
116:25, 120:16,
120:23, 121:8,
121:10, 132:5,
133:4, 138:25,
139:7, 140:13,
141:8, 142:15,
142:21, 142:23,
143:22, 143:24,
147:21, 148:10,
148:13, 148:14,
148:20, 148:23,
150:6, 150:21,
150:25, 151:5,
151:8, 151:12,
151:17, 151:24,
152:18, 157:24,
158:25, 161:15,

162:9, 162:11,
162:14, 163:2,
163:10, 163:13,
163:22, 163:25,
164:9, 165:2, 165:4,
172:11, 172:15,
172:18, 173:4,
173:9, 180:1,
181:21, 182:2,
182:3, 184:8,
184:12, 184:17,
185:7, 190:24,
191:12, 192:1,
192:4, 193:5, 193:7,
193:8, 193:11,
203:17, 203:20,
203:23, 204:2,
254:6, 254:10,
254:13, 254:14
**MUCH** [21] - 6:25,
11:21, 14:8, 21:16,
25:16, 40:11, 49:7,
65:7, 105:2, 135:8,
145:10, 155:6,
164:14, 186:22,
193:5, 204:3,
225:14, 248:19,
248:20, 251:3, 251:4
**MULTIFACTORIAL** [2]
- 156:5, 156:17
**MULTIPLE** [1] - 26:11
**MUNICIPALITY** [2] -
48:14, 50:3
**MUST** [6] - 14:4,
19:25, 65:18,
221:24, 223:8, 244:4
**MY** [107] - 3:19, 4:1,
4:6, 4:9, 4:19, 4:25:
5:4, 5:23, 37:11,
47:12, 56:10, 56:18,
59:24, 61:3, 61:8,
62:19, 71:4, 74:20,
87:10, 87:16, 97:9,
97:22, 98:2, 100:1,
108:25, 109:4,
114:11, 114:14,
116:2, 118:15,
119:15, 121:15,
122:10, 124:18,
125:7, 133:11,
133:22, 136:15,
139:7, 140:21,
140:22, 140:24,
141:1, 141:22,
143:1, 143:5,
143:10, 145:9,
148:2, 151:17,
153:23, 154:16,
155:4, 155:6, 155:7,
155:9, 155:14,

Exhibit 137

JA-0001893

155:17, 155:23,
156:12, 156:17,
156:18, 156:22,
163:3, 163:8,
163:22, 165:11,
165:17, 166:25,
167:7, 167:8, 167:9,
167:22, 168:12,
168:14, 168:19,
169:23, 171:1,
171:3, 171:20,
175:17, 178:4,
180:3, 180:9, 184:5,
185:3, 189:3, 191:7,
191:22, 192:12,
193:12, 194:8,
195:1, 195:4, 195:7,
199:19, 203:11,
203:20, 209:25,
238:10, 242:8,
245:13, 252:18,
252:21

**MYSELF** [1] - 98:3

### N

**NAME** [21] - 4:1, 4:6,
4:9, 4:20, 5:1, 5:4,
5:23, 18:17, 54:22,
58:1, 86:23, 97:22,
113:14, 113:19,
113:20, 113:21,
113:24, 118:22,
143:1, 162:21,
193:12

**NAMED** [1] - 68:23
**NAMES** [3] - 84:4,
86:18, 145:18
**NARROW** [1] - 120:22
**NARROWER** [2] -
6:25, 248:19
**NATIONAL** [20] - 64:7,
66:20, 81:20, 88:17,
88:22, 93:25, 94:25,
102:22, 103:4,
103:14, 111:23,
111:24, 112:2,
118:24, 118:25,
127:3, 154:3,
169:20, 184:6,
241:17
**NATIONALLY** [1] -
199:10
**NATIONWIDE** [1] -
229:12
**NATURAL** [3] -
127:14, 175:11,
176:23
**NATURE** [4] - 79:20,
147:4, 154:18,

212:14

**NEAR** [2] - 195:6,
206:22
**NEAR-DAILY** [1] -
195:6
**NEARLY** [1] - 81:14
**NECESSARILY** [4] -
85:11, 153:2, 153:4,
228:7
**NECESSARY** [7] -
19:1, 24:23, 202:17,
224:19, 238:5,
250:3, 252:22
**NEED** [20] - 3:22, 7:12,
10:25, 11:1, 15:4,
15:5, 49:14, 52:3,
57:2, 57:3, 57:5,
77:19, 124:12,
216:21, 226:18,
226:24, 248:17,
249:18, 251:4,
252:15
**NEEDED** [2] - 82:5,
223:11
**NEEDING** [1] - 179:11
**NEEDS** [8] - 12:6,
108:13, 123:19,
131:24, 132:1,
132:19, 221:1, 227:1
**NEGATIVE** [7] - 15:1,
71:13, 71:16, 72:11,
74:7, 77:25, 107:17
**NEGATIVELY** [1] -
141:23
**NEGLECTED** [1] -
241:22
**NEIL** [2] - 38:1
**NEUTRAL** [1] - 30:4
**NEVER** [4] - 211:17,
225:20, 226:5, 226:9
**NEVERTHELESS** [3] -
232:23, 235:3,
237:18
**NEW** [90] - 6:16, 7:4,
7:6, 7:18, 13:14,
14:5, 14:17, 14:25,
23:4, 25:1, 25:5,
26:16, 27:17, 27:18,
27:23, 27:25, 34:17,
38:17, 40:11, 41:5,
47:17, 49:16, 70:18,
87:19, 98:19, 98:23,
99:8, 100:1, 100:5,
100:8, 100:20,
103:6, 107:8,
107:20, 107:23,
108:9, 120:6, 138:3,
140:15, 144:21,
144:23, 146:9,
146:10, 146:14,

147:9, 148:20,
149:2, 149:7,
149:12, 149:17,
153:10, 160:11,
163:3, 163:8,
163:22, 167:6,
171:1, 171:3, 180:3,
180:9, 184:5, 185:3,
192:12, 196:10,
196:14, 198:22,
198:23, 199:2,
199:7, 199:23,
200:9, 200:13,
201:3, 201:15,
201:20, 203:16,
207:6, 208:17,
209:10, 209:21,
222:14, 231:4,
235:1, 236:1,
236:16, 236:17,
239:17, 239:22,
244:24
**NEWSPAPER** [2] -
161:18, 194:24
**NEXT** [17] - 106:22,
151:17, 157:24,
162:8, 175:3, 175:5,
175:9, 176:10,
176:14, 176:16,
185:8, 186:9,
186:14, 186:18,
188:1, 214:12, 215:6
**NICOLE** [9] - 2:3, 2:6,
4:6, 4:11, 4:13, 98:9,
98:11, 98:12, 162:12
**NIGHT** [1] - 127:20
**NIGHTS** [1] - 119:17
**NIH** [2] - 169:24,
170:18
**NIH-FUNDED** [1] -
170:18
**NO** [112] - 8:24, 10:25,
12:3, 13:4, 13:10,
14:20, 17:5, 25:8,
28:2, 31:2, 31:23,
32:23, 34:7, 35:4,
35:8, 37:3, 38:24,
41:3, 49:6, 51:24,
57:4, 65:6, 67:10,
69:12, 72:24, 73:13,
75:25, 81:2, 89:23,
90:7, 91:12, 99:21,
100:6, 100:10,
102:3, 106:4,
106:14, 106:25,
110:23, 112:21,
121:5, 133:2, 135:2,
135:3, 140:14,
143:10, 143:17,
146:15, 146:22,

148:22, 149:4,
149:9, 152:9,
152:12, 152:16,
153:15, 159:19,
160:4, 161:19,
164:21, 166:17,
173:4, 178:18,
178:20, 179:9,
183:2, 185:21,
185:23, 186:19,
186:24, 188:5,
188:15, 193:6,
194:21, 195:1,
196:9, 197:20,
198:5, 198:11,
199:4, 199:8,
199:12, 199:17,
200:9, 200:20,
201:13, 203:25,
204:2, 208:10,
208:24, 211:25,
217:8, 220:9,
220:17, 222:2,
222:3, 222:8, 224:3,
227:25, 233:22,
234:17, 235:4,
237:19, 239:15,
243:21, 244:13,
246:19
**NO-METHOD** [1] -
186:24
**NOBODY** [2] - 33:2,
235:4
**NON** [1] - 60:23
**NON-DOCTORS** [1] -
60:23
**NONCOMPLIANCE**
[1] - 50:24
**NONCONTRACEPTI
VE** [1] - 129:18
**NONE** [6] - 26:20,
75:9, 77:17, 77:18,
145:5, 198:18
**NONETHELESS** [1] -
250:18
**NONFEDERAL** [1] -
169:21
**NONGOVERNMENT
AL** [1] - 66:20
**NONLEADING** [1] -
133:6
**NONPREGNANCY** [1]
- 130:16
**NONPREGNANCY -
PREVENTION** [1] -
130:16
**NONPRESCRIPTION**
[2] - 185:20, 186:23
**NONPROFIT** [2] -
29:4, 29:19

**NONPROFITS** [1] -
99:6
**NOR** [1] - 26:22,
155:18, 247:14
**NORMAL** [3] - 124:4,
126:9, 126:10
**NORMATIVE** [1] -
30:12
**NORTHERN** [3] -
167:2, 206:14,
207:16
**NOT** [405] - 3:20, 5:13,
5:19, 6:2, 6:14, 7:4
7:13, 8:2, 8:13, 9:4
10:13, 11:5, 11:10,
11:13, 11:15, 13:3,
14:9, 14:21, 16:19,
16:20, 18:8, 18:23,
20:9, 21:13, 23:23,
24:6, 25:2, 25:15,
25:25, 26:20, 27:1,
27:6, 27:11, 27:12,
28:6, 28:16, 28:20,
28:25, 29:8, 29:13,
30:10, 30:13, 30:25,
31:2, 31:5, 31:20,
32:6, 32:13, 32:14,
32:22, 33:12, 33:14,
34:8, 34:18, 35:7,
36:1, 36:5, 36:11,
36:18, 37:8, 37:19,
37:20, 37:21, 38:7,
38:14, 39:12, 40:22,
40:24, 40:25, 41:9,
42:2, 42:5, 42:19,
43:8, 43:25, 44:1,
45:18, 46:4, 46:13,
46:15, 46:25, 47:10,
47:22, 48:18, 48:21,
49:9, 49:25, 50:14,
50:16, 50:21, 51:1,
51:10, 51:12, 51:23,
52:8, 52:11, 53:8,
53:13, 55:12, 55:14,
56:2, 56:25, 57:12,
57:17, 57:18, 57:24,
59:13, 60:19, 60:20,
60:22, 63:9, 64:25,
65:6, 65:10, 66:9,
67:4, 69:4, 69:12,
69:18, 69:25, 71:19,
71:22, 72:2, 72:24,
73:1, 73:3, 73:7,
78:10, 79:5, 79:10,
80:3, 80:14, 80:18,
80:19, 80:23, 80:25,
82:10, 82:18, 83:19,
83:25, 85:9, 85:11,
85:13, 86:1, 89:12,
89:21, 91:21, 93:10,

Exhibit 137                                                                                    JA-0001894

93:23, 96:19, 99:5,
99:12, 99:16, 99:23,
100:11, 100:14,
100:20, 101:5,
102:19, 103:8,
104:15, 104:18,
104:21, 105:15,
106:7, 106:17,
106:20, 108:9,
108:25, 110:18,
111:4, 111:15,
111:20, 112:7,
114:15, 121:2,
121:3, 125:14,
125:15, 125:24,
127:10, 128:10,
130:8, 132:16,
132:25, 133:8,
133:11, 139:10,
139:18, 139:22,
141:10, 144:9,
144:11, 144:13,
144:15, 144:17,
144:19, 144:24,
145:8, 146:2, 146:3,
146:6, 146:15,
146:21, 147:5,
147:6, 147:10,
147:18, 148:4,
150:3, 150:11,
150:15, 151:19,
152:10, 152:12,
152:13, 152:16,
153:1, 153:4,
153:11, 155:18,
156:19, 157:18,
158:15, 158:24,
159:2, 159:4, 159:6,
159:8, 159:9,
159:14, 159:23,
161:2, 161:6,
161:13, 161:25,
163:11, 163:17,
165:23, 172:19,
173:23, 174:6,
174:9, 178:1,
178:12, 178:24,
179:9, 179:11,
179:18, 181:8,
181:22, 182:19,
183:4, 186:22,
186:25, 189:23,
190:15, 190:25,
192:18, 192:21,
192:22, 193:19,
194:5, 194:11,
194:12, 194:13,
194:20, 194:25,
196:19, 196:22,
197:2, 197:4,
197:16, 197:24,

198:5, 198:7, 199:1,
199:4, 199:5, 199:8,
199:9, 199:12,
200:6, 200:9,
200:14, 200:15,
200:19, 202:25,
203:11, 204:14,
205:7, 205:25,
207:8, 208:12,
208:19, 208:25,
209:1, 209:9,
209:18, 210:8,
210:10, 210:25,
211:2, 211:5, 211:7,
212:10, 212:16,
213:18, 214:18,
214:19, 215:7,
215:19, 216:1,
216:11, 218:23,
219:1, 219:3, 221:4,
221:10, 221:13,
221:19, 223:5,
223:21, 224:20,
224:24, 225:3,
225:4, 225:7,
225:12, 225:16,
226:1, 226:14,
226:16, 226:24,
227:3, 227:6, 228:1,
228:9, 228:15,
228:20, 229:6,
230:23, 230:24,
230:25, 231:13,
231:17, 232:12,
232:13, 233:5,
233:19, 234:12,
235:12, 236:15,
236:16, 236:19,
236:25, 237:3,
238:23, 239:5,
239:20, 239:21,
240:1, 240:18,
240:21, 240:22,
242:10, 242:19,
243:9, 243:12,
244:5, 244:17,
244:19, 245:2,
245:14, 245:19,
246:12, 247:3,
247:13, 247:22,
247:23, 248:6,
248:7, 248:9,
248:19, 249:1,
249:7, 249:10,
249:13, 249:15,
249:23, 250:2,
250:13, 250:15,
251:4, 251:5, 252:21
**NOT-FOR-PROFIT** [1]
- 110:18
**NOTABLE** [1] - 136:15

**NOTE** [1] - 95:10
**NOTED** [2] - 81:11,
106:20
**NOTHING** [21] - 11:23,
43:10, 45:7, 45:23,
48:23, 91:8, 97:11,
104:25, 109:1,
112:17, 112:19,
142:19, 156:23,
205:19, 216:8,
216:9, 244:12,
247:25, 252:8,
252:10
**NOTICE** [22] - 8:15,
25:14, 26:20, 39:1,
39:19, 42:3, 52:17,
154:25, 160:5,
160:12, 169:12,
213:22, 215:17,
216:8, 217:21,
217:25, 218:6,
218:9, 228:11,
228:20, 230:16,
249:11
**NOTICEABLE** [1] -
209:4
**NOTICES** [4] - 232:7,
237:17, 244:12,
244:14
**NOTIFIED** [1] - 229:2
**NOTIFIES** [1] - 232:13
**NOTIFY** [3] - 212:1,
227:25, 244:9
**NOTION** [1] - 222:11
**NOTRE** [2] - 34:5
**NOW** [60] - 3:12,
16:17, 18:25, 21:21,
24:14, 25:9, 28:8,
36:8, 51:12, 52:1,
53:16, 54:6, 66:19,
70:5, 87:17, 95:7,
139:1, 139:6, 143:9,
156:2, 156:11,
157:10, 158:20,
159:19, 162:6,
165:15, 168:4,
171:9, 180:2,
196:14, 197:10,
198:9, 198:22,
200:1, 200:11,
200:20, 200:21,
204:5, 209:11,
211:23, 211:24,
216:18, 220:11,
225:9, 228:16,
229:6, 229:15,
232:11, 232:16,
234:20, 235:6,
236:11, 246:16,
246:25, 247:17,

248:25, 249:8,
249:11, 252:23
**NUANCE** [1] - 9:17
**NUMBER** [45] - 1:3,
3:7, 6:7, 36:5, 59:17,
70:7, 70:8, 70:12,
70:16, 71:13, 72:4,
75:13, 75:21, 88:19,
118:18, 122:12,
122:14, 125:5,
128:4, 136:23,
140:11, 145:1,
154:1, 154:7, 155:8,
155:12, 157:4,
169:18, 177:24,
186:3, 186:4,
187:13, 187:14,
187:15, 188:17,
192:23, 197:2,
197:3, 197:5, 197:7,
197:10, 206:14,
206:16, 211:20,
224:17
**NUMBERS** [11] - 71:3,
135:12, 187:9,
187:20, 188:12,
229:1, 229:16,
229:18, 229:19,
231:9, 237:20
**NUMERAL** [1] - 84:10
**NUMEROUS** [1] -
167:25
**NUTSHELL** [1] -
162:25
**NW** [2] - 2:12, 2:18

# O

**O'CLOCK** [1] - 234:18
**O'MALLEY** [1] - 83:13
**OATH** [1] - 6:3
**OBESE** [1] - 103:20
**OBJECT** [14] - 27:3,
64:22, 86:8, 116:23,
120:16, 142:16,
150:18, 162:14,
172:15, 181:22,
184:9, 226:20,
233:21, 249:9
**OBJECTED** [4] - 51:2,
65:17, 161:14,
244:25
**OBJECTING** [2] -
50:22, 158:23
**OBJECTION** [37] -
30:22, 30:25, 31:6,
31:7, 31:8, 32:7,
32:16, 33:7, 65:13,
66:13, 80:7, 85:4,
85:10, 112:22,

120:15, 132:5,
133:4, 138:25,
139:4, 139:5, 139:7,
140:13, 141:8,
147:16, 148:3,
148:18, 150:1,
150:3, 162:25,
173:5, 173:7,
190:24, 203:17,
232:18, 236:6, 240:5
**OBJECTIONABLE** [2]
- 116:24, 208:13
**OBJECTIONS** [9] -
26:2, 64:21, 121:7,
149:24, 198:24,
218:1, 242:9,
242:11, 248:20
**OBJECTIVE** [1] -
83:17
**OBJECTOR** [2] -
239:19, 248:25
**OBJECTORS** [5] -
40:5, 240:1, 242:16,
249:2, 249:15
**OBJECTS** [2] - 58:5,
247:6
**OBLIGATION** [1] -
250:1
**OBLIGATIONS** [2] -
47:15, 50:6
**OBSERVE** [1] -
106:14
**OBSERVED** [2] -
102:2, 108:5
**OBSERVES** [1] -
102:16
**OBSTETRICIAN** [1] -
114:3
**OBSTETRICS** [4] -
60:17, 115:8, 116:6,
118:7
**OBTAIN** [1] - 179:19
**OBTAINED** [1] -
197:23
**OBVIOUSLY** [7] -
11:23, 65:4, 124:5,
135:9, 172:8, 174:2,
178:11
**OCCASION** [1] - 95:14
**OCCASIONS** [1] -
179:2
**OCCUR** [5] - 8:21,
8:23, 73:6, 75:13,
233:7
**OCCURRED** [1] -
188:22
**OCTOBER** [1] -
212:21
**ODD** [2] - 222:20,
222:21

Exhibit 137                                                                                          JA-0001895

**ODDS** [2] - 126:12, 127:8

**OF** [1226] - 1:2, 1:3, 2:2, 2:8, 2:10, 2:15, 3:2, 3:3, 3:4, 3:5, 3:7, 4:3, 4:7, 4:10, 4:14, 4:18, 4:21, 4:24, 5:2, 5:5, 5:15, 5:24, 6:7, 6:8, 6:11, 6:14, 6:20, 6:23, 7:1, 7:6, 7:11, 7:21, 8:4, 8:9, 9:1, 9:9, 9:13, 9:14, 9:19, 10:14, 10:20, 11:12, 11:17, 11:18, 11:19, 11:20, 11:21, 12:1, 12:3, 12:5, 12:6, 12:7, 12:11, 12:13, 12:14, 12:16, 12:18, 12:22, 12:24, 13:6, 13:7, 13:16, 13:17, 13:19, 13:25, 14:7, 14:8, 14:11, 15:1, 15:6, 15:9, 15:13, 15:16, 15:18, 16:6, 16:9, 16:11, 16:25, 17:3, 17:13, 17:21, 17:23, 18:8, 18:20, 18:23, 19:3, 19:4, 19:13, 19:15, 19:17, 19:22, 19:24, 20:1, 20:11, 21:6, 21:12, 21:19, 21:24, 22:3, 22:4, 22:19, 22:20, 22:23, 22:24, 23:5, 23:17, 23:23, 24:1, 24:6, 24:10, 24:16, 24:18, 25:2, 25:4, 25:9, 26:1, 26:4, 26:6, 26:12, 26:13, 26:17, 26:20, 26:21, 26:23, 27:2, 27:16, 27:24, 28:2, 28:5, 28:11, 28:17, 28:22, 29:2, 29:4, 29:5, 29:17, 29:18, 29:19, 29:22, 30:8, 30:11, 30:13, 30:19, 30:21, 30:22, 30:23, 31:19, 31:21, 31:22, 31:23, 31:25, 32:25, 34:1, 34:3, 34:4, 34:13, 34:20, 34:22, 35:5, 35:6, 35:10, 35:18, 36:3, 36:5, 36:8, 36:12, 37:10, 37:15, 37:21, 37:23, 37:24, 38:6, 38:25, 39:1, 39:14, 39:22, 40:3, 40:4, 40:6, 41:4, 41:11, 41:19, 41:22, 41:25,

42:3, 42:4, 42:5, 42:7, 42:9, 42:17, 42:20, 42:23, 43:1, 43:2, 43:4, 43:7, 43:9, 43:10, 43:15, 43:20, 43:24, 44:3, 44:6, 45:4, 45:5, 45:10, 45:15, 45:22, 46:1, 46:8, 46:10, 46:16, 46:23, 47:3, 47:6, 47:9, 47:17, 48:2, 48:6, 48:23, 49:5, 49:7, 49:11, 49:18, 49:25, 50:3, 51:3, 51:9, 51:14, 51:19, 52:6, 52:9, 52:12, 52:15, 52:18, 52:19, 52:21, 53:17, 53:19, 53:20, 55:5, 56:12, 56:14, 57:8, 57:20, 58:22, 58:24, 59:3, 59:7, 59:17, 59:20, 59:24, 60:5, 60:7, 60:10, 60:16, 60:17, 61:2, 61:3, 61:6, 61:8, 61:15, 61:19, 62:2, 62:6, 62:9, 62:12, 62:19, 62:24, 63:2, 63:4, 63:5, 63:6, 63:8, 64:1, 64:4, 64:6, 64:9, 64:10, 64:18, 64:23, 65:1, 65:5, 65:7, 65:8, 66:4, 66:8, 66:17, 66:19, 66:20, 66:21, 66:24, 66:25, 67:2, 67:6, 67:7, 67:12, 67:19, 67:21, 68:3, 68:7, 68:10, 68:22, 69:4, 69:10, 69:14, 69:15, 69:17, 69:24, 70:8, 70:9, 70:19, 70:21, 71:2, 71:3, 71:5, 71:8, 71:9, 71:13, 71:14, 71:15, 71:16, 72:4, 72:5, 72:9, 72:15, 72:16, 73:6, 73:13, 73:14, 73:18, 73:20, 73:24, 74:4, 74:7, 74:9, 74:10, 74:11, 74:12, 75:5, 75:8, 75:10, 75:11, 75:13, 75:19, 75:20, 75:21, 75:23, 76:7, 76:17, 76:18, 77:3, 77:7, 77:9, 77:12, 77:13, 77:25, 78:6, 78:12, 78:15, 78:19, 78:25, 79:3, 79:5, 79:6, 79:16, 79:20,

79:24, 80:11, 80:17, 80:20, 80:24, 81:1, 81:9, 81:10, 81:12, 81:18, 81:23, 81:24, 82:13, 82:14, 83:4, 83:7, 83:8, 83:9, 83:20, 83:23, 83:24, 84:3, 84:7, 84:18, 84:21, 85:16, 85:20, 86:2, 86:4, 86:5, 86:18, 86:20, 87:2, 87:5, 87:11, 87:12, 88:10, 88:15, 89:4, 89:18, 89:21, 89:23, 90:3, 90:5, 90:7, 90:9, 90:11, 91:7, 91:18, 92:11, 92:14, 92:16, 92:19, 92:20, 92:24, 93:6, 93:22, 93:23, 94:1, 94:4, 94:8, 94:12, 94:17, 94:19, 94:22, 95:4, 95:17, 96:2, 96:5, 96:6, 96:10, 96:11, 96:12, 96:17, 96:21, 96:25, 97:3, 97:5, 98:3, 99:6, 100:5, 100:8, 101:3, 101:5, 101:6, 101:8, 101:12, 101:15, 101:22, 102:7, 102:18, 102:22, 103:5, 103:6, 103:15, 103:19, 104:11, 104:15, 104:19, 105:8, 105:10, 105:11, 106:1, 106:7, 106:16, 107:2, 107:5, 107:6, 107:9, 107:10, 107:11, 107:13, 107:17, 108:2, 108:4, 108:6, 108:7, 108:8, 108:10, 108:12, 108:14, 108:15, 108:20, 108:22, 108:25, 109:4, 110:1, 111:22, 111:23, 111:24, 112:11, 112:24, 114:4, 114:6, 114:13, 115:9, 115:15, 115:20, 116:1, 116:10, 116:15, 116:17, 116:18, 116:20, 117:2, 117:11, 117:13, 117:15, 117:16, 117:17, 118:2, 118:20,

118:22, 118:24, 118:25, 119:2, 119:14, 119:20, 120:4, 120:13, 120:19, 121:6, 121:19, 122:10, 122:21, 122:23, 123:5, 123:9, 123:11, 123:14, 123:15, 123:18, 123:22, 124:6, 124:8, 124:9, 124:19, 125:1, 125:2, 125:3, 125:5, 125:10, 125:13, 125:16, 125:18, 125:21, 125:25, 126:2, 126:4, 126:5, 126:7, 126:9, 126:10, 126:12, 126:17, 126:18, 126:20, 126:23, 126:24, 127:1, 127:8, 127:14, 127:16, 127:18, 127:19, 127:20, 127:21, 127:22, 127:23, 127:24, 128:1, 128:4, 128:5, 128:6, 128:7, 128:11, 128:17, 128:19, 128:21, 129:16, 129:18, 129:20, 129:22, 129:24, 130:1, 130:5, 130:18, 131:12, 131:19, 132:9, 132:12, 132:14, 132:19, 132:23, 133:11, 133:13, 133:14, 133:19, 133:23, 133:24, 134:1, 134:9, 135:1, 135:16, 135:21, 135:24, 136:3, 136:17, 136:23, 136:24, 137:3, 137:4, 137:6, 137:16, 138:22, 138:23, 139:1, 139:3, 139:10, 140:7, 140:11, 140:14, 140:21, 140:23, 141:10, 141:12, 141:17, 141:23, 141:25, 142:2, 142:3, 142:5, 142:13, 142:17, 143:10, 143:19, 143:25, 144:3,

144:14, 144:15, 145:1, 145:4, 145:5, 145:6, 145:13, 145:14, 145:16, 145:17, 145:18, 145:19, 145:22, 145:23, 145:24, 145:25, 146:1, 146:3, 146:9, 146:10, 146:13, 146:17, 146:18, 146:19, 146:25, 147:4, 147:9, 147:11, 147:12, 147:22, 147:24, 148:5, 148:8, 148:9, 148:19, 148:20, 149:1, 149:2, 149:7, 149:11, 149:12, 149:17, 149:25, 150:7, 150:19, 150:21, 150:22, 150:25, 151:2, 151:3, 151:9, 151:13, 151:14, 151:18, 152:3, 152:7, 153:9, 153:10, 153:23, 153:24, 154:9, 154:11, 154:17, 154:18, 155:8, 155:12, 155:17, 155:19, 155:20, 156:3, 156:5, 156:6, 156:8, 156:10, 156:22, 157:1, 158:12, 158:14, 158:19, 158:23, 159:3, 159:4, 159:11, 159:12, 159:13, 159:18, 159:22, 160:1, 160:14, 160:25, 161:6, 162:1, 164:1, 164:2, 164:4, 164:5, 164:11, 164:13, 164:14, 164:17, 166:4, 166:5, 166:13, 166:17, 166:19, 166:22, 167:1, 167:13, 167:15, 167:17, 167:19, 167:22, 168:1, 168:7, 168:9, 168:10, 168:12, 168:22, 168:24, 169:1, 169:7, 169:18, 169:20, 169:23, 170:9, 170:10, 170:11, 170:21, 171:4,

Exhibit 137                                                                                                    JA-0001896

171:18, 171:25,
172:4, 172:5, 172:6,
172:9, 172:13,
172:20, 172:21,
172:24, 173:2,
174:1, 174:4, 174:6,
174:8, 174:10,
174:11, 174:13,
174:16, 174:19,
174:25, 175:4,
175:9, 175:10,
175:12, 175:20,
176:17, 177:13,
177:17, 177:24,
178:3, 178:10,
178:18, 178:19,
179:1, 179:3, 180:6,
180:11, 180:13,
180:14, 180:15,
180:20, 181:5,
181:12, 181:14,
181:17, 181:18,
181:22, 182:7,
182:12, 182:14,
182:17, 182:18,
182:22, 182:25,
183:1, 183:12,
183:15, 183:16,
183:19, 183:20,
184:4, 184:9,
184:11, 184:22,
186:3, 186:4, 186:5,
186:10, 186:12,
186:13, 186:16,
186:20, 186:25,
187:1, 187:4, 187:6,
187:11, 187:13,
187:15, 187:21,
188:2, 188:12,
188:14, 188:19,
188:24, 189:10,
189:17, 189:21,
190:7, 190:8,
190:10, 190:16,
190:21, 191:1,
191:18, 191:20,
192:6, 192:7, 192:8,
192:17, 192:18,
193:2, 193:19,
193:21, 193:24,
193:25, 194:1,
194:2, 194:10,
194:14, 194:17,
194:18, 194:19,
194:21, 195:4,
195:11, 195:14,
195:20, 195:21,
196:18, 196:21,
196:25, 197:4,
197:7, 197:12,
197:15, 197:18,

197:23, 198:3,
198:12, 198:18,
198:19, 199:1,
199:5, 199:10,
199:11, 199:12,
199:13, 199:19,
200:7, 200:9,
200:11, 200:13,
200:15, 200:16,
200:17, 200:22,
201:2, 201:3,
201:12, 201:16,
201:19, 201:24,
201:25, 202:3,
202:4, 202:5, 202:9,
202:11, 202:13,
202:17, 202:21,
202:22, 203:7,
203:16, 205:3,
205:9, 205:15,
206:10, 206:12,
206:14, 206:18,
206:21, 206:25,
207:11, 207:13,
207:16, 207:21,
208:8, 208:17,
208:23, 209:3,
209:23, 210:8,
210:10, 211:8,
211:11, 211:16,
211:20, 211:22,
212:3, 212:4, 212:6,
212:12, 212:13,
212:14, 212:18,
212:21, 213:2,
213:4, 213:16,
213:22, 213:23,
213:24, 215:2,
215:11, 215:15,
215:25, 216:1,
216:15, 216:19,
216:22, 217:9,
217:21, 217:25,
218:3, 218:20,
218:23, 218:24,
219:3, 219:4,
219:14, 219:25,
220:1, 220:2, 220:4,
220:10, 220:12,
221:17, 221:20,
221:25, 222:16,
222:17, 223:4,
223:15, 223:20,
224:6, 224:7,
224:11, 224:17,
225:10, 225:14,
225:16, 225:19,
225:24, 226:10,
226:15, 226:16,
226:20, 226:25,
227:1, 227:12,

227:14, 227:17,
227:23, 228:5,
228:7, 228:11,
229:12, 229:13,
229:18, 229:19,
229:20, 229:23,
230:12, 230:15,
230:18, 230:20,
230:22, 231:7,
231:9, 231:17,
231:25, 232:2,
232:4, 232:5, 232:6,
232:8, 232:14,
232:16, 232:22,
233:1, 233:5, 233:6,
233:10, 233:19,
233:21, 234:4,
234:5, 234:23,
235:5, 235:9,
235:13, 235:16,
235:24, 236:1,
236:12, 236:15,
236:16, 236:17,
237:2, 237:8,
237:14, 237:19,
237:22, 238:9,
238:12, 238:14,
238:16, 238:20,
238:23, 239:2,
239:22, 240:3,
240:6, 240:12,
240:19, 240:25,
241:6, 241:11,
241:18, 242:9,
242:14, 242:19,
242:20, 243:2,
243:12, 243:13,
243:19, 243:22,
244:4, 244:10,
244:11, 244:12,
244:14, 244:17,
244:20, 244:21,
244:23, 244:25,
245:10, 246:1,
246:6, 246:11,
247:2, 247:8,
247:12, 247:13,
247:15, 247:19,
247:20, 248:1,
248:11, 249:8,
249:11, 250:14,
250:15, 250:20,
250:24, 250:25,
251:6, 251:8,
251:15, 252:5,
252:13, 252:20,
252:22, 253:4
**OFF** [4] - 143:10,
161:9, 165:5, 165:25
**OFFER** [8] - 34:7,
129:6, 129:15,

132:17, 163:5,
163:18, 172:12,
184:10
**OFFERED** [5] - 58:14,
65:19, 66:7, 112:23,
120:18
**OFFERING** [3] - 13:5,
13:11, 221:8
**OFFICE** [5] - 2:2, 4:7,
4:10, 4:14, 143:14
**OFFICIAL** [3] - 1:19,
170:7, 253:8
**OFTEN** [3] - 71:25,
136:18, 176:18
**OH** [5] - 58:18, 67:10,
74:6, 74:9, 192:20
**OKAY** [74] - 9:6,
20:19, 21:3, 21:18,
23:11, 24:12, 25:6,
25:16, 29:7, 33:10,
33:19, 39:5, 54:2,
54:5, 55:18, 57:22,
57:25, 65:12, 66:13,
88:9, 89:17, 89:22,
90:19, 91:3, 103:16,
105:2, 109:3,
111:10, 114:15,
121:2, 121:6,
129:10, 136:22,
139:16, 144:2,
148:13, 148:15,
156:25, 157:6,
158:9, 158:24,
161:3, 162:8,
162:16, 162:24,
163:11, 163:19,
164:7, 164:20,
165:1, 171:7,
175:22, 180:2,
180:24, 181:5,
182:8, 183:25,
185:5, 190:15,
192:3, 204:5,
204:11, 210:4,
210:11, 210:20,
215:13, 217:13,
234:9, 234:15,
236:13, 242:1,
242:5, 251:14
**OLD** [5] - 36:10,
36:11, 37:12,
126:15, 127:15
**OLDER** [2] - 108:7,
108:10
**ON** [287] - 3:8, 3:24,
5:11, 6:1, 6:23, 7:21,
8:3, 8:6, 8:8, 8:9,
8:13, 8:17, 9:4, 9:14,
9:18, 9:23, 10:13,
10:14, 11:6, 12:5,

14:1, 14:5, 14:6,
15:1, 15:15, 15:17,
16:11, 16:20, 17:17,
19:1, 20:1, 21:16,
21:24, 22:4, 25:1,
25:25, 26:7, 26:15,
27:2, 30:12, 30:23,
32:5, 32:8, 33:20,
33:21, 34:17, 36:12,
38:11, 38:14, 39:9,
39:11, 42:10, 42:19,
43:9, 44:10, 46:6,
46:14, 46:15, 47:3,
48:1, 48:2, 49:25,
51:11, 51:16, 51:17,
52:1, 52:4, 53:14,
59:18, 61:1, 61:4,
62:10, 63:3, 63:18,
64:1, 64:5, 64:10,
64:17, 65:2, 68:10,
68:13, 69:1, 69:15,
73:11, 73:21, 73:23,
73:25, 74:3, 74:10,
74:19, 75:5, 75:10,
75:19, 75:24, 76:23,
79:19, 79:20, 80:17,
81:4, 81:7, 83:18,
83:25, 84:9, 85:16,
85:25, 87:8, 87:22,
87:23, 87:25, 88:7,
89:8, 90:13, 90:19,
93:12, 93:22, 94:14,
96:6, 96:17, 98:9,
100:12, 100:15,
100:25, 101:11,
101:15, 101:23,
102:10, 104:11,
105:20, 106:9,
108:1, 108:10,
108:24, 110:19,
111:13, 111:15,
112:3, 114:12,
116:15, 116:17,
118:13, 119:8,
119:13, 119:16,
119:17, 119:18,
119:19, 120:12,
122:18, 124:6,
124:15, 125:8,
129:2, 131:22,
135:9, 135:10,
136:17, 136:19,
138:17, 139:21,
140:4, 140:24,
141:4, 141:7,
141:10, 141:21,
141:23, 145:12,
145:16, 145:19,
145:23, 150:11,
151:23, 152:11,
152:14, 154:8,

Exhibit 137                                                                                          JA-0001897

154:18, 156:17,
157:14, 158:22,
159:20, 160:16,
160:24, 161:5,
161:18, 162:6,
162:16, 163:3,
164:12, 164:14,
164:18, 164:19,
165:23, 166:22,
169:7, 173:2, 173 7,
174:25, 175:16,
176:17, 185:18,
185:22, 186:6,
188:25, 190:7,
190:22, 191:7,
195:6, 204:20,
205:13, 206:5,
206:18, 206:21,
207:10, 207:12,
209:6, 209:17,
211:2, 211:13,
212:8, 213:7, 215:1,
215:24, 216:4,
216:16, 217:20,
217:22, 219:6,
219:7, 219:8,
219:19, 220:15,
220:16, 221:21,
222:7, 222:13,
223:11, 224:10,
225:2, 228:6, 229:1,
230:19, 231:8,
231:17, 232:24,
233:8, 234:23,
235:8, 235:9,
235:16, 235:22,
236:1, 236:3, 236:7,
236:13, 237:10,
237:15, 238:21,
239:12, 239:25,
240:2, 240:19,
240:21, 242:8,
242:22, 244:3,
244:4, 244:20,
245:7, 245:13,
245:16, 245:20,
246:3, 246:6, 246:7,
246:14, 248:13,
250:7, 251:25,
252:12, 252:14
**ONCE** [4] - 132:22,
161:8, 192:11, 193:2
**ONE** [97] - 5:10, 8:19,
11:18, 13:10, 17:17,
20:25, 22:3, 25:23,
28:7, 28:10, 28:15,
30:16, 36:8, 39:14,
40:20, 41:10, 41:12,
45:10, 48:1, 48:23,
49:12, 52:15, 55:19,
64:9, 66:24, 67:21,

69:17, 73:18, 73:20,
74:19, 75:16, 76:5,
76:10, 76:16, 77:7,
80:20, 82:23, 85:16,
92:1, 92:7, 95:4,
97:9, 121:6, 121:9,
124:9, 125:16,
126:23, 126:24,
127:1, 127:16,
128:4, 129:24,
134:8, 134:12,
137:6, 141:16,
142:12, 145:1,
151:14, 154:11,
156:6, 156:25,
157:1, 161:22,
163:11, 173:7,
176:9, 182:18,
182:19, 185:25,
192:1, 192:23,
194:21, 198:13,
207:13, 207:19,
208:7, 213:8, 217:6,
218:19, 224:24,
231:17, 233:8,
234:10, 234:17,
234:21, 236:22,
241:24, 245:7,
248:16, 248:18,
249:21
**ONE-TIME** [2] - 134:8,
134:12
**ONES** [6] - 77:10,
108:7, 138:10,
170:6, 176:16, 232:8
**ONGOING** [3] -
111:24, 202:20,
202:23
**ONLY** [36] - 7:23, 8:21,
10:13, 14:21, 22:3,
28:1, 29:1, 29:15,
32:18, 33:5, 34:2,
37:5, 41:10, 64:9,
86:2, 91:17, 93:20,
99:16, 112:8,
149:23, 153:16,
164:25, 188:7,
188:25, 190:8,
193:1, 208:6,
210:12, 214:2,
221:15, 221:19,
229:1, 230:16,
235:12, 243:12,
245:21
**ONSET** [1] - 126:17
**OPEN** [4] - 25:1,
25:10, 96:9, 209:17
**OPENED** [1] - 213:9
**OPENING** [2] - 3:14,
3:16

**OPENINGS** [1] - 5:12
**OPENS** [2] - 3:1,
212:12
**OPERATING** [1] -
249:3
**OPINION** [22] - 36:7,
96:4, 96:8, 96:24,
98:18, 98:23,
100:20, 138:21,
141:5, 142:12,
156:17, 173:2,
188:18, 190:2,
190:25, 191:13,
191:17, 206:18,
207:16, 226:10,
252:4, 252:6
**OPINIONS** [2] - 97:3,
174:8
**OPPORTUNITY** [6] -
96:9, 103:5, 181:11,
190:17, 232:20,
236:3
**OPPOSED** [1] - 108:7
**OPPOSING** [1] - 11:4
**OPPOSITION** [1] -
251:19
**OPT** [12] - 13:7, 13:12,
13:16, 23:5, 40:5,
43:13, 96:10,
211:16, 212:1,
212:15, 232:20,
242:14
**OPT-OUT** [2] - 40:5,
43:13
**OPTIMAL** [2] - 71:20,
72:3
**OPTIMALLY** [1] -
107:15
**OPTING** [4] - 11:11,
11:15, 96:19, 228:15
**OPTION** [4] - 229:3,
230:12, 230:25,
248:8
**OPTIONAL** [6] -
211:23, 211:25,
226:14, 232:16,
248:10, 250:16
**OPTIONS** [16] - 100:1,
163:4, 163:23,
171:1, 171:3,
173:12, 180:3,
180:9, 184:5, 185:4,
190:16, 191:20,
191:21, 191:22,
192:12, 208:6
**OPTS** [1] - 7:4
**OR** [175] - 7 14, 8:5,
10:19, 12:3, 13:5,
13:8, 13:11, 13:13,
13:17, 13:19, 14:11,

15:18, 18:23, 19:25,
20:8, 20:14, 28:3,
28:19, 28:20, 29:4,
31:18, 31:20, 32:13,
32:22, 33 7, 34:21,
35:5, 36:5, 37:12,
37:17, 41:16, 41:21,
42:1, 42:5, 42:24,
43:10, 43:12, 44:7,
47:10, 48 6, 48:21,
49:2, 49:20, 50:23,
52:22, 56:2, 62:8,
65:1, 66:8, 67:9,
69:25, 72:6, 73:7,
73:18, 73 19, 79:5,
79:12, 80 3, 80:24,
82:18, 84:25, 85:17,
87:22, 88:10, 90:20,
90:23, 91:8, 91:21,
92:14, 100:21,
107:8, 109:11,
114:19, 116:10,
120:19, 120:22,
120:23, 121:3,
122:8, 123:13,
124:3, 125:21,
127:2, 128:24,
133:2, 133:12,
135:11, 135:21,
136:20, 142:8,
145:18, 148:5,
148:19, 149 7,
149:24, 150:3,
150:12, 150:15,
151:22, 153:17,
153:20, 154:2,
157:4, 159:7, 160:5,
169:11, 169:20,
172:7, 172:21,
172:24, 173:18,
173:23, 174:6,
174:9, 175:1, 175 8,
178:20, 178:25,
179:18, 179:19,
179:21, 181:9,
181:24, 184:18,
188:10, 189:23,
189:25, 190:1,
190:15, 191:14,
194:12, 199:14,
200:4, 202:13,
203:14, 205:10,
205:18, 207:23,
208:10, 210:5,
212:2, 214:13,
215:20, 218:7,
218:11, 218:24,
219:3, 219:21,
221:9, 221:20,
221:22, 222:4,
222:16, 222:21,

227:16, 229:22,
230:13, 230:14,
231:10, 237:14,
240:1, 242:19,
245:4, 247:3,
247:15, 247:24,
249:21, 250:10,
251:6, 252:24
**ORAL** [8] - 12:2,
79 21, 80:22, 80:24,
130:21, 133:17,
133:20, 135:5
**ORANGES** [1] -
109:11
**ORDER** [21] - 3:22,
30:12, 53:5, 54:9,
66:7, 97:25, 98:7,
143:3, 143:11,
180:20, 207:25,
214:17, 214:20,
214:23, 237:18,
245:13, 245:16,
246:1, 249:6,
252:18, 252:21
**ORDINARY** [1] - 241:5
**ORGANIZATION** [4] -
28:14, 29:4, 102:23,
217:25
**ORGANIZATIONS** [2]
- 27:6, 34:2
**ORGANIZED** [1] -
176:3
**ORIGINAL** [5] - 38:21,
42 21, 43:14, 43:22,
211:5
**ORIGINALLY** [2] -
55:3, 211:8
**OSORIO** [2] - 241:3,
241:4
**OTHER** [69] - 6:4,
13:9, 14:6, 15:2,
16:25, 17:6, 17:7,
28:14, 29:21, 34:1,
41 12, 43:2, 48 2,
50:19, 52:2, 71:3,
73:22, 74:11, 79:12,
85:22, 86:3, 86:9,
86 20, 92:11,
106:21, 107:2,
108:13, 108:15,
111:14, 115:23,
117:18, 119:1,
121:9, 121:17,
143:10, 149:16,
151:1, 151:10,
154:11, 161:22,
164:18, 169:5,
169:9, 172:19,
172:22, 173:25,
174:16, 175:5,

179:18, 179:20,
182:20, 185:19,
186:20, 187:13,
188:8, 188:25,
189:6, 189:8,
189:15, 192:14,
194:2, 194:22,
195:3, 195:17,
195:18, 197:22,
199:21, 202:10,
202:13, 203:4,
203:8, 203:9, 208:6,
208:22, 209:16,
213:5, 225:1, 230:1,
230:22, 231:4,
231:12, 231:18,
231:19, 239:3,
240:10, 240:23,
242:8

**OTHERS** [10] - 47:10,
62:8, 66:23, 72:19,
77:15, 93:6, 130:8,
155:5, 177:1, 215:21

**OTHERWISE** [4] -
53:23, 80 5, 82:5,
203:1

**OUGHT** [4] - 67:14,
69:9, 78:24, 79:3

**OUR** [48] - 6:1, 6:5,
7:22, 8:8, 9 14, 9:19,
9:20, 15:20, 16:9,
21:23, 23:22, 23:25,
24:3, 42:7, 42:16,
65:9, 67:10, 82:15,
86:1, 86:5, 86:6,
86:21, 109:18,
110:8, 111:21,
112:9, 112:22,
122:11, 141:24,
157:24, 158:7,
159:18, 179:13,
181:7, 183:5, 184:4,
187:4, 188:24,
212:22, 214:9,
215:2, 215:17,
216:24, 229:20,
230:8, 235:13,
237:15

**OURSELVES** [1] -
24:4

**OUT** [67] - 7:4, 7:22,
9:5, 9:14, 9:22, 13:7,
13:12, 13:16, 14:11,
23:5, 30:3, 32:21,
37:17, 40 5, 43:13,
44:11, 44 13, 44:18,
44:22, 76:17, 77:3,
77:9, 79:16, 83:6,
86:5, 91:18, 92:20,
96:10, 119:6, 126:3,

126:24, 127:1,
140:7, 149:19,
166:17, 178:9,
178:18, 182:13,
186:15, 188:13,
189:6, 189:10,
194:4, 206:4,
207:13, 210:13,
211:16, 212:1,
212:16, 214:12,
215:2, 216:6, 227:5,
228:15, 231:19,
232:20, 233:15,
239:17, 242:14,
243:11, 243:21,
244:10, 244:13,
244:22, 244:24,
249:25, 252:6

**OUT-OF-POCKET** [3]
- 166:17, 178:18,
189:10

**OUTCOMES** [5] -
75:20, 123:16,
169:22, 171:2,
180:10

**OUTLINES** [1] - 23:25

**OUTS** [1] - 222:6

**OUTSIDE** [11] - 6:22,
64:5, 84:4, 84:13,
88:10, 96:25,
102:18, 125:21,
141:11, 142:13,
141:24

**OUTSTANDING** [1] -
155:21

**OVARIAN** [7] - 108:15,
123:6, 126:7, 126:9,
126:16, 126:21,
128:18

**OVARIES** [3] - 126:11,
127:5, 127:10

**OVER** [41] - 12:21,
13:1, 19:24, 26:1,
26:3, 27:19, 27 23,
28:7, 51:23, 53:24,
57:1, 62:18, 65:9,
66:2, 93:1, 94:9,
95:1, 101:24, 108:4,
119:4, 122:24,
125:23, 134:12,
134:15, 134:25,
135:12, 135:16,
140:21, 154:17,
155:10, 155:16,
163:20, 181:12,
183:12, 186:14,
188:2, 188:19,
192:13, 229:9, 230:1

**OVER-THE-
COUNTER** [1] -

125:23

**OVERALL** [2] -
129:21, 145:10

**OVERLAP** [5] -
118:15, 118:17,
118:18, 237:17,
237:20

**OVERRULE** [2] -
65:12, 121:9

**OVERRULED** [4] -
141:13, 181:25,
185:5, 191:3

**OVERRULING** [1] -
173:7

**OVERSEE** [1] - 170:10

**OVERSEEING** [1] -
62:1

**OVERVIEW** [1] - 164:4

**OWN** [18] - 19:19,
23:17, 30:15,
120:25, 122:10,
136:15, 143:5,
155:4, 155:6, 155:7,
174:7, 189:17,
190:13, 190:14,
216:22, 229:17,
235:8, 242:13

**OWNERS** [2] - 29:4,
29:18

---

## P

**PA** [4] - 1:9, 1:21, 2:4,
2:7

**PACE** [2] - 122:23,
195:22

**PACT** [1] - 81:25

**PAGE** [26] - 9:14,
10:14, 43:9, 68:7,
68:8, 68 13, 74:18,
74:22, 80:17, 81:4,
82:20, 84:5, 84:18,
86:13, 90:13, 101:6,
101:8, 101:12,
107:23, 114:13,
143:25, 144:1,
185:8, 250:7, 254:1

**PAGES** [3] - 52:7,
84:9, 86 13

**PAID** [2] - 11:20, 79:13

**PAIN** [16] - 117:17,
123:6, 125:1, 125:5,
125:6, 125:11,
125:13, 125:17,
125:21, 126:3,
128:17, 128:18,
130:12, 142:1,
155:22

**PANEL** [1] - 104:21

**PAPER** [5] - 83:13,

93:10, 106:24,
110:25

**PAPERS** [2] - 9:20,
26:16

**PAR** [1] - 21:16

**PARAGARD** [1] -
90:20

**PARAGRAPH** [47] -
10:7, 10:15, 10:18,
10:22, 10:23, 10:24,
81:5, 81:8, 82:10,
82:21, 82:24, 83:7,
83:12, 98:18,
100:18, 100 19,
101:22, 102:14,
103:1, 103:4, 103:9,
103:11, 143:19,
143:25, 146:17,
146:23, 148:8,
148:15, 148 24,
149:5, 149:10,
149:14, 150:25,
151:6, 151:8, 158:8,
198:10, 199:18,
200:21, 201 6,
201:14, 201:22,
202:2, 202:9,
202:16, 221:13

**PARAGRAPHS** [8] -
10:3, 10:6, 10:10,
10:11, 10:16, 10:17,
147:12, 147:23

**PARAMETERS** [1] -
180:6

**PARDON** [1] - 115:11

**PARENS** [10] - 15:14,
16:7, 16:12, 17:15,
17:17, 18:2, 18:18,
34:25, 35 3, 35:8

**PARENTHESES** [1] -
81:16

**PARENTHOOD** [1] -
179:21

**PARITY** [3] - 215:23,
230:23, 231:5

**PART** [35] - 22:20,
22:23, 35:4, 42:9,
51:19, 52 6, 59:6,
59:24, 61:8, 67:6,
69:9, 69:14, 73:18,
73:20, 78:6, 78:15,
78:25, 79:3, 87:12,
94:4, 116 10, 118:2,
119:14, 120 4,
158:12, 159:18,
166:19, 167:15,
171:25, 172:5,
172:9, 174:25,
195:4, 216:7, 237 21

**PARTICIPANT** [1] -

181:13

**PARTICIPANTS** [3] -
110:14, 180:12,
207:23

**PARTICIPANTS '** [1] -
218:2

**PARTICIPATE** [2] -
182:15, 232:21

**PARTICIPATED** [1] -
73:14

**PARTICIPATING** [1] -
183:7

**PARTICULAR** [26] -
3:21, 20:2, 31:25,
49:11, 49:20, 87:18,
93:13, 96:13,
132:19, 173:5,
173:15, 174:5,
174:11, 174:13,
175:13, 182:20,
184:18, 195:2,
195:8, 195:13,
206:4, 208 24,
211:13, 214:20,
222:19, 227:20

**PARTICULARLY** [8] -
20:5, 36:13, 61:5,
181:9, 214:9,
214:14, 217:5, 246:2

**PARTIES** [5] - 3:13,
3:14, 3:16, 6:2,
251:16

**PARTNERED** [1] -
182:9

**PARTS** [2] - 95:17,
174:10

**PARTUM** [1] - 12:15

**PARTY** [5] - 34:6,
212:2, 218:7,
218:10, 229:4

**PASS** [2] - 158:6,
205:13

**PASSAGE** [1] - 90:5

**PASSED** [5] - 28:8,
198:11, 198:18,
224:20, 250:1

**PAST** [3] - 26:1, 51:25,
173:22

**PATCH** [2] - 175:7,
176:15

**PATCHWORK** [1] -
26 4

**PATIENT** [33] -
121:13, 121:15,
122:8, 122:10,
124:6, 124:11,
124:12, 124:15,
125:4, 129:17,
131:19, 132:14,
132:21, 132:23,

135:2, 136:24, 137:4, 140:2, 141:2, 152:25, 153:8, 154:15, 154:16, 154:19, 169:22, 171:2, 172:4, 179:16, 179:17, 179:18, 180:10, 190:11, 198:11

**PATIENT'S** [1] - 132:12

**PATIENT-CENTERED** [3] - 169:22, 171:2, 180:10

**PATIENTS** [89] - 11:10, 11:14, 11:19, 12:4, 12:9, 14:16, 22:19, 23:2, 23:14, 62:8, 117:12, 117:13, 118:10, 119:23, 121:14, 121:15, 121:21, 122:2, 122:5, 122:6, 122:8, 122:9, 122:13, 122:17, 122:20, 122:23, 122:25, 125:20, 125:22, 126:16, 126:19, 128:13, 128:14, 128:16, 129:2, 129:7, 130:5, 130:19, 130:24, 131:1, 131:5, 131:12, 131:22, 132:10, 132:24, 133:8, 133:13, 133:20, 133:23, 134:2, 135:10, 136:18, 137:11, 138:10, 138:17, 140:7, 140:15, 142:10, 145:5, 145:13, 145:22, 147:6, 155:1, 155:9, 155:12, 156:2, 156:18, 157:1, 171:21, 173:11, 175:14, 178:3, 178:15, 178:24, 179:7, 179:8, 189:20, 192:20, 198:18, 199:19, 200:2, 200:4, 200:5, 200:10, 200:15, 200:16, 203:9, 203:14

**PATIENTS'** [2] - 131:24, 202:4

**PATRIAE** [10] - 15:14,

16:7, 16:12, 17:15, 17:17, 18:2, 18:19, 34:25, 35:3, 35:8

**PATTERNS** [9] - 94:22, 102:1, 102:3, 106:14, 109:15, 109:19, 111:19, 112:9, 154:17

**PAUSE** [3] - 136:9, 160:20, 203:22

**PAY** [15] - 79:13, 79:16, 79:22, 80:3, 80:12, 80:13, 80:18, 90:7, 92:20, 135:10, 140:7, 153:10, 192:10, 192:22, 240:10

**PAYING** [3] - 14:11, 136:3, 231:12

**PAYMENT** [1] - 12:17

**PAYMENTS** [1] - 83:5

**PAYS** [7] - 79:18, 79:24, 90:7, 96:11, 96:13, 96:15, 178:20

**PCORI** [3] - 169:22, 171:2, 180:10

**PECULIAR** [1] - 187:19

**PEER** [4] - 104:6, 110:25, 169:5, 169:6

**PELVIC** [12] - 117:17, 123:6, 125:1, 125:5, 125:6, 125:11, 125:13, 125:17, 125:21, 128:17, 130:12, 155:22

**PENALTIES** [1] - 50:23

**PENN** [11] - 55:5, 60:7, 60:10, 61:2, 90:2, 93:5, 122:3, 166:1, 166:2, 168:14, 170:16

**PENNSYLVANIA** [109] - 1:2, 1:3, 2:8, 2:12, 3:3, 4:3, 5:24, 7:7, 12:13, 12:20, 12:25, 13:4, 13:6, 13:10, 14:7, 14:8, 15:1, 21:12, 22:13, 22:24, 23:15, 24:20, 27:20, 34:4, 34:21, 43:9, 43:19, 55:3, 64:2, 64:6, 64:8, 87:23, 88:12, 88:16, 88:24, 89:19, 89:24, 90:4, 93:2, 93:20, 93:23, 95:4, 96:6, 96:25, 100:4, 110:2, 110:8, 110:11, 112:2,

115:9, 115:15, 116:1, 116:16, 116:18, 117:2, 119:2, 121:19, 121:20, 127:2, 138:11, 138:24, 140:12, 141:7, 141:11, 141:21, 142:13, 146:8, 146:18, 146:24, 147:8, 147:13, 147:24, 148:16, 148:25, 149:6, 149:11, 149:15, 153:25, 157:2, 163:9, 181:12, 182:12, 190:23, 197:1, 197:19, 198:4, 197:6, 198:8, 199:2, 199:6, 199:9, 199:14, 202:19, 227:10, 229:19, 229:21, 230:2, 230:9, 230:21, 231:3, 232:2, 232:8, 232:14, 233:11, 235:4, 235:8, 242:12, 243:20, 252:4

**PENNSYLVANIA 'S** [4] - 34:11, 233:10, 234:2

**PENNSYLVANIANS** [1] - 12:21

**PEOPLE** [26] - 14:3, 21:10, 28:20, 29:17, 59:1, 62:4, 64:2, 64:5, 68:10, 75:17, 75:20, 79:25, 86:19, 94:18, 111:20, 148:6, 187:16, 199:10, 199:13, 216:21, 219:18, 220:2, 229:7, 235:3, 237:14, 250:23

**PER** [11] - 75:22, 76:11, 91:18, 118:12, 118:17, 119:11, 122:6, 135:11, 176:9, 176:18

**PERCENT** [37] - 69:24, 70:2, 70:4, 70:6, 70:7, 70:12, 70:21, 71:14, 73:6, 80:21, 81:2, 88:21, 88:23, 89:1, 89:10, 89:14, 92:7, 99:6, 125:3, 126:23, 133:23, 134:3,

137:8, 153:24, 154:1, 154:7, 157:4, 183:18, 183:20, 186:13, 186:17, 186:21, 186:25, 187:1, 197:8

**PERCENTAGE** [8] - 88:14, 88:15, 91:10, 133:19, 134:1, 157:1, 187:12, 187:15

**PERCENTAGES** [1] - 186:20

**PERFECT** [6] - 48:3, 75:16, 75:17, 157:11, 250:25

**PERFECTLY** [2] - 204:15, 222:18

**PERFORM** [4] - 122:15, 124:14, 129:19, 132:11

**PERFORMED** [5] - 22:9, 64:5, 92:22, 107:22, 109:10

**PERHAPS** [2] - 195:11, 205:20

**PERIOD** [9] - 25:10, 32:18, 71:2, 90:5, 94:9, 124:3, 154:20, 183:12, 209:17

**PERIODS** [6] - 125:11, 125:21, 125:22, 128:18, 131:13, 135:25

**PERMANENT** [5] - 26:5, 39:24, 176:10, 176:13, 244:22

**PERMANENTE** [1] - 83:15

**PERMISSION** [5] - 57:20, 57:25, 97:15, 116:21, 204:7

**PERMIT** [1] - 43:13

**PERMITTED** [1] - 66:9

**PERMITTING** [1] - 242:13

**PERSON** [7] - 65:1, 84:24, 146:11, 146:21, 150:15, 179:20, 236:22

**PERSONAL** [2] - 140:14, 174:7

**PERSONALLY** [4] - 141:1, 169:2, 173:24, 179:20

**PERSPECTIVE** [5] - 22:3, 22:18, 23:13, 133:11, 163:17

**PERSUADED** [2] - 50:14, 50:17

**PERTAIN** [2] - 155:3, 159:15

**PERTAINING** [3] - 204:25, 205:6, 206:7

**PERTAINS** [1] - 48:14

**PH.D** [1] - 58:9

**PH.D.'S** [1] - 61:1

**PHARMACIES** [1] - 203:14

**PHARMACISTS** [1] - 203:14

**PHARMACY** [1] - 192:21

**PHENOMENON** [2] - 145:4, 179:6

**PHILADELPHIA** [6] - 1:9, 1:21, 2:7, 22:24, 121:24, 167:9

**PHILOSOPHY** [1] - 51:9

**PHONE** [2] - 5:11, 98:9

**PHRASE** [3] - 18:15, 115:16, 246:5

**PHYSICIAN** [4] - 60:22, 163:16, 166:3, 193:2

**PHYSICIANS** [3] - 11:11, 75:4, 121:17

**PILL** [13] - 91:17, 96:19, 128:24, 130:21, 134:9, 135:5, 136:1, 145:18, 175:6, 176:15, 176:19, 190:1

**PILLS** [10] - 11:22, 12:3, 80:15, 91:8, 91:11, 91:14, 129:17, 133:17, 133:21, 134:5

**PITTSBURGH** [1] - 55:3

**PLACE** [11] - 24:17, 25:7, 81:7, 131:17, 133:16, 135:3, 160:6, 181:20, 189:18, 197:7, 207:6

**PLACES** [1] - 239:3

**PLAIN** [2] - 45:18, 125:17

**PLAINLY** [1] - 7:21

**PLAINTIFF** [3] - 26:22, 64:25, 208:16

**PLAINTIFF'S** [1] - 3:20

**PLAINTIFFS** [7] - 17:7, 17:8, 151:12, 206:19, 206:21, 216:19, 229:20

Exhibit 137    JA-0001900

**PLAINTIFFS'** [2] - 3:24, 164:9
**PLAN** [32] - 30:11, 53:9, 53:12, 53:21, 79:13, 79:19, 145:2, 145:3, 151:19, 206:19, 206:20, 206:21, 207:7, 207:9, 207:21, 207:22, 207:24, 208:7, 208:11, 208:18, 221:8, 228:2, 228:11, 230:13, 230:14, 230:15, 230:18, 244:4, 244:10, 244:11, 250:2
**PLANNED** [1] - 179:21
**PLANNING** [12] - 14:2, 14:6, 81:24, 81:25, 167:3, 167:5, 168:20, 175:11, 176:24, 177:8, 184:24, 194:18
**PLANS** [45] - 13:5, 13:11, 24:25, 25:1, 25:8, 25:10, 25:13, 42:24, 43:25, 52:12, 52:15, 52:20, 52:21, 52:23, 53:23, 63:5, 71:3, 72:9, 99:1, 196:15, 196:18, 196:22, 196:25, 197:8, 198:14, 199:15, 199:23, 202:21, 205:3, 205:7, 205:9, 205:11, 205:15, 206:1, 209:8, 209:11, 224:11, 224:13, 224:17, 229:10, 230:24, 244:8, 249:12
**PLAY** [3] - 173:10, 174:12, 177:7
**PLAYED** [1] - 59:6
**PLEASE** [12] - 3:23, 54:22, 87:23, 106:9, 113:9, 113:13, 113:19, 113:24, 162:20, 165:10, 182:5, 184:1
**POCKET** [7] - 14:11, 79:17, 92:20, 140:8, 166:17, 178:18, 189:10
**POINT** [41] - 9:7, 24:1, 25:11, 26:13, 30:3, 34:20, 35:15, 37:3, 37:13, 45:2, 46:15,

47:12, 55:23, 57:24, 85:25, 107:5, 107:6, 111:4, 116:23, 119:6, 125:23, 150:24, 159:3, 159:7, 159:12, 160:7, 160:11, 164:15, 165:15, 175:20, 183:23, 211:4, 222:19, 227:15, 227:19, 231:21, 239:17, 243:4, 243:21, 244:3, 244:18
**POINTED** [2] - 206:4, 233:15
**POINTS** [6] - 83:6, 163:15, 165:24, 187:11, 192:5, 231:18
**POISED** [1] - 21:24
**POLICE** [2] - 31:25, 240:2
**POLICES** [1] - 33:2
**POLICIES** [2] - 12:17, 25:3
**POLICING** [3] - 31:19, 31:22, 32:2
**POLICY** [5] - 12:18, 16:23, 52:22, 192:23, 220:10
**POLICYHOLDERS** [1] - 205:10
**POLICYMAKERS** [1] - 66:23
**POLITICAL** [2] - 110:22, 220:4
**POPULATION** [5] - 61:18, 121:16, 129:16, 141:2, 178:5
**POPULATION - BASED** [1] - 61:18
**PORTION** [3] - 207:12, 236:12, 252:21
**POSES** [1] - 30:24
**POSING** [1] - 230:5
**POSITION** [8] - 15:10, 50:14, 51:12, 58:14, 60:15, 140:22, 160:24, 247:1
**POSITIVE** [1] - 29:5
**POSSIBILITY** [1] - 89:9
**POSSIBLE** [6] - 5:18, 25:13, 234:13, 237:19, 240:3, 252:6
**POSSIBLY** [1] - 53:10
**POST** [15] - 12:15, 23:2, 112:15, 131:9, 140:6, 145:20,

145:21, 153:17, 153:20, 153:22, 155:12, 252:19, 252:20
**POST-ACA** [1] - 140:6
**POST-HEARING** [1] - 252:19, 252:20
**POSTMENOPAUSAL** [1] - 130:12
**POSTS** [1] - 194:24
**POTENTIAL** [3] - 71:24, 81:18, 212:12
**POTENTIALLY** [4] - 136:5, 137:19, 147:4, 211:19
**POWER** [2] - 35:4, 35:5
**PRACTICAL** [1] - 123:24
**PRACTICE** [36] - 22:20, 22:23, 69:1, 118:9, 120:25, 122:11, 123:4, 125:7, 131:11, 136:16, 154:17, 155:4, 155:6, 155:7, 155:10, 155:14, 155:23, 156:22, 171:10, 171:12, 171:14, 171:15, 171:18, 171:19, 171:20, 172:1, 173:11, 178:4, 178:22, 179:13, 189:17, 203:4, 203:9, 209:2
**PRACTICES** [1] - 155:15
**PRACTICING** [4] - 140:21, 163:16, 166:7, 171:22
**PRE** [8] - 23:2, 131:8, 132:22, 133:21, 145:20, 155:12, 177:16, 239:23
**PRE-ACA** [4] - 131:8, 132:22, 133:21, 239:23
**PRE-TERM** [1] - 177:16
**PRECEDENT** [4] - 37:8, 49:2, 49:3, 164:21
**PRECEDENTIAL** [4] - 36:19, 37:19, 37:24, 38:8
**PRECEPTS** [1] - 28:18
**PRECIPITOUSLY** [1] - 94:5
**PRECISE** [1] - 197:10

**PRECISELY** [2] - 194:9, 197:2
**PRECLUDE** [1] - 214:24
**PRECLUDED** [1] - 221:4
**PRECONCEPTION** [2] - 63:8, 73:23
**PREDICTION** [4] - 140:16, 140:18, 239:2, 239:8
**PREEMPTING** [1] - 216:9
**PREFATORY** [1] - 223:19
**PREFER** [2] - 9:23, 56:25
**PREFERENCE** [1] - 174:7
**PREFERENCES** [1] - 190:14
**PREFERRED** [2] - 85:5, 85:7
**PREGNANCIES** [40] - 7:15, 12:16, 14:14, 69:24, 71:15, 71:25, 72:5, 72:8, 72:20, 73:6, 75:13, 75:22, 81:20, 82:1, 88:8, 88:9, 88:12, 88:15, 89:18, 91:18, 106:23, 106:24, 142:4, 142:5, 150:7, 150:23, 151:3, 151:10, 151:14, 151:18, 176:18, 176:20, 177:11, 177:15, 177:17, 191:23, 202:10, 202:12
**PREGNANCY** [58] - 9:11, 10:1, 10:4, 10:8, 10:13, 10:21, 69:16, 69:21, 69:22, 70:20, 71:8, 71:11, 71:13, 71:19, 71:20, 71:22, 71:24, 72:14, 72:17, 72:23, 73:4, 73:21, 74:12, 74:15, 76:11, 77:7, 79:2, 80:20, 81:1, 81:13, 91:20, 96:22, 111:23, 117:14, 127:9, 130:6, 130:9, 130:15, 137:17, 137:18, 137:21, 142:6, 142:7, 149:16, 150:12, 151:1, 153:25, 154:6, 168:15,

168:18, 172:5, 172:7, 172:8, 173:18, 176:9, 187:23, 188:1
**PREGNANT** [22] - 31:11, 70:1, 71:23, 72:2, 72:3, 73:3, 76:1, 76:4, 76:18, 91:21, 126:12, 127:7, 127:8, 137:12, 137:14, 137:20, 150:16, 173:18, 173:20, 177:14, 188:4
**PREJUDICED** [1] - 164:24
**PRELIMINARY** [11] - 1:14, 3:9, 7:24, 8:4, 26:5, 159:13, 160:17, 244:22, 251:17, 251:18, 251:20
**PREMATURE** [6] - 123:6, 126:7, 126:8, 126:16, 126:21, 128:18
**PREMATURELY** [1] - 127:23
**PREMISE** [2] - 81:21, 82:7
**PREMISES** [1] - 106:2
**PREMIUMS** [1] - 208:2
**PRENATAL** [3] - 72:1, 72:3, 150:8
**PREPARATION** [4] - 93:11, 135:9, 195:17, 196:4
**PREPARATIONS** [1] - 134:14
**PREPARE** [7] - 98:1, 98:7, 143:4, 143:5, 143:11, 195:8, 196:5
**PREPARED** [2] - 164:2, 194:8
**PREPARING** [4] - 193:17, 194:3, 194:7, 194:23
**PREROGATIVE** [1] - 20:16
**PREROGATIVES** [1] - 19:20
**PRESCRIBE** [11] - 23:1, 119:22, 130:4, 130:6, 130:8, 130:14, 130:19, 132:1, 132:10, 133:25, 134:11
**PRESCRIBED** [4] - 80:4, 131:4, 133:17, 198:13

Exhibit 137                                                                                    JA-0001901

PRESCRIBING [6] - 94:22, 130:24, 130:25, 131:12, 131:16, 155:15
PRESCRIPTION [32] - 71:6, 77:10, 77:13, 77:15, 77:20, 79:23, 80:15, 80:19, 80:23, 94:19, 94:20, 132:10, 132:23, 133:2, 133:3, 133:8, 133:12, 133:20, 134:2, 135:6, 135:11, 135:22, 137:4, 139:23, 140:2, 153:1, 153:9, 153:13, 185:19, 186:20, 187:13
PRESCRIPTIONS [11] - 11:11, 11:15, 23:2, 80:25, 96:19, 133:24, 136:19, 140:8, 153:18, 155:1, 203:15
PRESENT [1] - 65:2
PRESENTATION [3] - 184:4, 184:21, 184:23
PRESENTATIONS [6] - 60:1, 61:13, 63:18, 63:24, 184:25, 185:11
PRESENTED [5] - 100:11, 100:14, 152:10, 152:13, 243:18
PRESENTING [1] - 184:5
PRESERVING [1] - 218:2
PRESS [1] - 194:25
PRESSED [1] - 136:24
PRESUMABLY [2] - 8:13, 8:14
PRETERM [1] - 72:6
PRETEXT [2] - 31:1, 31:3
PRETTY [9] - 40:11, 49:1, 49:7, 58:17, 79:18, 89:6, 188:22, 225:6, 226:7
PREVAIL [1] - 221:24
PREVAILS [1] - 30:17
PREVALENCE [1] - 127:3
PREVALENT [2] - 10:2, 69:23
PREVENT [5] - 130:6, 130:9, 130:15, 202:18, 205:14

PREVENTABLE [1] - 10:8
PREVENTATIVE [10] - 22:5, 64:11, 64:19, 65:13, 74:4, 172:13, 200:24, 202:20, 202:23, 202:25
PREVENTING [6] - 10:4, 10:13, 74:12, 74:15, 79:1, 214:8
PREVENTION [1] - 130:16
PREVENTIVE [35] - 43:21, 44:3, 45:5, 52:11, 67:3, 67:6, 67:13, 67:14, 68:23, 68:24, 69:4, 69:10, 73:5, 78:6, 78:15, 78:24, 78:25, 79:3, 87:13, 96:3, 97:5, 98:20, 98:25, 105:21, 144:5, 167:14, 169:11, 202:25, 220:13, 220:15, 221:12, 223:3, 223:7, 224:9, 250:3
PREVIOUS [4] - 50:25, 206:4, 207:14, 252:18
PREVIOUSLY [5] - 44:19, 51:14, 163:4, 163:18, 189:23
PRICE [2] - 2:11, 220:1
PRIESTS [9] - 39:16, 40:8, 40:10, 40:20, 41:11, 41:13, 41:20, 217:15
PRIMARILY [2] - 9:16, 143:7
PRIMARY [9] - 63:7, 67:11, 143:6, 156:14, 156:21, 167:17, 167:21, 171:20, 193:22
PRINCIPLE [3] - 50:5, 50:7, 240:25
PRINCIPLES [3] - 30:21, 191:2, 241:6
PRIOR [25] - 38:17, 39:9, 40:11, 79:9, 91:5, 130:1, 131:18, 132:15, 140:23, 154:13, 155:7, 155:23, 163:15, 170:13, 173:22, 178:6, 178:22, 197:11, 197:21, 209:2, 217:15,

228:10, 235:9, 252:5
PRIVATE [11] - 17:7, 20:9, 20:12, 66:21, 79:13, 81:19, 110:18, 169:24, 178:16, 182:9, 198:14
PRIVATELY [12] - 90:3, 93:2, 94:1, 153:19, 166:15, 178:15, 179:8, 180:16, 180:17, 182:11, 190:22, 190:23
PRIVATELY - INSURED [8] - 90:3, 93:2, 94:1, 178:15, 179:8, 180:17, 190:22, 190:23
PRIVILEGES [1] - 159:6
PROBABLY [7] - 5:20, 32:1, 157:4, 168:7, 193:2, 210:13, 228:7
PROBLEM [7] - 79:3, 124:7, 145:20, 148:7, 157:18, 203:10, 204:14
PROBLEMATIC [4] - 212:17, 222:21, 222:24, 250:12
PROBLEMS [8] - 111:20, 124:9, 124:11, 203:15, 212:13, 213:6, 229:15, 246:25
PROCEDURAL [15] - 8:6, 8:11, 8:12, 8:19, 8:21, 9:12, 38:13, 158:2, 158:23, 213:2, 213:19, 213:21, 213:22, 214:2, 215:15
PROCEDURE [6] - 6:23, 77:21, 100:16, 152:15, 172:20, 214:3
PROCEDURES [3] - 119:13, 119:15, 122:12
PROCEED [6] - 3:12, 3:22, 21:18, 120:10, 213:19, 213:20
PROCEEDING [4] - 65:5, 138:4, 184:18, 236:12
PROCEEDINGS [3] - 1:24, 210:25, 253:4
PROCESS [29] - 24:6, 100:15, 129:17,

143:14, 152:14, 211:7, 211:23, 212:6, 212:23, 212:25, 215:1, 215:2, 217:5, 217:24, 218:14, 226:14, 226:21, 228:25, 229:11, 232:10, 232:13, 232:15, 232:21, 233:4, 248:4, 248:11, 249:3, 250:16, 251:5
PRODUCE [4] - 91:17, 126:11, 127:5, 127:11
PRODUCED [5] - 1:24, 26:4, 47:18, 102:10, 212:25
PRODUCES [1] - 127:17
PRODUCT [2] - 169:1, 191:1
PRODUCTION [1] - 126:10
PRODUCTIVE [1] - 123:18
PRODUCTS [2] - 103:7, 208:9
PROFESS [1] - 248:2
PROFESSED [1] - 247:3
PROFESSIONAL [1] - 77:22
PROFESSIONALS [1] - 242:13
PROFESSOR [12] - 55:5, 60:16, 117:5, 117:22, 117:23, 118:3, 118:16, 163:21, 164:11, 166:5, 166:7, 171:10
PROFESSORIAL [1] - 118:10
PROFESSORS [2] - 60:24, 122:3
PROFFER [2] - 64:16, 120:11
PROFIT [1] - 110:18
PROGESTIN [1] - 91:17
PROGESTIN -ONLY [1] - 91:17
PROGRAM [14] - 14:2, 16:23, 58:17, 58:18, 60:24, 61:5, 61:7, 82:1, 82:2, 116:3, 170:16, 170:18, 237:6, 237:7
PROGRAMS [12] -

13:24, 14:4, 14:10, 59:21, 230:4, 231:10, 231:15, 231:19, 231:20, 231:25, 247:16
PROHIBIT [1] - 19:8
PROHIBITIVE [2] - 178:13, 179:4
PROHIBITS [4] - 33:24, 45:7, 45:23, 51:7
PROJECT [5] - 38:4, 62:2, 170:24, 170:25, 171:7
PROJECTS [8] - 59:17, 59:20, 62:18, 119:5, 169:16, 170:2, 170:5, 170:21
PROMOTING [1] - 220:16
PROMOTIONS [1] - 59:14
PROMULGATE [3] - 39:7, 216:5, 250:6
PROMULGATED [5] - 6:17, 6:22, 44:7, 44:19, 160:8
PRONG [4] - 8:22, 8:23, 20:6, 227:12
PRONGS [2] - 20:1, 20:7
PRONOUNCED [1] - 23:12
PROOF [1] - 184:11
PROPER [1] - 246:13
PROPOSED [2] - 217:21, 224:25
PROPOSITION [1] - 109:16
PROTECT [7] - 19:10, 19:12, 24:17, 208:3, 216:21, 235:3
PROTECTED [10] - 21:6, 27:5, 33:24, 99:4, 99:12, 99:22, 144:8, 144:16, 216:19, 239:6
PROTECTING [8] - 16:8, 17:21, 19:5, 19:19, 20:17, 21:5, 35:20, 234:4
PROTECTION [3] - 9:10, 19:14, 216:23
PROTECTIVE [1] - 108:14
PROTECTS [2] - 21:10, 21:12
PROTOCOLS [1] - 129:5
PROVE [1] - 82:6

Exhibit 137                                                                                  JA-0001902

**PROVERA** [1] - 175:8
**PROVIDE** [32] - 7:3, 13:8, 13:12, 13:23, 22:25, 23 16, 30:10, 32:16, 33 12, 38:18, 42:24, 44:23, 48:25, 53:19, 66:22, 77:23, 98:1, 141:9, 144:25, 170:18, 197:24, 208:7, 208:13, 217:25, 218:6, 218:9, 221:10, 223:8, 223:21, 228:6, 231:21, 250:2
**PROVIDED** [14] - 53:4 64:25, 77 22, 78:6, 85:12, 94:20, 182:22, 207:23, 217:24, 221:13, 221:18, 223:16, 228:10
**PROVIDER** [5] - 147:3, 182:10, 190:11, 193:22, 208:13
**PROVIDERS** [3] - 12:18, 193:3, 223:20
**PROVIDES** [3] - 42:23, 45 3, 222:12
**PROVIDING** [28] - 13:17, 23:5, 27:3, 27:12, 30:3, 31:6, 31:9, 32.7, 33.7, 36:1, 51:5, 89:23, 99:13, 99 23, 144:11, 144:17, 167:4, 196:19, 196:23, 197:16, 218:1, 227:2, 232:18, 239:20, 242:14, 244:25, 249:10
**PROVISION** [7] - 47:21, 47 24, 48:1, 48:2, 67:5, 220:23, 248:9
**PROVISIONS** [1] - 241:11
**PSYCHIATRY** [2] - 103:24, 104:10
**PUBLIC** [10] - 58:18, 60:16, 61:6, 81:19, 82:4, 159 19, 166:5, 228:1, 250:22, 251:11
**PUBLIC -TRADED** [1] - 250:22
**PUBLICATION** [4] - 101:18, 103:24, 104:10, 106:12

**PUBLICATIONS** [10] - 60:2, 62:21, 119:5, 168:4, 168:5, 168:8, 168:17, 168:19, 169:1, 169:5
**PUBLICLY** [8] - 28:25, 211:15, 225:17, 225:18, 226:13, 231:24, 248:7, 250:14
**PUBLICLY -FUNDED** [1] - 231:24
**PUBLICLY -TRADED** [5] - 211:15, 225:17, 225:18, 226:13, 248:7
**PUBLISH** [2] - 61:11, 117:9
**PUBLISHED** [13] - 62:25, 70:18, 93:7, 93:9, 93:10, 102:7, 104:3, 106:24, 108:1, 163:12, 195:22, 195:24, 196:1
**PUBLISHES** [1] - 89:7
**PULL** [1] - 178 9
**PURCHASED** [2] - 134:24, 219:18
**PURELY** [3] - 12:5, 130:6, 145:12
**PURPORTS** [2] - 159:22, 160:3
**PURPOSE** [8] - 43:20, 43:24, 48:6, 66:25, 67:7, 167:17, 180:15, 224:7
**PURPOSES** [6] - 130:15, 130:16, 131:20, 226:10, 233:25, 235:13
**PURSUANT** [2] - 114:11, 144:25
**PURSUING** [1] - 8:5
**PUSH** [1] - 136:18
**PUSHBACK** [1] - 145:11
**PUSHING** [1] - 145:22
**PUT** [22] - 8 15, 24:6, 25:7, 32:14, 48:18, 48:21, 74:19, 82:15, 95:1, 101:10, 160:5, 162:4, 162:5, 178:19, 184:7, 184:13, 189:18, 204:20, 205:17, 207:6, 236:7, 247:19
**PUTS** [2] - 128:5, 221:25
**PUTTING** [2] - 41:15,

184:15
**PUZZLED** [1] - 28:9

## Q

**QUALIFIED** [3] - 139:10, 179:21, 179:24
**QUALIFIES** [1] - 179:16
**QUALIFY** [4] - 179 19, 212:15, 212:16, 237:5
**QUALITY** [4] - 59:3, 123:14, 124:6, 127:19
**QUARTER** [1] - 210:12
**QUASI** [5] - 17 20, 18:19, 20:17, 35 20, 234:3
**QUASI-SOVEREIGN** [3] - 18:19, 20:17, 234:3
**QUESTION** [49] - 15:7, 29:15, 29:20, 29:21, 30:21, 31:15, 33:6, 37:11, 41:25, 44:25, 45:12, 46:23, 48 22, 51:9, 53 14, 55:14, 74:20, 80:9, 85:11, 105:19, 132:6, 133:6, 139:8, 139:9, 139:17, 140:18, 140:20, 141:16, 144:22, 147:17, 148:2, 151:15, 151:17, 152:5, 156:25, 157:1, 194:5, 195:7, 219:20, 220:3, 220:6, 234:23, 238:10, 239:12, 242:23, 243:5, 243:17
**QUESTIONABLE** [1] - 225:20
**QUESTIONED** [2] - 55:11, 226:9
**QUESTIONING** [7] - 51:7, 142:17, 154:11, 181:22, 212:12, 227:14, 246:10
**QUESTIONS** [23] - 28:11, 28:22, 36 8, 45:10, 47:4, 51:14, 51:16, 57:7, 57:21, 57:23, 62:5, 88:2, 93:13, 114:15,

116:20, 119:4, 166:22, 181:15, 193:6, 193:13, 203:25, 246:18, 246:19
**QUICK** [4] - 54:9, 74:19, 158:2, 240 19
**QUIETLY** [1] - 227:24
**QUITE** [5] - 27:15, 28:18, 62 3, 69:23, 242:12
**QUO** [3] - 7:25, 24:17, 212:20
**QUOTE** [2] - 66:10, 221:18

## R

**RACIALLY** [1] - 47:18
**RAGLAND** [1] - 38:5
**RAISE** [3] - 23:22, 87:24, 113:13
**RAN** [1] - 180:14
**RANDOMIZED** [3] - 180:19, 182:6, 182:18
**RANGE** [7] - 78:19, 119:11, 119:12, 119:13, 149:25, 190:7, 218:3
**RATE** [6] - 12:16, 70:21, 71:8, 80:20, 88:22, 96.22
**RATES** [2] - 70:11, 176:8
**RATHER** [8] - 16:14, 46:21, 92 2, 92:11, 208:17, 213:15, 232:20, 233:16
**RATIONALE** [5] - 49:1, 53:2, 164:8, 204:18, 209:10
**RE** [1] - 98:3
**RE-FAMILIARIZED** [1] - 98:3
**REACH** [8] - 8 2, 42:6, 42:8, 92:9, 177:22, 213:15, 213:18, 221:20
**REACHES** [1] - 164:13
**READ** [48] - 5:15, 37:15, 42 9, 81:8, 81:9, 95:14, 95:21, 100:23, 101:3, 105:8, 105:19, 109:5, 138:7, 138:14, 151:25, 152:3, 152:7, 190:17, 190 20, 194:6, 194:10,

194:11, 194:14, 194:16, 194:19, 194:20, 195:3, 195:6, 195:8, 195:10, 195:16, 195:21, 198:15, 199:24, 200:25, 201:9, 204:18, 204:24, 207:19, 221:6, 221 22, 222:4, 228:7, 239:7, 245:13, 245:16, 252:14
**READING** [12] - 83:2, 103 3, 151:7, 193:24, 194:16, 194:20, 195:5, 225:14, 226:16, 238:1, 238:17, 249:24
**READS** [2] - 205:5, 224:1
**READY** [4] - 24:15, 54 6, 54:14, 204:6
**REAL** [6] - 15:13, 27 20, 31:7, 125:18, 215:9
**REALITY** [1] - 50:10
**REALIZE** [2] - 104:9, 192:22
**REALIZED** [1] - 72:2
**REALLY** [20] - 17:5, 30 4, 30:25, 31:3, 55 12, 57:12, 72:15, 74 1, 75:18, 179:3, 185:21, 185:24, 185:25, 186:19, 188:25, 190:12, 190:15, 234:24, 243:18, 250:16
**REASK** [2] - 80:9, 133:5
**REASON** [18] - 8:10, 24 24, 30:5, 50 2, 99 18, 107 12, 147:5, 153:5, 153:9, 156:14, 159:18, 164:21, 172:17, 182:10, 190:5, 206:2, 209:22, 223:2
**REASONABLE** [8] - 96 5, 97:4, 138:22, 188:18, 221:5, 221:24, 232:17, 249:22
**REASONABLY** [3] - 46 20, 222 4, 238:6
**REASONED** [1] - 52:6
**REASONING** [4] - 49 5, 49:25, 133:16,

Exhibit 137                                                                JA-0001903

219:24
**REASONS** [9] - 52:16, 107:2, 172:18, 188:8, 206:23, 233:1, 234:5, 240:23, 251:8
**REASSURE** [1] - 178:19
**REBECCA** [3] - 2:16, 5:4, 193:12
**REBUTTAL** [2] - 234:12, 246:20
**RECALL** [12] - 5:13, 52:25, 91 10, 111:20, 140:1, 145:16, 194:11, 194:13, 194:22, 195:2, 195:13, 197:7
**RECALLED** [1] - 195:7
**RECEIPT** [1] - 63:4
**RECEIVE** [6] - 14:20, 124:13, 179:22, 199:19, 230:2, 231:11
**RECEIVED** [4] - 115:25, 180:11, 180:21, 252:1
**RECEIVING** [2] - 26:18, 27:7
**RECENT** [5] - 70:11, 83:8, 83:14, 90:3, 136:25
**RECENTLY** [10] - 39:19, 63:10, 89:21, 92:22, 93:25, 106:25, 107:22, 168:19, 196:4
**RECOGNITION** [1] - 242:9
**RECOGNIZE** [3] - 20:16, 114:9, 245:10
**RECOGNIZED** [2] - 27:9, 47:14
**RECOGNIZES** [2] - 50:5, 50:10
**RECOLLECTION** [1] - 153:23
**RECOMMEND** [1] - 78:23
**RECOMMENDATION** [3] - 44 6, 69:15, 78:2
**RECOMMENDATIONS** [25] - 12:6, 66:22, 67:2, 67:8, 67:11, 67:13, 67:17, 67:18, 67:23, 68:20, 68:25, 69:1, 69:2, 74:4, 78:11, 78:13, 78:19, 78:21, 82:17, 85:6, 85:17, 87:4, 87:8,

87:12, 107:18
**RECOMMENDED** [9] - 78:4, 78:21, 107:13, 136:25, 147:1, 149:2, 178:25, 201:17, 223:11
**RECOMMENDING** [1] - 173:15
**RECORD** [43] - 6:5, 9:22, 9:25, 10:21, 11:1, 11:2, 11:5, 14:23, 21:20, 22:2, 23:23, 53:5, 53:6, 54:22, 65:17, 98:15, 112:22, 113:14, 113:19, 113:24, 119:5, 162:4, 162:5, 162:21, 164:6, 209:1, 224:13, 231:14, 232:4, 235:10, 235:22, 236:7, 245:9, 245:20, 246:2, 246:7, 246:10, 248:13, 249:16, 250:14, 251:22, 253:4
**RECORDED** [1] - 1:24
**RECORDS** [5] - 154:15, 154:16, 154:19, 154:22, 209:3
**RECROSS** [4] - 105:3, 105:6, 112:20, 254:3
**RECRUIT** [1] - 180:15
**RECRUITED** [3] - 180:17, 180:18, 182:7
**RECRUITING** [2] - 180:12, 182:11
**RECRUITMENT** [1] - 182:8
**REDIRECT** [5] - 152:20, 152:22, 204:1, 204:2, 254:3
**REDRESSABILITY** [1] - 20:7
**REDRESSABLE** [1] - 17:11
**REDUCE** [5] - 12:16, 52:21, 108:15, 205:3, 205:9
**REDUCED** [2] - 6 7, 188:12
**REDUCING** [2] - 92:5, 92:6
**REDUCTION** [3] - 91:19, 91:22, 156:10
**REFER** [12] - 10:25, 81:4, 81:17, 128:24,

165:6, 179:15, 179:20, 219:9, 221:7, 223:19, 240:8
**REFERENCE** [4] - 102:13, 106:10, 106:22, 243:19
**REFERENCED** [2] - 53:9, 180:4
**REFERENCES** [2] - 98:3, 105:13
**REFERRED** [8] - 66:11, 112:1, 121:17, 125:8, 170:25, 194:25, 249:5
**REFERRING** [10] - 68:5, 99:20, 100:2, 105:15, 175:24, 193:20, 198:1, 201:6, 201:22, 202:2
**REFERS** [2] - 81:18, 129:1
**REFILLED** [1] - 79:23
**REFLECT** [1] - 106:7
**REFLECTED** [6] - 186:5, 204:25, 205:5, 206:6, 212:12, 231:15
**REFLECTING** [2] - 163:7, 185:12
**REFLECTS** [2] - 155:5, 176:2
**REFORMS** [1] - 219:25
**REFRAINING** [1] - 205:12
**REFUSE** [2] - 13:22, 133:20
**REFUSED** [1] - 140:2
**REGARD** [3] - 170:8, 192:12, 205:23
**REGARDING** [9] - 78:2, 78:7, 106:23, 163:22, 168:5, 173:11, 175:14, 178:15, 195:24
**REGARDLESS** [2] - 220:25, 229:17
**REGISTER** [7] - 101:7, 101:13, 105:16, 105:19, 111:7, 217:17, 237 12
**REGULAR** [1] - 125:8
**REGULARLY** [3] - 130:20, 134:11, 169:9
**REGULATED** [3] - 13:6, 13:12, 230:25
**REGULATION** [4] - 13:5, 13:11, 49:20,

218:12
**REGULATIONS** [11] - 6:16, 13:15, 21:14, 39:19, 40:12, 159:14, 159 22, 159:24, 217:24, 233:18, 238:11
**REGULATORS** [1] - 228:20
**REGULATORY** [1] - 44:21
**REINFORCES** [1] - 21:16
**REJECT** [2] - 134:2, 153:18
**REJECTED** [4] - 137:4, 219:22, 224:25, 225:6
**REJECTING** [1] - 137:9
**REJECTS** [1] - 217:1
**RELATE** [1] - 196:2
**RELATED** [8] - 57:13, 62:13, 62:25, 64:2, 64:5, 169:10, 208:10, 211:6
**RELATING** [1] - 62:22
**RELATIONS** [2] - 35:6, 72:16
**RELATIONSHIP** [1] - 102:20
**RELATIVE** [1] - 108:3
**RELATIVELY** [3] - 41:6, 142:7, 183:17
**RELEVANT** [7] - 20:6, 101:19, 103:25, 115:23, 160:11, 209:25, 226:15
**RELIABILITY** [2] - 111:16, 188:14
**RELIABLE** [4] - 94:16, 94:18, 111:19, 191:1
**RELIED** [5] - 39:9, 160:24, 206:5, 207:10, 209:6
**RELIEF** [1] - 17 12
**RELIES** [2] - 164:14, 224:10
**RELIGION** [4] - 28:17, 51:9, 225 19, 226:25
**RELIGIOUS** [53] - 6:17, 6:24, 26:2, 27:3, 27:6, 27:15, 29:1, 29:9, 29:18, 29:23, 31:20, 33:5, 33:7, 34:1, 38:21, 38:22, 40:5, 40:7, 40:22, 42:21, 44:10, 46:6, 46:14, 50:20, 95:10, 95 14, 99:3,

104:15, 120:7, 137:25, 138:7, 144:7, 149:24, 190:18, 198:24, 199:23, 211:15, 218:1, 232:18, 232:24, 237:13, 239:19, 243:11, 243:15, 243:25, 247:10, 247:12, 248:8, 248:25, 249:2, 249:15, 250:18
**RELY** [5] - 19:1, 101:4, 152:4, 161:18, 225:2
**RELYING** [5] - 15:17, 39:10, 162:6, 215:24, 216:4
**REMAIN** [1] - 30:9
**REMARKABLY** [1] - 159:24
**REMEDY** [1] - 240:15
**REMEDYING** [1] - 48:7
**REMEMBER** [5] - 74:1, 88:19, 143:8, 194:9, 224:23
**REMEMBERING** [1] - 210:24
**REMOVED** [1] - 96:17
**RENDERING** [1] - 250:15
**RENE** [1] - 3:6
**RENEW** [6] - 80:15, 80:19, 80:23, 80:25, 96:18, 112:22
**REPACKAGED** [1] - 185:14
**REPEAT** [4] - 5:19, 6:3, 164:3, 196:20
**REPEATEDLY** [1] - 36:17
**REPHRASE** [1] - 144:22
**REPLY** [1] - 251:21
**REPORT** [29] - 10:14, 67:22, 68:3, 68:7, 74:17, 82:15, 82:17, 83:24, 83:25, 84:3, 84:16, 84:18, 84:22, 85:4, 85:18, 85:19, 86:25, 87:2, 98:2, 98:4, 101:2, 102:11, 104:14, 104:15, 104:18, 105:9, 105:11, 105:15, 107:20
**REPORTED** [1] - 181:16

REPORTER [2] - 1:19, 253:8
REPRESENT [1] - 35:2
REPRESENTS [2] - 35:8, 122:13
REPRODUCTIVE [27] - 62:20, 63:6, 72:15, 110:19, 114:4, 115:13, 115:16, 115:20, 115:22, 116:2, 116:7, 116:9, 116:16, 117:15, 117:18, 118:8, 120:14, 121:1, 138:21, 138:23, 154:6, 167:4, 167:21, 168:20, 172:5, 180:16, 193:1
REPRODUCTIVE - AGE [2] - 180:16, 193:1
REQUEST [3] - 205:24, 217:6, 232:4
REQUESTED [3] - 3:14, 215:11, 252:4
REQUIRE [10] - 7:1, 7:2, 14:14, 43:25, 46:13, 50:20, 124:12, 214:25, 231:1, 241:6
REQUIRED [9] - 64:25, 108:17, 144:24, 172:20, 207:24, 225:11, 225:12, 228:19, 228:20
REQUIREMENT [9] - 26:3, 52:11, 212:1, 216:10, 227:25, 228:1, 228:2, 244:8, 245:1
REQUIREMENTS [10] - 213:2, 213:4, 216:1, 220:18, 221:11, 223:22, 228:12, 233:19, 233:22, 250:3
REQUIRES [7] - 46:12, 64:23, 119:17, 226:11, 226:12, 226:13, 237:2
REQUIRING [4] - 13:5, 13:11, 48:2, 50:22
REREAD [3] - 29:10, 98:2, 196:4
RESEARCH [45] - 23:17, 58:10, 58:15, 58:20, 58:24, 59:8,

59:17, 59:23, 59:24, 61:4, 61:15, 62:2, 62:3, 62:4, 89:18, 96:12, 110:18, 117:7, 118:2, 118:20, 119:20, 157:14, 166:9, 166:21, 167:15, 167:18, 167:19, 167:22, 169:2, 169:18, 169:22, 170:8, 170:11, 170:14, 170:15, 170:17, 170:20, 171:2, 180:11, 180:12, 187:5, 189:6, 193:25, 195:5, 195:19
RESEARCHED [3] - 63:17, 63:23, 166:18
RESEARCHER [5] - 22:18, 23:14, 118:13, 169:15, 193:23
RESEARCHERS [1] - 59:4
RESEARCHING [1] - 61:10
RESERVED [1] - 234:12
RESIDENCY [6] - 115:7, 115:8, 115:10, 167:8, 167:10, 167:14
RESIDENTS [7] - 16:9, 19:22, 118:6, 122:21, 234:2, 234:4, 251:11
RESOLVE [1] - 8:3
RESOLVES [1] - 241:5
RESOLVING [1] - 217:2
RESOURCES [3] - 22:6, 64:12, 220:13
RESPECT [18] - 27:15, 35:5, 46:5, 46:24, 88:11, 102:15, 111:7, 154:25, 159:10, 163:15, 173:6, 218:25, 221:12, 236:25, 237:1, 237:4, 250:20, 251:16
RESPECTFULLY [2] - 49:23, 245:22
RESPECTS [1] - 227:23
RESPOND [5] - 46:20, 111:20, 139:13,

222:19, 242:7
RESPONDING [3] - 39:25, 40:2, 41:2
RESPONSE [8] - 84:19, 86:14, 86:21, 222:17, 227:21, 236:22, 250:23, 251:19
RESPONSES [1] - 232:7
RESPONSIBILITIES [2] - 59:25, 118:15
RESPONSIBILITY [3] - 19:6, 19:9, 220:22
RESPONSIBLE [1] - 62:1
RESPONSIBLY [2] - 106:19
RESTORATION [1] - 247:10
RESTRUCTURED [2] - 6:5, 23:25
RESULT [53] - 7:6, 12:9, 12:22, 13:18, 16:6, 41:4, 43:16, 71:4, 71:15, 71:25, 76:10, 93:9, 96:21, 100:5, 100:8, 142:3, 144:3, 146:9, 146:10, 146:13, 146:19, 147:9, 148:5, 148:19, 148:20, 149:2, 149:7, 149:12, 149:17, 181:5, 197:23, 200:9, 200:22, 201:7, 211:8, 211:22, 212:4, 212:18, 212:22, 212:25, 213:3, 215:4, 217:9, 229:13, 231:7, 231:25, 232:16, 233:21, 247:8, 248:6, 248:12, 251:6
RESULTED [4] - 11:24, 22:11, 23:19, 189:5
RESULTING [1] - 126:9
RESULTS [9] - 10:4, 47:19, 47:20, 47:23, 93:8, 184:3, 185:4, 187:8, 248:11
RETHOUGHT [1] - 189:21
RETURN [6] - 126:5, 178:24, 233:8, 239:22, 239:24, 250:11

RETURNING [2] - 33:22, 121:13
REVERSIBLE [4] - 90:9, 174:21, 174:23, 183:18
REVIEW [11] - 56:19, 69:6, 84:1, 97:25, 143:3, 154:15, 165:23, 169:6, 169:8, 169:10, 194:4
REVIEWED [11] - 84:3, 84:14, 104:6, 110:25, 143:5, 143:7, 152:2, 154:13, 154:16, 187:10, 195:21
REVIEWER [1] - 169:5
REVIEWERS [1] - 84:13
REYNOLDS [1] - 217:1
RFRA [34] - 46:2, 46:5, 46:11, 46:12, 46:13, 46:14, 46:24, 47:2, 47:5, 47:8, 47:12, 50:11, 50:12, 50:20, 51:16, 51:17, 218:24, 218:25, 219:2, 219:4, 219:6, 219:7, 225:11, 225:13, 225:15, 225:16, 225:23, 226:11, 226:20, 226:22, 227:6, 247:17, 248:22
RICCI [2] - 47:16, 240:19
RIGHT [44] - 8:16, 16:16, 21:21, 25:9, 51:20, 76:13, 77:5, 79:18, 80:2, 80:20, 89:15, 91:1, 100:12, 100:21, 109:8, 113:13, 132:3, 143:8, 146:20, 147:9, 150:9, 150:13, 152:11, 152:15, 159:9, 159:17, 168:4, 171:12, 175:4, 176:1, 176:10, 177:25, 183:13, 192:19, 198:21, 200:11, 200:16, 200:19, 209:11, 217:19, 238:16, 246:16, 248:4, 252:23
RIGHTLY [1] - 28:19
RIGHTS [3] - 9:10,

35:5, 204:16
RING [2] - 175:7, 176:15
RISE [8] - 54:12, 113:5, 146:19, 157:22, 191:23, 191:24, 201:8, 210:14
RISEN [3] - 148:17, 148:19, 201:12
RISK [20] - 10:20, 48:10, 72:13, 72:16, 72:19, 72:23, 81:1, 91:25, 92:5, 92:6, 103:21, 107:6, 108:3, 108:8, 127:22, 127:23, 128:5, 128:6, 132:16, 230:20
RISKS [6] - 107:5, 108:12, 108:15, 123:16, 128:21, 142:8
RIVER [1] - 36:9
ROBERT [1] - 164:16
ROBERTS [1] - 219:22
ROBUST [1] - 74:3
ROD [1] - 174:24
ROLE [9] - 6:14, 22:8, 31:19, 33:17, 73:11, 117:22, 118:3, 173:10, 177:7
ROLES [1] - 170:7
ROLL [2] - 15:5, 88:6
ROMAN [4] - 84:7, 84:10
ROOM [2] - 2:12, 175:17
ROUGHLY [22] - 62:16, 69:20, 73:24, 118:10, 118:14, 119:9, 119:11, 122:5, 124:17, 125:2, 126:15, 126:21, 133:19, 133:23, 135:8, 135:13, 135:17, 135:19, 137:8, 229:12
ROUTINE [3] - 67:14, 69:10, 78:25
ROW [14] - 76:1, 176:4, 177:3, 185:18, 185:19, 185:20, 185:25, 186:8, 186:15, 186:22, 186:24, 187:18
ROWS [3] - 176:3, 185:25, 186:18

Exhibit 137                                                                                            JA-0001905

RPR [1] - 1:19
RULE [47] - 6:18, 6:22, 26:19, 28:7, 28:24, 29:1, 32:20, 35:9, 39:17, 39:20, 39:23, 40:4, 50:20, 52:7, 52:17, 64:23, 64:24, 95:10, 95:11, 95:14, 95:22, 120:7, 138:1, 138:2, 138:7, 138:9, 138:13, 144:21, 160:1, 172:20, 173:6, 206:5, 211:15, 212:16, 214:12, 214:21, 215:6, 217:8, 222:16, 223:18, 229:24, 248:8, 248:17, 248:19, 250:13
RULED [2] - 236:4, 236:9
RULEMAKING [4] - 217:4, 217:21, 251:1, 251:5
RULEMAKINGS [1] - 28:6
RULES [172] - 3:21, 7:4, 7:6, 7:18, 7:21, 8:13, 8:15, 9:3, 13:14, 14:5, 14:17, 14:25, 23:4, 25:5, 26:11, 26:16, 26:22, 30:3, 34:10, 34:17, 38:17, 39:7, 39:10, 41:5, 41:6, 43:20, 44:13, 44:19, 44:22, 45:5, 45:14, 45:16, 55:10, 87:17, 87:19, 95:7, 96:6, 96:9, 98:19, 98:23, 99:7, 99:8, 100:5, 100:9, 100:20, 100:23, 101:3, 101:21, 102:15, 103:1, 103:4, 137:23, 138:4, 138:23, 140:10, 140:11, 140:15, 140:25, 141:5, 141:19, 142:14, 144:4, 144:23, 146:9, 146:10, 146:14, 146:19, 147:9, 148:5, 148:20, 149:3, 149:8, 149:12, 149:17, 151:25, 152:2, 152:3, 152:6, 152:7, 152:24, 153:3,

153:10, 158:19, 160:4, 160:8, 160:11, 160:14, 160:23, 160:24, 161:2, 161:7, 161:10, 162:1, 172:21, 190:18, 190:21, 194:6, 194:10, 194:11, 194:15, 194:16, 194:20, 195:3, 200:9, 200:13, 200:18, 200:22, 201:3, 201:15, 201:20, 201:25, 202:6, 202:14, 202:17, 202:21, 202:23, 203:16, 209:5, 211:2, 211:10, 211:12, 211:18, 211:22, 212:20, 214:4, 214:8, 214:19, 214:24, 215:9, 215:11, 216:5, 216:17, 222:14, 224:25, 225:10, 227:23, 227:24, 228:15, 228:16, 229:8, 229:14, 231:16, 231:25, 232:16, 233:2, 233:22, 235:1, 236:1, 236:16, 236:18, 237:19, 237:22, 237:24, 238:2, 238:12, 238:14, 238:19, 238:23, 238:25, 239:3, 239:22, 243:9, 243:12, 244:24, 246:25, 247:18, 247:25, 248:1, 251:9
RULING [2] - 214:10, 246:7
RUN [2] - 11:14, 219:19
RUNNING [2] - 157:15, 157:16
RUNS [2] - 29:19, 220:19
RUSH [1] - 192:24
RÉSUMÉ [3] - 62:15, 154:14, 167:24

**S**

S-A-M-A-N-T-H-A [1] - 113:21
S.CT [1] - 241:4

SAFELY [1] - 21:21
SAFER [3] - 22:11, 23:20, 129:17
SAFETY [3] - 129:20, 174:1, 234:4
SAID [51] - 5:23, 8:20, 16:5, 18:25, 19:3, 29:11, 36:17, 37:7, 37:16, 37:18, 41:14, 41:16, 46:10, 70:2, 88:4, 105:20, 109:4, 111:21, 134:19, 135:6, 147:15, 159:11, 162:2, 164:4, 168:11, 183:9, 187:25, 205:16, 208:25, 211:1, 214:2, 215:25, 217:3, 217:23, 218:5, 218:8, 218:14, 225:10, 226:4, 226:6, 232:11, 234:16, 238:19, 240:3, 242:9, 245:10, 248:11, 248:23, 248:24, 249:8, 251:14
SAMANTHA [7] - 22:15, 113:9, 113:15, 113:16, 114:1, 120:12, 254:8
SAME [32] - 8:15, 8:23, 29:16, 34:1, 39:9, 41:20, 48:11, 50:1, 50:9, 76:14, 109:16, 125:9, 138:22, 141:8, 161:2, 164:13, 164:14, 164:19, 172:18, 172:22, 185:10, 185:12, 185:21, 185:25, 187:12, 187:15, 195:24, 201:22, 202:2, 214:4, 215:23, 217:20
SAMPLE [3] - 108:2, 186:13, 188:17
SANDBERG [3] - 2:16, 4:22, 4:23
SANTELLI [3] - 102:15, 106:22, 106:23
SASSO [5] - 84:24, 84:25, 85:1, 85:3, 86:21
SATISFIES [2] - 228:11, 243:25
SATISFY [1] - 17:13

SAVANNAH [1] - 206:19
SAVED [1] - 13:1
SAVINGS [3] - 10:5, 81:14, 81:19
SAW [2] - 186:2, 226:25
SAY [76] - 11:1, 11:2, 18:1, 18:7, 18:8, 20:4, 24:23, 28:24, 30:2, 32:5, 32:15, 33:5, 33:14, 33:15, 33:22, 34:19, 37:12, 37:13, 37:14, 39:6, 40:21, 40:24, 40:25, 41:8, 42:5, 49:8, 49:22, 52:3, 52:4, 59:6, 62:9, 62:19, 63:14, 74:1, 78:18, 87:7, 88:20, 89:3, 89:13, 90:15, 91:9, 95:3, 101:5, 101:18, 101:21, 102:15, 103:4, 106:8, 107:7, 118:16, 124:18, 128:23, 157:4, 175:3, 179:23, 188:21, 189:19, 192:20, 193:21, 202:25, 219:15, 220:21, 221:21, 222:4, 225:22, 227:6, 228:24, 237:25, 238:14, 239:3, 245:24, 245:25, 249:7, 249:22, 251:2
SAYING [8] - 20:13, 25:6, 34:8, 34:10, 161:18, 161:25, 209:23, 234:25
SAYS [38] - 11:4, 33:11, 35:19, 36:24, 81:16, 81:23, 86:14, 106:13, 109:23, 110:5, 151:9, 151:11, 158:18, 159:20, 161:5, 166:15, 176:17, 186:8, 186:9, 186:15, 187:4, 187:18, 206:6, 206:18, 207:15, 207:20, 215:19, 216:4, 221:7, 222:12, 223:18, 223:20, 227:7, 237:15, 241:9, 247:25
SCALE [1] - 252:4

SCALED [1] - 6:8
SCALIA [1] - 18:18
SCAN [2] - 67:10, 68:22
SCHEME [2] - 220:5, 241:9
SCHOLARLY [4] - 64:1, 64:4, 167:25, 168:2
SCHOOL [9] - 22:24, 60:24, 115:4, 116:17, 117:2, 164:16, 167:6, 171:23, 177:21
SCHOOLS [2] - 60:25, 199:20
SCIALABBA [4] - 241:3, 241:20, 241:21
SCIENCE [2] - 62:10, 129:9
SCIENCES [2] - 60:17, 166:6
SCIENTIFIC [9] - 66:21, 67:12, 69:6, 100:21, 101:19, 102:24, 103:25, 193:25, 223:12
SCIENTIST [1] - 58:10
SCOPE [11] - 6:25, 81:10, 108:20, 120:22, 139:1, 141:12, 150:5, 150:19, 150:21, 211:11, 225:24
SCOTT [1] - 2:2
SCRAMBLING [1] - 204:13
SCREEN [2] - 204:20, 207:12
SCREENINGS [1] - 221:13
SEARCH [1] - 53:18
SEARCHED [1] - 53:7
SEBELIUS [2] - 206:11, 215:23
SEC [1] - 162:16
SECOND [16] - 38:22, 46:1, 46:10, 52:10, 103:3, 172:22, 177:4, 185:19, 185:21, 185:24, 207:10, 211:21, 216:3, 236:10, 241:9, 241:24
SECONDLY [1] - 192:24
SECRETARY [4] - 39:7, 39:8, 216:5, 216:6

**SECTION** [5] - 68:8, 215:18, 215:25, 221:7, 237:13
**SECTIONS** [1] - 100:25
**SECTOR** [1] - 82:4
**SEE** [55] - 26:25, 36:23, 41:9, 57:23, 62:7, 76:1, 76:4, 77:6, 84:19, 86:16, 90:16, 96:18, 96:21, 109:10, 117:13, 117:16, 121:21, 122:5, 122:10, 122:18, 122:20, 123:11, 125:6, 125:15, 125:20, 125:22, 126:18, 127:25, 135:12, 143:23, 157:19, 167:24, 171:5, 176:6, 176:8, 176:11, 176:14, 176:17, 180:20, 180:22, 181:11, 181:16, 182:21, 182:23, 183:5, 183:6, 183:14, 186:24, 188:24, 191:23, 192:15, 193:1, 207:13, 222:3, 226:17
**SEEING** [5] - 122:23, 122:24, 187:14, 189:4, 193:3
**SEEK** [4] - 13:23, 194:4, 199:21, 237:6
**SEEKING** [3] - 6:6, 212:18, 214:7
**SEEM** [2] - 187:19, 226:3
**SEEMS** [5] - 20:13, 65:18, 82:11, 129:13, 222:20
**SEEN** [10] - 13:21, 25:15, 68:2, 99:5, 120:25, 131:11, 157:14, 191:16, 229:22
**SELECTED** [1] - 110:14
**SELECTIVE** [1] - 106:6
**SELF** [3] - 51:3, 121:17, 229:3
**SELF-CERTIFICATION** [1] - 51:3
**SELF-INSURERS** [1] - 229:3

**SELF-REFERRED** [1] - 121:17
**SEND** [2] - 218:15, 244:10
**SENSE** [8] - 15:16, 140:24, 141:10, 141:22, 210:2, 234:25, 237:3, 237:4
**SENT** [3] - 16:18, 182:13, 244:13
**SENTENCE** [2] - 102:14, 103:3
**SEPARATE** [5] - 38:18, 39:3, 42:7, 42:17, 169:4
**SEPARATED** [1] - 176:4
**SERIOUS** [6] - 103:21, 123:20, 127:21, 127:25, 142:2, 142:6
**SERIOUSLY** [1] - 222:23
**SERVE** [5] - 51:12, 61:21, 121:24, 169:4, 226:1
**SERVED** [1] - 101:15
**SERVES** [3] - 224:21, 226:4, 226:6
**SERVICE** [3] - 12:17, 77:23, 220:14
**SERVICES** [42] - 3:5, 12:14, 14:2, 22:5, 22:6, 30:11, 43:4, 43:21, 44:3, 45:5, 52:11, 58:21, 58:24, 59:8, 63:6, 64:11, 64:12, 67:3, 67:13, 68:25, 69:8, 73:5, 78:12, 78:24, 79:14, 79:17, 80:1, 82:4, 86:2, 87:3, 87:11, 87:13, 119:1, 167:4, 179:16, 179:22, 220:13, 221:19, 223:11, 223:16
**SERVING** [1] - 227:2
**SET** [7] - 15:18, 49:11, 109:5, 111:6, 132:19, 190:16, 191:20
**SETTING** [1] - 24:7
**SETTINGS** [1] - 63:7
**SETTLED** [1] - 35:1
**SEVEN** [1] - 238:20
**SEVERAL** [7] - 52:7, 129:14, 168:24, 177:12, 189:8, 195:17, 215:20
**SEVERE** [9] - 123:16, 124:9, 124:10,

124:11, 125:11, 125:20, 128:18, 137:19
**SEXUAL** [3] - 72:16, 102:18, 107:1
**SEXUALLY** [3] - 102:3, 106:15, 106:17
**SHALL** [7] - 18:8, 42:24, 42:25, 221:9, 221:10, 223:20, 223:21
**SHARED** [1] - 97:4
**SHARING** [7] - 78:16, 79:11, 83:8, 83:22, 87:14, 223:22, 250:3
**SHE** [46] - 4:11, 22:1, 22:2, 22:8, 22:16, 22:17, 22:22, 22:25, 23:13, 23:16, 65:13, 65:19, 68:18, 70:1, 71:23, 72:3, 80:14, 80:22, 80:23, 80:24, 80:25, 105:17, 120:25, 121:2, 123:18, 123:19, 127:15, 137:20, 139:10, 140:14, 141:9, 141:11, 150:22, 163:5, 163:16, 164:1, 164:13, 173:2, 173:19, 173:25, 174:1, 174:17, 179:4, 184:13
**SHEPHERD** [1] - 24:3
**SHIFT** [2] - 35:25, 231:24
**SHORT** [1] - 127:18
**SHORT-TERM** [1] - 127:18
**SHORTLY** [1] - 188:22
**SHOT** [1] - 176:15
**SHOULD** [31] - 5:15, 8:2, 18:21, 26:20, 30:9, 31:4, 31:9, 31:10, 37:15, 44:3, 47:15, 50:6, 51:10, 54:8, 66:9, 68:1, 78:6, 81:11, 101:8, 108:24, 177:13, 187:24, 213:18, 213:19, 245:4, 245:5, 245:6, 246:6, 247:2, 247:14, 247:22
**SHOW** [14] - 9:2, 34:11, 35:15, 72:5, 75:7, 94:10, 108:14, 189:12, 237:5,

237:8, 238:5, 238:7
**SHOWED** [1] - 90:11
**SHOWING** [5] - 79:24, 91:4, 106:24, 185:25, 207:3
**SHOWN** [1] - 189:9
**SHOWS** [3] - 75:21, 185:15, 187:8
**SIDE** [15] - 3:24, 3:25, 52:2, 74:7, 74:10, 101:23, 103:19, 107:9, 108:12, 174:4, 174:6, 176:17, 190:15, 242:8, 249:12
**SIDES** [1] - 252:18
**SIGN** [1] - 227:5
**SIGNIFICANCE** [4] - 42:4, 187:5, 187:7, 220:4
**SIGNIFICANT** [28] - 40:17, 40:19, 40:23, 41:1, 41:6, 41:10, 41:16, 94:11, 112:10, 124:8, 124:10, 127:19, 133:14, 134:8, 136:15, 153:5, 156:10, 187:9, 211:20, 213:6, 220:14, 220:24, 222:5, 231:3, 231:9, 231:17, 233:25, 237:18
**SIGNIFICANTLY** [12] - 6:5, 123:14, 123:16, 124:3, 126:10, 126:12, 134:10, 134:15, 155:10, 155:16, 156:19, 212:17
**SILLIMAN** [8] - 36:9, 36:12, 36:20, 36:24, 37:4, 37:9, 37:12, 37:15
**SIMILAR** [6] - 29:23, 125:12, 126:14, 159:25, 185:17, 191:8
**SIMILARITIES** [1] - 111:3
**SIMILARLY** [9] - 13:10, 19:9, 21:9, 95:21, 95:24, 101:23, 138:13, 183:2
**SIMPLY** [14] - 92:19, 214:23, 216:4, 217:8, 222:3, 223:14, 224:5,

225:2, 227:6, 228:4, 248:25, 249:23, 250:13, 251:4
**SINCE** [38] - 9:22, 19:8, 22:9, 23:18, 26:12, 35:1, 36:17, 36:23, 37:20, 37:21, 70:5, 82:13, 101:16, 119:5, 128:3, 131:5, 137:2, 140:14, 145:6, 145:9, 145:14, 152:24, 156:3, 156:19, 173:10, 178:14, 179:7, 188:21, 189:9, 189:11, 194:19, 197:9, 198:11, 198:17, 207:5, 207:6, 209:16, 240:11
**SINCERE** [10] - 30:6, 30:25, 32:6, 32:16, 33:7, 33:11, 149:24, 150:3, 198:24, 247:3
**SINCERELY** [7] - 29:25, 30:8, 51:4, 212:11, 212:14, 232:18, 247:24
**SINCERELY-HELD** [5] - 29:25, 30:8, 212:11, 232:18, 247:24
**SINCERITY** [5] - 31:19, 31:20, 240:2, 240:12, 247:13
**SINGLE** [23] - 34:21, 53:8, 100:4, 100:7, 137:3, 140:1, 146:7, 146:12, 146:18, 146:24, 147:8, 147:13, 147:23, 148:16, 148:25, 149:6, 149:10, 149:15, 194:20, 236:15, 236:17, 236:19
**SISTERS** [5] - 26:8, 27:8, 27:9, 27:11, 33:23
**SIT** [1] - 21:22
**SITTING** [2] - 143:13, 147:7
**SITUATION** [7] - 20:12, 30:24, 31:25, 173:24, 200:17, 228:21, 230:22
**SIX** [4] - 6:7, 6:12, 26:1, 90:17
**SIZE** [1] - 188:17
**SKIN** [1] - 77:2

**SKIP** [1] - 119:4
**SLAM** [1] - 226:22
**SLATE** [7] - 26:1,
27:2, 38:15, 42:20,
46:16, 211:2, 244:20
**SLIGHTLY** [1] - 91:24
**SMALL** [10] - 79:18,
79:24, 79:25, 80:12,
80:13, 84:7, 96:13,
108:7, 163:25
**SMALLER** [1] - 104:9
**SO** [352] - 5:18, 9:7,
14:3, 15:9, 16:19,
17:3, 17:12, 17:22,
19:8, 19:23, 21:19,
24:4, 24:15, 24:16,
24:19, 25:2, 25:6,
27:5, 27:22, 28:1,
28:9, 28:21, 29:1,
29:2, 29:15, 29:19,
30:4, 31:21, 32:2,
32:11, 32:25, 33:10,
36:4, 36:11, 37:7,
37:11, 40:7, 40:21,
43:19, 44:8, 44:12,
47:15, 47:24, 48:11,
48:12, 48:21, 49:2,
49:14, 52:1, 52:2,
53:3, 53:5, 53:9,
54:5, 54:10, 55:13,
55:18, 60:4, 60:12,
61:18, 63:2, 63:14,
65:18, 70:11, 70:25,
71:7, 72:13, 72:15,
73:2, 75:2, 75:15,
75:18, 75:25, 76:3,
77:10, 77:21, 78:25,
79:11, 79:15, 80:11,
80:17, 81:21, 82:9,
84:13, 86:25, 88:10,
88:25, 89:2, 89:4,
89:5, 89:8, 89:13,
90:2, 90:10, 90:19,
91:16, 91:19, 92:4,
92:9, 94:21, 94:25,
95:19, 96:15, 96:24,
98:6, 99:8, 99:11,
101:7, 101:18,
102:13, 103:18,
106:10, 106:22,
107:14, 108:16,
109:13, 109:25,
110:10, 111:9,
112:7, 115:16,
115:20, 117:14,
118:18, 119:16,
121:2, 121:6,
123:13, 124:2,
125:3, 125:20,
125:25, 126:24,

127:12, 127:18,
128:13, 128:16,
129:17, 130:4,
131:8, 131:18,
131:23, 132:11,
134:17, 135:11,
135:13, 135:21,
136:12, 139:16,
139:17, 140:7,
141:4, 141:15,
141:24, 142:15,
144:3, 145:13,
145:21, 146:3,
146:16, 147:4,
147:11, 148:15,
149:19, 151:19,
152:6, 155:2,
155:10, 155:12,
155:23, 156:1,
156:13, 157:19,
158:10, 158:21,
159:2, 159:6,
159:12, 159:15,
159:17, 159:19,
159:25, 160:5,
160:13, 160:21,
161:10, 161:12,
162:3, 163:5,
163:16, 164:24,
165:22, 166:7,
168:11, 169:8,
169:18, 169:25,
170:10, 170:25,
171:19, 171:21,
171:24, 172:3,
172:8, 173:5,
173:16, 174:21,
175:4, 175:6,
175:16, 175:17,
176:3, 176:4, 176:6,
176:16, 177:2,
177:3, 177:9,
177:12, 177:16,
177:20, 177:22,
177:23, 178:9,
178:18, 179:4,
179:14, 180:9,
180:13, 180:24,
181:2, 181:7,
181:15, 182:9,
182:13, 183:4,
183:14, 183:16,
183:21, 184:17,
185:15, 185:18,
185:23, 185:25,
186:7, 186:12,
187:7, 187:17,
187:19, 187:23,
188:4, 188:6,
188:11, 188:18,
189:3, 189:14,

190:8, 191:7,
191:10, 191:22,
192:22, 192:23,
192:25, 193:2,
194:11, 194:18,
195:5, 195:15,
195:16, 195:21,
196:10, 196:21,
197:15, 197:24,
198:1, 198:9,
198:17, 199:2,
199:5, 200:1, 200:6,
200:10, 204:17,
205:5, 205:16,
205:19, 205:22,
206:1, 206:8,
206:12, 207:13,
208:2, 208:20,
209:7, 209:24,
210:12, 212:3,
212:4, 212:16,
213:20, 214:5,
214:16, 214:20,
215:14, 215:21,
216:16, 216:20,
217:13, 218:12,
219:6, 219:10,
220:7, 220:21,
221:3, 222:9,
222:15, 222:19,
223:14, 225:2,
226:11, 227:20,
227:24, 228:13,
230:12, 230:23,
231:2, 231:7,
231:23, 233:1,
234:17, 234:18,
234:19, 235:1,
237:7, 237:12,
237:24, 238:9,
238:10, 238:18,
239:21, 241:14,
243:1, 243:9,
243:16, 244:18,
245:1, 248:13,
249:9, 250:7,
252:18, 252:22
**SOCIAL** [2] - 82:4,
179:13
**SOCIETY** [2] - 184:22,
184:24
**SOCIOLOGY** [1] -
57:10
**SOLACE** [1] - 240:24
**SOLELY** [1] - 46:6
**SOLICITUDE** [10] -
18:5, 18:8, 18:14,
18:20, 19:2, 19:17,
19:23, 35:13, 35:14,
35:22

**SOME** [131] - 6:14,
7:20, 9:15, 13:17,
13:19, 14:22, 15:6,
17:16, 20:4, 20:9,
23:16, 23:17, 24:1,
33:17, 35:25, 47:3,
47:15, 48:4, 48:25,
50:7, 53:20, 57:7,
57:20, 62:24, 63:11,
64:7, 69:7, 72:18,
73:15, 79:9, 79:10,
80:3, 88:1, 88:6,
91:8, 93:8, 94:18,
98:3, 101:5, 108:10,
118:17, 121:17,
121:18, 122:7,
123:1, 125:15,
127:9, 127:21,
128:21, 129:18,
130:1, 130:2, 130:5,
131:19, 133:18,
134:14, 135:10,
135:25, 136:5,
142:2, 142:5, 142:9,
144:4, 145:13,
145:16, 149:23,
150:25, 151:9,
160:14, 161:9,
164:1, 168:9,
168:10, 168:17,
168:22, 169:21,
169:23, 173:14,
174:15, 176:25,
178:11, 180:20,
184:4, 188:3, 188:8,
188:9, 188:12,
188:13, 189:12,
189:13, 189:19,
189:21, 189:23,
190:22, 194:19,
195:21, 196:15,
196:18, 196:21,
197:15, 197:23,
199:19, 200:10,
200:22, 200:23,
202:9, 205:6, 215:8,
222:12, 225:10,
225:17, 229:3,
229:23, 231:4,
232:6, 232:14,
232:21, 232:23,
235:9, 237:2, 238:3,
244:16, 245:10,
248:4, 248:10,
249:11, 250:20,
250:24
**SOMEBODY** [3] -
147:5, 153:6, 212:15
**SOMEHOW** [7] -
36:25, 37:13,
221:17, 224:1,

224:15, 226:11,
228:13
**SOMEONE** [5] - 32:21,
34:11, 53:16,
130:11, 179:15
**SOMEONE'S** [1] -
150:2
**SOMETHING** [18] -
27:17, 29:11, 79:16,
87:24, 93:14, 107:8,
125:6, 125:7,
130:13, 145:3,
147:18, 156:11,
178:7, 190:1, 209:5,
222:21, 231:13,
252:24
**SOMETIMES** [9] -
11:16, 61:17, 61:18,
62:3, 62:5, 62:7,
126:1, 126:3, 174:8
**SOMEWHAT** [1] -
17:16
**SOMEWHERE** [5] -
88:20, 88:25, 89:14,
186:6, 228:8
**SOON** [2] - 24:15,
252:6
**SORRY** [19] - 23:9,
58:1, 65:22, 72:25,
74:23, 75:24, 77:24,
103:8, 103:10,
105:14, 124:22,
148:4, 181:21,
184:8, 196:20,
200:23, 203:3,
222:7, 252:11
**SORT** [7] - 32:25,
81:9, 83:23, 94:16,
124:19, 220:10,
237:2
**SORTED** [1] - 54:9
**SORTS** [1] - 212:12
**SOUND** [2] - 14:18,
100:21
**SOUNDS** [1] - 249:20
**SOURCE** [6] - 42:20,
46:8, 75:3, 111:22,
184:9, 184:11
**SOURCES** [11] -
68:22, 69:9, 105:9,
105:10, 105:24,
106:21, 119:1,
121:16, 121:20,
122:10, 194:4
**SOVEREIGN** [9] -
17:20, 18:19, 19:12,
19:19, 20:16, 20:17,
35:16, 35:20, 234:3
**SPACE** [1] - 41:20
**SPACED** [1] - 177:15

**SPACING** [3] - 72:10,
177:11, 177:17
**SPANS** [1] - 52:7
**SPEAK** [10] - 22 8,
22:15, 117:9,
136:16, 141:16,
146:2, 155:2, 155:5,
164:2, 182:4
**SPEAKERS** [1] -
104:21
**SPEAKING** [8] - 6:13,
59:14, 86:9, 112:2,
117:11, 130:18,
140:21, 192:7
**SPECIAL** [10] - 18:5,
18:8, 18:14, 18:20,
19:2, 19:17, 19:23,
35:13, 35:14, 35:21
**SPECIALIZE** [1] -
114:3
**SPECIFIC** [20] - 34:2,
46:24, 62 24, 66:24,
67:3, 67:12, 73:11,
73:12, 101:6, 123:4,
132:16, 146:11,
146:21, 194:4,
214:24, 217:16,
223:7, 227:16,
229:2, 233:17
**SPECIFICALLY** [21] -
12:1, 59:4, 62:22,
69:12, 81:5, 83:6,
85:25, 95 9, 105:11,
108:22, 121:3,
137:24, 146:2,
164:15, 168:22,
182:11, 223:5,
226:6, 227:3,
231:21, 235:23
**SPECIFIES** [1] - 42:25
**SPECTRUM** [1] -
190:10
**SPECULATING** [1] -
231:14
**SPECULATION** [1] -
35:24
**SPELL** [4] - 54:21,
113:18, 162:20,
243:11
**SPELLED** [1] - 162:22
**SPEND** [2] - 14:5, 61:8
**SPENDING** [1] - 220:1
**SPENDS** [1] - 14:1
**SPENT** [1] - 167:2
**SPERMICIDE** [1] -
176:23
**SPERMICIDES** [1] -
77:13
**SPOKE** [3] - 93:19,
98:9, 111 14

**SPOKEN** [1] - 5:10
**SPONGE** [1] - 77:14
**SPONSOR** [2] - 208:7,
230:14
**SPONSORED** [2] -
199:22, 230:3
**SPONSORS** [1] -
250:2
**SPOUSES** [1] - 13:18
**SPRING** [2] - 180:13,
184:23
**SQUARE** [1] - 2:3
**SQUARED** [1] - 224:5
**SQUARELY** [2] - 47:7,
217:1
**STABLE** [1] - 177:23
**STAND** [5] - 15 25,
54:18, 113:9,
127:15, 157:7
**STANDARD** [5] - 9:13,
238:4, 238:5, 238 6,
242:11
**STANDING** [4] - 15:6,
15:7, 15:8, 15:12,
15:15, 15:21, 16:6,
16:7, 16:11, 17:1,
17:4, 17:6, 17:13,
18:2, 18:19, 18:24,
19:25, 20:1, 21:8,
21:16, 26:15, 33:23,
34:9, 35:22, 36:4,
36:6, 36:13, 37 10,
227:13, 233:9,
233:25, 234:6,
235:12, 236:13,
236:25, 237:4,
237:9, 237:11,
238:5, 238:21,
239:12
**STANDS** [2] - 170:16,
174:22
**START** [11] - 25:1,
25:4, 101:22, 103:3,
165:5, 165:25,
210:24, 219:15,
228:11, 230:18,
252:23
**STARTED** [6] - 51:25,
167:6, 168:11,
180:12, 188:22,
194:3
**STARTS** [3] - 101 22,
102:14, 103:11
**STATE** [60] - 13:24,
13:25, 14:4, 14:9,
16:11, 16:24, 17:1,
17:4, 17:20, 18 1,
18:21, 19:3, 19:12,
19:18, 19:22, 20:8,
35:2, 35:7, 35:10,

35:15, 35:18, 35 20,
48:15, 49:18, 54:21,
55:5, 60 7, 60:10,
61:2, 71:5, 82:2,
82:8, 89 7, 90:2,
93:5, 113:14,
113:18, 113:24,
151:20, 162:20,
166:1, 166:2,
168:14, 170:16,
182:12, 219:19,
228:20, 230:4,
231:1, 231:9,
231:10, 231:11,
231:12, 231:19,
231:20, 233:11,
237:6, 237:7, 244:23
**STATE'S** [2] - 20:16,
35:24
**STATE-BY-STATE** [1]
- 89:7
**STATE-FUNDED** [5] -
230:4, 231:10,
231:19, 237:6, 237 7
**STATED** [12] - 131:20,
159:18, 182:10,
198:10, 199:19,
200:21, 201:7,
201:14, 201:23,
202 3, 202:9, 202:16
**STATEMENT** [13] -
53:6, 86:15, 204:18,
204:22, 204:23,
205:5, 207:22,
217:7, 238:11,
238:13, 238 16,
238:24, 239:8
**STATEMENTS** [5] -
3:15, 3:16, 3:17,
3:18, 56 20
**STATES** [32] - 1:1,
2:10, 3:4, 3:5, 3:6,
10:2, 13:9, 16:16,
16:25, 17:19, 18 22,
25:22, 26:6, 35:7,
36:3, 36:13, 36:14,
69:22, 81:13, 94:23,
95:2, 95:5, 100:8,
110:19, 146:13,
154 7, 216:25,
229:24, 230:1,
230:6, 230:22, 231:4
**STATISTICAL** [8] -
139:9, 140:16,
140:18, 186:3,
187:4, 187:7, 188:16
**STATISTICALLY** [2] -
112:10, 187:9
**STATISTICS** [1] -
139:2

**STATUS** [11] - 7:25,
24:17, 52:24, 71:20,
205:12, 206:22,
207:25, 208:1,
208:6, 209:9, 212 20
**STATUTE** [19] - 13:5,
13:11, 17:24, 18:3,
35:11, 42:22, 43:1,
43:3, 43:20, 45:7,
45:22, 47 9, 215:19,
220:11, 221 22,
224:6, 225:4,
226:16, 230:23
**STATUTE'S** [2] -
43:24, 45 18
**STATUTES** [6] - 39:3,
39:6, 44:23, 48:4,
225:1, 231:6
**STATUTORY** [17] -
8 3, 38:18, 38:25,
42:7, 42:14, 42:17,
45:1, 46:1, 46:8,
46:10, 50:19,
213:15, 215:16,
220:5, 222:25,
241:5, 241:9
**STAY** [10] - 20:25,
31:4, 31:10, 31:12,
33:13, 245:4, 245 5,
245:6, 249:14
**STEAD** [1] - 9:18
**STEINBERG** [3] -
10:7, 10:17, 10:23
**STENOTYPE** [1] -
1:24
**STENOTYPE -
COMPUTER** [1] -
1:24
**STEP** [8] - 7:3, 7:10,
73:10, 219:6, 219:8,
219:11, 219:12,
219:15
**STEPPING** [1] - 238:9
**STEPS** [1] - 219 14
**STERILIZATION** [8] -
76:9, 76:21, 77:19,
79:15, 176:10,
176:13, 188 11,
208:10
**STETSON** [1] - 164:16
**STEVE** [1] - 3:5
**STILL** [14] - 26:6,
32:19, 50:4, 93:11,
127:7, 127:9,
145:13, 160:10,
178:14, 200:1,
201:11, 214:3,
232:24, 249 3
**STIMSON** [1] - 2:17
**STIPULATE** [7] -

55:19, 55:22, 57:1,
158:14, 159:2,
159:4, 159:6
**STIPULATED** [2] -
24 9, 55:15
**STOP** [4] - 14:12,
54 3, 87:23, 151:4
**STRAINS** [1] - 220:21
**STRAWBERRY** [1] -
2:3
**STREET** [2] - 1:20, 2:7
**STRICT** [1] - 126:17
**STRIKE** [2] - 136:11,
235:24
**STRONG** [4] - 48:8,
49 1, 167:20, 174:8
**STRONGLY** [1] -
251:11
**STRUCK** [2] - 247:12,
247:17
**STRUGGLED** [1] -
226:19
**STUDENTS** [6] -
59:18, 59:19, 61:5,
61:6, 118:6, 122:2
**STUDIED** [1] - 57 10
**STUDIES** [22] - 61 18,
61:19, 61:22, 63:2,
63:5, 63:8, 63:11,
64:7, 66:22, 72:4,
77 24, 83:8, 107:3,
108:10, 108:13,
152:6, 152:8, 189:9,
189:12, 189:15,
195:2
**STUDY** [107] - 22:9,
69 14, 77:25, 81:18,
82:8, 83:14, 90:3,
91:7, 92:21, 92:25,
93:4, 93:9, 93:19,
93:21, 94:1, 94:14,
94 16, 94:19, 94:24,
100:1, 101:24,
102:16, 102:19,
104:15, 104:18,
106:15, 106:20,
107:25, 108:1,
108:5, 109:5, 109:9,
109:13, 109:17,
109:18, 109:22,
109:25, 110:2,
110:8, 111:5,
111:13, 111:14,
112:2, 112 6, 112:7,
112:9, 112:13,
163:4, 163:6, 163:8,
163:9, 163:23,
164:1, 164 2, 164:5,
164:6, 171:1, 171:3,
171:4, 180:3, 180:5,

Exhibit 137

JA-0001909

180:7, 180:8, 180:9, 180:13, 180:15, 180:25, 181:6, 181:13, 181:17, 181:18, 181:24, 182:5, 182:15, 182:17, 182:18, 182:25, 183:8, 183:10, 183:16, 183:19, 183:21, 184:5, 184:19, 184:20, 185:16, 186:4, 186:5, 186:10, 186:11, 186:13, 186:16, 187:2, 187:21, 187:23, 187:25, 188:2, 188:21, 188:22, 188:24, 192:12, 195:14

**STUDYING** [2] - 59:2, 111:19

**STUFF** [1] - 246:12

**SUBCHAPTER** [1] - 215:20

**SUBGROUP** [3] - 73:21, 73:23, 73:25

**SUBGROUPS** [3] - 73:17, 73:18, 73:20

**SUBJECT** [6] - 48:9, 50:11, 50:12, 65:1, 146:4, 232:22

**SUBJECTED** [1] - 39:21

**SUBJECTING** [1] - 208:11

**SUBMISSION** [1] - 252:20

**SUBMIT** [1] - 26 23

**SUBMITTED** [3] - 229:25, 251:16, 251:22

**SUBMITTING** [3] - 51:3, 51:4, 251:23

**SUBSECTION** [2] - 43:7, 221.11

**SUBSECTIONS** [2] - 43:2, 43:3

**SUBSEQUENT** [5] - 37:7, 194:19, 208:16, 215:19, 232:7

**SUBSEQUENTLY** [1] - 209:25

**SUBSET** [2] - 149:24, 232:4

**SUBSIDIARY** [2] - 47:4, 51:16

**SUBSPECIALITY** [1] - 116:11

**SUBSPECIALTY** [2] - 115:13, 116:12

**SUBSTANTIAL** [7] - 43:18, 46:17, 50:24, 51:2, 67:5, 232:24, 233:6

**SUBSTANTIALLY** [1] - 247:16

**SUBSTANTIVE** [12] - 8:6, 8:17, 8:20, 8:22, 8:25, 9:12, 213:3, 213:23, 214:10, 214:13, 217:6, 218:18

**SUBSTANTIVELY** [1] - 9:3

**SUCH** [14] - 12:3, 47:4, 79:14, 103:21, 140:25, 156:11, 175:10, 175:11, 187:20, 201:19, 221:12, 228:16, 248:20, 251:1

**SUDDEN** [1] - 153:10

**SUDDENLY** [1] - 96:16

**SUE** [2] - 47:20, 47:23

**SUED** [2] - 26:2, 27:4

**SUFFER** [12] - 7:9, 7:19, 15:14, 117:16, 125:18, 126:16, 126:19, 128:1, 129:3, 147:13, 153:24, 227:10

**SUFFERED** [4] - 15:13, 18:23, 147:24, 148:6

**SUFFERING** [4] - 128:14, 129:12, 142:1, 235:3

**SUFFICIENT** [5] - 17:1, 20:10, 20:15, 20:18, 39:13

**SUFFICIENTLY** [1] - 240:21

**SUGGEST** [3] - 177:12, 237:24, 237:25

**SUGGESTED** [4] - 53:22, 125:3, 242:9, 252:12

**SUGGESTING** [3] - 31:2, 227:15, 247:21

**SUGGESTS** [4] - 37:9, 43:11, 106:18, 244:16

**SUITED** [1] - 190:12

**SUM** [1] - 14:25

**SUMMARY** [1] - 228:5

**SUPERSEDE** [1] -

215:20

**SUPERVISED** [1] - 59:19

**SUPPORT** [4] - 15:9, 67:5, 170:18, 214:13

**SUPPORTED** [5] - 221:14, 226:15, 226:16, 250:14, 250:15

**SUPPORTING** [3] - 155:19, 155:20, 251:18

**SUPPOSED** [7] - 78:8, 126:11, 127:14, 245:8, 245:20, 246:1, 251:5

**SUPPOSEDLY** [1] - 26:21

**SUPREMACY** [1] - 19:7

**SUPREME** [22] - 16:19, 26:7, 36:4, 37:24, 38:3, 38:5, 40:1, 40:2, 47:13, 47:16, 48:4, 49:2, 51:7, 211:9, 213:17, 219:15, 225:20, 226:2, 226:19, 226:23, 241:2, 249:6

**SURE** [36] - 28:23, 51:23, 53:5, 53:16, 57:24, 75:2, 78:17, 89:12, 98:14, 137:2, 139:18, 139:19, 141:15, 141:19, 143:22, 145:8, 153:11, 159:9, 163:2, 166:25, 168:11, 170:25, 174:21, 176:3, 180:9, 182:6, 183:14, 184:3, 187:17, 191:7, 193:19, 194:5, 195:7, 195:10, 195:13

**SURELY** [1] - 220:6

**SURGERIES** [1] - 122 14

**SURGICAL** [3] - 77:21, 119:15, 122:12

**SURPRISED** [1] - 176:19

**SURVEY** [7] - 62:4, 111:15, 111:17, 111:18, 111:23, 111:24, 182:17

**SURVEYS** [3] - 110:13, 181:14

**SUSPECT** [1] - 34:15

**SUSTAINED** [13] - 80:8, 85:13, 86:11, 132:6, 133:5, 139:12, 142 18, 147:20, 150:4, 150:20, 151:23, 203:19

**SUZANNE** [2] - 1:19, 253:9

**SWALLOW** [2] - 6:21, 26:19

**SWEAR** [1] - 113:12

**SWEATS** [1] - 127:20

**SWEEPING** [6] - 211:11, 218:16, 235:1, 248:6, 248:20, 251:1

**SWITCH** [2] - 243:23, 244:1

**SWORN** [4] - 54:20, 113:17, 162:17, 162:19

**SYLLOGISM** [1] - 49:7

**SYMPTOMS** [4] - 126:18, 127:20, 130:1, 132:12

**SYSTEM** [1] - 121:18

**SYSTEMATIC** [1] - 62:5

## T

**TAB** [14] - 56:7, 56:14, 68:1, 101:9, 101:10, 101:12, 114:12, 143:20, 143:22, 165:7, 165:15, 175:20, 183:23, 198:10

**TABLE** [16] - 6:10, 10:14, 74:18, 74:21, 75:15, 78 1, 80:18, 184:3, 184:21, 184:24, 185:2, 185:10, 185:15, 185:21, 185:24, 186:7

**TAKE** [36] - 8:15, 27:8, 29:14, 38:9, 48:10, 48:22, 49:7, 49:10, 54:8, 54:18, 73:10, 81:8, 85:13, 95:7, 113:3, 118:11, 118:14, 119:16, 129:18, 133:16, 161:7, 181:11, 187:17, 210:4, 210:8, 210:10, 212:19, 223:15,

225:3, 227:16, 232:2, 235:5, 242:5, 244:8, 250:17, 250:24

**TAKEN** [15] - 51:12, 54:13, 66:14, 107:10, 108:11, 113:7, 157:23, 184:3, 184:4, 184:21, 184:25, 185:2, 210:15, 214:11, 219:11

**TAKES** [1] - 88:6

**TAKING** [10] - 25:4, 48 12, 74:11, 122:12, 133:12, 160:23, 174:1, 227:17, 228:18, 236:17

**TALK** [16] - 34 24, 36 2, 38:12, 52:14, 82:11, 83:3, 88:3, 109:3, 157:19, 178:10, 178:12, 178:21, 182:1, 190:11, 215:14, 222:11

**TALKED** [11] - 18.18, 36.20, 88:4, 108:22, 128:22, 163:9, 176:22, 198:20, 216:24, 239:24, 249:18

**TALKING** [9] - 29:1, 38 20, 38:23, 38:25, 48 24, 109:11, 174:17, 217:16, 239:18

**TALKS** [2] - 82 24, 150:22

**TARGETED** [1] - 57:7

**TASK** [1] - 68:25

**TASKS** [1] - 58:6

**TAUGHT** [3] - 59:18, 63:17, 63:23

**TAX** [3] - 219:17, 219:24, 242:22

**TAXES** [1] - 240:10

**TEACH** [1] - 58:15, 61:4, 118:2, 118:5, 118:6

**TEACHER** [2] - 22:18, 23 14

**TEACHING** [5] - 59:22, 61:10, 119:20, 122:21, 175:13

**TEAM** [1] - 6:11

**TECHNICAL** [1] - 47:8

**TECHNOLOGY** [1] -

Exhibit 137                                                                 JA-0001910

75:3
**TEEN** [3] - 102:18, 106:23, 106:24
**TEENS** [2] - 102:15, 107:1
**TELL** [31] - 3:10, 15:23, 18:11, 36:10, 49:3, 50:16, 53:19, 88:14, 90:1, 107:25, 114:9, 116:24, 123:24, 143:20, 155:4, 161:11, 161:17, 162:6, 165:12, 170:24, 178:16, 180:4, 180:6, 185:8, 204:6, 214:19, 222:19, 222:20, 227:20, 229:17, 234:10
**TELLING** [3] - 33:10, 83:4, 236:20
**TEMPLE** [1] - 167:8
**TEN** [2] - 54:10, 113:4
**TEND** [1] - 72:20
**TENS** [1] - 52:12
**TENSION** [3] - 241:5, 247:11, 249:20
**TENURED** [1] - 117:25
**TERM** [5] - 19:24, 127:18, 127:21, 135:16, 177:16
**TERMINOLOGY** [1] - 53:11
**TERMS** [13] - 11:19, 15:12, 29:2, 99:16, 123:24, 132:14, 135:24, 136:23, 145:17, 160:1, 174:6, 189:17, 192:7
**TERRITORY** [2] - 35:18, 35:24
**TEST** [3] - 62:7, 187:4, 188:16
**TESTIFIED** [19] - 98:18, 98:22, 100:19, 107:16, 139:21, 139:25, 140:5, 143:18, 144:3, 145:8, 163:4, 164:12, 164:19, 171:11, 181:2, 184:14, 186:2, 235:25, 244:13
**TESTIFY** [4] - 23:7, 104:22, 121:3, 196:10
**TESTIMONY** [29] - 6:8, 9:16, 22:25, 23:16, 64:24, 65:3, 65:7, 65:11, 66:7, 68:5,

69:7, 111:7, 112:23, 120:18, 120:24, 145:9, 154:14, 161:19, 163:15, 164:10, 184:15, 203:24, 230:7, 235:24, 236:6, 236:20, 245:11, 246:9, 252:2
**TEXAS** [7] - 16:16, 16:25, 17:19, 36:3, 36:5, 36:12, 36:14
**TEXT** [1] - 43:24
**TEXTBOOK** [2] - 16:10, 17:10
**THAN** [48] - 11:22, 11:23, 12:2, 12:19, 16:14, 40:19, 41:1, 41:10, 46:21, 53:11, 53:23, 67:9, 72:18, 74:12, 76:10, 76:20, 77:7, 86:10, 86:21, 90:9, 91:24, 92:2, 92:11, 120:22, 122:24, 124:4, 134:4, 145:20, 154:2, 176:9, 176:12, 176:25, 187:6, 187:8, 194:2, 195:3, 195:11, 198:13, 210:13, 213:15, 225:15, 226:18, 231:3, 232:20, 233:16, 237:2, 238:4, 248:19
**THANK** [52] - 5:22, 11:3, 15:24, 20:19, 20:21, 21:18, 24:12, 25:16, 25:17, 65:25, 77:18, 97:14, 97:17, 98:14, 99:17, 104:24, 104:25, 105:2, 111:10, 113:2, 114:22, 116:25, 121:10, 142:21, 152:17, 152:18, 152:19, 157:6, 157:8, 157:21, 158:25, 165:2, 165:21, 167:23, 172:10, 175:19, 177:6, 184:7, 191:25, 193:5, 193:15, 203:2, 203:23, 204:3, 204:12, 235:14, 235:15, 246:21, 251:13, 251:23, 252:7, 252:25

**THANKS** [1] - 97:24
**THAT** [1412] - 3:19, 3:23, 5:11, 5:13, 5:14, 5:15, 5:16, 5:17, 5:18, 5:19, 6:4, 6:21, 7:5, 7:23, 8:2, 8:13, 8:23, 9:2, 9:15, 9:17, 9:19, 10:2, 10:5, 10:13, 10:21, 11:2, 11:14, 12:4, 12:25, 13:3, 13:7, 13:9, 13:12, 14:3, 14:8, 14:23, 15:2, 15:6, 15:10, 15:12, 15:22, 15:23, 16:18, 16:23, 17:1, 17:2, 17:4, 17:9, 17:13, 17:17, 17:20, 17:23, 17:24, 18:1, 18:7, 18:16, 18:21, 18:23, 18:24, 19:6, 19:9, 19:11, 19:13, 19:16, 19:17, 19:20, 19:25, 20:4, 20:8, 20:13, 20:18, 21:4, 21:7, 21:9, 21:12, 21:15, 21:16, 21:19, 21:22, 21:24, 22:5, 22:9, 22:10, 23:3, 23:17, 23:18, 23:25, 24:2, 24:3, 24:5, 24:7, 24:14, 24:15, 24:24, 25:2, 25:6, 25:8, 25:10, 25:11, 25:13, 25:15, 25:25, 26:16, 26:18, 26:19, 26:20, 26:23, 27:11, 27:19, 27:23, 28:4, 28:7, 28:12, 28:13, 28:18, 28:24, 29:5, 29:12, 29:16, 29:20, 29:25, 30:2, 30:9, 30:14, 30:15, 30:18, 30:20, 30:22, 31:4, 31:9, 31:10, 31:16, 31:17, 31:24, 31:25, 32:6, 32:8, 32:9, 32:10, 32:14, 32:17, 32:18, 32:23, 33:1, 33:4, 33:5, 33:6, 33:8, 33:13, 33:14, 33:15, 33:20, 34:2, 34:3, 34:6, 34:8, 34:10, 34:13, 34:17, 34:25, 35:2, 35:7, 35:9, 35:13, 35:15, 35:17, 35:18, 35:23, 35:25, 36:4, 36:8, 36:13, 36:16, 36:17, 36:24, 36:25, 37:1, 37:4, 37:6, 37:9, 37:12,

37:13, 37:15, 37:16, 37:21, 37:22, 38:2, 38:6, 38:22, 39:3, 39:6, 39:8, 39:9, 39:12, 39:17, 39:19, 40:21, 40:24, 41:1, 41:2, 41:3, 41:7, 41:9, 41:10, 41:14, 41:18, 41:20, 41:21, 41:22, 41:23, 41:25, 42:2, 42:4, 42:9, 42:20, 42:24, 43:2, 43:5, 43:8, 43:10, 43:11, 43:13, 43:16, 43:18, 43:19, 43:21, 44:15, 44:21, 44:23, 44:24, 44:25, 45:2, 45:7, 45:8, 45:12, 45:13, 45:16, 45:21, 45:23, 46:3, 46:12, 46:17, 46:19, 47:1, 47:2, 47:4, 47:10, 47:14, 47:19, 47:22, 48:5, 48:8, 48:14, 48:16, 48:17, 48:18, 48:20, 48:21, 48:25, 49:2, 49:3, 49:9, 49:14, 49:16, 49:21, 49:24, 50:2, 50:3, 50:5, 50:7, 50:9, 50:10, 50:12, 50:13, 50:14, 50:17, 50:19, 50:22, 51:1, 51:4, 51:6, 51:9, 51:12, 51:18, 52:4, 52:7, 52:8, 52:9, 52:16, 52:21, 52:25, 53:5, 53:8, 53:10, 53:14, 53:16, 53:22, 53:24, 54:10, 55:19, 55:23, 56:9, 56:10, 56:12, 56:15, 56:17, 56:18, 56:19, 57:11, 57:15, 57:22, 58:8, 58:22, 58:25, 59:6, 59:14, 59:15, 59:22, 59:23, 60:13, 60:24, 62:2, 62:9, 63:14, 63:24, 64:9, 64:11, 65:6, 65:14, 65:18, 65:19, 66:6, 66:9, 66:11, 66:12, 66:24, 66:25, 67:1, 67:3, 67:7, 67:9, 68:4, 68:8, 68:14, 68:23, 69:4, 69:17, 69:25, 70:1, 70:2, 70:7, 70:8, 70:9, 70:11, 70:12, 70:20, 70:25, 71:2, 71:9, 71:16, 71:23, 72:4, 72:5, 72:25,

74:19, 74:24, 75:1, 75:6, 75:13, 75:14, 75:22, 76:4, 76:9, 76:13, 76:16, 76:17, 76:20, 76:24, 76:25, 77:1, 77:2, 77:3, 77:20, 78:1, 78:4, 78:12, 78:14, 78:17, 78:18, 78:19, 78:21, 78:24, 78:25, 79:8, 79:12, 79:19, 79:22, 79:24, 80:2, 80:4, 80:14, 80:18, 80:20, 81:3, 81:7, 81:8, 81:11, 81:17, 81:18, 81:21, 82:5, 82:6, 82:7, 82:8, 82:9, 82:11, 82:21, 82:23, 82:24, 83:3, 83:7, 83:8, 83:11, 83:17, 84:19, 84:21, 84:24, 85:4, 85:5, 85:7, 85:14, 85:16, 85:24, 86:1, 86:4, 86:6, 86:9, 86:16, 86:21, 87:7, 87:8, 87:10, 87:15, 87:16, 87:24, 88:4, 89:4, 89:9, 89:14, 90:1, 90:6, 90:10, 91:2, 91:6, 91:14, 91:15, 91:16, 91:25, 92:19, 92:21, 93:8, 93:10, 94:4, 94:9, 94:10, 94:14, 95:7, 95:10, 95:24, 96:8, 96:13, 96:16, 96:18, 96:20, 96:21, 96:24, 96:25, 97:3, 98:4, 98:5, 98:18, 98:19, 98:22, 98:23, 99:5, 99:8, 99:11, 99:12, 99:17, 99:18, 99:19, 99:22, 100:1, 100:2, 100:3, 100:19, 100:20, 100:21, 100:23, 101:3, 101:8, 101:9, 101:18, 101:22, 102:2, 102:4, 102:8, 102:10, 102:14, 102:16, 102:20, 102:23, 102:24, 103:3, 103:11, 103:18, 103:22, 103:24, 104:12, 105:24, 106:5, 106:7, 106:10, 106:13, 106:15, 106:18, 106:20, 106:24, 106:25, 107:4, 107:7, 107:8,

Exhibit 137                                                                 JA-0001911

| | | | | |
|---|---|---|---|---|
| 107:10, 107:12, | 139:4, 139:10, | 172:23, 173:5, | 199:2, 199:15, | 221:2, 221:16, |
| 107:13, 107:14, | 139:13, 139:14, | 173:7, 173:14, | 199:24, 200:7, | 221:17, 221:18, |
| 107:15, 107:16, | 139:16, 139:17, | 173:19, 174:1, | 200:19, 200:21, | 221:20, 221:24, |
| 107:21, 107:22, | 139:21, 139:25, | 174:2, 174:12, | 200:25, 201:9, | 222:1, 222:3, |
| 107:25, 108:1, | 140:1, 140:5, 140:6, | 174:17, 174:24, | 201:14, 201:16, | 222:11, 222:13, |
| 108:5, 108:9, | 140:15, 140:24, | 175:6, 175:8, | 201:23, 201:25, | 222:19, 222:25, |
| 108:13, 108:15, | 140:25, 141:1, | 175:15, 175:16, | 202:3, 202:9, | 223:7, 223:9, |
| 109:9, 109:15, | 141:4, 141:9, | 175:23, 176:6, | 202:16, 203:7, | 223:11, 223:14, |
| 109:16, 109:22, | 141:11, 141:22, | 176:11, 176:14, | 204:24, 205:3, | 223:15, 223:16, |
| 109:23, 109:24, | 141:25, 142:5, | 176:16, 176:19, | 205:7, 205:9, | 223:17, 223:18, |
| 110:18, 111:4, | 142:8, 142:12, | 176:22, 177:2, | 205:19, 205:21, | 223:22, 224:5, |
| 111:18, 111:21, | 143:6, 143:19, | 177:12, 177:14, | 205:22, 205:25, | 224:12, 224:13, |
| 112:3, 112:5, | 143:21, 144:1, | 178:2, 178:7, | 206:1, 206:4, 206:8, | 224:18, 224:21, |
| 114:13, 115:3, | 144:3, 144:10, | 178:12, 178:17, | 206:13, 206:15, | 224:24, 225:2, |
| 115:7, 115:19, | 144:15, 144:16, | 178:20, 178:25, | 206:16, 206:17, | 225:5, 225:6, 225:8, |
| 115:21, 116:3, | 144:19, 144:20, | 179:6, 179:17, | 206:19, 206:23, | 225:11, 225:14, |
| 116:10, 116:11, | 144:22, 144:23, | 179:20, 181:3, | 207:4, 207:10, | 225:16, 225:18, |
| 117:18, 118:2, | 145:3, 145:4, 145:8, | 181:4, 181:7, | 207:15, 207:16, | 225:21, 225:25, |
| 118:11, 118:14, | 145:9, 145:22, | 181:11, 181:23, | 207:19, 207:20, | 226:4, 226:8, 226:9, |
| 118:18, 119:6, | 146:1, 146:2, 147:1, | 182:1, 182:22, | 207:23, 208:3, | 226:11, 226:12, |
| 119:12, 119:13, | 147:5, 147:6, | 183:1, 183:3, 183:4, | 208:7, 208:13, | 226:13, 226:15, |
| 119:14, 119:17, | 147:11, 147:18, | 183:11, 183:21, | 208:19, 208:21, | 226:17, 227:3, |
| 119:19, 120:4, | 147:22, 148:9, | 184:3, 184:4, 185:9, | 208:25, 209:3, | 227:4, 227:6, |
| 121:6, 122:7, 122:9, | 149:1, 149:23, | 185:10, 185:16, | 209:5, 209:7, | 227:10, 227:11, |
| 122:12, 122:14, | 150:7, 150:9, | 185:17, 186:2, | 209:10, 209:11, | 227:13, 227:21, |
| 123:4, 123:6, 123:8, | 150:11, 150:24, | 186:5, 186:7, 186:9, | 209:13, 209:14, | 227:22, 227:24, |
| 123:11, 123:12, | 151:11, 151:12, | 186:13, 186:24, | 209:16, 209:17, | 228:5, 228:6, 228:7, |
| 123:19, 124:2, | 151:25, 152:3, | 187:1, 187:8, | 209:20, 209:22, | 228:8, 228:9, |
| 124:3, 124:7, 125:3, | 152:5, 152:25, | 187:10, 187:19, | 209:24, 210:2, | 228:10, 228:11, |
| 125:6, 125:7, 125:9, | 153:2, 153:4, 153:7, | 187:25, 188:6, | 211:1, 211:2, 211:7, | 228:13, 228:14, |
| 125:13, 125:18, | 153:9, 153:12, | 188:8, 188:10, | 211:11, 211:13, | 228:17, 228:24, |
| 125:23, 126:7, | 153:23, 154:1, | 188:11, 188:13, | 211:14, 211:16, | 229:2, 229:3, 229:9, |
| 126:11, 126:13, | 154:2, 154:8, 155:2, | 188:14, 188:15, | 211:18, 211:21, | 229:10, 229:11, |
| 126:17, 127:1, | 156:6, 156:11, | 188:21, 188:25, | 211:22, 212:1, | 229:15, 229:17, |
| 127:3, 127:4, | 156:12, 156:14, | 189:3, 189:4, 189:6, | 212:3, 212:4, 212:5, | 229:18, 230:1, |
| 127:13, 127:15, | 156:20, 157:13, | 189:9, 189:10, | 212:16, 212:19, | 230:9, 230:12, |
| 127:17, 127:18, | 157:19, 158:5, | 189:12, 189:13, | 212:22, 212:25, | 230:16, 230:19, |
| 127:25, 128:2, | 158:7, 158:18, | 189:19, 189:22, | 213:1, 213:3, 213:8, | 230:24, 231:1, |
| 128:3, 128:5, 128:6, | 158:19, 159:8, | 189:24, 189:25, | 213:11, 213:12, | 231:7, 231:11, |
| 128:10, 128:12, | 159:10, 160:9, | 190:7, 190:25, | 213:17, 213:21, | 231:13, 231:16, |
| 128:22, 128:23, | 160:11, 160:14, | 191:8, 191:11, | 214:9, 214:12, | 231:21, 231:23, |
| 128:24, 129:5, | 160:24, 161:12, | 191:13, 191:16, | 214:14, 214:16, | 232:2, 232:5, 232:9, |
| 129:6, 129:13, | 161:13, 161:19, | 191:19, 191:22, | 214:17, 214:20, | 232:15, 232:17, |
| 129:15, 129:20, | 161:24, 161:25, | 192:15, 192:22, | 214:21, 215:2, | 233:2, 233:4, 233:5, |
| 130:2, 130:10, | 162:1, 162:5, 162:6, | 192:23, 194:1, | 215:3, 215:7, 215:9, | 233:6, 233:12, |
| 130:11, 130:13, | 163:4, 163:6, 163:9, | 194:8, 194:14, | 215:10, 215:16, | 233:15, 233:18, |
| 130:20, 131:14, | 163:11, 163:17, | 194:22, 195:2, | 215:24, 216:4, | 233:21, 233:24, |
| 131:22, 131:23, | 163:20, 164:3, | 195:8, 195:12, | 216:10, 216:11, | 234:6, 234:13, |
| 132:3, 132:17, | 164:20, 165:9, | 195:14, 195:15, | 216:19, 217:1, | 234:14, 234:25, |
| 132:20, 133:16, | 165:11, 165:16, | 195:16, 195:18, | 217:4, 217:7, 217:9, | 235:1, 235:2, 235:3, |
| 133:22, 134:2, | 165:17, 165:19, | 195:19, 195:22, | 217:11, 217:15, | 235:6, 235:7, |
| 134:4, 134:10, | 166:15, 166:16, | 196:1, 196:4, | 217:16, 217:22, | 235:10, 235:12, |
| 134:12, 134:15, | 166:21, 167:10, | 196:15, 196:18, | 217:24, 218:5, | 236:3, 236:4, 236:7, |
| 134:17, 134:19, | 167:24, 168:10, | 196:20, 196:21, | 218:15, 218:16, | 236:15, 236:19, |
| 135:6, 135:8, | 168:12, 168:14, | 197:7, 197:9, | 218:19, 218:22, | 236:20, 237:4, |
| 135:17, 135:19, | 169:2, 169:4, | 197:11, 197:16, | 219:1, 219:11, | 237:5, 237:7, 237:8, |
| 136:3, 136:5, | 169:12, 170:6, | 197:21, 197:23, | 219:16, 219:20, | 237:17, 237:21, |
| 136:11, 136:12, | 170:24, 170:25, | 198:2, 198:5, 198:6, | 219:23, 220:4, | 237:24, 237:25, |
| 136:24, 137:2, | 171:1, 171:7, | 198:7, 198:11, | 220:6, 220:7, | 238:1, 238:3, 238:7, |
| 137:6, 137:20, | 171:11, 171:12, | 198:15, 198:17, | 220:13, 220:19, | 238:8, 238:11, |
| 138:4, 138:9, 139:3, | 172:9, 172:15, | 198:20, 198:22, | 220:21, 220:23, | 238:13, 238:15, |

238:18, 238:21, 238:23, 238:24, 239:1, 239:2, 239:3, 239:4, 239:6, 239:8, 239:13, 239:15, 239:17, 239:18, 240:2, 240:4, 240:12, 240:14, 240:21, 240:25, 241:9, 241:14, 241:16, 241:17, 241:23, 241:24, 242:6, 242:8, 242:9, 242:10, 242:18, 242:22, 242:23, 242:24, 242:25, 243:4, 243:8, 243:12, 243:20, 243:21, 243:22, 243:24, 244:5, 244:8, 244:10, 244:13, 244:17, 244:19, 244:23, 244:24, 245:3, 245:4, 245:5, 245:8, 245:9, 245:12, 245:14, 245:24, 245:25, 246:3, 246:5, 246:7, 246:8, 246:12, 246:14, 246:17, 246:23, 246:25, 247:6, 247:8, 247:9, 247:11, 247:16, 247:18, 247:19, 247:21, 247:22, 247:23, 247:25, 248:1, 248:3, 248:5, 248:11, 248:12, 248:13, 248:14, 248:16, 248:18, 248:19, 248:20, 248:25, 249:14, 249:21, 250:1, 250:4, 250:8, 250:12, 250:23, 250:24, 251:4, 251:6, 251:9, 252:6, 252:12, 252:15, 252:16, 252:17, 252:18, 252:21, 252:22, 253:3
**THAT'S** [21] - 21 10, 29:8, 29:20, 38:1, 38:5, 44:14, 45:20, 46:7, 74.18, 76:14, 98:10, 117:21, 127:6, 132:4, 164:17, 168:7, 181:1, 198:21, 206:11, 210:2,

213:13
**THE** [2887] - 1:1, 1:2, 1:11, 2:2, 2:8, 3:1, 3:2, 3:5, 3:8, 3:10, 3:11, 3:12, 3 14, 3:16, 3:19, 3:20, 3:23, 3:24, 4 2, 4:3, 4:6, 4:7, 4:10, 4:11, 4:14, 4.18, 4 20, 4:23, 5:1, 5:5, 5:6, 5:8, 5:11, 5:13, 5:16, 5:17, 5:18, 5:23, 5:25, 6:2, 6:3, 6:5, 6:7, 6:8, 6:10, 6:11, 6:15, 6 17, 6 18, 6:19, 6:20, 6 21, 6:22, 6:23, 7 1, 7:4, 7:7, 7:9, 7:10, 7:11, 7:12, 7 14, 7 15, 7:17, 7:21, 7 22, 7:23, 7:24, 8 1, 8:4, 8:5, 8:6, 8:9, 8:10, 8:11, 8:12, 8:14, 8:15, 8:17, 8:18, 8:20, 8:21, 8.22, 8:25, 9 1, 9:2, 9:3, 9:4, 9:6, 9:10, 9:11, 9:12, 9:13, 9:18, 9:19, 9:22, 9 24, 9:25, 10:1, 10:2, 10:5, 10:6, 10:9, 10:10, 10:14, 10:15, 10:16, 10:17, 10:21, 10:23, 10:25, 11:1, 11:2, 11:4, 11:5, 11:9, 11:13, 11 17, 11:18, 11:20, 11:24, 12:4, 12:5, 12:6, 12:7, 12:8, 12:9, 12:11, 12:13, 12:14, 12:16, 12:18, 12:20, 12:22, 12:24, 12:25, 13:1, 13:2, 13:3, 13:6, 13:7, 13:14, 13:17, 13:20, 13:25, 14:1, 14:3, 14:4, 14:5, 14:7, 14:17, 14:23, 14:25, 15:1, 15:2, 15:3, 15:4, 15:5, 15:6, 15:7, 15:11, 15:14, 15:17, 15:19, 15:21, 15:22, 16:2, 16:4, 16:5, 16:7, 16:8, 16:13, 16:17, 16:19, 16:21, 16:22, 16:23, 16:24, 17:3, 17:4, 17:8, 17:10, 17:13, 17:18, 17:21, 18:2, 18:4, 18:7, 18:9, 18:11, 18.13, 18:15, 18:16,

18:17, 18:20, 18:21, 18:22, 19:2, 19:3, 19:7, 19:13, 19:14, 19:16, 19:21, 19.23, 19:24, 20:1, 20:5, 20:6, 20:7, 20:13, 20:14, 20:16, 20:19, 20:22, 21:1, 21:3, 21:5, 21:6, 21:10, 21:11, 21:12, 21 13, 21:14, 21:15, 21:16, 21:18, 21:20, 21:25, 22:2, 22:4, 22:5, 22:6, 22:7, 22:9, 22:10, 22:13, 22 23, 23:1, 23 4, 23:8, 23:11, 23:14, 23:18, 23:23, 24:5, 24:6, 24:10, 24:12, 24:16, 24:17, 24:18, 24 19, 24:24, 25:1, 25:2, 25:6, 25:7, 25:9, 25:10, 25:13, 25:16, 25:18, 25:20, 25:22, 25:24, 26:1, 26:3, 26:5, 26 7, 26:10, 26:11, 26:12, 26:13, 26:15, 26:16, 26 19, 27:2, 27:8, 27:9, 27:11, 27:14, 27:15, 27:16, 27:18, 27 20, 27:22, 27:24, 27:25, 28:2, 28 3, 28:6, 28:9, 28:10, 28:13, 28:15, 28:17, 28:21, 28:22, 28:23, 28 24, 28:25, 29:3, 29:5, 29:7, 29:10, 29:14, 29:15, 29:16, 29:17, 29:18, 29:24, 30:3, 30:7, 30:8, 30:11, 30:13, 30:20, 30:21, 30:23, 30:24, 31:2, 31:3, 31:5, 31:7, 31:8, 31:11, 31:14, 31:15, 31:18, 31:19, 31:20, 31:21, 31 22, 31:23, 32:2, 32:5, 32:6, 32:10, 32:11, 32:19, 32:20, 32:25, 33:5, 33:10, 33:11, 33:16, 33:17, 33 19, 33:21, 33:23, 33 24, 33:25, 34:1, 34:2, 34:4, 34:5, 34:15, 34:16, 34:17, 34 25, 35:3, 35:6, 35:7, 35:9, 35 13, 35:14, 35:15, 35:17, 35:18, 35:21, 35:24, 36:2, 36:3, 36:4, 36:8,

36:11, 36:12, 36:13, 36:14, 36:17, 36:20, 36:21, 36:24, 37:1, 37:3, 37:5, 37:9, 37:15, 37 16, 37:24, 37:25, 38 9, 38:13, 38:15, 38:16, 38:20, 38:21, 38:22, 38:25, 39:2, 39:3, 39:5, 39:7, 39:8, 39 9, 39:13, 39 14, 39:15, 39:16, 39:17, 39:18, 39:20, 39:21, 39:24, 39:25, 40:1, 40:2, 40:4, 40:6, 40:10, 40:11, 40 14, 40:15, 40:16, 40:17, 40:19, 40:21, 40:22, 41:1, 41:6, 41:7, 41:10, 41:11, 41:12, 41:13, 41:19, 41 20, 41:23, 41:25, 42 2, 42:4, 42:6, 42:7, 42:8, 42:10, 42:12, 42:13, 42:14, 42:15, 42:18, 42:20, 42 21, 42:22, 42:23, 43 1, 43:2, 43:5, 43:6, 43:10, 43:13, 43:16, 43:17, 43:19, 43:20, 43:22, 43:23, 43:25, 44:2, 44:4, 44:5, 44:6, 44:8, 44:9, 44:10, 44:11, 44:15, 44:17, 44:23, 44:24, 44:25, 45:2, 45:4, 45:7, 45:10, 45:11, 45:12, 45:13, 45:14, 45:15, 45:17, 45:18, 45:22, 45:23, 45:25, 46:1, 46:3, 46:5, 46:6, 46:8, 46:9, 46:10, 46:11, 46 12, 46:14, 46:17, 46 18, 46:20, 46:22, 46:23, 47:1, 47:2, 47:3, 47 7, 47:8, 47:9, 47 13, 47:16, 47:17, 47:18, 47:19, 47 20, 47:22, 47:23, 47:25, 48:1, 48:2, 48:4, 48:6, 48:7, 48:10, 48:11, 48:12, 48 13, 48:16, 48:20, 48 21, 49:5, 49:6, 49:8, 49:10, 49:15, 49 16, 49:17, 49:18, 49 25, 50:1, 50:3, 50:4, 50:9, 50:10, 50:11, 50:13, 50:16, 50:19, 50:20, 50:21, 50 23, 50:24,

50:25, 51:2, 51:4, 51 7, 51:11, 51:12, 51:13, 51:15, 51:16, 51 17, 51:18, 51:19, 51 20, 51:21, 51:24, 52 2, 52:4, 52:5, 52:6, 52:9, 52:11, 52:14, 52:15, 52:16, 52:18, 52:19, 52:21, 52 23, 53:2, 53:4, 53 6, 53:10, 53:15, 53 17, 53:18, 53:20, 53:23, 54:2, 54:5, 54:8, 54:12, 54:14, 54 17, 54:18, 54:21, 54 22, 54:23, 55:5, 55:10, 55:11, 55:12, 55:18, 55:19, 55:22, 56:1, 56:12, 56:14, 56:20, 56:24, 57:2, 57 5, 57:8, 57:12, 57:22, 57:23, 57:25, 58:1, 58:3, 58:5, 58:15, 58:18, 58:19, 58:20, 58:21, 58:22, 58 24, 59:2, 59:3, 59:6, 59:15, 60:17, 60:24, 61:2, 61:3, 61:5, 61:6, 61:15, 62:2, 62:3, 62:10, 62 12, 63:4, 63:12, 63:15, 63:20, 63:21, 64:1, 64:4, 64:10, 64:11, 64:13, 64:18, 64:21, 64:24, 64:25, 65:1, 65:2, 65:5, 65:8, 65:12, 65:17, 65:19, 65:20, 65:23, 66:2, 66:4, 66:5, 66:6, 66:8, 66:11, 66 13, 66:17, 66:19, 66:25, 67:2, 67:4, 67:7, 67:10, 67:12, 67:16, 67:21, 67:22, 68:3, 68:7, 68:10, 68:13, 68:17, 68:21, 68:22, 68:23, 68:24, 68:25, 69:2, 69:6, 69:11, 69:14, 69:15, 69:17, 69:22, 69:23, 70:1, 70:2, 70:7, 70:10, 70:11, 70:13, 70:16, 70:17, 70:18, 70:20, 70:21, 70:22, 71:1, 71:8, 71:9, 71:17, 71:20, 71:23, 71:24, 72:1, 72:7, 72 11, 73:3, 73:11, 73 12, 73:13, 73:14, 73:21, 73:22, 73:24, 73:25, 74:3, 74:9,

Exhibit 137                                                                                      JA-0001913

74:17, 74:19, 75:3,
75:5, 75:6, 75:8,
75:9, 75:11, 75:12,
75:15, 75:18, 75:21,
75:23, 75:25, 76:5,
76:6, 76:7, 76:8,
76:14, 76:23, 77:1,
77:2, 77:5, 77:6,
77:10, 77:12, 77:13,
77:14, 77:15, 77:23,
77:24, 78:2, 78:4,
78:8, 78:10, 78:11,
78:16, 78:18, 78:19,
78:20, 78:23, 79:5,
79:9, 79:19, 79:20,
80:8, 80:9, 80:11,
80:14, 80:17, 80:19,
81:4, 81:5, 81:7,
81:10, 81:12, 81:13,
81:18, 81:20, 81:21,
81:22, 81:23, 82:1,
82:2, 82:9, 82:13,
82:14, 82:15, 82:16,
82:17, 82:18, 82:19,
82:23, 83:2, 83:3,
83:4, 83:6, 83:7,
83:9, 83:10, 83:17,
83:19, 83:23, 83:24,
83:25, 84:2, 84:3,
84:5, 84:6, 84:9,
84:10, 84:11, 84:18,
84:21, 84:22, 85:4,
85:5, 85:7, 85:8,
85:10, 85:11, 85:13,
85:16, 85:18, 85:19,
85:22, 85:23, 85:25,
86:4, 86:5, 86:8,
86:11, 86:14, 86:18,
86:20, 86:25, 87:2,
87:3, 87:7, 87:9,
87:10, 87:12, 87:15,
87:17, 87:20, 88:3,
88:4, 88:5, 88:7,
88:9, 88:13, 88:14,
88:15, 88:17, 88:19,
88:20, 88:22, 88:25,
89:2, 89:3, 89:6,
89:7, 89:9, 89:11,
89:13, 89:16, 89:17,
89:18, 89:20, 89:22,
89:23, 89:25, 90:1,
90:2, 90:5, 90:8,
90:10, 90:11, 90:13,
90:15, 90:16, 90:17,
90:19, 90:21, 90:22,
90:24, 90:25, 91:1,
91:3, 91:6, 91:9,
91:12, 91:13, 91:14,
91:16, 91:19, 91:20,
91:23, 92:1, 92:3,
92:4, 92:5, 92:6,

92:8, 92:9, 92:12,
92:14, 92:16, 92:17,
92:21, 92:23, 92:24,
92:25, 93:1, 93:3,
93:5, 93:7, 93:8,
93:9, 93:12, 93:13,
93:17, 93:19, 93:23,
94:6, 94:8, 94:10,
94:12, 94:18, 94:19,
94:23, 95:1, 95:4,
95:7, 95:8, 95:10,
95:11, 95:14, 95:21,
96:2, 96:5, 96:6,
96:9, 96:16, 96:22,
97:1, 97:4, 97:10,
97:13, 97:16, 98:2,
98:3, 98:9, 98:11,
98:13, 98:14, 98:19,
98:23, 99:6, 99:7,
99:8, 99:11, 99:15,
99:20, 99:22, 100:1,
100:5, 100:7, 100:8,
100:15, 100:16,
100:20, 100:23,
100:25, 101:1,
101:3, 101:7,
101:10, 101:11,
101:12, 101:15,
101:19, 101:21,
101:22, 101:23,
102:1, 102:2, 102:6,
102:7, 102:10,
102:13, 102:14,
102:15, 102:19,
102:22, 102:23,
103:1, 103:3, 103:4,
103:6, 103:8,
103:11, 103:13,
103:14, 103:16,
103:19, 103:25,
104:3, 104:9,
104:11, 104:14,
104:15, 104:18,
104:21, 104:22,
105:2, 105:8, 105:9,
105:10, 105:11,
105:15, 105:18,
105:19, 105:20,
105:22, 105:24,
106:2, 106:7,
106:10, 106:11,
106:12, 106:13,
106:18, 106:21,
106:22, 107:3,
107:5, 107:6, 107:7,
107:9, 107:11,
107:13, 107:16,
107:22, 107:23,
108:6, 108:10,
108:12, 108:15,
108:20, 108:21,

109:3, 109:5, 109:7,
109:8, 109:13,
109:14, 109:16,
109:18, 109:20,
109:24, 109:25,
110:1, 110:2, 110:3,
110:4, 110:5, 110:8,
110:10, 110:12,
110:13, 110:15,
110:17, 110:19,
110:21, 110:23,
110:24, 110:25,
111:1, 111:2, 111:5,
111:6, 111:8, 111:9,
111:10, 111:14,
111:23, 111:25,
112:5, 112:6, 112:7,
112:11, 112:12,
112:13, 112:14,
112:19, 112:21,
112:22, 112:23,
112:24, 113:1,
113:2, 113:5, 113:8,
113:9, 113:11,
113:12, 113:13,
113:14, 113:15,
113:18, 113:19,
113:20, 113:24,
114:4, 114:12,
114:13, 114:15,
114:21, 115:9,
115:15, 115:16,
115:20, 116:1,
116:9, 116:15,
116:17, 116:18,
116:19, 116:22,
117:2, 117:13,
117:15, 118:18,
118:22, 118:24,
118:25, 119:2,
119:4, 119:5,
119:11, 119:17,
119:25, 120:3,
120:4, 120:6, 120:9,
120:13, 120:15,
120:18, 120:19,
120:21, 120:22,
120:24, 121:2,
121:3, 121:6, 121:9,
121:11, 121:18,
121:19, 121:21,
122:14, 122:24,
123:11, 123:14,
123:15, 123:18,
123:20, 124:7,
124:9, 124:11,
125:1, 125:4, 125:9,
125:16, 125:18,
125:23, 126:6,
126:11, 126:17,
126:18, 126:20,

127:2, 127:13,
127:16, 127:18,
127:21, 127:24,
128:4, 128:12,
128:14, 128:16,
128:21, 128:24,
129:5, 129:6,
129:14, 129:15,
129:17, 129:20,
129:22, 129:24,
130:2, 130:20,
130:21, 131:1,
131:2, 131:5, 131:6,
131:16, 131:18,
131:20, 131:24,
132:2, 132:6,
132:12, 132:13,
132:14, 132:18,
132:19, 132:20,
132:23, 133:5,
133:8, 133:11,
133:12, 133:13,
134:1, 134:6, 134:7,
134:9, 134:10,
134:11, 134:21,
134:22, 134:24,
134:25, 135:1,
135:2, 135:3, 135:5,
135:9, 135:12,
135:16, 135:17,
135:23, 136:1,
136:3, 136:5,
136:12, 136:13,
136:16, 136:17,
136:18, 136:23,
137:2, 137:8, 137:9,
137:22, 137:25,
138:1, 138:7,
138:10, 138:13,
138:17, 138:23,
139:1, 139:3, 139:4,
139:5, 139:12,
139:16, 139:17,
139:22, 139:25,
140:5, 140:6,
140:10, 140:11,
140:15, 140:17,
140:20, 140:23,
141:5, 141:6, 141:9,
141:11, 141:13,
141:15, 141:16,
141:17, 141:19,
141:23, 141:25,
142:2, 142:4,
142:13, 142:18,
142:20, 143:5,
143:6, 143:10,
143:13, 143:14,
143:20, 143:23,
144:1, 144:3,
144:14, 144:20,

144:21, 144:23,
144:25, 145:6,
145:9, 145:14,
145:16, 145:18,
145:22, 146:9,
146:10, 146:12,
146:13, 146:19,
146:25, 147:3,
147:4, 147:9,
147:11, 147:16,
147:17, 147:20,
147:22, 148:1,
148:5, 148:7, 148:8,
148:12, 148:20,
148:22, 149:2,
149:7, 149:12,
149:25, 150:2,
150:4, 150:5, 150:7,
150:15, 150:19,
150:20, 150:21,
150:22, 150:24,
151:2, 151:3, 151:4,
151:6, 151:11,
151:12, 151:13,
151:15, 151:18,
151:20, 151:22,
151:23, 151:25,
152:2, 152:3, 152:6,
152:7, 152:14,
152:15, 152:19,
152:20, 152:24,
153:1, 153:3, 153:5,
153:9, 153:16,
153:23, 153:24,
154:3, 154:4, 154:6,
154:7, 154:8, 154:9,
154:18, 154:20,
154:22, 155:2,
155:3, 155:7, 155:8,
155:12, 155:17,
155:18, 155:19,
155:20, 155:23,
155:24, 155:25,
156:3, 156:6, 156:7,
156:8, 156:14,
156:15, 156:17,
156:19, 156:20,
156:21, 156:25,
157:3, 157:6, 157:7,
157:8, 157:10,
157:14, 157:16,
157:18, 157:20,
157:22, 158:2,
158:4, 158:9,
158:10, 158:11,
158:12, 158:13,
158:14, 158:15,
158:16, 158:18,
158:19, 158:21,
158:22, 158:24,
159:1, 159:3, 159:4,

159:7, 159:8,
159:10, 159:12,
159:14, 159:18,
159:21, 159:22,
159:23, 159:25,
160:7, 160:9,
160:11, 160:14,
160:15, 160:17,
160:21, 160:22,
160:23, 160:24,
160:25, 161:1,
161:2, 161:3, 161:4,
161:6, 161:7, 161:8,
161:10, 161:13,
161:14, 161:16,
161:20, 161:23,
162:1, 162:2, 162:3,
162:4, 162:5, 162:8,
162:10, 162:12,
162:16, 162:20,
162:21, 162:22,
162:24, 163:3,
163:8, 163:11,
163:14, 163:15,
163:17, 163:19,
163:20, 163:22,
163:24, 164:1,
164:2, 164:5, 164:6,
164:7, 164:10,
164:12, 164:13,
164:14, 164:16,
164:17, 164:19,
164:20, 165:7,
165:9, 165:16,
165:22, 166:1,
166:4, 166:11,
166:13, 166:15,
166:18, 166:24,
167:1, 167:17,
167:19, 167:21,
168:1, 168:7,
168:10, 168:12,
168:23, 168:24,
169:1, 169:7,
169:19, 169:20,
169:22, 169:24,
170:6, 170:9,
170:11, 170:12,
170:14, 170:15,
170:21, 170:22,
170:25, 171:1,
171:2, 171:3, 171:4,
171:15, 172:12,
172:17, 172:18,
172:19, 172:22,
172:23, 172:24,
173:1, 173:2, 173:3,
173:5, 173:6,
173:20, 173:22,
174:1, 174:10,
174:11, 174:16,

174:19, 174:21,
174:23, 174:24,
174:25, 175:1,
175:2, 175:3, 175:4,
175:5, 175:6, 175:7,
175:9, 175:12,
175:14, 175:16,
175:17, 175:21,
175:24, 176:3,
176:4, 176:5, 176:6,
176:7, 176:10,
176:11, 176:12,
176:14, 176:15,
176:16, 176:17,
176:19, 176:21,
176:22, 176:23,
177:2, 177:3, 177:4,
177:11, 177:13,
177:17, 177:24,
178:6, 178:7,
178:10, 178:14,
178:17, 178:21,
178:22, 178:25,
179:7, 179:14,
179:16, 179:18,
179:23, 179:25,
180:3, 180:6, 180:7,
180:9, 180:10,
180:11, 180:12,
180:13, 180:14,
180:15, 180:20,
180:24, 181:11,
181:12, 181:13,
181:14, 181:17,
181:18, 181:19,
181:23, 181:25,
182:4, 182:7,
182:10, 182:12,
182:14, 182:15,
182:17, 182:18,
182:20, 182:25,
183:1, 183:3, 183:6,
183:7, 183:10,
183:11, 183:13,
183:15, 183:16,
183:17, 183:19,
183:20, 183:24,
184:1, 184:5, 184:9,
184:10, 184:11,
184:13, 184:14,
184:16, 184:17,
184:19, 184:20,
184:22, 184:23,
185:1, 185:3, 185:5,
185:8, 185:10,
185:12, 185:15,
185:16, 185:18,
185:19, 185:20,
185:21, 185:23,
185:25, 186:3,
186:4, 186:5, 186:8,

186:9, 186:10,
186:11, 186:12,
186:13, 186:14,
186:16, 186:18,
186:19, 186:22,
186:23, 186:24,
187:1, 187:3, 187:4,
187:7, 187:12,
187:13, 187:15,
187:17, 187:20,
187:21, 187:22,
187:24, 188:1,
188:2, 188:12,
188:13, 188:14,
188:16, 188:17,
188:21, 188:22,
188:23, 188:25,
189:1, 189:4, 189:5,
189:9, 189:11,
189:18, 189:20,
190:2, 190:9,
190:10, 190:16,
190:17, 190:21,
191:1, 191:2, 191:3,
191:4, 191:5, 191:7,
191:9, 191:11,
191:16, 191:19,
191:20, 191:21,
192:3, 192:6, 192:8,
192:9, 192:10,
192:12, 192:13,
192:18, 192:21,
192:25, 193:2,
193:7, 193:9,
193:17, 193:24,
193:25, 194:2,
194:3, 194:5, 194:6,
194:8, 194:10,
194:11, 194:14,
194:15, 194:16,
194:17, 194:20,
194:25, 195:3,
195:8, 195:10,
195:14, 195:15,
195:24, 196:3,
196:7, 196:10,
196:11, 196:16,
197:2, 197:3, 197:6,
197:7, 197:10,
197:11, 197:22,
198:5, 198:10,
198:11, 198:13,
198:17, 198:22,
198:23, 199:2,
199:7, 199:11,
199:14, 199:23,
200:9, 200:13,
200:17, 201:3,
201:12, 201:14,
201:16, 201:19,
201:22, 201:25,

202:6, 202:13,
202:17, 202:19,
202:21, 202:23,
203:16, 203:19,
204:1, 204:3, 204:9,
204:11, 204:13,
204:14, 204:17,
204:18, 204:20,
204:21, 204:22,
204:23, 204:24,
204:25, 205:1,
205:3, 205:4, 205:6,
205:9, 205:11,
205:14, 205:16,
205:18, 205:21,
205:23, 205:25,
206:1, 206:2, 206:3,
206:4, 206:5, 206:7,
206:8, 206:9,
206:10, 206:13,
206:14, 206:16,
206:17, 206:18,
206:19, 206:20,
206:22, 206:24,
206:25, 207:2,
207:5, 207:6,
207:10, 207:11,
207:12, 207:14,
207:15, 207:16,
207:18, 207:19,
207:20, 207:21,
208:1, 208:3, 208:6,
208:7, 208:13,
208:15, 208:16,
208:17, 208:20,
208:23, 209:1,
209:3, 209:5, 209:7,
209:8, 209:9,
209:10, 209:12,
209:20, 209:21,
209:22, 209:24,
210:4, 210:11,
210:14, 210:16,
210:19, 210:20,
210:22, 211:1,
211:5, 211:7, 211:9,
211:14, 211:16,
211:17, 211:18,
211:21, 211:22,
211:24, 212:5,
212:7, 212:9,
212:14, 212:20,
212:22, 212:23,
213:1, 213:2, 213:3,
213:4, 213:5, 213:7,
213:10, 213:11,
213:12, 213:13,
213:14, 213:16,
213:17, 213:18,
213:19, 213:20,
213:22, 213:23,

213:24, 214:2,
214:3, 214:4,
214:11, 214:12,
214:14, 214:16,
214:21, 214:25,
215:1, 215:6, 215:7,
215:8, 215:9,
215:10, 215:13,
215:15, 215:18,
215:21, 215:22,
215:23, 215:24,
215:25, 216:1,
216:2, 216:3, 216:4,
216:5, 216:9,
216:10, 216:12,
216:14, 216:19,
216:20, 216:21,
216:25, 217:1,
217:3, 217:4, 217:6,
217:7, 217:8,
217:12, 217:14,
217:15, 217:16,
217:18, 217:20,
217:21, 217:23,
218:3, 218:5, 218:8,
218:10, 218:13,
218:15, 218:17,
218:19, 218:20,
218:23, 219:2,
219:4, 219:6, 219:8,
219:10, 219:14,
219:15, 219:17,
219:19, 219:20,
219:21, 219:22,
219:24, 219:25,
220:1, 220:5, 220:8,
220:11, 220:13,
220:22, 220:25,
221:1, 221:2, 221:3,
221:4, 221:6, 221:7,
221:14, 221:15,
221:17, 221:19,
221:21, 221:22,
221:25, 222:1,
222:4, 222:7, 222:9,
222:10, 222:11,
222:12, 222:13,
222:14, 222:15,
222:17, 222:18,
222:24, 222:25,
223:1, 223:6, 223:7,
223:11, 223:14,
223:16, 223:19,
223:24, 223:25,
224:1, 224:2, 224:3,
224:6, 224:7,
224:10, 224:12,
224:13, 224:14,
224:17, 224:18,
224:20, 224:21,
224:24, 224:25,

225:1, 225:3, 225:5,
225:9, 225:10,
225:12, 225:15,
225:18, 225:19,
225:20, 225:22,
225:24, 225:25,
226:2, 226:3, 226:5,
226:8, 226:10,
226:11, 226:12,
226:14, 226:15,
226:16, 226:17,
226:18, 226:19,
226:20, 226:21,
226:23, 226:24,
227:1, 227:4, 227:5,
227:6, 227:8,
227:10, 227:11,
227:12, 227:13,
227:15, 227:19,
227:23, 228:5,
228:11, 228:13,
228:15, 228:16,
228:23, 228:25,
229:1, 229:4, 229:7,
229:8, 229:10,
229:16, 229:20,
229:23, 229:24,
229:25, 230:1,
230:5, 230:8,
230:15, 230:18,
231:2, 231:7, 231:9,
231:11, 231:14,
231:16, 231:18,
231:23, 232:2,
232:4, 232:5, 232:6,
232:8, 232:9,
232:11, 232:12,
232:13, 232:14,
232:15, 232:19,
232:22, 233:2,
233:4, 233:7, 233:9,
233:10, 233:13,
233:14, 233:15,
233:17, 233:18,
233:19, 233:20,
234:3, 234:4, 234:6,
234:9, 234:14,
234:16, 234:20,
234:22, 234:24,
234:25, 235:7,
235:9, 235:11,
235:15, 235:16,
235:20, 235:22,
235:24, 235:25,
236:1, 236:2, 236:6,
236:7, 236:9,
236:10, 236:11,
236:12, 236:16,
236:17, 236:21,
237:4, 237:8,
237:10, 237:13,

237:14, 237:15,
237:16, 237:17,
237:18, 237:21,
237:22, 238:2,
238:4, 238:6, 238:9,
238:10, 238:12,
238:14, 238:18,
238:19, 238:21,
238:22, 238:23,
239:1, 239:3,
239:10, 239:12,
239:13, 239:14,
239:15, 239:18,
239:22, 239:25,
240:6, 240:8, 240:9,
240:11, 240:12,
240:19, 240:22,
240:25, 241:8,
241:10, 241:12,
241:16, 241:20,
241:22, 242:1,
242:3, 242:5, 242:8,
242:11, 242:15,
242:16, 242:17,
242:18, 242:19,
242:20, 242:22,
242:25, 243:5,
243:6, 243:8,
243:10, 243:11,
243:13, 243:14,
243:15, 243:16,
243:18, 243:19,
243:20, 243:23,
243:24, 244:3,
244:4, 244:10,
244:11, 244:15,
244:17, 244:18,
244:21, 244:23,
244:25, 245:4,
245:5, 245:7, 245:9,
245:12, 245:13,
245:14, 245:16,
245:19, 245:20,
245:24, 245:25,
246:6, 246:7, 246:8,
246:9, 246:11,
246:14, 246:15,
246:19, 246:23,
246:24, 246:25,
247:2, 247:6, 247:7,
247:10, 247:11,
247:13, 247:15,
247:17, 247:18,
247:19, 247:21,
247:23, 247:25,
248:1, 248:4, 248:7,
248:8, 248:9,
248:10, 248:12,
248:13, 248:14,
248:15, 248:16,
248:21, 248:23,

248:24, 249:1,
249:3, 249:5, 249:6,
249:11, 249:16,
249:17, 249:18,
249:19, 249:21,
249:24, 250:3,
250:4, 250:5, 250:6,
250:7, 250:8,
250:11, 250:12,
250:13, 250:14,
250:15, 250:16,
250:21, 250:22,
251:4, 251:5, 251:9,
251:10, 251:12,
251:14, 251:15,
251:16, 251:17,
251:19, 251:20,
251:21, 251:22,
251:23, 252:1,
252:2, 252:4, 252:5,
252:8, 252:14,
252:18, 253:3, 253:4
**THEIR** [128] - 6:4,
6:15, 7:7, 11:10,
11:11, 11:15, 12:6,
12:11, 13:16, 13:17,
13:23, 23:5, 27:12,
30:15, 34:16, 35:5,
35:6, 44:22, 47:4,
52:21, 52:22, 53:22,
59:19, 67:5, 72:10,
79:15, 79:17, 80:4,
90:7, 95:1, 96:19,
98:21, 98:25,
100:24, 112:15,
124:24, 125:21,
125:22, 126:2,
126:20, 129:18,
130:1, 132:2,
132:13, 132:18,
145:25, 146:4,
149:11, 151:13,
151:14, 152:1,
153:9, 153:18,
156:12, 170:19,
171:6, 176:8,
177:10, 177:11,
177:20, 177:21,
177:22, 177:23,
178:17, 179:22,
180:22, 181:9,
182:24, 188:3,
188:10, 188:19,
189:21, 189:22,
190:11, 190:13,
190:14, 192:19,
193:1, 193:3, 193:4,
199:6, 199:15,
199:20, 199:22,
200:12, 201:7,
202:20, 202:22,

203:15, 205:3,
205:8, 205:10,
205:15, 206:22,
207:7, 207:9,
208:18, 209:9,
211:11, 212:2,
212:3, 216:22,
218:23, 218:24,
220:20, 221:2,
221:3, 221:18,
225:9, 225:24,
229:17, 230:4,
230:8, 230:20,
231:1, 232:24,
235:8, 243:25,
247:20, 249:4,
249:12, 249:13,
249:18, 251:23
**THEM** [87] - 3:15,
3:17, 3:21, 8:15, 9:9,
12:11, 14:5, 23:22,
25:2, 26:23, 33:13,
34:1, 34:20, 35:8,
44:22, 45:6, 46:13,
51:5, 53:4, 62:19,
67:19, 87:5, 91:7,
95:9, 106:1, 106:2,
107:15, 109:10,
114:9, 114:19,
118:17, 124:1,
125:24, 128:22,
130:3, 130:6, 130:8,
132:2, 133:9,
136:19, 137:14,
137:24, 137:25,
140:10, 145:23,
146:3, 147:1,
148:10, 149:2,
153:1, 168:24,
169:8, 177:25,
178:19, 178:20,
179:15, 179:22,
180:17, 180:19,
180:22, 182:15,
182:24, 189:22,
190:12, 190:15,
190:16, 190:20,
194:18, 194:19,
194:21, 200:12,
201:17, 203:7,
208:23, 214:8,
214:19, 214:24,
214:25, 216:12,
216:22, 218:9,
221:22, 224:15,
225:2, 235:5
**THEME** [2] - 17:17,
25:23
**THEMSELVES** [5] -
33:1, 238:19, 243:8,
243:11, 243:16

**THEN** [79] - 3:13, 8:16,
9:12, 11:5, 14:17,
15:14, 18:17, 23:3,
26:8, 26:9, 29:25,
32:9, 32:17, 33:8,
36:6, 37:21, 41:5,
41:16, 57:9, 58:6,
60:7, 63:10, 69:5,
70:5, 71:7, 75:9,
76:3, 76:6, 78:12,
78:14, 80:17, 81:15,
81:23, 83:14, 87:12,
87:15, 132:1,
135:16, 136:2,
139:25, 144:18,
159:15, 161:9,
161:22, 167:2,
167:6, 167:10,
168:18, 173:6,
175:2, 175:9,
176:21, 177:4,
186:8, 186:14,
186:21, 186:23,
187:3, 188:3,
189:24, 197:10,
198:17, 206:6,
209:16, 210:5,
211:8, 212:7,
214:25, 218:9,
221:11, 221:21,
222:14, 223:10,
223:24, 237:11,
239:21, 250:6, 251:2
**THEORY** [6] - 16:12,
17:14, 17:16, 17:17,
19:11, 34:25
**THERE** [251] - 6:4,
6:11, 7:14, 10:25,
17:16, 17:25, 19:17,
19:20, 20:14, 20:18,
21:5, 21:9, 24:19,
24:22, 25:8, 25:9,
25:23, 26:12, 27:15,
27:20, 27:21, 28:1,
28:5, 28:6, 28:18,
30:4, 30:14, 32:6,
32:15, 32:16, 32:20,
32:21, 33:17, 35:8,
37:5, 37:9, 39:2,
39:13, 39:16, 39:18,
39:20, 39:22, 39:24,
39:25, 40:3, 40:7,
40:8, 41:3, 41:5,
41:14, 41:15, 41:16,
42:2, 42:5, 44:17,
45:1, 45:6, 45:23,
47:5, 53:3, 53:10,
53:20, 54:3, 56:21,
57:7, 57:11, 58:10,
60:12, 60:15, 60:23,
65:5, 68:9, 69:4,

70:9, 70:18, 71:16,
72:4, 72:18, 72:19,
74:3, 75:15, 75:16,
76:16, 76 18, 77:3,
79:22, 79 23, 82:13,
83:11, 84:13, 86:18,
87:20, 89:9, 91:3,
91:4, 91:13, 91:19,
94:11, 94:20, 99:19,
106:25, 108:17,
110:11, 111:3,
111:16, 111:18,
114:6, 114:18,
115:5, 116:17,
118:15, 119:12,
119:13, 122:6,
125:5, 125:13,
125:15, 126:8,
126:15, 128:19,
129:10, 130:14,
131:18, 133:1,
134:14, 134:25,
135:3, 135:10,
137:16, 143:8,
144:20, 145:10,
155:7, 159:15,
160:3, 160:4,
161:19, 164:21,
166:3, 167:22,
168:17, 173:16,
174:15, 175:15,
176:7, 176:8,
177:12, 178:11,
179:2, 183:2, 183:9,
183:16, 183:18,
183:19, 186:10,
186:15, 186:18,
186:25, 187:8,
187:19, 188:7,
188:8, 188:9, 189:7,
189:8, 189:12,
190:25, 192:13,
192:23, 195:17,
195:22, 195:23,
195:25, 196:15,
197:1, 197:12,
197:15, 197:18,
197:22, 202:3,
205:20, 208:22,
209:13, 211:11,
211:12, 211:17,
211:25, 213:10,
214:9, 215:5,
216:15, 217:3,
217:4, 217:8,
217:10, 219:3,
220:17, 222:1,
222:3, 222:11,
222:21, 223:4,
224:12, 225:7,
225:8, 227:14,

227:25, 228:1,
228:8, 229:15,
230:1, 231:1, 231:8,
231:14, 231:18,
231:19, 231:24,
233:25, 234:17,
235:7, 235:10,
237:13, 237:19,
238:11, 239:7,
240:1, 240:24,
241:2, 242:15,
243:15, 243:19,
243:21, 244:7,
244:20, 244:21,
244:23, 245:2,
246:1, 247:24,
247:25, 248:4,
248:5, 249:20,
249:23, 251:3
**THERE'S** [11] - 22:1,
27:19, 65:6, 163:14,
168:4, 169:21,
189:12, 195:18,
227:25, 248:17,
249:23
**THEREFORE** [16] -
13:14, 14:18, 21:8,
30:10, 36:11, 56:2,
72:10, 79:3, 196:19,
197:15, 205:13,
230:5, 230:10,
230:19, 237:20,
245:19
**THERETO** [1] - 5:18
**THESE** [116] - 6:18,
7:4, 7:6, 7:17, 13:15,
13:19, 14:3, 14:15,
25:5, 26:7, 26:22,
34:9, 34:18, 39:10,
41:5, 42:1, 45:16,
46:2, 57:20, 71 9,
75:2, 75:5, 77:5,
78:13, 86:2, 87:11,
87:19, 91:5, 92:10,
92:13, 94:12, 96:9,
110:12, 114:11,
116:20, 123:25,
125:25, 126:5,
127:14, 130:4,
131:12, 131:19,
138:3, 138:22,
140:8, 140:25,
141:23, 145:11,
147:4, 149:17,
150:25, 151:2,
151:9, 153:10,
155:19, 156:18,
160:4, 181:12,
186:6, 187:8, 187:9,
196:14, 196:18,
196:22, 198:19,

200:5, 200:11,
200:22, 201:6,
202:2, 202:4, 202:9,
207:7, 207:8,
208:20, 208:25,
210:25, 211:2,
211:12, 211:22,
212:20, 214:8,
214:13, 214:24,
215:11, 216:17,
216:21, 217:23,
222:5, 229:13,
229:20, 231:9,
231:18, 231:19,
231:25, 232:6,
232:16, 233:21,
235:1, 237:19,
237:20, 237:21,
238:11, 238:25,
239:5, 239:21,
243:9, 243:12,
244:5, 244:24,
245:11, 250:1,
250:9, 250:10,
250:20, 251:25
**THEY** [215] - 3:22,
6:20, 6:21, 6:22,
6:25, 7:2, 9:22,
13:18, 14:11, 14:17,
14:18, 26:18, 30 14,
31:11, 34:12, 34 19,
40:12, 40:13, 40 16,
40:17, 40:25, 41:15,
44:11, 47:7, 47:20,
47:23, 51:17, 53:10,
53:22, 56:1, 58:17,
58:18, 61:17, 61:18,
62:7, 65:10, 65:18,
66:18, 68:12, 69:25,
71:19, 77:10, 78:14,
79:12, 79:13, 80 5,
86:3, 87 12, 90:6,
94:9, 95 13, 98:20,
98:24, 103:18,
106:2, 106:6,
107:12, 107:14,
110:14, 114:10,
114:19, 119:5,
119:6, 121:16,
121:20, 125:11,
125:24, 126:3,
127 7, 127:8, 127:9,
132:16, 133:1,
137:14, 137:18,
137:23, 137:25,
140:7, 141:6,
141:20, 145:1,
145:2, 153:1, 153:2,
153:11, 158:13,
159:24, 164:24,
169:19, 171:5,

174:9, 175:2, 176 9,
177:22, 177:23,
177:25, 178:1,
178:12, 178:20,
179:17, 180 19,
181:8, 181:13,
181:16, 182:17,
182:18, 182:19,
182:21, 187:25,
188:4, 188:5,
188:10, 190 9,
190:13, 191:20,
192:21, 192:22,
192:25, 193:3,
197:24, 199:16,
200:6, 200:14,
201:23, 203:7,
205:2, 205:8,
205:12, 206:5,
208:19, 209:4,
209:23, 212:24,
214:2, 214:12,
215:3, 215:8,
215:11, 215:16,
216:3, 216:12,
216:13, 216 18,
217:7, 217:11,
217:16, 219:1,
219:11, 221:2,
221:7, 221:16,
221:21, 222:1,
223:2, 225:24,
226:10, 227:17,
227:19, 228 6,
228:16, 228:18,
228:19, 228:20,
228:24, 229 1,
229:7, 229:9,
229:11, 229:16,
230:4, 230:10,
231:5, 231:16,
231:18, 231:21,
233:2, 233:3, 235:1,
235:2, 235:25,
236:15, 236 16,
236:21, 237:4,
237:7, 237:25,
238:7, 239:4,
239:15, 239:18,
244:1, 244:13,
247:4, 247:14,
247:20, 248:16,
248:17, 248:18,
249:8, 249:9,
249:10, 250:6,
250:7, 251:9
**THING** [11] - 5:10,
5:20, 28:24, 50:9,
71:11, 76:14, 83:2,
94:17, 124:19,
188:25, 234:10

**THINGS** [12] - 14:15,
125:12, 129:14,
156:17, 161:19,
173:16, 192:17,
194:22, 209:24,
223:24, 236:5, 242:8
**THINK** [159] - 3:22,
8:20, 15:6, 16:10,
16 22, 17:5, 19:1,
20:5, 20:6, 20:11,
27 22, 29:3, 29:16,
29:22, 30:20, 31:13,
32:4, 32:10, 35:14,
35 22, 36:16, 37:3,
39 2, 39:12, 40 7,
40 8, 40:13, 41:13,
41:25, 42:3, 42:9,
42:10, 44:20, 44:23,
44 24, 44:25, 45:21,
45 22, 47:2, 49:4,
49:24, 50:20, 51:17,
51 24, 52:2, 52:15,
52:17, 53:4, 53:16,
53:24, 54:8, 68:17,
85 20, 88:4, 89:2,
89 3, 89:5, 93:14,
94 18, 95:2, 95:8,
106:6, 108 21,
108:24, 111:9,
111:18, 128:10,
136:24, 137:3,
137:6, 137:23,
139:5, 139:14,
146:1, 147:3, 155:5,
156:5, 156:16,
158:16, 161:3,
161:13, 161:17,
170:4, 173:6,
173 19, 177:9,
177:24, 179:3,
183:9, 186 2,
189:14, 190:4,
190:6, 191:19,
192:20, 204:5,
204:14, 209:20,
209:25, 210:9,
210:23, 212:11,
212:16, 213:1,
214:1, 215:10,
216:11, 216:13,
217:10, 217:14,
218:18, 218:25,
219:14, 219:16,
222:17, 223:6,
224:5, 224:11,
224:23, 225:17,
225:23, 226:17,
227:4, 227 8,
227:10, 233:1,
233:12, 233:24,
234:9, 236:18,

236:20, 236:24,
237:1, 237:24,
238:6, 238:7, 238:8,
239:7, 241:14,
243:16, 244:2,
244:14, 245:12,
245:25, 246:8,
246:10, 246:12,
246:24, 247:8,
247:21, 248:3,
248:10, 248:12,
250:8, 250:23,
251:3, 252:16
**THINKS** [3] - 24:20,
31:9, 41:9
**THIRD** [16] - 34:6,
49:2, 62:19, 157:20,
164:16, 185:20,
186:22, 187:3,
212:2, 212:7,
213:17, 216:25,
217:3, 218:7,
218:10, 229:4
**THIRD-PARTY** [5] -
34:6, 212:2, 218:7,
218:10, 229:4
**THIRTIES** [1] - 89:12
**THIS** [303] - 3:7, 3:11,
3:19, 6:16, 7:8, 7:18,
7:21, 8:4, 8:10,
13:10, 13:21, 13:25,
17:5, 17:12, 17:18,
18:4, 19:11, 20:15,
22:17, 24:14, 24:21,
25:9, 25:25, 26:13,
26:14, 26:22, 27:1,
27:10, 27:16, 28:7,
29:22, 30:2, 30:5,
34:14, 35:18, 37:9,
37:13, 39:1, 39:4,
40:19, 41:9, 41:17,
42:20, 44:9, 45:15,
45:24, 46:15, 47:13,
49:5, 51:13, 55:22,
57:1, 57:24, 64:2,
64:5, 64:16, 65:1,
65:4, 66:7, 66:24,
68:2, 68:3, 74:21,
75:7, 75:21, 76:12,
78:9, 78:19, 82:2,
82:10, 83:12, 83:19,
83:20, 84:4, 84:14,
86:25, 87:18, 87:21,
87:22, 87:24, 88:10,
92:21, 93:13, 94:9,
94:16, 95:2, 96:17,
97:12, 97:23, 99:8,
100:11, 100:14,
100:24, 101:7,
101:12, 103:1,

103:9, 106:11,
107:8, 108:4,
108:19, 108:25,
109:20, 109:21,
110:24, 111:4,
111:12, 111:13,
112:25, 114:11,
114:14, 120:11,
120:20, 122:23,
123:13, 123:22,
124:5, 124:19,
125:2, 126:19,
127:12, 133:13,
138:4, 138:25,
140:15, 140:20,
142:16, 142:17,
145:19, 145:23,
146:11, 146:15,
146:21, 146:24,
147:2, 147:10,
150:19, 151:21,
152:1, 152:10,
152:13, 154:18,
155:18, 155:20,
156:1, 156:8, 158:6,
158:11, 159:1,
159:3, 159:7,
159:12, 159:13,
159:17, 159:19,
160:2, 160:7,
160:13, 160:14,
160:24, 161:1,
161:25, 162:1,
162:15, 163:1,
172:11, 172:19,
175:24, 176:2,
178:9, 178:19,
180:4, 180:25,
181:5, 181:22,
181:24, 182:4,
182:6, 183:12,
184:1, 184:3, 184:9,
184:13, 184:14,
184:18, 184:21,
184:24, 185:3,
188:20, 189:1,
189:14, 189:16,
190:18, 190:25,
192:22, 193:23,
195:6, 196:1, 196:4,
197:21, 203:9,
204:19, 204:22,
204:24, 205:5,
206:13, 206:17,
206:24, 206:25,
207:2, 207:11,
207:12, 207:13,
207:15, 208:16,
209:7, 209:18,
211:3, 211:4,
212:18, 212:21,

212:24, 215:6,
215:17, 215:18,
215:20, 216:6,
217:5, 217:13,
218:12, 218:16,
218:20, 219:24,
220:8, 220:10,
220:23, 222:2,
222:11, 223:18,
224:14, 225:10,
225:11, 225:23,
226:13, 226:22,
227:13, 227:17,
227:24, 228:4,
228:14, 228:19,
229:23, 230:12,
231:7, 232:22,
233:11, 233:17,
234:6, 234:23,
236:11, 238:3,
239:4, 239:8,
239:17, 239:25,
240:13, 240:18,
240:22, 241:1,
243:2, 243:17,
244:2, 244:8,
244:15, 245:1,
245:8, 246:1, 246:2,
246:5, 246:9,
246:15, 246:22,
248:3, 248:6,
248:19, 249:8,
249:16, 249:24,
250:4, 250:14,
251:2, 251:15,
251:16, 251:24
**THOROUGH** [1] -
132:11
**THOROUGHLY** [1] -
228:8
**THOSE** [122] - 5:19,
6:8, 9:21, 13:2, 26:4,
26:21, 27:6, 28:22,
37:17, 38:9, 38:17,
39:6, 41:25, 43:3,
47:6, 48:3, 51:3,
52:15, 53:7, 59:4,
61:15, 61:21, 68:10,
68:24, 69:5, 69:8,
69:9, 71:15, 73:17,
73:18, 74:12, 79:10,
86:19, 86:20,
108:22, 110:11,
110:14, 111:18,
114:9, 114:18,
122:8, 125:15,
127:24, 128:7,
128:14, 128:19,
128:20, 129:20,
129:23, 129:25,
130:2, 133:14,

133:24, 135:21,
137:18, 142:2,
142:3, 142:5,
144:10, 147:14,
147:25, 148:6,
150:8, 152:7,
153:19, 154:19,
155:16, 163:7,
168:22, 169:1,
170:5, 170:6, 174:9,
175:12, 176:4,
176:5, 176:13,
176:15, 179:16,
182:23, 184:25,
185:17, 185:24,
188:4, 189:15,
190:8, 190:21,
195:3, 195:21,
196:3, 196:22,
196:25, 197:18,
198:3, 203:11,
205:12, 205:22,
206:8, 206:9,
206:10, 209:24,
214:1, 214:6,
216:19, 220:2,
223:1, 229:16,
231:12, 231:15,
233:1, 233:22,
234:5, 243:22,
244:12, 244:14,
247:15, 248:10,
249:11, 249:19,
251:8
**THOUGH** [4] - 37:7,
50:8, 51:15, 198:19
**THOUGHT** [5] - 29:11,
93:15, 183:21,
241:23, 248:5
**THOUGHTFUL** [1] -
251:24
**THOUSAND** [1] -
92:16
**THOUSANDS** [2] -
39:22
**THREAT** [1] - 140:24
**THREATEN** [1] -
250:16
**THREATENING** [2] -
137:19, 142:9
**THREATENS** [1] -
211:19
**THREE** [23] - 6:8,
21:25, 38:15, 38:18,
39:2, 42:17, 43:2,
69:9, 74:1, 116:4,
128:7, 128:14,
128:16, 128:19,
176:3, 180:19,
182:18, 183:1,

183:12, 185:24,
211:12, 214:14,
250:11
**THRESHOLD** [1] -
41:18
**THROMBOSIS** [1] -
103:22
**THROUGH** [50] - 7:14,
9:1, 10:3, 10:6,
10:10, 10:16, 13:18,
13:24, 14:9, 17:11,
24:6, 39:1, 42:3,
55:19, 56:11, 56:15,
57:1, 68:8, 73:5,
74:25, 84:7, 94:3,
100:3, 110:4,
114:17, 137:24,
147:12, 147:23,
148:9, 148:10,
165:12, 165:18,
169:19, 169:20,
176:2, 180:10,
180:25, 181:3,
199:20, 199:22,
203:8, 203:13,
205:17, 208:23,
209:15, 214:3,
215:1, 222:11,
236:6, 248:4
**THROUGHOUT** [10] -
26:5, 28:13, 62:12,
68:4, 152:7, 168:2,
170:3, 181:18,
183:15, 224:25
**THURSDAY** [1] - 1:8
**THUS** [3] - 41:14,
220:3, 241:5
**TIED** [1] - 51:19
**TIER** [10] - 175:4,
175:5, 175:9,
175:10, 175:12,
176:5, 176:14,
176:21, 177:4, 177:5
**TIERS** [1] - 185:17
**TIME** [79] - 5:14, 17:4,
20:23, 31:11, 43:6,
43:16, 51:23, 52:1,
57:15, 58:21, 58:25,
59:14, 59:23, 61:8,
64:16, 65:6, 69:23,
70:1, 70:2, 71:2,
71:23, 72:3, 75:6,
75:8, 79:23, 83:7,
85:8, 86:4, 88:6,
94:9, 94:20, 108:4,
108:10, 110:1,
116:20, 124:8,
131:13, 133:22,
134:8, 134:12,
134:15, 135:12,

Exhibit 137          JA-0001918

141:16, 146:22,
154:17, 154:20,
155:11, 157:11,
160:2, 160:3, 160:7,
162:1, 164:5,
168:13, 172:4,
172:11, 177:10,
180:24, 183:12,
186:13, 188:10,
188:11, 188:20,
189:1, 192:13,
194:8, 194:10,
197:6, 208:24,
209:18, 209:21,
211:14, 217:13,
222:18, 234:12,
234:13, 242:12,
252:4, 252:19
**TIMES** [11] - 26:8,
26:12, 38:16,
107:23, 124:17,
124:18, 130:14,
133:1, 135:17,
155:13, 217:11
**TIMING** [3] - 129:22,
173:19, 193:2
**TITLE** [8] - 9:10,
47:21, 47:24,
117:22, 195:14,
231:22, 240:15,
247:5
**TO** [1233] - 3:20, 3:21,
3:22, 3:24, 5:14,
5:18, 6:2, 6:3, 6:6,
6:7, 6:15, 6:19, 7:2,
7:9, 7:10, 7:13, 7:17,
7:19, 7:24, 8:10,
8:12, 9:1, 9:7, 9:9,
9:16, 9:18, 9:21,
9:23, 10:25, 11:2,
11:8, 11:11, 11:16,
11:20, 12:5, 12:6,
12:7, 12:16, 13:7,
13:8, 13:12, 13:13,
13:14, 13:19, 13:20,
13:22, 13:25, 14:3,
14:10, 14:13, 14:14,
15:2, 15:3, 15:5,
15:8, 15:15, 16:8,
17:1, 17:10, 17:25,
18:7, 18:22, 18:23,
19:1, 19:6, 19:10,
19:12, 19:18, 20:4,
20:5, 20:6, 20:8,
20:11, 20:12, 20:14,
20:15, 20:23, 20:24,
20:25, 21:7, 21:22,
21:25, 22:17, 22:19,
23:1, 23:22, 23:24,
24:3, 24:4, 24:8,
24:10, 24:17, 24:21,

25:24, 26:13, 26:17,
26:24, 27:3, 27:10,
27:12, 27:15, 28:3,
28:25, 29:10, 29:12,
29:21, 29:22, 29:23,
30:5, 30:10, 30:12,
30:15, 30:19, 30:22,
31:6, 31:7, 31:8,
31:12, 31:18, 31:25,
32:5, 32:6, 32:7,
32:12, 32:16, 32:21,
33:7, 33:12, 33:13,
33:16, 33:22, 34:3,
34:4, 34:7, 34:9,
34:11, 34:12, 34:17,
34:19, 34:20, 34:22,
34:24, 35:5, 35:9,
35:14, 35:15, 35:16,
35:17, 35:21, 35:24,
36:1, 36:2, 36:9,
36:19, 37:2, 37:11,
37:19, 37:24, 37:25,
38:7, 38:12, 38:25,
39:4, 39:10, 39:21,
39:23, 39:25, 40:2,
40:11, 41:2, 41:4,
41:6, 41:17, 41:18,
41:21, 42:1, 42:2,
42:6, 42:8, 42:13,
42:21, 42:23, 43:2,
43:7, 43:11, 43:12,
43:13, 43:14, 43:15,
43:21, 43:25, 44:2,
44:8, 44:11, 44:13,
44:18, 44:22, 45:1,
45:2, 45:4, 45:9,
45:11, 45:12, 45:13,
45:14, 45:19, 45:21,
46:5, 46:12, 46:18,
46:20, 46:24, 47:1,
47:3, 47:11, 47:12,
47:13, 48:3, 48:8,
48:9, 48:10, 48:14,
48:15, 48:16, 48:23,
48:25, 49:3, 49:11,
49:14, 49:15, 49:18,
49:19, 49:22, 49:25,
50:1, 50:2, 50:11,
50:12, 50:22, 51:1,
51:2, 51:6, 51:13,
51:19, 51:20, 51:23,
52:1, 52:3, 52:10,
52:11, 52:12, 52:14,
52:20, 52:23, 53:4,
53:5, 53:14, 53:17,
53:18, 53:22, 53:25,
54:6, 54:9, 54:11,
54:14, 55:15, 56:2,
56:7, 56:23, 56:24,
56:25, 57:20, 57:25,
58:6, 58:12, 59:4,

59:6, 59:13, 60:4,
60:7, 60:10, 61:10,
62:6, 62:7, 62:9,
62:13, 62:15, 62:19,
62:20, 62:22, 62:25,
63:14, 64:2, 64:5,
64:16, 65:2, 65:9,
65:17, 65:21, 65:24,
66:6, 66:7, 66:11,
66:22, 67:2, 67:5,
67:8, 67:10, 67:14,
67:25, 68:5, 68:6,
68:13, 68:21, 68:22,
69:3, 69:6, 69:7,
69:8, 69:9, 69:11,
69:12, 70:4, 70:21,
70:22, 71:4, 71:7,
71:14, 71:23, 72:2,
72:3, 72:6, 72:7,
72:8, 72:20, 73:3,
73:17, 74:1, 74:17,
74:18, 74:19, 75:1,
76:1, 76:4, 76:7,
77:6, 77:22, 77:23,
78:8, 78:10, 78:11,
78:13, 78:17, 78:18,
78:22, 78:23, 78:24,
79:3, 79:9, 79:15,
79:16, 80:3, 80:13,
80:14, 80:21, 80:25,
81:2, 81:4, 81:7,
81:8, 81:14, 81:15,
81:17, 81:18, 81:19,
81:21, 82:6, 82:10,
82:11, 82:15, 82:16,
82:17, 82:18, 82:20,
82:21, 83:9, 83:11,
83:12, 83:19, 83:20,
83:23, 84:6, 84:17,
85:4, 85:18, 85:19,
86:1, 86:2, 86:5,
86:8, 86:13, 86:14,
86:21, 86:25, 87:2,
87:13, 87:17, 87:21,
87:23, 87:24, 88:6,
88:11, 88:17, 88:20,
89:4, 89:8, 89:13,
89:24, 91:5, 91:20,
92:1, 92:7, 92:10,
92:13, 92:15, 92:17,
92:18, 92:20, 93:9,
93:12, 94:2, 94:5,
94:10, 94:16, 94:18,
94:21, 95:7, 95:9,
95:10, 95:14, 96:4,
96:5, 96:10, 96:18,
96:21, 97:9, 97:15,
97:25, 98:1, 98:7,
98:17, 98:20, 98:24,
99:18, 99:20, 100:2,
100:11, 100:14,

100:18, 101:1,
101:6, 101:10,
101:25, 102:7,
102:13, 102:15,
104:8, 104:14,
104:21, 105:9,
105:15, 106:8,
107:14, 108:7,
108:13, 108:14,
108:15, 108:20,
109:3, 109:10,
109:13, 111:2,
111:7, 112:2,
112:22, 112:23,
113:9, 114:7, 114:8,
114:11, 114:12,
114:16, 114:17,
114:23, 114:24,
114:25, 115:4,
115:11, 116:13,
116:21, 116:23,
116:24, 118:9,
118:12, 118:13,
118:16, 119:3,
119:6, 119:8,
119:11, 119:14,
119:19, 120:11,
120:17, 120:18,
120:25, 121:2,
121:13, 121:21,
123:2, 123:3,
123:14, 123:17,
123:19, 124:4,
124:7, 124:8, 124:9,
124:10, 124:12,
124:14, 124:19,
124:22, 125:1,
125:3, 125:4, 125:8,
125:22, 125:23,
126:1, 126:5, 126:6,
126:11, 126:20,
127:10, 127:14,
127:15, 128:7,
128:11, 128:19,
128:20, 128:21,
128:24, 129:1,
129:4, 129:12,
129:14, 129:15,
129:19, 130:1,
130:4, 130:6, 130:9,
130:15, 130:19,
130:23, 130:24,
131:1, 131:4,
131:12, 131:18,
131:19, 131:20,
131:22, 132:10,
133:1, 133:10,
133:12, 133:13,
133:23, 133:24,
134:6, 134:9,
134:14, 134:17,

134:23, 134:25,
135:2, 136:1, 136:2,
136:16, 136:17,
136:19, 136:22,
136:24, 137:6,
137:12, 137:14,
137:19, 137:22,
137:23, 137:24,
138:21, 138:22,
139:8, 139:13,
140:7, 140:19,
140:21, 140:23,
140:24, 141:5,
141:6, 141:9,
141:15, 141:16,
141:19, 141:23,
141:24, 142:4,
142:16, 142:17,
143:3, 143:5,
143:11, 143:14,
143:18, 144:20,
144:24, 144:25,
145:4, 145:5, 146:2,
146:4, 146:25,
147:6, 147:19,
148:2, 148:10,
148:25, 149:1,
149:19, 149:24,
150:16, 150:24,
151:17, 152:10,
152:13, 152:25,
153:7, 153:8,
153:17, 153:18,
153:22, 154:4,
154:12, 154:14,
154:16, 154:25,
155:2, 155:3, 155:5,
155:7, 155:23,
156:1, 156:6, 156:7,
156:11, 156:12,
156:13, 156:18,
156:20, 157:18,
157:19, 158:6,
158:11, 158:14,
158:15, 158:23,
159:2, 159:4, 159:6,
159:9, 159:10,
159:15, 159:21,
159:22, 160:3,
160:19, 160:22,
161:9, 161:11,
161:14, 161:16,
161:17, 161:18,
161:19, 162:4,
162:15, 162:25,
163:15, 163:19,
163:25, 164:2,
164:5, 164:10,
164:12, 164:25,
165:5, 165:6,
165:13, 165:15,

Exhibit 137                                                                                          JA-0001919

165:22, 165:23, 165:24, 165:25, 168:14, 168:20, 169:6, 169:10, 169:13, 170:8, 170:13, 170:18, 170:19, 170:24, 170:25, 171:5, 171:9, 171:10, 172:6, 172:12, 172:15, 172:19, 172:23, 172:24, 173:1, 173:2, 173:6, 173:16, 173:17, 173:18, 173:20, 174:3, 174:5, 174:9, 174:15, 175:20, 175:25, 176:10, 176:11, 176:17, 177:16, 177:19, 177:20, 177:21, 177:24, 178:2, 178:6, 178:16, 178:19, 178:22, 178:24, 178:25, 179:3, 179:4, 179:15, 179:17, 179:19, 179:20, 179:22, 180:2, 180:3, 180:5, 180:15, 180:18, 180:20, 180:22, 180:24, 181:10, 181:11, 181:16, 181:22, 182:1, 182:4, 182:7, 182:13, 182:15, 182:23, 183:6, 183:14, 183:23, 184:14, 184:15, 185:8, 185:17, 186:4, 186:14, 187:1, 187:6, 187:17, 187:23, 188:1, 188:4, 188:6, 188:19, 189:7, 189:12, 189:24, 190:6, 190:9, 190:10, 190:11, 190:16, 190:17, 190:25, 191:1, 191:8, 191:10, 191:13, 191:14, 191:20, 192:10, 192:12, 192:20, 192:24, 193:13, 193:20, 194:20, 194:25, 195:4, 195:8, 196:2, 196:5, 196:10, 196:11, 197:11, 197:21,

197:24, 198:1, 198:12, 198:13, 198:22, 199:7, 199:16, 199:21, 200:12, 201:6, 201:15, 201:16, 201:22, 202:2, 202:17, 202:18, 202:21, 202:23, 204:7, 204:15, 204:25, 205:2, 205:3, 205:6, 205:8, 205:11, 205:13, 205:14, 205:19, 205:20, 205:23, 205:24, 206:7, 207:14, 207:23, 207:24, 207:25, 208:8, 208:11, 208:16, 209:2, 209:7, 209:8, 209:9, 209:12, 209:15, 209:18, 209:24, 209:25, 210:5, 210:6, 210:8, 210:10, 210:12, 210:18, 210:23, 211:4, 211:13, 211:16, 211:21, 212:1, 212:8, 212:15, 212:19, 212:20, 212:24, 213:16, 213:20, 214:10, 214:19, 214:21, 214:25, 215:6, 215:9, 215:17, 215:20, 215:21, 216:6, 216:10, 216:16, 216:17, 216:21, 217:8, 217:14, 217:17, 217:25, 218:1, 218:3, 218:6, 218:9, 218:14, 218:15, 218:17, 218:23, 218:24, 218:25, 219:5, 219:9, 219:14, 219:18, 219:20, 220:5, 220:6, 220:8, 220:12, 220:13, 220:16, 220:19, 220:20, 220:21, 220:22, 220:23, 221:1, 221:7, 221:12, 221:16, 221:21, 221:22, 222:4, 222:11, 222:12, 222:15, 222:19, 223:1, 223:2, 223:6, 223:9,

223:10, 223:16, 223:19, 224:2, 224:4, 224:8, 224:9, 224:14, 224:17, 224:18, 224:20, 224:23, 225:10, 225:17, 225:22, 226:3, 226:13, 226:17, 226:18, 226:21, 226:24, 227:2, 227:8, 227:9, 227:11, 227:15, 227:16, 227:20, 227:21, 227:25, 228:1, 228:2, 228:10, 228:20, 228:22, 229:7, 229:8, 229:11, 230:5, 230:9, 230:13, 230:14, 231:2, 231:10, 231:22, 231:24, 232:7, 232:18, 232:20, 233:8, 233:13, 233:19, 234:5, 234:10, 234:24, 235:2, 235:3, 235:4, 235:5, 235:11, 235:22, 235:24, 235:25, 236:7, 236:10, 236:18, 236:21, 236:25, 237:1, 237:4, 237:5, 237:18, 238:5, 238:7, 238:25, 239:7, 239:11, 239:13, 239:17, 239:22, 239:24, 240:1, 240:2, 240:5, 240:7, 240:8, 240:9, 240:10, 240:11, 240:19, 241:1, 241:6, 241:12, 241:14, 241:22, 242:7, 242:14, 242:17, 242:20, 242:24, 242:25, 243:4, 243:6, 243:7, 243:10, 243:18, 243:19, 243:22, 243:23, 244:1, 244:6, 244:8, 244:15, 244:19, 244:25, 245:8, 245:9, 245:20, 246:1, 246:22, 247:5, 247:6, 247:7, 247:9, 248:3, 248:5, 248:11, 248:13, 248:15, 248:23,

249:5, 249:14, 249:18, 249:22, 249:25, 250:2, 250:9, 250:11, 250:17, 250 20, 250:24, 251:1, 251:2, 251:5, 251:6, 251:7, 251:10, 251:12, 251:16, 251:19, 251:23, 252:3, 252:5, 252 6, 252:15, 252:16, 252:18, 252:22

**TODAY** [31] - 3:8, 7 23, 9:16, 21:25, 22:3, 22:15, 23:7, 25:24, 26:6, 34:15, 70:3, 70:8, 73:9, 97:4, 115:24, 120:9, 147:5, 147:7, 160:16, 195:12, 195:17, 196 10, 200:1, 201:2, 201:18, 201:24, 202:4, 202:11, 202:21, 227 14, 250:19

**TODAY'S** [2] - 252:1, 252:2

**TOGETHER** [2] - 6.12, 175:18

**TOLD** [9] - 47:19, 47:22, 69:12, 82:9, 86:1, 109:8, 110:6, 123:21, 152 25

**TOLERATE** [3] - 174:5, 174:6, 174 16

**TOO** [4] - 7:7, 37:12, 188:9, 219:8

**TOOK** [2] - 107:17, 160:6

**TOOL** [1] - 168:20

**TOOLS** [1] - 175:13

**TOP** [12] - 6:23, 7 21, 21:24, 58:18, 75:9, 75:25, 86:18, 119:19, 143:10, 144:1, 176:4, 177 3

**TOPIC** [4] - 64:2, 64:5, 69:17, 195:25

**TOPICS** [6] - 59:18, 61:4, 73:16, 73:17, 168:10, 169:10

**TOTAL** [1] - 134:6

**TOTALLY** [2] - 33:4, 89:12

**TOUCH** [1] - 212:8

**TOWARD** [4] - 76:7, 83:6, 168:14, 223:16

**TOWARDS** [1] -

164:15

**TRACEABLE** [1] - 17:10

**TRADED** [8] - 28:25, 211:15, 225:17, 225:18, 226:13, 248:7, 250:15, 250 22

**TRAINING** [8] - 59:1, 64:18, 118:7, 120:13, 166:25, 167:8, 167:18, 168:12

**TRANSCRIPT** [2] - 1:24, 253:4

**TRANSCRIPTION** [1] - 1:24

**TRANSFORMED** [1] - 161:9

**TRANSFUSION** [2] - 124:13, 124:14

**TREASURY** [4] - 3:6, 31 18, 161:6, 240:9

**TREAT** [11] - 22:19, 117:18, 119:22, 123:5, 128:8, 128:13, 129:11, 137:11, 138:11, 138:18, 141:24

**TREATMENT** [11] - 47:24, 48:1, 126:5, 130:1, 132:17, 149:12, 155:18, 155:21, 156:8, 202:4, 202:6

**TREATMENTS** [13] - 129:5, 129:7, 129:15, 129:19, 129:21, 129:23, 130:3, 131:20, 132:15, 133:15, 141:24, 145:12, 155:20

**TREATS** [1] - 23:14

**TRENDS** [2] - 94:3, 154:25

**TRIAL** [6] - 4:20, 4:23, 5:1, 5:4, 7:25, 182:6

**TRIGGER** [1] - 47:4

**TRIVEDI** [1] - 83:13

**TRUE** [11] - 29:8, 33:8, 34 1, 43:13, 45:21, 48:11, 96:25, 216:20, 242:11, 243:12, 243:13

**TRUISMS** [1] - 14:15

**TRUMP** [3] - 1:5, 2:19, 3:3

**TRUSSELL** [2] - 81:16, 81:22

Exhibit 137

JA-0001920

**TRY** [9] - 20:25, 133:10, 136:22, 161:22, 210:8, 210:10, 212:24, 229:7, 246:22

**TRYING** [6] - 111:2, 170:19, 173:18, 187:23, 187:25, 188:4

**TUBAL** [1] - 188:11

**TUESDAY** [2] - 6:1, 252:12

**TUONG** [1] - 23:8

**TURN** [13] - 56:7, 67:25, 68:6, 68:13, 83:23, 87:17, 100:18, 101:6, 104:14, 137:22, 171:9, 180:2, 198:22

**TURNED** [1] - 168:14

**TURNING** [4] - 98:17, 125:1, 143:18, 248:23

**TWICE** [1] - 115:17

**TWO** [40] - 6:16, 8:18, 30:17, 48:3, 73:20, 75:15, 82:3, 90:5, 110:13, 121:3, 127:24, 131:13, 164:18, 170:13, 171:4, 180:13, 181:12, 182:20, 182:21, 182:22, 183:1, 186:1, 186:18, 188:2, 192:5, 206:4, 206:8, 208:10, 208:20, 208:25, 209:11, 211:10, 211:22, 214:24, 215:11, 237:20, 241:11, 247:18, 249:19

**TWO-YEAR** [4] - 90:5, 171:4, 180:13, 188:2

**TYPE** [2] - 125:2, 139:10

**TYPES** [11] - 45:5, 125:13, 130:18, 133:24, 141:25, 182:22, 183:14, 185:16, 193:19, 193:21, 248:1

**TYPICAL** [4] - 75:16, 75:19, 75:23, 90:23

**TYPICALLY** [3] - 60:25, 79:16, 150:8

---

**U**

---

**U.S** [8] - 2:15, 4:18,

5:2, 38:2, 38:5, 68:24, 69:24, 241:19

**U.S.C** [5] - 38:19, 45:3, 223:19, 243:3

**ULTIMATELY** [6] - 11:13, 35:25, 67:16, 67:22, 231:11, 233:18

**ULTRA** [1] - 219:12

**UNABLE** [2] - 179:19, 209:12

**UNADORNED** [1] - 46:17

**UNCERTAINTY** [3] - 217:2, 217:4, 239:5

**UNCOMMONLY** [1] - 125:15

**UNDER** [77] - 6:3, 6:19, 7:10, 8:20, 8:21, 8:22, 8:25, 9:10, 12:22, 14:17, 15:14, 17:13, 17:15, 19:7, 19:11, 23:4, 26:12, 31:16, 39:13, 39:19, 42:4, 44:7, 46:5, 47:2, 47:5, 48:16, 50:11, 50:12, 51:16, 53:11, 64:22, 64:24, 71:22, 75:23, 76:12, 77:2, 78:16, 90:22, 95:18, 96:15, 98:21, 98:25, 99:6, 100:16, 102:1, 109:14, 140:10, 145:1, 152:15, 153:3, 198:14, 199:23, 201:14, 202:20, 213:11, 213:22, 215:25, 218:5, 219:2, 219:12, 220:3, 221:16, 222:4, 225:11, 225:12, 226:22, 229:2, 230:25, 240:5, 240:7, 244:21, 248:8, 248:21, 249:3

**UNDERGRADUATE** [2] - 57:12, 166:25

**UNDERLYING** [1] - 209:10

**UNDERMINE** [1] - 224:20

**UNDERMINED** [1] - 21:15

**UNDERPINNINGS** [1] - 132:13

**UNDERSERVED** [1] - 220:16

**UNDERSTAND** [38] -

24:19, 28:17, 28:21, 35:14, 41:24, 45:25, 46:4, 50:18, 55:10, 66:1, 76:12, 78:17, 78:18, 80:2, 95:16, 95:17, 95:18, 95:24, 105:18, 113:1, 120:21, 136:2, 137:2, 138:9, 138:16, 138:17, 140:10, 141:16, 157:13, 160:10, 161:21, 162:3, 164:20, 180:5, 194:5, 197:9, 216:15, 246:3

**UNDERSTANDING** [6] - 71:5, 87:10, 87:16, 133:10, 154:17, 166:13

**UNDERSTOOD** [1] - 68:19

**UNDERTAKE** [1] - 19:25

**UNDESIRABLE** [1] - 103:19

**UNFORTUNATELY** [2] - 183:4, 191:21

**UNIFORMLY** [1] - 139:22

**UNILATERALLY** [1] - 225:22

**UNINSURED** [1] - 179:15

**UNINTENDED** [57] - 7:15, 10:1, 10:4, 10:8, 10:13, 10:20, 12:16, 69:16, 69:20, 69:22, 69:24, 70:20, 71:8, 71:11, 71:13, 71:14, 71:19, 71:21, 71:25, 72:5, 72:8, 72:13, 72:17, 72:20, 72:23, 73:4, 73:6, 73:21, 74:15, 79:2, 80:20, 81:1, 81:13, 81:20, 82:1, 88:7, 88:9, 88:11, 88:15, 89:18, 96:22, 111:23, 142:4, 142:5, 149:15, 150:12, 150:22, 151:1, 151:2, 151:9, 151:14, 151:18, 153:25, 168:15, 191:23, 202:10, 202:12

**UNINTENTIONAL** [1] - 48:7

**UNIQUE** [2] - 132:19,

230:21

**UNITED** [21] - 1:1, 2:10, 3:4, 3:5, 3:6, 10:2, 16:16, 17:19, 25:22, 26:6, 35:7, 36:3, 36:13, 36:14, 69:22, 81:13, 100:7, 110:19, 146:13, 154:7, 216:25

**UNIVERSITY** [21] - 22:23, 34:4, 57:9, 58:13, 58:22, 59:10, 59:16, 60:4, 60:5, 115:9, 115:15, 116:1, 116:15, 116:18, 117:2, 119:2, 121:19, 167:1, 167:7, 167:12

**UNLESS** [5] - 9:22, 11:4, 30:5, 112:18, 246:18

**UNLIKE** [3] - 28:25, 112:12, 230:22

**UNLIKELY** [1] - 220:7

**UNPLANNED** [1] - 14:13

**UNPOLICED** [1] - 33:4

**UNPRECEDENTED** [1] - 242:10

**UNPUBLISHED** [1] - 109:9

**UNTIL** [9] - 3:12, 7:25, 28:8, 57:23, 115:14, 116:4, 180:14, 210:12, 234:17

**UP** [56] - 8:15, 11:13, 11:20, 15:22, 21:1, 33:20, 34:25, 49:1, 53:6, 66:5, 70:4, 73:16, 74:19, 81:7, 81:21, 90:18, 92:15, 92:18, 93:12, 96:9, 116:24, 122:23, 125:3, 126:20, 134:8, 134:13, 134:21, 136:3, 158:6, 159:23, 173:3, 176:7, 176:10, 187:17, 192:7, 192:9, 192:11, 204:6, 212:12, 213:3, 213:7, 213:16, 214:17, 215:3, 216:16, 222:1, 223:17, 229:1, 229:7, 230:5, 236:6, 242:18, 243:5, 248:17, 248:18

**UP-FRONT** [4] -

134:8, 134:21, 192:7, 192:9

**UPFRONT** [2] - 92:14, 96:20

**UPHELD** [2] - 39:14, 164:18

**UPON** [4] - 14:2, 100:20, 101:4, 152:4

**UPSET** [1] - 247:19

**UPSETTING** [1] - 124:5

**UPTAKE** [1] - 195:20

**URGE** [1] - 34:19

**URGED** [1] - 6:2

**URGING** [1] - 9:8

**US** [24] - 24:3, 53:4, 56:25, 64:25, 74:25, 75:1, 107:25, 129:22, 158:20, 161:11, 165:12, 170:24, 172:20, 180:4, 181:14, 185:9, 204:6, 212:19, 218:15, 223:13, 228:7, 235:12, 239:22, 241:6

**USAGE** [1] - 109:15

**USE** [73] - 5:14, 10:19, 11:16, 12:14, 13:19, 13:20, 18:12, 50:1, 61:25, 62:3, 62:13, 62:17, 63:9, 75:13, 75:16, 75:17, 75:19, 75:23, 77:7, 79:6, 80:3, 80:5, 80:19, 80:24, 81:15, 90:7, 90:23, 92:1, 92:7, 94:3, 94:12, 94:19, 94:22, 96:12, 96:14, 102:1, 102:3, 102:5, 102:17, 106:14, 106:16, 107:7, 108:8, 109:19, 111:19, 111:22, 112:9, 112:11, 129:2, 129:14, 130:20, 146:25, 149:1, 150:7, 155:19, 168:15, 173:1, 174:9, 175:13, 175:15, 181:15, 188:6, 189:25, 196:2, 201:16, 217:25, 221:17, 229:7, 229:10

**USED** [23] - 30:3, 42:21, 75:4, 75:25, 76:3, 76:5, 79:21,

Exhibit 137                                                                    JA-0001921

80:22, 81:2, 91:5, 94:9, 108:3, 115:16, 149:20, 153:13, 153:14, 172:24, 181:23, 183:15, 185:16, 189:14, 205:21, 232:15

**USEFUL** [3] - 24:20, 24:23, 103:7

**USES** [2] - 22:19, 232:12

**USING** [37] - 11:25, 12:2, 14:12, 22:22, 70:23, 73:7, 73:8, 74:13, 75:20, 75:22, 76:17, 79:25, 91:5, 91:7, 91:8, 91:10, 92:10, 94:1, 106:19, 108:6, 123:23, 156:2, 183:17, 183:19, 183:20, 186:3, 186:4, 186:14, 186:16, 186:25, 189:23, 189:24, 212:5, 232:9, 243:20, 243:23

**USUAL** [1] - 195:11

**USUALLY** [6] - 125:23, 153:6, 161:7, 161:10, 169:10, 175:16

**UTILIZATION** [2] - 140:23, 156:22

**UTILIZE** [3] - 155:18, 156:8, 156:12

---

**V**

**VAGINAL** [1] - 175:7

**VAGUE** [2] - 148:4, 212:10

**VALID** [1] - 8:11

**VALUE** [5] - 187:4, 187:6, 187:7, 188:16

**VARIATION** [3] - 122:7, 123:1, 145:17

**VARIES** [1] - 150:15

**VARIETY** [6] - 22:19, 52:5, 61:19, 117:16, 122:10, 137:16

**VARIOUS** [2] - 90:11, 175:14

**VARY** [2] - 150:11, 174:14

**VENOUS** [1] - 103:22

**VERSION** [2] - 160:14, 160:15

**VERSUS** [30] - 3:3, 16:10, 16:16, 17:19,

---

18:1, 19:2, 20:13, 21:5, 35:2, 35:12, 35:17, 36:3, 36:9, 36:12, 36:14, 38:1, 38:4, 47:16, 145:18, 185:23, 206:11, 215:23, 216:25, 219:16, 240:19, 241:3, 241:18, 242:18, 242:21

**VERY** [47] - 5:16, 8:10, 8:13, 15:5, 21:16, 23:24, 25:16, 28:20, 29:23, 62:16, 73:8, 76:8, 79:24, 84:11, 86:6, 96:13, 99:16, 105:2, 105:4, 111:12, 125:11, 136:23, 142:6, 164:4, 166:23, 174:2, 174:8, 174:9, 174:18, 176:1, 176:4, 177:9, 177:17, 177:25, 193:5, 204:3, 210:11, 212:23, 214:25, 215:18, 215:23, 217:3, 223:25, 224:12, 225:15, 236:20, 252:17

**VIEW** [6] - 3:19, 36:12, 41:21, 42:7, 42:16, 50:25

**VIEWPOINT** [1] - 110:22

**VIEWS** [1] - 28:20

**VII** [3] - 9:10, 240:15, 247:5

**VII'S** [2] - 47:21, 47:24

**VIOLATE** [3] - 7:21, 9:3, 233:2

**VIOLATED** [3] - 8:12, 9:3, 213:2

**VIOLATES** [2] - 213:3, 213:5

**VIOLATING** [2] - 47:21, 47:24

**VIOLATION** [3] - 17:23, 205:15, 215:15

**VIRES** [1] - 219:12

**VIRTUALLY** [2] - 26:13, 40:14

**VIRTUE** [1] - 249:8

**VISIT** [2] - 92:17, 172:6

**VISITS** [2] - 122:8, 125:4

**VITAE** [2] - 114:14,

---

143:6

**VITRO** [1] - 129:7

**VOLUME** [1] - 124:4

**VOX** [1] - 159:15

**VS** [3] - 1:4, 18:14, 233:12

---

**W**

**W-E-I-S-M-A-N** [1] - 54:24

**WADING** [1] - 51:10

**WAIT** [3] - 151:4, 177:13

**WAIVE** [1] - 215:17

**WAIVER** [1] - 82:1

**WAIVING** [1] - 216:8

**WALK** [3] - 74:25, 148:10, 176:2

**WANT** [31] - 5:14, 19:24, 20:23, 33:12, 49:14, 51:23, 78:17, 83:23, 87:23, 93:12, 100:18, 104:14, 105:9, 106:8, 109:4, 109:10, 141:15, 154:11, 165:23, 173:20, 174:9, 177:25, 182:7, 210:5, 211:13, 216:16, 219:14, 223:6, 233:8, 247:9

**WANTED** [13] - 6:15, 65:15, 69:25, 82:18, 114:16, 114:23, 119:6, 126:6, 171:9, 180:17, 239:17, 243:7, 252:12

**WANTING** [1] - 209:8

**WANTS** [1] - 234:10

**WARRANTED** [1] - 209:12

**WAS** [276] - 9:3, 16:15, 16:18, 17:1, 17:2, 19:6, 19:21, 21:5, 22:5, 27:20, 27:21, 28:1, 28:8, 34:4, 35:17, 37:4, 37:5, 39:12, 39:13, 39:18, 39:25, 40:2, 40:7, 41:1, 41:5, 41:12, 41:14, 41:15, 41:16, 41:17, 41:21, 42:2, 43:6, 43:7, 44:5, 44:7, 47:25, 51:1, 52:17, 53:5, 53:6, 53:7, 53:20, 57:8, 57:11, 58:14, 58:24, 59:24, 64:11, 65:19, 66:12, 66:25, 67:1,

---

67:7, 67:9, 67:10, 68:20, 69:11, 69:17, 69:18, 69:23, 70:2, 70:18, 70:25, 71:9, 72:1, 72:3, 73:15, 73:20, 73:22, 73:23, 74:3, 74:25, 75:7, 76:3, 76:5, 78:8, 78:23, 79:23, 80:4, 81:2, 81:13, 82:11, 82:13, 83:7, 83:8, 83:17, 84:3, 84:24, 85:4, 85:16, 86:1, 86:5, 87:1, 88:5, 91:3, 91:4, 92:22, 92:24, 93:1, 93:7, 94:11, 94:14, 94:23, 95:4, 95:6, 99:19, 100:1, 100:2, 100:3, 102:7, 105:14, 105:19, 106:10, 106:11, 107:21, 107:22, 108:1, 109:13, 109:15, 109:25, 110:1, 110:25, 111:1, 111:3, 111:13, 111:15, 112:3, 112:7, 112:8, 116:3, 116:9, 131:15, 131:17, 131:18, 134:1, 134:3, 136:12, 139:3, 143:6, 143:8, 145:9, 146:4, 151:15, 153:2, 153:10, 155:22, 159:21, 159:22, 160:15, 160:22, 163:3, 164:18, 167:10, 167:18, 167:19, 167:22, 169:23, 170:14, 170:25, 171:1, 171:3, 172:19, 175:24, 178:6, 179:4, 180:3, 180:7, 180:9, 180:13, 180:15, 180:25, 181:2, 181:3, 181:4, 181:19, 181:23, 182:6, 182:19, 183:2, 183:21, 184:24, 186:13, 186:17, 186:20, 187:8, 187:9, 187:19, 187:24, 188:7, 188:25, 189:1, 189:18, 192:12, 192:23, 194:18, 195:7,

---

195:13, 195:14, 195:22, 195:23, 196:1, 197:8, 197:12, 197:22, 204:24, 205:20, 205:21, 207:2, 207:4, 207:13, 207:19, 209:5, 209:10, 209:13, 209:22, 209:23, 211:8, 211:17, 214:2, 217:6, 217:18, 217:22, 219:3, 219:4, 219:16, 219:20, 219:24, 222:18, 223:1, 223:2, 223:9, 224:8, 224:18, 224:19, 224:24, 224:25, 226:8, 226:21, 226:22, 226:24, 227:3, 230:1, 232:5, 233:4, 233:5, 233:15, 236:4, 236:6, 236:20, 239:20, 240:18, 240:21, 241:15, 241:20, 243:1, 243:5, 243:19, 244:6, 244:15, 246:8, 246:14, 249:20

**WASHINGTON** [2] - 2:13, 2:18

**WASN'T** [2] - 16:13, 192:14

**WATER** [2] - 26:12, 244:20

**WAY** [39] - 5:13, 21:7, 25:13, 35:14, 40:15, 40:24, 41:7, 41:9, 53:10, 56:25, 62:5, 75:11, 88:1, 94:16, 94:18, 94:21, 111:14, 114:12, 129:19, 133:6, 142:9, 162:5, 179:20, 185:14, 213:16, 214:20, 214:22, 220:23, 222:3, 222:25, 227:5, 227:23, 228:15, 228:17, 229:16, 234:1, 239:7, 240:1, 250:21

**WAYNE** [2] - 206:11, 207:11

**WAYS** [9] - 14:15, 141:1, 169:18, 205:24, 218:19,

225:18, 233:17,
248:10, 250:24
**WE** [337] - 3:2, 3:8,
3:12, 3:13, 3:23,
5:10, 5:11, 6:5, 6:7,
6:8, 6:11, 6:12, 7:22,
7:25, 8:8, 8:16, 9:5,
9:8, 9:15, 9:17, 11:5,
13:21, 16:9, 16:10,
16:17, 16:21, 17:5,
17:12, 17:13, 17:24,
18:8, 18:16, 18:20,
18:25, 19:16, 20:15,
21:20, 21:22, 21:23,
21:24, 23:22, 23:25,
24:3, 24:9, 24:14,
25:3, 25:15, 25:23,
25:24, 26:25, 28:18,
29:1, 33:20, 34:18,
35:13, 35:22, 35:23,
35:24, 37:5, 38:22,
38:24, 39:10, 42:1,
42:10, 42:16, 43:17,
46:16, 46:25, 47:2,
48:24, 49:9, 49:10,
53:4, 53:7, 53:8,
53:9, 53:14, 54:5,
54:8, 54:9, 55:13,
55:18, 55:22, 57:1,
57:5, 58:6, 62:2,
62:4, 62:7, 64:22,
67:11, 67:18, 68:22,
69:3, 69:6, 69:12,
70:10, 70:11, 73:8,
73:15, 74:9, 75:18,
76:1, 76:6, 78:11,
78:13, 78:25, 82:18,
84:9, 85:25, 86:5,
86:6, 86:8, 88:23,
90:2, 91:6, 93:25,
94:2, 94:4, 94:8,
94:10, 95:8, 96:11,
96:18, 96:21, 102:2,
106:13, 108:20,
108:21, 109:11,
112:1, 112:9,
112:13, 112:22,
113:3, 120:16,
124:4, 125:15,
127:13, 127:25,
128:10, 128:16,
128:22, 129:4,
129:5, 129:6, 129:7,
129:14, 129:15,
129:18, 131:20,
133:10, 137:23,
139:1, 139:17,
142:15, 142:16,
146:1, 156:6,
157:11, 157:12,
157:13, 158:12,

159:1, 159:2, 159:3,
159:6, 159:16,
159:18, 159:20,
160:16, 161:4,
161:5, 161:11,
161:24, 161:25,
162:3, 162:4, 162:5,
162:12, 162:14,
163:6, 164:22,
164:23, 164:24,
166:21, 171:4,
171:7, 172:15,
174:22, 175:17,
176:22, 178:12,
178:21, 179:13,
180:11, 180:12,
180:16, 180:17,
180:18, 181:7,
181:10, 181:11,
181:15, 181:21,
181:22, 182:6,
182:9, 182:10,
182:13, 183:1,
183:4, 183:6,
183:14, 183:21,
184:4, 184:9,
184:21, 185:17,
187:5, 187:7,
187:14, 187:22,
187:25, 188:21,
188:23, 189:3,
189:10, 190:7,
191:22, 198:20,
201:11, 202:4,
204:5, 204:21,
205:17, 208:15,
208:23, 208:24,
209:11, 209:15,
209:16, 209:18,
210:12, 210:13,
210:24, 210:25,
211:4, 211:5, 211:7,
211:10, 211:12,
212:18, 212:24,
213:1, 214:7, 215:2,
215:7, 215:10,
215:17, 216:11,
216:13, 216:16,
216:21, 216:24,
218:14, 220:25,
221:7, 222:23,
223:6, 223:17,
224:5, 225:2,
225:23, 226:18,
228:3, 228:6,
228:13, 228:21,
229:15, 229:19,
230:16, 230:19,
230:23, 231:13,
232:3, 233:1,
233:11, 234:5,

234:17, 235:11,
235:23, 237:17,
237:19, 239:24,
243:7, 244:12,
244:16, 244:17,
246:15, 246:23,
246:25, 247:1,
247:9, 247:17,
248:6, 248:7, 248:8,
248:14, 249:22,
250:23, 251:2,
251:3, 251:8,
251:12, 252:15
**WE'RE** [4] - 8:9,
99:19, 210:11,
225:11
**WE'VE** [1] - 206:3
**WEB** [4] - 171:5,
180:21, 181:7, 250:7
**WEB-BASED** [3] -
171:5, 180:21, 181:7
**WEBSITE** [5] - 154:8,
175:16, 183:3,
183:5, 185:18
**WEBSITES** [2] -
182:22, 182:23
**WEEK** [7] - 118:11,
118:12, 118:14,
118:17, 119:9,
119:11, 119:19
**WEEKENDS** [1] -
119:17
**WEEKS** [2] - 28:1,
195:11
**WEIGH** [1] - 12:7
**WEIGHED** [1] - 26:7
**WEIGHT** [5] - 36:19,
38:8, 72:6, 168:18,
177:16
**WEISMAN** [26] - 10:2,
10:5, 10:9, 10:15,
10:21, 22:1, 54:19,
54:23, 55:2, 56:7,
64:17, 65:17, 86:9,
97:20, 104:24,
105:14, 163:4,
163:9, 163:17,
163:21, 164:4,
164:11, 181:2,
235:24, 236:14,
254:4
**WEISMAN'S** [1] - 65:7
**WELFARE** [2] - 16:9,
17:21
**WELL** [106] - 8:18,
9:13, 16:7, 16:12,
18:4, 19:21, 22:2,
22:17, 27:14, 27:24,
28:11, 30:7, 30:19,
32:19, 35:1, 36:20,

39:11, 40:10, 40:16,
40:18, 41:12, 43:14,
44:4, 44:5, 46:22,
48:20, 49:8, 50:12,
52:6, 53:15, 54:8,
58:15, 60:2, 62:18,
63:24, 64:6, 77:21,
78:10, 80:22, 81:18,
83:12, 85:22, 85:25,
88:3, 93:17, 105:17,
107:5, 108:21,
109:23, 120:17,
125:16, 128:3,
129:23, 137:16,
139:7, 142:13,
147:2, 148:7,
155:22, 155:24,
160:2, 161:3,
164:23, 167:9,
167:14, 169:23,
171:23, 173:16,
173:23, 174:25,
184:10, 188:12,
188:21, 189:19,
192:17, 193:22,
209:20, 210:11,
216:15, 216:22,
217:11, 219:10,
223:6, 223:17,
225:1, 225:23,
226:2, 227:3,
227:11, 227:12,
227:15, 227:18,
227:19, 227:22,
229:3, 230:22,
231:18, 237:10,
237:25, 244:7,
245:15, 248:24,
250:5, 250:23,
251:25
**WELL-REASONED** [1]
- 52:6
**WELLESLEY** [1] -
57:9
**WENDY** [1] - 1:11
**WENT** [28] - 60:4,
60:7, 70:4, 70:13,
71:1, 87:2, 94:6,
94:11, 99:8, 112:14,
112:15, 114:25,
115:4, 136:13,
137:3, 144:21,
144:24, 145:6,
145:10, 145:14,
152:24, 156:3,
188:23, 192:14,
197:7, 205:19,
246:9, 246:10
**WERE** [149] - 6:22,
6:25, 8:12, 11:18,

12:4, 16:18, 17:4,
25:7, 32:5, 40:11,
40:13, 41:15, 42:8,
43:5, 45:15, 51:6,
52:16, 53:3, 64:9,
65:10, 66:24, 67:4,
68:16, 68:22, 69:3,
69:6, 69:12, 69:24,
69:25, 71:3, 73:18,
73:24, 74:7, 78:11,
78:14, 79:12, 82:9,
82:16, 83:4, 83:22,
89:13, 91:10, 92:1,
92:7, 94:2, 94:10,
96:16, 100:2,
102:10, 106:17,
106:19, 107:4,
108:5, 109:16,
110:11, 110:12,
112:1, 122:18,
131:2, 132:24,
133:1, 137:8,
139:22, 144:20,
144:24, 145:2,
145:3, 145:21,
145:22, 145:23,
146:3, 153:19,
153:23, 155:1,
155:24, 159:1,
160:1, 160:4, 160:8,
160:12, 168:13,
178:11, 178:13,
179:2, 180:6,
180:19, 181:10,
181:11, 181:16,
182:11, 182:14,
182:18, 182:21,
183:6, 183:7,
183:10, 183:12,
183:14, 183:15,
183:16, 183:18,
183:20, 185:22,
186:14, 186:15,
186:25, 187:23,
187:25, 188:4,
188:5, 188:8, 188:9,
189:23, 193:3,
194:7, 196:15,
196:16, 196:18,
196:22, 197:1,
197:15, 197:16,
197:18, 198:4,
198:6, 198:20,
204:15, 205:20,
205:23, 208:25,
209:5, 209:22,
209:23, 211:2,
212:20, 213:20,
214:21, 217:12,
229:21, 232:9,
233:18, 244:24,

245:1, 252:16
**WEREN'T** [1] - 40:12
**WEST** [2] - 22:24,
121:24
**WHAT** [242] - 3:22,
5:19, 8:20, 11:1,
12:8, 15:9, 17:24,
23:3, 23:23, 28:10,
28:15, 28:16, 28:21,
29:21, 29:23, 30:7,
30:16, 32:8, 32:12,
33:10, 34:10, 34:19,
35:18, 36:11, 38:22,
44:3, 44:17, 45:5,
48:20, 48:24, 49:9,
49:14, 53:18, 54:5,
55:4, 56:9, 57:8,
57:23, 58:1, 58:3,
60:15, 61:2, 61:24,
65:14, 66:4, 66:17,
66:25, 67:11, 67:13,
68:20, 69:8, 73:15,
73:22, 75:7, 75:18,
75:21, 76:25, 78:8,
78:23, 80:11, 81:17,
83:3, 84:9, 85:20,
86:25, 88:15, 89:4,
89:22, 91:4, 91:21,
92:24, 94:23, 96:8,
96:17, 97:25, 101:9,
108:4, 109:23,
110:1, 110:15,
111:2, 114:2,
114:10, 114:13,
115:3, 115:10,
115:19, 117:11,
117:12, 117:15,
120:25, 123:9,
123:22, 123:25,
124:2, 126:7,
127:10, 128:10,
130:18, 131:15,
132:15, 132:16,
133:9, 133:19,
134:1, 134:21,
137:14, 139:8,
139:14, 139:18,
141:6, 141:10,
141:20, 143:3,
143:20, 145:8,
154:13, 154:25,
156:1, 157:1,
157:11, 158:16,
158:23, 159:11,
159:12, 159:14,
159:16, 159:20,
159:21, 159:25,
160:3, 160:6,
160:16, 161:10,
161:11, 161:12,
162:25, 164:7,

164:11, 164:24,
166:13, 167:19,
169:13, 171:18,
172:6, 173:14,
173:18, 173:23,
174:5, 174:8,
174:19, 174:22,
175:2, 176:2,
179:10, 180:6,
180:7, 181:5,
181:16, 183:6,
183:11, 183:14,
184:9, 184:11,
185:9, 187:14,
188:18, 188:21,
189:3, 190:5,
190:12, 190:13,
190:14, 190:21,
191:5, 191:17,
192:7, 193:4,
193:16, 193:19,
194:4, 195:14,
197:10, 204:5,
204:6, 204:21,
205:19, 207:2,
207:18, 208:21,
209:21, 210:24,
210:25, 211:10,
211:24, 212:14,
212:15, 212:16,
212:18, 212:24,
213:24, 214:5,
215:1, 217:23,
218:13, 221:2,
224:19, 225:23,
226:12, 226:25,
227:6, 230:9,
230:10, 232:6,
233:24, 234:25,
238:7, 238:14,
239:2, 239:5, 239:9,
239:24, 240:3,
241:14, 241:20,
245:2, 245:10,
246:2, 247:14,
247:17, 249:5,
249:8, 249:25,
252:14, 252:15
**WHAT'S** [4] - 61:21,
66:5, 212:10, 225:5
**WHATEVER** [3] -
42:25, 162:1, 247:20
**WHEATON** [7] - 26:9,
40:1, 41:2, 217:18,
217:22, 217:23,
218:8
**WHEN** [76] - 8:3,
13:16, 16:11, 18:12,
19:18, 35:15, 37:5,
43:2, 49:9, 49:12,
60:10, 61:20, 62:9,

66:23, 70:8, 70:10,
84:2, 87:7, 87:10,
89:3, 91:9, 92:16,
100:1, 100:2, 107:8,
109:20, 109:25,
112:1, 115:1, 115:5,
119:17, 119:22,
122:9, 122:18,
125:22, 127:14,
127:22, 128:23,
129:7, 129:11,
130:4, 130:14,
133:1, 133:8,
133:16, 133:25,
134:8, 134:12,
136:11, 157:13,
160:7, 164:18,
168:11, 168:14,
169:16, 173:19,
177:23, 177:25,
178:9, 179:10,
187:24, 188:15,
190:13, 191:9,
193:3, 194:3, 194:6,
194:12, 194:16,
205:16, 213:9,
213:14, 231:16,
241:4, 241:9, 243:14
**WHERE** [57] - 7:13,
15:15, 17:20, 18:18,
25:1, 25:3, 28:19,
30:24, 35:9, 51:20,
55:2, 56:24, 75:17,
90:15, 91:14,
102:13, 103:9,
114:24, 116:14,
121:13, 121:14,
122:7, 126:8,
134:14, 150:24,
161:4, 164:17,
167:1, 167:3,
169:23, 171:4,
171:14, 176:6,
176:14, 178:23,
179:3, 181:24,
182:21, 185:2,
186:8, 186:9,
186:10, 186:15,
187:3, 187:18,
218:14, 225:4,
226:19, 228:21,
229:4, 231:1, 231:5,
239:19, 244:10,
247:1, 247:12,
247:17
**WHETHER** [64] -
18:23, 20:15, 28:19,
31:24, 32:3, 32:13,
32:21, 33:6, 34:20,
36:5, 41:15, 41:16,
42:1, 42:5, 45:1,

45:10, 47:5, 48:21,
49:11, 49:19, 78:13,
79:5, 82:17, 90:20,
101:25, 109:11,
109:14, 110:10,
110:24, 121:3,
131:21, 138:22,
147:17, 150:2,
150:12, 150:14,
150:15, 159:9,
161:8, 161:20,
189:25, 207:8,
208:15, 212:13,
213:10, 218:22,
219:4, 219:20,
220:2, 221:3, 221:5,
222:10, 222:20,
222:21, 234:23,
240:1, 242:19,
242:22, 243:5,
243:17, 247:1,
247:2, 247:15
**WHICH** [131] - 6:1,
6:20, 6:25, 7:15,
7:19, 11:20, 12:7,
12:11, 15:17, 15:18,
21:6, 22:20, 24:20,
26:6, 29:18, 33:24,
35:7, 36:10, 36:21,
43:15, 43:20, 43:24,
45:3, 45:10, 48:15,
48:23, 49:16, 49:19,
50:14, 51:14, 52:23,
53:20, 53:21, 55:19,
56:7, 58:14, 62:4,
62:25, 63:8, 65:2,
65:8, 73:20, 75:3,
75:12, 75:19, 75:25,
76:10, 78:13, 79:2,
87:18, 90:6, 90:8,
91:17, 94:5, 102:4,
102:7, 106:7,
106:18, 106:22,
109:9, 111:24,
114:7, 120:9, 124:9,
124:10, 129:24,
132:9, 134:7, 134:8,
135:16, 135:21,
137:16, 139:8,
141:5, 141:19,
141:25, 143:25,
151:6, 153:6, 154:5,
155:4, 155:17,
157:10, 158:12,
159:22, 160:16,
160:25, 167:13,
169:22, 170:18,
171:16, 174:22,
174:24, 180:3,
186:13, 186:16,
187:8, 191:21,

198:9, 199:21,
204:19, 205:11,
205:24, 206:9,
206:24, 207:11,
209:12, 212:8,
214:25, 216:20,
217:11, 217:15,
217:17, 217:18,
220:9, 221:7, 222:5,
223:10, 223:20,
224:3, 224:8,
225:12, 232:3,
232:15, 232:21,
243:7, 246:2, 249:4,
249:12, 252:5
**WHILE** [5] - 25:8,
59:15, 129:10,
218:2, 245:10
**WHIM** [1] - 247:19
**WHITE** [3] - 1:19,
47:22, 253:9
**WHO** [152] - 7:12,
10:19, 12:25, 14:9,
14:12, 14:20, 15:21,
15:22, 22:19, 23:14,
26:18, 26:21, 27:3,
27:5, 28:14, 29:2,
29:15, 29:17, 30:17,
30:22, 32:2, 34:11,
34:22, 45:6, 60:23,
66:21, 71:21, 72:13,
72:16, 72:18, 73:7,
76:17, 77:22, 79:10,
82:16, 84:14, 86:19,
87:3, 90:3, 93:3,
96:15, 98:7, 100:5,
100:8, 106:17,
108:3, 108:5,
111:18, 117:13,
117:16, 118:5,
122:2, 125:18,
125:20, 126:1,
126:16, 126:19,
128:1, 129:3,
129:11, 129:24,
130:11, 134:2,
135:10, 137:1,
137:4, 137:19,
140:2, 140:12,
142:1, 143:11,
146:8, 146:13,
146:24, 147:8,
147:13, 147:24,
148:25, 149:6,
149:11, 149:15,
153:8, 153:16,
153:17, 153:24,
155:12, 156:2,
174:15, 178:16,
179:10, 180:16,
182:12, 182:13,

Exhibit 137          JA-0001924

182:16, 183:7,
183:10, 185:22,
187:23, 187:25,
188:9, 189:20,
189:23, 192:25,
195:13, 196:5,
199:6, 199:10,
199:14, 200:2,
200:4, 200:5,
200:10, 200:12,
200:15, 201:3,
201:6, 201:11,
201:19, 201:24,
202:12, 202:19,
202:22, 203:9,
203:14, 219:18,
226:20, 227:16,
228:14, 229:12,
229:13, 230:2,
230:24, 232:12,
235:10, 235:16,
236:3, 236:15,
236:17, 237:14,
237:15, 240:1,
240:4, 244:6, 244:8,
244:25, 247:22,
250:17, 250:18

**WHO'S** [5] - 34:3,
165:25, 172:4,
172:5, 210:16

**WHOEVER** [1] - 29:19

**WHOLE** [3] - 15:3,
83:2, 190:9

**WHOM** [4] - 13:18,
136:25, 137:11,
142:6

**WHOSE** [7] - 13:22,
84:4, 127:10,
146:18, 148:16,
200:16, 202:5

**WHY** [37] - 8:10,
15:22, 24:24, 26:25,
34:2, 36:21, 48:22,
58:12, 68 16, 70:16,
72:25, 82 11, 84:24,
85:2, 85:24, 92:9,
92:10, 106:5, 107:2,
107:12, 119:12,
139:16, 159:18,
160:10, 164:21,
184:10, 187:15,
188:6, 188:19,
192:12, 192:14,
219:10, 227:20,
230:16, 239:21,
244:5

**WIDELY** [1] - 30:3

**WIDESPREAD** [2] -
228:14, 244:15

**WILDLIFE** [1] - 241:19

**WILL** [172] - 3:11,
3:12, 3:13, 7:7, 7:8,
7:12, 7:14, 7 15,
7:18, 11:2, 11:5,
13:15, 13:19, 13:20,
13:23, 14:5, 14 8,
14:10, 14:16, 14:17,
14:19, 14:21, 14:22,
14:23, 14:25, 15:13,
17:16, 21:23, 22:1,
22:2, 22:8, 22:15,
22:22, 22:25, 23:3,
23:4, 23:6, 23:13,
23:16, 23:22, 24:3,
24:6, 24:15, 24 16,
25:3, 25:4, 25:10,
26:19, 26:21, 29:14,
29:24, 30:2, 34:15,
34:17, 35:25, 38:9,
45:5, 45:6, 48:9,
52:21, 53:14, 54:3,
54:9, 81:9, 85:13,
95:8, 98:19, 98:20,
98:23, 98:24, 103:2,
113:3, 113:24,
118:9, 120 24,
130:3, 140:11,
141:20, 141:22,
142:1, 144:4,
146:19, 146:24,
147:13, 151:1,
151:9, 157:11,
157:12, 157:19,
158:13, 162:4,
162:5, 165:6,
165:12, 165:16,
165:18, 166:22,
171:7, 175:23,
182:4, 184:1,
186:24, 187:17,
190:22, 191:17,
199:14, 200:2,
200:22, 200:23,
201:8, 201:15,
202:10, 202:19,
204:5, 205:3, 205:9,
206:21, 208:13,
210:8, 210:10,
212:23, 215:8,
218:8, 227:10,
229:8, 229:13,
229:18, 229:24,
230:10, 230:19,
231:3, 231:8,
231:10, 231:12,
231:17, 231:24,
232:19, 233:6,
233:9, 233:22,
234:24, 235:7,
235:10, 235:16,
235:18, 236:15,

236:17, 238:1,
238:3, 238:19,
238:20, 239:2,
239:5, 239:9, 241:8,
241:24, 242:5,
246:5, 246:22,
251:9, 252:3, 252:5,
252:15, 252:16

**WILLING** [2] - 174:5,
174:15

**WIND** [1] - 230:5

**WINDOW** [1] - 25:3

**WIPE** [1] - 43:22

**WISDOM** [5] - 66:8,
112:24, 120:19,
172:24, 246:11

**WISE** [1] - 223:9

**WISH** [6] - 52:20,
53:22, 205:2, 205:8,
212:1, 251:23

**WISHED** [1] - 220:5

**WITH** [222] - 3:23, 4:7,
4:9, 4:18, 4:20, 4:23,
5:5, 5:16, 21:1, 22:7,
26:2, 27 14, 28:4,
28:20, 29:23, 30:14,
32:23, 35:6, 38:21,
40:6, 41:22, 42:11,
43:20, 43:23, 45:18,
46:4, 46:21, 46:24,
47:14, 48:24, 48:25,
49:24, 50:6, 51:6,
52:20, 56:17, 56:20,
57:22, 59:4, 62:7,
62:20, 63:14, 63:20,
64:13, 64:25, 67:1,
67:22, 71:14, 71:20,
72:6, 72:16, 72:21,
74:20, 75:13, 77:5,
77:13, 78:7, 81:9,
81:14, 83:19, 83:21,
85:23, 87:1, 87:19,
87:22, 87:24, 88:11,
93:22, 97:4, 97:9,
97:12, 98:3, 98:7,
98:9, 101:1, 101:22,
102:14, 102:15,
103:11, 103:20,
104:11, 105:10,
105:13, 105:24,
106:2, 107:3,
107:20, 108:8,
108:19, 110:21,
111:7, 112:6, 118:9,
118:15, 118:17,
119:25, 120:3,
120:6, 122:21,
123:1, 124:15,
125:4, 125:11,
125:21, 127:4,

127:12, 128:13,
128:18, 128:22,
129:4, 129:11,
129:12, 129:15,
129:22, 129 25,
132:20, 133:13,
134:6, 136:16,
137:18, 138:3,
141:1, 142:6,
143:11, 143:13,
144:19, 153:6,
153:7, 153:12,
153:22, 154:25,
155:2, 155:6, 158:2,
158:7, 158:11,
158:24, 159 9,
163:15, 163:20,
166:11, 166:17,
167:1, 168:15,
168:21, 170 7,
171:6, 173:3, 173 6,
173:22, 176:19,
177:15, 178:18,
179:6, 180:22,
182:9, 182:24,
183:5, 188:18,
189:6, 189:14,
189:15, 189:16,
190:11, 192:1,
192:9, 194:19,
196:5, 196:7,
196:21, 197 3,
198:2, 198:17,
198:23, 203:4,
203:11, 203:20,
205:23, 205:24,
208:8, 208:12,
213:3, 213:7,
213:19, 213:20,
214:12, 214:21,
215:3, 217:6,
218:25, 221:12,
222:1, 222:25,
224:6, 224:18,
226:19, 228:15,
229:1, 229:5, 229:8,
229:16, 230:8,
230:16, 233:3,
236:25, 237:1,
237:3, 239:1, 239:4,
240:6, 240:11,
240:18, 240:21,
245:23, 246:25,
248:18, 249:15,
250:20, 251:16

**WITHDRAW** [1] -
26:17

**WITHDRAWAL** [5] -
76:3, 76:5, 77:14,
175:10, 176:23

**WITHIN** [12] - 47:7,

57 11, 59:7, 60:24,
73:12, 76:5, 80:20,
82 3, 97:4, 150:21,
204:15

**WITHOUT** [16] - 12:7,
14 11, 36:7, 37:17,
78:15, 78:21, 83:2,
87 14, 96:10,
127:16, 140:18,
153:4, 160 12,
178:1, 178:21

**WITNESS** [86] - 6:13,
23:25, 34:16, 54:18,
54 19, 54:23, 55:11,
64 16, 65:2, 84:10,
87:22, 87:25, 88:7,
88:13, 88:17, 88:22,
89:2, 89:6, 89:11,
89:16, 89:20, 89:25,
90 2, 90:17, 90:21,
90:24, 91:1, 91:6,
91:12, 91:16, 91:23,
92:3, 92:5, 92:8,
92:12, 92:23, 93:1,
93 5, 93:8, 97:12,
98 13, 105:22,
109:7, 109 18,
109:24, 110:2,
110:4, 110:8,
110:12, 110:17,
110:23, 111:1,
111:9, 113:6,
113:12, 113:15,
113:17, 113:20,
114:6, 120:11,
140:20, 141:15,
142:20, 148:22,
150:2, 152:19,
157:3, 157:8, 157:9,
157:20, 157:24,
162:8, 162 15,
162:18, 162:22,
163:1, 179:25,
184:20, 185:3,
191:2, 191:4, 191:7,
244:13, 246:8

**WITNESS'** [2] -
142:16, 164:12

**WITNESSES** [12] -
6:2, 6:7, 6:9, 6:12,
9:16, 21:25, 25:25,
34 18, 54:6, 239:13,
244:5, 254:3

**WITNESSES'** [1] -
245:11

**WOMAN** [33] - 70:1,
71 21, 72:1, 72:11,
72:15, 73:1, 80:13,
80 18, 100:4, 100:7,
123:17, 124:2,

127:12, 137:19, 146:7, 146:12, 146:18, 146:24, 147:8, 147:13, 147:24, 148:16, 148:25, 149:6, 149:11, 149:15, 173:17, 174:5, 174:15, 179:3, 179:10, 227:20

**WOMEN** [262] - 7:3, 7:6, 7:12, 7:13, 7:18, 7:20, 10:5, 10:9, 10:19, 11 25, 12:2, 12:19, 12 25, 13:15, 13:19, 13:22, 14:9, 14:12, 14:20, 15:1, 21:10, 21:13, 22:5, 22:11, 22:21, 23:4, 23:19, 26 18, 26:21, 30:9, 30:15, 31:4, 31:9, 31:10, 32:9, 33:12, 34:13, 64:11, 64:19, 67:3, 67:15, 69:21, 70 23, 71:17, 71:18, 72 21, 73:7, 75:22, 76:1, 76:4, 76:17, 77:3, 77:9, 78:8, 78:11, 78:22, 78:24, 79 9, 79:16, 80:3, 83:9, 89 24, 90:3, 91:5, 91:18, 92:10, 92:19, 92:25, 93:2, 93:20, 93:23, 94:1, 94:5, 94:13, 96:3, 96:6, 96:11, 96:15, 96 18, 96:25, 97:6, 98:20, 98:24, 101:24, 102:4, 103:21, 106:15, 106:17, 106:19, 107:11, 107:14, 107:22, 108:2, 108:3, 108:5, 108:12, 109:21, 110:6, 110:7, 110:11, 111:24, 112:3, 115:22, 117:16, 117:19, 119:15, 123:5, 123:25, 124:19, 125:2, 125:18, 126:1, 126:23, 126:24, 127:1, 127:10, 127:22, 128:1, 128:4, 129:11, 129:16, 129:24, 129:25, 130:2, 135:25, 136:3, 136:5, 138:23, 139:22,

140:11, 141:7, 141:10, 141:21, 141:23, 142:1, 142:5, 142:9, 142:13, 144:4, 149:20, 151:1, 151:9, 153:13, 153:14, 153:15, 153:16, 153:19, 153:24, 156:7, 156:11, 166:16, 168:15, 171:6, 171:20, 171:21, 172:13, 174:7, 174:15, 176:9, 176:18, 177:10, 177:12, 177:19, 178:11, 178:16, 180:16, 180:17, 181:9, 181:12, 181:16, 182:12, 182:13, 182:16, 183:7, 183:10, 183:17, 183:19, 183:20, 185:22, 186:3, 186 4, 186:10, 186:12, 186:15, 186:16, 186:25, 187:22, 187:25, 188:3, 188:4, 188 7, 188:8, 188:13, 188:19, 189:11, 189:13, 189:23, 190:3, 190:6, 190:9, 190:22, 190:23, 191:17, 191:19, 192:18, 192:24, 192:25, 193:1, 200:22, 200:23, 201:3, 201:6, 201:11, 201:19, 201:23, 201:24, 202:3, 202:5, 202:10, 202:12, 202:18, 202:22, 211:20, 212:4, 221:12, 227:1, 228:18, 228:23, 228:25, 229:8, 229:12, 229:18, 229:19, 229:24, 230:2, 230:9, 230:10, 230:19, 230:23, 231:8, 231:9, 231:17, 235:7, 235:10, 237:15, 237:23, 238:1, 238:3, 238:13, 238:19, 238:20, 238:24,

247:7, 247:22, 250:17

**WOMEN'S** [47] - 34:17, 58:22, 59:5, 59:7, 61 4, 62:20, 63:4, 63:7, 63:8, 63:11, 67:6, 67:11, 69:4, 69:10, 72:9, 78:6, 78:15, 79:2, 79:6, 83:5, 83:21, 95:19, 95:25, 101:16, 102:8, 120:14, 121:1, 127:5, 138:20, 140:22, 146:25, 149:1, 167:20, 169:8, 169:11, 170:17, 170:20, 189:17, 192:15, 201:15, 217:13, 223:25, 224:1, 224:7, 224:8, 236:1, 249:24

**WON** [2] - 65:20, 65:23

**WON'T** [3] - 162:6, 164:3, 244:1

**WONDER** [1] - 53:9

**WONDERING** [1] - 82:11

**WORD** [4] - 205:18, 205:21, 221:17, 221:25

**WORDED** [1] - 42:22

**WORDS** [7] - 28 14, 86:3, 90:16, 123 23, 192:14, 240:10, 240:19

**WORK** [45] - 6 15, 27:5, 57 8, 58:12, 58:20, 59:15, 59:22, 61:2, 61:3, 62:7, 62:10, 63:3, 64:1, 64:4, 72 9, 79:8, 86:5, 116:14, 116:15, 117:3, 117:5, 117:19, 118:13, 119:8, 119:10, 119:15, 119:17, 121:13, 124:20, 124:22, 126:1, 130:3, 166:1, 166:19, 169:4, 169:23, 171:10, 195:4, 199:19, 221:25, 231:15, 250:17, 251:5

**WORKED** [9] - 6:12, 58:9, 58:20, 59:10, 132:15, 132:16,

167:3, 173:23

**WORKER** [1] - 179:13

**WORKFORCE** [4] - 30:13, 123:18, 247:7, 247:23

**WORKING** [4] - 3:12, 122:11, 194:3, 222:5

**WORLD** [8] - 75:17, 121:22, 145:21, 239:18, 239 19, 239:22, 244:23, 247:9

**WORLDS** [1] - 131:8

**WORSE** [1] - 200:17

**WORSENING** [1] - 142:2

**WORSHIP** [3] - 43:15, 197:13, 197:16

**WOULD** [283] - 5:11, 5:19, 6:13, 8:13, 8:14, 8:16, 8:21, 8:23, 9:2, 9:21, 9:23, 11:10, 11 14, 16:24, 20:4, 20:9, 20:25, 21:22, 24:20, 24:23, 25:23, 27:11, 29:3, 29:16, 29:18, 30:21, 31:17, 31:22, 32:2, 32:4, 32:11, 32:14, 32:15, 33:5, 33:14, 33:15, 33:22, 34:6, 34:9, 34:24, 36:24, 37:1, 37:14, 37:25, 38:12, 40 4, 40:6, 40:18, 40:21, 40:24, 40:25, 41:8, 42:5, 42:13, 43:15, 43:16, 43:22, 45:2, 45:9, 47:20, 47 23, 48:18, 48:22, 50 11, 52:18, 53:18, 53 23, 55:10, 55:13, 56:7, 56:8, 56:11, 56:23, 56:25, 62:19, 64 16, 67:25, 68:6, 74:1, 74:17, 76:1, 76:4, 76:18, 77:3, 77:6, 77:19, 78:12, 78:14, 78:15, 78:21, 79:15, 79:16, 79:20, 79:22, 80:5, 80:14, 80:21, 81:1, 81:4, 81:7, 82:2, 82:5, 82:20, 84:17, 85:5, 85:7, 89:8, 89:14, 91 17, 92:10, 95:9, 95:19, 95:25, 96:18, 96:20, 96:21, 101:5, 101:18, 107:7, 112:22, 113:8, 116:13,

118:16, 119:8, 120:11, 122:17, 122:20, 123:3, 123:21, 124:18, 128:3, 128:11, 130:23, 131:22, 131:23, 132:1, 132:9, 133:1, 133:8, 133:9, 133:10, 133:20, 133:23, 133:25, 134:2, 134:17, 135:17, 137:22, 138:10, 138:23, 141:7, 146:3, 150:2, 151:19, 153:2, 153:4, 153:8, 153:11, 155:3, 156:20, 157:4, 158:6, 158:10, 162:14, 164:10, 164:15, 165:15, 166:17, 168:10, 172:12, 172:15, 175:3, 175:8, 175:20, 178:1, 178:9, 178:10, 178:20, 178:24, 179:4, 179:20, 180 2, 180:22, 181:22, 182:21, 182:24, 183:23, 184:9, 189:3, 191:8, 191:10, 191:11, 191:22, 191:23, 192:15, 193:4, 194:22, 194:25, 195:12, 196:21, 198:17, 201:7, 201:23, 202:3, 205:11, 208:6, 208:7, 212 7, 212:19, 213:21, 213:24, 214:2, 214:5, 214:7, 214:10, 214:20, 214:25, 215:3, 218:17, 219:9, 219:10, 219:11, 220:6, 220:8, 220:22, 226:22, 227:9, 228:13, 228:14, 228:17, 230:3, 231:1, 234:12, 235:21, 235:22, 235:23, 236:18, 236:19, 236:22, 237:3, 237:4, 237:5, 237:6, 237:8, 237:14, 237:15, 237:22,

238:12, 239:11, 239:22, 240:12, 240:15, 240:17, 240:18, 242:7, 242:17, 242:23, 242:24, 244:14, 244:16, 244:18, 245:3, 245:8, 247:18, 247:23, 248:3, 248:4, 248 5, 248:6, 248:7, 248:8, 248:16, 248:18, 251:12

**WOULDN 'T** [3] - 30:5, 32:1, 33:3
**WRAP** [1] - 216:16
**WRIGHT** [1] - 3:4
**WRIT** [1] - 47:2
**WRITE** [1] - 241:22
**WRITERS** ' [1] - 38:4
**WRITING** [7] - 25:25, 27:2, 38:14, 42:19, 46:15, 244:20, 252:23
**WRITTEN** [5] - 63:17, 63:23, 168:2, 228:16
**WRONGLY** [1] - 28:19
**WROTE** [2] - 194:12, 206:6

## Y

**YEAH** [7] - 91:23, 168:11, 175:24, 177:9, 179:25, 189:8, 234:19
**YEAR** [41] - 25:2, 75:13, 75:22, 76:2, 76:5, 76:11, 76:17, 77:7, 80:21, 90:5, 91:18, 122:5, 122:6, 123:2, 135:1, 135:14, 167:2, 167:4, 171:4, 176:9, 176:18, 180:13, 188:1, 188:2, 193:2, 195:23, 195:24, 196:1, 197:3, 197:9, 208:2, 212:21, 220:1, 228:11, 230:15, 230:18, 239:14, 241:20, 241:23, 252:5
**YEARS** [29] - 26 1, 27:7, 46:16, 59:11, 60:5, 60:12, 82:3, 82:4, 112:11, 115:10, 116:3, 116:4, 122:24, 127:15, 127:16,

134:11, 134:12, 134:19, 135:3, 135:16, 140:21, 155:16, 170:14, 171:23, 171:24, 181:13, 183:1, 193:24, 193:25
**YEP** [1] - 86:24
**YES** [216] - 4:13, 18:6, 22:14, 22:22, 29:6, 44:16, 45:13, 53:1, 54:1, 54:15, 55:24, 55:25, 56:10, 56:13, 56:16, 56:18, 56:22, 57:16, 57:24, 58:11, 59:9, 59:12, 59:24, 60:3, 60:14, 60:25, 61:12, 61:14, 61:23, 62:11, 62:14, 62:23, 63:2, 63:16, 63:22, 63:25, 64:3, 64:7, 64:14, 65:16, 67:18, 67:24, 68:3, 68:9, 68:12, 68:15, 69:17, 71:10, 73:6, 74:6, 74:9, 74:16, 74:22, 74:24, 76:22, 77:18, 77:21, 79:7, 80:6, 81:1, 81:6, 81:22, 82:8, 82:23, 83 1, 83:6, 83:19, 84:2, 84:15, 84:20, 84:23, 85:1, 86:17, 87:6, 88:13, 89:16, 89:25, 91:6, 92:12, 93:25, 95:6, 95:15, 95 20, 95:23, 96:1, 96:7, 97:2, 97:7, 97:10, 98:13, 99:2, 99:10, 99:14, 99:25, 100:25, 101:20, 102:9, 102:12, 102:21, 102:25, 103:23, 104:2, 104:7, 104:13, 104:20, 105:20, 105:22, 106:1, 107:19, 107:24, 109:7, 109:18, 109:24, 110:3, 111:1, 113:1, 115:18, 117:4, 117:24, 118:1, 118:21, 120:5, 120:16, 121:8, 121:23, 122:4, 123:2, 124 16, 124:21, 124:23, 124:25, 126:14, 128:9, 130:7, 130:13, 130:17,

131:3, 131:7, 131:10, 131:14, 131:25, 133:18, 134 20, 135:7, 135:15, 135:18, 135:20, 136:6, 136:15, 137:10, 138:5, 138:15, 140:4, 140:9, 142:11, 143:7, 143:23, 144:6, 149:22, 150:10, 152:2, 152:21, 153:21, 155:14, 156:10, 158:25, 160:21, 163:10, 163:24, 165:8, 165:11, 165:14, 165:17, 165:20, 166:12, 166:20, 167:18, 168:7, 168:25, 169:3, 169:6, 170:6, 170:23, 172:2, 173:13, 174:17, 177:2, 178:4, 178:5, 178:9, 179:2, 181:4, 181:7, 182:2, 183:14, 185:13, 185:15, 190:1, 190:4, 190:20, 191:16, 195:5, 196:13, 196:17, 196:24, 197:14, 198:1, 199:25, 201:1, 201:10, 204:9, 205:1, 209:14, 213:13, 219:7, 242:4
**YESTERDAY** [1] - 66:12
**YET** [7] - 11:21, 25:15, 82:10, 93:10, 147:18, 163:12
**YORK** [3] - 107:23, 167:6, 231:4
**YOU** [809] - 5:8, 5:14, 5:15, 5:17, 5:18, 5:22, 8:4, 8:5, 8:12, 8:18, 8:20, 8:24, 8:25, 9:13, 11:1, 11:2, 11:3, 14:23, 15:5, 15:17, 15:22, 15:24, 16:2, 16:16, 19:20, 20:19, 20:21, 20:22, 20:23, 21 18, 21:22, 22:2, 22:16, 22:22, 23:23, 24 1, 24:2, 24:4, 24:15, 24:12, 24:14, 24:15, 25:6, 25:16, 25:17,

25:20, 27:14, 28:19, 29:5, 30:16, 32:19, 34:15, 36:2, 36:8, 37:11, 37:14, 38:20, 40:21, 41 18, 42:5, 42:8, 42:9, 44:12, 46:3, 46:4, 46:11, 46:15, 46:22, 48:12, 48:20, 48:21, 48:22, 48:24, 48:25, 49:4, 49:6, 49:14, 49:16, 49:20, 49:21, 49:22, 49:24, 50:16, 50:20, 51:24, 51:25, 52:1, 52:3, 52:14, 52:25, 53:4, 53:14, 53:15, 53:16, 53:17, 53:18, 53:24, 54:6, 54:14, 54:17, 55:2, 55:4, 55:7, 55:8, 55:10, 55:14, 55:15, 56:2, 56:7, 56:9, 56:11, 56:12, 56:14, 56:17, 56:19, 56:20, 56:23, 56:24, 56:25, 57:3, 57:17, 57 22, 58:8, 58:9, 58:12, 58:20, 58:21, 59:6, 59:10, 59:13, 59:15, 59:22, 60:1, 60:4, 60:7, 60:10, 60:19, 61:10, 61:11, 61:20, 62:9, 62:10, 62:15, 62:16, 62:21, 62:24, 62:25, 63:14, 63:17, 63:20, 63:23, 64 1, 64:9, 65:14, 65:20, 65:23, 65:25, 66:24, 68:2, 68:6, 68:16, 69:20, 70:2, 70:3, 70:8, 70:16, 72:24, 73:1, 73:3, 73:11, 73:18, 74:17, 74:20, 74:25, 75:21, 76 4, 77:3, 77:6, 77:18, 77:19, 78:1, 78:18, 79:5, 81:4, 81:8, 81:9, 82:9, 82:20, 82:21, 83:3, 84:5, 84:6, 84:17, 84:19, 84:24, 85:2, 85:20, 86:13, 86:16, 87:7, 87:8, 87:18, 87 20, 87:21, 87:24, 88 3, 88:4, 88:5, 88:10, 89:3, 89:4, 89:17, 89:23, 91:9, 91:20, 91:21, 92:9, 92:16, 92:21, 93:3, 93:10, 93:12, 93:14, 93:15, 93:19, 93:21, 94 24, 95:4,

95:7, 95:13, 95:16, 95:18, 95:21, 95:24, 96 4, 96:24, 97:3, 97 14, 97:16, 97:17, 97 22, 97:25, 98:7, 98 12, 98:14, 98:18, 98:22, 99:3, 99:11, 99:15, 99:17, 99:18, 99:22, 100:1, 100:4, 100:7, 100 11, 100:14, 100:19, 100:23, 101:3, 101:15, 101:18, 102:10, 103:9, 104:24, 104:25, 105:2, 105:3, 105:8, 105:10, 105:19, 105:20, 105:24, 105:25, 106:2, 106:8, 107:2, 107:3, 107:16, 107:20, 107:25, 108:22, 108:24, 109:3, 109:4, 109:8, 109:9, 109:16, 109:20, 110:6, 110:10, 110:24, 111:10, 111:13, 111:14, 112:1, 112:5, 112:18, 113:2, 113:11, 113:24, 114:2, 114:7, 114:8, 114:9, 114:10, 114:12, 114:16, 114:17, 114:19, 114:22, 114:23, 114:24, 115:1, 115:3, 115:5, 115:7, 115:10, 115:12, 115:23, 116:5, 116:13, 116:14, 116:22, 116:23, 116:25, 117:3, 117:5, 117 7, 117:9, 117:11, 117:12, 117:19, 117:25, 118 2, 118:5, 118:22, 119:9, 119:22, 119:25, 120:3, 120:6, 121:10, 121:14, 121:21, 121:24, 122:2, 122 5, 122:15, 122:17, 122:18, 122:20, 122:23, 122:24, 123:3, 123:4, 123:9, 123:22, 123:23, 123:24, 124:1, 124:14, 126:6, 128:5, 128:8,

128:13, 128:23,
129:2, 129:11,
130:4, 130:5, 130:8,
130:14, 130:19,
130:23, 130:25,
131:4, 131:8,
131:11, 131:15,
131:23, 132:1,
132:9, 132:22,
133:2, 133:9,
133:16, 133:19,
133:25, 134:12,
134:14, 134:19,
135:5, 135:9,
135:11, 136:2,
136:11, 136:22,
136:23, 137:3,
137:11, 137:17,
138:3, 138:6, 138:9,
138:10, 138:14,
138:16, 138:17,
138:21, 139:4,
139:5, 139:17,
139:18, 139:25,
140:1, 140:5,
140:10, 140:17,
140:18, 141:4,
141:5, 141:14,
141:20, 142:12,
142:21, 143:3,
143:8, 143:11,
143:18, 143:20,
144:3, 144:7,
144:10, 144:14,
144:16, 144:20,
144:22, 144:23,
145:22, 146:3,
146:7, 146:12,
146:17, 146:23,
147:7, 147:11,
147:12, 147:22,
147:23, 148:15,
148:24, 149:5,
149:10, 149:14,
149:23, 150:14,
151:6, 151:25,
152:3, 152:5, 152:7,
152:10, 152:13,
152:17, 152:18,
152:19, 152:25,
153:1, 153:2, 153:8,
153:12, 153:16,
153:17, 153:18,
153:24, 154:2,
154:13, 154:14,
154:19, 154:22,
154:25, 155:4,
156:1, 156:14,
156:15, 157:4,
157:6, 157:8,
157:13, 157:14,

157:19, 157:21,
158:4, 158:16,
158:22, 158:23,
158:25, 159:1,
159:8, 159:9,
159:11, 159:25,
160:2, 160:5,
161:17, 162:6,
162:10, 162:17,
162:25, 163:19,
163:20, 164:15,
164:21, 164:23,
165:2, 165:6, 165:9,
165:12, 165:15,
165:16, 165:18,
165:21, 166:2,
166:7, 166:9,
166:11, 166:18,
166:22, 167:15,
167:23, 167:25,
168:2, 168:5, 168:9,
169:4, 169:12,
169:15, 169:16,
170:2, 170:7,
170:24, 171:10,
171:11, 171:18,
171:22, 172:10,
173:1, 173:7,
173:11, 174:7,
175:3, 175:13,
175:19, 175:20,
175:23, 176:1,
176:6, 176:7,
176:11, 176:14,
176:16, 177:6,
178:7, 178:14,
178:23, 178:24,
178:25, 179:6,
179:10, 179:23,
180:4, 180:5, 181:5,
182:1, 182:4, 182:7,
183:11, 183:23,
184:1, 184:7,
184:10, 184:17,
184:18, 185:8,
186:2, 186:8,
186:14, 186:18,
186:19, 186:23,
186:24, 187:14,
187:17, 188:15,
190:17, 190:21,
191:5, 191:25,
192:6, 192:10,
192:15, 192:24,
193:5, 193:9,
193:13, 193:14,
193:15, 193:16,
193:17, 193:19,
194:2, 194:3, 194:4,
194:6, 194:11,
194:12, 194:14,

194:22, 195:2,
195:7, 195:8,
195:13, 195:15,
196:5, 196:10,
196:14, 196:20,
196:21, 196:25,
197:4, 197:11,
197:18, 197:21,
198:1, 198:3,
198:10, 198:16,
198:17, 199:1,
199:5, 199:9,
199:13, 199:18,
199:25, 200:1,
200:7, 200:10,
200:11, 200:16,
200:21, 201:2,
201:7, 201:14,
201:18, 201:23,
201:24, 202:3,
202:5, 202:9,
202:11, 202:16,
202:21, 203:2,
203:3, 203:4, 203:7,
203:8, 203:13,
203:23, 204:3,
204:6, 204:9,
204:12, 204:15,
204:23, 204:24,
205:16, 205:19,
207:3, 208:21,
209:12, 210:5,
210:12, 213:7,
213:14, 214:5,
214:17, 214:18,
215:6, 217:17,
218:6, 218:8,
218:10, 218:14,
218:19, 219:11,
222:10, 222:19,
223:23, 224:16,
225:3, 229:17,
229:22, 230:7,
234:10, 234:16,
234:20, 235:14,
235:15, 235:20,
236:3, 236:7, 236:9,
236:10, 236:14,
239:11, 239:13,
240:23, 241:8,
241:25, 244:14,
244:19, 245:13,
245:16, 245:24,
245:25, 246:3,
246:18, 246:21,
249:5, 249:9,
249:10, 251:13,
252:7, 252:11,
252:12, 252:15,
252:16, 252:22,
252:23, 252:25

YOU'D [3] - 68:13,
137:24, 238:8
YOU'LL [1] - 74:19
YOU'RE [6] - 33:10,
38:21, 116:24,
157:19, 158:23,
196:18
YOU'VE [5] - 64:4,
115:16, 139:21,
167:24, 169:2
YOUNG [1] - 106:17
YOUNGER [2] - 72:21,
106:18
YOUR [419] - 4:1, 4:5,
4:8, 4:13, 4:16, 4:19,
4:22, 4:25, 5:3, 5:7,
5:9, 5:14, 5:17, 5:22,
6:2, 6:6, 8:6, 8:9,
8:17, 8:24, 9:7, 9:9,
9:15, 9:17, 9:22,
13:4, 15:9, 15:24,
15:25, 16:3, 16:20,
20:3, 20:21, 21:20,
21:24, 22:14, 22:16,
23:24, 24:9, 24:13,
24:15, 24:22, 25:12,
25:17, 25:19, 25:21,
25:23, 26:20, 27:1,
27:9, 27:19, 28:4,
28:23, 29:6, 29:13,
29:21, 30:20, 30:23,
31:13, 31:16, 32:15,
32:24, 33:3, 33:15,
33:23, 34:10, 34:11,
34:19, 34:25, 35:12,
36:12, 36:16, 37:14,
37:25, 38:13, 38:14,
38:24, 39:12, 40:14,
40:20, 40:25, 41:8,
41:21, 41:24, 42:16,
42:19, 44:20, 45:2,
45:10, 45:21, 46:2,
46:5, 46:7, 46:15,
46:25, 48:19, 49:4,
49:23, 50:14, 50:18,
51:14, 51:22, 53:1,
53:13, 54:3, 54:6,
54:7, 54:15, 54:21,
55:9, 55:10, 55:21,
55:24, 55:25, 56:23,
56:25, 57:4, 57:8,
57:19, 57:24, 58:1,
58:2, 58:8, 59:13,
60:13, 60:15, 61:2,
61:15, 62:12, 62:15,
64:15, 64:22, 65:4,
65:10, 65:12, 65:16,
65:25, 66:6, 66:13,
67:25, 68:1, 68:5,
68:14, 73:11, 83:23,

85:10, 86:8, 86:23,
87:17, 88:2, 90:10,
90:14, 96:2, 97:3,
97:8, 97:11, 97:14,
97:15, 97:17, 98:1,
98:8, 98:17, 98:18,
98:23, 100:18,
100:20, 103:10,
104:25, 105:5,
108:19, 109:1,
109:16, 109:25,
111:5, 111:7,
112:17, 112:21,
112:25, 113:10,
113:13, 113:14,
113:18, 113:24,
114:23, 115:10,
116:10, 116:13,
116:19, 116:25,
117:12, 117:19,
117:22, 118:9,
118:10, 118:13,
118:20, 119:3,
119:8, 119:20,
119:23, 120:11,
120:16, 120:20,
121:6, 121:8,
121:10, 121:13,
121:14, 122:21,
123:4, 124:17,
126:5, 126:15,
126:6, 128:11,
128:13, 130:5,
130:19, 130:23,
130:24, 131:1,
131:11, 132:22,
132:23, 133:19,
134:1, 136:7,
136:18, 136:19,
137:4, 137:22,
137:25, 138:20,
138:25, 139:3,
139:11, 139:14,
139:21, 139:23,
140:6, 140:13,
141:8, 142:15,
142:20, 142:21,
143:4, 143:11,
143:18, 143:19,
145:5, 145:13,
146:16, 146:17,
147:12, 147:16,
148:2, 148:3,
148:11, 150:1,
151:15, 151:20,
151:21, 152:18,
152:21, 154:14,
154:15, 155:15,
156:2, 156:23,
157:1, 158:1, 158:3,
158:6, 158:25,

Exhibit 137                                                                                    JA-0001928

160:11, 160:18,
161:15, 162:7,
162:8, 162:11,
162:14, 162:20,
162:24, 163:2,
163:13, 164:7,
164:9, 165:2,
165:22, 165:25,
166:13, 166:19,
166:22, 166:23,
167:15, 167:19,
167:24, 168:2,
169:12, 169:16,
170:3, 170:21,
171:9, 171:10,
171:14, 171:25,
172:11, 172:16,
173:4, 173:11,
174:12, 178:3,
178:15, 178:22,
180:2, 180:7,
181:21, 184:8,
188:14, 188:18,
189:7, 189:16,
190:2, 190:24,
191:5, 191:13,
191:17, 192:2,
193:8, 193:17,
194:7, 194:12,
194:23, 196:5,
198:9, 198:18,
199:18, 203:4,
203:9, 203:21,
203:23, 203:25,
204:2, 204:7,
204:12, 204:15,
204:18, 205:23,
209:14, 210:3,
210:7, 210:18,
210:21, 212:8,
212:11, 213:9,
214:1, 214:10,
218:6, 218:7,
218:17, 218:21,
224:11, 228:3,
232:1, 234:9,
234:11, 235:14,
235:18, 235:19,
235:21, 236:5,
236:13, 236:22,
236:24, 237:24,
238:2, 238:15,
238:16, 238:22,
239:12, 239:25,
240:17, 240:20,
240:24, 241:15,
241:24, 242:18,
242:21, 243:21,
244:2, 244:19,
245:7, 245:10,
245:18, 245:22,

245:23, 246:4,
246:17, 246:21,
249:7, 249:17,
250:11, 252:9,
252:10, 252:11,
252:17, 252:25
**YOURS** [1] - 110:1

## Z

**ZERO** [5] - 94:5,
219:6, 219:7, 219:8,
219:15
**ZOLNA** [1] - 70:19
**ZOOM** [1] - 207:13
**ZOOMING** [1] - 149:19
**ZUBIK** [13] - 26:9,
33:24, 40:3, 99:15,
99:20, 99:23,
144:14, 226:18,
226:22, 226:24,
227:3, 232:22, 249:6

Exhibit 137

JA-0001929

Draft—For Discussion Purposes

| | Case | Plaintiffs | Type: For-profit (F), Nonprofit (N), House of Worship or IA (H), Church Plan (C), Pro-life (P), Grandfathered (G) | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICPs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D | E | F | G | H | I | J |
| 2 | Am. Pulverizer Co. v. U.S. Dep't of Health and Human Servs., No. 6:12-cv-03459, 2012 WL 6951316 (W.D. Mo. Dec. 20, 2012); | | F | 175 employees | Complaint | Yes | | 175 | 175 | |
| 3 | American Family Association v. Sebelius, 1:13-cv-00932-SA-DAS (D. Miss. Feb. 20, 2013) | | N | 135 employees | Complaint | Yes | | 135 | 135 | |
| 4 | Annex Med., Inc. v. Burwell, No. 13-1118, 2013 WL 1276025 (8th Cir. Feb. 1, 2013) | | F | 18 employees | Complaint | Yes | | 18 | 18 | |
| 5 | Archdiocese of St. Louis v. Burwell, No. 4:13-cv-02300 (E.D. MO), No. 14-3016 (8th Cir.) | Archdiocese of St. Louis | H | 7,800 employees/staff | Complaint | No | Diocese self-insured plan (see Brandt v Burwell note below' | 0 | 0 | |
| 6 | | Catholic Charities of St. Louis | C | 1600 employees | Complaint | No | same | 0 | 0 | |
| 7 | Armstrong v. Burwell, No. 1:13-cv-00563-RBJ (D. Colo. Sept. 17, 2013); gov't appeal dismissed Sept. 4, 2014 (10th Cir. order); | | F | 730 employees | Complaint | Yes | | 730 | 730 | |
| 8 | Association of Christian Schools International v. Burwell, No. 1:14-cv-2966 (D. Colo.), No. 14-1492 (10th Cir.) | Association of Christian Schools International | N | 140 employees | Complaint | Yes | | 140 | 140 | |
| 9 | | Samaritan Ministries International | N | 133 employees | Complaint | Yes | | 133 | 133 | |
| 10 | | Taylor University | N | 1,900 Students; 641 Employees | Complaint | Students = no; employees = yes | Complaint does not state that they offer a student health plan; therefore students not counted | 641 | 641 | 0 |
| 11 | | Indiana Wesleyan University | N | 15,000 students; 3,565 employees (1,018 FT and 2,547 PT) | Complaint | Students = no; employees = partial | Complaint does not state that they offer a student health plan; therefore students not counted. Complaint states that 890 employees enroll in the plan. Because other entities usually provide the overall number of employees, not the number enrolled in the plan, and in the IFR, we estimate 62% of all employees are in plans, this number is upscaled to 890/62%=1435. | 1,435 | 1,435 | 0 |
| 12 | Autocam Corp. v. Burwell, 730 F.3d 618 (6th Cir. Sept. 17, 2013), | Autocam | F | 478 employees | Complaint | Yes | | 478 | 478 | |
| 13 | | Autocam Medical | F | 183 employees | Complaint | Yes | | 183 | 183 | |
| 14 | Ave Maria Foundation v. Burwell, No. 2:13-cv-15198 (E.D. Mich.), No. 14-1310 (6th Cir.) | The Ave Maria Foundation | N | 51 employees | Estimated number based on online information | Yes | | 51 | 51 | |
| 15 | | Ave Maria Communications | N | 19 employees | Form W-3 filing | Yes | | 19 | 19 | |
| 16 | | Domino's Farms Petting Farm | N | 18 employees | Form W-3 filing | Yes | | 18 | 18 | |
| 17 | | Rhodora J. Donahue Academy, Inc. | N | 26 employees | Website | Yes | | 26 | 26 | |
| 18 | | Thomas More Law Center | N | 14 employees | Form W-3 filing | Yes | | 14 | 14 | |
| 19 | Ave Maria School of Law v. Burwell, No. 2:13-cv-00795 (M.D. Fl.), Nos. 14-15777 (11th Cir.) | | N | 68 employees | Complaint | Employees = yes; students = no | Complaint does not state that they offer a student health plan; therefore students not counted | 68 | 68 | 0 |
| 20 | Ave Maria University v. Burwell, No. 2:13-cv-00630 (M.D. Fla.), Nos. 14-15780 (11th Cir.) | | N | 150 employees | Complaint | Employees = yes; students = no | Complaint does not state that they offer a student health plan; therefore students not counted | 150 | 150 | 0 |
| 21 | Barron Indus., Inc. v. Burwell, No. 1:13-cv-01330-KBJ (D.D.C. Sept. 25, 2013); | | F | 56 employees | Complaint | Yes | | 56 | 56 | |
| 22 | Beckwith Elec. Co. v. Burwell, No. 8:16-cv-1944 (M.D. Fla.) | | F | 126 employees | Complaint | Yes | | 126 | 126 | |
| 23 | Belmont Abbey College v. Sebelius, et al., No. 1:11-cv-01989 (D.D.C. Nov. 10, 2011) | | F | 1,600 students; 305 employees | Complaint | Yes | | 1,600 students; 305 employees | 305 | 1,600 |
| 24 | Bick Holdings, Inc. v. Burwell, No. 4:13-cv-00462-AGF (E.D. Mo. Apr. 1, 2013); | | F | 196 employees | Complaint | Yes | | 196 | 196 | |
| 25 | Brandt v. Burwell, No. 2:14-cv-00681 (W.D. Pa.), Nos. 14-3663, 14-4087 (3d Cir.) | Diocese of Greensburg | H | 3,100 employees; 5,000 other participants in plan (this is a high number- it includes employees from other Dioceses) | Complaint | No | Diocese self-insured plans; Government argued that these and all similar Catholic diocese-sponsored self-insured plans and entities participating in such plans that are litigants represented by Jones Day likely qualify to be church plans exempt from ERISA. See, e.g., Doc. # 23, 2:14-cv-00681-AJS (W.D. Pa.) We cannot force such plan TPAs to offer contraceptive payments, and it is likely the churches will tell them not to, and the TPAs will not make the offers. | 0 | 0 | |
| 26 | | Catholic Charities | C | 18 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 27 | | St. John School | C | 13 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |

Exhibit 138    JA-0001930

Draft—For Discussion Purposes

| Case | Plaintiffs | Type: For-profit (F), Nonprofit (N), House of Worship or IA (H), Church Plan (C), Pre-life (P), Grandfathered (G) | Number of Employees/Students | Document employee number located within | Are students/employees counted in final form? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICPs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|---|
| Briscoe v. Burwell, No. 1:13-cv-00285-WYD-BNB (D. Colo. Sept. 6, 2013); gov't appeal dismissed Sept. 4, 2014 (10th Cir. order) | Briscoe owns all plaintiff organizations involved: Continuum Health Partnerships, Inc./ Mountain States Health Properties, LLC/ Continuum Health Management, LLC/ CH-Greeley, LLC | F | 200 employees | Complaint | Yes | | 200 | 200 | |
| Catholic Benefits Association LCA v. Burwell (CBA I), No. 5:14-cv-00240 (W.D. Okla.), Catholic Benefits Association LCA v. Burwell (CBA II), No. 5:14-cv-00685 (W.D. Okla.),Nos. 14-6171, 14-6163, 15-6029, 15-6037, 15-6139, 16-6030, 16-6217 (10th Cir.) | Catholic Benefits Association | N | Unknown | N/A | | To estimate the number in CBA plans that may be effected, 10,000 used. | CBA does not carry its own insurance | 0 | 10,000 | |
| | Catholic Insurance Company | N | Unknown | N/A | | CBA owns CIC, so we assume CIC also does not offer insurance | 0 | 0 | |
| | Archdiocese of Baltimore | H | 5, 500 participants | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Cathedral Foundation (AKA Catholic Review Media) | C | 32 employees | Complaint | No | | 0 | 0 | |
| | Archdiocese of Oklahoma City- Complaint lists Mount St. Mary, St. Ann, and Office of Catholic Schools as sub-ministries | H | Unknown (see St. Ann, Mount St. Mary and Office of Catholic Schools below) | | No | Diocese self-insured plan | 0 | | |
| | St. Ann | C | 78 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Mount St. Mary | C | Unknown | | No | Diocese self-insured plan | 0 | 0 | |
| | Office of Catholic Schools | C | | | | | 0 | 0 | |
| | Villa St. Francis Catholic Care Center | N | 100 participants | Complaint | Yes | | 100 | 100 | |
| | Goodwill Publishers | N | 140 employees | Complaint | Yes | | 140 | 140 | |
| | Catholic Charities Oklahoma City | C | 103 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | All Saints | C | Unknown | | No | Diocese self-insured plan | 0 | 0 | |
| Catholic Charities of the Archdioceses of Philadelphia v. Burwell, No. 2:14-cv-3096 (E.D. Pa.), No. 14-3126 (3d Cir.) | Catholic Charities and Family Services, Diocese of Norwich | N | 69 employees | Second Complaint | Yes | | 69 | 69 | |
| | Catholic Social Services | C | 626 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Francis Homes for Boys | C | 227 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Edmund's Home for Children | C | 226 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Don Guanella Village | C | 413 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Divine Providence Village | C | 667 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Gabriel's System | C | 458 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Community Services | C | 92 | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Nutritional Development Services | C | 64 | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Villa St. Martha | C | 117 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Monica Manor | C | 356 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. John Neumann Nursing Home | C | 360 Employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Immaculate Mary Home | C | 490 Employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Francis Country Home | C | 488 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Martha Manor | C | 272 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Mary Manor | C | 339 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. John Vianney Center | C | 84 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Clinical Consultants | C | 19 | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| Catholic Diocese of Beaumont v. Burwell, No. 1:13-cv-00709 (E.D. Tex.), No. 14-40212 (5th Cir.) | Diocese | H | 950 employees; 232 staff at schools | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | |
| | Catholic Charities of Southeast Texas, Inc. | N | 18 employees | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | |
| Catholic Diocese of Biloxi v. Burwell, No. 1:14-cv-00146 (S.D. Miss.) | Diocese of Jackson | H | 900 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | H | 140 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Vicksburg | C | 70 employees | Website | No | Diocese self-insured plan | 0 | 0 | |
| | St Joseph | C | 85 employees | Website | No | Diocese self-insured plan | 0 | 0 | |
| | Diocese of Biloxi | H | 600 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | De L'epee Deaf Center | N | 5 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Social & Community Services Inc. | C | 20 employees | Form W-3 filing | no | Diocese self-insured plan | 0 | 0 | |
| | Resurrection Catholic and Sacred Heart | | 200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |

669265

Exhibit 138

JA-0001931

Draft—For Discussion Purposes

| | Case | Plaintiffs | Type: For-profit (F), Nonprofit (N), House of Worship or IA (H), Church Plan (C), Pre-life (P), Grandfathered (G) | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW-IA and SICPs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D | E | F | G | H | I |
| 69 | | St. Dominic-Jackson Memorial Hospital and affiliated locations and programs | G | 2,200 employees | Complaint | No | Self-insured plan sponsored by Catholic affiliated hospital; grandfathered and already omits contraceptives, so could retain grandfathered status or pursue church plan status to continue omitting. | 0 | 0 | |
| 70 | Conlon, Bishop of Catholic Diocese of Joliet v. Sebelius, 1:12-cv-03932 (N.D. Ill. May 21, 2012) | Diocese of Joliet | H | At least 1,570 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 71 | | Catholic Charities of Joliet | C | 240 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 72 | | Diocese of Springfield | H | 2585 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 73 | | Catholic Charities of Springfield | N | 200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 74 | | Catholic Charities of Chicago | N | 2700 employees | Complaint | Yes | Self-funded welfare benefit plan but not sure if church plan | 2,700 | 2,700 | |
| 75 | Catholic Diocese of Nashville v. Burwell, No. 3:13-cv-1303 (M.D. Tenn.); No. 13-6640 (6th Cir.) | Diocese of Nashville | H | 1200 employees | Complaint | No | House of Worship, fully insured | 0 | 0 | |
| 76 | | Catholic Charities | N | 115 employees | Complaint | Yes | | 115 | 115 | |
| 77 | | Aquinas College | N | 16 employees | Website | employees: yes; students: no | Website/news reports indicate recent drastic downsizing of workforce; students not counted because complaint does not allege a student plan | 16 | 16 | 0 |
| 78 | | Camp Marymount | N | 75 employees | Complaint | Yes | | 75 | 75 | |
| 79 | | MQA | N | 85 employees | Complaint | Yes | | 85 | 85 | |
| 80 | | St. Mary Villa | N | 50 employees | Complaint | Yes | | 50 | 50 | |
| 81 | | Dominican Sisters | H | 23 employees | Complaint | No | Religious order | 0 | 0 | |
| 82 | Catholic Diocese of Peoria v. Sebelius, 1:12-cv-01276 JES-BGC (C.D. Ill. August 9, 2012) | | H | Unknown | | No | Diocese self-insured plan (court order, 2013 WL 74240), and grandfathered | 0 | 0 | |
| 83 | Catholic Health Care System v. Burwell, No. 1:12-cv-02542 (E.D.N.Y.), No. 14-427 (2d Cir.); PACER | Archdiocese of New York | H | 10,000 employees | Complaint | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242 | 0 | 0 | |
| 84 | | ArchCare | C | 4,000 employees | Complaint | No | Catholic hospital self-insured plan | 0 | 0 | |
| 85 | | Catholic Health Services of Long Island | C | 17,000 employees | Complaint | No | Catholic hospital self-insured plan | 0 | 0 | |
| 86 | | The Diocese of Rockville Centre | H | 2,000 employees | Complaint | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242 | 0 | 0 | |
| 87 | | Monsignor Farrel High School | H | 73 employees | Website | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242 | 0 | 0 | |
| 88 | | Cardinal Spellman High School | H | 100 employees | Complaint | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242 | 0 | 0 | |
| 89 | Christian & Missionary Alliance Foundation, Inc., Nos. 2:14-cv-00580 (M.D. FL.), Nos. 15-11437, 15-11635 (11th Cir.) | CMA d/b/a Shell Point Retirement Center | | 1247 employees | Form W-3 filing | Yes | | 1,247 | 1,247 | |
| 90 | | Alliance Community for Retirement Living | | 344 employees | Form W-3 filing | Yes | | 344 | 344 | |
| 91 | | Alliance Home of Carlisle | | 219 employees | Form W-3 filing | Yes | | 219 | 219 | |
| 92 | | Town and Country Manor | | 365 employees | Form W-3 filing | Yes | | 365 | 365 | |
| 93 | | Simpson University | | 815 employees | Complaint | employees: yes; students: no | Complaint does not seek relief for any student plan | 815 | 815 | 0 |
| 94 | | Crown College | | 114 employees | Form W-3 filing; student enrollment: https://www.crown.edu/about/quick-facts/ ("nearly 1,300 students") | Yes | | 1,275 students; 114 employees | 114 | 1,275 |
| 95 | Christian Employers Alliance v. Burwell, No. 3:16-cv-309 (D.N.D.) | Christian Employers Alliance | | Unknown | | No | No claim was made for CEA plans, and no list of members beyond TBC and TIC | 0 | | |
| 96 | | Trinity Bible College | | 249 employees | Form W-3 filing | employees: yes; students: no | complaint does not mention student plan | 249 | 249 | |
| 97 | | Treasure Island Coins | | 9 staff | Website | Yes | | 9 | 9 | |
| 98 | Colorado Christian Univ. v. Burwell, No. 1:13-cv-02105 (D. Colo.), No. 14-1329 (10th Cir.) | Colorado Christian University | | 5,300 students; 680 employees | Complaint | Yes | | 5,300 students; 680 employees | 680 | 5,300 |
| 99 | Conestoga Wood Specialties Corp. v. Burwell (Burwell v. Hobby Lobby Stores, Inc.), No. 13-356 (U.S. June 30, 2014) | Conestoga Wood Specialties Corp. (Individual operators of Conestoga Wood Specialties Corporation are the three other named plaintiffs) | | 950 employees | Complaint | Yes | | 950 | 950 | |

669266

Exhibit 138

JA-0001932

Draft—For Discussion Purposes

| | Case | Plaintiffs | Type: For-profit (F), Nonprofit (N), House of Worship or IA (H), Church Plan (C), Pre-life (P), Grandfathered (G) | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW-IA and SICPs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | E | F | G | H | I | J |
| 100 | Diocese of Cheyenne v. Burwell, No. 2:14-cv-00021 (D. Wyo.), No. 14-8040 (10th Cir.) | Diocese of Cheyenne | | 16 employees plus over 100 teachers | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 101 | | Catholic Charities | | 6 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 102 | | St. Anthony School | | 41 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 103 | | St. Joseph's Home | | 130 employees, 62 orphan children | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 104 | | JPIICS | | 20 | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 105 | | Wyoming Catholic College | | 32 employees | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | 0 |
| 106 | Diocese of Fort Wayne-South Bend Inc. v. Burwell, No. 1:12-cv-00159 (N.D. Ind.), No. 14-1431 (7th Cir.) | Diocese of Fort Wayne South Bend | | 2,741 employees | Complaint | No | Diocese self-insured plan; also grandfathered | 0 | 0 | |
| 107 | | Catholic Charities | | 39 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| 108 | | St Anne Home | | 310 employees | Complaint | Yes | Self-insured plan, but not sure if it is a church plan | 310 | 310 | |
| 109 | | University of St Francis | | 2,300 students, 413 employees | Complaint | employees: yes; students: no | No student plan discussed; Employees are offered a self-insured health plan, but not sure it is a church plan, so included | 413 | 413 | 0 |
| 110 | | Our Sunday Visitor | | 300 employees | Complaint | Yes | Self-insured plan, but not sure if it is a church plan | 300 | 300 | |
| 111 | | Specialty Physicians | | 342 employees | Complaint | Yes | | 342 | 342 | |
| 112 | | Franciscan Alliance | | 18,000 employees | Complaint | Partial | All but 1,733 employees are on a church plan exempt from ERISA. See: https://www.franciscanhealth.org/sites/default/files/2015%20employee%20benefit%20booklet.pdf (Only employees in Illinois are in BCBS plans and there are 1733 of those employees according to complaint) | 1,733 | 1,733 | |
| 113 | Doboszenski & Sons, Inc. v. Burwell, No. 0:13-cv-03148-JNE-FLN (D. Minn. Nov. 11, 2013); | | | 32 employees | Complaint | Yes | | 32 | 32 | |
| 114 | Dobson v. Burwell, No. 1:13-cv-03326 (D. Colo.), No. 14-1233 (10th Cir.) | | | 28 employees | Complaint | Yes | | 28 | 28 | |
| 115 | Domino's Farms Corporation v. Sebelius et al., No. 12 cv-15488 (E.D. Mich. Dec. 20, 2012) | | | 89 employees | Complaint | Yes | | 89 | 89 | |
| 116 | Dordt Coll. v. Burwell, No. 5:13-cv-04100 (N.D. Iowa, Western Division), No. 14-2726 (8th Cir.) | Dordt College | | 1,400 students, 280 employees | Complaint | Yes | | 1,400 students, 280 employees | 280 | 1,400 |
| 117 | | Cornerstone University | | 2,923 students, 294 employees | Complaint | employees: yes; students: no | No student plan discussed | 294 | 294 | 0 |
| 118 | East Texas Baptist Univ. v. Burwell, 4:12-cv-03009 (S.D. Tex.), No. 14-20112 (5th Cir.) | Houston Baptist University | | 2,589 students, 416 employees | Complaint | No | Self-insured church plan | 0 | 0 | 0 |
| 119 | | East Texas Baptist University | | 1,290 students, 283 employees | Complaint | Yes | | 1,290 students, 283 employees | 283 | 1,290 |
| 120 | | Westminster Theological Seminary (Intervenor) | | 60 FT, 65 PT employees, 620 students | Complaint in intervention | employees: yes; students: no | complaint does not mention student plan | 125 | 125 | 0 |
| 121 | Eden Foods, Inc. v. Burwell, No. 13-1677 (6th Cir. June 28, 2013), | | | 128 employees | Complaint | Yes | | 128 | 128 | |
| 122 | Eternal Word Television Network, Inc. v. Burwell, No. 1:13-cv-00521 (S.D. AL.), No. 14-12696 (11th Cir.) | | | 350 employees | Complaint | Yes | | 350 | 350 | |
| 123 | Fellowship of Catholic University Students v. Burwell No. 1:13-cv-03263-MSK-KMT (D. Colo. Apr. 23, 2014) | | | 450 employees | Complaint | No | Case resolved on basis that plaintiff is integrated auxiliary | 0 | 0 | |
| 124 | Feldt & Co., Inc. v. Burwell, No. 13-CV-2635 DWF/JJK (D. Minn. Nov. 8, 2013); | Complaint lists two owners of the company as individual plaintiffs | | 4 employees | Website | Yes | | 4 | 4 | |
| 125 | Franciscan University v. Sebelius, 2:12-CV-440 (S.D. Ohio) | | | Unknown | Complaint | No | Sued while grandfathered and then dropped student plan. With no additional suit, no apparent affect from rule. | 0 | 0 | 0 |
| 126 | Geneva College v. Burwell, No. 2:12-cv-00207 (W.D. Pa.), Nos. 13-3536, 14-1374 (3rd. Cir.) | Geneva College | | 1,850 students, 350 employees | Complaint | Yes | | 1,850 students, 350 employees | 350 | 1,850 |
| 127 | | Seneca Hardwood Lumber | | 22 employees | Complaint | No | Permanent injunction shields from previous rule | 0 | 0 | |
| 128 | Gilardi v. U.S. Dep't of Health and Human Servs., No. 13-5069, 2013 WL 5854246 (D.C. Cir. Nov. 1, | Freshway Foods | | 340 employees | Complaint | Yes | | 340 | 340 | |
| 129 | | Freshway Logistics | | 55 employees | Complaint | Yes | | 55 | 55 | |
| 130 | Grace Schools v. Burwell, No. 3:12-cv-00459 (N.D. Ind.), No. 14-1430 (7th Cir.) | Grace College and Seminary | | 2,700 students, 457 employees | Complaint | Yes | | 2,700 students, 457 employees | 457 | 2,700 |
| 131 | | Biola University | | 6,222 students, 856 employees | Complaint | Yes | | 6,222 students, 856 employees | 856 | 6,222 |

Clean version

669267

Exhibit 138          JA-0001933

Draft—For Discussion Purposes

| Case | Plaintiffs | Type: For-profit (F), Nonprofit (N), House of Worship or IA (H), Church Plan (C), Pre-life (P), Grandfathered (G) | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW-IA and SICP's) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|---|
| Grote Indus. LLC v. Burwell, No. 13-1077, 2013 WL 5960692 (7th Cir. Nov. 8, 2013), cert. denied sub nom. Burwell v. Korte, No. 13-937 (U.S. July 1, 2014); | | | 1,148 employees | Complaint | Yes | | 1,148 | 1,148 | |
| Hall v. Burwell, No. 0:13-cv-00295-JRT-LIB (D. Minn. Apr. 2, 2013); | | | Approximately 50 employees | Complaint and online news reports | Yes | | 50 | 50 | |
| Hartenbower v. U.S. Dep't of Health and Human Servs., No. 1:13-cv-02253 (N.D. Ill. Apr. 18, 2013); | Hart Electric | | 54 employees (including owners) | Complaint | Yes | | 54 | 54 | |
| | H.I. Hart | | 7 employees | Complaint | Yes | | 7 | 7 | |
| Hastings Chrysler Center, Inc. v. Burwell, No. 0:14-cv-00265-PAM-JJG (D. Minn. May 28, 2014); | | | 60 employees | Complaint | Yes | | 60 | 60 | |
| Hobby Lobby Stores, Inc., et al. v. Sebelius, et al., No. | Hobby Lobby | | 13,240 employees | Complaint | Yes | | 13,240 | 13,240 | |
| CIV-12-1000-HE (W.D. Okla. Oct. 2, 2012); Burwell | Mardel | | 372 employees | Complaint | Yes | | 372 | 372 | |
| Holland v. U.S. Dep't of Health and Human Servs, No. 13-15487 (S.D. W. Va. July 15, 2014); | | | 150 employees | Complaint | Yes | | 150 | 150 | |
| Infrastructure Alternatives, Inc. v. Burwell, No. 1:13-cv-00031-RJJ (W.D. Mich. Sept. 30, 2013) | | | 70 employees | Complaint | Yes | | 70 | 70 | |
| Insight for Living Ministries v. Burwell, No. 4:14-cv-675 (E.D. Tex.), No. 15-40031 (5th Cir.) | | | 108 employees | Form W-3 filing | Yes | | 108 | 108 | |
| Johnson Welded Prods. v. Burwell, No. 1:16-cv-557 (D.D.C.) | | | 421 employees (including Lilli Johnson) | Complaint | Yes | | 421 | 421 | |
| Korte v. Burwell, No. 13-3841, 2013 WL 5960692 (7th Cir. Nov. 8, 2013), cert. denied No. 13-937 (U.S. July 1, 2014); | | | 90 employees | Complaint | Yes | | 90 | 90 | |
| Legatus v. Burwell, No. 2:12-cv-12061-RHC-MJH (E.D. Mich. Dec. 20, 2013) | Legatus | | 69 employees | Complaint | Yes | | 69 | 69 | |
| | Weingartz Supply Company, W&P Management LLC, and subsidiaries | | 170 employees | Complaint | Yes | | 170 | 170 | |
| Lindsay v. U.S. Dep't of Health and Human Servs., No. 13-cv-1210 (N.D. Ill. Mar. 20, 2013); | | | 70 employees | Complaint | Yes | | 70 | 70 | |
| Little Sisters of the Poor Home for the Aged v. Burwell, No. 1:13-cv-2611 (D. Colo.), No. 13-1540 (10th Cir.) | Christian Brothers Employee Benefit Trust ( Little Sisters uses Christian Brothers Employee Benefit Trust, and Christian Brothers Services is the TPA for the Christian Brothers Employee Benefit Trust) | | 5,000 employees | Complaint | No | Self-insured church plan | 0 | 0 | |
| Louisiana Coll. v. Burwell, No. 1:12-cv-00463 (W.D. La.), No. 14-31167 (5th Cir.) | | | 1,450 students, 260 employees | Complaint | No | | 0 | 0 | 0 |
| March for Life v. Burwell, No. 1:14-cv-1149 (D.D.C.), No. 15-5301 (D.C. Cir.) | | | 2 employees covered in plan; less than 10 overall | | No | All employees must/do oppose the coverage; therefore not counting as affected by rule | 0 | | |
| Media Research Center v. Sebelius, No. 1:14-CV-379 (E.D. Virginia) | | | 114 employees | Complaint | Yes | | 114 | 114 | |
| Mersino Mgmt. Co. v. Burwell, No. 13-1944 (6th Cir. July 9, 2014) | | | 110 employees | Complaint | Yes | | 110 | 110 | |
| Michigan Catholic Conf. v. Burwell, No. 1:13-cv-1247 (W.D. Mich.), No. 13-2723 (6th Cir.) | Michigan Catholic Charities | | 6,429 employees | Complaint | No | Self-insured church plan | 0 | 0 | |
| | Catholic Charities | | 55 employees | Complaint | No | Self-insured church plan | 0 | 0 | |
| Midwest Fastener Corp. v. Burwell, No. 1:13-cv-01337-ESH (D.D.C. Oct. 16, 2013); | | | 187 employees | Complaint | Yes | | 187 | 187 | |
| MK Chambers Co. v. Dep't of Health and Human Servs., No. 13-cv-11379 (E.D. Mich. Nov. 21, 2014) | | | 106 employees | Business profile on manta.org | Yes | | 106 | 106 | |
| Nagle, Christopher, et al. v. Kathleen Sebelius, et al.; No. 2:13-cv-12036-VAR-DRG (E.D. Mich. May 10, 2013) (AKA "M&N Plastics") | | | 109 employees | Complaint | Yes | | 109 | 109 | |
| Newland v. Burwell, 881 F. Supp. 2d 1287 (D. Colo. July 27, 2012), affirmed on appeal, No. 12-1380 (10th Cir. Oct. 3, 2013) | | | Unknown | | No | Permanent injunction | 0 | | |
| O'Brien v. U.S. Dep't of Health & Human Servs., No. 12-3357 (8th Cir. Nov. 28, 2012) | | | 87 employees | Complaint | Yes | | 87 | 87 | |
| Ozinga v. Burwell, No. 1:13-cv-3292 (N.D. Ill.), No. 15-3648 (7th Cir.) | | | 675± employees | Complaint | Partial | Only 110 obtain insurance through the plan that would be counted by the exemption. This is upscaled to 110/625*n=178 | 178 | 178 | |
| Persico v. Burwell, No. 1:13-cv-0303 (W.D. Pa.), Nos. 14-1376 (3d Cir.); | Catholic Diocese of Erie | | 1,500 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | St Martin Center | | 61 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| formerly Most Reverend Donald W. Trautman, Bishop of the Roman Catholic Diocese of Erie, et al., v. | Prince of Peace Center | | 20 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| Sebelius; No. 1:12-cv-00123-SPB (W.D. Pa. May 30, | Erie Catholic Preparatory School | | 80 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| Priests for Life, No. 1:13-cv-01261 (D.D.C.), No. 13-5368 (D.C. Cir.) | | | 60 employees | Website | Yes | | 60 | 60 | |

Clean version

669268

Exhibit 138    JA-0001934

Draft—For Discussion Purposes

| Case | Plaintiffs | Type: For-profit (F), Nonprofit (N), House of Worship or IA (H), Church Plan (C), Pre-life (P), Grandfathered (G) | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICPs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|---|
| Randy Reed Auto. Inc. v. Burwell, No. 5:13-cv-6117-SJ-ODS (W.D. Mo. Dec. 3, 2013); | | | approximately 179 employees | Complaint | Yes | | 179 | 179 | |
| Reaching Souls Int'l, Inc. v. Burwell, No. 5:13-cv-01092 (W.D. Okla.), No. 14-6028 (10th Cir.) | | | 78,000 participants (pastors, employees, and their families) | Complaint | No | Self insured church plan | 0 | 0 | |
| Real Alternatives, Inc. v. Burwell, No. 1:15-cv-105 (M.D. Pa.), No. 16-1275 (3d Cir.) | | | 3 employees | Complaint | No | All employees must/do oppose the coverage; therefore not counting as affected by rule: | 0 | 0 | |
| Right to Life of Michigan v. Kathleen Sebelius; No. 1:13-CV-01202 (W.D. Mich. Nov. 22, 2013) | | | 43 employees | Complaint | No | All employees must/do oppose the coverage; therefore not counting as affected by rule: | 0 | 0 | |
| Roman Catholic Archbishop of Washington v. Burwell, No. 1:13-cv-01441 (D.D.C.), Nos. 13-5371, 14-5021 (D.C. Cir.) | Catholic University | | 7,000 students, 1,766 employees | Complain | Yes | | 7,000 students, 1,766 employees | 1,766 | 7,000 |
| | Archdiocese of Washington | | 2,100 eligible employees, 1,200 teachers/employees at schools | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Thomas Aquinas College | | 370 students, 78 eligible employees | Complaint | No | Church plan and complaint does not state that it offers student insurance | 0 | 0 | 0 |
| | Consortium of Catholic Academies | | 119 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Archbishop Carroll | | 70 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Don Bosco | | 51 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Information Center | | 9 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Mary of Nazareth | | 44 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | | 890 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Victory Housing | | 184 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| Roman Catholic Archdiocese of Atlanta v. Burwell, No. 1:12-cv-03489 (N.D. Ga.), Nos. 14-12890, 14-13239 (11th Cir.) | Roman Catholic Archdiocese of Atlanta | | 9,800 students, 4,200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | | 75 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | CENG | | 200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Diocese of Savannah | | 5,000 students, hundreds of employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| Roman Catholic Diocese of Dallas v. Sebelius, No. 3:12-cv-01589-B (N.D. Tex.) | | | 900 teachers/staff, 100+ employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| School of the Ozarks v. Rightchoice Managed Care, Inc., No. 6:13-cv-03157 (W.D. Mo.), No. 15-1330 (8th Cir.) | | | 1,442 students, 601 employees | Students - online; employees - Form w3 Filing | Employees only | Complaint does not say they offer a student plan | 601 | 601 | |
| Sharpe Holdings, Inc. v. Burwell, No. 2:12-cv-92 (E.D. Mo.) and CNS Intl Ministries, No. 14-1507 (8th Cir.) | Sharpe | | 50 employees | 2dism complaint and Linked in | Yes | | 50 | 50 | |
| | Ozark | | 51 employees | 2dism complaint and Linked in | Yes | | 51 | 51 | |
| | CNS International Ministries | | 204 employees | Form W-3 filing | Yes | | 204 | 204 | |
| | NIS Financial | | 49 employees | 2dism Complaint | Yes | | 49 | 49 | |
| | CNS Corp | | 49 employees | 2dism Complaint | Yes | | 49 | 49 | |
| | Heartland Christian College | | 12 employees | Form W-3 filing | Employees only | Complaint does not say they offer a student plan | 12 | 12 | 0 |
| Sioux Chief Mfg. Co. v. Burwell, No. 13-0036-CV-W ODS (W.D. Mo. Feb. 28, 2013); | | | 370 employees | Complaint | Yes | | 370 | 370 | |
| SMA, LLC v. Burwell, No. 0:13-cv-01375-ADM-LIB (D. Minn. July 8, 2013); | | | 35 employees | Complaint | Yes | | 35 | 35 | |
| Southern Nazarene Univ. v. Burwell, No. 5:13-cv-1015 (W.D. Okla.), No. 14-6026 (10th Cir.) | Southern Nazarene University | | 2,100 students, 505 employees | Complaint | Yes | | 2,100 students, 505 employees | 505 | 2,100 |
| | OK Weselan University | | 1,220 students, 557 employees | Complaint | Employees only | Complaint does not say they offer a student plan | 557 employees | 557 | 0 |
| | OK Baptist University | | 1,900 students, 328 employees | Complaint | Yes | | 1,900 students, 328 employees | 328 | 1,900 |
| | Mid America Christian University | | 1,447 stuendts, 298 employees | Complaint | No | Mid America Christian Univ is on Guidestone, a self-insured church plan | 0 | 0 | 0 |
| Stewart v. Burwell, No. 1:13-cv-01879 (D.D.C. Apr. 3, 2014); | Encompass Develop, Design & Construct, LLC | | 43 employees | Complaint | Yes | | 43 | 43 | |
| Stinson Electric, Inc. v. Burwell, No. 14-00830-PJS-JJG (D. Minn. April 30, 2014); | | | 19 employees | Business profile on manta.org | Yes | | 19 | 19 | |
| The C.W. Zumbiel Co. v. Burwell, No. 1:13-cv-01611 (D.D.C. Nov. 27, 2013); | | | 350 employees | Complaint | Yes | | 350 | 350 | |
| The Criswell College v. Sebelius, No. 3:12-cv-04404-N (N.D. Tex.) | | | 322 students, 50 employees | Complaint | Employees only | Complaint does not say they offer a student plan | 50 | 50 | |
| The QC Grp., Inc. v. Burwell, No. 0:13-cv-01726-JRT-SER (D. Minn. Sept. 11, 2013); | | | 62 employees | Complaint | Yes | | 62 | 62 | |
| Thomas G. Wenski v. Kathleen Sebelius, No. 12-cv-23820-Graham/Goodman (S.D. Fla. Nov. 7, 2012) | Archdiocese of Miami | | Unknown | Complaint | No | House of worship | | | |
| | Catholic Health Services | | 2,000 employees | Complaint | Yes | | 2,000 | 2,000 | |
| | Catholic Hospice | | 610 employees | Form W-3 filing | Yes | | 610 | 610 | |

Exhibit 138

JA-0001935

Draft—For Discussion Purposes

| Case | Plaintiff | Type: For-profit (F), Nonprofit (N), House of Worship or IA (H), Church Plan (C), Pre-life (P), Grandfathered (G) | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICPs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|---|
| | St. Thomas University | | Unknown | | No | Lawsuit mentions St. Thomas University but asserts no claims for its health plans | 0 | 0 | 0 |
| Tonn & Blank Constr. v. Burwell, No. 1:12-cv-00325-JD-RBC (N.D. Ind. Apr. 1, 2013); | | | 60 employees | Complaint | Yes | | 60 | 60 | |
| Trijicon, Inc. v. Burwell, No. 1:13-cv-1207 (D.D.C.) | | | 469 employees | Complaint | Yes | | 469 | 469 | |
| Tyndale House Publishers, Inc. v. Burwell, 904 F. Supp. 2d 106 (D.D.C. Nov. 16, 2012); | | | 260 employees | Complaint | Yes | | 260 | 260 | |
| Union University v. Burwell, No. 1:14-cv-1079 (W.D. Tenn.) | | | 2,829 students, 1,116 employees | Students - online, employees - Form w3 Filing | Employees only | Complaint does not say they offer a student plan | 1,116 employees | 1,116 | 0 |
| Univ of Dallas v. Burwell, No. 4:12-cv-00314 (N.D. Tex.), No. 14-10241 (5th Cir.), Nos. 14-10661 (5th Cir.) | Roman Catholic Diocese of Fort Worth | | 6,500 students, 2,000 employees | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | |
| | University of Dallas | | 2,600 students, 725 employees | Complaint | Yes | | 2,600 students, 725 employees | 725 | 2,600 |
| | Catholic Charities | | 332 employees | Complaint | Yes | | 332 | 332 | |
| | Our Lady Of Victory Catholic School | | 23 employees | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | |
| Univ. of Notre Dame v. Burwell, No. 3:13-cv-1276 (N.D. Ind.), No. 13-3853 (7th Cir.) | | | 11,500 students, 5,000 employees | Complaint | yes | | 11,500 students, 5,000 employees | 5,000 | 11,500 |
| Valley Forge Christian College of the Assemblies of God v. Burwell, No. 14-4622 (E.D. Pa. Aug. 14, 2014) | | | Unknown | Complaint | No | Plaintiff voluntarily dismissed suit; our understanding is they were satisfied with previous accommodation | 0 | 0 | 0 |
| Weingartz Supply Co. v. Burwell, No. 2:12-cv-12061 (E.D. Mich.), No. 14-1183 (6th Cir.) | | | 170 employees | DC Ruling | Yes | | 170 | 170 | |
| Wheaton College v. Burwell, No. 1:13-cv-08910 (N.D. Ill.), No. 14-2396 (7th Cir.) | | | 870 Employees | Complaint | Yes | Note: Students not counted because complaint states that Wheaton dropped student coverage | 870 | 870 | 0 |
| Williams v. Burwell, No. 1:13-cv-01699 (D.D.C. Nov. 19, 2013); | | | 3 employees | Complaint | Yes | | 3 | 3 | |
| Willis Law v. Burwell, No. 1:13-cv-01124-CKK (D.D.C. Aug. 23, 2013); | | | 15 employees | Complaint | Yes | | 15 | 15 | |
| Yep v. Seblius, No. 1:12-cv-6756 (N.D. Ill.), Triune Health Group, Inc. v. Burwell, No. 1:12-cv-06756 (N.D. Ill.), No. 13-1478 (7th Cir.) | | | 4 employees | Website | Yes | | 4 | 4 | |
| Zubik v. Burwell, No. 2:13-cv-1459 (W.D. Pa.), Nos. 14-1377 | Diocese | | 140+ full-time employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| (3d Cir.) | Catholic Charities | | 115 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Cemeteries | | 207 employees | Complaint | No | Diocese self-insured plan. Cemeteries was covered by the diocese's previous self-insured plan the Catholic Employers Benefits Plan; the new complaint says that CEBS was converted to the Catholic Benefits Trust, and Cemeteries are omitted as co-plaintiffs. | 0 | 0 | |
| | | | | | | | Total | 64,352 | 46,737 |
| | | | | | | | | | 7% of students use university sponsored plans http://www.gao.gov/new.items/d08389.pdf |
| | | | | | | | Total | 64,352 | 3,272 |
| | | | | | | | | employees in affected plans | students in affected plans |

Exhibit 138

JA-0001936

DRAFT: INFORMATION NOT RELEASABLE TO THE PUBLIC UNLESS AUTHORIZED BY LAW: This information has not been publicly disclosed and may be privileged and confidential. It is for internal government use only and must not be disseminated distributed or copied to persons not authorized to receive the information. Unauthorized disclosure may result in prosecution to the full extent of the law.

Notification from Eligible Organizations to HHS Regarding Religious Objections to Providing Contraceptive Coverage

**Redacted**

| Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) [See instruction #2 above] | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Redacted | 8/26/2014 | E-mail | Cummins-Allison Corp and Cummins Illinois Inc. | Redacted | Other | No | Plan B Ella Mirena Copper IUDs | Redacted | Other | self-insured | Redacted |
| | 9/8/2014 | E-mail | Loyola University | | Non-profit | No | All | | Other | Fully insured | |
| | | | | | | | | | Other | Fully insured | |
| | 9/10/2014 | E-mail | Valley Forge Christian College | | Non-profit | Yes | Ulipristal (aka Ella) Levonorgestrel (aka Plan B Plan B One-Step Next Choice) Intrauterine Devices (of any type) Abortion services except to save the life of the mother | | Other | Fully insured | |
| | | | | | | | | | Other | self-insured | |
| | 9/18/2014 | E-mail | Sisters of the Order of St. Dominic of Grand Rapids (Dominican Sisters) | | Non-Profit | No | All | | Other | Fully insured | |
| | 9/19/2014 | E-mail | Continuant | | Other | No | Emergency Contraceptives & IUD's | | Other | Fully insured | |
| | | | | | | | | | Other | Fully insured | |
| | 10/ /2014 | E-mail | Management Analysis and Utilization Inc. | | Other | No | "All abortifacient coverages such as but not limited to morning after and week after services" | | Other | Both | |
| | | | | | | | | | Other | Both | |
| | | | | | | | | | Other | self-insured | |
| | 10/6/2014 | E-mail | Holy Ghost Preparatory School | | Non-profit | No | All | | Other | Fully insured | |
| | 10/9/2014 | Mail | The Catholic Diocese of Memphis in Tennessee | | Non-profit | No | | | Church Plan | self-insured | |
| | 10/9/2014 | Mail | Bellhaven University | | Non-profit | No | All | | Other | self-insured | |
| | | | | | | | | | Other | self-insured | |
| | | | | | | | | | Other | self-insured | |
| | 10/10/2014 | E-mail | Bingaman and Son Lumber Inc. PO Box 247 1195 Creek Mountain Rd Kreamer PA 17833 | | Other | | Plan B Ella Mirena Paraguard | | Other | Fully insured | |
| | | | | | | | | | Other | Fully insured | |

Notifications

670107

Exhibit 139



670108

Exhibit 139

JA-0001938

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Eligible Organization Information | | | | | Plan Information | | |
| | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See Instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| 26 | Redacted | | | Redacted | | | | | Redacted | Other | Fully insured | Redacted |
| 27 | | 10/15/2014 | E-mail | Loyola University | | Non-profit | No | All | | Other | Fully insured | |
| 28 | | | | | | | | | | Other | Fully insured | |
| 29 | | | | | | | | | | Other | Fully insured | |
| 30 | | 10/16/2014 | Litigation | Wheaton College | | Non-profit | Yes | "Abortion-causing drugs abortion procedures and related services but has no religious objection to providing coverage for contraceptive drugs and devices that prevent conception (as opposed to interfering with the continued survival of a human embryo). Specifica ly identifies Plan B ella and certain unspecified IUDs as drugs and devices to which it has religious objections." | | Other | self-insured | |
| 31 | | | | | | | | | | Other | self-insured | |
| 32 | | | | | | | | | | Student | Fully insured | |
| 33 | | 10/20/2014 | Ma l | Carithers-Wallace-Courtenay LLC | | Other | | | | | | |
| 34 | | 10/29/2014 | Email | Contract Packaging Inc. | | Other | | Plan B E la Next Choice | | Other | | |
| 35 | | 11/5/2014 | Ma l | Avesta Homes LLC | | Other | | All | | Other | Fully insured | |
| 36 | | 11/1 /2014 | E-mail | Kent Manufacturing Company | | Other | | | | | | |
| 37 | | 11/14/2014 | Ma l | Dakota Tube Inc | | Other | | | | | | |
| 38 | | 11/18/2014 | E-mail | Oral Roberts University | | Non-profit | | EC Plan B One-step (the morning after pil ); Ella Ulipristal Acetate (the week after pil ); copper intrauterine devices; hormonal intrauterine devices; as we l as any other drug device procedure or mechanism which has the purpose or effect of preventing an already fertilized egg from developing further by inhibiting or terminating its attachment to the uterus" | | Other | Fully insured | |

Notifications

670109

Exhibit 139

JA-0001939



670110

Exhibit 139

JA-0001940

| Tracking number | Date notification reached | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See Instruction #3 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Redacted | 11/20/2014 | E-mail | J.E. Dunn Construction Group Inc. | Redacted | Other | | Plan B (levonorgestrel) and its generic equivalents · ella (ulipristal acetate) · ParaGard (copper IUD) · Mirena and Skyla (levonorgestrel-releasing IUDs) | Redacted | Other | Self-insured | Redacted |
| | | | | | | | | | Other | Self-insured | |
| | 12/5/2014 | E-mail | Greenville College | | Non-profit | | Plan B Ella and ella I IUDs | | Other | self-insured | |
| | | | | | | | | | Other | self-insured | |
| | | | | | | | | | Other | self-insured | |
| | 12/5/2014 | E-mail | Covenant Presbyterian Church | | Non-profit | | | | | | |
| | 12/17/2014 | E-mail | Trinity Schools Inc. D/B/A Trinity School at River Ridge | | Non-profit | No | | | Other? | Fully insured? | |
| | 12/17/2014 | E-mail | People of Praise Minnesota Inc. | | Non-profit | No | | | Other? | Fully insured? | |
| | 12/2 /2014 | E-mail | Oral Roberts University | | Non-profit | | EC Plan B One-step [the morning after pill]; Ella (Ulipristal Acetate [the week after pill]); copper intrauterine devices; hormonal intrauterine devices; as well as any other drug device procedure or mechanism which has the purpose or effect of preventing an already fertilized egg from developing further by inhibiting or terminating its attachment to the uterus | | Other | self-insured | |
| | 1/8/2015 | Mail | ParishSOFT LLC | | Other | | "All contraceptive medications and procedures (aka Station abortions Rx contraceptive devices etc.)" | | Other | Fully insured | |
| | | | | | | | | | Other | Fully insured | |
| | 1/12/2015 | Mail | D4S Companies Inc. | | Other | | All | | Other | self-insured | |
| | 1/30/2015 | E-mail | Illinois Baptist Children's Home and Family Services | | Non-profit | No | | | | | |
| | 2/1 /2015 | Mail | Olivet Nazarene University | | Non-profit | No | "The Health Plan w ll not provide pay for and/or facilitate access to abortion inducing products and related counseling. This includes the use of Yaz BlaOne and the Copper 7 IUD when prescribed with a diagnosis of pregnancy." The Health Plan will require a prior authorization for the dispensing of Yaz BlaOne and the Copper-I IUD. Coverage of these products will not be allowed until a doctor confirms the use of the medications for non-abortifacient purposes." Plan B will be non-covered." | | Other | Fully insured | |
| | 4/15/2015 | Mail | St. Raphael Health Plan - all participating employers (LR6 4) | | Non-profit | | All | | Church Plan | self-insured | |

Notifications

670111



670112

Exhibit 139

JA-0001942

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | | | | | Eligible Organization Information | | | | | Plan Information | | |
| 6 | Tracking number (Redacted) | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization (Redacted) | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See Instruction #2 above) | Contraceptive services not provided | Plan name (Redacted) | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) (Redacted) |
| 54 | | 5/4/2015 | Ma l | Society of the Precious Blood | | Non-profit | | All | | Other | Fully insured | |
| 55 | | 5/22/2015 | E-mail | Michael James Sales Tax Solutions  LLC | | Other | | "Any and a l abortifacients" | | Other | Fully insured | |
| 56 | | 07/087/15 | Litigation (Zub k v. Burwell) | The ROMAN CATHOLIC DIOCESE OF PITTSBURGH (* exempt) | | Non-profit | Yes | All | | Church Plan | self-insured | |
| 57 | | 07/087/15 | Litigation (Zub k v. Burwell) | THE ROMAN CATHOLIC DIOCESE OF ERIE (*exempt) | | Non-profit | Yes | All | | Church Plan | self-insured | |
| 58 | | 07/087/15 | Litigation (Zub k v. Burwell) | CATHOLIC CHARITIES OF THE DIOCESE OF PITTSBURGH  INC. | | Non-profit | Yes | All | | Church Plan | self-insured | |
| 59 | | 07/087/15 | Litigation (Zub k v. Burwell) | THE CATHOLIC CEMETERIES ASSOCIATION OF THE DIOCESE OF PITTSBURGH | | Non-profit | Yes | All | | Church Plan | self-insured | |
| 60 | | 07/087/15 | Litigation (Zub k v. Burwell) | ST. MARTIN CENTER  INC. | | Non-profit | Yes | All | | Church Plan | self-insured | |
| 61 | | 07/087/15 | Litigation (Zub k v. Burwell) | PRINCE OF PEACE CENTER  INC. | | Non-profit | Yes | All | | Church Plan | self-insured | |
| 62 | | 07/087/15 | Litigation (Zub k v. Burwell) | ERIE CATHOLIC PREPARATORY SCHOOL | | Non-profit | Yes | All | | Church Plan | self-insured | |
| 63 | | 8/3/2015 | Mail | Oral Roberts University | | Non-profit | | EC Plan B One-step (the morning after pil ); Ella Ulipristal Acetate (the week after pil ); copper intrauterine devices; hormonal intrauterine devices; as wel l as any other drug device  procedure  or mechanism which has the purpose or effect of preventing an already fertilized egg  from developing further by inhibiting or terminating its attachment to the uterus" | | Student | Fully insured | |

Notifications

670113

Exhibit 139



Exhibit 139

JA-0001944

| | A | B | C | D | E Eligible Organization Information | F | G | H | I | J Plan Information | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) [See Instruction #2 above] | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| 64 | Redacted | 8/2 /2015 | E-mail | Cummins-Al ison Corp and Cummins II inois Inc | Redacted | Other | No | Plan B Ella Mirena Copper IUDs | Redacted | Other | self-insured | Redacted |
| 65 | | 9/25/2015 | E-mail | Weingartz Supply Co. Inc. & W & P Management LLC | | Other | Yes | All contraceptive services | | Other | Fully insured | |
| 66 | | 10/14/2015 | Mai l | Carolyn's Place Inc. | | Non-profit | | All contraceptive services | | | Fully insured | |
| 67 | | 10/14/2015 | Mai l | Dakota Tube Inc | | Other | | | | | | |
| 68 | | 10/28/2015 | Mai l | Tyndale House Publishers Inc. | | Other | | post-conceptive medications and devices namely emergency contraceptives such as the "morning-after pill " the "week-after pi l " and intrauterine devices | | Other | Self insured | |
| 69 | | 10/29/2015 | E-mail | Electrolock Inc. Dunstone Co. Inc. and Stone River Mgmt. Co. LLC. | | Other | | All | | Other | self-insured | |
| 70 | | 11/19/2015 | Mai l | Management Analysis and Ut ization Inc. | | Other | | Ella Plan B Plan B One Stop Next Choice Next Choice One Dose My Way and Take Action | | Other | Fully insured | |
| 71 | | | | | | | | | | | Fully insured | |
| 72 | | | | | | | | | | | self-insured | |
| 73 | | 12/17/2015 | SW/FT | Conestoga Wood Specialties Corp. Conestoga Transportation Inc. Phone: 717-445-6701 | | Other | Yes | Any hormonal drugs or IUDs | | Other | self-insured | |
| 74 | | 12/2 /2015 | E-mail | St. Joseph's Abby (AKA. Cistercian Abby of Spencer) | | Non-profit | No | ALL contraceptive services required to be covered under PHS Act section 2713 as added by the Affordable Care Act and incorporated into ERISA section 715 and Code section 9815 | | Church Plan | Fully insured | |
| 75 | | 12/2 /2015 | Mai l | Dakota Tube Inc. | | Other | | | | | | |
| 76 | | 1/28/2016 | Mai l | Community Foundation of Northwest Indiana Inc. St. Mary Medical Center St. Catherine Hospital | | Non-profit | | All - "objection to providing coverage of all contraceptive services required to be covered under PHS Act section 2713 as added by the Affordable Care Act and incorporated into ERISA section 715 and Code section 9815." | | Other | Self-insured | |
| 77 | | 2/2 /2016 | E-mail | Miller Contracting Services Inc. | | Other | | All | | Other | | |
| 78 | | 3/3/2016 | E-mail | Earth Sun Moon Trading company Inc | | Other | | All | | Other | Fully insured | |

Notifications

670115

Exhibit 139    JA-0001945

| M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|
| Service Provider Information | | | | | | | Action Taken | | | |
| Contact information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact information for TPA (enter N/A if none) | Original information or updated information? | For updated information, date the information is effective | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | | | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | | | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |

Notifications

**670116**

Exhibit 139

JA-0001946

| | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Redacted | | | | Redacted | | | | Redacted | | | Redacted |
| 79 | | 3/7/2016 | E-mail | Lourtaema Sales | | Other | | All | | | Other | Fully insured |
| 80 | | 3/24/2016 | E-mail | Continuum Health Partnerships Inc. | | Other | | Abortion causing drugs devices and sterilizations; patient education and counseling for all women with reproductive capacity. | | | Other | self-insured |
| 81 | | | | Continuum Health Management LLC | | | | | | | | |
| 82 | | | | Mountain States Health Properties LLC. | | | | | | | | |
| 83 | | 3/28/2016 | E-Mail | Fresh Unlimited Inc. | | Other | | All | | | Other | Fully Insured |
| 84 | | 4/1/2016 | E-mail | Sarkes Tarzian Inc. | | Other | | All | | | Other | Fully Insured |
| 85 86 87 88 89 90 | | 7/19/2016 | E-Mail | Mersino Management Company Mersino Southwest, LLC Mersino Enterprise Inc. Global Pump Company Mersino Properties Company, LLC Mersino Dewatering Inc. | | Other | Yes | All | | | Other | self-insured |
| 91 | | 7/26/2016 | Litigation: 2nd Circuit Court 1:12-cv-02543-BMC Catholic Health Care System | Catholic Health Care System (aka ArchCare) | | | Yes | abortion-inducing drugs sterilizations contraceptives | | | | self-insured |
| 92 | | | | Cardinal Spellman High School | | | Yes | | | | | self-insured |
| 93 | | | | Monsignor Farrell High School | | | | | | | | self-insured |
| 94 | | | | Catholic Health Services of Long Island | | | Yes | | | | | self-insured |
| 95 | | 7/26/2016 | Litigation: Geneva 3nd Circuit Court 2:12-cv-00207 | Geneva College (employee) | | | Yes | abortion-inducing drugs | | | Other | Fully Insured |
| 96 | | | | Geneva Co lege (Student) | | | Yes | | | | Student | Fully Insured |
| 97 | | 7/26/2016 | Litigation: Persico 3nd Circuit Court 1:13-cv-00303 | The Roman Catholic Diocese of Erie* (exempt) | | Non-profit | Yes | abortion-inducing drugs contraceptives or sterilization | | | Church Plan | self-insured |
| 98 | | | | Erie Catholic Preparatory School | | Non-profit | | | | | | |
| 99 | | | | PRINCE OF PEACE CENTER INC. | | Non-profit | | | | | | |
| 100 | | | | ST. MARTIN CENTER INC. | | Non-profit | | | | | | |
| 101 | | 7/26/2016 | Litigation: Zubik 3nd Circuit Court 2:12-cv-00676 | Catholic Charities of Pittsburgh | | Non-profit | Yes | abortion-inducing drugs contraceptives or sterilization | | | Church Plan | self-insured |
| 102 | | | | Diocese of Pitssburgh* (Exempt) | | | | | | | | |
| 103 | | 7/26/2016 | Litigation: Catholic Diocese of Beaumont 5th Circuit Court | Catholic Charities of Southeast Texas | | | | | | | Other | |
| 104 | | | | Catholic Diocese of Beaumont* (Exempt) | | | Yes | abortifacients contraception and ster lization | | | | self-insured |

Notifications

670117

Exhibit 139                                                                                                                        JA-0001947

| M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|
| | Service Provider Information | | Original Information or updated information? | For updated information, date the information is effective | | Action Taken | | | | |
| Contact Information for Issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact Information for TPA (enter N/A if none) | | | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Updated | N/A | | | | | | |
| | | | Updated | N/A | | | | | | |
| | | | Original | N/A | | | | | | |

Notifications

**670118**

Exhibit 139

| | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Redacted | | | | Redacted | | | | Redacted | | | Redacted |
| 105 | | 7/26/2016 | Litigation: ETBU 5th Circuit Court 4:12-CV-3009 | East Texas Baptist University (employee) | | | Yes | "abortion-inducing drugs ... and related services" NOT including contraceptives (compl. ¶ 28) | | Other | self-insured | |
| 106 | | | | Houston Baptist | | | Yes | | | | self-insured | |
| 107 | | | | Westminster | | | Yes | | | | | |
| 108 | | 7/26/2016 | Litigation: University of Dallas 5th Circuit Court 4:12-cv-314 | Roman Catholic Diocese of Fort Worth* (Exempt) | | Non-profit | Yes | "abortion-inducing drugs " sterilization and contraception | | Church Plan | self-insured | |
| 109 | | | | University of Dallas (employee) | | | Yes | "abortion-inducing drugs" and sterilization | | | self-insured | |
| 110 | | | | University of Da las (student) | | | Yes | "abortion-inducing drugs " sterilization and contraception (prescribed to treat a medical condition only not to prevent pregnancy) | | Student | Fully-insured | |
| 111 | | | | Catholic Charities of Fort Worth | | | Yes | abortion-inducing drugs sterilization and contraception | | | Fully insured | |
| 112 | | 7/26/2016 | Litigation: Catholic Diocese of Nashville 6th Circuit Court 3:13-cv-01303 | Aquinas College Nashv lle | | | Yes | "abortion-inducing products " sterilization and contraception | | | Fully insured | |
| 113 | | | | Camp Marymount Inc. | | | | | | | | |
| 114 | | | | Catholic Charities of Tennessee | | | | | | | | |
| 115 | | | | The Catholic Diocese of Nashv lle* (Exempt) | | | | | | | | |
| 116 | | | | Dominican Sisters of St. Cecilia* (Exempt) | | | | | | | | |
| 117 | | | | Mary Queen of Angels | | | | | | | | |
| 118 | | | | St. Mary's V lla Inc. | | | | | | | | |
| 119 | | 7/26/2016 | Litigation: MCC 6th Circuit Court 1:13-cv-01247-G/Q | Catholic Family Services (aka Catholic Charities of Kalamazoo) | | | Yes | contraception and sterilization | | | self-insured | |
| 120 | | | | Michigan Catho ic Conference* (Exempt) | | | | | | | | |
| 121 | | 7/26/2016 | Litigation: Catho ic Charities of Ft. Wayne 7th Circuit Court 1:12-cv-00159-JD-RBC | Catholic Charities of Ft. Wayne | | | Yes | "abortion-inducing products " steri ization and contraception | | | Self-insured | |
| 122 | | | | Diocese of Ft. Wayne* (Exempt) | | | Yes | "abortion-inducing products " steri ization and contraception | | | Self-insured | |
| 123 | | | | Franciscan Alliance | | | Yes | "abortion-inducing products " steri ization and contraception | | | Both | |
| 124 | | | | Our Sunday Visitor | | | Yes | "abortion-inducing products " steri ization and contraception | | | Self-insured | |
| 125 | | | | Specialty Physicians of l linois | | | Yes | "abortion-inducing products " steri ization and contraception | | | Fully-insured | |
| 126 | | | | St. Anne Home | | | Yes | "abortion-inducing products " steri ization and contraception | | | Self-insured | |
| 127 | | | | University of St. Francis | | | Yes | "abortion-inducing products " steri ization and contraception | | | Self-insured | |

Notifications

670119

Exhibit 139

| | M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Service Provider Information | | | | | | | | Action Taken | | |
| | Contact Information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact Information for TPA (enter N/A if none) | Original information or updated information? | For updated information, date the information is effective | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| 105 | Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| 106 | | | | Original | N/A | | | | | | |
| 107 | | | | Original | N/A | | | | | | |
| 108 | | | | | | | | | | | |
| 109 | | | | Original | N/A | | | | | | |
| 110 | | | | Original | N/A | | | | | | |
| 111 | | | | Original | N/A | | | | | | |
| 112 | | | | | | | | | | | |
| 113 | | | | | | | | | | | |
| 114 | | | | Original | N/A | | | | | | |
| 115 | | | | | | | | | | | |
| 116 | | | | | | | | | | | |
| 117 | | | | | | | | | | | |
| 118 | | | | | | | | | | | |
| 119 | | | | Original | N/A | | | | | | |
| 120 | | | | Original | N/A | | | | | | |
| 121 | | | | Original | N/A | | | | | | |
| 122 | | | | Original | N/A | | | | | | |
| 123 | | | | Original | N/A | | | | | | |
| 124 | | | | Original | N/A | | | | | | |
| 125 | | | | Original | N/A | | | | | | |
| 126 | | | | Original | N/A | | | | | | |
| 127 | | | | Original | N/A | | | | | | |

Notifications

670120

Exhibit 139

JA-0001950

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Eligible Organization Information | | | | | Plan Information | | |
| 6 | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| | Redacted | | | | Redacted | | | | Redacted | | | Redacted |
| 128 | | 7/26/2016 | Litigation: Grace Schools 7th Circuit Court 3:12-cv-00459-JD-CAN | Biola University (employee) | | | Yes | "abortion-inducing drugs like ella and Plan B" but not other contraceptives | | | Fully Insured | |
| 129 | | | | Biola University (student) | | | Yes | "abortion-inducing drugs like ella and Plan B" but not other contraceptives | | Student | Fully Insured | |
| 130 | | | | Grace Schools (employee) | | | Yes | "abortifacient drugs" but not all contraceptives | | | Self-insured | |
| 131 | | | | Grace Schools (student) | | | Yes | "abortifacient drugs" but not all contraceptives | | Student | Fully Insured | |
| 132 | | 7/26/2016 | Litigation: CNS 8th Circuit Court 2:12-cv-00092 | CNS International Ministries (holding company for other listed plaintiffs: Sharpe Holdings Inc. Ozark Nat'l Life Ins. Co. and N.I.S. Financial Services Inc.) | | | Yes | Plan B ella Copper IUDs | | | Self-insured | |
| 133 | | | | Heartland Christian College | | | Yes | Plan B ella Copper IUDs | | | Self-insured | |
| 134 | | 7/26/2016 | Litigation: Dordt 8th Circuit Court 5:13-cv-04100 | Cornerstone University | | | Yes | "post-coital 'emergency contraceptives'" such as "ella Plan B and IUDs" | | | Fully-insured | |
| 135 | | | | Dordt College (employee) | | | | | | | Self-insured | |
| 136 | | | | Dordt College (student) | | | | | | Student | Fully-insured | |
| 137 | | 7/26/2016 | Litigation: Little Sisters 10th Circuit Court No. 13-1540 (10th Cir) Appeal of No. 1:13-CV-02611 (D. Co.) | Little Sisters of the Poor Baltimore Inc. ( Little Sisters of Baltimore") | Non-profit | | Yes | "sterilization contraceptives and drugs that cause abortions." "contraceptives abort facient drugs sterilizations and related education and counseling " | | | self-insured | |
| 138 | | | | Little Sisters of the Poor Home for the Aged Denver Colorado ("Little Sisters of Denver") | Non-profit | | | | | | | |
| 139 | | 7/26/2016 | Litigation: Reaching Souls | Reaching Souls | | | Yes | ella Plan B Plan B one-step Next Choice Copper IUDs IUDs w/Progestin | Church Plan | | self-insured | |
| 140 | | | | Truett-McConnell College | | | | | | | | |
| 141 | | 7/26/2016 | Litigation: Southern Nazarene 10th Circuit Court No. 14-6026 (10th Cir) appeal of No. 5:13 CV-01015-F (W.D. Okla.) | Mid-America Christian | | | Yes | "contraceptives abortifacients [such as Plan B and e la] and related counseling to their employees and students." | | | self-insured | |
| 142 | | | | Oklahoma Baptist (employee) | | | | | | | Fully-insured | |
| 143 | | | | Oklahoma Baptist (student) | | | | | | Student | Fully-insured | |
| 144 | | | | Oklahoma Wesleyan | | | | Plan B ella and IUDs | | | Fully-insured | |
| 145 | | | | Southern Nazarene University (employee) | | | | "contraceptives abortifacients [such as Plan B and e la] and related counseling to their employees and students." | | | Partially self-insured, insured for claims over $100 000 | |

Notifications

670121

Exhibit 139

| M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|
| Service Provider Information | | | | | | | | Action Taken | | |
| Contact Information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact Information for TPA (enter N/A if none) | Original information or updated information? | For updated information, date the information is effective | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| Redacted | Redacted | Redacted | | | Redacted | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |

Notifications

**670122**

Exhibit 139

JA-0001952

| Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Redacted | | | Southern Nazarene University (student) | Redacted | | | | Redacted | Student | Fully-insured | Redacted |
| | 7/26/2016 | Litigation: Priests for Life DC 1:13-cv-01261 | Priests for Life | | | Yes | "contraception sterilization [and] abortifacients" | | | Fully-insured | |
| | | | Archdiocese of Washington ( listed in complaint as "Roman Catholic Archbishop of Washington D.C." and as "Archdiocese of Washington)")* (exempt) | | | | | | | self-insured | |
| | | | Catholic Charities of the Archdiocese of Washington Inc. | | | | | | | | |
| | | | Catholic Information Center Inc | | | | | | | | |
| | | | The Catholic University of America | | | | | | | Fully-insured | |
| | 7/26/2016 | Litigation: RCAW DC 1:13-cv-01441 | The Catholic University of America (student) | | | Yes | abortion-inducing products contraception or sterilization | | Student | Fully-insured | |
| | | | The Consortium of Catholic Academies of the Archdiocese o Washington D.C. | | | | | | | | |
| | | | Archbishop Carroll High School | | | | | | | | |
| | | | Don Bosco Cristo Rey High School of the Archdiocese of Washington D.C. | | | | | | | | |
| | | | Mary of Nazareth Roman Catholic Elementary School Inc. | | | | | | | self-insured | |
| | | | Roman Catholic Archbishop of Washington | | | | | | | | |
| | | | Victory Housing Inc. | | | | | | | | |
| | | | Thomas Aquinas College | | | | | | | | |
| | 7/26/2016 | Litigation: Beckwith Electric 11th Circuit (M.D. FL) 8:16-cv-01944 | Beckwith Electric Co. Inc. | | Other | Yes | "emergency contraception " "abort ifacients " "any drugs devices and services capable of ending innocent human life" (spec fica ly lists Plan B ella and the IUD as examples of "abortifacients") | | Other | self-insured | |
| | 7/26/2016 | Litigation: Johnson Welded DC(DCC) 1:16-cv-00557 | Johnson Welded Products Inc. | | Other | Yes | "all of the contraceptive services required by the contraceptive services mandate" | | Other | Not Indicated | |
| | 8/5/2016 | Ma l | Society of the Precious Blood | | Non-profit | No | All | | Other | Fully-insured | |
| | 9/1/2016 | Litigation: Catho ic Charities Archdiocese of Ph ladelphia 3rd Circuit 2:14-cv-03096-AB | Catholic Charities of the Archdiocese of Philadelphia d/b/a Catho ic Social Services | | Non-profit | Yes | "a l of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| | 9/1/2016 | Litigation: Catho ic Charities Archdiocese of Ph ladelphia 3rd Circuit 2:14-cv-03096-AB | St. John's Orphan Asylum | | Non-profit | Yes | "a l of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |

Notifications

670123

Exhibit 139

JA-0001953



670124

Exhibit 139

JA-0001954

| | A | B | C | D | Eligible Organization Information | | F | G | H | I | Plan Information | | | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | | | | | | | | | | | Plan type (Student Plan, Church Plan, Other) | | | |
| 6 | Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | | Type of organization (Non-profit or other) | Plaintiff in Litigation? [Yes or No] [See Instruction #2 above] | Contraceptive services not provided | Plan name | | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
| | Redacted | | | | Redacted | | | | | Redacted | | | Redacted |
| 165 | | 9/1/2016 | | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | St. Edmond's Home for Crippled Children | | Non-profit | Yes | "all of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 166 | | 9/1/2016 | | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Don Guanella Village of the Archdiocese of Philadelphia | | Non-profit | Yes | "all of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 167 | | 9/1/2016 | | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Divine Providence Village | | Non-profit | Yes | "all of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 168 | | 9/1/2016 | | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Philadelphia Protectory for Boys d/b/a St. Gabriel's System | | Non-profit | Yes | "all of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 169 | | 9/1/2016 | | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Catholic Community Services Inc. | | Non-profit | Yes | "all of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 170 | | 9/1/2016 | | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Nutritional Development Services Inc. | | Non-profit | Yes | "all of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 171 | | 9/1/2016 | | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Catholic Health Care Services - Supportive Independent Living d/b/a Villa St. Martha and Community Based Services | | Non-profit | Yes | "all of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 172 | | 9/1/2016 | | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | St. John Vianney Center | | Non-profit | Yes | "all of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 173 | | 9/1/2016 | | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Catholic Clinical Consultants | | Non-profit | Yes | "all of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 174 | | 9/1/2016 | | Litigation: Catholic Charities Archdiocese of Philadelphia 3rd Circuit 2:14-cv-03096-AB | Roman Catholic Archdiocese of Philadelphia | | Non-profit | Yes | "all of the required contraceptive services with the exception of the prescription and use of contraceptive medications for non-contraceptive medical purposes." | | Church Plan | Self-insured | |
| 175 | | 9/15/2015 | | Litigation: Diocese of Cheyenne 10th Circuit court 14-8040 | Diocese of Cheyenne | | Non-profit | Yes | "to providing procuring or facilitating access to abortion-inducing products abortion sterilization or contraceptives" except when "prescribed with the intent of treating a medical condition not with the intent to prevent pregnancy or to induce abortion." | | Church Plan | Self-insured | |
| 176 | | 9/15/2015 | | Litigation: Diocese of Cheyenne 10th Circuit court 14-8040 | Catholic Charities of Wyoming | | Non-profit | Yes | "to providing procuring or facilitating access to abortion-inducing products abortion sterilization or contraceptives" except when "prescribed with the intent of treating a medical condition not with the intent to prevent pregnancy or to induce abortion." | | Church Plan | Self-insured | |
| 177 | | 9/15/2015 | | Litigation: Diocese of Cheyenne 10th Circuit court 14-8040 | Saint Joseph's Children's Home | | Non-profit | Yes | "to providing procuring or facilitating access to abortion-inducing products abortion sterilization or contraceptives" except when "prescribed with the intent of treating a medical condition not with the intent to prevent pregnancy or to induce abortion." | | Church Plan | Self-insured | |

Notifications

670125

Exhibit 139

| | M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | | Service Provider Information | | | | | | | Action Taken | | |
| 6 | Contact Information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact Information for TPA (enter N/A if none) | Original information or updated information? | For updated information, date the information is effective | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| 165 | Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| 166 | | | | Original | N/A | | | | | | |
| 167 | | | | Original | N/A | | | | | | |
| 168 | | | | Original | N/A | | | | | | |
| 169 | | | | Original | N/A | | | | | | |
| 170 | | | | Original | N/A | | | | | | |
| 171 | | | | Original | N/A | | | | | | |
| 172 | | | | Original | N/A | | | | | | |
| 173 | | | | Original | N/A | | | | | | |
| 174 | | | | Original | N/A | | | | | | |
| 175 | | | | Original | N/A | | | | | | |
| 176 | | | | Original | N/A | | | | | | |
| 177 | | | | Original | N/A | | | | | | |

Notifications

670126

Exhibit 139

JA-0001956

| Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) [See instruction #2 above] | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Redacted | 9/15/2015 | Litigation: Diocese of Cheyenne 10th Circuit Court 14-8040 | St. Anthony Tri-Parish Catholic School | Redacted | Non-profit | Yes | "to providing  procuring  or fac ltating access to abortion-inducing products  abortion  steri ization  or contraceptives" except when "prescribed with the intent of treating a medical condition  not with the intent to prevent pregnancy or to induce abortion." | Redacted | Church Plan | Self-insured | Redacted |
| | 9/15/2015 | Litigation: Diocese of Cheyenne 10th Circuit Court 14-8040 | Wyoming Catholic College | | Non-profit | Yes | " abortion-inducing products or ster lization" except " contraceptives only when prescribed with the intent of treating a medical condition  not with the intent to prevent pregnancy." | | Church Plan | self-insured | |
| | 9/15/2015 | Litigation: Colorado Christian University 10th Circuit Court 14-1329 | Colorado Christian University (employee) | | Non-profit | Yes | "coverage for a l services  drugs  and devices that could terminate human life from the moment of conception  including medical abortions  emergency contraceptives l ke Plan B and E la  and IUDs" and "other contraceptives." | | Other | self-insured | |
| | 9/15/2015 | Litigation: Colorado Christian University 10th Circuit Court 14-1330 | Colorado Christian University (student) | | Non-profit | Yes | "coverage for abortions and all contraceptives  including emergency contraceptives and IUDs." | | Student | Fully Insured | |
| | 9/15/2015 | Litigation: Dobson 10th Circuit Court 14-1233 | Family Talk | | Non-profit | Yes | "abortion-inducing or implantation-preventing drugs  abortifacient items  and related education and counseling  spec fically IUDs and 'emergency contraception' such as Plan B and Ella" and "any course ing or referrals to promote or refer for … such abortion-inducing drugs  and IUDs " | | Other | Partia ly Self-insured with a stop-loss provider and a third-party administrator | |
| | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Association of Christian Schools International (employee) | | Non-profit | Yes | "the procurement of  participation in  facilitation of  or payment for abortion (including abortion-causing drugs and devices like Plan B  ella  and IUDs)" | | Other | self-insured | |
| | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Samaritan Ministries International (employee) | | Non-profit | Yes | "the procurement of  participation in  facilitation of  or payment for abortion (including abortion-causing drugs and devices like Plan B  ella  and IUDs)" | | Other | self-insured | |
| | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Taylor University (employee) | | Non-profit | Yes | "the procurement of  participation in  facilitation of  or payment for abortion (including abortion-causing drugs and devices like Plan B  ella  and IUDs)" | | Other | self-insured | |
| | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Indiana Wesleyan University | | Non-profit | Yes | "the procurement of  participation in  facilitation of  or payment for abortion (including abortion-causing drugs and devices like Plan B  ella  and IUDs)" | | Other | self-insured | |
| | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Asbury Theological Seminary | | Non-profit | Yes | "the procurement of  participation in  facilitation of  or payment for abortion (including abortion-causing drugs and devices like Plan B  ella  and IUDs)" | | Other | self-insured | |
| | 9/15/2015 | Litigation: Ass'n of Christian Schools Int'l v. Burwell 10th Circuit Court No. 14-1492 | Alliance Defending Freedom | | Non-profit | Yes | "emergency contraceptive medications  hormonal contraceptive medications and devices  and implanted contraceptive devices  or related counseling or referrals to promote the use of such items" | | Other | self-insured | |
| | 9/20/2016 | Litigation: Catholic Benefits Ass'n LCA v. Burwell 10th Circuit Court Nos. 14-6163  14-6171 | Good Will Pub ishers  Inc. | | Other | Yes | "contraception  abortion-inducing drugs or devices  sterilization  and related counseling" | | Other | Fully-insured | |
| | 9/20/2016 | Litigation: Catholic Benefits Ass'n LCA v. Burwell 10th Circuit Court Nos. 14-6163  14-6171 | Catholic Charities of the Archdiocese of Oklahoma City | | Non-profit | Yes | "contraception  abortion-inducing drugs or devices  sterilization  and related counseling" | | likely church plan  but never alleged | self-insured | |
| | 9/20/2016 | Litigation: Catholic Benefits Ass'n LCA v. Burwell 10th Circuit Court Nos. 14-6163  14-6171 | All Saints Catholic School | | Non-profit | Yes | "contraception  abortion-inducing drugs or devices  sterilization  and related counseling" | | likely church plan  but never alleged | self-insured | |

Notifications

670127

Exhibit 139

| | M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Service Provider Information | | | Original information or updated information? | For updated information, date the information is effective | | Action Taken | | | |
| | Contact Information for issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact Information for TPA (enter N/A if none) | | | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| 178 | Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| 179 | | | | Original | N/A | | | | | | |
| 180 | | | | Original | N/A | | | | | | |
| 181 | | | | Original | N/A | | | | | | |
| 182 | | | | Original | N/A | | | | | | |
| 183 | | | | Original | N/A | | | | | | |
| 184 | | | | Original | N/A | | | | | | |
| 185 | | | | Original | N/A | | | | | | |
| 186 | | | | Original | N/A | | | | | | |
| 187 | | | | Original | N/A | | | | | | |
| 188 | | | | Original | N/A | | | | | | |
| 189 | | | | Original | N/A | | | | | | |
| 190 | | | | Original | N/A | | | | | | |
| 191 | | | | Original | N/A | | | | | | |

Notifications

670128

Exhibit 139

| A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Eligible Organization Information | | | | | Plan Information | | |
| Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #2 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully-insured, self-insured or both? | Name of issuer (enter N/A if none) |
| Redacted | 9/20/2016 | Litigation: Catholic Benefits Ass'n LCA v. Burwell 10th Circuit Court Nos. 14-6163 14-6171 | The Cathedral Foundation d/b/a Catholic Review Media | Redacted | Non-profit | Yes | "contraception abortion-inducing drugs or devices sterilization and related counseling" | Redacted | likely church plan but never alleged | self-insured | Redacted |
| | 9/20/2016 | Litigation: Catholic Benefits Ass'n LCA v. Burwell 10th Circuit Court Nos. 14-6163 14-6171 | Vi la St. Francis Catholic Care Center Inc. | | Non-profit | Yes | "contraception abortion-inducing drugs or devices sterilization and related counseling" | | Other | Fully-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-12239 | THE ROMAN CATHOLIC ARCHDIOCESE OF ATLANTA an association of churches and schools | | Non-profit | Yes | "abortion-inducing products contraception steri lization and related counse ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | self-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13240 | THE MOST REVEREND WILTON D GREGORY and his successors Archbishop of the Roman Catholic Archdiocese of Atlanta | | Non-profit | Yes | "abortion-inducing products contraception steri lization and related counse ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | self-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13241 | CATHOLIC CHARITIES OF THE ARCHDIOCESE OF ATLANTA INC. a Georgia non-profit corporation | | Non-profit | Yes | "abortion-inducing products contraception steri lization and related counse ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | Self-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13242 | Catho ic Education of North Georgia Inc. (CENGI) | | Other | Yes | "abortion-inducing products contraception steri lization and related counse ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | Self-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13243 | THE ROMAN CATHOLIC DIOCESE OF SAVANNAH an ecclesiastical territory | | Non-profit | Yes | "abortion-inducing products contraception steri lization and related counse ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | Self-insured | |
| | 10/6/2016 | Litigation: Roman Catholic Archdiocese of Atlanta et al. v. Secretary U.S. Dep't of Health & Human Servs et al Nos. 14-12890 14-13244 | THE MOST REVEREND JOHN HARTMAYER and his successors Bishop of The Roman Catholic Diocese of Savannah et al. | | Non-profit | Yes | "abortion-inducing products contraception steri lization and related counse ing" "unless they are necessary for medica ly diagnosed conditions unrelated to contraception." | | Church Plan | Self-insured | |
| | 10/6/2016 | Eternal Word Television Network v. Burwell No. 14-12696 | Eternal Word Television Network Inc. | | Non-profit | Yes | "artificial contraception steri lization or abortion or related education and counseling." | | other | Self-insured | |
| | 11/ /2016 | Email/mail | Bick Group Inc. | | Other | Yes | "all contraceptive services" | | Other | Fully-insured | |
| | 11/9/2016 | Email | The Energy Lab INC | | Other | No | All | | Other | Fully-insured | |
| | 11/2 /2016 | Email | Marian University | | Non-profit | No | All | | Church Plan | self-insured | |

Notifications

670129

| M | N | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|
| Service Provider Information | | | | | | | | Action Taken | | |
| Contact Information for Issuer (enter N/A if none) | Name of TPA (enter N/A if none) | Contact Information for TPA (enter N/A if none) | Original information or updated information? | For updated information, date the information is effective | For updated information, summary of changes | For fu ly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | For for-profit organizations, date letter sent to organization (see instruction #1 above) | Notes | |
| Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |
| | | | Original | N/A | | | | | | |

Notifications

670130

Exhibit 139

JA-0001960

| Tracking number | Date notification received | Received via mail or e-mail? | Name of eligible organization | Contact information for eligible organization | Type of organization (Non-profit or other) | Plaintiff in Litigation? (Yes or No) (See instruction #3 above) | Contraceptive services not provided | Plan name | Plan type (Student Plan, Church Plan, Other) | Fully insured, self-insured or both? | Name of issuer (enter N/A if none) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Eligible Organization Information | | | | | Plan Information | | |
| Redacted | | | | Redacted | | | | Redacted | | | Redacted |
| | 11/26/2014 | Litigation: Louisiana College v. Burwell et al. No. 14-2143 | Louisiana College | | Non-profit | Yes | Objects to providing: RU-486; Plan B; ella; "counseling regarding the use of abortifacients like ella and Plan B;" and any "drugs  devices  services or procedures contrary to its faith." Sec. Am. Compl. Stat. Ct. Dist ?? at ¶¶ 27-13i  "While excluding abortifacients like ella and Plan B  LC's employee health plan does cover contraceptives that prevent ovulation." Sec. Am. Compl. Dist. Ct. Dkt ?? at ¶ 37 | | Church Plan | self-insured | |
| | 4/1 /2017 | Mix I | Continuum Health Partnerships Inc.; Continuum Health Management LLC; Mountain States Health Properties LLC | | Other | No | Abortion causing drugs  devices and sterilization; patient education and counseling for all women with reproductive capacity. | | Other | self-insured | |
| | | | | | | | | | | | |

Notifications

670131

Exhibit 139

JA-0001961

| | Service Provider Information | | Original information or updated information? | For updated information, date the information is effective | For updated information, summary of changes | For fu lly insured plans, date letter sent to issuer by HHS | For self-insured plan, date notification forwarded to DOL | Action Taken: For for-profit organizations, date letter sent to organization (see instruction #5 above) | Notes | |
|---|---|---|---|---|---|---|---|---|---|---|
| Contact information for issuer(enter N/A if none) | Name of TPA (enter N/A if none) | Contact information for TPA (enter N/A if none) | | | | | | | | |
| Redacted | Redacted | Redacted | Original | N/A | Redacted | | | | | |
| | | | Updated | 4/1/2017 | | | | | | |

Notifications

670132

Exhibit 139

JA-0001962



Redacted

Addresses

**670133**

Exhibit 139

Draft- For Discussion Purposes

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICPs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Am. Pulverizer Co. v. U.S. Dep't of Health and Human Servs., No. 6:12-cv-03459, 2012 WL 6951316 (W.D. Mo. Dec. 20, 2012); | | 175 employees | Complaint | Yes | | 175 | 175 | |
| American Family Association v. Sebelius, 1:13-cv 00032-SA-DAS (N.D. Miss. Feb. 20, 2013) | | 135 employees | Complaint | Yes | | 135 | 135 | |
| Annex Med., Inc. v. Burwell, No. 13-1118, 2013 WL 1276025 (8th Cir. Feb. 1, 2013) | | 18 employees | Complaint | Yes | | 18 | 18 | |
| Archdiocese of St. Louis v. Burwell, No. 4:13-cv-02300 (E.D. MO), No. 14-3016 (8th Cir.) | Archdiocese of St. Louis | 7,800 employees/staff | Complaint | No | Diocese self-insured plan (see Brandt v Burwell note below same | 0 | 0 | |
| | Catholic Charities of St. Louis | 1600 employees | Complaint | No | | 0 | 0 | |
| Armstrong v. Burwell, No. 1:13-cv-00563-RBJ (D. Colo. Sept. 17, 2013); gov't appeal dismissed Sept. 4 2014 (10th Cir. order); | | 730 employees | Complaint | Yes | | 730 | 730 | |
| Association of Christian Schools International v. Burwell, No. 1:14-cv-2966 (D. Colo.), No. 14-1492 (10th Cir.) | Association of Christian Schools International | 140 employees | Complaint | Yes | | 140 | 140 | |
| | Samaritan Ministries International | 133 employees | Complaint | Yes | | 133 | 133 | |
| | Taylor University | 1,900 Students; 641 Employees | Complaint | Students = no; employees = yes | Complaint does not state that they offer a student health plan; therefore students not counted | 641 | 641 | 0 |
| | Indiana Wesleyan University | 15,000 students; 3,565 employees (1,018 FT and 2,547 PT) | Complaint | Students = no; employees = partial | Complaint does not state that they offer a student health plan; therefore students not counted. Complaint states that 890 employees enroll in the plan. Because other entities usually provide the overall number of employees, not the number enrolled in the plan, and in the IFR we estimate 62% of all employees are in plans, this number is upscaled to 890/62%=1435 | 1,435 | 1,435 | 0 |
| Autocam Corp. v. Burwell, 730 F.3d 618 (6th Cir. Sept. 17, 2013), | Autocam | 478 employees | Complaint | Yes | | 478 | 478 | |
| | Autocam Medical | 183 employees | Complaint | Yes | | 183 | 183 | |
| Ave Maria Foundation v. Burwell, No. 2:13-cv-15198 (E.D. Mich.), Nos. 14-1310 (6th Cir.) | The Ave Maria Foundation | 51 employees | Estimated number based on online information | Yes | | 51 | 51 | |
| | Ave Maria Communications | 19 employees | Form W-3 filing | Yes | | 19 | 19 | |
| | Domino's Farms Petting Farm | 18 employees | Form W-3 filing | Yes | | 18 | 18 | |
| | Rhodora J. Donahue Academy, Inc. | 26 employees | Website | Yes | | 26 | 26 | |
| | Thomas More Law Center | 14 employees | Form W-3 filing | Yes | | 14 | 14 | |
| Ave Maria School of Law v. Burwell, No. 2:13-cv-00795 (M.D. Fla.), Nos. 14-15777 (11th Cir.) | | 68 employees | Complaint | Employees = yes; students = no | Permanent injunction 07/11/2018 | 0 | 0 | 0 |
| Ave Maria University v. Burwell, No. 2:13-cv-00630 (M.D. Fla.), Nos. 14-15780 (11th Cir.) | | 150 employees | Complaint | Employees = yes; students = no | Permanent injunction 07/11/2018 | 0 | 0 | 0 |
| Barron Indus., Inc. v. Burwell, No. 1:13-cv-01330 KBJ (D.D.C. Sept. 25, 2013); | | 56 employees | Complaint | Yes | | 56 | 56 | |
| Beckwith Elec. Co. v. Burwell, No. 8:16-cv-1944 (M.D. Fla.) | | 126 employees | Complaint | Yes | | 126 | 126 | |
| Belmont Abbey College v. Sebelius, et al., No. 1:11 cv-01989 (D.D.C. Nov. 10, 2011) | | 1,600 students; 305 employees | Complaint | Yes | | 1,600 students; 305 employees | 305 | 1,600 |
| Bick Holdings, Inc. v. Burwell, No. 4:13-cv-00462 AGF (E.D. Mo. Apr. 1, 2013); | | 196 employees | Complaint | Yes | | 196 | 196 | |
| Brandt v. Burwell, No. 2:14-cv-00681 (W.D. Pa.), Nos. 14-3663, 14-4087 (3d Cir.) | Diocese of Greensburg | 3,100 employees; 5,000 other participants in plan (this is a high number- it includes employees from other Dioceses) | Complaint | No | Diocese self-insured plan; Government argued that these and all similar Catholic diocese-sponsored self-insured plans and entities participating in such plans that are litigants represented by Jones Day likely qualify to be church plans exempt from ERISA. See, e.g., Doc. # 25, 2:14-cv-00681-AJS (W.D. Pa.). We cannot force such plan TPAs to offer contraceptive payments, and it is likely the churches will tell them not to, and the TPAs will not make the offers. | 0 | 0 | |
| | Catholic Charities | 18 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | St. John School | 13 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |

00805059

Exhibit 140

JA-0001964

Draft- For Discussion Purposes

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICFs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Briscoe v. Burwell, No. 1:13-cv-00285-WYD-BNB (D. Colo. Sept. 6, 2013); gov't appeal dismissed Sept. 4, 2014 (10th Cir. order); | Briscoe owns all plaintiff organizations involved: Continuum Health Partnerships, Inc./ Mountain States Health Properties, LLC/ Continuum Health Management, LLC/ CH-Greeley, LLC | 200 employees | Complaint | Yes | | 200 | 200 | |
| Catholic Benefits Association LCA v. Burwell CBA 1), No. 5:14-cv-00240 (W.D. Okla.), Catholic Benefits Association LCA v. Burwell (CBA II), No. 5:14-cv-00685 (W.D. Okla.),Nos. 14-6171, 14-6163, 15-6029, 15-6037, 15-6139, 16-6030, 16-6217 (10th Cir.) | Catholic Benefits Association | Unknown | N/A | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Catholic Insurance Company | Unknown | N/A | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Archdiocese of Baltimore | 5, 500 participants | Complaint | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Cathedral Foundation (AKA Catholic Review Media) | 32 employees | Complaint | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Archdiocese of Oklahoma City- Complaint lists Mount St. Mary, St. Ann, and Office of Catholic Schools as sub-ministries | Unknown (see St. Ann, Mount St. Mary and Office of Catholic Schools below) | | No | Permanent injunction 03/07/2018 | 0 | | |
| | St. Ann | 78 employees | Form W-3 filing | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Mount St. Mary | Unknown | | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Office of Catholic Schools | | | | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Villa St. Francis Catholic Care Center | 100 participants | Complaint | Yes | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Goodwill Publishers | 140 employees | Complaint | Yes | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Catholic Charities Oklahoma City | 103 employees | Form W-3 filing | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | All Saints | Unknown | | No | Permanent injunction 03/07/2018 | 0 | 0 | |
| | Catholic Charities and Family Services, Diocese of Norwich | 69 employees | Second Complaint | Yes | Permanent injunction 03/07/2018 | 0 | 0 | |
| Catholic Charities of the Archdioceses of Philadelphia v. Burwell, No. 2:14-cv-3096 (E.D. Pa.), No. 14-3126 (3d Cir.) | Catholic Social Services | 626 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Francis Homes for Boys | 227 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Edmund's Home for Children | 226 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Don Guanella Village | 413 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Divine Providence Village | 667 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Gabriel's System | 458 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Community Services | 92 | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Nutritional Development Services | 64 | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Villa St. Martha | 117 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Monica Manor | 356 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. John Neumann Nursing Home | 360 Employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Immaculate Mary Home | 490 Employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Francis Country House | 488 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Martha Manor | 272 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | St. Mary Manor | 339 employees | Form W-3 filing | No | Dioscese self-insured plan | 0 | 0 | |
| | St. John Vianney Center | 84 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Clinical Consultants | 19 | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| Catholic Diocese of Beaumont v. Burwell, No. 1:13-cv-00709 (E.D. Tex.), No. 14-40212 (5th Cir.) | Diocese | 950 employees; 232 staff at schools | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | |
| Catholic Diocese of Biloxi v. Burwell, No. 1:14-cv-00146 (S.D. Miss.) | Catholic Charities of Southeast Texas, Inc. | 18 employees | Complaint | | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | |
| | Diocese of Jackson | 900 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | 140 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Vicksburg | 70 employees | Website | No | Diocese self-insured plan | 0 | 0 | |
| | St Joseph | 85 employees | Website | No | Diocese self-insured plan | 0 | 0 | |
| | Diocese of Biloxi | 600 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | De L'epee Deaf Center | 5 employees | Form W-3 filing | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Social & Community Services Inc. | 20 employees | Form W-3 filing | no | Diocese self-insured plan | 0 | 0 | |
| | Resurrection Catholic and Sacred Heart | 200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |

for DOL

Page 2

Exhibit 140

Draft - For Discussion Purposes

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICPIs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Conlon, Bishop of Catholic Diocese of Joliet v. Sebelius, 1:12-cv-03932 (N.D. Ill. May 21, 2012) | St. Dominic-Jackson Memorial Hospital and affiliated locations and programs | 2,200 employees | Complaint | No | Self-insured plan sponsored by Catholic affiliated hospital; grandfathered and already omits contraceptives; so could retain grandfathered status or pursue church plan status to continue omitting. | 0 | 0 | |
| | Diocese of Joliet | At least 1,570 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities of Joliet | 240 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Diocese of Springfield | 2585 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities of Springfield | 200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| Catholic Diocese of Nashville v. Burwell, No. 3:13-cv-1303 (M.D. Tenn.), No. 13-6640 (6th Cir.) | Catholic Charities of Chicago | 2700 employees | Complaint | Yes | Self-funded welfare benefit plan but not sure if church plan | 2,700 | 2,700 | |
| | Diocese of Nashville | 1200 employees | Complaint | No | House of Worship, fully insured | 0 | 0 | |
| | Catholic Charities | 115 employees | Complaint | Yes | | 115 | 115 | |
| | Aquinas College | 16 employees | Website | employees: yes; students: no | Website/news reports indicate recent drastic downsizing of workforce; students not counted because complaint does not allege a student plan | 16 | 16 | 0 |
| | Camp Marymount | 75 employees | Complaint | Yes | | 75 | 75 | |
| | MQA | 85 employees | Complaint | Yes | | 85 | 85 | |
| | St. Mary Villa | 50 employees | Complaint | Yes | | 50 | 50 | |
| Catholic Diocese of Peoria v. Sebelius, 1:12-cv-01276-JES-BGC (C.D. Ill. August 9, 2012) | Dominican Sisters | 23 employees | | No | Religious order | 0 | 0 | |
| | | Unknown | | | Diocese self-insured plan (court order, 2013 WL 74240), and grandfathered | 0 | 0 | |
| Catholic Health Care System v. Burwell, No. 1:12-cv-02542 (E.D.N.Y.), No. 14-427 (2d Cir.); PACER | Archdiocese of New York | 10,000 employees | Complaint | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242. | 0 | 0 | |
| | ArchCare | 4,000 employees | Complaint | No | Catholic hospital self-insured plan' | 0 | 0 | |
| | Catholic Health Services of Long Island | 17,000 employees | Complaint | No | Catholic hospital self-insured plan | 0 | 0 | |
| | The Diocese of Rockville Centre | 2,000 employees | Complaint | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242. | 0 | 0 | |
| | Monsignor Farrel High School | 73 employees | Website | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242. | 0 | 0 | |
| | Cardinal Spellman High School | 100 employees | Complaint | No | In the lawsuit the government took the position that this is a self-insured church plan. See, e.g., 987 F.Supp.2d at 242. | 0 | 0 | |
| Christian & Missionary Alliance Foundation, Inc., No. 2:14-cv-00580 (M.D. FL.), Nos. 15-11437, 15-11635 (11th Cir.) | CMA d/b/a Shell Point Retirement Center | 1247 employees | Form W-3 filing | Yes | | 1,247 | 1,247 | |
| | Alliance Community for Retirement Living | 344 employees | Form W-3 filing | Yes | | 344 | 344 | |
| | Alliance Home of Carlisle | 219 employees | Form W-3 filing | Yes | | 219 | 219 | |
| | Town and Country Manor | 365 employees | Form W-3 filing | Yes | | 365 | 365 | |
| | Simpson University | 815 employees | Complaint | employees: yes; students: no | Complaint does not seek relief for any student plan | 815 | 815 | 0 |
| | Crown College | 114 employees | Form W-3 filing; student enrollment: https://www.crown.edu/about/quick-facts/ ("nearly 1,300 students") | Yes | | 1,275 students; 114 employees | 114 | 1,275 |
| Christian Employers Alliance v. Burwell, 3:16-cv-309 (D.N.D.) | Christian Employers Alliance | Unknown | | No | No claim was made for CEA plans, and no list of members beyond TBC and TIC | 0 | 0 | |
| | Trinity Bible College | 249 employees | Form W-3 filing | employees: yes; students: no | complaint does not mention student plan | 249 | 249 | |
| | Treasure Island Coins | 9 staff | Website | Yes | | 9 | 9 | |
| Colorado Christian Univ. v. Burwell, No. 1:13-cv-02105 (D. Colo.), No. 14-1329 (10th Cir.) | Colorado Christian University | 5,300 students; 680 employees | Complaint | Yes | Permanent injunction 07/11/2018 | 0 | 0 | 0 |
| Conestoga Wood Specialties Corp. v. Burwell (Burwell v. Hobby Lobby Stores, Inc.), No. 13-356 (U.S. June 30, 2014); | Conestoga Wood Specialties Corp. (Individual operators of Conestoga Wood Specialties Corporation are the three other named plaintiffs) | 950 employees | Complaint | Yes | | 950 | 950 | |

00805061

Exhibit 140

JA-0001966

Draft - For Discussion Purposes

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus 1b/W1A and SICPs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| DeOtte v. Azar, No. 4:18-cv-00825-Y (N.D. Tex. Complaint Oct. 6, 2018) | Richard W. DeOtte, Yvette DeOtte, John Kelley, Alison Kelley, Hotze Health & Wellness Center | 75 employees | Complaint | Yes | | 75 | 75 | |
| Diocese of Cheyenne v. Burwell, No. 2:14-cv-00021 (D. Wyo.), No. 14-8040 (10th Cir.) | Diocese of Cheyenne | 16 employees plus over 100 teachers | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | 6 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | St. Anthony School | 41 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | St. Joseph's Home | 130 employees, 62 orphan children | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | JPIICS | 20 | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Wyoming Catholic College | 32 employees | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plan | 0 | 0 | 0 |
| Diocese of Fort Wayne-South Bend Inc. v. Burwell, No. 1:12-cv-00159 (N.D. Ind.), No. 14-1431 (7th Cir.) | Diocese of Fort Wayne South Bend | 2,741 employees | Complaint | No | Diocese self-insured plan; also grandfathered | 0 | 0 | |
| | Catholic Charities | 39 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | St Anne Home | 310 employees | Complaint | Yes | Self-insured plan, but not sure if it is a church plan | 310 | 310 | |
| | University of St Francis | 2,300 students, 413 employees | Complaint | employees: yes; students: no | No student plan discussed. Employee are offered a self-insured health plan, but not sure it is a church plan, so included | 413 | 413 | 0 |
| | Our Sunday Visitor | 300 employees | Complaint | Yes | Self-insured plan, but not sure if it is a church plan | 300 | 300 | |
| | Specialty Physicians | 342 employees | Complaint | Yes | | 342 | 342 | |
| | Franciscan Alliance | 18,000 employees | Complaint | Partial | All but 1,733 employees are on a church plan exempt from ERISA. See: https://www.franciscanhealth.org/site s/default/files/2015%20employee%2 0benefit%20booklet.pdf (Only employees in Illinois are in BCBS plans and there are 1733 of those employees according to complaint | 1,733 | 1,733 | |
| Doboszenski & Sons, Inc. v. Burwell, No. 0:13-cv-03148-JNE-FLN (D. Minn. Nov. 11, 2013); | | 32 employees | Complaint | Yes | | 32 | 32 | |
| Dobson v. Burwell, No. 1:13-cv-03326 (D. Colo.), No. 14-1233 (10th Cir.) | | 28 employees | Complaint | Yes | | 28 | 28 | |
| Domino's Farms Corporation v. Sebelius et al., No. 12-cv-15488 (E.D. Mich. Dec. 20, 2012) | | 89 employees | Complaint | Yes | | 89 | 89 | |
| Dordt Coll. v. Burwell, No. 5:13-cv-04100 (N.D. Iowa, Western Divison), No. 14-2726 (8th Cir.) | Dordt College | 1,400 students, 280 employees | Complaint | Yes | Permanent injunction 06/14/2018 | 0 | 0 | 0 |
| | Cornerstone University | 2,923 students, 294 employees | Complaint | employees: yes; students: no | Permanent injunction 06/14/2018 | 0 | 0 | 0 |
| East Texas Baptist Univ. v. Burwell, No. 4:12-cv-03009 (S.D. Tex.), No. 14-20112 (5th Cir.) | Houston Baptist University | 2,589 students, 416 employees | Complaint | No | Self-insured church plan | 0 | 0 | 0 |
| | East Texas Baptist University | 1,290 students, 283 employees | Complaint | Yes | | 1,290 students, 283 employees | 283 | 1,290 |
| | Westminster Theological Seminary (Intervenor) | 60 FT, 65 PT employees, 620 students | Complaint in intervention | employees: yes; students: no | complaint does not mention student plan | 125 | 125 | 0 |
| Eden Foods, Inc. v. Burwell, No. 13-1677 (6th Cir. June 28, 2013), | | 128 employees | Complaint | Yes | | 128 | 128 | |
| Eternal Word Television Network, Inc. v. Burwell, No. 1:13-cv-00521 (S.D. AL), No. 14-12696 (11th Cir.) | | 350 employees | Complaint | Yes | | 350 | 350 | |
| Fellowship of Catholic University Students v Burwell, No. 1:13-cv-03263-MSK-KMT (D. Colo. Apr. 23, 2014) | | 450 employees | Complaint | No | Case resolved on basis that plaintiff is integrated auxiliary | 0 | 0 | |
| Feltl & Co., Inc. v. Burwell, No. 13-CV-2635 DWF/JJK (D. Minn. Nov. 8, 2013); | Complaint lists two owners of the company as individual plaintiffs | 4 employees | Website | Yes | | 4 | 4 | |
| Franciscan University v. Sebelius, 2:12-CV-440 (S.D. Ohio) | | Unknown | Complaint | No | Sued while grandfathered and then dropped student plan. With no additional suit, no apparent affect from rule. | 0 | 0 | 0 |
| Geneva College v. Burwell, No. 2:12-cv-00207 (W.D. Pa.), Nos. 13-3536, 14-1374 (3rd. Cir.) | Geneva College | 1,850 students, 350 employees | Complaint | Yes | Permanent injunction docket # 144 | 0 | 0 | 0 |
| | Seneca Hardwood Lumber | 22 employees | Complaint | No | Permanent injunction shields from previous rule | 0 | 0 | |
| Gilardi v. U.S. Dep't of Health and Human Servs., No. 13-5069, 2013 WL 5854246 (D.C. Cir. Nov. 1, | Freshway Foods | 340 employees | Complaint | Yes | | 340 | 340 | |
| | Freshway Logistics | 55 employees | Complaint | Yes | | 55 | 55 | |
| Grace Schools v. Burwell, No. 3:12-cv-00459 (N.D. Ind.), No. 14-1430 (7th Cir.) | Grace College and Seminary | 2,700 students, 457 employees | Complaint | Yes | Permanent injunction 06/14/2018 | 0 | 0 | 0 |
| | Biola University | 6,222 students, 856 employees | Complaint | Yes | Permanent injunction 06/14/2018 | 0 | 0 | 0 |

00805062

Exhibit 140    JA-0001967

Draft—For Discussion Purposes

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICFs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Grote Indus. LLC v. Burwell, No. 13-1077, 2013 WL 5960692 (7th Cir. Nov. 8, 2013), cert. denied sub nom. Burwell v. Korte, No. 13-937 (U.S. July 1, 2014); | | 1,148 employees | Complaint | Yes | | 1,148 | 1,148 | |
| Hall v. Burwell, No. 0:13-cv-00295-JRT-LIB (D. Minn. Apr. 2, 2013); | | Approximately 50 employees | Complaint and online news reports | Yes | | 50 | 50 | |
| Hartenbower v. U.S. Dep't of Health and Human Servs., No. 1:13-cv-02253 (N.D. Ill. Apr. 18, 2013); | Hart Electric H.I. Hart | 54 employees (including owners) 7 employees | Complaint Complaint | Yes Yes | | 54 7 | 54 7 | |
| Hastings Chrysler Center, Inc. v. Burwell, No. 0:14 cv-00265-PAM-JJG (D. Minn. May 28, 2014); | | 60 employees | Complaint | Yes | | 60 | 60 | |
| Hobby Lobby Stores, Inc., et al. v. Sebelius, et al., No: CIV-12-1000-HE (W.D. Okla. Oct. 2, 2012); | Hobby Lobby Mardel | 13,240 employees 372 employees | Complaint Complaint | Yes Yes | | 13,240 372 | 13,240 372 | |
| Holland v. U.S. Dep't of Health and Human Servs, No. 13-15487 (S.D. W. Va. July 15, 2014); | | 150 employees | Complaint | Yes | | 150 | 150 | |
| Infrastructure Alternatives, Inc. v. Burwell, No. 1:13 cv-00031-RJJ (W.D. Mich. Sept. 30, 2013) | | 70 employees | Complaint | Yes | | 70 | 70 | |
| Insight for Living Ministries v. Burwell, No. 4:14-cv 675 (E.D. Tex.), No. 15-40031 (5th Cir.) | | 108 employees | Form W-3 filing | Yes | | 108 | 108 | |
| Johnson Welded Prods. v. Burwell, No. 1:16-cv-557 (D.D.C.) | | 421 employees (including Lilli Johnson) | Complaint | Yes | | 421 | 421 | |
| Korte v. Burwell, No. 12-3841, 2013 WL 5960692 (7th Cir. Nov. 8, 2013), cert. denied No. 13-937 (U.S. July 1, 2014); | | 90 employees | Complaint | Yes | | 90 | 90 | |
| Legatus v. Burwell, No. 2:12-cv-12061-RHC-MJH (E.D. Mich. Dec. 20, 2013) | Legatus | 69 employees | Complaint | Yes | Legatus injunction 12/20/2013, case dismissed 02/02/2018 | 0 | 0 | |
| Lindsay v. U.S. Dep't of Health and Human Servs., No. 13-cv-1210 (N.D. Ill. Mar. 20, 2013); | Weingartz Supply Company, W&P Management LLC, and subsidiaries | 170 employees | Complaint | Yes | | 170 | 170 | |
| | | 70 employees | Complaint | Yes | | 70 | 70 | |
| Little Sisters of the Poor Home for the Aged v. Burwell, No. 1:13-cv-2611 (D. Colo.), No. 13-1540 (10th Cir.) | Christian Brothers Employee Benefit Trust ( Little Sisters uses Christian Brothers Employee Benefit Trust, and Christian Brothers Services is the TPA for the Christian Brothers Employee Benefit Trust) | 5,000 employees | Complaint | No | Self-insured church plan, and permanent injunction 05/29/2018 | 0 | 0 | |
| Louisiana Coll. v. Burwell, No. 1:12-cv-00463 (W.D. La.), No. 14-31167 (5th Cir.) | | 1,450 students, 260 employees | Complaint | No | Self-insured church plan | 0 | 0 | 0 |
| March for Life v. Burwell, No. 1:14-cv-1149 (D.D.C.), No. 15-5301 (D.C. Cir.) | | 2 employees covered in plan; less than 10 overall | | No | All employees must/do oppose the coverage; therefore not counting as affected by rules | 0 | 0 | |
| Media Research Center v. Sebelius, No. 1:14-CV-379 (E.D. Virginia) | | 114 employees | Complaint | Yes | | 114 | 114 | |
| Mersino Mgmt. Co. v. Burwell, No. 13-1944 (6th Cir. July 9, 2014) | | 110 employees | Complaint | Yes | | 110 | 110 | |
| Michigan Catholic Conf. v. Burwell, No. 1:13-cv-1247 (W.D. Mich.), No. 13-2723 (6th Cir.) | Michigan Catholic Charities Catholic Charities | 6,429 employees 55 employees | Complaint Complaint | No No | Self-insured church plan Self-insured church plan | 0 0 | 0 0 | |
| Midwest Fastener Corp. v. Burwell, No. 1:13-cv-01337-ESH (D.D.C. Oct. 16, 2013); | | 187 employees | Complaint | Yes | | 187 | 187 | |
| MK Chambers Co. v. Dep't of Health and Human Servs., No. 13-cv-11379 (E.D. Mich. Nov. 21, 2014) | | 106 employees | Business profile on manta.org | Yes | | 106 | 106 | |
| Nagle, Christopher, et al. v. Kathleen Sebelius, et al., No. 2:13-cv-12036-VAR-DRG (E.D. Mich. May 10, 2013) (AKA "M&N Plastics") | | 109 employees | Complaint | Yes | | 109 | 109 | |
| Newland v. Burwell, 881 F. Supp. 2d 1287 (D. Colo. July 27, 2012), affirmed on appeal, No. 12-1380 (10th Cir. Oct. 3, 2013) | | 265 employees | Dist Ct Brief 4/30/12 | No | Permanent injunction | 0 | | |
| O'Brien v. U.S. Dep't of Health & Human Servs., No. 12-3357 (8th Cir. Nov. 28, 2012) | | 87 employees | Complaint | Yes | | 87 | 87 | |
| Ozinga v. Burwell, No. 1:13-cv-3292 (N.D. Ill.), No. 15-3648 (7th Cir.) | | 675+ employees | Complaint | Partial | Only 110 obtain insurance through the plan that would be affected by the exemption. This is upscaled to 110/62%=178 | 178 | 178 | |
| Persico v. Burwell, No. 1:13-cv-0303 (W.D. Pa.), Nos. 14-1376 (3d Cir.); formerly Most Reverend Donald W. Trautman, Bishop of the Roman Catholic Diocese of Erie, et al. v. Sebelius, No. 1:12-cv-00123-SPB (W.D. Pa. May | Cathlice Diocese of Erie St Martin Center Prince of Peace Center Erie Catholic Preparatory School | 1,500 employees 61 employees 20 employees 80 employees | Complaint Form W-3 filing Form W-3 filing Complaint | No No No No | Diocese self-insured plan Diocese self-insured plan Diocese self-insured plan Diocese self-insured plan | 0 0 0 0 | 0 0 0 0 | |
| Priests For Life, No. 1:13-cv-01261 (D.D.C.), No. 13 5368 (D.C. Cir.) | | 60 employees | Website | Yes | | 60 | 60 | |

Exhibit 140

JA-0001968

Draft- For Discussion Purposes

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICFs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Randy Reed Auto. Inc. v. Burwell, No. 5:13-cv-6117-SJ-ODS (W.D. Mo. Dec. 3, 2013); | | approximately 179 employees | Complaint | Yes | | 179 | 179 | |
| Reaching Souls Int'l, Inc. v. Burwell, No. 5:13-cv-01092 (W.D. Okla.), No. 14-6028 (10th Cir.) | | 78,000 participants (pastors, employees, and their families) | Complaint | No | Self insured church plan and permanent injunction 03/15/2018 | 0 | 0 | |
| Real Alternatives, Inc. v. Burwell, No. 1:15-cv-105 (M.D. Pa.), No. 16-1275 (3d Cir.) | | 3 employees | Complaint | No | All employees must/do oppose the coverage; therefore not counting as affected by rules | 0 | 0 | |
| Right to Life of Michigan v. Kathleen Sebelius; No. 1:13-CV-01202 (W.D. Mich. Nov. 22, 2013) | | 43 employees | Complaint | No | All employees must/do oppose the coverage; therefore not counting as affected by rules | 0 | 0 | |
| Roman Catholic Archbishop of Washington v. Burwell, No. 1:13-cv-01441 (D.D.C.), Nos. 13-5371, 14-5021 (D.C. Cir.) | Catholic University | 7,000 students; 1,766 employees | Complain | Yes | | 7,000 students, 1,766 employees | 1,766 | 7,000 |
| | Archdiocese of Washington | 2,100 eligible employees, 1,200 teachers/employees at schools | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Thomas Aquinas College | 370 students, 78 eligible employees | Complaint | No | Church plan and complaint does not state that it offers student insurance | 0 | 0 | 0 |
| | Consortium of Catholic Academies | 119 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Archbishop Carroll | 70 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Don Bosco | 51 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Information Center | 9 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Mary of Nazareth | 44 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | 890 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Victory Housing | 184 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| Roman Catholic Archdiocese of Atlanta v. Burwell, No. 1:12-cv-03489 (N.D. Ga.), Nos. 14-12890, 14-13239 (11th Cir.) | Roman Catholic Archdiocese of Atlanta | 9,800 students; 4,200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | 75 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | CENG | 200 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Diocese of Savannah | 5,000 students; hundreds of employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| Roman Catholic Diocese of Dallas v. Sebelius, No. 3:12-cv-01589-B (N.D. Tex.) | | 900 teachers/staff, 100+ employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| School of the Ozarks v. Rightchoice Managed Care, Inc., No. 6:13-cv-03157 (W.D. Mo.), No. 15-1330 (8th Cir.) | | 1,442 students, 601 employees | Students - online; employees Form w3 Filing | Employees only | Complaint does not say they offer a student plan | 601 | 601 | |
| Sharpe Holdings, Inc. v. Burwell, No. 2:12-cv-92 (E.D. Mo.) and CNS Int'l Ministries, No. 14-1507 (8th Cir.) | Sharpe | 50 employees | 2dam complaint and Linked in | Yes | | 50 | 50 | |
| | Ozark | 51 employees | 2dam complaint and Linked in | Yes | | 51 | 51 | |
| | CNS International Ministries | 204 employees | Form W-3 filing | Yes | | 204 | 204 | |
| | NIS Financial | 49 employees | 2dam Complaint | Yes | | 49 | 49 | |
| | CNS Corp | 49 employees | 2dam Complaint | Yes | | 49 | 49 | |
| | Heartland Christian College | 12 employees | Form W-3 filing | Employees only | Complaint does not say they offer a student plan | 12 | 12 | 0 |
| Sioux Chief Mfg. Co. v. Burwell, No. 13-0036-CV W-ODS (W.D. Mo. Feb. 28, 2013); | | 370 employees | Complaint | Yes | | 370 | 370 | |
| SMA, LLC v. Burwell, No. 0:13-cv-01375-ADM-LIB (D. Minn. July 8, 2013); | | 35 employees | Complaint | Yes | | 35 | 35 | |
| Southern Nazarene Univ. v. Burwell, No. 5:13-cv-1015 (W.D. Okla.), No. 14-6026 (10th Cir.) | Southern Nazarene University | 2,100 students, 505 employees | Complaint | Yes | Permanent injunction 05/15/2018 | 0 | 0 | 0 |
| | OK Weselan University | 1,220 students, 557 employees | Complaint | Employees only | Permanent injunction 05/15/2018 | 0 | 0 | 0 |
| | OK Baptist University | 1,900 students, 328 employees | Complaint | Yes | Permanent injunction 05/15/2018 | 0 | 0 | 0 |
| | Mid America Christian University | 1,447 stuends, 298 employees | Complaint | No | Permanent injunction 05/15/2018 | 0 | 0 | 0 |
| Stewart v. Burwell, No. 1:13-cv-01879 (D.D.C. Apr. 3, 2014); | Encompass Develop, Design & Construct, LLC | 43 employees | Complaint | Yes | | 43 | 43 | |
| Stinson Electric, Inc. v. Burwell, No. 14-00830-PJS-JJG (D. Minn. April 30, 2014); | | 19 employees | Business profile on manta.org | Yes | | 19 | 19 | |
| The C.W. Zumbiel Co. v. Burwell, No. 1:13-cv-01611 (D.D.C. Nov. 27, 2013); | | 350 employees | Complaint | Yes | | 350 | 350 | |
| The Criswell College v. Sebelius, No. 3:12-cv-04404-N (N.D. Tex.) | | 322 students, 50 employees | Complaint | Employees only | Complaint does not say they offer a student plan | 50 | 50 | |
| The QC Grp., Inc., v. Burwell, No. 0:13-cv-01726-JRT-SER (D. Minn. Sept. 11, 2013); | | 62 employees | Complaint | Yes | | 62 | 62 | |

00805064

Exhibit 140

JA-0001969

Draft- For Discussion Purposes

| Case | Plaintiffs | Number of Employees/Students | Document employee number located within | Are students/employees counted in final total? | If not counted, explanation why | Number counted towards final total | Total employees (minus HoW/IA and SICFIs) | Total students at relevant universities |
|---|---|---|---|---|---|---|---|---|
| Thomas G. Wenski v. Kathleen Sebelius; No. 12-cv-23820-Graham/Goodman (S.D. Fla. Nov. 7, 2012) | Archdiocese of Miami | Unknown | | No | House of worship | 0 | 0 | |
| | Catholic Health Services | 2,000 employees | Complaint | Yes | | 2,000 | 2,000 | |
| | Catholic Hospice | 610 employees | Form W-3 filing | Yes | | 610 | 610 | |
| | St. Thomas University | Unknown | | No | Lawsuit mentions St. Thomas University but asserts no claims for its health plans | 0 | 0 | 0 |
| Tonn & Blank Constr. v. Burwell, No. 1:12-cv-00325 JD-RBC (N.D. Ind. Apr. 1, 2013); | | 60 employees | Complaint | Yes | | 60 | 60 | |
| Trijicon, Inc. v. Burwell, No. 1:13-cv-1207 (D.D.C.) | | 469 employees | Complaint | Yes | | 469 | 469 | |
| Tyndale House Publishers, Inc. v. Burwell, 904 F. Supp. 2d 106 (D.D.C. Nov. 16, 2012); | | 260 employees | Complaint | Yes | | 260 | 260 | |
| Union University v. Burwell, No. 1:14-cv-1079 (W.D. Tenn.) | | 2,829 students, 1,116 employees | Students - online; employees Form w3 Filing | Employees only | Complaint does not say they offer a student plan | 1,116 employees | 1,116 | 0 |
| Univ of Dallas v. Burwell, No. 4:12-cv-00314 (N.D. Tex.), No. 14-10241 (5th Cir.), Nos. 14-10661 (5th Cir.) | Roman Catholic Diocese of Fort Worth | 6,500 students, 2,000 employees | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plar | 0 | 0 | |
| | University of Dallas | 2,600 students; 725 employees | Complaint | Yes | | 2,600 students; 725 employees | 725 | 2,600 |
| | Catholic Charities | 332 employees | Complaint | Yes | | 332 | 332 | |
| | Our Lady Of Victory Catholic School | 23 employees | Complaint | No | Offers coverage through Christian Brothers Employee Benefit Trust- a self insured church plar | 0 | 0 | |
| Univ. of Notre Dame v. Burwell, No. 3:13-cv-1276 (N.D. Ind.), No. 13-3853 (7th Cir.) | | 11,500 students, 5,000 employees | Complaint | yes | | 11,500 students, 5,000 employees | 5,000 | 11,500 |
| Valley Forge Christian College of the Assemblies of God v. Burwell, No. 14-4622 (E.D. Pa. Aug. 14, 2014) | | Unknown | Complaint | No | Plaintiff voluntarily dismissed suit; our understanding is they were satisfied with previous | 0 | 0 | 0 |
| Weingartz Supply Co. v. Burwell, No. 2:12-cv-12061 (E.D. Mich.), No. 14-1183 (6th Cir.) | | 170 employees | DC Ruling | Yes | | 170 | 170 | |
| Wheaton College v. Burwell, No. 1:13-cv-08910 (N.D. Ill.), No. 14-2396 (7th Cir.) | | 870 Employees | Complaint | Yes | Permanent injunction 02/22/2018 | 0 | 0 | 0 |
| Williams v. Burwell, No. 1:13-cv-01699 (D.D.C. Nov. 19, 2013); | | 3 employees | Complaint | Yes | | 3 | 3 | |
| Willis Law v. Burwell, No. 1:13-cv-01124-CKK (D.D.C. Aug. 23, 2013); | | 15 employees | Complaint | Yes | | 15 | 15 | |
| Yep v. Seblius, No. 1:12-cv-6756 (N.D. Ill.), Triune Health Group, Inc. v. Burwell, No. 1:12-cv-06756 (N.D. Ill.); No. 13-1478 (7th Cir.) | | 4 employees | Website | Yes | | 4 | 4 | |
| Zubik v. Burwell, No. 2:13-cv-1459 (W.D. Pa.), Nos. 14-1377 (3d Cir.) | Diocese | 140+ full-time employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Charities | 115 employees | Complaint | No | Diocese self-insured plan | 0 | 0 | |
| | Catholic Cemeteries | 207 employees | Complaint | No | Diocese self-insured plan. Cemeteries was covered by the diocese's previous self-insured plan the Catholic Employers Benefits Plan; the new complaint says that CEBS was converted to the Catholic Benefits Trust, and Cemeteries are omitted as co-plaintiffs | 0 | 0 | |

Total: 48,654 | 25,265

10.6% of students covered in 2014

estimated 2,100,000 students were covered by plans of four-year granting institutions of higher education, and there were a total of 20,207,000 students in degree-granting postsecondary institutions other than 2-year degree programs. see at
https://www.acha.org/documents/Networks/Coalitions/Why_SHIPs_Matter.pdf and
https://nces.ed.gov/programs/digest/d16/tables/dt16_105.20.asp?current=yes.

Total: 48,654 employees in affected plans | 2,626 students in affected plans

for DOI

Page 7

Exhibit 140

## EBSA FORM 700-- CERTIFICATION
(revised August 2014)

This form may be used to certify that the health coverage established or maintained or arranged by the organization listed below qualifies for an accommodation with respect to the federal requirement to cover certain contraceptive services without cost sharing, pursuant to 26 CFR 54.9815-2713A, 29 CFR 2590.715-2713A, and 45 CFR 147.131. Alternatively, an eligible organization may also provide notice to the Secretary of Health and Human Services.

Please fill out this form completely. This form should be made available for examination upon request and maintained on file for at least 6 years following the end of the last applicable plan year.

| | |
|---|---|
| Name of the objecting organization | |
| Name and title of the individual who is authorized to make, and makes, this certification on behalf of the organization | |
| Mailing and email addresses and phone number for the individual listed above | |

I certify the organization is an eligible organization (as described in 26 CFR 54.9815-2713A(a), 29 CFR 2590.715-2713A(a); 45 CFR 147.131(b)) that has a religious objection to providing coverage for some or all of any contraceptive services that would otherwise be required to be covered.

Note: An organization that offers coverage through the same group health plan as a religious employer (as defined in 45 CFR 147.131(a)) and/or an eligible organization (as defined in 26 CFR 54.9815-2713A(a); 29 CFR 2590.715-2713A(a); 45 CFR 147.131(b)), and that is part of the same controlled group of corporations as, or under common control with, such employer and/or organization (within the meaning of section 52(a) or (b) of the Internal Revenue Code), is considered to meet the requirements of 26 CFR 54.9815-2713A(a)(3), 29 CFR 2590.715-2713A(a)(3), and 45 CFR 147.131(b)(3).

*I declare that I have made this certification, and that, to the best of my knowledge and belief, it is true and correct. I also declare that this certification is complete.*

_____
Signature of the individual listed above


_____
Date

**667329**

Exhibit 141                                                                                JA-0001971

The organization or its plan using this form must provide a copy of this certification to the plan's health insurance issuer (for insured health plans) or a third party administrator (for self-insured health plans) in order for the plan to be accommodated with respect to the contraceptive coverage requirement.

Notice to Third Party Administrators of Self-Insured Health Plans

In the case of a group health plan that provides benefits on a self-insured basis, the provision of this certification to a third party administrator for the plan that will process claims for contraceptive coverage required under 26 CFR 54.9815-2713(a)(1)(iv) or 29 CFR 2590.715-2713(a)(1)(iv) constitutes notice to the third party administrator that the eligible organization:

(1) Will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services; and

(2) The obligations of the third party administrator are set forth in 26 CFR 54.9815-2713A, 29 CFR 2510.3-16, and 29 CFR 2590.715-2713A.

As an alternative to using this form, an eligible organization may provide notice to the Secretary of Health and Human Services that the eligible organization has a religious objection to providing coverage for all or a subset of contraceptive services, pursuant to 26 CFR 54.9815-2713A(b)(1)(ii)(B) and (c)(1)(ii), 29 CFR 2590.715-2713A(b)(1)(ii)(B) and (c)(1)(ii), and 45 CFR 147.131(c)(1)(ii). A model notice is available at: http://www.cms.gov/cciio/resources/Regulations-and-Guidance/index.html#Prevention.

This form or a notice to the Secretary is an instrument under which the plan is operated.

PRA Disclosure Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 1210-0150. An organization that seeks to be recognized as an eligible organization that qualifies for an accommodation with respect to the federal requirement to cover certain contraceptive services without cost sharing may complete this self-certification form, or provide notice to the Secretary of Health and Human Services, in order to obtain or retain the benefit of the exemption from covering certain contraceptive services. The self-certification form or notice to the Secretary of Health and Human Services must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974, which generally requires records to be retained for six years. The time required to complete this information collection is estimated to average 50 minutes per response, including the time to review instructions, gather the necessary data, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: U.S. Department of Labor, Employee Benefits Security Administration, Office of Policy and Research, 200 Constitution Avenue, N.W., Room N-5718, Washington, DC 20210 or email ebsa.opr@dol.gov and reference the OMB Control Number 1210-0150.

**667330**

Exhibit 141    JA-0001972