

THE KAISER FAMILY FOUNDATION
- AND -
HEALTH RESEARCH &
EDUCATIONAL TRUST

•

# Employer Health Benefits

•

2017

ANNUAL SURVEY

THE HENRY J.
KAISER FAMILY FOUNDATION    -and-    HRET
HEALTH RESEARCH &
EDUCATIONAL TRUST

667080

Exhibit 142                                                    JA-0001973

Primary Authors:

**KAISER FAMILY FOUNDATION**

**Gary Claxton**

**Matthew Rae**

**Michelle Long**

**Anthony Damico**

**HEALTH RESEARCH & EDUCATIONAL TRUST**

**Gregory Foster**

**NORC AT THE UNIVERSITY OF CHICAGO**

**Heidi Whitmore**

Filling the need for trusted information on national health issues, the **Kaiser Family Foundation** is a nonprofit organization based in Menlo Park, California.

Founded in 1944, the **Health Research & Educational Trust (HRET)** is the not-for-profit research and education affiliate of the American Hospital Association (AHA). HRET's mission is to transform health care through research and education. HRET's applied research seeks to create new knowledge, tools and assistance in improving the delivery of health care by providers and practitioners within the communities they serve.

**NORC** at the University of Chicago is an independent research organization headquartered in downtown Chicago with additional offices on the University of Chicago's campus and in the D.C. Metro area. NORC also supports a nationwide field staff as well as international research operations. With clients throughout the world, NORC collaborates with government agencies, foundations, educational institutions, nonprofit organizations, and businesses to provide data and analysis that support informed decision making in key areas including health, education, economics, crime, justice, energy, security, and the environment. NORC's 75 years of leadership and experience in data collection, analysis, and dissemination—coupled with deep subject matter expertise—provides the foundation for effective solutions.

Copyright © 2017 Henry J. Kaiser Family Foundation, Menlo Park, California, and Health Research & Educational Trust, Chicago, Illinois. All rights reserved.

Printed in the United States of America.

**667081**

Exhibit 142                                                                                                          JA-0001974

# Abstract

This annual survey of employers provides a detailed look at trends in employer-sponsored health coverage including premiums, employee contributions, cost-sharing provisions, and employer practices. The 2017 survey included more than 2,100 interviews with non-federal public and private firms.

Annual premiums for employer-sponsored family health coverage reached $18,764 this year, up 3% from last year, with workers on average paying $5,714 towards the cost of their coverage, according to the Kaiser Family Foundation/Health Research & Education Trust 2017 Employer Health Benefits Survey. The 2017 survey includes information on the use of incentives for employer wellness programs, plan cost sharing, and firm offer rates. Survey results are released in a variety of ways, including a full report with downloadable tables on a variety of topics, summary of findings, and an article published in the journal *Health Affairs*.

**667082**

Exhibit 142

JA-0001975

# Summary of Findings

Employer-sponsored insurance covers over half of the non-elderly population; approximately 151 million nonelderly people in total.[1] To provide current information about employer-sponsored health benefits, the Kaiser Family Foundation (Kaiser) and the Health Research & Educational Trust (HRET) conduct an annual survey of private and nonfederal public employers with three or more workers. This is the nineteenth Kaiser/HRET survey and reflects employer-sponsored health benefits in 2017.

## HEALTH INSURANCE PREMIUMS AND WORKER CONTRIBUTIONS

In 2017, the average annual premiums for employer-sponsored health insurance are $6,690 for single coverage and $18,764 for family coverage [Figure A]. The average single premium increased 4% and the average family premium increased 3% in 2017. Workers' wages increased 2.3% and inflation increased 2.2% over the last year.[2] The average premium for family coverage is lower for covered workers in small firms (3-199 workers) than for workers in large firms (200 or more workers) ($17,615 vs. $19,235).

Premiums for family coverage have increased 19% since 2012 and 55% since 2007 [Figure B]. Average premiums for high-deductible health plans with a savings option (HDHP/SOs) are considerably lower than the overall average for all plan types for both single and family coverage, at $6,024 and $17,581, respectively [Figure A]. These premiums do not include any firm contributions to workers' health savings accounts or health reimbursement arrangements.

Premiums vary significantly around the averages for both single and family coverage, reflecting differences in health care costs and compensation decisions across regions and industries. Seventeen percent of covered workers are in plans with an annual total premium for family coverage of at least $22,517 (120% or more of the average family premium), and 21% of covered workers are in plans where the family premium is less than $15,011 (less than 80% of the average family premium).

Most covered workers make a contribution toward the cost of the premium for their coverage. On average, covered workers contribute 18% of the premium for single coverage and 31% of the premium for family coverage. Workers in small firms contribute a higher average percentage of the premium for family coverage than workers in large firms (39% vs. 28%).

Covered workers in firms with a relatively high percentage of lower-wage workers (at least 35% of workers earn $24,000 a year or less) contribute higher percentages of the premium for single (23%) and family (37%) coverage than workers in firms with a smaller share of lower-wage workers (18% and 31%, respectively).[3]

As with total premiums, the share of the premium contributed by workers varies considerably. For single coverage, 14% of covered workers are in plans that do not require them to make a contribution, 60% are in plans that require a contribution of 25% or less of the total premium, and 2% are in plans that require a contribution of more than half of the premium. For family coverage, 3% of covered workers are in plans that do not require them to make a contribution, 44% are in a plan that requires a contribution of 25% or less of the total premium, and 16% are in plans that require more than half of the premium. Covered workers in small firms are more likely than covered workers in large firms to be in a plan that requires the worker to contribute more than 50% of the total family premium (36% vs. 8%).

---

[1] Kaiser Commission on Medicaid and the Uninsured. The uninsured: A primer — Key facts about health insurance and the uninsured in the era of health reform: Supplemental Tables [Internet]. Washington (DC): The Commission; 2016 Nov [cited 2017 Aug 1]. http://files.kff.org/attachment/ Supplemental-Tables-The-Uninsured-A%20Primer-Key-Facts-about-Health-Insurance-and-the-Uninsured-in-America-in-the-Era-of-Health-Reform. See Table 1: 271.3 million nonelderly people, 55.8% of whom are covered by employer-sponsored insurance.

[2] Kaiser/HRET surveys use the April-to-April time period, as do the sources in this and the following note. The inflation numbers are not seasonally adjusted. Bureau of Labor Statistics. Consumer Price Index - All Urban Consumers: Department of Labor; 2017. [cited 2017 July 21] https: //data.bls.gov/timeseries/CUUR0000SA0?output_view=pct_1mth. Wage data are from the Bureau of Labor Statistics and based on the change in total average hourly earnings of production and nonsupervisory employees. Employment, hours, and earnings from the Current Employment Statistics survey: Department of Labor; 2017 [cited 2017 July 21]. http://data.bls.gov/timeseries/CES0500000008

[3] This threshold is based on the twenty-fifth percentile of workers' earnings as reported by the Bureau of Labor Statistics, using data for 2016. Bureau of Labor Statistics. May 2016 national occupational employment and wage estimates: United States [Internet]. Washington (DC): BLS; [last modified 2017 Mar 310; cited 2017 Aug 15]. Available from: http://www.bls.gov/oes/current/oes_nat.htm

**667083**

Exhibit 142

JA-0001976

SUMMARY OF FINDINGS

With regard to dollar amounts, the average annual premium contributions by covered workers for 2017 are $1,213 for single coverage and $5,714 for family coverage. Eight percent of covered workers contribute $12,000 or more a year for family coverage [Figure C]. Average contribution amounts for covered workers in HDHP/SOs are lower for single and family coverage than for covered workers in other plan types [Figure A]. Covered workers' average dollar contribution to family coverage has increased 74% since 2007 and 32% since 2012 Figure B]. Covered workers in small firms have lower average contributions for single coverage than workers in large firms ($1,030 vs. $1,289), but higher average contributions for family coverage ($6,814 vs. $5,264).

One reason for this variation in dollar amounts is the different approaches that employers use to structure employee contributions, particularly for family coverage. Of firms that offer family coverage, 45% of small firms and 15% of large firms provide the same dollar contribution for single and family coverage, which means that workers must pay the full additional premium cost to enroll family members in their plan. Forty-five percent of small firms and 75% of large firms make a higher dollar contribution for family coverage than for single coverage; 1% of small firms and 4% of large firms vary their approach with the class of the employee; and the remaining 9% of small firms and 6% of large firms take some other approach. Sixteen percent of covered workers are in a plan that requires workers who use tobacco to contribute more toward the premium.

**Figure A**
**Average Annual Firm and Worker Premium Contributions and Total Premiums for Covered Workers for Single and Family Coverage, by Plan Type, 2017**



* Estimate is statistically different from All Plans estimate within coverage type (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667084

Exhibit 142

JA-0001977

**Figure B**
**Average Annual Health Insurance Premiums and Worker Contributions for Family Coverage, 2007-2017**



NOTE: Since 2007, the average family premium has increased 55% and the average worker contribution toward the premium has increased 74%
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

**Figure C**
**Distribution of Worker Premium Contributions for Single and Family Coverage, 2017**



SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667085**

Exhibit 142                                                                                                  JA-0001978

## PLAN ENROLLMENT

PPOs continue to be the most common plan type in 2017, enrolling 48% of covered workers. Twenty-eight percent of covered workers are enrolled in a high-deductible plan with a savings option (HDHP/SO), 14% in an HMO, 10% in a POS plan, and <1% in a conventional (also known as an indemnity) plan [Figure D]. Over the last five years, enrollment in PPOs has fallen by 8 percentage points while enrollment in HDHP/SOs has increased by 9 percentage points. Six percent of firms offering an HDHP/SO offer only an HDHP/SO to at least some of their workers.

**Figure D**
**Distribution of Health Plan Enrollment for Covered Workers, by Plan Type and Firm Size, 2017**



* Enrollment in plan type is statistically different between All Small Firms and All Large Firms (p < .05).
NOTE: HMO is health maintenance organization. PPO is preferred provider organization. POS is point-of-service plan. HDHP/SO is high-deductible health plan with a savings option, such as a health reimbursement arrangement (HRA) or a health savings account (HSA).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Self-Funding.** Fifteen percent of covered workers in small firms and 79% in large firms are enrolled in plans that are either partially or completely self-funded, similar to last year. Although there has been discussion of more insurers offering partially self-funded plans (sometimes called level-premium plans) to smaller employers, we have not seen an increase in respondents reporting that they have self-funded plans in recent years.

**Association Health Plans.** Six percent of offering firms with fewer than 250 workers offer health benefits arranged through a trade or professional association.

## EMPLOYEE COST SHARING

Most covered workers must pay a share of the cost when they use health care services. Eighty-one percent of covered workers have a general annual deductible for single coverage that must be met before most services are paid for by the plan [Figure E]. Even workers without a general annual deductible often face other types of cost sharing when they use services, such as copayments or coinsurance for office visits and hospitalizations.

Among covered workers with a general annual deductible, the average deductible amount for single coverage is $1,505, similar to the average deductible last year ($1,478). The average deductible for covered workers is higher in small firms than in large firms ($2,120 vs. $1,276). Among all covered workers, including both those with and without a deductible, the average

**667086**

Exhibit 142

JA-0001979

deductible is $1,221. Fifty-eight percent of covered workers in small firms and 48% of covered workers in large firms are in a plan with a deductible of at least $1,000 for single coverage, similar to the percentages last year. Over the last five years, however, the percentage of covered workers with a general annual deductible of $1,000 or more for single coverage has grown substantially, increasing from 34% in 2012 to 51% in 2017 [Figure E]. Thirty-seven percent of covered workers in small firms are in a plan with a deductible of at least $2,000, compared to 15% for covered workers in large firms.

Deductibles have increased in recent years due to higher deductible amounts within plan types and to higher enrollment in HDHP/SOs. While growing deductibles in PPOs and other plan types generally increase enrollee out-of-pocket liability, the shift in enrollment to HDHP/SOs does not necessarily do so because most HDHP/SO enrollees receive an account contribution from their employers. Twenty-one percent of covered workers in an HDHP with a Health Reimbursement Arrangement (HRA) and 2% of covered workers in a Health Savings Account (HSA)-qualified HDHP receive an account contribution for single coverage at least equal to their deductible, while another 35% of covered workers in an HDHP with an HRA and 30% of covered workers in an HSA-qualified HDHP receive account contributions that, if applied to their deductible, would reduce their cost sharing to less than $1,000.

Whether they face a general annual deductible or not, a large share of covered workers also pay a portion of the cost when they visit an in-network physician. For primary care, 71% of covered workers have a copayment (a fixed dollar amount) when they visit a doctor and 22% have coinsurance (a percentage of the covered amount). For specialty care, 67% face a copayment and 26% face coinsurance. The average copayments are $25 for primary care and $38 for specialty care. The average coinsurance is 19% for primary and 19% for specialty care. These amounts are similar to those in 2016.

Most workers also face additional cost sharing for an emergency room visit, hospital admission, or outpatient surgery. After any general annual deductible is met, 32% of covered workers have a coinsurance and 58% have a copayment for an emergency room visit, and 64% of covered workers have a coinsurance and 12% have a copayment for hospital admissions. The average coinsurance rate for hospital admissions is 19% and the average copayment is $336 per hospital admission. The cost sharing provisions for outpatient surgery follow a similar pattern to those for hospital admissions.

While almost all (98%) covered workers are in plans with a limit on in-network cost sharing (called an out-of-pocket maximum) for single coverage, there is considerable variation in the actual dollar limits [Figure F]. Fifty-seven percent of these workers are in a plan with an annual out-of-pocket maximum for single coverage of more than $3,000, while 18% are in a plan with an out-of-pocket maximum of $6,000 or more.

667087

Exhibit 142                                                                                                    JA-0001980

SUMMARY OF FINDINGS

**Figure E**

**Percentage Of Covered Workers With Various Single Coverage General Annual Deductible Levels, 2012 and 2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: These estimates include workers enrolled in HDHP/SOs and other plan types. Account contributions include an employer's contribution to an HSA or HRA. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2012 and 2017

**Figure F**

**Percentage of Covered Workers Enrolled in a Plan with an Out-of-Pocket Maximum for Single Coverage, 2009-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: OOP refers to out-of-pocket. Out-of-pocket maximums reported are for in-network services. Covered workers without an OOP maximum are considered to be exposed to at least the specified threshold. Some of these workers may be enrolled in plans whose cost-sharing structure has other limits that make it impossible to reach the specified threshold.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 9

**667088**

Exhibit 142

JA-0001981

## AVAILABILITY OF EMPLOYER-SPONSORED COVERAGE

Fifty-three percent of firms offer health benefits to at least some of their workers, similar to the percentage last year [Figure G]. Eighty-nine percent of workers are in a firm that offers health benefits to at least some of its workers. Over the past decade, the percentage of workers at small firms that offer health benefits to at least some workers has decreased (78% vs 73%).

The likelihood of offering health benefits differs significantly by firm size, with only 40% of firms with 3 to 9 workers offering coverage while virtually all firms with 1,000 or more workers offer coverage.

Even in firms that offer health benefits, some workers are not eligible to enroll (e.g., waiting periods or part-time or temporary work status) and others who are eligible choose not to enroll (e.g., they feel the coverage is too expensive or they are covered through another source). In firms that offer coverage, 79% of workers are eligible for the health benefits offered, and of those eligible, 78% take up the firm's offer, resulting in 62% of workers in offering firms enrolling in coverage through their employer. All of these percentages are similar to 2016.

Looking across workers both in firms that offer and those that do not offer health benefits, 55% of workers are covered by health plans offered by their employer.

**Coverage for Family members.** Among firms offering health benefits, virtually all large firms and 94% of small firms offer coverage to spouses of eligible workers. Similarly, virtually all large firms and 92% of small firms offering health benefits offer coverage to other dependents of their eligible workers, such as children.



Figure G
Percentage of Firms Offering Health Benefits, by Firm Size, 1999-2017

## RETIREE COVERAGE

Of the large firms offering health benefits to workers in 2017, 25% also offer health benefits to retirees, similar to the percentage in 2016 (24%). Among large firms that offer retiree health benefits, 95% offer health benefits to early retirees (workers retiring before age 65) and 66% offer health benefits to Medicare-age retirees. Twenty-six percent of large firms

**667089**

Exhibit 142

JA-0001982

offering retiree benefits contribute to benefits through a contract with a Medicare Advantage plan. Twelve percent of large firms offering retiree benefits offer retiree benefits through a corporate or private exchange.

## SUPPLEMENTAL AND VOLUNTARY BENEFITS

Firms offering health benefits also offer a variety of supplemental and other health benefits to their workers. Among firms offering health benefits, 67% of small firms and 97% of large firms offer dental benefits to their workers; 47% of small firms and 82% of large firms offer vision benefits; 23% of small firms and 46% of large firms offer critical illness insurance; 16% of small firms and 28% of large firms offer hospital indemnity insurance; and 16% of small firms and 25% of large firms offer long-term care insurance. Among all firms offering these supplemental benefits, firms are more likely to make a contribution toward dental coverage (67%) or vision coverage (54%) than for critical illness insurance (3%) or hospital indemnity insurance (5%).

## WELLNESS, HEALTH RISK ASSESSMENTS AND BIOMETRIC SCREENINGS

A large share of firms have programs that encourage workers to identify health issues and to take steps to improve their health. Many firms offer health screening programs including health risk assessments, which are questionnaires asking workers about lifestyle, stress or physical health, and in-person examinations such as biometric screenings. Many firms also use incentives to encourage workers to complete assessments, participate in wellness programs, or meet biometric outcomes. As we have seen in previous years, there is considerable uncertainty among small firms on some questions, particularly those related to incentives, so findings are reported only for large firms in some instances.

**Health Risk Assessments.** Among firms offering health benefits, 38% of small firms and 62% of large firms provide workers an opportunity to complete a health risk assessment. A health risk assessment includes questions about a person's medical history, health status, and lifestyle. Fifty-two percent of large firms with a health risk assessment program offer an incentive to encourage workers to complete the assessment. Among large firms with an incentive, the incentives include: gift cards, merchandise or similar incentives (50% of firms); requiring a completed health risk assessment to be eligible for other wellness incentives (46% of firms); lower premium contributions or cost sharing (46% of firms); and financial rewards such as cash, contributions to health-related savings accounts, or avoiding a payroll fee (40% of firms).

**Biometric Screenings.** Twenty-one percent of small firms and 52% of large firms offering health benefits offer workers the opportunity to complete a biometric screening. A biometric screening is a health examination that measures a person's risk factors such as body weight, cholesterol, blood pressure, stress, and nutrition. Fifty-three percent of large firms with biometric screening programs offer workers an incentive to complete the screening. Among large firms with an incentive, the incentives include: lower premium contributions or cost sharing (49% of firms); gift cards, merchandise or similar incentives (44% of firms); requiring a completed biometric screening to be eligible for other wellness incentives (41% of firms); and financial rewards such as cash, contributions to health-related savings accounts, or avoiding a payroll fee (33% of firms). In addition, 14% of large firms with a biometric screening program have incentives tied to whether workers met specified biometric outcomes, such as a targeted body mass index (BMI) or cholesterol level.

**Health and Wellness Promotion Programs.** Many firms offer programs to help workers identify health risks and unhealthy behaviors and improve their lifestyles. Fifty-eight percent of small firms and 85% of large firms offer a program in at least one of these areas: smoking cessation; weight management; behavioral or lifestyle coaching. Thirty-two percent of large firms with one of these health and wellness programs offer workers an incentive to participate in or complete the program. Among large firms with an incentive for completing wellness programs, incentives include: gift cards, merchandise or similar incentives (68% of firms); requiring completion of activities to be eligible for other wellness incentives (44% of firms); financial rewards such as cash, contributions to health-related savings accounts, or avoiding a payroll fee (37% of firms); and lower premium contributions or cost sharing (19% of firms).

Eight percent of small firms and 14% of large firms report collecting health information from workers through wearable devices such as a Fitbit or Apple Watch.

As risk assessments and wellness programs have become more complex, incentives and rewards have become more sophisticated and may involve participating in or meeting goals in different programs (e.g., completing an assessment and

**667090**

Exhibit 142

JA-0001983

participating in a health promotion activity). To better understand the combined incentives or penalties facing program participants, we asked large firms that had any incentives for health risk assessments, biometric screenings, or the specified health and wellness promotion programs what the maximum incentive was for a worker for all of their programs combined. Among large firms with any type of incentive, 25% have a maximum incentive of 150 or less; 33% have a maximum incentive between $151 and $500; 23% have a maximum incentive between $501 and $1,000; 13% have a maximum incentive between $1,001 and $2,000; and 6% have a maximum incentive of more than $2,000 [Figure H].



**Figure H**
**Among Large Firms That Offer Workers an Incentive to Participate In or Complete Any Health Promotion Programs, Maximum Annual Value of the Incentive for All Programs Combined, 2017**

NOTE: Large firms have 200 or more workers. Includes incentives for health risk assessments, biometric screenings, and wellness programs. Firms with at least one of the listed health promotion programs were asked to report the maximum incentive an employee and his/her dependent could receive for all of the firm's health promotion programs combined. Forty-five percent of large offering firms have an incentive to complete any of their health promotion programs.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## SITES OF CARE

**Telemedicine.** Sixty-three percent of large firms that offer health benefits cover the provision of health care services through telecommunication in their largest health plan [Figure I]. Among these firms, 33% reported that workers have a financial incentive to receive services through telemedicine instead of visiting a physician's office.

**Retail Health Clinics.** Seventy-three percent of large firms cover services offering health benefits provided in retail health clinics, such as those found in pharmacies and supermarkets, in their largest health plan [Figure I]. Among these firms, 17% reported that workers have a financial incentive to receive services in a retail clinic instead of visiting a traditional physician's office.

**Nurse Hotline.** Seventy-nine percent of large firms offering health benefits have a nurse hotline as part of their largest health plan [Figure I].

## PROVIDER NETWORKS

**High Performance or Tiered Networks.** Fifteen percent of large firms offering health benefits have high performance or tiered networks in their largest health plan, similar to the percentage reported last year [Figure I]. These programs identify

**667091**

Exhibit 142

JA-0001984

providers that are more efficient and generally provide financial or other incentives for enrollees to use the selected providers.

**Narrow Networks.** Nine percent of large firms offering health benefits offer a health plan that they consider to have a narrow network (i.e., a network they would consider more restrictive than a standard HMO network), similar to the percentage reported last year [Figure I].

**Eliminated Hospitals or Health Systems.** Only 3% of large firms report that they or their health plan eliminated a hospital or health system in the past year in order to reduce the costs of their plan, similar to the percentage reported last year [Figure I].



**Figure I**
**Among Large Firms Offering Health Benefits, Percentage of Firms Whose Plan Includes Various Features, 2017**

NOTE: Large Firms have 200 or more workers. For Coverage at Retail Clinics, Delivery of Care Through Telemedicine, High Performance or Tiered Provider Network, and Nurse Hotline, firms were asked if their plan with the largest enrollment had these features. The High Performance or Tiered Provider Network question was asked of firms with 50 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Private Exchanges.** Four percent of firms offering health benefits with at least 50 workers offer health benefits through a private exchange. Among firms offering health benefits that do not currently offer through a private exchange, 10% with at least 50 workers, including 22% with at least 5,000 workers, say they have considered offering coverage through a private exchange.

## CONCLUSION

The market for employer-sponsored health benefits continues along with no big changes in 2017. Premium increases are modest and there is no appreciable change in cost sharing or enrollment by type of plan. Employers continue to invest in health promotion and wellness approaches, including building incentives around programs that collect information about employee health and lifestyles.

Despite continuing economic improvement, with lower rates of unemployment, and the ACA employer mandate, there are no signs that the long-term declines in the offer and coverage rates are reversing. Even with modest premium growth, offer rates for small firms remain much lower than those for large firms, and the percentage of workers covered at work remains at 62%.

We continue to see significant variation around the average premiums and contribution amounts, particularly for small businesses. A meaningful share of covered workers in small firms must pay a substantial share of the cost of family coverage, raising the question of whether this is a viable source of coverage for the dependents of these workers.

**667092**

Exhibit 142                                                                                     JA-0001985

The debate about the future of the ACA has focused on the provisions that extended coverage in the non-group market and Medicaid, with the provisions affecting employer-sponsored coverage receiving relatively little attention. Employers generally appear to have adapted to ACA provisions without significant disruption, including the employer requirement to offer coverage or pay a penalty, the provisions requiring preventive care be covered without cost sharing, and that non-grandfathered plans have an out-of-pocket limit on cost sharing. Even if repeal and replace efforts ultimately succeed, the impacts on the group market will likely be relatively small: for example, some employers may reduce offers of coverage to some of their lower-paid employees or may reduce the number of preventive services available without cost sharing; but the larger metrics measuring costs and coverage are unlikely to change in any significant way.

One policy that could affect the market over the next couple of years is the high-cost plan tax, also known as the Cadillac tax. In previous surveys, employers reported increasing cost sharing and making other changes in anticipation of the high-cost plan tax taking effect in 2018. With the effective date of the tax delayed until 2020 (and with the apparent widespread Congressional support for further delay), the pressure for employers with more expensive plans to take actions to reduce their cost seems to have abated. This could change abruptly, however, if the tax is not further delayed in the near future.

# METHODOLOGY

The Kaiser Family Foundation/Health Research & Educational Trust 2017 Annual Employer Health Benefits Survey (Kaiser/HRET) reports findings from a telephone survey of 2,137 randomly selected non-federal public and private employers with three or more workers. Researchers at the Health Research & Educational Trust, NORC at the University of Chicago, and the Kaiser Family Foundation designed and analyzed the survey. National Research, LLC conducted the fieldwork between January and June 2017. In 2017, the overall response rate is 33%, which includes firms that offer and do not offer health benefits. Among firms that offer health benefits, the survey's response rate is also 33%. To improve estimates for small firms, the 2017 survey had a significantly larger sample than previous years; the increased sample size lead to both more firms completing the survey and a lower response rate than in years past. Unless otherwise noted, differences referred to in the text and figures use the 0.05 confidence level as the threshold for significance.

For more information on the survey methodology, please visit the Methodology section at http://ehbs.kff.org/.

---

**The Kaiser Family Foundation**, a leader in health policy analysis, health journalism and communication, is dedicated to filling the need for trusted, independent information on the major health issues facing our nation and its people. The Foundation is a non-profit private operating foundation based in Menlo Park, California.

**The Health Research & Educational Trust (HRET)** Founded in 1944, the Health Research & Educational Trust (HRET) is the not-for-profit research and education affiliate of the American Hospital Association (AHA). HRET's mission is to transform health care through research and education. HRET's applied research seeks to create new knowledge, tools and assistance in improving the delivery of health care by providers and practitioners within the communities they serve.

**667093**

Exhibit 142



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Survey Design
and
Methods

Exhibit 142

# Survey Design and Methods

The Kaiser Family Foundation and the Health Research & Educational Trust (Kaiser/HRET) conduct this annual survey of employer-sponsored health benefits. HRET, a nonprofit research organization, is an affiliate of the American Hospital Association. The Kaiser Family Foundation designs, analyzes, and conducts this survey in partnership with HRET, and also funds the study. Kaiser contracts with researchers at NORC at the University of Chicago (NORC) to work with the Kaiser and HRET researchers in conducting the study. Kaiser/HRET retained National Research, LLC (NR), a Washington, D.C.-based survey research firm, to conduct telephone interviews with human resource and benefits managers using the Kaiser/HRET survey instrument. From January to June 2017, NR completed full interviews with 2,137 firms.

## SURVEY TOPICS

The survey includes questions on the cost of health insurance, health benefit offer rates, coverage, eligibility, enrollment patterns, premium contributions,[4] employee cost sharing, prescription drug benefits, retiree health benefits, and wellness benefits.

Kaiser/HRET asks each participating firm as many as 400 questions about its largest health maintenance organization (HMO), preferred provider organization (PPO), point-of-service (POS) plan, and high-deductible health plan with a savings option (HDHP/SO).[5] We treat exclusive provider organizations (EPOs) and HMOs as one plan type and report the information under the banner of "HMO"; if an employer sponsors both an HMO and an EPO, they are asked about the attributes of the plan with the larger enrollment. Similarly, starting in 2013, plan information for conventional (or indemnity) plans was collected within the PPO battery. Less than one percent of firms that completed the PPO section had more enrollment in a conventional plan than in a PPO plan. Firms with 50 or more workers were asked: "Does your firm offer health benefits for current employees through a private or corporate exchange?" Employers were still asked for plan information about their HMO, PPO, POS and HDHP/SO plan regardless of whether they purchased health benefits through a private exchange or not.

Firms are asked about the attributes of their current plans during the interview. While the survey's fielding period begins in January, many respondents may have a plan whose 2017 plan year has not yet begun [Figure M.1]. In some cases, plans may report the attributes of their 2016 plans and some plan attributes (such as HSA deductible limits) may not meet the calendar year regulatory requirements.

---

[4] HDHP/SO premium estimates do not include contributions made by the employer to Health Savings Accounts or Health Reimbursement Arrangements.
[5] HDHP/SO includes high-deductible health plans with a deductible of at least $1,000 for single coverage and $2,000 for family coverage and that offer either a Health Reimbursement Arrangement (HRA) or a Health Savings Account (HSA). Although HRAs can be offered along with a health plan that is not an HDHP, the survey collected information only on HRAs that are offered along with HDHPs. For specific definitions of HDHPs, HRAs, and HSAs, see the introduction to Section 8.

**667095**

Exhibit 142

JA-0001988

**Figure M.1**

**Among Firms Offering Health Benefits, Month In Which Plan Year Begins, 2017**

| | Percentage of Covered Workers | Percentage of Firms |
|---|---|---|
| January | 69% | 37% |
| February | 1 | 1 |
| March | 2 | 5 |
| April | 3 | 3 |
| May | 1 | 4 |
| June | 3 | 9 |
| July | 6 | 6 |
| August | 1 | 1 |
| September | 3 | 4 |
| October | 4 | 8 |
| November | 2 | 6 |
| December | 4% | 17% |

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## RESPONSE RATE

After determining the required sample from U.S. Census Bureau data, Kaiser/HRET drew its sample from a Survey Sampling Incorporated list (based on an original Dun and Bradstreet list) of the nation's private employers and from the Census Bureau's Census of Governments list of public employers with three or more workers. To increase precision, Kaiser/HRET stratified the sample by ten industry categories and six size categories. Kaiser/HRET attempted to repeat interviews with prior years' survey respondents (with at least ten employees) who participated in either the 2015 or the 2016 survey, or both. Firms with 3-9 employees are not included in the panel to minimize the impact of panel effects on the offer rate statistic. As a result, 1,427 of the 2,137 firms that completed the full survey also participated in either the 2015 or 2016 surveys, or both.[6] The overall response rate is 33%.[7] Response rates are calculated using a CASRO method, which accounts for firms that are determined to be ineligible in its calculation. Beginning in 2012, the calculation of the response rates was adjusted to be slightly more conservative than previous years.

While the Kaiser/HRET survey similar to other employer and household surveys has seen a general decrease in response rates over time, the decrease between the 2016 and 2017 response rates is not solely explained by this trend. In order to improve statistical power among sub-groups, including small firms and those with a high share of low income workers, the size of the sample was expanded from 5,732 in 2016 to 7,895 in 2017. As a result, the 2017 survey includes 204 more completes than the 2016 survey. While this generally increases the precision of estimates (for example, a reduction in the standard error for the offer rate from 2.2% to 1.8%), it has the effect of reducing the response rate. In 2017, non-panel firms had a response rate of 17%, compared to 62% for firms that had participated in one of the last two years.

To increase response rates, firms with 3-9 employees were offered an incentive for participating in the survey. A third of these firms were sent a $5 Starbucks gift card in the advance letter, a third were offered an incentive of $50 in cash or as a donation to a charity of their choice after completing the full survey, and a third of firms were offered no incentive at all. Our analysis does not show significant differences in responses to key variables among these incentive groups.

---

[6] In total, 139 firms participated in 2015, 274 firms participated in 2016, and 1,014 firms participated in both 2015 and 2016.
[7] Response rate estimates are calculated by dividing the number of completes over the number of refusals and the fraction of the firms with unknown eligibility to participate estimated to be eligible. Firms determined to be ineligible to complete the survey are not included in the response rate calculation.

**667096**

Exhibit 142

JA-0001989

The vast majority of questions are asked only of firms that offer health benefits. A total of 1,832 of the 2,137 responding firms indicated they offered health benefits. The response rate for firms that offer health benefits is also 33%.

We asked one question of all firms in the study with which we made phone contact but where the firm declined to participate. The question was "Does your company offer a health insurance program as a benefit to any of your employees?". A total of 3,938 firms responded to this question (including 2,137 who responded to the full survey and 1,801 who responded to this one question). These responses are included in our estimates of the percentage of firms offering health benefits.[8] The response rate for this question is 61%.

Beginning in 2014, we collected whether firms with a non-final disposition code (such as a firm that requested a callback at a later time or date) offered health benefits. By doing so we attempt to mitigate any potential non-response bias of firms either offering or not offering health benefits on the overall offer rate statistic. In 2017, 640 of the 1,801 firm responses that solely answered the offer question were obtained through this pathway.

## FIRM SIZE CATEGORIES AND KEY DEFINITIONS

Throughout the report, figures categorize data by size of firm, region, and industry. Unless otherwise specified, firm size definitions are as follows: small firms: 3 to 199 workers; and large firms: 200 or more workers. Figure M.2 shows selected characteristics of the survey sample. A firm's primary industry classification is determined from Survey Sampling International's (SSI) designation on the sampling frame and is based on the U.S. Census Bureau's North American Industry Classification System (NAICS). A firm's ownership category and other firm characteristics used in figures such as 3.3 and 6.22 are based on respondents' answers. While there is considerable overlap in firms in the "State/Local Government" industry category and those in the "public" ownership category, they are not identical. For example, public school districts are included in the service industry even though they are publicly owned.

**Figure M.2**

**Selected Characteristics of Firms in the Survey Sample, 2017**

|  | Sample Size | Sample Distribution After Weighting | Percentage of Total for Weighted Sample |
|---|---|---|---|
| **FIRM SIZE** | | | |
| 3-9 Workers | 129 | 1,921,747 | 60.5% |
| 10-24 Workers | 249 | 749,042 | 23.6 |
| 25-49 Workers | 229 | 268,005 | 8.4 |
| 50-199 Workers | 271 | 186,142 | 5.9 |
| 200-999 Workers | 507 | 43,191 | 1.4 |
| 1,000-4,999 Workers | 418 | 8,098 | 0.3 |
| 5,000 or More Workers | 334 | 2,121 | 0.1 |
| **REGION** | | | |
| Northeast | 397 | 631,535 | 19.9% |
| Midwest | 635 | 703,383 | 22.1 |
| South | 696 | 1,091,813 | 34.4 |
| West | 409 | 751,614 | 23.6 |
| **INDUSTRY** | | | |
| Agriculture/Mining/Construction | 105 | 332,848 | 10.5% |
| Manufacturing | 227 | 178,917 | 5.6 |
| Transportation/Communications/Utilities | 129 | 120,624 | 3.8 |
| Wholesale | 88 | 171,310 | 5.4 |
| Retail | 170 | 377,197 | 11.9 |
| Finance | 144 | 205,236 | 6.5 |
| Service | 783 | 1,333,575 | 42 |
| State/Local Government | 151 | 47,308 | 1.5 |
| Health Care | 340 | 411,531 | 12.9 |
| **ALL FIRMS** | **2,137** | **3,178,345** | **100%** |

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

Figure M.3 presents the breakdown of states into regions and is based on the U.S Census Bureau's categorizations. State-level data are not reported both because the sample size is insufficient in many states and we only collect information on a

[8] Estimates presented in Figures 2.1, 2.2, 2.3, 2.4, 2.5, and 2.26 are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits.

667097

Exhibit 142

JA-0001990

firm's primary location rather than where all workers may actually be employed. Some mid- and large-size employers have employees in more than one state, so the location of the headquarters may not match the location of the plan for which we collected premium information.

---

### Figure M.3
### States by Region, 2017

| Northeast | Midwest | South | West |
|---|---|---|---|
| Connecticut | Illinois | Alabama | Alaska |
| Maine | Indiana | Arkansas | Arizona |
| Massachusetts | Iowa | Delaware | California |
| New Hampshire | Kansas | District of Columbia | Colorado |
| New Jersey | Michigan | Florida | Hawaii |
| New York | Minnesota | Georgia | Idaho |
| Pennsylvania | Missouri | Kentucky | Montana |
| Rhode Island | Nebraska | Louisiana | Nevada |
| Vermont | North Dakota | Maryland | New Mexico |
| | Ohio | Mississippi | Oregon |
| | South Dakota | North Carolina | Utah |
| | Wisconsin | Oklahoma | Washington |
| | | South Carolina | Wyoming |
| | | Tennessee | |
| | | Texas | |
| | | Virginia | |
| | | West Virginia | |

Source: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017. From U.S. Department of Commerce, Economics and Statistics Administration, U.S. Census Bureau, available at http://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf

---

Figure M.4 displays the distribution of the nation's firms, workers, and covered workers (employees receiving coverage from their employer). Among the three million firms nationally, approximately 60.5% employ 3 to 9 workers; such firms employ 7.8% of workers, and 3.1% of workers covered by health insurance. In contrast, less than one percent of firms employ 5,000 or more workers; these firms employ 35.5% of workers and 39.9% of covered workers. Therefore, the smallest firms dominate any statistics weighted by the number of employers. For this reason, most statistics about firms are broken out by size categories. In contrast, firms with 1,000 or more workers are the most influential employer group in calculating statistics regarding covered workers, since they employ the largest percentage of the nation's workforce.

**667098**

Exhibit 142

JA-0001991



**Figure M.4**
**Distribution of Employers, Workers, and Workers Covered by Health Benefits, by Firm Size, 2017**

NOTE: Data are based on a data request to the U.S. Census Bureau for their most recent (2014) Statistics of U.S. Businesses data on private sector firms. State and local government data are from the Census Bureau's 2012 Census of Governments.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

Throughout this report, we use the term "in-network" to refer to services received from a preferred provider. Family coverage is defined as health coverage for a family of four.

The survey asks firms what percentage of their employees earn less than a specified amount in order to identify the portion of a firm's workforce that has relatively low wages. This year, the income threshold is $24,000 per year for lower-wage workers and $60,000 for higher-wage workers. These thresholds are based on the 25th and 75th percentile of workers' earnings as reported by the Bureau of Labor Statistics using data from the Occupational Employment Statistics (OES) (2016).[9] The cutoffs were inflation-adjusted and rounded to the nearest thousand. Prior to 2013, wage cutoffs were calculated using the now-eliminated National Compensation Survey.

## ROUNDING AND IMPUTATION

Some figures in the report do not sum to totals due to rounding. In a few cases, numbers from distribution figures may not add to the numbers referenced in the text due to rounding. Although overall totals and totals for size and industry are statistically valid, some breakdowns may not be available due to limited sample sizes or a high relative standard error. Where the unweighted sample size is fewer than 30 observations, figures include the notation "NSD" (Not Sufficient Data). Estimates with high relative standard errors are reviewed and in some cases not published. Many breakouts by subsets may have a large standard error, meaning that even large differences are not statistically different. Statistics among small firms and those weighted by the number of firms tend to have more variability.

To control for item nonresponse bias, Kaiser/HRET imputes values that are missing for most variables in the survey. On average, 5% of observations are imputed. All variables are imputed following a hotdeck approach. The hotdeck approach replaces missing information with observed values from a firm similar in size and industry to the firm for which data are missing. In 2017, there were eleven variables where the imputation rate exceeded 20%; most of these cases were for individual plan level

[9] General information on the OES can be found at http://www.bls.gov/oes/oes_emp.htm#scope. A comparison between the OES and the NCS is available at https://www.bls.gov/opub/mlr/2013/article/lettau-zamora.htm

**667099**

Exhibit 142

statistics. When aggregate variables were constructed for all of the plans, the imputation rate was usually much lower. There are a few variables that Kaiser/HRET has decided not to impute; these are typically variables where "don't know" is considered a valid response option (for example, the percentage of workers respondents believe are covered by Medicaid). Some variables are imputed based on their relationship to each other. For example, if a firm provided a worker contribution for family coverage but no premium information, a ratio between the family premium and family contribution was imputed and then the family premium was calculated. In addition, there are several variables in which missing data are calculated based on respondents' answers to other questions (for example, employer contributions to premiums are calculated from the respondent's premium and the worker contribution to premiums).

Since 2014, we estimate separate single and family coverage premiums for firms that provide premium amounts as the average cost for all covered workers, instead of differentiating between single and family coverage. This method more accurately accounts for the portion that each type of coverage contributes to the total cost for the one percent of covered workers who are enrolled at firms affected by this adjustment.

## SAMPLE DESIGN

We determined the sample requirements based on the universe of firms obtained from the U.S. Census Bureau. Prior to the 2010 survey, the sample requirements were based on the total counts provided by Survey Sampling Incorporated (SSI) (which obtains data from Dun and Bradstreet). Since 2010, we define Education as a separate sampling category for the purposes of sampling, rather than as a subgroup of the Service category. In the past, Education firms were a disproportionately large share of Service firms. Education is controlled for during post-stratification, and adjusting the sampling frame to also control for Education allows for a more accurate representation of both the Education and Service industries.

In past years, both private and government firms were sampled from the Dun and Bradstreet database. Beginning in 2009, Government firms were sampled from the 2007 Census of Governments. This change was made to eliminate the overlap of state agencies that were frequently sampled from the Dun and Bradstreet database. The sample of private firms is screened for firms that are related to state/local governments, and if these firms are identified in the Census of Governments, they are reclassified as government firms and a private firm is randomly drawn to replace the reclassified firm. The federal government is not included in the sample frame.

Finally, the data used to determine the 2017 Employer Health Benefits Survey sample frame include the U.S. Census' 2013 Statistics of U.S. Businesses and the 2012 Census of Governments. At the time of the sample design (December 2016), these data represented the most current information on the number of public and private firms nationwide with three or more workers. As in the past, the post-stratification is based on the most up-to-date Census data available (the 2014 update to the Census of U.S. Businesses was purchased during the survey fielding period).

## WEIGHTING AND STATISTICAL SIGNIFICANCE

Because Kaiser/HRET selects firms randomly, it is possible through the use of statistical weights to extrapolate the results to national (as well as firm size, regional, and industry) averages. These weights allow us to present findings based on the number of workers covered by health plans, the number of total workers, and the number of firms. In general, findings in dollar amounts (such as premiums, worker contributions, and cost sharing) are weighted by covered workers. Other estimates, such as the offer rate, are weighted by firms. Specific weights were created to analyze the HDHP/SO plans that are offered with a Health Reimbursement Arrangement (HRA) or that are Health Savings Account (HSA)-qualified. These weights represent the proportion of employees enrolled in each of these arrangements.

Calculation of the weights follows a common approach. We trimmed the weights in order to reduce the influence of weight outliers. First, we grouped firms into size and offer categories of observations. Within each strata, we identified the median and the interquartile range of the weights and calculated the trimming cut point as the median plus six times the interquartile range (M + [6 * IQR]). Weight values larger than this cut point are trimmed to the cut point. In all instances, very few weight values were trimmed. Finally, we calibrated the weights to U.S. Census Bureau's 2014 Statistics of U.S. Businesses for firms in the private sector, and the 2012 Census of Governments as the basis for calibration / post-stratification for public sector firms. Historic employer-weighted statistics were updated in 2011.

**667100**

Exhibit 142                                                                                                                           JA-0001993

In 2017, weights were not adjusted using the nonresponse adjustment process described in previous years' methods. As in past years, Kaiser/HRET conducted a small follow-up survey of those firms with 3-49 workers that refused to participate in the full survey. Based on the results of a McNemar test, we were not able to verify that the results of the follow-up survey were comparable to the results from the original survey. In 2010 and 2015, the results of the McNemar test were also significant and we did not conduct a nonresponse adjustment.

Between 2006 and 2012, only limited information was collected on conventional plans. Starting in 2013, information on conventional plans is collected under the PPO section and therefore, the covered worker weight is representative of all plan types for which the survey collects information.

The survey collects information on physician office visits for each plan type. Different plan types at the same firm may have different cost-sharing structures (e.g., copayments or coinsurance). Because the composite variables (using data from across all plan types) are reflective of only those plans with that provision, separate weights for the relevant variables were created in order to account for the fact that not all covered workers have such provisions. As discussed below, changes in the 2017 survey have reduced the number of variable-specific weights used.

To account for design effects, the statistical computing package R and the library package "survey" were used to calculate standard errors.[10],[11] All statistical tests are performed at the .05 confidence level, unless otherwise noted. For figures with multiple years, statistical tests are conducted for each year against the previous year shown, unless otherwise noted. No statistical tests are conducted for years prior to 1999.

Statistical tests for a given subgroup (firms with 25-49 workers, for instance) are tested against all other firm sizes not included in that subgroup (all firm sizes NOT including firms with 25-49 workers, in this example). Tests are done similarly for region and industry; for example, Northeast is compared to all firms NOT in the Northeast (an aggregate of firms in the Midwest, South, and West). However, statistical tests for estimates compared across plan types (for example, average premiums in PPOs) are tested against the "All Plans" estimate. In some cases, we also test plan-specific estimates against similar estimates for other plan types (for example, single and family premiums for HDHP/SOs against single and family premiums for HMO, PPO, and POS plans); these are noted specifically in the text. The two types of statistical tests performed are the t-test and the Wald test. The small number of observations for some variables resulted in large variability around the point estimates. These observations sometimes carry large weights, primarily for small firms. The reader should be cautioned that these influential weights may result in large movements in point estimates from year to year; however, these movements are often not statistically significant. Standard Errors for most key statistics are available in a technical supplement available at www.kff.org/ehbs.

## 2017 SURVEY

In 2017, we continued to make revisions to how the survey asks employers about their prescription drug coverage. In most cases, information reported in Prescription Drug Benefits (Section 9) is not comparable with previous years' findings. Over time, plans have developed more complex benefit designs. In order to better capture information on specialty drugs, we elected to ask about these drugs separately from the cost sharing on other tiers. We modified the question about the number of tiers a firm's cost-sharing structure has to ask specifically about tiers that do not exclusively cover specialty drugs. Average copayment and coinsurance values are still reported among workers with three or more tiers, two tiers, or the same cost sharing regardless of drug class, but none of these tiers includes cost sharing for tiers that exclusively cover specialty drugs. Forty-five percent of firms with drug coverage cover specialty drugs but do not have a tier that only covers this class of drugs. In these cases, cost sharing among specialty drugs is still captured with the plan's other drug classes.

Figures 9.1 and 9.2 report the distribution of cost-sharing structures including any tiers for specialty drugs. This analysis adds the number of tiers the firm reported by any tiers they may have for specialty drugs. Therefore, a firm with two tiers and a tier exclusively for specialty drugs is considered a three tier plan in this analysis, but a two tier plan when reporting average cost sharing values. Even if a firm has multiple specialty-only tiers, we collect information on only one.

Similar to 2016, we no longer require that a firm's cost-sharing tiers be sequential, meaning that the second tier copayment was higher than the first tier, the third tier was higher than the second, and the fourth was higher than the third. As drug

---

[10] Analysis of the 2011 survey data using both R and SUDAAN (the statistical package used prior to 2012) produced the same estimates and standard errors.
[11] A supplement with standard errors for select estimates can be found online at Technical Supplement: Standard Error Tables for Selected Estimates, http://ehbs.kff.org

**667101**

Exhibit 142

formularies have become more intricate, many firms have minimum and maximum amounts attached to their copayments and coinsurance, leading us to believe it was no longer appropriate to assume that a firm's cost sharing followed this sequential logic.

To reduce the length of survey, in several areas, including stoploss coverage for self-funded firms and cost sharing for hospital admissions, outpatient surgery, and emergency room visits, we revised the questionnaire to ask respondents about the attributes of their largest health plan rather than each plan type they may offer. This expands on the method we used for prescription drug coverage in 2016. Therefore, for these topics, aggregate variables represent the attributes of the firm's largest plan type, and are not a weighted average of all of the firms plan types. In previous surveys, if a firm had two plan types, one with a copayment and one with a coinsurance for hospital admissions, the covered worker weight was allotted proportionally toward the average copayment and coinsurance based on the number of covered workers with either feature. With of this change, comparison among plans types is now a comparison of firms where any given plan type is the largest. The change only affects firms that have multiple plan types (58% of covered workers). After reviewing the responses and comparing them to prior years where we asked about each plan type, we find that the information we are receiving is similar to responses from previous years. For this reason, we will continue to report our results for these questions weighted by the number of covered workers in responding firms.

Starting in 2017, respondents were allowed to volunteer that their plans did not cover outpatient surgery or hospital admissions. Less than 1% of respondents indicated that their plan did not include coverage for these services. Cost sharing for hospital admissions, outpatient surgery and emergency room visits was imputed by drawing a firm similar in size and industry within the same plan type.

In 2017, HSA-qualified health plans are not allowed to have separate per-person deductibles below the minimum family deductible ($2,600 in 2017). Some firms reported per-person deductibles below this limit; in these cases, firms were re-contacted, and in some instances, respondents confirmed these responses. We elected not to edit these deductibles to the legal minimum.

Beginning in 2017, values below 3% are not shown on graphical figures to improve the readability of those graphs. The underlying data for all estimates presented in graphs is available at www.kff.org/ehbs.

Annual inflation estimates are usually calculated from April to April. The 12 month percentage change for May to May was 2%.[12]

## HISTORICAL DATA

Data in this report focus primarily on findings from surveys jointly authored by the Kaiser Family Foundation and the Health Research & Educational Trust, which have been conducted since 1999. Prior to 1999, the survey was conducted by the Health Insurance Association of America (HIAA) and KPMG using a similar survey instrument, but data are not available for all the intervening years. Following the survey's introduction in 1987, the HIAA conducted the survey through 1990, but some data are not available for analysis. KPMG conducted the survey from 1991-1998. However, in 1991, 1992, 1994, and 1997, only larger firms were sampled. In 1993, 1995, 1996, and 1998, KPMG interviewed both large and small firms. In 1998, KPMG divested itself of its Compensation and Benefits Practice, and part of that divestiture included donating the annual survey of health benefits to HRET.

This report uses historical data from the 1993, 1996, and 1998 KPMG Surveys of Employer-Sponsored Health Benefits and the 1999-2016 Kaiser/HRET Survey of Employer-Sponsored Health Benefits. For a longer-term perspective, we also use the 1988 survey of the nation's employers conducted by the HIAA, on which the KPMG and Kaiser/HRET surveys are based. The survey designs for the three surveys are similar.

Published: September 19th, 2017. Last Updated: 2017-09-14

---

[12] Bureau of Labor Statistics, Consumer Price Index. U.S. City Average of Annual Inflation (April to April), 2000-2017: [cited 2017 July 21] http://data.bls.gov/timeseries/CUUR0000SA0?output_view=pct_1mth

**667102**

Exhibit 142



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Cost of
Health
Insurance

SECTION

1

667103

Exhibit 142

# Section 1

# Cost of Health Insurance

The average annual premiums in 2017 are $6,690 for single coverage and $18,764 for family coverage. The average premium for single coverage increased by 4% since 2016 and the average premium for family coverage increased by 3%. The average family premium has increased 55% since 2007 and 19% since 2012. The average family premium for covered workers in small firms (3-199 workers) ($17,615) is significantly lower than average family premiums for workers in large firms (200 or more workers) ($19,235).

## PREMIUM COSTS FOR SINGLE AND FAMILY COVERAGE

- The average premium for single coverage in 2017 is $6,690 per year. The average premium for family coverage is $18,764 per year [Figure 1.1].

- The average annual premium for family coverage for covered workers in small firms ($17,615) is lower than the average premium for covered workers in large firms ($19,235) [Figure 1.2].

- The average annual premiums for covered workers in HDHP/SOs are lower for single coverage ($6,024) and family coverage ($17,581) than overall average premiums. The average premiums for covered workers enrolled in PPO plans are higher for single ($6,965) and family coverage ($19,481) than the overall plan average [Figure 1.1].

- The average premiums for covered workers are lower in the South ($6,372 for single coverage and $18,038 for family coverage) than the average premiums for covered workers in all other regions. The average premium for family coverage for covered workers in the Northeast ($20,092) is higher than the average family premium for covered workers in all other regions [Figure 1.3].

- The average premiums for covered workers vary across industries, with those in the retail industry being particularly low ($5,716 for single coverage and $16.920 for family coverage) [Figure 1.4].

- The average premiums for covered workers in firms with a relatively large share of younger workers (where at least 35% of the workers are age 26 or younger) are lower than the average premiums for covered workers in firms with a smaller share of younger workers ($5,922 vs. $6,762 for single coverage and $16,893 vs. $18,939 for family coverage) [Figures 1.5 and 1.6].

- Premiums also vary by firm wage level. The average premiums for covered workers in firms with a relatively large share of lower-wage workers (where at least 35% of workers earn $24,000 a year or less) are less than the average premiums at firms with a smaller share of lower-wage workers ($6,035 vs. $6,739 for single coverage and $16,376 vs. $18,942 for family coverage) [Figures 1.5 and 1.6].

- The average premiums for covered workers in firms with at least some union workers are higher than the average premiums for covered workers in firms without union workers ($7,183 vs. $6,434 for single coverage and $19,885 vs. $18,177 for family coverage) [Figures 1.5 and 1.6].

- There is also variation in premiums by type of firm ownership. For both single and family coverage, covered workers at private for-profit firms have lower average annual premiums than covered workers at public firms or private not-for-profit firms [Figures 1.5 and 1.6].

**667104**

Exhibit 142

JA-0001997

**Figure 1.1**

**Average Annual Premiums for Covered Workers, Single and Family Coverage, by Plan Type, 2017**



\* Estimate is statistically different from All Plan Types estimate (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667105

Exhibit 142                                                                          JA-0001998

**Figure 1.2**

**Average Monthly and Annual Premiums for Covered Workers, by Plan Type and Firm Size, 2017**

| | Monthly | | Annual | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| **HMO** | | | | |
| All Small Firms (3-199 Workers) | $566 | $1,523 | $6,794 | $18,281 |
| All Large Firms (200 or More Workers) | 596 | 1,614 | 7,154 | 19,369 |
| **ALL FIRM SIZES** | **$588** | **$1,589** | **$7,052** | **$19,071** |
| **PPO** | | | | |
| All Small Firms (3-199 Workers) | $573 | $1,566 | $6,874 | $18,787 |
| All Large Firms (200 or More Workers) | 583 | 1,646 | 7,000 | 19,749 |
| **ALL FIRM SIZES** | **$580** | **$1,623** | **$6,965** | **$19,481** |
| **POS** | | | | |
| All Small Firms (3-199 Workers) | $512* | $1,328* | $6,149* | $15,942* |
| All Large Firms (200 or More Workers) | 615* | 1,726* | 7,383* | 20,711* |
| **ALL FIRM SIZES** | **$560** | **$1,512** | **$6,716** | **$18,146** |
| **HDHP/SO** | | | | |
| All Small Firms (3-199 Workers) | $480 | $1,344* | $5,761 | $16,134* |
| All Large Firms (200 or More Workers) | 509 | 1,502* | 6,105 | 18,029* |
| **ALL FIRM SIZES** | **$502** | **$1,465** | **$6,024** | **$17,581** |
| **ALL PLANS** | | | | |
| All Small Firms (3-199 Workers) | $540 | $1,468* | $6,486 | $17,615* |
| All Large Firms (200 or More Workers) | 565 | 1,603* | 6,776 | 19,235* |
| **ALL FIRM SIZES** | **$558** | **$1,564** | **$6,690** | **$18,764** |

* Estimates are statistically different within plan and coverage types between All Small Firms and All Large Firms (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667106**

Exhibit 142

JA-0001999

**Figure 1.3**

**Average Monthly and Annual Premiums for Covered Workers, by Plan Type and Region, 2017**

| | Monthly | | Annual | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| **HMO** | | | | |
| Northeast | $639 | $1,826* | $7,663 | $21,911* |
| Midwest | $613 | $1,637 | $7,356 | $19,648 |
| South | $529* | $1,529 | $6,353* | $18,348 |
| West | $599 | $1,542 | $7,179* | $18,508 |
| **ALL REGIONS** | **$588** | **$1,589** | **$7,052** | **$19,071** |
| **PPO** | | | | |
| Northeast | $637* | $1,829* | $7,641* | $21,946* |
| Midwest | $592 | $1,676 | $7,105 | $20,115 |
| South | $541* | $1,502* | $6,489* | $18,019* |
| West | $604 | $1,645 | $7,250 | $19,741 |
| **ALL REGIONS** | **$580** | **$1,623** | **$6,965** | **$19,481** |
| **POS** | | | | |
| Northeast | $604 | $1,656 | $7,250 | $19,875 |
| Midwest | $595 | $1,665 | $7,145 | $19,977 |
| South | $523 | $1,413 | $6,279 | $16,951 |
| West | $567 | $1,478 | $6,805 | $17,731 |
| **ALL REGIONS** | **$560** | **$1,512** | **$6,716** | **$18,146** |
| **HDHP/SO** | | | | |
| Northeast | $490 | $1,431 | $5,877 | $17,170 |
| Midwest | $514 | $1,454 | $6,177* | $17,446 |
| South | $512 | $1,538 | $6,150 | $18,459 |
| West | $481 | $1,398 | $5,768 | $16,780 |
| **ALL REGIONS** | **$502** | **$1,465** | **$6,024** | **$17,581** |
| **ALL PLANS** | | | | |
| Northeast | $583 | $1,674* | $7,001 | $20,092* |
| Midwest | $566 | $1,592 | $6,792 | $19,101 |
| South | $531* | $1,503* | $6,372* | $18,038* |
| West | $572 | $1,545 | $6,867 | $18,536 |
| **ALL REGIONS** | **$558** | **$1,564** | **$6,690** | **$18,764** |

* Estimates are statistically different within plan and coverage types from estimate for all firms not in the indicated region (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667107

Exhibit 142

JA-0002000

**Figure 1.4**

**Average Monthly and Annual Premiums for Covered Workers, by Plan Type and Industry, 2017**

| | Monthly | | Annual | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| **HMO** | | | | |
| Agriculture/Mining/Construction | NSD | NSD | NSD | NSD |
| Manufacturing | $540 | $1,441 | $6,486 | $17,288 |
| Transportation/Communications/Utilities | $780* | $1,708* | $9,354* | $20,499* |
| Wholesale | NSD | NSD | NSD | NSD |
| Retail | NSD | NSD | NSD | NSD |
| Finance | $538 | $1,585 | $6,453 | $19,024 |
| Service | $561 | $1,614 | $6,735 | $19,365 |
| State/Local Government | $608 | $1,699 | $7,292 | $20,392 |
| Health Care | $605 | $1,681 | $7,259 | $20,175 |
| **ALL INDUSTRIES** | **$588** | **$1,589** | **$7,052** | **$19,071** |
| **PPO** | | | | |
| Agriculture/Mining/Construction | $523* | $1,523 | $6,278* | $18,280 |
| Manufacturing | $575 | $1,667 | $6,899 | $20,002 |
| Transportation/Communications/Utilities | $673* | $1,831** | $8,074* | $21,973* |
| Wholesale | $543 | $1,617 | $6,518 | $19,409 |
| Retail | $504* | $1,451** | $6,051* | $17,410* |
| Finance | $579 | $1,656 | $6,953 | $19,872 |
| Service | $576 | $1,587 | $6,909 | $19,043 |
| State/Local Government | $594 | $1,519 | $7,131 | $18,228 |
| Health Care | $602 | $1,722 | $7,219 | $20,658 |
| **ALL INDUSTRIES** | **$580** | **$1,623** | **$6,965** | **$19,481** |
| **POS** | | | | |
| Agriculture/Mining/Construction | NSD | NSD | NSD | NSD |
| Manufacturing | NSD | NSD | NSD | NSD |
| Transportation/Communications/Utilities | NSD | NSD | NSD | NSD |
| Wholesale | NSD | NSD | NSD | NSD |
| Retail | NSD | NSD | NSD | NSD |
| Finance | NSD | NSD | NSD | NSD |
| Service | $554 | $1,473 | $6,647 | $17,680 |
| State/Local Government | NSD | NSD | NSD | NSD |
| Health Care | $599 | $1,652 | $7,182 | $19,826 |
| **ALL INDUSTRIES** | **$560** | **$1,512** | **$6,716** | **$18,146** |
| **HDHP/SO** | | | | |
| Agriculture/Mining/Construction | $472 | $1,245 | $5,666 | $14,944 |
| Manufacturing | $475 | $1,392 | $5,708 | $16,699 |
| Transportation/Communications/Utilities | $513 | $1,512 | $6,161 | $18,141 |
| Wholesale | $444* | $1,331** | $5,322* | $15,970* |
| Retail | $457* | $1,411 | $5,489* | $16,928 |
| Finance | $473 | $1,410 | $5,677 | $16,923 |
| Service | $502 | $1,474 | $6,020 | $17,686 |
| State/Local Government | $494 | $1,322* | $5,929 | $15,860* |
| Health Care | $606* | $1,707* | $7,270* | $20,483* |
| **ALL INDUSTRIES** | **$502** | **$1,465** | **$6,024** | **$17,581** |
| **ALL PLANS** | | | | |
| Agriculture/Mining/Construction | $513* | $1,429 | $6,151* | $17,144 |
| Manufacturing | $534 | $1,532 | $6,413 | $18,383 |
| Transportation/Communications/Utilities | $653* | $1,689* | $7,838* | $20,263* |
| Wholesale | $509* | $1,457 | $6,105* | $17,486 |
| Retail | $476* | $1,410* | $5,715* | $16,920* |
| Finance | $523* | $1,555 | $6,271* | $18,662 |
| Service | $550 | $1,546 | $6,599 | $18,555 |
| State/Local Government | $591 | $1,548 | $7,090 | $18,581* |
| Health Care | $603* | $1,703* | $7,233* | $20,442* |
| **ALL INDUSTRIES** | **$558** | **$1,564** | **$6,690** | **$18,764** |

NOTE: NSD: Not Sufficient Data

* Estimate is statistically different within plan type from estimate for all firms not in the indicated industry (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667108

Exhibit 142                                                                JA-0002001

**Figure 1.5**

**Average Annual Premiums for Covered Workers With Single Coverage, by Firm Characteristics and Firm Size, 2017**

| | A. Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|
| **LOWER WAGE LEVEL** | | | |
| Few Lower-Wage Workers | $6,527 | $6,823* | $6,739* |
| Many Lower-Wage Workers | $6,138 | $5,954* | $6,035* |
| **HIGHER WAGE LEVEL** | | | |
| Few Higher-Wage Workers | $6,302 | $6,538* | $8,455* |
| Many Higher-Wage Workers | $6,758 | $6,973* | $6,922* |
| **UNIONS** | | | |
| Firm Has at Least Some Union Workers | $7,252* | $7,178* | $7,183* |
| Firm Does Not Have Any Union Workers | $6,408* | $6,452* | $6,434* |
| **YOUNGER WORKERS** | | | |
| Few Younger Workers | $6,576* | $6,843* | $6,762* |
| Many Younger Workers | $5,086* | $6,143* | $5,922* |
| **OLDER WORKERS** | | | |
| Few Older Workers | $6,088* | $6,353* | $6,257* |
| Many Older Workers | $7,250* | $7,176* | $7,192* |
| **FUNDING ARRANGEMENT** | | | |
| Fully Insured | $6,466 | $6,904 | $6,626 |
| Self-Funded | $6,608 | $6,742 | $6,733 |
| **FIRM OWNERSHIP** | | | |
| Private For-Profit | $6,204* | $6,339* | $6,291* |
| Public | $7,350 | $7,549* | $7,531* |
| Private Not-For-Profit | $7,194* | $7,061** | $7,098* |
| **ALL FIRMS** | **$6,486** | **$6,776** | **$6,690** |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from estimate for all other firms not in the indicated size within each category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667109**

Exhibit 142

JA-0002002

SECTION 1.  COST OF HEALTH INSURANCE

**Figure 1.6**

**Average Annual Premiums for Covered Workers With Family Coverage, by Firm Characteristics and Firm Size, 2017**

| | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|
| **LOWER WAGE LEVEL** | | | |
| Few Lower-Wage Workers | $17,920* | $19,339* | $18,942* |
| Many Lower-Wage Workers | $15,033* | $17,437* | $16,376* |
| **HIGHER WAGE LEVEL** | | | |
| Few Higher-Wage Workers | $16,683* | $18,614* | $17,941* |
| Many Higher-Wage Workers | $18,983* | $19,750* | $19,565* |
| **UNIONS** | | | |
| Firm Has at Least Some Union Workers | $20,673* | $19,817* | $19,585* |
| Firm Does Not Have Any Union Workers | $17,300* | $18,765* | $18,177* |
| **YOUNGER WORKERS** | | | |
| Few Younger Workers | $17,970* | $19,352* | $18,939* |
| Many Younger Workers | $17,207* | $18,129* | $16,893* |
| **OLDER WORKERS** | | | |
| Few Older Workers | $16,827* | $18,393* | $17,834* |
| Many Older Workers | $19,136* | $20,032* | $19,840* |
| **FUNDING ARRANGEMENT** | | | |
| Fully Insured | $17,574 | $18,902 | $18,067* |
| Self-Funded | $17,852 | $19,321 | $19,217* |
| **FIRM OWNERSHIP** | | | |
| Private For-Profit | $17,167 | $18,867 | $18,285* |
| Public | $19,623 | $19,232 | $19,267 |
| Private Not-For-Profit | $18,600 | $20,057* | $19,658* |
| **ALL FIRMS** | **$17,615** | **$19,235** | **$18,764** |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from estimate for all other firms not in the indicated size within each category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## PREMIUM DISTRIBUTION

- There is considerable variation in premiums for both single and family coverage.

  – Twenty percent of covered workers are employed in a firm with a single premium at least 20% higher than the average single premium, while 21% of covered workers are in firms with a single premium less than 80% of the average single premium [Figures 1.7].

  – For family coverage, 17% of covered workers are employed in a firm with a family premium at least 20% higher than the average family premium, while 21% of covered workers are in firms with a family premium less than 80% of the average family premium [Figure 1.7].

- Six percent of covered workers are in a firm with a premium of at least $10,000 a year for single coverage [Figure 1.8]. Seven percent of covered workers are in a firm with a premium of at least $26,000 a year for family coverage [Figure 1.9].

**667110**

Exhibit 142

JA-0002003

SECTION 1. COST OF HEALTH INSURANCE

**Figure 1.7**
**Distribution of Annual Premiums for Single and Family Coverage Relative to the Average Annual Single or Family Premium, 2017**



NOTE: The average annual premium is $6,690 for single coverage and $18,764 for family coverage. The premium distribution is relative to the average single or family premium. For example, $5,152 is 80% of the average single premium, $6,021 is 90% of the average single premium, $7,360 is 110% of the average single premium, and $8,029 is 120% of the average single premium. The same break points relative to the average are used for the distribution for family coverage.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 1.8**
**Distribution of Annual Premiums for Covered Workers with Single Coverage, 2017**



SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 32

**667111**

Exhibit 142                                                                                      JA-0002004



**Figure 1.9**
**Distribution of Annual Premiums for Covered Workers with Family Coverage, 2017**



SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## PREMIUM CHANGES OVER TIME

- The average premium for single coverage is 4% higher than the single premium last year and the average premium for family coverage is 3% higher than the average family premium last year [Figure 1.10].

  – The average premiums for single and family coverage have grown at the same rate (19%) since 2012.

  – The average family premiums for both small and large firms have increased at similar rates since 2012 (15% for small firms and 20% for large firms). For small firms, the average family premium rose from $15,253 in 2012 to $17,615 in 2017. For large firms, the average family premium rose from $15,980 in 2012 to $19,235 in 2017 [Figures 1.11 and 1.12].

  – The $18,764 average family premium in 2017 is 19% higher than the average family premium in 2012 and 55% higher than the average family premium in 2007 [Figure 1.10] . The 19% family premium growth in the last five years is smaller than the 30% growth between 2007 and 2012, or the 51% premium growth between 2002 and 2007 [Figure 1.13].

  – The average family premiums for both small and large firms have increased at similar rates since 2007 (49% for small firms and 57% for large firms). For small firms, the average family premium rose from $11,835 in 2007 to $17,615 in 2017. For large firms, the average family premium rose from $12,233 in 2007 to $19,235 in 2017 [Figures 1.11 and 1.12].

- For covered workers in large firms, over the last five years, the average family premium in firms that are fully insured has grown at a similar rate to the average family premium for covered workers in fully or partially self-funded firms (16% for fully insured plans and 21% for self-funded firms) [Figure 1.14].

**667112**

Exhibit 142

JA-0002005

**Figure 1.10**
**Average Annual Premiums for Single and Family Coverage, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 1.11**
**Average Annual Premiums for Covered Workers with Family Coverage, by Firm Size, 1999-2017**



* Estimate is statistically different between All Small Firms and All Large Firms within year (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667113**

Exhibit 142     JA-0002006

SECTION 1. COST OF HEALTH INSURANCE

**Figure 1.12**

**Average Annual Premiums for Covered Workers with Family Coverage, by Firm Size, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 1.13**

**Cumulative Premium Increases for Covered Workers with Family Coverage, 2002-2017**



\* Percentage change in family premium is statistically different from previous five year period shown (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2002-2017. Bureau of Labor Statistics, Consumer Price Index, U.S. City Average of Annual Inflation (April to April), 2002-2017. Bureau of Labor Statistics, Seasonally Adjusted Data from the Current Employment Statistics Survey, 2002-2017 (April to April)

667114

Exhibit 142

JA-0002007

SECTION 1.  COST OF HEALTH INSURANCE



**Figure 1.14**
**Among Workers in Large Firms, Average Annual Premiums for Family Coverage, by Funding Arrangement, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Large Firms have 200 or more workers.  For definitions of Self-Funded and Fully Insured Plans, see the introduction to Section 10. Due to a change in the survey questionnaire, funding status was not asked of firms with conventional plans in 2006. Therefore, conventional plan funding status is not included in the averages shown in this figure for 2006. Self-Funded includes plans that purchase stoploss coverage against some risk.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667115**

Exhibit 142

JA-0002008



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

# Health Benefits Offer Rates

SECTION
**2**

667116

Exhibit 142                                                                                 JA-0002009

# Section 2

# Health Benefits Offer Rates

While nearly all large firms (200 or more workers) offer health benefits to at least some employees, small firms (3-199 workers) are significantly less likely to do so. The percentage of all firms offering health benefits in 2017 (53%) is similar to the percentage of firms offering health benefits last year (56%), but lower than the percentages of firms offering health benefits in 2007 (59%) and 2012 (61%). As we reported last year, there has been a long-term decline in the offer and coverage rates for employer-provided coverage, particularly among smaller firms.[1]

Firms not offering health benefits continue to cite cost as the most important reason they do not do so. Almost all firms that offer coverage offer to dependents such as children and the spouses of eligible employees.

## FIRM OFFER RATES

- In 2017, 53% of firms offer health benefits, similar to the 56% who reported doing so in 2016 [Figure 2.1].

  - Ninety-nine percent of large firms offer health benefits to at least some of their workers. In contrast, only 53% of small firms offer health benefits in 2017 [Figures 2.2 and 2.3]. The percentages of both small and large firms offering health benefits to at least some of their workers are similar to those of last year [Figure 2.2].

  - The overall percentage of firms offering coverage in 2017 is less than the percentage offering coverage in 2012 (61%) and 2007 (59%) [Figure 2.1]. As we reported last year, there has been a long-term decline in the offer and coverage rates for employer-provided coverage, particularly among smaller firms.

  - Since most firms in the country are small, variation in the overall offer rate is driven largely by changes in the percentages of the smallest firms (3-9 workers) offering health benefits. For more information on the distribution of firms in the country, see the Survey Design and Methods Section and Figure M.4.[2]

  - Ninety-six percent of firms with 100 or more workers offer health benefits to at least some of their workers in 2017. Ninety percent of firms with 50-99 workers offer benefits to at least some workers [Figure 2.4].

  - Eighty-nine percent of all workers are employed by a firm that offers health benefits to at least some of its workers [Figure 2.26].

- Offer rates vary across different types of firms.

  - Smaller firms are less likely to offer health insurance: 40% of firms with 3-9 workers offer coverage, compared to 78% of firms with 25-49 workers, and 92% of firms with 50-199 workers [Figure 2.3].

  - Offer rates throughout different firm size categories in 2017 remain similar to those reported in 2016 [Figure 2.2].

[1] Kaiser Family Foundation. Diminishing offer and coverage rates among private sector employees [Internet]. Menlo Park, (CA): KFF; 2016 Sep [cited 2017 Jul 13]. Available from: http://www.kff.org/private-insurance/issue-brief/diminishing-offer-and-coverage-rates-among-private-sector-employees/
[2] Because surveys only collect information from a portion of the total number of firms in the country, there is uncertainty in any estimate. Since there are so many small firms, sometimes even seemingly large differences are not statistically different. For more information on the Employer Health Benefits Survey's weighting and design please see the Survey Design and Methods section.

**667117**

Exhibit 142

JA-0002010

**Figure 2.1**
**Percentage of Firms Offering Health Benefits, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 2.2**

**Percentage of Firms Offering Health Benefits, by Firm Size, 1999-2017**

|  | 3-9 Workers | 10-24 Workers | 25-49 Workers | 50-199 Workers | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|---|---|---|---|
| 1999 | 55% | 74% | 88% | 97% | 65% | 99% | 66% |
| 2000 | 57% | 80% | 91% | 97% | 68% | 99% | 68% |
| 2001 | 58% | 77% | 90% | 96% | 67% | 99% | 68% |
| 2002 | 58% | 70%* | 87% | 95% | 65% | 98% | 66% |
| 2003 | 55% | 76% | 84% | 95% | 65% | 97% | 66% |
| 2004 | 52% | 74% | 87% | 92% | 62% | 98% | 63% |
| 2005 | 47% | 72% | 87% | 93% | 59% | 97% | 60% |
| 2006 | 49% | 73% | 87% | 92% | 60% | 98% | 61% |
| 2007 | 45% | 76% | 83% | 94% | 59% | 99% | 59% |
| 2008 | 50% | 78% | 90%* | 94% | 62% | 99% | 63% |
| 2009 | 47% | 72% | 87% | 95% | 59% | 98% | 59% |
| 2010 | 59%* | 76% | 92% | 95% | 68%* | 99% | 69%* |
| 2011 | 48%* | 71% | 85%* | 93% | 59%* | 99% | 60%* |
| 2012 | 50% | 73% | 87% | 94% | 61% | 98% | 61% |
| 2013 | 45% | 68% | 85% | 91% | 57% | 99% | 57% |
| 2014 | 44% | 64% | 83% | 91% | 54% | 98% | 55% |
| 2015 | 47% | 63% | 82% | 92% | 56% | 98% | 57% |
| 2016 | 46% | 61% | 80% | 91% | 55% | 98% | 56% |
| 2017 | 40% | 66% | 78% | 92% | 53% | 99% | 53% |

NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667118**

Exhibit 142

JA-0002011

**Figure 2.3**

**Percentage of Firms Offering Health Benefits, by Firm Size, Region, and Industry, 2017**

|  | Percentage of Firms Offering Health Benefits |
|---|---|
| **FIRM SIZE** | |
| 3-9 Workers | 40%* |
| 10-24 Workers | 66* |
| 25-49 Workers | 78* |
| 50-199 Workers | 92* |
| 200-999 Workers | 98* |
| 1,000-4,999 Workers | 99* |
| 5,000 or More Workers | 100* |
| **All Small Firms (3-199 Workers)** | **53%*** |
| **All Large Firms (200 or More Workers)** | **99%*** |
| **REGION** | |
| Northeast | 58% |
| Midwest | 52 |
| South | 50 |
| West | 55 |
| **INDUSTRY** | |
| Agriculture/Mining/Construction | 57% |
| Manufacturing | 67* |
| Transportation/Communications/Utilities | 57 |
| Wholesale | 63 |
| Retail | 42* |
| Finance | 58 |
| Service | 50 |
| State/Local Government | 83* |
| Health Care | 54 |
| **ALL FIRMS** | **53%** |

NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits.

\* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667119

Exhibit 142

JA-0002012

**Figure 2.4**
**Percentage of Firms Offering Health Benefits to At Least Some of Their Workers, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits. Firm size categories are determined by the number of workers at a firm, which may include full-time and part-time workers
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 2.5**
**Percentage of Firms Offering Health Benefits, by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the entire survey and those that answered just one question about whether they offer health benefits
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667120**

Exhibit 142

JA-0002013

## PART-TIME AND TEMPORARY WORKERS

- Among firms offering health benefits, relatively few offer benefits to their part-time and temporary workers.

  - The ACA defines full-time workers as those who on average work at least 30 hours per week, and part-time workers as those who on average work fewer than 30 hours per week. The employer shared responsibility provision of the ACA requires that firms with at least 50 full-time equivalent employees offer full-time employees coverage that meets minimum standards or be assessed a penalty.[3] Beginning in 2015, we modified the survey to explicitly ask employers whether they offered benefits to employees working fewer than 30 hours. Our previous question did not include a definition of "part-time". For this reason, historical data on part-time offer rates are shown, but we did not test whether the differences between 2014 and 2015 were significant. Many employers may work with multiple definitions of part-time; one for their compliance with legal requirements and another for internal policies and programs.

  - In 2017, 13% of all firms that offer health benefits offer them to part-time workers [Figure 2.7]. Large firms are more likely to offer health benefits to part-time workers than small firms (31% vs. 12%) [Figure 2.9].

- A small percentage (5%) of firms offering health benefits offer them to temporary workers [Figure 2.8]. Among firms offering health benefits, large firms are more likely than small firms to offer benefits to temporary workers (13% vs. 5%) [Figure 2.10]. The percentage of large firms offering health benefits to temporary workers is not statistically different from the 17% reported in 2016 [Figure 2.8].

**Figure 2.6**
**Among Firms Offering Health Benefits, Percentage That Offer Health Benefits to Part-Time Workers, by Firm Size, 1999-2017**

|  | 3-24 Workers | 25-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|---|---|---|---|---|
| 1999 | 20% | 25% | 35% | 52% | 61% | 21% | 39% | 21% |
| 2000 | 21% | 24% | 34% | 48% | 52% | 22% | 37% | 22% |
| 2001 | 17% | 31% | 42% | 55% | 60% | 20% | 45% | 20% |
| 2002 | 22% | 29% | 43% | 60% | 58% | 23% | 46% | 24% |
| 2003 | 24% | 29% | 38% | 57% | 57% | 25% | 42% | 26% |
| 2004 | 20% | 29% | 41% | 51% | 60% | 22% | 43% | 23% |
| 2005 | 27% | 28% | 33% | 46% | 61% | 27% | 38%* | 27% |
| 2006 | 31% | 28% | 40%* | 55%* | 63% | 30% | 43%* | 31% |
| 2007 | 23% | 25% | 38% | 54% | 63% | 23% | 41% | 24% |
| 2008 | 22% | 30% | 40% | 53% | 67% | 24% | 43% | 25% |
| 2009 | 31% | 27% | 44% | 55% | 60% | 30% | 48% | 31% |
| 2010 | 24% | 28% | 35%* | 55% | 61% | 25% | 39%* | 25% |
| 2011 | 12% | 26% | 40% | 50% | 59% | 15% | 42% | 16% |
| 2012 | 27%* | 30% | 41% | 61%* | 66% | 28%* | 45% | 28%* |
| 2013 | 24% | 28% | 45% | 55% | 68% | 25% | 47% | 25% |
| 2014 | 22% | 28% | 44% | 55% | 58%* | 24% | 46% | 24% |
| 2015 | 19% | 17% | 30% | 52% | 68% | 18% | 35% | 19% |
| 2016 | 15% | 18% | 28% | 48% | 56%* | 15% | 33% | 16% |
| 2017 | 12% | 14% | 28% | 40% | 62% | 12% | 31% | 13% |

NOTE: Prior to 2015, each respondent defined part-time according to their firm's policies. starting in 2015, respondents were asked whether employees working fewer than 30 hours per week were eligible for benefits. Due to this change, no statistical testing was conducted between the 2014 and 2015 estimates.
* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

---

[3] Internal Revenue Code. 26 U.S. Code § 4980H - Shared responsibility for employers regarding health coverage. 2011. https://www.gpo.gov/fdsys/pkg/USCODE-2011-title26/pdf/USCODE-2011-title26-subtitleD-chap43-sec4980H.pdf

**667121**

Exhibit 142                                                                                                           JA-0002014

**Figure 2.7**
**Among Firms Offering Health Benefits, Percentage That Offer to Part-Time Workers, by Firm Size, 2017**



\* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 2.8**

**Among Firms Offering Health Benefits, Percentage That Offer to Temporary Workers, by Firm Size, 1999-2017**

| | 3-24 Workers | 25-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|---|---|---|---|---|
| 1999 | 5% | 3% | 3% | 7% | 9% | 4% | 4% | 4% |
| 2000 | 2% | 7% | 9% | 8% | 8% | 3% | 9% | 3% |
| 2001 | 4% | 3% | 6% | 9% | 8% | 4% | 7% | 4% |
| 2002 | 3% | 4% | 5% | 8% | 7% | 3% | 6% | 3% |
| 2003 | 1% | 4% | 9% | 7% | 10% | 2% | 9% | 2% |
| 2004 | 4% | 3% | 8% | 8% | 7% | 3% | 8% | 4% |
| 2005 | 2% | 5% | 5% | 5% | 9% | 3% | 5% | 3% |
| 2006 | 3% | 4% | 6% | 9% | 11% | 3% | 6% | 3% |
| 2007 | 2% | 4% | 7% | 9% | 6%* | 2% | 7% | 2% |
| 2008 | 3% | 3% | 4% | 7% | 8% | 3% | 5% | 3% |
| 2009 | 4% | 3% | 4% | 7% | 9% | 3% | 5% | 3% |
| 2010 | 1% | 4% | 6% | 8% | 8% | 1% | 6% | 1% |
| 2011 | 4% | 4% | 6% | 5% | 4% | 4% | 6% | 4% |
| 2012 | 2% | 2% | 8% | 5% | 8% | 2% | 6% | 2% |
| 2013 | 2% | 5% | 6% | 5% | 8% | 3% | 6% | 3% |
| 2014 | 6% | 4% | 8% | 11%* | 8% | 5% | 9% | 5% |
| 2015 | 3% | 4% | 11% | 12% | *3%* | 3% | 11% | 3% |
| 2016 | 1% | 9% | 18% | 23%* | 20% | 3% | 17%* | 3% |
| 2017 | 3% | 8% | 11% | 18% | 26% | 5% | 13% | 5% |

\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667122**

Exhibit 142

JA-0002015

**Figure 2.9**

**Among Firms Offering Health Benefits, Percentage That Offer to Part-Time Workers, by Firm Size, 1999-2017**



\* Estimate is statistically different between All Small Firms and All Large Firms within year (p < .05).
NOTE: Prior to 2015, each respondent defined part-time according to their firm's policies; starting in 2015, respondents were asked whether employees working fewer than 30 hours per week were eligible for benefits.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 2.10**

**Among Firms Offering Health Benefits, Percentage That Offer to Temporary Workers, by Firm Size, 1999-2017**



\* Estimate is statistically different between All Small Firms and All Large Firms within year (p < .05).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667123**

Exhibit 142

JA-0002016

# SPOUSES, DEPENDENTS AND DOMESTIC PARTNER BENEFITS

- The majority of firms offering health benefits offer to spouses and dependents, such as children. In 2017, 94% of small firms and 100% of large firms offering health benefits offer coverage to spouses, similar to last year. Ninety-two percent of small firms and 100% of large firms offering health benefits cover other dependents, such as children, similar to last year. Five percent of small firms offering health benefits offer only single coverage to employees [Figure 2.11].

- Employers were also asked whether same-sex or opposite-sex domestic partners were allowed to enroll in the firm's coverage. While definitions may vary, employers often define domestic partners as an unmarried couple who has lived together for a specified period of time. Firms may define domestic partners separately from any legal requirements a state may have, and also, employers may have a different policy in different parts of the country or for different workers.

  – In 2017, 36% of firms offering health benefits offer coverage to opposite-sex domestic partners, similar to the 27% who did so in 2016. Forty percent of firms offering health benefits offer coverage to same-sex domestic partners, similar to the 32% who did so last year [Figure 2.13].

  – When firms are asked if they offer health benefits to opposite or same-sex domestic partners, many report that they have not encountered this issue. At some small firms, the firm may not have formal human resource policies on domestic partners simply because none of the firm's workers have asked to cover a domestic partner. Regarding health benefits for opposite-sex domestic partners, 30% of firms report in 2017 that they have not encountered this request or that the question was not applicable [Figure 2.12]. The vast majority of firms in the United States are small businesses [Figure M.1]. Therefore, statistics about the percentage of firms that offer domestic partner benefits are largely determined by small businesses. More small firms (31%) than large firms (2%) indicate that they have not encountered this request or that the question was not applicable [Figure 2.12]. Regarding health benefits for same-sex domestic partners, 34% of firms report that they have not encountered the request or that the question was not applicable. More small firms (35%) than large firms (4%) report that they have not encountered the issue of offering benefits to same-sex domestic partners [Figure 2.12].

  – Among large firms not offering health benefits to same-sex domestic partners, 3% stopped offering them within the last 12 months.

- Over half (57%) of firms that offer health benefits to spouses also offer coverage to same-sex spouses, with large firms more likely than small firms to offer coverage to same-sex spouses (88% vs. 56%). Small firms are more likely than large firms to report that this request has not been encountered (32% vs. 4%) [Figure 2.15].

- Among all firms that offer health benefits, 15% report providing additional compensation or benefits to employees if they enroll in a spouse's plan, and 18% provide additional compensation or benefits to employees if they do not participate in the firm's health benefits [Figure 2.16].

**667124**

Exhibit 142

JA-0002017

**Figure 2.11**

**Among Firms Offering Benefits, Percentage That Offer to Spouses, Dependents and Partners, 2017**



NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Not Encountered refers to firms where no workers requested domestic partner benefits and there is no corporate policy on coverage for that classification of domestic partners.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 2.12**

**Among Firms Offering Health Benefits, Percentage That Offer to Unmarried Same-Sex and Opposite-Sex Domestic Partners, by Firm Size and Region, 2017**

| | Same-Sex | | | Opposite-Sex | | |
|---|---|---|---|---|---|---|
| | Yes | No | Not Encountered | Yes | No | Not Encountered |
| **FIRM SIZE** | | | | | | |
| 3-24 Workers | 37%* | 22%* | 40%* | 33% | 29%* | 37%* |
| 25-199 Workers | 45 | 34 | 21* | 41 | 43* | 15* |
| 200-999 Workers | 48 | 49* | 5* | 40 | 58* | 2* |
| 1,000-4,999 Workers | 43 | 58* | 1* | 38 | 61* | ** |
| 5,000 or More Workers | 53* | 47* | 0* | 47* | 53* | 0* |
| **All Small Firms (3-199 Workers)** | 40% | 25%* | 35%* | 36% | 33%* | 31%* |
| **All Large Firms (200 or More Workers)** | 46% | 50%* | 4%* | 40% | 58%* | 2%* |
| **REGION** | | | | | | |
| Northeast | 48% | 28% | 24% | 35% | 38% | 27% |
| Midwest | 13* | 39* | 48 | 13* | 45 | 42 |
| South | 33 | 28 | 39 | 35 | 36 | 29 |
| West | 62* | 12* | 26 | 55* | 21* | 24 |
| **ALL FIRMS** | 40% | 26% | 34% | 36% | 34% | 30% |

NOTE: Not Encountered refers to firms where no workers requested domestic partner benefits and there is no corporate policy on coverage for that classification of domestic partners.

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667125**

Exhibit 142

JA-0002018

**Figure 2.13**

**Among Firms Offering Health Benefits, Percentage That Offer to Unmarried Opposite-Sex and Same-Sex Domestic Partners, by Firm Size, 2008-2017**

| | 2008 | 2009 | 2012 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| **Opposite-Sex Domestic Partners** | | | | | | | |
| Small Firms | 24% | 31% | 37% | 39% | 28% | 26% | 36% |
| Large Firms | 32% | 34% | 38% | 39% | 38% | 42% | 40% |
| **All Firms** | 24% | 31% | 37% | 39% | 28% | 27% | 36% |
| **Same-Sex Domestic Partners** | | | | | | | |
| Small Firms | 22% | 21% | 31% | 39% | 42% | 32% | 40% |
| Large Firms | 32% | 34% | 42%* | 49% | 47% | 49% | 48% |
| **All Firms** | 22% | 21% | 31% | 39% | 42% | 32% | 40% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. See Figure 2.12 for the percentage of firms indicating no and not encountered. These questions were not asked in the 2010, 2011, and 2013 surveys.

* Estimate is statistically different from estimate for the previous year shown (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2008-2017

**Figure 2.14**

**Among Firms Not Offering Domestic Partner Benefits, Percentage of Firms That Stopped Offering Those Benefits in the Last 12 Months, by Firm Size, 2017**



SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667126

Exhibit 142

JA-0002019

**Figure 2.15**

**Among Firms Offering Health Benefits to Spouses, Percentage of Firms That Offer Coverage to Same-Sex Spouses, by Firm Size, 2017**

| FIRM SIZE | Yes | No | Not Encountered |
|---|---|---|---|
| 3-49 Workers | 54%* | 11% | 35%* |
| 50-199 Workers | 67 | 15 | 18* |
| 200-999 Workers | 87* | 8 | 5* |
| 1,000-4,999 Workers | 92* | 8 | 1* |
| 5,000 or More Workers | 94* | 6 | 0* |
| **All Small Firms (3-199 Workers)** | **56%*** | **12%** | **32%*** |
| **All Large Firms (200 or More Workers)** | **88%*** | **8%** | **4%*** |
| **ALL FIRMS** | **57%** | **11%** | **31%** |

NOTE: Not Encountered refers to firms where no workers requested domestic partner benefits and there is no corporate policy on coverage for that classification of domestic partners

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 2.16**

**Among Firms Offering Health Benefits, Percentage That Provide Additional Incentives to Workers For Various Enrollment Decisions, by Firm Size, 2017**



Legend: ■ Additional Incentives for Enrolling in a Spouse's Plan   ▨ Additional Incentives for Not Participating in Firm's Health Benefits

- All Small Firms (3-199 Workers): 15%, 18%
- All Large Firms (200 or More Workers): 13%, 17%
- ALL FIRMS: 15%, 18%

Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## SUPPLEMENTAL AND VOLUNTARY BENEFITS

- Firms offering health benefits also offer a variety of supplemental and other health benefits to their workers. Large firms are more likely than small firms to offer these benefits [Figure 2.17]. Among firms offering health benefits:

    - Sixty-seven percent of small firms and 97% of large firms offer dental benefits to their employees. Of firms offering these benefits, 67% make a contribution toward the cost of the coverage [Figure 2.18].

    - Forty-seven percent of small firms and 82% of large firms offer vision benefits to their employees. Of firms offering these benefits, 54% make a contribution toward the cost of the coverage [Figure 2.18].

**667127**

Exhibit 142                                                                                                    JA-0002020

– Critical illness insurance provides a cash benefit when an enrollee is diagnosed with a specified condition, such as cancer. Twenty-three percent of small firms and 46% of large firms offer critical illness insurance to their employees. Of firms offering these benefits, 3% make a contribution toward the cost of the coverage [Figure 2.18].

– Hospital indemnity plans, sometimes known as hospital cash plans, provide a cash benefit when an enrollee is admitted to the hospital or has a certain type of outpatient surgery. Sixteen percent of small firms and 28% of large firms offer hospital indemnity insurance to their employees. Of firms offering these benefits, 5% make a contribution toward the cost of the coverage [Figure 2.18].

– Long-term care insurance covers assistance with daily living not generally covered by health insurance such as care from a home health worker or nursing home. Sixteen percent of small firms and 25% of large firms offer long-term care insurance to their employees, similar to the percentages in 2011. Of firms offering these benefits, 47% make a contribution toward the cost of the coverage [Figure 2.18].

---

**Figure 2.17**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer Voluntary Benefits In Addition to the Health Plan, by Firm Size, Region and Industry, 2017**

| | Separate Dental Insurance | Separate Vision Insurance | Separate Critical Illness Insurance | Separate Hospital Indemnity Insurance | Separate Long Term Care Insurance |
|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | |
| 3-49 Workers | 64%* | 44%* | 21%* | 14%* | 15% |
| 50-199 Workers | 89* | 71* | 43* | 31* | 23 |
| 200-999 Workers | 97* | 82* | 46* | 30* | 26* |
| 1,000-4,999 Workers | 97* | 86* | 44* | 29 | 20 |
| 5,000 or More Workers | 97* | 86* | 56* | 24 | 26* |
| All Small Firms (3-199 Workers) | 67%* | 47%* | 23%* | 16%* | 16%* |
| All Large Firms (200 or More Workers) | 97%* | 82%* | 46%* | 28%* | 25%* |
| **REGION** | | | | | |
| Northeast | 70% | 51% | 23% | 11% | 11% |
| Midwest | 54 | 39 | 14* | 12 | 11 |
| South | 68 | 49 | 37* | 26* | 25 |
| West | 78 | 54 | 20 | 14 | 15 |
| **INDUSTRY** | | | | | |
| Agriculture/Mining/Construction | 44% | 34% | 21% | 2%* | 14% |
| Manufacturing | 82 | 75* | 38 | 7* | 8 |
| Transportation/Communications/Utilities | 36 | 31 | 12 | 17 | 7 |
| Wholesale | 49 | 25* | 20 | 23 | 9 |
| Retail | 73 | 51 | 19 | 10 | 15 |
| Finance | 85 | 84 | 28 | 13 | 52* |
| Service | 70 | 47 | 18* | 12 | 10* |
| State/Local Government | 72 | 56 | 36 | 29 | 23 |
| Health Care | 86* | 62 | 59* | 59* | 30 |
| **ALL FIRMS** | **68%** | **49%** | **24%** | **16%** | **16%** |

NOTE: Critical illness insurance provides a cash benefit when an enrollee is diagnosed with a specified condition, such as cancer. Hospital indemnity plans provide a cash benefit when an enrollee is admitted to the hospital or has a certain type of outpatient surgery. Long term care insurance covers assistance with daily living not generally covered by health insurance such as care from a home health worker or nursing home. The survey asks firms that offer health benefits if they offer or contribute to supplemental benefits that are separate from coverage their health plans might include.

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667128**

Exhibit 142

JA-0002021

SECTION 2.  HEALTH BENEFITS OFFER RATES

**Figure 2.18**

**Among Firms Offering Health Benefits, Percentage That Offer Voluntary Benefits In Addition to Benefits Offered Through the Health Plan, by Firm Size, 2017**

| | Dental | | Vision | | Critical Illness | | Hospital Indemnity | | Long Term Care | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Offers Insurance Separately | Among Firms With Separate Offers Share That Contribute | Offers Insurance Separately | Among Firms With Separate Offers Share That Contribute | Offers Insurance Separately | Among Firms With Separate Offers Share That Contribute | Offers Insurance Separately | Among Firms With Separate Offers Share That Contribute | Offers Insurance Separately | Among Firms With Separate Offers Share That Contribute |
| **FIRM SIZE** | | | | | | | | | | |
| 200-999 Workers | 97%* | 69% | 82%* | 41% | 45%* | 2% | 30%* | 1% | 26%* | 41% |
| 1,000-4,999 Workers | 97% | 77 | 86* | 40* | 44* | 10* | 19 | 8 | 20 | 42 |
| 5,000 or More Workers | 97* | 78 | 86* | 33* | 58* | 1 | 24 | 5 | 28* | *6* |
| All Small Firms (3-199 Workers) | 67%* | 67% | 47%* | 55%* | 23%* | 3% | 16%* | 6% | 16%* | 47% |
| All Large Firms (200 or More Workers) | 97%* | 71% | 82%* | 41%* | 46%* | 3% | 28%* | 2% | 25%* | 40% |
| **ALL FIRMS** | 68% | 67% | 49% | 54% | 24% | 3% | 16% | 5% | 16% | 47% |

NOTE: Critical illness insurance provides a cash benefit when an employee is diagnosed with a specified condition, such as cancer. Hospital indemnity plans provide a cash benefit when an enrollee is admitted to the hospital or has a certain type of outpatient surgery. Long term care insurance covers assistance with daily living not generally covered by health insurance such as care from a home health worker or nursing home. The survey asks firms that offer health benefits if they offer or contribute to supplemental benefits that are separate from coverage their health plans might include.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 2.19**

**Among Firms Offering Health Benefits, Percentage That Offer Supplemental Insurance Benefits in Addition to Benefits Offered Through the Health Plan, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Critical illness insurance provides a cash benefit when an enrollee is diagnosed with a specified condition, such as cancer. Hospital indemnity plans provide a cash benefit when an enrollee is admitted to the hospital or has a certain type of outpatient surgery. Long term care insurance covers assistance with daily living not generally covered by health insurance such as care from a home health worker or nursing home. The survey asks firms that offer health benefits if they offer or contribute to supplemental benefits that are separate from any their health plans might include.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667129**

Exhibit 142

JA-0002022

**Figure 2 20**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer or Contribute to a Separate Benefit Plan Providing Dental or Vision Benefits, by Firm Size, 2000-2017**

| | 2000 | 2003 | 2006 | 2008 | 2010 | 2012 | 2014 | 2017 |
|---|---|---|---|---|---|---|---|---|
| Separate Dental Benefits: Small Firms | 30% | 37% | 46%* | 42% | 45% | 55% | 62% | 67%* |
| Separate Dental Benefits: Large Firms | 60% | 78%* | 79% | 81%* | 87%* | 59% | 88%* | 97%* |
| **Separate Dental Benefits: ALL FIRMS** | **31%** | **38%** | **50%*** | **43%** | **46%** | **54%** | **53%** | **69%*** |
| | | | | | | | | |
| Separate Vision Benefits: Small Firms | | | 20% | 15% | 16% | 27%* | 34% | 47%* |
| Separate Vision Benefits: Large Firms | | | 42% | 47% | 51% | 62%* | 63% | 82%* |
| **Separate Vision Benefits: ALL FIRMS** | | | **20%** | **16%** | **17%** | **27%*** | **35%** | **49%*** |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Data on vision benefits was not collected in 2000 and 2003. The survey asks firms that offer health benefits if they offer or contribute to a central vision insurance program that is separate from any dental or vision coverage their health plans might include.

*Estimate is statistically significant from estimate for the previous year shown (p < .05)

SOURCE: Kaiser HRET Survey of Employer-Sponsored Health Benefits, 2000-2017



**Figure 2.21**

**Among Firms Offering Health Benefits, Percentage That Offer Long Term Care Insurance in Addition to Benefits Offered Through the Health Plan, by Firm Size, 2007, 2011, and 2017**

Legend: ■ All Small Firms (3-199 Workers)  ▒ All Large Firms (200 or More Workers)  ▒ ALL FIRMS

2007: 19%, 25%, 19%
2011: 11%, 19%*, 11%
2017: 16%, 25%, 16%

* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: Long term care insurance covers assistance with daily living not generally covered by health insurance such as care from a home health worker or nursing home. The survey asks firms that offer health benefits if they offer or contribute to long term care insurance that is separate from any coverage their health plans might include.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007, 2011, and 2017

## FIRMS NOT OFFERING HEALTH BENEFITS

- The survey asks firms that do not offer health benefits if they have offered insurance or shopped for insurance in the recent past, and about their most important reasons for not offering coverage. Because such a small percentage of large firms report not offering health benefits, we present responses for small non-offering firms only.

  - The cost of health insurance remains the primary reason cited by firms for not offering health benefits. Among small firms not offering health benefits, 44% cite high cost as "the most important reason" for not doing so, followed by "the firm is too small" (17%) [Figure 2.22]. Relatively few small firms indicate that they do not offer because they believe that employees will get a better deal on the health insurance exchanges (2%).

- Many small non-offering firms have either offered health insurance in the past five years, or have shopped for health insurance in the past year. Twenty percent of small non-offering firms have offered health benefits in the past five years, and 13% have shopped for coverage in the past year [Figure 2.23]. The 20% of small non-offering firms that have offered

667130

Exhibit 142

JA-0002023

coverage in the past five years is similar to the 19% reported last year.

- Among small non-offering firms that report they stopped offering coverage within the last five years, 18% stopped offering coverage within the last year.

- Among small non-offering firms, 16% report that they provide funds to their employees to purchase health insurance on their own in the individual market or through a health insurance exchange [Figure 2.24]. Forty percent of these firms provide workers between $2,000 and $5,999 a year to purchase non-group insurance [Figure 2.25].

**Figure 2.22**

**Among Small Firms Not Offering Health Benefits, Most Important Reason for Not Offering, 2017**

|  | 3-9 Workers | 10-199 Workers | All Small Firms (3-199 Workers) |
|---|---|---|---|
| Cost of Health Insurance Too High | 42% | 49% | 44% |
| Firm is Too Small | 18 | 15 | 17 |
| Employees Are Covered Under Another Plan, Including Spouse's | 16 | 14 | 15 |
| Employees Will Get a Better Deal On Health Insurance Exchanges | 2 | 4 | 2 |
| Employee Turnover is Too Great | 0 | 3 | * |
| No Interest/Employees Do Not Want It | 10 | 4 | 9 |
| Most Employees Are Part-Time or Temporary Workers | 7 | 11 | 8 |
| Other | 4 | 5 | 4 |
| Don't Know | 0% | 2% | <1% |

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017



**Figure 2.23**
**Among Small Firms Not Offering Health Benefits, Percentage That Report the Following Actions, 2009-2017**

* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: Small Firms have 3-199 workers. Eighteen percent of small non-offering firms who indicated they had offered health insurance in the past five years said they stopped offering health benefits in the past 12 months.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

Exhibit 142

JA-0002024

**Figure 2.24**
**Among Small Firms Not Offering Health Benefits, Percentage That Provide Workers Funds to Purchase Non-Group Insurance, by Firm Size, 2012-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Among firms who provide funds to workers to purchase non-group coverage 7 percent started providing funds within the last 12 months. Starting in 2014, this question was modified to: Does your firm provide funds for workers to purchase insurance on their own in the individual market, or through a health insurance exchange?.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2012-2017

**Figure 2.25**
**Among Small Firms That Provide Workers Funds to Purchase Non-Group Insurance, Annual Amounts That Firms Provide to Workers, 2017**



NOTE: Many employers indicated that they base non-group insurance contributions on a variety of factors.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 53

**667132**

Exhibit 142                                                                JA-0002025

**Figure 2.26**
**Percentage of All Workers at Firms That Offer Health Benefits to At Least Some Workers,**
**by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: As noted in the Survey Design and Methods section, estimates presented in this figure are based on the sample of both firms that completed the
entire survey and those that answered just one question about whether they offer health benefits. Not all workers at a firm offering benefits are
eligible or enrolled in their firm's health benefits.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667133**

Exhibit 142

JA-0002026



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Employee
Coverage,
Eligibility, and
Participation

SECTION

3

667134

Exhibit 142

JA-0002027

# Section 3

# Employee Coverage, Eligibility, and Participation

Employers are the principal source of health insurance in the United States, providing health benefits for about 151 million non-elderly people in America.[1] Most workers are offered health coverage at work, and the majority of workers who are offered coverage take it. Workers may not be covered by their own employer for several reasons: their employer may not offer coverage, they may not be eligible for the benefits offered by their firm, they may elect to receive coverage through their spouse's employer, or they may refuse coverage from their firm. Before eligible workers may enroll, about three-quarters (76%) of covered workers face a waiting period.

## ELIGIBILITY

- Not all workers are eligible for the health benefits offered by their firm, and not all eligible workers "take up" (i.e., elect to participate in) the offer of coverage. The share of workers covered in a firm is a product of both the percentage of workers who are eligible for the firm's health insurance and the percentage that choose to take up the benefit. The percentage of workers eligible for health benefits at offering firms in 2017 is similar to last year and the recent past for both small and large firms [Figure 3.1].

  - Seventy-nine percent of workers in firms offering health benefits are eligible for the coverage offered by their employer. The percentage of eligible workers is higher in small firms with 3-24 workers (84%) than other firm sizes [Figure 3.2].

  - Eligibility varies considerably by firm wage level. Workers in firms with a relatively large share of lower-wage workers (where at least 35% of workers earn $24,000 a year or less) are less likely to be eligible for health benefits than workers in firms with a smaller share of lower-wage workers (68% vs. 81%) [Figure 3.3].

  - Workers in firms with a relatively large share of higher-wage workers (where at least 35% earn $60,000 or more annually) are more likely to be eligible for health benefits than workers in firms with a smaller share of higher-wage workers (88% vs. 73%) [Figure 3.3].

  - Eligibility also varies by the age of the workforce. Those in firms with a relatively small share of younger workers (where fewer than 35% of the workers are age 26 or younger) are more likely to be eligible for health benefits than those in firms with a larger share younger workers (81% vs. 64%) [Figure 3.3].

  - The average eligibility rate is particularly low in retail firms (54%) [Figure 3.2].

---

[1] Kaiser Commission on Medicaid and the Uninsured. The uninsured: A primer—Key facts about health insurance and the uninsured in the wake of national health reform [Internet]. Washington (DC): The Commission; 2016 Nov [cited 2016 Aug 1]. http://www.kff.org/uninsured/report/the-uninsured-a-primer-key-facts-about-health-insurance-and-the-uninsured-in-the-wake-of-national-health-reform/. See supplemental tables - Table 1: 270.2 million non-elderly people, 55.5% of whom are covered by ESI.

**667135**

Exhibit 142

JA-0002028

SECTION 3.  EMPLOYEE COVERAGE, ELIGIBILITY, AND PARTICIPATION

**Figure 3.1**

Eligibility, Take-Up Rate, and Coverage for Workers in Firms Offering Health Benefits, by Firm Size, 1999-2017

| | Percentage Eligible | | | Percentage of Eligible That Take Up | | | Percentage Covered | | |
|---|---|---|---|---|---|---|---|---|---|
| | All Small Firms | All Large Firms | All Firms | All Small Firms | All Large Firms | All Firms | All Small Firms | All Large Firms | All Firms |
| 1999 | 81% | 78% | 79% | 83% | 86% | 85% | 67% | 68% | 66% |
| 2000 | 82% | 80% | 81% | 83% | 84% | 84% | 68% | 67% | 68% |
| 2001 | 85% | 82% | 83% | 83% | 85% | 84% | 71% | 69% | 70% |
| 2002 | 82%* | 80% | 81%* | 82% | 86% | 85%* | 67%* | 69% | 68% |
| 2003 | 84% | 80% | 81% | 81%* | 85% | 84% | 68% | 68% | 68% |
| 2004 | 82% | 81% | 80% | 80%* | 84% | 83% | 64% | 68% | 67% |
| 2005 | 81% | 79% | 80% | 81%* | 85% | 83%* | 65% | 67% | 66% |
| 2006 | 83% | 78% | 78% | 81%* | 84% | 83% | 67% | 65% | 65% |
| 2007 | 80% | 78% | 79% | 82% | 84% | 82% | 64% | 65% | 65% |
| 2008 | 81% | 79% | 80% | 80% | 84% | 82% | 65% | 66% | 65% |
| 2009 | 81% | 79% | 79% | 79% | 82% | 81%* | 64% | 65% | 65% |
| 2010 | 82% | 77% | 79% | 77% | 82% | 80% | 63% | 63% | 63% |
| 2011 | 83% | 78% | 79% | 78% | 83% | 81% | 65% | 65% | 65% |
| 2012 | 78%* | 76% | 77% | 78% | 82% | 81% | 61% | 62% | 62% |
| 2013 | 80% | 76% | 77% | 77% | 81% | 80% | 62% | 62% | 62% |
| 2014 | 79% | 76% | 77% | 77%* | 81% | 80% | 61% | 62% | 62% |
| 2015 | 81% | 79% | 79% | 78% | 81% | 79% | 61% | 63% | 63% |
| 2016 | 82% | 78% | 79% | 77% | 79% | 79% | 63% | 62% | 62% |
| 2017 | 82% | 78% | 79% | 75% | 79% | 78% | 62% | 62% | 62% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. In 2009, Kaiser/HRET began weighting the percentage of workers that take up coverage by the number of workers eligible for coverage. The historical take-up estimates have also been updated. See the Survey Design and Methods section for more information.

* Estimate is statistically different from estimate for the previous year shown (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 3.2**

Eligibility, Take-Up Rate, and Coverage in Firms Offering Health Benefits, by Firm Size, Region, and Industry, 2017

| | Percentage of Workers Eligible for Health Benefits Offered by Their Employer | Percentage of Eligible Workers Who Participate in Their Employers' Plan (Take-Up Rate) | Percentage of Workers Covered by Their Employers' Health Benefits |
|---|---|---|---|
| **FIRM SIZE** | | | |
| 3-24 Workers | 84%* | 78% | 66% |
| 25-49 Workers | 81 | 73 | 59 |
| 50-199 Workers | 81 | 74* | 60 |
| 200-999 Workers | 78 | 78 | 61 |
| 1,000-4,999 Workers | 82 | 80 | 65 |
| 5,000 or More Workers | 77 | 79 | 61 |
| **All Small Firms (3-199 Workers)** | **82%** | **75%*** | **62%** |
| **All Large Firms (200 or More Workers)** | **78%** | **79%*** | **62%** |
| **REGION** | | | |
| Northeast | 78% | 77%* | 60% |
| Midwest | 76 | 76 | 58 |
| South | 81 | 79 | 64 |
| West | 81 | 79 | 64 |
| **INDUSTRY** | | | |
| Agriculture/Mining/Construction | 84% | 74% | 62% |
| Manufacturing | 93* | 79 | 74* |
| Transportation/Communications/Utilities | 87* | 87* | 76* |
| Wholesale | 91* | 85* | 77* |
| Retail | 54* | 63* | 34* |
| Finance | 95* | 82* | 78* |
| Service | 77 | 75* | 57* |
| State/Local Government | 88* | 89* | 79* |
| Health Care | 79 | 79 | 62 |
| **ALL FIRMS** | **79%** | **78%** | **62%** |

* Estimate for eligibility, take-up rate, or coverage is statistically different from all other firms not in the indicated size, region, or industry category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667136

Exhibit 142

JA-0002029



**Figure 3.3**

**Among Workers in Firms Offering Health Benefits, Percentage of Workers Eligible for Health Benefits Offered by Their Firm, by Firm Characteristics, 2017**

\* Estimates are statistically different from each other within category (p < .05).

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,600 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017.

## TAKE-UP RATE

- A large share of workers who are offered health benefits at work elect to enroll. In 2017, 78% of eligible workers take up coverage when it is offered to them, similar to last year [Figure 3.1].[2] Eligible workers in large firms (200 or more workers) are more likely to take up coverage when offered than eligible workers in small firms (3-199 workers) (79% vs. 75%) [Figure 3.2].

  - The likelihood of a worker accepting a firm's offer of coverage varies by firm wage level. Eligible workers in firms with a relatively small share of lower-wage workers (where fewer than 35% of workers earn $24,000 a year or less) are more likely to take up coverage than eligible workers in firms with a larger share of lower-wage workers (79% vs. 65%) [Figure 3.4].

  - Eligible workers in firms with a relatively large share of higher-wage workers (where at least 35% earn $60,000 or more annually) are more likely to take up coverage than those in firms with a smaller share of higher-wage workers (82% vs. 74%) [Figure 3.4].

  - Eligible workers in firms with relatively large share of younger workers (where at least 35% of the workers are age 26 or younger) are less likely to take up coverage than those in firms with a smaller share of younger workers (70% vs. 79%) [Figure 3.4].

  - The percentage of eligible workers taking up benefits in offering firms also varies by industry, with a lower average take-up rate at retail firms (63%) and a higher average take-up rate at state and local governments (89%) [Figure 3.2].

[2] In 2009, Kaiser/HRET began weighting the percentage of workers that take up coverage by the number of workers eligible for coverage. The historical take up estimates have also been updated. See the Survey Design and Methods section for more information.

**667137**

Exhibit 142

JA-0002030

- The share of eligible workers taking up benefits in offering firms (78%) has decreased over time, from 81% in 2012 and 82% in 2007.

**Figure 3.4**

**Among Workers in Firms Offering Health Benefits, Percentage of Eligible Workers Who Take Up Health Benefits Offered by Their Firm, by Firm Characteristics, 2017**



* Estimates are statistically different from each other within category (p < .05)
NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.
SOURCE: Kaiser/HRET Survey of Employer Sponsored Health Benefits, 2017

# COVERAGE

- The percentage of workers at firms offering health benefits that are covered by their firm's health plan in 2017 is 62%, the same percentage as last year [Figure 3.1].

    – The coverage rate at firms offering health benefits is the same for small firms and large firms in 2017. These rates are similar to the rates last year for both small firms and large firms [Figure 3.1].

- There is significant variation by industry in the coverage rate among workers in firms offering health benefits. The average coverage rate is particularly low in retail (34%) and service (57%) industries [Figure 3.2].

- Among workers in firms offering health benefits, those in firms with a relatively large share of lower-wage workers (where at least 35% of workers earn $24,000 a year or less) are less likely to be covered by their own firm than workers in firms with a smaller share of lower-wage workers (44% vs. 64%). A comparable pattern exists in firms with a relatively large share of higher-wage workers (where at least 35% earn $60,000 or more annually), with workers in these firms being more likely to be covered by their employer's health benefits than those in firms with a smaller share of higher-wage workers (72% vs. 54%) [Figure 3.5].

- Among workers in firms offering health benefits, those in firms with a relatively small share of younger workers (where fewer than 35% of the workers are age 26 or younger) are more likely to be covered by their own firm than those in firms with a larger share of younger workers (64% vs. 45%) [Figure 3.5].

- Among workers in all firms, including those that offer and those that do not offer health benefits, 55% of workers are covered by health benefits offered by their employer, the same percentage as last year. The coverage rate in 2017 is lower than the coverage rate in 2007 (59%).

**667138**

Exhibit 142

JA-0002031

**Figure 3.5**

**Among Workers in Firms Offering Health Benefits, Percentage of Workers Covered by Health Benefits Offered by Their Firm, by Firm Characteristics, 2017**



* Estimates are statistically different from each other within category (p < .05).

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 3.6**

**Percentage of All Workers Covered by Their Employer's Health Benefits, Both in Firms Offering and Not Offering Health Benefits, by Firm Size, 1999-2017**

| | 3-24 Workers | 25-49 Workers | 50-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All Small Firms | All Large Firms | All Firms |
|---|---|---|---|---|---|---|---|---|---|
| 1999 | 50% | 56% | 61% | 69% | 65%* | 64% | 55% | 66% | 62% |
| 2000 | 50% | 63% | 62% | 69% | 66% | 68% | 57% | 67% | 63% |
| 2001 | 49% | 62% | 67% | 71% | 69% | 69% | 58% | 69% | 65% |
| 2002 | 45% | 57% | 64% | 69% | 70% | 68% | 54% | 69% | 63% |
| 2003 | 44% | 59% | 61% | 68% | 69% | 68% | 53% | 68% | 62% |
| 2004 | 43% | 56% | 58% | 69% | 68% | 67% | 50% | 68% | 61% |
| 2005 | 41% | 55% | 59% | 65% | 69% | 66% | 50% | 66% | 60% |
| 2006 | 45% | 55% | 62% | 62% | 68% | 60% | 53% | 63% | 59% |
| 2007 | 42% | 61% | 59% | 66% | 69% | 63% | 50% | 65% | 59% |
| 2008 | 43% | 57% | 59% | 67% | 69% | 64% | 52% | 66% | 60% |
| 2009 | 39% | 54% | 59% | 63% | 67% | 65% | 49% | 65% | 59% |
| 2010 | 44% | 59% | 60% | 67% | 66% | 63% | 52% | 63% | 59% |
| 2011 | 38% | 49% | 59% | 63% | 66% | 64% | 48%* | 64% | 58% |
| 2012 | 36% | 54% | 56% | 61% | 66% | 61% | 47% | 62% | 56% |
| 2013 | 36% | 53% | 57% | 63% | 67% | 58% | 46% | 61% | 56% |
| 2014 | 33% | 52% | 55% | 60% | 66% | 61% | 44% | 62% | 55% |
| 2015 | 36% | 49% | 54% | 61% | 66% | 63% | 45% | 63% | 56% |
| 2016 | 32% | 47% | 57% | 62% | 63% | 60% | 44% | 61% | 55% |
| 2017 | 32% | 45% | 55% | 60% | 64% | 61% | 43% | 62% | 55% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

667139

Exhibit 142

JA-0002032

# WAITING PERIODS

- Waiting periods are a specified length of time after beginning employment before workers are eligible to enroll in health benefits. With some exceptions, the Affordable Care Act requires that waiting periods cannot exceed 90 days.[3] For example, employers are permitted to have orientation periods before the waiting period begins which, in effect, means a worker is not eligible for coverage 3 months after hire. If a worker is eligible to enroll on the 1st of the month after three months of employment, this survey rounds up and considers the firm's waiting period four months. For these reasons, some employers still have waiting periods exceeding the 90-day maximum.

- Seventy-six percent of covered workers face a waiting period before coverage is available, similar to last year [Figure 3.9]. Covered workers in small firms are more likely than those in large firms to have a waiting period (84% vs. 73%) [Figure 3.7].

- The average waiting period among covered workers who face a waiting period is 1.9 months [Figure 3.7]. A small percentage (2%) of covered workers with a waiting period have a waiting period of more than 3 months.

  - Respondents with waiting periods greater than 4 months generally indicated that employees had training or orientation periods, or measurement periods in which they were employees but were not eligible for health benefits. Some employers have measurement periods to determine whether variable hour employees will meet the requirements for the firm's health benefits.[4]

**Figure 3.7**

**Percentage of Covered Workers In Firms With a Waiting Period for Coverage and Average Waiting Period In Months, by Firm Size, Region, and Industry, 2017**

| | Percentage of Covered Workers In Firms With a Waiting Period | Among Covered Workers With a Waiting Period, Average Waiting Period (Months) |
|---|---|---|
| **FIRM SIZE** | | |
| All Small Firms (3-199 Workers) | 84%* | 2.2* |
| All Large Firms (200 or More Workers) | 73%* | 1.8* |
| **REGION** | | |
| Northeast | 71% | 1.9 |
| Midwest | 76 | 1.7* |
| South | 75 | 2 |
| West | 80 | 1.9 |
| **INDUSTRY** | | |
| Agriculture/Mining/Construction | 88%* | 2.5 |
| Manufacturing | 84* | 1.9 |
| Transportation/Communications/Utilities | 73 | 2 |
| Wholesale | 82 | 1.9 |
| Retail | 88* | 2.4* |
| Finance | 71 | 1.5* |
| Service | 68* | 1.9 |
| State/Local Government | 68 | 1.6* |
| Health Care | 84* | 1.8 |
| **ALL FIRMS** | **76%** | **1.9** |

\* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

[3] Variable hour employees may have a measurement period of up to 12 months before it is determined if they are eligible for benefits. Employers may require a cumulative service requirement of up to 1,200 hours before an employee may enroll. Federal Register. Vol. 79, No. 36. Feb 12, 2014. https://www.gpo.gov/fdsys/pkg/FR-2014-02-24/pdf/2014-03809.pdf

[4] Under the ACA, employers may determine whether or not an employee is a full-time employee by looking back at the number of hours an employee has worked during a defined period. See https://www.irs.gov/affordable-care-act/employers/identifying-full-time-employees

**667140**

Exhibit 142

JA-0002033

**Figure 3.8**

**Distribution of Covered Workers with the Following Waiting Periods for Coverage, 2017**



\* Estimates are statistically different from each other within category (p < .05).

NOTE: If a worker is eligible to enroll on the 1st of the month after three months of employment, this survey rounds up and considers the firm's waiting period four months. Some firms indicated that employees had training or measurement periods during which they were not eligible for health benefits. For these reasons, some firms still have waiting periods exceeding the 90-day maximum.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

---

**Figure 3.9**

**Percentage of Covered Workers In Firms With a Waiting Period for Coverage and Average Waiting Period In Months, by Firm Size, 2002-2017**

| | Percentage of Covered Workers with a Waiting Period | | | Average Waiting Period (Months) | | |
|---|---|---|---|---|---|---|
| | All Small Firms | All Large Firms | All Firms | All Small Firms | Al Large Firms | All Firms |
| 2002 | 86% | 71% | 76% | 2.6 | 2 | 2.2 |
| 2003 | 82% | 77% | 78% | 2.8 | 1.9 | 2.2 |
| 2004 | 82% | 65%* | 70%* | 2.6 | 2 | 2.2 |
| 2005 | 80% | 72% | 75% | 2.5 | 2.1 | 2.2 |
| 2006 | 81% | 69% | 73% | 2.5 | 2 | 2.2 |
| 2007 | 78% | 73% | 75% | 2.6 | 2 | 2.2 |
| 2008 | 78% | 73% | 75% | 2.5 | 1.9 | 2.1 |
| 2009 | 81% | 70% | 74% | 2.5 | 2 | 2.2 |
| 2010 | 78% | 73% | 74% | 2.5 | 2 | 2.2 |
| 2011 | 79% | 68% | 72% | 2.5 | 2 | 2.2 |
| 2012 | 81% | 70% | 74% | 2.7 | 2.1 | 2.3 |
| 2013 | 83% | 74% | 77% | 2.6 | 2.1 | 2.3 |
| 2014 | 83% | 72% | 75% | 2.3* | 2 | 2.1* |
| 2015 | 81% | 71% | 74% | 2.2 | 1.8* | 2* |
| 2016 | 78% | 70% | 72% | 2.1 | 1.9 | 1.9 |
| 2017 | 84% | 73% | 76% | 2.2 | 1.8 | 1.9 |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.

\* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2002-2017

**667141**

Exhibit 142

JA-0002034

## AUTO ENROLLMENT

- Thirty-one percent of firms offering health benefits, including 35% of firms with 3 to 49 workers and 18% of firms with 5,000 or more workers, automatically enroll eligible workers in health benefits after any applicable waiting period [Figure 3.10].



**Figure 3.10**
**Among Firms Offering Health Benefits, Percentage of Firms That Automatically Enroll Eligible Workers in Health Benefits, by Firm Size, 2017**

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667142**

Exhibit 142

JA-0002035



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Types of
Plans
Offered

SECTION

4

667143

Exhibit 142                                                                JA-0002036

# Section 4

# Types of Plans Offered

Most firms that offer health benefits offer only one type of health plan (81%). Large firms (200 or more workers) are more likely to offer more than one type of health plan than small firms (3-199 workers). Firms are most likely to offer their workers a PPO plan and are least likely to offer a conventional plan (sometimes known as indemnity insurance).

- Eighty-one percent of firms offering health benefits in 2017 offer only one type of health plan. Large firms are more likely to offer more than one plan type than small firms (55% vs. 17%) [Figure 4.1].

- The percentage of covered workers at firms that offer multiple plan types can also be analyzed. Fifty-eight percent of covered workers are employed in a firm that offers more than one health plan type. Seventy percent of covered workers in large firms are employed by a firm that offers more than one plan type, compared to 30% in small firms [Figure 4.2].

- About three-quarters (73%) of covered workers in firms offering health benefits work in firms that offer one or more PPO plans; 57% work in firms that offer one or more HDHP/SO plans; 33% work in firms that offer one or more HMO plans; 15% work in firms that offer one or more POS plans; and 1% work in firms that offer one or more conventional plans [Figure 4.4].[1]

- Among covered workers in firms offering only one type of health plan, those in large firms are more likely to be offered an HDHP/SO (36%) than those in small firms (23%). Covered workers in small firms offering only one type of plan are more likely to be offered a POS plan than covered workers in large firms (19% vs. 2%) [Figure 4.5].

- Among covered workers in firms offering only one type of health plan, 30% are in firms that only offer an HDHP/SO and 52% are in firms that only offer a PPO [Figure 4.5].

[1] Starting in 2010, we included firms that said they offer a plan type even if there are no covered workers enrolled in that plan type.

**667144**

Exhibit 142                                                          JA-0002037

SECTION 4.  TYPES OF PLANS OFFERED

**Figure 4.1**
**Among Firms Offering Health Benefits, Percentage of Firms That Offer One, Two, or Three or More Plan Types, by Firm Size, 2017**



* Distribution is statistically different from distribution for all other firms not in the indicated size category (p < .05).

NOTE: The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers. In addition, firms may offer different types of plans to different workers. Although firms may offer more than one of each plan type, the survey asks how many are offered among the following types: Conventional, HMO, PPO, POS, and HDHP/SO.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 4.2**
**In Firms Offering Health Benefits, Percentage of Covered Workers in Firms Offering One, Two, or Three or More Plan Types, by Firm Size, 2017**



* Distribution is statistically different from distribution for all other firms not in the indicated size category (p < .05).

NOTE: The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers. In addition, firms may offer different types of plans to different workers. Although firms may offer more than one of each plan type, the survey asks how many are offered among the following types: Conventional, HMO, PPO, POS, and HDHP/SO.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667145**

Exhibit 142

JA-0002038

**Figure 4.3**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer the Following Plan Types, by Firm Size, 2017**

| | Conventional | HMO | PPO | POS | HDHP/SO |
|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | |
| 3-24 Workers | 2% | 15% | 46% | 25% | 17%* |
| 25-199 Workers | 2 | 22 | 56 | 25 | 38* |
| 200-999 Workers | 1 | 31* | 70* | 11* | 52* |
| 1,000-4,999 Workers | 1 | 31* | 83* | 8* | 56* |
| 5,000 or More Workers | 1 | 34* | 82* | 12* | 69* |
| **All Small Firms (3-199 Workers)** | **2%** | **17%*** | **49%*** | **28%*** | **23%*** |
| **All Large Firms (200 or More Workers)** | **1%** | **31%*** | **73%*** | **10%*** | **53%*** |
| **ALL FIRMS** | **2%** | **17%** | **50%** | **27%** | **24%** |

NOTE: The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers. In addition, firms may offer different types of plans to different workers. Although firms may offer more than one of each plan type, the survey asks how many are offered among the following types: Conventional, HMO, PPO, POS, and HDHP/SO.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 4.4**

**In Firms Offering Health Benefits, Percentage of Covered Workers In Firms That Offer the Following Plan Types, by Firm Size, 2017**

| | Conventional | HMO | PPO | POS | HDHP/SO |
|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | |
| 200-999 Workers | 1% | 32% | 74% | 9%* | 54% |
| 1,000-4,999 Workers | 1 | 32 | 84* | 10 | 59 |
| 5,000 or More Workers | 2 | 44* | 78 | 14 | 76* |
| **All Small Firms (3-199 Workers)** | **1%** | **19%*** | **60%*** | **21%*** | **32%*** |
| **All Large Firms (200 or More Workers)** | **1%** | **39%*** | **78%*** | **12%*** | **67%*** |
| **ALL FIRMS** | **1%** | **33%** | **73%** | **15%** | **57%** |

NOTE: The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers. In addition, firms may offer different types of plans to different workers. Although firms may offer more than one of each plan type, the survey asks how many are offered among the following types: Conventional, HMO, PPO, POS, and HDHP/SO.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667146**

Exhibit 142

JA-0002039

**Figure 4.5**

**In Firms Offering Only One Type of Health Plan, Percentage of Covered Workers in Firms That Offer the Following Plan Type, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers. In addition, firms may offer different types of plans to different workers. Although firms may offer more than one of each plan type, the survey asks how many are offered among the following types: Conventional, HMO, PPO, POs, and HDHP/SO.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 4.6**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer Workers Various Plan Choices, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Firms with an HDHP/SO and at least one other plan type were asked if any workers were offered only an HDHP/SO. Among firms that offer an HDHP/SO, 61% of firms offer at least some workers no other plan type options either because they only offer an HDHP/SO or because some workers are only eligible to enroll in an HDHP/SO.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667147

Exhibit 142

JA-0002040

The survey collects information on a firm's plan with the largest enrollment in each of the plan types. While we know the number of plan types a firm has, we do not know the total number of plans a firm offers workers. In addition, firms may offer different types of plans to different workers. For example, some workers might be offered one type of plan at one location, while workers at another location are offered a different type of plan.

**HMO**  is a health maintenance organization. The survey defines an HMO as a plan that does not cover non-emergency out-of-network services.

**PPO**  is a preferred provider organization. The survey defines PPOs as plans that have lower cost sharing for in-network provider services, and do not require a primary care gatekeeper to screen for specialist and hospital visits.

**POS**  is a point-of-service plan. The survey defines POS plans as those that have lower cost sharing for in-network provider services, but do require a primary care gatekeeper to screen for specialist and hospital visits.

**HDHP/SO**  is a high-deductible health plan with a savings option such as an HRA or HSA. The survey treats HDHP/SOs as a distinct plan type even if the plan would otherwise be considered a PPO, HMO, POS plan. or indemnity plan.

**667148**

Exhibit 142

JA-0002041



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

# Market Shares of Health Plans

SECTION

5

667149

Exhibit 142                                    JA-0002042

# Section 5

# Market Shares of Health Plans

The largest share of covered workers is enrolled in PPOs, covering 48% of covered workers, followed by HDHP/SOs, HMOs, POS plans, and conventional plans. Enrollment distribution varies by firm size: HDHP/SOs have a relatively higher share of enrollment among large firms (200 or more workers) than small firms (3-199 workers) (30% vs. 23%), and POS plans are relatively more popular among small firms than large firms (18% vs. 6%).

- Forty-eight percent of covered workers are enrolled in PPOs, followed by HDHP/SOs (28%), HMOs (14%), POS plans (10%), and conventional plans (<1%) [Figure 5.1].

- The percentage of covered workers enrolled in HDHP/SOs is similar to last year.

- A larger share of covered workers are enrolled in HDHP/SOs than in HMOs in both small firms and large firms.

- Plan enrollment patterns vary by firm size.

  – Covered workers in large firms are more likely than covered workers in small firms to enroll in HDHP/SOs (30% vs. 23%). Covered workers in small firms are more likely than covered workers in large firms to enroll in POS plans (18% vs. 6%) [Figure 5.2].

- Plan enrollment patterns also differ across regions.

  – HMO enrollment is significantly higher in the West (29%) and significantly lower in the South (10%) and Midwest (8%) [Figure 5.3].

  – Covered workers in the South (54%) are more likely to be enrolled in PPOs than workers in other regions, while covered workers in the West (39%) are less likely to be enrolled in a PPO [Figure 5.3].

  – Covered workers in the Midwest (36%) are more likely to be enrolled in HDHP/SOs than workers in other regions, while covered workers in the South (23%) are less likely to be enrolled in HDHP/SOs [Figure 5.3].

**667150**

Exhibit 142                                                                                      JA-0002043

**Figure 5.1**
**Distribution of Health Plan Enrollment for Covered Workers, by Plan Type, 1988-2017**





NOTE: Information was not obtained for POS plans in 1988 or for HDHP/SO plans until 2006. A portion of the change in plan type enrollment for 2005 is likely attributable to incorporating more recent Census Bureau estimates of the number of state and local government workers and removing federal workers from the weights. See the Survey Design and Methods section from the 2005 Kaiser/HRET Survey of Employer-Sponsored Health Benefits for additional information.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017; KPMG Survey of Employer-Sponsored Health Benefits, 1993, 1996; The Health Insurance Association of America (HIAA), 1988

**Figure 5.2**
**Distribution of Health Plan Enrollment for Covered Workers, by Plan Type and Firm Size, 2017**



* Enrollment in plan type is statistically different between All Small Firms and All Large Firms (p < .05).

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. HMO is health maintenance organization. PPO is preferred provider organization. POS is point-of-service plan. HDHP/SO is high-deductible health plan with a savings option such as a health reimbursement arrangement (HRA) and health savings account (HSA).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 72

**667151**

Exhibit 142

JA-0002044

SECTION 5. MARKET SHARES OF HEALTH PLANS

**Figure 5.3**

**Distribution of Health Plan Enrollment for Covered Workers, by Firm Size, Region, and Industry, 2017**

| | Conventional | HMO | PPO | POS | HDHP/SO |
|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | |
| 3-24 Workers | 1% | 11% | 43% | 29%* | 16%* |
| 25-49 Workers | 3 | 17 | 40 | 17* | 23 |
| 50-199 Workers | 0* | 14 | 49 | 10 | 27 |
| 200-999 Workers | <1 | 20* | 47 | 5* | 29 |
| 1,000-4,999 Workers | <1 | 14 | 59* | 4* | 22* |
| 5,000 or More Workers | <1* | 12 | 46 | 8 | 34* |
| **All Small Firms (3-199 Workers)** | **1%** | **14%** | **45%** | **18%*** | **23%*** |
| **All Large Firms (200 or More Workers)** | **<1%** | **14%** | **49%** | **6%*** | **30%*** |
| **REGION** | | | | | |
| Northeast | <1% | 11% | 45% | 10% | 34% |
| Midwest | <1* | 8* | 49 | 7 | 36* |
| South | 1 | 10* | 54* | 11* | 23* |
| West | 1 | 29* | 39* | 9 | 22 |
| **INDUSTRY** | | | | | |
| Agriculture/Mining/Construction | 0%* | 15% | 57% | 12% | 16%* |
| Manufacturing | <1* | 10 | 47 | 5 | 38* |
| Transportation/Communications/Utilities | 1 | 20 | 48 | 10 | 23 |
| Wholesale | 0* | 11 | 48 | 16 | 25 |
| Retail | 2 | 11 | 52* | 7 | 28 |
| Finance | 0* | 14 | 35* | 6 | 46* |
| Service | 1 | 14 | 48 | 10 | 29 |
| State/Local Government | 0* | 16 | 65* | 7 | 12* |
| Health Care | 1 | 16 | 48 | 12 | 24 |
| **ALL FIRMS** | **<1%** | **14%** | **48%** | **10%** | **28%** |

NOTE: HMO is health maintenance organization. PPO is preferred provider organization. POS is point-of-service plan. HDHP/SO is high-deductible health plan with a savings option, such as a health reimbursement arrangement (HRA) and health savings account (HSA).

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017.

**667152**

Exhibit 142

JA-0002045



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Worker and
Employer
Contributions
for Premiums

SECTION

6

667153

Exhibit 142                                                                 JA-0002046

# Section 6

# Worker and Employer Contributions for Premiums

In 2017, premium contributions by covered workers average 18% for single coverage and 31% for family coverage.[1] The average monthly worker contributions are $101 for single coverage ($1,213 annually) and $476 for family coverage ($5,714 annually).[2] Covered workers in small firms (3-199 workers) have a lower average contribution amount for single coverage ($1,030 vs. $1,289), but a higher average contribution amount for family coverage ($6,814 vs. $5,264) than covered workers in large firms (200 or more workers).

- In 2017, covered workers on average contribute 18% of the premium for single coverage and 31% of the premium for family coverage [Figure 6.1]. The average contribution percentage for single coverage has remained stable in recent years. The average contribution percentage for family coverage is higher in 2017 than in 2012 (31% vs. 28%).

  – Covered workers in small firms on average contribute a lower percentage of the premium for single coverage (16% vs. 19%) and a higher percentage of the premium for family coverage (39% vs. 28%) than covered workers in large firms [Figure 6.24].

- Workers with single coverage have an average contribution of $101 per month ($1,213 annually), and workers with family coverage have an average contribution of $476 per month ($5,714 annually) toward their health insurance premiums [Figures 6.2, 6.3, and 6.4].

  – The average worker contributions in HDHP/SOs are lower than the overall average worker contribution for single coverage ($1,020 vs. $1,213) and family coverage ($4,599 vs. $5,714) [Figure 6.5].

- Worker contributions also differ by firm size. As in previous years, workers in small firms on average contribute a lower amount annually for single coverage than workers in large firms ($1,030 vs. $1,289). In contrast, workers in small firms on average contribute significantly more annually for family coverage than workers in large firms ($6,814 vs. $5,264) [Figure 6.6].

- The average worker contributions for single and family coverage in small firms and for single coverage in large firms are similar to last year. The average worker contribution for family coverage in large firms increased from $4,719 to $5,264 [Figures 6.8 and 6.9].

[1] Estimates for premiums, worker contributions to premiums, and employer contributions to premiums presented in Section 6 do not include contributions made by the employer to Health Savings Accounts (HSAs) or Health Reimbursement Arrangements (HRAs). See Section 8 for estimates of employer contributions to HSAs and HRAs.

[2] The average percent contribution is calculated as a weighted average of all a firm's plan types and may not necessarily equal the average worker contribution divided by the average premium.

**667154**

Exhibit 142

JA-0002047



**Figure 6.1**

**Average Percentage of Premium Paid by Covered Workers for Single and Family Coverage, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 6.2**

**Average Monthly Worker Premium Contributions Paid by Covered Workers for Single and Family Coverage, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 76

**667155**

Exhibit 142

JA-0002048

**Figure 6.3**
**Average Annual Worker and Employer Contributions to Premiums and Total Premiums for Single Coverage, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 6.4**
**Average Annual Worker and Employer Contributions to Premiums and Total Premiums for Family Coverage, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 77

**667156**

Exhibit 142

SECTION 6.  WORKER AND EMPLOYER CONTRIBUTIONS FOR PREMIUMS

**Figure 6.5**

**Average Annual Firm and Worker Premium Contributions and Total Premiums for Covered Workers for Single and Family Coverage, by Plan Type, 2017**



* Estimate is statistically different from All Plans estimate within coverage type (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 6.6**

**Average Annual Worker and Employer Contributions to Premiums and Total Premiums for Single and Family Coverage, by Firm Size, 2017**



* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05)
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 78

**667157**

Exhibit 142                                                                          JA-0002050



**Figure 6.7**

**Average Annual Worker and Employer Contributions to Premiums and Total Premiums for Single and Family Coverage, By Firm Wage Level, 2017**



\* Estimate is statistically different between firm wage level category (p < .05)
NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 6.8**

**Average Annual Worker Contributions for Covered Workers with Single Coverage, by Firm Size, 1999-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 79

**667158**

Exhibit 142                                                                                    JA-0002051

**Figure 6.9**

**Average Annual Worker Contributions for Covered Workers with Family Coverage, by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667159**

Exhibit 142

JA-0002052

### Figure 6.10

## Average Annual Worker Premium Contributions Paid by Covered Workers for Single and Family Coverage, by Firm Size, 1999-2017

|  | Single Coverage | | Family Coverage | |
|---|---|---|---|---|
|  | All Small Firms | All Large Firms | All Small Firms | All Large Firms |
| 1999 | $286 | $334 | $1,831* | $1,398* |
| 2000 | $280* | $363* | $1,940* | $1,453* |
| 2001 | $306* | $380* | $2,252* | $1,551* |
| 2002 | $406* | $495* | $2,647* | $1,893* |
| 2003 | $450 | $536 | $2,970* | $2,146* |
| 2004 | $513 | $578 | $3,382* | $2,340* |
| 2005 | $556 | $638 | $3,170* | $2,487* |
| 2006 | $515* | $689* | $3,550* | $2,658* |
| 2007 | $561* | $759* | $4,236* | $2,831* |
| 2008 | $624* | $769* | $4,101* | $2,982* |
| 2009 | $625* | $854* | $4,204* | $3,182* |
| 2010 | $865 | $917 | $4,665* | $3,652* |
| 2011 | $762* | $996* | $4,946* | $3,755* |
| 2012 | $848* | $1,001* | $5,134* | $3,926* |
| 2013 | $862* | $1,065* | $5,284* | $4,226* |
| 2014 | $902* | $1,160* | $5,508* | $4,523* |
| 2015 | $899* | $1,146* | $5,904* | $4,549* |
| 2016 | $1,021* | $1,176* | $6,597* | $4,719* |
| 2017 | $1,030* | $1,289* | $6,814* | $5,264* |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.

 * Estimate is statistically different between All Small Firms and All Large Firms within year (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667160**

Exhibit 142                                                                                          JA-0002053

SECTION 6.  WORKER AND EMPLOYER CONTRIBUTIONS FOR PREMIUMS

**Figure 6.11**

**Average Annual Firm and Worker Premium Contributions and Total Premiums for Covered Workers for Single Coverage, by Plan Type and Firm Size, 2017**



\* Estimates are statistically different within plan type between All Small Firms and All Large Firms (p < .05).
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 6.12**

**Average Annual Firm and Worker Premium Contributions and Total Premiums for Covered Workers for Family Coverage, by Plan Type and Firm Size, 2017**



\* Estimates are statistically different within plan type between All Small Firms and All Large Firms (p < .05).
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667161

Exhibit 142

JA-0002054

**Figure 6.13**

**Average Monthly and Annual Worker Premium Contributions Paid by Covered Workers for Single and Family Coverage, by Plan Type and Firm Size, 2017**

| | Monthly | | Annual | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| **HMO** | | | | |
| All Small Firms (3-199 Workers) | $90 | $733* | $1,078 | $8,791* |
| All Large Firms (200 or More Workers) | 143 | 510* | 1,713 | 6,120* |
| **ALL FIRM SIZES** | **$128** | **$571** | **$1,532** | **$6,850** |
| **PPO** | | | | |
| All Small Firms (3-199 Workers) | $101* | $628* | $1,218 | $7,535* |
| All Large Firms (200 or More Workers) | 112 | 456* | 1,349 | 5,477* |
| **ALL FIRM SIZES** | **$109** | **$504** | **$1,312** | **$6,050** |
| **POS** | | | | |
| All Small Firms (3-199 Workers) | $59 | $493 | $712 | $5,914 |
| All Large Firms (200 or More Workers) | 76 | 439 | 912 | 5,269 |
| **ALL FIRM SIZES** | **$67** | **$468** | **$804** | **$5,616** |
| **HDHP/SO** | | | | |
| All Small Firms (3-199 Workers) | $72 | $408 | $863 | $4,897 |
| All Large Firms (200 or More Workers) | 89 | 376 | 1,068 | 4,507 |
| **ALL FIRM SIZES** | **$85** | **$383** | **$1,020** | **$4,599** |
| **ALL PLANS** | | | | |
| All Small Firms (3-199 Workers) | $86* | $568* | $1,030* | $6,814* |
| All Large Firms (200 or More Workers) | 107* | 439* | 1,289* | 5,264* |
| **ALL FIRM SIZES** | **$101** | **$476** | **$1,213** | **$5,714** |

* Estimates are statistically different within plan and coverage types between All Small Firms and All Large Firms (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667162**

Exhibit 142

JA-0002055

**Figure 6.14**

**Average Monthly and Annual Worker Premium Contributions Paid by Covered Workers for Single and Family Coverage, by Plan Type and Region, 2017**

| | Monthly | | Annual | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| **HMO** | | | | |
| Northeast | $116 | $420* | $1,397 | $5,036* |
| Midwest | 125 | 426 | 1,502 | 5,118 |
| South | 116 | 613 | 1,390 | 7,357 |
| West | 139 | 630 | 1,667 | 7,562 |
| **ALL REGIONS** | **$128** | **$571** | **$1,532** | **$6,850** |
| **PPO** | | | | |
| Northeast | $139* | $463 | $1,673* | $5,556 |
| Midwest | 110 | 459 | 1,325 | 5,514 |
| South | 99* | 521 | 1,190* | 6,254 |
| West | 102 | 557 | 1,230 | 6,686 |
| **ALL REGIONS** | **$109** | **$504** | **$1,312** | **$6,050** |
| **POS** | | | | |
| Northeast | $124* | $418 | $1,484* | $5,022 |
| Midwest | 75 | 405 | 898 | 4,866 |
| South | 48 | 525 | 581 | 6,301 |
| West | 47 | 441 | 566 | 5,296 |
| **ALL REGIONS** | **$67** | **$468** | **$804** | **$5,616** |
| **HDHP/SO** | | | | |
| Northeast | $86 | $346 | $1,036 | $4,152 |
| Midwest | 92 | 392 | 1,106 | 4,706 |
| South | 89 | 438* | 1,072 | 5,250* |
| West | 65* | 323 | 775* | 3,875 |
| **ALL REGIONS** | **$85** | **$383** | **$1,020** | **$4,599** |
| **ALL PLANS** | | | | |
| Northeast | $117* | $414* | $1,407* | $4,967* |
| Midwest | 103 | 429* | 1,232 | 5,145* |
| South | 93 | 511* | 1,115 | 6,138* |
| West | 99 | 515 | 1,194 | 6,179 |
| **ALL REGIONS** | **$101** | **$476** | **$1,213** | **$5,714** |

* Estimate is statistically different within plan and coverage type from estimate for all other firms not in the indicated region (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667163

Exhibit 142

JA-0002056

**Figure 6.15**

**Average Annual Premium Contributions Paid by Covered Workers for Single and Family Coverage, by Firm Characteristics, 2017**

|  | Single Coverage | Family Coverage |
|---|---|---|
| **LOWER WAGE LEVEL** |  |  |
| Few Lower-Wage Workers | $1,201 | $5,693 |
| Many Lower-Wage Workers | $1,378 | $6,001 |
| **HIGHER WAGE LEVEL** |  |  |
| Few Higher-Wage Workers | $1,140 | $5,943 |
| Many Higher-Wage Workers | $1,285 | $5,492 |
| **UNIONS** |  |  |
| Firm Has at Least Some Union Workers | $1,355 | $5,033* |
| Firm Does Not Have Any Union Workers | $1,140 | $6,072* |
| **YOUNGER WORKERS** |  |  |
| Few Younger Workers | $1,213 | $5,781* |
| Many Younger Workers | $1,212 | $5,008* |
| **OLDER WORKERS** |  |  |
| Few Older Workers | $1,145 | $5,610 |
| Many Older Workers | $1,292 | $5,835 |
| **FUNDING ARRANGEMENT** |  |  |
| Fully Insured | $1,248 | $6,917* |
| Self-Funded | $1,190 | $4,933* |
| **FIRM OWNERSHIP** |  |  |
| Private For-Profit | $1,308 | $5,875 |
| Public | $1,110 | $5,213 |
| Private Not-For-Profit | $1,047* | $5,668 |
| **ALL FIRMS** | **$1,213** | **$5,714** |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from each other within firm characteristic (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## VARIATION IN WORKER CONTRIBUTIONS TO THE PREMIUM

- About four-fifths of covered workers are in a plan where the employer contributes at least half of the premium for both single and family coverage.
  - Fourteen percent of covered workers are in a plan where the employer pays the entire premium for single coverage; 3% of covered workers are in a plan where the employer pays the entire premium for family coverage [Figure 6.18].
- Covered workers in small firms are much more likely than covered workers in large firms to be in a plan where the employer pays 100% of the premium. Thirty-three percent of covered workers in small firms have an employer that pays the full premium for single coverage, compared to 6% of covered workers in large firms [Figure 6.17]. For family coverage, 10% of covered workers in small firms have an employer that pays the full premium, compared to 1% of covered workers in large firms [Figure 6.16].
- Sixteen percent of covered workers are in a plan where enrollees have a contribution of more than 50% of the premium for family coverage [Figure 6.18].

**667164**

Exhibit 142

JA-0002057

- – Thirty-six percent of covered workers in small firms work in a firm where the enrollee contribution for family coverage is more than 50% of the premium, compared to 8% of covered workers in large firms [Figure 6.18].

- – For single coverage, 3% of covered workers in small firms and 2% of covered workers in large firms are in a plan where the enrollee contribution for family coverage is more than 50% of the premium. The difference between the estimates for small and large firms is not statistically significant [Figure 6.18].

• There is substantial variation among workers in small firms and workers in large firms in the dollar amounts they contribute for single and family coverage. For example, among covered workers in small firms, 10% have no contribution for family coverage, while 19% have a contribution of more than $12,000. Among covered workers in large firms, 1% have no contribution for family coverage, while 4% have a contribution of more than $12,000 [Figure 6.16].

**Figure 6.16**
**Distribution of Worker Contributions for Single Coverage, by Firm Size, 2017**



* Distribution is statistically different from distribution for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667165**

Exhibit 142

JA-0002058

SECTION 6.  WORKER AND EMPLOYER CONTRIBUTIONS FOR PREMIUMS



**Figure 6.17**
**Distribution of Worker Contributions for Family Coverage, by Firm Size, 2017**

* Distribution is statistically different from distribution for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 6.18**
**Distribution of Percentage of Premium Paid by Covered Workers for Single and Family Coverage, by Firm Size, 2017**

* Distributions are statistically different between All Small Firms and All Large Firms within coverage type (p < 0.05)
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667166

Exhibit 142

JA-0002059

**Figure 6.19**
**Distribution of Percentage of Premium Paid by Covered Workers for Single Coverage, 2002-2017**



* Distribution is statistically different from distribution for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2002-2017

**Figure 6.20**
**Distribution of Percentage of Premium Paid by Covered Workers for Family Coverage, 2002-2017**



* Distribution is statistically different from distribution for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2002-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 88

**667167**

Exhibit 142

JA-0002060



**Figure 6.21**

**Distribution of the Percentage of Total Premium Paid by Covered Workers for Single and Family Coverage, by Firm Wage Level, 2017**

*Distributions for higher-wage and lower-wage firms are statistically different within single and family coverage (p < .05).
NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## DIFFERENCES BY FIRM CHARACTERISTICS

- The percentage of the premium paid by covered workers also varies by firm characteristics.

    - Covered workers in firms with a relatively large share of lower-wage workers (where at least 35% of workers earn $24,000 a year or less) on average have higher contribution rates for single coverage (23% vs. 18%) and family coverage (37% vs. 31%) than those in firms with a smaller share of lower-wage workers [Figures 6.22 and 6.23].

    - Covered workers in firms with a relatively large share of higher-wage workers (where at least 35% earn $60,000 or more annually) on average have lower contribution rates for family coverage than those in firms with a smaller share of higher-wage workers (29% vs. 34%) [Figure 6.23].

    - Covered workers in large firms that have at least some union workers on average have lower contribution rates for family coverage than those in firms without any union workers (25% vs. 30%) [Figures 6.23].

    - Covered workers in large firms that are partially or completely self-funded on average have lower contribution rates for family coverage than workers in large firms that are fully insured (26% vs. 35%) [Figure 6.23].[3]

    - Covered workers in private for-profit firms on average have higher contribution rates for both single coverage (21%) and family coverage (33%) than workers in public organizations and private not-for-profit firms [Figures 6.22 and 6.23].

[3] For definitions of Self-Funded and Fully-Insured plans, see the introduction to Section 10.

**667168**

Exhibit 142

JA-0002061

**Figure 6.22**

**Average Percentage of Premium Paid by Covered Workers for Single Coverage, by Firm Characteristics and Size, 2017**

| | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|
| **LOWER WAGE LEVEL** | | | |
| Few Lower-Wage Workers | *16% | 19%* | 18%* |
| Many Lower-Wage Workers | 21% | 26%* | 23%* |
| **HIGHER WAGE LEVEL** | | | |
| Few Higher-Wage Workers | *18% | *19% | 18% |
| Many Higher-Wage Workers | *15% | 20% | 18% |
| **UNIONS** | | | |
| Firm Has at Least Some Union Workers | *17% | *19% | 19% |
| Firm Does Not Have Any Union Workers | *16% | 20% | 18% |
| **YOUNGER WORKERS** | | | |
| Few Younger Workers | *16% | *19% | 18% |
| Many Younger Workers | 21% | 22% | 22% |
| **OLDER WORKERS** | | | |
| Few Older Workers | *17% | 20% | 19% |
| Many Older Workers | *16% | *19% | 18% |
| **FUNDING ARRANGEMENT** | | | |
| Fully Insured | *16% | 22% | 19% |
| Self-Funded | *17% | *18% | 18% |
| **FIRM OWNERSHIP** | | | |
| Private For-Profit | 19%* | 22%* | 21%* |
| Public | 7%* | 14% | 14%* |
| Private Not-For-Profit | 12%* | 16%* | 15%* |
| **ALL FIRMS** | 16% | 19% | 18% |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from estimate for all other firms not in the indicated size within each category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667169**

Exhibit 142

JA-0002062

**Figure 6.23**

**Average Percentage of Premium Paid by Covered Workers for Family Coverage, by Firm Characteristics and Size, 2017**

| | All Small Firms (3-199 Workers) | All Large Firms (200 or More Workers) | All Firms |
|---|---|---|---|
| **LOWER WAGE LEVEL** | | | |
| Few Lower-Wage Workers | 39% | 27%* | 31%* |
| Many Lower-Wage Workers | 41% | 34%* | 37%* |
| **HIGHER WAGE LEVEL** | | | |
| Few Higher-Wage Workers | 41% | 30% | 34%* |
| Many Higher-Wage Workers | 37% | 26% | 29%* |
| **UNIONS** | | | |
| Firm Has at Least Some Union Workers | 30% | 28%* | 28%* |
| Firm Does Not Have Any Union Workers | 40% | 30%* | 34%* |
| **YOUNGER WORKERS** | | | |
| Few Younger Workers | 39% | 28% | 31% |
| Many Younger Workers | 35% | 30% | 31% |
| **OLDER WORKERS** | | | |
| Few Older Workers | 39% | 28% | 32% |
| Many Older Workers | 39% | 27% | 30% |
| **FUNDING ARRANGEMENT** | | | |
| Fully Insured | 40%* | 35%* | 39%* |
| Self-Funded | 31%* | 26%* | 26%* |
| **FIRM OWNERSHIP** | | | |
| Private For-Profit | 40% | 29% | 33%* |
| Public | 23%* | 29% | 28% |
| Private Not-For-Profit | 40% | 25%* | 28% |
| **ALL FIRMS** | **39%** | **28%** | **31%** |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

\* Estimates are statistically different from estimate for all other firms not in the indicated size within each category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667170**

Exhibit 142

JA-0002063

**Figure 6.24**

**Average Percentage of Premium Paid by Covered Workers for Single and Family Coverage, by Plan Type and Firm Size, 2017**

| | Single Coverage | Family Coverage |
|---|---|---|
| **HMO** | | |
| All Small Firms (3-199 Workers) | 16% | 47%* |
| All Large Firms (200 or More Workers) | 23% | 32%* |
| **ALL FIRM SIZES** | **21%** | **36%** |
| **PPO** | | |
| All Small Firms (3-199 Workers) | 19% | 41%* |
| All Large Firms (200 or More Workers) | 20% | 29%* |
| **ALL FIRM SIZES** | **20%** | **32%** |
| **POS** | | |
| All Small Firms (3-199 Workers) | 12% | 38%* |
| All Large Firms (200 or More Workers) | 13% | 25%* |
| **ALL FIRM SIZES** | **12%** | **32%** |
| **HDHP/SO** | | |
| All Small Firms (3-199 Workers) | 15% | 31%* |
| All Large Firms (200 or More Workers) | 18% | 25%* |
| **ALL FIRM SIZES** | **17%** | **26%** |
| **ALL PLANS** | | |
| All Small Firms (3-199 Workers) | 16%* | 39%* |
| All Large Firms (200 or More Workers) | 19%* | 28%* |
| **ALL FIRM SIZES** | **18%** | **31%** |

* Estimates are statistically different within plan and coverage types between All Small Firms and All Large Firms (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667171**

Exhibit 142

JA-0002064

**Figure 6.25**

**Average Percentage of Premium Paid by Covered Workers for Single and Family Coverage, by Plan Type and Region, 2017**

| | Single Coverage | Family Coverage |
|---|---|---|
| **HMO** | | |
| Northeast | 19% | 24%* |
| Midwest | 20 | 26* |
| South | 23 | 40 |
| West | 20 | 41 |
| **ALL REGIONS** | **21%** | **36%** |
| **PPO** | | |
| Northeast | 23%* | 26%* |
| Midwest | 19 | 28* |
| South | 19 | 36* |
| West | 19 | 34 |
| **ALL REGIONS** | **20%** | **32%** |
| **POS** | | |
| Northeast | 22%* | 26% |
| Midwest | 13 | 26 |
| South | 9 | 38 |
| West | 9 | 32 |
| **ALL REGIONS** | **12%** | **32%** |
| **HDHP/SO** | | |
| Northeast | 17% | 24% |
| Midwest | 18 | 27* |
| South | 18 | 29* |
| West | 14 | 22 |
| **ALL REGIONS** | **17%** | **26%** |
| **ALL PLANS** | | |
| Northeast | 20% | 25%* |
| Midwest | 19 | 27* |
| South | 18 | 35* |
| West | 17 | 33 |
| **ALL REGIONS** | **18%** | **31%** |

* Estimate is statistically different within plan and coverage type from estimate for all other firms not in the indicated region (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667172**

Exhibit 142

JA-0002065



**Figure 6.26**
**Average Percentage of Premium Paid by Covered Workers, by Industry, 2017**

* Estimate is statistically different within coverage type from estimate for all other firms not in the indicated industry category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## CONTRIBUTION APPROACHES

- Firms take different approaches for contributing toward family coverage. Among firms offering health benefits, 45% of small firms and 15% of large firms contribute the same dollar amount for single coverage as for family coverage, which means that the worker must pay the entire difference between the cost of single and family coverage if they wish to enroll their family members. Forty-five percent of small firms and 75% of large firms make a larger dollar contribution for family coverage than for single coverage [Figure 6.27].

**667173**

Exhibit 142

JA-0002066



**Figure 6.27**

**Among Firms Offering Family Coverage, Percentage Using Various Approaches to Family Premium Contributions, by Firm Size, 2017**

* Estimate is statistically different within response selection from all other firms not in the indicated firm size category (p < .05)
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## CHANGES OVER TIME

- The average worker contributions for single and family coverage have increased 75% and 74%, respectively, over the last 10 years, and 28% and 32%, respectively, over the last five years.

- Over the last five years, the average worker contribution for family coverage has increased faster than the average employer contribution for family coverage (32% vs. 14% ) and the last ten years (74% vs. 48% ).

**667174**

Exhibit 142

JA-0002067

**Figure 6.28**

**Average Percentage of Premium Paid by Covered Workers for Single and Family Coverage, by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**Figure 6.29**

**Average Annual Worker Contributions for Covered Workers with Family Coverage, by Firm Wage Level, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667175**

Exhibit 142

JA-0002068



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

# Employee Cost Sharing

SECTION

7

**667176**

Exhibit 142                                                                 JA-0002069

# Section 7

# Employee Cost Sharing

In addition to any required premium contributions, most covered workers face cost sharing for the medical services they use. Cost sharing for medical services can take a variety of forms, including deductibles (an amount that must be paid before most services are covered by the plan), copayments (fixed dollar amounts), and coinsurance (a percentage of the charge for services). The type and level of cost sharing often vary by the type of plan in which the worker is enrolled. Cost sharing may also vary by the type of service, such as office visits, hospitalizations, or prescription drugs.

The cost-sharing amounts reported here are for covered workers using services provided in-network by participating providers. Plan enrollees receiving services from providers that do not participate in plan networks often face higher cost sharing and may be responsible for charges that exceed plan allowable amounts. The framework of this survey does not allow us to capture all of the complex cost-sharing requirements in modern plans, particularly for ancillary services (such as durable medical equipment or physical therapy) or cost-sharing arrangements that vary across different settings (such as tiered networks). Therefore, we do not collect information on all plan provisions and limits that affect enrollee out-of-pocket liability.

## GENERAL ANNUAL DEDUCTIBLES FOR WORKERS IN PLANS WITH DEDUCTIBLES

- A general annual deductible is an amount that must be paid by enrollees before most services are covered by their health plan. Non-grandfathered health plans are required to cover some services such as preventive care without cost sharing. Some plans require enrollees to meet a service-specific deductible, such as on prescription drugs or hospital admissions, in lieu of or in addition to a general annual deductible.

    - Eighty-one percent of covered workers are enrolled in a plan with a general annual deductible for single coverage, similar to 83% in 2016, but an increase from 72% in 2012 [Figure 7.2].

    - The percentage of covered workers enrolled in a plan with a general annual deductible for single coverage is similar for small firms (3-199 workers) and large firms (200 or more workers) (77% and 83%) [Figure 7.2].

    - The likelihood of having a deductible varies by plan type [Figure 7.1]. Covered workers in HMOs are less likely to have a general annual deductible for single coverage than workers in other plan types. Sixty-two percent of workers in HMOs do not have a general annual deductible for single coverage, compared to 35% of workers in POS plans and 14% of workers in PPOs.

- For covered workers in a plan with a general annual deductible, the average annual deductible for single coverage is $1,505, similar to the average deductible ($1,478) last year [Figures 7.3 and 7.10].

    - For covered workers in plans with a general annual deductible, the average deductibles for single coverage are $1,175 in HMOs, $1,046 in PPOs, $1,301 in POS plans, and $2,304 in HDHP/SOs [Figure 7.6].

    - The average deductibles for single coverage are higher across plan types for covered workers in small firms than for covered workers in large firms. For covered workers in PPOs with a general annual deductible, for example, the average deductible amount for single coverage in small firms is much higher than the average deductible amount in large firms ($1,594 vs. $856) [Figure 7.6]. Overall, for covered workers in plans with a general annual deductible, the average deductible amount for single coverage in small firms is higher than the average deductible amount in large firms ($2,120 vs. $1,276) [Figure 7.3].

    - Among covered workers in plans with a general annual deductible, the average deductible for workers in firms with a relatively large share of lower-wage workers (where at least 35% of workers earn $24,000 a year or less)

**667177**

Exhibit 142

JA-0002070

is higher than the average deductible for covered workers in firms with a smaller share of lower-wage workers ($2,234 vs. $1,449) [Figure 7.4].

– The average general annual deductible for single coverage for covered workers in plans with a deductible has increased 37% over the last five years, from $1,097 in 2012 to $1,505 in 2017 [Figure 7.8].

• There is considerable variation in the dollar values of general annual deductibles for covered workers at different firms. For example, 20% of covered workers enrolled in a PPO plan with a general annual deductible for single coverage have a deductible of less than $500, while 13% have a deductible of $2,000 or more [Figure 7.19].

**Figure 7.1**

**Percentage of Covered Workers With No General Annual Deductible for Single and Family Coverage, by Plan Type and Firm Size, 2017**

|  | Single Coverage | Family Coverage |
|---|---|---|
| **HMO** | | |
| 200-999 Workers | 66% | 66% |
| 1,000-4,999 Workers | 70 | 70 |
| 5,000 or More Workers | 58 | 58 |
| All Small Firms (3-199 Workers) | 59% | 58% |
| All Large Firms (200 or More Workers) | 63% | 63% |
| **ALL FIRMS** | **62%** | **62%** |
| **PPO** | | |
| 200-999 Workers | 17% | 17% |
| 1,000-4,999 Workers | 12 | 12 |
| 5,000 or More Workers | 9* | 9* |
| All Small Firms (3-199 Workers) | 22%* | 22%* |
| All Large Firms (200 or More Workers) | 12%* | 12%* |
| **ALL FIRMS** | **14%** | **14%** |
| **POS** | | |
| 200-999 Workers | 32% | 32% |
| 1,000-4,999 Workers | 24 | 24 |
| 5,000 or More Workers | 49 | 49 |
| All Small Firms (3-199 Workers) | 29% | 29% |
| All Large Firms (200 or More Workers) | 42% | 42% |
| **ALL FIRMS** | **35%** | **35%** |
| **ALL PLANS** | | |
| 200-999 Workers | 23% | 23% |
| 1,000-4,999 Workers | 13 | 18 |
| 5,000 or More Workers | 15 | 15 |
| All Small Firms (3-199 Workers) | 23% | 23% |
| All Large Firms (200 or More Workers) | 17% | 17% |
| **ALL PLANS** | **19%** | **19%** |

NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. HDHP/SOs are not shown because all covered workers in these plans face a minimum deductible. HDHP/SOs are included in the All Plans estimate. In HDHP/HRA plans, as defined by the survey, the minimum deductible is $1,000 for single coverage and $2,000 for family coverage. In HSA-qualified HDHPs, the legal minimum deductible for 2017 is $1,300 for single coverage and $2,600 for family coverage. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

* Estimate is statistically different from estimates for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 99

**667178**

Exhibit 142                                                                            JA-0002071

**Figure 7.2**

**Percentage of Covered Workers In a Plan That Includes a General Annual Deductible for Single Coverage, by Plan Type, 2006-2017**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **HMO** | | | | | | | | | | | | |
| All Small Firms | 17% | 14% | 25% | 27% | 34% | 38% | 33% | 44% | 55% | 46% | 44% | 41% |
| All Large Firms | 10% | 20%* | 18% | 12% | 26%* | 27% | 29% | 40% | 28% | 40% | 47% | 37% |
| All Firms | 12% | 18% | 20% | 16% | 28% | 29% | 30% | 41% | 37% | 42% | 46% | 38% |
| **PPO** | | | | | | | | | | | | |
| All Small Firms | 66% | 72% | 73% | 74% | 80% | 78% | 76% | 78% | 83% | 85% | 85% | 78% |
| All Large Firms | 69% | 71% | 66% | 74% | 76% | 82% | 77% | 82% | 86% | 84% | 84% | 88% |
| All Firms | 69% | 71% | 68% | 74% | 77% | 81% | 77% | 81% | 85% | 85% | 84% | 86% |
| **POS** | | | | | | | | | | | | |
| All Small Firms | 35% | 53%* | 59% | 63% | 94% | 68% | 58% | 78%* | 59% | 80% | 87%* | 71% |
| All Large Firms | 28% | 41% | 41% | 58% | 70% | 71% | 63% | 49% | 72%* | 61% | 66% | 58% |
| All Firms | 32% | 48%* | 50% | 62% | 66% | 69% | 60% | 66% | 70% | 72% | 76% | 65% |
| **ALL PLANS** | | | | | | | | | | | | |
| All Small Firms | 56% | 60% | 65% | 67% | 73% | 75% | 72% | 77% | 82% | 82% | 82% | 77% |
| All Large Firms | 54% | 59% | 56% | 61% | 68%* | 74% | 73% | 78% | 80% | 81% | 83% | 83% |
| **ALL FIRMS** | 55% | 59%* | 59% | 63% | 70%* | 74% | 72% | 78%* | 80% | 81% | 83% | 81% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. By definition, all HDHP/SOs have a deductible.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

**Figure 7.3**

**Percentage of Covered Workers In a Plan That Includes a General Annual Deductible and Average Deductible for Single Coverage, by Firm Size and Region, 2017**

| | Percentage of Covered Workers In a Plan With a General Annual Deductible | Among Covered Workers With a General Annual Deductible for Single Coverage, Average Deductible |
|---|---|---|
| **FIRM SIZE** | | |
| 3-49 Workers | 75% | $2,142* |
| 50-199 Workers | 79 | 2,096* |
| 200-999 Workers | 77 | 1,608 |
| 1,000-4,999 Workers | 82 | 1,184* |
| 5,000 or More Workers | 85 | 1,190* |
| **All Small Firms (3-199 Workers)** | **77%** | **$2,120*** |
| **All Large Firms (200 or More Workers)** | **83%** | **$1,276*** |
| **REGION** | | |
| Northeast | 80% | $1,405 |
| Midwest | 93* | 1,594 |
| South | 83 | 1,550 |
| West | 67* | 1,413 |
| **ALL FIRMS** | **81%** | **$1,505** |

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667179**

Exhibit 142

JA-0002072

**Figure 7.4**

**Percentage of Covered Workers In a Plan That Includes a General Annual Deductible and Average Deductible Values for Single Coverage, by Firm Characteristics, 2017**

| | Percentage of Covered Workers In a Plan With a General Annual Deductible | Among Covered Workers With a General Annual Deductible for Single Coverage, Average Deductible |
|---|---|---|
| **LOWER WAGE LEVEL** | | |
| Few Lower-Wage Workers | 80%* | $1,449* |
| Many Lower-Wage Workers | 90%* | $2,234* |
| **HIGHER WAGE LEVEL** | | |
| Few Higher-Wage Workers | 82% | $1,604* |
| Many Higher-Wage Workers | 80% | $1,408* |
| **UNIONS** | | |
| Firm Has at Least Some Union Workers | 79% | $1,198* |
| Firm Does Not Have Any Union Workers | 82% | $1,665* |
| **YOUNGER WORKERS** | | |
| Few Younger Workers | 81% | $1,493 |
| Many Younger Workers | 85% | $1,626 |
| **OLDER WORKERS** | | |
| Few Older Workers | 84% | $1,554 |
| Many Older Workers | 77% | $1,446 |
| **FIRM OWNERSHIP** | | |
| Private For-Profit | 86%* | $1,680* |
| Public | 68%* | $1,001* |
| Private Not-For-Profit | 77% | $1,374 |
| **ALL FIRMS** | **81%** | **$1,505** |

NOTE: Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.

* Estimates are statistically different from each other within firm characteristic (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667180**

Exhibit 142

JA-0002073

**Figure 7.5**

**Among Covered Workers With No General Annual Deductible, Percentage With Other Separate Cost Sharing for Various Services, by Plan Type, 2017**

| | Single Coverage | Family Coverage |
|---|---|---|
| **HMO** | | |
| Hospital Admissions | 73% | 72% |
| Outpatient Surgery | 87% | 87% |
| Emergency Room Visits | 100% | 100% |
| **PPO** | | |
| Hospital Admissions | 69% | 69% |
| Outpatient Surgery | 65% | 65% |
| Emergency Room Visits | 93% | 93% |
| **POS** | | |
| Hospital Admissions | 90% | 90% |
| Outpatient Surgery | 94% | 94% |
| Emergency Room Visits | 94% | 94% |
| **ALL PLANS** | | |
| Hospital Admissions | 74% | 74% |
| Outpatient Surgery | 80% | 80% |
| Emergency Room Visits | 97% | 97% |

NOTE: Separate cost sharing for hospital admissions includes the following types: separate annual deductible, copayment, coinsurance, and/or a charge per day (per diem). Cost sharing for emergency room visits and outpatient surgery include the following types: separate annual deductible, copayment, and/or coinsurance. HDHP/SOs are excluded because, by definition, all workers face a deductible.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667181**

Exhibit 142

JA-0002074

**Figure 7.6**

## Among Covered Workers With a General Annual Deductible for Single Coverage, Average Deductible, by Plan Type and Firm Size, 2017

|  | Average Single Coverage Deductible |
|---|---|
| **HMO** | |
| All Small Firms | $1,779* |
| All Large Firms | $906* |
| **ALL FIRM SIZES** | **$1,175** |
| **PPO** | |
| All Small Firms | $1,594* |
| All Large Firms | $856* |
| **ALL FIRM SIZES** | **$1,046** |
| **POS** | |
| All Small Firms | $1,697* |
| All Large Firms | $728* |
| **ALL FIRM SIZES** | **$1,301** |
| **HDHP/SO** | |
| All Small Firms | $3,298* |
| All Large Firms | $1,995* |
| **ALL FIRM SIZES** | **$2,304** |
| **ALL PLANS** | |
| All Small Firms | $2,120* |
| All Large Firms | $1,276* |
| **ALL FIRM SIZES** | **$1,505** |

NOTE  Small Firms have 3-199 workers and Large Firms have 200 or more workers. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667182**

Exhibit 142

JA-0002075

**Figure 7.7**

**Among Covered Workers With a General Annual Deductible for Single Coverage, Average Deductible, by Plan Type and Region, 2017**

| | Average Single Coverage Deductible |
|---|---|
| **HMO** | |
| Northeast | $880 |
| Midwest | NSD |
| South | 1,599* |
| West | 1,138 |
| **ALL REGIONS** | **$1,175** |
| **PPO** | |
| Northeast | $932 |
| Midwest | 983 |
| South | 1,149* |
| West | 981 |
| **ALL REGIONS** | **$1,046** |
| **POS** | |
| Northeast | $741* |
| Midwest | 1,142 |
| South | 1,896 |
| West | NSD |
| **ALL REGIONS** | **$1,301** |
| **HDHP/SO** | |
| Northeast | $2,160 |
| Midwest | 2,545 |
| South | 2,188 |
| West | 2,321 |
| **ALL REGIONS** | **$2,304** |
| **ALL PLANS** | |
| Northeast | $1,405 |
| Midwest | 1,594 |
| South | 1,550 |
| West | 1,413 |
| **ALL REGIONS** | **$1,505** |

NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
NSD: Not Sufficient Data

* Estimate is statistically different from estimate for all other firms not in the indicated region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667183**

Exhibit 142

JA-0002076

**Figure 7.8**

**Among Covered Workers With a General Annual Deductible, Average Single and Family Coverage Deductible, by Plan Type, 2006-2017**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Single Coverage** | | | | | | | | | | | | |
| HMO | $352 | $401* | $563 | $609* | $601 | $611 | $661 | $729 | $1'232* | $1'025 | $997 | $1'175 |
| PPO | $473 | $461* | $560* | $634* | $675 | $675 | $733 | $799 | $843 | $958 | $1'024 | $1'046 |
| POS | $563 | $362* | $762 | $1'06* | $1'046 | $928 | $1'014 | $1'314 | $1'215 | $1'230 | $1'737* | $1'301 |
| HDHP/SO | $1'715 | $1'729 | $1'812 | $1'838 | $1'903 | $1'908 | $2'086 | $2'003 | $2'215* | $2'099 | $2'799 | $2'304 |
| ALL PLANS | $584 | $616 | $735* | $826* | $977* | $991 | $1'097* | $1'135 | $1'217 | $1'318 | $1'478* | $1'505 |
| | | | | | | | | | | | | |
| **Family Coverage Deductible With Aggregate Structure** | | | | | | | | | | | | |
| HMO | $751* | $769 | $1'063 | $1'524* | $1'321 | $1'487 | $1'329 | $1'743 | $2'328 | $2'758 | $2'248 | $2'732 |
| PPO | $1'034 | $1'040 | $1'344* | $1'488 | $1'516 | $1'521 | $1'514 | $1'854 | $1'947 | $2'012 | $2'147 | $2'563* |
| POS | $'227 | $1'368 | $1'860 | $2'19* | $2'283 | $1'769 | $2'163 | $2'821 | $2'470 | $2'467 | $3'769* | $2'897 |
| HDHP/SO | $3'511 | $3'596 | $3'559 | $3'626 | $3'760 | $3'596 | $3'849 | $4'079 | $4'522* | $4'332 | $4'345 | $4'527 |
| | | | | | | | | | | | | |
| **Family Coverage Deductible With Separate Per-Person Structure** | | | | | | | | | | | | |
| HMO | $506 | $472 | $462 | $686 | $500 | $685 | $754 | $609 | $870 | $652 | $632 | $1'046 |
| PPO | $710 | $482* | $614 | $633 | $696 | $646 | $632 | $762* | $821 | $944 | $1'152 | $914 |
| POS | $992 | $592 | $776 | $1'090 | $1'164 | $912 | $1'092 | $1'080 | $1'153 | $1'153 | $1'180 | $1'128 |
| HDHP/SO | $3'005 | $3'427 | $2'334* | $2'09* | $2'053 | $2'149 | $2'821* | $2'203* | $2'126 | $1'965 | $2'411 | $2'645 |

*NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount, in which all family members are subject to expenses count toward the deductible, and plans that have a separate amount for each family member (typically with a limit on the number of family members required to reach that amount).*

*† Estimate is statistically different from estimate for the previous year shown (p < .05)*

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

---

**Figure 7.9**

**Prevalence and Value of General Annual Health Plan Deductible for Single Coverage, by Firm Size, 2006-2017**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Average General Annual Deductible Among Covered Workers Who Face a Deductible for Single Coverage** | | | | | | | | | | | | |
| All Small Firms | $775 | $862 | $1'124* | $1'254 | $1'39* | $1'537 | $1'599 | $1'715 | $1'797 | $1'836 | $2'069 | $2'120 |
| All Large Firms | $486 | $519 | $563 | $649* | $686 | $757 | $875* | $884 | $971 | $1'106* | $1'224 | $1'276 |
| All Firms | $584 | $616 | $735* | $826* | $977* | $991 | $1'097* | $1'135 | $1'217 | $1'318 | $1'478* | $1'505 |
| | | | | | | | | | | | | |
| **Percentage of Covered Workers Who Face a General Annual Deductible for Single Coverage** | | | | | | | | | | | | |
| All Small Firms | 56% | 60% | 66% | 67% | 73%* | 75% | 72% | 77% | 82% | 82% | 82% | 77% |
| All Large Firms | 54% | 59% | 56% | 61% | 68%* | 74% | 73% | 78% | 80% | 81% | 83% | 83% |
| All Firms | 55% | 59%* | 59% | 63% | 70%* | 74% | 72% | 72% | 78%* | 80% | 81% | 81% |
| | | | | | | | | | | | | |
| **Average General Annual Deductible for Single Coverage Among All Covered Workers** | | | | | | | | | | | | |
| All Small Firms | $43* | $464 | $722* | $851 | $1'00* | $1'177 | $1'163 | $1'330 | $1'493 | $1'507 | $1'689 | $1'631 |
| All Large Firms | $254 | $269 | $284 | $376* | $490* | $560 | $629* | $670 | $769* | $890* | $1'026 | $1'049 |
| ALL FIRMS | $303 | $343 | $433* | $533* | $646* | $747* | $802 | $883 | $989* | $1'077 | $1'221* | $1'221 |

*NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. Average general annual deductible is among covered workers. Workers in plans without a general annual deductible for in-network services are assigned a value of zero.*

*† Estimate is statistically different from estimate for the previous year shown (p < .05)*

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

# GENERAL ANNUAL DEDUCTIBLES AMONG ALL COVERED WORKERS

- As discussed above, the share of covered workers in plans with a general annual deductible has increased significantly over time: from 59% in 2007, to 72% in 2012, to 81% in 2017 [Figure 7.2], as have the average deductible amounts for covered workers in plans with deductibles: from $616 in 2007, to $1,097 in 2012, to $1,505 in 2017 [Figure 7.10]. Neither trend by itself captures the full impact of changes in deductibles on covered workers. We can look at the average impact of both trends together on covered workers by assigning a zero deductible value to covered workers in plans with no deductible and looking at how the resulting averages change over time. These average deductible amounts are lower in any given year but the changes over time reflect both the higher deductibles in plans with deductibles and the fact that more workers face them.

  – Using this approach, the average general annual deductible for single coverage for all covered workers in 2017 is $1,221 [Figures 7.9 and 7.10].

  – The 2017 value is 52% higher than the average general annual deductible of $802 in 2012 and 255% higher than the average general annual deductible of $343 in 2007 [Figures 7.9 and 7.10].

**667184**

Exhibit 142

JA-0002077

- Another way to look at deductibles is the percentage of all covered workers who are in a plan with a deductible that exceeds certain thresholds. Fifty-one percent of covered workers are in plans with a general annual deductible of $1,000 or more for single coverage, the same percentage as last year [Figure 7.12].

  - Over the last five years, the percentage of covered workers with a general annual deductible of $1,000 or more for single coverage has grown substantially, increasing from 34% to 51% [Figure 7.12].

  - Workers in small firms are more likely to have a general annual deductible of $1,000 or more for single coverage than workers in large firms (58% vs. 48%) [Figure 7.11].

  - Twenty-two percent of covered workers are enrolled in a plan with a deductible of $2,000 or more, similar to the percentage last year (23%) [Figure 7.14]. Thirty-seven percent of covered workers in small firms have a general annual deductible of $2,000 or more, as compared to 15% in large firms [Figure 7.14].

- One of the reasons for the growth in deductible amounts has been the growth in enrollment in HDHP/SOs, which have higher deductibles than other plans. While growing deductibles in other plan types generally increases enrollee out-of-pocket liability, the shift in enrollment to HDHP/SOs does not necessarily do so because most HDHP/SO enrollees receive an account contribution from their employers, which in essence reduces the high cost sharing in these plans.

  - Twenty-one percent of covered workers in an HDHP with an HRA and 2% of covered workers in an HSA-qualified HDHP receive an account contribution for single coverage at least equal to their deductible, while another 35% of covered workers in an HDHP with an HRA and 30% of covered workers in an HSA-qualified HDHP receive account contributions that, if applied to their deductible, would reduce the deductible to $1,000 or less [Figure 7.16].

  - If we reduce the deductibles that workers face by employer account contributions, the percentage of covered workers with a deductible liability of $1,000 or more would be reduced from 51% to 40% [Figures 7.12 and 7.13].

**Figure 7.10**
**Average General Annual Health Plan Deductibles for Single Coverage, 2006-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Average general annual deductible is among all covered workers. Workers in plans without a general annual deductible for in-network services are assigned a value of zero.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

667185

Exhibit 142

JA-0002078

**Figure 7.11**

**Percentage of Covered Workers Enrolled in a Plan with a High General Annual Deductible for Single Coverage, by Firm Size, 2017**



* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05)

NOTE: These estimates include workers enrolled in HDHP/SOs and other plan types. Average general annual health plan deductible for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.12**

**Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $1,000 or More for Single Coverage, by Firm Size, 2009-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)

NOTE: These estimates include workers enrolled in HDHP/SOs and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**667186**

Exhibit 142                                                                                                                JA-0002079

**Figure 7.13**
**Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $1,000 or More for Single Coverage, Reduced by Any HRA/HSA Contributions, by Firm Size, 2009-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE:  These estimates include workers enrolled in HDHP/SOs and other plan types. The net liability for covered workers enrolled in a plan with an HSA or HRA is calculated by subtracting the account contribution from the single coverage deductible. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. General annual deductibles are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**Figure 7.14**
**Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $2,000 or More for Single Coverage, by Firm Size, 2009-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE:  These estimates include workers enrolled in HDHP/SOs and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**667187**

Exhibit 142

JA-0002080

**Figure 7.15**

**Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $2,000 or More for Single Coverage, Reduced by Any HRA/HSA Contributions, by Firm Size, 2009-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: These estimates include workers enrolled in HDHP/SOs and other plan types. The net liability for covered workers enrolled in a plan with an HSA or HRA is calculated by subtracting the account contribution from the single coverage deductible. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. General annual deductibles are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**667188**

Exhibit 142

JA-0002081

## Figure 7.16

## Among Covered Workers, Average General Annual Deductibles for Single Coverage, Reduced by Any HRA/HSA Contributions, by Plan Type and Firm Size, 2017

|  | $0 (Or Less) | $1.000 or Less | More Than $1.000 |
|---|---|---|---|
| **HDHP/HRA** | | | |
| All Small Firms | 30% | 26% | 44% |
| All Large Firms | 18% | 38% | 44% |
| All Firms | 21% | 35% | 44% |
| | | | |
| **HSA** | | | |
| All Small Firms | 7%* | 15%* | 78% |
| All Large Firms | 0%* | 34%* | 66% |
| All Firms | 2% | 30% | 68% |
| | | | |
| **All HDHP/SO** | | | |
| All Small Firms | 16% | 20%* | 64% |
| All Large Firms | 7% | 36%* | 58% |
| All Firms | 9% | 32% | 59% |
| | | | |
| **Non-HDHP/SO** | | | |
| All Small Firms | N/A | 35%* | 65%* |
| All Large Firms | N/A | 67%* | 33%* |
| All Firms | N/A | 58% | 42% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. The net liability for covered workers enrolled in a plan with an HSA or HRA is calculated by subtracting the account contribution from the single coverage deductible. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. General annual deductibles are for in-network services. N/A: Not Applicable.

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667189**

Exhibit 142

JA-0002082

**Figure 7.17**

**Distribution of General Annual Deductibles for Single Coverage, Reduced by Any HRA/HSA Contributions, by Firm Size, 2007-2017**



Tests found no statistical difference from distribution for the previous year shown (p < .05).
NOTE: Account contributions include an employer's contribution to an HSA or HRA. These estimates include workers enrolled in HDHP/SOs and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

**Figure 7.18**

**Among Covered Workers With a General Annual Health Plan Deductible for Single Coverage, Distribution of Deductibles, 2007-2017**



* Distribution is statistically different from distribution for the previous year shown (p < .05).
NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

667190

Exhibit 142                                                                                       JA-0002083



**Figure 7.19**
**Distribution of General Annual Deductibles for Single Coverage, by Plan Type, 2017**

NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## GENERAL ANNUAL DEDUCTIBLES FOR WORKERS ENROLLED IN FAMILY COVERGE

- For family coverage, the majority of covered workers with general annual deductibles have an aggregate deductible, which means that all family members' out-of-pocket expenses count toward meeting the deductible amount. Among covered workers in a plan with family coverage, the percentages of covered workers with an average aggregate general annual deductible are 24% for workers in HMOs, 50% for workers in PPOs, and 43% for workers in POS plans [Figure 7.20].

    - The average deductible amounts for covered workers with an aggregate deductible for family coverage are $2,732 for HMOs, $2,503 for PPOs, $2,697 for POS plans, and $4,527 for HDHP/SOs [Figure 7.21]. Deductible amounts for aggregate family deductibles are similar to last year for plan types other than PPOs.

- The other type of family deductible, a separate per-person deductible, requires each family member to meet a separate per-person deductible amount before the plan covers expenses for that member. About two-thirds of covered workers in plans with separate per-person family deductibles (68%) consider the deductible met for all family members if a prescribed number of family members each reaches his or her separate deductible amounts [Figure 7.24].[1] Plans may also require each family member to meet a separate per-person deductible until the family's combined spending reaches a specified dollar amount.

    - For covered workers in health plans that have separate per-person general annual deductible amounts for family coverage, the average deductibles are $1,045 for HMOs, $914 for PPOs, $1,128 for POS plans, and $2,645 for HDHP/SOs [Figure 7.21].

---

[1]Some workers with separate per-person deductibles or out-of-pocket maximums for family coverage do not have a specific number of family members that are required to meet the deductible amount and instead have another type of limit, such as a per-person amount with a total dollar amount limit. These responses are included in the averages and distributions for separate family deductibles and out-of-pocket maximums.

**667191**

Exhibit 142

JA-0002084

- – Most covered workers in plans with a separate per-person general annual deductible for family coverage have a limit to the number of family members required to meet the separate deductible amounts [Figure 7.24]. Among those covered workers in plans with a limit on the number of family members, the most frequent number of family members required to meet the separate deductible amounts is two (39%) [Figure 7.25].

- For covered workers in plans with an aggregate deductible for family coverage, the average annual family deductibles in small firms are higher than the average annual family deductibles in large firms across plan types [Figure 7.21].

**Figure 7.20**

**Distribution of Type of General Annual Deductible for Covered Workers With Family Coverage, by Plan Type and Firm Size, 2017**

| | Aggregate Amount | Separate Amount | No Deductible |
|---|---|---|---|
| **HMO** | | | |
| All Small Firms | 30% | 11% | 58% |
| All Large Firms | 21% | 16% | 63% |
| **ALL FIRM SIZES** | **24%** | **14%** | **62%** |
| **PPO** | | | |
| All Small Firms | 61%* | 17%* | 22%* |
| All Large Firms | 45%* | 43%* | 12%* |
| **ALL FIRM SIZES** | **50%** | **36%** | **14%** |
| **POS** | | | |
| All Small Firms | 49% | 22% | 29% |
| All Large Firms | 37% | 21% | 42% |
| **ALL FIRM SIZES** | **43%** | **22%** | **35%** |
| **HDHP/SO** | | | |
| All Small Firms | 82% | 18% | N/A |
| All Large Firms | 85% | 15% | N/A |
| **ALL FIRM SIZES** | **84%** | **16%** | **N/A** |
| **ALL PLANS** | | | |
| All Small Firms | 59% | 18%* | 23% |
| All Large Firms | 53% | 31%* | 17% |
| **ALL FIRM SIZES** | **55%** | **27%** | **18%** |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Values for No Deductible for HDHP/SOs are not shown because all covered workers in these plans face a minimum deductible. HDHP/SOs are included in the All Plans estimate. In HDHP/HRA plans, as defined by the survey, the minimum deductible is $1,000 for single coverage and $2,000 for family coverage. In HSA-qualified HDHPs, the legal minimum deductible for 2017 is $1,300 for single coverage and $2,600 for family coverage. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. Among workers with a general annual family deductible, 62% of workers in HMOs, 58% of workers in PPOs, and 67% of workers in POS plans have an aggregate deductible. The survey distinguishes between plans that have an aggregate deductible amount in which all family members' out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount. N/A: Not Applicable.

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667192**

Exhibit 142

JA-0002085

**Figure 7.21**

**Among Covered Workers With a General Annual Deductible, Average Deductibles for Family Coverage, by Deductible Type, Plan Type and Firm Size, 2017**

| | Aggregate Amount | Separate Amount Per-Person |
|---|---|---|
| **HMO** | | |
| All Small Firms | $3,930* | NSD |
| All Large Firms | $2,091* | $744** |
| **ALL FIRM SIZES** | **$2,732** | **$1,045** |
| **PPO** | | |
| All Small Firms | $3,660* | $1,131 |
| All Large Firms | $1,899* | $880 |
| **ALL FIRM SIZES** | **$2,503** | **$914** |
| **POS** | | |
| All Small Firms | $3,348* | NSD |
| All Large Firms | $1,700* | NSD |
| **ALL FIRM SIZES** | **$2,697** | **$1,128** |
| **HDHP/SO** | | |
| All Small Firms | $6,633* | $3,409* |
| All Large Firms | $3,898* | $2,360* |
| **ALL FIRM SIZES** | **$4,527** | **$2,645** |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount. NSD: No Sufficient Data

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667193**

Exhibit 142

JA-0002086

SECTION 7. EMPLOYEE COST SHARING

**Figure 7.22**

**Among Covered Workers with a Separate Per-Person General Annual Health Plan Deductible for Family Coverage, Distribution of Deductibles, by Plan Type, 2017**



NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.23**

**Among Covered Workers with an Aggregate General Annual Health Plan Deductible for Family Coverage, Distribution of Deductibles, by Plan Type, 2017**



NOTE: By definition, 100% of covered workers in an HDHP/SO with an aggregate deductible have a family deductible of $2,000 or more. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 115

**667194**

Exhibit 142                                                                 JA-0002087

**Figure 7.24**

**Among Covered Workers With a Separate Per-Person General Annual Health Plan Deductible for Family Coverage, Structure of Deductible Limits, by Plan Type, 2017**



NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.25**

**Among Covered Workers With a Separate Per-Person General Annual Health Plan Deductible for Family Coverage and a Per-Person Limit, Distribution of Maximum Number of Family Members Required to Meet the Deductible, by Plan Type, 2017**



NOTE: Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount. Plans that reported having a separate family deductible were asked if they had a combined limit or if the limit was considered met when a specified number of family members reached their separate per-person limit. "Other" category may include per-person limits with a total family dollar limit.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667195

Exhibit 142

JA-0002088



**Figure 7.26**
**Among Covered Workers With an Aggregate General Annual Health Plan Deductible for Family Coverage, Distribution of Aggregate Deductibles, by Plan Type, 2012 and 2017**

NOTE: By definition, 100% of covered workers in an HDHP/SO with an aggregate deductible have a family deductible of $2,000 or more. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. The survey distinguishes between plans that have an aggregate deductible amount in which all family members out-of-pocket expenses count toward the deductible, and plans that have a separate amount for each family member, typically with a limit on the number of family members required to reach that amount.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2012 and 2017

# CHARACTERISTICS OF GENERAL ANNUAL DEDUCTIBLES

- The majority of covered workers with a general annual deductible are in plans where the deductible does not have to be met before certain services, such as physician office visits or prescription drugs, are covered.

  - Large majorities of covered workers (74% in HMOs, 75% in PPOs, and 74% in POS plans) with general annual deductibles are enrolled in plans where the deductible does not have to be met before physician office visits for primary care are covered [Figure 7.27].

  - Similarly, among workers with a general annual deductible, large shares of covered workers in HMOs (96%), PPOs (92%), and POS plans (94%) are enrolled in plans where the general annual deductible does not have to be met before prescription drugs are covered [Figure 7.27].

**667196**

Exhibit 142

JA-0002089



**Figure 7.27**
**Among Covered Workers with a General Annual Health Plan Deductible, Percentage with Coverage for the Following Services Without Having to First Meet the Deductible, by Plan Type, 2017**

NOTE: These questions are asked of firms with a deductible for single or family coverage. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services. HSA Qualified HDHPs are required by law to apply the plan deductible to nearly all services and therefore are not included here.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

# HOSPITAL ADMISSIONS, OUTPATIENT SURGERY AND EMERGENCY ROOM VISITS

- Whether or not a worker has a general annual deductible, most workers face additional types of cost sharing (such as a copayment, coinsurance, or a per diem charge) when admitted to a hospital or having outpatient surgery. The distribution of workers with cost sharing for hospital admissions, outpatient surgery and emergency room visits does not equal 100% as workers may face a combination of types of cost sharing. In some cases, these cost-sharing arrangements are very complicated; for example workers visiting an emergency room may have some forms of cost-sharing waived if they are admitted to the hospital but still face other cost-sharing. In addition, the average copayment and coinsurance rates include workers who may have a combination of these types of cost sharing.

- Beginning this year, to reduce burden on respondents, we revised the survey to ask respondents about cost sharing for inpatient admissions, outpatient surgery and emergency room visits only in their largest health plan type; previously, we asked for this information for the largest plan for each of the plan types that they offered. After reviewing the responses and comparing them to prior years where we asked about each plan type, we find that the information we are receiving is quite similar to responses from previous years. For this reason, we will continue to report our results for these questions weighted by the number of covered workers in the responding firms. There is a more detailed discussion in the survey design and methods section on this topic.

- For hospital admissions, 64% of covered workers have coinsurance and 12% have copayments. Lower percentages of workers have per day (per diem) payments (10%), a separate hospital deductible (1%), or both a copayment and coinsurance (6%), while 17% have no additional cost sharing for hospital admissions after any general annual deductible has been met [Figure 7.28].

    – For covered workers in HMO plans, copayments are more common (38%) and coinsurance (28%) is less common than the average for all covered workers [Figure 7.28].

    – HDHP/SOs, on average, have a different cost-sharing structure than other plan types for hospital admissions. Only

**667197**

Exhibit 142                                                                                              JA-0002090

1% of covered workers in HDHP/SOs have a copayment for hospital admissions, lower than the average for all covered workers [Figure 7.28].

– The average coinsurance rate for a hospital admission is 19%, the average copayment is $336 per hospital admission, and the average per diem charge is $257 [Figure 7.32]. Ninety-three percent of workers enrolled in a plan with a per diem for hospital admissions have a limit on the number of days a worker must pay the amount [Figure 7.33].

• The cost-sharing provisions for outpatient surgery are similar to those for hospital admissions, as most workers have coinsurance or copayments. In 2017, 19% of covered workers have a copayment and 64% have coinsurance for outpatient surgery. In addition, 6% have both a copayment and coinsurance, while 16% have no additional cost sharing after any general annual deductible has been met [Figure 7.29].

– For covered workers with cost sharing for outpatient surgery, the average coinsurance rate is 19% and the average copayment is $231 [Figure 7.32].

• The large majority of covered workers have cost sharing when they visit an emergency room. In 2017, 58% percent of covered workers have a copayment for emergency room visits and 32% have a coinsurance [Figure 7.30].

– For covered workers with cost sharing for an emergency room visit, the average coinsurance rate is 20% and the average copayment is $180 [Figure 7.32].

– Among covered workers in HDHP/SO plans, 21% have no cost sharing for an emergency room visit after any general annual deductible has been met, compared to 8% of covered workers in all plans [Figure 7.30].

**Figure 7.28**

**Distribution of Covered Workers With Separate Cost Sharing for Hospital Admissions, In Addition to Any General Annual Deductible, by Plan Type, 2017**

| Plan Type | Separate Annual Deductible for Hospital Admissions | Copayment | Coinsurance | Both Copayment and Coinsurance | Charge Per Day | None |
|---|---|---|---|---|---|---|
| HMO | 2% | 38%* | 28%* | 5% | 13% | 23% |
| PPO | * | 11 | 72* | 9 | 7 | 12* |
| POS | 6 | 15 | 46 | 10 | 43* | 1* |
| HDHP/SO | <1* | 1* | 74* | <1* | 1* | 24* |
| **ALL PLANS** | **1%** | **12%** | **64%** | **6%** | **10%** | **17%** |

NOTE: We collect information on the cost-sharing provisions in addition to any general annual plan deductible. The distribution of workers with different types of cost sharing does not equal 100% because workers may face a combination of types of cost sharing. Less than 1% of covered workers have an Other type of cost sharing. Information on separate deductibles for hospital admissions was collected only for HDHP/HRAs because federal regulations for HSA-qualified HDHPs make it unlikely these plans would have a separate deductible for specific services. 'Both Copayment and Coinsurance' category includes workers who are required to pay the higher amount of either the copayment or coinsurance. Under the plan. Zero percent of covered workers are enrolled in a plan that does not cover hospital admissions.

* Estimate is statistically different from All Plans estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667198**

Exhibit 142

JA-0002091

**Figure 7.29**

**Distribution of Covered Workers With Separate Cost Sharing for Outpatient Surgery, In Addition to Any General Annual Deductible, by Plan Type, 2017**

| Plan Type | Separate Annual Deductible for Outpatient Surgery | Copayment | Coinsurance | Both Copayment and Coinsurance | None |
|---|---|---|---|---|---|
| HMO | <1% | 57%* | 26%* | 5% | 15% |
| PPO | <1 | 12* | 73* | 7 | 14 |
| POS | <1 | 49* | 40* | 22 | 9* |
| HDHP/SO | <1 | 2* | 74* | <1* | 24* |
| **ALL PLANS** | **<1%** | **19%** | **64%** | **6%** | **16%** |

NOTE: We collect information on the cost-sharing provisions in addition to any general annual plan deductible. The distribution of workers with different types of cost sharing does not equal 100% because workers may face a combination of types of cost sharing. Less than 1% of covered workers have an 'Other' type of cost sharing. Information on separate deductibles for hospital admissions was collected only for HDHP/HRAs because federal regulations for HSA-qualified HDHPs make it unlikely these plans would have a separate deductible for specific services. 'Both Copayment and Coinsurance' category includes workers who are required to pay the higher amount of either the copayment or coinsurance under the plan. Zero percent of covered workers are enrolled in a plan that does not cover outpatient surgery.

* Estimate is statistically different from All Plans estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.30**

**Distribution of Covered Workers With Separate Cost Sharing for an Emergency Room Visit, In Addition to Any General Annual Deductible, by Plan Type, 2017**

| Plan Type | Separate Annual Deductible for Emergency Room Visits | Copayment | Coinsurance | Both Copayment and Coinsurance | None |
|---|---|---|---|---|---|
| HMO | 6% | 94%* | 6%* | 10%* | <1%* |
| PPO | 1 | 68* | 26 | 27* | 4* |
| POS | 3 | 83* | 9* | 27 | 2* |
| HDHP/SO | <1* | 16* | 62* | 7* | 21* |
| **ALL PLANS** | **1%** | **58%** | **32%** | **20%** | **8%** |

NOTE: We collect information on the cost-sharing provisions in addition to any general annual plan deductible. The distribution of workers with different types of cost sharing does not equal 100% because workers may face a combination of types of cost sharing. Less than 1% of covered workers have an 'Other' type of cost sharing. Information on separate deductibles for hospital admissions was collected only for HDHP/HRAs because federal regulations for HSA-qualified HDHPs make it unlikely these plans would have a separate deductible for specific services. 'Both Copayment and Coinsurance' category includes workers who are required to pay the higher amount of either the copayment or coinsurance under the plan. Zero percent of covered workers are enrolled in a plan that does not cover emergency room visits.

* Estimate is statistically different from All Plans estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667199**

Exhibit 142

JA-0002092

**Figure 7.31**

**Percentage of Covered Workers with the Following Types of Cost Sharing for Various Services, in Addition to Any General Annual Deductible, 2017**





NOTE: We collect information on the cost-sharing provisions in addition to any general annual plan deductible. The distribution of workers with different types of cost sharing does not equal 100% because workers may face a combination of types of cost sharing. Less than 1% of covered workers have an 'Other' type of cost sharing. Information on separate deductibles for hospital admissions was collected only for HDHP/HRAs because federal regulations for HSA-qualified HDHPs make it unlikely these plans would have a separate deductible for specific services. 'Both Copayment and Coinsurance' category includes workers who are required to pay the higher amount of either the copayment or coinsurance under the plan.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.32**

**Among Covered Workers With Separate Cost Sharing for Hospital Admissions, Outpatient Surgery or Emergency Room Visits, Average Cost Sharing, 2017**

| Type of Cost Sharing | Emergency Room Visit | Hospital Admission | Outpatient Surgery |
|---|---|---|---|
| Coinsurance | 20% | 18% | 19% |
| Copayment | $780 | $336 | $231 |
| Separate Annual Deductible | N/A | NSD | NSD |

NOTE: Estimates represent cost sharing in addition to any general annual deductible. The average amounts include workers who may have a combination of types of cost sharing. Cost sharing amounts are for in-network providers. N/A: Not Applicable.
NSD: Not Sufficient Data

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667200**

Exhibit 142

JA-0002093

**Figure 7.33**

## Among Covered Workers With a Charge Per Day for Hospital Admissions, Average Cost Sharing, 2017

|  | Among Covered Workers With a Charge Per Day for Hospital Admissions |
|---|---|
| Average Charge Per Day | $257 |
| Percentage of Covered Workers With a Limit On the Number of Days a Worker Must Pay Per-Day Amount | 93% |
| Average Number of Days the Per-Day Amount Must Be Paid | 5 |

NOTE: Estimates represent cost sharing in addition to any general annual deductible. Average amounts include workers who may have a combination of types of cost sharing. Cost sharing amounts are for in-network providers. Among covered workers with coinsurance for emergency room visits 93% are enrolled in a plan with neither a minimum nor maximum dollar amount for in-network visits

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits  2017

**Figure 7.34**
**Among Covered Workers with a Copayment for Hospital Admissions, Outpatient Surgery or Emergency Room Visits, Distribution of Copayments, 2017**



NOTE: Estimates represent cost sharing in addition to any general annual deductible. Distribution includes workers who may have a combination of types of cost sharing. Cost sharing amounts are for in-network providers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667201**

Exhibit 142

JA-0002094



**Figure 7.35**
**Among Covered Workers with Coinsurance for Hospital Admissions, Outpatient Surgery or Emergency Room Visits, Distribution of Coinsurance Rates, 2017**

NOTE: Estimates represent cost sharing in addition to any general annual deductible. Distribution includes workers who may have a combination of types of cost sharing. Cost sharing amounts are for in-network providers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## COST SHARING FOR PHYSICIAN OFFICE VISITS

- The majority of covered workers are enrolled in health plans that require cost sharing for an in-network physician office visit, in addition to any general annual deductible.[2]

  - The most common form of physician office visit cost sharing for in-network services is copayments. Seventy-one percent of covered workers have a copayment for a primary care physician office visit and 22% have coinsurance. For office visits with a specialty physician, 67% of covered workers have copayments and 26% have coinsurance [Figure 7.36].

  - Over the last five years, the percentage of covered workers with coinsurance for office visits with a specialist has risen from 19% to 26%.

  - Covered workers in HMOs, PPOs, and POS plans are much more likely to have copayments for both primary care and specialty care physician office visits than workers in HDHP/SOs. For primary care physician office visits, 62% of covered workers in HDHP/SOs have coinsurance, 18% have no cost sharing after the general annual plan deductible is met, and 18% have copayments [Figure 7.36].

  - Among covered workers with a copayment for in-network physician office visits, the average copayment is $25 for primary care and $38 for specialty physician office visits [Figure 7.37], similar to the amounts last year.

  - Among covered workers with coinsurance for in-network physician office visits, the average coinsurance rates are 19% for a visit with a primary care physician and 19% for a visit with a specialist [Figure 7.37], similar to the rates

[2] Starting in 2010, the survey asked about the prevalence and cost of physician office visits separately for primary care and specialty care. Prior to the 2010 survey, if the respondent indicated the plan had a copayment for office visits, we assumed the plan had a copayment for both primary and specialty care visits. The survey did not allow for a respondent to report that a plan had a copayment for primary care visits and coinsurance for visits with a specialist physician. The changes made in 2010 allow for variations in the type of cost sharing for primary care and specialty care visits. The survey includes cost sharing for in-network services only.

**667202**

Exhibit 142

JA-0002095

last year.

**Figure 7.36**

**Percentage of Covered Workers with the Following Types of Cost Sharing for Physician Office Visits, by Plan Type, 2017**



* Estimate is statistically different from All Plans estimate (p < .05)
NOTE: Figure represents cost sharing in addition to any general annual deductible. The survey includes questions on cost sharing for in-network services only.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.37**

**Among Covered Workers With Copayments And/Or Coinsurance for In-Network Physician Office Visits, Average Copayments and Coinsurance, by Plan Type, 2017**

|  | HMO | PPO | POS | HDHP/SO | All Plans |
|---|---|---|---|---|---|
| **Primary Care Office Visit** | | | | | |
| Average Copay | $22* | $25 | $25 | $25 | $25 |
| Average Coinsurance | NSD | 19% | NSD | 18% | 19% |
| **Specialty Care Office Visit** | | | | | |
| Average Copay | $35 | $39 | $39 | $40 | $38 |
| Average Coinsurance | NSD | 21% | NSD | 18% | *9% |

NOTE: NSD: Not Sufficient Data
* Estimate is statistically different from All Plans estimate (p < .05).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667203**

Exhibit 142    JA-0002096

**Figure 7.38**
**Among Covered Workers with a Copayment for a Primary Care Physician Office Visit,**
**Distribution of Copayments, by Plan Type, 2017**



NOTE: Copayments for EPOs, POS plans, and HDHP/SOs are for in-network providers
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 7.39**
**Among Covered Workers with a Copayment for a Specialist Physician Office Visit,**
**Distribution of Copayments, by Plan Type, 2017**



NOTE: Copayments for EPOs, POS plans, and HDHP/SOs are for in-network providers
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667204

Exhibit 142                                                                                          JA-0002097

**Figure 7.40**
**Among Covered Workers with a Copayment for a Primary Care Physician Office Visit,**
**Distribution of Copayments, 2006-2017**



* Distribution is statistically different from distribution for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

**Figure 7.41**
**Among Covered Workers with a Copayment for a Specialist Physician Office Visit,**
**Distribution of Copayments, 2006-2017**



* Distribution is statistically different from distribution for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

**667205**

Exhibit 142

JA-0002098

# OUT-OF-POCKET MAXIMUM AMOUNTS

- Most covered workers are in a plan that partially or totally limits the cost sharing that a plan enrollee must pay in a year. These limits are generally referred to as out-of-pocket maximum amounts. The Affordable Care Act (ACA) requires that non-grandfathered health plans have an out-of-pocket maximum of $7,150 or less for single coverage and $14,300 for family coverage.[3] Many plans have complex out-of-pocket structures, which makes it difficult to accurately collect information on this element of plan design.

- In 2017, 98% percent of covered workers are in a plan with an out-of-pocket maximum for single coverage. This is a significant increase from 87% in 2012 [Figure 7.42].

- For covered workers in plans with out-of-pocket maximums for single coverage, there is wide variation in spending limits.

  – Fifteen percent of covered workers in plans with an out-of-pocket maximum for single coverage have an out-of-pocket maximum of less than $2,000, while 21% have an out-of-pocket maximum of $6,000 or more [Figure 7.44].



**Figure 7.42**
**Percentage of Covered Workers in a Plan with an Out-of-Pocket Maximum for Single Coverage, 2009-2017**

Legend: All Small Firms (3-199 Workers) ■  All Large Firms (200 or More Workers)  ALL FIRMS

* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: Out-of-pocket maximums reported are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

[3] For those enrolled in an HDHP/HSA, the out-of-pocket maximum is $6,550 for an individual plan and $13,100 for a family plan.

**667206**

Exhibit 142

JA-0002099

**Figure 7.43**

**Percentage of Covered Workers in a Plan with an Out-of-Pocket Maximum Above Certain Thresholds for Single Coverage, 2009-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: OOP refers to out-of-pocket. Out-of-pocket maximums reported are for in-network services. Covered Workers without an OOP maximum are considered to be exposed to at least the specified threshold. Some of these workers may be enrolled in plans whose cost-sharing structure has other limits that make it impossible to reach the specified threshold.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**Figure 7.44**

**Among Covered Workers with an Out-of-Pocket Maximum for Single Coverage, Distribution of Out-of-Pocket Maximums, by Plan Type, 2017**



\* Estimate is statistically different from All Plans estimate within plan type (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667207**

Exhibit 142

JA-0002100



**Figure 7.45**
**Among Covered Workers with an Out-of-Pocket Maximum for Single Coverage, Average
Out-of-Pocket Maximums, by Firm Size, 2017**



* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667208**

Exhibit 142                                                                                    JA-0002101



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

High-Deductible
Health Plans
with Savings
Option

SECTION

8

667209

Exhibit 142                                                                                          JA-0002102

# Section 8

# High-Deductible Health Plans with Savings Option

To help cover out-of-pocket expenses not covered by a health plan, some firms offer high deductible plans that are paired with an account that allows enrollees to use tax-preferred savings to pay plan cost sharing and other out-of-pocket medical expenses. The two most common are health reimbursement arrangements (HRAs) and health savings accounts (HSAs). HRAs and HSAs are financial accounts that workers or their family members can use to pay for health care services. These savings arrangements are often (or, in the case of HSAs, always) paired with health plans with high deductibles. The survey treats high-deductible plans paired with a savings option as a distinct plan type - High-Deductible Health Plan with Savings Option (HDHP/SO) - even if the plan would otherwise be considered a PPO, HMO, POS plan, or conventional health plan. Specifically for the survey, HDHP/SOs are defined as (1) health plans with a deductible of at least $1,000 for single coverage and $2,000 for family coverage[1] offered with an HRA (referred to as HDHP/HRAs); or (2) high-deductible health plans that meet the federal legal requirements to permit an enrollee to establish and contribute to an HSA (referred to as HSA-qualified HDHPs).[2]

## PERCENTAGE OF FIRMS OFFERING HDHP/HRAS AND HSA-QUALIFIED HDHPS

- Twenty-four percent of firms offering health benefits offer an HDHP/HRA, an HSA-qualified HDHP, or both. Among firms offering health benefits, 9% offer an HDHP/HRA and 17% offer an HSA-qualified HDHP [Figure 8.1]. The percentage of firms offering an HDHP/SO is similar to last year.

  - Large firms (200 or more workers) are more likely than small firms (3-199 workers) to offer an HDHP/SO (53% vs. 23%). [Figure 8.3].

---

[1] There is no legal requirement for the minimum deductible in a plan offered with an HRA. The survey defines a high-deductible HRA plan as a plan with a deductible of at least $1,000 for single coverage and $2,000 for family coverage. Federal law requires a deductible of at least $1,300 for single coverage and $2,600 for family coverage for HSA-qualified HDHPs in 2017.  See the Text Box for more information on HDHP/HRAs and HSA-qualified HDHPs.

[2] The definitions of HDHP/SOs do not include other consumer-driven plan options, such as arrangements that combine an HRA with a lower-deductible health plan or arrangements in which an insurer (rather than the employer as in the case of HRAs or the enrollee as in the case of HSAs) establishes an account for each enrollee. Other arrangements may be included in future surveys as the market evolves.

**667210**

Exhibit 142                                                                                                     JA-0002103

SECTION 8.  HIGH-DEDUCTIBLE HEALTH PLANS WITH SAVINGS OPTION

**Figure 8.1**
**Among Firms Offering Health Benefits, Percentage That Offer an HDHP/HRA and/or an HSA-Qualified HDHP, 2005-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: Among all firms that offer health benefits, 2.3% offer both an HDHP/HRA and an HSA qualified HDHP.  Adding the percentage of firms offering
HDHP/HRA and HSA Qualified HDHPs may not sum to the percentage of firms offering HDHP/SOs because some firms offer both.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2005-2017

**Figure 8.2**
**Among Firms Offering Health Benefits, Percentage That Offer an HDHP/SO, by Firm Size, 2005-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2005-2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 132

**667211**

Exhibit 142                                                                                    JA-0002104



**Figure 8.3**
**Among Firms Offering Health Benefits, Percentage That Offer an HDHP/HRA and/or an HSA-Qualified HDHP, by Firm Size, 2017**

\* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).
NOTE: Among all firms that offer health benefits, 2.3% offer both an HDHP/HRA and an HSA-qualified HDHP. Adding the percentage of firms offering HDHP/HRA and HSA-Qualified HDHPs may not sum to the percentage of firms offering HDHP/SOs because some firms offer both.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2005-2017

# ENROLLMENT IN FIRMS OFFERING HDHP/HRAS AND HSA-QUALIFIED HDHPS

- Enrollment in HDHP/SO plans has increased over the last five years, from 19% of covered workers in 2012 to 28% in 2017.

  - Nine percent of covered workers are enrolled in HDHP/HRAs and 19% of covered workers are enrolled in HSA-qualified HDHPs in 2017. These percentages are the same as the percentages last year [Figure 8.5].

  - A higher percentage of covered workers in large firms is enrolled in HDHP/SOs than in small firms (30% vs. 23%) [Figure 8.6].

**667212**

Exhibit 142

JA-0002105

**Figure 8.4**
**Percentage of Covered Workers Enrolled in an HDHP/SO, by Firm Size, 2006-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

**Figure 8.5**
**Percentage of Covered Workers Enrolled in an HDHP/HRA or HSA-Qualified HDHP, 2006-2017**

* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Covered workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

667213

Exhibit 142

JA-0002106



**Figure 8.6**
**Percentage of Covered Workers Enrolled in an HDHP/HRA or HSA-Qualified HDHP, by Firm Size, 2017**

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).
NOTE: Covered workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## PREMIUMS AND WORKER CONTRIBUTIONS

- The average annual premiums in 2017 for covered workers in HDHP/HRAs are $6,438 for single coverage and $18,948 for family coverage [Figure 8.7]. The average annual premium for single coverage in HDHP/HRAs is significantly less than the average annual premium for single coverage for covered workers in plans that are not HDHP/SOs [Figure 8.8].

- The average annual premium for workers in HSA-qualified HDHPs is $5,773 for single coverage and $16,821 for family coverage. These amounts are significantly less than the average single and family premium for covered workers in plans that are not HDHP/SOs [Figure 8.8].

- The average single and family coverage premiums for covered workers enrolled in HSA-qualified HDHPs are lower than the premiums for covered workers enrolled in HDHP/HRAs.

- The average annual worker contributions to premiums for workers enrolled in HDHP/HRAs are $1,216 for single coverage and $5,130 for family coverage [Figure 8.7].

- The average annual worker contributions to premiums for workers in HSA-qualified HDHPs are $918 for single coverage and $4,289 for family coverage. The average contributions for single and family coverage for covered workers in HSA-qualified HDHPs are significantly less than the average premium contribution made by covered workers in plans that are not HDHP/SOs [Figure 8.8].

**667214**

Exhibit 142

JA-0002107

**Figure 8.7**

**HDHP/HRA and HSA-Qualified HDHP Features for Covered Workers, 2017**

| Annual Plan Averages For: | HDHP/HRA | | HSA-QUALIFIED HDHP | |
|---|---|---|---|---|
| | Single Coverage | Family Coverage | Single Coverage | Family Coverage |
| Premium | $6,438 | $18,948 | $5,773 | $16,821 |
| Worker Contribution to Premium | $1,216 | $5,130 | $918 | $4,289 |
| General Annual Deductible | $2,129 | $4,448 | $2,433 | $4,847 |
| Out-Of-Pocket Liability | $4,083 | Not Available | $4,271 | Not Available |
| Firm Contribution to the HRA or HSA | $1,351 | $2,444 | $608 | $1,086 |

NOTE: Firms were not asked about family coverage out-of-pocket maximums in 2017. The deductible averages for family coverage are for covered workers that face an aggregate amount. Twenty-one percent of covered workers enrolled in HDHP/HRA plans and 13.3% of covered workers in HSA-qualified HDHPs are in plans with a separate per person amount. When those firms that do not contribute to the HSA (47% for single coverage and 46% for family coverage) are excluded from the calculation, the average firm contribution to the HSA for covered workers is $795 for single coverage and $1,417 for family coverage. Three percent of covered workers are enrolled in a plan where the firm matches employee HSA contributions. For HDHP/HRAs, we refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA. Covered workers enrolled in a plan where the firm matches any employee contribution to an HSA account are not included in the average contribution (3% for single coverage and 3% for family coverage).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 8.8**

**Average Annual Premiums and Contributions to Savings Accounts for Covered Workers in HDHP/HRAs or HSA-Qualified HDHPs, Compared to Non-HDHP/SO Plans, 2017**

| | Single Coverage | | | Family Coverage | | |
|---|---|---|---|---|---|---|
| | HDHP/HRA | HSA-Qualified HDHP | Non-HDHP/SO Plans | HDHP/HRA | HSA-Qualified HDHP | Non-HDHP/SO Plans |
| Annual Premium | $6,438* | $5,773* | $6,949 | $18,948 | $16,821* | $19,225 |
| Worker Contribution to Premium | $1,216 | $918* | $1,288 | $5,130* | $4,289* | $6,149 |
| Firm Contribution to Premium | $5,222 | $4,855* | $5,661* | $13,817* | $12,532 | $13,076 |
| Annual Firm Contribution to the HRA or HSA | $1,351* | $608 | Not Applicable | $2,444 | $1,086 | Not Applicable |
| Total Annual Firm Contribution (Firm Share of Premium Plus Firm Contribution to HRA or HSA) | $6,573* | $5,473 | $5,661* | $16,261* | $13,608 | $13,076 |
| Total Annual Cost (Total Premium Plus Firm Contribution to HRA or HSA) | $7,789* | $6,390* | $6,949 | $21,391* | $17,895* | $19,225 |

NOTE: When those firms that do not contribute to the HSA (47% for single coverage and 46% for family coverage) are excluded from the calculation, the average firm contribution to the HSA for covered workers is $795 for single coverage and $1,417 for family coverage. Three percent of covered workers are enrolled in a plan where the firm matches employee HSA contributions. For HDHP/HRAs, we refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA. Covered workers enrolled in a plan where the firm matches any employee contribution to an HSA account are not included in the average contribution (3% for single coverage and 3% for family coverage). Values shown in the table may not equal the sum of their component parts. The averages presented in the table are aggregated at the firm level and then averaged, which is methodologically more appropriate than adding the averages.

* Estimate is statistically different from estimate for Non-HDHP/SO Plans (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667215**

Exhibit 142

JA-0002108

**Figure 8.9**

**Average Annual Premiums and Contributions for Covered Workers in HDHP/SOs and Non-HDHP/SO Plans, for Family Coverage, 2017**



* Estimate is statistically different from estimate for Non-HDHP/SO Plans (p < .05).

NOTE: When those firms that do not contribute to the HSA (42% for single coverage and 46% for family coverage) are excluded from the calculation, the average firm's contribution to the HSA for covered workers is $795 for single coverage and $1,417 for family coverage. Three percent of covered workers are enrolled in a plan where the firm matches employee HSA contributions. For HDHP/HRAs, we refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA. Covered workers enrolled in a plan where the firm matches any employee contribution to an HSA account are not included in the average contribution (3% for single coverage and 3% for family coverage). Values shown in the table may not equal the sum of their component parts. The averages presented in the table are aggregated at the firm level and then averaged, which is methodologically more appropriate than adding the averages.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 8.10**

**Total Annual Costs (Premiums and Account Contributions) for Covered Workers in HDHP/SOs, for Family Coverage, by Firm Size, 2017**



* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. When those firms that do not contribute to the HSA (42% for single coverage and 46% for family coverage) are excluded from the calculation, the average firm contribution to the HSA for covered workers is $795 for single coverage and $1,417 for family coverage. Three percent of covered workers are enrolled in a plan where the firm matches employee HSA contributions. For HDHP/HRAs, we refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA. Covered workers enrolled in a plan where the firm matches any employee contribution to an HSA account are not included in the average contribution (3% for single coverage and 3% for family coverage). Values shown in the table may not equal the sum of their component parts. The averages presented in the table are aggregated at the firm level and then averaged, which is methodologically more appropriate than adding the averages.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667216

Exhibit 142

JA-0002109

**Figure 8.11**
**Average Annual Premiums for Covered Workers with Family Coverage, by Plan Type, 2007-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

**Figure 8.12**
**Average Annual Premiums for Covered Workers with Single Coverage, by Plan Type, 2007-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

**667217**

Exhibit 142                                                                 JA-0002110

## PLAN DEDUCTIBLES

- As expected, workers enrolled in HDHP/SOs have higher deductibles than workers enrolled in HMOs, PPOs, or POS plans.
  - The average general annual deductible for single coverage is $2,129 for HDHP/HRAs and $2,433 for HSA-qualified HDHPs [Figure 8.14]. These averages are similar to the amounts reported in recent years. There is wide variation around these averages: 19% of covered workers enrolled in an HDHP/SO are in a plan with a deductible of $1,000 to $1,499 while 24% are in a plan with a deductible of $3,000 or more [Figure 8.13].

- The survey asks firms whether the family deductible amount is (1) an aggregate amount (i.e., the out-of-pocket expenses of all family members are counted until the deductible is satisfied), or (2) a per-person amount that applies to each family member (typically with a limit on the number of family members that would be required to meet the deductible amount) (see Section 7 for more information).
  - The average aggregate deductibles for workers with family coverage are $4,448 for HDHP/HRAs and $4,647 for HSA-qualified HDHPs [Figure 8.7]. As with single coverage, there is wide variation around these averages for family coverage: 18% of covered workers enrolled in HDHP/SOs with an aggregate family deductible have a deductible of $2,000 to $2,999 while 22% have a deductible of $6,000 dollars or more [Figure 8.15].

**Figure 8.13**

**Distribution of Covered Workers with the Following General Annual Deductible Amounts for Single Coverage, HSA-Qualified HDHPs and HDHP/HRAs, By Firm Size, 2017**





NOTE: In HSA-qualified HDHPs, the legal minimum deductible for 2017 is $1,300 for single coverage and $2,600 for family coverage. Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667218**

Exhibit 142

JA-0002111

**Figure 8.14**

**General Annual Deductible for Workers In an HDHP/SO After Any Employer Account Contributions for Single Coverage, by Firm Size, 2017**

| | HDHP/HRA | HSA-Qualified HDHP | HDHP/SO |
|---|---|---|---|
| **General Annual Deductible for Single Coverage** | | | |
| All Small Firms (3-199 Workers) | $3,072* | $3,416* | $3,298* |
| All Large Firms (200 or More Workers) | $1,699* | $2,164* | $1,995* |
| **ALL FIRMS** | $2,129 | $2,433 | $2,304 |
| **General Annual Deductible After Any HRA or HSA Contributions** | | | |
| All Small Firms (3-199 Workers) | $839 | $2,580* | $1,889* |
| All Large Firms (200 or More Workers) | $880 | $1,610* | $1,350* |
| **ALL FIRMS** | $867 | $1,823 | $1,479 |

NOTE: The net liability for covered workers enrolled in a plan with an HSA or HRA is calculated by subtracting the account contribution from the single coverage deductible. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. General annual deductibles are for in-network services

Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017



**Figure 8.15**

**Distribution of Covered Workers with the Following Aggregate Family Deductible Amounts, HDHP/HRAs and HSA-Qualified HDHPs, 2017**

NOTE: The deductible averages for family coverage are for covered workers that face an aggregate amount. Twenty-one percent of covered workers enrolled in HDHP/HRA plans and 13.3% of covered workers in HSA-qualified HDHPs are in plans with a separate per person amount. In HSA-qualified HDHPs, the legal minimum deductible for 2017 is $1,300 for single coverage and $2,600 for family coverage.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## OUT-OF-POCKET MAXIMUM AMOUNTS

- HSA-qualified HDHPs are legally required to have an annual out-of-pocket maximum of no more than $6,550 for single coverage and $13,100 for family coverage in 2017. Non-grandfathered HDHP/HRA plans starting in 2017 are required to have out-of-pocket maximums of no more than $7,150 for single coverage and $14,300 for family coverage. Virtually all HDHP/HRA plans have an out of pocket maximum for single coverage in 2017.

    - The average annual out-of-pocket maximum for single coverage is $4,083 for HDHP/HRAs and $4,271 for HSA-qualified HDHPs [Figure 8.7].

**667219**

Exhibit 142

JA-0002112

# EMPLOYER CONTRIBUTIONS TO PREMIUMS AND SAVINGS OPTIONS

- Employers contribute to HDHP/SOs in two ways: through their contributions toward the premium for the health plan and through their contributions (if any, in the case of HSAs) to the savings account option (i.e., the HRAs or HSAs themselves).

    - Looking at only the annual employer contributions to premiums, covered workers in HDHP/HRAs on average receive employer contributions of $5,222 for single coverage and $13,817 for family coverage [Figure 8.8]. These amounts are similar to the contribution amounts last year.

    - The average annual employer contributions to premiums for workers in HSA-qualified HDHPs are $4,855 for single coverage and $12,532 for family coverage, similar to the contribution amounts last year. The average employer contribution for covered workers in HSA-qualified HDHPs for single coverage is lower than the average contribution for covered workers in plans that are not HDHP/SOs [Figure 8.8].

- Looking at employer contributions to the savings options, covered workers enrolled in HDHP/HRAs on average receive an annual employer contribution to their HRA of $1,351 for single coverage and $2,444 for family coverage [Figure 8.8].

    - HRAs are generally structured in such a way that employers may not actually spend the whole amount that they make available to their employees' HRAs.[3] Amounts committed to an employee's HRA that are not used by the employee generally roll over and can be used in future years, but any balance may revert back to the employer if the employee leaves his or her job. Thus, the employer contribution amounts to HRAs that we capture in the survey may exceed the amount that employers will actually spend.

- Covered workers enrolled in HSA-qualified HDHPs on average receive an annual employer contribution to their HSA of $608 for single coverage and $1,086 for family coverage [Figure 8.8]. These amounts do not include the 3% of covered workers in HSA-qualified HDHPs whose employers say they vary account contributions based on certain factors, such as job classification or participation in a wellness program [Figure 8.18].

    - In many cases, employers that sponsor HSA-qualified HDHP/SOs do not make contributions to HSAs established by their employees. Forty-seven percent of employers offering single coverage and 46% offering family coverage through HSA-qualified HDHPs do not make contributions toward the HSAs that their workers establish. Twenty-three percent of workers with single coverage and 23% of workers with family coverage in an HSA-qualified HDHP do not receive an account contribution from their employer [Figures 8.16 and 8.17].

    - The average HSA contributions reported above include the portion of covered workers whose employer contribution to the HSA is zero. When those firms that do not contribute to the HSA are excluded from the calculation, the average employer contribution for covered workers is $795 for single coverage and $1,417 for family coverage.

    - The percentage of covered workers enrolled in a plan where the employer makes no HSA contribution for single and family coverage (23%) is similar to the percentage in recent years.

- Employer contributions to savings account options (i.e., the HRAs and HSAs themselves) for their workers can be added to their health plan premium contributions to calculate total employer contributions toward HDHP/SOs. We note that HRAs are a promise by an employer to pay up to a specified amount and that many employees will not receive the full amount of their HRA in a year, so adding the employer premium contribution amount and the HRA contribution represents an upper bound for employer liability that overstates the amount that is actually expended. Since employer contributions to employee HSA accounts immediately transfer the full amount to the employee, adding employer premium and HSA contributions is a good way to look at their total liability under these plans.

    - For HDHP/HRAs, the average annual total employer contribution for covered workers is $6,573 for single coverage and $16,261 for family coverage. The average total employer contribution amounts for covered workers for single

---

[3] The survey asks "Up to what dollar amount does your firm promise to contribute each year to an employee's HRA or health reimbursement arrangement for single coverage?" We refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. As discussed, HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA. Some employers may make their HRA contribution contingent on other factors, such as completing wellness programs.

**667220**

Exhibit 142

JA-0002113

coverage and family coverage in HDHP/HRAs are higher than the average amount that employers contribute toward family coverage in health plans that are not HDHP/SOs [Figure 8.8].

– For HSA-qualified HDHPs, the average total annual firm contribution for covered workers is $5,473 for single coverage and $13,608 for workers with family coverage. The average total firm contribution amounts for single and family coverage in HSA-qualified HDHPs are similar to the average firm contributions toward single and family coverage in health plans that are not HDHP/SOs [Figure 8.8].

• There is considerable variation in the amount that employers contribute to savings accounts.

– Forty-six percent of covered workers in an HDHP/HRA have an annual HRA contribution of less than $800, while 22% have an annual HRA contribution of $1,600 or more.

– Thirty-seven percent of covered workers in an HSA-qualified HDHP have an annual HSA contribution of less than $400, including 23% that have no HSA contribution from their employer. In contrast, 12% of covered workers in an HSA-qualified HDHP have an annual HSA contribution of $1,200 or more. These percentages do not include the 3% of covered workers with an employer that matches their HSA contribution.

**Figure 8.16**
**Distribution of Covered Workers with the Following Annual Employer Contributions to Their HRA or HSA, for Single Coverage, 2017**



NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667221**

Exhibit 142

JA-0002114

**Figure 8.17**
**Distribution of Covered Workers with the Following Annual Employer Contributions to Their HRA or HSA, for Family Coverage, 2017**



NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 8.18**
**Among Firms Offering Family Coverage and an HSA-Qualified HDHP, Percentage of Firms That Vary Their HSA Contribution on Anything Other Than Number of Dependents, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
NOTE: Includes firms who vary contributions based on participation in a wellness program, employee contributions, or job classification
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667222**

Exhibit 142

JA-0002115

### Figure 8.19
### Among Firms Offering an HSA-Qualified HDHP, Percentage of Firms That Contribute to the HSA through a Section 125 Cafeteria Plan, by Firm Size, 2017



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

NOTE: A Section 125 cafeteria plan allows employees to receive certain benefits, such as health insurance premiums, on a pretax basis. Under this arrangement, some employees may be able to elect to place money into an HSA account or into other benefit options.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

### Figure 8.20

Average Annual Employer Contributions to HSA Accounts for Covered Workers Enrolled in an HSA-Qualified HDHP, 2009–2017

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|
| **Among All Workers Enrolled in an HSA-Qualified HDHP, Average Employer Account Contribution** | | | | | | | | | |
| *Single Coverage* | | | | | | | | | |
| All Small Firms (3-199 Workers) | $1,119 | $969 | $1,186 | $1,248 | $1,384 | $1,519 | $1,224 | $1,486 | $1,537 |
| All Large Firms (200 or More Workers) | $946 | $798 | $647 | $676 | $737 | $707 | $667 | $707 | $670 |
| **ALL FIRMS** | **$1,000** | **$858** | **$886** | **$919** | **$951** | **$1,006** | **$809** | **$916** | **$795** |
| *Family Coverage* | | | | | | | | | |
| All Small Firms (3-199 Workers) | $2,077 | $1,696 | $1,671 | $2,951 | $2,383 | $2,161 | $1,636 | $2,332 | $2,192 |
| All Large Firms (200 or More Workers) | $1,121 | $1,431 | $1,241 | $1,119 | $1,337 | $1,297 | $1,361 | $1,361 | $1,253 |
| **ALL FIRMS** | **$1,640** | **$1,546** | **$1,559** | **$1,611** | **$1,675** | **$1,744** | **$1,412** | **$1,617** | **$1,412** |
| | | | | | | | | | |
| **Among Workers Enrolled in a Plan With an Employer Account Contribution, Average Employer Contribution to HSAs** | | | | | | | | | |
| *Single Coverage* | | | | | | | | | |
| All Small Firms (3-199 Workers) | $698 | $542 | $815 | $848 | $542 | $1,142 | $776 | $968 | $873 |
| All Large Firms (200 or More Workers) | $450 | $967 | $446 | $402 | $567 | $544 | $461 | $563 | $536 |
| **ALL FIRMS** | **$688** | **$858** | **$611** | **$609** | **$658** | **$769** | **$568** | **$688** | **$608** |
| *Family Coverage* | | | | | | | | | |
| All Small Firms (3-199 Workers) | $1,164 | $929 | $1,737 | $1,473 | $1,429 | $1,500 | $1,700 | $1,487 | $1,295 |
| All Large Firms (200 or More Workers) | $811 | $1,087 | $864 | $796 | $992 | $876 | $901 | $1,084 | $999 |
| **ALL FIRMS** | **$1,126** | **$1,006** | **$1,089** | **$1,070** | **$1,154** | **$1,346** | **$991** | **$1,208** | **$1,086** |

NOTE: In 2017, 22% of covered workers in an HSA-qualified single coverage plan and 23% of workers in family coverage were enrolled in plans in which an employer contribution to the account. Covered workers enrolled in a plan where the firm makes an employee contribution to the HSA account are not included in the average contribution. 3% for single coverage and 3% for family coverage.

* Estimate is statistically different from estimate for the previous year shown (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**667223**

Exhibit 142

JA-0002116

**Figure 8.21**

## Average Annual Employer Contributions to HSA and HRA Accounts, 2017

|  | Average Employer Account Contribution |
|---|:---:|
| **HSA for Single Coverage** | |
| All Small Firms (3-199 Workers) | $870* |
| All Large Firms (200 or More Workers) | $535* |
| **ALL FIRMS** | **$608** |
| | |
| **HSA for Family Coverage** | |
| All Small Firms (3-199 Workers) | $1,396* |
| All Large Firms (200 or More Workers) | $999* |
| **ALL FIRMS** | **$1,086** |
| | |
| **HRA for Single Coverage** | |
| All Small Firms (3-199 Workers) | $2,494* |
| All Large Firms (200 or More Workers) | $830* |
| **ALL FIRMS** | **$1,351** |
| | |
| **HRA for Family Coverage** | |
| All Small Firms (3-199 Workers) | $4,472* |
| All Large Firms (200 or More Workers) | $1,523* |
| **ALL FIRMS** | **$2,444** |

NOTE: When those firms that do not contribute to the HSA (47% for single coverage and 46% for family coverage) are excluded from the calculation, the average firm contribution to the HSA for covered workers is $795 for single coverage and $1,417 for family coverage. Three percent of covered workers are enrolled in a plan where the firm matches employee HSA contributions. Covered workers enrolled in a plan where the firm matches any employee contribution to an HSA account are not included in the average contribution (3% for single coverage and 3% for family coverage). For HDHP/HRAs, we refer to the amount that the employer commits to make available to an HRA as a contribution for ease of discussion. HRAs are notional accounts, and employers are not required to actually transfer funds until an employee incurs expenses. Thus, employers may not expend the entire amount that they commit to make available to their employees through an HRA.

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667224**

Exhibit 142

JA-0002117

## COST-SHARING FOR OFFICE-VISITS

- The cost-sharing pattern for primary care office visits differs for workers enrolled in HDHP/SOs. Thirty-nine percent of covered workers in HDHP/HRAs have a copayment for primary care physician office visits compared to 7% enrolled in an HSA-qualified HDHP [Figure 8.22]. Workers in other plan types are much more likely to face copayments than coinsurance for physician office visits (see Section 7 for more information).

**Figure 8.22**

**Distribution of Covered Workers In HDHP/HRAs and HSA-Qualified HDHPs With the Following Types of Cost Sharing In Addition to the General Annual Deductible, 2017**

|  | HDHP/HRA | HSA-Qualified HDHP | HDHP/SO |
|---|---|---|---|
| **Separate Cost Sharing for Primary Care Physician Office Visits** | | | |
| Copayment | 39% | 7% | *8% |
| Coinsurance | 48% | 69% | 62% |
| None | 13% | 21% | *8% |
| Other | 3% | 3% | 3% |
| **Separate Cost Sharing for Specialty Care Physician Office Visits** | | | |
| Copayment | 32% | 7% | *6% |
| Coinsurance | 54% | 70% | 66% |
| None | 11% | 20% | *7% |
| Other | 3% | 3% | 3% |

NOTE: The survey asks firms about the characteristics of either their largest HRA or HSA-Qualified HDHP. The HDHP/SO category is the aggregate of both the HRA and HSA plans. For more information see the Methods Section.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Health Reimbursement Arrangements (HRAs)** are medical care reimbursement plans established by employers that can be used by employees to pay for health care. HRAs are funded solely by employers. Employers may commit to make a specified amount of money available in the HRA for premiums and medical expenses incurred by employees or their dependents. HRAs are accounting devices, and employers are not required to expend funds until an employee incurs expenses that would be covered by the HRA. Unspent funds in the HRA usually can be carried over to the next year (sometimes with a limit). Employees cannot take their HRA balances with them if they leave their job, although an employer can choose to make the remaining balance available to former employees to pay for health care. HRAs often are offered along with a high-deductible health plan (HDHP). In such cases, the employee pays for health care first from his or her HRA and then out-of-pocket until the health plan deductible is met. Sometimes certain preventive services or other services such as prescription drugs are paid for by the plan before the employee meets the deductible.

**Health Savings Accounts (HSAs)** are savings accounts created by individuals to pay for health care. An individual may establish an HSA if he or she is covered by a "qualified health plan" – a plan with a high deductible (i.e., a deductible of at least $1,300 for single coverage and $2,600 for family coverage in 2017) that also meets other requirements. Employers can encourage their employees to create HSAs by offering an HDHP that meets the federal requirements. Employers in some cases also may assist their employees by identifying HSA options, facilitating applications, or negotiating favorable fees from HSA vendors. Both employers and employees can contribute to an HSA, up to the statutory cap of $3,400 for single coverage and $6,750 for family coverage in 2017. Employee contributions to the HSA are made on a pre-income tax basis, and some employers arrange for their employees to fund their HSAs through payroll deductions. Employers are not required to contribute to HSAs established by their employees but if they elect to do so, their contributions are not taxable to the employee. Interest and other earnings on amounts in an HSA are not taxable. Withdrawals from the HSA by the account owner to pay for qualified health care expenses are not taxed. The savings account is owned by the individual who creates the account, so employees retain their HSA balances if they leave their job.[4]

---

[4] See U.S. Department of the Treasury, Health Savings Accounts, available at http://www.irs.gov/pub/irs-drop/rp-14-30.pdf

**667225**

Exhibit 142

JA-0002118



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Prescription
Drug Benefits

SECTION

9

667226

Exhibit 142    JA-0002119

# Section 9

# Prescription Drug Benefits

Almost all covered workers have coverage for prescription drugs. Over the years that we have conducted the survey, coverage for prescriptions has become more complex as employers and insurers expanded the use of formularies with multiple cost-sharing tiers as well as other management approaches. Collecting information about these practices is challenging and was burdensome to respondents with multiple plans to report on.

Beginning in 2016, to reduce burden on respondents, we revised the survey to ask respondents about the attributes of prescription drug coverage only in their largest health plan; previously, we asked about prescription coverage in their largest plan for each of the plan types that they offered. After reviewing the responses and comparing them to prior years where we asked about each plan type, we find that the information we are receiving is quite similar to responses from previous years. For this reason, we will continue to report our results for these questions weighted by the number of covered workers in responding firms. There is a more detailed discussion in the survey design and methods section on this topic.

In addition, because of the significant policy interest in access to and the cost of specialty drugs, in 2016 we also began asking employers to report separately about the cost sharing for tiers that cover only specialty drugs. In cases in which a tier covers only specialty drugs, we report its attributes under the specialty banner, rather than as one of the standard tiers. This entails revising the way we group formulary tiers: for example, a three-tier formulary where the third tier covers exclusively specialty drugs is now consider a two-tier plan with an additional tier. This approach allows us to report on the cost sharing for specialty drugs regardless of the number of tiers in the formulary. For this reason, we are not presenting statistical comparisons of estimates relying on tiers to prior years.[1] This change is also discussed more fully in the survey design and methods section.

- Nearly all (99%) covered workers work at a firm that provides prescription drug coverage in their largest health plan.

## DISTRIBUTION OF COST-SHARING

- A large share of covered workers (91%) are in a plan with a tiered cost-sharing formula for prescription drugs [Figure 9.1]. Cost-sharing tiers generally refer to a health plan placing a drug on a formulary or preferred drug list that classifies drugs into categories that are subject to different cost sharing or management. It is common for there to be different tiers for generic, preferred and non-preferred drugs. In recent years, plans have created additional tiers which, for example, may be used for lifestyle drugs or expensive biologics. Some plans may have multiple tiers for different categories; for example, a plan may have preferred and non-preferred specialty tiers. The survey obtains information about the cost-sharing structure for up to five tiers.

- Eighty-three percent of covered workers are in a plan with three, four, or more tiers of cost sharing for prescription drugs [Figure 9.1]. These totals include tiers that cover only specialty drugs, even though the cost-sharing information for those tiers is reported separately.

  – HDHP/SOs have a different cost-sharing pattern for prescription drugs than other plan types. Covered workers in HDHP/SOs are more likely to be in a plan with the same cost sharing regardless of drug type (15% vs. 2%) or in a plan that has no cost sharing for prescriptions once the plan deductible is met (13% vs. <1%) as compared to covered workers in other types of plans [Figure 9.2].

---

[1] See the Methods Section for more information. In cases in which a firm indicated that one of their tiers was exclusively for specialty drugs, we reported the cost-sharing structure and any copay or coinsurance information under the specialty drug banner. Therefore, a firm that has three tiers of cost sharing may only have plan attributes for the generic and preferred tiers.

**667227**

Exhibit 142

JA-0002120

**Figure 9.1**

**Distribution of Covered Workers Facing Different Cost-Sharing Formulas for Prescription Drug Benefits, by Firm Size, 2017**



* Distribution is statistically different between Small Firm and Large Firm distributions (p < .05)

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Number of tiers include any tiers specifically for specialty drugs. Excluding tiers specifically for specialty drugs, 14% of covered workers with prescription drug coverage are enrolled in a plan with four or more tiers, 65% have three tiers, 13% have two tiers, 7% have the same cost sharing regardless of the drug, and 2% have no cost sharing after the deductible is met. For more information on the definition of specialty drugs and how this survey defines drug formulary tiers, see section 9.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 9.2**

**Distribution of Covered Workers Facing Different Cost-Sharing Formulas for Prescription Drug Benefits, by Plan Type, 2017**



* Distribution is statistically different between HDHP/SO Plan and Non-HDHP/SO distributions (p < .05).

NOTE: Number of tiers include any tiers specifically for specialty drugs. Excluding tiers specifically for specialty drugs, 14% of covered workers with prescription drug coverage are enrolled in a plan with four or more tiers, 65% have three tiers, 13% have two tiers, 7% have the same cost sharing regardless of the drug, and 2% have no cost sharing after the deductible is met. For more information on the definition of specialty drugs and how this survey defines drug formulary tiers, see section 9.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667228**

Exhibit 142

JA-0002121

# AVERAGE COST-SHARING NOT INCLUDING TIERS EXCLUSIVELY COVERING SPECIALTY DRUGS

- Even when formulary tiers covering only specialty drugs are not included, a large share (77%) of covered workers are in a plan with three or more tiers of cost sharing for prescription drugs. The cost-sharing statistics presented in this section do not include information about tiers that cover only specialty drugs. In cases in which a plan covers specialty drugs on a tier with other drugs, they will still be included in these averages. Cost-sharing statistics for tiers covering only specialty drugs are presented in the next section.

- For covered workers in a plan with three or more tiers of cost sharing for prescription drugs, copayments are the most common form of cost sharing in the first three tiers and coinsurance is the next most common. Among those with a fourth tier, the difference between the percentage with a copayment and a coinsurance requirement is not statistically significant [Figure 9.3].

  - Among covered workers in plans with three or more tiers of cost sharing for prescription drugs, the average copayments are $11 for first-tier drugs, $33 second-tier drugs, $59 for third-tier drugs, and $110 for fourth-tier drugs [Figure 9.6].

  - Among covered workers in plans with three or more tiers of cost sharing for prescription drugs, the average coinsurance rates are 17% for first-tier drugs, 25% second-tier drugs, 38% third-tier drugs, and 28% for fourth-tier drugs [Figure 9.6].

- Eleven percent of covered workers are in a plan with two tiers for prescription drug cost sharing (excluding tiers covering only specialty drugs).

  - For these workers, copayments are more common than coinsurance for both first-tier and second-tier drugs. The average copayment for the first tier is $11 and the average copayment for the second tier is $30 [Figure 9.3].

- Seven percent of covered workers are in a plan with the same cost sharing for prescriptions regardless of the type of drug (excluding tiers covering only specialty drugs).

  - Among these workers, 21% have copayments and 79% have coinsurance [Figure 9.3]. The average coinsurance rate is 19% and the average copayment is $11 [Figure 9.7].

  - Twenty-one percent of these workers are in a plan that limits coverage for prescriptions to generic drugs [Figure 9.9].

- Coinsurance rates for prescription drugs often have maximum and/or minimum dollar amounts associated with the coinsurance rate. Depending on the plan design, coinsurance maximums may significantly limit the amount an enrollee must spend out-of-pocket for higher cost drugs.

- These coinsurance minimum and maximum amounts vary across the tiers.

  - For example, among covered workers in a plan with coinsurance for the first cost-sharing tier, 25% have only a maximum dollar amount attached to the coinsurance rate, 8% have only a minimum dollar amount, 18% have both a minimum and maximum dollar amount, and 49% have neither. For those in a plan with coinsurance for the fourth cost-sharing tier, 52% have only a maximum dollar amount attached to the coinsurance rate, 4% have only a minimum dollar amount, 12% have both a minimum and maximum dollar amount, and 33% have neither. [Figure 9.8].

**667229**

Exhibit 142                                                                                                    JA-0002122

**Figure 9.3**
**Among Workers with Prescription Drug Coverage, Distribution of Covered Workers with the**
**Following Types of Cost Sharing for Prescription Drugs, 2017**



NOTE: Number of tiers refers to the number of tiers excluding those specifically for specialty drugs. 'Copay or Coinsurance Plus Any Difference' category includes workers who pay a copayment or coinsurance plus the difference between the cost of the prescription and the cost of a comparable generic drug.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667230**

Exhibit 142

JA-0002123

Figure 9.4

**Among Workers With Three or More Tiers of Cost Sharing, Distribution of Covered Workers With the Following Types of Cost Sharing for Prescription Drugs, by Firm Size, 2017**

| | Copayment | Coinsurance | No Cost Sharing for Generic Drugs | Some Other Amount |
|---|---|---|---|---|
| **First-Tier Drugs, Often Called Generics** | | | | |
| All Small Firms | 91%* | 4%* | 4% | 1% |
| All Large Firms | 78%* | 12%* | 8% | 2% |
| All Firms | 81% | 10% | 7% | 2% |
| | | | **Copay or Coinsurance Plus Any Difference** | |
| **Second-Tier Drugs, Often Called Preferred Drugs** | | | | |
| All Small Firms | 93%* | 6%* | 0% | 1% |
| All Large Firms | 62%* | 36%* | <1% | 1% |
| All Firms | 71% | 28% | <1% | 1% |
| **Third-Tier Drugs, Often Called Non-Preferred Drugs** | | | | |
| All Small Firms | 88%* | 11%* | 0% | 1% |
| All Large Firms | 59%* | 38%* | <1% | 3% |
| All Firms | 67% | 30% | <1% | 2% |
| **Fourth-Tier Drugs** | | | | |
| All Small Firms | 55% | 35% | 0% | 10% |
| All Large Firms | 42% | 45% | 3% | 10% |
| All Firms | 48% | 40% | 2% | 10% |

NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Among covered workers enrolled in a plan with three or more tiers, 85% of covered workers are enrolled in a plan where the first tier only covers generic drugs. 'Number of tiers' refers to the number of tiers excluding those specifically for specialty drugs. 'Copay or Coinsurance Plus Any Difference' category includes workers who pay a copayment or coinsurance plus the difference between the cost of the prescription and the cost of a comparable generic drug.

* Estimates are statistically different between Small Firm and Large Firm estimates within category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667231**

Exhibit 142

JA-0002124

**Figure 9.5**

**Among Covered Workers With Three or More Tiers of Prescription Cost Sharing, Distribution of Covered Workers With the Following Types of Cost Sharing for Prescription Drugs, by Plan Type, 2017**

| | Copayment | Coinsurance | No Cost Sharing for Generic Drugs | Some Other Amount |
|---|---|---|---|---|
| **First-Tier Drugs, Often Called Generics** | | | | |
| HDHP/SO Plans | 64%* | 16%* | 19% | 1% |
| Non-HDHP/SO Plans | 86%* | 8%* | 4% | 2% |
| ALL FIRMS | 81% | 10% | 7% | 2% |
| | | | **Copay or Coinsurance Plus Any Difference** | |
| **Second-Tier Drugs, Often Called Preferred Drugs** | | | | |
| HDHP/SO Plans | 46%* | 53%* | 0% | <1% |
| Non-HDHP/SO Plans | 77%* | 21%* | <1% | 1% |
| ALL FIRMS | 71% | 28% | <1% | 1% |
| **Third-Tier Drugs, Often Called Non-Preferred Drugs** | | | | |
| HDHP/SO Plans | 44%* | 56%* | 0% | 1% |
| Non-HDHP/SO Plans | 73%* | 24%* | <1% | 2% |
| ALL FIRMS | 67% | 30% | <1% | 2% |
| **Fourth-Tier Drugs** | | | | |
| HDHP/SO Plans | 27%* | 66%* | 0% | 7% |
| Non-HDHP/SO Plans | 52%* | 35%* | 2% | 10% |
| ALL FIRMS | 48% | 40% | 2% | 10% |

NOTE: Among covered workers enrolled in a plan with three or more tier tiers, 86% of covered workers are enrolled in a plan where the first tier only covers generic drugs. Number of tiers refers to the number of tiers excluding those specifically for specialty drugs. 'Copay or Coinsurance Plus Any Difference' category includes workers who pay a copayment or coinsurance plus the difference between the cost of the prescription and the cost of a comparable generic drug.

* Estimates are statistically different between plan type estimates within category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667232**

Exhibit 142

JA-0002125

**Figure 9.6**

## Among Covered Workers With Three or More Tiers of Prescription Drug Cost Sharing, Average Copayments and Coinsurance, 2017

|  | Cost Sharing for Covered Workers Enrolled In Plans With Three or More Tiers |
|---|---|
| **Average Copay** | |
| First Tier Copay | $11 |
| Second Tier Copay | $33 |
| Third Tier Copay | $59 |
| Fourth Tier Copay | $110 |
| | |
| **Average Coinsurance** | |
| First Tier Coinsurance | 17% |
| Second Tier Coinsurance | 25% |
| Third Tier Coinsurance | 38% |
| Fourth Tier Coinsurance | 28% |

NOTE. Among covered workers enrolled in a plan with three or more tier tiers. 86% of covered workers are enrolled in a plan where the first tier only covers generic drugs. Number of tiers refers to the number of tiers excluding those specifically for specialty drugs.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667233**

Exhibit 142

JA-0002126

### Figure 9.7

**Among Covered Workers With Prescription Drug Coverage, Average Copayments and Coinsurance, 2017**

|  | Average Copay | Average Coinsurance |
|---|---|---|
| **Plans With Three or More Tiers** | | |
| First Tier | $11 | 17% |
| Second Tier | $33 | 25% |
| Third Tier | $59 | 38% |
| Fourth Tier | $110 | 28% |
| | | |
| **Plans With Two Tiers** | | |
| First Tier | $11 | NSD |
| Second Tier | $30 | 29% |
| | | |
| **Plans With the Same Cost-Sharing For All Covered Drugs** | | |
| First Tier | $11 | 19% |

NOTE: Number of tiers refers to the number of tiers excluding those specifically for specialty drugs.
NSD: Not Sufficient Data
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

### Figure 9.8

**Distribution of Coinsurance Structures for Covered Workers Facing a Coinsurance for Prescription Drugs, 2017**



SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667234**

Exhibit 142

JA-0002127



**Figure 9.9**
**Among Covered Workers with Prescription Drug Coverage, Coverage of Generic Drugs by Plan Design, 2017**

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## SPECIALTY DRUGS

- Specialty drugs, such as biologics that may be used to treat chronic conditions or some cancer drugs, can be quite expensive and often require special handling and administration. We revised our questions beginning with the 2016 survey to obtain more information about formulary tiers that are exclusively for specialty drugs. We are reporting results only among large firms because a substantial share of small firms were unsure whether their largest plan covered these drugs.

  - Ninety-seven percent of covered workers at large firms have coverage for specialty drugs [Figure 9.10]. Among these workers, 47% are in a plan with at least one cost-sharing tier just for specialty drugs [Figure 9.11].

  - Among covered workers in a plan with a separate tier for specialty drugs, 45% have a copayment for specialty drugs and 46% have a coinsurance [Figure 9.12]. The average copayment is $101 and the average coinsurance rate is 27% [Figure 9.13]. Eighty percent of those with a coinsurance have a maximum dollar limit on the amount of coinsurance they must pay.

- Some covered workers are also required to meet a deductible before the plan covers specialty drugs. Among covered workers enrolled in a plan with a deductible and specialty drug coverage, 29% must meet the general annual deductible and 15% must meet a separate drug deductible before specialty drugs are covered [Figure 9.14].

**667235**

Exhibit 142                                                                                    JA-0002128

**Figure 9.10**
**Among Large Firms Whose Prescription Drug Coverage Includes Specialty Drugs, Percentage of Covered Workers Whose Plan with the Largest Enrollment Includes Coverage for Specialty Drugs, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

NOTE: Large Firms have 200 or more workers.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 9.11**
**Among Large Firms Whose Prescription Drug Coverage Includes Specialty Drugs, Percentage of Covered Workers Enrolled in a Plan That Has a Separate Tier for Specialty Drugs, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05).

NOTE: Large Firms have 200 or more workers.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667236**

Exhibit 142

JA-0002129

**Figure 9.12**

**Among Covered Workers at Large Firms Enrolled in a Plan with a Separate Tier for Specialty Drugs, Distribution of Covered Workers with the Following Types of Cost Sharing, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size within each category (p < .05)
NOTE: Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 9.13**

**Among Covered Workers at Large Firms Enrolled In a Plan With a Separate Tier for Specialty Drugs, Average Copayments and Coinsurance, by Firm Size, 2017**

| FIRM SIZE | Average Copay | Average Coinsurance |
|---|---|---|
| 200-999 Workers | $90 | 24% |
| 1,000-4,999 Workers | 89 | 27 |
| 5,000 or More Workers | 111* | 28 |
| **ALL FIRMS** | **$101** | **27%** |

NOTE: Large Firms have 200 or more workers.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667237**

Exhibit 142

JA-0002130

**Figure 9.14**

**Among Covered Workers Enrolled in a Plan with a Deductible and Specialty Drug Coverage, Percentage of Workers Enrolled in a Plan with Specialty Drugs Subject to a Deductible, by Firm Size, 2017**



NOTE: Small Firms have 3-199 workers and Large Firms have 200 or more workers. Seventy-nine percent of covered workers in small firms and 86% of covered workers in large firms are enrolled in a plan with either a general annual deductible or a separate annual deductible for prescription drugs.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## SEPARATE ANNUAL DRUG DEDUCTIBLES

- In addition to other cost sharing, some covered workers are also required to meet a separate prescription drug deductible before the plan covers some or all drugs. Fifteen percent of covered workers are in a plan with a separate annual deductible for prescription drugs [Figure 9.15]. These prescription drug deductibles are separate from any general annual deductible and may apply to all or a select number of tiers.

  - For 57% of covered workers in firms with a separate deductible for prescription drugs, the deductible applies to all drugs on each of the formulary tiers [Figure 9.16].

  - The average annual deductible among covered workers in firms who face a separate annual deductible is $149 [Figure 9.16].

**667238**

Exhibit 142                                                                JA-0002131

**Figure 9.15**

**Among Covered Workers with Prescription Drug Coverage, Percentage of Workers with a Separate Annual Deductible That Applies Only to Prescription Drugs, by Firm Size, 2005-2017**



Tests found no statistical difference from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2005-2017

**Figure 9.16**

**Percentage of Covered Workers With Drug Coverage Who Face a Separate Drug Deductible and Value of Drug Deductible, by Firm Size, 2017**

| | Percentage of Covered Workers With Drug Coverage Who Face a Separate Drug Deductible | Average Value of Drug Deductible | Among Covered Workers With a Separate Drug Deductible Percentage Enrolled in a Plan Where Deductible Applies to All Drugs Covered by the Plan's Formulary |
|---|---|---|---|
| **FIRM SIZE** | | | |
| 200-999 Workers | 8%* | $142 | 42% |
| 1,000-4,999 Workers | 15 | 204 | 51 |
| 5,000 or More Workers | 22* | 111* | 58 |
| All Small Firms (3-199 Workers) | 9%* | $223* | 63% |
| All Large Firms (200 or More Workers) | 17%* | $132* | 55% |
| **ALL PLANS** | **15%** | **$149** | **57%** |

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Generic drugs**  Drugs that are no longer covered by patent protection and thus may be produced and/or distributed by multiple drug companies.

**Preferred drugs**  Drugs included on a formulary or preferred drug list; for example, a brand-name drug without a generic substitute.

**Non-preferred drugs**  Drugs not included on a formulary or preferred drug list; for example, a brand-name drug with a generic substitute.

**Fourth-tier drugs**  New types of cost-sharing arrangements that typically build additional layers of higher copayments or coinsurance for specifically identified types of drugs, such as lifestyle drugs or biologics.

**Specialty drugs**  Specialty drugs such as biological drugs are high cost drugs that may be used to treat chronic conditions

667239

Exhibit 142                                                                                                          JA-0002132

such as blood disorder, arthritis or cancer. Often times they require special handling and may be administered through injection or infusion.

**667240**

Exhibit 142

JA-0002133



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Plan
Funding

SECTION

10

667241

Exhibit 142                                                                JA-0002134

# Section 10

# Plan Funding

Many firms, particularly larger firms, choose to pay for the health services of their workers directly from their own funds rather than by purchasing health insurance for them. This is called self-funding. Federal law (the Employee Retirement Income Security Act of 1974, or ERISA) exempts self-funded plans established by private employers from most state insurance laws, including reserve requirements, mandated benefits, premium taxes, and consumer protection regulations. Sixty percent of covered workers are in a self-funded health plan. Self-funding is common among larger firms because they can spread the risk of costly claims over a large number of workers and dependents.

Many firms with self-funded plans also use insurance, often called stoploss coverage, to limit their liability for very large claims or an unexpected level of expenses. About three-fifths of covered workers in fully or partially self-funded plans are in plans with stoploss insurance.

- Sixty percent of covered workers are in a plan that is completely or partially self-funded, similar to last year [Figures 10.1 and 10.2].

    - The percentage of covered workers enrolled in self-funded plans has been stable in recent years across firm sizes [Figure 10.2].

    - As expected, covered workers in large firms are significantly more likely to be in a self-funded plan than covered workers in small firms (79% vs. 15%). The percentage of covered workers in self-funded plans increases as the number of workers in a firm increases. Eighty-one percent of covered workers in firms with 1,000 to 4,999 workers and 91% of covered workers in firms with 5,000 or more workers are in self-funded plans in 2017 [Figures 10.1 and 10.4].

**667242**

Exhibit 142                                                                                              JA-0002135

SECTION 10. PLAN FUNDING

**Figure 10.1**
**Percentage of Covered Workers Enrolled in a Self-Funded Plan, by Firm Size, 2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. Due to a change in the survey questionnaire, funding status was not asked of firms with conventional plans in 2006; therefore, conventional plan funding status is not included in the averages in this figure for 2006. For definitions of self-funded and fully insured plans, see the introduction to Section 10.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 10.2**
**Percentage of Covered Workers Enrolled in a Self-Funded Plan, by Firm Size, 1999-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. Overall, 60% of covered workers are in a partially or completely self-funded plan in 2017. Due to a change in the survey questionnaire, funding status was not asked of firms with conventional plans in 2006; therefore, conventional plan funding status is not included in the averages in this figure for 2006. For definitions of self-funded and fully insured plans, see the introduction to Section 10.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667243**

Exhibit 142

JA-0002136

**Figure 10.3**

**Percentage of Covered Workers Enrolled in a Self-Funded Plan, by Plan Type, 1999-2017**

|      | Conventional | HMO   | PPO   | POS   | HDHP/SO | All Plans |
|------|--------------|-------|-------|-------|---------|-----------|
| 1999 | 65%          | 16%   | 60%   | 42%   |         | 44%       |
| 2000 | 64%          | 23%*  | 63%   | 45%   |         | 49%       |
| 2001 | 65%          | 31%*  | 61%   | 42%   |         | 49%       |
| 2002 | 58%          | 27%   | 61%   | 40%   |         | 49%       |
| 2003 | 49%          | 29%   | 61%   | 44%   |         | 52%       |
| 2004 | 43%          | 29%   | 64%   | 48%   |         | 54%       |
| 2005 | 53%          | 32%   | 65%   | 36%   |         | 54%       |
| 2006 |              | 33%   | 63%   | 32%   | 50%     | 55%       |
| 2007 | 53%          | 34%   | 65%   | 34%   | 41%     | 55%       |
| 2008 | 47%          | 40%   | 64%   | 29%   | 35%     | 55%       |
| 2009 | 48%          | 40%   | 67%   | 25%   | 48%*    | 57%       |
| 2010 | 61%          | 41%   | 67%   | 32%   | 61%*    | 59%       |
| 2011 | 53%          | 41%   | 70%   | 26%   | 54%     | 60%       |
| 2012 | 38%          | 37%   | 70%   | 29%   | 54%     | 60%       |
| 2013 |              | 31%   | 70%   | 31%   | 62%     | 61%       |
| 2014 |              | 32%   | 71%   | 22%   | 60%     | 61%       |
| 2015 |              | 38%   | 70%   | 36%*  | 68%*    | 63%       |
| 2016 |              | 37%   | 69%   | 24%   | 67%     | 61%       |
| 2017 |              | 24%   | 67%   | 39%   | 71%     | 60%       |

NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. Information was not obtained for
conventional plans in 2006 and for HDHP/SO plans prior to 2006. Starting in 2013, information on conventional plans is included in
the PPO estimate. See the Survey Design and Methods section for more information. Due to a change in the survey questionnaire,
funding status was not asked of firms with conventional plans in 2006; therefore, conventional plan funding status is not included in
the averages in this figure for 2006. For definitions of self-funded and fully insured plans, see the Introduction to Section 10.

\* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

**667244**

Exhibit 142

JA-0002137

**Figure 10.4**

**Percentage of Covered Workers In a Self-Funded Plan, by Firm Size, Region, and Industry, 2017**

|  | Self-Funded (Employer Bears Some or All of Financial Risk) |
|---|---|
| **FIRM SIZE** | |
| 200-999 Workers | 47%* |
| 1.000-4.999 Workers | 81* |
| 5.000 or More Workers | 91* |
| **All Small Firms (3-199 Workers)** | **15%*** |
| **All Large Firms (200 or More Workers)** | **79%*** |
| **REGION** | |
| Northeast | 68%* |
| Midwest | 63 |
| South | 64 |
| West | 45* |
| **INDUSTRY** | |
| Agriculture/Mining/Construction | 45%* |
| Manufacturing | 56 |
| Transportation/Communications/Utilities | 72 |
| Wholesale | 59 |
| Retail | 64 |
| Finance | 63 |
| Service | 49* |
| State/Local Government | 78* |
| Health Care | 76* |
| **ALL FIRMS** | **60%** |

NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. For definitions of self-funded and fully insured plans. see the introduction to Section 10.

* Estimate is statistically different from estimate for all firms not in the indicated size. region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667245

Exhibit 142

JA-0002138

**Figure 10.5**

**Percentage of Covered Workers Enrolled In a Self-Funded Plan, by Plan Type and Firm Size, 2017**

|  | HMO | PPO | POS | HDHP/SO |
|---|---|---|---|---|
| **FIRM SIZE** |  |  |  |  |
| 200-999 Workers | 20% | 60% | 28% | 46%* |
| 1,000-4,999 Workers | 39 | 88* | 91* | 90* |
| 5,000 or More Workers | 35 | 95* | 90* | 99* |
| **ALL FIRMS** | 24% | 67% | 39% | 71% |

NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. For definitions of self-funded and fully insured plans, see the Introduction to Section 10.

* Estimate is statistically different from estimate for all other firms not in the indicated size category within plan type (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 10.6**

**Percentage of Covered Workers Enrolled In Self-Funded HMO, PPO, and HDHP/SO Plans, by Firm Size, 1999-2017**

|  | HMO | | | | | PPO | | | | | HDHP/SO | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 3-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All HMO Plans | 3-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All PPO Plans | 3-199 Workers | 200-999 Workers | 1,000-4,999 Workers | 5,000 or More Workers | All HDHP/SO Plans |
| 1999 | 5% | 14% | 20% | *9* | *8* | *9* | 69% | 84% | 87% | 60% |  |  |  |  |  |
| 2000 | 4% | 13% | 27% | 35%* | 23%* | 23% | 72% | 69% | 88% | 61% |  |  |  |  |  |
| 2001 | 14% | 23% | 32% | 40% | 31%* | 23% | 66% | 87% | 87% | 61% |  |  |  |  |  |
| 2002 | 10% | 18% | 37% | 38% | 27% | *15* | 61% | 83% | 93% | 61% |  |  |  |  |  |
| 2003 | 8% | 27% | 27% | 44% | 28% | *13* | 60% | 85% | 93% | 61% |  |  |  |  |  |
| 2004 | 4% | 18% | 48% | 40% | 29% | *13* | 63% | 85% | 93% | 64% |  |  |  |  |  |
| 2005 | 10% | 17% | 50% | 44% | 32% | 18% | 67% | 86% | 95% | 65% |  |  |  |  |  |
| 2006 | 3% | 29% | 54% | 47% | 33% | *9* | 61% | 85% | 97% | 63% | 7% | 57% | 51% | 100% | 50% |
| 2007 | *1* | 19% | 44% | 58% | 34% | *7* | 65% | 87% | 90%* | 65% | 4% | 27% | 88% | 97% | 41% |
| 2008 | 10% | 22% | 48% | 86% | 40% | *5* | 55% | 85% | 94% | 64% | 7% | 48% | 72% | 91% | 35% |
| 2009 | 6% | 26% | 50% | 67% | 40% | 21% | 55% | 87% | 93% | 67% | 18% | 36% | 81% | 96% | 48%* |
| 2010 | 9% | 23% | 59% | 65% | 41% | *18* | 69%* | 85% | 96% | 67% | 24% | 52% | 88% | 99% | 51%* |
| 2011 | 5% | 16% | 54% | 67% | 41% | *9* | 85% | 84% | 88% | 70% | 11% | 45% | 89% | 98% | 54%* |
| 2012 | *13* | 14% | 45% | 80% | 37% | 20% | 63% | 84% | 97% | 70% | 14% | 39% | 86% | 98% | 54% |
| 2013 | 10% | 12% | 50% | 52% | 31% | *8* | 68% | 87% | 98% | 70% | 17% | 57% | 83% | 97% | 62% |
| 2014 | 1%* | 22% | 59% | 47% | 32% | 21% | 67% | 86% | 98% | 71% | 15% | 48% | 85% | 97% | 60% |
| 2015 | 11% | 15% | 47% | 66% | 38% | 21%* | 63% | 89% | 94% | 70% | 18% | 59% | 89% | 99% | 68%* |
| 2016 | 5% | 23% | 44% | 70% | 37% | *7* | 61% | 91% | 95% | 69% | 20% | 38%* | 87% | 98% | 67% |
| 2017 | 5% | 20% | 39% | 35%* | 24% | *9* | 69% | 88% | 95% | 67% | 19% | 46% | 90% | 99% | 71% |

NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. Estimates for POS plans are not shown due to high relative standard errors. For definitions of self-funded and fully insured plans, see the Introduction to Section 10. Information on funding status for HDHP/SOs was not collected prior to 2006.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017

## STOPLOSS COVERAGE AND ATTACHMENT POINTS

- Fifty-eight percent of covered workers in self-funded health plans are in plans that have stoploss insurance [Figure 10.7]. Stoploss coverage may limit the amount of claims that must be paid for each worker or may limit the total amount the plan sponsor must pay for all claims over the plan year.

    - The percentage of covered workers in self-funded plans with stoploss insurance (58%) is similar to the value when the survey first asked about stoploss insurance in 2011 (58)%.

    - Eighty-eight percent of covered workers in self-funded plans that have stoploss protection are in plans where the stoploss insurance limits the amount that the plan must spend on each worker. This includes stoploss insurance plans that limit a firm's per-employee spending and plans that limit both a firm's overall spending and per-employee spending [Figure 10.8].

    - Firms with per-enrollee stoploss coverage were asked for the dollar amount where the stoploss coverage would start to pay for most or all of the claim (called an attachment point). The average attachment point in small firms is $80,000. For large firms with a per-person limit, the average attachment point is $340,000 [Figure 10.8].

**667246**

Exhibit 142

JA-0002139

SECTION 10. PLAN FUNDING

**Figure 10.7**
**Among Covered Workers Enrolled in a Self-Funded Plan, Percentage Covered by Stoploss Insurance, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. For definitions of self-funded and fully insured plans, see the introduction to Section 10.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667247**

Exhibit 142

JA-0002140

**Figure 10.8**

**Prevalence and Average Attachment Points of Stoploss Insurance, by Firm Size and Region, 2017**

| | Percentage of Covered Workers in Partially or Completely Self-Funded Plans | Percentage of Covered Workers Enrolled in a Self-Funded Plan That Purchased Stoploss Insurance | Percentage of Covered Workers Enrolled in a Self-Funded Plan That Purchased Stoploss Insurance That Includes a Limit On Per-Employee Spending | Average Per-Employee Claims Cost at Which Stoploss Insurance Pays Benefits (Attachment Point) |
|---|---|---|---|---|
| **FIRM SIZE** | | | | |
| 50-199 Workers | 23%* | 73% | 94% | $80,000* |
| 200-999 Workers | 47* | 93* | 85 | 150,000* |
| 1,000-4,999 Workers | 81* | 91* | 92 | 290,000 |
| 5,000 or More Workers | 91* | 39* | 87 | 480,000* |
| **All Small Firms (3-199 Workers)** | 15%* | 60% | 93% | $80,000* |
| **All Large Firms (200 or More Workers)** | 79%* | 58% | 88% | $340,000* |
| **REGION** | | | | |
| Northeast | 68%* | 51% | 88% | $340,000 |
| Midwest | 63 | 71* | 89 | 320,000 |
| South | 64 | 58 | 85 | 300,000 |
| West | 45* | 48 | 96* | 390,000 |
| **All Self-Funded Firms** | 60% | 58% | 88% | $320,000 |

NOTE: A Limit on Per-Employee Spending includes stoploss insurance plans that limit a firm's per-employee spending as well as plans that limit both a firm's overall spending and per-employee spending. Attachment points refer to the dollar amount at which stoploss coverage begins to pay for most or all of a claim. For definitions of self-funded and fully insured plans, see the introduction to Section 10. There was insufficient data to report estimates for firms with 3 to 49 workers.

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667248**

Exhibit 142

SECTION 10. PLAN FUNDING

**Figure 10.9**

**Among Self-Funded Firms With Stoploss Coverage, Percentage of Covered Workers Enrolled in a Plan With an Attachment Point of $100,000 or Less, by Firm Size, 2011-2017**



Tests found no statistical difference from estimate for the previous year shown (p < .05)
NOTE: Among workers covered by a stoploss policy that includes a per-person limit.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2011-2017

**Figure 10.10**

**Percentage of Covered Workers Enrolled in Self-Insured Plans That Purchase Different Types of Stoploss Insurance, by Firm Size, 2017**



NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans. There was insufficient data to report estimates for All Small Firms (3-199 Workers).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667249

Exhibit 142

JA-0002142

**Figure 10.11**
**Among Covered Workers Enrolled in a Self-Funded Plan, Percentage Covered by Stoploss Insurance, by Firm Size, 2011-2017**



Tests found no statistical difference from estimate for the previous year shown (p < .05).
NOTE: Figure includes covered workers enrolled in partially or completely self-funded plans.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2011-2017

**Self-Funded Plan**  An insurance arrangement in which the employer assumes direct financial responsibility for the costs of enrollees' medical claims. Employers sponsoring self-funded plans typically contract with a third-party administrator or insurer to provide administrative services for the self-funded plan. In some cases, the employer may buy stoploss coverage from an insurer to protect the employer against very large claims.

**Fully Insured Plan**  An insurance arrangement in which the employer contracts with a health plan that assumes financial responsibility for the costs of enrollees' medical claims.

**667250**

Exhibit 142                                                                                          JA-0002143



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

# Retiree Health Benefits

SECTION

**11**

667251

Exhibit 142

JA-0002144

# Section 11

# Retiree Health Benefits

Retiree health benefits are an important consideration for older workers making decisions about their retirement. Health benefits for retirees provide an important supplement to Medicare for retirees age 65 or older. Over time, the percentage of firms offering retiree coverage has decreased. This survey asks retiree health benefits questions only of large firms (200 or more workers).

## EMPLOYER RETIREE BENEFITS

- In 2017, 25% of large firms that offer health benefits to their workers offer retiree coverage, similar to recent years [Figure 11.1]. However, there has been a downward trend in the percentage of firms offering retirees coverage, from 32% in 2007 and 40% in 1999.

- Retiree health benefits offer rates vary considerably by firm characteristics.

  – Among large firms offering health benefits, firms with 200-999 workers are less likely to offer retiree health benefits than firms with 1,000 or more workers (23% vs. 36%) [Figure 11.2].

  – The share of large firms offering retiree health benefits varies considerably by industry. State and local governments (73%) and transportation/communication/utilities industries (47%) have higher than average offer rates, while retail (5%) and health care (8%) have lower than average offer rates [Figure 11.2].

  – Among large firms offering health benefits, the share of public firms offering retiree benefits (67%) is higher than the shares of private for-profit firms (11%) or private not-for-profit firms (19%) offering retiree benefits [Figure 11.3].

  – Large firms with at least some union workers are more likely to offer retiree health benefits than large firms without any union workers (45% vs. 18%) [Figure 11.3].

- Twenty-six percent of large firms offering retiree benefits contribute to those benefits through a contract with a Medicare Advantage plan. Firms with 1,000-4,999 workers are more likely to contribute to retiree benefits through a contract with a Medicare Advantage plan than other large firms (44% vs. 21%) [Figure 11.4].

**667252**

Exhibit 142

JA-0002145



**Figure 11.1**
**Among Large Firms Offering Health Benefits to Active Workers, Percentage of Firms**
**Offering Retiree Health Benefits, 1988-2017**



Tests found no statistical difference from estimate for the previous year shown (p < .05). No statistical tests are conducted for years prior to 1999.

NOTE: Large Firms have 200 or more workers.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 1999-2017; KPMG Survey of Employer-Sponsored Health Benefits, 1991, 1993, 1995, 1998; The Health Insurance Association of America (HIAA), 1988.

**667253**

Exhibit 142                                                                JA-0002146

**Figure 11.2**

**Among Large Firms Offering Health Benefits to Active Workers, Percentage of Firms Offering Retiree Health Benefits, by Firm Size, Region, and Industry, 2017**

| | Percentage of Large Firms Offering Retiree Health Benefits |
|---|---|
| **FIRM SIZE** | |
| 200-999 Workers | 23%* |
| 1,000-4,999 Workers | 34* |
| 5,000 or More Workers | 42* |
| **REGION** | |
| Northeast | 26% |
| Midwest | 25 |
| South | 26 |
| West | 23 |
| **INDUSTRY** | |
| Agriculture/Mining/Construction | 13% |
| Manufacturing | 19 |
| Transportation/Communications/Utilities | 47* |
| Wholesale | 21 |
| Retail | 5* |
| Finance | 25 |
| Service | 25 |
| State/Local Government | 73* |
| Health Care | 8* |
| **All Large Firms (200 or More Workers)** | 25% |

\* Estimate is statistically different from estimate for all other large firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667254**

Exhibit 142

JA-0002147



**Figure 11.3**
**Among Large Firms Offering Health Benefits to Active Workers, Percentage of Firms**
**Offering Retiree Health Benefits, by Firm Characteristics, 2017**



* Estimates are statistically different from each other within category (p < .05)
NOTE: Large Firms have 200 or more workers. Firms with many lower-wage workers are those where at least 35% earn less than the 25th percentile of national earnings ($24,000 in 2017). Firms with many higher-wage workers are those where at least 35% earn more than 75th percentile of national earnings ($60,000 in 2017). Firms with many older workers are those where at least 35% of workers are age 50 or older. Firms with many younger workers are those where at least 35% of workers are age 26 or younger.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667255

Exhibit 142                                                                    JA-0002148

**Figure 11.4**

**Among Large Firms Offering Health Benefits to Medicare-Age Retirees, Percentage of Firms Offering Retiree Health Benefits Through a Contract With a Medicare Advantage Plan, by Firm Size and Region, 2017**

| | Percentage of Large Firms Offering Retiree Health Benefits Through a Contract With a Medicare Advantage Plan |
|---|---|
| **FIRM SIZE** | |
| 200-999 Workers | 20%* |
| 1,000-4,999 Workers | 44* |
| 5,000 or More Workers | 29 |
| **REGION** | |
| Northeast | 34% |
| Midwest | 27 |
| South | 29 |
| West | 11* |
| **All Large Firms (200 or More Workers)** | **26%** |

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## EARLY RETIREES AND MEDICARE-AGE RETIREES

- Among large firms offering retiree health benefits, most firms offer to early retirees under the age of 65 (95%). A lower percentage (66%) of large firms offering retiree health benefits offer to Medicare-age retirees. These percentages are similar to those in recent years [Figure 11.5].

- Among all large firms offering retiree health benefits, 61% offer health benefits to both early and Medicare-age retirees [Figure 4.6].

**667256**

Exhibit 142

JA-0002149

**Figure 11.5**

**Among Large Firms Offering Health Benefits to Active Workers and Offering Retiree Coverage, Percentage of Firms Offering Health Benefits to Early and Medicare-Age Retirees, 2000-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)

NOTE: Large Firms have 200 or more workers. Early retirees are those who retire before the age at 65. Among all large firms offering retiree benefits to active workers and offering retiree coverage, 61% offer health benefits to both early and Medicare-age retirees.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2000-2017

**Figure 11.6**

**Among Large Firms Offering Health Benefits to Active Workers and Offering Retiree Coverage, Percentage of Firms Offering Retiree Health Benefits to Early and Medicare-Age Retirees, by Firm Size and Region, 2017**

| | Percentage of Large Firms Offering Retiree Health Benefits to Early Retirees | Percentage of Large Firms Offering Retiree Health Benefits to Medicare-Age Retirees |
|---|---|---|
| **FIRM SIZE** | | |
| 200-999 Workers | 95% | 63% |
| 1,000-4,999 Workers | 95 | 73 |
| 5,000 or More Workers | 95 | 77 |
| **REGION** | | |
| Northeast | 97% | 62% |
| Midwest | 94 | 54 |
| South | 98 | 70 |
| West | 90 | 82* |
| **All Large Firms (200 or More Workers)** | 95% | 66% |

NOTE: Early retirees are those who retire before the age of 65. Among all large firms offering health benefits to active workers and offering retiree coverage, 61% offer health benefits to both early and Medicare-age retirees.

\* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667257

Exhibit 142

JA-0002150

## PRIVATE EXCHANGES

- Private exchanges have received considerable attention over the last several years. They are typically created by a consulting company, broker, or insurer, and are different than the public exchanges created under the Affordable Care Act (ACA). Private exchanges allow employees or retirees from multiple companies to choose from a larger number of health benefit options than one firm would generally provide. Twelve percent of large firms offering retiree health benefits report they offer benefits through a private exchange, similar to the percentage last year (6%) [Figure 11.7]. For more information on the use of private exchanges for active employees, please see Section 14.

- Thirty percent of large firms offering retiree benefits make a defined contribution for retiree health benefits [Figure 11.7]. A defined contribution is a set dollar amount that the retiree can use to purchase a retiree health plan they choose.

**Figure 11.7**

**Among Large Firms Offering Health Benefits to Active Workers and Retirees, Firm's Approach to Offering Retiree Health Benefits, by Firm Size and Region, 2017**

|  | Percentage of Large Firms Offering Retiree Health Benefits Through a Private Exchange | Percentage of Large Firms Offering Retiree Health Benefits Using a Defined Contribution Approach |
|---|---|---|
| **FIRM SIZE** | | |
| 200-999 Workers | 12% | 27% |
| 1,000-4,999 Workers | 10 | 39 |
| 5,000 or More Workers | 14 | 33 |
| **REGION** | | |
| Northeast | 25% | 16%* |
| Midwest | 9 | 26 |
| South | 7 | 37 |
| West | 2 | 45 |
| **All Large Firms (200 or More Workers)** | 12% | 30% |

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667258**

Exhibit 142

JA-0002151

**Figure 11.8**
**Among Large Firms Offering Health Benefits to Active Workers and Retirees, Percentage of Firms That Offer Retiree Coverage Through a Private Exchange, by Firm Size, 2014-2017**



Tests found no statistical difference from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2014-2017

**667259**

Exhibit 142                                                                      JA-0002152



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Health and
Wellness
Programs

SECTION

12

667260

Exhibit 142                                                                    JA-0002153

# Section 12

# Health and Wellness Programs

Firms continue to show considerable interest in programs that help workers identify health issues and manage chronic conditions. Many employers believe that improving the health of their workers and their family members can improve morale, productivity and reduce health care costs. In addition to wellness programs, many large firms use disease management programs to help workers manage chronic conditions.

In addition to offering wellness programs, a majority of large firms now offer health screening programs, including health risk assessments, which are questionnaires asking workers about lifestyle, stress or physical health, and biometric screening, which we define as in-person health examinations conducted by a medical professional. Firms and insurers may use the health information collected during screenings to target wellness offerings or other health services to workers with certain conditions or behaviors that pose a risk to their health. Some firms have incentive programs that reward or penalize workers for different activities, including participating in wellness programs or completing health screenings.

Only firms offering health benefits were asked about their wellness and health promotion programs. Information about incentives is reported only for large firms (200 or more workers) because many small firm (3-199 workers) respondents do not know this information about their programs. This year's survey includes new questions about how a firm evaluates its wellness programs and about penalties for workers who use tobacco.

Among large firms offering health benefits in 2017, 62% offer workers the opportunity to complete a health risk assessment, 52% offer workers the opportunity to complete a biometric screening, and 85% offer workers wellness programs such as programs to help them stop smoking or lose weight, or programs that offer lifestyle and behavioral coaching. Substantial shares of these large firms provide incentives for workers to participate in or to complete the programs.

## HEALTH RISK ASSESSMENTS

Some firms provide workers the opportunity to complete a health risk assessment to identify potential health issues. Health risk assessments generally include questions about medical history, health status, and lifestyle. At small firms, health risk assessments are typically administered by an insurer.

- Among firms offering health benefits, 38% of small firms and 62% of large firms provide workers the opportunity to complete a health risk assessment [Figure 12.1]. These percentages are similar to the corresponding percentages for 2016 (32% for small firms and 59% for large firms) [Figure 12.2].

  – Seventy-eight percent of firms offering health benefits with 5,000 or more workers provide workers the opportunity to complete a health risk assessment, similar to the percentage for 2016 (74%) [Figure 12.1].

- In firms providing workers the opportunity to complete a health risk assessment, 42% of covered workers complete an assessment, similar to the percentage in 2016 [Figure 12.3].

  – There is considerable variation across firms in the percentage of workers who complete the assessment. Nineteen percent of large firms providing workers the opportunity to complete a health risk assessment report that more than 75% of their workers complete the assessment, while 45% report no more than 25% of workers complete the assessment.

- Some firms offer incentives to encourage workers to complete a health risk assessment.

  – Among large firms that offer a health risk assessment, 52% offer workers an incentive to complete the assessment [Figure 12.4].

**667261**

Exhibit 142

JA-0002154

– Among large firms offering incentives for workers to complete a health risk assessment, 46% lower premium contributions or reduce cost sharing and 40% offer cash, HSA or HRA contributions, or allow the worker to avoid a payroll deduction [Figure 12.5]. In some firms, workers must complete the assessment to be eligible for other rewards under the firm's wellness programs. Some firms offer workers more than one type of incentive.

## Figure 12.1

## Among Firms Offering Health Benefits, Percentage of Firms That Provide an Opportunity to Complete a Health Risk Assessment, by Firm Size, 2017

|  | Percentage of Firms That Offer a Health Risk Assessment |
|---|---|
| **FIRM SIZE** |  |
| 3-24 Workers | 36% |
| 25-199 Workers | 44 |
| 200-999 Workers | 59* |
| 1,000-4,999 Workers | 77* |
| 5,000 or More Workers | 78* |
| **All Small Firms (3-199 Workers)** | **38%,*** |
| **All Large Firms (200 or More Workers)** | **62%,*** |
| **ALL FIRMS** | **39%** |

NOTE. A health risk assessment or appraisal includes questions on medical history, health status, and lifestyle and is designed to identify the health risks of the person being assessed.

 * Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667262**

Exhibit 142

JA-0002155

**Figure 12.2**

**Among Firms Offering Health Benefits, Percentage of Firms That Provide an Opportunity to Complete a Health Risk Assessment, by Firm Size, 2009-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)

NOTE: A health risk assessment or appraisal includes questions on medical history, health status, and lifestyle and is designed to identify the health risks of the person being assessed.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2009-2017

**Figure 12.3**

**Among Firms Providing Workers an Opportunity to Complete a Health Risk Assessment, Percentage of Workers that Complete the Assessment, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 184

**667263**

Exhibit 142

JA-0002156

**Figure 12.4**

**Among Large Firms Offering Health Benefits and Providing an Opportunity to Complete a Health Risk Assessment, Percentage of Firms That Offer Workers Incentives to Complete the Assessment, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

NOTE: A health risk assessment or appraisal includes questions on medical history, health status, and lifestyle and is designed to identify the health risks of the person being assessed.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.5**

**Among Large Firms Offering an Incentive to Workers Who Complete a Health Risk Assessment, Percentage of Firms Using Different Types of Incentives, by Firm Size, 2017**



NOTE: Large Firms have 200 or more workers. HRA is a health reimbursement arrangement and HSA is a health savings account. For more information, see section B.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667264**

Exhibit 142

JA-0002157

## BIOMETRIC SCREENING

Biometric screening is a health examination that measures a person's risk factors (such as cholesterol, blood pressure, and body mass index (BMI)) for certain medical issues. A biometric outcome involves assessing whether an enrollee meets specified health targets related to certain risk factors, such as meeting a target BMI or cholesterol level. As defined by this survey, goals related to smoking are not included in the biometric screening questions.

- Among firms offering health benefits, 21% of small firms and 52% of large firms provide workers the opportunity to complete a biometric screening [Figure 12.6]. These percentages are similar to 2016 (20% and 53%) [Figure 12.7].

- In firms providing workers the opportunity to complete a biometric screening, 41% of covered workers complete a screening [Figure 12.8].

  – There is considerable variation across firms in the percentage of workers who complete a biometric screening. Twenty-two percent of large firms providing workers the opportunity to complete a biometric screening report that more than 75% of their workers complete the screening, while 26% report no more than 25% of workers complete the screening.

- Firms that provide workers the opportunity to complete a biometric screening may include additional incentives for those workers who do so.

  – Among large firms with biometric screening programs, 53% offer workers an incentive to complete the screening [Figure 12.10]. The likelihood of a firm with a biometric screening program offering an incentive to complete a biometric screening increases with firm size [Figure 12.10]. Some firms report offering more than one type of incentive.

  – Among large firms with an incentive for workers to complete a biometric screening, 49% lower premium contributions or reduce cost sharing and 33% offer cash, HRA or HSA contributions, or allow the worker to avoid a payroll deduction. As with incentives for health risk assessments, workers in some firms must complete the biometric screening to be eligible for other rewards under the firm's wellness programs. [Figure 12.11].

- In addition to incentives for completing a biometric screening, some firms offer workers incentives to meet biometric outcomes. Among large firms with biometric screening programs, 14% reward or penalize workers based on achieving specified biometric outcomes (such as meeting a target BMI) [Figure 12.10].

  – The size of the incentives firms offer for meeting biometric outcomes varies considerably. Among large firms offering a reward or penalty for meeting biometric outcomes, the maximum reward is valued at $150 or less for 9% of firms and more than $1,000 for 17% of firms [Figure 12.12]. Twenty-three percent of these firms combine the reward with incentives for other activities.

**667265**

Exhibit 142

JA-0002158

### Figure 12.6

## Among Firms Offering Health Benefits, Percentage of Firms That Provide an Opportunity to Complete a Biometric Screening, by Firm Size, 2017

|  | Percentage of Firms That Offer a Biometric Screening |
|---|---|
| **FIRM SIZE** |  |
| 3-24 Workers | 19%* |
| 25-199 Workers | 27 |
| 200-999 Workers | 49* |
| 1,000-4,999 Workers | 63* |
| 5,000 or More Workers | 67* |
| **All Small Firms (3-199 Workers)** | **21%*** |
| **All Large Firms (200 or More Workers)** | **52%*** |
| **ALL FIRMS** | 22% |

NOTE: Biometric screening is a health examination that measures a person's risk factors for certain medical issues. Biometric outcomes could include meeting a target body mass index (BMI) or cholesterol level, but not goals related to smoking.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667266**

Exhibit 142

JA-0002159

**Figure 12.7**

**Among Firms Offering Health Benefits, Percentage of Firms That Provide an Opportunity to Complete a Biometric Screening, by Firm Size, 2012-2017**



\* Estimate is statistically different from estimate for the previous year shown (p < .05)

NOTE: Biometric screening is a health examination that measures a person's risk factors for certain medical issues. Biometric outcomes could include meeting a target body mass index (BMI) or cholesterol level, but not goals related to smoking.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2012-2017

**Figure 12.8**

**Among Firms Providing Workers an Opportunity to Complete a Biometric Screening, Percentage of Workers That Complete the Screening, by Firm Size, 2017**



\* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

The Kaiser Family Foundation and Health Research & Educational Trust / Page 188

**667267**

Exhibit 142                                                                                      JA-0002160

SECTION 12. HEALTH AND WELLNESS PROGRAMS

**Figure 12.9**

**Among Large Firms Offering Health Benefits, Percentage of Firms That Provide an Opportunity to Complete Either a Biometric Screening or a Health Risk Assessment, by Region and Industry, 2017**

|  | Health Risk Assessment | Biometric Screening |
|---|---|---|
| **REGION** | | |
| Northeast | 56% | 48% |
| Midwest | 66 | 55 |
| South | 63 | 54 |
| West | 65 | 50 |
| **INDUSTRY** | | |
| Agriculture/Mining/Construction | 43% | 32% |
| Manufacturing | 63 | 57 |
| Transportation/Communications/Utilities | 72 | 67 |
| Wholesale | 68 | 55 |
| Retail | 36* | 27* |
| Finance | 80* | 59 |
| Service | 58 | 50 |
| State/Local Government | 79* | 69* |
| Health Care | 64 | 51 |
| **All Large Firms (200 or More Workers)** | **62%** | **52%** |

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.10**

**Among Large Firms Offering Health Benefits and Providing an Opportunity to Complete a Biometric Screening, Percentage of Firms with Incentives to Complete the Screening, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667268

Exhibit 142

JA-0002161

**Figure 12.11**

**Among Large Firms Offering Workers an Incentive to Complete a Biometric Screening, Percentage of Firms with Various Types of Incentives, by Firm Size, 2017**



NOTE: Large Firms have 200 or more workers. HRA is a health reimbursement arrangement and HSA is a health savings account. For more information, see Section 8.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.12**

**Among Large Firms Offering Workers an Incentive to Meet Biometric Outcomes, Maximum Value of Incentive a Worker Can Receive for Achieving Outcomes, 2017**



NOTE: Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667269**

Exhibit 142

JA-0002162

# ADMINISTRATION OF HEALTH SCREENING PROGRAMS

Among firms offering health benefits, 44% of small firms and 69% of large firms offer workers a health risk assessment, biometric screening or both screening programs. The scope and administration of screening programs vary considerably across firms, and some firms use different administrators for different programs.

- Among firms that offer a health screening program, an insurer or third-party administrator administers some health screening programs at 87% of firms. third party vendors, such as wellness providers, administer some screening programs at (29%) of firms, and the firm itself administers some health screening programs at (9%) of firms [Figure 12.13].

- Thirty-seven percent of large firms offering health benefits have an incentive for workers to complete biometric screening or a health risk assessment. Among large firms with an incentive for either health screening program, 34% have incentives for workers not enrolled in the health plan and 49% have incentives for spouses enrolled as dependents in the plan [Figure 12.14].

- Among firms offering health benefits, 8% of small firms and 14% of large firms collect information from workers' wearable devices, such as a Fitbit or Apple Watch, as part of their wellness or health promotion program [Figure 12.15].



**Figure 12.13**
**Among Firms That Offer a Health Screening Program, Who Administers the Program, by Firm Size 2017**

Legend: The Firm | Third Party Vendor, Such as a Wellness Provider | Insurer or TPA

All Small Firms (3-199 Workers): 9%, 24%*, 88%*
All Large Firms (200 or More Workers): 12%, 48%*, 70%*
ALL FIRMS: 9%, 29%, 87%

* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05)
NOTE: Among firms offering health benefits, 44% of small firms and 69% of large firms offer workers a health risk assessment, biometric screening or both screening programs. Screening programs include either a health risk assessment or a biometric screening. TPA refers to Third Party Administrator, which some employers contract with to manage self-funded health plans. Percentages do not add to 100% because firms may have different types of administrators for different screening programs.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667270

Exhibit 142

JA-0002163



**Figure 12.14**
**Among Large Firms That Offer an Incentive for a Screening Program, Eligibility for Incentives or Penalties, 2017**



NOTE: Large Firms have 200 or more workers. Screening programs include either a health risk assessment or a biometric screening. Thirty-seven percent of large firms offering health benefits have an incentive for workers to complete either a biometric screening or a health risk assessment.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667271**

Exhibit 142

JA-0002164

**Figure 12.15**

**Among Firms Offering Health Benefits, Percentage of Firms Whose Wellness Program Collects Information From Workers' Mobile Apps or Wearable Technologies, by Firm Size, 2017**

|  | Percentage of Offering Firms Collecting Information From Workers' Mobile Apps or Wearable Technologies |
|---|---|
| **FIRM SIZE** |  |
| 3-24 Workers | 9% |
| 25-199 Workers | 7 |
| 200-999 Workers | 11 |
| 1,000-4,999 Workers | 22* |
| 5,000 or More Workers | 29* |
| **All Small Firms (3-199 Workers)** | **8%** |
| **All Large Firms (200 or More Workers)** | **14%** |
| **ALL FIRMS** | **8%** |

NOTE: Wearable technologies could include Fitbits or Apple Watches.

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## WELLNESS AND HEALTH PROMOTION PROGRAMS

Many firms and health plans offer programs to help workers engage in healthy lifestyles and reduce health risks. Wellness and health promotion programs may include exercise programs, health education classes, and stress-management counseling. These programs may be offered directly by the firm, an insurer, or a third-party contractor.

- Among firms offering health benefits, 40% of small firms and 72% of large firms offer programs to help workers stop smoking, 34% of small firms and 67% of large firms offer programs to help workers lose weight, and 47% of small firms and 72% of large firms offer some other lifestyle or behavioral coaching program. Fifty-eight percent of small firms and 85% of large firms offering health benefits offer at least one of these three programs [Figures 12.16 and 12.17].

- To encourage participation in wellness programs, firms may offer incentives to workers who participate in or complete wellness programs.

  - Thirty-two percent of large firms offering one of these wellness or health promotion programs offer an incentive to encourage workers to participate in or complete the programs [Figure 12.18]. Forty-six percent of firms with more than 5,000 workers offering one of these wellness or health promotion programs offer an incentive to participate in or complete the programs.

  - Among large firms offering incentives to workers to participate in or complete wellness or health promotion programs, 19% lower premium contributions or reduce cost sharing and 37% offer cash , HSA or HRA

**667272**

Exhibit 142

JA-0002165

contributions, or allow the worker to avoid a payroll deduction [Figure 12.19].

- Firms with incentives for health risk assessments, biometric screening, or wellness or health promotion programs were asked to report the maximum reward or penalty a worker could earn for all of the firm's health promotion activities combined. Some firms do not offer incentives for individual activities, but offer rewards to workers who complete a variety of activities. Among large firms offering incentives for any of these programs, the maximum value for all wellness-related incentives is $150 or less in 25% of firms and more than $1,000 in 19% of firms [Figure 12.20].

- Firms with incentives for health risk assessments, biometric screening, or wellness or health promotion programs were also asked how effective they believed incentives were for encouraging participation. Thirty-four percent of large firms offering incentives for any one of these programs said the incentives are "very effective" at encouraging workers to participate and 58% said the incentives are "somewhat effective", while 7% said the incentives are "not at all effective" [Figure 12.21].

- Firms offering a health screening program or a wellness program use a variety of metrics to evaluate their health promotion programs, including participation, employee satisfaction, and return on investment [Figure 12.23].

**Figure 12.16**

**Among Firms Offering Health Benefits, Percentage of Firms Offering Specific Wellness Programs to Their Workers, by Firm Size and Region, 2017**

| | Programs to Help Workers Stop Smoking | Programs to Help Workers Lose Weight | Other Lifestyle or Behavioral Coaching | At Least One of These Programs |
|---|---|---|---|---|
| **FIRM SIZE** | | | | |
| 3-49 Workers | 39%* | 31%* | 45%* | 57%* |
| 50-199 Workers | 52 | 52* | 55 | 64 |
| 200-999 Workers | 70* | 64* | 70* | 84* |
| 1,000-4,999 Workers | 80* | 78* | 75* | 90* |
| 5,000 or More Workers | 90* | 79* | 85* | 96* |
| **All Small Firms (3-199 Workers)** | 40%* | 34%* | 47%* | 58%* |
| **All Large Firms (200 or More Workers)** | 72%* | 67%* | 72%* | 85%* |
| **REGION** | | | | |
| Northeast | 60%* | 52%* | 58% | 72% |
| Midwest | 31 | 31* | 44 | 54 |
| South | 33 | 28 | 43 | 55 |
| West | 44 | 32 | 47 | 55 |
| **ALL FIRMS** | 41% | 35% | 47% | 59% |

NOTE: 'Other Lifestyle or Behavioral Coaching' can include health education classes, stress management, or substance abuse counseling.

* Estimate is statistically different from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667273**

Exhibit 142

JA-0002166

**Figure 12.17**

**Among Firms Offering Health Benefits, Percentage of Firms Offering Specific Wellness Programs to Their Workers, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
NOTE: 'Other Lifestyle or Behavioral Coaching' can include health education classes, stress management, or substance abuse counseling.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

---

**Figure 12.18**

**Among Firms Offering Specific Wellness Programs, Percentage of Firms That Offer Incentives to Workers Who Participate In or Complete Wellness Programs, by Firm Size, 2017**

|  | Incentives to Participate In or Complete Wellness Programs |
|---|---|
| **FIRM SIZE** |  |
| 200-999 Workers | 28%* |
| 1,000-4,999 Workers | 45* |
| 5,000 or More Workers | 46* |
| **All Small Firms (3-199 Workers)** | **11%*** |
| **All Large Firms (200 or More Workers)** | **32%*** |
| **ALL FIRMS** | **12%** |

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667274

Exhibit 142

JA-0002167

**Figure 12.19**

**Among Large Firms Offering Incentives to Workers Who Participate In or Complete Wellness Programs, Type of Incentive, 2017**



NOTE: Large Firms have 200 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.20**

**Among Large Firms That Offer Workers an Incentive to Participate In or Complete Any Health Promotion Programs, Maximum Annual Value of the Incentive for All Programs Combined, 2017**



NOTE: Large Firms have 200 or more workers. Includes incentives for health risk assessments, biometric screenings, and wellness programs. Firms with at least one of the listed health promotion programs were asked to report the maximum incentive a worker and his/her dependents could receive for all of the firms health promotion programs combined. Forty-five percent of offering firms have an incentive to complete any of their health promotion programs.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667275**

Exhibit 142

JA-0002168

**Figure 12.21**

**Among Large Offering Firms That Offer Workers an Incentive to Participate In or Complete Any Health Promotion Programs, Firms' Opinions on How Effective Incentives are for Employee Participation, by Firm Size, 2017**



Tests found no statistical difference for response choice from estimate for all other large firms
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.22**

**Among Large Firms Offering Health Benefits, Percentage of Firms Offering Various Wellness and Health Promotion Activities and Incentives, by Firm Size, 2017**

| | Firm Offers Health Risk Assessment | Incentive Offered for Completing Health Risk Assessment | Firm Offers Biometric Screening | Incentive Offered for Completing Biometric Screening | Incentive Offered for Meeting Biometric Outcomes | Firm Offers Specific Wellness Programs | Incentive Offered for Participating In or Completing Wellness Programs |
|---|---|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | | | |
| 200-999 Workers | 59%* | 28%* | 49%* | 24%* | 5%* | 84%* | 24%* |
| 1,000-4,999 Workers | 77* | 51* | 63* | 43* | 13* | 90 | 40* |
| 5,000 or More Workers | 78* | 54* | 67* | 50* | 16* | 96* | 44* |
| **All Large Firms (200 or More Workers)** | 62% | 32% | 52% | 28% | 7% | 85% | 27% |

NOTE: Specific Wellness Programs include Programs to Help Workers Stop Smoking, Programs to Help Workers Lose Weight, or Other Lifestyle or Behavioral Coaching

* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667276

Exhibit 142

JA-0002169

**Figure 12.23**
**Among Firms Offering An Incentive for Health Screening or Wellness Programs, Percentage of Firms Using Various Methods to Evaluate Programs, by Firm Size, 2017**



Test: found no statistical difference between All Small Firms and All Large Firms estimate (p < .05).
NOTE: Includes firms who have an incentive for a health risk assessment, biometric screening, or to participate in a wellness or health promotion program.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

# DISEASE MANAGEMENT

Disease management programs aim to improve health and reduce costs for enrollees with chronic illnesses by educating them about their disease and suggesting treatment options. These programs can help enrollees with conditions such as diabetes, asthma, hypertension, and high cholesterol.

- Forty-one percent of firms that offer health benefits offer disease management programs. Large firms are more likely than small firms to offer disease management programs (68% vs. 40%) [Figure 12.24].

- Nine percent of large firms that offer disease management programs offer incentives for workers to participate in or complete the programs. This percentage is highest among firms with 5,000 or more workers (26%) [Figure 12.26].

**667277**

Exhibit 142

JA-0002170

**Figure 12.24**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer Disease Management Programs, by Firm Size, Region and Industry, 2017**

|  | Percentage of Firms Offering Disease Management Programs |
|---|---|
| **FIRM SIZE** |  |
| 3-24 Workers | 39% |
| 25-199 Workers | 40 |
| 200-999 Workers | 66* |
| 1,000-4,999 Workers | 76* |
| 5,000 or More Workers | 82* |
| **All Small Firms (3-199 Workers)** | **40%*** |
| **All Large Firms (200 or More Workers)** | **68%*** |
| **REGION** |  |
| Northeast | 61%* |
| Midwest | 29 |
| South | 40 |
| West | 34 |
| **INDUSTRY** |  |
| Agriculture/Mining/Construction | 28% |
| Manufacturing | 60 |
| Transportation/Communications/Utilities | 14* |
| Wholesale | 15* |
| Retail | 32 |
| Finance | 35 |
| Service | 44 |
| State/Local Government | 36 |
| Health Care | 63* |
| **ALL FIRMS** | **41%** |

NOTE: Disease management programs try to improve health and reduce costs for enrollees with chronic illness such as diabetes, asthma, hypertension, and high cholesterol by teaching patients about their disease and suggesting treatment options.

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667278**

Exhibit 142

JA-0002171

SECTION 12.  HEALTH AND WELLNESS PROGRAMS

**Figure 12.25**

**Among Firms Offering Health Benefits, Percentage of Firms That Offer Disease Management Programs, by Firm Size, 2006-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE: Disease management programs try to improve health and reduce costs for enrollees with chronic illness such as diabetes, asthma, hypertension, and high cholesterol by teaching patients about their disease and suggesting treatment options.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

**Figure 12.26**

**Among Large Firms Offering Disease Management Programs, Percentage of Firms That Offer Incentives to Workers Who Participate In or Complete Programs, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
NOTE: Disease management programs try to improve health and reduce costs for enrollees with chronic illness such as diabetes, asthma, hypertension, and high cholesterol by teaching patients about their disease and suggesting treatment options.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2017

**667279**

Exhibit 142

JA-0002172

## PENALTIES FOR TOBACCO USE

- Among firms offering health benefits, 16% of small firms and 14% of large firms, including 49% of firms with 5,000 or more workers, require higher premium contributions or cost sharing from workers who use tobacco [Figure 12.27]. Some firms noted that not smoking is a condition of employment.

- Among firms with higher costs for workers who use tobacco, virtually all firms rely on self-reporting, including through a health risk assessment, to determine whether a worker uses tobacco [Figure 12.28].

- Among large firms with higher costs for workers who use tobacco, 56% indicate that dependents also have higher premium contributions or cost sharing if they use tobacco [Figure 12.29].

**Figure 12.27**
**Among Firms Offering Health Benefits, Percentage That Require Workers Who Use Tobacco to Contribute More to the Premium or Cost Sharing, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05).
NOTE: 1.96% of firms offering health benefits self-reported that not smoking is a condition of employment.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667280**

Exhibit 142                                                                                                    JA-0002173

**Figure 12.28**

**Among Firms With Higher Costs for Workers Who Use Tobacco, Percentage of Firms Using Various Methods to Determine Tobacco Use, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .03)
NOTE: Higher costs may include higher cost sharing or higher premium contributions
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 12.29**

**Among Large Firms With Higher Costs for Workers Who Use Tobacco, Percentage of Firms with Higher Premium Contributions or Cost Sharing for Spouses or Dependents Who Use Tobacco, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667281**

Exhibit 142

JA-0002174



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

# Grandfathered Health Plans

SECTION

13

667282

Exhibit 142                                                                                          JA-0002175

# Section 13

# Grandfathered Health Plans

The Affordable Care Act (ACA) exempts certain health plans that were in effect when the law was passed, referred to as grandfathered plans, from some standards in the law, including the requirement to cover preventive benefits without cost sharing, have an external appeals process, or comply with the new benefit and rating provisions in the small group market. In 2017, 23% of firms offering health benefits offer at least one grandfathered health plan, and 17% of covered workers are enrolled in a grandfathered plan.

As in years past, some firms had difficulty with the details of the term "grandfathering", as described in the provisions of the ACA. We would note that smaller firms in particular appeared to have some confusion about whether or not they are grandfathered. Many smaller firms, even those offering a health plan in effect in March 2010 (when the ACA was enacted), were unsure about whether their plan was grandfathered.

- Twenty-three percent of offering firms report having at least one grandfathered plan in 2017, unchanged from 23% in 2016 [Figure 13.1].

- Seventeen percent of covered workers are enrolled in a grandfathered health plan in 2017 [Figure 13.2].

    - The percentage of covered workers enrolled in a grandfathered plan is lower than 2016 (23%), continuing a decline from 26% in 2014, 36% in 2013, and 48% in 2012 [Figure 13.3].

**667283**

Exhibit 142

JA-0002176

**Figure 13.1**

**Percentage of Firms With at Least One Plan Grandfathered Under the Affordable Care Act (ACA), by Size and Region, 2017**

|  | Percentage of Firms With at Least One Grandfathered Plan |
|---|---|
| **FIRM SIZE** | |
| 3-24 Workers | 23% |
| 25-49 Workers | 22 |
| 50-199 Workers | 20 |
| 200-999 Workers | 26 |
| 1,000-4,999 Workers | 17 |
| 5,000 or More Workers | 15 |
| **All Small Firms (3-199 Workers)** | **23%** |
| **All Large Firms (200 or More Workers)** | **24%** |
| **REGION** | |
| Northeast | 17% |
| Midwest | 29 |
| South | 21 |
| West | 25 |
| **ALL FIRMS** | **23%** |

NOTE: For definitions of grandfathered health plans, see the introduction to Section 13.

Tests found no statistical difference from estimate for all other firms not in the indicated size or region category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667284**

Exhibit 142

JA-0002177

**Figure 13.2**

**Percentage of Covered Workers Enrolled In Plans Grandfathered Under the Affordable Care Act (ACA), by Size, Region, and Industry, 2017**

|  | Percentage of Covered Workers Enrolled In a Grandfathered Health Plan |
|---|---|
| **FIRM SIZE** | |
| 3-24 Workers | 26% |
| 25-49 Workers | 21 |
| 50-199 Workers | 16 |
| 200-999 Workers | 27* |
| 1,000-4,999 Workers | 15 |
| 5,000 or More Workers | 13* |
| **All Small Firms (3-199 Workers)** | **20%** |
| **All Large Firms (200 or More Workers)** | **16%** |
| **REGION** | |
| Northeast | 12% |
| Midwest | 18 |
| South | 18 |
| West | 19 |
| **INDUSTRY** | |
| Agriculture/Mining/Construction | 24% |
| Manufacturing | 11* |
| Transportation/Communications/Utilities | 27 |
| Wholesale | 15 |
| Retail | 10* |
| Finance | 12 |
| Service | 18 |
| State/Local Government | 23 |
| Health Care | 17 |
| **ALL FIRMS** | **17%** |

NOTE: For definitions of grandfathered health plans, see the introduction to Section 13. Nine percent of respondents indicated they did not know if their firm's plan was grandfathered.

* Estimate is statistically different from estimate for all firms not in the indicated size, region, or industry category (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667285**

Exhibit 142

JA-0002178

### Figure 13.3

**Percentage of Covered Workers Enrolled In Plans Grandfathered Under the Affordable Care Act (ACA), by Firm Size , 2011-2017**

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| **FIRM SIZE** | | | | | | | |
| 3-24 Workers | 69% | 57% | 53% | 36%* | 39% | 20%* | 26% |
| 25-49 Workers | 52 | 45 | 52 | 40 | 42 | 24* | 2* |
| 50-199 Workers | 63 | 55 | 44 | 31* | 26 | 26 | 16* |
| 200-999 Workers | 61 | 60 | 42* | 33 | 26 | 29 | 27 |
| 1,000-4,999 Workers | 54 | 41* | 34 | 21* | 20 | *7 | 15 |
| 5,000 or More Workers | 49 | 42 | 23* | 18 | 20 | 22 | 13 |
| **All Small Firms (3-199 Workers)** | 63% | 54%* | 49% | 35%* | 34% | 24%* | 20% |
| **All Large Firms (200 or More Workers)** | 53% | 46% | 30%* | 22%* | 22% | 22% | 16% |
| **ALL FIRMS** | 56% | 48%* | 36%* | 26%* | 25% | 23% | 17%* |

NOTE  For definitions of grandfathered health plans, see the Introduction to Section 13.

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2011-2017



### Figure 13.4
**Percentage of Covered Workers Enrolled in Plans Grandfathered Under the Affordable Care Act (ACA), by Firm Size, 2011-2017**

* Estimate is statistically different from estimate for the previous year shown (p < .05)
NOTE  For definitions of grandfathered health plans, see the Introduction to Section 13.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2011-2017

**Grandfathered Plans**  In the employer-sponsored market, health plans that were in place when the ACA was enacted (March 2010) can be grandfathered health plans. Department of Health and Human Services (HSS) rules stipulate that firms cannot significantly change cost sharing, benefits, employer contributions, or access to coverage in grandfathered plans. New employees can enroll in a grandfathered plan as long as the firm has maintained consecutive enrollment in the

**667286**

Exhibit 142

JA-0002179

plan. Grandfathered plans are exempted from many, but not all, of the ACA's consumer protection provisions.

667287

Exhibit 142

JA-0002180



EMPLOYER HEALTH BENEFITS
2017 ANNUAL SURVEY

Employer
Practices and
Health Plan
Networks

SECTION

14

2017

667288

Exhibit 142                                                        JA-0002181

# Section 14

# Employer Practices and Health Plan Networks

Employers play a significant role in financing and arranging for health care and health insurance coverage, so their experiences are important factors in health policy discussions. In recent years, employers have included new providers and sites of care, such as retail clinics, and some have pursued changes to their networks to reduce costs or improve quality. There also has been considerable interest in private health exchanges, which could provide firms and workers with a wider array of health plan choices, although thus far enrollment has been low.

## SHOPPING FOR HEALTH COVERAGE

Fifty-nine percent of firms offering health benefits reported shopping for a new health plan or a new insurance carrier in the past year, similar to the percentage last year. Small firms (3-199 workers) were more likely to shop for coverage (59%), and firms with 1,000-4,999 workers and firms with 5,000 or more workers were less likely to shop for coverage (36% and 24%, respectively) than firms in other size categories [Figure 14.1].

- Among firms that offer health benefits and who shopped for a new plan or carrier in the past year, 28% changed insurance carriers [Figure 14.2].

- Eighty-eight percent of firms offering health benefits used a broker or consultant to assist in choosing a health plan [Figure 14.3].

**667289**

Exhibit 142                                                                 JA-0002182

**Figure 14.1**

**Percentage of Firms Offering Health Benefits That Shopped For a New Plan or Health Insurance Carrier in the Past Year, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 14.2**

**Among Firms Offering Health Benefits That Shopped for a New Plan or Insurance Carrier, Percentage of Firms That Changed Insurance Carriers in the Past Year, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667290**

Exhibit 142

JA-0002183

**Figure 14.3**

**Among Firms Offering Health Benefits, Percentage of Firms That Use a Broker or Consultant to Assist In Choosing a Health Plan, by Firm Size, 2007, 2013, and 2017**

|  | 2007 | 2013 | 2017 |
|---|---|---|---|
| **FIRM SIZE** |  |  |  |
| All Small Firms (3-199 Workers) | 68% | 82%* | 87% |
| All Large Firms (200 or More Workers) | 82% | 90%* | 91% |
| **ALL FIRMS** | 68% | 82%* | 88% |

* Estimate is statistically different from estimate for the previous year shown (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007, 2013, and 2017

# PROVIDER NETWORKS

Firms and health plans can structure their networks of providers and their cost sharing to encourage enrollees to use providers who are lower cost or who provide better care. A tiered or high-performance network groups providers in the network based on the cost, quality and/or efficiency of the care they deliver. These networks encourage enrollees to visit preferred doctors by either restricting networks to efficient providers, or by having different cost sharing requirements based on the provider's tier.

- Twelve percent of firms with 50 or more workers that offer health benefits include a high-performance or tiered provider network in their health plan with the largest enrollment, a similar percentage to last year [Figures 14.6 and 14.7].

- Firms with 1,000-4,999 workers (23%) and firms with 5,000 or more workers (31%) are more likely to incorporate a high-performance or tiered network into their largest plan [Figure 14.6].

- Eight percent of firms offering health benefits report that they offer a plan that they considered to be a narrow network plan, similar to the percentage reported last year [Figures 14.4]. Narrow network plans limit the number of providers who can participate in order to reduce costs. Narrow network plans are generally more restrictive than standard HMO networks.

  - Firms with 5,000 or more workers offering health benefits are more likely to offer at least one plan with a narrow network than firms of other sizes [Figure 14.4].

- Six percent of firms offering health benefits said that either they or their insurer eliminated a hospital or health system from a provider network in order to reduce the plan's cost during the last year [Figure 14.4].

667291

Exhibit 142                                                                 JA-0002184

**Figure 14.4**

**Among Firms Offering Health Benefits, Percentage of Firms That Eliminated Hospitals From Their Network or Offer a Narrow Network Plan, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 14.5**

**Among Firms With 50 or More Workers Offering Health Benefits, Percentage of Firms That Eliminated Hospitals From Their Network or Offer a Narrow Network Plan, by Firm Size, 2014-2017**

|  | Firm Offers a Plan Considered a Narrow Network Plan | | | | Firm Insurer Eliminated a Hospital or Health System from Network to Reduce Cost | | | |
|---|---|---|---|---|---|---|---|---|
|  | 2014 | 2015 | 2016 | 2017 | 2014 | 2015 | 2016 | 2017 |
| **FIRM SIZE** | | | | | | | | |
| All Small Firms (50-199 Workers) | 8% | 6% | 6% | 8% | 6% | 4% | 4% | 4% |
| All Large Firms (200 or More Workers) | 8% | 5% | 6% | 8% | 6% | 6% | 5% | 3% |
| **ALL FIRMS (50 or More Workers)** | 8% | 6% | 6% | 8% | 6% | 5% | 4% | 4% |

NOTE: This question was asked of offering firms with 50 or more workers in 2014 and has since been asked of all offering firms regardless of firm size. In 2017, 6% of all offering firms eliminated a hospital or health system from their network and 8% of all offering firms offer a plan that could be considered a narrow network plan.

Tests found no statistical difference from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2014-2017

**667292**

Exhibit 142                                                                                          JA-0002185

**Figure 14.6**

**Among Firms with 50 or More Workers Offering Health Benefits, Percentage of Firms Whose Largest Plan Includes a High-Performance or Tiered Provider Network, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

NOTE: A high-performance network is one that groups providers within the network based on quality, cost, and/or the efficiency of care they deliver.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 14.7**

**Among Firms with 50 or More Workers Offering Health Benefits, Percentage of Firms Whose Largest Plan Includes a High-Performance or Tiered Provider Network, by Firm Size, 2007-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: A high-performance network is one that groups providers within the network based on quality, cost, and/or the efficiency of care they deliver.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2007-2017

**667293**

Exhibit 142

JA-0002186

# ALTERNATIVE CARE SETTINGS: TELEMEDICINE AND RETAIL CLINICS

Firms and health plans are incorporating new sites and methods of care in order to improve convenience and potentially reduce costs.

- Fifty-three percent of firms with 50 or more workers who offer health benefits cover the provision of some health care services through telemedicine in their largest health plan [Figure 14.8]. Telemedicine is the delivery of health care services through telecommunications to a patient from a provider who is at a remote location, including video chat and remote monitoring. This would not include the mere exchange of information via email, exclusively web-based resources, or online information a plan may make available unless a health professional provides information specific to the enrollee's condition. Larger firms are more likely to cover services provided through telemedicine than smaller firms [Figure 14.8].

    - Among firms with 50 or more workers whose plans cover health services through telemedicine, 26% provide a financial incentive for workers to use telemedicine instead of visiting a traditional physician's office in-person [Figure 14.9].

    - The percentage of large firms reporting that they cover services through telemedicine rose significantly in the last year, from 39% last year to 63% this year [Figure 14.10]. We note that we made a small change to the survey question, which could account for some of that change. This is a significant increase in one year, and we will examine this next year to see if the higher prevalence persists.

- Seventy-five percent of firms that offer health benefits cover care received in retail clinics, such as those located in pharmacies, supermarkets and retail stores, in their largest health plan [Figure 14.11]. These clinics are often staffed by nurse practitioners or physician assistants and treat minor illnesses and provide preventive services.

    - The percentage of firms covering care received in retail clinics in their largest health plan increased in the last year [Figure 14.12].

    - Fifteen percent of firms that cover care at retail clinics provide a financial incentive for workers to visit a retail clinic instead of a traditional physician's office [Figure 14.11].

- Seventy-three percent of firms that offer health benefits include a nurse hotline in their largest health plan. This is a significant increase from 55% in 2013 [Figure 14.13].

**667294**

Exhibit 142

JA-0002187

**Figure 14.8**

**Among Firms with 50 or More Workers Offering Health Benefits, Percentage of Firms Whose Plan with the Largest Enrollment Covers Telemedicine, by Firm Size, 2017**



* Estimate is statistically different between All Small Firms and All Large Firms estimate (p < .05)

NOTE:  Telemedicine is the delivery of health care services through telecommunications to a patient from a provider who is at a remote location including video chat and remote monitoring. This would not include the mere exchange of information via email, exclusively web-based resources, or online information a plan may make available unless a health professional provides information specific to the enrollee's condition.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 14.9**

**Among Firms With 50 or More Workers Offering Health Benefits, Percentage of Firms Whose Plan with the Largest Enrollment Covers Telemedicine and That Have an Incentive for Using Telemedicine, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)

NOTE:  Telemedicine is the delivery of health care services through telecommunications to a patient from a provider who is at a remote location including video chat and remote monitoring. This would not include the mere exchange of information via email, exclusively web-based resources, or online information a plan may make available unless a health professional provides information specific to the enrollee's condition.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667295**

Exhibit 142                                                                                                 JA-0002188

**Figure 14.10**

**Among Large Firms Offering Health Benefits, Percentage of Firms Whose Plan with the Largest Enrollment Covers Telemedicine, 2015-2017**



* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Large Firms have 200 or more workers. Telemedicine is the delivery of health care services through telecommunications to a patient from a provider who is at a remote location, including video chat and remote monitoring. This would not include the mere exchange of information via email exclusively web-based resources, or online information a plan may make available unless a health professional provides information specific to the enrollee's condition. There was a minor change in the survey question about telemedicine between 2016 and 2017.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2015-2017

---

**Figure 14.11**

**Among Firms Offering Health Benefits, Percentage of Firms Whose Plan With the Largest Enrollment Covers Care at Retail Clinics and That Have an Incentive to Visit Retail Clinics, by Firm Size, 2017**

| | Percentage of Firms That Cover Care Received at Retail Clinics | Among Firms That Cover Care Received at Retail Clinics, Percentage That Offer Financial Incentives to Visit a Retail Clinic Instead of a Traditional Physician's Office |
|---|---|---|
| **FIRM SIZE** | | |
| 200-999 Workers | 73% | 17% |
| 1,000-4,999 Workers | 75 | 18 |
| 5,000 or More Workers | 72 | 27* |
| **All Small Firms (3-199 Workers)** | 75% | 15% |
| **All Large Firms (200 or More Workers)** | 73% | 17% |
| **ALL FIRMS** | 75% | 15% |

NOTE: A retail clinic is a health care clinic located in retail stores, supermarkets, and pharmacies that treats minor illnesses and provides preventive health care services, such as flu shots.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667296**

Exhibit 142

JA-0002189

**Figure 14.12**

**Among Firms Offering Health Benefits, Percentage of Firms Whose Plan With the Largest Enrollment Covers Care at Retail Clinics and That Have an Incentive to Visit Retail Clinics, by Firm Size, 2010-2017**

| | Percentage of Firms That Cover Care Received at Retail Clinics | | | Among Firms that Cover Care Received at Retail Clinics, Percentage That Offer Financial Incentives | | |
|---|---|---|---|---|---|---|
| | All Small Firms | All Large Firms | All Firms | All Small Firms | All Large Firms | All Firms |
| 2010 | 43% | 47% | 43% | 4% | 16% | 5% |
| 2013 | 56%* | 61%* | 56%* | 17%* | 13% | 17%* |
| 2014 | 56% | 67% | 57% | 8% | 14% | 8% |
| 2016 | 60% | 73% | 61% | 6% | 10% | 6% |
| 2017 | 75%* | 73% | 75%* | 15% | 17%* | 15%* |

NOTE. Small Firms have 3-199 workers and Large Firms have 200 or more workers. A retail clinic is a health care clinic located in a retail store, supermarket, or pharmacy that treats minor illnesses and provides preventive health care services such as flu shots. Financial incentives include lower cost sharing for care received at retail clinics instead of traditional physician offices

* Estimate is statistically different from estimate for the previous year shown (p < .05).
SOURCE. Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2010-2017

**Figure 14.13**

**Among Firms Offering Health Benefits, Percentage of Firms Whose Plan With the Largest Enrollment Includes a Nurse Hotline, by Firm Size, 2013 and 2017**

| | 2013 | 2017 |
|---|---|---|
| **FIRM SIZE** | | |
| 3-24 Workers* | 49% | 74% |
| 25-199 Workers | 70% | 71% |
| 200-999 Workers* | 71% | 79% |
| 1,000-4,999 Workers | 84% | 81% |
| 5,000 or More Workers | 85% | 82% |
| **All Small Firms (3-199 Workers)*** | 54% | 73% |
| **All Large Firms (200 or More Workers)** | 74% | 79% |
| **ALL FIRMS*** | 55% | 73% |

* Estimate is statistically different from estimate for the previous year shown (p < .05).

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2013 and 2017

**667297**

Exhibit 142

JA-0002190

**Figure 14.14**
**Among Firms Offering Health Benefits, Percentage of Firms Whose Largest Plan Has Various Features, by Firm Size, 2017**



* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05).
NOTE: For Coverage at Retail Clinics, Delivery of Care Through Telemedicine, High Performance or Tiered Provider Network  and Nurse Hotline, firms were asked if their plan with the largest enrollment had these features. The High Performance or Tiered Provider Network question was asked of firms with 50 or more workers.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

## PRIVATE EXCHANGES AND DEFINED CONTRIBUTIONS

A private exchange is a virtual market that allows employers to provide their workers with a choice of several different health benefit options, often including supplemental or ancillary benefits options. Private exchanges generally are created by consulting firms, insurers, or brokers, and are different than the public exchanges run by the states or the federal government. There is considerable variation in the types of exchanges currently offered: some exchanges allow workers to choose between multiple plans offered by the same carrier while in other cases multiple carriers participate. The exchange operator may establish standards for the plans offered and may negotiate with insurers over the price and services provided. Although there has been considerable attention to the potential of private exchanges to change the market for employer-based coverage, participation thus far has been quite modest.

- Four percent of firms offering health benefits with 50 or more workers offer coverage through a private exchange. These firms provide coverage to 2% of covered workers in firms with 50 or more workers [Figure 14.16]. These percentages are the same as those in 2016.

- Firms offering health benefits with 50 or more workers that do not already offer health benefits through a private exchange were asked whether they had considered offering coverage through a private exchange. Ten percent of these firms are considering such an approach, lower than the percentage last year (18%) [Figure 14.15].

Some firms use a defined contribution approach to contribute toward the cost of health insurance. A defined contribution is a set dollar amount offered to the worker by the employer. Workers may then select one of several plans, paying the difference between the defined contribution and the cost of their chosen health insurance plan. This allows a firm to offer a larger variety of health plans to workers and to structure contributions or other rules to encourage workers to choose more efficient plans. Some private exchanges encourage employers to use a defined contribution approach to encourage competition among the participating insurers.

- Firms offering health benefits with 50 or more workers and that do not already offer benefits through a private

667298

Exhibit 142

JA-0002191

exchange were asked whether they had considered using a defined contribution approach. Nineteen percent of these firms were considering such an approach [Figure 14.15].

**Figure 14.15**

**Among Firms With 50 or More Workers Offering Health Benefits, Percentage Considering Offering Benefits Through a Private Exchange or Using a Defined Contribition Approach, by Firm Size and Region, 2017**

| | Private Exchange | | | Defined Contribution | | |
|---|---|---|---|---|---|---|
| | Have Considered Offering Benefits Through a Private Exchange | Have Not Considered Offering Benefits Through a Private Exchange | Don't Know | Have Considered Using a Defined Contribution Approach | Have Not Considered Using a Defined Contribution Approach | Don't Know |
| **FIRM SIZE** | | | | | | |
| 200-999 Workers | 13% | 85% | 2%* | 17% | 81% | 2% |
| 1,000-4,999 Workers | 12 | 87 | 1 | 18 | 81 | * |
| 5,000 or More Workers | 22* | 76* | 2 | 22 | 76 | 3 |
| **All Small Firms (50-199 Workers)** | 9% | 90% | <1%* | 19% | 77% | 4% |
| **All Large Firms (200 or More Workers)** | 13% | 85% | 2%* | 18% | 80% | 2% |
| **REGION** | | | | | | |
| Northeast | 17% | 83% | 1%* | 24% | 74% | 1% |
| Midwest | 9 | 90 | 1 | 26 | 69 | 6 |
| South | 7 | 92 | 1 | 16 | 82 | <1* |
| West | 9 | 90 | <1 | 7 | 86 | 7 |
| **ALL FIRMS (50 or More Workers)** | 10% | 89% | 1% | 19% | 78% | 3% |

NOTE: These questions were not asked of firms that already offer health benefits through a private exchange. In 2017, 4% of offering firms with 50 or more workers offered coverage through a private exchange. A private exchange is one created by a consulting company, not by a federal or state government. Private exchanges allow employees to choose from several health benefit options offered on the exchange. A defined premium contribution is a set dollar amount offered to the employee. Employees may then select one of several plans and pay the difference between the defined contribution and the cost of the health insurance option they choose.

* Estimate is statistically different from estimate within response option for all other firms not in the indicated size or region category (p < .05)

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 14.16**
**Among Firms with 50 or More Workers Offering Health Benefits, Percentage of Covered Workers Enrolled at a Firm That Offers Benefits Through a Private or Corporate Exchange, by Firm Size, 2017**



NOTE: A private exchange is one created by a consulting company, not by a federal or state government. Private exchanges allow employees to choose from several health benefit options offered on the exchange. In 2017, 4% of offering firms with 50 or more workers offered coverage through a private exchange.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**667299**

Exhibit 142

JA-0002192

## ASSOCIATION HEALTH PLANS AND MEDICAID

- An association health plan is an organization of employers that coordinates coverage in order to reduce costs or improve benefits. Six percent of offering firms with fewer than 250 workers offer health benefits through a trade or professional association health plan [Figure 14.17].

- A substantial share of firms that offer health benefits report having workers who receive coverage from Medicaid. Medicaid is a federally and state-funded program that provides health coverage for people who are poor, aged or disabled. Twenty percent of small firms and 48% of large firms report that they have workers covered by Medicaid. We note that, as expected, there is a significant share of firms, particularly larger firms, that do not know the answer to this question [Figure 14.18].

**Figure 14.17**
**Among Firms with Fewer Than 250 Workers Offering Health Benefits, Percentage of Firms Offering Benefits Through an Association Health Plan, by Firm Size, 2017**



Tests found no statistical difference from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

**Figure 14.18**
**Percentage of All Firms Stating That Some Workers Receive Coverage Through Medicaid, by Firm Size, 2017**

| | All Firms | | | Offering Firms | | | Non-Offering Firms | | |
|---|---|---|---|---|---|---|---|---|---|
| | Yes | No | Don't Know | Yes | No | Don't Know | Yes | No | Don't Know |
| FIRM SIZE | | | | | | | | | |
| 3-24 Workers | 16%* | 66%* | 18% | 18%* | 74%* | 8% | 15%* | 61%* | 23%* |
| 25-199 Workers | 27 | 47* | 26 | 25 | 54* | 21* | 38* | 41* | 44* |
| 200-999 Workers | 48 | 34* | 19 | 48* | 34 | 19* | NSD | NSD | NSD |
| 1,000-4,999 Workers | 47 | 23* | 30 | 47* | 23* | 30 | NSD | NSD | NSD |
| 5,000 or More Workers | 48* | 20* | 32* | 48* | 20* | 32* | NSD | NSD | NSD |
| All Small Firms (3-199 Workers) | 17%* | 63%* | 20% | 20%* | 68%* | 12%* | 14%* | 59% | 26% |
| All Large Firms (200 or More Workers) | 48%* | 32%* | 21% | 48%* | 31%* | 21%* | NSD | NSD | NSD |
| ALL FIRMS | 17% | 63% | 20% | 21% | 67% | 12% | 14% | 59% | 26% |

* NSD: No Significant Data
* Estimate is statistically different from estimate for all other firms not in the indicated size category (p < .05)
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2017

667300

Exhibit 142                                                                                          JA-0002193



-and-



The Henry J. Kaiser Family Foundation

Headquarters
2400 Sand Hill Road
Menlo Park, CA 94025
Phone 650-854-9400

Washington Offices and
Barbara Jordan Conference Center
1330 G Street, NW
Washington, DC 20005
Phone 202-347-5270

**www.kff.org**

Health Research & Educational Trust

155 North Wacker
Suite 400
Chicago, IL 60606
Phone 312-422-2600   Fax 312-422-4568

**www.hret.org**

This publication (#9060) is available on the Kaiser Family Foundation's website at www.kff.org.

September 2017

**667301**

Exhibit 142    JA-0002194



While faith groups directly involved in ministry are automatically exempt from Obamacare's birth control mandate, religiously affiliated nonprofits have to seek accommodation. | Getty

## Two years later, few Hobby Lobby copycats emerge

By **JENNIFER HABERKORN** | 10/11/2016 05:19 PM EDT

Obamacare supporters warned two years ago that if the Supreme Court allowed the owners of Hobby Lobby craft stores to eliminate birth control coverage because of their religious beliefs, others would rush to follow — and not just to eliminate contraceptives, but also, potentially, treatments like blood transfusions and vaccines.

Those fears haven't been borne out.

Since the 2014 high court ruling in favor of Hobby Lobby, only 52 companies or nonprofit organizations, have told the government they plan to opt out of Obamacare's requirement to

**669140**

Exhibit 143                                                                                          JA-0002195

cover birth control because it violates their religious beliefs, according to a POLITICO review of Obama administration records obtained under the Freedom of Information Act.

That's in addition to the employers who filed about 100 lawsuits against the contraception mandate, as well as an unknown number of employers that may have directly informed their insurer, instead of the government, of their religious objections — a tack taken, for example, by Georgetown University, a Catholic institution that offers insurance to students and employees. Telling the government or one's insurer that the mandate violates one's religious beliefs sets in motion the court-ordered accommodation that requires the insurer to provide and pay for such coverage directly.

Several insurance industry sources say they haven't gotten many such requests.

The anticlimactic response is noteworthy given the polarizing reaction to the Obamacare requirement that most employers provide contraception in their health plans at no additional cost. That provision is one of the most controversial elements of President Barack Obama's health care law — one that even now, in the administration's closing days, is still not fully resolved.

### Bill Clinton firmly declares his support for Obamacare
By YOUSEF SABA

"If that is anywhere close to the universe of entities [that object to the contraception mandate], that it is a little surprising," said Tim Jost, a legal expert on the health law and a member of the Institute of Medicine.

Religious groups, led by Catholic bishops, accused the White House of hijacking health insurance plans to issue birth control that some Christians object to on religious grounds — or risk severe fines. While faith groups directly involved in ministry (such as houses of worship) are automatically exempt from the health law's requirement, religiously affiliated nonprofits (such as hospitals, universities and charities) have to seek accommodation, as do for-profit businesses whose owners oppose contraception on religious grounds. Public health advocates argue birth control is a necessary part of a woman's health care that should not be denied just because she works for an employer with strong religious views.

Underscoring just how high-pressure the debate was within the White House — even some Democratic allies balked at the first rules — Obama in 2012 personally announced an "accommodation."

**669141**

Exhibit 143                                                                    JA-0002196

The policy was modified several times and now allows a Catholic university or other religious nonprofit to inform the government, its insurer or insurance administrator that it objects to birth control coverage. The insurer must then contact the women covered by the plan and offer to provide and pay for contraceptive coverage without involving the employer. That accommodation was extended to closely held for-profit businesses after the *Hobby Lobby* ruling in 2014.

Laurie Sobel, a senior policy analyst at the nonpartisan Kaiser Family Foundation, said her focus is on the number of women who work for employers that don't want to provide contraception — not the number of employers.

"What everyone wants to know is how many employees are affected," she said, citing "large universities and large nonprofit Catholic health care systems or hospitals" that employ thousands of women.

Catholic hospital chain Ascension Health, one employer using the accommodation, for instance, is the largest nonprofit health system in the country with 160,000 employees — tens of thousands of whom would likely be affected.

POLITICO obtained the accommodation notices filed by employers between 2014 and March.

Some of those opting out — such as J.E. Dunn Construction Group in Kansas City, Mo., or Loyola University in New Orleans — employ thousands of people, and presumably cover many more as spouses or dependents.

Others, such as Luurtsema Sales, a wholesale plant supplier in Michigan, and Earth Sun Moon Trading Co., a nature-inspired clothing company in Pennsylvania, appear to have far fewer employees. Thirty of the entities are nonprofits and 22 are for-profits. It is unknown how many women work for or have insurance coverage through the companies using the accommodation.

About half of the companies and schools objected to covering all forms of contraception. The other half objected to covering a particular approach — most often, to methods they equate to abortion, such as emergency contraception, including the morning-after pill, and certain intrauterine devices.

A few employers said they notified the government in protest to avoid risking the fines that come with not covering contraception.

**669142**

Exhibit 143                                                                    JA-0002197

"This letter is submitted under protest, as we don't believe we need an 'accommodation' in order to operate freely," Tyndale House Publishers, which publishes Christian books and Bibles, wrote at the top of its notice to HHS.

Tyndale and 14 other entities that filed lawsuits against the mandate — mostly for-profit companies — also informed the government of the objection. The Supreme Court told the government that it can count a lawsuit as a notification of a religious objection and try to contact the insurer to provide contraception directly.

Insurers say they don't track the number of employers that use the accommodation by notifying them directly instead of the government. Two major insurance administration trade groups say they are aware of few, if any, administrators with clients that want to use the accommodation.

"I am not aware of any at this moment," said Julian Roberts, president and CEO of the Third Party Administrators Association of America, echoing similar comments from Fred Hunt, past president of the Society of Professional Benefit Administrators, in a separate interview.

The third-party administrators say that in many states, the accommodation won't even work for their clients because the administrators legally cannot act like an insurer to provide contraception coverage. They have warned the Obama administration that the accommodation may have to be changed as a result.

---

**HEALTHCARE**
**Obamacare's millennial problem**
By **RACHANA PRADHAN** and **PAUL DEMKO**

---

In one case, the accommodation may have expanded access to contraception. A group of 160 churches and religious organizations in the St. Raphael Health Plan, which is associated with the Catholic Archdiocese of Milwaukee, chose to use the accommodation. The Obama administration in a letter told the administrator that churches are exempt from the mandate to cover contraceptives, but the churches said they would comply with it anyway.

Jerry Topczewski, chief of staff for the archdiocese, told POLITICO that the health plan is confident that it was not exempt and that it would have been fined had it not taken the accommodation. "We wouldn't be doing this if we didn't feel it was necessary," he said.

Several other religious non-profits filed for the accommodation, as well, including St. Joseph's Abbey, a community of monks in Massachusetts, and the Catholic Diocese of Memphis.

Exhibit 143                                                                    JA-0002198

Mark Rienzi, a Becket Fund attorney who has represented several clients opposed to the mandate and accommodation, including the Little Sisters of the Poor order of Catholic nuns, said the number of employers that want to opt out is tiny, compared with employers whose health plans are grandfathered so they don't have to comply with the contraceptive provision until their health plans change.

"That number is tiny compared to the 100 million people the government itself left out of the mandate for political reasons," Rienzi said, referring to the employers who had health plans in effect when the law passed in 2010, who don't need to comply with some requirements until they change their plans significantly. "The government's obsession with a molehill they can blame on the Little Sisters of the Poor, rather than the mountains of their own creation, is mystifying."

Advocates of the birth control coverage requirement argue that if even one woman is barred from coverage because of her employer's religious views, that's too many.

"Any woman in these plans who is being impacted and not having her birth control covered is important," said Mara Gandal-Powers, senior counsel at the National Women's Law Center, which advocated for the policy in court briefs. "It's an act of discrimination based on her sex."

Most for-profit companies appear to have grudgingly accepted the accommodation offered by the Obama administration but the religious nonprofits say that it still requires them to violate their religious beliefs. They call the form they must fill out "a permission slip" to provide contraception.

The Supreme Court earlier this year, in *Zubik v. Burwell*, ordered the government and religious groups to try to come up with a potentially new or further modified accommodation.

The case was sent back to lower courts to potentially sort out a compromise. The government asked for comments on the issue this summer and asked the courts if it could have until Nov. 30 before providing a new update.

Exhibit 143                                                                      JA-0002199



Volume 58 | Issue 3                                                                                    Article 2

5-1-2013

# No Compelling Interest: The "Birth Control" Mandate and Religious Freedom

Helen M. Alvare

Follow this and additional works at: http://digitalcommons.law.villanova.edu/vlr

Part of the Religion Law Commons, and the Sexuality and the Law Commons

## Recommended Citation

Helen M. Alvare, *No Compelling Interest: The "Birth Control" Mandate and Religious Freedom*, 58 Vill. L. Rev. 379 (2013).
Available at: http://digitalcommons.law.villanova.edu/vlr/vol58/iss3/2

This Symposia is brought to you for free and open access by Villanova University Charles Widger School of Law Digital Repository. It has been accepted for inclusion in Villanova Law Review by an authorized editor of Villanova University Charles Widger School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**668220**

Exhibit 144                                                                                    JA-0002200

2013]

# NO COMPELLING INTEREST: THE "BIRTH CONTROL" MANDATE AND RELIGIOUS FREEDOM

### Helen M. Alvaré*

## I. Introduction

THE free exercise of religion is ordinarily and immediately understood as part of the canon of "human rights." One recent event, however, more than almost any other in recent memory, is challenging this understanding: a regulation issued by the U.S. Department of Health and Human Services ("HHS"), under the authority of the 2010 federal health care law ("ACA"),[1] requiring religious institutions to provide their employees health insurance covering birth control, sterilization, and emergency contraception ("ECs") with no co-pay.[2] This regulation ("the Mandate"), is not imposed upon entities based on their status as federal grantees, but applies to all group health plans and health insurance issuers offering group or individual health insurance coverage.[3]

What is the "story" the Mandate tells about the free exercise of religion? That the absolute maximum availability of birth control, sterilization, and drugs that can in some circumstances act to destroy a human embryo are somewhere near the heart of women's equality and freedom. It also claims that the government is on the side of women, but that churches, particularly the Roman Catholic Church, are not. Legally, the Mandate has put the Catholic Church in the exemption-seeking business—the business of seeking *not* to comply with laws billed as advancing human rights for women. This is a position more than a little disagreeable to anyone pushed to take it.

The source of the Mandate is what HHS Secretary Kathleen Sebelius calls the "scienti[fic]"[4] recommendations commissioned by the HHS from

---

* Associate Professor of Law, George Mason University School of Law. An earlier version of this Article was presented at the Seventh Annual John F. Scarpa Conference on Law, Politics, and Culture: Living the Catholic Faith in Public Life, held at Villanova University School of Law, on September 14, 2012. The author would like to thank Melanie Knapp, Dorinda Bordlee, Austin L. Hughes, Richard Doerflinger, Matt Franck, Gerard V. Bradley, Michael New and Michael Moreland, and the George Mason summer research grant program.

1. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) [hereinafter "ACA"] (amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029).

2. For a further discussion of the Mandate's requirements, see *infra* notes 15–57.

3. 42 U.S.C. § 300gg-13(a) (2010).

4. Press Release, Dep't of Health & Human Servs., A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius (Jan. 20, 2012), *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html (discussing purposes and contents of mandate).

(379)

**668221**

Exhibit 144     JA-0002201

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

380                    VILLANOVA LAW REVIEW                    [Vol. 58: p. 379

the Institute of Medicine ("IOM"), a group of academics and scientists convened in order to provide advice to the federal government.[5] The IOM's case for the Mandate, spelled out on just eight pages of its two hundred and thirty-five page report, is the same case commonly forwarded on behalf of contraception and ECs in the past, usually by the leading proponents of a birth control and EC solution to the U.S. problems of "unintended pregnancy" and teen pregnancy (typically, though not always, an overlapping phenomenon).[6] On its face, it seems axiomatically true: contraception prevents pregnancy; unintended pregnancy is by definition unwanted by women; and greater usage of contraception should significantly reduce the unintended pregnancy problem. *A fortiori*, "free" contraception should increase usage of contraception in a way and to a degree that would cause unintended pregnancy rates to decline faster and more steeply.

It turns out, however, that this chain of reasoning does not work nearly as well as its proponents suggest when contraception is promoted on a *social* scale. Speaking quite generally, this is due both to the unique qualities of the sexual transaction, and to the way contraception affects the "marketplaces" for sex and marriage. In simple terms, contraception has the effect of lowering the "price" of sex, by separating sexual intercourse from the understanding that sex makes children who, in order to flourish, need their parents' commitment to one another and to the children, over a long period of time. This effect, in turn, tends to increase the demand for sex outside of marriage, which leads to more nonmarital pregnancies and abortions. Consequently, over the long run, large-scale contraception programs are not generally associated with steady declines in unintended pregnancy, which, in any event, is a difficult concept to measure.

Further, it seems likely that a legal Mandate will fail to accomplish its goal of closing the small gap between the current availability and use of contraception, and universal use by women at risk of unintended pregnancy. This is so because the group of women with the highest unintended pregnancy rates (the poor) are not addressed or affected by the Mandate, and are already amply supplied with free or low-cost contraception. It is also true because women have a true variety of reasons for not using contraception that the law cannot mitigate or satisfy simply by attempting to increase access to contraception by making it "free."

A possible way to overcome this thicket of obstacles to broader and more effective use of contraception—greatly stepped up usage of long-acting, reversible contraceptives ("LARCs")—poses its own risks and moral hazards, though it appears to constitute an important component of the strategy adopted by the Mandate and its supporters. But even if LARCs

---

5. For the IOM's formal self-description, see *infra* note 15.

6. STEPHANIE J. VENTURA, CTRS. FOR DISEASE CONTROL & PREVENTION, CHANGING PATTERNS OF NONMARITAL CHILDBEARING IN THE UNITED STATES (2009) (noting that about eighty-six percent of teen births are nonmarital; and rest take place within marriage).

**668222**

Exhibit 144                    JA-0002202

2013]            JOHN F. SCARPA CONFERENCE            381

could reduce "unintended pregnancy," there is another difficulty with the Mandate's goal to assist women's health via reducing unintended pregnancies: research may show a *correlation* between unintended pregnancy and various health conditions in women, but it does not clearly indicate a *causal* relationship.

What are the legal consequences of there being only an attenuated relationship, if any, between the Mandate and women's health? Most significantly, it eliminates the possibility that the government can show what the Religious Freedom Restoration Act of 1993[7] ("RFRA") requires in order for the government to burden free exercise: a "compelling governmental interest" and the "least restrictive means" of furthering that interest.[8] While this Article will not address the question of the "burden" on free exercise necessary to provoke a RFRA claim,[9] it will examine whether the government can demonstrate a "compelling governmental interest" for the Mandate. It will pursue this question by means of a close analysis of the document providing the basis for the Mandate, a report issued by the IOM entitled *Clinical Preventive Services for Women: Closing the Gaps*,[10] (the "Report" or "the IOM Report") as commissioned by HHS.[11]

Section II of this Article will set forth the current requirements of the HHS Mandate—I refer to the "current" requirements because the Obama Administration has promised that it will alter its language during 2013, and was in fact under court order to do so.[12] On February 1, 2013, the administration issued a proposed new rule,[13] which has no effect upon the arguments advanced in this Article. The new rule affects *how* the government will accomplish providing birth control, sterilization and ECs to the employees of certain types of religious institutions, so as to overcome such institutions' objections. But it does not rely upon different grounds for requiring health insurance policies generally to cover such drugs and devices. Section II will also discuss other, recent federal agency actions communicating equivalence between maximum access to contraception and women's freedom and equality; in so doing, it will highlight further the

---

7. Pub. L. No. 103-141, 107 Stat. 1488 (codified in scattered sections of 5 and 42 U.S.C.). The Supreme Court invalidated the RFRA with respect to state laws. City of Boerne v. Flores, 521 U.S. 506 (1999).

8. 42 U.S.C. § 2000bb-1(a)–(b).

9. For a complete discussion of the question of the Mandate's burden on free exercise, see Korte v. Sebelius, No. 12-3841, 2012 WL 6757353, at *3–4 (7th Cir. Dec. 28, 2012).

10. INST. OF MED., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS (2011) [hereinafter IOM 2011 REPORT].

11. *Id.* at frontspiece ("This study was supported by Contract HHSP23337013T between the National Academy of Sciences and the U.S. Department of Health and Human Services.").

12. Wheaton Coll. v. Sebelius, No. 12-5273, 2012 WL 6652505, at *2 (D.C. Cir. Dec. 18, 2012).

13. Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 8456, 8456–76 (Feb. 6, 2013).

668223

Exhibit 144                                                                 JA-0002203

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

382                    VILLANOVA LAW REVIEW                    [Vol. 58: p. 379

theme emerging from the federal government that religion, particularly any religion opposing contraception, is the enemy of women's freedom.

Even should the Obama Administration effectively change the Mandate during 2013, this Article's review of the government's proffered empirical basis for its vociferously held stance that women's health and freedom requires free contraception, performs a useful service. The Administration's willingness to push the Mandate aggressively—by defending it in court against many challenges, by making regular use of both presidential and HHS bully pulpits, by making the Mandate a centerpiece of the presidential reelection campaign—on the basis of so weak an empirical argument, should be studied. Also, federal and state lawmakers are continuously asserting that their advocacy for contraception is tantamount to a woman's health and freedom agenda. They also continue to draw unfavorable comparisons with religions'—especially the Catholic religion's—refusal to facilitate access to contraception. Consequently, any long-term strategy in support of religious freedom ought to include attention to the empirical bases for the government's claims about the causal relationship between contraception and women's health.

Section III, the heart of this Article, will closely scrutinize the argument set forth in the IOM Report that free contraception, sterilization, and ECs are crucial for preserving women's health. It will conclude that the IOM's argument is poorly sourced, poorly reasoned, biased, and incomplete with respect to the questions of contraception and women's health.

Section IV will engage in a "compelling governmental interest" analysis of the government's case for free contraception, relying primarily on the Supreme Court's most recent and thorough review and discussion of that standard respecting a law also claimed to find support in ultimately discredited empirical data. This is the "violent video games" case of *Brown v. Entertainment Merchants Association*.[14]

Section V offers some concluding reflections about the clash specifically between the "contraceptive project" embodied in the Mandate and other federal messages, and religious teachings about freedom for women in the arena of sex and marriage. The phrase "the contraceptive project" includes not only the government's plan to advance usage of contraception via a health insurance regulation; it also includes, as Section II of the Article will describe, an intention to advance the message that freedom and equality for women is achieved in substantial measure by enabling women—if they wish—to engage in sexual expression without forming lasting relationships, either with the sexual partner, or with a child. Section V will suggest that religious teachings opposed to the contraceptive project might realistically assist women to attain the health outcomes the government claims to support via the Mandate. This finding suggests that

---

14. 131 S. Ct. 2729 (2011).

**668224**

Exhibit 144                                                                JA-0002204

2013]              JOHN F. SCARPA CONFERENCE              383

a health care system in which religious witness is allowed to flourish better promotes women's long-term health and freedom.

## II.  THE MANDATE AND OTHER FEDERAL ENDORSEMENTS OF THE CONTRACEPTIVE PROJECT

### A.  *The HHS Mandate*

The Mandate arose as a result of the "preventive services" provision of the ACA, which required group health plans and health insurance issuers offering group or individual health insurance coverage, to cover, without a co-pay, both evidence-based items or services that have a rating of A or B in the current recommendations of the United States Preventive Services Task Force ("USPSTF") and, with respect to women, "such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources Services Administration."[15] HRSA is an agency of HHS.  HHS thereafter commissioned the IOM to produce recommendations.  The IOM, by its own description, was "established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. . . . [And] to be an adviser to the federal government."[16]

The IOM issued the Report on preventive services for women on July 19, 2011, including the following recommendation which is the subject of this Article: "The committee recommends for consideration as a preventive service for women: the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."[17]  On August 1, 2011, solely on the strength of the IOM Report, HHS issued guidelines tracking the language of the Report, defining preventive services to include "[a]ll . . . [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."[18]  The rule contained a very narrow religious exemption protecting an organization if: 1) its purpose is the inculcation of religious values; 2) it employs "primarily" persons who share the organization's religious tenets; 3) it serves "primarily" persons who share the or-

---

15.  42 U.S.C § 300gg–13(a)(4) (2006).  Section 2713 of the ACA, Coverage of Preventive Health Services, provides that all "group health plan[s]" must cover "preventive care and screenings" for women without cost-sharing.  *Id.*

16.  IOM 2011 REPORT, *supra* note 10, at iv.

17.  *Id.* at 109–10.

18.  Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8725 (Feb. 15, 2012).

668225

Exhibit 144                                                                      JA-0002205

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

384                    VILLANOVA LAW REVIEW                    [Vol. 58: p. 379

ganization's religious tenets; and 4) it qualifies under the IRS code as a church or religious order.[19]

Because almost all religious universities, hospitals, schools, and social services make their services available to persons regardless of their faith, and often hire persons of diverse faiths or persons with no faith, they are not eligible for this exemption. Additionally, Catholic educational, social service, and health care institutions were particularly impacted because the Catholic faith, alone among religions, has maintained for two millennia a tradition against both contraception and abortion.[20]  Other religious institutions opposed only to abortion were affected by the Mandate's inclusion of ECs and other contraceptives, which, according to the federal government and their manufacturers, can act at some times as an abortifacient, i.e., to destroy a human embryo.[21]  For religious employers who refuse to violate their consciences, the ACA imposed a fine that could amount to one hundred dollars per day per employee.[22]

Religious organizations and citizens sent hundreds of thousands of comments to HHS, objecting to the Mandate upon both constitutional (First Amendment) and legislative (Religious Freedom Restoration Act) grounds.  On February 12, 2012, however, the regulation was finalized without any substantive change.  Instead, HHS extended by one year the deadline by which "[n]onprofit employers who, based on religious beliefs, do not currently provide contraceptive coverage in their insurance plan," had to comply.[23]

Shortly thereafter, in March 2012, HHS issued a rambling Advanced Notice of Proposed Rulemaking,[24] which asserted that at some time in the undetermined future, HHS would try to devise a way to force religious institutions to provide contraception, sterilization and ECs to employees without enlisting the cooperation of the institutions—in other words to require employer-contracted insurance providers to "offer . . . coverage

---

19. Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46621, 46623 (Aug. 3, 2011).

20. PAUL VI, HUMANAE VITAE ¶ 14 (1968), *available at* http://www.vatican.va/holy_father/paul_vi/encyclicals/documents/hf_p-vi_enc_25071968_humanae-vitae_en.html; JOHN PAUL II, EVANGELIUM VITAE ¶ 57 (1995), *available at* http://www.vatican.va/holy_father/john_paul_ii/encyclicals/documents/hf_jp-ii_enc_25031995_evangelium-vitae_en.html.

21. For a further discussion of the potential post-fertilization mechanisms of action of the intrauterine device ("IUD") and some of the ECs endorsed by the FDA under the heading of "contraception," see *infra* notes 63–78.

22. *See* 26 U.S.C. § 4980(d) (2012); CYNTHIA BROUGHER, CONG. RESEARCH SERV., PREVENTIVE HEALTH SERVICES REGULATIONS: RELIGIOUS INSTITUTIONS' OBJECTIONS TO CONTRACEPTIVE COVERAGE 16 (2012), *available at* http://www.scribd.com/doc/100249369/CRS-Report-HHS-Contraception-Abortion-Mandate.

23. Dep't of Health & Human Servs., *supra* note 4; 77 Fed. Reg. at 8729.

24. Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. 16501 (Mar. 21, 2012) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, and 45 C.F.R pt. 147).

**668226**

Exhibit 144                                                                                JA-0002206

Alvare: No Compelling Interest: The "Birth Control" Mandate and Religious

2013]            JOHN F. SCARPA CONFERENCE            385

that does not include coverage for contraceptive services" to certain religious institutions, but simultaneously, "provide to the participants and beneficiaries covered under the plan separate health insurance coverage consisting solely of coverage for contraceptive services . . ." without "charge to the organization, group health plan, or plan participants or beneficiaries."[25]

On February 1, 2013, the Administration issued a proposed rule offering an exemption to religious institutions meeting only the fourth of its previous four requirements (being a church, an association of churches, or a religious order).[26] The government concluded that this reformulation would not "expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules."[27] The employees of other religious institutions—hospitals, social services, etc.—would be "automatically enrolled" to receive contraception, sterilization, and ECs without a co-pay via a separate insurance policy to be issued by the insurer chosen by the religious employer to provide general health insurance.[28] As discussed in the Introduction, however, the government's extended and aggressive posturing about a clash between religious freedom and women's freedom merits consideration no matter the final shape of the regulation, or the litigation. One reason of course, is that the theme of "contraception as women's freedom" seems to have staying power, such that religions will have to confront it regularly. This is indicated by particular features of the Mandate, by features of the government's litigation strategy respecting the Mandate, and by the shape of the "women's freedom" theme in the Obama reelection campaign and in several other federal regulations issued recently. Each will be addressed briefly below.

Beginning with the Obama presidential campaign, its main appeal to women was perhaps first famously sounded in a speech by campaign surrogate and Secretary of Health and Human Services, Kathleen Sebelius, at a fundraiser for the leading political arm of the abortion rights movement, NARAL Pro-Choice America.[29] There she stated: "We've come a long way in women's health over the last few decades, but we are in a war."[30] She was referring to Republicans' efforts to defund the largest abortion pro-

25. *Id.* at 16505–06.

26. Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 8456, 8456–76 (Feb. 6, 2013).

27. *Id.* at 8461. The text accompanying the proposed rule stated that the government had finally concluded after reflection that only the fourth requirement was logically necessary in order to limit the exemption to the religious institutions intended to be exempted all along.

28. *Id.* at 8463.

29. Sam Baker, *Probe: Sebelius Broke the Law by Campaigning for Obama Reelection,* THE HILL (Sept. 12, 2012), http://thehill.com/homenews/administration/2491 87-probe-sebelius-violated-law-by-campaigning-for-obama.

30. Robin Marty, *Sebelius: "We Are in a War",* RH REALITY CHECK (Oct. 6, 2011), http://www.rhrealitycheck.org/blog/2011/10/06/sebelius-0.

**668227**

Exhibit 144

JA-0002207

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

vider in the United States, Planned Parenthood, as well as their legislative proposals regarding federal funding for contraception and abortion generally. She equated these with "roll[ing] back the last 50 years in progress women have made in comprehensive health care in America."[31] Democratic Congresswomen picked up on the theme in the context of the first legislative hearing on the Mandate's effects upon religious freedom, using the sound bite, "Where are the women?"[32] They were referring to the all-male first panel of witnesses, taking no notice of two women on the second panel.[33]

This theme was then carried into the presidential campaign through a postcard campaign targeted to women ("Vote like your lady parts depend on it . . . because they kinda do"),[34] speeches at the Democratic National Convention, and a campaign speaking tour by an unmarried, non-Catholic law-student, Sandra Fluke, claiming that her Catholic law school owed her a free, daily supply of birth control as a matter of human rights. She further claimed that the school had denied an anonymous classmate the birth control pill in order to treat a physical disorder (endometriosis) unrelated to birth control, despite Catholic theology permitting such treatment.[35] Most revealing, perhaps, of the scope of the contraceptive project, was an Obama campaign television ad featuring an actress, Lena Dunham, from a show about the sex lives of unmarried women. Comparing voting for Obama to a first sexual experience, she closes with the suggestion that it is "super uncool to be out and about and someone says, 'Did you . . .' and you say 'No I wasn't ready.'" She adds, "Before I was a girl, now I was a woman," in both cases, comparing voting for President Obama to losing one's virginity.[36] These messages moved beyond the "women's health" tone and content of the IOM Report, appearing to celebrate female sexual expression per se as the essential element of women's freedom. Both Ms. Fluke and Ms. Dunham's messages, sponsored

---

31. *Id.*

32. Lines Crossed: Separation of Church and State. *Has the Obama Administration Trampled on Freedom of Religion and Freedom of Conscience?: Hearing Before the H. Comm. on Oversight and Government Reform*, 112th Cong. 1 (2012).

33. Dr. Allison Dabbs Garrett, the senior vice president for academic affairs at Oklahoma Christian University, and Dr. Laura Champion, the medical director at Calvin College Health Services, testified that the government mandate requiring religious institutions such as theirs to provide contraception, sterilization, and abortifacient drugs violated the First Amendment. *See id.* at 147–48.

34. For the text of the card, see Jonathon M. Seidl, *Obama Scrubs Controversial "Vote Like Your Lady Parts Depend on it" E-Card from Site*, THE BLAZE (Oct. 2, 2012 2:27 PM), http://www.theblaze.com/stories/obama-scrubs-controversial-vote-like-your-lady-parts-depend-on-it-e-card-from-site/.

35. *See* Joe Scott, *Can I Use Birth Control for Medical Reasons and not to Prevent Pregnancy?*, BUSTED HALO, http://bustedhalo.com/questionbox/can-i-use-birth-control-for-medical-reasons-and-not-to-prevent-pregnancy (last visited Feb. 14, 2013); Ira Stoll, *Sandra Fluke's Amazing Testimony*, WALL ST. J. (Mar. 9, 2012), http://online.wsj.com/article/SB10001424052970204603004577269491399954950.html.

36. BarackObamadotcom, *Lena Dunham—Your First Time*, YOUTUBE (Oct. 25, 2012), http://www.youtube.com/watch?v=o6G3nwhPuR4.

**668228**

Exhibit 144      JA-0002208

2013]          JOHN F. SCARPA CONFERENCE          387

and made nationally famous by the current Administration, are constitutive elements of the contraceptive project.

During his campaign, President Obama also associated himself frequently with the self-branded champion of women, and the premier promoter of a linkage between birth control, abortion, and women's freedom: the Planned Parenthood Federation of America. Planned Parenthood donated 15 million dollars of campaign advertisements to the President's re-election campaign.[37] And the President continued strenuously to support both federal and state grants for Planned Parenthood, for hundreds of millions dollars annually, as well as to deploy his Administration's Department of Justice to states where legislatures had re-directed their family planning funds away from local Planned Parenthoods, in favor of providers without an abortion connection. The Department of Justice threatened these states with the withdrawal of all federal Medicaid funding for all services for the poor.[38] Very likely, President Obama's close association with Planned Parenthood strengthened his campaign's and his Administration's publicity regarding their support for women. It also raised questions about the objectivity of the Mandate and the Report supporting it—both of which were mirror images of Planned Parenthood's agenda, and that of its former research affiliate, the Guttmacher Institute, respecting contraception and religious objectors.[39]

The Administration's "theme" about the clash between religious freedom and women's freedom is further displayed in the structure of the Mandate and in the federal government's litigation strategy. First, the Mandate effectively allows only houses of worship and religious orders to buy health insurance consistent with their faith. If a religious institution comes into contact with persons who are *not* members of the same faith, however, either as employees or as "clients," (students, patients, etc.), they must buy insurance covering services contradicting their faith. The impression given is that general audiences should be "shielded" from the religion's opposition to contraception, a teaching which other Administration statements characterize again and again as unreasonable and even contrary to the basic human rights of women.

---

37. Press Release, Planned Parenthood, Obama Reelection Is "Resounding Victory for Women" (Nov. 6, 2012), *available at* http://www.plannedparenthoodaction.org/elections-politics/press-releases/planned-parenthood-obama-reelection-resounding-victory-women-1300.htm.

38. *See, e.g.,* Karla Dial, *Obama Administration Sues Arizona,* CITIZENLINK (Oct. 5, 2012), http://www.citizenlink.com/2012/10/05/obama-administration-sues-arizona/.

39. Adam Sonfield, *The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost-Sharing,* 14 GUTTMACHER POL'Y REV. 7 (2011); *see, e.g. Birth Control Matters: Making Prescription Birth Control Affordable for America's Women,* PLANNED PARENTHOOD OF THE GREAT NW., http://www.plannedparenthood.org/ppgnw/birth-control-matters-32835.htm (last visited Feb. 14, 2013) ("We . . . believe that prescription birth control should be covered with no co-pays, so that more women can afford the method of birth control that works best for them.").

**668229**

Exhibit 144                                                                    JA-0002209

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

388                VILLANOVA LAW REVIEW                [Vol. 58: p. 379

The Administration's litigation strategy against corporate plaintiffs also effectively seeks to shield persons (employees) outside a religion from the religious teachings held by their employers. In the religious freedom cases commenced by Hercules Industries, Inc. and other companies, the Obama Administration argued that for-profit, corporate, secular entities are barred from asserting free exercise claims—that there is no such thing as a constitutionally cognizable "conscience" where such entities are concerned.[40]

### B.  *Other Federal Regulations Pursuing the Narrative: Contraception Equals Women's Flourishing*

The HHS Mandate is the leading, but not the only indicator of a larger "story" or theme about a clash between religious freedom and women's freedom and the Administration's choosing women's side by facilitating access to contraception. Another indicator was the imposition of a new requirement for recipients of federal anti-trafficking grants under the Victims of Trafficking and Violence Protection Act of 2000.[41] The text of the law does not demand that grantees provide access to contraception and abortion, but the Administration in 2011 imposed such a demand via agency grant-making guidelines.[42] Thus, although beginning in 2005, HHS had selected the U.S. Conference of Catholic Bishops ("USCCB") as the general contractor, and imposed no requirements related to contraception or abortion, in 2011, when the contract with the USCCB was about to expire, the Administration denied USCCB's application. Although the Administration had praised the USCCB's earlier work in public documents,[43] groups with lower competence scores—groups deemed even "noncompetitive" by professional program staff—received federal money

---

40. *See, e.g.,* Defendants' Memorandum in Support of Their Motion to Dismiss the First Amended Complaint and Amended Memorandum in Opposition To Plaintiffs' Motion for Preliminary Injunction, Newland v. Sebelius, No. 1:12-cv-01123 (D. Colo. July 13, 2012).

41. Pub. L. 106-386, 114 Stat. 1464.

42. ADMIN. FOR CHILDREN & FAMILIES, DEP'T OF HEALTH & HUMAN SERVS., NATIONAL HUMAN TRAFFICKING VICTIM ASSISTANCE PROGRAM 6 (2011), *available at* http://www.acf.hhs.gov/grants/open/foa/view/HHS-2011-ACF-ORR-ZV-0148 ("Taking into consideration the particular health risks posed to victims of trafficking, preference will be given to grantees under this FOA that will offer all victims referral to medical providers who can provide or refer for provision of treatment for sexually transmitted infections, family planning services and the full range of legally permissible gynecological and obstetric care . . . .").

43. *See, e.g.,* Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, Am. Civil Liberties Union of Mass. v. Sebelius, 821 F. Supp. 2d 474 (D. Mass. 2012) (No. 09-10038). The government in this case praised USCCB as a contractor, saying: "Rather, HHS weighed USCCB's overall proposal against religiously-neutral criteria and determined that USCCB provided the best proposal for assisting human trafficking victims at the best value." *Id.* at 5–6. The government also wrote: "the primary effect of the contract has been the provision of a wide range of assistance to human trafficking victims on a nationwide scale." *Id.* at 11.

**668230**

Exhibit 144                                    JA-0002210

2013]                 JOHN F. SCARPA CONFERENCE                 389

instead of the USCCB.[44] Another example of the narrative linking access to contraception and abortion with women's freedom, is a more subtle shift in the regulations applicable to the funding for the President's Emergency Program for AIDS Relief ("PEPFAR"). This Bush Administration program was begun in 2003 to provide HIV prevention and care.[45] The original program barred grantees who performed abortion, even with separate funds. Contraception was a component of PEPFAR, but prior to 2009, religious providers had been permitted to apply for grants limited to abstinence or fidelity programs. Consequently, Catholic Relief Services ("CRS")—the largest private provider of charitable services in the United States—became a major PEPFAR grantee.[46] Just days after President Obama assumed office in early 2009, however, he rescinded the rule limiting abortion providers' participation in the PEPFAR program.[47] Further, while he permitted grantees with religious or moral objections to contraception, the organization was required to notify U.S. officials of its objection prior to submitting its application.[48]

Considering together these Obama Administration funding decisions with the structure of and litigation concerning the Mandate, and the President's reelection campaign, it is easy to see the strong emergence of the theme that access to contraception, and in some cases abortion, is an essential and basic aspect of women's health care and even overall flourishing. Other influential groups and organizations—e.g., the United Nations and leading medical organizations—recently made a similar claim.[49] Re-

44. Jerry Markon, *Health, Abortion Issues Split Obama Administration and Catholic Groups*, WASH. POST (Oct. 31, 2011), http://www.washingtonpost.com/politics/health-abortion-issues-split-obama-administration-catholic-groups/2011/10/27/gIQAXV5xZM_story_1.html.

45. United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003, Pub. L. No. 108-25, 117 Stat. 711 (codified at 22 U.S.C. § 7601 (2006)); *see also PEPFAR and the Global Health Initiative*, AVERT: AVERTING HIV AND AIDS, http://www.avert.org/pepfar.htm (last visited Feb. 11, 2013).

46. Letter from USCCB and Catholic Relief Services to Members of Congress (Feb. 6, 2008), *available at* http://old.usccb.org/sdwp/international/2008-02pepfar_cong_ltr.pdf.

47. Mexico City Policy and Assistance for Voluntary Population Planning, 74 Fed. Reg. 4903 (Jan. 23, 2009), *available at* http://www.whitehouse.gov/the_press_office/MexicoCityPolicy-VoluntaryPopulationPlanning.

48. USAID, IMPLEMENTATION OF THE UNITED STATES LEADERSHIP AGAINST HIV/AIDS, TUBERCULOSIS AND MALARIA ACT OF 2003, AS AMENDED—CONSCIENCE CLAUSE IMPLEMENTATION, MEDICALLY ACCURATE CONDOM INFORMATION AND OPPOSITION TO PROSTITUTION AND SEX TRAFFICKING (2012), *available at* http://transition.usaid.gov/business/business_opportunities/cib/pdf/aapd12_04.pdf.

49. Press Release, American Academy of Pediatrics, AAP Recommends Emergency Contraception Be Available to Teens (Nov. 26, 2012), *available at* http://www.aap.org/en-us/about-the-aap/aap-press-room/pages/AAP-Recommends-Emergency-Contraception-Be-Available-to-Teens.aspx?nfstatus=401&nftoken=00000000-0000-0000-0000-000000000000&nfstatusdescription=ERROR%3a+No+local+token; *By Choice, not by Chance: Family Planning, Human Rights and Development*, UNITED NATIONS FAMILY PLANNING ASSOCIATION, http://www.unfpa.org/swp (last visited Feb. 24, 2012).

668231

Exhibit 144                                                                 JA-0002211

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

ligious organizations, then, particularly the Catholic Church, which hope to preserve their free exercise rights, cannot avoid addressing the matter of the government's claims regarding contraception. Seeking exemptions from laws imposing contraception mandates is of course, still possible, and a necessary part of any religious freedom strategy. But more will be needed in order to secure religious freedom—and, as my conclusion will suggest, perhaps women's freedom too, over the long run.

The Supreme Court's 1990 decision in *Employment Division v. Smith*[50] suggests an additional reason why religions ought to address the government's substantive claims regarding contraception and women's health. In *Smith*, the Court held that states may burden the free exercise of religion so long as they employ "neutral laws of general applicability," which bear a rational relationship to a legitimate state interest.[51] This remains true even if the burden upon religion is heavy and even if a core religious principle is at stake. Consequently, respecting state laws, religions must "win" their freedom in legislatures, because courts are far less obligated than in pre-*Smith* times, to protect their free exercise. The situation could be less difficult in states with their own Religious Freedom Restoration Acts, or with a religion-protective interpretation of their state's constitutional free exercise provision.

RFRA is more protective of free exercise as well, and has been applied to federal law by the Supreme Court.[52] RFRA requires a federal law burdening free exercise to be supported by a "compelling governmental interest" realized by the "least restrictive means."[53] Especially in recent years, however, religions' prospects even under RFRA have dimmed when the burden at issue involves women's access to contraception. As sketched above, access to contraception or even abortion—promoted and enforced by the government, and subsidized even by unwilling private persons and organizations—is increasingly framed as a "human right" by federal and other authorities. This is intrinsically powerful terminology.

In response to such arguments, religions' position on ECs and women's freedom must be fully developed. There are, logically, two steps to such a project. The first is the most important, and can be dispositive: to assess, and to critique the government's best case. Assuming, as this Article does, that the Mandate burdens religious freedom, the government must bear the burden of demonstrating a compelling state interest. The second step is to put forth the religious argument in terms appealing to all

---

50. 494 U.S. 872, 879 (1990) ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability . . . .'"), *superseded by statute*, Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq., *as recognized in* Sossamon v. Texas, 131 S. Ct. 1651 (2011).

51. *Id.* at 879.

52. *See* Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal, 546 U.S. 418 (2006); City of Boerne v. Flores, 521 U.S. 507 (1997).

53. 42 U.S.C. § 2000bb-1(a)–(b) (2006).

**668232**

Exhibit 144                                                                                      JA-0002212

2013]                JOHN F. SCARPA CONFERENCE                391

persons of good will. Because the first step requires a (surprisingly) lengthy consideration, this Article focuses almost exclusively upon it. It shows that the government has fallen far short of demonstrating a compelling governmental interest in forcing religious persons and institutions to provide insurance covering contraception and ECs.

## III. THE IOM REPORT

The most important and direct argument the federal government has made on the link between contraception and ECs, and women's health and flourishing is contained in the IOM Report furnishing, according to the federal government, nearly the entire basis for the Mandate. This is apparent from the virtually identical language of the IOM recommendation and the Mandate, from the public statements issued by Secretary Sebelius,[54] and from the government's nearly exclusive reliance upon the IOM Report in its briefs filed in defense of lawsuits challenging the Mandate.[55] It should be noted here too, that HHS and the President understood in advance that this Report would be closely scrutinized given how much controversy swirled about the "preventive" services provision of the ACA when it was first introduced, largely on the grounds that skeptics predicted that it was a stalking horse for possible abortion and contraceptive mandates.[56]

Upon close scrutiny, however, it turns out that the IOM Report is quite weak and cannot support the government's claim to demonstrate a "compelling governmental interest." It fails to show the required links between forcing employers to provide free contraception and ECs, and improving the health of women and girls.

The Administration claims the IOM Report demonstrates that employers must provide women and girls contraception and ECs with no co-pay,[57] because free contraception will lead to increased and more effective usage of these drugs and devices to prevent "unintended pregnancies" among women currently experiencing these, which pregnancies cause va-

---

54. Press Release, Dep't of Health & Human Servs., *supra* note 4.

55. *See, e.g.*, Defendants' Memorandum in Support of Their Motion to Dismiss the First Amended Complaint and Amended Memorandum in Opposition To Plaintiffs' Motion for Preliminary Injunction at 5–9, Newland v. Sebelius, No. 1:12-cv-01123 (D. Colo. July 13, 2012).

56. *Mikulski Amendment Would Include Planned Parenthood in Health Care Bill, Says Pro-Life Leader*, CATHOLIC NEWS AGENCY (Dec. 6, 2009), http://www.catholic newsagency.com/news/mikulski_amendment_would_include_planned_parent hood_in_health_care_bill_says_prolife_leader/; Amie Newman, *\*Updated\* Victory for Women's Health: Senate Passes Mikulski's Women's Health Amendment*, RH REALITY CHECK (Dec. 3, 2009), http://www.rhrealitycheck.org/blog/2009/12/03/victory-womens-health-senate-passes-mikulskis-womens-health-amendment.

57. For the sake of length, this Article will occasionally use the term "free contraception and ECs," although it is an outstanding question who will absorb the extra costs of contraception, if any, covered by an employer-sponsored health insurance plan.

668233

Exhibit 144                                                                JA-0002213

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

rious bad outcomes for women during the pregnancy and afterwards including: domestic violence, drinking, smoking, and depression. To a far smaller degree, the Report suggests that preventing abortions is another positive outcome linked to free contraception, on the grounds that unintended pregnancy rates drive abortion rates. The IOM argument seems intuitive on its face, which is perhaps the reason that the Report's asserted chain of causation, and the sources it relies upon, have not been closely scrutinized since it was issued in mid-2011. The following sections attempt to remedy this important oversight.

### A.   *The Report Relies upon Claims About Children's Health, Which, While Separately Important, Are Irrelevant to its Claims Regarding Women's Health, as Well as Outside the Charge Given to the IOM By HHS*

#### 1.   *Not Relevant to the Charge*

The IOM Report devotes a significant amount of early attention to the claims that children's health is compromised by a lack of contraception leading to unintended pregnancy. The threats to children's health addressed include: mothers' delayed entry into prenatal care, preterm birth, low birth weight, and less breastfeeding.[58] The Report also refers to outcomes for children when claiming that unintended pregnancy is associated with more smoking and alcohol consumption during pregnancy as "behaviors that present risks for the developing fetus."[59] Both sets of problems are linked to the necessity of providing women free contraception.

But there is of course an obvious logical problem with this portion of the Report's chain of reasoning. Even if it were the case that the Report was directed to boosting children's health, children's health is not boosted by their being prevented from coming into being. It is boosted by health services encouraging mothers to seek prenatal care, breastfeed, and avoid smoking and drinking during pregnancy. But the USPSTF already requires, among other services which *must* be insured without cost-sharing, prenatal care counseling on tobacco and alcohol usage, breastfeeding, and other matters related to the health of both mother and child.[60]

But perhaps more importantly, the material on children's health is not at all related to the "charge" given the IOM by HHS. The charge states, rather: "The Institute of Medicine will convene an expert committee to review *what preventive services are necessary for women's health and well-being* and should be considered in the development of comprehensive

---

58. IOM 2011 REPORT, *supra* note 10, at 103.

59. *Id.*

60. *USPSTF A and B Recommendations*, U.S. PREVENTIVE SERVS. TASK FORCE, http://www.uspreventiveservicestaskforce.org/uspstf/uspsabrecs.htm (last visited Feb. 17, 2013); *see also* 42 U.S.C. § 300gg–13(a)(4) (2006) (making "A" and "B" rated Task Force recommendations mandatory).

668234

Exhibit 144            JA-0002214

guidelines for preventive services for women."[61] The material on children's health might have been folded into the charge in the IOM Report had it suggested that it was harmful to women's health to take care of children with health problems associated with the claimed consequences of unintended pregnancy; but nowhere in the Report's eight pages of treatment of contraception is such a subject broached.[62] Though this is speculation, perhaps the government did not want to be associated with the argument that women ought generally to avoid taking care of sick children, for the sake of their own health. In any event, the material on children's health does not give any weight to the government's case about the necessity of free contraception for women's health.

### 2. *Causation Versus Correlation and Children's Health*

It is logically possible within the thesis of this Article to say nothing further about the Report's treatment of children's health. Yet, two further observations are helpful in order to grasp the Report's overall lack of rigor.

First, the section of the Report considering children's health does no more than suggest *correlation* (as opposed to *causation*) between unintended pregnancy and health outcomes for children. This is the same shortcoming the Report demonstrates on the very *relevant* matter of the link between unintended pregnancy and *women's* health.

Perhaps the most egregious example of the Report's poor methods respecting the children's material is its citing an utterly irrelevant source regarding a connection between unintended pregnancy and low birth weight: that source instead addresses an increased risk of cardiovascular disease in young women following gestational diabetes mellitus.[63] The other three studies the IOM cites regarding children's outcomes, in their actual texts, claim only to show an "associat[ion]," not causation, between shorter pregnancy intervals and low birth weight.[64] The claims about smoking and drinking during pregnancy will be addressed below, in the event the IOM Report is also suggesting that these behaviors affect a mother's health and are caused by unintended pregnancy. The cited stud-

---

61. IOM 2011 REPORT, *supra* note 10, at 2 (emphasis added) (quoting Office of Assistant Secretary for Planning and Evaluation (ASPE) of HHS, Statement of Task to Committee on Preventive Services for Women).

62. *Id.* at 102–11.

63. Baiju R. Shah, Ravi Retnakaran & Gillian. L. Booth, *Increased Risk of Cardiovascular Disease in Young Women Following Gestational Diabetes Mellitus*, 31 DIABETES CARE 1668 (2008).

64. IOM 2011 REPORT, *supra* note 10, at 103 (citing Agustin Conde-Agudelo et al., *Birth Spacing and Risk of Adverse Perinatal Outcomes: A Meta-Analysis*, 295 J. AM. MED. ASS'N 1809 (2006)); E. Fuentes-Afflick & N. A. Hessol, *Interpregnancy Interval and the Risk of Premature Infants*, 95 OBSTETRICS & GYNECOLOGY 383 (2000); B.P. Zhu, *Effect of Interpregnancy Interval on Birth Outcomes: Findings from Three Recent U.S. Studies*, 89 INT'L J. GYNECOLOGY & OBSTETRICS S25, S25–S33 (2005).

Exhibit 144                                                                 JA-0002215

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

394                    VILLANOVA LAW REVIEW                [Vol. 58: p. 379

ies also do not indicate a causal relationship between unintended pregnancy and these behaviors.

Second, even were the Report's claims about children's health well-supported, its recommendation to increase access to drugs and devices that can sometimes act to destroy the life of a child prenatally contradicts its apparent concern with children's flourishing during their prenatal existence. In other words, the IOM Report endorses women's access to free ECs, which can, according to the FDA and their manufacturers' statements, sometimes destroy prenatal life at the embryonic stage.[65] Furthermore, and according to a scientist relied upon in the IOM Report[66]: "[t]o make an informed choice, women must know that [ECs] . . . may at times inhibit implantation . . . ."[67]

While groups advocating abortion and ECs regularly employ the term "pregnancy" to mean the time after which the human embryo has attached itself to the mother's womb, according to many classic medical textbooks, though not all, genetically unique human life begins at the uniting of the male gamete with a female gamete ("fertilization") to produce a single-celled zygote. At the very least, it must be said that a thorough review of medical dictionaries' references to "conception" or "pregnancy" reveals no medical or scientific consensus in favor of implantation-based definitions of either term, and a more common acceptance of a "fertilization" based definition.[68] Yet the Secretary of HHS has acknowledged that some of the drugs covered by the Mandate can act to prevent implantation, stating: "The Food and Drug Administration has a category [of drugs] that prevent fertilization *and implantation*. That's really the scientific definition."[69] She added: "[t]hese covered prescription drugs are specifically those that are designed *to prevent implantation*."[70] The FDA approved package insert for Plan B reads: "Plan B may prevent a fertilized

---

65. On Plan B, see *How Does Plan B One-Step Work?*, PLAN B ONE-STEP, http://www.planbonestep.com/faqs.aspx (last visited Feb. 18, 2013); FOOD & DRUG ADMIN., PLAN B APPROVED LABELING (2006), *available at* http://www.accessdata.fda.gov/drugsatfda_docs/nda/2006/021045s011_ Plan_B_PRNTLBL.pdf. Regarding Ella, see WATSON PHARM., INC., ELLA LABELING INFORMATION (2010), *available at* http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022474s000lbl.pdf.

66. *See* IOM 2011 REPORT, *supra* note 10, at 105 (citing Princeton University's Dr. James Trussell).

67. JAMES TRUSSELL & ELIZABETH G. RAYMOND, EMERGENCY CONTRACEPTION: A LAST CHANCE TO PREVENT UNINTENDED PREGNANCY 7 (2013), *available at* http://ec.princeton.edu/questions/ec-review.pdf.

68. CHRISTOPHER M. GACEK, FAMILY RESEARCH COUNCIL, CONCEIVING "PREGNANCY": U.S. MEDICAL DICTIONARIES AND THEIR DEFINITIONS OF "CONCEPTION" AND "PREGNANCY" (2009), *available at* http://downloads.frc.org/EF/EF09D12.pdf.

69. Kelly Wallace, *Health and Human Services Secretary Kathleen Sebelius Tells iVillage "Historic" New Guidelines Cover Contraception, Not Abortion*, IVILLAGE (Aug 2, 2011), http://www.ivillage.com/kathleen-sebelius-guidelines-cover-contraception-not-abortion/4-a-369771 (alteration in original) (emphasis added).

70. *Id.*

**668236**

Exhibit 144                                                                                JA-0002216

egg from attaching to the womb (implantation)."[71] Regarding Ella, another EC, the European equivalent to the FDA, the European Medicines Agency (EMEA), calls Ella "embryotoxic" at low doses in animals, and even cites numerous studies showing Ella causes abortions in animals.[72]

Although not a scientific source, a *New York Times* article claiming that post-coital drugs were not embryocidal has gained so much attention that it merits brief attention.[73] The most complete response was written by Dr. Marie Hilliard,[74] a bioethicist who demonstrates that the reporter relied heavily upon one study with a very small sample size and inconclusive results about post-fertilization effects, as well as a second study[75] wherein the author was equally uncertain, concluding: "studies on the impact of LNG-EC on endometrial parameters involved in endometrial receptivity are not consistent, and current knowledge on cellular and molecular markers of endometrial receptivity in the human is insufficient to resolve this controversy."[76] Hilliard also points out that the reporter omitted to mention the most significant "study of studies" on the subject. This latter study clearly supports a post-ovulation effect.[77] Respecting the accuracy of the *New York Times* reporter, Dr. Hilliard also highlights the author's own admission that the FDA has refused—in the face of several requests by a Plan B manufacturer—to delete the reference to "implantation effects."[78]

---

71. *FDA's Decision Regarding Plan B: Questions and Answers*, Food & Drug Admin., http://www.fda.gov/Drugs/EmergencyPreparedness/BioterrorismandDrugPreparedness/ucm109795.htm (last updated Apr. 30, 2009); FOOD & DRUG ADMIN., BIRTH CONTROL GUIDE (2012), *available at* http://www.fda.gov/downloads/ForConsumers/ByAudience/forWomen/FreePublication/UCM282014.pdf.

72. EUROPEAN MEDS. AGENCY, CHMP ASSESSMENT REPORT FOR ELLAONE (2009), *available at* http://www.ema.europa.eu/docs/en_GB/document_library/EPAR_-_Public_assessment_report/human/001027/WC500023673.pdf.

73. Pam Belluck, *Abortion Qualms on Morning-After Pill May Be Unfounded*, N.Y. TIMES (June 5, 2012). http://www.nytimes.com/2012/06/06/health/research/morning-after-pills-dont-block-implantation-science-suggests.html?pagewanted=all &_r=0.

74. Marie T. Hilliard, *Are Journalists Now Scientists? A Reporter Loses Sight of Data on Plan B*, NAT'L CATHOLIC BIOETHICS CTR. (June 2012), http://www.ncbcenter.org/document.doc?id=444&erid=0.

75. Gabriela Noé et al., *Contraceptive Efficacy of Emergency Contraception with Levonorgestrel Given Before or After Ovulation*, 81 CONTRACEPTION 414 (2010).

76. *See* Hilliard, *supra* note 74; *see also* P.G.L. Lalitkumar et al., *Mifepristone, But Not Levonorgestrel, Inhibits Human Blastocyst Attachment to an In Vitro Endometrial Three-Dimensional Cell Culture Model*, 22 HUMAN REPROD. 3031, 3031–37 (2007).

77. Rafael T. Mikolajczyk & Joseph B. Stanford, *Levonorgestrel Emergency Contraception: A Joint Analysis of Effectiveness and Mechanism of Action*, 88 FERTILITY AND STERILITY 565 (2007) (examining data from multiple clinical studies reporting wide discrepancy between LNG-EC effectiveness in preventing pregnancy—between fifty-eight percent and ninety-five percent—and its effectiveness in preventing ovulation—between eight percent and forty-nine percent). The authors conclude that this may be explained, in part, by mechanisms of action other than ovulation disruption, including post-fertilization mechanisms. *Id.*

78. Belluck, *supra* note 73.

668237

Exhibit 144                                                                JA-0002217

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

B. *Women's Health*

Turning to the material in the Report addressing specifically women's health, the Report's conclusion—and the basis for the Mandate—is the claimed chain of causation between access to free contraception and women's improved health as a consequence of preventing unintended pregnancy. Each link in this chain is addressed below.

1. *The Claim that Access to Contraception Can Reduce Unintended Pregnancy at the Population Level Has Many Weak Links*

a. Unintended Pregnancy: An Uncertain Measure

It should first be noted that scholars disagree over how to measure "unintended pregnancy." The Report does not acknowledge this despite claims about rises and falls in the rate of unintended pregnancy, which constitute the heart of its argument. The notion of unintended pregnancy has been, according to a relevant white paper written by University of South Carolina Professor Austin L. Hughes,[79] "poorly and inconsistently defined."[80] Professor Hughes's paper, as well as an earlier report on unintended pregnancy by the IOM itself ("IOM 1995 Report"),[81] note that the literature recognizes two main categories of "unintended pregnancy": (1) unwanted (the mother did not want to become pregnant at all); and (2) mistimed (the mother was not seeking to become pregnant at that *time*). But different studies over time may assign to one or the other of these categories, or neither, other "situations," that are far less defined. These might include disagreement between partners regarding wantedness or timing, or even indifference to pregnancy. Also, a woman's opinion might shift over the course of the pregnancy. Further, "substantial literature addresses the difficulty of studying 'unintended pregnancy' through survey data because people's memory and/or interpretation of their past attitudes can change over time."[82] Despite these many difficulties with measuring unintended pregnancy, the IOM Report: "relies entirely on questionnaire survey data, and for purposes of analysis the responses are divided into just two categories: intended and unintended."[83]

A good example of the problems inherent in making simplistic claims regarding unintended pregnancies is the one and only study the IOM relies upon to claim that 49% of all pregnancies in the United States are

---

79. Austin L. Hughes, The Case for a Compelling Government Interest in the HHS Mandate: Examining the Scientific Evidence (Dec. 2012) (unpublished manuscript) (on file with author).

80. *Id.* at 13.

81. INST. OF MED., THE BEST INTENTIONS: UNINTENDED PREGNANCY AND THE WELL-BEING OF CHILDREN AND FAMILIES (1995) [hereinafter IOM 1995 Report].

82. Hughes, *supra* note 79, at 3.

83. *Id.* at 2–3.

668238

Exhibit 144                                                JA-0002218

Alvare: No Compelling Interest: The "Birth Control" Mandate and Religious

"unintended"—a study by Finer and Henshaw published in 2006.[84] A review of the study by Professor Hughes concluded:

> This study was based on survey responses of samples of women aged 15-44 in 1995 (10,847 women) and 2002 (7,643 women), conducted by the National Survey of Family Growth (NSFG; Finer and Henshaw 2006). In Finer and Henshaw's (2006) analysis, all "unwanted" and "mistimed" pregnancies were grouped as "unintended." Furthermore, Finer and Henshaw (2006) added an estimate of the number of abortions to the "unintended" category. Finer and Henshaw (2006) did not use the NSFG data themselves to estimate abortion rates (even though such data were included in the NSFG), because they believed abortions to be "underreported" in the NSFG. Rather, they attempted to estimate rates of abortion from other population data, then applied these estimates to the NSFG sample, adding the estimated numbers of abortions to the category "unintended pregnancy." Such a process is perilous because the NSFG samples may not in fact have been comparable to the populations from which the abortion data were taken. Thus, the estimates provided by Finer and Henshaw (2006) and relied on by IOM (2011) regarding the rate of "unintended pregnancy" in the U.S. are based on a number of questionable assumptions and may be considerably inflated.[85]

Adding a historical and evolutionary perspective, Professor Hughes adds that, by Finer and Henshaw's definition, "essentially every member of the U.S. population over the age of 45 is the result of an 'unintended pregnancy.' Likewise all those born over all of human history prior to the 1960's. If there are deleterious consequences to 'unintended pregnancy,' these should be demonstrated by data on populations born prior to the 1960's, as well as on contemporary populations."[86] He further observes:

> Being able to "plan" a pregnancy with any degree of precision, as a result of reliable contraceptive methods, represents a novel phenomenon in human history, for which we are adapted neither at the biological nor at the cultural level. For this reason, it might be reasonable to hypothesize that truly *intended* pregnancies might have deleterious consequences arising from our lack of adaptation for such a phenomenon. However, no study to date appears to have addressed the latter hypothesis.[87]

The elusiveness of the definition of unintended pregnancy is well known in the literature. The IOM was aware of this, referring to it in its

---

84. *Id.* (citing IOM 2011 REPORT, *supra* note 10, at 102).
85. *Id.* at 3.
86. *Id.*
87. *Id.* at 4 (citations omitted).

668239

Exhibit 144                                                                JA-0002219

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

398                    VILLANOVA LAW REVIEW                    [Vol. 58: p. 379

1995 report on unintended pregnancy. But in 2011 the IOM Report failed completely to acknowledge this important complexity.

b.  Does Greater Access to Contraception Really Reduce Unintended Pregnancy?

Even if we accepted the IOM Report's claims regarding how to define unintended pregnancy, it is not clear that the Report's recommendation would lower rates of unintended pregnancy. The Report makes the straightforward cause-and-effect claim that "greater use of contraception within the population produces lower unintended pregnancy . . . rates nationally."[88] In fact, this is one of the centerpieces of the Report (along with its claim that unintended pregnancy diminishes women's health).

Preliminarily, it should be noted that the Report and the Mandate are centrally about increasing "*access*" to contraception and ECs by making them free within the context of employer provided health insurance, and thereby seeking to reduce a claimed cause of illness in women, unintended pregnancy. This is precisely how Secretary Sebelius summarized the Mandate's intention.[89] Of course, this is all the government *could* do, short of coercive measures. It can give women access to contraception but it cannot force them to use it. Yet the Report does appear to claim to be able to affect women's overall decision to *use* contraception given that its explicitly articulated argument is that increased "use"[90] has in the past reduced unintended pregnancy; unless increased *access* translates into increased *usage*, it is difficult to see how increased access will achieve the government's hoped-for results. This Article will therefore take a close look at whether the government has met its burden of establishing each of the following linkages: greater access with greater usage, greater usage with reduced unintended pregnancies, and reduced unintended pregnancies with women's improved health.

A closer look at each reveals the Report's fatal weaknesses. For it turns out that there are many and varied reasons why women choose not to use contraception, most of which have nothing to do with cost. There is also the fact that due to both method and use failures, contraception usage does not guarantee the prevention of pregnancy. In fact, the Centers for Disease Control reports that more than 12 out of every 100 women using contraception will become pregnant in a given year, and that this figure essentially has not changed since 1995.[91] There is also the fact that

88. IOM 2011 REPORT, *supra* note 10, at 105.
89. Press Release, Dep't of Health & Human Servs., *supra* note 4 ("Today the department is announcing that the final rule on preventive health services will ensure that women with health insurance coverage will have *access* to the full range of the Institute of Medicine's recommended preventive services, including all FDA-approved forms of contraception.") (emphasis added).
90. IOM 2011 REPORT, *supra* note 10, at 105.
91. WILLIAM D. MOSHER & JO JONES, U.S. DEP'T OF HEALTH AND HUMAN SERVS., USE OF CONTRACEPTION IN THE UNITED STATES: 1982-2008 5 tbl.A (2010)

2013]                JOHN F. SCARPA CONFERENCE                399

the Report, and the Mandate it supports, address *employed women and the female children of employed parents provided employer-sponsored health care*, but that studies on the incidence of unintended pregnancy univocally report that unintended pregnancy is highly concentrated among low income women—who are already amply provided free or very lost cost contraception by federal and state governments.

The two studies on which the Report rests its entire claim are insufficient, separately or together, to overcome these oversights. Also, the Report ignores substantial evidence contradicting or substantially undermining its claims—including evidence available from the same sources the Report relies upon throughout the section on contraception: the Centers for Disease Control, the Guttmacher Institute, and a prior IOM report about unintended pregnancy in the United States.[92] The Report also ignores well-known and acclaimed studies considering the way that normalizing and facilitating access to birth control, and sometimes abortion, changes the "sex and mating markets" so as to produce a higher volume of nonmarital sexual encounters, pregnancies, births, and abortions; this literature appears to have a great deal of explanatory power respecting data from the last several decades. In short, the Report—the basis for the Mandate—treats a complex subject *simplistically*. *It fails in its essential claim.*

Turning now to the Report's evidence for its claims regarding greater access causing reduced rates of unintended pregnancy. As already noted, it relies upon two studies,[93] a 2010 report by Santelli and Melnikas,[94] and a study issued by the Guttmacher Institute.[95] It should be noted immediately here that Dr. Santelli is a senior fellow of the selfsame Guttmacher Institute, and a longtime supporter of large-scale birth control and abortion. He is a dedicated opponent of abstinence programs.[96] The Guttmacher Institute is the former research affiliate of the nation's largest network of providers of abortion and contraception, Planned Parenthood.

---

(estimating 1-year typical-use failure rates for selective contraceptive methods in United States).

92. *See* IOM 1995 REPORT, *supra* note 81.

93. IOM 2011 REPORT, *supra* note 10, at 105.

94. John S. Santelli & Andrea J. Melnikas, *Teen Fertility in Transition: Recent and Historic Trends in the United States*, 31 ANN. REV. PUB. HEALTH 371 (2010).

95. HEATHER D. BOONSTRA ET AL., GUTTMACHER INST., ABORTION IN WOMEN'S LIVES (2006), *available at* http://www.guttmacher.org/pubs/2006/05/04/AiWL.pdf.

96. *See John Santelli, Senior Fellow*, GUTTMACHER INST., http://www.guttmacher.org/media/experts/santelli.html (last visited Feb. 17, 2013); *see also* Press Release, Guttmacher Inst., Review Finds No Evidence to Support Funding of Rigid Abstinence-Only Programs (Sept. 16, 2008), *available at* http://www.guttmacher.org/media/nr/2008/09/16/ (advertising series of articles that identify major flaws in abstinence-only education, including problems with accuracy, effectiveness and ethics, all published in special edition of journal *Sexuality Research and Social Policy*, guest edited by John S. Santelli and Leslie M. Kantor).

668241

Exhibit 144                                                                JA-0002221

Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2

Regarding the two cited studies, the Report claims that the Santelli and Melnikas study *associates* increased contraceptive *usage* in teens over a ten-year period (early 1990s to early 2000s), with reductions in their pregnancy rates. The Guttmacher study considers unmarried women from 1982 to 2002; the Report claims it shows that increased contraceptive usage was *associated* with lowered unintended pregnancy and abortion rates. Obviously both studies on their face fail to prove the claim that greater use of contraception will produce lower rates *nationally*, i.e., within the population. Each has considered only a fraction of the population over a particular slice of the time during which contraception has been readily available. Neither is certainly generalizable to the entire population or to every period of time during which contraception and abortion have been available. Neither shows that increased *access* to contraception translated into increased *usage*, and thereby, lowered rates of unintended pregnancy.

Additionally, a 1995 IOM Report and a 2010 IOM Report seem at least to call into question the 2011 Report's global statements about cause and effect over the last three decades, with global statements of their own which were ignored in the 2011 Report. For example, the 1995 report states that "unintended pregnancy" is a "health condition of women for which little progress in prevention has been made despite the availability of safe and effective preventive methods."[97] The 2010 Report states that: "The committee considers that there has been no major progress in prevention of unintended pregnancy in light of the lack of decrease in rates over time and in comparison with rates in other countries."[98]

I will now consider the two cited studies on their own merits—insofar as their own content address the conclusions of the Report or the Mandate—and then as they have been criticized or called into question by other empirical scholars. Looking first at the Santelli and Melnikas study,[99] the Report cites it for the proposition that greater "*use*" of contraception "*produces* lower unintended pregnancy rates."[100] But when summarizing the study, the Report claims only that it demonstrates an "*association*" between rates of contraceptive use by adolescents from about the early 1990s to early 2000, and rates of unintended pregnancy.[101] In short, the Report itself acknowledges that the source does not prove what the Report claims.

Even if the Report sought to rely upon Santelli and Melnikas for the narrower proposition that among the *teen* population, greater access to contraception reduced unintended pregnancy, the Santelli and Melnikas study is unavailing. In parts not referenced by the Report, the study acknowledged the possibility that increasing access to contraception can

---

97. IOM 1995 REPORT, *supra* note 81, at 104.

98. INST. OF MED., WOMEN'S HEALTH RESEARCH: PROGRESS, PITFALLS, AND PROMISE 143 (2010).

99. Santelli & Melnikas, *supra* note 94.

100. IOM 2011 REPORT, *supra* note 10, at 105.

101. *Id.*

668242

Exhibit 144                                                    JA-0002222

have the effect of altering sexual behavior in a way that leads to a higher probability of pregnancy, stating that an *increase in teen sexual activity* "followed closely the introduction of modern contraception in the 1960s."[102]

The Report also did not acknowledge that portion of Santelli and Melnikas in which the authors estimated that high school teens' abstinence from sexual activity contributed to at least 50% of the decline in teen pregnancy rates during the stated time period, with increased contraception usage contributing the other 50%,[103] nor did it reference the study's extended treatment of the many other factors that "may" have influenced rates of unintended pregnancy among teens, including the economy, changes in population composition, changes in family dynamics, social mores, the HIV/AIDS pandemic, or the media. Santelli and Melnikas concluded this discussion with the statement that they "*do not attempt to resolve this debate*" about the "*causes and consequences of teen pregnancy.*"[104] Yet the IOM Report treats this source precisely as if it has so resolved the debate.

Equally important, the Report failed to note that Santelli and Melnikas's conclusions are hotly disputed by other scholars who claim that greater abstinence and less frequent sexual activity were the most important factors driving the decline in teen pregnancies during the 1990s. In particular, a 2003 article in *Adolescent Health* concluded that: 67% of the reported decline in teen pregnancies from 1991-95 was due to increased abstinence and 35.3% was likely attributable both to increased contraceptive use, less frequent sexual activity, or both.[105]

The Report, further, did not even mention the significant body of expert literature suggesting an even more fundamental shortcoming of studies like Santelli and Melnikas's: the body of research showing that while declines in teen pregnancies may occur after contraception is rendered more accessible to teens who were *already* sexually active but not using it, with respect to teens who were *not* sexually active, increased access to contraception is associated with the normalization of nonmarital sex and an increase in teen sexual behaviors leading to *more* teen pregnancies and abortions overall. One of the most important studies in this vein was published by Duke University Professor Peter Arcidiacono. His analysis of data from the 1997 National Longitudinal Survey of Youth suggested that while access to contraception decreases teen pregnancy in the short run, it increases teen pregnancy in the long run by encouraging sexual activity.[106] As noted above, Santelli and Melnikas acknowledged this dynamic

---

102. *Id.* at 375.

103. *Id.* at 376.

104. Santelli & Melnikas, *supra* note 94, at 373, 377-78 (emphasis added).

105. Joanna K. Mohn, Lynne R. Tingle & Reginald Finger, *An Analysis of the Causes of the Decline in Non-Marital Birth and Pregnancy Rates for Teens from 1991 to 1995*, 3 ADOLESCENT & FAMILY HEALTH 39 (2003).

106. PETER ARCIDIACONO ET AL., HABIT PERSISTENCE AND TEEN SEX: COULD INCREASED ACCESS TO CONTRACEPTION HAVE UNINTENDED CONSEQUENCES FOR TEEN

668243

Exhibit 144                                                                 JA-0002223

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

once in their piece, but do not apply it to any period past the 1960s. Worse, they appear to endorse the normalizing of teen sexual experience which has been associated in the past with rising rates of unintended pregnancy. To wit, at the end of their paper they state that the United States "could learn much about reducing teen fertility by examining the *success* of Western European countries . . . For example, Dutch parents. . . are much more likely to *normalize teen sexual activity* and contraception use."[107]

The Report and the Mandate's decision to include ECs also likely undercut their goal of reducing unintended pregnancy, especially among teens. ECs were hoped by many to be the "answer" to teens' notoriously inconsistent or incorrect use of contraception. Yet not only have ECs failed to lower teen pregnancy rates according to every relevant study in myriad countries, but they are disturbingly and regularly associated with increases in teen pregnancy and abortion rates.[108] Teens even admitted to researchers in two studies conducted in 2000 and 2005 that they "had been more careless about birth control and more likely to have had unprotected sex" when ECs were easily available.[109]

EC is similarly ineffective at the population level. In a meta-analysis of twenty-three studies evaluating the effectiveness of Plan B, Princeton's Dr. James Trussel, whose work was relied upon by the IOM report elsewhere,[110] concluded that "*no study* has shown that increased access to [Plan B] reduces unintended pregnancy or abortion rates on a population level."[111]

Finally, the Report never grapples with Santelli and Melnikas's conclusion that unintended pregnancy is highest among a group which will *not* be affected by the Mandate: poor teenagers.[112] They consistently suffer the highest rates of teen pregnancy, but are covered by myriad govern-

---

PREGNANCIES? (2005), *available at* http://public.econ.duke.edu/~psarcidi/addicted13.pdf.

107. Santelli & Melnikas, *supra* note 94, at 379–80 (emphasis added).

108. Jose Luis Dueñas et al., *Trends in the Use of Contraceptive Methods and Voluntary Interruption of Pregnancy in the Spanish Population during 1997-2007*, 83 CONTRACEPTION 82 (2011) (showing that over ten year period, 63% increase in contraceptive use was accompanied by 108% increase in abortion rate); *see also* David Paton, *The Economics of Family Planning and Underage Conceptions*, 21 J. HEALTH ECON. 207 (2002) (indicating that results such as those obtained in Spain, are results that logic and economics would predict).

109. Roni Caryn Rabin, *Teenagers and the Morning-After Pill*, N.Y. TIMES (Dec. 3, 2012), http://well.blogs.nytimes.com/2012/12/03/teenagers-and-the-morning-after-pill/?ref=ronicarynrabin.

110. IOM 2011 REPORT, *supra* note 10, at 108.

111. Elizabeth G. Raymond, James Trussel & Chelsea B. Polis, *Population Effect of Increased Access to Emergency Contraceptive Pills: A Systematic Review*, 109 OBSTETRICS & GYNECOLOGY 181 (2007) (emphasis added).

112. Santelli & Melnikas, *supra* note 94, at 373.

668244

Exhibit 144                                                        JA-0002224

Alvare: No Compelling Interest: The "Birth Control" Mandate and Religious

ment programs offering them free contraception. A recent Congressional Research Service report on teen pregnancy prevention.[113] explains why:

> An October 2006 study by the National Campaign to Prevent Teen Pregnancy estimated that, in 2004, adolescent childbearing cost U.S. taxpayers about $9 billion per year: in child welfare benefits, $2.3 billion; in health care expenses, $1.9 billion; in spending on incarceration (for the sons of women who had children as adolescents), $2.1 billion; in lost tax revenue because of lower earnings of the mothers, fathers, and children (when they were adults), $6.3 billion; and in offsetting public assistance savings (younger teens receive less annually over a 15-year period than those who give birth at age 20–21), $3.6 billion.[114]

Consequently, Congress has created a wide variety of federal programs to address teen pregnancy. In 1970, it created the National Family Planning Program, known as Title X of the Public Health Service Act.[115] In 2010, Title X–funded sites served more than five million patients, sixty-nine percent of whom were at or below the poverty level, via eighty-nine public and private grantees who in turn supported 4,389 individual service sites in all fifty states and the District of Columbia.[116] Teenagers represented one in four contraceptive clients served by publicly funded family planning centers in 2006, when they served nearly two million women younger than age twenty.[117] In fiscal year 2010, 317 million federal dollars were allocated for Title X family planning programs.[118] Likewise, both Title XIX of the Social Security Act (Medicaid)[119] and Title XX of the Social Security Act[120] provide federal funds to states for use in supporting pregnancy prevention services among both adolescents and older patients. The federal Maternal and Child Health Block Grant also funds 610 school-based or

---

113. CARMEN SOLOMON-FEARS, CONG. RESEARCH SERV., TEENAGE PREGNANCY PREVENTION: STATISTICS AND PROGRAMS (2011), *available at* http://www.napcwa.org/home/docs/CRS_TeenPregPrevstats.pdf.

114. *Id.* at 3–4.

115. Title X Family Planning Program (Population Research and Voluntary Family Planning Programs), 42 U.S.C. § 300 (2006).

116. CHRISTINA FOWLER ET AL., RTI INT'L, FAMILY PLANNING ANNUAL REPORT: 2010 NATIONAL SUMMARY 7-8, 21 (2011), *available at* http://www.hhs.gov/opa/pdfs/fpar-2010-national-summary.pdf.

117. *Facts on Publicly Funded Contraceptive Services in the United States*, GUTTMACHER INST. (May 2012), http://www.guttmacher.org/pubs/fb_contraceptive_serv.html.

118. *See* FOWLER ET AL., *supra* note 116, at 1.

119. 42 U.S.C. § 1396 et seq. (2010).

120. *Id.*; *see also* GUTTMACHER INST. & KAISER FAMILY FOUND., MEDICAID: A CRITICAL SOURCE OF SUPPORT FOR FAMILY PLANNING IN THE UNITED STATES (2005), *available at* http://www.kff.org/womenshealth/upload/Medicaid-A-Critical-Source-of-Support-for-Family-Planning-in-the-United-States-Issue-Brief-UPDATE.pdf.

**668245**

Exhibit 144    JA-0002225

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

404                VILLANOVA LAW REVIEW              [Vol. 58: p. 379

"school-linked" health clinics.[121]  These clinics provide "family planning" advice and services to adolescents.[122]  In short, even the "association" between contraceptive access and unintended pregnancies among teenagers is called into question when the teens already receiving an extraordinary amount of free contraception account for the highest rates of teen pregnancy, according to one of two studies cited for the central proposition in the IOM Report.

Turning to the second study cited by the Report for the claimed connection between increased access to contraception and lower unintended pregnancy rates, a Guttmacher Institute report[123] cited for the specific proposition that: "as the rate of contraceptive use by unmarried women increased in the United States between 1982 and 2002, rates of unintended pregnancy and abortion for unmarried women also declined."[124] On its face, the use of this report poses several problems.

First, this Guttmacher report considers unmarried women only, and only for a twenty-year period.  It cannot be generalized to *all* women in a population, nor can it suffice to prove that rising contraceptive usage during *all* periods will cause declines in rates of unintended pregnancy and abortion.

Second, this Guttmacher source is contradicted by other data, not mentioned in the Report, but also produced by the Guttmacher Institute. For example, two Guttmacher journal studies show that while unintended pregnancy rates were about 54% in 1981, and declined to 44.7% in 1994,[125] they increased by 2001 to 51%, and remained flat or edged higher through 2006.[126]  This period nearly overlaps with the period considered in the source cited in the Report, a period during which the cited source claims that women's use of contraception *increased* from 80% to 86%.[127]

Also, looking at an even longer stretch of time—the period from the 1970s to today—a period during which both a Guttmacher journal and the CDC report that the percentage of women who had "ever used" con-

---

121. Title V, Social Security Act, 42 U.S.C. §§ 701–710 (2010), *amended by* Pub. L. No. 112-240, 126 Stat. 2313 (2012); *see also* SOLOMON-FEARS, *supra* note 113, at 7.

122. U.S. DEP'T OF HEALTH & HUMAN SERVS., OMB NO: 0915-0172, GUIDANCE AND FORMS FOR THE TITLE V APPLICATION/ANNUAL REPORT 50 (n.d.), *available at* ftp://ftp.hrsa.gov/mchb/blockgrant/bgguideforms.pdf (focusing on Form 11 titled, "Tracking Performance Measures").

123. BOONSTRA ET AL., *supra* note 95.

124. IOM 2011 REPORT, *supra* note 10, at 105.

125. Stanley K. Henshaw, *Unintended Pregnancy in the United States*, 30 FAM. PLAN. PERSP. 24 (1998).

126. Lawrence B. Finer & Stanley K. Henshaw, *Disparities in Rates of Unintended Pregnancy in the United States, 1994 and 2001* 38 PERSP. ON SEXUAL REPROD. HEALTH 90 (2006); MOSHER & JONES, *supra* note 91 at 376-77.

127. IOM 2011 REPORT, *supra* note 10, at 105 (citing BOONSTRA ET AL., *supra* note 95, at 18).

**668246**

Exhibit 144                                                                    JA-0002226

Alvare: No Compelling Interest: The "Birth Control" Mandate and Religious

traception rose from about 90% to 99%—unintended pregnancy rates in the U.S. population rose from 35.4%[128] to approximately 49% today.[129]

Additional studies cast doubt upon the Report's reliance on just the one Guttmacher study for its claim of a causal connection between increased usage of contraception and lowered unintended pregnancy rates among unmarried women generally. One of these studies is a CDC report tracking the use of contraception from 1982 to 2008. It concluded that "[c]hanges in contraceptive method choice and use have not decreased the *overall* proportion of pregnancies that are unintended between 1995 and 2008."[130] Another study, a Guttmacher report on unintended pregnancy between 2001 to 2006, reached the same conclusion.[131] It did so despite CDC data showing that more women in the years between 2002 and 2008 were accessing methods of contraception deemed "more effective" by the IOM, the CDC, and Guttmacher. To wit: between 2002 and 2008, women's resort to ECs rose from 4% to 10%, to sterilization from 13% to 17%, to the pill from 15.6% to 17.3%, and to injectable contraceptives from 0% to 2%.[132]

It should also be remembered that the rise in unintended pregnancy rates from 44.7% to 51% between 1994 and 2001—before they settled at the rate of approximately 49% from 2001 to 2006—occurred during a period of time when, as the Report acknowledges, twenty-eight states passed laws quite similar to the Mandate.[133] These laws required a greater degree of private insurance coverage for contraception,[134] with seventeen of the twenty-eight requiring further that insurance cover the associated outpatient visit costs.[135] This is an important dynamic that the Report completely neglected to address.

---

128. Christopher Tietze, *Unintended Pregnancies in the United States, 1970-1972,* 11 FAM. PLAN. PERSP. 186, 186 n.* (1979) ("A recent report estimates that in 1972, 35.4% percent of all U.S. pregnancies were 'unwanted' or 'wanted later', thus providing, from, an independent source, an estimate very close to the one used here.").

129. Finer & Henshaw, *supra* note 126.

130. Jo Jones, William Mosher & Kimberly Daniels, *Current Contraceptive Use in the United States, 2006-2010, and Changes in Patterns of Use Since 1995,* NAT'L HEALTH STAT. REP., Oct. 2012, at 1, 11, *available at* http://www.cdc.gov/nchs/data/nhsr/nhsr060.pdf.

131. Lawrence B. Finer & Mia R. Zolna, *Unintended Pregnancy in the United States: Incidence and Disparities, 2006,* 84 CONTRACEPTION 478 (2011).

132. MOSHER & JONES, *supra* note 91, at 5.

133. IOM 2011 REPORT, *supra* note 10, at 108.

134. For a discussion of the twenty-eight states which, between 1996 and 2007, passed some form of contraceptive mandate, see *Insurance Coverage for Contraception Laws,* NAT'L CONFERENCE OF STATE LEGISLATURES, http://www.ncsl.org/issues-research/health/insurance-coverage-for-contraception-state-laws.aspx (last updated Feb. 2012).

135. IOM 2011 REPORT, *supra* note 10, at 108, (citing GUTTMACHER INST., INSURANCE COVERAGE OF CONTRACEPTIVES (2011)).

**668247**

Exhibit 144                                                                    JA-0002227

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

406                VILLANOVA LAW REVIEW                [Vol. 58: p. 379

There are four final points regarding the insufficiency of the IOM Report's treatment of the link between access to contraception and rates of unintended pregnancy, three brief and one longer. First, there are many reasons why even if women have access to contraception, they do not use it. These are treated below, tracing the link between the Mandate's assumption that increasing "access" by eliminating co-pays, will increase "usage." The Report does not even touch upon these reasons.

Second, there are many, many factors affecting rates of unintended pregnancy that were not identified or taken into account by the Report. They are understandably difficult to isolate and measure. Their prevalence might easily vary among different age cohorts within the U.S. population. These might include poverty rates, increasing rates of cohabitation (linked to higher rates of unintended pregnancy), later age at first marriage, and declining taboos associated with nonmarital sex, pregnancy, and birth.[136] Each of these factors might lead, for example, to indifference regarding pregnancy, mixed intentions, or competing intentions as between a father and an expectant mother. The IOM Report does not even allude to these, nor does it suggest that the two studies it relied upon to demonstrate a causal relationship between contraception and unintended pregnancy claimed to have controlled for the influence of these other factors.

Third, while there *is* a strategy that might work to produce lower rates of unintended pregnancies via increased access to contraception, it is not the same as the strategy advanced by the Report or the Mandate, and it raises as many questions and concerns as it answers. It involves providing free long-acting, reversible contraception to lower income women. It is a strategy endorsed by the IOM, which stated that "it is thought that the greater use of long-acting reversible contraceptive methods . . . might help further reduce unintended pregnancy rates. Cost barriers to use of the most effective contraceptive methods are important . . . ."[137] The American College of Obstetricians and Gynecologists has written that LARCs should be "first line" choices for young women.[138]

This strategy was tested in a recent study[139] the conclusions of which were widely publicized in 2011, and celebrated by Professor John Santelli,

---

136. *Facts on Unintended Pregnancy in the United States*, GUTTMACHER INST., http://www.guttmacher.org/pubs/FB-Unintended-Pregnancy-US.html (last updated Jan. 2012).

137. IOM 2011 REPORT, *supra* note 10, at 108.

138. ACOG Committee on Practice Bulletins, *Clinical Management Guidelines for Obstetricians-Gynecologists; Intrauterine Device*, 105 OBSTETRICS & GYNECOLOGY 223 (2005); *see also Increasing Use of Contraceptive Implants and Intrauterine Devices to Reduce Unintended Pregnancy*, ACOG Comm. Opinion (Am. Coll. of Obstetricians & Gynecologists, Washington, D.C.), Dec. 2009, at 2, *available at* http://www.acog.org/About%20ACOG/ACOG%20Departments/Long%20Acting%20Reversible%20Contraception/~/media/Departments/LARC/co450.pdf.

139. Jeffrey F. Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, 120 OBSTETRICS & GYNECOLOGY 1291 (2012).

**668248**

Exhibit 144                                                    JA-0002228

2013]                JOHN F. SCARPA CONFERENCE                407

author of one of the two articles cited by the IOM Committee,[140] as conclusive evidence for the wisdom of the Report's recommendations and the Mandate. The study involved recruiting women from the St. Louis area, a disproportionate percentage of whom were poor (37% public assistance), African American (50%), and less educated (35% with high school degree or less). They were encouraged to switch to longer acting contraceptive drugs and devices ("LARGs") for a three to ten year period. Researchers contacted the patients seven times over the first three years of use in order to monitor and encourage continued usage. After three years, rates of teen births and abortions declined significantly.

The study's findings have been called into question—given its lack of a control group, its indirect and incomplete manner of measuring "effects," and the possibility of a selection effect, i.e., the women and girls enrolled were more highly motivated to avoid a future pregnancy, many of them having been recruited from abortion clinics where they had recently undergone an abortion.[141] Also, for several reasons, its strategy of encouraging women toward specific, and "more effective" methods of contraception, raises as many questions and concerns as it answers, both about women's health and women's freedom. First, women are often dissatisfied with what are considered the "more effective" methods of birth control urged by the researchers conducting this study. According to a CDC report, relied upon in the IOM Report, 30% of women "ever" using the pill discontinued it because they were "dissatisfied with it." This is also true of 43% of women who ever used the Depo Provera injectable and 50% of women who ever used the contraceptive patch.[142] A very low percentage of women, about 5%, have ever chosen to use the IUD.[143] In the St. Louis study, only 5% of women had chosen LARGs prior to participation in this study; but researchers ultimately persuaded 75% of the women involved to take them up.

Second, this pattern raises some red flags related to the moral hazard of encouraging particularly less-privileged women to use LARGs. It should not be forgotten that only two decades ago, no fewer than seven states were seriously proposing offering Norplant TM—a surgically implanted hormonal contraceptive, lasting about five years—to women and girls, as a

---

140. Brian Alexander, *Free Birth Control Cuts Abortion Rate Dramatically, Study Finds*, NBC NEWS (Oct. 4, 2012), http://vitals.nbcnews.com/_news/2012/10/04/14224132-free-birth-control-cuts-abortion-rate-dramatically-study-finds?lite ("'What the study suggests to me,' said John Santelli, professor at Columbia University's Mailman School of Public Health, 'is that it's totally supportive of the president's provisions on reproductive care and preventive services for women in the Affordable Care Act.'").

141. Michael J. New, *New Study Exaggerates Benefits of No-Cost Contraception*, NAT'L REV. ONLINE (Oct. 10, 2012), www.nationalreview.com/corner/329898/new-study-exaggerates-benefits-no-cost-contraception-michael-j-new.

142. MOSHER & JONES, *supra* note 91, at 13.

143. *See, e.g., Contraceptive Use in the United States*, GUTTMACHER INST. (last visited Feb. 21, 2013), http://www.guttmacher.org/pubs/fb_contr_use.html.

**668249**

Exhibit 144

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 258 of 677

*quid pro quo* for ordinary or increased welfare benefits. The vast majority of the targeted populations were African American.[144] Also, once these young women are temporarily sterilized, with drugs and devices sometimes requiring surgical implantation and removal such that they "require less action by the women"[145] for three to ten years, the government, and likely the affected women and girls, are more than likely to fall into the trap of believing that all relevant consequences of sex are being managed. The psychological or spiritual consequences of sex without marriage, or a lesser form of commitment, and the consequences for rates of sexually transmitted diseases, discussed below, will almost certainly be neglected.

Third, it appears that the longer acting contraceptive drugs and devices more often pose both increased health risks for women, treated below, and the potential to act to destroy already-formed embryos, as discussed above.

Fourth and finally—and requiring a bit more extensive consideration—there is a growing body of scholarship, treated below, indicating that the persistence or worsening of high rates of unintended pregnancy, abortion, and sexually transmitted diseases, and also our nation's high rates of nonmarital births (the chief predictor of female poverty), are the "logical" result—in economic and psychological terms—of the new marketplace for sex and marriage made possible by increasingly available contraception (in some cases, combined with available abortion).

It is widely acknowledged that while contraception is often effective on an individual level to avoid conception, or birth, its effects on a social level might well be different. It was acknowledged by John Santelli, in his study cited favorably by the Report.[146] It has been written about from sociological and historical perspectives.[147] The twin rise in the availability of contraception and rates of nonmarital sexual encounters, pregnancies and births, was also predicted by its inventors and supporters, at the time when the "pill," was introduced at a population-wide scale. Dr. Min-Chueh Chang, for example, one of the co-developers of the birth control pill, reflected: "I personally feel the pill has rather spoiled young people. It's made them more permissive."[148] Dr. Alan Guttmacher, former director of the International Planned Parenthood Federation, further suggested that legal abortion would render contraception even less effective. "[W]hen an abortion is easily obtainable contraception is neither actively nor diligently used. . . . [I]f we had abortion on demand, there would be no

---

144. Jeanne L. Vance, Note, *Womb for Rent: Norplant and the Undoing of Poor Women*, 21 HASTINGS CONST. L.Q. 827, 853 (1994). *available at* http://www.hastingsconlawquarterly.org/archives/V21/I3/Vance.pdf.

145. IOM 2011 REPORT, *supra* note 10, at 108.

146. *See* Santelli & Melnikas, *supra* note 94.

147. Judith Treas, *How Cohorts, Education, and Ideology Shaped a New Sexual Revolution on American Attitudes Toward Nonmarital Sex*, 45 SOC. PERSP. 267 (2002).

148. Charles E. Rice, *Nature's Intolerance of Abuse*, ALL ABOUT ISSUES 6 (Aug. 1981).

668250

Exhibit 144            JA-0002230

2013]                    JOHN F. SCARPA CONFERENCE                    409

reward for the woman who practiced effective contraception."[149] More recently, economists have taken on the question of the relationship between contraception (and sometimes abortion) and rates of nonmarital sex, pregnancy, and abortion. None of their material is referenced by the IOM Report. Yet it is a vast and respected literature which can only be treated in summary form here.

In perhaps the most well-known paper on this subject—*An Analysis of Out-of-Wedlock Childbearing in the United States*[150]—Nobel prize-winning economist George A. Akerlof and his colleagues describe the path of women's increased participation in nonmarital sexual relations as a result of "technical changes": the increased availability and legalization of both contraception and abortion. The authors claim that, as compared with other explanations of nonmarital pregnancies and births—including but not limited to welfare theory or job theory—their "technology shock" hypothesis, combined with the declining stigma of a nonmarital birth—can better explain the magnitude and timing of changes in the numbers and rates of nonmarital pregnancies and births. They conclude that the current sex and mating market enabled by contraception and abortion operates to the disadvantage of women, and the relative advantage of men, due to a series of incentives structured by their availability. First, "[w]hen the cost of abortion is low, or contraceptives are readily available, potential male partners can easily obtain sexual satisfaction without making . . . promises [to marry in the event of pregnancy] and will thus be reluctant to commit to marriage."[151] Single women thus feel "pressured," because if they do not participate in sex, they are at a classic "competitive disadvantage" because "[s]exual activity without commitment is increasingly expected in premarital relationships."[152] "If they ask for . . . a guarantee [of marriage in the event of pregnancy], they are afraid that their partners will seek other relationships."[153] Even women who want children, reject contraception and abortion, and want a marriage guarantee as a condition for sex, have nonmarital sex anyway because it is the price of entering the mating market. Such a market is therefore likely to produce higher rates of sexual activity, nonmarital pregnancy, nonmarital births, and abortions all at the same time. This is indeed what has happened since the widespread legalization and availability of both contraception and abortion, despite predictions by pro-choice groups that widespread contraception would reduce all other named outcomes, and that legalized abortion would reduce nonmarital births.

---

149. Alan Guttmacher, Speech at the Law, Morality, and Abortion Symposium, Rutgers University Law School (Mar. 27, 1968), *in* 22 RUTGERS L. REV. 415, 437 (1968).

150. George A. Akerlof, Janet L. Yellen & Michael L. Katz, *An Analysis of Out-of-Wedlock Childbearing in the United States*, 111 Q.J. ECON. 277 (1996).

151. *Id.* at 290.

152. *Id.* at 280.

153. *Id.* at 290.

**668251**

Exhibit 144                                                                    JA-0002231

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

Economist Timothy Reichert brings additional insight to the question of the effects of contraception on the "mating market," as he depicts women's current situation as a case of what economists call the "prisoners' dilemma."[154] A prisoners' dilemma is any "social setting wherein all parties have a choice between cooperation and noncooperation, and . . . all parties would be better off if they choose cooperation," but—like prisoners being held for questioning in separate chambers—none can "effectively coordinate and enforce cooperation, [so] all parties choose the best *individual* choice, which is non-cooperation."[155] As a result, everyone involved is worse off.

According to Reichert, the prisoners' dilemma operates for women in the mating market as follows: first, contraception "lowers the costs of premarital and extramarital sexual activity below the level necessary for a separate sex market to form."[156] In other words, sex without the "cost," of pregnancy becomes the norm, such that sexual partners do not even have to consider the possibility of marriage. To this point, Reichert's analysis is quite similar to Akerlof, Yellen, and Katz's. Next, however Reichert takes a new, albeit not contradictory, approach, and claims to explain yet another negative consequence of the current mating market—women's marital unhappiness. He claims that more women than men begin populating what he calls the "marriage market" at a younger age because women generally want to have children sometime during their lives, but are biologically constrained to have them when they are younger. Women also know that stable marriage is better for children. By their early 30s, therefore, most women have entered the marriage market. Men have no similar, inbuilt impetus to leave the sex market and enter the marriage market. Thus, women have more "power" in the sex market, where they are relatively scarce, but face more competition in the marriage market, where they are competing with more women for fewer men. Reichert reasons that this translates into women more often striking "bad deals" at the margins in the marriage market, leading to a later desire for divorce. In fact, it is well-established today that women file for divorce approximately two times as often as men. Reichert suggests that women will eventually go along with attaching a lesser stigma to divorce, too, since they may want to exercise this option someday. This, in turn, leads to their entering marriage with less commitment, and with more concern to invest in income-producing skills in the event they need to support themselves and their children alone. Men respond rationally by doing the same.

In sum, according to Reichert, women are disadvantaged in the current mating market at least respecting their hopes to marry, to marry in time to have children, and to remain stably married. He further suggests that women are disadvantaged with respect to abortion because contracep-

---

154. Timothy Reichert, *Bitter Pill*, 203 FIRST THINGS 25 (2010).
155. *Id.* at 33.
156. *Id.* at 26.

**668252**

Exhibit 144

JA-0002232

2013]          JOHN F. SCARPA CONFERENCE          411

tion leads to greater demand for abortion. Contraception promises to al-
low "women [to] rationally plan their human capital investments,"[157] but
if things go awry and threaten their investments, abortion appears
necessary.

Considering this scholarship in the "women's health" terms adopted
by the IOM Report, at the very least it is possible, rationally, to conclude
that the normalization of sex dissociated from commitment, marriage, or
children might harm women over the long run. Sexual relationships with-
out commitment, nonmarital pregnancies and births, abortion, and di-
vorce are all associated with diminished mental, emotional, and
sometimes physical outcomes for women. The Report's failure even to
consider these renders its conclusion about contraception and women's
health at best premature and simplistic, and at worst wrong.

c.   Does Unintended Pregnancy Cause Harm to Women's Health?

Even if it could be demonstrated that greater access to contraception,
by eliminating co-pays, could reduce unintended pregnancy rates, there is
little persuasive evidence that the health conditions the Report claims wo-
men suffer while unintentionally pregnant, or thereafter, are *caused* by the
unintended pregnancy. Evidence indicates rather that that causation
might occur in the reverse order, *or* that both the unintended pregnancy
and the health conditions—smoking, drinking, domestic violence, and de-
pression—proceed from a third factor which is associated with *both* the
claimed independent variable (unintended pregnancy) and claimed de-
pendent variable (the health condition). In the case of unintended preg-
nancy, some literature suggests that the third factor might be "risk taking"
or "poverty." According to the analysis of the IOM Report by Professor
Austin Hughes:

When a statistically significant association is reported between
any two phenomena, it is important to be aware of the possible
explanations for such an association. It is always possible that a
statistically significant association might occur in a given data set
by chance alone; thus, it is important that any study reporting a
significant association be replicated on as many different popula-
tions as possible. Assuming that chance alone is not responsible
for an observed association, there are three possible causal pat-
terns that might account for it. Consider an association between
two phenomena, A and B. It is possible that A causes B, or that B
causes A. Furthermore, it is possible that there is a third phe-
nomenon (C) that causes both A and B. Both IOM (1995) and
IOM (2011) fail to provide a straightforward discussion of these
logical alternatives.[158]

_____

157. *Id.* at 30.
158. *See* Hughes, *supra* note 79, at 5.

668253

Exhibit 144                                                          JA-0002233

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

412            VILLANOVA LAW REVIEW            [Vol. 58: p. 379

Furthermore, in addition to the material set forth immediately above about the link between contraception and increased rates of unintended pregnancies, nonmarital births, abortion, and even divorce, there is additional evidence that greater use of contraception, including particularly the LARCs favored by the IOM Committee and its witnesses, can *harm* women's health.

The material in this subsection considers the Report's evidence, and what it omitted, concerning a relationship between unintended pregnancy, and women's health. The Report claims that unintended pregnancy can cause the following harms to women's health: excessive smoking and drinking during pregnancy, depression, and domestic violence.[159] Immediately it should be noted that the IOM's prior extensive report on unintended pregnancy acknowledged freely that "research is limited" regarding negative outcomes from unintended pregnancy.[160] It also stated in the same report that studies regarding women's health and unintended pregnancy are *not* able to demonstrate definitively "whether the effect is *caused by* or *merely associated with* unwanted pregnancy."[161] Yet the 2011 Report several times uses the language of "causality" or "the consequences" of unintended pregnancy, while failing to cite studies demonstrating causality.[162]

Turning to the Report's claim regarding domestic violence and depression as consequences of unwanted pregnancy, the Report cites the meta-analysis—a review of numerous papers treating a single topic—written by Gipson.[163] But the Report fails to reveal that the Gipson study's authors concluded there that, "[a]ssessing the relationship between pregnancy intention and its potential health consequences is fraught with a number of measurement and analytical concerns."[164] It also stated that "although longitudinal data may provide some inferences about the observed associations, *causality is difficult if not impossible to show.*"[165] Regarding psychosocial health and unintended pregnancy, the authors state "In light of the paucity of studies . . . and their limitations in terms of establishing causality, the existing research should only be considered to be suggestive of such an impact."[166] In its conclusion, the authors stated:

---

159. IOM 2011 REPORT, *supra* note 10, at 103.

160. IOM 1995 REPORT, *supra* note 81, at 103.

161. *Id.* at 65. Although the Report insists that it is not important to sort this out, this is both irrational and not the legal standard required in connection with a compelling governmental interest.

162. IOM 2011 REPORT, *supra* note 10, at 103.

163. *See id.*; *see also* Jessica D. Gipson et al., *The Effects of Unintended Pregnancy on Infant, Child, and Parental Health: A Review of the Literature*, 39 STUD. FAM. PLAN. 18 (2008).

164. Gipson et al., *supra* note 163, at 19.

165. *Id.* at 20 (emphasis added).

166. *Id.* at 29.

**668254**

Exhibit 144

JA-0002234

Alvare: No Compelling Interest: The "Birth Control" Mandate and Religious

The existing evidence on the impact of unintended pregnancy on child and parental health outcomes is mixed and is limited by an insufficient number of studies for some outcomes and by the aforementioned measurement and analytical concerns.[167]

Echoing Professor Hughes, it further notes "[a]n additional concern . . . that both health outcomes and pregnancy intentions may be jointly determined by a single, often unobserved factor."[168]

On the question of women's depression after a birth, Professor Hughes states that within the Gipson paper, the most relevant paper cited is a 1991 Australian study comparing rates of anxiety and depression immediately before, and up to six months after, a birth, between mothers whose pregnancies were described as "wanted" at the time of pregnancy and mothers whose pregnancies were described as "unwanted."[169] For mothers with no history of mental illness prior to pregnancy, 5.1% of mothers of "unwanted" infants experienced depression six months after birth, as compared with 2.6% of mothers of "wanted" infants. Causation could not clearly be established. Further, given the Australian study's reliance on the categories of wanted/unwanted, it is not clear whether it included both "mistimed" and "unintended" pregnancies (the subject of the Report) in the "unwanted" category. Further, even though the rate of depression was nearly twice as high in the mothers with "unwanted" infants as in mothers with "wanted" infants, the rates of depression were actually quite low in both groups.[170] In short, the 2011 Report did not offer any clear or significant causal relationship between depression and unintended pregnancy.

The 2011 Report also reads as if domestic violence is caused by unintended pregnancy, treating such violence in the paragraph about the "consequences of an unintended pregnancy for the mother."[171] It cites the IOM 1995 Report for this proposition although, as quoted immediately above, that report said that studies regarding women's health and unintended pregnancy were *not* able to demonstrate definitively "whether the effect is caused by or merely associated with unwanted pregnancy."[172] Furthermore, the 2011 Report failed to divulge the literature showing that the causation may well be reversed: i.e., domestic abuse may be a causal factor for unintended pregnancy. Scientists have proposed the likelihood of this chain of causation due to the tendency of abusive relationships to create an environment in which the likelihood of unintended pregnancy

167.  *Id.* at 20.

168.  *Id.*

169.  *See* Hughes, *supra* note 79, at 8 (citing J.M. Najman et al., *The Mental Health of Women 6 Months After They Give Birth to an Unwanted Baby: A Longitudinal Study*, 32 SOC. SCI. & MED. 241 (1991)).

170.  *See id.*

171.  IOM 2011 REPORT, *supra* note 10, at 103.

172.  IOM 1995 REPORT, *supra* note 81, at 65.

668255

Exhibit 144

JA-0002235

is increased—including in an article co-authored by Dr. Santelli, whose study on teen pregnancy is one of the two studies the Report cites for claiming a relationship between contraception access and rates of unintended pregnancy among teens.[173]

Regarding the claimed effects of unintended pregnancy on women's smoking and drinking, the IOM's 1995 Report had earlier admitted, respecting this alleged relationship, that these figures "drop significantly where studies control for other causes."[174] Furthermore, other studies indicate, quite plausibly, that causation regarding excess drinking and smoking may also be reversed, or that there is a third factor—a woman's risk-taking preferences—which accounts both for her unintended pregnancy and her smoking and drinking habits.[175] There is also the fact that virtually all mothers who smoke during pregnancy were smokers before getting pregnant.[176]

Given all of these possibilities—none seriously considered by the Report—the Report's recommendation to increase access to contraception in order to prevent women's smoking and drinking during pregnancy, whether these are directed toward the woman's health, or the child's, as discussed above, and to prevent depression and domestic violence, might easily be unavailing or ineffective. Also, and as already reported above, the preventive services recommended by the USPSTF, already required by the ACA to be provided without a co-pay, include counseling for pregnant women concerning smoking and drinking. And domestic violence prevention is a separately recommended preventive service for women within the 2011 IOM Report itself.[177]

The Report further failed to consider that increasing access to contraception—associated with a message of sexual expression as freedom, and the good of sexual expression outside of the context of a relational commitment, or parenting—might itself harm women's health. This is undoubtedly quite contested territory, but there is relevant evidence of two types: first, about a possible relationship between large contraception programs and increasing rates of sexually transmitted infections ("STIs"); and second, about the effects of contraceptive drugs and devices on women's

---

173. Jacquelyn C. Campbell et al., *The Influence of Abuse on Pregnancy Intention*, 5 WOMEN'S HEALTH ISSUES 214 (1995); Patricia M. Dietz et al., *Unintended Pregnancy Among Adult Women Exposed to Abuse or Household Dysfunction During Their Childhood*, 282 J. AM. MED. ASS'N 1359 (1999) (noting that this is co-authored by, among others, Dr. John S. Santelli).

174. IOM 1995 REPORT, *supra* note 81, at 68–69, 75.

175. Timothy S. Naimi et al., *Binge Drinking in the Preconception Period and the Risk of Unintended Pregnancy: Implications for Women and Their Children*, 111 PEDIATRICS 1136 (2003); Carolyn Westhoff et al., *Smoking and Oral Contraceptive Continuation*, 79 CONTRACEPTION 375 (2009); Gregory J. Colman & Ted Joyce, *Trends in Smoking Before, During, and After Pregnancy in Ten States*, 24 AM. J. PREVENTIVE MED. 29 (2003).

176. Colman & Joyce, *supra* note 175, at 29-35.

177. IOM 2011 REPORT, *supra* note 10, at 117.

**668256**

Exhibit 144                                                                JA-0002236

bodies and health. On the first matter, Professor Hughes has summarized that there exists:

> [E]pidemiological evidence support[ing] the hypothesis that the widespread availability of contraception in the U.S. after the 1960's was accompanied by an unprecedented epidemic in STIs. From 1966 to 1987, the number of genital human papilloma virus infections in the U.S. increased about sevenfold, and the number of genital herpes virus infections increased eleven fold in the same period. Gonorrhea and syphilis infections, which had decreased greatly by the 1950's due to the availability of antibiotics, rebounded substantially after the 1960's. At the present time, diseases caused by the sexually transmitted bacteria *Chlamydia trachomatis* and *Neisseria gonorrhoeae* are the most commonly reported notifiable diseases (i.e., diseases that must be reported by law) in the U.S. And of course a newly emerged STI, human immunodeficiency virus-1 (HIV-1), gained a foothold in the U.S. population during the same period.

> Because STIs are spread almost entirely by sexual activity with multiple partners, the problems of determining cause and effect that usually plague studies of epidemiological associations do not arise in this case. The STI epidemic is itself *prima facie* evidence that contemporary U.S. society has seen a substantial increase in non-marital, multiple-partner sexual activity. There is abundant evidence that availability of contraception was accompanied by widespread changes in attitudes toward non-marital sexual activity in the U.S. population. Therefore, it is reasonable to conclude that the current STI burden on the U.S. population is at least in part a consequence of widespread access to contraception.[178]

Additional research has replicated this result: among women in a U.S. city who used an injectable contraceptive versus women who did not use a hormonal contraceptive,[179] and among young women given increased pharmacy access to emergency contraception,[180] STI rates increased in both cases.

It has also been observed theoretically in a law and economics analysis, that it makes sense that lowering the price of sex increases the quantity demanded. Speaking first about the causal relationship between legaliz-

---

178. Hughes, *supra* note 79, at 12 (citations omitted).
179. Charles S. Morrison et al., *Hormonal Contraceptive Use, Cervical Ectopy, and the Acquisition of Cervical Infections*, 31 SEXUALLY TRANSMITTED DISEASES 561 (2004).
180. Christine Piette Durrance, *The Effects of Increased Access to Emergency Contraception on Sexually Transmitted Disease and Abortion Rates*, ECONOMIC INQUIRY (Dec. 5, 2012), http://onlinelibrary.wiley.com/doi/10.1111/j.1465-7295.2012.00498.x/abstract.

668257

Exhibit 144                                JA-0002237

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

416                VILLANOVA LAW REVIEW            [Vol. 58: p. 379

ing abortion and increased rates of certain STIs, two economics scholars write:

> What is clear, however, is that the CDC and medical authorities in general have not . . . considered that changes in institutions can cause changes in the relative prices faced by individuals. Instead, the medical community tends to attribute the changes in STD rates to fluctuating social mores, changing demographics, and changing diagnosis patterns. As indicated by our results, ignoring the effects of changing incentives precludes an accurate understanding and modeling of this epidemiological phenomenon.[181]

Respecting the effects of an increased access to contraception, the authors then conclude that: "As an unplanned pregnancy is one of the costs of sexual activity, the effect of contraception availability is similar to the effect of abortion availability. If contraception is used . . . the expected costs decline, leading to an increase in the quantity of sex demanded."[182] STIs being, intrinsically, a measure of multiple-partner sexual activity,[183] they are likely to increase with an increase in the quantity of non-monogamous sex in a population.

Nowhere does the IOM Report consider a potential relationship between its recommendation, and a potential for further "lowering the price of sex," in a way that might result in higher rates of STIs.

Finally, the IOM does not consider in sufficient detail the potential negative health effects of contraception upon women.[184] The Report says only that "for women with certain medical conditions or risk factors, some contraceptive methods may be contraindicated,"[185] and that there are "side effects" which are "generally considered minimal."[186] It adds an exception for "oral contraceptive users who smoke."[187] Several brief re-

---

181. Jonathan Klick & Thomas Stratmann, *The Effect of Abortion Legalization on Sexual Behavior: Evidence from Sexually Transmitted Diseases*, 32 J. LEGAL STUD. 407, 431-32 (2003) (footnote omitted).

182. *Id.* at 410.

183. *See* Hughes, *supra* note 79, at 12.

184. A brief filed in one of the cases against the Mandate takes up in detail the question of the threat to women's health posed by some contraception. *See* Brief Amici Curiae of Women Speak for themselves, Bioethics Defense Fund, and life Legal Defense Foundation in Support of Plaintiffs-Appellants, O'Brien v. Dep't of Health & Human Servs., No. 12-3357 (8th Cir. 2012). It argues that "the Government entirely failed to consider the robust body of medical evidence indicating that hormonal contraceptives have biological properties that significantly increase women's risk of breast, cervical, and liver cancer, stroke, and a host of other diseases including the acquisition and transmission of human immunodeficiency virus (HIV)." *Id.* at 3.

185. IOM 2011 REPORT, *supra* note 10, at 105.

186. *Id.*

187. *Id.*

668258

Exhibit 144                                                                    JA-0002238

Alvare: No Compelling Interest: The "Birth Control" Mandate and Religious

sponses highlight the insufficiency of the Report's treatment on this matter.

First, as of 2008, over 18% of American women smoke—i.e., approximately 21.1 million women.[188] This is a large cohort of women who might both receive free hormonal contraception as a consequence of the Report and the Mandate, while being admittedly quite susceptible to harms from hormonal contraceptives.

Second, there is an irony within the Report relative to women's health. While the Report states that women with particular health difficulties need to avoid becoming pregnant,[189] and may have a greater need for contraception, it fails to note that these *very women* might be at the greatest risk from using especially the more highly recommended methods, LARCs. Among the diseases the Report highlights are included: pulmonary hypertension, cyanotic heart disease, and Marfan Syndrome (a connective tissue disorder). Yet these are precisely the diseases for which leading, specialized medical associations recommend cheaper barrier or natural contraceptive methods, as distinguished from many of the more expensive hormonal methods the Report hopes to incentivize.[190]

Third, the Report ignores a large and deep literature about the negative effects of particular contraceptives, especially LARCs. As summarized by Professor Hughes:

> Although contraceptive methods prescribed in the U.S. are believed to be without harmful side-effects in most cases, there is a long history of discussion and controversy regarding the potential deleterious side-effects of certain contraceptives, especially [oral contraceptives]. To consider just one example, a recent meta-analysis found a small but significant association between increased breast-cancer risk and long-term [oral contraceptive] use. Not all studies have found such an association; and, as with

---

188. *Women and Tobacco Use*, AM. LUNG ASS'N, http://www.lung.org/stop-smoking/about-smoking/facts-figures/women-and-tobacco-use.html (last visited Feb. 20, 2013).

189. IOM 2011 REPORT, *supra* note 10, at 103–04.

190. *See, e.g., Patient Information: Marfan Syndrome*, HEART DISEASE & PREGNANCY, http://www.heartdiseaseandpregnancy.com/pat_mar_mom.html (last visited Feb. 20, 2013); *ACHA Q and A: Birth Control for Women with Congenital Heart Disease*, HEART MATTERS (2008), http://www.achaheart.org/Portals/0/pdf/Library%20Education/ACHA-Q-and-A-Birth-Control-for-Women-with-CHD.pdf (reporting that "barrier methods" are "safe for all users," but that risks are greater regarding various of hormonal methods, especially pills containing estrogen, and certain IUDS); PULMONARY HYPERTENSION ASS'N, BIRTH CONTROL AND HORMONAL THERAPY IN PAH (2002), *available at* http://www.phassociation.org/document.doc?id=1684 (reporting that "[t]he two safest methods of birth control are 1) the barrier method, which may include condoms in men and/or a diaphragm with spermacide in women, and 2) a vasectomy in the male partner for a woman with PAH in a monogamous (one partner) relationship. . . . [N]early half of the specialists did not advocate using BCP for their patients, and some actively discouraged patients from doing so . . . .").

668259

Exhibit 144                                                            JA-0002239

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

418                VILLANOVA LAW REVIEW                [Vol. 58: p. 379

any association study, this association does not necessarily imply a causal relationship. However, there are over 200,000 new breast cancer cases per year in the U.S., with a medical care cost per patient of $20,000-$100,000. If even a small fraction of these cases are due to [oral contraceptives], this would add substantially to the public health and economic costs of contraceptive use.[191]

Referring to the "long history of discussion and controversy" referenced by Professor Hughes, one should note that it is well known to the point of coverage in the *New York Times* that "taking a combination hormone birth control pill—which contains estrogen and a progestin hormone—can increase the risk of stroke and blood clots in the legs and lungs."[192] Further, various forms of birth control pills[193] and IUDs,[194] the latter with and without hormonal elements, have been the subject of myriad class action lawsuits in which leading pharmaceutical corporations have paid hundreds of millions of dollars to settle. The World Health Organization continues to list some hormonal contraceptives as a group 1 carcinogen.[195] Leading cancer associations including the American Cancer Society[196] and the International Agency for Research on Cancer (IARC)[197] as well as the World Health Organization, and the National Cancer Institute refer especially to estrogen-progesterone oral contraceptives as "known carcinogens."[198]

---

191. Hughes, *supra* note 79, at 12 (citations omitted).

192. Natasha Singer, *Health Concerns over Popular Contraceptives*, N.Y. TIMES (Sept. 25, 2009), http://www.nytimes.com/2009/09/26/health/26contracept.html?n=Top%252fNews%252fBusiness%252fCompanies%252fBayer%20A%252eG%252e&_r=1&.

193. Howard Ankin, *Bayer Healthcare Reaches Settlement in Yaz/Yasmin Lawsuits*, ANKIN LAW OFFICE L.L.C. (May 7, 2012), http://www.ankinlaw.com/blog/bayer-healthcare-reaches-settlement-in-yazyasmin-lawsuits/.

194. *Mirena IUD Lawsuit Update: Mirena IUD Adverse Event Reports to the FDA Exceed 45,000*, SFGATE (Nov. 26, 2012), http://www.sfgate.com/business/prweb/article/Mirena-IUD-Lawsuit-Update-Mirena-IUD-Adverse-4067514.php#ixzz2GYR9cWxp.

195. *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans*, INT'L AGENCY FOR RESEARCH ON CANCER, http://monographs.iarc.fr/ENG/Monographs/vol72/index.php (last visited Feb. 22, 2013).

196. *Known and Probable Human Carcinogens Introduction*, AM. CANCER SOC'Y, http://www.cancer.org/cancer/cancercauses/othercarcinogens/generalinformationaboutcarcinogens/known-and-probable-human-carcinogens (last visited Feb. 20, 2013).

197. *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans*, *supra* note 195.

198. WORLD HEALTH ORG., CARCINOGENICITY OF COMBINED HORMONAL CONTRACEPTIVES AND COMBINED MENOPAUSAL TREATMENT (2005), *available at* http://www.who.int/reproductivehealth/topics/ageing/cocs_hrt_statement.pdf; Steven A. Narod et al., *Oral Contraceptives and the Risk of Breast Cancer in BRCA1 and BRCA2 Mutation Carriers*, 94 J. NAT'L CANCER INST. 1773 (2002).

**668260**

Exhibit 144                                                                JA-0002240

Alvare: No Compelling Interest: The "Birth Control" Mandate and Religious

Additionally, quite recently, a study also suggested strongly that inject-able LARCs may double the risk of contracting and transmitting HIV,[199] to the point that even the World Health Organization is considering "re-evaluating . . . clinical recommendations on contraceptive use."[200]

Finally, in a report concerning preventive health care for women which does indicate, albeit far too briefly, some of the negative health ef-fects of contraception, it is curious to see a recommendation for contra-ception for women and girls *only*. In other words, it is at least surprising that there is no suggestion at all regarding placing any of the burden of contraception upon males. Male contraception is neither addressed nor recommended in the Report. Yet fifty-two years after the launch of the birth control pill, no pharmaceutical company has seen fit to develop hor-monal or other birth control products for men for reasons having to do with the burdens and side-effects of contraceptive usage. In the words of *Mother Jones Magazine*:

> A male pill might have to be easier on the body than female con-traceptives, too. Women have long complained of weight gain, moodiness, and other birth control side-effects . . . . A recent clinical trial for a male contraceptive delivered via injection (sim-ilar to Depo-Provera for women) was ended early despite promis-ing early results due to participants' complaints about side-effects such as depression, increased libido, and mood changes.

> Diana Blithe, a program director at the National Institute for Child Health and Human Development, says that "The reality is we could get a product out there very quickly if companies would aggressively take on the process of making it happen," she said. But until consumers really ask for that product, or until market-ing studies show it would really sell, US companies really have little to gain by developing a male contraceptive. Since condoms are widely available, protect against STDs, and have very few if any side-effects, it may be a long wait.[201]

This divergent treatment of men and women is simply "built in" to the Report, not questioned.

To conclude this section on the health consequences of contracep-tives themselves, it should at least be noted that it is very curious that a government report on the subject of preventive care for women does not pay greater deference to important statements about the health risks to

---

199. Renee Heffron et al., *Use of Hormonal Contraceptives and Risk of HIV-1 Transmission: A Prospective Cohort Study*, 12 LANCET 19 (2012).

200. Pam Belluck, *Contraceptive Use in Africa May Double Risk of H.I.V.*, N.Y. TIMES (Oct. 3, 2011), http://www.nytimes.com/2011/10/04/health/04hiv.html?pagewanted=all.

201. Jen Quraishi, *Birth Control for Men: Why the Wait?*, MOTHER JONES (June 17, 2011), http://www.motherjones.com/blue-marble/2011/06/hormonal-contra-ceptives-men-why-wait.

668261

Exhibit 144                                                        JA-0002241

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

420                VILLANOVA LAW REVIEW          [Vol. 58: p. 379

women, particularly of hormonal contraception, articulated by the World Health Organization and USAID. This Article is not a scientific study, and does not make the claim that most contraceptives are intrinsically dangerous to most women. But it can assert, on the evidence available, that there are serious and ongoing disputes over the safety and the negative external consequences of widely available contraception, especially when this is paired with the notion that sex and procreation are not weighty or important matters—the latter notion being an element of the contraceptive project, as described earlier.

Rather than consider any of the relevant data, however, the Report devotes a total of six lines of text to risks of contraceptives. By contrast, it devotes hundreds of lines of text to contraception's claimed powers of preventing the birth of unintended children, and an additional ten lines to the benefits of contraceptive "separate from the ability to plan one's family and attain optimal birth spacing."[202] These latter benefits include its claimed potential for reducing endometrial and ovarian cancer—the second noted to be a more tenuous proposal—and treating "menstrual disorders, acne or hirsutism [hairiness] and pelvic pain."[203]

### 2. Abortion Rates and Women's Health

While the Report does not squarely identify abortion as a problematic health outcome for women that contraception could prevent, it certainly suggests that avoiding abortion is a good outcome of increased contraceptive usage.[204] Obviously, the thrust of the Report concerns the relationship between contraception and unintended pregnancy. But lowered abortion rates are nonetheless mentioned. Such an outcome is regularly mentioned by supporters of large-scale contraception programs such as the Guttmacher Institute and Planned Parenthood, even while the same groups regularly support unlimited access to legal abortion. It is understandably designed to attract the support of Americans opposed to legal abortion.

For the proposition that increased contraception usage lowers abortion rates, the Report cites a Guttmacher report entitled "Abortion in Women's Lives,"[205] the same study used to support the claim that more contraception usage drives down rates of unintended pregnancies. A later section amply documents that this latter claim is at least doubtful at the population level; this section raises similar doubts about the claim regarding abortion rates. Like the link with unintended pregnancy rates, the link between contraception and abortion rates seems intuitively true. Yet again, what might be true on an individual scale for a contraception user who is motivated to avoid pregnancy, turns out not to be true on a social

---

202. IOM 2011 REPORT, *supra* note 10, at 107.
203. *Id.*
204. *Id.* at 103.
205. *Id.* at 105 (citing BOONSTRA ET AL., *supra* note 95).

**668262**

Exhibit 144                                                    JA-0002242

2013]            JOHN F. SCARPA CONFERENCE            421

scale. First, I will take a closer look at the Guttmacher source used, and then look at relevant evidence the Report did not consider.

Page 18 of the Guttmacher source cited in the Report claims that among *unmarried* women between 1982 and 2002 there was a 6% rise in the proportion of women using contraception and a decline in both unintended pregnancy rates and abortion rates—it acknowledges that *married* women's abortion rates did not change significantly.[206]

First, it should be noted that the Guttmacher report is a claim about unmarried women only, not about the population; the Report and the Mandate, however, are about all women of childbearing age at risk for unintended pregnancy.

Second, the Guttmacher source does not assert causation between contraceptive usage and abortion rates. Many factors affect abortion rates: the economy, mores, and changes in relationship and family structures, to name just a few. The cited Guttmacher study makes no effort to control for all of these factors. It simply says that contraceptive usage "*accompanied*" lower rates in unintended pregnancies and that the latter are a "key determinant" of abortion rates.[207] Then, without further evidence it concludes: "Thus, the increase in contraceptive use *contributed* significantly to the decrease in abortion rates among unmarried women."[208] Third, the Guttmacher report concerns one slice of time (1982-2002) over a long period of time during which both contraception and abortion have been legally available—1973 to today.

Fourth, on the page following the page relied upon by the IOM, the Guttmacher source states that: "[w]hen the desire for small families takes hold in a society, the initial result is often an increase in both contraceptive use and abortion. Over time, however, increasing levels of contraceptive use are accompanied by falling abortion rates."[209] The chart illustrating this claim, figure 3.3 on page 17, showed data from about 1983 to 2002. Beginning in 1983, it showed a rise in the percentage of unmarried women at risk of unintended pregnancy using contraceptives, and a corresponding decrease in unintended pregnancies per 1,000 unmarried women. But the chart omits reporting on the years 1970 to 1982; during these years, access to contraception was rising—especially due to the passage of the federal Title X program distributing large quantities of contraception—but abortion rates were *climbing* not falling. These rates climbed from about 14 per 1,000 women of childbearing age in 1973 to 24 per 1,000 in 1979—the rate increased all the way to 29 per 1,000 in 1980. It was only after this simultaneous *rise* in rates of contraception usage and abortion that abortion rates began to fall.

---

206. BOONSTRA ET AL., *supra* note 95, at 18.
207. *Id.*
208. *Id.*
209. *Id.* at 19.

668263

Exhibit 144                                                                JA-0002243

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

422                VILLANOVA LAW REVIEW            [Vol. 58: p. 379

Turning now to material concerning the relationship between contraception and abortion, which material is not considered in the Report. First, it should be noted that some of the drugs and devices covered by the Report and the Mandate act as embryocides, i.e., early abortifacients. It is not accurate to claim that a drug or device that *causes* an early abortion *prevents* abortion.

Second, at the level of the larger society, normalizing sex dissociated from commitment and from parenting, can lead to higher, not lower abortion rates, as people become simultaneously more willing to risk sex without a marital commitment, and less willing to tolerate the frustration of their intentions to avoid pregnancy. This explanation not only forms the basis for the law and economics' analyses linking greater contraceptive access to higher abortion rates,[210] but also helps explain two phenomena. First, using contraception is associated with a greater inclination to pursue abortion. For many years, it has been the case that women using contraception in the month they became pregnant are more likely to seek an abortion than women who were not using contraception at all.[211] It is also the case, as demonstrated by the most recent St. Louis study in which women were strongly encouraged to use, and continue using, LARCs over a period of three to ten years, that use of LARCs was associated with lower numbers of abortions, but *higher abortion ratios*. In other words, ordinarily, one of four pregnancies is aborted in the United States,[212] but in the St. Louis study, there was *one abortion for every one live birth* among a group of women encouraged in large numbers to use what they were told were the most effective contraceptives.[213] Their intention to avoid childbirth may thereby have been strengthened, leading to a greater willingness to seek and undergo an abortion. Third, the Report presumes that the *only study it cites* about the linkage between contraception and abortion relies upon accurate data about abortion rates over time. But reported abortion rates are notably unreliable.[214] The Centers for Disease Control has never made abortion reporting mandatory. Only forty-five states have consistently reported data to the CDC since 1999.[215] Historically, its results undercounted abortion as compared with the results reported by the Guttmacher Institute, although even Guttmacher would have difficulty

210. For a further discussion, see *supra* notes 88–157 and accompanying text.

211. RACHEL K. JONES ET AL., GUTTMACHER INST. CHARACTERISTICS OF U.S. ABORTION PATIENTS, 2008 7-8 (2010), *available at* http://www.guttmacher.org/pubs/US-Abortion-Patients.pdf.

212. KAREN PAZOL ET AL., CTRS. FOR DISEASE CONTROL & PREVENTION, ABORTION SURVEILLANCE—UNITED STATES, 2007 (2011), *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/ss6001a1.htm.

213. *See* Peipert et al., *supra* note 139, at 6.

214. CHARLES A. DONOVAN & NORA SULLIVAN, CHARLOTTE LOZIER INST., ABORTION REPORTING LAWS: TEARS IN THE FABRIC 1, 14 (2012), *available at* http://www.lozierinstitute.org/wp-content/uploads/2012/12/American-Report-Series-ABORTION-REPORTING-LAWS.pdf.

215. *Id.* at 4.

**668264**

Exhibit 144                                                JA-0002244

2013]                 JOHN F. SCARPA CONFERENCE                 423

getting reliable results from states which refrain from reporting at all, or which have only voluntary reporting. Several of these states have vast populations and are believed to have some of the highest rates of abortion in the nation. These include:[216] California, Washington, D.C., New Jersey, and Maryland.[217]

Even with the evidence of record, however, the Report is likely incorrect to conclude that "evidence exists" that "greater use of contraception within the population produces lower . . . abortion rates nationally."[218] Rates of contraception usage have not been associated consistently with lowered abortion rates. Even more importantly, abortion rates may decline for a time *only after* there had previously taken place a twin rise in the availability of contraception and in the rates of abortion. Interestingly, the only countries the cited 2006 Guttmacher report discusses at length regarding a time series from *before* the introduction of contraception to the present, are countries with what might be called an "amoral" resort to abortion: Hungary, Russia, and South Korea.[219] In other words, there is evidence that in each of those countries, abortion was not regarded as a real moral dilemma, of the wrenching nature it is considered in the United States;[220] it was rather the major form of "birth control" before true forms of contraception were introduced on a large scale. Not surprisingly, the introduction in those countries of contraception reduced the resort to abortion, although even in two out of three of those countries, contraceptive access was *first* correlated with rising rates of abortion. The United States is different from these types of countries. Abortion was and is a significantly fraught moral issue, personally and politically. When contraception was introduced here, its major effect was not to replace abortion and drive abortion rates down, but first to drive up rates of nonmarital sexual intercourse, and associated nonmarital pregnancies and abortions, before, in some selected years, helping to reduce the abortion rate. Its future effects are by no means certain.

3. *Will the Mandate, by Making Contraception and EC's "Free," Increase Effective Usage and Depress Unintended Pregnancy Rates?*

Even assuming that the Report employed a reliable measure of unintended pregnancy rates, *and* showed a causal relationship between increased contraception usage and rates of unintended pregnancy, *and* showed that unintended pregnancy is causally related to worse health outcomes for women, the Report has not shown that the government has a "compelling state interest" in forcing employers to offer "free" contracep-

---

216. *Id.* at 8.
217. *Id.*
218. IOM 2011 REPORT, *supra* note 10, at 105.
219. BOONSTRA ET AL., *supra* note 95 at 19.
220. *See, e.g.,* Kate Pickert, *40 Years Ago, Abortion Rights Activists Won an Epic Victory With* Roe v. Wade: *They've Been Losing Ever Since,* TIME, Jan. 14, 2013, *available at* http://www.time.com/time/covers/0,16641,20130114,00.html.

668265

Exhibit 144                                                        JA-0002245

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

424                VILLANOVA LAW REVIEW                [Vol. 58: p. 379

tion and ECs, unless it demonstrates further that this last command increase the effective *usage* of contraception so as to lower unintended pregnancy rates among the population. This section will demonstrate that the Report fails to meet this challenge.

First, the Mandate, and the IOM Report on which it is based, is addressed to an audience—employed women and the daughters of the employed receiving health insurance from an employer—which is not responsible for the vast majority of unintended pregnancies in the United States. These occur among poorer Americans who are already amply provided free or very low cost contraception. Second, there is the fact that even among users of contraception, pregnancy occurs with great regularity. Third, there are many factors affecting women's decisions regarding contraceptive usage. Cost is one of them, but it is not a large factor. Also, to the degree cost is important at all, it applies for the most part to women with lesser incomes, who, as stated above, are already amply supplied with free or low cost contraception by a myriad of federal and state programs.

On the first point, regarding the targeted audience: rates of unintended pregnancy are highest among groups the mandate will not affect—the poorest adolescents and women who are already served by myriad federal and state programs. The Report itself makes this observation; it notes that non-use of contraception is particularly likely among women who "have a low income, who are not high school graduates, and who are members of a racial or ethnic minority group."[221] Many other private and public studies conclude similarly,[222] as does the Finer and Henshaw study relied upon by the IOM Report on page 102. That study states the rate of unintended pregnancy for women below the poverty line is three times that of women above 200% of the poverty level.[223] The rate among college graduates is 26 per 1,000 women, but for women who did not finish high school, 76 per 1,000 women.[224] Another source trusted by the IOM Committee, the Guttmacher Institute, concludes in its January 2012 fact sheet on unintended pregnancy that the rate of unintended pregnancy among low income women is five times the rate of the highest income women.[225]

The Report already acknowledges that low income women are amply supplied with free or almost free contraception. Page 108 of the Report refers to contraceptive coverage as "standard practice for most federally funded insurance programs."[226] It cites its availability in community

---

221. IOM 2011 REPORT, *supra* note 10, at 102.

222. *See, e.g.,* Rachel K. Jones et al., *Contraceptive Use Among U.S. Women Having Abortions in 2000-2001*, 34 PERSP. ON SEXUAL & REPROD. HEALTH 294, 297-98 tbl.3 (2002) (noting that Table 3 displays percent of women obtaining abortions who had not been using contraceptive method in month of conception).

223. Finer & Henshaw, *supra* note 126, at 90.

224. MOSHER & JONES, *supra* note 91.

225. *Facts on Unintended Pregnancy in the United States*, *supra* note 136, at 108.

226. IOM 2011 REPORT, *supra* note 10, at 108.

**668266**

Exhibit 144                                        JA-0002246

2013]          JOHN F. SCARPA CONFERENCE          425

health centers, family planning centers, and Medicaid. It goes further with respect to Medicaid, and points out that since 1972 it has "required coverage for family planning in all state programs and has exempted family planning services and supplies from cost-sharing requirements."[227] It points out that twenty-six states also have their own Medicaid family programs for women who do not technically qualify for Medicaid.[228] In congressional testimony, Secretary Sebelius has also added that contraception is available at many other places including "community health centers, public clinics, and hospitals with income based support."[229] An editorial in the *New England Journal of Medicine* estimates that community health centers may be serving as many as 40 million Americans (up from 20 million) in coming years.[230] Additionally, of course, there are drug stores, large retail chains and Planned Parenthood, and other clinics receiving hundreds of millions of dollars of federal and state aid annually.

On the second point, contraception fails, even among regular users, with the CDC estimating that twelve percent of all women using contraception will become pregnant each year,[231] and with contraceptive users constituting the majority of patients of abortion clinics. Even for women using LARCs, a Guttmacher Institute journal estimated "first year" failure rates of the condom at fourteen percent, with eight percent for the pill, and four percent for LARCs.[232] Fourteen or twelve percent or four percent of users across a large population is still a large number of women experiencing an unintended pregnancy. These numbers indicate that even if the Mandate could narrow the gap between the eighty-nine percent of "at risk" women currently using contraception today, and one hundred percent, the result in terms of the total percentage of unintended pregnancies would be quite small. If one further considers that most women still will not choose LARCs, perhaps as many as ten percent of the new eleven percent of users would experience unintended pregnancy. And of course, any calculations about the overall effects of increased access to contraception should take into consideration the possibility that this might lead to more women and girls becoming sexually active.

Third, with the possible exception of its effect on the uptake of LARCS, as already discussed and critiqued, a Mandate making contraception "free" for employed women and the daughters of the employed, is not likely to close or even substantially narrow the small gap between the vast majority of such women currently using contraception effectively, and those who are not, because the latter have many reasons other than cost—

---

227. *Id.*

228. *Id.*

229. Press Release, Dep't of Health & Human Servs., *supra* note 4.

230. Eli Y. Adashi et al., *Health Care Reform and Primary Care—The Growing Importance of the Community Health Center*, 362 NEW ENG. J. MED. 2047, 2048 (2010).

231. MOSHER & JONES, *supra* note 91, at 4.

232. Nalini Ranjit et al., *Contraceptive Failure in the First Two Years of Use: Differences Across Socioeconomic Subgroups*, 33 FAM. PLAN. PERSP. 19, 21 (2001).

**668267**

Exhibit 144                                                    JA-0002247

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 276 of 677

reasons not addressed at all by the Mandate—for avoiding some or all contraception usage. In order to pursue this claim, I will first treat the matter of the currently high rates of usage of contraception, then indicate that the group targeted by the Mandate is already using it at rates exceeding the national average, then consider the many reasons other than price why some women are not using contraception.

On the matter of current usage of contraception, the IOM acknowledges that usage rates are high. With regard to extant private insurance coverage, for example, the Report states that: "contraceptive coverage has become standard practice for most private insurance and federally funded insurance programs."[233] It adds that that "private employers have also expanded their coverage of contraceptives as part of the basic benefits packages of most policies."[234] It reports on a 2010 survey indicating that eighty-five percent of large employers and sixty-two percent of small employers already offer coverage of FDA-approved contraceptives.[235] Further, according to the Guttmacher Institute, nine of ten employer-based insurance plans already cover the full range of prescription contraceptives.[236] The Report continues, saying that about ninety-nine percent of women ages fifteen to forty-four who had *ever* had sexual intercourse with a male had used at least one contraceptive method.[237] The Guttmacher Institute adds that among women seeking to avoid pregnancy eighty-nine percent are already practicing contraception.[238]

On the matter of contraceptive usage by the women targeted by the Mandate, the material immediately above indicates that employed women and the daughters of the employed already have a high level of access to contraception via their employer plans. Also women with more education and income generally use contraception at higher rates than the poor. This is a well-documented and persistent phenomenon.[239] Finally, more affluent women not only use contraception more regularly, but they also tend to use what researchers call "more effective methods," more often than their poorer sisters.[240]

---

233. IOM 2011 REPORT, *supra* note 10, at 108.

234. *Id.*

235. *Id.* at 109.

236. *Contraceptive Use in the United States, supra* note 143 (citing Adam Sonfield et al., *U.S. Insurance Coverage of Contraceptives and the Impact of Contraceptive Coverage Mandates*, 36 PERSP. ON SEXUAL AND REPROD. HEALTH 72 (2002)).

237. IOM 2011 REPORT, *supra* note 10, 103, (citing MOSHER & JONES, *supra* note 91).

238. *Contraceptive Use in the United States, supra* note 143.

239. Jones et al., *supra* note 222, at 298; *Contraceptive Use in the United States, supra* note 143 (citing Adam Sonfield et al., *U.S. Insurance Coverage of Contraceptives and the Impact of Contraceptive Coverage Mandates*, 36 PERSP. ON SEXUAL AND REPROD. HEALTH 72 (2002)); *Facts on Induced Abortion in the United States*, GUTTMACHER INST. (Aug. 2011), http://www.guttmacher.org/pubs/fb_induced_abortion.html.

240. *See, e.g.*, Tanya M. Phares et al., *Effective Birth Control Use among Women at Risk for Unintended Pregnancy in Los Angeles, California*, 22 WOMEN'S HEALTH ISSUES 351 (2012).

**668268**

Exhibit 144                                                                 JA-0002248

Alvare: No Compelling Interest: The "Birth Control" Mandate and Religious

Regarding cost as a factor respecting usage, several indicators suggest that it is at most, a small factor. The Report does not cite a single source indicating otherwise. First, as a very general matter, it should be noted that contraception is used *at higher rates* by those who pay *more* for it, than among those who receive it *free* or at very low cost, indicating in a general way that cost is not a very significant factor.[241] Second, myriad surveys of women and girls in the United States reveal that many other factors trump cost with regard to women's decision not to use contraception. In fact a CDC report cited in the Report for the ninety-nine percent "ever use" figure.[242] shows that, among the eleven percent of American women and girls at risk of unintended pregnancy who are *not* practicing contraception, lack of access is not a significant reason.[243] Rather among the subset of women who experienced "unintended pregnancy," leading reasons included: they did not think they could get pregnant (44%); they did not expect to have sex (14%); they "didn't really mind" if they got pregnant (23%); or they were "worried about the side effects" of birth control methods (16%). The proportions of women citing other reasons were much smaller. In fact, of its list of "frequently cited reasons for nonuse" the CDC did not list financial reasons at all.[244]

A 1996 study of adolescents listed as the "most frequently cited reasons for not using contraceptives prior to conception": "I didn't mind getting pregnant" (20%) and "I wanted to get pregnant" (17.5%), followed by "I was using birth control but it didn't work (broke)" (12%), "I thought there was something wrong with me and I couldn't get pregnant" (9%), and "I just didn't get around to it" (9%).[245] Again, cost was not mentioned as a factor. Finally, in Guttmacher and CDC reports on the rise in unintended pregnancies in the early 2000s among women in their 20s and 30s, unintended pregnancy rates among women ages twenty-five to twenty-nine rose from 66 to 71 per 1,000 women, and among ages thirty to thirty-four, from 38 to 44 per 1,000, the authors did not include the cost of birth control among the explanations. Rather they listed: more sexual activity, inconsistent use of birth control, ambivalence about getting pregnant, and worries about the "biological clock."[246] A CDC report on women's choice of birth control methods also indicates that women are not for the most part leaving the more effective methods of contraception due to cost, but rather because of side effects they attribute to the method.[247]

---

241. Jones et al., *supra* note 222; *Facts on Induced Abortion in the United States*, *supra* note 239.

242. IOM 2011 REPORT, *supra* note 10, at 103.

243. MOSHER & JONES, *supra* note 91, at 6.

244. *Id.* at 14.

245. Catherine Stevens-Simon et al., *Why Pregnant Adolescents Say They Did Not Use Contraceptives Prior to Conception*, 19 J. ADOLESCENT HEALTH 48 (1996).

246. Amy DePaul, *Unintended Pregnancy Down Among Teens But Up for Young Adults*, ALTERNET (Sept. 13, 2007), http://www.alternet.org/story/62429/unintended_pregnancy_down_among_teens_but_up_for_young_adults.

247. MOSHER & JONES, *supra* note 91, at 13–14.

668269

Exhibit 144                                                              JA-0002249

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

428                    VILLANOVA LAW REVIEW                [Vol. 58: p. 379

Finally, Professor Austin Hughes points out that in a Guttmacher source the IOM Report overlooked,[248] only 3.7% of the total sample of women who were seeking abortions listed financial reasons as the cause for their not using contraception. The authors of the study did not investigate further to determine what percentage of 3.7% of women could not objectively afford it, or how many were eligible for free or low cost contraception via one or more government programs.

Finally, regarding the relationship between income and contraceptive usage, long-term studies of contraception uptake among poorer populations worldwide indicate instead that cost and lack of access are not terribly important factors. The percentage of women reporting cost barriers as a reason for not using contraception ranged from a high of 4% to a low of 0.6%. Access barriers were reported by a high of 0.5% of women to a low of 0.3% of women, while health concerns or opposition to the use of contraception accounted for the largest share of reasons.[249] Harvard University development economist Lant Pritchett writes that surveys of poorer women who "do not want a child and are not using contraception" about why they are not using it, include:

> [A]nswers like that they dislike the side effects, that they are no longer fecund, they are sexually inactive, that they have religious objections, that their husband is out of the country for a year. That is, many women give reasons suggesting they do not want contraception and only a few cite access or price as reasons for their "unmet need" status attributed to them.

He concluded: "The lesson that actual implementation of family planning programs has consistently found is that getting uptake is hard, not just slapping it out there."[250]

In light of all of this material, how does the Report make the case for a causal relationship between cost and effective usage of contraception so as to cause the rate of unintended pregnancies in the United States to decline? It devotes one paragraph on page 109—in the contraception section—to the question, and a few paragraphs earlier in the Report, where the Report is considering the *general* question of cost and access to health care, not contraception particularly. The page 109 reference states that cost-sharing requirements can result in less use of preventive and primary care services, *particularly for low income populations*, citing a 2003 Hudman

---

248. Jones et al., *supra* note 222, at 297–98 (detailing in Table 3 percentage of women obtaining abortions who had not been using contraceptive method in month of conception, by reported reasons for nonuse.)

249. WORLD BANK, UNMET NEED FOR CONTRACEPTION 1, 3–4 (2010).

250. Berk Ozler, *Is There an "Unmet Need" for Birth Control*, WORLDBANK BLOGS (Apr. 7, 2011 7:37), http://blogs.worldbank.org/impactevaluations/is-there-an-unmet-need-for-birth-control-0.

**668270**

Exhibit 144

JA-0002250

2013]            JOHN F. SCARPA CONFERENCE            429

and O'Malley article about cost-sharing and low income populations.[251] This source is little help to the government's case. First, as already discussed, neither the Report nor the Mandate is about health insurance for low income populations, but for employed women and the daughters of the employed. Consequently, an article about the effect of cost sharing on low income populations is not relevant. Looking more closely at Hudman and O'Malley, one further finds that this piece acknowledges that not all studies find a relationship between cost sharing and access to primary and preventive services.[252] Finally, Hudman and O'Malley never make particular findings about contraception as a preventive service.

The second article cited on page 109 of the report is claimed to prove that "[e]ven small increments in cost sharing have been shown to reduce the use of preventive services, such as mammograms."[253] First, it should be noted that this article was specifically about mammograms only, not contraception, so it cannot provide any information or guidance about cost sharing and contraception. Second, the article studied only women using Medicare, and measured only "enrollees . . . between the ages of 65 and 69." As 65 is a common retirement age, and an age at which women are generally infertile, this study considered few if any women affected by the Mandate.

The most relevant study cited by the Report in this section claims to demonstrate that eliminating co-pays increases women's resort to LARCs versus other methods of contraception.[254] This study does not claim to show that more women overall will resort to contraception *usage* when contraception is free, nor that more women will remain faithful to LARCs over more than a few years—despite women's regular dissatisfaction with such methods[255]—only that more will consider using LARCs over other methods. But if government enthusiastically supported an increased resort to LARCs, as already suggested above, this might well reduce unintended pregnancy rates over time. The physical, emotional, and moral hazards of such a strategy are not considered in the Report.

Also regarding the relationship between cost and access, an earlier section of the Report treats this question with respect to preventive health care generally, not with specific reference to contraceptives.[256] First, it cites a Kaiser Family Foundation study for the claim that women are more

---

251. IOM 2011 REPORT, *supra* note 10, at 109 (citing JULIE HUDMAN & MOLLY O'MALLEY, HENRY J. KAISER FAMILY FOUND., HEALTH INSURANCE PREMIUMS AND COST-SHARING: FINDINGS FROM THE RESEARCH ON LOW-INCOME POPULATIONS 1 (2003), *available at* http://www.kff.org/medicaid/upload/Health-Insurance-Premiums-and-Cost-Sharing-Findings-from-the-Research-on-Low-Income-Populations-Policy-Brief.pdf).

252. *Id.* at 1–2.

253. *Id.* at 19 (citing Amal N. Trivedi et al., *Effect of Cost Sharing on Screening Mammography in Medicare Health Plans*, 358 NEW ENG. J. MED. 375 (2008)).

254. *Id.* at 109.

255. *See supra* note 232 and accompanying text.

256. IOM 2011 REPORT, *supra* note 10, at 19–20.

668271

Exhibit 144                                                                JA-0002251

Case 2:17-cv-04540-WB   Document 253-10   Filed 09/29/20   Page 280 of 677

likely than men to report cost barriers to accessing medical care.[257] But the study is inapposite: it asked men and women if they *or a family member* had delayed or forgone health care in the past year because of cost. Women reported, by a few percentage points more than men, that they or a family member (*male or female*) had done so.[258] The Report also cites other studies claiming that women delay various preventive care treatments due to costs,[259] but none consider contraception specifically.

### C.   *Concluding Thoughts about the IOM Report*

This Article has expended more space on the question of the relationship between mandatory "free" contraception and women's health than did the IOM Report itself. This is indicative not only of the genuine complexity of the topic, and the inability to make simple cause and effect connections and predictions about it, but also of the possibility that the IOM did not so much conduct an investigation of the topic as they did draft a brief on behalf of a preordained position. The lone dissenter to the IOM Report—Dr. Anthony Lo Sasso—was likely accurate when he wrote:

> The committee process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee's composition. Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy.[260]

His conclusions are supported by the doubtful objectivity of the IOM process as indicated by the prior commitments of so many of the panel members and invited witnesses. These matters have been fully documented in a set of comments submitted to HHS in 2011,[261] but a few highlights include the following: At least nine of the sixteen panel members had close ties with the nation's largest provider of government-subsidized birth control, and the largest abortion provider. Planned Parenthood—serving as members or even chairs of boards of directors of various Planned Parenthood affiliates nationwide. They had recently donated over one hundred thousand dollars to that organization. Others founded or worked directly for other contraception and abortion advocacy groups. Invited witnesses included Planned Parenthood, the abor-

---

257. *Id.* at 19 ("Indeed, women are consistently more likely than men to report a wide range of cost-related barriers to receiving or delaying medical tests and treatments and to filling prescriptions for themselves and their families.").

258. HENRY J. KAISER FAMILY FOUND., IMPACT OF HEALTH REFORM ON WOMEN'S ACCESS TO COVERAGE AND CARE 3 (2010), *available at* http://www.kff.org/womens-health/upload/7987.pdf.

259. IOM 2011 REPORT, *supra* note 10, at 19–20.

260. *Id.* at 207.

261. Letter from Anna Franzonello, Ams. United for Life, to Ctrs. for Medicare and Medicaid Servs. (Sept. 29, 2011), *available at* http://www.freedom2care.org/docLib/20110929_AmericansUnitedforLifepreventiveservicescomment.pdf.

**668272**

Exhibit 144

JA-0002252

2013]            JOHN F. SCARPA CONFERENCE            431

tion advocacy groups the National Women's Law Center, and the Guttmacher Institute. There was no representative on the panel, or as a witness, from the leading private provider of health care to women in the United States: Catholic health care services.

In sum, the IOM Report did not prove any of the following: that it used a reliable and consistent measure of unintended pregnancy; that there is a relationship between contraceptive usage and unintended pregnancy or abortion rates; that unintended pregnancy causes poor health outcomes for women; that rates of contraceptive usage are driven by cost; or that increasing usage among the objects of the Report—employed women and the daughters of the employed—will affect rates of unintended pregnancy which are highest among women already provided with free or low-cost contraception from the government. The IOM Report also did not consider the several categories of well-developed literature bearing on the subject of the links between contraceptive usage and women's health: physical side-effects of contraception; and the social changes effected by dissociating sex from commitment and from parenting.

## IV.  THE FEDERAL GOVERNMENT HAS NOT SATISFIED THE COMPELLING STATE INTEREST TEST FOR BURDENING THE FREE EXERCISE OF RELIGION

The Religious Freedom Restoration Act[262] forbids the federal government from substantially burdening the exercise of religion unless the burden: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.[263] This obtains even if the "burden results from a rule of general applicability."[264] A compelling governmental interest analysis also applies to federal and state laws burdening free exercise which are not "neutral laws of general applicability," according to the jurisprudence interpreting the First Amendment of the U.S. Constitution.[265] This Article does not take up the matter of the Mandate's substantial burden on free exercise, nor does it address the question of its "neutrality" or "general applicability." It does, however, suggest that in whatever context—RFRA or the First Amendment—the federal government is required to show a "compelling governmental interest" in the Mandate, the government should fail, based upon its failure to demonstrate such an interest in the Report the government claims provides its evidentiary basis for the Mandate.

The government's interest in the Mandate, as suggested by the Report, but also as specifically articulated by the Secretary of the responsible

---

262. 42 U.S.C. § 2000bb (2006). RFRA applies to laws passed by the federal government. *See* Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 419–20 (2006).

263. 42 U.S.C. § 2000bb-1(b).

264. *Id.* § 2000bb-1(a).

265. *See generally* Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993).

**668273**

Exhibit 144            JA-0002253

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

432                    VILLANOVA LAW REVIEW                    [Vol. 58: p. 379

agency, HHS, is: to "increase access to contraceptives"[266] in order to bene-
fit women's health. A recent U.S. Supreme Court decision engaged in an
extended discussion of what a government must demonstrate in order to
show that it possesses a "compelling interest" in promulgating a law. The
case was the First Amendment free speech decision: *Brown v. Entertainment
Merchants Association*.[267] There, the Supreme Court struck down Califor-
nia's law restricting minors' access to violent video games on the grounds
that the state had failed the compelling governmental interest analysis.
The decision strongly indicates that the shallow, disputed, and incomplete
argument on behalf of the Mandate will not satisfy a compelling state in-
terest test.

    The standard announced by the Court in *Brown* was as follows: the
state must "specifically identify an 'actual problem' in need of solving,"
and that the burden on the constitutional right is "actually necessary" to
the solution.[268] It may not make a merely "predictive judgment" about a
direct causal link based upon competing studies.[269] It may not rely upon
"ambiguous proof."[270]

    In *Brown*, California relied primarily upon the research of one Ph.D.
"and a few other research psychologists whose studies purport to show a
connection between exposure to violent video games and harmful effects
on children."[271] The Court rejected these as proof of a compelling state
interest due to the following defects: first, the state was required to "prove"
that the thing it is regulating is the "cause" of the harm it is seeking to
prevent.[272] Evidence of "correlation" (versus "causation") was insufficient.
So, additionally, were studies with "significant, admitted flaws in methodol-
ogy."[273] Further, even if causation could be shown, evidence that the "ef-
fects" are "small" and "indistinguishable" from effects produced by things
*not* regulated, renders the legislation underinclusive—the Court used the
expression "wildly underinclusive."[274] The Court continued:
"[u]nderinclusiveness raises serious doubts about whether the govern-
ment is in fact pursuing the interest it invokes, rather than disfavoring a
particular speaker or viewpoint."[275]

    Further, if there is only a "modest gap" between the government's
ultimate goal and the current situation on the ground, "the government

---

    266. Press Release, Dep't of Health & Human Servs., *supra* note 4. ("This rule
will provide women with greater access to contraception by requiring coverage and
by prohibiting cost sharing.").
    267. 131 S. Ct. 2729 (2011).
    268. *Id.* at 2738.
    269. *Id.*
    270. *Id.* at 2739.
    271. *Id.*
    272. *Id.*
    273. *Id.*
    274. *Id.* at 2740.
    275. *Id.*

**668274**

Exhibit 144                                                    JA-0002254

Alvare: No Compelling Interest: The "Birth Control" Mandate and Religious

does not have a compelling interest in each marginal percentage point by which its goals are advanced."[276] This last observation referred to a potential twenty percent gap between the video industry's practices regarding restraining minors' access to violent video games, and the California law's intention to require explicit parental or aunt or uncle approval.

Applying *Brown*'s summary of a "compelling governmental interest" analysis to the case at hand, it is not difficult to see how the federal government has failed, by a wide margin, to demonstrate such an interest with respect to the Mandate. There is, first, real empirical uncertainty about how to measure the "unintended pregnancy" the government wishes to prevent. Thus the state may not have identified an "actual problem" in need of solving.

Even, however, if the state had articulated a well-supported and consistent measure over time, of the meaning of unintended pregnancy, it did not show that the burden on religions' free exercise is "actually necessary" to solving the problem of unintended pregnancy. Rather, the government relied upon an intuitive or "predictive judgment" of a direct causal link between no-cost contraception and reduced rates of unintended pregnancy, and upon unsupported claims regarding causal links between unintended pregnancy and women's health outcomes. It seemed to rely upon the intuition that what is true on an individual scale—contraception can prevent a pregnancy—must be true on a social scale; but to do so it had to ignore a large and developed literature indicating that this has not been consistently true in the past, and that there are rational reasons—economic and psychological reasons, among others—why large scale contraceptive programs might produce different, even contrary results.

The government's proffer falls far short of the *Brown* standard. Like California in the *Brown* case, HHS here rested its finding on a relatively few studies. It didn't acknowledge let alone explore "competing studies"; its findings are a tiny drop in the ocean of the relevant literature and they are sometimes even strenuously contradicted by competing studies. This is exactly the kind of "ambiguous proof" the *Brown* Court rejected. Additionally, on the matter of "ambiguous proof," versus "prov[ing]" that the thing it is regulating is the "cause" of the harm it is seeking to prevent, the Report gave evidence only of "correlation" versus "causation," respecting the relationship between contraception and unintended pregnancy, *and* any relationships between unintended pregnancy and women's health. This is, according to *Brown*, insufficient de jure.

Finally, respecting the *Brown* requirement that any "causal" effects are more than "small," and not "indistinguishable" from effects produced by things which are *not* regulated—i.e., that the regulation is fatally underinclusive—it is easy to see from the evidence set forth above that laws addressing many *un*regulated things might have a greater effect upon women's decisions to use contraception and use it effectively—or to avoid

---

276. *Id.* at 2741 n.9.

**668275**

Exhibit 144

JA-0002255

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

434          VILLANOVA LAW REVIEW          [Vol. 58: p. 379

smoking, drinking, depression, and violence during and after a pregnancy—than a law reducing its cost to zero. These include: making contraception safer in order to address women's fears about its safety; supporting research on male contraception; supporting fertility education, so more women and girls will know when they are likely to become pregnant (and in the case of the first three suggestions, assuming the government could overcome the objection that "unintended pregnancy" is not significantly related to women's health); and stepping up preventive education for women—especially in their late adolescence and early twenties—concerning smoking, drinking, depression, and domestic violence, etc. Some of these proposals get at the causes of women's health problems. Others answer the concerns raised by women and girls in interviews about why they are among the few who choose not to use contraception.

Regarding this "few," it should also be noted that there is here, in the case of the Mandate, a far smaller gap than the twenty percent gap called too "modest" in the *Brown* opinion to justify sweeping regulations to attempt to close the gap to zero. In the words of the *Brown* Court: "Even if the sale of violent video games to minors could be deterred further by increasing regulation, the government does not have a compelling interest in each marginal percentage point by which its goals are advanced."[277] As applied to the Mandate then, one might say that "even if contraceptive usage by women at risk of unintended pregnancy could be deterred further by increasing regulation, the government does not have a compelling interest in each marginal percentage point by which its goals are advanced." Yet, given that even one hundred percent contraception usage by "at risk women," would leave between four and fourteen percent of users pregnant each year due to use or method failure, the gap between eighty-nine percent usage and one hundred percent usage may not really be amenable at all to government "help" or mandates. Only some sort of state-monitored sterilization or LARCs program pressing *usage*, not mere *access* to contraception—a program undoubtedly falling hardest on those who are poor and a minority, and at greatest risk for unintended pregnancy—would make more than a few percentage points difference at all. It would seem that *Griswold v. Connecticut*[278] and *Eisenstadt v. Baird*[279] would at the very least, forbid this type of governmental invasion of individuals' and couples' constitutionally delineated right to decide about contraception. More to the point, however, this is not what the Mandate does. The Mandate fails the *Brown* test. The government cannot demonstrate that increasing access to contraception will produce lowered rates of unintended pregnancy among the women affected by the Mandate, or that,

---

277. *See id.*

278. 381 U.S. 479 (1965).

279. 405 U.S. 438 (1972).

**668276**

Exhibit 144                    JA-0002256

Alvare: No Compelling Interest: The "Birth Control" Mandate and Religious

2013]          JOHN F. SCARPA CONFERENCE          435

even if it could, their health would thereby be improved. The Mandate fails the *Brown* test regarding a "compelling governmental interest."

## V. CONCLUDING THOUGHTS ON THE MANDATE, AND ON WOMEN AND RELIGIOUS FREEDOM

The practical effect of the HHS Mandate would be to render less visible the last and still visible objectors to the contraceptive project. These churches would be forced to sign on de facto if not theologically to the project. The Mandate would not only render their teachings more private—as they could no longer be shared *in practice* with employees or students, or clients, or patients—but it would de jure characterize their teachings as violations of women's freedom and equality.

This is troubling on its face, as it denigrates in substance a long held teaching of a religion espoused by about one quarter of American citizens. But things might also be worse. It might turn out that the government's efforts to advance women—by advancing the contraceptive project—harm women, in the various ways this Article suggests. This is possible because there is a rational and empirically supported possibility that women's freedom—including freedom from unwanted pregnancies, addictions, violence, and depression—is better achieved when women and men practice the virtues and disciplines expressed in the Christian and other churches' conscientious objection to the Mandate. This subject is too large to take up in an already lengthy Article. It should only be remarked here that the churches opposing the Mandate hold, and teach women and men to maintain, an understanding of the sacredness of sexual intercourse, and its intrinsic connection with the procreating of new, vulnerable, human life. These teachings are the natural precursors to fewer uncommitted sexual encounters, fewer unintended and nonmarital pregnancies, and fewer abortions. There is a great deal of evidence, in fact, indicating that women in particular benefit physically, mentally, and otherwise, from practicing the personal and religious disciplines flowing from these teachings. Consequently, there are good reasons to believe that their health will flourish in situations wherein the free exercise of religion is strongly protected. Not only do women, on average, practice their faiths more than men,[280] but among practicing Catholics and Christians generally, data shows that there is less nonmarital sex (a chief indicator of unintended pregnancy), more marriage, less cohabitation (thus less domestic abuse), and less excess drinking and depression.[281] Finally, across na-

---

280. *The Stronger Sex—Spiritually Speaking*, PEW FORUM ON RELIGIOUS AND PUB. LIFE (Feb. 26, 2009), http://www.pewforum.org/The-Stronger-Sex—Spiritually-Speaking.aspx.

281. *See, e.g.*, BYRON R. JOHNSON ET AL., CTR. FOR RESEARCH ON RELIGION AND URBAN CIVIL SOC'Y, ASSESSING THE EFFECTIVENESS OF FAITH-BASED ORGANIZATIONS: A SYSTEMATIC REVIEW OF THE LITERATURE (2002), *available at* www.manhattan-institute.org/pdf/crrucs_objective_hope.pdf; Achaempong Y. Amoeateng & Stephen J. Bahr, *Religion, Family, and Drug Abuse*, 29 SOC. PERSP. 53 (1986); Diane R. Brown &

668277

Exhibit 144          JA-0002257

*Villanova Law Review, Vol. 58, Iss. 3 [2014], Art. 2*

436                VILLANOVA LAW REVIEW                [Vol. 58: p. 379

tions, countries giving religious freedom a wider berth tend also to better respect women's equality.[282]

All of this is in addition to the practical observation that women would lose a great deal of health care if religious health care institutions were forced to go out of business due to the Mandate. The Catholic health care system in the United States alone accounts for one in six hospital patients, one in eight hospitals, 19 million emergency room visits and 101 million outpatient visit.[283] Studies show that this system provides "significantly better quality performance" than investor-owned systems and secular not-for-profit systems.[284]

Why then call it "women's freedom" when religion—a source of support and conviction, not to mention healthy relationships and healthcare, for women—is shackled? At the very least, the religious voice, the religious project where sex and marriage and parenting are concerned, ought to be allowed to continue to shine its light. Religion's thick, intuitive, and longstanding rationales for keeping in mind the links between sex and new life can help restore balance to our national discourse about sex and marriage and parenting. Not only women, but society itself, would be better off if the religious witness were allowed to live.

---

Lawrence E. Gary, *Religious Socialization and Educational Attainment Among African Americans: An Empirical Assessment*, 60 J. NEGRO EDUC. 411 (1991); John K. Cochran et al., *Religiosity and Alcohol Behavior: An Exploration of Reference Group Theory*, 3 SOC. F. 256 (1988); Christopher G. Ellison & Kristin L. Anderson, *Religious Involvement and Domestic Violence Among U.S. Couples*, 40 J. FOR THE SCI. STUDY OF RELIGION 269 (2001); Christopher G. Ellison et al., *Are There Religious Variations in Domestic Violence?*, 20 J. FAM. ISSUES 87 (1999); Christopher G. Ellison, *Race, Religious Involvement, and Depressive Symptomatology in a Southeastern U.S. Community*, 40 SOC. SCI. & MED. 1561 (1995); John Gartner et al., *Religious Commitment and Mental Health: A Review of the Empirical Literature*, 19 J. PSYCHOL. AND THEOLOGY 6 (1991); Deborah Hasin et al., *Alcohol and Drug Abuse in Patients with Affective Syndrome*, 26 COMPREHENSIVE PSYCHIATRY 283 (1985); Sung Joon Jang & Byron R. Johnson, *Neighborhood Disorder, Individual Religiosity, and Adolescent Use of Illicit Drugs: A Test of Multilevel Hypotheses*, 39 CRIMINOLOGY 109 (2001); Evelyn L. Lehrer & Carmel U. Chiswick, *Religion as a Determinant of Marital Stability*, 30 DEMOGRAPHY 385 (1993); Sharon Scales Rostosky et al., *Coital Debut: The Role of Religiosity and Sex Attitudes in the Add Health Survey*, 40 J. SEX RES. 358 (2003); Arland Thornton et al., *Reciprocal Effects of Religiosity, Cohabitation, and Marriage*, 98 AM. J. OF SOC. 628 (1992); Arland Thornton et al., *Religious Participation and Adolescent Sexual Behavior and Attitudes*, 51 J. MARRIAGE AND FAM. 641 (1989); David B. Larson & Byron R. Johnson, *Religion: The Forgotten Factor in Cutting Youth Crime and Saving At-Risk Urban Youth*, MANHATTAN INST. FOR POL'Y RESEARCH (Nov. 2, 1998), www.manhattan-institute.org/html/jpr-98-2.htm.

282. *See* Brian J. Grim, *Religious Freedom and Socio-Economic Well-Being, in* FREEDOM IN THE WORLD 42 (Paula A. Marshall ed., 2008).

283. CATHOLIC HEALTH ASS'N, CATHOLIC HEALTH CARE IN THE UNITED STATES 2 (2013), *available at* http://www.chausa.org/WorkArea/linkit.aspx?LinkIdentifier=id&ItemID=7830.

284. DAVID FOSTER, CTR. FOR HEALTHCARE IMPROVEMENT, DIFFERENCES IN HEALTH SYSTEM QUALITY PERFORMANCE BY OWNERSHIP 2 (2010), *available at* http://www.100tophospitals.com/assets/100TOPSystemOwnership.pdf.

**668278**

Exhibit 144                                                    JA-0002258

# ANALYZING THE IMPACT OF STATE LEVEL CONTRACEPTION MANDATES ON PUBLIC HEALTH OUTCOMES

*Michael J. New Ph.D.*[†]

## ABSTRACT

The recent mandate by the U.S. Department of Health and Human Services requiring private health insurance plans to cover all FDA-approved contraceptive drugs has generated a considerable amount of controversy. Much of the commentary and analysis has discussed whether this mandate violates the conscience rights of religious employers; however, there has been considerably less discussion as to whether these contraception mandates offer any significant public health benefit. Since the late 1990s, approximately thirty states have required that privately bought health insurance plans cover contraception. A time series cross-sectional analysis of state level public health data offers important insights as to what impact these contraceptive mandates have on public health outcomes. Results indicate that state contraception mandates have little impact on either unintended pregnancy rates or abortion rates.

## INTRODUCTION

Contraception has become a prominent political issue in recent years. Since 2010, abortion opponents have successfully stopped several states from funding Planned Parenthood.

In response, during the 2012 election cycle, various media outlets, President Obama, and other Democratic political candidates argued that Republican efforts to stop federal funding for Planned Parenthood would limit the availability of contraceptives and amount to a "War on Women."[1]

---

[†]    Professor New is an Associate Scholar at the Charlotte Lozier Institute in Washington D.C., as well as a visiting professor at Ave Maria University in Ave Maria, Florida.

1.    *See* Tamar Lewin, *Obama Will Speak at Commencement at Barnard College*, N.Y. TIMES (Mar. 3, 2012), http://www.nytimes.com/2012/03/04/us/politics/obama-will-speak-at-barnard-graduation.html?_r=0; *The War on Women*, N.Y. TIMES (Feb. 25, 2011), http://www.nytimes.com/2011/02/26/opinion/26sat1.html?_r=0.

**669099**

Exhibit 145

JA-0002259

Also, in February 2012, the Department of Health and Human Services (HHS) required that private health insurance plans cover all FDA-approved contraceptive drugs by August of 2012.[2]

After the Health and Human Services mandate was handed down, much of the subsequent public debate centered on whether religious groups or employers with strong religious beliefs could be exempted from the contraception mandate. The original HHS mandate did include a religious exemption; however, many felt the exemption was too narrow because it only applied to religious institutions that served those of the same religion.[3] For instance, a Catholic school that enrolled a non-trivial percentage of non-Catholic students would likely be ineligible for an exemption.[4]

Religious institutions filed a number of lawsuits arguing that the HHS contraception mandate violated their conscience rights.[5] Many specifically objected to the fact that the HHS mandate required employers to cover contraceptives, which work as abortifacients.[6] Plaintiffs included a range of religious groups and employers including Notre Dame University, Little Sisters of the Poor, and Priests for Life.[7] On June 30, 2014, in *Burwell v. Hobby Lobby Stores, Inc.*, the Supreme Court struck down the HHS mandate as applied to closely held corporations with religious objections.[8] As such, Hobby Lobby would not be compelled to provide contraception under their healthcare plans. The ruling was reached on statutory grounds, citing the Religious Freedom Restoration Act, because the mandate was not the "least

---

2. Coverage of Certain Preventative Services Under the Affordable Care Act, 78 Fed. Reg. 39,870 (July 2, 2013) (codified in 45 C.F.R. §§ 147, 156); Robert Pear, *Insurance Coverage for Contraception Is Required*, N.Y. TIMES (Aug. 1, 2011), http://www.nytimes.com/2011/08/02/health/policy/02health.html.

3. *See Fact Checking the White House: False Claims About the HHS Mandate*, THE BECKET FUND FOR RELIGIOUS LIBERTY, http://www.becketfund.org/fact-checking-the-white-house-false-claims-about-the-hhs-mandate/ (last visited July 6, 2015); Ed Whelan, *The HHS Contraception Mandate vs. the Religious Freedom Restoration Act—Introduction*, NAT'L REV. (Jan. 26, 2012), http://www.national review.com/bench-memos/289341/hhs-contraception-mandate-vs-religious-freedom-restoration-act-introduction-ed.

4. *See id.*

5. *See* Laurie Goodstein, *Catholics File Suits on Contraceptive Coverage*, N.Y. TIMES (May 21, 2012), http://www.nytimes.com/2012/05/22/us/catholic-groups-file-suits-on-contraceptive-coverage.html; Steve Kenny & Robert Pear, *Justice Blocks Contraception Mandate on Insurance in Suit by Nuns*, N.Y. TIMES (Dec. 31, 2013), http://www.nytimes.com/2014/01/01/us/politics/justice-sotomayor-blocks-contraception-mandate-in-health-law.html?_r=0; Paige Winfield Cunningham, *Religious Colleges Join Fight over Contraceptives*, THE WASH TIMES (Feb. 20, 2012), http://www.washingtontimes.com/news/2012/feb/20/religious-colleges-join-fight-over-contraceptives/?page=all.

6. *Id.*

7. *Id.*

8. Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014).

**669100**

Exhibit 145                                                                    JA-0002260

restrictive" method of implementing the government's interest.[9]    Other litigation is still pending.[10]

The debates about exemptions for employers with religious convictions have certainly been interesting and informative.  That said, there has been relatively little public discussion about the public policy implications of the 2012 HHS mandate.  Specifically, there has been little research as to whether contraception mandates have positive implications for public health.  As such, new research on this area has the ability to usefully inform ongoing public policy debates about not only the HHS mandate, but also contraception policies in general.

Between 1995 and 2010, twenty-eight states instituted mandates requiring that privately sold health insurance plans cover various forms of contraception.[11]  These mandates differ from state to state.  Some states require that all health insurance plans cover contraceptives.[12]  Other states only require those plans which cover pharmaceuticals and/or outpatient services to cover contraceptives.[13]  Overall, the states that have implemented some kind of contraceptive mandate tend to be ideologically and demographically diverse.  Additionally, a range of public health data from these states is publicly available.[14]  As such, an analysis of both unintended pregnancy rates and abortion rates in these states should lend important insights as to whether or not contraception mandates offer any public health benefit.

In Section I, therefore, I will provide a literature review on the impact of contraception on unintended pregnancies and abortions.  In Section II, I will explain the methodology used to analyze the impact of the twenty-eight state

---

9.    *Id.* at 2759.

10.    *See HHS Mandate Information Central*, THE BECKET FUND FOR RELIGIOUS LIBERTY, http://www.becketfund.org/hhsinformationcentral/ (last updated Apr. 29, 2015)

11.    *See* Frances A. Althaus & Stanley K Henshaw, *The Effects of Mandatory Delay Laws on Abortion Patients and Providers*, 26 FAM. PLAN. PERSP. 228 (1994)

12.    *See infra* Table 1 (referencing the nature of state contraceptive mandates, specifically Colorado, Hawaii, Maryland, New Hampshire, and Ohio).

13.    *See infra* Table 1 (referencing the nature of state contraceptive mandates, specifically Arizona, Arkansas, California, Connecticut, Delaware, Georgia, Illinois, Iowa, Maine, Montana, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Texas, Vermont, Virginia, West Virginia, and Wisconsin).

14.    The CDC has been releasing state level abortion data every year since the late 1960s  *See* CHARLES A. DONOVAN & NORA SULLIVAN, CHARLOTTE LOZIER INST., ABORTION REPORTING LAWS: TEARS IN THE FABRIC 1, 14 (2012), available at http://www. lozierinstitute .org/wp-content/uploads /2012/12/American-Report-Series-ABORTION-REPORTING-LAWS.pdf. The Guttmacher Institute frequently releases state level abortion data  The Guttmacher Institute also released state level data on unintended pregnancy rates for 2002, 2004, 2006, and 2008. *See* Kathryn Kost, *Unintended Pregnancy Rates at the State Level: Estimates for 2002, 2004, 2006 and 2008*, GUTTMACHER INST. 3, 5 (2013).

**669101**

Exhibit 145                                                                                    JA-0002261

contraceptive mandates on public health outcomes.  Section III presents the results, followed by a brief conclusion.

## I.  LITERATURE REVIEW

Abortion opponents receive a considerable amount of criticism from various media outlets for not being more supportive of contraception.[15]  That being said, research on the efficacy of programs to promote contraceptive use paints a mixed picture of its effectiveness.  The Guttmacher Institute, which up until 2007 was Planned Parenthood's research arm and still receives significant funding from Planned Parenthood, frequently publishes studies and analyses that argue contraception programs are effective;[16] however, a closer look at their research and other research that has appeared in peer-reviewed journals raises serious questions about the efficacy of contraceptive programs.

### A.  *Theoretical Reasons Why Contraceptive Programs May Be Ineffective*

The Guttmacher Institute has published a number of studies advocating for the effectiveness of various contraceptive programs; however, several of their studies are theoretical in nature and do not analyze hard data on either contraceptive spending or unintended pregnancy rates.[17]  They simply assume that if more money is spent, more people will have access to contraception, and unintended pregnancy rates will decline.[18]

These studies, however, often fail to take into account that there is a substantial body of research that finds that increasing the availability of

---

15.  William Saletan, *How Choice Can Stop Abortions*, SLATE (Oct. 3, 2014, 12:57 PM), http://www.slate.com/articles/news_and_politics/human_nature/2014/10/reducing_the_abortion_rate_long_acting_reversible_contraceptives_beat_abstinence.html.

16.  *See* Joerg Dreweke, *U.S. Abortion Rate Continues to Decline While Debate over Means to the End Escalates*, 17 GUTTMACHER POL'Y REV. 2, 2–3 (2014); Jennifer J. Frost et al., *Contraceptive Needs and Services, 2010*, GUTTMACHER INST. (2013); Susheela Singh & Jacqueline E. Darroch, *Adding It Up: Costs and Benefits of Contraceptive Services: Estimates for 2012*, GUTTMACHER INST. (2012).

17.  *See* Rachel Benson Gold et. al., *Next Steps for America's Family Planning Program: Leverging the Potential of Medicaid and Title X in an Evolving Health Care System*, GUTTMACHER INST. (2009), https://www.guttmacher.org/pubs/NextSteps.pdf; Jennifer Frost et. al., *The Impact of Publicly Funded Family Planning Clinic Services on Unintended Pregnancies and Government Cost Savings*, 19 J. HEALTH CARE FOR THE POOR & UNDERSERVED 777 (2008).

18.  *See* Rachel Benson Gold et. al., *Next Steps for America's Family Planning Program: Leverging the Potential of Medicaid and Title X in an Evolving Health Care System*, GUTTMACHER INST. (2009), https://www.guttmacher.org/pubs/NextSteps.pdf; Jennifer Frost et. al., *The Impact of Publicly Funded Family Planning Clinic Services on Unintended Pregnancies and Government Cost Savings*, 19 J. HEALTH CARE FOR THE POOR & UNDERSERVED 777 (2008).

**669102**

Exhibit 145                                                                    JA-0002262

contraception may result in more sexual activity.[19] This will reduce the effectiveness of any program designed to distribute contraceptives more widely or encourage contraceptive use.[20] Even an analysis of teen sexual activity by a scholar affiliated with the Guttmacher Institute found that the availability of the birth control pill in the early 1960s resulted in teens engaging in sexual activity at an earlier age.[21]

The Akerlof, Yellen, and Katz study, which appeared in *The Quarterly Journal of Economics* in 1996, was especially interesting.[22] The authors designed an economic model of mating and sexual behavior. They argued that before the advent of the birth control pill, the effective price of pre-marital sex was high because there was a substantial risk of an unintended pregnancy;[23] however, the advent of the birth control pill in the early 1960s had two important implications. First, it lowered the effective price of sex by reducing the risk of an unintended pregnancy.[24] This resulted in more pre-marital sexual activity.[25] Second, since a higher percentage of women were engaging in pre-marital sexual activity—other women felt compelled to engage in pre-marital sex in order to make themselves more attractive to potential mates.[26] The end result was more sexual activity and more unintended pregnancies.[27]

Now it is certainly possible that gains in contraception use may offset the risks involved with increased sexual activity; however, there is another important reason to question the efficacy of contraception programs. Namely, research shows that very few women forego contraception due to high cost or lack of availability.[28] This is unsurprising considering how

---

19. *See* George A. Akerlof et al , *An Analysis of Out-of-Wedlock Childbearing in the United States*, 111 Q. J. ECON. 277, 288, 307 (1996); David Paton, *The Economics of Family Planning and Underage Conceptions*, 21 J. HEALTH ECON. 207, 208 (2002); Claudia Goldin & Lawrence F Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. POL. ECON. 730, 752 (2002); Lawrence B. Finer, *Trends in Premarital Sex in the United States: 1954–2003*, 122 PUB HEALTH REP. 73, 76, 78 (2007); Peter Arcidiacono et al , *Habit Persistence and Teen Sex: Could Increased Access to Contraception Have Unintended Consequences for Teen Pregnancies?*, 30 J. BUS & ECON. STAT. 312, 312 (2012).

20. *See* Akerlof et al., *supra* note 19; Paton, *supra* note 19; Goldin & Katz, *supra* note 19; Finer, *supra* note 19; Arcidiacono et al., *supra* note 19

21. Finer, *supra* note 19, at 76.

22. Akerlof et al , *supra* note 19.

23. *Id.* at 294.

24. *Id.* at 294–95.

25. *Id.* at 288.

26. *Id.* at 290, 296–97.

27. *Id.* at 295–97.

28. *See* Rachel K. Jones et al., *Contraceptive Use Among U.S. Women Having Abortions in 2000–2001*, 34 PERSP. ON SEXUAL & REPROD. HEALTH 1 (2002).

**669103**

Exhibit 145                                                                    JA-0002263

widely available contraception is. In 2002, the Guttmacher Institute surveyed over 10,000 sexually active women who were not using contraception.[29]  The most frequently cited reasons for not using contraceptives included a perceived low risk of pregnancy, concerns about contraceptive methods, and ambivalence about contraception.[30]  Only twelve percent cited high cost or lack of availability.[31]  Additionally, in 2012 a study conducted by the Centers for Disease Control (CDC) of 5,000 teenage girls who gave birth after unplanned pregnancies found that only a small percentage had difficulty accessing contraception.[32]

Case studies provide additional evidence that few women forego contraception due to cost or availability. In the book *Unmarried Couples with Children*, sociologists Kathryn Edin of Harvard University and Paula England of Stanford University conducted an intense study of seventy-six low-income couples from Milwaukee, Chicago, and New York who had just given birth.[33]  The fertility patterns of all of the women in the study were carefully studied for four years.[34]  Edin and England found that only a very small percentage of these women wanted contraception but were unable to afford it.[35]  Specifically, all of the women surveyed were asked whether they had been in a situation where they wanted birth control but could not afford or find it.[36]  Tellingly, all said no.[37]  In fact, according to Edin and England, "[s]ome laughed when we asked this question, pointing out how hard clinics and schools in their communities push contraceptives."[38]

## B.  *U.S. Trends in Contraception Use, Abortion Rates, and Unintended Pregnancy Rates*

An analysis of trends in contraception use, abortion rates, and unintended pregnancy rates in the United States also raises questions about the efficacy of contraception programs. Many commentators give increased contraception

---

29.  *Id.* at 1.

30.  *Id.* at 4.

31.  *Id.*

32.  Ayanna T. Harrison et al., *Prepregnancy Contraceptive Use Among Teens with Unintended Pregnancies Resulting in Live Births—Pregnancy Risk Assessment Monitoring System (PRAMS), 2004–2008*, 61 MORBIDITY & MORTALITY WKLY. REP. (2012).

33.  PAULA ENGLAND & KATHRYN EDIN, UNMARRIED COUPLES WITH CHILDREN 5–6 (Paula England & Kathryn Edin eds., 2007).

34.  *Id.* at 6.

35.  *Id.* at 48.

36.  *Id.*

37.  *Id.*

38.  *Id.*

**669104**

Exhibit 145

use much of the credit for the fairly consistent decline in the U.S. abortion rate since the early 1980s and the approximately twenty-five percent decline in the number of abortions performed since 1990.[39]  These commentators are correct that contraception use has increased at a time when the abortion rate has been declining; however, there are two problems with this line of analysis.  First, contraception use has been rising since the early 1970s[40] and increases in contraception use during the 1970s did not reduce the incidence of abortion during that decade.[41]  Secondly, since the mid-1990s, there have actually been increases in the unintended pregnancy rate, the percentage of pregnancies that were unplanned, and the fertility rate.[42]  These factors make it unlikely that increases in contraception use are responsible for the U.S. abortion decline.  In fact, Guttmacher's own research finds that women facing unexpected pregnancy have become more likely to carry their pregnancy to term.[43]  This likely plays a large role in explaining the abortion decline in the United States.

## C.  Global Trends

Global data finds that the level of contraceptive use or contraceptive availability has little impact on either the abortion rate, the unintended pregnancy rate, or the fertility rate.[44]  A 2003 Guttmacher Institute study showed that contraception use and abortion rates rose simultaneously in several countries including United States, Cuba, Denmark, Netherlands, Singapore, and South Korea.[45]  In particular, contraception use rose dramatically in both Sweden and Spain during the 1990s, and abortion rates

---

39.   *Contraception Defeats Abortion*, THE DISH (Feb. 3, 2014, 12:43 PM), http://dish.andrewsullivan.com/2014/02/03/contraception-defeats-abortion/.  *See also* Sonya B. Gamble et al., *Abortion Surveillance—United States, 2005*, 57 MORBIDITY & MORTALITY WKLY. REP. (Nov. 14, 2008); Lisa M. Koonin et al., *Abortion Surveillance: Preliminary Data—United States, 1990*, 41 MORBIDITY & MORTALITY WKLY. REP. (Dec. 18, 1992).

40.   William D. Mosher & William F. Pratt, *Contraceptive Use in the United States, 1973–88*, 182 ADVANCE DATA 1, 1 (1990).

41.   *See id.*

42.   Jo Jones et al., *Current Contraceptive Use in the United States, 2006–2010, and Changes in Patterns of Use Since 1995*, 60 NAT'L HEALTH STAT. REP. 1, 2 (2012).

43.   Lawrence B. Finer & Mia R. Zolna, *Shifts in Intended and Unintended Pregnancies in the United States, 2001–2008*, 104 AM. J. PUB. HEALTH S43, S45–S46 (2014); Stanley K. Henshaw, *Unintended Pregnancy in the United States*, 30 FAM. PLAN. PERSP. 24, 28 (1998).

44.   *See* Cicely Marston & John Cleland, *Relationships Between Contraception and Abortion:  A Review of the Evidence*, 29 INT'L FAM. PLAN. PERSP. 6, 6 (2003); José Luis Dueñas et al., *Trends in the Use of Contraceptive Methods and Voluntary Interruption of Pregnancy in the Spanish Population During 1997–2007*, 83 CONTRACEPTION 82, 85 (2011); Lant H. Pritchett, *Desired Fertility and the Impact of Population Policies*, 20 POPULATION & DEV. REV. 1, 2 (1994).

45.   *See* Marston & Cleland, *supra* note 44.

**669105**

Exhibit 145                                                                                JA-0002265

increased.[46]  Additionally, cross-national studies find that the best predictor of national fertility rates is the amount of children that women want to have.[47]  The extent to which contraceptives are available has only a marginal impact.

D.  *Specific Studies on Contraception Availability and Unintended Pregnancies*

One unique study showed that significant increases in the price of contraception have little impact on unintended pregnancy rates.[48]  In 2005, the passage of the Federal Deficit Reduction Act led to a sharp increase in the price of birth control pills at college health centers.[49]  A 2011 study authored by the University of Michigan's Population Studies Center analyzed how this price increase impacted the sexual activity of college women.[50]  It found that after the price of oral contraceptives increased—there were statistically significant decreases in both the frequency of sexual intercourse and the number of sex partners.[51]  The unintended pregnancy rate remained about the same.[52]

Similarly, several controlled studies of contraception programs have also provided little evidence that encouraging contraception use will lower the incidence of unintended pregnancy.  Separate studies conducted in Britain, Scotland, and San Francisco have found that free contraceptive programs have been ineffective at lowering both teen pregnancy rates and abortion rates.[53]

---

46.  *See* K. Edgardh, *Adolescent Sexual Health in Sweden*, 78 SEXUALLY TRANSMITTED INFECTIONS 352 (2002); Dueñas et al., *supra* note 44.

47.  *See generally* Pritchett, *supra* note 44; Nicholas Eberstadt & Apoorva Shah, *Fertility Decline in the Muslim World*, HOOVER INST. POL'Y REV. (June 1, 2012), http://www.hoover.org/research/fertility-decline-muslim-world.

48.  Emily Gray Collins & Brad Hershbein, *The Impact of Subsidized Birth Control for College Women: Evidence from the Deficit Reduction Act* 21 (Population Studies Ctr., May 2011), *available at* http://www.psc.isr.umich.edu/pubs/pdf/rr11-737.pdf (an updated version was published in 2013).

49.  *Id. See generally* Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4 (2006).

50.  *See* COLLINS & HERSHBEIN, *supra* note 48, at 2.

51.  *Id.*

52.  *Id.*

53.  *See* Anna Glasier et al., *Advanced Provision of Emergency Contraception Does Not Reduce Abortion Rates*, 69 CONTRACEPTION 361, 361–64 (2004) (noting that offering supplies of emergency contraception had no measurable effect on abortion rates among young women in Scotland); Paton, *supra* note 19, at 223–24 (noting a lack of evidence to suggest that greater access to family planning has reduced conception or abortion rates among teen-women in the United Kingdom); Tina R. Raine et al., *Direct Access to Emergency Contraception Through Pharmacies and Effect on Unintended Pregnancy and STIs: A Randomized Controlled Trial*, 293 JAMA 54, 55 (2005) (noting that free access to emergency contraception did not decrease pregnancy in a study of young women in San Francisco).

**669106**

Exhibit 145                                                                JA-0002266

The British experience is particularly telling.  In 1999, the British government launched its Teenage Pregnancy Strategy program, which was supposed to cut the number of teen pregnancies in half by promoting comprehensive sexual education and birth control.[54]  Some £300 million ($454 million) was spent on this initiative.[55]  Since then, the British teen-abortion rate has climbed steadily.[56]  In fact, in 2009, the *Daily Mail* reported that teen-pregnancy rates in England are now higher than they were in 1995, and pregnancies among girls under sixteen (below the age of sexual consent) are also at the highest level since 1998, the year before the program began.[57]

Furthermore, there is a broad body of research on emergency contraceptive programs, which shows that they are ineffective at reducing either abortion rates or unintended pregnancy rates.  In fact, twenty-three studies published between 1998 and 2006 all show easier access to emergency contraception fails to achieve any statistically significant reduction in rates of either unintended pregnancy or abortion.[58]  Specific studies from Shanghai, Washington State, Britain, and Scotland all show that easier access to emergency contraception fails to significantly reduce either the abortion rate or the unintended pregnancy rate.[59]

## II.  METHODOLOGY

Since there is little evidence that increasing the use of contraceptives reduces the unintended pregnancy rate, it seems likely that contraception mandates would have little impact on the incidence of either unintended pregnancy or abortion; however, an analysis of state level data should lend

---

54.  *See* Steve Doughty, *Labour's £300m Policy 'Disaster' as Teen Pregnancies Rocket to Highest Level in Decade*, DAILY MAIL (Feb. 26, 2009, 7:13 PM), http://www.dailymail.co.uk/news/article-1155824/Labours-300m-policy-disaster-teen-pregnancies-rocket-highest-level-decade.html.

55.  *Id.*

56.  *Id.*

57.  *Id.*

58.  *See* Elizabeth G. Raymond et al., *Population Effect of Increased Access to Emergency Contraceptive Pills: A Systematic Review*, 109 OBSTETRICS & GYNECOLOGY 181, 182 (2007).

59.  *See* Jacqueline S. Gardner et al., *Increasing Access to Emergency Contraception Through Community Pharmacies: Lessons from Washington State*, 33 FAM. PLAN. PERSP. 172, 175 (2001) (noting the pregnancy and abortion rate increased in Washington during 1999, while the study was being conducted). Glasier et. al., *supra* note 53, at 361–64 (noting that offering supplies of emergency contraception had no measurable effect on abortion rates among young women in Scotland). Xiaoyu Hu et al., *Advanced Provision of Emergency Contraception to Postnatal Women in China Makes No Difference in Abortion Rates: A Randomized Controlled Trial*, 72 CONTRACEPTION 111 (2005) (noting free access to emergency contraception and birth control had no effect on the pregnancy rate or the abortion rate among Chinese women in the study as all pregnancies were terminated); Paton, *supra* note 19, at 223–24 (noting a lack of evidence to suggest that greater access to family planning has reduced conception or abortion rates among teen women in the United Kingdom).

**669107**

Exhibit 145                                                                    JA-0002267

insights as to the impact of contraception mandates. Since the early 1990s, twenty-eight states have required that contraceptive coverage be included as part of privately purchased state health insurance plans.[60] Regression analysis is well suited to analyze the impact of these contraception mandates on public health outcomes since there are a variety of factors that can impact unintended pregnancy rates.

## A. *Dependent Variables*

I will run regressions based on three separate dependent variables to analyze the impact of contraceptive mandates on public health outcomes. The first dependent variable is each state's unintended pregnancy rate. Guttmacher began to release state level data on unintended pregnancy rates in 2002;[61] however, as of 2014, is has only released state level data for four years: 2002, 2004, 2006, and 2008.[62] This relatively small number of data points may limit our analysis.

The second dependent variable analyzed is the state abortion rate as collected by the Centers for Disease Control (CDC). Since a relatively high percentage of unintended pregnancies are aborted, this can serve as a good proxy for the unintended pregnancy rate. Additionally, more data is available on abortion rates than unintended pregnancy rates.[63] The CDC has been releasing annual data on the incidence of abortion since the late 1960s.[64] There are, however, concerns about the reliability of CDC abortion data.[65] Federal reporting requirements for abortion data are weak and some states either release incomplete data to the CDC or fail to release any data at all.[66] In particular, California has not released any state abortion data to the CDC since 1997.[67]

---

60.  *See infra* Table 1.

61.  *See* Kost, *supra* note 14.

62.  *Id.*

63.  *See* Kost, *supra* note 14.

64.  *See* DONOVAN & SULLIVAN, *supra* note 14.

65.  *Id.*

66.  *Id.*

67.  *See generally* Laurie D. Elam-Evans et al., *Abortion Surveillance—United States, 1999*, 51 MORBIDITY & MORTALITY WKLY. REP. (Nov. 29, 2002); Laurie D. Elam-Evans et al., *Abortion Surveillance—United States, 2000*, 52 MORBIDITY & MORTALITY WKLY. REP. (Nov. 28, 2003); Sonya B. Gamble et al., *Abortion Surveillance—United States, 2005*, 57 MORBIDITY & MORTALITY WKLY. REP. (Nov. 28, 2008); Joy Herndon et al., *Abortion Surveillance—United States, 1998*, 51 MORBIDITY & MORTALITY WKLY. REP. (June 7, 2002); Lisa M. Koonin et al., *Abortion Surveillance—United States, 1997*, 49 MORBIDITY & MORTALITY WKLY. REP. (Dec. 8, 2000); Karen Pazol et al., *Abortion Surveillance—United States, 2006*, 58 MORBIDITY & MORTALITY WKLY. REP. (Nov. 27, 2009); Karen Pazol et al., *Abortion Surveillance—United States, 2007*, 60 MORBIDITY & MORTALITY WKLY. REP. (Feb.

**669108**

Exhibit 145                                                                    JA-0002268

The third dependent variable analyzed is the Guttmacher Institute's state abortion rate data. Guttmacher collects abortion data by conducting a survey of abortion facilities.[68]  As such, its data collection is more consistent from year to year and its data tends to be more reliable.[69]  Unfortunately, Guttmacher does not release data every year. For this analysis, I only have state abortion rate data from Guttmacher for seven years: 1991, 1992, 1995, 1996, 2000, 2005, and 2007.[70]

---

25, 2011); Karen Pazol et al., *Abortion Surveillance—United States, 2008*, 60 MORBIDITY & MORTALITY WKLY. REP. (Nov. 25, 2011), Karen Pazol et al., *Abortion Surveillance—United States, 2009*, 61 MORBIDITY & MORTALITY WKLY. REP. (Nov. 23, 2012); Karen Pazol et al., *Abortion Surveillance—United States, 2010*, 62 MORBIDITY & MORTALITY WKLY. REP. (Nov. 29, 2013); Karen Pazol et al., *Abortion Surveillance—United States, 2011*, 63 MORBIDITY & MORTALITY WKLY. REP. (Nov. 28, 2014); Lilo T. Strauss et al., *Abortion Surveillance—United States, 2001*, 53 MORBIDITY & MORTALITY WKLY. REP. (Nov. 26, 2004); Lilo T. Strauss et al., *Abortion Surveillance—United States, 2002*, 54 MORBIDITY & MORTALITY WKLY. REP. (Nov. 25, 2005); Lilo T. Strauss et al., *Abortion Surveillance—United States, 2003*, 55 MORBIDITY & MORTALITY WKLY. REP. (Nov. 24, 2006), Lilo T. Strauss et al., *Abortion Surveillance—United States, 2004*, 56 MORBIDITY & MORTALITY WKLY. REP. (Nov. 23, 2007) (all identifying state abortion data and demonstrating that California has not released any such data)

68.     *See* DONOVAN & SULLIVAN, *supra* note 14, at 4; Rachel K. Jones & Kathryn Kooistra, *Abortion Incidence and Access to Services in the United States, 2008*, 43 PERSP. ON SEXUAL REPROD. HEALTH 41, 43 (2011) (data from 2000, 2005, 2007, and 2008).

69.     *See* DONOVAN & SULLIVAN, *supra* note 14.

70.     *See* Stanley K. Henshaw, *Abortion Incidence and Services in the United States, 1995–1996*, 30 FAM. PLAN. PERSP. 264 (1998) (data from 1992, 1995, and 1996); Stanley K. Henshaw & Jennifer Van Vort, *Abortion services in the United States, 1991 and 1992*, 26 FAM. PLAN. PERSP. (1994) (data from 1991 and 1992). Jones & Kooistra, *supra* note 68.

**669109**

Exhibit 145                                                                        JA-0002269

356                    *AVE MARIA LAW REVIEW*                    [Vol. 13:2

**Table 1:  State Contraceptive Mandates[71]**

| State | Year | Nature of Mandate |
|---|---|---|
| Arizona | 2002 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Arkansas | 2005 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| California | 1999 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Colorado | 2010 | All Health Insurance Plans |
| Connecticut | 1999 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Delaware | 2000 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Georgia | 1999 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Hawaii | 1999 | All Health Insurance Plans |
| Illinois | 2003 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Iowa | 2000 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Maine | 1999 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Maryland | 1998 | All Health Insurance Plans |
| Massachusetts | 2002 | Only Plans That Cover Prescriptions and/or |

---

71.  *See Insurance Coverage for Contraception Laws*, NAT'L CONF OF ST. LEGISLATURES, http://www.ncsl.org/research/health/insurance-coverage-for-contraception-state-laws.aspx (last updated Feb. 2012)

**669110**

Exhibit 145                                                                JA-0002270

Summer 2015]        *CONTRACEPTION MANDATES*                     357

|  |  | Outpatient Services |
|---|---|---|
| Missouri | 2001 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Nevada | 1999 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| New Hampshire | 1999 | All Health Insurance Plans |
| New Jersey | 2005 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| New Mexico | 2001 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| New York | 2002 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| North Carolina | 1999 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Ohio | 2000 | All Health Insurance Plans |
| Oregon | 2007 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Rhode Island | 2000 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Texas | 2001 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Vermont | 1999 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Virginia | 1997 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Washington | 2007 | Only Plans Purchased Through the State's Health Insurance Exchange |

**669111**

Exhibit 145                                                                    JA-0002271

| West Virginia | 1995 | Only Plans That Cover Prescriptions and/or Outpatient Services |
| Wisconsin | 2009 | Only Plans That Cover Prescriptions and/or Outpatient Services |

## B.  *Independent Variables*

There are other factors besides the presence or absence of contraception mandates that may affect rates of abortion or rates of unintended pregnancy. As such, a variety of other factors will be held constant.  For instance, there is research that indicates that racial minorities, particularly African Americans and Hispanics, have higher rates of both unintended pregnancies and abortions than white women.[72]  As such, I include a series of variables measuring the racial composition of women between the ages of fifteen and forty-four in each state in the regression.

I also include separate variables measuring the percentage of women of childbearing age who are between the ages of 20 to 24, 25 to 29, 30 to 34, 35 to 39, and 40 to 44, respectively.  Some studies find that younger women tend to be more likely to face unintended pregnancies than their older counterparts.[73]  The pregnancy rate among teenagers has been declining,[74] but teenage girls are more likely than older women to seek an abortion when confronted with an unintended pregnancy.[75]  Additionally, it is possible that as women get older, their desire to avoid pregnancy may increase.  Older women may have greater concerns about birth defects or the health risks involved with carrying a pregnancy to term.  Overall, more information about the age distribution of women of childbearing age might provide additional insights about state trends in abortion rates and unintended pregnancy rates.

There is also evidence that low-income women are more likely to experience an unintended pregnancy and obtain abortions than high-income women.[76]  Additionally, a slow economy may render it more difficult for

---

72.  *See* Laurie D. Elam-Evans et al., *Abortion Surveillance—United States, 1999, supra* note 67; Jones et al., *supra* note 42.

73.  *See* Jones et al., *supra* note 42, at 45.

74.  *See* Sarah Kliff, *The Mystery of the Falling Teen Birthrate,* VOX (Jan. 21, 2015), http://www.vox.com/2014/8/20/5987845/the-mystery-of-the-falling-teen-birth-rate.

75.  *See* Karen Pazol et al., *Abortion Surveillance—United States, 2011,* 63 MORBIDITY & MORTALITY WKLY REP. Fig. 2 (Nov. 28, 2014), http://www.cdc.gov/mmwr/preview/mmwrhtml/ss6311a1.htm.

76.  *See* Jones et al., *supra* note 42, at 295–96; Rachel K. Jones, Lawrence B. Finer, & Susheela Singh, *Characteristics of U.S. Abortion Patients, 2008,* GUTTMACHER INST. 6, 8–9 (May 2010), https://www.guttmacher.org/pubs/US-Abortion-Patients.pdf; Lawrence B. Finer & Mia R. Zolna, *Shifts in*

**669112**

Exhibit 145                                        JA-0002272

some women to obtain the resources necessary to carry a pregnancy to term and raise a child. As such, the regression will include a variety of variables to measure the strength of each state's economy. They will include the log of real per capita personal income, the annual change in state per capita personal income growth, and the annual change in the unemployment rate.

When I am analyzing state abortion rates, I also include two variables to measure specific abortion policies. There is research that finds informed consent laws, which require women to make two separate trips to the abortion facility, reduce state abortion rates.[77] As such, an indicator variable is included to measure the presence or absence of this two-visit policy.

There is also a substantial body of evidence indicating that when states publicly fund abortion through Medicaid, the abortion rate increases.[78] As such, I also include an indicator variable to measure whether or not states are publicly funding abortion through Medicaid. Table 2 contains a list of variables used in this study and their sources.

---

*Intended and Unintended Pregnancies in the United States, 2001–2008*, 104 AM. J. OF PUB. HEALTH 43, 45 (2014).

77. *See* Althaus & Henshaw, *supra* note 11; Ted Joyce & Robert Kaestner, *The Impact of Mississippi's Mandatory Delay Law on the Timing of Abortion*, 32 FAM. PLAN. PERSP. 4, 12 (2000); Michael J. New, *Analyzing the Impact of U.S. Antiabortion Legislation in the Post-Casey Era: A Reassessment*, 14 ST. POL. & POL'Y Q. 228, 232 (2014).

78. *See* Deborah Haas-Wilson, *Women's Reproductive Choices: The Impact of Medicaid Funding Restrictions*, 29 FAM. PLAN. PERSP. 228, 228 (1997); Susan B. Hansen, *State Implementation of Supreme Court Decisions: Abortion Rates Since Roe v. Wade*, 42 J. POL. 372, 391–92 (1980); Carol C. Korenbrot et al., *Trends in Rates of Live Births and Abortions Following State Restrictions on Public Funding of Abortion*, 105 PUB. HEALTH REP. 555, 561 (1990); Shelly Lundberg & Robert D. Plotnick, *Effects of State Welfare, Abortion and Family Planning Policies on Premarital Childbearing Among White Adolescents*, 22 FAM. PLAN. PERSP. 246, 251 (1990); Kenneth J. Meier et al., *The Impact of State-Level Restrictions on Abortion*, 33 DEMOGRAPHY 307, 310 (1996); Kenneth J. Meier & Deborah R. McFarlane, *State Family Planning and Abortion Expenditures: Their Effect on Public Health*, 84 AM. J. PUB. HEALTH 1468, 1470 (1994); Stephen Matthews et al., *The Effects of Economic Conditions and Access to Reproductive Health Services on State Abortion Rates and Birthrates*, 29 FAM. PLAN. PERSP. 52, 59 (1997); Michael J. New, *Analyzing the Effect of Anti-Abortion U.S. State Legislation in the Post-Casey Era*, 11 ST. POL. & POL'Y Q. 28, 31, 37 (2011); New, *supra* note 77; James Trussell et al., *The Impact of Restricting Medicaid Financing for Abortion*, 12 FAM. PLAN. PERSP. 120, 129 (1980); Rebecca M. Blank et al., *State Abortion Rates: The Impact of Policies, Providers, Politics, Demographics, and Economic Environment* 2 (Nat'l Bureau Econ. Res., Working Paper No. 4853, 1994); Phillip B. Levine et al., *The Effect of Medicaid Abortion Funding Restrictions on Abortions, Pregnancies, and Births* 22 (Nat'l Bureau Econ. Res., Working Paper No. 5066, 1995).

**669113**

Exhibit 145                                                                          JA-0002273

### Table 2: Data Sources

| Variable | Source |
| --- | --- |
| Percent of women of childbearing age between 15–19 | U.S. Census Bureau |
| Percent of women of childbearing age between 20–24 | U.S. Census Bureau |
| Percent of women of childbearing age between 25–29 | U.S. Census Bureau |
| Percent of women of childbearing age between 30–34 | U.S. Census Bureau |
| Percent of women of childbearing age between 35–39 | U.S. Census Bureau |
| Percent of women of childbearing age between 40–44 | U.S. Census Bureau |
| Percent of women of childbearing age who are Black | U.S. Census Bureau |
| Percent of women of childbearing age who are Hispanic | U.S. Census Bureau |
| Percent of women of childbearing age 15–44 who are Native American | U.S. Census Bureau |
| Percent of women of childbearing age who are Asian | U.S. Census Bureau |
| Real Per Capita Personal Income | Bureau of Economic Analysis |
| Real Per Capita Income Growth | Bureau of Economic Analysis |
| Annual Change in the Unemployment Rate | Bureau of Labor Statistics |
| Data on Medicaid Funding For Abortion | New (2014); Merz, Jackson and Klerman (1995) |
| State Informed Consent Laws | New (2014) |
| State Data on Contraception Mandates | Alliance Defense Fund |

**669114**

Exhibit 145                                                                 JA-0002274

| State Data on Unintended Pregnancy Rates | Kost 2013 |
| --- | --- |
| State Data on Abortion RatesGuttmacher | CDC |

In this article, I ran my regressions on the natural log of each of the dependent variables. This allows us to measure the impact of contraception mandates in percentage terms. It also reduces the impact of statistical outliers and serves as a partial correction for heterosketasticity. All of the regressions were run using a generalized least squares model with an AR1 correction for autocorrelation. Year fixed effects are used in every model to hold constant factors that vary over time such as the strength of the national economy. In the first set of regressions, a random effects model is used where state indicator variables are not held constant. In the second and third set of regressions, a fixed effects model will be used where state indicator variables will be held constant. The results of the first set of regressions can be found in Table 3.

### Table 3: Regression Results: Analyzing the Effect of State Level Contraception Mandates

Technique: General Least Squares with a Correction for Autocorrelation: Random Effects Model (No State Fixed Effects)

|  | Model 1 | Model 2 | Model 3 |
| --- | --- | --- | --- |
|  | ln Unintended Pregnancy Rate | ln Abortion Rate (CDC) | ln Abortion Rate (AGI) |
| Percent 20–24 | -0.020 (0.019) | 0.090*** (0.032) | 0.096** (0.041) |
| Percent 25–29 | 0.030* (0.018) | 0.059** (0.028) | 0.078*** (0.030) |
| Percent 30–34 | 0.014 (0.017) | 0.010 (0.028) | 0.034 (0.032) |
| Percent 35–39 | -0.044** (0.026) | 0.010 (0.038) | 0.184*** (0.054) |

**669115**

Exhibit 145    JA-0002275

| | | | |
|---|---|---|---|
| Percent 40–44 | 0.015 | 0.096** | 0.039 |
| | (0.019) | (0.041) | (0.047) |
| Percent Black | 0.012*** | 0.016*** | 0.015*** |
| | (0.001) | (0.004) | (0.003) |
| Percent Hispanic | 0.006*** | 0.018*** | 0.014*** |
| | (0.001) | (0.004) | (0.003) |
| Percent Native American | 0.010*** | 0.001 | 0.011 |
| | (0.001) | (0.009) | (0.011) |
| Percent Asian | 0.007*** | 0.006 | 0.009** |
| | (0.001) | (0.004) | (0.004) |
| ln (Per Capita Personal Income) | 0.172*** | 0.597** | 1.393*** |
| | (0.066) | (0.250) | (0.265) |
| Percent Change Real Per Capita Personal Income | 0.003 | -0.005*** | -0.030*** |
| | (0.003) | (0.002) | (0.007) |
| Annual Change in Unemployment Rate | 0.019 | -0.001 | -0.036 |
| | (0.012) | (0.008) | (0.022) |
| Medicaid Funding of Abortion | --- | 0.136* | 0.101 |
| | | (0.070) | (0.070) |
| Informed Consent Law (Requiring Two Visits) | --- | -0.119# | -0.076 |
| | | (0.073) | (0.089) |
| Contraception Mandate | -0.016 | 0.068** | 0.083* |
| | (0.016) | (0.030) | (0.049) |
| Number of Observations | 154 | 956 | 324 |
| R Squared | 0.815 | 0.361 | 0.673 |

\# significant at the 11 percent level; * significant at the 10 percent level; ** significant at the 5 percent level; *** significant at the 1 percent level.
<u>Notes</u>:    Individual year variables are held constant; standard errors are in parentheses.

**669116**

Exhibit 145                                                                                    JA-0002276

The results indicate that states with contraception mandates have similar rates of unintended pregnancies as states that do not have contraception mandates. In Model 1, the coefficient for the state contraceptive mandates variable is very small and fails to achieve conventional standards of statistical significance. Additionally, the model indicates that states with contraception mandates actually have higher abortion rates than states without a contraceptive mandate. In Models 2 and 3, the coefficient indicating the presence of a contraceptive mandate is both positive and statistically significant.

The demographic variables are interesting. The age variables had a mixed impact on the unintended pregnancy rate; however, there is some evidence that when the demographic of women of childbearing age is older, the abortion rate increases. Additionally, states where a higher percentage of women of childbearing age are racial minorities have both higher unintended pregnancy rates and higher abortion rates. The coefficient for percentage African American and percentage Hispanic was positive and statistically significant in all three regression models.

Wealthier states, as measured by per capita personal income, have higher rates of both unintended pregnancies and abortions than poorer states. This is an unexpected finding. The abortion policy variables had the expected effects. The variable for Medicaid funding of abortions was positive in both models and statistically significant when abortion data from CDC data was analyzed. Similarly, the variable indicating the presence of an informed consent law requiring two visits to the abortion facility was negative in both models and approached levels of statistical significance when data from the CDC was analyzed.

The previous regression results were run with a model that included year indicator variables, but no state indicator variables. I will re-run the regressions with a fixed effects model that includes state indicator variables. The state fixed effects allow the model to compare unintended pregnancy rates and abortion rates in the same state both before and after the parental involvement laws were enacted. As such, the model captures the effects of the *enactment* of a contraception mandate instead of just the *presence* of a contraception mandate. The state fixed effects also control factors that vary across states, but do not vary much across time, such as geography and citizen ideology. Table 4 shows the results of the state fixed effects model.

**669117**

Exhibit 145                                                                                    JA-0002277

## Table 4:  Regression Results:  Analyzing the Effect of State Level Contraception Mandates

Technique:  General Least Squares with a Correction for Autocorrelation: Fixed Effects Model (State and Year Indicator Variables)

|  | Model 1 | Model 2 | Model 3 |
|---|---|---|---|
|  | ln Unintended Pregnancy Rate | ln Abortion Rate (CDC) | ln Abortion Rate (AGI) |
| Percent 20–24 | 0.031 (0.019) | -0.038 (0.028) | 0.016 (0.035) |
| Percent 25–29 | 0.034 (0.020) | -0.054** (0.025) | 0.013 (0.025) |
| Percent 30–34 | 0.034*** (0.012) | -0.074*** (0.026) | -0.032 (0.030) |
| Percent 35–39 | 0.040* (0.024) | -0.047** (0.033) | 0.123*** (0.046) |
| Percent 40–44 | 0.077*** (0.027) | -0.131*** (0.042) | -0.070 (0.047) |
| Percent Black | 0.035*** (0.011) | 0.049** (0.021) | 0.031 (0.020) |
| Percent Hispanic | -0.048*** (0.007) | -0.002 (0.009) | -0.022** (0.009) |
| Percent Native American | 0.057 (0.046) | 0.020 (0.017) | 0.014 (0.018) |
| Percent Asian | 0.009 (0.012) | 0.012 (0.009) | 0.010 (0.010) |
| ln (Per Capita Personal Income) | 0.534*** (0.166) | -1.433*** (0.335) | 1.704*** (0.440) |

**669118**

Exhibit 145                                                              JA-0002278

| | | | |
|---|---|---|---|
| Percent Change Real Per Capita Personal Income | 0.000 (0.003) | 0.007** (0.002) | -0.027*** (0.007) |
| Annual Change in Unemployment Rate | 0.011 (0.008) | -0.002 (0.008) | -0.071*** (0.022) |
| Medicaid Funding of Abortion | --- | 0.030 (0.082) | 0.104 (0.087) |
| Informed Consent Law (Requiring Two Visits) | --- | -0.061 (0.063) | -0.084 (0.066) |
| Contraception Mandate | 0.000 (0.022) | 0.039 (0.027) | 0.034 (0.042) |
| Number of Observations | 154 | 956 | 324 |
| R Squared | 0.97 | 0.902 | 0.925 |

\* significant at the 10 percent level; \*\* significant at the 5 percent level; \*\*\* significant at the 1 percent level

<u>Notes</u>:   Individual year variables are held constant; standard errors are in parentheses.

The results from the state fixed effects model demonstrate that the enactment of a state contraception mandate does little to change either the unintended pregnancy rate or the abortion rate.   The regression results indicate that contraception mandates have no effect on the unintended pregnancy rate and result in a slight increase in the abortion rate; however, the coefficient for the contraception mandate variable is small in all three regressions and does not come anywhere near conventional standards of statistical significance.

In this set of regressions, the variables measuring racial demographics lose some of their size and significance.   This is unsurprising since this set of regressions includes a set of state indicator variables, and state level racial demographics typically exhibit little change from year to year.   Interestingly, it appears that in states where the percentage of Hispanics is increasing, there are statistically significant reductions in both the abortion rate and the unintended pregnancy rate.   The coefficient for the Hispanic variable is negative in all three regressions and statistically significant in two.

**669119**

Exhibit 145                                                                    JA-0002279

The economic variables have inconsistent effects. High levels of per capita personal income appear to increase both the rate of unintended pregnancy and the rate of abortion when measured by Guttmacher; however, high levels of per capita income lower the abortion rate when the CDC measured it. Similarly, high rates of economic growth increase the abortion rate when the CDC measures it and lower the abortion rate when it is measured by Guttmacher. It is unclear why there are these inconsistencies. It is possible that too many economic variables are being included in these regression models. In future research, I will consider holding constant fewer economic variables.

Finally, the signs for the abortion policy variables are all in the expected direction. In both regressions, the coefficient for the Medicaid funding variable is positive, and the coefficient for variables for the two-visit requirement is negative. None of these variables reach conventional standards of statistical significance in these models. However, it should be noted that this study analyzes fewer years of abortion data than other studies that have analyzed state level abortion policy.[79] Additionally, during this timespan (1990–2010) only two states, New Mexico and Minnesota, enacted significant changes in their policies regarding Medicaid funding of abortion.[80] This partially explains why the abortion policy variables may not be as strong as they were in other analyses of state abortion policy.

The past two sets of regressions show that contraceptive mandates have little impact on either unintended pregnancy rates or abortion rates; however, as Table 1 indicates, there exists variation within these contraceptive mandates. Most mandates only require that those health insurance plans that cover prescriptions or outpatient services cover contraceptives; however, five states have enacted more comprehensive mandates that require all health insurance plans to cover contraceptives. It is possible that more comprehensive mandates may have a larger impact on public health outcomes. As such, another set of regressions is run to analyze the impact of this set of contraception mandates. The results are presented in Table 5.

### Table 5: Regression Results: Analyzing the Effect of State Level Contraception Mandates

Technique: General Least Squares with a Correction for Autocorrelation: Fixed Effects Model (State and Year Indicator Variables)

|  | Model 1 | Model 2 | Model 3 |
|---|---|---|---|

---

79. *See* New, *supra* note 77, at 236.
80. *Id.* at 235–37.

**669120**

Exhibit 145                                                        JA-0002280

| | ln Unintended Pregnancy Rate | ln Abortion Rate (CDC) | ln Abortion Rate (AGI) |
|---|---|---|---|
| Percent 20–24 | 0.031 (0.019) | 0.041 (0.028) | 0.013 (0.035) |
| Percent 25–29 | 0.034 (0.020) | -0.057** (0.025) | 0.011 (0.025) |
| Percent 30–34 | 0.034*** (0.012) | -0.077*** (0.026) | -0.028 (0.030) |
| Percent 35–39 | 0.040* (0.024) | -0.050 (0.033) | 0.119*** (0.046) |
| Percent 40–44 | 0.077*** (0.027) | -0.134*** (0.042) | -0.066 (0.047) |
| Percent Black | 0.035*** (0.011) | 0.049** (0.022) | 0.023 (0.022) |
| Percent Hispanic | -0.048*** (0.007) | 0.000 (0.009) | -0.020** (0.008) |
| Percent Native American | 0.057 (0.046) | 0.020 (0.017) | 0.021 (0.020) |
| Percent Asian | 0.009 (0.011) | 0.012 (0.010) | 0.018 (0.014) |
| ln (Per Capita Personal Income) | 0.533*** (0.166) | -1.411*** (0.337) | 1.685*** (0.438) |
| Percent Change Real Per Capita Personal Income | 0.000 (0.003) | 0.007** (0.003) | -0.028*** (0.007) |
| Annual Change in Unemployment Rate | 0.011 (0.008) | -0.001 (0.008) | -0.068*** (0.022) |

**669121**

Exhibit 145                                                                                JA-0002281

| | | | |
|---|---|---|---|
| Medicaid Funding of Abortion | --- | 0.027 (0.082) | 0.103 (0.087) |
| Informed Consent Law (Requiring Two Visits) | --- | -0.065 (0.063) | -0.085 (0.065) |
| Strong Contraception Mandate | 0.435 (0.853) | 0.055 (0.066) | 0.137 (0.125) |
| Number of Observations | 154 | 956 | 324 |
| R Squared | 0.815 | 0.902 | 0.924 |

\* significant at the 10 percent level; \*\* significant at the 5 percent level; \*\*\* significant at the 1 percent level.

<u>Notes:</u>    Standard errors are in parentheses.

The coefficients for the other economic, demographic, and policy variables exhibit little change from the previous set of regressions; however, what is of most interest is the variable measuring the presence of a broader contraceptive mandate. The regression results indicate that these broader contraception mandates actually appear to increase both the unintended pregnancy rate and the abortion rate. The coefficient for the comprehensive contraceptive mandate variable is positive in all three regressions. Since the coefficient never reaches conventional levels of statistical significance, we cannot be statistically confident that these mandates actually increase the incidence of either abortion or unintended pregnancy; however, there is certainly no evidence they reduce either the abortion rate or the unintended pregnancy rate. As such, these broader mandates appear to offer no discernable public health benefit.

CONCLUSION

The 2012 mandate by the Department of Health and Human Services (HHS) requiring that private health insurance plans cover all FDA-approved contraceptive drugs has certainly generated a great deal of media attention and controversy. Much of the ensuing debate has involved whether this mandate violates the conscience rights of religious groups or religious employers. There has been relatively little public discussion as to the public

**669122**

Exhibit 145    JA-0002282

health implications of this mandate or whether this mandate serves a compelling state interest.

Since the early 1990s, twenty-eight states have issued similar mandates requiring private health insurance plans to cover contraceptives.[81]  As such, an analysis of state level data can provide insights as to the public health implications of these contraceptive mandates.  My research, which analyzed data from all fifty states on abortion rates and unintended pregnancy rates, found little evidence that contraception mandates lower either the incidence of abortion or unintended pregnancy.  These findings add to a substantial body of research, which finds that programs designed to encourage or facilitate contraceptive use offer little, if any, public health benefit.

---

81.   *See Insurance Coverage for Contraception Laws, supra* note 71

**669123**

Exhibit 145                                                            JA-0002283

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,

    *Plaintiff,*

  v.

DONALD J. TRUMP, *et al.*

    *Defendants,*

LITTLE SISTERS OF THE POOR
SAINTS PETER AND PAUL HOME,

    *Proposed Defendant-Intervenors*

Civil No. 2:17-CV-4540

**DECLARATION OF MOTHER SUPERIOR MARIE VINCENTE**

I, Mother Superior Marie Vincente, hereby declare as follows:

1. I am over the age of 21 and am capable of making this declaration pursuant to 28 U.S.C. § 1746. I have not been convicted of a felony or crime involving dishonesty. I make this declaration based on my personal knowledge and experience of the Little Sisters, our organization, our ministry, and our religious beliefs and practices. My statements about the history of the Little Sisters, the scope of our ministry internationally, and the founding dates of our homes are drawn from organizational and historical documents that I believe to be correct.

2. I am the Mother Superior of the Saints Peter and Paul Home of the Little Sisters of the Poor in Pittsburgh, Pennsylvania.

3. I have been a Little Sister for 63 years, and have served as the Mother Superior of the Saints Peter and Paul Home for over 12 years.

Exhibit 146

## I. History, Organization, and Structure of the Little Sisters of the Poor

4. The Little Sisters of the Poor is an international Roman Catholic Congregation of Sisters that has provided loving care to needy elderly persons of any race, sex, or religion for over 175 years.

5. The Little Sisters of the Poor were founded in France, in the winter of 1839, when St. Jeanne Jugan carried a blind elderly woman off the streets and into her home and laid the woman in her own bed. Over time, other women joined St. Jeanne in a religious ministry designed to protect and care for the elderly poor.

6. By the time St. Jeanne died forty years later, the Little Sisters of the Poor had established homes in eight countries, including the United States, where the first home was founded in 1868 in Brooklyn, New York.

7. Today, there are Little Sisters homes in over thirty countries around the world serving over 13,000 poor elderly people.

8. The Little Sisters of the Poor have founded and operate over twenty-five homes in the United States, which are located in twenty states and the District of Columbia. These homes are hosted by over 300 Little Sisters of various nationalities.

9. All Little Sisters homes share the same fidelity to the Catholic beliefs. Every home is operated under the control of the Little Sisters, and every Little Sister takes a vow of obedience to God, which assumes obedience to the Pope, the Church's teaching, and the authority of the Church in her hierarchy.

10. While Catholic and committed to following Church teaching, the Little Sisters' homes are not under the civil legal ownership and control of the dioceses in

1

Exhibit 146
JA-0002285

which they are located. Instead, the Little Sisters of the Poor own and control the homes ourselves, through local corporations that are entirely within the civil legal control of the Little Sisters.

11. The Little Sisters' homes are not directly funded by the dioceses in which we are located. Instead, we take responsibility for funding our own operations. For most homes, about half of the budget comes from voluntary gifts, largely in response to the begging for funds and gifts in kind that the Little Sisters do to support our ministry.

## II. Little Sisters of the Poor Pittsburgh

12. The Saints Peter and Paul Home of the Little Sisters of the Poor in Pittsburgh ("Little Sisters Pittsburgh"), is a Pennsylvania non-profit corporation that qualifies as a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986 ("the Code"). The Pittsburgh home is under my direct authority as Mother Superior.

13. Little Sisters Pittsburgh currently employs about 67 full-time employees.

14. Little Sisters Pittsburgh have adopted the Christian Brothers Employee Benefit Trust (the "Christian Brothers Trust") to provide medical benefits coverage for their employees.

15. It is my understanding that Christian Brothers Trust is a Catholic entity designed to serve the Catholic Church and related faith-based entities. It is my understanding that, like the Little Sisters, the Christian Brothers Trust operates in a manner consistent with our mutual Catholic beliefs. One of the reasons the Little Sisters chose to use the Christian Brothers Trust for our health benefits is because it

2

Exhibit 146

JA-0002286

shares and is administered in accordance with our religious beliefs and provide benefits accordingly.

### III.  Religious Beliefs and Commitments of the Little Sisters of the Poor

16.   Jesus taught that "in so far as you did it to the least of these brothers of mine, you did it to me." *See* Matthew 25:34. This teaching is a fundamental part of who the Little Sisters are. St. Jeanne urged her fellow Little Sisters, "Never forget that the poor are Our Lord; in caring for the poor say to yourself: This is for my Jesus—what a great grace!" Thus, each Little Sister makes a vow of Hospitality, through which she promises to care for the aged as if they were Christ himself.

17.   As Little Sisters, we strive to witness to the value of the elderly by believing in their inviolable dignity. by recognizing their unique contributions to the Church and society, and by involving them in the activities of our Homes to develop their human potential.

18.   Caring for the dying is the summit of the Little Sisters' service to the elderly poor. The Little Sisters maintain a constant presence with those who have entered the dying process and their families. We try to relieve their sufferings as much as possible, which includes giving emotional and prayerful support. Our provision of spiritual support is always consistent with the faith of the person we are serving; we do not force religious observance on anyone.

19.   Because the Little Sisters care for those who are weak and dying, we strive to emphasize our respect for the uniqueness and dignity of each elderly person as they reach the end of their life. We offer this respect for two reasons. First, to treat

3

Exhibit 146

JA-0002287

the individual with the dignity they are due as a person loved and created by God, with the same respect and compassion as if he or she was Jesus Christ. Second, to convey a public witness of respect for life, in the hope that we can help build a Culture of Life in our society.

20.   We care for the elderly poor of all races and religions, or of no religion at all. We do not care for people because they are Catholic, but because we are Catholic.

21.   We also hire employees of all races and religions, or of no religion at all. Because staff members are an important extension of our ministry to the elderly, they must support the Little Sisters' mission by welcoming the elderly poor, helping to make them happy and caring for them with respect or dignity until death. Failure to do so is one of the relatively few explicit grounds for staff dismissal.

22.   The Little Sisters have also taken a vow of obedience to God, which assumes obedience to the Pope. We carefully follow all of his guidance, and obey all the decisions of the Church. Thus, we develop all of our programs, policies, and procedures in accord with the teachings of the Catholic Church, including its ethical teachings on the inviolable dignity of every human life.

23.   These teachings include Catholic religious teachings about abortion, contraception, sterilization, and cooperation with acts that are intrinsically immoral.

24.   Authoritative Catholic teachings are located in sacred Scripture and sacred tradition, and are set forth and specified in the Catechism of the Catholic Church, documents of ecumenical councils (such as the Second Vatican Council), papal encyclicals, directives issued by bishops' conferences, and other teaching documents

4

Exhibit 146

JA-0002288

of the Church. *See generally* Catechism of the Catholic Church Nos. 888-892 (describing the teaching office of the Church); *Dei Verbum* No. 10 (describing how "[s]acred tradition and Sacred Scripture form one sacred deposit of the word of God, committed to the Church").

25. Sections 2270 and 2271 of the Catechism of the Catholic Church (1994) affirm that life begins at conception, that directly intending to take innocent human life is gravely immoral. Thus a post-conception contraceptive is an abortifacient and "gravely contrary to moral law." *See also* section 2274 ("Since it must be treated from conception as a person, the embryo must be defended in its integrity, cared for, and healed, as far as possible, like any other human being.")

26. The Catholic Church also teaches that contraception and sterilization are intrinsic evils. *Id.* at Section 2370.

27. The Church teaches that programs of "economic assistance aimed at financing campaigns of sterilization and contraception" are "affronts to the dignity of the person and the family." *See* Section 234 of the Compendium of the Social Doctrine of the Church (2004).

28. In a landmark encyclical, Blessed Pope John Paul II made clear that Catholics may never "encourage" the use of "contraception, sterilization, and abortion[.]" *See* Section 91 of *Evangelium Vitae* (1995).

29. Similarly, the United States Conference of Catholic Bishops ("USCCB") has issued a series of directives to inform the provision of health services in every U.S. Catholic health institution. These directives prohibit providing, promoting,

5

Exhibit 146

condoning, or participating in the provision of abortions, abortion-inducing drugs, contraceptives, and sterilization. Exhibit A, USCCB Directives for Catholic Health Care Services at Nos. 45, 52, & 53.

30.  The directives specifically warn against partnering with other entities in a manner that could involve Catholic health care services in the provision of such "intrinsically immoral" services. *Id.* at Nos. 67-72.

31.  Rather, the USCCB Directives instruct us to "distinguish [ourselves] by service to and advocacy for" people who are "at the margins of society" and "particularly vulnerable to discrimination," such as "the poor, the uninsured and underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees." *Id.* at No. 3.

32.  The Little Sisters are particularly concerned about the possibility that our conduct may lead others to do evil, or think that the Little Sisters condone evil. *See* Catechism No. 2284, 86 (instructing Catholic institutions to avoid "scandal" and defining "scandal" as "an attitude or behavior which leads another to do evil"; scandal can be caused "by laws or institutions"). The Little Sisters beg for funds and goods at Catholic parishes and elsewhere to support our ministry. Thus, participating in the provision of health benefits that violate Catholic teaching poses a grave risk for the Little Sisters as they interact with Catholic faithful and others who share our beliefs.

33.  Catholic teaching also instructs us to provide our employees and their families adequate health benefits.  "In return for their labor, workers have a right to

6

Exhibit 146

wages and other benefits sufficient to sustain life in dignity." *Economic Justice For All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* ¶ 103, http://www.usccb.org/upload/economic_justice_for_all.pdf ("The dignity of workers also requires adequate health care").

34.   These religious teachings binding on how the Little Sisters carry out our religious ministry of caring for the elderly poor. We believe that the health plans that each home offers should be consistent with Catholic teaching.

### IV. The Impact of the Mandate on the Little Sisters

35.   The HHS contraceptive mandate (the "Mandate") requires the Little Sisters to participate in the provision of contraception, abortion, and sterilization to our employees via the use of our health plans, health plan information, and health plan infrastructure. If we do not comply with the Mandate, we face massive penalties, which places enormous pressure on the Little Sisters to violate our religious beliefs.

36.   Our vow of hospitality, which asks us to treat each person in our care as if he or she were Christ himself, commits us just as much to respecting the dignity of human life at its beginning as at its end. We can no more participate in the provision of contraception, abortion, and sterilization than we could participate in the provision of euthanasia or assisted suicide.

37.   Because of the religious beliefs set forth above, the Little Sisters cannot:

a. participate in the Mandate's program to promote and facilitate access to the use of sterilization, contraceptives, and abortion-inducing drugs and devices,

7

Exhibit 146

b. provide health benefits to our employees and plan beneficiaries that will include or facilitate access to sterilization, contraception, and abortion-inducing drugs and devices,

c. designate, authorize, or incentivize any third party to provide our employees or plan beneficiaries with access to sterilization, contraception, and abortion-inducing drugs and devices,

d. sign, execute, deliver, or otherwise file documents with a third party or with the government which could then be used to require, authorize, or incentivize that third party to provide our employees with access to sterilization, contraception, and abortion-inducing drugs;

e. agree to refrain from speaking with a third party to ask or instruct it not to deliver contraceptives, sterilization, and abortifacients to Little Sisters' employees and plan beneficiaries in connection with Little Sisters' health plans;

f. create or facilitate a provider-insured relationship (between the Little Sisters and Christian Brothers Services or any other third-party administrators), the sole purpose of which would be to provide contraceptives, sterilization, and abortifacients in connection with the Little Sisters' health plans;

g. create, maintain, support, and facilitate health insurance plans, information, and infrastructure that is used to provide contraceptives,

8

Exhibit 146

JA-0002292

sterilization, and abortifacients to Little Sisters' employees and plan beneficiaries;

h. take any action that would require, authorize, or incentivize Christian Brothers Trust or Christian Brothers Services to violate their own Catholic religious beliefs.

38. Obeying the Mandate's requirement to participate in the provision of abortion-inducing drugs would violate our public witness to the respect for life and human dignity that we are committed to displaying at all times through our vow of hospitality and our fidelity to Church teaching. It would similarly violate our duty to "advoca[te] for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable," such as "the unborn." Exhibit A, USCCB Directives, at No. 3.

39. The Little Sisters believe that our ministry and all of our resources— including our health insurance plans and the efforts we make to maintain those plans—are gifts from God that we must use to God's glory and for the good of all, to help bear the burdens and sufferings of others. We cannot allow those gifts to be co-opted to serve ends that we believe dishonor God and the dignity of the human person.

40. The Mandate threatens the Little Sisters with large fines and penalties if we continue to act in accordance with our religious beliefs.

41. For example, if we continue our practice of providing health benefits to our employees and their families without including or facilitating free access to sterilization, contraception, and abortion-inducing drugs and devices, we will face

9

Exhibit 146

fines of "$100 for each day in the noncompliance period with respect to each individual to whom such failure relates." 26 U.S.C. § 4980D(b)(1).

42.   Depending on how the I.R.S. applied this penalty, the Little Sisters homes could face tens of millions of dollars of fines *each year* for our inability to facilitate the required coverage.

43.   Little Sisters Pittsburgh currently employs about 67 full-time employees. If the I.R.S. levies the fine on a per-full-time-employee basis, we would be facing daily fines of $6,700 and annual fines of $2,445,500. If the I.R.S. levies the fine on the basis of total number of employees and dependents receiving benefits, the fines would be orders of magnitude larger.

44.   The entire annual budget for Little Sisters Pittsburgh, which currently provides care for about 95 needy elderly individuals, is about $8 million.

45.   Nor can we avoid these fines by choosing not to provide health benefits at all. Cutting off all benefits for our employees would be unconscionable. We love and respect our employees and are dedicated to providing adequate health benefits.

46.   Cutting off all employee benefits would also have a severe negative impact on our employees and their families, and on our ability to hire and retain qualified medical staff and other employees. Benefits plans are an important reason that many employees make choices about which jobs to pursue, to keep, and to abandon.

47.   Even if we could cut off all benefits in good conscience and without harming our employees or our homes, we would face large government fines for doing so. For

10

Exhibit 146                                                                                          JA-0002294

example, Little Sisters Pittsburgh would face annual fines of approximately $134,000 for dropping health benefits altogether.

48.   For these reasons, the Mandate imposes enormous pressure on the Little Sisters to participate in activities prohibited by our sincerely held religious beliefs.

49.   Prior to the Mandate, we engaged in conduct motivated by our sincerely held religious beliefs: providing benefits plans that do not include sterilization, contraception, and abortion-inducing drugs and devices. The Mandate penalizes our participation in that religious exercise.

50.   The Mandate also places enormous pressure on the Little Sisters to engage in conduct contrary to our sincerely held religious beliefs. I am charged with making decisions for the Little Sisters Pittsburgh. The severe threats of fines and punishment create enormous pressure on me to violate my religious beliefs as the price of continuing our mission of helping the needy elderly.

51.   We object to the Mandate not because it makes us *use* drugs or devices against our religious beliefs, but because it forces us to participate as a necessary part of the government's scheme to provide those drugs and devices.

**The Little Sisters' Litigation Against the Mandate**

52.   The Little Sisters tried to avoid having to sue the federal government to protect our ministry. We made multiple public statements and filed a detailed public comment with the federal government to inform it of our sincere religious objection to incorporating us into its scheme. But the government refused to exempt us. Which meant that on January 1, 2014, we would start facing massive penalties.

11

Exhibit 146

JA-0002295

53. We filed suit on September 24, 2013, and filed a motion for preliminary injunction one month later, on October 24. *Little Sisters of the Poor v. Sebelius*, No. 13-cv-2611 (D. Colo.).

54. Over the next four years, we would remain in constant litigation with the federal government. We twice had to go to the Supreme Court to be protected from the imposition of massive financial penalties.

55. The first time came on December 31, 2013, when just hours before the start of the penalties we filed for and received a temporary emergency injunction from Justice Sotomayor just hours. Later in January 2014, the rest of the Supreme Court would grant an injunction pending appeal without noted dissent. *Little Sisters of the Poor v. Sebelius*, 134 S. Ct. 1022 (2014).

56. And the second time came after the Supreme Court granted certiorari in our case, when it vacated a Tenth Circuit ruling against us, remanded the case for further consideration, and ordered that "the Government may not impose taxes or penalties" on us while the case remained pending. *Zubik v. Burwell,* 136 S. Ct. 1557 (2016).

57. Our case has remained pending at the Tenth Circuit since that time.

**The Interim Final Rule**

58. On May 4, 2017, President Trump invited members of the Little Sisters of the Poor to the White House for the traditional proclamation of the National Day of Prayer and the signing of an Executive Order related to religious liberty.

59. At the signing ceremony, the President made clear that the Mandate's application to the Little Sisters had been inappropriate and illegal. The President

12

Exhibit 146

described the Mandate as an "attack[ ] against the Little Sisters of the Poor" that had put them through "a long, hard ordeal," and he listed it as an example of past "abuses" of religious liberty. *See* https://www.c-span.org/video/?428059-1/president-trump-signsreligious-liberty-executive-order (starting at 28:30).

60.    The agencies issued an Interim Final Rule on October 6, 2017. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 82 Fed. Reg. 47792 (Oct. 13, 2017). The rule explicitly referred to the Little Sisters' lawsuit and the Supreme Court decision in our case as the impetus for the regulatory change: "Consistent with the President's Executive Order and the Government's desire to resolve the pending litigation and prevent future litigation from similar plaintiffs, the Departments have concluded that it is appropriate to reexamine the exemption and accommodation scheme currently in place for the Mandate." 82 Fed. Reg. 47799; *see also id.* at 47798 (describing lawsuits and *Zubik* decision).

61.    The Interim Final Rule conceded that "requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA," and that because "requiring such compliance did not serve a compelling interest and was not the least restrictive means of serving a compelling interest, we now believe that requiring such compliance led to the violation of RFRA in many instances." *Id.* at 47800, 47806.

13

Exhibit 146

### Conclusion

62.   Being forced into four years of litigation, including two trips to the Supreme Court, has been a difficult and burdensome experience for the Little Sisters. We do not want to alarm in any way the elderly poor whom we serve, nor their families, our employees, or our benefactors. But to protect our ability to serve them as we always have, and to avoid violating and publicly rejecting our religious beliefs, our only recourse was a lawsuit.

63.   It is deeply troubling to us that, after years of respectfully seeking recourse in federal court to be protected from the *federal* government, we are being forced to defend those same rights that are threatened by a *state* government. We had never been required to provide these objectionable services by Pennsylvania, and do not understand why Pennsylvania asks this Court to force us to provide them now. We hope a day will come when government will cease threatening our ministry in this way.

14

Exhibit 146

JA-0002298

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this _18_th day of November, 2017,

_Mother Superior Marie Vincente, L.S.P._
Mother Superior Marie Vincente

15

Exhibit 146

# EXHIBIT A

Exhibit 146

JA-0002300



*Issued by USCCB, November 17, 2009*

*Copyright © 2009, United States Conference of Catholic Bishops.*
*All rights reserved.*

*To order a copy of this statement, please visit* www.usccbpublishing.org *and click on*
*"New Titles."*

# Ethical and Religious Directives for Catholic Health Care Services

## *Fifth Edition*

United States Conference of Catholic Bishops

Exhibit 146

JA-0002301

# CONTENTS

Preamble

General Introduction

Part One: The Social Responsibility of Catholic Health Care Services

Part Two: The Pastoral and Spiritual Responsibility of Catholic Health Care

Part Three: The Professional-Patient Relationship

Part Four: Issues in Care for the Beginning of Life

Part Five: Issues in Care for the Seriously Ill and Dying

Part Six: Forming New Partnerships with Health Care Organizations and Providers

Conclusion

2

Exhibit 146

JA-0002302

# PREAMBLE

Health care in the United States is marked by extraordinary change. Not only is there continuing change in clinical practice due to technological advances, but the health care system in the United States is being challenged by both institutional and social factors as well. At the same time, there are a number of developments within the Catholic Church affecting the ecclesial mission of health care. Among these are significant changes in religious orders and congregations, the increased involvement of lay men and women, a heightened awareness of the Church's social role in the world, and developments in moral theology since the Second Vatican Council. A contemporary understanding of the Catholic health care ministry must take into account the new challenges presented by transitions both in the Church and in American society.

Throughout the centuries, with the aid of other sciences, a body of moral principles has emerged that expresses the Church's teaching on medical and moral matters and has proven to be pertinent and applicable to the ever-changing circumstances of health care and its delivery. In response to today's challenges, these same moral principles of Catholic teaching provide the rationale and direction for this revision of the *Ethical and Religious Directives for Catholic Health Care Services.*

These Directives presuppose our statement *Health and Health Care* published in 1981.[1] There we presented the theological principles that guide the Church's vision of health care, called for all Catholics to share in the healing mission of the Church, expressed our full commitment to the health care ministry, and offered encouragement to all those who are involved in it. Now, with American health care facing even more dramatic changes, we reaffirm the Church's commitment to health care ministry and the distinctive Catholic identity of the Church's institutional health care services.[2] The purpose of these *Ethical and Religious*

3

Exhibit 146

JA-0002303

*Directives* then is twofold: first, to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person; second, to provide authoritative guidance on certain moral issues that face Catholic health care today.

The *Ethical and Religious Directives* are concerned primarily with institutionally based Catholic health care services. They address the sponsors, trustees, administrators, chaplains, physicians, health care personnel, and patients or residents of these institutions and services. Since they express the Church's moral teaching, these Directives also will be helpful to Catholic professionals engaged in health care services in other settings. The moral teachings that we profess here flow principally from the natural law, understood in the light of the revelation Christ has entrusted to his Church. From this source the Church has derived its understanding of the nature of the human person, of human acts, and of the goals that shape human activity.

The Directives have been refined through an extensive process of consultation with bishops, theologians, sponsors, administrators, physicians, and other health care providers. While providing standards and guidance, the Directives do not cover in detail all of the complex issues that confront Catholic health care today. Moreover, the Directives will be reviewed periodically by the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops), in the light of authoritative church teaching, in order to address new insights from theological and medical research or new requirements of public policy.

The Directives begin with a general introduction that presents a theological basis for the Catholic health care ministry. Each of the six parts that follow is divided into two sections. The first section is in expository form; it serves as an introduction and provides the context in which concrete issues can be discussed from the perspective of the Catholic faith. The second section is

4

Exhibit 146

JA-0002304

in prescriptive form; the directives promote and protect the truths of the Catholic faith as those

truths are brought to bear on concrete issues in health care.

Exhibit 146

JA-0002305

# GENERAL INTRODUCTION

The Church has always sought to embody our Savior's concern for the sick. The gospel accounts of Jesus' ministry draw special attention to his acts of healing: he cleansed a man with leprosy (Mt 8:1-4; Mk 1:40-42); he gave sight to two people who were blind (Mt 20:29-34; Mk 10:46-52); he enabled one who was mute to speak (Lk 11:14); he cured a woman who was hemorrhaging (Mt 9:20-22; Mk 5:25-34); and he brought a young girl back to life (Mt 9:18, 23-25; Mk 5:35-42). Indeed, the Gospels are replete with examples of how the Lord cured every kind of ailment and disease (Mt 9:35). In the account of Matthew, Jesus' mission fulfilled the prophecy of Isaiah: "He took away our infirmities and bore our diseases" (Mt 8:17; cf. Is 53:4).

Jesus' healing mission went further than caring only for physical affliction. He touched people at the deepest level of their existence; he sought their physical, mental, and spiritual healing (Jn 6:35, 11:25-27). He "came so that they might have life and have it more abundantly" (Jn 10:10).

The mystery of Christ casts light on every facet of Catholic health care: to see Christian love as the animating principle of health care; to see healing and compassion as a continuation of Christ's mission; to see suffering as a participation in the redemptive power of Christ's passion, death, and resurrection; and to see death, transformed by the resurrection, as an opportunity for a final act of communion with Christ.

For the Christian, our encounter with suffering and death can take on a positive and distinctive meaning through the redemptive power of Jesus' suffering and death. As St. Paul says, we are "always carrying about in the body the dying of Jesus, so that the life of Jesus may also be manifested in our body" (2 Cor 4:10). This truth does not lessen the pain and fear, but gives confidence and grace for bearing suffering rather than being overwhelmed by it. Catholic

Exhibit 146

JA-0002306

health care ministry bears witness to the truth that, for those who are in Christ, suffering and death are the birth pangs of the new creation. "God himself will always be with them [as their God]. He will wipe every tear from their eyes, and there shall be no more death or mourning, wailing or pain, [for] the old order has passed away" (Rev 21:3-4).

In faithful imitation of Jesus Christ, the Church has served the sick, suffering, and dying in various ways throughout history. The zealous service of individuals and communities has provided shelter for the traveler; infirmaries for the sick; and homes for children, adults, and the elderly.[3] In the United States, the many religious communities as well as dioceses that sponsor and staff this country's Catholic health care institutions and services have established an effective Catholic presence in health care. Modeling their efforts on the gospel parable of the Good Samaritan, these communities of women and men have exemplified authentic neighborliness to those in need (Lk 10:25-37). The Church seeks to ensure that the service offered in the past will be continued into the future.

While many religious communities continue their commitment to the health care ministry, lay Catholics increasingly have stepped forward to collaborate in this ministry. Inspired by the example of Christ and mandated by the Second Vatican Council, lay faithful are invited to a broader and more intense field of ministries than in the past.[4] By virtue of their Baptism, lay faithful are called to participate actively in the Church's life and mission.[5] Their participation and leadership in the health care ministry, through new forms of sponsorship and governance of institutional Catholic health care, are essential for the Church to continue her ministry of healing and compassion. They are joined in the Church's health care mission by many men and women who are not Catholic.

7

Exhibit 146

JA-0002307

Catholic health care expresses the healing ministry of Christ in a specific way within the local church. Here the diocesan bishop exercises responsibilities that are rooted in his office as pastor, teacher, and priest. As the center of unity in the diocese and coordinator of ministries in the local church, the diocesan bishop fosters the mission of Catholic health care in a way that promotes collaboration among health care leaders, providers, medical professionals, theologians, and other specialists. As pastor, the diocesan bishop is in a unique position to encourage the faithful to greater responsibility in the healing ministry of the Church. As teacher, the diocesan bishop ensures the moral and religious identity of the health care ministry in whatever setting it is carried out in the diocese. As priest, the diocesan bishop oversees the sacramental care of the sick. These responsibilities will require that Catholic health care providers and the diocesan bishop engage in ongoing communication on ethical and pastoral matters that require his attention.

In a time of new medical discoveries, rapid technological developments, and social change, what is new can either be an opportunity for genuine advancement in human culture, or it can lead to policies and actions that are contrary to the true dignity and vocation of the human person. In consultation with medical professionals, church leaders review these developments, judge them according to the principles of right reason and the ultimate standard of revealed truth, and offer authoritative teaching and guidance about the moral and pastoral responsibilities entailed by the Christian faith.[6] While the Church cannot furnish a ready answer to every moral dilemma, there are many questions about which she provides normative guidance and direction. In the absence of a determination by the magisterium, but never contrary to church teaching, the guidance of approved authors can offer appropriate guidance for ethical decision making.

8

Exhibit 146

JA-0002308

Created in God's image and likeness, the human family shares in the dominion that Christ manifested in his healing ministry. This sharing involves a stewardship over all material creation (Gn 1:26) that should neither abuse nor squander nature's resources. Through science the human race comes to understand God's wonderful work; and through technology it must conserve, protect, and perfect nature in harmony with God's purposes. Health care professionals pursue a special vocation to share in carrying forth God's life-giving and healing work.

The dialogue between medical science and Christian faith has for its primary purpose the common good of all human persons. It presupposes that science and faith do not contradict each other. Both are grounded in respect for truth and freedom. As new knowledge and new technologies expand, each person must form a correct conscience based on the moral norms for proper health care.

Exhibit 146

JA-0002309

PART ONE

**The Social Responsibility of Catholic Health Care Services**

**Introduction**

Their embrace of Christ's healing mission has led institutionally based Catholic health care services in the United States to become an integral part of the nation's health care system. Today, this complex health care system confronts a range of economic, technological, social, and moral challenges. The response of Catholic health care institutions and services to these challenges is guided by normative principles that inform the Church's healing ministry.

First, Catholic health care ministry is rooted in a commitment to promote and defend human dignity; this is the foundation of its concern to respect the sacredness of every human life from the moment of conception until death. The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care.[7]

Second, the biblical mandate to care for the poor requires us to express this in concrete action at all levels of Catholic health care. This mandate prompts us to work to ensure that our country's health care delivery system provides adequate health care for the poor. In Catholic institutions, particular attention should be given to the health care needs of the poor, the uninsured, and the underinsured.[8]

Third, Catholic health care ministry seeks to contribute to the common good. The common good is realized when economic, political, and social conditions ensure protection for the fundamental rights of all individuals and enable all to fulfill their common purpose and reach their common goals.[9]

10

Exhibit 146

JA-0002310

Fourth, Catholic health care ministry exercises responsible stewardship of available health care resources. A just health care system will be concerned both with promoting equity of care—to assure that the right of each person to basic health care is respected—and with promoting the good health of all in the community. The responsible stewardship of health care resources can be accomplished best in dialogue with people from all levels of society, in accordance with the principle of subsidiarity and with respect for the moral principles that guide institutions and persons.

Fifth, within a pluralistic society, Catholic health care services will encounter requests for medical procedures contrary to the moral teachings of the Church. Catholic health care does not offend the rights of individual conscience by refusing to provide or permit medical procedures that are judged morally wrong by the teaching authority of the Church.

**Directives**

1. A Catholic institutional health care service is a community that provides health care to those in need of it. This service must be animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church.

2. Catholic health care should be marked by a spirit of mutual respect among caregivers that disposes them to deal with those it serves and their families with the compassion of Christ, sensitive to their vulnerability at a time of special need.

3. In accord with its mission, Catholic health care should distinguish itself by service to and advocacy for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable to discrimination: the poor; the uninsured and the underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees. In particular, the person

11

Exhibit 146

with mental or physical disabilities, regardless of the cause or severity, must be treated as a unique person of incomparable worth, with the same right to life and to adequate health care as all other persons.

4. A Catholic health care institution, especially a teaching hospital, will promote medical research consistent with its mission of providing health care and with concern for the responsible stewardship of health care resources. Such medical research must adhere to Catholic moral principles.

5. Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel.

6. A Catholic health care organization should be a responsible steward of the health care resources available to it. Collaboration with other health care providers, in ways that do not compromise Catholic social and moral teaching, can be an effective means of such stewardship.[10]

7. A Catholic health care institution must treat its employees respectfully and justly. This responsibility includes: equal employment opportunities for anyone qualified for the task, irrespective of a person's race, sex, age, national origin, or disability; a workplace that promotes employee participation; a work environment that ensures employee safety and well-being; just compensation and benefits; and recognition of the rights of employees to organize and bargain collectively without prejudice to the common good.

8. Catholic health care institutions have a unique relationship to both the Church and the wider community they serve. Because of the ecclesial nature of this relationship, the relevant

12

Exhibit 146

JA-0002312

requirements of canon law will be observed with regard to the foundation of a new Catholic health care institution; the substantial revision of the mission of an institution; and the sale, sponsorship transfer, or closure of an existing institution.

9. Employees of a Catholic health care institution must respect and uphold the religious mission of the institution and adhere to these Directives. They should maintain professional standards and promote the institution's commitment to human dignity and the common good.

13

Exhibit 146

JA-0002313

PART TWO

**The Pastoral and Spiritual Responsibility of Catholic Health Care**

**Introduction**

The dignity of human life flows from creation in the image of God (Gn 1:26), from redemption by Jesus Christ (Eph 1:10; 1 Tm 2:4-6), and from our common destiny to share a life with God beyond all corruption (1 Cor 15:42-57). Catholic health care has the responsibility to treat those in need in a way that respects the human dignity and eternal destiny of all. The words of Christ have provided inspiration for Catholic health care: "I was ill and you cared for me" (Mt 25:36). The care provided assists those in need to experience their own dignity and value, especially when these are obscured by the burdens of illness or the anxiety of imminent death.

Since a Catholic health care institution is a community of healing and compassion, the care offered is not limited to the treatment of a disease or bodily ailment but embraces the physical, psychological, social, and spiritual dimensions of the human person. The medical expertise offered through Catholic health care is combined with other forms of care to promote health and relieve human suffering. For this reason, Catholic health care extends to the spiritual nature of the person. "Without health of the spirit, high technology focused strictly on the body offers limited hope for healing the whole person."[11] Directed to spiritual needs that are often appreciated more deeply during times of illness, pastoral care is an integral part of Catholic health care. Pastoral care encompasses the full range of spiritual services, including a listening presence; help in dealing with powerlessness, pain, and alienation; and assistance in recognizing and responding to God's will with greater joy and peace. It should be acknowledged, of course, that technological advances in medicine have reduced the length of hospital stays dramatically. It

14

Exhibit 146
JA-0002314

follows, therefore, that the pastoral care of patients, especially administration of the sacraments, will be provided more often than not at the parish level, both before and after one's hospitalization. For this reason, it is essential that there be very cordial and cooperative relationships between the personnel of pastoral care departments and the local clergy and ministers of care.

Priests, deacons, religious, and laity exercise diverse but complementary roles in this pastoral care. Since many areas of pastoral care call upon the creative response of these pastoral caregivers to the particular needs of patients or residents, the following directives address only a limited number of specific pastoral activities.

**Directives**

10. A Catholic health care organization should provide pastoral care to minister to the religious and spiritual needs of all those it serves. Pastoral care personnel—clergy, religious, and lay alike—should have appropriate professional preparation, including an understanding of these Directives.

11. Pastoral care personnel should work in close collaboration with local parishes and community clergy. Appropriate pastoral services and/or referrals should be available to all in keeping with their religious beliefs or affiliation.

12. For Catholic patients or residents, provision for the sacraments is an especially important part of Catholic health care ministry. Every effort should be made to have priests assigned to hospitals and health care institutions to celebrate the Eucharist and provide the sacraments to patients and staff.

13. Particular care should be taken to provide and to publicize opportunities for patients or residents to receive the sacrament of Penance.

Exhibit 146

JA-0002315

14. Properly prepared lay Catholics can be appointed to serve as extraordinary ministers of Holy Communion, in accordance with canon law and the policies of the local diocese. They should assist pastoral care personnel—clergy, religious, and laity—by providing supportive visits, advising patients regarding the availability of priests for the sacrament of Penance, and distributing Holy Communion to the faithful who request it.

15. Responsive to a patient's desires and condition, all involved in pastoral care should facilitate the availability of priests to provide the sacrament of Anointing of the Sick, recognizing that through this sacrament Christ provides grace and support to those who are seriously ill or weakened by advanced age. Normally, the sacrament is celebrated when the sick person is fully conscious. It may be conferred upon the sick who have lost consciousness or the use of reason, if there is reason to believe that they would have asked for the sacrament while in control of their faculties.

16. All Catholics who are capable of receiving Communion should receive Viaticum when they are in danger of death, while still in full possession of their faculties.[12]

17. Except in cases of emergency (i.e., danger of death), any request for Baptism made by adults or for infants should be referred to the chaplain of the institution. Newly born infants in danger of death, including those miscarried, should be baptized if this is possible.[13] In case of emergency, if a priest or a deacon is not available, anyone can validly baptize.[14] In the case of emergency Baptism, the chaplain or the director of pastoral care is to be notified.

18. When a Catholic who has been baptized but not yet confirmed is in danger of death, any priest may confirm the person.[15]

19. A record of the conferral of Baptism or Confirmation should be sent to the parish in which the institution is located and posted in its baptism/confirmation registers.

16

Exhibit 146

JA-0002316

20. Catholic discipline generally reserves the reception of the sacraments to Catholics. In accord with canon 844, §3, Catholic ministers may administer the sacraments of Eucharist, Penance, and Anointing of the Sick to members of the oriental churches that do not have full communion with the Catholic Church, or of other churches that in the judgment of the Holy See are in the same condition as the oriental churches, if such persons ask for the sacraments on their own and are properly disposed.

With regard to other Christians not in full communion with the Catholic Church, when the danger of death or other grave necessity is present, the four conditions of canon 844, §4, also must be present, namely, they cannot approach a minister of their own community; they ask for the sacraments on their own; they manifest Catholic faith in these sacraments; and they are properly disposed. The diocesan bishop has the responsibility to oversee this pastoral practice.

21. The appointment of priests and deacons to the pastoral care staff of a Catholic institution must have the explicit approval or confirmation of the local bishop in collaboration with the administration of the institution. The appointment of the director of the pastoral care staff should be made in consultation with the diocesan bishop.

22. For the sake of appropriate ecumenical and interfaith relations, a diocesan policy should be developed with regard to the appointment of non-Catholic members to the pastoral care staff of a Catholic health care institution. The director of pastoral care at a Catholic institution should be a Catholic; any exception to this norm should be approved by the diocesan bishop.

17

Exhibit 146                                                                                    JA-0002317

PART THREE

## The Professional-Patient Relationship

**Introduction**

A person in need of health care and the professional health care provider who accepts that person as a patient enter into a relationship that requires, among other things, mutual respect, trust, honesty, and appropriate confidentiality. The resulting free exchange of information must avoid manipulation, intimidation, or condescension. Such a relationship enables the patient to disclose personal information needed for effective care and permits the health care provider to use his or her professional competence most effectively to maintain or restore the patient's health. Neither the health care professional nor the patient acts independently of the other; both participate in the healing process.

Today, a patient often receives health care from a team of providers, especially in the setting of the modern acute-care hospital. But the resulting multiplication of relationships does not alter the personal character of the interaction between health care providers and the patient. The relationship of the person seeking health care and the professionals providing that care is an important part of the foundation on which diagnosis and care are provided. Diagnosis and care, therefore, entail a series of decisions with ethical as well as medical dimensions. The health care professional has the knowledge and experience to pursue the goals of healing, the maintenance of health, and the compassionate care of the dying, taking into account the patient's convictions and spiritual needs, and the moral responsibilities of all concerned. The person in need of health care depends on the skill of the health care provider to assist in preserving life and promoting

18

Exhibit 146

JA-0002318

health of body, mind, and spirit. The patient, in turn, has a responsibility to use these physical and mental resources in the service of moral and spiritual goals to the best of his or her ability.

When the health care professional and the patient use institutional Catholic health care, they also accept its public commitment to the Church's understanding of and witness to the dignity of the human person. The Church's moral teaching on health care nurtures a truly interpersonal professional-patient relationship. This professional-patient relationship is never separated, then, from the Catholic identity of the health care institution. The faith that inspires Catholic health care guides medical decisions in ways that fully respect the dignity of the person and the relationship with the health care professional.

**Directives**

23. The inherent dignity of the human person must be respected and protected regardless of the nature of the person's health problem or social status. The respect for human dignity extends to all persons who are served by Catholic health care.

24. In compliance with federal law, a Catholic health care institution will make available to patients information about their rights, under the laws of their state, to make an advance directive for their medical treatment. The institution, however, will not honor an advance directive that is contrary to Catholic teaching. If the advance directive conflicts with Catholic teaching, an explanation should be provided as to why the directive cannot be honored.

25. Each person may identify in advance a representative to make health care decisions as his or her surrogate in the event that the person loses the capacity to make health care decisions. Decisions by the designated surrogate should be faithful to Catholic moral principles and to the person's intentions and values, or if the person's intentions are unknown, to the person's best interests. In the event that an advance directive is not executed, those who are in a position to

19

Exhibit 146      JA-0002319

know best the patient's wishes—usually family members and loved ones—should participate in the treatment decisions for the person who has lost the capacity to make health care decisions.

26. The free and informed consent of the person or the person's surrogate is required for medical treatments and procedures, except in an emergency situation when consent cannot be obtained and there is no indication that the patient would refuse consent to the treatment.

27. Free and informed consent requires that the person or the person's surrogate receive all reasonable information about the essential nature of the proposed treatment and its benefits; its risks, side-effects, consequences, and cost; and any reasonable and morally legitimate alternatives, including no treatment at all.

28. Each person or the person's surrogate should have access to medical and moral information and counseling so as to be able to form his or her conscience. The free and informed health care decision of the person or the person's surrogate is to be followed so long as it does not contradict Catholic principles.

29. All persons served by Catholic health care have the right and duty to protect and preserve their bodily and functional integrity.[16] The functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available.[17]

30. The transplantation of organs from living donors is morally permissible when such a donation will not sacrifice or seriously impair any essential bodily function and the anticipated benefit to the recipient is proportionate to the harm done to the donor. Furthermore, the freedom of the prospective donor must be respected, and economic advantages should not accrue to the donor.

20

Exhibit 146                                                                                          JA-0002320

31. No one should be the subject of medical or genetic experimentation, even if it is therapeutic, unless the person or surrogate first has given free and informed consent. In instances of nontherapeutic experimentation, the surrogate can give this consent only if the experiment entails no significant risk to the person's well-being. Moreover, the greater the person's incompetency and vulnerability, the greater the reasons must be to perform any medical experimentation, especially nontherapeutic.

32. While every person is obliged to use ordinary means to preserve his or her health, no person should be obliged to submit to a health care procedure that the person has judged, with a free and informed conscience, not to provide a reasonable hope of benefit without imposing excessive risks and burdens on the patient or excessive expense to family or community.[18]

33. The well-being of the whole person must be taken into account in deciding about any therapeutic intervention or use of technology. Therapeutic procedures that are likely to cause harm or undesirable side-effects can be justified only by a proportionate benefit to the patient.

34. Health care providers are to respect each person's privacy and confidentiality regarding information related to the person's diagnosis, treatment, and care.

35. Health care professionals should be educated to recognize the symptoms of abuse and violence and are obliged to report cases of abuse to the proper authorities in accordance with local statutes.

36. Compassionate and understanding care should be given to a person who is the victim of sexual assault. Health care providers should cooperate with law enforcement officials and offer the person psychological and spiritual support as well as accurate medical information. A female who has been raped should be able to defend herself against a potential conception from the sexual assault. If, after appropriate testing, there is no evidence that conception has occurred

21

Exhibit 146
JA-0002321

already, she may be treated with medications that would prevent ovulation, sperm capacitation, or fertilization. It is not permissible, however, to initiate or to recommend treatments that have as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum.[19]

37. An ethics committee or some alternate form of ethical consultation should be available to assist by advising on particular ethical situations, by offering educational opportunities, and by reviewing and recommending policies. To these ends, there should be appropriate standards for medical ethical consultation within a particular diocese that will respect the diocesan bishop's pastoral responsibility as well as assist members of ethics committees to be familiar with Catholic medical ethics and, in particular, these Directives.

Exhibit 146

JA-0002322

PART FOUR

**Issues in Care for the Beginning of Life**

**Introduction**

The Church's commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning, and with the dignity of marriage and of the marriage act by which human life is transmitted. The Church cannot approve medical practices that undermine the biological, psychological, and moral bonds on which the strength of marriage and the family depends.

Catholic health care ministry witnesses to the sanctity of life "from the moment of conception until death."[20] The Church's defense of life encompasses the unborn and the care of women and their children during and after pregnancy. The Church's commitment to life is seen in its willingness to collaborate with others to alleviate the causes of the high infant mortality rate and to provide adequate health care to mothers and their children before and after birth.

The Church has the deepest respect for the family, for the marriage covenant, and for the love that binds a married couple together. This includes respect for the marriage act by which husband and wife express their love and cooperate with God in the creation of a new human being. The Second Vatican Council affirms:

This love is an eminently human one. . . . It involves the good of the whole

person. . . . The actions within marriage by which the couple are united intimately

and chastely are noble and worthy ones. Expressed in a manner which is truly

23

Exhibit 146

JA-0002323

human, these actions signify and promote that mutual self-giving by which spouses enrich each other with a joyful and a thankful will.[21]

Marriage and conjugal love are by their nature ordained toward the begetting and educating of children. Children are really the supreme gift of marriage and contribute very substantially to the welfare of their parents. . . . Parents should regard as their proper mission the task of transmitting human life and educating those to whom it has been transmitted. . . . They are thereby cooperators with the love of God the Creator, and are, so to speak, the interpreters of that love.[22]

For legitimate reasons of responsible parenthood, married couples may limit the number of their children by natural means. The Church cannot approve contraceptive interventions that "either in anticipation of the marital act, or in its accomplishment or in the development of its natural consequences, have the purpose, whether as an end or a means, to render procreation impossible."[23] Such interventions violate "the inseparable connection, willed by God . . . between the two meanings of the conjugal act: the unitive and procreative meaning."[24]

With the advance of the biological and medical sciences, society has at its disposal new technologies for responding to the problem of infertility. While we rejoice in the potential for good inherent in many of these technologies, we cannot assume that what is technically possible is always morally right. Reproductive technologies that substitute for the marriage act are not consistent with human dignity. Just as the marriage act is joined naturally to procreation, so procreation is joined naturally to the marriage act. As Pope John XXIII observed:

The transmission of human life is entrusted by nature to a personal and conscious act and as such is subject to all the holy laws of God: the immutable and

24

Exhibit 146

JA-0002324

inviolable laws which must be recognized and observed. For this reason, one cannot use means and follow methods which could be licit in the transmission of the life of plants and animals.[25]

Because the moral law is rooted in the whole of human nature, human persons, through intelligent reflection on their own spiritual destiny, can discover and cooperate in the plan of the Creator.[26]

**Directives**

38. When the marital act of sexual intercourse is not able to attain its procreative purpose, assistance that does not separate the unitive and procreative ends of the act, and does not substitute for the marital act itself, may be used to help married couples conceive.[27]

39. Those techniques of assisted conception that respect the unitive and procreative meanings of sexual intercourse and do not involve the destruction of human embryos, or their deliberate generation in such numbers that it is clearly envisaged that all cannot implant and some are simply being used to maximize the chances of others implanting, may be used as therapies for infertility.

40. Heterologous fertilization (that is, any technique used to achieve conception by the use of gametes coming from at least one donor other than the spouses) is prohibited because it is contrary to the covenant of marriage, the unity of the spouses, and the dignity proper to parents and the child.[28]

41. Homologous artificial fertilization (that is, any technique used to achieve conception using the gametes of the two spouses joined in marriage) is prohibited when it separates procreation from the marital act in its unitive significance (e.g., any technique used to achieve extracorporeal conception).[29]

25

Exhibit 146

JA-0002325

42. Because of the dignity of the child and of marriage, and because of the uniqueness of the mother-child relationship, participation in contracts or arrangements for surrogate motherhood is not permitted. Moreover, the commercialization of such surrogacy denigrates the dignity of women, especially the poor.[30]

43. A Catholic health care institution that provides treatment for infertility should offer not only technical assistance to infertile couples but also should help couples pursue other solutions (e.g., counseling, adoption).

44. A Catholic health care institution should provide prenatal, obstetric, and postnatal services for mothers and their children in a manner consonant with its mission.

45. Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo. Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation. In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers.

46. Catholic health care providers should be ready to offer compassionate physical, psychological, moral, and spiritual care to those persons who have suffered from the trauma of abortion.

47. Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

26

Exhibit 146

JA-0002326

48. In case of extrauterine pregnancy, no intervention is morally licit which constitutes a direct abortion.[31]

49. For a proportionate reason, labor may be induced after the fetus is viable.

50. Prenatal diagnosis is permitted when the procedure does not threaten the life or physical integrity of the unborn child or the mother and does not subject them to disproportionate risks; when the diagnosis can provide information to guide preventative care for the mother or pre- or postnatal care for the child; and when the parents, or at least the mother, give free and informed consent. Prenatal diagnosis is not permitted when undertaken with the intention of aborting an unborn child with a serious defect.[32]

51. Nontherapeutic experiments on a living embryo or fetus are not permitted, even with the consent of the parents. Therapeutic experiments are permitted for a proportionate reason with the free and informed consent of the parents or, if the father cannot be contacted, at least of the mother. Medical research that will not harm the life or physical integrity of an unborn child is permitted with parental consent.[33]

52. Catholic health institutions may not promote or condone contraceptive practices but should provide, for married couples and the medical staff who counsel them, instruction both about the Church's teaching on responsible parenthood and in methods of natural family planning.

53. Direct sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available.[34]

27

Exhibit 146

54. Genetic counseling may be provided in order to promote responsible parenthood and to prepare for the proper treatment and care of children with genetic defects, in accordance with Catholic moral teaching and the intrinsic rights and obligations of married couples regarding the transmission of life.

28

Exhibit 146

# PART FIVE

## Issues in Care for the Seriously Ill and Dying

**Introduction**

Christ's redemption and saving grace embrace the whole person, especially in his or her illness, suffering, and death.[35] The Catholic health care ministry faces the reality of death with the confidence of faith. In the face of death—for many, a time when hope seems lost—the Church witnesses to her belief that God has created each person for eternal life.[36]

Above all, as a witness to its faith, a Catholic health care institution will be a community of respect, love, and support to patients or residents and their families as they face the reality of death. What is hardest to face is the process of dying itself, especially the dependency, the helplessness, and the pain that so often accompany terminal illness. One of the primary purposes of medicine in caring for the dying is the relief of pain and the suffering caused by it. Effective management of pain in all its forms is critical in the appropriate care of the dying.

The truth that life is a precious gift from God has profound implications for the question of stewardship over human life. We are not the owners of our lives and, hence, do not have absolute power over life. We have a duty to preserve our life and to use it for the glory of God, but the duty to preserve life is not absolute, for we may reject life-prolonging procedures that are insufficiently beneficial or excessively burdensome. Suicide and euthanasia are never morally acceptable options.

The task of medicine is to care even when it cannot cure. Physicians and their patients must evaluate the use of the technology at their disposal. Reflection on the innate dignity of human life in all its dimensions and on the purpose of medical care is indispensable for

29

Exhibit 146

JA-0002329

formulating a true moral judgment about the use of technology to maintain life. The use of life-sustaining technology is judged in light of the Christian meaning of life, suffering, and death. In this way two extremes are avoided: on the one hand, an insistence on useless or burdensome technology even when a patient may legitimately wish to forgo it and, on the other hand, the withdrawal of technology with the intention of causing death.[37]

The Church's teaching authority has addressed the moral issues concerning medically assisted nutrition and hydration. We are guided on this issue by Catholic teaching against euthanasia, which is "an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated."[38] While medically assisted nutrition and hydration are not morally obligatory in certain cases, these forms of basic care should in principle be provided to all patients who need them, including patients diagnosed as being in a "persistent vegetative state" (PVS), because even the most severely debilitated and helpless patient retains the full dignity of a human person and must receive ordinary and proportionate care.

**Directives**

55. Catholic health care institutions offering care to persons in danger of death from illness, accident, advanced age, or similar condition should provide them with appropriate opportunities to prepare for death. Persons in danger of death should be provided with whatever information is necessary to help them understand their condition and have the opportunity to discuss their condition with their family members and care providers. They should also be offered the appropriate medical information that would make it possible to address the morally legitimate choices available to them. They should be provided the spiritual support as well as the opportunity to receive the sacraments in order to prepare well for death.

30

Exhibit 146

56. A person has a moral obligation to use ordinary or proportionate means of preserving his or her life. Proportionate means are those that in the judgment of the patient offer a reasonable hope of benefit and do not entail an excessive burden or impose excessive expense on the family or the community.[39]

57. A person may forgo extraordinary or disproportionate means of preserving life. Disproportionate means are those that in the patient's judgment do not offer a reasonable hope of benefit or entail an excessive burden, or impose excessive expense on the family or the community.

58. In principle, there is an obligation to provide patients with food and water, including medically assisted nutrition and hydration for those who cannot take food orally. This obligation extends to patients in chronic and presumably irreversible conditions (e.g., the "persistent vegetative state") who can reasonably be expected to live indefinitely if given such care.[40] Medically assisted nutrition and hydration become morally optional when they cannot reasonably be expected to prolong life or when they would be "excessively burdensome for the patient or [would] cause significant physical discomfort, for example resulting from complications in the use of the means employed."[41] For instance, as a patient draws close to inevitable death from an underlying progressive and fatal condition, certain measures to provide nutrition and hydration may become excessively burdensome and therefore not obligatory in light of their very limited ability to prolong life or provide comfort.

59. The free and informed judgment made by a competent adult patient concerning the use or withdrawal of life-sustaining procedures should always be respected and normally complied with, unless it is contrary to Catholic moral teaching.

31

Exhibit 146
JA-0002331

60.     Euthanasia is an action or omission that of itself or by intention causes death in order to alleviate suffering. Catholic health care institutions may never condone or participate in euthanasia or assisted suicide in any way. Dying patients who request euthanasia should receive loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death.[42]

61. Patients should be kept as free of pain as possible so that they may die comfortably and with dignity, and in the place where they wish to die. Since a person has the right to prepare for his or her death while fully conscious, he or she should not be deprived of consciousness without a compelling reason. Medicines capable of alleviating or suppressing pain may be given to a dying person, even if this therapy may indirectly shorten the person's life so long as the intent is not to hasten death. Patients experiencing suffering that cannot be alleviated should be helped to appreciate the Christian understanding of redemptive suffering.

62. The determination of death should be made by the physician or competent medical authority in accordance with responsible and commonly accepted scientific criteria.

63. Catholic health care institutions should encourage and provide the means whereby those who wish to do so may arrange for the donation of their organs and bodily tissue, for ethically legitimate purposes, so that they may be used for donation and research after death.

64. Such organs should not be removed until it has been medically determined that the patient has died. In order to prevent any conflict of interest, the physician who determines death should not be a member of the transplant team.

65. The use of tissue or organs from an infant may be permitted after death has been determined and with the informed consent of the parents or guardians.

32

Exhibit 146                                                                              JA-0002332

66. Catholic health care institutions should not make use of human tissue obtained by direct abortions even for research and therapeutic purposes.[43]

33

Exhibit 146        JA-0002333

PART SIX

**Forming New Partnerships with Health Care Organizations and Providers**

**Introduction**

Until recently, most health care providers enjoyed a degree of independence from one another. In ever-increasing ways, Catholic health care providers have become involved with other health care organizations and providers. For instance, many Catholic health care systems and institutions share in the joint purchase of technology and services with other local facilities or physicians' groups. Another phenomenon is the growing number of Catholic health care systems and institutions joining or co-sponsoring integrated delivery networks or managed care organizations in order to contract with insurers and other health care payers. In some instances, Catholic health care systems sponsor a health care plan or health maintenance organization. In many dioceses, new partnerships will result in a decrease in the number of health care providers, at times leaving the Catholic institution as the sole provider of health care services. At whatever level, new partnerships forge a variety of interwoven relationships: between the various institutional partners, between health care providers and the community, between physicians and health care services, and between health care services and payers.

On the one hand, new partnerships can be viewed as opportunities for Catholic health care institutions and services to witness to their religious and ethical commitments and so influence the healing profession. For example, new partnerships can help to implement the Church's social teaching. New partnerships can be opportunities to realign the local delivery system in order to provide a continuum of health care to the community; they can witness to a

34

Exhibit 146

JA-0002334

responsible stewardship of limited health care resources; and they can be opportunities to provide to poor and vulnerable persons a more equitable access to basic care.

On the other hand, new partnerships can pose serious challenges to the viability of the identity of Catholic health care institutions and services, and their ability to implement these Directives in a consistent way, especially when partnerships are formed with those who do not share Catholic moral principles. The risk of scandal cannot be underestimated when partnerships are not built upon common values and moral principles. Partnership opportunities for some Catholic health care providers may even threaten the continued existence of other Catholic institutions and services, particularly when partnerships are driven by financial considerations alone. Because of the potential dangers involved in the new partnerships that are emerging, an increased collaboration among Catholic-sponsored health care institutions is essential and should be sought before other forms of partnerships.

The significant challenges that new partnerships may pose, however, do not necessarily preclude their possibility on moral grounds. The potential dangers require that new partnerships undergo systematic and objective moral analysis, which takes into account the various factors that often pressure institutions and services into new partnerships that can diminish the autonomy and ministry of the Catholic partner. The following directives are offered to assist institutionally based Catholic health care services in this process of analysis. To this end, the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops) has established the Ad Hoc Committee on Health Care Issues and the Church as a resource for bishops and health care leaders.

This new edition of the *Ethical and Religious Directives* omits the appendix concerning cooperation, which was contained in the 1995 edition. Experience has shown that the brief

35

Exhibit 146

JA-0002335

articulation of the principles of cooperation that was presented there did not sufficiently forestall certain possible misinterpretations and in practice gave rise to problems in concrete applications of the principles. Reliable theological experts should be consulted in interpreting and applying the principles governing cooperation, with the proviso that, as a rule, Catholic partners should avoid entering into partnerships that would involve them in cooperation with the wrongdoing of other providers.

**Directives**

67. Decisions that may lead to serious consequences for the identity or reputation of Catholic health care services, or entail the high risk of scandal, should be made in consultation with the diocesan bishop or his health care liaison.

68. Any partnership that will affect the mission or religious and ethical identity of Catholic health care institutional services must respect church teaching and discipline. Diocesan bishops and other church authorities should be involved as such partnerships are developed, and the diocesan bishop should give the appropriate authorization before they are completed. The diocesan bishop's approval is required for partnerships sponsored by institutions subject to his governing authority; for partnerships sponsored by religious institutes of pontifical right, his *nihil obstat* should be obtained.

69. If a Catholic health care organization is considering entering into an arrangement with another organization that may be involved in activities judged morally wrong by the Church, participation in such activities must be limited to what is in accord with the moral principles governing cooperation.

Exhibit 146

JA-0002336

70. Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization.[44]

71. The possibility of scandal must be considered when applying the principles governing cooperation.[45] Cooperation, which in all other respects is morally licit, may need to be refused because of the scandal that might be caused. Scandal can sometimes be avoided by an appropriate explanation of what is in fact being done at the health care facility under Catholic auspices. The diocesan bishop has final responsibility for assessing and addressing issues of scandal, considering not only the circumstances in his local diocese but also the regional and national implications of his decision.[46]

72. The Catholic partner in an arrangement has the responsibility periodically to assess whether the binding agreement is being observed and implemented in a way that is consistent with Catholic teaching.

37

Exhibit 146

JA-0002337

# CONCLUSION

Sickness speaks to us of our limitations and human frailty. It can take the form of infirmity resulting from the simple passing of years or injury from the exuberance of youthful energy. It can be temporary or chronic, debilitating, and even terminal. Yet the follower of Jesus faces illness and the consequences of the human condition aware that our Lord always shows compassion toward the infirm.

Jesus not only taught his disciples to be compassionate, but he also told them who should be the special object of their compassion. The parable of the feast with its humble guests was preceded by the instruction: "When you hold a banquet, invite the poor, the crippled, the lame, the blind" (Lk 14:13). These were people whom Jesus healed and loved.

Catholic health care is a response to the challenge of Jesus to go and do likewise. Catholic health care services rejoice in the challenge to be Christ's healing compassion in the world and see their ministry not only as an effort to restore and preserve health but also as a spiritual service and a sign of that final healing that will one day bring about the new creation that is the ultimate fruit of Jesus' ministry and God's love for us.

38

Exhibit 146

JA-0002338

# Notes

1. United States Conference of Catholic Bishops, *Health and Health Care: A Pastoral Letter of the American Catholic Bishops* (Washington, DC: United States Conference of Catholic Bishops, 1981).

2. Health care services under Catholic auspices are carried out in a variety of institutional settings (e.g., hospitals, clinics, outpatient facilities, urgent care centers, hospices, nursing homes, and parishes). Depending on the context, these Directives will employ the terms "institution" and/or "services" in order to encompass the variety of settings in which Catholic health care is provided.

3. *Health and Health Care*, p. 5.

4. Second Vatican Ecumenical Council, *Decree on the Apostolate of the Laity* (*Apostolicam Actuositatem*) (1965), no. 1.

5. Pope John Paul II, Post-Synodal Apostolic Exhortation *On the Vocation and the Mission of the Lay Faithful in the Church and in the World* (*Christifideles Laici*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 29.

6. As examples, see Congregation for the Doctrine of the Faith, *Declaration on Procured Abortion* (1974); Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* (1980); Congregation for the Doctrine of the Faith, *Instruction on Respect for Human Life in Its Origin and on the Dignity of Procreation: Replies to Certain Questions of the Day* (*Donum Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1987).

7. Pope John XXIII, Encyclical Letter *Peace on Earth* (*Pacem in Terris*) (Washington, DC: United States Conference of Catholic Bishops, 1963), no. 11; *Health and Health Care*, pp. 5, 17-18; *Catechism of the Catholic Church*, 2nd ed. (Washington, DC: Libreria Editrice Vaticana– United States Conference of Catholic Bishops, 2000), no. 2211.

8. Pope John Paul II, *On Social Concern, Encyclical Letter on the Occasion of the Twentieth Anniversary of "Populorum Progressio"* (*Sollicitudo Rei Socialis*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

9. United States Conference of Catholic Bishops, *Economic Justice for All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* (Washington, DC: United States Conference of Catholic Bishops, 1986), no. 80.

Exhibit 146

JA-0002339

10. The duty of responsible stewardship demands responsible collaboration. But in collaborative efforts, Catholic institutionally based health care services must be attentive to occasions when the policies and practices of other institutions are not compatible with the Church's authoritative moral teaching. At such times, Catholic health care institutions should determine whether or to what degree collaboration would be morally permissible. To make that judgment, the governing boards of Catholic institutions should adhere to the moral principles on cooperation. See Part Six.

11. *Health and Health Care,* p. 12.

12. Cf. *Code of Canon Law,* cc. 921-923.

13. Cf. ibid., c. 867, § 2, and c. 871.

14. To confer Baptism in an emergency, one must have the proper intention (to do what the Church intends by Baptism) and pour water on the head of the person to be baptized, meanwhile pronouncing the words: "I baptize you in the name of the Father, and of the Son, and of the Holy Spirit."

15. Cf. c. 883, 3°.

16. For example, while the donation of a kidney represents loss of biological integrity, such a donation does not compromise functional integrity since human beings are capable of functioning with only one kidney.

17. Cf. directive 53.

18. *Declaration on Euthanasia,* Part IV; cf. also directives 56-57.

19. It is recommended that a sexually assaulted woman be advised of the ethical restrictions that prevent Catholic hospitals from using abortifacient procedures; cf. Pennsylvania Catholic Conference, "Guidelines for Catholic Hospitals Treating Victims of Sexual Assault," *Origins* 22 (1993): 810.

20. Pope John Paul II, "Address of October 29, 1983, to the 35th General Assembly of the World Medical Association," *Acta Apostolicae Sedis* 76 (1984): 390.

21. Second Vatican Ecumenical Council, *Pastoral Constitution on the Church in the Modern World* (*Gaudium et Spes*) (1965), no. 49.

22. Ibid., no. 50.

23. Pope Paul VI, Encyclical Letter *On the Regulation of Birth* (*Humanae Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1968), no. 14.

24. Ibid., no. 12.

Exhibit 146

25. Pope John XXIII, Encyclical Letter *Mater et Magistra* (1961), no. 193, quoted in Congregation for the Doctrine of the Faith, *Donum Vitae,* no. 4.

26. Pope John Paul II, Encyclical Letter *The Splendor of Truth* (*Veritatis Splendor*) (Washington, DC: United States Conference of Catholic Bishops, 1993), no. 50.

27. "Homologous artificial insemination within marriage cannot be admitted except for those cases in which the technical means is not a substitute for the conjugal act but serves to facilitate and to help so that the act attains its natural purpose" (*Donum Vitae,* Part II, B, no. 6; cf. also Part I, nos. 1, 6).

28. Ibid., Part II, A, no. 2.

29. "Artificial insemination as a substitute for the conjugal act is prohibited by reason of the voluntarily achieved dissociation of the two meanings of the conjugal act. Masturbation, through which the sperm is normally obtained, is another sign of this dissociation: even when it is done for the purpose of procreation, the act remains deprived of its unitive meaning: 'It lacks the sexual relationship called for by the moral order, namely, the relationship which realizes "the full sense of mutual self-giving and human procreation in the context of true love"'" (*Donum Vitae,* Part II, B, no. 6).

30. Ibid., Part II, A, no. 3.

31. Cf. directive 45.

32. *Donum Vitae,* Part I, no. 2.

33. Cf. ibid., no. 4. (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

34. Cf. Congregation for the Doctrine of the Faith, "Responses on Uterine Isolation and Related Matters," July 31, 1993, *Origins* 24 (1994): 211-212.

35. Pope John Paul II, Apostolic Letter *On the Christian Meaning of Human Suffering* (*Salvifici Doloris*) (Washington, DC: United States Conference of Catholic Bishops, 1984), nos. 25-27.

36. United States Conference of Catholic Bishops, *Order of Christian Funerals* (Collegeville, Minn.: The Liturgical Press, 1989), no. 1.

37. See *Declaration on Euthanasia.*

38. Ibid., Part II.

39. Ibid., Part IV; Pope John Paul II, Encyclical Letter *On the Value and Inviolability of Human Life* (*Evangelium Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1995), no. 65.

41

Exhibit 146                                                                                                    JA-0002341

40. See Pope John Paul II. Address to the Participants in the International Congress on "Life-Sustaining Treatments and Vegetative State: Scientific Advances and Ethical Dilemmas" (March 20, 2004), no. 4, where he emphasized that "the administration of water and food. even when provided by artificial means. always represents a *natural means* of preserving life, not a *medical act*." See also Congregation for the Doctrine of the Faith, "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration" (August 1, 2007).

41. Congregation for the Doctrine of the Faith. Commentary on "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration."

42. See *Declaration on Euthanasia*, Part IV.

43. *Donum Vitae,* Part I. no. 4.

44. While there are many acts of varying moral gravity that can be identified as intrinsically evil. in the context of contemporary health care the most pressing concerns are currently abortion, euthanasia, assisted suicide, and direct sterilization. See Pope John Paul II's *Ad Limina* Address to the bishops of Texas. Oklahoma. and Arkansas (Region X), in *Origins* 28 (1998): 283. See also "Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" (*Quaecumqu Sterilizatio*). March 13, 1975, *Origins* 6 (1976): 33-35: "Any cooperation institutionally approved or tolerated in actions which are in themselves, that is, by their nature and condition. directed to a contraceptive end . . . is absolutely forbidden. For the official approbation of direct sterilization and. *a fortiori*, its management and execution in accord with hospital regulations, is a matter which. in the objective order. is by its very nature (or intrinsically) evil." This directive supersedes the "Commentary on the Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" published by the National Conference of Catholic Bishops on September 15, 1977, in *Origins* 7 (1977): 399-400.

45. See *Catechism of the Catholic Church*: "Scandal is an attitude or behavior which leads another to do evil" (no. 2284); "Anyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged" (no. 2287).

46. See "The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry," *Origins* 26 (1997): 703.

Exhibit 146

JA-0002342

This fifth edition of the *Ethical and Religious Directives for Catholic Health Care Services* was developed by the Committee on Doctrine of the United States Conference of Catholic Bishops (USCCB) and approved as the national code by the full body of the USCCB at its November 2009 General Meeting. This edition of the *Directives*, which replaces all previous editions, is recommended for implementation by the diocesan bishop and is authorized for publication by the undersigned.

*Msgr. David J. Malloy, STD*
*General Secretary, USCCB*

In 2001 the National Conference of Catholic Bishops and United States Catholic Conference became the United States Conference of Catholic Bishops.

Excerpts from *The Documents of Vatican II*, ed. Walter M. Abbott, SJ, copyright © 1966 by America Press are used with permission. All rights reserved.

Scripture texts used in this work are taken from the *New American Bible*, copyright © 1991, 1986, and 1970 by the Confraternity of Christian Doctrine, Washington, D.C., 20017 and are used by permission of the copyright owner. All rights reserved.

Copyright © 2009, United States Conference of Catholic Bishops, Washington, D.C. All rights reserved. No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the copyright holder.

To obtain a catalog of USCCB titles, visit *www.usccbpublishing.org* or call toll-free 800-235-8722. In the Washington metropolitan area or from outside the United States, call 202-722-8716. Para pedidos en español, llame al 800-235-8722 y presione 4 para hablar con un representante del servicio al cliente en español.

Exhibit 146

JA-0002343

# **Birth Control**

**Print the Birth Control Chart
(/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM517406.pdf)**
(2628 KB)

**En Español (/downloads/ForConsumers/ByAudience/ForWomen/FreePublica-
tions/UCM517408.pdf)** (433KB)

If you do not want to get pregnant, there are many birth control options to choose from. No one product is best for everyone. Some methods are more effective than others at preventing pregnancy. The only sure way to avoid pregnancy is not to have any sexual contact. This page lists FDA-approved and cleared methods for birth control. Talk to your healthcare provider about the best method for you.

**Types of Medicines and Devices for Birth Control**

- **Permanent Sterilization**
- **Long-Acting Reversible Contraceptives (LARC)**
- **Contraceptive Injection**
- **Short-Acting Hormonal Methods**
- **Barrier Methods**

**Other Contraception**

- **Emergency Contraception**

**Some things to think about when you choose birth control:**

- Your health.
- If you want to have children in the future.
- How often you have sex.
- How many sexual partners you have.
- If you will need a prescription or if you can buy the method over-the-counter.
- The number of pregnancies expected per 100 women who use a method for one year. For comparison, about 85 out of 100 sexually active women who do not use any birth control can expect to become pregnant in a year.
- This page lists pregnancy rates based on **typical use**. Typical use shows how effective the different methods are during actual use (including sometimes using a method in a way that is not correct or not consistent).

00803074

Exhibit 147

JA-0002344

- For more information on the chance of getting pregnant while using a method or on the risks of a specific product, please check the product label or **Trussell,J. (2011)."Contraceptive failure in the United States." Contraception 83(5):397-404. (http://www.kupferkette.info/down-loads/contraceptive-failure-in-the-united-states---2.pdf)** ⊡ **(http://www.fda.gov/AboutFDA/AboutThisWebsite/WebsitePolicies/Disclaimers/de-fault.htm)**

### Tell your doctor, healthcare provider, or pharmacist if you:

- Smoke.
- Have liver disease.
- Have blood clots.
- Have family members who have had blood clots.
- Are taking any other medicines, like antibiotics or daily prescription medicines.
- Are taking any herbal products, like St. John's Wort.
- Are breastfeeding.
- Have been pregnant recently.

### To avoid pregnancy:

- No matter which method you choose, it is important to follow all of the directions carefully. If you don't, you increase your chance of getting pregnant.
- The best way to avoid pregnancy is to not have any sexual contact.

## Sterilization Surgery for Women (also called trans-abdominal surgical sterilization)



### What is it?

One way is by tying and cutting the tubes — this is called tubal ligation.

The fallopian tubes also can be sealed using an instrument with an electrical current.

They also can be closed with clips, clamps, or rings.

Sometimes, a small piece of the tube is removed.

### How does it work?

- The fallopian tubes are blocked so the egg and sperm can't meet in the fallopian tube. This

00803075

Exhibit 147                                                                    JA-0002345

stops you from getting pregnant.

- It is supposed to be permanent.
- Sometimes it is possible to reverse the sterilization. Reversal involves another surgery that might not work.

### How do I get it?

- This is surgery.
- You will need general anesthesia.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, less than 1 may get pregnant.

### Some Risks

- Pain
- Bleeding
- Infection or other complications after surgery

**Does it protect me from sexually transmitted infections (STIs)?** No.

## Sterilization Implant for Women (Transcervical Tubal Sterilization Implant)



### What is it?

Small flexible, metal (containing nickel) coil that is put into the fallopian tubes with a special catheter through the vagina.

### How does it work?

The device works by causing scar tissue to form around the coil. This blocks the fallopian tubes and stops the sperm from reaching the eggs.

You need to use another birth control method during the first 3 months. You will need a special test to make sure the device is in the right place before you can stop your birth control.

00803076

Exhibit 147

JA-0002346

- It is permanent.

### How do I get it?

- The devices are placed into the tubes using a camera placed in the uterus.
- You will probably need anesthesia.
- Because it is inserted through the vagina, you do not need an incision (cutting).

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, less than 1 may get pregnant.

### Some Risks

- Pain/ cramping
- Pelvic or back discomfort
- Vaginal bleeding

**Does it protect me from sexually transmitted infections (STIs)?** No

**Learn more about the Sterilization Implant for Women. (/MedicalDevices/ProductsandMedi-calProcedures/ImplantsandProsthetics/EssurePermanentBirthControl/default.htm)**

## Sterilization Surgery for Men (Vasectomy)

This method is for men who are sure they never want to have a child or do not want any more children. If you are thinking about reversal, vasectomy may not be right for you. Sometimes it is possible to reverse the operation, but the likelihood of reversal decreases the more time passes between vasectomy and reversal.  Reversal involves complicated surgery that might not work.



### What is it?

This is a surgery a man needs only once.

It is permanent.

### How does it work?

- The surgery blocks a man's vas deferens (the tubes that carry sperm from the testes).
- After this surgery, the semen (the fluid that comes out of a man's penis) has no sperm in it.

00803077

Exhibit 147

JA-0002347

- It takes about three months to clear sperm out of a man's system. You need to use another form of birth control until a test shows there are no longer any sperm in the seminal fluid.

**How do I get it?**

- This is surgery.
- Local anesthesia is used.

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

- Out of 100 women whose partner has had a vasectomy, less than 1 may get pregnant.

**Some Risks**

- Pain
- Bleeding
- Infection

**The success of reversal surgery depends on:**

- The length of time since the vasectomy was performed.
- Whether or not antibodies to sperm have developed.
- The method used for vasectomy
- Length and location of the segments of vas deferens that were removed or blocked.

**Does it protect me from sexually transmitted infections (STIs)?** No.

# Long-acting Reversible Contraceptives (LARC)

**These methods last for several years. If you want to get pregnant, you can stop using them at any time.**

# IUD or IUS (intrauterine device or system)

**Copper IUD**

**What is it?**

00803078

Exhibit 147
JA-0002348



A T-shaped device containing copper that is put into the uterus by a healthcare provider.

### How does it work?

- The IUD prevents sperm from reaching the egg, from fertilizing the egg, and may prevent the egg from attaching (implanting) in the womb (uterus).
- It does not stop the ovaries from making an egg (ovulating) each month.
- The copper IUD can be used for up to 10 years.
- After the IUD is taken out, it is possible to get pregnant.

### How do I get it?

- A doctor or other healthcare provider needs to put in the IUD.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, less than 1 may get pregnant.

### Some Side Effects

- Cramps
- Heavier, longer periods or spotting between periods.

### Some Less Common Risks

- Pelvic inflammatory disease
- Ectopic pregnancy (a pregnancy outside of the uterus)
- Uterine perforation
- Expulsion - the IUD is no longer in the uterus and therefore there is no pregnancy protection

### Does it protect me from sexually transmitted infections (STIs)? No.

---

### IUD with progestin



### What is it?

A T-shaped device containing a progestin that is put into the uterus by a healthcare provider.

### How does it work?

- It may thicken the mucus of your cervix, which makes it harder for sperm to get to the egg, and also thins the lining of your uterus.
- The IUD with progestin can be used for up to 3 to 5 years, depending on the type.
- After the IUD is taken out, it is possible to get pregnant.

00803079

Exhibit 147
JA-0002349

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 378 of 677

### How do I get it?

- A healthcare provider needs to put in the IUD.
- You may need local anesthesia.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year

- Out of 100 women who use this method, less than 1 may get pregnant.

### Some Side Effects

- Irregular bleeding
- No periods (amenorrhea)
- Abdominal/pelvic pain

### Some Less Common Risks

- Pelvic inflammatory disease
- Severe infection
- Ectopic Pregnancy
- Uterine perforation
- Expulsion - the IUD is no longer in the uterus and therefore there is no pregnancy protection
- Ovarian cysts

### Does it protect me from sexually transmitted infections (STIs)? No.

---

### Implantable Rod



### What is it?

A thin, matchstick-sized rod that contains a progestin hormone.

It is put under the skin on the inside of your upper arm.

### How does it work?

- It stops the ovaries from releasing eggs.
- It thickens the cervical mucus, which keeps sperm from getting to the egg.
- It can be used for up to 3 years.

### How do I get it?

- After giving you local anesthesia, a healthcare provider will put it under the skin of your arm with a special needle.

00803080

Exhibit 147                                                                                                                JA-0002350

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

• Out of 100 women who use this method, less than 1 may get pregnant.

**Some Side Effects**

• Changes in menstrual bleeding patterns
• Weight gain
• Headache
• Acne

**Some Less Common Risks**

• Complication of insertion and removing including pain, bleeding, scarring, infection or movement of the implant to another part of the body.
• Ectopic pregnancy
• Ovarian cysts
• It is rare but some women will have blood clots, heart attacks or strokes.

**Does it protect me from sexually transmitted infections (STIs)?** No.

# Contraceptive Injection

**This metod is given as a shot (injection) every 3 months. If you want to get pregnant, you can stop using this at any time.**

Progestin Shot/Injection (Depo-Provera)



**What is it?**

A shot of a progestin hormone, either in the muscle or under the skin.

**How does it work?**

• The shot stop3 the ovaries from releasing eggs
• It also thickens the cervical mucus, which keeps the sperm from getting to the egg.

**How do I get it?**

• You need one shot every 3 months from a healthcare provider.

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100**

00803081

Exhibit 147

JA-0002351

**women who use this method for one year)**

• Out of 100 women who use this method, including women who don't get the shot on time, up to 6 may get pregnant.

**Some Side Effects**

• Loss of bone density

• Irregular bleeding or bleeding between periods

• Headaches

• Weight gain

• Nervousness

• Dizziness

• Abdominal discomfort

**Some Less Common Risks**

• Ectopic pregnancy

• It is rare, but some women will have blood clots.

**Does it protect me from sexually transmitted infections (STIs)?** No.

# SHORT ACTING HORMONAL METHODS

**Prevent pregnancy by interfering with ovulation and possibly fertilization of the egg. If you want to get pregnant, you can stop using them at any time.**

**Combination Oral Contraceptives**
**"The Pill"**



**What is it?**

A pill that has two hormones (estrogen and a progestin) to stop the ovaries from releasing eggs

It also thickens the cervical mucus, which keeps sperm from getting to the egg.

**How do I use it?**

• You should swallow the pill at the same time every day, whether or not you have sex.

• If you miss one or more pills, or start a pill pack too late, you may need to use another method of birth control, like a condom and spermicide

00803082

Exhibit 147                                                                                          JA-0002352

### How do I get it?

• You need a prescription from a healthcare provider.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

• Out of 100 women who use this method, about 9 may get pregnant.

### Some Side Effects

• Spotting or bleeding between periods
• Nausea
• Breast tenderness
• Headache

### Less Common Serious Side Effects

• It is not common, but some women who take the pill develop high blood pressure.
• It is rare, but some women will have blood clots, heart attacks, or strokes.

### Does it protect me from sexually transmitted infections (STIs)? No.

---

### Oral Contraceptives (Progestin-only)

### "The Mini Pill"



### What is it?

A pill that has only one hormone, a progestin.

It thickens the cervical mucus, which keeps sperm from getting to the egg.

Less often, it stops the ovaries from releasing eggs.

### How do I use it?

• You should swallow the pill at the same time every day, whether or not you have sex.
• You may need to use another method of birth control, like a condom and spermicide if:
• you are several hours late taking your pill
• you miss one or more pills
• you start a pack too late

### How do I get it?

• You need a prescription from a healthcare provider.

00803083

Exhibit 147

JA-0002353

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year**

- Out of 100 women who use this method, about 9 may get pregnant.

**Some Side Effects**

- Irregular bleeding
- Nausea
- Breast tenderness
- Headache

**Some Less Common Risks**

- It is not common, but some women who take the pill develop high blood pressure.

**Does it protect me from sexually transmitted infections (STIs)?** No.

---

**Patch**



**What is it?**

This is a skin patch you can wear on the lower abdomen, buttocks, upper arm or upper back.

It has two hormones (estrogen and progestin) that stop the ovaries from releasing eggs.

- It also thickens the cervical mucus, which keeps sperm from getting to the egg.

**How do I use it?**

- You put on a new patch and take off the old patch once a week for 3 weeks (21 total days).
- Don't put on a patch during the fourth week. Your menstrual period should start during this patch-free week.
- If the patch comes loose or falls off, you may need to use another method of birth control, like a condom and spermicide.

**How do I get it?**

- You need a prescription from a healthcare provider.

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

- Out of 100 women who use this method, about 9 may get pregnant.

**Some Side Effects**

00803084

Exhibit 147

JA-0002354

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 383 of 677

- Spotting or bleeding between periods
- Nausea, stomach pain
- Breast tenderness
- Headache
- Skin irritation

### Some Risks

- It will expose you to higher levels of estrogen compared to most combined oral contraceptives.
- There may be an increased risk of blood clots among women who use the patch as compared to women who use certain combined oral contraceptives.

**Does it protect me from sexually transmitted infections (STIs)?** No.

### Vaginal Contraceptive Ring



### What is it?

It is a flexible ring that is about 2 inches around.

It releases two hormones (progestin and estrogen) to stop the ovaries from releasing eggs.

- It also thickens the cervical mucus, which keeps sperm from getting to the egg.

### How do I use it?

- You put the ring into your vagina.
- Keep the ring in your vagina for 3 weeks and then take it out for 1 week. Your menstrual period should start during this ring-free week.
- If the ring falls out and stays out for more than 3 hours, replace it but use another method of birth control, like a condom and spermicide, until the ring has been in place for 7 days in a row.

### How do I get it?

- You need a prescription from a healthcare provider.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, about 9 may get pregnant.

### Some Side Effects and Risks

- Vaginal discharge, discomfort in the vagina, and mild irritation.
- Headache

00803085

Exhibit 147

JA-0002355

- Mood changes
- Nausea
- Breast tenderness

**Some Less Common Risks**

- It is not common, but some women who take the pill develop high blood pressure.
- It is rare, but some women will have blood clots, heart attacks, or strokes.

**Does it protect me from sexually transmitted infections (STIs)?** No.

# BARRIER METHODS:

**Block sperm from reaching the egg.**

**Diaphragm with Spermicide**
**Spermicides containing N9 (nonoxynol-9) can irritate the vagina and rectum. It may increase the risk of getting HIV (the virus that causes AIDS) from an infected partner.**



**What is it?**

A dome-shaped flexible disk with a flexible rim.

Made from silicone.

It covers the cervix.

**How do I use it?**

- You need to put a spermicidal jelly, cream or foam on the inside of the diaphragm before putting it into the vagina.
- You must put the diaphragm into the vagina before having sex.
- You must leave the diaphragm in place at least 6 hours after having sex.
- It can be left in place for up to 24 hours. You need to use additional spermicide every time you have sex.

**How do I get it?**

- You need a prescription.
- A healthcare provider will need to do an exam to find the right size diaphragm for you.
- You should have the diaphragm checked after childbirth or if you lose more than 15 pounds because you might need a different size.

**Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)**

- Out of 100 women who use this method, about 12 may get pregnant.

00803086

Exhibit 147

JA-0002356

## Some Side Effects

- Irritation
- Allergic reactions
- Urinary tract infection

## Some Less Common Risks

- If you keep it in place longer than 24 hours, there is a risk of toxic shock syndrome. Toxic shock syndrome is a rare but serious infection.

**Does it protect me from sexually transmitted infections (STIs)?** No.

---

### Sponge with Spermicide

**Spermicides containing N9 (nonoxynol-9) can irritate the vagina and rectum. It may increase the risk of getting HIV (the virus that causes AIDS) from an infected partner.**



### What is it?

A disk-shaped polyurethane sponge-like device with the spermicide N9 (nonoxynol-9) in it.

### How do I use it?

- Put it into the vagina before you have sex.
- Protects for up to 24 hours.
- You do not need to use more spermicide each time you have sex.
- You must leave the sponge in place for at least 6 hours after last having sex.
- You must take the sponge out within 30 hours after you put it in. Throw it away after you use it.

## How do I get it?

- You do not need a prescription.
- You can buy it over-the-counter.

## Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, 12 may get pregnant.
- It may not work as well for women who have given birth. Childbirth stretches the vagina and cervix and the sponge may not fit as well. Out of 100 women who use this method who gave birth, 24 may get pregnant.

## Some Side Effects

- Irritation

00803087

Exhibit 147

JA-0002357

## Some Less Common Risks

- If you keep it in place longer than 24-30 hours, there is a risk of toxic shock syndrome. Toxic shock syndrome is a rare but serious infection.

**Does it protect me from sexually transmitted infections (STIs)?** No.

**Cervical Cap with Spermicide**
**Spermicides containing N9 (nonoxynol-9) can irritate the vagina and rectum. It may increase the risk of getting HIV (the virus that causes AIDS) from an infected partner.**



### What is it?

A soft latex or silicone cup with a round rim, which fits snugly around the cervix.

### How do I use it?

- You need to put spermicide inside the cap before you use it.
- You must put the cap in the vagina before you have sex.
- You must leave the cap in place for at least 6 hours after having sex.
- You may leave the cap in for up to 48 hours.
- You do NOT need to use more spermicide each time you have sex.

### How do I get it?

- First, a healthcare provider needs to determine the correct cervical cap size for you. Then you need a prescription for the device.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, about 17 to 23 may get pregnant.
- It may not work as well for women who have given birth. Childbirth stretches the vagina and cervix and the cap may not fit as well.

### Some Side Effects and Risks

- Irritation
- Allergic reactions
- Aabnormal Pap test

00803088

Exhibit 147

JA-0002358

### Some Less Common Risks

- If you keep it in place longer than 48 hours, there is a risk of toxic shock syndrome. Toxic shock syndrome is a rare but serious infection.

### Does it protect me from sexually transmitted infections (STIs)? No.

---

### Male Condom



**What is it?**

A thin film sheath placed over the erect penis.

**How do I use it?**

- Put it on the erect penis right before sex.
- Pull out before the penis softens.
- Hold the condom against the base of the penis before pulling out.
- Use it only once and then throw it away.

### How do I get it?

- You do not need a prescription.
- You can buy it over-the-counter or online.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women whose partners' use this method, 18 may get pregnant.
- The most important thing is that you use a condom every time you have sex.
- It can be used with other barrier methods to decrease your chances of becoming pregnant.

### Some Risks

- Irritation
- Allergic reactions (If you are allergic to latex, you can try condoms made of polyurethane).

### Does it protect me from sexually transmitted infections (STIs)?

- Yes. Consistent and correct use of the male latex condom reduces the risk of STIs. The condom cannot provide absolute protection against STIs.

---

00803089

Exhibit 147

JA-0002359

## Female Condom



### What is it?

A thin, lubricated pouch that is put into the vagina. It consists of a nitrile (non-latex) sheath, a flexible larger outer ring, and a polyurethane inner ring to place in the vagina. Nitrile is also commonly used to make surgical gloves.

### How do I use it?

- Put the female condom into the vagina before sex.
- Follow the directions on the package to be sure the penis stays within the condom during sex and does not move outside the condom.
- Use it only once and then throw it away.

### How do I get it?

- You do not need a prescription.
- You can buy it over-the-counter or online.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, about 21 may get pregnant.
- The most important thing is that you use a condom every time you have sex.

### Some Risks

- Discomfort or pain during insertion or sex.
- Burning sensation, rash or itching.

### Does it protect me from sexually transmitted infections (STIs)?

- Yes. When used in the vagina, the female condom reduces the risks of STIs. The condom cannot provide absolute protection against STIs.

### Spermicide Alone
**Spermicides containing N9 (nonoxynol-9) can irritate the vagina and rectum. It may increase the risk of getting HIV (the virus that causes AIDS) from an infected partner.**

### What is it?

- A foam, cream, jelly, film, or tablet that you put into the vagina.

### How do I use it?

00803090

Exhibit 147

JA-0002360



You need to put spermicide into the vagina 5 to 90 minutes before you have sex.

You usually need to leave it in place at least 6 to 8 hours after sex; do not douche or rinse the vagina for at least 6 hours after sex.

Instructions can be different for each type of spermicide. Read the label carefully before you use a spermicide.

For better pregnancy protection, a spermicide may be used with a condom, diaphragm or cervical cap.

### How do I get it?

- You do not need a prescription.
- You can buy it over-the-counter.

### Chance of getting pregnant with typical use (Number of pregnancies expected per 100 women who use this method for one year)

- Out of 100 women who use this method, about 28 may get pregnant.
- Different studies show different rates of effectiveness.

### Some Risks

- Irritation
- Allergic reactions
- Urinary tract infection
- If you are also using a medicine for a vaginal yeast infection, the spermicide might not work as well.

**Does it protect me from sexually transmitted infections (STIs)?** No.

## Other Contraception

**Emergency Contraception (EC): May be used if you did not use birth control or if your regular birth control fails (such as a condom breaks). It should not be used as a regular form of birth control.**

**Levonorgestrel 1.5 MG (1 pill) or Levonorgestrel .75 MG (2 pills)**

### What is it?

- These are pills with a progestin hormone.
- They help prevent pregnancy after a birth control failure or unprotected sex.

00803091

Exhibit 147

JA-0002361



### How does it work?

It works mainly by stopping the release of an egg from the ovary. It may also work by preventing fertilization of an egg (the uniting of sperm with the egg) or by preventing attachment (implantation) to the womb (uterus).

For the best chance for it to work, you should start taking the pill as soon as possible within 72 hours after unprotected sex or birth control failure.

### How do I get it?

- 1-pill version: You can buy it over-the-counter. You do not need a prescription.
- 2-pill version: You can buy it over-the-counter if you are 17 or older. If you are younger than 17, you will need a prescription.
- Both the 1-pill and 2-pill options are equally safe and effective.

### Chance of getting pregnant

- One large study showed 7 out of every 8 women who would have gotten pregnant did not become pregnant after taking emergency contraception; other studies have resulted in lower pregnancy prevention rates.

### Some Side Effects

- Menstrual changes
- Headache, nausea, vomiting, dizzines
- Lower stomach (abdominal) pain
- Breast pain
- Tiredness

**Does it protect me from sexually transmitted infections (STIs)?** No.

---

### Ulipristal Acetate



### What is it?

A pill that blocks the hormone progesterone.

It helps prevent pregnancy after a birth control failure or unprotected sex.

https://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm   11/28/2018

00803092

Exhibit 147

JA-0002362

- It works mainly by stopping or delaying the ovaries from releasing an egg. It may also work by changing the lining of the womb (uterus) that may affect attachment (implantation).

## How do I use it?

- For the best chance for it to work, you should take the pill as soon as possible within 120 hours after unprotected sex.

## How do I get it?

- You need a prescription from a healthcare provider.

## Chance of getting pregnant

- In two large studies, 60 to 66% of expected pregnancies were prevented with correct use of ulipristal acetate.

## Most Common Side Effects

- Headache
- Nausea
- Abdominal pain
- Menstrual pain
- Tiredness
- Dizziness

## Does it protect me from sexually transmitted infections (STIs)? No.


This page should not be used in place of talking to your healthcare provider and reading the label for your product. This page is not intended to guide clinical practice. The product and risk information may change. See the product label and talk with your healthcare provider for more information on the risks of a specific product or on the chance of getting pregnant while using a method.

**More in Free Publications
(/ForConsumers/ByAudience/ForWomen/FreePublications/default.htm)**

**English Publications (/ForConsumers/ByAudience/ForWomen/FreePublications/ucm116718.htm)**

**Spanish Publications (/ForConsumers/ByAudience/ForWomen/FreePublications/ucm116729.htm)**

**Publications in Other Languages
(/ForConsumers/ByAudience/ForWomen/FreePublications/ucm116738.htm)**

00803093

Exhibit 147

JA-0002363

**IN THIS SECTION**   ⌄

←

# Is It Really 'FDA Approved?'



*"FDA approved!"*

Maybe you saw those words on a company's website, or in a commercial promoting a new product or treatment. Some marketers may say their products are "FDA approved," but how can you know for sure what the U.S. Food and Drug Administration approves?

FDA is responsible for protecting public health by regulating human drugs and biologics, animal drugs, medical devices, tobacco products, food (including animal food), cosmetics, and electronic products that emit radiation.

But not all those products undergo premarket approval — that is, a review of safety and effectiveness by FDA experts and agency approval before a product can be marketed. In some cases, FDA's enforcement efforts focus on products after they are already for sale. That is determined by Congress in establishing FDA's authorities (/about-fda/fda-basics/what-does-fda-regulate). Even when FDA approval is not required before a product is sold, the agency has regulatory authority (http://www.fda.gov/NewsEvents/ProductsApprovals/default.htm) to act when safety issues arise.

Here is a guide to how FDA regulates products — and what the agency does (and doesn't) approve.

## FDA doesn't approve companies.

FDA does not "approve" health care facilities, laboratories, or manufacturers. FDA does have authority to inspect regulated facilities to verify that they comply with applicable good manufacturing practice regulations.

Exhibit 148                                                                                      JA-0002364

Owners and operators of domestic or foreign food, drug, and most device facilities must register their facilities with FDA, unless an exemption applies. Blood and tissue facilities also must register with the agency.

Mammography facilities must be FDA certified and must display their FDA certificates where patients can see them. The certificate indicates that the facilities have met stringent standards for providing quality mammography (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMQSA/mqsa.cfm).

### FDA approves new drugs and biologics.

New drugs and certain biologics must be proven safe and effective to FDA's satisfaction before companies can market them in interstate commerce. Some examples of biologics that require approval are therapeutic proteins, vaccines, cellular therapies, and blood and blood products. Manufacturers must also prove they are able to make the drug product according to federal quality standards.

FDA does not develop or test products before approving them. Instead, FDA experts review the results of laboratory, animal, and human clinical testing done by manufacturers. If FDA grants an approval, it means the agency has determined that the benefits of the product outweigh the known risks for the intended use.

See the directory of approved and unapproved finished drugs on the market (/drugs/drug-approvals-and-databases/national-drug-code-directory).

### FDA doesn't approve compounded drugs.

Compounding is generally a practice in which a pharmacist or a doctor combines ingredients to create medications that meet the needs of individual patients, including those who are allergic to ingredients in FDA-approved medicines or who cannot swallow an FDA-approved pill. But consumers need to be aware that compounded drugs are not FDA approved. This means that FDA does not review applications for compounded drugs to evaluate their safety, effectiveness, or quality.

### FDA uses a risk-based, tiered approach for regulating medical devices.

FDA classifies devices according to risk. The highest-risk devices (Class III), such as mechanical heart valves and implantable infusion pumps, generally require FDA approval of a premarket approval application before marketing. To receive FDA approval for these devices, manufacturers must demonstrate with sufficient, valid scientific evidence that there is a reasonable assurance that the devices are safe and effective for their intended uses.

Generally, FDA "clears" moderate-risk medical devices (Class II) (for example dialysis equipment and many types of catheters) for marketing once it has been demonstrated that the device is substantially equivalent to a legally marketed predicate device that does not require premarket approval.

Devices that present a low risk of harm to the user (Class I) (for example non-powered breast pumps, elastic bandages, tongue depressors, and exam gloves) are subject to general controls only, and most are exempt from premarket notification requirements.

### FDA uses a risk-based approach for human cells and tissues.

All human cells and tissues intended for use in humans — collectively referred to as human cells, tissues, and cellular and tissue based products — are regulated to prevent the transmission of infectious disease. Those that pose an additional risk also require FDA approval before marketing. Examples of cells and tissues include bone, skin, corneas, ligaments, tendons, dura mater, heart valves, and reproductive tissue.

### FDA doesn't approve tobacco products.

There's no such thing as a safe tobacco product, so FDA's safe and effective standard for evaluating medical products is not appropriate for tobacco products. Instead, FDA regulates tobacco products based on a public health standard that considers the product's risks to the population as a whole.

To legally sell or distribute a new tobacco product in the United States, manufacturers must receive a written order from FDA. There are three pathways available to bring a tobacco product to market: premarket tobacco applications (/premarket-tobacco-applications), substantial equivalence applications (http://www.fda.gov/TobaccoProducts/Labeling/TobaccoProductReviewEvaluation/SubstantialEquivalence/default.htm), or exemption from substantial equivalence (http://www.fda.gov/TobaccoProducts/Labeling/TobaccoProductReviewEvaluation/ExemptionfromSubstantialEquivalence/default.htm).

Exhibit 148                                                                                                                              JA-0002365

A marketing order does not indicate that the tobacco product is either safe or "approved." It means that the manufacturer has complied with the requirements under the law to bring its product to market.

## FDA approves food additives in food for people.

Although FDA does not have premarket approval of food products, it has the authority to approve certain ingredients before they are used in foods. Those include food additives, such as substances added intentionally to food, and color additives.

Companies that want to add new food additives to food are responsible for providing FDA with information demonstrating that the additives are safe. FDA experts review the results of appropriate tests done by companies to ensure that the food additive is safe for its intended use. An approved food additive must be used in compliance with its approved uses, specifications, and restrictions.

Some food additives are food contact substances that could migrate into food, such as coatings, plastics, paper and adhesives, as well as colorants, antimicrobials, and antioxidants found in packaging. They undergo a different review process. The same safety standards still apply, but the food contact notification process is specific to the identified manufacturer or supplier. If at the end of the review period FDA does not object, the food contact notification becomes effective and the food contact substance may be legally marketed.

Certain food ingredients, such as those that are considered "generally recognized as safe" (GRAS) by scientific experts, do not require premarket approval as a food additive. FDA has a voluntary notification process under which a manufacturer may submit a conclusion that the use of an ingredient is GRAS.

## FDA approves color additives used in FDA-regulated products.

This includes those used in food (including animal food), dietary supplements, drugs, cosmetics, and some medical devices. These color additives (except coal-tar hair dyes) are subject by law to approval by the agency, and each must be used only in compliance with its approved uses, specifications, and restrictions.

In the approval process, FDA evaluates safety data to ensure that a color additive is safe for its intended purposes.

## FDA approves animal drugs and approves food additives for use in food for animals.

FDA is responsible for approving drugs for animals, including pets, livestock, and poultry. (Minor animal species include animals other than cattle, swine, chickens, turkeys, horses, dogs, and cats.)

Although FDA does not approve animal foods, including pet food, for marketing, it does approve food additives used in these products. FDA works to help ensure that food for animals (which includes livestock and poultry food, pet food and pet treats) is safe, made under sanitary conditions, and properly labeled.

The Preventive Controls for Animal Food rule, a new regulation mandated by the FDA Food Safety Modernization Act (FSMA), requires food companies to take steps to prevent foods from being contaminated and to use current good manufacturing practices (such as hygienic personnel practices, adequate sanitation practices, and proper equipment use) when making food for animals.

## FDA does not approve cosmetics.

Examples of cosmetics are perfumes, makeup, moisturizers, shampoos, hair dyes, face and body cleansers, and shaving preparations. Cosmetic products and ingredients, and their labeling, do not require FDA approval before they go on the market. There's one exception: color additives (other than coal-tar hair dyes). Cosmetics must be safe for their intended use and properly labeled.

## FDA doesn't approve medical foods.

A medical food is used for the dietary management of a disease or health condition that requires special nutrient needs. An example of a medical food is a food for use by persons with phenylketonuria, a genetic disorder. A person with this disorder may need medical foods that are formulated to be free of the amino acid phenylalanine. A medical food is intended for use under the supervision of a physician. It doesn't include products such as meal replacements or diet shakes, or products for the management of diseases like diabetes, which can be managed through modification of the normal diet.

Medical foods do not have to undergo premarket approval by FDA. But medical food companies must comply with other requirements, such as good manufacturing practices and registration of food facilities. Medical foods do not have to include nutrition information on their labels, and any claims in their labeling must be truthful and not misleading.

## FDA doesn't approve infant formula.

Exhibit 148                                                                                                    JA-0002366

FDA does not approve infant formulas before they can be marketed. But manufacturers of infant formula are subject to FDA's regulatory oversight.

Manufacturers must ensure that infant formula complies with federal nutrient requirements. Manufacturers must register with FDA and provide the agency with a notification before marketing a new formula.

FDA conducts yearly inspections of all facilities that manufacture infant formula and collects and analyzes product samples. FDA also inspects new facilities. If FDA determines that an infant formula presents a risk to human health, the manufacturer of the formula must conduct a recall.

### FDA doesn't approve dietary supplements.

Unlike new drugs, dietary supplements are not reviewed and approved by FDA based on their safety and effectiveness. Unless an exception applies, dietary supplements that contain a new dietary ingredient (a dietary ingredient not marketed in the United States before Oct. 15, 1994) require a notification to FDA at least 75 days before marketing.

The notification must include the information that provides the manufacturer's or distributor's basis for concluding that the dietary supplement will reasonably be expected to be safe. When public health concerns arise about a dietary supplement after the product is on the market, FDA evaluates the product's safety through research and adverse event monitoring.

### FDA doesn't approve the food label, including the Nutrition Facts panel.

FDA does not approve individual food labels before food products can be marketed. But FDA regulations require nutrition information to appear on most foods, including dietary supplements. Also, any claims on food products must be truthful and not misleading, and must comply with any regulatory requirements for the type of claim.

Manufacturers must provide the serving size of the food and specified information about the nutrient content of each serving on the "Nutrition Facts" panel of the food label (or on the "Supplement Facts" panel for dietary supplements).

### FDA doesn't approve structure-function claims on dietary supplements and other foods.

Structure-function claims describe the role of a food or food component (such as a nutrient) that is intended to affect the structure or function of the human body. One example is "calcium builds strong bones."

Dietary supplement companies that make structure-function claims on labels or in labeling must submit a notification to FDA. This notification must be submitted no later than 30 days after first marketing the dietary supplement with the structure-function claim. Also, the notification must include the text of the claim, as well as other information, such as the name and address of the notifier. Structure-function claims on dietary supplements carry a disclaimer stating that the claim has not been reviewed by FDA, and that the product is not intended to diagnose, treat, cure, or prevent any disease.

FDA does not require conventional food manufacturers to notify FDA about their structure-function claims or to carry a disclaimer.

### Misuse of FDA's logo may violate federal law.

FDA's logo is for official government use only. FDA's logo should not be used to misrepresent the agency or to suggest that FDA endorses any private organization, product, or service.

These are just some of the many ways FDA is responsible for protecting the public health.

Exhibit 148          JA-0002367

# EXHIBIT P

Exhibit 149

JA-0002368

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

COMMONWEALTH OF
PENNSYLVANIA,

                  Plaintiff,

    v.

DONALD J. TRUMP *et al.*

                  Defendants.

**NO. 2:17-cv-04540-WB**

## DECLARATION OF SETH A. MENDELSOHN

I, Seth A. Mendelsohn, declare and state as follows:

1.    I am the Executive Deputy Insurance Commissioner for the Pennsylvania
Department of Insurance (the "Department"). In this capacity I oversee, *inter alia*, the Office of
Insurance Product Regulation and Administration, including the Bureau of Life, Accident and
Health Insurance.

2.    The Department is the primary regulator for all health insurance products sold in
the Commonwealth of Pennsylvania.

3.    Insurance providers are subject to a complex set of federal and state laws and
regulations, and federal and state agencies have distinct but overlapping responsibilities in
regulating these entities.

4.    For instance, the federal Employee Retirement Income Security Act of 1974, 29
U.S.C. § 1001 *et seq.* (ERISA), governs most employee health care coverage and other benefit
plans offered by private employers. ERISA preempts certain state laws relating to the regulation
of insurance.

Exhibit 149

5.      As a result of the preemption provisions of ERISA, the Department does not regulate self-funded health care coverage plans offered by private employers, which are plans established and maintained by an employer or by an employee organization for which the employer or employee organization bears the direct financial risk for the cost of claims for health care benefits.  These plans are subject to ERISA and are regulated primarily by the U.S. Department of Labor.

6.      The Department does regulate fully-insured employer group health insurance policies.  These are health plans that an employer group purchases from an insurer, for which the insurer assumes the direct financial risk for the cost of claims for health care benefits.

7.      In addition, the Department regulates health insurance policies offered in the individual market.

8.      I am familiar with the Affordable Care Act's requirement that group health plans and health insurance issuers offering group or individual health insurance coverage cover preventive health services, including FDA-approved methods of contraception, without any cost-sharing requirements (the "Contraceptive Care Mandate").

9.      The Contraceptive Care Mandate applies both to ERISA-regulated plans as well as almost all insured group and individual health insurance plans that are regulated by the Department.

10.     More than 2.5 million women in Pennsylvania could benefit from the Contraceptive Care Mandate. This total includes women who receive insurance through their employer or through a spouse or other family member's employer, along with those who purchase insurance for themselves and their families through the individual market.

2

Exhibit 149

11.     The Department estimates that the women in Pennsylvania who have benefited from the Contraceptive Care Mandate have saved over $250 million annually as a result.

12.     Many states have enacted laws requiring insurers that cover prescription drugs to provide coverage for any Food and Drug Administration-approved contraceptive. These statutes are commonly referred to as "contraceptive parity" laws.

13.     Pennsylvania, however, does not have a "contraceptive parity" statute. As a result, employers offering Department-regulated plans that opt out of the ACA's Contraceptive Care Mandate will not be subject to any requirement to provide contraceptives to their employees and beneficiaries. Thus, women in plans provided by these employers will not receive contraceptive coverage through these plans.

14.     Similarly, employers offering plans that are subject to ERISA that opt out of the Contraceptive Care Mandate will also not be subject to any requirement to provide contraception to their employees and beneficiaries.

15.     The Department anticipates that women who lose contraceptive coverage through employer plans – whether the plan of their own employer or that of another family member – may seek contraceptive coverage from other sources, including state-funded programs, or face the financial burden of paying for the full cost of contraceptives themselves.

16.     Further, insofar as the Final Rules[1] effectively expand the universe of employers that may claim a contraceptive coverage exemption, even more women may be denied access to contraceptive coverage.

---

[1] "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act", 83 Fed. Reg. 57536 et seq. (Nov. 15, 2018) and "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act", 83 Fed. Reg. 57592 et seq. (Nov. 15, 2018) (the "Final Rules").

3

Exhibit 149                                                                                                    JA-0002371

17. Moreover, because the Final Rules contemplate that individuals, covered by employer plans that provide contraceptive care, may nevertheless opt out of the ACA's Contraceptive Care Mandate, and, in so doing, effectively deny contraceptive care to all of the individual's female dependents covered by the same plan, still more women may be denied access to contraceptive coverage.

18. In any case, whether it is the employer's choice or the individual's choice or the choice of the individual as to whom a woman is a dependent, women who have access to affordable employer-based coverage but who lose contraceptive coverage as a result of the Final Rules will be unable to purchase individual coverage on the marketplace with any applicable premium tax credit and cost sharing reductions. Again, the Department anticipates that women put in this position may seek contraceptive coverage from other sources, including state-funded programs, or face the financial burden of paying for the full cost of contraceptives themselves.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

SETH A. MENDELSOHN

Dated: December 12, 2018

4

Exhibit 149

JA-0002372

# HHS.gov

U.S. Department of Health & Human Services

## Introduction: About HHS

- Mission Statement

- Organizational Structure

- Cross-Agency Collaborations

---

## Mission Statement

The mission of the U.S. Department of Health and Human Services (HHS) is to enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services.

Back to top

## Organizational Structure

HHS is the U.S. Government's principal agency for protecting the health of all Americans and providing essential human services, especially for those who are least able to help themselves. HHS accomplishes its mission through programs and initiatives that cover a wide spectrum of activities, serving and protecting Americans at every stage of life, from conception. HHS is responsible for almost a quarter of all Federal outlays and administers more grant dollars than all other Federal agencies combined.

Eleven operating divisions, including eight agencies in the U.S. Public Health Service and three human services agencies, administer HHS's programs. While HHS is a domestic agency working to protect and promote the health and well-being of the American people, the interconnectedness of our world requires that HHS engage globally to fulfill its mission. In addition, staff divisions provide leadership, direction, and policy guidance to the Department.

The organizational chart for HHS and a description of the Agencies and Offices can be found on the Department's website at http://www.hhs.gov/.

Back to top

Exhibit 150                                                                                      JA-0002373

## Cross-Agency Collaborations

Improving health and human services outcomes cannot be achieved by the Department on its own; collaborations are critical to achieve our goals and objectives.

HHS collaborates closely with other Federal departments and agencies on cross-cutting topics. For example, through the President's Management Council, the Department engages with other Federal departments to identify and adopt best practices on performance and management initiatives. Another example, focused on mission-critical efforts, is the Federal Interagency Workgroup that led the Healthy People 2020 development effort, bringing together Federal staff from the Department with partners in the U.S. Departments of Agriculture and Education.

Federal Advisory Committees enable the Department to collaborate with other Federal departments and agencies, as well as members of the public, on high-priority issues. For example, the Interdepartmental Serious Mental Illness Coordinating Committee, established by the 21st Century Cures Act of 2016 (Pub. L. 114–255), convenes senior leaders from 10 Federal agencies including HHS; the Departments of Justice, Labor, Veterans Affairs, Defense, Housing and Urban Development, and Education; and the Social Security Administration, along with 14 non-Federal public members, to improve Federal coordination of efforts to address the needs of adults with serious mental illness and youth with serious emotional disturbance.

Importantly, the Federal Government has a unique legal and political government-to-government relationship with Tribal governments and a special obligation to provide services for American Indians and Alaska Natives based on these individuals' relationship to Tribal governments. Executive Order 13175, *Consultation and Coordination with Indian Tribal Governments*, requires consultation with Indian Tribal governments when considering policies that affect Tribal communities. The Department's Tribal Consultation Policy - PDF, first developed with Tribal participation in 2004, was updated in 2010. HHS works with Tribal governments, Indian organizations, and other Tribal organizations to facilitate greater consultation and coordination between States and Tribes on health and human services issues.

HHS works closely with State, local, and U.S. territorial governments, providing funding for program operations and technical assistance. HHS also fosters critical global relationships, coordinates international engagement across HHS and the U.S. Government, and provides leadership and expertise in global health diplomacy and policy to contribute to a safer, healthier world.

In addition, HHS has strong partnerships with the private sector, academia, research institutions, and nongovernmental organizations, including religious and faith-based organizations. The Department partners with the private sector, such as regulated industries, academic institutions, trade organizations, and advocacy groups. The Department leverages resources from these organizations to enable HHS to

Exhibit 150                                                                                          JA-0002374

accomplish its mission through strategies that minimize the burden on, and increase the benefits to, the American public. This effort occurs through Tribes and faith-based and community initiatives as well as grantees in the private sector, such as academic and research institutions, and community-based nonprofit organizations, which provide many services at the local level.

The narrative and strategies listed under the Strategic Goals and Objectives in this document provide additional descriptions of how the Department collaborates with governmental and nongovernmental groups.

Back to top

Content created by Assistant Secretary for Planning and Evaluation (ASPE)

Content last reviewed on February 28, 2018

Exhibit 150                                                                                        JA-0002375

been denied regular consular access required by the Vienna Convention. They have been denied repeated requests to be able to speak with their families via telephone, and they have been denied public information on any charges they may face.

In the 4 months they have been detained, the three have been allowed only two meetings with Swiss consular officials and have been denied due process and access to legal representation.

Even more alarming, Iranian officials have recently declared the three may be charged with espionage, a charge that is not only baseless but also completely at odds with who Shane, Sarah, and Josh are as individuals.

Shane, Sarah, and Josh made a simple mistake in accidentally crossing the border, and their continued detention is unwarranted and unreasonable. Since the three were detained, I have gotten to know Shane's mother Cindy and other members of the hikers' families. During our conversations, I have learned what a remarkable person Shane is and how he is dedicated through his work to bringing the world closer together through photo journalism.

Shane grew up in Onamia, MN, a small town in the central part of our State, and he graduated from the University of California at Berkeley. Prior to being detained in Iran, Shane was living with Sarah in Damascus. He has traveled around the Middle East as a free-lance journalist, reporting from Syria, Iraq, Darfur, Yemen, and Ethiopia. His writing and award-winning photographs have been published in the United States, the United Kingdom, Canada, and throughout the Middle East.

His latest trip with Sarah and Josh brought him to the Kurdistan region of Iraq, which is known for its scenic hikes among mountainous waterfalls. This is hardly the background of someone who would deliberately enter Iran in hopes of committing espionage.

A few weeks ago, I met with Shane's mom Cindy and members of Sarah and Josh's families in my office in Washington. As a mother, I can only imagine how difficult this ordeal must be for all of them. They have had no contact with their sons or their daughter. Yet I have been overwhelmed by their resolve. They are pursuing every avenue they can find to demonstrate to the Iranian Government that their children made a simple mistake and clearly deserve to be released.

I came away from our meeting even more committed to seeing that Cindy and Shane, along with Sarah and Josh and their families, are united as soon as possible. As we all know, Iran is in the center of many pressing foreign policy challenges we currently face. I, along with my colleagues, will address those, but Shane, Sarah, and Josh have absolutely nothing to do with these international fights. They have nothing to do with what is going on in Iran or Iran's differences with other countries. This is strictly a humanitarian case. I urge Iranian officials not to politicize it or seek to use the three hikers as diplomatic pawns. There is no cause for their continued detention, and nothing will be gained by prolonging it any further. Iran's leaders should demonstrate the necessary compassion by immediately releasing Shane, Sarah, and Josh and allowing them to return home to their families. In the meantime, they should at the very least allow them to speak to their families in the United States over the telephone.

I thank my friend, the Ambassador to Switzerland, and Swiss officials for their work in this area. It has been 122 days since Shane, Sarah, and Josh were first detained; 122 days in captivity, apparently just for straying over a line on a map when they were on a hike. We will continue to work with the families, with the State Department, and Swiss officials to do everything we can to bring Shane home to Minnesota.

Thank you, Mr. President. I yield the floor.

━━━━━━━━━━

## CONCLUSION OF MORNING BUSINESS

The ACTING PRESIDENT pro tempore. Morning business is closed.

━━━━━━━━━━

## SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of H.R. 3590, which the clerk will report.

The legislative clerk read as follows:

A bill, (H.R. 3590), to amend the Internal Revenue Code of 1986 to modify the first-time home buyers credit in the case of members of the Armed Forces and certain other Federal employees, and for other purposes.

Pending:

Reid amendment No. 2786, in the nature of a substitute.

The ACTING PRESIDENT pro tempore. The majority leader.

Mr. REID. Mr. President, today is the beginning of one of the most important debates in the history of our country. Today is the beginning of one of the most historic times in the Senate. Our two chairmen, Senators BAUCUS and DODD, have spent months of their lives working on the legislation that allows us to be where we are today. We now have before us a bill that saves money, saves lives, and saves Medicare. It is a bill, if you add in Medicare recipients, that will insure 98 percent of the people in America.

Mr. President, I note the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. REID. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. REID. Mr. President, one of the major goals of the Patient Protection and Affordable Care Act is to lower Federal health care costs and reduce the deficit. Our bill does that. According to the nonpartisan Congressional Budget Office, this legislation would not add a penny to the Federal deficit. In fact, it will reduce the deficit over both the short term and the long term, over the long term by as much as $650 billion.

In developing this bill with the Finance and HELP Committees, we were determined to ensure that the legislation not only would reduce our deficit and our debt but that it would do so without relying on additional surpluses in the Social Security trust fund. This legislation would increase revenues in the trust fund as workers' wages rise. But those revenues are supposed to be for Social Security, so we didn't touch a penny of them—they are all used for Social Security and nothing else.

Likewise, about $70 billion in revenues over the first 10 years of this bill flows from premiums paid into the new long-term care insurance program known as the CLASS Act. Several Members came to me and argued that none of these funds should be used for other purposes. I agreed. After all, these premiums would be used to build up a fund that later would be used to pay benefits. So, as with Social Security, we didn't use any of the CLASS surpluses for other programs.

I think it is important that as the Senate considers changing the legislation, we maintain our commitment to protecting Social Security and CLASS surpluses. In both cases, all additional revenues are dedicated to pay benefits. Diverting them to other purposes would not be fiscally responsible, and it wouldn't be fair to Social Security or to people who paid their CLASS premiums in good faith.

To help ensure we remain true to this commitment, I now ask unanimous consent that all amendments to the pending bill be considered out of order unless they are consistent with the following two principles: The additional surplus in the Social Security trust fund generated by this act should be reserved for Social Security and not spent in this act in any other fashion; and No. 2, the net savings generated by the CLASS program should be reserved for the CLASS program and not spent in any other manner in this act.

The ACTING PRESIDENT pro tempore. Is there objection?

Mr. ENZI. Reserving the right to object, neither of these requests are the requests I was just talked to about a minute and a half ago, so I object.

The ACTING PRESIDENT pro tempore. Objection is heard.

Mr. REID. Mr. President, I think what he saw a minute and a half ago is essentially the same thing, but I will recite this again.

I ask unanimous consent that no amendment be in order to the Reid substitute amendment 2786 or a subsequent substitute amendment and H.R.

Exhibit 151                                                                    JA-0002376

3590 if the additional surplus in the Social Security trust fund generated by this act would be expended on other provisions of this act and not reserved solely for Social Security, and the net savings generated by the CLASS program in the underlying substitute amendment and any subsequent substitute amendment are reserved solely for the CLASS program provisions of this act.

The ACTING PRESIDENT pro tempore. Is there objection?

Mr. ENZI. Mr. President, in the weeks this has been sequestered without us being able to review it and not having something that is not understandable in the short period of time we have to do it here, I have to object.

The ACTING PRESIDENT pro tempore. Objection is heard.

Mr. REID. Mr. President, I am sorry my friend objected. It is not too difficult to comprehend that any Social Security surpluses should be reserved for Social Security. It is not too difficult to comprehend that all monies related to the CLASS Act would be reserved for paying benefits for that. So I am disappointed that my friends on the other side of the aisle are not interested in making sure Social Security monies are not used and/or CLASS Act monies are not used for anything other than those two programs.

Mr. President, I have another unanimous consent request.

The process for developing this legislation has been very transparent. In fact, the hearings held in the Finance Committee were done very publicly, and that is an understatement. For weeks and weeks, members of that committee couldn't walk out of the room without being questioned by the press. The press was present at most of their meetings. So both the HELP and Finance Committees marked up their legislation in public markups. Republican and Democratic members of both committees offered numerous amendments, all of which were available to the public. Republican and Democratic members voted for or against those amendments in a public and transparent way, and each committee member can be held fully accountable to their constituents for all of those votes.

The merged bill before us is entirely consistent with the provisions produced in those public markups. The bill has been fully available on the Internet for about 2 weeks. So each and every American has had the opportunity, if they wanted, to read the text of the legislation and to communicate their views with their Senators.

One of the main reasons we have gone the extra mile in ensuring a fully transparent process is because of the leadership of Senator BLANCHE LINCOLN of Arkansas. From the very start of this debate, she has made clear to me that a transparent process and debate on this critical issue is a top priority of hers. To that end, Senator LINCOLN said she would not allow a vote on the

motion to proceed to this bill unless it had been available to the public for a reasonable period of time. She was joined by virtually everyone on this side of the aisle to that effect. They were right. The people did deserve a chance to see the bill before that vote, so we were sure to give them that chance. The Senator deserves credit for that, and I appreciate her standing up on that issue.

She believes—and I agree—that we can do more on the transparency front as this bill moves forward to the next stage of this process; therefore, Senator LINCOLN has asked me to propound on her behalf a unanimous consent request.

I ask unanimous consent that no amendment be in order to the Reid substitute amendment No. 2786, a subsequent substitute amendment, or H.R. 3590 unless the text or Internet link to the text of the amendment is posted on the home page of the official Senate Web site of the Member of the Senate who is sponsoring the amendment prior to the amendment being called up for consideration by the Senate and the amendment is filed at the desk. Further, that this unanimous consent agreement shall be in effect for the duration of the consideration of H.R. 3590.

The ACTING PRESIDENT pro tempore. Is there objection?

Mr. ENZI. Mr. President, in light of some of the trust problems and transparency problems we have, and while it appears to lead to greater transparency, we can also see ways that this can limit the ability for the minority to offer amendments. Therefore, I object.

The ACTING PRESIDENT pro tempore. Objection is heard.

Mr. REID. Mr. President, this is not a good way to start this debate. No. 1, there is an objection to the moneys in Social Security being protected and, No. 2, to the moneys in the CLASS Act being protected. That was also objected to.

Finally, Senator LINCOLN's request, which I support 100 percent, indicating that amendments should be filed on a Member's Web site—that doesn't sound too outlandish—and filed at the desk before they are offered, sounds pretty fair and square to me. I am disappointed this is the way the debate started.

Mr. President, there is an order before the body that there will be two amendments in order today. One will be offered by the Democrats and one will be offered by the Republicans. The one to be offered by the Democrats will be offered by the distinguished Senator from Maryland, BARBARA MIKULSKI, who I had the good fortune of serving with in the House of Representatives. She and I came here together in 1986 when we were elected to the Senate. She is a Senator I have such great respect and fondness for. We have been literally together and, because of our seniority, I am always one step behind her. Frankly, most people are a step

behind the Senator from Maryland. The amendment she is going to offer is very sound and good. She will explain it in detail. It expands women's health services. We had a consternation about mammograms a couple weeks ago, and this will put that all to rest.

I express my deep appreciation for the leadership of the Senator from Maryland on this issue and on so many other issues she is involved in.

As I have indicated, the managers of the bill on our side will be Senators BAUCUS and DODD. We look forward to a rigorous debate. With the consent of my friend from Wyoming, I ask that the Senator from Maryland be recognized.

Mr. ENZI. Mr. President, I was hoping I would have a chance to comment on the things I had to object to so I can give a more full explanation. I am happy to wait.

Mr. REID. Mr. President, there is no need to cut the Senator off. I have indicated to my staff earlier today that there is no one easier to get along with in the Senate than the Senator from Wyoming. I would never, ever cut him off intentionally. If there is anything he wishes to say, he should say it. If the Senator from Maryland will withhold for a moment, the Senator from Wyoming wishes to speak for a brief period of time.

The ACTING PRESIDENT pro tempore. The Senator from Wyoming is recognized.

Mr. ENZI. Mr. President, I cannot be brief on what just happened here. I will let the Senator go ahead. Frankly, I am a little upset about what has happened—combining a couple of unanimous consent agreements so that part of it would be acceptable and part would not be, leaving out the most important one, which is that we wouldn't take Medicare money from Medicare, and then not having much time to consider, or to rewrite, or to do anything with those. I have a lot of comments I wish to make on that, plus a general statement on the bill, which fits in with what just happened. I will defer to the Senator from Maryland.

The ACTING PRESIDENT pro tempore. The Senator from Maryland is recognized.

AMENDMENT NO. 2791 TO AMENDMENT NO. 2786

Ms. MIKULSKI. Mr. President, I have an amendment at the desk.

The ACTING PRESIDENT pro tempore. The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Maryland (Ms. MIKULSKI), for herself, Mr. HARKIN, Mrs. BOXER, and Mr. FRANKEN, proposes an amendment numbered 2791 to amendment No. 2786.

Ms. MIKULSKI. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The amendment is as follows:

Exhibit 151    JA-0002377

(Purpose: To clarify provisions relating to first dollar coverage for preventive services for women)

On page 17, strike lines 9 through 24, and insert the following: "ance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—

"(1) evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force;

"(2) immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved; and

"(3) with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration.

"(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.".

"Nothing in this subsection shall be construed to prohibit a plan or issuer from providing coverage for services in addition to those recommended by United States Preventive Services Task Force or to deny coverage for services that are not recommended by such Task Force.".

Ms. MIKULSKI. Mr. President, before I go into the contents of my amendment, I thank the Senator from Wyoming for his unfailing courtesy to allow me to proceed to offer my amendment. I have worked with the Senator from Wyoming on the Health, Education, Labor and Pensions Committee, and have often valued his sound counsel and steady hand as we have moved complex legislation. His considerable experience as an accountant and his commitment to the stewardship of Federal funds have often added to the consideration of legislation. As we move forward on both debating and refining the health care reform bill before us, I look forward to working with him. Again, I thank him for his courtesy.

I also want to acknowledge the Democratic leader and wish to support him for bringing something called the "merged" bill to the floor, which took the best elements of both the Finance Committee and the HELP Committee and brought them forth.

I believe the overriding bill before us is an excellent bill. No. 1, it expands universal access to health care that will now cover over 90 percent more Americans. It will end the punitive practices of insurance companies, particularly in the area of gender, age discrimination, and preexisting conditions. It also stabilizes and makes Medicare secure and, at the same time, it begins to bend the cost curve by following innovative practices related to quality control and prevention.

I think the overriding bill is an excellent one. I congratulate the manager of the bill on the floor, the Senator from Montana, Mr. BAUCUS, chairman of the Finance Committee, for the excellent work his committee did, for bringing in a great bill that establishes new ideas, such as medical homes, emphasizing primary care and prevention, and at the same time accomplishing the objectives I have mentioned.

However, as I reviewed the bill, I felt we could do more to be able to enhance and improve women's health care. That is what my amendment does. The essential aspect of my amendment is that it guarantees women access to lifesaving preventive services and screenings.

This amendment eliminates one of the major barriers to accessing care in the area of cost and preventive services. It does it by getting rid of, or minimizing, high copays and high deductibles that are often overwhelming hurdles for women to access screening programs. We know that screening is important and early detection is important because it saves lives. But it also saves money. It does it by reducing the top diseases that are killing women today, or certainly impairing their lives.

Today, according to the CDC, the top killers of women are cancer—breast cancer, cervical cancer, colorectal cancer, ovarian cancer. Also upfront and high on the list is lung cancer which, if identified early, can be treated with less invasive procedures and with lower costs. Another top killer of women is heart and vascular disease. And then there are the silent killers that often go undetected, such as diabetes, which can result in terrible consequences, such as the loss of an eye, the loss of a limb, or the loss of a kidney.

We now have screenings that are proven to detect these diseases early. Guaranteed access to these screenings, as I said, will save money and lives.

If we look at where women are today, we find women often forgo those critical preventive screenings because they simply cannot afford it, or their insurance company won't pay for it unless it is mandated by State law. Many women right now don't have insurance at all—seventeen million women in the United States of America are uninsured—or when they are insured, they have to pay large out-of-pocket expenses.

Three in five women have significant problems paying their medical bills. Women are more likely than men to neglect care or treatment because of cost. Fourteen percent of women report they delay or go without needed health care. Women of childbearing age incur 68 percent more out-of-pocket health care costs than men, simply because of the maternity aspect.

Women are often faced with the punitive practices of insurance companies. No. 1 is gender discrimination. Women often pay more and get less. For many insurance companies, simply being a woman is a preexisting condition. Let me repeat that. For many insurance companies, simply being a woman is a preexisting condition. We pay more because of our gender, anywhere from 2 percent to over 100 percent. A 25-year-old woman is charged up to 45 percent more than a 25-year-old male in the same identified health status. A 40-year-old woman is charged anywhere from 2 percent to 140 percent more than a 40-year-old man with the same health status for the same insurance policy.

What does my amendment do? It guarantees access to those critical preventive services for women to combat their No. 1 killers. We will provide these services at minimal cost.

The overall cost of my amendment has been scored by CBO. It says the cost is $1 billion. The majority leader, the Democratic leader, has provided opportunities to meet this cost. This amendment eliminates this big barrier of copayments and deductibles.

Let's talk about the benefit package. This benefit package is based on HRSA recommendations. It is based also on the recommendations of CDC. If this amendment passes, women will have access to the same preventive health services as the women in Congress have. If this passes, again, the women of America will have access to the same preventive services that we women in Congress have.

What does that mean? It means a mammogram, if your doctor says you need it; screening for cervical cancer, if your doctor says you need it; that check on diabetes, if your doctor is worried about you; and along with the symptoms related to menopause, there are other things, such as a loss of weight; and they may want to know at this juncture if you have diabetes. If you know that at 40, you are less likely to need kidney dialysis when you are 60.

The pending bill doesn't cover key preventive services, such as annual screenings for women of all ages to focus on our unique health needs. We know that for many people—for example, there are 15 million people in America with diabetes, and half are women. Often pregnant women with diabetes don't get the proper prenatal care. Heart disease is one of the top two leading causes of death in women—cancer and heart disease. Every year, over 267,000 women die from heart attacks. Women are generally unaware of their heart risks.

My amendment would, again, ensure heart disease screening for women. Remember that famous study that said "take an aspirin a day to keep a heart attack away." It was done on 10,000 male medical residents, and not one woman was included. Thanks to a bipartisan effort, Bernadine Healy, NIH, and the women of the Senate, supported by the good guys of the Senate, were able to get that screening for women, get that evaluation. We know we manifest things differently than guys do. Now we are on our way to detection—if you can afford to have a doctor and if you can afford to have the screening.

My amendment also guarantees screenings for breast cancer—yes, for

Exhibit 151

mammograms. We don't mandate that you have a mammogram at age 40. What we say is discuss this with your doctor. But if your doctor says you need one, you are going to get one.

Studies have found mammogram screening decreases breast cancer among women by over 40 percent. Regular Pap smears reduce cervical cancer by 40 percent. This year, over 4,000 women will die of cervical cancer.

My amendment does focus on women's health needs. Keeping a woman healthy not only impacts her own life but that of her family. It impacts her ability to care for her child or an aging parent.

Early detection saves money by treating diseases early. Screening tests for breast and cervical cancer cost about $150, but the treating of advanced breast cancer is over $10,000 and can even go much higher. The treating of early stages of cervical cancer is $13,000 and can go much higher.

My amendment also leaves the decision of which preventive services a patient will use between the doctor and the patient. The health reform debate is focused on what you should have when. We agree. Decisions should be made in doctors' offices, not in the office of a Member of Congress or the office of an insurance executive. The decision about what is medically appropriate and medically necessary is between a woman and her doctor.

The authors of the bill have done a very good job in protecting women in many areas. This actually refines and improves this particular issue. That is why I support the overall health reform bill providing universal access to health care for over 90 percent of the American people, ending those punitive practices of the insurance companies, stabilizing and strengthening Medicare, and improving quality in public health by using innovation and preventive services and quality. We can pass a health reform bill.

I conclude by saying that we will end the confusion about what is needed in the area of preventive health services for women when our coverage is often skimpy and spartan. We want to make sure what we do enables us to have access to these comprehensive services.

I hope this amendment is adopted unanimously. I believe good people on both sides of the aisle believe in its underlying premise: that early detection and screening save lives and save money.

Often those things unique to women have not been included in health care reform. Today we guarantee it and we assure it and we make it affordable by dealing with copayments and deductibles in a way CBO believes is fiscally achievable. In the long run, I think by doing this it will mean a lot to families, and it will mean a lot to the Federal budget.

Mr. President, I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Montana.

Mr. BAUCUS. Mr. President, before I give a statement on the bill, I wish to compliment the Senator from Maryland for standing up for and essentially helping the health care of women. As she has pointed out, women are discriminated against today in America in various ways. Her amendment addresses some of that discrimination. I very much appreciate that. I know all women in the country do. I do, too. I have a mom. I have sisters. I have women in my family, and I very much care.

I don't know if she made this point, but about 80 percent of health care decisions made for families are made by women. It is all the more important women are not discriminated against, partly because they make so many decisions that affect health care for Americans, but second, women themselves are often discriminated against. Some States have gender ratings which discriminate against women. In other States a preexisting condition is a factor that discriminates against women.

I thank the Senator from Maryland. She has hit the nail on the head. It is another reason this health care reform is going to mean so much for so many Americans. I personally very much thank the Senator from Maryland.

In the Presidential campaign of 1912, Theodore Roosevelt's platform said:

We pledge ourselves to work unceasingly in State and Nation for . . . the protection of home life against the hazards of sickness . . . through the adoption of a system of social insurance adapted to American use.

Today, nearly a century later, we are closer than ever to enacting meaningful health care reform.

As in Teddy Roosevelt's time, we seek protection against the hazards of sickness. Of necessity we seek a system uniquely adapted to American use. And recognizing the daunting task still ahead of us, we pledge ourselves to work unceasingly to get the job done.

In the years since Teddy Roosevelt, some of our Nation's greatest leaders signed up for this job. But at the same time, we have never faced a greater need to get the job done than we do today.

Why is that? Basically because health care costs are skyrocketing out of control. Every day American businesses are forced to cut benefits for their workers. Why? To remain competitive in the global marketplace. Every 30 seconds another American files for medical bankruptcy. Just think of that. Every 30 seconds another American files for medical bankruptcy. Every year, about 1.5 million families lose their homes because of health care costs. Our system is in crisis.

We have a historic need and we have a historic opportunity. We have an opportunity to enact groundbreaking reform that will finally rein in the growth of health care costs and help bring financial stability back to American families and businesses.

Unfortunately, there are some who stand in the way. Unfortunately, there are some who are spreading misinformation about how health care reform will work. On this very floor I have heard arguments that health care reform is about the government trying to take over health care. That is false.

The truth is, health care reform is about allowing patients and doctors to take back control of health care. We need to allow patients and their doctors together to take back control from the big insurance companies.

Our plan would not increase the government's commitment to health care. But don't just take my word for it. The nonpartisan Congressional Budget Office says:

[D]uring the decade following the 10-year budget window, the increases and decreases in the federal budgetary commitment to health care stemming from this legislation would roughly balance out, so that there would be no significant change in that commitment.

That is right, health care reform will not increase the Federal Government's budgetary commitment to health care.

I have also heard it argued that health care reform will increase the budget deficit. That, too, is false—plainly, patently false.

The bipartisan Congressional Budget Office says our plan would reduce the Federal deficit by $130 billion within the first 10 years—reduce the deficit in the first 10 years. That trend would continue, the CBO says, over the next decade. During the next decade, CBO says our bill would reduce the deficit roughly $450 billion. That is nearly one-half trillion dollars in deficit reduction, according to the Congressional Budget Office, in the second 10 years.

I have also heard it argued that health care reform will raise taxes. That, too, is false. In fact, health care reform will provide billions of dollars in tax relief to help American families and small businesses afford quality health insurance—tax cuts.

The Joint Tax Committee—again bipartisan and which serves both the House and the Senate—tells us, for example, that our bill would provide $40 billion in the tax cuts in the year 2017 alone—$40 billion in tax cuts in the year 2017. The average affected taxpayer will get a tax cut of nearly $450. The average affected taxpayer with an income under $75,000 in 2017 will get a tax cut of more than $1,300.

Let me repeat that. The average affected taxpayer with income under $75,000 in 2017 will get a tax cut of more than $1,300. They will also get a tax cut in earlier years, but it ramps up to that amount in 2017.

In the same vein, I have heard claims that health care reform will result in an increase in higher costs for Americans. That, too, is false.

Health care reform will not result in higher costs for Americans. Health care reform is fundamentally about lowering health care costs and making quality health care affordable for all Americans. Lowering costs is what health care reform is designed to do, lowering costs; and it will achieve this objective. How? In many ways.

Exhibit 151 JA-0002379

First, health care reform will end abusive practices by insurance companies. Reform will stop insurance companies from denying coverage or hiking up rates for those with a preexisting condition. We stop that in this legislation. That will lower costs. Reform will stop insurance companies from dropping coverage or reducing benefits for those who get sick.

Those reforms protect consumers, and they will protect Americans and reduce premium costs for Americans who are sick. These reforms will also help lower costs for small businesses and their employees. Right now, if one employee in a small business gets sick—just one—insurance companies can double the premiums they charge the whole business. I know that is true. I have heard this time and time again from small business owners in Montana. That is just because one employee gets sick, the insurance companies jack up premiums, double the premiums they otherwise would charge the whole business. That is just wrong. We stop that in this legislation.

How else do we lower costs in this bill? Health care reform will provide billions of dollars in tax credits and reform will limit out-of-pocket costs such as copayments that insurance companies are able to charge. We limit them. This will also help to ensure Americans can afford their total health care costs and not just their premiums.

That is very important. Premiums and out-of-pocket costs are both addressed by this bill. It limits growth in premiums and also limits growth in out-of-pocket costs. So total cost—premiums plus out-of-pocket costs—for Americans will be lower under this legislation than otherwise would be.

Third, health care reform will work to repeal the hidden tax of more than $1,000 in increased premiums that American families pay each year in order to cover the cost of caring for the uninsured.

Today, millions of Americans without health insurance are too often forced to turn to emergency rooms to get the care they need, and then health care providers shift the cost of that care to other Americans with health insurance. People with insurance, therefore, pay higher premiums. By providing quality, affordable health insurance to millions more Americans, health care reform will reduce this hidden tax and reduce premiums for all Americans—$1,000 per year per family due to uncompensated care. That is that hidden tax. This bill will virtually stop that hidden tax, stop that additional $1,000 that goes to average family premiums.

How else do we reduce health care costs? By providing affordable health care to more Americans which will increase the number of Americans in the insurance market. Why? What is so good about that?

One reason is more people will have health insurance. But also it will spread the risk of paying for an accident or disease more broadly. Spreading the risk more broadly should lower premium rates for everybody. It is a basic tenet of insurance.

Fifth, health care reform will reduce costs by cutting administrative red-tape. That is no small item. Today, insurance companies spend a lot of time and money finding ways to discriminate against people. They spend time and money to find ways to drop coverage, and insurance companies pass those administrative costs on to all Americans in the form of higher premiums. The figure I heard is about 18 percent of American health care dollars is administrative costs. This legislation would dramatically reduce that percentage to a much lower number. We don't know to exactly what level yet but a much lower level. About 18 percent of total health care dollars go to pay administrative costs. That is not the case in other countries. They pay 4 to 5 percent in other countries. We have to get that down in America, and health care reform will significantly achieve that result.

Health care reform will outlaw this discrimination, and also reform will eliminate those administrative costs that go along with it. Furthermore, health care costs will work to streamline administrative procedures across the board by requiring standard enrollment forms and marketing material through insurance exchanges. That, too, will help streamline procedures. That, too, will help reduce administrative costs for providing for standard enrollment forms and also standard marketing materials through insurance exchanges. That is going to lower administrative costs and make it much easier for a person to shop and know which policy is best for him or her. With the other reforms we are making competition is more on the basis of price not just underwriting, a fancy term for denying because of a preexisting condition and putting in all those extra escape clauses insurance companies often provide in small print. In a letter released today, the Congressional Budget Office said:

Compared with plans that would be available in the nongroup market—

And they are referring there to the individual market—

under current law, nongroup policies under the proposal would have lower administrative costs.

Let me say that again. Compared with plans that would be available in individual markets—individuals seeking insurance—under current law, individual policies under the proposal would have lower administrative costs.

Lower, not higher. Lower.

Six—another way to reduce costs. Health care reform creates insurance exchanges where consumers can easily shop and compare plans to find the right coverage. Exchanges will make it easier for Americans to choose the most efficient plans, and that will reduce their costs and put pressure on insurance companies to offer lower cost, higher quality plans.

Seven—still another way this bill reduces costs. Small business insurance exchanges will allow small companies to pool together to spread their risk and increase their buying power. More pooling available for small business insurance exchanges—this will allow small businesses to negotiate lower rates and provide more quality insurance plans with lower premiums to their employees.

Eight. Health care reform will strengthen oversight and enforcement measures to cut down on fraud, waste, and abuse in the health care system. Fraud, waste, and abuse are estimated to cost our health care system more than $60 billion every year. This bill will help reform our system to reduce fraud, waste, and abuse, which eats up way too many health care dollars.

Nine. Health care reform will move the focus of our system toward efficiency and value with payment incentives that reward quality care—not quantity and volume but reward quality care, reward outcomes. Over the long run, paying doctors and other health care providers for quality instead of quantity will reduce health care costs.

Ten. Health care reform will lower costs by working to change the focus of our health care system from treating sickness to promoting wellness. The big problem we have today is that we treat sickness. We don't spend enough time promoting wellness. Reform will make critical investments in policies that promote healthy living and help prevent costly chronic conditions that drive up costs throughout the system.

These are just 10 examples of how health care reform will reduce health care costs and lower premiums for American consumers. There are many more, but these are those 10, as I said. On the other hand, without reform; that is, without passing this legislation, costs are guaranteed to continue to skyrocket out of control.

Since Congress failed to enact health care reform in the 1990s, health care premiums have risen eight times faster than wages. Consider that. Since the last time we attempted to pass health care reform—and failed—in the 1990s, health care premiums have risen eight times faster than wages. And if we don't reform our health care system now, premiums will increase 84 percent in the next 7 years. And that is just premiums. What about out-of-pocket costs? Those, too, will increase at a rate much faster than wage increases.

Today, health care coverage costs the average American family more than $13,000 a year, according to the Kaiser Family Foundation. If current trends continue without reform, the average family plan will cost more than $30,000 a year in the next 10 years. That is up from $13,000 today to $30,000 10 years from now. And businesses could see their health care costs double in that same time. Without reform, our Nation's long-term fiscal picture is almost certainly unsustainable.

Exhibit 151                                                                                                    JA-0002380

As Peter Orszag said when he was Director of the Congressional Budget Office:

Rising health care costs represent the single most important factor influencing the Federal Government's long-term fiscal balance.

He was right. Without reform, instead of working to reduce our national deficit and stabilize the Federal budget, we will see total health care spending nearly double to encompass one-fifth of our gross domestic product in less than 10 years. And the Congressional Budget Office projects entitlement spending will double by the year 2050.

Without reform, millions of uninsured Americans will continue to suffer. A Harvard study found that every year in America, lack of health care coverage leads to about 45,000 deaths. People without health insurance have a 40-percent higher risk of death than those with private health insurance. You have a 40-percent higher chance of death if you don't have health insurance compared with those who do. That is 46 million Americans at risk today because they do not have health insurance. A recent Johns Hopkins study found that children without insurance have a 60-percent higher risk of death than those with private health insurance—a 60-percent higher risk of death than those with private health insurance.

Another recent Harvard study found that the risk of dying from car accidents and other traumatic injuries is 80 percent higher for those without insurance—80 percent higher. The risk of dying from car accidents and other traumatic injuries is 80 percent higher if you don't have health insurance. In the greatest country on Earth, no American should die simply because they do not have health insurance.

So, Mr. President, we are at a crossroads in history. We have a historic opportunity to enact meaningful health care reform that will work to stabilize our economy and provide quality, affordable health care coverage for millions of Americans. We are not the first to be here, but we have come further than ever before.

We laid the groundwork in the Finance Committee and the HELP Committee. We held many hearings and countless hours of meetings on health care reform. Each committee crafted meaningful legislation and held exhaustive markups where we incorporated amendments from both sides of the aisle. We produced balanced, meaningful legislation, and I am proud—I am very proud—of the work both committees accomplished. Now we have one health care plan before us in the Senate, two basic bills merged together. We have an opportunity to debate that plan and offer amendments to make it even better. Then we will be called upon to vote.

The health care of our Nation is depending on us. The health care of our economy is depending on us. History

itself is depending on us to answer the call. I am confident we will. I am confident we will at long last answer the call of history. I am confident we will soon enact meaningful health care reform that will lower costs and bring quality, affordable coverage to millions of Americans.

The ACTING PRESIDENT pro tempore. The Senator from Wyoming.

Mr. ENZI. Mr. President, as I mentioned earlier following the unanimous consent requests the leader made—who then introduced Senator MIKULSKI so that she could do her amendment, which kept me from commenting on the unanimous consent requests he made—I have to say I think those unanimous consent requests would have to be put in the category of a stunt. Unanimous consent usually means the two leaders have gotten together and negotiated some kind of agreement that we would abide by during this time. There was no agreement on this. Yet they went ahead and did the unanimous consent request solely so they could get the objection.

Nobody here, I am sure, wants to use Social Security money for anything except Social Security. So the real key to the stunt was the second one, which is the net savings generated by the CLASS program. That is a long-term care program that wound up in the Health, Education, Labor, and Pensions Committee bill.

The flaw with that particular amendment was that it collected money for 10 years without spending any and then it wound up with a huge liability. So we put in a little provision that it had to be actuarially sound because, quite frankly, it is not very good accounting to collect $70 billion in exchange for a $2 billion—excuse me, $2 trillion—I get the b's and the t's mixed up here, because we are talking about real money here—a $2 trillion bill. That is how much we are going to have to pay out over the next 10 years to cover the $70 billion we accept in payments for this new kind of insurance that would be provided. That kind of insurance is provided—it is provided in the private sector—but for considerably more than what they were providing for in the CLASS Act.

So that was to bring a little more attention to it, and I want to bring a little more attention to it because I want people to take a closer look at the way that winds up. It is a good idea that is not paid for, and it is not paid for in such a way that it winds up, once again, adding to the deficit but in some cagey ways.

As for having the amendments posted on the Web site before they are given, I hope the initial version is posted on the Web site by everybody before they do it. But one of the things that happens on this floor is that occasionally a good idea can be built on by somebody from the other side or even somebody from your own party, and when that happens you can modify the amendment. I am not sure that agreement

wouldn't have prohibited any modifications to amendments, which is kind of what we ran into in the Finance Committee when we were trying to do amendments.

So good ideas—they need a lot more work. And to just throw those out at the beginning and to have about 1½ minutes' notice that they are going to be thrown out—I just don't think that is the right way to go about this whole process.

I have been working on the Nation's broken health care system ever since I entered the Senate more than 12 years ago, and I had high hopes this would be the year the Democrats and the Republicans of the Senate would work together to provide health insurance to every American. I urged my colleagues to start with a blank piece of paper and develop a bipartisan bill that up to 80 Members of the Senate could support.

Unfortunately, the majority leadership had other ambitions, because the bill being debated today is a testament to a partisan ideological vision. It appears that the drafters of this bill took to heart the sentiments expressed by the Speaker of the House, who earlier this year said, ''We won the election, we write the bills.'' And for a number of weeks, the majority leader closed his door and wrote this bill on his own terms without any input from many of his colleagues or anybody on this side of the aisle.

This is a deeply flawed bill that fails to address the real needs of the American people. Americans overwhelmingly want reforms that will help lower their health care costs. Instead, this bill will spend $2.4 trillion when it is fully implemented and contains numerous provisions that will actually drive up the costs millions of Americans pay for their health care.

It is important to understand how we got here. At the beginning of this process, the majority staff of the HELP Committee decided they were going to draft a partisan bill based on the reforms that had recently been adopted in Massachusetts. Republicans were shut out of the process during the drafting of the HELP Committee bill. Rather than working to resolve the difficult issues, the drafters of the bill included over 200 separate instances where the bill gave the Secretary of Health and Human Services the authority to make important decisions about the types of health care plans millions of Americans can receive. Rather than confronting and debating these important policies—getting to the details, and the devil is always in the details—the majority empowered unelected government bureaucrats to make decisions that will affect the health care of every single American.

As a result of this partisan process, we were forced to file hundreds of amendments. The chairman and other Democratic members of the committee have repeatedly commented on the numerous amendments accepted by the majority during the markup. At the

Exhibit 151       JA-0002381

same time, they ignored the reality that most of these amendments were merely technical corrections which were necessary because the underlying bill was hastily written and filled with numerous drafting errors. Unfortunately, nearly all of the accepted Republican amendments merely tinkered around the edges. Almost all of the substantive alternative-idea amendments suffered the legislative fate of the party-line vote. In 12 days of markup at HELP, we had 45 rollcall votes on Republican-sponsored amendments and only 2 prevailed.

After the markup, the majority refused to release a final copy of the bill for over 2 months, denying the American people the chance to see what they had done. Once we finally got a copy of the bill, we learned that majority staff had unilaterally made numerous changes to the bill, in some cases undoing agreements that had been worked out by Members on issues such as prevention and wellness.

While this was happening, there were also ongoing bipartisan negotiations, led by Senator MAX BAUCUS. And I have to congratulate him for the process he started and got people involved in and for his persistence and the amount of time he put into it. This dwindled down to a Gang of 6. The Gang of 6 discussions were not an honest attempt to try to develop a bipartisan health care bill that would offer real solutions to the problems that face our health care system.

Ultimately, these negotiations failed to produce a bipartisan bill. I do not believe the failure was due to a lack of effort on the part of the participants but, rather, we were unsuccessful because the Democratic leadership chose to impose arbitrary and unrealistic time deadlines on the process that we commented on. The deadline slipped a few times, moved up a week, and then became finalized. The decision was made that it was more important to move fast than it was to get it right, and the decision ultimately doomed our efforts.

This, in turn, led to another partisan markup where the Finance Committee rejected most GOP health reform ideas. Proposals such as medical liability reform were rejected on jurisdictional grounds, while the chairman unilaterally included Democratic provisions that were clearly within the jurisdiction of other committees. Republican amendments were voted on and then unilaterally changed at the eleventh hour—actually, 1:30 in the morning—by amendments offered by the chairman.

The two bills were then merged, merged in secret, with no input from the many Republicans who want to enact a bipartisan health bill. We now have a 2,074-page bill that reflects many of the worst provisions from both the HELP and the Finance Committee bills.

We did not need to end up here today with Republicans opposing a partisan health care reform bill. The Senate should develop legislation that will impact one-sixth of our Nation's economy and affect the health of every American.

The former chairman of the Senate Finance Committee, Daniel Patrick Moynihan, a Democrat from New York, once provided the following perspective on how the Senate should consider major policy changes. He said:

Never pass major legislation that affects most Americans without real bipartisan support. It opens the doors to all kinds of political trouble.

Chairman Moynihan noted that absent such bipartisan support, the party that didn't vote for it would feel free to take shots at the resulting program whenever things go wrong and a large segment of the public would never accept it unless it was an overwhelming success. Chairman Moynihan understood a partisan legislative process guarantees that any glitches that occur in implementing the bill would provide ammunition for future attacks; thereby, further undermining public support of the new policies. There will, unfortunately, be plenty of glitches if this bill is ever enacted.

The Reid bill will impose $493 billion in new taxes, and many of them go into effect immediately. At same time, most Americans will not see any insurance reforms or other potential benefits from this bill until at least 2014. That leads to some interesting accounting.

The Reid bill will kill jobs and cut wages. The Congressional Budget Office has told us the employer mandates in this bill will likely result in lower wages and higher unemployment. These job and wage cuts would hit low-income workers, women, and minorities the hardest. It is hard to believe that with unemployment at a generational high, Democrats would even consider putting more jobs on the chopping block. The Reid bill mandates that Washington bureaucrats ration care. The bill lays the groundwork for a government takeover of health care, giving Washington bureaucrats the power to prevent patients from seeing the doctor they choose and obtaining new and innovative medical therapies.

I think that is attested to by the first amendment we have, the amendment by the Senator from Maryland, because her amendment preempts the provision in the bill that allows the U.S. Preventive Services Task Force to determine what preventive services should be covered. This amendment recognizes the problems associated with government bureaucrats determining what benefits should be covered. The majority realized it had a political problem when the U.S. Preventive Services Task Force said that women aged less than 50 years old should not have annual breast screening exams. This amendment doesn't do anything to protect patients who might be denied access to preventive tests in the future, such as prostate exams, colonoscopies, Pap smears, and so on, if bureaucrats decide to deny access.

This bill also shows how this will never be a truly science-based process. Bureaucrats will always have to respond to political pressure for powerful constituencies.

I guess we are part of the powerful constituencies. If we decide something should or should not be in there, that eliminates the science-based part of it.

I understand what they are trying to do. In the HELP Committee, when we were doing the markup, we did numerous amendments around this clinical effectiveness research, to see what it was supposed to eliminate from the health care for the person, separating them from their doctor by making these science-based decisions.

We did a series of amendments and found there, evidently, are a lot of things they are hoping will be precluded from people being able to get. I invite people to take a look at those amendments. We may have to try those again to see exactly where this process is going. I appreciate the Senator from Maryland making an attempt to solve a part of the problem, but I am having a little trouble with the reading of the amendment itself. At any rate, enough of that.

The Reid bill spends millions—billions. There is that word again. The Reid bill spends billions of taxpayer dollars on new pork-barrel spending. The bill would build new sidewalks, jungle gyms, and farmers' markets and creates a $15 billion slush fund for additional pork-barrel projects, a real deviation from what the Appropriations Committee has ever allowed.

This bill also fails to achieve the commonsense goals Republicans and Democrats share. This bill even breaks many of the promises President Obama has made about health care reform. President Obama repeatedly called for a health care bill that will reduce costs. This bill will actually drive up health care costs for millions of Americans as a result of new mandates and taxes. President Obama has also said that if Americans like the insurance they have, they can keep it. Under the bill, millions of Americans will lose their employer-provided health insurance.

President Obama promised not to raise taxes on individuals earning less than $250,000 per year. The bill would impose several new taxes on people who make considerably less than $250,000 a year.

President Obama said the health care reform would not increase the deficit. This bill will not increase the deficit only if you believe certain things. This bill will not increase the deficit if you believe Medicare payments to physicians will be cut by 40 percent over the next decade. I don't think anybody believes that.

The bill would reduce the deficit only if you believe Medicare payments to other providers will be slashed to levels that endanger patients' ability to get the care they need. No one believes that.

Exhibit 151                                                                                              JA-0002382

The bill will also reduce the deficit if you believe Congress will allow a massive new tax to be imposed on middle-class tax payers. I hope no one believes that.

If you don't believe Congress will allow all these things to happen, then you can't believe this bill will reduce the deficit. President Obama, in his remarks to the American Medical Association this summer, acknowledged the need to address our out-of-control medical liability. Rather than addressing this issue, this partisan bill preserves the costly, dangerous, duplicative medical malpractice system.

President Obama finally said no Federal dollars will go to pay for abortion. According to the National Right to Life and the Conference of Catholic Bishops, the Reid bill fails this requirement as well.

Despite all these failures, it is still not the worst health care bill in Congress. The Wall Street Journal got it right when they described the House-passed bill as the worst bill in America. Even if the Senate passed the bill before us today, it would still have to go to conference with the House bill and any final bill would have to move toward several provisions in the House bill and poll after poll suggests that the American people are opposed to this bill, let alone the wild one from the House.

If we cannot defeat this partisan bill and get back to work for the American people and write a bill that garners the support of both parties, doing it step by step so we can assure, for instance, the seniors that Medicare money will only be spent on Medicare—that is one of the pieces that ought to have been in that unanimous consent I started talking about. That is not going to happen, though. They are going to take a bunch of money out of there.

I think this legislation fails to meaningfully address these goals and will stick the American people with a bill we cannot afford. I believe we can do better, and we owe it to the American people to do so.

I yield the floor.

The PRESIDING OFFICER (Mrs. HAGAN). The Senator from Connecticut is recognized.

Mr. DODD. Madam President, let me begin, if I may, by congratulating the majority leader and my colleague and dear friend from Montana, Senator BAUCUS, and members of the Finance Committee as well as the members of the HELP Committee. As I said before, I am sort of an accidental participant in all this, in the sense that the person who should be standing at this desk and at this podium as the chairman of the HELP Committee is, of course, our deceased colleague from Massachusetts. I was filling in for him during the months of his illness and managing the markup of the bill that produced part, half—whatever the percentage is—of the combined legislation. All our colleagues know, whether you agreed or disagreed with him, he considered this issue to be what he called the passion of his public life, to make a difference for all Americans when it comes to their health care. So I know it is with a sense of sadness that, on the day on which we begin this historic debate and discussion, he is not here to participate—at least physically. We sense his presence, of course, those of us who had the privilege of serving with him for so many years, as Senator BAUCUS and I did, and worked with him on these many issues. Of course, our colleague from Wyoming, Senator ENZI, and Senator GRASSLEY did as well over the years. I thank all members of the committee.

It was a laborious undertaking. The Presiding Officer was very much a part of that as well, during those many hours we gathered in the Senate caucus room—the Russell caucus room now named the Kennedy caucus room—in some 23 sessions, over many hours. But that was only the culmination of an effort that began a long time ago.

Actually, the business of writing this bill began months and months earlier. My colleague from Montana can appreciate the hours I know I spent in meetings in his office, late into the evening, long before a markup began. Long before any formal conversations and discussions, there was a significant reaching out to our colleagues, to try to bring us together and develop what we all hoped to be the case and still can be the case; that is, a consensus bill, a bipartisan bill on health care.

I know as a matter of fact here, beginning last fall, Senator Kennedy, when he did have his strength, met on countless occasions with members of the minority to try and navigate the minefield of health care ideas, to see if it couldn't be possible to put together that kind of a consensus bill.

I know our committee began a long process, beginning last winter, to try to begin, long before the markup of this summer, to draft such a proposal, having what they call a walk-through of legislation, going through the various ideas and listening.

It was with some regret that I say this idea that the bill somehow being jammed down people's throats, with little or no thought given to other people's ideas and thoughts, is not borne out by the facts. I have been here for many years. I have been through many markups over three decades in this body on various committees. This effort was and still remains an effort to try to bring us together about this issue, which has such a massive impact on not only the individuals of our Nation who go through the fear every day of wondering whether the coverage they have will be adequate; and if they don't have that coverage, whether an illness or tragedy could befall them that could wipe out everything they have—not only today but for the rest of their lives.

This journey begins. My hope is, before we have finished the task, we will find that common ground that we each bear responsibility to try and achieve.

Before we left for the Thanksgiving holiday, the Senate held a landmark vote on whether we should even debate health care. I must say a lot of attention was given to that. There must be a lot of confusion in the minds of many Americans, wondering why we had to debate whether we could debate. The one issue this body is known for is endless debate. We are not limited, under our rules of the Senate, at least not formally limited, by how much time we can consume when we want to talk. The filibuster is a unique practice which only the Senate has. So we had to vote as to whether we could actually have a vote. We had a debate on whether we could have a debate on the subject matter that is obviously of great concern, whether you agree or disagree.

I think all Americans agree the present system needs a lot of work. The vote we took simply stated that after decades of inaction, despite the efforts of others over the years, this time the Senate would not fail to deliver the change the people we represent across America want and need.

We now begin that long, overdue conversation over exactly what change should look like in the area of health care. There are, as has been made clear over the past months, many different opinions on the subject matter, almost as many as there are Members of this body. I hope my fellow Senators are ready to share their thoughts, listen to the ideas of their colleagues and, most importantly, join together to act. The legislation we present for debate is designed to fix the things that are wrong with our system, while protecting and strengthening the things that are great about health care in America. As I have heard my colleague from Montana say on so many occasions, we are not out here to design or copy what goes on in Canada or Europe or Australia or New Zealand or any other country around the world. We are here to design an American health care plan, an American plan, one we are forging after listening to health care providers, our constituents, and others who have great interest in the debate and discussion and who bring very valuable facts to the table, as all of us, individually, even those not on the committee, have listened over many weeks and months—in fact, over many years that we have been debating this subject matter.

Our long history of innovation and discovery—cures, vaccines, and treatments, discovered and produced right here in our own country, that have saved countless lives here and around the world—is something for which every American ought to be proud. Our legislation, this combined bill, encourages that innovation so more groundbreaking medical discoveries can be made in America.

In fact, one of the debates that occurred in the HELP Committee, as my colleague and the Presiding Officer may recall, was on an amendment offered by Senator HATCH—no technical

Case 2:17-cv-04540-WB     Document 253-10     Filed 09/29/20     Page 411 of 677

amendment—dealing with how to create a pathway for the Food and Drug Administration to approve follow-on biologics and how many years of exclusivity innovators should receive for their original product. We had a heated debate in the committee. It went on for a day or so. In a divided vote, the Hatch amendment was approved with bipartisan support for this very critical and important issue. No technical change, I might add, a significant part of this bill.

Our legislation recognizes that we do best by our citizens when the public and private sectors work together. It has been our history in so many areas, not just in this area.

Medicare, the ironclad commitment to take care of our seniors, dating back to 1965, when Members who preceded us in this Chamber, in a heated debate that went on for days, heated debate over whether we would have a health care program for seniors, decided not on a partisan vote but nearly as much, that there ought to be something called Medicare. It took the poorest sector of our population, the elderly, and lifted them out of poverty. Because we said: After their works on behalf of all of us, their defense of our Nation in two world wars, and their contribution coming out of a depression, we ought to be able to do better by them when it comes to their health care needs, Medicare was established. And despite what some critics have said, this legislation protects and strengthens Medicare. I hope even our friends who have taken to labeling government-run programs such as Medicare as socialist takeovers will join us in keeping this important promise to our seniors.

Of course, Americans are justifiably proud of and happy with our workforce of dedicated health professionals, the doctors, specialists, primary care physicians, compassionate nurses, dedicated medical technicians, and family doctors all across the Nation who make a difference every single day in serving the people of our Nation. This legislation is designed to guarantee that you can get the care you need when you need it from the doctor you like. Meanwhile, it will help that physician spend less time filling out redundant paperwork and more time taking care of you and your family. It will help you spend less time fighting with your insurance company and more time getting better and getting back on your feet again.

There are many things to like about our health care system in the United States. This legislation doesn't change them. There are many things that are wonderful about our health care system. I think it is important at the outset to acknowledge that and to understand, again, the quality of innovation that occurs, the compassionate work done by health care providers in every community. In my State, there are 31 hospitals, all nonprofit hospitals, in the State of Connecticut. I have visited all of them over the years, but I have gone back recently and almost completed a round of going to see them all about this bill, sitting down with rural hospitals in northeastern Connecticut to major urban hospitals in Bridgeport and Hartford. I wish I could take everyone with me to see what everyone does. I know this is the case in other States where people do a remarkable job every day. If you show up in a hospital, they treat you. No one gets turned away. It is a wonderful thing about our health care system, the people who work in them every single day, reaching out to try and make a difference in the lives of these individuals, and how frustrating it is for these health care providers.

I met with a group of ophthalmologists in Hartford. One doctor was telling me how a family came to him the other night with a child that clearly needed a medical device and technology and knowing what a difference it could make for her. Yet that insurance company said: No, you can't do it; we don't provide that kind of coverage. The frustration that doctor expressed because he couldn't provide what that family needed. They didn't have the resources financially to pay for it, and they were being turned down. That child could not get that help. Under our bill that won't happen, if we can get this legislation done. Examples like that child happen every day across this great country of ours.

The high cost of health care has bankrupted millions of families. The system, in many ways, despite its strengths, is broken in too many places as well. Without reform, health care will continue to eat up larger and larger shares of budgets—the Federal budget, State budgets, business budgets and, of course, family budgets. Budgets, particularly family and business budgets, are at breaking points. The high cost of health care has bankrupted millions of families, shuttered the doors of businesses, forced States to make impossible choices, and put unimaginable strain on the Federal bottom line. If we don't address the skyrocketing cost of health care, more and more families, more and more businesses could lose everything and our deficit will explode. As bad as it is today, it gets worse if we do nothing.

That is the bigger picture. But the reality of our broken system can be captured by the tragedies that play out in American homes every single day. As we have discussed, tens of millions of our fellow citizens who don't have health insurance at all go to bed every single night knowing that if they wake up sick or their children wake up ill or in need of medical care, they might not be able to see a doctor to get the medical care they need. Many of these Americans don't have insurance because they can't get insurance, they have a preexisting condition, and no insurance company wants them on their rolls.

There are even more Americans who do have insurance but can't be sure of anything these days when it comes to their health care. They are paying more and more in premiums, twice what they paid even a decade ago. Yet they are getting less and less and less coverage for their money. They lie awake at night wondering, what if I lose my job, as many have over these last number of weeks and months, what if I get sick and find out my policy doesn't cover the care I need or, even worse, my insurance company cancels my policy altogether. What if I run out of benefits and have to pay out of my pocket. These are not irrational fears. They are anything but irrational fears. Millions of our fellow citizens have them every single day, and these nightmares come true for far too many of our citizens. People lose their homes because they get sick. People die because they can't afford care.

This does not happen to the 8 million of us who are Federal employees, all of us who serve in this body and the 435 who serve in the other body. Like all Federal employees, we have a special marketplace. Every year each one of us gets to choose from a long menu of insurance options. We sit down. We pick a plan that makes sense for us and our families, and we know the coverage we have chosen will be there when we need it. Every American should have the same opportunity as the people who represent them in the Halls of Congress. That is what our bill tries to do.

For too long health insurance has been a seller's market. Depending upon where you live, you may or may not have more than one option or two options to choose from. Sometimes there aren't any good options at all. You pay whatever the insurance companies want to charge you, and you get whatever coverage they feel like giving you. You are covered only until they decide they don't want to cover you any longer. By the way, if you lose your job, or if you want to change your job, if you want to start a business, if you want to move, you could lose your coverage entirely.

Our bill is designed to help you get a better deal and empowers every American family to pick the plan that works for them, creating a real marketplace, like the one Federal employees have, that members of congress have, with multiple insurance companies competing for your business and a real choice for you and your family. If you like what you have now, great, keep it. If you don't, you will have more and better options to consider. If you are one of the millions of uninsured Americans who has been denied coverage because of a preexisting condition, you will immediately have access to affordable coverage so that you will have insurance while this marketplace is being established. In that marketplace, you will finally have a chance to find affordable insurance that works for you and your family. No matter who you are or which plan you choose, you will have less expensive options. Insurance will be available regardless of your age or your health. And once you

Exhibit 151

JA-0002384

have it, the insurance company won't be allowed to take it away. You stay covered even if you lose your job, even if you move, even if you get sick.

On the day this bill is enacted, health insurance becomes a buyer's market, not a seller's market. That is as American as apple pie, having choices, good old competition out there. So little of it exists today. Our bill is designed to promote and create more of it. When businesses have to compete for your business, we all do better. Businesses do well and, obviously, the consumer has better choices. As other pieces of the legislation begin to take effect, our health care system will become less expensive and more responsive to the needs of the American people. Because American families and businesses literally can't afford more of the status quo, our bill makes health care more affordable.

According to the Congressional Budget Office, if you are buying health insurance in the individual market under the senate bill, premiums may be up to 20 percent lower than equivalent coverage today. According to CBO, if you are buying health insurance in the individual market, you could see premium costs be as much as 20 percent lower than what they are today. If you are working for a small business, according to CBO, your premiums may be up to 11 percent lower than what they are today. And according to the Congressional Budget Office, if you work for a large employer, which five out of six Americans do, your premiums could be lowered by as much as 3 percent. In every single category—individuals, small businesses, as well as large employers—premium costs come down under our bill, according to the Congressional Budget Office.

Compare that to the status quo of doing nothing or defeating this bill. I can't speak for every State, but I suspect these numbers are probably pretty much true across the country. In Connecticut, in the year 2000, a family of four paid on average about $6 to $7,000 a year in health care premiums. Today that same family in my State, 9 years later, is paying over $12,000 for that same coverage. And if we do nothing in the coming years, those numbers will jump to around $24 to $25,000 in 7 years and as much as $35,000 in 10 years.

Compare that with what we offer here in this bill. The CBO says we can actually lower premium costs in the individual market, the small group market, and the large group market. That is what is in this bill. That is why it is deserving of our support.

Because investing in keeping people well is more cost effective than waiting to treat them when they get sick, this legislation puts a focus on prevention. Let me pay a particular tribute to Senator TOM HARKIN, now chairman of the HELP Committee, who spent a long time on the prevention piece of this bill, as I know the Finance Committee did as well, combining efforts to encourage more effort in reducing the tremendous problems that are associated with four or five illnesses that consume about 70 or 75 percent of the health care dollar. You can't wipe them out altogether, but by working on prevention, dealing with obesity, smoking, cardiovascular problems, you can make a difference in those areas alone.

I know my fellow members of the HELP Committee, we passed legislation—and my good friend MIKE ENZI was a part of this and a strong supporter on the floor of this body—when for the first time in America history, the Food and Drug Administration can now regulate tobacco products. They can regulate mascara, cat food, dog food, men's cologne, all of those things get regulated, but tobacco did not. We changed that. We finally have regulation of the sale, marketing, and the production of tobacco products by the Food and Drug Administration. That is $180 billion a year in health-care related costs. Four hundred thousand people die every year from smoking-related products; 3,500 young people today will start smoking in the United States; 1,000 will become addicted for life, 3,500 a day just in that one area. If we can reduce people's dependency on those products, if we can get people to quit, if we can stop children from starting in the first place, what a difference that can make for people all across the country. From diabetes screenings to quit smoking programs to mammograms, you will be able to get preventive care at no cost to you under this bill. That we do right off the bat so you can stay well even if your family is not wealthy.

Because our seniors should be able to afford the prescriptions they need to stay healthy, this bill will shrink the Medicare Part D doughnut hole, giving seniors a 50-percent discount on medications. That is a huge savings to our people. Because 200 million American adults don't have insurance protection in place to handle the cost of long-term services and supports, our bill creates a new program that will give American families peace of mind, help working people who are also taking care of a loved one, and save Medicaid dollars in State and Federal budgets.

Because we need our small businesses to do what they do best—create jobs—our bill alleviates their burden by providing a tax credit to help them cover the cost of providing health care to their employees, as so many of them want to do. And because a buyers' market depends on educated buyers, our bill will empower consumers by eliminating the fine print in insurance policies. You will be able to make an apples-to-apples comparison when shopping for health insurance.

Again, according to the Congressional Budget Office, families and businesses will save money because this new marketplace will bring down administrative costs, ensuring you get the most out of your premium payments and increased competition for your business—competition that is increased even further with a strong public option as well.

The analysis confirms that if you like the plan the way it is, the bill explicitly provides that you will be able to keep it. In fact, just so we are clear, let me quote from the CBO, the Congressional Budget Office, analysis released today. I quote them:

[I]f they wanted to, current policyholders in the nongroup market would be allowed to keep their policy with no changes, and the premiums for those policies would probably not differ substantially from current-law levels.

The CBO estimates that as the marketplace gets up and running, the deficit will go down by $130 billion in the first 10 years after this bill passes and by $650 billion more in the second decade.

This bill lets you keep your insurance if you like it, this bill protects seniors, this bill gives families more choice, and this bill saves money.

While I hope we can keep our facts straight, let me say at the outset that I expect this to be a full, open, and at times passionate debate in this Chamber, as it should be. This is an issue that represents a full one-sixth, as you have heard already, Madam President, of our economy, and it affects every single one of our citizens. Still, I understand that no matter how patiently and thoroughly we discuss this issue, some will, of course, insist we are attempting to rush through a piece of partisan legislation. Again, let's get our facts straight. Thus far, between the two committees responsible for drafting this bill, we have held more than 100 bipartisan meetings, devoted more than 20 days toward the amendment process, considered more than 400 amendments, and, despite what I have heard, we accepted 170 amendments offered by the minority, including some very substantive ones. Clearly, there were technical ones. I am not suggesting otherwise. But to suggest that all of these were such is not to portray an accurate picture of what occurred. The legislation we will now debate was made available online 72 hours before even a procedural vote was cast.

Well, Madam President, I am committed to ensuring every Senator has the opportunity to offer his or her suggestions. That is what we did in our committee. It took a long time. But while people may not have been happy with the final outcome, I believe people ought to have an opportunity to be heard and their ideas to be vetted here and to engage, I hope, in a civil debate, a passionate but civil debate, not to engage in the ad hominem personal attacks that too often have contaminated debate but, rather, you ought to stand or fail based on the soundness of your ideas.

My dear friend Ted Kennedy spent a lifetime, as I said at the outset of these remarks, fighting for every American's right for decent health care. It is a cause I know we all support. This is our chance to get it right.

Exhibit 151 JA-0002385

This moment calls for commonsense problem-solving that cuts the cost of health care, protects patient choice, and ensures every American gets the care they need when they need it, from the doctors and providers of their choice.

This moment calls for compassion. We must finally hear the cry of the child whose ear infection goes untreated because his or her parents cannot find jobs and cannot afford a doctor; the voice of the small business owner who must choose between laying off workers and cutting off health benefits for them; the call of future generations who will see the rising tide of health care costs become a tsunami if we do not act in these days.

Perhaps most of all, this moment calls for courage. This bill does not necessarily guarantee a tickertape parade or a lot of applause lines. There are some very tough choices in this bill.

With the possible exception of the public option and a few other items, I suspect that if the roles were reversed here and we were sitting in the minority and our friends on the other side were in the majority, frankly, the bill we would be considering today might not be substantially different because, frankly, the options are not unlimited as to how to deal with costs and increased access and prevention. Yes, there are differences. I accept that and understand that. But the kinds of choices Senator BAUCUS and his committee made, and the ones we considered in our committee, were ones I believe most of my colleagues believe generally have to be dealt with: the quality of care, strengthening our workforce, dealing with the delivery system, increasing prevention and wellness in this country. What steps do we take? We can differ over this item or that, but I believe we generally believe these are items that must be part of a significant health care proposal. So I suspect these bills, were the roles reversed, might not be substantially different. It might not be that different.

Perhaps most of all, it is important we find the means to come together. The road we are on, the status quo, leads to ruin, in my view, for our economy and for our fellow citizens. The road to reform is a long and difficult one, but we have taken so many unprecedented steps just to come to this place. It is time now to finish the job.

So I am prepared—as I know our leader is and as I know my friend from Montana, the chairman of the Finance Committee, is, as are the members of that committee, as I believe most of our colleagues here—we would like a legacy to be left long after we have departed this Chamber that will say that in the first decade of the 21st century, when faced with the daunting challenge of doing something positive to increase the availability, increase the quality, and decrease the cost of health care in America, this Congress rose to the challenge and met its obligations. I feel optimistic we can achieve that.

Madam President, I yield the floor.

The PRESIDING OFFICER. The Senator from Montana.

Mr. BAUCUS. Madam President, I have a few small matters here before I yield to my friend from Iowa.

First, I cannot thank my colleague from Connecticut enough. He has worked so hard as the former chairman of the HELP Committee and now as a very active participant in the HELP Committee, along with Chairman HARKIN. I cannot thank him enough. The Senator from Connecticut has worked on health care in such a constructive way. I deeply appreciate his efforts.

Before I give up the floor, I wish to pay my strongest compliments to my colleague from Iowa, Senator GRASSLEY. Senator GRASSLEY is one heck of a guy. He represents his State, in my judgment, very, very well. As I am sure the Presiding Officer knows—certainly my colleague from Connecticut knows—we have worked very closely together, Senator GRASSLEY and I, on a nonpartisan basis as much as we possibly can because we both think—and I know most people think—good legislation is legislation where you work together, not where you are fighting each other.

Senator GRASSLEY and I started out trying to get this bill put together on a bipartisan basis working together. As it turned out, we did not quite get there. But I know in the end he would very much like to find a way to vote for health care reform, as most Members of the Senate would.

I am an optimist. I think most of us in this body are optimists. I have not given up yet. Who knows how this is going to evolve? Who knows what the amendments are going to be? Who knows what the votes are going to be in the next several weeks or so? But I am looking for an opportunity where Senator GRASSLEY and other very constructive Senators will join us, all together, in a way, with a little give and take here, perhaps, to find a solution.

So I just want to end by saying how much I appreciate the Senator. He does a super job.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Madam President, I thank the Senator from Montana for his kind remarks. He does describe the situation very well, particularly one where there was a very close working relationship during the summer and up until the middle of September, when people in this body felt we were not moving fast enough to get a product before the body, and so some of us were shoved to the side, not by Senator BAUCUS but by other people in this body.

I also compliment Senator DODD from this standpoint—that as I look at this 2,074-page bill we call health care reform, that as he described parts of this bill, I think you get a broad consensus that the things he talked about should be done. But that does not describe everything in this bill and it does not describe the opposition that comes to a certain part of this bill now, not only by Members of the body, but if you follow polls and town meetings around the country, you find a lot of the people are having second thoughts about the words "health care reform."

I would suggest to you, if you were in a coffee shop in any small town of the United States and they were talking about health care reform, and I came into that coffee meeting and I said: The bill before the U.S. Senate is going to raise premiums, it is going to raise taxes, it is going to take hundreds of billions of dollars out of Medicare, and it is not going to do anything about the inflation of health care, I will bet you that people at the end of that would say: Well, that doesn't sound like health care reform to me.

Even though Senator DODD describes a lot of things that are neither Democratic nor Republican nor even bipartisan, there is kind of a consensus that these things ought to be done. He describes it accurately. But, still, a lot of goals that were sought by those of us who were negotiating these things over a period of several months—that we ought to have it be revenue neutral—and on the 10-year budget window, it is revenue neutral. But, remember, that is 10 years of increased taxes and 6 years of program to make that happen. So you raise the question, if it was 10 years of expenditures and 10 years of income, would it be revenue neutral? Well, obviously not. And it does not do anything about health care inflation. Those are two goals that were sought over a long period of time. This 2,074-page bill does not do that.

I believe the people of the United States think our country has the best doctors and nurses in the world. But as Senator DODD pointed out, there is widespread agreement that the health care system in America does have problems. Costs are rising three times the rate of inflation. Americans are uninsured. Millions more fear losing their insurance in a weak economy and because of preexisting conditions. Doctors are ready to close their doors over high malpractice costs and low government reimbursement. So everybody says we need health care reform. Everybody agrees on that very much.

But, today, the Senate begins debate on a bill—2,074 pages—that would make a bad situation worse. It is unfortunate that early efforts to reach bipartisan solutions in Congress deteriorated into leadership-driven, partisan exercises.

The bills in Congress slide rapidly down the slippery slope to more and more government control of health care. They contain the biggest expansion of Medicaid since it was created 43 years ago. They impose an unprecedented Federal mandate for coverage, backed by enforcement authority of the Internal Revenue Service. They increase the size of government by $2.5 trillion when fully implemented. They give the Secretary of Health and

Exhibit 151    JA-0002386

Human Services extraordinary powers to actually define benefits for every private health plan in America and to redefine those benefits annually. They create dozens of new Federal bureaucracies and programs to increase the scope of the Federal Government's role in health care. That is a lot of power over people's lives, and it is concentrated here in Washington, DC, in the Federal Government.

The excesses of the bill appear willfully ignorant of what is going on in the rest of the economy outside of health care. These excesses make the bill far worse than doing nothing.

At this point in our Nation's history, we are a nation facing very challenging economic times—some people would say the great recession, not quite the Great Depression; other people would say the worst recession we have had since 1982. What have we seen? We have seen the auto industry go into bankruptcy. We have seen banks shutter their doors.

I have a chart that is up. We call it the wall of debt chart. The Federal debt has increased by $1.4 trillion just since inauguration. This chart shows the growing amount of debt the Federal Government is taking on. The amount of increased debt added just since the inauguration is $11,500 per household. It now exceeds $12 trillion for the first time in history.

Within 5 years, the Obama administration's policies will more than double the amount of debt held by the public, and by 2019 it will more than triple the debt. That is not according to this Senator but according to the Congressional Budget Office and the White House Office of Management and Budget. Already, foreign holdings of U.S. Treasurys stands at nearly $3.5 trillion or 46 percent of the Federal debt held by the public. In other words, people outside of this country are holding 46 percent of our Federal debt.

At the beginning of this debate, one of the key promises of health care reform was—and I said this previously, but I will repeat it now—that it would bring down Federal health costs. This needs to be done before health spending sinks the Federal budget and saddles the taxpayer.

I have another chart, a health spending chart or, more accurately, a Federal health spending chart. As this chart illustrates, this bill bends the Federal spending curve further upward by $160 billion over the next decade. The red area of this chart, emphasizing the red area of the chart, shows net additional Federal health spending—again, not according to this Senator but according to the Congressional Budget Office.

Americans have rightly lost faith when, in the face of the current economic crisis—the "great recession"—Congress thinks this $2.5 trillion restructuring of our health care system is a good idea.

The Reid bill also includes a government-run plan. A government-run plan would drive private insurers out of business and lead to a government takeover of the health care system. From rationing health care to infringing on doctor-patient relationships, a government-run system would guarantee U.S. taxpayers a staggering tax burden for generations to come.

The government cannot be a regulator, a funder, and a competitor at the same time without doing a great deal of damage to what the private sector has been doing for 60-some years. A government-run plan is not necessary for health care reform unless perchance the goal is to put in place the power of the Federal Government to drive down costs by—how? Not just driving them down but the consequences of that: rationing care and slashing payments to providers. These problems are bad enough, but much worse is that this bill—this bill—fails to solve the fundamental problems in health care. None of them take serious steps to reduce costs in health care.

The bills will cause health care premiums for scores of people to go up, not down. An analysis just released this very day by the Congressional Budget Office confirms our worst fears about the impact this bill will have on people's health insurance premiums. According to the Congressional Budget Office, the new benefit mandates and regulatory changes will actually increase costs of nongroup health insurance for individuals and families by 10 to 13 percent. That means millions of people who are expecting lower costs as a result of health care reform will end up paying more in the form of higher premiums. For large and small employers that have been struggling for years with skyrocketing health insurance premiums, the Congressional Budget Office concludes this bill will do little, if anything, to provide relief.

In fact, they cover their increased premiums they cause by spending even more on subsidies because of the increased premiums. So what happens? They do this by handing over close to $500 billion in hard-earned taxpayer dollars directly to health insurance companies. That sure doesn't sound as though this bill is actually reforming the market. The nonpartisan Congressional Budget Office analysis makes clear the Reid bill is not fixing the problem.

The Reid bill also imposes new fees and taxes that will be pushed directly to the consumer. These new fees and taxes will total about one-half trillion dollars over the next few years. On the front end, these fees and taxes will cause premium increases beginning next year when they go into effect, and those new fees increase premiums—for 4 years; they are there for 4 years—before most of the reforms take effect in 2014.

Then after forcing health premiums to go up, the legislation makes it mandatory to buy health insurance. Let's think about mandatory health insurance. The Federal Government is a government of limited powers under the 10th amendment. To my knowledge—and I think I know a lot about U.S. history—never in 225 years has the Federal Government said you had to buy anything. You don't have to buy—you buy what you want to buy in America, but not when this 2,054-page bill goes into effect. Then you will buy health insurance.

Somebody is going to throw at us: Well, the States make you buy car insurance, and probably most States do. My State of Iowa does. But under the 10th amendment, the State governments have a lot of power the Federal Government doesn't have.

The Reid bill also makes problematic changes to Medicare. It imposes higher premiums for prescription drug coverage on seniors and the disabled. The Reid bill creates a new independent Medicare board with broad authority to make further cuts in Medicare, and this bill makes that commission permanent. The damage this group of unelected people could do to Medicare is, in fact, unknown.

What is more alarming is that so many providers got exempted—they have political power, so they got exempted from the cuts this board would make—that it forces the cuts. Then what happens? They fall directly and disproportionately on seniors and the disabled.

Sooner or later, it has to be acknowledged that by making this board permanent, those savings are coming more and more—are going to bring more and more cuts to Medicare. That is a good example of the philosophical differences between the two sides in this body, and as the country divides itself more against this 2,054-page bill than for it, but still a large number of people in America support going in this direction. So those are philosophical differences between the two sides.

There are alternatives. Some of us want to reduce the overall cost of the legislation. We want to try to reduce the pervasive role of government, make it harder for undocumented workers to get benefits, allow alternatives to the individual mandate and harsh penalties, and add medical malpractice reforms. I bring a little bit of emphasis to medical malpractice reform because at my town meetings throughout this past year and particularly during the month of August people would say: Why don't you first try to save money in health care costs by taking on the lawyers and doing medical malpractice reform? But, instead, the prevailing view is to move millions of people from private coverage into public coverage and create new government programs that cover families making close to $90,000. Yet, even with all of these changes, after raising one-half trillion dollars in new taxes, cutting one-half trillion dollars in Medicare, imposing stiff new penalties for people who don't buy insurance, and increasing costs for those who do—after all of these changes, the Congressional

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 415 of 677

Budget Office says there are still 24 million people who will not have health insurance under the Reid bill.

I don't think this is what the American people had in mind when the President and the Congress promised to fix the health care system.

It is not too late for bipartisan legislation, so I have the hope that Senator BAUCUS just expressed before I spoke that builds on common ground to improve coverage, affordability, increased quality, and decreased costs. So here are some more alternatives. I have worked for years on bipartisan legislation that would transform Medicare from paying for volume of services provided to the quality of care delivered. There is also widespread support for stronger rules on insurance companies to make coverage more affordable and accessible, especially for small businesses and for people who aren't offered coverage by their employers, and for reforms to stop denials of coverage due to preexisting conditions. Tort reform would reduce abusive lawsuits that drive up costs and surely limit access to doctors. The nonpartisan Congressional Budget Office estimates that comprehensive medical liability reform would reduce Federal budget deficits by roughly $54 billion over the next 10 years. It would save even more when nonfederal health spending is taken into account. That would mean lower premiums for individuals and families.

So far the Democratic leaders in Congress have little interest in creating an environment where doctors don't have to engage in defensive medicine just to keep their practices open because somebody might sue them. The medical community should continue to make the case for reasonable reforms that will cut down on unnecessary medical tests that serve no purpose except to reduce malpractice premiums and to protect against frivolous lawsuits.

On several occasions, Republicans tried to take the legislative substance in a whole different direction. We tried to ensure the President's pledge not to tax middle-income families, seniors, and veterans was carried out. However, we were rebuffed at every step of the way. Republicans' efforts to provide consumers with a lower cost benefit option were consistently defeated. That means despite the promise, a lot of people are not actually going to be able to keep what they have as they were promised in the last Presidential campaign.

The Democratic leaders in Congress are advancing their extremist health care reform bills with a bare minimum of votes to do the job. I disagree with that approach. Health care is one-sixth of the economy. That is as large as the entire British economy. The legislation Congress is considering will affect every American at every level of health and at every stage of employment. When the debate began last year—in fact, it was just this month of November that I remember 8 or 10 of us

from different committees met with a solemn pledge. We were going to work together in a bipartisan way to get this job done. We met again for the next 6 months several times, but it just didn't work out.

But when that debate began last year, interested legislators of both parties set benchmarks that were no-brainers:

Health care reform should lower the cost of premiums. It should reduce the deficit. It should bend the growth curve in health care the right way—downward. The Reid bill doesn't do any of these things.

It is not too late to start over. I guess Senator BAUCUS has put forth that invitation. I hope it materializes. If both sides can set aside some philosophical differences, and if the Democratic leaders are willing to refocus on the principles that brought us to the table months ago, I believe we can produce health care reform that improves the quality of life for Americans who are suffering under the current health care system and doesn't degrade the quality of life for everyone else.

But it is not the entirety of this 2,074-page bill. These issues can be addressed without upending the entire health care system, with the result of higher taxes, higher insurance premiums, and deficits and debt that will get in the way of opportunities that result from the ingenuity and productivity and industry of the American people.

I get back to that coffee shop meeting, where people are discussing health care reform. As I walk into that coffee meeting and I tell them that this 2,074-page bill increases taxes, increases premiums, takes 400 or more billion dollars out of Medicare, and it doesn't do anything about controlling costs, according to the Congressional Budget Office, that group again will say: That doesn't sound like health care reform to me.

As we start this debate this week, I urge my colleagues to listen to the American people. The Reid bill is in the wrong direction.

I yield the floor.

The PRESIDING OFFICER. The Senator from Arizona is recognized.

MOTION TO COMMIT

Mr. McCAIN. Madam President, I ask unanimous consent to send to the desk at this time a motion to commit with instructions.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will report the motion.

The legislative clerk read as follows:

The Senator from Arizona [Mr. McCAIN] moves to commit the bill H.R. 3590 to the Committee on Finance with instructions to report the same back to the Senate with changes that do not include the following:

(1) Medicare Advantage cuts totaling −$118.1 billion.

(2) Medicare Advantage payment changes totaling −$1.9 billion.

(3) Provider cuts totaling −$150.0 billion.

(4) The establishment of the Independent Medicare Advisory Board totaling −$23.4 billion.

(5) Reporting requirements for long-term care hospitals, inpatient rehabilitation hospitals, and hospice programs totaling −0.2 billion.

(6) Penalties to hospitals totaling −1.5 billion.

(7) The expansion of CMS spending totaling −1.3 billion

(8) A Medicare shared savings program totaling −4.9 billion.

(9) Hospital penalties totaling −7.1 billion.

(10) A revision to the Medicare Improvement Fund totaling −22.3 billion.

(11) Home health care cuts totaling −42.1 billion.

(12) Hospice payment changes totaling −0.1 billion.

(13) Medicare disproportionate share hospital payments changes totaling −20.6 billion.

(14) Cuts to advanced imaging services totaling −3.0 billion.

(15) A revision of the payment for power-driven wheelchairs totaling −0.8 billion.

(16) Cuts for certain medigap plans totaling −0.1 billion.

(17) A reduction in the part D premium subsidy for high-income beneficiaries totaling −10.7 billion.

(18) Outpatient prescription drug cuts in long-term care facilities totaling −5.7 billion.

(19) Changes to preventive services in Medicare totaling −0.7 billion.

(20) A limitation on the Medicare exception to the prohibition on certain physician referrals for hospitals totaling −0.7 billion.

(21) Comparative effectiveness research totaling −0.3 billion.

(22) The elimination of indexing for part B premiums totaling −25.0 billion.

And reflects the Sense of the Senate that any savings to the Federal Hospital Insurance Trust Fund under section 1817 of the Social Security Act (42 U.S.C. 1395i) and the Federal Supplementary Medical Insurance Trust Fund under section 1841 of such Act (42 U.S.C. 1395t) by reason of the provisions of, and amendments made by, sections 6401, 6405, 6407, and 6410 should be used to strengthen the Medicare program under title XVIII of such Act.

Mr. McCAIN. Madam President, simply put, this motion to commit would be a requirement that we eliminate the one-half trillion dollars in Medicare cuts that are envisioned by this bill—one-half trillion dollars in cuts that are unspecified as to how, and one-half trillion dollars in cuts that would directly impact the health care of citizens in this country—Medicare Advantage cuts totaling $118 billion; an independent Medicare advisory board that would cost $23 billion; an expansion of Medicare hospital penalties totaling $7.1 billion; home health care cuts totaling $42.1 billion; and hospice—of all the things—payment changes. The list goes on and on.

All of these are cuts in the obligations we have assumed and that are the rightful benefits people have earned—particularly our senior citizens—across this Nation. This eliminates one-half trillion dollars in cuts to Medicare that are cuts that are unspecified.

I eagerly look forward to hearing from the authors of this legislation as to how they can possibly achieve one-half trillion dollars in cuts without impacting existing Medicare programs negatively and eventually lead to rationing of health care in this country.

Exhibit 151                                                                                                    JA-0002388

That is what this motion is all about. This motion is to eliminate those unwarranted cuts. All of us know there are enormous savings in fraud, abuse, and waste that can be identified. No expert I know of believes that would come up to one-half trillion dollars. Hospitals are cut by $105 billion. Nursing homes are cut by $14.6 billion. Hospices are cut by $7.6 billion.

These are not attainable cuts, without eventually rationing health care in America and rationing health care for our senior citizens, who have earned these benefits, and we have guaranteed them these benefits.

For the life of me, how the AARP can support this 2,000-page legislation is beyond my imagination. Seniors all over America, including Arizona, including the 330,000 senior citizens in my State who are under the Medicare Advantage Program, which will be drastically cut by some $120 billion, are outraged. The more they find out about it, the more angry they are becoming.

Here we are, as my colleague from the great State of Iowa, a leader on health care, articulated, with a totally partisan measure before the Senate, in which no Member on this side of the aisle has been consulted in any way. I point out that, historically, there has never been a major reform implemented by the Congress of the United States unless it is bipartisan in nature, and I don't believe the American people want this 2,000-some-page monstrosity, which is full of all kinds of provisions that they are either unaware of, or even in the study of this legislation, many of us have also become unaware of. But fundamentally, the Bernie Madoff/Enron accounting that has been going on with this bill is dependent upon envisioning one-half trillion dollars in cuts that are not attainable. If they are attainable, it would mean a direct curtailment and reduction of the benefits we have promised the senior citizens of this country. That is not acceptable.

What this motion to commit does is send it back to the Finance Committee: Come back with another bill. Only this time, don't put the cost of it on the backs of senior citizens of this country. Don't do it. It was back last summer, 3 months before he was elected President, on a campaign stop not far from Washington, DC, now-President Obama vowed not only to reform health care but to do it in a new way. He said:

I am going to have all the negotiations around a big table, televised on C-SPAN, so that people can see who is making arguments on behalf of their constituents and who are making arguments on behalf of the drug companies or the insurance companies.

Americans wanted to believe this would be true. Republicans offered to work with the majority on our ideas. But that was rejected. So what has happened? Business as usual. Let me read from a report of this past weekend about business as usual:

The Associated Press has moved a story saying that health care lobbyists and other interests have made 575 visits to the White House between January and August. The report is based on records released by the White House on Wednesday.

The timing of the release smells of a classic Washington tactic—dumping bad news on the getaway day before a long weekend. Clearly, the White House, which prides itself as being the most transparent administration in the history of the world, hopes this nugget gets lost over the four-day Thanksgiving weekend.

AP's Sharon Theimer:

Top aides to President Barack Obama have met early and often with lobbyists, Democratic political strategists and other interests with a stake in the administration's national health care overhaul, White House visitors records obtained Wednesday by the Associated Press show.

All of my fellow citizens watching, I urge you to call the White House and say you want to have an appointment to meet with the President or members of the administration in the White House. Five-hundred-seventy-five special interests were able to get in. Why can't you? Give them a call. Tell them you want to meet with the members of the administration. That is what 575 lobbyists have been able to do. Give them a call.

Continuing to quote:

The records show a broad cross-section of the people most heavily involved in the health care debate [except for average citizens] weighted heavily with those who want to overhaul the system.

It talks about who were among them.

The list also includes George Halvorson, chairman and CEO of Kaiser Health Plans; Scott Serota, president and CEO of Blue Cross and Blue Shield Association; Kenneth Kies, a Washington lobbyist who represents Blue Cross/Blue Shield, among other clients; Billy Tauzin, head of PHARMA, the drug industry lobby; and Richard Umbdenstock, chief of the American Hospital Associations.

Several lobbyists for powerful health care interests, including insurers, drug companies, and large employers also visited the White House complex, the records show.

Again, citizens, why don't you call the White House and ask for an appointment? The lobbyists and special interests—big donors—get it. They are not ambassadors. They are lobbying the White House on this issue.

Health care reform should have been about both sides sitting down together and fixing what is broken, reducing health care costs, while preserving the highest quality health care in the world.

Somewhere in the course of this debate, in the process of this legislation, we have lost sight of the fundamental problem with health care in America, and that is the cost of health care in America, not the quality. This legislation will destroy the quality and the availability, if the cuts envisioned in this legislation—this Enron accounting measure, where the first 4 years after this legislation—suppose this legislation were signed on the 1st of January by the President of the United States. Immediately benefits will begin being cut. Immediately taxes will go up. Guess what. None of the benefits will be given to any American citizen for 4

years. That is how you get deficit neutrality. That is how you get deficit neutrality.

If you started giving the benefits at the same time you raise the taxes, you have got about $1.3 trillion in deficit in a $2.5 trillion bill—a $2.5 trillion piece of legislation. Here we are with the highest deficits in history, with deficits and debt as far as the eye can see, with a stimulus package that has done so well that we now have 10.2 percent unemployment, and many predict it will go even higher. Wall Street is doing fine, and lobbyists are doing fine. Mr. Tauzin, the PhRMA lobbyist, is doing fine. I understand his salary is a couple million dollars a year, not to mention all the other perks. But the average citizen, including the 330,000 citizens of my State, who have the Medicare Advantage Program, are going to see it cut and cut over and over again—about $120 billion worth.

So what happened? The White House engaged in the tradition of handing out favors to special interests, including PhRMA, AARP, and AMA. Shame on AARP and shame on the AMA. We know there are many commonsense reforms that Americans want.

By the way, in this monstrosity, find me any significant, real medical malpractice reform. The threat of medical malpractice causes physicians to practice defensive medicine. The CBO estimates it would be roughly a savings of $54 billion over 10 years. That does not take into consideration the cost of defensive medicine that doctors have to practice because of fear of being sued.

I ask the distinguished chairman of the committee: Where is any meaningful medical malpractice reform in this 2,000-page bill? Where is it?

I had a townhall meeting the other day in Arizona, as I do quite frequently. There were a lot of doctors, nurses, and caregivers who came. I asked them: What do you do about medical malpractice reform? Every one of them said: We practice defensive medicine. We prescribe additional tests and procedures. We have to do it because we will find ourselves in court by the trial lawyers.

Do not underestimate, I say to my friends, the many special interests and their influence in this legislation, but do not underestimate the stunning success of the American Trial Lawyers Association that has made sure there is no provision in this bill that has to do with medical malpractice reform.

By the way, if there is an example, it is called the State of Texas. The State of Texas enacted meaningful and yet not draconian medical malpractice reform. Premiums have gone down. Cases have gone down. Doctors are flooding back into the State of Texas. It has worked.

We are going to hear from the other side that there may be demonstration projects, there may be this, there may be that. The demonstration project is the State of Texas. That is all we have to do. It has already been proven.

Exhibit 151                                                                                                                      JA-0002389

Instead of a reform which could save tens if not a couple hundred billion dollars, what are we going to do? We are going to cut hospitals by $505 billion, nursing homes by $14.6 billion, hospices by $7.6 billion, and the list goes on and on, up to one-half trillion dollars. My motion will send it back to the Finance Committee and tell them to remove these unnecessary, unneeded, unwanted, harmful cuts in the Medicare system, which will not allow us to fulfill our obligation to the senior citizens of this country.

Buried in this partisan legislation, as I mentioned, are 10 years of tax increases and Medicare cuts, a total over $1 trillion. Using CBO numbers, this stack of partisan legislation costs $2.5 trillion over its 10-year implementation.

Let me put this in different terms for you. Suppose you want to buy a house. You go and buy the house, but the terms of the contract of purchasing the house say you have to make payments on the house for the first 4 years and then after 4 years you can move in. That is why this is Bernie Madoff accounting. It is a sham. It is a sham. It is a sham to make people pay taxes and have their benefits cut for 4 years and then only after 4 years do the benefits kick in. That is the way, with this kind of accounting, they get to deficit neutral. It is crazy. It is crazy.

The increased taxes and Medicare cuts begin impacting Americans and our economy in 32 days, if this is passed. Let me repeat this. Starting in January 2010, just 1 month from now, the majority begins tax increases and Medicare cuts, starting in January, and incredibly delays implementation of this bill for 4 years. That is 1,460 days and 208 weeks of new taxes and Medicare cuts before implementation. That is playing games with the American people.

If they were not playing games by delaying implementation of the bill 4 years after the tax increases and Medicare cuts, we would not even be discussing this pile of legislation because it would be scored as adding over $1 trillion to our deficit.

If the other side wanted to be honest and reject the Madoff-Enron accounting, they would be talking about the first 10 years of real costs and the first 10 years of their tax increases and Medicare cuts.

The respected dean of the Washington press corps, David Broder, pointed this out just last week in his column in the Washington Post entitled "A Budget-Buster in the Making." By the way, the majority leader then felt compelled to come down and trash one of the most respected columnists in America whom I don't need to take the time to defend; he can defend himself and so will many others who have great respect for David Broder.

David Broder's column said:

It's simply not true that America is ambivalent about everything when it comes to the Obama health plan.

The day after the Congressional Budget Office gave its qualified blessing to the version of health reform produced by Senate Majority Leader Harry Reid, a Quinnipiac University poll of a national cross section of voters reported its latest results.

. . . by a 16-point margin, the majority in this poll said they oppose the legislation moving through Congress.

Broder went on to say:

I have been writing for months that the acid test for this effort lies less in the publicized fight over the public option or the issue of abortion coverage than the plausibility of its claim to be fiscally responsible.

This is obviously turning out to be the case. While the CBO said that both the House-passed bill and the one Reid has drafted meet Obama's test by being budget-neutral, every expert I have talked to says that the public has it right. These bills, as they stand, are budget-busters.

Here, for example, is what Robert Bixby, the executive director of the Concord Coalition, a bipartisan group of budget watchdogs, told me: "The Senate bill is far from reform. The House version, but there's not much reform in this bill. As of now, it's basically a big entitlement expansion, plus tax increases."

These are nonpartisan sources, but Republican budget experts such as former CBO director Douglas Holtz-Eakin amplify the point with specific examples and biting language. Holtz-Eakin cites a long list of Democratic-sponsored "budget gimmicks" that made it possible for the CBO to estimate that Reid's bill would reduce federal deficits by $130 billion by 2019.

Perhaps the biggest of these maneuvers was Reid's decision to postpone the start of subsidies to help the uninsured buy policies from mid-2013 to January 2014—long after taxes and fees levied by the bill would have begun.

Even with that change, there is plenty in the CBO report to suggest that the promised budget savings may not materialize. If you read deep enough, you will find that under the Senate bill, "federal outlays for health care would increase during the 2010–2019 period"—not decline. The gross increase would be almost $1 trillion—$948 billion, to be exact, mainly to subsidize the uninsured. The net increase would be $160 billion.

But this depends on two big gambles. Will future Congresses actually impose the assumed $420 billion in cuts to Medicare, Medicaid and other federal programs? They never have.

Why don't we tell the truth to the American people and take these supposed cuts out of this bill? Tell them the truth about what it costs and tell them the truth that this is a dramatic expansion of entitlements, but at the same time those presently eligible, those senior citizens, such as the 330,000 who are under the Medicare Advantage Program in my home State of Arizona, will not see that program maintained. You cannot reach these kinds of savings, these kinds of reductions, these kinds of cuts without impacting existing programs. I know of no expert who says it will who is an objective observer. I believe Dr. COBURN, Dr. BARRASSO, and others in the medical profession will say the same thing. Every time Congress has enacted so-called cuts in Medicare or contemplated it, they have never taken place.

That doctor fix? We took care of that problem. We just took it out of the bill.

But you know what we are going to do about the doctor fix. Every year we are going to delay it, delay it and delay it and it will never happen. That has been the history of the so-called doctor fix since its beginning.

And will this Congress enact the excise tax on high-premium insurance policies (the so-called Cadillac plans) in Reid's bill? Obama has never endorsed them, and House Democrats—reacting to union pressure—turned them down in favor of a surtax on millionaires' income.

The challenge to Congress—and to Obama—remains the same: Make the promised savings real, and don't pass along unfunded programs to our children and our grandchildren.

That means taking this legislation back, taking out these cuts in Medicare and programs that are vital to the citizens of this country and come back with a realistic—a realistic—piece of legislation that has malpractice reform, the ability to go across State lines to get the health insurance policy of your choice, rewards for wellness and fitness, expansion of health savings accounts, and medical malpractice reform.

There are many cost-saving measures we can enact to bring the cost of health care in America under control and preserve quality. Instead, we are doing the opposite.

If you are going to make these kinds of cuts—the $420 billion in cuts to Medicare and Medicaid and other Federal health programs—then you are going to impact the provision of health care in America.

Americans have been clear over-spending has to stop, nor do the American people believe empowering Washington bureaucrats in a new Federal health care entitlement is health care reform. The other side disregards the message from the American people all across the country, and the bill does the opposite.

I wish to talk just for a minute about a provision in this bill that is very important; that is, the transfer of power, the massive transfer of power in this bill to the Secretary of Health and Human Services. This is a huge transfer. "HHS would become federal giant under Senate plan" by Susan Ferrechio:

A quick search of the Senate health bill will bring up "secretary" 2,500 times.

That's because Health and Human Services Secretary Kathleen Sebelius would be awarded unprecedented new powers under the proposal, including the authority to decide what medical care should be covered by insurers as well as the terms and conditions of coverage and who should receive it.

I wish to repeat that. In this bill, the Secretary has the "authority to decide what medical care should be covered by insurers as well as the terms and conditions of coverage and who should receive it."

We saw a little precursor of that the other day with, for example, recommendations concerning mammograms. A board recommended that women under 50 should not get routine

Exhibit 151    JA-0002390

mammograms. Of course, the response was incredible and justified. Women all over America are now alive today because they had mammograms prior to the age of 50. The Secretary of Health and Human Services said that would not be carried out, et cetera. We are creating a situation where the Secretary of Health and Human Services and a board would decide that.

"The legislation lists 1,697 times where the Secretary of Health and Human Services is given the authority to create, determine or define things in the bill," said Devon Herrick, a health care expert at the National Center for Policy Analysis.

For instance, on Page 122 of this 2,079-page bill, the secretary is given the power to establish "the basic per enrollee, per month cost, determined on average actuarial basis, for including coverage under a qualified health care plan."

The HHS secretary would also have the power to decide where abortion is allowed under a government-run plan, which has drawn opposition from Republicans and some moderate Democrats.

And the bill even empowers the department to establish a Center for Medicare and Medicaid Innovation that would have the authority to make cost-saving cuts without having to get the approval of Congress first.

"It's a huge amount of power being shifted to HHS, and much of it is highly discretionary," said Edmund Haislmaier, an expert in health care policy and insurance markets at the Heritage Foundation, a conservative think tank.

Haislmaier said one of the greatest powers HHS would gain from the bill is the authority to regulate insurance. States currently hold this power, and under the Senate bill, the federal government would usurp it from them. This could lead to the federal government putting restrictions and changes in place that destabilize the private insurance market by forcing companies to lower premiums and other charges, he said.

"Health and Human Services doesn't have any experience with this," Haislmaier said. "I'm looking at the potential for this whole thing to just blow up on people because they have no idea what they are doing. Who in the Federal Government regulates insurance today? Nobody."

"The health care reform legislation would rely on the U.S. Preventive Services Task Force for recommendations as to what kind of screening and preventive care should be covered. Last week, the group, which operates under HHS, drew sharp criticism for advising that mammograms should begin at age 50, a decade later than the current standard."

"Critics of the bill said this was an example of how the new bill could empower HHS to alter health care delivery, but Democrats argue they would rather have the government making these decisions."

That is the key to it. They would rather have the government making these decisions. If you like the way the post office is run, you will love the way HHS runs health care in America.

I understand the amendment of the other side may address some of this, but under the Reid bill the Senate moved to consider, beginning in 32 days, the language from the bill on page 1,189 authorizes the Secretary to modify benefits under Medicare pursuant to task force recommendations. As I mentioned, how many women would have died if the coverage provisions guiding the new Federal plan under mammograms had been implemented? Then, on the following page, 1,190, the Secretary is authorized to deny payment for prevention services that the task force recommends against. So if this unelected panel changes the preventive recommendation for some other type of cancer, the Federal Government plan would not cover it. I don't think the American people want their health coverage decisions coming from a panel in Washington.

The Reid bill drives up costs and premiums. Just today the CBO released its assessment of what will happen to health insurance premiums under the new entitlement compared with premiums today. The CBO dealt a blow to claims the health care bill introduced by Senator REID will lower premiums when they released an analysis showing that premiums will go up significantly in the individual market. Premiums for individuals without employer-sponsored coverage would increase 10 to 13 percent or $2,100 per family in 2016. The Democrats' bill therefore requires individuals to purchase insurance that is more expensive than would be available under current law. For small businesses and employers, the bill largely preserves the status quo and does little if anything to lower the cost. In fact, CBO estimates that under the Reid bill the average family with employer-sponsored coverage will soon pay more than $20,000 per year for health insurance.

President Obama said the following during the campaign:

I have made a solemn pledge that I will sign a universal health care bill into law by the end of my first term as President that will cover every American and cut the cost of a typical family's premium by up to $2,500 a year.

Well, CBO's analysis shows that the President is breaking that pledge by both failing to achieve universal coverage and raising premiums, just as it contradicts an analysis by MIT economist John Gruber released by the White House this weekend claiming that individual premiums would go down. In fact, even with the generous assumptions made by CBO in a number of areas, premiums will either go up or remain unchanged.

From the CBO report just today, CBO says premiums in the individual market would be 10 percent to 13 percent higher in 2016 than under the current law. Average premiums would increase by $300 for an individual policy and by $2,100 for a family policy. The new benefit and coverage mandates actually drive up premiums by 27 to 30 percent, and this increase is offset by other factors, such as new administrative efficiencies.

CBO says that little more than half of enrollees in the individual market would receive a government subsidy. However, the bill before us would still require nearly 14 million Americans to purchase unsubsidized insurance that is more expensive than they have today.

President Obama has promised that seniors will not see a reduction in benefits. In fact, he said recently:

People currently signed up for Medicare Advantage are going to have Medicare and the same level of benefits.

How did he get there? How do you get there when you are cutting Medicare Advantage by $120 billion? There is no math—old or new—that gets you to no change in the benefits that they have under Medicare Advantage and yet cutting $120 billion. Traditional Medicare doesn't offer coordinated benefits that can improve the quality of care. Traditional Medicare doesn't have many of the aids or benefits for our seniors.

President Obama has also promised several times, "If you like what you have, you can keep it." The American people took those words as a promise that if they had a health benefit they were happy with, they could keep it. I want to make sure we are helping the President keep his promise. I want to help him keep his promise by sending this bill back, taking out the cuts that are in it on Medicare, on the $105 billion cuts to hospitals, nursing homes by $14.6 billion, hospices cut by $7.6 billion, Medicare Advantage by $120 billion. I want to send it back to the Finance Committee and come back with a bill that the American people can believe in that will preserve the solemn obligations we have made to our senior citizens.

Medicare Advantage provides the only choice in the Medicare Program allowing an option for seniors who want additional benefits or a better option. Medicare Advantage is working for nearly 11 million seniors to give them a choice about their health care and better benefits. As I mentioned, 330,000 beneficiaries in my State of Arizona are in Medicare Advantage, and they will see benefit reductions or their plan disappear. Eighty-nine percent of seniors need and have some form of supplemental coverage on top of Medicare to provide protections against out-of-pocket costs or additional benefits. Many low-income Americans and minorities rely on Medicare Advantage as their supplemental coverage.

Some have claimed that cutting the "extra payments" to Medicare Advantage plans reduces insurance company profits. Under Federal law, that is simply not the case. The fact is, 75 percent of those "extra payments" go directly to better benefits for seniors under current law. The other 25 percent goes back to the Federal Government. Unfortunately, those extra benefits will be taken from seniors who are enrolled in Medicare Advantage.

This bill contains $120 billion in direct cuts to private Medicare plans. Common sense says you can't do that without affecting benefits. The Congressional Budget Office thinks so as well. CBO assumes the Reid bill will cut benefits by more than half, from an average of $98 in additional benefits to $41 a month.

I see one of my colleagues is waiting to speak, but I hope the American people will understand what we are trying to do. All we are trying to do is send this back to be reworked, to be fixed on a bipartisan basis, and not to force $400-some billion in cuts and benefits that we have promised the American people. We want to send it back and come out with a bipartisan approach. Sit down, for the first time, Republicans and Democrats, have the C–SPAN cameras rolling—the way the President promised he would a year ago last October.

Let's sit down together and figure out how we can fix this.

The best way to fix it is to preserve the quality of health care in America and bring down the cost, not to pass a 2,074-page monstrosity that is full of the measures that would impair the ability, particularly of our senior citizens, to keep the benefits they have earned and we have promised them.

Madam President, I yield the floor.

The PRESIDING OFFICER. The Senator from Pennsylvania.

Mr. CASEY. Madam President, I rise to speak about health care, as we begin the debate in the Senate. I am grateful we are finally at this point where the Senate at long last will be debating our health care bill. It has been a long time in coming. Some of us have waited years, some have waited for decades to be at this point in our history.

On the Senate floor now is the Patient Protection and Affordable Care Act, and we are going to be discussing various aspects of that over the next couple of weeks.

I am reminded, as I rise today, of something Hubert Humphrey said a long time ago. He said the test of the government is how it treats those in the dawn of life—our children—those in the shadows of life—those who have challenges in their life, as we try to help them—and those in the twilight of life—older citizens across America. In large measure, we will be talking about each of those Americans in one way or another and a lot of other Americans as well. I rise to speak of our children but also to spend a couple of moments talking about older citizens, especially in light of some of the arguments made most recently on the Senate floor.

I will start with our older citizens. I come from the State of Pennsylvania where in our little State, with more than 12 million Pennsylvanians, we have almost 1 million Pennsylvanians over the age of 65. We have a very high number of Pennsylvanians on Medicare and also a lot of families who rely upon that kind of health care coverage, as we have for many generations. So when we speak of those in the twilight of life, we speak of many Americans who are covered by Medicare.

I want to make a couple of points about the bill that is on the floor now. First of all, with regard to older citizens, a couple of basic points on which I will provide a little more background. First of all, this bill, as it relates to

Medicare, will protect Medicare's already guaranteed benefits. The bill also reduces premiums and copays for older citizens. It will ensure that older citizens can keep their own doctor or doctors with whom they have developed a relationship, on whom they have come to rely, and in whom they have confidence. So we want to make sure they can keep their own doctors.

The bill keeps Medicare from going bankrupt in 8 years by stopping waste, fraud, and abuse and by other provisions as well. The bill provides new preventive and wellness benefits—something we have talked about for every age group, but we are finally going to do something about it to give people better health care options.

The bill also, as it relates to older citizens, lowers prescription drug costs. We will talk more about that. We have had a lot of discussion over the last couple of years about the so-called doughnut hole. That is a very nice-sounding way of describing falling into a period of coverage, if you are an older citizen getting prescription drug coverage, where you have to pay the whole freight, so to speak. This bill provides relief for those who are in that so-called doughnut hole with regard to Medicare prescription drug coverage.

Finally, this bill keeps older citizens in their homes and limits those who would be compelled, if they didn't get additional help, to go into nursing homes. Some do. Some choose to do that. But we want to provide more opportunity for people to stay in their homes, if they can.

In terms of preserving Medicare without the changes made in this bill, Medicare is going broke in 8 years—not 18, not 80, but 8 years—if we do nothing. Older citizens will have trouble accessing their doctors if we don't take action. Older citizens will have trouble affording prescription drugs if we don't take action. Finally, without reform, cost sharing for older citizens will increase to completely unaffordable levels.

Next, we have to make sure older citizens across America have the opportunity to continue to receive guaranteed protection for hospital stays, access to doctors, home health care, nursing home, and prescription drug coverage. We have to make sure we extend the life of the Medicare trust fund beyond 2022. Without reform, we cannot extend the Medicare trust fund beyond 2022. Without reform, we do not have the opportunity to ensure that trust fund will be there for older citizens across America. Finally, health reform will not interfere with any medical decisions made by patients and their doctors.

Let me step back a moment and reflect upon what we are talking about with regard to Medicare: Protecting our seniors, protecting their benefits. It is interesting to note this whole debate started January of 2009, in a fully engaged way, when staffs of all relevant committees were working on

this, month after month. Then it went into the summer, working on health care reform in the Health, Education, Labor, and Pensions Committee and the Finance Committee, improving bills, changing the bills. Now we have one bill that is the result of all that work. So this has been going on for months and months.

I keep hearing criticisms from my Republican colleagues on various aspects of the bill. There is nothing unusual about that. It is natural to have a decision and a debate. We are starting that today, at least on the floor. But we have been having a debate over many months. My point is that on the one hand you have the legislation that resulted from work by the two committees into one bill, so you have the Patients Protection and Affordable Care Act on the floor and you have had basically the ideas contained in that being discussed for many months. But what we have not seen, what I have been waiting for and have not seen, is a bill by the other side.

In other words, when we were working in June and July in the HELP Committee or when the Finance Committee was working all summer and into the fall, you would think that one of the results from that would be that Democrats had a point of view and they produced a bill; Republicans had a point of view. But they did not produce a bill. So you basically have a choice before the American people: the bill before us, which will change and which will be amended. I have some things I would want to change. But the answer cannot be let's go back to square one, where we were a year ago or 5 years ago or 10 years ago and just cancel this and try to start over. This is the result of many years of work, especially many months of work by people at the staff level and Senators across the board.

Unfortunately, the other side does not have a plan, so I can only conclude they want to stay with the status quo. They think where we are in health care is OK; that we should stay where we are, maybe tinker with it a little bit but not change much. I think that is unacceptable. Too many people I run into, in Pennsylvania especially, have said to us: Please provide some protections for me. We are talking about individuals who have health care. Provide some consumer protections. Make sure the Medicare trust fund will always be there. Help me with this doughnut hole problem. This is the problem too many seniors run into when they cannot pay for prescription drugs at a certain point in the delivery of that benefit.

I do not think the response of doing nothing or staying where we are is acceptable. That is one of the reasons why we have to make sure we focus on changes or debates about this bill, not going back to where we were in January or where we were 5 years ago and basically doing nothing year after year about health care and saying it is OK to stay where we are.

Exhibit 151        JA-0002392

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 421 of 677

We have a long way to go. But I think it is also important to point out this is not just a debate between Republicans and Democrats. We have had groups, across the board, that are neutral arbiters that weigh in on public policy but are not representing a Democratic point of view or a Republican point of view. The AARP said on November 20 of this year:

Opponents of health reform won't rest. They are using myths and misinformation to distort the truth and wrongly suggest that Medicare will be harmed. After a lifetime of hard work, don't seniors deserve better?

So says the AARP, just a couple of weeks ago—not even a couple of weeks ago, 10 days ago. The AARP also said on November 18, 2 days earlier:

The new Senate bill makes improvements to the Medicare program by creating a new annual preventive benefit, providing preventive benefits, and most notably for AARP members, reducing drug costs for seniors who fall into the dreaded Medicare donut hole [that I spoke about earlier] a costly gap in prescription drug coverage.

That is the AARP weighing in on not a concept, not a theory but the bill in front of us.

The American Medical Association, on that same day, November 20, 2009:

We are working to put the scare tactics to bed once and for all, and inform patients about the benefit of health care reform.

I could go on from there, but we have ample evidence that there is strong support for the ways this bill will strengthen Medicare.

I wish to move to the second topic I was going to cover today and that is the other end of Hubert Humphrey's test of government, what we do and what the test is of our Government as it relates to those in the dawn of life. I spoke of older citizens a moment ago. At the dawn of our life are children.

It has been a topic and a focus of mine since the very beginning of this debate, which for me began last spring when I was working in the Health, Education, Labor, and Pensions Committee before our work this summer on the bill. The Patient Protection and Affordable Care Act, which is the bill before us today, deals with many aspects of our health care system. One of them is how we take care of our children. I have come back to this issue over and over. I have had just a basic test for this legislation. It is very simple. It is four words: No child worse off, especially and importantly, children who are low income and are particularly vulnerable, therefore, and children with special needs. So ''no child worse off'' should be the foundation of what we do in this bill for our children.

That is particularly true for those who are vulnerable, as I said before; they are vulnerable or children with special needs. That is the foundation of what we should be doing, the foundation for a guiding philosophy. The way I look at this, every child in America, no matter who they are, no matter what circumstance, every child in America is born with a light inside them. For some, that light is boundless because of their circumstance, because

of their ability, because of advantages they have. Their potential is unlimited and that light burns very brightly without any help from anyone else. That is some children.

Then there are other children who have a light inside them and are deserving of our care and protection and advocacy. We have a lot of people around here who get besieged by lobbyists for different points of view, but very rarely do we have the same kind of lobbying power, the same kind of power in our system to stand for children. So we have to do that if an interest group will not. There are plenty who have advocated strongly for our children, but they don't get enough attention in my judgment.

There are some children who are born with a light inside them that does not burn very brightly because of their own circumstances or limitations or because of particular vulnerabilities that they have. They are the ones for whom we have to fight the hardest. They are the ones we have to stand up to the special interests for because they cannot do it for themselves. They don't have a voice sometimes in this debate unless the Senate stands up for them.

I believe no matter what the light is inside a child, no matter what the limit or whether it is unlimited potential, we have to make sure that potential is reached, the full potential—not most of it, not some of it, the full potential of every child, the full burning of that light inside them.

There are two programs that work well to do that. They are Medicaid and the Children's Health Insurance Program. Thank goodness both these programs came along: Medicaid, some 40 years ago, and Children's Health Insurance Program less than the last 15 years.

We have the opportunity to listen to people who come up to us on the street or who send us an e-mail or who send us a letter. It just so happens one of my constituents in Pennsylvania sent us a note the other day, literally 2 days ago, November 28. I will not give away her identity, but I will give you a general sense of what her challenge is.

She wrote to us talking about her two children who are covered by the Children's Health Insurance Program in Pennsylvania. By the way, Pennsylvania is one of the first States that put into place this program, almost 20 years ago, back in 1992–1993.

She wrote and said she was concerned that the House, in their bill, had made some changes that would adversely impact her situation. She said:

We qualify for free Children's Health Insurance Program benefits in Pennsylvania but my husband's income is greater than the 150 percent of the Federal poverty level which means our children wouldn't qualify for the coverage under the House's proposed plan.

Then she says:

This has us terrified.

She goes on to talk about what she and her husband are trying to do to make ends meet. She says:

Our water bills will increase and we are nervously awaiting the annual increase in heating.

I will not go through the whole letter, but suffice it to say we have a program in place now, the Children's Health Insurance Program, that works for families right now. Now we are engaged in a great debate on health care on the floor of the Senate and we deal with programs such as the Children's Health Insurance Program. What we have to make sure about is that we do nothing in this process to injure or harm or set limits on what we can do with a program that we know works.

This is a program which is good for a child, to make sure he or she reaches the full potential of that light inside them. This is good for his or her family. Imagine the peace of mind that a mother or father has in the course of the day, whether they are going off to work or whether they are home, to know their child has health care. Yet we have some families, some parents, terrified even with the coverage they have, worried that coverage will not remain in effect for their children. So we have to make sure that rule is followed: No child worse off in America. We want to fix what is broken and build upon what works.

I wish to make sure, as we go through this, we have a sense of what the difference is between these benefits and what can happen down the road. One of the things that will have an adverse impact on our health care system, generally, but in particular on a program such as the Children's Health Insurance Program, will be the skyrocketing cost of coverage. The share of household incomes spent on premiums is climbing. The New America Foundation reports that in 2008, household income spent—on the side, ''percent of median household income spent on health care''—is 26.3 percent. That is far too high as of 2008.

With no action, if we stay where we are, go down the same road we are on, the status quo, don't change anything, let's start over and keep scratching our head about this, here is what is going to happen by 2016, 7 years away. That median household income dedicated to health care will skyrocket to 45 percent nationally.

Unfortunately, in Pennsylvania, it goes up over 51 percent instead of 45 percent, so that is the ''do nothing'' path right now. Do nothing, and we can guarantee that those costs are going to keep going up and up.

I said before we know the Children's Health Insurance Program works. By the way, when that bill passed and when it was reauthorized, we had help from both sides of the aisle—sometimes not enough help but we have had help supporting that program. We know this program works because we can see it from the results achieved by our children because of this program.

Let's compare this to some other challenges in the economy. The national poverty rate. In 2007, a little

Exhibit 151       JA-0002393

more than 37 million Americans were in poverty, 12.5 percent of the population. In 2008, it was up to 13 percent. So the poverty rate went up from 2007 to 2008. The child poverty rate went from 18 percent to 19 percent, almost 1 million more kids in 1 year falling into poverty because of changes in the economy. People without health insurance, 2007 versus 2008, that has gone up. It may only be 15.3 to 15.4, but look at the overall number, from 45.7 to 46.3. Everything is going up. We would expect that, as tragic as that is, when times are bad. The national poverty rate is up, the child poverty rate up, and the uninsured rate is up.

What has not gone up between 2007 and 2008 is the number of uninsured children: 8.1 million in 2007 were covered; 7.3 million kids covered in 2008. That is good news, that the number of uninsured children is actually going down from roughly 8 to 7 million. That is good news. Why is that happening? It is not magic. If we didn't have a Children's Health Insurance Program, that number would be going up just as the other numbers. Why is the uninsured number for children going down? One basic reason—and we could point to maybe a few others—is because we have a program called the Children's Health Insurance Program which works and which, fortunately, we reauthorized a couple of months ago. Thank goodness we did that, or more and more children would fall into poverty. We are on a path now to go from the number of children who are insured, to get that number that is now in the double figure millions, to get that to 14 million children, to have that uninsured number keep going down and cover more and more children. In a couple of years, we will have the opportunity to say that in America, we have 14 million kids covered. What we have to do is make sure we have a successful program that works for the child, for their family, and for our society. Because guess what. We are going to have a better economy because of the Children's Health Insurance Program. If we invest in a child early, they get health care, and they will learn better. When they learn better, they will be doing better in school and have a better job and have a higher skill level. This whole debate about children's health insurance isn't just a nice thing to do; it is how we compete around the world in a tough economy. It is how we build a skilled workforce in a tough economy. It is how we build strong families.

This isn't just some nice program. This has real results for our economy, for gross national product growth, economic growth, for a skilled workforce. Fill in the blank. You could add 10 themes to that in terms of the impact of the legislation. But you have to be careful. In the midst of this health care reform debate, we have to make sure we don't do what some have urged which is to take the Children's Health Insurance Program, this program that we know works, and drop that into the health insurance exchange that will be created as a result of this bill. The exchange is a good idea to cover a lot of people. It just happens to be a bad idea when it comes to merging or putting the Children's Health Insurance Program in there. It needs to remain a stand-alone program.

One of the reasons why we can say we are at that point where it is a stand-alone program still is because during the debate in the Finance Committee, Senator ROCKEFELLER of West Virginia ensured that we kept the Children's Health Insurance Program out of the exchange and that the program would continue until 2019. Unfortunately, the House doesn't have the same provisions, and we want to make sure we do that by the end of the debate.

I filed an amendment today to make sure that children are protected by health care reform, so we can truly say that no child is worse off as a result of our health care reform bill. In a nutshell, this amendment will strengthen and safeguard health care for children in CHIP from now until 2019 and beyond with whatever changes the future of health care reform brings.

I will provide a couple of highlights. It continues funding through 2019. It ensures that children have access to the essential care they need. It streamlines and simplifies enrollment. The amendment also provides financial incentives for States to increase enrollment of eligible but uninsured children and calls for a study of children under the Children's Health Insurance Program compared to coverage of children under the so-called insurance exchange.

These are just some highlights of my amendment. I will be talking more about it.

I conclude with this thought. I know Senator BAUCUS was here a moment ago, chairman of the Finance Committee, who has worked very hard on this bill, this program, the Children's Health Insurance Program, and on the health care reform bill overall to protect our kids. I return to this letter I got 2 days ago from a mother, in essence commending the benefits of this program, that this program gives her peace of mind. What we have to do is make sure we keep the Children's Health Insurance Program intact and, if anything, strengthened over time so this mother doesn't have to worry again, so she doesn't have to be "terrified" of changes that will adversely impact her two children, especially in the midst of a bad economy but even if it were not.

I thank the Chair and yield the floor.

The PRESIDING OFFICER (Mrs. SHAHEEN). The Senator from Wyoming.

Mr. ENZI. Madam President, I thank the Senator from Pennsylvania for his comments. I certainly hope no one who is listening thinks that anybody wants to make any child worse off. That is a basic premise, and I appreciate his pointing out the way the House makes some children potentially worse off.

I want to constrain my comments to the Medicare amendment because I think that is one of the key parts of this whole bill. The Senator from Pennsylvania mentioned that there wasn't a Republican bill. Actually, there are four Republican bills, and there is one bipartisan bill out there that meets all of the goals the President put out. When we were going through the HELP Committee amendment process, we put one of those out, and it was voted down with one vote. We said: That didn't work very well. There were a lot of good ideas in there. They ought to have to consider every one of those.

We have been putting our ideas out one at a time so that hopefully the other side will glean something out of the amendment that will be worthwhile to be a part of the bill. All the good ideas couldn't be on one side of the aisle.

We began the day with kind of a stunt which, of course, was to have the leader propose a unanimous consent. He proposed that the Social Security money ought to stay with Social Security. I don't think there was any problem with that. But then he proposed that CLASS Act money ought to stay with the CLASS Act. That is a fund that isn't even actuarially sound to begin with. It is just a piece of the bill that is already in existence around here. He left out what he should have put in that unanimous consent request. He should have said Medicare money should be reserved for Medicare. That would have relaxed a lot of seniors. But it would have been untrue and impossible to pass this bill if that were the UC, because Medicare money is going to expansion of new programs outside of Medicare. That is what is upsetting seniors. And it ought to.

Medicare, as everybody has said, is going broke. That is a government option that is going broke. Well, never mind. But Medicare is going broke. We all agree on that. So why would we take $464 billion out of Medicare to use on other programs and then recognize that Medicare is going broke and throw in a special commission that will come to us once a year and suggest cuts to Medicare? That is not a bad idea, but some side deals have been made in this whole thing that keep that from being a very realistic option either. The hospitals can't be cut any more. The doctors, we are going to have to fix that, and that is where some of the phony accounting comes in.

The pharmaceuticals, the little deal they made for the doughnut hole, that will provide extra help to seniors through the doughnut hole, but it has to be on brand name products. We know that generics are a lot less expensive and a lot of seniors switch to generics, especially when they get to the doughnut hole and have to make decisions on their own and they want to save a few dollars. But that will not be a possibility under this bill because of the deal that was made with the

Exhibit 151                                                    JA-0002394

pharmaceuticals. They are going to pay their percentage on brand name products only. Why would they do that? If they can get you to use brand name products through the doughnut hole, when the government starts paying again, you will still use the brand name.

One of the ideas with health care is to get a little skin in the game with everybody so people are making good choices on health care. How much of a good choice are you going to make if you don't have to make a choice and you can keep on doing what you have been doing, whether it is the best choice for you, whether it is even what the doctor agrees with, and whether it is a whole lot more expensive for the government to keep Medicare going?

I rise to support the McCain motion to commit this bill and eliminate its Medicare cuts. Senator REID's bill cuts $464 billion from the Medicare Program. These cuts will eliminate benefits for Medicare patients. They will make it harder for them to see doctors and other providers and will threaten the survival of hospitals, nursing homes, and home health agencies. Don't take my word for it. The administration's own chief actuary recently reviewed the House bill with its similar levels of Medicare payment cuts and reached the same conclusion I just said.

Richard Foster, chief actuary at the Centers for Medicare and Medicaid Services, CMS, wrote that if these cuts were to take effect, many providers "could find it difficult to remain profitable and might end their participation in the program." He also noted that this could jeopardize Medicare beneficiaries' access to care. I have heard similar messages from doctors, home health aides, and nursing home owners back in Wyoming. They are all concerned about the one-half trillion dollars in Medicare cuts and what it will do to their ability to treat Medicare patients.

I have heard from folks at the Baggs Senior Center, the Star Valley Senior Citizens, the Southwest Sublette County Pioneers Senior Citizen Center, and from other Wyoming nursing homes about how the $15 billion in Medicare cuts to nursing home payments will devastate their ability to provide care for seniors in Wyoming. Many of these nursing homes are small businesses. They struggle to make payroll every month and deal with an ever increasing burden of government regulations. We have never cut those back. They tell me how their Medicare payment rates have already been reduced and how the additional cuts in the bill could force them to close their doors.

Connie Jenkins, executive director of the Star Valley Senior Center, recently wrote to me about the important role nursing homes play in rural towns in Wyoming. She noted that "in a rural state such as ours, closure of nursing homes would mean families travelling farther to visit [their] loved ones and in some cases loss of access altogether."

In rural States—and we are about as rural as you can get; we have the least population in the Nation, and we have a lot of land mass—there is a lot of distance between towns. If the nursing home in your town closes down, it is a long way to the next nursing home. The Reid bill would also cut $135 billion in Medicare payments to hospitals. In a State such as Wyoming, with an older population, between 40 to 50 percent of our hospital revenue comes from Medicare. Medicare already pays a fraction of what private insurers pay, and the cuts in this bill will undermine those hospitals' ability to continue to operate. I have heard from several Wyoming hospital executives that because of the payment cuts in this bill, they are going to need to ask their people to work fewer hours and take pay cuts.

They also said they may need to lay some folks off and to find ways to scale back the services they offer to their patients. They do not want to compromise the care they provide, but the payment cuts in this bill will not leave them a choice.

The Reid bill also cuts nearly $8 billion in payments to hospice care. Hospice care helps to relieve the suffering of people who are dying from diseases such as cancer. These are terminal patients, terminal patients who, of course, are not going to be cured. But the hospice is intended to help manage the pain and other symptoms of the patients with the terminal illness, and working with the families, much on a volunteer basis.

According to National Hospice and Palliative Care Organization, the cuts in the Reid bill, combined with prior regulatory cuts, would reduce Medicare payments to hospice providers by 14.3 percent through 2019. According to a June 2008 report from the Medicare Payment Advisory Commission, hospices already operate with narrow profit margins that average just 3.4 percent.

Smaller nonprofits and hospices in rural areas such as Wyoming already operate with negative profit margins. Many depend on charitable fundraising to keep their doors open and to enable them to keep treating patients. Yet the Reid bill would further cut their Medicare payments by $8 billion. This will force many hospices to close, which will threaten dying seniors' access to that type of care.

The Reid bill also cuts more than $40 billion in Medicare payments to home health agencies. According to the analysis done by one industry association, this level of cuts could put nearly 70 percent of all home health agencies at risk of having to close their doors. I want to say that again. The $40 billion in Medicare cuts to home health agencies, according to an analysis done by one industry association, could put nearly 70 percent of all home health agencies at risk of having to close their doors.

There are a lot of people who are out of nursing homes because they are getting home health care. If we eliminate home health care, we drive up the cost of care. If the Senate passes this bill, it will mean that Medicare patients may not be able to get the skilled nursing care, the physical and speech therapy, and the assistance that home health aides provide with many daily activities, such as dressing, bathing, helping patients live more fully with a disability.

The Medicare cuts in the Reid bill are not limited to slashing payments to hospitals and other providers. The bill also cuts $120 billion from the 11 million seniors on Medicare Advantage. These cuts make a mockery out of President Obama's promise that if you like what you have, you can keep it. As a result of these cuts, millions of Medicare beneficiaries will lose the benefits currently provided by Medicare Advantage plans.

Supporters of Senator REID's bill have tried to gloss over the impact these Medicare Advantage cuts will make, arguing they will only result in a loss of "extra benefits." For the seniors who have come to rely on Medicare Advantage plans to provide things such as flu shots, eyeglasses, hearing aids, and protections against catastrophic costs, these are not extra benefits that items and services they depend on.

We all agree Medicare needs to be strengthened and reformed. Its financing is unsustainable. The Hospital Insurance Trust Fund, which pays for hospital services, will be insolvent in 2017. The physician payment formula, which calls for Medicare payments to doctors to be cut by more than 40 percent over the next 10 years, is fundamentally broken. We know that. We even had a vote on that in this Chamber. We said it had to be paid for.

Let's see, $464 billion coming out of Medicare. Medicare is what is being affected by the doctors' payments. Why wouldn't we use some of that? But it is a lot of money. It is a lot of money, but it is not as much money as we are taking out of Medicare.

Unfortunately, the Reid bill does nothing to fix these problems. Instead, it cuts one-half trillion dollars from Medicare to create a brandnew entitlement program for the uninsured. This approach fails to address the real problem facing Medicare; and that is the physician formula. Instead, it uses the same gimmick that Congress has repeatedly used to fix this problem and provides a temporary fix in 2010, which will actually lead to steeper cuts in subsequent years.

Physicians have grown increasingly frustrated by Congress's repeated failure to replace the current payment formula. We kind of like to keep them hanging on a year at a time. I think it is a little bit of a hostage situation, but that is the way Washington works. It should not be that way. We should redo the formula. If we do not address this problem soon, many more physicians are going to decide it is not

Exhibit 151 JA-0002395

worth it to continue to treat Medicare patients.

The Congressional Budget Office has estimated that truly fixing the physician payment formula could cost upwards of $250 billion, yet the Reid bill does not address this problem.

Spiraling costs associated with medical liability lawsuits directly increase Medicare costs. These costs are calculated directly into payment formulas for providers such as physicians. In addition, physicians and hospitals order billions of dollars in extra tests and procedures to protect themselves from the threat of potential lawsuits.

We know that enacting commonsense medical liability reforms directly reduces the liability insurance premiums doctors pay. We have seen the results in States such as Texas, where physicians liability insurance premiums have decreased every year since the State-enacted reforms, with average liability rates dropping a total of 27 percent.

The Reid bill does nothing to address the problems of medical liability. Instead of including reforms that would help reduce Medicare costs and extend the solvency of the program, the only thing the Reid bill does is include a meaningless sense-of-the-Senate resolution on liability reform. That will not pay the bills.

We owe it to the 43 million people who depend on Medicare to reject the arbitrary cuts in the Reid bill. We need to come up with better solutions that will not endanger their ability to see a doctor or to get care at a hospital or a nursing home. Yes, if we do not pay the doctors, the doctors will not take them because in Medicaid they already will not take 40 percent of the patients; and in Medicare it is 20 percent already. A lot of people are being asked, when they call a doctor, if they are a Medicare patient. It is my contention if you cannot see a doctor, you do not have any kind of insurance at all. We do not take care of that problem, so we do need to come up with a better solution that will not endanger their ability to see a doctor or to get care at a hospital or a nursing home or to have home health care.

I believe we can do better. If the Senate passes this motion to commit, we can develop bipartisan reforms that will eliminate the unsustainable payment cuts and address the underlying problems facing the Medicare Program.

I yield the floor.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Madam President, I am not in favor of doing nothing. The previous Democratic speaker, Senator CASEY, said if we do nothing, costs will go up. I think the fact is, if you look at CBO's analysis, it says costs will go up even more if this bill, this 2,074-page bill, passes. So I want to spend some time because there has been some obfuscation on what this Congressional Budget Office letter to Senator BAYH means.

This morning, the nonpartisan Congressional Budget Office sent a letter to Senator BAYH providing a very detailed analysis of what health insurance premiums will look like as a result of this 2,074-page bill. I have the letter from the Congressional Budget Office right here, if anybody wants to read it in detail.

Like many of us, Senator BAYH wants to know if the Reid bill is addressing our constituents' No. 1 priority: costs. I think if you were to have a Saturday morning coffee club meeting in almost any of the small towns of America, and they were discussing health care reform—and emphasis upon the word ''reform''—and I walked into that meeting, and if I told them under this 2,074-page Reid bill that costs were not going to be brought under control, taxes were going to go up, premiums were going to go up, and we were taking $400 billion out of Medicare to set up a new health care program, they would probably unanimously respond: Well, that does not sound like health care reform to me.

A lot of Senators are concerned about costs because that is what we are hearing from the grassroots of America. Everyone, from the dean of Harvard's Medical School to even the New York Times, has said this bill does not sufficiently address the rising cost of health care. But before today, we were still all anxiously waiting to hear what the Congressional Budget Office has now said about that issue of rising costs. Well, today, CBO has spoken loudly and clearly. The Reid bill not only fails to bring down costs, it will actually raise costs for millions of Americans. I think that bears repeating. The Reid bill will make health insurance more expensive. Families will end up paying 10 to 13 percent more as a result of this 2,074-page bill.

Some proponents of the bill are trying to spin this, what they consider unfortunate news, and tell the American people that taxpayer-funded subsidies will actually offset these cost increases. In fact, tonight some Members have already been saying that this CBO analysis shows costs will come down.

But I want to make it very clear CBO says that is not the case. Well, this may be true; if you take $500 billion of taxpayers' hard-earned money and give it out in subsidies directly to insurance companies, sure, some people may end up paying less for health insurance. But this argument fails to recognize two big underlying problems.

First, most Americans will not qualify for any subsidies. They will end up paying higher premiums. In fact, 160 million Americans who stay in employer-based plans will not see any help. In fact, despite all the rhetoric about how employers cannot afford the status quo, CBO says this bill does little, if anything, to lower costs for employers. Maybe that is why the National Federation of Independent Businesses, the U.S. Chamber of Commerce, and a host of other business groups, oppose this 2,074-page bill.

The nonpartisan Congressional Budget Office goes on to say that 14 million people who cannot get coverage through an employer will not get any help either, but they will see a 10- to 13-percent increase in premiums. And, of course, an intrusive new insurance mandate will be enforced by the IRS if you do not do what has never been done in the 225-year history of America. Never has the Federal Government said any American had to buy anything. Now you have to buy insurance. If you do not buy it, pay the IRS more money. Some people are going to say: Well, you have to buy car insurance. But under the tenth amendment, the State governments have any powers that are not prohibited by the Federal Constitution to them.

So families who would have paid $13,100 under current law will actually pay more than $15,000 as a direct result of this 2,074-page bill. And people in employer-based coverage will be paying more than $20,000 a year for health insurance in 2016.

The second big problem is this: Health insurance premiums are still more expensive in the Reid bill than they would be under current law. The government is cutting Medicare and raising taxes to offset the increases. So instead of addressing the underlying issue of cost, as was promised, this bill enacts policies that drive up costs by close to 30 percent, and then hands over close to $500 billion in hard-earned taxpayer dollars directly to health insurance companies to offset the increases.

Well, you might not believe the spin. In fact, you better not believe the spin because the nonpartisan Congressional Budget Office has confirmed it. This bill fails to drive down the cost of health insurance premiums. It simply drives up prices with a bunch of arbitrary regulatory reforms, very cutely shifting the cost on to the American people in the form of higher taxes and massive Medicare cuts. So, once again, don't take my word for it. Read what the nonpartisan Congressional Budget Office says. They have confirmed what we have been hearing for months: The Democratic leadership bill means higher costs for millions of Americans.

I yield the floor.

Mr. ENZI. Madam President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. DURBIN. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

## MORNING BUSINESS

Mr. DURBIN. Madam President, I ask unanimous consent that the Senate proceed to a period of morning business, with Senators permitted to speak therein for up to 10 minutes each.

Exhibit 151                                                                                                          JA-0002396



Voinovich    Webb    Wicker
Warner    Whitehouse    Wyden

NOT VOTING—3

Begich    Byrd    Sessions

The nomination was confirmed.

The PRESIDING OFFICER. Under the previous order, the motion to reconsider is considered made and laid upon the table.

The President will be immediately notified of the Senate's action.

## LEGISLATIVE SESSION

The PRESIDING OFFICER. The Senate will resume legislative session.

## RECESS

The PRESIDING OFFICER. Under the previous order, the Senate will stand in recess until 2:15 p.m.

Thereupon, the Senate, at 12:33 p.m., recessed and reassembled at 2:15 p.m. when called to order by the Presiding Officer (Mr. CARPER).

## SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009—Resumed

The PRESIDING OFFICER. The Senator from Iowa is recognized.

Mr. GRASSLEY. Mr. President, as I said yesterday when I spoke on this very same bill, the excesses of the Reid bill appear willfully ignorant of what is going on in the rest of the economy outside of health care.

I believe the reason people have objected to the health care bill so quickly after the summer was that there was a rude awakening on a lot of other things the Congress has done to put this country further into debt, and then they heard us talking about $1.3 trillion and $1.6 trillion for health care, and they thought Congress had gone bananas. So everything seemed to focus on health care reform at that particular time. People were concerned about the economy as a whole. I think the health care issue in and of itself was what people came out for, but health care was kind of the straw that broke the camel's back and brought attention to everything else—the debt and things that weren't working. At the same time, they saw the auto industry going into bankruptcy and, of course, being bailed out or nationalized, as it is. They have seen banks go under. Then they wondered about health care being nationalized as well.

We have seen our Federal debt skyrocket by $1.4 trillion since this President took office. I say ''since this President took office'' because I acknowledge there was a trillion-dollar debt in last year's budget. Just with the addition, it comes out to $11,500 per household. So our Federal debt exceeds $12 trillion for the first time in history. Already, foreign holdings of U.S. Treasuries stand at nearly $3.5 trillion or 46 percent of the Federal debt held by the public. There doesn't appear to be light at the end of the tunnel. Don't just

take my word for it. We have the non-partisan CBO and the White House Office of Management and Budget which have intellectually honest people working there who aren't politically motivated who tell us really what is what. This is what they have to say. Both have stated that within 5 years, the Obama administration's policies will more than double the amount of debt held by the public. Both have stated that by 2019 these policies will more than triple the national debt.

In this context, you would expect Congress to be considering a bill that would create jobs and prevent the country from being burdened with a bigger and more unsustainable Federal budget. Instead of working to bring the Federal budget under control, we have in this Congress—the majority of it, by 60 being Democratic—putting forward a bill, this 2,074-page bill before us that will cost $2.5 trillion when fully implemented. Instead of addressing the budget crisis, this bill will bend the Federal spending curve the wrong way by over $160 billion over the next 10 years.

I remember during the summer that the Gang of 6, under the leadership of Senator BAUCUS—I was part of that bipartisan group—said there are two things we need to accomplish: We need to make sure that what we have comes out balanced, and we also need to make sure we do not have inflation of health care continuing to go up, that we would eventually bring it down. These bills don't do either. I know people say we do have the 10-year window balance. Yes, that is technically right. But when you have 10 years of income and 6 years of policy expenditure, it is easy to do almost anything you want to in that 10-year window. But you have to look beyond that 10-year window, and then you have questions about that.

So instead of addressing this budget crisis, this bill adds to the Federal burden with enormous costs from the biggest Medicaid expansion in history and unfunded liabilities from the new program. Instead of addressing this budget crisis, we are now considering this 2,074-page bill that cuts Medicare by 3½ trillion and threatens seniors' access to care.

After the bailouts of Wall Street and Detroit, a stimulus bill that has led to the highest unemployment in 26 years, and the Federal Reserve System shoveling money out the door without any accountability—they even object to having the GAO check on them—the health care reform agenda the Democratic leadership put forward is, once again, kind of the straw that broke the camel's back.

We have the Senator from Arizona offering a motion to send this bill back to the Finance Committee with instructions to report a bill without the drastic, arbitrary Medicare cuts that are in this bill. I support the Senator's motion because it is an opportunity to fix the bill and then come back to the full Senate with a better bill. Anything

that comes back to the Senate floor should not have the drastic and arbitrary Medicare cuts.

I am hearing this from seniors: I have paid into this Medicare for all these years. I am in retirement, and now Congress wants to take that money and establish a new entitlement program for somebody else other than seniors. So to a lot of seniors it just doesn't add up.

This bill, as written, now permanently cuts all annual Medicare provider payment updates in order to account for the supposed increases in productivity by health care providers. The productivity measure used to cut provider payments in this bill does not represent productivity for a specific type of provider, such as nursing homes.

You would think that if Medicare is going to reduce your payments to account for increases in productivity, it would at least measure your productivity, not an entire group of productivity or not somebody else's productivity but yours, and you would be rewarded according to that productivity or, if it wasn't productive, be harmed because of it because you are not doing the best job you can. But that is not the case. Instead, these reform bills would make the payment cuts based on measures of productivity for the entire economy. So if the productivity of the economy grows because computer chips and other products are made more efficiently, then health care providers see their payments go down. What is the relationship? These permanent cuts threaten beneficiary access to care.

The Chief Actuary at the U.S. Department of Health and Human Services recently identified this threat to beneficiary access to care. He confirmed this in an October 21 memorandum analyzing the House of Representatives' bill and again in a November 13 memorandum. Both the House bill and the Senate bill propose the same type of permanent Medicare productivity cuts.

We have a chart here. Here is what Medicare's own Chief Actuary had to say about these productivity cuts. Referring to these cuts, he wrote:

> The estimated savings . . . may be unrealistic.

In their analysis of these provisions, Medicare's own Chief Actuary said:

> It is doubtful that many could improve their own productivity to the degree achieved by the economy at large.

The Actuary goes on to say:

> We are not aware of any empirical evidence demonstrating the medical community's ability to achieve productivity improvements equal to those of the overall economy.

So you have a $14 trillion economy today. You have $2.3 trillion of that, or one-sixth, related to health care, and you are going to try to do something to the health care aspect, productivity measure, harm or benefit, based upon what happens to the entire $14 trillion economy? That doesn't make sense.

Exhibit 151

The Chief Actuary's conclusion is that it would be difficult for providers to even remain profitable over time as Medicare payments fail to keep up with the cost of caring for the beneficiaries.

Going back to my chart again, ultimately here is the Chief Actuary's conclusion—that providers who rely on Medicare might end their participation in Medicare, ''possibly jeopardizing access to care for beneficiaries.''

This bill also cuts $120 billion from the Medicare Advantage Program, which provides health coverage to 11 million seniors, including the 64,000 seniors in my State of Iowa. These drastic Medicare cuts would reduce Medicare payments for those 11 million beneficiaries by close to 50 percent.

Just like a lot of people, seniors are struggling financially right now, and these Medicare Advantage cuts will only make it harder for them to afford vision care, chronic-care management, dental care, and other benefits they have come to rely on, of their own choosing, because they decided to go to Medicare Advantage instead of staying in traditional Medicare. And what they are going to lose if they don't want to stay in Medicare Advantage and they are not going to get the benefits they got out of it, they go over to traditional Medicare, are these sorts of benefits which will not be included in traditional Medicare.

During the campaign, the President said that if you like what you have, you can keep it. Well, that won't be true for Medicare Advantage people. They will either pay more, which is contrary to what the President said in his September speech to the joint session of Congress, they are going to pay more or lose benefits.

Another problem is that this bill creates a new body of unelected officials with broad authority to make even further cuts in Medicare. Ironically, this body has been renamed the ''Independent Medicare Advisory Board,'' but it is not really advisory. I would hardly describe this group that way when its so-called recommendations can automatically go into effect, even absent congressional action—absent Congress going after it.

I want to go to the chart again. The Wall Street Journal has a more appropriate name for this group. They call it the ''rationing commission.'' They described it as ''the unelected body that will dictate future medical decisions.''

These additional cuts in Medicare will be driven by arbitrary spending targets and automatic Medicare cuts written into law by this bill.

This bill, unwisely, makes this board permanent. This bill requires this board to continue making even more cuts to Medicare and to do that forever. If you want to stop it, it will take another act of Congress to do it. Of course, this kind of sounds like the sustainable growth rate, or SGR, that impacts doctors every year. We always have to correct the mistakes that were

made by passing the sustainable growth rate, SGR, first set in place probably 20 years ago, because this SGR formula set arbitrary spending targets. These targets turned out to be unrealistic. Now that flawed formula will cause an automatic 21-percent cut in Medicare physician payments on January 1 if Congress doesn't intervene by the end of the year.

We all know the challenges Congress faces every year in trying to prevent these Medicare physician cuts that are supposed to take place because spending targets have been exceeded, so automatic payment cuts are then to automatically kick in.

We have all heard from physicians in our States about the challenges in providing care to Medicare beneficiaries while these payment cuts loom above. This permanent board would cause the same problem for the entire Medicare Program, not just as SGR does for physician payments. This is a far bigger threat to the Medicare Program. It will jeopardize access to health care for our Nation's seniors on a much bigger scale.

If this bill is enacted with this permanent board, we will be hearing from other providers, in addition to doctors, about how they cannot afford to treat Medicare patients.

What is more alarming is that special back-room deals were cut to exempt some providers. This forces then, because of these special exemptions that were made, even greater cuts to fall directly on the remaining providers.

Also, the Congressional Budget Office has confirmed that the board structure requires it to take focus on its Budget Act on premiums that seniors pay for Part D prescription drug coverage and for Medicare Advantage.

I have already spoken about Medicare Advantage but just think: One of the things we hear about this time of the year all the time from seniors is prescription drug costs are going up, premiums on Part D are going up. Then you want to give this advisory commission—that is not advisory—authority to increase premiums that seniors pay for Part D prescription drug coverage? That means higher premiums for some of our most vulnerable populations.

Another issue that cannot be ignored is the pending insolvency of the Medicare Program. The Medicare hospital insurance fund started going broke last year. That means more money is going out than is coming in from the payroll tax. The Medicare trustees—you remember, they report yearly and they look ahead 75 years—the Medicare trustees have been warning all of us for years that this trust fund is in terrible trouble and, by a certain date, 2017, we bust it. But rather than work to bridge Medicare's $37 trillion in unfunded liabilities—and that $37 trillion is that 75-year figure the trustees give us once a year, each spring, as they update it—so instead of working to bridge that $37 trillion of unfunded liabilities, this bill does what? It cuts $½ trillion from the

Medicare Program to fund yet another unsustainable health care entitlement program.

Medicare has a major problem with physician payments that could cost more than $250 billion to fix, but this bill ignores the problem. Instead, the proposed legislation assumes the government would implement the 23-percent Medicare cut scheduled to go against doctors in January 2011, as well as additional cuts that are scheduled for future years under that SGR.

By pretending the physician payment issue does not exist, this bill would leave future Congresses virtually no way to restructure Medicare that would fix this problem. Instead, this bill diverts Medicare resources elsewhere and ignores major problems such as that one.

Besides ignoring major problems, such as the physician payment issue, this bill also ignores the predictions of experts that Medicare cuts, such as are in this bill, will jeopardize access to care of Medicare beneficiaries.

There are no fail-safes in this bill that would automatically kick in if these drastic cuts caused limited provider access or worsened quality of care. Instead, Congress would have to step in. Congress can always step in, but will it step in. We know how impossible it is to undo this kind of damage. By making this board a permanent program and requiring permanent productivity cuts, they become part of the baseline in the next decade. They go on cutting, cutting, cutting forever. If Congress ever wants to shut off those cuts, then this is the problem Congress faces: We have to come up with offsets to do it. The administration can cut and cut and cut or add and add and add. They do not have to do that. But the budget laws require us to have these offsets or to do the famously impossible thing to do—get a 60-vote margin to overcome it.

The Congressional Budget Office has projected that these Medicare cuts keep increasing by 10 to 15 percent each year over the next decade. You heard me right. Medicare cuts keep growing 10 to 15 percent each year beyond the year 2019. Those are some pretty substantial cuts in a program that 43 million seniors and people with disabilities rely on for their health coverage.

Provisions, such as the productivity adjustments and the Medicare independent advisory board, would drive the increased cuts to the program. This gives us an idea of the damage these bills will do to health care. This is an example of the challenge Congress will face in the next decade if this bill—this 2,074-page bill—becomes law.

The few years of extended life this bill would give to the Medicare hospital insurance trust fund is a pyrrhic victory because the drastic and permanent Medicare cuts in this bill will worsen health care quality and access.

This bill is the wrong way to address a big and unsustainable budget. You

Exhibit 151

simply cannot slash Medicare payments, spend those funds to start up another new unsustainable government entitlement program, and then turn a blind eye toward the effect on access and quality. That is why I will support the motion of the Senator from Arizona to commit this bill and develop a bill without these Medicare cuts. I urge my colleagues to do the same.

The reason I urge my colleagues to do the same is because we have an opportunity to step back just a little ways, go back to the drawing board on bipartisanship and maybe come up with something that fits in with the health care issues affecting the lives of 306 million Americans and, secondly, restructuring one-sixth of our economy. That is something I have heard people on both sides of the aisle say ought to be done on more of a consensus basis than the partisan road this is going down. It was a road that, for the first 6 months of this year, looked very doable, but it never turned out that way.

I get back to this bottom line: If you are having a coffee club meeting in some restaurant Saturday morning in Delaware, Illinois or Iowa, and they are talking about health care reform and I go in to explain that what we are discussing right now on the floor of the Senate is going to raise taxes, it is going to raise premiums, it is going to not do anything about the inflation of health care costs, and we are going to take almost $1½ trillion out of the Medicare fund to fund a new entitlement program, I would say that unanimously people would say: This is not health care reform. There has to be something else. But we throw away the word "reform" when we are not accomplishing the kind of goals we set out to accomplish the first 6 months of this year.

I yield the floor.

The PRESIDING OFFICER. The Senator from Illinois.

Mr. DURBIN. Mr. President, there is a saying in Iowa; that is, that any old mule can kick down a barn door, but it takes a carpenter to build one. I would modify that slightly and say any old elephant can kick down a barn door, but it takes a carpenter to build one.

We are debating health care reform. The American people are following us closely because it affects every single one of us in this room, everyone in the galleries, and everyone watching. This is one of the few issues we will debate which you can bet is going to affect you and your family personally. It is rare that an issue comes before us of this gravity and an issue that reaches every single person in America. It may be the biggest single issue we have ever tackled on the floor of the Senate in terms of its scope and its impact on the future of every single one of us.

For more than a year, a lot of people have been working hard to come up with a piece of legislation that will have a positive impact on health care in America. It has involved lengthy committee hearings. The Presiding Officer is a member of the Senate Finance Committee. They sat in meetings hour after weary hour, day after weary day, considering amendments before they produced a bill that is part of what we have before us today.

The Senator from Iowa is part of that same committee. I understand he met personally over 60 times with Democratic Senators and a few from his own side trying to see if we could come up with some kind of bipartisan approach. I commend him for his good-faith effort in doing that.

There is another committee, the Health, Education, Labor, and Pensions Committee, that spent even more days in deliberation on a bill, considered over 100 different amendments, adopted over 100 Republican amendments to the bill, and not one single Republican Senator would then vote for the bill—not one. One Senator, Senator SNOWE of Maine, voted for the Senate Finance Committee bill. One Republican Senator voted for that version of the bill.

What we have today—and I wish to slightly modify the remarks of my friend from Iowa—is a 2,074-page bill with a 1-page add. This is Senator REID's amendment to use it as a substitute. So it is 2,075 pages, created by these two committees in the Senate and a similar endeavor taking place in the House.

For at least 10 days, this bill, in its entirety, has been available for public review. I ask anyone interested who wants to read this bill, as every Member should, to go to the Senate Democratic Web site. If you Google "Senate Democrats," you will find it and you will find this bill in its entirety, every single word of it, sitting out there to be read and reviewed, as it should be.

Then I invite you, for comparison's sake, to go to the Senate Republican Web site to look at the bill produced by the Senate Republican side. Take a look at the Senate Republican health care reform bill. Take a look at what they propose to change—the health care system in America. Look at the Senate Republican proposals for making health insurance more affordable. Look at the Senate Republican proposals for dealing with health insurance companies which deny you coverage because of preexisting conditions. Take a look at the Senate Republican approach to pass health care reform and not add to the deficit. I am afraid you will be disappointed because, as the Senator from Iowa knows, when you go to the Senate Republican Web site, there is no Senate Republican bill. In fact, what you will find on the Senate Republican Web site is the Democratic bill.

For more than a year, while we have labored to produce this monumental, historic legislation, our Republican colleagues on the other side of the aisle have not broken a sweat to produce their own answer to this challenge facing America. All they can do is come before us and criticize this bill. Any old mule can kick down a barn door, but it takes a carpenter to build one.

We have been working for over a year—almost a year—to build this health care reform package. Here is what we know. We just received a report from the Congressional Budget Office, which is akin to the referee up here. This is an agency that takes a look at what we do and tells us whether it is going to reduce the deficit, add to the deficit, reach its stated goal or fail to reach it. It is maddening sometimes to have this separate agency kind of looking over your shoulder, but they do. They reported just yesterday that this bill will make health insurance more affordable for many Americans and will not add to the costs for many others.

I wish it would do more. I wish it would bring down costs dramatically, even more. But for weeks and months we have heard from the Republican side that our health care reform proposal would run premiums sky high. It turns out they were wrong. This bill we have produced moves us toward more affordable health insurance. Every American who pays any attention to the cost of health insurance knows that is absolutely essential. In the last 10 years, health insurance premiums have gone up 131 percent in America. Ten years ago, a family could have bought health insurance for about $6,000 a year. Now they buy it on average for about $12,000 a year. In 7 or 8 years it will go up to $24,000 a year in premiums, projecting it will eat up 40 percent of your income for health insurance in just 8 or 10 years.

That is an impossible situation. We know it is. It is unsustainable. Businesses can't offer health insurance that expensive. Individuals can't buy health insurance that expensive. So if we do nothing we will reach a situation where the current health care system in America will start to collapse. I do not want to stand idly by and let that happen; neither does President Obama. He has challenged us to address it and address it honestly.

On the other side of the aisle, the Senate Republicans have not produced a bill, a proposal, an alternative which will make health insurance more affordable—nothing. They come before us in criticism of what we have done, and yet they cannot produce a bill.

I might also tell you the same Congressional Budget Office tells us the bill we put together will actually reduce the Federal deficit over the next 10 years by at least $130 billion. This bill, this 2,075-page bill, will cut more deficit than any piece of legislation we have ever enacted in Congress.

The Senator from Iowa is concerned about our national debt. So am I. Where is the Senate Republican proposal for health care reform that is going to reduce America's deficit? Incidentally, the same Congressional Budget Office says in the second 10 years—

think that far in advance—this approach will reduce the Federal deficit by another $650 billion.

I ask the Senator from Iowa, with all his concern about the Federal deficit, where is the Senate Republican bill that will reduce the Federal deficit by $750 billion over 20 years?

The answer, I am sorry to tell you, is it does not exist. They either have not or cannot write a bill. They are legislators, but frankly they have come here to be critical of what we have done and will not offer a substitute or an alternative.

There is something else this bill does. It is a travesty in America today that almost 50 million people do not have health insurance. A lot of these folks are children. A lot of them are people in low-wage jobs with no benefits. A lot of them are the newly unemployed. These are 50 million of our neighbors in America who go to sleep at night without the peace of mind of having health insurance protection.

In my life it happened once: newly married, college student, baby on the way, no health insurance, and our baby had a problem. I ended up carrying, for 8 years, medical bills that I slowly paid off year after year. That goes back many years ago, as you might imagine, but it was troubling and heartbreaking to be the father of a child and not have health insurance; to sit at Children's Memorial Hospital in Washington, in the room that was set aside for people without health insurance, and wait until my number was called to bring my wife and my baby in for a checkup. I didn't have health insurance. I never felt more helpless in my life.

Fifty million Americans go to bed each night with that feeling. They don't have health insurance. What does this bill, this 2,075-page bill, do about it? It extends the coverage of health insurance, the peace of mind and protection of health insurance to 94 percent of Americans. It is the largest extension of health insurance in our history.

Where is the Republican alternative that offers coverage for 94 percent of Americans? It doesn't exist. They have not written that bill. They don't know how to write that bill. They do know how to come and criticize this bill, but they cannot produce a bill which covers 94 percent of Americans and provides tax credits and tax assistance to help those Americans pay their premiums.

If you are making under poverty wages, let's say you are making less than $14,000 a year—and I have friends of mine in my State who are—you are covered by Medicaid. You don't pay premiums. The Federal Government compensates the States and pays the premiums. All the way up to about $80,000 for a family of four, we provide credits and help to pay the premiums, as we should, because premiums can break the bank not only for businesses but for families.

There is also something we do in this bill I never hear from the other side of the aisle—and I will tell you why in just a second. We give consumers across America a fighting chance when the health insurance company goes to war with you. Do you know what I am talking about? If somebody in your family gets sick, you know it is going to require a hospitalization or surgery and you know the cost is going to go sky high, and you say: Thank goodness, I have health insurance. You make the claim and the health insurance company comes back and says: We dispute the claim. We are not paying. People say: Wait a minute, I have been paying health insurance premiums for years just for this day, and you are telling me I don't have coverage?

It happens thousands and thousands of times each day. Do you know why? Health insurance companies are profitable when they say no. What are the reasons for saying no? "You failed to disclose a preexisting condition when you applied for the insurance." It turns out they go to ridiculous extremes to find an excuse not to provide coverage.

We also know what happens when you lose a job. You can't take your insurance with you, by and large. We know when your child reaches the age of 24 they are no longer carried on your family health insurance. Those are the realities of health insurance companies saying no. I have yet to hear the first Republican Senator come to the floor and say that is outrageous and it has to change. We have to tackle the health insurance industry because the health insurance industry opposes this bill.

The health insurance industry believes their profitability and their future depend on saying no. This bill starts saying to these companies: You can't say no based on a preexisting condition, based on lifetime limit, based on losing a job. And we cover kids through the age of 26. We extend the family coverage to children of that age, and you know that is only sensible because a lot of kids are going to college and getting out without jobs. You want them covered by your family health insurance plan. This bill does it.

Republicans have yet to produce one bill, just one, on health care reform to take on the health insurance industry. Instead, what they have come to do, and the pending amendment by the Senator from Arizona leads with this, is to protect the health insurance companies. The first thing the motion to commit does, from the Senator from Arizona, is to instruct the committee, the Senate Finance Committee, to protect a program called Medicare Advantage.

This is a great idea for health insurance companies and not a great idea for most seniors or taxpayers in America. Allow me to explain. The health insurance companies came to us several years ago and said Medicare is a bureaucratic mess. The government cannot run these programs. We are in the private sector. We understand competition. Let us compete with Medicare.

They were given the right to do that. Private health insurance companies were given the right to write health insurance that provides Medicare benefits. They said they could do it more cheaply and, in fact, some of them did. But at the end of the day, after years of watching them, it turned out these Medicare Advantage policies cost 14 percent more—not less, 14 percent more—than government-administered Medicare Programs. In other words, we were subsidizing health insurance companies, paying them more for the same Medicare coverage people already had received.

They loved it. Thousands and thousands of Americans are now covered by Medicare Advantage with these great subsidies coming from the Federal Government. Talk about an earmark, Senator, 14 percent—what an earmark that is, a subsidy given to the private health insurance companies.

Mr. McCAIN. Will the Senator yield for a question? Since the Senator mentioned my name, will he yield for a question?

Mr. DURBIN. What the basic problem with the amendment of the Senator form Arizona is—and I will yield in just a moment—what the basic problem with his amendment is, he is protecting these health insurance companies with Medicare Advantage. First thing he does. He is protecting this subsidy, this big fat earmark we put in legislation, 14 percent bump in premiums is protected by this motion to commit.

It is understandable the health insurance companies want to keep this. It is a sweet deal. They are getting paid for something they promised us would never happen. Also, there is a provision in the motion to commit of the Senator that says we should take out the conflict-of-interest sections in Medicare. Do you know what that is? That is when your doctor also owns the laboratory which does your blood test and the imaging center which does the x rays and says: I am not sure what is wrong with you, but I know there are two things you need: You need a blood test and you need an x ray.

Maybe you do; maybe you don't. We say in this bill you have to disclose to your patient that you have a personal financial interest in this laboratory and this processing operation, and you have to give them an alternative to shop for another place if they want. Is that unreasonable? It is one of the provisions the Senator from Arizona wants to take out. It is a savings in Medicare.

That is unfortunate. We have to do our best to eliminate the waste and fraud and abuse, as terrible as that old cliche is, in Medicare. Why is it that the same medical procedure offered in Rochester, MN, to a Medicare recipient costs twice as much or more in Miami, FL? Do you think maybe we ought to take a look at that? I think we should. I think maybe there is some price gouging. I want to know.

Exhibit 151    JA-0002400

Does that mean we are going to reduce the benefits for someone living in Miami? Not necessarily. But it means the taxpayers will not be ripped off. Medicare would not go broke. We are doing what we need to do to be responsible. So taking money out of Medicare means shutting off the subsidy to the private health insurance companies for Medicare Advantage. It means stopping the self-dealing of some doctors who are sending Medicare patients to their own labs and their own processing companies. It means finding out where the waste is taking place.

The Senator from Arizona says we instruct the Finance Committee to take out those provisions in the bill. Keep Medicare Advantage there, with the 14 percent subsidy for private health insurance companies, don't engage these doctors when it comes to these conflicts of interest. I don't think that is right.

It was not long ago that my friend from Arizona was a candidate for another office. During the course of his campaign for President, he suggested we have a pretty substantial cut in Medicare and Medicaid. In fact, during the campaign the Senator from Arizona called for $1.3 trillion in reforms in Medicare and Medicaid, more than twice as much as we are calling for in Medicare, 2½ times as much.

Douglas Holtz-Eakin, who worked for the Senator from Arizona, said the campaign planned to fund tax credits in their health care proposals with savings from Medicare and Medicaid. So the idea of saving money in Medicare is certainly not something with which the Senator is unfamiliar. We all understand there are possibilities for savings that don't jeopardize basic services for seniors. We also understand that left untouched, Medicare is going broke. Ignoring the problem will make it worse. If we want to put Medicare on sound footing we have to tackle this issue foursquare. We cannot afford these subsidies for private health care companies for Medicare Advantage, and we cannot afford the waste that is going on in the system today.

I might also tell you the increase in payroll taxes for those individuals making over $200,000 a year and families over $250,000 a year—that is the increase in the Medicare tax—is going to be buying 5 years of solvency for Medicare. So when they talk about our raising taxes—true, at the highest income levels—what they don't tell you is the other side of the coin. The money brought in goes straight to the Medicare trust fund to keep it solid.

What else does this bill do? It starts filling the doughnut hole. You may not know what that means until you happen to be a senior or have one in your family, but Medicare prescription drug coverage stops paying at a certain point. This bill starts coverage in the doughnut hole, in the gap in coverage that currently exists in Medicare prescription Part D.

Where is the Republican bill to fill the doughnut hole? It doesn't exist—at least I have not seen it. It is not on their Web site. Here is ours. That is why AARP has endorsed this bill. The American Association of Retired Persons knows this bill is a good bill for seniors.

I urge my colleagues to oppose the McCain motion to commit.

If we take this bill off the floor, which many Republicans want us to do, it will take us days, maybe a week, to bring it back to the floor. They want to delay this as long as possible. They want us to fail. They want us to stop. They want us to adopt the Senate Republican approach to health care reform which is do nothing, leave the system the way it is. We cannot continue the system the way it is. This is a responsible bill. It makes health insurance affordable. It reduces the deficit, according to the CBO, and covers 94 percent of Americans. It finally tackles the health insurance companies for the first time in a long time, and it buys at least 5 years more for the Medicare Program. I wish I could compare it to the Senate Republican approach, but that doesn't exist. Any mule can kick down a barn door. It takes a carpenter to build one.

I yield the floor.

The PRESIDING OFFICER (Mr. UDALL of Colorado). The Senator from Arizona.

Mr. McCAIN. I regret that the Senator from Illinois did not observe the courtesies of the Senate, particularly when a person's name is mentioned, as he continued to mention my name throughout and totally falsifying my position both in the Presidential campaign and the position that we have on this side and this amendment. I have always extended that courtesy to the Senator from Illinois. I deeply regret that even this comity of the Senate is no longer observed.

I say to the Senator from Illinois, I regret you would not respond to a question I had posed, when you had said: I will respond in a minute. Again, even comity is not observed here.

Mr. DURBIN. Will the Senator yield for a second?

Mr. McCAIN. I will go ahead with the—the Senator did not provide me with the courtesy of allowing me to respond to a question. Now you want me to respond to a question from you? I will display more courtesy than you displayed to me. Go ahead.

Mr. DURBIN. I apologize. I planned on yielding to you. I would be happy to yield to you. I always do, and I failed to. I apologize.

Mr. McCAIN. Well, I guess my questions were, one, did the Senator, who claimed that no Republican has done anything to curb the health care insurance industry, was the Senator in the Senate when Senator Kennedy and I fought for weeks and months for the Patients' Bill of Rights? Was the Senator here then? Was he engaged in that debate? Senator Kennedy and I fought for the Patients' Bill of Rights, and the majority on that side of the aisle opposed it. The fact is, there have been efforts on my part to curb the abuses of the health insurance industry by sponsorship of the Patients' Bill of Rights.

Second, during the campaign, yes, I said that we could reduce and eliminate waste, fraud, and abuse in spending, and I said it because of Senator COBURN's Patients' Choice Act which would save $1 trillion in the States in Medicaid savings, $400 billion over the next 10 years in Medicare savings. I wish the Senator from Illinois would examine the Patients' Choice Act, as proposed by the Senator from Oklahoma. Maybe he would learn something. The Coburn bill wants to preserve the best quality health care in America and not eliminate $12 billion in the Medicare Advantage Program, which 330,000 of my citizens who are enrollees like and want to keep, not eliminate $150 billion to providers, including hospitals, hospice, and nursing homes, $23 billion in unspecified decreases to be determined by an independent Medicare advisory board, as well as billions of additional cuts to the Medicare Program.

There is no relation between what I tried to do in my campaign and what is being done in this legislation, I tell my friend from Illinois. I would be glad to hear the Senator's response. I would be glad to extend him that courtesy.

Mr. DURBIN. I thank the Senator from Arizona. I commend him for his work on the Patients' Bill of Rights which I joined him in with Senator Kennedy and would do it again. The point I was making—

Mr. McCAIN. Your statement was that no Republican had done anything. You just said no Republican had done anything to curb the health insurance industry. The Patients' Bill of Rights certainly would have done it.

Mr. DURBIN. My point was that there are provisions in this bill dealing with the rights of consumers against health insurance companies which I have not heard the Senator or others——

Mr. McCAIN. That is not what you said.

Mr. DURBIN. I ask you, do you support the health insurance reforms in this bill that give patients rights against health insurance companies; preexisting conditions, for example?

Mr. McCAIN. My record is very clear of advocating for patients and against the abuses of insurance companies across the board.

Mr. DURBIN. Thank you.

Mr. McCAIN. I ask unanimous consent to yield to the Senator from Oklahoma to describe the Patients' Choice Act and the way we could truly save money and reduce fraud, abuse, and waste in the system and at the same time preserve quality health care.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Oklahoma.

Mr. COBURN. There needs to be some clarification. Medicare doesn't cover everything. Eighty-four percent of all

Exhibit 151                                                                                                    JA-0002401

Medicare patients have to buy a supplemental policy now. Do you know what Medicare Advantage is about? Who set the prices on Medicare Advantage? The government set the prices on Medicare Advantage. The very same people you want to run it now created a 14-percent premium. The insurance industry didn't set the prices. The Center for Medicare and Medicaid Services set the prices. The government is responsible for that differential.

Why is Medicare Advantage important? Because the vast majority of the people in my State and every State who have Medicare Advantage can't afford to buy a supplemental policy to make them whole on Medicare, because Medicare won't cover it. So Medicare Advantage for 89,000 Oklahomans is the only way they get equality with the rest of their peer group who can afford to buy a supplemental policy.

Now we are going to take that ability away from poor seniors in Oklahoma, Arizona, Iowa, and Illinois, and we are going to say: You don't get what everybody else has because you are economically disadvantaged. So we are going to give you substandard care, and we are going to take more of your income. Medicare Advantage offers the things you get with a supplemental policy when you can't afford to buy a supplemental policy. The very idea of saying we are going to take that away, when you are taking that away from the cheapest program we have in terms of performance, because what Medicare Advantage does, which their bill and this bill purports to do, is recommends and encourages and incentivizes prevention as the Senator from Iowa wants to do for everybody. It incentivizes it. It doesn't cost to have a prevention exam under Medicare Advantage. There is no out-of-pocket cost for our seniors who are poor who happen to have the benefit of Medicare Advantage. You are going to take that away. You are going to destroy it for 11 million seniors, the ability to get a preclearance, a screening exam, without them having to spend money on it.

Is there a way to get money out of Medicare? Yes, there is $100 billion worth of fraud a year in it. According to Harvard, there is $150 billion of fraud a year in Medicare. There is $2 billion worth of fraud.

I want to address something else the Senator——

Mr. McCAIN. Before the Senator continues, I ask unanimous consent to regain the floor and then yield to the Senator from Oklahoma.

The PRESIDING OFFICER. Is there objection?

Mr. McCAIN. I ask unanimous consent to engage in a colloquy with the Senator from Oklahoma.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mr. McCAIN. Mr. President, I have to address the situation since I have been accused by the majority leader of changing my position. The Senate considered the Deficit Reduction Act of 2005 which called for approximately $10 billion in reduction in Medicare costs, approximately $10 billion. Senator HARRY REID, Democrat of Nevada, said:

Unfortunately, the Republican budget is an immoral document. Let's look at what is in the bill before us. The budget increases burdens on America's seniors by increasing Medicare premiums, and we have not seen what the House is going to give us. It cuts health care, both Medicare and Medicaid, by a total of $27 billion.

The majority leader was outraged in 2005 that there should be reductions in Medicare and Medicaid spending of $27 billion. Now the distinguished majority leader, with the white smoke coming out of his office, says he is for $483 billion in cuts in Medicare. That is a remarkable flip-flop.

By the way, I might add, Senator DODD, who is here on the floor, said, concerning the Deficit Reduction Act of 2005:

For example, this bill cuts funding for Medicare and Medicaid which provide health care to poor children, working men and women, the disabled, and the elderly.

What a plea. What a plea.

Senator BARBARA BOXER said:

Mr. President, I strongly oppose the reconciliation bill before the Senate. The bill would cut vital programs for the middle class, elderly, and poor. That is why I cannot believe only 2 months after Katrina we have a bill that would cut Medicare and Medicaid by $27 billion.

The list goes on and on.

Now before us we have cuts of $483 billion, including hospice, hospitals, other vital programs for our seniors. If we are going to go around and talk about flip-flops, let's look at the rhetoric that accompanied my colleagues on the other side in their opposition to $27 billion in savings which, by the way, actually only saved $2 to $3 billion over 5 years.

I ask my friend from Oklahoma, does he believe it is possible to make these cuts, including from the Medicare Advantage Program, and establish a Medicare commission that would not, over time, cut benefits that exist today for Medicare and Medicaid patients?

Mr. COBURN. Mr. President, I would answer my colleague by saying this bill is a government-centered approach, not a patient-centered approach. It is the very reason we are in the trouble we are in today. We have had the government making decisions rather than the patients and the physicians. It will, in fact, lessen the care for seniors.

I gave a speech earlier this morning on the floor that if you are a senior, you should be worried. Because the Medicare Advisory Commission and the cost comparative effectiveness commission will now decide ultimately what you get. We have an amendment on the floor, which in many ways I support but I would like to modify, about reinstituting what should be the standard for mammography for women. How did we get there? We have a commission that looks at cost and not patients. From a cost standpoint, the task force on screening is absolutely right. But from the patient's standpoint, it is absolutely wrong. How do we decide the difference? Do we make the difference based on what something costs or do we make it on what my wife, who will soon be a Medicare patient, receives? The question is, will the cuts that are manifested by this bill impact seniors' care? As somebody who has practiced medicine for 25 years and cared for seniors for longer than that, I will tell you undoubtedly they will have delay, denied care, and 80 percent of them will be fine. But 20 percent of the seniors in this country will be markedly hurt by this bill because a bureaucracy looking at numbers, not patients, never putting their hand on the patient, will make a decision about what is good for them and what is not.

Everything we know about medicine is that is exactly the wrong way to practice it. Every patient is different. Every patient's family history is different. When we talk about taking $120 billion out of the Medicare Advantage Program, what we are talking about is decreasing access to some of the most important screening capabilities that many of these people have and making them unaffordable because they cannot afford a supplemental Medicare policy. They cannot accomplish it.

I want to address one other question. The majority whip said the Republicans have not had a bill. During the markup in the HELP Committee, I went through point by point the Patients' Choice Act. The Patients' Choice Act puts patients and doctors in charge, not the government in charge. The Patients' Choice Act neutralizes the tax effect to make everybody treated the same in this country, as far as the IRS is concerned.

Right now, if you get insurance through your insurance company, you get $2,700 worth of tax benefits. If you do not, you get $100. That is really fair. That is one of the reasons why people who do not get insurance through their employer cannot afford health insurance. It is because we do not give them the same tax benefit. It would give a tax cut to 95 percent of Americans, plus help them buy their care.

The Patients' Choice Act solves the liability problem by incentivizing States to have reforms in terms of the tort problem we have, where we know the cost is at least 6 to 7 percent more that we have spent on health care than we would if we had a realistic tort system.

Finally, we go after insurance companies because we do what is called risk readjustment. If you are dumping patients or cherry-picking—guess what—you have to pay extra; you have to pay to the very insurance companies that are covering those sick people. So we change the incentive to where an insurance company is incentivized to care for somebody rather than to dump them.

I was an advocate, when I was in the House, for the Patients' Bill of Rights.

Exhibit 151                                                                                                       JA-0002402

I was defeated at every turn, trying to make this. To say we did not come with a bill, on a party-line vote in the HELP Committee 13 voted against a commonsense bill that did not increase taxes, did not increase premiums, covered more people than this bill will cover by 4 million, putting everybody in Medicaid on a private insurance policy so no longer are they discriminated against by the doctors who will not take Medicaid, taking the Medicaid stamp off their forehead and giving them the same access to health care we have.

Mr. McCAIN. So does my colleague find it entertaining that my friends and colleagues on the other side of the aisle, in 2005—as part of the Deficit Reduction Act, we had to bring in the Vice President, who I think was overseas, in order to break the tie because they were worried about what Senator REID called an ''immoral document,'' referring to the Republican budget?

By the way, is the Senator aware that Citizens Against Government Waste has come out in favor of this amendment?

Mr. President, I ask unanimous consent that the letter from Citizens Against Government Waste be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

COUNCIL FOR CITIZENS
AGAINST GOVERNMENT WASTE,
*Washington, DC, December 1, 2009.*
U.S. SENATE,
*Washington, DC.*

DEAR SENATOR: You will soon vote on Senator John McCain's (R–Ariz.) motion to commit H.R. 3590 to the Senate Committee on Finance with instructions to remove the drastic cuts made to Medicare. On behalf of the more than one million members and supporters of the Council for Citizens Against Government Waste (CCAGW), I urge you to support this motion.

H.R. 3590, the Patient Protection and Affordable Care Act, would slash Medicare by $500 billion. Depriving seniors of their much-needed benefits is not a responsible way to achieve healthcare reform.

As it currently stands, the legislation calls for significant reductions including $120 billion to the highly successful Medicare Advantage program; $150 billion to providers including hospitals, hospice programs, and nursing homes; and $23 billion in unspecified decreases to be determined by an ''Independent Medicare Advisory Board.''

While CCAGW has been a long-time critic of improper payments and Medicare waste and fraud, the $500 billion in cuts in H.R. 3590 would not solve these inherent problems or help make Medicare solvent. The major reductions proposed to Medicare merely help lawmakers offset the costs of a massive new entitlement program to the detriment of the nation's senior citizens.

I urge you to support Senator McCain's motion to commit. All votes on this motion and other amendments pertaining to Medicare cuts will be among those considered in CCAGW's 2009 Congressional Ratings.

Sincerely,

THOMAS SCHATZ,
*President.*

Mr. McCAIN. Also, I say to the Senator, as you know, many of the seniors in my State—I would ask my colleague—have been very puzzled at the AARP's endorsement of a proposal that would cut their Medicare, where it has already been made clear that Medicare Advantage—and there are 330,000 seniors citizens in my State who are under Medicare Advantage—that it has been announced it will be slashed, and that somehow AARP is now supporting it.

All I can say is, is my friend aware there is an organization called 60 Plus that is working very hard on behalf of seniors to make sure they do not lose these benefits?

Mr. COBURN. I am. I would tell the Senator, again—how are we where we are? How are we where we are, when we are going to take a program that is working—granted, I think Medicare Advantage could be decreased through true competitive bidding. But CMS did not do that. We could bring the costs down and still have the same benefits. But this bill cuts the benefits in half, the extra benefits that Medicare patients have by being signed up on Medicare Advantage that everybody has who can afford a supplemental policy.

I want to address one other thing, if the Senator would allow me. The majority whip said: Don't we want to get rid of conflicts of interest? Yes. But his argument was specious because the price is set for an X-ray or a mammogram or a CT or a blood test. They are set by Medicare now. There is no differential in the price other than what Medicare says the differential will be. There is no arbitrariness. The government sets the price for every Medicare test out there by region. So there is no way to game it, as the Senator from Illinois said it was gamed. The best reason to have a lab in a doctor's office is so you do not have to wait and come back for another visit to the doctor who charges Medicare another $60 because you get the answer right then. We want to eliminate that. So what will we do? There is no cost savings in that. There is a cost increase because now, instead of giving an answer to the patient, the patient is going to wait as they send it off to the lab, and have them come back in.

Mr. McCAIN. Can I ask the Senator another question? How does the Senator envision that we can eliminate fraud and abuse and waste and institute significant savings? One of the ways is to retain the provisions in this amendment, this motion to commit, that uses the savings from fraud, abuse, and waste elimination to make the trust fund stronger, but at the same time preserves the benefits that our senior citizens have earned. How many times have you heard from senior citizens in your State saying: I paid into this trust fund. I paid for my Medicare all my life. Now it is going to be cut. How is that fair? How is that fair to my generation, the greatest generation?

Mr. COBURN. Well, if you take $100 billion a year—and that is not an exaggeration; even HHS, this last week, said their improper payments were $92 billion; the Inspector General and the GAO both say it is higher than that; that is on Medicare alone—if we just captured $70 billion of that.

How do you do that? Do you know how Medicare pays down? They pay and then chase. So you submit an invoice. They do not know if it is accurate. They pay it, and then they go try to get the money back afterwards.

How about precertification of a payment, as everybody else does that has anything to do with the volume that Medicare has? The other way you do it is with undercover patients, where you put people actively defrauding Medicare in jail. Less than $2 billion in this whole bill goes after fraud. That is 2 percent of the fraud per year. We could cover everybody in the country or extend the life of Medicare 20 years by eliminating the fraud that is in Medicare today. What are we going to do? We are not. We are going to create more government programs and more agencies that are going to be designed to be defrauded. So, therefore, the fraud is going to go up, not down. The fraud is going to go up, not down.

We are also going to limit the availability of prevention to seniors. I have read the prevention text in the bill. There are parts of it I absolutely agree with. We know if we manage prevention and we manage chronic diseases, we are going to save a lot of money. But we are not going to save any of it by building jungle gyms and sidewalks. What we have to do is incentivize people, both physicians and patients, to get in the preventive mode. We need accountable care organizations.

There are lots of things we can do. There are lots of things we can agree on. I know the Senator from Iowa and I agree on a lot on the prevention, but we ought to be saving that money, and we ought to eliminate the fraud. If we did nothing in this body except eliminate the fraud in Medicare, think what we would have done, think what we would have done for the kids who follow us.

Mr. President, $447 billion spent on Medicare; $100 billion in fraud. Wheelchairs that have been billed out so many times they have collected $5 million on them, doctors who submit false invoices, suppliers who submit invoices for people who are deceased. And we try to go get that after the fact? There are lots of things we could do. This bill is short on that. You all recognize it is short on it. It is the biggest savings out there. The reason there is not more in it is because CBO will not score it because we have never demonstrated that capability.

One final point. This bill only scores the way CBO scores because it says you intend to do what no Congress has ever done. It says you intend to cut Medicare $460 billion to $480 billion. If you intend to cut Medicare, the American people ought to know where you are going to do it, how it is going to affect them. But if you are just doing it for a

Exhibit 151                                                                 JA-0002403

scoring point, the young people in this country ought to know that too. Because where you say you are claiming $460 billion, you are adding to the deficit if, in fact, we do not cut Medicare that much. And is it fair to the Medicare Advantage patients, who are poor—who do not qualify for dual coverage with Medicaid, who cannot afford a supplemental policy—is it fair to take away the benefits they have today that we have given them—and it was not priced by the insurance industry; it was priced by CMS—and say because CMS, the government agency, did not price it, we are going to take away half of your benefits? It is not fair. It is not right. If there is anything immoral, that is immoral.

With that, I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD. Mr. President, the Senator from Iowa is to be recognized next.

The PRESIDING OFFICER. The Senator from Iowa.

Mr. HARKIN. Well, Mr. President, sitting here listening to the Senator from Arizona and the Senator from Oklahoma go on, I hardly know where to start. There have been so many accusations and so much misinformation it is hard to know where to begin.

I would begin by, first of all, saying the people who keep saying we are slashing Medicare and we are going to harm seniors are totally wrong. The fact is, the bill we have before us protects Medicare's guaranteed benefits, reduces premiums and copays for seniors, ensures that seniors can keep their own doctors, and ensures Medicare will not go broke in 8 years by stopping the waste, fraud, and abuse.

I might also say, as an aside, every time I hear the Senator from Oklahoma talking about waste and abuse and fraud in Medicare, it sounds like it is all in Medicare. The waste, fraud, and abuse we are talking about are the ripoffs of Medicare by pharmaceutical companies, many of which have been fined big fines and have settled. One of the most recent ones, I think, was almost for a billion-some dollars. It was one of the largest settlements in our history with a pharmaceutical company that was caught ripping off Medicare. And insurance companies have ripped off Medicare, and others. It is not within Medicare; it is those who are coming at Medicare and trying to plunder it.

But that is what we do in this bill: We are stopping that kind of waste and abuse against Medicare; not in Medicare but against Medicare. We provide new preventive and wellness benefits for seniors. We lower prescription drug costs, keep seniors in their own homes, and not nursing homes, with the CLASS Act and the Community Choice Act that is also in this bill.

When they talk about going after Medicare, boy, talk about crocodile tears. Was it not Newt Gingrich, the former Speaker of the House, the leader of the Republican revolution, who said he wanted Medicare to ''wither on the vine''? Was it not Senator Bob Dole, their standard bearer for President in the 1990s, who said he had fought against Medicare and was proud he voted against it? Now, all of sudden, it seems as though Republicans are the guardians of Medicare.

People know the truth. The American people know the truth. They know it is the Democrats who fought for Medicare. Lyndon Johnson, as President, and the Democrats in the House and Senate, if it were not for them, Medicare would have never been passed. It is the Democrats who have fought to keep Medicare alive and well and healthy, and expanding it to people all over this country every step of the way—being opposed by our friends on the other side of the aisle. And now to hear them talk about how much we are going after Medicare, boy, talk about crocodile tears.

The other thing I want to say is that I want to correct something the Senator from Oklahoma said. He talked about the recommendations that recently came out—I will have more to say about this in a minute—on mammograms. He said the U.S. Preventive Services Task Force—all they did was look at costs. That is what the Senator said. They looked at costs but they did not look at the people.

Recommendations that come from the U.S. Preventive Services Task Force cannot take into account cost. Cost cannot be a factor. They can only look at scientific evidence, safety, and efficacy. Cost cannot be taken in as any factor in their deliberations. So I wanted to set the record correct on that.

As I said, there were so many things I heard from the other side it is hard to know where to start. I see my leader here, Senator DODD, who did such a great job in getting our bill to the committee and getting it in the form that it is now and on the floor.

I wish to ask the Senator—I know the Senator was here listening to our friend, the Senator from Arizona, speak. Did it strike you that what he said was kind of missing the mark here a little bit and maybe not quite what we are doing in this bill?

Mr. DODD. I thank my colleague. Just to set the record straight, because it is amazing to me, in a very short amount of time, how people can misconstrue events. First of all, the Senator from Oklahoma was talking about the Medicare Advantage bill, and he said: Do you know who sets the rates? The government sets the rates.

That is true. That is because when that bill was passed, with very few people on this side supporting that bill—almost overwhelmingly on the other side—the requirement under the law, the requirement to pass, mandated under the law that the private plans of Medicare be overpaid, and on average those overpayments averaged 14 percent and in some States over 50 per-

cent. The law that was passed here by the majority—and running the place at the time—insisted upon the mandates being included. So if you wonder why that occurs today, it is because they required it in the law.

Secondly, when you talk about the Deficit Reduction Act of 2005—again, memories fade for some people. In fact, under that bill, children, working families lost the insurance they had. Cuts occurred. Women lost access to mammographies. Cervical cancer screenings were cut. Families lost benefits. There were direct cuts in them. The difference is, today, with what we are talking about, you don't cut these benefits at all—at all. In fact, we are increasing the opportunity for Medicare to be strengthened under this bill. There is a vast difference between what happened in 2005 and what is being supported today. So, again, I just want the record to be clear. You can't make these things up as you go along. That is what happened in 2005. It was an abomination and did great damage to people in this country. People lost their insurance.

Under our bill, 31 million Americans will have coverage. We now know the premiums are going to drop for 93 percent of all Americans. Premiums will actually come down for individuals, small businesses, and large employers. For five out of six people who have their jobs, those premiums come down. Thirty-one million Americans will be covered with health insurance. Compare that, if you will, with 2005 when we actually cut mammography screening, cervical cancer research, and assistance in health care for infants and children and women. That all got damaged in that year. Not in this bill. This is the difference.

I thank my colleague for yielding.

Mr. HARKIN. Mr. President, the only thing I would say to my friend from Connecticut—he said that in 2005 we had made all of these cuts in the Deficit Reduction Act. I just want to say for the record that I didn't vote for it and neither did the Senator from Connecticut.

Mr. DODD. Absolutely not.

Mr. HARKIN. Is this not when the Republicans were in charge and they had a Republican President and a Republican House and Senate? That is when they cut all the mammogram screenings and things such as that?

Mr. DODD. That is true. The record is very clear on this. People had the right to do so; that was their choice at the time. But to try to rewrite history somehow and say those cuts didn't occur—in fact, they did occur in these areas. That is why there were those of us here who objected strongly at the time. My colleague from Arizona is absolutely correct when he said that I said this was going to cut benefits for children and working families and cut screenings and tests for people. It did do that. Those of us who made those warnings on that day were proven to be 100 percent accurate. Compare that, if

Exhibit 151 JA-0002404

you will, with what we are talking about here today, particularly regarding reducing costs, premiums, and providing increased access for millions of Americans. That is the difference.

If you vote for the McCain amendment, we are right back where we were before—right back—which, of course, we all know means premium increases go up by literally 100 percent in the next 7 years. Tell that to a family of four in my State who is paying $12,000 right now and will go to $24,000 in 7 years, as opposed to having those premiums being reduced, depending on if you are an individual, small business, or large employer, by as much as 20 percent, 11 percent, or 3 percent, not to mention, of course, that you will also increase the number of people who will be covered under this.

The present situation runs the risk of bringing our economy to its knees if we don't act. Recommitting this bill—going back, in a sense—would roll the clock back and do great damage to both individuals and to our country economically. That vote in 2005 set us back terribly in this country. This proposal allows us to move forward and provide the coverage a lot of people need.

I thank my colleague.

Mr. HARKIN. I thank my friend for pointing out those facts.

Mr. President, I have a letter dated December 1, 2009, from the National Committee to Preserve Social Security and Medicare. It says:

Dear Senator:

On behalf of the millions of members and supporters of the National Committee to Preserve Social Security and Medicare, I am writing to express our opposition to the amendment offered by Senator McCain which would recommit the bill to the Senate Finance Committee.

Much of the rhetoric from opponents of health care reform is intended to frighten our Nation's seniors by persuading them that Medicare will be cut and their benefits reduced so that they too will oppose this legislation. The fact is that H.R. 3590, the Patient Protection and Affordable Care Act—

The bill we have before us—

does not cut Medicare benefits; rather, it includes provisions to ensure that seniors receive high quality care and the best value for our Medicare dollars. This legislation makes important improvements to Medicare which are intended to manage costs by improving the delivery of care and to eliminate wasteful spending.

I won't read all of it, but it concludes:

The committee urges you to oppose the motion to recommit the bill to the Finance Committee.

Sincerely, Barbara B. Kennelly, President and CEO.

Mr. President, I ask unanimous consent to have this letter printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

NATIONAL COMMITTEE TO PRESERVE
SOCIAL SECURITY AND MEDICARE,
*Washington, DC, December 1, 2009.*
U.S. SENATE,
*Washington, DC.*

DEAR SENATOR: On behalf of the millions of members and supporters of the National Committee to Preserve Social Security and Medicare, I am writing to express our opposition to the amendment offered by Senator McCain which would recommit H.R. 3590, the Patient Protection and Affordable Care Act, to the Senate Finance Committee with instructions to remove important Medicare provisions.

Much of the rhetoric from opponents of health care reform is intended to frighten our nation's seniors by persuading them that Medicare will be cut and their benefits reduced so that they too will oppose this legislation. The fact is that H.R. 3590, the Patient Protection and Affordable Care Act, does not cut Medicare benefits; rather it includes provisions to ensure that seniors receive high-quality care and the best value for our Medicare dollars. This legislation makes important improvements to Medicare which are intended to manage costs by improving the delivery of care and to eliminate wasteful spending.

The National Committee opposes any cuts to Medicare benefits. Protecting the Medicare program, along with Social Security, has been our key mission since our founding 25 years ago and remains our top priority today. In fact, these programs are critical lifelines to today's retirees, and we believe they will be even more important to future generations. But we also know that the cost of paying for seniors' health care keeps rising, even with Medicare paying a large portion of the bill. That is why we at the National Committee support savings in the Medicare program that will help lower costs. Wringing out fraud, waste and inefficiency in Medicare is critical for both the federal government and for every Medicare beneficiary.

The Senate bill attempts to slow the rate of growth in Medicare spending by two to three percent, or not quite $500 billion, over the next 10 years. However, it is important to remember that the program will continue growing during this time. Medicare will be spending increasing amounts of money—and providers will be receiving increased reimbursements—on a per capita basis every one of those years, for a total of almost $9 trillion over the entire decade. Even with the savings in the Senate bill, we will still be spending more money per beneficiary on Medicare in the coming decades, though not quite as much as we would be spending if the bill fails to pass.

America's seniors have a major stake in the health care reform debate as the skyrocketing costs of health care are especially challenging for those on fixed incomes. Not a single penny of the savings in the Senate bill will come out of the pockets of beneficiaries in the traditional Medicare program. The Medicare savings included in H.R. 3590, the Patient Protection and Affordable Care Act, will positively impact millions of Medicare beneficiaries by slowing the rate of increase in out-of-pocket costs and improving benefits; and it will extend the solvency of the Medicare Trust Fund by five years. To us, this is a win-win for seniors and the Medicare program.

The National Committee with urges you to oppose the motion to recommit the bill to the Finance Committee with instructions to strike important Medicare provisions from health care reform legislation.

Cordially,

BARBARA B. KENNELLY,
*President & CEO.*

Mr. HARKIN. Mr. President, I wish to talk about the amendment before us which has been offered by the Senator from Maryland, my colleague, Senator MIKULSKI. I am going to have more to say about the bill and engage with, perhaps, the Senators from Arizona and Oklahoma in the days and weeks ahead on the structure of the bill itself, but I wish to focus on the amendment that is now before us.

First of all, I am proud that this bill, the Patient Protection and Affordable Care Act, makes significant investments in prevention and wellness because I have long believed that such investments are essential for transforming our sick care system—that is what we have now, a sick care system—into a true health care system, one that keeps Americans healthy in the first place. It keeps them out of the hospital. It will keep a check on rising costs in both the public and private health care markets.

It does this in a number of ways. I won't go into all of them, but among the most important is that this bill requires insurance companies to cover highly effective preventive services with no copayments or deductibles—no copayments or deductibles. This is critical because we know that all too often people forgo their yearly checkups or screenings either because their insurance company doesn't cover them or, secondly, because they have high copays or deductibles that make them simply unaffordable. For example, I had a recent conversation with a small business owner in western Iowa, and he and his few employees have a $5,000 deductible. He recently turned 50. His doctor said: Time for you to get your first colonoscopy. Well, he found out that the colonoscopy was $3,000. He has a $5,000 deductible. This is all out-of-pocket. So not being a man of wealth and not having a lot of means, trying to struggle to keep his small business afloat, he is putting it off. He is putting it off. So that is what is happening now. But what we say in our bill is that these have to be covered without copays or deductibles.

There has been a lot of discussion recently on the coverage of preventive services for women in light of the recent recommendations issued by the U.S. Preventive Services Task Force on mammogram screenings. It has been alleged that the Reid bill, like the HELP and Finance bills that preceded it, only requires coverage of those services strongly recommended by the Preventive Services Task Force. This simply is not true. Under the language of this bill, health plans are required at a minimum—at a minimum—to provide coverage without cost for preventive services recommended by the Preventive Services Task Force. Understand that. It only says that health plans are required at a minimum to provide coverage at no cost for certain preventive services recommended by the Preventive Services Task Force. But these are

Exhibit 151

JA-0002405

simply the minimum level, not the maximum. The task force will establish the floor of covered preventive services, not the ceiling. No health plan will be prohibited from providing free coverage of a broader range of preventive services, and in many cases the Secretary of Health and Human Services may well require that. That is because our bill gives the Secretary of Health and Human Services the authority to identify additional preventive services that will be part of the essential health benefits offered by health insurers in the exchange.

The simple fact is, the Preventive Services Task Force cannot set Federal policy and they cannot deny coverage, period, although there has been a lot of misinformation that has gone out about this. They simply give doctors and patients the best medical information, as I said earlier, not based on cost—cost cannot be a factor—but based on science and based upon efficacy and based upon outcomes and nothing else.

Still, I share the concerns of some that the task force has not spent enough time studying preventive services that are unique to women. This is a concern that was raised when the HELP Committee debated the bill in committee. At that time, I worked with the Senator from Maryland, Ms. MIKULSKI, to include language requiring that all health plans cover comprehensive women's preventive care and screenings based upon guidelines supported by what we call HRSA, the Health Resources and Services Administration, again, with no copays, no deductions. That language is in our bill. It was not included in the merged bill. Senator MIKULSKI's amendment which is now before us and which I have co-sponsored would add that language—would add that language—like we had in our committee bill, and I strongly urge its adoption.

By voting for this amendment, which I understand we will do in a couple of hours, we can ensure all women will have access to the same baseline set of comprehensive preventive benefits that Members of Congress and those in the Federal Employees Health Benefits Program currently enjoy. Let me repeat that. If you vote for the Mikulski amendment, you will ensure that all women will have access to the same baseline set of preventive services that are enjoyed by Members of Congress, women Members of Congress, and all women Federal employees in the Federal Employees Health Benefits Plan. That is what voting for the Mikulski amendment will do.

Expanding preventive health care is just one of the ways this bill benefits women. Again, our health care system is broken. It is expensive. Today, less than half of women have access to employer-sponsored insurance coverage. Think about that. Less than half of the women in this country have access to employer-based insurance coverage. Again, many of these women work for very small businesses, and they can't afford to provide that kind of insurance coverage.

In most States, it is legal for insurance companies to charge women more than men for the same policy. Women can pay more than double what men pay at the same age for the same coverage. Each year, thousands of women are denied coverage from health insurance companies for preexisting conditions. In many States, a history of hospitalizations from domestic violence is considered a preexisting condition. Think about that. A battered woman lives through domestic violence and now can't get health insurance coverage because of a preexisting condition—being battered. That happens in many States. With these options, it is not surprising that more than 16 million women are uninsured in this country.

Women are often the health care decisionmakers for their families. They face difficult choices daily. One-third of women are forced to make tradeoffs between basic necessities and health care. In 2009, more than one-half of women reported delaying care because of its high cost.

Today, we have the opportunity to fix these problems. This historic legislation now before us increases access to affordable health insurance and ensures that women's coverage meets their health care needs.

We will end premium discrimination against women. We will end discrimination against those with preexisting conditions. We will prohibit the rescission of health insurance coverage because of an illness. We will provide more affordable insurance choices through the health insurance exchange, including a strong public option to increase competition and choice. We will ensure that the policies families buy are good enough. We will require that all insurance policies sold in all markets provide adequate coverage for primary and preventive care, for screenings, maternity services, and many other services that women and their families need to stay healthy.

As has been said many times before, this bill will extend coverage to an additional 31 million Americans who are currently uninsured. As I said, 16 million women in America are uninsured. So that is why Senator MIKULSKI's amendment is so important, vitally important. That is why this bill is so vitally important.

We are going to talk a lot about Medicare. I see the Republicans are focusing on that, although a recent letter I read and had inserted in the RECORD from the National Committee to Preserve Social Security and Medicare says we ought to oppose the McCain amendment. We will hear a lot about that.

What about the women of this country and what is happening to them? The Mikulski amendment addresses that in a very profound way. But then this bill takes it even a step further by making sure that women, many of whom work for small businesses, who are sort of in an uncovered pool, so to speak, out there by themselves, now they can go on the exchange. Now they can get the kind of coverage they need. They will have choices available to them—not just maybe one option and in some States no option. They will have different options available. They will be able to join with other like women around so they will have a bigger pool and better coverage for themselves and their families.

Yes, I can honestly say the health care reform bill before us, the Patient Protection and Affordable Care Act, is a pro-woman bill. It is not talked about a lot, but many of the things in this bill will go to ease the dilemma so many women find themselves in, in this country—providing basic necessities for their children or trying to get health care coverage for themselves. I can tell you so many women whom I have met and talked to have given up on buying health insurance for themselves so they will have enough money to feed and clothe their kids and send them to school. Women should not be forced to make that kind of a choice.

This bill before us will enable women to not have to make that choice. They will be able to get the insurance coverage they need at an affordable price, with the tax credits that are included for low-income women, and they will be able to have the piece of mind of knowing that they and their kids are truly covered with the health insurance they need.

I will keep coming back to these two things, time after time, as we go through the bill: prevention and wellness. Keeping people healthy in the first place is a big part of this bill. If there is one thing that will bend the cost curve, it is putting more focus up-front on prevention and more focus on keeping people healthy in the first place. That will save us money in the future.

The second theme is what this is going to do for the women of America; how is it going to help them and their families to have peace of mind and to have the health insurance coverage they need.

With that, I yield the floor.

The PRESIDING OFFICER (Mr. KAUFMAN). The Senator from Montana is recognized.

Mr. BAUCUS. Mr. President, I ask unanimous consent that the next four Republican speakers to be recognized be Senators JOHANNS, ROBERTS, HUTCHISON, and CORNYN and for the Democrats to speak in an alternating fashion, with the next Democrats being Senators MURRAY and CANTWELL to speak on the tragic shootings in Washington, and that following Senator ROBERTS, I be recognized.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

The Senator from Wyoming is recognized.

Exhibit 151        JA-0002406

Mr. ENZI. Mr. President, I yield to the Senator from Nebraska.

The PRESIDING OFFICER. The Senator from Nebraska is recognized.

Mr. JOHANNS. Mr. President, I rise to speak in support of the McCain amendment. I have been down here for a while, and I have listened to the debate on the Medicare cuts.

What strikes me about this debate is that reality sets in. It simply does. There will be a point at which hospitals, hospice programs, and skilled nursing facilities are going to see less money. That is simply the reality of what we are debating.

It is kind of remarkable to me that you could go from a period just a few years ago, where $10 billion over 5 years was described as immoral, and today we are talking about nearly $1½ trillion in cuts. That is going to have a real impact on real programs that involve real people in our States.

From our standpoint, when we try to look at this in a way that says: OK, if this were to happen, if, in fact, this gets the necessary votes, what impact will it have on real programs in Nebraska?

Let me walk down through that, if I might. For example, more than $40 billion in cuts from home health on the national level would translate back to the State I represent to the tune of $120 million in cuts. By 2016, according to our analysis back home, 68 percent of Nebraska home health agencies will be operating in the red.

In rural areas, as high as 80 percent will have negative margins. If you lose those services in rural areas, they are lost. In fact, they may be lost forever.

Skilled nursing facilities are already struggling to keep their doors open. I visit these facilities when I get back home. Many of us do that. They are already doing everything they can to make ends meet. We are already seeing them go under in community after community. I visit these facilities and they tell me: MIKE, we are just holding on.

Hospice programs in Nebraska have been very well received. Years ago, I might have predicted otherwise. The reality is, hospice has worked well in my State, and I am guessing it is also in other States in the country. A survey reported that 100 percent think access to hospice services is important. This bill cuts $80 billion nationally from hospice programs.

How can we legitimately expect little or no impact, or simply attempt to argue it away, when 38 Nebraska hospice programs are already operating right at the margin? If there is any reduction, they will go out of business.

Hospitals will also see negative impacts. Let me quote, if I might, from a Nebraska Hospital Association letter:

Our 85 community hospitals have a unique stake in this debate. Not only are we providers of care to more than 10,000 patients per day, we are also one of the largest consumers of health care because we employ 42,000 people. . . . Hospitals are an economic mainstay of the community they serve and we (the NHA) are opposed to all measures that weaken our financial stability and viability.

The Nebraska Hospital Association indicates that disproportionate share hospital cuts will be $128 million. If other hospital cuts are factored in, Nebraska hospitals say they will see a total loss of $910 million.

I visit these little 25-bed hospitals. They have no room for error. There is no margin there. When they lose something such as this, they simply cease to exist. That community, then, is on its way to ceasing to exist.

Finally, it is very clear that Medicare Advantage is on the chopping block. That is 35,000 Nebraskans. No matter how hard you want to argue that, there are 35,000 Medicare Advantage beneficiaries in my State who will experience cuts in the very program that is such an important safety net to them.

CBO, the Congressional Budget Office, estimates reduced benefits from $135 to $42 a month. The so-called extra payments that would be cut are helping Medicare Advantage beneficiaries get very valuable benefits. Many who utilize Medicare Advantage are truly our most vulnerable citizens.

We cannot ignore that important fact. Seniors with a Medicare Advantage plan might receive vision or dental benefits or have their Medicare copayments reduced. In our State—I am guessing this is true of States all across the country—what you see is some of the poorest actually have Medicare Advantage.

If you don't believe me, just yesterday I received a letter from some Hispanic groups which said this:

With the growing number of Hispanic seniors, one in four of whom have Medicare Advantage, the defunding of the Medicare Advantage program and other Medicare cuts proposed would result in fewer benefits and a significant disruption in the care and coverage senior Hispanic Americans receive.

I ask unanimous consent that this letter be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

NOVEMBER 16, 2009.

DEAR SENATOR: As organizations that represent Hispanic Americans, we are deeply concerned with the health care reforms currently being discussed. We do not support reforms that will lead to increases in taxes for all Americans but especially for small business owners, cuts in Medicare, and mandates on families and businesses.

Hispanic small businesses are among the fastest-growing sectors in the U.S.—growing at a rate of over three times faster than the national average. We have been hit hard by this slow economy and cannot afford a greater tax burden and mandates on our families and small businesses. The result will be more Hispanics out of work and reduced wages that directly impact low-income and minority communities.

With the growing number of Hispanic seniors, one in four of whom have Medicare Advantage, the de-funding of the Medicare Advantage program and other Medicare cuts proposed would result in fewer benefits and a significant disruption in the care and coverage senior Hispanic Americans receive.

Many of our families came to the United States to escape hardship, pursue business opportunities and enjoy its economic freedoms. We deserve the right to make our own health care choices and not be subjected to costly and inefficient government mandates.

More than 30 percent of Hispanics are currently uninsured, and we want real reform that would help them. These reforms must promote real competition and choice. We want to ensure that Hispanic families have affordable health care, more choices and that their direct relationships with their doctors remain intact and uninhibited by bureaucrats.

Competition-increasing solutions include allowing businesses and individuals to purchase health insurance across state lines, which would make it easier and less costly for small businesses to provide employees with coverage. Allowing groups to join together to purchase insurance—whether they be small business or church or community groups—would also have a significant impact on the affordability of insurance for Hispanics and increase choices.

Government-focused proposals where bureaucrats and not individual business owners will decide what coverage an employer should provide will not help our families or businesses. Also, individuals will be penalized with fines and higher taxes if they do not follow the rules in Washington.

We hope that you will consider these concerns and what is in the best interest of Hispanic Americans, and all Americans, as you vote on health care reform.

Sincerely,

Hialeah Chamber of Commerce & Industries, Hispanic Alliance for Prosperity Institute, Hispanic Leadership Fund, Hispanic Professional Women Association, CAMACOL—Latin Chamber of Commerce of U.S.A.

Patients' First (Pacientes Primero), The Latino Coalition, U.S. Mexico Chamber of Commerce, Virginia Hispanic Chamber of Commerce, Voces Action.

Mr. JOHANNS. How could any Member go back to their State and defend these cuts to services that provide very important health care needs? Americans simply deserve better than that. If we want serious Medicare reform, we should start with true waste and fraud and concentrate on Medicare insolvency—especially when we all agree insolvency arrives in 2017.

What we are doing in these days of debate is truly robbing from Peter to pay Paul—and Peter is soon to be broke. Unfortunately, that is exactly what we are doing. Americans deserve better than the bill we are debating. I can't stand silently and accept a bill that has such dramatic cuts in the services provided to Nebraska seniors.

I will conclude by saying I support the McCain motion to commit to remedy these problems and get us back on track with commonsense reform.

I yield the floor.

The PRESIDING OFFICER. The Senator from Washington is recognized.

LAKEWOOD, WA, POLICE SHOOTINGS

Mrs. MURRAY. Mr. President, we are obviously in the middle of a very important debate on health care. I thank the managers of this bill for allowing my colleague from Washington, Senator CANTWELL, and me to interrupt this important debate to talk for a few minutes about a very tragic event that

Exhibit 151

JA-0002407

Case 2:17-cv-04540-WB Document 253-10 Filed 09/29/20 Page 436 of 677

occurred in Washington over this past weekend.

Just 2 days ago, our State was shocked and saddened and appalled by news of the deadliest attack on law enforcement in Washington State's history. On Sunday morning, just after 8 a.m., a gunman walked into a coffee shop in Pierce County, WA, and opened fire, killing four members of the city of Lakewood Police Department who were going over the details of their upcoming shift.

It was a senseless and brutal killing. It specifically targeted the people who sacrifice each and every day to keep all of us safe—our police officers.

This terrible crime has not only left the families of these victims shattered, but it has shattered our sense of safety and left an entire community and State in disbelief.

It is also part of a shockingly violent month for my State's law enforcement community that has also included a senseless attack on October 31, which killed Seattle police officer Timothy Brenton and left another officer, Britt Sweeney, injured.

These attacks remind all of us of the incredible risks our law enforcement officers take each day and that even when doing the most routine tasks and aspects of their jobs, our law enforcement officers put themselves on the line for our safety.

Today my thoughts and prayers, like those all across Washington State and our Nation, remain with the families of the brave police officers who were killed on Sunday.

Officer Tina Griswold was a 14-year veteran who served in the police departments in Shelton and Lacey before she joined the Lakewood Police Force in 2004. She leaves behind a husband and two children.

Officer Ronald Owens followed his father into law enforcement. He was a 12-year veteran of law enforcement and served on the Washington State Patrol before moving to the Lakewood Police Department. He leaves behind a daughter.

SGT Mark Renninger was a veteran who wore the uniform of the United States before putting on the uniform of the Tukwila Police Department in 1996. He joined the Lakewood Police Department in 2004. He leaves behind a wife and three children.

Officer Greg Richards was an 8-year veteran who served in the Kent Police Department before he joined the Lakewood Police Department. He leaves behind a wife and three children.

Because of this senseless attack, nine children have lost their parents. These were officers—mother and fathers, husbands and wife—who woke up every day, put on their uniforms, and went out to protect our children, our communities, and our safety. On Sunday, they did not come home.

Already in news reports, Internet postings, and candlelight vigils thousands of tributes to these officers' dedication to their families and jobs have been shared. They paint a picture of brave officers who not only kept our communities safe but were also re-spected and revered members of our communities; a mother and fathers who in the wake of this tragedy will leave young families behind; neighbors and friends who coached softball and helped repair local homes and reached out to help those in need. They are police veterans who helped build the foundation of a new police force. They are public servants who put the safety of all of us behind their own every single day.

Already this year 111 police officers across our country have given their lives while serving to protect us. Each of those tragedies sheds light on just how big a sacrifice our police officers make in the line of duty. But these most recent attacks in my home State also offer an important reminder: that our officers are always in the line of duty, even when they are training other officers or out on routine patrols or simply having coffee.

There is no doubt these senseless attacks have left many law enforcement officers across my State and our country feeling targeted. But there is also no doubt that their willingness to put themselves on the line to protect us will continue unshaken. In fact, over the last 3 days, law enforcement officers from all across my State have risked their own lives in the successful search to find the man accused of this killing and to keep him from hurting more innocent people. That is a testament to the unwavering commitment they make to serve and protect each of us every day. It should remind all of us that these brave men and women deserve all the support we can provide to keep them safe.

No words are adequate to express the shock, the anger, and the disbelief that comes with such a brutal crime. No words will be enough to lessen the loss. Our law enforcement professionals put themselves between us and danger every day.

Right now, in light of such horrible events, we hold them even closer in our thoughts and our prayers.

Mr. President, I yield to my colleague from Washington State, Senator CANTWELL.

The PRESIDING OFFICER. The Senator from Washington.

Ms. CANTWELL. Mr. President, I rise today to join my colleague, Senator MURRAY, in expressing my sorrow over the tragedy that struck Washington State and the law enforcement community. I extend the prayers and condolences of the Senate and the entire Nation to the families, loved ones, and colleagues of the four police officers who lost their lives in the line of duty Sunday in Lakewood, WA.

Those four officers, part of Washington's best, are SGT Mark Renninger, Officer Ronald Owens, Officer Tina Griswold, and Officer Greg Richards.

Collectively, they served for 47 years in the line of duty. As Lakewood Police Chief Bret Farrar describes them, they were "outstanding individuals" who brought a range of talents to a 5-year-old department.

These heroes, who put their lives at risk for our safety every day, will be deeply missed and never forgotten. The men and women in blue who keep our communities safe make tremendous sacrifices daily, and so do their families.

The senseless tragedy that claimed the lives of these four officers, as my colleague said, the deadliest attack in Washington State history, reminds us of the risk that police officers take every day when they put on their badges.

The risks that police take every day was driven home again today when a Seattle police officer on routine patrol confronted, shot, and killed the person believed responsible for this crime. And at a time when we are all in shock over the loss of these officers, the police remain vigilant. They did not stop doing their job, even when tragedy struck close to home.

I thank all those who participated in the law enforcement's response since this tragedy happened. I thank the Pierce County Sheriff's Office and Sheriff Paul Pastor for the investigation they have led. My heart goes out to the Lakewood Police Department and Chief Bret Farrar.

I also thank the efforts of the Seattle Police Department and the interim Chief John Diaz for his efforts and his agency's work.

In a matter of days, police and public safety officers from all around the country will converge on Puget Sound. They will form a long blue line in a show of respect for those who have fallen—Mark Renninger, Ronald Owens, Tina Griswold, and Greg Richards.

This moving ritual, which happens all too often in our country, speaks eloquently of the solidarity all of us feel with those who risk their lives to keep us safe. This tragedy also struck our State earlier in October when Officer Timothy Brenton was struck down randomly while sitting in his police car.

I hope everyone in this country will take time today and tomorrow and next week, if they see a police officer, to thank them. Thank them for their service. Express your appreciation for the job they do putting themselves at risk for all of us. We did not have enough time to thank Mark, Ronald, Tina, and Greg, but we are thanking them in our thoughts and prayers, and we are sending strength to their families with much love and appreciation for what those officers and their families have done to serve us and our communities.

I yield the floor.

The PRESIDING OFFICER. The Senator from Montana.

Mr. BAUCUS. I am sorry. I think Mr. ROBERTS is to be recognized.

The PRESIDING OFFICER. The Senator from Kansas.

Mr. ROBERTS. Mr. President, I thank the distinguished Senator from Montana and my chairman of the Finance Committee.

Exhibit 151 JA-0002408

Let me say first to the Senators from Washington State that I think all Senators appreciate both Senators bringing to the attention of the Senate the heartfelt feelings in regard to the tragedy that happened in their State. I share their dismay with regard to what has happened. I know the thoughts and prayers of all Senators are with them. I appreciate the remarks they have brought to the body at this time.

I would now like to discuss briefly the motion to commit in regard to Medicare and the tremendous cuts that are proposed in the bill—a bill I define not as the Finance Committee bill, not as the HELP Committee bill, but the bill that was done behind closed doors, which I think was most unfortunate.

This bill slashes—and I think that is the appropriate word—nearly $½ trillion from Medicare. Then it is used to establish a huge new government entitlement program.

Earlier this year during the Finance Committee markup of the health care reform legislation, I offered a nearly identical amendment to the McCain motion to commit we are now considering, which is a motion simply to send the legislation back to the Finance Committee with instructions to strike the cuts to Medicare in this bill. Unfortunately, my amendment during that time failed in committee on a party-line vote.

Let me see if I understand this correctly. Medicare is going broke. It has around $38 trillion in projected future unfunded liabilities. It is a huge, crushing entitlement program that threatens to bankrupt this country. But instead of owning up to this enormous threat and doing something about it for our financial future, instead of considering a Medicare reform bill to address this menace to future generations of Americans, instead of guaranteeing that the government-run plan we currently have remains solvent, instead we are actually cutting some $465 billion from Medicare in order to start a brandnew, huge, crushing entitlement program that makes no sense.

If Medicare needs to be reformed—and I certainly believe it does—then we should be considering a Medicare reform bill right now. We certainly should not be cutting Medicare for the purpose of financing a huge new entitlement program.

My friends on the other side of the aisle have the temerity—that is a pretty strong word, but I think it applies—to assert these huge cuts will actually make Medicare more solvent. Nothing could be further from the truth. I have news for them. Cutting reimbursements to doctors, cutting reimbursements to hospitals and other providers—all providers—and it has been mentioned by my distinguished colleague from Nebraska—home health care providers, hospices is not reform. These cuts will hurt Medicare beneficiaries, our seniors who have worked their entire lives with the promise that this program would support them through their older age.

Medicare already pays doctors and hospitals well below cost—70 percent approximately for hospitals, 80 percent for doctors approximately. The only saving grace is that these providers have the ability to shift their losses on to private payers to keep their doors open or their practices going. But there is a limit to their ability to cost shift. There is only so much the private sector is willing to absorb.

American families already pay—now get this—an extra $90 billion in a hidden tax to make up the Medicare and Medicaid underpayments that we in past years have provided each year. More cuts to reimbursements coupled with the massive increase to Medicaid this bill assumes will push these limits, meaning that fewer doctors will open their doors to new Medicare patients. They are doing that right now. We are rationing right now as to access to doctors who accept Medicare patients, and health care access and quality for our seniors will be compromised.

Take the $105.5 billion cut to hospitals as an example. I know the National Hospital Organization has signed off on these cuts. I don't know why, but they have signed off on these cuts. I also know for a fact they will harm Kansas hospitals. I asked my Kansas Hospital Association—I did, at my request—to run the numbers on how this bill will affect their bottom lines. Their findings are frightening.

According to the Kansas Hospital Association's outside experts, this bill will result in nearly $1.5 billion in losses to Kansas hospitals over the next 10 years. It may be true that some urban hospitals that currently have large percentages of uninsured patients may have some of their cuts offset by the potential reduction this bill will make to the uninsured population. But that is no consolation to a hospital in McPherson, KS, for example, that may be too large to qualify for the higher reimbursements allotted for what we call critical access hospitals, and has, unfortunately, the misfortune of serving a smaller than average uninsured base. Those hospitals will see huge cuts without seeing any of the gains. This bill's $100 billion cut will only hurt these hospitals and their ability to serve Medicare and even non-Medicare patients. Remember the cost sharing.

Medicare's own actuaries at CMS, the Center for Medical Services—sort of an oxymoron—have agreed that the Democrats' cuts to hospitals and other providers could be dangerous and could cause them to end their participation in Medicare. So why are we doing this?

Another huge cut to Medicare in this bill is that $120 billion cut to the Medicare Advantage Program. My distinguished colleague from Nebraska has already talked about that, the effects of Medicare Advantage to Nebraska. Let me talk about Kansas. Close to 11 million, or one-quarter, of Medicare beneficiaries are enrolled in Medicare Advantage; 40,000 of those beneficiaries are in Kansas. I want to read an excerpt from one letter I received from a very satisfied Medicare Advantage customer in Shawnee, KS. Ms. Lila J. Collette is enrolled in Humana Gold Plus, a Medicare Advantage plan. She writes:

Please use everything in your power to let me and the many, many other people in Kansas who have chosen Humana Gold Plus to keep this wonderful plan.

Ms. Collette is not alone. Satisfaction rates among seniors enrolled in Medicare Advantage plans are very high. I know they are very unpopular to the other side and there are a lot of allegations made, but these people made that decision on their own, so why are we essentially gutting this program that provides quality and choice to our seniors?

I could go on about the cuts to hospice, home health care providers, nursing homes, but I think you get the point. I disagree with the failure to prioritize the solvency of Medicare over the establishment, again, of new government programs. And I certainly will never agree to financing these government expansions by bleeding the Medicare Program dry.

That is why, as I have said, I offered amendments in the Finance Committee markup that would have struck these Medicare cuts. Again, unfortunately, they were defeated on a party-line vote.

As the President is fond of saying, "Let me be clear." This bill is funded on the backs of our seniors and those who provide Medicare to our seniors. This bill slashes Medicare by $½ trillion. This bill threatens access to care for seniors and health care for all Americans. I hope my colleagues will join me in opposing these cuts by voting for the McCain motion to commit.

This is the key vote. Don't kid yourselves, this is the key vote. You are either for protecting Medicare or not.

I yield the floor.

The PRESIDING OFFICER. The Senator from Montana is recognized.

Mr. BAUCUS. Mr. President, I wish to once and for all lay to rest this false claim that the pending bill is going to "hurt seniors" and is going to hurt providers; it is going to be this long parade of horribles that the other side likes to mention. It is totally, patently untrue, the claims they are making.

No. 1, all the crying allegations on the other side that the underlying legislation cuts Medicare, it cuts Medicare, it cuts Medicare—that is what they say. What they do not say is it does not cut Medicare guaranteed benefits. It doesn't cut benefits. It does reduce the rate of growth that hospitals would otherwise receive. It does reduce the rate of growth that medical device manufacturers might receive. All that is true. So it is true it is cutting the rate of growth of Medicare providers. It is not true that this legislation cuts Medicare benefits. That is not true. The other side would like you to believe that is true by using the words

Exhibit 151

JA-0002409

Case 2:17-cv-04540-WB   Document 253-10   Filed 09/29/20   Page 438 of 677

they choose. By saying "cutting Medicare," they want you to think that is cutting Medicare benefits.

But it is not cutting Medicare benefits. Rather, the underlying bill reduces the rate of growth of government spending on providers, on hospitals, home health, hospice—lots of other providers. That is what is going on here. Don't let anybody fool you. This bill does not cut Medicare benefits. It does not. But it does reduce the rate of growth of providers.

Why are we doing that? First of all, most of these providers, virtually all the providers say—gee, we don't like our rate of growth, the Federal dollars coming to us, cut, but they will go along with it. They are OK with it. Why are they OK with it? Why is the American Hospital Association OK with reducing the rate of growth of hospital payments by $155 billion? Why are they OK with that? They are OK with that because they are going to make it up on volume. This legislation provides coverage for many more Americans. They are going to have health insurance. Americans who do not have health insurance now often have to go to the emergency room of the hospital, the hospital has to provide the care, it is uncompensated care—nobody is paying for those hospital benefits—and that cost is transferred on to private health insurance premium holders. They have to pick it up. On average, that is about $1,000 per family per year.

No. 1, let me repeat, there are no cuts to Medicare benefits. There are reductions in the rate of growth to Medicare providers—which the providers agree with, by and large. I won't say totally, I wouldn't stand here and say they are jumping up and down and they are enthusiastic about it, but I am saying they realize they are not getting hurt. They are going to do OK. They are going to do OK because they are going to make up in volume what they might otherwise lose. That is a very important point for people to understand.

Second, if you listen to the other side, what they would have us do is virtually do nothing. What does doing nothing mean? Doing nothing means the solvency of the Medicare trust fund is just over the horizon. This legislation extends the solvency of the Medicare trust fund another 4 to 5 years. Man, if I am a senior—I am about to be a senior—I would sure like the Medicare trust fund to be solvent. I would like that very much. This legislation extends the solvency of the Medicare trust fund by another 4 to 5 years, to about the year 2017. So without this legislation, the actuaries say the Medicare trust fund is going to become insolvent 5 years earlier, 2012, somewhere there. That is not many years from now; not many years at all. So it is very important we extend the solvency of the Medicare trust fund.

You might ask why is the Medicare trust fund in a little bit of jeopardy? Why is that? The very basic reason is because health care costs are going up at such a rapid rate in America. Our health care costs are going up by 50 or 60 percent more quickly than the next most expensive country. We already are paying per capita 50 percent or 60 percent more than the next most expensive country. So there is a whole host of things we are doing in this legislation to make sure we have some limit over our health care costs.

I realize I misspoke earlier. Currently the Medicare trust fund is due to be insolvent about the year 2017. This legislation extends the solvency of the Medicare trust fund to the year 2022. The principle is the same, just the 5 years is tacked on a little later period of time rather than upfront.

But we are doing a whole host of things in this legislation to reduce the rate of growth of health care costs to people in this country. It is health care costs which are driving up the Medicare trust fund costs so we are doing all we can to extend the solvency of the Medicare trust fund.

People are saying the Medicare trust fund is getting insolvent because baby boomers are retiring, and that will increase the pressure on it. But the Congressional Budget Office did a study 6 or 8 months ago that said about 70 percent of the additional cost of the Medicare trust fund is due to cost increases, it is not due to more baby boomers retiring when they reach the age of 65.

What do some of the groups say about this legislation? Let me say what AARP says. We have a chart here which indicates what the American Association of Retired People says about the underlying bill. If it was cutting Medicare as the other side says, you would think they would not like this bill. You would think they would have problems with it.

AARP has not totally endorsed this bill, but they don't have problems with it because they know we are doing the right thing. What do they say? AARP says:

Opponents of health care reform won't rest. [They are] using myths and misinformation to distort the truth and wrongly suggesting that Medicare will be harmed. After a lifetime of hard work, don't seniors deserve better?

That is what the AARP says, referring to the distortions, misrepresentations, and untruths, trying to scare seniors, mentioned by opponents of this legislation.

Here is another AARP quote. This is this month:

The new Senate bill makes improvements to the Medicare program by creating a new annual wellness benefit, providing free preventive benefits, and—most notably for AARP members—reducing the drug costs for seniors who fall into the dreaded Medicare donut hole, a costly gap in prescription drug coverage.

That is a very important point. This bill not only does not cut benefits, it increases benefits for seniors. A big one is referred to right there and that is the so-called doughnut hole, the gap in coverage under the prescription drug program. This legislation in effect says that seniors now who have $500 of their drug benefit, prescription drug benefits paid for when they are in that doughnut hole period, and add to that this bill also says it is all paid for, at least for 1 year, in this doughnut hole. We have to worry about that in subsequent years, but this bill improves the benefits that seniors will get, not take away benefits as the other side would imply.

It is true that private programs, such as Medicare Advantage, are reduced from what they otherwise would be, just as hospitals are reduced in payments from what they otherwise would get. I have a chart here. Let me point out the next chart here, if I could, which shows that the provider groups, hospitals, et cetera, are actually going to do OK under this legislation. What does this chart show? This chart shows that Medicare spending will continue to grow under this legislation. It will grow, and grow by a lot. Here, in 2010, it is $446 billion and you see a steady growth through the 10 years of this bill.

I might say parenthetically, one of the previous speakers said rural health care is going to be hurt, rural hospitals are going to be hurt in this legislation. I do not think that is entirely true. I have a lot of hospitals in my home State of Montana, rural hospitals. They are not upset with this legislation. They say it is OK. They approve it.

In addition, there are no cuts to critical access hospitals. In rural America most of those hospitals are critical access hospitals. So they are going to be OK.

Basically, if we did not pass this legislation, these provider groups—hospitals, nursing homes, home health, hospice, Medicare Advantage, even Part B Medicare improvement—would all increase by about 6.5 percent over the decade. Under this legislation they all increase by about 5 percent over this decade, with a 1.5 percent cut which they basically agree to.

I want to make that point clearly. We are not cutting Medicare. We are not cutting Medicare benefits, but we are reducing the rate of growth of Medicare spending.

Another point I want to make, if I may, is there is nothing new here. Many of the Senators who are advocating killing this bill made the opposite statement not too many years ago. What did they say? They said: You have to reduce the rate of growth in Medicare spending in order to save Medicare benefits. That is what they said a few years ago, exactly what they said. Let me read:

We propose slower growth in Medicare. Medicare would otherwise be bankrupt.

They are standing on this floor making the opposite statement today, the exact opposite statement today, trying to scare people to kill the bill.

Here is another Senator. I will not embarrass them by giving their names,

Exhibit 151

JA-0002410

but they are Senators who currently serve in this body.

We do heed the warning of the Medicare Board of Trustees and limit growth to more sustainable levels to prevent Medicare from going bankrupt in 2002. That is what is necessary to ensure that seniors do not lose their benefits altogether as a result of bankruptcy in 7 years.

One Senator said that. When? About 14 years ago. Exact same thing that is going on today.

We know, experts know that if we are going to save Medicare benefits, we have to stop overpaying some of the providers, hospitals and so forth. We are overpaying them.

Let me tell you one small example of how we are overpaying them. Did you know that the updates—the fancy term for paying more for hospitals and so forth—did you know they don't take productivity into account when they make these update recommendations? The recommendations are basically made by an organization called MedPAC. MedPAC is a nonpartisan organization composed of doctors and experts that advise Congress on what the payment updates—what the payment increases should be for different groups over the years. We in Congress basically look at them. We try to decide what makes sense, what doesn't, and so forth. But MedPAC has said that this is what we have to do. We have to slow the rate of growth in some of these providers because they are getting paid too much. They are getting paid more than they need to be paid.

I repeat: We are still going to allow 5 percent growth for all the providers over the next 10 years. None of them are really crying wolf, I might say. That is the main point I wanted to make.

I mentioned what AARP is saying. Let me mention the American Medical Association:

[We are] working to put the scare tactics to bed once and for all and inform patients about the benefits of health reform.

That is the American Medical Association. They are referring to the scare tactics of the other side. The AARP and the American Medical Association and others know that no senior will see a single reduction in their guaranteed Medicare benefits under this bill, not a single one.

I might also say that this bill would reduce premiums seniors would have otherwise paid. Much of those savings to seniors comes from eliminating massive overpayments to private insurers; that is, private companies such as Medicare Advantage.

A small point here. When seniors hear the words ''Medicare Advantage,'' they tend to think that is Medicare. It is not. It is a private company. Those are private companies. They were basically enhanced. Under the 2003 Medicare Part D legislation, they were given a lot more money to encourage them to have competition in rural areas. It turns out we gave them way too much additional money. They

know it. This legislation is trying to cut back on the excess they were provided back in the year 2003. The cut is about $118 billion over 10 years. I don't have with me how much is remaining. But that 5 percent figure I gave you of growth, that includes Medicare Advantage.

I mentioned already that this legislation would reduce prescription drug costs. That doesn't sound like a benefit cut to me; that sounds like an additional benefit for seniors. We also provide for new prevention and wellness benefits in Medicare. That is an addition. That is not a cut. That is an addition. We are also helping seniors stay in their own homes, not nursing homes. That is a benefit.

It is important to point out here that the opponents of health care reform do not have a plan to protect seniors and strengthen the Medicare Program. They say don't do what they said a few years ago. They say: Commit the bill, do nothing. They say: Go back and start from scratch again. That is basically what they say. If you listen to the music as well as the words, if you read between the lines, basically they are saying: Kill it. Don't do it. That doesn't make sense.

That is what they are saying. I hate to say this because I tend to be a pretty nonpartisan kind of a guy. But these are scare tactics. They are not truths. Sometimes you have to call a spade a spade, and that is exactly what is happening here.

I might say that MedPAC, the outfit that advises us, is nonpartisan. They can't help us decide what to do here. They think Medicare Advantage plans are overpaid by 14 percent. In addition, a typical couple will pay $90 more per year in Part B premiums to pay for Medicare Advantage overpayments even if they are not enrolled in these plans. That is not right.

Medicare home health providers—I gave that list earlier. One small part of that is Medicare home health providers. They have an average margin of 17 percent. That is a little high.

If we are trying to protect Medicare benefits, we have to make sure we are not overpaying the Medicare providers. That is just common sense. It is the right thing to do. So many seniors just need help with their Medicare benefits.

Nursing homes are making profits of 15 percent off of Medicare. In my judgment, that, too, is unacceptable. We have to bring those down within reason.

We have an obligation. This is a government program. We have an obligation to taxpayers to make sure we are not overpaying hospitals and providers. We have to do right by them, make sure they are doing OK, but just not overpay. That is a tough line to draw sometimes. It is a judgment call. But that is what we are doing here.

In addition, the Office of Inspector General has found rampant fraud and waste and abuse in the Medicare Program. There is a lot of fraud and waste

in the Medicare Program. The last figure I saw was about $60 billion in fraud in Medicare—providers, frankly, just ripping off taxpayers and seniors. We have added additional provisions in here to outlaw that fraud—additional screening, additional certification, additional ways to make sure that Medicare does a better job, that CMS does a better job in knowing which payments to providers are right and which are not right.

What is the real impact of the Medicare policies here? Let's be clear: The real impact of these policies, even with the Medicare changes in the bill, overall provider payments will still go up. I don't want to beat that horse too much, but I want to make it clear. We are not cutting benefits. We are reducing the rate of growth of spending for health care providers, hospitals, and nursing homes, but we are reducing it in a moderate way. We are not reducing it by too much. As this chart shows, those providers still get at least a 5-percent net increase in payments over the years, and the groups themselves have not really complained about them. Take the pharmaceutical companies, hospitals, nursing homes, home health, hospice—they are not crying crocodile tears because they know they are going to do better under health care reform.

Remember that famous meeting down at the White House not too long ago. The industry came in and talked to the President. Remember what they pledged, all these providers, how much they can cut reimbursements to them? This is including the insurance companies, hospitals, and everybody. They said they would cut $2 trillion over 10 years—$2 trillion. This legislation doesn't come close to cutting $2 trillion. I think the figure is about $400 billion. That is not $2 trillion, that is $400 billion. So we are not hurting them that much. We are not hurting them, frankly. They are doing OK.

I have quotes from hospital associations. This is from Sister Carol Keehan, president of the Catholic Health Association:

Clearly, the Catholic Health Association thinks the possibility that hospitals might pull out of Medicare . . . to be very, very unfounded.

I have heard the claim over here that this legislation is going to cause providers to pull out of Medicare. That is totally untrue. I have so many quotes here from people in the hospital industry who believe this is OK. They are not going to pull out.

Chip Khan, president of the Federation of American Hospitals:

Hospitals will always stand by senior citizens.

I also know some providers are going to do very well under this reform legislation. Wall Street analysts have suggested that many providers, including hospitals, will be ''net winners,'' according to the basic feeling among Wall Street analysts. Under our bill, they estimate hospital profitability

Exhibit 151                                                                        JA-0002411

will increase with reform because more and more hospital patients will have private health insurance.

Nobody is going to pull out. They are not going to cut Medicare benefits. It is true that there is a reduction in some of the private plan nonguaranteed benefits companies would give to seniors at the expense of private patients. That is true.

MedPAC has said it should be cut. MedPAC has said it should be cut more. We are giving these plans a break by not cutting them by what MedPAC says they should be cut.

Again, the reductions in this bill—for the providers, not beneficiaries—are far less than the health care industry itself said it could save over the next decade. A reminder: They pledged to save $2 trillion over 10 years. Under this legislation, they are going to be hit for $400 billion.

I mentioned before that the other side has often said this is exactly what we to have do, although today they say: No, no, no. I am not quite sure what the difference is between a few years ago when they said this is what we should do. Perhaps they can explain that.

I might mention, too—and this is very important, although we tend to lose sight of it—under this legislation, we provide delivery system reform.

There is a lot of waste in our health care system—estimates are 15, 20, 30 percent waste in the American system. Why is there so much waste, which means seniors are not given the benefits they should receive, which means private patients generally aren't getting the benefits they should receive because of all the waste? The waste is basically because of the way we pay for health care. We pay on the basis of quantity. We pay on the basis of volume. We do not pay on the basis of quality. To state it differently, a hospital tries to do the right thing, doctors try to do the right thing. They are paid on the basis of how many procedures they provide, basically, not outcomes, not quality. That is the basic root that has caused a lot of the waste in the current American system.

Health care is provided for differently in different parts of the country. The fancy term is "geographic disparity." Health care in one community is practiced one way. Health care in another community is practiced another way. They are very different.

Many of us have read the June 1 New Yorker article written by Dr. Gawande comparing El Paso, TX, with McAllen, TX. I see the two Senators from Texas on the floor. Perhaps they can help us elucidate what is going on in El Paso and what is going on in McAllen. In El Paso, the cost of health care is about half per person what it is McAllen, another border town. Spending per person in El Paso is about half what it is in McAllen. Yet the outcome; that is, how well the patients do, is a little bit better in El Paso than it is in McAllen. Why? According to the author of the

article, it is because of how medicine is practiced, what is the ethic, what is the sense in El Paso regarding health care and what is it in McAllen regarding health care. It may be dangerous for me to say so, but according to the author, his conclusion is that in El Paso, it is because the care is more patient centered, it is coordinated care, it is less on making a buck; whereas in McAllen, it is less coordinated care, more specialties in hospitals, a little bit more providers wanting to go make a buck.

The main point is that medicine is practiced so differently all over the country. There are geographic disparities. In Northern High Plains States, it is less spending per person and the outcomes are terrific. In some of the Sunbelt States—and I don't want to step on the toes of any Senators from Sunbelt States—there is more spending and the outcomes are worse. It is just because it is based on volume and quantity, not based on quality.

This legislation starts to put in place ways to move toward reimbursing based on quality, not volume. That, paradoxically, is going to result in lower costs and higher quality—lower costs but higher quality. Virtually all the folks in the health care community—the doctors, hospitals, and administrators I talk to—virtually all agree—I will be very conservative—80 percent agree, 85 percent agree, this is the direction in which we have to go.

This legislation goes in that direction. Failure to pass this legislation, which the other side wants, means we do not do any of that. It means we do not start putting in place ways to more properly reimburse doctors and hospitals and other health care providers.

This bill includes those patient-centered reforms I just mentioned. What are they? They include accountable care organizations, bundling is another concept, reducing unnecessary hospital readmissions, creating innovation centers. This bill starts to do that.

There is something else this bill does but which some on the other side get all exercised over and which I think they get exercised over improperly; that is, ways to start to compare one drug versus another, compare one procedure versus another, one medical device versus another. We have to start doing more of that with a nongovernment agency, with a private-public agency that works together so it gives good, solid information so we have more evidence-based medicine in America.

Right now, a lot of docs want to do the right thing, but what they do depends on the drug rep who comes in their office and starts peddling a certain drug. Docs feel uneasy about that, they do not like it, but they are so busy they see so many patients, it is hard to keep up to date. So we are trying to help them keep up to date with evidence-based medicine, and with a lot more health IT, health information technology, so they can get access to

the best evidence through these various organizations.

There are just so many reasons this legislation is so important. I personally believe we have to move a bit toward what is called integrated systems. We hear about Geisinger, the Mayo Clinic, the Cleveland Clinic, Intermountain Healthcare. There is some home health out in Seattle where doctors and hospitals and nursing homes and pharmacists are more integrated, and that, therefore, cuts down on cost, increases quality. It is more patient centered. It is more care coordinated. This legislation helps us move in that direction.

We are just trying to get started with this legislation, get started in doing some of the right things we know we should do. We do not have all the answers. Nobody has all the answers. But if we get this legislation passed, in the next couple, 3 or 4 or 5 years, working with the basic underpinnings of this legislation, we are going to help correct some mistakes. We are going to see some new opportunities. We are going to be working on getting health care costs down, which we have to begin doing to help our people, help our companies.

We are going to work to get more coverage so more people have health insurance. It is an embarrassment today. It is an absolute embarrassment that the United States of America, an industrialized country, does not provide health insurance for its people. It is more than an embarrassment. It is a travesty. It is a tragedy. It is just wrong, it is morally wrong.

So this legislation gets us moving on the right track. It helps Medicare beneficiaries not hurt them, as the other side would like you to believe. It does not unnecessarily harm doctors and hospitals. They kind of go along with this. They kind of know it is the right thing to do. They are still getting big increases in payments, and there are other reforms here which I have not the time to mention tonight. But I strongly urge us to say: Hey, this is the right thing to do. Let's get started. Let's pass this legislation and certainly trounce this committal motion to stop what we are doing. It is not right to stop this. We are getting started. Let's keep going.

I yield the floor.

The PRESIDING OFFICER. The Senator from Texas.

Mrs. HUTCHISON. Mr. President, I want to talk about health care legislation. That is what we have been talking about now on the Senate floor for the last week. I expect we will be talking about it for quite a long time.

We have just begun considering this bill, and the American people are growing in their opposition. According to a new Gallup Poll released yesterday, American independent voters now oppose this bill by an 18-point margin: 53 percent against it, 37 percent for it. This Gallup Poll states:

Despite the considerable efforts of Congress and the President to pass health insurance reform, the public remains reluctant to endorse that goal.

But this poll is just confirming what we have really known for months; that is, the bill before us—and the one that passed the House before that—is the wrong approach.

We are not against reform of health care; we need reform of health care. People are concerned about the rise of premiums in health care. So we ought to be looking at ways to address that issue. By doing what? By cutting the costs in the system and by allowing people to have more affordable health care options, none of which is in this bill.

Americans do not support $½ trillion in Medicare cuts. They do not support $½ trillion in new taxes. They do not support mandates. They do not support our growing national debt, which has hit its ceiling at $12 trillion. They certainly do not support a government takeover of our health care system.

Let's talk about the Medicare cuts. The Americans who are most impacted are those who are usually trying to protect: our seniors. I hear others on the Senate floor saying there are no cuts to Medicare. I am looking at the language in the bill. I am looking at the description of the bill, and the fact is there is $135 billion in cuts to hospitals, $120 billion in cuts to Medicare Advantage, $15 billion in cuts to nursing homes, $8 billion in cuts to hospice care. That is nearly $½ trillion in Medicare cuts. That is $500 billion.

In Texas, over half a million seniors are enrolled in Medicare Advantage. We know this bill will reduce their choices and the benefits they have today—benefits such as eyeglasses, hearing aids, dental benefits, preventive screenings, flu shots, home care, medical equipment, and more. So more and more seniors are not going to take the Medicare Advantage option which they now take and enjoy. This is not a solid approach.

I have heard others on the Senate floor on the other side of the aisle say it was Republicans who attempted to cut Medicare in previous years. The Republican effort to cut Medicare growth was $10 billion over 5 years. Not one Democrat voted for a $10 billion cut over 5 years. Yet today they are touting a $500 billion cut over 10 years.

Mr. President, $10 billion was out of the question, and $500 billion is now something that can be accepted? There is no reason to cut Medicare by $½ trillion. We should save Medicare. We should make it last longer and be more stable. But $500 billion in cuts is just going to make it worse. It is going to make it insupportable. Health care for our seniors will surely suffer on its face. That is a fact.

It is a fair question to ask: Well, what are Republicans for? Are you for health care reform? Well, of course we are for health care reform. Every one of us pays health insurance premiums,

and we know people who are complaining about the rise in premium costs, especially small businesspeople. I sympathize with that. We all do.

So what is our approach? Step-by-step reform. What the American people are looking for is reform that does not cripple the health care industry in our country, that does not bankrupt our country, and that does not include a government takeover of the health care system.

There are commonsense, fiscally responsible reforms that Republicans have been promoting for years and would support today if we could have a bill that had any Republican input whatsoever, which this one does not—allowing small businesses to pull together and purchase insurance.

Sitting on the floor with us today is Senator MIKE ENZI. Senator ENZI was the chairman, previously, of the HELP Committee. He produced a bill. He produced a bill that would have given more people coverage than the bill before us today—allowing small businesses to come together and pool their risk pool, make it larger, and give much more affordable premiums to more small businesses so they could afford to do what every small business wants to do; and that is, offer health care coverage to their employees.

But the Democrats killed Senator ENZI's bill. That would have been the first step to health care reform. We could have passed that years ago and been on the right track increasing the number of people who have affordable options for health care.

No. 2, reducing frivolous lawsuits. Where States have taken the measure to reduce frivolous lawsuits, such as Texas and a few other States, it has been a phenomenal success. It has brought down the cost of medical malpractice premiums for doctors. It has increased the number of doctors who are willing to practice medicine again. It has increased the number of doctors who will go into rural areas that are underserved. It works.

The estimates are that if we had a part of this bill that would reduce frivolous lawsuits, it would save about $50 billion a year. If we could reduce $50 billion out of the cost in the system that is not going for anything productive, we could then put that into either helping shore up Medicare or give the Medicare reimbursements to doctors and health care providers, to hospitals. We could help the system by cutting those costs. That is something Republicans would support in a heartbeat.

How about tax incentives to people who are buying their own health care insurance? If we provided families with a tax credit worth $5,000, it would give them the ability to put that on a health care policy for their families. It would cut the cost and allow them to have an affordable option. Another is a tax deduction above the line or a tax credit, which would be a huge incentive to employers, as well as to individuals, who would be able to have that kind of

help in covering the cost of health care. We are willing to support that.

Another is allowing individuals to purchase insurance across State lines; tear down that bureaucracy that keeps people from going across State lines and getting the very best deal for themselves and their families.

Even an exchange could work. That is something that is embedded in the bill, but it is an exchange that has so many mandates that it is going to raise the cost for everyone. Just a simple exchange that has competition and transparency could actually make a difference in cutting the costs of health care.

So I think there are many things we could do to reform health care, if we could have Republican input and a bipartisan bill that would offer more affordable health care coverage to more people in our country. These are ideas that would improve competition in the marketplace, reduce costs, increase access. We do not need a government-run plan to achieve that objective.

I will be offering an amendment that will allow States to opt out, without penalties, of this plan, if it passes, not just the government part of the plan, but all of the harmful measures. We should be providing choices, not forcing people into government plans. States should not be forced to participate in the government plan. They should not be forced to subsidize it. They should not pay for a plan through increased taxes, nor mandates on businesses.

We want businesses to grow. We want businesses to hire people. We want to have jobs created. This bill is a job killer. Has anyone noticed we have one of the worst recessions since the Great Depression in this country, that over 3 million people in this country have lost their jobs this year? Mr. President, 300,000 of them live in my home State of Texas. Yet we are talking about a bill that is going to increase mandates on businesses and surely will reduce the number of people who can be hired. There is a disconnect we need to put back together. We need to talk about options that can work, that can give more people health insurance coverage at a reasonable price and most certainly not be job killers, with mandates and taxes on small businesses that already are having a hard time staying afloat, creating jobs, and providing health care for their employees.

The first amendment we will vote on tonight is the Mikulski amendment that has to do with breast cancer screening and other preventive services for women. Senator MIKULSKI and I have worked together on women's health issues for a long time in this body. Two years ago, we championed the reauthorization of the National Breast and Cervical Cancer Early Detection Program, which provides screening and diagnostic services. So we know how important it is to address women's health care issues.

I was in complete disagreement with this new task force recommendation on

Exhibit 151                                                                                                              JA-0002413

mammograms and the need for mammograms for women under the age of 50. But I am very concerned that with the recent recommendations of the task force and how this health care bill that is before us relies on the task force, that the amendment is not going to do anything to solve that problem. The health care reform bill relies on the task force 14 times, and it even allocates money to pay for advertising the task force recommendations. This amendment does not address the problem. Rather than severing the ties with that task force so it will not become the norm, the amendment now allows yet another government agency, the Health Resources and Services Administration, to interfere with the relationship between a woman and her doctor. So now coverage decisions will be dictated by both the task force and the Health Resources and Services Administration. Instead of letting doctors and their patients make the decision about when a woman needs a mammogram, we have now not one government task force but two that we will have to intervene in that decision. Oh, my gosh, that does not make any kind of common sense. While I agree with Senator MIKULSKI about the great importance of preventive care for women, I disagree with this approach because it still injects a government agency or task force into the decision that is going to determine whether women have access, easy access, full access to the health care of their choice.

The item we will be considering after the Mikulski amendment and the Murkowski amendment is the McCain motion. The McCain motion is going to strike the Medicare cuts from this bill. His motion, which I certainly endorse and support, would send the bill back for a rewrite. It would send it back to the Finance Committee with instructions to give us a new bill that does not include $\frac{1}{2}$ trillion in Medicare cuts, a bill that would not be paid for on the backs of our seniors whom we should be protecting. As I mentioned previously, the bill that is before us would cut nearly $\frac{1}{2}$ trillion—$500 billion—from Medicare. It will not make it stronger; it will fund more government spending, more government takeover in our health care system. Health care reform should not mean slashing Medicare by cutting $\frac{1}{2}$ trillion from seniors' care. This is not reform.

If we can support the McCain motion to go back to the drawing board and look for a way we can have a bipartisan bill that would have Republican as well as Democratic input and agree to step-by-step reforms that would increase access, reduce costs and not take away choices of seniors and certainly not have a government takeover of health care, then I think we could produce something the President would sign and the American people would embrace. Right now, everyone I talk to in Texas is scared to death. They are scared to death of this big government takeover of our health care system be-

cause they know that when government gets involved, we are not going to have the quality we have known in the past, that the jobs are not going to be in the private sector, that we are not going to have the choice. When this bill—which relies on this task force 14 times to make the recommendations that would determine what the coverage is of the government plan—was put before us, all of a sudden people started to say women don't need mammograms before the age of 50, when we have always said it was after the age of 40; and after the age of 50, with a doctor's input, and that it would generally be on an annual basis.

The former head of the Red Cross, Bernadine Healy, and many of our health care agencies and task forces said that is going to kill women. That is going to kill women if they don't have early detection. Early detection is all we have for breast cancer right now. We don't have a cure. We only have early detection as a way to fight breast cancer. But all of a sudden, the task force that is relied on by this bill says we don't need mammograms before the age of 50; and after the age of 50, every 2 years, not every year; and after the age of 72, not at all. That is not health care reform. That is not what the President promised, and it is certainly not what Congress ought to assent to.

We can produce health care reform. We can lower the cost. We can give people access. We can give people choices. We don't have to mandate taxes and hurt businesses in this economic climate to do it. We have the capability to do something right. If we pass the McCain motion, we can go back to the drawing boards and do this right. That is the most important thing I hope we will do this week in the Senate for the American people, and they deserve it.

Thank you. I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD. Mr. President, I ask unanimous consent, if I may, that I be allowed to speak for 15 minutes and that that time include a colloquy with my colleague, the Senator from Minnesota.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DODD. Thank you, Mr. President. I wish to address a couple issues, if I may; one is this debate about Medicare cuts and savings. Let me put up one chart. I will not spend a long time on this, but I wish to make a point to my colleagues.

About a year ago, the Bush administration sent us a budget. According to the Congressional Budget Office and the Senate Budget Committee, the proposals in the Bush administration's budget in the last year alone called for $481 billion in Medicare savings and cuts. It was not in the context of a health care bill; that was part of a budget proposal. That was $481 billion, according to the CBO just last year. Literally, 12 months ago that was the proposal. In the context of the overall reform of the health care system, in

which we are trying to achieve savings to make sure the dollars are going to go further and go for the things that are needed, our proposal calls for $380 billion in savings over the coming 10 years.

I think, again, people need to understand what we are talking about and that is the difference. So a year ago, $481 billion and no health care proposal—just to get to budget proposals. Here we are in the context of over 10 years of trying to put things in this bill to ensure a more solid footing.

The National Committee to Preserve Social Security and Medicare, representing millions of our fellow citizens, wrote a letter to the Senate, every Member, dated December 1, 2009. Senator HARKIN earlier put the entire letter in the RECORD. I am going to read just one sentence from the letter, signed by Barbara Kennelly, the President and CEO of this organization:

Not a single penny of the savings in the Senate bill

This bill we are debating—

will come out of the pockets of beneficiaries in the traditional Medicare program.

This is an organization that does not bear a political label. It doesn't represent Democrats, Republicans, Independents. It merely spends every hour of every working day assessing what happens to Social Security and Medicare. That is all they do—all they do. Believe me when I tell my colleagues this organization would not make a statement such as this if it were untrue. I know the organization. I know the people involved. They are highly critical of Democrats and have been when they think we have gone too far in various areas. They state, categorically, what this bill does to Medicare.

I ask unanimous consent that the entire letter be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

NATIONAL COMMITTEE TO PRESERVE
SOCIAL SECURITY AND MEDICARE,
*Washington, DC, December 1, 2009.*

U.S. SENATE,
*Washington, DC.*

DEAR SENATOR: On behalf of the millions of members and supporters of the National Committee to Preserve Social Security and Medicare, I am writing to express our opposition to the amendment offered by Senator McCain which would recommit H.R. 3590, the Patient Protection and Affordable Care Act, to the Senate Finance Committee with instructions to remove important Medicare provisions.

Much of the rhetoric from opponents of health care reform is intended to frighten our nation's seniors by persuading them that Medicare will be cut and their benefits reduced so that they too will oppose this legislation. The fact is that H.R. 3590, the Patient Protection and Affordable Care Act, does not cut Medicare benefits; rather it includes provisions to ensure that seniors receive high-quality care and the best value for our Medicare dollars. This legislation makes important improvements to Medicare which are intended to manage costs by improving the delivery of care and to eliminate wasteful spending.

The National Committee opposes any cuts to Medicare benefits. Protecting the Medicare program, along with Social Security,

Exhibit 151    JA-0002414

has been our key mission since our founding 25 years ago and remains our top priority today. In fact, these programs are critical lifelines to today's retirees, and we believe they will be even more important to future generations. But we also know that the cost of paying for seniors' health care keeps rising, even with Medicare paying a large portion of the bill. That is why we at the National Committee support savings in the Medicare program that will help lower costs. Wringing out fraud, waste and inefficiency in Medicare is critical for both the federal government and for every Medicare beneficiary.

The Senate bill attempts to slow the rate of growth in Medicare spending by two to three percent, or not quite $500 billion, over the next 10 years. However, it is important to remember that the program will continue growing during this time. Medicare will be spending increasing amounts of money—and providers will be receiving increased reimbursements—on a per capita basis every one of those years, for a total of almost $9 trillion over the entire decade. Even with the savings in the Senate bill, we will still be spending more money per beneficiary on Medicare in the coming decades, though not quite as much as we would be spending if the bill fails to pass.

America's seniors have a major stake in the health care reform debate as the sky-rocketing costs of health care are especially challenging for those on fixed incomes. Not a single penny of the savings in the Senate bill will come out of the pockets of beneficiaries in the traditional Medicare program. The Medicare savings included in H.R. 3590, the Patient Protection and Affordable Care Act, will positively impact millions of Medicare beneficiaries by slowing the rate of increase in out-of-pocket costs and improving benefits; and it will extend the solvency of the Medicare Trust Fund by five years. To us, this is a win-win for seniors and the Medicare program.

The National Committee urges you to oppose the motion to recommit the bill to the Finance Committee with instructions to strike important Medicare provisions from health care reform legislation.

Cordially,

BARBARA B. KENNELLY,
*President & CEO.*

Mr. DODD. Thirdly, I wish to commend our colleague from Maryland, Senator MIKULSKI. Again, a lot has been said about her proposal dealing with women's health. Consider these two statistics as we try to get this right: Less than half the women in the United States have the option of obtaining health insurance through a job—less than half. They are forced either to purchase expensive insurance in the individual market or are dependent upon a spouse to provide health care.

Right now, today, whether you are a Democrat, Republican, conservative, liberal, whether you live in Connecticut, Texas or Minnesota, consider this: A healthy 22-year-old woman can be charged insurance rates 150 percent higher than a 22-year-old man in a similar condition. Our bill before us ends that—ends that. If you defeat the Mikulski amendment or recommit this bill, remember tonight or tomorrow, when the vote occurs, that 22-year-old woman and that 22-year-old man have a differential as much as 150 percent in health care premiums. That is what happens at this very hour. The Mikulski amendment changes that as well in our bill, among other things.

Lastly—and then I wish to turn to my colleague from Minnesota—just to remind my colleagues, again, what Senator BAUCUS has done with his committee in the Finance Committee and what we did in the HELP Committee to provide some meaningful advantages and help to people across this country immediately. One, our bill will provide $5 billion in immediate Federal support for a new program to provide affordable coverage to uninsured Americans with preexisting conditions. Coverage under this program will continue until the new exchanges are operating over the next few years.

Secondly, the bill creates immediate access to reinsurance for employer health care plans providing coverage for early retirees. Again, this will help protect coverage, while reducing premiums for employers and their retirees.

The bill also reduces the size of the doughnut hole immediately by raising the ceiling in initial coverage by $500 in 2010, the coming year—immediately. This will guarantee a 50-percent price discount on brand-name drugs and biologics purchased by low- and middle-income beneficiaries in the coverage gap. That is immediate.

Fourth, our bill will offer tax credits immediately to small businesses to make employee coverage more affordable. That is not a year or two or three from now, this is immediate. Tax credits of up to 50 percent of premiums will be available to firms that choose to offer the coverage as a result of the tax break.

Fifth, our bill will require insurers to permit children to stay on family policies until age 26. Right now, that ends at 23. Our bill extends it to 26 immediately, to have this benefit for people across the country who have families and children today who are staying home longer because of the absence of jobs out there for them.

Our bill will provide coverage for prevention and wellness benefits immediately and exempt these benefits from deductibles and other cost-sharing requirements in public and private insurance coverage. Not in a year, not 2 years, not 3 years but immediately when this bill becomes law.

Sixth, the bill would prohibit insurers from imposing lifetime limits on benefits and will restrict annual limits as well.

The bill also would prohibit group health plans from establishing eligibility rules of health care coverage that have the effect of discriminating in favor of higher wage employees.

In this bill, we also establish standards for insurance overhead to ensure that premiums are spent on health benefits. We also require public disclosure of overhead and benefit spending and require premium rebates from insurers that exceed established standards for overhead expenses.

Lastly, it would create new Web sites to provide information on a facilitated form of consumer choice of insurance options. And there are other immediate benefits to this legislation.

I think it is important, as we discuss the bill, that you understand there are substantial and meaningful improvements. We have debated this bill and debated these issues for months and months on end. The time has come to act. That is what we are proposing with this legislation.

With that, I appreciate the indulgence of my colleague from Minnesota. I yield to him for any additional comments he may wish to make.

Mr. FRANKEN. Mr. President, I thank Senator DODD for his leadership on this bill. I want to talk about Senator MIKULSKI's amendment.

First, a little bit about some of the claims that have been made on the floor today about Medicare. Senator DODD pointed out that in the Bush budget—the last Bush budget—there was a bigger cut to Medicare, but not in the context of any kind of health care reform. Senator BAUCUS said it so well about what the cuts are. They are to hospitals, and the hospitals are fine with it. They are not jumping-up-and-down excited about it, but they are fine with it because it comes in the context of health care reform.

We are covering 30 million more people. What does that mean to hospitals? When people come into the emergency room, they have coverage. The hospitals get paid. That is the context in which we are doing this; whereas, when President Bush was proposing those kinds of cuts, they were not in the context of insuring 31 million more people. When the uninsured were going into emergency rooms for the most inefficient care possible—and won't be now—it was costing every American family $1,100 in additional insurance costs. So they are comparing apples and oranges. We are doing so many things, and Senator DODD talked about some of the things this bill does. I want to talk about Senator MIKULSKI's amendment, because women are among the most severely disadvantaged in our current health care system. Right now, health insurance companies can and do discriminate against women solely on the basis of their gender.

Right now, it is legal in many States—again, not in all States, and this is why, when you are talking about getting health insurance from another State, you have to be careful. In Minnesota, we have stronger regulations. In other States, you don't. In many States, it is legal to charge women higher premiums, or deny them coverage at all, if they have had a C-section. It is a preexisting condition. If they have been the victim of domestic violence—in many States in this country an insurance company can deny a woman coverage because she has been the victim of domestic violence, because it is considered a preexisting condition. That is wrong.

I am immensely pleased that under this bill, for the first time, women will have access to comprehensive health

Exhibit 151    JA-0002415

benefits, including maternity care, without having to pay more than their male counterparts. But we can do even more for women's health in this country.

Senator MIKULSKI's amendment improves the bill to make sure women can get the preventive screenings they need to stay healthy. Most important, the amendment will make sure that women have access to these lifesaving screenings at no cost. So it doesn't interfere with a woman and her doctor, as my distinguished colleague from Texas said a few minutes ago. It makes these screenings available at no cost. Why is this important? Because right now, women are delaying or skipping preventive health care because they cannot afford it. That is not just bad for women's health, it is bad for our system because it drives up costs unnecessarily. Even in Minnesota, where we generally do a good job at health care, there are women right now who are not getting the care they need. They are skipping their annual exam because they are uninsured. Women who are uninsured are twice as likely not to get the care they need.

Other women in Minnesota simply cannot afford the coverage they have now. Since 2007, the number of women who have delayed or avoided preventive care because of cost has doubled. The economic crisis has only made things worse. But the economic situation is no excuse. The reality is that women are forgoing preventive services that could save their lives because of the way insurance works now.

Make no mistake what that is about. From 2000 to 2007, the health insurance companies saw their profits increase 428 percent. Women are forgoing preventive measures that could save their lives. Is this the kind of country we want to live in?

There was some good news yesterday. The CBO confirmed what many of us already knew—that with the insurance market reforms and subsidies in our bill, women will be able to purchase better coverage at a lower cost than they would be paying without the bill. That is huge. With Senator MIKULSKI's amendment, we will go even further, guaranteeing that women receive preventive care when they need it, without barriers. These screenings catch potential problems such as cancer as early as possible. This saves lives and, by the way, it saves money.

For example, cervical cancer screenings every 3 to 5 years could prevent four out of every five cases of invasive cancer. Regular screenings could prevent more than half of the cases of infertility. Senator MIKULSKI's amendment will give women the care they need when they need it. This is a huge step forward for justice and equality in our country.

It is also a top priority for me that health reform includes another crucial women's health service, which is access to affordable family planning services. These services enable women and fami-

lies to make informed decisions about when and how they become parents. Access to contraception is fundamental, a fundamental right of every adult American, and when we fulfill this right, we are able to accomplish a goal we all share—all of us on both sides of the aisle to reduce the number of unintended pregnancies. And so I believe that affordable family planning services must be accessible to all women in our reformed health care system.

We can't wait any longer, and I urge all of my colleagues to stand up with us and support this amendment.

The PRESIDING OFFICER. The Senator's time has expired.

Mr. FRANKEN. My apologies to Senator DODD. I guess I, as a freshman, am not necessarily familiar with all the rules. I think that means I must yield the floor, is that right?

The PRESIDING OFFICER. That is correct.

Mr. FRANKEN. I yield to my good friend from Texas.

Mr. BAUCUS. Mr. President, I didn't think there was a time agreement here.

Mr. DODD. Yes, I had asked consent for a time agreement. I suspect we are going to have a lot of time to talk about the bill.

I appreciate the comments of my colleague from Minnesota.

The PRESIDING OFFICER. The Senator from Texas is recognized.

Mr. CORNYN. Mr. President, I want to talk principally about the Medicare cuts in this bill and make sure that people understand the context in which this takes place and what it means in terms of benefits for seniors.

There has been a lot of parsing of language here in a way that I think can perhaps obscure the real impact of these proposals.

First, let me say there is broad agreement that our health care system needs reform. But I thought the purpose of that reform was to lower costs and make it more affordable—not raise premiums, raise taxes, and cut Medicare benefits.

Again, I say to our friends across the aisle, no one wants the status quo. But it is clear that our friends across the aisle are not interested in any proposals from this side of the aisle, as demonstrated by the party-line votes in the HELP Committee and the Finance Committee, and the product coming from the House of Representatives.

This is simply too important to do on a purely partisan basis. Yet that seems to be the intention of the majority. The American people want us to get this right because they understand this impacts 17 percent of our economy, and it affects all 300 million of us. This is important to them. As they have watched these debates and proposals, as they have learned more about them, it is no mystery why public opinion for these proposals has dropped like a rock. Again, it has dropped like a rock.

First of all, on cost, they realize that the proposals as made have masked the

true cost of this bill, and there was celebration when the bill came in under $900 billion. Forget the fact it doesn't actually go into effect until 4 years into the 10-year budget window, so it was only 6 years of implementation; and never mind that it didn't include reversing the 23-percent cut in physician payments that go into effect at the first part of next year, unless Congress acts. That was left out intentionally to make this look cheaper than it is.

The Senate Budget Committee has pointed out that this bill, when fully implemented, would cost the American people $2.5 trillion. I have constituents who asked me: Do you know what a trillion dollars is? They say: I don't know. We used to talk about a million dollars being a lot of money, and then a billion dollars. Now we are into the trillions—hence, the bumper sticker ''don't tell Congress what comes after a trillion,'' for fear we will spend it.

This bill, written by the majority leader behind closed doors, increases taxes by nearly $1½ trillion on American families and small businesses during the worst recession we have had since the Great Depression. Unemployment is 10.2 percent, and it is perhaps headed higher. This bill proposes to make it harder on businesses to retain employees, or perhaps maybe someday hire employees and bring down that unemployment rate.

This is a job-killing bill. That is why the American people, the more they learn about it, like it less and less. I predict that the longer this debate goes on, the more they learn about it, the less they will find to like about the bill for that and many other reasons.

This bill also, according to the CBO, increases health insurance premiums by $2,100 for American families purchasing insurance on their own. If you are fortunate and you have large group coverage, it is a little better. But for the millions who are not, it increases the cost of their insurance by $2,100 a year.

I want to focus primarily on the cuts in Medicare. When our colleagues celebrate the fact that this comes back budget neutral, let me explain that mystery. That means you have raised taxes so much and cut Medicare benefits so much, you can claim it is budget neutral. I daresay that is not cause for celebration. In order to create a $2.5 trillion new entitlement program—and that is what this is, at a time when the unfunded liabilities of our current entitlement programs go somewhere into the $40 trillion to $60 trillion range—this bill actually cuts $465 billion in payments from Medicare. These cuts include $135 billion to hospitals; $120 billion from 11 million seniors on Medicare Advantage, including a half million—or to be more precise, 523,000 Texans who depend on Medicare Advantage will see a cut in benefits because of this proposal if it passes.

Mr. President, $15 billion will be cut from nursing homes, $40 billion will be

Exhibit 151       JA-0002416

cut from home health agencies and $8 billion from hospice care.

You can try to parse those words and say we really are not cutting Medicare, but we are cutting Medicare Advantage. Indeed, the Obama administration's own Actuary at the Center for Medicare and Medicaid Services said Medicare cuts of this size would hurt seniors' access to care for several reasons.

First, let me start with Medicare Advantage. Medicare Advantage provides benefits over and above Medicare fee for service. But I think we need to understand that with regard to Medicare fee for service in my State, the last time I checked, 42 percent of physicians will not see a new Medicare patient because the payment rate is too low for the doctors to be able to break even or maybe perhaps earn a small profit. Again, 42 percent of Medicare patients are denied access to a doctor in my State because Medicare payments are so low.

What we did a few years ago was pass the Medicare Advantage Program, which was created to give seniors choice. In other words, there has been so much celebration of the public option or the government-run plan. We have a government-run plan now—Medicare fee for service, which has, depending on where you read, somewhere between an 8- to 12-percent faulty payment rate. In other words, it pays somewhere around 7.8 to 12.4 percent of bills it does not owe to people who do not deserve it, diverting that money away from payment for beneficiaries.

We decided a few years ago to give Medicare beneficiaries a choice—something I thought we all were for—a choice that provided better care coordination and better benefits. Today, 11 million seniors, including the 532,000 I mentioned in Texas, have chosen Medicare Advantage. But this bill, if passed in its current form, will take away health care benefits from those 11 million seniors on Medicare Advantage by cutting $118 billion from the program.

During the Finance Committee markup, the Congressional Budget Office acknowledged that Medicare Advantage cuts would mean fewer services, such as dental or vision.

Senator MIKE CRAPO asked this question:

So approximately half of the additional benefit would be lost to those current Medicare Advantage policyholders?

Congressional Budget Office Director Doug Elmendorf said:

For those who would be enrolled otherwise under current law, yes.

So approximately half the additional benefit would be lost to those current Medicare Advantage policyholders.

What happened to the President's promise that if you like what you have now, you can keep it? This is another example of a promise that breaks under this bill, in addition to the $2,100-per-family premium increase for those who buy their insurance on the individual market.

Despite the fact that this bill cuts $465 billion from the Medicare Program, it also fails to deal with draconian cuts that will go into effect in January, unless Congress acts, which will further ensure that seniors will be less likely to see a doctor in 2012. We all know this is sometimes called the doc fix, but this is basically a misguided decision Congress made back in the late nineties to cut provider benefits, thinking that they could do so and it would not have any impact on access to care. But what it has done is while on one hand Congress can stand here and say: Yes, we kept our promise to seniors by providing Medicare coverage, seniors are finding it harder and harder to find a physician who will actually see them because of those low reimbursement rates. This bill does nothing to cut the 23-percent cut in those benefits in 2012 which will have an extremely negative impact on seniors' ability to see a doctor.

We know the majority leader tried, on a standalone bill, to address this issue earlier. But it was not paid for. On a bipartisan basis, Senators in this body rejected sending a bill for $200 billion more to our children. We said we need to be responsible and pay for the bill.

Then the President said health care reform would be paid for by dealing with waste, fraud, and abuse in Medicare. But that is not what this bill does. The Congressional Budget Office said the Reid bill only saves $5.9 billion from reducing waste, fraud, and abuse—$5.9 billion in a bill which over a full 10 years of implementation will cost the American taxpayers $2.5 trillion.

Instead of cutting Medicare, we should be addressing this problem. We know it is a serious problem. The Obama administration found that there was at least $47 billion in Medicare fraud, and that is a conservative estimate. According to Harvard professor Malcolm Sparrow, Medicare fraud may consume as much as 15 to 20 percent of the $454 billion Medicare budget. That means the amount lost to fraud each year in Medicare alone is $70 billion to $90 billion. As I mentioned, improper payment rates, depending on where you look, range anywhere from 7.8 percent of all Medicare payments paid improperly to as much as 12.4 percent, depending on where you look.

Defrauding Medicare has become so lucrative that even the Mafia and other organized criminals are getting into the act. According to the Associated Press last month, members of a Russian-Armenian crime ring in Los Angeles were indicted for bilking Medicare of more than $20 million, and a week after the FBI issued search warrants for a Medicare fraud investigation in Miami, the body of a potential witness was found in the backseat of a car, riddled with bullets.

Earlier this year, I introduced a bill which I hope our colleagues on the other side of the aisle will look at as a way to change the paradigm in terms of the way we address this problem of Medicare fraud. Rather than the pay-and-pursue model, we would have a model which would actually detect potential fraud on the front end by certifying payees and otherwise making sure that money is spent properly. We need to implement commonsense solutions such as this to fix fraud in Medicare before we simply cut in half or cut $½ trillion out of benefits in provider benefits to create a new entitlement.

We all understand Medicare is in miserable shape financially—miserable shape. If nothing is done, Medicare will go broke in 2017, according to the Medicare trustees. The Medicare part of entitlement problems has unfunded liabilities—promises Washington made but cannot keep and does not know how to pay for, nearly $38 trillion. Mr. President, $38 trillion is more than three times the current national debt of $12 trillion, and $38 trillion translated into the burden on every American family means that each American family owes $322,000—more than most American families' homes are worth.

The bottom line is, it is simply irresponsible, without fixing Medicare, without fixing the fraud and the waste—which I know the Presiding Officer is as concerned about as I am—and without dealing with the fact that Medicare promises coverage but denies access because of low payments, to pillage nearly $½ trillion from the bankrupt Medicare program to create a new budget-busting entitlement program.

There had been some talk on the floor about earlier attempts to reduce the rate of growth of Medicare. Interestingly, back in 2005, when there were some proposals to do just that—but, frankly, the numbers paled in comparison: about $10 billion in cuts compared to $500 billion in cuts—the majority leader called those cuts immoral. I have a long list of comments made by our friends across the aisle which stand in stark contrast to the comments they are making today.

Frankly, we need to do something about the insolvency of Medicare. Even if we did not do anything else, that would be a great benefit to the seniors to whom we promised health coverage but who are currently denied coverage because of the problems I talked about.

I know the distinguished chairman of the Finance Committee talked about the sterling endorsements that come from a variety of Washington-based advocacy groups. One of them is the AARP, the American Association of Retired Persons.

Mr. President, I ask unanimous consent to have printed in the RECORD an article about AARP dated October 27 at the conclusion of my comments.

The PRESIDING OFFICER. Without objection, it is so ordered.

(See exhibit 1.)

Mr. CORNYN. Mr. President, what this article demonstrates is that one reason AARP might be opposed to maintaining Medicare Advantage and

Exhibit 151

JA-0002417

CONGRESSIONAL RECORD — SENATE *December 1, 2009*

be for the cuts in benefits to current Medicare Advantage beneficiaries is because that group and its subsidiaries collected more than $650 million in royalties and other fees last year from the sale of insurance policies, some of which are designed to fill that gap between Medicare fee for service and what it actually costs to get to see a doctor. It is a conflict of interest for this association. Frankly, I don't think its endorsement is worth the paper it is written on, just like other associations that, contrary to the best interests of their members, have made a deal that is bad for the American consumer. The American consumers know it. They know a bad deal when they see it—a deal that includes increased premiums, higher taxes, and cuts in Medicare. Frankly, I think those people with such glaring conflicts of interest should not be in the position of trying to endorse something that is basically going to enrich them to the detriment of the American people.

I plan to offer amendments about this bill's provisions as currently proposed to cut $1/2 trillion from the Medicare Program. My first amendment would make Medicare play by the same financial solvency rules as private insurers.

We hear our friends on the other side of the aisle talk about insurance companies. I have no doubt that their desire is, frankly, to do away with private sector involvement in the health coverage field, which leaves, of course, only the Federal Government—ultimately a single-payer system making decisions out of Washington, DC, that affect the health care delivery of 300 million people—a bad idea.

My first amendment would make Medicare play by the same financial solvency rules as private insurers. Because private insurers are owned by their shareholders and have fiduciary responsibilities, they could not do business the way Medicare does. They could not tolerate high fraud, waste, and abuse rates. They could not function based on the same risk-based capitalization that private insurance companies do. My amendment would ensure that before we pillage $1/2 trillion from the Medicare Program to pay for yet another unsustainable entitlement program, the Medicare Program should be able to meet the same solvency and risk-based capitalization requirements private insurance plans meet.

My second amendment will be to strike the unelected, unaccountable board of bureaucrats known as the Medicare advisory board.

We have heard this Medicare advisory board extolled, but this is the same kind of unelected, unaccountable board that we saw just a couple of weeks ago issued a new order or recommendation on mammograms based on cost-benefit, which would have condemned some women between the age of 40 and 49, denied them access to a mammogram and, frankly, condemned them to an early, premature death be-

cause of breast cancer. When you put all the power to determine the coverage and also payment in an unelected, unaccountable board, such as the Medicare advisory board, then, frankly, you are going to get more of that rationing and that same sort of cost-benefit analysis which is going to consign too many Americans to a premature death because, frankly, the Federal Government doesn't care and is not going to see them get access to care.

After the Reid bill pillages $465 billion from the Medicare Program to create a new entitlement, it sets up this new Medicare advisory board, an unaccountable board of bureaucrats, to find more ways to cut billions of dollars from Medicare. Unsurprisingly, patients, providers, and even Congress don't always agree with experts, including the ones we have in place today. According to the Wall Street Journal, the Medicare Payment Advisory Commission, created by Congress in 1997, has recommended more than $200 billion in cuts in the last year alone, which lawmakers—that means Congress—has ignored.

Artificial and arbitrary budget targets leave little room for innovation as well. What if we were to find a cure for Alzheimer's in 2020 but because it would be too expensive, the Medicare advisory board would say the Federal Government is not going to pay for it?

Some have said this independent board would be a way to insulate Medicare payment decisions from politics. But the very creation of the Board was the result of a political deal with the White House that insulated hospitals from future cuts.

I wish to close by saying I hope my colleagues will reconsider and vote for the McCain amendment, which will reverse the pillaging of $1/2 trillion from the Medicare Program to create a new entitlement program. We should fix Medicare's unfunded liabilities of nearly $38 trillion and not steal from Medicare to create another unsustainable entitlement program that will, of course, have to be paid for by our children and grandchildren on top of all the other debt we are piling on them. At a time of insolvent entitlement programs, record budget deficits, and unsustainable national debt, this country simply cannot afford to spend $2.5 trillion on an ill-conceived Washington health care takeover.

I yield the floor.

EXHIBIT 1

[From the Washington Post, Oct. 27, 2009]

AARP: REFORM ADVOCATE AND INSURANCE SALESMAN

(By Dan Eggen)

The nation's preeminent seniors group, AARP, has put the weight of its 40 million members behind healthcare reform, saying many of the proposals will lower costs and increase the quality of care for older Americans.

But not advertised in this lobbying campaign have been the group's substantial earnings from insurance royalties and the

potential benefits that could come its way from many of the reform proposals.

The group and its subsidiaries collected more than $650 million in royalties and other fees last year from the sale of insurance policies, credit cards and other products that carry the AARP name, accounting for the majority of its $1.14 billion in revenue, according to federal tax records. It does not directly sell insurance policies but lends its name to plans in exchange for a tax-exempt cut of the premiums.

The organization, formerly known as the American Association of Retired Persons, also heavily markets the policies on its Web site, in mailings to its members and through ubiquitous advertising targeted at seniors.

The group's dual role as an insurance reformer and a broker has come under increasing scrutiny in recent weeks from congressional Republicans, who accuse it of having a conflict of interest in taking sides in the fierce debate over health insurance. Three House Republicans sent a letter to AARP on Monday complaining that the group was putting its "political self-interests" ahead of seniors.

GOP lawmakers point to AARP's thriving business in marketing branded Medigap policies, which provide supplemental coverage for standard Medicare plans available to the elderly. Democratic proposals to slash reimbursements for another program, called Medicare Advantage, are widely expected to drive up demand for private Medigap policies like the ones offered by AARP, according to health-care experts, legislative aides and documents.

Republicans also question the high salaries and other perks given to some top AARP executives, who would not be subject to limits on insurance executives' pay included in the Senate Finance Committee's health reform package. Former AARP chief executive William Novelli received more than $1 million in compensation last year.

"We are witnessing a disturbing trend of handouts to special interests like AARP," said House Republican spokesman Matt Lloyd, referring to Democratic negotiations over health reform. "In return, AARP is lobbying for a government-run health-care bill that will pad their own executives' pockets at the expense of its own members and other vulnerable seniors."

AARP officials strongly dispute such allegations, arguing that the group's heavy reliance on brand royalties allows it to offer members a wide range of benefits—from lobbying for seniors in Washington to discount travel packages and financial advice. The organization notes that even though it offers a Medicare Advantage plan, it has long advocated curbing waste in that federal program.

"We're a consumer advocacy organization; we're not an insurance firm," said David Certner, AARP's director of legislative policy. "That drives everything we do. It's got to be good for our members, or we don't endorse it."

Added AARP spokesman Jim Dau: "We spend far more time at odds with private insurers than not."

AARP's ties to the insurance business date to its founding by former educator Ethel Percy Andrus, who started a group to help retired schoolteachers find health insurance in the years before Medicare; the effort led to the creation of AARP in 1958.

Now, the group relies more than ever on payments from auto, health and life insurers, according to financial statements. From 2007 to 2008, AARP royalties from insurance plans, credit cards and other branded products shot up 31 percent—from less than $500 million to $652 million—making such fees the primary source of revenue for the group last year, the records show. AARP's annual

Exhibit 151

financial report shows that 63 percent of that, or about $400 million, came from the nation's largest health insurance carrier, UnitedHealth Group, which underwrites four major AARP Medigap policies. Other carriers with AARP-branded plans include Aetna Life Insurance, Genworth Life Insurance and Delta Dental.

AARP is also a major powerhouse in Washington, spending more than $37 million on lobbying since January 2008. The organization's close ties with insurers have long attracted criticism from politicians of both parties.

During the health-care debate of the early 1990s, then-Sen. Alan Simpson (R–Wyo.) held hearings lambasting the group's business operations. Some Democrats criticized the group for supporting the Bush administration's expensive Medicare prescription-drug legislation in 2003.

Earlier this year, AARP and UnitedHealth said they were halting the sale of "limited benefit" health insurance policies after complaints from Sen. Charles E. Grassley (R–Iowa) that the plans were marketed in a misleading way.

Dean A. Zerbe, a former Grassley senior counsel who is now national managing director at the corporate tax firm Alliant Group, argues that AARP's involvement in the sale of insurance plans "really hurts their credibility."

"Either you're a voice for the elderly or you're an insurance company; choose one," Zerbe said. "They put themselves forward in the public arena as nonbiased observers, but they're very swayed by business interests."

Republicans renewed their attacks on AARP this year after the group emerged as a vigorous defender of many of the reforms under consideration by the Democrat-controlled Congress. Nancy LeaMond, an AARP executive vice president, appeared at a press conference Friday alongside House Speaker Nancy Pelosi (D–Calif.) to announce a new proposal for plugging gaps in coverage of Medicare prescription benefits.

Rep. Dave Reichert (R–Wash.), who has asked AARP to provide him with more details about its insurance-related businesses, said he believes the group is "misleading" its members about the alleged benefits of Democratic reforms. "Right now there's a feeling among seniors that AARP may not be entirely forthcoming," he said.

AARP launched a "fact check" section on its Web site this year to counter GOP criticisms of reform, including the discredited "death panels" claim, and argues that wringing savings out of Medicare and closing gaps in prescription coverage will help older Americans.

Several top AARP officials also said they have no idea whether the group might gain insurance business as a result of the proposed reforms. "We wouldn't know it, and we wouldn't really care," Certner said. "The advocacy is what drives what we do here, and not the other way around."

The PRESIDING OFFICER. The Senator from Montana is recognized.

Mr. BAUCUS. Mr. President, I understand we have several Senators who wish to speak. First, the Senator from Michigan, Ms. STABENOW, then Senator HATCH; Senator CARDIN would be third. I don't want to tread on any toes. I say to Senator CARDIN, there is a little bit of time constraint.

We are alternating. We are respecting the alternating back and forth.

The Senator from Michigan is next, Ms. STABENOW.

The PRESIDING OFFICER. The Senator from Michigan is recognized.

Ms. STABENOW. Mr. President, I, first, thank our distinguished leader on the Finance Committee. It is my pleasure to serve on the Senate Finance Committee. We have been working on this issue for well over a year—2 years now. I very much thank the Senator from Montana and appreciate his leadership in getting us to this point because I don't think we would have been here without his leadership. I very much appreciate that, as well as our leader, Senator REID, who has worked tirelessly, and, of course, the Senator from Connecticut, Mr. DODD, and Senator HARKIN from Iowa as well. We certainly appreciate their leadership.

The bottom line of the legislation in front of us is very simple. On behalf of the American people, we have put forward a health care reform bill that will save lives, it will save money, and it will save Medicare. It does that in multiple ways.

I wish to spend just a few moments this evening talking about Medicare because there is a very significant amendment in front of us that would undercut what we are trying to do to save Medicare. As we go through this next debate, as I have done many times, I am going to continue to talk about the ways in which we are saving lives and saving money.

The reality is, Medicare is a sacred trust with America's seniors, with people with disabilities. Our health care reform efforts, both in the House and the Senate, will help ensure that trust is never broken. That is what this is all about. In fact, I don't think I could look my 83-year-old mother in the eye, knowing how much she has benefited from Medicare, and be doing anything that would weaken Medicare—now or on into the future.

We are going to extend Medicare solvency while providing better, more affordable care for America's seniors and people with disabilities. In fact, we are going to add 5 years to the Medicare trust fund solvency, which is extremely important. In the long run, I expect, as we go forward, as we bring down costs, as we save money, we will, in fact, be adding years to the trust fund by what we are doing.

We are going to crack down on waste, fraud, and abuse in the Medicare Program and wasteful overpayments to insurance companies through a Medicare Advantage effort that essentially was set up to privatize Medicare—turn it over to primarily for-profit insurance companies.

Reform is going to make sure we have more affordable services for seniors. We are going to begin to close that doughnut hole, a gap in prescription drug coverage, right now. It was passed a number of years ago—and I might indicate not paid for—and our effort is entirely paid for. It does not add a dime to the national debt. In fact, it brings down the deficit. But we are closing a gap in coverage on prescription drugs by 50 percent. We are going to phase that in. We are going to

keep going until we get that completely closed.

We are going to make sure preventive services do not have a cost connected with them—no deductible, no copay. We want people to be getting the cancer screenings, the mammograms, the wonderful colonoscopies, the other preventive services people need, as well as being able to have a yearly physical with their physician, without deductibles and copays. We are going to aggressively attack fraud and abuse that raises Medicare costs for seniors and for taxpayers.

Reform is also about improving quality of care. It will move Medicare toward a system of rewarding high-quality care, investing in innovations, more efforts in primary care, family doctors, better coordination of care, cutting down on duplication of tests and bureaucracy and all those things we so frequently complain about in the Senate—as we should.

It is going to make long-term care services more affordable. There is such a growing demand and need for long-term services.

It is going to eliminate the imminent physician payment cut that threatens to stop seniors from having full choice of seeing their own doctor. As my colleagues know, I am deeply committed to permanently fixing a flawed physician payment system, but in this bill we make sure the 21-percent cut that is scheduled to take place next year does not take effect, and we will continue. We are committed to working until we completely solve this problem.

It is not a surprise our Republican colleagues are opposing a plan that actually protects Medicare, it actually protects Medicare benefits for seniors, people with disabilities, and keeps Medicare finances in the black for 5 additional years. Just months, 7 months ago, nearly 80 percent of the Republican House Members voted to end Medicare as we know it by turning it into a voucher program that provides a fixed sum of money to pay to private insurance companies, which, by the way, has led—we are now trying to fix overpayments to private for-profit insurance companies at the expense of Medicare and services for seniors.

A top AARP policy official called this scheme that was supported by 80 percent of the House Republicans, just 7 months ago—called this scheme "a very dangerous idea," saying it would raise costs for all beneficiaries and lower the quality of care for less-affluent seniors, lower income seniors.

Now faced with a plan that actually strengthens Medicare, actually saves Medicare for the future and makes sure money goes to Medicare beneficiaries rather than to insurance companies in high payments, some colleagues are pulling out all the stops to defend the health care status quo that sends hundreds of billions of dollars in overpayments to private insurance companies. That is, unfortunately, the result of the McCain amendment, which I strongly oppose.

Exhibit 151    JA-0002419

Many Republicans are resorting to traditional scare tactics and falsehoods, myths. We have heard this over and over. You can go to the AARP Web site and see the fact that, time after time, they have put up falsehoods to try to scare seniors, which I think is outrageous. For proof of how politically motivated these attacks are on the President's proposal and our proposals to eliminate waste and insurance company overpayments in Medicare Advantage, you have to look no further than the fact that a group of Republican Senators actually introduced a similar proposal as recently as this past May.

These kinds of distortions, the fear tactics that have been used, would be offensive under any circumstance, but they are especially disingenuous coming from a group of people who have a long history—a party that has a long history of opposing Medicare and that very recently tried to kill the program as we know it. Their most recent assault was just the latest in a war that Republicans have been waging on the program since the beginning when a majority of them voted no on even establishing Medicare. The overwhelming majority of Republican colleagues voted no.

Last time we had a Democratic President, leading Republicans across the country launched a vicious attack on Medicare. They bragged about opposing the creation of the program in the first place. They called for huge cuts to Medicare and even the ''elimination'' of entitlement programs such as Medicare, as we know them. One even blamed seniors' greed for Medicare's budget problems.

As we now debate this issue, I find it so interesting that colleagues on the other side of the aisle are indicating that, after years of history of trying to cut, eliminate, change Medicare, Republicans having voted against even establishing Medicare, that somehow they are now the protectors of Medicare. As AARP has said, there is nothing in this proposal that is going to cut benefits or increase out-of-pocket costs for seniors. They would not be supporting the efforts we have been involved with if, in fact, it did. I think we all know that.

President Obama and the Democratic majority in this Congress are committed to protecting and strengthening Medicare, a program we created—I should say my predecessors. I was not here. I was not fortunate enough to be here, but it was Democrats who created that program. I am very proud of it because it is one of the great American success stories, Medicare and Social Security. It is a sacred trust with our seniors, and our health insurers reform plan will ensure that trust is never broken.

Health care reform is about saving lives, saving money, and saving Medicare.

I yield the floor.

The PRESIDING OFFICER (Mr. TESTER). The Senator form Utah is recognized.

Mr. HATCH. Mr. President, I am honored to be able to speak on the floor on this very important set of issues. I rise in support of Senator MCCAIN's motion to recommit in order to eliminate the Medicare cuts contained in the legislation.

I do have to say, having listened to my friend from Michigan—and she is a good person and good friend of mine—I have to say I do not see how in the world taking $500 billion from Medicare is good for the Medicare Program. When you start talking about: We are going to find it in fraud, waste, and abuse, that is the biggest dodge that has been used for years and years. Frankly, it is not good for the Medicare Program, it is not good for Medicare beneficiaries, and it is simply not true. How can cuts of that magnitude, $500 billion, $½ trillion, be good for the program?

I support Senator MCCAIN's motion to recommit the Reid health care bill in order to eliminate the Medicare cuts contained in this legislation. Throughout the health care debate, we have heard the President pledge not to ''mess'' with Medicare. Unfortunately, that is not the case with the bill before the Senate, H.R. 3590, the Patient Protection and Affordable Care act. Interesting name. To be clear, the Reid bill cuts Medicare by $465 billion to fund a new government program. Unfortunately, our seniors and the disabled are the ones who suffer the consequences as a result of these reductions. Medicare is very important to the 43 million seniors and disabled Americans covered by the program. Throughout my Senate service, I have fought to preserve and protect Medicare for both beneficiaries and providers. Medicare is already in trouble today. The program faces tremendous challenges in the very near future. The Medicare trust fund will be insolvent by 2017, and the program has more than $37 trillion, almost $38 trillion in unfunded liabilities. So we are going to take $500 billion more out of Medicare? That doesn't make sense. Every senior in this country ought to be up in arms about it.

The Reid bill is going to make a bad situation much worse. Why is that the case? Again, the Reid bill cuts Medicare to create a new government entitlement program. More specifically, the Reid bill will cut nearly $135 billion from hospitals, $120 billion from Medicare Advantage, and almost $15 billion from nursing homes, more than $40 billion from home health agencies, and close to $8 billion from hospice providers. How can that be good for our seniors? These cuts will threaten beneficiary access to care, as Medicare providers find it more and more challenging to provide health services to Medicare patients. How can cutting $465 billion, almost $500 billion, out of Medicare strengthen the program? It

defies logic. I do not know how people can stand on this floor and make that statement. The people out there have caught on to it. Senior citizens have caught on to it. All across the country they are up in arms, and they should be.

In addition, the proposed legislation permanently cuts all annual Medicare provider payment updates. Hospitals, home health agencies, and hospice facilities would face even more annual reductions over the next 10 years. Advocates of these reductions, known as ''productivity adjustments,'' will argue that today Medicare is overpaying certain providers because current payment updates do not take into account increases in productivity which actually reduce the cost of providing beneficiaries health care services. Come on. To me these permanent productivity adjustments will make it harder for Medicare providers to remain profitable, as Medicare payments fail to keep up with the cost of providing these health care services.

As a result of these payment reductions, I believe many doctors and other Medicare providers will stop seeing Medicare patients. In my home State of Utah, low Medicare reimbursement rates are already a serious problem for beneficiaries and their health care providers. These additional reductions will only make it more difficult. I want to stress to my colleagues that cutting Medicare to pay for a new government program is irresponsible. Any reductions to Medicare should be used to preserve the program, not create a new government bureaucracy or a new entitlement program. I believe it makes more sense to target the Medicare savings towards paying off Medicare's unfunded liabilities or preventing the program's future insolvency.

I wish to take a few minutes to talk about the Medicare Advantage Program and how it is affected by the Reid bill. As I stated previously, the Reid bill reduces Medicare by close to $500 billion. Almost $120 billion comes out of the Medicare Advantage Program. During the Finance Committee's consideration of the Baucus health bill, I offered an amendment to protect extra benefits currently enjoyed by Medicare Advantage beneficiaries. Unfortunately, my amendment was defeated. In other words, the President's pledge assuring Americans that they would not lose benefits was not met by either the Finance Committee bill or the Reid bill currently under consideration in the Senate. Here is how supporters of the Finance Committee bill justified the Medicare Advantage reductions. They argued the extra benefits that would be cut, such as vision care, dental care, reduced hospital deductibles, lower copayments, and premiums, were not statutory benefits offered in the Medicare fee-for-service program. Therefore, these benefits did not count. Well, they counted for the seniors receiving those benefits.

A few weeks back our President once again assured the American people

Exhibit 151                                                                                      JA-0002420

that they could keep their current health plan. Here is what he said:

The first thing I want to make clear is that if you are happy with the insurance plan that you have right now, if the costs you're paying and the benefits you're getting are what you want them to be, then you can keep offering that same plan. Nobody will make you change it.

I believe that promise should apply to all Americans, including those participating in the Medicare Advantage Program. Congress is either going to protect existing benefits or not. It is that simple. Unfortunately, under the Reid bill, if you are a beneficiary participating in Medicare Advantage, that promise does not apply to you.

I have some history with the Medicare Advantage Program. I served as a member of the House-Senate conference, as did the distinguished chairman of the Finance Committee. We both served as members of the Senate conference committee which wrote the Medicare Modernization Act of 2003. Among other things, this law created the Medicare Advantage Program. We did it because we wanted to provide health care choices to beneficiaries living in rural America. And it did. Medicare+Choice didn't do it. We knew it wouldn't do it. When conference committee members were negotiating the conference report, several of us insisted that the Medicare Advantage Program was necessary in order to provide health care coverage choices to Medicare beneficiaries. At that time there were many parts of the country where Medicare beneficiaries did not have choice in coverage. In fact, the only choice offered to them was traditional fee-for-service Medicare, a one-size-fits-all government-run health program.

By creating the Medicare Advantage Program, we provided beneficiaries with a choice in coverage and then empowered them to make their own health care decisions as opposed to the Federal Government making those decisions for them. Today every Medicare beneficiary may choose from several health plans for his or her coverage. Medicare Advantage works. It has worked. It will work in the future, if we don't louse it up with this bill.

On the other hand, Medicare+Choice and its predecessors did not, because many plans across the country, especially in rural areas, were reimbursed at very low rates by the Medicare Program. I fear history could repeat itself if we are not careful. Let me take a minute to talk about Medicare+Choice. I represent a State where Medicare managed care plans could not exist due to low reimbursement rates. To address that concern, Congress included language which was signed into law establishing a payment floor for rural areas, but it was not enough. In fact, in Utah all of the Medicare+Choice plans eventually left because they were all operating in the red. This happened after promises were made that Medicare+Choice plans would be reim-

bursed fairly and that all Medicare beneficiaries would have access to these plans.

So during the Medicare Modernization Act conference, we fixed the problem. First, we renamed the program Medicare Advantage. Second, we increased reimbursement rates so that all Medicare beneficiaries, regardless of where they lived, be it in Fillmore, UT or New York City, had choice in coverage. Again, we did not want beneficiaries stuck with a one-size-fits-all government plan. Today Medicare Advantage works. Every Medicare beneficiary has access to a Medicare Advantage plan. Close to 90 percent of Medicare beneficiaries participating in the program are satisfied with their health coverage. But that could all change should the health care reform legislation currently being considered become law. Choice in coverage has made a difference in the lives of more than 10 million individuals nationwide. The extra benefits I have mentioned are being portrayed as gym memberships as opposed to lower premiums, copayments, and deductibles. To be clear, the Silver Sneakers program is one that has made a difference in the lives of many seniors, because it encourages them to get out of their home and remain active. It has been helpful to those with serious weight issues, and it has been invaluable to women suffering from osteoporosis and joint problems. In fact, I have received several hundred letters telling me how much Medicare Advantage beneficiaries appreciate this program.

Additionally, these beneficiaries receive other services such as coordinated chronic care management, dental coverage, vision care, and hearing aids.

In conclusion, I cannot support any bill that would jeopardize health care coverage for Medicare beneficiaries. I truly believe that if the bill before the Senate becomes law, Medicare beneficiaries' health care coverage could be in serious trouble. We owe it to the 43 million Americans, seniors and disabled who depend on Medicare, to reject the nonsensical Medicare cuts included in the Reid bill. We must have better solutions that will not hinder their ability to see the doctor of their choice.

I have been in the Senate now for 33 years. I pride myself for being bipartisan. I have coauthored many bipartisan health care bills since I first joined the Senate in 1977.

Let me be clear: I want a health reform bill to pass this Chamber, but I want it to be a bipartisan bill that passes the Senate by 70 to 80 votes. If a bill involving one-sixth of the American economy cannot get 70 to 80 votes, that bill has to be a lousy bill, especially if it is a partisan bill, like this one.

If we could do it in 2003, when we considered the Medicare prescription drug legislation, we can do it today. There has never been a bill of this magnitude

affecting so many American lives that has passed this Chamber on a straight party-line vote. In the past, the Senate has approved many bipartisan health care bills that have eventually been signed into law. The Balanced Budget Act in 1997, which included the Children's Health Insurance Program; the Ryan White Act; the Orphan Drug Act; the Americans with Disabilities Act; and the Hatch-Waxman Act are a few of these success stories, and I was a prime sponsor of every one of those bills. If the Senate passes this bill in its current form with a razor thin margin of 60 votes—or even 61, to be honest with you—it would be so partisan it wouldn't even be funny. This would be yet one more example of the arrogance of power since the Democrats have secured a 60-vote majority in the Senate.

There is a better way to handle health care reform. First and foremost, it must be bipartisan. We stand ready and willing to work on a bipartisan bill, without the restrictions that were placed on the distinguished Senator who chairs the Finance Committee. It should be bipartisan. Second, we cannot erode the existing system that has provided quality and affordable health care to most Americans for decades. While we all agree that the current system should be improved, this bill is certainly not the answer. If the Senate passes the McCain motion to recommit, we can begin to work on a bipartisan health bill that will eliminate the overwhelming Medicare payment reductions and at the same time address the serious issues facing the Medicare Program in the near future.

Look, we know that insurance should cover preexisting conditions. We know if we use 50 State laboratories by giving the States the money to address health care in accordance with their own demographics, not only will states resolve their own health care issues but we also will be able to learn from the successes of these States.

We all know if we address medical liability reform and eliminate approximately 90 percent of the frivolous cases that are filed—costing anywhere from $54 billion to $300 billion a year in unnecessary costs—we know those savings would help us pay for this bill.

We know there are so many things we could do on wellness and prevention that will work. I think all of us agree on most of these issues. Democrats could never agree on medical liability reform because the personal injury lawyers—and there is a limited group in what used to be the American Trial Lawyers Association—are high funders of Democratic races. So they are not willing to do anything about it. In fact, in the House bill, if you do not cooperate with the personal injury lawyers, you lose your money. It is unbelievable.

We know there are a number of other things we could do that both sides could agree on that would cut costs. We are currently spending in this country, without this bill, $2.4 trillion on

Exhibit 151    JA-0002421

health care, all told. This bill will add, over a true 10-year period, another $2.5 trillion to the cost. So it will result in almost $5 trillion in health care spending. Why don't they admit it is going to be at least $2.5 trillion? They do not admit it because for the first 3 or 4 years they count the taxes that are charged, but they do not implement the program until 2014 in the Reid bill. It is 2013 in the House bill, and even 2014 in some aspects of the House bill. That is the only reason they can say it is about $1 trillion. It is actually $2.5 trillion according to figures from the Senate Budget Committee, using the figures of the Congressional Budget Office.

I hate to see $500 billion come out of Medicare, at a time when Medicare is going to go insolvent by 2017 or 2018. I think it is absurd. I think it is ridiculous. I do not blame the seniors for being upset, and they are very upset throughout this country. They have reason to be upset. I urge my colleagues to support the McCain motion to commit this bill, and let's get working on a truly bipartisan bill.

There are some of us who have the reputation of working with the other side in a bipartisan way. We want to do it. We want to get it done. We want the vast majority of the people in this country happy with the final bill. We want to have between 75 and 80 votes, as a minimum, to pass this bill. That way, there would be at least some assurance that it was a bipartisan bill and it might have a real chance to work. But if we pass this bill 60 to 40, let's be honest about it, you know it is a lousy bill.

Mr. President, I yield the floor.

The PRESIDING OFFICER. The Senator from Maryland.

Mr. CARDIN. Mr. President, first, let me thank the Senator from Montana, Mr. BAUCUS, for bringing forward a bill that has been long overdue on the Senate floor.

This is a historic moment as we debate health care reform. Many of us have been looking forward to this moment for many years. As to this bill, the Congressional Budget Office has now confirmed, for the overwhelming majority of Americans, it will bring down their health care insurance premiums.

This bill will bring down the growth rate of health care costs. It will provide affordable options for millions of Americans who today have been denied the opportunity to buy health insurance.

The Congressional Budget Office tells us that it will insure 31 million Americans who otherwise would not have insurance, bringing down the uninsured rate. And, most importantly, the Congressional Budget Office—that objective scorekeeper; that is not Democrats, not Republicans; this is the objective scorekeeper—tells us this bill will bring down the Federal deficit.

So it is a responsible bill, a bill that will provide affordable insurance options for millions of Americans who are denied insurance today. It will reduce our deficit, and will start to get a handle on the escalating cost of health care. It saves money. It saves lives through prevention and early detection of diseases, and by expanded coverage. And it saves Medicare.

Why does it save Medicare? Because many of us who have been here for a long time understand that the only way you can bring down the cost of Medicare is to bring down the cost of health care. That is exactly what this bill does, providing for the long-term safety of Medicare for our seniors.

It also expands benefits for our seniors in prevention and helps to start to fill the doughnut hole in prescription drug coverage. The underlying bill moves us toward what we need to do in health care reform. It brings down health care costs. How? By managing diseases and understanding the way we pay for diseases today is where most of the cost in health care is. This helps us manage diseases. It expands insurance coverage, which will bring down costs. It provides for investments in health information technology so we can bring down the administrative costs, and it invests in wellness and prevention.

AMENDMENT NO. 2791

Mr. President, I rise today to encourage my colleagues to support the Mikulski amendment, which will ensure women have access to essential preventive services. The leading causes of death for women are heart disease, cancer, and stroke. Early screening for risk factors could prevent many of these deaths and lead to improved health and quality of life for women. But despite the benefits of early screening, many insurers do not cover them, and too often women skip them because the costs are prohibitive. We know early detection of disease saves lives, and so we must ensure that needed preventive services are available to all Americans, regardless of gender.

I have long worked to improve access to preventive services. Knowing what we do now about the importance of prevention, it seems hard to believe that before 1998 Medicare did not cover cancer screenings or other preventive services. I am proud of a bill I authored in 1997 as a Member of the House of Representatives. It established the first package of preventive benefits in traditional Medicare. It was part of the 1997 Balanced Budget Act, and it would not have passed but for strong bipartisan support.

Medicare now covers screenings for breast, colon, and prostate cancer, bone mass measurement for osteoporosis, diabetes testing supplies, glaucoma, and more. Last year's bill, the Medicare Improvements for Patients and Providers Act, gave HHS the authority to expand the list of covered services so that as new, highly effective procedures are discovered, they can be made available to beneficiaries without having to wait the length of time for Congress to act. This bill wisely builds on the benefit package for seniors and expands it to cover all Americans as part of their insurance coverage. We are expanding prevention and making sure it is available so all Americans will have a better insurance product that will cover preventive services.

Basic screenings can have an enormous impact on health and save money in the long run. Chronic disease incurs a huge cost for our health care system. Today, more than half of Americans live with at least one chronic condition, accounting for 75 percent of all health care spending each year. To bend the cost curve, we need to reduce the onset of chronic diseases before they become much more expensive to treat.

The American Cancer Society reports that the incidence of cervical cancer and mortality rates have decreased by 67 percent over the past three decades. This is mainly attributable to the introduction of the Pap test. The average cost for normal cervical screening in 2004 was $31. In contrast, the treatment for early-stage cervical cancer averaged $20,255, and the treatment for late-stage cervical cancer was almost $37,000. Screening saves lives, saves money. The bill before us invests in prevention. It will save money. It will save lives.

Breast cancer screening has also been shown to reduce mortality. Early-stage diagnosis gives a 5-year survival rate of 98 percent, and statistics compiled by the American Cancer Society indicate that 61 percent of breast cancers are diagnosed at this stage, largely due to mammographies and other early screening methods.

The bill before us guarantees coverage for a number of services to promote public health and wellness and prevent devastating chronic disease. Some of these measures include providing coverage for everyone for services that have an "A" or "B" rating by the U.S. Preventive Services Task Force. These tests and screenings are either recommended or strongly recommended and include screenings for osteoporosis, colon cancer, and would be covered with no cost sharing—a strong incentive for people taking advantage of these screenings.

Covering immunizations recommended for adults by the Advisory Committee on Immunization Practices of the CDC is also covered. Preventive care services and screenings for infants, children, and adolescents that are supported in comprehensive guidelines from the Health Resources and Services Administration—all that is in the underlying bill that will save us money and will save us lives.

In addition to these vital services, the women's preventive health services must also be covered, the Mikulski amendment. The Mikulski amendment extends the preventive services covered by the bill to those evidence-based services for women that are recommended by the Health Resources

Exhibit 151

JA-0002422

and Services Administration. HRSA, a division of the Department of Health and Human Services, has as its goal to improve access to primary and preventive care services to uninsured and underinsured individuals.

It focuses on maternal and child health, HIV/AIDS care, recruiting doctors in underserved areas, health care in rural areas, and organ donation. HRSA strives to develop "best practices" and create uniform standards of care, including eliminating health disparities among minority populations.

Some of the additional services for women that will be covered under the Mikulski amendment include mammograms for women under 50. In 2000, breast cancer was the most common cancer affecting Maryland women, and nearly 800 women died from the disease, according to the Maryland Department of Health and Mental Hygiene. According to the Kaiser Family Foundation, 76.6 percent of women aged 40 and over had a mammography within the past 2 years. This amendment would ensure that all of these women would have access to mammography with no out-of-pocket cost.

Also covered under the Mikulski amendment are cervical cancer screenings for all women, regardless of whether they are sexually active, and ovarian cancer screenings—all those will be made available under the Mikulski amendment. Ovarian cancer is the fifth leading cause of cancer deaths among women in Maryland. General yearly well-women visits would be covered; pelvic examinations, family planning services, pregnancy, and post partum depression screenings, chlamydia screenings for all women over 25. Chlamydia is the most prevalent sexually transmitted disease diagnosed in the United States. Approximately 4 million new cases of this disease occur each year, and up to 40 percent of the women infected with this disease may be unaware of its existence. It is the leading cause of preventable infertility and ectopic pregnancy.

Also included are HIV screenings for all women regardless of exposure to risk. According to the Kaiser Foundation, among those women who are HIV positive, 33 percent of the women were tested for HIV late in their illness and were diagnosed with AIDS within 1 year of testing positive.

We need to do a better job here. This is International Aids Awareness Day. I think it is very appropriate we have the Mikulski amendment on the floor today.

Studies reported by the Kaiser Foundation indicate that women with HIV experience limited access to care and experience disparities in access, relative to men. Women are the fastest growing group of AIDS patients, accounting for 34 percent of all new AIDS cases in 2001, compared with 10 percent in 1985. So this amendment will help in regard to that issue for our women.

Also included is sexually transmitted infection counseling for all women.

Women disproportionately bear the long-term consequences of STDs. Screenings for domestic violence are covered. The Maryland Network Against Domestic Violence reports that one out of every four American women—one out of every four American women—reports she has been physically abused by a husband or a boyfriend at some time in her life. Well, the Mikulski amendment provides screenings for domestic violence.

Also included are overweight screenings for teens, gestational diabetes screenings, thyroid screenings.

Much of the debate on health care reform has focused on quality—how do we make our health care system work better and produce better outcomes for the money we spend. Ensuring that women have access to preventive services that are recommended by experts on women's health is absolutely essential to providing quality care.

This amendment protects the rights of a woman to consult with a doctor to determine which services are best for her and guarantees access to these services at no additional cost. Preventive health care initiatives is one area I hoped we could all agree upon. The Senate has a long history of bipartisan support for women's preventive services. I hope the string remains unbroken with this amendment.

I strongly support the efforts spearheaded by Senator MIKULSKI to extend the services that are covered for women. I strongly urge my colleagues to support this very important amendment that makes a good bill better. This bill is desperately needed. Let's vote for those two amendments that improve it, such as the Mikulski amendment, and let's move forward with this debate.

With that, I yield the floor.

Mrs. FEINSTEIN. Mr. President, I rise in support of the Mikulski amendment and to discuss the importance of preventive health care for women.

All women should have access to the same affordable preventive health care services as women who serve in Congress.

The Mikulski amendment will ensure that is the case.

It will require plans to cover, at no cost, basic preventive services and screenings for women.

This may include mammograms, pap smears, family planning, and screenings to detect heart disease, diabetes, or postpartum depression—in other words, basic services that are a part of every woman's health care needs at some point in life.

We often like to think of the United States as a world leader in health care, with the best and most efficient system. The facts do not bear this out.

The United States spends more per capita on health care than other industrialized nations but has worse results.

According to the Commonwealth Fund, the United States ranks 15th in "avoidable mortality." This measures how many people in each country sur-

vive a potentially fatal, yet treatable medical condition. And the United States lags behind France, Japan, Spain, Sweden, Italy, Australia, Canada, and several other nations.

According to the World Health Organization, the United States ranks 24th in the world in healthy life expectancy. This measures how many years a person can expect to live at full health. The United States again trails Japan, Australia, France, Sweden and many other countries.

These statistics show we are not spending our resources wisely. We are not finding and treating people with conditions that can be controlled.

Part of the answer, without question, is expanding coverage. Too many Americans cannot afford basic health care because they lack basic health insurance.

The Mikulski amendment, and providing affordable access to preventive care, is another part of the answer.

Women need preventive care, screenings, and tests so that potentially serious or fatal illnesses can be found early and treated effectively.

We all know individuals who have benefited from this type of care.

A mammogram identifies breast cancer, before it has spread.

A pap smear finds precancerous cells that can be removed before they progress to cancer and cause serious health problems.

Cholesterol testing or a blood pressure reading suggest that a person might have cardiovascular disease, which can be controlled with medication or lifestyle changes.

This is how health care should work: a problem found early and addressed early. The Mikulski amendment will give more women access to this type of care.

Statistics about life expectancy and avoidable mortality can make it easy to forget that we are talking about real patients and real people who die too young because they lack access to health care.

Physicians for Reproductive Choice and Health shared the following story, which comes from Dr. William Leininger in California.

He states:

In my last year of residency, I cared for a mother of two who had been treated for cervical cancer when she was 23. At that time, she was covered by her husband's insurance, but it was an abusive relationship, and she lost her health insurance when they divorced.

For the next five years, she had no health insurance and never received follow-up care (which would have revealed that her cancer had returned). She eventually remarried and regained health insurance, but by the time she came back to see me, her cancer had spread.

She had two children from her previous marriage—her driving motivation during her last rounds of palliative care was to survive long enough to ensure that her abusive ex-husband wouldn't gain custody of her kids after her death. She succeeded. She was 28 when she died.

Cases like these explain why the United States trails behind much of

Exhibit 151

JA-0002423

the industrialized world life expectancy. For this woman, divorce meant the loss of her health care coverage, which meant she could not afford follow up care to address her cancer, a type of cancer that is often curable if found early.

This story shows the need to improve our system, so women can still afford health insurance after they divorce or lose their jobs, and it shows why health reform must adequately cover all the preventive services that women need to stay healthy.

I urge my colleagues to join me in supporting the Mikulski amendment.

The PRESIDING OFFICER. The Senator from Kentucky.

Mr. BUNNING. Mr. President, is the pending business still the health care reform bill?

The PRESIDING OFFICER. It is, and the motion to commit.

Mr. BUNNING. Mr. President, Republicans and Democrats alike agree that Congress needs to look at ways to reform our health care system. Too many Americans are uninsured, underinsured, or cannot afford the health insurance they have.

Reforming health care, which amounts to over 17 percent of our gross domestic product, is no easy task, and it is a process that should not be rushed. I believe Congress should move in an incremental approach to reforming health care. We are restructuring one-sixth of our national economy with this bill, and we should be darn sure we know what we are doing. I believe Congress should work in a bipartisan way to draft reform legislation instead of working in secret behind closed doors.

I support measures such as passing medical malpractice reform, allowing small businesses to band together to buy insurance, and allowing individuals to buy insurance across State lines. These strategies will help lower costs, make insurance more affordable, and increase coverage. That should be the goal of health care reform, and we can do this without putting Washington bureaucrats and Members of Congress in control of our health care. This seems like a win-win situation to me.

I also support the bill introduced earlier this year by Senators COBURN and BURR called the Patients' Choice Act which reforms the health care system. This bill helps States establish State-based exchanges, helps low-income families with health care costs, and improves health care savings accounts. I have heard members of the majority party claim that Republicans don't have a health care plan. They couldn't be more wrong. We just don't have a 2,000-plus page bill as they do that will drive up premiums, cut Medicare by $\frac{1}{2}$ trillion, and raise taxes on all Americans. We just don't have a bill as they do that costs $2.5 trillion and will threaten the future of our children and grandchildren as they struggle to pay the debts we are leaving them.

I wish to take a few minutes to explain my concerns with the bill that Senator REID has laid out before us. Unfortunately, it is hard to even know where to start. As I said, this bill is over 2,000 pages long. Its table of contents—the table of contents—is 13 pages long. It was written behind closed doors by a small group of hand-picked people by the majority leader, so most of us in the Senate, and the American people, had no idea what was in it before it was released. For a majority party that billed itself as being transparent, they certainly failed in writing this bill.

The bill we have before us changes the way health care is delivered in this country. It will affect every American regardless of whether they have insurance, regardless of whether they are satisfied with their insurance, or even if they are on Medicare. We need to make sure we know what we are doing and know what the long-term consequences are of any changes we make. At this point, I am not confident that we do.

This bill will cost $2.5 trillion over 10 years when fully implemented. It raises taxes by almost $\frac{1}{2}$ trillion. It cuts almost $\frac{1}{2}$ trillion from the Medicare Program. Yet it still leaves 24 million people uninsured. The bill jeopardizes the ability of Americans to keep their own doctor and will lead to the rationing of care.

The recent recommendations of the U.S. Preventive Services Task Force on breast cancer screening should be a wakeup call to all Americans about Washington bureaucrats meddling in their health care. Under this bill, health care premiums will rise, 5 million Americans will lose their employer coverage, and 15 million more will be added to Medicaid and the CHIP program. I think this is a move in the wrong direction.

Medicaid often underpays medical providers for treating patients which makes it hard for doctors who want to treat these patients and hard for patients to find doctors to treat them. We should be finding ways to help people better afford private insurance, not simply adding them to the public dole. This bill puts Washington bureaucrats and Members of Congress in control over many aspects of our health care which should scare everyone within the sound of my voice.

For example, starting in 2014, Washington will require most Americans to prove they have health insurance or pay a penalty tax. The penalty will be phased in over a couple of years, but in 2016, the penalty will be $750 per person with a maximum of $2,250 for a family. These amounts are indexed in future years, however, so the penalty will continue to increase.

If you aren't in one of the bill's special exemption categories, you will have to prove that you and your family have insurance when you sit down to fill out your taxes. If you don't, then you will get to send Uncle Sam an additional $750 or $2,250 on April 15.

I know the authors of this bill will try to argue that since their bill leads to nearly universal coverage, most Americans would not be affected by this tax. That couldn't be further from the truth. According to the Congressional Budget Office, the official scorekeeper, this bill leaves 24 million Americans uninsured. Twenty-four million Americans without insurance is not "universal coverage" or anything close to it. Also, Members of Congress are going to be telling people what type of insurance they have to buy, and we will not even be giving every American access to the cheapest plan on the market.

The bill requires that only four types of health care insurance can be offered in the exchange: bronze, silver, gold, and platinum. All the plans would have to offer certain benefits and meet certain criteria. However, the bill creates a special catastrophic plan for only special groups of people: those under the age of 30 and those who don't have affordable coverage. It doesn't matter that many more people want this level of coverage. If they aren't under 30 or meet some type of income eligibility test, they are just out of luck.

Catastrophic coverage is the right type of coverage for many different types of Americans, including singles, younger people, and the healthy. It is very likely to be the cheapest plan affordable on the exchange. Think about this: a young woman in her thirties, she eats right, she exercises, doesn't smoke, takes good care of herself. She wants a catastrophic plan, and it is all she needs. Under this bill, she couldn't buy into the catastrophic plan because of her age. Members of Congress tell her she isn't entitled to the cheapest plan on the market because she is too old. She is in her thirties. Or think of the 29-year-old male who has been enrolled in this catastrophic plan in his early twenties. On his next birthday, the Federal Government has a big birthday surprise for him. He will get kicked out of the insurance plan he has enjoyed for years and will be forced to join a more expensive health care plan. That is a wonderful birthday gift.

I don't think Congress's role is to require all Americans to buy insurance. I don't think Washington bureaucrats and elected Members of Congress should be dictating what health care options are available for the entire country.

I understand the importance of insurance. I think everyone should have insurance, but I don't think it is the Federal Government's responsibility to force people to buy it or micromanage what insurance looks like.

This bill also makes huge cuts in Medicare which will affect every senior. The bill cuts—and we have heard it many times today—$465 billion from the Medicare Program. These cuts would not be used to shore up the Medicare Program which will be insolvent in just about 8 years. Instead, these cuts will be used to fund new government spending. This move further jeopardizes the viability of the Medicare Program.

Exhibit 151    JA-0002424

I know AARP and the American Medical Association are trying to tell seniors these cuts will actually be good for the Medicare Program and the program would not be harmed, but let's be honest. When you think about it, does it really make any sense? Congress is going to cut $465 billion from a program that is already facing bankruptcy, and it will somehow make it stronger? If you believe that, I have some oceanfront property to sell you in Arizona.

Under this bill, hospitals will be cut, nursing homes will be cut, health home agencies will be cut, hospices will be cut, and Medicare Advantage programs will be cut. By cutting the reimbursement rate for providers, they are making it harder for seniors to find medical providers to treat them. Plain and simple: Seniors will have the same benefit, but if they cannot find anyone to treat them, then their benefits don't do them any good, do they?

I have to tell my colleagues there isn't one medical provider who walks in my office each year who is happy with their reimbursement rate under Medicare. I cannot think of one. Hospitals are not happy. The doctors are not happy. Hospice care providers who provide such valuable services to dying Americans and their families are not happy. No one is happy.

What do you think is going to happen to these reimbursements when the cuts go into effect? How happy will the providers be then?

Another problem with this bill is the creation of a government plan. I can say I do not support a government-run plan in any form. I have already described the significant problems with Medicare and Medicaid. Creating a new government-run health program will lead to the same sort of problems that plague these plans.

I fear it will eventually undermine private insurance enough so we are left with a single-payer, government-run system. I have been in Congress long enough to know it will be a disaster for this country.

Finally, this bill imposes an unprecedented tax increase on Americans. The tax hikes in this bill would start hitting Americans next year, while the spending and benefits will not start, in many cases, until 2014. That is how the majority is hiding the true cost of the bill—using 10 years of tax hikes to offset 6 years of spending.

Everybody knows tax increases are deadly in a fragile economy. But that is not preventing the majority from pushing through $½ trillion in tax hikes in this bill. In further defiance of logic, these tax increases will actually drive up the cost of health care. I was under the impression the goal of health care reform was to reduce costs, not increase them.

As I mentioned earlier, if you have the misfortune of being uninsured, you will be further punished under this bill by paying a penalty tax. If you are an employer that hires a low-income worker and cannot afford to provide health insurance, you probably will be punished with a penalty tax. If you are an employer that offers retirees prescription drug coverage, your taxes will go up. If you have extremely high medical costs and use itemized deductions for medical expenses to defray your costs, your taxes will go up. If you use a flexible spending account, health reimbursement account or health savings account for over-the-counter medicines, your taxes will go up. If you have a flexible spending account, it will be capped and then probably disappear in a few years because of the high-cost plan tax, so your taxes will go up.

This bill also creates a new marriage penalty in the Medicare payroll tax and uses the money to pay for a brandnew entitlement program. It also imposes a new tax on cosmetic surgery. If a family is forced to liquidate a health savings account because of tough economic times, the government will confiscate even more money.

The bill also imposes new taxes on brand-name drugs, medical devices, and health insurance, all of which will increase health care costs and drive up premiums. Now that the government has succeeded in driving up premiums, the government will hit you again by taxing high-cost insurance policies. It makes perfect sense—drive up the cost of insurance premiums with new taxes and then tax them again for being too costly.

We could have health care reform that reduces health care costs for families and businesses. We could have health care reform that didn't raid $½ trillion from Medicare. We could have health care reform that allows people who like the coverage they have to truly keep it. We could have health care reform that doesn't drastically expand government spending on health care or push people into government programs. We could have health care reform that does not increase taxes on the American people at the worst possible time, during a recession. We could have health care reform that is done in the light of day rather than behind closed doors.

The American people deserve better, and we ought to defeat this bill.

I yield the floor.

The PRESIDING OFFICER. The Senator from Montana is recognized.

Mr. BAUCUS. Mr. President, as I understand it, there are a couple Senators left, besides myself, Senator SESSIONS and Senator BURR. There may be others, but I see them at the moment.

America's health care system is in a crisis. It is a crisis not just for the 46 million Americans who lack health insurance; it is also a crisis for those who have health insurance but are worried they cannot afford to keep it. It is also a crisis for those who are underinsured and those who have poor health insurance.

Rising health care costs affect families and American businesses. That we know. Health insurance premiums continue to outpace wages and inflation by a large margin. Between 1999 and 2008, premiums for employer-sponsored health benefits more than doubled. In that 9-year period, they increased 117 percent for families and individuals, and they increased 119 percent for employers. In each case, both for families and for employers, health insurance premiums doubled. Clearly, that is outpacing wages. I think the margin is 5 or 6 to 1, with premiums going up compared with wages for Americans.

Health care coverage for the average family now costs more than $13,000 a year. If the current trend continues, by 2019, the average family plan will cost more than $30,000. That is over a 10-year period—from $13,000 for the average family today to $30,000 that family will pay then.

Annual health spending growth is expected to continue to outpace average annual growth in the overall economy by 2 percent over the next 10 years. Health care spending is going up faster than the economy is growing. Add to that the insult, frankly, that this year alone not only would health spending increase 5 percent but GDP is expected to decrease two-tenths of a percent. So the gap is widening even further.

Americans spend $4.5 million in health care every minute of every day. Think of that. We, in America, spend about $4.5 million in health care every minute. That is $2.5 trillion a year. It is pretty hard for anybody to get his or hands around 1 trillion, but we are talking about $2.5 trillion that Americans spend on health care every year. Without reform, health care expenditures will increase to $4.4 trillion in just the next 9 years. That would be more than one-fifth of our economy. So health care is taking a bigger and bigger bite out of our economy. These are not just numbers.

Every 30 seconds, another American files for bankruptcy after a serious health problem. Think of that. Every year, about 1.5 million families lose their homes to foreclosure. Why? Because of unaffordable medical costs. In America, nobody should go bankrupt because they are sick. That is immoral.

These numbers tell us what we have to do. We have to do two things at once. First, our health care reform bill must provide health care for millions of Americans who today don't have health insurance. At the same time, we must reduce the rate of growth in health care spending. We must do both. To be successful, health care reform must rein in the cost of health care spending, and we must succeed. Millions of Americans depend on it.

Our plan is to reduce the Federal budget deficit by $130 billion over the next 10 years. Think of that. Many have said an economic recovery is through health care reform. We have to get control of our deficits. One way to do that is to get control of our health care spending. The bill before us now reduces the deficit by $130 billion over the next 10 years.

Exhibit 151                                                                                    JA-0002425

We need to go much further, clearly, but that reduction is sure a lot better than no reduction. At the same time, our plan would reduce the number of uninsured by 31 million. It would reduce the number of Americans who are uninsured and, at the same time, we will cut the Federal budget deficit. So we are doing both.

This bill reins in costs through changes in spending, reforms how providers deliver health care, and it changes the tax treatment of health care. Savings from this bill are estimated to total $106 billion in 2019. The CBO, Congressional Budget Office, which we all rely upon, expects that, in combination, it would increase 10 to 15 percent in the next decade; that is, savings growth, creative savings would grow by that much. That is what CBO says. That is a strong rate of savings. Those are all provisions to control the excessive growth in health care spending.

Our plan also reevaluates the tax treatment of health care. The current Tax Code includes numerous health care subsidies and incentives. The current tax treatment of certain health care expenses encourages people to spend more on health care than they need to. Why? Because there is no limit under the law, none; that is, all employer-provided health care benefits in America today are totally tax free. The more the benefits are, if a company wanted to provide not only a Cadillac policy but diamond and gold benefits—great benefits—it is not needed tax free. That tends to encourage excessive health care spending. These indirect health care costs totalled nearly $200 billion in 2008. That makes health care the largest Federal tax expenditure. Health care today is the largest Federal tax expenditure. Our laws changed about 60 years ago and moved in that direction, limiting subsidies for expensive insurance plans. Our bill limits incentives to overspend on health care. Our bill will help to slow the growth of health care spending.

Also, the CBO, in a letter they sent to the Congress yesterday, concluded there is about—this provision, the tax on so-called Cadillac plans, would result in a reduction in premiums those persons would otherwise pay—a reduction of, I think, about 5 to 7 percent. There has been a lot of concern in this body and beyond this body that that provision—the Cadillac plan provision—would raise costs for those folks who have those plans. The CBO concluded that the premiums for those kinds of plans would be reduced, I think, by 5 to 7 percent, rather than compared with current law. Several parts of our plan have the effect of reducing costs. I mentioned excess tax on high-cost insurance premiums, and that is a powerful one.

Our plan also caps flexible health savings accounts. It puts a cap on them so it is not unlimited. There is no cap, so the Tax Code tends to encourage excessive use of that provision.

Our plan would also conform with the definition of qualified medical expenses, the definition used by the itemized deduction for medical expenses. That, too, will help.

Reducing existing tax expenditures for health care costs is one of the best ways to slow the growth of health care spending. We could use our code, all the tools available. Our goal is not only to reduce costs but also improve quality. There are many provisions in the bill that accomplish that result, which would improve the quality of health care. A lot of people hear us talk about how costly health care in America is today. It is costly—too costly. There is a lot of waste. We are enacting provisions to cut out the waste.

I sense some Americans are thinking: Gee, maybe they are going to cut my Medicare benefits and reduce the quality back there in Washington, where they are worried about excessive health care costs. The exact opposite is the case. All the provisions in here enhance the quality of health care. The list is very long. One that immediately comes to mind is additional spending for primary care doctors. We all know they are underpaid in America. They are not taking Medicare patients, and they are going out of practice, especially in rural areas. This legislation adds 10 percent additional payment to primary care doctors in each of the next 5 years. That will help primary care doctors continue to practice.

I might mention that health information technology will also help improve quality. There are lots of demonstration projects and pilot projects to improve quality through bundling, care organizations, reining in excessive readmission rates some hospitals have. We also have an outfit that compares how drugs work compared with other procedures. All that is going to help address quality.

I want folks to know that while we are reducing costs—that is true because costs have to be reduced—we are also increasing the quality of health care in America. There are many other incentives in this bill that I don't have time to mention tonight that accomplish that result.

In response to the excise tax on high-cost insurance, insurance companies will offer lower cost plans that fall under the thresholds. I think that is one of the reasons why premiums for those folks will fall. This will give consumers a lower cost alternative. These plans will still have the minimum level of benefits that will be required by law under the health care system.

Other changes to the tax treatment of health expenses will also help individuals make more cost-effective health care decisions. For example, our plan would require employers to tell their employees the value of their health insurance.

That reminds me two of the other provisions for increasing transparency so hospitals tell people what they charge for various procedures. I think the same should also apply to physicians so people have a better idea what they will pay or their insurance company will pay for these procedures.

As I said, our plan will require employers to tell their employees the value of their health insurance. This will help people to know how much they are actually spending.

I mentioned changes to flexible savings accounts, health savings accounts, and the definition of "medical expenses." That will all help. It will also help to reduce costs by increasing competition. That has not been mentioned enough on the floor. This bill increases competition. We all know that in too many of our States, there are too few health insurance companies. In my State of Montana, Blue Cross/Blue Shield provides at least half the market. There is another company that is basically the rest. In some States, Blue Cross has the entire market. It is wrong. There is not enough competition. The exchange we are putting in place will encourage competition.

Do you know what else will encourage competition? That is all the insurance market reforms—all of them—telling companies they cannot deny coverage based on a preexisting condition, telling companies they cannot rate according to health status, dealing with rules in the States, which means when you go to buy insurances—especially as an individual—there will be competition based on price. Companies will basically offer many of the same products, but they cannot deny coverage for preexisting conditions. The effect of that will be prices should come down because there will be more competition when insurance companies base it on price.

Then there is the public option. That is another addition. That is in this bill. We don't know if it will or not. There are a lot of ways we help provide competition. It will help more competition, and transparency will help more competition. Competition is going to help bring down the costs.

Our bill will reduce costs also by reforming health care delivery system—I mentioned a lot of that already—including how we pay for doctors.

The bill is balanced. It finds savings in health care outlays—savings that are realistic, that make sense. It looks to reduce health tax expenditures. That is a fancy term for deductions. The bill reduces the Federal deficit in the first 10 years. That point needs to be driven home. This bill reduces the Federal deficit in the first 10 years and the subsequent 10 years will have a positive effect bringing down the budget deficit. In fact, CBO says the second 10 years of our plan will cut the deficit by a quarter of a percent of the gross domestic product. That is about $450 billion. That is nearly $½ trillion in deficit reduction.

We need to remember the cost of doing nothing is unacceptable. Basically, we have two choices in life: try

Exhibit 151      JA-0002426

or do nothing. To ask the question is to answer it. Of course, we tried. Our Nation is in crisis. We have a health care crisis. It is a formidable task. It is exceedingly complex and difficult. But we have an obligation to try, at least try, to fix it.

If we try, then that poses a second question. If we try, we ask the question: Do we try our best or not? The answer is obvious: We try our best.

This legislation is a combination of a year or two of work by folks in the medical profession, of health care economists—Americans who are trying to find ways to get control of costs and improve quality. There are not a lot of new ideas here. They are ideas that have been percolating around for the last year or two. Some are in Massachusetts, some in other States. Some of it is going into integrated systems, such as Geisinger and Intermountain. The idea of bundling is already practiced by other institutions. There is not a lot that is terribly new.

We are pulling together, we are helping establish a policy in our country that comes up with a plan, a system in America that allows doctors and patients to have total free choice. They choose. We are helping doctors with the best evidence, the best information so they can focus on the patient care even more than they are now. We are cutting down the budget deficits. That is very important. And we are also helping Medicare by extending the solvency of Medicare another 5 years. These are things we pulled together and have to do.

I very much hope we can move on and get this legislation passed and work with the House and the President signs a bill that we can start finally putting together something of which we will be very proud. Our country does not have a health care system today. It is a free-for-all. It is a free-for-all for all kinds of groups. This is the first effort to get something together that works, giving doctors and hospitals and patients the choice they want to have and they should have. We are also bringing costs down and improving quality of health care.

The PRESIDING OFFICER. The majority leader.

Mr. REID. Mr. President, I appreciate the statement of the chairman of the Finance Committee. It is one of the most well-reasoned statements we have had. And rightfully so. No one worked harder on this matter than Senator BAUCUS. I appreciate his dedication, hard work, and the way he handles that Finance Committee.

Mr. President, I ask unanimous consent that the time until 2:15 p.m. tomorrow, Wednesday, December 2, be for debate with respect to the pending Mikulski amendment and the McCain motion to commit; that during this period, Senator REID or his designee be recognized to offer an amendment as a side-by-side to the McCain motion, and Senator MURKOWSKI or her designee be recognized to offer an amendment as a

side-by-side to the Mikulski amendment; that the debate time be divided equally among the four principals listed above; that no other amendments or motions to commit be in order during the pendency of these amendments and motion; that at 2:15 p.m. tomorrow, the Senate proceed to vote in relation to the above noted in the following order; that prior to each vote there be 2 minutes of debate equally divided and controlled in the usual form, and after the first vote, the remaining votes in the sequence be 10 minutes in duration; further, that all amendments and motion provided under this consent require an affirmative 60-vote threshold for adoption, and that if those included in the agreement do not achieve that threshold, then the amendments and motion be withdrawn:

Mikulski amendment No. 2791; Murkowski amendment regarding preventive care; Reid or designee amendment regarding Medicare; McCain motion to commit regarding Medicare.

Mr. President, before I put this to a final consent request, let me say, we have been trying to get some votes today. It would be very good if we could move this bill along, have some votes tomorrow afternoon. We would have four votes. We have two amendments pending. This, in fact, would dispose of those amendments.

The PRESIDING OFFICER. Is there objection?

Mr. McCONNELL. Mr. President, reserving the right to object, and I will have to object, I wish to say to my good friend, the majority leader, I thought over the last couple of hours we would be able to get consent to have votes on the Mikulski and Murkowski amendments. But I had indicated to him, and I want to say publicly, that we have a number of speakers interested in speaking on the Medicare issue and the McCain motion. So I will not be able to lock in the McCain motion or the side-by-side that I gather under this consent request my good friend, the majority leader, may offer.

I would still like to be able to get the two votes earlier referred to—the Mikulski and Murkowski amendments—but regretfully I cannot even lock those in right now. But I want to do that as soon as possible so at least we can get those two votes at some point reasonably early in the day and turn back to debate on the McCain motion.

I might say, we want to vote on the McCain motion. We certainly have no desire to delay that vote. But we do have a number of people who want to speak to it. With that understanding and with the point I want to make to my good friend that I want to get the two amendments by MIKULSKI and MURKOWSKI locked in as soon as possible, I must object.

The PRESIDING OFFICER (Mr. UDALL of Colorado). Objection is heard.

The Senator from Alabama.

Mr. SESSIONS. Mr. President, I wish to share a few thoughts as we go forward on the health care debate and re-

mind our colleagues what we have been hearing at the town meetings that most of us have been having around the country and what people are concerned about.

Part of it is they think we don't have a very good perspective on what is going on in America. They are not happy with us. They think we are losing our fiscal minds, that we are ignoring the fact that we are facing a soaring debt. We passed on top of the debt we already had an $800 billion stimulus package—$800 billion—the largest spending bill in the history of America on top of all our other baseline bills.

Our baseline appropriations bills, not even including the additions by the stimulus, are showing double-digit increases. These increases are far more than President Bush ever had, and he was criticized for reckless spending. He never had the kind of baseline spending increases that were passed a few months ago, a few weeks ago in some cases.

This year, as of September 30, we acknowledged and accounted for a $1.4 trillion budget deficit in 1 year—1 year, $1.4 trillion, September 30. The Republicans never had a deficit so large in 1 year. And in the next year, it is projected to be over $1 trillion, and continue to average $1 trillion each year over the next 10 years. In the 8th, 9th, and 10th years of the President's 10-year budget, the deficit goes up. It does not ever go down, it continues to go up. Therefore, we end up with a huge debt. That is according to our own Congressional Budget Office hired by the Congress—approved by the majority of our colleagues who are, of course, Democrats. They approve the Budget Director, and he tries to do a pretty good job of giving us honest numbers.

This is what the numbers show. In 2008, we had $5.8 trillion in debt in America since the founding of the Republic. By 2013, 5 years down the road, that will double to $11.8 trillion. And in 10 years, the 10-year budget the President submitted to us—I did not submit this budget, President Obama submitted it and it was passed by the Congress—increases that debt to $17.3 trillion, tripling the debt of America in 10 years. That is what the people are very concerned about, among other things.

What does all this pending mean also? It means government power, government reach, government domination, government takeover. People are concerned about it. They are asking: Are you not getting the message? What is the matter with you? That is what I am hearing. I think people have a right to be concerned.

One of the issues I have raised is the fact that the interest on the debt in 2009 was $170 billion for 1 year—that is for interest alone. By 2019, interest on the debt, according to CBO, in 1 year, will be $799 billion. That number is higher than the budget for defense. It is larger than any other program. We

Exhibit 151                                                                                                    JA-0002427

spend about $100 billion a year on education, and $40 or so billion on highways. But in 10 years, we will be spending $800 billion on interest alone. And how much of that is owned by foreign governments, many of whom are not our friends and our allies?

So even the President has said this debt is unsustainable. The economists say it is unsustainable. Every politician I know of says that it is unsustainable. Yet we continue outrageous spending, and in the midst of this financial tempest, what do we now have before us? The promise of a $2.5 trillion new health care program—$2.5 trillion as it will cost when fully implemented.

The question I have heard asked of the President, and I have heard asked of the Democratic leadership and the Congress: But, Congressman, Senator, we don't have the money. What do you say about that?

They say: Oh, don't worry. We have this great new program that is going to help you in so many ways. We are going to spend a lot of money, true, but it is going to be deficit neutral. My goodness, it is not even going to be budget neutral, it is going to save us $130 billion in 10 years. Will you guys just relax? Don't worry about it. We are going to save $130 billion. Thank us. We are going to give you this program, save $130 billion, and you will get a lot more health care out here— still with 24 million uninsured, but we will have a lot of money spent to help you with your health insurance, they will say.

The President said he would not sign a bill into law that would add one single dime to the national debt. Well, people say: How are you going to do that? That sounds pretty good, if we can make that happen. How are we going to do it? Well, the answer is we are going to raid Medicare, we are going to raise taxes, and we are not going to pay the doctors who do our work. There will be $494 billion in tax increases, $465 billion in Medicare cuts—and Medicare is already on a glide path to insolvency by 2017—and a $250 billion shortfall for our physicians. Those are payments they have been promised and they thought they were going to get as part of this fix.

So I would just make the point that we can give everyone in America a new car if we just raised taxes and raided Medicare. That would be pretty easy, wouldn't it? Anything can count as deficit-neutral if you raise taxes high enough. So this is not a deficit-neutral program. Just because we raise taxes, does it have to be that we should prioritize first to use that money to start a new program? What about addressing the shortfall in highway funding that we are hearing so much about? What about the cost of our effort in Afghanistan? What about other expenses we have? What about saving Medicare, a program our seniors depend on? If we are going to raise taxes, why don't we use the money for that? Who says we

have to raise taxes to start a new program?

Well, I suggest to you that based on the omission of doctors fix alone we don't have a $130 billion surplus in this bill. The fact that it is unpaid for, we have a $130 billion net deficit because the bill fails to pay $250 billion in doctor fees that I predict we will eventually pay, one way or another. The way we have done it in the past is we have just socked it to the debt. We have just paid the doctors, raised no revenue, and changed the law. We have just paid them and increased our debt that much each year.

So I say these are not sound numbers. I am telling you, the American people's instincts are right about this. We are not being responsible about how we manage the people's business, promising that this bill is going to be better for everybody. But let me ask for the average American who is doing the right thing, who is struggling and scraping together money to make insurance premiums each month, will that person pay less for their health care? CBO basically says no. If that individual is not in an employer-provided group plan already, if he's among those who are already paying the highest costs for health care in the country, then he is one of the people who are going to pay as much as 10 to 13 percent more under this bill than he currently pays.

Will health care, as a percentage of our total economy, our total GDP, will it be reduced by this bill, therefore getting more health care at a better cost? Not according to the scoring we have seen. In fact, just the opposite is the case. If this bill passes, a larger percentage of our GDP will go to health care than before.

So I just raise concerns. This is a plan to create an entirely new government-dominated health care plan. This is a new program. How are we going to do it? By raiding Medicare, raising taxes, and not paying doctors, among a bunch of other flimflammery that is in the bill. We talk about this public option. Well, Senator BAUCUS says we may not have a public option. It is in the House bill, and it is in this bill that is on the Senate floor.

So we don't have the money for a monumental new health care program. We could do a lot of things to improve health care in America that could help contain the rising cost of health care, that could be done in a way that would not diminish the circumstances we are in today. What about Medicare? Do you remember when President Bush proposed fixing Social Security and many Senators—Democrats as well as Republicans—said: Well, President Bush, if you want to do something, why don't you fix Medicare? That is the one in the biggest trouble?

In truth, Medicare is sinking faster than Social Security. Medicare will decline by 2017 and go into deficit. We have a shortfall in Medicare now. What we should do is focus on Medicare

every way that we can to create efficiencies and more productivity, contain growth and cost and extend that period of time before it goes in default. The last thing we should be doing is taking $465 billion from Medicare. It is only going to accelerate its decline. That is common sense.

Mr. President, I would just like to read a letter I received from one of my constituents—Mr. Bill Eberle in Huntsville, AL. He said:

I strongly urge you to vote against the health care bill passed by the House. The worst part of this bill is that much of the cost will be paid by cuts to Medicare. I am 68 years old, and I have paid into Medicare for 40 years believing that it would cover much of my health care costs when I became 65. Now I am being told that the government has found people who need coverage more than I do, and they will cut the care for which I have paid for 40 years in order to cover people who have paid nothing. It is not the government's money. The money belongs to those of us who have paid into it for so many years and we are watching as it is being taken from us.

Well, I think that is a pretty fair statement of it. Medicare is heading to insolvency in 2017. We have had a number of proposals to try to help on that front. We haven't had much support from our colleagues on the other side of the aisle even for modest fixes.

I remember one bill that was going to reduce Medicare spending by $10 billion over 5 years, and you would have thought we were going to savage the whole program, although we were trying to make it more sustainable in the long run. It was a big mess. But now we are talking about $465 billion being taken from Medicare.

So, Mr. President, Medicare is a big problem. We need to work hard to bring it under control and honor our seniors who have been paying into this program and not drawing a dime from it on the promise that when they turned 65 they would start being able to draw on Medicare and it would take care of their health care needs in their senior years. That was a solemn commitment. Before we start some monumental new program, we need to make sure we are prepared to honor that commitment because they paid their money. They have paid their money. So if we raise taxes, why shouldn't we pay the Medicare bill first? If we raise taxes, why shouldn't we pay our doctors the money we owe them or some of the other priorities that we have in our country?

Mr. President, I feel strongly that the American people are sending us the right message. They are acting like good public-minded citizens would. They are seeing a reckless new spending program that they rightly anticipate will grow and grow and grow and expand far beyond all the projections we have today; that it will result in a government takeover of a whole large portion of our economy, and they have not been impressed that the government can run these kinds of things very effectively and they are not in

Exhibit 151

JA-0002428

favor of it. So they are rightly concerned, and that is why polling numbers show the American people don't favor this legislation.

I think their instincts are right. I think we should listen to them.

I appreciate the effort to improve health care in America. I support a number of reform provisions, some of which are in this bill, but others could be a part of this bill to make health care more affordable, more effective, and help people who are having a hard time financing their insurance premiums. But the truth is, the bill doesn't really reduce the premium cost for most people. Many people who are paying their bills today are not going to get any reduction. In fact, they may see an increase. So for these reasons, I oppose the legislation, I thank the Presiding Officer, and I yield the floor.

The PRESIDING OFFICER. The Senator from Montana.

Mr. BAUCUS. Mr. President, I believe Senator DURBIN may be coming to the floor. In the meantime, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. DURBIN. Mr. President, I ask unanimous consent the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DURBIN. Mr. President, today, all day, we have been debating the health care reform bill, which has been a matter worked on in the Senate and the House for a solid year. I wish to salute the Senator from Wyoming, Mr. ENZI, who joined with several other Senators in, I understand, 61 separate meetings talking about this bill, in an effort which did not bear fruit as they hoped but was a bipartisan effort to come up with some solution to our health care situation in America. I hope we can still reach some bipartisan accommodation before this bill passes.

At this point in time, only one Republican Senator has voted for any form of Senate health care reform and that was Senator SNOWE in the Senate Finance Committee. We hope others will join us before this bill comes to final passage in the Senate, but that is the reality of the political situation.

The bill before us is over 2,000 pages long. Some have criticized its length. I defy anyone to write down, in 2,000 pages or less, a description of the current medical system in America. I think it would take many more pages to explain the complexity of the situation. But people across America understand a few basics.

Health insurance is reaching the point where it is not affordable. Families cannot afford to pay for it anymore, businesses cannot. Fewer people have coverage at their workplace, and many who go out into the open market cannot afford to pay the premiums. Today we have reached a point where our COBRA plan, which is health insur-

ance for those who have lost their job—we provided a helping hand to many unemployed people across America—it expired today. It picked up two-thirds of the premiums. I ran into people who said, even with the two-thirds picked up by the Federal Government, I still cannot afford it. So it is understandable that health insurance is no longer affordable, and it is not getting any better.

In the last 10 years, health insurance premiums have gone up 131 percent. We estimate that, in the next 8 years, the cost of health insurance will double. In 8 years, it is anticipated that families will spend up to 45 percent of their income on health insurance. That is not sustainable.

So the starting point is to find ways to bring down cost. The Congressional Budget Office gave us a report yesterday and said we are on the right track. I can come up with other ideas which I think might be more helpful, but this is the art of the possible. I think we are moving toward a model which will start to bring down costs.

The second thing we do that is critically important is, we expand coverage so it reaches 94 percent of Americans. Currently, there are about 50 million Americans without health insurance. These are people who are unemployed, folks who work at businesses that cannot afford health insurance or folks out on their own who cannot afford to pay for their own health insurance. We now reach a point with this bill where 94 percent of Americans have coverage. That is a good thing.

We also do it in a fiscally responsible way because this bill, according to the Congressional Budget Office, which is the neutral referee in this battle, according to that office, we will save, in the first 10 years of this bill, $130 billion or more from our deficit. It will be the biggest deficit reduction of any bill considered by Congress. In the second 10 years, they estimate $650 billion in savings. To think we have $3/4 trillion dollars in deficit reduction in this health care reform says to me, in the eyes of the Congressional Budget Office and most observers, it is a fiscally responsible bill.

There is a section of the bill which I think is critically important too. Many people with health insurance find out that when they need it the most it is not there. The health insurance companies will deny coverage, saying they are dealing with preexisting conditions that were not covered, there is a cap on the amount they will pay, your child is now age 24 and is not covered by your family plan. All these things are excuses for health insurance companies to say no. When they say no, they make more money. We start eliminating, one by one, these perverse incentives for health insurance companies to say no.

We give consumers and families across America a fighting chance, when they actually need health insurance, that it will be there. Two out of three

people filing for bankruptcy today in America file because of medical bills. That reflects the reality, that we are each one accident or one diagnosis away from a medical bill that could wipe out our life savings. The sad reality is 74 percent of people filing for bankruptcy because of health care bills have health insurance, and it turns out it is not worth anything. When they needed it, it failed them.

We need to move to a point where the health insurance companies are held accountable, where when you pay premiums for a lifetime, the policy is there to cover you when you need it. That is what this is about.

We eliminate some of the most egregious discrimination in insurance premiums. The insurance industry is one of two businesses in America exempt from antitrust laws. So they literally get together, they collude and conspire when it comes to setting premium costs and allocating markets, and they can do it legally under the McCarran-Ferguson Act. Because of that, what they have done is to create discrimination against some people—women, certain age groups, people living in certain places—when it comes to premiums. We eliminate, by and large—not completely but by and large—this type of discrimination.

The other point that has been raised repeatedly is about Medicare. There is a pending amendment by Senator McCAIN. As a Democrat, we take great pride in Medicare. It was a Democratic President, Lyndon Baines Johnson, who led a Democratic Congress in passing it. Very few, if any, Republicans supported it. Over the years, it has been a program we have stood behind as a party because we believe it has provided so much well-being for 45 million American, now today, seniors.

This bill starts to move us toward a place where you can basically say there is a sound economic footing for Medicare in the future. If we don't do something today, in 7, 8, or 9 years, the Medicare Program could go bankrupt. If we wait 5 years to do it, imagine what we will have to do then.

This bill moves in the direction of making Medicare more sound by eliminating some of the waste that is currently in the program.

There was a time when our friends on the other side joined us in saying this program could be more efficient. But now the McCain amendment says basically there should be no cuts in Medicare, even if the cut is in wasteful spending. Senator McCAIN has a strong record on the Patients' Bill of Rights, but I think his amendment goes too far when it comes to Medicare. I hope that we can defeat it or that he will reconsider it.

The last point I want to make is that this debate will continue. We hope to move to amendments. If we get to a point where we are dealing with filibusters and slowdowns in an effort to run out the clock and make us all leave on Christmas Eve with the job not finished, many of us are going to get tired

Exhibit 151                                                                                                    JA-0002429

of that approach. If there are honest amendments offered in good faith, debated, and brought for a vote, that is what the Senate is about. But if we continue to delay indefinitely the consideration of these amendments, our patience will grow thin, and we will have to move this toward a point where the bill is honestly considered.

## FURTHER CHANGES TO S. CON. RES. 13

Mr. CONRAD. Mr. President, section 301 of S. Con. Res. 13, the 2010 budget resolution, permits the chairman of the Senate Budget Committee to adjust the allocations of a committee or committees, aggregates, and other appropriate levels and limits in the resolution, and make adjustments to the pay-as-you-go scorecard, for legislation that is deficit-neutral over 11 years, reduces excess cost growth in health care spending, is fiscally responsible over the long term, and fulfills at least one of eight other conditions listed in the reserve fund.

I have already made one adjustment pursuant to section 301(a) on November 21, for S.A. 2786, the Patient Protection and Affordable Care Act, an amendment in the nature of a substitute to H.R. 3590. I now file further changes to S. Con. Res. 13 pursuant to section 301(a) for S.A. 2791, an amendment to clarify provisions relating to first dollar coverage for preventive services for women. I find that in conjunction with S.A. 2786, this amendment also satisfies the conditions of the deficit-neutral reserve fund to transform and modernize American's health care system. Therefore, pursuant to section 301(a), I am further revising the aggregates in the 2010 budget resolution, as well as the allocation to the Senate Finance Committee.

I ask unanimous consent to have the following revisions to S. Con. Res. 13 printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

CONCURRENT RESOLUTION ON THE BUDGET FOR FISCAL YEAR 2010—S. CON. RES. 13; FURTHER REVISIONS TO THE CONFERENCE AGREEMENT PURSUANT TO SECTION 301(a) DEFICIT-NEUTRAL RESERVE FUND TO TRANS-FORM AND MODERNIZE AMERICA'S HEALTH CARE SYSTEM

[In billions of dollars]

| Section 101 | |
|---|---|
| (1)(A) Federal Revenues: | |
| FY 2009– | 1,532.579 |
| FY 2010– | 1,623.888 |
| FY 2011 – | 1,944.811 |
| FY 2012– | 2,145.815 |
| FY 2013– | 2,322.897 |
| FY 2014 – | 2,560.448 |
| (1)(B) Change in Federal Revenues: | |
| FY 2009– | 0.008 |
| FY 2010– | – 42.098 |
| FY 2011 – | – 143.820 |
| FY 2012– | – 214.578 |
| FY 2013– | – 192.440 |
| FY 2014 – | – 73.210 |
| (2) New Budget Authority: | |
| FY 2009 | 3,675.736 |
| FY 2010– | 2,910.707 |
| FY 2011 – | 2,842.766 |

CONCURRENT RESOLUTION ON THE BUDGET FOR FISCAL YEAR 2010—S. CON. RES. 13; FURTHER REVISIONS TO THE CONFERENCE AGREEMENT PURSUANT TO SECTION 301(a) DEFICIT-NEUTRAL RESERVE FUND TO TRANS-FORM AND MODERNIZE AMERICA'S HEALTH CARE SYSTEM—Continued

[In billions of dollars]

| | |
|---|---|
| FY 2012– | 2,829.808 |
| FY 2013– | 2,983.128 |
| FY 2014– | 3,193.887 |
| (3) Budget Outlays: | |
| FY 2009 | 3,358.952 |
| FY 2010– | 3,021.741 |
| FY 2011 – | 2,966.921 |
| FY 2012– | 2,863.655 |
| FY 2013– | 2,989.852 |
| FY 2014 – | 3,179.437 |

CONCURRENT RESOLUTION ON THE BUDGET FOR FISCAL YEAR 2010—S. CON. RES. 13; FURTHER REVISIONS TO THE CONFERENCE AGREEMENT PURSUANT TO SECTION 301(a) DEFICIT-NEUTRAL RESERVE FUND TO TRANS-FORM AND MODERNIZE AMERICA'S HEALTH CARE SYSTEM

[In millions of dollars]

| Current Allocation to Senate Finance Committee: | |
|---|---|
| FY 2009 Budget Authority — | 1,178,757 |
| FY 2009 Outlays — | 1,166,970 |
| FY 2010 Budget Authority — | 1,249,836 |
| FY 2010 Outlays — | 1,249,342 |
| FY 2010–2014 Budget Authority — | 6,824,797 |
| FY 2010–2014 Outlays — | 6,818,905 |
| Adjustments: | |
| FY 2009 Budget Authority — | 0 |
| FY 2009 Outlays — | 0 |
| FY 2010 Budget Authority — | 0 |
| FY 2010 Outlays – | 0 |
| FY 2010–2014 Budget Authority — | 20 |
| FY 2010–2014 Outlays — | 20 |
| Revised Allocation to Senate Finance Committee: | |
| FY 2009 Budget Authority — | 1,178,757 |
| FY 2009 Outlays — | 1,166,970 |
| FY 2010 Budget Authority — | 1,249,836 |
| FY 2010 Outlays — | 1,249,342 |
| FY 2010–2014 Budget Authority — | 6,824,817 |
| FY 2010–2014 Outlays — | 6,818,925 |

## MORNING BUSINESS

Mr. DURBIN. I ask unanimous consent that the Senate proceed to a period of morning business, with Senators permitted to speak for up to 10 minutes each.

The PRESIDING OFFICER. Without objection, it is so ordered.

## CARTAGENA LANDMINE BAN TREATY REVIEW CONFERENCE

Mr. LEAHY. Mr. President, I want to speak briefly on a subject that many Members of Congress—Democrats and Republicans—have had an abiding interest in over the years.

Throughout this week, delegates from countries around the world will gather in Cartagena, Colombia, to participate in the Second Review Conference of the Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction.

The Cartagena review conference would have been the perfect opportunity for the Obama administration to announce its intention to join the 156 other nations that are parties to the treaty, including our coalition allies in Iraq and Afghanistan.

In fact, every member of NATO and every country in our hemisphere, ex-

cept Cuba, is a party to the treaty. The United States is one of only 37 countries that have not joined, along with Russia and China.

By announcing our intention to join the treaty in Cartagena, this administration would have signaled to the rest of the world that the United States is finally showing the leadership that has been wanting on these indiscriminate weapons that maim and kill thousands of innocent people every year.

The U.S. military is the most powerful in the world. Yet we have seen how civilian casualties in Afghanistan have become one of the most urgent and pressing concerns of our military commanders, where bombs that missed their targets and other mistakes have turned the populace against us.

Despite this, one of the arguments the Pentagon makes for resisting calls to join the Mine Ban Treaty is to preserve its option to use landmines in Afghanistan, even though we have not used these indiscriminate weapons since 1991.

Since the Pentagon has never voluntarily given up any weapon, including poison gas, which President Woodrow Wilson renounced in 1925, perhaps this is to be expected.

But can anyone imagine the United States using landmines in Afghanistan, a country where more civilians have been killed or horribly injured from mines than any other in history?

A country which, like our coalition partners, is itself a party to the treaty?

A country where if we used mines and civilians were killed or injured the public outcry in Afghanistan and around the world would be deafening?

Can anyone imagine this President, who has been awarded the Nobel Peace Prize which only a few years ago was awarded to the International Campaign to Ban Landmines, having to publicly defend such a decision?

I wonder if anyone at the Pentagon has thought of the military and political implications of that.

Last Tuesday, the State Department spokesman announced that the administration had completed a review on its landmine policy and had decided to continue supporting the Bush administration's policy, which was, in key aspects, a retreat from the policy of President Clinton.

This was a surprise to me and others, as I had encouraged the administration to conduct such a review and then heard nothing for months. In fact, I had spoken personally with President Obama about it just a few weeks before.

I did not hesitate to express my disappointment, as did many others. Thereafter the State Department corrected itself, and announced that a "comprehensive review" is continuing and reaffirmed its earlier decision to send a team of observers to the Cartagena review conference this week.

It is unfortunate that the State Department spokesman misspoke. However, the administration's approach to

Exhibit 151                                                                                              JA-0002430

For many, the answer to that question is quite clear. We know that some here in Washington have wanted government-run health care for many years. It is hard to escape the conclusion that these same people saw the current economic crisis as their moment. Earlier this year, some in this administration said that "a crisis is a terrible thing to waste." Americans are hoping this bill is not what they meant, but they are concerned that it is.

Americans already know this bill will make our economic problems worse, not better, without even addressing the serious health care problems we already face—and they would be right. That is why they want us to start over and accomplish the real mission of lowering costs.

That is precisely what the McCain amendment would allow us to do. The McCain amendment would send this bill back for a rewrite. It would send it back to the Finance Committee with instructions to give us a new bill that does not include $\frac{1}{2}$ trillion cuts to Medicare. It would send the bill back to committee; send us a new bill without $\frac{1}{2}$ trillion cuts to Medicare, one that does not pay for the bill on the backs of seniors; that is, if you pass the McCain amendment.

Here is a program, the Medicare Program, that is already struggling, a program that needs help. Yet, in order to finance their vision of reform, our friends on the other side want to use Medicare as a piggy bank to create an all-new government program that is bound to have the same problems as Medicare. As written, their bill would cut nearly $\frac{1}{2}$ trillion from Medicare—not to make the program stronger but to fund more government spending. In the process, millions of seniors would lose benefits. Literally millions of seniors would lose benefits.

The McCain amendment would not let that happen. The McCain amendment tells the committees: Don't cut hospitals. The McCain amendment tells the committees: Don't cut hospice. The McCain amendment tells the committees: Don't cut home health care. The McCain amendment tells the committees: Don't cut Medicare Advantage. It would allow us to focus our efforts, instead, on the prevention of waste, fraud, and abuse, which we know to be rampant in this program. It would ensure we are not cutting one government program just to create a new one. That is what a vote in favor of the McCain amendment would be, it would be a vote to preserve Medicare, not weaken it. That is the message America's seniors want to hear in this health care debate, that improving health care in America doesn't have to come at their expense.

Some may argue that they need to cut Medicare to create a new government program. That is their call. But it is not the call Americans are asking us to make. I haven't gotten a call yet from anybody in Kentucky or around the country saying: Please cut Medicare so you can start a new program for somebody else—not my first call.

The American people want us to start over from the beginning and craft a bill they can actually support, and we know they don't support this bill. All the surveys indicate that. Then we could start over and end junk lawsuits against doctors and hospitals that drive up costs, something the majority didn't find any room for in their 2074-page bill—not a word about controlling junk lawsuits against doctors and hospitals. Then we could encourage healthy choices such as prevention and wellness programs, something the majority somehow couldn't squeeze into their 2074-page bill. Then we could lower costs by letting consumers buy coverage across State lines, something the majority must have overlooked in their 2074-page bill. Then we could address the rampant waste, fraud, and abuse, something our friends didn't think was important enough to seriously address in their 2074-page bill.

The McCain amendment would allow us to vote with seniors. That is what the McCain amendment is about. It would allow the Senate to say we are not going to finance a new government program on the backs of seniors, we are not going to use Medicare as a piggy bank to fund a new government program. It would allow us to vote with the American people. Most important, it would allow us to start over and get this right.

I yield the floor.

━━━━━━━

## RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

━━━━━━━

## SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of H.R. 3590, which the clerk will report.

The legislative clerk read as follows:

A bill (H.R. 3590) to amend the Internal Revenue Code of 1986 to modify the first-time home buyers credit in the case of members of the Armed Forces and certain other Federal employees, and for other purposes.

Pending:

Reid amendment No. 2786, in the nature of a substitute.

Mikulski amendment No. 2791 (to amendment No. 2786), to clarify provisions relating to first dollar coverage for preventive services for women.

McCain motion to commit the bill to the Committee on Finance, with instructions.

The ACTING PRESIDENT pro tempore. Under the previous order, the time until 11:30 will be for debate only, with the Republicans controlling the first 30 minutes and the majority controlling the next 30 minutes, with the remaining time equally divided and controlled between the two leaders or their designees and with Senators permitted to speak therein for up to 10 minutes each.

The Senator from Arizona is recognized.

Mr. KYL. Mr. President, I ask unanimous consent that during the 30 minutes controlled by the Republicans, we be allowed to engage in a colloquy.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. KYL. Mr. President, I will begin by making some comments about the amendment Senator McCAIN, my colleague from Arizona, has filed. This is an amendment that, as the minority leader just said, will protect America's seniors. It will disallow the Medicare cuts this bill includes.

The economist Milton Friedman famously said, "There is no such thing as a free lunch," and that applies to health care as well. There is no such thing as free health care. Someone has to pay. Since this bill is a $2.5 trillion bill, the first question is, Who pays? The first answer to who pays is, it is America's seniors, because about half of the cost of the bill is allegedly paid for by cuts to Medicare.

Let me break down a little bit more specifically than the Republican leader did exactly what that means. This is about $500 billion in Medicare cuts as follows: $137.5 billion from hospitals who treat seniors; $120 billion from Medicare Advantage, which is the insurance program that provides benefits to seniors which will be cut more than in half as a result of this $120 billion reduction; $14.6 billion from nursing homes that treat seniors; $42.1 billion from home health care for seniors; and $7.7 billion from hospice care, one of the most cruel cuts of all.

Obviously, with cut this dramatic there is no way to avoid jeopardizing the care seniors now enjoy, and seniors know this. That is why they have been writing our offices and attending town-hall meetings to let us know they disapprove. I quoted from two letters constituents of mine from Arizona sent asking to please not cut their Medicare Advantage Program. This has been called the crown jewel of the Medicare system, and many of them rely on Medicare Advantage for dental care or vision care or hearing assistance they have come to rely on. They are not buying the claims that somehow or other we can make $\frac{1}{2}$ trillion cuts in Medicare without somehow hurting their care. They know better than that, and they are right. The care they have been promised will be compromised to pay for this new government entitlement under the bill.

Finally, many are wondering what happened to the promise that they get to keep the care they have. We all heard the President say that many times: If you like the care you have, you get to keep it. That is simply not true. There are 337,000 Arizonans who are Medicare Advantage patients. They like what they have. Yet we know, according to the Congressional Budget

Office, that the benefits they have under Medicare Advantage are going to be cut by more than half. They are saying: What happened to the policy I like? I am not going to be able to keep it if this bill passes.

This is why the McCain amendment must pass. If our Democratic colleagues are not willing to protect Medicare, then I cannot imagine how the bill could otherwise be made acceptable since it starts with the commitments that Congress and the President have made to our senior citizens.

The ACTING PRESIDENT pro tempore. The Senator from Tennessee is recognized.

Mr. ALEXANDER. I congratulate the Senator from Arizona on his analysis of the Medicare cuts. I heard the Democratic leader talk about figures and how we have some figures and the Democrats have other figures. I agree with him. I think someone watching this must think we are on two different planets sometimes, so let me focus in on the figures.

I believe I heard my colleague say to pay for this health care bill over 10 years there would be $465 billion in the Medicare cuts. Where does that figure come from?

Mr. KYL. Mr. President, I say to my friend from Tennessee, first of all it comes from a reading of the bill. It is very clear in the bill as to how much money is taken from Medicare. The number the Senator from Tennessee just articulated is the correct number.

In addition to that, the Congressional Budget Office and the Joint Tax Committee analyzed the specific numbers. Obviously they were given the numbers in the bill, but the numbers they are using are—I just broke it down into four or five general categories. There are other divisions within that. But as I said, for notional purposes here: $137.5 billion from hospitals; $120 billion from Medicare Advantage. That number might be $118 billion; I am not precisely certain of it, but it is very close. There is $14.6 billion from nursing homes, $42.1 billion from home health, and $7.7 billion from hospice care. If any of our colleagues would like to contest these numbers, I would be happy to be corrected, but I believe those are the correct numbers.

Mr. ALEXANDER. I think the Senator from Arizona is right. The President of the United States, in his address to us about health care, and the New York Times, the Wall Street Journal—everyone who has reported on the Congressional Budget Office figures said the same thing. We are going to pay for this bill, which is $2.5 trillion over 10 years when fully implemented, by $465 billion cuts in Medicare.

What Senator MCCAIN in his amendment that we are in support of is saying is, don't cut grandma's Medicare to pay for someone else's insurance. He goes on to say, if you are going to find some savings in waste, fraud, and abuse in grandma's Medicare, spend it on grandma. The reason for that is that

the Medicare trustees have said to us that there is $38 trillion in unfunded liabilities for the Medicare Program and that the program will start going bankrupt between 2015 and 2017. According to the Medicare trustees, they say, ''We need timely and effective action to address Medicare's financial challenges,'' and the proposal, if I may say to the Senator from Arizona, who is on the Finance Committee and deeply involved in what we need to do about our Nation's finances, I don't think the Medicare trustees were thinking that the timely and effective action we could take to keep Medicare from going broke was to take $465 billion out of it and spend it on some new program.

Mr. KYL. On a new program. That is exactly correct. What the Medicare trustees were saying is, if we can effect cost savings in Medicare, and surely there are some to be had there, they should go to strengthen the Medicare Program itself and not allow it to go bankrupt, rather than it being used to create a new government program.

Perhaps one of the reasons why there are different numbers from one side of the aisle to the other is that sometimes we are not talking apples to apples. We are talking apples to oranges, and perhaps both numbers are correct in their context. The Senator from Tennessee used the number $2.5 trillion when the program is fully implemented. That is a very important statement. The other side will argue it is only $1½ trillion for the first 10 years of the program. That is a correct statement. But it is $2.5 trillion for the first 10 years of total implementation of the program. What is the reason for the difference? For the first 4 years, money is being collected, but very few benefits are going out. The benefits start after year No. 4. So if we take the first 10 years of the program, we are collecting money to pay for it over the entire 10 years, but almost all of the benefits only occur during the last 6 years. Naturally, we have collected more money than we have paid out. But when we take the first 10 years of full implementation, it is as my colleague from Tennessee noted, a cost of $2.5 trillion. That is how sometimes we get somewhat different numbers.

As long as we are clear about what we are talking about, one thing is crystal clear: Whether it is $1½ trillion or $2.5 trillion, we are talking real money. Somebody has to pay for it. If America's seniors are being asked to pay for half of it, that is not fair to America's seniors, given the commitment we have made to them. That is the point of the McCain amendment. Protect Medicare, protect America's seniors. We can do that with the simple amendment Senator MCCAIN has which is send the bill back to committee—it would only take 1 day—and send it back here without those Medicare cuts in the bill.

Mr. ALEXANDER. I see the Senator from Idaho here. I wish to hear his observations. If there is any issue in this

entire health care debate that symbolizes why we on the Republican side want to change the debate to a step-by-step approach to reducing the cost of premiums, it would be the Medicare issue. As the Senator from Arizona said, what we need to do about Medicare is make it solvent as quickly as we can, as effectively as we can. The Senator from Kansas said the other day that the proposal to take $465 billion from grandma's Medicare and spend on it some new program is like writing a check on an overdrawn account in a bank to buy a big, new car. There is a lot of truth to that.

The President said earlier this year something I agree with. He said this health care debate is not just about health care. It is about the role of the Federal Government in the everyday life of Americans. He is exactly right about that. This health care debate, which we are beginning this week, is not just about health care. It is about the stimulus package, about the takeover of General Motors. It is about the trillion dollar debt. It is about the Washington takeovers. It is about too much spending, too much taxes, too much debt. The Medicare provisions in this bill are a perfect symbol of that. That is why Senator MCCAIN is right. What he is saying is, don't cut grandma's Medicare and spend it on some new program. If you can find some savings in the waste, fraud, and abuse of grandma's Medicare, spend on it grandma. Make sure those of us who are older and those of us who are younger and looking forward to Medicare can count on its solvency.

Later this week we will talk more about premiums going up. There was a lot of discussion yesterday because, according to the Wall Street Journal, some health premiums would rise. For people who get their insurance from large employers, this bill won't make much difference. And for small employers, if you get your insurance from a small employer, it won't make much difference. If you are going to the individual market to buy insurance yourself, your premiums will go up, except we are going to get some money from somewhere to help pay part of your premiums, at least for about half of Americans who are in the individual market. Where are we going to get that money? From grandma. We are going to get it from Medicare. So that is what is wrong with this bill. And what is right about the McCain amendment is, it says simply, don't cut Medicare. If we find savings, which we hope we can in Medicare, we should spend it on making Medicare solvent.

I wonder if the Senator from Idaho is hearing from seniors in his State about the proposed $465 billion cuts to Medicare and how they feel about taking that money and spending it to create a new program?

Mr. CRAPO. I thank the Senator from Tennessee. Very definitely we are hearing from seniors in Idaho who see through this. It is very clear to the

Exhibit 151 JA-0002432

folks in Idaho that what we are seeing is a proposed massive growth of the Federal Government by over $2.5 trillion, when fully implemented, that is to be funded on the backs of American taxpayers and senior citizens through cuts in Medicare. In fact, in addition to those who have contacted me who are seeing their health benefits lost, I have also been contacted by a number of the providers. We are talking about those who are in home health care or hospice health care, skilled nursing facilities or hospitals and the like.

They make a very interesting point. Their point is that not only will senior citizens—in Medicare Advantage in particular—literally be losing their benefits dramatically, but that other senior citizens who are in traditional Medicare will also be losing access and quality of care. How is that the case? We know from the details of this bill that we are going to see major cuts in hospice care, home health care, skilled nursing facilities, and hospitals.

The points made to me by those providers are that they have already gone through a series of very deep cuts, cuts to the point that in Idaho for home health care, we have lost something like 30 percent of our facilities already. The way one of them explained to it me was that if you reduce the compensation we are receiving, then we have to reduce something in our budget. He said: We can't just start taking bricks off of our buildings. What we will end up having to do is to reduce personnel. That would be the nurses and the doctors and the other care providers who are there to provide support for these individuals. We will have to reduce the number of rooms we operate or the facilities we provide. In the end, there will be a reduction of services and access available to senior citizens, including a reduction in the quality of the care they are able to be provided.

Mr. ALEXANDER. In discussing the Medicare cuts, another provision of the bill which we will be talking about this month and next month as we go through the health care debate is what about the problem of paying doctors and hospitals who see Medicare patients. They get paid about 83 percent of the rate they would be paid if they were seeing a private care patient. Every year Congress has to make an adjustment in something we did a few years ago which automatically cuts the amount of money that we pay doctors who are seeing Medicare patients.

That is a big problem for Medicare patients. Because if the doctors can't be paid, they won't see the patients, and Medicare patients may find themselves increasingly in the condition that Medicaid patients do, low-income Americans who are covered through the State program—that is our largest government-run program—where they are paid about 60 percent of what doctors who see private patients are paid and about half of Medicaid doctors won't see new patients.

I ask the Senator, does he see anywhere in this bill a provision for the $¼

trillion that will be needed to pay doctors 10 years from now what they are making today? If it is not in the bill, where is that $¼ trillion going to come from? Is it going to come from Medicare cuts, or will it come from adding to the deficit?

Mr. CRAPO. Obviously, it will come from cuts in Medicare or increased taxes or simply more debt on the Federal level.

The Senator raises a very interesting point. This question of fixing the compensation rates for physicians in Medicare is a huge question, one which we have been fighting for for a number of years to try to find a solution to, as each year we delay the expected cuts that will happen. I have talked about this factor in the context of being a budget gimmick in this bill. What do I mean by that? Those who say this bill reduces the deficit are able to say so only because it has about $500 billion of new taxes, about $500 billion of Medicare cuts, and a number of budget gimmicks that delay the implementation of the spending side of the bill or, in this case, don't even include at all one of the major expenses that needs to be accommodated, and that is the fix for physician compensation. If any of those things were not in this bill, this bill would drive up the deficit tremendously.

What we are going to see, in addition to these fiscal impacts on the Federal Treasury in terms of huge increases in the debt or huge increases in more taxes, even more than we are talking about with this bill, is we are going to see the very real potential that access to medical care for seniors will be again reduced because of this factor.

Let me give a couple of statistics. In their June 2008 report, the Medicare Payment Advisory Commission, or MedPAC, said that 29 percent of Medicare beneficiaries who were surveyed were looking for a primary care physician and had trouble finding one to treat them. In other words, about 30 percent of Medicare beneficiaries today are having trouble finding a physician who will take a Medicare patient. That is before the $465 billion of cuts and before simply not including physicians at all in this legislation.

A 2008 survey by the Texas Medical Association found that only 58 percent of the State's doctors took new Medicare patients, and only 38 percent of the primary care doctors accepted new patients. Again, it is an example from MedPAC and from one State that indicates what we know is happening around the country; namely, that doctors in increasing numbers are no longer taking new Medicare patients, just as they have been doing with Medicaid patients for years. Yet we see these massive cuts to Medicare being proposed that will have the same impact on hospice care and home health service and skilled nursing facilities and hospitals, and we see that doctors are not even included at all, meaning they are projected now to receive

major reductions. I think it is over 20 percent reduction in their compensation for taking Medicare patients.

The solution here to establishing a massive new Federal entitlement program is not to cut Medicare. I want to repeat something both the Senators from Arizona and Tennessee have already said that is critical. Reducing the Medicare budget by $464 billion, by any number, is something that has been encouraged in terms of trimming the growth path for Medicare. That is something this Congress has looked at in the past. But never was it intended by those who made these projections about needing to control the spiraling cost of Medicare that we address the fiscal circumstances in Medicare with the intended purpose of creating another new, massive Federal entitlement program that will grow the Federal Government by over $2 trillion—we talked about the numbers; the full 10-year period is $2.5 trillion—and leave Medicare with these dramatic cuts, this loss of service and loss of benefits to the recipients, while they see this new government growth with a new government program. That was not in the mind of anybody who was asking us to deal with the solvency issues on Medicare, and I don't think it was in the mind of anybody who asked that we have some kind of health care reform to deal with the rising cost of premiums.

Mr. ALEXANDER. Mr. President, how much time remains on the Republican side?

The ACTING PRESIDENT pro tempore. The Senator has 8½ minutes.

Mr. ALEXANDER. Would the Chair let me know when 4 minutes remain.

The Senator from Idaho will conclude our remarks at that time.

The Senator from Idaho has made an important point, anticipating our Democratic friends will have the next 30 minutes and some other things they may be saying the rest of the day. There was a lot of talk yesterday about the CBO report about the effect of this $2.5 trillion proposal on premiums. Rather than take my word for it, let's go to the news section of the Wall Street Journal of today which has the headline: "Some Health Premiums to Rise." That means going up. That means the cost of your insurance is going up for some Americans.

So my question is, why would we spend $2.5 trillion over 10 years, cut Medicare, raise taxes, and run up the debt to raise some health premiums? I thought the whole exercise was to lower the cost of health care premiums.

The article says:

The analysis released Monday by the nonpartisan Congressional Budget Office and the Joint Committee on Taxation—

We are supposed to pay some attention to these outfits as nonpartisan—

painted a more complicated and uncertain picture. It said people who pay for their own insurance would see a higher bill, albeit for more generous benefits—

Exhibit 151    JA-0002433

That is the government-approved insurance you are going to be forced to buy.

unless they are lower earners who qualify for a new government tax credit.

Where is the money going to come from for those subsidies? It is going to come from grandma. It is going to come from Medicare. It is going to come from taxes. And it is going to come from increasing the debt.

Those are facts.

Employees of small firms—

Says the Wall Street Journal—

would effectively see their insurance premiums unchanged—

So for small firms, we are going to spend $2.5 trillion over 10 years, cut Medicare, cut taxes, and run up premiums for millions of Americans, so your insurance will continue to go up at about the rate it already was. Why should we be doing that?

while workers at large firms would see something between unchanged and slightly lower premiums under the bill—

Compared to what would already happen—

according to the analysis.

We need to change the debate. We need to start over. Instead of this comprehensive 2,000-page bill that is full of taxes, mandates and, as a general effect, raises premiums and taxes and cuts Medicare, we should set a clear goal, reducing costs, and begin to go step by step toward that goal—reducing junk lawsuits against doctors, allowing health care to be purchased across State lines to increase competition, allowing small businesses to combine in health plans so they can offer more insurance to employees at a lower cost.

These three bills I mentioned have been offered and rejected so far by the Democratic majority. We should have more flexibility in health savings accounts, efforts at waste, fraud, and abuse, which are, in effect, Medicaid—the largest government program—and Medicare—the second largest—and more aggressive steps to encourage wellness and prevention.

One approach, the comprehensive 2,000-page bill, Washington-takeover approach, Americans are very leery of. In my respectful opinion, this bill is historic in its arrogance for thinking we could take a system that affects almost all 300 million Americans, 16 percent of the economy, and change it all at once.

Instead, why don't we go step by step to re-earn the trust of the American people? Republicans will be making those proposals on the floor this month and next month and as long as it takes to try to see that we get real health care reform. Cutting grandma's Medicare by $½ trillion and spending it on a new program at a time when Medicare is going broke is not real health care reform.

Mr. CRAPO. Mr. President, how much time remains?

The ACTING PRESIDENT pro tempore. There is 4½ minutes remaining.

The Senator from Idaho.

Mr. CRAPO. Thank you, Mr. President. I wish to conclude with our time this morning by focusing on the larger picture a little bit, as my colleague from Tennessee has done in his concluding remarks.

When you ask Americans whether they want health care reform, the vast majority would say yes. When you ask them what they mean by that, the vast majority in the polls and in my personal experience are saying: We want to see the spiraling costs of health care and our health insurance brought under control and reduced, and we want to see increased access to quality health care for those who do not have access today and for those who have limited access today.

This bill fails on those two central points. What this legislation does, instead, is increase the size of government by $2.5 trillion of new Federal spending, establishing massive new Federal controls over the economy, and even creating a Federal Government insurance company. It increases taxes by about $500 billion, and not just on the so-called wealthy. The vast majority of these taxes is going to squarely hit those who President Obama said would not be hit: those who make less than $200,000 a year and, frankly, all the way down the income chain.

It cuts Medicare by $464 billion. It puts a major new unfunded mandate on our States, which are already struggling in their fiscal budgets. As my colleague indicated, it causes the price of insurance premiums to go up for the individual market, to go up in the small group insurance market, and to be basically unchanged in the large insurance market, according to the CBO study.

By the way, one of the things that is not pointed out in that CBO study very much is in that large market, which it says will be the only part of the market that does not see insurance rates go up, one of the reasons is because their health care will go down. In other words, there is a tax on these larger, high-cost insurance premiums that is going to be either passed through and cause their insurance to go up or will be avoided by reducing the cost of their insurance and reducing coverage of the benefits in these policies. So one way or the other, all Americans are going to see their health care premiums go up or, in the large groups, see their health care premiums be held the same by reducing the quality of the insurance they have.

If you go back to those two reasons Americans wanted health care reform, did we see premiums go down? No. Did we see increased quality or increased access to care? Well, there are some who are going to get a subsidy in this program for this new massive Federal program. But at what price? Mr. President, $2.5 trillion, $464 billion of cuts in Medicare, the establishment of a major new government program that would essentially be funded on the backs of massive new tax increases, massive Federal tax increases, and Medicare cuts, and in the end we will still be in a system in which we are seeing spiraling increases in health care costs. To me, that is not the kind of reform we need.

My colleague from Tennessee indicated there are a number of reforms on which we can find common ground that will reduce health care costs. There are a number of reforms on which we can find common ground that will help us to increase access to quality care. That is where our focus should be. That is why I stand here today in support of my colleague JOHN McCAIN, his motion to commit this legislation to the Finance Committee. As was indicated, it could be done in 1 day, to simply remove the Medicare cuts that are contained within it. Let's fix that part of this bill, and then let's work forward.

I see my time has expired. I encourage this Senate to focus closely on the legislation and to let us work together in a bipartisan fashion rather than speeding ahead and trying to pass legislation that has not had the opportunity for this kind of bipartisan effort to develop a good work product for the American people.

The ACTING PRESIDENT pro tempore. The Senator from Connecticut.

Mr. DODD. Mr. President, our colleague from Maryland, Senator MIKULSKI, I believe is on her way to the floor of the Senate. She and several other Members, in the time we have allocated to us between now and 11:30, will address her amendment she proposed yesterday. But pending her arrival, I want to respond, if I could, very briefly to some of the conversation here this morning.

First, I know some people have short memories, but I am somewhat intrigued to hear our good friends and colleagues talk about preserving Medicare. I have been around here a few years and recall very vividly the debates of 1995 and 1997 on the issue of Medicare, where our friends, who were in the majority in those days, were talking about slowing the growth of Medicare and one of the proposals they had for doing so was to cut into the benefits of Medicare recipients.

We do not do that in this bill at all. Quite to the contrary, despite the language about "big cuts in Medicare," we strengthen the Medicare Program substantially. That is the reason the AARP and other major organizations involved with the elderly have endorsed our proposals. They would hardly be doing so if they thought this was some massive cut into the Medicare Program that has been so critical to so many of our fellow citizens.

Just for a little bit of history here—In 1995 our Republican colleagues proposed cutting benefits to Medicare beneficiaries. Newt Gingrich, our former Speaker and friend from the other body, was quoted as saying "let's let Medicare wither on the vine." That is not ancient history. That is not 1965.

Exhibit 151 JA-0002434

That is just a few years ago in all of this debate.

There are some very strong provisions in the bill that reduce premiums and co-pays for seniors, ensure seniors are able to see their own doctors, and keep Medicare from going bankrupt for an additional 5 years. If we adopt the McCain amendment, we are being told today by CBO and others that Medicare becomes insolvent in 8 years. So vote for the McCain amendment and you are going to have an insolvent program in 8 years. That is a fact.

We extend the life here an additional 5 years. We provide new preventive and wellness benefits for seniors, lower prescription drug costs, allow seniors to stay in their homes and not end up in nursing homes.

This is a long bill. It is a big bill. But instead of complaining about its size, I would encourage my colleagues to read it and understand what is being done for Medicare. This is a complicated area, but, nonetheless, critically important.

Mr. President, I see my colleague from California, Senator BOXER, who is here, and others who want to address the issue of the Mikulski amendment, and I will yield the floor so they can be heard. I believe it is going to be each for 5 minutes. There are about seven of our colleagues who want to be heard on the issue before 11:30.

Mrs. BOXER. Mr. President, if I might respond.

The ACTING PRESIDENT pro tempore. The Senator from California is recognized.

Mrs. BOXER. The plan is, women colleagues will be coming to the floor. As they come, I will yield to them, until Senator MIKULSKI gets here, and then she will yield the time, if that is all right.

Mr. DODD. Very good.

Mrs. BOXER. Mr. President, before I start, I want to say to my colleague from Connecticut how much I appreciate his work and the work of Senator BAUCUS and Senator REID. What a remarkable moment we have here.

When I go home—and I was home for the holidays—people are urging us to get this done. They know their biggest chance of going into bankruptcy is a health care crisis—62 percent. They know, as my friend Senator DODD has said almost every day of this debate, every morning 14,000 people lose their health care. They know if we do not intervene with a good bill, their premiums—in my home State, I say to the Senator—will be 41 percent of their income, the average income, by 2016.

Can you imagine? That is unsustainable. For people who say: Why don't we address the economy instead of health care, let me say what happens to my constituents if they have to pay 41 percent of their income for premiums. Even if they have a good job, I say to my friend from Connecticut, they cannot make it. So the status quo is cruel, and it is particularly cruel to women.

AMENDMENT NO. 2791

Mrs. BOXER. Mr. President, I am proud to support the Mikulski-Harkin-Boxer amendment to improve preventive health coverage for women. The Mikulski amendment addresses this critical issue by requiring that all health plans cover comprehensive women's preventive care and screenings—and cover these recommended services at little or no cost to women. These health care services include annual mammograms for women at age 40, pregnancy and postpartum depression screenings, screenings for domestic violence, annual women's health screenings, and family planning services.

The preventive services covered under this amendment would be determined by the Health Resources and Services Administration to meet the unique preventive health needs of women. HRSA is an agency within the Department of Health and Human Services. HHS Secretary Kathleen Sebelius has already said that "Mammograms have always been an important life-saving tool in the fight against breast cancer and they still are today." The Secretary made clear that recommendations by the U.S. Preventive Services Task Force "do not set federal policy and they don't determine what services are covered by the federal government."

This is not the first time that experts have disagreed about this issue. I have been in this battle before, with Senator MIKULSKI, who called a hearing with all of the women Senators in 1994 where I insisted that routine mammograms for women over 40 must be covered. And thank goodness we fought back then, and in 1997 and in 2002 when this issue was raised again and again. Since 1991, the death rate from breast cancer has been reduced by over 20 percent.

According to a 2007 Partnership for Prevention report, 3,700 additional lives would be saved each year if we increased to 90 percent the portion of women age 40 and older who have been screened for breast cancer in the past 2 years. The most recent data show us that approximately 17 percent of breast cancer deaths occurred in women who were diagnosed in their forties. That is why the American Cancer Society continues to recommend annual screening using mammography and clinical breast examination for all women beginning at age 40. Mammograms are still the most effective and valuable tool for decreasing suffering and death from breast cancer. The Mikulski amendment will ensure women are able to get access to this and other lifesaving preventive services at no cost.

The underlying bill introduced by Senator REID already requires that preventive services recommended by the U.S. Preventive Services Task Force be covered at little to no cost. These recommendations already include some women's preventive services such as osteoporosis screenings.

But they do not include certain recommendations that many women's health advocates and medical professionals believe are critically important, such as screenings for ovarian cancer—a disease that will claim the lives of nearly 15,000 women this year. We know that when ovarian cancer is diagnosed early, more than 93 percent of women survive longer than 5 years.

Women are often the decisionmakers for their families when it comes to health care. But women too often put the health needs of their family members and their children ahead of their own.

By passing this amendment, we are saving the lives of countless mothers, daughters, grandmothers and sisters who would otherwise forgo preventative health care because of high copays and expensive deductibles.

I would like to share with my colleagues a story from a doctor in my home State of California, William Leininger, that drives home the importance of this amendment:

In my last year of residency, I cared for a mother of two who had been treated for cervical cancer when she was 23. At that time, she was covered by her husband's insurance, but it was an abusive relationship, and she lost her health insurance when they divorced.

For the next five years, she had no health insurance and never received follow-up care (which would have revealed that her cancer had returned). She eventually remarried and regained health insurance, but by the time she came back to see me, her cancer had spread.

She had two children from her previous marriage—her driving motivation during her last rounds of palliative care was to survive long enough to ensure that her abusive ex-husband wouldn't gain custody of her kids after her death. She succeeded. She was 28 when she died.

That is not a story that should be told in the richest nation in the world.

As I said, I am so proud to support the Mikulski-Harkin-Boxer amendment to improve preventive health care coverage for women. Here is why. It is a fact that women are increasingly delaying or skipping altogether preventive health care, and they are doing it because of costs.

I read a statistic done by a nonpartisan group that said about 39 percent of men are delaying going to a physician to check on a problem. But over 50 percent of women are doing that either because they do not have health coverage or they are fearful of the copay. So we could sit here and do nothing—that is the easy thing to do: Scare people, do nothing—or we could step to the plate, save Medicare, which is very important to save, and that is what this bill does. Because we say we are not going to spend money on waste, fraud, and abuse. We are going to spend money on health care for our people.

And to believe that my friends on the other side are the ones who are going to save Medicare? You just have to read history. Senator DODD explained it; Newt Gingrich saying: Let Medicare wither on the vine; Bob Dole, our friend, who said, at the time of his Presidential campaign: I fought against Medicare. It was a failure.

Exhibit 151

JA-0002435

Well, if you ask our seniors, I think they are the group most pleased with their coverage. It is not perfect, but it is critical, and we save it here. We extend the life of Medicare.

So here we are in a situation where many women are delaying going to the doctor, getting their preventive services, and the Mikulski amendment addresses this critical issue. It requires that all health plans cover comprehensive women's preventive care and screenings, and cover them at little or no cost.

The reason this is so important is— first of all, in the HELP Committee, under Senator DODD's and Senator Kennedy's leadership, this piece of the package was in the bill because Senator MIKULSKI and others pushed so hard to get it placed into the bill.

Mr. President, I would ask my friend from Maryland, Senator MIKULSKI, if I could complete my remarks and then give the floor over to her?

Mr. President, I thank the Senator.

I am so proud to work with Senator MIKULSKI. I say to the Senator, we worked on this issue over the years. I just asked my staff to go back and look at the first time we teamed up to ensure that women get mammograms at age 40. That was in 1994. Then, again, over the years, every 3 or 4 years, this whole notion would rear its ugly head: Well, women can do without mammography. The question I have is, What is going to replace it? They would keep trying to take away our tools of self-examination and mammography. We know if you look through the years— and Senator MIKULSKI and I are proud of a lot of the work we do, but this goes right at the top of the list—we know mortality for breast cancer is way down since the early 1990s. It is 20 percent down since the early 1990s. We have had to stand our ground to protect women, to make sure they get those services they need, those life-saving services, at little or no cost.

I would also say the American Cancer Society continues to recommend annual screening using mammography and clinical breast exams for all women beginning at age 40. There are a lot of other very important tests that are included in the Mikulski amendment—very important tests—to deal with cervical cancer and ovarian cancer, finding the markers so we know how to deal with these deadly diseases. To give up the tools we have, to turn it over to some organization that does not report to the Secretary of HHS, makes no sense.

What my friend has done with her amendment is to make sure the group that decides this is under the jurisdiction of the HHS Secretary. We know the HHS Secretary has already said she wants to make sure women, starting at age 40, get those mammograms.

I am going to close by reading from an article in the March 10, 1994, San Francisco Chronicle. It says:

Joining what became a phalanx of six female Senators staring down at federal health officials Boxer said she will insist that routine mammograms and a host of other women's health needs be part of any new nationwide benefit package.

The article goes on. It is very clear. What I said at the time is:

After all of these years of women being told it is crucial by age 40 to get a baseline mammogram, now to have this tremendous confusion hit us is very disturbing.

Well, it was disturbing on March 10, 1994, when I first got involved in this issue. It was disturbing when Senator SNOWE, 3 years later, had us pass S. Res. 47 which said this is our only tool. Let's do it. Thank goodness we have now in this body women and men who get the fact that we refuse as women to be stripped of the only tools we have. Making all of these important tests part of this package is going to save lives. It is going to save money. It is going to mean our families can breathe a deep sigh of relief out there.

So I wish to thank Senator MIKULSKI for her leadership on this issue and to always stand right at her side on this issue of mammography. We also worked on standards for mammography. Remember that one? It was the deregulation fever that hit the Republican side. They wanted to take away the regulations for mammography, roll them back. We fought the fight, and we will continue to fight the fight.

So thank you very much. I strongly support this amendment.

I yield the floor for my friend, Senator MIKULSKI.

The ACTING PRESIDENT pro tempore. The Senator from Maryland is recognized.

Ms. MIKULSKI. Mr. President, as we debate health care reform, we need to recognize in the United States of America that health care is a women's issue. Health care reform is a must-do women's issue, and health insurance reform must be a must-change women's issue.

Too often when we look at when health care is even available to us, we face discrimination. We face continually the punitive practices of insurance companies that charge women more and give us less in a benefit. A 25-year-old woman pays more for health insurance than her male counterpart of the same health status. A 40-year-old woman pays almost 35 percent more for her insurance than a male of the same age, same health status. We want to change that in health care reform. We want to end the punitive practices of the private insurance companies in their gender discrimination.

We, the women of the Senate, are concerned that even being a woman is being viewed by the insurance companies as a preexisting condition.

Now we have the opportunity to change the law and change the direction of health care. I have offered an amendment to expand the screening and preventive services available to women in order to save our lives, make sure our lives are not impaired as we get older and, at the same time, be able to save money. We know early detection saves lives, curtails the expansion of disease, and, in the long run, saves money.

There are certain killers of women, the dread ''c'' word, cancer—breast cancer, ovarian cancer, cervical cancer that are unique to we women. Then there is the dread disease of lung cancer that affects men and women but is emerging as a main killer of women. Then there is the other issue of heart disease and vascular disease. We know for years women were often left out of the research on heart disease. For years women's heart disease went undetected and unrecognized because our symptoms are different. We can change this law.

In my amendment we expand the key preventive services for women, and we do it in a way that is based on recommendations from the Centers for Disease Control and from HRSA. It will be based on the benefit package available to Federal employees. It means if our amendment passes, the women of America will have the same access to preventive and screening services as the women of Congress. What is good enough for a United States Senator should be good enough for any woman in the United States of America.

That is why we ask not only the women to join us but the good men of quality who support us. We know people such as Senator DODD, Senator REID, Senator BAUCUS, men of quality, never fear we women who seek equality. They have raced for the cure as long and as hard as we have and have fought for mammogram standards. This is why we are wearing pink today. Pink is the universal color that says while we race for the cure, we want to have access to it when we find it. But to have access to the cure, we are going to need to have access to mammograms to be able to get that diagnosis, and then we are going to have to have health insurance to be able to pay for the treatment we have.

This is the Titanic battle we have today: Are we going to have access to health insurance and are we going to have access to these preventive services?

We do know in the area of heart disease and cancer and silent, undetected killers such as diabetes, it is often undetected. What happens is, for many women they do not get that early detection and screening, No. 1, because they can't afford it. They can't afford it because they either don't have health insurance and there are other demands on their family or, No. 2, when they go, if they do have insurance, they find their benefit might not be covered. So many of these benefits are based on State mandates, but worse than that it is the copayments and high deductibles.

Many women say: Well, my insurance company provides for it, but this copayment and deductible, I have to choose between my children's shoes or my deductible. We want to either

Exhibit 151                                                                                                    JA-0002436

eliminate or shrink those deductibles and eliminate that high barrier, that overwhelming hurdle that prevents women from having access to these early detection and screening programs.

Much is being debated about mammograms. We believe access to mammograms should be universal, universal access. But the decision on whether to get one should be made with your doctor. Well, that is great to say, but you need to have access to your doctor. You need to not have to overcome the high hurdle of deductions or copayments to be able to do it.

We know mammogram screenings decrease breast cancer by over 40 percent. Regular pap smears reduce cervical cancer by 40 percent. This year, 4,000 women will die of cervical cancer. Then let's take the dread, but often overlooked, diabetic screening. Diabetes is the underlying cause of two-thirds of chronic illness in both younger and older women. If we find it early and get everybody in the right program, they are going to be able to get the treatment they need so they don't lose an eye, they don't lose a kidney, they don't lose a leg.

We can't lose any more time. We need to provide universal access to health care to the American people and we need to make sure they have access to the screening and early preventive actions that will save lives.

Mr. President, I urge the adoption of the Mikulski amendment, and I thank you for your leadership on this issue.

I ask unanimous consent that the remaining time be equally divided between Governor SHAHEEN, Senator HAGAN, Senator MURRAY, and Senator GILLIBRAND.

The PRESIDING OFFICER (Mr. DODD). Without objection, it is so ordered.

Who seeks recognition?

The Senator from New Hampshire.

Mrs. SHAHEEN. Mr. President, I rise today in support of Senator MIKULSKI's amendment to ensure that women have access to preventive health care screenings and care at no cost. I wish to thank Senator MIKULSKI for her leadership not just in this effort but over the years to make sure women are treated fairly when it comes to our health care.

As a woman, a mother of three daughters and a grandmother of three granddaughters, this is an issue that is critically important to me personally. But as a former Governor, now a Senator and a policymaker, I understand these preventive services are not just good for women but they are good for families—for the children and husbands and brothers and fathers of the women we are talking about today. This amendment is good for our society as a whole.

Women must have access to vitally important preventive services such as screenings for breast cancer, cervical cancer, pregnancy, and postpartum depression screenings, annual well-woman visits, and preconception counseling that promotes healthier pregnancies and optimal birth outcomes. It is the right thing to do, but it is also fiscally responsible.

Not only does diagnosing disease early significantly increase a woman's chance for survival, but it also significantly decreases the projected costs of treatment. In fact, one recent study estimated that almost 80 percent of all health care spending in the United States can be attributed to potentially preventable chronic illness. This amendment takes a great step forward to early diagnosis of these costly and potentially preventable diseases. We must ensure these important services are provided at no cost.

Too often, women forgo their health care needs because they are not affordable. We know cost plays a greater role in preventing women from accessing health care than it does men. In 2007, more than half of all women reported problems accessing needed health care because of costs.

It is clear we need to support Senator MIKULSKI's amendment that will give women access to important health care screening.

The PRESIDING OFFICER. The Senator from New York is recognized.

Mrs. GILLIBRAND. Mr. President, I rise in support of Senator MIKULSKI's amendment, which improves the health care measures that are already in this act.

Women must shoulder the worst of the health care crisis, including outrageous discriminatory practices in care and coverage. Not only do we pay more for the coverage we seek for the same age and the same coverage as men do, but in general women of child-bearing age spend 68 percent more in out-of-pocket health care costs than men.

Some of the most essential services required by women are currently not covered by many insurance plans, such as childbearing, Pap smears, and mammograms. A standard in-hospital delivery can cost between $5,000 and $10,000 and much more if there are complications. You cannot imagine what it is like for a pregnant woman to recognize she may not have coverage for the essential services she needs for herself and her child. The health care bill before us ensures that this will no longer happen.

However, there is much room for improvement. In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost.

This fundamental inequity in the current system is dangerous and discriminatory and we must act.

The prevention section of the bill before us must be amended so coverage of preventive services takes into account the unique health care needs of women throughout their lifespan.

With Senator MIKULSKI's amendment, even more preventive screening will be covered, including for post-partum depression, domestic violence, and family planning.

Covering more preventive screening at no cost to women will encourage that more women go to the doctor, improving their health, saving lives and, as Senator MIKULSKI brought out, saving money.

The whole point of this health care bill is to lower costs across the board. When you shift America's health care system to preventive services over the current emergency room services, you are going to do exactly that.

This amendment will ensure that the coverage of women's preventive services is based on a set of guidelines developed by women's health experts.

This amendment will also preserve the doctor-patient relationship, to allow the patient to consult with their doctor on what services are best for them.

This amendment will cost $490 million over 10 years and it is fully paid for.

The health care crisis in America must be addressed, and I am very supportive of Senator MIKULSKI's amendment.

The PRESIDING OFFICER. The Senator from North Carolina is recognized.

Mrs. HAGAN. Mr. President, I rise in support of the amendment offered by the senior Senator from Maryland.

This amendment tackles a serious problem: Women are increasingly skipping critical preventive health care screenings because of costs, even when they have health insurance.

This summer, I received an e-mail from a woman named Julie in Raleigh, NC, about her sister who had no insurance and waited years to get a mammogram because she couldn't afford to pay the $125 fee for a mammogram. Then she found a lump in her breast.

Eventually, the mass grew so large Julie's sister finally got her mammogram and paid for it with cash. The mammogram confirmed what she had suspected, that she had breast cancer. But now that she had a diagnosis, she had no way to pay for the treatment.

She lost her battle with breast cancer in March of this year. Julie's sister, perhaps, could have beaten this cancer if she had had access to affordable, preventive care and, after her diagnosis, access to insurance or medical care to cover her cancer treatment.

In this heartbreaking situation, Julie's sister was sick and stuck. This health care reform bill will provide people such as Julie's sister with access to affordable, quality health insurance.

The President of Randolph Hospital in Asheboro, NC, wrote to me recently that a few years ago, he was in a meeting with 20 to 30 of his nursing assistants who were covered by the hospital's insurance plan. Of those who were old enough to require a mammogram, only 20 percent had actually gotten one. The reason, they said, was the

Exhibit 151    JA-0002437

high out-of-pocket costs they would have to pay.

When these women had to choose between feeding their children, paying the rent, and meeting other financial obligations, they skipped important preventive screenings and took a chance with their personal health.

The hospital then decided to remove the financial barrier to preventive care and pay for 100 percent of preventive screenings.

With the passage of Senator MIKULSKI's amendment, we will do the same for all women. A comprehensive list of women's preventive services will be covered with no added out-of-pocket expenses.

With this amendment, we will ensure that, as the old saying goes, "An ounce of prevention is worth a pound of cure," for women across America.

The PRESIDING OFFICER (Mrs. GILLIBRAND). The Senator from Washington is recognized.

Mrs. MURRAY. Madam President, I add my thanks to the Senator from Maryland, Ms. MIKULSKI, for bringing forth this important issue as we address health care reform in this country to ensure that all our families have access to health care.

One of the most important things we can do is make sure the caregivers in our families—the women—get access to preventive care so they can take care of their families.

This amendment will require all the health plans to cover comprehensive women's preventive care and screenings at no cost to women. That is extremely important. We all understand that—but especially in these tough economic times, when families across the country are struggling. One of the results has been that a lot of women are skipping or delaying their health care. We all know this personally. As moms, you take care of your kids first. When you do that, you often leave your families at risk because you haven't gotten the necessary preventive care.

We know that, in 2007, a quarter of women reported delaying or skipping health care because of the costs. In May of 2009, a report by the Commonwealth Foundation found that more than half of women delayed or avoided preventive care because of its cost.

This amendment will ensure that those women don't delay their preventive care because they cannot afford it. It is extremely important for this bill, it is important for women in this country, and it is important for men and children in this country as well.

I add my thanks to the senior Senator from Maryland and all our Senate colleagues who have been down here to make sure that one of the first things we do as we move the bill to the floor is make sure women's preventive care is covered.

I yield the floor.

Ms. MIKULSKI. Madam President, that concludes our discussion and our responses to this portion of the health care reform bill.

I must say: Alert, alert, alert. We have just been informed that a shrill advocacy group is spreading lies about this amendment. They are saying that because it is prevention, it includes abortion services. There are no abortion services included in the Mikulski amendment. It is screening for diseases that are the biggest killers for women—the silent killers of women. It also provides family planning—but family planning as recognized by other acts. Please, no more lies. Let's get off of it and save lives.

The PRESIDING OFFICER. The Senator's time has expired.

The Senator from Montana is recognized.

Mr. BAUCUS. Madam President, I yield myself 1 minute. Very much straight to the point here, there has been some discussion about CBO's assessment on the health care premiums. The letter was out yesterday. That letter shows that for all Americans—all Americans—premiums will be lower. They will be modestly lower to those larger employers. We have a range between those small businesses of between a 1-percent reduction and a 2-percent increase, and for the individual market there is more variation because there is much more variation currently in the individual market.

Those who purchase in the individual market will be getting a lot better quality of insurance than they are getting today—much better. About 60 percent of those in the individual market will find that their premiums are actually lower after the tax credit/subsidies are taken into consideration.

So netted all out together, all Americans are going to see their premiums are lower for what they get today. About 7 percent will see an increase, but they are getting better coverage than today—quite a bit better coverage. On a net basis, basically, bottom line, everyone were will see his or her premiums lower. For the 7 percent that are not lowered, they will get a lot better quality of insurance. That will more than offset the increase in premium. That is what that CBO letter says. I urge all folks who are interested to read that letter.

I have one other minor point on the so-called Cadillac plans. CBO said that those who receive Cadillac plans will find their premiums reduced, not increased—I think it is by about 6 or 7 percent. That, too, is very important. There has been a lot of discussion about the effect of premiums on Cadillac plans. CBO says those premiums will be reduced.

My minute is probably up. I wish to use the last seconds to just say that the net, all the way across the board, CBO says premiums will be reduced when you take subsidies into consideration and compare the plans people get today with what they would otherwise get in the future, the quality of coverage.

The PRESIDING OFFICER. The Senator from Oklahoma is recognized.

Mr. COBURN. Madam President, how much time remains on the Republican side?

The PRESIDING OFFICER. Three minutes.

Mr. COBURN. Madam President, I ask unanimous consent to consume that 3 minutes and the other 15 minutes allotted to our side on the executive nomination, and when that 18 minutes is up, the remainder be followed by the time on the Democratic side and the nomination be reported.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. COBURN. Madam President, I wished to spend a few minutes on this.

As a physician who cared for Medicare patients for 25 years, I cannot tell you how worried I am about what this bill is going to do to my senior patients. When Medicare was first written, two things were put into the law—very straightforward, very direct. Let me read them to you, for a minute. I hope Americans listen to this. Here is what the law is. CMS is breaking the law today and, with the new Medicare Commission, they are going to break it even further under this bill.

Section 1801 says this:

    Nothing in this title shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

That says that the Federal Government cannot practice medicine. That is what it says.

Section 1802 says this—and this is where it is important for my Medicare patients and everyone out there:

    Any individual entitled to insurance benefits under this title may obtain health services from any institution, agency, or person qualified to participate under this title if such institution, agency, or person undertakes to provide him such services.

Well, what we have in this bill is the gutting of those two foundational principles of Medicare. The first is the Medicare Advisory Commission is going to tell you what you can and cannot have. Here is what we are going to see: You will choose what I tell you to choose if you are a Medicare patient.

Not only do we have almost $500 billion in cuts to Medicare, under the auspices that we have to control entitlement spending; not only are we taking away plans from people who are very satisfied with what they have today, but we have enhanced, and will enhance, the ability of the Federal Government to practice medicine.

My colleagues on the other side of the aisle, who have never practiced medicine, who know the legalese but don't know the consequences of right now the rationing of Medicare on drugs such as Epigen and Neupogen—you see, Medicare has decided when oncologists can use those drugs. They have taken a

Exhibit 151

JA-0002438

blanket position, although they have released it somewhat. But what it says is this—I will give you a patient who has breast cancer. She is 67 years old. She is being treated for breast cancer. She becomes anemic and neutropenic. That means her white blood cell count, her ability to fight infection goes down.

We have wonderful drugs that raise the white blood cell count and raise the red blood cell count. But Medicare, in its obvious wisdom of practicing medicine, has told the oncologists when they can and cannot use it. That is fine for 75 percent of the patients, but it totally ignores the other 25 percent of the patients who happen to have complicating factors, such as congestive heart failure or if they become anemic under breast cancer chemotherapy and have congestive heart failure as well. The government says you cannot have erythropoietin at this level of hemoglobin regardless of whether you have congestive heart failure.

What happens is the practice of medicine out of Washington or Maryland, more specifically, determines who can and cannot have a drug; in this case, erythropoietin.

What is the consequence of that? The consequence is that the patient did not die of breast cancer; she died of congestive heart failure that could have easily been treated had we not had medicine practiced by CMS denying the ability of the physician to give the patient exactly what she needed when she needed it.

We are starting down that road with this bill—aggressively starting down that road—because the Medicare Payment Advisory Commission, combined with the Comparative Effectiveness Panel will not look at complications and will not look at secondary diseases. They will look at the average.

I want to tell my colleagues, when you are sitting in an office with your doctor, you are not average. You are you, and you are a specific individual with a set of factors that nobody else has. The judgment in the practice of medicine cannot be done by an insurance company or CMS at a distance without them having a hand on the patient. They never have their hand on a patient.

The whole art of medicine, which is 40 percent of getting people well, is the knowledge and training and experience and gray hair that comes with looking at the total patient, being one on one, not having the government between the doctor and their treatment of a patient.

What this bill does—this bill is a lie one of two ways. One, it says we are going to take this money out of Medicare and you are not going to notice any difference. That cannot be true. If we take $500 billion or $400 billion-plus out of Medicare, millions of seniors are going to notice a difference in their health care and what they get under Medicare. If we say that is not true, then the only way that is not true is

the game that is being played on the financing of this program; that is to say, we are going to cut this money out of Medicare and then with a wink and a nod know we are never going to do it.

The majority leader said yesterday there is nothing more important in this Nation right now than passing health care reform. I differ with that statement. I think 10.2 percent unemployment is a whole lot more important, and finding those people jobs, than passing health care reform. I think a $12 trillion debt is more important to address than fixing health care right now. I think the fact that we have $350 billion worth of waste, fraud, and duplication in the Federal Government every year, and we are not addressing it, is more important than fixing health care right now. I think the fact that our economy is still on its back and people are continuing to lose jobs is more important than fixing health care right now.

I understand the political dynamics, but I also understand very well with my quarter of a century of practicing medicine that what this bill is going to do is destroy the best health care system in the world, and it is going to undermine the security of every senior in this country because what starts as a small couple of things, such as Neupogen and Epogen or like when you can have bone densitometry and whether your osteoporosis can truly be evaluated, CMS has already said how much you can do that, whether your bones are falling apart or not. It is the start of the government practicing medicine.

It is the beginning of our seniors having the government step in between them and their physician in terms of best for that senior and the government saying: No, I will tell you what you are going to have. I will tell you what you will have.

Thomas Jefferson taught us a lot. He predicted we would have ''future happiness for us if we can prevent the government from wasting the labors of the people under the pretense of taking care of them.''

I want to see a lot of things changed in health care. I want to see true competition in the insurance industry. I want to make sure nobody loses their insurance because they get sick. I want to make sure everybody can get insurance if they are sick. I do not disagree with the basic premise. What I disagree with is moving $2.5 trillion more under government control, which will raise costs ultimately in the health care sector. If it does not raise costs and we are truly going to take this money from Medicare, what it is going to do to our seniors, I have a message for you: You are going to die soon, and they are going to say that is not true, that it is not true.

When you restrict the ability of the primary caregivers in this country to do what is best for their senior patients, what you are doing is limiting

their life expectancy. We are saying CMS, the Medicare Payment Advisory Commission, and the Comparative Effectiveness Panel will tell the doctors what they can and cannot do, ignoring the 20 percent of the people for whom that is exactly the wrong prescription. So for 20 percent of our seniors, this bill is going to be a disaster, but it is going to save money because you are not going to be around for us to spend any money on you because the government will have already told us what the treatment plan will be for you. We will decide in Washington through the Center for Medicare and Medicaid Services what you will receive.

They will dispute that, but the people who are going to be disputing that are lawyers; they are not doctors. They have never laid a hand on a patient. They have never put their hand forward on a Medicare patient knowing the consequences of the total patient, the background, the medical history, the sociologic factors that fit, the family dynamics, the past medical history, the family history, and the present state of mind of that patient.

Even more important, what this bill is going to do is divide the loyalty of your doctor away from you. When you go to the doctor today, most of the time that doctor's No. 1 interest is in you and your well-being. When you have this Medicare Payment Advisory Commission and you have this Comparative Effectiveness Panel, what that does is that causes the physician—he or she—to take their eyes off of you. Now they are going to put their eyes on what the government says because the consequences of not doing what the government says will ultimately result in some type of sanction.

Do we want physicians to be patient-centered and focused on their patients or do we want physicians to have their eye on the government and half of an eye on the patient? Which do you think is going to give us the best care? Which do you think is going to give us the greatest quality of life? What is going to give us the greatest longevity with the greatest quality of life? Is it the government practicing medicine, or is it the trust that has been developed through years between a patient and a doctor to do what is in the best, long-term interest of that patient?

I cannot tell you the number of people who die from the CMS regulations on Epogen for oncologists. But there were hundreds—hundreds—because Medicare never looked at the patient; they looked at dollars.

As we go forward in this debate, what I want seniors in America to know—and I am fast approaching Medicare age; I am 3 years from it—I want them to know the key thing they are going to lose in this bill is the loyalty and primacy of their physician thinking about them. We are going to divide that loyalty to where the physician is going to be looking at the government. If you think that is not true, just look at what has happened so far when CMS

Exhibit 151

has decided to start practicing medicine.

In the HELP Committee, I offered an amendment to change the language so there would be absolutely a prohibition on rationing care and directing the care from Washington. It was rejected out of hand—rejected out of hand. Not one of my colleagues on the other side of the aisle voted to prohibit rationing of health care.

Why would they do that? Because the ultimate intention through the Comparative Effectiveness Panel is to ration care. It is to ration the care. It is to limit the amount of dollars we spend and never look at the individual patient.

If we think about the Medicare cuts in this bill, we are going to take $135 billion out of the hospitals. Do you think seniors will ever notice that? I do. I think when you ring your button and you are hurting and you need pain medicines or you need to go to the bathroom, the time it takes for somebody to get there will not be sufficient. What will happen is you will wait. You will have a complication. If you have acute shortness of breath and press the button, the available nurses will not be there. There will be a consequence to cutting $135 billion from payments to hospitals in this country.

We are going to take $120 billion out of the seniors—the one in five seniors who now have Medicare Advantage. I agree, it is more expensive than Medicare. It needs to have some cost containment through competitive bidding, but we should not be decreasing the services, which is exactly what is going to happen. If you are a senior on Medicare Advantage, you are going to lose benefits you now have. You are going to lose them.

One of the ideas of Medicare Advantage was preventive services. One of the things that improved the care in rural America was Medicare Advantage. Yet we are going to take that away. The vast majority of the benefits we are going to cut in half.

We are going to take $15 billion from nursing homes. That may or may not be appropriate, but the way to do that is through a competitive experience based on quality and outcome rather than some green-eyeshade staffer saying we can take $15 billion out of Medicare from payments to nursing homes.

One little secret that is not in this bill, that has not been addressed in this bill, is the estimate by a Harvard researcher that there is $120 billion to $150 billion a year in fraud in Medicare alone. HHS admits to $90 billion. We know it is well over $100 billion a year. Cleaning up the fraud in Medicare would pay for a lot of health care for a lot of folks in this country. There is $2 billion in this whole bill to clean up the fraud.

Why would we not fix that first? Why would we take money from Medicare to create a new program when in fact we are wasting 10 to 15 percent?

The PRESIDING OFFICER. The time of the Senator has expired.

Mr. COBURN. I will close with this remark. If you are a senior and you are on Medicare, you better be afraid of this bill. I don't come to the floor and say that very often, but your health care is totally dependent, in terms of being decreased by this bill.

I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD. Madam President, I ask unanimous consent I be allowed to speak for 1 minute 7 seconds and the time be taken from that of my good friend and colleague from Vermont, the chairman of the Judiciary Committee.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DODD. Madam President, Senator TOM COBURN and I have become great friends. We have spent a lot of time together this summer in my HELP Committee. He talked with great eloquence about that distance that can occur between a doctor and patient, and obviously as someone who practiced medicine for a long time, he speaks from strong personal experience, and I admire and respect that immensely. But let me say to my colleagues, without this bill we are talking about here, this comes to a simple choice. Under existing law, the way things are today, one institution stands between a doctor and patient and that is your insurance company. They ration care all the time. In fact, I am a living example of rationed care, having been through surgery, getting preapproval twice before surgery and then being rejected by the very insurance company I paid premiums to for a long time as a Member of this body. We are working it out, I believe, because they thought—I am 65—that Medicare ought to pay for my surgery rather than the company I paid premiums to for a long time.

They were rationing my care. That insurance company, it wasn't some government entity or someone else, they are the ones. Without our bill, the only one getting to decide what health services anyone receives is the insurance industry.

I hope we would have a chance to debate this further, as I am confident we will.

Let me also say how much I support the effort by Senator MIKULSKI on her efforts to see to it that women are treated equally, and particularly in preventive care, and I strongly urge the adoption of her amendment and ask to be added as a cosponsor to that amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DODD. I thank the Chair.

Mr. LEAHY. Madam President, our Nation is in the midst of a historic debate about how to reform our health insurance system. Three House committees and two Senate committees have spent countless hours trying to answer the question of how best to introduce competition and make health insurance affordable for all Americans.

I applaud their efforts, and I applaud the efforts of the many Senators who have fought to bring this important debate to the Senate floor.

I have pushed and will continue to push for provisions that accomplish the "three C's" of health insurance reform: choice, competition, and cost control. I recently reaffirmed my support for a public option.

A public option would give consumers more choices to purchase an affordable and quality health insurance plan and will help drive down overall health care costs. I will continue to push for inclusion of a public option in the final Senate bill.

Amid this discussion of how best to introduce competition into the health insurance industry, it is important to remember that today the health insurance industry does not have to play by the same rule of competition as other industries. Due to a six decade-old special interest exemption, the business of insurance is not subject to the Nation's antitrust laws. If there was ever a good reason for such an exemption, it no longer exists.

While there are divergent views on the best way to introduce choice and competition into health insurance market, we can surely agree that health and medical malpractice insurers should not be allowed to collude to set prices and allocate markets.

Today, I am filing the Health Insurance Industry Antitrust Enforcement Act of 2009 as an amendment to the Patient Protection and Affordable Care Act. This legislation, which I introduced in September and which is co-sponsored by 18 Senators, will repeal the antitrust exemption for health insurance and medical malpractice insurance providers, and ensure that the basic rules of fair competition apply to the industry as part of the reforms that the larger health care bill will enact. Our Nation's antitrust laws exist to protect consumers, and it is vital that the health insurance and medical malpractice insurance companies are subject to these laws.

These laws promote competition, which ensures that consumers will pay lower prices and receive more choices.

The Majority Leader, an original cosponsor of this legislation, testified before the Senate Judiciary Committee that "[i]t is of the upmost importance that we make sure the insurance industry is playing by the same rules as everyone else, and that they are subject to competition." I could not agree more, and I encourage the leader to schedule a vote on this amendment early in this debate. The President also recently supported Congress's efforts to determine whether any justification remains for permitting price fixing.

The vast majority of the companies doing business in the United States are subject to the Federal antitrust laws.

However, a few industries have used their influence to maintain a special, statutory exemption from the antitrust laws. The insurance industry is

one of those few remaining industries. In the markets for health insurance and medical malpractice insurance, patients and doctors are paying the price, as costs continue to increase at an alarming rate, while patients and small businesses suffer. This is wrong, and this amendment fixes this problem.

The Health Insurance Industry Antitrust Enforcement Act is supported by a cross-section of groups interested in promoting competition, including the Consumer Federation of America, Health Care for American Now, and the American Hospital Association. I also received a letter from a coalition of 10 State attorneys general who voiced their specific need for this legislation.

The top law enforcement officers in those States argue that "Repeal of the McCarran-Ferguson exemption would enhance competition in health and medical malpractice insurance by giving state enforcers, as well as federal enforcers, additional tools to combat harmful anti-competitive conduct." The letter goes on to state that "The McCarran-Ferguson exemption serves no plausible public interest."

This amendment will prohibit the most egregious anticompetitive conduct—price fixing, bid rigging and market allocations—conduct that harms consumers, raises health care costs, and for which there is no justification. Subjecting health and medical malpractice insurance providers to the antitrust laws will enable customers to feel confident that the price they are being quoted is the product of a fair marketplace.

The lack of affordable health insurance plagues families throughout our country, and this amendment is a first step towards ensuring that health insurers and medical malpractice insurers are subject to fair competition. I hope all Senators will join me in support of this important amendment.

Madam President, I note my amendment removes the outdated, antiquated, unnecessary antitrust protection given to our insurance companies, a protection which, instead of allowing them to thrive and give us lower premiums, has perversely acted in such a way that our premiums continue to rise 15 percent in the last year alone. This will help change that.

━━━━━━━

EXECUTIVE SESSION

NOMINATION OF JACQUELINE H. NGUYEN TO BE UNITED STATES DISTRICT JUDGE FOR THE CENTRAL DISTRICT OF CALIFORNIA

The PRESIDING OFFICER. Under the previous order, the Senate will proceed to executive session to report the following nomination.

The bill clerk read the nomination of Jacqueline H. Nguyen, of California, to be United States District Judge for the Central District of California.

The PRESIDING OFFICER. The Senator from Vermont is recognized.

Mr. LEAHY. Madam President, I understand the Senator from California desires some time. I yield her 5 minutes, beginning now.

Mrs. FEINSTEIN. Madam President, I rise to speak in support of the nomination of California Superior Court Judge Jacqueline Nguyen to be a Federal District Court Judge from the Central District of California. I urge her confirmation.

Judge Nguyen is a tested judge with a track record of success as both a judge and a Federal prosecutor. She will be the first Vietnamese American on the Federal bench. Her nomination comes about this way.

I have had, for a long time, a bipartisan judicial selection committee in California to advise me in recommending judicial nominees to the President. The committee gave Judge Nguyen its unanimous recommendation. Then I recommended her to the President for his nomination to the Federal district court. I believe she is going to be an excellent Federal district court judge in the Central District.

Judge Nguyen was born in South Vietnam. She immigrated to this country with her family at the age of 10 during the final days of the Vietnam war. The Nguyens spent several months living in a refugee camp in Camp Pendleton, San Diego, before moving to the La Crescenta neighborhood of Los Angeles. She was naturalized in 1984.

Judge Nguyen's parents worked two and three jobs at a time in Los Angeles, and Judge Nguyen and her siblings worked side by side with them, cleaning a dental office, peeling and cutting apples for a pie company, and finally managing the doughnut shop that their parents bought and owned.

In her application to my selection committee, she explained that looking back on these experiences she realizes now that they were difficult. She wrote:

But I nevertheless feel incredibly fortunate because those early years gave me invaluable life lessons that have shaped who I am today.

She went on to graduate from Occidental College in 1987 and from UCLA Law School in 1991. She was in the Moot Court Honors Program.

For the first 4 years of her career, she practiced commercial law as a litigation associate at the private law firm of Musick, Peeler and Garrett, where her caseload included complex contract disputes and intellectual property cases. In 1995 she left the firm to become an assistant U.S. attorney in the U.S. Attorney's Office in Los Angeles, and a very good one.

As an assistant U.S. attorney in the criminal division, she prosecuted a wide variety of crimes, including violent crimes, narcotics trafficking, organized crime, gun cases, and all kinds of fraud. She spent 6 months in the organized crime strike force section, handling a title III wiretap investigation of a Russian organized crime group responsible for smuggling sex slaves into the United States from the Ukraine. In 2000, she received a special commendation from FBI Director Louis Freeh for obtaining the first conviction ever in the United States against a defendant for providing material support to a designated terrorist organization.

The Justice Department recognized her with three additional rewards for superior performance as an assistant U.S. attorney, and in 2000 she was promoted to deputy chief of the general crimes section.

In 2002, Judge Nguyen left the U.S. attorney's office when Governor Gray Davis appointed her to the Superior Court in Los Angeles, and she has been on that bench for more than 7 years and has presided over more than 65 jury trials.

As she has said in her own words:

I am deeply passionate about the privileges that we enjoy as Americans and am committed to spending my life in public service. If I am given the honor to serve as a United States District Judge, I believe my experiences, work ethic, maturity and judgment will serve me well.

I could not agree more. I think Judge Nguyen will be a truly outstanding judge of the Federal district court and I urge my colleagues to support her nomination.

I yield the floor.

The PRESIDING OFFICER. The Senator from Vermont is recognized.

Mr. LEAHY. Madam President, I absolutely concur with the comments of the distinguished senior Senator from California in support of the nomination of Judge Jacqueline Nguyen to serve on the Federal Court in the Central District of California. I supported Judge Nguyen in the committee and I am glad we are able to act on her nomination today.

Judge Nguyen participated in a confirmation hearing before the Judiciary Committee on September 23. Hers was a historic hearing at which, for the first time, three Asian Pacific American judicial nominees appeared together—Judge Nguyen, Dolly Gee and Judge Edward Chen. Indeed, three Asian Pacific American judicial nominees have never been confirmed in the same year. Of the 876 active judges serving on our Federal courts, only 8 are Asian Pacific American.

We also held a November hearing for Judge Denny Chin, a well-respected judge on the Southern District of New York, whom President Obama has nominated for elevation to the Second Circuit Court of Appeals. Judge Chin was the first Asian Pacific American appointed as a Federal district court judge outside the Ninth Circuit. If confirmed to the Second Circuit, he will be the only active Asian Pacific American judge to serve on a Federal appellate court anywhere in the country. It is unbelievable that with 179 Federal appellate court judgeships in our country, none are currently held by an Asian Pacific American. More than 14

Exhibit 151

JA-0002441

For many, the answer to that question is quite clear. We know that some here in Washington have wanted government-run health care for many years. It is hard to escape the conclusion that these same people saw the current economic crisis as their moment. Earlier this year, some in this administration said that ''a crisis is a terrible thing to waste.'' Americans are hoping this bill is not what they meant, but they are concerned that it is.

Americans already know this bill will make our economic problems worse, not better, without even addressing the serious health care problems we already face—and they would be right. That is why they want us to start over and accomplish the real mission of lowering costs.

That is precisely what the McCain amendment would allow us to do. The McCain amendment would send this bill back for a rewrite. It would send it back to the Finance Committee with instructions to give us a new bill that does not include $\frac{1}{2}$ trillion cuts to Medicare. It would send the bill back to committee; send us a new bill without $\frac{1}{2}$ trillion cuts to Medicare, one that does not pay for the bill on the backs of seniors; that is, if you pass the McCain amendment.

Here is a program, the Medicare Program, that is already struggling, a program that needs help. Yet, in order to finance their vision of reform, our friends on the other side want to use Medicare as a piggy bank to create an all-new government program that is bound to have the same problems as Medicare. As written, their bill would cut nearly $\frac{1}{2}$ trillion from Medicare—not to make the program stronger but to fund more government spending. In the process, millions of seniors would lose benefits. Literally millions of seniors would lose benefits.

The McCain amendment would not let that happen. The McCain amendment tells the committees: Don't cut hospitals. The McCain amendment tells the committees: Don't cut hospice. The McCain amendment tells the committees: Don't cut home health care. The McCain amendment tells the committees: Don't cut Medicare Advantage. It would allow us to focus our efforts, instead, on the prevention of waste, fraud, and abuse, which we know to be rampant in this program. It would ensure we are not cutting one government program just to create a new one. That is what a vote in favor of the McCain amendment would be, it would be a vote to preserve Medicare, not weaken it. That is the message America's seniors want to hear in this health care debate, that improving health care in America doesn't have to come at their expense.

Some may argue that they need to cut Medicare to create a new government program. That is their call. But it is not the call Americans are asking us to make. I haven't gotten a call yet from anybody in Kentucky or around the country saying: Please cut Medicare so you can start a new program for somebody else—not my first call.

The American people want us to start over from the beginning and craft a bill they can actually support, and we know they don't support this bill. All the surveys indicate that. Then we could start over and end junk lawsuits against doctors and hospitals that drive up costs, something the majority didn't find any room for in their 2074-page bill—not a word about controlling junk lawsuits against doctors and hospitals. Then we could encourage healthy choices such as prevention and wellness programs, something the majority somehow couldn't squeeze into their 2074-page bill. Then we could lower costs by letting consumers buy coverage across State lines, something the majority must have overlooked in their 2074-page bill. Then we could address the rampant waste, fraud, and abuse, something our friends didn't think was important enough to seriously address in their 2074-page bill.

The McCain amendment would allow us to vote with seniors. That is what the McCain amendment is about. It would allow the Senate to say we are not going to finance a new government program on the backs of seniors, we are not going to use Medicare as a piggy bank to fund a new government program. It would allow us to vote with the American people. Most important, it would allow us to start over and get this right.

I yield the floor.

───────

RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

───────

SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of H.R. 3590, which the clerk will report.

The legislative clerk read as follows:

A bill (H.R. 3590) to amend the Internal Revenue Code of 1986 to modify the first-time home buyers credit in the case of members of the Armed Forces and certain other Federal employees, and for other purposes.

Pending:

Reid amendment No. 2786, in the nature of a substitute.

Mikulski amendment No. 2791 (to amendment No. 2786), to clarify provisions relating to first dollar coverage for preventive services for women.

McCain motion to commit the bill to the Committee on Finance, with instructions.

The ACTING PRESIDENT pro tempore. Under the previous order, the time until 11:30 will be for debate only, with the Republicans controlling the first 30 minutes and the majority controlling the next 30 minutes, with the remaining time equally divided and controlled between the two leaders or their designees and with Senators permitted to speak therein for up to 10 minutes each.

The Senator from Arizona is recognized.

Mr. KYL. Mr. President, I ask unanimous consent that during the 30 minutes controlled by the Republicans, we be allowed to engage in a colloquy.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. KYL. Mr. President, I will begin by making some comments about the amendment Senator McCAIN, my colleague from Arizona, has filed. This is an amendment that, as the minority leader just said, will protect America's seniors. It will disallow the Medicare cuts this bill includes.

The economist Milton Friedman famously said, ''There is no such thing as a free lunch,'' and that applies to health care as well. There is no such thing as free health care. Someone has to pay. Since this bill is a $2.5 trillion bill, the first question is, Who pays? The first answer to who pays is, it is America's seniors, because about half of the cost of the bill is allegedly paid for by cuts to Medicare.

Let me break down a little bit more specifically than the Republican leader did exactly what that means. This is about $500 billion in Medicare cuts as follows: $137.5 billion from hospitals who treat seniors; $120 billion from Medicare Advantage, which is the insurance program that provides benefits to seniors which will be cut more than in half as a result of this $120 billion reduction; $14.6 billion from nursing homes that treat seniors; $42.1 billion from home health care for seniors; and $7.7 billion from hospice care, one of the most cruel cuts of all.

Obviously, with cut this dramatic there is no way to avoid jeopardizing the care seniors now enjoy, and seniors know this. That is why they have been writing our offices and attending town-hall meetings to let us know they disapprove. I quoted from two letters constituents of mine from Arizona sent asking to please not cut their Medicare Advantage Program. This has been called the crown jewel of the Medicare system, and many of them rely on Medicare Advantage for dental care or vision care or hearing assistance they have come to rely on. They are not buying the claims that somehow or other we can make $\frac{1}{2}$ trillion cuts in Medicare without somehow hurting their care. They know better than that, and they are right. The care they have been promised will be compromised to pay for this new government entitlement under the bill.

Finally, many are wondering what happened to the promise that they get to keep the care they have. We all heard the President say that many times: If you like the care you have, you get to keep it. That is simply not true. There are 337,000 Arizonans who are Medicare Advantage patients. They like what they have. Yet we know, according to the Congressional Budget

Exhibit 151                                                          JA-0002442

Office, that the benefits they have under Medicare Advantage are going to be cut by more than half. They are saying: What happened to the policy I like? I am not going to be able to keep it if this bill passes.

This is why the McCain amendment must pass. If our Democratic colleagues are not willing to protect Medicare, then I cannot imagine how the bill could otherwise be made acceptable since it starts with the commitments that Congress and the President have made to our senior citizens.

The ACTING PRESIDENT pro tempore. The Senator from Tennessee is recognized.

Mr. ALEXANDER. I congratulate the Senator from Arizona on his analysis of the Medicare cuts. I heard the Democratic leader talk about figures and how we have some figures and the Democrats have other figures. I agree with him. I think someone watching this must think we are on two different planets sometimes, so let me focus in on the figures.

I believe I heard my colleague say to pay for this health care bill over 10 years there would be $465 billion in the Medicare cuts. Where does that figure come from?

Mr. KYL. Mr. President, I say to my friend from Tennessee, first of all it comes from a reading of the bill. It is very clear in the bill as to how much money is taken from Medicare. The number the Senator from Tennessee just articulated is the correct number.

In addition to that, the Congressional Budget Office and the Joint Tax Committee analyzed the specific numbers. Obviously they were given the numbers in the bill, but the numbers they are using are—I just broke it down into four or five general categories. There are other divisions within that. But as I said, for notional purposes here: $137.5 billion from hospitals; $120 billion from Medicare Advantage. That number might be $118 billion; I am not precisely certain of it, but it is very close. There is $14.6 billion from nursing homes, $42.1 billion from home health, and $7.7 billion from hospice care. If any of our colleagues would like to contest these numbers, I would be happy to be corrected, but I believe those are the correct numbers.

Mr. ALEXANDER. I think the Senator from Arizona is right. The President of the United States, in his address to us about health care, and the New York Times, the Wall Street Journal—everyone who has reported on the Congressional Budget Office figures said the same thing. We are going to pay for this bill, which is $2.5 trillion over 10 years when fully implemented, by $465 billion cuts in Medicare.

What Senator McCAIN in his amendment that we are in support of is saying is, don't cut grandma's Medicare to pay for someone else's insurance. He goes on to say, if you are going to find some savings in waste, fraud, and abuse in grandma's Medicare, spend it on grandma. The reason for that is that

the Medicare trustees have said to us that there is $38 trillion in unfunded liabilities for the Medicare Program and that the program will start going bankrupt between 2015 and 2017. According to the Medicare trustees, they say, "We need timely and effective action to address Medicare's financial challenges," and the proposal, if I may say to the Senator from Arizona, who is on the Finance Committee and deeply involved in what we need to do about our Nation's finances, I don't think the Medicare trustees were thinking that the timely and effective action we could take to keep Medicare from going broke was to take $465 billion out of it and spend it on some new program.

Mr. KYL. On a new program. That is exactly correct. What the Medicare trustees were saying is, if we can effect cost savings in Medicare, and surely there are some to be had there, they should go to strengthen the Medicare Program itself and not allow it to go bankrupt, rather than it being used to create a new government program.

Perhaps one of the reasons why there are different numbers from one side of the aisle to the other is that sometimes we are not talking apples to apples. We are talking apples to oranges, and perhaps both numbers are correct in their context. The Senator from Tennessee used the number $2.5 trillion when the program is fully implemented. That is a very important statement. The other side will argue it is only $1½ trillion for the first 10 years of the program. That is a correct statement. But it is $2.5 trillion for the first 10 years of total implementation of the program. What is the reason for the difference? For the first 4 years, money is being collected, but very few benefits are going out. The benefits start after year No. 4. So if we take the first 10 years of the program, we are collecting money to pay for it over the entire 10 years, but almost all of the benefits only occur during the last 6 years. Naturally, we have collected more money than we have paid out. But when we take the first 10 years of full implementation, it is as my colleague from Tennessee noted, a cost of $2.5 trillion. That is how sometimes we get somewhat different numbers.

As long as we are clear about what we are talking about, one thing is crystal clear: Whether it is $1½ trillion or $2.5 trillion, we are talking real money. Somebody has to pay for it. If America's seniors are being asked to pay for half of it, that is not fair to America's seniors, given the commitment we have made to them. That is the point of the McCain amendment. Protect Medicare, protect America's seniors. We can do that with the simple amendment Senator McCAIN has which is send the bill back to committee—it would only take 1 day—and send it back here without those Medicare cuts in the bill.

Mr. ALEXANDER. I see the Senator from Idaho here. I wish to hear his observations. If there is any issue in this

entire health care debate that symbolizes why we on the Republican side want to change the debate to a step-by-step approach to reducing the cost of premiums, it would be the Medicare issue. As the Senator from Arizona said, what we need to do about Medicare is make it solvent as quickly as we can, as effectively as we can. The Senator from Kansas said the other day that the proposal to take $465 billion from grandma's Medicare and spend on it some new program is like writing a check on an overdrawn account in a bank to buy a big, new car. There is a lot of truth to that.

The President said earlier this year something I agree with. He said this health care debate is not just about health care. It is about the role of the Federal Government in the everyday life of Americans. He is exactly right about that. This health care debate, which we are beginning this week, is not just about health care. It is about the stimulus package, about the takeover of General Motors. It is about the trillion dollar debt. It is about the Washington takeovers. It is about too much spending, too much taxes, too much debt. The Medicare provisions in this bill are a perfect symbol of that. That is why Senator McCAIN is right. What he is saying is, don't cut grandma's Medicare and spend it on some new program. If you can find some savings in the waste, fraud, and abuse of grandma's Medicare, spend on it grandma. Make sure those of us who are older and those of us who are younger and looking forward to Medicare can count on its solvency.

Later this week we will talk more about premiums going up. There was a lot of discussion yesterday because, according to the Wall Street Journal, some health premiums would rise. For people who get their insurance from large employers, this bill won't make much difference. And for small employers, if you get your insurance from a small employer, it won't make much difference. If you are going to the individual market to buy insurance yourself, your premiums will go up, except we are going to get some money from somewhere to help pay part of your premiums, at least for about half of Americans who are in the individual market. Where are we going to get that money? From grandma. We are going to get it from Medicare. So that is what is wrong with this bill. And what is right about the McCain amendment is, it says simply, don't cut Medicare. If we find savings, which we hope we can in Medicare, we should spend it on making Medicare solvent.

I wonder if the Senator from Idaho is hearing from seniors in his State about the proposed $465 billion cuts to Medicare and how they feel about taking that money and spending it to create a new program?

Mr. CRAPO. I thank the Senator from Tennessee. Very definitely we are hearing from seniors in Idaho who see through this. It is very clear to the

Exhibit 151

folks in Idaho that what we are seeing is a proposed massive growth of the Federal Government by over $2.5 trillion, when fully implemented, that is to be funded on the backs of American taxpayers and senior citizens through cuts in Medicare. In fact, in addition to those who have contacted me who are seeing their health benefits lost, I have also been contacted by a number of the providers. We are talking about those who are in home health care or hospice health care, skilled nursing facilities or hospitals and the like.

They make a very interesting point. Their point is that not only will senior citizens—in Medicare Advantage in particular—literally be losing their benefits dramatically, but that other senior citizens who are in traditional Medicare will also be losing access and quality of care. How is that the case? We know from the details of this bill that we are going to see major cuts in hospice care, home health care, skilled nursing facilities, and hospitals.

The points made to me by those providers are that they have already gone through a series of very deep cuts, cuts to the point that in Idaho for home health care, we have lost something like 30 percent of our facilities already. The way one of them explained to it me was that if you reduce the compensation we are receiving, then we have to reduce something in our budget. He said: We can't just start taking bricks off of our buildings. What we will end up having to do is to reduce personnel. That would be the nurses and the doctors and the other care providers who are there to provide support for these individuals. We will have to reduce the number of rooms we operate or the facilities we provide. In the end, there will be a reduction of services and access available to senior citizens, including a reduction in the quality of the care they are able to be provided.

Mr. ALEXANDER. In discussing the Medicare cuts, another provision of the bill which we will be talking about this month and next month as we go through the health care debate is what about the problem of paying doctors and hospitals who see Medicare patients. They get paid about 83 percent of the rate they would be paid if they were seeing a private care patient. Every year Congress has to make an adjustment in something we did a few years ago which automatically cuts the amount of money that we pay doctors who are seeing Medicare patients.

That is a big problem for Medicare patients. Because if the doctors can't be paid, they won't see the patients, and Medicare patients may find themselves increasingly in the condition that Medicaid patients do, low-income Americans who are covered through the State program—that is our largest government-run program—where they are paid about 60 percent of what doctors who see private patients are paid and about half of Medicaid doctors won't see new patients.

I ask the Senator, does he see anywhere in this bill a provision for the $¼

trillion that will be needed to pay doctors 10 years from now what they are making today? If it is not in the bill, where is that $¼ trillion going to come from? Is it going to come from Medicare cuts, or will it come from adding to the deficit?

Mr. CRAPO. Obviously, it will come from cuts in Medicare or increased taxes or simply more debt on the Federal level.

The Senator raises a very interesting point. This question of fixing the compensation rates for physicians in Medicare is a huge question, one which we have been fighting for for a number of years to try to find a solution to, as each year we delay the expected cuts that will happen. I have talked about this factor in the context of being a budget gimmick in this bill. What do I mean by that? Those who say this bill reduces the deficit are able to say so only because it has about $500 billion of new taxes, about $500 billion of Medicare cuts, and a number of budget gimmicks that delay the implementation of the spending side of the bill or, in this case, don't even include at all one of the major expenses that needs to be accommodated, and that is the fix for physician compensation. If any of those things were not in this bill, this bill would drive up the deficit tremendously.

What we are going to see, in addition to these fiscal impacts on the Federal Treasury in terms of huge increases in the debt or huge increases in more taxes, even more than we are talking about with this bill, is we are going to see the very real potential that access to medical care for seniors will be again reduced because of this factor.

Let me give a couple of statistics. In their June 2008 report, the Medicare Payment Advisory Commission, or MedPAC, said that 29 percent of Medicare beneficiaries who were surveyed were looking for a primary care physician and had trouble finding one to treat them. In other words, about 30 percent of Medicare beneficiaries today are having trouble finding a physician who will take a Medicare patient. That is before the $465 billion of cuts and before simply not including physicians at all in this legislation.

A 2008 survey by the Texas Medical Association found that only 58 percent of the State's doctors took new Medicare patients, and only 38 percent of the primary care doctors accepted new patients. Again, it is an example from MedPAC and from one State that indicates what we know is happening around the country; namely, that doctors in increasing numbers are no longer taking new Medicare patients, just as they have been doing with Medicaid patients for years. Yet we see these massive cuts to Medicare being proposed that will have the same impact on hospice care and home health service and skilled nursing facilities and hospitals, and we see that doctors are not even included at all, meaning they are projected now to receive

major reductions. I think it is over 20 percent reduction in their compensation for taking Medicare patients.

The solution here to establishing a massive new Federal entitlement program is not to cut Medicare. I want to repeat something both the Senators from Arizona and Tennessee have already said that is critical. Reducing the Medicare budget by $464 billion, by any number, is something that has been encouraged in terms of trimming the growth path for Medicare. That is something this Congress has looked at in the past. But never was it intended by those who made these projections about needing to control the spiraling cost of Medicare that we address the fiscal circumstances in Medicare with the intended purpose of creating another new, massive Federal entitlement program that will grow the Federal Government by over $2 trillion—we talked about the numbers; the full 10-year period is $2.5 trillion—and leave Medicare with these dramatic cuts, this loss of service and loss of benefits to the recipients, while they see this new government growth with a new government program. That was not in the mind of anybody who was asking us to deal with the solvency issues on Medicare, and I don't think it was in the mind of anybody who asked that we have some kind of health care reform to deal with the rising cost of premiums.

Mr. ALEXANDER. Mr. President, how much time remains on the Republican side?

The ACTING PRESIDENT pro tempore. The Senator has 8½ minutes.

Mr. ALEXANDER. Would the Chair let me know when 4 minutes remain.

The Senator from Idaho will conclude our remarks at that time.

The Senator from Idaho has made an important point, anticipating our Democratic friends will have the next 30 minutes and some other things they may be saying the rest of the day. There was a lot of talk yesterday about the CBO report about the effect of this $2.5 trillion proposal on premiums. Rather than take my word for it, let's go to the news section of the Wall Street Journal of today which has the headline: ''Some Health Premiums to Rise.'' That means going up. That means the cost of your insurance is going up for some Americans.

So my question is, why would we spend $2.5 trillion over 10 years, cut Medicare, raise taxes, and run up the debt to raise some health premiums? I thought the whole exercise was to lower the cost of health care premiums.

The article says:

The analysis released Monday by the nonpartisan Congressional Budget Office and the Joint Committee on Taxation—

We are supposed to pay some attention to these outfits as nonpartisan—

painted a more complicated and uncertain picture. It said people who pay for their own insurance would see a higher bill, albeit for more generous benefits—

Exhibit 151          JA-0002444

That is the government-approved insurance you are going to be forced to buy.

unless they are lower earners who qualify for a new government tax credit.

Where is the money going to come from for those subsidies? It is going to come from grandma. It is going to come from Medicare. It is going to come from taxes. And it is going to come from increasing the debt.

Those are facts.

Employees of small firms—

Says the Wall Street Journal—

would effectively see their insurance premiums unchanged—

So for small firms, we are going to spend $2.5 trillion over 10 years, cut Medicare, cut taxes, and run up premiums for millions of Americans, so your insurance will continue to go up at about the rate it already was. Why should we be doing that?

while workers at large firms would see something between unchanged and slightly lower premiums under the bill—

Compared to what would already happen—

according to the analysis.

We need to change the debate. We need to start over. Instead of this comprehensive 2,000-page bill that is full of taxes, mandates and, as a general effect, raises premiums and taxes and cuts Medicare, we should set a clear goal, reducing costs, and begin to go step by step toward that goal—reducing junk lawsuits against doctors, allowing health care to be purchased across State lines to increase competition, allowing small businesses to combine in health plans so they can offer more insurance to employees at a lower cost.

These three bills I mentioned have been offered and rejected so far by the Democratic majority. We should have more flexibility in health savings accounts, efforts at waste, fraud, and abuse, which are, in effect, Medicaid—the largest government program—and Medicare—the second largest—and more aggressive steps to encourage wellness and prevention.

One approach, the comprehensive 2,000-page bill, Washington-takeover approach, Americans are very leery of. In my respectful opinion, this bill is historic in its arrogance for thinking we could take a system that affects almost all 300 million Americans, 16 percent of the economy, and change it all at once.

Instead, why don't we go step by step to re-earn the trust of the American people? Republicans will be making those proposals on the floor this month and next month and as long as it takes to try to see that we get real health care reform. Cutting grandma's Medicare by $½ trillion and spending it on a new program at a time when Medicare is going broke is not real health care reform.

Mr. CRAPO. Mr. President, how much time remains?

The ACTING PRESIDENT pro tempore. There is 4½ minutes remaining.

The Senator from Idaho.

Mr. CRAPO. Thank you, Mr. President. I wish to conclude with our time this morning by focusing on the larger picture a little bit, as my colleague from Tennessee has done in his concluding remarks.

When you ask Americans whether they want health care reform, the vast majority would say yes. When you ask them what they mean by that, the vast majority in the polls and in my personal experience are saying: We want to see the spiraling costs of health care and our health insurance brought under control and reduced, and we want to see increased access to quality health care for those who do not have access today and for those who have limited access today.

This bill fails on those two central points. What this legislation does, instead, is increase the size of government by $2.5 trillion of new Federal spending, establishing massive new Federal controls over the economy, and even creating a Federal Government insurance company. It increases taxes by about $500 billion, and not just on the so-called wealthy. The vast majority of these taxes is going to squarely hit those who President Obama said would not be hit: those who make less than $200,000 a year and, frankly, all the way down the income chain.

It cuts Medicare by $464 billion. It puts a major new unfunded mandate on our States, which are already struggling in their fiscal budgets. As my colleague indicated, it causes the price of insurance premiums to go up for the individual market, to go up in the small group insurance market, and to be basically unchanged in the large insurance market, according to the CBO study.

By the way, one of the things that is not pointed out in that CBO study very much is in that large market, which it says will be the only part of the market that does not see insurance rates go up, one of the reasons is because their health care will go down. In other words, there is a tax on these larger, high-cost insurance premiums that is going to be either passed through and cause their insurance to go up or will be avoided by reducing the cost of their insurance and reducing coverage of the benefits in these policies. So one way or the other, all Americans are going to see their health care premiums go up or, in the large groups, see their health care premiums be held the same by reducing the quality of the insurance they have.

If you go back to those two reasons Americans wanted health care reform, did we see premiums go down? No. Did we see increased quality or increased access to care? Well, there are some who are going to get a subsidy in this program for this new massive Federal program. But at what price? Mr. President, $2.5 trillion, $464 billion of cuts in Medicare, the establishment of a major new government program that would essentially be funded on the backs of

massive new tax increases, massive Federal tax increases, and Medicare cuts, and in the end we will still be in a system in which we are seeing spiraling increases in health care costs. To me, that is not the kind of reform we need.

My colleague from Tennessee indicated there are a number of reforms on which we can find common ground that will reduce health care costs. There are a number of reforms on which we can find common ground that will help us to increase access to quality care. That is where our focus should be. That is why I stand here today in support of my colleague JOHN McCAIN, his motion to commit this legislation to the Finance Committee. As was indicated, it could be done in 1 day, to simply remove the Medicare cuts that are contained within it. Let's fix that part of this bill, and then let's work forward.

I see my time has expired. I encourage this Senate to focus closely on the legislation and to let us work together in a bipartisan fashion rather than speeding ahead and trying to pass legislation that has not had the opportunity for this kind of bipartisan effort to develop a good work product for the American people.

The ACTING PRESIDENT pro tempore. The Senator from Connecticut.

Mr. DODD. Mr. President, our colleague from Maryland, Senator MIKULSKI, I believe is on her way to the floor of the Senate. She and several other Members, in the time we have allocated to us between now and 11:30, will address her amendment she proposed yesterday. But pending her arrival, I want to respond, if I could, very briefly to some of the conversation here this morning.

First, I know some people have short memories, but I am somewhat intrigued to hear our good friends and colleagues talk about preserving Medicare. I have been around here a few years and recall very vividly the debates of 1995 and 1997 on the issue of Medicare, where our friends, who were in the majority in those days, were talking about slowing the growth of Medicare and one of the proposals they had for doing so was to cut into the benefits of Medicare recipients.

We do not do that in this bill at all. Quite to the contrary, despite the language about "big cuts in Medicare," we strengthen the Medicare Program substantially. That is the reason the AARP and other major organizations involved with the elderly have endorsed our proposals. They would hardly be doing so if they thought this was some massive cut into the Medicare Program that has been so critical to so many of our fellow citizens.

Just for a little bit of history here—In 1995 our Republican colleagues proposed cutting benefits to Medicare beneficiaries. Newt Gingrich, our former Speaker and friend from the other body, was quoted as saying "let's let Medicare wither on the vine." That is not ancient history. That is not 1965.

Exhibit 151       JA-0002445

That is just a few years ago in all of this debate.

There are some very strong provisions in the bill that reduce premiums and co-pays for seniors, ensure seniors are able to see their own doctors, and keep Medicare from going bankrupt for an additional 5 years. If we adopt the McCain amendment, we are being told today by CBO and others that Medicare becomes insolvent in 8 years. So vote for the McCain amendment and you are going to have an insolvent program in 8 years. That is a fact.

We extend the life here an additional 5 years. We provide new preventive and wellness benefits for seniors, lower prescription drug costs, allow seniors to stay in their homes and not end up in nursing homes.

This is a long bill. It is a big bill. But instead of complaining about its size, I would encourage my colleagues to read it and understand what is being done for Medicare. This is a complicated area, but, nonetheless, critically important.

Mr. President, I see my colleague from California, Senator BOXER, who is here, and others who want to address the issue of the Mikulski amendment, and I will yield the floor so they can be heard. I believe it is going to be each for 5 minutes. There are about seven of our colleagues who want to be heard on the issue before 11:30.

Mrs. BOXER. Mr. President, if I might respond.

The ACTING PRESIDENT pro tempore. The Senator from California is recognized.

Mrs. BOXER. The plan is, women colleagues will be coming to the floor. As they come, I will yield to them, until Senator MIKULSKI gets here, and then she will yield the time, if that is all right.

Mr. DODD. Very good.

Mrs. BOXER. Mr. President, before I start, I want to say to my colleague from Connecticut how much I appreciate his work and the work of Senator BAUCUS and Senator REID. What a remarkable moment we have here.

When I go home—and I was home for the holidays—people are urging us to get this done. They know their biggest chance of going into bankruptcy is a health care crisis—62 percent. They know, as my friend Senator DODD has said almost every day of this debate, every morning 14,000 people lose their health care. They know if we do not intervene with a good bill, their premiums—in my home State, I say to the Senator—will be 41 percent of their income, the average income, by 2016.

Can you imagine? That is unsustainable. For people who say: Why don't we address the economy instead of health care, let me say what happens to my constituents if they have to pay 41 percent of their income for premiums. Even if they have a good job, I say to my friend from Connecticut, they cannot make it. So the status quo is cruel, and it is particularly cruel to women.

AMENDMENT NO. 2791

Mrs. BOXER. Mr. President, I am proud to support the Mikulski-Harkin-Boxer amendment to improve preventive health coverage for women. The Mikulski amendment addresses this critical issue by requiring that all health plans cover comprehensive women's preventive care and screenings—and cover these recommended services at little or no cost to women. These health care services include annual mammograms for women at age 40, pregnancy and postpartum depression screenings, screenings for domestic violence, annual women's health screenings, and family planning services.

The preventive services covered under this amendment would be determined by the Health Resources and Services Administration to meet the unique preventive health needs of women. HRSA is an agency within the Department of Health and Human Services. HHS Secretary Kathleen Sebelius has already said that "Mammograms have always been an important life-saving tool in the fight against breast cancer and they still are today." The Secretary made clear that recommendations by the U.S. Preventive Services Task Force "do not set federal policy and they don't determine what services are covered by the federal government."

This is not the first time that experts have disagreed about this issue. I have been in this battle before, with Senator MIKULSKI, who called a hearing with all of the women Senators in 1994 where I insisted that routine mammograms for women over 40 must be covered. And thank goodness we fought back then, and in 1997 and in 2002 when this issue was raised again and again. Since 1991, the death rate from breast cancer has been reduced by over 20 percent.

According to a 2007 Partnership for Prevention report, 3,700 additional lives would be saved each year if we increased to 90 percent the portion of women age 40 and older who have been screened for breast cancer in the past 2 years. The most recent data show us that approximately 17 percent of breast cancer deaths occurred in women who were diagnosed in their forties. That is why the American Cancer Society continues to recommend annual screening using mammography and clinical breast examination for all women beginning at age 40. Mammograms are still the most effective and valuable tool for decreasing suffering and death from breast cancer. The Mikulski amendment will ensure women are able to get access to this and other life-saving preventive services at no cost.

The underlying bill introduced by Senator REID already requires that preventive services recommended by the U.S. Preventive Services Task Force be covered at little to no cost. These recommendations already include some women's preventive services such as osteoporosis screenings.

But they do not include certain recommendations that many women's

health advocates and medical professionals believe are critically important, such as screenings for ovarian cancer—a disease that will claim the lives of nearly 15,000 women this year. We know that when ovarian cancer is diagnosed early, more than 93 percent of women survive longer than 5 years.

Women are often the decisionmakers for their families when it comes to health care. But women too often put the health needs of their family members and their children ahead of their own.

By passing this amendment, we are saving the lives of countless mothers, daughters, grandmothers and sisters who would otherwise forgo preventative health care because of high copays and expensive deductibles.

I would like to share with my colleagues a story from a doctor in my home State of California, William Leininger, that drives home the importance of this amendment:

In my last year of residency, I cared for a mother of two who had been treated for cervical cancer when she was 23. At that time, she was covered by her husband's insurance, but it was an abusive relationship, and she lost her health insurance when they divorced.

For the next five years, she had no health insurance and never received follow-up care (which would have revealed that her cancer had returned). She eventually remarried and regained health insurance, but by the time she came back to see me, her cancer had spread.

She had two children from her previous marriage—her driving motivation during her last rounds of palliative care was to survive long enough to ensure that her abusive ex-husband wouldn't gain custody of her kids after her death. She succeeded. She was 28 when she died.

That is not a story that should be told in the richest nation in the world.

As I said, I am so proud to support the Mikulski-Harkin-Boxer amendment to improve preventive health care coverage for women. Here is why. It is a fact that women are increasingly delaying or skipping altogether preventive health care, and they are doing it because of costs.

I read a statistic done by a nonpartisan group that said about 39 percent of men are delaying going to a physician to check on a problem. But over 50 percent of women are doing that either because they do not have health coverage or they are fearful of the copay. So we could sit here and do nothing—that is the easy thing to do: Scare people, do nothing—or we could step to the plate, save Medicare, which is very important to save, and that is what this bill does. Because we say we are not going to spend money on waste, fraud, and abuse. We are going to spend money on health care for our people.

And to believe that my friends on the other side are the ones who are going to save Medicare? You just have to read history. Senator DODD explained it; Newt Gingrich saying: Let Medicare wither on the vine; Bob Dole, our friend, who said, at the time of his Presidential campaign: I fought against Medicare. It was a failure.

Exhibit 151                                                                                                                    JA-0002446

Well, if you ask our seniors, I think they are the group most pleased with their coverage. It is not perfect, but it is critical, and we save it here. We extend the life of Medicare.

So here we are in a situation where many women are delaying going to the doctor, getting their preventive services, and the Mikulski amendment addresses this critical issue. It requires that all health plans cover comprehensive women's preventive care and screenings, and cover them at little or no cost.

The reason this is so important is—first of all, in the HELP Committee, under Senator DODD's and Senator Kennedy's leadership, this piece of the package was in the bill because Senator MIKULSKI and others pushed so hard to get it placed into the bill.

Mr. President, I would ask my friend from Maryland, Senator MIKULSKI, if I could complete my remarks and then give the floor over to her?

Mr. President, I thank the Senator.

I am so proud to work with Senator MIKULSKI. I say to the Senator, we worked on this issue over the years. I just asked my staff to go back and look at the first time we teamed up to ensure that women get mammograms at age 40. That was in 1994. Then, again, over the years, every 3 or 4 years, this whole notion would rear its ugly head: Well, women can do without mammography. The question I have is, What is going to replace it? They would keep trying to take away our tools of self-examination and mammography. We know if you look through the years—and Senator MIKULSKI and I are proud of a lot of the work we do, but this goes right at the top of the list—we know mortality for breast cancer is way down since the early 1990s. It is 20 percent down since the early 1990s. We have had to stand our ground to protect women, to make sure they get those services they need, those life-saving services, at little or no cost.

I would also say the American Cancer Society continues to recommend annual screening using mammography and clinical breast exams for all women beginning at age 40. There are a lot of other very important tests that are included in the Mikulski amendment—very important tests—to deal with cervical cancer and ovarian cancer, finding the markers so we know how to deal with these deadly diseases. To give up the tools we have, to turn it over to some organization that does not report to the Secretary of HHS, makes no sense.

What my friend has done with her amendment is to make sure the group that decides this is under the jurisdiction of the HHS Secretary. We know the HHS Secretary has already said she wants to make sure women, starting at age 40, get those mammograms.

I am going to close by reading from an article in the March 10, 1994, San Francisco Chronicle. It says:

Joining what became a phalanx of six female Senators staring down at federal health officials Boxer said she will insist that routine mammograms and a host of other women's health needs be part of any new nationwide benefit package.

The article goes on. It is very clear. What I said at the time is:

After all of these years of women being told it is crucial by age 40 to get a baseline mammogram, now to have this tremendous confusion hit us is very disturbing.

Well, it was disturbing on March 10, 1994, when I first got involved in this issue. It was disturbing when Senator SNOWE, 3 years later, had us pass S. Res. 47 which said this is our only tool. Let's do it. Thank goodness we have now in this body women and men who get the fact that we refuse as women to be stripped of the only tools we have. Making all of these important tests part of this package is going to save lives. It is going to save money. It is going to mean our families can breathe a deep sigh of relief out there.

So I wish to thank Senator MIKULSKI for her leadership on this issue and to always stand right at her side on this issue of mammography. We also worked on standards for mammography. Remember that one? It was the deregulation fever that hit the Republican side. They wanted to take away the regulations for mammography, roll them back. We fought the fight, and we will continue to fight the fight.

So thank you very much. I strongly support this amendment.

I yield the floor for my friend, Senator MIKULSKI.

The ACTING PRESIDENT pro tempore. The Senator from Maryland is recognized.

Ms. MIKULSKI. Mr. President, as we debate health care reform, we need to recognize in the United States of America that health care is a women's issue. Health care reform is a must-do women's issue, and health insurance reform must be a must-change women's issue.

Too often when we look at when health care is even available to us, we face discrimination. We face continually the punitive practices of insurance companies that charge women more and give us less in a benefit. A 25-year-old woman pays more for health insurance than her male counterpart of the same health status. A 40-year-old woman pays almost 35 percent more for her insurance than a male of the same age, same health status. We want to change that in health care reform. We want to end the punitive practices of the private insurance companies in their gender discrimination.

We, the women of the Senate, are concerned that even being a woman is being viewed by the insurance companies as a preexisting condition.

Now we have the opportunity to change the law and change the direction of health care. I have offered an amendment to expand the screening and preventive services available to women in order to save our lives, make sure our lives are not impaired as we get older and, at the same time, be able to save money. We know early detection saves lives, curtails the expansion of disease, and, in the long run, saves money.

There are certain killers of women, the dread "c" word, cancer—breast cancer, ovarian cancer, cervical cancer that are unique to we women. Then there is the dread disease of lung cancer that affects men and women but is emerging as a main killer of women. Then there is the other issue of heart disease and vascular disease. We know for years women were often left out of the research on heart disease. For years women's heart disease went undetected and unrecognized because our symptoms are different. We can change this law.

In my amendment we expand the key preventive services for women, and we do it in a way that is based on recommendations from the Centers for Disease Control and from HRSA. It will be based on the benefit package available to Federal employees. It means if our amendment passes, the women of America will have the same access to preventive and screening services as the women of Congress. What is good enough for a United States Senator should be good enough for any woman in the United States of America.

That is why we ask not only the women to join us but the good men of quality who support us. We know people such as Senator DODD, Senator REID, Senator BAUCUS, men of quality, never fear we women who seek equality. They have raced for the cure as long and as hard as we have and have fought for mammogram standards. This is why we are wearing pink today. Pink is the universal color that says while we race for the cure, we want to have access to it when we find it. But to have access to the cure, we are going to need to have access to mammograms to be able to get that diagnosis, and then we are going to have to have health insurance to be able to pay for the treatment we have.

This is the Titanic battle we have today: Are we going to have access to health insurance and are we going to have access to these preventive services?

We do know in the area of heart disease and cancer and silent, undetected killers such as diabetes, it is often undetected. What happens is, for many women they do not get that early detection and screening, No. 1, because they can't afford it. They can't afford it because they either don't have health insurance and there are other demands on their family or, No. 2, when they go, if they do have insurance, they find their benefit might not be covered. So many of these benefits are based on State mandates, but worse than that it is the copayments and high deductibles.

Many women say: Well, my insurance company provides for it, but this copayment and deductible, I have to choose between my children's shoes or my deductible. We want to either

Exhibit 151       JA-0002447

eliminate or shrink those deductibles and eliminate that high barrier, that overwhelming hurdle that prevents women from having access to these early detection and screening programs.

Much is being debated about mammograms. We believe access to mammograms should be universal, universal access. But the decision on whether to get one should be made with your doctor. Well, that is great to say, but you need to have access to your doctor. You need to not have to overcome the high hurdle of deductions or copayments to be able to do it.

We know mammogram screenings decrease breast cancer by over 40 percent. Regular pap smears reduce cervical cancer by 40 percent. This year, 4,000 women will die of cervical cancer. Then let's take the dread, but often overlooked, diabetic screening. Diabetes is the underlying cause of two-thirds of chronic illness in both younger and older women. If we find it early and get everybody in the right program, they are going to be able to get the treatment they need so they don't lose an eye, they don't lose a kidney, they don't lose a leg.

We can't lose any more time. We need to provide universal access to health care to the American people and we need to make sure they have access to the screening and early preventive actions that will save lives.

Mr. President, I urge the adoption of the Mikulski amendment, and I thank you for your leadership on this issue.

I ask unanimous consent that the remaining time be equally divided between Governor SHAHEEN, Senator HAGAN, Senator MURRAY, and Senator GILLIBRAND.

The PRESIDING OFFICER (Mr. DODD). Without objection, it is so ordered.

Who seeks recognition?

The Senator from New Hampshire.

Mrs. SHAHEEN. Mr. President, I rise today in support of Senator MIKULSKI's amendment to ensure that women have access to preventive health care screenings and care at no cost. I wish to thank Senator MIKULSKI for her leadership not just in this effort but over the years to make sure women are treated fairly when it comes to our health care.

As a woman, a mother of three daughters and a grandmother of three granddaughters, this is an issue that is critically important to me personally. But as a former Governor, now a Senator and a policymaker, I understand these preventive services are not just good for women but they are good for families—for the children and husbands and brothers and fathers of the women we are talking about today. This amendment is good for our society as a whole.

Women must have access to vitally important preventive services such as screenings for breast cancer, cervical cancer, pregnancy, and postpartum depression screenings, annual well-woman visits, and preconception counseling that promotes healthier pregnancies and optimal birth outcomes. It is the right thing to do, but it is also fiscally responsible.

Not only does diagnosing disease early significantly increase a woman's chance for survival, but it also significantly decreases the projected costs of treatment. In fact, one recent study estimated that almost 80 percent of all health care spending in the United States can be attributed to potentially preventable chronic illness. This amendment takes a great step forward to early diagnosis of these costly and potentially preventable diseases. We must ensure these important services are provided at no cost.

Too often, women forgo their health care needs because they are not affordable. We know cost plays a greater role in preventing women from accessing health care than it does men. In 2007, more than half of all women reported problems accessing needed health care because of costs.

It is clear we need to support Senator MIKULSKI's amendment that will give women access to important health care screening.

The PRESIDING OFFICER. The Senator from New York is recognized.

Mrs. GILLIBRAND. Mr. President, I rise in support of Senator MIKULSKI's amendment, which improves the health care measures that are already in this act.

Women must shoulder the worst of the health care crisis, including outrageous discriminatory practices in care and coverage. Not only do we pay more for the coverage we seek for the same age and the same coverage as men do, but in general women of child-bearing age spend 68 percent more in out-of-pocket health care costs than men.

Some of the most essential services required by women are currently not covered by many insurance plans, such as childbearing, Pap smears, and mammograms. A standard in-hospital delivery can cost between \$5,000 and \$10,000 and much more if there are complications. You cannot imagine what it is like for a pregnant woman to recognize she may not have coverage for the essential services she needs for herself and her child. The health care bill before us ensures that this will no longer happen.

However, there is much room for improvement. In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost.

This fundamental inequity in the current system is dangerous and discriminatory and we must act.

The prevention section of the bill before us must be amended so coverage of preventive services takes into account the unique health care needs of women throughout their lifespan.

With Senator MIKULSKI's amendment, even more preventive screening will be covered, including for postpartum depression, domestic violence, and family planning.

Covering more preventive screening at no cost to women will encourage that more women go to the doctor, improving their health, saving lives and, as Senator MIKULSKI brought out, saving money.

The whole point of this health care bill is to lower costs across the board. When you shift America's health care system to preventive services over the current emergency room services, you are going to do exactly that.

This amendment will ensure that the coverage of women's preventive services is based on a set of guidelines developed by women's health experts.

This amendment will also preserve the doctor-patient relationship, to allow the patient to consult with their doctor on what services are best for them.

This amendment will cost \$490 million over 10 years and it is fully paid for.

The health care crisis in America must be addressed, and I am very supportive of Senator MIKULSKI's amendment.

The PRESIDING OFFICER. The Senator from North Carolina is recognized.

Mrs. HAGAN. Mr. President, I rise in support of the amendment offered by the senior Senator from Maryland.

This amendment tackles a serious problem: Women are increasingly skipping critical preventive health care screenings because of costs, even when they have health insurance.

This summer, I received an e-mail from a woman named Julie in Raleigh, NC, about her sister who had no insurance and waited years to get a mammogram because she couldn't afford to pay the \$125 fee for a mammogram. Then she found a lump in her breast.

Eventually, the mass grew so large Julie's sister finally got her mammogram and paid for it with cash. The mammogram confirmed what she had suspected, that she had breast cancer. But now that she had a diagnosis, she had no way to pay for the treatment.

She lost her battle with breast cancer in March of this year. Julie's sister, perhaps, could have beaten this cancer if she had had access to affordable, preventive care and, after her diagnosis, access to insurance or medical care to cover her cancer treatment.

In this heartbreaking situation, Julie's sister was sick and stuck. This health care reform bill will provide people such as Julie's sister with access to affordable, quality health insurance.

The President of Randolph Hospital in Asheboro, NC, wrote to me recently that a few years ago, he was in a meeting with 20 to 30 of his nursing assistants who were covered by the hospital's insurance plan. Of those who were old enough to require a mammogram, only 20 percent had actually gotten one. The reason, they said, was the

Exhibit 151

JA-0002448

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 477 of 677

high out-of-pocket costs they would have to pay.

When these women had to choose between feeding their children, paying the rent, and meeting other financial obligations, they skipped important preventive screenings and took a chance with their personal health.

The hospital then decided to remove the financial barrier to preventive care and pay for 100 percent of preventive screenings.

With the passage of Senator MIKULSKI's amendment, we will do the same for all women. A comprehensive list of women's preventive services will be covered with no added out-of-pocket expenses.

With this amendment, we will ensure that, as the old saying goes, "An ounce of prevention is worth a pound of cure," for women across America.

The PRESIDING OFFICER (Mrs. GILLIBRAND). The Senator from Washington is recognized.

Mrs. MURRAY. Madam President, I add my thanks to the Senator from Maryland, Ms. MIKULSKI, for bringing forth this important issue as we address health care reform in this country to ensure that all our families have access to health care.

One of the most important things we can do is make sure the caregivers in our families—the women—get access to preventive care so they can take care of their families.

This amendment will require all the health plans to cover comprehensive women's preventive care and screenings at no cost to women. That is extremely important. We all understand that—but especially in these tough economic times, when families across the country are struggling. One of the results has been that a lot of women are skipping or delaying their health care. We all know this personally. As moms, you take care of your kids first. When you do that, you often leave your families at risk because you haven't gotten the necessary preventive care.

We know that, in 2007, a quarter of women reported delaying or skipping health care because of the costs. In May of 2009, a report by the Commonwealth Foundation found that more than half of women delayed or avoided preventive care because of its cost.

This amendment will ensure that those women don't delay their preventive care because they cannot afford it. It is extremely important for this bill, it is important for women in this country, and it is important for men and children in this country as well.

I add my thanks to the senior Senator from Maryland and all our Senate colleagues who have been down here to make sure that one of the first things we do as we move the bill to the floor is make sure women's preventive care is covered.

I yield the floor.

Ms. MIKULSKI. Madam President, that concludes our discussion and our responses to this portion of the health care reform bill.

I must say: Alert, alert, alert. We have just been informed that a shrill advocacy group is spreading lies about this amendment. They are saying that because it is prevention, it includes abortion services. There are no abortion services included in the Mikulski amendment. It is screening for diseases that are the biggest killers for women—the silent killers of women. It also provides family planning—but family planning as recognized by other acts. Please, no more lies. Let's get off of it and save lives.

The PRESIDING OFFICER. The Senator's time has expired.

The Senator from Montana is recognized.

Mr. BAUCUS. Madam President, I yield myself 1 minute. Very much straight to the point here, there has been some discussion about CBO's assessment on the health care premiums. The letter was out yesterday. That letter shows that for all Americans—all Americans—premiums will be lower. They will be modestly lower to those larger employers. We have a range between those small businesses of between a 1-percent reduction and a 2-percent increase, and for the individual market there is more variation because there is much more variation today currently in the individual market.

Those who purchase in the individual market will be getting a lot better quality of insurance than they are getting today—much better. About 60 percent of those in the individual market will find that their premiums are actually lower after the tax credit/subsidies are taken into consideration.

So netted all out together, all Americans are going to see their premiums are lower for what they get today. About 7 percent will see an increase, but they are getting better coverage than today—quite a bit better coverage. On a net basis, basically, bottom line, everyone were will see his or her premiums lower. For the 7 percent that are not lowered, they will get a lot better quality of insurance. That will more than offset the increase in premium. That is what that CBO letter says. I urge all folks who are interested to read that letter.

I have one other minor point on the so-called Cadillac plans. CBO said that those who receive Cadillac plans will find their premiums reduced, not increased—I think it is by about 6 or 7 percent. That, too, is very important. There has been a lot of discussion about the effect of premiums on Cadillac plans. CBO says those premiums will be reduced.

My minute is probably up. I wish to use the last seconds to just say that the net, all the way across the board, CBO says premiums will be reduced when you take subsidies into consideration and compare the plans people get today with what they would otherwise get in the future, the quality of coverage.

The PRESIDING OFFICER. The Senator from Oklahoma is recognized.

Mr. COBURN. Madam President, how much time remains on the Republican side?

The PRESIDING OFFICER. Three minutes.

Mr. COBURN. Madam President, I ask unanimous consent to consume that 3 minutes and the other 15 minutes allotted to our side on the executive nomination, and when that 18 minutes is up, the remainder be followed by the time on the Democratic side and the nomination be reported.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. COBURN. Madam President, I wished to spend a few minutes on this.

As a physician who cared for Medicare patients for 25 years, I cannot tell you how worried I am about what this bill is going to do to my senior patients. When Medicare was first written, two things were put into the law—very straightforward, very direct. Let me read them to you, for a minute. I hope Americans listen to this. Here is what the law is. CMS is breaking the law today and, with the new Medicare Commission, they are going to break it even further under this bill.

Section 1801 says this:

Nothing in this title shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

That says that the Federal Government cannot practice medicine. That is what it says.

Section 1802 says this—and this is where it is important for my Medicare patients and everyone out there:

Any individual entitled to insurance benefits under this title may obtain health services from any institution, agency, or person qualified to participate under this title if such institution, agency, or person undertakes to provide him such services.

Well, what we have in this bill is the gutting of those two foundational principles of Medicare. The first is the Medicare Advisory Commission is going to tell you what you can and cannot have. Here is what we are going to see: You will choose what I tell you to choose if you are a Medicare patient.

Not only do we have almost $500 billion in cuts to Medicare, under the auspices that we have to control entitlement spending; not only are we taking away plans from people who are very satisfied with what they have today, but we have enhanced, and will enhance, the ability of the Federal Government to practice medicine.

My colleagues on the other side of the aisle, who have never practiced medicine, who know the legalese but don't know the consequences of right now the rationing of Medicare on drugs such as Epigen and Neupogen—you see, Medicare has decided when oncologists can use those drugs. They have taken a

blanket position, although they have released it somewhat. But what it says is this—I will give you a patient who has breast cancer. She is 67 years old. She is being treated for breast cancer. She becomes anemic and neutropenic. That means her white blood cell count, her ability to fight infection goes down.

We have wonderful drugs that raise the white blood cell count and raise the red blood cell count. But Medicare, in its obvious wisdom of practicing medicine, has told the oncologists when they can and cannot use it. That is fine for 75 percent of the patients, but it totally ignores the other 25 percent of the patients who happen to have complicating factors, such as congestive heart failure or if they become anemic under breast cancer chemotherapy and have congestive heart failure as well. The government says you cannot have erythropoietin at this level of hemoglobin regardless of whether you have congestive heart failure.

What happens is the practice of medicine out of Washington or Maryland, more specifically, determines who can and cannot have a drug; in this case, erythropoietin.

What is the consequence of that? The consequence is that the patient did not die of breast cancer; she died of congestive heart failure that could have easily been treated had we not had medicine practiced by CMS denying the ability of the physician to give the patient exactly what she needed when she needed it.

We are starting down that road with this bill—aggressively starting down that road—because the Medicare Payment Advisory Commission, combined with the Comparative Effectiveness Panel will not look at complications and will not look at secondary diseases. They will look at the average.

I want to tell my colleagues, when you are sitting in an office with your doctor, you are not average. You are you, and you are a specific individual with a set of factors that nobody else has. The judgment in the practice of medicine cannot be done by an insurance company or CMS at a distance without them having a hand on the patient. They never have their hand on a patient.

The whole art of medicine, which is 40 percent of getting people well, is the knowledge and training and experience and gray hair that comes with looking at the total patient, being one on one, not having the government between the doctor and their treatment of a patient.

What this bill does—this bill is a lie one of two ways. One, it says we are going to take this money out of Medicare and you are not going to notice any difference. That cannot be true. If we take $500 billion or $400 billion-plus out of Medicare, millions of seniors are going to notice a difference in their health care and what they get under Medicare. If we say that is not true, then the only way that is not true is

the game that is being played on the financing of this program; that is to say, we are going to cut this money out of Medicare and then with a wink and a nod know we are never going to do it.

The majority leader said yesterday there is nothing more important in this Nation right now than passing health care reform. I differ with that statement. I think 10.2 percent unemployment is a whole lot more important, and finding those people jobs, than passing health care reform. I think a $12 trillion debt is more important to address than fixing health care right now. I think the fact that we have $350 billion worth of waste, fraud, and duplication in the Federal Government every year, and we are not addressing it, is more important than fixing health care right now. I think the fact that our economy is still on its back and people are continuing to lose jobs is more important than fixing health care right now.

I understand the political dynamics, but I also understand very well with my quarter of a century of practicing medicine that what this bill is going to do is destroy the best health care system in the world, and it is going to undermine the security of every senior in this country because what starts as a small couple of things, such as Neupogen and Epogen or like when you can have bone densitometry and whether your osteoporosis can truly be evaluated, CMS has already said how much you can do that, whether your bones are falling apart or not. It is the start of the government practicing medicine.

It is the beginning of our seniors having the government step in between them and their physician in terms of best for that senior and the government saying: No, I will tell you what you are going to have. I will tell you what you will have.

Thomas Jefferson taught us a lot. He predicted we would have "future happiness for us if we can prevent the government from wasting the labors of the people under the pretense of taking care of them."

I want to see a lot of things changed in health care. I want to see true competition in the insurance industry. I want to make sure nobody loses their insurance because they get sick. I want to make sure everybody can get insurance if they are sick. I do not disagree with the basic premise. What I disagree with is moving $2.5 trillion more under government control, which will raise costs ultimately in the health care sector. If it does not raise costs and we are truly going to take this money from Medicare, what it is going to do to our seniors, I have a message for you: You are going to die soon, and they are going to say that is not true, that it is not true.

When you restrict the ability of the primary caregivers in this country to do what is best for their senior patients, what you are doing is limiting

their life expectancy. We are saying CMS, the Medicare Payment Advisory Commission, and the Comparative Effectiveness Panel will tell the doctors what they can and cannot do, ignoring the 20 percent of the people for whom that is exactly the wrong prescription. So for 20 percent of our seniors, this bill is going to be a disaster, but it is going to save money because you are not going to be around for us to spend any money on you because the government will have already told us what the treatment plan will be for you. We will decide in Washington through the Center for Medicare and Medicaid Services what you will receive.

They will dispute that, but the people who are going to be disputing that are lawyers; they are not doctors. They have never laid a hand on a patient. They have never put their hand forward on a Medicare patient knowing the consequences of the total patient, the background, the medical history, the sociologic factors that fit, the family dynamics, the past medical history, the family history, and the present state of mind of that patient.

Even more important, what this bill is going to do is divide the loyalty of your doctor away from you. When you go to the doctor today, most of the time that doctor's No. 1 interest is in you and your well-being. When you have this Medicare Payment Advisory Commission and you have this Comparative Effectiveness Panel, what that does is that causes the physician—he or she—to take their eyes off of you. Now they are going to put their eyes on what the government says because the consequences of not doing what the government says will ultimately result in some type of sanction.

Do we want physicians to be patient-centered and focused on their patients or do we want physicians to have their eye on the government and half of an eye on the patient? Which do you think is going to give us the best care? Which do you think is going to give us the greatest quality of life? What is going to give us the greatest longevity with the greatest quality of life? Is it the government practicing medicine, or is it the trust that has been developed through years between a patient and a doctor to do what is in the best, long-term interest of that patient?

I cannot tell you the number of people who die from the CMS regulations on Epogen for oncologists. But there were hundreds—hundreds—because Medicare never looked at the patient; they looked at dollars.

As we go forward in this debate, what I want seniors in America to know—and I am fast approaching Medicare age; I am 3 years from it—I want them to know the key thing they are going to lose in this bill is the loyalty and primacy of their physician thinking about them. We are going to divide that loyalty to where the physician is going to be looking at the government. If you think that is not true, just look at what has happened so far when CMS

Exhibit 151

JA-0002450

Case 2:17-cv-04540-WB Document 253-10 Filed 09/29/20 Page 479 of 677

has decided to start practicing medicine.

In the HELP Committee, I offered an amendment to change the language so there would be absolutely a prohibition on rationing care and directing the care from Washington. It was rejected out of hand—rejected out of hand. Not one of my colleagues on the other side of the aisle voted to prohibit rationing of health care.

Why would they do that? Because the ultimate intention through the Comparative Effectiveness Panel is to ration care. It is to ration the care. It is to limit the amount of dollars we spend and never look at the individual patient.

If we think about the Medicare cuts in this bill, we are going to take $135 billion out of the hospitals. Do you think seniors will ever notice that? I do. I think when you ring your button and you are hurting and you need pain medicines or you need to go to the bathroom, the time it takes for somebody to get there will not be sufficient. What will happen is you will wait. You will have a complication. If you have acute shortness of breath and press the button, the available nurses will not be there. There will be a consequence to cutting $135 billion from payments to hospitals in this country.

We are going to take $120 billion out of the seniors—the one in five seniors who now have Medicare Advantage. I agree, it is more expensive than Medicare. It needs to have some cost containment through competitive bidding, but we should not be decreasing the services, which is exactly what is going to happen. If you are a senior on Medicare Advantage, you are going to lose benefits you now have. You are going to lose them.

One of the ideas of Medicare Advantage was preventive services. One of the things that improved the care in rural America was Medicare Advantage. Yet we are going to take that away. The vast majority of the benefits we are going to cut in half.

We are going to take $15 billion from nursing homes. That may or may not be appropriate, but the way to do that is through a competitive experience based on quality and outcome rather than some green-eyeshade staffer saying we can take $15 billion out of Medicare from payments to nursing homes.

One little secret that is not in this bill, that has not been addressed in this bill, is the estimate by a Harvard researcher that there is $120 billion to $150 billion a year in fraud in Medicare alone. HHS admits to $90 billion. We know it is well over $100 billion a year. Cleaning up the fraud in Medicare would pay for a lot of health care for a lot of folks in this country. There is $2 billion in this whole bill to clean up the fraud.

Why would we not fix that first? Why would we take money from Medicare to create a new program when in fact we are wasting 10 to 15 percent?

The PRESIDING OFFICER. The time of the Senator has expired.

Mr. COBURN. I will close with this remark. If you are a senior and you are on Medicare, you better be afraid of this bill. I don't come to the floor and say that very often, but your health care is totally dependent, in terms of being decreased by this bill.

I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD. Madam President, I ask unanimous consent I be allowed to speak for 1 minute 7 seconds and the time be taken from that of my good friend and colleague from Vermont, the chairman of the Judiciary Committee.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DODD. Madam President, Senator TOM COBURN and I have become great friends. We have spent a lot of time together this summer in my HELP Committee. He talked with great eloquence about that distance that can occur between a doctor and patient, and obviously as someone who practiced medicine for a long time, he speaks from strong personal experience, and I admire and respect that immensely. But let me say to my colleagues, without this bill we are talking about here, this comes to a simple choice. Under existing law, the way things are today, one institution stands between a doctor and patient and that is your insurance company. They ration care all the time. In fact, I am a living example of rationed care, having been through surgery, getting preapproval twice before surgery and then being rejected by the very insurance company I paid premiums to for a long time as a Member of this body. We are working it out, I believe, because they thought—I am 65—that Medicare ought to pay for my surgery rather than the company I paid premiums to for a long time.

They were rationing my care. That insurance company, it wasn't some government entity or someone else, they are the ones. Without our bill, the only one getting to decide what health services anyone receives is the insurance industry.

I hope we would have a chance to debate this further, as I am confident we will.

Let me also say how much I support the effort by Senator MIKULSKI on her efforts to see to it that women are treated equally, and particularly in preventive care, and I strongly urge the adoption of her amendment and ask to be added as a cosponsor to that amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DODD. I thank the Chair.

Mr. LEAHY. Madam President, our Nation is in the midst of a historic debate about how to reform our health insurance system. Three House committees and two Senate committees have spent countless hours trying to answer the question of how best to introduce competition and make health insurance affordable for all Americans.

I applaud their efforts, and I applaud the efforts of the many Senators who have fought to bring this important debate to the Senate floor.

I have pushed and will continue to push for provisions that accomplish the "three C's" of health insurance reform: choice, competition, and cost control. I recently reaffirmed my support for a public option.

A public option would give consumers more choices to purchase an affordable and quality health insurance plan and will help drive down overall health care costs. I will continue to push for inclusion of a public option in the final Senate bill.

Amid this discussion of how best to introduce competition into the health insurance industry, it is important to remember that today the health insurance industry does not have to play by the same rule of competition as other industries. Due to a six decade-old special interest exemption, the business of insurance is not subject to the Nation's antitrust laws. If there was ever a good reason for such an exemption, it no longer exists.

While there are divergent views on the best way to introduce choice and competition into health insurance market, we can surely agree that health and medical malpractice insurers should not be allowed to collude to set prices and allocate markets.

Today, I am filing the Health Insurance Industry Antitrust Enforcement Act of 2009 as an amendment to the Patient Protection and Affordable Care Act. This legislation, which I introduced in September and which is cosponsored by 18 Senators, will repeal the antitrust exemption for health insurance and medical malpractice insurance providers, and ensure that the basic rules of fair competition apply to the industry as part of the reforms that the larger health care bill will enact. Our Nation's antitrust laws exist to protect consumers, and it is vital that the health insurance and medical malpractice insurance companies are subject to these laws.

These laws promote competition, which ensures that consumers will pay lower prices and receive more choices.

The Majority Leader, an original cosponsor of this legislation, testified before the Senate Judiciary Committee that "[i]t is of the upmost importance that we make sure the insurance industry is playing by the same rules as everyone else, and that they are subject to competition." I could not agree more, and I encourage the leader to schedule a vote on this amendment early in this debate. The President also recently supported Congress's efforts to determine whether any justification remains for permitting price fixing.

The vast majority of the companies doing business in the United States are subject to the Federal antitrust laws.

However, a few industries have used their influence to maintain a special, statutory exemption from the antitrust laws. The insurance industry is

Exhibit 151 JA-0002451

one of those few remaining industries. In the markets for health insurance and medical malpractice insurance, patients and doctors are paying the price, as costs continue to increase at an alarming rate, while patients and small businesses suffer. This is wrong, and this amendment fixes this problem.

The Health Insurance Industry Antitrust Enforcement Act is supported by a cross-section of groups interested in promoting competition, including the Consumer Federation of America, Health Care for American Now, and the American Hospital Association. I also received a letter from a coalition of 10 State attorneys general who voiced their specific need for this legislation.

The top law enforcement officers in those States argue that ''Repeal of the McCarran-Ferguson exemption would enhance competition in health and medical malpractice insurance by giving state enforcers, as well as federal enforcers, additional tools to combat harmful anti-competitive conduct.'' The letter goes on to state that ''The McCarran-Ferguson exemption serves no plausible public interest.''

This amendment will prohibit the most egregious anticompetitive conduct—price fixing, bid rigging and market allocations—conduct that harms consumers, raises health care costs, and for which there is no justification. Subjecting health and medical malpractice insurance providers to the antitrust laws will enable customers to feel confident that the price they are being quoted is the product of a fair marketplace.

The lack of affordable health insurance plagues families throughout our country, and this amendment is a first step towards ensuring that health insurers and medical malpractice insurers are subject to fair competition. I hope all Senators will join me in support of this important amendment.

Madam President, I note my amendment removes the outdated, antiquated, unnecessary antitrust protection given to our insurance companies, a protection which, instead of allowing them to thrive and give us lower premiums, has perversely acted in such a way that our premiums continue to rise 15 percent in the last year alone. This will help change that.

━━━━━━━━━

EXECUTIVE SESSION

━━━━━━━━━

NOMINATION OF JACQUELINE H. NGUYEN TO BE UNITED STATES DISTRICT JUDGE FOR THE CENTRAL DISTRICT OF CALIFORNIA

The PRESIDING OFFICER. Under the previous order, the Senate will proceed to executive session to report the following nomination.

The bill clerk read the nomination of Jacqueline H. Nguyen, of California, to be United States District Judge for the Central District of California.

The PRESIDING OFFICER. The Senator from Vermont is recognized.

Mr. LEAHY. Madam President, I understand the Senator from California desires some time. I yield her 5 minutes, beginning now.

Mrs. FEINSTEIN. Madam President, I rise to speak in support of the nomination of California Superior Court Judge Jacqueline Nguyen to be a Federal District Court Judge from the Central District of California. I urge her confirmation.

Judge Nguyen is a tested judge with a track record of success as both a judge and a Federal prosecutor. She will be the first Vietnamese American on the Federal bench. Her nomination comes about this way.

I have had, for a long time, a bipartisan judicial selection committee in California to advise me in recommending judicial nominees to the President. The committee gave Judge Nguyen its unanimous recommendation. Then I recommended her to the President for his nomination to the Federal district court. I believe she is going to be an excellent Federal district court judge in the Central District.

Judge Nguyen was born in South Vietnam. She immigrated to this country with her family at the age of 10 during the final days of the Vietnam war. The Nguyens spent several months living in a refugee camp in Camp Pendleton, San Diego, before moving to the La Crescenta neighborhood of Los Angeles. She was naturalized in 1984.

Judge Nguyen's parents worked two and three jobs at a time in Los Angeles, and Judge Nguyen and her siblings worked side by side with them, cleaning a dental office, peeling and cutting apples for a pie company, and finally managing the doughnut shop that their parents bought and owned.

In her application to my selection committee, she explained that looking back on these experiences she realizes now that they were difficult. She wrote:

But I nevertheless feel incredibly fortunate because those early years gave me invaluable life lessons that have shaped who I am today.

She went on to graduate from Occidental College in 1987 and from UCLA Law School in 1991. She was in the Moot Court Honors Program.

For the first 4 years of her career, she practiced commercial law as a litigation associate at the private law firm of Musick, Peeler and Garrett, where her caseload included complex contract disputes and intellectual property cases. In 1995 she left the firm to become an assistant U.S. attorney in the U.S. Attorney's Office in Los Angeles, and a very good one.

As an assistant U.S. attorney in the criminal division, she prosecuted a wide variety of crimes, including violent crimes, narcotics trafficking, organized crime, gun cases, and all kinds of fraud. She spent 6 months in the organized crime strike force section, handling a title III wiretap investigation of a Russian organized crime group responsible for smuggling sex slaves into the United States from the Ukraine. In 2000, she received a special commendation from FBI Director Louis Freeh for obtaining the first conviction ever in the United States against a defendant for providing material support to a designated terrorist organization.

The Justice Department recognized her with three additional rewards for superior performance as an assistant U.S. attorney, and in 2000 she was promoted to deputy chief of the general crimes section.

In 2002, Judge Nguyen left the U.S. attorney's office when Governor Gray Davis appointed her to the Superior Court in Los Angeles, and she has been on that bench for more than 7 years and has presided over more than 65 jury trials.

As she has said in her own words:

I am deeply passionate about the privileges that we enjoy as Americans and am committed to spending my life in public service. If I am given the honor to serve as a United States District Judge, I believe my experiences, work ethic, maturity and judgment will serve me well.

I could not agree more. I think Judge Nguyen will be a truly outstanding judge of the Federal district court and I urge my colleagues to support her nomination.

I yield the floor.

The PRESIDING OFFICER. The Senator from Vermont is recognized.

Mr. LEAHY. Madam President, I absolutely concur with the comments of the distinguished senior Senator from California in support of the nomination of Judge Jacqueline Nguyen to serve on the Federal Court in the Central District of California. I supported Judge Nguyen in the committee and I am glad we are able to act on her nomination today.

Judge Nguyen participated in a confirmation hearing before the Judiciary Committee on September 23. Hers was a historic hearing at which, for the first time, three Asian Pacific American judicial nominees appeared together—Judge Nguyen, Dolly Gee and Judge Edward Chen. Indeed, three Asian Pacific American judicial nominees have never been confirmed in the same year. Of the 876 active judges serving on our Federal courts, only 8 are Asian Pacific American.

We also held a November hearing for Judge Denny Chin, a well-respected judge on the Southern District of New York, whom President Obama has nominated for elevation to the Second Circuit Court of Appeals. Judge Chin was the first Asian Pacific American appointed as a Federal district court judge outside the Ninth Circuit. If confirmed to the Second Circuit, he will be the only active Asian Pacific American judge to serve on a Federal appellate court anywhere in the country. It is unbelievable that with 179 Federal appellate court judgeships in our country, none are currently held by an Asian Pacific American. More than 14

Exhibit 151

JA-0002452

should be made by a patient and a doctor. It shouldn't be made by an insurance company, by Members of Congress or by someone you have never met. No matter what independent task forces recommend and no matter what some Republican Senators falsely claim, this legislation—the one before this body—offers free preventive services to millions of women who are being discriminated against by their insurance companies, and this amendment before this body makes that absolutely clear.

Senator MIKULSKI has long been someone who has been a leader and has looked out for women's health. Years ago, she worked with me on a problem women have; 90 percent of the people who have a disease called interstitial cystitis are women. I discovered that when three women came to visit me in Las Vegas. It was a disease that was ignored. People thought it was psychosomatic. Working with Senator MIKULSKI, we had the National Institutes of Health set up a protocol. Now 40 percent of those people, who previously were thought to be psychosomatic and who suffered with symptoms they described as shoving slivers of glass up and down their bladder, are symptom free—not 100 percent but 40 percent. It is easier to diagnose now.

Senator MIKULSKI has also worked hard to have the National Institutes of Health set up a division for women's health problems. So she is a leader in this area, has been for a long time, and with this amendment she does it once again.

I am sorry to see Republicans deliberately confuse the facts about women's health, particularly as they relate to mammograms. It shows how desperate some of them are to distract the American people from the real debate and from the fact they have no vision for fixing our health care system, which is so broken.

I am even more sorry to say it is part of a larger trend. In recent days, they have been distorting the data from the Congressional Budget Office, an independent agency Republicans in the past have praised. What are they complaining about now, the Republicans? They are complaining about two of this Nation's top priorities: reforming our health care insurance system and helping our economy recover.

First, on health care. The Congressional Budget Office said yesterday the majority of American families who buy insurance in the new marketplace we will create—what we call health insurance exchanges—will see their premiums go down. They will go down by as much as 60 percent. Out of 100 percent of the American people, 93 percent will have a drop in their insurance premiums with this legislation—93 percent.

CBO's experts aren't the first to recognize these benefits. Massachusetts Institute of Technology's Jonathan Gruber, who is one of the most respected economists in the world, said in today's Washington Post:

Here's a bill that reduces the deficit, covers 30 million people and has the promise of lowering premiums in the long run.

Pretty good statement. That means millions of Americans who today cannot afford coverage or whose medical bills drive them to financial ruin. Remember what I said yesterday as this debate began. Last year, 750,000 people in America filed for bankruptcy. Almost 70 percent of the bankruptcy filings were because of health care costs. But of those people who filed for bankruptcy because of health care costs, 62 percent of them had health insurance. Does that speak about a system that is in trouble? Of course it does.

So I repeat: This bill will mean millions of Americans who today cannot afford coverage or whose medical bills drive them to financial ruin will be able to afford to stay healthy. It means, if we don't reform health care, millions more will find themselves in bankruptcy, bad health or worse.

Second, on economic recovery. The Congressional Budget Office said yesterday the extraordinary steps we took to bring our economy back from the brink have created and saved hundreds of thousands of jobs. I will direct my comments to the American people but also to the brave Republicans who joined with us to make this possible—Senators SNOWE and COLLINS. I want them to know that what they did helped us get that legislation passed and, according to the Congressional Budget Office, saved hundreds of thousands of jobs. The CBO said yesterday the extraordinary steps we took to bring our economy back from the brink have created or saved hundreds of thousands of jobs. Its estimate reaches as high as 1.6 million jobs, each one a direct result of our economic recovery plan. Pretty good. The same report also said our country's gross domestic product has gone up by as much as 3.2 percentage points higher than it would have if we hadn't acted.

Let us not do what our colleagues on the other side of the aisle are doing—betting on failure. This country is coming out of a hole that was dug by this administration for some 8 years. The facts are that what we did on a bipartisan basis in January and February has brought this country out of an economic hole. We still have a ways to go, no question about it. But we created 1.6 million jobs and increased the gross national product by as much as 3.2 percentage points. Pretty good. These facts tell us the same thing: Not acting is not an option.

Some of my Republican colleagues prefer to close their eyes and ears to this reality. They prefer to play politics than to do what is right and what is necessary. They are content to say no, instead of offering constructive alternatives and a way to lead our country and our constituents back to health.

At the beginning of this second day of debate, I say: Come along and work with us to improve this legislation. Try

to improve it the way Senator MIKULSKI looked at it and said: This legislation can be improved. We want to work with the minority. We want to have legislation that is bipartisan. We don't want to do this alone. We need the Republicans' help, and I hope they will join with us. It would certainly look better. Let's stop berating this legislation before this body. If they do not like it, try to do something to make it better.

As we know, this legislation saves lives, it saves money, it saves Medicare, and it brings down insurance premiums. That is a pretty good deal. And it brings down the debt. It saves $130 billion over the next 10 years and, after that, $650 billion. Not bad. So the numbers they keep talking about are out of—I don't know where they come from. We, as a body, have used the Congressional Budget Office for 50 years. It is bipartisan. That is the way it should be. We should start talking real numbers, not fake numbers.

## RECOGNITION OF THE MINORITY LEADER

The ACTING PRESIDENT pro tempore. The Republican leader is recognized.

## HEALTH CARE REFORM

Mr. McCONNELL. Mr. President, certainly in a country of 300 million people there are differences of opinion, and you will see them on full display in the Senate on this monumental 2,074-page scheme that would expand the reach of government deeper into our lives, raise taxes, increase health care premiums, and cut Medicare for seniors.

On the other side are the American people. We know, from all the surveys we have seen, the American people are opposed to this bill. They are astonished that we are trying to pass a bill that is clearly opposed by the American people in every survey that has been published.

Americans do support reform, but this isn't the reform they were asking for, and it is not the reform they were told they could expect. In fact, it is pretty clear by now that the American people were sold a bill of goods when the administration and its allies in Congress said their health care bill would lower costs and help the economy because the plan that has been produced, that is before the Senate, will not do either.

The debate is no longer about improving care by reducing costs. We are past that. This plan will raise costs on American families, and it will make an already struggling economy even worse. The only question now is how we got to a point where we are actually considering spending trillions of dollars on a brand new government entitlement at a time when more than 1 in 10 Americans is looking for a job and when our debts and deficits are well past the tipping point.

Exhibit 151      JA-0002453

For many, the answer to that question is quite clear. We know that some here in Washington have wanted government-run health care for many years. It is hard to escape the conclusion that these same people saw the current economic crisis as their moment. Earlier this year, some in this administration said that "a crisis is a terrible thing to waste." Americans are hoping this bill is not what they meant, but they are concerned that it is.

Americans already know this bill will make our economic problems worse, not better, without even addressing the serious health care problems we already face—and they would be right. That is why they want us to start over and accomplish the real mission of lowering costs.

That is precisely what the McCain amendment would allow us to do. The McCain amendment would send this bill back for a rewrite. It would send it back to the Finance Committee with instructions to give us a new bill that does not include $\frac{1}{2}$ trillion cuts to Medicare. It would send the bill back to committee; send us a new bill without $\frac{1}{2}$ trillion cuts to Medicare, one that does not pay for the bill on the backs of seniors; that is, if you pass the McCain amendment.

Here is a program, the Medicare Program, that is already struggling, a program that needs help. Yet, in order to finance their vision of reform, our friends on the other side want to use Medicare as a piggy bank to create an all-new government program that is bound to have the same problems as Medicare. As written, their bill would cut nearly $\frac{1}{2}$ trillion from Medicare—not to make the program stronger but to fund more government spending. In the process, millions of seniors would lose benefits. Literally millions of seniors would lose benefits.

The McCain amendment would not let that happen. The McCain amendment tells the committees: Don't cut hospitals. The McCain amendment tells the committees: Don't cut hospice. The McCain amendment tells the committees: Don't cut home health care. The McCain amendment tells the committees: Don't cut Medicare Advantage. It would allow us to focus our efforts, instead, on the prevention of waste, fraud, and abuse, which we know to be rampant in this program. It would ensure we are not cutting one government program just to create a new one. That is what a vote in favor of the McCain amendment would be, it would be a vote to preserve Medicare, not weaken it. That is the message America's seniors want to hear in this health care debate, that improving health care in America doesn't have to come at their expense.

Some may argue that they need to cut Medicare to create a new government program. That is their call. But it is not the call Americans are asking us to make. I haven't gotten a call yet from anybody in Kentucky or around

the country saying: Please cut Medicare so you can start a new program for somebody else—not my first call.

The American people want us to start over from the beginning and craft a bill they can actually support, and we know they don't support this bill. All the surveys indicate that. Then we could start over and end junk lawsuits against doctors and hospitals that drive up costs, something the majority didn't find any room for in their 2074-page bill—not a word about controlling junk lawsuits against doctors and hospitals. Then we could encourage healthy choices such as prevention and wellness programs, something the majority somehow couldn't squeeze into their 2074-page bill. Then we could lower costs by letting consumers buy coverage across State lines, something the majority must have overlooked in their 2074-page bill. Then we could address the rampant waste, fraud, and abuse, something our friends didn't think was important enough to seriously address in their 2074-page bill.

The McCain amendment would allow us to vote with seniors. That is what the McCain amendment is about. It would allow the Senate to say we are not going to finance a new government program on the backs of seniors, we are not going to use Medicare as a piggy bank to fund a new government program. It would allow us to vote with the American people. Most important, it would allow us to start over and get this right.

I yield the floor.

———

## RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

———

## SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of H.R. 3590, which the clerk will report.

The legislative clerk read as follows:

A bill (H.R. 3590) to amend the Internal Revenue Code of 1986 to modify the first-time home buyers credit in the case of members of the Armed Forces and certain other Federal employees, and for other purposes.

Pending:

Reid amendment No. 2786, in the nature of a substitute.

Mikulski amendment No. 2791 (to amendment No. 2786), to clarify provisions relating to first dollar coverage for preventive services for women.

McCain motion to commit the bill to the Committee on Finance, with instructions.

The ACTING PRESIDENT pro tempore. Under the previous order, the time until 11:30 will be for debate only, with the Republicans controlling the first 30 minutes and the majority controlling the next 30 minutes, with the remaining time equally divided and controlled between the two leaders or their designees and with Senators per-

mitted to speak therein for up to 10 minutes each.

The Senator from Arizona is recognized.

Mr. KYL. Mr. President, I ask unanimous consent that during the 30 minutes controlled by the Republicans, we be allowed to engage in a colloquy.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. KYL. Mr. President, I will begin by making some comments about the amendment Senator McCAIN, my colleague from Arizona, has filed. This is an amendment that, as the minority leader just said, will protect America's seniors. It will disallow the Medicare cuts this bill includes.

The economist Milton Friedman famously said, "There is no such thing as a free lunch," and that applies to health care as well. There is no such thing as free health care. Someone has to pay. Since this bill is a $2.5 trillion bill, the first question is, Who pays? The first answer to who pays is, it is America's seniors, because about half of the cost of the bill is allegedly paid for by cuts to Medicare.

Let me break down a little bit more specifically than the Republican leader did exactly what that means. This is about $500 billion in Medicare cuts as follows: $137.5 billion from hospitals who treat seniors; $120 billion from Medicare Advantage, which is the insurance program that provides benefits to seniors which will be cut more than in half as a result of this $120 billion reduction; $14.6 billion from nursing homes that treat seniors; $42.1 billion from home health care for seniors; and $7.7 billion from hospice care, one of the most cruel cuts of all.

Obviously, with cut this dramatic there is no way to avoid jeopardizing the care seniors now enjoy, and seniors know this. That is why they have been writing our offices and attending town-hall meetings to let us know they disapprove. I quoted from two letters constituents of mine from Arizona sent asking to please not cut their Medicare Advantage Program. This has been called the crown jewel of the Medicare system, and many of them rely on Medicare Advantage for dental care or vision care or hearing assistance they have come to rely on. They are not buying the claims that somehow or other we can make $\frac{1}{2}$ trillion cuts in Medicare without somehow hurting their care. They know better than that, and they are right. The care they have been promised will be compromised to pay for this new government entitlement under the bill.

Finally, many are wondering what happened to the promise that they get to keep the care they have. We all heard the President say that many times: If you like the care you have, you get to keep it. That is simply not true. There are 337,000 Arizonans who are Medicare Advantage patients. They like what they have. Yet we know, according to the Congressional Budget

Exhibit 151                                                                JA-0002454

Advantage. It is neither Medicare nor an advantage. Quite the opposite, in fact.

You are accurate in your numbers, by the way, because I want people to know, as much as we respect the Senator from Illinois and his math, the numbers he identifies of $100 billion this program is costing us, comes from the Congressional Budget Office. We didn't make up these numbers. That is the cost savings by modifying Medicare Advantage that has cost us so much and deprived the overwhelming majority of our elderly the benefits they end up paying for. So I appreciate very much the Senator's question.

Mr. BAUCUS. If the Senator will yield for another question, might I ask my friend if it isn't also true that in the June MedPAC report it states that Medicare Advantage overpayments cost taxpayers an extra $12 billion?

Mr. DODD. That is correct. And again, that is MedPAC.

Mr. BAUCUS. Well, that is right, that is MedPAC. I think the point the Senator from Illinois is making needs to be underlined two or three or four times here—and the Senator from Connecticut has made it too—and that is there is a huge distinction between Medicare and these private insurance plans.

Mr. DODD. I think too many of our fellow citizens hear the word Medicare Advantage and assume that is the Medicare Program, and it is not.

Mr. BAUCUS. It is not. It is a private plan.

What Medicare Advantage is overpaid—that is what these insurance companies are overpaid, and a lot of that goes back to the Part D drug bill and so forth—do those overpayments necessarily mean better benefits for persons who signed up for those plans?

Mr. DODD. No. In fact, there is no evidence that overpayments to plans leads to better health care. That is again according to MedPAC.

Mr. BAUCUS. If that is true, why might that be the case, just so people understand?

Mr. DODD. Because insurers, not seniors or the Medicare Program, determine how these overpayments are used. And too often they are used to line the pockets of insurers, to increase their profits and not to provide benefits.

Mr. BAUCUS. Does Medicare decide what the benefits will be for those folks?

Mr. DODD. No, it is the private carriers that decide that.

Mr. BAUCUS. The private insurance carriers.

Mr. DODD. Yes, they are the ones that set the rates and determine where the profits go. That is why it is such a misnomer to call this Medicare Advantage, because it is neither Medicare nor an advantage.

The PRESIDING OFFICER. The time has expired.

Mr. DODD. Mr. President, I ask unanimous consent for 2 additional minutes.

The PRESIDING OFFICER. Is there objection?

Mr. COBURN. Reserving the right to object, I will ask for 2 additional minutes for my side.

Mr. DODD. Well, I gave 2 minutes to my friends earlier.

Mr. COBURN. How about 1?

Mr. DODD. OK, 1. Well, make that 2. If he wants 2 additional minutes, I have no problem giving my colleague 2 additional minutes.

Mr. BAUCUS. You already said it, but I think it is worth repeating——

The PRESIDING OFFICER. Without objection, the request is agreed to.

Mr. BAUCUS. Most seniors, as they pay Part B premiums under fee for service, don't get any benefit whatsoever?

Mr. DODD. That is correct. None whatsoever. In fact, all they do get is higher premiums.

Mr. BAUCUS. That is right. Higher premiums.

Mr. DODD. Higher premiums. And 78 percent, almost 80 percent are paying more for a program from which they never get any benefit.

Mr. BAUCUS. The figure I saw—I guess it is $90 a year they pay extra and get no benefit from it.

Mr. DODD. So vote for the McCain amendment and you do exactly what Senator DURBIN is suggesting: Preserve Medicare Advantage, and under Medicare Advantage 78 percent of our elderly pay more premiums, never get any benefits, and the private carriers get to pocket the difference. That is a great vote around here. That is great health care reform.

Mr. DURBIN. I say to the Senator from Connecticut, could we characterize this as an earmark in the Medicare Advantage Program?

Mr. DODD. It is two ears, not even one ear. I give it two ears.

Mr. BROWN. I say to Senator DODD, we remember 10 years ago when the insurance companies came to the government and said we can do something that later became Medicare Advantage, and we can do it less expensively. They said we can do it for 5 percent less than the cost of Medicare and the government unfortunately made the agreement with them to sign up to do that. Then what happened in the last 10 years is, the insurance lobbyists came here and lobbied the Bush administration and lobbied the Congress and got bigger payments. It is a subsidy for the insurance companies, but you and Senator BAUCUS and Senator DURBIN said it is not Medicare, it is private insurance, privatized form of Medicare that serves the insurance companies very well, is that correct, but doesn't serve the seniors in this country?

Mr. DODD. I will sit here all day waiting for someone to identify a single benefit guaranteed under the Medicare Program that is cut in our bill. They are all talking about Medicare Advantage, not Medicare. There are no guaranteed benefits cut under this bill nor can those benefits be cut. Our legislation bans and prohibits any cuts in guaranteed benefits.

The PRESIDING OFFICER (Mr. CASEY). The Senator from Oklahoma is recognized.

Mr. COBURN. One of the questions and one of the promises was: If you have what you have now and you like it, you can keep it. What is happening under this bill for 11 million seniors on Medicare Advantage, that is not going to happen. If they like it, they are not going to be able to keep what they have. You can't deny that. That is the truth.

Medicare Advantage needs to be reformed. There is no question about it. I agree. As the Senator alluded to, in the Patients Choice Act we actually save $160 billion in the Patients' Choice Act, but we don't diminish any of the benefits, and we do that because CMS failed to competitively bid it, because when it was written—and I understand who wrote it—when it was written we didn't make them competitively bid it. You could get the same savings, actually get more savings and not reduce benefits in any amount, if you competitively bid that product. But we have decided we are not going to do that.

The second point I make with my colleagues is the vast majority of people on Medicare Advantage are on the lower bottom economically. They can't afford an AARP supplemental bill. They can't afford to pay an extra $150 or $200 a month. So what happens most of the time with Medicare Advantage is we bring people up to what everybody else in Medicare gets because most people can afford—84 percent of the people in this country can afford to buy a Medicare supplemental policy because Medicare doesn't cover everything.

Your idea to try to save money, I agree with. But cutting the benefits I do not agree with. You are right, Senator DODD, the basic guaranteed benefits have to be supplied to Medicare Advantage and then the things above that which you get from the supplemental policy, what you can afford to buy, is what these people get. And what you are taking away from poorest of our elderly is the ability to have the same care that people get who can afford to buy a supplemental policy. That is the difference.

The PRESIDING OFFICER. The time of the Senator has expired.

Mr. COBURN. I appreciate my chairman for his courtesy in yielding the time.

<hr />

## RECESS

The PRESIDING OFFICER. Under the previous order, the Senate stands in recess until 12:30 p.m.

Thereupon, the Senate, at 11:35 a.m., recessed until 12:30 p.m. and reassembled when called to order by the Presiding Officer (Mrs. HAGAN).

<hr />

## SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009—Continued

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Madam President, on Monday the Congressional Budget Office sent a letter to the Senator from Indiana, Mr. BAYH, that provides a very comprehensive analysis of what health insurance premiums will look like as a result of this 2,074-page bill before us, introduced by Senator REID. Listening to that discussion, I am starting to wonder if anyone actually read the letter. I hear a lot of people saying this letter proves that premiums will go down under the Reid bill, even though that is not what the letter says. I am here to tell my colleagues what the letter really says.

The letter makes it very clear that premiums will increase on average by 10 to 13 percent for people buying coverage in the individual market. Since it seems to fly by everybody what this letter actually said about increasing premiums, I brought down a chart to show everyone in case they missed it.

The letter from the CBO says very clearly that for the individual market, premiums are going to go up 10 to 13 percent. My colleagues keep saying premiums are going to go down, conveniently forgetting, then, to mention this 10- to 13-percent increase. They prefer to talk about the 57 percent of Americans in the individual market who are getting subsidies. It is true that government is spending $500 billion in hard-earned taxpayer money to cover up the fact that this bill drives up premiums faster than current law. So we might as well repeat it: Premiums will go up faster under this bill.

Supporters of this bill are covering this increase in cost how? By handing out subsidies. If you are one of the 14 million who doesn't happen to get a subsidy, you are out of luck. You are stuck with a plan that is 10 to 13 percent more expensive and also, simultaneous with it, an unprecedented new Federal law that mandates that you purchase insurance. If you don't purchase insurance, you are going to pay a penalty to the IRS every time you file your income tax. Some may say this is just the individual market. It only accounts for a small portion of the total market. If you are comfortable with 14 million people paying more under this bill than they would under current law, let's look at the employer-based market.

The Congressional Budget Office analysis says this bill maintains the status quo in the small group and large group insurance market. Is that something to be celebrating? Are expectations so low at this point that my friends on the other side of the aisle are celebrating that this bill will increase premiums for some and maintain the status quo for everyone else? I am being generous in using the phrase "status quo" because this bill actually makes things worse for millions of people. This bill is so bad that my friends on the other side of the aisle are trying to convince the American people that this is just more of the same, when that doesn't happen to be the case.

Whatever happened to bending the growth curve? If that is too Washingtonese for people, the goal around here of a bill at one time was to make sure the inflation in insurance didn't continue to go up so much that it would go the other way.

Then what about the President's promise that everyone would save $2,500? According to the Congressional Budget Office, almost every small business will pay between 1 percent more to 2 percent less for health insurance. That means, of course, that compared to what businesses would have paid under current law, this bill will either raise premiums 1 percent or decrease them a whopping 2 percent. It doesn't sound like this bill is providing any real relief or, for sure, not providing $2,500 savings for every American, as President Obama repeatedly pledged during the campaign. Larger businesses will pay the same or up to 3 percent less for health insurance. Once again, that doesn't sound like relief; it sounds like more of the same.

In fact, the Congressional Budget Office has confirmed that between now and 2016, premiums will continue to grow at twice the rate of inflation. I thought Congress was considering health reform to put an end to unsustainable premium increases.

So this bill cuts Medicare by $500 billion, raises taxes by $500 billion, restructures 17 percent of our economy, and spends $2.5 trillion. Yet some of my colleagues on the other side of the aisle are celebrating that they have achieved the status quo when, in fact, the situation will be worse. I always thought the status quo was unacceptable. I thought businesses could not afford the status quo. I thought the status quo was killing American businesses, killing jobs, and making this country less competitive. But Member after Member keeps coming down to the floor to celebrate spending $2.5 trillion on the status quo. We could have done that for free. Am I missing something? Did people really read the same letter I did from the CBO?

When President Obama visited Minneapolis in September, he didn't sound as though he was celebrating maintaining the status quo. On the contrary, I have a chart with one of his quotes:

I will not accept the status quo. Not this time. Not now. . . .

Some Members seem to disagree. Some Members are celebrating that they are making things worse for millions of Americans and maintaining the status quo for everyone else.

Here is what Vice President BIDEN said:

The status quo is simply unacceptable. Let me say that again—the status quo is simply unacceptable. Rising costs are crushing us.

That doesn't sound like a call for more of the same. Once again, Members on the other side of the aisle seem quite comfortable investing $2.5 trillion in more of the same. That is taxpayer dollars we are talking about.

If I asked most Iowans how they would feel about government spending

$2.5 trillion and premiums would still increase as fast or faster, they would say that was a pretty bad investment. Well, I will not argue with what our constituents would say on that point. I agree with them.

This Congressional Budget Office letter tells me that we are debating a pretty bad investment. Our constituents want lower costs. That is their main concern. But this bill fails to address that concern because it raises premiums. Despite offering new ideas throughout the committee process and on the floor of the Senate, Republicans are being accused of supporting the status quo. CBO has spoken, and it is pretty clear that my colleagues are not only OK with the status quo, they are OK with making things worse: higher taxes, higher premiums, increased deficit, less Medicare. They are celebrating that they spent $2.5 trillion to raise premiums for 14 million people, not bending the growth curve of inflation in health care, and not cutting costs. Don't take my word for it. Read the letter. Read the letter from the Congressional Budget Office. I have copies I will pass out if anybody wants them. I have this chart that demonstrates that point.

I also wish to take a few minutes at this time to correct some inaccurate comments made earlier by some of my colleagues. When we are talking about 17 percent of the economy and something that touches the lives of every single American, I want to make sure we have an honest and accurate debate. This morning I heard at least three Members on the other side of the aisle say that Medicare Advantage is not part of Medicare. This is totally false.

But don't take my word for it. I would like to have Members turn to page 50 of the handbook, "Medicare and You." Presumably it has the date of 2010 on it. It is sent out every year. In fact, I think I have two copies of this in my household. If anybody wants to save paper and not waste taxpayer money, they can get on the Internet and tell them only to send one to their house next year. I have done that.

This book says, for those who say Medicare Advantage is not part of Medicare:

A Medicare Advantage plan is another health coverage choice that you may have as part of Medicare.

I repeat, despite what Members were saying earlier, the "Medicare and You" handbook says very clearly: Medicare Advantage Plans are part of Medicare. So if you are cutting Medicare Advantage benefits, you are, in fact, cutting Medicare benefits.

Next, I hear a lot of Members talking about guaranteed benefits versus statutory benefits. I can't speak for my other 99 colleagues, but the seniors in Iowa who have come to rely upon the free flu shots, eyeglasses, and dental care that Medicare Advantage provides don't care if they are guaranteed or if they are statutory. Seniors in Iowa just want to know they will still have

Exhibit 151

JA-0002456

these benefits after health reform is passed.

The Senator from Connecticut challenged any Member to come down to the Senate floor and point out where this bill will cut benefits. He even read a section from page 1,004 of this 2,074-page bill that talks about how the Medicare Commission cannot cut benefits or ration care. I have read page 1,004. What Senator DODD failed to mention is that this section only refers to Parts A and B of Medicare. It fails to provide any protection to Medicare Part D, the prescription drug benefit, or the Medicare Advantage Program that covers 11 million seniors.

Are we now going to start hearing that Medicare Part D is not part of Medicare either? In fact, on page 1,005, it specifically says the Medicare Commission can "[i]nclude recommendations to reduce Medicare payments under parts C and D."

I have asked CBO, and they have confirmed this authority could result in higher premiums and less benefits to seniors. In fact, this is what Congressional Budget Office Director Elmendorf said, and we have that on a chart for you to see the quote I am going to read: "A reduction in subsidies to [Part D] would raise the cost to beneficiaries."

Lastly, I wish to raise an issue about access to care. I keep hearing my friends on the other side of the aisle talk about how these cuts will not affect seniors. They say they are just overpayments to providers. Well, in my opinion, if you cannot find a doctor or if you cannot find a home health provider or a hospice provider to deliver care, then that tends to be a very big problem. I would even consider that a cut in benefits or hurting access to care.

But, once again, do not take my word for it. In talking about similar cuts to Medicare in the House bill, the Office of the Actuary at the Centers for Medicare & Medicaid Services said providers that rely on Medicare might end their participation, "[p]ossibly jeopardizing access to care for beneficiaries."

So let's be accurate and let's be honest. Medicare Advantage is part of Medicare, and this bill cuts benefits seniors have come to rely upon. The Medicare Commission absolutely has authority to cut benefits and to raise premiums, and this bill will jeopardize that access to care.

Those are all facts. They are not my facts but facts taken directly from the language of this 2,074-page bill and from reports of the Congressional Budget Office and the Office of the Actuary at the Centers for Medicare & Medicaid Services.

I yield the floor.

The PRESIDING OFFICER. The Senator from Illinois.

Mr. DURBIN. Madam President, it seems I am following the Senator from Iowa every day. I, first, wish to acknowledge my friendship and respect for him. But the Medicare Advantage Program, which the Republican side is trying to protect, is a program which is private health insurance.

The largest political opponent to health care reform in America is the private health insurance industry. We estimate they have spent $23 million so far lobbying to defeat this bill because they are doing very well under the current system. They are very profitable companies, and they realize, if they face competition, limitations on the way they do business, it will cut into their bottom line and their profits, and, naturally, are fighting the bill.

The amendment before us, the motion to commit by Senator McCAIN— the first thing it does is to protect the Medicare Advantage Program. That is a private health insurance program that was created with the promise that it would be cheaper than traditional government-run Medicare. In some cases, they have offered a cheaper policy. But, overall, these private health insurance companies are charging the Medicare Program 14 percent more than the actual cost of the government-run system.

The promise that the private sector could do it more cheaply and better turned out not to be true. So we are paying a subsidy in profits—extra profits—to private health insurance companies. The McCain amendment, which has been supported by Senator GRASSLEY and others who have come to the floor, is an effort to stop us from eliminating this subsidy.

What is this subsidy worth? This subsidy to private health insurance companies will cost the Medicare Program $170 billion over the next 10 years—no small amount. We believe that money is better spent on extending benefits to Medicare beneficiaries, not in providing additional profits to already profitable private health insurance companies.

Yes, Medicare Advantage policies are offering Medicare benefits, but they are charging more for it than the government. So it did not turn out to be a bargain. It turned out to be a loss to the Medicare Program. They did not do what they promised to do. We want to hold them accountable. The McCain amendment wants to let them off the hook and basically say: Private health insurance companies, keep drawing that money out of Medicare. We are not going to hold you accountable.

That earmark of the Medicare Advantage Program, that decision by Congress to give them a special privilege in selling this health insurance, is too darn expensive for senior citizens and people who rely on Medicare. That is why we are opposing the McCain amendment.

I might add, this is the third day of the debate on health care reform in America. We have yet to vote on a single amendment because the Republicans refuse to allow us to bring an amendment to the floor for a vote. How can you have an honest debate about a bill of this seriousness and magnitude if you cannot bring a measure to a vote on the floor?

Those who follow the Senate know it is a peculiar institution and its rules protect minorities, and individual Senators can object to a vote. The Republican Senators have objected to a vote, even on the McCain amendment, which I believe was filed on Monday, and here we are on Wednesday. We have talked about it. We know what is in it. We should vote on it. But the Republicans do not want to vote on it. They want to drag this out in the hopes that our desire to go home for Christmas means we will walk away from health care reform.

Well, if a few of the Republican Senators could have just left the Democratic caucus, they would know better. We are determined to bring this bill to a vote. We are determined to bring real health care reform to this country. We know what is at stake.

The current health care system in America is not affordable for most Americans. Health insurance premiums have gone up dramatically in cost. Individuals cannot afford to buy a policy. Businesses are dropping coverage of their employees. We know the costs are unsustainable.

Unless we start bringing those costs down, this great health care system is going to collapse. We need to preserve the things that are good in this system and fix those that are broken. Affordability is the first thing we need to address. The second thing we need to address, quite obviously, is to make sure every American has the right, as a consumer, to get coverage when they need it.

How many times have you heard the story of people who pay their health insurance premiums their whole lives, then somebody gets sick in their house—a new baby, a child, your wife, your husband—a big medical bill is coming, you go to the health insurance company, and you are in for a battle. They will not pay it. They say: Oh, we took a look at your application you filed a few years ago. You failed to disclose that you had acne when you were an adolescent. Am I making that up? No. That is an actual case. Because you did not disclose that you had acne as an adolescent, you failed to disclose a preexisting condition, so we have no obligation to pay for anything. If this sounds farfetched, believe me, it is an actual case—and there are many others like it.

Private insurance companies have spent a fortune hiring an army of people, sitting in front of computer screens, talking to the people who are paying the premiums, and above their computers is a sign that says: "Just Say No." They say no consistently because every time they say no, their profits go up. But it leaves individuals and families in a terrible situation—denied coverage because of a preexisting condition; denied coverage because they could not carry their health insurance policy with them after they

lost their job; denied coverage because of a cap in the amount of money the policy would pay; rescinded, where they walk away from an insurance policy because of some objection they have, legal objection; or how about one of your kids who turned age 24, no longer covered by your family health plan, now out on their own, maybe fresh from college, and has no job and no health insurance.

This bill addresses those issues. This bill eliminates the concern people will have over a preexisting condition. It takes away the power of the health insurance companies to say no. It finally creates a situation, which we have waited for for a long time. America is the only civilized, industrialized country in the world where a person can die for lack of health insurance. It does not happen anywhere else—only in America. Madam President, 45,000 people a year die for lack of health insurance.

Who are these people? Let me give you an example, one person whom I met. Her name is Judie, and she works in a motel in southern Illinois. She is 60 years old, a delightful, happy woman. She is the one who takes the dishes at the end of this little breakfast they offer at the motel. She could not be happier and nicer. She is 60 years old, with diabetes. She never had health insurance in her life—never. She goes to work every day, works 30 hours a week, and makes about $12,000 a year. She does not have health insurance, but she does have diabetes. She said to me: If I had health insurance, I would go to the doctor. I have had some lumps that have concerned me for a little while here, but I can't afford it, Senator.

That is an example of a person who does not have the benefit of health insurance. This bill we are talking about—this bill we are going to produce for everyone to read on the Internet; it is already there; it has been there for 10 days already; it will continue to be there—this bill makes sure that 94 percent of the people in America have health insurance coverage. That is an alltime high for the United States of America.

I might also say, despite the criticisms—and they are entitled to be critical on the Republican side of the aisle—they have yet to answer the most basic criticism I have offered. Where is your bill? Where is the Republican health care reform bill? They cannot answer that question because it does not exist. They have had a year to explore their ideas and develop them, but they have failed. They cannot produce a bill. They are for the current system, as it exists, that is unsustainable, unaffordable, leaving too many Americans vulnerable to health insurance companies that say no and too many Americans without health insurance.

I wish to address one particular issue that seems to come up all the time, and it is the issue of medical mal-

practice. I know my Republican colleagues are going to bring up that issue. Senator McCAIN has, many others have as well. President Obama recently recognized this as an issue of concern. Our bill will as well. We are going to explore, encourage, and fund State efforts to find ways to reduce medical malpractice premiums and to reduce, even more importantly, the incidence of medical errors.

Medical malpractice reform proposals are based in States. The Federal Government does not have a medical malpractice law, not in general terms. It does for specific programs such as Indian health care, for example, or federally qualified clinics. But when it comes to the general practice of medicine, that is governed by State laws, and the States decide when you can sue, what you can sue for, and the procedures you have to follow.

In almost every State there has been a system that has developed over the years to handle these cases. States regularly change and update their laws. The States try to strike a balance to protect patients, preserve their hospitals and doctors and other medical providers, ensure that those who are injured have a chance for compensation, and manage the cost of their system.

At least twenty-eight States, as of last year, have decided to impose caps on noneconomic damages in medical malpractice cases. A long time ago, before I came to Congress, I used to be a practicing lawyer in Springfield, IL, and I handled medical malpractice cases. So I do not profess to be an expert, nor even have current knowledge of medical malpractice, but I did in a previous life have some experience. I defended doctors, when they were sued, for a number of years on behalf of insurance companies, and I represented plaintiffs who were victims of medical negligence. So I have been on both sides of the table. I have been in the courtroom. I have gone through the process.

Here is what it comes down to. If you are a victim of medical malpractice, medical negligence, the jury can give you an award, which usually includes a number of possibilities: pay your medical bills, pay for any lost wages, pay for any additional expenses that may be associated with the court case, and pay for pain and suffering. Those are the basic elements that are involved in a medical malpractice lawsuit.

The pain and suffering part of it—it is pain, suffering, loss of a spouse or child, loss of fertility, scars, and disfigurement—is an area where many States have said: We want to limit the amount you can recover for pain and suffering, what they call noneconomic losses. It is not medical bills. It is not lost wages. So my State, for example, has a limitation of $500,000 on noneconomic damages in a medical malpractice case, recently enacted by our general assembly. In the State of Texas, it is $250,000. Those are so-called

caps, limitations on the amount of money a jury can award for pain and suffering, when they find, in fact, you were a victim of medical negligence.

Some States have decided to establish caps on pain and suffering, how much you can recover; others have not. The reason many imposed caps was because they wanted to bring down the cost of medical malpractice insurance for doctors and hospitals. Well, a number of States have done that. At least twenty-eight States have done that, and we have been able to step back and take a look: How did it work? If you put a cap, a limitation, on recovery for pain and suffering, noneconomic loss, does that mean there will be lower malpractice premiums for doctors? In some cases, yes; in some cases, no.

Minnesota is an interesting example. Minnesota does not have caps on damages. Yet it has some of the lowest malpractice premiums in America. Twenty-five States, including Minnesota, use a certificate of merit system which means before you can file a lawsuit you need a medical professional to sign an affidavit that you have a legitimate claim before you even get into the court. That is in Minnesota, it is in Illinois, and a number of other States to stop so-called frivolous lawsuits.

Some States such as Vermont have low malpractice premiums and don't have any malpractice reforms. It is hard to track cause and effect here between tort reform, malpractice changes, and the actual premiums charged physicians.

There are ways Congress can help States build on what already works for each State. Senator BAUCUS, who is here on the floor and who is chairman of the Senate Finance Committee, has worked with Senator ENZI to create incentives for State programs to look for innovative ways to reduce malpractice premiums and the incidence of medical negligence. I think that is a good idea and I hope it will ultimately be included in this bill.

One of the major considerations when it comes to malpractice reform is making sure we focus on real facts. One myth we hear over and over again is about frivolous lawsuits flooding the courts. I have heard many colleagues come to the floor and call it "jackpot justice," frivolous lawsuits, fly-by-night lawyers filing medical malpractice lawsuits. I am sure there is anecdotal evidence for each and every statement, but when you look at the record, you find that malpractice claims and lawsuit payouts are actually decreasing in America.

In 2008, according to the Kaiser Family Foundation, there were 11,025 paid medical malpractice claims against physicians nationwide. One year in America, the total number of medical malpractice claims paid, according to the Kaiser Family Foundation, was 11,025. There are 990,000 doctors in America, so roughly 1 percent of doctors is being charged with malpractice

Exhibit 151

and paying each year. This is a decrease from 2007 where the number was 11,478. So the number of malpractice claims has gone down. The number of paid claims for every 1,000 physicians has decreased from 25.2 in 1991 to 11.1 in 2008. That is a little over 1 percent of doctors actually paying malpractice claims.

Not only is the number of claims decreasing, but the amount they are paying to victims is decreasing as well. The National Association of Insurance Commissioners—not a group that is biased one way or the other when it comes to plaintiffs or defendants—said in 2003, malpractice claim payouts peaked at $8.46 billion. In 2008 that number had been cut in half. In 5 years it went down from $8.4 billion to $4 billion. So rather than a flood of frivolous lawsuits, fewer lawsuits are being filed and dramatically less money is being paid out.

Incidentally, the New York Times in a summary of research in September of this year found that only 2 to 3 percent of medical negligence incidents actually lead to malpractice claims. So it is not credible to argue that we have this flood of malpractice cases—they are going down—or this flood of payouts for malpractice in America. It has been cut in half in 5 years.

A third key consideration in this debate is cost. One of the main goals of pursuing health care reform is to try to reduce the cost to the system and we want to try to do that in a way that won't compromise the quality of care. There has been a lot of talk about the Congressional Budget Office report that was ordered up by Senator HATCH on October 9. The Congressional Budget Office for years said they could not put a pricetag on medical malpractice reform in terms of savings to the system, but on October 9 they reported to Senator HATCH that they could. Senator HATCH asked them what would be the impact on our health care system if we had a Texas-style cap, which is $250,000 for pain and suffering—I see the Senator from Texas on the floor and I hope I am quoting the Texas law correctly. He was a former Texas supreme court justice. Am I close?

Mr. CORNYN. Close.

Mr. DURBIN. Close. That is all I will get from the Senator from Texas, close. But the fact is that Senator HATCH said to the CBO, what if we had the Texas-style cap on every State in the Union, what would be the net result? They came back and said there would be a savings of over $50 billion over the next 10 years. They said 40 percent of the savings would come from lower medical liability premiums, 60 percent through reduced utilization of health care services.

I don't question the Congressional Budget Office reaching that conclusion. They worked hard to come up with their figures. But there are other ways to reach results they want to achieve of lowering medical liability premiums and saving overall health care expenditures rather than adopting Federal damage caps. Keep in mind, these caps on what you can recover are for people who have been judged by a jury of their peers to have been victims. These are not people who have said I think I was hurt. We are talking about people who have a right to recovery in a lawsuit who are being told even though you were hurt, and somebody did something wrong, we are going to limit how much you can be paid when it comes to these noneconomic losses.

The CBO analysis that Senator HATCH received went on to say:

Because medical malpractice laws exist to allow patients to sue for damages that result from negligent health care, imposing limits on that right might be expected to have a negative impact on health outcomes.

They cited one study which found that a 10-percent reduction in costs related to medical malpractice liability would increase the Nation's overall death rate by .2 percent. By calculation that means that if the Hatch proposal were applied nationwide, according to the CBO—and this is a cited study—4,853 more Americans would be killed each year by medical malpractice—or more than 48,000 Americans over a 10-year period of time that the CBO examines. So if you accept their projection on the savings for medical malpractice reform asked for by Senator HATCH, you cannot escape the fact that they say yes, you will save money, but more Americans will die because there will be more malpractice.

Let's look at the savings that can be achieved through reduced malpractice insurance premiums. The CBO said a $250,000 Federal damage cap would reduce overall malpractice premiums by about 10 percent and would reduce overall health care spending by .2 percent. Do we need a federally mandated cap to achieve that? Malpractice insurance premiums are already going down. According to the Medical Liability Monitor's comprehensive survey of premiums in the areas of internal medicine, general surgery and OB/GYN: "The most recent three years have shown a leveling and now a reduction in the overall average rate change" for medical malpractice premiums. There was a time in the early 2000s where malpractice premiums were going up 20 percent a year, in 2003, 2004, and 9 percent in 2005. Since then they have gone down each year by less than 1 percent in 2006, by .4 percent—I am sorry, .4 percent increase in 2007, but a 4.3 percent decrease in 2008. That is without any Federal cap on damages.

Let's also consider the issue of defensive medicine. Many people claim that doctors do things such as order tests to cover themselves because they are afraid of being sued. I agree that there are undoubtedly some doctors who think that way. There was a famous article printed in the New Yorker where a surgeon from Boston, Dr. Gawande, who went to McAllen, TX—you probably saw this, Senator CORNYN—and he wanted to know in this article why in McAllen, TX, they were paying more for Medicare patients than any other place in the United States. So he visited with doctors and surgeons and hospital administrators to ask them why. What is peculiar about that city and its elderly people? He sat down with the doctors, and the first doctor said, Well, it is defensive medicine. We are doing all of these extra tests and extra costs to Medicare to cover ourselves, to protect ourselves. The doctor sitting next to him said, Oh, come on. With the Texas law, nobody is filing malpractice lawsuits around here. We are doing these extra procedures because it is a fee-for-service system. You are paid more when you do more. So at least in this case there was a dispute as to whether this was truly defensive medicine or overbilling.

Dr. Carolyn Clancy, the director for the Agency of Healthcare Research and Quality in the Department of HHS, has called medical errors a national problem of epidemic proportions. According to that agency, the rate of adverse events has risen about 1 percent in each of the past 6 years. The Institute of Medicine estimated in 1999 that up to 98,000 people died in America due to preventable medical errors. These medical errors cost a lot. A 2003 study published in the Journal of the American Medical Association found the medical errors in U.S. hospitals in the year 2000—just 1 year—led to approximately 32,600 deaths, 2.4 million extra days of patient hospitalization, and an additional cost of $9.3 billion.

I wish to also say a word about the medical malpractice insurers. Remember, insurance companies and organized baseball are the only two businesses in America exempt from the antitrust laws. What it means is that insurance companies can literally legally sit down and collude and conspire when it comes to the prices they charge, and they do. They have official organizations—one used to be known as the Insurance Services Offices—that would sit down to make sure every insurance company knew what the other insurance company was charging, and they could literally work out the premiums, how much they charge.

The same thing was true in market allocation. Insurance companies, unlike any other business in America, can pick and choose where they will do business: Company X, you take St. Louis; company Y, you take Chicago; company Z, you get Columbus, OH. They can do it legally.

So the obvious question is: If this is not on the square in terms of real competition from health insurance companies, are these companies, in fact, paying out the kind of money they should?

Let me see if I can find a chart here. My staff was kind enough to bring these out. Well, I can't. They are great charts, but I can't find the one I am looking for at this moment.

According to the information of the National Association of Insurance Commissioners, in 2008, medical malpractice insurers charged $11.4 billion

Exhibit 151 JA-0002459

in premiums, but only paid out $4.1 billion in losses. In other words, they took in $7 billion more than they paid out in losses. That is a loss ratio of 36 percent, which means they are basically collecting $3 for every $1 they pay out—pretty close. How does that compare to the rest of the insurance industry? Well, it turns out that private automobile liability insurance had a loss ratio of 66 percent, a payout of $2 out of every $3; homeowners, 72 percent, workers comp insurance, 65 percent. These medical malpractice insurance companies are holding back premiums and not paying them out. It reached a point in my State where our insurance commissioner ordered that they declare a dividend and pay back some of the premiums they had collected from doctors and hospitals when it came to malpractice insurance.

But rather than get lost in statistics, as important as they are, I think it is important that we also talk about the real life stories that are involved in medical malpractice. I hear these terms such as ''frivolous lawsuits'' and ''jackpot justice'' and people taking advantage of the system, but let's not forget the real life stories that lie behind medical malpractice. Let me show my colleagues a picture here of a couple. This is Molly Akers of New Lenox, IL, a lovely young lady, with her husband. Molly Akers had a swelling in her breast and went to her doctor who performed a biopsy that showed she had breast cancer. Molly had several mammograms which found no evidence of a tumor, but the doctors decided that despite the mammograms, she must have a rare form of breast cancer. They recommended a mastectomy, removing Molly Akers' right breast. After the operation, the doctor called her into the office and said that on further review, she never actually had breast cancer. The radiologist had made a mistake. He reviewed her slides and accidentally switched Molly's slides with someone else. Molly was permanently disfigured by an unnecessary surgery. She said afterwards:

I never thought something like this could happen to me, but I know now that medical malpractice can ruin your life.

By the way, that other woman whose slides were switched with Molly's was told she was cancer free. What a horrific medical error that turned out to be.

This next picture is of Glenn Steinberg of Chicago. He went into surgery for the removal of a tumor in his abdomen. Ten days after the surgery, while still in the hospital, Glenn was having severe gastrointestinal problems. The doctors x-rayed his abdomen where the original surgery took place, and they found a 4-inch metal retractor from the surgery lodged against his intestine. A second surgery was performed to remove the metal piece, during which Glenn's lungs aspirated, and he died later that night.

Glenn's wife, Mary Steinberg, lost her husband. She said:

Not a day goes by that I don't miss Glenn's companionship and the joy he brought to our household. Because of gross negligence, he was not here to support me when my son went off to serve our country in Iraq.

In this photo is a group of kids, including Martin Hartnett of Chicago. When Martin's mom Donna arrived at the hospital to deliver, her labor wasn't progressing. Her doctor broke her water and found out that it was abnormal.

Rather than considering a C-section, Donna's doctor started to administer a drug to induce contractions. Six hours later, she still hadn't delivered, but her son's fetal monitoring system began indicating that he was in severe respiratory distress. The doctor finally decided it was time to perform an emergency C-section, but it was another hour before Donna was taken into the operating room.

During that time, the doctor failed to administer oxygen or take immediate steps to help Martin breathe. After he was born, Martin was in the intensive care unit for 3 weeks. Later, Donna learned that Martin had substantial brain damage and cerebral palsy—a direct result of the doctor's failure to respond to indications of serious oxygen deprivation and delivery in a timely manner.

Donna's doctor told her not to have any more children because there was a serious problem with her DNA, which could result in similar disabilities in any of her future kids. Since then, Donna has given birth to three perfectly healthy sons.

Donna sued the doctor responsible for Martin's delivery and received a settlement. She is thankful she has money from the settlement to help cover the costs associated with Martin's care that aren't covered by health insurance, such as the wheelchair-accessible van that she bought for $50,000 and the $100,000 she spent making changes to her home so her son can get around the house in a wheelchair.

What would Donna have done without the money from that settlement? It is a scary thought because Martin is going to require a lifetime of care. When we put caps on recoveries and say there is an absolute limit to how much someone who has created a problem has to pay out, we have to think about it in terms of real-life stories, such as Martin's. Martin will live for a long time, and he is going to need help. Somebody needs to be responsible for that. The person who caused this should be responsible for it. That is pretty basic justice in America.

When you establish an artificial cap on noneconomic losses for pain and suffering, then you are saying there is a limit to how much can be paid. I recall the case of a woman in Chicago who went into a prominent hospital—one that I have a great deal of respect for—to have a mole removed from her face—a very simple mole removal. They gave her a general anesthesia. In the course of that anesthesia, they gave her oxy-

gen. The oxygen tank—in the administration of it—caught fire, literally burning off her face. She went through repeated reconstructive surgeries. I have met her. There was scarring and, as you can imagine, a lot of pain. Was $250,000 too much money for that, for what she went through? Her life will never be the same. That is the kind of disfigurement covered by noneconomic losses that would be limited by medical malpractice caps.

There are better ways to do this. We can, in fact, reduce the cost of medical malpractice insurance. We can, in fact, reduce medical errors. We should not do it at the expense of innocent victims—people who went in, with all the trust in the world, to doctors and hospitals and had unfortunate and tragic results.

Every time I get up to speak on this subject I always make a point of saying—and I will today—how much I respect the medical profession in America. There isn't one of us in this Chamber, or anyone watching this, who can't point to men and women in the practice of medicine who are true heroes in their everyday lives, who sacrifice greatly to become doctors, and who work night and day to get the best results for their patients. They richly deserve not only our praise but our respect.

But there are those who make mistakes—serious mistakes. There are innocent victims who end up with their lives changed or lost because of it. We cannot forget them in the course of this debate. This is about more than dollars and cents. It is about justice in this country. I urge my colleagues, when the issue of medical malpractice comes before us, to remember the doctors but not to forget the victims and their families.

I yield the floor.

The PRESIDING OFFICER. The Senator from Texas is recognized.

Mr. CORNYN. Madam President, while our colleague from Illinois is still on the Senate floor, I always enjoy listening to him. He is one of the most effective advocates, and he is an outstanding lawyer. He and I frequently disagree, but I always enjoy listening to his arguments. That isn't what I came to talk about, but I am glad I happened to be here when he talked about the successful effort we have had in Texas, through medical liability reform laws, to make medical liability insurance more affordable for physicians and, as a consequence, increase the number of doctors who have moved to our State, including rural areas, which has increased the public's access to good, quality health care. We have seen, in 100 counties, where they didn't even have an OB-GYN, or obstetrician—a doctor who delivers babies—after medical liability reform, that has changed dramatically, along with a number of other high-risk specialties that have moved to these counties where they were previously afraid to go for risk of litigation and what that might mean to their future and career.

Exhibit 151    JA-0002460

This is an important topic. We will talk about it more. I appreciate the Senator raising the issue. We have a different view about it. If we can save $54 billion and still allow each of these people who were harmed by medical negligence to recover—which, in fact, they would be under the Texas cap on noneconomic damages—each of these individuals would be able to recover their lost wages, their medical bills, and they would be able to receive large amounts of money for pain and suffering—I am sure not enough to compensate them for what they have been through. But no one should understand that these individuals would somehow be precluded or that the courthouse doors would be shut to people who are victims of medical negligence.

There needs to be some reasonable limitations that will help, in the end, make health care more accessible, which is what we are talking about.

I want to focus briefly on the cuts to Medicare in this new, huge piece of legislation we are considering. Of course, we are told by the CBO that as a result of Medicare cuts and the huge number of tax increases this bill is "paid for." In other words, assuming the assumptions that the CBO took into account, which span for a 10-year budget window and are almost never true in the end—but if you take it on faith that we are going to raise taxes by $½ trillion and cut Medicare by $½ trillion, they say this is a budget-neutral bill—notwithstanding the fact that it spends $2.5 trillion over 10 years—basically, what we are saying to America's seniors, those already vested in the Medicare Program, is that we are going to take $464 billion that would go into the Medicare Program and we are going to use it to create a new government entitlement program.

Our record of fiscal responsibility, when it comes to entitlement programs, is lousy, to say the least. We know Medicare, Social Security, is another entitlement program, and Medicaid have run up tens of trillions of dollars in unfunded liabilities. Most of them are riddled with fraud, waste, and abuse.

The question I have, and I think many have, is why in the world would you take money out of the Medicare Program that is scheduled to go insolvent in 2017, that has tens of millions of dollars in unfunded liabilities—why would you take $½ trillion out of Medicare to create yet another entitlement program that, no doubt, will have many of the problems we see now under our current entitlement programs? It just doesn't make sense, if you are guided by the facts.

Of course, our colleagues on the floor have said: We can cut $465 billion out of Medicare and, you know what, Medicare beneficiaries would not feel a thing.

Well, I don't think that is possible when you cut $135 billion in hospital payments, when you cut $120 billion out of Medicare Advantage on which 11

million seniors depend, on which they depend for their health care, or when you cut $15 billion from payments to nursing homes, another $40 billion in home health care. I think one of the most effective ways of delivering low-cost health care is in people's homes. You cut $40 billion from that, and you cut $8 billion from hospice, which is where people go during their final days in their terminal illness.

Some of my colleagues claim these cuts would not hurt patients, but many people, including me, disagree. As a matter of fact, to quote President Obama's own Medicare actuary, he said providers might end their participation in the program. In other words, as in Medicare now, in my State, 58 percent of doctors will see a new Medicare patient because reimbursements—payments to providers—are so low, which means that 42 percent will not see a new Medicare patient.

In Travis County, Austin, TX, the last figures showed that only 17 percent of physicians in Travis County will see a new Medicare patient because reimbursement rates are so low. Yet we are going to take money from Medicare to create a new entitlement program. There is no question in my mind that providers—in the words of the Medicare actuary—might be hedging their bets. I think he is hedging his bets. He also said many will end their participation in the program and thus jeopardize access to care for beneficiaries.

We have heard some of the debate earlier about when our side of the aisle made proposals to fix some of the problems with the Medicare Program—not to create a new entitlement program—by taking this amount of money, $464 billion, from it. When we tried to fix it earlier, some colleagues, including the majority leader, called those cuts immoral and cruel. To quote President Obama on the campaign trail, he was one of those who criticized Senator McCAIN for some of the proposals he made to try to fix the broken Medicare Program.

As we have heard from a Texas Hospital Association, the Medicare cuts to hospitals simply will not work because—and this is another sort of accounting trick that in Washington, DC, and in Congress people think we can get away with and fool the American people about what is actually happening. People are a lot smarter than I think Members of Congress sometimes give them credit for. Under the Senate bill, the expanded coverage doesn't start until 2014. But the hospital cuts begin immediately.

I have talked about the broken Medicare Program and, frankly, I think a lot of people would rather see us fix Medicare and Medicaid before we create yet another huge entitlement program that is riddled with fraud, that is on a fiscally unsustainable path, and one that, frankly, promises coverage but ultimately denies access to care because of unrealistically low pay-

ments to providers. We are going to make that worse if this bill passes, not better.

Well, this bill also includes something else that I think the public needs to be very aware of. It uses not only budget gimmicks so that our friends who support this bill can say that it extends the life of the Medicare trust fund for a few years, the problem is it doesn't solve the fundamental imminent bankruptcy of Medicare. That is one of the reasons the bill sponsored by the distinguished majority leader creates a new, unaccountable, unelectable board of bureaucrats to make further cuts to Medicare Programs.

After the Reid bill pillages Medicare for $½ trillion, as I said, to pay for a new entitlement, it creates a board of unelected, unaccountable bureaucrats, the so-called Medicare advisory board, which sounds pretty innocuous, but they have been given tremendous power—to meet budget targets—another $23 billion in the first years alone.

If Congress doesn't substitute those cuts with other cuts to providers or benefits, the board's Medicare cuts would go into effect automatically. That would mean Medicare patients, physicians, hospitals, and everyone else who depends on Medicare would have no say in what happens to personal medical decisions because they would just be cut and shut down by this unelected, appointed board.

The government-charted boards of experts we have in existence today are not always right. We may remember the Medicare Payment Advisory Commission, so-called MedPAC, which was created by Congress in 1997, has recommended more than $200 billion in cost cuts in the last year alone that Congress has not seen fit to order. In other words, this MedPAC board makes recommendations, and Congress is then left with the option in its wisdom to act to make those cuts. Congress has said no to the tune of $200 billion in the last year alone.

Then there is another relatively notorious board of experts—unaccountable, faceless, nameless bureaucrats—that we have learned a little bit about in the last few days: the U.S. Preventive Services Task Force. They are supposed to recommend preventive services but just recently said that women under the age of 50 do not need a mammogram to screen for breast cancer. Respected organizations, such as the American Cancer Society and the Komen Advocacy Alliance, disagree based on their own rigorous review of the latest medical evidence.

As the father of two daughters, I can tell you, I do not want my wife or my daughters restricted in their access to diagnostic tests that may save their lives if their doctor recommends, in his or her best medical judgment, that they get those tests. Yet what we will have in the future, if the medical advisory board is passed, is an unelected, unaccountable board of bureaucrats

Exhibit 151

that can make cuts, based on expert advice, which will ultimately limit access to diagnostic tests, including tests such as mammograms, which became very controversial. The Secretary of Health and Human Services came out immediately and said: We will never allow that to go into effect.

Not even the Secretary of Health and Human Services, under this provision, could reverse the decision of this unelected, unaccounted board which may well—I would say probably will in some cases—limit a person's access to diagnostic tests and procedures that could save their life even though their personal physician, in consultation with that patient, may say: This is what you need. When you give that power to the government, not only to render expert advice but then to decide whether to pay or not to pay for a procedure, then the government—namely, some bureaucrat in Washington, DC—is going to make the decisions based on a cost-benefit analysis.

OK, on a cost analysis, we can afford, according to the decision of the U.S. Preventive Services Task Force, to lose women to breast cancer—women between the age of 40 and 49—because we don't think they need a mammogram. And on a cost-benefit analysis, they may say: Tough luck. But that is not where we should go with this legislation.

Many health care providers are concerned about the Medicare Payment Advisory Commission. According to a letter from 20 medical speciality groups, they said:

We are writing today to reiterate our serious concerns with several provisions that were included in the health care reform bill . . . and to let you know that if these concerns are not adequately addressed when the health care reform package is brought to the Senate floor, we will have no other choice but to oppose the bill.

Included in those concerns was the "establishment of an Independent Medicare Commission whose recommendations could become law without congressional action . . ."

According to a letter from the American Medical Association today:

AMA policy specifically opposes any provision that would empower an independent commission to mandate payment cuts for physicians. . . . Further, the provision does not apply equally to all health care stakeholders, and for the first four years significant portions of the Medicare program would be walled off for savings . . .

This is an example of another trade association that basically decided to cut a deal with the administration behind closed doors, and they have been prevented from some of these cuts under this Medicare Commission while physicians have not been accorded similar treatment, and they do not think it is fair. They think it is unfair, and I agree with them.

This letter goes on to say:

In addition, Medicare spending targets must reflect appropriate increases in volume that may be a result of policy changes, innovations that improve care, greater longevity,

and unanticipated spending for such things as influenza pandemics. These are critical issues with the potential for significant adverse consequences for the program, which must be properly addressed through a transparent process that allows for notice and comment.

Sounds to me as if the American Medical Association thinks this is a lousy idea, and I agree with them.

Artificial budget targets that the Medicare advisory board would have to meet leave virtually no room for medical innovation. It is unbelievable what medical science in America and across the world has done to increase people's quality of life—their longevity as a result of heart disease, for example. People who would have died in the seventies are today living healthy because they are taking prescription medications to keep their cholesterol in check, and they have access to innovative surgical procedures, such as stents and other things that can not only improve their quality of life but their longevity as well.

If we have the Medicare advisory board saying: We are not going to pay for some of these things, it will crush medical innovation and have a direct impact on quality of life and longevity. What if we find a cure for Alzheimer's in 2020, but because this board says: It is too expensive, we are not going to pay for it, you are out of luck. What if there are things we cannot anticipate today, which we know there will be because who ever heard of the H1N1 virus or swine flu just a year ago?

Some of my colleagues have said an "independent board," such as the Medicare advisory board, would insulate health care payment decisions from politics. But the very charter of the Medicare advisory board was the result of a deal cut behind closed doors with the White House, a political deal, and it has a lot of reasons why, as we can tell, I don't think it is going to work well.

According to Congress Daily:

Hospitals would be exempt from the [board's] ax, according to the committee staff and hospital representatives, because they already negotiated a cost-cutting agreement with [the chairman of the Finance Committee] and the White House. "It's something that we worked out with the committee, which considered our sacrifices," said Richard Coorsh, spokesman for the Federation of American Hospitals. A committee aide and a spokeswoman for the American Hospital Association reiterated that hospitals received a pass—

They were protected from 4 years of cuts—

based on the $155 billion cost-cutting deal already in place.

Is that the kind of politics we want to encourage behind closed doors—deals cut to protect one sector of the health care industry and sacrifice another while denying people access to health care? That is the kind of politics I would think we would want to avoid.

The truth is, the Reid bill gives more control over personal health decisions

to Washington, DC, where politics will always play a role in determining winners and losers when the government is in control because people are going to come to see their Members of Congress and say: Will you help us? We are your constituents. And Members of Congress are always going to try to be responsive, if they can, within the bounds of ethics to their constituents.

This needs to be not a process that is dictated by politics but on the merits and on the basis of preserving the sacred doctor-patient relationship. If we really want to insulate health care from politics, we need to give more control to patients—to patients, to families, to mothers and fathers, sons and daughters—to make health care decisions in consultation with their physician, not nameless, faceless, unaccountable bureaucrats.

I filed an amendment to completely strike the Medicare advisory board from the Reid bill. I urge my colleagues to support it at the appropriate time. The Medicare advisory board empowers bureaucrats to make personal medical decisions instead of patients, whose power to determine their own future, in consultation with their doctor, we ought to be preserving.

The Medicare advisory board is an attempt to justify the $½ trillion pillaging of Medicare from America's seniors to create a new entitlement program. We should fix Medicare's nearly $38 trillion in unfunded liabilities, not steal from a program that is already scheduled to go insolvent in 2017.

At a time of insolvent entitlement programs, record budget deficits, and unsustainable national debt, this country simply cannot afford a $2.5 trillion spending binge on an ill-conceived Washington health care takeover.

I yield the floor.

Mr. GREGG addressed the Chair.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Madam President, it is the tradition in this body that a person seeking recognition gets recognized, is it not?

The PRESIDING OFFICER. It is, and I say the Senator from California was here earlier.

Mrs. FEINSTEIN. If I might, Madam President, my understanding was we alternate, go from side to side. I have been sitting here waiting.

Mr. GREGG. Madam President, I believe I have the floor.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. GREGG. Madam President, I ask unanimous consent that at the conclusion of remarks of the Senator from California, I be recognized.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from California.

AMENDMENT NO. 2791

Mrs. FEINSTEIN. Madam President, I admire the Senator's gentility. I thank him very much.

I rise to say a few words on behalf of the Mikulski amendment, but before I do, I wish to make a generic statement.

Exhibit 151

JA-0002462

Those of us who are women have essentially had to fight for virtually everything we have received. When this Nation was founded, women could not inherit property and women could not receive a higher education. In fact, for over half this Nation's life, women could not vote. It was not until 1920, after perseverance and demonstrating, that women achieved the right to vote. Women could not serve in battle in the military, and today we now have the first female general. So it has all been a fight.

Senator MIKULSKI and Senator BOXER in the House in the 1980s carried this fight. Those of us in the 1990s who came here added to it. You, Madam President, have added to it in your remarks earlier. The battle is over whether women have adequate preventive services provided by this bill. I thank Senator MIKULSKI and Senator BOXER for their leadership and for their perseverance and their willingness to discuss the importance of preventive health care for women. Also, I thank Senator SHAHEEN, Senator MURRAY, and Senator GILLIBRAND, joined by Senators HARKIN, CARDIN, DODD, and others, for coming to the floor and helping women with this battle.

The fact is, women have different health needs than men, and these needs often generate additional costs. Women of childbearing age spend 68 percent more in out-of-pocket health care costs than men. Most people don't know that, but it is actually true. So we believe all women—all women—should have access to the same affordable preventive health care services as women who serve in Congress, no question. The amendment offered by Senator MIKULSKI—and she is a champion for us—will ensure that is, in fact, the case. It will require insurance plans to cover at no cost basic preventive services and screenings for women. This may include mammograms, Pap smears, family planning, screenings to detect postpartum depression, and other annual women's health screenings. In other words, the amendment increases access to the basic services that are a part of every woman's health care needs at some point in her life.

Let me address one point because there is a side-by-side amendment submitted by the Senator from Alaska. Nothing in our bill would address abortion coverage. Abortion has never been defined as a preventive service. The amendment could expand access to family planning services—the type of care women need to avoid abortions in the first place.

As I mentioned, the Senator from Alaska has offered an alternative version of this proposal. But regardless of the merits or problems with her proposal, it remains a kind of budget buster. According to the CBO, the amendment would cost $30.6 billion over 10 years. Adopting this amendment would require us to spend some of the surplus raised by the CLASS Act or some of the budget surpluses in the bill. The

underlying bill, as written, reduces the budget deficit by $130 billion in the first 10 years and as much as $650 billion in the second 10 years. This is a very important thing, in my view, and we need to maintain these savings. The Mikulski amendment would do that. It costs $940 million over 10 years as opposed to the $24 billion to $30 billion in the Murkowski amendment.

The Mikulski amendment is, I believe, the best way to expand access to preventive care for women, while keeping this bill fiscally responsible.

We often like to think of the United States as a world leader in health care, with the best and the most efficient system. But the facts actually do not bear this out. The United States spends more per capita on health care than other industrialized nations but in fact has worse results. According to the Commonwealth Fund, the United States ranks No. 15 in avoidable mortality. That means avoidable death. This analysis measures how many people in each country survive a potentially fatal yet treatable medical condition. The United States lags behind France, Japan, Spain, Sweden, Italy, Australia, Canada, and several other nations.

According to the World Health Organization, the United States ranks No. 24 in the world in healthy life expectancy. This term measures how many years a person can expect to live at full health—robust health. The United States again trails Japan, Australia, France, Sweden, and many other countries.

These statistics show we are not spending our health care resources wisely. The system is failing to identify and treat people with conditions early on that can be controlled. Part of the answer, without question, is expanding coverage. Too many Americans cannot afford basic health care because they lack basic health insurance. But another piece of the puzzle is ensuring this coverage provides affordable access to preventive care—the ability to be screened early—and that is what the Mikulski amendment will accomplish.

Women need preventive care—screenings and tests—so that potentially serious or fatal illnesses can be found early and treated effectively. We all know individuals who have benefitted from this type of care—a mammogram that suddenly identifies an early cancer before it has spread or before it has metastasized; a Pap smear that finds precancerous cells that can be removed before they progress to cancer and cause serious health problems; cholesterol testing or a blood pressure reading that suggests a person might have cardiovascular disease which can be controlled with medication or lifestyle changes. This is how health care should work—a problem found early and addressed early. The Mikulski amendment will give women more access to this type of preventive care.

Statistics about life expectancy and avoidable mortality can make it easy to forget that we are talking about real patients and real people who die too young because they lack access to health care. Physicians for Reproductive Choice and Health shared the following story, which comes from Dr. William Leininger in California, and here is what he says:

In my last year of residency, I cared for a mother of two who had been treated for cervical cancer when she was 23. At that time, she was covered by her husband's insurance, but it was an abusive relationship and she lost her health insurance when they divorced. For the next 5 years, she had no health insurance and never received followup care, which would have revealed that her cancer had returned. She eventually remarried and regained health insurance, but by the time she came back to see me, her cancer had spread. She had two children from her previous marriage, and her driving motivation during her last rounds of palliative care was to survive long enough to ensure that her abusive ex-husband wouldn't gain custody of her children after her death. She succeeded. She was 28 years old when she died.

Cases like these explain why the United States trails behind much of the industrialized world in life expectancy. For this woman, divorce meant the loss of her health coverage, which meant she could not afford followup care to address her cancer—a type of cancer that is often curable if found early. And that is where prevention comes in. So this tragic story illustrates the need to improve our system so women can still afford health insurance after they divorce or lose their jobs. And it shows why health reform must adequately cover all the preventive services women need to stay healthy.

The Mikulski amendment is a fight—I am surprised, but it is a fight—but it will help expand access to preventive care while keeping the bill fiscally responsible. To me, it is a no-brainer. If you can prevent illness, you should. In and of itself it will end up being a cost savings. So I have a very difficult time understanding why the other side of the aisle won't accept a measure that is more fiscally responsible by far than their measure, will do the job, and will give women preventive care and begin to change that statistic which shows that, among other nations, we do so badly.

I thank the Presiding Officer for coming to the floor and speaking out on this, and I hope there are enough people in this body who recognize that virtually everything women have gotten in history has been the product of a fight, and this is one of those.

I yield the floor.

The PRESIDING OFFICER (Mr. CARDIN). The Senator from New Hampshire.

Mr. GREGG. Mr. President, I ask unanimous consent that the next Republican speaker be the Senator from Louisiana, Senator VITTER.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. GREGG. Mr. President, at this point I rise to speak generally about

Exhibit 151                                                                                                          JA-0002463

the bill and specifically about this Medicare proposal—the proposal in the bill and the motion that has been offered by Senator McCAIN, which I think is an excellent idea.

Let's start with the size of this bill. It is unusual that we would be considering a bill of this size and not have had more time to take a look at it, but the bill itself—and I am glad that the chairman of the Finance Committee has essentially agreed with this earlier today—costs $2.5 trillion when it is fully implemented—$2.5 trillion. When my budget staff took a look at this bill—and we only had a brief time to do it, obviously, last week—and came up with that number, people on the other side of the aisle said, regrettably: No, that is a bogus number. The number is $840 billion, it is not a $2.5 trillion bill. However, it is $2.5 trillion when it is fully implemented. When the programmatic activity of this bill is under full steam, over a 10-year period, it will cost over $2.5 trillion. That is huge—huge.

In an earlier colloquy, I heard the chairman of the Finance Committee—who does such a good job as chairman—make the point: Well, it is fully paid for. It is fully paid for in each 10-year period. That is true, literally. I give him credit for that. But two questions are raised by that fact. The first is this: Why would you expand the Federal Government by $2.5 trillion when we can't afford the government we have?

The resources that are being used to pay for this, should they ever come to fruition, are resources which should probably be used to make Medicare solvent or more solvent, or, alternatively, to reduce our debt and deficit situation, as we confront it as a nation. We know for a fact that every year for the next 10 years—even before this bill is put in place—we are going to run a $1 trillion deficit every year, because that is what President Obama has suggested. We know for a fact that our public debt is going to go from 35 percent of our gross national product up to 80 percent of our gross national product within the next 6 years without this bill being passed. We know we are in a position where we are headed down a road which is basically going to hand to our children a nation that is fiscally insolvent because of the amount of debt put on their back by our generation through spending and not paying for it.

So why would we increase the government now by another $2.5 trillion when we can't afford the government we have? That is the question I think we have to ask ourselves. Isn't there a better way to try to address the issue of health care reform without this massive expansion of a new entitlement—creating a brandnew entitlement which is going to cost such an extraordinary amount of money and dramatically expand Medicaid, which is where most of the spending comes from in this bill—a massive expansion of Medicaid and a

massive new entitlement created that we don't have today?

This bill, when it is fully implemented, will take the size of the Federal Government from about 20 percent of GDP or a little less—where it has historically been ever since the post-World War II period—up to about 24 or 25 percent of GDP. To accomplish that, and claim you are not going to increase the deficit, requires a real leap of faith. Because it means that to pay for this—and this is why the McCain motion is so important—you are going to have to reduce Medicare spending by $1 trillion, when this bill is fully implemented—$1 trillion over a 10-year window. In fact, during the period from 2010 to 2029, Medicare spending will be reduced in this bill by $3 trillion.

Those dollars will not be used to make Medicare more solvent. And we know we have serious problems with Medicare. Those dollars will be used to create a brandnew entitlement and to dramatically increase the size of government for people who do not pay into the hospital insurance fund; for people who have not paid Medicare taxes, for the most part but, rather, for a whole new population of people going under expanded Medicaid and people getting this new entitlement under the public plan. So if you are going to reduce Medicare spending in the first 10 years by $450 billion, and the second 10 years fully implemented—there is some overlap there, but fully implemented $1 trillion, and then over a 19-year period, the two decades, by $3 trillion, instead of using those monies—those seniors' dollars—to try to make Medicare more solvent, they are going to be used for the purposes of expanding and creating a new entitlement and expanding Medicaid.

This is hard to accept as either being fair to our senior population or being good policy from a fiscal standpoint. Why is that? Because if we look at the Medicare situation, we know Medicare as it is structured today has an unfunded liability of $55 trillion—$55 trillion. That means in the Medicare system we do not know how we are going to pay $55 trillion worth of benefits we know we are now obligated for.

The answer we get from the other side of the aisle is: Well, this $55 trillion number goes down, because this bill cuts Medicare and, therefore, the benefit structure reduces. But do the revenues, or the reduction in that, go toward the purpose of making Medicare more solvent? No. Those monies are taken and spent. Those monies are taken and used to create a larger government. They aren't used to reduce the deficit or to reduce the debt, all of which is being driven, in large part, by this $55 trillion worth of unfunded liability as we go forward. No, they are being used to create a brandnew entitlement which has nothing to do with seniors, and a brandnew entitlement which is going to be paid for, in large part, by seniors, or by a reduction in their benefit structure.

That makes very little sense, because essentially you are taking money out of the Medicare system and using it to expand the government, when in fact what we should be doing, if you are going to take money out of the Medicare system, is you should be using it to reduce the obligations of the government—the debt obligation—so the Medicare system becomes more affordable. That is not the goal here, however.

Then, of course, there is the practical aspect of this. We know these types of proposals are plug numbers to a great degree, because we know this Congress is not going to stand up to a $1½ trillion cut in Medicare over the next 10 years and a $3 trillion cut in Medicare over the next 20 years. Why do we know that? I know it from personal experience. I was chairman of the Budget Committee the last time we tried to address the fact that we have an outyear liability in Medicare that is not affordable—this $55 trillion number. We know it is not affordable. We know we have to do something about it. So I suggested, when I was chairman of the Budget Committee, that we reduce Medicare spending, or its rate of growth—not actual spending, its rate of growth—by $10 billion over a 5-year period, less than 1 percent of Medicare spending. My suggestion was that we do that by requiring—primarily we get most of that money by requiring senior citizens who are wealthy to pay a reasonable proportion of their Part D premium and then take those moneys and basically try to make Medicare a little more solvent with it. We got no votes from the other side of the aisle—none, zero—on that proposal.

Now they come forward with a representation that they are going to reduce Medicare spending and benefits to seniors by $3 trillion over the next 20 years and $400-some-odd billion over the next 10 years, and they expect this to be taken seriously? Of course not. This is all going to end up being unpaid-for expenditures in expansion of these programs.

These brandnew entitlements that are being put in this bill and this expansion of other entitlements that do not deal with Medicare, by the way, are going to end up being in large part paid for by creating more debt and passing it on to our children. As I mentioned earlier, that is a fairly big problem for our kids. They are going to get a country, as it is today, that has about $70 trillion in unfunded liability just in the Medicare and Medicaid accounts, to say nothing of the other deficits we are running up around here. Now we are going to throw another huge amount on their backs.

Some percentage of this $2.5 trillion—probably a majority of it—will end up being added to the deficit and debt as we move out into the outyears even though it is represented that it is not going to be. The only way you can claim you are going to pay for this, of course, is with these Medicare cuts and

Exhibit 151                                                                    JA-0002464

these tax increases that are in this bill, and these fee increases. We are going to spend a little time on the tax increases and fee increases and the speciousness of those proposals, but right now we are focusing on Medicare.

In any event, what we have is a bill that takes government and explodes its size. We already have a government that is pretty big—20 percent of our economy. You are exploding it to 24 percent of our economy, and then you are saying you are going to pay for that by dramatically reducing Medicare spending. It does not make any philosophical sense, and it certainly does not pass the test of what happens around here politically.

In addition, there is the issue of how this bill got to a score in the first 10 years that made it look as if it was more fiscally responsible. I have heard people from the other side. Again, I respect the chairman of the Finance Committee for acknowledging that this bill, when fully implemented, is a $2.5 trillion bill. But a lot of folks are claiming this is just an $843 billion bill, that is all it is in the first 10 years, that is all it costs. There are so many major budget gimmicks in this bill that accomplish that score that Bernie Madoff would be embarrassed—embarrassed by what this bill does in the area of gamesmanship.

Let's start with the fact that it begins most of the fees, most of the taxes, and most of the Medicare cuts in the first year of the 10 years, but it does not begin the spending on the new program, the new entitlements, until the fourth and fifth year. So they are matching 4 and 5 years of spending against 10 years of income and Medicare cuts and claiming that therefore there is a balance.

Ironically, it is represented and rumored—and I admit this is a rumor—that originally they were going to start the spending in the third year under this bill. Of course, nobody knew what the bill was because it was written in private and nobody got to see it. But then they got a score from CBO that said it didn't work that way, so they simply moved the spending back a year and started it in the fourth year. They sent it back to CBO, and CBO said: If you take a year of spending out in the 10 years and you still have the 10 years of income from the taxes, fees, and cuts in Medicare, you get a better score. We will give you a better score. You will get closer to balance. It is a pretty outrageous little game of hide the pea under the shell.

This is probably the single biggest—in my experience, and I have been on the Budget Committee for quite a while—in my experience, it is the single biggest gaming of the budget system I have ever seen around here. But it is not the only one; there is something here called the CLASS Act.

Mr. HATCH. Will the Senator yield?

Mr. GREGG. I will be happy to yield to the Senator from Utah for purposes of a question.

Mr. HATCH. What is the current cost of our health care across the board in this country, without this bill?

Mr. GREGG. It is about 16 to 17 percent of our gross national product.

Mr. HATCH. That is $2.5 trillion?

Mr. GREGG. That is correct.

Mr. HATCH. The Senator is saying they are going to add, if you extrapolate it out over another 10 years, $2.5 trillion.

Mr. GREGG. It takes the spending from 16 to 17 percent to about 20 percent of GDP.

Mr. HATCH. If I understand my colleague correctly, he is saying, to reach this outlandish figure of $843 billion, literally they do not implement the program until 2014 and even beyond that to a degree, but they do implement the tax increases?

Mr. GREGG. The Senator from Utah, of course, being a senior member of the Finance Committee, is very familiar with those numbers, and that is absolutely correct.

Mr. HATCH. Is that one of the budget gimmicks my colleague is talking about?

Mr. GREGG. I think that is the biggest in the context of what it generates in the way of Pyrrhic, nonexistent savings because it basically says we are really not spending—because it doesn't fully implement the plan in the first year, it says we are not spending that much money. In fact, we know that when the plan is fully implemented, it is a $2.45 trillion not a $840 billion bill.

Mr. HATCH. Am I correct that the Democrats have said—and they seem to be unified on this bill—that literally this bill is budget neutral? But as I understand it, in order to get to the budget neutrality, they are socking it to a program that has about $38 trillion in unfunded liabilities called Medicare—to the tune of almost $500 billion or $1⁄2 trillion in order to pay for this? Am I correct on that? No. 2, who is going to lose out when they start taking $500 billion out of Medicare? And what are they going to do with that $500 billion? Are they going to put it into something else? Are they using this just as a budgetary gimmick? What is happening here? As the ranking member on the Budget Committee today, you really could help all of us understand this better.

Mr. BAUCUS. Will the Senator yield for a question?

Mr. GREGG. If I can first answer the question of the Senator from Utah, and then I will be happy to answer the chairman of the Finance Committee.

The Senator from Utah basically is correct in his assumption. Essentially, they are claiming an approximately $400-some-odd billion savings in Medicare over 10 years which they are then using to finance the spending in this bill over the last 5 years, 5 to 6 years of the 10-year window. In the end, after you fully implement this bill and you fully implement the Medicare cuts, it represents $3 trillion of Medicare reductions over a 20-year period.

Where does it come from? It comes from two different accounts, primarily. One is, just about anybody who is on Medicare Advantage today—about 25 percent of those people will probably completely lose their Medicare Advantage insurance, and it is 12,000 people in New Hampshire, so say 4,000 people.

Mr. HATCH. How many people on Medicare are on Medicare Advantage?

Mr. GREGG. I believe 11 million people.

Mr. HATCH. That will be what percentage of people on Medicare?

Mr. GREGG. About 25 percent of those people will lose their Medicare insurance under this proposal, mostly in rural areas. And second, because there is $160 billion of savings scored. You can't save that type of money in Medicare Advantage unless people don't get the Medicare Advantage advantage.

Second, it comes in significant reductions in provider payments. How do provider payments get paid for when they are cut, I ask the Senator from Utah. I suspect it is because less health care is provided.

Mr. HATCH. How does that affect the doctors?

Mr. GREGG. It certainly affects the hospitals, and it probably affects the doctors. I have heard the Senator from Montana say they are going to straighten out the doctor problem down the road, but that is another $250 billion of spending which we don't know where they are going to get the money from. But, yes, it would affect, in my opinion, all providers—doctors, hospitals, and other people who provide health care to seniors. You cannot take $450 billion out of the Medicare system and not affect people's Medicare.

Mr. HATCH. Am I wrong in saying Medicare is already headed toward insolvency and that it has up to almost $38 trillion in unfunded liability over the years for our young people to have to pay for?

Mr. GREGG. The Senator from Utah is correct again. The Medicare system is headed toward insolvency, and it goes cash-negative in 2013, I believe—maybe it is 2012—in the sense that it is paying out less than it takes in, and it has an unfunded liability that exceeds, actually, $38 trillion now. I think it is up around——

Mr. HATCH. Then how can our friends on the other side take $1⁄2 trillion out of Medicare, which is headed toward insolvency, to use for some programs they want to now institute anew?

Mr. GREGG. I think the Senator from Utah has asked one of the core questions about this bill. Why would you use Medicare savings, reductions in Medicare benefits, which will definitely affect recipients, for the purposes of creating a new program rather than for the purposes of making health care more solvent if you are going to do that in the first place? And are these savings ever going to really come about? One wonders about that also.

Exhibit 151                                                                                    JA-0002465

Mr. HATCH. I heard someone say today on the floor—I don't know who it was, I can't remember—that Medicare Advantage really isn't part of Medicare. Is that true?

Mr. GREGG. Actually, I would yield to the Senator from Utah on that issue—not the floor but yield on that question because I think the Senator from Utah was there when Medicare Advantage was drafted as a law.

Mr. HATCH. I was there in the Medicare modernization conference, along with the distinguished chairman of the committee, Senator BAUCUS, and others, when we did that because we were not getting health care to rural America. The Medicare+Choice plan didn't work. Doctors would not take patients. Hospitals could not pay; they could not take patients. There were all kinds of difficulties in rural America. So we did Medicare Advantage, and all of a sudden we were able to take care of those people. Yes, it costs a little more, but that is because we went into the rural areas to do it.

But this would basically decimate Medicare Advantage, wouldn't it, what is being proposed here? And that is part of Medicare.

Mr. GREGG. I believe it is a legal part of Medicare, Medicare Advantage.

Mr. HATCH. No question about it.

Mr. GREGG. And this would have a massively disruptive effect on people who get Medicare Advantage because you are going to reduce it—the scoring is there will be a reduction in Medicare Advantage payments of approximately $162 billion, I believe it is, and there is no way you are going to keep getting the advantages of Medicare Advantage if you have that type of reduction in payments.

Mr. HATCH. How can they take $\frac{1}{2}$ trillion out of Medicare? That is not all Medicare Advantage. Medicare Advantage is only part of that, the deductions they will make there. But how can they do that and still run Medicare in a solvent, constructive, decent, and honorable fashion?

Mr. GREGG. If the Senator will allow me to respond, the problem here is we have rolled the Medicare issue into this major health reform bill—or the other side has—and they have used Medicare as a piggy bank for the purposes of trying to create a brandnew entitlement which has nothing to do with senior citizens. Yes, Medicare needs to be addressed. It needs to be reformed. The benefit structure probably has to be reformed. But we should not use those dollars for the purposes of expanding the government with a brandnew entitlement. We should use those dollars to shore up Medicare so we don't have this massive insolvency.

Mr. HATCH. You mean they are not using this $500 billion to shore up Medicare and to help it during this period of possible insolvency with a $38 trillion unfunded liability? They are not using it for that purpose?

Mr. GREGG. That is correct.

Mr. HATCH. For what purpose are they using it?

Mr. GREGG. They are using to fund the underlying bill, and the underlying bill expands a variety of initiatives in the area of Medicaid and in the area of a brandnew entitlement for people who are uninsured to subsidize the government plan.

Mr. HATCH. You were going to talk about the CLASS Act.

Mr. GREGG. The CLASS Act is another classic gimmick of budgetary shenanigans which I would like to speak to, briefly. I know the Senator from Montana had a question or maybe he has gone past that point and we have answered all his questions. I can move on to the CLASS Act.

Mr. BAUCUS. I would like to hear you talk about the CLASS Act. I am no fan of the CLASS Act myself so why don't you proceed.

Mr. GREGG. I thank the Senator for his forthrightness on that. The CLASS Act needs to be explained. It is a great title. We come up with these wonderful "motherhood of titles." We attach them to things and then suddenly they take on a persona that has no relationship to what they actually do. The CLASS Act is a long-term care insurance program which will be government run. It is another takeover of private sector activity by the Federal Government. But what is extraordinarily irresponsible in this bill is, we all know in long-term care insurance that you buy it when you are in your thirties and your forties. You probably don't buy it when you are in your twenties. You buy it in your thirties, forties, and fifties. You start paying in premiums then. But you don't take the benefits. The cost of those insurance products don't incur to the insurer until people actually go into the retirement home situation, which is in their late sixties and seventies, most likely eighties in our culture today, where many people are working well into their seventies. So there is a large period of people paying in, and then 30 or 40 years later, they start to take out.

What has happened in this bill, which is a classic Ponzi scheme—in fact, ironically, the chairman of the Budget Committee did call it a Ponzi scheme, the Senator from North Dakota, Mr. CONRAD—they are scoring these years when people are paying into this new program and, because the program doesn't exist, everybody who pays into it, starting with day one, the beneficiaries of that program aren't going to occur until probably 30 or 40 years later. They are taking all the money that is paid in when people are in their thirties, forties, fifties, and sixties as premiums. They are taking that money and they are scoring it as revenue under this bill and they are spending it on other programmatic initiatives for the purposes of claiming the bill is balanced. It adds up to about $212 billion over that 20-year period, 2010 to 2029.

OK. So you spend all the premium money. What happens when these people do go into the nursing home, do require long-term care when they become

75, 80, 90 years old? There is no money. It has been spent. It has been spent on something else, on a new entitlement, on expanding care to people under Medicaid, on whatever the bill has in it. So we are going to have this huge bill that is going to come due to our kids one more time. We already are sticking them with $12 trillion of debt right now, and we are going to raise the debt ceiling, sometime in the next month, to, I don't know what it is going to be, but I have heard rumors it may be as high as 13 more trillion. We know we have another $9 trillion of debt coming at us just by the budgets projected for the next 10 years. Now we are going to, 30 years from now, have this huge bill come in as the people who decided to buy into the CLASS Act suddenly go into the retirement home. There will not be any money there for them. It is gone. It will have been spent by a prior generation to make this bill balanced.

The CLASS Act has been described as a Ponzi scheme relative to its effect on the budget. It is using dollars which should be segregated and protected under an insurance program. If this were an insurance company, for example, they would actually have to invest those dollars in something that would be an asset which would be available to pay for the person when they go into the nursing home so they are actuarially sound. But that is not what happens under this bill. Under this bill, those dollars go out the door as soon as they come in for the purposes of representing that this bill is in fiscal balance. It is not. It is not in fiscal balance, obviously.

Even if you were to accept these incredible activities of budgetary gimmickry, the fundamental problem with this bill is it grows the government by $2.5 trillion, and we can't afford that when we already have a government that well exceeds our capacity to pay for it. Inevitably, we will pass on to these young pages, as they go into their earning careers and raise their families, a government that is so expensive, they will be unable to buy a home, send their kids to college or do the things they wish to do that give one a quality of life.

I have certainly taken more than my fair share of time at this point. The Senator from Louisiana was going to go next.

I yield the floor.

The PRESIDING OFFICER. The Senator from Montana.

Mr. BAUCUS. Mr. President, it has been a very interesting discussion, listening to the Senator from New Hampshire. Several points. One, the underlying bill is clearly not a net increase in government spending on health care. The numbers are bandied about by those on the other side—$1 trillion, $2.5 trillion, et cetera. I do acknowledge and thank the Senator from New Hampshire for saying, yes, it is all paid for. He did say that. He did agree this is all paid for. So I just hope when other Senators on that side of the aisle

Exhibit 151

JA-0002466

start talking about this big cost, $1 trillion, $2 trillion, whatever, that they do admit it is paid for. The ranking member of the Senate Budget Committee flatly said: Yes, it is all paid for. I would hope other Members on that side of the aisle heed the statement of the Senator from New Hampshire, ranking member of the Senate Budget Committee, for saying it is all paid for.

But don't take my word for it or his word. It is what the CBO says. In fact, let me quote from a letter to Senator REID not too long ago:

The CBO expects that during the decade following the 10-year budget window, the increases and decreases in Federal budgetary commitment to health care stemming from this legislation would roughly balance out so that there would be no significant change in that commitment.

That is, a commitment to health care, to government health care spending, no change basically. It is flat. Although it is a little better than flat because the subsequent CBO letter has said the underlying bill achieves about $130 billion in deficit reduction over 10 years and one-quarter of a percent of GDP reduction in the next 10 years. The Senator from New Hampshire talks about large deficits this country is facing. That is true. Frankly, all of us in the Senate have a responsibility to try to reduce that budget deficit as best and as reasonably as we possibly can. Bear in mind, this underlying health care bill helps reduce the budget deficit. Sometimes people on the other side like to suggest that $1 trillion over 10 years will add to the budget deficit. Again, we have definitely established it does not add to the budget deficit at all, not one thin dime.

In addition, we actually reduce the budget deficit through health care reform, through this underlying legislation. We all know the Medicare trust fund is in jeopardy, in part, because baby boomers are retiring more but also because health care costs are going up at such a rapid rate. That is health care costs for everybody. It is health care costs for me, for every Senator, for every senior, for businesses. Let's not forget, we spend in America about 60 percent more per person on health care than the next most expensive country, about 50 to 60 percent more per person. The trend is going in the wrong direction. We are going to spend about $33 trillion in America on health care over the next 10 years. That is going to be somewhat evenly divided between public expenditures and private. Every other country in the world has figured out ways to limit the rate of growth of increase in health care spending. We haven't. We are the only industrialized country—in fact, developing country—that hasn't figured out how to get some handle on the rate of growth of increase in health care spending.

One could say: Gee, let's forget about it. Just let the present trend continue. We all bandy about different figures.

One I am fond of at least remembering is the average health care insurance policy in America today costs about $13,000. If we do nothing over 8 years, it will be $30,000. That is a much higher rate of increase than income for Americans. It means the disparity between wages of the average American and what they are paying on health care will widen all the more if we do nothing. We have to do something. This legislation is a good-faith effort to begin to get a handle on the rate of growth of spending in this country.

The Senator from New Hampshire was being honest, frankly. Some on the other side are being not quite so honest. He is basically saying: Yes, it is true we are not cutting beneficiary cuts, although he talks about Medicare Advantage. Let me point out that there is nothing in this legislation that requires any reductions in any beneficiary cuts. In fact, guaranteed benefits under Medicare are expressly not to be cut under the express language of this bill. The portion we are talking about is Medicare Advantage. The fact is, there is nothing in this bill that requires any cuts at all in Medicare Advantage payments. Those Medicare Advantage payments are in addition to the guaranteed Medicare payments, such as gym memberships, things such as that which are not part of traditional Medicare.

Why do I say there is nothing in there that requires cuts for those extras? That is because the decision on what benefits or what extras Medicare Advantage plans have to give the guaranteed benefits, that is by law. But the decision as to what extras should go to their members is a decision based not upon us in the government, in Congress, not upon the HHS Secretary; it is based on the corporate officers of these companies. They are overpaid, Medicare Advantage plans, right now. Everybody knows they are overpaid. Even they, privately, will tell you they are overpaid. They are overpaid based upon legislation that Congress passed in 2003, the Medicare Part D, by setting these high benchmarks. They are overpaid. The MedPAC commission also said they are overpaid to the tune of about between 14 and 18 percent. So the reductions that are provided for in this bill, in Medicare Advantage plans, the effect of those reductions is up to the officers of those plans.

They could cut premiums people otherwise pay. They could cut benefits to help themselves, help their salaries. They could cut stockholders. They could cut administrative costs.

They can decide what they want to do. That is solely a decision of the executives of Medicare Advantage plans. Private insurance plans is what they are. They are private insurance plans, so there is nothing here that says the fringes, the extras, have to be cut at all. Those executives could keep those fringes and maybe have a little less return to their stockholders or maybe make some savings in their adminis-

trative costs, maybe not increase their salaries. There is nothing here that requires those fringes, those extras, to be cut, nothing whatsoever.

The Senator from New Hampshire says: Oh, it is about $400 billion to $500 billion of reduced payments to providers in this legislation. That is true. Well, let's look and see what the consequences of that are. First of all, that means the Medicare trust fund's solvency is extended. It is more flush with cash. I would think all Senators here would like to extend the life of the Medicare trust fund. A good way to do that is by what we are doing in this bill, saving about $450 billion over 10 years that otherwise would be paid to Medicare providers is not being paid, and those benefits inure to the trust fund.

There is no dispute—none whatsoever—that this legislation extends the life of the Medicare trust fund by another 5 years. That is because of those changes in the structure and also because there are no cuts in benefits. There are no cuts in benefits, I say to Senators. Although sometimes Senators on that side of the aisle like to either say or strongly imply there are cuts in benefits, there are no cuts in benefits. There are no cuts in the guaranteed benefits with the basic benefits, and there are no required cuts for the fringes or the extras because the officers can make that decision not to cut, if they want to. That is their choice, as I have explained a few minutes ago.

Let's look to see what the other side proposed not too many years ago back in 1997. They proposed cutting the Medicare benefit structure, cutting payments to providers, big time—big time. They proposed a 12.4-percent cut to providers back in 1997, when they were in charge. They did that in part to save the Medicare trust fund, to extend the life of the Medicare trust fund.

I have a hard time understanding why back then it was a good thing to do, which was about three times more of a cut—let's see, twice as heavy a cut to Medicare providers back then, in 1997, than it is today. Nobody over there has explained why it was the right thing to do back then but not the right thing to do today, when the goal is the same. The goal is the same; that is, to extend the solvency of the trust fund.

One could say—I think the Senator from New Hampshire did say—well, let's take those savings, which do extend the solvency of the trust fund, but not—he said—provide another program. I think he wants to use that to cut the deficit. That is what I think he wants to do.

That is a very basic, fundamental, values question I think this country should face; that is, do we want to set up a system where virtually all Americans have health insurance? We are the only industrialized country in the world that does not have a system where its citizens have health insurance—the only industrialized country

Exhibit 151    JA-0002467

in the world. It is a very basic question. I think we should ask ourselves as Americans: In every other industrialized country, health insurance, health care is a right. That is the starting point. In every other country that has a health care system, health care is a right—that everybody should have health care.

Of course, it is true, people are different. Some are tall, some are short. Some are very athletically endowed, some are not. Some are smart, some are not so smart. But health care does not care—that is a way to put it—whether you are dumb, smart, tall, skinny. It affects everybody; that is, diseases affect everybody, and everybody needs health care regardless of your station in life, regardless of your income, regardless of whether you are an egghead, you are brilliant, or an athlete. It makes no difference whatsoever. We are Americans.

I frankly believe other countries on that point have it right; that is, that they treat all their citizens basically equally because disease is indiscriminate—who is going to get disease—accidents are indiscriminate—who is going to get in an accident—and so forth. So we could take this $400 billion, $500 billion and reduce the deficit with it and forget any health insurance coverage. That would be an option. That is a legitimate question we could ask ourselves. I frankly think the better choice is to take that $400 billion, $500 billion, which does extend the solvency of the trust fund, and help set up a way, help set up a system so all Americans have health insurance. We do it in a way that reduces the budget deficit. We do it in a way that reduces the budget deficit in the first 10 years and also in the next 10 years.

I again repeat, if trimming the rate of growth of provider payments was OK back in 1997—that was twice as much as today back then to extend the solvency of the Medicare trust fund—why isn't it OK today to do half as much to extend the life of the trust fund, in this case for 5 more years, and at the same time help provide health insurance benefits for people who deserve it?

Let's not forget, hospitals want us to do this. They want everyone to have health insurance. Doctors want us to have a system where everybody has health insurance, whether it is Medicaid or it is private health insurance. All the providers want it. The pharmaceutical industry does, the home health industry does, the hospice industry does. The durable medical equipment manufacturers want it. They all want it because they know it is the right thing to do. They also know they are not going to get hurt.

I heard some reference here that some HHS actuary, commenting on the House bill, said, oh, gee, it might scare providers and whatnot, but we actually got subsequent information which showed that letter—that actuary admitted it is extremely variable, what he came up with. There are lots of factors he did not take into consideration. I also have statements from hospital administrators saying no way are they going to be allowed.

In fact, let's remind ourselves of this: It was not too many weeks ago, a couple months ago—remember that meeting—when all the health care providers and the insurance industry went to the White House? They were all over there. What did they pledge to President Obama to help get health care reform passed? That they would cut their reimbursements by $2 trillion over 10 years. They would cut. They agreed to cut their payments that Uncle Sam makes to them in the health care system by $2 trillion over 10 years. It was widely reported in the papers.

What did we do in this bill? We reduced the rate of increase in payments to providers, not by $2 trillion, not by $1 trillion, less than $1½ trillion over that same 10-year period. So if they could commit back then to $2 trillion, you would think, my gosh, this is a quarter of that. That is not too bad and not going to hurt anybody, and providers are not going to be leaving.

I might add too, I have a letter from AARP to the majority leader dated today. It has been handed to me. In part it says:

The legislation before the Senate properly focuses on provider reimbursement reforms. . . . Most importantly, the legislation does not reduce any guaranteed Medicare benefits.

This is a letter today from the American Association of Retired People. I will re-read that portion. It is addressed to Senator REID:

The legislation before the Senate properly focuses on provider reimbursement reforms. . . .

And, man, we need about a week or so to talk about all the reforms in this bill that are so important so we have a better health care system focusing more on quality than we currently do in the United States system. Again:

Most importantly, the legislation does not reduce any guaranteed Medicare benefits.

In the letter they also say:

AARP believes that savings can be found in Medicare through smart, targeted changes aimed at improving health care delivery, eliminating waste and inefficiency, and aggressively weeding out fraud and abuse.

That is important. It is very important. I might add, too, that every person today who pays a Part B premium—every American today—every senior today who pays that quarter, that 25 percent of Part B today, pays also for the waste that is in the system today, especially under Part B. So if we get the waste out, we also will be able to reduce that Part B premium payment that seniors have to pay too. I think that is a good thing.

So the more you dig into this bill, the more you see the good features. I do not think all the good features have been pointed out in this bill. One of our jobs here is to point out what they are, so when this legislation passes—mark my words, this legislation is going to be enacted. It is going to be enacted, I will not say exactly when, but certainly, if not this month, it will be signed by the President either this month or next month—then Americans are going to start to see: Oh, gee, there is a lot in there that is good. I didn't know about that. That is good. I like that. It may not be perfect, but they started in the right direction. That is pretty good. They are going to like it.

I hear all these references to polls around here, and that is because of all the confusion, in part. But once it is passed and people look to see what is in it—they will look to see what is in it because that is the law. They are forced to look to see what is in it because that is the law.

I know some of my colleagues on the other side of the aisle may say: Yes, when they look to see what is in it, they will see how bad it is. I disagree. That is not my view. My view is, the more this legislation is subjected to the light of day, the disinfectant of sunshine, which shows what is in this bill, the more people are going to say: Hey, that was a good thing they did back then in December or January.

I yield the floor.

The PRESIDING OFFICER. The Senator from Louisiana.

Mr. VITTER. Mr. President, I rise to talk about a very important topic on the floor right now, along with the Medicare issue; that is, preventive screenings and services, particularly for women. I want to focus on a very specific and important example of that, which is breast cancer screening through mammography, and also through the practice of self-examination.

This is very timely because 2 weeks ago, a U.S. government-endorsed panel issued new recommendations on this topic, which I believe, along with tens of millions of Americans, is a major step in the wrong direction. I think we need to focus on this recent action and talk about this and fix it in the context of this health care reform debate.

What am I talking about? Well, on Tuesday, November 17—literally just a couple weeks ago—the U.S. Preventive Services Task Force, which is an official government-sanctioned body—a task force about preventive medicine—issued new recommendations regarding breast cancer screening for women, including the use of mammography.

These new recommendations they came out with a couple weeks ago are a big step backward, a big retrenchment in terms of what the current state of knowledge is and what their previous recommendations were. Their new recommendations, just out 2 weeks ago, do four things that take a big step back on breast cancer screening.

No. 1, for women between the ages of 40 and 49, rather than get a routine mammogram every 2 years to screen for breast cancer, the task force said: Forget about that. We do not recommend that anymore. We step back from that recommendation.

Exhibit 151                                                    JA-0002468

Case 2:17-cv-04540-WB Document 253-10 Filed 09/29/20 Page 497 of 677

No. 2, for women aged 50 to 74, the previous recommendation was to get a routine mammogram to screen against breast cancer every year. The task force, 2 weeks ago, stepped back from that and said: No, every other year is probably good enough. So not every year: every other year.

No. 3, for women over the age of 75, the previous recommendation was to have routine screening at least every 2 years. The new recommendation from the task force steps back from that and says: No, we do not recommend routine screening over the age of 75.

And, No. 4, the task force 2 weeks ago said: We no longer recommend breast self-examination by women to detect lumps to get treatment early. We do not believe in that. We do not think the science is clear on that. We step back from that.

Those are four huge changes in their previous recommendations. Those are four huge, new recommendations completely at odds with what I believe is the clear consensus in the medical community and the treatment community.

When I first read about these new U.S. Preventive Services Task Force recommendations, around November 17, I had the immediate reaction I just enunciated, but I said: I am not an expert. I am not a doctor. I am not a medical expert. I want to hear from folks who are much closer to this crucial issue than me. So my wife and I convened a roundtable discussion in Baton Rouge, LA. We had it on Monday, November 23. It was at the Mary Bird Perkins Cancer Center. They were very kind to host it. It was cohosted by Women's Hospital in Baton Rouge. We had a great roundtable discussion featuring a lot of different people, including oncologists, other MDs, other medical experts, and including, maybe most importantly, several breast cancer survivors who literally lived through this issue themselves. Those breast cancer survivors were all women who got breast cancer and had it detected relatively early, in their forties. So they are exactly the group of people these new recommendations would work against because the new recommendations say don't get regular mammography screening in your forties.

Again, I was interested in hearing from the real experts, both medical experts and the survivors, what they thought about it. I wasn't very surprised, quite frankly, when they all had exactly the same reaction I did to these new U.S. Preventive Service Task Force recommendations. Everybody to a person said this is a big step backward. This will make us move in the wrong direction. Increased screening, early detection is a leading reason we are winning increasingly the fight against breast cancer. It is a leading reason we are doing so much better in this fight.

In that one room at the Mary Bird Perkins Cancer Center, in a sense we had a snapshot through history and proof of the great gains we have made, including through early screening because, as I said, we had these survivors, all a supercause for celebration: Folks who had detected their cancer, most of them relatively early; all of them first got it and detected it either in their forties or some in their thirties. Unfortunately, in the same room, we had a life experience on the other end of the spectrum going back 40-plus years. That is my wife Wendy who lost her mother to breast cancer when she was 6 years old. One of the reasons is simple and straightforward and directly related to what we are talking about.

Back in the late 1960s when Wendy lost her mom to breast cancer there wasn't this same routine. There wasn't this emphasis on screening. There wasn't the recommendation for annual mammograms. There wasn't the educational push for self-examination. There wasn't that focus, and because of that, far more women, tragically, including Wendy's mother, died.

We have made huge progress since then. Again, the very life experiences in that one room in Baton Rouge proved that. The medical doctors and the oncologists, the other experts, as well as the breast cancer survivors, all made that point.

So I am standing on the Senate floor to urge us to take focused, specific action to legislatively repeal any impact of these new recommendations by the U.S. Preventive Services Task Force issued in November.

This topic is on the Senate floor. It is on the floor through the Mikulski amendment. There is probably going to be a Republican alternative to that Mikulski amendment. My concern is, in terms of everything on the floor now, none of it directly, specifically takes back the impact of those new recommendations. I think that is the first matter we should all come together on, 100 to nothing, on this topic.

We can have a broader debate. We can have differences about the best approach to prevention and screening. But the first concrete, focused thing we should do right now on the Senate floor today is come together, 100 to nothing, to legislatively overrule any impact of those new recommendations. That is, again, what I have been hearing from experts not just in Baton Rouge, not just in that one room, but across the country; experts in terms of oncologists, other medical doctors, leaders of the cancer associations across the country and, perhaps most importantly, breast cancer survivors. I daresay that is what every Member of this body has heard from their States since those new recommendations came out around November 17.

So, again, whatever we do in this broader debate, I have a very simple, basic, focused suggestion. Let's show the American people we can come together around something on which I believe we all agree.

There is an expression: It is mom and apple pie. Well, this should be considered mom and apple pie because it is literally about mom and our wives and our daughters and, obviously, half the population. So let's come together around this issue, and let's legislatively overrule any legal impact, any legal consequence of these new task force recommendations of the U.S. Preventive Service Task Force.

That is what my Vitter amendment, No. 2808, does. I had hoped the amendments on the Senate floor on this general topic would do that already. Unfortunately, the one that is pending now, at least the Mikulski amendment, does not do that. In fact, in some ways it points to the new recommendations of the task force and holds up those new recommendations. Our current law holds up the current recommendations. I think because the new recommendations they promulgated around November 17 are so egregious, such a bad idea, because the consensus around the country starting with experts and oncologists is so clear that we should negate any impact of them. So, again, my Vitter amendment No. 2808, which is currently filed as a second-degree amendment to the Mikulski amendment, would do that.

Let me be perfectly clear and read my text because it is very short:

For the purposes of this Act, and for the purposes of any other provision of law, the current recommendations of the United States Preventive Service Task Force regarding breast cancer screening, mammography, and prevention shall be considered the most current other than those issued in or around November 2009.

So what it does is simple. It says we are erasing, we are canceling out, any effect of those new recommendations made by the task force in and around November 2009. We are saying that never happened because the consensus is so clear against it.

Again, I expected the Mikulski amendment to do that directly. It doesn't do that. It does other things about prevention, which is fine. We can debate those points. We can have a discussion about that. But I think we need to all come together to absolutely, categorically, specifically, legislatively take back, overrule these new recommendations.

I am certainly eager to work with everyone in this body starting with Senator MIKULSKI, starting with Senator MURKOWSKI, whom I believe may offer a Republican alternative to include this language. I hope this language, which seems to me is a no-brainer given the consensus on the topic, can be included in both of those amendments. It should be just accepted and included in the Mikulski amendment. It should be accepted and included in the Murkowski amendment. That would be my goal so that whatever happens on these votes, we come together in a unified way. Literally, it would in essence be 100 to nothing, to say: No, time out. These new recommendations of the U.S. Preventive Services Task Force from November of

Exhibit 151 JA-0002469

this year are a huge step backwards, a huge mistake. That is what the experts are saying. That is what oncologists are saying. That is what cancer specialists are saying. That is what leaders of cancer associations are saying. That is what, perhaps most importantly, breast cancer survivors are saying.

We can look at history in this country in the last several decades and happily point to real progress in this fight. One of the causes of that good news, that improvement since the late 1960s when my wife Wendy's mom passed away from breast cancer, clearly one of the underlying reasons, clearly one of the leading causes is dramatic improvement in this prevention and screening, using mammography, also educating about self-examination.

So, again, I have this second-degree amendment. My hope and my goal would be that this language, which should be noncontroversial, would be accepted on it, as well as any Republican alternative, and that whatever happens in terms of those votes, we come together and make crystal-clear that this task force of unelected bureaucrats—didn't include a single oncologist, by the way—made a big mistake and we are going to make sure those new recommendations don't have any impact in terms of law, in terms of government programs, in terms of legal impact on insurance companies.

Again, I look forward to working with everyone on the floor, including Senator MIKULSKI, including Senator MURKOWSKI and others to pass this language. It should be a no-brainer. It is mom and apple pie. Let's pass it and at least in this focused way come together and do the right thing in direct reaction to something that just happened 2 weeks ago.

Thank you, Mr. President. I yield the floor.

The PRESIDING OFFICER. The Senator from Ohio is recognized.

Mr. BROWN. Mr. President, I certainly appreciate Senator VITTER's empathy for victims of breast cancer, for people who obviously should be tested for breast cancer, in many cases more frequently than they are. I am sorry about Wendy's mother's death from breast cancer.

I think, though, that Senator VITTER missed the larger point. While most of us in this Chamber disagree with the finding of that Bush-appointed commission—committee, commission, task force—I think the bigger question is that a whole lot of the status quo which Senator VITTER has defended, sort of ad hominem, the bigger question is under the status quo so many women aren't getting tested for breast cancer. It is estimated that 4,000 breast cancer deaths could be prevented just by increasing the percentage of women who receive breast cancer screening.

That is why the Mikulski amendment is so important. It is important because in this country today, if you take a group of 1,000 women who have breast cancer and who have insurance, and 1,000 women who have breast cancer who don't have insurance, those who don't have insurance are 40 percent more likely to die. So the issue is that committee—I think that commission made a mistake. We pretty much, most of us here, think that commission made a mistake. I am not sure why those people whom President Bush put on the commission made the decision they did. It should have been oncologists sitting; Senator VITTER is right about that.

The larger point is that women without insurance don't get tested, and women without insurance are 40 percent more likely to die of breast cancer than those with insurance. At the same time, as the Presiding Officer knows, in the State of Maryland, women typically pay more for their insurance than men do on the average.

So if we are going to do this right, it means we need insurance reform, which is what this legislation does. No more preexisting conditions, no more men and women who have their insurance canceled because they got too sick last year and had too many expenses and the insurance companies practiced rescission and they cut them off. No more if I have insurance and if I have a child born with a preexisting condition do I lose my insurance.

I come to the floor pretty much every day reading letters from people in Ohio—from Galion and Girard and Gallipolis and Lima, all over my State. Typically, people were pretty happy with their insurance if they had written me a year ago, these people. But today these people writing found out their insurance doesn't cover what they thought it did. They end up losing their insurance because of a preexisting condition. They can't get insurance because they once had breast cancer. They have had this discrimination against them because of gender or geography or disability. That is what is important about the bill and what is important about the Mikulski amendment.

That is why I would hope Senator VITTER, as he is pushing for assistance for women with breast cancer—I applaud him for that—would go deeper than just dismissing the recommendations of one government commission and that, in fact, he would advocate for better testing, more frequent testing for women who are not getting tested often enough today, and that the rates for women would be comparable to the rates for men. That is, again, why the Mikulski amendment is so important.

I will repeat: The health reform legislation as is will finally put an end to discrimination, discrimination that charges women significantly higher premiums because they have had children.

It is considered a preexisting condition by some insurance companies if a woman had a C-section because she might get pregnant again and she is going to have another C-section and that costs more. A woman with a C-section has a preexisting condition. A woman who has been—in some cases, with some insurance companies' policies—victimized by domestic violence has a preexisting condition because the boyfriend, the husband or whoever hit her the one time, the insurance companies would suggest, is going to do it again. So she has a preexisting condition. What kind of health care system is that?

That is why I suggest Senator VITTER support the Mikulski amendment and support this legislation. In fact, it will put rules on insurance policies so people will be treated in a different way than they have been in the past.

Let me talk, for a moment, specifically about the Mikulski amendment and why it is so important. It will ensure that women are able to access needed preventive care and screenings at no additional cost. One of the things, in spite of the McCain amendment—and I appreciated Senator BAUCUS's comments a minute ago about how ironic it is. I was in the House of Representatives for 14 years and in the Senate now for the last 3 or so. I have heard so many colleagues eviscerate Medicare. They have tried to cut Medicare, privatize it, and come at it from all different directions repeatedly over these last 15 years. Now they want to tell us they are the ones who want to protect Medicare. In fact, this legislation saves money and saves lives, and this legislation saves Medicare.

One of the things this legislation does for Medicare beneficiaries is it will begin to provide these preventive care screenings so seniors will pay no copay. It is not cutting Medicare and services, as my friends on the other side say—all those who are opposed to every part of the bill, most of whom have tried to slow this legislation down. We cannot even vote on the McCain amendment. We are ready to do it, but the Republicans don't seem to want to move forward on this legislation.

Let me go back to why the Mikulski amendment makes so much sense. All health care plans would cover comprehensive women's preventive care and screenings, requiring that recommended services be covered at no cost to women. We know that to get preventive screenings and care—if we make them at no cost, the chances of people getting them are significantly higher. More than half of women delay or avoid preventive care because of the costs. One in five women at age 50 has not received a mammogram in the past 2 years.

That isn't because the Commission, appointed by the former President Bush, made this decision; it is not because of their bureaucratic decision that Senator VITTER rails about, and many of us agree with; it is not because 1 in 5 women age 50 has not received a mammogram; it is that they don't have insurance, in most cases, and they cannot afford the mammogram.

Exhibit 151                                                                                                    JA-0002470

In 2009, some 40,000 women will lose their lives to breast cancer; 4,000 breast cancer deaths, one-tenth of those could have been prevented by increasing these preventive screenings. These kinds of mammograms, this preventive care, and these doctor visits will be covered for free for women.

This amendment would broaden the comprehensive set of women's health services that health insurance companies must cover and pay for.

For instance, it would ensure that women of all ages are able to receive annual mammograms, covered by their insurer. It would encourage coverage of pregnancy and postpartum depression screenings, Pap smears, screenings for domestic violence, and annual women's health screenings. It makes so much sense. It would save the lives of women, and it means women would suffer from a lot less illnesses. It will save money for the health care system because these illnesses will be detected much earlier, and women will get the kind of care they should. That is what this whole legislation is about and what the Mikulski amendment will add to.

This amendment will remove any and all financial barriers to preventive care so we can diagnose diseases and illnesses early—when we have the best chance at being able to save lives, obviously.

Understand again, this legislation and the Mikulski amendment are supported by the National Organization for Women, the National Partnership of Women and Families, the American Cancer Society Cancer Action Network, and all kinds of women's organizations. They understand this is the best thing for women in this country.

I hope the Senate can proceed to a vote on this amendment. I hope my Republican colleagues will not just talk about the bad decision of this Commission—and most of us think it was a bad decision—but actually do something about it, something substantive, and give women in this country a fairer shake from health care insurance companies and cover these preventive services and cancer screenings. It will make a big difference if we can move forward and expand preventive health care services to women.

I yield the floor.

The PRESIDING OFFICER (Mr. MERKLEY). The Senator from Oklahoma is recognized.

Mr. COBURN. Mr. President, I wish to pick up where Senator BROWN left off. I will describe one of my real patients, but I will not use her real name. I will call her "Sheila." Sheila was 32 years old. She came in with a breast mass. I examined it and thought it was a cyst. I sent her to get an ultrasound, which confirmed it a cyst. OK. We did a mammogram to make sure. The mammogram said it looks like a cyst. The standard of care for somebody with a cyst is to watch it expectantly, unless it is painful, because 99 percent of them are benign cysts. I had the good for-

tune to do a needle drainage on her cyst 3 days after she had her mammogram. There were highly malignant cells within the cyst. She has since died.

The reason I wanted to tell the story about Sheila is because what the Senator from Ohio, in supporting the Mikulski amendment, doesn't recognize is, we don't allow the Preventive Services Task Force to set the rules and guidelines. We do something worse: We let the Secretary of HHS set the guidelines.

The people who ought to be setting the guidelines are not the government; they are the professional societies that know the literature, know the standards of care, know the best practices; and, in fact, the Mikulski amendment doesn't mandate mammograms for women. It leaves it to HRSA, the Health Resources Services Administration, which has no guidelines on it today whatsoever.

So what you are saying with the Mikulski amendment is, we want the government to, once again, decide—all of us are rejecting what the Preventive Services Task Force has said, but instead we are going to shift and pivot and say we will let the HRSA decide what your care should be.

The other aspect of the Mikulski amendment I fully agree with. I don't think there ought to be a copay on any preventive services. I agree 100 percent. But the last place we ought to be making decisions about care and process and procedure is in a government agency that, No. 1, is going to look at cost as much as at preventive effectiveness.

If the truth be known, the Preventive Services Task Force, from a cost standpoint—as a practicing physician, I know how to read what they put out—from a cost standpoint, it is exactly right. From a clinical standpoint, they are exactly wrong, because if you happen to be under 50 and didn't have a screening mammogram and your cancer was missed, to you, they are 100 percent wrong. You see, the government cannot practice medicine effectively. What we are trying to do in this bill throughout is have the government practice medicine, whether it is the comparative effectiveness panel or the Medicare Payment Advisory Commission.

What we have asked is for the government to make decisions.

Let me tell you what that is. That is the government standing between me and my patient. It is denying me the ability to use my knowledge, my training, my 25 years of well-earned gray hair, and combine that with family history, social history, psychological history, where it might be important, and clinical science, and me putting my hand on a patient such as I did Sheila. Most physicians would never have stuck a needle in that cyst, and she would not have lived the 12 years that she lived. She would have lived 1 or 2 years. But she got 12 years of life because clinical judgment wasn't de-

ferred or denied by a government agency.

There is a wonderful member of the British Parliament who happens to be a physician. When we were debating the issue of the comparative effectiveness panel, which will be applied to whatever HRSA or the Secretary does, I asked him: What about the national institute of comparative effectiveness in England? Here is what he said: As a physician, it ruins my relationship with my patient because no longer is my patient 100 percent my concern. Now my patient is 80 percent my concern and the government is 20 percent of my concern. So what I do is I take my eye off my patient 20 percent of the time to make sure I am complying with what the national institute of comparative effectiveness says—even if it is not in my patient's best interest.

When we pass a bill that is going to subterfuge or undermine the advocacy of physicians for their patients, the wonderful health care we have in this country will decline. There are a lot of other things about the bill I don't agree with. But the No. 1 thing, as a practicing physician, that I disagree with is the very fact—the thing I am most opposed to as a practicing physician—I like best practices. I use Vanderbilt in my practice. I like them. They make me more efficient and make me a better doctor. But they are not mandated for me when I see something that in my judgment and in the art of medicine I get to go the other way because I know what is best for my patient.

What we have in this bill is what we passed with the stimulus bill, the comparative effectiveness panel—which is utilized in this bill—and we have the Medicare Payment Advisory Commission saying you have to cut. Where do we cut? Whose breast cancer screening do we cut next year? When we have the Commission saying we have to, unless we act affirmatively in another way, we are dividing the loyalty of every physician in this country away from their patients. They are no longer a 100-percent advocate for their patients. This is a government-centered bill. It is not a patient-centered bill.

Going back to the Mikulski amendment and what will come with the Murkowski amendment, the Murkowski amendment is far better. It does everything Mikulski does but doesn't divide the loyalty or advocacy of the physician. Here is what it does. The Murkowski amendment says nobody steps between you and your doctor—nobody, not an insurance company, not Medicare or Medicaid. We use as a reference the professional societies in this country who do know best, whether it be for mammograms and the American College of Surgeons, the American College of OB/GYNs, the American College of Oncology, the American Academy of Internal Medicine or the American College of Physicians, which have come to a consensus in terms of what best practices are but

Exhibit 151 JA-0002471

don't mandate what will or will not be paid for when, in fact, the art of medicine is applied to save somebody's life, such as Sheila's.

For you see, if this bill passed, Sheila would have lived 2 years instead of 12. Ten years was really important to her family. She got to see the children I delivered for her grow up. One of them she got to see married.

If we decide the government is going to practice medicine, which is what this bill does—the government steps between the patient and their caregiver, deciding in Washington what we will do—what you will have is good outcomes 80 percent of the time and disasters 20 percent of the time. That is not what we want.

I do not deny that there are plenty of problems in my profession in terms of not being as good as we should be, of not having our eye on the ball some of the time, of making mistakes some of the time. I do not deny that. But what I do embrace is most people who go into the field of medicine go in for exactly the right reason; that is, to help people. It is so ironic to me that we have a bill before us that limits and discourages and takes away the most altruistic of all efforts, which is to do 100 percent the best right thing for your patient.

The reason having HRSA or the Secretary set guidelines is bad is because most patients do not fit the textbook. Here is what the textbook says, but this patient has this condition, this history, and this finding that are different. What we have done in this bill is, multiple times, take the learned judgment of caregivers and say: You will bow to what the Federal Government says; you will bow to what HRSA says; you will bow to what the Secretary of HHS says. Seventy-five times in this bill, there are new programs created; 6,950 times in this bill are requirements for the Secretary to set up new rules and regulations. If you do not think that will put the government between you and your care, you have no understanding of health care in this country and you have no understanding of the problems we face today because of Medicare and Medicaid rules that interrupt and limit the ability for us to care in the best way for our patients.

I am for the prevention aspects of the Mikulski amendment. I think it is a great idea. As a matter of fact, it should not be just about women. It should be about screening for prostate cancer for men as well. It should be about treadmills for people with high cholesterol. It should be about true preventive measures. Why were they not included? Because what we have done under the Mikulski amendment is $892 million over 10 years. We want to do this for one group but we will not do it for the other.

If you think the government will not get in between, let me give three examples right now which violate Federal law today. The Center for Medicare and Medicaid Services today violates Fed-

eral law. They ration the following three things:

If, in fact, you are elderly and you have a complication with your colon and you are a high-risk patient to have a perforation if you were to have a colonoscopy—that is when we go in with a fiber optic light to look at the colon—Medicare denies the ability for you to have a CT automated, camera-centered, swallowed-pill colonoscopy, which is available. The technology is proven and is being used outside of Medicare. You cannot have a video colonoscopy by way of a remote-control camera. Why did CMS eliminate that? They eliminated it because it costs too much. So if you are 87 years old and you have a mass in your colon and you cannot have a regular colonoscopy, you cannot even buy this procedure; it is against the law because Medicare forbids it.

No. 2—and this has happened to me numerous times—women with severe osteoporosis—a loss of calcium in their bones at 50 years of age—diagnosed with a DEXA scan in a screening prevention so they do not get a collapsed vertebra or break a hip, you put them on a medicine. The medicines are expensive, there is no question, but they really do work. Some medicines work for some people; other medicines work for others. Once you do a DEXA scan, under Medicare rules, you cannot do another one for 2 years. So you cannot check to see if the medicine is working after 6 months, to see if you see an improvement in the calcification of a woman's bones, because Medicare said it is too expensive and we are doing too many of them. Rather than go after the fraud in DEXA scans, what they did was ration the care.

Here we have a woman and you have diagnosed her properly. You have started her on the medicine, but you have to wait 2 years. What happens during that period of time if you are given a medicine that is not working effectively? Because it did not work in her case, you have to wait 2 years and her osteoporosis advances and she falls and breaks her hip because Medicare said we were doing too many of them?

Take what CMS did to all the oncologists in this country. They said we are paying too much money for EPOGEN. EPOGEN is an acronym for erythropoietin, which is a chemical that is kicked out by your kidneys to cause you to make red blood cells. When you get chemotherapy for breast cancer or colon cancer, like I have had, sometimes that chemotherapy not only kills your cancer but it kills your blood cells. Because we were using too much EPOGEN, Medicare put out a rule rationing EPOGEN and said: Unless you have a hemoglobin of X amount, you cannot get a shot of EPOGEN, and by the way, you cannot take your own money and buy it either. The doctor will get fined if he gives it to you if you don't meet the guideline. What happens? For 80 percent of the patients, it worked fine.

But for those patients who have other comorbid—other conditions, such as congestive heart failure or chronic obstructive pulmonary disease—emphysema—where significant drops in hemoglobin can cause organ failures in other parts of the body, there was no exception made by CMS for a physician to make a judgment and say: This rule should not apply here because this patient is going to end up in the hospital.

My oncologist told me a story of one of his patients who could not get EPOGEN. It ended up that their heart failure was exacerbated because they got anemic from the chemotherapy, ended up on a ventilator in ICU, and died. Why did they die? Because they got heart failure. Why did they get heart failure? Because they got too anemic. Why did they get too anemic? Because Medicare would not allow the doctors to give them the medicine.

What is wrong with the bill, what is wrong with the Mikulski amendment is we rely on government bureaucracies to make the decisions about care rather than the trained, learned, experienced, truly caring caregivers in this country to make those decisions. Instead of going after the fraud in Medicare, which is well in excess of $90 billion a year, we decided we will ration care.

The authors of this bill are going to say: No, that is not true. But when I offered amendments in committee to prohibit rationing of Medicare services—to prohibit it—it was voted down. Every person who voted for moving on this bill voted against the rationing. Why would they do that? Because ultimately the feeling is: We know better. Washington knows better. We know your patients better. We know how to practice medicine better. We are going to take ivory tower doctors who do not have real practices anymore, we are going to take retired researchers, and we are going to tell you how to practice. And we are going to save money by limiting what you can get.

The chairman of the Finance Committee has said we do not truly cut Medicare Advantage, that the services are not reduced. The chairman's own bill, on page 869, subtitle C, part C—I won't go through reading it—reduces Medicare Advantage payments. The differential from $135 to—I will read it to the chairman. The chairman is shaking his head. Let me read it to him. Let me also reference what CBO has said. I will be happy to yield to the chairman if he wants to talk now.

Mr. BAUCUS. As soon as I get the page number, I guess I would like to ask the Senator from Oklahoma a question.

Mr. COBURN. I will be happy to yield for a question.

Mr. BAUCUS. What page?

Mr. COBURN. Page 869, subtitle C, part C.

Mr. BAUCUS. I don't have it with me right now, but there are no required reductions in fringes or extras—

Mr. COBURN. No required reductions in what?

Exhibit 151 JA-0002472

Mr. BAUCUS. Fringes, such as gym memberships, and extras such as that. The bill basically provides that there be no reductions in guaranteed Medicare payments. There is a long list of what guaranteed Medicare payments are.

Even the Medicare Advantage companies, which are private companies with officers and they have stockholders—they have to report to their board of directors, and they have all these administrative costs, very huge admin costs. The reductions to Medicare Advantage—the application of reductions to Medicare Advantage plans are at the discretion of the officers. The officers can decide they are not going to cut the fringes; that is, the fringes and the extras that are beyond, in addition to the guaranteed Medicare benefits.

If an officer wants to, it is his discretion, I am assuming—

Mr. COBURN. Reclaiming my time, I ask unanimous consent to have printed in the RECORD CBO 11/21/2009, which shows an average from $135 down to $51 per month on the average Medicare Advantage beneficiary.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

ESTIMATED EFFECTS OF THE MEDICARE ADVANTAGE (MA) PROVISIONS OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT ON ENROLLMENT IN MA PLANS AND ON FEDERAL SUBSIDIES FOR ENROLLEES IN MA PLANS OF BENEFITS NOT COVERED BY MEDICARE

Under Current Law

| | Enrollment in MA Plans (millions) | | Average Subsidy of Extra Benefits Not Covered by Medicare (dollars per month) | |
|---|---|---|---|---|
| | 2009 | 2019 | 2009 | 2019 |
| All Areas | 10.6 | 13.9 | 87 | 135 |
| Areas with Bids that Average Less than 100 Percent of Spending Per Beneficiary in the Fee-for-Service Sector | 4.7 | 6.9 | 120 | 172 |
| Areas with Bids that Average More than 100 Percent of Spending Per Beneficiary in the Fee-for-Service Sector | 5.9 | 7.0 | 61 | 98 |

Under the Patient Protection and Affordable Care Act

| | Reduction in enrollment in MA plans, 2019 | | Net reduction in Medicare spending 2010–2019 Billions of dollars | Average subsidy of extra benefits not covered by Medicare, 2019 Dollars per month |
|---|---|---|---|---|
| | Percent | Millions | | |
| All Areas | −18 | −2.6 | 105 | 49 |
| Areas with Bids that Average Less than 100 Percent of Spending Per Beneficiary in the Fee-for-Service Sector | −29 | −2.0 | a −62 | 51 |
| Areas with Bids that Average More than 100 Percent of Spending Per Beneficiary in the Fee-for-Service Sector | −9 | −0.6 | −43 | 47 |

a The estimate of a $105 billion net reduction in Medicare spending over the 2010–2019 period reflects a $118 billion reduction in Medicare payments that would be offset, in part, by a $13 billion reduction in Part B premium receipts.
Note: Under current law, extra benefits include health care services not covered by Medicare, such as vision care and dental care, and subsidies of beneficiaries' out-of-pocket costs for Part B or Part D premiums or cost sharing for Medicare-covered benefits. Under the Patient Protection and Affordable Care Act, extra benefits would include health care services not covered by Medicare and subsidies of beneficiaries' out-of-pocket costs for cost sharing for Medicare-covered benefits.

Mr. COBURN. The fact is, if you like what you have, you cannot keep it, for 2.6 million Americans. You can say that is not true. That is what CBO says. Here are their numbers. They sent the report to the chairman.

Mr. BAUCUS. Will the Senator yield?

Mr. COBURN. I will be happy to yield.

Mr. BAUCUS. It is true—first of all, we need to back up. Isn't it true that the MedPAC commission came to the conclusion that the Medicare Advantage plans are overpaid?

Mr. COBURN. Absolutely. I agree with the chairman.

Mr. BAUCUS. It is also true that it is their recommendation that the Medicare plans overpaid by the amount of 14 percent.

Mr. COBURN. I don't know the actual amount. I agree with the chairman that they are overpaid.

Mr. BAUCUS. That is true. They are overpaid.

Mr. COBURN. Yes.

Mr. BAUCUS. If they are overpaid, doesn't it necessarily mean there are reductions in payments attributable to each beneficiary by definition?

Mr. COBURN. I agree with that.

Mr. BAUCUS. If they are overpaid—

Mr. COBURN. Here is what I would say. This morning, the claim made by the chairman and Senator DODD is that Medicare Advantage is not Medicare. Medicare Advantage is Medicare law. It was signed into law. It is a part of Medicare. The chairman would agree with that?

Mr. BAUCUS. Absolutely. In 2003, I made the mistake and agreed to give the Medicare Advantage plans way more money than they deserved. And

as the Senator from Oklahoma has said, they are overpaid.

Mr. COBURN. I agree with the chairman. You won't hear that from me. How did we get there? How did we get there? How did we get there, to where they are overpaid? We have an organization called the Center for Medicare and Medicaid Services. They are the ones who let the contract, are they not? They, in fact, are. Twenty-five percent of the overpayment has to be rebated to CMS today; the Senator would agree with that? Seventy-five percent for extra benefits, 25 percent rebate. How did we get to where they are overpaid? Because we have a government-centered organization that is incompetent in terms of how they accomplished the implementation of that bill.

What was said by Senator DODD this morning—and I confronted him already on it, but it bears repeating—is that the Patients' Choice Act eliminates the dollars without eliminating the services because it mandates competitive bidding with no elimination in services for Medicare Advantage. So if you want to save money, competitively bid rather than go through eight pages of reductions year by year in the payments that go back to Medicare Advantage.

We have this complicated formula that nobody who listens to this debate would understand. I know the chairman understands it because he helped write it. But the fact is 2.6 million Americans, according to CBO, will see a significant change in their Medicare benefits. Medicare Advantage is Medicare Part C. We have had a kind of a differential made that it isn't really

Medicare. It is Medicare. And 20 percent of the people in this country who are on Medicare are on Medicare Part C—Medicare Advantage—and they like it. And why do they like it? Because most of them don't have enough money to buy a supplemental Medicare policy to cover the costs that are associated with deductibles and copays and outliers. So I agree with the chairman that Medicare Advantage is overpaid, but I disagree with the way you are going about getting there.

I also disagree with taking any of the money that is now being spent on Medicare Part C and creating another program. I think all that money ought to be put back into the longevity of Medicare.

In case you don't understand how impactful that is, we now owe, in the next 75 years—actually, we don't owe it, because none of the Senators sitting here will be around. Our kids are going to get to pay back $44 trillion in money for Medicare we will have spent, that we allowed to grow, in fraud, close to $100 billion a year and then did nothing about it. This bill does essentially nothing about that $100 billion a year, or $1 trillion every 10 years. If we were to eliminate that—which this bill does not—we would markedly extend the life and lower the debt that is going to come to our children.

That leads me to the other important aspect of the health care debate. We know when you take out the funny accounting—the Enron accounting—in this bill, and you match up revenues with expenses, you are talking about a $2.5 trillion bill. The chairman of the

Exhibit 151

Finance Committee readily admits he has it paid for, and CBO says you have it paid for. But how does he pay for it? He pays for it with the 2.6 million people who like what they have today and who are going to lose what they have today. He pays for it by raising Medicare taxes. Then the Medicare taxes he raises he doesn't spend on Medicare, he spends that on a new entitlement program. Think about what we are doing. Is there a better way to accomplish what we are doing?

I thank the chairman for indulging me and allowing me to continue this long. I will wind up with a couple of statements and then share the floor with him.

You know, after practicing medicine for 25 years, I know we have a lot of problems in health care, and I appreciate the efforts of the chairman of the Finance Committee to try to find a solution for them. It is not a bipartisan solution, but it is a solution. And it is a solution that grows the government. It puts the government in charge of health care and creates blind bureaucracies that step between you and your doctor. That is one way of doing it. But wouldn't a better way be to do the following: Let's incentivize people to do the right thing, rather than building bureaucracies and mandating how they will do it. Wouldn't it be better to incentivize tort reform in the States? Wouldn't it be better to incentivize physicians based on outcomes? Wouldn't it be better to incentivize good behavior by medical supply companies, DME, drug companies, hospitals, physicians, through accountable care organizations, through transparency for both quality and price?

We don't have any of that in here. What we have is a government-centered bureaucracy that, according to CBO figures, will add 25,000 Federal employees to implement this program—25,000. If you call the Federal Government, how long does it take you now to get an answer? Yet we are going to add 25,000 employees just in health care. That is an extrapolation of the amount of agencies, dividing what CBO says per agency and per cost they will come up with. Wouldn't it be better to fix the things that are broken, rather than to try to fix all of health care?

I heard one of my colleagues today say on the floor, and I think it is true, that people in America are upset with us, and I think rightly so. I apologize to the American people for my arrogance. I apologize to the American people for the arrogance of this bill; the thinking that we got it right; that we can fix it in Washington; that we don't have to listen to the people out there; that we don't have to listen to the people who are actually experiencing the consequences of what we are going to do. I apologize for the arrogance of saying we can create a $2.5 trillion program and that we know best. Well, you know what, we don't know what is best.

As Senator ALEXANDER has said so many times, what needs to happen is

we need to start over. We need to protect the best of American medicine. And what is the best? Well, if you get sick anywhere in the world, this is the best place in the world to get sick, whether you have insurance or not. If you have heart disease or atherosclerotic disease, this is the best place in the world. It costs too much, there is no question, but it is the best place. If you have cancer, you are one-third more likely to live and be cured of that cancer living in this country than anywhere else in the world—for any cancer. It just costs too much.

This bill doesn't address the true causes of the cost. What are the true causes of the cost? Well, No. 1, we know Medicare and Medicaid underpay and so we get a cost shift that is $1,700 per year per family in this country. So you get to pay three taxes in this country on health care: You pay your regular income tax, which goes to pay for Medicaid, and it also now starting to pay for Medicare as well; you have to pay 1.45 percent, plus your employer gets to pay 1.45 percent of every dollar you earn for Medicare; and then your health insurance costs $1,700 more per year because Medicaid and Medicare don't compensate for the actual cost of the care because of the government-centered role that is played in terms of the mandates, the rules, and regulations.

We have a tort system in this country that costs upward of $200 billion in waste a year, which is 8 percent of the cost. Ninety percent of all cases are settled with no wrong found at all on the part of caregivers, and of the remaining 10 percent only 3 percent find anything wrong. Of 97 percent of all the cases, only 10 percent go to trial, and 73 percent of that 10 percent are found in favor of the providers. So we spend all this money practicing defensive medicine and there is not one thing in this bill to fix that problem. That is 8 percent.

Take your health care premium, or your percentage of your health care premium, and apply 8 percent, and that is going down the drain because I am ordering tests you don't need but I need to protect myself in case somebody tries to extort money from me with a lawsuit that I know is going to get thrown out, but I have to have it there to prove it. And then we have inefficiencies.

Ultimately, what we need to do is to protect what is good, incentivize the correct behavior in what is wrong, and go after the fraud in health care with a vengeance—put doctors in jail, hospital administrators in jail. Don't slap them with a fine and ban them from Medicare. Put them in jail. The people who are stealing our grandkids' money, up to $100 billion a year, need to go to jail. We play pay and chase. We pay everybody and then we try to figure out whether they deserve to get paid. Nobody else does that, but the government does, and that is who we are getting ready to put in charge of another $2.5 trillion worth of health care?

One of the reasons health care is in trouble in this country is that 61 percent of all the health care is run through the government today. Look at TRICARE for our military, look at VA care, look at Indian health care, at SCHIP and Medicaid. There is an estimate of $15 billion a year in fraud in New York City alone on Medicaid. That is one estimate, per year, in one city on Medicaid. And then Medicare. And we are going to say those are running so good that we ought to move another $2.5 trillion, or 15 percent of health care, to where we are at 76 percent of all health care is run by the government? I reject that out of hand until we can demonstrate we are good at what we do.

What we ought to be doing is turning it back. The private sector isn't the answer to everything. I agree with that. I can't stand 80 percent of the insurance bureaucrats I deal with. But at least I have a fighting chance, because they will call me back when I need to do something for a patient. I never get a call back from Medicare. They do not call me back. The State doesn't call me back on Medicaid when I need to do something. So I go on and do it and find somebody else to pay for it. That is the kind of system we have today.

Think about the mothers in this country in a Medicaid system where 40 percent of the primary care doctors in this country won't see their children. That is Medicaid. That is realistic Medicaid today in our country. So they have a sick kid, but they can't get in to a doctor, even though they have insurance. They have Medicaid, but they can't get in. Why can't they get in? Because only 1 in 50 doctors last year who graduated from medical school goes into primary care. We have created an abrupt shortage in primary care. And, No. 2, the payment is not enough to pay for the overhead to see the child. So you have a weepy woman who is worried about her sick kid, and care is delayed if you can't get in. It doesn't matter if you have Medicaid if you can't be seen. So what happens? She goes to the emergency room. What happens in the emergency room? We spend three or four times as much as we should, because that is an emergency department. The doctor has no knowledge of the child or the mother. He doesn't want to get sued, so we have a 40-percent defensive medicine cost in the emergency room.

The answer is not more government health care. The answer is creating the incentives for people to do the right thing. The only way we get things under control in health care in this country and the only way we create access for people in this country is to decrease the cost of health care. This bill doesn't decrease the cost of health care. If we want to make sure we do what is best for American medicine while we fix what is wrong, we will do it one significant part at a time. I can't imagine dealing with thousands, tens of thousands of more bureaucrats in

Exhibit 151     JA-0002474

health care, and I can't imagine the impact it is going to have between me and my patients. It is going to severely impact them. Do I want everybody in this country to have available care? Yes; 15 percent of my practice was gratis, for people who had no care, who had no money. That is true with a lot of physicians out there in this country. It is true with a lot of labs. It is true with a lot of hospitals. It is true with a lot of the providers in this country. They are caring people.

We are going to tie them up. We are going to put regulations and ropes around them. We are going to mandate rules and regulations, and we, in our arrogant wisdom, are going to tell Americans how they are going to get their health care. I certainly hope not. But I am not thinking about me. I am thinking about our kids and our grandkids.

I will end with one last comment. Thomson-Reuters, in a study put out October 9 of this year—it is a very well-respected firm—their estimate of the $2.4 trillion that we spend on health care per year in this country is that between $600 and $850 billion of it is pure waste. Defensive medicine costs and malpractice is between $250 billion to $325 billion by their estimate. Not one thing in this bill to address that—not one thing.

Fraud, there is between $125 and $175 billion per year—insignificant in this bill, $2 billion to $3 billion.

Administrative inefficiency, 17 percent—between $100 and $150 billion wasted on paperwork in health care every year.

Provider errors—that is me—between $75 and $100 billion; that is either wrong diagnosis or failure to treat appropriately. It is the smallest of all.

What are we doing? We are going to tell the providers—the hospitals, the medical device companies, the drug companies, the doctors, the radiologists, the labs, the physical therapists—we are going to tell them how to do it. That is not where the problem is.

My hope is that the American people will come to their senses and say: Wait a minute. Slow down. Stop. Fix the important things. Fix the worst thing first, the next thing second, the next thing third, the next thing fourth. The unintended consequences of this bill are going to be unbelievable. Nobody is smart enough to figure all this out—nobody. Nobody on my staff, nobody on the Finance Committee, nobody in Majority Leader REID's office can predict all the unintended consequences that are going to come about because of this bill.

The chairman has been awfully patient, and I see my colleague here to offer an amendment. With that, I yield the floor.

The PRESIDING OFFICER (Mr. BURRIS). The Senator from Oregon is recognized.

Mr. MERKLEY. Mr. President, I rise today to share a few thoughts about our health care proposal and also to address the amendment of my good friend from Maryland, Senator MIKULSKI. We have heard the word "arrogant" echo in this Chamber. "The bill before us is arrogant."

I come to it with a somewhat different perspective. For 10 years, as a representative of a working class neighborhood back in Oregon, as a State legislator, I have heard a lot of stories from America's working families—from the working families in my House district back home, a lot of stories regarding health care. There is a lot of concern that they can't afford health care. There is a lot of concern that their children do not have appropriate coverage. There is a lot of concern that their health care is tied to their job, and if they lose their job they are going to lose their health care.

There is a huge amount of stress for America's families who understand if you have health care you have to worry about losing it, and if you don't have it you have to worry about getting sick. That is why we are here today in this Chamber debating health care, because so many of us have heard from our constituents, so many of us know from our personal experience what a dysfunctional, broken health care system we have in America.

Sometimes, listening to this conversation on the Senate floor, you would think this is a rather complicated debate. But the heart of this bill is not that complicated. The heart of this bill is that every single American should have access to affordable, quality health care, and that we can take a model that has worked very well for the Federal employees of our Nation, a model that encourages competition, a model that says let's create a marketplace where every individual, every small business that currently struggles to get health care and has to pay a huge premium for health care—enable them to join a health care pool that will negotiate a good deal on their behalf.

I think every American who has tried to get health care on their own, every small business that is paying a 15- to 20-percent premium because they don't have the clout of a large business, understands if they could join with other businesses, if they could join with other individuals, they would get a lot better deal.

Americans understand if there is a large pool of citizens who are seeking health insurance that insurers are going to be attracted to market their goods. We have seen that in the Federal employees system, where insurers come and compete. It turns the tables. It takes the power away from the insurance companies and it gives the power to the American citizen because now the citizen is in charge. Now the citizen gets to choose between health care providers instead of having to search for anyone from whom they can possibly get a policy.

I do not find that it is arrogant to try to create a system in which individuals and small businesses get health care that is more affordable. I don't find that a bill that says we are going to invest in prevention is arrogant, that is smart. I don't find a bill that says we are going to create incentives to do disease management arrogant, so someone suffering from diabetes has the disease managed rather than ending up with an expensive amputation of their foot. That is intelligent, that is not arrogant.

I don't find that having a bill that says every single American is going to find affordable health care, and if they are too poor to afford it we will provide a subsidy to assist them, to get everyone in the door, that is not arrogant. That is saying we are all in this together as citizens and that health care is a fundamental factor in the quality of life. It is a fundamental factor in the pursuit of happiness. It is not arrogant to find for fundamental access to health care.

I rise specifically to address the amendment offered by my good friend from Maryland, Senator MIKULSKI. The legislation we are considering has many parts that make health care more affordable and available, that expand access; many parts to hold insurance companies accountable. But a big part of health care reform also deals with helping people avoid illness or injury in the first place. That is what Senator MIKULSKI's amendment does and why it is so important that it be included in this package.

Preventive screening saves lives. That is a fact. Early detection saves lives. That is a fact. Too many women forgo both because of the cost.

I want to share a story from a physician in Oregon. The physician is Dr. Linda Harris. I am going to quote her story in full. It is not that long. She says:

I work one day a week at our county's public health department. There I met Sue, a 31-year-old woman who came in with pelvic pain and bleeding. She proved to have extremely aggressive cervical cancer that was stage IV when I diagnosed it.

She continues:

When Sue was 18 she had a tubal ligation after she gave birth to her only child. As a single mom she did not have the financial resources to have more children. She concentrated on raising her daughter. Sue always worked, sometimes 2 jobs at once, but never the kind of job that offered health insurance. But because she had a tubal ligation she did not qualify for our State's family planning expansion project that provides free annual exams, Pap smears and contraceptive services to many of our clients.

The doctor continues:

Cervical cancer is an entirely preventable disease. Pap smears almost always find it in its preinvasive form, but Sue never came in for a Pap smear or an annual exam. Her lack of affordable access to basic health care proved fatal. When Sue died of cervical cancer her daughter was 13.

That is the completion of the story that the doctor shared. Sue should not be viewed as a statistic in a broken health care system. But, instead, we

Exhibit 151 JA-0002475

should take her story to heart, about the importance of preventive services. Sue is one of 44,000 Americans who die each year because they lack insurance, according to a recent Harvard Medical School study.

Let me repeat that statistic because I think it is hard to get your hands around—44,000 Americans die each year because they lack insurance. I don't think it is arrogant to say we should build a health care system that gives every single American access to affordable, quality care so that 44,000 of our mothers and fathers, our sons and brothers, our daughters, our wives, our sisters—so that 44,000 of them do not die each year because they lack insurance.

Senator MIKULSKI's amendment will help keep this tragedy from happening to our families. To put it plainly, it will save lives. It does this by allowing the Health Resources and Services Administration to develop evidence-based guidelines to help bridge critical gaps in coverage and access to affordable preventive health services—the same approach the bill takes to address gaps in preventive services for children. This will guarantee women access to the kinds of screenings and tests that can prevent illnesses or stop them early.

As the American Cancer Society Cancer Action Network notes:

Transforming our broken "sick care" system depends on an increased emphasis on detection and early prevention, enabling us to find diseases when they are easier to survive and less expensive to treat.

That last point is also important. Treating illnesses also saves money. With so much emphasis on the cost of health care, we should all agree that it is common sense to include reforms that lower health care costs for all Americans.

I was noticing that her amendment has a long list of organizations stating how important this is—the National Organization for Women, the National Partnership for Women and Families, the Religious Coalition for Reproductive Choice, the American Cancer Society-Cancer Action Network, the National Family Planning and Reproductive Health Association.

I applaud Senator MIKULSKI for offering this amendment. I urge my colleagues to remember the 44,000 Americans who die every year because they do not have access to insurance, because they do not have access to preventive services, and vote to include this important reform.

The PRESIDING OFFICER. The Senator from Alaska is recognized.

Ms. MURKOWSKI. Mr. President, I ask unanimous consent I be permitted to engage in colloquy with my Republican colleagues on an amendment I will be discussing.

The PRESIDING OFFICER. Without objection, it is so ordered.

Ms. MURKOWSKI. Mr. President, there has been a great deal of discussion this week certainly, and last week, with the announcement from the U.S. Preventive Services Task Force, the USPSTF, of their recommendations as they relate to mammograms and recommendation that women under the age of 50 do not need to be screened until they reach age 50, and then on attaining the age 50, every other year after that.

When these recommendations came out on November 16, it is fair to say they generated a level of controversy, a level of discussion and a level of confusion around the country by women from all walks of life. For many years now, women have operated under what we knew to be the standards, the protocols. If you had a history of breast cancer in your family, you took certain steps earlier, but the general recommendation was out there. Certainly, the guidelines we had been following, the assurances we were seeking as women were that we would be encouraged to engage in these screenings on an annual basis. They gave us all a level of confidence. When these new recommendations, these new guidelines came out just a couple weeks ago, I do think the level of confusion, the level of anxiety that was raised because of this announcement brought a focus to some of what we are talking about when we discuss health care reforms and should the government be involved in our health care.

I know I have received e-mails from friends, from relatives, girlfriends I haven't heard from in a while, talking with women, generally, about what do they think about this. I would hear story after story of the woman who discovered, at age 39, a lump, something that was off, something that was not right, and then the stories subsequent to that, the steps she took as an individual with her doctor. Again, the announcement that we now have these guidelines that this preventative screening task force has put in place and everything we thought we knew and understood about what we should be doing with our health has been unsettled brings us to the discussion today.

We have an amendment offered by the Senator from Maryland. I would like to offer a little bit later an amendment, but I would like to speak to the amendment now, if I may. I am proposing this as a side-by-side to the Mikulski amendment. This is designed to allow for an openness, a transparency on preventative services, not just mammograms. I don't want to limit it to only mammograms, because we know that preventive services in so many other aspects of our health are also equally key and also equally important. What I am looking to do with my amendment is to rely on the expertise, not of a government-appointed task force but to rely on the expertise of medical organizations and the experts, whether they are within the college of OB/GYNs or surgeons or oncologists, rely on them and their expertise to determine what services,

what preventive services should be covered.

What we are seeking to do is allow for a level of information so an individual can select insurance coverage based on recommendations by these major professional medical organizations on preventative health services, whether it is mammography or for cervical cancer screening.

I think we learned from the announcement from the USPSTF, the Preventive Services Task Force, that when we have government engaging in the decisions as to our health care and what role they actually play, there is a great deal of concern and consternation. I have heard from many colleagues on both sides of the aisle: That task force was wrong. We think they have made a mistake in their recommendations.

What we are intending to do with this amendment is keep the government out of health care decision-making and allow the spotlight to be shown on the level of prevention coverage that patients will get under their health care plan, rather than relying on unelected individuals, basically individuals who are appointed by an administration to serve as part of this panel of 16, on the Preventive Services Task Force. My amendment specifies that all health plans must consult the recommendations and the guidelines of the professional medical organizations in determining what prevention benefits should be covered by all health insurance plans.

I know at least those of us who are on the Federal employees health benefits have an opportunity to subscribe to the Blue Cross/Blue Shield plan. This is their booklet that is out for 2010. This is under their standard basic option plan. Turn to preventive care for adults that is covered. They provide, under this particular plan, for cancer diagnostic tests and screening procedures for colorectal cancer tests, for prostate cancer, cervical cancer, mammograms, ultrasound, abdominal aneurysm. There is a list we can look to.

What we don't see laid out in this booklet or any of the other pamphlets that outline given plans out there is, OK, for instance, the breast cancer test, is there an age restriction. I am told under Blue Cross there is not. But it doesn't indicate that there. What do the experts recommend? It is not clear from what we receive. So what my amendment would do, in part, is to allow for this information to be directly made available to patients, to individuals who are looking at the plans, to make a determination as to what they will select.

If you go to the Web sites of these professional medical organizations, for instance, the American Congress of Obstetricians and Gynecologists, they recommend that cervical cancer screening should begin at age 21 years, regardless of sexual history. Cervical cytology screening is recommended

Exhibit 151                                                                                          JA-0002476

every 2 years for women between the ages of 21 and 29. The American Society of Clinical Oncology, as to the recommendations for mammography, urges all women beginning at age 40 to speak with their doctors about mammography, to understand the benefits and potential risks. By age 50, at the latest, they should be receiving mammograms. The American College of Surgeons, in their recommendations, recommend that women get a mammogram every year starting at age 40.

As an individual who is looking to make a determination as to what the experts are saying out there, what is being recommended, I would like to know that this information is made available to me to help me make these decisions. What our amendment would require is the plans would be required to provide this information directly to the individuals through the publications they produce on an annual basis. What we are talking about now is the doctors. It is the specialists who will be recommending what preventative services to cover, not those of us here in Washington, DC, in Congress, not the Secretary of Health and Social Services, who may or may not be a doctor or a medical professional, not a task force that has been appointed by an administration. We are trying to take the politics out of this and put it on the backs of the medical professionals who know and understand this. This is where I think we want to be putting the emphasis. This is where we want to be relying on the professionals, not the political folks.

Additionally, my amendment ensures that the Secretary of Health and Human Services shall not use any recommendations made by the U.S. Preventive Services Task Force to deny coverage of any items or services. This is the crux of so much of what we are discussing right now with these latest recommendations that came out by USPSTF. The big concern by both Republicans and Democrats and everyone is the insurance companies are going to be using these recommendations now to deny coverage to women under 50 or to a woman who is over 50, if she wants to have a mammogram every year; that she would only be allowed coverage for those mammograms every other year rather than on an annual basis. We want to take that away from the auspices, if you will, of the government. To suggest that we will deny coverage based on the recommendations of this government task force is not something I think most of us in this country are comfortable with.

We specify very clearly that the Secretary cannot use any recommendations from the USPSTF to deny coverage of any items or services. We also include in the amendment broad protections to prevent, again, the bureaucrats, the government folks at the Department of Health and Human Services, from denying care to patients based on the use of comparative effectiveness research.

Finally, we include a provision that ensures that the Secretary of Health and Human Services may not define or classify abortion or abortion services as preventative care or as preventative services.

This amendment is relatively straightforward. It relies, essentially, on the recommendation of practicing doctors, as opposed to the bureaucrats, to the politicians, to those in office. My amendment addresses the concern that the government will make coverage determinations for your health care decisions. What we are doing here, quite simply, is making it transparent, making clear that the preventive services recommended by the professional medical organizations are visible, are transparent. We require the insurance companies to disclose that information that is recommended and, again, recommended by the professionals.

This is a good compromise. It basically keeps the government out, and it keeps the doctors in. It requires the insurance companies to disclose the information to potential enrollees and allows for, again, a transparency that, to this point in time, has been lacking.

It has been suggested by at least one other Member on the floor earlier that my amendment would cost somewhere in the range of $30 billion. I would like to note for the record, we have not yet received a score on this. We fully believe it will be much less than has been suggested. When the statement was made, it was not with a full view of the amendment we have before us and is not consistent with that. I did wish to acknowledge that as we begin the discussion on my amendment.

Mr. ENZI. Mr. President, first, I wish to thank the Senator from Alaska for the tremendous work she has done on this issue and for the dozens of people she has talked to over the last couple days to try to come up with an amendment that would actually solve the problem everybody has been talking about.

I appreciate the Senator from Maryland recognizing this major flaw in the bill, and it is in the bill. The U.S. Preventive Services Task Force is in the bill. That is exactly the group that specified this new policy on mammograms that has upset people all across the country. It upset everybody so much that we have an amendment on the floor by the Senator from Maryland reacting to that and reacting to the fact that it is in the bill at the current time.

So I appreciate the Senator from Alaska coming up with a plan that actually is more comprehensive than the amendment from the Senator from Maryland because the Senator has had a little bit longer to work on it. I appreciate the words the Senator has in there that "you cannot deny." The Senator is on the Health, Education, Labor, and Pensions Committee with me, and I know we have worked on this issue in committee. I hoped this kind of a realization would have been made

at that time. We had some amendments where you could not deny based on this or the comparative effectiveness or could not prohibit based on it. We know all those amendments failed, meaning there was probably some intention to deny or to prohibit based on these groups.

So I appreciate the Senator bringing up the fact that it is the caregivers who will have some say in this so Washington cannot come between you and your doctor. I wish the Senator would go into a little bit of some of her background from Alaska because the Senator and Alaska have been very involved in breast cancer for a long time, and people ought to be aware of the kind of services that are available out there and what the costs of those services are.

Ms. MURKOWSKI. I appreciate the question from my colleague from Wyoming. The Senator knows, coming from a rural State, that our health care costs are typically higher, and it is not just an issue of cost, but it is an issue of access, and particularly in my State, where most of our communities are not connected by roads, it is very difficult to gain access to a provider. It is even more difficult to gain access, for instance, to mammography units.

I have been involved in this issue, in terms of women's health and cancer screening, for many decades now, primarily because my mother got started in it back when I was still in high school and saw a need to provide for breast cancer screening for women in rural areas, where they could not afford to fly into town, as we would call it, for the screenings. So she engaged in an effort—and continues to this day—to raise money for not only mobile mammography units but to figure out how we move those units from village to village.

Essentially, what they have been able to do, over the years, is you put that mobile mammography unit on the back of a barge and you take it up and down the river and you stop in every village and offer free screenings for women. You fly it into a village, where you are not on a river. We have been making this effort, again, for decades, working, chipping away slowly at the issue of breast cancer. We recognize it in our State. Particularly with our Alaska Native populations, we see higher levels of breast cancer than we would like. We are trying to reduce that.

But when these recommendations came out several weeks ago from the USPSTF, I will tell you, there was a buzz around my State amongst women about: Well, now what do I do? Where do I go? Do I need to go in for my screening? What should I do?

There is an article that was actually in the news just, I guess, a couple weeks ago, and it cites a comment from a doctor. Her comment was, the new recommendations were confusing patients who usually come in for their annual screenings. She said: My schedulers have called to schedule patients

Exhibit 151    JA-0002477

to come in for their followup mammogram, and they have been told: Well, I don't have to do that now. This government group says I don't have to do that.

Mr. President and my colleague from Wyoming, maybe some do not. But what about those who are at risk? These are the ones whom I think we are continuing to hear from who say: Please, add some clarity to this.

Mr. ENZI. Mr. President, I know there is not any word that probably turns a family upside down as much as the word "cancer," and it does not matter which form of cancer it is. It is just drastic because we do not know all the implications of it. Maybe someday we will. Maybe someday we will know how people get it, and we will be able to cure it with a vaccine. But, so far, what we have are some mechanisms for putting it into remission.

One of the reasons I know how upsetting that is and how it turns the world upside down is, 3½, 3¾ years ago my wife was diagnosed with colon cancer. She had screenings, but she listened to her body. She said: Something is the matter here. She kept going to doctors. So even if they do not recommend the screenings, if your body is saying something is the matter, pursue it until you are either convinced nothing is the matter or a doctor finds what is the matter. That is the advice she gives to everybody. These are things that need to be between the patient and the doctor.

Now that she is in remission, one of the things the doctor recommended was that she take Celebrex. That is something normally for arthritic pain, but what they found was in some patients that will keep polyps from growing that will turn into cancer in the colon, and we definitely do not want that to recur again. So she is taking that. But it is a constant fight with making sure that is an approved medication and that it can be done and that it will be paid for.

If that were just a task force recommendation—first of all, since she had the screening, they would say she does not have a problem and, later, she would die from it. But she was able to listen to her body, get the treatment she needed, and now is continuing to get the treatment without a task force saying: No, 99 percent of the people do not need that. Her doctor and she are able to determine what she needs.

On other screenings, once you have cancer, there are other times you need to have MRIs, other kinds of tests run. That, again, has to be up to the doctor and the patient to determine how often those are needed. Again, I know from talking to a number of people whom I know—not just ladies either—who have had cancer, once you have had cancer and you are in remission, you would actually prefer to have your screening a little bit earlier for the mental reassurance you get with it.

Again, from talking to people—and we have talked to more now because we

are trying to give some reassurances to them when this terrible word comes up—when they go to the doctor, one of the first things that happens is they weigh in, they take your blood pressure. When you are waiting for a decision on how the blood test you got turned out or the MRI you got turned out or whatever it was, that blood pressure goes through the roof. Quite frequently, you cannot leave the doctor's office until you have—you went there for the information, so, of course, you stay for the information, but they will not let you leave until they do the blood pressure test again, to make sure it goes down below the critical stage. That is how much impact this has on people.

So I am glad the Senator did something that goes a little bit further, covers a few more things, and makes sure people have access to their doctor, to the tests they need, and not to be relying on some government bureaucracy to say: Well, in 99 percent of the cases or 85 percent of the cases—who knows how far down they will take it, depending on what the costs are. We do not want that to happen.

I think the Senator's amendment allows patients to get these preventive benefits and stops government bureaucrats and outside experts from ever blocking patients' access to those types of services.

I appreciate the Senator from Maryland who put up an amendment. I do not think it meets that standard. They still rely on government experts called the U.S. Preventive Services Task Force to decide what preventive benefits should be covered under private health insurance. This is the same Preventive Services Task Force that made this decision that women under the age of 50 should not receive annual mammograms.

In fact, I think I even remember in there that they were not necessarily recommending self-examination. Most people I know who are very young discovered it with self-examination. I certainly would not want them to quit doing that because there is a recommendation from somebody who does not understand them or their body.

Patients do want to receive preventive screenings. Sometimes they are a little reluctant to do it because nobody wants the possibility of hearing that word given to them.

Americans should be able to get screened for high blood pressure and diabetes when a doctor recommends they get these tests. I think the Senator and I agree they should be able to get colonoscopies, prostate exams, and mammograms, so they can prevent deadly cancers from progressing to the point where they are no longer curable. Many of these diseases are preventable or curable or can be put into remission if they are discovered early enough.

I think we agree with Senator MIKULSKI's goal that all Americans should be able to get preventive benefits, but we disagree that her amendment achieves

that stated goal. Her amendment does not ensure access to mammograms for women who are under the age of 50. Part of that I am taking from an Associated Press article.

As most Americans know, last month the U.S. Preventive Services Task Force revised the recommendations for screening for breast cancer, advising women between the ages of 40 and 49 against receiving routine mammograms and women ages 50 and over to receive a mammogram just once every 2 years. The U.S. Preventive Services Task Force lowered its grade for these screenings to a C.

That sparked the political firestorm, as many women became confused about what services they could get and when they could get them. The health care bills before Congress further confused the issue because they rely heavily on the recommendations of the task force. That is what is in the bill. The underlying Reid bill says—and the Mikulski amendment restates—that all health plans must cover preventive services that receive an A or B grade from the task force. Let's see, we just said that was a C grade.

Because breast cancer screenings for women under the age of 50 are no longer classified by the task force as an A or B, plans would not have to cover those services. So Senator MIKULSKI drafted an amendment to try to fix this problem, but I think it confuses the matter some more.

I say to the Senator, I appreciate the effort you have gone to, to try to clarify that and expand it to some other areas—and to not add another layer of bureaucracy—by saying that all services and screenings must be covered by health plans.

However, the previous amendment does not have any guidelines that are specifically for women or prevention.

Ms. MURKOWSKI. If I may comment on the Senator's last statement, this is very important for people to understand. There has been much said about the Mikulski amendment and what it does or does not do. But it is very important for women to understand the Mikulski amendment will not provide for those mammograms for women who are younger than age 50. Her amendment specifically provides that it is "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force."

So you go to the task force report, and as the Senator has noted, women who fall between the ages of 40 and 49 receive a grade of a C, and the recommendation is, specifically: Do not screen routinely. Individualized decision to begin biannual screening, according to the patient's context and values. But they have received a C designation by USPSTF.

According to the Mikulski amendment, those women who are younger than 50 years of age will not be eligible

Exhibit 151                                    JA-0002478

or will not be covered under the mandatory screening requirement she has set forth in her amendment.

I think where she was trying to go was to ensure that these recommendations would not be used to deny coverage. She adds a paragraph stating that nothing shall preclude health plans from covering additional services recommended by the task force that are either not an A or a B recommendation. But the amendment does not require plans to cover services that are not an A or a B. In other words, if you are 45 years of age, you are in this C category, and the amendment does not require, then, that your preventive screening services be covered. So for those women who are in this age group—Congresswoman DEBBIE WASSERMAN SCHULTZ just went through a recent bout of cancer, and I think that was diagnosed at age 41. For those women who fall into this category, this amendment the Senator from Maryland has introduced does not address the concerns that have been raised by these recommendations coming out of this preventive task force. Again, I think we need to understand that what this amendment specifically allows for is first-dollar coverage for immunizations for children, children's health services as outlined with the HRSA—Human Resources Services Administration—guideline. But, in fact, the requirement to provide for screening coverage for women who are not in this A or B category—in other words, anybody younger than 50—we need to understand is not covered through this.

Our amendment, through allowing for a level of transparency, ensures that when you go to obtain your insurance, you can see very clearly what the professional medical organizations recommended are the guidelines and then what your insurer is proposing to offer you for your coverage. If it is not coverage you like, then shop around. This is what this insurance exchange is supposed to be all about.

Mr. ENZI. Mr. President, I congratulate the Senator from Alaska also.

Isn't it true that the Senator's amendment ensures that the Secretary of Health and Human Services won't be able to deny any of these services based on any recommendation? That is one of the things we have been concerned about. Again, that is an unelected bureaucrat who could come between you and your doctor and your health care. I know the Senator has covered that in her amendment, too, and I do appreciate it.

Ms. MURKOWSKI. It states very clearly on the second page that the Secretary shall not use any recommendation made by the U.S. Preventive Services Task Force to deny coverage and items serviced by a group health plan or a health insurance issuer. So, yes, we make it very clear that these recommendations from the USPSTF cannot be used to deny coverage.

I think the opportunity to have medical professionals, as this USPSTF is comprised of—we should have an entity that is kind of looking out and seeing what best practices are. But then that entity should not be the one that causes a determination as to whether coverage is going to be offered. You can use that as a resource, most certainly, just as we use as a resource the recommendation from, say, for instance, the American Congress of Obstetricians and Gynecologists, the American College of Surgeons, the American Society of Clinical Oncology, but it is not going to be the determining factor. I think that is where we need to make that separation, where my amendment separates from Senator MIKULSKI's.

Mr. ENZI. Mr. President, I also appreciate that the Senator from Alaska makes sure they can't deny care based on comparative effectiveness research, which actually was part of the stimulus bill that was run through at that point in time, and finally that the Senator's amendment includes a common-sense provision that would prohibit the Secretary from ever determining that abortion is a preventive service.

So I hope all of my colleagues, whether they are pro-life or pro-choice, would support this change to ensure that the controversial issues don't sidetrack the debate on the preventive issues because what we are talking about is the preventive issues, and I appreciate the Senator covering that.

Ms. MURKOWSKI. I am glad the Senator mentioned the issue of the abortion services. I think there is a vagueness in the amendment Senator MIKULSKI has offered. Some have suggested that it would allow those in the Human Resources Services Administration, HRSA, to define abortions as a preventive test, which could provide that health insurance plans then be mandated to cover it. That has generated some concern, obviously. Some have opposed the amendment, saying that if Congress were to grant any executive branch entity sweeping authority to define services that private plans must then cover, merely by declaring a given service to constitute preventive care, then that authority could be employed in the future to require all health plans to cover abortions.

So all we are doing with my amendment is just making very clear there are no vagaries, there is no second-guessing. It just makes very clear that the Secretary cannot make that determination that preventive services are to include abortion services.

Mr. ENZI. Mr. President, as I said before, my wife says that she had probably never mentioned the word "colon" twice in her whole life, and since then she has become an encyclopedia for people who have a very similar problem. She had a colonoscopy a short time before. She was still having problems, and they had said there is no problem, but she kept getting it checked until she found that there was a problem. So people need to listen to their bodies, and they need to listen to their doctors, and they shouldn't have a bureaucrat coming in between that. So I thank the Senator.

Ms. MURKOWSKI. I thank the Senator for the dialog here today. I think this is an important part of our discussion as we debate health care reform on the floor. We have had good conversations already yesterday and today about the cuts to Medicare, the impact we will feel as a nation if these substantive cuts advance. But I think this discussion—and we are narrowing it so much on what the recommendations have been from this task force, but I think it is a good preview of what the American people can expect if we move in the direction of government-run health care, of bureaucrats, whether it is the Secretary of Health and Human Services or whether it is task forces that have been appointed by those in the administration, who are then able to make that determination as to what is best for you and your health care and your family's health care.

I think the discussion we have had today about ensuring that it is not best left to these entities, these appointed entities to make these determinations, but let's leave it to—or let's allow the information to come to us from the medical professionals. Senator COBURN has spoken so eloquently on the floor about relying on those who really know and understand, who live this and who practice this, rather than us as politicians who want to be doctors. I don't want to be a doctor. I want to be able to rely on the good judgment of a provider I trust, and I want him or her to be able to make those decisions based on their understanding of me and my health care needs and what is best for me and what the best practices are that are out there, rather than having a task force telling them: That is the protocol for Lisa. She is 52. She is able to get a mammogram every other year now. I want to know that it is me and my doctor who are making these decisions.

I hope Members will take a look at the amendment I will offer and consider how it allows for truly that kind of openness, that kind of transparency, and gives individuals the freedom of choice in their health care that I think we all want.

With that, I thank my colleague from Wyoming, and I yield the floor.

The PRESIDING OFFICER. The Senator from Montana is recognized.

Mr. BAUCUS. Mr. President, I ask unanimous consent that Senator WHITEHOUSE, Senator STABENOW, Senator DODD, and I be allowed to engage in a colloquy.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Rhode Island is recognized.

Mr. WHITEHOUSE. I thank the Presiding Officer. I am delighted to be on the floor, along with the distinguished chairman of the Finance Committee and the distinguished Senator from Michigan, who has worked so hard on these issues.

Exhibit 151                                                                                    JA-0002479

I am sure I am not going to be the only person to say this, but I would like to respond briefly to the colloquy that just took place between the Senator from Wyoming and the Senator from Alaska because, as I understand it, the Mikulski amendment provides for preventive services that are in the A and B category as a floor, not a ceiling, at a minimum, and it instructs the Health Resources and Services Administration to provide recommendations and guidelines for comprehensive women's preventive care and screenings. Once that is done, then all plans would be required to be totally apart from the A or the B.

In terms of the Health Resources and Services Administration being an entity that wants to get between you and your doctor, these are actually scientists, not bureaucrats. It is an independent panel.

I think it comes with some irony to hear the concern expressed on the other side of the aisle repeatedly about bureaucrats coming between Americans and their doctors and telling them what care they can and cannot have when my experience in Rhode Island leading up to this debate, the Presiding Officer's experience in Illinois leading up to this debate, Senator STABENOW's experience in Michigan leading up to this debate—all of our experience in our home States leading up to this debate—has been that the problem has been that the private for-profit insurance industry is out there denying care every chance it gets.

I think the distinguished Senator from Illinois was presiding when I told the story of a family member of mine who died recently who was diagnosed with a very serious condition. He went to the National Institutes of Health to get the best possible treatment. He got the best specialist on his particular diagnosis in the country, and when he took that back to New York, his insurance company said: I am sorry, that is not the indicated care. That is just one experience I have had. Hundreds of Rhode Islanders have been in touch with me about their nightmare stories over and over again, whether it is because you have a preexisting condition and they won't insure you; or once you get diagnosed, they won't authorize your doctor to proceed with the care you need; or even if you go ahead and get the care, they will do everything they can to avoid paying the doctor and create every kind of administrative, bureaucratic headache for the doctor. The private insurance industry is standing between you and the care you need.

I have not once—not once since I have been here—heard anybody on the other side of the aisle express any concern about the bureaucrat between you and your doctor as long as it is an insurance company bureaucrat. It seems to me they actually approve of bureaucrats getting between you and your doctor as long as it is a bureaucrat who is an insurance company bureaucrat who has a profit motive to deny you health care. Then it is OK. Then they don't complain. But when it is independent scientists working hard to generate the best science that can be done so that people get the best information to make decisions, then suddenly we hear about bureaucrats.

I think the people listening to this should have that history in mind as they evaluate this claim that we are trying to put bureaucrats between Americans and their doctors. By stripping the abuses away from the insurance company, this bill does more to relieve that problem than any other piece of legislation I can think of.

I yield to the distinguished Senator from Michigan.

The PRESIDING OFFICER. The Senator from Michigan is recognized.

Ms. STABENOW. I thank my colleague from Rhode Island because I couldn't agree more with what he just said in terms of who is standing between, in this case, a woman and her doctor or any patient and their doctor.

Right now, I assume the Senator would agree with me that the first person, unfortunately, the doctor may have to call is the insurance company to see whether he can treat somebody, to see what it is going to cost, is it covered. Right now, we know that half the women in this country, in fact, postpone, delay getting the preventive care they need because they can't afford it. So the amendment from the distinguished Senator from Maryland is all about making sure women can get the preventive care we need, whether it is the mammogram, whether it is the cervical cancer screenings, whether it is focused on pregnancy.

Would the Senator from Rhode Island agree that right now in the marketplace, I understand that about 60 percent of the insurance companies in the individual market don't cover maternity care?

They don't cover prenatal care. They don't cover maternity care, labor and delivery, and health care through the first year of a child's life. That is standing between a woman, her child, and her doctor. That is the ultimate standing between a woman and her doctor, since they were not going to cover that.

I think one of the most important things we are doing in this legislation is to have as basic coverage—something as basic as maternity care. When we are 29th in the world in the number of babies that make it through the first year of life, that live through the first year of life, that is something we should all be extremely outraged about, concerned about.

This legislation is about expanding health care coverage, preventive care, making sure babies and moms can get prenatal care, that babies have every chance in the world to make it through the first year of life because we have adequate care there. Yet the ultimate standing between a woman and her doctor is the insurance company saying: We don't think maternity coverage is basic care.

Mr. WHITEHOUSE. If the Senator will yield.

Ms. STABENOW. Yes.

Mr. WHITEHOUSE. That is the business model of the private health insurance industry now. They want to cherry-pick out anybody who might be sick, and that is why we have the preexisting condition exclusion.

Then they have an absolute army of insurance company officials whose job it is to deny care. I went to the Cranston, RI, community health center a few months ago. It is a small community health center providing health care in the Cranston, RI, area. It doesn't have a great big budget. I asked them how difficult it is to deal with the insurance companies in order to get approval and get claims paid. They said: Well, Senator, 50 percent of our personnel are engaged not in providing health care but in fighting with the insurance industry to get permission for care and to get claims paid.

Ms. STABENOW. Will the Senator repeat that to me? That is astounding. He said 50 percent?

Mr. WHITEHOUSE. Yes. Half of the staff of the community health center was dedicated to fighting with the insurance industry, and the other half was actually providing the health care.

In addition, they had to have a contract for experts, consultants, to help fight against the insurance industry. That was another $200,000—$200,000 for a little community health center, plus half of their staff.

What we have seen in the past 8 years is that the administrative expense of the insurance industry has doubled. That is what they are doing. It is like an arms race. They put on more people to try to prevent you from getting care because it saves them money when they do. They have a profit motive to deny people.

In the case of a member of my family whom they tried to deny, he had the fortitude to fight back and eventually they caved. But for every person like him who fights and gets the coverage they paid for and are entitled to, some will be too ill, too frightened, too old, too weak, too confused, or some simply don't have the resources, when they are burdened with a terrible diagnosis like that, to fight on two fronts. So they give up and the insurance company makes money.

It is systematized. Not once have I heard anybody on the other side of the aisle in the Senate complain about that. It is a scandal across this country. It is the way they do business. I don't think there is a person on the Senate floor who hasn't heard a story of a friend or a loved one or somebody they know and care about who has been through that process. It is not hypothetical. It is happening now, and it is happening to all of us. But it is only when we come in and try to fight that suddenly this concern is raised, this "oh my gosh, you are going to get bureaucrats." But they happen to have no

Exhibit 151          JA-0002480

profit motive. They will work for the government and will be trying to do the right thing and be experts. But suddenly it is no good.

Ms. STABENOW. As the Senator has said eloquently, we have all had situations like this happen in our families. Everybody listening and everybody involved in the Senate family has certainly had that happen to us. I have found it very interesting; every Tuesday morning we invite people from Michigan who are in town, to come by and we do something called "Good Morning, Michigan."

Not long ago, a woman came in and said:

I'm finally excited. I am 65 and now I can choose my own doctor because I am going to be on Medicare.

Medicare is a single-payer, government-run health care system. I could not get my mother's Medicare card away from her if I had to wrestle her to the ground because, in fact, it has worked. It is focused on providing health care. That is their mission.

One of the things I think is indicative of the whole for-profit health care system—by the way, we are the only ones in the world who have a for-profit health care system—is when they talk as an industry, they talk about the "medical loss ratio." The medical loss ratio is how much they have to pay out on your health care. So the language of the insurance industry—now, it is different if there is a car accident or if your home is on fire. We understand you don't want to pay out for a car accident or for a home fire. But in this case, we have an institution set up, through which most of us—we have over 82 percent of us in the private for-profit insurance market through our employers. We are in a system where the provider, the insurance company, calls it a "medical loss" if they have to pay out on your insurance. I think that alone is something that, to me, sends a very big red flag, if they are trying to keep their medical loss ratio down.

We have in this legislation been doing things to keep that up. We want them to be paying out for most of the dollars paid on a premium in health care so the people are getting the health care they are paying for. That is what this legislation is all about. But as my friend from Rhode Island has indicated, point by point, when we look at every amendment in the Finance Committee—I would say virtually every amendment from our colleagues on the Republican side—and when we look at the amendments so far on the floor of the Senate, the first two being offered are about protecting the for-profit insurance companies, making sure excessive payments that are currently going out for for-profit companies under Medicare continue; making sure we are protecting the industry's ability—not the doctor's ability to decide what care you need, when you need it, and so on, but the insurance company's ability to decide what they

will pay for, what is covered, when you will get it—and, by the way, if you get too sick, they will find a technicality and they will drop you.

All of those things we are addressing are to protect patients, protect taxpayers, consumers, in this legislation. Would the Senator not agree?

Mr. WHITEHOUSE. I do.

Ms. STABENOW. The sign behind the Senator is right. It is about saving lives, money, and Medicare.

Mr. WHITEHOUSE. As the Senator noted, there is an astonishing similarity between the interests of the private health insurance industry and the arguments made by our friends on the other side on the floor. It is amazing. They are identical, virtually, to one another. I have yet to hear an argument about health care coming from the other side of the aisle that does not reflect the interests and the welfare of the private insurance industry, about which for years I never heard them complain while they were denying care.

We have another example beyond Medicare. I am struck that today is the first day since the President's speech in which he announced another 30,000 men and women will be going over to Afghanistan in addition to the ones there. All of us in the Senate and in America are proud of our soldiers. We wish them well. Those of us who have visited Afghanistan know how challenging an environment it is and how difficult it is to be away from one's family. There can be no doubt in our minds that we want the best for our men and women in the service. Everybody agrees we want the best for them. Our friends on the other side also want the best for them.

When we give them health care, what do we give them that we think is the best? We give them government health care through TRICARE and through the Veterans' Administration. I have not heard a lot of complaining about that, about stripping our veterans out of the Veterans' Administration and letting them go to the tender mercies of the private health insurance industry because when there is not an issue that involves the essential interests of the private health insurance industry, then they will do the right thing and recognize that is best for our service men and women. That is best for our veterans and, of course, we all support that. It makes perfect sense. It belies the arguments we are hearing today.

Ms. STABENOW. I totally agree with the Senator. I thank him for his comments. What I find even more perplexing is that what we have on the floor is not a single-payer system, even though some of us would support that. It is not. It is, in fact, building on the private system but creating more accountability. We are not saying there would not be a private insurance industry. What we are doing is saying that small businesses and individuals who cannot find affordable insurance today should be able to pool together in a larger risk pool. That has been, in fact,

a Republican and Democratic idea going back years.

We are saying if they want to be able to ask us to cover these folks, we are saying to the insurance companies they have to stop the insurance abuses. We are not saying they can't offer insurance. In fact, this is a model like the Federal employee health care model, where people who don't have insurance today can get a better deal in a group pool, like a big business and a small business and individuals will purchase from private insurance companies. Many of us believe there ought to be a public option in there as well. But we are talking about private insurance companies participating.

All we are saying is, wait a minute. If you are going to have access to the individuals that now will have the opportunity to buy insurance, we want those rates to be down, and we want them to be affordable. We want to make sure there are no preexisting conditions. We want to know that if somebody pays a premium every month, and then somebody gets sick, that they don't get dropped on some technicality. We want to make sure that women aren't charged twice as much as men, which in many cases is happening today. Sometimes there is less coverage. We want to make sure maternity care is considered basic, that women's health is considered a basic part of a health insurance policy. We are not saying we are eliminating the private sector. We are not going to the VA model or even the Medicare model.

This is reasonable, modest, and should be widely supported on a bipartisan basis. These ideas have come from both Democrats and Republicans over the years, and yet we still get arguments that are wholly and completely protecting the interests of an industry that we are, in fact, trying to engage and provide affordable health care insurance.

Mr. BAUCUS. Mr. President, who has the floor? We are all talking.

The PRESIDING OFFICER. The Senator from Montana is recognized. A colloquy was going on and it was terrific.

Mr. BAUCUS. I ask my colleagues, is it not true that basically in America, although all of America spends about $2.5 trillion on health care, basically it is 50/50. It is 41 or 42 percent public and about 60 percent private. We in America have roughly a 50–50 system today; is that right?

Ms. STABENOW. I say to our colleague that I believe that is the case. In my State, we have 60 percent in the private market through employers.

Mr. BAUCUS. This legislation before us basically retains that current division. What we are doing is coming up with uniquely American ideas. We are not Great Britain, France, or Canada. We are roughly 50–50—a little more private in fact. In 2007, it was 46 percent public and about 54 percent private. Roughly, that is where we are. It might change ever so slightly. But we are not those other countries, we are America.

Exhibit 151 JA-0002481

This legislation before us maintains that philosophy; is that correct?

Ms. STABENOW. Absolutely. In fact, I think it invites the private sector to participate in a new marketplace.

Mr. WHITEHOUSE. If I may interject, I add that it is a relatively familiar American principle to put public and private agencies side by side in competition, in fair competition, and let the best for the consumer win. We see it in public universities. Many of us have States with public universities that we are very proud of. They compete with private universities. I think every one of us has a public university in our State, and it is a model that works very well in education. Many of us—unfortunately not in Rhode Island—have public power authorities that compete with the private power industry.

In fact, some of the most ardent opponents of a public option go home and buy their electricity from a public electric cooperative or a public power authority. We see it in workers compensation insurance. A lot of health care is delivered through workers compensation insurance.

Mr. BAUCUS. But isn't that a pretty good system—don't put too many eggs in one basket? Doesn't each keep the others on their toes a little bit?

Mr. WHITEHOUSE. I think it is the oldest principle of competition, as the distinguished chairman of the Finance Committee pointed out.

Mr. BAUCUS. Doesn't this legislation provide for more competition than currently exists?

Mr. WHITEHOUSE. I think it does.

Mr. BAUCUS. For example, with exchanges, with health insurance market reform and with the ratings reform.

Mr. WHITEHOUSE. All of those, and a public option. All of that adds to a better environment. One of the interesting things about this is you only have a good and fair market. America is founded on market principles. We all believe in market principles. One of the things about the market is that people will cheat on it if there are not rules around the market. If you don't make sure that the bread is good, honest, healthy bread, some rascal will come and will sell cheap, lousy, contaminated bread in the market. You have to have discipline and walls to protect the integrity of the market.

That is what the health insurance market has lacked. That is overdue. I think it will enliven the market in health insurance and animate the market principle.

Mr. BAUCUS. I ask my colleagues, is there anything in this legislation which will interfere with the doctor-patient relationship; that is, to date people choose their own doctors, whichever doctor they want. They can, by and large, go to the hospital they want, although the doctor may send them to another hospital. Is there anything in this legislation that diminishes that freedom of choice patients would have to choose their doctor?

Mr. WHITEHOUSE. Nothing.

Ms. STABENOW. If I may add, I think one of the most telling ways to approach that is the fact that the American Medical Association, the physicians in this country, support what we are doing. They are the last ones who would support putting somebody—somebody else, I should say, because I believe we have insurance company bureaucrats frequently between our doctors and patients—but they would not be supporting us if it were doing what we have been hearing it is doing.

Mr. BAUCUS. What about the procedures doctors might want to choose for their patients? Is there anything in this legislation which interferes with the decision a physician might make as to which procedure to prescribe, in consultation with his or her patient?

Ms. STABENOW. As a member of the Finance Committee with the distinguished chairman, we have heard nothing. We have written nothing that would in any way interfere with procedures. In fact, I believe through the fact we are making insurance more affordable, we are going to make more procedures available because more people will be able to afford to get the care they need.

Mr. WHITEHOUSE. The American Academy of Family Physicians and the American Nurses Association support this legislation because they know that instead of interfering between the doctor and the patient, we are actually lifting out the interference that presently exists at the hands of the private insurance for-profit industry between the patient and the doctor. They want to see this, and that is one of the important reasons.

Another important reason, something the distinguished chairman of the Finance Committee is very responsible for, beginning all the way back at the start of this year when the Finance Committee, under his leadership, had the "prepare to launch" full-day effort on delivery system reform.

What you will see is doctors empowered in new ways to provide better care, to have better information.

Mr. BAUCUS. I might ask my friend—that is very true—Could he explain maybe how doctors may be, in this legislation, empowered to have better information to help them provide even better care? What are some of the provisions?

Mr. WHITEHOUSE. There are a great number of ways and much of it is thanks to the chairman's leadership and Chairman DODD on the HELP Committee. We put together a strong package melded by Leader REID. The main ingredients are taking advantage of electronic health records so you are not running around with a paper record, you are not having to fill out that clipboard again, they are not having to do another expensive MRI because they cannot access the one you had last week. If you have drugs you are taking, the drug interactions that might harm you will be caught by the computer and signal the doctor so they can be aware of it and make a decision whether to change the medication. The electronic health record is a part of that.

Investment in quality reform is a huge issue. Hospital-acquired infections are prevalent throughout this country. They cost about $60,000 each on average. They are completely preventable. Nobody knows this better than Senator STABENOW from Michigan because it was in her home State that the Keystone Project began, which has since migrated around the country. It has gone statewide in my home State through the Rhode Island Quality Institute. It has been written up by the health care writer Dr. Atul Gawande in the New Yorker magazine. What the information from Senator STABENOW's home State of Michigan shows is that in 15 months, they saved 1,500 lives in intensive care units and over $150 million by better procedures to prevent hospital-acquired infections.

Ms. STABENOW. If I may add to that—and I thank the chairman for putting in language on the Keystone initiative in the bill—in this bill, we are, in fact, expanding what has been learned about saving lives and saving money by focusing on cutting down on infections in the intensive care units, by focusing on surgical procedures, things that actually will save dollars, don't cost a lot, and save lives. But they involve thinking a little differently, working a little bit differently as a team. Our physicians, hospitals, and nurses have found that if they made quality a priority, it became a priority.

There are so many things in this legislation that will save money, save lives, increase quality, and that is what this is all about, which is why so broadly we see the health care community, all the providers, nurses, doctors, and so on, supporting what we are doing.

Mr. BAUCUS. I think it is important not to overpromise because some of these initiatives, some of these programs will take a little time to take effect. In fact, some of the provisions do not take effect for a couple, 3 years. But still, wouldn't my colleagues agree that some of these are going to probably yield tremendous dividends in the future, especially generally the focus on quality, not outcomes, reimbursing physicians and hospitals based on quality, not outcomes, the pilot projects, the bundling, the counter care organizations and other similar efforts in this legislation. One of the two or both may want to comment on that point. I think it is a point worth making.

Mr. WHITEHOUSE. It is a very important point. Again, this is not something that emerged suddenly or overnight. The distinguished Senator from the Finance Committee has been working hard on this a long time, back even before "prepare to launch," which is an early reflection of the work he has been doing.

Exhibit 151                                                                                                          JA-0002482

As we look at this bill, and as people who have been watching this debate have seen, this legislation saves lives, saves money, and saves medicine. We can vouch for that through the findings of the Congressional Budget Office. But the Congressional Budget Office has been very conservative in its scoring.

Mr. BAUCUS. Very.

Mr. WHITEHOUSE. There is a letter the CBO wrote to Senator CONRAD. There is testimony and a colloquy he engaged in with me in the Budget Committee that makes clear that beyond the savings that are clear from this legislation, there is a promise of immense further savings. What he said is:

Changes in government policy——

Such as these——

have the potential to yield large reductions in both national health expenditures and Federal health care spending without harming health. Moreover, many experts agree on some general directions in which the government's health policies could move.

The chairman of the Finance Committee has developed those general directions through those hearings and it is now in the legislation. But the conclusion he reaches is:

The specific changes that might ultimately prove most important cannot be foreseen today and could be developed only over time through experimentation and learning.

The MIT report that came out the other day, Professor Gerber, Dr. Gerber said the toolbox to achieve these savings through experimentation and learning is in this bill. I think his phrase was everything you could ask for is in this bill.

As the distinguished chairman of the Finance Committee knows better than I do, there are big numbers at stake here. If you look at what President Obama's Council on Economic Advisers has estimated, there is $700 billion a year—when we talk numbers, we usually multiply by 10 because it is a 10-year window. So when people say there is this much in the bill, it is over 10 years. This is 1 year, $700 billion in waste.

The New England Health Care Institute estimated $850 billion annually in excess costs and waste. The Lewin Group, which has a relatively good opinion around here, and George Bush's former Treasury Secretary, Secretary O'Neill, have estimated it is over $1 trillion a year. So whether it is $700 billion or $850 billion or $1 trillion, even if these tools in the toolbox that we will refine through learning and experimentation achieve only a third, it is $200 billion or $300 billion a year.

Mr. BAUCUS. Right. Some people are worried, perhaps, gee, there they go back there in Congress. They talk about waste—which is good; we want to get rid of waste. But then when they talk about waste, they talk about cutting out the waste, people think: Gee, if they are cutting out the waste and they are cutting health care reimbursements, gee, won't that hurt health care in America? Won't that harm health care in America? Won't that reduce quality? If they are cutting so much, $600 billion, $700 billion, $800 billion—that is a lot of money—aren't they going to start cutting quality health care in America?

I see my good friend, the chairman of the HELP Committee, on the floor. He may want to join in this discussion as well, adding different points as to why the legislation we are putting together increases quality, does not cut quality, but it increases quality at the same time it reduces waste. I wonder if my colleagues might comment on all of that because it is an extremely, I think, important point to drive home our legislation improves quality health care.

Mr. DODD. I was going to raise the point, I say to my colleague and chairman of the Finance Committee, that there are a lot of good things about our health care system. We want to start off acknowledging that our providers, doctors do a magnificent, wonderful job. But we also know the system is fundamentally broken because it is based on quantity rather than quality.

That is my question. There is a question mark at the end of it. It is my opinion that is what it is. In other words, doctors and hospitals—the system—are rewarded based on how many patients you see, how many hospital beds are filled, how many tests get done, how many screenings are provided along the way. So it is all based on quantity. The more quantity you have, the system survives. Inherent in that is the question, if that is what drives the system, only quantity, then obviously what you are going to end up doing is have a sick care system, not a health care system.

If we asked, what are you trying to do over all—to fundamentally shift from a quantity-based system to a quality-based system where we try to keep people out of doctors' offices, out of hospitals, out of situations where they need to be there. That is what we are trying to achieve. To do that, we need to incentivize the system in reverse. The incentives today are to fill all these places. We are trying to incentivize by keeping people healthier, living a better health style, stopping smoking, losing weight, eating better food—all of these things that are not only good for you but overall save money. Am I wrong?

Mr. BAUCUS. I think my colleague is exactly right. As he was speaking, I was thinking of that article a lot of us have referred to often, the June 1 New Yorker article by Atul Gawande, comparing El Paso, TX, and McAllen, TX. They are both border towns. In El Paso, health care expenditures per person are about half what they are in McAllen. And yet the outcomes in El Paso are better than they are in McAllen.

One might ask: Why in the world is that happening? Why is there twice as much spent in McAllen than El Paso and the outcomes are different? The answer is we have a system which allows the McAllens in the system, that allows payment in basic quantity and volume as opposed to quality.

I believe it depends on the community what the culture is. Some communities have a culture of patient-focused care. The current system allows that, but, unfortunately, if the culture in the community is more to make money, our reimbursement system today allows for that as well. So I think one of the things we are trying to do is to get more quality in the system—reimbursement to pay doctors and hospitals—more quality, as you have said—and that is going to even out a lot of the geographic disparities that have occurred in the country over time and so the quality will increase and the cost and the waste will decrease.

Mr. DODD. One last question I wished to raise, if I could, because our colleague from Montana said something yesterday that I think deserves being repeated, as I understood him, on the point he just made about the Gawande piece, which did that comparison between McAllen, TX, in Hidalgo County, which is the poorest county in the United States, and El Paso, and then I think you talked about Minnesota as well.

There is a fellow by the name of Don Berwick, a doctor who is an expert on integrated care, and one of the things he says—and I think you said this yesterday it deserves being repeated—it isn't just at the Cleveland Clinic or the Mayo Clinic where this happens—that kind of culture that exists at community hospitals and small hospitals all over the country where they have figured out integrated care; that is where doctors and hospitals have figured out how to provide services and reduce costs.

I have 31 hospitals in my State, and similar to all our colleagues, I have been visiting many of them and talking to people. Manchester Community Hospital is a very small hospital in Manchester, CT—a community hospital—and they have reduced costs and increased quality because they have figured out, between the provider physicians and the hospital, how to do that. My point is—and your point is—this is happening all across America in many places, and we need to be rewarding that when it occurs.

Mr. BAUCUS. There is no doubt about that. In fact, it is interesting the Senator mentioned his name because not too long ago I asked him that question. I said: Why, Dr. Berwick, is it that in some communities they get it and some they do not? His answer was that sometimes there is somebody—maybe it is a hospital or someone who is a pretty dominant player—who kind of starts it out and gets it right, and that is true.

He invited 10 integrated systems to Washington, DC, to kind of talk over what works and what doesn't work.

Exhibit 151                                    JA-0002483

These are not the big-named institutions; they are the lesser named institutions. In fact, one of them I can probably say is the Billings Clinic, in Billings, MT—not too widely known, but they participated last year—the same process and integration with the docs, the acute care, and the postacute care. They have significantly cut costs, they have significantly improved the quality, and they are very proud of what they have done.

Mr. WHITEHOUSE. May I offer a specific example from the bill as an illustration of this?

One of the very few areas in which the Congressional Budget Office is prepared to document savings from these quality improvements is in the area of hospital readmissions. The chairman of the Finance Committee worked very hard to get hospital readmission language in his bill, I think we had it in the HELP bill as well, Chairman DODD, and it is in the bill Leader REID put together. What it does is it strips, over 10 years, $7 billion—I think is the number—$7 billion of money that hospitals would otherwise be paid when somebody gets out of the hospital and is readmitted within 30 days for the same condition.

The reason they are willing to apply those savings is because now you can demonstrate that if you have better prerelease planning, then people will go out and they will do better on their own. They will do better at home or they will do better in a nursing home, and therefore they will not come back. So you save lives because the health care is better, and you save money because they do not come back to the hospital. You improve on the front end. The hospital will do that. They will invest and improve on the front end because they don't want to pay on the back end if they are not recovering their costs with the readmission. It is a win-win for everyone. The individual American who has to be readmitted to the hospital and undergo, once again, all the procedures and all the risks that being in a hospital entails because he or she didn't get a proper discharge plan is not helped out by having to go back to the hospital.

Mr. BAUCUS. I have very direct experience in this. My mother was in the hospital 3 years ago—in another hospital, not the Billings Clinic—and there was no discharge plan. There was no way to help deliver health care for her when she left the hospital and went into a rehab center—sort of a nursing home. Sure enough, she didn't get the proper meds, she didn't get the proper attention, the doctor did not see her every day or after that, and, lo and behold, she had to be readmitted to the hospital. She had a gastrointestinal issue, and, sure enough, they took care of her back in the hospital. But once she was discharged, they did it right. They improved upon the mistakes they had made.

So I saw it firsthand, and it irritated the dickens out of me, frankly, in seeing how they did not pay sufficient attention to my mother. If this happens to my mother, my gosh, I bet it is even worse in lots of other situations.

Mr. DODD. If my colleagues will yield, I wished to thank Senator WHITEHOUSE, who was on our committee for the duration of our markup and he did a stunning job. He was a very valuable member of the committee and he made some wonderful suggestions to our bill all the way through the process.

I was told the other night by a friend of mine—Jack Conners, who is very involved in Boston and sits on the board and chairs the board of the hospitals in Boston—I think my colleague from Rhode Island may recognize the name—the average elderly person discharged from the hospital gets, on average, four medications—on average. Within 1 month, that individual, in most cases living alone, maybe with someone else, but on in years and so less capable of understanding it all, is basically not taking the four medications—or only taking parts of them—and finding themselves right back in the hospital as a readmission.

In our bill, we do a little bit to address that, and I think there is some effort in the Finance Committee bill through telemedicine—there are ways now through technology to provide some advice. This might not be a bad idea in terms of employment issues. It wouldn't take much to train people to be a home health care provider and to stop in. Your mother was in a nursing home, but most people end up in their apartment.

Mr. BAUCUS. Well, she is now home and getting great attention. I made sure of that.

Mr. DODD. We could help people who are being discharged, and the savings, by employing some people to do it, I think, would vastly be less than the cost of sending them back to the hospital.

Mr. BAUCUS. An example of that. I was talking to the head of Denver Health. It is an integrated system. I have forgotten the name, but she was so enthusiastic about the integration she performed with Denver Health. I will give you one small example, and it is one you just mentioned. She said: We have patients here—heart patients—and when they are discharged we ask them: Are you taking your meds? Are you controlling your blood pressure? Are you taking your medication to control your blood pressure?

They say: Oh, yeah, yeah, yeah, I am taking my meds.

She says: Well, why is your blood pressure so high?

The response is: Well, I, I, I. Because they are integrated, they check with their pharmacy, which is part of their system, to check the refill rate of the patients. Sure enough, they find their patient's refill history shows they were not taking their meds. So they get the patients back and they say: You are not taking your meds.

They say: Oh, I guess I wasn't.

They tell them: We are checking on you.

So, sure enough, they take their meds, and they have a much better outcome, generally, with their cardio patients because of that integration.

Mr. DODD. It works.

Mr. WHITEHOUSE. Part of what the distinguished chairman worked so hard on was to put in place the program so we will be able to begin to reimburse doctors for those kinds of discussions.

Mr. BAUCUS. Absolutely.

Mr. WHITEHOUSE. Right now, our payment system is driving them away from having that kind of simple discussion. It doesn't always support the electronic prescribing that would let you know they are not picking up their meds. But President Obama did a great job on that, with the electronic health record funding he put through.

But this question of doing what you are paid to do, if all you are paid for are procedures, then the hospital doing the discharge summary, if they couldn't get paid for that, but they did get paid when the person came back and was readmitted and maybe $40,000, $50,000, a day, it doesn't take too long to figure out where their effort is going to be. It is not going to be in those areas that save money for the system but hurt them financially because we have set up the payment system with all these perverse incentives.

Mr. BAUCUS. I don't know how much longer my colleague wanted to speak, but some time ago I know Senator HATCH wanted to speak at 5 o'clock, so I am trying to be traffic cop here.

Mr. DODD. If I could, Mr. Chairman, make the case—because I think it needs to be said and, unfortunately, over, over, and over again—because it is argued on the other side that we are cutting back on providers of the hospitals, for instance. That is accurate. We are doing that. If that is all we were doing, the complaint would have great legitimacy. But what we have done in this bill is to try to create a justification for that and provide the resources that make those savings reasonable. If you are having fewer readmissions in a hospital, which the hospitals support, if you are doing the kinds of things we are talking about to keep people healthy so they do not go back in, then these numbers become realistic numbers.

It is not just saying we are cutting out funding. We are improving systems in bill. People pick up the bill all the time and say: Look at all the pages. It is because a lot of thought has gone into this to do exactly what Senator WHITEHOUSE and the chairman of the committee talked about all day yesterday. This isn't just a bunch of language here. It goes to the heart of this and how we intend to accommodate the interests of the individual by improving their quality and simultaneously reducing the cost.

Everyone has made those claims that is what we need to do—increase quality, reduce cost, increase access. So

Exhibit 151                                                              JA-0002484

you can't just say it and not explain how you do it. What we have done in our bill is explain how we do that, how we increase access, how we improve quality for the individual and institutions and simultaneously bring down cost. That is what we spent the last year working on, to achieve exactly what is in these pages that people weigh and pick up all the time. If they would look into them, they would see the kind of achievements we have reached.

Those achievements have been recognized by the most important organizations affecting older Americans—AARP and the Commission to Preserve Social Security and Medicare. They have examined this. These are not friends of ours. These are people who objectively analyze what we are doing, and it is their analysis, their conclusion, reached independently, along with many others, that we have been able to reduce these costs, these savings, in this bill and simultaneously increase access and improve quality.

That has been the goal we have all talked about for years. This bill comes as close to achieving the reality of those three missions than has ever been done by this Congress, or any Congress for that matter. So when people talk about these cuts in Medicare, they need to be honest enough for people to realize what we have done is to stabilize Medicare, extend its solvency, and guarantee those benefits to people who rely on Medicare. That has all been achieved in this bill.

So when people start with these scare tactics and language to the contrary, listen to those organizations who don't bring any political brief to this, who don't have an R or a D at the end of their names. Their organizations are designed, supported, financed by, and applauded by the very individuals who count on having a solid, sound Medicare system. These organizations unanimously—unanimously—have said that guaranteed benefits in this bill remain intact. We stabilize Medicare, and we provide the kind of programs that will save lives and increase the quality of life for people. It is not only about staying alive but the quality of life and being able to live a quality life, independently, for as many years as possible.

At the end of the day, we all die one at a time in this country. No matter what else we do, that is the final analysis. But to the extent you can extend life and improve the quality of life and save the kind of money we ought to, that is the goal of this bill, and we largely achieve it.

I applaud, again, the Finance Committee, and the chairman, Max Baucus, who helped us get through and navigate these very difficult waters, and I thank our colleague from Rhode Island for his articulating these issues as well as his contributions during the HELP Committee proceedings on this bill. He brought many sound and very positive ideas to the table.

I wish to take a minute or two as well, if I could, to respond to our colleague and friend from New Hampshire, who, at some length, talked about his problems with what we call the CLASS Act that was part of our HELP Committee bill. I wish to briefly address those comments.

The CLASS Act was an issue Senator Kennedy championed for many years— the idea of providing an independent, privately funded source of assistance to people who become disabled but who want to continue working and earn a salary; who do not want to be limited by the constraints of a Medicaid system, which is very undesirable. Not a nickel of public moneys is used. Individuals make the contribution. If it vests for 5 years, and if you are faced with those kinds of disability issues, you can then collect approximately $75 per day to provide for your needs— maybe a driver, maybe someone providing meals—but you then have the opportunity to continue working as an individual, without any limitations on what you can make or earn.

Again, no public money is involved. It builds up. Thanks to JUDD GREGG in our committee it is actuarially sound. He offered an amendment which insisted on the actuarial soundness of this program. The CLASS Act assists individuals who need long-term services and supports with such things as: assisted transportation, in-home meals, help with household chores, professional help getting ready for work, adult day care, and professional personal care. It also saves about $2 billion in Medicaid savings. There are very few provisions that almost instantaneously do that.

Again, these dollars have to remain for just this purpose. You cannot raid this fund for any other purpose—which was a concern legitimately raised by some, that this $75 billion may be used for other purposes. We have attempted to write into this legislation prohibitions to keep these moneys from being offered for any other purpose.

In fact, Senator GREGG, when he offered his amendment, said:

I offered an amendment, which was ultimately accepted, that would require the CLASS Act premiums be based on a 75-year actuarial analysis of the program's costs. My amendment ensures that instead of promising more than we can deliver, the program will be fiscally solvent and we won't be passing the buck—or really passing the debt—to future generations. I'm pleased the HELP Committee unanimously accepted this amendment.

Which we did. I hear some of my colleagues say this bill did not have anything but technical amendments of the 161 Republican amendments I took during committee markup—this was one of the amendments, Senator GREGG's amendment, which we accepted unanimously. My colleague from Utah was of course a member of the committee. He diligently paid attention to every amendment that was offered and I know remembers as we adopted one of his amendments dealing with biologics

in the committee that Senator Kennedy strongly supported in conjunction with Senator HATCH. But this CLASS Act is a unique and creative idea. We thank our colleague from Massachusetts, no longer with us, for coming up with and conceptualizing this idea that individuals, with their own money, contributing to a fund, could eventually draw down to provide these benefits should they become disabled. Individuals often want to continue working and being self-sufficient without getting into Medicaid, which limits your income, restrains you entirely.

Here is a totally privately funded program, no public money, just what you are willing to contribute over a period of years to protect against that eventuality that you might become disabled, so you can continue to function.

I have one case here, Sara Baker, a 33-year-old woman in my home State of Connecticut living in Norwalk. Two years ago Sara's mother, who was only 57 years old at the time, suddenly suffered a massive stroke. The stroke left the right side of her body completely paralyzed. She lost 100 percent of her speech. Sara recalls that fateful day when she got the call. I will quote her:

I was living out west in Arizona—working, dating—living and loving my life. Then . . . I got the phone call. . . . In seconds, literally, my entire world fell apart. I swear I can still feel that feeling through my whole body when I think about it. So there I was in a state of complete and total lunacy, getting on a plane with one suitcase—home to Connecticut. Guess what? I never went back.

Sara's mother was transferred to a rehab hospital. Sara went to the hospital every single day for 2 months to be at her mother's side as she went through therapy. Sara's mother had worked as an RN for 17 years. Her mom and the hospital social worker both agreed, her health insurance was "as good as they come."

However, when it comes to long-term care, they don't come as good. Her mother was abruptly discharged from the rehab hospital after 60 days, when her insurance company decided she had made enough "progress."

Sara went 9 months without working, dipped into what savings she had, and then went into debt to provide the long-term services and supports her mother needed.

As she recalled, and I will quote her again:

I made the whole house wheelchair accessible. I became a team of doctors, nurses, aides, and a homemaker. I helped her shower, get dressed, cut food, gave medicine, took her blood pressure. . . . What would have happened if I wasn't there? Basically, one of two things—I could have hired someone to come to the house, all out of pocket of course, or the State could have depleted her assets—her home, savings, everything—and she would have been put in a nursing home funded by Medicaid.

Stories like Sara's are not the exception, unfortunately. They happen every minute of every day, all across our country. They are common in my State

Exhibit 151
JA-0002485

as well as any other State in the Nation. At any moment any one of us or someone we love can become disabled and need long-term services.

We also have an aging population. In my home State of Connecticut, the number of individuals 85 and over, the population most likely to need long-term care, will grow by more than 70 percent in the next 20 years.

Families such as Sara's are doing the right thing. They take care of each other, as most people understand we all would try and do. They do whatever they have to do. But the cost of long-term care can be devastating on middle-class working families. While 46 million Americans lack health insurance, more than 200 million lack any protection against the costs of long-term care. The CLASS Act will help fill that gap. It doesn't solve it all. It helps fill a gap. It is an essential part of health care reform. The CLASS Act will establish a voluntary—purely voluntary, there are no mandates on employers, no mandates on employees, no mandates on anyone—national insurance program.

If you decide, only you decide, voluntarily to contribute and participate in this, it happens. It is a long-term care insurance program financed by premium payments collected through payroll at the request of the individual, not a mandate on the employer. When individuals develop functional limitations, such as Sarah's mother, they can receive a cash benefit in the range of $75 a day, which comes to over $27,000 a year.

It is not intended to cover all the costs of long-term care but it could help many families like Sarah's. It could pay for respite care, allowing family caregivers to maintain employment. It could pay for home modifications. It could pay for assistive devices and equipment. It could pay for personal assistance services—allowing individuals with disabilities to maintain their independence, and community participation. It could allow individuals to stay in their homes versus having to go to a nursing home. It would prevent individuals from having to impoverish themselves by selling off everything they have, to then go through that title XIX window and become Medicaid recipients and then be constrained on what they could possibly earn.

Think about what if this young woman Sara had a family living out West, her own children instead of being single, how would she have done that? How would she have been able to pack up a whole family and move from the West to the East to take care of her mother in those days? Many families face these issues every day.

So while this proposal is not going to solve every problem, it is a very creative, innovative idea that does not involve a nickel of public money, not a nickel. It is all voluntary, depends upon the individual willing to make that contribution, to provide that level

of assistance, Lord forbid they should end up in a situation where they find themselves disabled and need some long-term services to allow them to survive and be part of their community life, including going back to work, without impoverishing themselves, selling off everything they have in order to make themselves qualified for Medicaid assistance.

I applaud my colleague from Massachusetts. There are a lot of great things he did over the years. He was a champion of so much when it came to working families and their needs in health care. But this idea, the Kennedy idea of the CLASS Act, is one that has a wonderful legacy to it. It is the heart of this bill. It has been endorsed and supported by over 275 major organizations in the country. I have never seen a proposal such as this receive a level of support across the spectrum that the CLASS Act is getting.

I know there will be those who try to take this out of the bill. I will stand here hour after hour and defend this very creative, innovative idea that can make a difference in the lives of millions of our fellow citizens, not only today but for years to come.

I again thank Senator Kennedy and his remarkable staff who did such a wonderful job on this as well, and I thank Senator GREGG, even though he is critical of the program. Senator GREGG's ideas were adopted unanimously in our markup of the bill and provided the actuarial soundness of this proposal for a long 75 years to come. For that we are grateful to him, for offering those amendments which were adopted by every Republican and every Democrat on the committee at the time of our markup last summer.

I see my colleague from Utah, and I have great respect for my friend from Utah. He and I have worked on so many issues together. Either he would get me in trouble politically or I would get him in trouble politically when we went to work on things. The very first major piece of legislation I ever worked on in the Chamber was to establish some Federal support for families who needed it for childcare. It was a long, drawn-out battle, but the person who stood with me almost a quarter of a century ago to make that happen—and today it has almost become commonplace for people to get that kind of assistance—but as long as I live, I will never forget I had a partner named ORRIN HATCH who made that possible. Whatever differences we have—and that is not the only thing we have worked on together, but it was the very first thing I worked on and he joined me in that effort—it became the law of the land and today millions of families manage to navigate that difficult time of making sure their families are going to get proper care and attention while they go out and work hard and try to provide for them as well. I thank him for that and many other things as well.

The PRESIDING OFFICER. The Senator from Utah is recognized.

Mr. HATCH. Mr. President, I thank my colleague. There is no question he is a great Senator. I have always enjoyed working with him and we have done an awful lot together. I want to compliment Senator WHITEHOUSE too, a terrific human being and great addition to this Senate and I have a lot of respect for him. He gives me heartburn from time to time, as does Senator DODD. On the other hand, they are great people and very sincere. Our chairman of the committee, Max Baucus, is a wonderful man. He is trying to do the best he can under the circumstances. I applaud him for it. Senator STABENOW from Michigan and I have not seen eye to eye on a lot of things, but we always enjoy being around each other.

This is a great place, there is no question about it. We have great people here. But that doesn't make us any less unhappy about what we consider to be an awful bill.

But right now, today, let me talk about a few specific things. Today the senior Senator from Illinois came to the floor and spoke about my efforts to reduce the costs associated with medical malpractice liability. I don't think his statement should go unanswered. Not only were a number of his statements simply incorrect as factual matters, but some of them even bordered on being offensive. I am not offended, I can live with it, I can take criticism, but some of them I think were a little bit over the top.

First of all, he referred to the recent letter I received from the CBO which indicated that the government would realize significant savings by enacting some simple tort reform measures. I don't know anybody in America who has any brains who doesn't realize we have to do something about tort reform when it comes to health care. According to the CBO, these measures would reduce the deficit by $54 billion over 10 years. That is a lot of money. Private sector savings would be even more significant. According to the CBO, we would likely see a reduction of roughly $125 billion in private health care spending over the same 10-year period, and that, in my view, is a low estimate. Democrats apparently want the American people to think these numbers are so insignificant that this issue should be ignored in this health care bill, and I have to respectfully disagree.

I may be one of the few Senators in this body who actually tried medical malpractice cases. I actually defended them. I defended doctors, hospitals, nurses, health care practitioners. I understand them.

There are cases where there should be huge recoveries. I would be the first to admit it. I saw the wrong eye taken out, the wrong leg taken off, the wrong kidney. You only have two of each of those. You bet your bottom dollar we settled those for significant amounts of money. But I also saw that the vast majority of the cases were frivolous,

Exhibit 151                                                                                           JA-0002486

Case 2:17-cv-04540-WB     Document 253-10     Filed 09/29/20     Page 515 of 677

brought to get the defense costs which then only ranged from $50,000 to $200,000, depending on the jurisdiction. If a lawyer can get a number of those cases they can make a pretty good living by bringing those cases just to get the defense costs, which of course adds to all the costs of health care. There is no use kidding about it.

Furthermore, Senator DURBIN, the distinguished Senator from Illinois, cited the same CBO letter in order to claim that the tort reform measures supported by many on my side of the aisle would cause more people to die.

Give me a break.

I can only assume he is referring to the one paragraph in the CBO letter that addresses the effect of tort reform on health outcomes. In that single paragraph the CBO referred to three studies. One of these studies indicated that a reduction in malpractice lawsuits would lead to an increase in mortality rates—one of the three.

The other two studies cited by the CBO found that there would be no effects on health outcomes and no negative effects could be expected. So, let's be clear, the CBO did not reach a conclusion in this case. These studies were cited only to show that there is disagreement in this area and, once again, the majority of the studies cited said there would be no negative effects on health outcomes. Apparently, omitting data and studies that disagree with your conclusions is becoming common practice among policy makers these days.

In his speech earlier today, the distinguished Senator from Illinois also discounted the prominence of defensive medicine in our health care system, saying only that ''some doctors'' perform unnecessary and inappropriate procedures in order to avoid lawsuits. Once again, the facts would contradict this generalization. A number of studies demonstrate this. For example, a 2005 study of 800 Pennsylvania physicians—where I used to practice law—in high-risk specialties found that 93 percent of these physicians had practiced some form of defensive medicine. That was published in the Journal of the American Medical Association, June 1, 2005.

In addition, a 2002 nationwide survey of 300 physicians—this is the Harris Interactive ''Fear of Litigation Study''—found that 79 percent of physicians ordered more tests than are necessary. Think about that. If 79 percent are ordering more tests than are necessary, you can imagine the multibillions of dollars in unnecessary defensive medicine that comes from that. But that is not the end of that ''Fear of Litigation Study.'' Seventy-four percent of physicians referred patients to specialists who, in their judgment, did not need any such referral. Think about it—referring people to specialists that they knew they didn't need. Think of the cost, the billions of dollars in cost. Fifty-two percent of physicians suggested unnecessary invasive proce-

dures. The word ''invasive'' is an important word. Fifty-two percent. Why? Because they are trying to protect themselves by making sure that everything could possibly be done. Forty-one percent of physicians prescribed unnecessary medications. This is a nationwide survey of 300 physicians.

The costs associated with defensive medicine are real—I would say unnecessary defensive medicine because I believe there are some defensive medicine approaches that we would want the doctors to do but not to the extent of these doctors ordering more tests than are necessary, ordering more specialists than are necessary, suggesting unnecessary invasive procedures, unnecessary medications. This is the medical profession itself that admits this.

In another study Pricewaterhouse found that defensive medicine accounts for approximately $210 billion every year or 10 percent of the total U.S. health care cost. Here are some more facts from the Pricewaterhouse study. Of the $2.2 trillion spent every year on health care in the United States, as much as $1.2 trillion can be attributed to wasteful spending—$1.2 trillion of $2.2 trillion. Yet, the Democrats want to deny that unnecessary defensive medicine is being utilized to a significant extent. According to this study, defensive medicine is the largest single area of waste in the health care system. It is on par with inefficient claim processing and care spent on preventable conditions.

Yet, despite these overwhelming numbers—and I know some Democrats will say that is Pricewaterhouse and they must have been doing it at the expense of somebody who had an interest. Pricewaterhouse and other accounting firms generally try to get it right. They got it right here. Those of us who were in that business can attest to it.

Yet, despite these overwhelming numbers, my friends on the other side have opted to overlook them and instead relate horrific stories associated with doctors' malpractice, apparently trying to imply that Republicans simply don't care about these truly tragic occurrences. However, nothing could be further from the truth. In fact, in all the proposals that have been offered during this debate, there has not been a single suggestion to prevent plaintiffs from obtaining the compensation for actual losses they have incurred, not one suggestion that they should. Instead, we have sought to impose some limits on the noneconomic damages. All economic damages damages awarded for actual loss, past, present, and future—are fine, fair game. We've sought only impose some limits on the noneconomic damages in order to define the playing field, encourage settlement, and introduce some level of predictability to the system.

It is no secret that personal injury lawyers—some of them—are prolific political contributors to those politicians who fight against tort reform. With a Democratic majority and a

Democrat in the White House, their lobbying efforts during this Congress have reached unprecedented levels. Given this reality, it is obvious why trial lawyers have not been asked to give up anything in the current health care legislation.

Supporters of this health care bill will be asking the American people to pay higher health care premiums, for seniors to give up Medicare Advantage, which 25 percent of them have enlisted in, for businesses to pay higher taxes, for medical device manufacturers to pay more just to bring a device to the market that may save lives or make lives more worth living. The only group that has not been asked to sacrifice or change the way they do business happens to be the medical liability personal injury lawyers.

I would hope we would focus our efforts more on helping the American people than on preserving a fund-raising stream for politicians. Sadly, that doesn't appear to be happening in the current debate.

As I said, there are some very honest and decent attorneys out there who bring cases that are legitimate where there should be high rewards. But the vast majority, I can personally testify, are less than legitimate and the resulting costs are costing every American citizen an arm and a leg. It is something we ought to resolve. We ought to resolve it in a way that takes care of those who truly have injuries and get rid of these frivolous cases driving up the cost for every American.

Not too long ago, I talked to one of the leading heart specialists in Washington. He acknowledged, we all order a lot of tests and so forth that we don't need, that we know we don't need. But we do it so that the history we have of the patient shows we did everything possible to rule out everything that possibly could occur, even though we know we don't need to do it. To be honest, under the current system of lawsuits, I don't blame them. They are trying to protect themselves.

We should also discuss the shortage of doctors we have going into high-risk specialties. We have areas in this country where you can't get obstetricians and gynecologists to the people. Law schools will tell you, at least the ones I know, that there aren't that many young people going into obstetrics and gynecology today because they may not make as much money and the high cost of medical liability insurance is so high that they really can't afford to do it. And, of course, they don't want to get sued.

So much for that. I love my distinguished friend from Illinois, and he knows it. I care for him. But let me tell you, I think he knows better. He knows that I know better. I would be the first to come to bat for somebody who was truly injured because of the negligence of a physician. I don't have any problem with that at all.

I just thought I would make a few comments about this but, again, say

Exhibit 151       JA-0002487

that I understand some of the excesses that go on on the floor. But that was an excess this morning, even though I know my dear friend is sincere and dedicated and one of the better lawyers in this body. Having said that, I will end on that particular subject.

Let me once again take a few minutes to talk about the Medicare provisions in this Democratic Party health care bill.

Throughout the health care debate, we have heard the President pledge not to ''mess'' with Medicare. Unfortunately, that is not the case with the bill before the Senate. To be clear, the Reid bill reduces Medicare by $465 billion to fund a new government program. Unfortunately, seniors and the disabled in the United States are the ones who suffer the consequences as a result of these reductions. Everyone knows Medicare is extremely important to 43 million seniors and disabled Americans covered by the Medicare Program.

Throughout my Senate service, I have fought to preserve and protect Medicare for both beneficiaries and providers. Medicare is already in trouble today. The program faces tremendous challenges in the very near future. The Medicare trust fund will be insolvent by 2017, and the program has more than $37 trillion in unfunded liabilities. This is going to be saddled onto our children and grandchildren.

The Reid bill will make the situation much worse. Why is that the case? Again, the Reid bill cuts Medicare to fund the creation of a new government entitlement program. More specifically, the Reid bill will cut nearly $135 billion from hospitals—where are they going to get this money?—$120 billion from Medicare Advantage, almost $15 billion from nursing homes, more than $40 billion from home health care agencies, and close to $8 billion from hospice providers. These cuts will threaten beneficiary access to care as Medicare providers find it more and more challenging to provide health services to Medicare patients. Many doctors are not taking Medicare patients now because of low reimbursement rates.

Let me stress to my colleagues that cutting Medicare to pay for a new government entitlement program is irresponsible. Any reductions to Medicare should be used to preserve the program, not to create a new government bureaucracy.

As I just said, the President has consistently pledged: We are not going to mess with Medicare. Once again, this is another example of a straightforward pledge that has been broken over the last 11 months. Maybe you cannot blame the President because he is not sitting in this body. The body is breaking it.

This bill strips more than $120 billion out of the Medicare Advantage Program that currently covers 10.6 million seniors or almost one out of four seniors in the Medicare Program. According to the Congressional Budget Office,

under this bill the value of the so-called ''additional benefits,'' such as vision care and dental care, will decline from $135 to $42 by 2019. That is a reduction of more than 70 percent in benefits. You heard me right: 70 percent.

During the Finance Committee's consideration of health care reform, I offered an amendment to protect these benefits for our seniors, many of whom are low-income Americans and reside in rural States and rural areas. However, the majority party would not support this important amendment. The majority chose to skirt the President's pledge about no reduction in Medicare benefits for our seniors by characterizing the benefits being lost—vision care, dental care, and reduced hospital deductibles—as ''extra benefits.''

Let me make the point as clearly as I can. When we promise American seniors we will not reduce their benefits, let's be honest about that promise. So we are either going to protect benefits or not. It is that simple. Under this bill, if you are a senior who enjoys Medicare Advantage, the unfortunate answer is, no, they are not going to protect your benefits.

All day today, we had Members on the other side of the aisle claim that Medicare Advantage is not part of Medicare. This is absolutely—I have to tell you, it is absolutely unbelievable. I would invite every Member making this claim to turn to page 50 of the ''2010 Medicare and You Handbook.'' It says:

A Medicare Advantage is another health coverage choice you may have—

Get these words—

as part of Medicare.

Let me repeat that:

A Medicare Advantage is another health coverage choice you may have as part of Medicare.

Hey, that is the Medicare ''2010 Medicare and You Handbook.'' Who is kidding whom about it not being part of Medicare?

So the bottom line is simple: If you are cutting Medicare Advantage benefits, you are cutting Medicare.

I also heard the distinguished Senator from Connecticut this morning mention that the bureaucrat-controlled Medicare Commission will not cut benefits in Part A and Part B. Well, once again, my friends on the other side are only telling you half the story. So much for transparency. On page 1,005 of this bill, it states in plain English:

Include recommendations to reduce Medicare payments under C and D.

I am just waiting for Members on the other side of the aisle to come down and now claim that Part D is also not a part of Medicare. We all know it is.

It is also important to note that the Director of the nonpartisan Congressional Budget Office has told us in clear terms that this unfettered authority given to the Medicare Commission would result in higher premiums.

It is important details such as these that the majority does not want us to discuss and debate in full view of the American people. They call it slow-walking. They call it obstructionism. Making sure we take enough time to discuss a 2,074-page bill that will affect every American life and every American business is the sacred duty of every Senator in this Chamber. We will take as long as it takes to fully discuss this bill, and you can talk for a month about various parts of this bill that are outrageous and some that are really good, too, in all fairness—not many, however.

I have heard several Members from the other side of the aisle characterize the Medicare Advantage Program as a giveaway to the insurance industry. You know, when you cannot win an argument, you start blaming somebody else. So they want a government insurance company to take the place of the insurance industry. Well, maybe that is too much. They want it to compete with the insurance industry. But how do you compete with a government-sponsored entity? And there are comments that the so-called government plan will cost more than the current insurance businesses they are so criticizing. I am not happy with the insurance industry either, but, by gosh, let's be fair.

Let me give everyone watching at home a little history lesson on the creation of Medicare Advantage. I served as a member of the House-Senate conference committee which wrote the Medicare Modernization Act of 2003. The distinguished Senator from Montana would agree with me, it was months of hard, slogging work every day to try to come up with the Medicare Modernization Act of 2003. Among other things, this law created the Medicare Advantage Program. It gives people vision care, dental care, et cetera.

When conference committee members were negotiating the conference report back then, in 2003, several of us insisted that the Medicare Advantage Program was necessary in order to provide health care coverage choices to Medicare beneficiaries. At that time, there were many parts of the country where Medicare beneficiaries did not have adequate choices in coverage. In fact, the only choice offered to them was traditional fee-for-service Medicare, a one-size-fits-all, government-run health program.

By creating the Medicare Advantage Program, we were providing beneficiaries with choice in coverage and then empowering them to make their own health care decisions as opposed to the Federal Government making them for them. Today, every Medicare beneficiary may choose from several health plans.

We learned our lessons from Medicare+Choice, which was in effect at the time, and its predecessors. These plans collapsed, especially in rural areas, because Washington decided—

Exhibit 151                                    JA-0002488

again, government got involved—to set artificially low payment rates. In fact, in my home State of Utah, all of the Medicare+Choice plans eventually ceased operations because they were all operating in the red. You cannot continue to do that. It was really stupid what we were expecting them to do. I fear history could repeat itself if we are not careful.

During the Medicare Modernization Act conference, we fixed the problem. We increased reimbursement rates so all Medicare beneficiaries, regardless of where they lived—be it Fillmore, UT, or New York City—had choice in coverage. Again, we did not want beneficiaries stuck with a one-size-fits-all, Washington-run government plan.

There were both Democrats and Republicans on that committee, by the way, and the leader was, of course, the distinguished Senator from Montana. I admire him for the way he led it, and I admire him for trying to present what I think is the most untenable case here on the floor during this debate. He is a loyal Democrat. He is doing the best he can, and he deserves a lot of credit for sitting through all those meetings and all of that markup and everything else and sitting day-in and day-out on the floor here.

Today, Medicare Advantage works. Every Medicare beneficiary has access to a Medicare Advantage plan, if they so choose, and close to 90 percent of Medicare beneficiaries participating in the program are satisfied with their health coverage. But that can all change should this health care reform legislation currently being considered become law.

In States such as Utah, Idaho, Colorado, New Mexico—just to mention some Western States—Wyoming, Montana—you can name every State—rural America was not well served, and we did Medicare Advantage.

Choice in coverage has made a difference in the lives of more than 10 million Americans nationwide—almost 11 million Americans. The so-called ''extra benefits'' I mentioned earlier are being portrayed as gym memberships as opposed to lower premiums, copayments, and deductibles.

To be clear, the Silver Sneakers Program is one that has made a difference in the lives of many seniors because it encourages them to get out of their homes and remain active. It is prevention at its best. It has been helpful to those with serious weight issues, and it has been invaluable to women suffering from osteoporosis and joint problems. In fact, I have received several hundred letters telling me how much Medicare Advantage beneficiaries appreciate this program. They benefit from it. Their lives are better. They use health care less. They do not milk the system. They basically have a better chance of living and living in greater health.

Throughout these debates, throughout these markups, throughout these hearings that have led us to this point, every health care bill I know of has a

prevention and wellness section in the bill that will encourage things such as the Silver Sneakers Program that has benefited senior citizens so much and was not one of the major costs of Medicare Advantage.

Additionally, these beneficiaries receive other services such as coordinated chronic care management, which is important, coordinated chronic care management for seniors; dental coverage—really important for low-income seniors; vision care—can you imagine how important that is to people over 60 years of age? How about those who are over 70 or 80 years of age? And hearing aids—can you imagine how important that is to our senior citizens? This program helps these seniors, and it helps them the right way.

Let me read some letters from my constituents. These are real lives being affected by the cuts contemplated in the bill.

Remember, there is almost $500 billion cut by this bill from Medicare, which goes insolvent by 2017 and has an almost $38 trillion unfunded liability.

Let me read this letter from a constituent from Layton, UT:

I recently received my healthcare update for 2010. I am in a Med Advantage plan with Blue Cross/Blue Shield. Thanks to the cuts in this program by Medicare, my monthly premiums have risen by 49% and my office visit co-pay has increased 150%. Senator HATCH, I am on a fixed income and this has really presented a problem for me and many others I know on the same program. And, at my age I certainly can't find a job that would help cover the gap. I worked all my life to enjoy my retirement and thanks to the current economy I've lost a lot of those monies that were intended to help supplement my income.

This letter is from a constituent from Logan, UT, where the great Utah State University is:

Please stop the erosion of Medicare Advantage for seniors. Very many of us are already denied proper medical and dental care not to mention those who cannot afford needed medications. Hardest hit are ones on Social Security who are just over the limit for extra help but cannot keep up with the rising medical costs that go way beyond the so-called ''cost of living increases'' which we are not getting this year anyway. If those in government who make these decisions had to live as we do day to day, I think we would find better conditions for seniors. The difference in decision making changes when you are hungry and cold your own self.

Here is a constituent from Pleasant Grove, UT:

Please do not phase out the Medicare Advantage program, senior citizens need it. Our supplement insurance rates go up every year and our income does not keep pace with the cost of living.

Here is a constituent from Salt Lake City, UT:

We met with our insurance agent this morning about the increased costs of our Medicare Advantage plans due to the health care reform bill now before Congress.

Our premium costs have already been significantly increased with the coverage substantially decreased. We are in our 80s and cannot afford these increases and are hurt by the decreased coverage. We are writing to

you to have you stop the cuts and restore the coverage to Medicare Advantage plans. This is an issue that is very important and very real to us at this point in our lives. Please stop the cuts and restore coverage.

I can't support any bill that would jeopardize health care coverage for Medicare beneficiaries. I truly believe if this bill before the Senate becomes law, Medicare beneficiaries' health care coverage could be in serious trouble.

I have been in the Senate for over 30 years—33 to be exact. I pride myself on being bipartisan. I have coauthored many bipartisan health care bills since I first joined the Senate in 1977. Almost everyone in this Chamber wants a health care reform bill to be enacted this year. I don't know of anybody on either side who would not like to get a health care bill enacted.

On our side, we would like to do it in a bipartisan way, but this bill is certainly not bipartisan. It hasn't been from the beginning. We want it to be done right. History has shown that to be done right, it needs to be a bipartisan bill that passes the Senate with a minimum of 75 to 80 votes. We did it in 2003 when we considered the Medicare prescription drug legislation, and I believe we can do it again today if we have the will and if we get rid of the partisanship. I doubt there has ever been a bill of this magnitude affecting so many American lives that has passed this Chamber on an almost—or maybe in a complete—straight party-line vote. The Senate is not the House of Representatives. This body has a different constitutional mandate than the House. We are the deliberative body. We are the body that has in the past and should today be working through these difficult issues to find clear consensus. True bipartisanship is what is needed.

In the past, the Senate has approved many bipartisan health care bills that have eventually been signed into law. I know a lot of them have been mine, along with great colleagues on the other side who deserve the credit as well. The Balanced Budget Act in 1997 included the Hatch-Kennedy SCHIP program. How about the Ryan White Act. I stood right here on the Senate floor and called it the Ryan White bill. His mother was sitting in the audience at the time. How about the Orphan Drug Act. When I got here we found that there were only two or three orphan drugs being developed. These are drugs for population groups of less than 250,000 people. It is clear that the pharmaceutical companies could not afford to do the pharmaceutical work to come up with treatments or cures for orphan conditions. So we put some incentives in there; we put some tax benefits in there. We did some things that were unique. If I recall it correctly, it was about a $14 million bill.

Today we have over 300 orphan drugs, some of which have become blockbuster drugs along the line. They wouldn't have been developed if it

Exhibit 151 JA-0002489

hadn't been for that little, tiny orphan drug bill. That was a major bill when I was chairman of the Labor and Human Resources Committee. They now call it the Health, Education, Labor, and Pensions Committee.

How about the Americans With Disabilities Act. Tom Harkin stood there, I stood here, and we passed that bill through the Senate. It wasn't easy. There were people who thought it was too much Federal Government, too much this, too much that. But Senator HARKIN and I believed—as did a lot of Democrats and a lot of Republicans, as the final vote showed—that we should take care of persons with disabilities if they would meet certain qualifications.

How about the Hatch-Waxman Act. We passed that. Henry Waxman, a dear friend of mine, one of the most liberal people in all of the House of Representatives and who is currently the very powerful chairman of the Energy and Commerce Committee over there, we got together, put aside our differences, and we came up with Hatch-Waxman which basically almost everybody admits created the modern generic drug industry.

By the way, most people will admit that bill has saved at least $10 billion to consumers and more today, by the way, every year since 1984.

I could go on and on, but let me just say I have worked hard to try and bring our sides together so we can in a bipartisan way do what is right for the American people.

Let me just tell my colleagues, if the Senate passes this bill in its current form with a razor thin margin of 60 votes, this will become one more example of the arrogance of power being exerted since the Democrats secured a 60-vote majority in the Senate and took over the House and the White House. There are essentially no checks or balances found in Washington today, just an arrogance of power, with one party ramming through unpopular and devastating proposals such as this, one after another.

Well, let me say there is a better way to handle health care reform. For months I have been pushing for a fiscally responsible and step-by-step proposal that recognizes our current need for spending restraint while starting us on a path to sustainable health care reform. There are several areas of consensus that can form the basis for sustainable, fiscally responsible, and bipartisan reform.

These include:

Reforming the health insurance market for every American by making sure no American is denied coverage simply based on a preexisting condition. Some of my colleagues on the other side have tried to blast the insurance industry, saying they are an evil, powerful industry. We need to reform them, no question about it, and we can do it if we work together.

Protecting the coverage for almost 85 percent of Americans who already have coverage they like by making that cov-

erage more affordable. This means reducing costs by rewarding quality and coordinated care, giving families more information on the cost and choices of their coverage and treatment options, and—I said it earlier—discouraging frivolous lawsuits that have permeated our society and made the lives of a high percentage of our doctors, especially in those very difficult fields of medicine, painful and those fields not very popular to go into today. And, of course, we could promote prevention and wellness measures.

We could give States flexibility to design their own unique approaches to health care reform. Utah is not New York, Colorado is not New Jersey, New York is not Utah, and New Jersey is not Colorado. Each State has its own demographics and its own needs and its own problems. Why don't we get the people who know those States best to make health care work? I know the legislators closer to the people are going to be very responsive to the people in their respective States. I admit some States might not do very well, but most of them would do much better than what we will do here with some big albatross of a bill that really does not have bipartisan support.

Actually, in talking about New York, what works in New York will most likely not work in Colorado, let alone Utah. As we move forward on health care reform, it is important to recognize that every State has its own unique mix of demographics. Each State has developed its own institutions to address its challenges, and each has its own successes. We can have 50 State laboratories determining how to do health care in this country in accordance with their own demographics, and we could learn from the States that are successful. We could learn from the States that make mistakes. We could learn from the States that cross-breed ideas. We could make insurance so that it crosses State lines.

Can you imagine what that would do to costs? We could do it. But there is no desire to do that today with this partisan bill.

There is an enormous reservoir of expertise, experience, and field-tested reform. We should take advantage of that by placing States at the center of health care reform efforts so they can use approaches that best reflect their needs and their challenges.

My home State of Utah has taken important and aggressive steps toward sustainable health care reform. They already have an exchange. They are trying some very innovative things. By anybody's measure the State of Utah has a pretty good health care system. Is it perfect? No. But we could help it to be, with a fraction of the Federal dollars that this bill is going to cost. This bill over 10 years is at least $2.5 trillion, and I bet my bottom dollar it will be over $3 trillion. That is on top of $2.4 trillion we are already spending, half of which they claim may be not well spent. We know a large percentage of that is not well spent.

Like I say, my home State of Utah has taken important and aggressive steps toward sustainable health care reform. The current efforts to introduce the defined contribution health benefits system and implement the Utah health exchange are laudable accomplishments.

A vast majority of Americans—I believe this to be really true—agree a one-size-fits-all Washington government solution is not the right approach. That is why seniors and everybody else except a very few are up in arms about these bills. That is what this bill is bound to force on us: a one-size-fits-all, Washington-run, controlled government program. I am not just talking about the government option. That is a small part of the argument today. If we pass this bill, we will have Washington governing all of our lives with regard to health care. I can't think of a worse thing to do when I look at the mess they have made with some very good programs.

Unfortunately, the path we are taking in Washington right now is to simply spend another $2.5 trillion of taxpayer money to further expand the role of the Federal Government. I just wish the majority would take a step back, keep their arrogance of power in check, and truly work on a real bipartisan bill that all of us can be proud of. They have the media with them selling this bill as less than $1 trillion. Give me a break. Between now and 2014, yes, they will charge everybody the taxes they can get and the costs they can get, but the bill isn't implemented until 2014, and even some aspects not until 2015. That is the only way, with that budgetary gimmick, they could get the costs to allegedly be down below $900 billion. But even the CBO—certainly the Senate Budget Committee—acknowledges that if you extrapolate—I think my colleagues on the other side acknowledge that if you extrapolate it out over a full 10 years, you have at least $2.5 trillion and in some circumstances as much as $3 trillion.

How can we justify that? With the problems we have today, a $12 trillion national debt, going up to $17 trillion if we do things like this? How can we justify it? How can we stick our kids and our grandkids and our great grandkids—my wife and I have all three, by the way, kids, grandkids, and great-grandkids. How can we stick them with the cost of this bill? This is just one bill. I hate to tell you some of the other things that are being put forth in not only this body but the other. How come we do it on bills that are totally partisan bills?

If we look at what has happened, the HELP Committee, the Health, Education, Labor and Pensions Committee, came up with a totally partisan bill. Not one Republican was asked to contribute to it. They just came up with what they wanted to do. It was led by one staff on Capitol Hill. It is a very partisan bill. Then the House came up with their bill. Not one Republican, to

Exhibit 151    JA-0002490

my knowledge, had even been asked to help, and it is a tremendously partisan bill—both of which are tremendously costly too.

Then the distinguished Senator from Montana tried to come up with a bill that would be bipartisan in the Finance Committee, but in the end, even with the Gang of 6—and I was in the original Gang of 7, but I couldn't stay because I knew what the bottom bill was going to be, and I knew I couldn't—I couldn't support it. So I voluntarily left, not because I wanted to cause any problems but because I didn't want to cause any problems. I found myself coming out of those meetings and decrying some of the ideas that were being pushed in those meetings. I just thought it was the honorable thing to do to absent myself from the Gang of 7. It became a Gang of 6 and then the three Republicans finally concluded that they couldn't support it either.

But I will give the distinguished chairman from Montana a great deal of credit because he sat through all of that. He worked through all of it. He worked through it in the committee, but then it became a partisan exercise in committee by and large.

Yes, there were a couple of amendments accepted: My gosh, look at that. Then what happened? They went to the majority leader's office in the Senate, and they brought the HELP bill and the bill from the Finance Committee, and they molded this bill, this 2,074-page bill with the help of the White House. Not one Republican I know of had anything to do with it, although I know my dear friend, the distinguished majority leader, did from time to time talk with at least one Republican, but only on, as far as I could see, one or two very important issues in the bill. There are literally thousands of important issues in this bill, not just one or two. There are some that are more important than others, but they are all important.

I am not willing to saddle the American people with this costly, overly expensive, bureaucratic nightmare this bill will be. I hope my colleagues on the other side will listen, and I hope we can start over on a step-by-step approach that takes in the needs of the respective States that is not a one-size-fits-all solution, that both Republicans and Democrats can work on, which will literally follow the principles of federalism and get this done in a way that all of us can be proud of.

I don't have any illusions and, thus far, it doesn't look like that will happen. But it should happen. That is the way it should be done. I warn my friends on the other side, if they succeed in passing this bill without bipartisan support—if they get one or two Republicans, I don't consider that bipartisan support. You should at least get 75 to 80 votes on a bill this large, which is one-sixth of the American economy, 17 percent of the American economy. You should have to get 75 to 80 votes minimally. It would even be better if you can get more, as we did with CHIP and other bills. On some we have gotten unanimous votes—on bills that cost money, by the way. Republicans have voted for them, too. Republicans will vote for a good bill even if it costs some money. We are not about to vote for something costing $2.5 trillion to $3 trillion. I don't think the American people are going to stand for it.

Beware, my friends, of what you are doing. I can tell you right now this isn't going to work. I want to make that point as clear as I can.

With that, I yield the floor.

The PRESIDING OFFICER (Mr. BENNET). The Senator from Illinois is recognized.

Mr. BURRIS. Mr. President, as a life-long public servant, I have always believed in the fundamental greatness of this country. I am sure this is a belief shared by every single one of my colleagues in this body. It is what drove us to serve in the first place, just as it has driven generations of Americans to serve in many capacities throughout our history. Democrat or Republican, liberal or conservative, we are united by our underlying faith in the democratic process and our respect for the people we have come here to represent. That is what makes this country great, the belief that together we can make progress. Together, we can shape our own destiny. That is why we gather here in this august Chamber, to bring the voices of the American people to Washington, to the very center of our democracy.

Earl Warren, the late Chief Justice of the Supreme Court, articulated this very well:

Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests.

He said this in reference to a court case about elected representatives at the State level, but his insight rings especially true here in the highest lawmaking body in the land.

I ask my colleagues to reflect upon this simple truth for a moment. We address one another as "the Senator from Illinois" or "the Senator from Texas" or "the Senator from Colorado" or "the Senator from Utah," but we do not speak for towns, or companies, or lines on a map. Our solemn duty is to listen to the people we represent and give voice to their concerns and interests here in Washington. We strive to do this every day, but far too often partisan politics get in the way.

When it comes to difficult issues such as health care reform, the voices of the people sometimes get lost in all of the talk about Republicans versus Democrats, red States versus blue States. The media gets caught up in the horse race and, more often than we would wish, the atmosphere of partisanship follows us into this Chamber.

As our health care reform bill has cleared the first hurdle and moved to the Senate floor, I urge my colleagues to listen to the people—not just to the party leadership—as they decide how to vote. If they shut out the health care insurance lobbyists, the special interests, and the partisan tug of war, they might be surprised at what they will hear from the American people.

In my home State of Illinois, the weight of consensus is hard to ignore. Folks stop me on the streets, stop me in hallways outside of my office, talk to me on airplanes; they call, write, and e-mail. They contact me every way possible. The message is always the same: We need real health care reform. They are telling me don't give up and don't back down. That is because the American people overwhelmingly support reform. They need health care reform now—not tomorrow or next year, they need it now.

I urge my colleagues to think of the uninsured people in their own States. Think about that. Who are the ones who are uninsured? These are the folks who need reform the most. We have all heard at least a few of the heartbreaking stories. Sadly, we will never be able to hear them all because there are too many. So it is time for us to listen and to take a stand on their behalf. It is time to bring comprehensive health care reform to every State in the Union, because in my home State of Illinois, 15 percent of the population is uninsured. In the most advanced country on Earth, this is simply unacceptable. We need to dramatically expand access to quality, affordable health care. But it is not just a blue States issue, it is an American issue. This is a problem that touches all of us. In fact, as we look across the map, we see that many of our States that need the most help are actually the red States.

Eighteen percent of the people in Tennessee and Utah don't have health insurance and cannot get the quality care they need. The number of uninsured stands at 20 percent in Alaska, and it is nearly 21 percent in Georgia, Florida, and Wyoming. In Oklahoma, Nevada, and Louisiana, more than 22 percent of the total population is uninsured, and 24 percent without health insurance in Mississippi. More than a quarter of the population in New Mexico can't get health insurance. In the great State of Texas, almost 27 percent of the population has no health coverage. These numbers speak for themselves. We need to expand coverage to include more of these people.

A recent study conducted by Harvard University shows that the uninsured are almost twice as likely to die in the hospital as similar patients who do have insurance. This human cost is unacceptable, and the financial cost is too much to bear.

While my friends on the other side seek to delay and derail health care reform at this crucial juncture, this bill seeks to save the health of our citizens, to save the lives of Americans, and to save money in the way coverage is offered and delivered. By extending coverage to these individuals and increasing access to preventive care, we can

Exhibit 151 JA-0002491

catch illnesses before they become serious.

That is why I am proud to support provisions such as the amendment offered by my colleague from the great State of Maryland, Senator MIKULSKI. This measure would guarantee women access to preventive care and health screenings at no cost. If more women could get regular screenings and tests, such as mammograms, we can catch illnesses such as breast cancer, heart disease, and diabetes. We can keep more people out of the emergency rooms, we can save lives, and we can save money.

The best way to expand access is to create a strong public option that will lower costs, increase competition, and restore accountability to the insurance industry.

I am fighting for every single Illinoisan to make sure they have access to quality, affordable health care, and to make sure they have real choices. I am fighting for every Illinoisan, because every one of us will benefit from comprehensive reform. But I recognize that those who are uninsured need help the most, and they need it now.

I ask my colleagues to consider this need and to think about how many of their constituents stand to benefit from our reform package.

It is no secret that my Republican friends seek to block and delay this legislation. Many of them represent the so-called red States, where opposing health care reform is seen as a good political move. In the cynical course of politics as usual, most of those red States will be written off because they typically support the Republican Party. But not this time. Health reform isn't about politics. It is not about one party or the other. It is about the lives that are at stake here that we are trying to help. It is about the people who suffer every day under a health care system that fails to live up to the promises of this great Nation.

When it comes to our health care legislation, a vote against reform is a vote against the people who so desperately need our help. That is why I am asking my Republican friends to rise above politics as usual when they make this choice.

Recently, some of my colleagues across the aisle have said our bill would slash Medicare. This is simply not the case. There is no cut in Medicare—no $465 billion cut. Our bill would do nothing of the kind. This is another cynical attempt to scare seniors into opposing health care reform. We have had enough of that.

The truth is this: According to the nonpartisan Congressional Budget Office, health care reform will lower seniors' Medicare premiums by $30 billion over the next 10 years by focusing on prevention and wellness, increasing efficiency and making the program more cost effective.

Our Republican friends can choose to engage in partisan games and spread fear and disinformation about health care reform, they can turn their backs on the people they swore to represent, or they can cast aside the tired constraints of partisanship and stand up for what is right. When they go home to the people who sent them to Washington, they can look those people in the eye and say: I fought for you. I stood up to the special interests, the campaign donors, and the political forces that tried to block reform. I didn't vote like a Senator who represents a red State or a blue State; I voted like a Senator who represented your State and all the good, hardworking people who desperately need this help.

That is the spirit that drove each of us to enter public service in the first place. That is what makes this country great, the belief that policy is decided by the interests of the people, not big corporations or political parties.

This country is more than just a set of lines on a map, and the more you cross those lines, the more you learn that ordinary Americans don't care who scores political points or who gets reelected. They care about results. They care about real costs and real health outcomes.

It is time for us to deliver. It is time to stand for the uninsured, the sick, the poor, and all those who cannot stand for themselves. I say to my colleagues, it is time to come together on the side of the American people and make health care reform a reality. This health care legislation that is being debated on this floor will save lives, it will save money, and it will save Medicare.

I yield the floor.

The PRESIDING OFFICER. The Senator from Nevada.

Mr. ENSIGN. Mr. President, I ask unanimous consent that I and my two colleagues be able to engage in a colloquy.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. ENSIGN. Mr. President, I would like to start by talking about the bill in general.

Mr. DURBIN. Mr. President, will the Senator from Nevada yield for a question before he starts?

Mr. ENSIGN. Yes.

Mr. DURBIN. Can the Senator give us an indication of how long he expects the colloquy to last?

Mr. ENSIGN. Maybe 40 minutes, somewhere in there.

Mr. DURBIN. I thank the Senator.

Mr. ENSIGN. Mr. President, there is a lot of talk about this bill. I wish to make some general comments about it. First, following the comments of my colleague from Illinois, he said there are not $½ trillion in Medicare cuts. According to the Congressional Budget Office, there are $464 billion to $465 billion in Medicare cuts. So maybe not quite $½ trillion, but we are certainly getting close.

There are, however, $½ trillion in new taxes in this bill, 84 percent of which will be paid by those making less than $200,000 a year, a direct violation of the campaign pledge made by President Barack Obama, then-Candidate Obama.

This bill will result in increased premiums and health care costs for millions of Americans. This is a massive government takeover of our health care system. As a matter of fact, according to the National Center for Policy Analysis, in this 2,074 page bill—there are almost 1,700, 1,697 to be exact—references to the Secretary of Health and Human Services, giving her the authority to create, determine, or define things relating to health care policy in this bill. Basically, we are placing a bureaucrat in charge of health care policy instead of the patient and the doctor making the choices in health care.

I believe we cannot just be against this bill. What I do believe in is a step-by-step approach, an incremental approach, some good ideas on which we should be able to come together.

I think both sides agree we should eliminate preexisting conditions. Somebody who played by the rules, had insurance, happened to get a disease, they should not be penalized, charged outrageous prices, or have their insurance dropped. I think we can all agree on that.

We should be able to agree that if you can buy auto insurance across State lines, you should be able to buy health insurance in the State where it is the cheapest. Individuals should be able to find a State that has a policy that fits them and their family and be able to buy it there. If you can save money and you happen to be uninsured, especially today, it seems to make sense. Let's have that as one of our incremental steps.

I also believe this bill covers some of it, but I believe we need to incentivize people to engage in healthier behaviors. Seventy-five percent of all health care costs are caused by people's behaviors. Let me repeat that. Three-quarters of all health care costs are driven by people's poor choices in their behavior.

For instance, smoking. On average, it is around $1,400 a year to insure a smoker versus a nonsmoker. For somebody who is obese versus somebody with the proper body weight, it is about the same, $1,400 a year. For somebody who does not control their cholesterol versus somebody on regulating medication, it is several hundred dollars a year. For somebody who does not control their blood pressure versus somebody who does—let's give incentives through lower premiums to encourage people to engage in healthier behaviors. That will save money for the entire health care system and our Country will have healthier people with better quality lives.

Currently, big businesses, because of their number of employees, are allowed to take advantage of purchasing power. We ought to allow individuals and small businesses to join together in

Exhibit 151                                                    JA-0002492

groups to take advantage of that purchasing power. They are called small business health plans.

I believe my colleagues are going to talk about an idea they have, something I talked about for years, the idea of medical liability reform. There are several models out there. They are going to talk about a loser pays model, which other countries have engaged in and they do not have nearly the frivolous lawsuits nor the defensive medicine we practice in this country.

How many doctors order unnecessary tests in the United States because of fear of frivolous lawsuits? Talk to any doctor, and they will tell you every one of them orders unnecessary tests simply to protect themselves against the possibility that a jury may say: Gee, why didn't you order this test even though it was not indicated at the time?

That accounts for a large amount of medical costs. As a matter of fact, the Congressional Budget Office said $100 billion between the private and public sector would be saved with a good medical liability reform bill.

I believe we need a patient-centered health care system, not an insurance company-centered health care system, not what this bill does, a government-centered health care system, where bureaucrats are in control of your health care. We need a patient-centered system.

Before us we have the Mikulski amendment. This is more of government-centered health care. There is a report out based on prevention that indicates that mammograms should not be paid for, basically, for women under 50 years of age, from 40 to 50 years of age, and women in the Medicare population age, the report indicates that they do not need annual mammograms. This was based mainly on cost. If you look at it from a cost standpoint, that is probably correct.

But think about it. If you are a woman and you get cancer and you could have had a mammogram diagnose it a lot earlier, you sure would rather have had that mammogram rather than have that mammogram denied.

The Senator from Maryland has proposed an amendment to try to fix the problem. The problem is, instead of one government entity determining whether somebody is going to get coverage, the amendment turns it over to the Secretary of Health and Human Services. Another government bureaucrat will determine whether something such as a mammogram will be paid for. According to the Associated Press, her amendment does not even mention mammograms.

Senator MURKOWSKI and Senator COBURN have come up with an alternative that actually puts the decision of whether to cover preventive services in the hands of experts in the field. Whether it be a mammogram for breast cancer, or an MRI, which most people think is going to be better than a

mammogram for diagnosing breast cancer, or whether it is a test for prostate cancer for men. Those kinds of things should be determined by experts in the field, not by government bureaucrats.

The various colleges—the American College of Obstetrics and Gynecology, for instance, has come out with certain recommendations, along with the American College of Surgeons. Those are the experts with peer-reviewed science. Those are the individuals who should determine what the recommendations are as to whether we pay for preventive services, not government bureaucrats.

Unfortunately, the Mikulski amendment just gives that determination to a government bureaucrat. That is why we should reject the Mikulski amendment, and adopt the amendment offered by the Senator from Alaska, the Murkowski amendment puts the decision making in the hands of the of the experts, where that decision should be made.

Let me close with this point. We have seen a lot of comparisons where are people saying that other countries have a better health care system than the United States. Let me give you the example of cancer survival rates.

This chart compares the average cancer survival rates in the European Union and the United States, it makes the point as to whether a government bureaucrat is making a health decision or the doctor and the patient are making the health treatment decision.

For kidney cancer, the European Union has a 56 percent 5 year survival rate; the United States, 63 percent survival rate after 5 years. On colorectal cancer, about the same difference between the United States and the European Union. Look at breast cancer, 79 percent after 5 years in the European Union; 90 percent in the United States. The most dramatic difference is on prostate cancer, 78 percent survival after 5 years in the European Union; 99 percent survival rate in the United States.

These are dramatic differences. Where would you rather get your health care if you had one of these cancers? The United States or Europe?

Canada, has even worse results than this. As a matter of fact, Belinda Stronach, a member of the Canadian Parliament, led the charge against a private system side by side with the government-run system in Canada. She did not want the private system.

Tragically, a couple years later, she developed breast cancer. Did she stay in Canada to get treatment, where there is a government-run health care system? No. Where did she go? She came to the United States. She was actually treated at UCLA. Why, because we have a superior system of quality in the United States.

We have a problem with cost. Some of the incremental steps I talked about will address costs.

I wish to turn it over now to my colleagues who are going to talk about

medical liability reform. Let's look out for the patient instead of the trial lawyers in the United States. Their idea on a loser pays system, I think, has a lot of merit, and it is something this body should consider very seriously.

I yield the floor to the Senator from Georgia, my good friend and colleague.

Mr. CHAMBLISS. Mr. President, I thank the Senator from Nevada for yielding. Senator GRAHAM and I do have an amendment we have filed today with respect to reforming the health care system in a real, meaningful way. It is an amendment that deals with tort reform, and it is a true loser pays system. We are going to talk about that in a few minutes.

Before I get to that, I wish to go back to some of the points the Senator from Nevada has talked about. I particularly appreciate his work on the mammogram issue, especially since this has been highlighted over the last couple weeks with respect to the recommendation that has come out of the independent board that advises HHS. I thank him for his work on that issue.

He is dead on. All of us know our wives are told every year, when they reach a certain age, they need to have a mammogram to make sure. Just like we do every year, go in and get a physical, they need to get their mammogram. The Senator talks about those kinds of checkups providing you with the kind of preventive health care that is going to hold down health care costs. I am a beneficiary of that. During a routine medical examination in 2004, it was determined I had prostate cancer. I was very fortunate it was picked up when it was, at an early stage. Instead of having to go through a lot of expensive procedures I might have had to go through, we were fortunate to be able to treat it. We are working on getting cured.

Senator ENSIGN is exactly right, this is the kind of test we need to make sure we encourage females to get and not put barriers in front of them.

Medicare is such a valuable insurance policy and program that 40 million Americans today take advantage of it. Mr. President, 1.2 million Georgians are Medicare beneficiaries. Again, I am one of those who is a Medicare beneficiary. So this is particularly important to me.

More importantly, in addition to these 40 million Medicare beneficiaries who are in the country today, there are another 80 million baby boomers who are headed toward Medicare coverage.

We have an independent Medicare Commission that was established by Congress years ago that is required to come to Congress every year and give Congress an update on the financial solvency of the Medicare Program. The purpose of that bipartisan Commission is to allow this body, along with our colleagues over in the House, the benefit of the work they do every year in looking at the amount of revenues that come in, in the form of the Medicare tax, and the outlays that go out, in the

Exhibit 151       JA-0002493

form of payments to medical suppliers for our Medicare beneficiaries.

In the spring of this year, 2009, the independent Medicare Trustees Report reported back to Congress and said that unless real, meaningful reforms are made in the Medicare system, Medicare is going to start paying out more in benefits than it takes in in tax revenues in the year 2017.

Mr. President, what that means is that in 2017, Medicare is going to be insolvent, and it is just a matter of time before Medicare goes totally broke. And those individuals who are baby boomers, who have been paying into this program for 40 years, 50 years, or whatever it may be, are all of a sudden going to reach the Medicare age, where they expect to reap the benefits of the Medicare taxes they have been paying for all these years, and guess what. Not only are benefits going to be reduced, but unless something happens, unless there is meaningful reform and it is done in the right way, there is not going to be a Medicare Program.

I want to go back to something the junior Senator from Illinois said a few minutes ago. In talking about this issue of cuts in Medicare, he said this bill we have up for debate now that was filed by Senator REID does not have cuts in Medicare. He could not be more incorrect. And that is not a Republican statement. It is not a statement by anybody other than the Congressional Budget Office. I refer to a letter that has already been introduced during the course of this debate—a letter dated November 18—to the Honorable HARRY REID, the majority leader. I would refer the Senator to page 10 of that letter in which the Director of the Congressional Budget Office says this in reference to provisions affecting Medicare, Medicaid, and other programs:

Other components of the legislation would alter spending under Medicare, Medicaid and other Federal programs. In total, CBO estimates that enacting these provisions would reduce direct spending by $491 billion over the 2010–2019 period.

Then the letter goes on, on this page alone, to delineate three areas where Medicare provisions are going to be reduced or cut, and I would specifically refer to them, but first is a fee-for-service sector, and this is other than physician services. It is going to be reduced by $192 billion over 10 years. The Medicare Advantage Program—a program that literally thousands of Georgians take advantage of today and millions of Americans take advantage of—is going to be reduced by $118 billion over 10 years, over the period 2010 to 2019. Medicaid and Medicare payments to hospitals—what we call disproportionate share payments, DSH payments—are going to be reduced or cut by $43 billion over 10 years.

What does a reduction in these benefits mean to each individual community or each individual State? I can tell you what it means to the local hospital in the rural area of Georgia where I live. The reduction in DSH payments is going to amount to a reduction in income at Colquitt Regional Medical Center in Moultrie, GA, by $16.8 million over a 10-year period. These cuts in Medicare are going to result in a reduction in payments to Emory Hospital in Atlanta in the amount of $367 million over a 10-year period.

So anybody who says these aren't cuts in Medicare spending simply has not read the bill and certainly has not read the letter from the Director of the Congressional Budget Office to Senator REID dated November 18, 2009.

I want to turn this over to my colleague from South Carolina after this final statement with reference to reductions in Medicare spending.

There is a specific reduction of $8 billion in this bill over a 10-year period in hospice benefits.

Again, we have heard a number of personal stories around here, and I have a particular personal story myself. My father-in-law died when he was 99 years old. It was 3 years ago. The last 2 years of his life, he lived in an assisted-living home and he had hospice come in 2 or 3 or 4 days a week, for whatever he needed. Had he not had the benefit of hospice, he would have had to go in a hospital, and no telling how much in the way of Medicare medical expenses he would have incurred. But thank goodness we had hospice available, and he spent 2 days in the hospital. Otherwise, he was able to live in his assisted-living home, have my wife go by and spend quality time with him, which she will tell you today were the best 2 to 3 years of her life as far as her relationship with her father was concerned, because she had hospice there to take care of him. Yet here we are talking about reducing a benefit by $8 billion that saved no telling how many thousands of dollars in the case of my family, and you can multiply that across America, and it is pretty easy to see we don't need to be reducing a benefit that is going to save us money in the long run.

I would like to turn it over to my friend from South Carolina, who also has some comments regarding Medicare, and then we will talk about our loser pays bill.

Mr. GRAHAM. I thank my friend from Georgia, and I will try to be brief.

I guess to say that we need to do health care reform is pretty obvious to a lot of people. The inflationary increases in the private sector, to businesses, particularly in the health care area, are unsustainable. A lot of individuals are having to pay for their own health care costs and are getting double-digit increases in premiums. In the public sector, the Medicare and Medicaid Programs are unsustainable. Medicare alone is $38 trillion underfunded.

Over the next 75 years, we have promised benefits to the baby-boom generation and current retirees, and we are $38 trillion short of being able to honor those benefits.

What has happened? We have created a government program that everyone likes, respects, and is trying to save, and actuarially it is not going to make it unless we reform it. So what have we done? In the name of health care reform, we have taken a program many senior citizens rely upon—all senior citizens, practically—and we have reduced the amount of money we are going to spend on that program and then taken the money from Medicare to create another program the government will eventually run. It makes no sense.

We need to look at saving Medicare from impending bankruptcy. Why would we reduce Medicare by $464 billion and take the money out of Medicare, which is already financially in trouble, to create a new program? It makes no sense to me. That is not what we should be trying to do, from my point of view, to reform health care.

The Medicare cuts Senator CHAMBLISS was talking about, they are real. The way our Democratic colleagues and friends try to get to revenue neutrality on the additional spending, to get it down to where it doesn't score in a deficit format, is they take $464 billion out of Medicare to offset the spending that is required by their bill.

Here is the question for the country: How many people in America really believe this Congress or any other Congress is actually going to reduce Medicare spending by $464 billion over 10 years? I would argue that if you believe that, you should not be driving. There is absolutely no history to justify that conclusion.

In the 111th Congress, there were 200 bills proposed—and I was probably on some of them—to increase the amount of payments to Medicare. In 1997, we passed a balanced budget agreement when President Clinton was President slowing down the growth rate of Medicare. That worked fine for a while, until doctors started complaining, along with hospitals, about the revenue reductions. Every year since about 1999, 2000, we have been forgiving the reductions that were due under the balanced budget agreement because none of us want to go back to our doctors and say we are going to honor those cuts that were created in 1997 because it is creating a burden on our doctors. Will that happen in the future? You better believe it will happen in the future. In 2007, Senators CORNYN and GREGG introduced an amendment to reduce Medicare spending by $33.8 billion under the reconciliation instructions. It got 23 votes. I remember not long ago the Republican majority proposed reducing Medicare by $10 billion. Not one Member of the Democratic Senate voted for that reduction. They had to fly the Vice President back from Pakistan to break a tie over $10 billion.

So my argument to the American people is quite simple: We are not going to reduce Medicare by $464 billion, and if we don't do that, the bill is not paid for, and that creates a problem of monumental proportions. If we

Exhibit 151    JA-0002494

do reduce Medicare by $464 billion and take the money out of Medicare to create another government program, we will do a very dishonest thing to seniors. We are damned if we do and damned if we don't. And during the whole campaign, I don't remember anybody suggesting that we needed to cut Medicare to create health care reform for non-Medicare services, but that is exactly what we are doing.

To my Democratic colleagues: There will come a day when Republicans and Democrats are going to have to sit down and seriously deal with the underfunding of Medicare and with the impending bankruptcy of Medicare. Everything we are doing in this bill may make sense to save Medicare from bankruptcy, but it doesn't make sense to pay for another government-run health care program outside of Medicare. It makes no sense to take the savings we are trying to find in Medicare and not use them to save Medicare from what I think is going to be a budget disaster.

So let it be said that this attempt to pay for health care, to make it revenue neutral, will require the Congress to do something with Medicare that it has never done before and is not going to do in the future. So the whole concept is going to fall like a house of cards.

The way we have tried to pay for this bill has so many gimmicks in it, it would make an Enron accountant blush.

Now, as to tort reform, quite frankly, I used to practice law and did mostly plaintiffs' work. I am not a big fan of Washington taking over State legal systems. I prefer to let States do what they are best at doing and let the Federal Government do a few things well—and we are doing a lot of things poorly. But if we are going to take over the entire health care system, if that is going to be the option available to us, then we also need to nationalize the way we deal with lawsuits.

And to the AMA: There will come a day, if we keep going down the road here, where the Federal Government will determine how you get to be a doctor. There will be no State medical societies, and we will have a national system to police doctors. That is what is coming if we continue to nationalize health care.

So, with Senator CHAMBLISS, I have tried to come up with a more reasoned approach when it comes to legal reform. I have always believed people deserve their day in court. There is no better way to resolve a dispute than to have a jury do it. I would rather have a jury of independent-minded citizens decide a case than a bunch of politicians or any special interest group. So the jury trial, to me, is a sacrosanct concept that has served this country well.

But one thing I have always been perplexed about in America is that the risk of suing somebody is very one-sided. Most developed nations have a loser pays rule. I think you should

have your day in court, but there ought to be a downside to bringing another person into the legal system. So I think a loser pays rule will do more to modify behavior than any attempt to cap damages. Let both wallets be on the table. You can have your day in court, but if you lose, you are going to have to pay some of the other side's legal cost, which will make you think twice.

As to the indigent person, most people who sue each other are not indigent. The judge would have the ability to modify the consequences of a loser pays rule, but we need to know going in that both wallets are on the table. Under our proposal, we have mandatory arbitration where the doctor and the patient will submit the case to an arbitration panel. If either side turns down the recommendation of the panel, they can go to court. But then the loser pay rule kicks in.

I think that will do more to weed out frivolous lawsuits than arbitrarily capping what the case may be worth in the eyes of a jury. I think it really does create a financial incentive not to bring frivolous lawsuits that does not exist today.

If there is a $500,000 damage cap, most of the people I know would say: I will take the $500,000. That is not much of a deterrent. But if we told someone they can bring this suit if the arbitration didn't go their way, but if they go into court after arbitration they risk some of their financial assets, people will think twice. I think that is why this is a good idea. The National Chamber of Commerce has endorsed it, and I am proud of the fact that they have endorsed it.

I would rather not go down this road, but if we are going to nationalize health care we also need to do something about the legal system that is going to be affected by the nationalization of health care.

A final comment I would like to make about what we are doing is that it is probably worrisome to people at home that we are about to change one-sixth of the economy and cannot find one Republican vote to help. I guess there are two ways to look at that: It is the problem of the Republican Party or maybe the bill is structured in a way that is so extreme there is no middle to it. I would argue that what we have done is abandon the middle for the extreme. It is pretty extreme, in my view, to take a program that is $38 trillion underfunded, cut it, and take the money to create a new program rather than saving the one that is in trouble. It is pretty extreme, in my view, to take a country that is so far in debt you cannot see the future and add $2.5 trillion of more debt onto a nation that is already debt laden in the name of reforming health care.

When you look at the second 10-year window of this bill, it adds $2.5 trillion to the national debt. Is that necessary to reform health care? Do we need any more money spent on health care or

should we just take what we spend and spend it more wisely? The first 10 years is a complete gimmick. What we do in the first 10 years of this bill is collect the $½ trillion in taxes for the 10-year period, and we don't pay any benefits until the first 4 years are gone. That is not fair. That is a gimmick. That catches up with you in the second 10-year period.

So the reason we do not have any bipartisan support is because we have come up with a concept that has no middle to it. This is a power grab by the Federal Government. This is a chance to set in motion a single-payer health care plan that the most liberal Members of the House and the Senate have been dreaming of. This is a liberal bill written by and for liberals, and it is not going to get any moderate support on the Republican side—and there is some over here to be had—and they are going to have a hard time convincing those red State Democrats that this is good public policy. That is where we find ourselves, trying to change one-sixth of the economy in a way that you don't have any hope of bringing people together.

I would argue we should stop and start over.

I thank my good friend from Georgia for trying to find a way to change lawsuit abuse in a more reasoned fashion.

Mr. CHAMBLISS. I thank my colleague from South Carolina, Senator GRAHAM, for his thoughtful process that we went through in thinking through the loser pays bill and the amendment we have filed. Just like you, having practiced law for 26 years before I was elected to the House, the same year you were, and then we were elected over here, I tried plaintiffs cases as well as defendants cases. I never represented a plaintiff in a malpractice case. I was always on the other side.

I have great sympathy for individuals who are wronged by a physician who is negligent. You and I agree that anybody who is the victim of negligent action ought to have their day in court. That is what we provide for under our bill. There is absolutely no question about the fact that anybody who is subject to negligent acts on the part of a physician, they can have their day in court, and they should have their day in court if that is what they decide they want to do.

But under a loser pays provision like we have designed, we can eliminate, hopefully, the frivolous lawsuits that add significantly to the cost of health care delivery in this country. In 2003, direct tort litigation costs in America accounted for 2.2 percent of our GDP. That is double the percentage of Canada, Great Britain, Germany, France, and Australia—all of which have loser pays systems.

The State of Alaska has had a loser pays system since 1884 and tort claims in the State of Alaska constitute a smaller percentage of total litigation than the national average.

Exhibit 151    JA-0002495

Florida, which applied a loser pays rule to medical malpractice suits from 1981 to 1985, saw 54 percent of their plaintiffs drop their suits voluntarily.

It does make a difference on frivolous suits. In the State of Florida during that same period of time, the jury awards for plaintiffs rose significantly. Just as in our situation, anybody who had a legitimate case in Florida during that period of time had the right to have their case adjudicated by a jury. Those who made the decision to do so received more significant awards. That is the way the system ought to work.

This is a win-win situation for the cost of health care delivery. It is a benefit to the physicians—sure, because they eliminate part of their significant cost of delivering health care services. But it also is a huge benefit to those individuals in America who are subject to negligent acts on the part of physicians.

I ask unanimous consent that a letter to Senator GRAHAM and myself from Bruce Josten at the U.S. Chamber of Commerce, dated November 3, 2009, be printed in the RECORD, and I yield the floor.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

NOVEMBER 3, 2009.

Hon. LINDSEY GRAHAM,
*U.S. Senate,*
*Washington, DC.*
Hon. SAXBY CHAMBLISS,
*U.S. Senate,*
*Washington, DC.*

DEAR SENATORS GRAHAM AND CHAMBLISS: The U.S. Chamber of Commerce, the world's largest business federation representing more than three million businesses and organizations of every size, sector, and region, thanks you for introducing S. 2662, the "Fair Resolution of Medical Liability Disputes Act of 2009."

This legislation represents a positive and significant step toward providing a more reliable justice system for the victims of medical malpractice. Your bill encourages the states to establish alternative methods for resolving medical liability claims and provides them with the latitude to develop unique approaches that fit the needs of their diverse populations. The Chamber commends you for making this important and thoughtful effort to bring needed reforms to America's medical liability systems.

The issue of medical liability reform is central to any serious effort to overhaul America's healthcare system. The Congressional Budget Office recently determined that medical liability reform would reduce total national healthcare spending by $11 billion in 2009 and reduce the federal budget deficit by $54 billion over 10 years. The Chamber believes these estimates of healthcare savings may be too conservative. Yet nonetheless, the $54 billion in deficit reduction is significant, representing over 10 percent of the net cost of the insurance coverage provisions agreed to in the Finance Committee's "America's Healthy Future Act of 2009." We are confident that you will be a forceful and effective advocate for medical liability improvements that will expand access to justice for injured patients and lower the cost of healthcare.

There is bipartisan agreement that for healthcare reform to be successful, it must "bend the growth curve," making healthcare

delivery more efficient and slowing healthcare inflation. Medical liability reform should play a critical role in such effort. The Chamber appreciates your work on this legislation and looks forward to working with you and the Senate in the coming weeks and months to refine your legislation and advance commonsense changes to our system of resolving medical liability claims.

Sincerely,

R. BRUCE JOSTEN.

The PRESIDING OFFICER. The Senator from Illinois is recognized.

Mr. DURBIN. Could the Chair inform me how much time was used on the Republican side during the last group of speakers?

The PRESIDING OFFICER. That was 42 minutes 14 seconds.

Mr. DURBIN. I thank the Chair. I am going to proceed to speak in the same manner and yield to the Senator from Vermont. Our time will be less than that in total.

I see the Senator from Louisiana is here. We are going to be speaking less than 42 minutes. We guarantee him that much. We will follow the same process, if there is no objection, that was just followed with three Republican speakers who spoke in that 42-minute period of time.

I ask unanimous consent that Senator SANDERS be recognized after me to speak and that our total time be no more than 42 minutes.

Mr. VITTER. I object.

The PRESIDING OFFICER. Is there objection? Objection is heard.

Mr. DURBIN. Mr. President, I just offered that to the Republican side, and they asked me for permission and I gave permission, unanimous consent.

We will speak as long as we like. We will enter into a colloquy. I hope the Senator from Louisiana will reconsider.

Let me try to address a few of the issues that have been raised on the Senate floor. First, on the issue of medical malpractice, this is an issue often brought up on the other side of the aisle.

The first thing I would like to say is this is the bill we are debating. It is 2,074 pages, and one extra page makes it 2075 pages. It has taken us a year to put this together. There have been a series of committee hearings that have led to the creation of this legislation. It has been posted on the Web site for anyone interested. If they go to Google, for example, and put in "Senate Democrats," they will be led to a Web site which will let them read every word of this bill. It has now been out there for 12 days at least, and it will continue to be there for review by anyone interested.

If you then Google "Senate Republicans" and go to their Web site on health care and look for the Senate Republican health care reform bill, you will find—this bill, the Democratic bill, because there is no Senate Republican health care bill. For a year, and with an enormous number of speeches, they have come to the floor and talked

about health care but have never sat down and prepared a bill to deal with the health care system, which leads us to several conclusions.

This is hard work and they have not engaged in that hard work. It is easier to be critical of this work product. They have chosen that route. That is their right to do. This is the Senate. We are the majority party. We are trying to move through a bill. But all of the ideas they have talked about tonight and other evenings have not resulted in a bill.

Second, it may be that they do not want to see a change in the current system; they are happy with the health care system as it exists today. That is possible. In fact, I think it drives some of them to the point where they criticize our bill but do not want to change the system because they like it.

I guess there are some things to like about it. There are good hospitals and doctors in America. Some people are doing very well with the current system. But we also know there are some big problems. We know the current system is not affordable. We know the cost of health insurance has gone up 131 percent in the last 10 years; that 10 years ago a family of four paid about $6,000 a year for health insurance. Now that is up to $12,000 a year. We anticipate in 8 years or so it will be up to $24,000 a year. Roughly 40 percent or more of a person's gross income will be paid in health insurance.

That is absolutely unsustainable. So businesses are unable to offer health insurance as well as individuals are unable to buy health insurance. The Republicans have not proposed anything, nothing that will make health insurance more affordable. This bill addresses that issue. They have nothing.

Second, we know there are about 50 million Americans without health insurance. These are people who work for businesses that cannot afford to offer a benefits package. They are people who are recently unemployed, and they are people in such low-income categories they cannot afford to buy their own health insurance, and their children—50 million. This bill we have before us will give coverage to 94 percent of the people in America, the largest percentage of people insured in the history of our country.

The Republicans have failed to produce a bill that expands coverage for anyone in America. Under the Republican approach, nothing would be done to help the 50 million uninsured.

The third issue is one about health insurance companies. Everybody has an experience there. It is, unfortunately, not good for most, because when you pay premiums all your life and then need the health insurance, many times it is not there. What we do is give consumers bargaining power and a fighting chance with health insurance. That, to me, is a reasonable approach. It eliminates discrimination against people because of a preexisting condition and putting caps on the

Exhibit 151    JA-0002496

amount of money that is being paid. We extend the coverage for children under family health plans from age 24 to age 26. We do things that give people peace of mind that when they need health insurance for themselves and their family it will be there.

The Republicans fail to offer anything that deals with health insurance reform. That is a fact. They have said a lot about Medicare.

I would like to tell you that tomorrow, or soon, I will be cosponsoring and Senator BENNET of Colorado will be offering an amendment which could not be clearer on the issue of this bill and the Medicare Program. The amendment is so short and brief and direct and understandable, I want to read a couple of highlights:

Nothing in the provisions of, or amendments made by, this Act shall result in the reduction of guaranteed benefits under title XVIII of the Social Security Act.

That is Medicare. What Senator BENNET is saying is that people will have their Medicare benefits guaranteed. Nothing in this bill will infringe on their Medicare benefits, despite everything that has been said.

The Bennet amendment goes on to say:

Savings generated for the Medicare program under title XVIII of the Social Security Act under the provisions of, and amendments made by, this Act shall extend the solvency of the Medicare trust funds, reduce Medicare premiums and other cost-sharing for beneficiaries, and improve or expand guaranteed Medicare benefits and protect access to Medicare providers.

All of the speeches made in the last 3 days about how this bill threatens Medicare—it does not—will be completely cleared up by the Bennet amendment. I hope some Republicans who have a newfound love of the Medicare Program, which was started many years ago, will join us in voting for this amendment. It would be great to see if their speeches to save Medicare will result in their votes for the Bennet amendment. This is a critically important amendment. I commend him for being so straightforward and showing real leadership on an issue of this magnitude.

I know the Senator from Vermont is interested in speaking. I am prepared to yield for comments and questions. Before I do, I wish to say by way of introduction that we heard one of our Republican colleagues say this is a single-payer bill, that at the end of the day we will have created a single-payer system. I think the Senator from Vermont is familiar with the concept of single payer, and I would invite his comments or questions through the Chair to me about his feelings on this issue.

Mr. SANDERS. I thank my friend from Illinois for asking that question because, coincidentally, we have just introduced and brought to the desk legislation for a single-payer national health care program. I suggest to my friend from Illinois and my Republican friends that it is a very different bill

than the legislation we are now looking at. In no way, shape, or form is the legislation being debated now a single-payer national health care program. As my friend from Illinois understands—and I ask his views on this—I have heard some of our Republican friends talk about how strong this current health care system is that we have right now. I ask my friend from Illinois, do you think we can do better than being the only major country in the industrialized world that does not guarantee health care to all of its people? Can we do better than that?

Mr. DURBIN. In response to the Senator from Vermont, we must do better. This is the only civilized, developed, industrialized country in the world where a person can literally die because they don't have health insurance. Forty-five thousand people a year die because they don't have health insurance. What does that mean? One illustration: If you had a $5,000 copay on your health insurance policy—and people face that—and you go to the doctor and the doctor says: Durbin, we think you need a colonoscopy, and I realize I have to pay the first $5,000 and the colonoscopy is going to cost $3,000, and I say I am going to skip it—which people do, and bad things happen—I develop colon cancer and die, my insurance has failed me. Basic preventive care is not there. We are the only civilized, developed country where that is a fact.

Mr. SANDERS. I ask my friend from Illinois, has he talked to physicians who have, on that issue, told him that they have lost patients who walked into their office and they say: Why didn't you come in here 6 months ago or a year ago? And that patient says: I didn't have any money, and I thought maybe the pain in my stomach or my chest would get better.

I have had that conversation with physicians in Vermont. I wonder if the Senator has talked to physicians who have said the same thing.

Mr. DURBIN. A lady I met 2 weeks ago in southern Illinois, 60 years old, a hostess at a hotel who serves breakfast in the morning—they are there as we travel around our States—has never had health insurance in her life, is diabetic, and told me that her income is so low, $12,000 a year, she could not afford to go to a physician to check out some lumps she had discovered. That is the reality of the current health care system in the wealthiest, greatest Nation on Earth.

Mr. SANDERS. We have heard discussions of death panels. I think the Senator might agree with me that when we talk about death panels, we are talking in reality about 45,000 people who die every single year because they don't get to a doctor on time. That seems to me to be what a death panel is.

In the midst of all this, with 46 million uninsured, with 45,000 people dying every year because they don't get to a doctor when they should, when pre-

miums have doubled in the last 9 years, when we have almost 1 million Americans going bankrupt because of medically related bills, I ask my friend from Illinois, isn't it time for a change? Isn't it time this country now moves forward and provides health care for all of our people in a comprehensive and cost-effective way?

Mr. DURBIN. Mr. President, I certainly agree with the Senator from Vermont. I would add one more statistic. Of the nearly 1 million people filing for bankruptcy in America each year because of health care costs, medical bills they can't pay, three-fourths of them have health insurance. Three-fourths of them were paying premiums. These were the people turned down when they needed coverage. These were the people who ran into caps on coverage on their policies. These are folks who had to battle it out and lost the battle with the insurance companies to try to get lifesaving drugs. That is the reality of the current system.

The fact is, the Republican side of the aisle has not produced an alternative. We have. We have worked long and hard to do it. They have not.

Mr. SANDERS. I ask my friend from Illinois if we are not only dealing with the personal health care issue of 46 million uninsured and people dying, but are we not dealing with a major economic issue? How are businesses going to compete with the rest of the world when every single year they are seeing huge increases in their health insurance premiums, and rather than investing in the business that they are supposed to be in, they are having to spend enormous sums of money as health care costs soar? I know small businesses in Vermont tell me that in some cases not only can they not provide health insurance to their workers, they cannot even provide it for themselves. I have to believe there is a similar situation in Illinois.

Mr. DURBIN. It is. We are sent many books and some of them I have a chance to glance at. This is the recent one I received, entitled "Bend the Health Care Trend." They have here information which says: American health care spending reached $2.4 trillion in 2008 and will exceed $4 trillion by 2018. We expect a doubling of basic health insurance premiums in 8 to 10 years, and we know what you just described is reality. Even businesses owned by a couple, a husband and wife, are finding themselves not only unable to provide health insurance for their employees, because of its cost, they can't cover themselves.

I had a friend of mine, one of my boyhood friends, I grew up with him and his wife. His small business had one of their employees under the health insurance plan, and his wife had a baby with a serious illness. As a result, their premiums went through the roof. He had to cancel his group health insurance. He had to cancel the insurance he gave to his employees. He gave his employees the $300 a month, whatever it

Exhibit 151

was they were paying, and said: We are all on our own now. We have to go in the private market. The couple with the sick baby couldn't find any health insurance. My friend, who was in his 60s, and his wife are in a pitched battle every year about how much they have to pay for health insurance and the company, the only one that will cover them, each year excludes whatever they turned a claim in for last year. So that is the reality of health insurance for small businesses.

I also want to tell my friend from Vermont, about one-third of all realtors in America are uninsured, have no health insurance. They are independent contractors, and they have no health insurance, one out of three.

Mr. SANDERS. While we are talking about the economics of health care, I wonder if my friend from Illinois has had the same experience I have had in Vermont where people tell me they are staying on the job, not because they want to stay on their job but because the job is providing decent health insurance. They can't go where they want to go because the new job may not provide insurance or they are afraid about the interval when they may not have any health insurance at all. I wonder if my friend from Illinois happened to see the piece in the paper, unbelievable, where a middle-aged fellow joined the U.S. military because his wife was suffering from cancer, and he couldn't find a way to get health care for her so he joined the military. Does the Senator think this is what should be going on in the greatest country in the world?

Mr. DURBIN. We can do better. I would say to those who call our plan a single-payer plan, what we are trying to do is to get fair treatment from private health insurance companies for consumers and families across America and to give them choices. The Senator from Vermont, I assume, is part of the Federal Employees Health Benefits Program. So am I. Most Members of Congress belong to the program. Eight million Federal employees and Members of Congress are part of this program. It may be the best health insurance in America. And we can shop. I just got a notice in the mail that says open enrollment is coming. If you don't like the way you were treated by your health insurance plan last year, you can change. You can pick a new one. If it is a generous plan, more money will be taken out of your check. If it is not, less money will be taken out. We can shop. What we do on the insurance exchanges in this bill is say to these Americans who wouldn't otherwise have options, go shopping. Find the best health insurance plan for your family. Exercise your choice.

I would say to Senator HARRY REID, who drafted this bill, I thank him for his hard work. He includes a public option, a not-for-profit health insurance plan with lower costs that people can choose, if they care to. Giving people that choice, giving them an option to

go shopping for the most affordable, best health insurance plan is what we enjoy as Members of Congress and what every American family should.

Mr. SANDERS. I ask my friend from Illinois, does he think some of our Republican friends feel so threatened and so upset by giving the American people the option to choose a public Medicare-type plan as opposed to a private insurance plan? Do you think that maybe, just maybe, some of our friends are more interested in representing the interests of the big private insurance companies rather than the needs of the American people?

Mr. DURBIN. I say to my colleague from Vermont, I am waiting for the first Republican Senator to offer an amendment to this bill to abolish Medicare. If they really believe that government health insurance is such a bad idea, they ought to step right up and show it.

Mr. SANDERS. I would say to my friend from Illinois that that is an interesting proposal and, in fact, I was almost thinking of offering an amendment at one point. We have a lot of people in this country who stand up and say: Get the government out of health care. Well, I think some of my Republican friends have kind of echoed that message. I do think that the Senator from Illinois is right. We may bring forth an amendment to allow our Republican friends to say: Let's abolish the Veterans' Administration. Because, as you know, that is a government-run program which most veterans in my State and I think around the country are very proud of. They think it is a good program. From what the statistics tell us, it is a very cost-effective way to provide quality health care to all of our veterans. Maybe we should bring forward an amendment to those who say get the government out of health care. If you want to abolish the Veterans' Administration, go for it. And what about TRICARE. Maybe you want to abolish TRICARE. Go for it. Maybe you want to abolish SCHIP which is providing high quality health insurance for millions of kids. Maybe we might work together and bring forth an amendment.

Let our Republican friends who say get the government out of health care, let them abolish the Veterans' Administration, Medicare, SCHIP, Medicaid, let them do that. We will see how many votes they might get.

Mr. DURBIN. There is another way that Senators who loathe the idea of government-run health insurance plans can show personally their commitment to that idea, by coming to the floor and publicly announcing they will not participate in the Federal Employees Health Benefit Program which provides health insurance for Members of Congress. I have yet to hear the first Member, critical of government health plans, come forward and say: So in a show of unity and personal commitment, I am going to opt out.

Mr. SANDERS. I suggest to my friend from Illinois that we could take

it a step further. I go to the Capitol physician's office. That is where I go. We pay extra money for it. I have Blue Cross/Blue Shield, but I go there. Do you know who runs the Capitol physician's office, which I suspect the vast majority of the Members of Congress go to and get very fine primary health care?

Well, it is that terrible government agency, the U.S. Navy. So maybe some of our friends who are busy denouncing government health care might want to say they do not want to take advantage of that very fine, high quality health care, and that speaks for the whole military as well. While we are at it, maybe you should abolish health care for the U.S. military, which is all government run and, by the way, generally regarded as pretty good quality health care.

I would ask my friend his views on that.

Mr. DURBIN. I do not think you will hear that. I think you will hear a lot of speeches about socialized medicine, socialism, and the big reach of government.

When it comes right down to it, there is not a single Member from the other side who stepped up and said: Therefore, I will offer an amendment to abolish it. They will have their chance in this bill, and if they want to, they can. I do not think the people who have this coverage today would like to see it gone.

Mr. SANDERS. It might be an interesting amendment, I would say to my friend. There is another area where it is a semigovernment nonprofit, which I know the Senator from Illinois feels very strongly about, and that is the Federally Qualified Community Health Centers begun by Senator Kennedy over 40 years ago, where we now have over 1,200 community health centers all over this country. In fact, I know this is widely supported in a bipartisan or tripartisan way, because the Federally Qualified Community Health Centers provide quality health care and dental care and low-cost prescription drugs and mental health counseling.

I might say to my friend from Illinois, one of the provisions in that 2,000-page bill he is holding up is legislation he and I and others have worked hard on, which is to substantially expand the Community Health Center Program into every underserved area in America. We talk about 46 million people being uninsured in this country. We have 60 million people who do not have access to a doctor on a regular basis.

If we expand the Community Health Center Program, if we expand to a significant degree the National Health Service Corps so we can help young people become primary health care physicians by paying off their very substantial medical debts, would my friend agree with me that this would be a major step forward in improving primary health care in America?

Mr. DURBIN. The Senator from Vermont has been a leader on this

Exhibit 151                                                                                                                                          JA-0002498

issue. I can recall when President Obama came forward with his stimulus bill, the recovery and reinvestment bill, that the Senator from Vermont was one of the leaders to put additional funds in the bill to build clinics all across America—in rural areas we represent, in the towns and cities we represent as well—for the very reason the Senator mentioned: Because for a lot of people who I represent in downstate, southern Illinois, in some of the rural regions, it is a long drive to a doctors clinic for primary care. So these community health clinics, FHQA clinics, are going to offer people primary care.

I think as a result of this bill, when we enact it—and I feel very good about the enactment of this because I think we sense this is a moment in history we should not miss—we are going to see this network grow across America. And it has proven itself to be so good.

In the city of Chicago, I have visited these community health clinics. I will bet the Senator does in Vermont. What I find there—many times I will walk in the door. The administrator will be there. We will start talking. I will meet the doctors. I will meet the nurses. When I finally get a chance to drink a cup of coffee and talk to them for a few minutes, I say—and I mean it—if I were sick, I would feel confident walking into the front door of this clinic, that I would be in the best of hands—better than the most expensive clinic in my State.

Mr. SANDERS. My friend from Illinois makes the point. And I have visited virtually all of them in the State of Vermont. We have gone from 2 to 8, with 40 satellites. We have over 100,000 people in the State of Vermont who now use these Federally Qualified Health Centers.

I know my friend from Illinois is also aware that when you talk about health care, you have to talk about dental care.

Mr. DURBIN. Yes.

Mr. SANDERS. Because what is true in Vermont is true in Illinois. You have a whole lot of people who do not have access to a dentist, which these Federally Qualified Health Centers now provide, and mental health counseling, and low-cost prescription drugs.

So I thank my friend from Illinois. I am sure the Senator and I are going to work together to make sure we, in fact, are successful in keeping people out of the emergency room, keeping them out of the hospital, by enabling them to get the medical care they need when they need it. I look forward to working with my friend on that.

Mr. DURBIN. I might say, the Senator from Vermont has also raised an important issue. We know we are going to need more primary care physicians, so there are provisions in this bill to encourage young people to pursue primary care—internists, family practitioners—because those are the frontline people who are needed more frequently for preventive care and basic checkups, so people have a chance to

see a good doctor before they get sick or become seriously ill and it is much more expensive.

Mr. SANDERS. Right.

Mr. DURBIN. So we are pushing forward for more and more health care professionals. Again, the Republican critics of this legislation have offered nothing—nothing—when it comes to encouraging the growth in the number of our health care workers in America. This ought to be something that is nonpartisan. I would think that at some point they would agree that many things in here are essential for the future of our country. I think that is one of them.

Mr. SANDERS. Would my friend from Illinois agree, it does not make a whole lot of sense for people who do not have health insurance today to go into an emergency room and run up a huge cost or to get terribly ill because they do not go to a doctor when they should and end up in the hospital? Wouldn't it make a lot more sense, both for the personal health of the individual and saving money for the system, to provide health care to people when they need it?

Mr. DURBIN. I agree with the Senator from Vermont. I would say we have some of the best health care in America but also the most expensive health care in America. We spend more per person than any other nation on Earth, and a lot of it has to do with money not being well spent. People who do not have access to a medical home, which we establish in this bill, people who do not have access to a community health care clinic, in desperation, will take a baby with a high fever in to an emergency room.

Mr. SANDERS. Right.

Mr. DURBIN. They will wait for hours to finally see a doctor. Once there, they will have the most expensive care they could ever face, when they could have gone for a doctor's appointment.

Mr. SANDERS. Exactly.

Mr. DURBIN. And taken care of it for a fraction of the cost. That is not good for the hospitals because many of them are giving charity care they do not get compensated for, and they pass that cost along to other patients, and it certainly is not good for the families involved.

Mr. SANDERS. At this point, let me thank my friend from Illinois for allowing me to engage in this colloquy with him. I am going to yield back the floor to him and thank him for his very good work.

Mr. DURBIN. I thank the Senator from Vermont.

I say, at this point in time, we have three or four amendments before the Senate on health care reform. We started the debate on Monday. We are now wrapping up Wednesday. We are about to go into the 4th day of the debate on one of the most important bills in the history of the U.S. Senate, and we have yet to reach an agreement with the Republican side of the aisle to have the amendments voted on.

If we are only doing four amendments or three amendments in 4 days, this is not going to be the kind of debate the American people expected. They expected us to bring issues before the floor here, debate them, with a reasonable period of time, and then vote and move to another issue. Certainly, there are a lot of things to talk about.

So I hope the Republican side of the aisle will have a change of heart and will start to join us in this dialog, will offer their amendments in a timely fashion—we will give them their opportunity to debate them—and then bring them to a vote. But the fact is, we have not had a single vote this week on health care reform amendments because of objections from the other side. That is not in the interest of moving forward this important legislation and giving Members an opportunity to present their amendments and have them voted on in a timely fashion.

Mr. President, I yield the floor.

The PRESIDING OFFICER. The Senator from Illinois.

Mr. DURBIN. Mr. President, I ask unanimous consent that after any leader time on Thursday, December 3, and the Senate resumes consideration of H.R. 3590, it be in order for any of the majority or Republican bill managers to be recognized for a total period of time not to extend beyond 10 minutes, equally divided and controlled; that the time until 11:45 a.m. be for debate with respect to the Mikulski amendment No. 2791 and the McCain motion to commit; and during this time it be in order for Senator MURKOWSKI to call up her amendment with respect to mammography, a copy of which is at the desk; and that it also be in order for Senator BENNET of Colorado to call up amendment No. 2826, a side-by-side amendment with respect to the McCain motion to commit; that no other amendments or motions to commit be in order during the pendency of these amendments and motion; that at 11:45 a.m., the Senate proceed to vote in relation to the Mikulski amendment No. 2791; that upon disposition of the Mikulski amendment, the Senate then proceed to vote in relation to the Murkowski amendment; that upon disposition of these two amendments, the Senate continue to debate until 2:45 p.m. the Bennet of Colorado amendment No. 2826 and the McCain motion to commit, with the time equally divided and controlled between Senators BAUCUS and MCCAIN or their designees; that at 2:45 p.m., the Senate proceed to vote in relation to the Bennet of Colorado amendment No. 2826; that upon disposition of that amendment, the Senate then proceed to vote in relation to the McCain motion to commit; that prior to the second vote in each sequence, there be 2 minutes of debate, equally divided and controlled in the

Exhibit 151

JA-0002499

usual form; that each of the above referenced amendments or motion be subject to an affirmative 60-vote threshold, and that if the amendments or motion do not achieve that threshold, then they be withdrawn; further, that if any of the above listed achieve the 60-vote threshold, then the amendment or motion be agreed to, and the motion to reconsider be laid upon the table; further, that it be in order if there is a request for the yeas and nays to be ordered with respect to that amendment or motion, regardless of achieving the 60-vote threshold, that if the yeas and nays are ordered, the vote would occur immediately with no further debate in order with respect to this particular consent.

The PRESIDING OFFICER. Is there objection?

Mr. VITTER. Mr. President, reserving my right to object.

The PRESIDING OFFICER. The Republican leader.

Mr. McCONNELL. Mr. President, reserving the right to object, and I will not object, I would just like to point out we have had some difficulty actually on both sides getting to the two votes that are designated in this consent agreement.

Our side of the aisle, the Republican side of the aisle, was prepared to vote on both of those amendments tonight. Then a problem developed on the other side, which I understand because we had had a problem on our side earlier. But I do just want to make it clear that Republicans were prepared and fully ready and willing to vote on the two amendments in the consent agreement tonight.

Mr. President, I do not object.

Mr. VITTER. Mr. President, reserving the right to object.

The PRESIDING OFFICER. The Senator from Louisiana.

Mr. VITTER. Thank you, Mr. President.

Mr. President, I certainly concur with the distinguished majority whip's goal of more amendments and more votes.

With regard to this very important screening and mammography issue, my goal has been a very focused one. I have a filed second-degree amendment that has a very simple, focused objective, which I believe is extremely noncontroversial. I believe it would be supported by everyone in this body, and that is simply to ensure that there is no legal force and effect to the recent recommendations issued in November of 2009 by the U.S. Preventative Services Task Force with regard to breast cancer screening, use of mammography, and self-examination.

As everyone knows, those new recommendations were shocking in that they took a giant step back from the previous recommendations and took a giant step back in terms of recommended screening, which virtually every expert I know of strongly disagrees with.

So this filed, simple second-degree amendment simply says that those new

recommendations of November of this year have no force and effect. I will read the amendment. It is very short. To be clear, it does nothing more than that.

[For the purposes of this Act, and for the purposes of any other provision of law, the current recommendations of the United States Preventive Service Task Force regarding breast cancer screening, mammography, and prevention shall be considered the most current other than those issued in or around November 2009.]

So we are simply ensuring that those new recommendations—which I strongly disagree with, experts strongly disagree with, I believe all of my colleagues do—have no legal force and effect. So I would simply ask that the unanimous consent proposed be modified so that the Mikulski amendment incorporates this language. I would propose that as an alternative unanimous consent request.

The PRESIDING OFFICER. Is there objection to the request, as modified?

Mr. DURBIN. I object.

The PRESIDING OFFICER. Objection is heard.

Is there objection to the original request from the Senator from Illinois?

Mr. VITTER. Yes, I continue to reserve my right to object. I am very disappointed about objecting to this important and what should be noncontroversial provision. I would suggest another solution, which is to take the unanimous consent request on the floor and modify it so there is simply a vote on this second-degree amendment, amendment No. 2808, immediately before the vote on the Mikulski amendment.

The PRESIDING OFFICER. Is there objection to the request, as modified?

Mr. DURBIN. Mr. President, reserving the right to object.

The PRESIDING OFFICER. The Senator from Illinois.

Mr. DURBIN. I am not sure I would support or oppose the amendment offered by the Senator from Louisiana, but this matter has been on the floor now for 3 days. I say to the Senator, there is a pending amendment here on your side of the aisle from Senator MURKOWSKI on this issue, and I would hope that the Senator has approached her to incorporate his language. I do not know if the Senator approached Senator MIKULSKI. But at this point we think we have some effort being made at fairness on both sides, that there will be Democratic amendments and Republican amendments both offered—Mikulski and Murkowski and McCain and Bennet—and so I would object because I believe we have the basis for a fair agreement at this point.

The PRESIDING OFFICER. Objection is heard. Is there objection to the original request of the Senator from Illinois?

Mr. VITTER. Mr. President, reserving my right to object, again, I am very disappointed to hear that. I have approached both sides. Senator MURKOWSKI has incorporated similar lan-

guage, and I was hoping we could come together, 100 to nothing, to actually pass this on to the bill, whichever alternative tomorrow is voted up—and maybe they both will be—but whichever is voted up or whichever is voted down, I think it is very important to come together and state that we don't want these new task force recommendations to have any force and effect.

So let me propose a third and final alternative unanimous consent request: that at any point after these votes, but before cloture is filed on the pending matter, this amendment No. 2808 receive a vote on the Senate floor as a first-degree amendment to the underlying bill.

Mr. DURBIN. Mr. President, reserving the right to object, may I suggest to my friend from Louisiana, would you consider approaching Senators MIKULSKI and/or MURKOWSKI the first thing tomorrow and see if they are prepared to work with you on this? This Mikulski amendment has been pending for 3 days.

Mr. VITTER. Mr. President, if I could——

Mr. DURBIN. Well, then, I object.

The PRESIDING OFFICER. Objection is heard.

Is there objection to the original request?

Mr. VITTER. Mr. President, reserving my right to object, just so I can respond directly, I didn't mean to cut the Senator off. If he has any further statement, I will be happy to listen to it. But just so I can respond directly, the first thing today, I approached both those Members and everyone involved in this debate about this language and certainly the majority side has had this language for at least 7½ hours. The equivalent of this language has been incorporated into the Murkowski amendment, but my hope is that the same thing be accepted in the Mikulski amendment because it is not clear which is going to be adopted. I don't see the great controversy here. So that was my hope. And that is why I approached those two Senators and the majority side about 7½ hours ago about it with specific language.

So I renew my last unanimous consent request I made in that spirit.

Mr. DURBIN. Reserving the right to object, the staff advises me that they are reaching out to Senator MIKULSKI at this moment. I don't know if we can be in contact with her this evening, but I would ask the Senator from Louisiana if he would consider allowing us to go forward with this unanimous consent request and hope we can still modify it tomorrow, if there is an agreement with Senator MIKULSKI at that point. I don't think that jeopardizes the right of the Senator from Louisiana to offer this at a later time during the course of this debate.

Based on that, I would continue to object.

The PRESIDING OFFICER. Objection is heard.

Exhibit 151  JA-0002500

Is there objection to the original unanimous consent of the Senator from Illinois?

Mr. VITTER. Mr. President, reserving the right to object, merely to respond through the Chair, I would say I have been working in that spirit. I have given the language to the majority side. I have been working both at the staff level and Member level with many folks. This should be noncontroversial. I don't know of any Senator who disagrees with this. So I will accept that offer. I will not object to this pending unanimous consent, but I truly hope the offer is made in good faith because I believe, when anyone reads this language, they will agree with it.

Again, it simply says these latest recommendations by the U.S. Preventive Services Task Force, made 2 weeks ago, will not have any legal force and effect. I believe all of us—certainly, it is my impression and, I guess, we will find out tomorrow morning—I believe all of us want to stop them from having force and effect because it is a great step backward in terms of breast cancer screening and mammography and even education about self-examination.

So I certainly take that offer and look forward to the majority side rereading this language and hopefully accepting it tomorrow morning because I can't imagine, on substantive grounds, objecting to the language.

Thank you. With that, I will not object.

The PRESIDING OFFICER. Without objection, the request from the Senator from Illinois is agreed to.

Mr. DURBIN. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. DURBIN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 2808 TO AMENDMENT NO. 2791

Mr. DURBIN. Mr. President, I ask unanimous consent that the previous order with respect to H.R. 3590 be modified to provide that the Vitter amendment No. 2808 to the Mikulski amendment No. 2791 be agreed to and the motion to reconsider be laid upon the table; that the order be further modified to provide that the vote with respect to the Mikulski amendment should now reflect the Mikulski amendment, as amended.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment (No. 2808) was agreed to, as follows:

(Purpose: To prevent the United States Preventive Service Task Force recommendations from restricting mammograms for women)

On page 2 of the amendment, after line 15 insert the following:

"(5) for the purposes of this Act, and for the purposes of any other provision of law, the current recommendations of the United States Preventive Service Task Fore regarding breast cancer screening, mammography, and prevention shall be considered the most current other than those issued in or around November 2009."

---

MORNING BUSINESS

Mr. DURBIN. Mr. President, I ask unanimous consent that the Senate proceed to a period of morning business, with Senators permitted to speak therein for up to 10 minutes each.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

REMEMBERING MARY JOSEPHINE OBERST

Mr. McCONNELL. Mr. President, today I rise to honor the life of a Kentucky heroine, Ms. Mary Josephine Oberst of Owensboro. Ms. Oberst passed away on November 13, 2009, at the age of 95. A native Kentuckian, she proudly served her country as a member of the Army Nurse Corps beginning in 1937. In July 1941, Ms. Oberst was sent to the Philippines, and in early May the following year, when Bataan and Corregidor fell to the Japanese during the Battle of the Philippines, more than 60 nurses, including Ms. Oberst, were taken as prisoners of war, POWs, by the Japanese. These nurses, later christened the "Angels of Bataan," were held as POWs for 33 months. During this time, Ms. Oberst continued her duties as a nurse, caring for fellow prisoners, even though she herself suffered from malaria and significant weight loss. In early February 1945, the 44th Tank Battalion rescued the POWs who were later brought back to the United States.

After overcoming the medical conditions which resulted from her imprisonment, Ms. Oberst was appointed captain and continued to serve as a member of the Army Nurse Corps. She worked in hospitals in Louisville, KY; Fort Knox, KY; and Ashford, WV, until her retirement from the Corps in 1947. Ms. Oberst was honored for her duty with several military service awards, including the Bronze Star Medal. Mary Josephine Oberst was a woman of high character, who faithfully served our country. Today, I wish to honor her life and her service, as well as give my condolences to her family for their loss.

---

AMINATOU HAIDAR

Mr. LEAHY. Mr. President, I want to bring to the attention of Senators who may not already be aware, a situation that has been unfolding in Morocco and the Canary Islands.

Last year, I had the privilege of meeting Ms. Aminatou Haidar, called by some the "Saharawi Gandhi," who received the 2008 human rights award from the Robert F. Kennedy Center for Justice and Human Rights. Ms. Haidar is a focus of attention again today because she is on a hunger strike in the Canary Islands after being summarily deported by the Moroccan Government on her way home to Western Sahara from the United States, where, coincidently, she had been to receive the "Civil Courage Prize" from the Train Foundation.

Ms. Haidar is no newcomer to difficulties with the Moroccan authorities. She was first imprisoned in 1987 when she was a 20-year-old college student, after calling for a vote on independence for Western Sahara. When she was released after 4 years, during which she was badly mistreated, she continued her advocacy for the right of the Saharawi people to choose their own future.

Arrested again in 2005 and separated from her two daughters, she led a group of 37 other Saharawi prisoners on a 51-day hunger strike for better prison conditions, investigations into allegations of torture, and the release of political prisoners.

Since her 2006 release, she has continued her nonviolent struggle, which has brought widespread attention to the cause of the Saharawi people. The United Nations Security Council has repeatedly endorsed a referendum on self-determination for the people of Western Sahara.

On November 13, when Ms. Haidar arrived at the airport in El-Ayoun, she was detained by Moroccan authorities. She was told that by insisting on writing her place of residence as "Western Sahara" on her immigration form, she was in effect waiving her Moroccan citizenship. Her passport was taken, and she was forcibly put on a plane without travel documents to the Canary Islands, a Spanish archipelago located 60 miles west of the disputed border between Morocco and Western Sahara.

She remains there at the airport, separated from her daughters, in the 17th day of a hunger strike, and her health is reportedly rapidly deteriorating. She has refused an offer of a Spanish passport, insisting that she will not be a "foreigner in her own country," and the Moroccan Government refuses to reinstate her passport. She is, in effect, a stateless person.

This is unacceptable. Article 12 of the International Covenant on Civil and Political Rights, which Morocco has ratified, states in part, "Everyone shall be free to leave any country, including his own. . . . No one shall be arbitrarily deprived of the right to enter his own country."

The situation in Western Sahara is a difficult one for the Saharawi people and the Moroccan Government. It is a protracted dispute in which the international community has invested a great deal to try to help resolve, without success. I recall the time and energy former Secretary of State James Baker devoted to it. The solution he proposed was rejected by the Moroccan Government.

Morocco and the United States are friends and allies, and I have commended the Moroccan Government for

Exhibit 151       JA-0002501

principles and those who have defended them against hollow attacks from the other side. One after another, Republicans have come to the floor with disingenuous claims.

For example, they have talked about health care premiums, overlooking the fact that those costs will go down for the vast majority of Americans—in fact, 93 percent. They have talked about the deficit, ignoring the fact that health care reform will do more to lower the deficit than any other measure has in years—remember, over 20 years, almost $¾ trillion. They have tried to scare seniors, saying you are going to die soon, as an example, closing their eyes to the fact that we strengthen Medicare and cut waste, fraud, and abuse from the program. They have tried to scare women, closing their ears to the fact that we will make it easier than ever for women to get the preventive screenings they need, and that is a gross understatement. They claim to speak for the American people but neglect to mention that, for the last year, a majority of the Americans have consistently said it is more important than ever to nurse our health care system back to health.

What is the most consistent Republican attack on this bill? They carefully count the number of pages in this legislation but completely discount the number of people it helps. Can anyone think of a more superficial way to measure the worth of a bill than how many pages it is printed on? As far as I can tell, the only threat that poses is more paper cuts, perhaps.

Those who want to keep the broken system the way it is throw everything they can at the wall, but nothing has stuck. Incredibly, my distinguished counterpart, the Republican leader, last week, called the health care crisis manufactured, in spite of the fact that 750,000 people filed for bankruptcy last year—70 percent of them because of health care costs. In one sense, my Republican counterpart is right—it was manufactured. This health care crisis has been manufactured by the greedy insurance companies that raise families' rates on a whim and deny health care to the sick.

Remember, the health care industry is exempt from the antitrust laws. They can conspire to fix prices with no civil or criminal penalties. No other business is like that, except baseball. This crisis was manufactured by leaders who enabled them, who empowered them, and who sat idly by while the problem grew worse and worse, until it finally collapsed into a crisis.

My Republican friends have been so busy coming up with distortions that they have forgotten to come up with solutions. They seem more concerned with scaring the American people than helping them. This barrage of baseless accusations underscores how desperate some are to distract the American people from the real debate and from the fact they have no vision for fixing our health care system, which is broken.

Yes, correcting the record has taken a long time. That is OK. We will continue to do so as long as necessary. Democrats are more than willing to defend this good bill. After all, it is not hard to do. As Mark Twain, a great Nevadan, said: "If you tell the truth, you don't have to remember anything."

I wish to note that I especially appreciate the assistant leader, my friend of decades, Senator DURBIN, for his brilliant statements on the floor during the last several weeks on this health care issue. I so admire his spunk, his intelligence, and his ability to deliver a message.

---

## RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

---

## SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of H.R. 3590, which the clerk will report.

The assistant legislative clerk read as follows:

A bill (H.R. 3590) to amend the Internal Revenue Code of 1986 to modify the first-time home buyers credit in the case of members of the Armed Forces and certain other Federal employees, and for other purposes.

Pending:

Reid amendment No. 2786, in the nature of a substitute.

Mikulski amendment No. 2791 (to amendment No. 2786), to clarify provisions relating to first-dollar coverage for preventive services for women.

McCain motion to commit the bill to the Committee on Finance, with instructions.

The ACTING PRESIDENT pro tempore. Under the previous order, the time until 11:30 will be equally divided with alternating blocks of time, with Republicans controlling the first 30 minutes and the majority controlling the second 30 minutes.

The Senator from Wyoming is recognized.

Mr. ENZI. Mr. President, I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. KYL. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. KYL. Mr. President, to continue our debate on the McCain amendment to ensure Medicare benefits for our seniors are not cut, as would happen under this legislation, I wanted to talk a little bit about the commitments we have made to our seniors and what exactly would happen under the legislation that is before us.

As we all know, seniors have paid into the Medicare Program, and that is

with the expectation that they will get the benefits that have been promised to them. The question is, Why would we, at this point, reduce the benefits that have been promised to them, especially if the purpose is not to enhance the financial viability of Medicare, which everyone knows is going broke but, rather, to use that money to establish a new entitlement program?

Let me break down the list of cuts seniors would face under this legislation: $137.5 billion would be cut from hospitals that treat seniors, $120 billion from the Medicare Advantage plan. By the way, that Medicare Advantage plan serves almost 40 percent of the Arizona seniors on Medicare. It cuts $14.6 billion from nursing homes, $42.1 billion from home health care, and $7.7 billion from hospice care. These are deep cuts, and you cannot avoid jeopardizing the health care seniors now have under Medicare by making these deep cuts. That is why the Chief Actuary at the Centers for Medicare and Medicaid Services—we use the initials CMS—believes these cuts would cause some providers to end their participation in Medicare, which, of course, would further threaten seniors' access to care. There would not be as many providers to whom they could go for their services.

Our friends on the other side of the aisle say part of this is an intention to eliminate waste, fraud, and abuse. Of course, we have known for many years that there is waste, fraud, and abuse in Medicare, but actually doing something about the problem and recognizing it are two different things. If it were easy to wring hundreds of billions of dollars of savings from Medicare by just pointing to waste, fraud, and abuse, we would have done it a long time ago. Certainly the President would, during his first year in office, want to do that, given the fact we are spending a lot of money and he is trying to find sources of revenue for the various spending programs he has proposed. If it were that easy to do, it would have been done before now.

Moreover, Medicare faces a $38 trillion, 75-year unfunded liability. That is almost incomprehensible. Most of us believe that whatever savings we could achieve in Medicare, to the extent you could eliminate waste, fraud, and abuse, for example, you should do that to help make Medicare solvent.

Next I want to talk about what seniors are telling us. They believe, according to public opinion surveys—and I have talked to enough of them to know this is true—that these Medicare cuts are going to jeopardize their health care. They are troubled in particular by this $120 billion proposed cut to Medicare Advantage. It has been called the crown jewel of Medicare. It is the private insurance addition to Medicare in which many are able to participate in programs they would never have been able to afford otherwise. It gives them this choice to supplement Medicare to provide all kinds

Exhibit 151          JA-0002502

of benefits such as dental, vision, hearing, physical fitness programs, and other things, as I said, that they could not get otherwise. One in four of the beneficiaries in Arizona, as I said, signs up for this program—more than 329,000 seniors. They like the low deductibles and copayments in Medicare Advantage.

But the Congressional Budget Office has bad news for the seniors who like this program and who like the extra benefits they have under Medicare Advantage because, as the Congressional Budget Office notes, it would cut benefits on average by 64 percent over the next 10 years, from an actuarial value of $135 to $49 a month. Think about that. The actuarial value of the benefits the average Medicare Advantage participant has is worth $135 a month today. It would be cut in this bill to $49 a month. That is a 64-percent cut, according to the Congressional Budget Office. When we say we are not cutting benefits seniors currently receive, that is not true. This legislation would do that.

I have been sharing letters from constituents who have expressed concerns to me. Let me share three more letters today.

One recently arrived from Joseph and Mary-Lou Dopak of Sun City West, in Arizona, of course. They wrote as follows:

The plan to reduce our coverage and take $120 billion from Medicare Advantage is a slap in the face to all seniors. The Medicare Advantage plan works because Medicare funds are given to a private insurance company to administer the plan.

We do not want our Medicare Advantage plan robbed to fund a government-operated comprehensive health insurance plan. Commonsense tells us that will not work.

The President should be fixing what ails the current health care system, instead of putting everyone into a government-operated health care plan.

For our President to pick on Medicare Advantage is totally unfair to those of us upon whose shoulders this country has been built.

A constituent from Tucson, AZ, wrote a rather short and direct letter, and so it is easy to quote here.

I am a senior citizen age 83. If I lose my Medicare Advantage coverage, I'll also lose my primary care physician of 18 years because he does not accept Medicare Direct. Senator KYL, do not let them take away my Medicare Advantage.

I get these letters every day. I have not yet had a constituent come up to me and say: Please, would you take away the Medicare Advantage Program, it is not right. Everybody has said, of course: Please preserve this important program.

Finally, a constituent from Phoenix, AZ, who suffers from multiple sclerosis, describes what it means to her.

I am a 57-year-old woman with multiple sclerosis, currently on Social Security Disability. I make under $14,000 a year and have been on the Secure Horizons Medicare Advantage plan for a long time now. . . .

I realize it is hard for Congress to understand, but we need to keep our Medicare Advantage plans in order to have [quality] health care at a price we can afford.

We need you to help protect Medicare Advantage plans for the seniors in your State. We are the ones you need to fight for and we should not have to choose between going to a doctor and getting our medication and having food on the table and a place to live. Please do your part to protect our Medicare Advantage plans and keep prices within our reach.

As I said, these are the kinds of letters we get all the time. It is hard for these folks to understand, first of all, why, having paid into the plan and having taken advantage of what is a good supplement to the basic Medicare, that would be taken away from them. I think it is even harder for them to fathom that the reason it is being done is to pay for a new program rather than to keep Medicare itself solvent.

I tell folks like this that I will continue to fight for her and I will continue to try to protect this program because we believe it is essential. It is why I support the McCain amendment to commit the bill back to committee. It only has to be there a day. We are not talking about a further delay here. But it addresses both of the key issues of cuts and savings. If the McCain amendment passes, it would send the bill back to the Finance Committee with instructions to remove the Medicare cuts from the bill. That is all it does. But, second, those savings would be applied to Medicare rather than to fund a new government program. Those savings could therefore address the waste, fraud, and abuse problem that has been identified by everyone. It can be used to strengthen the Medicare trust fund rather than to fund a new health care entitlement program.

We believe the first thing we should do to see whether we can actually fix this bill—I have been quoted as saying that I don't think we can fix this bill. By that, I mean, with all due respect to my colleagues on the other side of the aisle, I don't think they want to make the changes I think would be necessary for the American people to begin to support this kind of legislation. Seniors are overwhelmingly opposed to the Medicare cuts. That is a fact. If my colleagues on the other side of the aisle are not willing to support the McCain amendment or something like it, I don't know how we could then say we can fix this bill. So I hope my colleagues will use this process we have to actually make amendments to the bill and not simply have a political discussion.

Republicans have pointed out that there are better ways to reform the health care problems we have today than to do it on the backs of seniors. We put forth a bounty of ideas. Let me just recoup some of them.

We think we could start and we could save a great deal of money by medical malpractice reform. That would bring down costs. We could allow Americans to buy lower cost insurance policies across State lines. That alone would unleash a wave of competition for patients' business. We could allow small businesses to band together to get the

same purchasing power big businesses have. These ideas have essentially been ignored by the majority. Instead, we have this big government takeover of health care at a huge cost and significant reduction in quality and benefits to the American people. We don't think this is the way to go.

Certainly, on behalf of my senior citizen constituents and others who are on Medicare Programs, I am going to continue to fight for them, as my colleague John McCain is, and therefore urge my colleagues to support his amendment to eliminate the Medicare cuts under this bill.

The ACTING PRESIDENT pro tempore. The Senator from Kansas is recognized.

Mr. BROWNBACK. Mr. President, I rise to speak in favor of the McCain motion, and I do it from the perspective of a representative of the State of Kansas.

We have a number of senior citizens and hospitals that are Medicare-dependent. We have a number of providers for whom a majority of their practice is Medicare reimbursement. They are scared to death of these cuts, and the cuts are well documented—$500 billion in Medicare cuts, and for the 43 million senior citizens on a program that is already projected to go insolvent by 2017, specific cuts of $135 billion from hospitals, $120 billion from 11 million seniors in Medicare Advantage, nearly $15 billion from nursing homes, nearly $40 billion from home health agencies, and then—a cruel gesture, it seems to me—nearly $8 billion from hospice, where people are getting their final care for cancer and diseases that are killing them—$8 billion cut from hospice.

What that does in a State such as mine and in many rural hospitals, it cuts the legs out from under them. They are not going to have the money they need to operate. They are going to do everything they can to continue to operate—and they will, probably. What they will try to do is tax their local citizenry, raise property taxes, in all probability, to make up for the Medicare cuts because they are going to have a hospital there and they are going to do everything they can to keep a hospital there.

But what a terrible gesture on our part here, to take money that has been going into Medicare—and people have been paying into Medicare—and then steal it for a new program that is not going to get everybody covered on top of that and from a program that is already set to go insolvent by 2017. It is like writing a big fat check on an overdrawn bank account to start something new, to buy a new motorcycle. That doesn't make sense to people. Then it seems cruel and unusual to the senior citizens that you are taking $500 billion and really gutting a lot of their care programs on a program that doesn't work.

I met earlier, within the last several days, with the Kansas Association of

Exhibit 151                                                                                    JA-0002503

Anesthesiologists. They are looking at these things and saying: This is really going to hurt us and our ability to provide services and care. I talked with other individuals who look at this, and they say: Wait a minute, you are going to change everything to try to get a few more people covered and you are going to gut a Medicare program that is not paying the bills now, that a number of private insurance plans are helping to subsidize Medicare and Medicaid, and you are going to cut the reimbursements that are not making things work yet? It makes no sense to individuals that this would take place.

I get called by a number of individuals across the State of Kansas saying they are very scared of this bill and what it is going to do to their health care. I do telephone townhall meetings, as a number of individuals across this body do, and the individuals there whom you get on a random phone calling basis are scared and mad about this bill and the prospects of what it does to their health care. I get it from individuals. I get it from mail.

I was in a meeting in Kansas the week of Thanksgiving, and I polled the audience—it was an audience that was mostly over the age of 65—how many were in favor of the overall bill? There were about 200-some people there, and 10 were in favor. How many opposed? Everybody else, with a few saying they don't have an opinion. But it was 90 percent, 95 percent opposed to this bill, and it is because they look at it and they see what it is going to do to them, and they don't see it providing the care that is being promised—and adding, on top of that, to the deficit.

One of two things is going to happen on these Medicare cuts, because we have seen, in the past, efforts to control the spending in Medicare passed by this body and then each year those cuts to try to restrain the spending on Medicare being restored.

One of two things is going to happen. Either these cuts in Medicare are going to take place, and it is going to cripple the program and particularly hurt it in a number of rural areas across the country and in my State, or these cuts will never take place in Medicare and it is going to add to a ballooning deficit and debt that is taking place right now. Either choice is an irresponsible choice for this body to do. It is irresponsible for us to do for this country. Most people look at it and say: I want to get more people covered, and I want to bend down the cost curve. But let's do that on an incremental basis.

Senator KYL spoke about incremental changes that can take place, whether it is tort reform, allowing bigger pooling on health insurance, whether it is starting more community-based clinics, one that I look at as something that has worked in my State to get more people covered at an earlier phase in their health care needs. All of those are incremental, low cost, and, in some cases, ones that actually do bend down the cost curve and

that can help, not a gargantuan $2.5 trillion program that takes $500 billion out of Medicare that is already headed toward insolvency in less than a decade. The bill doesn't make sense to individuals.

Then to do it on top of a time period when the President, 10 days ago, comes back from China, meeting with our bankers, as most people look at it, and the bankers lecturing us on why are we spending more money which we don't have, going further and further into debt, which we should not do at this point in time, being lectured by the Chinese when we ought to be talking to them about what they are doing about human rights and currency. We are being lectured about fiscal irresponsibility, and it is because of bills such as this. If we just stop and slow down and listen to seniors and others across this country, there is a commonsense middle ground that we can go to, that doesn't cost anything along the nature of this, doesn't change health care for most people but addresses the narrow problem of getting the cost curve down, of getting more people covered. This bill with these cuts in Medicare cripples many of my providers in the State of Kansas and will make them raise property taxes to keep the hospitals open, to try to provide doctors in the community—a lot of the hospitals are going to close and a lot of providers will stop providing Medicare—or, in all probability, these cuts will never happen, and it will be added to the debt and deficit, completely irresponsible toward our kids.

I urge my colleagues to vote for the McCain motion that makes sense, that is what the citizenry wants to do: send these cuts in Medicare back to communities and pull out of this bill.

I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Tennessee.

Mr. CORKER. Mr. President, how much time remains on our side?

The ACTING PRESIDENT pro tempore. There is 7 minutes 6 seconds.

Mr. CORKER. I thank the Chair.

Mr. President, I am glad to be on the floor of the Senate with the distinguished Senators from Kansas and Connecticut and Montana. We have obviously before us one of the most important issues we will deal with in this body.

I have had over 40 townhall-like meetings since the beginning of August. I can say without hesitation that I have never used those meetings to try to focus on some of the hot-button issues that divide us. On not one occasion have I tried to do that. I have tried to focus on the fundamentals of this health care bill. Way back when, when I began meeting with the distinguished chairman of the Finance Committee—I greatly appreciated his desire to meet with me—and realized that Medicare may be a place where money will be taken to leverage a new entitlement, I began expressing my concerns about that.

Later, I sent a letter to Majority Leader REID, signed by 36 Senators, talking about the fact that if Medicare moneys were used to leverage a new entitlement, we could not support that effort.

The reason I say this is, this is the same exact thing I have been saying about this bill from day one, before it was ever constructed. I am very dismayed that we find ourselves here in December debating a bill that does exactly that.

When I first came to this body, there was a lot of concern about the solvency of Medicare. Everyone here knows the trustees have stated that in 2017 Medicare will be absolutely insolvent. Two Senators from opposite sides of the aisle have tried to create legislation that would put in place a commission, eight Republicans and eight Democrats, to actually solve that issue. We realize we do not have the resources in Medicare to actually deal with the liabilities we have with seniors.

The fact that we are taking $464 billion in savings out of Medicare to leverage a new entitlement, to me, is totally irresponsible. It is the same thing I have been saying from day one. I am dismayed that we would consider kicking the can down the road, making sure that people of the generation of the many people who are helping us on the floor today will be saddled with huge amounts of cost that they will not be able to deal with in a responsible manner. I am discouraged.

The fact is, the other piece of this that is extremely troubling is that we all know we have the issue of SDR, the doc fix, which is a colloquial term to describe the fact that in any year after this bill passes, physicians across the country will be receiving a 23-percent cut for serving Medicare recipients. Medicare recipients understand what that means. It means they will have less physicians to deal with the needs they will have at that time. This bill, instead of dealing with that issue, deals with it for one year. What that means is there is about $250 billion worth of expenses that are not being dealt with with this Medicare savings.

Let me go walk it one more time. We have a program that is insolvent. We have a program that cannot meet the needs of those people who have paid into it for years and many of us continue to pay into. This program is insolvent, and we are going to take moneys out of this program, $464 billion—something that most Americans cannot do, something that does not pass the commonsense test in Tennessee, and my guess is doesn't pass the commonsense test in most States—we are going to take $464 billion out of this program, this entitlement which is underfunded and insolvent, and we will leverage it to create a new entitlement for Americans. Yet we are not going to deal with the issue of the doc fix, which is a $250 billion issue. We are going to kick the can down the road. We are going to cause physicians around the

Exhibit 151    JA-0002504

country next year to, if this bill passes—if not, certainly they will be dealing with that this year—but we are going to cause physicians around the country another year to be concerned about these huge cuts, not deal with it in this bill, and possibly end up with a $250 billion obligation that could have been dealt with during this health care reform that now is not met, that is going to create additional fiscal burdens to this country and certainly great distress to seniors and physicians who care for them.

I tried to stick with the basic fundamental building blocks of this bill. I don't think anybody in this body has ever heard me focus on some of the more emotional issues. The fact that we would use Medicare moneys to create a new entitlement, the fact that we would have an unfunded mandate to States through Medicaid of $25 billion, to me, is problematic; the fact that premiums are going to increase, whether it is the CBO number of 10 to 13 percent or the Oliver Wyman number in my State which says 60 percent, the fact that private premiums are going to go up and the fact that we are using 6 years' worth of costs and 10 years' worth of revenues—I don't know how we have gotten caught up in this debate in such a manner that we are ignoring basic fundamentals that I don't think any of us on our own accord would consider supporting.

The fact is, I am afraid this, again, has become nothing but a political victory for the President.

What I hope we will do is step back and do some things in a bipartisan way that will stand the test of time. I ran on health care reform. I would like to see us do responsible health care reform. The basic fundamentals of this bill do not meet that test.

I see my time has expired. I thank the Chair and the Senators on the other side of the aisle who have worked hard to put this bill together. I hope they will step back away from these flawed fundamentals, and I hope in some form or fashion we will put together a bill that will stand the test of time.

I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Connecticut is recognized.

Mr. DODD. Mr. President, how much time do we have?

The ACTING PRESIDENT pro tempore. The Senator has 30 minutes.

Mr. DODD. Mr. President, let me first talk about the Medicare issue, because this has been the subject of sort of round-and-round debate, back and forth over the last couple of days. It is important to share, again, as emphatically as I know how what is being done with regard to Medicare. The whole idea is to strengthen Medicare, to put it on a sounder footing, to extend its solvency from 8 years by an additional 5 years, which we do under this bill, making it a stronger, more reliable source of health care for older Americans.

In fact, the finest and largest organization representing older Americans, which doesn't lightly endorse proposals without examining them thoroughly—hardly a partisan group given the fact of where they have been on these issues—has put out, once again, in the last 24 hours, a statement laying out the facts of what is included in the bill drafted by the Finance Committee principally in this area of Medicare.

Let me recite, if I may, the facts as they identify them. Fact No. 1, none of the health care reform proposals being considered by Congress would cut Medicare benefits or increase out-of-pocket costs for Medicare services. That is not from the Democratic National Committee. It is not from the HELP Committee or the Finance Committee. This is from AARP saying: None of the proposals in this bill cut Medicare benefits or cut Medicare services.

Fact No. 2, the health care reform bill drafted by the Finance Committee will lower prescription drug costs for people in the Medicare Part D coverage gap, or the so-called doughnut hole with which many seniors are familiar.

We are going to cut the cost of prescription drugs. Again, this is not from some partisan group announcing what is in the bill. This is from an objective, nonpartisan analysis of the bill that is before us.

Fact No. 3, health care reform will protect seniors' access to their doctors and reduce the cost of preventive services so patients stay healthier. Again, that is critical.

I presume others understand this; it is so axiomatic you wonder why you have to explain it. It is better to catch a problem before it becomes a major problem. Through mammograms, colonoscopies, obviously examinations and screenings, you can discover that an individual has a problem and, if caught early enough, can address it. As many of my colleagues know because it became rather public, I went through cancer surgery in August. It was discovered that I had an elevated PSA test, indicating I had prostate cancer. That screening let me know that I had a growing problem that I had to deal with. So I went through a variety of discussions on what best to do, what was the best way to handle all of this and decided that surgery made the most sense.

The cost of that surgery is expensive. It is not cheap—$5,000, $6,000, $7,000, $8,000 to do it. If I had not discovered I had prostate cancer and it had grown, I could have become 1 of the 30,000 men a year in this country who die from it, or if I had waited longer for it to be full-blown cancer, I am told it could have easily cost $250,000. So by catching this early and getting the needed treatment, I was not only able to stay alive and stay healthier, with two young daughters aged 4 and 8—and looking forward to the day I may dance at their weddings—but also there were the savings because it did not grow

into a problem that would require massive expenditures to deal with it.

Our bill deals with that. We provide for the first time ever that seniors and other Americans have access to prevention and screening tests that would allow them to discover problems they have early on. That is according to AARP. That is what we drafted in this legislation. It is a major benefit.

I listened to our colleague from North Carolina yesterday, Senator HAGAN, talk about nurses in a hospital in her State of North Carolina who were not getting mammograms early, not because they did not want them but because, of course, the out-of-pocket expenses for them are so high they could not afford to do it and pay rent and put food on the table and take care of their families.

That hospital in North Carolina decided they were no longer going to require their nurses to pay those high out-of-pocket expenses and they eliminated that. As a result, every nurse—or almost every nurse—in that hospital got those mammograms early on and, of course, could identify problems before they became larger issues for them to grapple with.

That is what this bill of ours does. That is a major achievement—a major achievement. So the suggestion is, we ought to roll back and commit this bill. But that would eliminate the kind of investments we make in reducing the cost of prescription drugs or providing the kinds of benefits so people can get screenings and treat problems while they are still small.

As a Senator, I have a health care plan that allows me to do that. I am 1 of 8 million people in this country who are Federal employees. We all get to do that. Why should a Senator's battle with cancer be more important than someone else's in this country? Why shouldn't every American male over the age of 50 be able to be screened to determine whether they might have prostate cancer?

That is what we are talking about. That is what we are achieving in this bill. The idea that the status quo is OK is wrong. It is not OK. To say we ought to throw the bill back into committee, again—we all know what the meaning of that is, of course. It will mean an end to this legislation. Those are the facts.

Fact No. 4, if you will: Rather than weaken Medicare, the health care reform will strengthen the financial status of the Medicare Program. That is from AARP. That is not some partisan conclusion.

I say, respectfully, to our colleagues, and having been through this at great length over the summer, filling in for our friend whom we have now lost, Senator Kennedy, we went through long debates and discussions early on, a lot of bipartisan discussions. As I pointed out earlier, as to the bill that came out of the Health, Education, Labor, and Pensions Committee in the Senate, we conducted the longest

Exhibit 151

JA-0002505

markup in the history of that committee, going back decades, in order to listen to each other and to try to provide a bipartisan bill.

In many ways, that bill is a bipartisan bill. It did not get bipartisan votes, unfortunately, coming out of committee. But the substance of the legislation includes the ideas and thoughts of our colleagues across the political spectrum, and it is important the public know that during the debate.

This is not a bill that was rushed through, jammed through. My colleague from Montana, Senator BAUCUS, spent weeks and weeks—months—with Democrats and Republicans gathered around the table late into the evenings talking about how we can shape this bill on a bipartisan basis. I attended many of those meetings in his office. No one can accuse the Senator from Montana of not reaching out to the other side to be a part of this solution. He went beyond the extra mile to achieve that, and he was flatly turned down, regretfully, in that effort. But that should not be a reason why we do not try to move forward.

I am still hoping we can get bipartisan support for the bill before it is concluded, but we will only get there if we work at it, and this is where we are working at it: on the floor of the Senate, and this debate is an opportunity to come forward and make constructive suggestions—not sending the bill back to committee, in effect, killing the legislation. That is the effect of what would happen if the McCain amendment were adopted.

Rather than engage in this kind of debate back and forth, where the Republicans say Medicare gets cut and the Democrats say, no, it does not, I wished to share with my colleagues this morning what nonpartisan, outside groups say about this bill. Listen to those who have made an analysis of this bill who do not wear a partisan hat, who do not have a political label attached to their names but are viewing every syllable, every punctuation mark in the bill to determine what it does for people. The most important, significant organization that represents the interests of the elderly in this country has analyzed this bill and has said to America: This is a good bill. This bill strengthens Medicare, provides benefits, and reduces costs.

That is what we have tried to achieve over these many months. So let's move on. If you want to cut this bill, if you want to change all this, then offer an amendment and let's vote on it, up or down, and move forward. I urge my colleagues to support this legislation and reject the McCain amendment because I think his proposal would do great damage to the effort we have achieved so far.

With that, I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Montana is recognized.

Mr. BAUCUS. Mr. President, I noted that the other side, in the last couple,

3 days, has tried to make the case that seniors' Medicare benefits are in jeopardy because "this legislation cuts Medicare." I have heard that statement over and over and over and over again. In fact, the last speaker on the other side made that same point.

I am confounded, I am very surprised, when I hear these statements. Why am I very surprised? Because it is totally, patently false. It is false. It is untrue. There are no benefits cut here, none. One could say that with the private plans, the Medicare Advantage plans, which are vastly overpaid—the non-partisan MedPAC organization states they are vastly overpaid by about 14 percent—one could say those private plans—it is not Medicare; those private plans, Medicare Advantage; those are not Medicare plans, those are private plans, private insurance plans—they may be overprescribing some non-guaranteed benefits for beneficiaries, things such as eyeglasses or something like that, which might be cut back. That is true. But none of the guaranteed benefits—the basic benefits under Medicare that every senior knows about when he or she goes to the doctor; and it is care under Medicare—is reduced. None. Nothing is cut.

In fact, this legislation adds benefits to seniors. For example, it virtually fills up this thing we call the doughnut hole. That is the portion of prescription drug payments that seniors otherwise would have to pay. But we say $500 of that is going to be paid for, and the rest of it is going to be paid for at least for 1 more year. So that is an additional benefit. Then all the screening provisions that are in this bill, that is an additional benefit. There are many other benefits that are added onto the ordinary benefits seniors have.

So it is not true—it is not true—that the basic guaranteed benefits under Medicare are cut. None of the guaranteed benefits under Medicare are cut—none. So it is totally untrue. It is false when people make the claim that "Medicare is being cut."

They are being very clever, the people who are making those claims. What they are saying when they say Medicare will be cut—they want you to think they mean benefits will be cut—but deep in their mind, what they are holding back in their mind—well, when pressed, they will agree, well, it is the Medicare providers, it is the hospitals, it is the medical equipment manufacturers, it is the pharmaceutical industry. That is being cut. That is "Medicare" that is being cut and, therefore, that will hurt seniors. That is kind of the way they get around it.

Well, the fact is, the way you preserve the solvency of the trust fund is to make sure there are not so many payments, frankly, by Uncle Sam going to pay for all the doctors and hospitals and so forth so the solvency of the trust fund is extended. Right now this legislation extends the solvency of the Medicare trust fund. If this legislation were not to pass, the Medicare trust

fund would probably go insolvent in about the year 2017. But this legislation extends the solvency of the trust fund for at least 5 more years to 2022.

So I wish to make it very clear that this legislation we are considering does not cut Medicare benefits. In fact, the hospitals and docs, I would say, are going to find at least a 5-percent increase in growth over the next 10 years in payments to them under the Medicare Program—growth. I have a chart which I showed yesterday on the floor. It showed, for each of the various years, it is a 5-percent increase in growth for all those industries. They are being cut 1.5 percent, but that is from a 6.5-percent growth, to net down to a 5-percent growth for each of the years.

You ask analysts on Wall Street how hospitals are doing. They are doing great under this legislation. You ask analysts on Wall Street how the pharmaceutical industry is doing. They are doing great under this legislation. You ask any analyst about other industries—home health care, hospice care, you name it—they are all doing OK. Wall Street analysts say they are doing fine.

Why are they doing fine? Why, objectively, are they doing fine? Why do the CEOs of these organizations not grumble too much? Because they know what they may lose in a little bit of a reduction in their payments—they will still get big, hefty payments—they will make up in volume because so many more people will have health insurance. They know that. They are going to make a lot of money. So they are OK.

So it is not true that Medicare is going to go broke under this legislation. First of all, there is no reduction in benefits. That is very clear. Senator DODD read a letter from AARP making that very clear. Also, the reductions are not reductions in provider payments; they are reductions in the rate of growth of provider payments, and they are going to do fine. Providers do not care that much because they are making it on volume because everybody is going to have health insurance. They have quite a bit—a 5-percent growth rate anyway. So it is not true—it is not true—that Medicare is in jeopardy because of this legislation. It is not true that benefits are going to be cut. In fact, just the opposite is true. This legislation strengthens benefits, increases benefits, extends the length of the Medicare trust fund to a future date further down the road, so it stays solvent for many years than otherwise is the case.

This legislation helps seniors. It helps seniors, contrary to what you are hearing on the other side that it hurts seniors. If you just look at the facts, not the rhetoric—not the rhetoric but just look at the facts, look at the facts and look at who the supporters of this legislation are and objective groups and what they say about this legislation—you cannot help but be compelled

Exhibit 151    JA-0002506

*December 2, 2009*                    CONGRESSIONAL RECORD — SENATE

to the conclusion that this legislation is not only good for seniors, it is very good for seniors.

RECOGNITION OF THE MINORITY LEADER

The ACTING PRESIDENT pro tempore. The Republican leader is recognized.

Mr. McCONNELL. Mr. President, with the apologies to my good friends from Montana and Connecticut, I was unavoidably detained at the opening and would like to now, on my leader time, give my opening remarks.

The ACTING PRESIDENT pro tempore. The Senator has the floor.

AFGHANISTAN

Mr. McCONNELL. Mr. President, the challenges of the ongoing war in Afghanistan are immense, but Americans believe in the mission. They trust the advice of our commanders in the field to see that mission through.

So I support the President's decision to follow the advice of General Petraeus and General McChrystal in ordering the same kind of surge in Afghanistan that helped turn the tide in Iraq.

These additional forces will support a counterinsurgency strategy that will enable us to begin the difficult work of reversing the momentum of the Taliban and keeping it from power.

The President is right to follow the advice of the generals in increasing troops, and he is also right to focus on increasing the ability of the Afghan security forces so they can protect the people.

By doing both, he has made it possible for our forces to create the right conditions for Afghanistan—the right conditions for them to defend themselves, create a responsible government, and remain an ally in the war on terror.

Although our forces are in Afghanistan to defend our security interests, the people of Afghanistan must assume a greater burden in the future. The President's plan recognizes that.

Once we achieve our objectives—an Afghanistan that can defend itself, govern itself, control its borders, and remain an ally in the war on terror—then we can reasonably discuss withdrawal, a withdrawal based on conditions, not arbitrary timelines.

But, for now, we owe it to the American people, to those who died on 9/11, and to the many brave Americans who have already died on distant battlefields in this long and difficult struggle, to make sure Afghanistan never again serves as a sanctuary for al-Qaida. We owe it to the men and women who are now deployed or who will soon be deployed to provide every resource they need to prevail.

HEALTH CARE REFORM

With every passing day, the American people become more and more perplexed about the Democratic plan for health care, and they like it less and less.

Americans thought reform meant lowering costs. This bill actually raises costs. Americans thought reform meant helping the economy. This bill actually makes it worse. Americans thought reform meant strengthening Medicare. This bill raids it to create a new government program that will have the same problems that Medicare does. Americans wanted reform. What they are getting is the opposite—more spending, more debt, more burdens on families and businesses already struggling to get by.

One of the biggest sources of money to pay for this experiment is Medicare. This bill cuts Medicare Advantage by $120 billion. It cuts hospitals by $135 billion. It cuts home health care by $42 billion. It cuts nursing homes by $15 billion. It cuts hospice by $8 billion.

Reform shouldn't come at the expense of seniors. The McCain amendment guarantees it wouldn't. The McCain amendment would send this bill back to the Finance Committee with instructions to remove the language that cuts Medicare. The McCain amendment also says any funds generated from rooting out waste, fraud, and abuse should be used to strengthen Medicare, not to create an entirely new government program.

A vote in favor of the McCain amendment is a vote to protect Medicare. Let me say that again. A vote in favor of the McCain amendment is a vote to protect Medicare. A vote against the McCain amendment is a vote to raid this vital program in order to create another one for an entirely new group of Americans. So a vote against the McCain amendment is a vote to take money out of Medicare to create a program for an entirely different set of Americans. A vote against the McCain amendment is a vote against our seniors, and it is a vote against real health care reform.

Mr. President, I yield the floor.

Mr. DODD. Mr. President, how much time remains?

The ACTING PRESIDENT pro tempore. There is 13½ minutes.

Mr. DODD. I yield myself 5 minutes, if I may. I want to go back, if I can. I wish to put up these charts. Again, I say this respectfully, because I genuinely believe that people across the spectrum want to see some reform of the health care system. The question is whether the proposal that has been laid before us by the Finance Committee and the HELP Committee achieves reform and whether the ideas we bring to the table are actually going to achieve lower costs, provide greater access, and improve the quality of health care. We believe very firmly and strongly that it does.

There are outside observers of this process who have no political agenda whatsoever other than to make determinations as to whether the goals we have sought in this legislation achieve the desired results. It is the conclusion of the major organizations that make these determinations that, in fact, we have done exactly what we said we had set out to do.

But I wish to point out, because I think it is important when I hear the arguments from our friends on the other side about their deep concerns about Medicare, it is very important they understand that over the last number of years, we have seen quite the opposite reaction when it comes to the Medicare Program in our Nation. Going back to 1995, when our friends took control of both this body and the other body, the then-Speaker of the House Newt Gingrich announced to the world that basically he was prepared to let Medicare "wither on the vine." That is not ancient history. That is not 1965 when the Medicare Program was adopted; that is merely 14 years ago when the other party, for the first time in 40 years, became the dominant party here in Congress. One of the first statements from the leadership of that party was to let this program "wither on the vine." Again, that is one person, the Speaker, the leader of the revolution that produced the results electorally in 1994. But I think it is important as a backdrop. When we hear the debate about Medicare, it is important to have some history about where the parties have been on this issue, generally speaking. So in 1995 we begin with that as a backdrop.

In 1997, 2 years later, it happened again. In 1997, proposed Medicare cuts in the Republican Balanced Budget Act of that year were twice as much as the savings we are talking about in this bill. They proposed a 12.4-percent reduction in Medicare benefits in 1997. Of course, the last budget submitted by President Bush last year—again, reflective of where things stand, and this is a year ago, not 14 years ago, and not 1997, but 2009—the Bush administration in its submission of this budget proposed a $481 billion reduction in Medicare benefits. That was not in the context of a health reform bill; that was in the context of a budget proposal.

Here we are talking about savings by reducing costs for hospitals and other providers as a way of strengthening Medicare, providing more benefits to the beneficiaries themselves through things such as prescription drugs as well as screenings and early prevention efforts which are included in our bill. Those things have been identified, of course, by AARP and the National Committee to Preserve Social Security and Medicare. They have analyzed our proposals and have suggested we do just that. We strengthen Medicare and we preserve those benefits. Our bill saves $380 billion in order to strengthen the Medicare proposal. It improves the quality of health care for seniors as part of our comprehensive reform. In fact, Senator COBURN's Patient Choice Act actually imposes $40 billion more in cuts to Medicare Advantage than our bill does.

I find it somewhat intriguing that those who are arguing for the Coburn proposal as an alternative and simultaneously suggesting we ought not to do anything to Medicare Advantage have

Exhibit 151                                                                                                    JA-0002507

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 536 of 677

not read the Coburn bill, because he cuts $40 billion more out of Medicare Advantage than we did in our legislation as proposed.

In conclusion, let me quote from the National Committee to Preserve Social Security and Medicare—again, not a partisan organization. Their sole mission is to see to it that Social Security and Medicare will be there for the people it was intended to support. Let me quote exactly from a letter sent to every Senator yesterday from the committee:

Not a single penny of the savings in the Senate bill—

the bill now before us—

will come out of the pockets of beneficiaries in the traditional Medicare program. The Medicare savings included in H.R. 3590, the Patient Protection and Affordable Care Act, will positively impact millions of Medicare beneficiaries by slowing the rate of increase in out-of-pocket costs and improving benefits, and it will extend the solvency of the Medicare trust fund by 5 years. To us, this is a win-win for seniors and the Medicare program.

So we can hear all of the partisan debate back and forth as to what this bill does, but if you are interested in what those organizations say, whose sole mission is to analyze whether beneficiaries are going to be advantaged or disadvantaged by what is being proposed here, they categorically, unequivocally, suggest that the McCain amendment does just the opposite of what our bill does. It would roll the clock back, damage seniors terribly by reducing or eliminating the provisions we have included in our bill, and they strongly support what the Finance Committee wrote in its bill that is now presented to all of us here as a way to strengthen and preserve the Medicare Program.

I say to my colleagues and to others, you can listen to this partisan debate back and forth as to whether you want to believe the Democrats or believe the Republicans, but I would suggest if you are not clear who to believe in this, listen to the organizations whose job it is to protect this program, with whom we have worked very closely to determine that we would not in any way reduce those guaranteed benefits that Senator BAUCUS addressed in his remarks. That is what we do. That is why this bill is a good bill and deserving of our support. I urge our colleagues to reject the McCain amendment.

Mr. President, I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Montana.

Mr. BAUCUS. Mr. President, the Republican leader a few moments ago said this bill raises costs. With all due respect to my good friend from Kentucky, that statement is false.

Just this week, the nonpartisan Congressional Budget Office, the organization that analyzes legislation—and both sides, both bodies depend on it; it is a very professional outfit, I might add—said our bill would reduce premiums, not increase but reduce premiums for 93 percent of Americans.

And for all Americans, it would make sure that better quality insurance is available.

Let me state that a little bit differently. The Congressional Budget Office said that for 93 percent of Americans, premiums would be reduced. It is true that for 7 percent that is not the case. Those are Americans whose incomes are too high to qualify for subsidies; that is, the tax credits, buying insurance in exchange. But those 7 percent would get a lot better insurance, a lot higher quality insurance than they get today because of the insurance market reforms that are in this legislation. The provisions prevent insurance companies from denying coverage based on preexisting conditions, health status, the committee market rating provisions, no rescissions, et cetera. So for all Americans, it is true that this legislation will provide better quality insurance comparing apples with apples. There is a reduction for 93 percent of Americans. The other 7 percent would be in the individual market and they would have a lot higher quality insurance. So if the quality is much higher, it would exceed the increase in premiums. They would be getting a better deal than they would otherwise be getting.

CBO looked at this for the year 2016. They didn't look at it for other years, but at least that is the case for 2016: a reduction, not an increase but a reduction. In fact, for many in the nongroup market, those who individually buy insurance, they would find their premiums would be reduced about 40 or 50 percent. About 60 percent of those in the nongroup market are finding their insurance premiums would be reduced. I don't have the exact figure in front of me, but it is in the neighborhood of a 40- or 50-percent reduction in premiums. That is due to tax credits. Again, CBO says those tax credits would cover nearly two-thirds of premiums. So I guess I was a little conservative. It is a little more than 40 or 50 percent. It would cover two-thirds of premiums.

CBO said those getting these tax credits would pay for roughly 56 percent to 59 percent lower premiums than they would without our bill. Those are real savings. That is with respect to the premiums.

What about out-of-pocket costs? This legislation has absolute limits on out-of-pocket costs. Today insurance companies can sell you a policy, you pay certain premiums, but there is no limit on the out-of-pocket costs you might have to pay. Your deductible is so high, for example. This legislation puts an absolute limit so no policy can be sold that allows you to have out-of-pocket costs above a certain amount. I think it is $6,000 for an individual, and it might be double that for a family. But there is a limit. So this bill does not, as stated by the minority leader, raise costs. In fact, it reduces costs.

In addition, there are many people who say, Oh, gosh, this is a $1 trillion bill. Some people even say it is a $2.5 trillion bill. Senators on the other side of the aisle make those statements and they say this to try to scare us.

I will be honest with you. I don't know if they believe in that. They like saying it because it is a nice, good scare tactic. I say I am not sure they believe it. I wonder if they believe it, because when you read the legislation, it is deficit neutral. It does not add to the deficit.

We have a budget resolution. Under that budget resolution, health care legislation for the next 10 years has to be deficit neutral. It cannot add one thin dime to the deficit. So I am a little curious when people talk about a $1 trillion bill. In fact, it reduces the deficit by $130 billion over a 10-year period. That is what the Congressional Budget Office says, the professional nonpartisan budget office.

In the second 10 years, the CBO says our bill reduces the deficit by a one-quarter of 1 percent of the gross domestic product. That is roughly $½ trillion. In the second 10 years, this legislation reduces the deficit by $½ trillion. That is a reduction in the deficit.

I don't know why these people are saying on the other side that this is a trillion-dollar bill. One said—and I will not mention his name—the other day that this is a $2.5 trillion bill. That is not true. It is just not true because it is paid for. It would only be fair for them to say it is paid for. I think it is fair to get both sides of the story, not just one side. It does cost $1 trillion over 10 years, but it is more than paid for over 10 years. Those who say $2.5 trillion—they start at 2014 up to 2020, and say that is why it costs so much. It is paid for during those years, too.

Let me make it very clear this bill doesn't raise costs. In fact, it lowers costs, and the CBO says so. It doesn't add to the Federal deficit. In fact, it reduces the Federal deficit. I urge everyone to look at the facts closely whenever we hear statements made by anybody, including me. I urge people to listen to the words and read between the lines and see what is really going on. Like my father used to say: Don't believe everything you read and only half of what you hear. Take everything with a few grains of salt.

The PRESIDING OFFICER (Mr. KIRK). The Senator from Tennessee is recognized.

Mr. ALEXANDER. Mr. President, I agree with the Senator. That is why we have 22 minutes on the Republican side to clear up some misconceptions.

The Democratic health care bill does cost $2.5 trillion over 10 years when it is fully implemented. If I may say so, it is arrogant to think the American people couldn't figure out the difference between the first 10 years, when the bill wasn't implemented in 4 of those years, and they would like to know that it costs $2.5 trillion.

Mr. BAUCUS. Will the Senator yield for a question?

Mr. ALEXANDER. If it is on your time.

Exhibit 151      JA-0002508

Mr. BAUCUS. Is it paid for?

Mr. ALEXANDER. The Senator is right. It is paid for by cutting grandma's Medicare. It is paid for by cutting grandma's Medicare by $465 billion over a 10-year period of time, and about $500 billion in taxes——

Mr. BAUCUS. That is a second question I would love to debate with the Senator. But on the first question only, the Senator admits it is paid for?

Mr. ALEXANDER. No. I admit it costs $2.5 trillion, and the attempt to pay for it is through Medicare cuts, tax increases, and increases to the deficit by not including the physician reimbursement in the health care bill.

Mr. BAUCUS. One more question. I think we all know the House has taken action on physician reimbursement, and the Senate will also do so before we adjourn. That is the so-called doc fix. That is a separate issue. That will be paid for. Putting the doctor issue aside, health care reform—and I say that because we take up the doc fix virtually every year. We don't take up health care reform every year. That is an entirely separate proposition, separate legislative endeavor.

If the Senator will bear with me and take the doc fix off the table for a second—we can address that later—health care reform—to use a 10-year number, or when you start in 2010 or in 2014, wherever you are starting—either there is $1 trillion or $2.5 trillion, depending where you start, not getting into how it is paid for. Is it paid for and therefore it is not deficit; am I not correct?

Mr. ALEXANDER. I will concede to the Senator from Montana that the attempt of the Democrats to pay for this $2.5 trillion bill consists of Medicare cuts, tax increases, and additions to the deficit by not including the physician reimbursement, which is an essential part of any 10-year health care plan. There may be other problems, but those are the three things I know about.

Mr. BAUCUS. One more question on my time. Is it true there are no cuts in guaranteed beneficiary payments—none whatsoever—in this legislation—in guaranteed benefits?

Mr. ALEXANDER. I would say no to that, Mr. President, because the Director of the Congressional Budget Office made it clear there would be specific cuts in benefits for those who have Medicare Advantage, which is about one out of four seniors.

Mr. BAUCUS. Is it true those provisions are not guaranteed provisions? I am talking about guaranteed benefits that seniors expect to get when they go to the doctor, fee for service, expected benefits, under ordinary Medicare, not benefits that a private plan may pay in addition.

Mr. ALEXANDER. Mr. President, it is clear there are $465 billion in cuts in Medicare. The Chair and the Senator from Montana and the Senator from Connecticut have all agreed that is a big part of how the bill is supposedly paid for. It is specific enough to say that $135 billion comes from hospitals; $120 billion from Medicare Advantage, which 11 million seniors have; nearly $15 billion from nursing homes; $40 billion from home health agencies; $8 billion from hospices.

The Director of the CBO testified that provisions like that would result in specific cuts to benefits for Medicare Advantage. He said that fully half of the benefits currently provided to seniors under Medicare Advantage would disappear. The changes would reduce the extra benefits, such as dental, vision, and hearing coverage, that currently are made available to beneficiaries.

Mr. BAUCUS. One more question. Does the Senator agree this legislation will extend the solvency of the Medicare trust fund for 5 years, and failure to pass this would mean the solvency of the Medicare trust fund would not be extended for 5 years?

Mr. ALEXANDER. I wholeheartedly disagree with that. The Medicare trustees have said that between 2015 and 2017 Medicare will be approaching insolvency. They have asked that we take urgent action. The urgent action recommended by the Democratic majority is that we take $465 billion out of the Medicare Program over 10 years and spend it on a new entitlement.

It is hard for me to understand how that can make Medicare more solvent, when you take money out of grandma's Medicare and spend it on someone else.

Mr. McCAIN. Will the Senator yield?

Mr. ALEXANDER. Yes.

Mr. McCAIN. Isn't it, shall we say, Enron accounting when you have a proposal that, as soon as the bill becomes law, you begin to raise taxes and cut benefits, and then you wait 4 years before any of the benefits are then extended to the beneficiaries? That, on its face, is a remarkable piece of legislation. My experience, which has only been 20-some years, is that we haven't passed legislation that says we are going to collect taxes on it for 4 years, and then we are going to give you whatever benefits that may accrue from this legislation. Again, there has been no time in history where we have taken money from an already failing system to create a new entitlement program.

Mr. BAUCUS. Which colleague is the Senator asking that?

Mr. McCAIN. I believe the Senator from Tennessee has the floor.

Mr. BAUCUS. He does.

Mr. McCAIN. I was addressing the person who has the floor, which I am sure the Senator from Montana should understand by now.

Mr. ALEXANDER. I say to the Senator from Arizona that he is exactly right. Another way to describe it, the Senator from Kansas said it was like writing a big check on an overdrawn bank account and buying a big new car. Maybe another way, if I may respond to the Senator from Arizona—I ask unanimous consent that Republican Senators, on our time, be allowed to engage in a colloquy.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mr. BAUCUS. May I ask the Senator another question?

Mr. ALEXANDER. I would like to finish responding to Senator McCAIN, if I might.

Mr. BAUCUS. Then I have a question on the same subject.

Mr. ALEXANDER. I hope the Parliamentarian is keeping track of the Republican time. I am enjoying the questioning, and I thank the Senator for his question. One of the things—in fact, a great compliment has been paid to the Senator from Arizona. It is rare that a Senator can have something he said actually begin to break through the fog.

Dana Milbank, a columnist for the Washington Post, wrote a column about it being all about grandma and wondering why we never mention grandpa. Maybe Mr. Milbank hasn't seen the movie "My Big Fat Greek Wedding," where the man said, "I'm the head of the house," and the woman said, "I'm the neck, because I can turn the head any way I want."

We are talking about grandma because she can help persuade grandpa. If we take $465 billion out of Medicare over 10 years, grandma and grandpa and those who are younger and looking forward to Medicare will be affected.

If I may say to the Senator from Arizona—and I see the Senator from Oklahoma and the Senator from Nebraska—it wasn't long ago, in response to the question—in fact, in 2005, when we sought to restrain the growth of Medicare by $10 billion over 5 years, and this is what they said—remember, they are "restraining" the growth of Medicare by $465 billion and spending it on a new program, and Republicans were, at that time, trying to save $10 billion over 5 years.

"An immoral document," said Senator REID and Senator DODD. The Senator from Connecticut said that funding for Medicare would be cut. Senator ROCKEFELLER: "A moral disaster of monumental proportion." Senator BOXER, in the same way, compared it to Katrina. Senator KERRY said we are "passing the costs on to seniors." Senator LEVIN said people are "going to be hurt by this bill." "Irresponsible and cruel," said Senator KOHL. Senator REED and Senator Hillary Clinton also made similar comments.

That was for $10 billion of restraining the growth of Medicare to spend it on the existing program. Yet this proposal by the Democrats would take $465 billion and spend it on a new program.

Mr. McCAIN. Isn't it true—and the Senator from Montana is on the Senate floor and wants to enter into this. Maybe he can respond to his comments of 14 years ago. We weren't trying to create a new entitlement program, which is the object of the Senator's bill. We were just trying to enact some savings in the Medicare system.

Exhibit 151    JA-0002509

What did Senator BAUCUS say? He said:

And above all, we must not use Medicare as a piggy bank.

What are we using the $483 billion in cuts in Medicare for?

Then he said:

That is disgraceful. Perhaps some changes lie ahead. But if they do, they should be made for the single purpose of keeping Medicare services for senior citizens and people with disabilities.

Isn't it true that now that we are taking $483 billion out of a failing system the Medicare trustees say is going to go bankrupt, and the Senator from Montana, 14 years ago, said:

Seniors could easily be forced to give up their doctor, as doctors begin to refuse Medicare patients and hospitals—especially rural hospitals—close.

Isn't that the effect of taking $483 billion in cuts in Medicare? Then the Senator from Montana went on to say:

Equivalent to blowing up the house and erecting a pup tent where it used to be.

Instead of blowing up a pup tent, I would say what they are doing is like a hydrogen bomb. Finally, Senator BAUCUS said:

Staggering. The leadership now proposes something like $250 billion in Medicare cuts. It is staggering. It is a reduction of nearly a quarter in Medicare services by the year 2002.

All of us here learn about the issues. Apparently, the Senator from Montana didn't learn much, because he was deeply concerned 14 years ago about a very small savings in Medicare. Now he wants to spend $2.5 trillion and taking $483 billion out of Medicare to create a new entitlement system.

Mr. BAUCUS. Might I respond to the Senator?

Mr. ALEXANDER. Mr. President, I am happy to see a debate actually break out on the Senate floor on this issue.

Mr. BAUCUS. Here is your opportunity; here is your chance.

Mr. ALEXANDER. As long as it is on Democratic time.

Mr. BAUCUS. It is on both sides. We have even time.

Mr. ALEXANDER. I mean whatever time the Senator uses should be on Democratic time.

Mr. BAUCUS. Yes. The basic question, obviously, is how to protect Medicare benefits. I think most of us would say how do we protect Medicare benefits and extend the solvency of the Medicare trust fund. I think we would all agree that excessive payments to providers would cause insolvency of the trust funds to come earlier rather than later. We all agree with that proposition.

The next question is, What would excessive payments to providers be? Do providers get paid excessively? I think that is an honest question we should ask ourselves in a way to help extend the solvency of the Medicare trust fund. In fact, in 1995, many Senators, especially on the other side of the aisle, did say just that, that we have to cut Medicare in order to save benefits. That was made by many Senators. I have them right in front of me, if anybody wants to hear them. I am not going to go through all of that, but it is the truth. That is exactly what we are doing in this bill. We are trying to help extend the solvency of the Medicare trust fund by cutting down on excessive provider payments from the Medicare trust fund.

How do we decide whether payments are excessive? That is the basic question here. All we can do is just give it our best shot, make our best judgment. I think it makes sense to look at the recommendations by outside independent groups, what they think. One is MedPAC, the Medicare Payment Advisory Commission. That is an outside group, as we all know, that advises Congress on Medicare payments. As Members of Congress, we are not totally competent to know exactly what dollars should go to which industry group. We have too many other obligations to think about. As Senators, we must be responsible to do the best we can. MedPAC has said these groups have been overpaid. And Wall Street analysts tend to agree. In fact, MedPAC said, with respect to Medicare Advantage, that they have been overpaid—I forget the exact amount but much less than the $118 billion reduction in this bill.

In fact, I totaled up and looked at the projected growth rate of providers—hospitals, nursing homes, home health, hospice, PhRMA, you name it—and on average their growth rate over the next decade is going to be 6½ percent. That is the growth rate of providers. We decided to trim that a little bit by 1.5 percent. So it is 5 percent. It is a 5-percent growth rate in an attempt to try to find the right levels of reimbursement to providers, which will also help extend the solvency of the Medicare trust fund.

When we talk to providers, they basically agree with those cuts. They basically agree. Why do they basically agree? They basically agree because they know that with much more coverage, with many more people having health insurance, they could spread out their business. They may lose a little on margin, but they can pick it up on volume. That is exactly what their business plan is under this bill.

Wall Street analysts say—I quote them—these industries are doing great, they are doing well under this bill. They are not getting hurt. So we do achieve a win-win—I don't like that phrase, by the way, but I will use it here—where the solvency of the trust fund is being extended and where reimbursement rates to providers are fair—not being hurt; it is fair. And that is why they want this bill, by and large.

Most groups tend to want this bill enacted because they know it is good for the country, it is good for the seniors, and it is good for them too.

Mr. McCAIN. Mr. President, may I just mention again, $70 billion in fraud, abuse, and waste, and Senator COBURN, the doctor, can tell you, that is nowhere in this bill. The fact is, maybe some of the providers have been bought off, jawboned, or had their arms twisted or given a good deal, like PhRMA has. Recipients know you cannot cut $483 billion without ultimately affecting their benefits, and that is a fact.

Again, conspicuous by its absence, I say to the Senator from Montana, totally conspicuous by its absence is any meaningful malpractice reform, which has been proven in the State of Texas and other States to reduce costs and to increase the supply of physicians and caregivers. There is nothing in this bill that is meaningful about medical malpractice reform.

I had a townhall meeting with doctors in my State, and everyone stood up and said: I practice defensive medicine because I fear being sued.

If you are really serious, I say to the Senator from Montana, if you are really serious about this, medical malpractice should be a key and integral part of it. Even the CBO costed it out at about $54 billion a year. When you count in all the defensive medicine, it could be as much as $200 billion over 10 years. That is conspicuous by its absence. I think it brings into question the dedication of really reducing health care costs across America.

Mr. ALEXANDER. Mr. President, we have enjoyed our discussion with the distinguished chairman of the Finance Committee and thank him for his questions.

Senator COBURN, who is a physician—the Senator from Montana talked about doctors being overpaid. He talked about——

Mr. BAUCUS. No, no, no, I did not. With all due respect, I did not say that.

Mr. ALEXANDER. Didn't I hear the words "providers overpaid"?

Mr. BAUCUS. I talked about hospitals. I did not talk about doctors overpaid. If I may say to my friend from Tennessee, this legislation pays more to primary care doctors, a 10-percent increase in Medicare reimbursement for each of the next 5 years. I did not say "doctors."

Mr. ALEXANDER. I must have misunderstood. Normally when we talk about providers, we talk about hospitals and physicians.

We have a physician on the Senate floor, the Senator from Oklahoma. I wonder if he, having heard this debate, might want to comment. I might say, isn't it true that the McCain motion, which we have on the floor, would send this back to the Finance Committee and say: If there are savings, let's spend it on Medicare to actually strengthen it?

Mr. COBURN. Mr. President, I thank the Senator. The first comment I have is about relying on what Wall Street analysts say today. They have about this much credibility in this country today. Look at the economic situation we find ourselves in because of what

Exhibit 151 JA-0002510

Wall Street analysts have said. That is the first point I would make.

The second point is that the majority whip yesterday said we should cut Medicare Advantage because of the 14 percent. Senator DODD just recently went after the Patients' Choice Act because we actually make it be competitively bid without any reduction in benefits. Your bill, for every Medicare Advantage, cuts 50 percent of the benefits out. It cuts the benefits.

The difference is—and I agree with the majority whip—we do need to have the savings in Medicare Advantage, but the way you get that is through competitively bidding it while at the same time maintaining the requirements for the benefits that are offered. There is a big difference in those two. Ours ends up being pure savings to save Medicare. The savings in this bill are to create a new entitlement.

The other point I wish to make is, if you are a senior out there listening and if you are going to be subject to the new increase in Medicare tax, for the first time in history, we are going to take the Medicare tax and not use it for Medicare, we are going to use it for something else under this bill. This one-half of 1 percent is now going to be consumed in something outside of Medicare. So no longer do we have a Medicare tax for the Medicare trust fund. We have a Medicare tax that funds the Medicare trust fund plus other programs.

I say to my colleagues, I think we want a lot of the same things. How we go about it—the Senator from Montana recognized the fact that we are going to increase payments to primary care physicians. Ask yourself the question why only 1 in 50 doctors last year who graduated from medical school is going into primary care. Why do you think that is? Could it be that the government that is setting the payment rates created a maldistribution in remuneration to primary care physicians; therefore, they choose to go where they can make 200 percent more over their lifetime by spending 1 additional year in residency rather than doing primary care?

What this bill does, and what the Senator from Arizona is trying to do by sending this bill back, is to refocus it on the fact that Medicare money ought to be used for Medicare. If, in fact, we are going to slow the growth of Medicare, can we do that without cutting benefits? To slow the growth in this bill for 11 million Americans who now have Medicare Advantage will diminish their benefits. That is out of the $120 billion that is going to come.

You cannot tell a senior who is in a rural area today, who is on the economic lower rungs of the ladder, who uses Medicare Advantage to equalize their care with somebody who can afford a Medicare supplemental policy, you cannot tell them this is not going to decrease their benefits and their care, because it is. And in the bill, it actually states that it is going to decrease their benefits.

Mr. McCAIN. Will the Senator yield? Very briefly, the Senator from Montana talked about the support the bill gets. AARP makes more money from Medigap plans they sell to seniors. AARP should be opposing the bill, but other groups such as 60 Plus are educating seniors.

The AMA endorsement of the bill—shocking. The bill puts the government in charge, but AMA cut a deal to get their Medicare payments addressed by increasing the deficit by $250 billion.

Mr. COBURN. Mr. President, will the Senator yield for a minute?

Mr. McCAIN. PhRMA—my God, if there ever was an obscene alliance made that will harm seniors because it has the administration against drug reimportation from Canada and competition for treatment of Medicare patients.

So now we understand a little bit better why these special interest groups, 500-some of them, have visited the White House in recent months, according to White House logs.

Mr. COBURN. The Senator would probably be interested to know—and, I know, my colleagues on the other side—that the American Medical Association now represents less than 10 percent of the actively practicing physicians in this country. The physicians as a whole in this country are adamantly opposed to this bill. The reason they are opposed to this bill is because you are inserting the government between them and their patient. That is why they are opposed to this bill.

So you have the endorsement of the AMA which represents less than 10 percent of the practicing doctors—actively practicing doctors—in this country because not only will it increase payments, but CPT code revenue is protected. That is the revenue AMA gathers from the payment system that continues to be fostered in this bill, which is their main source of revenue.

Mr. McCAIN. May I ask my colleague's indulgence for just a moment because, as you know, the majority leader seems to appear more and more frantic as he, perhaps, is reading the same polls we are that more and more Americans, when they figure out this legislation, are becoming more and more opposed to it.

Yesterday, the majority leader came out and directly addressed me, saying:

This man talks about earmarks, but his amendment is one big earmark to the insurance industry. And in addition to that, the sponsor of the amendment—

Talking about me—

during his Presidential campaign talked about cutting these moneys.

Mr. President, I hate, I say to my colleagues, to take a trip back down memory lane, but at the time—of course, this was echoed by a DNC spokesperson, who then echoed it throughout the blogosphere and left-wing liberal blogs. The fact is, on October 20, FactCheck.org says:

He accuses McCain of proposing to cut benefits. Not true.

This is from FactCheck.

In a TV ad and in speeches, Obama is making bogus claims that McCain plans to cut $880 billion from Medicare spending and to reduce benefits.

A TV spot says—

A very well-funded campaign, I might add—

McCain's plan requires "cuts in benefits, eligibility, or both."

Obama said in a speech that McCain plans "cuts" that would force seniors to "pay more for your drugs, receive fewer services, and get lower quality care."

A second ad claims that McCain's plan would bring about a 22 percent cut in benefits.

FactCheck.org says:

These claims are false, and based on a single newspaper report that says no such thing. McCain's policy director states unequivocally that no benefit cuts are envisioned.

Mr. President, I ask unanimous consent to have printed in the RECORD the entire FactCheck.org article.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

OBAMA'S FALSE MEDICARE CLAIM

SUMMARY

In a TV ad and in speeches, Obama is making bogus claims that McCain plans to cut $880 billion from Medicare spending and to reduce benefits.

A TV spot says McCain's plan requires "cuts in benefits, eligibility or both."

Obama said in a speech that McCain plans "cuts" that would force seniors to "pay more for your drugs, receive fewer services, and get lower quality care."

Update, Oct. 21: A second Obama ad claims that McCain's plan would bring about a 22 percent cut in benefits, "higher premiums and co-pays," and more expensive prescription drugs.

These claims are false, and based on a single newspaper report that says no such thing. McCain's policy director states unequivocally that no benefit cuts are envisioned. McCain does propose substantial "savings" through such means as cutting fraud, increased use of information technology in medicine and better handling of expensive chronic diseases. Obama himself proposes some of the same cost-saving measures. We're skeptical that either candidate can deliver the savings they promise, but that's no basis for Obama to accuse McCain of planning huge benefit cuts and more expensive prescription drugs, and claims that both nursing home care and a patient's choice of doctor could be affected.

ANALYSIS

As the narrator says that McCain's plan "means a 22 percent cut in benefits," the ad displays a footnote citing an Oct. 6 Wall Street Journal story as its authority.

But, in fact, the Journal story makes no mention of any 22 percent reduction, or any reduction at all. To the contrary, the story's only mention of what might happen to benefits is a quote from McCain adviser Douglas Holtz-Eakin promising to maintain "the benefit package that has been promised." The story quotes him as saying "savings" would come from eliminating Medicare fraud and by reforming payment policies to lower the overall cost of care.

The fact is that McCain has never proposed to cut Medicare benefits, or Medicaid benefits either. Obama's claim is based on a false reading of a single Wall Street Journal story, amplified by a one-sided, partisan

Exhibit 151                                                          JA-0002511

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 540 of 677

analysis that piles speculation atop mis-interpretation. The Journal story in turn was based on an interview with McCain adviser Holtz-Eakin. He said flatly in a conference call with reporters after the ad was released, "No service is being reduced. Every beneficiary will in the future receive exactly the benefits that they have been promised from the beginning."

TWISTING FACTS TO SCARE SENIORS

Here's how Democrats cooked up their bogus $882 billion claim.

On Oct. 6, the Journal ran a story saying that McCain planned to pay for his health care plan "in part" through reduced Medicare and Medicaid spending, quoting Holtz-Eakin as its authority. The Journal characterizes these reductions as both "cuts" and "savings." Importantly, Holtz-Eakin did not say that any benefits would be cut, and the one direct quote from him in the article makes clear that he's talking about economies:

Wall Street Journal, Oct. 6: Mr. Holtz-Eakin said the Medicare and Medicaid changes would improve the programs and eliminate fraud, but he didn't detail where the cuts would come from. "It's about giving them the benefit package that has been promised to them by law at lower cost," he said.

Holtz-Eakin complains that the Journal story was "a terrible characterization" of McCain's intentions, but even so it clearly quoted him as saying McCain planned on "giving [Medicare and Medicaid beneficiaries] the benefit package that has been promised."

Nevertheless, a Democratic-leaning group quickly twisted his quotes into a report with a headline stating that the McCain plan "requires deep benefit and eligibility cuts in Medicare and Medicaid"—the opposite of what the Journal quoted Holtz-Eakin as saying. The report was issued by the Center for American Progress Action Fund, headed by John D. Podesta, former chief of staff to Democratic President Bill Clinton. The report's authors are a former Clinton administration official, a former aid to Democratic Sen. Bob Kerrey and a former aid to Democratic Sen. Barbara Mikulski.

The first sentence said—quite incorrectly—that McCain "disclosed this week that he would cut $1.3 trillion from Medicare and Medicaid to pay for his health care plan." McCain said no such thing, and neither did Holtz-Eakin. The Journal reporter cited a $1.3 trillion estimate of the amount McCain would need to produce, over 10 years, to make his health care plan "budget neutral," as he promises to do. The estimate comes not from McCain, but from the Urban-Brookings Tax Policy Center. McCain and Holtz-Eakin haven't disputed that figure, but they haven't endorsed it either.

Nevertheless, the report assumes McCain would divide $1.3 trillion in "cuts" proportionately between the two programs, and comes up with this: "The McCain plan will cut $882 billion from the Medicare program, roughly 13 percent of Medicare's projected spending over a 10-year period." And with such a cut, the report concludes, Medicare spending "will not keep pace with inflation and enrollment growth—thereby requiring cuts in benefits, eligibility, or both."

The Obama campaign began the Medicare assault with a 30-second TV ad released Oct. 17, which it said would run "across the country in key states."

ANNOUNCER. John McCain's health care plan . . . first we learned he's going to tax health care benefits to pay for part of it.

Now the Wall Street Journal reports John McCain would pay for the rest of his health care plan "with major reductions to Medicare and Medicaid."

Eight hundred and eighty-two billion from Medicare alone. "Requiring cuts in benefits, eligibility, or both."

John McCain . . . Taxing Health Benefits . . . Cutting Medicare. We Can't Afford John McCain.

OBAMA. I'm Barack Obama and I approved this message.

The ad quotes the Wall Street Journal as saying McCain would pay for his health care plan with "major reductions to Medicare and Medicaid," which the ad says would total $882 billion from Medicare alone, "requiring cuts in benefits, eligibility, or both."

Obama elaborated on the theme Oct. 18 in a stump speech in St. Louis, Mo., claiming flatly that seniors would face major medical hardships under McCain:

Obama, Oct. 18: But it turns out, Senator McCain would pay for part of his plan by making drastic cuts in Medicare—$882 billion worth. Under his plan, if you count on Medicare, you would have fewer places to get care, and less freedom to choose your doctors. You'll pay more for your drugs, receive fewer services, and get lower quality care.

Update, Oct. 21: A second and even more misleading Obama ad begins: "How will your golden years turn out?" It states flatly that McCain's plan would mean a 22 percent cut in benefits, higher premiums, higher co-pays, . . .

Mr. McCAIN. Mr. President, I hope the Senator from Nevada will stop making false claims—repeating the false claims that were in attack ads on me throughout the campaign, funded by tens of millions of dollars, about my positions on health care in America which the fact checkers found to be totally false.

As the narrator says that McCain's plan "means a 22 percent cut in benefits," the ad displays a footnote citing an Oct. 6 Wall Street Journal story as its authority.

FactCheck:

But, in fact, the Journal story makes no mention of any 22 percent reduction, or any reduction at all.

I hope, among other things, in his, may I describe, frustration, that the Senate majority leader would at least not repeat false accusations about what I wanted to do in the Presidential campaign. It is unfortunate.

And I hope that maybe, instead of attacking David Broder, instead of attacking me, instead of attacking others who are in support of this amendment, maybe we could have a more meaningful discussion about the facts surrounding this legislation.

Mr. DODD. Mr. President, may I inquire how much time remains on both sides?

The PRESIDING OFFICER. Thirty seconds remains for the minority.

Mr. DODD. The minority has 30 seconds.

The PRESIDING OFFICER. The Senator from Nebraska.

Mr. JOHANNS. Mr. President, I will speak very quickly, since we have 30 seconds.

Reality does set in. We have looked at the impact of these cuts on our nursing home beds in Nebraska. We have about 14,000 beds dedicated to Medicare. This will be a loss of $663 per bed. That affects real people.

I thank the Chair.

The PRESIDING OFFICER. The minority's time has expired.

Mr. DODD. Mr. President, I yield 2 minutes of our time to the Senator from Nebraska.

Mr. JOHANNS. I thank the Senator. That is very kind of you, and I appreciate that.

Maybe it comes from my time as Governor, maybe it comes from my time as mayor, but somehow, some way, you have to live with the legislation that is passed, whether it is by the Federal Government, whether it is at the State level or whatever. You can bounce this back and forth all day, but the reality is these are real cuts and they involve real programs that involve real people in our States. You can describe them any way you want, you can call them excessive payments, you can do this, that, or the next thing. You can say: Well, we are giving this our best shot, but the difficulty is this is a high-risk venture. We will be impacting in my State, for example—and every Senator could stand up and give this same speech—but this will impact the most vulnerable population in our Nation—people who are in a nursing home and who are the Medicare beneficiaries.

As I said in my short statement, there are 14,061 nursing home beds across our State that are dedicated to Medicare patients. We are working overtime to try to understand what this legislation does to real people. The number we have come up with, working with our nursing home industry, is that if this legislation is passed, each bed is impacted by a loss of $663.

I will sum up my comments by reading something that was sent to me by someone who works in the nursing home industry. Here is what this person says:

For the first time in my career, I am honestly questioning how much longer I can continue. To constantly be up against regulation and funding, when all you want to do is make a difference in someone's life, is exhausting.

This is a high-risk venture. This shouldn't be about taking our best shot, this should be about getting this legislation right.

I thank the Chair.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD. Mr. President, let me, if I can, address a couple of points. First of all, I made this point yesterday, but it deserves being made again because the suggestion somehow that this bill doesn't provide any benefits to anyone until the year 2014 is untrue. I could spend the next 40 minutes describing the various things our bill does immediately. Upon the enactment of this legislation, there are tax breaks immediately for small businesses to be able to reduce the cost of health care in a market where small businesses pay, on average, 18 percent more for health care premiums than other businesses do. As pointed out by the CBO, under our bill you are actually seeing premium cost reductions in the small

Exhibit 151          JA-0002512

business market, as well as the individual market and the large-group market.

Right away our legislation closes a good part of that doughnut hole, which is an immediate benefit to the cost of prescription drugs for the elderly. That doesn't happen 4 or 5 years from now, but immediately.

We provide immediate screening and prevention services for Americans. As I mentioned earlier, that is not only the humane thing to do, it is also a great cost saver. If you can detect an early problem and deal with it, the cost savings are monumental, and we all know that.

Under our health care plans as Senators—where we get 23 different options every year to choose from—we have that benefit. I am a beneficiary of that benefit, having identified a health care problem early through screening. That was not only beneficial to me personally, because I am going to be alive for a longer period of time than otherwise, but it saved thousands of dollars in long-term medical costs that would have occurred if I had not identified the problem. Those are simple things that are included in our bill that happen immediately.

You can't be dropped by your health care carrier, as you are today. Today, you can be dropped for no cause—for no reason whatsoever. That is stopped immediately on the adoption of this legislation.

So when I heard my good friend from Arizona saying there are no benefits in this bill for 4 or 5 years, that is not true. And again, a simple reading of the legislation would identify any number—I have here a long list—of benefits that will happen immediately.

The issue Senator BAUCUS has raised over and over again is the issue of guaranteed benefits under Medicare. Guaranteed benefits. Let me challenge my colleagues to identify a single guaranteed benefit under Medicare that is cut by the bill before us. There is not a single benefit under the guaranteed program that is in any way disadvantaged or reduced as a result of this legislation. What is cut are private health care plans under the Medicare Advantage Program. The reason why we are doing this is Medicare Advantage overpayments cost every senior more money. A typical elderly couple pays $90 more per year in Part B premiums to pay for the Medicare Advantage overpayments, even if they are not enrolled in these plans. That is $90, on average, for every couple, and they get none of the benefits from it. Fully 78 percent of beneficiaries are forced to pay higher premiums for non-Medicare extra benefits they will never see.

Again, I understand some people would like to have these additional benefits. I understand that. They are not guaranteed Medicare benefits. These are benefits that are provided for under Medicare Advantage. But 78 percent of our elderly are paying higher premiums so a smaller percentage of people can get those benefits. Why should 78 percent of the elderly in this country pay a higher premium for a smaller percentage of people under private health care plans?

What Senator BAUCUS and the Finance Committee tried to do is to reduce those costs. Those are not guaranteed Medicare benefits. There is no guaranteed Medicare benefit that is cut under this bill, and I defy any Member of this body to find one guaranteed benefit that is reduced under this plan.

Mr. BURR. Will the Senator yield for a question?

Mr. DODD. I will be happy to yield to my friend.

Mr. BURR. I would ask the distinguished Senator from Connecticut if we empower the independent Medicare advisory board to come up with $23.4 billion in cuts under Medicare? Can the Senator from Connecticut assure me that the independent Medicare advisory board would not find a benefit that they would suggest cutting?

Mr. DODD. Absolutely. That is not allowed under this. You cannot cut guaranteed benefits. Going back and looking at providers—

Mr. BURR. If the Senator will yield for an additional question: Is this board empowered to find $23.4 billion worth of cuts?

Mr. DODD. Not under guaranteed benefits. That is very clear.

Mr. BURR. Will the Senator show me that language?

Mr. DODD. The board is prohibited, forbidden, from proposing changes that would take benefits away from seniors or increase their costs. The board cannot ration care, raise taxes on Part B premiums, or change Medicare benefits eligibility or cost-sharing standards.

It couldn't be more clear. They are absolutely prohibited from doing that. And that is the point we have been trying to make here. Frankly, as we know, there are hospitals that will tell you themselves, in many cases, as a provider, there are cost savings there. I am told—and again my colleagues know more about these details than I do—that it is not uncommon for an elderly person to leave a hospital and, on average, be given four prescription drugs to take. I am told as well that within a month or so that elderly person is not following their prescriptions very well—either they live alone, or for one reason or another they do not follow their prescriptions—and they end up being readmitted. There is a very high readmission rate in hospitals, thus raising the cost for hospitalization.

Our bill makes significant efforts to try to reduce the problem of hospital readmissions, which, again, raises costs tremendously. That is where the savings are coming from here, by taking steps to try and reduce the readmission rate to the hospitals. That is a cost savings that is not denying a benefit to the elderly. It is trying to save money and save lives. That is what we are trying to achieve here.

But, again, I challenge any Member to come up and identify a single guaranteed benefit under Medicare that is cut in this bill. There are none. And 78 percent of our elderly should not be required to pay additional premiums to take care of a handful of other people out there. I understand why they want some of these benefits, and they shouldn't be denied them, if they want to pay for them, but don't charge the other Medicare beneficiaries for the benefit they never get.

Mr. DURBIN. Will the Senator yield for a question?

Mr. DODD. I would be happy to yield to my colleague.

Mr. DURBIN. It is interesting to me that under the McCain amendment, the first line in the amendment—the motion to commit—relates to Medicare Advantage. I used to work for an old fellow in Illinois politics named Cecil Partee, and Cecil said: For every issue in politics, there is a good reason and a real reason. We hear a lot of good reasons on the floor for this McCain amendment and the future of Medicare. The real reason is on the first line of Senator MCCAIN's motion to commit. He says: Send this back to committee and don't touch Medicare Advantage.

I want to ask the Senator from Connecticut about Medicare Advantage, because some of the things I have read around the country about Medicare Advantage tell me this plan, run by private health insurance companies, costs more than basic Medicare. These companies promised us, when they got involved, they would show us how to run a health insurance plan. They would show us how to provide Medicare benefits and they would save us money. Some have. But by and large, if I am not mistaken, isn't the verdict in—a 14-percent increase in cost for Medicare benefits under this Medicare Advantage?

Mr. DODD. My colleague from Illinois is absolutely correct, it is 14 percent. In some States it is 50 percent more.

Mr. DURBIN. When we talk about saving over $100 billion in the Medicare Program over the 10 years, part of it is by saying to those private health insurance companies that are overcharging Medicare recipients, the party is over. The subsidy is over. We are going to make sure that every American who qualifies for Medicare gets the basic benefits, but we will not allow these private health insurance companies to get a subsidy from the Federal Government at the expense of Medicare and its recipients.

Mr. DODD. And then charging the other 78 percent of Medicare recipients to raise their premiums. That is the outrage of all this.

Mr. DURBIN. So the motive behind the McCain amendment is less about saving Medicare and more about saving a private health insurance program called Medicare Advantage.

Mr. DODD. And talk about misbranding, calling something Medicare

Exhibit 151

JA-0002513

Advantage. It is neither Medicare nor an advantage. Quite the opposite, in fact.

You are accurate in your numbers, by the way, because I want people to know, as much as we respect the Senator from Illinois and his math, the numbers he identifies of $100 billion this program is costing us, comes from the Congressional Budget Office. We didn't make up these numbers. That is the cost savings by modifying Medicare Advantage that has cost us so much and deprived the overwhelming majority of our elderly the benefits they end up paying for. So I appreciate very much the Senator's question.

Mr. BAUCUS. If the Senator will yield for another question, might I ask my friend if it isn't also true that in the June MedPAC report it states that Medicare Advantage overpayments cost taxpayers an extra $12 billion?

Mr. DODD. That is correct. And again, that is MedPAC.

Mr. BAUCUS. Well, that is right, that is MedPAC. I think the point the Senator from Illinois is making needs to be underlined two or three or four times here—and the Senator from Connecticut has made it too—and that is there is a huge distinction between Medicare and these private insurance plans.

Mr. DODD. I think too many of our fellow citizens hear the word Medicare Advantage and assume that is the Medicare Program, and it is not.

Mr. BAUCUS. It is not. It is a private plan.

What Medicare Advantage is over-paid—that is what these insurance companies are overpaid, and a lot of that goes back to the Part D drug bill and so forth—do those overpayments necessarily mean better benefits for persons who signed up for those plans?

Mr. DODD. No. In fact, there is no evidence that overpayments to plans leads to better health care. That is again according to MedPAC.

Mr. BAUCUS. If that is true, why might that be the case, just so people understand?

Mr. DODD. Because insurers, not seniors or the Medicare Program, determine how these overpayments are used. And too often they are used to line the pockets of insurers, to increase their profits and not to provide benefits.

Mr. BAUCUS. Does Medicare decide what the benefits will be for those folks?

Mr. DODD. No, it is the private carriers that decide that.

Mr. BAUCUS. The private insurance carriers.

Mr. DODD. Yes, they are the ones that set the rates and determine where the profits go. That is why it is such a misnomer to call this Medicare Advantage, because it is neither Medicare nor an advantage.

The PRESIDING OFFICER. The time has expired.

Mr. DODD. Mr. President, I ask unanimous consent for 2 additional minutes.

The PRESIDING OFFICER. Is there objection?

Mr. COBURN. Reserving the right to object, I will ask for 2 additional minutes for my side.

Mr. DODD. Well, I gave 2 minutes to my friends earlier.

Mr. COBURN. How about 1?

Mr. DODD. OK, 1. Well, make that 2. If he wants 2 additional minutes, I have no problem giving my colleague 2 additional minutes.

Mr. BAUCUS. You already said it, but I think it is worth repeating——

The PRESIDING OFFICER. Without objection, the request is agreed to.

Mr. BAUCUS. Most seniors, as they pay Part B premiums under fee for service, don't get any benefit whatsoever?

Mr. DODD. That is correct. None whatsoever. In fact, all they do get is higher premiums.

Mr. BAUCUS. That is right. Higher premiums.

Mr. DODD. Higher premiums. And 78 percent, almost 80 percent are paying more for a program from which they never get any benefit.

Mr. BAUCUS. The figure I saw—I guess it is $90 a year they pay extra and get no benefit from it.

Mr. DODD. So vote for the McCain amendment and you do exactly what Senator DURBIN is suggesting: Preserve Medicare Advantage, and under Medicare Advantage 78 percent of our elderly pay more premiums, never get any benefits, and the private carriers get to pocket the difference. That is a great vote around here. That is great health care reform.

Mr. DURBIN. I say to the Senator from Connecticut, could we characterize this as an earmark in the Medicare Advantage Program?

Mr. DODD. It is two ears, not even one ear. I give it two ears.

Mr. BROWN. I say to Senator DODD, we remember 10 years ago when the insurance companies came to the government and said we can do something that later became Medicare Advantage, and we can do it less expensively. They said we can do it for 5 percent less than the cost of Medicare and the government unfortunately made the agreement with them to sign up to do that. Then what happened in the last 10 years is, the insurance lobbyists came here and lobbied the Bush administration and lobbied the Congress and got bigger payments. It is a subsidy for the insurance companies, but you and Senator BAUCUS and Senator DURBIN said it is not Medicare, it is private insurance, privatized form of Medicare that serves the insurance companies very well, is that correct, that doesn't serve the seniors in this country?

Mr. DODD. I will sit here all day waiting for someone to identify a single benefit guaranteed under the Medicare Program that is cut in our bill. They are all talking about Medicare Advantage, not Medicare. There are no guaranteed benefits cut under this bill nor can those benefits be cut. Our legislation bans and prohibits any cuts in guaranteed benefits.

The PRESIDING OFFICER (Mr. CASEY). The Senator from Oklahoma is recognized.

Mr. COBURN. One of the questions and one of the promises was: If you have what you have now and you like it, you can keep it. What is happening under this bill for 11 million seniors on Medicare Advantage, that is not going to happen. If they like it, they are not going to be able to keep what they have. You can't deny that. That is the truth.

Medicare Advantage needs to be reformed. There is no question about it. I agree. As the Senator alluded to, in the Patients Choice Act we actually save $160 billion in the Patients' Choice Act, but we don't diminish any of the benefits, and we do that because CMS failed to competitively bid it, because when it was written—and I understand who wrote it—when it was written we didn't make them competitively bid it. You could get the same savings, actually get more savings and not reduce benefits in any amount, if you competitively bid that product. But we have decided we are not going to do that.

The second point I make with my colleagues is, the vast majority of people on Medicare Advantage are on the lower bottom economically. They can't afford an AARP supplemental bill. They can't afford to pay an extra $150 or $200 a month. So what happens most of the time with Medicare Advantage is we bring people up to what everybody else in Medicare gets because most people can afford—84 percent of the people in this country can afford to buy a Medicare supplemental policy because Medicare doesn't cover everything.

Your idea to try to save money, I agree with. But cutting the benefits I do not agree with. You are right, Senator DODD, the basic guaranteed benefits have to be supplied to Medicare Advantage and then the things above that which you get from the supplemental policy, what you can afford to buy, is what these people get. And what you are taking away from poorest of our elderly is the ability to have the same care that people get who can afford to buy a supplemental policy. That is the difference.

The PRESIDING OFFICER. The time of the Senator has expired.

Mr. COBURN. I appreciate my chairman for his courtesy in yielding the time.

---

RECESS

The PRESIDING OFFICER. Under the previous order, the Senate stands in recess until 12:30 p.m.

Thereupon, the Senate, at 11:35 a.m., recessed until 12:30 p.m. and reassembled when called to order by the Presiding Officer (Mrs. HAGAN).

---

SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009—Continued

The PRESIDING OFFICER. The Senator from Iowa.

Exhibit 151



# Congressional Record

**United States
of America**

**PROCEEDINGS AND DEBATES OF THE *111*th CONGRESS, FIRST SESSION**

---

*Vol. 155*          WASHINGTON, WEDNESDAY, DECEMBER 2, 2009          *No. 177*

---

# *Senate*

The Senate met at 9:30 a.m. and was called to order by the Honorable TOM UDALL, a Senator from the State of New Mexico.

## PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Eternal God, thank You for the gift of this day. Help us to use it for Your glory. Guide our lawmakers to labor with diligence for the good of our Nation. Deliver them from bitterness, frustration, and futility as they lift their eyes to You, their ever-present help for life's difficulties. Lord, save them from the futile repetition of old errors and the restoration of old evils. May they live such exemplary lives that people who see their good works will glorify You. Use the Members of this body to increase opportunities for more abundant life to people everywhere. Help our lawmakers to be aware of Your nearness and to recognize Your voice as You lead them to Your desired destination. We pray in Your sacred Name. Amen.

## PLEDGE OF ALLEGIANCE

The Honorable TOM UDALL led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## APPOINTMENT OF ACTING PRESIDENT PRO TEMPORE

The PRESIDING OFFICER. The clerk will please read a communication to the Senate from the President pro tempore (Mr. BYRD).

The assistant legislative clerk read the following letter:

U.S. SENATE,
PRESIDENT PRO TEMPORE,
*Washington, DC, December 2, 2009.*
*To the Senate:*
Under the provisions of rule I, paragraph 3, of the Standing Rules of the Senate, I hereby appoint the Honorable TOM UDALL, a Senator from the State of New Mexico, to perform the duties of the Chair.

ROBERT C. BYRD,
*President pro tempore.*

Mr. UDALL thereupon assumed the chair as Acting President pro tempore.

## RECOGNITION OF THE MAJORITY LEADER

The ACTING PRESIDENT pro tempore. The majority leader is recognized.

## SCHEDULE

Mr. REID. Mr. President, following leader remarks, the Senate will resume consideration of the health care reform legislation. It will be for debate only until 11:30 a.m., with alternating blocks of time. The first 30 minutes will be under the control of the Republicans; the majority will control the next 30 minutes.

The Senate will recess from 11:30 a.m. until 12:30 p.m. today. Following the recess, the Senate will resume consideration of the health care legislation. I am hopeful we can have some votes this afternoon. We have been unable to work that out with the minority and so we will see what the afternoon brings.

## HEALTH CARE REFORM

Mr. REID. Mr. President, this historic health care reform bill before us is strong, and it is a strong head start in the right direction toward urgently needed change. But similar to nearly every bill to come before the Senate, it stands to benefit from the constructive input of all Senators. This good bill will be even better when this body debates it, refines it, and improves it.

I am pleased we have begun the amendment process. I hope we will soon be able to begin voting on those amendments—the ones drafted and sponsored by both Republicans and Democrats. But as we delve into the details and give the individual parts of this bill the considerable thought and attention they deserve, let's not forget the big picture.

So as we begin the third day of debate on this bill, let's remember what it does: First, we are making it more affordable for every American to live a healthy life. Second, we are doing it in a way that is fiscally responsible and in a way that will help our economy recover.

This bill does not add a dime to the deficit—quite the opposite. In fact, we will cut it by $130 billion in the first 10 years and as much as $¾ trillion in the next 10 years. We do this by keeping costs down. This critical piece of legislation will cost less than $85 billion a year over the next decade—well under President Obama's goal. It will make sure every American can afford quality health care. We will make sure that more than 30 million Americans who don't have health care today will soon have it. It will not only protect Medicare, but it will make it stronger. In short, this legislation saves lives, saves money, and saves Medicare.

The Congressional Budget Office and respected economists outside Washington have studied it, and they agree. The bill will do what we set out to do at the beginning of this Congress: It will lower costs and increase value so all Americans can afford quality health care, not just a few.

The experts have crunched the numbers, and they have come back with positive reviews. It will help parents afford to take care of their children and help bosses provide coverage for their workers. It creates more choices and more competition in the health care market. It will protect everyone against insurance company abuses, and for all the changes, in areas where our health care system does work, it keeps it the way it is.

I am very happy with the way Democratic Senators have stood for these

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

S12093

Exhibit 151                                                    JA-0002515

principles and those who have defended them against hollow attacks from the other side. One after another, Republicans have come to the floor with disingenuous claims.

For example, they have talked about health care premiums, overlooking the fact that those costs will go down for the vast majority of Americans—in fact, 93 percent. They have talked about the deficit, ignoring the fact that health care reform will do more to lower the deficit than any other measure has in years—remember, over 20 years, almost $¾ trillion. They have tried to scare seniors, saying you are going to die soon, as an example, closing their eyes to the fact that we strengthen Medicare and cut waste, fraud, and abuse from the program. They have tried to scare women, closing their ears to the fact that we will make it easier than ever for women to get the preventive screenings they need, and that is a gross understatement. They claim to speak for the American people but neglect to mention that, for the last year, a majority of the Americans have consistently said it is more important than ever to nurse our health care system back to health.

What is the most consistent Republican attack on this bill? They carefully count the number of pages in this legislation but completely discount the number of people it helps. Can anyone think of a more superficial way to measure the worth of a bill than how many pages it is printed on? As far as I can tell, the only threat that poses is more paper cuts, perhaps.

Those who want to keep the broken system the way it is throw everything they can at the wall, but nothing has stuck. Incredibly, my distinguished counterpart, the Republican leader, last week, called the health care crisis manufactured, in spite of the fact that 750,000 people filed for bankruptcy last year—70 percent of them because of health care costs. In one sense, the Republican counterpart is right—it was manufactured. This health care crisis has been manufactured by the greedy insurance companies that raise families' rates on a whim and deny health care to the sick.

Remember, the health care industry is exempt from the antitrust laws. They can conspire to fix prices with no civil or criminal penalties. No other business is like that, except baseball. This crisis was manufactured by leaders who enabled them, who empowered them, and who sat idly by while the problem grew worse and worse, until it finally collapsed into a crisis.

My Republican friends have been so busy coming up with distortions that they have forgotten to come up with solutions. They seem more concerned with scaring the American people than helping them. This barrage of baseless accusations underscores how desperate some are to distract the American people from the real debate and from the fact they have no vision for fixing our health care system, which is broken.

Yes, correcting the record has taken a long time. That is OK. We will continue to do so as long as necessary. Democrats are more than willing to defend this good bill. After all, it is not hard to do. As Mark Twain, a great Nevadan, said: "If you tell the truth, you don't have to remember anything."

I wish to note that I especially appreciate the assistant leader, my friend of decades, Senator DURBIN, for his brilliant statements on the floor during the last several weeks on this health care issue. I so admire his spunk, his intelligence, and his ability to deliver a message.

───────

## RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

───────

## SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of H.R. 3590, which the clerk will report.

The assistant legislative clerk read as follows:

A bill (H.R. 3590) to amend the Internal Revenue Code of 1986 to modify the first-time home buyers credit in the case of members of the Armed Forces and certain other Federal employees, and for other purposes.

Pending:

Reid amendment No. 2786, in the nature of a substitute.

Mikulski amendment No. 2791 (to amendment No. 2786), to clarify provisions relating to first-dollar coverage for preventive services for women.

McCain motion to commit the bill to the Committee on Finance, with instructions.

The ACTING PRESIDENT pro tempore. Under the previous order, the time until 11:30 will be equally divided with alternating blocks of time, with Republicans controlling the first 30 minutes and the majority controlling the second 30 minutes.

The Senator from Wyoming is recognized.

Mr. ENZI. Mr. President, I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. KYL. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. KYL. Mr. President, to continue our debate on the McCain amendment to ensure Medicare benefits for our seniors are not cut, as would happen under this legislation, I wanted to talk a little bit about the commitments we have made to our seniors and what exactly would happen under the legislation that is before us.

As we all know, seniors have paid into the Medicare Program, and that is

with the expectation that they will get the benefits that have been promised to them. The question is, Why would we, at this point, reduce the benefits that have been promised to them, especially if the purpose is not to enhance the financial viability of Medicare, which everyone knows is going broke but, rather, to use that money to establish a new entitlement program?

Let me break down the list of cuts seniors would face under this legislation: $137.5 billion would be cut from hospitals that treat seniors, $120 billion from the Medicare Advantage plan. By the way, that Medicare Advantage plan serves almost 40 percent of the Arizona seniors on Medicare. It cuts $14.6 billion from nursing homes, $42.1 billion from home health care, and $7.7 billion from hospice care. These are deep cuts, and you cannot avoid jeopardizing the health care seniors now have under Medicare by making these deep cuts. That is why the Chief Actuary at the Centers for Medicare and Medicaid Services—we use the initials CMS—believes these cuts would cause some providers to end their participation in Medicare, which, of course, would further threaten seniors' access to care. There would not be as many providers to whom they could go for their services.

Our friends on the other side of the aisle say part of this is an intention to eliminate waste, fraud, and abuse. Of course, we have known for many years that there is waste, fraud, and abuse in Medicare, but actually doing something about the problem and recognizing it are two different things. If it were easy to wring hundreds of billions of dollars of savings from Medicare by just pointing to waste, fraud, and abuse, we would have done it a long time ago. Certainly the President would, during his first year in office, want to do that, given the fact we are spending a lot of money and he is trying to find sources of revenue for the various spending programs he has proposed. If it were that easy to do, it would have been done before now.

Moreover, Medicare faces a $38 trillion, 75-year unfunded liability. That is almost incomprehensible. Most of us believe that whatever savings we could achieve in Medicare, to the extent you could eliminate waste, fraud, and abuse, for example, you should do that to help make Medicare solvent.

Next I want to talk about what seniors are telling us. They believe, according to public opinion surveys—and I have talked to enough of them to know this is true—that these Medicare cuts are going to jeopardize their health care. They are troubled in particular by this $120 billion proposed cut to Medicare Advantage. It has been called the crown jewel of Medicare. It is the private insurance addition to Medicare in which many are able to participate in programs they would never have been able to afford otherwise. It gives them this choice to supplement Medicare to provide all kinds

Exhibit 151        JA-0002516

Mr. McCONNELL. I say to my friend from New Hampshire, nobody is going to buy outrage over a mere 40 Members out of 100 Members of the Senate having an opportunity, for the first time, to offer amendments. The majority, by the way, has the right to do this, and I don't complain about it. They are going to offer an amendment for every amendment we offer, so not only did they have the bill in their conference room in secret for 6 weeks, out here on the floor they are going to get 50 percent of the amendments we vote on. I don't think they will be able, with a straight face, to convince the American people that somehow the 40 of us who are asking for an opportunity to amend a bill that all the surveys indicate the American people don't want us to pass is somehow unfair.

Mr. GREGG. I will ask one more question because I find the irony in the situation so unique. A memo which outlines what the rights are of all Members—but Members of the minority specifically because the rules are meant to protect the minority from the majority; that is the tradition of our Government, of course, which seems to be an affront to the majority at this point—that a memo of that nature, which essentially says the minority has certain rights in order for the institution to function correctly—I am wondering, why did we create these rules in the first place? Wasn't it so we could continue the thought of Adams, of Madison, who suggested that the Senate should be the place where, when legislation comes forward which has been rushed through the House, the Senate should be the place where that legislation receives a deliberative view, where it is explored as to its unintended consequences and as to its consequences generally, and where the body has the opportunity to amend it effectively so it can be improved? Isn't that the purpose of the Senate? And isn't that what the rules of the Senate are designed to do, to accomplish the goals of our Founding Fathers to have a Senate where the legislation is adequately aired and considered versus being rushed through in a precipitous way?

Mr. McCONNELL. It was George Washington who presided over the Constitutional Convention who was asked: General, what do you think the Senate is going to be like?

He said: I think it is going to be like the saucer under the tea cup and the tea is going to slosh out of the cup down into the saucer and cool off. That is precisely the point the Senator raises, which is the Senate is the place viewed to be a body that ought to and correctly takes its time. The House of Representatives passed this massive restructuring of one-sixth of our economy in 1 day. That is not the way the Senate operates. I can remember when our friends on the other side were in the minority. Specifically, I can remember the now-assistant majority leader say-

ing the Senate is not the House—praised the procedures in the Senate. If ever there were a measure, if ever in the history of America there were a measure that the Americans expect us to take our time on and to get it right, it is this one, this massive 2,000-page effort to restructure one-sixth of our economy and have the government take over all of American health where we see, in all of the public opinion polls, people are saying please don't pass this—they want to try to rush it.

They want to try to rush it, try to get it through here in a heck of a hurry, back it up against Christmas. I have said to the majority leader, we are happy to be here. We are going to be here Saturday and Sunday. I did ask for an opportunity for Members to go to church Sunday morning, if they want to, and the majority leader indicated that would be permissible. But after that, we will be here and ready to vote.

Mr. GREGG. I thank the Republican leader for his response. I suspect, were the majority leader in the minority, he would be insisting on exactly what the Republican leader is insisting on—a fair and open debate which allows the minority to make its case as to the good points in this bill and as to the bad points. The way you make that case is by following the rules of the Senate; is that not correct?

Mr. McCONNELL. The American people expect and deserve no less than exactly what we have been discussing.

I yield the floor.

RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of H.R. 3590, which the clerk will report.

The bill clerk read as follows:

A bill (H.R. 3590) to amend the Internal Revenue Code of 1986 to modify the first-time home buyers credit in the case of members of the Armed Forces and certain other Federal employees, and for other purposes.

Pending:

Reid amendment No. 2786, in the nature of a substitute.

Mikulski amendment No. 2791 (to amendment No. 2786), to clarify provisions relating to first-dollar coverage for preventive services for women.

McCain motion to commit the bill to the Committee on Finance, with instructions.

The ACTING PRESIDENT pro tempore. Under the previous order, there will be 10 minutes equally divided for the bill managers to speak.

The Senator from Montana.

Mr. BAUCUS. Madam President, I yield myself 2½ minutes from the time under the control of the managers.

For the benefit of all Senators I want to take a moment to lay out today's program.

The time between now and 11:45 is for debate on the amendment by the Senator from Maryland, Ms. MIKULSKI, the chairwoman of the Subcommittee on Retirement and Aging of the Health, Education, Labor and Pensions Committee.

And at the same time, we will debate the side-by-side amendment by the Senator from Alaska, Ms. MURKOWSKI.

At 11:45, the Senate will conduct two back-to-back rollcall votes on the two amendments, first on the amendment by the Senator from Maryland, and second on the amendment by the Senator from Alaska.

Thereafter, we will conduct approximately 2 hours of debate on the McCain motion to commit on Medicare and the side-by-side amendment by the Senator from Colorado, Mr. BENNET.

At 2:45, the Senate will conduct two back-to-back votes on the amendment by the Senator from Colorado, followed by a vote on the motion to commit by the Senator from Arizona.

Thereafter, we expect to turn to another Democratic first-degree amendment and another Republican first-degree amendment.

This is the fourth day on this bill, and we are only late this morning coming to our first vote. Even for the U.S. Senate, this is a slow pace.

I note that some have made plans for delaying this bill in even more extreme fashion. As the majority leader noted, on Tuesday, one Senator circulated a list of delaying tactics available under the Senate rules.

I presume all Senators know the Senate's rules already. So to send the letter leaves the impression that that Senator would like to urge Senators to use some of the delaying tactics stated in the memo.

But I urge a more cooperative course. Out of courtesy to other Senators who desire to offer amendments, I urge my colleagues to allow us to reach unanimous consent agreements to order the voting of future amendments in a more timely fashion. That is simply the only way that we can ensure that more colleagues will have the time and opportunity to offer and debate their amendments.

I thank all Senators.

The ACTING PRESIDENT pro tempore. The Senator has consumed his time.

Mr. BAUCUS. I ask unanimous consent that the order of December 2 be modified to delete all after the word "table.''

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. BAUCUS. I ask unanimous consent that the debate time from 2 to 2:45 this afternoon be divided as follows in the order listed: the first 17½ minutes under the control of Senator McCAIN or his designee; the next 17 minutes under the control of Senator BAUCUS or his designee; and the final 10 minutes, 5 minutes each for Senator McCAIN and Senator BENNET of Colorado.

Exhibit 151                                                                    JA-0002517

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The Senator from Iowa.

Mr. HARKIN. Madam President, I heard the distinguished minority leader earlier in his comments say that one of the reasons they are slowing this bill down and having all this debate is it has been a strictly partisan venture thus far. I beg to differ with the minority leader.

I see our distinguished ranking member of the HELP Committee here on the floor. In the HELP Committee, for the enlightenment of Senators, we had 13 days of markup, 54 hours, 788 amendments were filed, 287 amendments were considered and debated and voted on or accepted, and 161 Republican amendments were adopted. No one was denied the opportunity to offer any amendment, to discuss them, debate them, and get a vote or have it accepted, whatever the case might be. To me, this is truly a bipartisan way of proceeding.

The minority leader's argument basically goes to the fact that the people of this country overwhelmingly elected Democrats to guide and make changes for the future. One of the biggest changes is in our health care system. One of the responsibilities of being a majority party is to propose. That is what we have done. We are proposing changes in the health care system. The function of the minority is to offer amendments, constructive amendments, offer different ideas, and if their ideas are better or if they receive majority approval, then the bill is thus changed. That happened in the HELP Committee. As I said, 161 Republican amendments were adopted. To me, that is bipartisan. That is what we have been doing. What is kind of not acceptable is this idea that things are just going to slow down for the purposes of delaying and eventually making sure we don't have a bill.

Let me say that after all that lengthy debate we had in the HELP Committee, we passed a bill. The same will happen here on the Senate floor. I don't care how many times the minority wants to drag it out and slow it down to try to kill this bill, this bill will pass the Senate, we will go to conference, and we will have it on the President's desk early next year.

The ACTING PRESIDENT pro tempore. The Senator from Wyoming.

Mr. ENZI. I appreciate the comments, some of which need correction, from yesterday and those that have just been made.

On a partisan bill, I sat through all of those days in the HELP Committee. That bill was rushed and put together. Senator Kennedy was not able to be involved in that part of it. His staff did it. They did it in a hurry. We turned in 159 amendments that were accepted. Most of those were for typos and minor corrections. There were a few that actually had some substance to them. That bill was passed on July 15 out of committee without a single Republican vote. It wasn't published. We didn't see the final version until September 17. The ones that were really something that could have made a difference were taken out without the permission of any Republican Senator. That is not bipartisan.

We talked about how many hours we spent together. If you don't accept things from the minority party, it is not bipartisan. It is still partisan. Just spending hours doesn't make any difference.

To move on to a different topic, yesterday we were talking about costs. I hope the people take a look at a Wall Street Journal article from yesterday that says:

A bill that raises prices but lowers costs, and other miracles.

We heard all day yesterday that this bill is going to save people a lot of money. This article reads:

We have now reached the stage of the health-care debate when all that matters is getting a bill passed, so all news is good news, more subsidies mean lower deficits, and more expensive insurance is really cheaper insurance. The nonpolitical mind reels.

Consider how Washington received the Congressional Budget Office's study Monday of how Harry Reid's Senate bill will affect insurance costs, which by any rational measure ought to have been a disaster for the bill.

CBO found that premiums in the individual market will rise by 10% to 13% more than if Congress did nothing. Family policies under the status quo are projected to cost $13,100 on average, but under ObamaCare will jump to $15,200. Fabulous news! "No Big Cost Rise in U.S. Premiums Is Seen in Study," said the New York Times, while the Washington Post declared, "Senate Health Bill Gets a Boost." The White House crowed that the CBO report was "more good news about what reform will mean for families struggling to keep up with skyrocketing premiums under the broken status quo." Finance Chairman Max Baucus chimed in from the Senate floor that "Health-care reform is fundamentally about lower health-care costs. Lowering costs is what health-care reform is designed to do, lowering costs; and it will achieve this objective."

Except it won't. CBO says it expects employer-sponsored insurance costs to remain roughly in line with the status quo, yet even this is a failure by Mr. Baucus's and the White House's own standards.

Meanwhile, fixing the individual market—which is expensive and unstable largely because it does not enjoy the favorable tax treatment given to job-based coverage—was supposed to be the whole purpose of "reform." Instead, CBO is confirming that new coverage mandates will drive premiums higher. But Democrats are declaring victory, claiming that these higher insurance prices don't count because they will be offset by new government subsidies.

About 57% of the people who buy insurance through the bill's new "exchanges" that will supplant today's individual market will qualify for subsidies that cover about two-thirds of the total premium. So the bill will increase costs but it will then disguise those costs by transferring them to taxpayers from individuals. Higher costs can be conjured away because they're suddenly on the government balance sheet. The Reid bill's $371.9 billion in new health taxes are also apparently not a new cost because they can be passed along to consumers, or perhaps will be hidden in lost wages. This is the paleo-liberal school of brute-force wealth redistribution, and a very long way from the repeated White House claims that reform is all about "bending the cost curve." The only thing being bent here is the budget truth.

Moreover, CBO is almost certainly underestimating the cost increases. Based on its county-by-county actuarial data, the insurer WellPoint has calculated that Mr. Baucus's bill would cause some premiums to triple in the individual market. The Blue Cross Blue Shield Association came to similar conclusions. One reason is community rating, which forces insurers to charge nearly uniform rates regardless of customer health status or habits. CBO doesn't think this will have much of an effect, but costs inevitably rise when insurers aren't allowed to price based on risk. This is why today some 35 states impose no limits on premium variation and six allow wide differences among consumers.

The White House decided to shoot messengers like WellPoint to avoid rebutting their message. But Amanda Kowalski of MIT, William Congdon of the Brookings Institution and Mark Showalter of Brigham Young have found similar results. In a 2008 paper in the peer-reviewed Forum for Health Economics and Policy, these economists found that state community rating laws raise premiums in the individual market by 20.9% to 33.1% for families and 10.2% to 17.1% for singles. In New Jersey, which also requires insurers to accept all comers (so-called guaranteed issue), premiums increased by as much as 227%.

The political tragedy is that there are plenty of reform alternatives that really would reduce the cost of insurance. According to CBO, the relatively modest House GOP bill would actually reduce premiums by 5% to 8% in the individual market in 2016, and by 7% to 10% for small businesses. The GOP reforms would also do so without imposing huge new taxes. But Democrats don't care because their bill isn't really about "lowering costs." It's about putting Washington in charge of health insurance, at any cost.

The ACTING PRESIDENT pro tempore. The time of the Senator has expired.

Under the previous order, the time until 11:45 a.m. shall be equally divided between the Senator from Maryland, Ms. MIKULSKI, and the Republican leader or his designee.

Mr. HARKIN. Madam President, parliamentary inquiry: There is time between now and the hour of 11:45 a.m. equally divided between the Republican side and the Democratic side; is that correct?

The ACTING PRESIDENT pro tempore. That is correct.

Mr. HARKIN. Madam President, I assume, then, the normal thing will be to go back and forth from one side to the other, the Republican side and the Democratic side?

The ACTING PRESIDENT pro tempore. That will not be an order unless it is propounded.

Mr. BAUCUS. Madam President, I think it is perfectly understood.

Mr. ENZI. That is our understanding as well.

Mr. HARKIN. Madam President, I ask unanimous consent to be recognized for 7 minutes.

Exhibit 151    JA-0002518

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. BAUCUS. Madam President, will the Senator yield for a quick inquiry to my friend from Wyoming?

Mr. ENZI. Yes.

Mr. BAUCUS. Madam President, I might inquire of my colleague from Wyoming if that item the Senator was quoting from about costs in the Wall Street Journal was a news article or an editorial.

Mr. ENZI. That was an editorial by the Wall Street Journal, the staff of the Wall Street Journal, confirmed by MIT, Brigham Young, and others.

Mr. HARKIN. Madam President, I ask if the Chair will remind me when the 7 minutes is up.

The ACTING PRESIDENT pro tempore. The Chair will do so.

Mr. HARKIN. Madam President, I have to respond to my friend from Wyoming about doing this in a hurry. He mentioned that we did the bill in a hurry in our committee. Actually, it was last November, shortly after the election, when I received a call from Senator Kennedy talking about doing a health reform bill, asking if I would take charge of a section dealing with public health and prevention and wellness. I think then he asked Senator MURRAY to take over workforce development, Senator BINGAMAN did coverage, and Senator MIKULSKI did quality improvements. So that was in November.

I cannot speak for the others who did the other sections. All I can say is, on our side, in what I did, we had five hearings. We had five hearings on public health and prevention and wellness and what ought to go into a bill. I think those hearings commenced in December and went through about February. Then we worked until June, and we did not start our markup until June. So we had almost 6 months of hearings and putting things together in the bill before we started a markup. I rather doubt that can be said to be rushing anything.

But I just want to focus on the vote that is coming up on the amendment offered by the Senator from Maryland, Ms. MIKULSKI, which will strengthen provisions in the bill concerning preventive health benefits for women.

As an initial matter, I am proud of the significant investments the bill makes overall in wellness and prevention. It has not been talked about very much. If you read the public press out there, the popular press, and watch TV, about the only thing you think is in the bill is a public option and abortion and that is what this bill is about. Well, those may be the hot points and the flashpoints—it makes for good press—but I submit that one of the most important parts, if not the most important part, of this bill is what it does for prevention and wellness, trying to move our costs upstream, keeping people healthy in the first place.

I have said many times, what good does it do us if we are just going to pour more money into paying bills for a broken, dysfunctional, sick care system—not a health care system, a sick care system? That is what we have in America today. This bill begins the transformation of moving us from a sick care system to a true health care system.

The Senator from Maryland has a very important amendment to make clear—to make clear—that what is included in the bill is to strengthen the preventive services that basically inure to the women of this country. The Mikulski amendment reiterates the recommendations of our bill, and it also points out that the recommendations of the U.S. Preventive Services Task Force is a floor, not a ceiling—it is a minimum. In other words, health plans are required at a minimum to provide first-dollar coverage for preventive services recommended by the Preventive Services Task Force, but that is just the minimum. The Secretary of Health and Human Services has full discretion to identify additional preventive services that will be part of the essential package offered by health insurance on the exchange.

Again, there has been some talk here about this task force, the Preventive Services Task Force, that somehow this is a bunch of bureaucrats, it is a government-run task force, it has a political agenda. I have heard all these things said on the floor in the last day or so. Well, in fact, the Preventive Services Task Force is an independent body that evaluates the benefits of clinical preventive services. It makes recommendations—again, no decisions, merely recommendations—about which services are most effective.

Who is on this task force? Experts and leaders in primary care who are renowned internists, pediatricians, family physicians, gynecologists, and obstetricians. And these professionals are not located in Washington, DC; they are based all over the country. Some may be in one State or another State. They are all over the country, and they are experts in these different areas, recognized by their peers. They do not sit in an office at Health and Human Services. They bring years of medical training and experience to the jobs they do.

Does that mean they never make a mistake? No. No one is perfect. No Senator is perfect. Neither is every doctor perfect. And neither is any task force always going to make what we might consider to be the perfect answer. But our bill does not grant them the authority to tell insurance companies what not to cover. That is clear. But to hear the debate on the floor, you would think it is just the opposite, that the Preventive Services Task Force can tell insurance companies what they cannot cover. That is not true. Our bill says that those recommendations that are A and B—categorized by the Preventive Services Task Force, by these expert doctors around the country—these are the ones they say really are key preventive services, have the most benefit. We say in our bill that those services must be covered without copays, without deductibles. That means that is the floor. That is the floor.

Again, I might also add that preventive services that are rated by the Advisory Committee on Immunization Practices and comprehensive guidelines supported by the Health Resources and Services Administration are also part of the recommendations to establish that floor.

So, again, I would say it is a pretty big floor when you put all those together. Again, it does not establish a ceiling and it does not say what cannot be done. It just says you have to do these basics. That is the floor.

I do understand the concerns of some that the task force has not spent enough time studying preventative services that are unique to women. Senator MIKULSKI goes back a long way on this issue. I can remember some years ago Senator MIKULSKI pointing out to me, in my capacity as the then-chairman of the Appropriations subcommittee that funds NIH——

The ACTING PRESIDENT pro tempore. The Senator's time has expired.

Mr. HARKIN. Madam President, I ask unanimous consent for 3 more minutes.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. HARKIN. Senator MIKULSKI said: If you look at the research being done at NIH, it is almost all done on men and not on women. I remember that some years ago, and all of a sudden a lightbulb went off in my head. I said: You are right. So we had to start changing the focus of a lot of the research done to focus on the unique situations faced by women.

Well, this was also a concern that was raised in our HELP Committee by Senator MIKULSKI, and we included language to require all health plans to cover comprehensive women's preventive care and screenings based on guidelines promulgated by the Health Resources and Services Administration—again, without any copays or deductibles. That was in our health bill but unfortunately was not included in the merged bill. But Senator MIKULSKI's amendment, which we are about to vote on, brings us back to the position we had in the HELP Committee bill. I think that was largely supported, if I am not mistaken, on both sides, at least in our HELP Committee. At least no one offered any amendment to strike it when we were debating it in committee. So I assume it was supported generally by both Republicans and Democrats.

By voting for the Mikulski amendment, we can make doubly sure that the floor we are establishing in the bill for preventive services that are unique to women also has no copays and no deductibles. Again, that is why this amendment is so important.

Exhibit 151

JA-0002519

I know our friend Senator MURKOWSKI has a different way of approach. I commend her for her involvement and her interest in this issue. She has been a great member of our committee, and I have done a lot of great work with Senator MURKOWSKI. But I think her amendment misses the mark in this way: It asks insurers to use guidelines from provider groups when making coverage decisions. Well, that does not guarantee women will get any of the preventive services they need.

Here is a statement from the American Heart Association and the American Stroke Association. It says:

. . . we are concerned that Senator Murkowski's preventive health services amendment would take a step backwards by substituting the judgment of the independent U.S. Preventive Services Task Force with the judgment of private health insurance companies.

Madam President, I ask unanimous consent that this letter from the American Heart Association and the American Stroke Association be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

STATEMENT BY AMERICAN HEART ASSOCIATION CEO NANCY BROWN ON MURKOWSKI AMENDMENT ON PREVENTIVE HEALTH SERVICES

(Dec. 2, 2009)

The American Heart Association strongly supports requiring health plans and Medicare to provide first-dollar coverage for clinical preventive services that are evidence-based and necessary for the prevention or early detection of an illness or disability. We appreciate that Senator Murkowski's amendment recognizes the value of the guidelines and recommendations made by professional medical organizations (as well as by voluntary health organizations like the American Heart Association). But even these guidelines must be held to the standard of being evidenced based. In addition, we are concerned that Senator Murkowski's preventive health services amendment would take a step backwards by substituting the judgment of the independent U.S. Preventive Services Task Force with the judgment of private health insurance companies. Although we have previously recommended to Congress that the USPSTF membership be expanded to include specialists to broaden the expertise of the Task Force, we believe an expanded USPSTF would be the best entity to objectively and rigorously make recommendations for covering clinical preventive services and do not support eliminating it from this role.

The ACTING PRESIDENT pro tempore. The Senator's time has expired.

Mr. HARKIN. Madam President, I will have more to say about the Murkowski amendment later. But, again, the point is, the Mikulski amendment is right on point. It should be adopted.

The ACTING PRESIDENT pro tempore. Who yields time?

Mr. ENZI. Madam President, I yield 10 minutes to the Senator from Florida.

The ACTING PRESIDENT pro tempore. The Senator from Florida.

Mr. LEMIEUX. Madam President, I come to the floor today to draw back the curtain a little, I hope, and to widen the lens to talk about the issue of the bill before us, not just on this particular amendment but on what it is going to mean for my constituents in Florida and for the people of this country.

I had the opportunity last week to be back home in Florida, in south Florida, in Palm Beach County and Broward County and Miami-Dade County, where I talked to doctors, hospital administrators, folks who run Medicare Advantage plans, as well as everyday Floridians, specifically senior citizens. The responses I heard were nearly unanimous, and that was grave concern about the bill that is being debated on this floor and a general confusion as to why the Congress is pursuing the path that it is. The people of Florida do not understand why we are going to cut Medicare to create a new program. The people of Florida do not understand why we are going to raise taxes to create a new program. The people whom I have spoken to in Florida do not understand why we would undertake a new $2.5 trillion health care proposal if it was not going to reduce the cost of health insurance for the 170 million to 180 million Americans who have health insurance today.

Why are we embarking upon this measure if it is not going to affect most everyday Floridians and everyday Americans who are struggling under the high cost of health insurance? Health insurance premiums have increased 130 percent in the past 10 years.

When the President put this proposal forward and when he campaigned on it, he said his major goal was to reduce the cost of health insurance. When he addressed the Nation in a joint session of Congress on September 9, he said his plan would reduce the cost of health insurance. But we find out that for at least 32 million Americans, it will raise the cost of health insurance 10 to 13 percent. So at least half of the goal, if not most of the goal, of his plan for most Americans in this country will not be accomplished. Yet we are going to cut nearly $1/2 trillion out of Medicare, we are going to raise taxes by $1/2 trillion, and we are going to spend $2.5 trillion on this program, which was admitted to by Senator BAUCUS yesterday on the floor, which cannot be, under my understanding, in any way budget neutral.

But I want to speak specifically about the cuts to Medicare. It cuts $192 billion, according to the Congressional Budget Office, "to Medicare's payment rates for most services." I think we have to be clear here that if you cut providers, you are going to cut services. The very reason we talked about increasing doctor payments in that $1/4 trillion program was so that patients would not receive fewer services, so there would be ample doctors providing services for Medicare. It is beyond logic to argue that cutting providers will not cut services. What will happen when we cut providers, doctors, nursing homes, home health agencies, hospitals? Fewer and fewer of them will provide benefits, and fewer and fewer of them will take Medicare.

The Chief Actuary of CMS believes the cuts in the bill we have before us could cause providers to end their participation in Medicare:

. . . providers for whom Medicare constitutes a substantive portion of their business could find it difficult to remain profitable and might end their participation in the program.

Every American understands this. If we pay less money to health care providers, they are going to offer less benefits or more and more they are not going to participate in Medicare.

The Medicare Payment Advisory Commission found in June of last year that 29 percent of Medicare beneficiaries who were looking for a primary care doctor had a problem finding one to treat them. This is of grave concern to the 3 million Floridians who are on Medicare. If a doctor will not see them, what kind of health care plan is this? These seniors, our "greatest generation," have paid into this program their whole life. It is illusory if they can't find a doctor who will treat them.

One of my constituents, Earl Bean, from Sanford, FL, recently told CNN that he called about 15 doctors when he was trying to find health care, and he was told they were not taking new Medicare patients. So when we cut $1/2 trillion out of Medicare, is that going to improve health care for seniors or is it going to continue to decline health care for seniors? You can't get blood from a stone. It is going to make the situation worse. For anyone to come to this floor and say that it would not is incredible.

We have in Florida the second highest Medicare population. When we cut $135 billion from hospitals and $21 billion from the disproportionate share fund, which is basically money that goes to these hospitals to provide health care for seniors and the indigent, how are they going to be able to provide that health care? I spoke to the administrator of the North Broward Hospital District and told him about this cut to the DSH funds, and he told me it would be devastating to their provision of health care.

Then we are going to take a very popular program called Medicare Advantage—more than 900,000 Floridians in my State—and we are going to cut it as well. I recently visited the Leon Medical Center and their new facility in Miami Dade County where they provide state-of-the-art, first-class health care for seniors; not only normal health care but eyeglasses, hearing aids, dental care, and the constituents who go there love it. They are getting the kind of health care that you would hope your senior citizens in your family would get.

The principal of the company, Ben Leon, told me they have saved $70 billion in the way they have run their system. He told me if we continue on this path with these cuts to Medicare Advantage, he will not be able to provide

Exhibit 151          JA-0002520

these good services going forward. There are some fixes to grandfather folks in, but all in all people will be cut, and all in all the program will not be as good, and it will decline the health care of seniors in Florida and across this country.

We will cut $15 billion from nursing home care and $40 billion from home health agencies. I spoke to a provider of a home health agency practice in Florida. He said these cuts will put half of the home health care agency folks out of business. At a time when we have 11.2 percent unemployment in Florida, this health care bill is going to cost people their jobs, and it is going to decline the quality of health care.

I am also concerned about this Medicare advisory board. This independent board of nonelected folks is going to have the power to cut Medicare by $23 billion over the next 10 years, and it will be up to this body to reinstate those cuts. These people are not elected, my constituents in Florida don't know who they are, but they are going to be responsible for the decline of their Medicare and their health care.

The "greatest generation," who fought to protect this country, is looking at this health care bill and wondering why. Folks with health insurance in this country—more than 170 million who are not going to see their health care costs go down but up—are wondering why. Americans who are seeing higher taxes and penalties for not buying these health insurance programs under this bill are wondering why.

If we are here to reform health care—and we should be—if we are here to try to make sure the 45 million people in this country and the nearly 4 million Floridians get health insurance—and we should be—then why don't we take a step-by-step approach?

I am new to this body. My first day here was September 10, so I have not even been here 3 months. But I can tell my colleagues, the American people, if they knew what I know now and could see what I see, would be baffled by this process. There is not a give-and-take on this issue. We didn't all sit down together in a conference room and work this out to have a bipartisan bill. The Democratic leader worked on it with his colleagues but not with us.

So now we have a program that cuts Medicare, that raises taxes, that doesn't decrease the cost of health care for the majority of Americans and will cost us $2.5 trillion and can't be budget-neutral, at a time when we have a $12 trillion debt, a debt that requires each of us—each family—to put $100,000 on our shoulders to be responsible for that debt, a debt where the third largest payment in our budget is for interest payments, and over the next 10 years those interest payments will go up by $500 billion, enough to pay for many of the budgets of the Federal Government——

The ACTING PRESIDENT pro tempore. The Senator has used his 10 minutes.

Mr. LeMIEUX. Including the wars in Afghanistan and Iraq.

I thank the Chair, and I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Maryland is recognized.

Mr. HARKIN. How much time would the Senator like to consume?

The ACTING PRESIDENT pro tempore. The Senator from Maryland controls the time, and the Senator from Maryland has 33 minutes.

Ms. MIKULSKI. Madam President, I yield myself a firm 10 minutes.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Ms. MIKULSKI. Madam President, health care is a woman's issue. Health care reform is a must-do woman's issue, and health insurance reform is a must-change issue.

So many of the women and men of the Senate are here today to fight for change and to make sure we have universal access to health care. When we have universal access, it makes a difference in our lives, which means we have to have universal access to preventive and screening services.

My amendment—and, by the way, it is a bipartisan amendment—makes universal access to preventive and screening services for women available.

There is much discussion about whether women should get a particular service at a particular age. We don't mandate that women get a service; we leave that up to a decision made with the woman and her doctor. But, first of all, they need to be able to have a doctor. So we are for universal access, and this is why the underlying bill is so important.

Then, when you have that, there should also be universal access to preventive and screening services, particularly to the top killers of women, those things that are unique to women. We think about cancer: breast cancer, ovarian cancer, and cervical cancer. Also, women are dying at an increased rate of lung cancer. Then there are these other silent killers that have had a lethal effect on women, and that is cardio and vascular disease. So we want to guarantee universal access to medically appropriate or medically necessary screening and preventive services.

Many women don't get these services because, first of all, they don't have health insurance; and, No. 2, when they do have it, it means these services are either not available unless they are mandated by States or the copayments are so high that they avoid getting them in the first place.

The second important point about my amendment is it eliminates deductibles and copayments. So we eliminate two big hurdles: having insurance in the first place, which is the underlying bill, as well as copayments and deductibles. I know of no one in this room who would not want to be on our side on this issue.

I wish to acknowledge the role the Senator from Alaska has played, Ms. MURKOWSKI, as well as Senator KAY BAILEY HUTCHISON, Senator SNOWE, and Senator COLLINS. We, the women of the Senate, have worked on a bipartisan basis for years making sure we were included in the protocols at NIH, increasing funding for important research areas to find that cure, to race for that cure and, at the same time, to be able to have mammogram standards. What the Murkowski amendment—and by the way, she is MURKOWSKI, I am MIKULSKI. We sound alike, and the amendments might sound alike, and, but, boy, are they different.

The Murkowski amendment offers information. I think that is important. That is a threshold matter. You have to have information to make an informed decision. But it does not guarantee universal access to these services, and, of course, it does not eliminate the high payments and deductibles. So her amendment is flawed. My amendment is terrific. My amendment offers key preventive services, including an annual women's health screening that would go to a comprehensive assessment of the dangers to women, including heart disease and diabetes.

We hope when the Senate makes its decision today, it deals with the fact that for we women, the insurance companies take simply being a woman as a preexisting condition. We face so many issues and hurdles. We can't get health care. We can't get health insurance because of preexisting conditions called a C-section.

I am going to be meeting with an insurance company executive later where his company denied health insurance to a woman who had a medically mandated C-section, and a letter from this insurance company said: We are not going to give you insurance unless you have a sterilization—a coerced sterilization in the United States of America. That is going to be an amendment for another day. But I just wish to give the flavor and the power of what women face when we have to cope with the insurance companies or where there are barriers to our getting these health care screening services.

So we want to be able to save lives, and we want to be able to save money. We believe in universal access, and if you utilize the service it is because you have had the consultation with your doctor. We do know early screening and detection does save lives, and, at the same time, it saves money.

I will conclude with this: When we look at heart disease and diabetes, not only cancer but early detection of diabetes means, in a well-managed program, under appropriate medical supervision you very likely will not lose that eye, you will not lose that kidney, you will not lose that leg, and, most of all, you will not lose your life.

So let's not lose the Mikulski amendment. Let's go with Mikulski and thank MURKOWSKI for her information, but hers is too tepid and too limited.

Exhibit 151    JA-0002521

Madam President, I ask my colleague, one of the great guys who supports us, Senator CARDIN, how much time he needs.

I yield 5 minutes to Senator CARDIN.

Mr. CARDIN. First, let me thank my colleague, Senator MIKULSKI, for her leadership on this issue. I strongly support her amendment for the reasons she said. This is a very important point about providing preventive health services to the women of America, a critically important part of our strategy not only to bring down costs in health care, but to have a health care system that is fair in America.

I have been listening to my colleagues on the other side of the aisle talk about the underlying bill. They talk about it as if this is a static situation. Many of the criticisms I hear about the underlying bill are criticisms about our current health care system. I can tell my colleagues the people in Maryland, many of whom are finding it difficult to find affordable coverage today, are outraged with what is happening with private insurance companies and the attitudes they are taking.

As Senator MIKULSKI pointed out, they are denying coverage for pre-existing conditions or imposing arbitrary caps. As has been indicated, if we are unable to get this bill passed, what is going to happen in the future? We know costs are going to become even greater, more people are going to lose their coverage, insurance companies are going to continue their arbitrary practices, and the health care of Americans is in jeopardy.

We are already spending so much of our economy on health care, and if we don't take action, it will be a greater part of our economy.

But we have some good news. The underlying bill has now been analyzed by the CBO; that is the independent scorekeeper. What they tell us is, if we pass the underlying bill, for the overwhelming majority of Americans, they are going to find that their health insurance premiums will either stay the same or go down. For the overwhelming majority of Americans, they will have a better insurance product that will cover the types of preventive services Senator MIKULSKI is talking about, which are in her amendment.

We are not only going to bring down the cost for the overwhelming majority of Americans as to what will happen if we don't pass a bill, we are going to provide better coverage for them. The underlying bill will also reduce dramatically the number of people who don't have health insurance in America by 31 million. That will make our system much more effective.

I have heard my colleagues talk about what is going to happen with Medicare. If we pass the underlying bill, we are going to strengthen Medicare. We already have a provision that there cannot be reductions in the guaranteed benefits. We pointed out that AARP endorses the bill. They understand there will be additional preventive health care for our seniors, and we will help fill the doughnut hole in prescription drugs.

When you reduce the number of uninsured, the amount of cost Medicare has to pay for health care in our hospitals is reduced. That is why we can reduce our payments to hospitals in America, because the amount of uncompensated care they currently have will be dramatically reduced. I have heard colleagues on the other side of the aisle talk about Medicare Advantage. I remember when we used to pay the private insurance companies in Medicare a little less than people in traditional Medicare. Then we paid them the same. Now we are paying them more. That is corporate welfare. Medicare Part B premiums are higher than they should be. Taxpayer support is higher than it used to be. We know these benefits that are being paid could be gone tomorrow. We saw the private insurance companies leave the Maryland market and so many other markets. These are reforms that save the taxpayers money and strengthen Medicare for the future.

Bottom line: The bill is good for middle-income families. It will provide the insurance reform so they can have an insurance product that can cover their needs, including wellness and prevention programs. It is good for small business because it offers more choice. I can tell you chapter and verse of small companies in Maryland that, today, cannot get an affordable product and are seeing 20, 30 percent increases in their premiums. They need this bill in order to be able to preserve health care for their employees.

This bill, with the Mikulski amendment, will provide the preventive health care for all Americans that is so desperately needed, which will reduce costs, improve quality, and make our health care system more efficient and effective in the future, bringing down costs by investing in wellness and prevention.

I urge my colleagues to support the Mikulski amendment and to support the underlying bill.

I yield the floor.

Mr. ENZI. Madam President, I yield 10 minutes to the Senator from South Dakota.

The ACTING PRESIDENT pro tempore. The Senator from South Dakota is recognized.

Mr. THUNE. Madam President, I appreciate the opportunity to speak on this important piece of legislation.

Again, I point out to my colleagues, and to anybody else who may be observing, the volume of this bill. This is 2,100 pages and 21 pounds, which means it is about a pound per 100 pages. It is $1.2 billion dollars per page, $6.8 million per word, and it creates 70 new government programs. It gives the Secretary of Health and Human Services—in 1,600 or 1,700 instances in this bill—the opportunity to create, define, and determine things in the bill.

This is a big government bill, a massive expansion of the Federal Government—$2.5 trillion, when it is fully implemented. Of course, the paid-fors in the bill—all the things in this bill, not only those intended things but also the unintended consequences of the bill—you have some revenue to pay for these things. Where do we get the revenue?

In the Reid bill, they decided they are going to raise taxes on small businesses, individuals and families and they are going to cut Medicare by about $½ trillion.

What is ironic about that is, a few years ago, the Republicans, back when we were in the leadership in the Senate, tried to do a budget bill that actually achieved some savings in Medicare and Medicaid, to the tune of $27 billion combined. But the Medicare savings in that bill was $10 billion. That was over a 5-year period, at $2 billion per year. I wish to remind some of my colleagues on the other side about some of the comments they made about that.

Senator REID, at the time—bear in mind this was to reduce Medicare by $2 billion per year, $10 billion over 5 years. The now-majority leader said:

Unfortunately, the Republican budget is an immoral document.

The Senator from West Virginia said this:

This proposed budget would be a moral disaster of monumental proportions.

A couple other colleagues in the Senate commented. The Senator from Michigan said:

People who rely on Medicare and Medicaid are going to be hurt by this bill.

The Senator from Wisconsin said:

I urge my colleagues to reject this bill, and the irresponsible and cruel budget of which it is part.

The former Senator from New York, Mrs. Clinton, said this:

This bill slashes $6.4 billion from Medicare over the next 5 years.

It was actually $10 billion. My point is simply this: It was $10 billion over 5 years, $2 billion per year. Those were the statements—overstatements—about the impact that a $2 billion reduction per year in Medicare was going to have on people in this country. Now we are talking about $½ trillion in Medicare cuts.

Where do their cuts come from? They will come from $118 billion from Medicare Advantage, which now we have about 11 million Americans impacted by Medicare Advantage. Every State has seniors who have subscribed to that program whose benefits will be cut if this bill is enacted. You get it out of hospitals because there are $135 billion in reductions and reimbursements to hospitals; $15 billion in reductions to nursing homes and reimbursements; $40 billion in reductions to home health agencies; and $8 billion in reductions to hospices.

Those are all the ways this $2.5 trillion expansion of the Federal Government is to be paid for. I didn't even get into the tax cuts, which will be a debate for another day.

The Medicare cuts in this bill are unlike anything we have seen in the past.

Exhibit 151      JA-0002522

Clearly, when you compare it to 3, 4 years ago, when we were trying to achieve $10 billion in savings over 5 years, you thought the sky was falling. Now here they are trying to pay for a $2.5 trillion expansion of the Federal Government by cutting $500 billion out of Medicare.

The point I also wish to make, because it has been made by the other side—by the most recent speaker—is that somehow this recent CBO analysis should be hailed as good news. The corks are popping in the celebration, and people are crowing about the new CBO report because it has such good news for this bill and the impact it will have on people who buy health insurance in this country.

What is it they are celebrating? CBO, in its report, essentially said this: 90 percent of Americans are going to see their premiums increase or see virtually the same increases as they do today year after year.

That is preserving the status quo, not decreasing costs, as promised. President Obama, when he was running for office in 2007, said when he got a chance to do health care reform, he was going to reduce costs by $2,500 for every family in this country and cover everybody.

This bill, after spending $2.5 trillion and creating 70 new government programs, doesn't cover everybody. There are still 24 million Americans who don't get covered under this bill, according to the CBO. Furthermore, nobody—I shouldn't say nobody—90 percent of Americans, those who don't get subsidies, don't come out any better. They will still see the year-over-year increases in premiums they have been seeing for the past several years, and the cost of health care is growing at twice the rate of inflation. If you assume a year-over-year increase similar to the past several years, in the small group market, you are looking at annual increases of over 6 percent for the cost of health care—to the point where a family that, today, is paying $13,000 a year for health insurance, in 2016, will pay over $20,000 a year for health insurance. So nobody gets any better out of this, except a handful of people who will get subsidies. If you are in the individual marketplace, your premiums go up. According to the CBO, there will be a 10- to 13-percent increase in premiums in the individual market. If you are in the large group market, you will see an almost 6-percent increase a year. If you are in the small group market, premiums will go up over 6 percent a year.

We are talking about spending $2.5 trillion, cutting reimbursements to nursing homes, to hospitals, to home health agencies and hospices, and raising taxes on health care providers, medical device manufacturers, prescription drugs, raising the Medicare payroll tax which, incidentally, doesn't go to preserve or extend the lifespan of Medicare or put it on a path toward sustainability but creates a whole new government entitlement.

We are going to do all that for what? At best, to keep the status quo for people today; at worst, to increase their premiums by 10 to 13 percent. That is the bottom line. That is what this says. That is the new CBO report. That is the CBO report about which the other side is saying this is great news. They are celebrating. It is great news that premiums are going to continue to go up at twice the rate of inflation, just like in the past, protecting and preserving the status quo as we know it in America today.

This bill does nothing about the fundamental issue of cost. It doesn't matter what market you are in—small group market, large group market—it stays the same, at best, and in the individual marketplace, your premiums will go up 10 to 13 percent. That is the news being hailed by the other side as validating the argument for why we need to pass a 2,100-page, $2.5 trillion monstrosity of a bill with 70 new government programs in it.

We will vote on the Medicare amendment later. Senator McCAIN has a motion to commit the bill to essentially take the Medicare cuts out of it. I hope my colleagues vote for it. They are arguing it doesn't cut Medicare. How can you say that with a straight face? How can you say you are going to find $500 billion to pay for this bill out of Medicare and then say it doesn't cut Medicare? Of course it cuts Medicare. Of course it raises taxes. You can't finance $2.5 trillion of new spending unless you find a way to finance it.

The way they have chosen to finance this is to hit seniors squarely between the eyes and cut reimbursements to the providers all across this country that are dealing with the serious health needs our senior citizens are experiencing. In South Dakota, we have a lot of people who are employed in the health care industry. I think that is true of every State. Even in small towns in South Dakota, in nursing home employment you are talking about almost 6,000 employees. You are going to take $15 billion out of nursing homes, $40 billion out of home health agencies, $135 billion out of hospitals, and what we are talking about are huge reductions in Medicare, unlike anything we have seen.

As I said, to put it into perspective, a few short years ago, when we were in the majority, in a budget trying to reduce Medicare by $10 billion over a 5-year period, it was referred to as "immoral," as a "monumental disaster," as "cruel"—$10 billion over 5 years. This has $½ trillion in Medicare cuts—cuts to Medicare Advantage and providers.

I hope my colleagues will support the McCain motion.

I yield the floor.

Ms. MIKULSKI. Madam President, I yield 3½ minutes to the junior Senator from Minnesota, Mr. FRANKEN.

The ACTING PRESIDENT pro tempore. The Senator from Minnesota is recognized.

Mr. FRANKEN. Madam President, I rise to express my support for Senator MIKULSKI's amendment for women's health.

This amendment is crucial because it is about prevention. Prevention is one of the key ways this bill will transform our system of sick care into true health care. It is common sense. You get the right screenings at the right time so you find diseases earlier. It saves lives and it saves money.

The Senate bill already has several provisions for preventive care, which I strongly support. For example, colonoscopies and screening for heart disease will be covered at no cost. It is a good start.

The current bill relies solely on the U.S. Preventive Services Task Force to determine which services will be covered at no cost. The problem is, several crucial women's health services are omitted. Senator MIKULSKI's amendment closes this gap. Under her amendment, the Health Resources and Services Administration will be able to include other important services at no cost, such as the well woman visit, prenatal care, and family planning.

These preventive services will truly improve women's health. For example, if all women got the recommended screening for cervical cancer, we could detect this disease earlier and prevent four out of every five cases of this invasive cancer. This will improve the health of our mothers, sisters, and our daughters. This bill and this amendment will make prevention a priority and not an afterthought.

Although I respect the efforts of my distinguished colleague from Alaska, the Murkowski alternative falls short. The Murkowski amendment does nothing to guarantee women will have improved access to coverage and cost-sharing protections for preventive services. Rather than establish objective, scientific standards about which preventive services should be covered, this alternative only requires insurers to consult with medical organizations when making coverage decisions.

While we know the U.S. Preventive Services Task Force recommendations do not cover all necessary services, the Murkowski amendment entirely removes even this basic coverage requirement from the bill, leaving women without any protections under health care reform for essential preventive care. This means that important preventive care for women, including screening for osteoporosis and sexually transmitted infections, may not be covered by insurance plans.

In the simplest terms, the Murkowski amendment maintains the status quo, and we know the status quo is not working for millions of women who are forgoing preventive care because they simply cannot afford it. The Murkowski amendment continues to leave prevention coverage decisions up to health insurance companies, and that means there would be no guarantee

Exhibit 151    JA-0002523

Case 2:17-cv-04540-WB Document 253-10 Filed 09/29/20 Page 552 of 677

that any health plan will cover basic preventive services at all.

Do we want to leave these important decisions up to the insurance companies? The health of American women is too important to leave in their hands. That is why I urge my colleagues to support Senator MIKULSKI's amendment and vote to make sure women can get the preventive screenings they need to stay healthy. Most important, this amendment will make sure women have access to these lifesaving screenings at no cost.

The ACTING PRESIDENT pro tempore. The Senator's time has expired.

Mr. FRANKEN. I request another 45 seconds.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. FRANKEN. Madam President, prevention is just one of the ways this bill will improve women's health. It also ends insurance companies' practice of charging women more because they happen to be women, or denying coverage based on a history of pregnancy, C-section, or domestic violence.

We need to pass this bill this year to ensure comprehensive, affordable care for women throughout the country. And we need to include this amendment because I want to be able to look my wife in the eye, I want to be able to look my daughter in the eye—my son, too—and my future grandchildren in the eye and say we did everything we could in this bill to improve women's health. We cannot wait any longer. I urge all my colleagues to stand with us and support this amendment.

I yield the floor.

Mr. ENZI. Madam President, I yield 5 minutes to the Senator from Oklahoma.

The ACTING PRESIDENT pro tempore. The Senator from Oklahoma.

Mr. COBURN. Madam President, it is interesting, as a practicing physician who has actually cared for women and nobody so far who has been in on this debate has ever done. I congratulate the Senator from Maryland for her care about prevention because we all know that is key.

The mischaracterization we heard about this bill is astounding. The reason we got in trouble with the Preventive Task Force is because it did something that was inappropriate and did not have the appropriate professional groups on its task force when it made its recommendation on breast cancer screening.

The Murkowski amendment says we will rely on the professional societies to make the determinations of what must be available. We have heard the Senator from Iowa say health insurance will decide that. That is absolutely untrue. Health insurance will not decide it. The professional societies will decide what will be covered, and the insurance companies must cover it under the Murkowski amendment.

The second point is there will not be any objective criteria. The objective criteria doctors practice under today are the guidelines of their professional societies.

Here is the difference between the Murkowski amendment and the Mikulski amendment: The Senator from Maryland relies on the government to make the decision on what will be covered. She refers to the Health Resources and Services Administration. She refers to the Health Resources and Services Administration which has no guidelines whatsoever on women's health care right now, other than prenatal care and childcare. That is the only thing they have.

For whom does HRSA work? HRSA works for the Secretary of Health and Human Services. So the contrast between these two amendments could not be any more clear in terms of do we want to solve the problems we just experienced on mammogram recommendations? We can let the government decide, which got us into this trouble, and they will set the practice guidelines and recommendations for screening or you can let the American College of Obstetricians and Gynecologists or the American College of Surgeons or the American College of Oncologists set and use their guidelines.

The choice is simple: The government can decide what care you get or the people who do the care, the professionals who know what is needed, who write the peer-reviewed articles, who study the literature and make the recommendations for their guidelines.

Every month I get from the American College of Obstetricians and Gynecologists their new guidelines. I try to follow them at every instance. The fact is, the Mikulski amendment says government will decide. That is what it says. The government will decide through HRSA. The Murkowski amendment says it is the best practices known by the physicians who are out there practicing. What is the difference? How does it apply to you as a woman? It applies to you as a woman because the people who know best get to make the recommendations rather than a government bureaucracy. That is the difference.

If you will recall, under the stimulus bill we passed, we have a cost comparative effectiveness panel, which will surely be in the mix associated with the recommendations. If you look at what the task force on preventive recommendations said from a cost standpoint, they were absolutely right. From a patient standpoint, they were absolutely wrong.

The real debate on this bill—the Mikulski amendment is the start of the real debate—is do we have the government decide based on cost or do we have the professional caregivers who know the field decide based on what is best for that patient. That is the difference.

What the Senator from Alaska does, which is necessary, is she says we will rely on the American College of Obstet-

rics and Gynecology. We will rely on the American College of Surgeons. We will rely on the American College of Oncologists to determine what should be the screening recommendations for patients.

For, you see, what happens with the Mikulski amendment is the government stands between you and your doctor. That is what is coming. That is what will be there.

There is no choice under the Murkowski amendment for an insurance company to have the option either to cover or not to cover. They must. It says "shall" do that. So the mischaracterizations on what the Murkowski amendment actually says and does are unfortunate.

The ACTING PRESIDENT pro tempore. The Senator's time has expired.

Mr. COBURN. I yield the floor.

The ACTING PRESIDENT pro tempore. Who yields time?

The Senator from Maryland.

Ms. MIKULSKI. Madam President, how much time does our side have?

The ACTING PRESIDENT pro tempore. There is 17 minutes 15 seconds remaining.

Ms. MIKULSKI. I yield 5 minutes to the Senator from Michigan.

The ACTING PRESIDENT pro tempore. The Senator from Michigan.

Ms. STABENOW. Madam President, first, I thank Senator MIKULSKI for her leadership not only on this important amendment but on so many issues in health care, issues for women across this country. We are honored to call her dean for all of us as it relates to focusing on the issues that are so critical to women and their families.

I thank Senator REID for making this a priority and making this the first amendment we are offering in this debate.

We all know that often women are the ones making health care decisions for their families as well as themselves. They are more likely to be the person making health insurance choices. Women of childbearing age pay on average 68 percent more for their health care than men do. We have so many instances in which insurance companies are standing between women and their doctors right now in making decisions—decisions not to cover preventive services, such as a mammogram screening or a cervical cancer screening, decisions to call pregnancy a preexisting condition so women cannot get health insurance, decisions not to cover maternity care so that women and their babies can get the care they need so that babies can be successful in life, both prenatal care and postnatal care.

Women of this country have a tremendous stake in health care reform. We pay more now, if we can find coverage at all, and there are too many ways in which insurance companies block women from getting the basic health services they need.

This amendment is critically important to make sure that women are able

Exhibit 151 JA-0002524

to get preventive care services without a deductible and without copays. This amendment recognizes the unique health needs of women. It requires coverage of women's preventive services developed by women's health experts to meet the unique needs of women.

Why do we stress that? We stress that because for years we have struggled in so many areas to make sure that women's health needs were focused on and not just health in general. When we look at research through the National Institutes of Health and what it took to get to a place where research would be done for women on women's subjects or on female mice or rats rather than male subjects to make sure that the differences between men and women were considered in research, we have made important steps in that direction. Again, Senator MIKULSKI was leading the way as it relates to having a women's health research effort in our country.

This is one more step to make sure we are covering women's preventive services developed by women's health experts for the unique needs of women. That is what this is all about—making sure women have access to preventive services such as cervical cancer screenings, osteoporosis screenings, annual mammograms for women under 50, pregnancy and post partum screenings, domestic violence screenings, and annual checkups for women.

We know more women die of heart disease than actually any other disease. This is something I do not think is widely known. We have even heard that many physicians do not realize the extent to which heart disease is prevalent in women. All of us women have worked together on a women's heart bill and part of that is for screenings. Part of that is to make sure we are screening for heart disease and strokes, the No. 1 killer of women. This would make sure those screenings would be part of health care reform.

I could go on to list all the different prevention items, but I will simply say that when we are talking about women's health and we are talking about women's lives, this is an incredibly important amendment to adopt.

The ACTING PRESIDENT pro tempore. The Senator's time has expired.

Ms. STABENOW. I yield the floor.

Mr. ENZI. Madam President, I yield 5 minutes to the Senator from Texas.

The ACTING PRESIDENT pro tempore. The Senator from Texas.

Mrs. HUTCHISON. Madam President, I rise to speak on the Mikulski amendment and the Murkowski amendment because I feel very passionate about women's issues. In fact, Senator MIKULSKI and I have worked throughout my time in the Senate and her time before me on these very issues—assuring that women's health care concerns, which are different from men's in many instances, are a part of any health care coverage in our country, and ongoing we must assure the same.

I have been an advocate for cancer screening services for women, and I was dismayed when I saw the U.S. Preventive Services Task Force a few weeks ago issuing new guidelines for cancer screening for women—breast cancer screening for women. We have all lived with breast cancer throughout the course of the history of women, but especially in the last probably 25 years the strides that we have made in saving lives and in the survivability of women with breast cancer is because we have had early detection. We don't have a cure for breast cancer, and we are all fighting for that cure, but until we get it, the first line of defense is early detection.

So now we have a new task force recommendation that says everything we have had and enjoyed over the last 25 years in saving women's lives is no longer relevant because now, before the age of 50, you don't need a mammogram, and after the age of 50 it is every other year.

Well, I know Senator MIKULSKI and I agree we do not think that is right. Neither did any other woman in the Senate when that was proposed years ago by President Clinton. We all stood up and said no. I am standing up and I am saying no once again, and I am sure every woman in the Senate is, as many women in America are.

But the Mikulski amendment doesn't actually fully address the problem of having the task force—which is relied on 14 times in the bill before us—as the arbiter of what is necessary for our government program and that it then will surely become the private sector standard as well. That task force even has money allocated to advertize its task force recommendations. So rather than the Mikulski amendment severing the ties with the task force, the amendment now has another government agency that has the same capability to basically interfere between the woman and her doctor, which is where we want the decisions to be made. Coverage decisions will be dictated by both the task force and a new Health Resources and Services Administration entry into the mix.

While I certainly agree with Senator MIKULSKI about the importance of preventive services for women and insurance coverage decisions, I can't support her amendment because we still have not one but two government task forces and committees that will be in the middle of these health care coverage decisions. I think the coverage decisions should be made by doctors and their patients. That is why I have joined with Senator MURKOWSKI in offering the alternative approach. This is what we should expect from any future health care reform, and it is certainly what we expect today.

The Murkowski amendment will leave the medical decisions to the guidelines established by those who know medical treatment best, which is our own doctors. In fact, we have just received a CBO assessment of what the Murkowski amendment would cost, and it actually says there will be a savings. So rather than the Mikulski amendment, which would spend $1 billion over 10 years, the Murkowski amendment would actually save $1.4 billion over 10 years. Why? Because the Murkowski amendment relies on the combined commonsense and clinical judgment of American physicians.

The ACTING PRESIDENT pro tempore. The Senator's time has expired.

Mrs. HUTCHISON. So, Madam President, I urge a vote for the Murkowski amendment. I know we have the same goals as Senator MIKULSKI and her amendment, but I don't believe the Mikulski amendment achieves the goal of having a woman and her doctor make the decisions for her. That is the key that I think is so important in this debate. I urge a vote for the Murkowski amendment.

I thank the Chair, and I yield the floor.

The ACTING PRESIDENT pro tempore. Who yields time?

Ms. MIKULSKI. Madam President, I yield 4 minutes to the Senator from the State of Washington, who has been a real leader on these issues.

By the way, Madam President, before the Senator speaks, I want to thank Senator STABENOW for a unique courtesy. This is her desk, and as many of my colleagues know, I broke my ankle and I can't get up to where my desk is at this point. I will, however, in a matter of another few weeks. But she has given me this desk on loan so that I could stand on my own two feet to debate this amendment, and I wanted to thank her for the courtesy.

Madam President, I also want to note something while the senior Senator from the Republican leadership is here, and the author of the amendment. We, the women of the Senate, on a bipartisan basis, have worked for women's health. Today, we disagree on what is the best way to achieve it by these two amendments. I want to thank my colleagues for setting a tone of civility. I think this has been one of the most rational, civilized conversations we have had over this, and I would like to thank them.

As the leader on this side of the aisle, in terms of seniority, I would like to extend my hand in friendship and suggest when this bill is done, and this amendment is done, we continue to focus on this wonderful work that we have done together. We have done things that have saved millions of lives, and so I look forward to continuing that.

Madam President, I now yield 4 minutes to the Senator from the State of Washington, Mrs. MURRAY.

The ACTING PRESIDENT pro tempore. The Senator from Washington.

Mrs. MURRAY. Madam President, I thank my colleague from Maryland, and I would just say that wherever she stands on the floor of the Senate, she leads us all. So we are delighted you are here and thank you so much for

Exhibit 151

your leadership on this critical issue of making sure women have access to quality preventive health care services and screenings which are so critical to women across the country.

Madam President, the Senator from Maryland offered this amendment, and I worked with her in the committee. She has been a leader on this for many years, and I echo her comments as well that this has always been an issue. For as long as I have been here—since 1993—the women in the Senate, on both sides of the aisle, have stood up to make sure that women's care is part of health care, and we understand we have to stand shoulder to shoulder. It is unfortunate at this time that we see this in a little different light, but I agree with Senator MIKULSKI. We will keep working together throughout our time here to make sure women's preventive services are covered.

I do support the Mikulski amendment and the MIKULSKI approach. Her amendment requires all health plans to cover comprehensive women's preventive care and screenings at no cost to women. I just wanted to come to the floor for a minute and point out why this is so important.

When the economy is hurting, women on the whole tend to think of caring for their families first and not caring for themselves. They take care of their children and their spouses first, and they end up delaying or skipping their own health care in order to take care of their families. In fact, we know in 2007, a quarter of women reported delaying or skipping their health care because of cost. In May of 2009, just 2 years later, a report by the Commonwealth Foundation found that more than half of women today are delaying or avoiding preventive care because of its cost.

That is not good for women, it is not good for their families, and it is not good for their ability to be able to take care of their families and to take care of themselves. So Senator MIKULSKI's amendment is extremely important, especially in this economic time. We know if women get the preventive care and care for their needs, then they are able to care for their families. Yet the situation we find ourselves in today is that women are not taking preventive care. They are not taking care of themselves. Therefore, when they get sick, they end up in the hospital and then their families are in trouble. So we know preventive services can save lives, and it means better health outcomes for women.

We have to make sure we cover preventive services, and this takes into account the unique needs of women. Senator MIKULSKI's amendment will make sure this bill provides coverage for important preventive services for women at no cost. Women will have improved access to well-women visits—important for all women; family planning services; mammograms, which we have all talked about so many times, to make sure they maintain their health.

Madam President, I want to emphasize that this amendment preserves the doctor-patient relationship and allows patients to consult with their doctors on what services are best for them. This has become a large topic of conversation over the last several weeks, and Senator MIKULSKI's amendment makes sure if a woman under 50 decides to receive an annual mammogram, this amendment will cover it. She will be able to work with her own doctor and take care of her health.

So, Madam President, I come to the floor today to strongly support the Mikulski amendment, to thank her for her leadership, and I hope we can get to and vote on this important issue and move on and pass health care reform.

My constituents, when I go home, say: Move on. Get this done. We have to take care of this because of our economy, because of the impact on small businesses, because of the rising costs of premiums, and because of the large number of people who are losing their health care coverage. This health care bill is going to make a major difference when we get it passed, and the American public can take a deep breath and say: Finally, our government has moved forward.

So let's get past this amendment. I support strongly the Mikulski amendment. Let's move on this bill and take a major step forward for health care coverage for all Americans and pass the health care bill.

Madam President, I yield the floor.

ABORTION

Mr. CASEY. Madam President, may I ask the Senator from Maryland to yield for a question about her amendment, No. 2791 to H.R. 3590, the purpose of which is to clarify provisions relating to first dollar coverage for preventive services for women?

Ms. MIKULSKI. Of course.

Mr. CASEY. Senator MIKULSKI had a similar amendment in the HELP Committee bill and at that time, I commended the Senator on its substance as I am a strong supporter of preventive care for women. I thank her for offering this important amendment and particularly for calling our attention to the importance of first dollar coverage of preventive services for women.

Ms. MIKULSKI. I thank the Senator.

Mr. CASEY. Particularly in view of some of the recent controversy about mammograms and coverage, I am particularly grateful that the Senator has clarified this with this amendment and allow for the fact that preventive services must preserve the doctor-patient relationship. Thus, women under 50 may decide with their doctor that they should have a mammogram screening and this amendment would ensure coverage of such service.

Ms. MIKULSKI. That is correct.

Mr. CASEY. There is one clarification I would like to ask the Senator. I know we discussed it during the HELP markup and it was not clarified at that time and thus I chose to vote against the amendment because of the possi-

bility that it might be construed so broadly as to cover abortion. But I understand that the Senator has now clarified specifically that this amendment will not cover abortion in any way. Specifically, abortion has never been defined as a preventive service and there is neither the legislative intent nor the language in this amendment to cover abortion as a preventive service or to mandate abortion coverage in any way. I ask the Senator is that correct?

Ms. MIKULSKI. Yes, that is correct. This amendment does not cover abortion. Abortion has never been defined as a preventive service. This amendment is strictly concerned with ensuring that women get the kind of preventive screenings and treatments they may need to prevent diseases particular to women such as breast cancer and cervical cancer. There is neither legislative intent nor legislative language that would cover abortion under this amendment, nor would abortion coverage be mandated in any way by the Secretary of Health and Human Services.

Mr. ENZI. Madam President, I yield 2 minutes to the Senator from Kansas.

Mr. BROWNBACK. Madam President, I rise in support of the amendment of the Senator from Alaska, and I have talked with my good friend, the Senator from Maryland, Ms. MIKULSKI, about a side issue that is included in the definition of preventive care. The Senator from Maryland stated in a colloquy that "there are no abortion services included in the Mikulski amendment." She has stated that in colloquy.

I have trouble, however, because I believe a future bureaucracy could interpret it differently. So I asked my friend from Maryland if she would include clear legislative language in this saying simply:

Nothing in this Act shall be construed to authorize the Secretary, or any other governmental or quasi-governmental entity, to define or classify abortion or abortion services as "preventive care" or as a "preventive service."

I think that clarifies the issue, and it would be my hope that my colleague from Maryland would include that in her language. It is not in there, even though there have been statements on the floor. But, as we all know as legislators, it is one thing to say something on the Senate floor, and it is one thing to have a colloquy, but it is far different to have it written in the base law. This is not in the base law.

So I would urge my colleague, the Senator from Maryland, to include this language. Absent that, I think there is too much room for a broader definition of what preventive care means; that it could include abortion services as well, and I would urge my colleagues to vote against the Mikulski amendment if that is the case.

On that ground, I think there are other issues involved, and that is why I think the approach of the Senator from

Exhibit 151      JA-0002526

Alaska is superior, while maintaining the doctor-patient privilege. I think this is a good debate for us to have, given these recent discussions. But absent this change, I think there is another issue that is involved that I would urge my colleagues to consider.

Madam President, I want to yield back to maintain some time for the Senator from Wyoming to be able to speak, so I yield the floor.

Mr. FEINGOLD. Madam President, disappointed that the Senate health care debate has gotten off on the wrong foot. The first amendment voted on would add almost a billion dollars to our budget deficits over the next 10 years. We should make sure health plans cover women's preventive care and screenings, but we should also find a way to pay for it, rather than adding that cost to the already mountainous public debt. At a time of record deficits, Americans expect fiscal responsibility from their representatives in Congress.

The PRESIDING OFFICER (Mr. KIRK). Who yields time?

Ms. MIKULSKI. Mr. President, we are waiting for Senator BOXER to come to the floor, so if the other side of the aisle has another speaker, I know at the end we hope that Senator LISA and Senator BARB—I say that because our last names sound so much the same—could wrap it up.

How would the Senator from Wyoming like to proceed? We are waiting for Senator BOXER or for Senator BAUCUS.

Mr. ENZI. Mr. President, I yield 10 minutes to the Senator from Alaska so she can actually propose her amendment that we have been debating and take up to 10 minutes.

Ms. MIKULSKI. Then I will wrap up.

Mr. ENZI. That would still leave us with 2 minutes. If it does leave us with 2 minutes, then I would have the Senator from Wyoming use that 2 minutes.

Ms. MIKULSKI. Whatever way it will work and accommodate you while we are waiting to see who our speakers are.

The PRESIDING OFFICER. The Senator from Alaska is recognized.

Ms. MURKOWSKI. Mr. President, I want to start my comments by acknowledging my colleague from Maryland and accept her gracious offer to continue to work on this issue as it relates to women's health and women's health services. As has been noted by the Senator from Maryland and the Senator from Washington, this is an issue that we women of the Senate have come together on repeatedly, to work cooperatively. While we do have, some would say, somewhat dueling amendments here, I think it is important to recognize the goals we are both seeking to attain here are certainly right in alignment. We are just choosing different means to get there. But I appreciate, again, the civility and cooperation from not only Senator MIKULSKI but the other women of the Senate on this very important issue.

I wish to reiterate a couple of points about my amendment that I made yesterday.

The PRESIDING OFFICER. The Senator from Maryland.

Ms. MIKULSKI. Mr. President, I fear the microphone of the Senator from Alaska is not working.

Ms. MURKOWSKI. Is that better?

Ms. MIKULSKI. That is so much better. I want to hear about the amendment and continue our conversation.

Ms. MURKOWSKI. The Senator just missed all the kind remarks I directed to her attention.

Ms. MIKULSKI. I ask unanimous consent she be extended an additional 2 minutes. No, I withdraw that request.

Ms. MURKOWSKI. I will make sure those comments that were made for the RECORD will be delivered to the Senator personally.

I want to reiterate some points I made yesterday about my amendment and I will also share with my colleagues, I know the Senator from Texas mentioned it as well, the CBO score we received late last evening. It provides us with a score showing a cost savings of $1.4 billion over the next 10 years. I think this is significant, as Members, certainly from the other side, raised the importance of fiscal discipline and our fiduciary responsibility here. Importantly, the CBO indicated the provisions on the second page which prevent the Secretary from using the recommendations of the USPSTF to deny coverage would cost money which means we are protecting certain benefits and that is very important.

The amendment we will have before us, the Murkowski amendment, is one that allows or requires a level of transparency with the recommended health screenings, prevention services that are deemed necessary not by some task force that is appointed by folks within the administration, not by some commission that has political relationships. What we are urging is that the health screenings, the preventive services, be determined by those who are actually in the field, those practitioners—those who are engaged in oncology, OB/GYNs. We need to be looking to the experts. We need to be looking to that peer-reviewed science. We don't need to be looking to those entities that have been brought together by a government entity or by the Secretary. We need to be looking to the likes of the American Society of Clinical Oncology, the American College of Surgeons, the American College of Radiation Oncology, the American College of Obstetrics and Gynecology. We need to look to their recommendations.

Again, as I mentioned yesterday in my comments, if you go to their Web sites, if you look to their specific recommendations, they will give guidance, guidance that, again, is based on their practice in oncology, their practice as an OB/GYN. Look to what they set out as the guidelines for cervical cancer screening, for mammograms,

and let that information be made available publicly through the pamphlets, the plans that come together from the insurance companies. But allow them—allow me, as a consumer of health care, me as a consumer looking for the best plan for me and my family—to know what those guidelines are, not from a government task force but from those who are the real experts. I think this is the transparency that health care shoppers are looking for.

Some have suggested: LISA, your amendment doesn't require the insurance companies to provide any prevention or screening services. There is no mandate in there. If we do not have a mandate, then the insurance companies are not going to provide health care prevention and screening services.

I think we need to ask the question here, what is the point of prevention? It is to prevent more expensive care in the future by preventing the chronic and more acute illnesses. So should not the insurance companies want to utilize more preventive services, utilize more screenings, more wellness services, in order to keep down the costs of care based on the judgment of the doctors, based on the judgment of the professionals, and not necessarily those who, again, are part of a government entity?

I know within my staff I have a member who is on the FEHBP plan, but they contact her on a somewhat regular basis about her diabetes care, ensuring she is taking her medications, getting the necessary preventive services offered by her insurer for her particular condition.

It has been mentioned by several of my colleagues that this USPSTF is not such a bad group of guys, they are not just these nameless, faceless bureaucrats. I think it is important to recognize, and even the American Heart Association has recognized it, that the Preventive Services Task Force is limited to only primary care doctors and not specialists such as the oncologists, the cancer doctors who see patients every day battling cancer. These doctors who are providing Americans with their suggestions on what services are necessary for cancer screenings, but yet these doctors are not part of this task force, have again shone the spotlight on what happens when you have a government entity or government task force that is basically the one saying this is what is going to be covered, this is not what is going to be covered. In my amendment, we specifically provide that the recommendations from USPSTF cannot be used to deny coverage of an item or service by a group health plan or health insurance offeror. I think that is very important.

I think it is also important to recognize that what we do in my amendment is make sure the health plans consult the recommendations and guidelines of the professional medical organizations to determine what prevention benefits should be covered by these health insurance plans throughout the country.

Exhibit 151

JA-0002527

We also require plans to provide this information directly to the individuals. You get to see it for yourself. You get to make that determination. So what that means is the doctors and the specialists will be recommending what preventive services to cover, not those in Washington, DC.

My amendment ensures that the Secretary of Health and Human Services shall not use any of the recommendations, again made by the task force, to deny coverage. We also include broad protections to prevent bureaucrats at the Department of Health and Human Services from denying care to patients based on comparative effectiveness research. And finally, we have a provision that ensures the Secretary of Health and Human Services may not define or classify abortion or abortion services as preventive care or as preventive services.

The PRESIDING OFFICER. The time of the Senator has expired.

Ms. MURKOWSKI. I appreciate that. I think my amendment is straightforward. I think it is a good compromise and again it is a clear differential between what we are going to do to allow a woman to have full choice with her doctor as opposed to government telling us who we should be seeing.

AMENDMENT NO. 2836 TO AMENDMENT NO. 2786

Mr. President, I ask consent to call up my amendment, No. 2836.

The PRESIDING OFFICER. The clerk will report the amendment.

The assistant legislative clerk read as follows:

The Senator from Alaska [Ms. MURKOWSKI] for herself, Mrs. HUTCHISON, and Mr. JOHANNS, proposes an amendment numbered 2836 to amendment No. 2786.

Ms. MURKOWSKI. I ask unanimous consent that further reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To ensure patients receive doctor recommendations for preventive health services, including mammograms and cervical cancer screening, without interference from government or insurance company bureaucrats)

On page 17, strike lines 11 through 14.

On page 17, line 15, strike "(2)" and insert "(1)".

On page 17, line 20, strike "(3)" and insert "(2)".

On page 17, between lines 24 and 25, insert the following:

"Notwithstanding any other provision of law, the Secretary shall not use any recommendation made by the United States Preventive Services Task Force to deny coverage of an item or service by a group health plan or health insurance issuer offering group or individual health insurance coverage or under a Federal health care program (as defined in section 1128B(f) of the Social Security Act (42 U.S.C. 1320a–7b(f))) or private insurance.

"(b) DETERMINATIONS OF BENEFITS COVERAGE.—A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, in determining which preventive items and services to provide coverage for under the plan or coverage, consult the medical guidelines and recommendations of relevant professional medical organizations of relevant medical practice areas (such as the American Society of Clinical Oncology, the American College of Surgeons, the American College of Radiation Oncology, the American College of Obstetricians and Gynecologists, and other similar organizations), including guidelines and recommendations relating to the coverage of women's preventive services (such as mammograms and cervical cancer screenings). The plan or issuer shall disclose such guidelines and recommendations to enrollees as part of the summary of benefits and coverage explanation provided under section 2715.''.

On page 17, line 25, strike "(b)" and insert "(c)".

On page 18, lines 3 and 4, strike "or (a)(2)".

On page 18, line 4, strike "(a)(3)" and insert "(a)(2)".

On page 18, line 11, strike "(c)" and insert "(d)".

On page 124, between lines 22 and 23, insert the following:

(d) RULE OF CONSTRUCTION WITH RESPECT TO PREVENTIVE SERVICES.—Nothing in this Act (or an amendment made by this Act) shall be construed to authorize the Secretary, or any other governmental or quasi-governmental entity, to define or classify abortion or abortion services as "preventive care" or as a "preventive service".

On page 1680, strike lines 10 through 12, and insert the following:

"(A) to permit the Secretary to use data obtained from the conduct of comparative effectiveness research, including such research that is conducted or supported using funds appropriated under the American Recovery and Reinvestment Act of 2009 (Public Law 111–5), to deny coverage of an item or service under a Federal health care program (as defined in section 1128B(f)) or private insurance; or".

The PRESIDING OFFICER. The Senator from Montana is recognized.

Mr. BAUCUS. Mr. President, I am going to speak very briefly on the pending subject and then let the sponsor of the amendment, that is the Mikulski amendment, finish up here. I think it is very telling—I know this point has been made before but I think it bears repeating—the American Heart Association, American Stroke Association has written and released to the Senate this letter. I will read the most important part here. Basically they say they strongly support requiring health plans and Medicare providing first dollar coverage for clinical preventive services that are evidence based and necessary for the prevention or early detection of an illness or disability. We all agree with that.

They go on then to comment on the Murkowski amendment, saying they appreciate the Murkowski amendment recognized the value of the guidance and recommendations but they go on to say that even these guidelines must be held to a standard of being evidence based.

I might say, I run across this over and over again in the medical profession—medical experts. We need to keep moving more and more toward evidence-based medicine.

This statement from the American Heart Association, American Stroke Association, goes on to say:

In addition, we are concerned that Senator Murkowski's preventive health services amendment would take a step backwards by substituting the judgment of the independent U.S. Preventive Services Task Force with the judgment of private health insurance companies.

Frankly, it is a point I very much agree with. I don't think we want the judgment of private health insurance companies making these decisions. I think it is appropriate the sponsor of the amendment finish. She is doing a very good job.

Mr. ENZI. I will yield our final minute to the Senator from Wyoming.

The PRESIDING OFFICER. The Senator from Wyoming is recognized.

Mr. BARRASSO. Mr. President, my wife Bobbi was diagnosed with breast cancer by a screening mammogram in her forties. It is that screening mammogram that has saved her life. By the time of the mammogram, the tumor had spread and she has had two operations and two full bouts of chemotherapy. I do not want a government bureaucrat making a decision for the women of America if they should be allowed to have screening mammograms. It saves lives—1 in 1900, for women in their 40s.

The Reid bill empowers bureaucrats to decide what preventive benefits will be allowed for American women. The amendment from the Senator from Maryland does the same—bureaucrats, not the physicians who are doing the treating. That is why I support the amendment of the Senator from Alaska, because that amendment says the Federal Government cannot use recommendations of the U.S. Preventive Services Task Force, recommendations from bureaucrats, to deny care to anyone including seniors on Medicare—anyone in America. That is how this decision should be made, not by government bureaucrats.

I yield the floor.

The PRESIDING OFFICER. The Senator from Maryland is recognized.

Ms. MIKULSKI. Mr. President, how much time is there on our side?

The PRESIDING OFFICER. The Senator has 3 minutes.

Ms. MIKULSKI. Mr. President, I yield myself 3 minutes.

As we get ready to conclude the debate on both the Mikulski as in BARBARA MIKULSKI and Murkowski as in LISA MURKOWSKI amendments, I want to first say a word about the Senator from Alaska. We have worked together on the Health, Education, Labor and Pensions Committee. We have worked together as women of the Senate, to provide access to women's health services. Not too long ago, when I had my awful fall, she gave me much wisdom and counsel and practical tips because she herself had broken her ankle. To us, when you say to Senator LISA or Senator BARB, "Break a leg," it has a whole different meaning. I again thank her for all her work. I have great respect for her. I look forward to our continued working together.

Exhibit 151        JA-0002528

But I do sincerely disagree with her amendment because what her amendment does is, it guarantees, really, only information. It does not guarantee universal access to preventive and screening services.

It also does not remove the cost barriers by eliminating the high deductibles for the copayments when you go to get a preventative or screening service. It tells insurance companies to give information on recommended preventative care. That is a good thing, but it is a threshold thing. You need to have universal access to the service.

In addition, we do not mandate that you have the service; we mandate that you have access to the service. The decision as to whether you should get it will be a private one, unique to you. We leave it to personalized medicine. So in the poignant case of the wife of the Senator from Wyoming, it would have been up to the doctor, the physician, to get her the service she needed.

It is not only I or one side of the aisle that is opposing the Murkowski amendment. The American Cancer Society, the American Heart Association, and the American academy of GYN services oppose it.

My amendment is a superior amendment because it guarantees universal access to preventative and screening services. It also eliminates one of the major barriers to accessing care by getting rid of high payments and deductibles. It doesn't say you will have a mammogram at 40 because, again, we are substituting ourselves for the task force; it says you will have universal access to that mammogram if you and your doctor decide it is medically necessary or medically appropriate.

Vote for Mikulski. Don't vote for Murkowski. And please, on this one, get it straight.

The PRESIDING OFFICER. Under the previous order, the question is on agreeing to amendment No. 2791 offered by the Senator from Maryland, Ms. MIKULSKI, as amended.

Ms. MIKULSKI. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be.

The clerk will call the roll.

The assistant legislative clerk called the roll.

The result was announced—yeas 61, nays 39, as follows:

[Rollcall Vote No. 355 Leg.]

YEAS—61

| | | |
|---|---|---|
| Akaka | Collins | Kirk |
| Baucus | Conrad | Klobuchar |
| Bayh | Dodd | Kohl |
| Begich | Dorgan | Landrieu |
| Bennet | Durbin | Lautenberg |
| Bingaman | Feinstein | Leahy |
| Boxer | Franken | Levin |
| Brown | Gillibrand | Lieberman |
| Burris | Hagan | Lincoln |
| Byrd | Harkin | McCaskill |
| Cantwell | Inouye | Menendez |
| Cardin | Johnson | Merkley |
| Carper | Kaufman | Mikulski |
| Casey | Kerry | Murray |

| | | |
|---|---|---|
| Nelson (FL) | Shaheen | Vitter |
| Pryor | Snowe | Warner |
| Reed | Specter | Webb |
| Reid | Stabenow | Whitehouse |
| Rockefeller | Tester | Wyden |
| Sanders | Udall (CO) | |
| Schumer | Udall (NM) | |

NAYS—39

| | | |
|---|---|---|
| Alexander | DeMint | LeMieux |
| Barrasso | Ensign | Lugar |
| Bennett | Enzi | McCain |
| Bond | Feingold | McConnell |
| Brownback | Graham | Murkowski |
| Bunning | Grassley | Nelson (NE) |
| Burr | Gregg | Risch |
| Chambliss | Hatch | Roberts |
| Coburn | Hutchison | Sessions |
| Cochran | Inhofe | Shelby |
| Corker | Isakson | Thune |
| Cornyn | Johanns | Voinovich |
| Crapo | Kyl | Wicker |

The PRESIDING OFFICER (Mr. BURRIS). On this vote, the yeas are 61, the nays are 39. Under the previous order requiring 60 votes for the adoption of this amendment, amendment No. 2791, as amended, is agreed to. Under the previous order, the motion to reconsider is considered made and laid upon the table.

AMENDMENT NO. 2836

Under the previous order, there will now be 2 minutes of debate, equally divided, prior to a vote in relation to amendment No. 2836, offered by the Senator from Alaska, Ms. MURKOWSKI.

The Senator from Maryland.

Ms. MIKULSKI. Mr. President, I rise in opposition to the Lisa Murkowski amendment. Though well-intentioned, it does not guarantee universal access to preventive and screening services for women. It does not remove the cost barriers of high payments and codeductibles. It is opposed by the American Cancer Society and the American Heart Association. It primarily provides information on those matters.

We salute her intention, but we think her amendment is too limited, and, to quote the American Heart Association, it would be an actual "step backwards" in the area of making preventive services available, particularly not only in the matter of cancer but in heart and vascular disease—the emerging No. 1 killer for women.

I urge defeat of the Murkowski amendment.

The PRESIDING OFFICER. The Senator's time has expired.

The Senator from Alaska.

Ms. MURKOWSKI. Mr. President, the purpose of this amendment is to ensure we do not have government entities that are making these decisions as individuals working with our doctors feel is best.

The intent behind this amendment is to ensure that those medical professional organizations, whether it is the American Society of Clinical Oncology or the American College of Surgeons or the American College of Radiation Oncology or the American Society of Obstetricians and Gynecologists—those who are in the practice, those who are making the recommendations—these are the individuals we want to know are being consulted, not some entity

that has been created by those of us in the government or by some administration, by some Secretary.

So what we propose with this amendment is an insurance offering, if you will. You will know fully what is part of your plan. It is you and your doctor making these decisions.

I urge a "yes" vote on this amendment.

Mr. ENSIGN. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second? There appears to be.

The question is on agreeing to the Murkowski amendment.

The clerk will call the roll.

The bill clerk proceeded to call the roll.

The result was announced—yeas 41, nays 59, as follows:

[Rollcall Vote No. 356 Leg.]

YEAS—41

| | | |
|---|---|---|
| Alexander | DeMint | McCain |
| Barrasso | Ensign | McConnell |
| Bennett | Enzi | Murkowski |
| Bond | Graham | Nelson (NE) |
| Brownback | Grassley | Risch |
| Bunning | Gregg | Roberts |
| Burr | Hatch | Sessions |
| Chambliss | Hutchison | Shelby |
| Coburn | Inhofe | Thune |
| Cochran | Isakson | Vitter |
| Collins | Johanns | Voinovich |
| Corker | Kyl | Wicker |
| Cornyn | LeMieux | |
| Crapo | Lugar | |

NAYS—59

| | | |
|---|---|---|
| Akaka | Franken | Mikulski |
| Baucus | Gillibrand | Murray |
| Bayh | Hagan | Nelson (FL) |
| Begich | Harkin | Pryor |
| Bennet | Inouye | Reed |
| Bingaman | Johnson | Reid |
| Boxer | Kaufman | Rockefeller |
| Brown | Kerry | Sanders |
| Burris | Kirk | Schumer |
| Byrd | Klobuchar | Shaheen |
| Cantwell | Kohl | Specter |
| Cardin | Landrieu | Stabenow |
| Carper | Lautenberg | Tester |
| Casey | Leahy | Udall (CO) |
| Conrad | Levin | Udall (NM) |
| Dodd | Lieberman | Warner |
| Dorgan | Lincoln | Webb |
| Durbin | McCaskill | Whitehouse |
| Feingold | Menendez | Wyden |
| Feinstein | Merkley | |

The PRESIDING OFFICER. On this vote, the yeas are 41, the nays are 59. Under the previous order, requiring 60 votes for the adoption of amendment No. 2836, the amendment is withdrawn.

Mr. NELSON of Nebraska. Madam President, this afternoon I voted against the amendment offered by my colleague, the senior Senator from Maryland, Ms. MIKULSKI.

I voted against this amendment with regret because I strongly support the underlying goal of furthering preventive care for women, including mammograms, screenings, and family planning. Unfortunately, the amendment did not incorporate language I suggested to specifically clarify that abortion would not be covered as a future preventive care service. I appreciate the assurances from Senator MIKULSKI in a colloquy on the floor that abortion would not be covered as a preventive service, but words do not supersede the language in the legislative text. I do

Exhibit 151

JA-0002529

look forward to ways in which Congress can further preventive care services for women.

The PRESIDING OFFICER. The Senator from Colorado is recognized.

AMENDMENT NO. 2826 TO AMENDMENT NO. 2786

Mr. BENNET. Mr. President, I have an amendment No. 2826 at the desk. I would like to call it up at this time.

The PRESIDING OFFICER. The clerk will report.

The assistant bill clerk read as follows:

The Senator from Colorado [Mr. BENNET], for himself, Mr. HARKIN, Mr. DODD, Mr. BROWN, Mr. DURBIN, Mrs. LINCOLN, Mr. WYDEN, Mr. BEGICH, Mr. BAYH, and Mrs. SHAHEEN, proposes an amendment numbered 2826 to amendment No. 2786.

Mr. BENNET. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To protect and improve guaranteed Medicare benefits)

On page 1134, between lines 3 and 4, insert the following:

### Subtitle G—Protecting and Improving Guaranteed Medicare Benefits

**SEC. 3601. PROTECTING AND IMPROVING GUARANTEED MEDICARE BENEFITS.**

(a) PROTECTING GUARANTEED MEDICARE BENEFITS.—Nothing in the provisions of, or amendments made by, this Act shall result in a reduction of guaranteed benefits under title XVIII of the Social Security Act.

(b) ENSURING THAT MEDICARE SAVINGS BENEFIT THE MEDICARE PROGRAM AND MEDICARE BENEFICIARIES.—Savings generated for the Medicare program under title XVIII of the Social Security Act under the provisions of, and amendments made by, this Act shall extend the solvency of the Medicare trust funds, reduce Medicare premiums and other cost-sharing for beneficiaries, and improve or expand guaranteed Medicare benefits and protect access to Medicare providers.

Mr. BENNET. Mr. President, I was paying very close attention to the floor debate over the last few days, and at times I am beginning to wonder what bill it is we are debating. Only in Washington could an effort to extend the life of the Medicare trust fund be viewed or distorted somehow as being unfair or bad for seniors.

We know—and it is in print in the CBO report—this bill doesn't take away any senior's guaranteed Medicare benefits. We know the bill extends Medicare solvency for 5 additional years. How does it do that? It does it in a way that is different from the way government usually does business, which is either adding or cutting from a program. It changes the way we deliver medicine in this country, and it does it in a way that protects senior benefits, and it extends the life of Medicare.

The attacks on this bill and my amendment have nothing to do with those facts. The sad part is that there are ideas on every side of this debate that are worth considering. We should be debating those ideas rather than claiming something that is just not true about the bill.

These Washington tactics of trying to shift health care reform back to some committee to languish is exactly why nothing ever gets done around here. The almost unbelievable part of this is that the opponents of my amendment say the health care bill hurts seniors. Yet the bill and our amendment is being supported by the AARP, the Alliance for Retired Americans, Center for Medicare Rights, and the National Committee to Preserve Social Security and Medicare.

What are the opponents of my amendment actually saying—that AARP and other senior advocates don't know what they are doing? They know what they are doing, and they also know what is in the bill. The AARP has seniors' best interests in mind, and they want what is best for Medicare in the long run. This bill makes tremendous strides to a more solvent, more stable Medicare Program for years to come.

Unfortunately, in the hopes of eventually trying to kill the bill, there are people who are making claims that are frightening our seniors—meant to frighten them—here and also in Colorado, where people have been calling on their phones convinced that somehow I want to cut their benefits. Nothing could be further from the truth. I believe strongly in the sacred trust we have created with our seniors. That is why I introduced this amendment. Seniors are looking for simple clarity, and health care reform can help their lives.

This amendment says, in the clearest and most unambiguous of terms, as directly as we can say it, that nothing in this bill will cut guaranteed Medicare benefits. All guaranteed Medicare benefits stay intact for every senior in Colorado and all across the country. Seniors will still have access to hospital stays, to doctors, home health care, nursing homes, and prescription drugs.

The second part of the amendment goes further and says clearly and directly to seniors that we will use this bill to further protect and strengthen Medicare. We will extend the life of the Medicare trust fund. We will lower premiums or cost share, increase Medicare benefits, and improve access to providers. You don't need to believe me. Look at the CBO. These improvements will be paid for with money saved in Medicare under this bill.

What is so regrettable about the debate, and so tragic, is, if we don't actually get this done, Medicare would be bankrupt in just 7 years—in 2017. In the Senate bill we are now considering, we extend the trust fund's solvency by 5 years. We lower premiums for seniors by $30 billion over 10 years. That is real money back in the pockets of our seniors. We eliminate copays that seniors now have to pay for preventive care. That means when seniors go to the doctor for a colonoscopy, they would not have to make the copay like they have to under current law. When they go to get a mammogram, the same is true.

We know preventive care like that saves lives and also money.

Most seniors live on a fixed income. Free preventive care is the best way to encourage seniors to seek important medical precautions. More preventive care is proven to save lives and lower health care costs.

Mr. President, health care reform will cut the cost of brand-name prescription drugs in half for those who are stuck in the gap of coverage between initial and catastrophic coverage. We eliminate the 20-percent cut physicians would otherwise see next year, making sure seniors can continue to see their own doctor.

Opponents of health care reform don't have a plan to protect seniors and strengthen the Medicare Program. I have heard more criticism about the number of pages in the bill than I have heard about a responsible alternative that would extend the life of Medicare and make the other benefits that are in this bill.

I wanted to come to the floor with a simple and straightforward message to seniors: We will protect Medicare. This bill does. We will make sure nobody touches your guaranteed benefits. This bill does. We will make sure Medicare is around for future generations. This bill gets us started in that direction. That is why I have introduced this amendment and why I support health care reform.

Everything I have said today is entirely consistent with the findings of the CBO, the nonpartisan organization that advises this Chamber. This legislation makes explicit the commitment that all of us share to the seniors across the United States of America. It is my hope that once this amendment passes, we can get beyond the debate we have had over the last 72 hours and get on to the substantive aspects of the bill.

I urge support for my amendment. I yield the floor.

The PRESIDING OFFICER. The Senator from Ohio is recognized.

Mr. VOINOVICH. Mr. President, over the past several months I have come to the floor on a couple of occasions to remind my colleagues and the American people about the unsustainable fiscal crisis confronting this country.

Our national debt has exceeded $12 trillion for the first time in history. In fact from 2008 to 2009 alone, the Federal debt will increase 22 percent, boosting the country's debt-to-income ratio—or national debt as a percentage of GDP—from 70 percent last year to 86 percent this year. We have not seen this kind of debt to GDP ratio since the Second World War 65 years ago.

The American people know that this is unsustainable, but my Senate colleagues from on the other side of the aisle continue to ignore this reality. I pledged that I would continue to cry "the emperor has no clothes" until we did something to address this crisis.

I should explain. Most people know the story, "The Emperor's New Clothes," by Hans Christian Anderson.

Exhibit 151                                                                              JA-0002530

In the tale, an emperor goes about the land wearing a nonexistent suit sold to him by a new tailor who convinced the monarch the suit is made of the finest silks. The tailors—two swindlers—tell the emperor that the threads of his robes will be so fine that they will look invisible to those dim-witted, or unfit for their position. The emperor and his ministers, themselves unable to see the clothing, lavish the tailor with praise for the suit, because they do not want to appear dimwitted or incompetent.

Word spread across the kingdom of the emperor's beautiful new robes. To show off the extraordinary suit, a parade was formed. People lined the streets to see the emperor show off his new clothes. In this case, the health care reform bill before the Senate.

Again, afraid to appear stupid or unfit, everyone pretends to see the suit. It is only when a child cries out "the emperor wears no clothes" does the crowd acknowledge that the emperor is, in fact, naked.

Like the little boy crying out, those of us on this side of the aisle are pointing out this bill is fiscally not responsible.

Yet, while not addressing our current health care challenges, the so-called health care reform bill we are debating also creates new programs at a time when we aren't paying for the one we already have, and it adds $2.5 trillion to what we are already spending.

I learned as a mayor and as a Governor, if you cannot afford what you are doing, how can you take on new responsibilities?

We could be using this opportunity to fix our health care system by finally working to lower health care costs and pass those savings on to citizens who are already overburdened by an expensive health care system.

Yet instead of commonsense incremental reforms that increase access to affordable, quality health care, reduce the costs of health care for all Americans, and lower our national health care spending, we have this bill before us.

Unfortunately, the bill violates the medical principle, first, do no harm. Instead, it is more of the same—more spending and more taxes—on an already struggling economy, this at a time when we are currently witnessing the worst recession this country has experienced since the Great Depression.

The legislation we are considering when fully implemented, as I pointed out, spends $2.5 trillion to restructure our health care system. Yet it fails to rein in the cost of health spending in the next decade. According to the Congressional Budget Office, the Federal Government's commitment to health care; that is, the cost of health care paid for by the Federal Government, would actually increase. In other words, we are adding more on to this extraordinary debt we have—unfunded mandates we have—in terms of Medicare.

The bill's proponents will tell you it is paid for. But as David Broder points out in his November 22 Washington Post editorial:

While CBO said that both the House-passed bill and the one Reid has drafted meet Obama's test by being budget neutral, every expert I have talked to says the public has it right. These bills, as they stand, are budget-busters.

And that is what many people are hearing right now from their constituents, particularly many of those individuals who are taking advantage of the Medicare Advantage Program.

Furthermore, as former CBO Director Douglas Holtz-Eakin pointed out in the Wall Street Journal, this bill uses "every budget gimmick and trick in the books."

What are these gimmicks? Most troubling to me and what my colleagues on the floor have been discussing for the last few days is what the bill does to the Medicare Program.

I think we need to be honest with the American people. The Medicare Program is already on shaky footing. Despite $37 trillion in unfunded—unfunded—future Medicare costs and the prediction that the Medicare trust fund is expected to be insolvent by 2017, this bill calls for $465 billion in cuts to Medicare, not to fix the program but, as I said, to create new programs.

For example, this health care bill fails to acknowledge the $250 billion that is necessary to reform the Medicare physician payment formula to ensure that our Nation's seniors will be able to see the doctor of their choice in the future. I have heard it firsthand from family and friends that in some places in Ohio, Medicare beneficiaries already face delays for physician services.

Right in my hometown, I have had doctors tell me: GEORGE, if I have somebody before they are Medicare eligible and they go on Medicare, I will take care of them. I am not taking anymore new Medicare patients because of the reimbursement system. I heard the same thing in terms of Medicaid.

We have a problem out there. Sadly, my friends on the other side of the aisle do not want to be honest with the American people and include the cost of the physician payment fix in the bill. It should be there. Let's be honest about it. Let's be transparent. It is another example, I think, of the smoke and mirrors and budget gimmicks and tricks that former CBO Director Douglas Holtz-Eakin mentioned.

Like I said, we must fix our health care system to help millions of Americans who find themselves without insurance and those struggling to pay their health insurance premiums. We must increase competition in the private market, make it easier for small businesses and individuals to purchase insurance and reform our medical liability system. I call this malpractice lawsuit abuse reform. We should have done that a long time ago. But the fact is that the trial lawyers do not want that to happen. So we are doing nothing about a problem that is causing physicians to give unnecessary tests that are driving up the cost of health care in this country.

Most important, we need to focus our efforts on jobs, jobs, jobs, jobs, jobs because one of the best things we can do to increase health care coverage is to help businesses start to hire again. I need a job. One of the reasons I need a job is when I have a job, in most instances, I have some form of health care. We have a lot of people who are being dropped off. We need more jobs. We should be concentrating on that if we want to up the number of people who can get health care.

To repeat, we do not need to create another set of government programs that spends an additional $2.5 trillion to build a new entitlement system when we cannot afford the one we have now. That is the biggest thing with me. If you cannot afford what you have, how can you take on more? When we do that, we are being fiscally irresponsible. We should deal with what we have. It is amazing to me. If you look around the country, States are cutting their expenses and they are raising taxes. And what are we doing in Washington? We are taking on more expensive programs we cannot afford. That is what I think is troublesome to me as a debt hawk.

We need to understand what we are doing. The American people are paying attention and they know that the emperor has no clothes when it comes to doing something about our unsustainable fiscal crisis.

We are losing our credibility and our credit worldwide. They know it is immoral to be putting this debt on the backs of our children and grandchildren. I believe this health care bill does that exactly. It exacerbates our current fiscal situation.

There are lots of good things out there, a lot of good things we all would like to do. But just like a family, if you cannot afford what you are doing now, how can you afford to take on more responsibility in terms of debt?

Mr. President, I yield the floor.

The PRESIDING OFFICER. The Senator from Rhode Island.

Mr. REED. Mr. President, I think it is important to focus on the fiscal difficulties we have today, but I think it is also important to recognize the probable causes of these huge deficits: two wars, unfunded, no attempt to fund them, spent simply by running up the deficit; tax cuts, which were unfunded and which did not ultimately generate the kind of sustained economic growth and job growth that their supporters advertised, and then the Medicare Part D program, an entitlement program which was also completely unpaid for.

Today we have people talking about entitlement reform, how that is a key aspect of health reform. But so many of my colleagues on the Republican side supported President Bush when he

Exhibit 151

JA-0002531

proposed the Medicare Part D program, a worthy program in concept, but in the context of not paying for it, it is a concept that is costing us greatly today.

Additionally, it is particularly ironic at this moment, because we are considering a McCain motion that would report this health care bill back to the committee with the instructions to restore $400 billion in spending, roughly, over 10 years. I cannot think of anything more contrary to the notion of entitlement reform.

What we have tried to do in this bill is to restructure Medicare so that it will continue providing quality health care, but also recognize the high costs we are facing going forward and the general economic climate we face today. Again, let me remind you, in January 2001, the unemployment rate was about 4.6 percent. When President Obama took office, it was double that and growing and continuing to grow.

We have seen some effects to limit this growth, but it is still a critical issue. Again, this reform package is designed not only to deal with the quality of health care, accessibility to health care, and affordability of health care, but it is designed to, over the long term, begin to rein in costs that are absolutely out of control.

Those suffering the most from this course are the American people and, in some respects, small business men and women. Their health care costs are going up faster than any other costs, and in many instances faster than wages, and it is unsustainable.

If in my State of Rhode Island we do not take effective action, we will see within several years premiums reaching $24,000 to $30,000 a year for a family of four. We cannot sustain that.

If someone is interested in taking the very difficult step of entitlement reform, they would reject the McCain motion. But there are other reasons to reject the amendment, as well. First, the funding that has been eliminated from the current health care system and the system going forward, has been eliminated because it does not improve care. This is particularly true in Medicare Advantage.

This was a program that was developed and sold essentially to the American people as cost containment for Medicare. This was one of the proposals that would rein in out-of-control health care costs by giving insurance companies the ability to manage more effectively.

Of course, what we have seen is a significant increase in payments to Medicare Advantage payments over traditional Medicare. Of course, these insurance companies can manage health care very well as long as they are receiving very significant premium payments from beneficiaries. But, those premiums do not essentially go to better health care. It certainly does, however, to better profits for the insurance companies.

Indeed, with Medicare Advantage there is a rebate given to each insurance company. This is not the case with traditional Medicare. The rebate was designed essentially to provide, again, lower cost access to health care benefits for the consumers of Medicare Advantage.

The GAO found that 19 percent of Medicare Advantage beneficiaries actually pay more than traditional Medicare for home health care and 16 percent pay more for inpatient services. Here is the irony. We are paying the insurance companies more, but the beneficiaries of Medicare Advantage are, indeed, are also paying more. So there is no cost savings in this regard, in this program at least.

The other point, which is I think critical and I alluded to, is that for the same services you receive in Medicare Advantage, there is, on average, a 14-percent increase overall for those similar services in traditional Medicare.

We have to, I think, take tough steps to eliminate these over-payments, but steps that will enhance the quality of care for seniors, and that is what is being done in this bill. While some of these resources are being used to help redesign a system for all Americans, there will also be significant improvements for seniors, for care that is more effective and efficient, and less costly.

Let me suggest something else. We are all paying right now for the cost of uninsured Americans. It has been estimated that every private insurance plan in this country is paying—every individual payer, businesses or individual—about $1,000 a year for uncompensated care. That is the cost hospitals shift from their uncompensated care on to the insurance providers, the carriers, and that is translated into higher premiums for all Americans.

Under this legislation, the hospitals will now see patients presenting themselves with an insurance card. Mr. President, over 94 percent of Americans, it has been estimated, will be covered under our proposal. So instead of showing up for free care, they will be under an insurance plan. The hospitals will benefit. Medicare, Medicaid, and the whole health care system will benefit.

Again, this is one of the changes that would be reversed by the McCain motion.

Also, we have taken steps so that hospitals will be much more effective in managing their patient flow. Readmissions will hopefully be reduced by some of the provisions in this legislation.

There are many things we should do and will do, but I believe we can successfully balance expanding our coverage system, protecting quality of care, but also recognizing, as has been suggested, the fiscal implications not just for the moment but going forward. I suggest if someone is serious about entitlement control, serious about the fiscal implications of this legislation or any other legislation, they will not simply order the committee to restore these cuts. They would do something much more proactive and, indeed, support what I believe are sensible, sound proposals to provide quality, to ensure that over the long run, Medicare is more solvent.

In fact—the final point—the legislation before us would extend the life of Medicare, the solvency of Medicare over at least 5 years. So for those people who say we are trying to end Medicare, their solution is simply to let it go bankrupt apparently in 2017 or to simply ignore it and let it find its own fate.

We can do better. I urge rejection of the McCain motion. I yield the floor.

The PRESIDING OFFICER (Mr. UDALL of New Mexico). The Senator from Wyoming is recognized.

Mr. BARRASSO. Mr. President, I come to the floor also to talk about Medicare and what I see to be significant cuts in the Medicare Program. I practiced medicine in Wyoming for 25 years, taking care of families from across the State and many of these wonderful folks who are on Medicare. They depend on Medicare for their health care. They depend on Medicare. Patients depend on it, the hospitals depend upon it, the physicians, the nursing homes, the home health care agencies—all of them depend on Medicare for their health care.

I listened to my close friends from across the aisle come to the floor as well, and they seem to be trying to convince the American public that the 2,074-page bill which weighs over 20 pounds actually does not cut Medicare. I heard the chairman of the Finance Committee talk about it on the floor; I have heard it from the majority leader.

The health care reform plan we are looking at on this floor cuts $464 billion from Medicare, and I have a list of all the Medicare cuts in this bill, page after page, column after column. When you add them all up, it cuts $135 billion from our hospitals—from our hospitals—that are providing the care. We have heard about some of the cost shifting from the Senator from Rhode Island. Cost shifting occurs. Medicare is one of the biggest deadbeats when it comes to paying for hospital services, and it is why hospitals end up shifting more costs to people who have health insurance, and why, for those people, their premiums will go up if this bill becomes law. So $135 billion cut from hospitals.

The bill cuts $120 billion from a program called Medicare Advantage. There are 11 million Americans in this country who are on Medicare Advantage. They know who they are. They know it is a program that has worked well for them. People ask me what the difference is. Why would somebody want to be on a program called Medicare Advantage? Well, there is an advantage to those seniors who depend upon Medicare for their health care if they are on Medicare Advantage. The No. 1 advantage is, it actually helps coordinate care.

Exhibit 151    JA-0002532

We know one of the best ways to help people keep down the cost of their medical care is to find problems early and to get early treatment. So find the problem and treat it before it gets too bad. Well, Medicare Advantage does both preventive care as well as coordinated care. One of the big problems with Medicare is, it will pay a lot for doing something to someone, but it will not pay much for helping someone stay healthy. But now all of a sudden we are going to cut $120 billion from Medicare Advantage, which actually works on prevention and on coordinated care.

Then there is $42 billion from home health care agencies that will be cut. Those are the folks who come into someone's home and help them stay out of the hospital. The advantage of home health care is to allow people to get care at home and not need to be in the hospital, but suddenly we are looking at $42 billion in cuts on Medicare for home health care agencies.

Then let's take a look at nursing homes: $15 billion in cuts for nursing homes—those facilities taking care of people on Medicare—which, to me, means they are actually cutting it from the people who depend on Medicare for their nursing home needs.

As an orthopedic surgeon, I have taken care of many people, such as a grandmother who breaks her hip. She doesn't need to go into a nursing home permanently, but what she needs to do is to go there for a short period of time for rehabilitation, where she can get better and get stronger. She is not ready to go home, and she does not need to stay in a hospital, but she needs to be in a nursing home for a period of time to get rehabilitated and then to get ready to go home and go back to an independent life. There is a gap in time, and nursing homes help with that. They are wonderful as a way to give somebody an opportunity to gain their strength. In our country, such as it is now, so many grandparents are living in communities where, perhaps, their children or grandchildren are no longer living or they can't go and live with a son or daughter, but they need additional help and so they go to a nursing home.

So for that patient who has broken a hip—the type of patient I have taken care of in the hospital—this bill is going to end up cutting from the hospital $135 billion from Medicare for that patient. It will end up cutting nursing homes by $15 billion, for patients who rely on nursing homes as they recover from their hip surgery. Then once they get home and get ready for an independent life, a lot of times they can benefit from home health care—someone coming into the home and checking on them, giving them medications, making sure they are doing all right, checking their wound, and a number of different things—this bill will cut $42 billion from home health care agencies; again, cutting the services to people who depend upon those services for their health care needs.

Then there is an $8 billion cut from hospice providers, people who take care of our patients—my patients—in the final stages of their life. At a time in their life when their body may be riddled with cancer or they just need a place to go and be treated with respect and to be cared for, we are cutting $8 billion in this bill from the hospice providers—people who are there and helping people in the final stages of their life.

When I look at this, I say: How in the world can my colleagues on the other side say they are not cutting Medicare for our seniors? I read through the bill and there is $135 billion from hospitals, $120 billion from Medicare Advantage, $40 billion from home health care agencies, almost $15 billion from nursing homes, and $8 billion from hospice providers, for a total of $464 billion for this country's seniors. I don't think we should pass this bill. Of course, there is another $500 billion in taxes. It is a huge and hugely expensive bill.

To me, this is absolutely nothing but robbing our folks who are on Medicare to start a whole new government program. I am worried seniors all around the country are going to have less access to doctors, especially in rural and in frontier States, such as Wyoming. I am concerned they are going to see community hospitals and home health care agencies and nursing homes—skilled nursing facilities—struggling to keep their doors open.

It is time for this Congress, for this Senate to listen to America's seniors. Let's listen to the administration's own chief actuary. Richard Foster, the chief actuary for the Centers for Medicare and Medicaid Services, said if these Medicare cuts take effect, then many providers "could find it difficult to remain profitable and might end their participation in the program." They may say: I don't want anything else to do with Medicare. I am closing my doors to Medicare patients.

We cannot have that in this country, but I believe that is what this bill does. Even the nonpartisan Congressional Budget Office said these Medicare cuts could "reduce access to care or diminish the quality of care." Is that what this Senate wants, to reduce access to care or diminish the quality of care?

How many experts does it take to convince the majority party that cutting Medicare to pay for a brandnew government program is irresponsible? We all agree Medicare is going broke. The trust fund will run out of money in the year 2017. It has more than $37 trillion in unfunded liabilities. The Presiding Officer knows that in his State, as well as in mine, Medicare's physician payment formula, which calls for doctors to face a more than 40-percent cut over the next 10 years, is a system that is broken. The Reid bill does nothing to fix this problem. Instead, it takes $½ trillion from Medicare to create a brandnew entitlement program.

It punishes a group of people in order to benefit another. To me, that is not reform. It will only make the system worse.

That is why I support the motion we will be voting on today, the McCain motion. It says we are not going to finance a new government program on the backs of our Medicare patients, on the people who depend upon Medicare for their health care. It instructs the Finance Committee to write a bill that doesn't cut hospitals, that doesn't cut home health care, that doesn't cut Medicare Advantage, and that doesn't cut hospice for our seniors who depend upon those services. A vote for the McCain motion gives us a chance to get this right.

I do want health care reform. I just don't want this bill. This is the wrong prescription for our country. I don't believe we have to take the money out of Medicare and then spend it on a brandnew entitlement program. I go home to Wyoming every weekend—and I know other Members go home and listen to their constituents—and what I hear from the people in Wyoming is: Don't cut my Medicare. Don't raise my taxes. Don't make things worse for me in this economy. I certainly can't afford it. The people of Wyoming want practical, commonsense health care reform; reform that drives down the cost of medical care, improves access to providers and creates more choices.

It is clear this bill has a very different plan in mind. It is not too late to work together for meaningful reform. We do not have to dismantle the current health care system and build it up in the image of big government and then try to say this is reform. The American people are telling us what kind of changes they want, and that is why I will be voting for the McCain motion.

I yield the floor.

The PRESIDING OFFICER. The Senator from Montana is recognized.

Mr. BAUCUS. Mr. President, I wonder if the Senator from Wyoming would be available to answer a question.

Mr. BARRASSO. I will, Mr. President.

Mr. BAUCUS. I am thankful to my good friend and neighbor to my State.

Is it true the CBO letters say the Senate bill will extend the life—extend the solvency of the Medicare trust fund? Is that true?

Mr. BARRASSO. I don't have that letter with me, but everything I look at says this will gut Medicare, make it go broke sooner, and it will be bad for seniors.

Mr. BAUCUS. I don't have the letter in front of me, but in all deference and respect to my good friend from Wyoming, the CBO says the exact opposite. It is the conclusion of the Congressional Budget Office that this legislation will help seniors by extending the solvency of the Medicare trust fund by, I guess, 4 to 5 years. That is black and white. If I had the letter in front of me, I could read it to him, but that is a

Exhibit 151

fact. This legislation will extend the solvency of the Medicare trust fund by another 5 years.

So instead of being insolvent in the year 2017, under this legislation, that is extended to the year 2022. That is a fact. At least the fact is that is what CBO concludes in their letter. That is a fact.

Second, as a caring physician, does the Senator think that we as a country should try to find a way to provide health insurance for so many Americans—some of them lower income—who don't have health insurance in our country? Because, after all, we are the only industrialized country in the world that doesn't find a way to make sure its citizens have health insurance.

As a physician who sees patients, many of whom can't pay their bills and defer medical treatment because they do not have health insurance, I am wondering if the Senator believes this country should try to find a way where its citizens have health insurance.

Mr. BARRASSO. The Senator absolutely believes we need to find a way to make sure all the citizens of this country have insurance, and there are ways to do it: allowing people to buy insurance across State lines. That doesn't take a 2,000-page bill. There are ways to do it to help get down the cost of care that give individuals incentives to buy their own insurance, giving tax breaks to those individuals. We could do things with tort reform, such as the loser pays rule. We could allow small groups to join together to have a better ability to bargain and get the cost of insurance down.

So this Senator absolutely believes we need to find a way to get everyone insured. There are people who need help who don't have help, and we need to find a way to do that, but it is not this 2,000-page bill.

Mr. BAUCUS. I will ask this question, and then I will finish because I know my colleagues want to speak.

One of the basic underpinnings of this legislation is that we should change the way we reimburse providers, moving away from quantity and volume and more toward quality. I am curious—and this is not an antagonistic question. I am just trying to get a physician's point of view because so many doctors I talk to think that although it creates a little uncertainty, probably that is the right thing to do—to move our reimbursing based on quality, coordinated care, and focusing on the patient rather than our current system, which reimburses more on quantity and the number of services provided, et cetera.

Is that something the Senator thinks we should pursue in this country?

Mr. BARRASSO. The current system is broken, Mr. President. The reimbursement system focuses more on doing things than on helping patients stay healthy and get better. Medicare has done a terrible job of that over the years, in terms of giving incentives for people or even for paying for preventive services. They have not done that over the years.

This is an illustration of how the system is broken. It is now December—the end of the year—and it is the busiest time of year for me as a physician in Wyoming because people have met their deductibles—those who have insurance have met their deductibles for the year—and they come into the office and say: Is it now time for my operation? I have to get it done before the 1st of the year because my deductible has been used up, and I want to have my operation so I am not going to have to pay for it.

In this country, we have the incentives all wrong in terms of health care. We do need health care reform.

Mr. BAUCUS. I agree.

Mr. BARRASSO. I don't think this bill is the way to do it, which is a government takeover of the health care system.

Mr. BAUCUS. Mr. President, I have to address that one. My colleagues want to speak, but I think it is worth repeating over and over again: This legislation is designed to retain the uniquely American solution to health care—roughly half public, half private. It is designed to make sure patients can still, as they should, choose their own doctor, any doctor they want—primary care doc, specialist, no gatekeepers and all that stuff. The doctors are totally free and should be free to make their own decisions, after consultation with their patients, as to what procedure makes sense or doesn't make sense.

In addition to that, frankly, more competition with the exchanges. This legislation, frankly, is rooted almost entirely on maintaining the current free market system in health care. There is some insurance market reform, which I think everybody agrees with, which is denying preexisting conditions as a basis for denying coverage, and there is a modest expansion of Medicaid for lower income people who just can't get health care, but otherwise this is legislation which is rooted in the current American system.

We have a good system. It works. This is just designed to make it work a little better by making sure it reimburses, as the Senator from Wyoming wants, based more on quality. He didn't mention this, but I know he agrees, also insurance market reform so those patients who come to him don't have to wait until the end of the year in the future as they have in the past.

But I want to get it very clear, this is no "government takeover." That is a scare tactic. It is not accurate. It is basically maintaining our current system.

I would now like to yield 10 minutes to my good friend from Vermont.

The PRESIDING OFFICER. The Senator from Vermont is recognized.

Mr. SANDERS. I am going to speak on something other than health care. I thank my friend from Montana for yielding.

## CONFIRMATION OF FEDERAL RESERVE CHAIRMAN

Mr. SANDERS. Mr. President, what I want to touch upon is my strong belief that Ben Bernanke should not be reappointed for a second term as Chairman of the Federal Reserve. In that regard, I placed a hold on his nomination.

Everyone in this country understands we are in the midst of the worst economic crisis since the Great Depression. We are looking at 17 percent of our people being either unemployed or underemployed. We are looking at average length of unemployment being longer than it has been since World War II. We are looking at a situation where, over the last 8 or 9 years, median household income has declined by over $2,000. We are looking at a situation where, according to USA Today, September 18, 2009:

> The incomes of the young and middle aged, especially men, have fallen off a cliff since 2000, leaving many age groups poorer than they were even in the 1970's.

What we are seeing is a long-term trend resulting in the collapse of the middle class, an increase in poverty, a growing gap between the rich and everybody else. Then, to make a very bad situation worse, as a result of the greed, irresponsibility, and illegal behavior of Wall Street, we are now in a terrible economic decline.

The American people voted overwhelmingly last year for a change in our national policies and for a new direction in the economy. After 8 long years of trickle-down economics that benefited the very wealthy at the expense of the middle class and working families, the people of our country demanded a change that would put the interests of ordinary people ahead of the greed of Wall Street and the wealthy few. What the American people did not bargain for was another 4 years for one of the key architects of the Bush economy, Federal Reserve Chairman Ben Bernanke.

The Chairman of the Federal Reserve—and the Federal Reserve itself—has four main responsibilities. I want the American people to determine whether they believe the Fed has, in fact, succeeded in fulfilling these obligations. Here they are, four main responsibilities:

No. 1, to conduct monetary policy in a way that leads to maximum employment and stable prices. Maximum employment? When you have 17 percent of your people unemployed or underemployed, I do not think the Fed or all of us, any of us, have succeeded in that area.

No. 2, to maintain the safety and soundness of financial institutions. Obviously, that has not been the case either.

No. 3, to contain systemic risk in financial markets.

No. 4, to protect consumers against deceptive and unfair financial products.

Not since the Great Depression has the financial system been as unsafe,

Exhibit 151       JA-0002534

unsound, and unstable as it has been during Mr. Bernanke's tenure. More than 120 banks have failed since he has been Chairman, and the list of troubled banks has grown from 50 to over 416.

Mr. Bernanke has failed to prevent banks from issuing deceptive and unfair financial products to consumers. Under his leadership, mortgage lenders were allowed to issue predatory loans that they knew consumers would be unable to repay. This risky practice was allowed to continue long after the FBI warned, in 2004, of an epidemic in mortgage fraud.

Here is what the bottom line is. The bottom line is that the key responsibility of the Fed is to maintain the safety and soundness of our financial institutions, and they failed. They failed. As a result of the greed and speculation on Wall Street—which the Fed should have been observing, which the Fed should have acted against, which the Fed should have warned the American people and the Congress about—they did nothing and our financial system went over the edge.

Then, after not doing their jobs as a watchdog, not fulfilling their obligation to protect the safety and soundness of our financial system, the financial collapse occurred, and what happened? What the Fed did is provide not only—not only did Congress put $700-plus billion into the bailout, the Fed provided several trillion dollars of zero-interest loans to large financial institutions. When I asked Chairman Bernanke which financial institutions received these zero-interest loans, the answer was: I am not going to tell you. Not going to tell you.

The reason Congress, against my vote, bailed out Wall Street is they were too big to fail. Large financial institutions were too big to fail. Since the collapse, three out of the four largest financial institutions have become even larger. So the systemic danger for our economy is even greater today than it was before the bailout.

The American people want a new Wall Street. They want a Wall Street which begins to respond to the needs of small business, so we can begin to create jobs, not just to Wall Street's outrageous executive compensation.

Let me suggest some of the things I think a Fed Chairman should be doing, things Mr. Bernanke is not.

No. 1, today, bailed out financial institutions are charging consumers 25 or 30 percent interest rates on their credit cards. The Fed has the power to stop that, to put a cap on interest rates. That is what they should be doing.

The Fed has the power to demand that bailed-out institutions provide loans at low interest rates to small and medium-sized businesses so we can begin to create the kinds of jobs that are desperately needed in this country. That is not what Mr. Bernanke has done.

The Fed has the power now to do what is taking place in the United Kingdom, something that many econo-

mists are demanding, and that is to start breaking up these large financial institutions which are too big to fail. In my view, if an institution is too big to fail, it is too big to exist. We have to start breaking them up, not allow them to get even larger. The Fed has chosen not to do that.

We need transparency at the Fed. I am the author of a GAO audit of the Fed, which now has 30 cosponsors, which I hope we will pass. But at the very least, if the taxpayers of this country are putting at risk trillions of dollars being lent out to large financial institutions, we have a right to know which institutions are receiving that money and under what terms.

Let me conclude by saying this: This country is in the midst of a horrendous economic crisis. Millions of families all over this country are at their wit's end. They are suffering. They are trying to figure out how they are going to keep warm this winter, how they are going to pay their bills. The time is now for a new Fed, for a new direction on Wall Street, for a Wall Street which is helping our productive economy create decent-paying jobs, not a Wall Street based on greed, only for themselves, whose goal in life is to make as much money as possible for their CEOs.

We need a new Fed, we need a new Wall Street, and we surely need a new Chairman of the Fed. My hope is that President Obama will give us a new nominee and not Mr. Bernanke.

I yield the floor.

The PRESIDING OFFICER. Who yields time? The Senator from Montana.

Mr. BAUCUS. Mr. President, I ask how much time is remaining on each side?

The PRESIDING OFFICER. On the majority side, 9 minutes 20 seconds; on the minority side, 23 minutes 10 seconds.

Mr. BAUCUS. Mr. President, I yield 9 minutes—how many seconds?

The PRESIDING OFFICER. Now 9 minutes 11 seconds.

Mr. BAUCUS. I yield 9 minutes 11 seconds to the Senator from Iowa.

The PRESIDING OFFICER. The Senator from Iowa is recognized.

Mr. HARKIN. I am deeply saddened that my Republican colleagues have, now we see very clearly, resorted to fear tactics in their desperate attempt to preserve a dysfunctional, costly, status quo medical system that we have in this country today. Republicans, in their attempt to strike fear in seniors across the country, are trying to convince the people that they have changed from the party that has always opposed Medicare to now being Medicare's staunchest defenders. But we all know, if it were up to our friends on the other side of the aisle, there would be no Medicare. They fought its very creation. Don't take my word for it, take one of their standard-bearers who ran for President. Senator Bob Dole, who was here when we created Medicare, Senator Dole, a friend of

mine—I have a good deal of admiration for Senator Dole—said, "I was there, fighting the fight, voting against Medicare—one of twelve—because we knew it wouldn't work in 1965." He said that in 1995 when he was running for President. He was proud of the fact that he and Republicans had opposed the establishment of the Medicare system.

You might say: That was then, what about recently? Here is the former Speaker of the House, Newt Gingrich. He said, "We believe it's going to wither on the vine," speaking of Medicare.

Now my friends on the other side of the aisle—listening to them, you would think they were the biggest supporters of Medicare forever, when they opposed it from its very beginning.

Now we hear all the stuff about Medicare Advantage. If, in fact, we are going to be cutting a little bit out of Medicare Advantage, they would like to tell you that somehow this is going to ruin Medicare. If that were true, why would the National Committee to Preserve Social Security and Medicare, AARP, the alliance for retired Americans, groups that represent tens of millions of seniors—why would they stand with us in support of our bill and not with the Republicans, who want to gut the very provisions we have in there that will strengthen and preserve Medicare?

Do people really believe our Republican colleagues care more about seniors than these groups that actually represent seniors?

The truth is, when we talk about Medicare Advantage, we are talking about private insurance companies who promised that through competition they were going to deliver better quality health care to seniors at a lower cost. It all sounded good. But what has happened since Medicare Advantage has come in? The reality is, Medicare is now paying on average 14 percent more to these private plans than it would cost to cover the same beneficiaries under traditional Medicare. In some cases, it is as high as 50 percent more. That is $12 billion a year more than if these beneficiaries stayed in Medicare. Basically, we are giving a $12 billion subsidy to these companies.

Again, don't take my word for it. This is from a June 2009 MedPAC report:

> We estimate that in 2009, Medicare paid about $12 billion more for enrollees of [Medicare Advantage] plans than it would if they were in [fee-for-service] Medicare.

A $12 billion slush fund. We are saying we are going to reduce some of those subsidies. I hear my friends on the other side: My gosh, Medicare is going to take away all these benefits, and all that other kind of stuff. Not necessarily. Right now we know, according to CBO, our bill will lower seniors' Medicare premiums by $30 billion over 10 years.

Then the other side says: But if you cut these Medicare Advantage payments, you will see their benefits cut.

Exhibit 151                                                                JA-0002535

That is absolutely not true. All Medicare plans, whether traditional Medicare or private, must offer all required Medicare benefits. Here is the kicker. If, in fact, there are some cuts made in Medicare Advantage, then these private companies that are making $12 billion in their slush fund, maybe rather than cutting benefits, maybe they will decide to cut their CEO salaries from $12 million a year to $10 million a year. Maybe they will decide instead of three or four corporate jets, they only need one. Maybe they will start reducing some of the profits they are making, huge profits they are making off of the taxpayers and off of Medicare payees right now.

Again, if we cut the Medicare Advantage Program, I guess my friends on the other side would say, No. 1, they can continue to pay their CEOs $12 million a year salaries. They can continue the corporate jets. They can continue to have fancy buildings. They can continue to have outrageous profits. But they will have to cut Medicare. That is what the other side is saying.

We are saying: No, cut the CEO salaries. Cut the enormous profits. Cut those corporate jets. Cut all of that stuff you are using the slush fund for, but keep the benefits for Medicare.

As I said, under present law they cannot cut the basic Medicare benefits. No senior anywhere in America will lose their core Medicare benefits under our bill. Let's be clear about that. If they did, AARP, the National Committee to Preserve Social Security and Medicare, and the National Alliance for Retired Americans would never be supporting our bill.

Lastly, according to an economic survey done at Boston University, they extensively analyzed Medicare Advantage payments and found that just 14 percent of the additional funds these private plans have received have gone to benefit Medicare enrollees. The vast majority of the payments, 86 percent, go to profits, CEO salaries, corporate jets, all these other things, or some of it may go to things such as gym memberships, spa memberships. I raised the point the other day. Why should my Medicare beneficiaries in Iowa have to pay more in Medicare so that a Medicare beneficiary, say, in Arizona can go to a spa and have it paid for by Medicare Advantage, paid for by the subsidies of $12 billion that we give them that come both from taxpayers and from Medicare recipients right now? I don't think it is fair for my seniors in Iowa to have to pay for that.

A lot has been said about all the people who are in the Medicare Advantage plans. I looked up the figures. Right now, nationally, only 18.6 percent of all enrollees are in Medicare Advantage, a little less than one out of five. In my State, in Iowa, it is 10 percent, 1 out of every 10. Why is that? We don't have a lot of spas in Iowa. We don't have those fancy things like they have in Florida and Texas and Arizona and California, wherever else all this stuff is going.

What my seniors need is the peace of mind of knowing that Medicare is going to be there for them in the future. They need to know they are going to get the benefits we have put in this plan that are in our bill and that will help Medicare beneficiaries.

Here is what they are. AARP says:

The new Senate bill makes improvements in the Medicare program by creating a new annual wellness benefit, providing preventive benefits and, most notably for AARP members, reducing drug costs for seniors who fall into the dreaded Medicare doughnut hole.

The bill also makes improvements on age rating, a discriminatory practice that allows insurers to charge exorbitant age-based premiums to older Americans.

Finally, AARP strongly supports provisions in the Senate bill to strengthen long-term services and supports. We also applaud inclusion of provisions to improve access to Medicaid home and community-based services.

All is in our bill, all of which would fall if we adopt the McCain amendment. I urge colleagues not to listen to the rhetoric from the other side. Listen to those who really do represent seniors. Make sure we preserve and protect the basic Medicare functions for seniors and for those who are about to retire. You will not get that through Medicare Advantage. If Medicare Advantage wants to exist and compete on a level playing field, God bless them. Go ahead and get it done. That is what we were promised when Medicare Advantage came through here. I remember. Competition. But what we found is, we had to cough up an additional $12 billion to subsidize them.

It is time for us again to say no to the fearmongers, to those who are trying to strike fear in seniors. It is time to stand up, support the Bennet amendment, which makes very clear that any savings that come from Medicare has to go back into Medicare. That is the way it ought to be. That is what is in this bill. The Bennet amendment makes that crystal clear. The McCain motion does away, basically, with all of the protections, all of the things we have worked so hard for since 1965 to provide. The McCain motion, when you strip away all the verbiage, really what it does is, it basically takes us back to pre-1965 when we didn't even have Medicare. That is the kind of intent behind it.

Mr. BROWN. Will the Senator yield for a question?

Mr. HARKIN. I am glad to yield.

Mr. BROWN. I thank the Senator for his incredible leadership on this issue and the public option, affordability, and on prevention and wellness.

I have listened to the debate with Senator MCCAIN and others on Medicare. It seems that they are protecting is not Medicare but the huge insurance company subsidies when President Bush moved to privatize Medicare. It used to be the insurance companies told us they could do their part of Medicare, one-fifth, one-sixth of Medicare; that they could do it more effi-

ciently even though insurance companies have a 15-, 20-percent administrative cost overhead and Medicare's is 3 or 4 percent or 2 percent.

The PRESIDING OFFICER. The Chair reminds the Senator, the majority time has expired.

Mr. BROWN. I ask unanimous consent for 2 additional minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BROWN. Much of what they are trying to protect is insurance company subsidies, not Medicare benefits which their party has opposed for much of the last 40 years, including its creation.

Mr. HARKIN. As I said earlier, what they are talking about in preserving these benefits and this subsidy for Medicare Advantage is the big CEO compensation packages, the corporate jets, the fancy buildings, the high profits, somewhere between 30 percent and 200 percent profits made by these companies that are providing Medicare Advantage. That is what the Republicans are trying to protect, not the Medicare recipients.

Mr. BROWN. I thank the Senator.

The PRESIDING OFFICER. The Senator from Utah is recognized.

Mr. BENNETT. Mr. President, I listened with some interest to the comments made when I came on the Senate floor. I simply want to make this one observation about Medicare Advantage. President Obama promised that Americans who have coverage they like would not lose the coverage they have. There are a number of Americans who have Medicare Advantage. They like it, and they want to keep it. This Congress is about to say: No, you can't. This Congress, through this bill, if it passes, is going to eliminate Medicare Advantage. Frankly, the people who go after Medicare Advantage because they like it are going to be the ones who are disadvantaged. They are going to be the ones who will see President Obama's pledge violated.

Frankly, I don't think they much care about how much an executive is paid or what happens in the company. They care that they have coverage they like, coverage they are paying for, coverage they have chosen, and they are being told by the Federal Government they cannot have what they want.

There is another aspect to this that I would like to explore in the time I have. We keep hearing so much about the CBO and all of the scores the CBO is pointing out along with rhetoric that says we can't afford to wait, we need a solution now, the status quo is unacceptable. I would like to point out that the status will remain quo for 4 years if this bill passes. In the budget smoke and mirrors that have been put into this bill in order to make it look as if it costs less money, they make the effective date in 2014, so there will be 4 years after the passage of this bill where Americans will not see any kind of change in their plans. What they

Exhibit 151 JA-0002536

will see is an increase in their premiums. They will see an increase in taxes.

Why do I say that? Between January of 2010 and January of 2014 there will be four open seasons in which plans can be changed. As the taxes start to hit, as the costs start to hit, those companies that are involved in offering these plans will say: OK, we have to get ready for the expenditures. What do we do? We have four open seasons in which to change our plans before this thing hits.

Obviously, that cannot be scored by CBO because CBO does not know what changes will be made. But do we really think we can go through four open seasons with no change whatsoever in the face of this enormous change that will hit in January of 2014? Do we really think everything is going to remain static? That is what the CBO computers are. Do we really think the $500 billion they want to take out of Medicare to help pay for this will not be hashed over again and again?

One of two things will happen. No. 1, the Democrats will blink in the face of the anger of senior citizens and say: We really didn't mean it. Yes, the bill cuts Medicare by $500 billion, but we really didn't mean it. We have 4 years in which to fix it; that is, 4 years in which to replace that $500 billion. Of course, when that $500 billion is replaced, if that is the way they decide to go, then we will know that the numbers we are getting out of CBO are completely phony. Then we will know the statement that this bill is revenue neutral is a nonstarter. Then we will know there was never any intention to try to deal with this cost.

Suppose future Congresses stand firm and say: Yes, we are going to stand firm in this 4-year period. We are going to stand firm against the anger of senior citizens who are seeing their Medicare benefits get cut. We are going to take the $500 billion out of Medicare. Then we will see the promises that are being made around here—that there will be no cut in Medicare services—all disappear.

I hear people say: We are not cutting benefits. We are just cutting payments to providers. That statement is being made over and over again on the other side of the aisle: We are not cutting benefits. We are going to take that $500 billion away from the providers, but the benefits will remain the same.

In my State, I have plenty of providers that are on the edge, right now, financially. They are on the edge of going out of business, right now, financially because of the cuts that have been made in Medicare in the name of cutting down payments to providers.

What happens to the people who are in a nursing home that is currently dependent upon Medicare payments in order to survive if they come in and say: All right, we are not going to do anything to the benefits these people are entitled to in this nursing home, we are just going to cut enough payments to the nursing home that the nursing home goes out of business. What happens to the people who are in the nursing home under that circumstance? Well, they are going to have to go someplace else and there is going to have to be money to pay for them to go someplace else and the money is going to have to flow through Medicare someplace else and then we are back to the first option I talked about, which is we were not serious when we said we were going to take $500 billion out of Medicare. We were not serious. In order to make sure you do not lose your benefits, we are going to have to start reinvesting in some of these providers. We have seen providers go out of business because of the cuts into Medicare. We need to start putting that money back into Medicare. Then we are back into the circumstance we have been talking about all along: This thing is not paid for.

One final point I wish to make: We had a hearing today with the Chairman of the Federal Reserve. Ben Bernanke is up for reappointment and, of course, the entire conversation was about the economy and what is the future of the economy. There were a number of people who had a conversation about the past, but I wished to focus on the future.

I pointed this out to the Chairman and asked for his comments with respect to the future of our economy. Most of my constituents do not understand what I am about to say. Frankly, most of the people in the press do not understand it, and maybe even some Members of this body do not understand it. When we talk about the Federal budget, two-thirds of the Federal budget is beyond the control of this Congress. Two-thirds of the Federal budget is on autopilot, unless this Congress changes entitlements.

Somebody says: Well, what does this word "entitlement" mean? Why do you talk about entitlements? Entitlement means, by law, these individuals are entitled to this money, whether we have it or not. The Federal Government has made a contract with them. All right, it is a social contract rather than a legal contract, but it is as binding politically where the Federal Government has to spend the money, whether it has it or not.

Indeed, that is what we have seen in fiscal year 2010. The budget we passed said revenues are going to be $2.2 trillion and entitlement spending is going to be $2.2 trillion, which means every function of the government—our Embassies overseas; our troops, wherever they may be; education; national parks; whatever it is—every dime will have to be borrowed in fiscal year 2010, every single dime because every penny coming into the Federal Government is already programmed to go out, without coming through the Congress. It does not go through the appropriations process. We do not get to vote on it. People are entitled to receive this money, and it is going to go out there.

What are we talking about? We are talking about creating a new entitlement, a very expensive new entitlement. How are we going to pay for it? According to this bill, we are going to pay for it by transferring money from an existing entitlement. Anyone who thinks that is what is going to happen, in the face of the anger that is being generated by people who read about this, believes a fairytale.

The whole notion of trying to balance the cost of this tremendous new entitlement by somehow a bookkeeping entry that says we will take it out of the Medicare account and we will put it in this account, and the computers that do not think—the computers simply compute—will say: Well, then, if you put it in this account, then this account is revenue neutral. But the government's account is not revenue neutral. This thing is going to cost $500 billion, wherever we get the money. It is a cynical ploy, smoke and mirrors of the worst kind, in a budgetary bait and switch, to say we are going to take this out of Medicare.

I hear from my constituents—I hear from people who are not my constituents who recognize me as a Senator in airports and other places—as they say, increasingly: Do not pass this bill. We see it in the polls, but we see it in the passion of the people who come up to us and let us know how firmly they are opposed to this bill. The American people do not want it, and the American people are right.

I yield the floor.

The PRESIDING OFFICER. The Senator from Iowa is recognized.

Mr. GRASSLEY. Mr. President, I would like to also make a statement related to the amendment that is being presented by the Senator from Colorado. Speaking for several Members on my side—hopefully, for all the Members on my side—we are very concerned, as I think we have all made clear by now, that the Medicare savings in this bill are being used not for preserving Medicare but, instead, are being used to finance the creation of a new Federal entitlement program.

My understanding of the purpose of the amendment of the Senator from Colorado is to indicate that Medicare savings will be used for extending the solvency of Medicare and the trust fund, reducing Medicare premiums and other cost sharing for beneficiaries, and to improve or expand Medicare benefits and access to providers.

Nobody can argue with that purpose the Senator has expressed or his amendment expresses. But the concern on our side that we have with this amendment is it does not require that the savings from Medicare would only—with emphasis upon the word "only"—be used for that purpose.

As the Congressional Budget Office has made clear, the cuts in Medicare in this bill are not being used solely for Medicare, as the Senator's amendment suggests, but, instead, are being used

Exhibit 151                                                              JA-0002537

mostly to fund the creation of an entirely new and separate subsidy program. For the Senator to accomplish what he intends to accomplish would require entirely different language to ensure that savings from Medicare in this bill would only be used to protect Medicare benefits for seniors, as the law now expresses.

The right approach would include language making sure seniors have the same access as they have today, to home health services, skilled nursing facilities and services, hospice care, hospital services, preventive benefits, and the benefits provided in the Medicare Advantage Program. So the Senate, it seems to me, should also ensure that Medicare savings in this bill are not being siphoned off to finance a new and separate entitlement program.

It is very clear to me—and I hope we are able to make it clear to people, all 100 Senators—that the Bennet amendment, as written, does not protect Medicare.

I yield the floor.

The PRESIDING OFFICER. Who yields time?

Mr. BAUCUS. Mr. President, I do not think I have any time, but I ask unanimous consent that as to the time I do have after 2 o'clock, I can take 2 minutes of that so I can ask a question of my good friend from Iowa.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. BAUCUS. Mr. President, I might ask my friend from Iowa, Senator GRASSLEY, a question, if he is available for a question. I am taking time.

Mr. GRASSLEY. Mr. President, I will take a short minute to respond to a question. But our side has 7—

Mr. BAUCUS. I understand. I do not want to cut into that time at all.

Mr. GRASSLEY. Could we discuss this maybe a little bit later, what you brought up?

Mr. BAUCUS. I am taking it off my time, not your time.

Mr. GRASSLEY. OK.

Mr. BAUCUS. Is it true the Congressional Budget Office said this bill, over 10 years, is not only deficit neutral but actually decreases the budget deficit by about $130 billion? Is that true? Is that what the Congressional Budget Office said?

Mr. GRASSLEY. That is true. But I do not think the Senator wants to go down that road because, do not forget, there are 6 years of programs, of expenditures, and there is 10 years of revenue coming in. If you want to play that game, you can pay down the entire national debt.

Mr. BAUCUS. Well, I do not know—to be totally fair and respectful to one of my very best friends in the Senate—to cover that point, isn't it also true the Congressional Budget Office said in the second 10 years this bill will reduce the budget by one-quarter percent of GDP? Isn't that also true, according to the Congressional Budget Office?

Mr. GRASSLEY. I cannot respond to that because I do not know that for sure. So I do not want to respond. But if you tell me, I tend to believe everything you tell me.

Mr. BAUCUS. We trust each other. We both trust each other. That is what the letter says.

Thank you.

The PRESIDING OFFICER. The Senator from Arizona is recognized.

Mr. McCAIN. Mr. President, I ask unanimous consent that my colleagues and I—the Senator from Tennessee, Mr. ALEXANDER; the Senator from Oklahoma, Mr. COBURN; Senator LEMIEUX from Florida; Senator ENZI; and Senator CRAPO—be allowed to engage in a colloquy.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mr. McCAIN. Mr. President, how much time do we have?

The PRESIDING OFFICER. The minority has 3 minutes 42 seconds; and then, on top of that, at 2 o'clock, the Senator from Arizona controls 17½ minutes.

Mr. McCAIN. Thank you. I will let those minutes run together, if there is no objection.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. McCAIN. Mr. President, I wish to begin our conversation with a brief comment about the American Association of Retired Persons, known as the AARP, that has now come out against this amendment, incredibly.

It is a fascinating history of that liberal Democratic group because, in 1993, when we had some savings in Medicare, the AARP said:

If we're talking about Medicare cuts alone as a way of financing health reform, we would fight that with all our strength—we've gone as far as we can go down that road.

The AARP, on $6.4 billion Medicare cuts in 2005, said: "Strongly Opposes." They said the:

. . . conference agreement . . . undermines the critical protections built into both the Medicaid and Medicare programs. Instead of . . . shared sacrifice to achieve budgetary savings. . . .

Every time there has ever been a savings in Medicare or Social Security in any way, shape, or form, the AARP has come out against it, except now when there is the most massive cut in Medicare in history and a transfer of those funds to a vast new $2.5 trillion entitlement program. It was described as $2.5 trillion just yesterday by the chairman of the Finance Committee.

I say shame on the AARP. I say to my friends, especially those who are under the Medicare Advantage Program, the 330,000 in my State, for whom, admittedly, they are going to cut their Medicare Advantage benefits, take your AARP card, cut it in half, and send it back. They have betrayed you.

The PRESIDING OFFICER. The Senator from Oklahoma is recognized.

Mr. COBURN. Mr. President, the chart behind me shows the cuts in Medicare that are in this bill. We have heard all sorts of arguments. I have a few rhetorical questions for my colleagues and my friend, the President of the United States.

There is no question Medicare Advantage costs too much. I have agreed to that with the chairman of the Finance Committee. But you cannot say that coordinated care does not improve the care of seniors, and that is going to be cut. You cannot say that eyeglasses and hearing aids are not going to be cut, and they do improve the care. You cannot say to seniors who cannot afford a supplemental policy, who have Medicare Advantage, they are not going to lose some of their care. They are. In fact, 2.6 million, according to the Congressional Budget Office, are going to lose that very care—not some of it, all of it. They are going to lose that advantage under this legislation. The answer to the question, will this impact seniors care, is yes. We have heard these cuts aren't going to impact anybody or the only people they are going to impact are the insurance companies. Well, I am all for impacting the insurance companies, but I don't want to impact patients negatively.

So we have cuts to Medicare, including hospitals, of $134.7 billion; hospices, $7.7 billion; nursing homes, $14.6 billion; Medicare Advantage, $120 billion; home health agencies, $42.1 billion; and then you say you are not going to do anything to impact the care of seniors. My colleague from Iowa, whom I love, disputed my statement about the fact that the life expectancy is going to go down under this bill. He has never practiced medicine a day in his life. I know what goes on inside hospitals. When you cut $130 billion out of the hospitals, the time you are going to wait for me, the time you wait after you push your call button is going to get extended and the complications from that are going to result in decreased quality of care and shortened life expectancies. There is no question about it.

So we can play the game, but the real thing Americans ought to know is almost $500 billion of spending on Medicare patients today is going to go by the wayside to be spent on a new entitlement, on a brandnew entitlement.

The PRESIDING OFFICER (Mr. BROWN). The Senator from Idaho is recognized.

Mr. CRAPO. If the Senator from Oklahoma will respond to a question, he is a physician, and he has very well pointed out how the cuts to Medicare Advantage will reduce benefits to senior citizens. The impacts on the hospitals and home health care and the skilled nursing facilities and so forth will be reduced services. I am aware of a June 2008 report from the Medicare Payment Advisory Commission, MedPAC, which said 29 percent of Medicare beneficiaries they surveyed who were looking for a primary care physician had trouble finding one who would treat them. A similar survey in Texas showed that in that State, only

58 percent of the State's doctors would be willing to take a new Medicare patient, and only 38 percent of the primary care doctors accepted new patients.

So my question is, in addition to the reduction of benefits, in addition to the reduction of access to hospitals and skilled nursing facilities and so forth, won't these cuts and the impact on Medicare also represent a lack of ability by Medicare recipients to literally find physician care?

Mr. COBURN. There is no question, to answer my colleague from Idaho, that if it doesn't eliminate the ability, it will deny by delaying the ability. Care delayed is care denied. All you have to do is read all of the tragedies that have gone on in this country for people who have delayed care which has resulted in large complications for that individual.

Mr. ENZI. Mr. President, I wish to raise a point as the accountant around here. You have mentioned some ways to cut Medicare to pay for this. Actually there are only two ways you can pay for a government program. You have to do it through cuts or through taxes. I don't think there is anybody in America who believes you can do $1 trillion worth of new programs and have them all paid for, unless you steal somewhere. That is what we are doing from Medicare. We say that is not going to affect Medicare. If you eliminate the DSH payments which are part of this, it is going to put some Wyoming hospitals out of business. I can assure you that if those seniors can't go to a hospital in their town, they are going to consider that a benefit cut. They are going to be upset, and they ought to be.

The same with nursing homes. If you cut back on nursing homes, the people who have to move to another town for a nursing home—because all of our towns don't have more than one nursing home—puts quite a burden not only on the patient who isn't going to get to see their family as much, but also on the family who has to travel a long way to see the patient. So I don't think we ought to be paying for the new programs by doing this when Medicare needs an extended life.

I am always fascinated when they explain that this will extend the life of Medicare because, yes, if you cut payments to everybody, that maybe saves money and extends the life of it, if we did that. Is there anybody who thinks we are going to cut the doctors over the next 10 years by $250 billion? No, we are not going to do that. We never have.

Mr. COBURN. Would the Senator yield for a moment?

Mr. ENZI. Yes.

Mr. COBURN. My one criticism of my colleagues in writing this bill is I think there is money we can save in Medicare. It is called waste, fraud, and abuse. A Harvard professor who studies this says there is at least $125 billion a year in fraud. We have had several studies that say it is anywhere from $100 billion to $175 billion a year. There is nothing in this bill to eliminate fraud. What we are doing is we are taking care from seniors instead of taking the money from the fraudulent actors in the health care system.

Mr. ALEXANDER. Mr. President, if I may say to the Senator from Arizona, I greatly appreciate his making this amendment, because there is so much said here on the Senate floor that must be hard for many people to follow. But one thing I believe everybody agrees on is there are going to be $465 billion in cuts to Medicare over the next 10 years, period. Everybody agrees with that. The President of the United States has said we are going to pay for this new health care bill with one-half from Medicare cuts and one-half from taxes. Everyone agrees with that.

What Senator MCCAIN's amendment is saying is two things—and Senator MCCAIN, let me see if I characterize properly your amendment, because it is a very simple amendment, as I read it. It is saying, send it back to the Finance Committee and say, bring the health care bill back without the Medicare cuts, without these cuts to hospitals, cuts to hospices, cuts to nursing homes, cuts to Medicare Advantage, and cuts to home health agencies.

Second, if we are going to take money from grandma's Medicare, let's spend it on grandma. Let's take the savings we find in Medicare and absolutely make sure we spend it on Medicare, which the trustees have said is likely to go broke between 2015 and 2017.

Did I correctly characterize the Senator's amendment?

Mr. MCCAIN. Absolutely.

Mr. ALEXANDER. And does the Senator recall a few years ago when the Republicans suggested saving $10 billion over 5 years in Medicare, the majority leader said that was immoral, and that other Democratic Senators thought it was awful? If $10 billion in savings to try to make Medicare stronger is immoral, what is spending nearly $½ trillion on a new program called?

Mr. LEMIEUX. I wonder if I could ask a question.

The PRESIDING OFFICER. The Senator from Florida is recognized.

Mr. LEMIEUX. I have a question for my colleague from Tennessee. I am new here. This is all new to me. I thought the goal was to reduce health care costs while trying to provide health care for more Americans. We are taking money out of health care for seniors to create a new entitlement program. We are taking money out of nursing homes, home health care, hospitals, and a program called Medicare Advantage that people in my State I know enjoy very much. How does it make sense that we are taking money out of Medicare to start a new health care program?

Mr. ALEXANDER. Well, if I may say—and then I think maybe others could respond—if you are going to spend $2.5 trillion a year, you have to get the money from somewhere. What the Democratic health care bill does is get it three places. One is from seniors, one is from taxes, and one is from the grandchildren of seniors; that is, debt. It comes from those three places.

What we heard earlier this week was the Congressional Budget Office saying the total effect of that $2.5 trillion is that for most Americans, premiums would continue to go up as they already are, and that for people who go into the individual market they will go up even more—they will go up even more—except there will be some subsidies for a little over half of those people, and where is the subsidy money coming from? It is coming from Medicare. So that is the answer to the question.

Mr. LEMIEUX. It would seem to me—and again, I am new to this process—that 100 Senators would vote for Senator MCCAIN's proposal because everyone in this Chamber believes we should strengthen Medicare. Who could be for taking money out of Medicare if we don't need to? These are two separate issues. Shouldn't every Senator in this Chamber say let's send this back to the Finance Committee so those cuts can be restored and we can start over and take a step-by-step approach? That only seems fair to me.

Perhaps my colleague from Oklahoma could comment on that.

The PRESIDING OFFICER. The Senator from Oklahoma is recognized.

Mr. COBURN. I thank the Chair.

We are in trouble in Medicare in this Nation. Everybody knows it. We have made promises. The unfunded liability on Medicare is $79 trillion. For us to take $½ trillion, no matter what the Enron accounting says afterward, the fact is we are going to reduce that; we are going to make that worse. We may not make it worse next year or the year after, but we are going to make it worse. It is going to be worse for seniors, but it is also, as the Senator from Tennessee said, going to be extremely worse for the seniors' kids and grandkids. Not only have we done that, we have raised the taxes in Medicare on a certain group of people and we are going to take that money and not put it in Medicare; we are going to take that money, a Medicare tax, and create a new entitlement.

So the Senator from Florida is absolutely right. If you vote against the McCain motion you are saying you want to cut $½ trillion out of Medicare and that it will have no effect whatsoever on the care.

I remind the Senator from Florida, there are 1 million people on Medicare Advantage in the State of Florida, 1 million people who are going to lose benefits under this bill. One million people in the State of Florida will lose benefits under this bill.

Mr. ALEXANDER. Mr. President, I would ask the Senator from Oklahoma, who is a physician himself, if one of the

Exhibit 151 JA-0002539

effects of cuts in Medicare is to make it more difficult for people who are on Medicare to see a doctor. It is like giving somebody a bus ticket and not having a bus.

I have been reading in the newspapers, for example, in the Washington Post last month, that the Mayo Clinic, which is often held up as an outstanding example of a clinic that keeps costs under control, has announced it no longer will accept Medicaid patients from Nebraska and Montana, and some Mayo clinic facilities in Arizona and in Florida are beginning to say no more Medicare patients.

Is this what the Senator from Oklahoma thinks could be happening at other hospitals and centers, even very good ones such as the Mayo Clinic where they allegedly keep costs at a reasonable level?

Mr. COBURN. I think that is entirely possible. I don't know that to be factual as of yet. What I do know is we are going to have 44 million baby boomers in the next 12 years jump into Medicare and we are cutting Medicare. We are going to have 44 million baby boomers jump into Medicare. I am one of them. We are going to cut the amount of available funds from Medicare under this bill.

Mr. ENZI. Mr. President, I wish to ask the Senator from Idaho what he thinks will happen with these Medicare cuts as they affect jobs and the economy. That is one of the biggest things on people's minds right now, jobs and the economy. We are concentrating on something here where we are going to maybe make a difference, even though CBO says it won't be much of a difference.

Mr. CRAPO. I thank the Senator from Wyoming for that question, because as we have already reviewed, there will be major cuts in benefits to Medicare, to the Medicare Advantage Program. There are going to be major reductions in access to Medicare, in terms of access at hospitals and skilled nursing homes and facilities and home hospice and other care.

But one of the other things we haven't focused on—and it is kind of interesting that today is the big White House jobs summit—what is going to happen as a result of these Medicare cuts. In addition to the reduction of access and care and benefits to seniors, we are going to lose jobs. I have had in my office here representatives of nursing and home health care facilities from Idaho who have told me that if this bill is adopted, a number of those facilities are simply going to have to go out of business or they are going to have to dramatically reduce the services they provide, meaning that the nurses and the other caregivers who work there will no longer have jobs. That is part of the way our senior citizens will lose access because there will simply be fewer places, fewer physicians, fewer facilities that will take Medicare patients with this kind of an attitude of the Federal Government toward funding of Medicare.

In the end, what do we have? We have a massive expansion of government, $2.5 trillion for a massive new entitlement program, along with which come these incredible government controls over the economy, as well as the creation of a new government insurance company, funded by $½ trillion, almost, of Medicare cuts, $½ trillion in taxes, and a massive debt, an unfunded mandate pushed on to the States.

That is one of the reasons why I think the Senator from Arizona was so wise in bringing this motion as the first step in focusing on one of the first fixes that needs to be made to this bill. Let's step back. Let's not pay for a brandnew $2.5 trillion entitlement program on the backs of our senior citizens.

Mr. ALEXANDER. How much time is left?

The PRESIDING OFFICER. The Senator from Arizona is controlling the time, and there is 3 minutes 20 seconds remaining.

Mr. McCAIN. Mr. President, I mentioned the AARP and their opposition to this amendment. There is an organization called 60 Plus that has millions of supporters and members. They also feel very different from the AARP. Their message is:

Soon you [the Senate] will vote on the McCain motion to commit with instructions. The motion would commit it to the Senate Committee on Finance—

Et cetera.

I and the 5.5 million supporters of 60 Plus urge you to support this motion. The Patient Protection and Affordable Care Act is nothing of the sort. It would cut Medicare by $500 billion. These cuts would harm seniors who have paid into the program and expect it to be there to help them with their health care needs. At 60 Plus, we pride ourselves on advocating for the best interests of seniors. That is a "yes" vote on this motion.

Let's pay attention to 60 Plus.

Mr. COBURN. I have a question. Does 60 Plus sell supplemental insurance policies to seniors?

Mr. McCAIN. I don't believe so.

Mr. COBURN. But AARP does. I wonder why people want seniors off Medicare Advantage.

Mr. McCAIN. Most people believe this would be a windfall of tens of millions of dollars for AARP if the legislation is passed as presently crafted.

Mr. ALEXANDER. How many Medicare Advantage members are there, for example, in Arizona? Is it a small program or a large program?

Mr. McCAIN. Our figures are that 330,000 people in my State of Arizona are on Medicare Advantage. I noticed yesterday, when the distinguished chairman of the Finance Committee and the Senator from Connecticut were talking, they were disparaging the entire program, saying how it wasn't any good, talking about the cost overruns and saying it was a bad program. They have opposed it from the start.

So the message to the 330,000 Americans in Arizona who are on Medicare Advantage is that they are out to get you.

Mr. CRAPO. According to the Senator from Tennessee, it is my understanding that nationwide it is about one-quarter of all Medicare beneficiaries. About one in four Medicare beneficiaries in America will see their benefits cut. All Medicare beneficiaries will see their access cut. So these problems we are talking about are not just limited in their impact.

Mr. McCAIN. I will respond again. There are cost problems with Medicare Advantage, but those cost problems can be fixed. Those cost problems can be brought under control. But the fact is, to do away with a program that allows them a choice in how they receive their care is, of course, again, an effort to have the government make the decisions for people, which flies in the face of everything we stand for and believe in.

Mr. ALEXANDER. I may say to the Senator from Arizona, I have heard our friends on the other side say Republicans are scaring seniors about Medicare cuts. Mr. President, it is not Republican Senators who are scaring seniors about Medicare cuts; it is the Democratic health care bill that is scaring seniors, because there are $½ trillion of Medicare cuts that will pay for half of this program, and they are outlined on this chart, as the Senators have discussed.

The PRESIDING OFFICER. The time of the Senator from Arizona has expired. The senior Senator from Montana has 15 minutes 50 seconds.

Mr. BAUCUS. I will yield myself about 10 minutes. The Senator from Tennessee says this is going to hurt seniors. Let's ask the senior organizations what they think about that.

Let's also look at this organization called 60 Plus. What does the AARP say in the letter to Senator REID, dated December 2? It talks about this legislation:

The legislation before the Senate properly focuses on provider reimbursement reforms. . . .

I am sorry all my colleagues have fled the Senate. I would like for them to stay and listen to this. I would like to hear their response. But they have just fled the Senate after making sound bites.

Mr. ALEXANDER. Mr. President, I am here.

Mr. BAUCUS. I will take my time. The AARP letter, dated December 2, states:

The legislation before the Senate properly focuses on provider reimbursement reforms. . . .

Most importantly, the legislation does not reduce any guaranteed Medicare benefits.

That is AARP. All this is scare talk about "grandma." With all due respect to my friend from Tennessee, he says that. He has been using that phrase a lot. But AARP says that grandma is fine. AARP says:

Most importantly, the legislation does not reduce any guaranteed Medicare benefits.

It doesn't reduce any benefits, according to AARP. Going on:

Exhibit 151      JA-0002540

AARP believes that savings can be found in Medicare. . . .

The savings in Medicare will extend the solvency of Medicare. I am sure my friend from Tennessee knows the actuary said this legislation extends the solvency of Medicare, helps Medicare. The benefits go on longer than the status quo. Also, it does so, according to AARP, by eliminating waste and inefficiency and aggressively rooting out fraud and abuse. The last sentence is:

We therefore urge you to oppose the McCain amendment to recommit. . . .

The AARP says this hurts seniors, the McCain motion to commit. I think the job of the AARP is to figure out what is best for seniors. That is their conclusion.

It is not just AARP's view. There is another letter. This is from the National Committee to Preserve Social Security and Medicare. They say basically this legislation doesn't cut Medicare benefits. Again, this is the National Committee to Preserve Social Security and Medicare. They say, rather, this legislation includes provisions to ensure that seniors receive high-quality care and the best value for their Medicare dollars. That is a very reputable senior organization. AARP is a very reputable senior organization. The National Committee to Preserve Social Security and Medicare is a very reputable organization. That is what they say.

Who is this 60 Plus association I have heard referred to? Let me just tell my colleagues what 60 Plus really is. I will read this. This is from Wikipedia, and it may not be accurate. It says this about 60 Plus:

The 60 Plus Association is an American conservative advocacy group based in Arlington, Virginia, that bills itself as the conservatives' alternative to the AARP.

That makes good sense because over the years it has sought to privatize Social Security. 60 Plus, over the years, has sought to privatize Social Security. They want to end the Federal estate tax. They also want to strengthen gun rights, but that is not relevant.

According to the AARP—

And this is a bit biased—

the 60 Plus Association employed the talents of conservative direct mail mogul Richard A. Viguerie to solicit new members.

We all know who Viguerie is. 60 Plus is a very conservative organization. I don't think they are real interested in senior citizens. They have different fish to fry. Also, AARP criticized 60 Plus as being partisan because its issues and causes mirror those of only one of two major parties, the Republican Party.

A final criticism leveled by the AARP [about 60 Plus] is that because it lists no dues-paying members and [get this] receives the majority of its contributions from the pharmaceutical industry, the group is simply a front organization for the pharmaceutical industry.

I ask unanimous consent to have these letters in opposition to the McCain amendment, in support of the Bennet amendment, and the Wikipedia information printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

ALLIANCE FOR RETIRED AMERICANS,
*Washington, DC, December 1, 2009.*

DEAR SENATOR, The Alliance for Retired Americans, on behalf of its nearly four million members throughout the nation, opposes the motion by Senator John McCain to commit the Patient Protection and Affordable Care America Act, H.R. 3590, to the Finance Committee. We urge its prompt defeat by the Senate.

The McCain motion to commit would seriously undermine important, substantive, and positive changes in the health care needs of older Americans contained in the bill, none more important than proposed Medicare improvements. In fact, the McCain motion would increase health care burdens on Medicare beneficiaries in several instances. The McCain motion would, for the first time, subject Medicare Part D prescription drug premiums to means testing, causing a rise in premiums for many older Americans. In addition, the motion to commit would halt indexing to Medicare Part B physicians services premiums, causing even more seniors to pay higher premiums, which currently can be as much as $300 per month. Furthermore, the McCain motion would continue the wasteful Medicare Advantage overpayments that currently threaten the financial stability of the Medicare Trust Fund.

The Alliance supports provisions in the Patient Protection and Affordable Care Act that improve health care for older Americans such as allowing Medicare beneficiaries to keep their choice of doctors, lowering prescription drug costs, eliminating copayments for preventive screenings, expanding access to long-term supports and service, and providing assistance for pre-Medicare eligible early retirees. All of these improvements will not be possible should the McCain motion pass.

The legislation does not cut Medicare benefits. With the expected rising costs of Medicare, the legislation slows the rate of the program's growth without reducing benefits. The McCain motion would actually undercut fiscally responsible attempts to meet the challenges of providing health care for older Americans.

The Alliance for Retired Americans is committed to enacting legislation that improves the quality of life for retirees and all Americans. Defeat of the McCain motion to commit the Patient Protection and Affordable Care Act to the Finance Committee will directly benefit our members and more than forty million older Americans. If we can be of assistance, please contact Richard Fiesta, Director of Government and Political Affairs, at the Alliance.

Sincerely yours,

BARBARA J. EASTERLING,
*President.*
RUBEN BURKS,
*Secretary-Treasurer.*
EDWARD F. COYLE,
*Executive Director.*

———

AARP,
*Washington, DC, December 2, 2009.*
Hon. HARRY REID,
*Majority Leader, U.S. Senate,*
*Washington, DC.*

DEAR LEADER REID: AARP supports moving forward on health care reform, and we remain committed to enacting legislation this year that protects and strengthens Medicare, improves the delivery of health care and provides affordable insurance for all. Accordingly, we oppose the amendment offered by Senator McCain to recommit H.R. 3590 to the Senate Finance Committee.

As we have said from the outset, AARP supports a balance of revenues and savings with shared responsibility from individuals, employers and the government. With respect to Medicare, AARP supports policies to eliminate waste, fraud and abuse—and to im-

prove the quality, value and sustainability of the program for current and future beneficiaries. The legislation before the Senate properly focuses on provider reimbursement reforms to achieve these important policy objectives. Most importantly, the legislation does not reduce any guaranteed Medicare benefits.

AARP believes that savings can be found in Medicare through smart, targeted changes aimed at improving health care delivery, eliminating waste and inefficiency, and aggressively weeding out fraud and abuse. Such changes will help strengthen Medicare's long-term financing without increasing costs for beneficiaries that make health care less affordable. Medicare provides critical health security to older Americans, and it is important that Medicare continue to deliver high quality care. As health care costs, including Medicare costs, continue to skyrocket, it is essential that we make changes to improve health care delivery, improve Medicare's financing, and ensure maximum value for our Medicare dollars. We believe that Medicare changes in this bill begin to move us down this path, without reducing guaranteed Medicare benefits.

With these savings, the legislation before the Senate takes important steps to improve access to preventive services for Medicare beneficiaries. However, more should be done to strengthen Medicare—including closing the Medicare Part D coverage gap, or "doughnut hole," as pledged by the President.

We therefore urge you to oppose the McCain amendment to recommit, and we remain firmly committed to working with you to strengthen Medicare and enact comprehensive health care reform this year that improves access and affordability of health care for all.

Sincerely,

ADDISON BARRY RAND.

———

NATIONAL COMMITTEE TO PRESERVE
SOCIAL SECURITY AND MEDICARE,
*Washington, DC, December 3, 2009.*
U.S. Senate,
*Washington, DC.*

DEAR SENATOR: On behalf of the National Committee to Preserve Social Security and Medicare's millions of members and supports, I am pleased to endorse the amendment of Senator Michael Bennet of Colorado which clarifies that H.R. 3590, the Patient Protection and Affordable Care Act, would improve the Medicare program as part of health care reform.

Senator Bennet's amendment puts into law two of the most important criteria the National Committee has been using when analyzing health care reform proposals. First, it states explicitly that the legislation would not reduce any of Medicare's guaranteed benefits. Second, it ensures that savings from Medicare would be used to improve Medicare. Improvements in H.R. 3590 include extending the solvency of the Medicare trust funds by five years, reducing the amount of future increases in premiums, eliminating cost-sharing for preventive benefits, making prescription drugs more affordable, and ensuring access to Medicare providers.

Protecting Medicare and Social Security has been the National Committee's key mission since our founding 27 years ago and remains our top priority today. Our members are no different than seniors all over this country who are nervous about rising out-of-pocket health care costs and are concerned about the Medicare savings in health care reform legislation. This is a legitimate concern, but it is important to put these savings

Exhibit 151

JA-0002541

Case 2:17-cv-04540-WB Document 253-10 Filed 09/29/20 Page 570 of 677

in perspective. The federal government will spend almost $9 trillion on Medicare in the next decade. The proposed savings of nearly $500 billion mean that the growth in spending will be reduced by about two percent over the next 10 years by eliminating wasteful spending and outright fraud.

The H.R. 3590, the Patient Protection and Affordable Care Act, includes savings that are designed to protect Medicare beneficiaries and improve the Medicare program. Senator Bennet's amendment expressly prohibits any reductions in guaranteed Medicare benefits and makes sure all savings are reinvested back into Medicare. I urge you to support the Bennet amendment which is important to Medicare beneficiaries and the solvency of the Medicare program.

Cordially,

BARBARA B. KENNELLY,
President & CEO.

————

NATIONAL COMMITTEE TO PRESERVE
SOCIAL SECURITY AND MEDICARE,
Washington, DC, December 1, 2009.
U.S. Senate,
Washington, DC.

DEAR SENATOR: On behalf of the millions of members and supporters of the National Committee to Preserve Social Security and Medicare, I am writing to express our opposition to the amendment offered by Senator McCain which would recommit H.R. 3590, the Patient Protection and Affordable Care Act, to the Senate Finance Committee with instructions to remove important Medicare provisions.

Much of the rhetoric from opponents of health care reform is intended to frighten our nation's seniors by persuading them that Medicare will be cut and their benefits reduced so that they too will oppose this legislation. The fact is that H.R. 3590, the Patient Protection and Affordable Care Act, does not cut Medicare benefits; rather it includes provisions to ensure that seniors receive high-quality care and the best value for our Medicare dollars. This legislation makes important improvements to Medicare which are intended to manage costs by improving the delivery of care and to eliminate wasteful spending.

The National Committee opposes any cuts to Medicare benefits. Protecting the Medicare program, along with Social Security, has been our key mission since our funding 25 years ago and remains our top priority today. In fact, these programs are critical lifelines to today's retirees, and we believe they will be even more important to future generations. But we also know that the cost of paying for seniors' health care keeps rising, even with Medicare paying a large portion of the bill. That is why we at the National Committee support savings in the Medicare program that will help lower costs. Wringing out fraud, waste and inefficiency in Medicare is critical for both the federal government and for every Medicare beneficiary.

The Senate bill attempts to slow the rate of growth in Medicare spending by two to three percent, or not quite $500 billion, over the next 10 years. However, it is important to remember that the program will continue growing during this time. Medicare will be spending increasing amounts of money—and providers will be receiving increased reimbursements—on a per capita basis every one of those years, for a total of almost $9 trillion over the entire decade. Even with the savings in the Senate bill, we will still be spending more money per beneficiary on Medicare in the coming decades, though not quite as much as we would be spending if the bill fails to pass.

America's seniors have a major stake in the health care reform debate as the skyrocketing costs of health care are especially challenging for those on fixed incomes. Not a single penny of the savings in the Senate bill will come out of the pockets of beneficiaries in the traditional Medicare program. The Medicare savings included in H.R. 3590, the Patient Protection and Affordable Care Act, will positively impact millions of Medicare beneficiaries by slowing the rate of increase in out-of-pocket costs and improving benefits; and it will extend the solvency of the Medicare Trust Fund by five years. To us, this is a win-win for seniors and the Medicare program.

The National Committees urges you to oppose the motion to recommit the bill to the Finance Committee with instructions to strike important Medicare provisions from health care reform legislation.

Cordially,

BARBARA B. KENNELLY,
President & CEO.

————

60 PLUS ASSOCIATION
[From Wikipedia]

The 60 Plus Association is an American conservative advocacy group based in Arlington, Virginia, that bills itself as the conservatives' alternative to the AARP, (formerly the American Association of Retired Persons). Over the years, it has sought to privatize Social Security, end the federal estate tax and strengthen gun rights. Current issues include opposing health care reform proposals; opposing federal energy standards; opposing the General Motors bailout; and opposing tax increases on those earning more than $250,000 per year. 60 Plus is a member of the Cooler Heads Coalition, an climate change denial organization.

According to the AARP, the 60 Plus Association employed the talents of conservative direct mail mogul Richard A. Viguerie, to solicit new members. The AARP has also criticized the 60 Plus Association as being partisan because its issues and causes mirror those of only one of the two major United States parties, the Republicans. A final criticism leveled by the AARP is that because it lists no dues-paying members and receives the majority of its contributions from the pharmaceutical industry, the group is simply a front organization for the pharmaceutical industry.

The organization's website provides positive reviews of its work by conservative politicians and commentators, including:

"The 60 Plus Association has helped provide the organization and momentum needed for repeal of the federal estate or death tax. I commend the Association for its efforts to abolish this unfair and burdensome tax."—Rep. Ralph M. Hall (R-TX)

"Small business leaders recognize how counter-productive this tax really is. That's why they endorsed repeal of the death tax and why my bill is supported by the 60 Plus Association."—Senator Jon Kyl (R-AZ)

"Jim Martin (who, by the way, gave George W. [Bush] his first political job) is the head of Washington, DC-based, The 60 Plus Association and one of the country's most vocal defenders of the tax rights of seniors."—Mona Lipschitz, News Editor "Talkers Magazine" "Sources" Column March 2001.

LEADERSHIP

60 Plus is led by its President James L. Martin, a 73-year-old veteran of the U.S. Marines. Martin has previously led several conservative advocacy groups, and also was chief of staff for six years for former Republican congressman and senator, the late Edward Gurney of Florida. Martin also served as a member of President George W. Bush's health and human services transition team.

FUNDING

In 2001, 60 Plus received a total of $275,000 from the Pharmaceutical Research and Manufacturers of America, the group Citizens for Better Medicare, itself largely supported by the pharmaceutical industry, and three drug companies (Merck, Pfizer and Wyeth-Ayerst) plus another $300,000 from Hanwha International Corp., the U.S. subsidiary of a Korean conglomerate with chemical and pharmaceutical interests—amounts that made up about 29 percent of its revenue. "We're not a front for anybody," James L. Martin, the chairman of 60 Plus, told the AARP Bulletin. "I get money from lots of sources. I've received money from the pharmaceuticals—I wish it was more." 60 Plus does not provide any explanation of its funding on its website.

In 2003, President Jim Martin told the British Medical Journal that 60 Plus had 225,000 members, whom he would not disclose for privacy purposes. However, according to the organization's IRS Form 990, 91 percent of its $11 million in 2002 revenue came from one undisclosed source. The Public Citizen watchdog group suspects that the pharmaceutical industry was that source. According to the Washington Post, in 2002, 60 Plus received an unrestricted educational grant (which can be used as most needed) from the Pharmaceutical Research and Manufacturers of America. As recently as 2001, 60 Plus has not reported any member dues as revenue on its past tax returns, reported the AARP Bulletin.

60 Plus also earns income from sponsoring life insurance and health screening for its members.

HEALTH CARE REFORM

On August 7, 2009, 60 Plus released a TV ad to be aired on cable networks to inform viewers about the proposed U.S. health care reform legislation. Media Matters for America watchdog group found that the ad was largely false and used "scare tactics" to discourage voters from backing reform. To publicize the ad's launch, 60 Plus issued a press release titled "Massive Medicare Cuts Await Elderly Says New Ad From Seniors Group" that read in part, " . . . The healthcare proposal touted by the Obama Administration means massive Medicare cuts in order to pay for healthcare 'reform'." 60 Plus provided no evidence of these supposed "massive Medicare cuts."

Mr. BAUCUS. Mr. President, I think it is pretty clear that the main organizations that care about seniors support this bill. Another organization—60 Plus—I don't know what they think. I guess they oppose it because they want to privatize Social Security, and they get most of the money from the pharmaceutical industry. I don't think they care about senior citizens, frankly, and certainly not as much as these other organizations.

I think it is also important to point out that this legislation is deficit neutral over not just the first 10 years but over the next 10 years. It is more than deficit neutral. This legislation generates a $130 billion surplus the first 10 years and, as we all know, reduces the budget by a quarter of GDP over the next 10 years. So this is not irresponsible; it is very fiscally responsible. It is strongly supported by the senior organizations that care for seniors. I might say, too, it is not raiding Medicare at all. It is strengthening the Medicare trust fund and it extends the solvency of the trust fund.

Therefore, I think, clearly, as AARP says, we should oppose the McCain amendment, which hurts Social Security beneficiaries, does not help them.

Exhibit 151

JA-0002542

I yield such time as the Senator from Illinois needs.

The PRESIDING OFFICER. The Senator from Montana has 9 minutes 20 seconds, and the other side's time has expired.

Mr. DURBIN. Mr. President, I ask to be recognized for 5 minutes. If the chair would advise me when I have used that time.

I found it interesting, as I am sure the Senator from Montana has, to listen to all of the Republican Senators who have come to the floor to defend Medicare. I am sure the Senator from Montana has the same memory I do—that when it was created, it was created by the Democratic side of the aisle, with the general opposition of the Republican side of the aisle. They said it was socialized medicine, too much government, and it would fail. Now they are coming riding to the rescue of Medicare. We have a right to be skeptical about the arguments they are making.

Imagining these Republican Senators defending Medicare is trying to imagine a fish riding a bicycle. I cannot put it in my mind. But they are doing it. The Senator who sponsored this motion to commit, Senator McCAIN, just a year ago, in the course of his Presidential campaign, called for eliminating $1.3 trillion in spending from Medicare and Medicaid. Now he comes to the floor and says this bill, which would reduce costs in Medicare by less than half of that amount over a 10-year period of time is irresponsible and the death knell of Medicare.

What is the real story? The real story is the Republican side of the aisle is defending the private health insurance companies—companies making generous profits from Medicare Advantage. This is a program offered by private health insurance companies to replace government-run Medicare. It turned out, in many instances, to have failed miserably. It costs more money because these private health insurance companies are taking profits out of the Medicare Advantage Program. So they have pleaded with the other side of the aisle to come to their rescue. They have sent in their best troops on the other side of the aisle, headed by the senior Senator from Arizona, who has said the first thing I will do is to protect these private health insurance companies and their rights to overcharge seniors in Medicare for Medicare Advantage.

He talks about the people now receiving Medicare Advantage, who may be disadvantaged and see a different policy in the future. What the Senator from Arizona and others don't dwell on is that everybody under Medicare today pays $90 a year more into Medicare to subsidize the private health insurance companies that offer Medicare Advantage. This is a tax—a tax—which the Senator from Arizona is trying to preserve. It is a tax on Medicare recipients.

The Senator from Arizona was right a year ago. We can take an honest look at Medicare and Medicaid and take money out of the system without disadvantage to the people involved.

I want to say to the Senator from Arizona and others that once we have dispatched his motion to commit, he will have a chance to vote for Senator MICHAEL BENNET's amendment. It could not be clearer. It has two parts. It says—repeating what this bill says, it says unequivocally:

No provision in this Senate bill can reduce any Medicare benefit guaranteed by statute.

Next paragraph:

Savings in Medicare from the bill will go to extend the life of the Medicare trust fund, lower part B premiums, or cost sharing, expands benefits, improves access to providers.

We know, and the seniors across America know, that left unattended and uncared for, Medicare may go broke in just a matter of 7 or 8 years. This bill before us will extend the life of Medicare for at least 5 years. It will put Medicare on sound footing which every senior and their families want to have. That is why AARP, the largest organization of senior citizens across America, has urged Members of the Senate in both parties to oppose the McCain motion to commit. That is why I stand today with the Senator who is chairman of the Finance Committee and say to my Republican friends, with their newfound love affair with Medicare, that they should reject the 60 Plus organization, this "wise counsel" they turned to that came up with the idea of privatizing Social Security.

How would you like to have had all your Social Security money in the stock market over the last 2 years? Boy, there is a great idea. Stick with this 60 Plus group if you like the notion of privatizing Social Security. Stick with AARP if you want Medicare to be strong, on sound financial footing.

I yield the floor.

The PRESIDING OFFICER. The senior Senator from Montana is recognized.

Mr. BAUCUS. Mr. President, I think it is appropriate to remind people of some of the provisions that are in this bill.

To repeat, because some people have listened to some of this debate and some have not and some might be tuning in right now, the fact is, without reform, without this legislation, Medicare is expected to go broke in the next 8 years. That is according to the Medicare trustees report. With this legislation, that is extended for at least 5 more years. That protects seniors. This legislation protects seniors. Without reform, that is, without this bill, costs will rise and seniors will be forced to bear more and more of the burden out of their own pockets. This legislation adds benefits for seniors. It does not take it away, as the other side implies.

Without reform, seniors will struggle to afford prescriptions in the doughnut hole. I remind my colleagues that this legislation will cut the cost of brand-name prescription drugs in half for seniors during that gap, the so-called doughnut hole.

It will also help provide more benefits in terms of annual wellness visits. When seniors go to the doctor for a colonoscopy, mammography, or other preventive screenings, they will not have copays, as is currently the case today. That is an added benefit this legislation provides for seniors.

Also, this legislation helps seniors who are eligible for both Medicare and Medicaid with access to home, community-based alternatives. A lot of our seniors would like that additional benefit. That is all in this legislation.

This legislation provides more benefits for seniors, not fewer. This legislation protects seniors; it does not harm them. This legislation extends the solvency of the trust fund rather than the reverse.

I might also say—and I think the Senator from Illinois made a very good point—currently, seniors who are paying a Part B premium are really paying a $90 tax per year for those persons who are in Medicare Advantage. We know Medicare Advantage is overpaid. The Senator from Oklahoma, Mr. COBURN, agreed with me when I asked him just yesterday if Medicare Advantage was overpaid. He said, yes, it is overpaid by a very large margin. This legislation can adjust that overpayment.

I might also say, too, that the groups I mentioned support this legislation. But the main point I want to make is this: There are so many fundamental provisions in this legislation that really have not come out much in debate, a little esoteric but under the heading of "delivery system reform." We must begin to change the way we reimburse doctors and hospitals so we are focusing much more on quality of care rather than quantity of care. Some of that is already happening in America without legislation. Basically, it is the nature of integrated systems. We all talked about them. I know Senators on the other side of the aisle also agree with this new trend where hospitals, doctors, nursing homes, and other groups get together and they coordinate their care. Their care is much more patient focused. We have to move much more in that direction.

This will go a long way once it starts kicking in—it is going to take maybe 3 or 4 years to finally have an effect—toward eliminating the waste in our current system. Estimates are we have between $200 billion to $300 billion to $800 billion annually in waste in the American health care system. That is the reason health care costs are so high for family, businesses, governments, whatnot. We have to begin to get that under control, and this legislation does that.

If we do not pass this legislation, we will be postponing the day when we have to begin to get some of these excessive costs under control, and then the problem will be much more difficult. An ounce of prevention is worth a pound of cure in medicine. It is also true in legislation. Clearly, now is the

Exhibit 151

JA-0002543

time to exercise a little ounce of prevention by starting to curb excessive costs, and this bill does that.

Mrs. LINCOLN. Mr. President, with a mother who is covered by Medicare, I remain committed to protecting seniors' access to Medicare, just as I have throughout my public service, which is exactly why I am opposed to the McCain motion to commit. Mr. McCAIN's purpose is not to protect Medicare but to frighten our Nation's seniors so that they will oppose health care reform. I have noted that he has taken his scare tactics to a new level by recording his voice for an automated phone call into my State claiming to seniors that these Medicare savings are going to cut their benefits. He urges them to call me. I believe the seniors in my State know me better than that. They know that I have worked my entire career in this body to protect Medicare.

I have cosponsored the Bennet amendment as an extra safeguard to ensure our seniors that this bill does not cut the guaranteed Medicare benefits that they receive today and that any savings generated from making the Medicare Program more efficient will go back into improvements to the program.

If we do nothing, the Medicare Program will be broke in just 8 years. This bill restores the program's solvency beyond 2022. It will reduce premiums and copays for seniors; ensure seniors can keep their own doctors; cut the billions of dollars of waste, fraud, and abuse that occur annually; provide new prevention and wellness benefits for seniors; lower their prescription drug costs; and help them to stay in their own homes rather than going to nursing homes if that is what they wish to do.

So what about the $500 billion in Medicare cuts Republicans say seniors should be worried about? Well, what they are not saying is that part of the reason Medicare is insolvent is the fact that private insurers under the Medicare Advantage Program are overpaid by 14 percent on average. A typical couple pays $90 more per year in Part B premiums to pay for Medicare Advantage overpayments, even if they are not enrolled in these plans. This bill curbs those overpayments, saving over $118 billion, by for the first time requiring competitive bidding of Medicare Advantage plans against one another. Furthermore, Medicare and Medicaid subsidies to hospitals that help them cover the cost of the uninsured will be reduced since hospitals will have less need for them once millions more Americans have health insurance. That is another $43 billion. Provision after provision is specifically designed to ensure greater value in Medicare, all while the Republicans are using fear tactics to score political points.

I have heard from many seniors in Arkansas, recently, and over the years, about their satisfaction with Medicare. It is not a perfect program, and as a

Senator it is my job to ensure that Congress continue to improve upon the program as needed so that it can continue to meet the needs of our Nation's seniors. Rightly so, seniors in my State are concerned about the misinformation spreading that we will cut their benefits and allow bureaucrats to ration their care. Organizations such as AARP, the Alliance for Retired Americans, and the National Committee to Preserve Social Security and Medicare have stood up to say enough with the misinformation campaign. Today I add my voice to that chorus.

Mr. FEINGOLD. Mr. President, I opposed Senator McCAIN's attempt to send the bill back to committee because it would have effectively ended the current debate on health care reform. Moreover, while I have concerns about some of the offsets in the bill—such as cuts to hospice and home health care—it would be fiscally irresponsible to throw out provisions that cut down on wasteful spending and reward quality, as the McCain motion would have done. Those provisions are key to helping to put Medicare on the path to long-term fiscal sustainability.

The PRESIDING OFFICER. The Senator's time has expired. The next 10 minutes is evenly divided between the Senator from Colorado and the Senator from Arizona.

Mr. McCAIN. Mr. President, I yield 2 minutes to the Senator from Iowa.

The PRESIDING OFFICER. The senior Senator from Iowa is recognized for 2 minutes.

Mr. GRASSLEY. Mr. President, as I stated earlier, the Bennet amendment, as written, does not protect Medicare. So I have a modification I would like to present that ensures Medicare savings in this bill are not being siphoned off to finance a new and separate entitlement program.

To that end, I ask unanimous consent to modify the amendment by adding the following before the period at the end of subsection (b):

. . . and furthermore that, notwithstanding any other provision of this Act or amendment made by this Act, net Medicare savings specified in the most recent estimate available from the Director of the Congressional Budget Office before enactment are appropriated to the Secretary and shall be used for such purposes and to maintain Medicare policies for home health services, skilled nursing facility services, hospice care, hospital services, and benefits provided by the Medicare Advantage program, as under the provisions of such Title as specified on the day before the date of enactment of this Act.

End of my amendment.

The PRESIDING OFFICER. Is there objection?

Mr. BAUCUS. Reserving the right to object, under current law, if less is spent for Medicare providers, the benefits inure to the Medicare trust fund beneficiaries.

Although I have the greatest respect for the Senator from Iowa, this is a stunt, and I object.

The PRESIDING OFFICER. Objection is heard.

Mr. GRASSLEY. Then if I may?

The PRESIDING OFFICER. The Senator from Iowa.

Mr. GRASSLEY. Mr. President, I would like to make very clear that this objection confirms that the Bennet amendment does not protect Medicare as the other side claims that it protects Medicare.

I yield the floor.

The PRESIDING OFFICER. Who yields time? The Senator from Arizona is recognized.

Mr. McCAIN. Mr. President, this motion sends the legislation back to the Finance Committee for a short period of time with instructions to report back with cost offsets other than Medicare cuts. The motion says we should retain the provisions in the legislation addressing fraud and abuse and retain those savings to strengthen the Medicare trust fund. Instead of cutting over $450 billion from Medicare providers and beneficiaries, the committee should do what it should have done in the first place—protect seniors' benefits and access to providers. It is much needed.

Mr. President, I say to my friends, let's save seniors who have paid into the Medicare Program their whole lives from these damaging cuts. I hope my colleagues will vote in favor of this motion. Let's use Medicare savings to save Medicare, not to fund a whole new $2.5 trillion entitlement program. I urge a vote in favor of the motion.

I yield back the remainder of my time.

The PRESIDING OFFICER. The Senator from Colorado is recognized for 5 minutes.

Mr. BENNET. Mr. President, I wish to sum up the debate over Medicare in the Senate health bill and on the motion and amendment before us.

Only in Washington, DC, could an effort to extend the life of Medicare somehow be distorted as being bad for seniors. We know from the Congressional Budget Office, a nonpartisan organization that supports both sides of the aisle, that this Senate bill does not take away any seniors' guaranteed Medicare benefits. It extends Medicare solvency for 5 additional years. My amendment simply confirms these two facts.

I am the first person who would insist we have an open process for this debate. I think there are ideas on each side of this debate on this bill that are worth considering and should be considered. But it is why I find it so confounding that opponents of my amendment want to send the entire bill back to committee so debate stops. How can we return home to the people of our States and admit to them we just gave up and sent health care back to the committee for another round?

The people who do not want change are the people who are content to leave it the same and do not have a theory about how to extend Medicare. They would have seniors believe the bill is bad for seniors. Yet AARP, the Alliance for Retired Americans, the Center

for Medicare Rights, and the National Committee to Preserve Social Security and Medicare beg to differ. They disagree. They agree with this amendment and with the underlying bill. Senior advocacy organizations, grassroots organizations with their ears to the ground hearing the voices and concerns of seniors, support health care reform, and they agree that with my amendment, this bill strengthens Medicare and preserves seniors' benefits.

With the Senate bill finally reaching the floor, seniors are looking for simple clarity on how health care reform can help their lives. Nothing in this bill will cut guaranteed Medicare benefits, and this bill will extend Medicare solvency for 5 additional years. It actually makes the system work better instead of cutting or adding to a program. It actually changes the way Medicare works so it will be stronger and more stable.

People may disagree with the prescription, but as a general matter everybody knows the status quo is unsustainable, and this bill helps seniors. It eliminates the copay seniors have to pay for preventive care. We know preventive care saves lives and it saves money.

As we close debate on my amendment and the alternative motion to commit the bill to committee, I urge all the Members of this body to consider the consequences of inaction. My amendment affirms what the current Senate bill does to help seniors and strengthen Medicare. We all know even more can be done, so let's continue this debate and reject the motion to commit the bill back to the Senate committee.

I urge every Member of this body to support my amendment. Please vote yes on the Bennet amendment and protect our seniors.

I yield the floor.

The PRESIDING OFFICER. Who yields time?

Mr. BAUCUS. How much time remains?

The PRESIDING OFFICER. The Senator from Montana has 1 minute 50 seconds.

Mr. BAUCUS. The Senator from Arizona has yielded back his time. We might as well yield back our time, and we can vote.

The PRESIDING OFFICER. The Senator from Arizona yielded back his time. The Senator from Montana yields back his time. All time is yielded back.

The question is on agreeing to amendment No. 2826.

Mr. McCAIN. Mr. President, have the yeas and nays been ordered?

The PRESIDING OFFICER. They have not.

Mr. McCAIN. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

The result was announced—yeas 100, nays 0, as follows:

[Rollcall Vote No. 357 Leg.]

YEAS — 100

Akaka, Alexander, Barrasso, Baucus, Bayh, Begich, Bennet, Bennett, Bingaman, Bond, Boxer, Brown, Brownback, Bunning, Burr, Burris, Byrd, Cantwell, Cardin, Carper, Casey, Chambliss, Coburn, Cochran, Collins, Conrad, Corker, Cornyn, Crapo, DeMint, Dodd, Dorgan, Durbin, Ensign, Enzi, Feingold, Feinstein, Franken, Gillibrand, Graham, Grassley, Gregg, Hagan, Harkin, Hatch, Hutchison, Inhofe, Inouye, Isakson, Johanns, Johnson, Kaufman, Kerry, Kirk, Klobuchar, Kohl, Kyl, Landrieu, Lautenberg, Leahy, LeMieux, Levin, Lieberman, Lincoln, Lugar, McCain, McCaskill, McConnell, Menendez, Merkley, Mikulski, Murkowski, Murray, Nelson (NE), Nelson (FL), Pryor, Reed, Reid, Risch, Roberts, Rockefeller, Sanders, Schumer, Sessions, Shaheen, Shelby, Snowe, Specter, Stabenow, Tester, Thune, Udall (CO), Udall (NM), Vitter, Voinovich, Warner, Webb, Whitehouse, Wicker, Wyden

The PRESIDING OFFICER (Mr. KIRK). On this vote, the yeas are 100, the nays are 0. Under the previous order requiring 60 votes for the adoption of this amendment, the amendment (No. 2826) is agreed to.

Mr. DURBIN. Mr. President, I move to reconsider the vote.

Mrs. BOXER. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

MOTION TO COMMIT

The PRESIDING OFFICER. There will now be 2 minutes of debate equally divided on the motion to commit offered by the Senator from Arizona.

The Senator from Montana is recognized.

Mr. BAUCUS. Mr. President, I ask my colleague if he wishes to go first? Whatever he wants to do. It is his motion.

Mr. McCAIN. Please go ahead.

Mr. BAUCUS. Mr. President, the McCain motion is next. Unless we act today and pass health care reform, the Medicare trust fund runs out of money in 2017. There are two ways to keep Medicare solvent: find efficiencies so Medicare spends less or increase revenues going into the trust fund—two ideas. Our bill would make Medicare Advantage more efficient. We would introduce competitive bidding——

Mr. BYRD. Mr. President, may we have order? We have a Senator speaking here. May we have order?

I thank the Chair.

Mr. BAUCUS. I thank the Senator from West Virginia.

We extend the trust fund for 5 more years. That is in this bill. Yes, Medicare Advantage plans would not be overpaid as much, but those plans could pay for greater efficiency by cutting their profits or cutting their executives' pay. They could do that. Nothing says they have to go after beneficiaries.

Our bill does nothing to reduce the guaranteed Medicare benefits. To the contrary, our bill would improve Medicare benefits. It would help seniors on the prescription drug doughnut hole and add new preventive benefits such as annual wellness visits. The bill would help ensure doctors would be available to treat Medicare patients. We would prevent the 21-percent cut in doctor payments under current law. For all those reasons, the American Association of Retired Persons supports reform and opposes the McCain motion.

I urge my colleagues to support reform and oppose the motion to commit.

Mr. McCAIN. Mr. President, this motion proposes to send the legislation back to the Finance Committee to remove the nearly $½ trillion in cuts that will severely impact all seniors who are eligible for Medicare. As the Senator from Montana mentioned, the system is going to go broke in 7 years. So what does this legislation contemplate? That we take $½ trillion out of their savings and use it to fund a $2.5 trillion new entitlement program. What does that do for the Medicare trust fund? Nothing.

I urge my colleagues to vote in favor of this motion and send it back to the Finance Committee. Do the right thing for the seniors of this country.

Mr. BOND. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second? There is a sufficient second.

The question is on agreeing to the motion. The clerk will call the roll.

The assistant legislative clerk called the roll.

The result was announced—yeas 42, nays 58, as follows:

[Rollcall Vote No. 358 Leg.]

YEAS—42

Alexander, Barrasso, Bennett, Bond, Brownback, Bunning, Burr, Chambliss, Coburn, Cochran, Collins, Corker, Cornyn, Crapo, DeMint, Ensign, Enzi, Graham, Grassley, Gregg, Hatch, Hutchison, Inhofe, Isakson, Johanns, Kyl, LeMieux, Lugar, McCain, McConnell, Murkowski, Nelson (NE), Risch, Roberts, Sessions, Shelby, Snowe, Thune, Vitter, Voinovich, Webb, Wicker

NAYS—58

Akaka, Baucus, Bayh, Begich, Bennet, Bingaman, Boxer, Brown, Burris, Byrd, Cantwell, Cardin, Carper, Casey, Conrad, Dodd, Dorgan, Durbin, Feingold, Feinstein, Franken, Gillibrand, Hagan, Harkin, Inouye, Johnson, Kaufman, Kerry, Kirk, Klobuchar, Kohl, Landrieu, Lautenberg, Leahy, Levin, Lieberman, Lincoln, McCaskill, Menendez, Merkley, Mikulski, Murray, Nelson (FL), Pryor, Reed, Reid, Rockefeller, Sanders, Schumer, Shaheen, Specter, Stabenow, Tester, Udall (CO), Udall (NM), Warner, Whitehouse, Wyden

The PRESIDING OFFICER. On this vote, the yeas are 42, the nays are 58.

Exhibit 151

JA-0002545

Under the previous order requiring 60 votes for the adoption of this motion, the motion is withdrawn.

Mr. BAUCUS. Mr. President, I move to reconsider the vote.

Mr. HARKIN. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

The PRESIDING OFFICER. The majority leader.

Mr. REID. Mr. President, I ask unanimous consent that the Senate be in a period of debate only between now and 4:30. It is my understanding there has been an agreement that at 4:30 we will all go to the classified room in the Visitor Center to listen to what the administration has to say about Iraq and Afghanistan. I haven't had a chance to clear this with the Republican leader, but for the next hour we will remain in a period of debate only and come back and offer the amendment after we finish with the classified briefing.

We have not yet had agreement to recess at 4:30. I ask unanimous consent that we recess from 4:30 until 5:30 for a classified briefing.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Idaho.

Mr. CRAPO. Mr. President, I wish to continue discussing the health care legislation we just voted on. We had a series of votes dealing with the Medicare issue. I wish to start my remarks by turning to the Senator from Mississippi, Mr. WICKER, and ask him if he has comments he wishes to make.

Mr. WICKER. Mr. President, I appreciate the Senator yielding to me. I think it is important for us all to understand where we are now. We have had a debate about the Medicare issue. The Senate had an opportunity, with the McCain amendment, to protect Medicare from the almost one-half trillion dollars in cuts the Reid bill proposes to do to Medicare. We said no to that opportunity and instead passed the amendment offered by Senator BENNET of Colorado which in sum total does absolutely nothing. What we have done now with the Bennet amendment is say that along with apple pie and motherhood, we also love Medicare, and we want everybody to know that. But the substantive effect of what we have now done is nothing.

I have this challenge to the managers of the bill on the other side and to the Democratic leadership: Now that Bennet has passed and McCain has been defeated, I challenge them to take this bill, send it back to CBO and CMS and have the independent analysts there look at it again. They will be duty bound to come back with the facts. The facts will be that the almost one-half trillion dollars cut in Medicare is still there.

Now that the McCain motion to commit has been defeated, and the sham of the Bennet amendment has been passed, there are still the same cuts to hospitals, there are still the same cuts to Medicare Advantage and to all the senior citizens who depend on that and who were told during the campaign their coverage would not be taken away from them if they liked it. The cuts to nursing homes are there. The cuts to home health care are there. And the cuts to hospice are still there.

Send the bill back to CBO. We can continue debating it. We will not have to miss out on one bit of rhetoric that we have already had. But ask the independent analysts: Are the Medicare cuts still there? They will be duty bound to come back to us and say: Yes, the same cuts that were there before are current in the bill now.

We have accomplished absolutely nothing today to protect Medicare.

I thank the Senator for yielding.

Mr. CRAPO. Mr. President, I thank the Senator from Mississippi.

Mr. President, I ask unanimous consent that several of my colleagues and I may engage in a colloquy during the time we have.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CRAPO. Thank you, Mr. President.

I wish to follow up on the comments of Senator WICKER from Mississippi because it is very critical that the American public understand what has happened in the Senate.

When you talk about health care reform, the vast majority of Americans have a couple of ideas in mind. First and foremost, they want to lower health care premiums and costs. That is what Americans think about primarily when they think about the need for health care reform.

They also want to see better access to quality health care and make sure those who are uninsured have access to health care, and those who are underinsured have access to health care, and that we all have access to quality health care. That is what this debate should be about.

But, instead, the legislation we see before us does not achieve that. Does it reduce the cost of health care? No. It drives up the cost of health care. It raises taxes hundreds of billions of dollars. It cuts Medicare by hundreds of billions of dollars. It grows government by $2.5 trillion of new spending. It forces the most needy in our society into a failing Medicaid system. It imposes a damaging unfunded mandate on our struggling States. It still leaves millions of Americans uninsured and establishes massive government controls over our health care economy, including the creation now of a government insurance company.

We have been focusing in the debate on one part of this for the last little while; that is, the Medicare cuts. Mr. President, $464 billion of the revenue to pay for this massive new entitlement that is being created is to come from Medicare, and it is nothing other than a direct transfer of assets in the United States from America's seniors in the Medicare system to a new government entitlement program.

There are other cuts. There are details of these cuts that I will put up right now on a chart.

The debate we have been having over the last, oh, almost 3 or 4 days now, is whether we should commit the bill back to the Finance Committee so these Medicare cuts can be removed. We just had two votes. One was what I will call a cover vote. It said we do not want to cut Medicare benefits and we should make sure that anything we do protects Medicare. It did not have any detail in it, but it passed 100 to nothing because it does nothing. It does not change what is in the bill. By the way, as I said, that vote just passed by 100 to nothing.

The second vote we took failed. Was the vote 40 to 60? I do not recall the exact vote. What would that amendment have done? That amendment would have put the bill back into the Finance Committee and required that we take out the Medicare cuts.

So let no one be confused, after the first round now in the Senate, we still see this in the bill—a transfer of $464 billion from the Medicare Program to the establishment of a new entitlement program. I do not believe that is what Americans had in mind when they were talking about reform of health care.

There has been a study that came out—OK. I have the exact vote here. It was not 40 to 60. It was 42 to 58, but it was defeated, in any event, and now we still have the cuts to Medicare in the bill. Well, we are going to continue debating this issue.

I myself have an amendment that will send—for the skilled nursing homes—the bill back to Finance to correct the cuts for the skilled nursing homes. There are others who will try to address some of the pieces of this legislation to see if we can't find a way to fix and restore the strength and stability of the Medicare system.

Everyone admits we need to reform Medicare. But until this bill, none of us thought we were talking about taking from Medicare in order to create a massive new entitlement program, with the government control that comes along with it.

What do these cuts do? I am going to start out with the hospitals, the hospice services, the nursing homes, and the home health agencies. The reduction in Medicare spending on these medical providers will basically result in lower access to care for our seniors. I have had representatives in my office of both skilled nursing facilities and home health agencies who have talked to me about what this means to them. They have pointed out that the last time Congress did something like this, we lost, in Idaho, 30 percent, for example, I believe it is, of our home health agencies. They are not there anymore. If we have these kinds of deep cuts in the future, we are going to lose more of our home health care agencies.

One of the owners said to me—he put it this way: If you reduce the allocation of income to home health agencies, I have to either reduce employment, which means not hire as many nurses and medical providers, or I have to close parts of my building and stop operating as many rooms in the building, or do something to reduce costs.

What that means is that seniors will have less access. But that is not all this bill does. In addition to reducing the access for hospitals, hospice service, nursing homes, and home health agencies, it also cuts Medicare Advantage deeply.

Quickly, what is Medicare Advantage? Medicare Advantage is a program that about one out of four American seniors participate in in Medicare. It is an opportunity which Congress started a few years back to try to let the private sector become a part of the delivery system in Medicare. In other words, to put it simply, private sector insurance companies can contract with the Federal Government to provide Medicare services to Medicare beneficiaries, so it is the private sector getting involved in health care delivery rather than the government simply delivering the health care through a single-payer system. That, in a quick summary, is what Medicare Advantage was all about.

What we found was that it was phenomenally successful because the private sector was able, through its management, to not only provide the statutorily required Medicare coverage but additional benefits, very critical additional benefits, such as preventive health care, dental coverage, vision coverage, and things such as that—things that make a big difference in the lives of our seniors and enables some of those who cannot buy additional coverage for those things Medicare does not cover to get access to it through Medicare Advantage.

That is why in my State 27 percent of all of the Medicare recipients have moved to Medicare Advantage. It is the most popular part of Medicare in America today, and it is growing faster than any other part of Medicare because it is delivering more to the Medicare beneficiaries.

This bill slashes $120 billion from it, some of us believe because there is a bias against the private sector delivery of health care. But for whatever reason, the Medicare Advantage portion is where the cuts are focused.

Let's put up the next chart.

When we had the issue before the Finance Committee, we had the head of CBO before us, and I asked him a question about the cuts to Medicare Advantage. We had a colloquy between us at that point, and I asked:

So, approximately half of this additional benefit—

In other words, these additional things that Medicare Advantage has been able to provide to our seniors under Medicare—

So, approximately half of this additional benefit would be lost to those current Medicare Advantage policyholders?

And his response was:

For those who would be enrolled otherwise under the current law, yes.

The point being, not only will we lose skilled nursing facilities, home health care, hospice care, and hospital care, and access to that care, we are also going to see senior citizens lose benefits. Again, what is the purpose? The purpose is not to shore up Medicare. In fact, it will take $464 billion—taxpayer dollars that are allocated to Medicare in our current system—and transfer that straight over to the establishment of a new entitlement program.

I want to let my colleague from Nevada comment on this for a minute, but before I turn it over to my colleague from Nevada, I wish to point out that as we approach this issue, the question of why would we transfer $464 billion out of the Medicare system to a new government entitlement program, one of the reasons is because the President pledged he would not sign a bill that did not reduce the deficit.

As I said earlier, this bill grows the spending in the Federal Government by approximately $2.5 trillion over the first full 10 years of its implementation of spending. The only way to cover that increase in the size of the government is to either raise more taxes or to cut spending somewhere, and what the bill does is both. It raises taxes—which we are going to be talking about in future days—and it cuts spending. The place where it cuts spending is Medicare. That is why what we see is increased taxes, cuts in Medicare, growth of government, and the establishment of a new Federal entitlement program, with all of the accompanying accoutrements of Federal control, including a new government owned and operated insurance company.

I see my colleague from Nevada standing and turn to him for his comments on this issue.

Mr. ENSIGN. First of all, I think my colleague from Idaho has made some excellent points about, truly there will be cuts that are going to happen in Medicare. And do not just take the politicians' word for these cuts. Listen to the CBO Director. He is the nonpartisan, I repeat, nonpartisan, official scorekeeper. When asked direct questions, by not only the Senator from Idaho but others, he absolutely says the benefits, especially under Medicare Advantage, will be cut.

In my home State of Nevada, tens of thousands—I think about 200,000 altogether—of seniors have voluntarily chosen Medicare Advantage over traditional Medicare. The reason? Very simple. There are extra benefits in Medicare Advantage. You hear the Democrats talk about the doughnut hole in Medicare Part D, which is prescription drug coverage. Well, there is not a doughnut hole under most of the Medicare Advantage plans because the private sector, through its efficiency, has

been able to fill that doughnut hole. In other words, they get complete coverage of prescription drugs through their Medicare Advantage plans.

Also, under Medicare Advantage, they get additional preventive health care services. They also get vision and dental. And depending on the plan, depending on its makeup, there are different types of benefits to attract seniors to certain plans. It is no wonder that about one out of four seniors in America have voluntarily signed up for Medicare Advantage. Nobody forced them into this system. They voluntarily chose this system.

If you think about it, seniors do not like change. For most seniors, they like what they have. They do not like to change. For one out of four seniors to have voluntarily changed, there has to be something pretty attractive about Medicare Advantage.

There are some real attractive things for seniors in Medicare Advantage plans. That is why when you actually poll seniors regarding Medicare Advantage, the vast majority of them are thrilled with the coverage they have. They do not want to lose benefits. Who would want to voluntarily lose benefits?

But with the $120 billion cut in Medicare Advantage the Democratic majority has put in this bill, about half of the benefits in Medicare Advantage plans will be cut. Isn't that correct, I ask my friend, the Senator from the State of Idaho?

Mr. CRAPO. The Senator from Nevada is correct. In fact, I am just thumbing through here to get the exact statistics. But the bottom line is, the CBO indicated, I think it was something like from an average number of $140 or so of extra benefits—that it would go down to about half of that. So they would get about half of those extra benefits.

Mr. ENSIGN. That is per month?

Mr. CRAPO. Per month.

Mr. ENSIGN. So $140 per month. According to CBO, about half of those benefits would be cut under this plan, isn't that correct?

Mr. CRAPO. That is correct.

Mr. WICKER. If the Senator would yield on that point.

Mr. CRAPO. I would be happy to yield.

Mr. WICKER. We have three Republicans standing now saying this, and we have had quoted some official independent sources. Let me quote a Democrat, Representative MICHAEL MCMAHON of New York:

Medicare Advantage, which serves approximately 40 percent of my seniors on Medicare, would be cut dramatically.

That is why that Democrat from the State of New York voted no on the plan when it was before the House of Representatives. So you don't have to take our word for it, from a partisan standpoint. Democrats are saying no because of the Medicare cuts and the cuts to Medicare Advantage—drastic cuts.

Mr. ENSIGN. The Senator from Idaho and I serve on the Finance Committee

Exhibit 151     JA-0002547

where a large portion of this bill was written. We both heard Democrats on the other side of the aisle complaining about cuts to Medicare Advantage. Yet when I look in this bill, the total dollar figure in cuts to Medicare Advantage is the same as what came out of the Finance Committee; isn't that correct?

Mr. CRAPO. The Senator from Nevada is correct. I have in front of me the exact numbers right now from CBO that were provided in the Finance Committee markup. During the markup, CBO estimated that the value of the extra benefits offered by Medicare Advantage plans will drop from $135 a month to $42 a month, based on the cuts contained in that bill, which are essentially the same level of cuts we now see in the bill before us on the floor.

Mr. ENSIGN. Let me make a couple other general points about this bill. I think we have pretty well covered the fact that Medicare Advantage is going to take a severe hit. Medicare overall, that includes hospice care, hospital care, nursing home care, home health—all of them are taking severe cuts. More than likely, those cuts are going to come, if the government doesn't rescue those cuts in the future, from benefits to seniors.

If the government decides not to have those cuts in the future, then the deficit is going to go up. You can't have it both ways. You can't have both a deficit-neutral bill and not have the cuts in Medicare. In other words, you are going to either have the cuts in Medicare or you are going to have ballooning deficits into the future.

There are several other problems with the bill that I would like to point out. First of all, we know it is over 2,000 pages; there is incredibly complex language in those over 2,074 pages. It places bureaucrats in charge of health care decisions instead of creating a patient-centered health care system that says the doctor-patient relationship is where most of the health care choices should be made. As a matter of fact, according to the National Center for Policy Analysis, in almost 1,700 places in this bill it authorizes the Secretary of Health and Human Services to ''make, create, determine, or define'' things regarding health care policy. Mr. President, 1,697 times, to be exact, the Secretary of Health and Human Services basically makes health care policy—not doctors, not health care providers; bureaucrats in Washington, DC.

You mentioned before there were $½ trillion in new taxes and about $½ trillion in Medicare cuts. We know this bill will lead to millions of Americans having increased premiums.

We have talked a lot about what is wrong with the bill, however, many on this side of the aisle have offered positive solutions. We have talked about allowing small businesses to join together to take advantage of purchasing power that big businesses have. We have talked about allowing people to

buy insurance across State lines. Some States have less expensive plans than others. You can buy your auto insurance across State lines. Why shouldn't we be able to buy our health insurance across State lines?

Mr. CRAPO. If I could interrupt, my understanding is, the Republican bill in the House, which has both ideas in it and which was evaluated, what it would do to the cost of health care and health care insurance premiums, that those ideas would actually reduce health care premiums by, I think, 5 or 6 or 8 percent. I don't remember the exact number, but the point is, those ideas would hit the reason Americans want health care reform; that is, reduce the cost of health care coverage.

Mr. ENSIGN. I am glad the Senator from Idaho made that point, because the No. 1 problem with health care in the United States is not quality. We have the finest quality system—by almost any measure, the finest quality health care system in the entire world. The problem is that it is too expensive. We should be going after costs. This bill does not do that. This bill actually raises premiums for tens of millions of Americans. That isn't the direction we should be taking health care.

Another idea the vast majority of people on this side have supported is medical liability reform. Once again, in the Finance Committee, we asked the question—I, personally, asked the question of the CBO Director: How much money would medical liability reform—the common one I offered and Senator HATCH offered—how much would that save between the government and the private sector? He said: Over $100 billion. Well, that is not chump change; that is a significant amount of money, $100 billion. Add that to buying across State lines, add that to small business health plans, add that to incentivizing healthy behaviors—add that to the elimination of preexisting conditions. I think Republicans and Democrats alike agree, if you have insurance and you have played by the rules and you get a disease, your insurance should not be taken away or denied. We should eliminate preexisting conditions for those that have played by the rules. We shouldn't allow insurance companies to unexplainably increase rates. We should take a step-by-step, incremental approach to health care reform instead of gutting Medicare, as the Senator from Idaho has talked about, to create a new government entitlement program. That is what we are saying on this side of the aisle. However, it seems to be falling on deaf ears on the other side of the aisle.

Mr. CRAPO. I know my colleague from Mississippi wants to make a comment or two, but may I ask, Mr. President, how much time remains for our side?

The PRESIDING OFFICER. There is 7½ minutes.

Mr. WICKER. Mr. President, if I could just maybe take 1 minute of that

time and then y colleagues can wrap it up.

I wish to emphasize what a devastating effect these Medicare cuts are going to have on rural America. Once again, I wish to quote some of my colleagues from the other end of the building because it shows the bipartisan opposition we have against these cuts from rural America.

MIKE ROSS, a Democrat from Arkansas, said:

With more than $400 billion in cuts to Medicare, it could force many of our rural hospitals to close, providing less access and care for our senior citizens.

Representative LARRY KISSELL of North Carolina:

From the day I announced my candidacy for this office, I promised to protect Medicare.

So he voted no on the bill in the House of Representatives.

IKE SKELTON said:

The proposed reductions to Medicare could further squeeze the budgets of our rural health care providers.

Finally, Representative BOUCHER, a senior Democrat from Virginia, said:

The plan could place at risk the survival of our regions' hospitals.

Unless these Medicare changes are taken out of the bill, this bill devastates health care for senior citizens in rural America.

I thank my colleague for yielding me the time.

Mr. CRAPO. Thank you very much. I wish to use the remainder of our time to speak for a minute about what this bill does to different costs in our country. I think the point we made in this colloquy is, after the votes we just took, let no one be confused: the $464 billion of cuts to Medicare remain in the bill.

Let's talk about the question of the cost curve. There has been a lot of talk about what has become known as the cost curve. It has been said by everybody we need to bend the cost curve down. Some are saying this bill bends the cost curve down. Well, which cost curve are they talking about? Are they talking about the size of government, the growth of government? No. If you take the first full 10 years of the growth of spending in this bill—which, by the way, is delayed for 4 years—if you start when the spending starts and take the first full year, 10 years of spending, the new spending, the growth of government is about $2.5 trillion. I don't see how anybody could say that cost curve is bending down. It has skyrocketed.

Well, would it be the cost of health care, which I think is the cost curve Americans were thinking about, health care insurance and the quality of health care that is provided? Well, CBO just came out with its report that analyzed that issue and there are a number of independent groups that have analyzed it and they all pretty much say it is not going to reduce the cost of health insurance. It is not going to reduce the cost of health care. In fact, for

Exhibit 151 JA-0002548

the neediest in America, those who are in the individual market, it will drive up the cost of their insurance and not by just a little bit, by around 10 to 13 percent. For those in the small group area, it will drive up theirs—not as much—by about 1 to 3 percent. For those in the large group area, there is a possibility that theirs might taper off a little bit; the estimate is somewhere between zero impact and 2 percent reduction.

But is that what we are talking about in America, 30 percent of the people in this country seeing their health care insurance costs go up and the rest seeing theirs remain basically stable? That is not the cost curve reduction I thought Americans were talking about in health care reform.

So then what other cost curve could they be talking about? Well, there is a lot of talk about the deficit. Sometimes they try to shift away from the cost of health care to the cost of the bill to the people of America, and they say the deficit is reduced. Well, how can you say that? There is only one way you can say that and that is if you accept the budget gimmicks in the bill. If you raise taxes by around $500 billion and if you cut Medicare by $464 billion, then you can say this massive expansion of government is somehow covered and that the deficit won't grow.

Well, I think we have talked about the Medicare cuts part of this. We are going to talk about the tax increases, which are hundreds of billions of dollars of new taxes in the future, but what did I mean when I said you can only say the deficit goes down if you accept the budget gimmicks?

This bill starts the collection of revenues and the cuts out at the front end but doesn't start the spending for 4 years, so you have 10 years—in the 10-year window we are looking at, we have 10 years of revenue and 6 years, basically, of spending. Sure, if you only count 6 years of the spending side of the bill against 10 years of its collection side, you are going to be able to make that deficit look a little better.

In addition, there are major expenditures we all know are going to have to be done in health care, such as the SGR fix for physician compensation in Medicare, that are not even in the bill, an expense we know over 10 years is around 200 billion to 250 billion of extra dollars; simply not there, not counted. Well, if you want to show a deficit reduction, you certainly want to leave out of your bill a lot of the spending you are going to do in the future. It is gimmicks such as these, it is tax increases, and it is Medicare cuts that allow one to say the deficit goes down.

In conclusion, the reality is, this bill will increase the growth of government by $2.5 trillion for a full 10-year measure, increase taxes by hundreds of billions of dollars, cut Medicare by hundreds of billions of dollars, create a Federal insurance company, create massive Federal controls over the health care economy, push the neediest

of the uninsured not into an insurance policy but into a failing Medicare system, and push an unfunded mandate of tens of billions of dollars onto our States. That is not the kind of health care reform we need. As my colleague from Nevada indicated, there are reforms that do make a difference that will reduce the cost of health care, that will cut down the spiraling costs of health care insurance, and will not require us to have such an intrusion of the Federal Government into the management of our economy.

It is time for us to slow down and start, step by step, to address the kinds of reforms that will reduce the cost of insurance and the cost of health care and that will help us to increase access to quality care in America. We can do it, and we have a number of very good ideas on the table we will be exploring in greater detail in future days as well that will help us to do it.

With that, I reserve the balance of our time.

May I ask how much time remains?

The PRESIDING OFFICER (Mrs. SHAHEEN). The minority has no time.

Mr. CRAPO. I thank the Chair.

The PRESIDING OFFICER. The Senator from Montana.

Mr. BAUCUS. Madam President, I think it would be instructive to stop all this rhetorical talking past each other on Medicare Advantage and explain a little bit about how we got to where we are in this legislation.

I don't know the exact year, but I think it was back in the 1980s sometime, up to a certain point Medicare was basically paid fees for services. That is the basic Medicare model. The service was provided and there are certain set rates for that service. Then, in the 1980s, private companies thought maybe they could be more efficient, private insurance companies. So they came to Congress and said: We can do a better job in compensating Medicare based on fee for service, so let's set up something called Medicare Advantage, private entities.

So Congress said: OK, competition is a good thing. So we did that. Congress did that. We basically set the rates to be paid to Medicare Advantage plans at 95 percent of fee for service. After all, the plan said they could do it more cheaply and they could compete. So we said: OK, that sounds like a good idea. We will pay you 95 percent of what otherwise would be paid under fee for service. That continued for a while.

In 1997, the plan said: Gee, we need a little more money. So Congress said: All right. And we gave a little more money to Medicare Advantage and basically said, OK, that will pay the 95 percent. But if you are not doing so well and making money at 95, we will set kind of a higher floor, according to certain areas of the country, and you could choose whatever enables you to have the greatest compensation.

The big change occurred in 2003, in the Medicare Modernization Act, otherwise known as the drug bill. It was the

legislation that created drug benefits for seniors. As we all know, frankly, when Medicare was created, it didn't have an outpatient drug benefit because drugs weren't comparatively as important then as they are today. Today there are miracle drugs that help in a lot of ways. We created the drug benefit in 2003.

The Congress did something else then. Many Members of Congress were concerned that Medicare Advantage might not offer the plans in rural parts of America, that there wouldn't be enough incentive for Medicare Advantage to go to rural America to offer the drug benefits—not only the drug benefits but other benefits they provided. Congress, frankly, gave a lot of money to Medicare Advantage plans so there could be at least two plans operating in all parts of the country. Give them enough money and they will go; that was the theory. Guess what happened. We gave them a lot of money and they went.

We have reached the point now where Medicare Advantage is, by everybody's estimate, quite dramatically overpaid, as the Senator from Oklahoma, Mr. COBURN, said when I asked him yesterday whether Medicare Advantage plans are overpaid. He said, "Yes, they are definitely overpaid.''

MedPAC, which advises us on Medicare reimbursement, said to us that we are way overpaying Medicare Advantage plans. I hear figures of from 14 to 18 percent overpayment. It depends on what part of the country you are in. Let's be conservative and say it is 14 percent in fee for service, that they are overpaid. MedPAC is an independent advisory group that helps us figure out what in the world we pay hospitals, nursing homes, home health agencies, etc. We are not the experts. We need help. MedPAC said to the Congress that we are overpaying them big time.

We decided let's figure out a way to reform the system. How about a little competition? Right now, Medicare Advantage plans are paid what is called a benchmark, depending upon the fee for service in their certain area. We all know fee for service is much less in rural America, and I am sure in the home State of the occupant of the chair. Fee for service is much higher in other more urban States and so forth.

As it turned out, under the benchmarks for fee for service, they were way overpaying in States where fee for service is so high, and not quite as much overpaid where fee for service is so low. That is a nutty system in the current law today.

What we are doing in this legislation is, basically, we are saying: Look, let's introduce a little competition. We are saying: Let's get rid of the benchmark-type fee for service. It is out of whack in different parts of the country. What are we going to do? We say: OK, we will divide the country into geographic areas. In your area, wherever you might be, Uncle Sam—or Medicare—will pay the average competitive bid

Exhibit 151

JA-0002549

for that area. The average cost you bid for that area is what we are going to pay, which eliminates this big disparity between States and makes it much more fair so that reimbursement is based much more on what it actually costs in a certain area, but it is competitively bid. That is what we are trying to do.

Is that a good thing to do? I think most of us think so. Is it perfect? I don't know for sure, but we are trying our best to make this a better system, a better program than we currently have. As a consequence, we are going to save some money, and there will be competition. Most of us think competition is often a pretty good thing. That is what this is, I remind my colleagues. As a consequence, we are not going to be overpaying Medicare Advantage plans anymore. The amount we reduced the payment to is in line with what MedPAC says we should pay, the Medicare Payment Advisory Commission.

We are trying to be responsible and reasonable with taxpayer money, seniors who pay into Medicare. The point is often made that, gee, this will hurt Medicare Advantage, hospitals, and so forth. I think it is worth reminding all of us that a meeting occurred at the White House, I think, 4 to 6 months ago, when all of the so-called providers—the hospitals, insurance companies, including Medicare Advantage plans—all got together with the President and said: Mr. President, we agree this country needs health care reform. They all agreed.

Let's move back in history a little bit. When President Clinton attempted health care reform, all those groups were opposed to health care reform. This time, they are pretty much in favor of it because they know if we don't fix it, it is going to collapse.

Back to that meeting. What did they say? They said: Mr. President, we have all gotten together and we think we can contribute. We can cut collectively $2 trillion in payments that go to us over the next 10 years.

That is what they said. That is pretty interesting. Thank you very much. So we are working together to get health care reform.

Why do you think they would agree to $2 trillion? They got their calculators out and got their financial officers together and said: Gee, if everybody has health care—remember, 46 million Americans don't have health insurance—if everybody had health insurance, hospitals, Medicare Advantage plans said: Hey, we can make some money because everybody has health insurance.

So that was the deal. They will have a little lower margins, but they will make it up on volume. That is why they said to the President: We can cut $2 trillion that otherwise would be reimbursements to us.

In this legislation, did we reduce the rate of increase over 10 years by $2 trillion? No. Did we decrease the rate of increase in expenditures by half of that

or $1 trillion? No. Do we reduce the rate of increase of health care expenditures down to, say, $450 billion, close to $500 billion? Yes, that is what we did. About one-quarter of the industry said they could voluntarily contribute. Are they squawking today? No. Why? Because they got a pretty good deal. They know they can continue to provide services and the hospitals are going to do well and home health care agencies will do well. I will add that the profit margin for home health agencies is about 17 percent. That is pretty good. So we are cutting them a little bit. The profit margin for nursing homes—Medicare payments to nursing homes—is about 15 percent. We are cutting that a little bit. But they are still making money and still will do well. In fact, their average rate of growth over the next 10 years is going to be in excess of 5 percent a year. Wall Street analysts say these outfits are doing pretty well. You don't see their stocks going down.

We are trying to do what is right and to reform Medicare Advantage, as I just outlined it. It is a pretty fair attempt at reform. Also, we will reduce payments to hospitals and other providers in an amount that they can live with—not be happy with but an amount they are OK with, and where they know they can still make money. That extends the solvency of the Medicare trust fund another 5 years because those providers are not being paid as much as they would otherwise be paid.

I hear Senators crying crocodile tears about how seniors are going to be cut, and so forth. Frankly, with the changes we made, I think it is very fair, and it will extend the solvency of the trust fund. There is not one dime of guaranteed Medicare benefits that will be cut—not one thin dime—in this legislation. It is true that because Medicare Advantage—the rate of growth of increase in Medicare Advantage plans is trimmed back a little, perhaps there will not be as many extra benefits—not the guaranteed benefits but extras, fringe benefits, like gym memberships and things like that. Don't forget, that is not because that is a decision made by Medicare or by Congress; that is a decision made by the executive offices of these private companies. I am not saying they should do this. They could trim salaries, overhead, and they could have a little less return to stockholders, and they could cut down administrative costs. There are various things they could do, which doesn't have to be passed on to reductions in fringes. Let's keep things in perspective as to what is actually going on.

Mr. DODD. If my colleague will yield, I appreciate what the Senator has just done. This is an area where I think there is a lot of confusion and misunderstanding. A lot of it begins with just the branding, the title of something. This was, frankly, a revelation to me, going back a number of weeks ago. I heard the words "Medicare Advantage." I thought this has to be part of the regular Medicare Program because it has that title.

Mr. BAUCUS. Most people did.

Mr. DODD. If my colleague will correct me if I am wrong, this is not traditional Medicare; this is a private plan, right?

Mr. BAUCUS. That is correct. To be totally fair, the other side likes to trot out this Medicare pamphlet that includes Medicare Advantage. I think that is misleading and not accurate. As the Senator says, these are private plans.

Mr. DODD. In looking back a few years ago, the original reason—and I don't recall the debate as well as my colleague, the chairman of the Finance Committee, does. As I remember, the original idea behind this was—and he said this already, but it deserves being repeated—this was a way of cutting costs, reducing expenditures. In a sense, we were sold this idea on the fact that we could do this better, more efficiently, at far less cost.

Mr. BAUCUS. Absolutely. That was the rationale.

Mr. DODD. That is why we supported trying this idea. A couple of things happened since then. One, I think the overpayments, on average, are around 14 percent.

Mr. BAUCUS. That is correct. It depends on the part of the country.

Mr. DODD. So, on average, it is 14 percent in overpayment. Is it also true that roughly 80 percent of Medicare beneficiaries don't get any of these benefits?

Mr. BAUCUS. That is correct.

Mr. DODD. And that the average Medicare couple over the age of 65 is paying, I am told, about $90 a year more in Medicare payments for benefits they don't get.

Mr. BAUCUS. Exactly.

Mr. DODD. So here we have 75 to 80 percent of the beneficiaries of Medicare paying more money and not getting the benefits for a program that costs more than 14 percent more, and it is a private plan.

Mr. BAUCUS. With great considerable administrative costs and profits that otherwise could go to seniors.

Mr. DODD. Our bill does something that I think our friend from Oklahoma, Senator COBURN, pointed out that is absolutely critical, which is that competitive bidding did not exist in the original.

Who was setting these rates originally during this period of time? How did these rates get set? Did Congress set them?

Mr. BAUCUS. Congress did. Congress set the benchmarks.

Mr. DODD. Is it true that if these Medicare Advantage plans come in under the benchmark bid, they actually get a piece of the savings? Is that correct as well?

Mr. BAUCUS. That is correct.

Mr. DODD. So there is an incentive to trim the cost of the administration of the program. It is also true the plans get bonus payments for care, coordination, and quality, and plans can use these bonuses to improve benefits?

Exhibit 151

JA-0002550

Mr. BAUCUS. That is correct. Under this legislation, we say—frankly, under the earlier Medicare Advantage plans, HMOs had some coordinated care, but the other half, the private fee for service, preferred provider organizations did not have coordinated care.

We are saying in the legislation that if you are in the Medicare Advantage plan, which includes a whole list, and you provide coordinated care, we are going to give you a bonus.

Mr. WICKER. Madam President, will my friend yield for a question?

Mr. DODD. Certainly.

Mr. WICKER. I realize we do not have much time. I have a quick question. I was listening to the debate on television. I understood the Senator to say Medicare Advantage is not part of Medicare. My question is: I have here the Medicare handbook for 2010, ''Medicare and You.'' It says right on page 50:

Medicare Advantage Plans (Part C). A Medicare Advantage plan . . . is another health coverage choice you may have as part of Medicare.

My question to the Senator is—to my friends on the other side of the aisle: Is the Medicare handbook inaccurate and, if so, will you be calling CMS, Medicare, and be asking them to change what they say explicitly on page 50 of the Medicare handbook?

Mr. BAUCUS. That is a very interesting question. When I was told about the handbook, that is what I thought I was going to do, is call up Medicare and say that is misleading and it is inaccurate because it is misleading and it is inaccurate.

Mr. DODD. Absolutely.

Mr. BAUCUS. These are private companies.

Mr. WICKER. Even though Medicare put it in their handbook, has had it for several years, it is wrong?

Mr. DODD. They are wrong. It is a private health care plan. It is a private health care plan. Medicare is a public plan. Medicare Advantage is not Medicare, and it is certainly not an advantage, given the overpayments that occurred.

Mr. WICKER. Isn't it part of the Medicare legislation?

Mr. DODD. It is a private plan. My colleague understands that, I hope. Medicare Advantage is a private plan. You know that, of course, don't you? I assume you know that.

Mr. BAUCUS. It has officers, a board of directors.

Mr. WICKER. I know this. It is in the handbook. I want my two friends of the majority party to get it out of there. We thought all along it is part of Medicare and the millions of senior citizens who rely on this and who were told in the campaign, if you are satisfied with your coverage, you don't have a thing to worry about, they are going to be able to keep their coverage. Under the Democratic legislation, they would not be allowed to keep their coverage under this bill.

Mr. DODD. If I can reclaim my time, 80 percent of older Americans are paying $90 more a year for this. Do they have any say in this? They don't get any of the benefits. Why are they writing a check for $90 a year to pay a private plan from which they get no benefits? What about them? Don't they deserve something in all this?

Mr. WICKER. The question I had was: Is this a part of Medicare?

Mr. DODD. It is not.

Mr. WICKER. I realize my friends have a difference of opinion. The authorities for Medicare who put this publication out year after year say Medicare Advantage is part of Medicare. It is Part C. I think it is disingenuous for my friends to say it is not.

Mr. DODD. The only reason it is part of it is it is subsidized. This plan gets subsidized by the American taxpayers. That is the only qualification that puts it under the Medicare umbrella because our taxpayers are writing a check to a private company. That is why it gets included as part of Medicare. Other than that, it is a private plan.

Mr. BAUCUS. This is a semantic question. When you see the operational effects, as my good friend from Connecticut said——

Mr. WICKER. One other question. Is it a semantic question to ask: Are the American seniors who are currently enjoying Medicare Advantage going to be disallowed from this program? The answer is yes, under this bill.

Mr. BAUCUS. This legislation, if I may say, expressly states there will be no reduction in what is called guaranteed benefits under Medicare. No reduction, whether it is under Medicare Advantage, whether it is under fee for service—whatever it is, no reduction whatsoever.

To be fair to my good friend, I used the words ''guaranteed benefits.'' Guaranteed benefits are the usual benefits seniors think of when they are under Medicare. They go to a doctor, hospital, so on.

We have given, unfortunately, so many additional dollars to the so-called Medicare Advantage plans—way above what they should have received. MedPAC agrees. Senator COBURN totally agrees they have been paid way too much. They have taken advantage of that advantage by giving additional benefits, in addition to the guaranteed benefits. Those additionals are things such as gym memberships—a lot of extra stuff that, frankly, is not part of Medicare, is not directly related to health.

I might say, too—I have said this a couple, three times and I will say it again—a reduction in the increase of payments to Medicare Advantage, the effect of those reductions is a decision made by the officers of that company. They could take those reductions and apply them anywhere. They could reduce their salaries. They could reduce their admin costs. They could take other actions that would reduce the rate of growth, the rate of return of their stockholders. They do not have to take it out of the beneficiaries. That is their choice. They do not have to.

Mr. DODD. Medicare Advantage decides how to use their extra payments to provide benefits. They decide; Congress does not. There is nothing in the legislation that forces plans to reduce benefits at all, rather than reducing profits.

Medicare Advantage is one of the profitable business lines of the private insurance. In fact, the New York Times on November 2—just about a month ago—reported:

Humana, the health insurer, posted on Monday a 65 percent jump in third-quarter profits—

We are talking about private health care. These are profits, a 65-percent jump in profits off this plan—

as bulging membership and premiums from Medicare Advantage overcame a lackluster commercial segment.

I appreciate the fact that people are getting eyeglasses and things. That is wonderful. But we need to be clear about this. These are not the guaranteed benefits, and 80 percent of Medicare beneficiaries get none of these advantages and yet pay more so other people under this private health care plan—because it is subsidized by the American taxpayers—get them.

Again, now we are going to put competitive bidding in place. Our bill allows, under these plans, if they follow and do some of the incentives, to actually share in some of the profits. We are not talking about eliminating all of this plan. We are trying to make it work better for people under the bill.

We have to be honest what we are talking about. This is a private insurance company that is subsidized by the American taxpayers. It is not what, traditionally, people think of Medicare.

Mr. WICKER. Will the Senator yield?

Mr. DODD. I will be happy to yield.

Mr. WICKER. The chairman, when he is calling HHS to change the handbook, also needs to tell them to change their Web site, where it says Medicare Advantage is part of Medicare.

Can the Senator from Connecticut guarantee that under this legislation, the benefits to Medicare Advantage recipients will not be cut? Can he make this guarantee?

Mr. DODD. What I wish to say and what I wish to ask my colleague—

Mr. WICKER. The reason he cannot make this guarantee—

Mr. DODD. Let me claim my time. There is not a single guaranteed benefit under Medicare that is cut in this bill. Not one. I defy any Member of this body to identify a guaranteed benefit under Medicare that gets cut. You cannot find one. Do we cut out gym memberships and things such as that? Yes, that may happen. But on the guaranteed benefits—operative word is ''guaranteed''—under guaranteed benefits, there is not a single cut to a benefit. That is why an organization representing 40 million Americans that endorsed the Bush prescription drug plan, by the way, in 2003—hardly a partisan organization as some have suggested today—has basically opposed

Exhibit 151

JA-0002551

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 580 of 677

the McCain motion and has endorsed the legislation before us today. That organization, I say to my good friend, would never be endorsing a bill that was going to cut guaranteed benefits under Medicare.

Mr. BAUCUS. I wish to say something else to put this in perspective. That is according to analysis of Medicare Advantage plans from Oppenheimer Capital Fund, dated November 12 of this year, between 2006 and 2009. Their estimate is, Medicare Advantage accounted for nearly 75 percent of the increase in gross profits among the larger Medicare plans in the industry.

Let me say this:

. . . Medicare Advantage . . . has been a huge driver—

Quoting from the Oppenheimer Capital Fund—

a huge driver of earnings growth for the industry in recent years. Between 2006 and 2009, we estimate that Medicare Advantage accounted for nearly 75 percent of the increase in gross profits among the larger plans in the industry, highlighted by an estimated gross profit increase of $1.9 billion in 2009, relative to commercial risk earnings gains—

That is basic health insurance, not Medicare Advantage plans but basic health insurance—

of nearly $600 million. Medicare Advantage probably won't be as much of a contributor in 2009—

But it is going to be a very large contributor in 2009 because of advantages they get.

Mr. WICKER. It is clear the Senator does not like Medicare Advantage. It is also clear no guarantee can be made that Medicare Advantage benefits will not be cut under this legislation. It is also clear there are tens and tens of millions of American senior citizens who like their Medicare Advantage, notwithstanding the Senator from Montana, and they stand to lose those benefits under this legislation.

Mr. DODD. Let me point out, one of the things we have not talked about, I say to my friend from Mississippi, under our legislation, this bill protects seniors in Medicare Advantage from plans that care more about profits than seniors, trying to pass the buck. Under our bill, it allows the Secretary of Health and Human Services to kick out any plan under Medicare Advantage that significantly increases their premiums or decreases their benefits. Under existing law, that would not happen; under our bill, it does.

It is not about being hostile to Medicare Advantage. It is being realistic about all this and trying to make the tough decisions we have to make about trying to stabilize Medicare, seeing to it we are going to have protections in premium reductions and cost savings, as well as increasing access and quality.

All we are trying to point out is, when you have a Medicare Advantage plan that has run as poorly as this one has, at great cost we now learned—14 percent above, on average; some places it is 50 percent above average—where is the equity. By the way, I say to my friend from Mississippi, it is a private health care plan that receives subsidies from the American taxpayers, where 80 percent of seniors today pay more and get nothing for it. Where is the equity in this? There is no equity in this. Why should 80 percent of that population pay $90 or more a year, on average, for a benefit they don't get? Where is the equity?

Mr. BAUCUS. I might add, too, to remind us all, this legislation provides additional benefits for all seniors, including Medicare Advantage recipients—additional benefits. What are they? No copayment for certain preventive care—mammograms, for example, colonoscopies, screening benefits that are not in existence today. There are a whole host of other things that are additional.

This legislation provides additional benefits to Medicare Advantage members that are not there today.

When I say "guaranteed benefits," I am talking about the usual benefits seniors think of under Medicare. It is hospital care, it is nurses, it is all medically necessary physician care, diagnostic testing, supplies. It is home health care, preventive care, skilled nursing, hospice—all the things that are basically related to health care.

The only thing that might be trimmed back a little is, I call them the fringe stuff, the excesses, such as gym memberships. I wish I had the whole list because some of them are not related.

As I said earlier, they may not be cut. They don't have to be. It is up to the private companies whether to cut. I have nothing against companies making profits. They should make profits. It is our responsibility as Senators to make sure the reimbursement rates Medicare pays providers are fair and reasonable and not excessive. We have been told they are excessive. So we are trying to find a way to make it fairer.

Mr. WICKER. This segment of debate will end at the bottom of the hour, so it is almost over. I appreciate my friends yielding. This debate will continue for days, weeks. I say to my friends, there are Members on their side of the aisle who have come before this body and said these Medicare Advantage cuts are unacceptable. I think they are going to have to have a lot of convincing too. Democratic Members of the House have also come forward. I am not convinced. I don't think this are convinced.

The PRESIDING OFFICER. All time has expired.

Mr. DODD. Madam President, I ask unanimous consent for 2 additional minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DODD. Madam President, let me say to my colleague again that here we have two organizations representing 43 million seniors in our country, and these are organizations that don't just write letters on the fly. They have staffs that examine proposals here, and that is all they do. We have AARP, which is an organization that is highly regarded and well recognized, representing 40 million seniors in the country, and the Commission to Preserve Social Security and Medicare, which represents an additional 3 million, and that is all they do. This is a totally nonpartisan examination. These two organizations, representing almost 50 million of our seniors, have examined this bill in detail—every dotted "I," every semicolon, every comma, every proposal—and have done exhaustive research, and they have said: This is a good bill. This bill is deserving of support.

We received a letter today from them. They are not Democrats. They are not Republicans. They are not trying to get an advantage over anybody. They are examining whether this bill stabilizes and strengthens Medicare, puts seniors in a stronger position, is going to see to it that we can extend the life of the program and provide guaranteed benefits that are needed, and their answer was a resounding yes—yes, this bill is deserving of our support.

Again, I appreciate the political debate here, but at some point we have to step back and let those whose job it is to analyze our suggestions and our ideas—just as AARP supported President Bush 6 years ago with his prescription drug bill. They didn't join Democrats or Republicans; they liked the idea—still do—and supported it. Today, they are not supporting us as Democrats. They would reject this bill out of hand if they thought we did something adverse to the interest of their membership. But they said: No, this is a good bill, deserving of support. The two largest organizations in this country representing seniors have said: Get behind this bill. Let's support our seniors. Let's make Medicare stronger and strengthen it. And this bill does it.

That is why we should be joining together, not fighting over this. Medicare Advantage is a private health care plan subsidized by the American taxpayer. Eighty percent of the seniors don't get the Advantage. That is why we are creating these changes in this bill.

I applaud my colleague from Montana, the chairman of the Finance Committee, who did incredible work, along with his staff and other members, in producing this product.

---

RECESS

The PRESIDING OFFICER. The Senate stands in recess until 5:30 p.m.

Thereupon, the Senate, at 4:33 p.m., recessed until 5:30 p.m. and reassembled when called to order by the Presiding Officer (Mr. WHITEHOUSE).

---

SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009—(Continued)

(Mrs. SHAHEEN assumed the Chair.)

Mr. WHITEHOUSE. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

Exhibit 151                                                                        JA-0002552

back to health. The bill before the Senate saves lives, saves money, and saves Medicare.

### EXHIBIT 1

U.S. SENATE,
*Washington, DC, December 1, 2009.*

DEAR REPUBLICAN COLLEAGUE: As we embark on Senate debate of Majority Leader Reid's massive $2.5 trillion health care reform legislation, it is critical that Republican senators have a solid understanding of the minority's rights in the Senate.

I think that we can all agree that the Democrats' bill is the wrong choice for our nation. It will impact one-sixth of our economy, vastly grow the government, and pile tremendous debt on future generations. We are at an important crossroads both for the economy and for the health care system. Therefore, it is imperative that our voices are heard during this debate.

We, the minority party, must use the tools we have under Senate rules to insist on a full, complete and fully informed debate on the health care legislation—as well as all legislation—coming before the Senate. As laid out in the attached document, we have certain rights before measures are considered on the floor as well as certain rights during the actual consideration of measures. Every Republican senator should be familiar with the scope of these rights, which serve to protect our ability to speak on behalf of the millions of Americans who depend on us to be their voice during this historic debate.

I hope you find the attached information helpful. If you have any questions, please contact my communications office.

Sincerely,

JUDD GREGG.

FOUNDATION FOR THE MINORITY PARTY'S RIGHTS IN THE SENATE (Fall 2009)

The Senate rules are designed to give a minority of Senators the right to insist on a full, complete, and fully informed debate on all measures and issues coming before the Senate. This cornerstone of protection can only be abrogated if 60 or more Senators vote to take these rights away from the minority.

I. Rights Available to Minority Before Measures are Considered on Floor (These rights are normally waived by Unanimous Consent (UC) when time is short, but any Senator can object to the waiver.)

New Legislative Day—An adjournment of the Senate, as opposed to a recess, is required to trigger a new legislative day. A new legislative day starts with the morning hour, a 2-hour period with a number of required procedures. During part of the "morning hour" any Senator may make non-debatable motions to proceed to items on the Senate calendar.

One Day and Two Day Rules—The 1-day rule requires that measures must lie over one "legislative day" before they can be considered. All bills have to lie over one day, whether they were introduced by an individual Senator (rule XIV) or reported by a committee (rule XVII). The 2-day rule requires that IF a committee chooses to file a written report, that committee report MUST contain a CBO cost estimate, a regulatory impact statement, and detail what changes the measure makes to current law (or provide a statement why any of these cannot be done), and that report must be available at least 2 calendar days before a bill can be considered on the Senate floor. Senators may block a measure's consideration by raising a point of order if it does not meet one of these requirements.

"Hard" Quorum Calls—Senate operates on a presumptive quorum of 51 senators and quorum calls are routinely dispensed with by

unanimous consent. If UC is not granted to dispose of a routine quorum call, then the roll must continue to be called. If a quorum is not present, the only motions the leadership may make are to adjourn, to recess under a previous order, or time-consuming motions to establish a quorum that include requesting, requiring, and then arresting Senators to compel their presence in the Senate chamber.

II. Rights Available to Minority During Consideration of Measures in Senate (Many of these rights are regularly waived by Unanimous Consent.)

Motions to Proceed to Measures—with the exception of Conference Reports and Budget Resolutions, most such motions are fully debatable and 60 votes for cloture is needed to cut off extended debate.

Reading of Amendments and Conference Reports in Entirety—In most circumstances, the reading of the full text of amendments may only be dispensed with by unanimous consent. Any Senator may object to dispensing with the reading. If, as is often the case when the Senate begins consideration of a House-passed vehicle, the Majority Leader offers a full-text substitute amendment, the reading of that full-text substitute amendment can only be waived by unanimous consent. A member may only request the reading of a conference report if it is not available in printed form (100 copies available in the Senate chamber).

Senate Points of Order—A Senator may make a point of order at any point he or she believes that a Senate procedure is being violated, with or without cause. After the presiding officer rules, any Senator who disagrees with such ruling may appeal the ruling of the chair—that appeal is fully debatable. Some points of order, such as those raised on Constitutional grounds, are not ruled on by the presiding officer and the question is put to the Senate, then the point of order itself is fully debatable. The Senate may dispose of a point of order or an appeal by tabling it; however, delay is created by the two roll call votes in connection with each tabling motion (motion to table and motion to reconsider that vote).

Budget Points of Order—Many legislative proposals (bills, amendments, and conference reports) are subject to a point of order under the Budget Act or budget resolution, most of which can only be waived by 60 votes. If budget points of order lie against a measure, any Senator may raise them, and a measure cannot be passed or disposed of unless the points of order that are raised are waived. (See http://budget.senate.gov/republican/pressarchive/PointsofOrder.pdf )

AMENDMENT PROCESS

Amendment Tree Process and/or Filibuster by Amendment—until cloture is invoked, Senators may offer an unlimited number of amendments—germane or non-germane—on any subject. This is the fullest expression of a "full, complete, and informed" debate on a measure. It has been necessary under past Democrat majorities to use the rules governing the amendment process aggressively to ensure that minority Senators get votes on their amendment as originally written (unchanged by the Majority Democrats.)

Substitute Amendments—UC is routinely requested to treat substitute amendments as original text for purposes of further amendment, which makes it easier for the majority to offer 2nd degree amendments to gut 1st degree amendments by the minority. The minority could protect their amendments by objecting to such UC's.

Divisible Amendments—amendments are divisible upon demand by any Senator if they contain two or more parts that can stand independently of one another. This can

be used to fight efforts to block the minority from offering all of their amendments, because a single amendment could be drafted, offered at a point when such an amendment is in order, and then divided into multiple component parts for separate consideration and votes. Demanding division of amendments can also be used to extend consideration of a measure. Amendments to strike and insert text cannot be divided.

Motions to Recommit Bills to Committee With or Without Instructions—A Senator may make a motion to recommit a bill to the committee with or without instructions to the Committee to report it back to the Senate with certain changes or additions. Such instructions are amendable.

AFTER PASSAGE GOING TO CONFERENCE, MOTIONS TO INSTRUCT CONFEREES, MATTERS OUT OF SCOPE OF CONFERENCE

Going to Conference—The Senate must pass 3 separate motions to go to conference: (1) a motion to insist on its amendments or disagree with the House amendments; (2) a motion to request/agree to a conference; and (3) a motion to authorize the Chair to appoint conferees. The Senate routinely does this by UC, but if a Senator objects the Senate must debate each step and all 3 motions may be filibustered (requiring a cloture vote to end debate).

Motion to Instruct Conferees—Once the Senate adopts the first two motions, Senators may offer an unlimited number of motions to instruct the Senate's conferees. The motions to instruct are amendable—and divisible upon demand—by Senators if they contain more than one separate and distinct instruction.

Conference Reports, Out of Scope Motions—In addition to demanding a copy of the conference report to be on every Senator's desk and raising Budget points of order against it, Senators may also raise a point of order that it contains matter not related to the matters originally submitted to the conference by either chamber. If the Chair sustains the point or order, the provision(s) is stricken from the conference agreement, and the House would then have to approve the measure absent the stricken provision (even if the House had already acted on the conference report). The scope point of order can be waived by 60 Senators.

Availability of Conference Report Language. The conference report must be publicly available on a website 48 hours in advance prior to the vote on passage.

---

## RECOGNITION OF THE MINORITY LEADER

The ACTING PRESIDENT pro tempore. The Republican leader is recognized.

---

## HEALTH CARE REFORM

Mr. McCONNELL. Madam President, this measure was in the majority leader's office for 6 weeks. It has only been on the floor of the Senate for 3 days. I think it is clearly not the case that the Republicans want to delay a process that we have only now gotten an opportunity to participate in, since this has been a strictly partisan venture from the beginning. But we will have an opportunity over a number of weeks to offer amendments. We will have four votes today and hopefully we can proceed at a more rapid pace than we got off to in the first couple of days. Of

Exhibit 151                                                                                                                JA-0002553

Case 2:17-cv-04540-WB    Document 253-10    Filed 09/29/20    Page 582 of 677

course the reason we didn't have votes last night was because there were objections on that side of the aisle. But hopefully we are now into a process where we can go forward without the kind of delay that we had generated by both sides over the last couple of days.

Yesterday some of our friends on the other side were at great pains to explain one of the core pieces of their health care plan. I am referring of course to the massive cuts in Medicare they plan to make as a way of expanding government's reach even further into the lives and, more specifically, into the medical care of every American.

I have no doubt that our friends were reluctant to call for these cuts. But in the middle of a recession, and at a time when more than 1 in 10 working Americans is looking for work, it isn't easy to find $1/2 a trillion lying around. They had to find the money somewhere. And so they set their sights on Medicare.

Republicans have been entirely consistent in this debate: Medicare is already in trouble. The program needs to be fixed, not raided to create another new government program. We have fought these senseless cuts from the outset. And we will continue to fight them.

Democrats, meanwhile, have taken a novel approach. They have apparently decided there is no way to defend these Medicare cuts, so they will just deny they are doing it. It hardly passes the smell test.

Here are the facts. According to this bill: Medicare Advantage is cut by $120 billion; hospitals that treat Medicare patients are cut by $135 billion; home health care is cut by more than $42 billion; nursing homes are cut by nearly $15 billion; hospice care is cut by $7.6 billion.

These are the cuts that our friends on the other side claim not to be cuts. This is the plan that our friends on the other side have said will "save Medicare"—a talking point so plainly contradicted by the facts, it is almost impossible to repeat it with a straight face.

One Democrat took this strategy to a new level yesterday when he declared on the floor that it wasn't even accurate to describe cuts to Medicare Advantage as cuts because Medicare Advantage, he said, is not a Medicare Program.

Well, that is apparently news to the Department of Health and Human Services, which states on its Web site, in words as plain as the alphabet that "Medicare Advantage plans . . . are part of the Medicare program." And it is news to the millions of American seniors who depend on this popular program for their care.

At the moment, Medicare Advantage has nearly 11 million enrollees looking at it another way, or nearly one-fourth of all Medicare beneficiaries are on Medicare Advantage.

In recent years, this program has proven to be particularly popular with seniors in rural areas who would otherwise have limited access to care. Seniors have shown they want this plan. And I daresay that if you had asked seniors earlier this year what they expected health care reform would look like, it wouldn't have involved massive cuts to a program that they have shown they like and want.

Medicare Advantage has also been proven to help in a particular way low-income and minority seniors. That is one of the reasons minorities are more likely to enroll in it. So this program has given a boost to historically disadvantaged populations and helped give them a greater measure of dignity toward the end of their lives.

These cuts are bad enough. But despite what our friends have said, the Democrat plan for Medicare Advantage doesn't stop here because their bill also gives the Medicare Commission explicit new authority to cut even more from this popular program in the years ahead.

The President has repeatedly said that people who like the plans they have will be able to keep them under his plan. He has said people currently signed up for Medicare Advantage will have the same level of benefits under his plan.

Well, common sense tells us that you can't cut $120 billion from a benefits program without affecting benefits, and the independent Congressional Budget Office confirms what common sense tells us, and they actually quantify it.

CBO says the bill we are debating will cut extra benefits that seniors receive through Medicare Advantage by more than half. The fact is, cuts to Medicare Advantage are cuts to Medicare. And if it is true of Medicare Advantage, it is true of the other Medicare cuts in this bill. Democrats can deny these cuts all they want. Seniors aren't buying it.

Later this afternoon we are going to have a Bennet amendment, Bennet of Colorado, as a side-by-side to Senator McCAIN's motion, which would send back to committee the Medicare cuts in this bill and ask the committee to report it back without them. I want to comment briefly on the Bennet amendment and we are going to have more to say on that during the course of today's debate.

This amendment is a shell game, a shell game designed to hide the $1/2 trillion in cuts I have been talking about. The Bennet of Colorado amendment is a shell game designed to hide the $1/2 trillion in cuts I have described. If the Bennet amendment passes, the bill will still cut $1/2 trillion from Medicare.

Let me say that again. If the Bennet of Colorado amendment passes, the bill will still cut $1/2 trillion from Medicare. It does not protect Medicare. There is only one way to protect Medicare and that is to support the McCain motion.

I yield the floor.

Mr. GREGG. Will the Senator yield for a question?

Mr. McCONNELL. I will be happy to yield to the Senator from New Hampshire.

Mr. GREGG. The Senator is absolutely right to point out the Bennet amendment is a shell game, charade, and a farce; that there will still be $1/2 trillion in the first 10 years but actually $2.5 trillion over the period 2010 to 2029 to be cut out of Medicare.

Earlier the majority leader came to the floor and talked about a memo that I sent around, which is a fairly innocuous memo to our fellow Members, which outlined the rights to fellow Members relative to floor activity, and I sent in my position as Budget ranking member, because most of these issues are tied to the budget, and the covering letter said we as a minority must use the tools we have under the Senate rules to insist on a full, complete, and fully informed debate on health care legislation as well as all legislation that comes before the Senate.

I ask the Republican leader, is it not reasonable that we should have a full, complete, and fair debate on this health care bill?

Mr. McCONNELL. I say to my friend from New Hampshire, we know this bill was produced by Democrats in committee. Then it went to the majority leader's conference room and stayed there for 6 weeks. There were no Republicans in those meetings, not a one. So after being in the majority leader's conference room for 6 weeks, it has been on the floor of the Senate for 3 days. This will be the fourth day.

To suggest that Republicans don't want to offer many amendments to this massive 2,000-page bill that seeks to restructure one-sixth of our economy is nonsense. The American people will not stand for not having a free and open amendment process during the course of this debate. This is a debate, I say to my friend from New Hampshire, the American people deserve to have for a considerable period of time. For goodness' sake, we spent 4 weeks on a farm bill in the last Congress. F

Mr. GREGG. If the Republican leader will yield further, it is ironic, is it not, that the majority leader would come to the floor and complain about an innocuous statement that outlines the rules which Members of the Senate have, a statement which I suspect he actually would pass out to his members for information were they in the minority—maybe even in the majority, because they would like to know how the rules work in the Senate—after the majority leader had completely subverted the rules of the Senate by not taking this 2074-page bill through committee so it could be amended, in the open, so it could be amended but, rather, writing it in the back room, some closet around here, with three or four Members of the Senate present? Isn't there an ironic inconsistency to his outrage on the fact that we suggested people should know the rules here while he has basically tried to go around the rules?

Exhibit 151      JA-0002554

Mr. McCONNELL. I say to my friend from New Hampshire, nobody is going to buy outrage over a mere 40 Members out of 100 Members of the Senate having an opportunity, for the first time, to offer amendments. The majority, by the way, has the right to do this, and I don't complain about it. They are going to offer an amendment for every amendment we offer, so not only did they have the bill in their conference room in secret for 6 weeks, out here on the floor they are going to get 50 percent of the amendments we vote on. I don't think they will be able, with a straight face, to convince the American people that somehow the 40 of us who are asking for an opportunity to amend a bill that all the surveys indicate the American people don't want us to pass is somehow unfair.

Mr. GREGG. I will ask one more question because I find the irony in the situation so unique. A memo which outlines what the rights are of all Members—but Members of the minority specifically because the rules are meant to protect the minority from the majority; that is the tradition of our Government, of course, which seems to be an affront to the majority at this point—that a memo of that nature, which essentially says the minority has certain rights in order for the institution to function correctly—I am wondering, why did we create these rules in the first place? Wasn't it so we could continue the thought of Adams, of Madison, who suggested that the Senate should be the place where, when legislation comes forward which has been rushed through the House, the Senate should be the place where that legislation receives a deliberative view, where it is explored as to its unintended consequences and as to its consequences generally, and where the body has the opportunity to amend it effectively so it can be improved? Isn't that the purpose of the Senate? And isn't that what the rules of the Senate are designed to do, to accomplish the goals of our Founding Fathers to have a Senate where the legislation is adequately aired and considered versus being rushed through in a precipitous way?

Mr. McCONNELL. It was George Washington who presided over the Constitutional Convention who was asked: General, what do you think the Senate is going to be like?

He said: I think it is going to be like the saucer under the tea cup and the tea is going to slosh out of the cup down into the saucer and cool off. That is precisely the point the Senator raises, which is the Senate is the place viewed to be a body that ought to and correctly takes its time. The House of Representatives passed this massive restructuring of one-sixth of our economy in 1 day. That is not the way the Senate operates. I can remember when our friends on the other side were in the minority. Specifically, I can remember the now-assistant majority leader say-

ing the Senate is not the House—praised the procedures in the Senate. If ever there were a measure, if ever in the history of America there were a measure that the Americans expect us to take our time on and to get it right, it is this one, this massive 2,000-page effort to restructure one-sixth of our economy and have the government take over all of American health where we see, in all of the public opinion polls, people are saying please don't pass this—they want to try to rush it.

They want to try to rush it, try to get it through here in a heck of a hurry, back it up against Christmas. I have said to the majority leader, we are happy to be here. We are going to be here Saturday and Sunday. I did ask for an opportunity for Members to go to church Sunday morning, if they want to, and the majority leader indicated that would be permissible. But after that, we will be here and ready to vote.

Mr. GREGG. I thank the Republican leader for his response. I suspect, were the majority leader in the minority, he would be insisting on exactly what the Republican leader is insisting on—a fair and open debate which allows the minority to make its case as to the good points in this bill and as to the bad points. The way you make that case is by following the rules of the Senate; is that not correct?

Mr. McCONNELL. The American people expect and deserve no less than exactly what we have been discussing.

I yield the floor.

RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

SERVICE MEMBERS HOME OWNERSHIP TAX ACT OF 2009

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of H.R. 3590, which the clerk will report.

The bill clerk read as follows:

A bill (H.R. 3590) to amend the Internal Revenue Code of 1986 to modify the first-time home buyers credit in the case of members of the Armed Forces and certain other Federal employees, and for other purposes.

Pending:

Reid amendment No. 2786, in the nature of a substitute.

Mikulski amendment No. 2791 (to amendment No. 2786), to clarify provisions relating to first-dollar coverage for preventive services for women.

McCain motion to commit the bill to the Committee on Finance, with instructions.

The ACTING PRESIDENT pro tempore. Under the previous order, there will be 10 minutes equally divided for the bill managers to speak.

The Senator from Montana.

Mr. BAUCUS. Madam President, I yield myself 2½ minutes from the time under the control of the managers.

For the benefit of all Senators I want to take a moment to lay out today's program.

The time between now and 11:45 is for debate on the amendment by the Senator from Maryland, Ms. MIKULSKI, the chairwoman of the Subcommittee on Retirement and Aging of the Health, Education, Labor and Pensions Committee.

And at the same time, we will debate the side-by-side amendment by the Senator from Alaska, Ms. MURKOWSKI.

At 11:45, the Senate will conduct two back-to-back rollcall votes on the two amendments, first on the amendment by the Senator from Maryland, and second on the amendment by the Senator from Alaska.

Thereafter, we will conduct approximately 2 hours of debate on the McCain motion to commit on Medicare and the side-by-side amendment by the Senator from Colorado, Mr. BENNET.

At 2:45, the Senate will conduct two back-to-back votes on the amendment by the Senator from Colorado, followed by a vote on the motion to commit by the Senator from Arizona.

Thereafter, we expect to turn to another Democratic first-degree amendment and another Republican first-degree amendment.

This is the fourth day on this bill, and we are only late this morning coming to our first vote. Even for the U.S. Senate, this is a slow pace.

I note that some have made plans for delaying this bill in even more extreme fashion. As the majority leader noted, on Tuesday, one Senator circulated a list of delaying tactics available under the Senate rules.

I presume all Senators know the Senate's rules already. So to send the letter leaves the impression that that Senator would like to urge Senators to use some of the delaying tactics stated in the memo.

But I urge a more cooperative course. Out of courtesy to other Senators who desire to offer amendments. I urge my colleagues to allow us to reach unanimous consent agreements to order the voting of future amendments in a more timely fashion. That is simply the only way that we can ensure that more colleagues will have the time and opportunity to offer and debate their amendments.

I thank all Senators.

The ACTING PRESIDENT pro tempore. The Senator has consumed his time.

Mr. BAUCUS. I ask unanimous consent that the order of December 2 be modified to delete all after the word "table."

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. BAUCUS. I ask unanimous consent that the debate time from 2 to 2:45 this afternoon be divided as follows in the order listed: the first 17½ minutes under the control of Senator McCAIN or his designee; the next 17 minutes under the control of Senator BAUCUS or his designee; and the final 10 minutes, 5 minutes each for Senator McCAIN and Senator BENNET of Colorado.

Exhibit 151                                                                 JA-0002555

U.S. Department of Health & Human Services

**Office of Adolescent Health**

# Trends in Teen Pregnancy and Childbearing

## Teen Births

In 2016, there were 20.3 births for every 1,000 adolescent females ages 15-19, or 209,809 babies born to females in this age group.[1] Births to teens ages 15-19 account for 5.3 percent of all births in 2016. Nearly nine in ten (89 percent) of these births occurred outside of marriage.[1] The 2016 teen birth rate (births per 1,000 females ages 15-19 in a given year) is down nine percent from 2015, when the birth rate was 22.3, and down 67 percent from 1991 when it was at a record high of 61.8.[1] The teen birth rate has declined more or less continuously over the past quarter century, and is at the lowest level ever recorded. Still, the teen birth rate in the United States remains higher than that in many other developed countries, including Canada and the United Kingdom.[2]

Not all teen births are first births. In 2016, one in six (17 percent) births to 15- to 19-year-olds were to females who already had one or more births.[1] Avoiding repeat teen births is one of the goals of OAH's Pregnancy Assistance Fund (PAF) grant program to states and tribes. Grantees may use PAF Program funds to help expectant and parenting teens complete high school or earn postsecondary degrees, as well as to gain access to healthcare, child care, family housing, and other critical supports. The money can also be used to improve services for pregnant women who are victims of domestic violence and to increase public awareness and education efforts surrounding teen pregnancy prevention, among other activities. Through PAF Program grants, OAH also supports work with adolescent males who become young fathers. Find more information about the Pregnancy Assistance Fund.

## Variations in Teen Birth Rates across Populations

Teen birth rates differ substantially by age, racial and ethnic group, and region of the country. Most adolescents who give birth are 18 or older; in 2016, 74 percent of all teen births occurred to 18- to 19-year-olds.[1] Birth rates are also higher among Hispanic and black adolescents than among their white counterparts. In 2016, Hispanic adolescent females ages 15-19 had a higher birth rate (31.9 births per 1,000 adolescent females) than black adolescent females (29.3) and white adolescent females (14.3) (see Figure 1).[1] To help put these differences in perspective, estimates from 2013 show that eight percent of white adolescent females will give birth by their 20th birthday, as will 16 percent of black adolescent females and 17 percent of Hispanic adolescent females.[3]

Although Hispanic teens still have a higher birth rate than their black and white peers, the rate has declined substantially in recent years. Since 2007, the teen birth rate among Hispanics has declined by 58 percent, compared with declines of 53 percent for blacks and 47 percent for whites.[1]

Figure 1: Birth rates per 1,000 females ages 15-19, by race and Hispanic origin of mother, 1990-2016

Exhibit 152                                                                                    JA-0002556

In 1990, birth rates were 116.2 for black adolescents, 100.3 for
Hispanic adolescents, and 42.5 for white adolescents. In 2016, the birth
rates were 29.3 for black adolescents, 31.9 for Hispanic adolescents,
and 14.3 for white adolescents.

*Source for 1990-2014: Centers for Disease Control and Prevention. (2015). Births: Final data for 2014.*
*National Vital Statistics Reports, 64(12). Retrieved*
*from https://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_12.pdf - PDF*
*Source for 2015: Centers for Disease Control and Prevention. (2017). Births: Final data for 2015. National*
*Vital Statistics Reports, 66(1). Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_01.pdf -*
*PDF*
*Source for 2016: Centers for Disease Control and Prevention. (2018). Births: Final data for 2016. National*
*Vital Statistics Reports, 67(1). Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_01.pdf -*
*PDF*

Table 1: Birth rates per 1,000 females ages 15-19, by race and Hispanic origin of mother, 1990-2016

| Year | Total | White | Black | Hispanic |
|------|-------|-------|-------|----------|
| 1990 | 59.9 | 42.5 | 116.2 | 100.3 |
| 1991 | 61.8 | 43.4 | 118.2 | 104.6 |
| 1992 | 60.3 | 41.7 | 114.7 | 103.3 |
| 1993 | 59.0 | 40.7 | 110.5 | 101.8 |
| 1994 | 58.2 | 40.4 | 105.7 | 101.3 |
| 1995 | 56.0 | 39.3 | 97.2 | 99.3 |
| 1996 | 53.5 | 37.6 | 91.9 | 94.6 |
| 1997 | 51.3 | 36.0 | 88.3 | 89.6 |
| 1998 | 50.3 | 35.3 | 85.7 | 87.9 |
| 1999 | 48.8 | 34.1 | 81.0 | 86.8 |
| 2000 | 47.7 | 32.6 | 79.2 | 87.3 |
| 2001 | 45.0 | 30.3 | 73.1 | 84.4 |
| 2002 | 42.6 | 28.6 | 67.7 | 80.6 |

Exhibit 152    JA-0002557

| Year | Total | White | Black | Hispanic |
|------|-------|-------|-------|----------|
| 2003 | 41.1 | 27.4 | 63.7 | 78.4 |
| 2004 | 40.5 | 26.7 | 61.8 | 78.1 |
| 2005 | 39.7 | 26.0 | 59.4 | 76.5 |
| 2006 | 41.1 | 26.7 | 61.9 | 77.4 |
| 2007 | 41.5 | 27.2 | 62.0 | 75.3 |
| 2008 | 40.2 | 26.7 | 60.4 | 70.3 |
| 2009 | 37.9 | 25.7 | 56.7 | 63.6 |
| 2010 | 34.3 | 23.5 | 51.5 | 55.7 |
| 2011 | 31.3 | 21.7 | 47.3 | 49.6 |
| 2012 | 29.4 | 20.5 | 43.9 | 46.3 |
| 2013 | 26.5 | 18.6 | 39.0 | 41.7 |
| 2014 | 24.2 | 17.3 | 34.9 | 38.0 |
| 2015 | 22.3 | 16.0 | 31.8 | 34.9 |
| 2016 | 20.3 | 14.3 | 29.3 | 31.9 |

*Source for 1990-2014: Centers for Disease Control and Prevention. (2015). Births: Final data for 2014.*
*National Vital Statistics Reports, 64(12). Retrieved from*
*https://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_12.pdf - PDF*
*Source for 2015: Centers for Disease Control and Prevention. (2017). Births: Final data for 2015. National*
*Vital Statistics Reports, 66(1). Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_01.pdf -*
*PDF*
*Source for 2016: Centers for Disease Control and Prevention. (2018). Births: Final data for 2016. National*
*Vital Statistics Reports, 67(1). Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_01.pdf -*
*PDF*

Teen birth rates also vary substantially across regions and states. In 2016, the lowest teen birth rates were
reported in the Northeast, while rates were highest in states across the southern part of the country (see
Figure 2).[1] See how your state compares on birth rates, pregnancy rates, sexual activity, and
contraceptive use with OAH's reproductive health state fact sheets.

Exhibit 152
JA-0002558

Figure 2: Birth rates per 1,000 females ages 15-19, by state, 2016

The U.S. teen birth rate was 20.3 in 2016.

*Source: Centers for Disease Control and Prevention. (2018). Births: Final data for 2016. Hyattsville, MD: National Center for Health Statistics. Retrieved from: https://www.cdc.gov/nchs/pressroom/sosmap/teen-births/teenbirths.htm*

Table 2: Birth rates per 1,000 females ages 15-19, by state, 2016

| State | Teen birth rate (ages 15-19 year) | Teen birth rate range |
|-------|-----------------------------------|-----------------------|
| United States | 20.3 | — |
| Alabama | 28.4 | 28.0 - 34.6 (dark red) |
| Alaska | 25.8 | 23.4 - 26.1 (red) |
| Arizona | 23.6 | 23.4 - 26.1 (red) |
| Arkansas | 34.6 | 28.0 - 34.6 (dark red) |
| California | 17.0 | 15.5 - 17.8 (light orange) |
| Colorado | 17.8 | 15.5 - 17.8 (light orange) |
| Connecticut | 9.4 | 8.5 - 15.0 (cream) |
| Delaware | 19.5 | 18.7 - 21.9 (orange) |
| District of Columbia | 24.0 | 23.4 - 26.1 (red) |
| Florida | 19.3 | 18.7 - 21.9 (orange) |
| Georgia | 23.6 | 23.4 - 26.1 (red) |
| Hawaii | 19.2 | 18.7 - 21.9 (orange) |
| Idaho | 20.1 | 18.7 - 21.9 (orange) |
| Illinois | 18.7 | 18.7 - 21.9 (orange) |
| Indiana | 23.6 | 23.4 - 26.1 (red) |
| Iowa | 17.2 | 15.5 - 17.8 (light orange) |
| Kansas | 21.9 | 18.7 - 21.9 (orange) |

Exhibit 152                                                                        JA-0002559

5/15/2019                                    Trends in Teen Pregnancy and Childbearing | HHS.gov

| State | Teen birth rate (ages 15-19 year) | Teen birth rate range |
|---|---|---|
| Kentucky | 30.9 | 28.0 - 34.6 (dark red) |
| Louisiana | 30.6 | 28.0 - 34.6 (dark red) |
| Maine | 14.7 | 8.5 - 15.0 (cream) |
| Maryland | 15.9 | 15.5 - 17.8 (light orange) |
| Massachusetts | 8.5 | 8.5 - 15.0 (cream) |
| Michigan | 17.7 | 15.5 - 17.8 (light orange) |
| Minnesota | 12.6 | 8.5 - 15.0 (cream) |
| Mississippi | 32.6 | 28.0 - 34.6 (dark red) |
| Missouri | 23.4 | 23.4 - 26.1 (red) |
| Montana | 23.7 | 23.4 - 26.1 (red) |
| Nebraska | 19.1 | 18.7 - 21.9 (orange) |
| Nevada | 24.2 | 23.4 - 26.1 (red) |
| New Hampshire | 9.3 | 8.5 - 15.0 (cream) |
| New Jersey | 11.0 | 8.5 - 15.0 (cream) |
| New Mexico | 29.8 | 28.0 - 34.6 (dark red) |
| New York | 13.2 | 8.5 - 15.0 (cream) |
| North Carolina | 21.8 | 18.7 - 21.9 (orange) |
| North Dakota | 20.3 | 18.7 - 21.9 (orange) |
| Ohio | 21.8 | 18.7 - 21.9 (orange) |
| Oklahoma | 33.4 | 28.0 - 34.6 (dark red) |
| Oregon | 16.6 | 15.5 - 17.8 (light orange) |
| Pennsylvania | 15.8 | 15.5 - 17.8 (light orange) |

Exhibit 152                                                                                     JA-0002560

| State | Teen birth rate (ages 15-19 year) | Teen birth rate range |
|-------|-----------------------------------|------------------------|
| Rhode Island | 12.9 | 8.5 - 15.0 (cream) |
| South Carolina | 23.7 | 23.4 - 26.1 (red) |
| South Dakota | 25.1 | 23.4 - 26.1 (red) |
| Tennessee | 28.0 | 28.0 - 34.6 (dark red) |
| Texas | 31.0 | 28.0 - 34.6 (dark red) |
| Utah | 15.6 | 15.5 - 17.8 (light orange) |
| Vermont | 10.3 | 8.5 - 15.0 (cream) |
| Virginia | 15.5 | 15.5 - 17.8 (light orange) |
| Washington | 16.6 | 15.5 - 17.8 (light orange) |
| West Virginia | 29.3 | 28.0 - 34.6 (dark red) |
| Wisconsin | 15.0 | 8.5 - 15.0 (cream) |
| Wyoming | 26.1 | 23.4 - 26.1 (red) |

*Source: Centers for Disease Control and Prevention. (2018). Births: Final data for 2016. Hyattsville, MD: National Center for Health Statistics. Retrieved from: https://www.cdc.gov/nchs/pressroom/sosmap/teen-births/teenbirths.htm*

## Teen Pregnancies

The national teen pregnancy rate (number of pregnancies per 1,000 females ages 15-19) has declined almost continuously over the last quarter century. The teen pregnancy rate includes pregnancies that end in a live birth, as well as those that end in abortion or miscarriage (fetal loss).* The teen pregnancy rate declined by 63 percent in less than 25 years — from 117.6 pregnancies per 1,000 females ages 15-19 in 1990 to 43.4 in 2013 (the most recent year in which data are available).[4] According to recent research, this decline is due to the combination of an increased percentage of adolescents who are waiting to have sexual intercourse and the increased use of effective contraceptives by teens.[4,5]

About 77 percent of teen pregnancies are unplanned. In other words, the pregnancies are unwanted or occurred "too soon," according to a national survey of adolescents.[6] In 2013, the majority of pregnancies to adolescent females ages 15-19 in the United States — an estimated 61 percent — ended in a live birth;

Exhibit 152                                                                                      JA-0002561

15 percent ended in a miscarriage; and 25 percent ended in an abortion. The rate of abortions among adolescents is the lowest since abortion was legalized in 1973 and is 76 percent lower than its peak in 1988.[4]

* The teen pregnancy rate is the sum all live births, abortions, and miscarriages (or fetal losses) per 1,000 adolescent females ages 15-19 in a given year.

## Characteristics Associated with Adolescent Childbearing

Numerous individual, family, and community characteristics have been linked to adolescent childbearing. For example, adolescents who are enrolled in school and engaged in learning (including participating in after-school activities, having positive attitudes toward school, and performing well educationally) are less likely than are other adolescents to have a baby.[7] At the family level, adolescents with mothers who gave birth as teens and/or whose mothers have only a high school degree are more likely to have a baby before age 20 than are teens whose mothers were older at their birth or who attended at least some college. In addition, having lived with both biological parents at age 14 is associated with a lower risk of a teen birth.[8] At the community level, adolescents who live in wealthier neighborhoods with strong levels of employment are less likely to have a baby than are adolescents in neighborhoods in which income and employment opportunities are more limited.[7]

---

< Previous: Teen Pregnancy Prevention Program

Next: Negative Impacts of Teen Childbearing >

---

## Footnotes

[1] Centers for Disease Control and Prevention. (2018). Births: Final data for 2016. National Vital Statistics Reports, 67(1). Retrieved from https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_01.pdf - PDF

[2] United Nations Statistics Division. (2015). *Demographic Yearbook 2013*. New York, NY: United Nations. Retrieved from http://unstats.un.org/unsd/demographic/products/dyb/dyb2013/Table10.pdf - PDF

[3] Cook, E. (Unpublished). *Percentage of teens who will experience a first birth based on analyses of NCHS Vital Statistics 2013 final birth data.* Washington, DC: Child Trends.

[4] Kost, K., Maddow-Zimet, I., & Arpaia, A. (2017). *Pregnancies, births and abortions among adolescents and young women in the United States, 2013: National and state trends by age, race and ethnicity.* Guttmacher Institute. Retrieved from https://www.guttmacher.org/sites/default/files/report_pdf/us-adolescent-pregnancy-trends-2013.pdf - PDF

[5] Santelli, J. S., Lindberg, L. D., Finer, L. B., & Singh, S. (2007). Explaining recent declines in adolescent pregnancy in the United States: The contribution of abstinence and improved contraceptive use. *American Journal of Public Health, 97*(1), 150-156.

Exhibit 152                                                                                                  JA-0002562

[6] Centers for Disease Control and Prevention. (2012). *National health statistics reports: Intended and unintended births in the United States: 1982-2010* (No. 55). Retrieved from http://www.cdc.gov/nchs/data/nhsr/nhsr055.pdf - PDF

[7] Kirby, D., & Lepore, G. (2007). *Sexual risk and protective factors: Factors affecting teen sexual behavior, pregnancy, childbearing and sexually transmitted disease.* Washington, DC: ETR Associates and The National Campaign to Prevent Teen and Unplanned Pregnancy. Retrieved from http://recapp.etr.org/recapp/documents/theories/RiskProtectiveFactors200712.pdf - PDF

[8] Centers for Disease Control and Prevention. (2011). Teenagers in the United States: Sexual activity, contraceptive use, and childbearing, 2006-2010 National Survey of Family Growth. *Vital Health Statistics, 23*(31). Retrieved from http://www.cdc.gov/nchs/data/series/sr_23/sr23_031.pdf - PDF

---

Content created by Office of Adolescent Health

Content last reviewed on May 14, 2019



Exhibit 152                                                                                      JA-0002563

**HealthCare**.gov

# Preventive care benefits for children

Most health plans must cover a set of preventive health services for children at no cost. This includes Marketplace and Medicaid coverage.

> **IMPORTANT**
> These services are free only when delivered by a doctor or other provider in your plan's network.

## Coverage for children's preventive health services

All Marketplace health plans and many other plans must cover the following list of preventive services for children without charging you a copayment (/glossary/co-payment) or coinsurance (/glossary/co-insurance). This is true even if you haven't met your yearly deductible (/glossary/deductible).

1. Alcohol, tobacco, and drug use assessments (http://www.healthfinder.gov/HealthTopics/Category/parenting/healthy-communication-and-relationships/talk-to-your-kids-about-tobacco-alcohol-and-drugs) for adolescents

2. Autism screening (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-1-to-4) for children at 18 and 24 months

3. Behavioral assessments for children ages: 0 to 11 months (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-babys-visit-to-the-doctor-ages-0-to-11-months) , 1 to 4 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-1-to-4) , 5 to 10 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-5-to-10) , 11 to 14 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-11-to-14) , 15 to 17 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-teens-visit-to-the-doctor-ages-15-to-17)

4. Bilirubin concentration screening (https://healthfinder.gov/healthtopics/category/parenting/doctor-visits/talk-with-your-doctor-about-newborn-screening#the-basics_1) for newborns

Exhibit 153                                                                                      JA-0002564

5. Blood pressure screening for children ages: 0 to 11 months (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-babys-visit-to-the-doctor-ages-0-to-11-months) , 1 to 4 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-1-to-4) , 5 to 10 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-5-to-10) , 11 to 14 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-11-to-14) , 15 to 17 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-teens-visit-to-the-doctor-ages-15-to-17)

6. Blood screening (https://healthfinder.gov/healthtopics/category/parenting/doctor-visits/talk-with-your-doctor-about-newborn-screening#the-basics_1) for newborns

7. Cervical dysplasia screening (http://healthfinder.gov/HealthTopics/Category/doctor-visits/screening-tests/get-tested-for-cervical-cancer) for sexually active females

8. Depression screening (http://healthfinder.gov/HealthTopics/Category/doctor-visits/screening-tests/get-your-teen-screened-for-depression) for adolescents beginning routinely at age 12

9. Developmental screening (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/watch-for-signs-of-speech-or-language-delay) for children under age 3

10. Dyslipidemia screening for all children once between 9 and 11 years and once between 17 and 21 years, and for children at higher risk of lipid disorders ages: 1 to 4 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-1-to-4) , 5 to 10 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-5-to-10) , 11 to 14 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-11-to-14) , 15 to 17 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-teens-visit-to-the-doctor-ages-15-to-17)

11. Fluoride chemoprevention supplements (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/take-care-of-your-childs-teeth) for children without fluoride in their water source

12. Fluoride varnish (https://healthfinder.gov/healthtopics/category/parenting/doctor-visits/take-care-of-your-childs-teeth) for all infants and children as soon as teeth are present

13. Gonorrhea preventive medication (http://healthfinder.gov/HealthTopics/Category/pregnancy/doctor-and-midwife-visits/talk-with-your-doctor-about-newborn-screening) for the eyes of all newborns

14. Hearing screening for all newborns (http://healthfinder.gov/HealthTopics/Category/pregnancy/doctor-and-midwife-visits/talk-with-your-doctor-about-newborn-screening) ; and for children once between 11 and 14 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-

Exhibit 153

JA-0002565

ages-11-to-14) , once between 15 and 17 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-teens-visit-to-the-doctor-ages-15-to-17) , and once between 18 and 21 years

15. Height, weight and body mass index (BMI) measurements for children ages: 0 to 11 months (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-babys-visit-to-the-doctor-ages-0-to-11-months) , 1 to 4 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-1-to-4) , 5 to 10 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-5-to-10) , 11 to 14 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-11-to-14) , 15 to 17 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-teens-visit-to-the-doctor-ages-15-to-17)

16. Hematocrit or hemoglobin screening (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-1-to-4) for all children

17. Hemoglobinopathies or sickle cell screening (http://healthfinder.gov/HealthTopics/Category/pregnancy/doctor-and-midwife-visits/talk-with-your-doctor-about-newborn-screening) for newborns

18. Hepatitis B screening (http://www.uspreventiveservicestaskforce.org/Page/Document/UpdateSummaryFinal/hepatitis-b-virus-infection-screening-2014?ds=1&s=adolescent) (https://www.healthcare.gov/links-to-other-sites/) for adolescents at high risk, including adolescents from countries with 2% or more Hepatitis B prevalence, and U.S.-born adolescents not vaccinated as infants and with at least one parent born in a region with 8% or more Hepatitis B prevalence: 11–17 years

19. HIV screening (http://healthfinder.gov/HealthTopics/Category/health-conditions-and-diseases/hiv-and-other-stds/get-tested-for-hiv) for adolescents at higher risk

20. Hypothyroidism screening (http://healthfinder.gov/HealthTopics/Category/pregnancy/doctor-and-midwife-visits/talk-with-your-doctor-about-newborn-screening) for newborns

21. Immunization vaccines (http://healthfinder.gov/HealthTopics/Category/doctor-visits/shotsvaccines/get-your-childs-shots-on-schedule) for children from birth to age 18 — doses, recommended ages, and recommended populations vary:

  ○ Diphtheria (http://www.vaccines.gov/diseases/diphtheria/index.html) , Tetanus (http://www.vaccines.gov/diseases/tetanus/index.html) , Pertussis (Whooping Cough) (http://www.vaccines.gov/diseases/pertussis/index.html)

  ○ Haemophilus influenza type b (http://www.vaccines.gov/diseases/hib/index.html)

  ○ Hepatitis A (http://www.vaccines.gov/diseases/hepatitis_a/index.html)

  ○ Hepatitis B (http://www.vaccines.gov/diseases/hepatitis_b/index.html)

  ○ Human Papillomavirus (HPV) (http://www.vaccines.gov/diseases/hpv/index.html)

Exhibit 153    JA-0002566

- Inactivated Poliovirus (http://www.vaccines.gov/diseases/polio/index.html)

- Influenza (flu shot) (http://www.vaccines.gov/diseases/flu/index.html)

- Measles (http://www.vaccines.gov/diseases/measles/index.html)

- Meningococcal (http://www.vaccines.gov/diseases/meningitis/index.html)

- Pneumococcal (http://www.vaccines.gov/diseases/pneumonia/index.html)

- Rotavirus (http://www.vaccines.gov/diseases/rotavirus/index.html)

- Varicella (Chickenpox) (http://www.vaccines.gov/diseases/chickenpox/index.html)

22. Iron supplements (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-babys-visit-to-the-doctor-ages-0-to-11-months) for children ages 6 to 12 months at risk for anemia

23. Lead screening (https://healthfinder.gov/healthtopics/category/parenting/safety/protect-your-family-from-lead) for children at risk of exposure

24. Maternal depression screening for mothers of infants at 1, 2, 4, and 6-month visits (https://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-babys-visit-to-the-doctor-ages-0-to-11-months#the-basics_1)

25. Medical history for all children throughout development ages: 0 to 11 months (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-babys-visit-to-the-doctor-ages-0-to-11-months), 1 to 4 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-1-to-4), 5 to 10 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-5-to-10), 11 to 14 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-11-to-14), 15 to 17 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-teens-visit-to-the-doctor-ages-15-to-17)

26. Obesity screening and counseling (http://healthfinder.gov/HealthTopics/Category/parenting/nutrition-and-physical-activity/help-your-child-stay-at-a-healthy-weight)

27. Oral health risk assessment for young children ages: 0 to 11 months (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-babys-visit-to-the-doctor-ages-0-to-11-months), 1 to 4 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-1-to-4), 5 to 10 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-5-to-10)

28. Phenylketonuria (PKU) screening (http://healthfinder.gov/HealthTopics/Category/pregnancy/doctor-and-midwife-visits/talk-with-your-doctor-about-newborn-screening) for newborns

29. Sexually transmitted infection (STI) prevention counseling and screening (http://healthfinder.gov/healthtopics/category/health-conditions-and-diseases/hiv-and-other-stds) for adolescents at

Exhibit 153

JA-0002567

higher risk

30. Tuberculin testing for children at higher risk of tuberculosis ages: 0 to 11 months (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-babys-visit-to-the-doctor-ages-0-to-11-months) , 1 to 4 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-1-to-4) , 5 to 10 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-5-to-10) , 11 to 14 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-11-to-14) , 15 to 17 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-teens-visit-to-the-doctor-ages-15-to-17)

31. Vision screening (http://healthfinder.gov/HealthTopics/Category/doctor-visits/screening-tests/get-your-childs-vision-checked) for all children

# More information about preventive services for children

- Preventive services for children age 0 to 11 months (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-babys-visit-to-the-doctor-ages-0-to-11-months)

- Preventive services for children age 1 to 4 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-1-to-4)

- Preventive services for children age 5 to 10 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-5-to-10)

- Preventive services for children age 11 to 14 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-childs-visit-to-the-doctor-ages-11-to-14)

- Preventive services for children age 15 to 17 years (http://healthfinder.gov/HealthTopics/Category/parenting/doctor-visits/make-the-most-of-your-teens-visit-to-the-doctor-ages-15-to-17)

# More on prevention

- Learn more about preventive care from the CDC (http://www.cdc.gov/prevention/) .

Exhibit 153

JA-0002568

- See preventive services covered for adults (/preventive-care-adults/) and women (/preventive-care-women/).

- Learn more about what else Marketplace health insurance plans cover. (/coverage/what-marketplace-plans-cover/)

# Can we improve this page?

中文 (/LANGUAGE-RESOURCE/#CHINESE) | KREYÒL (/LANGUAGE-RESOURCE/#CREOLE) | FRANÇAIS (/LANGUAGE-RESOURCE/#FRENCH) |

DEUTSCH (/LANGUAGE-RESOURCE/#GERMAN) | ગુજરાતી (/LANGUAGE-RESOURCE/#GUJARATI) | हिंदी (/LANGUAGE-RESOURCE/#HINDI) | ITALIANO

(/LANGUAGE-RESOURCE/#ITALIAN) | 日本語 (/LANGUAGE-RESOURCE/#JAPANESE) | 한국어 (/LANGUAGE-RESOURCE/#KOREAN) | POLSKI

(/LANGUAGE-RESOURCE/#POLISH) | PORTUGUÊS (/LANGUAGE-RESOURCE/#PORTUGUESE) | РУССКИЙ (/LANGUAGE-RESOURCE/#RUSSIAN) |

ESPAÑOL (/LANGUAGE-RESOURCE/#SPANISH) | TAGALOG (/LANGUAGE-RESOURCE/#TAGALOG) | TIẾNG VIỆT (/LANGUAGE-

RESOURCE/#VIETNAMESE)

A federal government website managed and paid for by the U.S. Centers for Medicare & Medicaid Services. 7500 Security Boulevard, Baltimore, MD 21244

Exhibit 153

JA-0002569

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## 42 CFR Part 59

[HHS–OS–2018–0008]

RIN 0937–ZA00

## Compliance With Statutory Program Integrity Requirements

**AGENCY:** Office of the Assistant Secretary for Health, Office of the Secretary, HHS. Department of Health and Human Services.

**ACTION:** Final rule.

**SUMMARY:** The Office of Population Affairs (OPA), in the Office of the Assistant Secretary for Health, issues this final rule to revise the regulations that govern the Title X family planning program (authorized by Title X of the Public Health Service Act) to ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning and related statutory requirements. Accordingly, OPA amends the Title X regulations to clarify grantee responsibilities under Title X, to remove the requirement for nondirective abortion counseling and referral, to prohibit referral for abortion, and to clarify compliance obligations with state and local laws. In addition, Title X regulations are amended to clarify access to family planning services where an employer exercises a religious or moral objection. Finally, Title X regulations are amended to require physical and financial separation to ensure clarity regarding the purpose of Title X and compliance with statutory program integrity provisions, and to encourage family participation in family planning decisions, as required by Federal law.

**DATES:** *Effective date:* This rule is effective on May 3, 2019.

*Compliance date:* Compliance with the physical separation requirements contained in § 59.15, is required March 4, 2020.

Compliance with the financial separation requirements contained in § 59.15 is required by July 2, 2019. Until that date, the Department will expect grantees to comply with either § 59.15 or the "Separation" section of the guidance at 65 FR 41281, 41282.

Compliance with §§ 59.7 and 59.5(a)(13) is required by July 2, 2019.

Compliance for reporting, assurance, and provision of service in §§ 59.5(a)(12) and (13) as it applies to all required reports, 59.5(a)(14), (b)(1) and

(8), 59.13, 59.14, 59.17, and 59.18 is required by July 2, 2019.

Compliance for all other requirements of this final rule is required by the effective date, that is, by May 3, 2019.

**FOR FURTHER INFORMATION CONTACT:** The Office of the Assistant Secretary for Health (OASH) at (202) 690–7694, *ASH@hhs.gov,* or by mail at 200 Independence Avenue SW, Washington, DC 20201

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary and Background
  A. Executive Summary
  1. Purpose
  2. Summary of the Major Provisions
  a. Clear Financial and Physical Separation
  b. Ensure Transparency for Legal and Ethical Use of Taxpayer Dollars Among Subrecipients
  c. Nondirective Pregnancy Counseling Permitted, Not Required
  d. Referral for Abortion as a Method of Family Planning Prohibited, No Longer Required
  e. Sexual Abuse Reporting Requirements Training and Protocols
  f. Family Participation in Family Planning Decisionmaking
  g. Expanded Review and Selection Criteria
  h. Formal Revocation of Compliance With Title X Requirements by Project Recipients in Selecting Subrecipients Rule
  3. Summary of Costs, Savings and Benefits of the Major Provisions
  B. Background
II. Statutory Authority, Overview, Analysis, and Response to Public Comments
  A. General Comments
  B. To what programs do these regulations apply? (42 CFR 59.1)
  C. Definitions (42 CFR 59.2)
  1. Definition of Advanced Practice Provider
  2. Definition of Family Planning
  3. Definition of Grantee
  4. Definition of Low Income Family
  5. Definition of Program or Project
  6. Definition of Subrecipient
  D. Who is eligible to apply for a family planning services grant or contract? (42 CFR 59.3)
  E. What requirements must be met by a family planning project? (42 CFR 59.5)
  1. Broad Range of Acceptable and Effective Family Planning Methods (42 CFR 59.5(a)(1))
  a. Acceptable and Effective Methods and Services
  b. Projects Required To Provide a Broad Range of Family Planning Methods and Services, But Participating Entities May Offer a Limited Number of Family Planning Methods and Services
  c. Listing Particular Services in the Broad Range of Family Planning Services That May Be Provided
  2. Projects Shall Not Provide, Promote, Refer For, or Support Abortion as a Method of Family Planning (42 CFR 59.5(a)(5))
  3. Removal of the Requirement for Consultation (42 CFR 59.5(a)(10))
  4. Promotion of Access to Comprehensive Primary Health Services (42 CFR 59.5(a)(12))
  5. Title X Transparency (42 CFR 59.5(a)(13)
  6. Encouragement of Family Participation (42 CFR 59.5(a)(14))
  7. Provide for Medically Necessary Services (42 CFR 59.5(b)(1))
  8. Provide for Coordination and Referral, Consistent With Prohibition on Referral for Abortion (42 CFR 59.5(b)(1))
  F. Criteria for Selection of Grantees (42 CFR 59.7)
  G. Confidentiality (42 CFR 59.11)
  H. Standards of Compliance With Prohibition on Abortion (42 CFR 59.13)
  I. Requirements and Limitations With Respect to Post-Conception Activities (42 CFR 59.14)
  1. Prohibition on Referral For, and Encouragement, Promotion, Advocacy, Support, and Assistance of, Abortion as a Method of Family Planning (42 CFR 59.14(a), 59.5(a)(5), and 59.16(a))
  2. Information About Prenatal Care, Use of Permitted Information To Refer for Abortion, and Examples (42 CFR 59.14(b)(1), (c), and (e))
  3. Emergency Care and Medically Necessary Information (42 CFR 59.14(b)(2) and 59.14(d))
  J. Maintenance of Physical and Financial Separation (42 CFR 59.15)
  K. Prohibition on Activities That Encourage, Promote or Advocate for Abortion (42 CFR 59.16)
  L. Compliance With Reporting Requirements (42 CFR 59.17)
  M. Appropriate Use of Funds (42 CFR 59.18)
  N. Transition Provisions (42 CFR 59.19)
III. Economic/Regulatory Impact and Paperwork Burden
  A. Introduction and Summary
  1. Executive Orders 12866 and 13563 and the Congressional Review Act
  2. Regulatory Flexibility Act (RFA)
  3. Unfunded Mandates Reform Act
  4. Federalism
  5. Summary of the Final Rule
  B. Analysis of Economic Impacts
  1. Need for Regulatory Action
  2. Affected Entities
  3. Estimated Costs
  a. Learning the Rule's Requirements
  b. Training
  c. Assurance Submissions
  d. Documentation of Compliance
  e. Monitoring and Enforcement
  f. Physical Separation
  g. Encouraging Parental Involvement in Family Planning Services
  4. Estimated Benefits
  a. Upholding and Preserving the Purpose and Goals of the Title X Program
  b. Patient/Provider Benefits and Protections
  C. Analysis of Regulatory Alternatives
  D. Executive Order 13771
  E. Regulatory Flexibility Analysis
  F. Assessment of Federal Regulation and Policies on Families
  G. Paperwork Reduction Act

Exhibit 154

JA-0002570

## I. Executive Summary and Background

### A. Executive Summary

#### 1. Purpose

The primary purpose of this rule is to finalize, with changes in response to public comments, revisions to the Title X family planning regulations proposed on June 1, 2018.[1] This rule, promulgated pursuant to the Department's authority,[2] will ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning, as well as related statutory requirements. In addition, the rule ensures that grantee responsibilities, referral requirements, and documentation obligations are clear under the Title X program. The rule also clarifies that provision of family planning services under Title X may be available under the good reason exception at the discretion of the project director for women denied coverage for contraceptives if the sponsor of their health plan exercises a religious or moral exemption recognized by the Department.[3] The rule protects vulnerable populations by ensuring Title X providers comply with State reporting requirements. And, consistent with Federal law, the rule encourages family participation in family planning decisions of minors except where the minor is or may be the victim of child abuse or incest. To ensure the best applicants are chosen, the rule expands review and selection criteria to include provisions that will help evaluate applicants' adherence to statutory requirements and goals. In addition, the rule formally repeals the 2016 amendments to the Title X eligibility requirements, which were nullified by a joint resolution of disapproval, under the Congressional Review Act, signed by the President. This rule will protect the integrity of the Title X program, pursuant to congressional purpose, to offer a broad range of family planning methods and services and improve the quality of programs that specifically provide support in this area.

#### 2. Summary of the Major Provisions

##### a. Clear Financial and Physical Separation

This rule finalizes requirements that ensure clear physical and financial separation between a Title X program and any activities that fall outside the program's scope. This physical and financial separation will ensure compliance with the statutory requirement that Title X funding not support programs where abortion is a method of family planning—and is consistent with the plain text of Section 1008, legislative history, and case law. In particular, the rule protects against the intentional or unintentional co-mingling of Title X resources with non-Title X resources or programs by amending the Department's regulation finalized on July 3, 2000, (the "2000 regulations"), which required no physical separation and only limited financial separation.[4] This rule will require Title X providers to maintain physical and financial separation from locations which provide abortion as a method of family planning.

Together, these changes address several concerns of the Department. They address concerns over the fungibility of Title X resources and the potential use of Title X resources to support programs where, among other things, abortion is a method of family planning. They address the potential for ambiguity between approved Title X activities and non-Title X activities and services, which creates significant risk for public confusion over the scope of Title X services, including whether Title X funds are allocated for, or spent on, non-Title X services, including abortion-related purposes. And they address the concern that Title X resources could facilitate the development of, and ongoing use of, infrastructure for non-Title X activities. The Department seeks to protect Title X (and Title X funds) as the only discrete, domestic, Federal grant program focused solely on the provision of cost-effective family planning methods and services. The final rule thus requires physical and financial separation to protect the statutory integrity of the Title X program, to eliminate the risk of co-mingling or misuse of Title X funds, and to prevent the dilution of Title X resources.

##### b. Ensure Transparency for Legal and Ethical Use of Taxpayer Dollars Among Subrecipients

This rule facilitates the legal and ethical use of taxpayer dollars by implementing reporting requirements with respect to the use of Title X funds. The 2000 regulations do not require grantees to submit significant information to the government about their subrecipients, referral agencies, or other partners to whom Title X funds may flow. This lack of reporting can be a significant barrier to the Department's ability to ensure Title X funds are directed only to Title X activities. Accordingly, the final rule requires that Title X grant applicants include, as part of their applications, a list of all planned subrecipients, detailed descriptions of the extent of services and collaboration with subrecipients, and a clear explanation of how the applicant, if successful, would conduct an oversight program with respect to its subrecipients.[5] The final rule defines a subrecipient as any entity that provides family planning services with Title X funds under a written agreement with a grantee or another subrecipient. Consistent with grant reporting requirements, grantees must regularly report and demonstrate their own compliance, as well as ensure the compliance of their subrecipients with all statutory and regulatory requirements. The Department will also require grantees to establish a plan to ensure that they and their subrecipients comply with all applicable State reporting requirements of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, and human trafficking, adequately train staff regarding such requirement and include protocols that ensure such minors are provided counseling on how to resist attempts to coerce them into engaging in sexual activities; and will commit to preliminary screening of such minors. The final rule establishes that the continuation of funding for grantees and subrecipients is contingent on their demonstration to the satisfaction of the Secretary that the statutory and regulatory requirements of Title X have been met. To ensure proper accounting of Title X funds, the Secretary may

---

[1] See Compliance with Statutory Program Integrity Requirements, 83 FR 25502 (proposed June 1, 2018) (to be codified at 42 CFR part 59).

[2] For a detailed discussion regarding statutory authority, see infra Section II. Statutory Authority, Overview, Analysis, and Response to Public Comments.

[3] See Religious exemptions in connection with coverage of certain preventive services, 45 CFR 147.132 (2019); see also Moral exemptions in connection with coverage of certain preventive health services, 45 CFR 147.133 (2019).

[4] See Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 42 CFR part 59, which omit any mention of physical or financial separation; see also Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 FR 41270, 41275–41276 (July 3, 2000) where the Department discusses its decision in the 2000 regulation to require financial separation, while choosing to not require physical separation.

[5] To further ensure program transparency (and ensure a seamless continuum of care), applicants and grantees are also required to provide certain information about agencies or individuals providing referral services and their collaborations with such referral agencies and individuals.

Exhibit 154                                                                                                JA-0002571

review grantee and subrecipient records to ensure regulatory compliance.

To increase program integrity, the Department will also increase various monitoring and reporting requirements. Under the final rule, grantees will be required to receive approval for any change in the use of grant funds, and to fully account for and justify charges against the Title X grant. The final rule will also increase monitoring requirements to better ensure appropriate billing practices. And because the 2000 regulations offer scant guidance on the Anti-lobbying Act and appropriations law provisions applicable to Title X, this final rule will require Title X grantees to provide assurances satisfactory to the Secretary that they both understand and agree to the prohibition against lobbying and political activity in the Title X project.

The Department believes that these changes will ensure that OPA has the information necessary to determine whether Title X projects, grantees, and subrecipients are compliant with the statutory and regulatory provisions applicable to the program.

c. Nondirective Pregnancy Counseling Permitted, Not Required

This rule finalizes several regulatory provisions designed to ensure that the requirements of the Title X regulations are consistent with certain laws that protect the conscience rights of individuals and entities who decline to perform, participate in, or refer for, abortions. The 2000 regulations require Title X projects to provide abortion referral[6] and nondirective counseling on abortion, if requested. The Department believes this requirement is inconsistent with federal conscience laws and, as discussed below with respect to the referral provision, also violates Section 1008. With respect to conscience, the regulatory requirement to counsel on abortion, if requested, conflict with HHS enforced statutes protecting conscience in health care, including the Church Amendment,[7]

Coats-Snowe Amendment[8] and the Weldon Amendment[9] for individual and institutional entities who object. The Department acknowledged this conflict in the 2008 conscience regulations, stating that its "current regulatory requirement that grantees must provide counseling and referrals for abortion upon request . . . is inconsistent with the health care provider conscience protection statutory provisions and this regulation." Ensuring that Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law, 73 FR 78072, 78087 (Dec. 19, 2008). The proposed rule in this rulemaking similarly recognized the ongoing conflict between the 2000 regulation and conscience protections. In the 2008 provider conscience regulation, the Department stated that OPA was "aware of this conflict with the statutory requirements [of the Church, Coats-Snowe, and Weldon Amendments] and, as such, would not enforce this Title X regulatory requirement on objecting grantees or applicants," *id.*, but was unable to directly address the Title X requirements, given the rulemaking context. The Department believes that it is appropriate and necessary to revise the Title X regulatory text to eliminate the provisions which are inconsistent with the health care conscience statutory provisions.[10]

---

[8] The Coats-Snowe Amendment bars the federal government and any State or local government that receives federal financial assistance from discriminating against a health care entity, as that term is defined in the Amendment, who refuses, among other things, to provide referrals for induced abortions. *See* 42 U.S.C. 238n(a).

[9] The Weldon Amendment was added to the annual 2005 health spending bill and has been included in subsequent appropriations bills. *See* Consolidated Appropriations Act, 2018, Public Law 115–141, Div. H, sec. 507(d), 132 Stat. 348, 764; Consolidated Appropriations Act, 2017, Public Law 115–31, Div. 507(d), 131 Stat. 135, 562. The Weldon Amendment bars the use of appropriated funds on a federal agency or programs, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not, among other things, refer for abortions.

[10] In the preamble to the 2000 regulations, the Department addressed a comment that the requirement to provide options counseling "should not apply to employees of a grantee who object to providing such counseling on moral or religious grounds," and rejected it, contending that it is not necessary because, under the Church Amendments, "grantees may not require individual employees who have such objections to provide such counseling," but "in such cases the grantees must make other arrangements to ensure that the service is available to Title X clients who desire it." 65 FR 41270, 41274 (July 3, 2000). But the evidence collected in the Department's 2018 conscience proposed rule, 83 FR 25502, 25506 (June 1, 2018), suggests that neither grantees nor their employees may know of the requirements of the Church

Under the final rule, the Title X regulations no longer require pregnancy counseling, but permits the use of Title X funds in programs that provide pregnancy counseling, so long as it is nondirective. Nondirective pregnancy counseling is the meaningful presentation of options where the physician or advanced practice provider (APP)[11] is "not suggesting or advising one option over another." 138 Cong. Rec. H2822, H2826, 1992 WL 86830. Section 1008 and its legislative history offers additional clarity specifically as to abortion, where the physician or APP cannot engage in "promoting, encouraging, or advocating abortion." *Id.* at H2829. Nondirective counseling does not mean that the counselor is uninvolved in the process or that counseling and education offer no guidance, but instead that clients take an active role in processing their experiences and identifying the direction of the interaction. In nondirective counseling, the Title X physicians and APPs promote the client's self-awareness and empower the client to be informed about a range of options, consistent with the client's expressed need and with the statutory and regulatory requirements governing the Title X program. In addition, the Title X provider may provide a list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), some (but not the majority) of which may provide abortion in addition to comprehensive primary care.

Accordingly, this final rule eliminates the abortion counseling requirements in the 2000 regulations, consistent with the Department's interpretation of federal conscience laws and Section 1008. This rule continues to allow nondirective pregnancy counseling, as discussed in more detail below.

---

Amendment. More importantly, the Department's 2000 analysis failed to consider that the Coats-Snowe Amendment (and the subsequently passed Weldon Amendment) protects institutional health care providers from discrimination by federal programs, including Title X, on the basis of their refusal to counsel or refer for abortion and, thus, that "under section 245 of the Public Health Service Act and the Weldon Amendment, the Department cannot . . . enforce 42 CFR 59.5(a)(5) against an otherwise eligible grantee or applicant who objects to the requirement to counsel on or refer for, abortion." 73 FR at 78088.

[11] Under this final rule, nondirective counseling may be provided by physicians and advanced practice providers. As discussed in detail below, the final rule defines "advanced practice providers" as including physician assistants and advanced practice registered nurses.

---

[6] Referral for abortion is discussed in the next section.

[7] The Church Amendments, among other things, prohibit certain HHS grantees from discriminating in the employment of, or the extension of staff privileges to, any health care professional because they refused, because of their religious beliefs or moral convictions, to perform or assist in the performance of any lawful sterilization or abortion procedures. The Church Amendments also prohibit individuals from being required to perform or assist in the performance of any health service program or research activity funded in whole or in part under a program administered by the Secretary contrary to their religious beliefs or moral convictions. *See* 42 U.S.C. 300a–7.

Exhibit 154

### d. Referral for Abortion as a Method of Family Planning Prohibited, No Longer Required

This rule finalizes the revocation of the requirement that Title X projects refer for abortion, and finalizes the prohibition against using Title X funds to refer for abortion as a method of family planning, or to perform, promote, or support abortion as a method of family planning. Although the 2000 regulations require Title X programs to refer for abortion when requested by a client,[12] the Department no longer believes that the requirement is appropriate or permissible. Like the counseling requirement, the Department believes the referral requirement is in conflict with federal conscience protections, such as the Church, Coats-Snowe, and Weldon Amendments, for individual and institutional entities which object, and is finalizing the proposal to remove that requirement from the regulations. Furthermore, the Department believes that, in most instances when a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning. The Department believes both the referral for abortion as a method of family planning, and such abortion procedure itself, are so linked that such a referral makes the Title X project or clinic a program one where abortion is a method of family planning, contrary to the prohibition against the use of Title X funds in such programs. The Department, thus, views such abortion referrals in the Title X project as a violation of Section 1008, which prohibits the use of Title X funds in programs where abortion is a method of family planning. *See* 42 U.S.C. 300a–6. Even if the referral requirement was not in tension with these statutes, the Department believes that such a requirement may deter qualified providers from applying for Title X grants or participating in Title X projects, and may introduce ambiguity about the use of Title X funds to support abortion as a method of family planning. Accordingly, this final rule removes the requirement that Title X funded entities refer for abortion, and prohibits Title X projects from referring for abortion as a method of family planning, or from performing, promoting, referring for, or supporting abortion as a method of family planning.

### e. Sexual Abuse Reporting Requirements Training and Protocols

This rule finalizes the requirement that Title X programs and providers comply with State and local sexual abuse reporting requirements, as well as the requirement for training and clinic protocols on such requirements and related issues, to ensure that Title X providers meet the applicable statutory and regulation reporting requirements of the Title X program and treat the survivors of sexual abuse and assault with dignity and compassion, without hindering State and local efforts to prevent sexual abuse.[13] Section 59.11 of the 2000 regulations, on the confidentiality of Title X records, provides that personal information may not be disclosed absent consent by the individual, except to provide treatment, or as required by law, "with appropriate safeguards for confidentiality." *See* 42 CFR 59.11. To ensure that Title X grantees and subrecipients comply with applicable reporting requirements, the Department clarifies in this final rule that concerns about confidentiality of information may not be used as a rationale for noncompliance with such reporting laws.

As established in § 59.17 of this final rule, Title X providers are required to comply with all State and local laws regarding notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, or human trafficking. The 2000 regulations permit the use of confidential information obtained by project staff to comply with State and local reporting requirements,[14] but do not expressly address the appropriations law requirement to report certain crimes, nor impose a federal obligation on Title X grantees and subrecipients to comply with State reporting or notification requirements. The final rule clarifies that Title X grantees and subrecipients must comply with State and local laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, and/or human trafficking. To ensure compliance with that obligation and to ensure the appropriate care for such patients, their safety, and their personal empowerment, the final rule requires Title X grantees and subrecipients to have in place a plan to implement the specific reporting requirements that apply to them in their State (or jurisdiction), as well as to provide for annual training for all personnel with respect to these requirements, how such reports are to be made, and appropriate interventions, strategies, and referrals.

As part of prevention, protection, and risk assessment efforts, grantees and subrecipients are required to include in such plans, protocols to identify individuals who are victims of sexual abuse or targets for underage sexual victimization and to ensure that every minor who presents for treatment is provided counseling on how to resist attempts to coerce minors into engaging in sexual activities.[15] Title X projects are also required, under this final rule, to conduct a preliminary screening of any minor who presents with an STD, pregnancy, or suspicion of abuse, in order to rule out victimization of the minor. Section 59.17 requires grantees and subrecipients to maintain records that would identify, among other things, the age of any minor clients served, the age of their sexual partner(s) where required by State law, and what reports or notifications were made to appropriate State agencies. The Department will use this documentation to ensure appropriate compliance with State notification laws.

### f. Family Participation in Family Planning Decisionmaking

This rule finalizes requirements that Title X providers encourage appropriate family participation in family planning decisions, as required by Federal law.[16] The Title X statute itself requires the encouragement of such family

---

[12] *See* 42 CFR 59.5; 65 FR 41270, 41278 (July 3, 2000).

[13] *See* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Public Law 115–245, Div. B, sec. 208, 132 Stat. 2981, 3070 ("HHS Appropriations Act 2019") (emphasizing the Congressional expectation that "Notwithstanding any other provision of law, no provider of services under title X of the PHS Act shall be exempt from any State law requiring notification or the reporting of child abuse, child molestation, sexual abuse, rape, or incest.").

[14] *See* 42 CFR 59.11.

[15] The annual appropriations laws also impose on Title X recipients the obligation to provide "counseling to minors on how to resist attempt to coerce minors into engaging in sexual activities." *See* HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. 2981, 3070; Consolidated Appropriations Act, 2018, Public Law 115–141, Div. H, sec. 207, 132 Stat. 348, 736; Consolidated Appropriations Act, 2017, Public Law 115–31, Div. H, sec. 207, 131 Stat. 135, 538; Consolidated Appropriations Act, 2016, Public Law 114–113, Div. H, sec. 207, 129 Stat 2242, 2620. Such requirement is also consistent with Title X's direction to provide special services for adolescents.

[16] Title X requires that, "[t]o the extent practical, entities which receive grants or contracts under this subsection shall encourage family [sic] participation in projects under this subsection." 42 U.S.C. 300(a). Congress also includes a rider in HHS's annual appropriations act that provides that "[n]one of the funds appropriated in this Act may be made available to any entity under title X of the PHS Act unless the applicant for the award certifies to the Secretary that it encourages family participation in the decision of minors to seek family planning services." HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. 2981, 3070; Consolidated Appropriations Act 2018, Public Law 115–141, Div. H, sec. 207, 132 Stat. 348, 736.

Exhibit 154

JA-0002573

participation to the extent practical,[17] and the Department will continue to enforce compliance with this provision. An appropriations rider specifically emphasizes that grantees encourage family participation "in the decision of minors to seek family planning services." [18] Accordingly, to ensure compliance with these requirements and the policy underlying them, the Department will also require specific recordkeeping with respect to such encouragement for minors. To ensure compliance with the requirement that Title X projects encourage family participation in the decision of minors to seek family planning services, § 59.5(a)(14) requires Title X projects to document in each minor's medical records the specific actions taken to encourage such family participation or the specific reason why such family participation was not encouraged. Consistent with the revision to the unemancipated minor example in the definition of "low income family" that the Department finalizes in this rule, documentation of such encouragement is not required if the Title X provider documents in the medical record that (1) the minor is suspected to be the victim of child abuse or incest and (2) it has, if permitted or required by applicable State or local law, reported the situation to the relevant authorities. These requirements are sensitive to confidentiality issues as well as reporting requirements for abuse.

g. Expanded Review and Selection Criteria

This rule updates and expands the review and scoring criteria applicable to grant applications, to ensure the criteria serve as a meaningful instrument to assess the quality of the applicant and the application. The 2000 Title X regulations set forth application review criteria that give the Department significant flexibility in determining awards but lack rigor, making it possible for less qualified applicants to garner high scores and affording the Department little help in selecting strong Title X grantees. The amended and revised § 59.7 ensures that successful applicants both meet the statutory requirements of the Title X program and are adequately responsive to the statutory goals and purposes of the Title X program. Under this rule, any grant application that does not clearly address how the proposal will satisfy the requirements of the rule would not proceed to the competitive review process, but would be deemed ineligible for funding.

The Department will explicitly summarize each requirement of the Title X regulations (or include the entire regulation) within the Funding Announcement and will require applicants to describe how they affirmatively comply, or would affirmatively comply with each provision. Once an applicant successfully demonstrates such affirmative compliance with the Title X regulations (a yes/no issue), the Department will consider each applicant competitively according to the criteria set forth in the regulation. The first criterion ensures that the project offers a broad range of acceptable and effective family planning methods and services and does not use abortion as a method of family planning. The second criterion looks at the relative need of the applicant and whether the applicant will make rapid and effective use of the funds. The third criterion takes into account the number of patients being served, while also considering the availability of family planning services in the proposed area. The fourth criterion considers the extent to which the services are needed in that local area and if the applicant proposes innovative ways to provide services to unserved or underserved patients. These provisions better achieve the statutory requirements and goals of Title X and increase competition and rigor among applicants, encouraging broader and more diverse applicants and better ensuring the selection of quality applicants.

h. Formal Revocation of Compliance with Title X Requirements by Project Recipients in Selecting Subrecipients

This rule formally revokes the 2016 amendments to the Title X eligibility requirements. In 2016, the Department finalized a rule that amended Title X eligibility requirements, prohibiting any grantee/recipient making service subawards as part of its Title X project, from excluding an entity from receiving a subaward for reasons other than its ability to provide Title X services. Compliance With Title X Requirements by Project Recipients in Selecting Subrecipients, 81 FR 91852, 91859–91860 (Dec. 19, 2016) (adding paragraph (b) to 45 CFR 59.3) (the "2016 regulation"). The Department's stated reason for issuing the rule was to respond to new approaches to competing or distributing Title X funds that were being employed by several States. *Id.* at 91858–91859. The 2016 regulation took effect on January 18, 2017, but was nullified under the Congressional Review Act on April 13, 2017, when the President signed House Joint Resolution 43. *See* Public Law 115–23, 131 Stat. 89. Consistent with the joint resolution of disapproval, this rule repeals the 2016 regulation and, thus, permits States and other Title X grantees freely to select Title X subrecipients so long as they comply with the statutory, regulatory, and policy provisions in the funding announcement.

3. Summary of Costs, Savings and Benefits of the Major Provisions

| Provision | Savings and benefits | Costs |
|---|---|---|
| Clear Financial and Physical Separation ........... | The purpose of this provision is to ensure that the regulatory language is consistent with Section 1008 of the Public Health Service Act. The Department estimates no specific economic savings from finalizing this part of the rule. However, the Department expects the quality of Title X services to improve as Title X funds are focused and prioritized according to the statutory parameters. | The Department estimates that there will be transition costs where certain other programs that shared facilities with Title X programs must now establish separate physical facilities. After receiving public comments, the Department estimates physical compliance costs of $36.08 million. |

[17] The Department notes that, although section 1001 of the PHS Act states that "[t]o the extent *practicable*, entities which receive grants or contracts under this subsection shall encourage family participation in projects assisted under this subsection," PHS Act § 1001(a), in the U.S. Code, 42 U.S.C. 300(a), the word "practical" is used in the provision. The Department believes that the two words are intended to have the same meaning and uses the two words interchangeably when discussing the statutory requirement.

[18] *See* HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. 2981, 3070.

Exhibit 154

| Provision | Savings and benefits | Costs |
|---|---|---|
| Ensure Transparency for Legal and Ethical Use of Taxpayer Dollars among Subrecipients. | The purpose of this provision is to ensure that Title X funds are allocated and accounted for both by Title X grantees and by the Department. The Department estimates no specific cost savings from finalizing this part of the Rule. However, the Department expects that enhanced accounting and monitoring will result in more effective use of Title X resources. | The Department estimates, in part based on public comments, that the cost of implementing additional reporting and training requirements will be $8.53 million. Medical and health services managers will spend an average of four hours each year to complete reports regarding information related to subrecipients, and referral agencies and individuals involved in the grantee's Title X project at each grantee and subrecipient. The labor cost will be $254,000 each year ($52.58 per hour × 4 hours × 1,208 grantees and subrecipients). |
| Nondirective Pregnancy Counseling Permitted, Not Required. | The purpose of this provision is to remove the requirement that providers provide pregnancy counseling, particularly, abortion counseling. Eliminating the requirement to counsel for abortion, and allowing non-directive pregnancy counseling in general, will relieve burdens by giving projects flexibility, and relieve burdens on conscience that some entities and individuals experienced from complying with the previous requirement, or provide more flexibility for applicants that otherwise might not have applied due to the burdens on conscience of the previous requirement. This rule will also reduce the regulatory burden associated with monitoring and Title X providers for compliance with the abortion counseling requirement. | The Department estimates no costs from finalizing this part of the rule. |
| Abortion Referral Prohibited, No Longer Required. | The purpose of this provision is to remove the requirement for, and institute a prohibition against abortion referral in the Title X program. Eliminating the requirement to refer for abortion will relieve burdens on conscience that some entities and individuals experienced from complying with the previous requirement, and provide more flexibility for applicants that otherwise might not have applied due to the burdens on conscience of the previous requirement. This rule will also reduce the regulatory burden associated with monitoring and regulating Title X providers for compliance with the abortion referral requirement. | The Department estimates no costs associated with removing the requirement for abortion referral. The addition of a prohibition against abortion referral will involve no additional monitoring costs, as current mechanisms in place are expected to be sufficient. |
| Sexual Abuse Reporting Requirements Training and Protocols. | The purpose of this provision is to ensure providers are complying with State and local sexual abuse reporting requirements. The Department estimates no specific economic savings from finalizing this part of the rule. However, the Department expects Title X providers will be more informed about State and local reporting requirements, and therefore, will protect vulnerable populations. | The Department estimates that individuals involved with delivering family planning services would require an average of 4 hours of training in the first year following publication of this rule. In subsequent years, the Department assumes that this new information would be incorporated into existing training requirements, resulting in no incremental burden. As a result, using wage information provided in Table 2, this would imply costs of $2.71 million in the first year following publication of a final rule in this rulemaking. |
| Family Participation in Family Planning Decisionmaking. | The purpose of this provision is to ensure compliance with the requirement by Congress to encourage family participation in family planning decisionmaking, and to include this requirement in regulation. The Department estimates no specific economic savings from finalizing this part of the rule. However, the Department expects Title X providers will encourage parent and child communication as is expected under Federal law. | The Department estimates that complying with the requirement to encourage family participation will result in 75% (600,000) of adolescent patients' medical records requiring appropriate documentation. As a result, using wage information provided, this would imply costs of $2.0 million in the each year following publication of a final rule in this rulemaking. |

Exhibit 154

| Provision | Savings and benefits | Costs |
|---|---|---|
| Expanded Review and Selection Criteria .......... | The purpose of this provision is to increase the quality and expand the specificity of grant application review criteria. The Department estimates no specific economic savings from finalizing this part of the rule. However, these criteria will better achieve the statutory requirements and goals of Title X by increasing competition and rigor among applicants, encouraging broader and more diverse applicants and better ensuring the selection of quality applicants. | |
| Formal Revocation of Compliance with Title X Requirements by Project Recipients in Selecting Subrecipients Rule. | The purpose of this provision is to finalize the revocation of the 2016 regulation. The Department estimates no specific economic savings from finalizing this part of the rule as it is a formal repeal of a change that was nullified by under the Congressional Review Act. | The Department estimates no costs from finalizing this part of the rule as it is a formal repeal of a change that was nullified by joint resolution of disapproval under the Congressional Review Act that was signed by the President. |

*B. Background*

Title X of the Public Health Service Act, 42 U.S.C. 300 through 300a–6, was enacted in 1970 by Public Law 91–572, 84 Stat. 1504. As amended, it authorizes the Secretary of Health and Human Services, among other things, "to make grants and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. 300(a).

Presently, the Title X program funds approximately 90 public health departments and community health, family planning, and other private nonprofit agencies through grants, supporting delivery of family planning services at almost 4,000 service sites.[19] As a program designed to provide voluntary family planning services, the Title X program should help men, women, and adolescents make healthy and fully informed decisions about starting a family and determining the number and spacing of children.

Section 1008 of the Act contains the following prohibition, which has not been altered since it was enacted in 1970: "None of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." 42 U.S.C. 300a–6. The Conference Report described the purpose of this provision as follows:

It is, and has been, the intent of both Houses that funds authorized under this

legislation be used only to support preventive family planning services, population research, infertility services, and other related medical, information, and educational activities. The conferees have adopted the language contained in section 1008, which prohibits the use of such funds for abortion, in order to make clear this intent.

H.R. Rep. No 91–1667, at 8–9 (1970) (Conf. Rep.). Later Congresses have, through annual appropriations provisions, reiterated aspects of this requirement, for example, by adding that "amounts provided to said [voluntary family planning] projects under such title shall not be expended for abortions." *See, e.g.,* HHS Appropriations Act 2019, Public Law 115–245, Div. B, 132 Stat. at 3070.

Since it originally created the Title X program in 1970, Congress has, from time to time, imposed additional requirements on it, including the following:

• Requirement that "all pregnancy counseling shall be nondirective." [20]

• Obligation to ensure that Title X funds "shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for public office." [21]

• Requirement that Title X (1) projects provide distinct services for adolescents;[22] (2) service providers encourage family participation in family

planning services including, but not limited to, those for minors;[23] (3) grantees certify to the Secretary that they "provide counseling to minors on how to resist attempts to coerce minors into engaging in sexual activities." [24]

• Condition that, "[n]otwithstanding any other provision of law, no provider of services under Title X of the PHS Act shall be exempt from any State law requiring notification or the reporting of child abuse, child molestation, sexual abuse, rape, or incest." [25]

Title X authorizes the Secretary to promulgate regulations governing the program. 42 U.S.C. 300a–4. In the preamble to the proposed rule, the Department explained that, since 1971, it has repeatedly exercised rulemaking authority with respect to the Title X program. The Department began issuing regulations implementing Title X, including section 1008, in 1971. *See* 36 FR 18465 (Dec. 15, 1971). Although those regulations, and revised regulations issued in 1980, 45 FR 37436 (Jun. 3, 1980), as well as guidelines promulgated in 1981, prohibited Title X projects from providing abortion as a method of family planning, they did not

---

Exhibit 154

[19] Fowler et al., *Family Planning Annual Report: 2017 National Summary* (Aug. 2018), *https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2017-national-summary.pdf.*

[20] *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Public Law 104–134, sec. 104, 110 Stat. 1321 (1996) ("Omnibus Appropriations Act 1996"); HHS Appropriations Act 2019, Public Law 115–245, Div. B, 132 Stat. at 3070–71.

[21] HHS Appropriations Act 2019, Public Law 115–245, Div. B, 132 Stat. at 3071.

[22] *See* 42 U.S.C. 300(a) (requirement to provide "a broad range of acceptable and effective family planning methods and services (including . . . services for adolescents)").

[23] *See* Omnibus Budget Reconciliation Act of 1981, Public Law 97–35, sec. 931(b)(1), 95 Stat. 357, 570 (1981) (amending Section 1001(a) of the Public Health Service Act to require that "[t]o the extent practical, entities which receive grants or contracts . . . shall encourage family participation in projects assisted under this subsection."); 42 234 U.S.C. 300(a); Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1998, Public Law 105–78, sec. 212, 111 Stat. 1467, 1495 ("HHS Appropriations Act 1998"); HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. at 3090.

[24] Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1998, Public Law 105–78, sec. 212, 111 Stat. 1467, 1495; HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. at 3090.

[25] HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 208, 132 Stat. at 3090.

provide further guidance on the application of that prohibition.

On February 2, 1988, the Secretary of Health and Human Services promulgated Title X regulations (the "1988 regulations") to give specific program guidance regarding the statutory prohibition on the use of Title X funds in programs where abortion is a method of family planning. *See* Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects, 53 FR 2922 (Feb. 2, 1988). The 1988 regulations had several key features to support compliance with the statutory prohibition. To more effectively implement section 1008, the regulations prohibited Title X projects from counseling or referring project clients for abortion as a method of family planning; required grantees to separate their Title X project—physically and financially—from prohibited abortion-related activities; and established compliance standards for family planning projects under Title X to specifically prohibit certain actions that promote, encourage, or advocate abortion as a method of family planning, such as the use of project funds for lobbying for abortion, developing and disseminating materials advocating abortion, or taking legal action to make abortion available as a method of family planning. *See* 53 FR 2945.

The 1988 regulations were upheld on both statutory and constitutional grounds by the United States Supreme Court in *Rust* v. *Sullivan,* 500 U.S. 173 (1991). In *Rust,* the Supreme Court rejected claims that the regulations violated the Administrative Procedure Act (APA), the First Amendment, the Fifth Amendment, or the Title X statute. Regarding the APA, the Court applied *Chevron U.S.A., Inc.* v. *Natural Resources Defense Council,* 467 U.S. 837 (1984), reasoning that "substantial deference" was owed "to the interpretation of the authorizing statute by the agency authorized with administering it." 500 U.S. at 184. Accordingly, it reaffirmed that "[a]n agency is not required to 'establish rules of conduct to last forever,' but rather 'must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" 500 U.S. at 186–187. The Court declined to view the regulations skeptically because they represented a change in policy; instead, the Court noted that it "has rejected the argument that an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretation' of the statute in

question." *Id.* The Court concluded that the regulations' "program integrity" requirements—the portions of the regulations mandating separate facilities, personnel, and records—were "based on a permissible construction of the statute and are not inconsistent with congressional intent." *Id.* at 188. Accordingly, the Court "defer[red] to the Secretary's reasoned determination that the program integrity requirements are necessary to implement the prohibition." *Id.* at 190.

The Court further upheld the prohibition on abortion counseling and referral, as well as the requirement of physical and financial program separation, as consistent with the First Amendment. *Id.* at 192–198. The Court held the "Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected and [Congress] may validly choose to fund childbirth over abortion and 'implement that judgment by the allocation of public funds' for medical services relating to childbirth but not to those relating to abortion." *Id.* at 201 (internal quotations omitted). The Court concluded that the regulations were "a permissible construction of Title X." *Id.* at 203.

The 1988 regulations were operative until February 5, 1993, when President Clinton suspended them pursuant to a Presidential Memorandum, The Title X "Gag Rule", 58 FR 7455 (Feb. 5, 1993), and the Department issued a proposed rule, Standards of Compliance for Abortion-Related Services in Family Planning Service Projects, 58 FR 7464 (Feb 5, 1993), that it finalized seven years later as the 2000 regulations. *See* 65 FR 41270 (July 3, 2000). The 2000 regulations essentially returned to the 1981 regulations (with one revision), which eliminated the provisions of the 1988 regulations that (1) prohibited Title X projects from counseling or referring project clients for abortion as a method of family planning; (2) required grantees to separate their Title X project physically and financially from any abortion activities; and (3) implemented compliance standards for family planning projects under Title X that specifically prohibit certain actions designed broadly to promote or encourage abortion as a method of family planning, such as the use of project funds to lobby for abortion, to develop and disseminate materials advocating abortion, or to take legal action to make abortion available as a method of family planning. While a contemporaneous notice stated that more than separate bookkeeping entries and allocation of funds was necessary to

separate Title X project activities from non-Title X abortion activities, that notice nevertheless discussed and approved shared facilities, staff, and records, as long as costs were pro-rated and properly allocated. *See* Provision of Abortion-Related Services in Family Planning Service Projects, 65 FR 41281, 41282 (July 3, 2000). The 2000 regulations also required that Title X providers offer nondirective counseling on, and referral for, abortion at the request of a Title X client, despite the statutory prohibition on funding programs where abortion is a method of family planning and the adoption of the Coats-Snowe Amendment in 1996 and Weldon Amendment in 2005, which prohibited the federal government and State and local governments that receive federal financial assistance from discriminating against health care entities that refuse, among other things, to refer for abortion.

On December 19, 2016, the Department finalized a rule that amended Title X eligibility requirements, requiring that no grantee making subawards for the provision of services as part of its Title X project prohibit an entity from receiving a subaward for reasons other than its ability to provide Title X services. 81 FR 91852, 91860 (Dec. 19, 2016). The Department's stated reason for issuing the rule was to respond to new approaches to competing or distributing Title X funds that were being employed by several States. The 2016 regulation took effect on January 18, 2017, but was nullified under the Congressional Review Act, when the President signed the Joint Resolution of Disapproval, on April 13, 2017. *See* Title X Requirements by Project Recipients in Selecting Subrecipients, Public Law 115–23, 131 Stat. 89 (April 13, 2017).

On June 1, 2018, the Department published a proposed rule in the **Federal Register**, through which it solicited public comments on proposed changes to the 2000 Title X regulations and the formal revocation of the 2016 regulation in accordance with the Joint Resolution of Disapproval. *See* 83 FR 25502, 25504–25505 (June 1, 2018). The Department believes the provisions of this final rule provide much needed clarity regarding the Title X program's role as a family planning program that is statutorily forbidden from paying for abortion and funding programs/projects where abortion is a method of family planning. The Department believes that the 2000 regulations fostered an environment of ambiguity surrounding appropriate Title X activities. This uncertainty was reflected in many of the public comments that argued Title X

Exhibit 154

should support statutorily prohibited activities, such as abortion. This rule rectifies the ambiguity created by the 2000 regulations. Specifically, this rule:

• Clearly delineates a bright line between Title X and non-Title X activities;

• provides grantees direction on how to ensure that no Title X funds are expended where abortion is a method of family planning;

• increases the ability of applicants to receive funding for innovative projects that propose to serve underserved and unserved populations; and

• offers additional protection to patients who may be victims of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, and human trafficking.

## II. Statutory Authority, Overview, Analysis, and Response to Public Comments

The Department provided a 60-day public comment period for the proposed rule that closed on July 31, 2018. The Department received over 500,000 public comments,[26] which are posted at *www.regulations.gov*. After considering the comments, the Department finalizes the proposed rule with the changes discussed below. In this preamble, the Department discusses the public comments, its responses, and the text of the final rules.

The Department proposed to revise the authorities cited for the regulations at 42 CFR part 59, subpart A, from "42 U.S.C. 300a–4", to "42 U.S.C. 300 through 300a–6". Some commenters support the Department's authority to modify Title X regulations. Other commenters contend that the Department does not have authority to make various changes. The Department has legal authority under section 1006 of the Public Health Service Act, 42 U.S.C. 300a–4, to promulgate and amend regulations to implement the Title X family planning program, and sections 1001 through 1008 of the Public Health Service Act (42 U.S.C. 300 through 300a–6) include substantive provisions which the Department implements through such regulations. The Department has repeatedly exercised its authority to issue regulations to guide Title X grantees in carrying out the program. Section 1006 of the Act states that "[g]rants and contracts made under this title shall be

made in accordance with such regulations as the Secretary may promulgate," and section 1001 also specifies that the Secretary shall by regulation specify certain rights to apply for grants or contracts. The grant of regulatory rulemaking authority in section 1006 is sufficient authority to support all of the requirements adopted through this final rule. However with respect to various details of these final rules, the Department also relies on section 1008 and other directives throughout the Title X statute, as well as appropriations provisos and riders governing the Title X program. The final rule is designed to refocus the Title X program on its statutory mission—the provision of voluntary, preventive family planning services specifically designed to enable individuals to determine the number and spacing of their children—while clarifying that women must be referred for appropriate, medically necessary care identified during preconception screening and for prenatal care services, since such care is important for the health of the women and for healthy pregnancy and birth. The Department believes this final rule provides appropriate guidance for compliance with such requirements.

Therefore, the Department finalizes, without change, its proposed revision to the authorities cited for 42 CFR part 59, subpart A.

Comments supporting or challenging the Department's authority to make particular changes are discussed in more detail in the relevant sections below.

### A. General Comments

While many comments were specific to certain sections of the proposed rule, a sizeable number were more general in nature, or commented on portions of the preamble, including content in the background, the need for change, and the statutory authorities sections. Those comments are summarized here, together with responses by the Department. Many related comments are addressed in greater detail further below, within the discussion of specific provisions of the regulation.

*Comments:* Many commenters affirm the accuracy of the historical record summarized by the Department in the proposed rule. This includes the long-standing prohibition on promoting abortion in the Title X program, the Supreme Court's upholding of the 1988 regulations in *Rust* v. *Sullivan*, the Court's reaffirmation of Congress's general intent for Title X to have a preconception focus, the legal precedent for the government to favor childbirth over abortion (for example, *Harris* v.

*McRae,* 448 U.S. 297 (1980)), the continued bipartisan support for the Title X statute, and the various supplemental requirements imposed by Congress on the Title X program. Other commenters also contend that, since *Roe* v. *Wade,* 410 U.S. 113 (1973), Title X grantees have unlawfully treated abortion as a method of family planning despite statutory prohibitions and that the 2000 regulations facilitate such activity in violation of the Title X statute. Additional commenters recall the history, purpose, importance, and value of Title X as the sole federal program dedicated to funding family planning services for low income individuals, including the provision of birth control, cancer screening, sexually transmitted disease (STD) testing and treatment, and other preventive care.

The Department received comments expressing diverse and conflicting views on the proposed rule. Many commenters support the language of the rule as proposed, so as to prevent taxpayer dollars from being used to pay for activities related to abortion, contrary to the Title X statute, and to provide the necessary transparency to assure Title X funds are not used for abortion or abortion-related costs. Other commenters assert that proposed changes could reduce access to services, especially for the most vulnerable populations. Some commenters note that the proposed rule closely mirrors the 1988 regulations, while others object to the proposed rule's provisions, particularly on certain abortion referrals, and the similar but broader provisions in the 1988 regulations, and point out that those provisions were never fully implemented. Some commenters support the proposed rule as providing much needed clarification to ensure adherence to the original intent of Title X and to correct the regulations that were issued in 2000. Other commenters contend that the proposed rule is unnecessary, unjustified, unethical, and was proposed without evidence of need.

Some commenters raised legal objections to the rule. Several comments contend the Department's proposed rule is contrary to congressional intent, violative of State sovereignty, and inconsistent with the First Amendment rights of Title X grantees and the Fifth Amendment rights of women. These commenters assert that women have a constitutional right to abortions, and health care workers have a responsibility to counsel individuals on the full scope of family planning options.

Commenters assert that the proposed changes create ethical and legal risks,

---

[26] This includes attachments and over 40 mass mailing or internet comment generating campaigns, which accounted for more than 480,000 of the comments. The **Federal Register** docket lists only 205,000 comments; however a significant number of comments were submitted in batches to *www.regulations.gov*.

Exhibit 154

fail to follow professional standards of care for health professionals, and violate conditions associated with federal grant funding under section 330 of the Public Health Service Act.[27] Commenters request clarification on how broadly reporting requirements would apply, specifically regarding referral agencies. They assert that Federally Qualified Health Centers (FQHC), funded under Section 330 of the Public Health Safety Act, are already required to provide significant data reporting, including patient demographics, financial indicators, and clinical quality. Commenters believe that the proposed Title X reporting requirements would be potentially redundant with the existing section 330 reporting requirements. Commenters also argue section 330 requires FQHCs to provide ''voluntary family planning'' services. This rule, they argue, creates a conflict with that requirement by reducing the family planning options, and potentially reduces the performance of FQHCs by restricting their supplementary Title X funding.

Others argue that the proposed rule would make it difficult to meet national performance measures for the Title V Maternal and Child Health Services Block Grant, which serve as a measure of our country's progress on adolescent annual preventive medical visits. Still other commenters argue the proposed rule violates the APA on multiple grounds, including that the rule is arbitrary and capricious, and they assert that the Department has not provided adequate reasons for its rulemaking by examining the relevant data and articulating a satisfactory explanation for its action, including a rational connection between the facts found and the choices made. Several commenters urge the Department to withdraw the proposed rule. Some commenters contend the rule is not legally supportable and that, if the Department finalizes the rule, it will be challenged in court.

In contrast, other commenters argue that the proposed rule closely tracks the 1988 regulations, which were upheld on both statutory and constitutional grounds by the Supreme Court. Those commenters argue that the proposed rule is just as constitutional now as it was then, and observe that many other cases have affirmed the principle that the government is not obligated to fund or facilitate abortions.

Numerous commenters state that the Department has spent much time and effort to craft a solution where there is no problem to be addressed. They claim

Title X has never funded abortions, and Title X providers fully understand what the statutes and 2000 regulations require. They state that examples of the misuse of Title X funds are not well founded. Several commenters state that, under the comment filing deadline of July 31, 2018, they were unable to evaluate the full extent of the impacts of the Notice of Proposed Rule Making (NPRM) on affected communities. These commenters requested that the Department extend the comment period an additional 60 days, or to October 1, 2018. They contend this extension would provide the Department more time to hear from impacted populations on changes to Title X. One commenter contends their extension request was due to the Department rushing the publication of the proposed rule, and engaging in insufficient public engagement with stakeholders prior to the release of the rulemaking. Another commenter mentions they were requesting an extension because they experienced issues with submitting their comments electronically.

*Response:* The Department notes that there is, generally, a common understanding regarding the history and the purpose of the Title X program, together with the sharp diversity of opinion regarding the need for revisions to the 2000 regulations. The Department appreciates the emphasis many comments place on Title X's role in caring for low income individuals by providing a broad range of family planning methods and services. The Department concludes these final rules will contribute to more clients being served, gaps in service being closed, and improved client care that better focuses on the family planning mission of the Title X program. The Department expects these positive outcomes, in part, because the Department believes (1) program parameters will be more clear; (2) new applicants will apply to serve unserved or underserved patients and/ or less concentrated population areas because the review and selection criteria will no longer skew in favor of heavily populated areas; (3) new providers who previously were unable to participate in Title X projects due to conscience concerns with the 2000 regulations will be free to apply for a Title X grant or to participate in a Title X project; (4) Title X providers will be more likely to provide comprehensive primary care services or refer to primary health providers who can fulfill non-Title X needs in close proximity to the clinics, furthering overall health care of patients; and (5) the broad and clear definition for ''family planning'' will

enable grantees to better provide a broad range of family planning methods and services to meet the needs and desires of more patients.

The Department believes that the final rule represents a better interpretation of the statutory provisions applicable to the Title X program than the 2000 Regulations. The rule permits and will encourage better and closer compliance with these legal obligations on the part of grantees and their subrecipients. The Department agrees with comments stating that the proposed rule is necessary to protect the integrity of the Title X program, and the Department has authority to take such action, as discussed above and supported by case law.[28] The Spending Clause of the Federal Constitution provides Congress authority to spend monies and to impose conditions and requirements with respect to the expenditures of funds,[29] and it has exercised this authority to create the Title X program and impose conditions upon it. The Department has, in turn, exercised its legal authority[30] to issue regulations to guide Title X grantees in carrying out the program. The rule will ensure adherence to the statutory provisions adopted by Congress for the Title X program.

The Department agrees with comments that section 1008 establishes a broad prohibition on funding, directly or indirectly, activities that treat abortion as a method of family planning.[31] The Department also agrees with comments that the 2000 regulations are inconsistent with that interpretation insofar as they require referral for abortion as a method of family planning, allow the use of funds for building infrastructure that could be used for abortion services, and do not require clear physical separation between Title X activities and abortion-related services.[32] The Department

---

[27] *See* 42 U.S.C. 254b.

[28] *See Rust,* 500 U.S. at 193.

[29] Art. 1, sec. 8, cl. 1.

[30] *See* 42 U.S.C. 300a–4.

[31] *See* 42 U.S.C. 300a–6.

[32] As described in the preamble to the 1988 regulations, 53 FR at 2923, prior to issuance of any regulations pursuant to Title X, the Department had, since 1972, interpreted section 1008 not only as prohibiting the provision of abortion, but also as prohibiting Title X projects from in any way promoting or encouraging abortion as a method of family planning. Further, based on the legislative history, the Department had also, since 1972, interpreted section 1008 as requiring that the Title X program be ''separate and distinct'' from any abortion activities of a grantee. However, in such interpretations, the Department generally took the view that if activity did not have the immediate effect of promoting abortion, or which did not have the principal purpose or effect of promoting abortion, it was permitted in a project. *See* GAO, No. HRD–82–106, Restrictions on Abortion and

Continued

Exhibit 154    JA-0002579

notes that the 2000 regulations also do not ensure transparency and accountability in the use of taxpayer funds since they fail to require grantees to provide the Department with information about subrecipients, to ensure monitoring for potential misuse of funds and for compliance with federal laws (including a Title X-specific appropriations provision) that prohibit the use of taxpayer funds for political activity or lobbying. Finally, the 2000 regulations prescribe inadequate grant application review criteria for selecting grantees of Title X funds who will comply with all of these requirements.

The Department believes that the final rule is a reasonable interpretation of the Title X statute and applicable laws in light of the express statutory terms, legislative history, and case law regarding the implementation and enforcement of provisions such as section 1008. The express terms in section 1008 reasonably support the Department's conclusion that there must be a separation between Title X projects and funds and any project where abortion is a method of family planning. *See* 42 U.S.C. 300a–6. The express terms of section 1008 also reflect the congressional purpose that Title X primarily has a preconception focus and should fund and, thereby, encourage preconception services. *See Rust,* 500 U.S. at 190 ("It is undisputed that Title X was intended to provide primarily prepregnancy preventive services."). This focus on preconception care generally excludes payment for postconception care and services, though it can allow the provision of information and counseling in a postconception context, or access to postconception services outside the Title X project, if Title X's restrictions concerning abortion as a method of family planning are maintained. It is, thus, no surprise that the Supreme Court concluded that the 1988 regulations' "program integrity" requirements, which are substantially similar to the ones adopted in this final rule—including the portions of the regulations mandating separate facilities, personnel, and records—were "based on a permissible construction of the statute and are not inconsistent with congressional intent." *Id.* at 188. The Court noted that, "if one thing is clear from the legislative history, it is that Congress intended that Title X funds be kept separate and distinct from abortion-related activities. . . ."

Lobbying Activities in Family Planning Programs Need Clarification, at 22 (Sept. 24, 1982), *https:// www.gao.gov/assets/140/138760.pdf.*

Certainly, the Secretary's interpretation of the statute that separate facilities are necessary, especially in light of the express prohibition of § 1008, cannot be judged unreasonable." *Id.* at 190. The Court "defer[red] to the Secretary's reasoned determination that the program integrity requirements are necessary to implement the prohibition." *Id.* The Department now reaffirms that reasoned determination and reaches similar conclusions here.

The Department disagrees with commenters who contend the proposed rule (or this final rule) violates the Constitution and the intent of Title X. The Supreme Court rejected similar constitutional challenges to the 1988 regulations. As an initial matter, it upheld the statutory limitation of Title X funds to programs where abortion is not a method of family planning, concluding that "[t]here is no question but that the statutory prohibition contained in § 1008 is constitutional" because Congress "may 'make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds.' " *Id.* at 192 (internal citations omitted; ellipsis in original). The Court further explained that the provisions in the 1988 regulations barring counseling and referral were consistent with the First and Fifth Amendments. *Id.* at 193–94, 203. The Department believes the Court's analysis encompasses, and is equally applicable to, the provisions of this final rule for similar reasons.

The Department disagrees with commenters contending the proposed rule, to the extent it is finalized here, infringes on the legal, ethical, or professional obligations of medical professionals. Rather, the Department believes that the final rule adequately accommodates medical professionals and their ethical obligations while maintaining the integrity of the Title X program. In general, medical ethics obligations require the medical professional to share full and accurate information with the patient, in response to her specific medical condition and circumstance. Under the terms of this final rule, a physician or APP may provide nondirective pregnancy counseling to pregnant Title X clients on the patient's pregnancy options, including abortion. Although this occurs in a postconception setting, Congress recognizes and permits pregnancy counseling within the Title X program, so long as such counseling is nondirective. The permissive nature of this nondirective pregnancy counseling affords the physician or APP the ability to discuss the risks and side effects of each option, so long as this counsel in

no way promotes or refers for abortion as a method of family planning. It permits the patient to ask questions and to have those questions answered by a medical professional. Within the limits of the Title X statute and this final rule, the physician or APP is required to refer for medical emergencies and for conditions for which non-Title X care is medically necessary for the health and safety of the mother or child.

The Department appreciates comments expressing concern about administrative reporting burdens on FQHCs who receive funding under both Section 330 and Title X. However, different federal programs often have different reporting and other requirements, depending on the specific statutory requirements and constraints. The fact that some federal grant programs may require more (or less) to qualify for funding is an appropriate reflection of Congressional direction. The Department is mindful of the administrative burden when establishing requirements for federal grant programs and seeks, as possible, to impose substantially the same administrative requirements on grant programs. However, it is under no obligation to impose the same requirements for multiple grant programs; rather, it is guided by the statutory requirements placed by Congress regarding each individual federal grant program. To the extent that requirements overlap, the Department believes that no additional burden results because the information can be readily shared within the grantee organization. Where the Title X program imposes additional requirements, these additional requirements are the result of specific statutory requirements applicable to the Title X program. The Department believes that these additional requirements are reasonable in light of those specific statutory requirements and the Department's need to ensure compliance with such requirements.

The Department also believes that concerns that Title X will conflict with Section 330's voluntary family planning requirements are unfounded. This final rule continues the historical Title X emphasis that family planning must be voluntary—the definition of "family planning" adopted by the final rule and, thus, applicable to the Title X program explicitly states that "family planning methods and services are never to be coercive and must always be strictly voluntary." This final rule also confirms the statutorily mandate that a "broad range" of family planning methods and services be available under Title X. This requirement also supports the voluntary

Exhibit 154

nature of family planning by providing a variety of methods and services so that the individual patient can make an informed choice, based on her own lifestyle and needs. To the extent that limitations are imposed on the Title X program (*e.g.,* abortion provisions), the Department has carefully designed these to enforce explicit statutory mandates applicable to Title X. However, the Department intends to continue emphasizing the broad range of family planning methods and services as a way to fulfill the various family planning needs of patients who visit the many Title X clinics across the nation. Thus, the Department finds that section 330 and Title X are complementary in this respect.

The Department does not agree that the final rule will impede the ability of States and jurisdictions to meet the national performance measure (NPM) for annual adolescent preventive well visits for the Title V Maternal and Child Health Services Block Grant. Some commenters contend that any limitation on a patient's ability to access affordable health care at their preferred site of care for family planning services or to meet with the provider of their choice for preventive health care will impede States' ability to meet their goals for the well-woman visit NPM and the adolescent well-visit NPM for Title V. But by encouraging Title X projects to offer either comprehensive primary health care services onsite or have a robust referral linkage with primary health care providers who are in close proximity to the Title X site, the Department believes this final rule should reinforce States' ability to meet their goals for well-woman and adolescent well-visit NPMs. Furthermore, the Department does not believe that the rule will limit the ability of individuals to access affordable health care; thus, achievement of the NPM will remain unaffected by the changes in regulation. The Title X program currently provides services to adolescents and will continue to provide these services.

The Department agrees with comments stating that demonstrated abuses of Medicaid funds do not necessarily mean Title X grants are being abused and did not make that argument in the proposed rule. Rather, the Department believes that examples of abuse in other Federal programs help illustrate the need for clarity with respect to permissible and impermissible activities in connection with the Title X program and Title X funds, especially where the 2000 regulations foster confusion and

ambiguity.[33] Title X is a grant program where funds are disbursed before completion of the service, increasing the possibility of intentional or unintentional misuse of funds. Appropriate accountability standards are particularly appropriate in the case of grant programs such as Title X.

The Department's reasons for deciding to revise the 2000 regulations go beyond evidence regarding abuses of Medicaid funds by entities that are also Title X grantees or subrecipients, and are discussed in more detail below. These additional reasons include the Department's view that Title X grantees must be financially transparent and accountable throughout the grant disbursement process, rather than only after the grant is spent. The Department has a compelling interest in ensuring that, from the moment of disbursal, Title X funds are used only for permissible activities under the Title X statute,[34] rather than condoning after-the-fact correction and bookkeeping adjustments. The Department disagrees with some commenters who characterize the government's pursuit of this interest as "restricting abortion rights"; the Supreme Court rejected similar arguments and challenges to similar provisions in the 1988 regulations. *See Rust,* 500 U.S. at 177–178 (upholding similar Title X "program integrity" requirements).

The Department also seeks to remedy the potential for confusion, under the 2000 regulations, about whether Title X funds can be, or are being used, in a project where abortion is a method of family planning. It does so by finalizing the rule to strengthen the requirements for financial separation and to preclude shared physical space and staff with respect to abortion. It also does so by improving grant monitoring, including fiscal and internal controls, to prevent the misuse of taxpayer funds. The Title X program is not unique in the need for such grant monitoring to identify and prevent such misuse. However,

particularly because providing abortion as a method of family planning has been statutorily prohibited,[35] and abortion is a source of contentious public debate, the Department believes improved accountability measures are a useful and responsible action that will expand taxpayers' trust in the Title X program.

In response to commenters who contend the rule will be challenged in court, the Department believes the Supreme Court's decision in *Rust* provides broad support for the approach taken in this rule. Although the rule differs in some respects from the 1988 regulations upheld in *Rust,* some of those differences arise from the Department's desire to implement statutory provisions that did not exist at the time the 1988 regulations were adopted. Other differences, such as the permission for nondirective pregnancy counseling—which implements an appropriations rider that was adopted as early as 1996 [36] and has been regularly included in HHS's appropriations through fiscal year 2019—are more permissive than the 1988 regulations and less susceptible to the type of challenges that plaintiffs brought (unsuccessfully) in *Rust.* Other changes concern issues not directly addressed in *Rust,* but plainly supported by the Department's discretion to implement the program as set forth in Title X and applicable statutes. The Department believes that each component of the rule is legally supportable, individually and in the aggregate. To the extent a court may enjoin any part of the rule, the Department intends that other provisions or parts of provisions should remain in effect.

The Department disagrees with commenters who state that the 60-day comment period was insufficient. The APA does not have a minimum time period for comments, and 60-day comment periods are used for large numbers of very significant rules, including rules that contain far more complicated and complex proposed requirements. The comment period closed 60 days after publication of the proposed rule in the **Federal Register** on June 1, 2018, but the proposed rule went on display at the Office of the Federal

---

[33] ". . . [A]udits have found overbilling . . . improper practices resulting in significant Title XIX-Medicaid overpayment . . . [and] "unbundling" or "fragmentation" billing schemes related to pre-abortion examinations, counseling visits, and other services performed in conjunction with an abortion, and improper billing for the abortions themselves." *See* Foster, *Profit. No Matter What, 2017 Report on Publicly Available Audits of Planned Parenthood Affiliates and State Family Planning Programs,* Charlotte Lozier Institute Special Report Series 3 (Jan. 4, 2017), *https://lozierinstitute.org/profit-no-matter-what (summarizing evidence from publicly available audits).* These examples of abuse illustrate the need to clarify any confusion or ambiguity that may cause or add to the problems uncovered by the auditors.

[34] 42 U.S.C. 300a–6.

[35] *Id.*

[36] Omnibus Consolidated Rescissions and Appropriations Act of 1996, Public Law 104–134, 110 Stat. 1321, 1321–221 (stating that "amounts provided to said projects under such title shall not be expended for abortions, that all pregnancy counseling shall be nondirective, and that such amounts shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for public office."). The 2019 Appropriations Act contains the same directive.

Exhibit 154

JA-0002581

Register on June 1, 2018 and on the Department's website on May 22, 2018. The comment period provided ample time for the submission of over 500,000 comments by a variety of interested parties, including extensive comments by a number of entities. Those comments offer a broad array of perspectives on the full range of issues raised in the proposed rule. After reviewing the public comments and the requests for additional time, the Department does not believe that extending the comment period is or was necessary for the public to receive sufficient notice of, and opportunity to comment on, the proposed rule. Nor is there anything in the statutory provisions governing the Title X program that would have required additional outreach outside of the public notice and comment process and the comment period. Consequently, the Department concludes that the comment period was legally sufficient and is not extending the comment period.

*B. To what programs do these regulations apply? (42 CFR 59.1)*

*Summary of changes:* The original language of the 2000 regulations at § 59.1 remains intact. The proposed rule proposed to add that, unless otherwise noted, Title X program requirements and regulations would apply equally to grantees and their subrecipients and that grantees would be responsible for ensuring that the entire project, which includes all subrecipients, complies with the Title X regulations. With certain exceptions, the proposed rule also provided that the regulatory requirements of Title X would apply equally to any contracts established under Section 1001 to carry out a Title X project. The Department finalizes the proposed changes to § 59.1 with slight technical changes to clarify the language regarding the requirements for grantees and subrecipients.

*Comments:* Some commenters question the need for the proposed changes. They state that the Department is not lacking information about subrecipients, as the Department already publishes a directory listing all subrecipients online. Some commenters contend that previously, the Department's legal relationships have been with Title X grantees concerning project operations only, not with subrecipients.

Several commenters state that the rule gives unprecedented information and regulatory authority to the Department regarding Title X grantees and subrecipients. Some commenters assert that the regulations attempt to give the Department unchecked discretion to disqualify applications. Several commenters contend the proposed rule would impose burdensome and redundant bureaucratic responsibilities on grantees and would limit the participation of certain providers. Some commenters object to the application of the rule to subrecipients, contending it will impose unacceptable burdens on subrecipients and drive qualified providers from Title X projects.

One commenter believes that treating grants and contracts equally will circumvent fair contracting rules, expediting allocation of funds to organizations and programs that do not submit applications as part of a competitive procurement or that will not be required to follow program regulations, including basic eligibility guidelines. The commenter states that, if implemented, this change could drastically alter the landscape of Title X providers, potentially allowing, among other things, for-profit organizations and health care providers that do not meet the highest standards of quality care to be awarded federal funds through a non-competitive process. One commenter states the proposed rule does not adequately discuss the regulatory or economic impact of applying the same requirements of contracts as family planning grants to entities, as contract and grant regulations differ.

One comment states that the proposed rule does not address whether Title X funds used for contracts would offset funds used for grants.

*Response:* The Department disagrees with commenters who contend that the Department already has sufficient information about subrecipients. Although an online directory lists subrecipients, important information about the grant project is not reported at a granular level. The Department does not know the scope of services provided by individual subrecipients, nor the degree of compliance with statutory and regulatory requirements by individual subrecipients. The Department maintains it is reasonable and appropriate to require additional transparency in these areas to ensure accountability for, and compliance with, the statutory integrity provisions applicable to the Title X program. Moreover, it is quite common for regulatory requirements to flow down from grantees to subrecipients; this final rule simply makes that expectation explicit.

The Department also does not agree with some commenters contending that these regulations are unnecessary, redundant, or overly burdensome. As discussed more below, the Department has a duty to ensure that Title X funds are spent in accordance with statutory requirements; that duty applies equally to Title X funds used by grantees and subrecipients. The final rule helps the Department fulfill that duty and thereby to ensure the proper accounting of Title X funds. The Department believes there has been insufficient transparency and accountability in the use of taxpayer funds because grantees have not been required to provide the Department with sufficient information about subrecipients, to ensure monitoring for potential misuse of funds, or to address express statutory program integrity provisions and limitations (including a Title X specific appropriations provision) that, among other things, prohibit the use of taxpayer funds for political activity or lobbying. The final rule will redress these insufficiencies and improve the transparency and accountability that surrounds the use of Title X funds.

The Department concludes that the final rule appropriately requires that the program integrity provisions of Title X family planning program apply to projects whether they are established by grants or contracts and to any entity receiving Title X funds. The Department disagrees that the application of Title X regulations to the execution of contracts is an exercise of improper or unprecedented regulatory authority. Title X authorizes the Secretary to carry out the Title X program by entering into contracts with, or issuing grants to, public or private nonprofit entities and to promulgate regulations governing grants and contracts issued in the program. 42 U.S.C. 300(a), 300a–4. Thus, the Department has the authority to issue regulations governing the program, including provisions that apply statutory requirements both to grantees and contractors, and subrecipients of Title X funds. With respect to subrecipients, since grantees in most instances do not directly provide Title X services, the only way to ensure compliance with the statutory and regulatory requirements is to require the inclusion of provisions in contracts with, or grants to, subrecipients that require such compliance. Such flow-down requirements are a commonly used mechanism in the Department's grant programs to ensure that the programs are properly implemented. The Department believes that ensuring Title X funds are expended by subrecipients consistent with the statutory and regulatory parameters is a responsibility that all Title X grantees reasonably assume when they extend the financial benefits of the program to another party.

Exhibit 154

The Department disagrees with commenters that challenge the Department's oversight role in the proposed rule. Title X grantees must ensure adequate oversight of Title X funds, including the use of those funds by subrecipients. The statutory restrictions imposed on the use of Title X funds cannot be avoided by distributing the funds to subrecipients. The Department is committed to ensuring all rules governing Title X funds are applied to both primary grantees and subrecipients. The Department does not agree with commenters who state that the administrative cost of ensuring that subrecipients are compliant with Title X is overly burdensome. Although there may be additional costs involved with these oversight measures, specifying that grantees are responsible for ensuring the compliance of their subrecipients does not add an additional requirement; it merely makes more explicit the fact that grantees are already responsible for ensuring the compliance of their Title X projects with the statutory and regulatory requirements applicable to Title X projects. The specific oversight measures required by this final rule are reasonable and necessary to ensure such compliance with the Title X requirements and proper accountability of Title X funds. The costs associated with those measures are detailed below.

The Department disagrees that the rule will exclude qualified providers from providing Title X services since any eligible organization may apply to provide Title X services, so long as it complies with the requirements set forth in the statute, related regulations, and the funding announcement. The Department disagrees with commenters who suggest oversight will hinder the participation of health centers, except to the extent that they are not compliant with Title X requirements. An organization that qualifies under Title X to provide statutorily appropriate services may also provide non-Title X services, so long as they do so in a manner that complies with the Title X regulations. The Department believes that the provisions of the final rule will result in expanded preconception family planning options available to individuals consistent with the Title X program's explicit mandate.

The Department has considered the comments that express concern about the proposed language that treats Title X contracts and grants equally, but concludes that a plain reading of the statute supports that approach. Title X authorizes the Secretary to award grants and/or enter into contracts to establish

and operate voluntary family planning projects—and then authorizes the Secretary to adopt regulations to implement the Title X program.[37] The Department interprets this grant of authority to afford it flexibility in choosing the vehicles to implement the Title X statute, but not to allow funding vehicles that avoid the requirements of the Title X program. Grants and contracts are entered into under different general procedures and are governed by different sets of procedural law. Title X projects, however, whether implemented by grant or contract, must comply with applicable substantive requirements of the Title X statute, which these regulations implement.

Accordingly, regardless of whether the Department enters into a grant or contract, requirements of the Title X program shall apply, except for §§ 59.4, 59.8, and 59.10. For example, the Department interprets section 1008 of Title X to require certain restrictions concerning abortion referrals, and physical and financial separation between Title X activities and activities not permitted under the Title X statute. That interpretation would apply to project activities whether they are undertaken by grant or by contract. This regulatory provision applying certain sections of this rule to contracts is necessary to ensure consistency in the implementation and enforcement of Title X statutory program integrity provisions if a project is implemented through the issuance of a contract.

The Department notes comments that draw distinctions between grants and contracts in the general regulatory system and how they serve different purposes. The Department recognizes these differences exist, but for reasons stated above, believes it necessary to ensure the basic requirements of the Title X program are consistent. Title X authorizes the Secretary to enter into contracts, not just grants, to implement the program.[38] The Department believes it is necessary to treat contracts and grants similarly for both grantees (or, in the case of contracts, contractors) and subrecipients or subcontractors.

The Department disagrees with commenters who contend the proposed rule would circumvent ordinary procurement procedures. The Department's purpose in adding the provision on its ability to carry out a Title X program/project by contract was not to evade or avoid the substantive requirements imposed by Title X or these regulations—the Department, for example, could not contract with a for-

profit entity to carry out a Title X program or project because that would be inconsistent with 42 U.S.C. 300(a)—but to confirm that contracts to implement the Title X program must be consistent with, and implement, the substantive requirements entailed in these regulations, including those related to the prohibition on the use of funds for projects where abortion is a method of family planning. If the Department enters into contracts, it would do so based on other rules generally applicable to contracts, except as specified in the Title X statute or these regulations. Thus, for example, any contracts issued under Title X would continue to be competitive to the extent required by law and regulation. To make that clear, the proposed rule would provide that certain sections of part 59 subpart A would not apply to contracts because those sections address processes specifically applicable to grants and grant applications. The substantive requirements of the other sections of the subpart, in contrast, would apply to Title X projects or programs, regardless of whether they are carried out by grant or contract.[39]

Accordingly, the Department expects both grantees and contractors to ensure that Title X funds are spent on statutorily appropriate activities. The proposed rule and this final rule help to ensure that this expectation is met by formalizing those requirements and that process.

One commenter had inquired about how the issuance of a contract to implement a Title X project would affect Title X grants. Since the funds for the program are fixed by appropriations, funds used for contracts in a given fiscal year would not be used for grants, and vice versa. Thus, Title X funds used for contracts would be offset from funds used for grants, as stated in the proposed rule.

### C. Definitions (42 CFR 59.2)

#### 1. Definition of Advanced Practice Provider

*Summary of changes:* The 2000 regulations did not define "advanced practice provider," and the Department had not proposed such a definition in the proposed rule. However, as a result

---

[37] *See* 42 U.S.C. 300(a), 300a–4(a).

[38] *See* 42 U.S.C. 300(a).

[39] Although the Department had proposed that § 59.3 would not be applicable to contractors carrying out a Title X project, after further consideration, and in light of the public comments, the Department now believes that such contractors should be required to comply with § 59.3. Accordingly, the Department does not include that section in the list of regulatory provisions that would not apply to entities who have contracted with the Department to implement a Title X project. This is discussed in more detail below in response to comments concerning § 59.3.

Exhibit 154

of comments on the type of medical professional who could provide nondirective counseling and referrals under the proposed rule, as discussed in greater detail below, the Department has determined that, in addition to medical doctors, advanced practice providers (APPs) may provide nondirective counseling and referrals. For greater clarity on the scope of such APPs who can provide such services in Title X projects, the Department defines APPs to include those medical professionals who receive at least a graduate level degree in the relevant medical field and maintain a federal or State-level certification and licensure to diagnose, treat, and counsel patients. The term APP includes physician assistants and advanced practice registered nurses (APRN) who are performing increasingly critical roles within the health care system.[40] Examples of APRNs that qualify as an APP include Certified Nurse Practitioner (CNP), Clinical Nurse Specialist (CNS), Certified Registered Nurse Anesthetist (CRNA), and Certified Nurse-Midwife (CNM).[41] These APPs are qualified, due to their advanced education, licensing, and certification to diagnose and treat patients while advancing medical education and clinical research.[42] The

[40] Other Federal Agencies refer to APPs as Mid-Level Practitioners. *See* U.S. Department of Justice Drug Enforcement Diversion Control Division, *Mid-Level Practitioners Authorization by State,* Drug Enforcement Administration, *https:// www.deadiversion.usdoj.gov/drugreg/practioners/ index.html.* "Mid-Level Practitioners" and "Advanced Practice Provider" generally describe the same group of individuals; the Department here chooses the latter term in recognition of the increasingly critical and advanced roles that PAs and APRNs play within the clinic environment.

[41] The Department recognizes the wide range of specializations within the nursing profession. These examples were selected as APPs due to their advanced medical degrees, licensing, and certification requirements. *See* National Council of State Boards of Nursing, *APRNS in the U.S, https:// www.ncsbn.org/aprn.htm. See also* American Association of Nurse Practitioners, *What's a Nurse Practitioner (NP)?, https://www.aanp.org/about/all- about-nps/whats-a-nurse-practitioner* (stating that "[a]ll NPs must complete a master's or doctoral program and have advanced clinical training beyond their initial professional registered nurse preparation" while being regulated by the licensing requirements of each State where the individual practices).

[42] *See,* Catherine S. Bishop, *Advanced Practitioners Are Not Mid-Level Providers,* J Adv Pract Oncol, (Sept. 1, 2012), *https:// www.ncbi.nlm.nih.gov/pmc/articles/PMC4093350/* (noting that Physician Assistants and Advanced Practice Nurses "have at least a master's degree and many hold doctorates.") *See also* Jacquelyn Corley, *Advanced-Practice Providers Are Key to America's healthcare Future,* Forbes, (Mar. 16, 2017), *https:// www.forbes.com/sites/realspin/2017/03/16/ advanced-practice-providers-are-key-to-americas- healthcare-future/#3d25c1f95998.*

final rule establishes this definition for purposes of Title X in § 59.2.

2. Definition of Family Planning

*Summary of changes:* The 2000 regulations do not define "family planning." The proposed rule, at § 59.2, proposed to define "family planning" as "the voluntary process of identifying goals and developing a plan for the number and spacing of children and the means by which those goals may be achieved." Further, the proposed definition included "a broad range of acceptable and effective choices, which may range from choosing not to have sex to the use of other family planning methods and services to limit or enhance the likelihood of conception (including contraceptive methods and natural family planning or other fertility awareness-based methods) and the management of infertility (including adoption)." Family planning services are described in the proposed definition to include "preconception counseling, education, and general reproductive and fertility health care to improve maternal and infant outcomes, and the health of women, men, and adolescents who seek family planning services, and the prevention, diagnosis, and treatment of infections and diseases which may threaten childbearing capability or the health of the individual, sexual partners, and potential future children)." Family planning and family planning services are to be voluntary and never coercive. The proposed rule emphasizes that family planning "does not include postconception care (including obstetric or prenatal care) or abortion as a method of family planning. Family planning, as supported under this subpart, should reduce the incidence of abortion." The proposed rule indicates that prenatal referrals are required and medically necessary for the health of the pregnant mother, as well as the unborn baby, and are not included in this prohibition.

The Department finalizes this definition with changes, including clarifying the role of adoption as a family planning activity by permitting Title X providers to provide information about or referrals for adoption as a Title X service; increasing the understanding that family planning must not be coercive and must always be voluntary; and by making technical edits for consistency and readability.

*Comments:* Some commenters state there is little support for the Department to define family planning. They note that, while the Department says the definition's purpose is to avoid the "risk of the intentional or unintentional use of Title X funds for impermissible

purposes," the Department cites no actual violation of Title X in relation to the provision of abortion services.

Some commenters oppose the explicit exclusion of abortion in the definition. One commenter notes that abortion does impact the number and spacing of children and should not be excluded from the meaning of family planning. Such commenters state that couples use abortion as a method of family planning to determine their desired number of children or to space them. They contend that excluding abortion from the definition by labeling it postconception care reflects a failure to consider who may want or need to have an abortion. Additionally, one commenter states that the last sentence of the new definition should be stricken because reducing abortion was not the intent of the enabling legislation. Some commenters suggest the definition creates ambiguity concerning abortion that is not used as a method for family planning.

Many commenters ask the Department to eliminate language that mentions natural family planning and fertility awareness-based methods (FABMs), contending that the definition prioritizes those methods over other contraceptive methods. Such commenters worry that the definition de-emphasizes contraception in favor of abstinence, natural family planning, and fertility awareness-based methods that the agency has long recognized are less-effective methods of family planning. Commenters also contend, for example, that fertility awareness-based methods do not fit everyone's lifestyle and are ineffective for many women; that abstinence programs are ineffective and ignore the needs of participants already engaged in sexual activity; that avoiding sex as a family planning method conflicts with CDC, WHO, and UN definitions of family planning; and directing Title X funds towards natural family planning is unnecessary as 93% of sites report offering it and less than 0.5% of female Title X contraceptive users rely on it.

Some commenters ask, in the alternative, that if the Department does not eliminate language that mentions natural family planning, the Department instead clarify whether it intends to prioritize and promote natural family planning and other FABMs for Title X patients over other contraceptive options, and if so, to provide its justification, and explain why that would not undermine patients' ability to obtain voluntary care free from coercion. Some commenters also state that the proposed language may "blur the lines" between choices, methods,

Exhibit 154

and services, and contend this may diminish the range of each provided under the Title X program.

One commenter says the definition of family planning should ensure that women have sufficient access to evidence-based family planning and sexual health information, and the full range of medically accepted forms of contraception, in order to avoid issues that may arise in light of the new definition of family planning. Commenters express concern that the definition would leave many women without access to contraception or the most effective methods to prevent pregnancy. Other commenters oppose the definition of family planning because they contend negative impacts will result, such as driving some providers out of business; increasing the incidence of unintended pregnancy; increasing the incidence of sexually transmitted diseases; leading to grantees offering a more limited scope of services, making it difficult for patients to receive care they need; and leading to increased costs on the health care system as the result of unintended pregnancies.

One commenter supports including only preconception services in the definition of family planning, and states that the definition empowers the Department and Title X providers to provide comprehensive services. Another commenter similarly states that, by placing postconception care beyond the scope of Title X, and by expressly excluding abortion from the definition of family planning, the definition reorients Title X towards its intended purpose.

Other commenters oppose including only preconception services in the definition. One commenter contends that excluding postconception care disrupts the continuity of care for family planning clients. The commenter additionally states the limitation is contrary to national standards that promote early access to prenatal care. Another commenter argues that the government is discriminating against women who seek abortions by defining the practice as postconception care and excluding this type of care from the definition of family planning, but then requiring projects to refer all pregnant woman for prenatal care.

Some commenters request that the Department eliminate language referring to adoption. Commenters assert that the management of infertility, including adoption, exceeds the intent of the program as its inclusion is beyond the language of the Title X statute. Including adoption would put a strain on the program, commenters contend, as

it would redirect a large amount of Title X funds. Additionally, commenters contend adoption is a postconception activity, and say its inclusion in the definition contradicts the definition's statement that family planning only includes preconception activities.

Some commenters also argue that excluding abortion is a violation of the First Amendment's religion clauses due to preferring some religious ideas over others and enforcing religion with the power of the government. They contend excluding abortion, and in their view emphasizing natural family planning, is characteristic of particular religious views.

Finally, one commenter states that the rule does not make it clear whether female or male sterilization services are considered within the scope of family planning methods, and contends they are consistent with the goal of determining the number and spacing of one's children.

*Response:* Title X of the Public Health Service Act confers broad authority on the Secretary of Health and Human Services "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. 300(a). Congress placed specific limitations on what constitutes appropriate "family planning" for purposes of Title X. In Section 1008, Congress expressly required that "[n]one of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." 42 U.S.C. 300a–6. Congress did not fully define "family planning" in the Title X statute. However, section 1006 authorizes the Secretary to promulgate regulations governing grants and contracts in the program. 42 U.S.C. 300(a). Accordingly, the Department has statutory authority to define "family planning" for the purposes of the Title X program.

Given the statutory emphasis on family planning, the Department believes defining the phrase is important to ensure a coherent and reliable implementation of Title X, consistent with carefully considered statutory parameters. The Department disagrees with commenters who contend there is little support for creating the definition for family planning because no violations have been identified. The Department does not have to identify violations in order

to interpret a statutory term. The Department deems it useful to develop and maintain a definition of family planning, in order to establish the scope of the Title X family planning program, to ensure consistency across the program, and to meaningfully ensure that the family planning projects implemented under Title X grants and/or contracts provide a broad range of family planning methods and services, consistent with the Title X statute. The Department believes it is appropriate to exercise its rulemaking authority to define family planning as a term important to the scope of the Title X projects, the development of grant applications, and the issuance of grants and contracts in the Title X program.

Moreover, the Department notes that the definition will address in part its concern that the requirement for abortion referrals, as provided in the 2000 regulations, violates or leads to violations of section 1008's prohibition on funding Title X projects where abortion is a method of family planning. Concerns about family planning methods being used indirectly to violate requirements of the program dates back at least to the 1988 regulations. There, the Department stated, in § 59.14, that a "Title X project may not use prenatal, social service or, emergency medical or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning . . ." 53 FR at 2945. This provision was upheld by the Supreme Court.[43] That the 2000 regulations required certain abortion referrals, in a way the Department, both previously and now, deems inconsistent with the Title X statute, is itself a cause of confusion about what should and should not be included as "family planning" under the Title X program, and justifies the Department's decision to establish a definition of family planning in this rule.

The Department disagrees with the many commenters that oppose defining "family planning" to exclude abortion and that urge the Department to define the term to include abortion. Such commenters appear to be either unaware of, or confused about (or to have intentionally ignored), the fact that Title X explicitly excludes[44] funding for projects where abortion is a method of family planning. The Department is statutorily required to exclude abortion as a method of family planning for purposes of the Title X program, *see* 42 U.S.C. 300a–6, and has no statutory authority to consider family planning under Title X to include abortion. The

---

[43] *Rust v. Sullivan*, 500 U.S. at 192–195.
[44] *See* 42 U.S.C. 300a–6.

Exhibit 154

fact that so many commenters are unaware of or confused about this requirement, and ask the Department to include abortion as a method of family planning in violation of the Title X statute, reinforces the Department's view that it is appropriate to define "family planning" to clarify the scope of the Title X family planning program, as well as to establish other requirements that separate the Title X family planning program and Title X family planning projects from abortion as a method of family planning.

Some commenters ask how the definition applies to abortions that are not used as a method of family planning. Section 1008 prohibits funding Title X projects where abortion is a method of family planning, but does not preclude referral for services to address health issues or conditions where treatment constitutes a medical necessity. In addition, annual Title X appropriations law has consistently barred the expenditure of Title X funds for abortion. *See* HHS Appropriations Act 2019, Public Law 115–245, Div. B, 132 Stat. 2981, 3070 (funds provided to Title X projects "shall not be expended for abortion"); Consolidated Appropriations Act 2018, Public Law 115–141, Div. H, Title II, 132 Stat. 348, 716 (same); Consolidated Appropriations Act 2017, Public Law 115–31, Div. H, Title II, 131 Stat. 135, 521 (same); Consolidated Appropriations Act 2016, Public Law 114–113, Div. H, Title II, 129 Stat. 2242, 2602 (same). Title X primarily focuses on the provision of certain preconception health care services. Nevertheless, because of certain specific statutory provisions, the Department believes that Title X providers can provide certain counseling and referrals in a postconception setting, if compliance with the Title X statutory and regulatory restrictions concerning abortion is maintained. The Department has interpreted Title X to allow nondirective postconception pregnancy counseling because of an express annual appropriations rider on nondirective pregnancy counseling may be offered. In addition, under the Infant Adoption Awareness grants program, Congress specified that eligible health centers (which includes Title X clinics) should receive training on providing adoption information and referrals, and that the Secretary should encourage the same,[45]

therefore expressing its intent that postconception adoption information and referrals be included as part of any nondirective counseling in Title X projects. Thus, adoption counseling and referral is appropriate under Title X, since Congress specified that Title X clinics and providers were eligible health centers to whom adoption related training should be offered.[46] However, this provision differs from the actual provision of adoption services to an interested family, which is outside of Title X health care services. In addition, Title X funds may not be spent on childbirth services or prenatal care, but referrals for prenatal care can be required because it is medically necessary for pregnancy and provides information rather than services.

Taking those provisions, the annual appropriations provision, and section 1008 together, the Department has concluded that Title X projects may allow a physician or APP to provide nondirective counseling on abortion generally as a part of nondirective pregnancy counseling, and may refer for abortion for documented emergency care reasons, but may not refer for abortion as a method of family planning. Similarly, the nondirective pregnancy counseling can include counseling on adoption, and corresponding referrals to adoption agencies. As a consequence, the Department considers it appropriate to define "family planning" as (1) excluding abortion, (2) permitting the provision of nondirective pregnancy counseling (including abortion and adoption), and (3) including and requiring Title X projects to refer for prenatal care services.

The Department disagrees with commenters who oppose the last sentence of the definition because, in the commenters' view, Congress's intent in Title X did not include the reduction of abortion.[47] The 1988 regulations, which were upheld by the Supreme Court in *Rust,* contained the same statement, that "[f]amily planning, as supported under this subpart, should reduce the incidence of abortion." *See Rust,* 500 U.S. at 193. The Court stated, "Here the Government is exercising the authority it possesses under *Maher* and *Harris* v. *McRae,* 448 U.S. 297 (1980), to subsidize family planning services

which will lead to conception and childbirth, and declining to 'promote or encourage abortion.' The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Id.* In choosing to fund family planning methods, but declaring no Title X project can receive funding where abortion is a method of family planning, Congress decided to encourage certain activities as an alternative to funding abortion. The Court explained such a decision neither infringes upon nor does it constitute State interference in abortion; it represents a legitimate choice by the government to encourage some activities over others. *Id.* Reducing abortion is also commonly identified by the government, researchers, private organizations, and many public commenters here, as being a potential and significant benefit of family planning.[48] The Department, therefore, concludes it is appropriate to define one purpose of family planning, under the Title X family planning program, as being to reduce the incidence of abortion.

Defining family planning, for the purposes of Title X, to exclude abortion, and as being, at least in part, for the purpose of reducing abortion, does not suggest that Title X projects may engage in directive pregnancy counseling to reduce abortion. As discussed below, when a Title X physician or an APP engages in pregnancy counseling, such counseling must be nondirective. But the fact that reducing abortion is not a goal of pregnancy counseling under Title X does not mean that the Department's provision and promotion of family planning in all other contexts cannot be undertaken, in part, for the purpose of reducing abortion. When the Department funds Title X projects that provide a broad range of family planning methods and services to prevent pregnancy, the results will likely include, among other things, a decrease in pregnancy and with it, a decrease in the incidence of abortion as a method of family planning.

The Department disagrees with commenters who oppose the

---

[45] *See* 42 U.S.C. 254c–6 (Congress authorized the Department to make grants "for the purpose of developing and implementing programs to train the designated staff of eligible health centers in providing adoption information and referrals to pregnant women on an equal basis with all other

courses of action included in nondirective counseling to pregnant women.").

[46] Finalizing the definition of family planning to include adoption information and referrals is also part of the Department's fulfillment of its duties under section 330F, should grants under that section be funded.

[47] The final sentence of the proposed definition of "family planning" is that "[f]amily planning, as supported under this subpart, should reduce the incidence of abortion."

[48] *See, e.g.,* Guttmacher Institute, *New Clarity for the U.S. Abortion Debate: A Steep Drop in Unintended Pregnancy Is Driving Recent Abortion Declines,* (March 18, 2016), *https:// www.guttmacher.org/gpr/2016/03/new-clarity-us-abortion-debate-steep-drop-unintended-pregnancy-driving-recent-abortion* (stating that "expanding women's access to family planning services not only protects U.S. women's health and rights, it also reduces abortion rates.")

Exhibit 154                                                                 JA-0002586

definition's references to natural family planning, fertility awareness-based methods, and choosing not to have sex (which some commenters refer to as abstinence), or who say the definition emphasizes those methods over contraception or other methods. The definition of "family planning" does not emphasize or prioritize those methods over contraception, but mentions them alongside contraception and other family planning methods in a non-exhaustive list of methods of family planning. To the extent many commenters oppose including natural family planning and fertility awareness-based methods in "family planning" at all, the commenters are arguing against the Title X statute, not this rule. Title X specifies that the Department fund projects "which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods . . .)." 42 U.S.C. 300(a). Congress has, thus, dictated that, for the purposes of Title X, family planning includes natural family planning methods. As a consequence, the Department lacks the authority to exclude natural family planning—or any other family planning method or service mentioned in the Title X statute—from the definition of family planning in Title X. Since Congress explicitly mentions it in Title X as part of family planning services to be provided by a Title X project, the Department declines to delete or deemphasize natural family planning.

The term "fertility awareness-based methods" is a more recent term that refers to the same general kind of family planning methods that Congress intended when it included "natural family planning" in the Title X family planning program. The science of natural family planning methods, and other family planning methods (including contraceptives), has advanced significantly since Congress enacted Title X in 1970. As explained further below, the term "fertility awareness-based methods" includes similar family planning methods and services captured by the term "natural family planning" in the statute. But for greater clarity as to the scope of the program, the Department finalizes the definition as proposed to mention fertility awareness-based methods alongside natural family planning.

The Department agrees with commenters who support Congress's inclusion of natural family planning methods in Title X. Some commenters point out that very few women use natural family planning methods within Title X, but there is insufficient

information on why this may be the case. It may be that the method is not presented by a clinic as a meaningful option or it may be that staff are not adequately trained in the method. In general, an increasing number of persons are choosing natural family planning methods,[49] at the same time that the scientific basis and approvals for fertility awareness-based methods are also increasing.[50] Requiring projects to provide natural family planning, in addition to contraceptives and other family planning methods and services, does not mandate that such projects provide them in the same quantity, but that natural family planning be meaningfully included in the project.

In response to this and other sections of the proposed rule, some commenters contend natural family planning or fertility awareness-based methods should be excluded from Title X projects because they are not effective. The Department does not find the exclusion of such methods to be consistent with the direction of Congress in section 1001(a), which explicitly includes natural family planning in the range of family planning methods provided through Title X. The commenters also provide no evidence to conclude that natural family planning is categorically ineffective, even if such a conclusion could overcome the statutory language including natural family planning as among the methods of family planning that may be offered in a Title X project. These commenters do not acknowledge that, in the last 40 years, the science behind, and efficacy of, fertility awareness-based methods has improved significantly, leading to FDA approval of certain medical products involving such methods and to increased utilization of these methods.[51] The Department also does not find it consistent with the principle of patient

choice categorically to deprive individuals or families of the option of obtaining natural family planning or fertility awareness-based family planning methods within Title X projects.

The Department similarly disagrees with commenters who oppose including choosing not to have sex as a method of family planning. Choosing not to have sex, either for a long period of time or for selected intervals, or choosing not to have sex as often or with as many sexual partners, is clearly a preconception method of family planning for reducing unintended pregnancy. In addition, choosing not to have sex or engaging in sex with a single monogamous partner is protective of preconception health, particularly because it protects an individual from exposure to STDs that may contribute to infertility and negative health outcomes. As a viable method for delaying or avoiding pregnancy altogether, the Department would be remiss if it were to exclude this method, since consistently choosing not to have sex is the most effective way to prevent pregnancy. As with natural family planning, the inclusion of this method within the definition of "family planning" does not invalidate other methods within that definition, nor mean that every Title X clinic has to provide counseling services related to this method of family planning.

The Department therefore disagrees with commenters who contend that recognizing these options within the definition of family planning will diminish an individual's ability to choose another form of family planning. Projects must also provide contraception, and can do so in proportion to the demand for such methods. The individual's free and informed choice to select a family planning method is respected by requiring projects to provide the broad range of family planning options that Congress contemplated in the statute, and to allow individuals to freely select the method they prefer. The definition of family planning merely specifies that these methods are included in the broad range of family planning methods available within each Title X project. Projects may comply with the statutory directive when they include natural family planning in the broad range of family planning methods and services that must be provided. The definition also specifies that family planning is never to be coercive and must always be strictly voluntary. This precludes the conclusion, put forth by some commenters, that including natural family planning or choosing not to have

---

[49] The Guttmacher Institute reported that the percentage of women using natural family planning doubled between 2008 and 2014. Megan L. Kavanaugh and Jenna Jerman, *Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014*, Guttmacher Institute, 97 *Contraception* 1:14–21 (Jan. 2018), *https://www.contraceptionjournal.org/article/S0010-7824(17)30478–X/fulltext*.

[50] *See e.g.,* FDA News Release, *FDA allows marketing of first direct-to-consumer app for contraceptive use to prevent pregnancy,* (Aug. 10, 2018), *https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm616511.htm (permitting marketing of a fertility-awareness-based mobile medical application).*

[51] *See, e.g.,* Shawn Malarcher, et. al., *Fertility Awareness Methods: Distinctive Modern Contraceptives,* 4 Global Health: Science and Practice 13, 13 (2016), *available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4807745/pdf/013.pdf* (stating fertility awareness methods of contraception have been tested and proven effective at pregnancy prevention and safe to use).

Exhibit 154

sex in the definition imposes a requirement on any clients.

The Department also notes that this final rule is consistent with the proposed rule, which explicitly includes contraception in the definition of family planning. Contrary to the suggestion of some commenters, the definition does not place a lower priority on contraception as a method of family planning, nor somehow invite Title X providers to pressure clients to use natural family planning instead of contraception. The rule, both as proposed and finalized, will allow funded projects to provide all acceptable and effective Title X family planning methods, while ensuring that participating entities or service sites that wish to offer only a single method or a limited number of methods may also participate in Title X projects, so long as each Title X project, as a whole, provides a broad range of family planning methods and services, including contraception and natural family planning.

Clarifying that those options fall within the program is well within the purview of the Title X program, and ensures individuals' voluntary and informed access to the family planning option of their choice. The Department does not agree that the definition blurs lines between different family planning options, methods, or choices. Rather, the Department agrees with comments suggesting that the new definition of family planning will expand access to a broad range of family planning methods and services and will ensure patients have the ability to make voluntary and informed family planning choices. To provide clarity and ensure that duplicative terms are not interpreted with different meanings, the Department revises the definition by using the words used in the Title X statute, "methods and services," instead of the word "choices" that was used in the proposed rule. The Department further modifies the sentence "Family planning and family planning services are never coercive and are strictly voluntary" to read "Family planning methods and services are never to be coercive and must always be strictly voluntary." This clarifies the terms in the sentence and also further aligns the definition with the voluntary requirements set forth in sections 1001 and 1007 of Title X.

The Department acknowledges the concerns of commenters who contend the proposed definition would leave women without access to contraception or other methods of family planning, but believes that these concerns are overstated. The Department is aware of reported success rates regarding various forms of preconception family planning for those engaged in sexual activity. The Department wishes to emphasize that, consistent with the statutory provisions, contraception will continue to be a significant category of family planning methods for Title X projects. This is why the family planning definition specifically mentions contraception among other family planning methods and services and why § 59.5 continues to require a broad range of acceptable and effective family planning methods and services within Title X projects. The Department does not intend to implement or enforce these regulations to have any limiting effect on Title X organizations that offer contraception options if those organizations are otherwise compliant with the Title X grant requirements. The Department believes that the proposed rule broadens access for women seeking preconception family planning options by permitting grantees or subrecipients to provide various or specialized forms of family planning, while also ensuring that projects, as a whole, provide a broad range of family planning methods and services.

The Department finds there is insufficient evidence to support the contention of some commenters that negative impacts will result from the definition, such as driving out some providers, increasing unintended pregnancy, or increasing STDs. The definition encompasses contraception and other methods that these commenters support, and it will not deprive Title X projects of the ability to offer any such methods or services. To the extent commenters believe these negative results will occur because the definition of family planning excludes abortion, and includes natural family planning, both parameters have been mandated by the Title X statute for decades. Any such effect, then, would be attributable to implementing the program as Congress directed.

The Department disagrees with commenters who ask that the definition specify that all family planning methods and services must be "medically approved." The Department also discusses this issue below concerning the change in such language at § 59.5. When Congress specified what family planning methods and services Title X projects must provide, Congress directed that the methods and services be "acceptable and effective"; it did not specify that they be "medically approved." The Department also does not understand, and commenters fail to explain, what the addition of "medically approved" to the definition would mean in practice. Family planning methods and services are often provided through licensed health care professionals. Thus, it is true of all family planning methods or services provided by Title X providers that at least one medical professional or clinic has "approved" the method or service, by virtue of providing it to the client. It is not clear what else a requirement of medical approval might mean, or what commenters believe it to mean, if inserted into the family planning definition. For example, would approval by one medical doctor suffice, or would some larger number need to approve, and if so, how many; would certain medical organizations, or governmental organizations, or both, need to approve, and if so, which ones; would a certain level of medical consensus need to exist concerning a particular method or service, and if so, how would the Department measure that consensus; and when doctors and medical organizations disagree either about a family planning method or service, how would that requirement apply? For all of these reasons, the Department does not believe the Title X statute requires the term "medically approved" be included in this definition, and does not believe including it is appropriate. The Department instead relies on the statutory language "acceptable and effective" as sufficiently ensuring that family planning methods and services are appropriate for clients served in Title X projects.

The Department disagrees with commenters who contend the definition of family planning violates the religion clauses of the First Amendment. As discussed in *Rust,* the Supreme Court has stated many times that the Constitution does not require the government to fund abortion, and it allows the government to encourage alternatives to abortion. *See Rust,* 500 U.S. at 201. The inclusion of natural family planning in the definition of "family planning" is a congressional mandate and has existed for decades—there is no legitimate legal reason to believe it violates the First Amendment.

In response to commenters asking whether family planning includes sterilization, the Department clarifies that acceptable and effective methods of sterilization are a preconception means of implementing an individual's or family's decision as to the number and spacing of births.

The Department agrees with commenters that support the limitation in the proposed definition that family planning does not include postconception health care (as distinct from certain types of postconception counseling/information, such as in the

Exhibit 154

JA-0002588

case of congressionally permitted nondirective pregnancy counseling), but does include preconception counseling, education, and health care that can improve maternal and infant outcomes; the health of women, men, and adolescents who seek family planning services; and the prevention, diagnosis, and treatment of infections and diseases that may threaten childbearing capability or the health of the individual, sexual partners, and potential future children. This is consistent with the legislative history of the Title X program, which emphasizes Congress's intent for the program to focus on preconception health services as important to family planning.[52] This Congressional intent is another basis for excluding abortion as a method of family planning from the definition of family planning for the purposes of Title X, because abortion is a postconception service. As discussed further below, Title X projects are not required to provide abortion information or counseling, and if nondirective pregnancy counseling is offered, any abortion counseling also must be nondirective.

The Department finds that a distinction between preconception health care services and postconception services is effective and can be more cost-effective. The Department disagrees with commenters who contend limiting family planning to preconception care is contrary to national standards. For the purposes of the Title X program, the limitation to preconception care is appropriate and consistent with Congressional intent. Any concern with national standards is met and addressed by encouraging Title X projects to offer either comprehensive primary health care services onsite or have a robust referral linkage with primary health care providers who are in close proximity to the Title X site. The Department will administer Title X funds to focus on permissible preventive care and preconception family planning, while promoting robust referral networks to ensure that clients have ready access to non-Title X health care services that they need, including treatment for health conditions that are not provided by Title X and for postconception care

(other than abortion as a method of family planning).

The Department appreciates and responds to comments raising concern about the inclusion of adoption in family planning services and clarifies the purpose of the rule in this regard, finalizing a change to the language concerning adoption. Adoption is a method by which families can plan their family size, to either increase it, decrease it, relieve burdens attendant to insufficiently spaced children, or deal with infertility (although infertility management is not the only way in which adoption is a method of family planning, and adoption is not the only method of infertility management). Insofar as adoption is considered a preconception method by which families may plan their family size or respond to infertility, it fits comfortably within the broad range of family methods and services contemplated by Title X. Although many commenters focus on the important role of Title X providers in preventing unintended pregnancy through contraception or not having sex, Congress clearly intended Title X to support family planning through more than preventive services, as evidenced by the emphasis on infertility services in Title X. *See* 42 U.S.C. 300(a) (Title X family planning projects required to "offer a broad range of acceptable and effective family planning methods and services (including natural family planning, infertility services, and services for adolescents)").[53] The Department thus found and continues to find that Title X is an important resource for individuals seeking assistance to have children, and adoption is one method by which a Title X client who is not pregnant may seek to have children.[54]

Moreover, Congress has expressed its intent that postconception adoption information and referrals be included as part of any nondirective counseling in Title X projects when it passed the Children's Health Act of 2000, adding section 330F ("Grants Regarding Infant Adoption Awareness") to the Public Health Service Act on October 17, 2000. Public Law 106–310, 114 Stat. 1101, sec. 1201, codified at 42 U.S.C. 254c–6

(hereinafter "Infant Adoption Awareness grants"). There, Congress authorized the Department to make grants "for the purpose of developing and implementing programs to train the designated staff of eligible health centers in providing adoption information and referrals to pregnant women on an equal basis with all other courses of action included in nondirective counseling to pregnant women." 42 U.S.C. 254c–6(a)(1). Congress specified that grantees shall offer that training to Title X grantees and the Secretary shall make reasonable efforts to encourage Title X grantees to participate in that training.[55] At least some major organizations "understood the legislation and the guidelines for the Program to strongly suggest that those working in clinics receiving funds through Title X family planning grants . . . be the principal target for the training." [56] If the provision to pregnant women, of nondirective adoption counseling and referral were not appropriate under Title X, Congress would not have specified that Title X clinics and providers were eligible health centers to whom such adoption related training should be offered. This interpretation has been carried into current practice by major adoption organizations, such as The National Council for Adoption.[57]

By contrast, because of Congress's primary focus on funding preconception care in Title X, the Department deems the provision of adoption services themselves to be outside the scope of the Title X program. This clarification should address the concern by some commenters about a potential strain on resources of the Title X program caused by the inclusion of adoption in the family planning definition. Title X providers may provide adoption counseling, information, and referral as a voluntary family planning service for non-pregnant clients as a means of addressing health care issues related to

---

[52] *See* H.R. Rep. No 91–1667, at 8–9 (1970) (Conf. Rep.) (emphasizing the intent of Congress that Title X funds specifically support preconception family planning, stating "[i]t is, and has been, the intent of both Houses that funds authorized under this legislation be used only to support preventive family planning services, population research, infertility services and other related medical, information, and educational activities. The conferees have adopted the language contained in section 1008, which prohibits the use of such funds for abortion, in order to make clear this intent.").

[53] *See* 53 FR at 2922 (the Department historically found "it is clear that Congress intended the term 'family planning' to be broader in scope than simply contraception, as infertility services are included as one of the mandatory services listed in section 1001(a) of the Act.").

[54] *Id.* This interpretation is consistent with the Department's history of enforcing Title X regulations regarding adoption: "Both approaches [adoption and infertility services] constitute legitimate means of determining family size and spacing, but adoption is simply one means of addressing the broader problem of infertility." *Id.*

[55] *See* 42 U.S.C. 254c–6(a)(5) & (6)(A) (adoption organization required to make reasonable efforts to ensure that training is provided to, among others, "eligible health centers that receive grants under section 1001 (relating to voluntary family planning)"; with respect to eligible health centers that received grants under section 330 or 1001, "[t]he Secretary shall make reasonable efforts to encourage eligible health centers to arrange for designated staff to participate in such training. Such efforts shall affirm Federal requirements, if any, that the eligible health center provide nondirective counseling to pregnant women.").

[56] *See* The National Council For Adoption, *NCFA's Infant Adoption Awareness Training Program—A Successful Model,* 193.

[57] Finalizing the definition of family planning to include adoption information and referrals is also part of the Department's fulfillment of its duties under section 330F, should grants under that section be funded.

Exhibit 154

JA-0002589

fertility and reproduction, such as infertility, and as part of nondirective postconception counseling, but may not provide adoption services themselves within the project.

This approach is consistent with the Title X parameters and with the Department's history of implementing Title X. In the 1981 Title X program guidelines, "Program Guidelines for Project Grants for Family Planning Services," the Department allowed nondirective counseling on, and referral for, adoption and foster care when a woman with an unintended pregnancy requested information on her options. The 1988 regulations continued this support for encouragement of counseling on and referral for adoption. The 2000 regulations required both counseling and referral on adoption, if the client requested such assistance. Given this history and Congress's expressed intent, the Department concludes that Title X funds may facilitate access to adoption through nondirective adoption counseling and referral as a part of the nondirective counseling offered to pregnant clients.

Congress's express intent to include adoption information and referral in Title X projects can be contrasted with its express intent to exclude Title X funding from any projects where abortion is a method of family planning. The Title X statute contains no similar prohibition on funding projects where adoption is a method of family planning, and section 330F requires the Secretary to encourage the inclusion of adoption information and referrals in the Title X program. Similarly, the Title X statute contains no similar prohibition on funding projects that include postconception referrals for prenatal care, which is necessary for pregnancy as a medical condition. Thus, the Department disagrees with commenters contending that the definition improperly discriminates by treating adoption more favorably than abortion. Simply put, abortion is prohibited as a method of family planning within a Title X project and adoption is not. Given Congress's explicit differential treatment of adoption and abortion throughout the applicable statutes, the definition is an appropriate exercise of the Department's authority to promulgate regulations to implement the Title X family planning program.

For all these reasons, the definition of family planning appropriately includes adoption information and referral as a family planning method. To clarify this, in response to questions from commenters about this issue, the Department modifies this aspect of the family planning definition in the final rule by changing "the management of infertility (including adoption)" to "the management of infertility, including information about or referrals for adoption."

### 3. Definition of Grantee

*Summary of changes:* The 2000 regulations did not define a "grantee" under Title X. The proposed rule, at § 59.2, proposed to define "grantee" as "the entity that receives Federal financial assistance by means of a grant, and assumes legal and financial responsibility and accountability for the awarded funds, for the performance of the activities approved for funding and for reporting required information to the Office of Population Affairs."

There were no substantive comments regarding this definition.

The Department finalizes the definition of "grantee" in § 59.2 without change, except for minor grammatical corrections.

### 4. Definition of Low Income Family

*Summary of changes:* The 2000 regulations at § 59.2 defined "low income family" by income and allowed the project director to determine "good reasons" where an individual may qualify even if income exceeded the defined amount. Pursuant to an example in the definition, minors who wish to receive services on a confidential basis are considered on the basis of their own resources. The proposed rule, at § 59.2, proposed to modify the existing definition of "low income family" relating to minors by requiring the program to document its efforts to encourage the unemancipated minor to involve his/her family in the decision to seek family planning services, in order to ensure compliance with the applicable Title X and appropriations law provisions on the issue. In addition, the proposed rule included a provision whereby the project director may consider a woman as a low income family when her employer-sponsored health insurance does not cover certain contraceptives because of her employer's religious or moral objection to such contraceptives. The Department recognizes that a woman's insurance coverage may relate to her ability to pay for family planning services. The Department finalizes the proposed modifications with no substantive changes to the definition with respect to unemancipated minors, but with some minor grammatical corrections. However, in response to public comments, the Department also finalizes paragraph (2) under the definition for low-income family for cases involving "payment for contraceptive services only," where the woman's employer "does not provide the contraceptive services sought by the woman because the employer has a sincerely held religious or moral objection to providing such coverage." This final rule clarifies that, in these cases, the project director may exercise discretion under the existing "good reason" exception to "consider her insurance coverage status as a good reason why she is unable to pay for contraceptive services." In making this determination, the project director "must also consider other circumstances affecting her ability to pay." This final rule then provides mechanisms by which a director may determine whether the woman is from a "low income family" or is eligible for a discount for contraceptive services on the schedule of discounts provided for in § 59.5."

*Comments:* Some commenters support the proposed changes to the definition of low income family. Some of these commenters support the encouragement of family participation in the family planning decisions of minors. Some also support the definition's clarification about how women may be eligible to receive contraceptive services where health insurance from their employers does not cover those services due to their employers' religious or moral objections. Some commenters support the change because they say it assists the Department in not requiring employers to violate their religious or moral beliefs, while protecting the ability of women to receive family planning services.

Commenters support the encouragement of family participation in the family planning decisions of minors, noting that it does not block access to family planning services. Rather, as comments explain, family participation should be the standard for any health care service provided to minors because they do not always know their family history and certain contraceptives are contraindicated for females with certain health conditions. In addition, parents are better able to direct health care decisions for their children if they are aware of other health care services and products that their children are receiving.

Some commenters oppose the definition's requirement that emancipated minors be charged based on their own income only if there is documentation of specific actions taken with respect to each minor to encourage such family participation. Such commenters are concerned this would threaten the confidentiality of these patients, as well as the patient-provider

Exhibit 154    JA-0002590

relationship. Commenters state that providers typically use their expertise and judgment when deciding whether or not to encourage family involvement in the care of patients who are minors, and they identify situations in which family involvement should not be encouraged, such as in cases of neglect, coercion, or abuse. Some commenters are worried that the definition could cause strain on the patient-provider relationship and could lead to patients omitting information that would impact their care. Other commenters are concerned the definition would increase barriers for minors receiving low cost or free, confidential care. Such commenters conclude the revision runs counter to congressional intent, by including services for adolescents in the Title X statute, and exceeds the Department's authority under Title X. One commenter asks the Department to include additional language in the rule to ensure confidentiality for such minors; confidentiality of the information received about minors' circumstances; that the encouragement of family involvement is not coercive; and, that the minor's decision to involve his or her family is strictly voluntary.

Many commenters also oppose revising the definition of low income family to include women who are unable to obtain certain family planning services under their employer-sponsored health insurance policies due to their employer's sincerely held religious or moral objections. Many such commenters assert that Title X is already underfunded, and this revision would result in a large number of new Title X patients and could reduce services for actual low income patients, due to limited funds. Many stated that, if the Department does revise the definition, there must be increased Title X funding to account for the new patients.

Commenters who are health care providers note that the Department did not discuss the impacts this change would have on Title X patients and providers. Such commenters stated that the proposed rule did not provide evidence to support the conclusion that the Title X network can absorb the new patient population, nor address how the change would impact current patients. They also contend that the proposed rule did not discuss any financial impacts, operational impacts on projects, or corresponding costs. For example, commenters contend the Department did not explain how women are to show they are in an employer plan with a religious or moral objection to contraceptive coverage. Some Title X providers comment that requiring

projects to verify that status would be cumbersome and involve administrative costs. Some commenters ask whether newly eligible patients would be able to obtain other services (*e.g.,* STD testing or Pap test) during a contraceptive visit and whether these services would also be free, and request guidance on that question.

Many commenters object to the new definition on the ground that previous interim final rules concerning contraceptives issued by the Department and the Departments of Labor and of the Treasury in October 2017 are not in effect based on court orders. Such commenters also contend the definition applies to women who are the policyholders of employer-sponsored insurance but not to other beneficiaries of such plans. Commenters further object that the definition does not guarantee coverage for such women but only states the project director may consider her as being from a low income family if good reasons exist under the definition. And commenters object that some women with insurance sponsored by an employer that objects to contraceptive coverage for religious or moral reasons might not have access to a Title X provider.

Some commenters assert that the Secretary does not have the legal authority to deem women as "low income" if their employer-sponsored plans have religious or moral objections to contraceptive coverage. Some commenters object that the definition only encompasses women, not men, whose employer-sponsored plans have religious or moral objections to contraceptive coverage, and they believe the definition does not encompass transgender men. One commenter contends the definition constitutes impermissible government subsidy of religious objections under the Establishment Clause of the First Amendment.

*Response:* The Department agrees with commenters generally supporting the revised definition concerning minors and women with employer-sponsored health insurance that does not cover contraceptive services based on the employer's religious or moral objections. Nevertheless, the Department has carefully considered all the comments, including comments opposing the changes, and is finalizing the definition with changes in response to those comments.

The Department disagrees with the suggestion of some commenters that its revised definition of low income family threatens the confidentiality of unemancipated minors. The revised definition explains that, if a project

director seeks to consider only an unemancipated minor's own resources to determine whether the minor seeking confidential services qualifies as a low income family, the project director must document efforts to encourage family participation in the unemancipated minor's decision to seek family planning services. As discussed more fully below, such encouragement is specifically required by Congress and would occur within the context of the provider-patient relationship. Communications in that relationship are already confidential, and communications in which the provider encourages family participation in the minor's decision to seek family planning services would be subject to the same confidentiality requirements.

The Department similarly disagrees with the suggestion that this documentation requirement infringes on the judgment of medical professionals or threatens minors who are in abusive home circumstances. As discussed below, this final rule does not require a Title X provider to encourage family involvement "if the Title X provider has documented in the medical record: (i) That it suspects the minor to be the victim of child abuse or incest; and (ii) That it has, consistent with, and if permitted or required by, applicable State or local law, reported the situation to the relevant authorities." Situations exist where confidentiality is important, and the Department incorporated those into the proposed rule. Moreover, the rule does not require family participation, but merely the encouragement of such participation. Inserting references to that general requirement in the definition of "low income family" concerning unemancipated minors simply reinforces the already existing statutory requirement—and ensures that Title X providers are actually complying with such requirements. To the extent that there were any infringement on the judgment of medical professionals, it would be the result of requirements imposed on the Title X program by Congress, requirements that the Department merely seeks to faithfully implement.[58]

Some commenters contend the Department lacks statutory authority to include as "low income" patients women who have employer-sponsored health insurance that does not cover contraceptive services based on the employer's religious or moral

---

[58] For additional responses to similar comments, please see the discussion of § 59.17, in which the Department responds more fully to similar objections.

Exhibit 154

objections, but this argument appears to be premised on a misunderstanding of the Department's proposal. Section 1006 gives the Secretary of HHS the authority to promulgate regulations governing grants and contracts issued under the Title X statute. 42 U.S.C. 300a–4. Section 1006 further specifies that projects receiving Title X grants or contracts must assure the Department that ''priority will be given in such project or program to the furnishing of such services to persons from low income families'' and that ''no charge will be made in such project or program for services provided to any person from a low income family except to the extent that payment will be made by a third party (including a government agency) which is authorized or is under legal obligation to pay such charge.'' 42 U.S.C. 300a–4(c)(2). Section 1006 does not define ''low income family,'' but instead declares that the Secretary has discretion to define ''the term 'low income family'. . . in accordance with such criteria as he may prescribe so as to insure that economic status shall not be a deterrent to participation in the programs. . . .'' 42 U.S.C. 300a–4(c). Consequently, Congress granted the Secretary discretion to decide what constitutes a ''low income family'' for the purpose of giving priority of services to persons from such families, so as to ensure that economic status is not a deterrent to participating in Title X programs. *Id.*

For decades, the Department has implemented such regulations by defining ''low income family'' to mean a family whose total income does not exceed 100% of the Poverty Level guidelines,[59] along with individuals in families whose income does exceed that level but for whom the project director determines—based on unenumerated factors—that there are ''good reasons'' to conclude is ''unable'' to pay for family planning services. 42 CFR 59.2. The 2000 regulations provide the example of unemancipated minors who desire to receive services on a confidential basis. 42 CFR 59.2. The proposed addition to the definition maintains the same standard and simply specifies that one factor relevant to the ''good reasons'' standard is a woman's insurance status –which may affect her financial/economic status—with respect to the provision of contraception because of her employer's religious or moral objection to contraceptive coverage. Project directors already have this discretion under the 2000 regulations. The text of the proposed rule simply makes it explicit that a project director

may rely on this factor in such circumstances. Some commenters are under the mistaken impression that the proposed rule requires project directors to consider women as being from a low income family if they have this insurance status, but the proposed rule said the project director ''may'' reach that conclusion, not that the director ''must'' do so.

This clarification does not, as some commenters contend, contradict the text or intent of the Title X statute. Congress authorized the Secretary to decide what constitutes a ''low income family'' in the program, and the Department's decades-old decision has allowed project directors to deem families ''low income'' even if their income exceeds 100% of the Poverty Guidelines. Thus, project directors might conclude based on a particular prospective client's insurance, income, and financial situation that the individual is unable to pay for family planning services. The proposed definition clarifies that a project director may—but is not required to—allow the same treatment for women with health insurance from an employer with a religious or moral objection to contraceptive coverage. And the definition instructs the project director to consider the woman's income in assessing her ability to pay. Thus, under the definition, if a project director concludes that a woman with that insurance status who has an income above 100% of the Poverty Guidelines[60] can afford to pay for family planning, the project director should conclude that she is not from a low income family. But the project director is also free to conclude, taking into account the particular circumstances, that a woman with that insurance status who has an income above 100% of the Poverty Guidelines cannot, in fact, afford to pay for family planning and should qualify as ''low income.'' That flexibility makes sense, as a woman's ability to obtain contraceptive services through an insurance plan may be relevant to her ability to pay for family planning services, and Congress has long directed that ''low income family'' be defined ''so as to insure that economic status shall not be a deterrent to participation in the programs assisted under this title.'' 42 U.S.C. 300a–4(c).

Some commenters correctly read the proposed definition to mean the project director may, or may not, deem a particular woman who lacks insurance coverage for contraception because of her employer's religious or moral objection as being from a ''low income family,'' and they object to the Department giving the director that discretion. They seem to ask that the Department require the project director to deem such women as being from a ''low income family,''[61] regardless of her family's total annual income, or other factors contributing to her ability to pay for family planning.

The Department rejects that suggestion. It is true that the Department has required, in the ''low income family'' definition, that a project director ''must'' consider only an unemancipated minor's own resources if the minor seeks confidential services to determine whether the minor is from a ''low income family.'' In that way, the Department has previously exercised its regulatory authority to define ''low income family'' to include some persons who potentially have ability to pay for family planning—namely, minors from families who may have access to funds to pay for family planning services even if they are not employed. But in this case, the Department declines to finalize the definition to require project directors to consider a woman as being from a ''low income family'' based solely on her employer's religious or moral objection to contraceptive coverage. Some women in such circumstances may be unable to pay for family planning, but others may be able to pay. For example, some may be from families with total incomes well above the poverty level, and their other circumstances may reflect that they are able to pay. The Department wishes to leave this discretion with the project director.

The Department disagrees with commenters who contend the definition is confusing and leaves project directors with insufficient guidance. For decades, the definition of ''low income family'' has given project directors discretion to determine whether good reasons exist as to why a person cannot pay for family planning. The definition being finalized here provides more guidance, not less, for the project director's exercise of that discretion in the given scenario.

Some commenters object that projects will not be able to determine whether a woman's employer-sponsored insurance omits contraceptive coverage, or does so on the basis of religious or moral objections, but the Department believes

---

[59] *See* 42 U.S.C. 9902(2).

[60] The poverty guidelines updated periodically in the **Federal Register** by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. 9902(2). *See* Office of the Assistant Secretary for Planning and Evaluation, *U.S. Federal Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal Programs* (Nov. 15, 2018, 9:51 a.m.), *https://aspe.hhs.gov/poverty-guidelines.*

[61] *See* 42 U.S.C. 300a–4.

Exhibit 154

this concern is overstated. This task is not fundamentally different from the task that projects face in determining what a person's income is, or whether, despite their income being above the poverty level, good reasons exist for considering them unable to pay for family planning. Guidance has set forth a variety of ways to seek information of this kind, including that set forth in the 2014 Title X program requirements.[62] Projects are also generally required to obtain third party payment or contribution for services that persons receive for free or at a sliding scale discount. All of these types of information are similar to the types of information that might demonstrate to a project that a woman has employer-sponsored health insurance that does not provide certain contraceptive coverage because the employer has a religious or moral objection to providing such coverage. A pay stub may demonstrate where a person works. Proof of insurance may demonstrate the person has coverage. A plan's summary of benefits and coverage would also indicate whether the plan covers the contraceptive services a woman seeks. And just as projects contact third party payers to obtain payment or contributions, projects could contact a woman's insurer to inquire whether the plan covers the particular contraceptive services and could ask if the lack of coverage is due to a religious or moral objection on the part of the plan sponsor. Where a woman wants to obtain the coverage confidentially, the project may not be able to make such contact, but in those cases, the same difficulty would be presented under the definition from the 2000 regulations, with respect to whether to deem those persons as having good reasons for their inability to pay for family planning services. The revised definition does not add uncertainty that is not already inherent in the good reasons discretion afforded to project directors. Rather, it adds clarity concerning one good reason that can form the basis of that good reason determination.

The Department understands the objection that project directors may seek more specific instructions on how to implement the definition, and also understands the concerns of some

commenters who believe that women should automatically be deemed as being from a "low income family" if her employer-sponsored insurance coverage omits contraceptive services on the basis of a religious or moral objection. Such comments reflect that, for some women, not having contraceptive coverage may affect their ability to pay and, thus, their economic status. In light of this concern, and the desire to provide more specific direction sought by commenters, the Department is finalizing the definition with the modification that a project director may exercise discretion to consider such women as being from a "low income family" or eligible for a discount for contraceptive services on the schedule of discounts provided for in § 59.5, based on the impact that not having contraceptive coverage may have on their ability to pay for contraceptives.

Under the women's preventive services guidelines issued by the Department, certain plans (or issuers or plan administrators) are required to cover all FDA-approved contraceptives with no cost-sharing, unless an exemption applies to the plan based on sincerely held religious beliefs or moral convictions. *See* 45 CFR 147.132 (religious exemption criteria); 45 CFR 147.133 (moral exemption criteria); *see also* 45 CFR 147.131 (religious or moral accommodation criteria). In addition, various entities with religious or moral objections have obtained permanent injunctions from federal courts, entitling them to exemptions from the federal contraceptive coverage requirement.[63] Where a woman has health insurance coverage through an employer that does not provide the contraceptive services she seeks from a project, because her employer has a sincerely held religious or moral objection to providing such coverage, the project director may approximate the net effect on the woman's economic status by the average annual cost of the contraceptive services that would have been covered if her employer did not object. For example, if she seeks oral contraceptives, and her employer had covered oral contraceptives without cost-sharing, she would incur no out-of-pocket cost for oral contraceptives. If her employer omits oral contraceptives on the basis of a religious or moral objection, her annual cost as the result of that decision can be approximated by the annual out-

of-pocket cost she would bear for oral contraceptives.

Consequently, in the final rule, the Department modifies the example involving a woman whose employer-sponsored health insurance does not cover contraceptives because of a religious or moral objection on the part of the employer. In such a situation, in determining whether such a woman's income is more than 100% of poverty level, or whether she is subject to sliding scale discounts for contraceptive services under § 59.5, the project director may reduce the woman's annual income by the annual out-of-pocket cost she would pay for the desired contraceptive services. The project director may estimate the annual cost based on the project director's expertise regarding the costs of contraceptive services, or reduce the woman's estimated total income by an estimated[64] average of $600 per year. This gives the project director additional discretion and guidance in considering the income status of a woman whose employer omits contraceptives from her insurance plan on the basis of a religious or moral objection.

The Department disagrees with commenters who assert that the example is discriminatory because it only refers to women. As discussed more fully below, the definition does not preclude men from seeking to establish good reasons for which they are unable to pay for family planning services. This specific example simply refers to women because it has mainly arisen in a context related to coverage for women's contraceptive services. A section of the PHS Act added by the Affordable Care Act,[65] specifies that certain group health plans and issuers shall provide coverage, with no cost sharing, of women's preventive services as provided by guidelines supported by the Health Resources and Services Administration (HRSA), a component of the Department. Section 2713(a)(4) does not apply to men and does not provide for cost-free coverage of men's contraceptive services. Where a woman's plan omits contraceptive coverage on the basis of religious or moral objections, it falls into an exemption to the guidelines set forth at 45 CFR 147.131 and 147.133. That exemption does not apply to men's contraceptive coverage, because the

---

[62] Office of Population Affairs, *Program Requirements for Title X Funded Family Planning Projects*, Health and Human Services, 12 (April 2014), *https://www.hhs.gov/opa/sites/default/files/Title-X-2014-Program-Requirements.pdf* ("Although not required to do so, grantees that have lawful access to other valid means of income verification because of the client's participation in another program may use those data rather than re-verify income or rely solely on clients self-report.").

[63] *See, e.g., Catholic Benefits Ass'n LCA* v. *Hargan,* No. 5:14–cv–00240–R (W.D. Okla. order filed Mar. 7, 2018), and *Dordt Coll.* v. *Burwell,* No. 5:13–cv–04100 (N.D. Iowa order filed June 12, 2018).

[64] *See* 83 FR 57536, 57551 (Nov. 15, 2018) (estimating the average annual cost of contraceptives at just under $600 per year).

[65] *See* 42 U.S.C. 300gg–13(a)(4) as added by the Affordable Care Act, Public Law 111–148, 124 Stat. 119, 131, sec. 1001 (adding new PHS Act section 2713).

Exhibit 154                                                                 JA-0002593

**7738**    **Federal Register** / Vol. 84, No. 42 / Monday, March 4, 2019 / Rules and Regulations

underlying requirement of section 2713(a)(4) does not encompass preventive services for men. Given these circumstances, the Department deems it appropriate to illustrate how the project director could apply the discretion embodied in the existing low income family definition when a woman's employer-sponsored insurance plan omits contraceptive coverage on the basis of a religious or moral objection.

The Department notes that the definition maintains the decades-old discretion granted to the project director to deem a person as having good reasons why he or she cannot pay for family planning and therefore deem him or her as being from a "low income family." Consequently, project directors may also consider a man's lack of access to insurance coverage for contraceptive services as potentially constituting a good reason why the project will consider the man as being from a low income family. The definition has required, and continues to require, project directors to take into consideration such indicia of ability to pay. This final rule mentions one specific context involving women who may not have access to contraceptive coverage as one possible application of the "good reasons" determination, but does not do so in an exclusive way, nor does it negate the applicability of the project director's pre-existing discretion to any person seeking services from the project.

Some commenters ask the Department to clarify whether a woman, who is considered as being from a low income family based in part on the lack of contraceptive coverage in her plan due to her employer's religious or moral objection, then qualifies to receive just the contraceptive services that her plan omits, or qualifies to receive all family planning services provided by the project, such as pap smears and STD testing. The Department clarifies that a project director may consider the woman with this insurance status as being from a low income family, or as qualifying for sliding scale discounts, for the purposes of her payment for the contraceptive services she seeks that are not covered by her insurance plan. The revision does not specify that such a woman will be deemed as being from a low income family for the purpose of receiving other services from the Title X project. Presumably, the woman would have insurance coverage for such other services, and the Title X provider could bill her health insurance company for them. Nevertheless, as noted above, the definition retains the decades-old discretion given to the project director to make a "good reasons" determination

to deem a person as being from a "low income family" for the purposes of receiving all the services offered in the Title X project. The example specifies and clarifies how the project director's discretion could be applied in a particular situation, but it does not add limitations to the project director's discretion in other hypothetical cases raised by commenters.

Many commenters express concern that implementation of the example would cause a financial strain on the program. The Department disagrees. As noted above, the example does not mandate that project directors must consider a woman as being from a "low income family" based on her employer's religious or moral objection to contraceptive coverage in her insurance plan. The example simply affirms the project director's discretion to take that fact into consideration. Project directors are aware of long-standing flexibility when defining "low income," since the 2000 regulations do not preclude project directors from deeming women who do not have contraceptive coverage because of their employer's religious or moral objection to contraceptive coverage in their insurance plans to be "low income." Because the project director already has that discretion under the 2000 regulations, the Department disagrees that merely making this discretion even more explicit will result in a significant number of women being granted low income status to receive free or low cost contraceptive services from Title X projects. Commenters did not provide data from which the Department could reliably estimate how many women will seek to obtain free or low cost contraceptives from Title X providers as a result of this change and how many will then be granted "low income family" status by project directors.

To the extent that commenters base this objection on estimates in rules concerning religious and moral exemptions to the contraceptive coverage guidelines, the Department notes that such estimates were speculative. The Department, along with the Departments of Labor and of the Treasury, attempted to set forth various estimates concerning the number of women who would use the exemptions, but noted that they lacked adequate data to know whether those estimates were accurate. 83 FR 57536, 57550 (Nov. 15, 2018). The Departments made several assumptions that they noted were likely too high. *Id.* at 57581. And they emphasized that the estimate was not the number of women that they believed would be affected by use of the

exemptions by sponsors of health insurance plans.

Even if those estimates of the women affected by the religious and moral exemption rules were accurate, the Department could not simply assume that all of those women would obtain contraceptive services from a Title X project. As noted above, the proposed additional example in this definition does not require a project director to consider a woman to be from a low income family on this basis. Project directors might conclude that women seeking to use the clarifying example have incomes that, despite their lack of contraceptive coverage, render them able to pay for contraceptive services. Moreover, it is unlikely that all women affected by the exemption rules will seek services from Title X projects. Some of those women may have family incomes under which they can afford the services. Some may choose, for other reasons, not to seek contraceptive services from Title X projects. For example, some may share their employers' objections to such contraceptives.

The Department is not aware of data from which to reliably estimate how many women will seek contraceptive services from Title X projects because the sponsors of their health plans have religious or moral objections leading them to omit contraceptive coverage from their insurance plans, but believes that any overall cost to the Title X program will be slight. With regard to low income women in general, the Department is aware that significantly less than half of such women receive services from Title X projects. In 2017, Title X projects served more than 4 million persons of whom 90% were low income persons.[66] The official poverty rate in 2016 was 12.7%,[67] therefore encompassing more than 41 million persons.[68] Thus, fewer than 10% of persons eligible for low income status in Title X projects sought and obtained Title X services. The Department estimates that an even smaller fraction of women would be affected by the exemptions provided for entities with religious and moral objections to providing contraceptive coverage. And

[66] Christina Fowler et al., *2017 Family Planning Annual Report*, Health and Human Services, (2008), *https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2017-national-summary.pdf*.

[67] Jessica Semega et al., *Income and Poverty in the United States: 2016*, U.S. Census Bureau, (Sept. 12, 2017), *https://www.census.gov/library/publications/2017/demo/p60-259.html*.

[68] U.S. Census Bureau, *Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2016*, (2017), *https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk*.

Exhibit 154    JA-0002594

the Department does not expect that the sliding scale discount discussed above would lead to a significantly greater number of women obtaining discounted contraceptives than would otherwise receive them. Their incomes will only be reduced by the cost of contraceptives, which, on average, is about $600 per year (see 83 FR at 57551), but the Title X sliding scale discounts span several thousand dollars between ranges. Women could thus be deemed to receive less income and still not be eligible for discounts. Finally, Title X projects pay only a fraction of the retail costs for contraceptive services discussed in the religious and moral exemption final rules.

Consequently, the Department concludes that the number of women whose employers have religious or moral objections leading them to omit contraceptive coverage from their insurance plans is small compared to the number of low income women served by Title X projects; at most, a small minority of such women will seek contraceptive services from Title X projects; the revision to the definition allows project directors to consider deeming those women as being from low income families, but it is likely that only a fraction of them will be deemed unable to pay for family planning; and the cost to the projects of contraceptive services provided or discounts offered is only a fraction of the retail costs of contraceptive services. In light of these factors, even assuming that the use of this example would lead more women to seek to use the existing "good reasons" exception than had previously, the Department does not believe it will lead to an unreasonable strain on the Title X program.

Even if there is an economic impact on the program, it is supported by the Title X statute. Where women are actually deemed to be from a "low income family" after the project director's consideration of their insurance status, the Title X statute provides for low cost or discounted contraceptive services. As discussed above, insurance status is one factor that may affect a woman's overall economic status or ability to pay for family planning services. The Department concludes it is appropriate to clarify the "low income family" definition through the proposed example, so that project directors may appropriately extend eligibility to such women. This helps fulfill the purposes of the Title X statute to ensure that women are not prevented from participating in the program due to their economic status.

The Department disagrees with commenters contending these revisions

in the definition violate the Establishment Clause of the First Amendment. The proposed example clarifies the discretion that a project director has long had under the rules concerning good reasons why some persons may be deemed from a low income family. Specifying that a project director may consider a woman's lack of contraceptive coverage as a result of a religious exemption exercised by the sponsor of her health plan from contraceptive coverage into consideration does not violate the Establishment Clause. The example also allows the project director to consider a woman's lack of contraceptive coverage from a sponsor's non-religious moral objection, or to take any number of other non-religious factors into account as a good reason that the woman may be unable to pay for family planning services. The Department also disagrees with a commenter who argues that project directors should consider whether a woman's health plan covers abortion. Title X precludes considering abortion as a method of family planning.

Accordingly, the Department finalizes the definition of "low income family" without change to the prefatory text or paragraph (1), but with changes to paragraph (2) to emphasize that the project director may exercise discretion under the existing "good reason" exception to "consider her insurance coverage status as a good reason why she is unable to pay for contraceptive services" when her employer has a sincerely held religious or moral objection to providing such coverage. The final rule in paragraph (2) is also finalized with guidance for the project director in making this determination.

5. Definition of Program or Project

*Summary of changes:* The 2000 regulations did not define a Title X "program" or "project." The proposed rule, at § 59.2 proposed to define "program" and "project" as interchangeable and mean ". . . a plan or sequence of activities that fulfills the requirements elaborated in a Title X funding announcement . . . ." The proposed definition indicated that implementation of a Title X "program" or "project" may be completed by grantees, subrecipients, or partnering providers working under grantees or subrecipients who deliver comprehensive family planning services.

The Department finalizes this definition as discussed below in response to public comment by stating "*Program* and *project* are used interchangeably and mean a plan or sequence of activities that is funded to

fulfill the requirements elaborated in a Title X funding announcement; it may be comprised of, and implemented by a single grantee or subrecipient(s), or a group of partnering providers who, under a grantee or subrecipient, deliver comprehensive family planning services that satisfy the requirements of the grant within a service area."

This clarification establishes the Department's finding that any organization receiving Title X funds is responsible to adhere to Title X requirements.

*Comments:* One commenter asked the Department to alter the definition of "Program or Project" because many of the prohibitions against using Title X funding for abortion only legally apply to the program or project, so the commenter asked the Department to reexamine the definition to be sure that entities cannot use the definition to escape compliance with the rule's requirements. In addition, the commenter suggested that the phrase "and may be comprised of" does not form part of the working definition but only describes how a program or project, as defined, may be comprised. That leaves the legally operative definition in the proposed rule of "program" and "project" as being "a plan or sequence of activities that fulfills the requirements elaborated in a Title X funding announcement."

At the same time, the commenter expresses concern that if an entity does not fulfill all or some of the requirements of the announcement, the program or project could argue that it does not meet this definition, and thus can avoid the requirements of the rule. Instead, the commenter suggests restating the definition as "[a]n enterprise, scheme or venture carried out or proposed to be carried out by a grantee, subrecipient(s) or a group of partnering providers pursuant to a Title X award granted by the Secretary."

*Response:* The Department appreciates the commenter's observations concerning whether aspects of the program and project definition might inadvertently allow entities to avoid compliance with the requirement of the rule. The 1988 regulations stated that "'[p]rogram' and 'project' are used interchangeably and mean a coherent assembly of plans, activities and supporting resources contained within an administrative framework." The proposed definition was similar in referencing plans and activities. The Department agrees with the commenter that the definition should include not only a plan or sequence of activities that fulfills Title X requirements, but those that seek to

Exhibit 154    JA-0002595

fulfill them. A program or project is one that receives Title X funding, as distinct from applications and proposed projects that are not awarded funding. In response to the commenter, the Department clarifies that, when it stated in the proposed rule that a program or project "may be comprised of, and implemented by a single grantee or subrecipient(s), or a group of partnering providers who, under a grantee or subrecipient, deliver comprehensive family planning services that satisfy the requirements of the grant within a service area," it intended those parameters to be, and those parameters will be, treated as operative parts of the definition. The Department intends to enforce all requirements of the Title X program with respect to any entity receiving a Title X grant. If an applicant cannot sufficiently show that the program will meet all the Title X requirements, then it will not qualify for a Title X grant. Consequently, the Department finalizes this definition by changing the word "fulfills" to "is funded to fulfill," and by changing the phrase "and may" to ", and it may".

### 6. Definition of Subrecipient

*Summary of changes:* The 2000 regulations do not define subrecipient. The proposed rule, at § 59.2, proposed to define "subrecipient" as "any entity that provides family planning services with Title X funds under a written agreement with a grantee or another subrecipient. These entities may also be referred to as "delegates" or "contract agencies.'"

There were no substantive comments under this section that are not already discussed elsewhere in the preamble to this rule. The Department finalizes this definition without change, except for minor grammatical corrections.

### D. Who is eligible to apply for a Family Planning Services Grant or contract? (42 CFR 59.3)

*Summary of changes:* The proposed rule at § 59.3 proposed to delete the provision that was rendered void by means of the CRA joint resolution of disapproval that was signed by the President, and would make corresponding changes to the heading of the section. The Department finalizes this section with changes in response to comments concerning the applicability of this section to contracts. As revised, the section would specify that "[a]ny public or nonprofit private entity in a State may apply for a family planning grant or contract under this subpart."

*Comments:* One commenter supports the proposed language to nullify the provisions of the 2016 regulation and

believes it will help improve the Title X program by making it permissible to fund organizations that do not provide artificial contraceptives. Another commenter thinks the federal government should directly fund national family planning organizations.

*Response:* The Department appreciates the support for the revocation of the nullified 2016 regulation. Regarding the commenter who calls for direct funding of entities that provide natural family planning, the Title X regulations already permit, and this final rule allows, such entities to be participating entities in Title X projects. For projects to receive a grant, they must provide a broad range of family planning methods and services. The Department does not prioritize providers of one specific family planning method over another. Accordingly, the Department believes the Title X program works most efficiently with grantor and grantees as defined in this rule.

As discussed above in section II.B concerning § 59.1, the proposed rule would not apply § 59.3 to contracts, and some commenters asked whether § 59.3 and other sections should apply to contracts. Section 1001 of the Title X statute specifies that, "in the establishment and operation of voluntary family planning projects," the Secretary "is authorized to make grants and to enter into contracts with public or nonprofit private entities." To conform § 59.3 to the scope of the statute, the Department finalizes § 59.3 with changes to the title of that section to read "Who is eligible to apply for a family planning services grant or contract?" Likewise, the text of § 59.3 is finalized with change to read: "Any public or nonprofit private entity in a State may apply for a family planning grant or contract under this subpart."

### E. What Requirements Must be Met by a Family Planning Project? (42 CFR 59.5)

In the proposed rule, the Department proposed a number of revisions and additions to § 59.5(a)(1), (5), and (10) and (b)(1) and (8). Each is discussed in turn.

### 1. Broad Range of Acceptable and Effective Family Planning Methods (42 CFR 59.5(a)(1))

#### a. Acceptable and Effective Methods and Services

*Summary of changes:* The 2000 regulations required that Title X programs provide a broad range of acceptable and effective family planning methods that were medically approved.

The proposed rule proposed to revise § 59.5(a)(1) by removing the language, "medically approved" and by clarifying the acceptable and effective family planning methods and services under Title X.

*Comments:* Many commenters oppose the proposed language because it removes the phrase "medically approved" as a description of the broad range of acceptable and effective family planning methods a project must provide. Some commenters state the language could reduce access to the safest, effective, and medically approved contraceptive methods, increase risks associated with promoting medically unreliable methods, place political ideology over science, and undermine recommendations jointly issued by OPA and the CDC on Quality Family Planning. Many commenters feel that the proposed language is misleading to patients and could negatively impact the quality of care provided to patients, especially to adolescents and young adults who may require hormonal contraceptive methods which have been associated with decreased rates of teen and unintended pregnancies.

Some commenters, however, support the proposed rule and point out that it will increase choices for persons served by Title X projects, allowing the government to choose the most qualified applicants instead of the applicants who happen to provide the most services.

*Response:* Section 1001(a) of the PHS Act requires Title X projects to "offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods . . .)." 42 U.S.C. 300a(a). The final rule at § 59.5(a)(1) ensures that the regulatory language is consistent with the statutory language.

The Department disagrees with comments that oppose removal, from the regulatory text, of the phrase "medically approved," leaving "acceptable and effective" to describe the family planning methods and services to be provided by Title X projects. As noted above, the Title X statute does not contain the phrase "medically approved" and it is far from clear what that undefined phrase requires. The Title X statute provides that Title X projects "shall offer a broad range of acceptable and effective family planning methods and services . . . ." 42 U.S.C. 300. That language was sufficient when Congress drafted the Title X statute, and the Department concludes that it is sufficient today. As such, the revision is clearly within the Department's statutory authority. The Department disagrees with commenters

Exhibit 154

who contend removing this language causes the regulations (or the Title X statute) to promote medically inaccurate information, or Title X to be administered based on a political ideology.

The "medically approved" language risked creating confusion about what kind of approval is required for a method to be deemed "medically approved." Family planning methods offered by Title X projects are already offered by health care professionals, so, to that extent, those methods are already medically approved. But different medical doctors and professional organizations may differ on which methods of health care they approve, including different methods of family planning. Some family planning methods cannot be medically approved by a government agency, such as the Food and Drug Administration, because they do not fall within its jurisdiction.[69] This does not mean that such methods of family planning are unacceptable or ineffective in the view of medical sources.[70] Moreover, various medical sources may view a particular method differently, based on different criteria, and it is not clear what the "medically approved" standard would mean in a circumstance where medical authorities differ regarding a particular method. The statutory language of "acceptable

and effective family methods or services," without the phrase "medically approved" provides sufficient guidance to Title X projects in considering the types of family planning methods and services that they provide.

The Department does not believe that the final language of the first two sentences of § 59.5(a)(1), as finalized here, would limit access to family planning services or other necessary health care, nor lead to an increase in unintended pregnancies.

b. Projects Required To Provide a Broad Range of Family Planning Methods and Services, but Participating Entities May Offer a Limited Number of Family Planning Methods and Services

*Summary of changes:* The Department proposed to specify in the proposed rules that participating entities within a project would not be required to provide every method or service. The Department further proposed that, projects as a whole provide a "broad range of such family planning methods and services," but not be required to provide every acceptable and effective method or service. The Department finalizes these sentences in § 59.5(a)(1) without change.

*Comments:* Some commenters agree with the Department that not every project or participating entity should be required to provide all Title X services, so long as the overall Title X project offers a broad range of family planning methods and services. They believe that allowing participating entities that do not offer all services will increase the pool of potential applicants, allow projects to offer a broader range of services by utilizing specialty providers, and allow the government to choose the most qualified applicants.

Many commenters express concern with the language describing the broad range of family planning methods and services that projects must provide. Some commenters say the proposed language would reduce the methods offered within a project by stating, "projects are not required to provide every acceptable and effective family planning method or service . . . as long as the entire project offers a broad range of such family planning methods and services." Commenters express concern that projects will not be required to provide every acceptable and effective family planning method or service, and contend the language seems to encourage projects to not offer every acceptable and effective family planning method or service. Many commenters state that the proposed rules are inconsistent with the original intent of Title X to establish as a national goal the

provision of adequate family planning services and to all those who want them but cannot afford them. Many commenters oppose the proposed language because they believe it will limit access to family planning services and other necessary health care. One commenter states that the definition will limit access to comprehensive reproductive health services, and therefore adversely impact women's ability to attain positive economic outcomes for themselves and their families. A commenter requests that the Department clarify that, even if a Title X project need not provide every acceptable and effective family planning method or service, a project must provide a broad range of contraceptive methods. Some commenters assert that the proposed rule may cause more abortions by encouraging low-efficacy methods of family planning and decreasing access to contraception and, therefore, increasing unintended pregnancies.

Many commenters express concern regarding the language specifying that participating entities within a project may offer a single method, or a very limited number of methods, of family planning. Some of these commenters suggest that this weakens the Title X program, undermining its status as a program offering comprehensive services, and prevents patients from making the best decisions about their health due to lack of information or options.

Many commenters suggest that allowing participating entities that offer limited services would divert scarce family planning dollars away from entities that provide effective and preferred methods of contraception and instead provide grants to entities that provide few, if any, methods that patients find acceptable. One commenter expresses concern that inexperienced entities might participate in the Title X program, making navigation more challenging as patients struggle to find providers that offer desired services. Some commenters contend that the proposed rule opens the potential for what they call "fake" women's health care facilities to receive funding from Title X, and that the proposed rule deemphasizes the importance of contraception and the full range of family planning methods.

Some commenters express concern that the language might allow for or encourage coercion, and might undermine the standard of health care service delivery and outcomes. Many commenters express concern that the rule will remove a person's choice in the selection of family planning method.

---

[69] *See* FDA, *Birth Control* (March 6, 2018), *https://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm. See also,* FDA, *Enforcement Story Archive* (August 7, 2003), *https://www.fda.gov/iceci/enforcementactions/enforcementstory/enforcementstoryarchive/ucm106947.htm* ("Warning Letter Issued for "Fertility Awareness Kit"). *But see* FDA, *FDA allows marketing of first direct-to-consumer app for contraceptive use to prevent pregnancy* (August 10, 2018), *https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm616511.htm.*

[70] For example, pursuant to a contract with HRSA, in March 2016, the American College of Obstetricians and Gynecologists (ACOG) launched the "Women's Preventive Services Initiative." In its "Clinical Recommendations," ACOG recommended that instruction in fertility awareness-based methods of family planning, and counseling, initiation of use, follow-up care, management, and evaluation of the same, be provided with no cost-sharing in health coverage. *See* Women's Preventive Services Initiative, *Clinical Recommendations Contraception,* American College of Obstetricians and Gynecologists (2018), *https://www.womenspreventivehealth.org/recommendations/contraception.* The Health Resources and Services Administration (HRSA), a component of HHS, adopted this recommendation on December 20, 2016, and added coverage of fertility awareness-based methods of family planning to its women's preventive services guidelines, issued pursuant to Section 2713(a)(4) of the Affordable Care Act (42 U.S.C. 300gg-13(a)(4)). *See* HRSA, *Women's Preventive Services Guidelines,* Health Resources & Services Administration (October 2017), *https://www.hrsa.gov/womens-guidelines-2016/index.html.* On that basis, fertility awareness-based methods of family planning could be said to be "medically approved."

Exhibit 154

Some commenters believe the proposed rule presents a potential threat to reverse decades of progress in reducing unintended and teen pregnancy, citing that natural family planning methods require a regular menstrual cycle to be effective, which adolescents rarely have.

Other commenters, however, assert that there is no requirement for each participating entity to provide all family planning services and that this flexibility is in line with our Nation's longstanding commitment to protecting freedom of conscience and comports with the First Amendment.

*Response:* The Department finalizes without change the language specifying that participating entities within a project "may offer only a single method or a limited number of methods of family planning as long as the entire project offers a broad range of such family planning methods and services." Neither the Title X statute nor the proposed rule would permit a Title X project as a whole to provide only one (or a limited number of) family planning methods and services. The Department is finalizing this rule which continues to require Title X projects to offer a broad range of family planning methods and services.

The Department appreciates concerns of commenters who believe the proposed language that says projects are not required to provide every acceptable and effective family planning method or service would reduce the range of family planning methods that Title X projects must provide, but does not believe that this is a reasonable interpretation of the proposed rule. To clarify, projects would continue to be required to offer a broad range of family planning methods and services, consistent with the statutory mandate. However, neither the plain language of the statutory requirements, nor the 2000 regulatory text, requires that Title X projects provide every acceptable and effective family planning method or service. Thus, the proposed rule and this final rule merely clarify, and make explicit, that the requirement for a broad range of acceptable and effective family planning methods and services does not mean every acceptable and effective family planning method or service. Furthermore, neither the plain language of the statute, nor the 2000 regulatory text, requires participating entities within a project to provide every acceptable and effective family planning method or service, or even a broad range of such methods or services. It is permissible under the 2000 regulations for a subrecipient within a funded project to offer only a single or limited number of family planning methods or

services. *See* 42 CFR 59.5(a)(1) ("If an organization offers only a single method of family planning, it may participate as part of a project as long as the entire project offers a broad range of family planning services."). The same is true under this final rule. This is permissible only if the project as a whole provides a "broad range" of such methods and services. The final rule merely acknowledges and clarifies this reality.

The Department disagrees that requiring a broad range of family planning methods and services, while recognizing that some projects may not offer every method or service, would lead to an increase in unintended pregnancies. Similar to the 2000 regulations, this rule requires the project as a whole to offer a broad range of acceptable and effective family planning methods and services, which includes contraceptives. While the rule clarifies the broad range of family planning methods and services permissible under Title X, it also ensures Title X patients are free, without coercion, to select any of the broad range of family planning methods and services offered in a project. The Title X statute has always provided as much, and the 2000 regulations did too.

The Department disagrees with commenters opposing the language allowing participating entities to offer one or few family planning methods. The 2000 regulations explicitly permits this, stating "[i]f an organization offers only a single method of family planning, it may participate as part of a project as long as the entire project offers a broad range of family planning services"; this language has been included in regulations since at least 1988. To the extent the commenters opposing this language do not find fault with the 2000 regulations, the Department sees no cause for concern over this provision. About four million patients are annually served with the current provision that allows organizations that offer only a single family planning method to participate in a Title X project. The Department now merely confirms this practice by stating that "[a] participating entity may offer only a single method or a limited number of methods of family planning as long as the entire project offers a broad range of such family planning methods and services." Therefore, the Department disagrees with the concerns expressed about including this sentence in the final rule.

The Department also disagrees that the proposed rule weakens the standing of Title X programs as comprehensive sources for family planning. The rule does not prohibit projects or providers from offering every acceptable and

effective family planning method or service, so long as abortion is not considered a method of family planning. The rule simply reflects, as stated in the 2000 regulations, that Title X projects are required to provide a broad range of acceptable and effective family planning methods and services (not every such method or service), and that participating entities are permitted to participate in a Title X project even if not all of them offer every method—and, indeed, even if some participating entities within a project offer only one family planning method. The range of available family planning methods has significantly increased over the last few decades. The Department believes it may be unreasonably difficult or expensive to add a new requirement that all projects and all participating entities must offer all acceptable and effective forms of family planning. It may also be difficult for clients to access certain methods in which not all participating entities have specific training and expertise. This rule enhances the ability of individual Title X projects to offer, and clients to access, such methods, while preserving the requirement that individual Title X projects offer a broad range of family planning methods and services. The Department disagrees with some commenters who say the rule is misleading to Title X clients. This rule is substantially similar to the 2000 regulations rule in that it permits single method providers to participate in the Title X program and includes natural family planning methods as those that qualify under the "broad range."

The Department disagrees that the proposed and final rules authorize Title X funding for what some commenters call "fake" women's health care facilities. It is not clear what such commenters deem to be "fake" facilities, but nothing in the rule authorizes projects to use clinics that engage in fraud or allow the practice of medicine without a license. Title X projects are subject to quality oversight by the Department and are also subject to relevant State laws in the operation of health clinics.

The Department believes that permitting entities to provide services for which they have particular expertise allows greater access to family planning methods in Title X projects and contributes to quality care for patients. The final rule does not require projects to include participating entities that offer only one or just a few methods, but it continues to allow them to do so, if they deem it appropriate and consistent with offering a broad range of family planning methods and services.

Exhibit 154

The final rule, thus, clarifies and reframes, but does not create or invent the ability of a single-method entity to participate in a Title X project. The Department believes that continuing to allow such entities to participate will give people served under Title X access to specialized expertise in certain methods. Increasing client choices among family planning clinics and methods in a project is likely to decrease unintended pregnancies, not increase them, because clients are more likely to visit clinics that respect their views and beliefs and to use methods that they desire and that fit their individual circumstances.

The Department also agrees with commenters that say the final rule is consistent with principles of the First Amendment and laws that protect freedom of conscience. By allowing projects to use entities that offer a single method or limited methods—including providers that might do so for reasons of conscience—the language being finalized will, among other things, both protect the ability of health care providers and facilities with conscientious objections to providing certain types of family planning methods and services to participate in Title X projects and maintain Title X projects that offer a broad range of family planning methods and services.

c. Listing Particular Services in the Broad Range of Family Planning Services That May Be Provided

*Summary of changes:* The 2000 regulations recognized natural family planning and services for adolescents as some of the broad range of acceptable and effective family planning methods. The proposed rule proposed to clarify that natural family planning and other fertility-awareness based methods qualify as acceptable methods, as do contraceptives. In addition, as a mechanism for addressing infertility, the Department proposed to add adoption as a family planning service. Therefore, the Department finalizes § 59.5(a)(1) with changes to replace the word "and" with the word "or" before the phrase "other fertility-awareness based methods."

*Comments:* The Department received several comments about the listing of particular services in the broad range of family planning services that may be provided. Some commenters objected to references to natural planning or fertility awareness-based methods because fertility awareness-based methods are already offered at 93% of Title X clinics and natural family planning is already a method included in the Quality Family Planning

Guidelines provided by CDC. Others object to these methods because they assert that the methods are ineffective, or at least among the least effective forms of family planning.

Other commenters object to language specifying adoption as a type of family planning service. They contend that the management of infertility, including adoption, is beyond the language and intent of the Title X statute. They also believe that including adoption would put a strain on the program, as it would redirect a large amount of Title X funds. And they assert that including adoption in the definition is contradictory because adoption is a postconception activity and the new definition states that family planning only includes preconception activities. Some commenters also assert that the Department improperly redefines the meaning of a reproductive life plan.

*Response:* The Department disagrees with commenters who say the rule should not mention natural planning or additional fertility awareness-based methods, and who contend the rule emphasizes those methods over other forms of family planning. As discussed in the context of the definition of family planning in § 59.2, the Title X statute itself requires projects to offer a broad range of family planning methods and services, and specifies that those methods "includ[e] natural family planning methods, infertility services, and services for adolescents." 42 U.S.C. 300(a). The Department concludes that Title X projects (although not necessarily each provider or site within a project) must offer both contraception and natural family planning in order for the Department faithfully to implement Title X's "broad range" requirement. The proposed and final rules, far from over-emphasizing natural family planning or emphasizing it to the exclusion of contraceptives, add contraceptives to this non-exclusive list of examples of family planning methods that projects must provide. The proposed rule at § 59.5(a)(1) also includes the phrase "and other fertility awareness-based methods" alongside "natural family planning." As discussed concerning the "family planning" definition, "natural family planning" is not defined in the Title X statute, and scientific advances have occurred in natural family planning methods in the last 40 years, so that some medical professionals now refer to related methods as "fertility awareness-based methods." [71] The final rule does not

emphasize natural family planning over other forms of family planning.

The definition of family planning at § 59.2 uses the word "or" before the phrase "other fertility awareness-based methods," whereas the text at § 59.5(a)(1) uses the word "and." The Department considers the word "or" to be more appropriate in both instances. This clarifies that by "other fertility awareness-based methods," the Department is not referring to methods that are not "natural family planning," nor is it requiring projects to offer natural family planning and other fertility awareness-based methods as if those are two different kinds of categories. Instead, by using the word "or," the Department intends for projects to have flexibility in deciding which types of natural family planning or fertility awareness-based methods they will offer in meeting their obligation to offer natural family planning methods within the project. Therefore, the Department finalizes § 59.5(a)(1) with a change to replace the word "and" with the word "or" before the phrase "other fertility-awareness based methods."

The language specifying that participating entities may offer only a single method does not mention natural family planning or any other single method. Therefore, it does not emphasize natural family planning over other methods as some commenters contend. Under the final rule, single-method providers are permitted in projects whether their single method is a natural family planning method, a contraceptive method (for example, an implant), or some other family planning method. The Department disagrees with commenters' concerns that allowing single or limited method entities to participate in a Title X project limits family planning to natural family planning methods, limits what individuals may choose, or deprives individuals of methods they may choose. Those results have not occurred under the 2000 regulations, which already allow for single method participating entities.

The Department also disagrees with commenters who oppose the inclusion of adoption information as a type of infertility services offered by Title X providers. As discussed with respect to the proposed definition of family planning, the Title X statute does not define "family planning," and the Department has always read the

---

[71] *See, e.g.,* Shawn Malarcher, et. al., *Fertility Awareness Methods: Distinctive Modern Contraceptives,* 4 Global Health: Science and

Practice 13, 13 (2016), *available at https:// www.ncbi.nlm.nih.gov/pmc/articles/PMC4807745/ pdf/013.pdf* (stating fertility awareness methods of contraception have been tested and proven effective at pregnancy prevention and safe to use).

Exhibit 154

examples it gives of family planning methods and services as being a non-exclusive list; otherwise, Title X could fund nothing but "natural family planning methods, infertility services, and services for adolescents." Adoption is a method of planning the size of one's family and the spacing of children raised in one's family, and it can be used to enlarge one's family or to plan one's family in the context of infertility.

In addition, under Infant Adoption Awareness grants program, Congress specified that eligible health centers (which includes Title X clinics) should receive training on providing adoption information and referrals, and that the Secretary should encourage the same.[72] Accordingly, Title X projects may provide adoption information and referrals as a preconception family planning method, especially in the context of providing infertility services, and may provide adoption information and referrals during postconception pregnancy counseling as long as the pregnancy counseling satisfies the statutory requirement that it be nondirective. Therefore, the Department considers it appropriate to include adoption information in the non-exclusive list of services mentioned among a possible broad range of family planning methods and services a Title X project might offer. But consistent with the change finalized in the definition of "family planning," the Department modifies the phrase contained in the proposed rule, "including infertility services, including adoption, and services for adolescents" to provide "including infertility services, information about or referrals for adoption, and services for adolescents".

Importantly, the proposed language in no way limits the choices of Title X clients or infringes on their views of what services to choose. The final rule does not require any Title X client to pursue adoption, natural family planning, or any other particular family planning method or service. On the contrary, as discussed above, the definition of family planning is finalized to specify that "[f]amily planning methods and services are never to be coercive and must always be strictly voluntary."

[72] See 42 U.S.C. 254c–6 (Congress authorized the Department to make grants "for the purpose of developing and implementing programs to train the designated staff of eligible health centers in providing adoption information and referrals to pregnant women on an equal basis with all other courses of action included in nondirective counseling to pregnant women").

### 2. Projects Shall Not Provide, Promote, Refer for, or Support Abortion as a Method of Family Planning (42 CFR 59.5(a)(5))

*Summary of changes:* The 2000 regulations prohibited Title X projects from providing abortion as a method of family planning. They also specified that Title X projects must provide information on, counseling regarding, and referral for, a variety of services for pregnant women, including abortion. The proposed rule, at § 59.5(a)(5), instead proposed to emphasize the duty of Title X providers to "[n]ot provide, promote, refer for, support or present abortion as a method of family planning." The proposed rule would allow nondirective pregnancy counseling, but would delete the current language in that paragraph (including (i) and (ii)), which stated that "[a] project must . . . [o]ffer pregnant women the opportunity to be provided information and counseling regarding . . . [p]renatal care and delivery; [i]nfant care, foster care, or adoption; and [p]regnancy termination" and that a project must, "[i]f requested to provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, and referral upon request, except with respect to any option(s) about which the pregnant woman indicates she does not wish to receive such information and counseling." *See* 42 CFR 59.5(a)(5).

At §§ 59.14 and 59.16, the proposed rule proposed more specific parameters to implement the requirement in § 59.5(a)(5) that "[a] Title X project may not perform, promote, refer for, support, or present abortion as a method of family planning . . ." and to implement the requirement that any pregnancy counseling provided by Title X projects must be nondirective. The proposed rule addressed in this section relates to the proposal to remove the requirement for nondirective pregnancy counseling and referral (including the obligation to counsel on, and refer for, abortion), and replace it with a prohibition in § 59.5(a)(5) on the use of Title X funds to perform, promote, refer for, support, or present abortion as a method of family planning. Comments discussing pregnancy counseling are discussed in a distinct part of this preamble, as are comments discussing the deletion of the requirement to refer for abortions. Comments discussing the prohibition on abortion referrals, and permissible referral activities in general, are discussed with regard to section §§ 59.14 and 59.16.

The Department finalizes the proposed rule in § 59.5(a)(5) with one change to make it clear that providers are allowed to provide nondirective pregnancy counseling about abortion, by removing "present" from the proposed list of prohibitions regarding abortion as a method of family planning.

*Comments:* Many commenters support eliminating the requirement that Title X family planning providers counsel for, provide information about, and refer for abortion, citing protections found in health care conscience laws and principles. Such commenters contend that the requirement in the 2000 regulations of abortion referrals, information and counseling is inconsistent with section 1008 of Title X, and with the conscience protections provided for in laws such as the Church, Coats-Snowe, and Weldon Amendments. Commenters also contend the proposed language appropriately protects and recognizes the importance of religious freedom and freedom of speech.

Other supportive commenters note that the 2000 regulations stand in the way of some organizations applying for Title X funds, or participating in Title X projects, due to the requirement for abortion referrals and information. Such commenters contend the 2000 regulations limit choice for patients, especially those who live in rural or remote areas, where faith-based and local community organizations would be more likely to apply if the abortion counseling and referral requirement were lifted.

Some commenters express concerns related to federal conscience protections, including the Weldon, Coats-Snowe, and Church Amendments, that may apply to Title X grantees and subrecipients. The Church Amendments prohibit grantees from discriminating in "the employment, promotion, or termination of employment of any physician or other health care personnel" or "the extension of staff or other privileges to any physician or other health care personnel" because "he performed or assisted in the performances of a lawful sterilization procedure or abortion. . . ." 42 U.S.C. 300a–7(c). One commenter asks that the final rule include similar conscience protections for health care personnel who refuse to engage in family planning research or services that are contrary to their religious beliefs or moral convictions. A commenter also requests clarification on whether this provision would require religious or pro-life groups who receive Title X funds to hire someone who disagrees with their religious and moral convictions

Exhibit 154

regarding abortion. Other commenters seek clarity on whether Title X projects must hire personnel who disagree with certain family planning methods. Some commenters state there is no need for further regulatory review to protect the rights of those who decline to participate in abortion-related services, but rather, contend there is a need to protect the rights of those who conscientiously provide and seek abortion-related services.

Several commenters disagree with the proposed rule's elimination of the abortion information, counseling, and referral requirements. Such commenters argue that withholding information about pregnancy options interferes with the patient-provider trust relationship, is contradictory to patient-centered care, and compromises the health of the patient, as well as the ability of the patient to make timely and fully informed decisions. One commenter states that some patients are surprised to hear abortion is legal and have other misconceptions about the procedure, making it imperative that comprehensive information about abortion be shared with those patients.

Some commenters contend that restricting counseling for and information about abortion in Title X projects would encroach on physicians' codes of ethics and responsibilities to patients. Many commenters state that prohibitions on abortion counseling and referral would directly conflict with the requirements or codes of ethics of medical professional associations, including the American College of Physicians and the American College of Obstetricians and Gynecologists. These associations state that patients should receive full and accurate information to inform their health care decisions. For example, commenters refer to the American Medical Association Code of Medical Ethics that providers should "present relevant information accurately and sensitively, in keeping with the patient's preferences" and that "withholding information without patient's knowledge or consent is ethically unacceptable." Some commenters contend that the restriction on referral, and on directive abortion counseling, may put providers at risk of medical liability since a delay or failure to diagnose is one of the top three liability allegations cited by ob-gyns, who are already at an elevated liability risk compared to their colleagues.

One commenter takes the view that the rule should prohibit Title X from offering nondirective counseling on abortion altogether. The commenter proposes instead that providers should provide only life-affirming counseling to pregnant clients who consent to receive such counseling. The commenter says this approach would protect the conscience rights of those organizations and their employees.

*Response:* The Department believes the requirement to provide information, counseling, and referral for abortion in the 2000 regulations is incorrect and inconsistent with a number of federal conscience protection statutes and, at least with respect to referral, with section 1008's prohibition on funding Title X projects where abortion is a method of family planning. As described in the preamble to the 1988 regulations, prior to issuance of any regulations pursuant to Title X, the Department had, since 1972, interpreted section 1008 not only as prohibiting the provision of abortion but also as prohibiting Title X projects from in any way promoting or encouraging abortion as a method of family planning. *See* 53 FR 2922, 2923. Based on the legislative history, the Department has also, since 1972, interpreted section 1008 as requiring that the Title X program be "separate and distinct" from any abortion activities of a grantee. Although the Department had generally permitted activities that did not have the immediate effect of promoting abortion, or the principal purpose or effect of promoting abortion, the Department also provided in its 1988 Title X regulations that "a Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning." The 1988 regulations added that "[a] Title X project may not use prenatal, social service, emergency medical, or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning." 53 FR at 2945.

Since that time, however, Congress has contemplated that nondirective pregnancy counseling may be offered in Title X projects. The HHS fiscal year 2019 appropriations act provides that "amounts provided to said projects under such title shall not be expended for abortions, that all pregnancy counseling shall be nondirective. . . ."[73] Similarly, the statute establishing the Infant Adoption Awareness program directed the Department to include "nondirective counseling to pregnant women." 42 U.S.C. 254c–6.

The Department has carefully considered the provision of counseling and information about abortion in the Title X context in light of Section 1008, the appropriations riders in place since 1996 that all counseling be nondirective, public comments, policy considerations, and the Department's historical positions. As a result, the Department concludes that:

• Title X projects will not be required to refer for abortion (and, as discussed in regard to § 59.14, referrals for abortion as a method of family planning are prohibited).

• Physicians or APPs within Title X projects may offer pregnancy counseling, including counseling that addresses the option of abortion among other options, so long as the counseling is nondirective and does not include referrals for abortion as a method of family planning.

• Title X projects will not be required to offer nondirective pregnancy counseling in general, or abortion information and counseling specifically.

In stating that "all pregnancy counseling shall be nondirective," Congress did not explicitly require pregnancy counseling, nor prohibit such counseling from discussing abortion if the counseling is nondirective. Unlike abortion referral, nondirective pregnancy counseling would not be considered encouragement, promotion, support, or advocacy of abortion as a method of family planning, which would be prohibited by the Title X statute and this final rule. Therefore, the approach of this final rule is more permissive than the 1988 regulations, which prohibited any counseling concerning the use of abortion as a method of family planning, but predated Congress's directive that all pregnancy counseling in the program be nondirective. Therefore, the Department finalizes without change the proposed rule's deletion of the language in § 59.5(a)(5) requiring pregnancy options information and counseling, including requiring information, counseling and referrals for abortion. Consistent with that rescission of § 59.5(a)(5)(i) and (ii), there is no requirement in the final rule that a project offer nondirective counseling or information about abortion. The rule does not, however, prohibit nondirective pregnancy counseling by physicians or APPs, even if that counseling discusses abortion.

Some commenters urge the Department to prohibit nondirective counseling concerning abortion in a way similar to the 1988 regulations. The Department acknowledges that it has the

---

[73] HHS Appropriations Act 2019, Public Law 115–245, Div. B, 132 Stat. 2981, 3071. This provision has been inserted into various HHS appropriations acts since first adopted in the 1996 Appropriations Act. *See, e.g.,* Consolidated Appropriations Act 2018, 115 Pub. L. 141, Div. H., 132 Stat 348, 717; Consolidated Appropriations Act 2017, 115 Pub. L. 31, Div. H, 131 Stat. 135, 521.

Exhibit 154

discretion to interpret section 1008 as it did in the 1988 regulations, but it disagrees that it must prohibit discussion of abortion in nondirective pregnancy counseling. Instead, the Department interprets Congress's directive that all pregnancy counseling be nondirective as permitting the Department to allow nondirective pregnancy counseling even if such counseling includes abortion among other options. Nevertheless, the Department also agrees, to take a phrase from the 1988 regulations, that Title X projects should not use the permission to provide pregnant patients certain information through nondirective counseling "as an indirect means of encouraging or promoting abortion as a method of family planning." Title X projects and service providers must be careful that nondirective counseling related to abortion does not diverge from providing neutral, nondirective information into encouraging or promoting abortion as a method of family planning, or into referral for abortion as a method of family planning. The Department anticipates that it may provide further guidance to grantees on this issue.

Some commenters contend this rule will deprive women of the information they need about abortion or where to obtain one, but the purpose of Title X is not to provide such information. To the contrary, Congress expressly restricted the Department from funding Title X projects where abortion is a method of family planning. Title X programs, accordingly, may offer information about abortion only as part of nondirective pregnancy counseling. The primary focus of Title X remains on preconception family planning methods and services. In implementing section 1008, moreover, the Department has a history of establishing prohibitions on abortion referral, even if at other times it has allowed or required such referrals. The 1988 regulations, for example, prohibited Title X projects from providing abortion information, counseling or referrals. The 2000 regulations took a different approach by requiring information, counseling and referrals for abortion as a method of family planning in certain cases. The Department has now reconsidered this issue and believes the approach taken in this final rule is a better interpretation of section 1008, consistent with the subsequent Congressional directive that all pregnancy counseling be nondirective. Further, in the Department's view, it is not necessary for women's health that the federal government use the Title X program to

fund abortion referrals, directive abortion counseling, or give to women who seek abortion the names of abortion providers. Information about abortion and abortion providers is widely available and easily accessible, including on the internet.

The Department disagrees with commenters who assert that prohibiting referrals or directive counseling about abortion violates the First Amendment rights of grantees or subrecipients. The Supreme Court explicitly rejected this claim in *Rust,* upholding the provisions of the 1988 regulations "prohibiting counseling, referral, and the provision of information regarding abortion as a method of family planning." *Rust,* 500 U.S. at 193. The Court explained that the challenged provisions are permissible because they "are designed to ensure that the limits of the federal program are observed. . . . This is not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside of the project's scope." *Rust,* 500 U.S. at 193–94. The Court rejected the argument that the restrictions constitute impermissible viewpoint discrimination, and instead held the government may "choose[] to fund a program dedicated to advance certain permissible goals," even when "in advancing those goals necessarily discourages alternative goals." *Id.* at 194. The same principles would sustain this rule under the First Amendment. In fact, this rule is more permissive of speech than the regulations upheld by *Rust,* because this rule allows physicians or APPs to provide nondirective pregnancy counseling even if it discusses abortion, as long as the project does not promote, encourage, or refer for abortion as a method of family planning.

The Department appreciates comments that discuss how conscience laws such as the Church, Coats-Snowe, and Weldon Amendments apply in the context of the Title X program. In deciding to rescind the requirement that Title X projects counsel, provide information on, and refer for abortion, the Department concludes those requirements in the 2000 regulations are not consistent with federal conscience laws. As explained in the preamble to the proposed rule, the Department had already acknowledged this problem in the preamble to the 2008 regulations implementing these conscience protections. 73 FR 78087. There, the Department observed, "[w]ith regards [sic] to the Title X program, commenters are correct that the current regulatory requirement that grantees must provide

counseling and referrals for abortion upon request (42 CFR 59.5(a)(5)) is inconsistent with the health care provider conscience protection statutory provisions and this regulation. The Office of Population Affairs, which administers the Title X program, is aware of this conflict with the statutory requirements and, as such, would not enforce this Title X regulatory requirement on objecting grantees or applicants." *Id.* Although those 2008 conscience statute regulations were partially repealed in 2011, 76 FR 9968 (Feb. 23, 2011), the underlying statutes remain valid and in place, and the reasoning in the preamble to the 2008 regulations on this point remains persuasive.[74]

The Department continues to conclude that the abortion referral and counseling requirements in the 2000 regulations cannot be enforced against objecting grantees or applicants, and that such requirements cannot be used to deny participation in the Title X program or a Title X project comprised of objecting family planning providers. The 2000 regulations required that projects provide information about abortion, counsel a client about abortion if she asks for it, and refer her for abortion. However, the Weldon Amendment prohibits the federal government from engaging in discrimination against a health care entity on the basis that it does not, among other things, refer for abortion. The Coats-Snowe Amendment also prohibits the federal government and State and local governments that receive federal financial assistance—such as State and local health departments that receive Title X funds—from discriminating against a health care entity on the basis that it refuses to "provide referrals" for abortion or refuses to "make arrangements for" providing referrals for abortion. To ensure compliance with these and other federal conscience laws, this final rule does not require Title X projects to provide any nondirective counseling, information, or referral for abortion. In order to ensure compliance with section 1008, the Department affirmatively prohibits referrals for abortion. The Department thus concludes that these federal conscience protection laws, along with its interpretation of section 1008, support its decision to finalize the rescission of the requirement in the

---

[74] As noted in the proposed rule, the Department has issued a proposed rule that would expand the Department's enforcement ability with respect to federal conscience protection and related anti-discrimination laws. Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 83 FR 3880 (Jan. 26, 2018).

Exhibit 154

2000 regulations that projects provide abortion information, counseling, and referral in § 59.5(a)(5).

The Department appreciates the concerns of commenters about other ways in which federal conscience laws might apply in Title X projects, for example, whether they require Title X providers to hire personnel with certain views or objections, or prohibit entities from firing an individual willing to perform an abortion, or who has done so in the past. The Department intends to operate the Title X program consistent with federal conscience laws, the First Amendment, the Religious Freedom Restoration Act, and similar federal laws. The Department also notes that the Title X statute itself explicitly prevents programs from receiving Title X funds where abortion is a method of family planning. Accordingly, any Title X project must ensure compliance with this final rule to receive Title X funds. The Title X statute has coexisted with federal conscience laws for over 40 years. The limitation on referral for abortion as a method of family planning in this final rule, along with the removal of the abortion counseling, information, and referral requirements, is consistent with these statutory provisions. Just as *Rust* affirmed the government's right to place such limits on the Title X program, the Department concludes that it can fully achieve the goals of the Title X program while faithfully enforcing federal conscience laws.

The Department declines the invitation of a commenter to expand these final rules to further address the protection of conscience in the Title X program. First, because the Department did not propose such provisions in the proposed rule and did not expressly request comment on the issue, it does not have the benefit of extended comment on the issue. Second, the Department does not believe further clarification of this issue is necessary in this final rule, when the federal health care conscience laws are already the subject of separate rulemaking. The Department also will not address in this rule individual qualifications for staff hiring by a Title X program for services performed before or outside the Title X program, nor accept one commenter's invitation to add provisions to implement the Religious Freedom Restoration Act as it may apply to personnel who work for entities participating in Title X projects. Rather, the Department simply notes that the Office of Population Affairs bears the responsibility for holding grantees responsible for complying with federal conscience laws in the Title X program. In addition, the HHS Office for Civil Rights has been designated to receive complaints of conscience law violations and to coordinate with the relevant program office with respect to such complaints.

The Department does not agree with the commenter who proposes that Title X providers provide prenatal care. While the Department agrees that prenatal care is important to maternal and infant outcomes, the primary purpose of the Title X program is to provide preconception family planning services. Nondirective counseling and referrals for postconception services— although not the provision of postconception health care services themselves—are the appropriate approach in the context of pregnancy, so long as they do not include referral for abortion as a method of family planning. Within a Title X project, Title X providers may not provide prenatal care because it is outside the scope of the project, but must refer for prenatal care as pregnancy makes such referral medically necessary. However, the Department encourages Title X grantees either to offer comprehensive primary health services onsite (although outside the scope of the Title X project) or to have a robust referral linkage with primary health providers who are in close physical proximity to the Title X site.

The Department agrees with commenters that say the Department should offer more guidance concerning how projects that provide nondirective pregnancy counseling should do so consistent with applicable Title X statutory requirements. The proposed rule set boundaries on Title X projects concerning referral for, encouragement of, promotion of, advocacy for, support for, and assistance with, abortion as a method of family planning, and those boundaries would also apply to any nondirective pregnancy counseling that physicians or APPs provide within the Title X project. The proposed rule did not further specify the parameters of such counseling, for example by defining ''nondirective.'' Nevertheless, projects must comply with Congress's requirement that pregnancy counseling be nondirective, and the Department must enforce that requirement.

Therefore, the Department offers the following guidance on the requirement of nondirective pregnancy counseling. When a woman is confirmed to be pregnant, a physician or APP may provide nondirective pregnancy counseling. While all pregnancy counseling must be nondirective, in compliance with Congress's consistent direction through the HHS appropriation laws, this rule permits the physician or APP to exercise discretion on whether to offer such counseling.[75] Nondirective counseling is designed to assist the patient in making a free and informed decision. In nondirective counseling, abortion must not be the only option presented by physicians or APPs; otherwise the counseling would violate not only the Congressional directive that all pregnancy counseling be nondirective, but also the prohibitions in this rule on encouraging, advocating, or supporting abortion as a method of family planning, which the Department prohibits in order to implement, among other provisions, section 1008. Each option discussed in such counseling must be presented in a nondirective manner. This involves presenting the options in a factual, objective, and unbiased manner and (consistent with other Title X requirements and restrictions) offering factual resources that are objective, rather than presenting the options in a subjective or coercive manner. Physicians or APPs should discuss the possible risks and side effects to both mother and unborn child of any pregnancy option presented, consistent with the obligation of health care providers to provide patients with accurate information to inform their health care decisions.

Title X projects should not use nondirective pregnancy counseling, or referrals made for prenatal care or adoption during such counseling, as an indirect means of encouraging or promoting abortion as a method of family planning. They should not use such counseling or referrals to steer clients to abortion or to specific providers because those providers offer abortion as a method of family planning. Referrals for abortion as a method of family planning may not be offered. If the patient is provided a list or the contact information of licensed, qualified, comprehensive primary health care service providers (including providers of prenatal care), the list—and the Title X staff—must not identify to the woman which, if any, providers on the list offer abortion.

Referrals for abortion for emergency care purposes are not prohibited.[76]

---

[75] While the decision to offer nondirective counseling is subject to the discretion of physicians and APPs, this rule requires referral for prenatal care in these situations because it is a medically necessary care for all pregnant women. In any case, all pregnancy counseling must be nondirective.

[76] Similarly, in cases involving rape and/or incest, it would not be considered a violation of the prohibition on referral for abortion as a method of family planning if a patient is provided a referral to a licensed, qualified, comprehensive health service provider who also provides abortion,

Continued

Exhibit 154

JA-0002603

Permitted referrals under this scenario include one in which a medical emergency is revealed, such as when a woman has a suspected ectopic pregnancy.[77] Because prenatal care is medically necessary for pregnancy, prenatal care referral is required and does not, under this final rule, render any pregnancy counseling impermissibly directive.

Referrals for, and information about, adoption are also permitted, as long as the counseling remains nondirective. Title X projects are not required to offer nondirective counseling or information on abortion.

Referring for adoption or prenatal care, but not for abortion, does not, in the Department's view, make pregnancy counseling directive in light of Congress's legislative directives applicable to the Title X program. Where care is medically necessary, as prenatal care is for pregnancy, referral for that care is not directive because the need for the care preexists the direction of the counselor, and is, instead, the result of the woman's pregnancy diagnosis or the diagnosis of a health condition for which treatment is warranted. Moreover, seeking prenatal care is not the same as choosing the option of childbirth. Regarding adoption referrals, in Infant Adoption Awareness grants and the Infant Adoption Awareness Training Act, Congress made clear that the provision of adoption information and referrals do not necessarily render pregnancy counseling directive.[78] By contrast, Congress has prohibited funding projects where abortion is a method of family planning. That disparate treatment in Congress's legislative directives makes it appropriate to prohibit referrals for abortion as a method of family planning, including during nondirective pregnancy counseling, while permitting (and in some instances, mandating) referrals for other purposes.

The Department disagrees with commenters who contend the rule will require health care professionals to violate medical ethics, regulations concerning the practice of medicine, or malpractice liability standards. In *Rust*, the Supreme Court upheld the prohibition in the 1988 regulations on both referral for, and counseling about, abortion in the Title X program. The Department does not believe the Court in *Rust* upheld a rule that required the violation of medical ethics, regulations concerning the practice of medicine, or malpractice liability standards. Federal and State conscience laws, in place since the early 1970s, have protected the ability of health care personnel to not assist or refer for abortions in the context of HHS funded or administered programs (or, under State law, more generally). Indeed, in *Roe* v. *Wade*, 410 U.S. 113 (1973), the Court favorably quoted the proceedings of the American Medical Association House of Delegates 220 (June 1970), which declared "Neither physician, hospital, nor hospital personnel shall be required to perform an act violative of personally-held moral principles." *See Roe*, 410 U.S. at 144, n.38. And in *NIFLA* v. *Becerra*, the Supreme Court upheld conscience objections to making certain statements, despite objections from professional medical organizations that similarly asserted medical ethics standards. *Nat'l Inst. of Family & Life Advocates* v. *Becerra*, 138 S. Ct. 2361, 2371–76 (2018).[79] The restrictions on referral for, encouragement of, promotion of, advocacy for, support of, and assistance of, abortion in Title X only apply to abortion as a method of family planning, not for any other reason that might give rise to malpractice liability, and the final rule has a specific provision in § 59.14(c), allowing referrals in case of emergencies.

As the Supreme Court affirmed, section 1008 and its implementing regulations are simply a matter of Congress's choice of what activities it will fund, not about what all clinics or medical professionals may or must do outside the context of the federally funded project. The Department believes that medical ethics, regulations concerning the practice of medicine, and malpractice liability standards are not inconsistent with this final rule. The Supreme Court upheld similar conditions and restrictions in *Rust* as a constitutionally permissible exercise of Congress's Spending Power. As federal law, these requirements apply to federal grantees, notwithstanding any potential State law to the contrary.

3. Removal of the Requirement for Consultation (42 CFR 59.5(a)(10))

*Summary of changes:* The 2000 regulations, at § 59.5(a)(10)(i), "[p]rovide that if an application relates to consolidation of service areas or health resources or would otherwise affect the operations of local or regional entities, the applicant must document that these entities have been given, to the maximum feasible extent, an opportunity to participate in the development of the application. Local and regional entities include existing or potential subrecipients which have previously provided or propose to provide family planning services to the area proposed to be served by the applicant." The proposed rule would remove that requirement and paragraph. The proposed rule would redesignate the provision that existing or potential subrecipients be given an opportunity for maximum participation in the ongoing policy decisions of the project, from § 59.5(a)(10)(ii) to § 59.5(a)(10). The Department finalizes this part of the rule without change.

*Comments:* Many commenters are concerned that this change would open the door for multiple projects in one region, uncoordinated care, and a disruption in the currently successful Title X network by excluding current providers that have the expertise to provide quality services. Some commenters recommend that the language in § 59.5(a)(10) remain unchanged to preserve opportunities for local stakeholder input.

*Response:* The Department disagrees with commenters who challenge removing the consultation requirement at § 59.5(a)(10). Title X requires the Department to issue grants that provide a broad range of acceptable and effective family planning methods and services. Encouraging competition among applicants is conducive to achieving the goals of the Title X statute. The Department concludes that it is not necessary, and is potentially counterproductive, to require new applicants to first consult with pre-existing providers, as currently required by § 59.5(a)(10)(i), although they may choose to do so. New applicants bring fresh ideas and innovative approaches to serving patients with their family planning needs. Requiring new applicants to consult with previous or current grantees could have the

---

[77] However, as with nondirective pregnancy counseling on abortion, Title X projects and service providers must ensure that they do not, under the cover and pretext of providing such abortion referral, actually refer for abortion as a method of family planning. This is an area in which Title X projects can expect OPA monitoring and oversight and should maintain appropriate records to support such referrals.

[78] The Act calls for Title X project staff to have access to training on including adoption information and referrals "in nondirective counseling to pregnant women", where Infant Adoption Awareness grants are in operation. 42 U.S.C. 254c–6(a)(6)(A).

[79] *See e.g. U.S. Supreme Court Amici Curiae Brief of the American Academy of Pediatrics,* California, the American College of Obstetricians and Gynecologists, et al., *NIFLA,* No. 16–1140 (U.S. Ct) (filed Feb. 27, 2018).

provided that the Title X provider has complied with any applicable State and/or local laws requiring reporting to, or notification of, law enforcement or other authorities and such reporting or notification is documented in the patient's record.

Exhibit 154

unintended consequence of quashing new ideas in favor of maintaining a potentially sub-par status quo in a given locale. The Department agrees it is important that new applicants build robust community partnerships in order to expand the reach of Title X services. In some cases, awareness of a region's existing services might strengthen an application, so applicants might continue to be incentivized to consult existing grantees. But the Department will not require consultation with previous grantees as a prerequisite to application. The Department will continue to review applications based on their quality and to fund those best positioned to achieve the goals of the Title X statute and the criteria set forth in the final rule.

The Department disagrees with commenters who contend current Title X providers will necessarily be shut out as future Title X providers. Removal of this consultation requirement does not prejudge whether current grantees will continue to receive Title X grants, nor whether new applicants will receive grants. The Department, likewise, does not believe that the removal of the consultation requirement will lead to uncoordinated care. Of course, applicants may voluntarily choose with whom they partner and with whom they consult, and such coordination may strengthen an applicant's proposal. However, the Department believes the removal of this as a requirement encourages a broader range of applicants and permits innovative approaches that may not have been envisioned or supported in the past.

The Department finds no evidence to support the assertion that the final rule will drive current providers from the Title X program. Under the final rule, the government will choose from the most qualified applicants in order to achieve the statutory goals of the program. The fact that some applicants received funding in the past is not a guarantee of future funding, but neither is it a guarantee that their funding will end in the future. Encouraging new applicants in the program could improve both the quality and breadth of service within the Title X program; it does not reflect a preference for new applicants over previous grantees.[80]

## 4. Promotion of Access to Comprehensive Primary Health Services (42 CFR 59.5(a)(12))

*Summary of changes:* The proposed rule included a new § 59.5(a)(12), which stated, "In order to promote holistic health and provide seamless care, Title X service providers should offer either comprehensive primary health services onsite or have a robust referral linkage with primary health providers who are in close physical proximity to the Title X site." The Department finalizes this provision with only stylistic changes to improve readability.

*Comments:* Many commenters state that providing comprehensive primary care onsite or through a robust referral linkage is not conducive or appropriate for Title X service providers, as many patients prefer to have their reproductive health managed by a specialist. Many commenters express that specialists have the most up-to-date knowledge of their specialty, and this is why many primary care providers in turn refer out to those specialists. Many commenters additionally indicate that this rule would create an administrative burden and result in less primary care. Many commenters state that the Department's proposed primary care requirement, including regarding a robust referral linkage, is unclear, and the regulatory text would fail to give sufficient notice to Title X grantees about the obligations under the rule.

A commenter supports the new text and expresses the view that the rule would amend the criteria for grants and increase competition to encourage a broader, more diverse, applicant pool.

*Response:* The Department concludes that it is appropriate to encourage Title X service providers to have comprehensive primary health services onsite (although such services cannot be billed to the Title X program, unless it serves the goals of the program) or to build a robust referral linkage with primary health providers who are in close physical proximity to the Title X site. The 2000 regulations have similar provisions at § 59.5(b)(2) and (8), requiring projects to provide "referral to and from other social and medical services agencies" and "coordination and use of referral arrangements with other providers of health care services, local health and welfare departments, hospitals, voluntary agencies, and health services projects supported by other federal programs." Like the 2000 regulations, the final rule allows for a referral linkage if projects do not offer comprehensive health services onsite. The final rule adds, however, that such referral entities should be in close

proximity to the service site, and places additional emphasis on projects providing services onsite. The Department considers this change appropriate to help minimize the difficulty of patients receiving needed health care outside of Title X services.

The Department believes that the connection between Title X services and comprehensive primary care decreases the overall cost and transportation challenges to obtain needed health care services identified as a result of routine family planning screening and consultation. A 2013 Child Trends Research Brief, "The Health of Women Who Receive Title X supported Family Planning Services," found that 60% of women receiving care at Title X clinics report that the clinic is their primary source for health care, yet many fear they cannot address other health concerns with their family planning provider, making the need for a linkage to comprehensive primary care providers essential for women's health.[81] The report also found that women who receive care at Title X clinics generally have worse health status than women who receive services elsewhere, and that, of such women, (1) over 25% report at least 3 health concerns; and (2) one-third are obese, with an additional 29% being overweight.[82] The placing of Title X services in the context of a comprehensive primary care setting or with strong referral networks to such care is consistent with Congress's expectation. In the 1975 Title X reauthorization, the Senate Report stated: "The Committee believes that Family Planning Services under Title X generally are most effectively provided in a general health setting and thus encourages coordination and integration into all programs offering general healthcare." S. Rep. No 63, 94 Cong., 1st Sess. 65–66 (1975), reprinted in 1975 US Code Cong. & Admin News 469, 528.

Since Title X family planning services are primarily limited to preconception services, it is important that Title X sites assist clients with onsite care outside of the Title X project itself, or at least with referrals to local providers, to achieve optimal preconception and general health outcomes. Since any sexually active woman of childbearing age could become pregnant, the inclusion of preconception health screenings in the continuum of family planning care is

---

[80] The removal of the requirement for consultation likewise does not violate the requirement in Title X section 1001(b) that "[l]ocal and regional entities shall be assured the right to apply for direct grants and contracts . . ., and the Secretary shall by regulation fully provide for and protect such right", which only addresses the right of certain entities to apply for direct grants and contracts. 42 U.S.C. 300(b).

[81] Elizabeth Wildsmith et al., *The Health of Women who Receive Title X-Supported Family Planning Services,* Child Trends, 1 (Dec. 1, 2013), *https://www.childtrends.org/publications/the-health-of-women-who-receive-title-x-supported-family-planning-services.*

[82] *Id.*

Exhibit 154

JA-0002605

important for clients, whether or not seeking pregnancy. Access to comprehensive preconception health care is also important to family planning outcomes because pregnancy may stress and affect extant health conditions. Linkages to comprehensive primary health care may be critical to ensure that pregnancy does not negatively impact such conditions. In addition, the greatest risks affecting the health of a baby occur early in a pregnancy—often before a woman realizes she is pregnant—such that helping women achieve optimal preconception health is important to ensure healthy pregnancies (as well as healthy babies) should conception occur.

The Department disagrees with commenters who contend this language concerning the proximity of comprehensive primary health care cannot be implemented by Title X service providers that specialize in family planning. First, as part of providing comprehensive primary health care, clinic may employ, among other providers, health care providers who specialize in family planning. Second, the primary care provision presents two options, onsite comprehensive primary care and referrals; it does not require the provision of onsite comprehensive primary care by Title X service providers. The Department believes this clarification addresses some concerns of commenters who feared that specialized providers could not provide all the services that an individual may need. The final rule also does not permit primary care to be subsidized by Title X funds, unless it serves the goals of the program. Thus, the requirement for Title X service providers to provide onsite, or have a robust referral linkage with, comprehensive primary health services does not move Title X outside of its scope of services. Instead, the final rule makes it easier to ensure that Title X clients, particularly low income clients, have access to necessary medical services and related educational and nondirective counseling services; that screening, diagnosis, and treatment can be provided within close proximity to the clinic; and that the most needy have access to care.

5. Title X Transparency (42 CFR 59.5(a)(13)

*Summary of changes:* The proposed rule proposed to add § 59.5(a)(13), to require that projects "[e]nsure transparency in the delivery of services" by reporting certain information "in grant applications and all required reports." It then outlined three types of information that would be reported: "(i)

Subrecipients and referral agencies and individuals by name, location, expertise and services provided or to be provided; (ii) Detailed description of the extent of the collaboration with subrecipients, referral agencies and individuals, as well as less formal partners within the community, in order to demonstrate a seamless continuum of care for clients; and (iii) Clear explanation of how the grantee will ensure adequate oversight and accountability for quality and effectiveness of outcomes among subrecipients and those who serve as referrals for ancillary or core services."

The Department adopts this provision in the final rule with four changes. First, in § 59.5(a)(13)(i), the Department replaces "referral agencies" with simply "agencies" who are "providing referral services". Second, the Department removes the phrase "as well as less formal partners within the community" from § 59.5(a)(13)(ii) and replaces it with any individuals "providing referral services". Third, the Department removes the phrase "and those who serve as referrals for ancillary or core services" from § 59.5(a)(13)(iii). Fourth, the Department makes stylistic changes to improve clarity.

*Comments:* Many commenters contend the transparency requirements would add administrative burden and costs to projects, stating that programs lack familiarity with policies, referral practices, or services offered by their subrecipients. Some commenters contend that these requirements will discourage qualified entities from applying for Title X grants and will put Title X programs, in particular programs with larger referral networks, in the overly burdensome position of providing oversight for programs that provide non-Title X services. One commenter suggests that this rule would limit grantees' referral networks and clients' health care choices and would pose a special burden to larger grantees. Many commenters state the new reporting requirements for grantees would take time away from staff who might otherwise be engaged in patient care. Commenters also state that the Department already has a level of transparency in place, complete with access to subrecipient information, and that the proposed language creates a disincentivized and burdensome outcome for providers to continue collaborations.

The Department also received comments on whether and how to include referral agencies in these requirements. One commenter states that the Department should require documentation from referral agencies to ensure that referrals are not used to

promote abortion. Other commenters state that the referral agencies, which receive no Title X funding, should not be subject to these reporting requirements.

Some commenters state that the regulatory text is unclear and inconsistent, and fails to provide sufficient notice of obligations under the rule. They point out that it does not define "less formal partners" and does not express a distinction between "ancillary" and "core" services. They contend the rule unreasonably assumes an individual physician would know the myriad revenue streams that a large system receives.

*Response:* The Department disagrees that the rule will impose an inappropriate administrative burden or cost on projects. The reporting requirements would expand transparency surrounding Title X services. The proposed rule would require applicants to provide certain information in their applications, required reports, and in response to performance measures. The information required would include the name, location, expertise and services provided or to be provided by the subrecipient/referral agency/individual; a detailed description of the extent of the collaboration with subrecipient/ referral agency, in order to demonstrate a seamless continuum of care for clients; and a clear explanation of how the grantee will ensure adequate oversight of, and accountability for quality and effectiveness of outcomes by, subrecipients. This information is necessary to ensure that Title X projects are achieving the goals of the program and expending grant funds properly.

The Department also disagrees with the suggestion that the transparency requirements disincentivize collaborations. The fact that grantees need to describe subrecipient and agencies or individuals providing referral services by name, location, expertise and services provided or to be provided does not deter those collaborations. Grantees should already know the details of those collaborations if they are important to the success of their projects. Understanding and being able to describe the details of collaborations is important to ensure the collaborations help the project achieve the goals of the program and comply with all applicable program requirements.

The Department appreciates the responses to its request for comment specifically on whether a referral agency should be subject to the same reporting requirements as a grantee and/or

Exhibit 154

subrecipient.[83] After carefully considering the comments on this issue, the Department concludes that the regulations should apply differently to referral agencies than to subrecipients of funding. A subrecipient "provides family planning services with Title X funds under a written agreement with a grantee or another subrecipient." As such, the subrecipient functions as a part of the Title X program in providing preconception family planning services. Referral agencies do not receive Title X funds to provide Title X services. The Department, thus, has concluded it will not use these rules to hold referral agencies to the same requirements that are expected of grantee and subrecipient entities. Grantees and subrecipients must provide certain information regarding their referral network, as described elsewhere in this rule, but since referral entities do not receive Title X funding, they are not required to comply with the requirements of this final rule.

The Department also concurs that the phrase "ancillary or core services" may not have been clear. Therefore, the Department does not include the phrase "and those who serve as referrals for ancillary or core services" in § 59.5(a)(13)(iii) of the final rule. The Department also agrees with commenters who say it is difficult to understand what is meant by "less formal partners." The Department believes it is sufficient to include subrecipients and referral agencies and individuals in the explanation of collaborations, so the phrase "as well as less formal partners within the community" will likewise not be included in § 59.5(a)(13)(ii) of the final rule.

6. Encouragement of Family Participation (42 CFR 59.5(a)(14))

*Summary of changes:* The proposed rule would add § 59.5(a)(14), a new requirement that projects "[e]ncourage family participation in the decision of minors to seek family planning services and ensure that the records maintained with respect to each minor document the specific actions taken to encourage such family participation (or the specific reason why such family

participation was not encouraged)." The Department adopts this language with changes to clarify that family participation is encouraged for all patients, including, but not exclusive of, minors in the final rule.

*Comments:* Many commenters express concern that this language undermines patient confidentiality and access to care by placing increased pressure on adolescent patients to involve their family, and may possibly cause patients to avoid seeking care. Many commenters state this requirement creates barriers for young people to obtain care by imposing several new, but in their opinion, antiquated requirements on providing care to minors, especially through screening the adolescents for STDs or pregnancy.

Many commenters express concern that providers will be confused about their obligations. They assert this requirement is not responsive to the CDC/OPA Quality Care Guidelines, and state that it runs afoul of the Title X regulations that require providing services in a manner that protects patients dignity and ensures patient choices are entirely voluntary. Many commenters suggest that involving family members is not always advisable or realistic, and could cause conflict with some State statues or regulations that allow minors to make decisions about their health care, including contraception. One such commenter suggests that this paragraph be stricken or at least clarified further.

Many commenters feel that clinicians should not be required to take specific actions to document attempts to involve family members, as this would undermine patient-provider relationships and is unnecessary and excessively burdensome. Alternatively, commenters recommend that the efforts and funds from Title X programs would be better used to support training for providers on the best methods to encourage family involvement consistent with minor patient's confidentiality rights, health needs, and best interests.

Some commenters support the language requiring, and documenting, the encouragement of family participation, saying it is an appropriate clarification of the Congressional mandate for the program. Several commenters state that the requirement is consistent with the statutes and Supreme Court jurisprudence on parental rights. One commenter states that the encouragement of family participation and other reporting requirements provide an appropriate layer of protection for children to ensure Title X agencies are considering

circumstances in which minors may be suffering abuse. One commenter states that the language does not have a chilling effect on access to Title X health services. Other commenters commend the Department's proposed language and suggest that encouraging parental involvement should always be the standard for any health care services provided to a minor.

*Response:* The Department realizes that the Title X statute is clear that family participation should be encouraged for all patients who access family planning services, and not merely minors. Congress requires that "[t]o the extent practical, entities which receive grants or contracts under this subsection shall encourage familiy [sic] participation in projects assisted under this subsection." 42 U.S.C. 300(a). However, pursuant to annual appropriations provisions, Congress directs additional specific requirements with respect to the encouragement of family participation in the decisions of minors to seek family planning services: "None of the funds appropriated in this Act may be made available to any entity under title X of the PHS Act unless the applicant for the award certifies to the Secretary that it encourages family participation in the decision of minors to seek family planning services . . . ."[84] To ensure compliance with these requirements, the final rule requires Title X service providers to encourage family participation in the decision of minors and others to seek family planning services. It also requires providers to document, in the records maintained with respect to each minor patient, the specific actions taken to encourage such family participation (or the specific reason why such family participation was not encouraged).[85] The Department believes that the rule clarifies the steps the Title X providers must take, consistent with governing law, to encourage family participation, especially with respect to minors.

The Department disagrees that the rule causes conflict with State statutes and other Title X regulations. As noted above, the rule specifically implements several federal statutory requirements by requiring encouragement of family participation in family planning decisions while making allowance for instances where such encouragement would not be appropriate. Requiring

---

[83] The Department proposed to define "subrecipient" as "any entity that provides family planning services with Title X funds under a written agreement with a grantee or another subrecipient. These subrecipients have entered into binding agreements or other financial relationships with Title X grantees to provide Title X services in a given State or community. A "[s]ubrecipient" may also be referred to as a "delegate" or "contract agency." These entities receive Title X funds to provide Title X services, and are subject to the Title X statute and regulations.

[84] HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. at 3090.

[85] As noted below, suspecting child abuse, child molestation, incest, or the like and reporting it to the appropriate authorities, consistent with State or local reporting or notification laws, would constitute a good reason not to encourage family participation.

Exhibit 154    JA-0002607

Title X projects to encourage family participation in the decision of unemancipated minors to seek family planning services does not require, and is not the equivalent of, parental notification or family participation. Rather, the ordinary meaning of Congress's requirement would be for a provider to converse with a minor (or other) patient in the course of care, and in an appropriate way, encourage family participation in the patient's consideration of family planning methods and services. This requirement is consistent with the ordinary understanding that communication between health care providers and patients is essential to providing quality and effective care. Congress is not required to fund projects where minors (or other patients) are given subsidized family planning but not encouraged to involve their families in their family planning decisions. To the extent that there is conflict between the Title X statutory (and regulatory) requirements and any requirements of State law, the federal requirements would apply to the recipients (and subrecipients) of Title X funds.

The Department understands some commenters' concerns about the need to maintain patient confidentiality. The Department agrees that Title X providers must continue to comply with laws concerning patient confidentiality, including those specifically pertaining to the confidentiality of minors with respect to Title X services. Health care providers already have conversations with their patients and document those discussions in patient records, while maintaining patient confidentiality. More broadly, such health care providers in the Title X program are also already required to encourage family participation where practical by the statutory directives adopted by Congress. This provision merely implements that requirement. With respect to minors, the Department believes that Title X projects and participating entities can comply with the rule's requirement to encourage family participation and to document such encouragement, or to note the reason why that was not appropriate, without infringing on patient confidentiality.

To those commenters who contend that encouraging family participation imposes barriers to the care of minors, the Department would point out that Congress made a different judgment. Congress requires that, "[t]o the extent practical", Title X grantees "shall encourage familiy [sic] participation in projects assisted under this subsection." 42 U.S.C. 300(a). Similarly, specifically

with respect to minors, Congress has made it a condition of funding that an applicant for a Title X award "certifies to the Secretary that it encourages family participation in the decision of minors to seek family planning services." HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. at 3090; Consolidated Appropriations Act 2018, Public Law 115–141, Div. H, sec. 207, 132 Stat. 348, 736. Congress clearly did not anticipate a meaningful barrier when it enacted these requirements. Moreover, encouraging family participation is not the same as requiring family participation. The rule also allows appropriate discretion for health care professionals with respect to the requirement to encourage family participation where, for example, family participation may present a serious risk to the minor, such as when child abuse or incest is suspected. The rule simply requires Title X providers to document, in the patient's records, the reasons why family participation was not encouraged and, consistent with applicable local law, to report any suspected abuse to the relevant authorities.

The Department disagrees with those who contend the rule may compromise the provision of patient-centered care or the protection of the patient's dignity. The Department believes that involving parents in general, and in family planning decision-making in particular, can improve behavioral consistency with health recommendations for an adolescent. There is evidence that parent-child communication about family planning decisions increases the likelihood that the adolescent will consistently make healthier choices.[86]

For all these reasons, the Department considers it appropriate to finalize the proposed rule concerning encouragement of family participation, with the clarification noted above.

## 7. Provide for Medically Necessary Services (42 CFR 59.5(b)(1))

*Summary of changes:* The proposed rule would amend § 59.5(b)(1) to require that any referrals to other medical facilities be made consistent with § 59.14(a), which would bar referral for abortion as a method of family planning. The department finalizes 42 CFR

59.5(b)(1) with stylistic changes and to change the phrase "when medically indicated" to "when medically necessary." The finalized provision requires Title X projects to:

Provide for medical services related to family planning (including physician's consultation, examination, prescription, and continuing supervision, laboratory examination, contraceptive supplies) and referral to other medical facilities when medically necessary, consistent with § 59.14(a), and provide for the effective usage of contraceptive devices and practices.

All comments concerning this section are addressed in the section of this preamble that discusses new § 59.14(a).

## 8. Provide for Coordination and Referral, Consistent With Prohibition on Referral for Abortion (42 CFR 59.5(b)(1))

*Summary of changes:* The 2000 regulations state that projects must "[p]rovide for coordination and use of referral arrangements with other providers of health care services, local health and welfare departments, hospitals, voluntary agencies, and health services projects supported by other federal programs." The proposed rule would amend this provision by requiring that any referrals be consistent with § 59.14(a), which would bar referral for abortion as a method of family planning.

The Department's discussion of and response to other comments relevant to this language are incorporated in the section of the preamble discussing proposed § 59.14(a).[87]

The Department finalizes this language without change, except for corrections in punctuation.

## F. Criteria for Selection of Grantees (42 CFR 59.7)

*Summary of changes:* At § 59.7 of the proposed rule, the Department proposed to revise the criteria for the selection of grantees set forth in the 2000 regulations. The 2000 regulations set forth seven criteria for the Department to take into account, including the four criteria established in PHS Act section 1001(b). Those four criteria are included in the 2000 regulations and are similar to the PHS Act wording: (1) "The number of patients to be served, and, in particular, the number of low-income patients," (2) "the extent to which

---

[86] Patricia Dittus et al., *Parental Monitoring and Its Associations with Adolescent Sexual Risk Behavior: A Meta-analysis,* 136 Pediatrics e1587–99 (2015).

Tianji Cai et al., *The School Contextual Effect of Sexual Debut on Sexual Risk-Taking: A Joint Parameter Approach,* J Sch Health. 2018; 88: 200–207 (2018). *library.nih.gov/pubmed/29gov.ezproxyhhs.nihlibrary.nih.gov/pubmed/29399838* or *https://www.ncbi.nlm.nih.gov/pubmed/29399838.*

[87] As discussed above, in § 59.5(a)(12) the Department is finalizing requirements concerning the relationship between Title X service providers and comprehensive primary health services. The Department is also maintaining the requirement for coordination and use of referral arrangements in in § 59.5(b)(8), but qualifying that requirement with the more specific requirements set forth in in § 59.14(a).

Exhibit 154                                                                                                    JA-0002608

family planning services are needed locally,'' (3) ''the relative need of the applicant,'' and (4) an applicant's ''capacity to make rapid and effective use of such assistance.'' The 2000 regulations also added three additional criteria not listed in the PHS Act: (5) The ''adequacy of the applicant's facilities and staff,'' (6) the ''relative availability of non-federal resources within the community to be served and the degree to which those resources are committed to the project,'' and a catch-all criterion considering (7) ''the degree to which the project plan adequately provides for the requirements set forth in these regulations.'' The proposed rule would restructure these requirements into five parts: first, in paragraph (b), a consideration of whether the applicant proposes to satisfy the requirements set forth in the regulations, and then, in paragraph (c), the four criteria set forth in section 1001(b), elaborating on each one to indicate how the Department would implement them. The proposed rule would delete the remaining two paragraphs of the 2000 regulations discussing cost allocations for projects as determined by the Secretary.

The Department finalizes this section with changes in § 59.7(c)(2) to address concerns raised by certain commenters regarding an applicant's ability to procure a broad range of diverse subrecipients. In the final rule, the Department also retains § 59.7(b) and (c) of the 2000 regulations, which the proposed rule would have deleted, but redesignates them as § 59.7(d) and (e). Finally, several stylistic changes are made to improve clarity and readability of the application review criteria.

*Comments:* Several commenters state the rule significantly alters the existing program grant review criteria, undermining the usefulness of the criteria for the purpose of differentiating the best applications and best uses of Title X funds. Some commenters state that the new, shorter list of criteria contributes to greater Department leeway in making decisions about awards that do not focus on the effectiveness of the family planning care. One commenter contends that the new criteria will limit the number of qualified and experienced health care providers who can compete for funding. One commenter states the Department provides no justification or rationale for the requirement for new and inexperienced partners. The commenter laments that the wording of the rule appears to require projects to partner with new organizations each year—an unworkable proposition because the pool of new providers is limited.

Some commenters state the rule will unconstitutionally give an advantage to religious groups due to the second factor of the grant review process criteria stating that preference will be given ''especially among a broad range of partners and diverse subrecipients and referral individuals and organizations, and among non-traditional Title X partnering organizations.'' Some of these commenters express concern that the ''diverse'' and ''non-traditional'' organizations the Department is referring to are faith-based providers or religious entities that oppose abortion and some or all forms of contraception. The commenters state that these organizations have been previously ineligible to receive Title X funds but would now be eligible under the new criteria. One commenter argues the rule provides no evidence supporting the idea that there are many ''non-traditional'' organizations and different kinds of new subrecipients that could cycle into Title X projects and improve low income patients' access to high-quality family planning services.

Some commenters state the rule will not increase competition and rigor among applicants, encourage broader and more diverse applicants, or better ensure quality applicants are selected. Rather, they contend the rule will curtail the current wide reach of Title X by allowing funding to organizations that do not provide comprehensive pregnancy counseling. A few commenters state that there was no evidence that a change in the application review process or additional diversity among applicants is necessary.

Some commenters note that the existing network of Title X primary grantees and subrecipients has been relatively stable over time and has developed deep expertise and experience in family planning that profoundly benefits the communities they serve. They believe the rule will jeopardize the existence of well-developed, proven-effective programs that are based on the best clinical standards, scientific evidence, and care. One commenter asserts that, although the Department states there will be increased competition for funding, the changes set forth in the proposed rule will only change the types of entities applying for these funds, inviting organizations to apply that have no interest in fulfilling the statutory program mandate to provide a broad range of effective family planning methods and services.

Some commenters express concern regarding how much weight will be allocated to each criterion, and whether preferences may be established for Title X projects that do not provide a full scope of scientific, medically based care, citing providers of natural family planning and other fertility awareness-based methods. One commenter expresses a belief that sites providing abortion services will be disqualified and other sites that offer natural family planning and fertility awareness-based methods will be preferred.

One commenter supporting the proposed rule describes the process for evaluating applicants as thorough, and is in favor of requiring applicants to demonstrate their ability to comply with regulations, especially in terms of separation of funds and transparency of activity. The commenter adds that this requirement likely would reduce the potential for misuse of funds. One commenter argues grant applicants should be required to provide written assent to all relevant statutory and regulatory requirements, and should submit all relevant organizational documents, such as personnel manuals, client guidelines and protocols, in order to demonstrate that the organization has a pervasive policy framework and organizational culture consistent with the law and the final rule.

Several commenters state the Department will have unchecked discretion to prevent applications from reaching the objective review process that now governs the awarding of grants, putting the Department in complete unfettered control of which applications will be a part of the objective review process. Such commenters state that, historically, the process has hinged on the evaluation of objective review panels, but the new assessment would be subjective and non-transparent, and would give the Department discretion to block any applicant from reaching the competitive review process, perhaps for political purposes. Several commenters state the criteria are unclear and vague, and ask the Department to specifically and clearly state the criteria with which it will review applicants before they reach the objective panel review. One commenter contends the Department is bypassing the regulatory process to add new criteria, and says the rule will include a subjective standard without oversight.

A few commenters state that, in applying these criteria retroactively to grantees with current grants at the time the final rule goes into effect, the rule would undermine the fairness of the funding opportunity announcement (FOA) and thwart the award process in which applicants were scored on criteria about which they were aware at the time of their applications. The commenters contend that imposition of

Exhibit 154                                                                                                                              JA-0002609

these measures well after the application due date of the previous FOA would create a fundamentally unfair scoring process with respect to that FOA and would unjustly provide funding to organizations not capable of providing the full range of comprehensive services that has long been the benchmark of Title X care.

*Response:* The Department generally agrees with commenters who support the proposed language of § 59.7 as providing a thorough process to ensure applicants demonstrate their ability to comply with regulations and avoid misuse of funds.

Proposed § 59.7(b) would require Title X applicants to clearly address how their proposal will satisfy the requirements of this regulation, in order to proceed to the competitive grant review process. As a result of confusion by some commenters, the Department provides additional clarity with further detail related to the requirements for compliance with this initial screening. An applicant would be required to describe its plans for affirmative compliance with each requirement of the Title X regulations, as explicitly defined by the Department in the funding announcement. For example, this would include not only demonstrating physical and financial separation from abortion as a method of family planning (when compliance with such requirement becomes required), but also explaining how the applicant will provide a broad range of acceptable and effective family planning methods and services. The funding announcement will clearly describe how applicants should address this requirement, including any documentation that is necessary to demonstrate affirmative compliance with each of the regulation requirements. The Department will implement these requirements to better direct Title X funds for family planning projects, to prevent misuse of funds, and to save taxpayer dollars by only sending qualified applications to the costly and time consuming competitive review committee. Once the applicant successfully demonstrates affirmative compliance with the Title X regulations (a yes/no issue), the Department will consider each applicant competitively according to the criteria set forth in the regulation.

In response to a commenter suggesting that applicants be required to submit additional documentation such as personnel guidelines and documents regarding the organizational structure of applicants, the Department agrees that submission of such documents may be included to support an application, but will not require it. The Department concludes that such a requirement may be overly burdensome. Applicants will be required to demonstrate they will achieve the goals of the program and meet the statutory and regulatory criteria, but the Department declines to add the additional documentation requirements suggested by the commenter.

The Department acknowledges the confusion expressed by commenters on the meaning of the phrase "a broad range of partners and diverse subrecipients and referral individuals and organizations, and among non-traditional Title X partnering organizations" in § 59.7(c)(2) of the proposed rule. Although most such commenters objected to the need for new partners, the Department notes that it does not intend that grant funds be designated to referral individuals or referral organizations, since such referrals are made without any monetary exchange. Grant funds would only be provided to "non-traditional Title X partnering organizations" if they are subrecipients in a Title X project. The Department further clarifies that it does not intend that grantees must change subrecipient relationships each year, but that grantees make ongoing efforts to expand the network of partners throughout the service area, especially with respect to nontraditional partnering organizations. The Department additionally clarifies that it does not expect grantees who plan to provide all family planning services themselves, to now designate that these services be provided by subrecipients. The Department wishes to spur innovation and more extensive service, but does not wish to limit grantees' flexibility. However, if grantees implement a model in which they partner with subrecipients for services, the Department wants to emphasize that a broad range of subrecipients be partners, including those who are nontraditional organizations, but this does not necessarily mean that such subrecipients will be new providers in the Title X program. Finally, the Department adds the phrase "as applicable" following the "broad range of diverse subrecipients in recognition of and to allow for grantees, such as community health centers, who may choose to directly provide services and not use any subrecipients. To clarify this provision and resolve the concerns of many commenters, the Department modifies the language of § 59.7(c)(2) in the final rule to read as follows: "The degree to which the relative need of the applicant for federal funds is demonstrated in the proposal, and the applicant shows capacity to make rapid and effective use of grant funds, including its ability to procure a broad range of diverse subrecipients, as applicable, in order to expand family planning services available to patients in the project area."

The Department rejects the claim by some commenters that the criteria set forth in the rule gives an unconstitutional advantage to religious groups. Neither the proposed language, nor the language of the final rule (including § 59.7(c)(2)), mentions religious groups nor expresses a preference in favor of them. The Department's focus in implementing Title X is on providing and expanding the provision of services to low income, unserved or underserved patients in a timely manner. The Department welcomes applications from faith-based organizations as well as secular non-profit entities. With respect to the criteria in § 59.7(c)(2), the Department would favor those applicants that can meet the needs of patients, especially those who are unserved and underserved, seeking family planning services, while complying with the statutory and regulatory requirements of the Title X program. The Department encourages Title X applicants to develop innovative strategies to meet the family planning needs of the various populations in their proposed service areas. Diversity in the range of partners included in applicants' proposals is but one factor among many that the Department will consider in reviewing applications.

The Department disagrees with commenters who contend the criteria in § 59.7 will diminish the program's effectiveness. Rather, these criteria will assist the Department in ensuring that the statutory requirements of the Title X program are met, the program is serving patients as Congress intended, gaps in services (or populations served) are closed, and providers are free to explore and test new ways to better provide service to patients.

The Department similarly disagrees with commenters who fear the rule, and the review criteria in particular, will exclude some applicants, especially those who provide abortion or those who have long experience with the program. No provision in Title X or in the proposed or final rule prevents abortion-providing organizations from applying for, and receiving, Title X funding, so long as the organization meets this rule's requirements with respect to the proposed Title X project, including physical and financial separation, and not providing,

Exhibit 154

promoting, or referring for abortion as a method of family planning in the Title X project. Nothing in § 59.7 excludes experienced Title X providers from continuing to compete on a level playing field for Title X funds. In fact, some review criteria might be more easily met by applicants with experienced and established networks. The Department intends for all funded applicants, both new and those who are experienced Title X providers, to improve or expand the quality and scope of overall service to clients, as a result of following the criteria set forth in these final rules.

The Department also disputes the assertion by some commenters that an emphasis will be placed on natural family planning over other methods. In the final rule at § 59.7(c)(1), the Department clearly and specifically requires every Title X project to provide a "broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." The Department emphasizes that Section 1001 of the Title X statute includes natural family planning in its non-exclusive list of family planning methods and services. *See* 42 U.S.C. 300(a). The Department's definition of family planning recognizes the broad range of statutorily acceptable services by "including contraceptive methods, and natural family planning or other fertility awareness-based methods." Accordingly, nothing in the criteria set forth in § 59.7 expresses a preference for applicants that offer natural family planning or other fertility awareness-based methods themselves—they simply require each project to offer both contraceptives and natural family planning or other fertility-awareness based methods.

Consistent with the Department's historic processes, the weight attached to each criterion is not established in this rule. This is not only consistent with how the Department has operated, but also with the process of most other grant funding programs. The Department reserves the discretion to set forth more specific weights for each criterion in funding opportunity announcements.

The Department has not given itself unchecked discretion to disqualify applications in this rule. First, the Department is bound to maintain the integrity of the program and to implement the program in such a manner as to ensure compliance with statutory requirements. All provisions in this rule seek to achieve that purpose. The 2000 regulations afforded the

Department significant flexibility in determining criteria for awards. In the revised version of § 59.7, paragraph (b) sets forth an overarching requirement that each applicant clearly address how the proposal will satisfy the requirements of the regulations and describe the applicant's plans for affirmative compliance. That paragraph, far from giving the Department unconstrained discretion, ensures that projects will comply with the provisions of the applicable statutes (which are embodied in the regulation) and the regulations themselves. It also increases the efficiency of the review process by only expending Department resources for the competitive review panel to review applications that meet the minimum requirements for the program.

Second, paragraph (c) of § 59.7, as revised, does not set forth any novel flexibility or discretion not already provided by the Title X statute and available under the Title X regulations. The 2000 regulations, like section 1001(b) of Title X, simply state the Department shall "take into account" those factors. The statutory list of factors is not exclusive. And the Department has periodically described, in funding opportunity announcements and its grants policy, other criteria applicable to proposals, paying due attention to consistency with the Title X statute and regulations. Section 59.7(c) of this final rule states that applicants "will be subject" to those criteria, again leaving the Department some discretion to describe additional criteria. But in all events, the Department recognizes that such criteria must be consistent with any applicable statutes and regulations. And here, the new regulatory criteria are consistent with the requirements set forth in the Title X statute.

Third, as is true throughout the Department, Title X grants are awarded through a merit-based grantmaking process consistent with the Department's grants policy, and in accordance with the Executive Branch's Uniform Administrative Requirements and the Department's own grants regulations. In this competitive process, eligible applications are reviewed by a panel of independent reviewers and evaluated based in part on criteria in the Title X program regulations, and published in the funding opportunity announcement. In addition to the independent review panel, Federal staff review each application for programmatic, budgetary, and grants management compliance. Finally, applications recommended for funding are evaluated, in accordance with 45

CFR 75.205, for risks before an award is issued.[88]

The Department does not agree with commenters that it will assert unchecked discretion to arbitrarily dismiss applications before reaching the independent review panel. For example, as stated in paragraph (b) of the final rule, the Department has committed to "explicitly summarize each requirement of the Title X regulations . . ." or provide the entire regulation with which the applicant must demonstrate compliance, and has explained that applicants must "describe its plans for affirmative compliance with each requirement." These requirements, which focus on regulatory provisions with which grantees must comply, provide meaningful parameters to the Department's discretion. Failure by an applicant to clearly demonstrate compliance with Title X regulations would constitute a fatal flaw to an application for Title X funds.

The Department also notes that broad discretion is granted to it by the Title X statute when selecting between potential grantees. The 2000 regulations acknowledged this discretion when they stated that "the Secretary may award grants for the establishment and operation of those projects which will in the Department's judgment best promote the purposes of Section 1001." 42 CFR 59.7(a). Requiring applicants to establish compliance with Title X regulatory provisions is important to providing the Department with an informed baseline for exercising this discretion. As noted above, these regulatory provisions ensure compliance with the statutory framework and, thus, provide useful information for assessing applications both before and within the competitive grant review process. The Department believes that receiving this information will enable the Department to more efficiently and effectively review the significant number of applications for Title X funding, as well as provide important information to the independent review panel. Accordingly, the Department finds that the final rule reflects a proper and effective exercise of the Department's grant discretion bound by the statutory and regulatory text.

---

[88] 45 CFR 75.204 ("HHS funding agency review of merit of proposals", provides that "[f]or competitive grants or cooperative agreements, unless prohibited by Federal statute, the HHS awarding agency must design and execute a merit review process for applications. This process must be described or incorporated by reference in the applicable funding opportunity (*see* appendix I to this part.) *See also* § 75.203.")

Exhibit 154    JA-0002611

In sum, the Department believes the final rule functionally and appropriately limits the Department's discretion by requiring that applicants be subject to the criteria set forth in § 59.7(c), and that the discretion the Department retains under § 59.7 to consider other factors is not fundamentally different from the non-exclusive lists of factors set forth in the 2000 regulations. The Department believes that this final rule will help ensure reliability and certainty in the grant selection process, while maintaining an open process similar to the selection process for other grants at the Department. In pursuing these ends, the Department continues to focus on ensuring compliance with the statutory Title X requirements,[89] including the program integrity provisions referenced throughout this preamble; expanding the type and nature of the Title X providers and ensuring the diversity of such providers so as to fill gaps and expand family planning services offered through Title X; and using review criteria as a meaningful instrument to assess the quality of the applicant and the application. The Department believes that these goals, which are consistent with the Title X statute and similar to the approach taken in the 2000 regulations, are best achieved by finalizing § 59.7 as set forth in this final rule.

In response to a commenter who requests that an additional criterion be added to § 59.7(c) to consider whether there is a family planning gap in the community, the Department appreciates the concern. But, as part of the final rule, § 59.7(c)(4) already states the Department will consider "[t]he extent to which family planning services are needed locally. . ." and whether the applicant proposes innovative ways to provide services to unserved or underserved patients. The Department believes that the community's need—including any family planning gaps in the community—is already adequately addressed in that criterion. Furthermore, in response to comments cited earlier that emphasize the value of Title X as the sole federal program dedicated to funding family planning services for low income individuals, the Department adds a reference to low-income patients to the criterion in § 59.7(c)(3) in order to accentuate the obligation of Title X projects to serve low-income patients and populations.

The Department agrees with the concerns of commenters who ask that the application criteria not be effective

with regard to a FOA that has already been published, and where applications have already come due, prior to the effective date of this final rule. The Department agrees that applicants should know the criteria on which review of their applications will be based. Therefore, the Department will establish compliance dates for these provisions so that § 59.7 and the criteria set forth therein will be applied only to future FOAs issued after the effective date of this final rule, consistent with the effective dates and compliance dates established in this final rule. To the extent these criteria are relevant to applications for continuation awards under previously awarded grants, § 59.7 will also apply if those continuation award applications are due after the effective/compliance date, *i.e.,* more than 60 days after the publication date of the final rule. As discussed below, the Department is establishing compliance dates for other provisions of the final rule in the transition provision, § 59.19, so language clarifying the compliance date for § 59.7 is set forth in that provision.

The proposed rule would have deleted current § 59.7(b) and (c) from the Title X regulations. These provisions concern the amount of an award with respect to a project's estimated costs. The Department did not receive comments concerning the proposal to delete these paragraphs. Upon further consideration, however, the Department has determined that it is appropriate to retain these two paragraphs from the 2000 regulations. In section 1006(a), Title X provides that, while the Secretary shall determine the amount of any grant, no grant may generally be made for less than 90% of its costs. The Department believes that these current provisions in the Title X regulations—which reiterates this requirement and provides that no grant may be made for an amount equal to 100% of the project's estimated costs—express statutory requirements for the Title X program. The Department believes explicitly maintaining these statutory parameters in the Title X regulations provide helpful clarity for Title X grantees. Therefore, the Department is not finalizing the proposal to delete these two paragraphs from the 2000 rule, and this final rule will retain the paragraphs, redesignated as paragraphs (d) and (e).

### G. Confidentiality (42 CFR 59.11)

*Summary of changes:* The 2000 regulations required that all information obtained by project staff about individuals must be held confidential and not disclosed without the

individual's documented consent, with limited exceptions required by law. The proposed rule, at § 59.11, would clarify that confidentiality concerns cannot be the basis for failure to comply with legal requirements to report or provide notice of certain criminal activity. With the proposed amendment, section 59.11 would specify that "[a]ll information as to personal facts and circumstances obtained by the project staff about individuals receiving services must be held confidential and not be disclosed without the individual's documented consent, except as may be necessary to provide services to the patient or as required by law, with appropriate safeguards for confidentiality; concern with respect to the confidentiality of information, however, may not be used as a rationale for noncompliance with laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, human trafficking, or similar reporting laws. Otherwise, information may be disclosed only in summary, statistical, or other form which does not identify particular individuals."

The Department adopts the modification to this section without change, except for corrections in punctuation.

*Comments:* Many commenters assert that medical professionals are deeply committed to protecting patients who may be victims of abuse or other criminal activity, and their commitment is reflected in their ongoing compliance with State and local reporting laws. Commenters emphasize the importance of confidentiality in the care of adolescents, with commenters characterizing Title X providers as access points for youth autonomy. Commenters argue that, without assurances of confidentiality, young people would not seek family planning services. They contend that the proposed changes to confidentiality protections would hinder access to contraception and information for young people, both of which have contributed to lower instances of teen pregnancy.

*Response:* The Department agrees with commenters who stress that Title X providers must continue to comply with laws concerning patient confidentiality, including those specifically pertaining to the confidentiality for minors with respect to Title X services. For this reason, the Department does not change the current regulatory provision that requires that all information as to personal facts and circumstances obtained by the project staff about individuals receiving services must be held confidential and

[89] *See* 42 U.S.C. 300–300a–6; HHS Appropriations Act 2019, Public Law 115–245, Div. B, secs. 207–208 132 Stat. at 3090.

Exhibit 154

not be disclosed without the individual's documented consent, except as necessary to provide services to the patient or as required by law, with appropriate safeguards for confidentiality. The Department also does not change the further specification in the rule that, in any other case, information may be disclosed only in summary, statistical, or other form which does not identify particular individuals. The rule will, thus, continue to protect the confidentiality of patient information subject to these well-established exceptions and limitations. The only change is to clarify that the concerns for "appropriate safeguards for confidentiality" may not be used as a rationale for noncompliance with State or local laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, human trafficking, or similar criminal activity.

The Department believes the final rule is consistent with standard health care confidentiality practices, in which providers already have conversations with their patients, document those discussions in patient records, and comply with State and local reporting requirements, while otherwise maintaining the confidentiality of that information. Although the Department understands the challenge of balancing protection for victims, complying with State reporting laws, and maintaining trust in the patient-provider relationship, the Department's annual appropriations law requires that Title X projects comply with such State reporting requirements. Moreover, the Department believes that Title X programs can best serve minors and other vulnerable populations by ensuring Title X providers have a plan for reporting abuse as required by State and local reporting laws. Title X projects and participating entities can comply with these reporting requirements and document the measures taken to comply, much as health care providers do in other contexts, without infringing in any way on patient confidentiality.

*H. Standards of Compliance With Prohibition on Abortion (42 CFR 59.13)*

*Summary of changes:* The proposed rule would add § 59.13, which would specify that "[a] project may not receive funds under this subpart unless it provides assurance satisfactory to the Secretary that, as a Title X grantee, it does not provide abortion and does not include abortion as a method of family planning. Such assurance must also include, at a minimum, representations (supported by documentary evidence where the Secretary requests it) as to compliance with this section and each of the requirements in §§ 59.14 through 59.16. A project supported under this subpart must comply with such requirements at all times during the project period."

The Department finalizes this definition with changes in response to comments that emphasize the grantee's responsibility to provide satisfactory assurance to the Secretary that the project complies with the statutory and regulatory Title X requirements.

*Comments:* One commenter states that the definitions of "grantee" and "project" are unclear and create confusion. Specifically, the commenter states that, under § 59.13, "[a] project may not receive funds under this subpart unless it provides assurance satisfactory to the Secretary that, as a Title X grantee, it does not provide abortion and does not include abortion as a method of family planning." Project, however, is defined to "mean a plan or sequence of activities that fulfills the requirements elaborated in a Title X funding announcement and may be comprised of, and implemented by a single grantee or subrecipient(s), or a group of partnering providers who, under a grantee or subrecipient, deliver comprehensive family planning services that satisfy the requirements of the grant within a service area." The commenter contends that § 59.13 treats "grantee" and "project" interchangeably, and therefore causes confusion, as well as risking the interpretation that, under § 59.13, the grantee may not provide abortion or include abortion as a method of family planning both inside and outside the project. The commenter contends this ambiguity fails to give applicants a sufficient understanding of how the rule works, and what conditions apply to applicants for grants.

Commenters also assert that the regulations do not articulate how compliance should be demonstrated under § 59.13, and what documentary evidence would be necessary to provide this assurance.

Other commenters raise general concerns discussed elsewhere in this preamble.

*Response:* The Department agrees with the commenter that there is a lack of clarity with respect to the use of the terms "grantee" in § 59.2 and "project" in § 59.13. The Department intends the compliance standards in § 59.13 to apply to a grantee's activities within a Title X project, not to a grantee's activities outside of a project. The Department recognizes that an entity that serves as a Title X grantee may provide abortion or include abortion as a method of family planning separate from, independent of, and outside, the Title X project for which the grantee has been selected. Such an entity may still qualify for a Title X grant, so long as it meets each of the requirements in §§ 59.13 through 59.16 with respect to the project, including but not limited to the physical and financial separation, and ensures compliance with those requirements by its subrecipients with respect to the project. This recognition is consistent with *Rust* v. *Sullivan* [90] and the 1988 regulations.[91] The Department believes that the lack of clarity in the proposed rule was not due to the definition of "grantee" in § 59.2, but the use of the terms "grantee" and "project" in § 59.13.

The Department addresses this confusion by modifying a phrase and adding further clarity with regard to where responsibility for compliance lies.[92] Consequently, the Department finalizes § 59.13 to state: "A project may not receive funds under this subpart unless the grantee provides assurance satisfactory to the Secretary that the project does not provide abortion and does not include abortion as a method of family planning. Such assurance must also include, at a minimum, representations (supported by documentary evidence where the Secretary requests it) as to compliance with this section and each of the requirements in §§ 59.14 through 59.16. A project supported under this subpart must comply with such requirements at all times during the project period." The Department believes this change addresses the confusion raised by the commenter concerning how the definition of grantee applies in § 59.13.

The Department disagrees with commenters who contend the proposed rule at § 59.13 gives improper or unprecedented regulatory authority to the Department beyond the concern addressed above. Title X authorizes the Secretary to promulgate regulations governing grants and contracts issued in the program. 42 U.S.C. 300a–4. Thus, the Department is authorized, and in many cases required to, apply requirements both to primary grantees and to subrecipients of Title X funds. This includes the requirements set forth in section 1008.

---

[90] 500 U.S. 173.

[91] 42 CFR 59.1–59.12 (1988 ed.), 53 FR 2922 (Feb. 2, 1988).

[92] As discussed above, the Department believes the concern raised by the commenter does not require a change to the definitions of "grantee" and "project" in § 59.2, since they are clear, and not the subject of the commenter's concern.

Exhibit 154

The Department disagrees with commenters who assert that the regulations do not articulate how compliance would be demonstrated under § 59.13, and what documentary evidence would be necessary to provide this assurance. The plain text in proposed § 59.13 would require that the grantee provide representations of compliance with the section and each of the requirements in §§ 59.14 through 59.16, and be prepared to support the representations with documentary evidence of compliance if requested by the Department. Proposed § 59.17(b) similarly requires the establishment and documentation of certain protocols, plans and training related to knowledge of and compliance with certain State or local notification or reporting requirements. The grantee would provide a representation or assurance that it has adopted the required protocols and conducted/provided the required training. The types of documentary evidence that might be required could include (1) copies of the protocols or plans that have been adopted and implemented; (2) copies of the training materials; (3) training session sign in sheets; and (4) notations in patients' records as to reporting, notification, or in the case of minors, screening for abuse or victimization. To the extent that additional documentation is required by the Secretary at a later date, future guidance will be communicated to grantees.[93]

### I. Requirements and Limitations With Respect to Post-Conception Activities (42 CFR 59.14)

*Summary of changes:* The proposed rule would add § 59.14, which would provide guidance to grantees regarding the requirements and limitations of the Title X program with respect to the post-conception activities of projects and clinics. Sections 59.5(a)(5) and 59.16(a) contain related provisions. Because many comments on these related sections overlap, some comments (and responses) in this section are also applicable to those sections as well.

Comments concerning the prohibition on providing or performing abortion as a method of family planning are addressed above in the discussion of the definition of "family planning" in § 59.2 and in the discussion of the prohibition on providing, promoting, referring for,

or supporting abortion as a method of family planning in § 59.5(a)(5).

Comments concerning the rescission of the requirement in the 2000 regulations to provide abortion counseling, information, and referrals, and concerning nondirective pregnancy options counseling under this rule, are addressed above in the discussion of § 59.5(a).

Comments concerning the prohibition on referral for abortion as a method of family planning, on the promotion, or support of abortion as a method of family planning, and on taking affirmative action to assist a patient to secure an abortion, are considered here, and relate to § 59.14 as well as parts of §§ 59.5(a)(5) and 59.16(a).

The Department finalizes the language at § 59.14 with changes in response to public comments, as discussed below.

1. Prohibition on Referral for, and Encouragement, Promotion, Advocacy, Support, and Assistance of, Abortion as a Method of Family Planning (42 CFR 59.14(a), Inclusive of Pertinent Portions of §§ 59.5(a)(5), and 59.16(a))

*Summary of changes:* The first sentence of proposed § 59.14(a) would provide that "[a] Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." This sentence remains unchanged in the final rule. The remaining language in § 59.14(a) would permit doctors to provide a list of licensed, qualified, comprehensive primary health care providers (some of which may also provide abortion services) and guidance on circumstances when the list could be provided. The Department now finalizes language in the first sentence without change. In response to comments, the Department has updated the remaining language of § 59.14(a), regarding the list of comprehensive health service providers and has updated the examples listed at the end of § 59.14. Further discussion of these changes regarding the list is included in the subsection below, entitled "Information About Prenatal Care, Use of Permitted Information To Refer For Abortion, and Examples (42 CFR 59.14(b), (c), and (e))." A further discussion of this prohibition is also included in the discussion of § 59.16, which contains a related provision.

*Comments:* Many commenters strongly support the proposed language to prohibit Title X projects from referring for abortion as a method of family planning and from promoting, supporting, encouraging, advocating for,

or assisting abortion as a method of family planning. They contend these prohibitions are consistent with Congressional intent for Title X, including in section 1008 of the PHS Act. Some commenters note that, in *Rust,* 500 U.S. at 17892, the Supreme Court upheld a prohibition on abortion referrals in the 1988 regulations as being both constitutionally valid and a permissible implementation of the statutory restrictions on the program. Another commenter states that the government is permitted to direct how Title X funds are spent, consistent with the Title X statute, and that this sustains the prohibition on referrals. The commenter contends the proposed rule would ensure not only that program funds are not used to directly provide abortions, but also that program funds do not support loopholes by which some providers abuse the system to refer for abortion as a method of family planning. Another commenter supports the proposed rule because it will be consistent with a number of State laws that prohibit Title X providers from referring for abortions.

Other commenters oppose the prohibition on abortion referrals. A significant number of commenters call the prohibition a gag rule, arguing it restricts providers from speaking freely with their patients about every health concern they may have. They state that this prohibition violates ethical standards and undermines the patient-provider relationship, noting that a health care provider should not fail to provide certain services, namely those associated with abortion, because of private religious beliefs. Some commenters also contend the proposed changes disregard the consciences of providers who support ensuring patient access to information related to abortion and abortion-related services, including providing abortion referrals. And some commenters state that the abortion referral prohibitions in the proposed rule regulate activities outside the Title X program and are, therefore, illegal.

A commenter supporting the proposed rule disputes the characterization of the prohibition on abortion referrals and promotion as a gag rule. The commenter contends the language merely implements what the law already requires and does not prevent physicians or APPs from providing nondirective counseling as long as it is done in a manner consistent with the Title X statute. In addition, the commenter notes that abortion referral prohibitions do not prevent a doctor from making medical determinations on behalf of a patient that require services

---

[93] Grantees are already required to affirm that neither they nor any of their subrecipients provide abortion as a method of family planning. At the present time, the Department contemplates a narrow compliance requirement where the grantee assures the Department of compliance and provides adequate representations to bolster that assurance, such as those discussed above.

Exhibit 154

outside of the scope of the Title X program.

*Response:* Having examined its past rules governing the Title X program, the public comments on this issue, and the Department's interpretations of section 1008's prohibition on funding Title X programs "where abortion is a method of family planning," the Department concludes that the requirement in the 2000 regulations for abortion referral is inconsistent with the Department's current interpretation of section 1008.[94] The language of Section 1008 goes beyond merely prohibiting the funding of abortion (which is addressed in the Title X appropriation provision), or of projects that perform abortion. The Title X statute prohibits spending Title X funds on programs where abortion is treated as a method of family planning. This prohibition impacts Title X projects in a variety of ways. If a Title X project refers for, encourages, promotes, advocates, supports, or assists with, abortion as a method of family planning, it is a program "where abortion is a method of family planning" and the Title X statute prohibits Title X funding for that project. For this reason, the Department agrees with commenters who support the language prohibiting such activities in the proposed rule as legally permissible and appropriate.

The Supreme Court has already recognized the reasonableness of this interpretation. In *Rust,* the Supreme Court upheld the provisions in the 1988 regulations that a Title X project may not "provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning," provisions implementing that prohibition, and provisions stating a Title X project may not "encourage, promote, or advocate abortion as a method of family planning" or "assist women to obtain abortions." *See* 53 FR 2923–2924; *Rust,* 500 U.S. at 179–80. The Supreme Court held that "[t]he broad language of Title X plainly allows the Secretary's construction of the statute" to prohibit abortion referral, counseling, and advocacy, and the Secretary "amply justified his changed interpretation." *Rust,* 500 U.S. at 184–87. The Court further concluded "[t]here is no question but that the statutory prohibition contained in § 1008 is constitutional," because Congress "may 'make a value judgment favoring childbirth over abortion, and . . .

implement that judgment by the allocation of public funds.' " *Id.* at 192 (internal citations omitted; ellipses in original). The court explained that the challenged provisions of the 1988 regulations were also consistent with the First Amendment:

The challenged regulations implement the statutory prohibition by prohibiting counseling, referral, and the provision of information regarding abortion as a method of family planning. They are designed to ensure that the limits of the federal program are observed. The Title X program is designed not for prenatal care, but to encourage family planning. A doctor who wished to offer prenatal care to a project patient who became pregnant could properly be prohibited from doing so because such service is outside the scope of the federally funded program. The regulations prohibiting abortion counseling and referral are of the same ilk. . . . This is not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside of the project's scope.

*Id.* at 193–94.

The Department disagrees with the view of some commenters that the prohibitions on referral for, encouragement of, promotion of, advocacy for, support of, or assistance with, abortion as a method of family planning regulate non-Title X activities. The Department intends these prohibitions to apply only to the Title X project. The Supreme Court, in *Rust* rejected a First Amendment claim in which the challengers contended that similar regulations apply outside the Title X project, stating that "[t]he Secretary's regulations do not force the Title X grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from Title X activities. . . . The regulations govern the scope of the Title X project's activities, and leave the grantee unfettered in its other activities." *Rust,* 500 U.S. at 196. Furthermore, the Court stated that an entity that receives Title X funds "can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it is simply required to conduct those activities through programs that are separate and independent from the project that receives Title X funds." *Id.*

The Department also disagrees with commenters who contend that prohibiting referring for, promoting, supporting, encouraging, advocating for, or taking any other affirmative action to assist a patient to secure, abortion as a method of family planning in Title X projects violates the Church Amendment rights of Title X projects or their employees. Although paragraph

(c)(1) of the Church Amendments protects personnel on the basis that they "performed or assisted in the performance of a lawful . . . abortion," [95] those are not inconsistent with the clear statutory prohibition that funds may not be provided to Title X projects where abortion is a method of family planning. Projects can comply with this prohibition on the use of Title X funds without discriminating against personnel in a way that violates the Church Amendments.

The Department, thus, finalizes the first sentence of § 59.14(a).

2. Information About Prenatal Care, Use of Permitted Information To Refer for Abortion, and Examples (42 CFR 59.14(b)(1), (c), and (e))

*Summary of changes:* The proposed rule would provide in § 59.14(b) that, once a Title X client is diagnosed as pregnant, she must be referred for appropriate prenatal and/or social services. The proposed rule also would have required that the project provide any information necessary to protect her health and the health of the unborn child until the referral appointment is kept, including referral for emergency medical services when appropriate. In § 59.14(c), the proposed rule would have acknowledged the duty of a physician to promote patient safety in allowing a doctor to provide a list, if asked, of licensed, qualified, comprehensive health service providers, some of which may provide abortion in addition to comprehensive prenatal care. In paragraph (e), the Department would set out several examples to illustrate the application of the requirements of paragraphs (a) through (d).

The Department finalizes § 59.14(b)(1) with changes, including to permit the provision of a single list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care) to pregnant clients. In addition, the final rule requires referral for prenatal care since such care is medically necessary to maintain or improve the health of both the mother and the unborn baby. The Department simplifies and clarifies the description of pregnancy health information in this final rule to read "[i]nformation about maintaining the health of the mother and unborn child during pregnancy."

The Department also finalizes provisions addressing the permissive nature of nondirective pregnancy counseling and the provision of information about pregnancy health.

---

[94] As discussed *supra* at I(A)(2)(c) Nondirective Pregnancy Counseling Permitted, Not Required and elsewhere in this preamble, such a requirement also raises issues under the Church, Coats-Snowe, and Weldon Amendments.

[95] 42 U.S.C. 300a–7.

Exhibit 154                                                                 JA-0002615

The Department is simplifying this language and separating the requirements into enumerated subparagraphs of paragraph (b)(1) for clarity. The final rule, thus, specifies that referrals for prenatal care are required, because of its medical necessity due to pregnancy. Further, the Title X provider may also choose, but is not required to, provide nondirective pregnancy counseling, referrals to social services or adoption agencies, and information consistent with Section 1008 and appropriate post-conception activities under Title X regulation.

As discussed below, the Department also finalizes, as proposed, the final sentence in proposed paragraph (b) concerning cases that require emergency care as paragraph (b)(2).

The Department finalizes § 59.14(c) with changes in response to comments, including the consolidation of the two lists of comprehensive health care providers (from paragraphs (a) and (c) of the proposed rule) into one list and the addition of the requirement that the list and project staff not identify which providers on the list, if any, perform abortion.

The Department finalizes § 59.14(e), which sets forth examples illustrating the rules described in paragraphs (a) through (d), with changes consistent with the changes to those subsections.

*Comments:* Many commenters oppose the list of providers that may be shared with pregnant patients who request abortion. Commenters believe the list lacks necessary detail, may be difficult to understand for some patients, and difficult to implement for some providers because of the lack of comprehensive service providers who also provide abortion in their community.

Other commenters oppose the fact that the list may include some health providers that perform abortions, contending that Title X projects should not provide women seeking abortion with any list of providers that perform abortion. They contend providing such a list, or any information a woman may use to obtain an abortion, would violate section 1008 as it would make the project one "where abortion is a method of family planning." Such commenters also contend providing such a list would constitute a referral for abortion. They point to the proposed rule, published by the HHS Office for Civil Rights in January 2018 to implement conscience laws such as the Weldon Amendment, defining referral as providing information that could provide assistance in obtaining a

particular health care service. *See* 83 FR 3880, 3924 (Jan. 26, 2018).[96]

Several commenters contend that rule's description of two lists—one that may include abortion providers to be given to pregnant patients who want an abortion (described in § 59.14(a) and (c)), and another (described at the end of § 59.14(a)) that does not include abortion providers and that would be given to all other pregnant patients—is confusing and cumbersome for both the patient and the provider.

Other commenters object to the requirement that only doctors are permitted to give the list of providers to a woman seeking abortion described in § 59.14(a) and (c).

Some commenters assert that requiring referrals for pregnant patients to obtain prenatal and/or social services, regardless of the patient's wishes, violates the Congressional requirement that all Title X counseling be nondirective.

Many commenters present objections to the examples set forth in subsection (e) consistent with their objections to the requirements of subsection (a) that those examples illustrate.

*Response:* The Department agrees that it is appropriate to implement section 1008 to prohibit referrals for, and encouragement, promotion, advocacy, support, and assistance of abortion. The Department also agrees that, while nondirective pregnancy counseling is permissible in Title X projects by physicians or APPs, even if nondirective abortion counseling is provided among other options (so long as the counseling falls within parameters of the Title X statute and this regulation), abortion referral is inconsistent with the prohibition against funding Title X projects where abortion is a method of family planning.

The Department's approach to counseling is somewhat different than in the 1988 regulations which, in addition to prohibiting abortion referrals, also prohibited "counseling concerning the use of abortion as a method of family planning." In subsequent years, Congress has indicated that nondirective postconception counseling would be permissible, without requiring that any such counseling occur. It has done so through appropriations law provisions requiring that any pregnancy counseling offered in Title X projects be nondirective.[97] The Department believes these enactments make it

appropriate for the Department to allow nondirective pregnancy counseling in Title X projects by physicians or APPs, even if the counseling includes nondirective counseling on abortion. Although Congress did not require projects to offer pregnancy counseling, a permissible interpretation of the statutory provision requiring that any such counseling be nondirective is that abortion may be discussed in a nondirective way. The Department believes that it would also be a permissible interpretation to conclude that, even without discussion of abortion, other nondirective counseling should be presented to the pregnant woman. In the absence of more specific direction from Congress in the nondirective counseling provision, the Department concludes that it is permissible to interpret the various statutory requirements for Title X so as to permit projects to provide nondirective pregnancy counseling, even if it involves counseling on abortion, as long as that counseling is truly nondirective.

As clarified by the direction given by Congress, nondirective counseling is consistent with the provision as analyzed in *Rust*. The 1988 regulations upheld in *Rust* stated a Title X project may not, among other things, "provide counseling concerning the use of abortion as a method of family planning," "provide referral for abortion as a method of family planning," "encourage, promote or advocate abortion as a method of family planning," or "use prenatal, social service or emergency medical or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning, such as by weighing the list of referrals in favor of health care providers which perform abortions, by including on the list of referral providers health care providers whose principal business is the provision of abortions, by excluding available providers who do not provide abortions, or by 'steering' clients to providers who offer abortion as a method of family planning." *Rust,* 500 U.S. at 179–80 (*citing* 42 CFR 59.8(a)(1)–(3) (ed. 1988)). In upholding those provisions, the Supreme Court added that the Department may also prohibit "abortion-related speech" and "abortion advocacy" in a Title X project. *Rust,* 500 U.S. at 175. The language of this final rule, which at §§ 59.14(a) and 59.16(a) similarly prohibits a Title X project from referring for, promoting, supporting, encouraging, advocating for, or taking any other affirmative action to assist a patient to secure, abortion as a method

---

[96] That proposed rule has not yet been finalized.

[97] *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Public Law 104–134, sec. 104, 110 Stat. 1321; HHS Appropriations Act 2019, Public Law 115–245, Div. B, 132 Stat. 3070.

Exhibit 154    JA-0002616

of family planning, is consistent with the provisions of the 1988 regulations that the Supreme Court upheld in *Rust*. Thus, the Supreme Court's conclusions upholding these provisions of the 1988 regulations would be equally applicable to this final rule and the permissions surrounding nondirective pregnancy counseling.

The Department has seriously considered the many comments offered regarding the two lists referenced in proposed § 59.14(a) and (c): One list required for pregnant clients generally, and another list permitted in the more specific circumstance where pregnant clients have decided to seek an abortion and request an abortion referral. The Department agrees that the proposal for two lists to be provided in two different and specific circumstances was potentially confusing and/or burdensome for projects which might be confused or unclear about how to develop and implement the lists. The proposed rule's duplicative description (in both paragraphs (a) and (c)) of the more specific list allowed when a client requests abortion may also have been confusing. And although the proposed rule attempted to describe, in more detail, how a project would respond to requests for abortion or abortion referrals, the Department concludes that description was also potentially confusing and is unnecessary in the final rule.

The Department is finalizing § 59.14(b)(1)(ii) to allow Title X providers to give a single list of providers to any pregnant woman. This list will contain licensed, qualified, comprehensive primary health care providers (including providers of prenatal care). At § 59.14(c), the Department consolidates and finalizes the description and requirements applicable to such list. The Department permits, but does not require, some providers on the list of comprehensive primary health care providers (including providers of prenatal care) to be providers that also provide abortion. The Department believes this will enable some projects to create a single list of comprehensive primary health care providers (including providers of prenatal care). For example, some service sites might find that the main provider of comprehensive primary or prenatal health care services is a hospital that also performs some abortions. At the same time, projects cannot create or distribute a list in which every provider (or a majority) on the list provides abortion. Projects, however, may compile their list so that no providers of abortion are on the list.

Because referrals for abortion as a method of family planning are prohibited, the list of comprehensive primary health care providers (including providers of prenatal care) that Title X projects and providers may provide to pregnant clients (and which may include abortion providers) cannot be used to indirectly refer for abortion or to identify abortion providers to a client. Thus, in the circumstance where a pregnant woman asks for an abortion or an abortion referral for family planning purposes, the project's response would be to say it does not refer for abortions, and then to offer her, if she desires, a list of comprehensive primary health care providers (including providers of prenatal care); that list could include (but not identify) such providers that also perform abortions.

The Department believes these limitations on the list of comprehensive primary health care providers (including providers of prenatal care), as well as the context in which the list would be provided, prevents distribution of that list from violating section 1008, even if some providers on the list also provide abortions. There are many potential reasons or purposes for a Title X provider to provide the list to a pregnant patient. If provision of the list is for a referral purpose, it must be for a permissible purpose, such as to refer the patient for prenatal care or for care of pre-existing maternal health conditions, not for the purpose of referring for abortion as a method of family planning. The final rule prohibits the list and project staff from identifying which, if any, providers on the list provide abortions. The Department, therefore, disagrees with some commenters who contend that including any abortion providers on a list of comprehensive primary and/or prenatal health care providers would render the project one "where abortion is a method of family planning."

In response to comments, the Department has decided to eliminate the requirement that a list provided specifically to women seeking abortion referrals be provided only by a doctor. Some commenters object to this requirement and note that the proposed rule did not require the list of prenatal care referrals, which was to be provided to all pregnant women, to be provided only by a doctor. Upon consideration of these comments, the Department has decided not to finalize any restriction on which personnel may provide the list to a pregnant patient. Any member of the Title X staff may provide the list, but only physicians and APPs may provide any nondirective pregnancy counseling.

In light of section 1008 and federal conscience laws, the Department has concluded it will not require Title X projects to offer nondirective counseling or information about abortion. The Department similarly will not require projects to offer nondirective pregnancy counseling on other subjects if they choose not to do so. Congress did not require that projects offer pregnancy counseling, but only that such counseling be nondirective, when/if offered. The Department concludes that the final rule should take a similar approach. Accordingly, this rule does not require a Title X project to offer abortion-related pregnancy counseling (or pregnancy counseling at all). When a project chooses to offer such pregnancy counseling, it must be nondirective. The clinic may offer referral services except that, given the statutory parameters set forth in Section 1008, a project is not permitted to provide referrals for abortion as a method of family planning.[98] As noted above, with respect to § 59.5(a)(5), this final rule rescinds the requirement of pregnancy options counseling from the 2000 regulations. This final rule neither requires nor prohibits pregnancy counseling (although pursuant to Congressional mandate, if such counseling occurs, it must be nondirective). Consistent with federal law (including the requirements of this final rule), Title X projects and providers must comply with all applicable laws concerning the practice of medicine and the offering of medical advice, as they may apply to the Title X project or provider that provides pregnant clients with nondirective pregnancy counseling, a list of comprehensive primary and prenatal health care providers, prenatal care referrals, assistance with setting up referral appointments, or information about pregnancy health.

Some commenters contend that providing prenatal care referrals violates Congress's requirement that pregnancy counseling be nondirective. The Department responds to this comment above in its discussion of referrals for prenatal care and adoption in § 59.2. Prenatal care is medically necessary for any patient who is pregnant, so referrals for such care do not render counseling directive. Moreover, the Department notes that low income women are more likely to deliver low birthweight babies

---

[98] Projects may permit each Title X clinic to make the decision whether it will provide each aspect of permissible counseling. The Department notes, however, that clinics, providers, and staff cannot be required to counsel on abortion if, for example, such activity would be contrary to their religious beliefs or moral convictions.

Exhibit 154

JA-0002617

and to deliver before term, and less likely to access adequate prenatal care services. Yet prenatal care is one of 14 mandatory categories of Medicaid services and is deemed medically necessary for pregnant women. Because prenatal care is essential in order to optimize the health of the mother and unborn child, and to help ameliorate the current health inequality as it relates to low income women,[99] referring low income pregnant women for prenatal care is of increased importance.[100] Therefore, the Department adds additional clarity regarding referrals for prenatal care in an example in § 59.15(e)(1). The Department continues to believe that Title X projects are well situated to provide such referrals.

The Department does not, however, agree with the commenter who proposes that Title X providers are responsible for prenatal care. While the Department agrees that prenatal care is important to maternal and infant outcomes, and encourages Title X providers to provide comprehensive health care services onsite or through robust referral networks, the provision of postconception and pregnancy services (as distinct from information and referrals for them) are outside the scope of Title X.

Accordingly, the Department is finalizing this section as discussed to simplify and clarify the approach set forth in the proposed rule. Consequently, § 59.14(a) is finalized to prohibit Title X projects from referring for abortion, which includes "any affirmative action to assist a patient to secure such an abortion." Section 59.14(b)(1) is also finalized to only require Title X projects to refer pregnant clients to a "health care provider for medically necessary prenatal health care." Subsection (b)(1) also establishes that the Title X provider may also provide certain specified counseling and/or information to the pregnant woman. Finally, subsection (b)(2) establishes that, in cases requiring emergency care, referral is required "to an appropriate provider of medical services needed to address the emergency." [101] Section 59.14(c) is finalized to establish that a Title X project may not use lists, referrals, or counseling "as an indirect means of

encouraging or promoting abortion as a method of family planning." Subsection (c) further establishes that while the list may include some providers who provide abortion services, "[n]either the list nor project staff may identify which providers on the list perform abortion."

The Department is finalizing the changes described above to reduce confusion, facilitate implementation of the rule, provide pregnant clients with counseling and information for prenatal care and information to promote the health of the mother and unborn child, and implement section 1008 to ensure Title X does not fund projects where abortion is a method of family planning. The Department also finalizes the examples in paragraph (e), with changes corresponding to the changes made in paragraphs (a) through (d).

### 3. Emergency Care and Medically Necessary Information (42 CFR 59.14(b)(2) and (d))

*Summary of changes:* In the last sentence of § 59.14(b), the proposed rule would require that, "[i]n cases in which emergency care is required, the Title X project shall only be required to refer the client immediately to an appropriate provider of emergency medical services." The Department finalizes § 59.14(b)(2), in response to comments discussed below, by replacing "an appropriate provider of emergency medical services" with "an appropriate provider of medical services needed to address the emergency."

At § 59.14(d), the proposed rule would provide: "Provision of medically necessary information. Nothing in this subpart shall be construed as prohibiting the provision of information to a project client that is medically necessary to assess the risks and benefits of different methods of contraception in the course of selecting a method, provided that the provision of such information does not otherwise promote abortion as a method of family planning." The Department finalizes § 59.14(d) without change.

*Comments:* Some commenters object that the proposed rulemaking does not allow for medically necessary, but non-emergency, referrals for abortion. These commenters state that when maternal and child health outcomes will be compromised if a pregnancy is continued, or if appropriate treatment and services are delayed, referral for abortion is needed.

Several commenters express concern that the proposed language would allow providers to refer patients who need emergency care only to an emergency room, which may not be the best place for the patient. They assert that this will

increase unnecessary emergency room use. Commenters ask the Department to clarify in the rulemaking that providers be allowed to refer the pregnant woman to the provider that is clinically appropriate for the patient.

Several other commenters request that the Department clarify the language in the proposed rulemaking regarding women who experience ectopic pregnancies and other life-threatening conditions related to pregnancy. They contend that the exception for "danger of death" should be included in the discussions of the Hyde Amendment. They contend this would assure that Title X providers have accurate information to be compliant and consistent among federal agencies.

*Response:* The Department disagrees with commenters contending that restrictions in the rule on referral and directive counseling affect situations concerning emergency or medically necessary care. Section 1008 prohibits funding for Title X projects where abortion is a method of family planning, and the final rule's restrictions on referral, promotion, or encouragement of abortion are similarly limited to abortion as a method of family planning. Referral for abortion because of an emergency medical situation does not fall into restrictions concerning abortion as a method of family planning. Paragraph (b)(1) of § 59.5 of the final rule makes clear that Title X grantees and subrecipients not only may, but must, provide for "referral to other medical facilities when medically necessary." *See also* § 59.5(b)(8).[102]

The Department appreciates commenters who suggest that the final sentence in proposed § 59.14(b) limits referral to emergency rooms. The Department agrees with a commenter who stated that a hospital emergency room may not always be the most appropriate referral location and that the referral should be commensurate with the medical need. Because the text of the proposed rule would require only referral to "an appropriate provider of emergency medical services," the Department finalizes this language with clarification to avoid confusion and to emphasize, "[i]n cases in which emergency care is required, the Title X project shall only be required to refer the client immediately to an appropriate provider of medical services needed to

---

[99] Tanya Nagahawatte and Robert L. Goldenberg, *Poverty, Maternal Health, and Adverse Pregnancy Outcomes,* 1136 Ann. N.Y. Acad. Sci. 80, 81 (2008), *https://www.ncbi.nlm.nih.gov/pubmed/17954684.*

[100] Rita Hamad and David H. Rehkopf, Poverty, Pregnancy, and Birth Outcomes: Earned Income Tax Credit, 29(5) Paediatr Perinat Epidemiol 444–452, Jul. 24, 2015. PMCID: PMC4536129.

[101] This sentence in § 59.14(b) is addressed in the immediately below section.

---

[102] As noted above, Title X projects and service providers must ensure that they do not, under the cover and pretext of providing such abortion referral, actually refer for abortion as a method of family planning. This is an area in which Title X projects can expect OPA monitoring and oversight, and should maintain appropriate records to support such referrals.

Exhibit 154      JA-0002618

address the emergency.'' This language is intended to emphasize that it does not require that such referral be to an emergency room.

It is also not the intent of the regulatory provisions at § 59.14(b)(2) or § 59.5(b)(1) to restrict the ability of health professionals to communicate to a patient any information they discover in the course of physical examination (or otherwise) about her medical condition, such as an extant condition that might make her pregnancy high risk; to communicate an assessment of the urgency of the need for treatment; or to ensure that a patient is referred to the appropriate specialist for treatment of the condition, consistent with the exercise of his or her professional judgment and the parameters of the Title X program. The restrictions in these provisions solely concern abortion as a method of family planning. For this reason, the Department disagrees that these provisions of the final rule will increase medical liability, or will prohibit Title X projects from providing the factual information necessary to assess risks of a particular family planning or contraceptive method as set out in the patient package inserts.

As noted, at § 59.14(c), the final rule will also provide that a Title X project may not use emergency medical or other referrals as an indirect means of encouraging or promoting abortion as a method of family planning.

### J. Maintenance of Physical and Financial Separation (42 CFR 59.15)

The proposed rule, at § 59.15, would require physical and financial separation of a Title X project or facility from prohibited activities (*e.g.,* abortion as a method of family planning).

The Department finalizes this section without change. The Department finalizes the compliance date for this section, as set forth in § 59.19, with changes in response to public comments, as discussed below.

*Comments:* Many commenters express support for the proposed financial and physical separation provisions and the Department's efforts to enforce the restrictions. These commenters agree that the proposed separation provisions will ensure statutory compliance with section 1008, eliminate potential confusion, and reduce the use of Title X funds for non-Title X services. One commenter adds that maintaining separate funds is a common requirement for federal grants and contracts. Another commenter states that, as upheld in *Rust* v. *Sullivan,* the Secretary is entitled to interpret Title X to include ''separate facilities.'' Several commenters point out that the proposed separation

amendments are consistent with numerous State laws.

Many other commenters contend that the proposed financial and physical separation requirements and reduced flexibility of funds are illegal, not intended by Congress, burdensome, and unworkable. To begin, commenters claim that the Department fails to adequately justify why the change is necessary and argue that concerns about fungibility or possible co-mingling of funds are flawed. They assert that Title X already prohibits clinics from using federal funds to provide abortions and requires that funds used for abortion be kept separate, and that regular, extensive, and comprehensive audits currently are already used to enforce the existing rule. They contend that the 2000 regulations have successfully ensured separation compliance and that no additional measures are needed. They also contend that improving public education efforts so the public understands Title X funds cannot be used for abortion, would make physical separation unnecessary. These commenters urge the Department to withdraw the new separation requirement, or at a minimum, to provide clearer justifications for the requirement.

Some commenters focus on the possible burden and workability of the rule. They contend that the Department lacks evidence that the rules are feasible, particularly because the separation requirements in the 1988 regulations, which were nearly identical to the proposed rule here, were never fully implemented. They assert that the Department neglected to do adequate research and analysis of how the proposed changes would interact with various State laws, including laws that govern medical licensure and scope of practice. Some commenters state that a Department notice (Provision of Abortion-Related Services in Family Planning Projects, 65 FR 41281, 41282 (July 3, 2000)) allows Title X service sites to use common waiting rooms, staff, filing systems, and other resources and argue that changes to this approach would impair the family planning network by constraining certain providers' ability to participate in the Title X program. They state, for example, that many Title X grantees are hospitals that must be able to perform abortions in emergency situations and would not be able to afford separate infrastructure. Other commenters contend that the financial separation provisions would increase the cost of medical supplies and reduce grantees' ability to make cost-effective bulk purchases. Some commenters contend

that 60 days from the date the final rule is published is insufficient time to accomplish the requirement of separate electronic health records. One commenter urges the Department to consult with a diverse group of Title X providers to calculate the monetary and time costs to comply with the proposed changes.

Some commenters contend that the rule will harm patient care. They state that, for women seeking both Title X services and abortion, the rule would require two separate visits to separate facilities because of effects of the restrictions on same-day post-abortion contraception. They claim that the need for two separate visits would create unnecessary costs and obstacles to care. Other commenters express concern that the new provisions would exacerbate health inequalities in terms of sexually transmitted diseases (STDs) among low income people affected by the loss of Title X providers. Some commenters state that the separation provisions undermine the objectives of integrated care and health systems. Similarly, many commenters argue that the requirement for separate electronic medical records (EHR) contradicts the principles of integrated, patient-centered medical care. They contend the financial separation requirement could lead to instances of missing or incomplete patient data and increased costs, as the same patient must have two separate medical records—one for Title X services and another for abortion services.

Some commenters raise other objections. One commenter, for example, expresses concern that the mandated physical separation would reinforce the notion that abortion is not a normal and legal part of health care. One commenter states that if the separation provisions force clinics that perform abortions to close, it would impede training for residents in obstetrics and gynecology. Another commenter expresses concern that requiring physical separation serves to highlight locations where abortion services are provided, which may increase the risk of those locations being the target of violent crime or protest. Several commenters object to the proposed signage requirements. Many other commenters object to the rule because, in their view, it gives the Department unrestricted authority to determine how to apply the separation requirements, while leaving Title X programs with insufficient guidance.

Finally, some commenters argue that mere physical and financial separation is not enough to ensure program integrity. They recommend Title X

Exhibit 154

**7764**    **Federal Register** / Vol. 84, No. 42 / Monday, March 4, 2019 / Rules and Regulations

clinics have distinctive names from clinics that offer abortions, distinct organizational entities, organizational headquarters, or unique signage and labeling on all Title X materials and service sites.

*Response:* The Department agrees with the commenters who support the rule and the Department's legal authority to require physical and financial separation. The rule is nearly identical to the policy set forth in the 1988 regulations, which was upheld by the Supreme Court in *Rust* v. *Sullivan.* 500 U.S. 173. After having reconsidered this issue, the Department's interpretation of section 1008 in the 1988 and 2000 regulations, and the public comments, the Department reaffirms its conclusions and its approach in the 1988 regulations with respect to physical and financial separation, as set forth in the proposed rule. The Department finds that the approach outlined in the proposed rule is in line with the Congressional mandate to separate Title X funds from those where abortion is a method of family planning. The Department finalizes that provision, with some changes discussed below.

In the 1988 regulations, the Department noted that it was requiring physical and financial separation because it found the regulations inadequate without that requirement, stating that the Department found, "as a matter of experience with Title X, its responsibility to administer the program as provided by Congress, and its general administrative discretion, that the provisions of the current guidelines do not faithfully or effectively maintain the prohibition contained in section 1008." 53 FR at 2923. The 1988 regulations had several key features to address this deficiency and required compliance with the statutory prohibition. Among those, the regulations required grantees to separate their Title X project—physically and financially—from any abortion activities.

Those regulations were upheld on both statutory and constitutional grounds in *Rust.* 500 U.S. 173. The Supreme Court first rejected the claim that the regulations violated the Administrative Procedure Act. The Court concluded that—although the language of section 1008 did not directly prescribe physical and financial separation—the "broad language of Title X plainly allows the Secretary's construction of the statute." *Id.* at 184. The Court declined to view the regulations skeptically merely because the agency had changed its view and reaffirmed the legal principle that "[a]n agency is not required to 'establish rules

of conduct to last forever,' but rather 'must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.' '" *Id.* at 186–87 (internal citations omitted). The Court held the portions of the regulations mandating separate facilities, personnel, and records were "based on a permissible construction of the statute and are not inconsistent with congressional intent." *Id.* at 188. On the contrary, the Court noted, "if one thing is clear from the legislative history, it is that Congress intended that Title X funds be kept separate and distinct from abortion-related activities. . . Certainly, the Secretary's interpretation of the statute that separate facilities are necessary, especially in light of the express prohibition of [section] 1008, cannot be judged unreasonable." *Id.* at 190. Accordingly, the Court "defer[red] to the Secretary's reasoned determination that the program integrity requirements are necessary to implement the prohibition." *Id.*

The Court similarly rejected constitutional challenges to the regulations. As an initial matter, it upheld the statutory limitation of Title X funds to programs where abortion is not a method of family planning, concluding that "[t]here is no question but that the statutory prohibition contained in [section] 1008 is constitutional" because Congress "may 'make a value judgment favoring childbirth over abortion and . . . implement that judgment by the allocation of public funds.' '" 500 U.S. at 192–93 (internal citations omitted; ellipsis in original). The Court explained that the requirement of physical and financial separation was also consistent with the First Amendment:

> By requiring that the Title X grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has, consistent with our teachings . . . not denied it the right to engage in abortion related activities. Congress has merely refused to fund such activities out of public fisc, and the Secretary is simply requiring a certain degree of separation from the Title X project to ensure the integrity of the federally funded program.

*Id.* at 198. The Court held that the regulations did not violate any Fifth Amendment rights because the "Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected and [Congress] may validly choose to fund childbirth over abortion and 'implement that judgment by the allocation of public funds' for medical services relating to childbirth but not to those relating to abortion." *Id.* at 201

(internal quotations omitted). The Court, thus, held that the regulations "are a permissible construction of Title X and do not violate either the First or Fifth Amendments to the Constitution." *Id.* at 203.

The Department carefully considered the issue of physical and financial separation in light of the statutory guidance of section 1008 and notes that it is similar to the 1988 regulations, which were upheld by the Supreme Court. The Department has reconsidered the 2000 regulations, which allowed the sharing of physical space so long as certain financial separation was maintained. The Department continues to hold with the 2000 regulations, to the degree it requires financial separation, that financial separation is a necessary condition to implementing section 1008, but it no longer believes financial separation is sufficient without physical separation. For the reasons discussed below, financial separation without physical separation does not sufficiently address the Congressional mandate that Title X funds be separate and distinct from abortion-related services.

The Department disagrees with commenters who contend it has not provided sufficient reasons or evidence to justify the physical and financial separation requirements. In *Rust,* the Supreme Court upheld imposing those requirements as a legitimate interpretation of the Congressional mandate in section 1008, and the Department continues to believe that the physical and financial separation requirements are in line with that mandate. 500 U.S. at 203. But the Department also believes that such separation would appropriately address certain concerns it has with the current arrangements in which physical separation is not required. First, under the current arrangement, it is often difficult for patients, or the public, to know when or where Title X services end and non-Title X services involving abortion begin. As the Department explained in the proposed rule, shared facilities create a risk of the intentional or unintentional use of Title X funds for impermissible purposes, the co-mingling of Title X funds, the appearance and perception that Title X funds being used in a given program may also be supporting that program's abortion activities, and the use of Title X funds to develop infrastructure that is used for the abortion activities of Title X clinics. Even with the strictest accounting and charging of expenses, a shared facility greatly increases the risk of confusion and the likelihood that a violation of the Title X prohibition will occur.

Exhibit 154    JA-0002620

This concern is particularly acute in light of more recent evidence that abortions are increasingly performed at sites that focus primarily on contraceptive and family planning services—sites that could be recipients of Title X funds. A 2014 report from the Guttmacher Institute provides detail about the various types of facilities at which abortions are performed.[103] It notes that "nonspecialized clinics"—i.e., "nonhospital sites in which fewer than half of patient visits are for abortion services," including physicians' offices—may provide 400 or more abortions per site per year.[104] The report notes that, "[w]hile many of these [nonspecialized] clinics primarily serve contraceptive and family planning clients, about half provided 400 or more abortions per year." [105] It defines "abortion clinics" as "nonhospital facilities in which half or more of patient visits are for abortion services, regardless of annual abortion caseload." [106] According to the Guttmacher Institute, nonspecialized clinics accounted for 24% of all abortions in 2008;[107] 31% in 2011;[108] and 36% in 2014.[109] In addition, nonspecialized clinics represented 26% of abortion providers in 2008;[110] 30% in 2011;[111] and 31% in 2014.[112] Further, despite a 3% drop in the total number of abortion facilities between 2011 and 2014, the number of abortion clinics dropped by 17%, while the number of nonspecialized clinics performing abortions remained stable.[113] The performance of abortions at nonspecialized clinics that also may provide Title X services increases the risk and potential both for confusion

and for the co-mingling or misuse of Title X funds.

Together, these circumstances create a risk of intentional or unintentional misuse of Title X funds and have created public confusion over the scope of Title X services, about whether Title X projects provide abortion services, and about whether federal taxpayers fund abortion services provided by organizations that are grantees (or subrecipients) of Title X grants/funds. The Department believes that such potential co-mingling and confusion provides sufficient supporting evidence, in addition to the Department's rationale for physical and financial separation upheld in *Rust* (which the Department also adopts now), that the 2000 Regulations neither adequately reflect nor ensure compliance with the text and purpose of section 1008. It is generally the Department's view that, if it is difficult to distinguish Title X activities from non-Title X activities, then adequate physical separation has not been achieved.

As discussed above, the Department interprets section 1008 to require Title X project activities to be separate and distinct from prohibited activities (*e.g.,* abortion as a method of family planning). Thus, the Department finalizes the proposed text of § 59.15 so that, when a grantee or subrecipient conducts abortion activities that are not part of the Title X project, and would not be permissible if they were, the grantee must ensure that the Title X-supported project is separate and distinguishable from those other activities.

The Department disagrees with comments opposing the requirement of physical separation on the basis that other means exist to achieve same goals of the proposed rule while still allowing the Title X project and a program engaged in prohibited activities to occupy the same physical space. The Department considered other alternatives to physical separation. For example, it considered whether signs or brochures could be posted to indicate distinctions between the Title X project and Title X prohibited activities, or whether separate staff and examinations rooms within the same area in the facility could sufficiently delineate a separation between the Title X project and abortion-related services. The Department has determined, however, that a shared reception area with materials available on both Title X family planning services and abortion-related services would not resolve the confusion, but could allow it to continue. Signage is often not read, and the segregation of staff or staff

responsibilities would not, in the Department's view, provide sufficient distinction to end confusion. Single facilities often have staff fulfilling distinct roles without making the program itself separate. Patients might not be aware of the distinction made between different examination rooms if the entrance and reception area is shared in common, especially in a smaller facility. The optics and practical operation of two distinct services within a single collocated space do not sufficiently create the separation Congress intended when it said Title X funds cannot be spent "where" abortion is a method of family planning. As in its 1988 regulations, the Department interprets section 1008 to require clear physical separation between Title X projects and places "where" abortion is offered as a method of family planning.

The Department agrees that educational efforts to help the general public understand the services provided by Title X as well as those not provided by Title X, would be beneficial and will be considered by the Department. The Department believes that public educational efforts could augment the requirement for physical separation and contribute to more accurate public perception. But such efforts do not negate the need for clear and understandable separation between Title X services and abortion services at the clinic level. Physical separation assists with statutory compliance, in addition to improving public perception, by ensuring that both intentional and unintentional comingling of resources, activities, and services do not take place in ways that are exacerbated when both services are housed in the same space.

The final rule seeks to reduce, and potentially eliminate, any confusion—actual or potential—as to the scope of services supported by Title X funds by requiring funded projects to maintain clear physical and financial program separation from programs that use abortion as a method of family planning. The Department believes the rule will create a clearer and more transparent system of separation and accountability, similar to that established by the 1988 regulations and affirmed in *Rust*. It will also help assure fidelity to the text and purpose of section 1008 and facilitate auditing and enforcement of program requirements. The rule does not, however, restrict the use of non-Title X funds outside the Title X program, nor does it impose restrictions on funds provided by other federal programs.

The Department disagrees with commenters who contend that, because the Department did not have sufficient

[103] Rachel K. Jones and Jenna Jerman, *Abortion incidence and service availability in the United States, 2014,* 49 Guttmacher Institute Perspectives on Sexual and Reproductive Health 17, 19 (2017), *https://www.guttmacher.org/journals/psrh/2017/01/abortion-incidence-and-service-availability-united-states-2014.*

[104] *Id.* at 19.

[105] *Id.* at 20.

[106] *Id.* at 19.

[107] Rachel K. Jones and Kathryn Kooistra, *Abortion incidence and access to services in the United States, 2008,* 43 Guttmacher Institute Perspectives on Sexual and Reproductive Health 41, 46 (2011), *https://www.guttmacher.org/sites/default/files/pdfs/pubs/psrh/full/4304111.pdf.*

[108] Rachel K. Jones and Jenna Jerman, *Abortion incidence and service availability in the United States, 2011,* 46 Guttmacher Institute Perspectives on Sexual and Reproductive Health 3, 6 (2014), *https://www.guttmacher.org/sites/default/files/article_files/abortion_incidence_in_the_united_states_2011.pdf.*

[109] *See* Jones 2017, supra at 20.

[110] *See* Jones 2011, supra at 46.

[111] *See* Jones 2014, supra at 6.

[112] *See* Jones 2017, supra at 20.

[113] *See* Jones 2017, supra at 20.

Exhibit 154

JA-0002621

opportunity after several years of litigation to put the 1988 regulations into effect before a new administration chose not to implement them, the Department may not implement essentially the same rules now. When the Supreme Court upheld the 1988 regulations, the Court held it was legally permissible for the Department to put them into effect. Nothing in the Administrative Procedure Act precludes the Department from re-adopting regulatory provisions that it had previously adopted, successfully defended in court, and then rescinded.

Commenters contend that the Department should have conducted more research regarding State laws, and regulation implementation costs by interviewing Title X providers. However, the number or administrability of State laws cannot take precedence over the statutory requirements of the federal Title X grant program. Additionally, the large volume of responses submitted within the 60-day comment period verifies that this process was sufficient for organizational and State stakeholder responses, both of which the Department received and carefully considered.

With respect to the contention of some commenters that the physical and financial separation requirements will destabilize the network of Title X providers, the Department disagrees. The rule continues to allow organizations to receive Title X funds even if they also provide abortion as a method of family planning, as long as they comply with the physical and financial separation requirements. The rule also allows case-by-case determinations on whether physical separation is sufficiently achieved to take the unique circumstances of each program into consideration. As is true for all program requirements, the Department welcomes regular interaction with grantees and subrecipients, should they have questions. Project officers are available to help grantees successfully implement the Title X program in compliance with both the statute and the regulation. The Department encourages grantees to contact the program office with questions, discuss ways to comply with the physical separation requirement, and put a workable plan in place to meet the compliance deadline. Moreover, the Department will not require compliance with the physical separation requirements of § 59.15 until one year after this final rule is published in the **Federal Register**. This will give grantees and subrecipients time to make arrangements to comply with physical separation requirements if they choose

to seek Title X funds (or to participate in a Title X project) and also offer abortions as a method of family planning. Other provisions of the rule encourage additional entities to apply for Title X grants and additional individuals and institutions to participate in the Title X program. If certain grantees and/or subrecipients choose not to continue in the Title X program because they elect not to comply with the physical separation requirements in § 59.15 in one year, the Department will be in a position to continue to fulfill the purpose of Title X by funding projects sponsored by entities that will comply with the physical separation requirement and provide a broad range of family planning methods and services to low income clients. In several locations, there are already competing applicants to serve the same region. The Department believes that, overall, the final rule will contribute to more clients being served, gaps in services being closed, and improved client care that better focuses on the family planning mission of the Title X program.

Commenters' insistence that requiring physical and financial separation would increase the cost for doing business only confirms the need for such separation. If the collocation of a Title X clinic with an abortion clinic permits the abortion clinic to achieve economies of scale, the Title X project (and, thus, Title X funds) would be supporting abortion as a method of family planning. Put differently, the abortion clinic would be benefiting from the presence of the Title X project in the same location. Moreover, it would be the participation of the Title X project in bulk purchases and other economies of scale that enables the abortion clinic to achieve economies of scale. Such an argument makes the case that comingling of funds between Title X and abortion services is difficult to avoid without a physical and financial separation between the two.

The final rule does not prevent a woman from seeking and obtaining an abortion. It simply draws a bright line between permissible services provided with Title X funds and prohibited abortion services. The Department, thus, disagrees with commenters who contend the rule should not be finalized because women might need to make separate visits if they seek both Title X services and abortions from a Title X provider. Congress chose to restrict the use of Title X funding in section 1008, and the Supreme Court held in *Rust* that the requirement of physical and financial separation is not an impermissible imposition on any Fifth Amendment right concerning abortion.

Moreover, for the reasons discussed above, the Department does not anticipate any loss of Title X providers that will exacerbate health inequalities or harm patient care. The Department anticipates that the rule, overall, will contribute to more clients being served and gaps in services being closed. In response to commenters who contend more time is needed than the proposed 60 days to implement aspects of § 59.15 other than physical separation, such as factors concerning separate signs and other forms of identification in paragraph (d), or factors concerning the requirement for separate electronic health care records in paragraph (c), which commenters say would require separate Electronic Health Record (EHR) systems, the Department disagrees. The Department notes that EHR systems would be considered part of the physical separation requirement. The Department found that approximately 80% of the 4,000 Title X sites were using an electronic practice management system in 2016, with about 70% using the more advanced EHR system.[114] For those with an EHR system, the implementation of a new site within the same system should take significantly less time than the one year provided in the final rule. In addition, depending upon the EHR system, it may not be necessary to acquire a new EHR license at all. While some EHR systems include integrated administrative or financial accounting systems, that is not the universal practice. Moreover, although some EHR systems can generate separate financial reports, as well as a variety of other useful information for the Title X program, current grantees should already maintain financial separation, so whether such separation is accomplished through an EHR system or another means, this rule should not impose additional burden on the provider.

Although the proposed rule does not identify these factors as such, factors (b)–(d) are factors that help determine whether there is physical separation (the degree of separation from facilities; existence of separate personnel, electronic or paper-based health records, and workstations; and the extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent). Accordingly, the 1-year compliance date applicable to physical separation will apply to them. Factor (a) (separate, accurate accounting records)

---

[114] OPA, 2016 Sustainability Assessment: The Title X program (Feb. 2017).

Exhibit 154

relates to financial separation. In light of those concerns, the Department is finalizing § 59.19's transition provisions so that the physical separation requirements of § 59.15 will have a compliance date (by which covered entities must comply with the physical separation requirements of the section) of one year after publication in the **Federal Register**. The financial separation requirements of § 59.15 will have a compliance date of 120 days after publication in the **Federal Register**. During that transition period, Title X projects will still be required to comply with the financial separation requirements of the 2000 regulations, and accompanying guidance that the Department has published concerning financial separation. Title X projects may transition to compliance with the physical and financial separation requirements of § 59.15 prior to the respective compliance dates if they choose to do so.

Regarding the remaining comments, the Department rejects the comment that it should not finalize the rule because physical separation reinforces the notion that abortion is not a normal part of health care. It is Congress that singled out abortion as an impermissible activity for Title X projects when it specified that it will not fund Title X projects where abortion is a method of family planning.[115] The Department is merely implementing that determination by Congress in a legally permissible manner by determining that there should be physical separation between Title X projects and abortion as a method of family planning.

The Department likewise rejects the suggestion that the rule will impede training for residents in obstetrics and gynecology because the rule will force abortion clinics to close. This final rule does not require clinics that perform abortions to shut down; it only requires that Title X programs maintain physical and financial separation from any provision of abortion. Residents in obstetrics and gynecology will be able to continue their training on family planning methods and services in Title X clinics or at other clinics that provide abortion services. Such training is not impeded by this final rule.

Although the Department takes seriously the concerns raised about potential violence to locations where abortion services are provided, the Department views those concerns as

misplaced objections to this rule. Congress chose not to use Title X funds to support programs where abortion is a method of family planning, and the Department has determined that a clear separation between Title X projects and locations offering abortion services is the most appropriate means of implementing that requirement. In order to comply with statutory program integrity provisions to separate Title X funds from facilities where abortion is a method of family planning, the Title X project should not be intermixed with such abortion services. The Department believes that having signs and other forms of materials referencing or promoting abortion present together with Title X materials will confuse the patient regarding what Title X allows. In addition, the Department believes clinic signs must be clear in identifying Title X services versus abortion services. All such requirements avoid confusion regarding what are Title X services and what are not Title X services. Congress has separately provided protections for locations offering abortion services. *See, e.g.,* 18 U.S.C. 248.

Title X authorizes the Secretary to promulgate regulations governing the program. 42 U.S.C. 300a–4. The Department has exercised this authority through regulations to guide Title X grantees in carrying out the program. The Department disagrees with commenters who assert that Title X programs have insufficient guidance on how to apply the physical and financial separation requirements. The Department has included the factors it considers for physical and financial separation of Title X project or facility from prohibited activities in § 59.15. The Department will also take individual circumstances into consideration. For example, a Title X service site might be a hospital that also performs some abortions. However, there is likely less chance of confusion between the hospital's family planning services and abortion services. There are many and diverse centers within the hospital, often in different locations within the hospital building or complex, with different entrances, signage, waiting rooms, and protocols. In addition, it is highly unlikely that a Title X clinic and abortion facilities would be collocated within a hospital building or complex. As long as the Title X clinic and the hospital facilities where abortions are performed are not collocated or located adjacent to each other within a hospital building or complex, it is highly likely that the hospital is not violating the requirement that there be physical separation

between the Title X funded activities and activities related to abortion as a method of family planning. By contrast, in a free-standing clinic, physical separation might require more circumstances to be taken into account in order to satisfy a clear separation between Title X services and abortion services. A free-standing clinic would likely present greater opportunities for confusion between Title X and abortion services, including, for example, the same entrances, waiting rooms, signage, examination rooms, and the close proximity between Title X and impermissible services.

The Department does not believe that the physical and financial separation requirement will lead to the mishandling of patient data, as some commenters suggest. Separate EHR systems may lead to two separate electronic medical records, but that is no more burdensome than if the clinic only offers specific services and the patient needs to go to a separate clinic for other needed health care services. It is not uncommon for people to have different health care providers for different health care needs. If Title X services and abortion services are separate, it is no more difficult for Title X providers to maintain two electronic records, one for Title X services and another for abortion services, than to keep abortion services and other services separate within the same EHR system. Moreover, because of growing interoperability of EHRs and other health IT, it is a simpler matter for one provider to share a patient's EHR with another provider—thus, any risk associated with mishandling or missing patient data should be minimized.

Finally, the Department has considered comments on whether the rule should also require, not just physical and financial separation between Title X projects and programs where abortion is a method of family planning, but also organizational separation, and/or provisions such as a requirement that a Title X clinic must operate under a distinct name from a facility that provides abortion as a method of family planning. After considering all the comments and balancing the Department's need to transition to and implement the proposals it is finalizing in this rule, the Department has concluded that, at this time, it will not finalize this rule to add a requirement of organizational separation or name separation, beyond the requirement for physical and financial separation.

---

[115] It is also Congress that prohibits the use of Title X funds to pay for any abortions and the use of other federal funds to pay for abortions, except in cases of rape, incest, or where the life of the mother is endangered unless an abortion is performed.

Exhibit 154                                                                                                    JA-0002623

*K. Prohibition on Activities That Encourage, Promote or Advocate for Abortion (42 CFR 59.16)*

*Summary of changes:* In the first two sentences of proposed § 59.16(a), the proposed rule would require that "[a] Title X project may not encourage, promote or advocate abortion as a method of family planning. This restriction prohibits actions to assist women to obtain abortions or to increase the availability or accessibility of abortion for family planning purposes." The Department finalizes the title and first two sentences of proposed § 59.16(a) as § 59.16(a)(1), with a change to clarify, in response to comments, that the prohibitions apply in the Title X project, not to a grantee's or subrecipient's activities outside of the Title X project and with respect to abortion as a method of family planning, as explained above in response to comments discussed in the section of the preamble addressing § 59.14(a).

The proposed third sentence, and paragraphs (a)(1) through (6), of § 59.16 would specify that the prohibitions include various activities. Paragraph (b) gives examples to illustrate how the proposed prohibitions and specific items listed in § 59.16(a) would apply.

The Department finalizes the third sentence, and paragraphs (a)(1) through (5), of § 59.16 without change, except for formatting changes to improve readability, as § 59.16(a)(2)(i) through (v). The Department finalizes paragraph (a)(6) of the proposed rule in § 59.16(a)(2)(vi), as modified in response to comments. The Department finalizes § 59.16(b)(2) and (3) with changes for clarity in response to comments, as discussed below, and otherwise finalizes § 59.16(b) without change.

*Comments:* In the discussion of § 59.14(a), the Department addressed comments concerning prohibitions on referral for, and encouragement, promotion, advocacy, support, and assistance of abortion. The Department does not repeat those comments and responses here to the extent they overlap with the comments concerning the specific actions listed in paragraphs (a)(1) through (6) of § 59.16, or the examples explained in paragraph (b).

The Department received various and conflicting comments about its legal authority to enact this section. Some commenters argue the Department is exceeding its statutory authority by impermissibly limiting providers' non-Title X activities and by limiting speech and activities by defining such activities as lobbying. Some of these commenters assert the Department does not adequately explain why the prohibitions

on advocacy, lobbying and political activities are justified, stating that it is unreasonable to impose the cost of complying with the proposed rule with no justification. Other commenters contend the proposed rule sufficiently protects free speech by prohibiting the encouragement, promotion or advocacy of abortion by Title X projects but not outside of those projects. These commenters further defend the proposed rule on First Amendment grounds by supporting the Department's rescission of the paragraph in § 59.5 that required Title X providers to counsel on, and refer patients for, abortion.

Some commenters state that the proposed language in § 59.16 is vague, making it difficult to discern what is permissible under the proposed rule, causing confusion, and leading to a prohibitory effect on activities paid for with non-Title X funds. Some of those commenters state that the vagueness may lead to decreased participation in the program or the exclusion of qualified providers, reducing access to care for many patients. Some commenters contend that, to comply with the restriction not to pay affiliation dues or disseminate materials with non-Title X funds, grantees would need separate facilities, and this would lead to the isolation of family planning centers that receive Title X funding, limitations on access, and decreases in the quality of care.

Other commenters oppose the section as unnecessary, arguing that Title X grantees already receive sufficient guidance on what is and is not a permissible use of funding, and that the Department has power without this rule to remedy any findings of noncompliance.

Still other commenters support the proposed rule, and assert that the Department should add additional activities to § 59.16, activities that would be considered as promoting abortion. They ask the Department to provide a wider list of prohibited activities in order to avoid confusion. One commenter provided a list of additional activities that should be prohibited.

Multiple commenters express concern about the proposed rule's impact on State law. For example, commenters write that § 59.16 is not consistent with California's Reproductive Privacy Act and Healthy Youth Act. Some commenters contend that, in New York, organizations that can apply for funding through Title X are already prohibited from funding or engaging in any kind of lobbying activities, rendering this section unnecessary.

*Response:* As noted above, the Department has slightly modified § 59.16(a) to more clearly explain it applies to actions undertaken within the Title X project, not actions and speech undertaken by Title X grantees (and subrecipients) outside the Title X project. This, and the discussion above, of the Supreme Court's rejection of First Amendment challenges to the 1988 regulations, which had substantially the same provisions, adequately addresses commenters concerns that § 59.16 fails to adequately protect free speech. The Department clarifies again that nothing in this rule restricts the use of non-Title X funds.

In *Rust* v. *Sullivan,* the Supreme Court upheld similar regulations "broadly prohibit[ing] a Title X project from engaging in activities that 'encourage, promote or advocate abortion as a method of family planning." *Rust,* 500 U.S. at 180. As in this rule, the general prohibition was followed by a list of prohibited activities that included, with respect to abortion as a method of family planning, "lobbying for legislation that would increase [its] availability," "developing or disseminating materials advocating" it, "providing speakers to promote" it, "using legal action to make [it] available in any way," and "paying dues to any group that advocates" it. *Id.* The Court concluded a prohibition on such activities is within the Secretary's discretion in implementing section 1008. *Id.* at 184–87. The Court further concluded such conditions did not violate either free speech principles under the First Amendment, or women's rights under the Fifth Amendment. *Id.* at 192–200, 200–203.

The Department concludes that § 56.16 of the final rule does not violate the First Amendment's protections for the same reasons that the Supreme Court held that the 1988 regulations withstood First Amendment challenges in *Rust.* Both this rule and the rule upheld in *Rust* entail the same basic prohibition on encouraging, promoting, and advocating abortion as a method of family planning within the scope of the Title X project, while leaving Title X providers free to undertake any activity they desire outside the scope of the Title X project. This rule contains many of the same illustrations of activities that fall within the prohibition. The list of activities included in the 1988 regulations was non-exclusive, using the same language set forth in this final rule that "[p]rohibited actions include" various specific activities. The proposed rule adds some additional examples to those set forth in the 1988 regulations, namely the development of materials

Exhibit 154

that promote a favorable attitude towards abortion, a reference to web-based materials in that context, and the addition of "educators" to the prohibition on "speakers" that promote abortion as a method of family planning. Those examples are well within the reasoning of *Rust,* and indeed within the broad philosophy of the 1988 regulations. However, the Department is removing the phrase regarding a prohibition on the use of Title X funds for the production of materials that "promote a favorable attitude towards abortion." The Department makes this change in acknowledgement of some of the commenters who contend the section is vague and subjective, so that it would be difficult for grantees to know what would be a permitted activity and what would constitute an impermissible activity. The Department agrees that the phrase is vague, and believes that prohibiting materials that promote abortion as a method of family planning is clear and sufficient. This final rule also includes some examples prohibiting project funds from being used on lobbying, specifically the use of project funds for attendance at events and conferences where the grantee or subrecipient engages in lobbying, and the restriction on payment of dues to a group that does not separately collect and segregate funds used for lobbying purposes. These clauses implement the specific Congressional prohibition that Title X project funds "shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for public office." [116] As proposed, § 59.16(a)(4) would prohibit "[p]aying dues to any group that, as a more than insignificant part of its activities, advocates abortion as a method of family planning and does not separately collect and segregate funds used for lobbying purposes." The Department considers this provision concerning lobbying to be an appropriate measure to implement Congress's prohibition on the use of Title X funds "in any way" for lobbying. [117] As noted above, the Department finalizes this text, and makes corresponding changes to the examples in § 59.16(b)(2) and (3).

[116] *See* Omnibus Consolidated Rescissions and Appropriations Act, 1996; HHS Appropriations Act 2019, Public Law 115–245, Div. B, 132 Stat at 3071.

[117] Title X funds "shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for public office." HHS Appropriations Act 2019, Public Law 115–245, Div. B, 132 Stat. at 3071.

The Department appreciates commenters' suggestions of additional activities that should be included in § 59.16(a) as actions that cannot be undertaken in Title X projects, but declines to add to the list of actions in § 59.16(a). The regulatory text indicates that the list is non-exhaustive and that prohibited actions "include" the actions listed; it does not indicate that those actions listed are the only actions that fall under the prohibition on encouragement, promotion, or advocacy of abortion as a method of family planning.

The Department disagrees with commenters who contend the provisions will have the effect of pushing providers out of the Title X program, and, therefore, that § 59.16 will have a negative impact on access to care. Much of § 59.16 merely implements the applicable appropriations law provisions; thus, Title X projects should not currently be using Title X funds to engage in such activities. To the extent that § 59.16 incorporates new requirements, the Department concludes that the articulation of those requirements in rulemaking after notice and public comment is an appropriate approach to ensure consistency and compliance with the parameters applicable to Title X. But in any event, nothing in the final rule precludes entities that encourage, promote, or advocate abortion from being grantees or subrecipients, if such activities are undertaken outside the scope of the project and consistent with the physical and financial separation requirements of these rules. Because section 1008 precludes projects where abortion is a method of family planning, if entities are encouraging, promoting, or advocating such abortions within a project, they are diverging from the goals of Title X. By ensuring that Title X project funds are not diverted to activities that encourage, promote or advocate abortion as a method of family planning, or that assist women to obtain abortions for family planning purposes or to increase the availability or accessibility of abortion, the Department anticipates that more project funds will be available to provide the family planning services that Congress intends in its focused approach to Title X's scope.

The Department does not agree that this rule inadequately considers the requirements of State laws. The rule represents implementation of a clear choice by Congress not to fund certain activities in Title X projects. Applicants for Title X funding will need to maintain an awareness regarding State and local laws to which they are subject,

as well as the requirements to which they are subject under this final rule.

The Department finalizes the example in § 59.16(b)(2) with a clarifying change. The proposed rule provided a proposed example that established a Title X project violates paragraph 59.16(a) if it makes an appointment with an abortion clinic for a pregnant client. The Department clarifies this example to be more consistent with section 1008 of the PHS Act, which prohibits funding a Title X project where abortion "is a method of family planning." Consistent with that language, as noted above and in the second sentence of § 59.16(a), the provisions of this rule implementing section 1008 apply to "abortion for family planning purposes." Therefore the Department finalizes the example listed in § 59.16(b)(2) to specify that the scenario in question is one where "[a] Title X project makes an appointment for a pregnant client for an abortion for family planning purposes . . ." The Department also makes a change to the example in § 59.16(b)(3), so that it illustrates more directly the activity prohibited in § 59.16(a)(2)(iv), by incorporating into the example information about whether the lobbying funds were separately collected and segregated.

## L. Compliance With Reporting Requirements (42 CFR 59.17)

*Summary of changes:* The proposed rule would add § 59.17, which imposes requirements concerning compliance with State and local laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence (IPV) or human trafficking. The Department finalizes this section with changes in response to public comments to clarify notification, screening of minors, and recordkeeping relating to minors; and to expand related topics to be covered in annual staff training.

*Comments:* Some commenters express support for increased compliance requirements of § 59.17(a) and contend that providing evidence of compliance with all State and local laws would strengthen protection for minors and vulnerable adult populations. Some argue that some Title X entities enable sexual exploitation by failing to institute compliance procedures with State and local laws that would help victims, and they request an investigation into Title X entities to determine the extent of failed abuse reporting. Several commenters favor expanding reporting requirements to include reporting of general criminal conduct unrelated to acts of sexual abuse.

Exhibit 154

Many commenters state that the proposed rule wrongly gives the Department compliance oversight over State and local reporting laws. Several commenters contend that mandated reporting of intimate partner violence (IPV) would prevent patients from speaking candidly with health care providers for fear that their abuse will be reported before they have had the opportunity to protect themselves (and their children, if applicable) financially, legally, and physically from their abusers. Commenters mention that medical records documenting IPV and other abuse issues can be used in legal contexts, putting patients at risk for further violence.

Many commenters note the complexity and variety of State and local reporting laws. Several commenters emphasize that there must be a balance between the protection for victims of abuse, complying with State laws, and trust in the patient-provider relationship. Several commenters note that State laws already include specific requirements that provide clear direction to health professionals regarding their obligations to report and their responsibility to exercise discretion. One commenter argues that federal and state laws should support physicians in their clinical judgment. Other commenters contend that allegations of providers avoiding reporting responsibilities are without evidence and should not be a basis for policy-making.

In reply to the Department's request for comment on whether a referral agency (to which a Title X project refers) should be subject to the same reporting requirements as a grantee or subrecipients subject to § 59.17, some commenters state there is no need for a referral agency to be subject to the same reporting requirements as a grantee or subrecipient. Several commenters state that community partners and referral agencies are not Title X funded entities, are often overburdened and additional requirements may cause referral agencies to terminate collaborative relationships rather than comply with the new reporting requirements, thereby reducing patients' access to health care.

Some commenters contend that Department enforcement of the provisions of § 59.17(b), including the threat of revocation of funding based on whether providers comply with State and local reporting requirements, would increase pressure on Title X projects to over-report abuse and to engage in "excessive policing," thus traumatizing patients through interrogative questioning. They also contend the rule would erode patient-provider trust, put

patients at risk for serious harm, re-victimize patients that have experienced trauma, stigmatize patients that are sexually active, and negate personal agency for adolescents.

Many commenters contend that mandatory screening raises issues regarding confidentiality for adolescents and minors, noting that the Title X protections for patient confidentiality are some of the strongest under current law.

A few commenters mention that the proposed rule would result in increased cost for screening and reporting, specifically noting the transition to electronic health record templates. A few commenters note that this would lead to decreased care and family planning options for patients, resulting in increased costs for unintended pregnancies.

Many commenters fear, in particular, that screening minors with a sexually transmitted disease (STD), pregnancy, or suspicion of abuse would be harmful to patients and detrimental to the provider-patient relationship, compromising trust and honesty in consultations. Many argue that mandated screening would shift the provider role to that of an interrogator, making young people less likely to reveal abuse, and making them less likely to return to the Title X facility. One commenter argues that the age of a teenager's sexual partner does not have bearing on family planning services. Others contend that mandatory screening would deter patients from seeking family planning services and treatment for STDs, resulting in increased pregnancy and STDs.

Other commenters assert that screening should only be required for patients that show signs of abuse. Commenters argue that the screening is unnecessary, as Title X grantees already are mandated to adhere to Federal and State notification requirements. Some commenters note that the proposed rule may conflict with Medicaid coverage, which permits confidential family planning services for individuals of childbearing age, suggesting that it creates confusion as to who must be screened.

Several commenters support a commitment to confidentiality, but also support the new rules as an important safeguard for minors who may be the victims of sexual abuse. One commenter recommends that projects be required, rather than permitted, to diagnose, test for, and treat STDs.

Finally, some commenters describe instances in which they claim the language of the proposed rule is confusing. For example, they contend

that required screening for patients "under the age of consent in the State" is inconsistent with the requirement for Title X projects to implement a plan committing to preliminary screening of teenagers with a sexually transmitted disease (STD), pregnancy, or any other suspicion of abuse. Such commenters suggest the language be re-written to clarify the intent.

*Response:* The Department agrees with commenters who voice support for § 59.17 to ensure those vulnerable to abuse are protected in Title X projects. The Department takes seriously the duty of Title X grantees and subrecipients to comply with State and local laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, and human trafficking. Congress has specifically emphasized the importance it attaches to compliance with such laws by Title X funding recipients. As stated in the most recent appropriations act, "[n]ot withstanding any other provision of law, no provider of services under Title X of the PHS Act shall be exempt from any State law requiring notification or the reporting of child abuse, child molestation, sexual abuse, rape, or incest." [118] The Department interprets that direction to include State or local laws respecting intimate partner violence (IPV) and human trafficking. In addition, the Secretary has authority under section 1006 of Title X to issue regulations governing grants and contracts in the Title X program. Thus, to ensure compliance with this Congressional mandate, the Department believes it is appropriate to include specific regulatory requirements with respect to the care and treatment of survivors of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence and human trafficking within the context of the provision of family planning services, and the reporting or notification of such criminal acts under State and local notification laws in § 59.17. The Department disagrees with commenters who assert that the Department does not have the authority to oversee compliance with reporting the listed crimes by Title X providers in Title X projects.

The Department understands the sensitivity that comes with IPV, but concludes that, if a State or local jurisdiction has enacted laws to require reporting of IPV by entities that are Title X grantees or subrecipients, it is appropriate for the Department to ensure that such entities comply with

---

[118] HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 208, 132 Stat. at 3090.

Exhibit 154

those laws as a condition of receiving Title X funds. Title X providers may be the first health care touchpoint for the survivors of IPV. As such, they should be prepared and trained not only to treat such individuals with dignity and care in addressing such individuals' family planning needs, but also to refer them for other needed health care and to report such IPV to the appropriate authorities. State and local reporting laws that include IPV do so, among other reasons, because of its connection to poverty, because most IPV victimizes women, and because intimate partner homicides make up 40% to 50% of all murders of women in the United States.[119] Moreover, IPV may include rape, sexual abuse, and/or other crimes expressly addressed in the Title X appropriations provision. The Department considers these reasons sufficient to include IPV in the reporting requirements of this rule.

The Department acknowledges that complying with State and local laws may be complicated, and for that reason Title X grantees and subrecipients must have in place a plan that ensures that the grantee and any subrecipients are aware of what specific reporting requirements apply to them in their State (or jurisdiction), and provide adequate training for all personnel with respect to these requirements and how such reports are to be made. The complexity of those laws is not an excuse for non-compliance, and the Department will not tolerate Title X grantees and subrecipients failing to comply with the reporting requirements that State and local governments have seen fit to enact as binding legal requirements. The proposed rule at § 59.17 defers to State and local jurisdictions on what reporting requirements apply, and in this way fully respects Federalism and the proper jurisdiction over such crimes that is exercised by State and local governments. The proposed rule does not add any substantive reporting requirement that State and local jurisdictions do not already impose; the rule simply ensures that the Title X grantees and subrecipients are in compliance with federal law by ensuring that such grantees and subrecipients are in compliance with State and local reporting requirements.

As several commenters note, State and local laws can be vital resources in crafting protocols since they often provide direction to health professionals regarding how to balance their obligations for reporting with the exercise of discretion to best protect the safety of the victim. As part of prevention, protection, and risk assessment efforts, grantees and subrecipients should include compliance protocols to identify individuals who are victims of sexual abuse or who are targets for underage sexual victimization, as well as to ensure that every minor who presents for treatment is provided counseling on how to resist attempts to coerce them into engaging in sexual activities (as required by appropriations law applicable to Title X).

The Department believes that increased compliance requirements strengthen protection for minors and other vulnerable populations. The proposed rule, and this final rule, at § 59.17 explicitly address the requirement for Title X projects to comply with all State and local laws regarding the notification or reporting of crimes involving sexual exploitation, child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, and human trafficking (collectively, "State notification laws"). The Department's Office of Inspector General (OIG) issued a 2005 report revealing that even though OPA informs and periodically reminds Title X grantees and subrecipients of their responsibilities regarding State child-abuse and sexual-abuse reporting requirements, it could not determine the extent to which grantees actually comply with these requirements.[120] The Department believes that minors and other vulnerable communities are better served if Title X providers are accountable for complying with these State and local laws.

The Department is also sensitive to concerns raised by commenters that victims of abuse are sometimes repeatedly victimized after abuse is reported. Therefore, the Department expects grantees and subrecipients to include additional training in their protocols to assist counselors with their interactions with a victim of abuse and to ensure that they are equipped to make referrals that increase the safety of the patient. The regulatory text is updated to reflect this additional component of training for Title X staff in paragraph (b)(1)(ii) of § 59.17. The final rule adds that the policies will include training regarding State notification laws and "appropriate interventions, strategies, and referrals to improve the safety and current situation of the patient. . . ."

The Department has considered the request of some commenters to broaden the reporting requirements even further. The Department concludes, however, that the proposed language is consistent with language that has been included in appropriations acts for the Department since fiscal year 1999.[121] Additionally, the Department has considered some commenters' requests to further investigate the specific entities which the commenters allege have misappropriated Title X funds. The Department believes that the clarification of reporting requirements found in the rule will remedy any confusion about the use of Title X funds. The Department will investigate any credible report of fiscal abuse or misuse of funds and take appropriate action, if found.

Having considered the comments about whether to broaden the reporting requirements to include entities that are not grantees or subrecipients, such as referral agencies, the Department agrees with commenters who state that referral partners should not be subject to the same reporting requirements. Referral agencies do not receive Title X funds, therefore, the Department declines to make changes in § 59.17 that would expand the provision to impose reporting requirements on entities that are neither recipients nor subrecipients of Title X funds.

The Department disagrees with commenters who say the training and reporting requirements in the proposed rule will lead to over-reporting or erode patient trust and confidentiality. Title X grantees and subrecipients are already subject to State and local reporting laws, and Congress has made it clear that the receipt of Title X funds does not permit Title X grantees and subrecipients to avoid such obligations. In addition, § 59.11 of the 2000 regulations permits the use of confidential information obtained by project staff to comply with State and local reporting requirements. The Department will not second guess the determinations of States or local governments that these reporting requirements do not erode patient trust and confidentiality, but protect vulnerable persons. The Department is not aware of compelling evidence to the contrary from commenters. The Department also hopes that victims of

---

[119] Office of Justice Programs, *Causes and Consequences of Intimate Partner Violence*, National Institute of Justice (Oct. 24, 2007), *https://www.nij.gov/topics/crime/intimate-partner-violence/Pages/causes.aspx.*

[120] HHS OIG, OEI–02–03–00530, *Letter on Federal Efforts to Address Applicable Child Abuse and Sexual Abuse Reporting Requirements for Title X Grantees* (Apr. 25, 2005), *https://www.hhs.gov/opa/sites/default/files/child-abuse-reporting-requirements.pdf.*

[121] *See, e.g.,* Department of Health and Human Services Appropriations Act, 1999, Public Law 105–277, Title II, sec. 219, 112 Stat. 2681, 2681–363 (1998).

Exhibit 154                                                    JA-0002627

abuse will feel increased trust with Title X providers as a result of the training required in the final rule, not only with respect to compliance with State and local reporting laws, but also how to offer strategies to improve the victim's current situation, including the patient's safety.

The Department disagrees with commenters who assert the regulations will abrogate confidentiality for minors, stigmatize them, cause them to lose their personal agency, or violate their informational privacy rights. All recordkeeping, except that which must be submitted as a result of mandatory reporting, is subject to the same confidentiality requirements as other medical services rendered by the clinic. If a minor is a suspected victim of abuse, the Title X provider has the obligation to report suspected abuse,[122] make appropriate referrals if needed, and empower the minor with skills to build self-efficacy and the self-confidence to resist any future sexual coercion.[123]

The Department disagrees with some commenters who contend the age of a minor's sexual partner has no relevance for Title X grantees. State and local reporting laws concerning sexual abuse or child abuse often have elements concerning the age of the minor and the minor's sexual partner. Title X exempts neither Title X providers nor Title X health care providers from their responsibility to comply with State and local reporting laws. Child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, and human trafficking are crimes that affect individuals, families, and communities. Title X projects should be the exemplar of an appropriate model for protecting those who are vulnerable to sexual abuse, rape, and assault; in developing protocols to identify clients who may be at risk for sexual abuse; in counseling teens on, and in producing programs and materials that assist teens in, resisting sexual exploitation, abuse, and coercion;[124] and in assuring appropriate support and management of teens (and

women and men) who have been exploited, abused or coerced into unequal sexual partnerships. The Department believes asking the right questions can identify victims of abuse for mandatory reporting purposes, protect them from continued victimization, and help them access services to increase their health and safety in the future. With regard to comments concerning the requirement in § 59.17(b)(2)(ii) to maintain records including those which "[i]ndicate the age of the minor client's sexual partners where required by law," the Department clarifies what is meant by that paragraph by finalizing it to read, "[i]ndicate the age of the minor client's sexual partners if such age is an element of a State notification law under which a report is required. . . ." The Department does not believe that conforming to the reporting requirement will result in a regulatory burden or increased costs for reporting to State and local authorities, since grantees and subrecipients should already be complying with this mandate.

The Department disagrees that required sexual abuse/victimization screenings are harmful to patients. Similar to typical components of a medical history, Title X projects are already required to conduct a preliminary screening of any teen who presents with an STD, pregnancy, or suspicion of abuse in order to rule out victimization of a minor. Such screening is required with respect to any individual who is under the age of consent in the jurisdiction in which the individual receives Title X services. If positively diagnosed, projects are permitted to treat STDs as an appropriate preconception service. The requirement in the final rule is more explicit in the age parameters in order to offer consistency from State to State and to ensure that this requirement consistently applied throughout all Title X services areas. This requirement is responsive to both State notification laws as well as the appropriations rider related to sexual coercion of minors. The Department does not believe, as some commenters suggest, that Title X providers should be required to diagnose, test for, and treat STDs, although testing and treatment would be an appropriate referral service, if not offered onsite. Sites must offer a variety of family planning services, but are not required to provide all such services. As an important component of the screening process, staff would sensitively converse with patients and build trust, while obtaining the

information needed to comply with the screening and reporting requirements.

The Department disagrees with commenters who assert the rule conflicts with Medicaid coverage confidentiality requirements. The rule requires screening for minors who are pregnant or test positive for STDs. The preliminary screening is used to determine whether the minor is a likely victim of sexual coercion, a concern of Congress, as evidenced by its specific mandate that Title X projects provide "counseling to minors on how to resist attempts to coerce minors into engaging in sexual activities."[125] While Medicaid and Title X both allow family planning services to be provided confidentially to individuals of childbearing age, providers serving patients who use Medicaid must still do their due diligence to ensure they are complying with all State and local reporting requirements, and if Title X grantees, with the appropriations riders applicable to the program. In light of State and local laws against incest and laws regulating age-specific requirements for permitting sexual relations with minors, the Department believes that mandatory screening of minors ensures that Title X providers are adequately assessing their legal requirements under State and local law, the protection to minors sought in the appropriation rider, and the patient's overall health. The Department is specifically directed to focus Title X grantees on these issues: Appropriations law provisions requires Title X applicants to certify that it "provides counseling to minors on how to resist attempts to coerce minors into engaging in sexual activities"[126] and requires Title X providers to comply with State notification or reporting laws on child abuse, child molestation, sexual abuse, rape, or incest. The confluence of these two separate, but related, mandatory provisions are addressed in this Section.

The Department disagrees with commenters who assert only those with visible signs of abuse should be screened or that screening is unnecessary. Pregnancy, or the presence of an STD, can be evidence of abuse or a predictive sign of abuse, especially among younger minors. Often victims

---

[122] As Representative Ernest Istook said during the debate regarding the provision: "It says, if there is a situation, such as I described, involving an underage child, Title X providers must report that and comply with State law the same as anyone else who deals with services to our young people." 143 Cong. Rec. H7053 (daily ed. Sept. 9, 1997).

[123] HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. at 3090.

[124] As noted above, the annual appropriations laws also impose on Title X grantees the obligation to provide "counseling to minors on how to resist attempt to coerce minors into engaging in sexual activities." *See* HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. at 3090.

.

[125] Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1998, Public Law 105–78, sec. 212, 111 Stat. 1467, 1495; HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. at 3090.

[126] Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1998, Public Law 105–78, sec. 212, 111 Stat. 1467, 1495; HHS Appropriations Act 2019, Public Law 115–245, Div. B, sec. 207, 132 Stat. at 3090.

Exhibit 154

do not self-identify and may have no obvious indicators at all, elevating the necessity of screening. The Department believes that a confidential and empathetic screening process will enable a program to better serve those individuals who have been victimized and to identify those instances where state or local law requires notification of certain crimes.

The Department agrees with some commenters who observe that the language of the proposed rule is inconsistent in referring to a "minor" several times, an individual below the "age of consent" in another place, and to a "teen" in the first part of the first sentence of § 59.17(b)(1)(iv). The Department intended the rule to refer to "minors" in all such instances, and finalizes § 59.17(b)(1)(iv) to change the word "teen" to "minor;" and to remove the sentence referencing "age of consent" in relation to State laws, since preliminary screening for minors would be separate from, but inclusive of, ages included in individual State notification laws.

Although § 59.17(a) defines the term "State notification laws" for the purposes of the section to refer collectively to "all State and local laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence or human trafficking", the prefatory text of § 59.17(b)(1) mistakenly uses the phrase "State laws" instead of "State notification laws." The Department therefore finalizes § 59.17(b)(1) prefatory text to change the phrase "State laws" to "State notification laws," consistent with the intent of the proposed rule.

*M. Appropriate Use of Funds (42 CFR 59.18)*

The 2000 regulations required that any Title X funds must be expended solely for the purposes for which the funds were granted. The proposed rule would add § 59.18, which clarifies this language by detailing the prohibited uses of Title X funds, including their use for abortion-related infrastructure building, lobbying activities, and any other possible misuse of funds. The Department finalizes the section without change, except to make technical edits that improve understanding and readability.

*Comments:* Many commenters that object to § 59.18's proposed prohibition on uses for Title X funds, including limits on infrastructure building, and raise objections that overlap with their objections to the proposed requirements of § 59.15 for physical and financial separation of Title X projects and prohibited activities. The Department's response to those comments above encompasses those objections.

Some commenters support the proposed language of § 59.18 prohibiting the use of Title X funds for building infrastructure that supports a Title X grantee's abortion-related activities. Commenters state that the proposed changes will help ensure that Title X funds are correctly appropriated. Others believe the rule should go further and require grantees or subrecipients to demonstrate that they do not fund abortion services with Title X funds.

Some commenters contend it is unnecessary for the Department to prohibit the use of Title X funds to support abortion services, infrastructure building for that purpose, or lobbying. They contend current accounting, reporting, and auditing requirements already ensure that each Title X project fully accounts for and justifies charges against the Title X grant.

*Response:* The Department agrees with commenters who support the proposed language of § 59.18.

The Department disagrees with commenters who suggest that there have been no concerns raised regarding improper use of Title X funds. The Department believes that, even if the extent of such misuse of funds is not fully known, the Department is still legally obliged to ensure funds are not misused, so it is appropriate for the final rule to identify what constitutes such misuse of Title X funds. Increased transparency will ensure greater accountability for the use of Federal funds and will mitigate confusion about what services the federal government supports and funds.

As explained in the proposed rule, the flexibility in the use of Title X funds under the 2000 regulations raises concerns about the fungibility of assets that could be used to build infrastructure for abortion services. By law, Title X providers must secure other sources of revenue to leverage Title X grants. 42 CFR 59.7(c) ("No grant may be made for an amount equal to 100 percent for the project's estimated costs."). Medicaid providers are reimbursed by States for allowable expenditures. By their very nature, grants afford considerably greater latitude and versatility to grantees on how funds are used. If an organization receives both Medicaid and Title X funding, for example, Medicaid reimbursement payments might be used to cover many family planning services, freeing up Title X funds to be used for infrastructure-building and support. In its *Moving Forward: Family Planning in the Era of Health Reform* report, the Guttmacher Institute reported that providers do in fact use Title X funds in this way:

Up-front funding helps supply a cash-flow cushion for providers who are often operating on tight and uncertain budgets. More specifically, Title X grantees use the program's flexible grant funding in a variety of ways to address staff-related issues, including hiring individuals capable of meeting communities' need for linguistic or culturally appropriate care, training staff on the latest medical techniques or to provide tailored counseling for clients with special needs, maintaining sufficient staff to operate outside regular business hours and paying sufficient wages to staff at all levels to reduce high turnover rates that often plague health centers. Providers may also use Title X funds for operational investments, such as utilizing advanced technologies and facilitating more accessible and efficient client care . . . . Finally, Title X undergirds the infrastructure and general operations of the health centers themselves in ways that Medicaid and private insurance simply cannot. Title X funds go to centers up front as grants, rather than after the fact as reimbursement for services centers have provided to individual enrollees. Providers have long relied on that flexibility to hire, train and maintain their staff to meet the diverse needs of their clients and community. They have also depended on these grants to keep their lights on and their doors open, to adapt to unexpected budget shortfalls and to make improvements to their facilities. Such versatility is even more vital in the era of health reform. The up-front investments in staffing, training and infrastructure needed to work effectively with health plans—and to thereby draw in new revenue to serve more clients—are substantial, and flexible funds like those provided through Title X are ideal for such investments. Those expenses include upgrading health information technology systems and training staff on their use, training clinicians and front-line staff to properly code and bill for services provided, obtaining the appropriate credentials to ensure third-party reimbursement, and devoting time and resources to researching available health plans and negotiating contracts with them. They may also include expenses related to outsourcing some administrative functions to private contractors or as part of collaborations with other health care providers.[127]

In a 2007 report, Guttmacher expanded upon the infrastructure support afforded by Title X funding:

Title X can subsidize the intensive outreach necessary to encourage some individuals to seek services. Furthermore, by paying for everything from staff salaries to utility bills to medical supplies, Title X funds provide the essential infrastructure support that enables clinics to go on and claim

---

[127] Sonfield, A., Hasstedt, K., Gold, R.B., *Moving forward. Family planning in the era of health reform.* Guttmacher Institute 30 (March 2014), *https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.*

Exhibit 154

JA-0002629

Medicaid reimbursement for the clients they serve.[128]

Infrastructure building may include securing physical space, developing or acquiring health information technology systems (including electronic health records), bulk purchasing of contraceptives or other clinic supplies, clinical training for staff, and community outreach and recruiting. An anecdotal story [129] from the 2007 report reinforces the point:

Ibarra of California's Venice clinic says her agency sends street outreach teams into the community with backpacks of condoms and basic educational materials, while other teams make regular visits to homeless shelters. Often, it will take multiple visits to a shelter or street-corner conversations until someone feels safe enough to come to a clinic. According to Ibarra, Title X will fund and train the outreach workers, purchase the condoms and often even develop the educational materials they distribute. Only when a client actually comes to the clinic is reimbursement available (through Medicaid or any other source), and then only if the client qualifies. According to Annette Amey, director of program evaluation for CFHC, "it's all about getting people to the inside of the clinic door, and for that Title X dollars are indispensable."

The Department is concerned about this infrastructure building on both statutory and policy grounds. As a statutory matter, the use of Title X funds to build infrastructure that can be used for purposes prohibited with these funds, such as support for the abortion business of a Title X grantee or subrecipient, clearly violates section 1008. As a policy matter, Title X is the only discrete, domestic, Federal grant program focused solely on the provision of cost-effective family planning methods and services. As the number of Americans at or below the poverty level has increased, the need to prioritize the use of Title X funds for the provision of family planning services has as well.

The Department concludes it is appropriate to implement the statutory requirements applicable to Title X by imposing the § 59.18 restrictions addressing the use of Title X funds for infrastructure purposes related to abortion, particularly in combination with the § 59.15 requirement of physical and financial separation of Title X projects from prohibited activities (*e.g.,* abortion as a method of family planning). Because Title X projects would not share any infrastructure with

abortion-related activities, direction of Title X funds toward such infrastructure would no longer threaten to divert funds to impermissible activities. That separation would thus ensure that Title X funds are used for the purposes expressly mandated by Congress, that is, to offer family planning methods and services—and that any infrastructure built with Title X funds would not be used for impermissible purposes.

*N. Transition Provisions (42 CFR 59.19)*

*Summary of changes:* The proposed rule would add § 59.19, which specifies the effective dates and compliance dates of the provisions of the proposed rule. The Department finalizes this provision with changes to the compliance dates in response to public comments, and makes some minor formatting and technical edits to improve readability.

*Comments:* Many commenters contend transition periods by which covered entities must comply with the rule are not long enough. Some recommend lengthening the physical separation transition period from one to two years, while many recommend extending the period to three years. Some contend they do not know how long would be needed for compliance, but at least an additional year is needed. Various commenters worry that many Title X recipients would be unable to receive care while clinics are in the process of separating after the proposed one year time period expires.

One commenter asks that the changes be scheduled to take effect at the end of the project period during which the rule is finalized in order to limit confusion for current grantees. One commenter suggests that Title X create different transition requirements for different Title X providers based on resource-level, location revenue, and client population.

Additionally, one commenter notes the cost of establishing new Electronic Health Record (EHR) systems would include the costs for new hardware and infrastructure for these systems. In New York State, providers may not purchase equipment in the final year of a grant cycle. Since 2019 is the final year of the grant for New York State Family Planning projects, the commenter contends that these providers would be unable to comply with the new requirements until a new grant is issued.

One commenter requests that the financial transition period be lengthened from 60 days to six months, stating that, according to businesses that provide modification and implementation of EHR systems, six months, at minimum, is needed. The

majority of commenters recommended changing the transition period to one year for financial separation.

*Response:* The effective date for all sections of the final rule is 60 days after publication of this rule in the **Federal Register**, as set forth in the Dates section of this notice. Except with respect to the provisions for which the Department establishes a separate compliance date, covered entities will be expected to comply with the requirements of this final rule by that date.

The Department extends some of the compliance dates of certain sections or paragraphs in the rule, by which covered entities must comply with those sections after their effective date, in response to public comments as follows.

The Department maintains the compliance date of one year for the physical separation requirements of § 59.15. The Department disagrees with commenters who contend one year is an insufficient time period for covered entities to comply with the physical separation requirement of the rule. The Department believes one year is an ample and generous amount of time for an entity to rearrange locations, find new locations, comply with related State requirements, or even make changes to a facility to physically separate Title X services from abortion services. These rules might be satisfied by placing Title X projects (or the abortion services) in a different location without changing any physical or facility space. It is not uncommon for health care providers to change locations, change their physical space, or even add new service delivery locations. As a result, the Department disagrees with commenters who assert that patients will lose service because of the physical separation requirement would apply beginning one year after the publication of the final rule.

The Department agrees with commenters who contend some other components of § 59.15, such as those pertaining to electronic health records, should also be subject to the one-year separation requirement. The Department considers the electronic health records to pertain to physical separation and, thus, subject to the one-year compliance deadline. However, the Department will require that Title X projects and providers comply with the requirement of financial separation by July 2, 2019. The Department therefore finalizes paragraph (a) of the transition rule specifying the compliance date for the physical separation requirements contained in § 59.15, by which covered entities must comply with such requirement, as March 4, 2020. Title X projects may comply with the physical

[128] Gold, R.B., *Stronger Together: Medicaid, Title X Bring Different Strengths to Family Planning Effort,* Guttmacher Institute 15 (May 17, 2007), *https://www.guttmacher.org/gpr/2007/05/stronger-together-medicaid-title-x-bring-different-strengths-family-planning-effort.*

[129] *Id.* at 17.

Exhibit 154    JA-0002630

separation requirements of § 59.15 earlier than the one year compliance date if they choose, and may comply with the financial separation requirements of § 59.15 earlier than the 120 day compliance date if they choose. Prior to the compliance date for the financial separation requirements of this final rule, the Department expects that grantees will comply with the "Separation" section of the guidance at 65 FR 41281, 41282, or with the financial separation requirements of § 59.15.

Various parts of the final rule impact applications for grants, namely § 59.7, the removal of § 59.5(a)(10)(i), and § 59.5(a)(13) as it applies to grant applications. The Department intends that these requirements will apply prospectively to applications for competitive or continuation awards, but not to applications that have been submitted before publication of the final rule or that are due in a time period soon after publication of the final rule. The Department intends that these provisions will apply to applications for which the Department has informed the applicant these provisions will apply. Therefore, the Department finalizes paragraph (b) of the transition section to establish that the compliance date for covered entities regarding § 59.7, the deletion of § 59.5(a)(10)(i), and § 59.5(a)(13) as it applies to grant applicationswill be the date on which competitive or continuation award applications are due, where that date occurs after July 2, 2019.''

The Departments have carefully reviewed comments seeking more time for implementation of requirements for reporting, submitting assurances, and providing certain services. These sections include §§ 59.5(a)(12), 59.5(a)(13) as it applies to all required reports, 59.5(a)(14), (b)(1) and (8), 59.13, 59.14, 59.17, and 59.18. In response to the request by commenters that more than 60 days is needed for compliance with such requirements, the Department has concluded that it will finalize the transition section to allow 120 days for compliance with this section. The Department believes this provides sufficient time for grantees and subrecipients to comply with these requirements. Therefore, the Department finalizes paragraph (c) of the transition section to establish the compliance date for covered entities regarding § 59.5(a)(12), § 59.5(a)(13) as it applies to all required reports, § 59.5(a)(14), § 59.5(b)(1), § 59.5(b)(8), § 59.13, § 59.14, § 59.17, and § 59.18is July 2, 2019.''

The Department concludes that the remaining requirements of the final

rules, that is, all requirements not specified above, can be satisfied within 60 days of publication of the final rules in the **Federal Register**, that is, by the effective date. For example, Title X projects can comply with the prohibition on referrals for abortion as a method of family planning within 60 days. Therefore, the Department does not establish a separate compliance date for such provisions of this final rule.

## III. Economic/Regulatory Impact and Paperwork Burden

### A. Introduction and Summary

The Department examined the impacts of the final rule as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993); Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011); the Regulatory Flexibility Act, 5 U.S.C. 601 (RFA); Unfunded Mandates Reform Act, 1995, Public Law 104–4, Title II, sec. 202(a), 109 Stat. 48, 64 (1995); Executive Order 13132 on Federalism (August 4, 1999); the Congressional Review Act, 5 U.S.C. 804(2); section 654, 5 U.S.C. 601 (note), on the Assessment of Federal Regulation and Policies on Families; E.O. 13771 on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017); and the Paperwork Reduction Act of 1995, 44 U.S.C. 3501–3520.

In addition, the Department carefully reviewed the public comments, and as a result, has updated the estimated costs for implementing the final rule in some cases. Those changes are described below and reflected in the narrative and calculations represented later in this section.

1. Executive Orders 12866 and 13563 and the Congressional Review Act

*Comments:* Commenters contend that the Administration failed to solicit public input on the proposed rule, citing E.O. 12866, noting that the proposed rule was not included in the Spring 2018 Unified Regulatory Agenda and that public input was not permitted prior to final review.

Commenters contend that the proposed rule qualifies as a "significant regulatory action" under E.O. 12866 and E.O. 13563, and maintain that the Economic Impact Analysis performed by the Department failed to address the potential cost to patients and providers. Commenters contend that the Department focused on the benefits and protections of the proposed rule, but failed to adequately address potential problems. For example, commenters contend that the Department did not accurately estimate costs associated

with the physical separation requirement, the new definition of "low income family," and unintended births that will result from the regulation.

*Response:* Although some commenters claimed that this rule would increase unintended pregnancies, the Department disagrees, for the reasons set forth above, and believes this rule will lead to a better or wider distribution of family planning services. In any event, the Department is not aware, either from its own sources or from commenters, of actual data that could demonstrate a causal connection between the type of changes to Title X regulations contemplated in this rulemaking and an increase in unintended pregnancies, births, or costs associated with either, much less data that could reliably calculate the magnitude of that hypothetical impact. Therefore, the Department concludes that those are not likely or calculable impacts for the purpose of the Executive Order.

The Department's impact analysis provides its best thinking on the effects of the proposed rule. It acknowledges that it is difficult to forecast all of its effects, and acknowledges uncertainty regarding the estimates. However, the Department believes that this proposed rule will result in better outcomes for people interested in utilizing Title X family planning services and does not believe that public comments provided substantive evidence of negative effects of the proposed rule.

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Under Executive Order 12866, the Office of Management and Budget's (OMB's) Office of Information and Regulatory Affairs determines whether a regulatory action is significant and, therefore, subject to the requirements of the Executive Order and review by OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action that is likely to result in a rule that (1) has an annual effect on the economy of $100 million or more, or adversely affects in a material way a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities (also referred to as economically significant); (2) creates serious inconsistency or otherwise interferes with an action taken or

Exhibit 154

JA-0002631

planned by another agency; (3) materially alters the budgetary impacts of entitlement grants, user fees, or loan programs, or the rights and obligations of recipients thereof; or (4) raises novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order. OMB has determined that this final rule is a significant, but not economically significant, regulatory action under section 3(f) of Executive Order 12866.

## 2. Regulatory Flexibility Act (RFA)

The RFA requires agencies that issue regulations to analyze options for regulatory relief of small entities, businesses, 501(c)(3) entities, as well as government entities if a rule has a significant impact on a substantial number of small entities. The RFA generally defines a "small entity" as (1) a proprietary firm meeting the size standards of the Small Business Administration (SBA); (2) a nonprofit organization that is not dominant in its field; or (3) a small government jurisdiction with a population of less than 50,000. (States and individuals are not included in the definition of "small entity.") The Department considers a rule to have a significant economic impact on a substantial number of small entities if at least 5% of small entities experience an impact of more than 3% of revenue. The Department does not believe that the rule will have a significant economic impact on a substantial number of small entities. Supporting analysis is provided below.

## 3. Unfunded Mandates Reform Act

Section 202(a) of the Unfunded Mandates Reform Act of 1995 requires that agencies prepare a written statement, which includes an assessment of anticipated costs and benefits, before proposing "any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any one year." Public Law 104–4, Title II, sec. 202(a), 109 Stat. 48, 64 (1995). The current threshold after adjustment for inflation is $150 million. The Department does not expect this rule to result in expenditures that would exceed this amount.

## 4. Federalism

Executive Order 13132 establishes certain requirements that an agency must meet when it promulgates a rule that imposes substantial direct requirement costs on State and local governments or has federalism implications.

*Comments:* Commenters contend that the Department is preempting State law (without approval from Congress) by eliminating abortion referral and counseling requirements for Title X projects. Commenters assert that the Department failed to obtain State and local government input on the proposed rule, and failed to provide a comprehensive analysis for the Federalism implications of the proposed rule, which would have included a summary of the concerns expressed by State and local government officials. Commenters note that the Department included a federalism impact statement in a 2016 effort to revise Title X eligibility funding and argued that one should be required for this rule as well. Commenters recommend that an analysis be conducted that will assess how to address potential conflicts between the rule and State law. Commenters assert that State and local entities qualify as Title X grantees or subrecipients and would incur increased costs associated with providing access to services no longer provided by Title X, as well as costs associated with reduced access to those services for the public.

One commenter stated that the Department did not adequately assess the impact of the NPRM on individuals' health and well-being, as is required under Public Law 105–277. According to the commenter, the Department provided no details of an assessment in the NPRM, but only stated that the proposed rule would not negatively impact health and well-being. The commenter requests that the Office of Management and Budget (OMB) look into this issue.

*Response:* The Department disagrees with commenters who suggest the proposed rule preempts State law by removing the requirement for abortion counseling and referral. This regulation only impacts the Title X program and has no impact on State laws that may, in other venues or circumstances, require State or local entities to counsel and/or refer for abortion. And to the extent that any State laws requiring referral for abortion cannot be carried out in a Title X project, it is due to Congress's restriction on the use of Title X funds in projects where abortion is a method of family planning.

The Department also disagrees with comments suggesting that federalism requires the Department to permit Title X projects to provide directive counseling and information about abortion, or referrals for abortion. As the Supreme Court held in *Rust* v. *Sullivan,* the federal government is not required to fund Title X projects that promote or refer for abortion. 500 U.S. at 193–94. Regardless of the status of State laws that some commenters say require the provision of directive counseling, information, or referrals for abortion, neither the principle of federalism nor the Constitution requires the federal government to fund Title X programs or projects—or any other program—that include directive counseling, information, or referrals for abortion as a method of family planning. And the Department believes it would be inconsistent with restrictions on the Title X program to allow (or require) Title X projects to provide directive counseling about abortion. The Department has determined that the final rule will not contain policies that have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. The changes in the rule represent the Federal Government regulating its own program.

The Department disagrees with comments that suggest the inclusion of a federalism impact statement in the 2016 Title X regulation demands the same for this rule. The 2016 regulation was a regulatory change to the status quo of the 2000 regulations that limited the ability of states and other grantees to choose their own subrecipients; the Department specifically stated that its reason for issuing the rule was to respond to new approaches to competing or distributing Title X funds that were being employed by several States. As a result, the 2016 regulation had a federalism impact. This final rule, however, removes a provision that Congress has already legislatively repealed through the Congressional Review Act. That regulatory provision was nullified as a matter of law when the President signed the repeal. This rule simply conforms the text of the Title X regulations to what Congress has already done. Consequently, there is no federalism impact of the removal of this provision.

Additionally, States are free to apply or not apply for Title X funding and so are only required to comply with regulations in this Federal program if they decide to apply for a grant under the discretionary Title X program and, thereby, voluntarily agree to follow the statutory program integrity provisions, the regulation provisions, and those requirements communicated in the funding announcement. Should they agree that the Title X program is a good fit for their State government

Exhibit 154                                                                                                    JA-0002632

application, this regulation establishes the program's core requirements to maintain statutory program integrity, but States (or other grantees) have the freedom to implement their own programs, select their own subrecipients, establish their own referral networks, and test approaches within this framework to identify the most effective and innovative means to serve Title X patients in their States.

The Department disagrees with comments suggesting that State and local entities will incur additional costs to provide services that were once part of Title X, but are no longer permitted. Commenters fail to provide convincing evidence of these costs and also fail to provide evidence that there will be reduced access to Title X services as a result of this rule. Accordingly, the

Department concludes that the final rule does not contain policies that have federalism implications, as defined in Executive Order 13132 and, consequently, a federalism summary impact statement is not required.

5. Summary of the Final Rule

This final rule amends the regulations governing the Title X program to ensure programmatic compliance with statutory program integrity provisions. Specifically, the rule:

(1) Aligns the regulation with the statutory requirements and purpose of the Title X program, the appropriations provisos and riders addressing the Title X program, and other obligations and requirements established under other Federal law;

(2) Expands the scope of enforcement and auditing mechanisms available to

the Department to enforce such program requirements; and

(3) Requires individuals and entities covered by this proposed rule to adhere to certain procedural and administrative requirements that aim to improve client care and increase transparency.

The Department evaluated the effects of this rule over 2019–2023. As a result of comments, it has increased estimated costs. Costs are estimated to be $69.2 million in 2019 and $14.8 million in subsequent years. Present value costs of $110.4 million and annualized costs of $26.4 million are estimated using a 3% discount rate; present value costs of $91.1 million and annualized costs of $27.2 million are estimated using a 7% discount rate. The quantified and non-quantified benefits and costs are summarized in Table 1.

TABLE 1—ACCOUNTING TABLE OF BENEFITS AND COSTS OF ALL PROPOSED CHANGES

| | Present value over 5 years by discount rate (Millions of 2016 dollars) | | Annualized value over 5 years by discount rate (Millions of 2016 dollars) | |
| --- | --- | --- | --- | --- |
| | 3 Percent | 7 Percent | 3 Percent | 7 Percent |
| Benefits: Quantified Benefits ................................................. | 0 | 0 | 0 | 0 |
| Non-quantified Benefits (see below): Program integrity of Title X, especially with respect to ensuring that projects and providers do not fund, support, or promote abortion as a method of family planning. Enhanced compliance with statutory requirements and appropriations riders and provisos. Expanded number of entities interested in participating in Title X, including by the removal of abortion counseling and referral requirements that potentially violate federal health care conscience protections. Enhanced patient service and care. | | | | |
| Costs: Quantified Costs ................................................. | 110.4 | 91.1 | 26.4 | 27.2 |
| Non-quantified Costs: None | | | | |

*B. Analysis of Economic Impacts*

1. Need for Regulatory Action

This final rule addresses two categories of problems:

(1) Insufficient compliance with the statutory program integrity provisions and the purpose and goals of the Title X program (especially those related to section 1008), the appropriations provisos and riders addressing the Title X program, and other obligations and requirements established under other Federal law; and

(2) Lack of transparency regarding the provision of services (with respect to both the identity of the providers and the services being provided by such entities). Each of the issues fall into one or more of these categories.

While the 2000 regulations state that Title X projects must not provide abortion as a method of family planning, they do not provide sufficient guidance

to ensure that Title X projects comply with section 1008 by not encouraging or promoting abortion as a method of family planning. Limiting section 1008's prohibition to only "direct" facilitation of abortion is not consistent with the best reading of that provision, which was intended to ensure that Title X funds are also not used to encourage or promote abortion. For example, the 2000 regulations:

• Mandate that providers provide counseling on and referral for abortion, if requested by the client;

• Permit shared locations, facilities, personnel, file systems, phone numbers, and websites between Title X clinics and abortion clinics, creating confusion regarding the scope of Title X services and whether the Federal government is funding abortion services; and

• Permit a fungibility of assets that can be used to free funds and build infrastructure for abortion services,

including physical space, health information technology systems, community recruitment, and bulk purchase of contraceptives and other clinic supplies.

The lack of clear operational guidance on the abortion restriction in section 1008 has created confusion as to what activities are proscribed by section 1008. With abortions increasingly performed at nonspecialized clinics primarily serving contraceptive and family planning clients, it is critical that the Department ensure that Federal funds are not directly or indirectly supporting, encouraging, or promoting abortion as a method of family planning and that there is a clear demarcation between Title X services and abortion-related services for which Title X funds cannot be used.

The 2000 regulations suffer from additional deficiencies. They are inconsistent with the conscience

Exhibit 154

protections embodied in the Church, Coats-Snowe, and Weldon Amendments; do not address the statutory requirement that Title X projects encourage family participation in minors' decisions to seek family planning services; do not address the statutory requirement that Title X projects provide counseling to minors on how to resist attempts to coerce minors into engaging in sexual activities; do not expressly address the obligation of Title X grantees and subrecipients to comply with State sexual abuse reporting or notification requirements; and do not expressly prohibit the use of Title X funds to encourage, promote, or advocate for abortion, to support any legislative proposal that encourages abortion, or to support or oppose any candidate for public office. In addition, the 2000 regulations do not communicate that Title X providers should either offer comprehensive primary health services onsite or have a robust referral linkage with primary health providers who are in close physical proximity to the Title X site. And the 2000 regulations fail to require grantees to provide the Department sufficient information about the subrecipients with which they (or their subrecipients) contract or other partners to whom Title X funds may flow, thus hindering OPA from exercising appropriate oversight of the activities of its program and project subrecipients.

This final rule addresses each of the foregoing problems. First, to assist the Department in ensuring compliance with, and enforcement of, the section 1008 prohibition, the final rule will prohibit family planning projects from using Title X funds to encourage, promote, provide, refer for, or advocate for abortion as a method of family planning; require assurances of compliance; eliminate the requirement that Title X projects provide abortion counseling and referral; require physical and financial separation of Title X activities from those which are prohibited under section 1008; and provide clarification on the appropriate use of funds in regard to the building of infrastructure.

To assist the Department in ensuring compliance with, and enforcement of, appropriations provisos and riders addressing the Title X program, the final rule also reiterates the voluntary, non-coercive nature of Title X services; requires Title X facilities to encourage family participation in a minor's decision to seek family planning services; requires Title X facilities to provide minors with counseling on how to resist attempts to coerce them into

engaging in sexual activities; prohibits the use of Title X funds for any activity that in any way tends to promote public support or opposition to any legislative proposal or candidate for office; clarifies the duty of projects to comply with State and local laws requiring notification and reporting of criminal sexual exploitation; explains that confidentiality of information may not be used as a rationale for noncompliance with such notification or reporting laws; and requires assurances of compliance and maintenance of records.

To assist the Department in ensuring compliance with conscience protections embodied in the Church, Coats-Snowe, and Weldon Amendments, the final rule eliminates the requirement that Title X projects provide abortion counseling and referral. These changes will also add clarity to extant conscience protections, making it easier for entities to participate who may have felt unable to do so in the past. In addition, though already permitted in the 2000 regulations, the final rule clarifies that participating entities within a project may offer only a single method or a limited number of methods as components of a Title X family planning project, so long as the overall project provides a broad range of acceptable and effective family planning methods and services throughout the service area.

Second, to ensure that the Title X program places an adequate emphasis on holistic family planning services that recognize the need for linkages with comprehensive primary health care providers, the final rule clarifies the definition of family planning; provides for the referral of pregnant patients for appropriate prenatal services; encourages the provision of comprehensive primary health services onsite or through a robust referral linkage; and updates the application review criteria, including to expand provision of family planning service in under- and un-served areas and populations.

Third, to ensure transparency regarding the provision of services, the final rule requires additional information from applicants and grantees regarding subrecipients, requires a clear explanation of how grantees ensure adequate oversight and accountability for compliance and quality outcomes among subrecipients and requires each project supported under Title X to fully account for, and justify, charges against the Title X grant. The Department believes these changes will ensure that OPA has the information necessary to determine

whether Title X projects, grantees, and subrecipients are complying with the statutory provisions of the program. Title X grantees and subrecipients must comply with the Federal laws that are the subject of this proposed rulemaking. In addition to conducting outreach and providing technical assistance, OPA has the authority to initiate compliance reviews and take appropriate action to assure compliance with the provisions in this final rule.

2. Affected Entities

This rule would affect the operations of entities which receive Title X grants or are subrecipients of such entities at some point in time. According to the 2016 Family Planning Annual Report (FPAR), there were 91 Title X grantees and 1,117 Title X subrecipients in 2016.[130] These entities operated at 3,898 service sites, and provided services to 4,007,552 people.[131] For purposes of this analysis, the Department assumes that these numbers will remain the same across time. Title X services were delivered by 3,550 clinical services provider full-time equivalent employees (FTEs), which include 780 physician FTEs, 258 registered nurse FTEs, and 2,512 combined FTEs from physician's assistants (PAs), nurse practitioners (NPs), and certified nurse midwives (CNMs).[132] These FTEs are associated with 1,403 Title X family planning encounters per FTE, for 5.0 million total Title X family planning encounters across these providers in 2016.[133] Title X services are also delivered by other types of service providers, who were involved with 1.7 million Title X family planning encounters in 2016.[134] Providers in these categories include registered nurses, public health nurses, licensed vocational or licensed practical nurses, certified nurse assistants, health educators, social workers, and clinic aides. The Department assumes that there are 1,403 encounters per FTE for individuals in these categories, which implies approximately 1,219 FTEs in this category in 2016.[135] To convert FTEs reported in the FPAR to the number of individuals in these categories, the Department assumes that each individual works an average of between 0.5 FTEs and 1.0 FTEs delivering Title X services, with 0.75 FTEs as its central estimate, uniformly

---

[130] Fowler et al., *Family Planning Annual Report: 2016 National Summary* 7 (Aug. 2017), *https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf*.

[131] *Id.* at 8.

[132] *Id.* at 49–51.

[133] *Id.* at 51.

[134] *Id.* at 24.

[135] *Id.* at 49.

Exhibit 154    JA-0002634

across occupation categories. This implies that there are approximately 4,733 clinical service providers and 1,625 other service providers associated with the provision of Title X family planning services. The Department will use these estimates as its estimate of service providers affected by this rule.

The Department estimates the hourly wages of individuals affected by this proposed rule using information on hourly wages in the May 2016 National Occupational Employment and Wage Estimates provided by the U.S. Bureau of Labor Statistics [136] and salaries from the U.S. Office of Personal Management.[137] It uses the salary of registered nurses as a proxy for "other clinical service providers" and "other types of service providers" described above. In FPAR, PAs, NPs, and CNMs are not distinguished. Since wages in these three categories are very similar, the Department uses the average wage across this group when discussing impacts affecting the group. The Department uses the wages of Medical and Health Services Managers as a proxy for management staff, and the wages of Lawyers as a proxy for legal staff throughout this analysis. To value the time of potential Title X service grantees, the Department takes the average wage across all occupations in the U.S. The Department assumes that federal employees affected by the proposed changes to the Title X regulation are Step 5 within their GS-level and earn locality pay for the District of Columbia, Baltimore, and Northern Virginia. It divides annual salaries by 2,087 hours to derive hourly wages. It assumes that the total dollar value of labor, which includes wages, benefits, and overhead, is equal to 200% of the wage rate. Estimated hourly rates for all relevant categories are included below.

Throughout, estimates are presented in 2016 dollars. When present value and annualized values are presented, they are discounted relative to year 2016. Finally, the Department estimates impact over five years starting in 2019. Please note that the list includes staff that the Department assumes will be impacted by the final rule and is inclusive of those positions which are included in the APP category.

### TABLE 2—HOURLY WAGES

| | |
|---|---|
| Physician | $101.04 |
| Physician Assistant | 49.08 |
| Nurse Practitioner | 50.30 |
| Certified Nurse Midwife | 49.23 |
| Registered Nurse | 34.70 |
| Medical and Health Services Managers | 52.58 |
| Lawyers | 67.25 |
| Federal employees in the District of Columbia, Baltimore, and Northern Virginia (2016) | |
| GS–13 Step 5 | 50.04 |
| GS–14 Step 5 | 59.13 |
| GS–15 Step 5 | 69.56 |

### 3. Estimated Costs

#### a. Learning the Rule's Requirements

To comply with the regulatory changes proposed in this final rule, affected entities must learn the rule's requirements, review their policies in the context of these new requirements, and determine how to respond. Affected entities here would include not only existing grantees and subrecipients, but also potential grantees and subrecipients. Consistent with our view that this proposed rule would increase competition for Title X funding, the Department estimates that potential grantees and subrecipients range from between 100% and 300% of their 2016 values, with a central estimate of 200%. This implies 182 potential grantees and 2,234 potential subrecipients. The Department estimates that learning the final rule's requirements and determining how to respond would require an average of 20 hours for potential grantees and an average of 10 hours for potential subrecipients, divided evenly between managers and lawyers, in the first year following publication of the final rule. As a result, using wage information provided in Table 2, this implies costs of $3.11 million in the first year following publication of the final rule.

#### b. Training

Individuals involved with delivering family planning services would need to receive training on the requirements of the final rule. To convert FTEs reported in FPAR to the number of individuals who would receive training, the Department assumes that each individual works an average of between 0.5 FTEs and 1.0 FTEs delivering Title X services, with 0.75 FTEs as its central estimate. This implies that there are approximately 4,733 clinical service providers and 1,625 other service providers who will need training in order to ensure compliance with these regulations. The Department estimates that these individuals would require an average of 4 hours of training in the first year following publication of this rule.

In subsequent years, it assumes that this new information would be incorporated into existing training requirements, resulting in no incremental burden. As a result, using wage information provided in Table 2, this would imply costs of $2.71 million in the first year following publication of a final rule in this rulemaking.

In addition, training materials would need to be updated to reflect changes made by this rulemaking. Training materials for Title X providers are currently developed by contract. The Department estimates that these updates would cost approximately $200,000. In addition, changes to training materials would require interaction with OPA employees in order to ensure that the materials are suitable for Title X providers. The Department estimates that this would require half of an FTE at the GS–13 level and half of an FTE at the GS–14 level. It estimates that all of these costs would be incurred in the first year following publication of the final rule. Using wage information provided in Table 2, this would imply costs of $0.43 million in the first year after publication of the final rule.

#### c. Assurance Submissions

Title X grantees and subrecipients face new assurance requirements because of this final rule. The Department estimates that these new requirements would require a lawyer to spend an average of 3 hours reviewing the assurances and 3 hours reviewing organizational policies and procedures or taking other actions to assess compliance, and a medical and health services manager to spend 2 hours total for the same tasks the first year of the final rule for each grantee and subrecipient. In subsequent years, the Department estimates that these new requirements would require a lawyer to spend an average of 1 hour reviewing the assurances, 3 hours reviewing organizational policies and procedures or taking other actions to assess compliance, and a medical and health services manager to spend 2 hours total for the same tasks at each grantee and subrecipient. Using wage information provided in Table 2, this would imply costs of $1.2 million in the first year following publication of the final rule, and $0.9 million in subsequent years.

#### d. Documentation of Compliance

Title X grantees and subrecipients need to document their compliance

---

[136] Bureau of Labor Statistics, *Occupational Employment and Wage Statistics,* (May 2016), *https://www.bls.gov/oes/2016/may/oesnat.htm.*

[137] Office of Personnel Management, *Salary Table 2016–DCB,* (Jan. 2016), *https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2016/DCB.pdf.*

Exhibit 154

with new requirements because of this final rule. First, Title X grantees are required to encourage minors to involve family in their decisions to seek family planning services. Actions taken to satisfy this requirement must be documented in a minor's medical record. The Department estimates that each occurrence would require a physician assistant to spend an average of 2 minutes to make appropriate documentation in a minor's medical records. Approximately 20% (800,000) of the 4 million Title X clients are adolescents. The Department estimates that complying with the requirement to encourage family participation will result in 75% (600,000) of adolescent patients' medical records requiring appropriate documentation. Using wage information provided in Table 2, this would imply costs of $2.0 million in each year following publication of this rule.

In addition, the rule requires Title X projects to report certain crimes in compliance with State notification laws, and to counsel minors on how to resist sexual coercion, but the Department does not include cost estimates for compliance with these provisions because grantees are already required to comply with these congressional mandates. However, while Congress encourages family participation, especially related to minors, this rule requires an additional compliance step that grantees document that they encourage family participation with each minor—and to so document this conversation in each minor's patient file.

Second, grantees must generate reports with information related to subrecipients involved in the grantee's Title X project. The Department believes that this will impose direct and indirect costs. It estimates that these new requirements would require a health services manager to spend an average of 4 hours in each year following publication of the final rule at each grantee and subrecipient. Using wage information provided in Table 2, this would imply costs of $0.5 million in each year following publication of a final rule in this rulemaking.

In addition, based on public comment, the Department also believes that these documentation requirements will result in indirect costs. In particular, it believes that affected entities may update systems to facilitate newly required documentation and reporting. It estimates that between 25% and 75% of service sites, with a central estimate of 50%, will make changes along these lines in response to these new requirements. These changes could

range from very minor tweaks to existing systems to more comprehensive overhauls. The Department estimates that an average of between $1,000 and $5,000, with a central estimate of $3,000, would be incurred at these sites in the first year following publication of this proposed rule. This would imply costs of $11.69 million in the first year following publication of a final rule.

e. Monitoring and Enforcement

This final rule will result in additional monitoring of Title X grantees and subrecipients in order to ensure compliance with new regulatory and existing statutory requirements.

Some commenters contend that requiring grantees to provide information concerning their subrecipients will be burdensome because of limited funding and the magnitude of oversight required and will prohibit them from freely selecting subrecipients. Commenters contend that these requirements will be prohibitive to providing comprehensive care and continuing partnerships with referral agencies. Other commenters contend that many clinics will be forced to close as a result of the burdensome requirements and that this is evidence of a departmental agenda to discourage participation in the Title X program. Commenters request a response as to whether the Department has studied the costs to subrecipients and referral agencies associated with data collection, training and oversight. Commenters also note that other programs with comparable federal funding are not required to submit to the same requirements.

HHS does not agree with commenters who say that providing the Department with information regarding subrecipients is unduly burdensome or prohibitive, since grantees already are responsible for ensuring that all partners who receive funding as a part of the grant project are providing services that are responsive and compliant with the purposes of Title X. The Department is only requiring that compliance and appropriate service provision be documented and submitted to HHS. Grantees may relieve reporting burdens by requiring subrecipients to draft compliance reports that grantees can submit to HHS after certifying their accuracy. Commenters provided no documentation to support the assertion that such certification of subrecipient compliance would be unique among federal programs. In addition, as a result of comments, HHS is only requiring monitoring and oversight of subrecipients, not referral agencies, because only grantees and subrecipients

receive Title X funds for their services. Requirements regarding referral agencies will be limited to the grantee providing information that they should already have available, such as the name of the referral agency, the services it provides, and the extent of the referral partnership. For all of these reasons, the Department does not find this objection compelling.

Similarly, the Department does not agree with the concern expressed by some commenters regarding the effect of this rule on quality and accessibility of Title X services. These commenters did not provide evidence that the rule will negatively impact the quality or accessibility of Title X services. And the Department believes that this rule will likely improve quality and accessibility for Title X services.

For example, the Department expects that honoring statutory protections of conscience in Title X may increase the number of providers in the program. If health care providers or entities know they will be protected from discrimination on the basis of conscience with respect to counseling on, or referring for, abortion, they might seek to participate in programs as a subrecipient where they may previously have been deterred from doing so under the current regulations because of concerns that they would be forced to violate their religious belief or moral conviction. This may also lead to an increase in the number of health care providers who apply and receive funding under the Title X program, thus decreasing current gaps in family planning services in certain areas of the country. For example, under the 2000 regulations, some individuals and entities may have chosen not to apply to provide Title X services because they anticipated they would be pressured to counsel or refer for abortions. One public commenter supporting finalization of the proposed rule on behalf of religiously affiliated health care organizations cited polling data and organizational comments suggesting that protecting conscience in the Title X program would prevent medical providers or students from refraining from participation in the program due to concerns about being forced to violate their consciences.[138]

[138] See comment of Jonathan Imbody (posted July 23, 2018), available at *https://www.regulations.gov/document?D=HHS-OS-2018-0008-69125* (citing a Christian Medical Association and Freedom2Care poll conducted on May 3, 2011, which found that 91 percent of physicians who practiced medicine based on the principles of their faith said they would be forced to leave medicine if coerced into violating the faith tenets and medical ethics principles that guide their practice of medicine). Freedom2Care and The Christian Medical

Exhibit 154

Similarly, a certain proportion of decisions by currently practicing health providers to leave the profession are presumably motivated by such pressure.[139] With the final rule's added emphasis on protecting rights of conscience, more individuals may enter the Title X family planning program, helping to meet that unmet need for care.

This effect may also occur at the macro scale in the health industry. For example, hospitals or other facilities that will not refer for abortion as a method of family planning may view the final rule as granting Title X participants greater freedom to provide family planning services consistent with their beliefs and may find it worthwhile to apply for Title X funds, or seek to participate in a Title X project as a subrecipient, in order to serve more people or new populations, or underserved communities, including urban or rural, consistent with their calling to serve the health care needs of the poor and underserved.

As a result, the rule will not impede access to care in areas with fewer providers, such as rural communities, but enhance it. Indeed, because patients may seek out health care providers that reflect their own religious beliefs or moral convictions, service delivery should be improved because opportunities for conflict may be limited and the cultural competency of providers may be increased.[140] Another way this effect may manifest itself is that, if the number of family planning providers were to remain constant, the average provider would have more highly qualified staff, because the Title X grantees and their subrecipients would be selecting from a larger pool of medical and health professionals. Ultimately, the Department believes that

this final rule will result in more Title X applicants, which will likely translate into more diverse grantees and subrecipients. In addition, the Department closely monitors the performance of the Title X program, including through the Family Planning Annual Report, which should allow the Department to quickly identify and respond to any problems in order to maintain high quality standards within the program.

The Department estimates that addressing additional monitoring and enforcement activities would require management staff for each grantee to spend an average of an additional 40 hours each year, and would require an average of an additional 10 hours for each Title X service provider each year. Finally, additional monitoring and enforcement require additional time by Federal staff. The Department estimates this would require 3 FTEs at the GS–13 level, 2 FTEs at the GS–14 level, and 2 FTEs at the GS–15 level. As a result, using wage information provided in Table 2, this would imply costs of $8.53 million every year following publication of this rule.

f. Physical Separation

As a result of this final rule, Title X providers would be required to provide Title X services at facilities that are physically separate from facilities at which abortion as a method of family planning is provided. A Congressional Research Service[141] report estimates that 10% of clinics that receive Title X funding offer abortion as a method of family planning in addition to their Title X-funded activities. In addition, Title X providers may share resources with unaffiliated entities that offer abortion as a method of family planning. As a result, the Department estimates that between 10% and 30% of service sites, with a central estimate of 20%, would need to be evaluated to determine whether they comply with the proposed physical separation requirements. Commenters contend that the Department underestimated the costs related to new physical separation requirements, but themselves did not provide sufficient data to estimate these effects across the Title X program. Commenters also provided extremely high cost estimates based on assumptions that they would have to build new facilities in order to comply with the requirements for physical separation from abortion as a method of

family planning. The Department does not anticipate that entities will necessarily engage in construction of new facilities to comply with the new requirements, rather that entities will usually choose the lowest cost method to come into compliance. The Department expects that the lowest cost method will vary across covered entities depending on their circumstances, and that covered entities will make the decision which best suits their circumstances in light of the new requirements, and therefore that entities will likely choose the lowest cost method, given their circumstances. For example, Title X providers which operate multiple physically separated facilities and perform abortions may shift their abortion services, and potentially other services not financed by Title X, to distinct facilities, a change which likely entails only minor costs. Other Title X providers, with different circumstances, will have different options and therefore may have a more or less costly lowest cost method. Furthermore, as stated above, the Department estimates that between 10% and 30% of service sites, with a central estimate of 20%, would be subject to physical separation requirements, because their Title X services and abortion services are currently collocated. Accordingly, the Department believes that enforcing the physical separation requirements as interpreted through Section 1008 should have minimal effect on the majority of current Title X providers. The Department has updated quantitative estimates in response to these comments, while acknowledging that there is substantial uncertainty regarding the magnitude of these effects. The Department estimates that evaluation of sites would require an average of an additional five hours by management staff at each of these affected service sites in the first year following publication of the final rule. Similarly, it estimates that this evaluation would affect between 10% and 30% of grantees, with a central estimate of 20%. The Department estimates that this would require an average of an additional forty hours, divided evenly between lawyers and management staff, for each affected grantee, in the first year following publication of a final rule. It estimates that these evaluations would determine that between 10% and 20% of service sites, with a central estimate of 15%, do not comply with physical separation requirements. At each of these service sites, the Department estimates that an average of between $20,000 and

Association, *National Poll Shows Majority Support Healthcare Conscience Rights, Conscience Law* (May 3, 2011), *https://docs.wixstatic.com/ugd/809e70_7ddb46110dde46cb961ef3a678d7e41c.pdf*.

[139] The Christian Medical Association and Freedom2Care poll of May 3, 2011, found that 82% of medical professionals "said it was either 'very' or 'somewhat' likely that they personally would limit the scope of their practice of medicine if conscience rules were not in place. This was true of 81% of medical professionals who practice in rural areas and 86% who work full-time serving poor and medically-underserved populations . . . 91% agreed, 'I would rather stop practicing medicine altogether than be forced to violate my conscience.' ") Freedom2Care and The Christian Medical Association, *National Poll Shows Majority Support Healthcare Conscience Rights, Conscience Law* (May 3, 2011).

[140] In a 2011 poll, 88% of adults said it was very or somewhat important that they share moral beliefs with their health care providers. *See* Freedom2Care and The Christian Medical Association, *National Poll Shows Majority Support Healthcare Conscience Rights, Conscience Law* (May 3, 2011).

[141] Angela Napili, *Title X (Public Health Service Act) Family Planning Program*, Congressional Research Service 22 (Aug. 31, 2017), *https://fas.org/sgp/crs/misc/RL33644.pdf*.

Exhibit 154

JA-0002637

$40,000, with a central estimate of $30,000, would be incurred to come into compliance with physical separation requirements in the first year following publication of a final rule in this rulemaking. This estimate is an increase from an averaged estimate between $10,000 and $30,000 in the proposed rule. Using wage information provided in Table 2, this would imply costs of $36.08 million in the first year following publication of a final rule, an increase from an estimated cost of $24.38 million in the proposed rule.

The Department does not anticipate that these requirements will have a significant impact on access to services. Although some facilities may relocate in response to the new requirement, the Department does not anticipate that there will be a decrease in the overall number of facilities offering services, since it anticipates other, new entities will apply for funds, or seek to participate as subrecipients, as a result of the final rule. Further, the Department cannot calculate or anticipate future turnover in grantees. Various entities may change their decision to apply to be a grantee or sub-grantees or may change the way in which they provide services, affecting the viability of their applications. Such calculations would be purely speculative and, thus, very difficult to forecast or quantify. Based on the Department's best estimates, it anticipates that the net impact on those seeking services from current grantees will be zero, as any redistribution of the location of facilities will mean that some seeking services will have shorter travel times and others seeking services will have longer travel times to reach a facility. Additionally, as a result of this final rule, the Department anticipates expanded competition that will engender new and/or additional grantees who will serve previously unserved or underserved areas, likely expanding coverage and patient access to services.

### g. Encouraging Parental Involvement in Family Planning Services

Title X providers are already required by the Title X statute to encourage minors to involve their parents in family planning services, but this rule would ensure that actions are taken to satisfy this requirement and require such actions be documented in a minor's medical record. As noted previously, the Department estimates that complying with the requirement to document the encouragement of family participation will result in 600,000 adolescent patients' medical records requiring documentation each year. The

Department estimates that an additional 0–50% of these adolescents, with a central estimate of 25%, would receive additional encouragement to involve parents each year. It estimates that this would require an average of an additional ten minutes spent by a registered nurse and ten minutes spent by the service recipient in each case. These impacts would occur each year upon publication of this final rule. Using wage information provided in Table 2, this would imply costs of $2.93 million in each year upon publication of this final rule.

The Department does not include costs associated with compliance with State reporting requirements or the requirement that minors receive counseling to avoid sexual coercion because these Congressional requirements should already be satisfied by grantees.

### 4. Estimated Benefits

This final rule is expected to offer benefits to taxpayers and stakeholders who want assurance that their tax dollars are being used in compliance with the requirements of the Title X program. It is also expected to increase the number of entities interested in participating in Title X as grantees or subrecipient service providers and, thereby, to increase patient access to family planning services focused on optimal health outcomes for every Title X client. Third, because of the clarifying language, as well as the new provisions within this rule, the Department expects the quality of service to improve. Finally, the rule would clarify the role of the Title X program within communities across the nation, expand and diversify the field of medical professionals who serve individuals and families, and build a better appreciation for the important services offered as a result.

### a. Upholding and Preserving the Purpose and Goals of the Title X Program

As discussed throughout this rule, the statutory prohibition on the use of Title X funds in programs/projects where abortion is a method of family planning has been in existence as long as the program. This final rule is expected to provide the Department with tools to ensure compliance with those statutory requirements. It is also expected to increase transparency and assurances that taxpayer dollars are being used as Congress intended. The Title X program, too, would benefit, as the requirement of physical and financial separation and the prohibition on infrastructure building for non-Title X purposes will

ensure greater accountability for the use of Federal funds and mitigate confusion about what services the Federal government supports and funds.

### b. Patient/Provider Benefits and Protections

The Department expects that the final rule will have additional benefits for patients and providers. Benefits for patients are significant. First, as noted above, the new regulation will encourage Title X service providers to offer either comprehensive primary health services onsite or have a robust referral linkage with primary health providers who are in close physical proximity to the Title X site. This will promote seamless care and services for patients while expanding the breadth of services available within the States, territories, and throughout the regions.

Second, the final rule will protect certain patients from coercion or further victimization. It will require Title X facilities to counsel minors on how to resist attempts to coerce them into engaging in sexual activities. Such consulting would serve to help minors resist coercion and exercise self-determination. In addition, the final rule will protect certain Title X patients from further victimization by requiring Title X grantees and subrecipients to comply with all State and local laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, and human trafficking; to develop a plan for such compliance and provide adequate training for all personnel on the subject; and to maintain records identifying the age of any minor clients served, the age of their sexual partner(s) where required by law, and the reports or notifications made to appropriate State or local law enforcement or other authorities, in accordance with such laws. These provisions would protect patients, especially minor children, from further victimization, and promote the identification and bringing to justice of those who would prey on women, men, and children.

For providers, the final rule is expected to create benefits through respect for conscience. It will do so by better aligning the Title X regulations with the statutory prohibitions on discrimination against health care entities, including individual health care providers, who refuse to participate in abortion-related activity such as counseling on, and referral for, abortion. Potential grantees and subrecipients that refuse to provide abortion counseling and referrals will clearly be eligible to participate in the Title X program and to apply to provide family planning

Exhibit 154

services as grantees or subrecipients. And the expansion of provider and family planning options would have salutary benefits for patients, including for patients who seek providers who share their religious beliefs or moral convictions.

As the Department has stated with regard to other conscience protection actions, open communication in the doctor-patient relationship would foster better over-all care for patients. While the benefit of open and honest communication between a patient and her doctor is difficult to quantify, one study showed that even "the quality of communication [between the physician and patient] affects outcomes . . . [and] influences how often, and if at all, a patient would return to that same physician."[142] Facilitating open communication between providers and their patients helps to eliminate barriers to care. Because positions of conscience are often grounded in religious influence, "[d]enying the aspect of spirituality and religion for some patients can act as a barrier. These influences can greatly affect the well-being of people. These influences were reported to be an essential element in the lives of certain migrant women which enabled them to face life with a sense of equality."[143] It is important for patients seeking care to feel assured that their faith, and the principles of conscience grounded in their faith, would be honored, especially in the area of family planning. This would ensure that patients with such religious beliefs or moral convictions feel they are being treated fairly and that their religious beliefs or moral convictions are respected.[144]

*C. Analysis of Regulatory Alternatives*

The Department considered a variety of options to ensure that it is clear to grantees, the general public, and patients who depend upon Title X services, that Title X programs do not fund, support, or promote abortion as a method of family planning. Specifically, the Department considered:

(1) Maintaining the status quo, where only line-item, pro-rated financial separation from activities that treat abortion as a method of family planning is required. However, such financial

accounting separation leaves too much ambiguity surrounding abortion activities that may be a part of the overall services of the organization or facility, although not a part of Title X-funded family planning services. The Department considered utilizing programmatic guidance and funding opportunity announcements (FOAs, also known as notices of funding opportunities) to address that problem, but such actions would not be able to fix the requirement that Title X providers provide counseling on, and referral for, abortion upon request, a requirement inconsistent with federal conscience laws, and at least in terms of abortion referrals, is also inconsistent with section 1008 and that could be discouraging to potential grantees and subrecipients that refuse to counsel on, or provide referrals for, abortion. The maintenance of this requirement, as noted above, is potentially inconsistent with the Coats-Snowe Amendment and the Weldon Amendment. Moreover, part 59 as it currently exists, affords no mechanisms by which the Department would be able to verify whether grantees and their subrecipients are complying with the statutory program integrity, education, and reporting requirements. In addition, the Department would still be required to use application review criteria that the Department now believes fail to ensure that applicants comply with the statutory requirements of the Title X program. As detailed earlier, application review criteria must serve as a meaningful instrument to assess the quality of the applicant and the application. While the Department had discretion under the 2000 regulations to strengthen the selection criteria through FOA requirements, such an approach does not give the public notice of the long term commitment of the program.

(2) Requiring signage, brochures or separate staff and examination rooms within the same physical space to delineate a separation between Title X and abortion-related services. The Department considered that this less restrictive option might serve the same goal as physical separation in erasing, or mitigating, the current confusion between Title X and abortion-related services. But the Department determined that a shared reception area with materials available on both Title X family planning services and abortion-related services would continue the confusion, rather than mitigate it. Signage is often not read, and the segregation of staff or staff responsibilities within the same reception area likely would not provide

sufficient distinction to end confusion. If the same physical space provides both Title X and abortion-related services, signs and separate receptionists may only diminish, but not eliminate, the public perception and confusion. Different examination rooms would likely have little impact because patients would be unaware that the purpose of a suite of examination rooms differs by funding stream, if the entrance and reception area is shared in common. The optics and practical operation of two distinct services within a single collocated space are difficult, if not impossible to overcome.

Commenters contend that the Department neglected to fully address the economic impact of proposed regulatory provisions, maintain that there are more cost-effective alternatives, and present three regulatory alternatives that would not substantively change the status quo and which were not considered in the analysis: (1) Provide exemptions to those with objections to providing information about abortion; (2) improve public education efforts, so the public understands Title X funds cannot be used for abortion; and (3) permit longer time frames between finalization of, and required compliance to, the final rule in order to lower costs associated with implementation.

The Department appreciates these suggestions, but does not accept these as meaningful alternatives to the changes proposed by the rule. While cost is an important consideration in any rulemaking, compliance with statutory program integrity provisions is of greater importance and none of the alternatives suggested by commenters guarantees such program integrity. The first alternative, the provision of exemptions to those who object to providing information concerning abortion, is unnecessary with the elimination of the requirement for abortion counseling and referral. Also, the Department's approach obviates the need for a burdensome process, involving the expenditure of additional time and resources by both the provider and the federal government associated with proposing, processing, and investigating each request for exemption. The elimination of the requirement for abortion counseling and referral, coupled with the regulatory permission for nondirective pregnancy counseling, achieves the same objective without the need for such a burdensome process. In addition, the mere existence of the requirements—even with a process to apply for exemptions—may serve to discourage organizations with religious or moral objections to

---

[142] Fallon E. Chipidza, F. E. *et al.*, Impact of the Doctor-Patient Relationship, *The Primary Care Companion for CNS Disorders* 17(5) (Oct. 22, 2015), *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4732308.*

[143] Scheppers, E. *et al.*, Potential Barriers to the Use of Health Services Among Ethnic Minorities: A Review, *Family Practice* (23):325, 343 (June 1, 2006). *https://academic.oup.com/fampra/article/23/3/325/475515.*

[144] *Id.*

Exhibit 154

counseling on, or referring for, abortion from applying. Moreover, that alternative does not address the fact that the Department believes that the current requirement to provide abortion referrals upon request is inconsistent with PHS Act § 1008's prohibition on funding projects where abortion is a method of family planning. Second, the Department agrees that educational efforts to help the general public understand the services provided by Title X would be beneficial, but this alternative does not negate the need for clear and understandable separation between Title X services and abortion services at the clinic level. Physical separation assists with statutory compliance, in addition to improving public perception, by ensuring that both intentional and unintentional comingling of resources, activities, and services do not take place in ways that are exacerbated when both services are housed in the same space. Finally, the Department considered longer implementation periods and has updated and extended transition periods and compliance dates for the provisions of this final rule, in response to comments, but the Department is not convinced that extending the time period for compliance with the final rule in any way decreases the overall cost.

The Department, therefore, concludes that no other alternative would adequately address the two categories of problems it seeks to address: (1) Insufficient compliance with the statutory requirements and the purpose and goals of the Title X program (especially those related to section 1008), the appropriations provisos and riders addressing the Title X program, and other obligations and requirements established under other Federal laws; and (2) lack of transparency regarding the provision of Title X family planning services.

Thus, for these reasons and other stated reasons for our decision to propose both physical and financial separation, the Department determines that all of these options would be insufficient to ensure statutory compliance and clarity regarding such compliance.

### D. Executive Order 13771

Executive Order 13771 on Reducing Regulation and Controlling Regulatory Costs (January 30, 2017) requires that the costs associated with significant new regulations "to the extent permitted by law, be offset by the elimination of existing costs associated with at least two prior regulations." This final rule is considered an Executive Order 13771

regulatory action. The Department estimates that this rule generates $15.0 million in annualized costs at a 7% discount rate, discounted relative to fiscal year 2016, over a perpetual time horizon.

### E. Regulatory Flexibility Analysis

As discussed above, the RFA requires agencies that issue a regulation to analyze options for regulatory relief of small entities if a rule has a significant impact on a substantial number of small entities. The Department considers a rule to have a significant economic impact on a substantial number of small entities if at least 5% of small entities experience an impact of more than 3% of revenue.

In the public comments, some commenters contend that implementing the new requirements within the first year after publication of the final rule will require transitioning to electronic health records, allocating staff to perform additional documentation, recruiting new staff/consultants, engaging legal support, and allocating training time (requiring facility closure). Commenters argue that these changes would incur costs much higher than the Department's estimated cost to implement the new requirements. Commenters express concern that these requirements will result in decreased provider participation in the Title X program, reducing services for the communities they serve.

In most cases, the Department does not find these comments compelling, since commenters do not provide sufficient detail and explanation. The Department accordingly does not find comments that predicted a large impact more reliable than the estimates set forth in the proposed rule. But the Department made some amendments to this final rule, particularly with respect to extending compliance dates and clarifying what requirements fall under each date of compliance. These amendments are described in other parts of the final rule and those germane to the RIA are detailed throughout this section.

The Department calculates the costs of the changes per service site over 2019–2023. The estimated average annualized cost of the final rule per service site is approximately $6,761 using a 3% discount rate, accounting for comments received. This represents an increase from $5,423 in the proposed rule. The Department notes that this figure includes all costs and that relatively large entities are likely to experience proportionally higher costs. The U.S. Small Business Administration establishes size standards that define a

small entity. According to these standards, family planning centers with revenues below $11.0 million are considered small entities. Since the estimated costs of the final rule would be a small fraction of the standard by which a family planning center entity is considered a small entity, the Department anticipates that this final rule will not have a significant economic impact on a substantial number of small entities.

### F. Assessment of Federal Regulation and Policies on Families

Section 654 of the Treasury and General Government Appropriations Act of 1999, Public Law 105–277, sec. 654, 112 Stat. 2681 (1998), requires Federal departments and agencies to determine whether a policy or regulation could affect family well-being.[145]

Agencies must assess whether the regulatory action: (1) Impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) if the regulatory action financially impacts families, are justified; (6) may be carried out by State or local government or by the family; and (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society.[146] If the determination is affirmative, then the Department or agency must prepare an impact assessment to address criteria specified in the law.

Some commenters contend that the proposed rule fails to address the impact of unplanned births on families, arguing that unplanned births are a known factor in familial instability and dysfunction, decreased disposable income, and decreased relationship satisfaction. Commenters contend that the Department has incorrectly concluded that the proposed rule will not pose negative effects to family well-being, and noted a lack of evidence and/ or justification for this conclusion. Commenters contend that increased

---

[145] This section discusses the assessment required in Executive Order 12606, The Family, which was revoked on April 21, 1997. Office of Management and Budget, Memorandum from Jacob Lew, Dir., To Heads of Executive Departments, Agencies, & Independent Establishments Assessment of Federal Regulations and Policies on Families (Jan. 26, 1999), *https://www.fws.gov/policy/library/rglew.pdf*.

[146] Treasury and General Government Appropriations Act, 1999, Public Law 105–277, sec. 654, 112 Stat. 2681, 2681–528 to 2681–530 (1998).

Exhibit 154

unintended pregnancies decrease Quality Adjusted Life Years (QALYs), and therefore the proposed rule would result in increased costs. Commenters contend that access to contraceptives has several benefits including the pursuit of higher education and increased earning power for unmarried women, leading to more enduring relationships in the future; and enabling couples to plan the number of children in their family, increasing parents' ability to invest in their children, and in turn improving children's development and ability to succeed in school.

The Department does not change from its opinion that the action taken in this final rule cannot be carried out by State or local government or by the family because the rule pertains to the enforcement of certain Federal laws and the administration of a Federal program. While the Department agrees that family planning is important, it does not agree that the final rule will negatively impact access to family planning. On the contrary, more patients could have access to services because of changes to the program. Commenters offer no compelling evidence that this rule will increase unintended pregnancies or decrease access to contraception.

Other commenters note that the Department previously has supported legislation that increases access to family planning care and provides necessary referrals. Commenters contend that the Department has supported the personal agency of families and individuals over Federal involvement in family activities in the past. Commenters contend that the Department should be required to explain its change in position.

The Department is perplexed by these comments, since the Department supports increased access to family planning services, promotes informed care for patients, and encourages family participation in family planning decisions. The final rule is designed to increase access to family planning and referrals to maintain the health of the patient. In fact, providing health care services to patients is of such importance to the Department that it encourages grantees to either provide comprehensive health services or maintain a close relationship with those who do. The Department therefore rejects the premise of this set of comments and concludes that it is not necessary to prepare a Family Policymaking Assessment.

The Secretary certifies that this final rule has been assessed in accordance with section 654 of the Treasury and General Government Appropriations Act of 1999, Public Law 105–277, sec.

654, 112 Stat. 2681 (1998), and will not negatively affect family well-being.

*G. Paperwork Reduction Act*

This final rule contains information collection requirements (ICRs) that are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501–3520. A description of these provisions is given in the following paragraphs with an estimate of the annual burden, summarized in Table 3. To fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the Paperwork Reduction Act of 1995 (PRA), the Department solicited comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

The Department solicited public comment on each of the required issues under section 3506(c)(2)(A) of the PRA. The collections of information required by the final rule relate to § 59.2 (Definitions), § 59.5 (What requirements must be met by a family planning project?), § 59.7 (What criteria would the Department of Health and Human Services use to decide which family planning services projects to fund and in what amounts?), § 59.13 (Standards of compliance with prohibition on abortion), § 59.17 (Compliance with reporting requirements), and § 59.18 (Appropriate use of funds).

Section 59.2 would apply to situations where an unemancipated minor wishes to receive services on a confidential basis and be considered on the basis of her/his own resources, as would § 59.5(a)(14). In such cases, the Title X provider would be required to document in the minor's medical records the specific actions taken by the provider to encourage the minor to involve her/his family (including her/his parents or guardian) in her/his decision to seek family planning services. This documentation requirement would not apply if the Title X provider (1) believes that the minor is a victim of child abuse or incest and (2) has, consistent with applicable State or local law, reported the situation to the relevant authorities. The reporting requirement must be documented in the medical record.

Section 59.5 requires Title X providers to report, in grant applications and in all required reports, information regarding subrecipients and referral agencies and individuals, including a detailed description of the extent of collaboration and a clear explanation of how the grantee will ensure adequate oversight and accountability; and to maintain records with respect to minors on the specific actions taken to encourage family participation (or the reason why such family participation was not encouraged).

Section 59.7 requires Title X grant applicants to describe, within their applications, their affirmative compliance with each provision of the regulations governing the Title X program.

Section 59.13 requires Title X grantees to provide assurance satisfactory to the Secretary that, as a Title X grantee, it does not provide abortion and does not include abortion as a method of family planning. This assurance will include, at a minimum, representations (supported by documentary evidence where the Secretary requests it) as to compliance with § 59.13 and each of the requirements in § 59.14 through § 59.16.

Section 59.17 requires Title X grantees to provide appropriate documentation or other assurance satisfactory to the Secretary that it has in place and has implemented a plan to comply with all State and local laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, and human trafficking. It also requires Title X grantees to maintain records to demonstrate compliance with the requirements of § 59.17, and makes continuation of funding for the Title X services contingent upon demonstrating to the Secretary that the criteria have been met.

Lastly, § 59.18 requires Title X grantees to give a detailed accounting of use related to grant dollars, both in their applications for funding, and within any annually required reporting, and to fully account for, and justify, charges against the Title X grant.

*Burden of Response:* The Department is committed to leveraging existing grant, contract, annual reporting, and other Departmental forms where possible, rather than creating additional, separate forms for grantees to sign. The Department anticipates two separate burdens of response: (1) Assurance of compliance; and (2) documentation of compliance.

The burden for the assurance of compliance is the cost of grantee and/ or subrecipient staff time to (a) review

Exhibit 154

the assurance language as well as the underlying language related to stated requirements; (b) to review grantee and/or subrecipient policies and procedures or to take other actions to assess grantee and/or subrecipient compliance with the requirements to which the grantee and/or subrecipient is required to assure compliance.

The labor cost would include a lawyer spending an average of 3 hours reviewing all assurances and a medical and health service manager spending an average of one hour reviewing and signing the assurances at each grantee and subrecipient. The Department estimates the number of grantees and subrecipients at 1,208, based on 2016 number of Title X grantees and subrecipients, as represented in Title X FPAR data. The mean hourly wage (not including benefits and overhead) for these occupations is $67.25 per hour for the lawyer and $52.58 for the medical and health service manager, as noted in the table above. The labor cost is $307,000 in the first year (($67.25 × 3 + $52.58 × 1) × 1,208 grantees and subrecipients). The Department estimates that the cost, in subsequent years, would be $145,000, which would

represent an annual allotment of one hour for the lawyer and one hour for the medical and health service manager (($67.25 × 1 + $52.58 × 1) × 1,208 grantees and subrecipients).

The Department estimates that all grantees and subrecipients will review their organizational policies and procedures or take other actions to self-assess compliance with applicable Title X requirements each year, spending an average of 4 hours doing so. The labor cost is a function of a lawyer spending an average of 3 hours and a medical and health service manager spending an average of one hour. The labor cost for self-assessing compliance, such as reviewing policies and procedures, is a total of $307,000 each year (($67.25 × 3 + $52.58 × 1) × 1,208 grantees and subrecipients).

The burden for the documentation of compliance is the cost of grantee and/or subrecipient staff time to (a) document in a minor's medical records actions taken to encourage the minor to involve parents in family planning services and (b) complete reports regarding information related to subrecipients, referral agencies and individuals involved in the grantee's

Title X project. The Department assumes that a physician assistant would be used to document such compliance. The mean hourly wage (not including benefits and overhead) for this occupation is $49.08 per hour. The labor cost would require spending an average of 10 minutes to make appropriate documentation in a minor's medical records. Approximately 20% (800,000) of the 4 million Title X clients are adolescents. The Department estimates that complying with the requirement to encourage family participation will result in 75% (600,000) of adolescent patients' medical records requiring appropriate documentation. The labor cost will be $982,000 each year ($49.08 per hour × 2 minutes × 600,000 adolescents).

The labor cost would also include a medical and health services manager spending an average of four hours each year to complete reports regarding information related to subrecipients involved in the grantee's Title X project at each grantee and subrecipient. The labor cost will be $254,000 each year ($52.58 per hour × 4 hours × 1,208 grantees and subrecipients).

TABLE 3—ANNUAL RECORDKEEPING AND REPORTING REQUIREMENTS OR BURDEN OF RESPONSE IN YEAR ONE/SUBSEQUENT YEARS UPON PUBLICATION OF THE FINAL RULE

| Regulation burden | OMB control No. | Respondents responses | Hourly rate ($) | Burden per response (hours) | Total annual burden (hours) | Labor cost of reporting ($) |
|---|---|---|---|---|---|---|
| Assurance of Compliance .................... | NEW .... | 1,208/1,208 | 63.58/62.36 | 8/6 | 9,664/7,248 | 614,000/452,000 |
| Documentation of Compliance .............. | NEW .... | 1,208/1,208 | 52.58/52.58 | 4/4 | 4,832/4,832 | 254,000/254,000 |
| Documentation on Minor's Medical Records. | NEW .... | 600,000/600,000 | 49.08/49.08 | .03/.03 | 20,000/20,000 | 982,000/982,000 |
| Total Cost ...................................... | | ...................... | | .................. | ...................... | 1,850,000/1,688,000 |

The Department asked for public comment on the information collection including what additional benefits may be cited as a result of this rule. Where warranted, changes were made in the preceding calculations of cost.

The Department has submitted a copy of this rule to OMB for its review of the rule's information collection and recordkeeping requirements. These requirements are not effective until they have been approved by OMB.

**List of Subjects in 42 CFR Part 59**

Family planning, Grant programs—health, Grant programs—social programs, Health professions, Reporting and recordkeeping requirements, Youth, Health, Abortion, Birth control, Title X, Contraception, Natural family planning, Infertility, Fertility awareness.

For the reasons set forth in the preamble, the Department of Health and Human Services amends 42 CFR chapter I, subchapter D, part 59, as set forth below:

**PART 59—GRANTS FOR FAMILY PLANNING SERVICES**

■ 1. The authority citation for part 59 is revised to read as follows:

**Authority:** 42 U.S.C. 300 through 300a–6.

■ 2. Revise § 59.1 to read as follows:

**§ 59.1   To what programs do these regulations apply?**

(a) The regulations of this subpart are applicable to the award of grants under section 1001 of the Public Health Service Act (42 U.S.C. 300) to assist in the establishment and operation of voluntary family planning projects. These projects shall consist of the

educational, comprehensive medical, and social services necessary to aid individuals to determine freely the number and spacing of their children. Unless otherwise specified, the requirements imposed by these regulations apply equally to grantees and subrecipients, and grantees shall require and ensure that subrecipients (and the subrecipients of subrecipients) comply with the requirements contained in these regulations pursuant to their written contracts with such subrecipients.

(b) Except for §§ 59.4, 59.8, and 59.10, the regulations of this subpart are also applicable to the execution of contracts under section 1001 of the Public Health Service Act (42 U.S.C. 300) to assist in the establishment and operation of voluntary family planning projects, and will be applied in accordance with the

Exhibit 154    JA-0002642

applicable statutes, procedures and regulations that generally govern Federal contracts. To this extent, the use of the terms "grant", "award,", "grantee" and "subrecipient" in applicable regulations of this subpart will apply similarly to contracts, contractors and subcontractors, and the use of the term "project" or "program" will also apply to a project or program established by means of a contract.

■ 3. Amend § 59.2 by:

■ a. Adding in alphabetical order definitions for "Advanced Practice Provider", "Family Planning" and "Grantee";

■ b. Revising the definition of "Low income family"; and

■ c. Adding in alphabetical order definitions for "Program and project", and "Subrecipient".

The additions and revision read as follows:

### § 59.2    Definitions.

\*    \*    \*    \*    \*

*Advanced Practice Provider* means a medical professional who receives at least a graduate level degree in the relevant medical field and maintains a license to diagnose, treat, and counsel patients. The term Advanced Practice Provider includes physician assistants and advanced practice registered nurses (APRN). Examples of APRNs that are an Advanced Practice Provider include certified nurse practitioner (CNP), clinical nurse specialist (CNS), certified registered nurse anesthetist (CRNA), and certified nurse-midwife (CNM).

\*    \*    \*    \*    \*

*Family planning* means the voluntary process of identifying goals and developing a plan for the number and spacing of children and the means by which those goals may be achieved. These means include a broad range of acceptable and effective family planning methods and services, which may range from choosing not to have sex to the use of other family planning methods and services to limit or enhance the likelihood of conception (including contraceptive methods and natural family planning or other fertility awareness-based methods) and the management of infertility, including information about or referrals for adoption. Family planning services include preconception counseling, education, and general reproductive and fertility health care, in order to improve maternal and infant outcomes, and the health of women, men, and adolescents who seek family planning services, and the prevention, diagnosis, and treatment of infections and diseases which may threaten childbearing capability or the health of the individual, sexual partners, and potential future children. Family planning methods and services are never to be coercive and must always be strictly voluntary. Family planning does not include postconception care (including obstetric or prenatal care) or abortion as a method of family planning. Family planning, as supported under this subpart, should reduce the incidence of abortion.

*Grantee* means the entity that receives Federal financial assistance by means of a grant, and assumes legal and financial responsibility and accountability for the awarded funds, for the performance of the activities approved for funding and for reporting required information to the Office of Population Affairs.

*Low income family* means a family whose total income does not exceed 100% of the most recent Poverty Guidelines issued pursuant to 42 U.S.C. 9902(2). The project director may find that "Low income family" also includes members of families whose annual income exceeds this amount, but who, as determined by the project director, are unable, for good reasons, to pay for family planning services. For example:

(1) Unemancipated minors who wish to receive services on a confidential basis must be considered on the basis of their own resources, provided that the Title X provider has documented in the minor's medical records the specific actions taken by the provider to encourage the minor to involve her/his family (including her/his parents or guardian) in her/his decision to seek family planning services, except that documentation of such encouragement is not to be required if the Title X provider has documented in the medical record:

(i) That it suspects the minor to be the victim of child abuse or incest; and

(ii) That it has, consistent with, and if permitted or required by, applicable State or local law, reported the situation to the relevant authorities.

(2) For the purpose of considering payment for contraceptive services only, where a woman has health insurance coverage through an employer that does not provide the contraceptive services sought by the woman because the employer has a sincerely held religious or moral objection to providing such coverage, the project director may consider her insurance coverage status as a good reason why she is unable to pay for contraceptive services. In making that determination, the project director must also consider other circumstances affecting her ability to pay, such as her total income. The project director may, for the purpose of considering whether the woman is from a "low income family" or is eligible for a discount for contraceptive services on the schedule of discounts provided for in § 59.5, consider her annual income as being reduced by the total annual out-of-pocket costs of contraceptive services she uses or seeks to use. The project director may determine those costs, or estimate them at $600.

\*    \*    \*    \*    \*

*Program* and *project* are used interchangeably and mean a plan or sequence of activities that is funded to fulfill the requirements elaborated in a Title X funding announcement; it may be comprised of, and implemented by, a single grantee or subrecipient(s), or a group of partnering providers who, under a grantee or subrecipient, deliver comprehensive family planning services that satisfy the requirements of the grant within a service area.

\*    \*    \*    \*    \*

*Subrecipient* means any entity that provides family planning services with Title X funds under a written agreement with a grantee or another subrecipient. These entities may also be referred to as "delegates" or "contract agencies."

■ 4. Revise § 59.3 to read as follows:

### § 59.3    Who is eligible to apply for a family planning services grant or contract?

Any public or nonprofit private entity in a State may apply for a family planning grant or contract under this subpart.

■ 5. Amend § 59.5 by:

■ a. Revising paragraphs (a)(1) and (5);

■ b. Removing paragraph (a)(10)(i);

■ c. Redesignating paragraph (a)(10)(ii) as (a)(10);

■ d. Adding paragraphs (a)(12), (13), and (14); and

■ e. Revising paragraphs (b)(1) and (8).

The revisions and additions read as follows:

### § 59.5    What requirements must be met by a family planning project?

(a) \*  \*  \*

(1) Provide a broad range of acceptable and effective family planning methods (including contraceptives, natural family planning or other fertility awareness-based methods) and services (including infertility services, information about or referrals for adoption, and services for adolescents). Such projects are not required to provide every acceptable and effective family planning method or service. A participating entity may offer only a single method or a limited number of methods of family planning as long as the entire project offers a broad range of such family planning methods and services.

\*    \*    \*    \*    \*

Exhibit 154    JA-0002643

**7788**    **Federal Register** / Vol. 84, No. 42 / Monday, March 4, 2019 / Rules and Regulations

(5) Not provide, promote, refer for, or support abortion as a method of family planning.

\* \* \* \* \*

(12) Should offer either comprehensive primary health services onsite or have a robust referral linkage with primary health providers who are in close physical proximity, to the Title X site, in order to promote holistic health and provide seamless care.

(13) Ensure transparency in the delivery of services by reporting the following information in grant applications and all required reports:

(i) Subrecipients and agencies or individuals providing referral services by name, location, expertise and services provided or to be provided;

(ii) Detailed description of the extent of the collaboration with subrecipients, referral agencies, and any individuals providing referral services, in order to demonstrate a seamless continuum of care for clients; and

(iii) Clear explanation of how the grantee will ensure adequate oversight and accountability for quality and effectiveness of outcomes among subrecipients.

(14) Encourage family participation in the decision to seek family planning services; and, with respect to each minor patient, ensure that the records maintained document the specific actions taken to encourage such family participation (or the specific reason why such family participation was not encouraged).

(b) \* \* \*

(1) Provide for medical services related to family planning (including physician's consultation, examination, prescription, and continuing supervision, laboratory examination, contraceptive supplies) and referral to other medical facilities when medically necessary, consistent with § 59.14(a), and provide for the effective usage of contraceptive devices and practices.

\* \* \* \* \*

(8) Except as provided in § 59.14(a), provide for coordination and use of referral arrangements with other providers of health care services, local health and welfare departments, hospitals, voluntary agencies, and health services projects supported by other federal programs.

\* \* \* \* \*

■ 6. Amend § 59.7 by:
■ a. Revising paragraph (a);
■ b. Redesignating paragraphs (b) and (c) as paragraphs (d) and (e); and
■ c. Adding new paragraphs (b), and (c).
The revisions and additions read as follows:

**§ 59.7   What criteria will the Department of Health and Human Services use to decide which family planning services projects to fund and in what amount?**

(a) Within the limits of funds available for these purposes, the Secretary may award grants for the establishment and operation of those projects which will, in the Department's judgment, best promote the purposes of statutory provisions applicable to the Title X program, and ensure that no Title X funds are used where abortion is a method of family planning.

(b) Any grant applications that do not clearly address how the proposal will satisfy the requirements of this regulation shall not proceed to the competitive review process, but shall be deemed ineligible for funding. The Department will explicitly summarize each requirement of the Title X regulations or include the Title X regulations in their entirety within the Funding Announcement, and shall require each applicant to describe its plans for affirmative compliance with each requirement.

(c) If the proposal is deemed compliant with this regulation, then applicants will be subject to criteria for selection within the competitive grant review process, including:

(1) The degree to which the applicant's project plan adheres to the Title X statutory purpose and goals for the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents), while meeting all of the statutory and regulatory requirements and restrictions, including that none of the funds shall be used in programs where abortion is a method of family planning.

(2) The degree to which the relative need of the applicant for Federal funds is demonstrated in the proposal, and the applicant shows capacity to make rapid and effective use of grant funds, including its ability to procure a broad range of diverse subrecipients, as applicable, in order to expand family planning services available to patients in the project area.

(3) The degree to which the applicant takes into account the number of patients, particularly low-income patients, to be served while also targeting areas that are more sparsely populated and/or places in which there are not adequate family planning services available.

(4) The extent to which family planning services are needed locally and the applicant proposes innovative ways to provide services to unserved or underserved communities.

\* \* \* \* \*

■ 7. Revise § 59.11 to read as follows:

**§ 59.11   Confidentiality.**

All information as to personal facts and circumstances obtained by the project staff about individuals receiving services must be held confidential and not be disclosed without the individual's documented consent, except as may be necessary to provide services to the patient or as required by law, with appropriate safeguards for confidentiality; concern with respect to the confidentiality of information, however, may not be used as a rationale for noncompliance with laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence, human trafficking, or similar reporting laws. Otherwise, information may be disclosed only in summary, statistical, or other form which does not identify particular individuals.

■ 8. Add § 59.13 through § 59.19 to subpart A to read as follows:
Sec.

\* \* \* \* \*

59.13   Standards of compliance with prohibition on abortion.
59.14   Requirements and limitations with respect to post-conception activities.
59.15   Maintenance of physical and financial separation.
59.16   Prohibition on activities that encourage, promote, or advocate for abortion.
59.17   Compliance with reporting requirements.
59.18   Appropriate use of funds.
59.19   Transition provisions; compliance.

**§ 59.13   Standards of compliance with prohibition on abortion.**

A project may not receive funds under this subpart unless the grantee provides assurance satisfactory to the Secretary that the project does not provide abortion and does not include abortion as a method of family planning. Such assurance must also include, at a minimum, representations (supported by documentary evidence where the Secretary requests it) as to compliance with this section and each of the requirements in §§ 59.14 through 59.16. A project supported under this subpart must comply with such requirements at all times during the project period.

**§ 59.14   Requirements and limitations with respect to post-conception activities.**

(a) *Prohibition on referral for abortion.* A Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take

Exhibit 154                                                                                    JA-0002644

any other affirmative action to assist a patient to secure such an abortion.

(b) *Information about prenatal care.* (1) Because Title X funds are intended only for family planning, once a client served by a Title X project is medically verified as pregnant, she shall be referred to a health care provider for medically necessary prenatal health care. The Title X provider may also choose to provide the following counseling and/or information to her:

(i) Nondirective pregnancy counseling, when provided by physicians or advanced practice providers;

(ii) A list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care);

(iii) Referral to social services or adoption agencies; and/or

(iv) Information about maintaining the health of the mother and unborn child during pregnancy.

(2) In cases in which emergency care is required, the Title X project shall only be required to refer the client immediately to an appropriate provider of medical services needed to address the emergency.

(c) *Use of permitted lists or referrals to encourage abortion.* (1) A Title X project may not use the provision of any prenatal, social service, emergency medical, or other referral, of any counseling, or of any provider lists, as an indirect means of encouraging or promoting abortion as a method of family planning.

(2) The list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care) in paragraph (b)(1)(ii) of this section may be limited to those that do not provide abortion, or may include licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), some, but not the majority, of which also provide abortion as part of their comprehensive health care services. Neither the list nor project staff may identify which providers on the list perform abortion.

(d) *Provision of medically necessary information.* Nothing in this subpart shall be construed as prohibiting the provision of information to a project client that is medically necessary to assess the risks and benefits of different methods of contraception in the course of selecting a method, provided that the provision of such information does not promote abortion as a method of family planning.

(e) *Examples.* (1) A pregnant client of a Title X project requests prenatal health care

services. Because the provision of such services is outside the scope of family planning supported by Title X, the client is referred for prenatal care and may be provided a list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care). Provision of a referral for prenatal health care is consistent with this part because prenatal care is a medically necessary service.

(2) A Title X project discovers an ectopic pregnancy in the course of conducting a physical examination of a client. Referral arrangements for emergency medical care are immediately provided. Such action complies with the requirements of paragraph (b) of this section.

(3) After receiving nondirective counseling at a Title X provider, a pregnant woman decides to have an abortion, is concerned about her safety during the procedure, and asks the Title X project to provide her with a referral to an abortion provider. The Title X project tells her that it does not refer for abortion, but provides the following: A list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), which is not presented as a referral for abortion, but as a list of comprehensive primary care and prenatal care providers that does not identify which providers perform abortion, and the project staff member does not identify such providers on the list; and information about maintaining her health and the health of her unborn child during pregnancy. Such actions comply with paragraphs (a) through (c) of this section.

(4) A pregnant woman asks the Title X project to provide her with a list of abortion providers in the area. The project tells her that it does not refer for abortion, and provides her a list that consists of hospitals and clinics and other providers, all of which provide comprehensive primary health care (including prenatal care), as well as abortion as a method of family planning. Although there are several licensed, qualified, comprehensive primary health care providers (including providers of prenatal care) in the area that do not provide abortion as a method of family planning, none of these providers is included on the list. Provision of the list is inconsistent with paragraphs (a) and (c) of this section.

(5) A pregnant woman requests information on abortion and asks the Title X project to refer her for an abortion. The counselor tells her that the project does not consider abortion a method of family planning and, therefore, does not refer for abortion. The counselor offers her nondirective pregnancy counseling, which may discuss abortion, but the counselor neither refers for, nor encourages, abortion. The counselor further tells the client that the project can help her to obtain prenatal care and necessary social services and offers her the list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), assistance, and information for pregnant women described in paragraph (b) of this section. None of the providers on the list provide abortions. Such actions are consistent with paragraphs (a) through (c) of this section.

(6) Title X project staff provide contraceptive counseling to a client in order to assist her in selecting a contraceptive method. In discussing oral contraceptives, the project counselor provides the client with information contained in the patient package insert accompanying a brand of oral contraceptives, referring to abortion only in the context of a discussion of the relative safety of various contraceptive methods and in no way promoting abortion as a method of family planning. The provision of this information is consistent with paragraph (d) of this section and this section generally and does not constitute an abortion referral.

## § 59.15    Maintenance of physical and financial separation.

A Title X project must be organized so that it is physically and financially separate, as determined in accordance with the review established in this section, from activities which are prohibited under section 1008 of the Act and §§ 59.13, 59.14, and 59.16 of these regulations from inclusion in the Title X program. In order to be physically and financially separate, a Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient. The Secretary will determine whether such objective integrity and independence exist based on a review of facts and circumstances. Factors relevant to this determination shall include:

(a) The existence of separate, accurate accounting records;

(b) The degree of separation from facilities (*e.g.*, treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites) in which prohibited activities occur and the extent of such prohibited activities;

(c) The existence of separate personnel, electronic or paper-based health care records, and workstations; and

(d) The extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent.

## § 59.16    Prohibition on activities that encourage, promote, or advocate for abortion.

(a) *Prohibition on activities that encourage abortion.* (1) A Title X project may not encourage, promote or advocate abortion as a method of family planning. This restriction prohibits actions in the funded project that assist women to obtain abortions for family planning purposes or to increase the availability or accessibility of abortion for family planning purposes.

Exhibit 154                                                                                                 JA-0002645

(2) Prohibited actions include the use of Title X project funds for the following:

(i) Lobbying for the passage of legislation to increase in any way the availability of abortion as a method of family planning;

(ii) Providing speakers or educators who promote the use of abortion as a method of family planning;

(iii) Attending events or conferences during which the grantee or subrecipient engages in lobbying;

(iv) Paying dues to any group that, as a more than insignificant part of its activities, advocates abortion as a method of family planning and does not separately collect and segregate funds used for lobbying purposes;

(v) Using legal action to make abortion available in any way as a method of family planning; and

(vi) Developing or disseminating in any way materials (including printed matter, audiovisual materials and web-based materials) advocating abortion as a method of family planning.

(b) *Examples.* (1) Clients at a Title X project are given brochures advertising a clinic that provides abortions, or such brochures are available in any fashion at a Title X clinic (sitting on a table or available or visible within the same space where Title X services are provided). Provision or availability of the brochure violates paragraph (a)(2)(vi) of this section.

(2) A Title X project makes an appointment for a pregnant client for an abortion for family planning purposes. The Title X project has violated paragraph (a)(1) of this section.

(3) A Title X project pays dues with project funds to a State association that, among other activities, lobbies at State and local levels for the passage of legislation to protect and expand the legal availability of abortion as a method of family planning. The association spends a significant amount of its annual budget on such activity and does not separately collect and segregate the funds for such purposes. Payment of dues to the association violates paragraph (a)(2)(iv) of this section.

(4) An organization conducts a number of activities, including operating a Title X project. The organization uses non-project funds to pay dues to an association that, among other activities, engages in lobbying to protect and expand the legal availability of abortion as a method of family planning. The association spends a significant amount of its annual budget on such activity. Payment of dues to the association by the organization does not violate paragraph (a)(2)(iv) of this section.

(5) An organization that operates a Title X project engages in lobbying to increase the legal availability of abortion as a method of family planning. The project itself engages in no such activities, and the facilities and funds of the project are kept separate from prohibited activities. The project is not in violation of paragraph (a)(2)(i) of this section.

(6) Employees of a Title X project write their legislative representatives in support of legislation seeking to expand the legal availability of abortion, in their personal capacities and using no project funds to do so. The Title X project has not violated paragraph (a)(2)(i) of this section.

(7) On her own time and at her own expense, a Title X project employee speaks before a legislative body in support of abortion as a method of family planning. The Title X project has not violated paragraph (a)(2)(i) of this section.

(8) A Title X project uses Title X funds for sex education classes in a local high school. During the course of the class, information is distributed to students that includes abortion as a method of family planning. The Title X project has violated paragraph (a)(2)(vi) of this section.

### § 59.17  Compliance with reporting requirements.

(a) Title X projects shall comply with all State and local laws requiring notification or reporting of child abuse, child molestation, sexual abuse, rape, incest, intimate partner violence or human trafficking (collectively, "State notification laws").

(b) A project may not receive funds under this subpart unless it provides appropriate documentation or other assurance satisfactory to the Secretary that it:

(1) Has in place and implements a plan to comply with State notification laws. Such plan shall include, at a minimum, policies and procedures that include:

(i) A summary of obligations of the project or organizations and individuals carrying out the project under State notification laws, including any obligation to inquire about or determine the age of a minor client or of a minor client's sexual partner(s);

(ii) Timely and adequate annual training of all individuals (whether or not they are employees) serving clients for, or on behalf of, the project regarding State notification laws; policies and procedures of the Title X project and/or provider with respect to notification and reporting of child abuse, child molestation, sexual abuse, rape, incest,

intimate partner violence and human trafficking; appropriate interventions, strategies, and referrals to improve the safety and current situation of the patient; and compliance with State notification laws.

(iii) Protocols to ensure that every minor who presents for treatment is provided counseling on how to resist attempts to coerce them into engaging in sexual activities; and

(iv) Commitment to conduct a preliminary screening of any minor who presents with a sexually transmitted disease (STD), pregnancy, or any suspicion of abuse, in order to rule out victimization of a minor. Projects are permitted to diagnose, test for, and treat STDs.

(2) Maintains records to demonstrate compliance with each of the requirements set forth in paragraph (b)(1) of this section, including which:

(i) Indicate the age of minor clients;

(ii) Indicate the age of the minor client's sexual partners if such age is an element of a State notification law under which a report is required; and

(iii) Document each notification or report made pursuant to such State notification laws.

(c) Continuation of grantee or subrecipient funding for Title X services is contingent upon demonstrating to the satisfaction of the Secretary that the criteria have been met.

(d) The Secretary may review records maintained by a grantee or subrecipient for the purpose of ensuring compliance with the requirements of this section, the requirement to encourage family participation in family planning decisions, or any other section of this rule.

### § 59.18  Appropriate use of funds.

(a) Title X funds shall not be used to build infrastructure for purposes prohibited with these funds, such as support for the abortion business of a Title X grantee or subrecipient. Funds shall only be used for the purposes, and in direct implementation of, the funded project, expressly permitted by this regulation and authorized within section 1001 of the Public Health Service Act, that is, to offer family planning methods and services. Grantees must use the majority of grant funds to provide direct services to clients, and each grantee shall provide a detailed plan or accounting for the use of grant dollars, both in their applications for funding, and in any annually required reporting. Any significant change in the use of grant funds within the grant cycle shall not be undertaken without the approval of the Office of Population Affairs.

Exhibit 154                                    JA-0002646

(b) Title X funds shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for office.

(c) Each project supported under Title X shall fully account for, and justify, charges against the Title X grant. The Department shall put additional protections in place to prevent possible misuse of Title X funds through misbilling or overbilling, or any other unallowable expense.

**§ 59.19   Transition provisions; compliance.**

(a) *Compliance date concerning physical and financial separation.* The date by which covered entities must comply with the physical separation requirements contained in § 59.15, is March 4, 2020. The date by which covered entities must comply with the financial separation requirements contained in § 59.15 is July 2, 2019.

(b) *Compliance date concerning applications.* The date by which covered entities must comply with § 59.7 and 59.5(a)(13) (as it applies to grant applications), is the date on which competitive or continuation award applications are due, where that date occurs after July 2, 2019.

(c) *Compliance date concerning reporting, assurance, and provision of service requirements.* The date by which covered entities must comply with §§ 59.5(a)(12), 59.5(a)(13) (as it applies to all required reports), 59.5(a)(14), (b)(1) and (8), 59.13, 59.14, 59.17, and 59.18gg is July 2, 2019.

**Alex M. Azar II,**
*Secretary, Department of Health and Human Services.*

[FR Doc. 2019–03461 Filed 2–26–19; 4:15 pm]

**BILLING CODE 5140–34–P**

Exhibit 154

JA-0002647

5/15/2019                        About HRSA | Official web site of the U.S. Health Resources & Services Administration

Health Resources & Services Administration                                                            Explore

 HRSA
Health Resources & Services Administration

[                                                    ] 🔍

Advanced Search

☺ share | 🖨 ✉ f 𝕩

Home > About HRSA

# About HRSA

**Tens of millions of Americans receive quality, affordable health care and other services through HRSA's 90-plus programs and more than 3,000 grantees.**

The Health Resources and Services Administration (HRSA), an agency of the U.S. Department of Health and Human Services, is the primary federal agency for improving health care to people who are geographically isolated, economically or medically vulnerable.

HRSA programs help those in need of high quality primary health care, people living with HIV/AIDS, pregnant women, and mothers. HRSA also supports the training of health professionals, the distribution of providers to areas where they are needed most and improvements in health care delivery.

HRSA oversees organ, bone marrow and cord blood donation. It compensates individuals harmed by vaccination, and maintains databases that protect against health care malpractice, waste, fraud and abuse.

Since 1943 the agencies that were HRSA precursors have worked to improve the health of needy people. HRSA was created in 1982, when the Health Resources Administration and the Health Services Administration were merged.

## Vision

Healthy Communities, Healthy People

## Mission

To improve health outcomes and address health disparities through access to quality services, a skilled health workforce, and innovative, high-value programs.

## Goals

Goal 1: Improve Access to Quality Health Care and Services
Goal 2: Foster a Health Care Workforce Able to Address Current and Emerging Needs
Goal 3: Enhance Population Health and Address Health Disparities through Community Partnerships
Goal 4: Maximize the Value and Impact of HRSA Programs
Goal 5: Optimize HRSA Operations to Enhance Efficiency, Effectiveness, Innovation, and Accountability

*Date Last Reviewed:  March 2019*

### About HRSA

Organization

Bureaus & Offices

Budget

News & Events

Strategic Plan

Contact

Agency Overview
(PDF - 496 KB)

HRSA Year in Review
(PDF - 140 KB)

Advisory Committees

### HRSA Facts

**Administrator**
George Sigounas, MS, Ph.D.

**Headquarters**
5600 Fishers Lane
Rockville, MD 20857

**Staff**
HRSA on board employment as of 9/30/18 – 2,108

**Funding**
$11.5 billion in FY 2018

**Department**
HRSA is an agency of the U.S. Department of Health and Human Services

 About HRSA                      Connect with HRSA               Find Health Services

- **Bureaus & Offices**                               Health Center

- **Budget**                                                                                    HIV Medical Care and
                                                                                                Treatment
- **Strategic Plan**

Exhibit 155                                                                                            JA-0002648

5/15/2019                    About HRSA | Official web site of the U.S. Health Resources & Services Administration

- **Working at HRSA**
- **About HRSA**

Sign up for
email updates



Locate other health services

Contact Us    |    Viewers & Players    |    Privacy Policy    |    Disclaimers    |    Accessibility    |    Freedom of Information Act    |    No Fear Act
U.S. Department of Health and Human Services    |    USA.gov    |    Whitehouse.gov

Language Assistance Available

| | | | |
|---|---|---|---|
| Español | 繁體中文 | Tiếng Việt | 한국어 |
| Tagalog | Русский | العربية | Kreyòl Ayisyen |
| Français | Polski | Português | Italiano |
| Deutsch | 日本語 | فارسی | English |

Exhibit 155                                                                              JA-0002649