# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
and STATE OF NEW JERSEY,

      Plaintiffs,

  v.

DONALD J. TRUMP, et al.

      Defendants,

LITTLE SISTERS OF THE POOR SAINTS
PETER AND PAUL HOME,

      Intervenor-Defendant.

No. 17-CV-4540-WB

**INTERVENOR-DEFENDANT'S
SUPPLEMENTAL JOINT
APPENDIX**

| SUPPLEMENTAL JOINT APPENDIX INDEX | | | |
|---|---|---|---|
| **Exhibit Number** | **Begin Bates** | **End Bates** | **Description** |
| Exhibit 177 | JA-0003410 | JA-0003413 | Mendelsohn Decl., Dkt. No. 90-18 |
| Exhibit 178 | JA-0003414 | JA-0003418 | Gennace Decl., Dkt. No. 90-22 |
| Exhibit 179 | JA-0003419 | JA-0003428 | Chuang Decl. Excerpt, Dkt. No. 90-14 |
| Exhibit 180 | JA-0003429 | JA-0003437 | Butts Decl. Excerpt, Dkt. No. 90-17 |
| Exhibit 181 | JA-0003438 | JA-0003443 | Allen Decl., Dkt. No. 90-19 |
| Exhibit 182 | JA-0003444 | JA-0003448 | Adelman Decl., Dkt. No. 90-21 |
| Exhibit 183 | JA-0003449 | JA-0003453 | Luke Vander Bleek Comments on RFI |
| Exhibit 184 | JA-0003454 | JA-0003471 | Campaign Life Missouri Comments on RFI |
| Exhibit 185 | JA-0003472 | JA-0003476 | Current HRSA Guidelines |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,

                              Plaintiff,

        v.                                        NO. 2:17-cv-04540-WB

DONALD J. TRUMP *et al.*

                              Defendants.

## DECLARATION OF SETH A. MENDELSOHN

I, Seth A. Mendelsohn, declare and state as follows:

1.      I am the Executive Deputy Insurance Commissioner for the Pennsylvania
Department of Insurance (the "Department"). In this capacity I oversee, *inter alia*, the Office of
Insurance Product Regulation and Administration, including the Bureau of Life, Accident and
Health Insurance.

2.      The Department is the primary regulator for all health insurance products sold in
the Commonwealth of Pennsylvania.

3.      Insurance providers are subject to a complex set of federal and state laws and
regulations, and federal and state agencies have distinct but overlapping responsibilities in
regulating these entities.

4.      For instance, the federal Employee Retirement Income Security Act of 1974, 29
U.S.C. § 1001 *et seq.* (ERISA), governs most employee health care coverage and other benefit
plans offered by private employers.  ERISA preempts certain state laws relating to the regulation
of insurance.

JA-0003410

5.      As a result of the preemption provisions of ERISA, the Department does not regulate self-funded health care coverage plans offered by private employers, which are plans established and maintained by an employer or by an employee organization for which the employer or employee organization bears the direct financial risk for the cost of claims for health care benefits. These plans are subject to ERISA and are regulated primarily by the U.S. Department of Labor.

6.      The Department does regulate fully-insured employer group health insurance policies. These are health plans that an employer group purchases from an insurer, for which the insurer assumes the direct financial risk for the cost of claims for health care benefits.

7.      In addition, the Department regulates health insurance policies offered in the individual market.

8.      I am familiar with the Affordable Care Act's requirement that group health plans and health insurance issuers offering group or individual health insurance coverage cover preventive health services, including FDA-approved methods of contraception, without any cost-sharing requirements (the "Contraceptive Care Mandate").

9.      The Contraceptive Care Mandate applies both to ERISA-regulated plans as well as almost all insured group and individual health insurance plans that are regulated by the Department.

10.     More than 2.5 million women in Pennsylvania could benefit from the Contraceptive Care Mandate. This total includes women who receive insurance through their employer or through a spouse or other family member's employer, along with those who purchase insurance for themselves and their families through the individual market.

2

JA-0003411

11.     The Department estimates that the women in Pennsylvania who have benefited from the Contraceptive Care Mandate have saved over $250 million annually as a result.

12.     Many states have enacted laws requiring insurers that cover prescription drugs to provide coverage for any Food and Drug Administration-approved contraceptive. These statutes are commonly referred to as "contraceptive parity" laws.

13.     Pennsylvania, however, does not have a "contraceptive parity" statute. As a result, employers offering Department-regulated plans that opt out of the ACA's Contraceptive Care Mandate will not be subject to any requirement to provide contraceptives to their employees and beneficiaries. Thus, women in plans provided by these employers will not receive contraceptive coverage through these plans.

14.     Similarly, employers offering plans that are subject to ERISA that opt out of the Contraceptive Care Mandate will also not be subject to any requirement to provide contraception to their employees and beneficiaries.

15.     The Department anticipates that women who lose contraceptive coverage through employer plans – whether the plan of their own employer or that of another family member – may seek contraceptive coverage from other sources, including state-funded programs, or face the financial burden of paying for the full cost of contraceptives themselves.

16.     Further, insofar as the Final Rules[1] effectively expand the universe of employers that may claim a contraceptive coverage exemption, even more women may be denied access to contraceptive coverage.

---

[1] "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act", 83 Fed. Reg. 57536 et seq. (Nov. 15, 2018) and "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act", 83 Fed. Reg. 57592 et seq. (Nov. 15, 2018) (the "Final Rules").

JA-0003412

17.     Moreover, because the Final Rules contemplate that individuals, covered by employer plans that provide contraceptive care, may nevertheless opt out of the ACA's Contraceptive Care Mandate, and, in so doing, effectively deny contraceptive care to all of the individual's female dependents covered by the same plan, still more women may be denied access to contraceptive coverage.

18.     In any case, whether it is the employer's choice or the individual's choice or the choice of the individual as to whom a woman is a dependent, women who have access to affordable employer-based coverage but who lose contraceptive coverage as a result of the Final Rules will be unable to purchase individual coverage on the marketplace with any applicable premium tax credit and cost sharing reductions.  Again, the Department anticipates that women put in this position may seek contraceptive coverage from other sources, including state-funded programs, or face the financial burden of paying for the full cost of contraceptives themselves.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

SETH A. MENDELSOHN

Dated: December 12, 2018

4

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, and STATE OF NEW JERSEY, | Civil Action No: 2:17-cv-04540-WB |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, *et al.* | |
| Defendants. | |

### <u>DECLARATION OF PHILIP GENNACE</u>

I, Philip Gennace, declare and state as follows:

1.      I am the Assistant Commissioner of Life and Health in the New Jersey Department of Banking and Insurance ("DOBI"). In this capacity, I oversee, *inter alia*, the licensing and oversight of health insurance regulated by the State of New Jersey. I make this affidavit based on my personal knowledge and information provided to me in my official capacity.

2.      DOBI is the primary regulator for all fully-insured health insurance plans sold in the State of New Jersey.

3.      Insurance carriers are subject to a complex set of federal and state laws and regulations, and federal and state agencies have distinct but overlapping responsibilities in regulating these entities.

4.      For instance, the federal Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), governs most employee benefit plans offered by private employers, including private employers' self-funded employee health benefit plans. ERISA

JA-0003414

preempts most state laws relating to such plans.

5.      As a result of the preemption provisions of ERISA, DOBI does not regulate self-funded health coverage plans offered by private employers, which are plans established and maintained by an employer or by an employee organization for which the employer or employee organization bears the direct financial risk for the costs of claims for health care benefits. These plans are subject to ERISA and are regulated primarily by the U.S. Department of Labor, and are often colloquially referred to as "ERISA plans."

6.      DOBI does regulate fully-insured employer group health plans issued in the State. These are health plans that an employer group purchases from an insurer, for which the insurer assumes the direct financial risk for the cost of claims for health care benefits.

7.      In addition, DOBI regulates health insurance policies offered in the individual market.

8.      I am familiar with the Affordable Care Act's (ACA) requirement that group health plans and health insurance issuers offering group or individual health insurance coverage cover preventive health services, including FDA-approved methods of contraception, without any cost-sharing requirement (the "Contraceptive Care Mandate").

9.      The Contraceptive Care Mandate applies both to non-grandfathered ERISA-regulated plans, as well as almost all insured group and individual health insurance plans that are regulated by DOBI.

10.     In addition, New Jersey law requires employers who offer fully-insured plans to provide coverage for expenses incurred in the purchase of prescription female contraceptives to the same extent as any other outpatient prescription drug under the policy ("New Jersey

2

Mandate").[1]

11.    Unlike the ACA's Contraceptive Care Mandate, however, the New Jersey Mandate does not require insurers to cover women's contraceptive services without cost sharing. Also, the ACA contraceptive mandate covers all FDA-approved female contraceptive methods. By contrast, the New Jersey mandate covers only those methods which are obtained via prescription (not those that are available over the counter or through an inpatient or out-patient procedure).

12.    In addition, a religious employer (defined as a church, association or convention of churches, or an elementary or secondary school controlled, operated, or principally supported by a church) is statutorily entitled to an exclusion from the New Jersey Mandate if the required coverage conflicts with the employer's *bona fide* religious beliefs and practices. The exemption is not available for prescription drugs that may act as contraceptives but are prescribed for a particular user for medical reasons other than contraception. Also, the exemption is not available for prescription female contraceptives that are necessary to preserve the life or health of an insured.

13.    Approximately 3,434,000 New Jersey residents who have health coverage are covered by employer plans that are self-funded.[2]  Under ERISA, such plans offered by private employers are exempt from state regulation, including the New Jersey Mandate.

14.    Private employers offering self-funded plans that opt out of the Contraceptive Care

---

[1] *See* N.J.S.A. 17B:27A-7.12 (for individual health benefits plans); N.J.S.A. 17B:26-2.1y (for individual health insurers); N.J.S.A. 17:48A-7bb (for medical service corporations); N.J.S.A. 17:48-6ee (for hospital service corporations) and N.J.SA. 17:48E-35.29 (for health service corporations); N.J.S.A. 17:48F-13.2 (for prepaid prescription service organizations); N.J.S.A. 26:2J-4.30 (for health maintenance organizations); N.J.S.A. 17B:27A-19.15 (for small employer health benefits plans); N.J.S.A. 52:14-17.29j (for the State Health Benefits Plan); and N.J.S.A. 17B:27:46.1ee (for group health insurers).

[2] This includes residents covered under New Jersey's state health benefits programs, as well as self-funded plans offered by private employers.

JA-0003416

Mandate under the newly expanded exemptions will not be subject to any federal or state requirement to provide contraception to their employees and beneficiaries. Thus, women in plans provided by these employers will not receive contraceptive coverage through these plans.

15.    Upon information and belief, a number of these newly-exempted employers are expected to be New Jersey employers.  As a result, those newly-exempted entities that offer self-funded plans, or that are church-affiliated schools eligible for New Jersey's religious exemption,[3] would no longer have an obligation to provide any contraceptive coverage for their employees and their employees' female dependents.

16.    Moreover, because the ACA's Contraceptive Care Mandate is broader than the New Jersey Mandate and prohibits cost sharing, even employees and female dependents of newly-exempt employers who offer fully-insured plans subject to the New Jersey Mandate will lose coverage for certain contraceptive methods and be subject to cost sharing that was previously prohibited.

17.    Therefore, many New Jersey women are likely to lose the medical coverage for contraceptive care to which they are otherwise entitled under the ACA.

18.    DOBI anticipates that some women who lose contraceptive coverage through their employer's plans, particularly low-income women, will seek contraceptive coverage from other sources, including state-funded programs, such as the New Jersey Prescription Assistance Program, Medicaid, and Title X clinics. Women who do not seek outside funding or who seek it but do not qualify for financial assistance likely will face substantial additional costs. Among

---

[3] Churches and associations and conventions of churches have been exempted from the ACA's Contraceptive Care Mandate since 2011.  *See* 76 Fed. Reg. 46621-01 (Aug. 3, 2011).  However, unlike Defendants' broad new religious exemption, the 2011 exemption was not applicable to most church-affiliated schools.

JA-0003417

these women, some likely will forgo regular contraceptive use or use cheaper, less effective contraceptive methods, resulting in more unintended pregnancies.

19.     Women who lose their contraceptive coverage obtained through their employers' plans, even if they are in plans that remain subject to the New Jersey Mandate, likely will in many cases face copays and deductibles when attempting to obtain necessary contraceptive coverage. These financial constraints likely will cause some women to change their preferred choice of contraceptive method, fail to consistently maintain their use of contraceptives, or forgo contraceptive use entirely, which will result in more unintended pregnancies.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

PHILIP GENNACE

Dated: 12/12/18

5

JA-0003418

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA,<br><br>                    Plaintiff,<br><br>     v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>                    Defendants. | **No. 2:17-cv-04540-WB** |

## DECLARATION OF CYNTHIA H. CHUANG, M.D., MSc[1]

I, Cynthia H. Chuang, hereby submit this declaration in support of the Motion for Preliminary Injunction filed by the Commonwealth of Pennsylvania in the above-captioned matter and, in support thereof, I state as follows:

**I.    My Background and Experience**

1.     I am a practicing general internist, primary care provider, professor, and health services researcher, with a principal research interest in unintended pregnancy prevention and contraceptive decision-making in adult women.

**A. *My Job, Educational Training and Academic Practice***

2.     I work as a Professor of Medicine, Public Health Services, and Obstetrics and Gynecology in the Departments of Medicine, Public Health Sciences, and Obstetrics and Gynecology at the Pennsylvania State University College of Medicine, where I also serve as the Chief of the Division of General Internal Medicine, a division of over 70 physicians with clinical practice in primary care medicine, hospital medicine, palliative care, and post-acute care.

---

[1] I attach a true and correct copy of my curriculum vitae hereto as Exhibit 1.

JA-0003419

3.      I am also the Research Director of the Penn State K12 BIRCWH (Building Interdisciplinary Research Careers in Women's Health) Program.

4.      I have been on faculty at the Penn State College of Medicine since 2004.

5.      I earned a Bachelor of Science degree from the University of Michigan in 1992 and earned my Medical Degree from the New York University School of Medicine in 1997.

6.      Thereafter, I completed my residency and chief residency in Internal Medicine at Temple University Hospital, in Philadelphia, Pennsylvania, in 2001.

7.      I earned a Masters of Science in Epidemiology (MSc) from the Boston University School of Public Health in 2003 and completed my General Internal Medicine fellowship and residency in Preventive Medicine at Boston University School of Medicine, in 2004.

8.      During my training, some of my most formative experiences were when I worked with patients in the areas of pregnancy prevention and contraceptive care at a family planning clinic in rural California; a primary care clinic at Temple University in North Philadelphia, Pennsylvania; and a women's health clinic at Boston Medical Center in Boston, Massachusetts.

9.      Throughout my career, I have been an investigator on a number of studies and projects regarding contraception and reproductive health. For example, I was the Principal Investigator of a Patient-Centered Outcomes Research Institute (PCORI) contract to design and evaluate interventions aimed at assisting women with personalized contraceptive choices that best meet their individual needs (CD–1304–6117), and recipient of a National Institutes of Health (NIH) K23 career development award to study unintended pregnancy in women with chronic medical conditions. I am the Penn State site Principal Investigator for the PCORNet PaTH Clinical Data Research Network, a multi-institutional integrated research network in partnership with the University of Pittsburgh/University of Pittsburgh Medical Center, Temple University Health

2

JA-0003420

System, Johns Hopkins University Health System, Geisinger Health System, and the University of Utah Health System.

10.    I have authored over 70 scholarly publications, a significant portion of which focus on women's healthcare and preventive services. Among other topics, I have written about: reducing unintended pregnancies through reproductive planning and contraceptive action planning, contraceptive decision-making in women with and without chronic medical conditions, and the meaning of pregnancy intention.

11.    Some of my recent articles include:

    a.    Snyder A, Weisman CS, Liu G, Leslie D, Chuang CH. The impact of the Affordable Care Act on contraceptive use and costs among privately insured women. *Women's Health Issues* 2018, 28(3): 219-223.

    b.    "Measuring Oral Contraceptive Adherence Using Self-Report Versus Pharmacy Claims Data," Contraception, 2017 Sep 04, Nelson HN, Borrero S, Lehman E, Velott DL, Chuang CH;

    c.    "How Do Pregnancy Intentions Affect Contraceptive Choices When Cost Is Not a Factor? A Study of Privately Insured Women," Contraception, 2015 Nov; 92(5):501-7, Weisman CS, Lehman EB, Legro RS, Velott DL, Chuang CH; and

    d.    "Making the Most of the Affordable Care Act's Contraceptive Coverage Mandate for Privately-Insured Women," Women's Health Issues, 2014 Sep-Oct; 24(5):465-8, Weisman CS, Chuang CH.

12.    I have received multiple awards and recognitions for my academic work including delivering the 2017 Spring Dean's Lecture (Contraceptive Use: Before, During and After the Affordable Care Act). I received the Dean's Award for Innovation in Team Science in 2014, the

JA-0003421

Department of Medicine Excellence in Mentoring Award in 2014 and the Junior Faculty Award for Excellence in Research in 2008. I have also received the Dean's Award for Excellence in Teaching in 2010 and 2014, and the Special Recognition for Education Leadership and Service Award on 2005.

**B.** *My Medical Practice*

13.    In addition to my academic work, I am also a clinician and maintain an active adult primary care practice in Hershey, Pennsylvania, in which a portion of my patients are women of child-bearing age.

14.    My practice is focused on preventive medicine and chronic disease management.

15.    For my female patients of child-bearing age, preventive medicine includes reproductive life planning, including the use of contraceptives.

16.    For medical reasons, the ideal "spacing" between pregnancies is eighteen months, because there is a greater risk of poor birth outcomes, like low birthweight and preterm birth, if pregnancies are not properly spaced.

17.    I routinely have conversations with my patients about spacing out their pregnancies due to their medical health and educational, work and economic goals.  Indeed, the Centers for Disease Control and Prevention (CDC) recommends that doctors counsel their patients about issues of "reproductive life planning," including their life, financial and job goals.

18.    These conversations routinely result in changes to patients' contraceptive care. Indeed, I have found that it is important to be flexible with respect to contraceptive care because patients' changing life situations will frequently call for changes in their contraceptive method choice.

19.    Through my medical practice, I have found that the most important thing about

JA-0003422

providing preventive contraceptive care is to counsel my patients to use the method of contraception that is best suited for their individual needs at their particular place in life.

20.     My patients are generally highly insured and mostly white.

21.     Some live in highly rural areas and drive long distances to see me.

22.     I direct low-income patients without insurance to the Medicaid program (if eligible). I direct other uninsured or underinsured women without contraceptive coverage to seek care through Planned Parenthood, or another Federally Qualified Health Center (FQHC), where they may qualify for contraceptive coverage under Title X.

23.     Some of my patients also work for and receive their health insurance through Catholic Schools and other institutions which might seek to eliminate contraceptive coverage through their employer-sponsored plans under the new religious and moral exemptions.

## II.    My Opinion on the Final Religious Exemption Rule and Final Moral Exemption Rule

24.     I have reviewed both the final Religious Exemption Rule and the final Moral Exemption Rule (together, the "Final Exemption Rules"), as well as the amended Complaint filed by the Commonwealth of Pennsylvania in the above-captioned matter that challenges them.

25.     Based upon my knowledge, education, training and experience, it is my professional opinion that the Final Exemption Rules will cause immediate and irreversible harm because they will cause women to lose preventive contraceptive care under their employer group health plans.

### A. *Cost is a Barrier to Contraceptive Access*

26.     It is my understanding, and it has been my experience, that cost is a barrier to access to contraceptives.   This has been corroborated in research studies.

27.     Prior to passage of the Affordable Care Act (the "Affordable Care Act" or "ACA"),

5

JA-0003423

before preventive contraceptive care was provided at no out-of-pocket cost under the ACA's contraceptive mandate, I regularly counseled my patients about the cost related to their recommended contraceptive choices.

28.    At that time, it was not unusual for my patients to reject the specific contraceptive I had recommended due to its cost; instead, they would request that I prescribe a less effective, but cheaper, method of contraception. Or they would forego use of contraception altogether.

29.    Such requests were most frequent when I had recommended intrauterine Devices (IUDs) or contraceptive implants. IUDs and implants carried heavy cost-sharing responsibilities and, therefore, were most expensive to patients pre-ACA. But they are also a much more effective method of contraceptive care (<1% failure rate) than birth control pills (9% failure rate).

30.    After the ACA passed and the contraceptive mandate was instituted, however, I saw that my patients were free to make contraceptive choices on the basis of their medical and personal needs and concerns, alone, without the burden of having to weigh the cost of the preferred medical choice. Put otherwise, post-ACA, the only concern has become what is best for the patient.

31.    Since the ACA passed, no patient has contacted me to ask for a different, cheaper method of contraception than the one I had prescribed due to the cost under private insurance plans.

32.    Furthermore, as a result of the ACA's contraceptive mandate, I have seen patients switch from a cheaper, less effective method to a more effective, expensive method that was better for their medical health and personal needs.

JA-0003424

**B.** *Because Patients Will Lose Contraceptive Coverage under the New Final Exemption Rules, They Will Make Less Medically Sound Contraceptive Choices and, Therefore, Will Be Harmed*

33.     It is apparent, however, that under the new Final Exemption Rules this post-ACA focus on what is best for the patient will change.

34.     This is so because, as a result of the Final Exemption Rules, some women will lose insurance coverage for preventive contraceptive care.

35.     As a result, their costs for contraceptive care will rise.

36.     Based upon my own experience and existing scientific and empirical information that I have reviewed and am aware of, under the new Final Exemption Rules, cost will, again, become a barrier to women's access to and use of the contraceptive that is medically recommended for them.

37.     Many of these women who will no longer receive contraceptive coverage will not only face financial harm, but will also face medical harm.

38.     This harm will manifest itself in the disruption of these patients' medical treatment, whether by substituting a less effective but cheaper method of contraception or by being forced to stop using contraceptives at all, due to financial reasons.

39.     Some of these women will face unintended pregnancy and other adverse medical consequences.

**C.** *The New Final Exemption Rules Are Not Based Upon Sound Scientific or Empirical Evidence*

40.     It is also my opinion that the new Final Exemption Rules are not based upon sound scientific or empirical evidence.

41.     The Final Exemption Rules indicate, among other things, that contraceptives are not effective in preventing unintended pregnancy.  This is false.

JA-0003425

42.     This claim in the Final Exemption Rules is inconsistent with the weight of scientific and empirical authority.

43.     Indeed, well-established research indicates that contraceptives are, in fact, effective preventing unintended pregnancy. To be sure, while various methods of contraception can be effective at preventing unintended pregnancy, some are more effective than others.

44.     Several other statements in the Final Exemption Rules are also not scientifically credible.

45.     The Final Exemption Rules state that some commenters criticized the 2011 IOM Report for citing studies that assert associative relationship between contraceptive use and decreases in unintended pregnancy, and not causal relationships.  Establishing a causal relationship would be unethical and unrealistic.  Studies of association have shown that women using specific contraceptive methods are less likely to become pregnant than women not using those methods. A causal relationship could only be established if a study were conducted where women were randomly assigned to receive a specific contraceptive method and compared with women who were randomly assigned to use no contraceptive method. Studies of association have provided the rationale for the knowledge that smoking causes lung cancer, HIV causes AIDS, and Pap smears reduce cervical cancer.

46.     The Final Exemption Rules acknowledge commenters who report that hormonal contraceptives cause depression, citing one large study from Denmark.  This report should not be evaluated in isolation, as other studies have found no consistent association between hormonal contraceptive use and depressive symptoms, while others have found hormonal contraception has reduced levels of depressive symptoms.  These studies are difficult to conduct, since women who are receiving hormonal contraception must be enrolled in health care services, where they are more

JA-0003426

likely to be screened and treated for depression.

47.    The Final Exemption Rules acknowledge commenters who report that hormonal contraceptives may increase the risk of certain health conditions, such as venous thromboembolic disease (VTE) (i.e., deep venous thrombosis and pulmonary embolism).  While it is true that the risk of VTE is increased with use of estrogen-containing hormonal contraception, pregnancy and the postpartum state increase VTE risk significantly more so.  Thus, preventing unintended pregnancy is a more effective way to reduce risk of VTE than avoiding hormonal contraception.

48.    Similarly, the Final Exemption Rules acknowledge commentators who expressed concern over the possible increased risk of certain cancers.  There is conflicting evidence as to whether long-term hormonal contraceptive use may increase the risk of breast cancer, however there is strong evidence that hormonal contraception reduces the risk of ovarian and uterine cancer, and some evidence that it reduces the risk of colorectal cancer.  The magnitude of the reductions in ovarian, uterine, and colorectal cancer greatly outweigh the potential increased risk in breast cancer.

JA-0003427

49.    For these reasons, I believe that an injunction of the Final Exemption Rules is necessary to prevent immediate and irreparable harm to women in Pennsylvania and around the Country, who will lose ongoing preventive care coverage under their group health plans due to the Final Exemption Rules.

I hereby affirm that the foregoing is true and correct based upon my knowledge, information and belief, and I make these statements subject to the penalty of perjury.

Date: 12/14/2018                    By: _____
                                         CYNTHIA H. CHUANG, M.D., MSc

JA-0003428

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF
PENNSYLVANIA,

                  Plaintiff,

    v.

DONALD J. TRUMP, *et al.*,

                 Defendants.

**No. 2:17-cv-04540-WB**

## DECLARATION OF SAMANTHA F. BUTTS, M.D., MSCE[1]

I, Samantha F. Butts, hereby submit this declaration in support of the Motion for Preliminary Injunction filed by the Commonwealth of Pennsylvania in the above-captioned matter and, in support thereof, I state as follows:

## I.    My Background and Experience

1.    I am a doctor, teacher, and clinical researcher in the area of women's reproductive health. Of the time I spend working, I spend approximately 15% on education and administration, 10%-15% on clinical research, and 70%-75% on patient care.

### A. *My Education, Licensure and Board Certifications*

2.    I earned a Bachelor of Arts degree, *cum laude*, from Harvard University, in 1994, and a Medical Degree from the Harvard University School of Medicine, in 1998.

3.    I completed both my residency in Obstetrics and Gynecology (1998-2002) and a Fellowship in Reproductive Endocrinology and Infertility (2002-2005) at the Hospital of the University of Pennsylvania.

4.    After that, I earned a Masters of Science in Epidemiology (MSCE) from the

---

[1] I attach a true and correct copy of my curriculum vitae hereto as Exhibit A.

University of Pennsylvania School of Medicine in 2006.

5.    I have been licensed to practice medicine in Pennsylvania since 2001.

6.    I have also been certified by the American Board of Obstetrics and Gynecology with a specialty in Obstetrics and Gynecology since 2006 and subspecialty in Reproductive Endocrinology & Infertility since 2009.

**B.** *My Teaching, Research and Additional Qualifications*

7.    I have held a faculty position at the University of Pennsylvania School of Medicine since 2005.

8.    I started as an Assistant Professor and, since 2014, I have served as an Associate Professor of Obstetrics and Gynecology, in the Division of Reproductive Endocrinology and Infertility (REI). From 2014-2016, I was honored to serve as the Ombudsman for the Students at the University of Pennsylvania School of Medicine, Perelman School of Medicine.

9.    As an AssociateProfessor of Obstetrics and Gynecology, I am actively involved in the clinical training of medical students, residents and fellows. I participate in didactic education programs and mentor resident-driven clinical research projects.

10.    I also developed the first comprehensive reproductive endocrinology and infertility curriculum for trainees at the Hospital of the University of Pennsylvania and supervise resident training in reproductive endocrinology and infertility. In 2011, my achievements in resident education were recognized with a National Faculty Teaching Award from the American College of Obstetricians and Gynecologists and the Council on Resident Education in Obstetrics and Gynecology.

11.    I also spend a meaningful amount of my time acting as a clinical researcher.

12.    In this capacity, I serve and have served as an investigator and principal

2

JA-0003430

investigator on a number of studies and projects regarding women's healthcare, many of which have been fully funded by grants. For example, I was one of the first people to receive a National Institute of Health training grant as part of the NIH's National Training Program in Reproduction (NIH T32 grant), and I was the inaugural recipient of the New Investigator Award from the Center of Excellence in Environmental Toxicology at the University of Pennsylvania.

13. I have published more than 100 scholarly articles, abstracts, research publications, reviews, book chapters, and committee reports related to women's reproductive healthcare. Among these, I have researched and written peer-reviewed articles about treating hormonal disorders, such as polycystic ovary syndrome, using contraceptives as a first-line medication. *See, e.g., Polycystic Ovary Syndrome: How Best to Manage?*, Consultant, 46:745-749, (2006) and *Abnormal Uterine Bleeding*, NMS Series for Independent Study: Obstetrics and Gynecology, Chap. 23, (6th. Ed. 2008).

14. I am often engaged to consult and collaborate with academic and private institutions. Recently, for example, as a member of the American College of Obstetricians and Gynecologists' Committee on Gynecologic Practice (ACOG Committee), I was asked to develop an opinion regarding treatment of Primary Ovarian Insufficiency. In connection with my work on this issue, the ACOG Committee published an opinion in May of 2017 recommending that contraceptives be considered among the options to provide as hormone replacement therapy to treat Primary Ovarian Insufficiency. *See* Opinion 698, *Hormone Therapy for Primary Ovarian Insufficiency*, Obstetrics and Gynecology, 129(5): 963-964 (May 2017).

15. In connection with my work, I have lectured throughout the country, by invitation, about reproductive health. For example, at the 2016 Women in Statistics Conference in Charlotte, North Carolina, I delivered a presentation called "Reproductive Decision Making

3

JA-0003431

and Your Career: Embracing Biology, Debunking Myths, and Gaining Control."

16.    I have also organized and moderated multiple scientific meetings throughout my career, including annual meetings of the American Society of Reproductive Medicine.

17.    I have held various professional appointments, as well. Among these, I have been a Member of the Center for Research on Reproduction and Women's Health since 2005; an Associate Scholar for the Center for Clinical Epidemiology and Biostatistics at the University of Pennsylvania since 2006; and a Member of the Center for Excellence in Environmental Toxicology, Endocrine Disruptors Core, since 2008.

18.    I also maintain memberships in a number of professional, academic, and scientific societies, both nationally and internationally, including the American Society for Reproductive Medicine (since 2002), the Society for Reproductive Endocrinology and Infertility (since 2002), the American College of Obstetricians and Gynecologists (since 1998) and the Endocrine Society (since 2012). I have received many professional accolades, awards, and honor society memberships throughout my career.

### C. *My Medical Practice*

19.    In addition to my academic work, I maintain an active medical practice and, in 2017, was listed as one of *Philadelphia Magazine*'s "Top Doctors".

20.    Since 2005, I have served as an Attending Physician in the Department of Obstetrics and Gynecology, and also in the Reproductive Surgical Facility at the Hospital of the University of Pennsylvania.

21.    Last year I saw and treated approximately 1,500 to 2,000 patients.

22.    Some of my patients travel thousands of miles for the specialty medical treatment I can provide at Penn Medicine.

JA-0003432

23.    But in many ways, my medical practice reflects the reality that the Hospital of the University of Pennsylvania is also the community hospital of West Philadelphia.

24.    In addition to specialty patients and residents of West Philadelphia, I also treat many members of the academic community at at the University of Pennsylvania.

25.    My clinical expertise includes reproductive endocrinology, with a focus on managing hormonal disorders such as polycystic ovary syndrome, primary ovarian insufficiency/premature ovarian failure, amenorrhea, dysmenorrhea/chronic pelvic pain, and abnormal uterine bleeding, as well as in infertility, in vitro fertilization, and reproductive surgery.

26.    Many of these medical conditions and disorders are common among women.

27.    As part of my practice, I regularly prescribe contraceptives for both contraceptive and non-contraceptive purposes.

## II.    Benefits of Contraceptive Use

### A. *Contraceptives Are Effective and Approved for Uses Other Than Preventing Pregnancy*

28.    Contraceptives are effective, and approved, to be used as medication for purposes other than preventing pregnancy.  Indeed, I regularly use all kinds of contraceptives for non-contraceptive uses, including for the treatment of life-threatening problems.

29.    For example, contraceptives are the standard first-line of care for a number of hormonal, and other, disorders, including poly-cystic ovarian syndrome, primary ovarian insufficiency/premature ovarian failure, amenorrhea, dysmenorrhea/chronic pelvic pain, and abnormal uterine bleeding.

30.    These conditions greatly impact the quality of life of the many women who suffer from them. In fact, about 10% percent of all women have irregular periods caused by poly-cystic

JA-0003433

ovarian syndrome or other hormonal disorders which can significantly harm well-being and quality of life. Extreme cases of heavy menstrual bleeding due to hormonal or anatomic problems of the uterus that I see and treat can at times be life-threatening.

31.    I frequently use contraceptives to treat these conditions in my own medical practice and, in fact, prescribe "birth control pills" more for these other purposes than to prevent pregnancy given the population of patients who make up my practice.

32.    Throughout my career, I have been required to perform non-operative blood transfusions for at least 50 women due to loss of blood caused by heavy periods and acute menstrual bleeding that can cause anemia.

33.    In 2009, the FDA approved use of the Mirena Inter-Uterine Device (IUD) to treat women with heavy bleeding and hemophilia. Among my patients who use the Mirena IUD, the vast majority (90%-95%) use it for purposes other than birth control.

34.    The hormonal and other disorders I treat inflict direct and indirect personal and financial costs upon the women who suffer from them; they prevent women from participating fully in the workplace and, more broadly in society.

35.    Contraceptives are a cost-effective and clinically proven way to treat these often debilitating disorders.

**B. *Contraceptives Are Effective in Preventing Unintended and Ill-Advised Pregnancies, and Their Use Causes Other Long-Term Health Benefits***

36.    Contraceptives also play an important role in preventing unintended pregnancy.

37.    For some women, this treatment is not optional – it is necessary to prevent serious illness and even death.

38.    There are multiple high risk conditions for which pregnancy is relative or absolutely contraindicated. These conditions include cardiac problems and history of stroke.

6

JA-0003434

39.    For survivors of breast cancer, pregnancy hormones can cause serious medical harm until the patient is well into remission.

40.    Contraceptives help patients avoid unintended pregnancies in such situations; they prevent medical harm and save lives.

41.    Contraceptives use also carries long-term health benefits for women.

42.    For instance, it has been shown that long-term users of the standard oral contraceptive pill (at least 5-10 years of usage) are 50-80% less likely to develop ovarian or uterine cancer.

## III.    My Opinion on the "Religious Exemption Rule" and "Moral Exemption Rule"

43.    I have reviewed both the "Religious Exemption Rule" and the "Moral Exemption Rule" (together, the "Rules"), as well as the Complaint filed by the Commonwealth of Pennsylvania in the above-captioned matter that challenges them.

44.    Based upon my knowledge, education, training and experience, it is my professional opinion that the Rules will cause immediate and irreversible harm because they will cause women to lose preventive contraceptive care under their employer group health plans.

### A. *Cost is a Barrier to Contraceptive Access*

45.    It is my understanding, and it has been my experience, that cost is a barrier to patient access to contraceptives.

46.    Prior to passage of the Affordable Care Act (the "Affordable Care Act" or "ACA"), before preventative contraceptive care was provided at no additional cost under the ACA's contraceptive mandate, I regularly counseled my patients about the cost related to their recommended contraceptive choices.

47.    I would estimate that, prior to the ACA, about 10-20% of the patients for whom I

7

had prescribed contraceptives would come back from the pharmacy without filling their prescriptions; they would, instead, request that I prescribe a less effective, but cheaper, method of contraception. Or they would forego use of contraception altogether.

48.     Such requests were most frequent when I had prescribed an IUD because, pre-ACA, IUDs were one of the most expensive forms of contraception for patients. But they are also a much more effective method of contraceptive care than are birth control pills.

49.     And, for therapeutic reasons, some patients cannot take estrogen birth control pills, at all.

50.     After the ACA passed and the contraceptive mandate was instituted, however, I saw that my patients were free to make contraceptive choices on the basis of their medical needs and concerns, alone, without the burden of having to weigh the cost of the preferred medical choice. Post-ACA, the only concern has been what is best for the patient.

51.     As a result, I have seen my patients making more medically informed contraceptive choices and have not had the experience of patients rejecting the contraceptives I prescribed due to their cost under private insurance plans.

C. *Because Patients Will Lose Contraceptive Coverage under the New Rules, They Will Make Less Medically Sound Contraceptive Choices and, Therefore, Will Be Harmed*

52.     It is apparent, however, that under the new Rules this post-ACA focus on what is best for the patient will change.

53.     This is so because, as a result of the Rules, some women will lose insurance coverage for preventative contraceptive care.

54.     As a result, their cost for contraceptive care will rise.

55.     Based upon my own experience and existing scientific and empirical information that I have reviewed and am aware of, under the new Rules, cost will, again, become a barrier to

8

JA-0003436

women's access to and use of the contraceptive that is medically recommended for them.

56.    Many of these women who will no longer receive contraceptive coverage will not only face financial harm, but will also face medical harm.

57.    This harm will manifest itself in the disruption of these patients' medical treatment, whether by substituting a less effective but cheaper method of contraception or by being forced to stop using contraceptives at all, due to financial reasons.

58.    Some of these women will face unintended pregnancy and other adverse medical consequences.

### D. *The New Rules Are Not Based Upon Sound Scientific or Empirical Evidence*

59.    It is also my opinion that the new Rules are not based upon sound scientific or empirical evidence.

60.    The Rules indicate, among other things, that contraceptives are not effective in preventing unintended pregnancy, that they are harmful to women's health, and that they promote promiscuity. This is false.

61.    These representations conflict with peer-reviewed and medically-accepted data, and are not credible.

62.    For these reasons, I believe that an injunction of the Rules is necessary to prevent immediate and irreparable harm to women in Pennsylvania and around the Country, who will otherwise lose ongoing preventive care coverage under their group health plans due to the Rules.

I hereby affirm that the foregoing is true and correct based upon my knowledge, information and belief, and I make these statements subject to the penalty of perjury.

Date: ___10\25\17___           By: _____

SAMANTHA F. BUTTS, M.D., MSCE

9

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA,<br><br>                    Plaintiff,<br><br>       v.<br><br>DONALD J. TRUMP *et al.*<br><br>                    Defendants. | NO. 2:17-cv-04540-WB |

### DECLARATION OF LEESA ALLEN

I, Leesa Allen, hereby submit this declaration in support of the Motion for Preliminary Injunction filed by the Commonwealth of Pennsylvania in the above-captioned matter and, in support thereof, I state as follows:

**I.     Background**

1.     I serve as the Acting Executive Deputy Secretary for the Pennsylvania Department of Human Services ("DHS" or "the Department"). Before assuming my current position, I was the Deputy Secretary for Medical Assistance Programs at DHS. I have worked for the Department of Public Welfare, now DHS, since 1993, serving in various roles within the Office of Medical Assistance Programs since 2000. I was most recently the Deputy Secretary for Medical Assistance Programs, the Executive Medicaid Director, Chief of Staff, and Director of the Bureau of Policy. In my current role, I oversee all of the Department's operations and report directly to the Acting Secretary of DHS, who serves as a member of the Governor's cabinet.

2.     DHS is responsible for administering a variety of services and benefits to residents of Pennsylvania, including health care services, support for individuals with

disabilities, child support enforcement, treatment for substance use disorder, and services for children and families.

**II.    Pennsylvania's Medical Assistance Program**

3.      DHS's Office of Medical Assistance Programs has primary responsibility for overseeing Commonwealth programs that offer health benefits to Pennsylvania residents. Those programs include the Medicaid program, known as Medical Assistance in Pennsylvania. In my prior role as Deputy Secretary for Medical Assistance Programs, I oversaw the Office of Medical Assistance Programs.

4.      Medicaid is a program jointly funded by the states and the federal government that makes health care available to low-income individuals and families. States have responsibility for administering Medicaid, but are subject to federal oversight.

5.      Medicaid is funded according to a formula under which the federal government contributes a specific amount for every dollar spent by Pennsylvania. If additional Pennsylvanians enroll in the Medical Assistance program, the federal and state government will both spend more on the program, thereby shifting costs from the private to the public sector.

6.      As of August 2017, there were 2,869,246 Pennsylvanians enrolled in the Medical Assistance program. For the period April 1, 2016, through March 31, 2017, a total of $28.8 billion in state and federal funding was spent on Medical Assistance. Of that amount, $11.2 billion was provided by the Commonwealth, and the remainder was provided by the federal government.

7.      Eligibility for Medical Assistance is based primarily on income level. The Affordable Care Act expanded Medicaid eligibility so that individuals and families with incomes up to 138% of the federal poverty limit would generally be eligible for the program. However, in

2

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), the Supreme

Court ruled that states could not be required to expand Medicaid under the ACA, and therefore

the expansion was rendered optional.

8.      Governor Tom Wolf elected to expand the Medical Assistance program in 2015,

so that individuals and families in Pennsylvania with incomes up to 138% of the federal poverty

limit are eligible for the program. Over 700,000 Pennsylvanians have enrolled in the Medical

Assistance program as a result of the expansion.

9.      For women who are pregnant, Medical Assistance eligibility requirements are

different. Pregnant women are eligible if they have incomes at or below 215% of the federal

poverty limit. In 2017, 215% of the federal poverty limit is $25,929 for an individual and

$52,890 for a family of 4.

10.      Medical Assistance provides beneficiaries with a variety of contraception options.

In November 2016, DHS announced that it was making changes to its payment policies to

hospitals to encourage the use of long-acting reversible contraception (LARC), which includes

intrauterine devices and birth control implants.

11.      Although LARCs are more effective than other methods of contraception and

save money in the long run, they can have high upfront costs. By changing its fee-for-service

payment policies for hospital providers for these costs, DHS has made it easier for women to use

LARCs.

12.      Over half of all unplanned pregnancies occur within two years of delivery of a

child. For this reason, the Commonwealth encourages the use of LARCs as post-partum

contraception to reduce the rate of such unplanned pregnancies.

3

13. In addition, Medical Assistance offers specific benefits for eligible pregnant women Those benefits include full scope medical benefits, as well as other benefits including proper prenatal care and early detection and treatment of health problems.

### III. Pennsylvania's Family Planning Services Program

14. DHS also administers Pennsylvania's Family Planning Services program. The Family Planning Services program provides family planning benefits to individuals who are not eligible for full Medical Assistance benefits but satisfy other conditions. The Family Planning Services program receives federal and state Medicaid funds.

15. The Family Planning Services program was launched in 2008 as the SelectPlan for Women. Originally, it operated pursuant to a "Section 1115 waiver" granted by the U.S. Secretary of Health and Human Services. Section 1115 waivers free states from certain requirements of the Medicaid program so they can implement demonstration projects using federal and state Medicaid funds. Section 1115 waivers must be renewed every 5 years.

16. In 2015, the SelectPlan for Women Program authorized under the Section 1115 Waiver was transitioned to the Family Planning Services program authorized under the Medicaid State Plan. Under a provision of the ACA, states were provided the option to provide family planning and family planning-related services to individuals with incomes at or below 215% of the federal poverty limit who would not otherwise be eligible for Medicaid. With the transition, the program began to provide family planning and family planning-related services to men as well. As a result of this new authority, the Commonwealth no longer needs to seek a waiver from the Department of Health and Human Services every five years.

JA-0003441

17.    The Family Planning Services program is open to individuals and families with incomes at or below 215% of the federal poverty limit.  Pregnant women (who would be eligible for Medical Assistance) are not eligible.

18.    In August 2017, 17,333 individuals were enrolled in the Family Planning Services program.

19.    Women and men who are employed and who receive health insurance through their employer may participate in Family Planning Services, provided they satisfy the eligibility criteria, and many beneficiaries of the program are employed. However, individuals who receive coverage for family planning services through their employer or from another source are not eligible for the program. Therefore, those participants in Family Planning Services who are employed either do not receive health coverage from their employers or receive coverage that does not include family planning services.

20.    Because the Family Planning Services program is funded under Medicaid, total spending on the program depends on enrollment. If more individuals participate in the program, federal and state spending increase.

21.    The Family Planning Services program provides contraceptive benefits, including coverage for birth control pills and LARCs.  The program also provides a variety of other benefits, including pregnancy counseling, HIV and STD testing and treatment, and male and female sterilization.

22.    These services are provided to beneficiaries without copays, deductibles, or other cost-sharing arrangements.

23.    It is not unreasonable to expect that women who do not receive contraceptive care from their employers or private insurance will turn to government-funded programs,

5

such as Medical Assistance, to the extent they are eligible for these programs. Therefore, some eligible women who require contraceptive care but who work for employers that choose to opt out under the new exemption rules will likely seek out other coverage options, including the Commonwealth-funded programs discussed above.

## IV.    The Administration's Executive Orders

24.    I am generally familiar with the Affordable Care Act's Contraceptive Care Mandate, which requires non-grandfathered group health plans and health insurance issuers offering group or individual health insurance coverage to provide coverage for FDA-approved methods of contraception without imposing cost-sharing requirements.

25.    I understand that the Administration issued two rules on October 6, 2017, that expanded the exemptions from the Contraceptive Care Mandate. Under these rules, covered entities may opt out of complying with the mandate on the basis of a sincerely held moral or religious conviction.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

*Leesa M. Allen*

Dated: October 27 , 2017

6

JA-0003443

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,
and STATE OF NEW JERSEY

        Plaintiffs,

    v.

DONALD J. TRUMP, *et al.*

        Defendants.

**Civil Action No:**
**2:17-cv-04540-WB**

## DECLARATION OF SARAH ADELMAN

I, Sarah Adelman, declare and state as follows:

1.    I serve as Deputy Commissioner of the New Jersey Department of Human Services. In this capacity I oversee the Division of Medical Assistance and Health Services ("DMAHS").

2.    DMAHS administers New Jersey's $17 billion state- and federally- funded Medicaid and Children's Health Insurance Programs (collectively referred to as "NJ FamilyCare") that provide health coverage for certain low to moderate income residents. Through its programs, DMAHS serves more than 1.7 million people in New Jersey.

3.    NJ FamilyCare provides comprehensive medical coverage and family planning services to its beneficiaries.

4.    New Jersey also has Title X family planning clinics within the state that are not affiliated with DMAHS.

JA-0003444

5.      Medicaid is a program jointly funded by the states and the federal government that makes health care available to low-income individuals and families. States have responsibility for administering Medicaid, but are subject to federal oversight.

6.      Medicaid is funded according to a formula under which the federal government contributes a specific amount for every dollar spent by New Jersey. If additional New Jerseyans enroll in the Medical Assistance program, the federal and state government will both spend more on the program, thereby shifting costs from the private to the public sector.

7.      As of October 2018, there were 1,747,375 NJ FamilyCare beneficiaries in New Jersey. For State fiscal year 2018, a total of approximately $16,267,000,000 in state and federal funding was spent on NJ FamilyCare. Of that amount, roughly $9,843,000,000 was provided by the federal government, and $6,424,000,000 was provided by New Jersey.

8.      For fiscal year 2018, DMAHS's estimated cost to provide contraceptive and family planning coverage through NJ FamilyCare was approximately $15 million, with the federal government covering 90% of that cost.

9.      Eligibility for NJ FamilyCare is based primarily on income level. The Affordable Care Act expanded Medicaid eligibility so that individuals and families with incomes up to 138% of the federal poverty level would generally be eligible for the program. However, in National Federation of Independent Business v. Sebelius, 567 U.S. 519 (2012), the Supreme Court ruled that states could not be required to expand Medicaid under the Affordable Care Act, and therefore the expansion was rendered optional.

10.     New Jersey elected to expand Medicaid in January 2014, so that single adults, childless couples, parents, and caretakers with incomes up to 138% of the federal poverty limit

JA-0003445

are eligible for the program. Over 500,000 of these individuals have enrolled in NJ FamilyCare since its expansion.

11.    For women who are pregnant, NJ FamilyCare has expanded income-based eligibility so that pregnant women are eligible if they have incomes at or below 205% of the federal poverty level. At present, 205% of the federal poverty level is $4,302 per month for a family of four.

12.    DMAHS is planning the 2019 rollout of a family planning benefit program called Plan First for individuals with income ranging from 133% to 205% of the federal poverty level.

13.    DMAHS projects that there will be 10,000 to 12,000 Plan First participants in the first year of the program, and between 31,000 to 55,000 participants by the fifth program year.

14.    DMAHS designed the Plan First program to allow pregnant women to transition seamlessly into the Plan First program after the 60-day postpartum period and to allow Plan First beneficiaries who become pregnant to easily transition to a DMAHS program ensuring early prenatal treatment. The eligibility standards for Plan First will mirror the current NJ FamilyCare requirements for pregnant women.

15.    NJ FamilyCare provides beneficiaries with a variety of contraception options, and there is no co-pay for family planning preventive services.

16.    Among those options is long-acting reversible contraception ("LARC"), which includes intrauterine devices and birth control implants. While NJ FamilyCare has always covered LARC devices in an outpatient setting or as part of a bundled inpatient payment, it began to allow providers to bill separately for devices and insertion in the immediate postpartum period (defined as within 10 minutes after delivery of the placenta) in July 2018. In addition, the Plan First program will provide for access to LARCs for additional individuals in 2019.

JA-0003446

17.     New Jersey recognizes the importance of allowing members who wish to utilize LARC devices to have free and open access to them to reduce the rate of unplanned pregnancies. Although LARCs can have high upfront costs, they are not associated with compliance issues that can cause failures with other comparable methods of birth control, and as such are more effective than most other methods of contraception and would likely result in better outcomes and better long-term savings to the State when compared to other contraceptive methods.

18.     LARCs facilitate optimal "birth spacing," defined as a minimum 18 month interval between pregnancies. Without birth spacing, babies are more likely to be premature, of low birthweight, small for their gestational age, and, consequently, more likely to face long-term health problems and higher mortality rates. In 2017, the prematurity rate in New Jersey was one in eleven babies.[1]

19.     DMAHS anticipates that some women, particularly low-income women, who lose contraceptive coverage through their employer's plans may seek contraceptive coverage from other sources, such as NJ FamilyCare, Plan First, and Title X. This will result in additional costs to New Jersey, which will be forced to absorb additional costs presently borne by private insurers.

20.     Other women who lose their contraceptive benefits may forego contraceptive use entirely, which would result in increased numbers of unintended pregnancies and a dramatic increase in costs to State-funded programs designed to ensure the health of women and infants.

21.     The loss of employer-sponsored health insurance coverage for contraception can be expected to disproportionately impact New Jersey's women of color. In 2015, 28% of New

---

[1]  March of Dimes, *A Profile of Prematurity in New Jersey, available at* https://www.marchofdimes.org/peristats/tools/prematurityprofile.aspx?reg=34.

Jersey pregnancies were unplanned, including 53.1% among non-Hispanic black women and 31.8% among Hispanic women.[2]

22.    I am generally familiar with the Affordable Care Act's Contraceptive Care Mandate, which requires non-grandfathered group health plans and health insurance issuers offering group or individual health insurance coverage to provide coverage for FDA-approved methods of contraception without imposing cost-sharing requirements.

23.    I understand that the Administration has issued rules that expanded the exemptions from the Contraceptive Care Mandate. Under these rules, covered entities may opt out of complying with the mandate on the basis of a sincerely held moral or religious conviction.

24.    The expanded exemptions are expected to result in greater financial expenditures by both the State of New Jersey and women in New Jersey on contraceptive coverage and on healthcare generally for women and infants.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Sarah Adelman

Dated: 12|7|18

---

[2] The Centers for Disease Control and Prevention and New Jersey Department of Health, *Pregnancy Risk Assessment Monitoring Report on Pregnancy Intention 2012-2015*, *available at* https://www.nj.gov/health/fhs/maternalchild/documents/NJ%20Pregnancy%20Intention%20Topic%20Report%202012-2015.pdf.

# PUBLIC SUBMISSION

**As of:** November 03, 2017
**Received:** September 20, 2016
**Status:** Posted
**Posted:** October 26, 2016
**Tracking No.** 1k0-8s0q-ymha
**Comments Due:** September 20, 2016
**Submission Type:** Web

**Docket:** CMS-2016-0123
Coverage for Contraceptive Services CMS-9931-NC

**Comment On:** CMS-2016-0123-0001
Requests for Information: Coverage for Contraceptive Services

**Document:** CMS-2016-0123-54186
IL

---

## Submitter Information

**Name:** Luke Vander Bleek
**Address:**
   Morrison,  IL,  61270
**Email:** lukevb@fitzgeraldpharmacy.com
**Organization:** NA

---

## General Comment

See attached file(s)

---

## Attachments

Sample drug coupon

Alternative Ways Women Might Access Contraceptives

JA-0003449

# Discount Drug Coupon

ENVISIONRx

**Your Prescription:**

## atorvastatin 20mg
30 tablets

Discounted price with this coupon:

$**10.63**   If your prescription is for 30 tablets to be taken over **30 to 84 days**.

$**10.63**   If your prescription is for 30 tablets to be taken over **84+ days**.

This is your estimated price at **Kroger Pharmacy**; he pharmacy will provide the exact pricing.

Questions? Call **1-844-852-7434**

**Pharmacist Info:**

Member ID
**1RX471245**

RxGroup
**RXG1**

RxBin
**009893**

RxPCN
**DCAE1**

Pharmacists call: **1-844-852-7434**

---

## Print this free coupon and hand it to your pharmacist.

### Frequently Asked Questions

**What if my pharmacy cannot process this coupon?**
If your pharmacy is unable or unwilling to process your coupon, please call 1-844-852-7434. Most issues can be resolved quickly.

**Can I use the coupon with my health insurance?**
This coupon price may be lower than your health insurance co-pay, but it cannot be used to lower your co-pay. Ask your pharmacist to help you find the best possible price.

**What do I do if the coupon price is wrong?**
While GoodRx prices are generally very accurate, prices can change. Please report any issues to info@goodrx.com so we can help. The final price is determined by your local pharmacy.

### Remember...this coupon:

- Will work at other pharmacies (price may vary).
- Can be used for all of your family's prescriptions.
- Has no fees or obligations. It's free to use.

**For the Pharmacist**

This coupon displays a contracted rate based on agreements between your pharmacy or purchasing group and a Pharmacy Benefit Manager (PBM).

Please use the above BIN, PCN and Group number to adjudicate.

Questions? Please call 1-844-852-7434.

---

**This coupon was printed on 08/31/16. Please note that all prices are subject to change over time.**
**For up-to-date prices and coupons, check www.goodrx.com or download the GoodRx iPhone or Android app.**

**Questions? We're here to help - email us at info@goodrx.com**
THIS CARD IS NOT INSURANCE. IT CANNOT BE USED IN CONJUNCTION WITH ANY FEDERAL OR STATE FUNDED PROGRAM, SUCH AS MEDICARE OR MEDICAID.

JA-0003450

Centers for Medicare & Medicaid Services
Department of Health and Human Resources
Room 445-G, Hubert H. Humphrey Building
200 Independence Avenue SW
Washington, DC 20201

      Re:    CMS – 9931 – NC:  Request for Information

Dear Sir or Madam:

I am writing in response to the government's "request for information" or "RFI" concerning alternative ways to provide women with "seamless" access to contraceptives in ways that do not make use of an objecting religious employer's health plan.

By way of background, I am a pharmacist with over three decades of experience serving patients. I am also the owner and operator of a community pharmacy. From 2006 to 2007, I served as President and subsequently as Chairman of the Board of the Illinois Pharmacists Association.

The community pharmacist's role in providing healthcare provides some valuable insights about ways in which the government can provide seamless access to contraceptives separate from an employer-provided plan.  Therefore, in an effort to assist the government in fulfilling the Supreme Court's direction to find alternative ways women might obtain contraceptives, I am writing to offer the following brief comments.

1. Women seeking to use an insurance policy to pay for prescription contraceptives in nearly all cases must obtain a prescription from a licensed prescriber and have it filled at a pharmacy.  As such, and by law, nearly everyone obtaining prescription contraceptives will interact with a pharmacy to get them.

2. That is a good thing.  Pharmacies and pharmacists help patients every day by ensuring that they receive the correct medications, understand the safe and proper use of medications, avoid contra-indications that could be dangerous to the patient's health, and to facilitate patients' use of their insurance, other benefits cards, and coupons to obtain the best price for their medications.

3. According to the Kaiser Family Foundation, in 2015 alone, patients entrusted community retail pharmacies in the United States to fill and assist in billing more than four billion prescriptions.  Because of that experience, pharmacists have an intricate knowledge of the various plans, cards, and systems used to pay for prescription drugs.

4. For example, pharmacists regularly process coupons such as the attached to obtain free or reduced price medications for patients.  These coupons have become increasingly common in recent years and work by using the networks constructed by large pharmacy benefit managers or "PBMs." Because they use the same systems used for processing insurance claims, these coupons typically include information virtually identical to an insurance card, including a member ID, group number, bank identification number, and processor control number.  Pharmacists routinely enter this type of information in order to process insurance claims for prescription drugs.  Pharmacists often get this information

from a coupon provided by the patient, from a patient's insurance card, or even by looking on the internet for coupon offers that would help a particular patient.

5. One simple way to provide seamless contraceptive coverage separate from an employer's plan would be to provide women with coupons that would entitle them to free birth control. The coupons could be made available in doctor's offices, on the internet, in magazines, etc., and would allow the bearer to have the prescription filled free of charge.

6. Alternatively, rather than requiring a patient to have a coupon, pharmacies could easily be alerted to the coupon codes and informed that, if a patient's insurance does not completely cover the costs of contraceptives, to enter the coupon code instead. From the patient's point of view, this transaction would be entirely seamless.

7. This could be as simple as having PBM companies—which would process any claim that would be rejected by an insurer—respond to the pharmacy by including information that would allow for payment. Thus, instead of simply sending a claim response message that reads **"claim rejected: drug not covered by plan,"** the PBM could also send **"For coverage resubmit using i.d.,# 111111111, BIN # 0123465, PCN : BCPILL, and group number: 42057830."**

8. Making use of the transaction with the PBM—which anyone receiving coverage through an insurer would need to conduct anyway--would ensure that anyone whose insurance plan rejected a claim for contraceptives would be able to receive them. This approach would have the added benefit of addressing not only the situation of a religious objector but also the tens of millions of people who do not have contraceptive coverage for other reasons (for example, if they are on a grandfathered plan that excludes coverage).

9. The government could likely partner with a pharmacy benefits manager or "PBM" company to work on such a system. PBMs, having extensive experience processing payments for prescription drugs, would likely be eager to work with the government in this respect. Furthermore, a PBM company may charge little or nothing at all for its services, since PBM companies typically receive significant value by monetizing the data that is received in processing the payments.

10. To eliminate the need for coupons or coupon codes for subsequent transactions, the government program could simply use the information received from the original coupon transaction, which generally contains patient specific information including the patient's full name, address, date of birth and gender, to enroll each woman in a "contraceptive-only plan" going forward. A personalized "contraceptive only" insurance card could be mailed discretely to the patient's home for use at any participating pharmacy.

11. Using coupons, or coupon codes, or contraceptive-only plans would allow women to obtain free contraceptives separate from their employer's plan. Separate coverage would not interfere with seamless access. In fact, by utilizing processes created by federal and state governments and health insurance companies referred to a coordination of benefits "COB", pharmacists regularly facilitate billing transactions involving multiple insurance plans. Millions of patients have more than one plan—including health, dental, vision, prescription drug, supplemental, and sometimes government plans. Likewise, many patients have both insurance plans and a flex-spending card, and patients regularly use both when obtaining prescription medications. Pharmacies are accustomed to dealing

with this situation and would certainly be able to assist patients in using a particular plan designed to cover contraceptives.

12. For women who work for religious employers opposed to contraception, an additional benefit of using an alternative payment source is that alternative sources would have nothing at all to do with a woman's employer or the employer's health insurance plan. This would give an added measure of privacy and comfort to women who work for a religious employer but who do not share the employer's religious beliefs about contraception.

13. Just today as I administered influenza vaccines I noted how fast, efficient and seamless the experience is for our Medicare patients as our staff quickly processed prescription and billing claims with little more required of our patients than their dates of birth and Medicare numbers. None of these patients used employer insurance plans to pay for their care. Perhaps there is no need to examine any system other than that used by Medicare to facilitate community pharmacy-provided influenza vaccination services to find how simply the federal government can provide medication services to a specific patient population.

In short, because virtually every sale of prescription contraceptives necessarily involves a willing doctor and a willing pharmacy, there is no reason to drag an unwilling employer into the transaction. Rather, pharmacies are quite capable of filling prescriptions for contraceptives seamlessly without using an employer's plan. Pharmacists assist patients in using multiple plans, multiple cards, coupons, coupon codes and government reimbursement programs every day across the country. They would be well situated to assist the government in achieving its goals of expanding access to contraceptives separate from an employer-provided health plan.



Samuel Lee
Director

*Submitted electronically via regulations.gov*

September 20, 2016

Secretary Sylvia M. Burwell                    Secretary Thomas E. Perez
U.S. Department of Health & Human              U.S. Department of Labor
Services                                        200 Constitution Ave., NW
200 Independence Ave., SW                       Washington D.C.  20210
Washington, D.C.  20201

Secretary Jacob J. Lew
U.S. Department of the Treasury
1500 Pennsylvania Ave., NW
Washington, D.C.  20220

Dear Secretaries Burwell, Perez and Lew,

Thank you for the opportunity to respond to your Request for Information (code CMS-9931-NC) regarding contraceptive coverage in health insurance plans that also respects the conscience rights of those who do not wish to provide it for their employees.

I submit to you and other interested parties the experience in Missouri, where 15 years ago a compromise was struck on a fair and comprehensive contraceptive mandate law.

In 2001, the Missouri General Assembly enacted, and Governor Bob Holden signed into law, a measure which requires most health insurance companies to provide contraceptive coverage as part of health benefit plans – while also protecting the conscience rights of those who don't want to pay for or provide contraceptive coverage.

I have first-hand knowledge of this legislation, both as a pro-life lobbyist at the time (and currently) at the Missouri State Capitol, as well as having personally benefitted by being able to purchase health insurance coverage that excludes contraceptive coverage.

The law came after much debate, discussion and give-and-take by both pro-life and pro-choice sides. The proposal had broad bipartisan support at a time when the Missouri House of Representatives was controlled by Democrats and the Missouri Senate by Republicans.  The measure was part of a bill that

Campaign Life Missouri • P.O. Box 142585 • St. Louis, MO 63114-0585 • 314-368-4242

JA-0003454

was a priority for Democratic Governor Bob Holden.  It passed almost unanimously in both legislative bodies.

Section 376.1199[1] was the result of this compromise, and it passed in virtually identical form in two bills: HB 762[2] & SB 266[3].

Among other women's health benefits required to be provided in section 376.1199 (i.e., direct access to an OB/GYN, annual cancer screenings, treatment for osteoporosis), the law requires that effective January 1, 2002:

1. Health carriers issuing health benefit plans (defined in section 376.1350[4]) that provide pharmaceutical coverage shall include coverage for prescription contraceptives at no charge or at the same level of deductible, coinsurance or co-payment as any other covered drug;
2. Contraceptives are defined as those approved by the FDA for use as a contraceptive, while excluding drugs and devices that are intended to induce an abortion (defined in section 188.015[5]).  No health carrier shall be required to pay for, reimburse, provide any resources for, refer a patient for, etc., an abortion, except to save the life of the mother;
3. Health carriers shall offer and issue health benefit plans to a person or entity which excludes coverage for contraceptives if the use or provision of contraceptives is contrary to the moral, ethical or religious beliefs or tenets of the person or entity;
4. Health carriers owned, operated or controlled in substantial part by an entity that is operated pursuant to moral, ethical or religious tenets that are contrary to the use or provision of contraceptives are exempt from the insurance requirement for contraceptive coverage;
5. Prescription contraceptive drugs or devices ordered by a health care provider for reasons other than contraceptive or abortion purposes shall not be excluded from coverage;
6. Except for health carriers that are exempt from providing contraceptive coverage (those operated pursuant to moral, ethical or religious tenets opposed to contraception; those that provide certain supplemental insurance policies, accident-only policies, short-term policies, etc.), a health carrier shall allow enrollees in a health benefit plan that excludes coverage for contraceptives to purchase a health benefit plan that includes coverage for contraceptives.  As discussed below, health carriers as a matter of practice have not charged enrollees for this add-on contraceptive benefit;
7. Health benefit plans shall provide clear and conspicuous written notice:
   a. Whether coverage for contraceptives is or is not included;
   b. That an enrollee in a group health plan with coverage for contraceptives has the right to exclude coverage for contraceptives;

---

[1] Section 376.1199, RSMo, http://www.moga.mo.gov/mostatutes/stathtml/37600011991.html (last visited September 19, 2016).  Click on the year "2001" at the bottom of the web page to bring up the version as enacted in 2001.
[2] Missouri House of Representatives website, HB 762 in 2001, http://house.mo.gov/content.aspx?info=/bills01/bills01/HB762.htm (last visited September 19, 2016).
[3] Missouri Senate website, SB 266 in 2001, http://www.senate.mo.gov/01INFO/bills/SB266.htm (last visited September 19, 2016).
[4] Section 376.1350, RSMo, http://www.moga.mo.gov/mostatutes/stathtml/37600013501.html (last visited September 19, 2016).
[5] Section 188.015, RSMo, http://www.moga.mo.gov/mostatutes/stathtml/18800000151.html (last visited September 19, 2016).

568144
JA-0003455

    c.  That an enrollee in a group health plan without coverage for contraceptives has the right to purchase coverage for contraceptives;

8.  Health carriers shall not disclose to the person who or entity which purchased the health benefit plan the names of enrollees who either exclude or include coverage for contraceptives;

9.  Health carriers and the person who or entity which purchased the health benefit plan shall not discriminate against an enrollee who either excluded or included coverage for contraceptives.

HB 762 passed 150-0 in the House and 30-2 in the Senate. Governor Bob Holden signed the bill into law on June 21, 2001.[6] SB 266 passed 29-2 in the Senate[7] and 154-0 in the House[8]. The governor signed that bill into law on July 12, 2001[9].

Although section 376.1199 was enacted in two separate bills, the original and main vehicle was in HB 762, which was sponsored by Democratic House Speaker Jim Kreider[10], but handled by Democratic Rep. Joan Barry[11] in the House and Republican Sen. Betty Sims[12] in the Senate.

News reports at the time accurately recounted that:

> Sen. Betty Sims, R-Ladue, and Rep. Joan Barry, D-Oakville, celebrated Friday afternoon over passage of the women's health initiative, another top priority of Holden's. It was one of the few major bills that Republicans and Democrats could agree upon. … The measure also says that if an HMO has pharmaceutical coverage, it also must cover contraceptives. That part of the bill progressed only after abortion rights groups, anti-abortion organizations and insurance companies worked out a compromise in Barry's office earlier in the session. The coverage does not include abortion-inducing drugs. People with moral or ethical concerns may opt out of the contraception coverage. ("Lawmakers leave without action on many issues," *St. Louis Post-Dispatch*, May 19, 2001, page 12[13])

The passage of this contraceptive mandate law with robust conscience protection was hailed in a *St. Louis Post-Dispatch* editorial as "no small triumph this year when abortion opponents and abortion rights supporters compromised on an important women's health bill …":

---

[6] Missouri House of Representatives Activity History for HB 762, http://house.mo.gov/content.aspx?info=/bills01/action01/aHB762.htm (last visited September 19, 2016).
[7] Journal of the Senate for Friday, May 18, 2001, page 1748, http://www.senate.mo.gov/01info/pdf-jrnl/Day76.pdf#page=8 (last visited September 19, 2016).
[8] Journal of the House for Friday, May 18, 2001, pages 2545-47, http://www.house.mo.gov/billtracking/bills01/jrn01/jrn077.pdf#page=80 (last visited September 19, 2016).
[9] Missouri Senate website, SB 266 in 2001, http://www.senate.mo.gov/01info/actions/SB266a.htm (last visited September 19, 2016).
[10] Speaker of the Missouri House Jim Kreider, 2001, http://house.mo.gov/content.aspx?info=/bills01/member01/mem142.htm (last visited September 19, 2016).
[11] Representative Joan Barry, 2001, http://house.mo.gov/content.aspx?info=/bills01/member01/mem100.htm (last visited September 19, 2016).
[12] Senator Betty Sims, 2001, http://www.senate.mo.gov/01info/members/mem24.htm (last visited September 19, 2016).
[13] "Lawmakers leave without action on many issues," *St. Louis Post-Dispatch*, May 19, 2001, page 12, https://www.newspapers.com/clip/6697562/st_louis_postdispatch/ (last visited September 19, 2016).

568145

JA-0003456

… The controversial part of the bill requires insurers that provide prescription drug benefits to also cover contraceptives.  Abortion opponents were able to accept this provision once the word contraceptive was defined to exclude the abortion pill, RU-486.  Abortion rights supporters made a concession to the other side by agreeing to an exemption that allows those who object to contraceptives on religious or ethical beliefs to opt out. … Lobbyists for Planned Parenthood, the Missouri Catholic Conference and Campaign Life Missouri say they kept focused on their common goal – better health care for women. ("Abortion: Finding common ground," Editorial: *St. Louis Post-Dispatch*, June 20, 2001, page 20[14])

The health insurance lobby joined pro-life and pro-choice groups, Republicans and Democrats, in supporting the measure:

[S]upporters say the law is taking effect only because of successful behind-the-scenes negotiations that anti-abortion activist Sam Lee calls "unique." … The Missouri Association of Health Plans, which represents 15 managed-care insurers, backs the bill.  So does the Missouri Catholic Conference, Lee's Campaign Life Missouri and Planned Parenthood – three groups that generally are together only in court. ("'Unique' detente in abortion war produced women's health care bill," *St. Louis Post-Dispatch*, June 17, 2001, page C2[15])

Prior to the bill's signing, Planned Parenthood encouraged the governor to sign it into law:

"The Missouri General Assembly just passed a law that the governor proposed as part of a women's health commitment that would require insurance companies to include federally approved contraceptives for women in their health plans," [Erika] Fox[, vice president of public policy for the Kansas City chapter of Planned Parenthood] said.  "We hope that the governor will sign it, and it will come into effect July 1." ("Missouri could require employers to cover contraceptives," *The Maneater* (University of Missouri – Columbia, Mo., student newspaper), June 20, 2001[16])

And during the bill signing with Gov. Holden, Planned Parenthood and other women's health advocates praised the passage of the law:

"We're thrilled about the impact this is going to have to improve the lives of women," Paula Gianino of Planned Parenthood of the St. Louis Region, whose group fought for the legislation for the last three years. ("Women's health care law is praised at signing by Holden," *St. Louis Post-Dispatch*, June 22, 2001, page A12[17])

[14] "Abortion: Finding common ground," Editorial: *St. Louis Post-Dispatch*, June 20, 2001, page 20 https://stltoday.newspapers.com/clip/6706104/abortion_finding_common_ground/ (last visited September 20, 2016).
[15] "'Unique' detente in abortion war produced women's health care bill," *St. Louis Post-Dispatch*, June 17, 2001, page C2, https://stltoday.newspapers.com/clip/6697457/st_louis_postdispatch/ (last visited September 20, 2016).
[16] "Missouri could require employers to cover contraceptives," *The Maneater* (University of Missouri – Columbia, Mo., student newspaper), June 20, 2001 http://www.themaneater.com/stories/2001/6/20/missouri-could-require-employers-cover-contracepti/ (last visited September 20, 2016).
[17] "Women's health care law is praised at signing by Holden," *St. Louis Post-Dispatch*, June 22, 2001, pages A1, A12, https://stltoday.newspapers.com/clip/6697043/st_louis_postdispatch/ and https://stltoday.newspapers.com/clip/6697157/st_louis_postdispatch/ (last visited September 20, 2016).

568146

JA-0003457

Later in 2001, the Guttmacher Institute, in its state legislative roundup, described the new law as "progress" for "reproductive health advocates":

> For their part, reproductive health advocates have continued to make progress in requiring insurance coverage of contraceptives, with three states approving new mandates for a total of 16 (see chart).  Missouri, New Mexico and Texas enacted laws … All three new laws include some type of exemption: Missouri's, a painstaking compromise, is the broadest, applying to employers, insurers and individual enrollees and allowing for moral and ethical objections, in addition to religious ones.  However, it also allows enrollees to buy coverage directly from the insurer, and it protects enrollees from discrimination and guarantees their privacy in relation to their decisions about coverage. ("The States at Midyear: Major Actions on Reproductive Health–Related Issue," *The Guttmacher Report on Public Policy*, August 2001, pages 8-9[18])

The new law worked as planned, and those who wanted to opt out of contraceptive coverage were able to do so.  The Archdiocese of St. Louis, for example, was able to provide contraceptive-free plans for its employees.  Other not for profit organizations in Missouri have been able to obtain coverage for their employees that excludes contraceptive coverage.

I purchased an individual plan in 2008 from Anthem Blue Cross and Blue Shield that excluded contraceptive coverage.  Even after the passage of the Affordable Care Act, I was able to continue contraceptive-free coverage because my plan was considered grandfathered.  (A PDF copy of my last Anthem Contract in 2015 is available upon request.)  I retained that plan until July 1, 2015, when I switched to a contraceptive-free plan through the Archdiocese of St. Louis.  (As a deacon in the Catholic Church, I am eligible to purchase health insurance through the Archdiocese.)

For those who are in a group health plan that does not have contraceptive coverage, health insurance companies notify enrollees that they can obtain it.  And if they are in a group health plan that does have contraceptive coverage, health insurance companies notify enrollees that they can exclude it.

For example, Anthem Blue Cross and Blue Shield in Missouri has provided this notice and form in some insurance plan documents:

**Notice to Applicant/Subscriber**
**Concerning Contraceptive Coverage**

If the coverage offered to you includes benefits for prescription drugs (pharmaceuticals), it probably also includes benefits for contraceptive drugs and devices.

*The following information applies to you and any family members to be covered under your health benefits plan through Anthem Blue Cross and Blue Shield (Anthem):*

---

[18] "The States at Midyear: Major Actions on Reproductive Health–Related Issue," *The Guttmacher Report on Public Policy*, August 2001, pages 8-9, https://www.guttmacher.org/sites/default/files/article_files/gr040408.pdf (last visited September 20, 2016).

568147
JA-0003458

      o   If the coverage offered to you includes benefits for contraceptive drugs and devices, you may exclude them from your own coverage because of your moral, ethical or religious beliefs.

      o   If the coverage offered to you does not include benefits for contraceptive drugs and devices, you may add them to your own coverage.

***If you do not wish to change your benefits for contraceptive drugs and devices, please discard this form.***

To make one of the choices indicated above, please complete the Contraceptive Benefits Option Form on the reverse side.  Date of birth and Social Security Number information will be used only to identify the person completing this form.

Please mail your completed form directly to Anthem at the address shown below

And on the next page, the form provides two options: "Option 1: To Exclude Contraceptives" and "Option 2: To include Contraceptives."  Option 1 states:

I understand that the health benefits plan provided through Anthem Blue Cross and Blue Shield (Anthem) includes benefits for contraceptive drugs and devices.  However, because of my moral, ethical and/or religious beliefs, I do not want benefits for contraceptive drugs and devices as part of the coverage for myself or for any family members to be included on my membership. I understand that *my premium will not be reduced because of this change*.

Option 2 states:

I understand that the health benefits plan provided through Anthem Blue Cross and Blue Shield (Anthem) covers prescription drugs but does not cover contraceptive drugs and devices. However, I wish to include benefits for contraceptive drugs and devices as part of the coverage for myself and for any family members to be included on my membership.  I understand that *my premium will not be increased because of this benefit change.* [19]

**Thus, for those enrollees in Missouri without contraceptive coverage who wish to obtain it, they can do so directly from Anthem.  It will obtained at no cost to the enrollee, with no notification made to their employer and without any action needing to be taken by their employer.**

UnitedHealthCare in Missouri provides similar notices and forms.  For those with contraceptive coverage included, UnitedHealthCare has provided this notice and form in plan documents:

    •   According to our records, your health benefit plan currently ***includes*** benefits for contraceptives. …

---

[19] "Notice to Applicant/Subscriber Concerning Contraceptive Coverage," *Anthem Blue Cross and Blue Shield in Missouri*, form 23330MOMENABS 8/11, https://www.anthem.com/shared/noapplication/f4/s2/t0/pw_ad085567.pdf (last visited September 20, 2016).

568148

JA-0003459

… **If you choose to request a change in your health plan's benefits for contraceptives, please complete and return the Contraceptive Benefits Option form below.** Missouri state law requires that we keep your decision about contraceptive coverage confidential. <u>Do not send this completed form to your employer.</u> …

… **Contraceptive Benefits Option Form**

*Only complete this form if you are requesting a change in your contraceptive benefits.*

I understand that my employer's health benefit plan *includes* benefits for contraceptive drugs and devices. Because of my moral, ethical and/or religious beliefs, **I do _not_ want benefits for contraceptives as part of the coverage for myself or for any family members to be included.** I understand that the amount I am charged for my health benefit plan will not change because of this request.[20]

And for those who have a plan in which contraceptive coverage has been excluded, this <u>form and plan</u> has been included in plan documents:

- According to our records, your health benefit plan currently ***does _not_ include*** benefits for contraceptives. …

… **If you choose to request a change to your benefits for contraceptives, please complete the Contraceptive Benefits Option Form below.** Missouri state law requires that we keep your decision about your contraceptive coverage confidential. <u>Do not send this completed form to your employer.</u> …

… **Contraceptive Benefits Option Form**

*Only complete this form if you are requesting a change in your contraceptive benefits.*

I understand that my employer's health benefit plan covers prescription drugs but does **not** cover contraceptive drugs and devices. **I wish to *include* benefits for contraceptives as part of the coverage for myself and for any family members covered on this plan.** I understand that the amount I am charged will not change because of this request and my benefits for contraceptives will be subject to the terms of my health benefit plan.[21]

**Again, for those enrollees in Missouri with or without contraceptive coverage who wish to make changes to their plan, they can do so directly with UnitedHealthCare. Contraception will be included or excluded at no cost to the enrollee, with no notification made to their employer and without any action needing to be taken by their employer.**

For your convenience, I've attached to this letter a copy of the Missouri law, as well as some of the sample notices and forms used by Anthem Blue Cross and Blue Shield and UnitedHealthCare.

---

[20] "Notice of Benefits/Contraceptive Benefits Option Form," UnitedHealthCare, form M52067-C 11/12, http://broker.uhc.com/assets/MissouriCsubscriber.pdf, (last visited September 20, 2016).

[21] "Notice of Benefits/Contraceptive Benefits Option Form," UnitedHealthCare, form M52067-B 11/12, https://broker.uhc.com/assets/MissouriBsubscriber.pdf, (last visited September 20, 2016).

568149

JA-0003460

I am happy to provide additional information on the Missouri contraceptive mandate law with conscience protection, and how it has worked in Missouri.

Sincerely yours,

Samuel Lee
Director, Campaign Life Missouri
(314) 368-4242
samuelhlee@mindspring.com

8

# Missouri Revised Statutes

Chapter 376
Life, Health and Accident Insurance

←376.1192

**Section 376.1199.1**

376.1200→

August 28, 2015

**Coverage for certain obstetrical/gynecological services--exclusion of contraceptive coverage permitted, when--rulemaking authority.**

376.1199. 1. Each health carrier or health benefit plan that offers or issues health benefit plans providing obstetrical/gynecological benefits and pharmaceutical coverage, which are delivered, issued for delivery, continued or renewed in this state on or after January 1, 2002, shall:

(1) Notwithstanding the provisions of subsection 4 of section 354.618, provide enrollees with direct access to the services of a participating obstetrician, participating gynecologist or participating obstetrician/gynecologist of her choice within the provider network for covered services. The services covered by this subdivision shall be limited to those services defined by the published recommendations of the accreditation council for graduate medical education for training an obstetrician, gynecologist or obstetrician/gynecologist, including but not limited to diagnosis, treatment and referral for such services. A health carrier shall not impose additional co-payments, coinsurance or deductibles upon any enrollee who seeks or receives health care services pursuant to this subdivision, unless similar additional co-payments, coinsurance or deductibles are imposed for other types of health care services received within the provider network. Nothing in this subsection shall be construed to require a health carrier to perform, induce, pay for, reimburse, guarantee, arrange, provide any resources for or refer a patient for an abortion, as defined in section 188.015, other than a spontaneous abortion or to prevent the death of the female upon whom the abortion is performed, or to supersede or conflict with section 376.805; and

(2) Notify enrollees annually of cancer screenings covered by the enrollees' health benefit plan and the current American Cancer Society guidelines for all cancer screenings or notify enrollees at intervals consistent with current American Cancer Society guidelines of cancer screenings which are covered by the enrollees' health benefit plans. The notice shall be delivered by mail unless the enrollee and health carrier have agreed on another method of notification; and

(3) Include coverage for services related to diagnosis, treatment and appropriate management of osteoporosis when such services are provided by a person licensed to practice medicine and surgery in this state, for individuals with a condition or medical history for which bone mass measurement is medically indicated for such individual. In determining whether testing or treatment is medically appropriate, due consideration shall be given to peer-reviewed medical literature. A policy, provision, contract, plan or agreement may apply to such services the same deductibles, coinsurance and other limitations as apply to other covered services; and

568151
JA-0003462

(4) If the health benefit plan also provides coverage for pharmaceutical benefits, provide coverage for contraceptives either at no charge or at the same level of deductible, coinsurance or co-payment as any other covered drug.

No such deductible, coinsurance or co-payment shall be greater than any drug on the health benefit plan's formulary. As used in this section, "contraceptive" shall include all prescription drugs and devices approved by the federal Food and Drug Administration for use as a contraceptive, but shall exclude all drugs and devices that are intended to induce an abortion, as defined in section 188.015, which shall be subject to section 376.805. Nothing in this subdivision shall be construed to exclude coverage for prescription contraceptive drugs or devices ordered by a health care provider with prescriptive authority for reasons other than contraceptive or abortion purposes.

2. For the purposes of this section, "health carrier" and "health benefit plan" shall have the same meaning as defined in section 376.1350.

3. The provisions of this section shall not apply to a supplemental insurance policy, including a life care contract, accident-only policy, specified disease policy, hospital policy providing a fixed daily benefit only, Medicare supplement policy, long-term care policy, short-term major medical policies of six months or less duration, or any other supplemental policy as determined by the director of the department of insurance, financial institutions and professional registration.

4. Notwithstanding the provisions of subdivision (4) of subsection 1 of this section to the contrary:

(1) Any health carrier shall offer and issue to any person or entity purchasing a health benefit plan, a health benefit plan that excludes coverage for contraceptives if the use or provision of such contraceptives is contrary to the moral, ethical or religious beliefs or tenets of such person or entity;

(2) Upon request of an enrollee who is a member of a group health benefit plan and who states that the use or provision of contraceptives is contrary to his or her moral, ethical or religious beliefs, any health carrier shall issue to or on behalf of such enrollee a policy form that excludes coverage for contraceptives. Any administrative costs to a group health benefit plan associated with such exclusion of coverage not offset by the decreased costs of providing coverage shall be borne by the group policyholder or group plan holder;

(3) Any health carrier which is owned, operated or controlled in substantial part by an entity that is operated pursuant to moral, ethical or religious tenets that are contrary to the use or provision of contraceptives shall be exempt from the provisions of subdivision (4) of subsection 1 of this section. For purposes of this subsection, if new premiums are charged for a contract, plan or policy, it shall be determined to be a new contract, plan or policy.

5. Except for a health carrier that is exempted from providing coverage for contraceptives pursuant to this section, a health carrier shall allow enrollees in a health benefit plan that excludes coverage for contraceptives pursuant to subsection 4 of this section to purchase a health benefit plan that includes coverage for contraceptives.

6. Any health benefit plan issued pursuant to subsection 1 of this section shall provide clear and conspicuous written notice on the enrollment form or any accompanying materials to the enrollment form and the group health benefit plan application and contract:

568152
JA-0003463

(1) Whether coverage for contraceptives is or is not included;

(2) That an enrollee who is a member of a group health benefit plan with coverage for contraceptives has the right to exclude coverage for contraceptives if such coverage is contrary to his or her moral, ethical or religious beliefs;

(3) That an enrollee who is a member of a group health benefit plan without coverage for contraceptives has the right to purchase coverage for contraceptives;

(4) Whether an optional rider for elective abortions has been purchased by the group contract holder pursuant to section 376.805; and

(5) That an enrollee who is a member of a group health plan with coverage for elective abortions has the right to exclude and not pay for coverage for elective abortions if such coverage is contrary to his or her moral, ethical, or religious beliefs.

For purposes of this subsection, if new premiums are charged for a contract, plan, or policy, it shall be determined to be a new contract, plan, or policy.

7. Health carriers shall not disclose to the person or entity who purchased the health benefit plan the names of enrollees who exclude coverage for contraceptives in the health benefit plan or who purchase a health benefit plan that includes coverage for contraceptives. Health carriers and the person or entity who purchased the health benefit plan shall not discriminate against an enrollee because the enrollee excluded coverage for contraceptives in the health benefit plan or purchased a health benefit plan that includes coverage for contraceptives.

8. The departments of health and senior services and insurance, financial institutions and professional registration may promulgate rules necessary to implement the provisions of this section. No rule or portion of a rule promulgated pursuant to this section shall become effective unless it has been promulgated pursuant to chapter 536. Any rule or portion of a rule, as that term is defined in section 536.010, that is created under the authority delegated in this section shall become effective only if it complies with and is subject to all of the provisions of chapter 536 and, if applicable, section 536.028. This section and chapter 536 are nonseverable and if any of the powers vested with the general assembly pursuant to chapter 536 to review, to delay the effective date or to disapprove and annul a rule are subsequently held unconstitutional, then the grant of rulemaking authority and any rule proposed or adopted after August 28, 2001, shall be invalid and void.

(L. 2001 H.B. 762 merged with S.B. 266, A.L. 2012 S.B. 749)

*Effective 10-12-12, see § 21.250. S.B. 749 was vetoed on July 12, 2012. The veto was overridden on September 12, 2012.

(2013) Subsections 1(4), 4, 5, 6(1), 6(2), and 6(3) of section are pre-empted by the federal Affordable Care Act and its implementing regulations. Missouri Insurance Coalition v. Huff, 947 F.Supp.2d 1014 (E.D.Mo.).

568153

JA-0003464

2001

**2001**

376.1199. 1. Each health carrier or health benefit plan that offers or issues health benefit plans providing obstetrical/gynecological benefits and pharmaceutical coverage, which are delivered, issued for delivery, continued or renewed in this state on or after January 1, 2002, shall:

(1) Notwithstanding the provisions of subsection 4 of section 354.618, provide enrollees with direct access to the services of a participating obstetrician, participating gynecologist or participating obstetrician/gynecologist of her choice within the provider network for covered services. The services covered by this subdivision shall be limited to those services defined by the published recommendations of the accreditation council for graduate medical education for training an obstetrician, gynecologist or obstetrician/gynecologist, including but not limited to diagnosis, treatment and referral for such services. A health carrier shall not impose additional co-payments, coinsurance or deductibles upon any enrollee who seeks or receives health care services pursuant to this subdivision, unless similar additional co-payments, coinsurance or deductibles are imposed for other types of health care services received within the provider network. Nothing in this subsection shall be construed to require a health carrier to perform, induce, pay for, reimburse, guarantee, arrange, provide any resources for or refer a patient for an abortion, as defined in section 188.015, other than a spontaneous abortion or to prevent the death of the female upon whom the abortion is performed, or to supersede or conflict with section 376.805; and

(2) Notify enrollees annually of cancer screenings covered by the enrollees' health benefit plan and the current American Cancer Society guidelines for all cancer screenings or notify enrollees at intervals consistent with current American Cancer Society guidelines of cancer screenings which are covered by the enrollees' health benefit plans. The notice shall be delivered by mail unless the enrollee and health carrier have agreed on another method of notification; and

(3) Include coverage for services related to diagnosis, treatment and appropriate management of osteoporosis when such services are provided by a person licensed to practice medicine and surgery in this state, for individuals with a condition or medical history for which bone mass measurement is medically indicated for such individual. In determining whether testing or treatment is medically appropriate, due consideration shall be given to peer-reviewed medical literature. A policy, provision, contract, plan or agreement may apply to such services the same deductibles, coinsurance and other limitations as apply to other covered services; and

(4) If the health benefit plan also provides coverage for pharmaceutical benefits, provide coverage for contraceptives either at no charge or at the same level of deductible, coinsurance or co-payment as any other covered drug. No such deductible, coinsurance or co-payment shall be greater than any drug on the health benefit plan's formulary. As used in this section, "contraceptive" shall include all prescription drugs and devices approved by the federal Food and Drug Administration for use as a contraceptive, but shall exclude all drugs and devices that are intended to induce an abortion, as defined in section 188.015, which shall be subject to section 376.805. Nothing in this subdivision shall be construed to exclude coverage for prescription contraceptive drugs or devices ordered by a health care provider with prescriptive authority for reasons other than contraceptive or abortion purposes.

2. For the purposes of this section, "health carrier" and "health benefit plan" shall have the

568154

same meaning as defined in section 376.1350.

3. The provisions of this section shall not apply to a supplemental insurance policy, including a life care contract, accident-only policy, specified disease policy, hospital policy providing a fixed daily benefit only, Medicare supplement policy, long-term care policy, short-term major medical policies of six months or less duration, or any other supplemental policy as determined by the director of the department of insurance, financial institutions and professional registration.

4. Notwithstanding the provisions of subdivision (4) of subsection 1 of this section to the contrary:

(1) Any health carrier may issue to any person or entity purchasing a health benefit plan, a health benefit plan that excludes coverage for contraceptives if the use or provision of such contraceptives is contrary to the moral, ethical or religious beliefs or tenets of such person or entity;

(2) Upon request of an enrollee who is a member of a group health benefit plan and who states that the use or provision of contraceptives is contrary to his or her moral, ethical or religious beliefs, any health carrier shall issue to or on behalf of such enrollee a policy form that excludes coverage for contraceptives. Any administrative costs to a group health benefit plan associated with such exclusion of coverage not offset by the decreased costs of providing coverage shall be borne by the group policyholder or group plan holder;

(3) Any health carrier which is owned, operated or controlled in substantial part by an entity that is operated pursuant to moral, ethical or religious tenets that are contrary to the use or provision of contraceptives shall be exempt from the provisions of subdivision (4) of subsection 1 of this section.

For purposes of this subsection, if new premiums are charged for a contract, plan or policy, it shall be determined to be a new contract, plan or policy.

5. Except for a health carrier that is exempted from providing coverage for contraceptives pursuant to this section, a health carrier shall allow enrollees in a health benefit plan that excludes coverage for contraceptives pursuant to subsection 4 of this section to purchase a health benefit plan that includes coverage for contraceptives.

6. Any health benefit plan issued pursuant to subsection 1 of this section shall provide clear and conspicuous written notice on the enrollment form or any accompanying materials to the enrollment form and the group health benefit plan contract:

(1) Whether coverage for contraceptives is or is not included;

(2) That an enrollee who is a member of a group health benefit plan with coverage for contraceptives has the right to exclude coverage for contraceptives if such coverage is contrary to his or her moral, ethical or religious beliefs; and

(3) That an enrollee who is a member of a group health benefit plan without coverage for contraceptives has the right to purchase coverage for contraceptives.

568155

JA-0003466

7. Health carriers shall not disclose to the person or entity who purchased the health benefit plan the names of enrollees who exclude coverage for contraceptives in the health benefit plan or who purchase a health benefit plan that includes coverage for contraceptives. Health carriers and the person or entity who purchased the health benefit plan shall not discriminate against an enrollee because the enrollee excluded coverage for contraceptives in the health benefit plan or purchased a health benefit plan that includes coverage for contraceptives.

8. The departments of health and senior services and insurance, financial institutions and professional registration may promulgate rules necessary to implement the provisions of this section. No rule or portion of a rule promulgated pursuant to this section shall become effective unless it has been promulgated pursuant to chapter 536. Any rule or portion of a rule, as that term is defined in section 536.010, that is created under the authority delegated in this section shall become effective only if it complies with and is subject to all of the provisions of chapter 536 and, if applicable, section 536.028. This section and chapter 536 are nonseverable and if any of the powers vested with the general assembly pursuant to chapter 536 to review, to delay the effective date or to disapprove and annul a rule are subsequently held unconstitutional, then the grant of rulemaking authority and any rule proposed or adopted after August 28, 2001, shall be invalid and void.

Top



Missouri General Assembly

Copyright © Missouri Legislature, all rights reserved.

568156

JA-0003467

**Notice to Applicant/Subscriber**
**Concerning Contraceptive Coverage**

If the coverage offered to you includes benefits for prescription drugs (pharmaceuticals), it probably also includes benefits for contraceptive drugs and devices.

*The following information applies to you and any family members to be covered under your health benefits plan through Anthem Blue Cross and Blue Shield (Anthem):*

- If the coverage offered to you includes benefits for contraceptive drugs and devices, you may exclude them from your own coverage because of your moral, ethical or religious beliefs.

- If the coverage offered to you does not include benefits for contraceptive drugs and devices, you may add them to your own coverage.

***If you do not wish to change your benefits for contraceptive drugs and devices, please discard this form.***

To make one of the choices indicated above, please complete the Contraceptive Benefits Option Form on the reverse side. Date of birth and Social Security Number information will be used only to identify the person completing this form.

Please mail your completed form directly to Anthem at the address shown below:

Anthem Blue Cross and Blue Shield
P.O. Box 659804
San Antonio, TX  78265-9104

568157

JA-0003468

**Contraceptive Benefits Option Form**

Anthem ✚ ®

---

**You need to complete this form only if you want to make changes in your contraceptive coverage.**

### OPTION 1: TO EXCLUDE CONTRACEPTIVES

Complete Option 1 *only* if your health benefits plan includes benefits for contraceptive drugs and devices *and* you want to exclude these benefits from your coverage for moral, ethical or religious reasons.

I understand that the health benefits plan provided through Anthem Blue Cross and Blue Shield (Anthem) includes benefits for contraceptive drugs and devices. However, because of my moral, ethical and/or religious beliefs, I do not want benefits for contraceptive drugs and devices as part of the coverage for myself or for any family members to be included on my membership. I understand that *my premium will not be reduced because of this change.*

| Printed last name | First name | M.I. | Date of birth |
|---|---|---|---|
| | | | |

| Member signature | Date | Social security no. or Anthem identification no. |
|---|---|---|
| X | | |

If you are enrolling through a group, please complete the following:

| Anthem group name | Anthem group no. (if known) |
|---|---|
| | |

### OPTION 2: TO INCLUDE CONTRACEPTIVES

Complete Option 2 *only* if your health benefits plan excludes benefits for contraceptive drugs and devices, but you want contraceptive coverage.

I understand that the health benefits plan provided through Anthem Blue Cross and Blue Shield (Anthem) covers prescription drugs but does not cover contraceptive drugs and devices. However, I wish to include benefits for contraceptive drugs and devices as part of the coverage for myself and for any family members to be included on my membership. I understand that *my premium will not be increased because of this benefit change.*

| Printed last name | First name | M.I. | Date of birth |
|---|---|---|---|
| | | | |

| Member signature | Date | Social security no. or Anthem identification no. |
|---|---|---|
| X | | |

If you are enrolling through a group, please complete the following:

| Anthem group name | Anthem group no. (if known) |
|---|---|
| | |

In Missouri, (excluding 30 counties in the Kansas City area) Anthem Blue Cross and Blue Shield is the trade name of RightCHOICE® Managed Care, Inc. (RIT), Healthy Alliance® Life Insurance Company (HALIC), and HMO Missouri, Inc. RIT and certain affiliates administer non-HMO benefits underwritten by HALIC and HMO benefits underwritten by HMO Missouri, Inc. RIT and certain affiliates only provide administrative services for self-funded plans and do not underwrite benefits. Independent licensees of the Blue Cross and Blue Shield Association.
® ANTHEM is a registered trademark of Anthem Insurance Companies, Inc. The Blue Cross and Blue Shield names and symbols are registered marks of the Blue Cross and Blue Shield Association.

23330MOMENABS 8/11

**568158**

JA-0003469



<Adr_Ln_1_Txt>
<Adr_Ln_2_Txt>
<Cty_Nm>, <State_Cd> <Zip_Cd>

# Notice of Benefits

This notice is to tell you about benefit coverage for contraceptives (birth control) under your current health benefit plan and your right, under Missouri law, to request that benefits for contraceptives be removed from your plan coverage.

- According to our records, your health benefit plan currently *includes* benefits for contraceptives.

- Missouri state law gives you the right to *remove* benefits for contraceptives in your health benefit plan.

- Your health benefit plan does *not* pay for abortions unless a spontaneous abortion *or* as necessary to save the life of the mother.

**If you choose to request a change in your health plan's benefits for contraceptives, please complete and return the Contraceptive Benefits Option form below.** Missouri state law requires that we keep your decision about contraceptive coverage confidential. Do not send this completed form to your employer.

Please make a copy for your records and mail your completed form to:
**UnitedHealthcare**
**Attention: Executive Administration**
**13655 Riverport Drive**
**Maryland Heights, MO 63043**

- - - - - Cut here and return bottom portion - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# Contraceptive Benefits Option Form

***Only complete this form if you are requesting a change in your contraceptive benefits.***

I understand that my employer's health benefit plan *includes* benefits for contraceptive drugs and devices. Because of my moral, ethical and/or religious beliefs, **I do *not* want benefits for contraceptives as part of the coverage for myself or for any family members to be included.** I understand that the amount I am charged for my health benefit plan will not change because of this request.

Printed Name of Subscriber _____

Date of Birth of Subscriber _____ Subscriber Identification Number _____

Group Name _____ Group Number _____

Signature of Subscriber _____ Date _____



<Fst_Nm> <Lst_Nm>
<Adr_Ln_1_Txt>
<Adr_Ln_2_Txt>
<Cty_Nm>, <State_Cd> <Zip_Cd>

# Notice of Benefits

This notice is to tell you about benefit coverage for contraceptives (birth control) under your current health benefit plan and your right, under Missouri law, to request to include benefits for contraceptives in your plan coverage.

- According to our records, your health benefit plan currently *does **not** include* benefits for contraceptives.

- Missouri state law gives you the right to *include* benefits for contraceptives in your health benefit plan. To request contraceptive benefits, use the form provided below.

- Your health benefit plan does ***not*** pay for abortions unless a spontaneous abortion *or* as necessary to save the life of the mother.

**If you choose to request a change to your benefits for contraceptives, please complete the Contraceptive Benefits Option Form below.** Missouri state law requires that we keep your decision about your contraceptive coverage confidential. <u>Do not send this completed form to your employer.</u>

Please make a copy for your records and mail your completed form directly to the following address:
**UnitedHealthcare**
**Attention: Executive Administration**
**13655 Riverport Drive**
**Maryland Heights, MO 63043**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Cut here and return bottom portion

## Contraceptive Benefits Option Form

### *Only complete this form if you are requesting a change in your contraceptive benefits.*

I understand that my employer's health benefit plan covers prescription drugs but does **not** cover contraceptive drugs and devices. **I wish to *include* benefits for contraceptives as part of the coverage for myself and for any family members covered on this plan.** I understand that the amount I am charged will not change because of this request and my benefits for contraceptives will be subject to the terms of my health benefit plan.

Printed Name of Subscriber _____

Date of Birth of Subscriber _____ Subscriber Identification Number _____

Group Name _____ Group Number _____

Signature of Subscriber _____ Date _____

**568160**

JA-0003471

Case 2:17-cv-04540-WB Document 258 Filed 10/23/20 Page 65 of 70



Health Resources & Services Administration                                    Explore

**Get reimbursed for COVID-19 testing and treatment of uninsured individuals.** Learn more »



Home > Women's Preventive Services Guidelines

# Women's Preventive Services Guidelines



On December 17, 2019, HRSA updated the HRSA-supported Women's Preventive Services Guidelines. Read the most current version.

*Non-grandfathered plans and coverage (generally, plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) are required to provide coverage without cost sharing consistent with these guidelines beginning with the first plan year (in the individual market policy year) that begins on or after December 17, 2020. Before that time, non-grandfathered plans are generally required to provide coverage without cost sharing consistent with the previously issued guidelines.*

In 2018, the HRSA-supported Women's Preventive Services Initiative released the Well Woman Chart, a resource that includes age-based preventive service recommendations for women from adolescence to maturity. The chart does not include updates to the HRSA-supported comprehensive guidelines, but provides additional clarity for patients and providers, with the goal of improving women's health across the life span.

## Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being

The Affordable Care Act – the health insurance reform legislation passed by Congress and signed into law by President Obama on March 23, 2010 – helps make prevention affordable and accessible for all Americans by requiring health plans to cover preventive services and by eliminating cost sharing for those services. Preventive services that have strong scientific evidence of their health benefits must be covered and plans can no longer charge a patient a copayment, coinsurance or deductible for these services when they are delivered by a network provider.

### Women's Preventive Services Guidelines Supported by the Health Resources and Services Administration

Under the Affordable Care Act, women's preventive health care – such as mammograms, screenings for cervical cancer, prenatal care, and other services – generally must be covered with no cost sharing. However, the law recognizes and HHS understands the need to take into account the unique health needs of women throughout their lifespan.

The HRSA-supported health plan coverage guidelines, developed by the Institute of Medicine (IOM), will help ensure that women receive a comprehensive set of preventive services without having to pay a co-payment, co-insurance or a deductible. HHS commissioned an IOM study to review what preventive services are necessary for women's health and well-being and therefore should be considered in the development of comprehensive guidelines for preventive services for women. HRSA is supporting the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines.

Health Resources and Services Administration Women's Preventive Services Guidelines

### Learn More

- Women's Preventive Services Initiative report
- 2011 IOM Report *Clinical Preventive Services for Women: Closing the Gaps*
- 2016 Guidelines
- US Preventive Services Task Force
- Bright Futures
- Advisory Committee on Immunization Practices

### For Further Information

Contact
wellwomancare@hrsa.gov.

10/23/2020
Case 2:17-cv-04540-WB Document 258 Filed 10/23/20 Page 66 of 70
Women's Preventive Services Guidelines | Official web site of the U.S. Health Resources & Services Administration

*Non-grandfathered plans (plans or policies created or sold after March 23, 2010, or older plans or policies that have been changed in certain ways since that date) generally are required to provide coverage without cost sharing consistent with these guidelines in the first plan year (in the individual market, policy year) that begins on or after August 1, 2012.*

| Type of Preventive Service | HHS Guideline for Health Insurance Coverage | Frequency |
|---|---|---|
| Well-woman visits. | Well-woman preventive care visit annually for adult women to obtain the recommended preventive services that are age and developmentally appropriate, including preconception care and many services necessary for prenatal care. This well-woman visit should, where appropriate, include other preventive services listed in this set of guidelines, as well as others referenced in section 2713. | Annual, although HHS recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors. * (see note) |
| Screening for gestational diabetes. | Screening for gestational diabetes. | In pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes. |
| Human papillomavirus testing. | High-risk human papillomavirus DNA testing in women with normal cytology results. | Screening should begin at 30 years of age and should occur no more frequently than every 3 years. |
| Counseling for sexually transmitted infections. | Counseling on sexually transmitted infections for all sexually active women. | Annual. |
| Counseling and screening for human immune-deficiency virus. | Counseling and screening for human immune-deficiency virus infection for all sexually active women. | Annual. |
| Contraceptive methods and counseling. ** , *** (see note) | All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity. | As prescribed. |
| Breastfeeding support, supplies, and counseling. | Comprehensive lactation support and counseling, by a trained provider during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment. | In conjunction with each birth. |
| Screening and counseling for interpersonal and domestic | Screening and counseling for interpersonal and | Annual. |

JA-0003473

10/23/2020     Women's Preventive Services Guidelines | Official web site of the U.S. Health Resources & Services Administration

Case 2:17-cv-04540-WB Document 258 Filed 10/23/20 Page 67 of 70

| | | |
|---|---|---|
| violence. | domestic violence. | |
| Screening for anxiety. | Screening for anxiety in adolescent and adult women, including those who are pregnant or postpartum. Optimal screening intervals are unknown and clinical judgement should be used to determine screening frequency. | As prescribed. |
| Screening for breast cancer. | Screening for breast cancer by mammography in average-risk women no earlier than age 40 and no later than age 50. Screening should continue through at least age 74 and age alone should not be the basis to discontinue screening. | Screening mammography should occur at least biennially and as frequently as annually. |
| Screening for diabetes mellitus after pregnancy. | Screening for diabetes mellitus in women with a history of gestational diabetes mellitus (GDM) who are not currently pregnant and who have not previously been diagnosed with type 2 diabetes mellitus . | Initial testing should ideally occur within the first year postpartum and can be conducted as early as 4–6 weeks postpartum. |
| Screening for urinary incontinence. | Screening for urinary incontinence. | Annual. |

_\* Refer to guidance issued by the Center for Consumer Information and Insurance Oversight entitled _Affordable Care Act Implementation FAQs, Set 12, Q10_.

\*\*(I)(a) Objecting entities—religious beliefs.

_(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:_
_(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent the non-governmental plan sponsor objects as specified in paragraph (I)(a)(2) of this note. Such non-governmental plan sponsors include, but are not limited to, the following entities:_
_(A) A church, an integrated auxiliary of a church, a convention or association of churches, or a religious order;_
_(B) A nonprofit organization;_
_(C) A closely held for-profit entity;_
_(D) A for-profit entity that is not closely held; or_
_(E) Any other non-governmental employer;_
_(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (I)(a) (2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and_
_(iii) A health insurance issuer offering group or individual insurance coverage to the extent the_

JA-0003474

*issuer objects as specified in paragraph (I)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (I)(a)(1)(iii), the plan remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.*

*(2) The exemption of this paragraph (I)(a) will apply to the extent that an entity described in paragraph (I)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage, payments, or a plan that provides coverage or payments for some or all contraceptive services, based on its sincerely held religious beliefs.*
*(b) Objecting individuals—religious beliefs. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (I)(b), and nothing in 45 CFR 147.130(a)(1)(iv), 26 CFR 54.9815–2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate benefit package option, or a separate policy, certificate or contract of insurance, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held religious beliefs.*

*(II)(a) Objecting entities—moral convictions.*

*(1) These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, and thus the Health Resources and Service Administration exempts from any Guidelines requirements issued under 45 CFR 147.130(a)(1)(iv) that relate to the provision of contraceptive services:*
*(i) A group health plan and health insurance coverage provided in connection with a group health plan to the extent one of the following non-governmental plan sponsors object as specified in paragraph (II)(a)(2) of this note:*
*(A) A nonprofit organization; or*
*(B) A for-profit entity that has no publicly traded ownership interests (for this purpose, a publicly traded ownership interest is any class of common equity securities required to be registered under section 12 of the Securities Exchange Act of 1934);*
*(ii) An institution of higher education as defined in 20 U.S.C. 1002 in its arrangement of student health insurance coverage, to the extent that institution objects as specified in paragraph (II)(a) (2) of this note. In the case of student health insurance coverage, section (I) of this note is applicable in a manner comparable to its applicability to group health insurance coverage provided in connection with a group health plan established or maintained by a plan sponsor that is an employer, and references to "plan participants and beneficiaries" will be interpreted as references to student enrollees and their covered dependents; and*
*(iii) A health insurance issuer offering group or individual insurance coverage to the extent the issuer objects as specified in paragraph (II)(a)(2) of this note. Where a health insurance issuer providing group health insurance coverage is exempt under this paragraph (II)(a)(1)(iii), the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under these Guidelines unless it is also exempt from that requirement.*

*(2) The exemption of this paragraph (II)(a) will apply to the extent that an entity described in paragraph (II)(a)(1) of this note objects to its establishing, maintaining, providing, offering, or arranging (as applicable) coverage or payments for some or all contraceptive services, or for a plan, issuer, or third party administrator that provides or arranges such coverage or payments, based on its sincerely held moral convictions.*
*(b) Objecting individuals—moral convictions. These Guidelines do not provide for or support the requirement of coverage or payments for contraceptive services with respect to individuals who object as specified in this paragraph (II)(b), and nothing in § 147.130(a)(1)(iv), 26 CFR 54.9815– 2713(a) (1)(iv), or 29 CFR 2590.715-2713(a)(1)(iv) may be construed to prevent a willing health insurance issuer offering group or individual health insurance coverage, and as applicable, a willing plan sponsor of a group health plan, from offering a separate policy, certificate or contract of insurance or a separate group health plan or benefit package option, to any individual who objects to coverage or payments for some or all contraceptive services based on sincerely held moral convictions.*

*(III) Definition. For the purposes of this note, reference to "contraceptive" services, benefits, or coverage includes contraceptive or sterilization items, procedures, or services, or related patient education or counseling, to the extent specified for purposes of these Guidelines.*

JA-0003475

Case 2:17-cv-04540-WB   Document 258   Filed 10/23/20   Page 69 of 70

*See Federal Register Notice: [Religious Exemptions and Accommodations for Coverage of Certain Preventive Services under the Affordable Care Act](PDF - 488 kb).*

HRSA, in concert with an external review committee, will review, and continually update, the *[Women's Preventive Services' Guidelines](.)*

*_\*\*\* General Notice*

*On July 29, 2019, in a case in the Northern District of Texas, DeOtte v. Azar, No. 4:18-CV-00825-O, 2019 WL 3786545 (N.D. Tex. July 29, 2019) the court determined that the "Contraceptive Mandate, codified at 42 U.S.C. § 300gg–13(a)(4), 45 C.F.R. § 147.130(a)(1)(iv), 29 C.F.R. § 2590.715–2713(a)(1)(iv), and 26 C.F.R. § 54.9815–2713(a)(1)(iv), violates the Religious Freedom Restoration Act" with respect to individuals and entities with religious objections to contraceptive coverage and thus enjoined enforcement of those provisions against such individuals and entities.*

*The Departments of Labor, Health and Human Services, and the Treasury are working with the Department of Justice in these on-going suits.*

*Date Last Reviewed:  December 2019*

 About HRSA

 Connect with HRSA

 Find Health Services

- **Bureaus & Offices**
- **Budget**
- **Strategic Plan**
- **Working at HRSA**
- **About HRSA**

   

Health Center

HIV Medical Care and Treatment

 Sign up for email updates

 Locate other health services

Contact Us  |  Viewers & Players  |  Privacy Policy  |  Disclaimers  |  Accessibility  |  Freedom of Information Act  |  EEO/No Fear Act
U.S. Department of Health and Human Services  |  USA.gov  |  Whitehouse.gov

## Language Assistance Available

| | | | |
|---|---|---|---|
| Español | 繁體中文 | Tiếng Việt | 한국어 |
| Tagalog | Русский | العربية | Kreyòl Ayisyen |
| Français | Polski | Português | Italiano |
| Deutsch | 日本語 | فارسی | English |

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the forgoing document was electronically filed with the Clerk of

the Court using the CM/ECF system, which will send notification of such filing to all counsel of

record.

Dated: October 23, 2020

<div style="margin-left: 40%;">

/s/ Mark Rienzi
Mark Rienzi
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095

</div>