**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COMMONWEALTH OF | ) | |
| PENNSYLVANIA and | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 2:17-cv-04540 (WB) |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States; | ) | |
| ALEX M. AZAR II, in his official | ) | |
| capacity as Secretary of Health and | ) | |
| Human Services; UNITED STATES | ) | |
| DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES; STEVEN T. | ) | |
| MNUCHIN, in his official capacity as | ) | |
| Secretary of the Treasury; UNITED | ) | |
| STATES DEPARTMENT OF THE | ) | |
| TREASURY; EUGENE SCALIA, in his | ) | |
| official capacity as Secretary of Labor; | ) | |
| and UNITED STATES DEPARTMENT | ) | |
| OF LABOR, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**REPLY BRIEF IN SUPPORT OF FEDERAL**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

    I.     The Final Rules Comply With the APA.............................................. 2

          A.    The Religious Exemption Rule Reasonably Addresses the Problems It Aimed to Resolve, Including the Agencies' Obligation to Consider RFRA .......................................................................................... 2

          B.    The Agencies Provided a Reasoned Explanation for Their Position on the Safety, Efficacy, and Benefits of Contraception..................................... 6

          C.    The Moral Exemption Rule Comports With Congressional Intent .............. 8

          D.    The Agencies Engaged in Reasoned Decisionmaking ................................. 8

          E.    Plaintiffs' Challenges to the Regulatory Impact Analysis Are Meritless...... 9

    II.    The Final Rules Otherwise Fully Comply with Applicable Law........................... 11

          A.    The Religious Exemption Rule Comports With the Establishment Clause....................................................................................... 11

          B.    The Final Rules Do Not Create an Unreasonable Barrier to Care............... 13

          C.    The Final Rules Are Consistent With Equal Protection Principles ............. 14

          D.    The Final Rules Are Consistent With Title VII and Section 18116 ........... 14

          E.    The Court Need Not Resolve Little Sisters' Constitutional Challenges, Which Lack Merit in Any Case ................................................................. 14

CONCLUSION.................................................................................................... 15

## INTRODUCTION

The Court should enter summary judgment in favor of Federal Defendants on all of Plaintiffs' claims. Plaintiffs do not dispute that the Supreme Court's decision on the petition for certiorari from the Third Circuit's appellate decision on this Court's preliminary injunction order, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020), directly controls three of Plaintiffs' claims. Am. Compl. ¶¶ 174-76 (Agencies' acceptance of comments after the issuance of interim final rules violated the Administrative Procedure Act ["APA"]), ¶ 182 (Agencies violated the APA by enacting the Final Rules without statutory authority) ¶ 185 (Agencies could not consider RFRA when enacting the religious exemption), ECF No. 89.[1] The rest of Plaintiffs' claims should fare no better.

Plaintiffs make a number of arguments intended to show that the Final Rules are arbitrary and capricious. These arguments fail. The "'arbitrary and capricious' standard of the APA is a high bar" for Plaintiffs to cross, *New Jersey Bd. of Pub. Utilities v. FERC*, 744 F.3d 74, 102 (3d Cir. 2014), and Plaintiffs cannot cross it here. Plaintiffs argue that the Religious Exemption Rule is too broad. But arbitrary and capricious review is not strict scrutiny—there is no narrow tailoring requirement—and the Religious Exemption Rule satisfies the APA by being at least rationally connected to its purpose. Plaintiffs also argue that the Moral Exemption Rule contravenes congressional intent. But as the Supreme Court pointed out in *Little Sisters*, Congress afforded the agencies "broad discretion . . . to create the religious and *moral* exemptions." 140 S. Ct at 2381 (emphasis added). Nor is there any defect in the Rules' explanation of the Agencies' evolution in thinking: the Rules recognize the Agencies' changes in position and explain the bases for the changes. Similarly unavailing are Plaintiffs' attacks on the Rules' regulatory impact assessments —the Agencies reasonably assessed the impact of the Rules using available information.

Plaintiffs' remaining constitutional and statutory claims also come up short. "There is no basis for an argument . . . that the [Final Rules] violate[] th[e] [Establishment] Clause," *Little*

---

[1] The abbreviations in this brief have the same meaning as in Federal Defendants' Motion for Summary Judgment.

*Sisters*, 140 S. Ct. at 2396 n.13 (Alito, J., concurring), as the Religious Exemption Rule relieves a government-imposed burden on the exercise of religion. Plaintiffs' equal protection claim also fails, as do statutory claims premised on sex-discrimination. The Final Rules do not discriminate on the basis of sex: only women receive contraceptive coverage without cost sharing under the ACA, and those affected by the Final Rules are distinguished from women who receive coverage not by their sex, but by the religious or moral objections of their employers. And the Rules do not create an unreasonable barrier to women obtaining contraceptives because declining to require private entities to cover contraceptives is not the establishment of a barrier under the law.

Finally, in their brief, Little Sisters raise two constitutional challenges to the contraceptive coverage mandate as a whole. The Court need not resolve these arguments, and should enter summary judgment in Federal Defendants' favor.

## I.    The Final Rules Comply with the APA.

### A.    The Religious Exemption Rule Reasonably Addresses the Problems It Aimed to Resolve, Including the Agencies' Obligation to Consider RFRA.

The religious exemption represents the Agencies' reasonable response to the need to accommodate religious exercise, both as a policy matter and to comply with RFRA. It applies only to entities with sincere religious objections to the contraceptive mandate. The Agencies' decision was both reasoned and reasonable—that Plaintiffs would have crafted a different exemption or accommodation is of no moment. As Federal Defendants previously noted, Fed. Defs.' SJ Mem. at 27-31, ECF No. 254-1, because RFRA required the Religious Exemption Rule, any error in analyzing or explaining other factors would be harmless, but in any event, the Agencies' decision to consider RFRA's requirements—which has now been blessed by the Supreme Court—was certainly not arbitrary or capricious. Plaintiffs' objections largely rest on their continued resistance to the lenient standard for arbitrary and capricious review. But "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court is to determine only whether the agency's decision "was the product of reasoned

decisionmaking," *id.* at 52, and whether there was a "rational connection between the facts found and the choice made," *id*. at 43.

Contrary to this lenient standard, Plaintiffs appear to assert that the religious exemption must be *perfectly* tailored to the Agencies' RFRA analysis—and cover no entities except those that are substantially burdened by the accommodation. But the APA does not require such a flawless fit. Plaintiffs offer no response to the cases Federal Defendants have previously cited for the proposition that "[t]he APA does not . . . require agencies to tailor their regulations as narrowly as possible to the specific concerns that generated them." *Assoc. Dog Clubs of N.Y., Inc. v. Vilsack*, 75 F. Supp. 3d 83, 92 (D.D.C. 2014). Here, the Religious Exemption Rule is clearly "within a zone of reasonableness," and this Court should decline Plaintiffs' invitation to require that the Agencies "identify the optimal threshold with pinpoint precision." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214-15 (D.C. Cir. 2013) (quotation marks omitted).

The reasonableness of the Agencies' choice is enhanced because as a practical matter, entities that do not object to providing contraceptive coverage through the accommodation are unlikely to stop providing such coverage given that covering contraceptives is cost-neutral and valuable to some employees and students. Plaintiffs' suggestion that the Agencies could go no further than the bare minimum required by RFRA would require the Agencies to err on the side of impinging on religious liberty or, at the very least, hit a bullseye that the past nine years of litigation have shown is easy to miss. It would also impose a significant substantive constraint on the Agencies' "broad [statutory] discretion . . . to create the religious . . . exemption[]"—a constraint nowhere recognized by the Supreme Court. *Little Sisters*, 140 S. Ct. at 2380-81 (describing the discretion as "virtually unbridled"). That is not what the APA requires. Regarding the religious exemption's coverage of publicly traded companies, Plaintiffs erroneously try to impose a standard higher than arbitrary and capricious review when an agency's decision involves interpretations of a statute that the agency does not administer. Pls.' SJ Reply at 4, ECF No. 260. The only authority Plaintiffs cite for this remarkable proposition is a case noting the unremarkable fact that agencies are generally not entitled to *Chevron* deference in their interpretation of statutes that they do not

administer. *Id.* (citing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018)). But of course the Agencies do not rely on *Chevron* deference for their interpretation of RFRA here. Plaintiffs' theory that some higher standard applies would vitiate arbitrary and capricious review, since agencies frequently must consider a variety of factors and statutes in their reasoning. In any event, the Agencies' analysis does "make sense" under RFRA, Pls.' SJ Reply at 4, particularly after *Hobby Lobby* recognized that RFRA protected certain for-profit companies. It was therefore not arbitrary or capricious for the Agencies to act to protect any publicly traded objectors. Indeed, to conclude that the Agencies were required to wait until the Supreme Court passed on such an objection would require the Agencies to *under*-protect religious exercise.

Plaintiffs' suggestion that the Agencies could have relied on the broad discretion provided by the Women's Health Amendment but did not do so, *id.* at 5, is belied by the Rule, which relies on that authority (in addition to RFRA) throughout. *See, e.g.*, 83 Fed. Reg. 57,536, 57,539-40, 57,556 (Nov. 15, 2018). That the discussion about publicly traded companies focused on RFRA merely reflects the reality that if such objectors existed, RFRA would require action to protect them, and if no such objectors existed, then no one would be harmed by providing for an exemption.

While Plaintiffs still object that the religious exemption lacks a "mechanism to evaluate the sincerity of an objector's religious belief," they acknowledge that the Agencies considered this issue and identified at least three avenues to address any insincere objection (the Public Health Service Act, the Internal Revenue Code, and ERISA, *see* 83 Fed. Reg. 57,558). Pls.' SJ Reply at 5. Plaintiffs' labelling of these avenues as "outsourc[ing]," *id.*, misses the point—the entire discussion of those avenues in the Final Rules was part of the Agencies' analysis of what would be required to protect only sincere objections. Plaintiffs' mere disagreement with the Agencies' conclusions is not cognizable under arbitrary and capricious review. Even if Plaintiffs' second-guessing of the Agencies' policy decisions were appropriate under the APA, Plaintiffs provide no reason to believe that insincere objections to the mandate are likely, given that contraceptive coverage is cost neutral and considered to be a valuable benefit by some employees and students.

4

Plaintiffs argue that potential harm to women who may lose contraceptive coverage requires "some justification." *Id*. at 6. But of course the Agencies provided such justification: they considered the potential effects on women at length and ultimately concluded that the Rules represented the best balancing of the various interests. *See infra* I.B. That Plaintiffs disagree does not mean that the Agencies acted arbitrarily or capriciously.

Turning to RFRA, Plaintiffs raise the implausible argument that it is unclear whether "the Religious Rule resolves *any* actual RFRA conflicts." Pls.' SJ Reply at 6. This argument is directly contrary to the Supreme Court's explanation in *Little Sisters* that *Hobby Lobby* established that the contraceptive mandate was "unlawful as applied to religious entities with complicity-based objections." 140 S. Ct. at 2384. That is the RFRA conflict the Agencies sought to resolve— relieving the substantial burden imposed by the mandate on those with complicity-based objections. The Supreme Court held that the Agencies properly considered "RFRA concerns raised in 'public comments and . . . court filings in dozens of cases—encompassing hundreds of organizations.'" *Id.* (quoting 82 Fed. Reg. 47,792, 47,802 (Oct. 1, 2017)). Indeed, it would likely have been arbitrary and capricious if the Agencies "did not look to RFRA's requirements." *Id.*

Plaintiffs' apparent basis for arguing that the Religious Exemption Rule would not resolve any RFRA conflicts is decisions of various circuit courts that were vacated by the Supreme Court in light of *Zubik* or substantially undermined by *Little Sisters.* Plaintiffs also cite *Real Alternatives, Inc. v. Secretary*, 867 F.3d 338 (3d Cir. 2017), but that case presented only the question of whether the accommodation substantially burdened *employees*—not objecting employers or schools. *See id.* at 355 & n.17. In any event, as we have previously noted, there is no requirement that Agencies survey a particular number of legal cases, or adopt the view of a particular case, especially in an area of the law that was, prior to *Little Sisters*, unsettled and contradictory. Plaintiffs' citation to a case where an agency acted ultra vires by rejecting a binding interpretation of law, Pls.' SJ Reply at 7 (citing *Bastardo-Vale v. Att'y Gen. United States*, 934 F.3d 255, 259 n.1 (3d Cir. 2019) (en banc)), is inapposite because there is no binding interpretation of law that precluded the Agencies' actions. And concluding that the Agencies were arbitrary and capricious in resolving RFRA

conflicts would be particularly senseless here where the Supreme Court has already held that the Agencies were *correct* to identify RFRA concerns and work to resolve them. If the Supreme Court had agreed with Plaintiffs that the accommodation had resolved any RFRA conflicts with the mandate, it would not have "directed the parties on remand [in *Zubik*] to 'accommodat[e]' the free exercise rights of those with complicity-based objections to the self-certification accommodation," nor held that RFRA was "an important aspect of the problem" that the Agencies needed to consider. *Little Sisters*, 140 S. Ct. at 2383–84. This Court should not rely on the Third Circuit's decision in this case, which has been reversed and remanded by *Little Sisters*, Pls.' SJ Reply at 7, but should instead consider the issues in light of the Supreme Court's guidance in *Little Sisters*.

Finally, Plaintiffs argue that the fact that an objecting employer will, even under the Rules, need to take some action to use the exemption suggests that no entities are substantially burdened by the accommodation. *Id*. But neither Plaintiffs nor this Court may "'tell [objecting entities] that their beliefs are flawed.'" *Little Sisters*, 140 S. Ct. at 2383. In any event, some entities' religious objection to the accommodation relates to being forced to trigger the provision of contraceptives through their plan, *id*. at 2376, not *ceasing* to provide them. And *Hobby Lobby* and *Little Sisters* make clear that, for those with religious objections to the mandate or accommodation, the penalty inflicted for noncompliance imposes a substantial burden. *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 724-26 (2014)*; Little Sisters*, 140 S. Ct. at 2389-90 (Alito, J., concurring).

### B. The Agencies Provided a Reasoned Explanation for Their Position on the Safety, Efficacy, and Benefits of Contraception.

Plaintiffs contend that the Agencies inadequately explained changes in their views on the safety, efficacy, and benefits of contraception. Pls.' SJ Reply at 8. That contention is wrong: as an initial matter, contrary to the statement of Plaintiffs, Federal Defendants have not "revers[ed]" their positions on the safety, efficacy, and benefits of contraceptives. Pls.' SJ Reply at 8. They adopted only the more nuanced conclusion that the benefits of contraception and the mandate are less certain than previously recognized and do not justify obligating those with sincere religious and moral objections to provide contraceptive coverage. *See, e.g.*, 83 Fed. Reg. at 57,555-56. The

Final Rules contain voluminous explanations of the Agencies' previous position on that issue, the Agencies' recognition that their position had changed, discussions of public comments on the issue, and extensive reasoning for the Agencies' change. *See, e.g.*, *id* at 57,546-56.[2]

Plaintiffs take issue with the fact that the Agencies did not weigh the costs and benefits of the Final Rules separately for each of the 18 FDA-approved contraceptives. Pls.' SJ Reply at 8. But that Plaintiffs would have preferred for the Agencies to write the Rules differently does not establish that the Rules are arbitrary and capricious. *See, e.g., Am. Paper Inst. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983). To the contrary, the Agencies' approach was utterly rational. Under the Rules, depending on the scope of its religious beliefs, an objecting entity could be exempt from providing coverage for all 18 FDA-approved contraceptives. *See* 83 Fed. Reg. at 57,575. Thus, it was reasonable for the Agencies to collectively assess the benefits and burdens of the exemptions with regard to all FDA-approved forms of contraceptives. Plaintiffs relatedly argue that the studies cited by the Rules as support for the proposition that some contraceptives have negative health effects relate only to oral and hormonal contraceptives. Pls.' SJ Reply at 8. That is irrelevant. That some contraceptives may have more mixed health effects than previously thought is relevant to the consideration of the benefits and burdens of the Rules, even if the Agencies' assessment of the health effects of other forms of contraception did not change.

Plaintiffs also argue that the Agencies erred by using "non-medical beliefs [about whether certain forms of contraception function as abortifacients] to manufacture a medical debate" and to suggest disagreement about when pregnancy begins. *Id*. at 8-9. Tellingly, Plaintiffs do not cite to a page in the Federal Register to support this argument. The Agencies did not rely on the fact that some commenters view certain contraceptives as abortifacients to assess the health effects of contraception (or to redefine pregnancy), but instead as evidence that some entities have

---

[2] Plaintiffs insist that "defendants claim that moving from a place of confidence to a place of uncertainty is not actually a changed position." Pls.' SJ. Reply at 8. But Federal Defendants made no such claim: Federal Defendants acknowledged in their opening brief that, in the Final Rules, the Agencies changed certain positions. Fed. Defs.' SJ Mem. at 16.

conscience objections to contraceptives that may interfere with implantation. 83 Fed. Reg. at 57,554. Indeed, contrary to Plaintiffs' argument, the Agencies "declined to take a position on the scientific . . . debate[ ]" regarding whether some contraceptives are abortifacients. *Id.*

Plaintiffs close with unpersuasive arguments regarding teen pregnancy rates and Colorado's contraceptive equity law. Their argument related to teen pregnancy rates rehashes the argument made in their opening brief, which Federal Defendants have already refuted. Fed. Defs.' SJ Mem. at 18-19. With respect to Colorado's contraceptive equity law, Plaintiffs contend that the Agencies "plainly failed to consider [comments regarding that law] because [they] stated that no comment 'point[ed] to studies showing those state mandates reduced unintended pregnancies.'" Pls.' SJ Reply at 9 (quoting 83 Fed. Reg. at 57,555). But the Agencies' statement that "public commenters did not point to studies showing those state mandates reduced unintended pregnancies" does not show that the Agencies failed to consider state contraceptive laws. Rather, it demonstrates that the Agencies did not agree that the studies "show[ed]" that the state mandates were the cause of a reduction in unintended pregnancies. Under the APA, the Court should defer to the Agencies' conclusions—not Plaintiffs'—regarding scientific matters, like this one, within HHS's area of expertise. *See Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 198 (3d Cir. 1999).

## C.      The Moral Exemption Rule Comports With Congressional Intent.

Plaintiffs argue the Moral Exemption Rule is arbitrary and capricious because Congress would not have wanted the Agencies to enact a moral exemption. Pls.' SJ Reply at 9-10. But the Supreme Court reached the opposite conclusion about congressional intent. "Congress could have limited HRSA's discretion in any number of ways, but it chose not to do so." *Little Sisters*, 140 S. Ct. at 2380. Instead, Congress, through the ACA, gave "HRSA broad discretion . . . to create the religious and *moral exemptions*." *Id.* at 2381 (emphasis added). That holding resolves the matter.

## D.      The Agencies Engaged in Reasoned Decisionmaking.

The Rules comply with the APA's undemanding requirement of reasoned decision making. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). The Agencies concluded that applying the contraceptive mandate to employers with conscience objections is not

the least restrictive means of furthering a compelling governmental interest as applied to those objectors. *E.g.*, 83 Fed. Reg. at 57,556. Moreover, they clearly explained the multiple, independent reasons for this conclusion, including that the Rules already do not apply to churches or integrated auxiliaries, *e.g., id.* at 57,547-48. These rationales are reasonable. *See Little Sisters*, 140 S. Ct. at 2392 (Alito, J., concurring). Plaintiffs' four counterarguments all fail.

First, Plaintiffs say that substantial adverse comments "may signal" an error in judgment. Pls.' SJ Reply at 10 (quotation marks and citations omitted), but, even if that were correct (and it is not, *see* Fed. Defs.' SJ Mem. at 22), the adverse comments received by the Agencies do not signal any error here, as discussed throughout this brief and the opening brief. Second, Plaintiffs claim that the rule is arbitrary because it fails to "confront a contrary consensus from medical experts." *Id.* at 11. But the administrative record does not reflect a "contrary consensus," *see e.g.*, 83 Fed. Reg. 57,552-55, and, in any case, courts are to defer to the scientific judgments of expert agencies. *Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 198 (3d Cir. 1999). Moreover, the Rules address medical judgments as part of a broader balancing of the benefits of the contraceptive coverage mandate and the interests of those with conscience objections to providing coverage, and such balancing is beyond the purview of medical experts who are only considering one aspect of the problem. *See* 83 Fed. Reg. at 57,556. Plaintiffs argue that the Agencies purportedly failed to consider "whether Title X clinics have funding to absorb any increased demand" from the Rules, contending that this issue is "different . . . and broader" than eligibility limits to Title X. But the Rules are not premised on the idea that Title X has the capacity to assist all women affected by the Rules, and thus cannot be arbitrary or capricious on this basis. *See id*. at 57,551. Lastly, Plaintiffs argue that Defendants' response to comments regarding contraceptive counseling was somehow only "tangentially relevant" to those comments. But the Rules themselves belie such an assertion. *See id.* at 57,556 (responding to comment by noting that "it is not clear that merely expanding exemptions as done in these rules will have a significant effect on contraceptive use and health").

### E.    Plaintiffs' Challenges to the Regulatory Impact Analysis Are Meritless.

Plaintiffs' arguments that the Agencies' regulatory impact analysis is arbitrary and

capricious remain meritless. *See* Fed. Defs.' SJ Mem. at 24-27. The most basic flaw is that Plaintiffs largely ignore the deferential standard applicable to such analyses. *See* Pls.' SJ Reply at 12; *cf. Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003). Moreover, they incorrectly argue that the Agencies improperly "excluded" dependents of people who claim the individual exemption. As with their opening brief, however, Pls.' SJ Mem. at 30-31, Plaintiffs identify no comment suggesting that such individuals were improperly excluded. *See id.*; *see also* 83 Fed. Reg. at 57,568. In any event, any such exclusion would have minimal relevance, since, as a matter of common sense, most dependents likely share the policyholder's faith. *See id.* at 57,568-69 (objecting individuals "would not use the objectionable items even if they were covered").

Furthermore, in an attempt to make the Agencies' estimates appear outlandish, Plaintiffs again conflate the Agencies' estimation of the number of entities using the accommodation with their alternative method of using user-fee adjustments. *See* Pls.' SJ Reply at 13. Their opening brief attacked the use of the 209-entity estimate in the context of one of two methods used by the Agencies to estimate the number of women affected, which relied on information related to the user-fee adjustment. As described in Federal Defendants' brief, however, the 209-entity estimate *was not a factor* in calculating the estimates based on user-fee adjustments. *See* Fed. Defs.' SJ Mem. at 25. The Agencies were careful to describe how they arrived at both numbers separately, as well as why they were inherently imperfect estimates. *See, e.g.*, 83 Fed. Reg. at 57,576. On reply, Plaintiffs contend that the purported disconnect between the two renders the 209-entity estimate a "meaningless, unexplained number." Pls.' SJ Reply at 14. But just because the Agencies arrived at different estimates using different methodologies does not render one or the other "meaningless;" it simply means that there were "multiple levels of uncertainty involved in measuring the effect of the expanded exemption." 83 Fed. Reg. at 57,574. Both methodologies are rationally supported and explained in the Rules, which is all the APA requires.

Next, Plaintiffs contend that the Agencies' decision to rely on statements of hospitals to determine how many would continue to use the accommodation was irrational. But it is reasonable for an agency to rely on the statements of regulated entities about their future intentions, while

acknowledging that some entities may change course, which is exactly what the Agencies did here. *Id*. at 57,576-77. The APA requires reasoned decision making, not clairvoyance.

Lastly, Plaintiffs continue to press their argument that the Agencies improperly used "the same assumption twice," *i.e.*, that they purportedly first estimated that 379,000 women of childbearing age "receive insurance coverage from an entity reasonably likely to use the exemption," but then improperly cut that estimate again by two thirds. Plaintiffs' argument misunderstands the significance of the 379,000 number. Those were not employees of entities "reasonably likely to use the exemption," but rather of employers that had not covered contraceptives prior to the coverage mandate and, thus, *could* conceivably qualify for the new exemption. *See id*. at 57,580. As described in our opening brief, the Agencies then reasonably estimated that one-third of those individuals receive coverage from an employer or school that in fact *would* likely qualify for the new exemptions. The first number was derived from the number of "private, non-publicly traded third party employers that did not cover contraception pre-Affordable Care Act, and whose plans were neither exempt nor omitted from mandatory contraceptive coverage under the previous regulations," but crucially, no information or comments suggested that "all or most entities that omitted coverage of contraceptive coverage pre-[ACA] did so on the basis of sincerely held conscientious objections . . . or religious beliefs." *Id.* The Agencies thus appropriately reduced the number of potentially affected employees; they did not mistakenly double-count their reduction as Plaintiffs contend.

## II.     The Final Rules Otherwise Fully Comply with Applicable Law.

### A.     The Religious Exemption Rule Comports With the Establishment Clause.

"[T]here is no basis for an argument" that the Final Rules are inconsistent with the Establishment Clause. *Little Sisters*, 140 S. Ct. at 2396 n.13 (Alito, J., with Gorsuch, J., concurring). Plaintiffs' attempt to conflate the Religious Exemption Rule's accommodation of religious exercise with an impermissible "foster[ing of] a religious preference," Pls' SJ Reply at 15, cannot be squared with *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327 (1987), which recognized that alleviating governmental interference with religious exercise is a permissible

legislative purpose. And, as the Supreme Court has recognized, it issued the *Zubik* remand precisely so that the Agencies would accommodate religious exercise. *Little Sisters*, 140 S. Ct. at 2383; *see also* 83 Fed. Reg. at 57,546-48. Plaintiffs' attempt to minimize the sincere religious objections that many entities have to the accommodation invites just what RFRA prohibits. The Agencies—and courts—may not "tell [a] plaintiff that [its] beliefs are flawed" because in their view "the connection between what the objecting parties must do . . . and the end that they find to be morally wrong is simply too attenuated." *Little Sisters*, 140 S. Ct. at 2383 (cleaned up).

Plaintiffs insist that the Final Rules go beyond "simply removing a barrier" and thus necessarily indicate "a preference for religious interests over others." Pls.' SJ Reply at 16. But that is mistaken. The government has lifted the same burden on religious employers that the government itself imposed, *see Amos*, 483 U.S. at 338, after determining that the burden is not narrowly tailored to achieve any compelling governmental interest. The lifting of a *government-imposed* burden on religious exercise is permitted under the accommodation doctrine referenced in *Amos*. *See Tex. Monthly v. Bullock*, 489 U.S. 1, 18 n.8 (1989) (plurality opinion).

Plaintiffs are also wrong to claim that the Final Rules violate the Establishment Clause on the theory that the Rules unduly burden Plaintiffs. As Federal Defendants explained in their opening brief, Plaintiffs' characterization rests on the "'incorrect presumption'" that "'the government has an obligation to force private parties to benefit those third parties and that the third parties have a right to those benefits.'" Fed. Defs.' SJ Mem. at 33 (quoting 83 Fed. Reg. at 57,549). Moreover, contrary to Plaintiffs' assertion, this case is not like *Estate of Thornton v. Caldor*, 472 U.S. 703, 710 (1985), where the problem with the relevant statute was not that it burdened other employees, but that it intruded on private relationships to favor religious individuals by imposing on employers an "absolute duty" to allow employees to be excused from work on "the Sabbath [day] the employee unilaterally designate[d]." *Id.* at 709. Here, far from taking sides in an otherwise-private dispute between religious employees and their employers, the government has simply lifted its own self-imposed barrier.

Plaintiffs relatedly complain that the Agencies did not even "consider[]" the interests of

women and that this somehow amounts to an Establishment Clause violation, Pls.' SJ Reply at 16, but again this is wrong. Even assuming there were a duty under the Establishment Clause to make such an inquiry, the Agencies provided reasoned explanations for the promulgation of the Final Rules and responded meaningfully to comments regarding their effect, as explained above.

Finally, the Establishment Clause analysis is not altered by the fact that the Final Rules postdate the effective date of the contraceptive-coverage mandate. It remains the case that prior to the imposition of that mandate, women were not entitled to receive contraceptive coverage without cost sharing through their health plans. That is the "relevant baseline" here. *See id*.

The Agencies reasonably decided to adopt the religious exemption to satisfy their RFRA obligation to eliminate the substantial burden that the mandate imposes on objecting employers, *Hobby Lobby*, 573 U.S. at 725-26, and complied with the Establishment Clause in doing so.

**B.     The Final Rules Do Not Create an Unreasonable Barrier to Care.**

Section 1554 of the ACA prohibits regulations that "*create*[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "*impede*[] timely access to health care services." 42 U.S.C. § 18114(1), (2) (emphases added). Contrary to Plaintiffs' strained reading, Pls.' SJ Reply at 16-18, "creating" or "impeding" something requires an affirmative act. The Supreme Court has long recognized this common-sense "distinction between regulations that impose burdens on health care providers and their clients and those that merely reflect Congress's choice not to subsidize certain activities." *California v. Azar*, 950 F.3d 1067, 1092 (9th Cir. 2020) (en banc) (citations omitted). Here, Congress did not require a contraceptive mandate in the Women's Health Amendment, nor did it smuggle one into a different provision of the same Act. The Agencies thus created no barrier to care when they expanded the exemptions to the mandate.

Plaintiffs err in attempting to distinguish *California*. Though the case itself concerned restrictions on the use of federal funds, the Ninth Circuit's analysis was not limited to such restrictions. *See id*. For the same reasons that a governmental decision not to subsidize abortion services did not run afoul of § 1554, the decision not to require private entities with conscience objections to provide coverage for contraceptive services is similarly permissible.

### C.     The Final Rules Are Consistent With Equal Protection Principles.

As explained previously, the Final Rules do not discriminate on the basis of sex. Fed. Defs.'
SJ Mem. at 36-38. As before, Plaintiffs fail to cite *any* authority suggesting that declining to require
subsidization of contraception constitutes a sex-based equal protection violation. *Compare* Pls.'
SJ Reply at 18-19 *with* Fed. Defs.' SJ Mem. at 37 n.12. Plaintiffs' essential claim is that, despite
the fact that the Rules do not create any sex-based distinction, an exemption to the obligation to
subsidize contraception disparately impacts women. But "[t]he equal protection component of the
Fifth Amendment prohibits only purposeful discrimination," and not disparate impact. *Harris v.
McRae*, 448 U.S. 297, 323 n.26 (1980) (citation omitted). As a result, Plaintiffs' claim fails.

### D.     The Final Rules Are Consistent With Title VII and Section 18116.

The Final Rules comply with Title VII's prohibition on "employer[s]" discriminating
against an employee or job applicant "because of" or "on the basis of" "sex." 42 U.S.C. § 2000e-
2(a), (b). First, Title VII only prohibits employment discrimination, and Plaintiffs are not in an
employment relationship with the Federal Government. Fed. Defs. SJ Mem. at 39-40. In arguing
to the contrary, Plaintiffs misplace their reliance on an out-of-circuit district court decision, *New
York v. HHS*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019), that fails even to mention this threshold issue,
and that has been appealed. *See Planned Parenthood Fed'n v. Azar*, No. 20-31 (2d Cir.). Second,
Plaintiffs may not assert an APA claim for an alleged Title VII violation—if their claim were
meritorious, an adequate alternative remedy would be available: a Title VII action. Fed. Defs.' SJ
Mem. at 40. Plaintiffs cite no authority suggesting that such an action would not constitute an
adequate alternative remedy. Pls.' Reply MSJ at 19 n.4. Third, more fundamentally, the Final
Rules do not discriminate on the basis of sex, as explained *supra* II.C. For the same reason, the
Final Rules are consistent with 42 U.S.C. § 18116, which also prohibits sex discrimination.

### E.     The Court Need Not Resolve Little Sisters' Constitutional Challenges, Which Lack Merit in Any Case.

In their supplemental summary judgment brief, Little Sisters for the first time raises two

constitutional challenges to the contraceptive coverage mandate as a whole.[3] Little Sisters argues that the Court can provide no redress to Plaintiffs because the mandate was void *ab initio* for two reasons: (1) it was authorized by an unconstitutional delegation of authority, and (2) it was approved by an officer, the Administrator of HRSA, who was appointed in violation of the Appointments Clause. Little Sisters' Supp. SJ Br. at 11-15, ECF No. 259. The Court need not address these arguments if it upholds the Final Rules. The Little Sisters have not brought these arguments as claims against the Federal Defendants, and thus they would be appropriately considered by this Court only as relevant to the existing claims in this case.

To the extent this Court believes it must address them, these arguments fall flat for at least two reasons. First, Little Sisters' nondelegation argument fails because Congress provided HRSA with criteria to guide its delegation of authority: HRSA was to provide comprehensive guidelines, "with respect to women, [for] such additional preventive care and screenings not described in paragraph (1)." 42 U.S.C. § 300gg-13. These criteria are a sufficient intelligible principle under governing precedent. *See, e.g., Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 474 (2001). *Little Sisters* is not to the contrary—the Court expressly disavowed reaching any conclusion on nondelegation. 140 S. Ct. at 2382. Second, any possible Appointments Clause problem with the contraceptive mandate has been cured by the Secretary of Health and Human Services' ratification of the mandate through a rulemaking implementing it. *Guedes v. ATF*, 920 F.3d 1, 13 (D.C. Cir. 2019; *see, e.g.*, 78 Fed. Reg. 39,870, 39,872, 39,899 (Jul. 2, 2013) (notice of final regulations "[a]pproved" by Kathleen Sebelius, "Secretary, Department of Health and Human Services").[4]

## CONCLUSION

Federal Defendants respectfully request the Court to enter judgment in their favor.

---

[3] Little Sisters also argues that the contraceptive coverage mandate would violate the First Amendment if it required them to provide contraceptive coverage in violation of their religious beliefs. Little Sisters' Supp. SJ. Br. at 15-17. But the Final Rules eliminate any such obligation, and those rules should be upheld. The Court need not address Little Sisters' argument.

[4] If the Court is inclined to adopt Little Sisters' arguments, Federal Defendants respectfully request that the Court permit separate briefing to enable them to more fully address those arguments.

DATED: November 24, 2020               Respectfully submitted,


JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JENNIFER B. DICKEY
Principal Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

MICHELLE R. BENNETT
Assistant Director, Federal Programs Branch

*/s/ Justin M. Sandberg*
JUSTIN M. SANDBERG (Il. Bar No. 6278377)
Senior Trial Counsel
MICHAEL GERARDI
CHRISTOPHER R. HEALY
REBECCA M. KOPPLIN
DANIEL RIESS
Trial Attorneys
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 514-5838
Justin.Sandberg@usdoj.gov
*Attorneys for Federal Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 24, 2020, a copy of the forgoing document was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

DATED this 24th day of November, 2020.          /s/ *Justin M. Sandberg*
                                                 JUSTIN M. SANDBERG