# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; ALEX M. AZAR II, *in his official capacity as Secretary of Health and Human Services;* UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEVEN T. MNUCHIN, *in his official capacity as Secretary of the Treasury*; UNITED STATES DEPARTMENT OF THE TREASURY; RENE ALEXANDER ACOSTA, *in his official capacity as Secretary of Labor;* and UNITED STATES DEPARTMENT OF LABOR,<br><br>    Defendants,<br><br>LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,<br><br>    Intervenor-Defendant. | No. 17-CV-4540-WB<br><br><br><br><br><br>**REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION ................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

I.   The States lack Article III standing. ........................................................................... 2

    A.  The States have no Article III injury. ................................................................. 2

    B.  The States cannot show redressability. .............................................................. 3

II.  The Mandate itself violates the nondelegation doctrine. ............................................. 3

III. HRSA did not have the authority to issue the Mandate under the Appointments
    Clause. ........................................................................................................................ 5

IV. The Mandate is unconstitutional under the First Amendment as applied to
    religious objectors. ...................................................................................................... 5

V.  Under *Little Sisters*, the Final Rule does not violate the APA ................................... 6

    A.  The Final Rule is permitted by RFRA. .............................................................. 6

    B.  The Final Rule is required by RFRA. ................................................................ 7

    C.  The Final Rule contains a sufficient explanation of its findings. ...................... 9

    D.  The Final Rule is not overbroad. ..................................................................... 10

    E.  The Final Rule is severable. ............................................................................ 11

VI. The Final Rule does not violate the Establishment Clause. ...................................... 12

VII. The Final Rule does not violate the Equal Protection Clause. ................................. 13

VIII. The Final Rule does not violate Section 1554 of the ACA. .................................... 14

IX. The Final Rule does not violate Section 1557 or Title VII. ...................................... 14

CONCLUSION .................................................................................................................... 15

CERTIFICATE OF SERVICE ............................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Christian Sch. Tuition Org. v. Winn*,
  563 U.S. 125 (2011)........................................................................................2

*Becerra v. Azar*,
  950 F.3d 1067 (9th Cir. 2020) ......................................................................14

*Brockett v. Spokane Arcades, Inc.*,
  472 U.S. 491 (1985).......................................................................................12

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)....................................................................................8, 11

*Corp. of the Presiding Bishop v. Amos*,
  483 U.S. 327 (1987).......................................................................................12

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006).........................................................................................4

*DeOtte v. Azar*,
  393 F. Supp. 3d 490 (N.D. Tex. 2019) ...........................................................3

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016).....................................................................................6

*Franciscan Alliance v. Burwell*,
  227 F. Supp. 3d 660 (N.D. Tex. 2016) ..........................................................15

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010).........................................................................................5

*Geneva Coll.* v. *HHS*,
  778 F.3d 422 (3d Cir. 2015)............................................................................1

*Green Island Power Auth. v. FERC*,
  577 F.3d 148 (2d Cir. 2009).............................................................................9

*Little Sisters v. Pennsylvania*,
  140 S. Ct. 2367 (2020)............................................................................ *passim*

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018).....................................................................................5

*Mayor of Baltimore v. Azar*,
  973 F.3d 258 (4th Cir. 2020) ....................................................................10, 14

*Mistretta v. United States*,
   488 U.S. 361 (1989) ...............................................................................................4

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) ...........................................................................................6

*Pa. Prison Soc'y v. Cortes*,
   508 F.3d 156 (3d Cir. 2007) ...................................................................................2

*Panama Refining Co. v. Ryan*,
   293 U.S. 388 (1935) ...............................................................................................4

*In re Union Pac. R.R. Emp. Prac. Litig.*,
   479 F.3d 936 (8th Cir. 2007) ................................................................................15

*Zubik v. Burwell*,
   136 S. Ct. 1557 (2016) ............................................................................. 6, 7-8, 11

**Statutes**

20 U.S.C. § 1681 ............................................................................................................15

42 U.S.C. § 18116 ..........................................................................................................15

**Regulations**

45 C.F.R. § 147.132 ...........................................................................................10, 11, 12

45 C.F.R. § 147.133 ...................................................................................................12

47 Fed. Reg. 38,409 (Aug. 31, 1982) ..............................................................................5

83 Fed. Reg. 57,536 (Nov. 15, 2018) .................................................................... *passim*

**Constitutional Provisions**

U.S. Const. amend. I .............................................................................................1, 5, 13

U.S. Const. art. II, § 2, cl. 2 .....................................................................................1, 5

## INTRODUCTION

The States' remaining arguments require this Court to hold that there is no rational explanation for the Final Rule. But that position ignores the Supreme Court's 7-2 rejection of the States' core claims, as well as the Court's findings that:

- the Final Rule is authorized by a "capacious grant of authority" from Congress;

- the Court had "directed the Government to accommodat[e] . . . religious exercise;"

- even if the Final Rule caused third-party harm, "it is Congress, not the Departments, that has failed to provide the protection for contraceptive coverage;"

- and the agencies had "explained [their] position in fulsome detail" in the Final Rule.

The States instead press arguments that even if correct, would not change the outcome of the Final Rule. They also fail to show that they will be harmed by a Rule that has now been in place for months, or how this Court could redress their problem, given the comprehensive injunctions against the Mandate. How could this Court's ruling help them? The States never say.

But the States do say something dispositive: they finally acknowledge that the forcing the Little Sisters to participate in the so-called "accommodation" would "facilit[ate] access to" contraception. Opp. 17. That effectively concedes the RFRA argument, which the States had previously dodged only by relying on the stale understanding that the religious objector "in no way" "facilitate[s]" "the provision of contraceptive coverage." *Geneva Coll.* v. *HHS*, 778 F.3d 422, 438 (3d Cir. 2015). Now that the States admit that allowing religious objectors not to comply with the "accommodation" would "directly interfere" with contraceptive coverage, Opp. 17, there can be no serious dispute about whether the "accommodation" imposes a substantial burden, and thus whether RFRA required the Final Rule.

That is enough to end the case. And ending the case here will spare the Mandate itself from being invalidated on nondelegation, Appointments Clause, and First Amendment grounds the States cannot rebut. It is time for the contraceptive mandate litigation to end.

## ARGUMENT

**I.  The States lack Article III standing.**

**A.  The States have no Article III injury.**

The States' central response on standing underscores how they fail to reckon with *Little Sisters*. The States claim their "standing is settled" by prior rulings, Opp. 21, but those decisions have been "reverse[d]." *Little Sisters v. Pennsylvania*, 140 S. Ct. 2367, 2386 (2020). The States offer no response to the Little Sisters' point that three months of a live Final Rule changes the *facts* of the standing analysis. Br. 8. Ruling against the States on standing does not require the Court to disclaim its prior holding that the States showed "more than a mere possibility" of injury prior to the Final Rule taking effect. ECF No. 136 at 14. It requires only observing that the possibility did not come to pass. With the Final Rule in effect since August 20, the States' failure to offer evidence showing *anyone* to have lost coverage due to the Final Rule is fatal on summary judgment, where they "bear[] the burden of proof" to support their claims with "specific facts" in evidence. *Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 161 (3d Cir. 2007); Br. 7-8.[1]

By contrast, *Little Sisters* does stand for the proposition that the agencies had the power to accommodate sincere religious objectors. And the States make no response to the point that standing for any overbreadth claim must be supported by a claim of actual harm from that overbreadth, conceding the point. Br. 9. Rather, the States attempt to flip their burden to the agencies, arguing, for example, that the *absence* of evidence that any for-profits with shareholders object to the Mandate dooms the Final Rule. *See* Opp. 5. But the utter *absence* of such proof is a standing problem for the States before it could be a merits problem for the agencies.

---

[1] The States' only answer is to suggest that the Supreme Court could have ruled on the States' standing. But "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011).

**B.  The States cannot show redressability.**

While the States' argument on injury relies on pretending no facts have changed, their argument on redressability requires hoping that circumstances will change. They acknowledge that the Mandate is enjoined against any "current and future employer in the United States that objects" to compliance via the accommodation. *DeOtte v. Azar*, 393 F. Supp. 3d 490, 513 (N.D. Tex. 2019); *see* Opp. 22-23. They only note *DeOtte* is "on appeal" and that it arguably does not apply to "health plans from colleges and universities"—but never name any such plans affecting their citizens not covered by other injunctions. Opp. 23. To the extent the States imply harm could arise if entities with no religious objection used the exception (illegally), they likewise identify no such lawbreakers.

The States also assert that their failure to challenge the exemptions in the HRSA Guidelines themselves does not matter to redressability, because "[e]xemptions from the Guidelines always have been the work of the Agencies, not HRSA." Opp. 22. That is wrong. The Supreme Court held that "the ACA leaves the Guidelines' content to the *exclusive discretion of HRSA*" including "broad discretion" to create "religious . . . exemptions." 140 S. Ct. at 2381 (emphasis added). Acknowledging the agencies' separate power to add exceptions does not change the Supreme Court's clear language on this point. *See id.* at 2380 (HRSA can "identify and create exemptions from its own Guidelines."). Particularly where the States rely on the HRSA Guidelines having independent force—since the Guidelines are the only place the Mandate's required contraceptives are listed—they cannot disclaim that power in part contrary to a clear Supreme Court ruling.

**II. The Mandate itself violates the nondelegation doctrine.**

Contrary to the States' view, the Supreme Court didn't seem to think the nondelegation doctrine was "well beyond the scope of this case." Opp. 23. Rather, the Court simply pointed out that such a challenge had not yet been pressed. 140 S. Ct. at 2382. That was no problem for the Court at the time, because it was rejecting the States' and the dissent's argument to use the statute

to force contraceptive coverage. *Id.* Rather, at that stage, it was enough to point to the "virtually unbridled" and "exclusive" discretion, and to note that the religious exemption was permissible. [2]

Now, however, the States ask this Court to go further, and to force the agencies to use that expansive grant of authority to require contraceptive coverage. Anything less would not redress their claimed harm. At this stage, it is not only proper but necessary to consider whether the underlying statute the States wish to deploy is valid (and thus could provide the redress the States seek) or not. On that score, the States do not engage the case law holding that Congress must *both* "clearly delineate[] the general policy, . . . *and* the boundaries of this delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989) (emphasis added). The States pretend that "intelligible principle" refers only to boundaries: that confining HRSA's otherwise unbridled discretion to services that are "preventive," "for women," and not redundant with another mandate is sufficient. Opp. 23. But in *Panama Refining Co. v. Ryan*, the President was likewise working within narrow boundaries: he could only regulate "petroleum," and then only its "interstate and foreign" transportation, and then only that "produced or withdrawn" beyond that "permitted by state authority." 293 U.S. 388, 415 (1935). Yet the Supreme Court held that even a "defined," circumscribed authority violates the nondelegation doctrine where Congress has "declare[d] no policy" to guide the policy choices *within* that authority. *Id.* at 414-15. Likewise, the *Little Sisters* Court found HRSA was granted "virtually unbridled discretion" within its scope of authority, and that Congress was "completely silent" as to "any criteria or standards," declining to even provide an "illustrative" list. 140 S. Ct. at 2380. That lacks an intelligible principle in the precise language ("unbridled discretion") of the doctrine, and it forecloses the States' request here. Br. 11-12.

---

[2] The States claim, without real explanation, that the Little Sisters should not be permitted to raise this argument, even in district court. Opp. 23. Permission to defend a regulation against a legal challenge logically includes permission to raise standing defects with that challenge. And even if the Little Sisters were not raising that doctrine, this Court has a continuing "obligation to assure" itself of standing after the Supreme Court's comments. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006).

III.    **HRSA did not have authority to issue the Mandate under the Appointments Clause.**

Because the "continuing office" of the HRSA Administrator exercises "significant discretion" when carrying out "important functions" of government, she is subject to the Appointments Clause, and may not exercise those functions absent Senate confirmation or a congressional exception. *See Lucia v. SEC*, 138 S. Ct. 2044, 2053 (2018) (internal quotation marks omitted). The States' lead response again requires ignoring *Little Sisters*' extensive discussion of HRSA's "virtually unbridled authority," and "exclusive discretion" by insisting its Guidelines have "no independent force." Opp. 24. But HRSA's Guidelines must have independent force; the required services are nowhere to be found in the CFR. So the federal government's argument regarding the CFR rulemaking, Fed. Reply 15, is beside the point. And if the States are arguing that the agencies can nevertheless "define[]" "compliance" with the Guidelines in a way that permits exemptions, *id.*, that is no distinction from *Lucia*. There, the fact that the relevant officers' decisions bound no one until the SEC "issue[d] an order" did not undercut their discretion. 138 S. Ct. at 2054.

The States' fallback argument is weaker still: that the ACA "taps HRSA" rather than the HRSA Administrator personally. Opp. 24. But HRSA "is directed by [the] Administrator" in all its duties. 47 Fed. Reg. 38,409, 38,410 (Aug. 31, 1982). And even where a responsibility is spread across a multi-person government body, the Appointments Clause applies. *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010). The HRSA Administrator cannot act as an officer without proper appointment, and the Mandate therefore cannot lawfully be enforced.

IV. **The Mandate is unconstitutional under the First Amendment as applied to religious objectors.**

The Little Sisters explained in their brief that if the Final Rule is struck down, the underlying Mandate cannot be re-implemented because it violates the First Amendment. Br. 15-17. The prior religious exemption from the Mandate violates the First Amendment by discriminating among religious institutions. Additionally, both the First Amendment and RFRA require the government

to eliminate preferences among religious organizational structures that interfere with the internal affairs of religious groups, particularly where so many other avenues exist to serve the States' claimed interest. It is therefore illegal for this Court to revive that version of the Mandate. The States have no response to the Mandate's unconstitutional discrimination, and their only response to *Our Lady*'s requirement of respect for the internal deliberations of religious organizations is that *Our Lady* involves different religious beliefs than this case. Opp. 16. But the Little Sisters' religious beliefs about how to respect life itself *are* part of the "very reason for the[ir] existence," as it helps define their mission of serving the elderly poor. *Id.* Requiring that they act inconsistently with those beliefs would "undermine [their] independence" all the same. *Id.*; *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020).

## V.  Under *Little Sisters*, the Final Rule does not violate the APA.

### A.  The Final Rule is permitted by RFRA.

The States do not contest that the agencies were permitted to "exercise their rulemaking discretion to resolve RFRA violations" in the Final Rule. Opp. 6. Instead, they argue that this Court should strike the Final Rule as arbitrary and capricious if it disagrees with the agencies about whether there was a RFRA violation at all. Opp. 7.

The agencies were not working from a clean slate when they adopted the Final Rule. After they had altered the Mandate multiple times, and at each iteration received numerous comments asking for a broader religious exemption than they had provided, *Little Sisters*, 140 S. Ct. 2374-78, after they had been enjoined from enforcing the Mandate against dozens of religious objectors, Br. 5, and after the agencies were "directed" *by the Supreme Court* "to 'accommodat[e]' . . . religious exercise," *Little Sisters*, 140 S. Ct. at 2381 n.7—presumably in a way that they had not already done so, there were many "adequate reasons" for the Final Rule. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Indeed, the Supreme Court's order in *Zubik* overrides the notion that there is no need to "remedy any conflicts," Opp. 7, and *Little Sisters* affirmed as much.

140 S. Ct. at 2383-84. But even if the agencies had *not* been ordered by the Supreme Court to accommodate religious exercise, removing a burden on religious exercise in consideration of RFRA would not be arbitrary and capricious, even if this Court disagreed about whether there was a RFRA violation. To hold as much would be to put the agencies in a Catch-22, whereby they would be "susceptible to claims that the rules were arbitrary and capricious" if they did *not* attempt to relieve burdens on religious exercise, and they would be vulnerable to claims like the States' if they did. *Little Sisters*, 140 S. Ct. at 2384.

Next, admitting that there *is* some problem, the States argue that the potential alleged loss of contraceptive coverage for employees means that any "disconnect" between that problem and the Final Rule renders the exemption arbitrary and capricious. To begin with, the States have not brought any evidence that such a disconnect exists. *See* Br. 7-9; *supra* Part I. But even if it does, the States have not grappled with the Supreme Court's reasoning that any third-party harms are the fault of the statute here, not the agencies. *Little Sisters*, 140 S. Ct. at 2382 ("it is Congress, not the Departments, that has failed to provide the protection for contraceptive coverage"). That is particularly true where, as here, Congress also allowed for that same disconnect by providing for secular exemptions from the rule. *See* Br. 27-28.

## B.  The Final Rule is required by RFRA.

The Little Sisters have explained that the Final Rule was necessary to comply with RFRA because the accommodation imposed a substantial burden and violated RFRA. Br. 21-29. The States largely decline to respond to the Little Sisters' arguments on this front, and they fail entirely to contest the Little Sisters' arguments that the Mandate cannot survive strict scrutiny, Br. 27-29.

The States cannot—and do not even try to—deny that accommodation coverage comes from the employer's health plan, that a touted *benefit* of the "accommodation" system was precisely that women would *not* have two separate plans, or that the coverage depends on issuance of a plan instrument under the employer's plan, *see* Br. 24-26; Suppl. Br. for Resp'ts, *Zubik v. Burwell*, 136

S. Ct. 1557 (2016) (No. 14-1418), 2016 WL 1445915, at *17 ("There is *no mechanism* for requiring TPAs to provide separate contraceptive coverage *without a plan instrument*; *self-insured employers could not opt out of the contraceptive-coverage requirement by simply informing their TPAs that they do not want to provide coverage for contraceptives*.") (emphasis added). The States also fail to dispute the Little Sisters' factual assertions that the Mandate requires them to take actions that violate their beliefs. Instead, they continue to argue that the accommodation does not "trigger" provision of contraceptives. Opp. 7. This revives the argument foreclosed by *Hobby Lobby* and *Little Sisters* that a burden is measured by how "attenuated" is "the connection between what the objecting parties must do . . . and the end that they find to be morally wrong." *Little Sisters*, 140 S. Ct. at 2383 (citing *Burwell v. Hobby Lobby Stores, Inc*, 573 U.S. 682, 723-24 (2014)).

More importantly, the States now admit that compliance with the accommodation "facilit[ates] access to" contraceptive coverage, and that without the involvement of the employers, the coverage won't be provided. Opp. 17. That, of course, is what religious objectors have always understood and what *Geneva College* misunderstood based on incorrect facts. Now that all parties agree that the forced involvement of religious objectors *is* directly involved in providing contraceptive coverage—so much that the States now say it would be "directly interfer[ing]" (Opp. 17) with that coverage to give the Little Sisters an exemption—the States have effectively conceded substantial burden. *Accord Little Sisters*, 140 S. Ct. at 2398 ("The Little Sisters, among others, maintained that the accommodation itself made them complicit in providing contraception. The measure thus failed to 'assuage[]' their 'sincere religious objections.'") (Kagan, J., concurring).

Instead of addressing the Mandate's merits under RFRA, the States return continuously to *Real Alternatives*. But they do not acknowledge the Little Sisters' point that *Real Alternatives* dealt with a different religious belief than the Final Rule purports to address, Br. 23, or that *Real Alternatives* relied on incorrect facts, Br. 23-27, that the States now effectively concede. The Final Rule was

thus required by RFRA to avoid the substantial burden of forcing religious objectors to "facilit[ate] access to" and "directly" help provide contraceptives in violation of their undisputed religious beliefs. Opp. 17.

### C. The Final Rule contains a sufficient explanation of its findings.

The above arguments demonstrate that the States' arbitrary and capricious arguments—delving even into the details of the Final Rule's regulatory impact estimates—are misplaced. *See* Opp. 12-14. The thrust of the Final Rule is fundamentally that the prior accommodation triggered, and failed, RFRA's strict scrutiny analysis. The States make much of the fact that the Supreme Court did not rule that the Final Rule was required by RFRA or that it was not arbitrary and capricious. But they fail to grapple with the Supreme Court's reasoning, which provides every indication that it is not arbitrary and capricious to "simply reach[] a different conclusion" about the accommodation under RFRA. *Little Sisters*, 140 S. Ct. at 2384 n.12.

The Little Sisters and the agencies have explained why the States are incorrect about the Final Rule's insufficiency even aside from RFRA, explanations the States attempt to sidestep. Br. 29-34, Fed. Br. 15-27, ECF No. 257. Nevertheless, none of the States' complaints bear on the Final Rule's necessity. Opp. 8-9. And any error is harmless because "the outcome of the administrative proceedings" could not be changed by further explanation, a different regulatory impact estimate, or better consideration of comments. *See Green Island Power Auth. v. FERC*, 577 F.3d 148, 165 (2d Cir. 2009). That outcome is determined by RFRA and approved by *Little Sisters*. Br. 29-34.

The States argue that the release of the administrative record should change this Court's analysis of whether the agencies sufficiently considered comments, but this Court reviewed the agencies' responses to comments regarding "scientific evidence of the harm to the health and economic security of women," "comments that assert the broad religious and moral exemptions will cause women to lose contraceptive coverage," comments that the exemption will "create barriers to medical care . . . and, specifically, a comment submitted by various States . . . regarding

the medical risks associated with pregnancy." ECF No. 136 at 26 (citations omitted). The States have supplied no comments at this stage that address new issues beyond those this Court already considered. Furthermore, since this Court has already held that the agencies met the "not 'particularly demanding'" test of "consider[ing] and respond[ing] to significant comments," the States' invocation of *Mayor of Baltimore v. Azar* is unhelpful, where the regulation "merely stated that it 'disagree[d]'" with the comments. 973 F.3d 258, 277 (4th Cir. 2020). As *Little Sisters* already found, the agencies "explained [their] position in fulsome detail." 140 S. Ct. at 2385.

**D.  The Final Rule is not overbroad.**

As the Little Sisters explained, the Final Rule exempts entities only "to the extent of [their] objections." 45 C.F.R. § 147.132(a)(1); *see id.* (a)(2). For that reason, an entity that objects only to "some, but not all, contraceptive items" are not exempt from maintaining a plan "with respect to the items to which they do not object." J.A. 23. Likewise, an entity that objects to compliance with the Mandate as originally designed, but not to compliance via the accommodation, would not be excused from compliance altogether.

The States have no answer for the "to the extent" language. And indeed, their claim of overbreadth falls apart without it: "optional for entities that are otherwise also eligible for the expanded exemptions" by its terms does not mean optional for entities that are *not* exempt from compliance by the available means. Opp. 3 (quoting J.A. 34). And the States likewise do not address the possibility of reluctant users of the accommodation. Br. 35-36. Rather, they continue to assume without explanation that any entity that used the accommodation (rather than filing suit) must be "content" with that option as a religious matter. Opp. 3. But the agencies' stating that "some" accommodated entities "may" switch to the exemption while "others might not," is perfectly consistent with an understanding that some entities may have complied under compulsion despite their sincere beliefs. J.A. 42.

The States' other concern that the Final Rule reaches "beyond RFRA violations" because the exemption is not limited to cases where "compliance with the mandate or the Accommodation imposes a substantial burden" just misunderstands the substantial burden analysis. Opp. 4. As *Little Sisters* clarifies, the "substantial burden" is the objective "consequence[]" of non-compliance—the heavy fines levied by statute. 140 S. Ct. at 2377 (quoting *Hobby Lobby*, 573 U.S. at 691). So the Mandate substantially burdens religious practice "to the extent that an entity . . . objects" based on a sincere religious belief—the exact line drawn by the Final Rule. 45 C.F.R. § 147.132(a)(2). And while the States insist that the Final Rule must be overbroad unless it provides for a government-directed sincerity review on top of multiple private rights of action, they decline to engage with other federal exemptions not conditioned on such review. *See* Br. 19-20.

With the claims that the Final Rule extends to non-objectors set aside, the States' remaining overbreadth claim is against an exemption for for-profits not closely held. Opp. 5. But the States ignore that *Little Sisters* specifically blesses the agencies' discretion to resolve an "uncertain legal question" in favor of religious objectors. Opp. 5; *see Little Sisters*, 140 S. Ct. at 2383-84 (discussing *Zubik*'s "direct[ion]" to accommodate without a final decision as to whether the "accommodation ran afoul of RFRA"). And the agencies' interpretation was perfectly reasonable where the *Hobby Lobby* Court found, for example, that free exercise law pre-RFRA had historically protected for-profits. 573 U.S. at 708, 714-16. The Court's brief discussion of publicly traded companies did not suggest any exception to that principle, only providing a "practical" note as to the unlikelihood that companies with many "unrelated shareholders—including institutional investors" would decide to operate under shared religious beliefs—yet another hurdle to the States' Article III standing. *Id.* at 717; *supra* Part I.

### E.  The Final Rule is severable.

After not addressing the issue in their opening brief, the States agree with the Little Sisters that "[w]hen only some parts of a regulation are unlawful, they may be set aside and the rest of the

regulation saved." Opp. 24. Yet the States miss the point, saying that severability won't matter if they win on *every single claim*. Opp. 25 ("no aspect of the rules is spared from all of [the] flaws" the States have claimed). But severability *does* matter to each of the States' overbreadth claims— the only remaining claims any Justice in the *Little Sisters* 7-2 majority took seriously enough to raise. If the Court finds only the protections for publicly traded companies and nonreligious objectors improper, the States have provided no reason to not simply sever 45 C.F.R. § 147.132(a)(1)(i)(D) and 45 C.F.R. § 147.133 and leave the other protections undisturbed. Likewise, this Court can sever any *application* of the Final Rule to organizations whose sincere religious belief does not require them to make use of the exemption, if it agrees with the States that the Final Rule covers any such organizations. Br. 38; *see, e.g.*, *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504-06 (1985) ("severability clause" cut in favor of declaring statute "invalid to the extent that it reaches too far, but otherwise left intact"). The severability clause of the Final Rule contemplates and approves severance when a provision is held "invalid or unenforceable by its terms, or as applied to any person or circumstance." 45 C.F.R. § 147.132(d).

The States admit that severability is an option, and cite no authority that it should not be used here. There are multiple specific provisions that can be carved out, but in any case, this Court can sever any part of the regulation that is overbroad.

**VI. The Final Rule does not violate the Establishment Clause.**

The States also persist in their erroneous interpretation of the Establishment Clause. As the Little Sisters previously explained, the accommodation at issue in *Corporation of Presiding Bishop v. Amos* imposed a dramatic burden on a third party—the loss of a job—yet the Supreme Court nonetheless upheld that exemption. 483 U.S. 327, 334-35 (1987); Br. 39-40. The States never explain how or why *Amos* requires a contrary result in this case.

Furthermore, the States repeat their argument that the Final Rule unconstitutionally grants religious organizations an "absolute right to insist others conform" to their beliefs without any

proper balancing of interests. Opp. 15. But again, as the Little Sisters previously pointed out, and as the States themselves conceded, the strict scrutiny analysis from RFRA itself requires courts to balance interests and "take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." Br. 40 n.13. As the Little Sisters have consistently explained, RFRA's analysis ensures a proper and constitutional balancing of interests.

At bottom, then, the States' argument reduces to this: the government may legally exempt millions of employers through grandfathering; the government may exempt small businesses from providing any insurance coverage at all; and the government may exempt its own government-run plans from the preventive services mandate. Yet when the government decides to lift that same burden for a religious organization like the Little Sisters, that is the action that somehow offends the Establishment Clause. No reasonable reading of the Establishment Clause requires this result, and the Court should reject it as well.

## VII.   The Final Rule does not violate the Equal Protection Clause.

The Little Sisters previously pointed out that "[t]he States cite no case for the novel proposition that an exception to a rule with a sex-based classification is itself a sex-based classification," "[n]or have they offered any case for the even more preposterous notion that the proper judicial remedy in such a case would be to enforce the original sex-based classification." Br. 42. The States have still not done so. The Final Rule focuses on one portion of the preventive services mandate because that is the portion that was repeatedly enjoined. And if the agencies created a sex-based classification when they created the Final Rule, then Congress also did so when it passed the statute, and courts did so when they created judicial exemptions.

In any event, as the Little Sisters also explained, the Final Rule would easily pass heightened scrutiny because protecting the First Amendment and statutory rights of religious groups like the Little Sisters is unquestionably a significant government interest, and the Final Rule is also substantially related to that interest because the Rule is based upon the known religious objectors

and information gathered during the rulemaking process. Br. 42. The States do not even attempt to argue otherwise. Opp. 18-19. Their Equal Protection argument fails.

## VIII.  The Final Rule does not violate Section 1554 of the ACA.

The Final Rule does not create unreasonable barriers or impede timely access for the reasons the Little Sisters and the agencies have provided. Br. 43-44; Fed. Br. 35-36.

The States erroneously argue that the ACA itself requires the provision of contraceptives and that the Final Rule "operate[s] against that baseline." Opp. 17-18. But as the Supreme Court noted, the "contraceptive mandate" was "not required by (or even mentioned in) the ACA." *Little Sisters*, 140 S. Ct. at 2373. In other words, the States mischaracterize the proper baseline, and cannot rely on the Women's Health Amendment for this argument.

It is for the same reason that of two cases applying Section 1554 to the same regulation, Opp. 17, *Becerra* is more persuasive here. *Becerra v. Azar* recognized a "distinction between . . . burdens on health care providers and their clients and those that merely reflect Congress's choice not to subsidize certain activities." 950 F.3d 1067, 1092 (9th Cir. 2020). Here, it is not even government funds that the agencies declined to use; it is the private health plans of religious employers, and Congress did not mandate the coverage, so it can hardly impede access for the Little Sisters to choose not to be involved. *Baltimore*, by contrast, finds a violation in regulating "medical options between a patient and her provider." 973 F.3d at 288. Here, the agencies are simply allowing employers like the Little Sisters to opt out of the relationship between a patient and her provider.

## IX.  The Final Rule does not violate Section 1557 or Title VII.

The Final Rule does not violate Section 1557 of the ACA or Title VII. Were the Court to adopt the States' reasoning, every change to the preventive services mandate, including the Mandate itself—which treats women and men differently—would violate Section 1557. Br. 44.

Additionally, Section 1557 prohibits discrimination "on the ground prohibited under . . . title IX." 42 U.S.C. § 18116(a). As one court has already concluded, Section 1557 incorporates Title IX's religious exemption, which states that Title IX does not apply to religious organizations. *Franciscan Alliance v. Burwell*, 227 F. Supp. 3d 660, 691 (N.D. Tex. 2016); *see* 20 U.S.C. § 1681(a)(3). Accordingly, it simply cannot be the case that the exemption at issue here, which protects religious organizations, is inconsistent with Section 1557, which itself includes an exemption for religious organizations. The States may disagree with this conclusion, but they fail to offer any case—let alone any reasoning—supporting their position. Opp. 20-21.

Nor are the States' Title VII arguments persuasive. Opp. 19-20. The States never respond to the point that if the Final Rule violates Title VII, the same conclusion must follow for their own choices to limit contraceptive coverage. Br. 45. Nor do they address *In re Union Pac. R.R. Emp. Prac. Litig.*, 479 F.3d 936, 942 (8th Cir. 2007), which held that Title VII does not mandate contraceptive coverage. And finally, the States also do not answer "how such a Title VII theory could ever work for religious non-profits like the Little Sisters, who are statutorily exempt." Br. 45. Indeed, the States' only argument repeats their erroneous assertion that "the applicable baseline" is full contraceptive coverage. Opp. 20. But this again gets it entirely backwards. *See Little Sisters*, 140 S. Ct. at 2373-74; *supra* Part VIII; Br. 9-10. Congress's choice not to mandate contraceptives cannot mean that the agencies' offer of an exemption from a self-created mandate violates Title VII.

## CONCLUSION

This Court should grant summary judgment in favor of the Defendants and deny the States' summary judgment motion. In the alternative, Defendant-Intervenor respectfully requests that, if the Court accepts the States' arguments and invalidates the Final Rules, the Court also invalidate the regulations implementing the Mandate prior to October 13, 2017.

Dated: November 24, 2020                    Respectfully submitted,

                                            /s/ Mark Rienzi
                                            Mark Rienzi, *pro hac vice*
                                            Lori Windham, *pro hac vice*
                                            Eric Rassbach, *pro hac vice*
                                            Diana Verm, *pro hac vice*
                                            The Becket Fund for Religious Liberty
                                            1200 New Hampshire Ave. NW, Suite 700
                                            Washington, DC 20036
                                            Telephone: (202) 955-0095
                                            Facsimile: (202) 955-0090
                                            mrienzi@becketlaw.org

                                            Nicholas M. Centrella
                                            Conrad O'Brien PC
                                            1500 Market Street, Suite 3900
                                            Philadelphia, PA 19102-2100
                                            Telephone: (215) 864-8098
                                            Facsimile: (215) 864-0798
                                            ncentrella@conradobrien.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of the Court for the United States District Court for the Eastern District of Pennsylvania using the CM/ECF system, and that service will be effectuated through the CM/ECF system.

Dated: November 24, 2020

 /s/ *Mark Rienzi*
Mark Rienzi